SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                    :

      In re                          :      Chapter 11

                                     :

DELPHI CORPORATION, et al.,        :      Case No. 05-_____ (___)

                                     :

                      Debtors.    :      (Jointly Administered)

                                     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

AFFIDAVIT OF ROBERT S. MILLER, JR.
UNDER LOCAL BANKRUPTCY RULE 1007-2
AND IN SUPPORT OF CHAPTER 11 PETITIONS
AND VARIOUS FIRST DAY APPLICATIONS AND MOTIONS

("FIRST DAY AFFIDAVIT")

STATE OF MICHIGAN          )
                          )        ss:
COUNTY OF OAKLAND          )

    Robert S. Miller, Jr., being duly sworn, deposes and says:

    1.   I am the Chairman and Chief Executive Officer of Delphi Corporation

("Delphi"), a corporation organized under the laws of Delaware.  Delphi and certain of its

subsidiaries and affiliates (the "Affiliated Debtors")[1] are the debtors and debtors-in-possession in

the above-captioned chapter 11 cases (collectively, the "Debtors" or the "Company").  In that

capacity, I am familiar with the day-to-day operations, business and financial affairs of the

Debtors.

    2.   I submit this affidavit on behalf of the Debtors pursuant to Rule 1007-2 of the

Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules")

and in support of the Debtors' (a) voluntary petitions for relief under Chapter 11 of title 11 of the

United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code") and (b) "first-

day" motions, which are being filed concurrently herewith (collectively, the "First Day

---

[1]    In addition to Delphi, the following entities are debtors in these related cases: ASEC Manufacturing General Partnership, ASEC Sales General Partnership, Aspire, Inc., Delco Electronics Overseas Corporation, Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems Global (Holding), Inc., Delphi Automotive Systems Human Resources LLC, Delphi Automotive Systems International, Inc., Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems LLC, Delphi Automotive Systems Overseas Corporation, Delphi Automotive Systems Risk Management Corp., Delphi Automotive Systems Services LLC, Delphi Automotive Systems Tennessee, Inc., Delphi Automotive Systems Thailand, Inc., Delphi China LLC, Delphi Connection Systems, Delphi Diesel Systems Corp., Delphi Electronics (Holding) LLC, Delphi Foreign Sales Corporation, Delphi Integrated Service Solutions, Inc., Delphi International Holdings Corp., Delphi International Services, Inc., Delphi Liquidation Holding Company, Delphi LLC, Delphi Mechatronic Systems, Inc., Delphi Medical Systems Colorado Corporation, Delphi Medical Systems Corporation, Delphi Medical Systems Texas Corporation, Delphi NY Holdings Corporation, Delphi Services Holding Corporation, Delphi Technologies, Inc., DREAL, Inc., Environmental Catalysts, LLC, Exhaust Systems Corporation, Packard Hughes Interconnect Company, Specialty Electronics, Inc., and Specialty Electronics International Ltd.

Motions").[2]    The Debtors seek the relief set forth in the First Day Motions with the goal of minimizing the adverse effects of the commencement of the chapter 11 cases on their businesses.

3.    I am authorized by each of the Debtors to submit this affidavit.  Except as otherwise indicated, all facts set forth in this affidavit are based upon personal knowledge, my review of relevant documents or my opinion based upon experience, knowledge and information concerning the operations of the Debtors.  References to the Bankruptcy Code, the chapter 11 process and related legal matters are based on my understanding of such matters in reliance on explanation provided by, and advice of, counsel.  If called upon to testify, I would testify competently to the facts set forth in this affidavit.

4.    Part I of this affidavit provides an overview of the Debtors' businesses, the circumstances affecting the Debtors and the events leading to the Debtors' chapter 11 filing.  Part II sets forth relevant facts in support of the Debtors' various First Day Motions.  Part III sets forth the specific information required under Local Bankruptcy Rule 1007-2.

Part I
Nature Of Debtors' Business And Statement Of
Circumstances Leading To Debtors' Chapter 11 Filing
(Local Bankr. R. 1007-2(a)(1))

A.    The Chapter 11 Filings

5.    On October 8, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession.  To enable the Debtors to operate efficiently following the chapter 11 filings, the Debtors will request various types of relief in "first-day" applications and

---

[2]    Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to them in the First Day Motions.

motions filed with the Court.  With more than 180,000 employees worldwide, global 2004

revenues of approximately $28.6 billion and global assets as of August 31, 2005 of

approximately $17.1 billion,[3] Delphi is the largest manufacturing and technology company ever

to seek chapter 11 relief.  Delphi ranks as the fifth largest public company business

reorganization in terms of revenues, and the thirteenth largest public company business

reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will

continue their business operations without supervision from the Bankruptcy Court, and will not

be subject to the chapter 11 requirements of the U.S. Bankruptcy Code.

       B.      <u>Background And Current Business Operations</u>

       6.    Over the past century, the operations which are now owned by Delphi

Corporation and its subsidiaries and affiliates (collectively, the "Company" or  "Delphi") have

become a leading global technology innovator with significant engineering resources and

technical competencies in a variety of disciplines.  Today, the Company is arguably the single

largest global supplier of vehicle electronics, transportation components, integrated systems and

modules, and other electronic technology. The Company's technologies and products are present

in more than 75 million vehicles on the road worldwide.  Technology developed and products

manufactured by Delphi are changing the way drivers interact with their vehicles.  Delphi is the

leader in the breadth and depth of technology to help make cars and trucks smarter, safer, and

better.  The Company supplies products to nearly every major global automotive original

equipment manufacturer (each, an "OEM"), with 2004 sales to its former parent, General Motors

Corporation ("GM"), equaling approximately $15.4 billion and sales to each of Ford Motor

Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and

---

[3]     The aggregated financial data used in this First Day Affidavit generally consists of consolidated
information from Delphi and its worldwide subsidiaries and affiliates.

Volkswagen Group exceeding $850 million.  In addition, Delphi has further diversified its

customer base by taking advantage of its technological and manufacturing core competencies.

Delphi is making increasingly significant contributions in communications (including

telematics), computers, consumer electronics, energy, and the medical devices industry.[4]

       7.   Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary

of GM.  Prior to January 1, 1999, GM conducted the Company's business through various

divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions

and subsidiaries were transferred to Delphi and its subsidiaries and affiliates (the "Spin-Off") in

accordance with the terms of a Master Separation Agreement between Delphi and GM.  As

contemplated by GM and Delphi and as part of the Spin-Off, in February 1999 Delphi

commenced a public offering of 100 million shares of Delphi's common stock and in May of that

year, GM distributed the remaining Delphi common stock it held to holders of record of certain

of GM's common stock.

       8.   In connection with these transactions, Delphi accelerated its evolution from a

North American-based, captive automotive supplier to a global supplier of components,

integrated systems, and modules for a wide range of customers and applications.  For the

calendar year 2004, the Company generated total net sales of $28.6 billion.  Although GM is still

the Company's single largest customer, today more than half of Delphi's revenue is generated

from non-GM sources.

       9.   The Company's implementation of a diversification strategy began in earnest

immediately following the Spin-Off.  However, due to the significant planning that goes into

each vehicle model, Delphi's efforts to generate new business do not immediately affect its

---

[4]      An overview of Delphi's U.S. and global operations is attached as <u>Exhibit A</u>.

5

financial results, because supplier selection in the auto industry is generally finalized several

years prior to the start of production of the vehicle.  For example, business won in 2005 will

generally not affect financial results until late 2007 or beyond.  When awarding new business,

which is the foundation for the Company's forward revenue base, customers are increasingly

concerned with the financial stability of their supply base.  Thus, to continue winning business

and to maintain a robust forward revenue base, it is particularly important for Delphi to stabilize

its business and continue to diversify its customer base.  The Company believes that it will

maximize stakeholder value and the Company's future prospects if it achieves these restructuring

goals in advance of the expiration of certain benefit guarantees between GM and certain of

Delphi's unions representing most of its U.S. hourly employees which coincides with the

expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

10.   Delphi's success to date in diversifying its customer base is due to numerous

factors, including technology, quality, delivery, service, and price.  The Company's

diversification strategy proved to be particularly prudent as it partially mitigated the effects of

significant decreases in sales to GM, which were principally due to volume decreases as a result

of lower GM North America production and, to a lesser extent, price reductions and decisions to

exit certain businesses.

11.   As part of its growth strategy, Delphi has established an expansive global

presence with a network of manufacturing sites, technical centers, sales offices, and joint

ventures located in every major region of the world.  In the U.S., the Debtors employ

approximately 50,600 people.  Those employees work in approximately 44 manufacturing sites

and 13 technical centers across the country, and in Delphi's worldwide headquarters and

customer center located in Troy, Michigan.  Approximately 34,750 of these individuals are

hourly employees, 96% of whom are represented by approximately 49 different international and local unions.  Outside the United States, the Company's foreign entities employ more than 134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

12.    The Debtors' domestic corporate structure consists of (a) 43 directly and indirectly wholly-owned subsidiaries, 38 of which have sought chapter 11 protection, and (b) eight directly and indirectly partially-owned joint ventures, with ownership interests ranging from 19% to 80%, none of which has sought chapter 11 protection.  In addition, Delphi Foundation, Inc., a Delaware non-profit, non-stock corporation, was created by the Debtors exclusively for receiving and administering funds for charitable, educational, and scientific purposes.  All of the trustees of Delphi Foundation, Inc. are Delphi employees.  This charitable organization is not a debtor in these cases and the Debtors anticipate that Delphi Foundation, Inc. will continue making charitable contributions in its ordinary course. [5]

C.    Summary Of Prepetition Indebtedness

13.    The Debtors' chapter 11 petitions listed consolidated global assets and liabilities, as of August 31, 2005, of approximately $17.1 billion and $22.2 billion, respectively. Delphi had $3.9 billion in outstanding debt as of June 30, 2005, of which $3.4 billion was long-term debt.  The Debtors' obligations consist primarily of the following:

(a)    Revolving Credit Facility.  Throughout 2004, the Debtors had two financing arrangements with a syndicate of lenders providing for an aggregate of $3.0 billion in available revolving credit facilities, comprised of a five-year revolving credit line in the amount

---

[5]        Organizational charts describing Delphi's domestic U.S. entities (including all of the debtors in the pending chapter 11 cases) and the relationships between Delphi's U.S. and global entities are attached as Exhibit B.

of $1.5 billion, expiring in June 2009, and a 364-day revolving credit line in the amount of $1.5

billion.  On June 14, 2005, Delphi reached an agreement with its lending syndicate to refinance

its $3.0 billion in available revolving credit facilities with an amended and restated $1.825 billion

secured revolving credit facility and a new $1.0 billion secured six-year term loan.  To

accomplish this refinancing, Delphi terminated its 364-day revolving credit line and amended the

terms of its existing $1.5 billion five-year revolving credit facility (the "Revolving Credit

Facility") to, among other things, increase the available credit under that credit facility to $1.825

billion.  The Revolving Credit Facility carries a variable interest rate of 500 basis points above

the London Interbank Borrowing Rate ("LIBOR") on outstanding borrowings, subject to

adjustment based upon Delphi's credit ratings.  On August 3, 2005, Delphi drew down $1.5

billion under the Revolving Credit Facility.  As of September 30, 2005, the Debtors also had

approximately $91 million in letters of credit outstanding against the Revolving Credit Facility,

which remain outstanding.

   (b)  <u>Term Loan</u>.  In connection with its amendment of the Revolving Credit

Facility, Delphi also added a $1.0 billion secured six-year term loan (the "Term Loan"), requiring

interest payments during the term at a variable interest rate of 650 basis points above LIBOR and

having a 1% per annum amortization for the first five years and nine months with the then-

outstanding principal and any accrued and unpaid interest due in full at the end of the term, on

June 14, 2011.  The Term Loan was fully-drawn as of June 30, 2005 and the proceeds of the

Term Loan were used for funding pension contributions, paying down short-term debt, and other

general corporate purposes.  Delphi prepaid approximately $9.2 million of its Term Loan in early

September and on October 7, 2005, Delphi paid down an additional $1.8 million

(approximately).  The lenders have ten days in which to accept or decline this $1.8 million

payment.  All such repayments represented proceeds from the sale of certain assets of the

Company.  In addition, Delphi made a regularly scheduled quarterly amortization payment of

approximately $2.5 million on September 30, 2005.

(c)  <u>Senior Unsecured Debt</u>.  Delphi also had approximately $2.0 billion in senior

unsecured securities outstanding as of the Petition Date.  Such senior unsecured securities were

issued in four tranches: (i) $500 million in securities bearing interest at 6.55% and maturing on

June 15, 2006, (ii) $500 million in securities bearing interest at 6.50% and maturing on May 1,

2009, (iii) $500 million in securities bearing interest at 6.50% and maturing on August 15, 2013,

and (iv) $500 million of securities bearing interest at 7.125% and maturing on May 1, 2029.

(d)  <u>Junior Subordinated Notes And Trust Preferred Securities</u>.  Delphi's wholly-

owned non-debtor subsidiaries, Delphi Trust I ("Trust I") and Delphi Trust II ("Trust II"), issued

trust preferred securities in 2003.  Trust I issued 10 million shares of 8.25% Cumulative Trust

Preferred Securities (the "Cumulative Trust Preferred Securities"), with a liquidation amount of

$25 per trust preferred security and an aggregate liquidation preference amount of $250 million.

The sole assets of Trust I are $257 million of aggregate principal amount of Delphi junior

subordinated notes due 2033.  Trust II issued 150,000 shares of Adjustable Rate Trust Preferred

Securities (the "Adjustable Rate Trust Preferred Securities" and, collectively with the

Cumulative Trust Preferred Securities, the "Trust Preferred Securities") with a five-year initial

rate of 6.197%, a liquidation amount of $1,000 per trust preferred security and an aggregate

liquidation preference amount of $150 million.  The sole assets of Trust II are $155 million of

aggregate principal amount of Delphi junior subordinated notes due 2033.  Neither Trust I nor

Trust II has sought chapter 11 protection.  Pursuant to the Amended and Restated Declarations of

Trust for Trust I and Trust II, Delphi's filing of a chapter 11 petition was an "Early Termination

Event" which the Debtors anticipate will cause each of Trust I and Trust II to dissolve and their

assets to be liquidated by their respective trustees.  Upon such liquidation, the Debtors expect

that the holders of the Trust Preferred Securities will surrender their securities in exchange for a

pro rata share of the Trusts' respective junior subordinated notes.

(e)   U.S. Accounts Receivable Securitization Facility.  As of the Petition

Date, Delphi had also maintained a revolving accounts receivable securitization program in the

United States (the "U.S. Facility Program").  Under the U.S. Facility Program, certain

receivables, related securities, and collections (collectively, the "Receivables") generated by

Delphi, Delphi Automotive Systems LLC, and Delco Electronics LLC (subsequently merged

into Delphi Automotive Systems LLC) were sold and assigned to Delphi Receivables LLC,

which in turn sold and assigned the Receivables to the parties to a Receivables Purchase

Agreement.  In March 2005, the U.S. Facility Program, which would have expired on March 22,

2006, was amended to allow Delphi to maintain effective control over the Receivables.  In June

2005, the U.S. Facility Program was further amended to add a new co-purchaser to the program,

to adjust the borrowing limit to $730 million, and to conform the leverage ratio financial

covenant to be consistent with the amended Facilities' covenant.  On October 6, 2005, the

Debtors gave notice of their election to terminate the U.S. Facility Program pursuant to the terms

of the relevant agreements upon the earlier of October 11, 2005 and the occurrence of an

amortization event.  The commencement of these chapter 11 cases has constituted such an

amortization event and the U.S. Facility Program has terminated.   As of the Petition Date, there

were no borrowings under the U.S. Facility Program.[6]

---

[6]      The Company's non-debtor foreign affiliates also maintain European accounts receivable securitization
facilities denominated in euros (€) and British pounds sterling (£).

D.    Events Leading To Chapter 11 Filing

14.    In the first two years following the Spin-Off, the Company generated more than $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales.  Reflective of a downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005.  Indeed, the Company experienced net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[7]

15.    The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

16.    U.S. Legacy Liabilities And Operational Restrictions.  To borrow a phrase from recent airline restructurings, Delphi is essentially the last remaining "hub and spoke legacy operator" in the automobile industry.  The majority of the Debtors' collective bargaining agreements provide for wages and benefits which are well above market, costly pension plans and retiree health care and other benefits, and burdensome operating restrictions, constraining the

---

[7]    Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

Debtors' ability to compete effectively with their U.S. peers. In connection with the Spin-Off,[8]

the Company was required to assume the terms and conditions of the collective bargaining

agreements negotiated by its unions and GM. Delphi is the only U.S. auto supplier with an OEM

assembly pattern labor agreement, resulting in unsustainable, inflexible and uncompetitive costs

and liabilities. Consequently, the Debtors compensate their hourly workers an average of

approximately $64 per hour, including benefits and legacy liabilities, which is nearly three times

more than the hourly labor rates of its U.S. peer companies.

17.    Delphi's domestic hourly pension and other post-employment benefits,

including without limitation retiree health care and life insurance (collectively, "OPEB"),

exposed the Debtors to a staggering $10.4 billion in unfunded liabilities at the end of calendar

year 2004, of which approximately $2.6 billion was on account of the Debtors' unfunded hourly

pension obligations and $7.8 billion was on account of the Debtors' OPEB obligations to their

hourly workers. During the first six months of 2005, the Debtors' cash outflow associated with

its hourly pension and OPEB obligations  was approximately $485 million and $70 million,

respectively. The Debtors project that cash outflows for hourly pension contributions and OPEB

payments through 2007 will be approximately $1.7 billion and will increase geometrically

thereafter if not addressed now as a result of the projected retirement of the Company's U.S.

workforce in the years to come.

---

[8]    At the time of the Spin-Off, the Debtors' three major unions, the United Auto Workers Union (the "UAW"),
International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communications
Workers of America ("IUE-CWA"),  and the United Steelworkers of America ("USWA"), (the UAW,
together with the IUE-CWA and the USWA, collectively, the "Unions") requested certain assurances
regarding the security of pension, retiree medical, and certain other benefits provided to their workers. To
address these issues, GM agreed to guaranty those benefits if Delphi came under financial distress prior to
October 2007. Pursuant to a separate agreement, Delphi agreed to indemnify GM on its guarantees to the
UAW, but not to the IUE-CWA or USWA.

18.    In addition, due to declining business conditions, an increasing proportion of the Company's U.S. hourly workforce is, and is expected to continue to be, in a paid but non-productive status, i.e., a fixed cost which is independent of volume and revenue.  Under the terms of Delphi's collective bargaining agreements with its U.S. Unions, the Company is generally not permitted to permanently lay off idled workers, and in recent months, the number of idled hourly workers that receive nearly full pay and benefits has been as high as 4,000, although performing no work.  Coupled with restrictions on the Debtors' ability to exit non-strategic, non-profitable operations, the magnitude of the cost of carrying idled, non-productive workers in the event of plant closings or winddowns effectively prevents the Debtors from addressing poor product portfolio businesses and non-profitable manufacturing operations. Historically, under the terms of the Spin-Off from GM, this problem was somewhat mitigated because Delphi's UAW employees were permitted to return to GM's employ (known as "flowback") under certain conditions.  As a result of GM's lower production volumes, however, the opportunities for Delphi's employees to flowback to GM have been limited and may be further limited in the future. Consequently, although the U.S. hourly workforce was reduced by 15% over the 15-month period ended December 31, 2004, as of June 30, 2005 approximately 12% of the Company's U.S. hourly workforce was in a non-productive status.  In 2004, this cost the Company more than $170 million, including wages and benefits.  This situation is placing, and will increasingly place, financial burdens on Delphi of a scope and magnitude that threatens the Debtors' long-term viability and is no longer tolerable.

19.    Challenging U.S. Vehicle Production Environment For Domestic OEMs. In light of the current economic climate in the U.S. automotive industry, the Debtors are facing considerable challenges due to revenue decreases and related pricing pressures stemming from a

13

substantial slowdown in GM's North American vehicle production.  Although the Debtors have

shown steady growth of their non-GM business – for the first six months of 2005, non-GM sales

exceeded sales to GM for the first time – these gains have been outpaced by the decrease of their

GM sales.  Indeed, GM still comprises approximately 49% of the Company's sales and GM sales

for the first six months of 2005 were down by approximately $1.6 billion, an 18.9% year-over-

year decline, thereby adversely affecting the Company's financial performance.

20.   Increasing Commodity Prices.  During the first six months of 2005, the

Debtors faced substantial commodity cost increases, most notably for steel and petroleum-based

resin products.  The Debtors continue to work proactively with suppliers and customers to

manage these cost pressures, including seeking alternative product designs and material

specifications, combining the Company's purchase requirements with customers and suppliers,

and changing suppliers, but despite these efforts, raw material supply has continued to be

constrained and commodity cost pressures have continued to intensify as the Company's supply

contracts expire during 2005.  To the extent that the Debtors experience cost increases, they will

seek to pass these cost increases on to customers, but if the Debtors are not successful, their

income in future periods will be further adversely affected.  To date, due to previously

established contractual terms, the Company's success in passing commodity cost increases on to

customers has been limited.

21.   In light of the factors described above, the Company determined that it

would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities,

product portfolio, operational issues and forward looking revenue requirements.  As a result,

over the last six months, the Debtors have been engaging their Unions, as well as GM, in

discussions seeking consensual modifications that would permit Delphi to align its U.S.

14

operations to its strategic portfolio and be competitive with its U.S. peers, and to obtain financial

support from GM to implement the Company's restructuring plan.  Despite significant efforts to

reach a resolution, the Company determined that these discussions were not leading to the

implementation of a plan sufficient to address the Debtors' issues on a timely basis.  In order to

preserve value, the Company determined to commence these chapter 11 cases for its U.S.

businesses to complete the Debtors' transformation plan.

22.    While not related to the filing of these chapter 11 cases, Delphi completed a

financial restatement in June 2005, the effects of which reduced retained earnings as of

December 31, 2001 by $265 million, reduced 2002 net income by $24 million, and improved

2003 net loss by $46 million.  The nature of the restatement adjustments have been described on

Form 8-K filings with the Securities and Exchange Commission.  In conjunction with the

restatement, the audit committee of the company's Board of Directors concluded its internal

investigation of certain accounting transactions over the previous five years.  The Company is

continuing to cooperate with the government's investigation of these matters.  The audit

committee identified four material weaknesses in connection with its investigation involving lack

of knowledge of generally accepted accounting procedures and appropriate staffing; certain

ineffective or inadequate accounting policies; certain ineffective or inadequate controls over the

administration and related accounting treatment for contracts; and an ineffective "tone" within

the organization related to the discouragement, prevention, or detection of "management

override" as well as inadequate emphasis on analysis of accounts and financial transactions.

While these material weaknesses were not fully remediated as of December 31, 2004, the

weaknesses did not contribute to the filing of these chapter 11 cases.  Delphi has made and will

continue to make improvements to its policies and procedures as well as to the staffing of

positions which play a significant role in internal controls to address these matters as more fully

described in the Company's SEC filings.  Subsequent to the restatement, Delphi announced

certain changes to strengthen its management team such as the appointment of a new Chairman

and Chief Executive Officer, new Executive Vice President and Chief Financial Officer, and new

Vice President and General Counsel.  Robert S. "Steve" Miller, Jr. joined Delphi as Chairman

and Chief Executive Officer on July 1, and Robert J. Dellinger and David M. Sherbin joined

Delphi in October, 2005 as Executive Vice President and Chief Financial Officer and new Vice

President and General Counsel, respectively.  Various private lawsuits commenced against the

Debtors arising from and related to the restatement are now stayed as against the Debtors under

the provisions of the U.S. Bankruptcy Code.

      23.   Not one of the Company's foreign subsidiaries[9] is a debtor in these chapter

11 cases and, outside of the United States, the Debtors do not plan to commence any

reorganization, bankruptcy, or insolvency cases.  The Company's foreign entities are separate

legal entities under the direction of local management, and are distinct from the U.S. operations.

The Debtors' non-U.S. businesses are generally competitive with their peers, have positive cash

flow, and are experiencing high growth opportunities.  Moreover, the foreign subsidiaries do not

materially rely on funding from the U.S. entities, and the Company does not expect that these

chapter 11 cases will have any material adverse impact on the foreign operations.  The overall

liquidity available to Delphi (including more than $1 billion on hand outside the U.S., which

Delphi does not plan to repatriate to fund U.S. operations) will support its global operations

---

[9]      The Debtors have three foreign European offices that are branches of U.S. entities and therefore part of these chapter 11 cases.  Only one branch - located in Liverpool, England – has material assets and operations.

outside the U.S. and help ensure the continued adequacy of working capital throughout its global business units.

      E.      <u>Financing Facilities</u>

      24.    Delphi plans to finance its global operations going forward with $4.5 billion in debt facilities plus additional committed and uncommitted financing lines and/or securitization facilities in Asia, Europe, and the Americas.  The financing includes $2.5 billion borrowed from prepetition revolver and term loan facilities and a commitment for $2 billion in senior secured debtor-in-possession financing (the "DIP Financing") from a group of lenders led by JPMorgan Chase Bank, N.A., J. P. Morgan Securities, Inc., and Citigroup Global Markets Inc. (the "Agent").  A motion seeking approval of an adequate protection package for the benefit of Delphi's prepetition lenders and approval of the proposed DIP Financing on an interim and final basis has been filed with the Bankruptcy Court (the "DIP Financing Motion") and the Debtors will seek approval of the interim order as part of their planned first day hearing.

      25.    Prior to the Petition Date, the Debtors surveyed various sources of postpetition financing from both new and existing lenders to create a competitive process that would result in terms and conditions acceptable to the Debtors.  The Debtors obtained proposals for debtor-in-possession financing from various global financial institutions.  Collectively, these institutions provided four debtor-in-possession financing proposals that would require senior "priming" liens and four proposals that would refinance in full the Prepetition Obligations.  The Debtors and their advisors negotiated with each of the lenders through good-faith, extensive, arms-length negotiations, which culminated in an agreement by the Agent to provide postpetition financing on the terms and subject to the conditions set forth in the DIP credit agreement, the DIP Financing Motion, and the related proposed interim and final orders.  The Debtors

concluded, in consultation with their advisors, that the DIP Financing offered by the Agent is

competitive, addresses the Debtors' working capital and liquidity needs, presents the best option

available, and will enable the Debtors to effectuate their transformation plan and to preserve their

value as a going concern.

26.    The DIP Financing provides the Debtors with a $2 billion senior secured

priming facility which, subject to certain limitations, permits the Debtors to lend or advance

funds to, or make intercompany investments in, their foreign subsidiaries.  This facility, together

with the Debtors' approximately $500 million in cash-on-hand (which does not include the

approximately $1 billion on-hand in non-U.S. entities), should provide more than adequate

liquidity to fund operations during the chapter 11 cases and to implement the Company's

transformation plan.

F.    Restructuring Goals

27.    Through the reorganization process, the Debtors intend to achieve

competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive

legacy liabilities and burdensome restrictions under current labor agreements, and realigning

Delphi's global product portfolio and manufacturing footprint to preserve the Company's core

businesses.  This will require negotiation with key stakeholders over their respective

contributions to the restructuring plan or, absent consensual participation, the utilization of the

chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned

in the Company's transformation plan.  The Debtors believe that a substantial segment of

Delphi's U.S. business operations must be divested, consolidated, or wound-down through the

chapter 11 process.

28.    Upon the conclusion of this process, the Debtors expect to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

Part II
Summary Of First Day Applications And Motions

29.    An important and, in some cases, critical element in the Debtors' successful reorganization is approval of each of the First Day Motions submitted concurrently herewith.  In furtherance of the objective of successful reorganization, the Debtors request that "first-day" orders of the types mentioned below be entered.  Factual information in support of such first-day orders is provided below and in the applications and motions filed concurrently herewith.

A.    Motion For Order Under Fed. R. Bankr. P. 1015(b) Authorizing Joint Administration

30.    As reflected in the corporate organization chart attached as Exhibit A to the above-mentioned motion, Delphi is the direct or indirect parent of all of the Affiliate Debtors. The Debtors seek entry of an order directing joint administration of their chapter 11 cases for procedural purposes only.

31.    Entry of an order directing joint administration of these chapter 11 cases will avoid duplicative notices, applications, and orders, thereby saving the Debtors considerable time and expense.  The rights of creditors will not be adversely affected as this motion requests only administrative, and not substantive, consolidation of the estates.  Each creditor may still file its claim against a particular estate, and the rights of all creditors will be enhanced by the reduced costs that will result from the joint administration of these chapter 11 cases.  This Court will be

19

relieved of the burden of entering duplicative orders and maintaining duplicative files, and

supervision of the administrative aspects of these chapter 11 cases by the United States Trustee

for the Southern District of New York (the "U.S. Trustee") will be simplified.

32.    I believe the relief requested is necessary and appropriate and is in the best

interest of the Debtors' estates, creditors and other parties-in-interest.

B.    Motion For Order Under 11 U.S.C. § 521 And Fed. R. Bankr. P. 1007(a)
Authorizing Debtors To (I) Prepare Consolidated List Of Creditors And Equity
Security Holders In Lieu Of Mailing Matrix, (II) File Consolidated List Of The 50
<u>Largest General Unsecured Creditors, And (III) Mail Initial Notices</u>

33.    The Debtors seek entry of an order authorizing them to (a) prepare a

consolidated list of creditors and a list of equity security holders in electronic format only,

identifying their creditors in the format or formats currently maintained in the ordinary course of

business in lieu of any required mailing matrix, (b) file a consolidated list of the 50 largest

general unsecured creditors, and (c) mail initial notices.  The Debtors further seek authority not

to file either of the consolidated list of creditors or the list of equity security holders with this

Court concurrently with the filing of their bankruptcy petitions, but instead to make such lists

available only upon request.

34.    Permitting the Debtors to maintain a consolidated list of their creditors in

electronic format only in lieu of filing a creditor matrix is warranted under the circumstances.

Converting the Debtors' computerized information to a format compatible with the matrix

requirements would be an exceptionally burdensome task and would greatly increase the risk and

recurrence of error with respect to information already intact on computer systems maintained by

the Debtors or their agents.

35.    Moreover, the Debtors request authority to file a single, consolidated list of

their 50 largest general unsecured creditors, since many creditors are shared amongst certain of

the Debtors.  Indeed, to file deconsolidated list of creditors for each Affiliated Debtor would require the Debtors to expend significant resources and effort to reconcile which claims are assertable against which Debtors.

36.    Contemporaneously herewith and as further described below, the Debtors, by separate application, are seeking authority to retain Kurtzman Carson Consultants LLC ("KCC") as their notice and claims agent.  The Debtors propose that KCC undertake all mailings directed by this Court, the U.S. Trustee, or as required by the Bankruptcy Code.  Additionally, KCC will assist in consolidation of the Debtors' computer records into a creditor database and complete the  mailing of notices.

37.    I believe the relief requested is necessary and appropriate and is in the best interest of the Debtors' estates, creditors and other parties-in-interest.

C.     Motion For Order Under 11 U.S.C. § 521(l) And Fed. R. Bankr. P. 1007 And 9006(b) Granting Extension Of Time For Debtors To File Schedules And Statements

38.    The Debtors seek entry of an order extending the time within which the Debtors must file with this Court (a) a schedule of assets, liabilities, and executory contracts and unexpired leases, (b) a statement of financial affairs, and (c) a list of equity security holders (collectively, the "Schedules and Statements") to January 22, 2006, without prejudice to the Debtors' ability to request additional time or a waiver should it become necessary.

39.    Due to the complexity, diversity and breadth of their operations, the Debtors believe that the 15-day period of time after the Petition Date to file such Schedules and Statements provided by Bankruptcy Rule 1007(c) will not be sufficient to permit completion of the Schedules and Statements.  To prepare the required Schedules and Statements, the Debtors must compile information from books, records and documents relating to many affiliates and a multitude of transactions.

21

40.    I believe the relief requested is necessary and appropriate and is in the best interest of the Debtors' estates, creditors and other parties-in-interest.

D.    Motion For Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing (I) Omnibus Hearing Dates, (II) Certain Notice, Case Management, And Administrative Procedures, And (III) <u>Scheduling Initial Case Conference In Accordance With Local Bankr. R. 1007-2(e)</u>

41.    The Debtors seek an order establishing certain notice, case management, and administrative procedures.  Specifically, the Debtors request entry of an order, including: (a) directing that all matters be heard at regular monthly hearings to be scheduled in advance (the "Omnibus Hearing Dates") (b) establishing notice and scheduling procedures for evidentiary hearings pursuant to Bankruptcy Rule 9014(c) providing procedures for the timely filing of pleadings so that the underlying matters will be scheduled to be heard at the appropriate Omnibus Hearing Date (d) limiting notice procedures and (e) establishing procedures for responding to requests for copies of filings.  In addition, the Debtors seek to schedule an initial case management conference in accordance with Local Rule 1007-2(e).

42.    The Debtors estimate that they have in excess of one hundred thousand and other parties-in-interest.  The Debtors anticipate that many of these parties will file motions and applications in these cases in pursuit of various forms of relief.  To efficiently manage this process, the Debtors propose that every notice, motion, or application, and all briefs, memoranda, affidavits, declarations, or other documents filed in these cases be subject to the case management procedures established in this motion.

43.    I believe the relief requested is necessary and appropriate and is in the best interest of the Debtors' estates, creditors and other parties-in-interest.

22

E.    Motion For Administrative Order Under 11 U.S.C. § 331 (I) Establishing
Procedures For Interim Compensation And Reimbursement Of Expenses Of
Professionals And (II) Setting Final Hearing Thereon

44.    Contemporaneously with the filing of this motion, the Debtors seek

approval of the employment of (a) Skadden, Arps, Slate, Meagher & Flom LLP as restructuring

and bankruptcy counsel, (b) Shearman & Sterling LLP as special counsel, (c) O'Melveny &

Myers LLP as special labor counsel, (d) Groom Law Group Chartered as special employee

benefits counsel, (e) Togut, Segal & Segal LLP as conflicts counsel, (f) Rothschild Inc. as

financial advisors and investment bankers, and (g) FTI Consulting Inc. as restructuring and

financial advisors.  In addition, a statutory committee of unsecured creditors (the "Committee")

and possibly other statutory committee likely will be appointed in these cases, and likely will

retain counsel, and possibly other professionals, to assist them.

45.    The Debtors request the establishment of procedures (a) for compensating

and reimbursing the chapter 11 professionals on a monthly basis and (b) governing the interim

and final fee application process.  In addition, pursuant to section 503(b)(3)(F) of the Bankruptcy

Code, the Debtors seek to establish a mechanism by which members of the Committee (and

members of any other statutory committees) may be reimbursed for expenses incurred in the

performance of their duties.

46.    The Debtors propose that a Joint Fee Review Committee (the "Fee

Committee") be established in these cases comprised of one representative from each of the

following (a) the U.S. Trustee, (b) the Debtors, (c) the Committee, and (d) any other statutory

committee that may be appointed in these cases, with the U.S. Trustee receiving two votes and

each other representative receiving one vote on all matters to be voted on by the Fee Committee.

The Debtors propose that the Fee Committee meet on or prior to November 15, 2005, to establish

a budgeting and monthly fee review protocol for these cases generally consistent with the

approach approved by the United States Bankruptcy Court for the Southern District of New York

in the chapter 11 cases of In re Adelphia Communications Corp. for implementation no later than

in connection with the December 2005 calendar month.  The Debtors request that the first report

of the Fee Committee include a summary description of the protocol agreed to by the Fee

Committee.

47.    Finally, in cases of this magnitude, the volume of fee and expense requests

are such that the Fee Committee will not have the resources to thoroughly review such requests

without the assistance of dedicated outside professionals.  These outside professionals provide

valuable services which will allow the Fee Committee to fulfill its duties economically and

effectively, such as preparation of computer-generated analyses of the chapter 11 professionals'

monthly fee statements and fee applications, preparation of reports to the Fee Committee on such

statements and applications, and coordination of discussions with the chapter 11 professionals on

any fee or expense issues, as directed by the Fee Committee.  The Debtors believe that the cost

of such professionals' services will be more than offset by the value to the Fee Committee of the

services to be provided.

48.    I believe the relief requested is necessary and appropriate and is in the best

interest of the Debtors' estates, creditors and other parties-in-interest.

F.    Motion For Order Under 11 U.S.C. §§ 105(a), 363, 507, 1107, And 1108 (I)
      Authorizing The Debtors To Pay Prepetition Wages And Salaries To Employees
      And Independent Contractors; (II) Authorizing The Debtors To Pay Prepetition
      Benefits And Continue The Maintenance Of Human Capital Benefit Programs In
      The Ordinary Course; And (III) Directing Banks To Honor Prepetition Checks
      For Payment Of Prepetition Human Capital Obligations

49.    The Debtors seek authority, in their discretion and in the exercise of their

business judgment, (i) authorizing, but not directing, the Debtors to pay all human capital

obligations of the Debtors, including prepetition claims of the Debtors' domestic active and

inactive employees, any independent contractors, including those provided by employee supplier

agreements, who currently are under formal or informal contracts, (collectively, and solely for

the purposes of this motion, the "Employees"), and those prepetition claims on account of

benefits to be provided to any of the Debtors' retirees and their surviving spouses (collectively,

the "Retirees"), (ii) authorizing, but not directing, the Debtors to pay prepetition benefits and

continue the Debtors' various human capital benefit plans and programs, the most significant of

which are described below (collectively, the "Prepetition Human Capital Obligations"), and (iii)

directing all banks to honor prepetition checks for payment of Prepetition Human Capital

Obligations and prohibiting banks from placing any holds on, or attempting to reverse, any

automatic transfers to Employees' accounts for Prepetition Human Capital Obligations.

50.    As part of the relief being sought in the Motion, the Debtors also seek

authorization to pay all federal, state, local, and foreign income withholding, payroll,

employment, unemployment, social security, and similar taxes (including, but not limited to,

taxes relating to the Federal Insurance Contributions Act ("FICA")) whether withheld from

Employees' wages or paid directly by the Debtors to governmental authorities, as well as other

Employee withholdings, including, but not limited to, pension plan contributions, union dues,

charitable contributions, and garnishment contributions, if any.  The defined term "Prepetition

Human Capital Obligations" is meant to include all such payments.

51.    As of the Petition Date, the Debtors employ approximately 50,600

Employees in the United States.  Of those Employees, approximately 15,850 are salaried

Employees[10] and approximately 34,750 are hourly Employees.  Of the salaried Employees, there

---

[10]    Salaried Employees may be broken down into four categories (with the approximate number of associated
individuals in the parenthetical after the group name): (i) U.S. non-executive salaried employees (15,365)

are approximately 230 flexible service Employees who are employed to work between 50% and 80% of the employing unit's base work week. In addition, approximately 33,350 of the Debtors' hourly Employees are represented by 49 different international and local unions (each, individually, a "Union" and, collectively, the "Unions") each of which has collective bargaining agreements with the Debtors (each, individually, a "CBA," and, collectively, the "CBAs").

52.    Employee Compensation: Wages, Salaries, And Bonuses. The Debtors' average monthly payroll for their salaried Employees is approximately $109.9 million. On a semi-monthly basis (generally the 15th and the last business day of each month), the Debtors pay salaried Employees by electronic funds transfer or check for current salaried amounts owed plus any prior-period overtime. The Debtors' salaried Employees were most recently paid on September 30, 2005. Because the Debtors pay salaried Employees' overtime two weeks in arrears, certain salaried Employees are also owed approximately $1.3 million for prepetition overtime work. As of the Petition Date, the Debtors owe their salaried Employees wages in the amount of approximately $24.5 million.

53.    The Debtors' average monthly payroll for their approximately 34,750 hourly Employees is approximately $168.6 million. Hourly Employees are paid on a weekly basis (either on Thursday or Friday), one week in arrears by electronic funds transfer or check. Hourly Employees were most recently paid on October 7, 2005. However, because approximately 49% of payroll for non-unionized hourly Employees is paid by check, the Debtors estimate that as much as $14.5 million of the hourly payroll issued by checks may not have cleared the Debtors'

---

(collectively, "Classified Employees"); (ii) executives (463) (collectively, "Executives"); (iii) a subgroup of more senior Executives (90) (collectively, "Senior Executives"); and (iv) officers (24) (collectively, "Officers").

accounts prior to the Petition Date.  As of the Petition Date, the Debtors owe their hourly

Employees wages in the amount of approximately $56.8 million.

54.     The Debtors hire independent contractors and other contract employees

(collectively, the "Contract Service Personnel") through agencies and other third parties

("Contract Personnel Suppliers") to work in various positions for the Debtors including, but not

limited to, engineering, information technology, clerical positions and commissioned

manufacturing sales.  The Debtors typically pay the Contract Personnel Suppliers via invoice on

the second day of the second month following the month in which the services were rendered

(the "MNS-2 Date").  While the terms of the various Contract Service Personnel agreements

provide that the Contract Service Personnel hired pursuant to those agreements are not

employees of the Debtors, the Debtors fear that should their Contract Personnel Suppliers or

their independent contractors not be paid for the Contract Service Personnel's time, that the

Contract Service Personnel will not be paid and thus will refuse to work.  As of the Petition Date,

approximately $20 million is owed to these Contract Service Personnel and Contract Personnel

Suppliers.  Because many of the Contract Service Personnel are engineers, information

technology personnel, and other skilled persons who are critical to the Debtors' operations or

who interact directly with suppliers, customers, and other third parties with whom Delphi

conducts business as the "face of Delphi," the Debtors seek authority, but not direction, to pay

these parties the amounts owed on account of prepetition work performed, and to continue

payments in the ordinary course of business.

55.     The Debtors currently offer bonuses to certain of their Employees through

several separate plans, including, as defined below, the 2002 Classified Incentive Plan, Long-

Term Incentive Plan, Subsidiary Bonus Plans, and Profit Sharing Plan (as specifically

enumerated, the "Bonus Plans").  These plans are designed to provide incentives to such

Employees to achieve results that lead to a more efficient operation of the Debtors' businesses.

Eligibility for the various plans depends on the Employee's classification or level.  The actual

amount of the bonuses paid depends on whether the Debtors meet minimum performance goals.

Under this motion, the Debtors seek authority, but not direction, to honor current obligations

under the Bonus Plans.

    56. In the ordinary course of their businesses, certain of the Debtors' full-time

and part-time Classified Employees, who are in good standing with the Debtors, have

participated in an incentive bonus plan that is tied to the net income and quality performance of

the Debtors (the "Classified Incentive Plan").  Under the Classified Incentive Plan, compensation

levels ("Classified Bonuses") are based on the Employee's monthly base salary, the amount of

time accrued for the plan year, and the percentage allocated by the plan for the Employee's level.

Delphi sets minimum and maximum performance target levels, outside of which Classified

Bonuses are not paid.  In addition, no Classified Bonus given to any particular Employee may

exceed two times that Employee's annual salary.  Eligible Employees receive a portion of their

Classified Bonuses in a lump sum cash distribution, with the remaining amount delivered in a

deferred compensation distribution (which pays out according to a vesting schedule over four

years).  The Debtors have an accrued prepetition obligation under the 2002 Classified Incentive

Plan in the amount of $8.3 million, which will increase to approximately $12.2 million

(including an estimate for employer taxes) to be paid out fully on March 1, 2006 as the final

payment of the deferred portion of the 2002 plan.  The Debtors request authority, but not

direction, to honor its obligations under the 2002 Classified Incentive Plan.

57.    The Debtors' Officers and Executives are eligible to receive cash and non-cash awards under the Debtors' Long-Term Incentive Plan (the "Long-Term Plan").  The Long-Term Plan is designed to motivate the Debtors' Officers and Executives to accomplish corporate objectives including meeting or surpassing certain cash flow objectives and increasing sales diversification efforts.  The performance-based cash awards under the Long-Term Plan, which is commonly called the "Performance Achievement Plan," (the "PAP Award") are subject to the achievement of certain business criteria over the "performance period," which is currently three years, and are designed to reward Employees for the accomplishment of key long-term strategic objectives.  Performance goals, as well as corresponding minimum and maximum performance threshold values, are established by the independent compensation committee of the Board of Directors (the "Compensation Committee") prior to the expiration of the first quarter of the specified performance period.  The final awards also are determined by the Compensation Committee and are based on the performance goals established versus the performance achieved and may be adjusted for individual performance.   A Senior Executive or Officer generally becomes eligible for a particular cycle of the Long-Term Plan if he or she has worked at least 12 months of the cycle as a Senior Executive or Officer.  The Debtors currently maintain PAP Awards for the 2003-2005 performance period.  The Debtors forecast that the 2003-2005 payout will be at 26% of target compensation level established for each executive level of responsibility.  PAP Awards under the 2003-2005 Long-Term Plan are expected to total approximately $3.7 million and are scheduled to be paid in the first quarter of 2006.  Moreover, no PAP Awards will be paid prior to November 30, 2005.  The Debtors hereby seek authority, but not direction, to make PAP Award payments under the 2003-2005 Long-Term Plan.

58.     Several of the Debtors' subsidiaries also have various bonus programs to compensate their salaried and hourly Employees for successful product launches; for achieving certain sales, revenue, and performance targets; and to incentivize the Employees to continue work for the Debtors.  Total prepetition benefits under these programs aggregate to approximately $1.3 million for 397 Employees, an average of $3,275 per Employee.  The Debtors request authority, but not direction, to continue these programs and make payments related to these programs in the ordinary course.

59.     The Debtors maintain, in the ordinary course of business, a profit sharing plan ("Profit Sharing Plan") for eligible Union Employees, as required under various of the CBAs.  Pursuant to the Profit Sharing Plan, eligible Employees share in the Debtors' profits from U.S. operations.  No payments under the Profit Sharing Plan were made in 2004 and none are anticipated in 2005.  The Debtors hereby seek authority, but not direction, to continue the Profit Sharing Plan in the ordinary course of business.

60.     The Debtors' Employees that serve as directors receive no additional compensation for their service on the Board of Directors.  The Debtors pay Non-Employee members of the Board of Directors (the "Directors") a $55,000 cash retainer per year, except for the lead independent Director who receives a $100,000 cash retainer.  Directors who chair a committee receive an additional $10,000-15,000 per year.  In addition, non-Employee Directors have the option to take their cash compensation in Delphi common stock units.  The stock portion of each non-Employee Director's annual compensation is automatically deferred until he or she no longer serves on the Board of Directors, at which time Directors receive the cash value of their Delphi common stock units.  As of the Petition Date, the 8 non-Employee Directors are owed an aggregate of approximately $7,000 in cash (representing approximately 8 days of the

30

Directors' fourth quarter accrual) and a small amount of Delphi common stock on account of

their work for the Debtors during the prepetition period.  Finally, the Debtors owe one Director,

who resigned from the Board in July 2005, the cash value of the Directors' accrued common

stock units as valued at the end of the fourth quarter 2005.

   61. <u>Other Employee Compensation:  Vacation, Sick and Personal Leave,</u>

<u>Indemnification Expense Reimbursement, Severance, and Other Compensation</u>.  The Debtors

offer their Employees other forms of compensation, including vacation pay, sick leave and

personal time pay, reimbursement of certain expenses, and severance pay.  These forms of

compensation are usual, customary, and necessary if the Debtors are to retain qualified

Employees to operate their businesses and to continue to honor commitments under their CBAs.

Accordingly, the Debtors request authority, but not direction, to honor outstanding prepetition

obligations with respect to such compensation in the ordinary course of business and to continue

these compensation programs postpetition in the ordinary course of business

   62. All regular full-time and regular part-time salaried Employees are eligible to

accrue paid vacation.  For salaried Employees, vacation time varies from zero weeks to five

weeks, depending on length of service.  Full-time salaried Employees with a length of service

date prior to January 1, 2001, may be eligible for four additional vacation days per year.

Vacation time becomes vested on a current calendar year basis at the rate of 25% per completed

calendar quarter.  Vacation time does not carry over from year to year and salaried Employees

are not entitled to pay for accrued but unused vacation except in particular circumstances

including, but not limited to, certain employment separations when an Employee has unused but

vested vacation days.  Over the last three years, the Debtors have paid a <u>de</u> <u>minimis</u> amount per

year on account of paying for accrued but unused vacation.  In addition, the Debtors periodically

declare a summer vacation period during which some or all of salaried Employees' vacation

applies.  Furthermore, salaried Employees are eligible for paid holidays, the number of which

vary slightly from year to year.  Typically, holidays include national holidays and the last week

of the calendar year.

63.    The Debtors also maintain a vacation purchase program for salaried

Employees.  Salaried full-time Employees with a length of service date on or after January 1,

2001 are eligible to purchase five additional vacation days, in increments of one day, during the

annual enrollment periods.  Each vacation day costs the equivalent of one day's pay (determined

by the Employee's base salary as of September 1, 2004), paid on a before-tax basis.  During the

past year, there were 1,148 Employees eligible for the program and 302 employees elected

between one and five days.  Additionally, the Debtors have offered all active salaried Employees

the opportunity to purchase up to an additional ten vacation days, with the approval of their

supervisor.  Both such purchases are calculated at a rate equivalent to the Employee's calculated

daily rate based upon their monthly salary.  The last such program elections occurred from

February 7, 2005 to February 18, 2005 and participating Employees currently have such

elections deducted from their paychecks each pay period.

64.    Because of the Debtors' various Union contracts, hourly Employee vacation

time policies vary.  Generally, hourly Employees receive between zero weeks and five weeks of

vacation time per year, based on seniority.  The average hourly Employee has 170 hours (4.5

weeks) of vacation annually.  Vacation time vests 50% at the end of thirteen worked pay periods

and vests ratably over the next thirteen weeks until 100% vested at the end of twenty-six worked

pay periods (for a full-time hourly Employee, generally June 30th).  Under certain Union CBAs,

including those governing UAW Employees and IUE-CWA Employees, the Debtors pay eligible

Employees for any accrued but unused vacation time outstanding at the end of the calendar year by February 1st of the following year. As part of their normal operations and in conjunction with their CBAs, the Debtors may close their factories during the week of July 4th ("Independence Week"). In addition, the Debtors reserve the right to choose the week preceding or following Independence Week as a mandatory shut down week. Time off on account of Independence Week is generally paid at the rate of eight hours of straight-time pay while the shut down week is generally deducted from hourly Employees' accrued vacation days. As of the Petition Date, the Debtors estimate that approximately $37.3 million, or an average of $1,108 per hourly Employee, exists in accrued but unused vacation days. Hourly Employees are also entitled to paid holidays, the number of which vary slightly from year to year. Hourly Employees, including UAW Employees and IUE-CWA Employees, receive holiday pay for all company-declared holidays generally including national holidays and the last week of the calendar year.

65.    At any time, almost all Employees have accrued vacation and holiday eligibility. The Debtors anticipate that their Employees will utilize accrued vacation time and take holiday time in the ordinary course of business without resulting in any material cash flow requirements beyond the Debtors' normal payroll obligations. The Debtors request authority, but not direction, to continue its vacation and holiday policies in the ordinary course and pay any outstanding prepetition amounts related thereto.

66.    The Debtors respective treatment of sick leave for Employees varies. For absences up to a week for reasons other than vacation or holidays, salaried Employees clear the absences through their managers and are generally paid for their time off. If a salaried Employee is absent for more than seven days, then applicable disability leave policies, as described more fully below, apply. Hourly Employees who are absent from work are not paid for their time. If

an hourly Employee is sick for more than seven days, then applicable short-term and long-term disability policies, as described below, apply.

67.     All Employees may be eligible for leaves of absence, either pursuant to company policy or applicable law.  Employees are eligible for paid leaves of absence for jury duty, 3-5 days of bereavement leave upon the death of certain qualifying family members, disability leave (as described below), and other leaves for additional education.  Furthermore, hourly Employees under certain Union contracts are technically entitled to be paid for military duty lasting for 30 days or less and salaried Employees may be paid for 15 days of military service less military pay.  In certain instances, Employees may also take unpaid personal leaves of absence for a variety of purposes.  The Debtors believe that the estimated value of accrued but unpaid benefits as of the Petition Date for any Employees that are currently on leaves of absence is de minimis.  The Debtors request authority, but not direction, to continue their personal leave policies in the ordinary course and pay any outstanding prepetition amounts related thereto.

68.     Pursuant to the Delphi bylaws and the organizational documents of the Affiliate Debtors, the Debtors must advance expenses to Directors, Officers, Executives, and certain other salaried Employees and may generally advance expenses to those Employees[11] for the defense of suits against the individuals, provided that the individuals meet particular eligibility requirements.  Such eligibility requirements include, but are not limited to, that (a) the claim against such Employee or Director relates to his or her employment with the Debtors and the actions at issue were undertaken in good faith and in a manner reasonably believed to be lawful and in the best interests of the Debtors and (b) the Employee or Director agrees to reimburse the Debtors should it be determined that he or she is not entitled to be indemnified

---

[11]     On or about October 8, 2005, Delphi amended its bylaws so as to provide for mandatory indemnification of its Executives and certain other salaried Employees.

under applicable law.  Furthermore, pursuant to the bylaws, the Debtors reserve the right to

withdraw indemnification pending further fact investigation.  Pursuant to this motion, the

Debtors seek authority, but not direction, to continue advancing expenses to approximately 21 of

its Employees and Directors, including one former Employee, who are involved in ordinary

course litigation such as employment cases, wrongful discharges and automobile accidents.  In

addition, the Debtors seek to advance expenses to those Employees who may become involved

in this type of ordinary course litigation because of prepetition acts.  The Debtors believe that the

failure to advance expenses to these Employees and Directors would be detrimental to the morale

of their Employees and would adversely effect the Debtors' ability to execute their

transformation plan.

69.    In addition, the Debtors seek authority, but not direction, to advance

expenses to approximately 50 of its Employees and Directors, including 19 former Employees,

currently engaged (and those who may become engaged on account of prepetition acts) in

defending against shareholder class action suits and ERISA class action suits, and participating

in the investigation by the Securities and Exchange Commission.  The Debtors believe that the

claims against such Employee or Director relates to his or her actions undertaken in good faith

on behalf of the Debtors in a manner reasonably believed to be lawful and in the best interests of

the Debtors.  Moreover, in the event that it is determined that the Employee or Director is not

eligible for indemnification, the Employee or Director has agreed to reimburse the Debtors.  For

current Employees and Directors, the Debtors seek authorization, but not direction, to advance

all expenses for the defense of these suits.  For former Employees and Directors, the Debtors

seek to advance expenses limited to an aggregate cap of $5 million, on a case-by-case basis

pursuant to approval by the Compensation Committee, and only for advances not otherwise
reimbursable from other third parties.

70.     Pursuant to their normal business practices, the Debtors routinely reimburse
Employees and Directors for certain expenses incurred within the scope of their employment
including travel, lodging, professional seminars and conventions, ground transportation, business
meals, and other similar items reimbursable under the Debtors' existing policies (collectively, the
"Reimbursable Business Expenses").  Accordingly, all such Reimbursable Business Expenses
were incurred by Employees and Directors with the understanding that they would be reimbursed
by the Debtors.  As of September 30, the Debtors estimate that approximately $300,000 in
Reimbursable Business Expenses has been incurred by certain Employees and Directors and has
not yet been reimbursed to these Employees and Directors.

71.     Certain Employees and Directors may not have been reimbursed for
Reimbursable Business Expenses that were incurred prior to the Petition Date.  In part, this
resulted from the Debtors filing their Chapter 11 petitions in the midst of their regular
reimbursement cycle for Reimbursable Business Expenses.  Typically, Employees and Directors
submit receipts for reimbursement which are processed through the normal expense report and
accounts payable process.  Business related credit card charges are paid directly to credit card
providers by the Debtors on behalf of the Employees and Directors.  The Debtors reimburse out
of pocket expenses via payroll, twice a month.  It is difficult for the Debtors to determine
accurately the amount of Reimbursable Business Expenses outstanding as of the Petition Date
because not all Employees and Directors have submitted expense reports as of the Petition Date.
By this motion, the Debtors seek authority, but not direction, to pay all Reimbursable Business
Expenses in the ordinary course of business, including those incurred prior to the Petition Date

36

for which Employees have not yet been reimbursed, and to continue its policies relating to

Reimbursable Business Expenses in the ordinary course of business.

72.     The Debtors provide certain Employees with relocation related expenses

(collectively, the "Relocation Expenses") in order to incentivize desirable candidates to accept

positions with the Debtors, incentivize existing Employees to accept transfers to other locations

within the Debtors' companies (nationally or internationally), or encourage flowbacks to GM

from Delphi plants that have too little work for the existing number of Employees (collectively,

"Relocating Employees").  Relocation Expenses include those incurred through Debtors'

domestic salary relocation program, hourly relocation allowance program, and expatriate

relocation program.  It is critical that the Debtors be authorized to pay these Relocation Expenses

in order to, among other things, ensure that items belonging to Relocating Employees will be

delivered and that Relocating Employees will be reimbursed for their expenses incurred in

connection with their moves for the Debtors' benefit.

73.     For salaried Employees transferring domestically, the Debtors reimburse

certain Relocation Expenses.  As part of the program, the Debtors advance lump sum payments

to domestic salaried Relocating Employees to cover incidentals and temporary living during the

relocation process, depending on the relocating Employee's family size and distance of

relocation.  These lump sum payments have replaced the Debtors' former receipt reimbursement

system and have reduced Relocation Expenses by fixing the amount of reimbursable expenses at

the outset of the relocation.  In addition, the Debtors currently use SIRVA Relocation ("SIRVA")

to administer the Debtors' domestic relocation program.  SIRVA pays certain relocation-related

vendors, including shipping companies, realtors and relocation agents and purchases Employees'

homes prices based on fair market appraisals.  As of the Petition Date, the Debtors have no

37

outstanding payments due to domestic salaried Relocating Employees and approximately $1 million owed to SIRVA. The Debtors seek authority, but not direction, to continue this program in the ordinary course.

74.    The Debtors also pay a relocation allowance to certain hourly Employees, including UAW Employees, when an eligible Employee is transferred to a different Delphi or GM plant ("Relocation Allowance"). Eligible Employees may choose one of two options for the Relocation Allowance. Under the basic relocation option, an hourly Employee transferring to another Delphi plant may retain the right to return to the original community but not to his or her original plant and is given a Relocation Allowance in an amount between $3,038 and $4,767, based on the number of miles the Employee must move. Under the second option, the Debtors pay eligible Employees $25,000, $67,000 or $89,000 to transfer to another Delphi plant or to flowback to GM ("Enhanced Relocation Amounts"). The Enhanced Relocation Amounts are meant to cover relocation expenses, to serve as an incentive to relocate to a plant where more work is available, and to encourage Union Employees to continue work at the new plant. In keeping with these purposes, for the $25,000 Enhanced Relocation Amount, Employees receive $20,000 of the payment upon relocation and the balance one year later. Employees receiving $67,000 or $89,000 receive the bulk of the payment ($50,000 and $72,000, respectively) in a lump sum upon relocation and the balance in two equal installments on the first and second anniversary of their transfer, so long as they are still active Employees. Pursuant to this motion, the Debtors seek to pay the anniversary payments to relocating hourly Employees who transferred between Delphi plants. As of the Petition Date, approximately $3.7 million was owed in Enhanced Relocation Amounts.

75.    At times, because of the global reach of the Debtors' businesses, Employees are moved across continents, resulting in large Relocation Expenses.  To facilitate the moves of its Employees to international parts of the Debtors' businesses, rather than paying out-of-pocket business expenditures on a receipt-by-receipt basis, the Debtors manage the reimbursement of international relocation expenses by advancing funds to expatriate Employees in lump sum payments.  This program has saved the Debtors $20,000-50,000 per expatriate Employee because the expatriate Employees manage the funds instead of the Debtors, resulting in an almost zero exception rate.  These sums are comprised of an aggregate of several types of allowances (collectively, "Expatriate Relocation Expenses").  The first is a sum equal to $6,000 or one month's pay (whichever is greater) paid prior to the move to cover a variety of incidentals.  The second is a sum equal to 5% of an Employee's base salary, paid for up to 3 years.  The first year is paid in a lump sum installment representing the annual anticipated expenses for the first year.  The Debtors advance payments in years 2 and 3 on a monthly basis to the extent the Employee remains at the foreign facility.  In addition, expatriate Relocating Employees are only eligible for the second sum if they are relocating across regions (i.e., from the United States to Europe or from Europe to Asia).  In addition to these amounts, the Employee may receive an expatriate spending account paid during the first month of the assignment and upon the first and second anniversary of the assignment to cover expenses such as life event trips, a home leave, and spousal assistance.  Finally, if the expatriate Relocating Employee has transferred to a country with a higher cost of living, the expatriate Relocating Employee may receive a cost of living allowance to offset the increased living expenses the expatriate Relocating Employee will encounter in the host country.  Depending on facts and circumstances, the Debtors may also pay the cost of housing, schooling or utilities to certain expatriate Relocating Employees.  Expatriate

39

05-44481-rdd    Doc 7    Filed 10/08/05    Entered 10/08/05 17:14:13    Main Document
Pg 40 of 155

Relocation Expenses, which are largely based on family size and distance of relocation, vary

widely, from as little as $1,500 per family to over $50,000 per family and, as indicated above,

are generally paid over three years.  Historically, on average, the Debtors spend $218,000 per

month on this program.  As of the Petition Date, the Debtors believe that there are no prepetition

obligations currently owed to expatriate Relocating Employees.  The Debtors request authority,

but not direction, to continue paying Expatriate Relocation Expenses in the ordinary course of

business.

    76.    In the ordinary course of business, for eligible salaried Employees, the

Debtors maintain a program through which their eligible Employees are provided automobiles.

Under this program, the Debtors provide Employees with either a company-leased vehicle or a

monthly stipend in lieu of a company-leased vehicle for use to pay for automobile and

automobile-related expenses (collectively, the "Automobile Expenses").  For Employees who

receive company-leased vehicles, the Debtors pay certain automobile expenses including lease

payments, maintenance charges, and gas expenses.  Employees receiving company-leased

vehicles have a set monthly deduction taken from their wages, half of which is deducted from

each semi-monthly paycheck.  For the approximately 1,010 Employees who receive company-

leased vehicles, the Debtors expend approximately $650,000 per month on account of

Automobile Expenses.  For the approximately 2,120 Employees who receive stipends ranging

from $630 to $2,550 per month per Employee, the Debtors pay approximately $1.8 million per

month.  Employees that receive a stipend receive a monthly payment amount that is divided in

two and paid in each of the two paychecks salaried Employees receive each month.  For the

morale of its Employees and in light of the business of the Debtors, the reimbursement and

payment of Automobile Expenses is an important reimbursable expense.  As of the Petition Date,

40

the Debtors believe that there are approximately $300,000 in prepetition obligations currently owed for Automobile Expenses. The Debtors request authority, but not direction, to continue such payments in the ordinary course of business.

77.     In the ordinary course of business, the Debtors also reimburse certain education expenses whereby the Debtors pay for certain degreed programs for Employees. In particular, for an Employee to receive tuition reimbursement, the Employee's manager must approve the requested program, determining that the requested program will help the Employees acquire skills that will assist them in their work with the Debtors. The forecasted tuition reimbursement cost for hourly and salaried Employees for the remainder of the 2005 calendar year is approximately $665,000 per month for 625 Employees.

78.     The Debtors maintain a separation allowance plan for full-time and flexible service Classified Employees (the "Separation Allowance Plan"). Under the Separation Allowance Plan, if a Classified Employee signs a release of claims, the Classified Employee is eligible for 3 to 12 months base monthly salary (actual amount depending on length of service and/or responsibility in the organization), outplacement services, and a $2,000 lump sum payment upon signing a release of claims against the Debtors and, in some cases, General Motors. Separated Classified Employees who are otherwise eligible for the Separation Allowance Plan but who refuse to sign a release of claims are generally eligible for one month of base monthly salary only.

79.     The Debtors have a separate severance policy for Executives and Officers, which ranges from 12 to 18 months base pay plus up to 18 months equivalent bonus target with a general signed release of claims. The specific amount for an individual payment varies, based upon level of responsibility and on whether the Executive or Officer signs a non-compete

41

agreement, with Officers eligible for 18 months base pay plus 18 months target bonus and Senior Executives eligible for 12 months base pay plus 12 months target bonus. Officers and Senior Executives who do not sign a non-compete agreement as part of their severance receive 12 months pay only.

80.    Within the last twelve months, approximately 100 salaried Employees have been offered and have accepted severance or Separation and Allowance Plan benefits. As of the Petition Date, all but 2 of these Employees have received payment for their Separation Allowance Plan Benefits. The Debtors do not believe that any significant severance obligations arose between October 1 and the Petition Date.

81.    The Debtors have also agreed to separate certain hourly Employees in accordance with collectively bargained, plant-specific attrition plans. For example, some Union Employees terminated as a result of events such as plant closings, downsizing, restructuring, or job elimination, are eligible to receive a lump sum cash payment and vested but unused vacation days upon leaving the Debtors' employment. Similarly, lump sum cash payments have been offered to and accepted by Hourly Employees retiring as part of early retirement packages at a plant in Lockport, New York and Columbus, Ohio. Lockport Employees are expected to separate on December 1, 2005, under a program in which each of the approximately 140 Lockport Employees will receive $25,000 upon separation. The 12 Columbus Employees had a separation date of October 1, 2005 under a plan valued at $24,000 ($2,000 per Employee). As of the Petition Date, the Debtors believe that all of these amounts have been paid.

82.    By this motion, the Debtors request authority, but not direction, to continue honoring severance payments and the Separation Allowance Plan for the benefit of current and former Employees and to pay any prepetition amounts related thereto. Maintenance of such

payments is necessary in order to sustain the morale of the Debtors' current Employees who may otherwise leave the Debtors' employ at a critical stage of these proceedings if they believe, rightly or wrongly, that severance benefits will not be paid upon termination.

83.   In situations where Employees unexpectedly have a short work week due to a plant closing unexpectedly under circumstances such as part shortages or acts of God, the Debtors pay their Employees 80% of their daily wages ("Short Work Week Pay").  Because on a day-to-day basis, the Debtors do not know if a qualifying event will occur, the amount of Short Work Week Pay varies widely.  The Debtors request authority, but not direction, to continue to provide Short Work Week Pay in the ordinary course of business.

84.   The Debtors currently provide collectively-bargained supplemental unemployment benefit compensation pursuant to the 2003 Supplemental Unemployment Benefit Plan ("SUB Plan") to certain of its Union Employees with one or more years of seniority due to reduction in force, discontinuance of a plant or operation, temporary layoff, or being unable to do work offered by the plant.  Pursuant to the SUB Plan, these Employees receive 95% of their weekly after-tax wage.  Typically SUB Plan benefits are paid one week in arrears, however, payment only occurs upon evaluation of the Employee's unemployment paperwork and thus, in certain cases, an Employee's SUB Plan benefits may be paid two or more weeks in arrears.  On average, obligations under this program range between $3.3 million and $4.9 million per month, averaging $4.3 million per month.  Because of the difficulty in estimating which Employees have outstanding paperwork to complete, it is difficult to precisely forecast how much the Debtors owe their Employees for SUB Plan benefits as of the Petition Date.  The Debtors request authority, but not direction, to continue to provide SUB Plan benefits in the ordinary course of business.

85.    Upon exhaustion of SUB Plan eligibility and under certain other circumstances consistent with contractual obligations, the Debtors may place eligible Employees in a non-productive status ("JOBS Bank").  While in the JOBS Bank, such Employees are contractually required to report to a superior on a daily basis and to be available for assignment.  These Employees are paid full wages and benefits.  Approximately 2,500 Employees currently receive SUB Plan Benefits and JOBS Bank benefits.  As of the Petition Date, the Debtors estimate that they owe approximately $1.9 million in prepetition benefits under JOBS Bank.  The Debtors request authority, but not direction, to continue paying JOBS Bank benefits in the ordinary course of business.

86.    This program provides benefits to eligible UAW and IUE-CWA hourly Employees with ten or more years of seniority who are on indefinite layoff due to reduction in force, discontinuance of a plant or operation, or being unable to do work offered by the plant.  Currently, no one qualifies for this benefit and thus the Debtors have no outstanding obligations under this program.  The Debtors request authority, but not direction, to provide guaranteed income stream benefits in the ordinary course of business, if needed, as required under the CBAs.

87.    As a result of the purchase of certain of the Debtor subsidiaries and the divestiture of parts of the Debtors' business, the Debtors have certain prepetition contractual obligations to certain Employees.  These include a contractual obligation to pay $33,035 to one non-Executive Employee and $192,900 to approximately 21 non-Executive Employees of Delphi Medical Systems Colorado Corporation, a recent acquisition of the Debtors.  In addition, within the last twelve months, 8 salaried Employees have agreed to separate and sign a release of claims in connection with the June 30, 2005 sale of the Debtors' starting, lighting, and ignition lead-acid

44

battery business ("Battery Business Sale"), in exchange for a total of no more than $570,000. None of these payments are due to Executives, Officers or Directors of the Debtors.

88.    The Debtors estimate that less than 1% of the Debtors' entire workforce, or approximately 465 Employees, are owed in excess of $10,000 per individual for prepetition Human Capital Obligations, with no Employee receiving more than approximately $200,000, and, on average, no more than $28,200 per Employee.[12]   Accordingly, the Debtors believe that, pursuant to section 507(a)(3) of the Bankruptcy Code, the vast majority of Employees would ultimately be paid in full at the end of these chapter 11 cases in accordance with a Plan.  With respect to those amounts in excess of the priority cap, it is critical to make these relatively de minimis payments to preserve morale and prevent the departure of key Employees who might otherwise find other employment opportunities if not paid.  Consequently, pursuant to this motion, the Debtors seek authority, but not direction, to pay all outstanding amounts owed as of the Petition Date for accrued and unpaid Human Capital Obligations.

89.    Medical and Insurance Benefit Plans. The Debtors have established plans and policies to provide their Employees and Retirees with: (a) health benefits, including medical, prescription drug, dental, mental health and vision; (b) insurance benefits, including short and long-term disability, long-term care, life insurance, accidental death and dismemberment insurance, and legal services; and (c) flexible spending account plans ((a), (b), and (c) collectively, the "Medical and Insurance Benefits").[13]  The Debtors fund the Medical and

---

[12]    These numbers include calculations of payments owing on account of wages, bonuses, automobile expenses, vacation pay (to the extent it can be paid in cash), basic health benefits, and benefits for those laid off.  These numbers do not attempt to allocate other postretirement benefits across the entire population.  In addition, these numbers do not include payments made on account of SERP benefits, as described herein.

[13]    Delphi and the Affiliate Debtors collectively sponsor many different Medical and Insurance Benefits plans which are administered through numerous third parties.  Employees, Retirees, and their dependents' eligibility for these benefits varies depending on the terms set forth in the applicable Health Benefit Plans.

Insurance Benefits through company contributions and private insurance arrangements. Benefits

for salaried Employees and Retirees vary based upon whether salaried Employees began service

to the Debtors prior to 2001 (collectively, "Pre-2001 Salaried Employees") or on or after January

1, 2001 (collectively, "Post-2000 Salaried Employees") and which types of coverage the salaried

Employees elected during annual benefits enrollment. Benefits for hourly Employees vary based

on nationally and locally negotiated CBAs, to the extent applicable, and which types of coverage

the hourly Employees elected during the enrollment period.

      90.   Salaried Employees choose their particular Medical and Insurance Benefits

through a standard cafeteria-plan system as authorized under section 125 of the Internal Revenue

Code of 1986, as amended. Salaried Retirees may elect to change the plan in which they are

enrolled on an annual basis, concurrently with salaried Employees. Hourly Employees and

Retirees may elect to change the medical plan in which they are enrolled no more than once in

any one year period except in instances where they have been affected with certain "life events,"

including without limitation, relocation and gaining or losing dependents.

      91.   An important element of the Medical and Insurance Benefits is medical,

prescription drug, mental health, dental, vision and other similar coverage (collectively, the

"Health Benefits," and the plans under which they are administered, collectively the "Health

Benefit Plans"). Most of Debtors' Employees and Retirees are enrolled in Health Benefit Plans

that are self-insured, although some are fully insured and some of the plan type options offered

through Debtors' Health Benefit Plans include health maintenance organizations (an "HMO,"

collectively, the "HMOs"). These HMO premiums are paid on a monthly basis at the end of

each month. Claims for self-insured carriers are reimbursed on a checks cleared basis through a

zero-balance account that is funded by the Debtors, as required. Most carriers process checks at

least two times each week.  The self-insured Health Benefit Plans are administered by Blue

Cross and Blue Shield of Michigan ("BCBSM"), Connecticut General Life Insurance Company

("CIGNA"), United HealthCare, Inc., and others (collectively, "Administrators") in exchange for

payment of administration and processing fees in accordance with the administrator-specific

service agreements.  On an yearly basis, for example, the Debtors pay BCBSM (the largest of the

Debtors processors) approximately $10.8 million in fees (approximately $900,000 per month) in

connection with its claims processing services, including standard monthly fees and incentive

compensation or penalties related to the proper payment of claims and timeliness of addressing

claims.  In the aggregate, on an average yearly basis, the Debtors pay their Administrators a total

of $20 million in fees for claims processing services.

          92.    Claims under the self-insured features of Debtors' Health Benefit Plans are

paid by the Administrators.  Providers or the Employees, Retirees, or eligible dependents submit

medical claims to the Administrators.  Upon receipt of a request for payment, the Administrators

review the claim and pay the covered portion of Health Benefits for which the Employee,

Retiree, or eligible dependent is eligible.  Typically, claims are paid out of a bank account

established by the Administrator and funded by Debtors on a daily basis.  There may be some

variations in this process among certain Administrators engaged by Delphi or the Affiliate

Debtors.  There is typically some lag time between submission, processing, and payment of

claims.  With regard to the gap of time between when the Employee, Retiree, or eligible

dependent receives the medical care and when the provider, Employee, Retiree, or eligible

dependent submits the claim for reimbursement (the "Pipeline Medical Claims"), it is estimated

that as of September 30, 2005, the Pipeline Medical Claims aggregate value is approximately

$36.9 million ($26.5 million for Employees and $10.4 million for Retirees).  By this motion, the

Debtors request authority to pay the Pipeline Medical Claims, plus any unpaid plan

administrative fees or claims handling charges owed to the Administrators in connection

therewith.

93.     Debtors offer fully-insured Health Benefits in all states where Employees,

Retirees, and their eligible dependents reside.  The plans are administered by numerous

insurance companies (the "Alternate Administrators").  Processing of claims under these plans is

substantially similar to self-insured Health Benefit Plans.  However, Debtors' payment terms are

established in advance of claim experience based on negotiated rate agreements establishing

premiums for a given period of time.[14]

94.     In general, a salaried Employee and his or her dependents are eligible for

Health Benefits on the Employee's date of hire.   The Health Benefits for salaried Employees are

partially funded through monthly Employee contributions.  The remainder is funded from the

general assets of the Debtors.  While exact benefits vary for Pre-2001 Salaried Employees and

Post-2000 Salaried Employees, most of the benefits described below are available to all salaried

Employees.   For medical coverage, while initially enrolled in a standard plan, after 31-61 days

and on an annual basis thereafter, salaried Employees may choose between a variety of plans

including the standard plan, an enhanced standard plan, a point of service plan ("POS"), or a

health maintenance organization ("HMO").  Employee contributions vary depending on the plan

chosen.  Additional Health Benefits provided to salaried Employees and their dependents

include, but are not limited to, prescription drug coverage, subject to co-payments, traditional

dental coverage, and vision benefits.  A salaried Employee and his/her dependents may remain

---

[14]     Debtors also fund a small portion of COBRA benefits for severed Employees in accordance with their
statutory obligations.  The Debtors hereby seek authority to fund such obligations in the ordinary course of
business.

eligible for benefits for a limited time if such Employee's active, full-time work ceases due to

disability, leave of absence or separation.  In sum, approximately 50,800 participants are covered

by the Debtors' salaried Health Benefit Plans, including approximately 15,300 salaried

Employees, 3,900 Retirees, and 31,600 dependents.

       95.    <u>Health Benefits for Hourly Non-Union Employees and Certain Hourly</u>

<u>Union Employees</u>.  In general, hourly Employees are eligible for Health Benefits, including

comprehensive medical, dental, vision, mental health and prescription drug coverage, pursuant to

Employees' applicable CBAs, if they normally work at least 30 hours per week and have

successfully acquired seven months of seniority.  These benefits may extend to Employees'

dependents, including, but not limited to, spouses and children.  Hourly Employees may choose

their particular medical coverage from a variety of options, including traditional indemnity, PPO,

and HMO plans.  An Employee and his/her dependents may remain eligible for benefits for a

limited time if such Employee's active, full-time work ceases due to disability, leave of absence,

or layoff.  In sum, nearly 109,400 hourly participants are covered by the Debtors' Health Benefit

Plans, including nearly 33,700 Employees, 13,400 Retirees, and approximately 62,300

dependents.

       96.    During the first nine months of fiscal year 2005, the Debtors spent

approximately $58.3 million per month, or approximately $356 per month per participant, in

connection with Health Benefits.  As of September 30, 2005, the Debtors estimate that the

aggregate outstanding unpaid amount for the Health Benefits is approximately $54.4 million, of

which $46.7 million constitute known and estimated self-insured reserves and related

administrative costs and $7.5 million constitute accrued amounts payable to the private insurance

companies. In addition, the Debtors have accumulated postretirement benefit obligations relating

49

to health care of $3.2 billion and $5.6 billion for Retirees and Employees, respectively.[15]

However, the current monthly cash expense for Retirees' Health Care is $14 million, based on a

historical average. By this motion, the Debtors seek authority, but not direction, to make all

payments, claims and remittances due and owing as of the Petition Date for Health Benefits in

the ordinary course of business and to continue honoring these benefits postpetition.

97.   <u>Insurance Benefits</u>. The Debtors provide their Employees and Retirees with

certain life and accident insurance benefits including: (a) basic and optional life and accident

insurance, dependent life and accident insurance, supplemental life benefits and personal

accident insurance; (b) short-term and long-term disability; and (c) other related benefits ((a),

(b), and (c), collectively, "Insurance Benefits").

98.   Debtors provide life and accident insurance to Employees and Retirees

pursuant to group policies issued by MetLife. Delphi maintains employee benefit welfare plans

which provide life insurance benefits, as described below, for different classifications of

Employees. In addition, the Affiliate Debtors also provide insurance benefits through MetLife or

other insurance companies, as locally negotiated. The Debtors seek authority but not direction to

continue payments related to life and accident insurance in the ordinary course.

99.   Delphi provides Basic Life Insurance to all salaried Employees and Retirees

free of charge. For Pre-2001 Salaried Employees, the Debtors provide basic life insurance equal

to two times an Employee's base annual salary. Pre-2001 Salaried Employees also are offered

the option of purchasing additional optional coverage in the amount of one to five times the

Employee's base salary. For Post-2000 Salaried Employees, Basic Life Insurance coverage

begins 31-61 days after active service to Delphi begins and payments under the plan equal

---

[15]      Of the $9.6 billion, obligations as of December 31, 2004 for Employees and Retirees, hourly and salaried,
were $7.4 billion and $1.4 billion, respectively.

$50,000.  At their own expense, Post-2000 Salaried Employees may purchase additional optional

life insurance in $100,000 increments up to $1,000,000, but not to exceed ten times the

Employee's base salary.  Salaried Employees may also purchase, at their own expense, insurance

for their dependents in a variety of increments.  As part of the basic life insurance that Delphi

provides, salaried Employees also receive work-related death benefits.  If a salaried Employee

dies due to a work-related incident, Pre-2001 Salaried Employees' beneficiaries receive an

additional one times the Employee's salary and Post-2000 Salaried Employees receive an

additional $50,000.  Moreover, for Employees designated as Officers or Executives after January

1, 1989, the Debtors provide a supplemental life benefits program ("SLBP"), which provides the

beneficiary of an Officer or Executive who dies with a payment equal to two times the Officer or

Executive's annual base salary plus two times the annual base salary in excess of $200,000.

Unlike basic life insurance benefits, SLBP is self-insured by the Debtors and claims are paid in a

lump sum from the Debtors' general assets.  Recipients take ordinary income for this benefit.  As

of the Petition Date, the Debtors have accrued $1.4 million for life insurance benefits and SLBP

for salaried Employees.  The Debtors seek authority, but not direction, to continue these program

in the ordinary course of business and to pay any prepetition amounts related thereto.

        100.  The Debtors provide basic life insurance for their hourly Employees in

negotiated amounts as set forth in their applicable plan documents.  These amounts range from

$8,000 to $82,000.  Hourly Employees may also purchase additional optional coverage in the

amount of $10,000 to $200,000.  Under some plans, hourly Employees with terminal illnesses

may accelerate up to half of their life insurance benefits.  Furthermore, all hourly Employees

may purchase, at their own expense, insurance for their dependents in a variety of increments.

Part of the premium Delphi pays for basic life insurance also goes to provide extra accident

insurance for hourly Employees.  The amount of coverage is based on the hourly rate of the

Employee and ranges up to $41,000 based on the terms of the applicable CBA.  In addition, three

times the amount may be paid for occupational-related deaths.  As of the Petition Date, the

Debtors have accrued $1.6 million for basic and options life insurance benefits for hourly

Employees.  The Debtors seek authority, but not direction, to continue this program in the

ordinary course of business and to pay any prepetition amounts related thereto.

> 101.    The Debtors also provide Employees with optional personal accident
insurance, at Employee's expense in a variety of coverage levels ranging from $10,000 to

$500,000.  Accident Insurance covers accidental dismemberment or other defined accidental

losses.  It is not payable if the injury is self-inflicted or if other excluded events occur.  The

Debtors seek authority but not direction to continue this program in the ordinary course.

> 102.    The Debtors also provide certain Employees with short-term and long-term
disability benefits and optional long-term care insurance (collectively, "Disability Benefits").

The Debtors self-insure the short-term and long-term disability benefits.  Under this motion, the

Debtors seek authority, but not direction, to pay all amounts due and owing as of the Petition

Date for Disability Benefits in the ordinary course of business and to continue these benefits

postpetition.

> 103.    Salaried Employees are eligible for short-term disability benefits ("Short-
Term Disability") upon sickness or other disability which prevents the Employee from

performing the duties of his or her occupation.  Pre-2001 Salaried Employees' Short-Term

Disability benefits equal 60% of base pay, provided the disability arose in the first 12 months of

service, and 75% of base salary if the disability occurs thereafter.  Post-2000 Salaried Employees

are eligible for Short-Term Disability benefits after six months of service in amounts equal to 75% of base pay for up to 25 weeks (with an additional week of salary continuance).

104.    Pre-2001 Salaried Employees with ten years of service are eligible for extended disability benefits ("Extended Disability") and Post-2000 Salaried Employees are eligible for long-term disability benefits ("Long-Term Disability") after six months of service. The Debtors provide Extended Disability to eligible Employees free of charge at the rate of 60% of the Employees' monthly base salary.  Conversely, Long-Term Disability is administered by MetLife and fully-funded by Post-2000 Salaried Employees through pre-tax contributions. Benefits under both plans are paid out after-tax at the rate of 60% of the Employee's monthly base salary as of September 1 of the year prior to the first day of disability.  In addition, for certain Pre-2001 Salaried Employees who were not eligible for Extended Disability because of their length of service, the Debtors provided Supplemental Extended Disability benefits, which are fully-funded by the Employee.  In addition, both Extended Disability and Long-Term Disability benefits are decreased by certain monthly benefits under the SRP, as defined below, as well as other governmental benefits.  For most salaried Employees, payments are made for the length of the disability until such Employee either returns to work or obtains the age of 65.  On an average monthly basis, the Debtors spend approximately $841,000 per month on account of salaried Short-Term Disability, Extended Disability, Long-Term Disability.

105.    All salaried Employees may also elect to purchase long-term care insurance.  This is a completely voluntary program administered by John Hancock Life Insurance Company (also the claims fiduciary under the program) for which the Debtors' offer, as a sponsoring employer, to make payroll deductions upon an Employee's election.  The Debtors do not fund nor make guarantees for the payment of these benefits.

53

106.    The specific Disability Benefits provided for hourly Employees differ depending on which CBA governs the hourly Employee's employment.  Generally, hourly Employees' short-term disability benefits equal a negotiated weekly rate payable for up to one year.  The Debtors spend, on average, approximately $2.85 million per month on account of hourly Employees' short-term disability benefits.[16]

107.    Hourly Employees are also eligible for extended disability benefits, which equal a negotiated monthly rate.  For hourly Employees with less than ten years of service and continued disability, extended disability benefits are payable for a time equal to the hourly Employee's length of service.  For hourly Employees with more than ten years of service and continued disability, benefits are provided until age 65.[17]  The Debtors typically spend approximately $867,000 per month on account of hourly Employees' long-term disability benefits, as based upon historical averages.

108.    The Debtors provide, at the Debtors' expense, personal umbrella liability insurance ("PULI") administered through AON Risk Services and provided by Chubb Custom Insurance Company for Executives, Officers, and Non-Employee members of the Board of Directors, their spouses, and other eligible family members.  PULI provides personal liability protection up to $5 million and the Debtors pay premiums in advance at the beginning of the plan year.  Income is imputed to eligible participants for the value of this benefit. The Debtors seek authority, but not direction, to continue to provide PULI to its Executives and Officers.

---

[16]    Debtors have accrued approximately $1.6 million, as of the Petition Date, for short term disability benefits.

[17]    As of the Petition Date, the Debtors have accrued $154.4 million for long-term disability benefits hourly Employees and Retirees.  This amount is actuarially derived and includes the present value of anticipated payments to currently disabled Employees and Retirees and an accrual for the possibility of current Employees becoming disabled in the future.

109.    The Debtors also provide their Employees with flexible spending account plans pursuant to which some Employees maintain accounts for healthcare and dependent care. Under the flexible spending account plans, Employees have amounts withheld from their paychecks and those amounts subsequently can be used to reimburse Employees for their healthcare expenses and dependent care expenses, such as insurance deductible amounts. Flexible spending accounts are composed entirely of the Employee contributions and the Debtors believe that these monies are being held in trust for the benefit of those contributing Employees and, therefore, generally are not property of the Debtors' bankruptcy estates. Nevertheless, out of an abundance of caution, the Debtors seek the approval of this Court to continue this program and to reimburse Employees in the ordinary course.

110.    As part of the November benefits enrollment process whereby Employees choose which level of Health and Insurance Benefits they would like to elect, salaried Employees hired prior to January 1, 2001, are to receive a $1,200 lump sum payment on March 15, 2006 to help defer the cost of Health and Insurance Benefits. In particular, this sum is intended to defer part of the cost of co-payments that salaried Employees are required to make for Health and Insurance Benefits. There is no prepetition obligation under this program. The Debtors seek authority, but not direction, to continue this program in the ordinary course of business.

111.    Pension Plans. The Debtors maintain many employee benefit pension plans for their Employees. The Plans include qualified defined contribution and defined benefit plans, non-qualified supplemental executive retirement plans, and excess plans, (collectively, the "Pension Plans"). Pursuant to this motion, the Debtors seek authority, but not direction, to

honor, continue, and make funding contributions to these Pension Plans in the ordinary course of

business.

112.    The Debtors maintain several tax-qualified Pension Plans for the benefit of

their Employees, including defined contribution and defined benefit plans.

113.    The Debtors maintain numerous defined contribution plans for the benefit

of their Employees.  These include the Delphi Savings-Stock Purchase Program (the "S-SPP"),

the Delphi Personal Savings Plan for Hourly-Rate Employees in the United Stated (the "PSP"),

the Delphi Income Security Plan for Hourly-Rate Employees ("ISP"), the ASEC Manufacturing

Savings Plan, the Delphi Mechatronic Systems Savings-Stock Purchase Program, the Packard-

Hughes Interconnect 401(k) Plan, the Delphi Diesel Systems Corp. Retirement Savings Portfolio,

the Specialty Electronics, Inc. 401(k) Plan, and the Delphi Medical Systems Colorado 401(k)

Plan (collectively the "Defined Contribution Plans").  The Defined Contribution Plans provide

for automatic pre-tax or post-tax salary deductions of eligible compensation up to the limits set

by the Internal Revenue Code of 1986, as amended.  Generally, Employees may take loans in

any amount between $1,000 and one-half of the current eligible assets in their account up to

$50,000 with a fixed rate of interest.  State Street Bank and Trust Company serves as Trustee for

all Defined Contribution Plans but the Delphi Diesel Systems Corp. Retirement Savings

Portfolio, Specialty Electronics, Inc. 401(k) Plan, and Delphi Medical Systems Colorado 401(k)

Plan.  In the past, the Debtors have paid matching contributions depending on Employee

eligibility, the governing CBA, and Employees' participation.  However, Debtors have, on

several occasions, altered or suspended their matching contributions.  For example, Delphi most

recently suspended the S-SPP match effective October 16, 2004.[18]   The largest Defined

---

[18]        Certain of the Debtors currently maintain matching programs for their Defined Contribution Plans in
amounts ranging from $.25-$.30 on the dollar for each dollar contributed up to 5% of salary.

Contribution Plans, the S-SPP, the PSP, and the ISP, are described in more detail below.

Approximately 33,300 Employees and 9,100 Retirees participate in the S-SPP, the PSP, and the

ISP.  The Debtors request authority, but not direction, to honor, continue and make funding

contributions to the Defined Contribution Plans in the ordinary course of business.

114.   Upon date of hire, Delphi salaried Employees are automatically enrolled in

the S-SPP with a deferral rate of 3% of eligible salary.  Under the S-SPP and subject to IRS

limits, Employees are able to defer compensation on a pre-tax and after-tax basis up to 60% of

eligible salary.  Eligible Employees are fully vested in the S-SPP for all Employee elective

deferrals.  The Debtors' contributions to the S-SPP become vested at the end of each calendar

year for the Employee's first three years of participation; thereafter, the Debtors' contributions

vest immediately.  If the S-SPP participant leaves Delphi's employ before completing three years

of employment, all of the Debtors' contributions are forfeited that were made in the calendar year

the participant separates from employment.  S-SPP participants may choose to invest

contributions in over 70 investment options under the S-SPP, may transfer assets and change

investment options on a daily basis, and take loans from their S-SPP accounts.  For Employees

hired on and after January 1, 1993 and before January 1, 2001, Delphi contributes 1% of pay

annually.  As indicated above, although currently suspended, Delphi may provide matching

contributions subject to specified limits.  Although participants may move assets out of the

Delphi Common Stock Fund, allocations and transfers into the Delphi Common Stock Fund are

currently suspended.

115.   The Debtors contribute to the PSP for certain UAW, IUE-CWA, USWA

and other hourly Employees.  Hourly Employees who have been employed by the Debtors for 90

days are eligible to enroll in the PSP, if their governing CBA so provides.  UAW hourly

employees hired on or after May 3, 2004, are automatically enrolled in the PSP with a deferral

rate of 3% of the first 7% of eligible weekly pay.  Under the PSP and subject to IRS limits,

Employees may defer on a pre-tax and after-tax basis up to 60% of eligible weekly pay.  For

certain PSP participants, the Debtors also contribute up to 8% of an eligible Employee's base

hourly rate on the straight-time portion of all compensated hours worked on a weekly basis,

including vacation and holiday pay.  For those Employees receiving 8% contributions from the

Debtors, the contribution includes 1% towards post-employment health care and life insurance.

Eligible Employees are fully vested in the PSP for all employee elective deferrals.  The Debtors'

contributions to the PSP become vested as defined in the local CBAs.  If the PSP participant

leaves Delphi's employ before completing the requisite vesting period, all of the Debtors'

contributions are forfeited.  PSP participants may choose to invest contributions in over 70

investment options under the PSP and may transfer assets and change investment options on a

daily basis.  Delphi contributions are invested only in Delphi Common Stock Fund during the

vesting period.  Upon vesting, the Employee may transfer those assets as well.  PSP Employees

may also take loans from their PSP accounts.

116.    The ISP is a qualified defined contribution savings plan into which Delphi

contributes a set amount, ranging from $.08 to $.47 for each hour an eligible hourly employee

works.  Eligible hourly Employees include those IUE-CWA, USWA, and certain other union-

represented employees with whom Delphi has negotiated a competitive wage and benefit

package.  The ISP's primary purpose is to supplement state unemployment compensation in the

event of a lay-off, in lieu of SUB Plan benefits.  Any balance in the ISP will generally be paid

when the employee terminates employment.  On average, the Debtors contribute approximately

$60,000 per month to ISP accounts for the benefit of certain hourly Employees.

117.    The Debtors maintain several single-employer defined benefit pension plans for their Employees.  Benefits differ widely among the Defined Benefit Plans, which, in the aggregate, cover defined benefits for approximately 17,050 Employees and 16,620 Retirees. The largest of the plans are described in more detail below.  The Debtors request authority, but not direction, to honor and make funding contributions to the Defined Benefit Plans in the ordinary course of business.

118.    Delphi's salaried Employees with 5 or more years of service are eligible for retirement benefits under the Delphi Retirement Program for Salaried Employees ("SRP").  The SRP is comprised of three parts: (1) Part A, the Delphi funded feature for Pre-2001 Salaried Employees ("Part A"); (2) Part B, the voluntary, contributory feature for Pre-2001 Salaried Employees ("Part B"); and (3) Part C, the cash balance feature for which Post-2000 Salaried Employees are eligible ("Part C").  Benefits under Part A are funded solely by Delphi and provide a pension based on years of service, age at retirement, and the applicable benefit rate.  In addition to the base benefit determined by a formula, retirees may be eligible for supplemental benefits until the retirees are eligible for social security.  Part B benefits provide an additional monthly or lump-sum benefit to Retirees.  Although contingent on Employee contributions, Delphi funds approximately 85% of the benefits paid.  The employee contribution is 1.25% of the Employee's eligible monthly base salary in excess of $3,700.  Part B benefits are comprised of primary and supplemental benefits.  The primary monthly benefit is the aggregate of (i) five percent (5%) of the Employee's contributions made prior to July 1, 1977; (ii) six and one-quarter percent (6.25%) of the Employee's contributions made between July 1, 1977 and October 1, 1979; and (iii) eight and one-third percent (8.33%) of the Employee's contributions made after October 1, 1979.  The supplementary monthly benefit is equal to 1% of the amount by which the

Employee's monthly base salary over the 60 highest months in the last 120 months exceeds an

applicable amount (set forth in the SRP), multiplied by years of service.  Participation in Part B

is voluntary.  For Employees hired after 2000, the SRP provides a "cash balance" benefit.

Benefits under Part C are based on the Debtors' annual  contribution of 4.7% of the Employee's

base salary and an annual interest credit.  Under Part C, benefits can be paid in a lump sum or as

an annuity.

119.    The Delphi Hourly-Rate Employees Pension Plan ("HRP"), a benefit

funded solely by Delphi for which the bulk of Debtors' Union Employees are eligible, provides a

pension based on years of service and the applicable benefit rate.  In particular, the HRP provides

benefits to UAW, IUE-CWA and USWA Employees and certain other represented and non-

represented employees with 5 or more years of credited service.  HRP benefits are comprised of

(1) a basic benefit (determined using the applicable benefit rate in effect as of the date of

retirement multiplied by years of credited service), (2) a temporary benefit (payable to certain

retirees until eligible for 80% of Social Security), (3) an early retirement supplement (payable to

certain retirees until eligible for 80% of Social Security), and (4) an interim supplement (payable

to certain retirees until eligible for 80% of Social Security).  Specific rates are set forth in

schedules in the HRP.

120.    The Debtors also maintain several plans that are not qualified under the

Internal Revenue Code for tax purposes.  These include the Delphi Supplemental Executive

Retirement Program ("SERP"), 2005 Delphi U.S. Executive Retirement Incentive Program

("ERIP") (an amendment to the SERP), Delphi Benefit Equalization Plan for Salaried Employees

("BEP"), ASEC Manufacturing Supplemental Retirement Plan, and ASEC Manufacturing

Supplemental Savings Plan (collectively, the "Non-qualified Plans").  The largest of these plans

60

are described below.  These plans are intended to supplement the Defined Benefit Plans, and

therefore, some of the calculations are based upon numbers derived from the applicable Defined

Contribution Plans and Defined Benefit Plans.  Pursuant to this motion, the Debtors seek

authority, but not direction, to continue the Non-qualified Plans postpetition.

        121.    The Debtors maintain the SERP for Officers and Executives to incentivize

Officers and Executives to maintain long-standing employment with the Debtors.  The SERP is

an unfunded retirement plan which provides Officers and Executives (or their designated

beneficiaries) with the greater of the benefit provided by a "Regular Formula" or under an

"Alternative Formula." [19]  To be eligible for a benefit, an Officer and Executive generally must

have ten years of credited service in SRP and attain age 62 prior to retirement.  Alternately,

through the Debtors' ERIP, an Officer or Executive may become eligible, at the Debtors'

election, for SERP benefits if the individual is ages 53 to 61, is eligible to retire under the SRP, is

a redundant Employee who is offered the ERIP, and executes a release of claims.  ERIP

recipients receive unreduced SERP benefits and SRP benefits (reduced for age), plus additional

SERP benefits to replace the SRP age-reduction amount.  Currently, the Debtors provide SERP

benefits to approximately 150 former Officers and Executives (or, in certain cases, their

surviving beneficiaries).  Under this motion, the Debtors seek authority, but not direction, to

---

[19]    *Regular Formula*: Under the Regular Formula, the Officer or Executive's monthly pension is equal to 2% of average monthly base salary for the highest 60 months during the 120 months preceding retirement, times years of SRP service, less the sum of other retirement benefits, plus 2% of the maximum age 65 primary social security benefit in the year of retirement, multiplied by SRP service plus benefits under certain other of Delphi's programs.

    *Alternative Formula*:  Under the Alternative Formula, the Officer or Executive's monthly pension is equal to 1.5% of the Officer or Executive's average total direct compensation, including incentive compensation, for the highest 60 months during the 120 months preceding retirement, times years of SRP service to a maximum of 35 years, less the sum of other retirement benefits, plus 100% of the age 65 primary social security benefit, plus benefits under certain other Delphi programs.  Benefits under the Alternative Formula cease if an Officer or Executive engages in competitive activity or acts in a manner inimical or contrary to the best interests of Delphi.

continue to pay prepetition and postpetition SERP benefits amounts up to $5,000 per month per

eligible Retiree (including eligible Employees who retire during the pendency of these cases) for

SERP benefits, which for some Retirees is a significant reduction in monthly benefits.  The

Debtors believe that the maintenance of SERP benefits is essential in the retention of and in

maintaining the morale of current Employees as it signals the Debtors' willingness to take care of

the Employees who have given many years of service to the Debtors.

122.    The BEP is available to Officers and Executives whose contribution and

benefit levels in the S-SPP exceed certain limits permitted under section 415 of the Internal

Revenue Code.  This program is not funded and, since October 2004, when the Debtors' match

was suspended, contributions have been de minimis.  Individual account balances track Delphi

common stock and distributions from the BEP can be made upon separation from the Debtors no

later than full distribution of the participant's S-SPP account.  The Debtors request authority, but

not direction, to continue the BEP in the ordinary course of business.

123.    Workers' Compensation Obligations.  Under the laws of the various

jurisdictions in which they operate, the Debtors are required to maintain workers' compensation

policies and programs and to provide Employees with workers' compensation coverage for

claims arising from or related to workplace illnesses or injuries arising during their employment

with the Debtors.  Therefore, and in accordance with applicable requirements of local law, the

Debtors maintain workers' compensation programs in all states in which they operate.

124.    In ten states,[20] the Debtors currently provide their Employees with a self-

insured workers' compensation plan.  In addition, the Debtors maintain an excess insurance

policy provided by ACE American Insurance Company ("ACE"), which provides $1 million of

---

[20]    The states include Alabama, Georgia, Indiana, Kansas, Michigan, Mississippi, New Jersey, New York,
Ohio, and Wisconsin.

coverage for each accident.  Pursuant to these policies, Employees seeking reimbursement for

work-related injuries file their claims directly against the Debtors.  ACE, or its third-party

administrator, investigates the claims against the Debtors and validates those deemed

meritorious.  For the policy, the Debtors pay a minimum annual premium of $880,527 (based on

a fixed estimated amount of total annual remuneration).  The Debtors have contracted with

Sedgwick CMS, a third-party administrator, to administer the Debtors' self-insured workers'

compensation program.  In connection with their self-insured workers' compensation programs,

the Debtors maintain letters of credit, security deposits, or surety bonds in the aggregate amount

of $25.7 million for the benefit of the ten states in which the Debtors self-insure.

125.    In the remainder of states in which the Debtors operate, the Debtors

currently insure their workers' compensation liabilities through a series of jurisdiction-specific

workers' compensation policies issued by ACE.  Pursuant to these policies, Employees seeking

reimbursement for work-related injuries file their claims directly against the Debtors.  ACE, or

its third-party administrator, investigates the claims against the Debtors and validates those

deemed meritorious.  The Debtors pay premiums to purchase Issuer policies with differing

deductibles, the amounts of which vary with state law requirements.  The Debtors are obligated

to reimburse ACE for any policy deductible amounts.

126.    If the Debtors are unable to pay their prepetition workers' compensation

obligations, the Debtors expect that the letters of credit, security deposits, and/or surety bonds

will be drawn, resulting in millions of dollars of claims against the estates.  Further, the Debtors

believe that if they are not permitted to honor their workers' compensation obligations (a)

alternative arrangements for workers' compensation coverage would most certainly be more

costly, (b) the failure to provide coverage may, in some states, subject the Debtors or their

officers to severe penalties and possibly a shut down, and (c) the Debtors may have their
qualified self-insured employer status revoked in the respective states, resulting in much higher
costs to the Debtors' estate.  Thus, the Debtors believe that their failure to pay amounts relating
to these workers' compensation claims would make it more difficult to successfully reorganize.

127.    The Debtors' outstanding obligations relating to workers' compensation
arise from incurred but not paid claims and incurred but not reported ("IBNR") claims.  The
Debtors estimate their IBNR through an actuarial process that is common in the insurance
industry.  At the end of June 30, 2005,  approximately 7,000 workers' compensation claims were
pending against the Debtors arising out of Employees' alleged on-the-job injuries.  The Debtors
estimate that the aggregate amount payable on account of incurred but not yet paid claims and
IBNR claims arising prior to the Petition Date is approximately $260.4 million.  The Debtors
expect that cash payments for the next 12 months related to prepetition workers' compensation
claims will be approximately $81.2 million.

128.    By this motion, the Debtors seek authority, but not direction, to pay all
amounts related to workers' compensation claims and IBNR claims that arose prior to the
Petition Date as they become due in the ordinary course of business and to continue paying
workers compensation in the ordinary course.

129.    <u>Other Benefits Obligations</u>.  In addition to the benefits described herein, the
Debtors offer certain other benefit programs to various groups of non-Executive hourly and/or
salaried Employees.  These programs include the suggestion plan program under which
Employees, other than Officers and Executives, are compensated for making suggestions outside
of one's job scope that improve the Debtors' businesses.   Compensation ranges between
recognition for an idea, gift certificates, or payments in amounts up to $20,000 per person.  As of

June 30, 2005, the Debtors paid $4.0 million to hourly Employees and $1.3 million to salaried

Employees in 2005 for suggestions under this plan.  In addition, for certain UAW and IUE-CWA

members, the Debtors provide tuition assistance for dependants up to $1,500 per year, which is a

taxable program to recipient Employees.  Such obligations cost the Debtors approximately

$725,000 per month for, on average, 835 individuals.  Additional benefits offered to Employees

include, but are not limited to, trainee programs; loan programs; a fellowship program whereby

the Debtors pay Employees 50% of their base salary and pay tuition expenses for the Employees

to go to graduate school to study engineering and business; employee assistance programs (EAP

programs); military leave policies; jury duty policies; executive financial planning services;

executive physicals; adoption assistance; and others (collectively, "Other Benefits Obligations").

The costs of these other benefit obligations vary by program but , however, the Debtors believe

that these programs are important to maintaining Employee morale and retaining the Debtors'

workforce and assert that failing to honor such programs at this time would have an intangible

adverse affect on the morale of the Debtors' Employees.  Thus, by this motion the Debtors

request authority, but not direction, to continue the Other Benefits Obligations in the Debtors'

sole discretion and make prepetition and postpetition payments pursuant to such programs in the

ordinary course of business.

130.    As part of the Debtors' Other Benefit Obligations, the Debtors have

obligations to various charitable causes.  The Debtors' businesses are guided by adherence to the

Delphi Principles – five tenets which provide the cultural framework to guide the Debtors' and

their Employees' actions.  One of the Delphi Principles is "Responsibility to Society" and the

Debtors have a long-standing commitment to build and maintain effective relationships with the

communities and institutions with which they and their Employees interact.  One of the primary

elements of the Debtors' commitment is an active involvement with charitable and social

organizations in the communities in which the Debtors' operate their businesses, including by

way of monetary contributions to such organizations (the "Charitable Contributions").

Charitable Contributions are made either directly by one of the Debtors or through the Debtors'

charitable organization, Delphi Foundation, Inc.  The Debtors believe that the Charitable

Contributions generate significant goodwill for the Debtors, which benefits the Debtors'

relationships with their customers and Employees, many of whom live in the communities

benefited by the Charitable Contributions and volunteer with the organizations that receive the

Charitable Contributions.  The Debtors firmly believe that strong relationships with these

communities, customers, and Employees enhances the Debtors' long-term economic and

operational success.  Furthermore, a failure to continue the Debtors' prepetition Charitable

Contributions in the ordinary course would present a severe hardship to certain of the

communities and organizations that have come to rely upon the Debtors' generosity.  Finally, the

Debtors note that the amount of the Debtors' Charitable Contributions is miniscule in comparison

to the size of the Debtors' businesses.[21]  As such, the Debtors respectfully assert that continuation

of the Charitable Contributions is in the best interest of the Debtors and their estates and,

therefore, request authority to continue making Charitable Contributions in the ordinary course

of their businesses.[22]

       131.  <u>Social Security, Income Taxes and Other Withholding</u>.  The Debtors

routinely withhold from Employees' wages (i) federal, state, local, and foreign income

---

[21]      The Debtors estimate that their total Charitable Contributions for calendar year 2005 will be approximately
$1 million.

[22]      The Debtors believe that the Charitable Contributions are made in the ordinary course of the Debtors'
businesses and, therefore, that the Debtors' continuation of their Charitable Contribution policies does not
require court authority.  Nevertheless, the Debtors seek authority to continue making Charitable
Contributions herein out of an abundance of caution.

withholding, payroll, employment, unemployment, social security, and similar taxes (including, but not limited to, taxes relating to FICA); (ii) Employee contributions for health plans, disability and additional life insurance; (iii) Employee contributions to Pension Plans; (iv) legally ordered deductions such as wage garnishments, child support, and tax levies; (v) voluntary charitable contributions; (vi) union dues; (vii) flexible spending account contributions; (viii) other voluntary savings; and (ix) other miscellaneous deductions (collectively, the "Employee Deductions").

132.    The Debtors forward amounts equal to the Employee Deductions from their general operating accounts to appropriate third-party recipients.  Due to the commencement of these Chapter 11 cases, these funds were deducted from Employee wages but may not have been forwarded to appropriate third-party recipients.  The Debtors believe that the Employee Deductions, to the extent they remain in the Debtors' possession, constitute moneys held in trust and, therefore, are not property of the Debtors' bankruptcy estates.  Thus, the Debtors believe that they are entitled to continue their practice in the ordinary course of business of directing such funds to the appropriate parties.  Nevertheless, out of abundance of caution, the Debtors seek the approval of this Court to continue these practices and direct such funds to the appropriate parties.

133.    The Debtors are also obligated to directly pay certain federal, state, local, and foreign income, payroll, employment, unemployment, social security, and similar taxes (including, but not limited to, taxes relating to the Federal Insurance Contributions Act ("FICA")) to governmental authorities.  Failure to pay such amounts may subject certain Employees or Board members to potential criminal liability, diverting their focus from the Debtors' reorganization.  The Debtors seek the authority, but not direction, to make these

payments to the appropriate governmental authorities even where such payments are on account of prepetition liabilities.

134. <u>Administration Obligations</u>. As is customary in the case of most large companies, the Debtors utilize the services of numerous professionals, consultants and other administrators in the ordinary course of business to whom they outsource the administration of providing Prepetition Human Capital Obligations. These administrative services include administering the Debtors' Medical and Insurance Benefits, Pension Plans and workers compensation obligations; facilitating the administration and maintenance of their books and records; assisting with legal compliance issues; assisting with outplacement services; and conducting special administrative and legal compliance projects in respect of Employee benefit plans and programs (collectively, the "Administrative Obligations"). These employee benefits consultants include those referenced throughout this motion as well as administrators such as Towers Perrin, Deloitte and Touche LLC, Hewitt Associates LLC, and Salomon Smith Barney. The ordinary course services provided by these third parties ensure that the Debtors' multiple Prepetition Human Capital Obligations continue to be administered in the most cost-efficient manner and comply with all applicable laws. The Debtors request authority, but not direction to pay the prepetition Administrative Obligations related to the Employee benefit programs identified in this motion that may be outstanding as of the Petition Date and to continue the practice of relying on and compensating third parties to perform the Administrative Obligations postpetition.

135. Also, in furtherance of the goal of allowing the Debtors to continue to provide Human Capital Obligations without interruption, the Debtors request that all third party benefit providers and third party processors with whom the Debtors directly or indirectly have

contracted to provide services in connection with meeting their Human Capital Obligations be directed to continue to provide to the Debtors those services they provided prior to the Petition Date until further order of this Court.

136.   <u>Direction to the Banks</u>. Finally, the Debtors seek an order (a) authorizing and directing all financial institutions upon which any checks, drafts, electronic funds transfers, or wire transfers are drawn in payment of the Prepetition Human Capital Obligations – either before, on, or after the Petition Date – to honor all such checks or drafts issued, upon presentation thereof, or all such wire transfer instructions, upon receipt thereof, provided that sufficient funds are immediately available and on deposit in the applicable accounts and (b) prohibiting financial institutions from placing any holds on, or attempting to reverse, any automatic transfers to Employees' accounts for Prepetition Human Capital Obligations.  The Debtors request that such financial institutions be authorized and directed to rely on the representations of the Debtors as to which checks, drafts or wire transfers are in payment of the Prepetition Human Capital Obligations.

137.   The Debtors also request that any party receiving payment from the Debtors be authorized and directed to rely upon the representations of the Debtors as to which payments are authorized by the requested relief.

138.   Continued payment, when due, of prepetition wages, salaries and commissions, and the continuation, without interruption, of compensation and benefits plans, policies, programs and practices underlying the Prepetition Human Capital Obligations and described herein is necessary to ensure the ongoing services of the Debtors' Employees.  The Employees are vital to the Debtors' continuing operations and to the ultimate ability of the Debtors to reorganize in these Chapter 11 cases.  There is a significant risk that Employees

whose prepetition obligations are not honored in the ordinary course of business will terminate

their employment relationships with the Debtors.  The continued service and dedication of the

Employees is critical to the Debtors and their prospects for a successful reorganization.  In order

to retain their Employees and maintain morale under difficult working conditions, and, therefore,

to avoid jeopardizing the basic operation of their businesses, the Debtors simply must have

authority to pay or otherwise satisfy all Prepetition Human Capital Obligations.

139.   The Debtors' creditors and these estates will be better off as a whole, and

clearly will be no worse off, if the Debtors are permitted to honor prepetition obligations to

Employees in the ordinary course.  The Debtors' businesses and prospects for a reorganization

will be seriously undermined if Employees are not paid and if they, as a consequence, leave the

Debtors' employ at this critical juncture.  Indeed, the Debtors' Employees are familiar with the

Debtors' manufacturing processes; hiring and training new workers will seriously impact the

Debtors' efficiency as well as their ability to deliver automotive parts, electronics, and other of

the Debtors' products and product lines in a timely fashion.  Without payment to the Debtors'

Employees, the damage to the Debtors' prospects for rehabilitation and hence, the costs to

creditors as a whole, would be immediate and irreparable.

140.   I believe that the relief requested herein is in the best interests of the

Debtors and their estates and creditors and should be approved.

G.    Motion For Scheduling Order On Debtors' Motions To (1) Reject Collective
      Bargaining Agreements Under 11 U.S.C. §1113(c) And (II) Eliminate Retiree
      Medical And Life Insurance Benefits For Union-Represented Retirees Under 11
      U.S.C. § 1114(g)

141.   The Debtors seek to establish establishing notice procedures, briefing

schedule, and hearing date regarding the Debtors' Motions To (a) Reject Collective Bargaining

Agreements Under Section 1113(c) And (b) Eliminate Retiree Medical And Life Insurance

Benefits For Union-Represented Retirees Under Section 1114(g) (the "1113/1114 Motions").

Specifically, the Debtors propose the following schedule:

- December 16, 2005:    the Debtors to file the 1113/1114 Motions

- January 4, 2006:       any opposition to the 1113/1114 Motions to be filed and
                          served

- January 11, 2006:      any reply to opposition to the 1113/1114 Motions be filed and
                          served

- January 17, 2006:      hearing on the Debtors' 1113/1114 Motions

142.    The Debtors must obtain significant labor and retiree cost savings and other modifications from the unions representing the employees of the Debtors (collectively, the "Unions") in order to complete their transformation plan and reorganize successfully.  Although the Debtors intend to pursue and hope to obtain ratified, signed cost-reduction agreements, there is no guarantee that these efforts will be successful.  If, however, the Debtors are unable to achieve voluntary contractual modifications, the Debtors will be forced to seek authority of this Court (a) to reject the collective bargaining agreements in place with each of the Unions and (b) to eliminate retiree benefits for existing retirees who were members of the Unions.

143.    I believe that the relief requested herein is in the best interests of the Debtors and their estates and creditors and should be approved.

H.     Motion For Order (I) Appointing Unions As Authorized Representatives  For
Union-Represented Retirees Under 11 U.S.C. §§  1114(c) And 1114(d) Or, In The
Alternative, (II) Establishing Procedures For Solicitation, Nomination, And
Appointment Of Committee Of Retired Employees

144.   The Debtors seek entry of an order (a) appointing the International

Unions[23] as authorized representatives for Union-represented, retirees, or, in the alternative, (b)

establishing procedures for solicitation, nomination, and appointment of a committee of retired

hourly employees in the Debtors' chapter 11 cases to represent such retirees.

145.   In order to successfully reorganize, the Debtors require significant cost

reductions and labor modifications, including elimination of retiree medical and life insurance

benefits for its hourly active employees and current hourly retirees whose benefits were covered

by a collective bargaining agreement.

146.   The Debtors believe that the International Unions representing the various

employee groups will agree to serve as the authorized representatives for their respective current

retirees for purposes of section 1114.  In the event, however, that one or more of the International

Unions refuse to serve as the authorized representatives of retired hourly employees, the Debtors

request an order pursuant to section 1114 of the Bankruptcy Code approving procedures for the

solicitation, nomination, and appointment of members to a committee to serve as the "authorized

representative" of those retired hourly employees of the Debtor who are entitled to receive

"retiree benefits" within the meaning of section 1114(a) of the Bankruptcy Code, and who are

not represented in these bankruptcy proceedings by a labor organization acting as their

authorized representative.

---

[23]     The International Unions, as that term is used herein, are the United Auto Workers, the International Union
of Electronic, Electrical, Salaried, Machine And Furniture Workers-Communications Workers of America,
the United Steelworkers Of America, the International Association of Machinists And Aersospace
Workers, the International Brotherhood of Electrical Workers, and the International Union of Operating
Engineers.

147.    The Debtors are intent on achieving a successful reorganization with the full and voluntary participation of the International Unions and local unions representing the employees of the Debtors (collectively, the "Unions").  To carry out their restructuring plans, the Debtors must obtain cost reductions and labor modifications, including elimination of retiree medical and life insurance benefits for hourly active employees and current retirees whose benefits were covered by a collective bargaining agreement.   A vast majority of the Debtors' union-represented employees and retirees are enrolled in company-sponsored medical and insurance benefits plans that are self-insured.  There is no guarantee, however, that the Debtors' efforts to obtain cost reductions and labor modifications on a consensual basis will be successful. Accordingly, because these cost reductions and labor modifications are necessary in order for the Debtors to successfully reorganize, the Debtors intend to file, on or about December 16, 2005, various motions to (a) reject the collective bargaining agreements of those Unions with which, as of that date, the Debtors do not have ratified, signed, agreements for modifications to their collective bargaining agreements, and (b) eliminate retiree medical and life insurance benefits of existing Union-represented retirees.

148.    The Debtors do not at this time plan to eliminate retiree health care for salaried and management retirees because these retirees are differently situated than the Union-represented retirees.  The Debtors have the right unilaterally to eliminate health care for retirees, and earlier this year eliminated health care benefits for salaried and management retirees over age 65.  Furthermore, such retirees are not entitled to benefits under the General Motors benefit guarantee, and the savings achieved by elimination of pre-65 health care would be significantly off-set by the costs associated with the legal requirement to offer such retirees life-time COBRA benefits.  The Debtors will continue to monitor the need to eliminate these benefits, however,

and reserve the right to seek appointment of a retiree committee for non-union retirees later in this case.

149.    I believe that the relief requested is necessary and appropriate and is in the best interest of the Debtors' estates, creditors and other parties-in-interest.

I.       Motion For Protective Order Under 11 § U.S.C. 1113(d)(3) And 1114(k)(3)

150.    The Debtors seek protective order to maintain the confidentiality of relevant information provided to the unions and that may need to be provided to this Court or other parties-in-interest in connection with sections 1113 and 1114.

151.    On or before October 21, 2005, the Debtors expect that, if circumstances require, they may be forced to provide one or more of the unions representing their employees with proposals for necessary modifications to their respective collective bargaining agreements with the Debtors, as well as any relevant information as is necessary to evaluate the respective proposals.  In addition, following appointment of a retiree committee pursuant to section 1114 of the Bankruptcy Code, the Debtors expect to provide that Committee with one or more proposals for reduction in retiree medical benefits, as well as any relevant information as is necessary to evaluate the respective proposals.

152.    During its pre-petition negotiations with the unions, the negotiating Debtors were similarly concerned with protecting the confidentiality of sensitive information provided and therefore executed confidentiality letters of agreement with some of its unions. With the filing of a chapter 11 petition, however, there is a heightened public interest in any information related to the negotiating Debtors' financial condition, and therefore, the likelihood of disclosure of such confidential information, inadvertent or otherwise, has also inevitably increased.  A protective order is necessary to expedite and facilitate the provision and exchange

of all necessary relevant information required by sections 1113 and 1114 in a manner consistent

with the need to protect the confidentiality of that information.

153.   I believe that the relief requested is necessary and appropriate and is in the

best interest of the Debtors' estates, creditors and other parties-in-interest.

J.   Motion For Order Under 11 U.S.C. §§ 105(a), 363, 364, 1107, And 1108 And
Fed. R. Bankr. P. 6004 And 9019 Authorizing Continuation Of Vendor Rescue
Program And Payment Of Prepetition Claims Of Financially-Distressed Sole
Source Suppliers And Vendors Without Contracts

154.   The Debtors seek entry of an order authorizing but not directing the

Debtors to pay prepetition claims owing to certain of the Debtors' suppliers which are essential to

the uninterrupted functioning of the Debtors' business operations (the "Essential Suppliers,"

whose claims shall be identified as "Essential Supplier Claims").  Failure to pay the Essential

Supplier Claims would, in the Debtors' business judgment, very likely result in the Essential

Suppliers halting their provision of goods and/or services to the Debtors, in most cases because

the Essential Suppliers could not afford to continue to operate their businesses if the Debtors fail

to pay their prepetition claims.  Payment of the Essential Supplier Claims is vital to the Debtors'

reorganization efforts because the Essential Suppliers are the sole source from which the Debtors

can procure the goods and services they provide.

155.   Not paying the Essential Supplier Claims would very likely result in the

Essential Suppliers' ceasing operations, thereby forcing the Debtors to try to obtain goods and

services elsewhere.  Replacement goods and services, however, would not be available for a

prolonged period and, even then, would likely be available only at a higher price or on terms

unfavorable to the Debtors.  Such replacement goods might also be incompatible with equipment

or systems currently operated by the Debtors, or not be of the quality required by the Debtors and

their customers, thereby creating a devastating administrative burden on the Debtors and causing

tremendous disruptions to the Debtors' businesses.

156.    Indeed, the failure to pay these claims, as further described below, would

likely result in (a) the Debtors' inability to obtain necessary materials to produce their products,

(b) temporary shutdowns of the manufacturing facilities of the Debtors and the Debtors' original

equipment manufacturer customers ("OEMs") within as few as 24 hours from a vendor's failure

to timely ship parts to the Debtors (with corresponding potentially catastrophic damage claims ),

and (c) severe negative effects on the Debtors and the Debtors' OEM customers, which include

many of the largest vehicle producers in the United States,  and the Debtors' long-term business

relationships with such customers.  These effects are primarily due to the highly-integrated

nature of the OEM supply chain, the Debtors' central role in the supply chain, and the OEM

customers' stringent quality requirements that significantly limit the availability of alternative

sources of supply.

157.    The Debtors also seek authorization but not the direction to continue their

prepetition vendor rescue program (the "Vendor Rescue Program") in the ordinary course of

business.   The vendors currently participating in the Debtors' Vendor Rescue Program, and the

vendors that may participate in the Vendor Rescue Program in the future, are among the Debtors'

most financially-troubled suppliers.  Absent expedited payment or other financial support by the

Debtors under the Debtors' Vendor Rescue Program, such suppliers would likely cease

operations in the near future.  Without these vendors, the Debtors' manufacturing facilities would

quickly shut down, and, as with the Essential Suppliers, lead to similar shutdowns at certain of

the Debtors' and the Debtors' OEM customers' facilities.  This in turn would give rise to

potentially staggering costs to and damage claims against the Debtors that far exceed the cost of the Vendor Rescue Program to the Debtors' estates.

158.     To maintain their operations and remain competitive in the marketplace, the Debtors seek limited discretionary authority to pay certain prepetition Essential Supplier Claims up to an aggregate amount of $90 million (the "Essential Supplier Claims Cap").   The Essential Supplier Claims Cap represents approximately 6.9% of the Debtors' average monthly disbursements to trade creditors over the preceding twelve months, which are estimated to be approximately $1.3 billion.

159.     In calculating the amount of the Essential Supplier Claims Cap, the Debtors carefully analyzed all of their vendors to identify the Debtors' sole source suppliers, whose products are necessary for the Debtors to continue operating their manufacturing facilities.  The Debtors then analyzed whether the suppliers provided goods and services pursuant to enforceable long-term contracts and, if so, whether enforcement of those contracts could be accomplished in a timely manner without unduly disrupting the Debtors' businesses. The Debtors also evaluated the financial and operational prospects of their suppliers which are parties to enforceable contracts to identify those suppliers whose financial or operational position is so precarious that if the Debtors' prepetition obligations are not paid, the suppliers' businesses would most likely fail.

160.     The Debtors relied upon several methods of analysis to determine which of their suppliers were so financially and/or operationally constrained.  First, the Debtors reviewed their Financially Troubled Supplier Database ("FTSD"), which the Debtors maintain in the ordinary course of their businesses.  The FTSD contains information on all suppliers in the Vendor Rescue Program or which the Debtors are actively monitoring because the Debtors have

identified such suppliers as high risk.  Second, the Debtors reviewed supplier information

available through open ratings, an internet solution provider that uses business data from inside

and outside the enterprise, cleans and unifies this data, and applies proprietary analytics to

deliver actionable intelligence on the performance, financial opportunities, and risks presented

by the Debtors' suppliers.  Utilizing the open ratings software, the Debtors can quantify the

financial and operational stability of each of their suppliers.  Upon development of the FTSD and

open ratings reports, the Debtors' personnel who are responsible for managing and tracking the

Debtors' supplier relationships, and who have an intimate knowledge of the Debtors' supplier

base, reviewed and further refined the pool of suppliers which would likely be unable or

unwilling to continue to provide critical goods and services if their prepetition claims remain

unpaid.  The Debtors then estimated the amount that they believe must be paid to such suppliers

to ensure the continuing viability of their businesses and, thereby, the continued supply of critical

goods and services to the Debtors.  The Essential Supplier Claims Cap represents this estimated

amount.

161.    Significantly, the Essential Supplier Claims Cap represents only a small

portion of the total amount of prepetition trade claims outstanding for all creditors.  It represents

the Debtors' best estimate as to the minimum amount that must be paid to only Essential

Suppliers (a) with whom the Debtors have no enforceable long-term contracts, (b) with whom

the Debtors have contracts that may be terminable for any reason, or (c) whose financial

condition is so distressed that payments to the vendor are necessary for the vendor to survive.

162.    To minimize the amount of payments required, the Debtors request

authority to identify Essential Suppliers in the ordinary course of their business circumstances

warrant.  Identifying the Essential Suppliers now would likely cause such suppliers to demand

payment in full.  When determining whether a creditor is a Essential Supplier, the Debtors, in

their sole discretion, will consider, among other things, (a) whether the goods or services the

creditor provides can be replaced or acquired on better terms, (b) whether failure to pay

prepetition trade claims will require the Debtors to incur higher costs for goods or services

postpetition, (c) whether the enforcement of a contract with a vendor who refuses to ship product

can be accomplished in a timely and cost-efficient manner without unduly disrupting the

Debtors' operations in light of all relevant circumstances, (d) whether failure to pay prepetition

trade claims will cause the Debtors to lose significant sales or future revenue, and (e) whether

failure to pay prepetition trade claims will cause the Debtors to be unable to meet their

commitments to their OEM customers, potentially incurring significant damage claims thereby.

163.    The Debtors propose to condition the payment of Essential Supplier

Claims on the agreement of the individual Essential Suppliers to continue supplying goods and

services to the Debtors on MNS-2 payment terms  and those other terms and conditions as are

embodied in the Delphi's general terms and conditions or such other more favorable trade terms,

practices and programs in effect between such supplier and the Debtors in the twelve months

prior to the Petition Date (the "Customary Trade Terms"), or such other favorable trade terms as

are agreed to by the Debtors and the Essential Supplier.  The Debtors reserve the right to

negotiate new trade terms with any Essential Supplier as a condition to payment of any Essential

Supplier Claim.

164.    To ensure that the Essential Suppliers deal with the Debtors on Customary

Trade Terms, the Debtors propose that a letter substantially in the form of the letter attached to

the motion as <u>Exhibit A</u> be sent to the Essential Suppliers along with a copy of the order granting

this motion.  Such a letter, once agreed to and accepted by a Essential Supplier, shall be referred to herein as a "Trade Agreement."

165.    The Debtors seek only the authority to enter into Trade Agreements and not a mandate that they do so.  The Debtors submit that there may be limited circumstances in which payment to certain Essential Suppliers, prior to or in lieu of the Debtors' and such Essential Supplier's having entered into a Trade Agreement, is necessary to avoid causing irreparable harm to the Debtors' business operations.  In those cases, the Debtors seek authority to make payments on account of such Essential Supplier's claims, notwithstanding the fact that following diligent efforts to enter into a Trade Agreement with an Essential Supplier, no Trade Agreement has been reached.

166.    Prior to the Petition Date, the Debtors also prefunded their obligations (the "Prefunding Transfers") to certain suppliers (the "Prefunded Suppliers") who the Debtors believe would have qualified for relief under the terms of this motion had they not received payment of the Debtors' outstanding obligations prior to the Petition Date and whose cooperation they view as being particularly essential to the uninterrupted functioning of the Debtors' businesses.   The total amount of payments to Prefunded Suppliers, other than in the ordinary course of business (for instance, for amounts due on October 4, 2005, the most recent MNS-2 payment date), was approximately $76 million.  To ensure that the Prefunded Suppliers receive the same treatment as any of the Essential Suppliers paid pursuant to the terms of an order entered with respect to this motion, the Debtors respectfully request that this Court require each Prefunded Supplier to enter into a Trade Agreement with the Debtors within 30 days of the Petition Date.  To entice the Prefunded Suppliers to enter into Trade Agreements, the Debtors further request that they be authorized to waive and release any rights that they or their estates may have under section 547

80

of the Bankruptcy Code to avoid the Prefunding Transfers in exchange for a Prefunded

Supplier's entry into a Trade Agreement.

167.    Furthermore, given the just-in-time and sole source nature of the Debtors'

businesses and the huge disruptions of the Debtors' and their OEM customers' business

operations that would be caused by a supplier's refusal to ship products to the Debtors, the

Debtors are concerned that a rogue supplier may attempt to inappropriately use the sole source

nature of its contract with the Debtors as leverage to receive payment on account of its

prepetition claim by threatening, notwithstanding its contractual obligations, to withhold

shipment of products to the Debtors unless such claim is paid pursuant to this motion.

Notwithstanding that such an action would violate the automatic stay provisions of section 362

of the Bankruptcy Code, the Debtors have experienced such behavior by suppliers in the past.  I

anticipate that a small percentage of the Debtors' suppliers which are either unfamiliar with the

provisions of the Bankruptcy Code or simply decide to be recalcitrant will make such threats,

and that such threats will in fact be credible, despite the Debtors' belief that such supplier does

not meet the standards required for payment pursuant to this motion and the supplier's failure to

demonstrate otherwise.  With respect to many of the Debtors' suppliers, the Debtors would be

left with no palatable short-term response to such a refusal to ship.  The Debtors would face the

shut down of certain of their and their OEM customers' operations within such an abbreviated

time period that it would be impossible for the Debtors to receive effective relief from this Court,

even on an expedited basis.  Thus, the Debtors would be forced either to violate an order of this

Court (by paying such supplier) or to allow their plants and their OEM customers' facilities to be

idled.  In such a situation, the Debtors request that they be granted the authority, but not the

direction, to elect, in their sole discretion, to waive the conditions of the Essential Supplier

motion for payment of a claim under the Essential Supplier Claims Cap and to pay conditionally the claim of such threatening supplier, subject to the procedures outlined in the motion.

168.    Certain of the Debtors' employees who have been responsible for maintaining, and have intimate knowledge of, the Debtors' trade relationships and who are responsible for being aware of, understanding and responding to the needs and inner workings of the Debtors' suppliers, have conducted an extensive analysis and review of the Debtors' immediate trade needs and supplier base, and have determined that each of the Essential Suppliers is likely to be unable to meet upcoming obligations and cease business operations in the near-term if the Essential Supplier Claims are not paid immediately.  Furthermore, the cessation of the Essential Suppliers' businesses would throw the operations of the Debtors into disarray, as numerous manufacturing facilities would lack the requisite parts to be able to meet their operational needs and be forced to shut down, which in turn would cause the Debtors to be unable to provide parts to their OEM customers, thereby causing numerous of the OEM customers' manufacturing facilities to shut down.

169.    The same analysis supports the Debtors' continuation of the Vendor Rescue Program.  The troubled suppliers find themselves in even more precarious financial straits than do the Debtors' proposed Essential Suppliers.  Simply put, even payment in full of the prepetition claims of these troubled suppliers will be insufficient to support the continuation of their businesses.  Absent the financial and operational assistance provided by the Vendor Rescue Program, the troubled suppliers would likely have ceased operations prior to the Petition Date and, absent post-petition continuation of the Vendor Rescue Program, are practically guaranteed to cease operations in the near future.

170.    Accordingly, I believe that the relief requested herein is in the best

interests of the Debtors, their estates, and creditors and should be approved.

K.    Motion For Order Under 11 U.S.C. §§ 105(a), 363, 1107, And 1108 Authorizing
(I) Payment Of Prepetition Obligations To Foreign Creditors And (II) Financial
Institutions To Honor And Process Related Checks And Transfers

171.    The Debtors seek entry of an order (a) authorizing but not directing the

Debtors to pay, in their sole discretion and in the ordinary course of business, as and when due,

prepetition claims (the "Foreign Claims") owing to vendors, service providers, regulatory

agencies, and governments located in foreign jurisdictions (collectively, the "Foreign Creditors"),

including, without limitation, claims for payment for direct and indirect materials (collectively,

"goods")  and services provided to the Debtors, as well as import or tax obligations, and (b)

authorizing their banks to receive, process, honor, and pay checks or electronic transfers used by

the Debtors to pay prepetition obligations to Foreign Creditors.  The Foreign Creditors include,

among others, foreign vendors and foreign governmental authorities.  The Debtors have

reviewed 2005 forecasted annual purchase volumes as well as actual disbursements made by the

Debtors for, or related to, Foreign Creditors during the period from January through July, 2005.

The average monthly payments for or related to Foreign Creditors during this period were, in the

aggregate approximately $29 million per month.  Although it is difficult to estimate with

precision, the Debtors estimate that the outstanding prepetition obligations owing to all Foreign

Creditors as of the Petition Date is approximately $40 million.

172.    If the Foreign Claims are not paid, the Foreign Creditors may take

precipitous action against the Debtors based upon an erroneous belief that they are not subject to

the jurisdiction of this Court and, thus, not subject to the automatic stay provisions of 11 U.S.C.

§ 362(a).  The Foreign Creditors could, among other things, sue in a foreign court and obtain a

judgment against the Debtors to collect prepetition amounts owed to them.  They could immediately seek to attach or seize the Debtors' foreign assets even prior to obtaining a judgment.  In addition, foreign governmental authorities might seize the Debtors' assets in such countries, including, without limitation, parts and other goods destined for the Debtors' manufacturing plants in the U.S.  The foreign governmental entities could also seek civil penalties against the Debtors.  More importantly, the Debtors' foreign suppliers could refuse to do business with the Debtors.  The impact of such events on the Debtors' operations would be catastrophic.

173.   Payment of the Foreign Claims is also necessary because the Debtors' manufacturing facilities use the "just-in-time" supply method for processing their products.  The just-in-time supply method is standard in the automotive industry and is used not only by other automotive equipment suppliers, but, more importantly, by the Debtors' original equipment manufacturer ("OEM") customers.   Use of the just-in-time supply method means that the Debtors do not maintain a significant inventory of the components supplied by the Foreign Creditors that are suppliers (the "Foreign Suppliers") and, accordingly, the Debtors rely upon frequent, and in many cases daily, shipments of components from such Foreign Suppliers to keep their manufacturing facilities operating.  Similarly, the Debtors' OEM customers do not maintain a significant inventory of the Debtors' products (in many cases, less than 24 hours) and rely instead upon frequent shipments of such products to keep their manufacturing plants operating.

174.   The Debtors also rely on the sole source supply method – a method under which they purchase all of their requirements for a particular part from one supplier.  Many of the Foreign Suppliers are sole source suppliers of certain parts necessary for the Debtors' manufacturing operations.  Each of these parts must meet demanding specifications imposed by

84

both the Debtors and their OEM customers before they can be used in manufacturing the

Debtors' products.  In this regard, numerous tests and verifications of manufacturing processes,

sometimes taking place over the course of several months, must be run to validate and qualify

each of the parts.  The Debtors employ the sole source supply method to reduce the cost of

production start-up, capital investment, and validation costs necessary to make each part (which

are recouped by suppliers through their per piece prices), to achieve a consistent quality of parts,

and to achieve economies of scale.

175.   To obtain an alternative source of supply for the parts currently supplied by

the Foreign Suppliers, the Debtors would have to undergo their OEM customers' rigorous

approval processes, which involve extensive testing and evaluations and typically last one month

or more.  Many of the parts sold to the Debtors by the Foreign Suppliers are not standard parts,

but rather were custom-designed years in advance of production and built to fit the Debtors'

specific needs.  Even when accelerated, the delivery of capital equipment, the tooling, build, and

the testing, and approval process for validating new suppliers typically takes three to six months

or more to complete.  Failure to maintain the supply of parts could therefore have a devastating

impact on the Debtors' businesses as well as their customers' and other suppliers' businesses.

176.   Indeed, if the Foreign Suppliers fail to ship goods or refuse to do business

with the Debtors because of a failure to pay the Foreign Claims, or if foreign governmental

entities seize goods from sole-source suppliers because of a failure to pay the Foreign Claims

owing to such entities, the Debtors' manufacturing facilities utilizing those parts would likely be

forced to shut down less than 24 hours after the missed shipment.  Within less than 24 hours after

a shutdown of one of the Debtors' facilities, the Debtors' OEM customers would likely be forced

to halt production of their products on one or more of their assembly lines.  A shutdown of even

one assembly line could cause an affected OEM customer to assert damages against the Debtors

exceeding $10 million per day.

177.    Besides the potential damages, which, if valid, could severely dilute, if not

eviscerate, stakeholder recoveries, the Debtors would also be harmed by continuing to incur the

considerable fixed costs connected to the facilities idled by the failure to receive parts without

generating any revenue to offset such fixed costs.  A line shutdown could also cause the Debtors

to suffer a loss of customer relations and goodwill.  The long-term damage caused by such

shutdowns to the Debtors' businesses would therefore be both immeasurable and irreparable.

178.    Accordingly, I believe that the relief requested herein is in the best

interests of the Debtors, their estates, and creditors and should be approved.

L.      Motion of the Debtors for Order under 11 U.S.C. § 105(a) Enforcing the
        Protections of 11 U.S.C. §§ 362 and 525 and Approving Notice to Customers,
        Suppliers and Other Stakeholders of the Debtors' Non-Debtor Global Affiliates

179.    To aid in the administration of the Debtors' bankruptcy cases and to further

their reorganization prospects, the Debtors are seeking an order that confirms the application of

two key protections provided by the Bankruptcy Code -- the automatic stay provisions of section

362 and the anti-discrimination provisions of section 525.  The global nature of the Debtors'

businesses and their extensive dealings with non-U.S. creditors who are unfamiliar with the

protections afforded chapter 11 debtors under sections 362 and 525 of the Bankruptcy Code

require that an order implementing these protections be entered by this Court.

180.    In addition, to alleviate the confusion that likely will arise concerning the

Non-Debtor Global Affiliates, the Debtors seek approval from this Court of a notice to the

customers, suppliers, and other stakeholders of the non-Debtor Global Affiliates confirming that

the non-Debtor Global Affiliates are not included in these U.S. chapter 11 cases and are not

subject to (a) the supervision of this Court or (b) the provisions of the Bankruptcy Code.

181.    Such an order is particularly appropriate in the Debtors' chapter 11 cases

primarily because the Debtors operate global businesses across nearly 40 different countries.

The Debtors believe that many of the non-U.S. creditors affected by sections 362 and 525 of the

Bankruptcy Code likely are not aware of the significant and necessary protection these sections

provide to the Debtors.  Moreover, certain of the Debtors' assets are located around the globe,

which may further confuse a non-U.S. creditor.  Accordingly, the Debtors respectfully request

that this Court issue the Order which restates the applicable provisions of sections 362 and 525

of the Bankruptcy Code and approves a notice substantially in the form of the notice attached as

Exhibit A to the motion.  The Debtors believe that the existence of this order, which the Debtors

will be able to transmit to affected parties, will maximize the protections afforded by sections

362 and 525 of the Bankruptcy Code.  Further, the Debtors believe that the "automatic" and self-

executing nature of these protections may not be recognized by foreign creditors or tribunals

unless embodied in an order of this Court.

182.    Because non-U.S. stakeholders may not be familiar with U.S. chapter 11

reorganizations, it is imperative to communicate to non-U.S. customers and suppliers that the

customers, suppliers, and other stakeholders of the Debtors' non-debtor global subsidiaries and

affiliates (the "non-Debtor Global Affiliates") are not included in these chapter 11 cases and thus

are not subject to this Court's supervision or the chapter 11 process. Word of these bankruptcy

cases and their notoriety likely will spread internationally to various third parties that deal with

the Debtors and the non-Debtor Global Affiliates, likely creating confusion as to which Delphi

affiliates are and are not debtors in these chapter 11 cases.

183.    As a result of this confusion, the Debtors believe that some third parties

may be hesitant or, worse yet, refuse to deal with non-Debtor Global Affiliates under the

mistaken assumption that such affiliates are part of these bankruptcy cases.  Any detrimental

effect resulting from the Debtors' bankruptcy cases on the operations of non-Debtor Global

Affiliates will ultimately prejudice the Debtors' reorganization efforts.  The Debtors believe that

the notice will help in educating the non-U.S. customers and suppliers, which in turn will assist

the Debtors in achieving a successful reorganization.

184.    Accordingly, I believe that the relief requested herein is in the best

interests of the Debtors, their estates, and creditors and should be approved.

M.    Motion  for Order under 11 U.S.C. § 503(b) Confirming Grant of Administrative
Expense Status to Obligations Arising from Postpetition Delivery of Goods and
Authorizing Debtors to Pay Such Obligations in the Ordinary Course of Business

185.    The Debtors seek an order confirming that their subcontractors, suppliers

and vendors (the "Vendors") will have administrative expense priority claims for those

undisputed obligations arising from prepetition purchase orders outstanding on the Petition Date

(the "Outstanding Orders") relating to materials, supplies, goods, products and related items that

are or will be received and accepted by the Debtors on or subsequent to the Petition Date.

186.    In the ordinary operation of the Debtors' businesses, numerous Vendors

provide the Debtors with tens of millions of dollars of goods on a daily basis.  Indeed, because of

the Debtors' use of "just-in-time" inventory systems, the Debtors receive goods from Vendors on

a continuous basis.  As of the Petition Date, and in the ordinary course of their businesses, the

Debtors had a substantial number of Outstanding Orders with the Vendors.  As a result of the

filing of the Debtors' chapter 11 cases, many of the Vendors may be concerned that delivery or

shipment of goods after the Petition Date pursuant to a prepetition purchase order will render a

Vendor who makes such shipment a general unsecured creditor of the Debtors' estates.

Accordingly, without confirmation that claims for goods shipped pursuant to Outstanding Orders

will be entitled to administrative expense priority status, Vendors may decline to ship, or may

instruct their shippers not to deliver, goods destined for the Debtors unless the Debtors issue

substitute purchase orders postpetition which could impose a significant administrative burden as

it could require the Debtors to issue thousands of new purchase orders.  If this were to occur, I

believe the Debtors' supply chain would be disrupted.

187.   I believe that it is essential to the Debtors' operations and, thus, to the

success of their reorganization efforts, that the relief requested herein be granted.  The Debtors'

payment of their Vendors' Outstanding Orders will help ensure that the Debtors' manufacturing

operations continue seamlessly.  Accordingly, I believe that the relief requested herein is in the

best interests of the Debtors and their estates and their creditors.

N.      Motion of the Debtors for Order Pursuant to 11 U.S.C. §§ 362, 503 and 546 and
        Fed. R. Bankr. P. 9019 Establishing Procedures for Treatment of Reclamation
        Claims

188.   As a result of the commencement of these cases, the Debtors expect to

receive numerous reclamation claims demanding that the Debtors return certain goods

(collectively, the "Reclamation Goods") purportedly delivered to the Debtors on or prior to the

commencement of these cases (collectively, the "Reclamation Claims").

189.   It is of paramount importance for the Debtors to maintain normal business

operations and avoid costly and distracting litigation relating to Reclamation Claims.  If the

Debtors are unable to establish a uniform set of reclamation procedures to resolve the

Reclamation Claims, they will be faced with the prospect of simultaneously defending multiple

reclamation adversary proceedings at a time when the Debtors need to focus on critical aspects

of the reorganization process. The Debtors seek entry of an order (a) providing administrative

treatment for certain holders of valid reclamation claims and (b) establishing procedures for the

resolution and payment of valid reclamation claims against the Debtors.

190.   Accordingly, I believe that the relief requested herein is in the best

interests of the Debtors, their estates, and creditors and should be approved.

O.   Motion For Order Under 11 U.S.C. §§ 105, 363(b), 1107, And 1108 Authorizing
Payment Of Certain Prepetition (I) Shipping And Delivery Charges For Goods In
Transit And (II) Customs Duties

191.   Prior to the Petition Date, as an integral part of their businesses, the

Debtors used and made payments to domestic and foreign commercial common carriers, movers,

shippers, freight forwarders/consolidators, delivery services, customs brokers, shipping auditing

services, deconsolidators, distributors, logistics management companies, and certain other third

party service providers (collectively, the "Shippers") to ship, transport, store, move through

customs, and deliver, Goods through established national and international distribution networks,

as well as a network of third-party warehouses to store Goods in transit (collectively, the

"Warehousemen") (such payments, the "Shipping and Warehousing Charges").

192.   The Debtors seek entry of an order authorizing but not directing them to

(a) make those payments to Shippers and Warehousemen that the Debtors determine, in the

exercise of their business judgment, to be necessary or appropriate in order to obtain the release

of raw materials, parts, components, certain finished goods, indirect materials, tooling,

machinery, and equipment (collectively, the "Goods") held by such Shippers and Warehousemen

and (b) pay Customs Duties (as defined below) and such other incidental prepetition import

expenses as the Debtors determine, in the exercise of their business judgment, to be necessary or

appropriate to obtain Goods in transit and to satisfy the liens, if any, in respect thereof.

193.    The Debtors further request that this Court authorize and direct all banks and other financial institutions on which checks are drawn or electronic funds are transferred with respect to Shipping and Warehousing Charges (as defined below) or Customs Duties to receive, process, honor, and pay any and all such checks or electronic transfers, whether such checks or transfers were issued before or after the Petition Date, upon the receipt by each such bank of notice of such authorization.

194.    The automotive supply industry is shipping intensive.  Goods are transferred between the Debtors' manufacturing facilities and sales offices, from suppliers and vendors to the Debtors' numerous facilities, and from the Debtors' numerous facilities to customers.  Thus, the Debtors rely extensively on the Shippers and Warehousemen to transport and store Goods.  The services provided by the Shippers and Warehousemen are critical to the day-to-day operations of the Debtors' businesses.  At any given time, there are countless shipments en route to and from the Debtors' various facilities.  Therefore, certain Shippers and Warehousemen currently are in possession of Goods that are vital to the Debtors' operations.  The Debtors estimate that, as of the Petition Date, outstanding Shipping and Warehousing Charges equaled approximately $56 million.

195.    Because of the filing of these chapter 11 cases, certain Shippers and Warehousemen who hold Goods for delivery to or from the Debtors may refuse to release those Goods pending payment for their prepetition services, thereby disrupting the Debtors' operations.  Indeed, under some state laws, a Shipper or Warehouseman may have a lien on the Goods in its possession, which secures the charges or expenses incurred in connection with the transportation or storage of such Goods.   Additionally, pursuant to section 363(e) of the Bankruptcy Code, the

Shippers or Warehousemen, as bailees, may be entitled to adequate protection in the form of a

possessory lien.

196.    The Debtors have a reputation for reliability and dependability among their

customers.  In fact, many of the Debtors' pricing policies and marketing strategies revolve

around that reliability and dependability.  The Debtors rely on the timely shipment of Goods to

prevent breakdowns in their supply and delivery network.  Indeed, because of the nature of the

Debtors' businesses, and particularly in light of the Debtors' "just-in-time" inventory policy

resulting in low inventory reserves, even one delayed shipment could cause a plant to shut down.

Accordingly, because the Debtors are, in many cases, dependent on third-party Shippers and

Warehousemen, it is essential that their bankruptcy cases not be a reason or excuse for any third

party Shippers and Warehousemen to cease performing timely services or to retain products,

equipment, or Goods.

197.    The Debtors seek to make those payments to Shippers and Warehousemen

that they determine, in the exercise of their business judgment, are necessary or appropriate, for

several reasons.  First, if prepetition Shipping and Warehousing Charges are not paid, many of

the independent Shippers and Warehousemen may refuse to perform additional services for the

Debtors.  In such event, the Debtors will incur additional expenses (such as premium shipping

and storage costs) to replace the Shippers and Warehousemen, the amounts of which likely will

exceed the amount of unpaid prepetition Shipping and Warehousing Charges that the Debtors

request permission to pay hereunder.

198.    Second, some of the Goods at issue, although not yet received by the

Debtors, are destined for ultimate delivery to the Debtors' customers.  If the Goods are not made

available promptly, the Debtors may frustrate the expectations of their customers and lose

92

customer goodwill.  Furthermore, failure to make payments to the Shippers and Warehousemen will impede certain supplier deliveries, which will result in additional impediments to the Debtors' operations.  These outcomes would be inimical to the Debtors' efforts to reorganize.

199.   The Debtors also seek authority for the Debtors and their customs brokers, as the Debtors' agents, to continue to make necessary payments of customs duties, import-related taxes, and other incidental import expenses (collectively, the "Customs Duties") to the U.S. Customs and Border Protection Agency (the "U.S. Customs Service") and to non-U.S. customs authorities, even if the Debtors incurred the relevant liability prior to the Petition Date.  In the ordinary course of their businesses, the Debtors purchase certain of the raw materials, parts, components, certain finished goods, indirect materials, tooling, machinery, and equipment that they use in the operation of their businesses from overseas, and then import such goods into the United States and other jurisdictions (collectively, the "Imported Goods").  The Debtors' purchase of the Imported Goods is vital to the operations of their businesses.  Without the uninterrupted purchase and delivery of Imported Goods, the Debtors could not continue business in the ordinary course with their suppliers and maintain uninterrupted distribution of their finished products to their customers.  If Customs Duties are not timely paid, the U.S. Customs Service and non U.S. customs authorities may demand liquidated damages, assess interest, or impose other sanctions.

200.   As priority claims, these Customs Duties must be paid in full before the Debtors may make any distributions to holders of general unsecured claims in connection with a chapter 11 plan.  Accordingly, the proposed relief most likely will affect only the timing of the payment of the Customs Duties and, therefore, will not prejudice the rights of general unsecured creditors.

93

201.    Thus, payment of the Customs Duties will benefit the Debtors' estates because (a) the Debtors' operations might otherwise be interrupted, (b) forfeiture of goods for which the Debtors have already become indirectly obligated will be avoided, and (c) potential liens, fines, penalties, and interest charges will be avoided.  Accordingly, the Debtors request that this Court authorize the Debtors to pay prepetition Customs Duties in the approximate amount of $5 million.

202.    While it is difficult to estimate the total amount of Shipping and Warehousing Charges that may be due and owing as of the Petition Date, based on the actual and forecasted spending for 2005, from which the Shipping and Warehousing Charges detailed above are derived, the Debtors submit that the total amount to be paid to the Shippers and Warehousemen if the requested relief is granted is not significant when compared with the importance and necessity of the Goods held by the Shippers and Warehousemen and the additional losses the Debtors may suffer if plant operations are affected.  Indeed, such amount is particularly insignificant in relation to the Debtors' annual sales revenues, which could be disrupted substantially and irreparably if the Debtors cannot obtain immediately the Goods held by the Shippers and Warehousemen on the Petition Date.

203.    Additionally, it is critical that the Debtors obtain relief to pay Customs Duties to avoid the levying of damages or interest, or the imposition of other sanctions, by the U.S. Customs Service or by non-U.S. customs authorities.  Absent payment, the Debtors' customs brokers, the U.S. Customs Service, and non-U.S. customs authorities also might assert liens against the Imported Goods, which could interfere with the delivery of such goods to the Debtors' manufacturing facilities and interfere with the Debtors' operations.  Non-U.S. customs authorities also might take other action against the Debtors in their respective jurisdictions.

204.    Accordingly, I believe that the relief requested herein is in the best interests of the Debtors and their estates and creditors and should be approved.

P.    Motion For Order Under 11 U.S.C. §§ 105, 363(b), 546(b), 1107, And 1108 Authorizing Payment Of Contractors And Service Providers In Satisfaction Of Liens

205.    The Debtors seek entry of an order (a) authorizing but not directing the Debtors to pay the Contractor Claims (as defined below) in the ordinary course of the Debtors' businesses and (b) authorizing and directing all applicable banks and other financial institutions to receive, process, honor, and pay any and all checks drawn on the Debtors' accounts or electronic transfers authorized by the Debtors to pay the Contractor Claims; provided, however, that honoring, performing, or exercising such rights and obligations will not give rise to administrative claims solely as a result of the entry of an order providing such authorization and will not be deemed an assumption of any contract.

206.    In connection with the fabrication of equipment and with repair, maintenance, and construction activities conducted at the Debtors' promises, the Debtors employ third-party tool builders, project managers, contractors, and maintenance companies (collectively, the "Contractors") which have agreed, pursuant to contract or otherwise (collectively, the "Agreements"), to render such services.

207.    Generally speaking, the Debtors have developed strong, long-standing relationships with their Contractors, which have allowed the Debtors to negotiate very favorable pricing and trade credit terms.  The Debtors fear that their failure to honor prepetition obligations to the Contractors would jeopardize these relationships.  Because the universe of qualified Contractors is very limited, the Debtors believe that it would be extremely difficult to replace the majority of these providers with new providers on economically viable terms.

95

208.    Although the Debtors generally have made timely payments to the

Contractors, as of the Petition Date some of the Contractors might not have been paid for certain

prepetition goods and services provided.  As a result, certain Contractors might refuse to perform

their ongoing obligations under the Agreements.  Absent the Contractors' services, the physical

condition of certain of the Debtors' properties and assets would deteriorate.  The Contractors'

failure to provide ongoing services would adversely affect the Debtors' sales and hamper their

reorganization efforts.  Additionally, as discussed below, many of the Contractors currently are

in possession of equipment that is vital to the Debtors' operations, and such Contractors might

assert possessory liens, refusing to redeliver such equipment to the Debtors until they are paid

prepetition amounts.

209.    The Debtors' failure to pay the Contractors for prepetition goods and

services likely would result in many of the Contractors having a right to assert liens under

applicable state mechanics', repairmans', materialmans', tool builders', and shipping lien statutes

(collectively, the "Liens") against the relevant property or assets of the Debtors, which Liens

may be perfected notwithstanding the automatic stay.

210.    Finally, the existence and perfection of Liens not only would disrupt the

Debtors' reorganization efforts but also could cause the Debtors to be in default under certain of

their real estate leases.

211.    Therefore, to avoid undue delay and to facilitate the continued operations

of the Debtors' businesses and the maintenance of their properties, the Debtors seek immediate

authority to pay and discharge, on a case-by-case basis and in their sole discretion, the claims of

all Contractors that have given or could give rise to Liens against the Debtors' assets, properties,

and/or offices, regardless of whether such Contractors already have perfected their interests (the

96

"Contractor Claims"); provided, however, that with respect to each Contractor Claim, (a) the Debtors would not be authorized to pay a Contractor Claim unless the Contractor has perfected or, in the Debtors' judgment, is capable of perfecting or may be capable of perfecting in the future one or more Liens in respect of such Contractor Claim, (b) such payment would not be deemed to be a waiver of rights regarding the extent, validity, perfection, or possible avoidance of the related Liens, and (c) the Contractor agreed to release promptly any Liens upon payment of such Contractor Claim; provided, however, that should the Contractor fail to release promptly such Liens upon payment by the Debtors, any such Liens would be deemed released and expunged, without necessity of further action. Although it is difficult for the Debtors to estimate the amount of prepetition Liens that might arise from the Debtors' prepetition fabrication of equipment, repair, maintenance, and construction activities, the Debtors estimate that the Liens resulting therefrom could be approximately $63 million unless the Debtors are authorized to continue to pay the Contractors in the ordinary course of their businesses.

212.    Accordingly, I believe that the relief requested herein is in the best interests of the Debtors and their estates and creditors and should be approved.

Q.    Motion For Order Under 11 U.S.C. §§ 363 And 553 Authorizing (I) Continued Maintenance Of Existing Bank Accounts, (II) Continued Use Of Existing Cash Management Systems, (III) Continued Use Of Existing Business Forms, (IV) Preservation And Exercise Of Intercompany Setoff Rights And (V) Grant Of Administrative Priority Status For Postpetition Intercompany Transactions

213.    The Debtors respectfully request a waiver of certain of the U.S. Trustee's operating guidelines that require the Debtors to close all prepetition bank accounts, open new "Debtor-in-Possession" accounts for each Debtor, and provide new checks, business forms and stationery. Specifically, the Debtors seek an order authorizing the (a) continued maintenance of existing bank accounts, (b) continued use of their existing cash management systems,

(c) continued use of their existing business forms, (d) preservation and exercise of intercompany

setoff rights and (e) grant of administrative priority status for post-petition intercompany

transactions.

214.    In the ordinary course of their businesses, all but three of the Debtors

utilize an integrated, centralized cash management system (the "Integrated Cash Management

System"), under which funds collected by different operational divisions of the Debtors at

various banks in various locations throughout the world are, through a series of transactions,

transferred to concentration accounts and used, through other accounts, to pay operating

expenses.

215.    In addition to the foreign branch office accounts discussed below, the three

Debtors that do not participate in the Integrated Cash Management System – Delphi Integrated

Service Solutions, Inc., Delphi Medical Systems Colorado Corporation, and Specialty

Electronics, Inc. – as well as the Debtors' foreign, non-Debtor affiliates, utilize stand-alone cash

management systems and their own bank accounts (the "Independent Cash Management

Systems").  Some of the Debtors' foreign, non-Debtor affiliates do, however, participate in the

Integrated Cash Management System for processing intercompany receipts and payables through

a monthly "netting" process as described below.

216.    The Integrated Cash Management System is managed primarily by the

Debtors' financial personnel in Troy, Michigan through coordination with certain third-party

processing service providers.  By utilizing the Integrated Cash Management System, the Debtors

are able to facilitate cash forecasting and reporting, monitor collection and disbursement of

funds, and maintain control over the administration of the various bank accounts required to

effect the collection, disbursement, and movement of cash.

217.    The vast majority of the Debtors' operating accounts are concentrated in ten U.S. banks  and are centered around a treasurer account (the "Treasurer Account") held by Delphi Automotive Systems LLC ("DAS") at Bank One - MI which acts as the "hub" for the accounts comprising the Integrated Cash Management System.  Most of the ten U.S. banks have a concentration account and one or more attached zero balance accounts ("ZBAs").  The Debtors utilize a treasury management system known as "Integra-t" to manage the daily flow of funds through the Integrated Cash Management System, reconcile the concentration accounts, and post cash transactions to the general ledger in an automated fashion.  The movement of funds through the Integrated Cash Management System is described below and is illustrated in the charts attached to the motion as Exhibit B.

218.    The Treasurer Account.  DAS maintains the Treasurer Account as the central concentration account in the Integrated Cash Management System.  On a daily basis, as necessary, the Treasurer Account provides funds to controlled disbursement accounts (directly or through intermediary concentration accounts) at Bank One – MI, BofA, BONY, Citibank, Comerica, JPMorgan, and Mellon.  The Treasurer account, on a daily basis, also receives funds from receipt, lockbox, investment, and custodial accounts maintained at Bank One – IL, Bank One – MI, Citibank, Citifunds, Deutsche Asset Management, Fidelity Investments, Fifth Third Bank, Harris, HSBC Bank USA, N.A. ("HSBC"), JPMorgan, JPMorgan Chase Securities ("JPM Securities"), RBS Securities, and The Reserve Fund.  In the ordinary course of business, the Treasurer Account also funds intercompany loans to the Debtors' non-U.S. subsidiaries and affiliates as necessary through accounts held by Delphi at Deutsche Bank ("Deutsche").  In addition, funds in the Treasurer Account are transferred on a daily basis into overnight

investment accounts, or into other investments in accordance with the Debtors' investment guidelines,  and then returned to the Treasurer Account as needed.

219.   <u>Concentration Accounts</u>.  As noted above, as part of the Integrated Cash Management System, the Debtors maintain concentration accounts at BofA, Bank One – IL, Bank One – MI, BONY, Citibank, Comerica, Harris, JPMorgan, Key, and Mellon.  Such accounts are used to (a) receive transfers from the Treasurer Account on a daily basis to process transfers to the controlled disbursement and payroll disbursement accounts, as well as any other miscellaneous disbursement accounts held at such banks, and (b) make transfers to the Treasurer Account on a daily basis to process receipts received to lockbox and receipt accounts.  In addition, the concentration account DAS maintains at Key is for the purpose of receiving miscellaneous deposits, such as for payments sent to one of the Debtors' facilities rather than the Debtors' appropriate receipt bank.  Except as noted in footnote five above,  balances in the various concentration accounts are transferred into the Treasurer Account on a daily basis.

220.   <u>Controlled Disbursement Accounts</u>.  The Debtors maintain accounts at many of the banks participating in the Integrated Cash Management System for the purpose of making disbursements to, inter alia, employees, benefits and insurance providers, vendors, taxing authorities, and shareholders.  For the most part, disbursements are centralized and processed with the assistance of certain third party service providers, such as Affiliated Computer Services ("ACS"), which is the subcontractor to GM for the provision of vendor, tax, and payroll disbursement processing services under the Financial Services Supply Agreement between GM and DAS dated as of December 16, 1998 (the "FSS Agreement").

221.   The Debtors maintain the following disbursement accounts as part of their Integrated Cash Management System:

(a)   U.S. dollar disbursements to vendors of Delphi's domestic divisions that participate in the Integrated Cash Management System are made through disbursement accounts held at JPMorgan.  Vendor disbursements are made on a daily basis with the significant majority of disbursements made on the "MNS-2" date each month.   Separate disbursement accounts are maintained at JPMorgan based on the type of disbursement to be made (e.g., checks, automated clearing house ("ACH") transfers, manual checks, and wire transfers).  Payments to affiliates that are not "netted" (as described in paragraph (b) below) also are made out of accounts at JPMorgan.

(b)   Disbursement accounts at JPMorgan and the Treasurer Account provide funding to accounts at Deutsche for (i) the Debtors' (and their non-Debtor subsidiaries') weekly foreign currency settlement and monthly netting of intercompany payables and receivables ("Weekly Foreign Currency Settlements" (as described below) and "Major Netting" (as described below), and (ii) disbursements made in currencies other than U.S. dollars for the Debtors' domestic divisions (as described below).

(c)   Disbursements for the Debtors' obligations to various taxing authorities are made from disbursement accounts held at JPMorgan in the name of DAS and Delphi Automotive Systems Services LLC.

(d)   Historically, dividends generally were declared quarterly and paid from an account held at BONY (i) by electronic funds transfer on the dividend payment date and (ii) by check, on a rolling basis, as checks were presented.

(e)   Disbursements for payroll obligations to hourly employees of the Debtors are made from accounts held at BofA and Comerica.  DAS maintains one account at each of BofA and Comerica that is used to meet payroll obligations owing to hourly employees

101

employed in the State of Michigan. Delphi Automotive Systems Services LLC maintains one account at each of BofA and Comerica to fund payroll obligations owing to all other hourly employees. Hourly payroll is processed and disbursed on a weekly basis.

(f)   Disbursements for payroll obligations to salaried employees are made from an account held at Bank One – MI. Salaried payroll is processed and disbursed twice per month, on the 15th and the last day of each month, unless either of these days is a weekend or holiday resulting in the payment day generally being the last business day preceding the date.

(g)   Healthcare and other employee benefit disbursements are paid through several third party service providers from (i) controlled disbursement accounts held at BofA, Bank One - MI, Citibank, and JPMorgan to pay healthcare service and other employee benefit providers, (ii) depository or special depository accounts held at Bank One - MI to process payments for workers' compensation and other benefits, and (iii) trust funding accounts, disbursement accounts, and a special depository account held at Bank One – MI to fund the Delphi–UAW Layoff Benefit Trust, the Delphi-IUE Welfare Benfit Trust Legal Services Plan, the Delphi–IUE Welfare Benefit Trust, and the Delphi Salaried Welfare Benefit Trust, and to make disbursements from such trusts to the beneficiaries thereof.

(h)   Disbursements for obligations of ASEC Manufacturing General Partnership and ASEC General Sales Partnership (together, "ASEC") are made from accounts at BofA and Mellon.

(i)   Disbursements for obligations of Delphi Diesel Systems Corp. are made from accounts held at Citibank.

102

(j)   Disbursements for obligations of Packard Hughes Interconnect Company are made from an account at Citibank.

(k)   Disbursements for obligations of Delphi Connection Systems are made from accounts at Citibank and BofA.

(l)   Other disbursement accounts that are part of the Integrated Cash Management System are maintained at Bank One – MI and JPMorgan in the names of Delphi Mechatronic Systems, Inc. and Delphi Medical Systems Texas Corporation, respectively.

222.   Receipt And Lockbox Accounts.  The Debtors participating in the Integrated Cash Management System are organized generally into seven operating divisions: (a) Corporate/Headquarters,  (b) Delphi Electronics & Safety, (c) Delphi Energy & Chassis, (d) Delphi Packard, (e) Delphi Product & Service Solutions, (f) Delphi Saginaw, and (g) Delphi Thermal & Interior.  Since receipts are collected on a divisional basis, each division holds several bank accounts for the collection of receipts.  These accounts are maintained at Bank One – IL, Bank One – MI, Harris, and JPMorgan.  Funds in the Debtors' receipt and lockbox accounts are swept into the Treasurer Account on a daily basis, frequently through an intermediary concentration account held at the same bank as the relevant receipt and/or lockbox accounts.  No disbursements are made from any receipt or lockbox account.  The Debtors' maintain the following receipt and lockbox accounts as part of their Integrated Cash Management System:

(a)   The Debtors maintain lockbox accounts at Bank One – MI, Bank One – IL, and Harris.  These lockbox accounts are used primarily to collect receipts from the Debtors' customers other than GM and are generally held in the name of either DAS or Delphi Receivables LLC ("Delphi Receivables"), a wholly-owned non-Debtor subsidiary. Prior to the Petition Date, certain of the lockbox accounts were utilized in connection

with the Debtors' U.S. accounts receivable securitization agreement and, as such, are all subject to control agreements in favor of JPMorgan, the arranger under the securitization agreement.   Historically, the accounts are ZBAs and, with respect to all such accounts, funds are swept into demand deposit accounts held at the relevant bank on a periodic basis.

(b)   The Debtors and Delphi Receivables also maintain demand deposit accounts (including the demand deposit accounts referenced in the last sentence of paragraph (i) above) at Bank One – IL, Bank One – MI, and Harris for processing domestic, non-GM receipts  (with the exception of GM Delphi Saginaw receipts) and accounts at JPMorgan for collection of overseas accounts receivables.   These accounts are also subject to control agreements in favor of JPMorgan, as the arranger under the U.S. securitization agreement.   Historically, the accounts are ZBAs and, with respect to all such accounts held at Bank One – IL, Harris, and JPMorgan, funds are swept into concentration accounts at the relevant bank, and, with respect to all such accounts held at Bank One – MI, funds are swept into the Treasurer Account on a periodic basis.

(c)   The Debtors maintain demand deposit accounts at Bank One – IL and Bank One - MI for the collection and processing of receipts from GM.   The Debtors' accounts receivable from GM are not part of the U.S. securitization facility and, as such, these accounts are not subject to control agreements.   These accounts are ZBAs and, with respect to all such accounts held at Bank One – IL, funds are swept into a concentration account at Bank One – IL or, with respect to all such accounts held at Bank One – MI, funds are swept into the Treasurer Account on a periodic basis.

(d)   An account is maintained at JPMorgan for the collection of accounts receivable owing to Delphi Technologies Inc.

(e)   The Debtors maintain lockbox and other receipt accounts at Bank One - MI that are related to specific Debtor entities and are not part of the U.S. securitization facility described in paragraphs (i) and (ii) above.  Such accounts are also ZBAs and funds held therein are swept into the Treasurer Account on a daily basis.  ASEC Manufacturing General Partnership, DAS, and Delphi Diesel Systems Corp. also maintain collection accounts at Bank One - MI.  Amounts in such accounts are swept into the Treasurer Account on a periodic basis.  In addition, Delphi Mechatronic Systems, Inc. maintains accounts at Bank One – IL.

(f)   Packard Hughes Interconnect Company also maintains accounts at Bank One – IL for the collection of receipts.

(g)   DAS, Delphi, Delphi Automotive Systems Overseas Corporation, Delphi Automotive Systems International, Inc., Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems Thailand, Inc., and Delphi China LLC also maintain stand-alone receipt accounts at Citibank and JPMorgan.

223.   Non-U.S. Accounts.  Delphi also maintains accounts with non-U.S. financial institutions for the purpose of, inter alia, (a) coordinating the cash management systems of the Debtors' United States operations and the Debtors' and their non-Debtor foreign subsidiaries' foreign operations through the Major Netting transactions, (b) facilitating the Debtors' prepetition foreign currency exchange rate risk management strategies, and (c) paying the Debtors' foreign suppliers through the Weekly Foreign Currency Settlements.

224.   <u>Netting Accounts</u>.  Delphi maintains one multi-currency master funding account (the "Master Funding Account"), one "Trading Account," and three related multi-currency accounts at Deutsche in Frankfurt, Germany.  These four accounts, in conjunction with various subaccounts thereof, form the basis for the Debtors' weekly settlement ("Weekly Foreign Currency Settlements") and monthly netting ("Major Netting") of intercompany payables and receivables.

225.   Delphi's Major Netting process combines over 500 monthly payments and receipts among approximately 88 affiliated entities in approximately 20 countries with receipts in approximately 12 currencies into one net payment or receipt for each entity in its local currency.  In the Major Netting process, all (a) receivables and payables due to or from the Debtors and their non-Debtor affiliates are netted into one payment to or from each non-Debtor affiliate in their respective local currency and (b) disbursements made in currencies other than U.S. dollars for the Debtors' domestic division payments to third-party foreign suppliers are converted into such supplier's local currency.  Net paying entities remit funds to the multi-currency Deutsche accounts discussed above and net receiving entities are paid from those Deutsche accounts, in each case in the appropriate local currency.  To the extent that U.S. entities are net paying entities, the amounts of such entities' required payments are transferred from an account held by DAS at JPMorgan to the Trading Account at Deutsche, through which the Debtors settle their foreign currency exposure with respect thereto.  From the Trading Account (as defined below), funds are transferred to the Master Funding Account for payment.  The Debtors' Integrated Cash Management System and other processes in place allow the Debtors to track all obligations owing between related entities and ensure that all transactions cleared through the Major Netting process are accounted for appropriately on each entity's books.

226.    Major Netting settles once per month on the MNS-2 date, through a

process in which Delphi and its non-Debtor affiliates initiate payment instructions either (a)

internally or through ACS with respect to trade receivables owing from, and trade payables

owing to, non-Debtor affiliates or (b) through a third-party service provider, Electronic Data

Systems Corporation ("EDS"), with respect to payments to third-party foreign suppliers, to

Deutsche, which in turn processes the disbursements by wire or check to the appropriate net

receiving third-party foreign suppliers.  Through Major Netting, the Debtors significantly reduce

the number of intercompany transactions, transaction costs related thereto and the Debtors'

overall foreign exchange rate exposure.

227.    The Weekly Foreign Currency Settlements are the process through which

the Debtors' U.S. divisions make all payments to non-U.S. suppliers in such suppliers' local

currencies.  This process occurs on a weekly basis for all obligations to foreign suppliers for

which payment will become due in the following seven-day period.  To effectuate the Weekly

Foreign Currency Settlements, the required funds are transferred from an account held by DAS

at JPMorgan (the same account used in the Major Netting process) to the Trading Account.  As

with the Major Netting process, the Debtors purchase foreign currencies and then transfer the

funds from the Trading Account to the Master Funding Account for payment to the foreign

suppliers.

228.    Foreign Currency Exchange Rate Risk Management Accounts.  In the

ordinary course of the Debtors' businesses, the Debtors enter into swap agreements, forward

contracts, and zero cost collars in order to offset each division's global net foreign currency

exposure for select currency pairs.  Such transactions are crucial to the Debtors' financial

success.  Absent use of such financial instruments, the Debtors would face significant exposure to adverse changes in exchange rates.

229.    The decision to enter into a derivative transaction is made by Delphi's treasury group located in Troy, Michigan and transactions are processed through the Debtors' trade booking system – known as "IT/2."  Each trade is assigned a control number by the IT/2 system so that it is specifically identifiable.  Upon verification in IT/2, trades are uploaded into CMS (a third-party matching system) and trades are matched or cancelled with the respective counterparty.

230.    DAS maintains an account at Toronto-Dominion Bank ("TD Bank") for Canadian dollars disbursements (the "CAD Disbursements").  This account is funded from the Master Funding Account upon the issuance of payment instructions (initiated at Delphi headquarters) through IT/2 to Deutsche.  Vendor payment instructions are then sent to TD Bank via ACS through EDS and, upon receipt of such instructions, TD Bank makes the CAD Disbursements.

231.    DAS maintains one account at Bank One - Canada ("Bank One - Canada") for the management of certain of its funds.  Funds are regularly transferred between the Treasurer Account and this accounts at Bank One - Canada as necessary.  The Debtors do not normally leave a balance in the account at Bank One - Canada.

232.    Finally, certain of the Debtors maintain bank accounts for their foreign branch offices.  Specifically, Delco Electronics Overseas Corporation maintains an account at National Westminster Bank PLC ("NatWest"), Delphi Automotive Systems Overseas Corp. maintains accounts at Citibank, and Delphi International Services, Inc. maintains accounts at Citibank, N.A. (Taipei Branch) and UBS AG.

233.    In addition to the ZBAs described above, three of the Debtors — Delphi Integrated Service Solutions, Inc., Delphi Medical Systems Colorado Corporation, and Specialty Electronics, Inc. — maintain their own stand-alone cash management systems at Bank One – MI, Branch Banking & Trust Company, JPMorgan, and UMB Bank, N.A. that are not subject to zero balance arrangements with the Treasurer Account.  Generally, each of these Debtors may maintain one or more (a) lockbox or deposit accounts to receive deposits, (b) ZBAs used to make payments on account of various disbursements, and (c) stand-alone accounts used for a variety of purposes, including, inter alia, the processing of bankcard transactions.

234.    <u>Payroll Pay-Through Accounts</u>.  DAS maintains one payroll pay-through account at each of Bank of Lenawee, Brunswick Bank and Trust, Community Banking Company of Fitzgerald, M&I Marshall and Illsley, Regions Bank, UMB Bank, N.A., and United Bank & Trust.  These accounts are maintained solely to permit hourly employees who do not have bank accounts to cash their payroll checks at no cost to them.

235.    <u>Investment And Settlement Accounts</u>.  Citibank is the Debtors' investment custodian for non-money market funds and DAS maintains both a custodial investment account to hold investment securities and a settlement account used to receive payments on account of commodities hedging agreements (comprised of fixed and floating swap agreements).  DAS also maintains (a) a demand deposit account for investments at Fifth Third Bank, (b) a money market fund at The Reserve Fund, (c) a money market fund at Fidelity Investments, (d) a money market fund at HSBC, (e) a money market account at JPM Securities,  (f) a money market fund at RBS Securities, and (g) a money market fund at Deutsche Asset Management.  In addition, Delphi maintains a money market fund at Citifunds.

236.    The Debtors' Integrated Cash Management System is complex, highly
automated, and computerized.  Nonetheless, the cash management procedures employed by the
Debtors constitute ordinary, usual, and essential business practices, and are similar to those used
by other major corporate enterprises.  The Integrated Cash Management System provides
significant benefits to all of the Debtors, including the ability to (a) control corporate funds
centrally, (b) invest idle cash, (c) ensure availability of funds when necessary, and (d) reduce
administrative expenses by facilitating the movement of funds and the development of more
timely and accurate balance and presentment information.  Furthermore, the use of a centralized
cash management system reduces interest expenses by enabling the Debtors to utilize all funds
within the system rather than relying upon short-term borrowing to fund the Debtors' and their
non-Debtor subsidiaries' cash requirements.

237.    The operation of the Debtors' businesses requires that the cash
management systems continue during the pendency of these chapter 11 cases.  Requiring the
Debtors to adopt new, segmented cash management systems at this early and critical stage of
these cases would be expensive, would create unnecessary administrative problems, and would
be much more disruptive than productive.  Any disruption could have a severe and adverse
impact upon the Debtors' ability to reorganize.  Moreover, as a practical matter, because of the
Debtors' complex corporate and financial structure, it would not be possible to establish a new
system of accounts and a new cash management and disbursement system without substantial
additional costs and expenses to the Debtors' bankruptcy estates and a significant disruption of
the Debtors' business operations.  Consequently, maintenance of the existing cash management
systems, including the Debtors' continued ability to transfer funds between themselves, is not
only essential but is in the best interests of all creditors and other parties-in-interest.

238.    The Debtors' Integrated Cash Management System allows the Debtors to centrally manage all of their cash flow needs and includes the necessary accounting controls to enable the Debtors, as well as their creditors and this Court, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable.  The Debtors will continue to maintain detailed records reflecting all transfers of funds.  In furtherance of this goal, the Debtors are requesting that all banks at which their accounts are maintained be authorized and directed to continue to administer those accounts as they were maintained prepetition, without interruption and in the usual and ordinary course.  The banks should also be authorized and directed to pay any and all checks, drafts, wires, or ACH transfers issued on the bank accounts for payment of any claims arising on or after the Petition Date so long as sufficient funds are in those accounts.

239.    To effectuate the foregoing, the Debtors request that (a) the banks be authorized and directed to honor all representations from the Debtors as to which checks should be honored or dishonored and (b) any final payment made by a bank at which the Debtors' maintained an account prior to the Petition Date (including any ACH transfer or wire transfer the Banks are or become obligated to settle) against any of the Debtors' bank accounts, or any instrument issued by a bank on behalf of any Debtor pursuant to a "midnight deadline" or otherwise, shall be deemed to be paid prepetition, whether or not actually debited or settled from the Debtors' bank accounts prepetition.  To the extent that the Debtors have directed that any prepetition checks be dishonored, they reserve the right to issue replacement checks to pay the amounts related to such dishonored checks, consistent with the orders of this Court.

240.    Also in furtherance of the goal of allowing the Debtors to continue to operate their existing cash management systems without interruption, the Debtors request that,

until further order of this Court, all third-party service providers with whom the Debtors directly or indirectly have contracted to provide services in connection with the operation of their cash management systems be authorized and directed to continue to provide to the Debtors the services they provided prior to the Petition Date.

241.    The Debtors maintain accounts at many of the banks participating in the Integrated Cash Management System for the purpose of making disbursements to, inter alia, employees, vendors, taxing authorities, and shareholders.  For the most part, disbursements are centralized and processed with the assistance of certain third party service providers.  In order to use the property of their estates and to ensure an orderly transition into chapter 11, the Debtors also request authority to continue to use their existing cash management systems in the ordinary course of their businesses.

242.    The Debtors seek a waiver of the U.S. Trustee requirement that their bank accounts be closed and that new postpetition bank accounts be opened.  If enforced in these cases, such requirements would cause enormous disruption in the Debtors' businesses and would impair the Debtors' efforts to pursue alternatives to maximize the value of their estates.  The Debtors' bank accounts comprise an established cash management system that the Debtors need to maintain in order to ensure smooth collections and disbursements in the ordinary course of their businesses.

243.    Accordingly, to avoid delays in payments to administrative creditors, to ensure as smooth a transition into chapter 11 as possible with minimal disruption, and to aid in the Debtors' efforts to complete these cases successfully and rapidly, it is important that the Debtors be permitted to continue to maintain their existing bank accounts.  If necessary, the Debtors should also be permitted to open new accounts (and give the U.S. Trustee notice of such

newly-opened accounts), wherever they are needed, regardless of whether such banks are designated depositories in this jurisdiction. The Debtors request that their existing bank accounts be deemed debtor-in-possession accounts and that their maintenance and continued use, in the same manner and with the same account numbers, styles, and document forms as those employed during the prepetition period, be authorized.

244.   Prior to the Petition Date, the Debtors and certain non-debtor affiliates provided a number of services to, and engaged in intercompany financial transactions with, each other in the ordinary course of their respective businesses. Discrete transfers in the appropriate intercompany accounts are made on account of the provision of these services. These transactions are recorded by each entity as an intercompany obligation and ultimately satisfied between the entities.

245.   In addition, in the ordinary course of business the Debtors periodically are required to infuse capital into certain of their foreign subsidiaries and affiliates. This infusion of capital generally is in the form of a loan. The Debtors use repayment of loans as a tax efficient method of upstreaming cash throughout the enterprise. Because these entities are part of the Debtors' overall corporate ownership structure, throughout the entirety of these transactions the funds remain within the spectrum of the Debtors' control.

246.   The Debtors believe that the continuation of these and other intercompany services is beneficial to their estates and creditors and that corresponding transfers among the appropriate intercompany accounts (collectively, the "Intercompany Transactions") should therefore be permitted. Accordingly, the Debtors seek authority to continue the Intercompany Transactions postpetition. Specifically, in certain cases as noted above, the Intercompany Transactions result in tax benefits to the Debtors. Additionally, if the Intercompany Transactions

113

were discontinued, a number of services presently provided to the Debtors at reasonable or nominal costs would be disrupted. Accordingly, the Debtors submit that the continuation of the Intercompany Transactions is in the best interests of the Debtors' estates and their creditors.

247.    To minimize expenses to their estates, the Debtors also request authorization to continue to use all correspondence, business forms (including, but not limited to, letterheads, purchase orders, and invoices), and checks existing immediately prior to the Petition Date without reference to the Debtors' status as debtors-in-possession. As soon as reasonably practicable, however, the Debtors will cause the phrase "Debtor-In-Possession" to be included on their checks issued within the United States.

248.    Parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors-in-possession as a result of the size and notoriety of these cases, the press releases issued by the Debtors, and information circulating within the automotive industry. Moreover, each of the Debtors' vendors will receive direct notice of the commencement of these cases.

249.    Changing correspondence and business forms would be expensive, unnecessary, and burdensome to the Debtors' estates and disruptive to the Debtors' business operations and would not confer any benefit upon those dealing with the Debtors. For these reasons, the Debtors request that they be authorized to use existing checks and business forms without being required to place the label "Debtor-In-Possession" on each.

250.    I believe that the relief requested is necessary and appropriate and is in the best interest of the Debtors' estates, creditors and other parties-in-interest.

R.    Motion For Order Under 11 U.S.C. § 345 Authorizing Continued Use Of Existing
Investment Guidelines

251.    The Debtors seek (a) authority to continue investing their cash in

accordance with their existing investment guidelines attached to the motion as Exhibit A (the

"Investment Guidelines") and (b) to the extent necessary, waiver of the investment and deposit

requirements of section 345(b) of the Bankruptcy Code.

252.    Prior to the Petition Date, the Debtors generally invested their U.S.

controlled cash and cash equivalents in accordance with the Investment Guidelines.  The goal of

the Debtors' short-term investment program is to manage effectively the Debtors' cash by

preserving principal, providing liquidity, and maintaining yield.  Investments for speculative

purposes are not permitted.  All investments must have a maturity of 45 days or less and be

denominated in U.S. dollars.

253.    Citibank, N.A. is the Debtors' investment custodian for non-money market

investments.  The Debtors also maintain investment funds held in a combination of the following

accounts:  (a) a demand deposit account for investments at Fifth Third Bank (b) a money market

fund at The Reserve Fund (c) a money market fund at Fidelity Investments (d) a money market

fund at HSBC Bank USA, N.A. (e) a money market account at JPMorgan Chase Bank (f) a

money market fund at RBS Securities (g) a money market fund at Citifunds; and (h) a money

market fund at Deutsche Asset Management.

254.    The Debtors' assets consist of, among other things, cash, cash equivalents,

short-term investments, and deposit accounts.  Prior to the commencement of these chapter 11

cases, the Debtors' invested cash in accordance with conservative guidelines and with the

primary goal of protecting principal and the secondary goals of maximizing yield and liquidity.

255.    In order to maximize the assets of their estates, the Debtors seek authority to invest monies of their estates pursuant to the Investment Guidelines.  In accordance therewith, the Debtors will invest their cash in their sole discretion in the short-term investment instruments identified as permitted investments on <u>Exhibit A</u> attached to the motion, in all instances subject to the sectoral, credit rating, and other limitations and restrictions set forth in those Investment Guidelines.  Compliance with these internal Investment Guidelines is guaranteed by a rigorous and daily process of internal review.

256.    The average aggregate daily balance in the Debtors' investment accounts from September 1, 2005 through September 23, 2005 was approximately $1.0 billion.

257.    The Investment Guidelines will enable the Debtors to maintain the security of their investments, as contemplated by section 345 of the Bankruptcy Code, while at the same time providing the Debtors with the flexibility required to maximize the yield on the investment and deposit of cash.

258.    I believe that the relief requested is necessary and appropriate and is in the best interest of the Debtors' estates, creditors and other parties-in-interest.

S.    Motion For Order Under 11 U.S.C. §§ 105(A), 363, 1107, And 1108 Authorizing Debtors To Honor Prepetition Obligations To Customers And Otherwise <u>Continue Customer Programs In Ordinary Course Of Business</u>

259.    Prior to the Petition Date and in the ordinary course of their businesses, the Debtors engaged in certain practices to develop and sustain positive reputations with their customers and in the marketplace for their products (collectively, the "Customer Programs"). Such practices include, among others, warranty programs, customer adjustments, and customer rebates and allowances.  The common goals of the Customer Programs have been to meet competitive pressures, ensure customer satisfaction, and generate goodwill for the Debtors,

thereby retaining current customers, attracting new ones, and ultimately enhancing revenue and profitability.

260.     The Debtors request entry of an order authorizing, but not directing, the Debtors, in their business judgment, to (a) perform certain of their prepetition obligations related to the Customer Programs as they determine advisable, and (b) continue, renew, replace, implement new, and/or terminate those Customer Programs as they see fit, in the ordinary course of their businesses and without further application to this Court.

261.     Maintaining certain of the Debtors' Customer Programs that are provided to consumer customers is critical because the Debtors' consumer goods face significant competition in the marketplace.  Prospective purchasers of Delphi-branded consumer goods have many alternatives from which to choose.  A belief that the Debtors will not honor obligations such as product warranties could easily dissuade consumers from purchasing the Debtors' products.  Similarly, maintaining certain of the Debtors' Customer Programs that are provided to OEM customers is crucial to the Debtors' businesses.  Any doubts regarding the Debtors' ability to honor their customer commitments to the OEMs could result in OEM customers' sourcing their supply needs elsewhere.  This would have a severe impact on the Debtors' revenues and ability to preserve enterprise value.  Accordingly, the Debtors request the authority to honor all such obligations related to the Customer Programs.  Set forth below are general descriptions and examples of some (but not all) of the Customer Programs offered by the Debtors.  They include the Debtors' Warranty Programs, Customer Adjustments, and Customer Rebates and Allowances (each as defined below).

262.     <u>Warranty Programs</u>. The Debtors' prepetition warranty programs (the "Warranty Programs") can generally be classified into two categories: (a) warranties providing

that the components supplied to the Debtors' OEM customers and integrated into such customers'

products (including motor vehicles), and the service parts supplied to the Debtors' OEM

customers, will be, among other things, free from defects in material and workmanship (the

"OEM Warranties" and the Debtors' obligations with respect thereto, the "OEM Warranty

Obligations") and (b) standard consumer limited warranties provided to the ultimate purchasers

of the Debtors' consumer electronics products and Delphi-branded aftermarket automotive parts,

such as satellite radio receivers, mobile video systems, and mobile navigation systems (the

"Consumer Warranties" and, collectively with the OEM Warranties, the "Warranties").

263.    From an accounting perspective, the Debtors recognize expected warranty

costs for products sold at the time of sale.  The Debtors' warranty accrual is based on

management's estimate of the amount that will eventually be required to settle such warranty

obligations.  This estimate is based upon consideration of many factors, including past

experience, production changes, and industry developments.  During the eight months ended

August 31, 2005, the Debtors accrued estimated warranty costs of approximately $41 million and

settled (in cash or in kind) warranty claims of approximately $39 million.  As of August 31,

2005, the Debtors' accrued balance for estimated warranty costs was $155 million,  the majority

of which is for estimated OEM Warranty Obligations.  The amount of warranty accrual for OEM

Warranties is due in part to the lengthy term of these warranties which are generally coterminous

with the product warranties offered by the Debtors' OEM customers and, therefore, does not

represent the actual amount of currently-payable obligations.

264.    The outstanding prepetition Consumer Warranty Obligations are

significantly smaller than the OEM Warranty Obligations because they generally cover a

relatively short period of time.   Although the Debtors cannot determine with certainty the

outstanding Consumer Warranty Obligations as of the Petition Date, the Debtors accrue a reserve

for Consumer Warranty Obligations (a) in an amount equal to 5.1% of sales of consumer

electronics goods and (b) on an incident-rate basis for Delphi-branded aftermarket automotive

parts.  Based upon their past experience, the Debtors believe that the amount of the reserve is a

reasonable estimate of future Consumer Warranty Obligations.  The Debtors' accrued reserve for

Consumer Warranty Obligations as of August 31, 2005 was approximately $3.6 million.

265.    The Debtors believe that the Warranties benefit customer development and

retention, solidify customer relationships, and bolster sales of new and existing products.  As

noted above, potential purchasers of the Debtors' consumer goods have many options in the

marketplace and will be less likely to purchase the Debtors' products if such products are

perceived as not carrying the same warranties as competing products.  Furthermore, any doubts

regarding the Debtors' ability to honor their customer commitments to the OEMs could result in

OEM customers' sourcing their supply needs elsewhere, which would negatively affect the

Debtors' revenues, long-term prospects, and ability to preserve enterprise value.  The Debtors

assert that the total likely amount of prepetition Warranty Obligations is significantly less than

the potential damage that would be done to the Debtors' businesses by a failure to honor certain

of the Warranties in the ordinary course of the Debtors' businesses.  Thus, the Debtors

respectfully request that this Court authorize but not direct the Debtors to continue to honor the

Warranties and to satisfy prepetition Warranty Obligations at their discretion.

266.    Customer Adjustments.  As noted above, the Debtors are the single largest

global supplier of vehicle electronics, transportation components, integrated systems and

modules, and other electronic technology.  The Debtors believe that one of the many reasons that

OEMs select the Debtors' goods for their products is the consistently high quality of the Debtors'

goods.  Nevertheless, and despite the Debtors' continuous focus on and dedication to quality, it is

inevitable in the production of complex electronics and other components that certain unexpected

situations will arise in which the goods supplied to the OEM customers do not conform to such

customers' specifications (the "Nonconforming Goods").  Similarly, despite the Debtors' intricate

inventory and supply chain management systems, it is inescapable that goods occasionally will

be, among other things, misdelivered, delivered in an inaccurate quantity, or damaged in transit

("Misdelivered Goods" and, collectively with the Nonconforming Goods, the "Adjusted Goods").

267.    Issues also arise with respect to the invoicing and payment system used by

the Debtors and the OEM customers.  The Debtors and their customers generally rely upon a

complex electronic data interchange system for invoicing, pricing, and payment.  Nevertheless,

errors do occur.  Such errors include duplicate invoicing (when two invoices are created for the

same shipment), improper invoicing (when the invoice created does not properly reflect the

goods shipped or is otherwise incorrect), duplicate payment (when a customer makes two

payments on account of the same shipment), mispricing (when a customer is charged or pays an

incorrect price – either too high or too low – for the Debtors' products), and various other billing

and payment errors (the "Invoicing or Payment Errors").

268.    In the event of delivery of Adjusted Goods or an Invoicing or Payment

Error, the Debtors and the affected customer will agree to adjust the amount owed by such

customer in connection with the affected shipment (the "Invoice Adjustments").  The adjustment

generally will be in such amount as is allocable to the Adjusted Goods or sufficient to correct the

Invoicing or Payment Error, as appropriate.

269.    The Debtors may also incur, directly or indirectly, additional shipping

charges in connection with expediting delivery in order to ensure timely delivery of goods (such

charges, "Premium Freight").  Alternatively, the Debtors may directly or indirectly incur charges

in connection with the sorting, rework, or repair of the Adjusted Goods if such activities are

practicable (the "Repairs" and, collectively with Invoice Adjustments and Premium Freight, the

"Customer Adjustments").

270.    By this motion, the Debtors seek the authority but not this Court's direction

to continue to honor the Customer Adjustments.  The Debtors assert that their Customer

Adjustment practices are standard in the Debtors' industries and are done in the ordinary course

of their businesses, such that court authority is unnecessary pursuant to section 363 of the

Bankruptcy Code.  Nevertheless, out of an abundance of caution, the Debtors seek authority to

continue their Customer Adjustments.

271.    Honoring the Customer Adjustments is undoubtedly in the best interests of

the Debtors and their estates.  While it is difficult for the Debtors to track the number of

Adjusted Goods or the cost associated with Customer Adjustments because such amounts are

generally netted against outstanding invoices and not separately settled, nevertheless, the Debtors

believe that Adjusted Goods make up a relatively insignificant percentage of all goods produced

by the Debtors.  Therefore, the amount of Customer Adjustments is similarly insignificant as a

percentage of the Debtors' total sales.  In contrast, the harm to the Debtors' goodwill and their

OEM relationships from a failure to honor Customer Adjustments would be significant.  In

essence, absent the relief requested in this motion, the Debtors would be forced to attempt to

collect on amounts invoiced for products that were nonconforming, misdelivered, or otherwise

unusable to the customer, or to collect on invoices that are clearly and verifiably inaccurate.  Any

such attempts would undoubtedly be met with fierce resistance by customers and would likely

lead to costly and time-consuming litigation in which the Debtors' likelihood of success would

be questionable.   In addition to the costs associated with such litigation, the Debtors' adoption of

such an antagonistic policy with respect to their customers would undeniably have a negative

impact upon their ability to be awarded new programs from such customers.  The minimal

amount that could possibly be saved in the short-term through a failure to honor the Customer

Adjustments would be significantly outweighed by the long-term consequences such a position

would have on the Debtors' business prospects.  Therefore, honoring the Customer Adjustments

and the Debtors' obligations with respect thereto are clearly in the best interests of the Debtors

and their estates.

        272.    <u>Customer Rebates And Allowances</u>.  The Debtors' consumer electronics

products and Delphi-branded aftermarket automotive parts are sold through various sales

channels and at various retail outlets across the United States and abroad.  In connection with

their relationships with the retail outlets and other participants in sales channels through which

the Debtors sell such products, the Debtors generally provide these customers with certain

rebates, incentives, and allowances (collectively, the "Customer Rebates and Allowances") to

support the development, promotion, and marketing of the Delphi brand and the Debtors'

products.  The Debtors accrue expense reserves for the Customer Rebates and Allowances based

upon the terms of their agreements with the relevant customers.  As of August 31, 2005, the

accrued expense reserve for the Customer Rebates and Allowances was approximately $4.7

million.

        273.    By this motion, the Debtors seek the authority but not this Court's direction

to continue to honor the Customer Rebates and Allowances.  As with Customer Adjustments, the

Customer Rebates and Allowances practices are standard in the Debtors' industries and are done

in the ordinary course of their businesses.  Accordingly, the Debtors believe that court authority

122

to continue these practices is unnecessary pursuant to section 363 of the Bankruptcy Code.

Nevertheless, out of an abundance of caution, the Debtors seek authority to continue their

Customer Rebates and Allowances in the ordinary course of the Debtors' businesses.

274.    The Debtors' customers play a meaningful and irreplaceable role in the

promotion, marketing, and sale of the Debtors' consumer electronics products and Delphi-

branded aftermarket automotive parts.  The Customer Rebates and Allowances are an integral

part of the Debtors' incentive package to their customers and ensure that these customers actively

promote the Debtors' products.  Absent continued payment of the Customer Rebates and

Allowances, the Debtors cannot ensure that these customers will continue to actively and

effectively market their products.  The ultimate effect of a failure to honor the Customer Rebates

and Allowances in the ordinary course of the Debtors' businesses would likely be to decrease the

Debtors' long-term sales of their consumer electronics products and Delphi-branded aftermarket

automotive parts and the long-term prospects of many important product lines, to the detriment

of the Debtors' creditors and their estates.

275.    In essence, the Debtors desire to continue during the postpetition period

those Customer Programs that they believe were beneficial to their businesses and cost-effective

during the prepetition period.  The Debtors believe that such relief is necessary to preserve their

critical business relationships with their original equipment manufacturer customers  and to

promote goodwill among customers purchasing Delphi-branded products at retail establishments.

The total operational and administrative cost to the Debtors to continue the Customer Programs

is relatively insignificant in comparison to the revenue that such Customer Programs generate.

For the reasons set forth herein, it is in the best interests of the Debtors and their estates to

continue, in the ordinary course of their businesses, those of the Customer Programs that they determine to be beneficial.

276.    I believe that if the Debtors are precluded from honoring their Customer Programs, the Debtors' relationships with existing customers will be seriously jeopardized, and they will effectively lose the ability to attract new customers in the future.  Customers may, in the Debtors' opinion, cease doing business with the Debtors in such a scenario.  The Debtors' loss of existing and potential customers would, in their business judgment, eliminate an economic advantage disproportionate to the amount of the claims sought to be honored.

277.    The collective amount of prepetition obligations that the Debtors seek to honor in this motion is a reasonalbe price to pay to maintain the Debtors' enterprise value.  Indeed, the damage to the Debtors' prospects for rehabilitation and, hence, the cost to creditors as a whole would be immediate and irreparable if the Debtors were put in the position of having to advise customers that basic business obligations like consumer warranties and customer adjustments could no longer be honored.  The Debtors therefore believe that these estates as a whole will be better off, and clearly will be no worse off, if the Debtors are permitted to honor these claims in the ordinary course.

278.    Finally, there is no practical or legal alternative to the Debtors' honoring these prepetition obligations in the ordinary course; no other alternative will facilitate the Debtors' reorganization.  The Debtors cannot expect to survive in the face of the intense competition they face in their industry if they are denied the ability to honor such basic obligations as the consumer warranty obligations.

279.    I believe the relief requested is necessary and appropriate and is in the best interest of the Debtors' estates, creditors and other parties-in-interest.

T.    Motion for Order under 11 U.S.C. §§ 105, 363(b), 507(a)(8), 541, 1107 and 1108
Authorizing Debtors to Pay Prepetition Sales, Use, Trust Fund and Other Taxes
and Related Obligations

280.    The Debtors seek authority to pay prepetition sales, use, and other similar "trust fund" taxes, and other tax obligations detailed herein, to the respective authorities in the ordinary course of the Debtors' businesses.

281.    Sales Taxes And Use Taxes. The Debtors collect from customers and remit an assortment of state and local sales and gross receipts taxes (collectively, the "Sales Taxes") to various taxing, licensing, and other government authorities (collectively, the "Taxing Authorities").  On a periodic basis, typically monthly, the Debtors remit to the Taxing Authorities the Sales Taxes collected during the previous period.  Some Taxing Authorities require the Debtors to prepay the Sales Taxes.  The Debtors estimate that they owe approximately $100,000 in Sales Taxes to certain of the Taxing Authorities for periods prior to and including the Petition Date.

282.    The Debtors may also be responsible for the payment of use taxes (the "Use Taxes") when they purchase tangible personal property from suppliers.  Use Taxes arise when the Debtors purchase equipment from a supplier for use in a state in which the supplier has no business operations.  Without such nexus, the supplier is not obligated to collect or remit sales taxes.  Nevertheless, the purchasers, in this case the Debtors, are obligated to self-assess and pay the Use Taxes to the states or local taxing jurisdictions in which the personal property is used. The Debtors' obligations to self-assess and pay Use Taxes also arise in a number of states in which the Debtors have received authorization to self assess and remit Use Taxes.  The Debtors generally remit the Use Taxes to Taxing Authorities on a monthly basis.  The Debtors estimate that they owe approximately $3,800,000 in Use Taxes to certain of the Taxing Authorities for

periods prior to and including the Petition Date, less any payments made by the Debtors during the 30 days prior to the Petition Date.

283.  <u>Michigan Single Business Tax</u>. Michigan law imposes personal liability on certain officers of a corporation if that corporation fails to pay the Michigan Single Business Tax (the "MSB Tax").  The MSB Tax is a modified value-added tax and is the only general business tax levied by the State of Michigan.  The Debtors estimate that they owe approximately $1,200,000 in MSB Tax to the relevant Michigan taxing authority for periods prior to and including the Petition Date, less any payments made by the Debtors during the 30 days prior to the Petition Date.

284.  <u>Wisconsin Partnership Withholding Tax</u>.  Wisconsin law imposes personal liability on members, officers, employees, or other responsible persons of an entity that fails to pay the Wisconsin Partnership Withholding Tax (the "WPW Tax").  The WPW Tax is a withholding tax paid on behalf of the nonresident partners, members, shareholders and beneficiaries of a partnership, limited liability company, "S" corporation, estate, or trust for the privilege of doing business, or deriving income from property located, in the State of Wisconsin. The Debtors believe that, as of the Petition Date, no WPW Tax is owed to the relevant Wisconsin taxing authority, but seek authority to pay any amounts that subsequently might be determined to be owed for periods prior to the Petition Date, not to exceed $250,000 in the aggregate.

285.  <u>Franchise Taxes</u>. The Debtors pay franchise taxes and de minimis registration fees (collectively, the "Franchise Taxes") to certain of the Taxing Authorities so the Debtors can operate their businesses in the applicable taxing jurisdiction.  Some states assess a flat Franchise Tax on all businesses and other states assess a Franchise Tax based upon some

measure of income, gross receipts, net worth, or other measure of value. Certain states impose personal liability on the directors, officers, and employees of a corporation if that corporation fails to pay Franchise Taxes. Additionally, the Debtors failure to pay the Franchise Taxes could cause some states to challenge the Debtors' right to operate within their jurisdiction. Addressing any subsequent action taken by those states would be costly, place an administrative burden on management, and divert management's attention from the reorganization process. The Debtors estimate that they owe an aggregate amount of approximately $750,000 in Franchise Taxes to certain of the Taxing Authorities for periods prior to and including the Petition Date, less any payments made by the Debtors during the 30 days prior to the Petition Date.

286.    Business License Fees And Annual Report Taxes. Many municipal and county governments require the Debtors to obtain a business license and to pay corresponding business license fees (collectively, the "Business License Fees"). The criteria which require a company to obtain a business license and the manner in which the Business License Fees are computed vary greatly according to local tax laws. Some jurisdictions assess Business License Fees based on a flat fee, others upon the number of employees working in the jurisdiction, and others upon gross receipts. Certain state governments also require the Debtors to pay annual report or bi annual report taxes (collectively, the "Annual Report Taxes") in order to be in good standing for purposes of conducting business within that state. The Debtors believe that there are no prepetition Business License Fees or Annual Report Taxes owed, but seek authority to pay any amounts that subsequently might be determined to be owed for periods prior to the Petition Date, not to exceed $50,000 in the aggregate.

287.    Ohio Kilowatt-Hour Tax. As large, industrial users of electricity, the Debtors are currently qualified and registered in certain of their locations as "self-assessing

127

purchasers" for purposes of the Ohio Kilowatt-Hour Tax (the "KWH Tax").  In the event the

Debtors do not timely file and remit the self-assessed KWH Tax, the Ohio Commissioner of

Revenue may cancel the Debtors' ability to self-assess for a period of two years, in which case

the Debtors will be compelled to pay the KWH Tax at a non-self-assessment rate that is

approximately 39% higher than the Debtors' current rate, or an anticipated additional amount of

approximately $725,000 over the two-year period.  Non-payment of the KWH Tax also risks the

imposition of a 15% penalty and possibly the disruption of the delivery of electricity to the

Debtors' Ohio facilities.  The Debtors believe that, as of the Petition Date, no KWH Tax is owed

to the Ohio Commissioner of Revenue, but seek authority to pay any amounts that subsequently

might be determined to be owed for periods prior to the Petition Date, not to exceed $100,000 in

the aggregate.

   288. <u>Method Of Payment</u>.  As stated above, in connection with the normal

operation of their businesses, the Debtors incur and collect Sales Taxes, Use Taxes, the MSB

Tax, the WPW Tax, Franchise Taxes, Business License Fees, Annual Report Taxes, the KWH

Tax and other similar taxes (collectively, the "Prepetition Taxes").  The Prepetition Taxes are

paid to the Taxing Authorities on a periodic basis (monthly, quarterly, or yearly, depending on

the particular Prepetition Tax) with funds drawn by checks or by means of electronic fund

transfers.  Accordingly, to the extent any check or electronic transfer has not cleared the banks as

of the Petition Date, the Debtors request that this Court authorize and direct the banks, when

requested by the Debtors in their sole discretion, to receive, process, honor, and pay such checks

or electronic transfers.  To the extent the Taxing Authorities have otherwise not received

payment for all Prepetition Taxes owed, the Debtors seek authorization to issue checks, or to

128

provide for another means of payment, to the Taxing Authorities, to the extent necessary to pay all outstanding Prepetition Taxes.

289.    The Debtors believe that some, if not all, of the Taxing Authorities will cause the Debtors to be audited if the Prepetition Taxes are not paid immediately, and may even attempt to suspend the Debtors' business operations.  Such audits and disruptions in business activities will materially affect the Debtors' reorganization prospects and unnecessarily divert the Debtors' attention away from the prosecution of these chapter 11 cases.  Moreover, to the extent that certain of the Prepetition Taxes are "trust fund" taxes collected for third parties, the Debtors believe that such taxes are not property of the estates under section 541(d) of the Bankruptcy Code, and that the Debtors therefore have no equitable interest in these taxes.

290.    Without question, the payment of the Prepetition Taxes is necessary to avoid interruption of the Debtors' business activities.  A withholding of the payment of the Prepetition Taxes likely would cause taxing and other authorities to take precipitous action, including a marked increase in state audits, a flurry of lien filings or lift-stay motions, and significant administrative problems.  Prompt and regular payment of the Prepetition Taxes will avoid these unnecessary governmental actions.

291.    Most importantly, payment of the Prepetition Taxes is necessary because, in cases in which the Prepetition Taxes constitute "trust fund" taxes, many states have laws providing that certain officers and directors of the collecting entity may be held personally liable for the payment of such funds to the taxing or other authorities in certain circumstances.  To the extent that such Prepetition Taxes of the Debtors were unpaid as of the Petition Date in such jurisdictions, certain of the Debtors' officers and directors may be subject to lawsuits in such jurisdictions during the pendency of these proceedings.

292.    Such potential lawsuits would prove extremely distracting for the Debtors, for the named officers and directors whose immediate and full-time attention to the Debtors' reorganization process is required, and for this Court, which might be asked to entertain various motions seeking injunctions relating to potential state court actions.  It is in the best interests of the Debtors' estates and consistent with the reorganization policy of the Bankruptcy Code to eliminate the possibility of such time consuming and potentially damaging distractions.

293.    Accordingly, I believe that the relief requested herein is in the best interests of the Debtors, their estates, and creditors and should be approved.

U.    Motion For Order Under 11 U.S.C. §§ 105, 362, And 541 And Fed. R. Bankr. P. 3001 Establishing Notification And Hearing Procedures For Trading In Claims And Equity Securities

294.    The Debtors seek authorization to protect and preserve valuable tax attributes, including net operating loss carryforwards ("NOLs") of at least $1.5 billion, amortizable research and experimental expenditures ("R&E Amounts") of at least $1 billion, and other tax credits of at least $250 million ("Tax Credits," and together with the NOLs and R&E Amounts, "Tax Attributes") by establishing notice and hearing procedures regarding the trading of claims against, and equity securities in, the Debtors, that must be complied with as a precondition to the effectiveness of such trades or transfers.  If left unrestricted, such trading could severely limit the Debtors' ability to use a valuable asset of their estates – namely their Tax Attributes – and could have significant negative consequences for the Debtors, their estates, and the reorganization process.  To preserve to the fullest extent possible the flexibility to craft a plan of reorganization that maximizes the use of their Tax Attributes, the Debtors seek limited relief that will enable them to closely monitor certain transfers of claims and equity securities, so as to

be in a position to act expeditiously to prevent such transfers if necessary to preserve their Tax

Attributes.

295.   By establishing procedures for continuously monitoring claims-trading and

equity-securities-trading, the Debtors can preserve their ability to seek substantive relief at the

appropriate time if it appears that additional trading may jeopardize the use of their Tax

Attributes.   I believe that the requested relief imposes a minimal burden to achieve a substantial

benefit.   Accordingly, I believe that the relief requested herein is in the best interests of the

Debtors, their estates, and creditors and should be approved.

V.   Motion for Interim and Final Order under 11 U.S.C. §§ 105, 366, 503, And 507
     (I) Prohibiting Utilities From Altering, Refusing, Or Discontinuing Services On
     Account Of Prepetition Invoices And (II) Establishing Procedures For
     Determining Requests For Additional Assurance

296.   In the normal conduct of their business operations, the Debtors obtain

natural gas, water, electric, telephone, fuel, sewer, cable, telecommunications, internet, paging,

cellular phone, and other similar services (collectively, the "Utility Services") provided by

hundreds of utility companies and other providers (each a "Utility Company" and collectively,

the "Utility Companies").   The Utility Companies service the Debtors' corporate offices and

operations and their numerous facilities around the country.   I believe that uninterrupted utility

services are essential to ongoing operations, and, therefore, to the success of the Debtors'

reorganization.   Should the Utility Companies refuse or discontinue service, even for a brief

period, the Debtors' business operations would be severely disrupted.   The impact on the

Debtors' businesses, operations and revenue would be extremely harmful and would jeopardize

the Debtors' reorganization efforts.   I believe that it is it is therefore critical that utility services

continue uninterrupted.

297.   I believe that that the Debtors have provided sufficient assurances of their future performance with respect to the Utility Companies.  Furthermore, the adequate assurance method proposed in this motion is a reasonable accommodation of the interests of the Utility Companies and the Debtors.   Accordingly, I believe that the relief requested herein is in the best interests of the Debtors, their estates, and creditors and should be approved.

W.     Motion For Order Under 11 U.S.C. §§ 105, 361, 362, 363, 364(c), 364(d), And 364(E) And Fed. R. Bankr.  P. 2002, 4001, And 9014 (I) Authorizing Debtors To Obtain Secured Postpetition Financing On Superpriority Secured And Priming Basis, (II) Authorizing Use Of Cash Collateral, (III) Granting Adequate Protection To Prepetition Secured Lenders, (IV) Granting Interim Relief, And (V) Scheduling A Final Hearing Under Fed. R. Bankr. P. 4001(b) And (c)

298.     As discussed in the background section, the Debtors plan to finance its global operations going forward with $4.5 billion in debt facilities plus additional committed and uncommitted financing lines and/or securitization facilities in Asia, Europe, and the Americas. During the ordinary course of their operations, the Debtors generate cash from their use of their prepetition collateral (such cash, excluding receivables security, the "Cash Collateral").  The Debtors seek, among other things, authorization to use the Cash Collateral and to provide adequate protection (in the form described in further detail in the motion) to the prepetition agent and the prepetition secured lenders under the prepetition credit agreement.

299.   The Debtors' Efforts To Obtain Financing. The Debtors currently do not have any available sources of funds other than the Cash Collateral and the proposed DIP Financing to carry on the operation of their businesses.   The Debtors urgently require working capital to continue their operations.  The uncertainty concerning the Debtors' financial condition has curtailed the Debtors' availability of credit and acceptable credit terms.  More specifically, the Debtors' ability to maintain business relationships with their vendors and suppliers, to

132

purchase new inventory, and otherwise to finance their operations is dependent on their ability to use Cash Collateral and obtain the funds that would be made available under the DIP Financing.

300.    Any potential disruption of the Debtors' operations would be devastating at this critical juncture.  The Debtors' inability to obtain sufficient liquidity and to make payments on certain obligations on a timely basis may result in a permanent and irreplaceable loss of business, causing a loss of value to the detriment of the Debtors and all parties-in-interest.  In light of the foregoing, the Debtors have determined, in the exercise of their sound business judgment, that the DIP Financing is critical to their ongoing operations in the ordinary course.

301.    The Debtors have been unable to obtain credit from any source on terms more favorable than those offered pursuant to the Financing.  Prior to the Petition Date, the Debtors surveyed various sources of debtor-in-possession financing from a number of global financial institutions.  The Debtors obtained proposals for debtor-in-possession financing from various global financial institutions.  Collectively, these institutions provided four debtor-in-possession financing proposals that would require senior "priming" liens and four proposals that would refinance in full the Prepetition Debt.  After exhaustive negotiations involving their financial and legal advisors, the Debtors concluded that the Financing offered by the Agent presented the best option available and would enable the Debtors to preserve their value as a going concern.  The proposal received from the Agent is competitive and addresses the Debtors' working capital and liquidity needs.

302.    The DIP Credit Agreement.  Prior to the Petition Date, the Debtors engaged in good-faith and extensive, arm's-length negotiations with the JPMorgan Chase Bank, N.A. the ("Agent") and Citicorp USA, Inc. ("CUSA").  These negotiations culminated in an

agreement by the Agent and CUSA to provide debtor-in-possession financing on the terms and subject to the conditions set forth in the DIP Credit Agreement and the interim order.

303.    <u>Use of Cash Collateral</u>.  Each a Debtor, have pledged substantially all of their assets to their prepetition agent for the benefit of the prepetition secured lenders.  The Debtors use this cash in the normal course of their businesses in order to continue to finance their operations, make essential payments such as employee salaries, payroll, taxes, the purchase of goods, materials, and other general corporate and working capital purposes in the ordinary course of the Debtors' businesses generally.  As of the Petition Date, the Debtors have a cash balance of approximately $500 million.  The Debtors require continued use of this Cash Collateral in order to pay their ongoing obligations and otherwise operate their business.  The Debtors need the use of the Cash Collateral in addition to the use of the cash collateral generated by the receivables security.

304.    <u>Adequate Protection</u>. The Debtors and the prepetition agent have discussed the terms upon which the prepetition agent believes the prepetition secured lenders would consent to the Debtors' use of the prepetition secured lenders' Cash Collateral and the granting of priming liens on the prepetition collateral under section 364(d)(1) of the Bankruptcy Code described herein.  The parties have agreed that the prepetition secured lenders and the prepetition agent shall receive, among other adequate protection provided for in the interim order and described in the motion.

305.    The Debtors' ability to fulfill their working capital needs can be satisfied only if the Debtors are authorized to borrow under the DIP Credit Agreement and to use such proceeds to fund the operations of the Debtors. The credit provided under the DIP Credit Agreement will enable the Debtors to continue financing their operations, pay their employees,

vendors, and suppliers, and operate their businesses in an orderly and reasonable manner to preserve and enhance the value of their assets and enterprise for the benefit of all parties-in-interest.  Moreover, the availability of credit under the DIP Credit Agreement will provide employees, vendors, and suppliers and other parties with confidence in the Debtors that will enable and encourage them to resume ongoing credit relationships with the Debtors.   Finally, the implementation of the Financing will be viewed favorably by the Debtors' employees and outside parties and thereby help promote the Debtors' successful reorganization.

306.    A working capital facility of the type and magnitude needed in these chapter 11 cases could not have been obtained on an unsecured basis.  Potential sources of the proposed DIP Financing for the Debtors, obtainable on an expedited basis and on reasonable terms, were extremely limited.

307.    The Debtors have exercised sound business judgment in determining that a debtor-in-possession credit facility is appropriate and have satisfied the legal prerequisites to borrow under the DIP Credit Agreement.  The terms of the DIP Credit Agreement are fair and reasonable and are in the best interests of the Debtors' estates.  Accordingly, the Debtors should be granted authority to enter into the DIP Credit Agreement and borrow funds from the DIP Lenders on the secured, administrative superpriority basis described above, pursuant to section 364(c) of the Bankruptcy Code, and take the other actions contemplated by the DIP Credit Agreement and as requested herein.

308.    Without the liquidity provided by the DIP Financing, the Debtors will be unable to pay suppliers, employees, and other constituencies that are essential to the orderly operation of their businesses.  The Debtors' managers have exercised their best business judgment in negotiating the DIP Financing that is presently before this Court.

135

309.    No party-in-interest can contend seriously that the Debtors do not need immediate access to a working capital facility.  As with most other large businesses, the Debtors have significant cash needs.  Access to substantial credit is necessary to meet the day-to-day costs associated with maintaining business relationships with the Debtors' vendors and suppliers, purchasing new inventory, and otherwise financing their operations.  Access to sufficient cash is therefore critical to the Debtors.  In the absence of immediate access to cash and credit, the Debtors' suppliers will refuse to sell critical supplies and services to the Debtors, and the Debtors will be unable to operate their businesses.  The inability to meet payments to vendors and satisfy customers' desires for particular products would impair seriously the Debtors' prospects for reorganization.

310.    For these reasons, I believe that access to credit under the DIP Financing is critical.  The Debtors cannot wait for the beneficial effects of the DIP Financing, any substantial delay could have the same impact as denial of this motion.  Accordingly, I believe that the relief requested is necessary and appropriate and is in the best interest of the Debtors' estates, creditors and other parties-in-interest.

X.      Motion For Order Under 11 U.S.C. §§ 361 And 363(b) And Fed R. Bankr. P. 4001(c) Authorizing Debtors To Continue Honoring Prepetition Insurance Premium Finance Agreement And Continue The Grant Of A Security Interest To Insurance Premium Finance Company

311.    The Debtors seek to continue honoring their obligations pursuant to a prepetition insurance premium finance agreement for the purpose of financing the purchase of several forms of insurance coverage, and continue the grant of a security interest to the insurance premium finance company in all sums payable to Delphi under the financed insurance policies.

312.    Since February 5, 2005, Delphi has financed certain of its fiduciary, directors and officers, and employment practices liability insurance (collectively, the "Insurance

136

Policies") pursuant to a Commercial Insurance Premium Finance and Security Agreement (the

"Finance Agreement") between Delphi and Cananwill, Inc. ("Cananwill"), dated February 21,

2005.  The Insurance Policies are essential to the preservation of the Debtors' businesses,

properties, and assets.  In some cases the coverage is required by regulations, laws, and/or

contracts that govern the Debtors' business obligations.

313.    In total, Delphi is financing approximately 20 Insurance Policies under the

Finance Agreement.  Delphi has financed the Insurance Policies to take advantage of favorable

interest rates under the Finance Agreement and to increase liquidity.  Pursuant to the Finance

Agreement, Cananwill agreed to pay in advance to Delphi's insurance carriers the sum of

$6,099,339.65, which constitutes the full annual insurance premium for each of the Insurance

Policies.  In exchange, the Finance Agreement required Delphi to pay Cananwill a cash down

payment of $564,992.11 and to make 11 monthly payments, each in the amount of $564,992.11,

starting on March 1, 2005.  The Finance Agreement further provided for Cananwill to receive a

finance charge in the amount of $115,573.56.  In addition, the Finance Agreement includes a

security agreement which grants to Cananwill a security interest in all sums payable to Delphi

under the Insurance Policies, including any gross return premiums that would be payable in the

event of cancellation of the Insurance Policies (the "Unearned Premiums") and loss payments

that reduce the Unearned Premiums.  Thus, as discussed below, Cananwill likely is entitled to

adequate protection in the form of payment under the Finance Agreement.  As of the Petition

Date, Delphi owed Cananwill a total of approximately $1.7 million under the Finance

Agreement.

314.    In the Debtors' business judgment, the terms of the Finance Agreement

represent the best possible terms for financing the premiums of the Insurance Policies.  Under the

Finance Agreement, the Debtors are being charged an annual interest rate of just 3.77%. The

Debtors' estates will benefit by maintaining this low-cost financing from Cananwill. Moreover,

any interruption of payments might adversely affect the Debtors' ability to obtain financing for

future policies on favorable terms.

315.    Although the Insurance Policies cover certain of the Debtors' foreign, non-

Debtor affiliates, the Debtors do not allocate any of the premiums to such affiliates. The Debtors

base their allocation of their insurance costs on exposure or past losses. The vast majority of the

exposure resides in the U.S. Debtors, and there is no history of a non-U.S. claim being made

under the Insurance Policies in an amount that approaches the amount of the Debtors' deductible

thereunder.

316.    I believe that the relief requested is necessary and appropriate and is in the

best interest of the Debtors' estates, creditors and other parties-in-interest.

Y.    Motion For Order Under 11 U.S.C. §§ 105, 363, 1107, And 1108 And Fed. R.
      Bankr. P. 4001 Authorizing Debtors To Enter Into, Continue Performance Under,
      And Provide Credit Support Under Derivative Contracts

317.    The Debtors seek an order authorizing, but not directing, the Debtors to (a)

continue entering into, "rolling over," adjusting, modifying, and settling Derivative Contracts (as

defined below) for the purpose of hedging the Debtors' risk to fluctuations in foreign currency

exchange rates, commodity prices, and changes in interest rates, (b) continue performing under

their existing hedging and derivative contracts, and (c) perform all such other actions (the

"Ancillary Transactions") necessary or appropriate to implement, execute, and perform such

transactions, including, but not limited to, posting collateral or margin, and delivery of

settlement, on account of Derivative Contracts.

318.    The Debtors' businesses are sensitive to fluctuations in foreign currency exchange rates, commodity prices, and changes in interest rates.  The Debtors maintain a centralized hedging program that consists of entering into derivative contracts to mitigate the risks associated with such fluctuations.  Derivative contracts are financial contracts, the values of which are based on the price of a traditional security such as a stock or bond, an asset such as a commodity, or a market index (collectively, the "Derivative Contracts").

319.    Derivative contracts can take a number of different forms, including forward contracts, swap contracts, option contracts, or combinations of the foregoing.  A forward contract obligates the purchaser of such contract to acquire a security or asset on a specified date in the future at a specified price.  If, on the specified date, the actual price of the security or asset is higher than the specified price in the contract, the purchaser will profit; if the actual price is lower than the price specified in the contract, the purchaser will incur a loss.

320.    A swap contract obligates each party to the contract to exchange or swap cash flows at specified intervals.  For example, an interest rate swap contract might obligate one party to pay a cash flow calculated at a fixed rate of interest on a hypothetical principal amount, known as a notional amount, while the other party might be obligated to pay a cash flow calculated at a floating rate of interest on the same notional amount.

321.    An option contract provides the purchaser the right, but not the obligation, to purchase a security or asset at a specified price on a specified date.  Each of these contracts may be used for purposes of hedging or reducing risk or for purposes of speculating on the prices of underlying securities, assets, or indices.

322.    Fluctuations in the price of copper, primary and secondary aluminum, platinum, palladium, and natural gas (collectively, the "Commodities") significantly affect the

Debtors' operations. Consequently, the Debtors historically have entered into derivative

contracts with respect to 60% to 80% of their Commodities requirements. The Debtors have

entered into swap contracts with numerous global banks, for periods that typically extend for up

to three years, to hedge (or reduce) the risks associated with such fluctuations in the

Commodities.

323.   The amount of the Commodities that is hedged by the Debtors in any

particular year and at any particular time is dependent on a variety of factors relating to the price

of the Commodities and the relative cost of entering into swap contracts to hedge their exposure

to fluctuations.

324.   In addition, because of the international scope of the Debtors' businesses,

fluctuations in foreign currency exchange rates may significantly affect their operations. To

manage or reduce the risks associated with fluctuations in foreign currency exchange rates, the

Debtors have entered into Derivative Contracts related to over 24 pairs of currencies. The

Debtors have entered into such contracts with numerous global banks for periods that typically

extend up to 24 months.

325.   As of the Petition Date, the Debtors have entered into Derivative Contracts

to hedge approximately $$1.5 billion of their foreign currency exposure. Entering into these

Derivative Contracts enables the Debtors to limit substantially their exposure to fluctuations in

the foreign currency exchange rates around the world.

326.   Generally, Derivative Contracts entered into by the Debtors are

documented in the form of (a) master agreements, (b) confirmations issued under general terms

and conditions, or (c) single transaction agreements (collectively, the "Transaction

Agreements").  The Transaction Agreements set forth the terms and conditions that govern the
transactions entered into between the Debtors and the counterparties from time to time.

327.    The Debtors and the counterparties use the ISDA Master Agreement when
a master agreement is employed.  The Debtors and the counterparties then enter into individual
transactions under the ISDA Master Agreement.  These individual transactions are customarily
documented in the form of confirmations, which set forth, among other terms and conditions,
specified methods for calculation of payment amounts and specified payment dates for financial
transactions.

328.    Under the Transaction Agreements, proper termination upon an early
termination event, whether the transactions under the Transaction Agreements are forward
contracts, option agreements, swap agreements, or otherwise, is typically accomplished by (a)
both parties ceasing all further performance under the transactions, (b) one party determines that
the other is in default and specifies the amounts payable by each party to the other party at the
time of termination, and (c) the "netting" of the amounts due to and from each party, thereby
reaching a net settlement amount payable by one party (the "Termination Payment").

329.    Under many Transaction Agreements, a Termination Payment would be
payable by either the defaulting party or the non-defaulting party.  Thus, termination could, and
often will, result in a net payment to the Debtors.  These "in the money" agreements, where an
embedded net amount due to the Debtors is present, constitute significant assets of the Debtors'
estates.

330.    Moreover, many Transaction Agreements expressly address the rights of
setoff and netting.  Some agreements may restrict common law setoff rights.  Other agreements

may expand setoff and netting rights to include multiple Transaction Agreements and multiple

affiliates of the contracting parties.

331.    To effectively manage risks inherent in the Debtors' businesses, the

Debtors must be able to enter quickly into Derivative Contracts and must be able to maintain the

confidentiality of the basic terms of the Derivative Contracts.  Given the confidential and

immediate nature of entering into Derivative Contracts, it is impracticable and counterproductive

to require the Debtors to seek separate bankruptcy court approval of each Derivative Contract.

332.    The Debtors, accordingly, believe it is necessary and appropriate to obtain

from this Court an order that confirms the Debtors' authority to continue their customary

practices regarding the Derivative Contracts to overcome the concerns of their counterparties.

333.    I believe the relief requested is necessary and appropriate and is in the best

interest of the Debtors' estates, creditors and other parties-in-interest.

Z.      Application For Order Under 11 U.S.C. §§ 327(a) And 329 And Fed. R. Bankr. P.
        2014 And 2016 (I) Authorizing Employment And Retention Of Skadden, Arps,
        Slate, Meagher & Flom LLP And Affiliated Law Practice Entities As Attorneys
        For Debtors-In-Possession And (II) Scheduling Final Hearing Thereon

334.    The Debtors seek to employ and retain the firm of Skadden, Arps, Slate,

Meagher & Flom LLP ("Skadden") to represent the Debtors as their principal restructuring and

bankruptcy counsel in connection with the filing of their chapter 11 petitions and prosecution of

their chapter 11 cases.  The Debtors have selected Skadden as their attorneys because of its

experience and knowledge in the field of debtors' and creditors' rights and business

reorganizations under chapter 11 of the Bankruptcy Code.  Since July 12, 2005, Skadden has

performed extensive legal work for the Debtors in connection with their ongoing restructuring

efforts and has provided advice regarding, without limitation, their efforts to effectuate a

consensual resolution with General Motors Corporation and the Debtors' major unions.  In

142

addition, prior to commencement of these chapter 11 cases, the Debtors sought the services of

Skadden with respect to, among other things, advice regarding restructuring matters in general

and, if required,  preparation for the potential commencement and prosecution of chapter 11

cases for the Debtors.

335.    I believe that continued representation by their prepetition restructuring

counsel, Skadden, is critical to the Debtors' efforts to restructure their businesses because

Skadden has become familiar with the Debtors' business and financial and legal affairs and,

accordingly, is well-suited to guide the Debtors through the chapter 11 process.

AA.    Application For Order Under 11 U.S.C. §§ 327(e) And 328(a) And Fed. R. Bankr.
P. 2014(a) (I) Authorizing Employment And Retention Of Togut, Segal & Segal
LLP As Conflicts Counsel For Debtors And (II) Scheduling Hearing Thereon

336.    The Debtors seek to employ Togut, Segal & Segal LLP ("TS&S") a as

their conflicts counsel in connection with these chapter 11 cases to handle matters that the

Debtors may encounter which are not appropriately handled by Skadden and other professionals

because of a potential conflict of interest or, alternatively, which can be more efficiently handled

by TS&S. This will avoid unnecessary litigation and reduce the overall expense of administering

these chapter 11 cases.  Having been involved in several cases where it has previously served as

conflicts counsel, TS&S has found that the relationship works best when counsel has a duty to

immediately inform TS&S of any bankruptcy-related matter where there is any involvement of

another client of the relevant counsel's firm, even if the Debtor is not adverse to that client.  In

that way and in this case, counsel is free to advise the Debtors without any appearance of bias.

As soon as TS&S is notified of a transaction affecting a Skadden or another counsel's client, it

becomes TS&S' responsibility to advise the Debtors on any aspect of the bankruptcy-related

transaction, motion or litigation as it affects such other client.  This best serves the Debtors'

fiduciary obligation to all creditors.

337.    I am aware that the Debtors are applying to retain Skadden as the Debtors' general bankruptcy counsel, Shearman & Sterling as the Debtors' special counsel, O'Melveny as the Debtors' special labor counsel, Groom as the Debtors' special employee benefits counsel, and the other professionals retained by the Debtors to perform specific tasks that are unrelated to the work to be performed by TS&S as conflicts counsel to the Debtors.  The retention of TS&S as special counsel will enhance the employment of the Debtors' general bankruptcy counsel to represent the Debtors generally and to assist them in carrying out their duties under these chapter 11 cases. I understand that TS&S will work with the other professionals retained by the Debtors to avoid any such duplication.

BB.    Application For Order Under 11 U.S.C. §§ 327(e) And 328(a) And Fed. R. Bankr. P. 2014 (I) Authorizing Employment And Retention Of Shearman & Sterling LLP As Special Counsel For Debtors And (II) Scheduling Final Hearing Thereon

338.    The Debtors request the entry of an order, authorizing the Debtors to retain and employ the law firm of Shearman & Sterling LLP ("Shearman & Sterling") on a general retainer, as counsel to the Debtors in these chapter 11 cases.

339.    The Debtors seek to retain Shearman & Sterling because:  (a) the Debtors believe that Shearman & Sterling is well qualified to act as special counsel; (b) prior to the Petition Date, Shearman & Sterling actively represented the Debtors with regard to their prepetition financing, their debtor in possession financing, European financing matters, general corporate matters, securities law matters, certain litigation and employment matters, general planning for their chapter 11 cases, and preparation of various "First Day Motions" in connection with these chapter 11 cases; and (c) the Debtors believe that continuation of such representation is in the best interests of the estates.

340.    The Debtors believe that Shearman & Sterling's services will not be duplicative of the services to be provided by Skadden as the Debtors' general bankruptcy

144

counsel, O'Melveny and Meyers LLP, the Debtors' special labor counsel, Groom Law Group

Chartered the Debtors' special employee benefits counsel, and the other professionals retained by

the Debtors to perform specific tasks that are unrelated to the work to be performed by Shearman

& Sterling as special counsel to the Debtors.  Rather, the retention of Shearman & Sterling as

special counsel will enhance the employment of the Debtors' general bankruptcy counsel to

represent the Debtors generally and to assist them in carrying out their duties under chapter 11.

The Debtors understand that Shearman & Sterling will work with the other professionals retained

by the Debtors to avoid any duplication of services.

341.    Accordingly, I believe that Shearman & Sterling is well qualified to act as

special counsel on behalf of the Debtors in these cases.

CC.    Application For Order Under 11 U.S.C. §§ 327(e) And 1107(a) (I) Authorizing
       Employment And Retention Of Groom Law Group Chartered As Special
       Employee Benefits Counsel To Debtors And (II) Scheduling Final Hearing
       Thereon

342.    The Debtors desire to retain and employ Groom Law Group Chartered

("Groom") as their special employee benefits counsel in these chapter 11 cases.  Groom has

performed similar work for the Debtors in the past and is therefore familiar with the Debtors'

businesses and operations.  In particular, I understand Groom is especially attuned to the unique

employee benefits issues that arise in the Debtors' industry.  Most importantly for present

purposes, several members of Groom have extensive experience in employee benefits law and its

interplay with restructuring and bankruptcy law.  Accordingly, I believe that Groom is well

qualified to serve as special employee benefits counsel in these chapter 11 cases in an efficient

and effective manner.

343.    I believe that the employment of Groom will enhance and will not

duplicate the employment of Skadden, the Debtors' general bankruptcy counsel, Shearman &

145

Sterling, the Debtors' special counsel, O'Melveny, the Debtors' special labor counsel, and the

employment of other professionals retained by the Debtors to perform specific tasks that are

unrelated to the work to be performed by Groom as special employee benefits counsel to the

Debtors.  I understand that Groom will work with the other professionals retained by the Debtors

to avoid any such duplication.

> DD.    Application For Order Under 11 U.S.C. §§ 327(e) And 1107(a) (I) Authorizing
> Employment And Retention Of O'Melveny & Myers LLP As Special Labor
> Counsel To Debtors And (II) Scheduling Final Hearing Thereon

344.    The Debtors desire to retain O'Melveny & Myers LLP ("O'Melveny") as

their special labor counsel in these chapter 11 cases.  Prior to the petition date, O'Melveny has

performed work for the Debtors in connection with these chapter 11 cases and is familiar with

the Debtors' businesses and operations.  In particular, O'Melveny is especially attuned to the

unique labor issues that arise in the Debtors' industry.

345.    More generally, O'Melveny is a full service international law firm, and

attorneys at O'Melveny provide legal services in virtually every major practice area, including

corporate and securities, litigation, intellectual property, banking, tax, employee benefits, real

estate, government regulation, and international trade.  I understand that O'Melveny has

significant experience in providing labor advice to companies with regard to employers'

obligations and rights under sections 1113 and 1114 of the Bankruptcy Code and under the

Employee Retirement Income Security Act of 1974.  Accordingly, I believe that O'Melveny is

both well-qualified and uniquely able to represent the Debtors as their special labor counsel in

these chapter 11 cases in a most efficient and timely manner.

346.    I believe that the employment of O'Melveny will enhance and will not

duplicate the employment of Skadden, the Debtors' general bankruptcy counsel, the employment

of Shearman & Sterling as special counsel, the employment of Groom Law Group Chartered, as

special employee benefits counsel, and the employment of other professionals retained by the

Debtors to perform specific tasks that are unrelated to the work to be performed by O'Melveny as

special labor counsel to the Debtors.  I understand that O'Melveny will work with the other

professionals retained by the Debtors to avoid any such duplication.

      EE.    Application For Order Under 11 U.S.C. §§ 327(a) And 328 (I) Authorizing
              Employment And Retention Of Rothschild Inc. As Financial Advisor And
              <u>Investment Banker To Debtors And (II) Scheduling Final Hearing Thereon</u>

       347.    The Debtors seek to employ and retain Rothschild Inc. ("Rothschild") as

financial advisor and investment banker with regard to certain restructuring matters in

connection with the Debtors' chapter 11 cases.  Rothschild is a member of one of the world's

leading independent investment banking groups, with expertise in domestic and cross-border

mergers and acquisitions, restructurings, privatization advice, and other financial advisory

services, and with particular experience in providing high-quality investment banking and

financial advisory services to financially troubled companies.

       348.    Since May 1, 2005, Rothschild has provided services to the Debtors in

connection with the Debtors' restructuring efforts.  Rothschild provides a broad range of

corporate advisory services, including services pertaining to general financial advice and

corporate restructuring.  The resources, capabilities, and experience of Rothschild in advising the

Debtors are crucial to the Debtors' successful restructuring.  I believe that an experienced

financial advisor and investment banker, such as Rothschild, fulfills a critical service that

complements the services provided by the Debtors' other professionals.

       349.    I am aware that the Debtors have submitted applications relating to the

proposed retention and employment of additional professionals in connection with these chapter

147

11 cases, including FTI Consulting, Inc., and Kurtzman Carson Consultants LLC.  The services

to be provided by Rothschild are not intended to duplicate the services of these or any other

proposed professional to the Debtors, and Rothschild will make every effort to avoid duplicating

the work performed by such other professionals retained by the Debtors.

FF.    Application For Order Under 11 U.S.C. § 327(a) And Fed. R. Bankr. P. 2014 And
2016 (I) Authorizing Employment And Retention Of FTI Consulting, Inc. As
Restructuring Advisors To Debtors And (II) Scheduling Final Hearing Thereon

350.    The Debtors desire to retain FTI Consulting, Inc. ("FTI") as their

restructuring and financial advisors to provide such restructuring advisory services as FTI and

the Debtors deem appropriate and feasible in order to advise the Debtors and their subsidiaries

and affiliates in the course of these chapter 11 cases.  I understand that FTI is well experienced in

providing restructuring and financial advisory services in restructurings and reorganizations, and

that it is well respected for services it has rendered in large and complex chapter 11 cases on

behalf of debtors and creditors throughout the United States.  In addition, FTI has significant

experience in the automotive industry and is involved in numerous chapter 11 cases in these

context.

351.    FTI has developed a great deal of institutional knowledge regarding the

Debtors' operations, finances, and systems.  Such experience and knowledge will be valuable to

the Debtors in their efforts to reorganize.  Accordingly, I believe that FTI is well qualified to

provide restructuring advisory services to the Debtors during these chapter 11 cases.

352.    I am aware that the Debtors have filed an application to retain Rothschild

as financial advisors and investment bankers to the Debtors.  FTI will work closely with

Rothschild to ensure that the services provided by each firm are complementary and not

duplicative.

148

GG.     Application For Order Under 28 U.S.C. § 156(c) Authorizing Retention And
        Appointment Of Kurtzman Carson Consultants LLC As Claims, Noticing, And
        Balloting Agent For The Clerk Of The Bankruptcy Court

353.    The Debtors seek entry of an order authorizing the retention and

appointment of KCC as claims, noticing, and balloting agent to, among other things, (a)

distribute required notices to parties-in-interest, (b) receive, maintain, docket, and otherwise

administer the proofs of claims filed in the these chapter 11 cases, (c) tabulate acceptances and

rejections of the Debtors' plan(s) of reorganization, and (d) provide such other administrative

services that the Debtors may require.

354.    The Debtors estimate that there are potentially in excess of one hundred

thousand creditors and other parties-in-interest involved in the Debtors' cases, many of whom are

expected to file proofs of claim and to whom certain notices, including notice of the

commencement of these chapter 11 cases, and voting documents, must be sent.  The noticing that

will be required in these chapter 11 cases as well as the receiving, docketing and maintenance

of proofs of claim would be unduly time consuming and burdensome for the office of the

Clerk of this Court.  I believe that the most effective and efficient manner by which to

accomplish the process of receiving, docketing, maintaining, photocopying, and transmitting

proofs of claim in these cases is for them to engage an independent third party to act as an agent

of this Court.

355.    KCC is a data processing firm that specializes in noticing, claims

processing, and other administrative tasks in chapter 11 cases.  The Debtors wish to engage KCC

to send out certain designated notices, to maintain claims files and a claims register, and to act as

voting agent with respect to certain creditors in these chapter 11 cases.  The Debtors believe that

such assistance will expedite service of Bankruptcy Rule 2002 notices, streamline the claims

administration process, and permit the Debtors to focus on their reorganization efforts.

356.    I believe that the relief requested is necessary and appropriate, and is in the

best interest of the Debtors' estates, creditors and other parties-in-interest.

HH.    Motion For Order Under 11 U.S.C. §§ 327, 330, And 331 Authorizing Retention
Of Professionals Utilized By Debtors In Ordinary Course Of Business

357.    The Debtors customarily retain the services of various attorneys,

accountants, and other professionals to represent them in matters arising in the ordinary course of

business (collectively, the "Ordinary Course Professionals").  The Debtors seek authorization but

not direction (a) to retain Ordinary Course Professionals without the necessity of a separate,

formal retention application approved by this Court for each Ordinary Course Professional and

(b) to compensate the Ordinary Course Professionals for postpetition services rendered, subject

to certain limits set forth below, without the necessity of additional Court approval.

358.    Prior to the filing of their chapter 11 petitions, Ordinary Course

Professionals rendered services to the Debtors consisting of, among other things, (a) tax

preparation and other tax advice, (b) legal advice pertaining to various corporate and intellectual

property matters, (c) legal representation in respect of personal injury, commercial and

employment matters, and (d) real estate brokerage.

359.    The Debtors propose that they be permitted to pay, without formal

application to this Court by any Ordinary Course Professional, 100% of the postpetition fees and

disbursements to each Ordinary Course Professional upon the submission to the Debtors of an

appropriate invoice setting forth in reasonable detail the nature of the services rendered after the

Petition Date.  Except as provided below, the Debtors believe that such fees and disbursements

will not exceed either (a) $60,000 per month per Ordinary Course Professional or (b) $900,000

in the aggregate per Ordinary Course Professional over the life of these chapter 11 cases.

360.    The Debtors currently employ the following Ordinary Course Professionals

which the Debtors would expect regularly to submit invoices for services in excess of the

$60,000 per month limit:  (a) Baker & Daniels; (b) Butzel, Long; (c) Cadwalader Wickersham &

Taft LLP; (d) Covington & Burling LLP; (e) Cantor Colburn LLP; (f) Equis Corporation;  (g)

Ernst & Young LLP; (h) Howard & Howard Attorneys, P.C.; (i) Jones Day; (j) Jones Lang

LaSalle; (k) Price, Heneveld, Cooper, DeWitt; (l) Rader Fishman & Grauer; and (m) Wilmer

Cutler Pickering Hale & Door, LLP (collectively, the "Key Ordinary Course Professionals").

The Debtors believe, however, that the fees and disbursements to be paid to Key Ordinary

Course Professionals should not exceed $125,000 per month per Key Ordinary Course

Professional.

361.    The Debtors propose that the procedures for payment of Key Ordinary

Course Professionals be the subject of a protocol to be established by the Joint Fee Review

Committee, as contemplated by the Motion For Administrative Order Under 11 U.S.C. § 331

Establishing Procedures For Interim Compensation And Reimbursement Of Professionals, filed

contemporaneously herewith.  The Debtors further propose that the Key Ordinary Course

Professionals (a) be authorized to continue to render services to the Debtors pending the

establishment of such protocol and (b) not be required to file a formal retention application

unless required to do so by the Joint Fee Review Committee.

362.    The Debtors also request that they be authorized but not directed to employ

and retain additional Ordinary Course Professionals in their sole discretion without the need to

file individual retention applications for each by filing with this Court a supplement listing the

name of the additional Ordinary Course Professional and whether such professional is to be a

Key Ordinary Course Professional, along with a brief description of the services to be rendered

and will be served upon the U.S. Trustee, counsel for the creditors' committee, and counsel for

the agent under the Debtors' proposed postpetition credit facility, without the need for any further

hearing or notice to any other party.

363.    Accordingly, I believe that the relief requested in this motion is necessary

and appropriate, and is in the best interests of the Debtors, their estates and their creditors.

PART III

Information Required By Local
Bankruptcy Rule 1007-2

364.    Local Bankruptcy Rule 1007-2 requires certain information related to the

Debtors, which is set forth below.

365.    Pursuant to Local Bankruptcy Rule 1007-2(a)(4), Schedule 1 hereto lists

the following information with respect to each of the holders of the Debtors' 50 largest unsecured

claims on a consolidated basis, excluding claims of insiders:  the creditor's name, address

(including the number, street, apartment or suite number, and zip code, if not included in the post

office address); and telephone number; the name(s) of person(s) familiar with the debtors'

accounts, the amount of the claim, and an indication of whether the claim is contingent,

unliquidated, disputed or partially secured.  In each case, the claim amounts listed on Schedule 1

are estimated and subject to verification.  In addition, the Debtors reserve their rights to assert

remedies, defenses, counterclaims and offsets with respect to each claim.

366.    Pursuant to Local Bankruptcy Rule 1007-2(a)(5), Schedule 2 hereto

provides the following information with respect to each of the holders of the five largest secured

claims against the Debtors on a consolidated basis: the creditor's name and address (including the

152

number, street, apartment or suite number, and zip code, if not included in the post office

address); the amount of the claim; a brief description of the claim; an estimate of the value of the

collateral securing the claim and whether the claim or lien is disputed. In each case, the claim

amounts and collateral values listed on Schedule 2 are estimated and subject to verification. In

addition, the Debtors reserve their rights to assert remedies, defenses, counterclaims and offsets

with respect to each claim.

367.    Pursuant to Local Bankruptcy Rule 1007-2(a)(6), Schedule 3 hereto

provides a summary of the Debtors' assets and liabilities on a consolidated basis.

368.    Pursuant to Local Bankruptcy Rule 1007-2(a)(7), Schedule 4 hereto

provides the following information: the number and classes of shares of stock, debentures and

other securities of the Debtors that are publicly held and the number of holders thereof; the

number and classes of shares of stock, debentures, and other securities of the Debtors that are

held by the Debtors' officers and directors and the amounts so held.

369.    Pursuant to Local Bankruptcy Rule 1007-2(a)(8), Schedule 5 hereto

provides a list of all of the Debtors' property in the possession or custody of any custodian,

public officer, mortgagee, pledgee, assignee of rents or secured creditor, or agent for any such

entity, giving the name, address, and telephone number of such entity and the court in which any

proceeding relating thereto is pending.

370.    Pursuant to Local Bankruptcy Rule 1007-2(a)(9), Schedule 6 hereto

provides a list of the premises owned, leased or held under other arrangement from which the

Debtors operate their businesses.

371.    Pursuant to Local Bankruptcy Rule 1007-2(a)(10), Schedule 7 hereto

provides the location of the Debtors' substantial assets, the location of their books and records,

and the nature, location and value of any assets held by the Debtors outside the territorial limits of the United States.

372.   Pursuant to Local Bankruptcy Rule 1007-2(a)(11), Schedule 8 hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property.

373.   Pursuant to Local Bankruptcy Rule 1007-2(a)(12), Schedule 9 hereto provides a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

374.   Pursuant to Local Bankruptcy Rule 1007-2(b)(1)-(2)(A), Schedule 10 hereto provides the estimated amount of weekly payroll to the Debtors' employees on a consolidated basis (not including officers, directors and stockholders) and the estimated amount to be paid to officers, stockholders, directors and financial and business consultants retained by the Debtors, for the 30 day period following the filing of the Debtors' chapter 11 petitions.

375.   Pursuant to Local Bankruptcy Rule 1007-2(b)(3), Schedule 11 hereto provides, for the 30 day period following the filing of the chapter 11 petition, a list of estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees on a consolidated basis.

<u>Conclusion</u>

I hereby certify that the foregoing statements are true and correct to the best of my

knowledge information and belief, and respectfully request that all of the relief requested in the

First Day Motions be granted, together with such other and further relief as is just.


*Robert S. Miller, Jr.*
Robert S. Miller, Jr.
Chairman and Chief Executive Officer


Sworn to before me this 8th
day of October, 2005.


*Michelle Piscitelli*
Notary Public

Michelle Piscitelli
Notary Public, State of MI
County of Oakland
My Commission Expires Sept. 22, 2007
Acting in the County of Oakland