SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------ x
                               :
    In re                      :    Chapter 11
                               :
DELPHI CORPORATION,            :    Case No. 05-_____ (___)
                               :
                    Debtor.    :    (Jointly Administered)
                               :
------------------------------ x

MOTION FOR (I) ORDER SCHEDULING EXPEDITED HEARING ON
"FIRST DAY MOTIONS" AND (II) BRIDGE ORDERS

("BRIDGE ORDER MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"),[1] debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors") hereby submit this motion (the "Motion") for an order (the "Order") in the form attached hereto as Exhibit A authorizing an expedited hearing on various "first day motions" and applications filed by the Debtors contemporaneously herewith (collectively, the "First Day Motions"). To avoid immediate and irreparable harm to the Debtors' businesses and operations, the Debtors further respectfully request that this Court immediately enter bridge orders respecting certain of the most essential First Day Motions granting the relief requested in the First Day Motions on an interim basis pending this Court's disposition of such motions. In support of this Motion, the Debtors submit the Affidavit Of Robert S. Miller, Jr. In Support Of Chapter 11 Petitions And First Day Orders, sworn to October 8, 2005. In further support of this Motion, the Debtors respectfully represent as follows:

Background

A.      The Chapter 11 Filings

1.      On October 8, 2005 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The

---

[1] In addition to Delphi, the following entities are debtors in these related cases: ASEC Manufacturing General Partnership, ASEC Sales General Partnership, Aspire, Inc., Delco Electronics Overseas Corporation, Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems Global (Holding), Inc., Delphi Automotive Systems Human Resources LLC, Delphi Automotive Systems International, Inc., Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems LLC, Delphi Automotive Systems Overseas Corporation, Delphi Automotive Systems Risk Management Corp., Delphi Automotive Systems Services LLC, Delphi Automotive Systems Tennessee, Inc., Delphi Automotive Systems Thailand, Inc., Delphi China LLC, Delphi Connection Systems, Delphi Diesel Systems Corp., Delphi Electronics (Holding) LLC, Delphi Foreign Sales Corporation, Delphi Integrated Service Solutions, Inc., Delphi International Holdings Corp., Delphi International Services, Inc., Delphi Liquidation Holding Company, Delphi LLC, Delphi Mechatronic Systems, Inc., Delphi Medical Systems Colorado Corporation, Delphi Medical Systems Corporation, Delphi Medical Systems Texas Corporation, Delphi NY Holding Corporation, Delphi Services Holding Corporation, Delphi Technologies, Inc., DREAL, Inc., Environmental Catalysts, LLC, Exhaust Systems Corporation, Packard Hughes Interconnect Company, Specialty Electronics, Inc., and Specialty Electronics International Ltd.

2

Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have moved this Court for an order authorizing joint administration of these chapter 11 cases.

2. No trustee, examiner, or creditors' committee has been appointed in the Debtors' cases.

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

B. Current Business Operations Of The Debtors

4. With more than 180,000 employees worldwide, global 2004 revenues of approximately $28.6 billion and global assets as of August 31, 2005 of approximately $17.1 billion,[2] Delphi ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations without supervision from the Bankruptcy Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy Code.

5. Over the past century, the operations which are now owned by Delphi have become a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines. Today, the Company is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company's technologies and products are present in more than 75 million vehicles on the road worldwide. The Company supplies

---

[2] The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

3

products to nearly every major global automotive original equipment manufacturer with 2004 sales to its former parent, General Motors Corporation, equaling approximately $15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

6. As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world. In the U.S., the Debtors employ approximately 50,600 people. Those employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in Delphi's worldwide headquarters and customer center located in Troy, Michigan. Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and local unions. Outside the United States, the Company's foreign entities employ more than 134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

7. Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM. Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's

4

single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

8. Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle. When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base. The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base. The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C.  Events Leading To The Chapter 11 Filing

9. In the first two years following Delphi's separation from GM, the Company generated more than $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales. Reflective of a downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005. The Company experienced net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[3]

---

[3]  Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

5

10. The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

11. In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues and forward looking revenue requirements. Having concluded that pre-filing discussions with its Unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

12. Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses. This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned in the Company's transformation plan. The Debtors believe that a substantial

6

segment of Delphi's U.S. business operations must be divested, consolidated, or wound-down through the chapter 11 process.

13. Upon the conclusion of this process, the Debtors expect to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

## Relief Requested

14. On the Petition Date, the Debtors filed the First Day Motions to be heard by this Court in an expedited manner. Prompt entry of the relief requested in the First Day Motions is critical to maintaining the Debtors' ongoing operations and the value of their estates. Accordingly, by this Motion, the Debtors seek entry of an order setting a first day hearing (the "First Day Hearing") on the First Day Motions described on the proposed first day agenda attached hereto as Exhibit B. A certification of the exigent nature of the relief requested herein is attached hereto as Exhibit C. A proposed notice of the chapter 11 filing and of the First Day Hearing is attached hereto as Exhibit D.

15. The Debtors further respectfully request that this Court immediately, and without a hearing, enter several bridge orders, the forms of which are attached hereto as Exhibits E, F, G, H, I, J, K, L, M, and N, which grant the relief requested in the following First Day Motions, respectively, on an interim basis (collectively, the "Bridge Orders," and individually, as defined below) pending this Court's disposition of the First Day Motions:

    (a)    Motion For Order Under 11 U.S.C. §§ 363 And 553 Authorizing (I) Continued Maintenance Of Existing Bank Accounts, (II) Continued Use Of Existing Cash Management Systems, (III) Continued Use Of Existing

7

Business Forms, (IV) Preservation And Exercise Of Intercompany Setoff Rights, And (V) Grant Of Administrative Priority Status For Postpetition Intercompany Transactions (the "Cash Management Motion," and the Bridge order requested herein, the "Cash Management Bridge Order");

(b) Motion For Order Under 11 U.S.C. § 345 Authorizing Continued Use Of Existing Investment Guidelines (the "Investment Guidelines Motion," and the bridge order requested herein, the "Investment Guidelines Bridge Order");

(c) Motion For Order Under 11 U.S.C. §§ 105(a), 363, 1107, And 1108 Authorizing Debtors To Honor Prepetition Obligations To Customers And To Otherwise Continue Customer Programs In Ordinary Course Of Business (the "Customer Programs Motion," and the bridge order requested herein, the "Customer Programs Bridge Order");

(d) Motion For Order Under 11 U.S.C. §§ 105(a), 363, 364, 1107, And 1108 And Fed. R. Bankr. P. 6004 And 9019 Authorizing Continuation Of Vendor Rescue Program And Payment Of Prepetition Claims Of Financially-Distressed Sole Source Suppliers And Vendors Without Contracts (the "Essential Suppliers Motion," and the bridge order requested herein, the "Essential Suppliers Bridge Order");

(e) Motion For Order Pursuant To 11 U.S.C. §§ 105(a) And 363(b) Authorizing (I) Payment Of Prepetition Obligations To Foreign Creditors And (II) Financial Institutions To Honor And Process Related Checks And Transfers (the "Foreign Creditors Motion," and the bridge order requested herein, the "Foreign Creditors Bridge Order");

(f) Motion For Order Under 11 U.S.C. § 503(b) Confirming Grant Of Administrative Expense Status To Obligations Arising From Postpetition Delivery Of Goods And Authorizing Debtors To Pay Such Obligations In Ordinary Course Of Business (the "Administrative Expense Motion," and the bridge order requested herein, the "Administrative Expense Bridge Order");

(g) Motion For Order Under 11 U.S.C. §§ 105 And 363(b) Authorizing Payment Of Certain Prepetition (A) Shipping And Delivery Charges For Goods In Transit And (B) Customs Duties (the "Shipping And Customs Motion," and the bridge order requested herein, the "Shipping and Customs Bridge Order");

(h) Motion For Order Under 11 U.S.C. §§ 105(a), 363, 507, 1107, And 1108 (I) Authorizing Debtors To Pay Prepetition Wages And Salaries To Employees And Independent Contractors; (II) Authorizing Debtors To Pay Prepetition Benefits And Continue Maintenance Of Human Capital Benefit Programs In Ordinary Course, And (III) Directing Banks To Honor Prepetition Checks

8

For Payment Of Prepetition Human Capital Obligations (the "Human Capital Obligations Motion," and the bridge order requested herein, the "Human Capital Obligations Bridge Order");

(i) Motion For Order Under 11 U.S.C. §§ 105, 363, 1107, And 1108 And Fed. R. Bankr. P. 4001 Authorizing Debtors To Enter Into, Continue Performance Under, And Provide Credit Support Under Derivative Contracts (the "Derivative Contracts Motion," the bridge order requested herein, the "Derivative Contracts Bridge Order"); and

(j) Motion For Orders Under U.S.C. §§ 361, 362, 363, 364(C), And 364(D) (I) Authorizing Debtors To Obtain Secured Postpetition Financing On A Superpriority Secured And Priming Basis, (II) Authorizing Use Of Cash Collateral, (III) Granting Adequate Protection To Prepetition Lenders, (IV) Granting Interim Relief, And (V) Scheduling A Final Hearing Under Fed. R. Bankr. P. 4001(C) (the "DIP Financing Motion," the bridge order requested herein, the "Cash Collateral Bridge Order").

## Basis For Relief

16. Bridge orders similar to those identified above have been entered in other large chapter 11 cases. See In re Delta Airlines, Inc., Case No. 05-17923 (PCB) (Bankr. S.D.N.Y. Sept. 14, 2005) (granting, until first day hearing, numerous bridge orders for, inter alia, relief related to wages, cash management, customer programs, foreign and other critical vendors, investment guidelines, and cash collateral); In re US Airways Group, Inc., Case No. 04-13819 (SSM) (Bankr. E.D. Va. Sept. 12, 2004) (granting, until first day hearing, numerous bridge orders for, inter alia, relief related to wages, cash management, customer programs, foreign and other critical vendors, and investment guidelines); and In re US Airways Group, Inc., Case No. 02-83984 (SSM) (Bankr. E.D. Va. Aug. 11, 2002) (granting, until first day hearing, numerous bridge orders for, inter alia, relief related to wages, cash management, customer programs, foreign vendors, and essential trade vendors).

17. Furthermore, the relief requested by the Bridge Orders is only that relief which the Debtors deem absolutely essential to their operations, and without which – even for a short period of time – the Debtors fear their operations could be significantly disrupted.

9

18. The Debtors' domestic and international operations continue on a day-to-day basis. Because the Debtors expect that the First Day Hearing may be held on the afternoon of October 11, 2005, or such other time as may be set by this Court, there will be a significant "gap" period between the time the chapter 11 cases are commenced, i.e., Saturday, October 8, 2005, and the First Day Hearing. Absent entry of the Bridge Orders, the Debtors' business operations could face substantial disruption.

19. For example, if the Debtors are not immediately allowed to honor their obligations to employees pursuant to the Human Capital Obligations Bridge Order, the Debtors risk the highly detrimental impact on employee morale and performance that likely would result if any wage, reimbursement, or other payments to employees are not fulfilled. Similarly, if the Debtors are not allowed to make certain limited payments and provide other assurances to their suppliers and other vendors pursuant to the Essential Suppliers Bridge Order, the Foreign Creditors Bridge Order, the Shipping and Customs Bridge Order, and the Administrative Expense Bridge Order, the Debtors face the prospect of having the frequent deliveries of goods and services that their manufacturing operations rely upon interrupted. Even a short interruption in such supply likely would be disastrous and cause the Debtors' and their customers' manufacturing operations to shut down in less than 24 hours, given the "just-in-time" and sole source nature of the Debtors' supply chain. Such interruptions would tarnish the Debtors' image with their customers and jeopardize the successful launch of these chapter 11 cases, thereby adversely affecting the Debtors' reorganization prospects. To further protect the Debtors' crucial relationships with their customers, the Debtors further seek authority to continue certain valuable customer programs pursuant to the Customer Programs Bridge Order.

20. In connection with the above-described Bridge Orders, the use of cash collateral pursuant to Cash Collateral Bridge Order is essential to the Debtors' ability to maintain their business operations between the Petition Date and the date of the First Day Hearing because, absent such relief, the Debtors will have not have access to the funds necessary to make the payments allowed under the other Bridge Orders or to make other postpetition payments arising in the ordinary course of their businesses. The Debtors request the authority to provide their prepetition secured lenders with adequate protection with respect to any diminution in the value of such lenders' collateral during the period covered by the Cash Collateral Bridge Order through the grant of replacement liens in the Debtors' after-acquired inventory.

21. Finally, absent the relief sought in the Cash Management Bridge Order and the Investment Guidelines Bridge Order, the Debtors' complex cash management systems and investment policies would be unable to function, potentially requiring the Debtors to close hundreds of bank accounts and liquidate hundreds of millions of dollars in investments. The Debtors believe that their bank accounts are all held at financially secure financial institutions and that their investment guidelines are conservative, appropriate for an organization of their collective size, and promote the best interests of the estates by focusing on the primary goal of protecting principal, while also furthering the secondary goals of maximizing yield and liquidity. The Derivative Contracts Bridge Order similarly is necessary to preserve contractual relationships that protect the estates against fluctuating commodities prices and foreign currency exchange rates. Thus, such contracts are essential to the preservation of value for the benefit of all parties-in-interest in these chapter 11 cases.

22.  In addition to the interim nature of the Bridge Orders, the Debtors also have limited the scope of the relief granted thereunder. In the Cash Management Bridge Order, the Debtors seek authority only to continue in the use of their current cash management systems, and not to open new accounts or close existing ones, nor to engage in intercompany setoffs prior to the final approval of the Cash Management Motion. Similarly, the Derivatives Contracts Bridge Order does not authorize entry into new derivatives contracts or the modification of existing contracts. Likewise, although the Customer Programs Bridge Order authorizes the Debtors to make payments under existing customer programs, it does not authorize renewal, replacement, termination, or creation of new customer programs. Moreover, the Essential Suppliers Bridge Order grants authority up to $45 million to pay essential suppliers, and not the $90 million requested in the Essential Suppliers Motion, and does not seek authority to waive and release the Debtors rights under section 547 of the Bankruptcy Code. Finally, in the Cash Collateral Bridge Order, the Debtors have sought only authority to utilize cash collateral and have not sought authorization to enter into a postpetition financing arrangement.

23.  Thus, as set forth above, given the absolutely critical nature of the relief requested and the limited scope and duration of the Bridge Orders, the Debtors believe that entry of the Bridge Orders is both appropriate and necessary to facilitate a successful reorganization.

Notice

24.  Notice of this Motion has been provided by facsimile, electronic transmission, overnight delivery, or hand delivery to (a) the Office of the United States Trustee, (b) the Debtors' 50 largest unsecured creditors, (c) counsel for the agent under the Debtors' prepetition credit facility, and (d) counsel for the agent under Debtors' proposed postpetition

credit facility. The Debtors also served the Notice of Chapter 11 Filings and Of "First Day Motions" by facsmile on (a) the Debtors' 50 largest unsecured creditors and (b) all unions representing employees of the Debtors. In the Notice attached hereto as <u>Exhibit D</u>, the Debtors advised parties that the Debtors would seek final approval of the relief requested in this Motion and the First Day Motions at the First Day Hearing. The Notice also explains that the First Day Motions may be viewed on <u>www.delphidocket.com</u> and on this Court's website. In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

Memorandum Of Law

25. Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court (a) enter an order (i) scheduling a First Day Hearing on the afternoon of October 11, 2005 or such other time as may be set by this Court, (ii) shortening time for and limiting notice of the First Day Hearing, and (iii) deeming notice of the First Day Hearing to be adequate and appropriate notice under the circumstances of these chapter 11 cases if given as described herein, (b) enter the Bridge Orders, and (c) grant the Debtors such other and further relief as is just.

Dated: New York, New York
      October 8, 2005

          SKADDEN, ARPS, SLATE, MEAGHER
          & FLOM LLP

          By: /s/ John Wm. Butler, Jr.
              John Wm. Butler, Jr. (pro hac vice motion pending)
              John K. Lyons
              Ron E. Meisler
          333 West Wacker Drive, Suite 2100
          Chicago, Illinois 60606
          (312) 407-0700

          - and -

          By: /s/ Kayalyn A. Marafioti
              Kayalyn A. Marafioti (KM 9632)
              Thomas J. Matz (TM 5986)
          Four Times Square
          New York, New York 10036
          (212) 735-3000

          Attorneys for Delphi Corporation, et al.,
              Debtors and Debtors-in-Possession