SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

     - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                :
       In re                        :     Chapter 11
                                  :
DELPHI CORPORATION, et al.,     :     Case No. 05-_____ (___)
                                  :
                 Debtors.     :     (Jointly Administered)
                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

MOTION FOR ORDER UNDER 11 U.S.C. §§ 105(a), 363, 507, 1107, AND 1108
(I) AUTHORIZING DEBTORS TO PAY PREPETITION WAGES AND SALARIES
TO EMPLOYEES AND INDEPENDENT CONTRACTORS, (II) AUTHORIZING DEBTORS
TO PAY PREPETITION BENEFITS AND CONTINUE MAINTENANCE
OF HUMAN CAPITAL BENEFIT PROGRAMS IN THE ORDINARY COURSE,
AND (III) DIRECTING BANKS TO HONOR PREPETITION CHECKS FOR
<u>PAYMENT OF PREPETITION HUMAN CAPITAL OBLIGATIONS</u>

("HUMAN CAPITAL OBLIGATIONS MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the

"Affiliate Debtors"),[1] debtors and debtors-in-possession in the above-captioned cases

(collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order under 11

U.S.C. §§ 105(a), 363, 507(a)(3), 507(a)(4), 541, 1107, and 1108: (i) authorizing the Debtors to

pay prepetition wages and salaries to employees and independent contractors, (ii) authorizing the

Debtors to pay prepetition benefits and continue the maintenance of human capital benefit

programs in the ordinary course, and (iii) directing banks to honor prepetition checks for

payment of prepetition human capital obligations.  In support of this Motion, the Debtors submit

on the Affidavit Of Robert S. Miller, Jr. In Support Of Chapter 11 Petitions And First Day

Orders, sworn to October 8, 2005 (the "Miller Affidavit").  In further support of this Motion, the

Debtors respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8, 2005 (the "Petition Date"), each of the Debtors filed a

voluntary petition in this Court for reorganization relief under chapter 11 of title 11 of the United

---

[1]    In addition to Delphi, the following entities are debtors in these related cases: ASEC Manufacturing
General Partnership, ASEC Sales General Partnership, Aspire, Inc., Delco Electronics Overseas
Corporation, Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems Global (Holding),
Inc., Delphi Automotive Systems Human Resources LLC, Delphi Automotive Systems International, Inc.,
Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems LLC, Delphi Automotive Systems
Overseas Corporation, Delphi Automotive Systems Risk Management Corp., Delphi Automotive Systems
Services LLC, Delphi Automotive Systems Tennessee, Inc., Delphi Automotive Systems Thailand, Inc.,
Delphi China LLC, Delphi Connection Systems, Delphi Diesel Systems Corp., Delphi Electronics
(Holding) LLC, Delphi Foreign Sales Corporation, Delphi Integrated Service Solutions, Inc., Delphi
International Holdings Corp., Delphi International Services, Inc., Delphi Liquidation Holding Company,
Delphi LLC, Delphi Mechatronic Systems, Inc., Delphi Medical Systems Colorado Corporation, Delphi
Medical Systems Corporation, Delphi Medical Systems Texas Corporation, Delphi NY Holdings
Corporation, Delphi Services Holding Corporation, Delphi Technologies, Inc., DREAL, Inc.,
Environmental Catalysts, LLC, Exhaust Systems Corporation, Packard Hughes Interconnect Company,
Specialty Electronics, Inc., and Specialty Electronics International Ltd.

States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").  The Debtors

continue to operate their businesses and manage their properties as debtors-in-possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have moved this

Court for an order authorizing joint administration of these chapter 11 cases.

2.       No trustee, examiner, or creditors' committee has been appointed in the

Debtors' cases.

3.       This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

4.       The statutory predicate for the relief requested herein is sections 105(a),

363, 507(a)(3), 507(a)(4), 541, 1107, and 1108 of the Bankruptcy Code.

B.       Current Business Operations Of The Debtors

5.       With more than 180,000 employees worldwide, global 2004 revenues of

approximately $28.6 billion and global assets as of August 31, 2005 of approximately $17.1

billion,[2] Delphi ranks as the fifth largest public company business reorganization in terms of

revenues, and the thirteenth largest public company business reorganization in terms of assets.

Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations

without supervision from the Bankruptcy Court, and will not be subject to the chapter 11

requirements of the U.S. Bankruptcy Code.

6.       Over the past century, the operations which are now owned by Delphi

have become a leading global technology innovator with significant engineering resources and

technical competencies in a variety of disciplines.  Today, the Company is arguably the single

---

[2]       The aggregated financial data used in this Motion generally consists of consolidated information from
Delphi and its worldwide subsidiaries and affiliates.

largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company's technologies and products are present in more than 75 million vehicles on the road worldwide.  The Company supplies products to nearly every major global automotive original equipment manufacturer with 2004 sales to its former parent, General Motors Corporation, equaling approximately $15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

7.     As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world.  In the U.S., the Debtors employ approximately 50,600 people.  Those employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in Delphi's worldwide headquarters and customer center located in Troy, Michigan.  Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and local unions.  Outside the United States, the Company's foreign entities employ more than 134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

8.     Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-

based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

9.      Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle.  When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base.  The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base.  The Debtors also believe that this must be accomplished in advance of  the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C.      Events Leading To The Chapter 11 Filing

10.      In the first two years following Delphi's separation from GM, the Company generated more than $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales.  Reflective of a downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005.  The Company experienced net operating losses of $608 million for the first six

months of calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[3]

11.    The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues and forward looking revenue requirements.  Having concluded that pre-filing discussions with its Unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

13.    Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses.  This will require negotiation with key stakeholders over their respective

---

[3]        Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, p rimarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

contributions to the restructuring plan or, absent consensual participation, the utilization of the

chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned

in the Company's transformation plan.  The Debtors believe that a substantial segment of

Delphi's U.S. business operations must be divested, consolidated, or wound-down through the

chapter 11 process.

        14.    Upon the conclusion of this process, the Debtors expect to emerge from

chapter 11 as a stronger, more financially sound business with viable U.S. operations that are

well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all

of its resources to continue to deliver value and high-quality products to its customers globally.

Additionally, the Company will preserve and continue the strategic growth of its non-U.S.

operations and maintain its prominence as the world's premier auto supplier.

Relief Requested

        15.    By this Motion, the Debtors request that this Court enter an order,

pursuant to sections 105(a), 363, 507(a)(3), 507(a)(4), 541, 1107, and 1108 of the Bankruptcy

Code.  The Debtors seek authority, in their discretion and in the exercise of their business

judgment, (a) authorizing but not directing the Debtors to pay all human capital obligations of

the Debtors, including prepetition claims of the Debtors' domestic active and inactive employees,

any independent contractors, including those provided by employee supplier agreements, who

currently are under formal or informal contracts (collectively, and solely for the purposes of this

Motion, the "Employees"), and those prepetition claims on account of benefits to be provided to

any of the Debtors' retirees and their surviving spouses (collectively, the "Retirees"),

(b) authorizing but not directing the Debtors to pay prepetition benefits and continue the Debtors'

various human capital benefit plans and programs ((a) and (b) collectively, the "Prepetition

Human Capital Obligations"), the most significant of which are described below, and

7

(c) directing all financial institutions to honor prepetition checks for payment of Prepetition

Human Capital Obligations and prohibiting such financial institutions from placing any holds on,

or attempting to reverse, any automatic transfers to Employees' accounts for Prepetition Human

Capital Obligations.

16.     As part of the relief being sought in the Motion, the Debtors also seek

authorization to pay all federal, state, local, and foreign income withholding, payroll,

employment, unemployment, social security, and similar taxes (including, but not limited to,

taxes relating to the Federal Insurance Contributions Act ("FICA")) whether withheld from

Employees' wages or paid directly by the Debtors to governmental authorities, as well as other

Employee withholdings, including, but not limited to, pension plan contributions, union dues,

charitable contributions, and garnishment contributions, if any.  The defined term "Prepetition

Human Capital Obligations" is meant to include all such payments.

<u>Basis For Relief</u>

17.     As of the Petition Date, the Debtors employ approximately 50,600

Employees in the United States.[4]  Of those Employees, approximately 15,850 are salaried

---

[4]     On a global basis, as of December 31, 2004, the Debtors and their non-Debtor affiliates employ
approximately 185,000 people.  Of those employees, approximately 37,300 are salaried employees and
147,900 are hourly employees.  In addition, approximately 74.8% or 110,600 of hourly employees are
represented by unions around the world.  The Debtors and their non-Debtor affiliates employ personnel
around the world, including Canada, the United States, Mexico, South America, Europe, the Middle East,
and the Asia Pacific region.  With certain notable exceptions described below, Employees located in
foreign countries are employed by foreign entities that are not Debtors in these cases.  The restructuring of
the Debtors' United States operations is not expected to have a material adverse impact on foreign
operations, and foreign employees will continue to be paid in the ordinary course of business.

Although most employees working in foreign countries are employed by foreign entities, the Debtors also
have approximately 145 expatriate-U.S. salaried Employees.  These Employees are U.S. salaried full time
or flexible service Employees who transferred to another country to work on the Debtors' behalf but remain
on the U.S. payroll.  Additionally, there are approximately 140 non-U.S. expatriate employees from other
countries that are working in the U.S. on the Debtors' behalf.  The relief requested herein includes a request
for authorization, but not direction, to honor the Debtors' obligations to their expatriate Employees.
Finally, the Debtors have approximately 435 Employees who work at branch offices in Liverpool, England,
seven Employees in a branch office in Moscow, Russia and one Employee at a branch office in Zurich,
Switzerland.  These Employees are included in the number of listed U.S. Employees and through this

Employees[5] and approximately 34,750 are hourly Employees.  Of the salaried Employees, there

are approximately 230 flexible service Employees who are employed to work between 50% and

80% of the employing unit's base work week.  In addition, approximately 33,350 of the Debtors'

hourly Employees are represented by 49 different international and local unions (each,

individually, a "Union" and, collectively, the "Unions"), each of which has collective bargaining

agreements with the Debtors (each individually a "CBA," and collectively, the "CBAs").[6]

Annexed hereto as Exhibit A is a list of international and local unions with which the Debtors

have CBAs.[7]

       18.     The Debtors provide their Employees with many compensation and

benefit programs.  In Part I(A) hereof, the Debtors describe and seek authority but not direction

to pay Employees' prepetition and postpetition wages and salaries, including any commissions

and bonuses for which the Employees are eligible.  In Part I(B) hereof, the Debtors describe their

vacation, sick leave, personal leave, expense reimbursement, and severance policies and request

---

    Motion, the Debtors seek authority to continue its Human Capital Obligations with respect to these
    Employees.

[5]    Salaried Employees may be broken down into four categories (with the approximate number of associated
    individuals in the parenthetical after the group name): (i) U.S. non-executive salaried Employees (15,365)
    (collectively, "Classified Employees"), (ii) executives (463) (collectively, "Executives"), (iii) a subgroup of
    more senior Executives (90) (collectively, "Senior Executives"), and (iv) officers (24) (collectively,
    "Officers").

[6]    Approximately 12 of the Debtors' salaried Emp loyees are represented by the United Auto Workers
    ("UAW") subject to a master collective bargaining agreement covering two bargaining units and a site-
    specific local collective bargaining agreement at each of two sites.  For purposes of this Motion, the salary
    and benefits provided to these Employees have been combined with salaried Employees.

[7]    Many Union Employees are covered by national agreements with the UAW,  International Union of
    Electronic, Electrical, Salaried, Machine and Furniture Workers-Commu nications Workers of America
    ("IUE-CWA"), and United Steelworkers of America ("USWA").  Other Union Employees are covered
    solely by site-specific agreements: International Association of Machinists and Aerospace Workers
    ("IAM"), International Brotherhood of Electrical Workers ("IBEW"), International Union of Operating
    Engineers ("IUOE"), and Electronic and Space Technicians ("EAST").  Moreover, certain additional IUE
    bargaining units exist which are not governed by the IUE-CWA national agreement including IUE-CWA at
    Foley, Alabama and IUE-CWA at Landrum, South Carolina.  The UAW bargaining unit at the Tulsa,
    Oklahoma site is not governed by the UAW-Delphi National Agreement.

authority but not direction to continue each of these programs and pay prepetition and

postpetition amounts thereunder.

19.    In Part II hereof, the Debtors seek authority but not direction to pay certain

prepetition amounts under their health, insurance, retirement, and other employee benefit

programs and continue those programs during the postpetition period.  Part II(A) hereof sets

forth the Debtors' health and insurance benefit plans and their obligations thereunder.  Part II(B)

hereof outlines the Debtors' retirement plans, including defined contribution, defined benefit,

tax-qualified, and non-tax-qualified retirement plans.  Part II(C) hereof describes the Debtors'

workers' compensation programs and obligations thereunder.  Part II(D) hereof addresses other

benefits that the Debtors provide to their Employees and Retirees.  In Part II(E) hereof, the

Debtors seek authority but not direction to pay social security, income taxes, and other

withholdings required by law.  In Part II(F) hereof, the Debtors review their administrative

obligations in connection with maintaining Prepetition Human Capital Obligations.  In addition,

the Debtors request that third party processors be directed to continue to provide to the Debtors

those services that the processors provided prior to the Petition Date, until further order of this

Court.

20.    Finally, in Part III hereof, the Debtors ask this Court to direct banks to

honor prepetition checks for the payment of Prepetition Human Capital Obligations until further

order of this Court.

21.    Pursuant to this Motion, the Debtors do not seek to make any payments on

account of prepetition liabilities to former Officers or Directors except as set forth in paragraphs

38, 39, 61, 64(a)(i), 64(c)(ii), and 69(a).

I.      AUTHORIZATION TO PAY PREPETITION WAGES AND SALARIES

A.      Employee Compensation: Wages, Salaries, And Bonuses

   (a)      Salaried Employees

         22.      The Debtors' average monthly payroll for their salaried Employees is approximately $109.9 million.  On a semi-monthly basis (generally the 15th and the last business day of each month), the Debtors pay salaried Employees by electronic funds transfer or check for current salaried amounts owed plus any prior-period overtime.  The Debtors' salaried Employees were most recently paid on September 30, 2005.  Because the Debtors pay salaried Employees' overtime two weeks in arrears, certain salaried Employees are also owed approximately $1.3 million for prepetition overtime work.  As of the Petition Date, the Debtors owe their salaried Employees wages in the amount of approximately $24.5 million.

   (b)      Hourly Employees And Contract Service Personnel

         23.      Hourly Employees.  The Debtors' average monthly payroll[8] for their approximately 34,750 hourly Employees[9] is approximately $168.6 million.  Hourly Employees are paid on a weekly basis (either on Thursday or Friday), one week in arrears by electronic funds transfer or check.  Hourly Employees were most recently paid on October 7, 2005.  Because approximately 49% of payroll for non-unionized hourly Employees is paid by check, however, the Debtors estimate that as much as $14.5 million of the hourly payroll issued by checks may not have cleared the Debtors' accounts prior to the Petition Date.  As of the Petition

---

[8]      Payroll figures include hourly straight time pay, overtime paid in the ordinary course, cost of living adjustments, and shift premium payments for hourly Employees who work overnight or weekend shifts.

[9]      This figure includes Employees that are either non-Union hourly Employees or hourly Union Employees who are currently working as "per diem" Employees, generally receiving wages commensurate with salaried Employees and benefits of hourly Employees.

Date, the Debtors owe their hourly Employees wages in the amount of approximately $56.8 million.

24.    <u>Contract Service Personnel.</u>    The Debtors hire independent contractors and other contract employees (collectively, the "Contract Service Personnel") through agencies and other third parties ("Contract Personnel Suppliers") to work in various positions for the Debtors including, but not limited to, engineering, information technology, clerical positions, and commissioned manufacturing sales.  The Debtors typically pay Contract Personnel Suppliers' invoices on the second day of the second month following the month in which the services were rendered (the "MNS-2 Date").  While the terms of the various Contract Service Personnel agreements provide that the Contract Service Personnel hired pursuant to those agreements are not employees of the Debtors, the Debtors fear that should their Contract Personnel Suppliers or their independent contractors not be paid for the Contract Service Personnel's time, the Contract Service Personnel will not be paid and thus will refuse to work.  As of the Petition Date, approximately $20 million is owed to the Contract Service Personnel and Contract Personnel Suppliers.  Because many of the Contract Service Personnel are engineers, information technology personnel, and other skilled persons who are critical to the Debtors' operations or who interact directly with suppliers, customers, and other third parties with whom Delphi conducts business as the "face of Delphi," the Debtors seek authority but not direction to pay these parties the amounts owed on account of prepetition work performed, and to continue payments in the ordinary course of business.

(c)    <u>Bonuses</u>

25.    The Debtors currently offer bonuses to certain of their Employees through several separate plans, including, as defined below, the 2002 Classified Incentive Plan, Long-Term Incentive Plan, Subsidiary Bonus Plans, and Profit Sharing Plan (as specifically

enumerated, the "Bonus Plans").[10]  These plans are designed to provide incentives to such

Employees to achieve results that lead to a more efficient operation of the Debtors' businesses.

Eligibility for the various plans depends on the Employee's classification or level.  The actual

amount of the bonuses paid depends on whether the Debtors meet minimum performance goals.

Under this Motion, the Debtors seek authority, but not direction, to honor current obligations

under the Bonus Plans.

      26.    <u>Incentive Compensation Plan For Salaried Classified Employees</u>.  In the

ordinary course of their businesses, certain of the Debtors' full-time and part-time Classified

Employees who are in good standing with the Debtors have participated in an incentive bonus

plan that is tied to the net income and quality performance of the Debtors (the "Classified

Incentive Plan").  Under the Classified Incentive Plan, compensation levels ("Classified

Bonuses") are based on the Employee's monthly base salary, the amount of time accrued for the

plan year, and the percentage allocated by the plan for the Employee's level.  Delphi sets

minimum and maximum performance target levels, outside of which Classified Bonuses are not

paid.  In addition, no Classified Bonus given to any particular Employee may exceed two times

that Employee's annual salary.  Eligible Employees receive a portion of their Classified Bonuses

in a lump sum cash distribution, with the remaining amount delivered in a deferred compensation

distribution (which pays out according to a vesting schedule over four years).  The Debtors have

an accrued prepetition obligation under the 2002 Classified Incentive Plan in the amount of $8.3

million, which will increase to approximately $12.2 million (including an estimate for employer

taxes) to be paid out fully on March 1, 2006 as the final payment of the deferred portion of the

---

[10]    Concurrent with this Motion, the Debtors have filed a "KECP" Motion, to replace the Debtors' prepetition
Annual Incentive Plan and Long-Term Incentive Plan.

2002 Classified Incentive Plan.  The Debtors request authority but not direction to honor its

obligations under the 2002 Classified Incentive Plan.

       27.    <u>Long-Term Incentive Plan</u>.  The Debtors' Officers and Executives are

eligible to receive cash and non-cash awards under the Debtors' Long-Term Incentive Plan (the

"Long-Term Plan").  The Long-Term Plan is designed to motivate the Debtors' Officers and

Executives to accomplish corporate objectives including meeting or surpassing certain cash flow

objectives and increasing sales diversification efforts.  The performance-based cash awards

under the Long-Term Plan, which is commonly called the "Performance Achievement Plan," (the

"PAP Award") are subject to the achievement of certain business criteria over the "performance

period," which is currently three years, and are designed to reward Employees for the

accomplishment of key long-term strategic objectives.  Performance goals, as well as

corresponding minimum and maximum performance threshold values, are established by the

independent compensation committee of the Board of Directors (the "Compensation

Committee") prior to the expiration of the first quarter of the specified performance period.  The

final awards also are determined by the Compensation Committee and are based on the

performance goals established versus the performance achieved and may be adjusted for

individual performance.   A Senior Executive or Officer generally becomes eligible for a

particular cycle of the Long-Term Plan if he or she has worked at least 12 months of the cycle as

a Senior Executive or Officer.[11]  The Debtors currently maintain PAP Awards for the 2003-2005

performance period.  The Debtors forecast that the 2003-2005 payout will be at 26% of target

---

[11]      The Debtors also allow certain Executive not otherwise eligible for PAP to receive reduced compensation
(generally 50%) under PAP in situations where such Executives are in strategic positions and making
performance contributions that have been identified as exemplary.  Typically, less than 50 Executives per
year are compensated under this reduced PAP benefit.  The Debtors request authority, but not direction, to
continue to pay these Executives who have been included in the award group for the 2003-2005 Long-Term
Plan.

compensation level established for each executive level of responsibility.  PAP Awards under the

2003-2005 Long-Term Plan are expected to total approximately $3.7 million and are scheduled

to be paid in the first quarter of 2006.  Moreover, no PAP Awards will be paid prior to

November 30, 2005.  The Debtors hereby seek authority, but not direction, to make PAP Award

payments under the 2003-2005 Long-Term Plan. [12]

28.    Subsidiary Bonus Programs.  Several of the Debtors' subsidiaries also

have various bonus programs to compensate their salaried and hourly Employees for successful

product launches; for achieving certain sales, revenue, and performance targets; and to

incentivize the Employees to continue work for the Debtors. [13]  Total prepetition benefits under

these programs aggregate to approximately $1.3 million for 397 Employees, an average of

$3,275 per Employee.  The Debtors request authority, but not direction, to continue these

programs and make payments related to these programs in the ordinary course.

29.    Profit Sharing Plan.  The Debtors maintain, in the ordinary course of

business, a profit sharing plan ("Profit Sharing Plan") for eligible Union Employees, as required

under various of the CBAs.  Pursuant to the Profit Sharing Plan, eligible Employees share in the

Debtors' profits from U.S. operations.  No payments under the Profit Sharing Plan were made in

2004 and none are anticipated in 2005.  The Debtors hereby seek authority, but not direction, to

continue the Profit Sharing Plan in the ordinary course of business.

---

[12]    The Debtors do not hereby seek authority to pay prepetition amounts to Retirees under the PAP Award.

[13]    These programs include, but are not limited to, Delphi Medical Sales' Incentive Compensation Plan; Delphi
Medical Systems' Material Incentive Program; Delphi Connection Systems' sales incentive plans; Delphi
Diesel Systems' site performance incentive plans, remanufacturing productivity incentives, sales incentives,
and commissions programs; Integrated Service Solutions' incentive plan and commission program; and
Delphi Mechatronic Systems' Commuting Bonus.

(d)    Board Of Directors Fees

30.    The Debtors' Employees who serve as directors receive no additional compensation for their service on the Board of Directors.  The Debtors pay Non-Employee members of the Board of Directors (the "Directors") a $55,000 cash retainer per year, except for the lead independent Director who receives a $100,000 cash retainer.  Directors who chair a committee receive an additional $10,000-$15,000 per year.  In addition, non-Employee Directors have the option to take their cash compensation in Delphi common stock units.  The stock portion of each non-Employee Director's annual compensation is automatically deferred until he or she no longer serves on the Board of Directors, at which time Directors receive the cash value of their Delphi common stock units.  As of the Petition Date, the eight non-Employee Directors are owed an aggregate of approximately $7,000 in cash (representing approximately eight days of the Directors' fourth quarter accrual) and a small amount of Delphi common stock on account of their work for the Debtors during the prepetition period.  Finally, the Debtors owe one Director, who resigned from the Board in July 2005, the cash value of the Directors' accrued common stock units as valued at the end of the fourth quarter 2005.

B.    Other Employee Compensation:  Vacation, Sick And Personal Leave, Indemnification Expense Reimbursement, Severance, And Other Compensation

31.    The Debtors offer their Employees other forms of compensation, including vacation pay, sick leave and personal time pay, reimbursement of certain expenses, and severance pay.  These forms of compensation are usual, customary, and necessary if the Debtors are to retain qualified Employees to operate their businesses and to continue to honor commitments under their CBAs.  Accordingly, the Debtors request authority but not direction to honor outstanding prepetition obligations with respect to such compensation in the ordinary

course of business and to continue these compensation programs postpetition in the ordinary course of business.

    (a)    <u>Vacation And Holidays</u>

    32.    <u>Salaried Employee Vacation And Holiday Policies</u>.  All regular full-time and regular part-time salaried Employees are eligible to accrue paid vacation.  For salaried Employees, vacation time varies from zero weeks to five weeks, depending on length of service.  Full-time salaried Employees with a length of service date prior to January 1, 2001, may be eligible for four additional vacation days per year.  Vacation time becomes vested on a current calendar year basis at the rate of 25% per completed calendar quarter.  Vacation time does not carry over from year to year and salaried Employees are not entitled to pay for accrued but unused vacation except in particular circumstances, including but not limited to certain employment separations when an Employee has unused but vested vacation days.[14]  During the last three years, the Debtors have paid a <u>de minimis</u> amount per year on account of accrued but unused vacation.  In addition, the Debtors periodically declare a summer vacation period during which some or all of salaried Employees' vacation applies.  Furthermore, salaried Employees are eligible for paid holidays, the number of which vary slightly from year to year.  Typically, holidays include national holidays and the last week of the calendar year.

    33.    <u>Salaried Vacation Purchase Program</u>.  The Debtors also maintain a vacation purchase program for salaried Employees.  Salaried full-time Employees with a length of service date on or after January 1, 2001 are eligible to purchase five additional vacation days, in increments of one day, during the annual enrollment periods.  Each vacation day costs the

---

[14]    This policy varies for certain salaried Affiliate Debtor Employees who receive payments for accrued but unused vacation time at the end of the calendar year.  The Debtors believe, however, that the prepetition amounts owed on account of accrued vacation time are <u>de minimis</u>.

equivalent of one day's pay (determined by the Employee's base salary as of September 1, 2004),

paid on a before-tax basis.  During the past year, there were 1,148 Employees eligible for the

program and 302 employees elected between one and five days.  Additionally, the Debtors have

offered all active salaried Employees the opportunity to purchase up to an additional ten vacation

days, with the approval of their supervisor.  Both such purchases are calculated at a rate

equivalent to the Employee's calculated daily rate based upon their monthly salary.  The last such

program elections occurred from February 7, 2005 to February 18, 2005 and participating

Employees currently have such elections deducted from their paychecks each pay period.

      34.    <u>Hourly Employee Vacation Policies</u>.  Because of the Debtors' various

Union contracts, hourly Employee vacation time policies vary.  Generally, hourly Employees

receive between zero weeks and five weeks of vacation time per year, based on seniority.  The

average hourly Employee has 170 hours (4.5 weeks) of vacation annually.  Vacation time vests

50% at the end of 13 worked pay periods and vests ratably over the next 13 weeks until it is fully

vested at the end of 26 worked pay periods (for a full-time hourly Employee, generally June

30th).  Under certain Union CBAs, including those governing UAW Employees and IUE-CWA

Employees, the Debtors pay eligible Employees for any accrued but unused vacation time

outstanding at the end of the calendar year by February 1st of the following year.  As part of their

normal operations and in conjunction with their CBAs, the Debtors may close their factories

during the week of July 4th ("Independence Week").  In addition, the Debtors reserve the right to

choose the week preceding or following Independence Week as a mandatory shut down week.

Time off on account of Independence Week is generally paid at the rate of eight hours of

straight-time pay while the shut down week is generally deducted from hourly Employees'

accrued vacation days.  As of the Petition Date, the Debtors estimate that approximately $37.3

million, or an average of $1,108 per hourly Employee, exists in accrued but unused vacation

days.  Hourly Employees are also entitled to paid holidays, the number of which vary slightly

from year to year.  Hourly Employees, including UAW Employees and IUE-CWA Employees,

receive holiday pay for all company-declared holidays generally including national holidays and

the last week of the calendar year.

35.      At any time, almost all Employees have accrued vacation and holiday

eligibility.  The Debtors anticipate that their Employees will utilize accrued vacation time and

take holiday time in the ordinary course of business without resulting in any material cash flow

requirements beyond the Debtors' normal payroll obligations.  The Debtors request authority, but

not direction, to continue its vacation and holiday policies in the ordinary course and pay any

outstanding prepetition amounts related thereto.

(b)      Sick Leave And Personal Leave

36.      Sick Leave.  The Debtors respective treatment of sick leave for Employees

varies.  For absences up to a week for reasons other than vacation or holidays, salaried

Employees clear the absences through their managers and are generally paid for their time off.  If

a salaried Employee is absent for more than seven days, then applicable disability leave policies,

as described more fully below, apply.  Hourly Employees who are absent from work are not paid

for their time.  If an hourly Employee is sick for more than seven days, then applicable short-

term and long-term disability policies, as described below, apply.

37.      Personal Leave.  All Employees may be eligible for leaves of absence,

either pursuant to company policy or applicable law.  Employees are eligible for paid leaves of

absence for jury duty, 3-5 days of bereavement leave upon the death of certain qualifying family

members, disability leave (as described below), and other leaves for additional education.

Furthermore, hourly Employees under certain Union contracts are technically entitled to be paid

for military duty lasting for 30 days or less and salaried Employees may be paid for 15 days of

military service less military pay.[15]  In certain instances, Employees may also take unpaid

personal leaves of absence for a variety of purposes.  The Debtors believe that the estimated

value of accrued but unpaid benefits as of the Petition Date for any Employees that are currently

on leaves of absence is de minimis.[16]  The Debtors request authority but not direction to continue

their personal leave policies in the ordinary course and pay any outstanding prepetition amounts

related thereto.

        (c)      Indemnification

        38.      Pursuant to the Delphi bylaws and the organizational documents of the

Affiliate Debtors, the Debtors must advance expenses to Directors, Officers, Executives, and

certain other salaried Employees and may generally advance expenses to those Employees[17] for

the defense of suits against the individuals, provided that the individuals meet particular

eligibility requirements.  Such eligibility requirements include but are not limited to that (a) the

claim against such Employee or Director relates to his or her employment with the Debtors and

the actions at issue were undertaken in good faith and in a manner reasonably believed to be

lawful and in the best interests of the Debtors and (b) the Employee or Director agrees to

reimburse the Debtors should it be determined that he or she is not entitled to be indemnified

under applicable law.  Furthermore, pursuant to the bylaws, the Debtors reserve the right to

withdraw indemnification pending further fact investigation.  Pursuant to this Motion, the

---

[15]     Given the current need for military personnel, the Debtors have expanded these policies on a case-by-case basis to continue compensation for Employees serving in the Armed Forces beyond 30 days.

[16]     This excludes liabilities on account of short-term disability and long-term disability, as discussed and quantified below.

[17]     On or about October 8, 2005, Delphi amended its bylaws so as to provide for mandatory indemnification of its Executives and certain other salaried Employees.

Debtors seek authority but not direction to continue advancing expenses to approximately 21 of

its Employees and Directors, including one former Employee, who are involved in ordinary

course litigation such as employment cases, wrongful discharges and automobile accidents.  In

addition, the Debtors seek to advance expenses to those Employees who may become involved

in this type of ordinary course litigation because of prepetition acts.  The Debtors believe that the

failure to advance expenses to these Employees and Directors would be detrimental to the morale

of their Employees and would adversely effect the Debtors' ability to execute their

transformation plan.

    39.  In addition, the Debtors seek authority but not direction to advance

expenses to approximately 50 of its Employees and Directors, including 19 former Employees,

currently engaged (and those who may become engaged on account of prepetition acts) in

defending against shareholder class action suits and ERISA class action suits, and participating

in the investigation by the Securities and Exchange Commission.  The Debtors believe that the

claims against such Employee or Director relates to his or her actions undertaken in good faith

on behalf of the Debtors in a manner reasonably believed to be lawful and in the best interests of

the Debtors.  Moreover, in the event that it is determined that the Employee or Director is not

eligible for indemnification, the Employee or Director has agreed to reimburse the Debtors.  For

current Employees and Directors, the Debtors seek authorization but not direction to advance all

expenses for the defense of these suits.  For former Employees and Directors, the Debtors seek to

advance expenses limited to an aggregate cap of $5 million, on a case-by-case basis pursuant to

approval by the Compensation Committee, and only for advances not otherwise reimbursable

from other third parties.

(d)    <u>Expense Reimbursement</u>

40.    <u>Reimbursable Business Expenses</u>.  Pursuant to their normal business practices, the Debtors routinely reimburse Employees and Directors for certain expenses incurred within the scope of their employment including travel, lodging, professional seminars and conventions, ground transportation, business meals, and other similar items reimbursable under the Debtors' existing policies (collectively, the "Reimbursable Business Expenses"). Accordingly, all such Reimbursable Business Expenses were incurred by Employees and Directors with the understanding that they would be reimbursed by the Debtors.  As of September 30, the Debtors estimate that approximately $300,000 in Reimbursable Business Expenses has been incurred by certain Employees and Directors and has not yet been reimbursed to these Employees and Directors.

41.    Certain Employees and Directors may not have been reimbursed for Reimbursable Business Expenses that were incurred prior to the Petition Date.  In part, this resulted from the Debtors' filing their Chapter 11 petitions in the midst of their regular reimbursement cycle for Reimbursable Business Expenses.  Typically, Employees and Directors submit receipts for reimbursement which are processed through the normal expense report and accounts payable process.  Business related credit card charges are paid directly to credit card providers by the Debtors on behalf of the Employees and Directors.  The Debtors reimburse out of pocket expenses via payroll, twice a month.  It is difficult for the Debtors to determine accurately the amount of Reimbursable Business Expenses outstanding as of the Petition Date because not all Employees and Directors have submitted expense reports as of the Petition Date. By this Motion, the Debtors seek authority but not direction to pay all Reimbursable Business Expenses in the ordinary course of business, including those incurred prior to the Petition Date

22

for which Employees have not yet been reimbursed, and to continue its policies relating to

Reimbursable Business Expenses in the ordinary course of business.

42.    <u>Relocation Expenses</u>.  The Debtors provide certain Employees with

relocation related expenses (collectively, the "Relocation Expenses") in order to incentivize

desirable candidates to accept positions with the Debtors, incentivize existing Employees to

accept transfers to other locations within the Debtors' companies (nationally or internationally),

or encourage flowbacks to GM from Delphi plants that have too little work for the existing

number of Employees (collectively, "Relocating Employees").  Relocation Expenses include

those incurred through the Debtors' domestic salary relocation program, hourly relocation

allowance program, and expatriate relocation program.  It is critical that the Debtors be

authorized to pay these Relocation Expenses in order to, among other things, ensure that items

belonging to Relocating Employees will be delivered and that Relocating Employees will be

reimbursed for their expenses incurred in connection with their moves for the Debtors' benefit.

(a)    <u>Domestic Salary Relocation</u>.  For salaried Employees transferring

domestically, the Debtors reimburse certain Relocation Expenses.  As part of the program, the

Debtors advance lump sum payments to domestic salaried Relocating Employees to cover

incidentals and temporary living during the relocation process, depending on the relocating

Employee's family size and distance of relocation.  These lump sum payments have replaced the

Debtors' former receipt reimbursement system and have reduced Relocation Expenses by fixing

the amount of reimbursable expenses at the outset of the relocation.  In addition, the Debtors

currently use SIRVA Relocation ("SIRVA") to administer the Debtors' domestic relocation

program.  SIRVA pays certain relocation-related vendors, including shipping companies, realtors

and relocation agents and purchases Employees' homes prices based on fair market appraisals.

23

As of the Petition Date, the Debtors have no outstanding payments due to domestic salaried Relocating Employees and approximately $1 million owed to SIRVA. The Debtors seek authority but not direction to continue this program in the ordinary course.

(b)   <u>Hourly Relocation</u>. The Debtors also pay a relocation allowance to certain hourly Employees, including UAW Employees, when an eligible Employee is transferred to a different Delphi or GM plant ("Relocation Allowance"). Eligible Employees may choose one of two options for the Relocation Allowance. Under the basic relocation option, an hourly Employee transferring to another Delphi plant may retain the right to return to the original community but not to his or her original plant and is given a Relocation Allowance in an amount between $3,038 and $4,767, based on the number of miles the Employee must move. Under the second option, the Debtors pay eligible Employees $25,000, $67,000, or $89,000 to transfer to another Delphi plant or to flowback to GM ("Enhanced Relocation Amounts"). The Enhanced Relocation Amounts are meant to cover relocation expenses, to serve as an incentive to relocate to a plant where more work is available, and to encourage Union Employees to continue work at the new plant. In keeping with these purposes, for the $25,000 Enhanced Relocation Amount, Employees receive $20,000 of the payment upon relocation and the balance one year later. Employees receiving $67,000 or $89,000 receive the bulk of the payment ($50,000 and $72,000, respectively) in a lump sum upon relocation and the balance in two equal installments on the first and second anniversary of their transfer, so long as they are still active Employees. Pursuant to this Motion, the Debtors seek to pay the anniversary payments to relocating hourly Employees who transferred between Delphi plants. As of the Petition Date, approximately $3.7 million was owed in Enhanced Relocation Amounts.

(c)   <u>Expatriate Relocation Expenses</u>.  At times, because of the global reach of the Debtors' businesses, Employees are moved across continents, resulting in large Relocation Expenses.  To facilitate the moves of its Employees to international parts of the Debtors' businesses, rather than paying out-of-pocket business expenditures on a receipt-by-receipt basis, the Debtors manage the reimbursement of international relocation expenses by advancing funds to expatriate Employees in lump sum payments.  This program has saved the Debtors $20,000-$50,000 per expatriate Employee because the expatriate Employees manage the funds instead of the Debtors, resulting in an almost zero exception rate.  These sums are comprised of an aggregate of several types of allowances (collectively, "Expatriate Relocation Expenses").  The first is a sum equal to $6,000 or one month's pay (whichever is greater) paid prior to the move to cover a variety of incidentals.  The second is a sum equal to 5% of an Employee's base salary, paid for up to three years.  The first year is paid in a lump sum installment representing the annual anticipated expenses for the first year.  The Debtors advance payments in years two and three on a monthly basis to the extent that the Employee remains at the foreign facility.  In addition, expatriate Relocating Employees are eligible for the second sum only if they are relocating across regions (<u>e.g.</u>, from the United States to Europe or from Europe to Asia).  In addition to these amounts, the Employee may receive an expatriate spending account paid during the first month of the assignment and upon the first and second anniversary of the assignment to cover expenses such as life event trips, a home leave, and spousal assistance.  Finally, if the expatriate Relocating Employee has transferred to a country with a higher cost of living, the expatriate Relocating Employee may receive a cost of living allowance to offset the increased living expenses that the expatriate Relocating Employee will encounter in the host country.  Depending on facts and circumstances, the Debtors may also pay the cost of

housing, schooling, or utilities to certain expatriate Relocating Employees. Expatriate

Relocation Expenses, which are largely based on family size and distance of relocation, vary

widely, from as little as $1,500 per family to over $50,000 per family and, as indicated above,

are generally paid over three years. Historically, on average, the Debtors spend $218,000 per

month on this program. As of the Petition Date, the Debtors believe that there are no prepetition

obligations currently owed to expatriate Relocating Employees. The Debtors request authority

but not direction to continue paying Expatriate Relocation Expenses in the ordinary course of

business.

      43.    <u>Automobile Expenses</u>. In the ordinary course of business, for eligible

salaried Employees, the Debtors maintain a program through which their eligible Employees are

provided automobiles. Under this program, the Debtors provide Employees with either a

company-leased vehicle or a monthly stipend in lieu of a company-leased vehicle for use to pay

for automobile and automobile-related expenses (collectively, the "Automobile Expenses"). For

Employees who receive company-leased vehicles, the Debtors pay certain automobile expenses

including lease payments, maintenance charges, and gas expenses. Employees receiving

company-leased vehicles have a set monthly deduction taken from their wages, half of which is

deducted from each semi-monthly paycheck. For the approximately 1,010 Employees who

receive company-leased vehicles, the Debtors expend approximately $650,000 per month on

account of Automobile Expenses. For the approximately 2,120 Employees who receive stipends

ranging from $630 to $2,550 per month per Employee, the Debtors pay approximately $1.8

million per month. Employees that receive a stipend receive a monthly payment amount that is

divided in two and paid in each of the two paychecks salaried Employees receive each month.

For the morale of its Employees and in light of the business of the Debtors, the reimbursement

and payment of Automobile Expenses is an important reimbursable expense.  As of the Petition

Date, the Debtors believe that there are approximately $300,000 in prepetition obligations

currently owed for Automobile Expenses.  The Debtors request authority but not direction to

continue such payments in the ordinary course of business.

44.      Tuition Reimbursement.  In the ordinary course of business, the Debtors

also reimburse certain education expenses whereby the Debtors pay for certain degreed programs

for Employees.  In particular, for an Employee to receive tuition reimbursement, the Employee's

manager must approve the requested program, determining that the requested program will help

the Employees acquire skills that will assist them in their work with the Debtors.  The forecasted

tuition reimbursement cost for hourly and salaried Employees for the remainder of the 2005

calendar year is approximately $665,000 per month for 625 Employees.

(e)      Severance

45.      Salaried Separation Allowance Plan.  The Debtors maintain a separation

allowance plan for full-time and flexible service Classified Employees (the "Separation

Allowance Plan").  Under the Separation Allowance Plan, if a Classified Employee signs a

release of claims, the Classified Employee is eligible for 3 to 12 months base monthly salary

(actual amount depending on length of service and/or responsibility in the organization),

outplacement services, and a $2,000 lump sum payment upon signing a release of claims against

the Debtors and, in some cases, General Motors.  Separated Classified Employees who are

otherwise eligible for the Separation Allowance Plan but who refuse to sign a release of claims

are generally eligible for one month of base monthly salary only.

46.      The Debtors have a separate severance policy for Executives and Officers,

which ranges from 12 to 18 months base pay plus up to 18 months equivalent bonus target with a

general signed release of claims.  The specific amount for an individual payment varies, based

27

upon level of responsibility and on whether the Executive or Officer signs a non-compete

agreement, with Officers eligible for 18 months base pay plus 18 months target bonus and Senior

Executives eligible for 12 months base pay plus 12 months target bonus. [18] Officers and Senior

Executives who do not sign a non-compete agreement as part of their severance receive 12

months pay only.

47.     Within the last twelve months, approximately 100 salaried Employees

have been offered and have accepted severance or Separation and Allowance Plan benefits.  As

of the Petition Date, all but two of these Employees have received payment for their Separation

Allowance Plan Benefits.  The Debtors do not believe that any significant severance obligations

arose between October 1, 2005 and the Petition Date.

48.     The Debtors have also agreed to separate certain hourly Employees in

accordance with collectively bargained, plant-specific attrition plans.  For example, some Union

Employees terminated as a result of events such as plant closings, downsizing, restructuring, or

job elimination, are eligible to receive a lump sum cash payment and vested but unused vacation

days upon leaving the Debtors' employment.  Similarly, lump sum cash payments have been

offered to and accepted by Hourly Employees retiring as part of early retirement packages at a

plant in Lockport, New York and Columbus, Ohio.  Lockport Employees are expected to

separate on December 1, 2005, under a program in which each of the approximately 140

Lockport Employees will receive $25,000 upon separation.  The 12 Columbus Employees had a

separation date of October 1, 2005 under a plan valued at $24,000 ($2,000 per Employee).  As of

the Petition Date, the Debtors believe that all of these amounts have been paid.

---

[18]     Such release generally includes a claim release, non-solicitation, non-compete, non-disclosure, and non-disparagement agreement with the Company.

49.    By this Motion, the Debtors request authority but not direction to continue honoring severance payments and the Separation Allowance Plan for the benefit of current and former Employees and to pay any prepetition amounts related thereto.  Maintenance of such payments is necessary in order to sustain the morale of the Debtors' current Employees who may otherwise leave the Debtors' employ at a critical stage of these proceedings if they believe, rightly or wrongly, that severance benefits will not be paid upon termination.

(f)    Other Bargained-For Compensation

50.    Short Work Week Pay.  In situations where Employees unexpectedly have a short work week due to a plant closing unexpectedly under circumstances such as part shortages or acts of God, the Debtors pay their Employees 80% of their daily wages ("Short Work Week Pay").  Because on a day-to-day basis, the Debtors do not know if a qualifying event will occur, the amount of Short Work Week Pay varies widely.  The Debtors request authority, but not direction, to continue to provide Short Work Week Pay in the ordinary course of business.

51.    Supplemental Unemployment Benefit Compensation.  The Debtors currently provide collectively-bargained supplemental unemployment benefit compensation pursuant to the 2003 Supplemental Unemployment Benefit Plan ("SUB Plan") to certain of its Union Employees with one or more years of seniority due to reduction in force, discontinuance of a plant or operation, temporary layoff, or being unable to do work offered by the plant. Pursuant to the SUB Plan, these Employees receive 95% of their weekly after-tax wage. Typically SUB Plan benefits are paid one week in arrears, although payment only occurs upon evaluation of the Employee's unemployment paperwork and thus, in certain cases, an Employee's SUB Plan benefits may be paid two or more weeks in arrears.  On average, obligations under this program range between $3.3 million and $4.9 million per month, averaging $4.3 million per

month.  Because of the difficulty in estimating which Employees have outstanding paperwork to complete, it is difficult to precisely forecast how much the Debtors owe their Employees for SUB Plan benefits as of the Petition Date.  The Debtors request authority, but not direction, to continue to provide SUB Plan benefits in the ordinary course of business.

52.    JOBS Bank.  Upon exhaustion of SUB Plan eligibility and under certain other circumstances consistent with contractual obligations, the Debtors may place eligible Employees in a non-productive status ("JOBS Bank").  While in the JOBS Bank, such Employees are contractually required to report to a superior on a daily basis and to be available for assignment.  These Employees are paid full wages and benefits.[19]  Approximately 2,500 Employees currently receive SUB Plan Benefits and JOBS Bank benefits.  As of the Petition Date, the Debtors estimate that they owe approximately $1.9 million in prepetition benefits under JOBS Bank.[20]  The Debtors request authority, but not direction, to continue paying JOBS Bank benefits in the ordinary course of business.

53.    Guaranteed Income Stream Benefit Program.  This program provides benefits to eligible UAW and IUE-CWA hourly Employees with ten or more years of seniority who are on indefinite layoff due to reduction in force, discontinuance of a plant or operation, or being unable to do work offered by the plant.  Currently, no one qualifies for this benefit and thus the Debtors have no outstanding obligations under this program.  The Debtors request authority but not direction to provide guaranteed income stream benefits in the ordinary course of business, if needed, as required under the CBAs.

---

[19]    For this liability, the Debtors have reserved approximately $74 million, a number that represents wages expected to be paid to employees in the JOBS banks through the fourth quarter of 2007.

[20]    The prepetition amounts owed for wages and benefits for these SUB Plan and JOBS Bank Employees are also captured in this Motion within the amounts reported for hourly wages and benefits.

(g)    Contractual Payments Resulting From Acquisitions Or Divestitures

54.    As a result of the purchase of certain of the Debtor subsidiaries and the divestiture of parts of the Debtors' business, the Debtors have certain prepetition contractual obligations to certain Employees.  These include a contractual obligation to pay $33,035 to one non-Executive Employee and $192,900 to approximately 21 non-Executive Employees of Delphi Medical Systems Colorado Corporation, a recent acquisition of the Debtors.  In addition, within the last twelve months, eight salaried Employees have agreed to separate and sign a release of claims in connection with the June 30, 2005 sale of the Debtors' starting, lighting, and ignition lead-acid battery business ("Battery Business Sale"), in exchange for a total of no more than $570,000.  None of these payments are due to Executives, Officers, or Directors of the Debtors.

55.    The Debtors estimate that less than 1% of the Debtors' entire workforce, or approximately 465 Employees, are owed in excess of $10,000 per individual for prepetition Human Capital Obligations, with no Employee receiving more than approximately $200,000,[21] and, on average, no more than $28,200.[22]  Accordingly, the Debtors believe that, pursuant to section 507(a)(3) of the Bankruptcy Code, the vast majority of Employees would ultimately be paid in full at the end of these chapter 11 cases in accordance with a Plan.  With respect to those amounts in excess of the priority cap, it is critical to make these relatively de minimis payments to preserve morale and prevent the departure of key Employees who might otherwise find other employment opportunities if not paid.  Consequently, pursuant to this Motion, the Debtors seek

---

[21]    The highest paid Employee receives an amount exceeding $10,000 because of payments from PAP Awards.

[22]    These numbers include calculations of payments owing on account of wages, bonuses, automobile expenses, vacation pay (to the extent it can be paid in cash), basic health benefits, and benefits for those laid off.  These numbers do not attempt to allocate other postretirement benefits across the entire population.  In addition, these numbers do not include payments made on account of SERP benefits, as described herein.

authority but not direction to pay all outstanding amounts owed as of the Petition Date for

accrued and unpaid Human Capital Obligations.

II.    AUTHORIZING PAYMENT OF PREPETITION BENEFITS
       AND THE CONTINUATION OF BENEFIT PROGRAMS

A.    Medical And Insurance Benefit Plans

56.    The Debtors have established plans and policies to provide their

Employees and Retirees with: (a) health benefits, including medical, prescription drug, dental,

mental health and vision; (b) insurance benefits, including short and long-term disability, long-

term care, life insurance, accidental death and dismemberment insurance, and legal services; and

(c) flexible spending account plans ((a), (b), and (c) collectively, the "Medical and Insurance

Benefits").[23]  The Debtors fund the Medical and Insurance Benefits through company

contributions and private insurance arrangements.  Benefits for salaried Employees and Retirees

vary based upon whether salaried Employees began service to the Debtors prior to 2001

(collectively, "Pre-2001 Salaried Employees") or on or after January 1, 2001 (collectively, "Post-

2000 Salaried Employees") and which types of coverage the salaried Employees elected during

annual benefits enrollment.  Benefits for hourly Employees vary based on nationally and locally

negotiated CBAs, to the extent applicable, and which types of coverage the hourly Employees

elected during the enrollment period.

57.    Salaried Employees choose their particular Medical and Insurance

Benefits through a standard cafeteria-plan system as authorized under section 125 of the Internal

---

[23]    Delphi and the Affiliate Debtors collectively sponsor many different Medical and Insurance Benefits plans
which are administered through numerous third parties.  Employees, Retirees, and their dependents'
eligibility for these benefits varies depending on the terms set forth in the applicable Health Benefit Plans.
This Motion describes the programs applicable to the vast majority of the Debtors' 50,600 Employees,
however other like programs exist which cover Delphi's smaller Affiliate Debtors and their Employees.
Through this Motion, the Debtors seek to continue these like programs as well and pay prepetition amounts
related thereto.

Revenue Code of 1986, as amended, 26 U.S.C. § 125.   Salaried Retirees may elect to change the

plan in which they are enrolled on an annual basis, concurrently with salaried Employees.

Hourly Employees and Retirees may elect to change the medical plan in which they are enrolled

no more than once in any one year period except in instances in which they have been affected

with certain "life events," including without limitation, relocation and gaining or losing

dependents.

      (a)    <u>Health Benefits</u>

      58.    An important element of the Medical and Insurance Benefits is medical,

prescription drug, mental health, dental, vision and other similar coverage (collectively, the

"Health Benefits," and the plans under which they are administered, collectively, the "Health

Benefit Plans").   Most of Debtors' Employees and Retirees are enrolled in Health Benefit Plans

that are self-insured, although some are fully insured and some of the plan type options offered

through Debtors' Health Benefit Plans include health maintenance organizations (an "HMO,"

collectively, the "HMOs").   These HMO premiums are paid on a monthly basis at the end of

each month.   Claims for self-insured carriers are reimbursed on a checks cleared basis through a

zero-balance account that is funded by the Debtors, as required.   Most carriers process checks at

least two times each week.   The self-insured Health Benefit Plans are administered by Blue

Cross and Blue Shield of Michigan ("BCBSM"), Connecticut General Life Insurance Company

("CIGNA"), United HealthCare, Inc., and others (collectively, "Administrators")[24] in exchange

---

[24]    Metropolitan Life Insurance Company ("MetLife") operates Delphi's National Benefits Center, which
services all variety of employee benefits-related inquiries, including Health Benefits, on Delphi's behalf.
The Debtors' major medical carriers are BCBSM, United HealthCare, and CIGNA.   BCBSM administers
plans in Alabama, California, Colorado, Florida, Indiana, Kentucky, Maryland, Michigan, Missouri, New
Jersey, New York, North Carolina, Ohio, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah
and Wisconsin via BCBS plans, a "BlueCard Program," or specific agreements with other plans.
Prescription drug benefits are administered by Medco Health Solutions, Inc.   CIGNA administers mental
health benefits.   Dental carriers include Delta Dental and JLT Services.   Vision carriers include Cole
Managed Vision and Davis Vision.   The Debtors also use smaller, regional health care service providers

for payment of administration and processing fees in accordance with the administrator-specific service agreements. On an yearly basis, for example, the Debtors pay BCBSM (the largest of the Debtors processors) approximately $10.8 million in fees (approximately $900,000 per month) in connection with its claims processing services, including standard monthly fees and incentive compensation or penalties related to the proper payment of claims and timeliness of addressing claims. In the aggregate, on an average yearly basis, the Debtors pay their Administrators a total of $20 million in fees for claims processing services.

59.    Claims under the self-insured features of Debtors' Health Benefit Plans are paid by the Administrators. Providers or the Employees, Retirees, or eligible dependents submit medical claims to the Administrators. Upon receipt of a request for payment, the Administrators review the claim and pay the covered portion of Health Benefits for which the Employee, Retiree, or eligible dependent is eligible. Typically, claims are paid from a bank account established by the Administrator and funded by Debtors on a daily basis. There may be some variations in this process among certain Administrators engaged by Delphi or the Affiliate Debtors. There is typically some lag time between submission, processing, and payment of claims. With regard to the gap of time between when the Employee, Retiree, or eligible dependent receives the medical care and when the provider, Employee, Retiree, or eligible dependent submits the claim for reimbursement (the "Pipeline Medical Claims"), it is estimated that as of September 30, 2005, the Pipeline Medical Claims aggregate value is approximately $36.9 million ($26.5 million for Employees and $10.4 million for Retirees). By this Motion, the Debtors request authority to pay the Pipeline Medical Claims, plus any unpaid plan

---

and specialized third party administrators, including Green Shield Canada, HealthPlus Options, Inc., Health Solutions, Inc., Hewitt Associates LLC, Medstat Group, Inc., M Plan, Inc., National Foot Care Program, Inc., Health International, Inc., Towers Perrin, the Regents of the University of Michigan, Value Options, Inc., and FBD Consulting.

administrative fees or claims handling charges owed to the Administrators in connection therewith.

60.    Debtors offer fully-insured Health Benefits in all states where Employees, Retirees, and their eligible dependents reside.  The plans are administered by numerous insurance companies (the "Alternate Administrators").  Processing of claims under these plans is substantially similar to self-insured Health Benefit Plans.  However, Debtors' payment terms are established in advance of claim experience based on negotiated rate agreements establishing premiums for a given period of time.[25]

61.    <u>Health Benefits For Salaried Employees</u>.  In general, a salaried Employee and his or her dependents are eligible for Health Benefits on the Employee's date of hire.[26]  The Health Benefits for salaried Employees are partially funded through monthly Employee contributions.  The remainder is funded from the general assets of the Debtors.  Although exact benefits vary for Pre-2001 Salaried Employees and Post-2000 Salaried Employees, most of the benefits described below are available to all salaried Employees.   For medical coverage, while initially enrolled in a standard plan, after 31-61 days and on an annual basis thereafter, salaried Employees may choose between a variety of plans including the standard plan, an enhanced standard plan, a point of service plan ("POS"), or a health maintenance organization ("HMO").  Employee contributions vary depending on the plan chosen.  Additional Health Benefits provided to salaried Employees and their dependents include, but are not limited to, prescription drug coverage, subject to co-payments, traditional dental coverage, and vision benefits.  A salaried Employee and his/her dependents may remain eligible for benefits for a limited time if

---

[25]    Debtors also fund a small portion of COBRA benefits for severed Employees in accordance with their statutory obligations.  The Debtors hereby seek authority to fund such obligations in the ordinary course of business.

such Employee's active, full-time work ceases due to disability, leave of absence or separation. In sum, approximately 50,800 participants are covered by the Debtors' salaried Health Benefit Plans, including approximately 15,300 salaried Employees, 3,900 Retirees, and 31,600 dependents.

      62.    <u>Health Benefits For Hourly Non-Union Employees And Certain Hourly Union Employees</u>.  In general, hourly Employees are eligible for Health Benefits, including comprehensive medical, dental, vision, mental health, and prescription drug coverage, pursuant to Employees' applicable CBAs, if they normally work at least 30 hours per week and have successfully acquired seven months of seniority.[27]  These benefits may extend to Employees' dependents, including but not limited to spouses and children.  Hourly Employees may choose their particular medical coverage from a variety of options, including traditional indemnity, PPO, and HMO plans.  An Employee and his/her dependents may remain eligible for benefits for a limited time if such Employee's active, full-time work ceases due to disability, leave of absence, or layoff.  In sum, nearly 109,400 hourly participants are covered by the Debtors' Health Benefit Plans, including nearly 33,700 Employees,[28] 13,400 Retirees, and approximately 62,300 dependents.

      63.    During the first nine months of fiscal year 2005, the Debtors spent approximately $58.3 million per month,[29] or approximately $356 per month per participant, in

---

[26]      In this context, salaried Employees include regular full-time Employees and flexible service Employees.

[27]      Certain of the Debtors' hourly Employees covered by particular local Union CBAs (the "Local CBA" or, collectively, the "Local CBAs") are not entitled to comprehensive benefits until reaching "core group" parity, which generally occurs after a Local CBA Employee has been employed for between one and ten years.  Under the terms of the Local CBAs, Employees are covered by a special HMO agreement with United HealthCare only.  Moreover, dental, vision, and hearing aid coverage is excluded until they reach full core group parity.

[28]      This number includes former Employees receiving COBRA benefits and surviving spouses.

[29]      On a gross basis, not including plan participant contributions.

connection with Health Benefits.  As of September 30, 2005, the Debtors estimate that the aggregate outstanding unpaid amount for the Health Benefits is approximately $54.4 million, of which $46.7 million constitute known and estimated self-insured reserves and related administrative costs and $7.7 million constitute accrued amounts payable to the private insurance companies. In addition, the Debtors have accumulated postretirement benefit obligations relating to health care of $3.2 billion and $5.6 billion for Retirees and Employees, respectively.[30] However, the current monthly cash expense for Retirees' Health Care is $14 million, based on a historical average.  By this Motion, the Debtors seek authority, but not direction, to make all payments, claims and remittances due and owing as of the Petition Date for Health Benefits in the ordinary course of business and to continue honoring these benefits postpetition.

(b)    Insurance Benefits

64.    The Debtors provide their Employees and Retirees with certain life and accident insurance benefits including: (a) basic and optional life and accident insurance, dependent life and accident insurance, supplemental life benefits and personal accident insurance; (b) short-term and long-term disability; and (c) other related benefits  ((a), (b), and (c), collectively, "Insurance Benefits").

(a)    Life And Accident Insurance.  Debtors provide life and accident insurance to Employees and Retirees pursuant to group policies issued by MetLife.  Delphi maintains employee benefit welfare plans which provide life insurance benefits, as described below, for different classifications of Employees.  In addition, the Affiliate Debtors also provide insurance benefits through MetLife or other insurance companies, as locally negotiated.  The

---

[30]    Of the $8.8 billion, obligations as of December 31, 2004 for Employees and Retirees, hourly and salaried, were $7.4 billion and $1.4 billion, respectively.

Debtors seek authority but not direction to continue payments related to life and accident insurance in the ordinary course.

(i)      Life And Work-Related Death Benefit Insurance For Salaried Employees. Delphi provides Basic Life Insurance to all salaried Employees and Retirees free of charge. For Pre-2001 Salaried Employees, the Debtors provide basic life insurance equal to two times an Employee's base annual salary. Pre-2001 Salaried Employees also are offered the option of purchasing additional optional coverage in the amount of one to five times the Employee's base salary. For Post-2000 Salaried Employees, Basic Life Insurance coverage begins 31-61 days after active service to Delphi begins and payments under the plan equal $50,000.[31]  At their own expense, Post-2000 Salaried Employees may purchase additional optional life insurance in $100,000 increments up to $1,000,000, but not to exceed ten times the Employee's base salary. Salaried Employees may also purchase, at their own expense, insurance for their dependents in a variety of increments. As part of the basic life insurance that Delphi provides, salaried Employees also receive work-related death benefits. If a salaried Employee dies due to a work-related incident, Pre-2001 Salaried Employees' beneficiaries receive an additional one times the Employee's salary and Post-2000 Salaried Employees receive an additional $50,000. Moreover, for Employees designated as Officers or Executives after January 1, 1989, the Debtors provide a supplemental life benefits program ("SLBP"), which provides the beneficiary of an Officer or Executive who dies with a payment equal to two times the Officer or Executive's annual base salary plus two times the annual base salary in excess of $200,000. Unlike basic life insurance benefits, SLBP is self-insured by the Debtors and claims are paid in a lump sum from the Debtors' general assets. Recipients take ordinary income for this benefit. As

---

[31]      For flexible service Employees, the benefit amount is $15,000.

of the Petition Date, the Debtors have accrued $1.4 million for life insurance benefits and SLBP

for salaried Employees.  The Debtors seek authority but not direction to continue these program

in the ordinary course of business and to pay any prepetition amounts related thereto.[32]

(ii)    <u>Life And Accident Insurance For Hourly Employees</u>.  The

Debtors provide basic life insurance for their hourly Employees in negotiated amounts as set

forth in their applicable plan documents.  These amounts range from $8,000 to $82,000.  Hourly

Employees may also purchase additional optional coverage in the amount of $10,000 to

$200,000.  Under some plans, hourly Employees with terminal illnesses may accelerate up to

half of their life insurance benefits.  Furthermore, all hourly Employees may purchase, at their

own expense, insurance for their dependents in a variety of increments.  Part of the premium

Delphi pays for basic life insurance also goes to provide extra accident insurance for hourly

Employees.  The amount of coverage is based on the hourly rate of the Employee and ranges up

to $41,000 based on the terms of the applicable CBA.  In addition, three times the amount may

be paid for occupational-related deaths.  As of the Petition Date, the Debtors have accrued $1.6

million for basic and options life insurance benefits for hourly Employees.  The Debtors seek

authority, but not direction, to continue this program in the ordinary course of business and to

pay any prepetition amounts related thereto.

(b)    <u>Personal Accident Insurance</u>.  The Debtors also provide Employees

with optional personal accident insurance, at Employee's expense, in a variety of coverage levels

ranging from $10,000 to $500,000.  Accident Insurance covers accidental dismemberment or

other defined accidental losses.  It is not payable if the injury is self-inflicted or if other excluded

---

[32]    The Debtors seek authority, but not direction, to continue basic life insurance benefits for Retirees, but do
not seek authority to cover self-insured SLBP for Retirees.

events occur.  The Debtors seek authority but not direction to continue this program in the ordinary course.

(c)    Short-Term And Long-Term Disability.  The Debtors also provide certain Employees with short-term and long-term disability benefits and optional long-term care insurance (collectively, "Disability Benefits").  The Debtors self-insure the short-term and long-term disability benefits.  By this Motion, the Debtors seek authority but not direction to pay all amounts due and owing as of the Petition Date for Disability Benefits in the ordinary course of business and to continue these benefits postpetition.

(i)    Salaried Employees Short-Term Disability.  Salaried Employees are eligible for short-term disability benefits ("Short-Term Disability") upon sickness or other disability which prevents the Employee from performing the duties of his or her occupation.  Pre-2001 Salaried Employees' Short-Term Disability benefits equal 60% of base pay, provided the disability arose in the first 12 months of service, and 75% of base salary if the disability occurs thereafter.  Post-2000 Salaried Employees are eligible for Short-Term Disability benefits after six months of service in amounts equal to 75% of base pay for up to 25 weeks (with an additional week of salary continuance).

(ii)    Salaried Employees Long-Term Disability.  Pre-2001 Salaried Employees with ten years of service are eligible for extended disability benefits ("Extended Disability") and Post-2000 Salaried Employees are eligible for long-term disability benefits ("Long-Term Disability") after six months of service.  The Debtors provide Extended Disability to eligible Employees free of charge at the rate of 60% of the Employees' monthly base salary.  Conversely, Long-Term Disability is administered by MetLife and fully-funded by Post-2000 Salaried Employees through pre-tax contributions.  Benefits under both plans are paid

out after-tax at the rate of 60% of the Employee's monthly base salary as of September 1 of the year prior to the first day of disability. In addition, for certain Pre-2001 Salaried Employees who were not eligible for Extended Disability because of their length of service, the Debtors provided Supplemental Extended Disability benefits, which are fully-funded by the Employee. In addition, both Extended Disability and Long-Term Disability benefits are decreased by certain monthly benefits under the SRP, as defined below, as well as other governmental benefits. For most salaried Employees, payments are made for the length of the disability until such Employee either returns to work or obtains the age of 65.[33] On an average monthly basis, the Debtors spend approximately $841,000 per month on account of salaried Short-Term Disability, Extended Disability, and Long-Term Disability.[34]

(iii)    <u>Long-Term Care Insurance</u>. All salaried Employees may also elect to purchase long-term care insurance. This is a completely voluntary program administered by John Hancock Life Insurance Company (also the claims fiduciary under the program) for which the Debtors offer, as a sponsoring employer, to make payroll deductions upon an Employee's election. The Debtors do not fund nor make guarantees for the payment of these benefits.

(iv)    <u>Hourly Employees' Short-Term Disability</u>. The specific Disability Benefits provided for hourly Employees differ depending on which CBA governs the hourly Employee's employment. Generally, hourly Employees' short-term disability benefits equal a negotiated weekly rate payable for up to one year. The Debtors spend, on average,

---

[33]    For certain Employees hired between 1996 and 2001, Extended Disability benefits may terminate earlier unless the Employee purchased, at his or her own expense, supplemental extended disability benefits.

[34]    As of the Petition Date, the Debtors have accrued $54.4 million for salaried Employees and Retirees. This amount is actuarially derived and includes the present value of anticipated payments to currently disabled Employees and Retirees and an accrual for the possibility of current Employees becoming disabled in the future.

approximately $2.85 million per month on account of hourly Employees' short-term disability benefits.[35]

    (v) <u>Hourly Employees Extended Disability Benefits</u>.  Hourly Employees are also eligible for extended disability benefits, which equal a negotiated monthly rate.  For hourly Employees with than ten years of service and continued disability, extended disability benefits are payable for a time equal to the hourly Employee's length of service.  For hourly Employees with more than ten years of service and continued disability, benefits are provided until age 65.[36]  The Debtors typically spend approximately $867,000 per month on account of hourly Employees' long-term disability benefits, as based upon historical averages.

    (d) <u>Personal Umbrella Liability Insurance</u>.  The Debtors provide, at the Debtors' expense, personal umbrella liability insurance ("PULI") administered through AON Risk Services and provided by Chubb Custom Insurance Company for Executives, Officers, and Non-Employee members of the Board of Directors, their spouses, and other eligible family members.  PULI provides personal liability protection up to $5 million and the Debtors pay premiums in advance at the beginning of the plan year.  Income is imputed to eligible participants for the value of this benefit. The Debtors seek authority but not direction to continue to provide PULI to its Executives and Officers.

    65. <u>Flexible Spending Accounts</u>.  The Debtors also provide their Employees with flexible spending account plans pursuant to which some Employees maintain accounts for healthcare and dependent care.  Under the flexible spending account plans, Employees have

---

[35] Debtors have accrued approximately $1.6 million, as of the Petition Date, for short term disability benefits.

[36] As of the Petition Date, the Debtors have accrued $154.4 million for long-term disability benefits hourly Employees and Retirees.  This amount is actuarially derived and includes the present value of anticipated payments to currently disabled Employees and Retirees and an accrual for the possibility of current Employees becoming disabled in the future.

amounts withheld from their paychecks and those amounts subsequently can be used to

reimburse Employees for their healthcare expenses and dependent care expenses, such as

insurance deductible amounts.  Flexible spending accounts are composed entirely of the

Employee contributions and the Debtors believe that these monies are being held in trust for the

benefit of those contributing Employees and, therefore, generally are not property of the Debtors'

bankruptcy estates.  Nevertheless, out of an abundance of caution, the Debtors seek the approval

of this Court to continue this program and to reimburse Employees in the ordinary course.

66.     Flex Plan Payments.  As part of the November benefits enrollment process

whereby Employees choose which level of Health and Insurance Benefits they would like to

elect, salaried Employees hired prior to January 1, 2001, are to receive a $1,200 lump sum

payment on March 15, 2006 to help defer the cost of Health and Insurance Benefits.  In

particular, this sum is intended to defer part of the cost of co-payments that salaried Employees

are required to make for Health and Insurance Benefits.  There is no prepetition obligation under

this program.  The Debtors seek authority, but not direction, to continue this program in the

ordinary course of business.

B.     Pension Plans

67.     The Debtors maintain many employee benefit pension plans for their

Employees.[37]  The Plans include qualified defined contribution and defined benefit plans, non-

qualified supplemental executive retirement plans and excess plans (collectively, the "Pension

---

[37]     General Motors Investment Management Company ("GMIMCo") is the named fiduciary for investment
purposes and an investment manager of most of Delphi's employee benefit plans and many of the Affiliate
Debtors' employee benefit plans.  In this capacity, GMIMCo is responsible for investing the assets of
Debtors' Defined Benefit Plans, appointing other investment managers, and appointing trustees. State Street
Bank and Trust Company serves as Trustee for the 401(k) Plans and Defined Benefit Plans for which
GMIMCo serves as named fiduciary for investment purposes.  Fidelity Investments is the recordkeeper for
many of Debtors' 401(k) Plans and serves as trustee for the Delphi Diesel Systems Corp. Retirement
Savings Portfolio.

Plans").  Pursuant to this Motion, the Debtors seek authority but not direction to honor, continue,
and make funding contributions to these Pension Plans in the ordinary course of business.

      68.   <u>Tax Qualified Retirement Plans</u>.  The Debtors maintain several tax-
qualified Pension Plans for the benefit of their Employees, including defined contribution and
defined benefit plans.

      (a)   <u>Defined Contribution Plans</u>.  The Debtors maintain numerous
defined contribution plans for the benefit of their Employees.  These include the Delphi Savings-
Stock Purchase Program (the "S-SPP"), the Delphi Personal Savings Plan for Hourly-Rate
Employees in the United Stated (the "PSP"), the Delphi Income Security Plan for Hourly-Rate
Employees ("ISP"), the ASEC Manufacturing Savings Plan, the Delphi Mechatronic Systems
Savings-Stock Purchase Program, the Packard-Hughes Interconnect 401(k) Plan, the Delphi
Diesel Systems Corp. Retirement Savings Portfolio, the Specialty Electronics, Inc. 401(k) Plan,
and the Delphi Medical Systems Colorado 401(k) Plan (collectively the "Defined Contribution
Plans").  The Defined Contribution Plans provide for automatic pre-tax or post-tax salary
deductions of eligible compensation up to the limits set by the Internal Revenue Code of 1986, as
amended.  Generally, Employees may take loans in any amount between $1,000 and one-half of
the current eligible assets in their account up to $50,000 with a fixed rate of interest.  State Street
Bank and Trust Company serves as Trustee for all Defined Contribution Plans but the Delphi
Diesel Systems Corp. Retirement Savings Portfolio, Specialty Electronics, Inc. 401(k) Plan, and
Delphi Medical Systems Colorado 401(k) Plan.  In the past, the Debtors have paid matching
contributions depending on Employee eligibility, the governing CBA, and Employees'
participation.  On several occasions the Debtors have, however, altered or suspended their
matching contributions.  For example, Delphi most recently suspended the S-SPP match

effective October 16, 2004.[38]    The largest Defined Contribution Plans, the S-SPP, the PSP, and

the ISP, are described in more detail below.  Approximately 33,300 Employees and 9,100

Retirees participate in the S-SPP, the PSP, and the ISP.  The Debtors request authority but not

direction to honor, continue, and make funding contributions to the Defined Contribution Plans

in the ordinary course of business.

(i)      S-SPP.  Upon date of hire, Delphi salaried Employees are

automatically enrolled in the S-SPP with a deferral rate of 3% of eligible salary.  Under the S-

SPP and subject to IRS limits, Employees are able to defer compensation on a pre-tax and after-

tax basis up to 60% of eligible salary.  Eligible Employees are fully vested in the S-SPP for all

Employee elective deferrals.  The Debtors' contributions to the S-SPP become vested at the end

of each calendar year for the Employee's first three years of participation; thereafter, the Debtors'

contributions vest immediately.  If the S-SPP participant leaves Delphi's employ before

completing three years of employment, all of the Debtors' contributions are forfeited that were

made in the calendar year the participant separates from employment.  S-SPP participants may

choose to invest contributions in over 70 investment options under the S-SPP, may transfer

assets and change investment options on a daily basis, and take loans from their S-SPP accounts.

For Employees hired on and after January 1, 1993 and before January 1, 2001, Delphi

contributes 1% of pay annually.  As indicated above, although currently suspended, Delphi may

provide matching contributions subject to specified limits.  Although participants may move

assets out of the Delphi Common Stock Fund, allocations and transfers into the Delphi Common

Stock Fund are currently suspended.

---

[38]      Certain of the Debtors currently maintain matching programs for their Defined Contribution Plans in
amounts ranging from $.25-$.30 on the dollar for each dollar contributed up to 5% of salary.

(ii)    <u>PSP</u>.  The Debtors contribute to the PSP for certain UAW, IUE-CWA, USWA, and other hourly Employees.  Hourly Employees who have been employed by the Debtors for 90 days are eligible to enroll in the PSP, if their governing CBA so provides.  UAW hourly employees hired on or after May 3, 2004 are automatically enrolled in the PSP with a deferral rate of 3% of the first 7% of eligible weekly pay.  Under the PSP and subject to IRS limits, Employees may defer on a pre-tax and after-tax basis up to 60% of eligible weekly pay.  For certain PSP participants, the Debtors also contribute up to 8% of an eligible Employee's base hourly rate on the straight-time portion of all compensated hours worked on a weekly basis, including vacation and holiday pay.  For those Employees receiving 8% contributions from the Debtors, the contribution includes 1% towards post-employment health care and life insurance.  Eligible Employees are fully vested in the PSP for all employee elective deferrals.  The Debtors' contributions to the PSP become vested as defined in the local CBAs.  If the PSP participant leaves Delphi's employ before completing the requisite vesting period, all of the Debtors' contributions are forfeited.  PSP participants may choose to invest contributions in over 70 investment options under the PSP and may transfer assets and change investment options on a daily basis.  Delphi contributions are invested only in Delphi Common Stock Fund during the vesting period.  Upon vesting, the Employee may transfer those assets as well.  PSP Employees may also take loans from their PSP accounts.

(iii)    <u>ISP</u>.  The ISP is a qualified defined contribution savings plan into which Delphi contributes a set amount, ranging from $.08 to $.47 for each hour an eligible hourly employee works.   Eligible hourly Employees include those IUE-CWA, USWA, and certain other union-represented employees with whom Delphi has negotiated a competitive wage and benefit package.  The ISP's primary purpose is to supplement state unemployment

46

compensation in the event of a lay-off, in lieu of SUB Plan benefits.  Any balance in the ISP will

generally be paid when the employee terminates employment.  On average, the Debtors

contribute approximately $60,000 per month to ISP accounts for the benefit of certain hourly

Employees.

(b)    Defined Benefit Pension Plans.  The Debtors maintain several

single-employer defined benefit pension plans for their Employees.  Benefits differ widely

among the Defined Benefit Plans, which, in the aggregate, cover defined benefits for

approximately 17,050 Employees and 16,620 Retirees.[39]  The largest of the plans are described

in more detail below.  The Debtors request authority but not direction to honor and make funding

contributions to the Defined Benefit Plans in the ordinary course of business.

(i)    SRP.  Delphi's salaried Employees with five or more years

of service are eligible for retirement benefits under the SRP.  The SRP is comprised of three

parts: (1) Part A, the Delphi funded feature for Pre-2001 Salaried Employees ("Part A"); (2) Part

B, the voluntary, contributory feature for Pre-2001 Salaried Employees ("Part B"); and (3) Part

C, the cash balance feature for which Post-2000 Salaried Employees are eligible ("Part C").

(1)    Part A.  Benefits under Part A are funded solely by

Delphi and provide a pension based on years of service, age at retirement, and the applicable

benefit rate.  In addition to the base benefit determined by a formula, retirees may be eligible for

supplemental benefits until the retirees are eligible for social security.

(2)    Part B.  Part B benefits provide an additional

monthly or lump-sum benefit to Retirees.  Although contingent on Employee contributions,

---

[39]    These include the Delphi Retirement Program for Salaried Employees ("SRP"), Delphi Hourly-Rate
Employees Pension Plan ("HRP"), ASEC Manufacturing Retirement Program, Delphi Mechatronic
Systems Retirement Program, Packard-Hughes Interconnect Non-Bargaining Retirement Plan, Packard-

Delphi funds approximately 85% of the benefits paid.  The employee contribution is 1.25% of the Employee's eligible monthly base salary in excess of $3,700.  Part B benefits are comprised of primary and supplemental benefits.  The primary monthly benefit is the aggregate of (i) five percent (5%) of the Employee's contributions made prior to July 1, 1977; (ii) six and one-quarter percent (6.25%) of the Employee's contributions made between July 1, 1977 and October 1, 1979; and (iii) eight and one-third percent (8.33%) of the Employee's contributions made after October 1, 1979.  The supplementary monthly benefit is equal to 1% of the amount by which the Employee's monthly base salary over the 60 highest months in the last 120 months exceeds an applicable amount (set forth in the SRP), multiplied by years of service.  Participation in Part B is voluntary.

   (3) <u>Part C</u>.  For Employees hired after 2000, the SRP provides a "cash balance" benefit.  Benefits under Part C are based on the Debtors' annual contribution of 4.7% of the Employee's base salary and an annual interest credit.  Under Part C, benefits can be paid in a lump sum or as an annuity.

   (ii) <u>HRP</u>.  The HRP, a benefit funded solely by Delphi for which the bulk of Debtors' Union Employees are eligible, provides a pension based on years of service and the applicable benefit rate.  In particular, the HRP provides benefits to UAW, IUE-CWA and USWA Employees and certain other represented and non-represented employees with five or more years of credited service.  HRP benefits are comprised of (1) a basic benefit (determined using the applicable benefit rate in effect as of the date of retirement multiplied by years of credited service), (2) a temporary benefit (payable to certain retirees until eligible for 80% of Social Security), (3) an early retirement supplement (payable to certain retirees until

---

Hughes Interconnect Bargaining Retirement Plan, Packard-Hughes Interconnect Foley Retirement Plan, and the Delco Electronics Overseas Corporation Pension Plan (collectively, the "Defined Benefit Plans").

eligible for 80% of Social Security), and (4) an interim supplement (payable to certain retirees until eligible for 80% of Social Security).  Specific rates are set forth in schedules in the HRP.

69.   <u>Non-qualified Plans And ERIP</u>.  The Debtors also maintain several plans that are not qualified under the Internal Revenue Code for tax purposes.  These include the Delphi Supplemental Executive Retirement Program ("SERP"), 2005 Delphi U.S. Executive Retirement Incentive Program ("ERIP") (an amendment to the SERP), Delphi Benefit Equalization Plan for Salaried Employees ("BEP"), ASEC Manufacturing Supplemental Retirement Plan, and ASEC Manufacturing Supplemental Savings Plan (collectively, the "Non-qualified Plans").  The largest of these plans are described below.  These plans are intended to supplement the Defined Benefit Plans, and therefore, some of the calculations are based upon numbers derived from the applicable Defined Contribution Plans and Defined Benefit Plans.  Pursuant to this Motion, the Debtors seek authority, but not direction, to continue the Non-qualified Plans postpetition.

(a)   <u>SERP</u>.  The Debtors maintain the SERP for Officers and Executives to incentivize Officers and Executives to maintain long-standing employment with the Debtors.  The SERP is an unfunded retirement plan which provides Officers and Executives (or their designated beneficiaries) with the greater of the benefit provided by a "Regular Formula" or under an "Alternative Formula."[40]  To be eligible for a benefit, an Officer and Executive

---

[40]   *Regular Formula*: Under the Regular Formula, the Officer or Executive's monthly pension is equal to 2% of average monthly base salary for the highest 60 months during the 120 months preceding retirement, times years of SRP service, less the sum of other retirement benefits, plus 2% of the maximum age 65 primary social security benefit in the year of retirement, multiplied by SRP service plus benefits under certain other of Delphi's programs.

*Alternative Formula*:  Under the Alternative Formula, the Officer or Executive's monthly pension is equal to 1.5% of the Officer or Executive's average total direct compensation, including incentive compensation, for the highest 60 months during the 120 months preceding retirement, times years of SRP service to a maximum of 35 years, less the sum of other retirement benefits, plus 100% of the age 65 primary social security benefit, plus benefits under certain other Delphi programs.  Benefits under the Alternative Formula

generally must have ten years of credited service in SRP and attain age 62 prior to retirement.

Alternately, through the Debtors' ERIP, an Officer or Executive may become eligible, at the

Debtors' election, for SERP benefits if the individual is ages 53 to 61, is eligible to retire under

the SRP, is a redundant Employee who is offered the ERIP, and executes a release of claims.

ERIP recipients receive unreduced SERP benefits and SRP benefits (reduced for age), plus

additional SERP benefits to replace the SRP age-reduction amount.  Currently, the Debtors

provide SERP benefits to approximately 150 former Officers and Executives (or, in certain

cases, their surviving beneficiaries).  Under this Motion, the Debtors seek authority but not

direction to continue to pay prepetition and postpetition SERP benefits amounts up to $5,000 per

month per eligible Retiree (including eligible Employees who retire during the pendency of these

cases) for SERP benefits, which for some Retirees is a significant reduction in monthly benefits.

The Debtors believe that the maintenance of SERP benefits is essential in the retention of and in

maintaining the morale of current Employees as it signals the Debtors' willingness to take care of

the Employees who have given many years of service to the Debtors.

(b)   BEP.  The BEP is available to Officers and Executives whose

contribution and benefit levels in the S-SPP exceed certain limits permitted under section 415 of

the Internal Revenue Code.  This program is not funded and, since October 2004, when the

Debtors' match was suspended, contributions have been de minimis.  Individual account balances

track Delphi common stock and distributions from the BEP can be made upon separation from

the Debtors no later than full distribution of the participant's S-SPP account.  The Debtors

request authority but not direction to continue the BEP in the ordinary course of business.

---

cease if an Officer or Executive engages in competitive activity or acts in a manner inimical or contrary to
the best interests of Delphi.

C.    Workers' Compensation Obligations

70.    Under the laws of the various jurisdictions in which they operate, the Debtors are required to maintain workers' compensation policies and programs and to provide Employees with workers' compensation coverage for claims arising from or related to workplace illnesses or injuries arising during their employment with the Debtors. Therefore, and in accordance with applicable requirements of local law, the Debtors maintain workers' compensation programs in all states in which they operate.

71.    In ten states,[41] the Debtors currently provide their Employees with a self-insured workers' compensation plan. In addition, the Debtors maintain an excess insurance policy provided by ACE American Insurance Company ("ACE"), which provides $1 million of coverage for each accident. Pursuant to these policies, Employees seeking reimbursement for work-related injuries file their claims directly against the Debtors. ACE, or its third-party administrator, investigates the claims against the Debtors and validates those deemed meritorious. For the policy, the Debtors pay a minimum annual premium of $880,527 (based on a fixed estimated amount of total annual remuneration). The Debtors have contracted with Sedgwick CMS, a third-party administrator, to administer the Debtors' self-insured workers' compensation program. In connection with their self-insured workers' compensation programs, the Debtors maintain letters of credit, security deposits, or surety bonds in the aggregate amount of $25.7 million for the benefit of the ten states in which the Debtors self-insure.

72.    In the remainder of states in which the Debtors operate, the Debtors currently insure their workers' compensation liabilities through a series of jurisdiction-specific workers' compensation policies issued by ACE. Pursuant to these policies, Employees seeking

---

[41]    The states include Alabama, Georgia, Indiana, Kansas, Michigan, Mississippi, New Jersey, New York, Ohio, and Wisconsin.

reimbursement for work-related injuries file their claims directly against the Debtors.  ACE, or

its third-party administrator, investigates the claims against the Debtors and validates those

deemed meritorious.  The Debtors pay premiums to purchase Issuer policies with differing

deductibles, the amounts of which vary with state law requirements.  The Debtors are obligated

to reimburse ACE for any policy deductible amounts.

73.    If the Debtors are unable to pay their prepetition workers' compensation

obligations, the Debtors expect that the letters of credit, security deposits, and/or surety bonds

will be drawn, resulting in millions of dollars of claims against the estates.  Further, the Debtors

believe that if they are not permitted to honor their workers' compensation obligations (a)

alternative arrangements for workers' compensation coverage would most certainly be more

costly, (b) the failure to provide coverage may, in some states, subject the Debtors or their

officers to severe penalties and possibly a shut down, and (c) the Debtors may have their

qualified self-insured employer status revoked in the respective states, resulting in much higher

costs to the Debtors' estate.  Thus, the Debtors believe that their failure to pay amounts relating

to these workers' compensation claims would make it more difficult to successfully reorganize.

74.    The Debtors' outstanding obligations relating to workers' compensation

arise from incurred but not paid claims and incurred but not reported ("IBNR") claims.  The

Debtors estimate their IBNR through an actuarial process that is common in the insurance

industry.  At the end of June 30, 2005,  approximately 7,000 workers' compensation claims were

pending against the Debtors arising out of Employees' alleged on-the-job injuries.  The Debtors

estimate that the aggregate amount payable on account of incurred but not yet paid claims and

IBNR claims arising prior to the Petition Date is approximately $260.4 million.  The Debtors

expect that cash payments for the next 12 months related to prepetition workers' compensation claims will be approximately $81.2 million.

75.    By this Motion, the Debtors seek authority, but not direction, to pay all amounts related to workers' compensation claims and IBNR claims that arose prior to the Petition Date as they become due in the ordinary course of business and to continue paying workers compensation in the ordinary course.

D.    Other Benefits Obligations

76.    In addition to the benefits described herein, the Debtors offer certain other benefit programs to various groups of non-Executive hourly and/or salaried Employees.  These programs include the suggestion plan program under which Employees, other than Officers and Executives, are compensated for making suggestions outside of one's job scope that improve the Debtors' businesses.   Compensation ranges between recognition for an idea, gift certificates, or payments in amounts up to $20,000 per person.  As of June 30, 2005, the Debtors paid $4.0 million to hourly Employees and $1.3 million to salaried Employees in 2005 for suggestions under this plan.  In addition, for certain UAW and IUE-CWA members, the Debtors provide tuition assistance for dependants up to $1,500 per year, which is a taxable program to recipient Employees.  Such obligations cost the Debtors approximately $725,000 per month for, on average, 835 individuals.  Additional benefits offered to Employees include, but are not limited to, trainee programs; loan programs; a fellowship program whereby the Debtors pay Employees 50% of their base salary and pay tuition expenses for the Employees to go to graduate school to study engineering and business; employee assistance programs (EAP programs); military leave policies; jury duty policies; executive financial planning services; executive physicals; adoption

assistance; and others (collectively, "Other Benefits Obligations").[42]  The costs of these other

benefit obligations vary by program, but the Debtors believe that these programs are important to

maintaining Employee morale and retaining the Debtors' workforce and assert that failing to

honor such programs would have an intangible adverse effect on the morale of the Debtors'

Employees.  Thus, by this Motion, the Debtors request authority but not direction to continue the

Other Benefits Obligations in the Debtors' sole discretion and make prepetition and postpetition

payments pursuant to such programs in the ordinary course of business.

77.     As part of the Debtors' Other Benefit Obligations, the Debtors have

obligations to various charitable causes.  The Debtors' businesses are guided by adherence to the

Delphi Principles – five tenets which provide the cultural framework to guide the Debtors' and

their Employees' actions.  One of the Delphi Principles is "Responsibility to Society" and the

Debtors have a long-standing commitment to build and maintain effective relationships with the

communities and institutions with which they and their Employees interact.  One of the primary

elements of the Debtors' commitment is an active involvement with charitable and social

organizations in the communities in which the Debtors' operate their businesses, including by

way of monetary contributions to such organizations (the "Charitable Contributions").

Charitable Contributions are made either directly by one of the Debtors or through the Debtors'

charitable organization, Delphi Foundation, Inc.  The Debtors believe that the Charitable

Contributions generate significant goodwill for the Debtors, which benefits the Debtors'

relationships with their customers and Employees, many of whom live in the communities

benefited by the Charitable Contributions and volunteer with the organizations that receive the

Charitable Contributions.  The Debtors firmly believe that strong relationships with these

---

[42]     Under this Motion, the Debtors do not seek to pay prepetition amounts related to the Legal Services Plan or the Training Fund.

communities, customers, and Employees enhances the Debtors' long-term economic and

operational success. Furthermore, a failure to continue the Debtors' prepetition Charitable

Contributions in the ordinary course would present a severe hardship to certain of the

communities and organizations that have come to rely upon the Debtors' generosity. Finally, the

Debtors note that the amount of the Debtors' Charitable Contributions is miniscule in comparison

to the size of the Debtors' businesses.[43]  As such, the Debtors respectfully assert that continuation

of the Charitable Contributions is in the best interest of the Debtors and their estates and,

therefore, request authority to continue making Charitable Contributions in the ordinary course

of their businesses.[44]

E.      Social Security, Income Taxes, And Other Withholding

78.    The Debtors routinely withhold from Employees' wages (i) federal, state,

local, and foreign income withholding, payroll, employment, unemployment, social security, and

similar taxes (including, but not limited to, taxes relating to FICA); (ii) Employee contributions

for health plans, disability and additional life insurance; (iii) Employee contributions to Pension

Plans; (iv) legally ordered deductions such as wage garnishments, child support, and tax levies;

(v) voluntary charitable contributions; (vi) union dues; (vii) flexible spending account

contributions; (viii) other voluntary savings; and (ix) other miscellaneous deductions

(collectively, the "Employee Deductions").

79.    The Debtors forward amounts equal to the Employee Deductions from

their general operating accounts to appropriate third-party recipients. Due to the commencement

---

[43]    The Debtors estimate that their total Charitable Contributions for calendar year 2005 will be approximately
$1 million.

[44]    The Debtors believe that the Charitable Contributions are made in the ordinary course of the Debtors'
businesses and, therefore, that the Debtors' continuation of their Charitable Contribution policies does not
require court authority. Nevertheless, the Debtors seek authority to continue making Charitable
Contributions herein out of an abundance of caution.

of these Chapter 11 cases, these funds were deducted from Employee wages but may not have

been forwarded to appropriate third-party recipients. The Debtors believe that the Employee

Deductions, to the extent they remain in the Debtors' possession, constitute moneys held in trust

and, therefore, are not property of the Debtors' bankruptcy estates. Thus, the Debtors believe

that they are entitled to continue their practice in the ordinary course of business of directing

such funds to the appropriate parties. Nevertheless, out of abundance of caution, the Debtors

seek the approval of this Court to continue these practices and direct such funds to the

appropriate parties.

80.     The Debtors are also obligated to directly pay certain federal, state, local,

and foreign income, payroll, employment, unemployment, social security, and similar taxes

(including, but not limited to, taxes relating to the Federal Insurance Contributions Act

("FICA")) to governmental authorities. Failure to pay such amounts may subject certain

Employees or Board members to potential criminal liability, diverting their focus from the

Debtors' reorganization. The Debtors seek the authority, but not direction, to make these

payments to the appropriate governmental authorities even where such payments are on account

of prepetition liabilities.

F.     Administration Obligations

81.     As is customary in the case of most large companies, the Debtors utilize

the services of numerous professionals, consultants, and other administrators in the ordinary

course of business to whom they outsource the administration of providing Prepetition Human

Capital Obligations. These administrative services include administering the Debtors' Medical

and Insurance Benefits, Pension Plans, and workers compensation obligations; facilitating the

administration and maintenance of their books and records; assisting with legal compliance

issues; assisting with outplacement services; and conducting special administrative and legal

compliance projects in respect of Employee benefit plans and programs (collectively, the

"Administrative Obligations").  These employee benefits consultants include those referenced

throughout this Motion as well as administrators such as Towers Perrin, Deloitte and Touche

LLC, Hewitt Associates LLC, and Salomon Smith Barney.  The ordinary course services

provided by these third parties ensure that the Debtors' multiple Prepetition Human Capital

Obligations continue to be administered in the most cost-efficient manner and comply with all

applicable laws.  The Debtors request authority, but not direction to pay the prepetition

Administrative Obligations related to the Employee benefit programs identified in this Motion

that may be outstanding as of the Petition Date and to continue the practice of relying on and

compensating third parties to perform the Administrative Obligations postpetition.

　　　　　82.　　　Also, in furtherance of the goal of allowing the Debtors to continue to

provide Human Capital Obligations without interruption, the Debtors request that all third party

benefit providers and third party processors with whom the Debtors directly or indirectly have

contracted to provide services in connection with meeting their Human Capital Obligations be

directed to continue to provide to the Debtors those services they provided prior to the Petition

Date until further order of this Court.

## III.　　　DIRECTION TO THE BANKS

　　　　　83.　　　Finally, the Debtors seek an order (a) authorizing and directing all

financial institutions upon which any checks, drafts, electronic funds transfers, or wire transfers

are drawn in payment of the Prepetition Human Capital Obligations – either before, on, or after

the Petition Date – to honor all such checks or drafts issued, upon presentation thereof, or all

such wire transfer instructions, upon receipt thereof, provided that sufficient funds are

immediately available and on deposit in the applicable accounts and (b) prohibiting financial

institutions from placing any holds on, or attempting to reverse, any automatic transfers to

Employees' accounts for Prepetition Human Capital Obligations. The Debtors request that such financial institutions be authorized and directed to rely on the representations of the Debtors as to which checks, drafts or wire transfers are in payment of the Prepetition Human Capital Obligations.

84. The Debtors also request that any party receiving payment from the Debtors be authorized and directed to rely upon the representations of the Debtors as to which payments are authorized by the requested relief.

85. Continued payment, when due, of prepetition wages, salaries and commissions, and the continuation, without interruption, of compensation and benefits plans, policies, programs and practices underlying the Prepetition Human Capital Obligations and described herein is necessary to ensure the ongoing services of the Debtors' Employees. The Employees are vital to the Debtors' continuing operations and to the ultimate ability of the Debtors to reorganize in these chapter 11 cases.

86. Nothing in this Motion nor any payments made by the Debtors pursuant to this Motion, shall be deemed an assumption, adoption, or rejection of any employee benefit plan, CBA, employment agreement, other program or contract, or otherwise affect the Debtors' rights under 11 U.S.C. §§ 365 and 1113 to assume or reject any executory contract between the Debtors and the contract counterparty or Debtors' rights under 11 U.S.C. § 1114, if applicable, to modify or terminate retiree benefits. Moreover, for the relief requested, the Debtors are merely seeking authority, but not direction. Accordingly, it should not be presumed that the Debtors have determined, as of this time, which of the Prepetition Human Capital Obligations they will pay or honor, nor should any party rely on this Motion as to any specific claim or benefit.

Applicable Authority

87.     Sections 507(a)(3) and 507(a)(4) of the Bankruptcy Code require that

certain claims for prepetition wages, salaries, commissions, vacation, severance, sick leave, and

employee benefit contributions be accorded priority of payment in an amount not to exceed

$10,000 for each employee.  Because of the large number of Employees and Retirees that work

for the Debtors, and because some amounts are not known to the Debtors at this time (pending

submission of claims by Employees and Retirees), it is difficult for the Debtors to know the

precise amount due to each Employee for the prepetition period.  However, the overwhelming

majority of the Debtors' Employees and Retirees are owed amounts that are under the $10,000

cap contained in sections 507(a)(3) and 507(a)(4).

88.     By this Motion, the Debtors seek authority to pay outstanding prepetition

obligations to their Employees in full, even if they exceed $10,000 per Employee.  The Debtors

believe that all prepetition claims exceeding $10,000 have arisen in the ordinary course of the

business of the Debtors and are reasonable in relation to the value of the services rendered.

There are several provisions of the Bankruptcy Code that authorize a debtor to honor prepetition

obligations if the circumstances warrant, and that therefore support the relief requested in this

Motion.  Courts have recognized each of these statutory provisions as valid authority for such

payments.  For instance, courts have authorized payment of prepetition obligations pursuant to

section 105(a) of the Bankruptcy Code, which allows a bankruptcy court to enter any order

"necessary or appropriate" to carry out the provisions of the Bankruptcy Code.  See, e.g., In re

Just for Feet, Inc., 242 B.R. 821, 824-25 (D. Del. 1999).  Authority for such payments also may

be found in sections 1107(a) and 1108 of the Bankruptcy Code, which vest debtors-in-possession

with authority to continue operating their businesses; sometimes this duty and the concomitant

fiduciary duty to maximize estate value may be fulfilled only through the pre-plan payment of

certain unsecured claims.  See, e.g., In re Mirant Corp., 296 B.R. 427, 429 (Bankr. N.D. Tex.

2003); In re CoServ, L.L.C., 273 B.R. 487, 498 (Bankr. N.D. Tex. 2002).

89.     Other courts have suggested that authority for a debtor's determination to

honor prepetition obligations may be found in section 363(b)(1) of the Bankruptcy Code, which

authorizes a debtor to use estate funds outside the ordinary course of business.  See In re Kmart

Corp., 359 F.3d 866, 872-73 (7th Cir. 2004); see also In re Ionosphere Clubs, Inc., 98 B.R. 174,

175-176 (Bankr. S.D.N.Y. 1989).  Since the In re Kmart decision was announced, several

bankruptcy courts have explicitly authorized debtors to honor prepetition obligations pursuant to

section 363(b)(1) of the Bankruptcy Code, in particular, in the context of honoring obligations to

employees.  See, e.g., In re FV Steel & Wire Co., Case No. 04-22421, et seq. (Bankr. E.D. Wis.

2004) (accrued employee wages and benefits); In re Jay's Foods, LLC, Case No. 04 B 8681

(Bankr. N.D. Ill. 2004) (accrued employee wages and benefits and accrued obligations to

customers); In re Haynes International, Inc., Case No. 04-05364 (Bankr. S.D. Ind. 2004)

(employees; shippers with goods in their possession; and creditors secured by artisans and

materialmen's liens).

90.     The common source of authority for each of the foregoing statutory

provisions and court decisions is the "doctrine of necessity" or "necessity of payment" rule first

recognized by the Supreme Court more than 120 years ago in Miltenberger v. Logansport,

Crawfordsville & Southwest Railway, 106 U.S. 286 (1882).  In Miltenberger, the Supreme Court

acknowledged the basic duty of an equity receiver "to protect and preserve the trust funds in its

hands."  Id. at 310 (quoting Wallace v. Loomis, 97 U.S. 146, 162-63 (1878)).  More importantly,

the Court held that, consistent with this duty, "[m]any circumstances may exist which may make

it necessary and indispensable to the business . . . and the preservation of the property, for the

receiver to pay preexisting debts . . . out of the earnings of the [debtor] . . . under the order of the

court . . . ." Id. at 311.

   91.  Courts have recognized the applicability of the "necessity of payment"

doctrine with respect to the payment of prepetition employee compensation and benefits. See,

e.g., Mich. Bureau of Workers' Disability Comp v. Chateaugay Corp. (In re Chateaugay Corp.),

80 B.R. 279, 285-89 (S.D.N.Y. 1987) (under "necessity of payment" doctrine, it is appropriate

for bankruptcy court to defer to Debtors' business judgment in permitting payment of certain

workers' compensation claims); In re Ionosphere Clubs, Inc., 98 B.R. at 176 ("This rule

recognizes the existence of the judicial power to authorize a debtor in a reorganization case to

pay pre-petition claims where such payment is essential to the continued operation of the

debtor."). See also In re Winn-Dixie Stores, Inc., Case No. 05-11063 (RDD) (Bankr. S.D.N.Y.

Mar. 15, 2005); In re Tower Auto., Inc., Case No. 05-10578 (ALG) (Bankr. S.D.N.Y. Feb. 3,

2005); In re Spiegel, Inc., Case No. 03-11540 (CB) (Bankr. S.D.N.Y. 2003); In re Conseco, Inc.,

Case No. 02-49672 (CAD) (Bankr. N.D. Ill. Dec. 18, 2002); In re WorldCom, Inc., Case No. 02-

13533 (AJG) (Bankr. S.D.N.Y. July 22, 2002); In re NTL, Case No. 02-41316-41321 (ALG)

(Bankr. S.D.N.Y. May 10, 2002); In re Global Crossing Ltd., Case No. 02-40188 (REG) (Bankr.

S.D.N.Y. 2002); In re Kmart Corp., Case No. 02-02474 (SPS) (Bankr. N.D. Ill. Jan. 25, 2002); In

re Enron Corp., Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. Dec. 3, 2001); In re Comdisco, Inc.,

Case No. 01-24795 (RB) (Bankr. N.D. Ill. July 16, 2001); In re Wehrenberg, Inc., 260 B.R. 468,

469 (Bankr. E.D. Mo. 2001); In re Loews Cineplex Entm't Corp., Case No. 01-40346 (SMB)

(Bankr. S.D.N.Y. 2001) and In re Bethlehem Steel Corp., Case No. 01-15288 (BRL) (Bankr.

S.D.N.Y. 2001). The Debtors submit that, as illustrated below, application of the "necessity of

payment" doctrine is wholly warranted in these cases.

92.     Courts have articulated various tests for determining whether prepetition claims may be honored.  Some have held that the holders of the claims must be "indispensable" or "necessary" to the debtor's rehabilitation efforts.  See, e.g., In re Payless Cashways, Inc., 268 B.R. at 543; In re Just for Feet, Inc., 242 B.R. at 824-25.  Others have held that prepetition claims may be paid, but only if the debtor establishes that (i) continued dealing with the creditor "is virtually indispensable to profitable operations"; (ii) failure to deal with the creditor will eliminate "an economic advantage disproportionate to the amount of the claim"; and (iii) there is "no practical or legal alternative" to payment of the claim.  In re CoServ., 273 B.R. at 498; In re Mirant Corp., 296 B.R. at 429.  Similarly, prepetition claims may be honored if (i) the holder of the claim will cease doing business with the debtor if not immediately paid and (ii) the estate will gain enough from continued dealing with the paid claimant to provide some benefit to other claimants, i.e., the business must be at least as well off with the payments as without them.  See In re Kmart, 359 F.3d at 868, 874.

93.     The relief requested in this Motion clearly satisfies these standards.  As established by the Miller Affidavit, the Debtors believe that there is a significant risk that Employees whose prepetition obligations are not honored in the ordinary course of business will terminate their employment relationships with the Debtors.  The continued service and dedication of the Employees is critical to the Debtors and their prospects for a successful reorganization.  To retain their Employees and maintain morale under difficult working conditions, and, therefore, to avoid jeopardizing the basic operation of their businesses, the Debtors simply must have authority to pay or otherwise satisfy all Prepetition Human Capital Obligations as summarized above.

94.     Second, as established by the Miller Affidavit, the Debtors' creditors and these estates will be better off as a whole, and clearly will be no worse off, if the Debtors are permitted to honor prepetition obligations to Employees in the ordinary course.  The Debtors' businesses and prospects for a reorganization will be seriously undermined if Employees are not paid and if, as a consequence, they leave the Debtors' employ at this critical juncture.  Indeed, the Debtors' Employees are familiar with the Debtors' manufacturing processes.  Hiring and training new workers will seriously impact the Debtors' efficiency as well as their ability to deliver automotive parts, electronics, and other of the Debtors' products and product lines in a timely fashion.  Without payment to the Debtors' Employees, the damage to the Debtors' prospects for rehabilitation and hence, the costs to creditors as a whole, would be immediate and irreparable.

95.     The relief requested in this Motion is necessary for the Debtors' businesses to continue in the ordinary course and, therefore, the Debtors submit that the relief requested also should be authorized under section 105 of the Bankruptcy Code.  The Employees are vital to the continued operation of the Debtors' businesses and to their successful reorganization. Authorization to pay the Debtors' prepetition obligations to their Employees is necessary to maintain the Debtors' Employees' morale and prevent many of them from suffering extreme personal hardship or from seeking other employment.  Accordingly, the Debtors submit that the relief sought herein is consistent with section 105(a) of the Bankruptcy Code.

96.     With respect to Retirees, it is critical to pay the certain amounts requested herein as many of the benefits sought to be honored in this Motion may be protected under section 1114 and this could require modification by agreement or by order of the Court.  In addition, failure to pay Retirees at this time could negatively affect the morale of the Debtors'

current workforce, because the Debtors' loyalty to its Employees after they retire will be called into question.

97.    In addition, the Debtors' payment of their prepetition obligations to their Employees in the ordinary course of business should neither unduly prejudice general unsecured creditors nor materially affect the Debtors' estates because, pursuant to sections 507(a)(3) and 507(a)(4) of the Bankruptcy Code, priority claims already are entitled to payment in full under a reorganization plan.  See 11 U.S.C. § 1129(a)(9)(B).

98.    Courts have routinely granted to large business debtors the same or substantially similar relief to that requested in this Motion.  See, e.g., In re Winn-Dixie Stores, Inc., Case No. 05-11063 (RDD) (Bankr. S.D.N.Y. Mar. 15, 2005); In re Tower Auto., Case No. 05-10578 (ALG) (Bankr. S.D.N.Y. Feb. 3, 2005); In re Conseco, Inc., Case No. 02-49672 (CAD) (Bankr. N.D. Ill. Dec. 18, 2002); In re WorldCom, Inc., Case No. 02-13533 (AJG) (Bankr. S.D.N.Y. July 22, 2002); In re Enron, Case No. 01-B-16034 (AJG) (Bankr. S.D.N.Y. December 3, 2001); In re Kmart Corp., Case No. 02-02474 (SPS) (Bankr. N.D. Ill. Jan. 25, 2002); and In re Comdisco, Inc., Case No. 01-24795 (RB) (Bankr. N.D. Ill. July 16, 2001).

99.    As part of the foregoing relief, the Debtors also seek authority to pay all Employee Deductions.  The failure to make such payments may subject the Debtors and their officers to federal or state liability.  See City of Farrell v. Sharon Steel Corp., 41 F.3d 92, 98-99 (3d Cir. 1994) (state law requiring debtor to withhold city income tax from its employees' wages created trust relationship between debtor and city for payment of withheld taxes); DuCharmes & Co. v. Michigan (In re DuCharmes & Co.), 852 F.2d 194, 195-96 (6th Cir. 1988) (noting the special liabilities for failure to pay trust fund taxes).

100.    Furthermore, under 11 U.S.C. § 541, such funds are not property of the Debtors' estates, and therefore the funds are not subject to the normal bankruptcy prohibitions against payment.  See Begier v. IRS, 496 U.S. 53, 59 (1990) (because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not "property of the estate."); See also H.R. Rep. No. 95-959, at 368 (1977); S. Rep. No. 95-989, at 82 (1978).

101.    The Debtors therefore request that this Court confirm that such trust fund withholding is not property of the Debtors' estates and that the Debtors may direct such Prepetition Withholding Obligation amounts and the Union Dues to the proper parties in the ordinary course of business.  Courts have routinely granted to large business debtors the same or substantially similar relief to that requested in this Motion.  See, e.g., In re Winn-Dixie Stores, Inc., Case No. 05-11063 (RDD) (Bankr. S.D.N.Y. Mar. 15, 2005); In re Tower Automotive, Case No. 05-10578 (ALG) (Bankr. S.D.N.Y. Feb. 3, 2005); In re Conseco, Inc., Case No. 02-49672 (CAD) (Bankr. N.D. Ill. Dec. 18, 2002); In re WorldCom, Inc., Case No. 02-13533 (AJG) (Bankr. S.D.N.Y. July 22, 2002); In re Enron, Case No. 01-B-16034 (AJG) (Bankr. S.D.N.Y. December 3, 2001); In re Kmart Corp., Case No. 02-02474 (SPS) (Bankr. N.D. Ill. Jan. 25, 2002); and In re Comdisco, Inc., Case No. 01-24795 (RB) (Bankr. N.D. Ill. July 16, 2001).

102.    The Debtors seek authority to pay their Prepetition Human Capital Obligations and to continue postpetition the compensation and benefit plans, programs and policies in effect immediately prior to the Petition Date.  If authorized, however, such action should not be deemed to be an assumption or adoption of any agreement or policy providing such coverage.[45]

---

[45]    The Debtors are in the process of reviewing these matters and reserve their rights with respect to future cessation or continuation of these programs, to assumption or rejection of any executory contracts and to termination of CBAs or Retiree benefits.

<u>Notice</u>

103.    Notice of this Motion has been provided by facsimile, electronic transmission, overnight delivery, or hand delivery to (i) the Office of the United States Trustee, (ii) the Debtors' 50 largest unsecured creditors, (iii) counsel for the agent under the Debtors' prepetition credit facility, and (iv) counsel for the agent under the Debtors' proposed postpetition credit facility.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

<u>Memorandum Of Law</u>

104.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that this Court enter an order (i) authorizing the Debtors to pay prepetition wages and salaries to employees and independent contractors, (ii) authorizing the Debtors to pay prepetition benefits and continue the maintenance of human capital benefit programs in the ordinary course, (iii) directing banks to honor prepetition checks for payment of prepetition human capital obligations, and (iv) granting the Debtors such other and further relief as is just.

Dated:  New York, New York
        October 8, 2005

                                    SKADDEN, ARPS, SLATE, MEAGHER
                                        & FLOM LLP

                                    By:  s/ John Wm. Butler, Jr.
                                        John Wm. Butler, Jr. (pro hac vice motion pending)
                                        John K. Lyons
                                        Ron E. Meisler
                                    333 West Wacker Drive, Suite 2100
                                    Chicago, Illinois  60606
                                    (312) 407-0700

                                        - and -

                                    By:  s/ Kayalyn A. Marafioti
                                        Kayalyn A. Marafioti (KM 9632)
                                        Thomas J. Matz (TM 5986)
                                    Four Times Square
                                    New York, New York 10036
                                    (212) 735-3000

                                    Attorneys for Delphi Corporation, et al.,
                                        Debtors and Debtors-in-Possession