SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                               :
    In re                         :        Chapter 11
                               :
DELPHI CORPORATION et al.,     :        Case No. 05-_____ (___)
                               :
                               :        (Jointly Administered)
Debtors.                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

MOTION FOR ORDER UNDER §§ 105 AND 363 AUTHORIZING THE DEBTORS
TO IMPLEMENT A KEY EMPLOYEE COMPENSATION PROGRAM

("KECP MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"),[1] debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order under 11 U.S.C. §§ 105(a) and 363(b)(1) authorizing the Debtors to implement a key employee compensation program.  In support of this Motion, the Debtors submit the Affidavit Of Robert S. Miller, Jr. In Support Of Chapter 11 Petitions And First Day Orders, sworn to October 8, 2005.  In further support of this Motion, the Debtors respectfully represent as follows:

Background

A.    The Chapter 11 Filings

1.    On October 8, 2005 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have moved this Court for an order authorizing joint administration of these chapter 11 cases.

2.    No trustee, examiner, or creditors' committee has been appointed in the Debtors' cases.

---

[1]    In addition to Delphi, the following entities are debtors in these related cases:  ASEC Manufacturing General Partnership, ASEC Sales General Partnership, Aspire, Inc., Delco Electronics Overseas Corporation, Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems Global (Holding), Inc., Delphi Automotive Systems Human Resources LLC, Delphi Automotive Systems International, Inc., Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems LLC, Delphi Automotive Systems Overseas Corporation, Delphi Automotive Systems Risk Management Corp., Delphi Automotive Systems Services LLC, Delphi Automotive Systems Tennessee, Inc., Delphi Automotive Systems Thailand, Inc., Delphi China LLC, Delphi Connection Systems, Delphi Diesel Systems Corp., Delphi Electronics (Holding) LLC, Delphi Foreign Sales Corporation, Delphi Integrated Service Solutions, Inc., Delphi International Holdings Corp., Delphi International Services, Inc., Delphi Liquidation Holding Company, Delphi LLC, Delphi Mechatronic Systems, Inc., Delphi Medical Systems Colorado Corporation, Delphi Medical Systems Corporation, Delphi Medical Systems Texas Corporation, Delphi NY Holdings Corporation, Delphi Services Holding Corporation, Delphi Technologies, Inc., DREAL, Inc., Environmental Catalysts, LLC, Exhaust Systems Corporation, Packard Hughes Interconnect Company, Specialty Electronics, Inc., and Specialty Electronics International Ltd.

2

    3.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

    4.  The statutory predicate for the relief requested herein is sections 105(a) and 363(b)(1) of the Bankruptcy Code.

B.  Current Business Operations Of The Debtors

    5.  With more than 180,000 employees worldwide, global 2004 revenues of approximately $28.6 billion and global assets as of August 31, 2005 of approximately $17.1 billion,[2] Delphi ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations without supervision from the Bankruptcy Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy Code.

    6.  Over the past century, the operations which are now owned by Delphi have become a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines. Today, the Company is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company's technologies and products are present in more than 75 million vehicles on the road worldwide. The Company supplies products to nearly every major global automotive original equipment manufacturer with 2004 sales to its former parent, General Motors Corporation, equaling approximately $15.4 billion and sales to each of

---

[2] The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

3

Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

7. As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world. In the U.S., the Debtors employ approximately 50,600 people. Those employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in Delphi's worldwide headquarters and customer center located in Troy, Michigan. Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and local unions. Outside the United States, the Company's foreign entities employ more than 134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

8. Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM. Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

9. Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of

the vehicle. When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base. The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base. The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C.     Events Leading To The Chapter 11 Filing

10.    In the first two years following Delphi's separation from GM, the Company generated more than $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales. Reflective of a downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005. The Company experienced net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[3]

11.    The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S.

---

[3]    Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

5

vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12.     In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues and forward looking revenue requirements.  Having concluded that pre-filing discussions with its Unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

13.     Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses.  This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned in the Company's transformation plan.  The Debtors believe that a substantial segment of Delphi's U.S. business operations must be divested, consolidated, or wound-down through the chapter 11 process.

14.     Upon the conclusion of this process, the Debtors expect to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all

of its resources to continue to deliver value and high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

## Relief Requested

15.     By this Motion, the Debtors seek authority, under sections 105(a) and 363(b)(1) of the Bankruptcy Code, to implement a key employee compensation program (the "Key Employee Compensation Program"), as described herein, and as more fully set forth in Exhibit 1 to the Order.  The purpose of the Key Employee Compensation Program is to retain and incentivize Covered Employees (as defined below) during the Debtors' restructuring period.

## Basis For Relief

A.      Importance Of Covered Employees

16.     As a result of the Debtors' historical financial performance, many of the company's incentive based compensation programs failed to provide salaried and executive workforce with total compensation that is competitive with the industry norm.  As the Debtors implement their transformation plan, it is imperative that the Debtors' key personnel are appropriately incentivized to maximize the financial performance of the Debtors' operations.  The alignment of an incentive program that tracks the Debtors' goals is crucial to the Debtors' ability to navigate through this process and to emerge successfully from chapter 11.

17.     Moreover, because the Debtors' current salaried and executive total compensation programs are not competitive in the automotive industry, over the last several months following the arrival of Robert S. "Steve" Miller, Jr. as Chairman and Chief Executive Officer, senior management, in consultation with the board of directors of Delphi, decided to realign its executive compensation program to properly incentivize the Company's personnel who

are needed to implement the Company's transformation plan and maximize value for all stakeholders.[4] This point has been particularly lucid as more that 25 executives have left the Company's employ since January 1, 2005.

18.     Further exacerbating the Company's risk of attrition, the commencement of a bankruptcy case heightens employee concerns regarding possible job loss, and often increases employee responsibilities, creates longer hours, and imposes other burdens as a result of an employer's status as a debtor-in-possession. Thus, at a time when the Debtors most need the continued efforts and loyalty of Covered Employees, the Debtors must take proactive steps to ensure that mechanics are in place to allow their employees to remain loyal, despite potential opportunities with competitors or other employers who may be perceived as providing more stable employment opportunities. In order to address these concerns, the Debtors designed a special incentive compensation program that aligns the interests of both program participants and the Debtors' stakeholders (the "Key Employee Compensation Program"), which program has been benchmarked against competitive practices in the industry.

B.      Development Of The Key Employee Compensation Program

19.     The Debtors, with input from certain financial advisors, compensation experts and legal advisors, including Watson Wyatt Worldwide ("Watson") and the Debtors' counsel, Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), have evaluated their existing compensation structure and incentive plans and obtained input from their board and senior executives to identify Covered Employees and consider the appropriate incentive levels.

---

[4]     It should be noted that Mr. Miller has "opted out" of the KECP, continues as an employee "at will" without an employment agreement or severance plan, and is not entitled to any material compensation beyond base salary except as determined by the Board of Directors in connection with Mr. Miller's completion of his period of service as Chief Executive Officer.

8

20.     The Key Employee Compensation Program does not include a retention or stay component which differentiates it from other incentive programs and the issues raised in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCA").  The primary reason for the elimination of a retention component and the inclusion of a fully developed exit plan is to focus the Debtors' approximately 486 executives (the "Covered Employees") on achieving certain benchmarks and encourage them to complete an efficient and successful reorganization.

21.     In developing the Key Employee Compensation Program, the Debtors considered specific incentive programs implemented by other companies in chapter 11, including, but not limited to, Federal Mogul and Hayes-Lemmerz, other automotive industry suppliers. Reviewing these and similar programs was helpful in developing a basis from which the Debtors could develop a plan suitable to their needs.  Based on their analysis of the various programs, the Debtors, with the assistance of Watson and Skadden, undertook the development of the Key Employee Compensation Program.

22.     The Debtors determined that they required a program that would not only incentivize Covered Employees to remain in the Debtors' employ during the chapter 11 cases, but which would also align their interests with the Debtors' stakeholders to encourage maximum effort and performance during the cases. To achieve these goals, the Debtors created an overall incentive program that the Debtors believe incorporate the most effective components of the employee plans the Debtors reviewed.  Thereafter, the Debtors calculated the appropriate levels of compensation that would achieve the Debtors' goal of motivating Covered Employees at competitive rates while also being mindful of the duty to manage these estates in a fiscally responsible manner and maximize stakeholder recoveries.

23. The Debtors began to develop the Key Employee Compensation Program over the past several months, and the Debtors worked directly with the Compensation Committee of the board of directors (the "Compensation Committee") and the Company's advisors to refine and finalize the Key Employee Compensation Program. Specifically, the Debtors have crafted the Key Employee Compensation Program to ensure that the appropriate employees were included and were assigned levels of compensation designed to achieve the Debtors' desired goals. Based on this analysis, the Debtors believe that (a) the Key Employee Compensation Program is reasonable and competitive against other plans approved in similar chapter 11 cases, (b) the value of the Key Employee Compensation Program to the eligible employees and the cost to the Debtors is consistent with other plans implemented by other chapter 11 companies of comparable size, and (c) the Key Employee Compensation Program strikes an appropriate balance between the employees' and the Debtors' concerns.

C.   Summary Of The Key Employee Compensation Program[5]

Covered Employees

24. The proposed Key Employee Compensation Program covers the Debtors' executives. In contrast to the plans of many other chapter 11 debtors, the Debtors' Key Employee Compensation Program does not cover the Debtors' chief executive officer, as Mr. Miller opted not to participate in this program and to be compensated at the discretion of the Compensation Committee, subject to approval of the full Board of Directors, as they deem appropriate at the end of his period of service as Chief Executive Officer based upon the merit of his performance.

25. The proposed Key Employee Compensation Program is described in Exhibit 1 attached to the Order. As can be seen in Exhibit 1, the Key Employee Compensation

---

[5]   The description of the Key Employee Compensation Program is intended as a summary only. The actual terms of the Key Employee Compensation Program set forth in Exhibit 1 to the order shall control.

10

Program has two principal components and calls out a third program that the Company implemented prepetition: (a) an annual incentive plan, (b) an emergence bonus plan, and (c) a prepetition severance plan that was modified during the third quarter of 2005. Noticeably absent from <u>Exhibit 1</u> is any form of retention plan. The debtors are not going to make periodic payments to employees to reward them merely for staying with the company. In addition, the company has determined to eliminate an unrelated retention plan, already approved by the Compensation Committee of the Board of Directors in early 2005 and, the unvested, unfunded portion of the Debtors' long-term incentive programs. The Debtors believe that the program described herein will serve in part to replace the former retention plan with a thoughtful program which will likely create better opportunities for the Company and its Covered Employees. Indeed, payments to Covered Employees are tied to specific performance and emergence targets, and therefore are geared so as to incentivize employees to work towards an early and successful emergence from chapter 11.

<u>Annual Incentive Plan</u>

26. The annual incentive plan is designed to promote the Company's business turnaround by conditioning payments on the Debtors' achievement of certain financial objectives. Specifically, the plan was developed in order to encourage participants to increase the Debtors' enterprise value, and thus increase value and returns for all stakeholders during the Debtors' chapter 11 cases. This particular component of the Key Employee Compensation Program is designed to replace the Debtors' prepetition annual incentive program. In doing so, the Debtors have adopted a plan that is a fairly similar in concept to the prepetition plan, but with modifications to certain of the components. In particular, the performance targets track EBITDAR goals rather

11

than net earnings targets and the performance periods have been shortened to increase the incentive to meet the targeted goals.[6]

27.     Under the annual incentive plan, employees' eligibility to receive annual bonuses is dependent on whether the Debtors reach their projected business plan EBITDAR levels over performance periods, generally covering six months as well as an acceptable level of personal performance.  The EBITDAR levels for the first performance period, covering October 1, 2005 to June 30, 2006,[7] will be set before December 31, 2005, by the Compensation Committee, an independent committee of the Debtors' Board of Directors.  The second performance period will run from July 1, 2006 to December 31, 2006.  Six month performance periods will continue thereafter until the Debtors exit chapter 11.  Each participant's bonus opportunity for a performance period will equal one-half of his or her current annual plan opportunity (except for the first performance period where the opportunity will be 75% of the prepetition annual plan opportunity) to reflect the shortened performance periods.

Emergence Bonus Plan

28.     As outlined in <u>Exhibit 1</u>, the Key Employee Compensation Program will afford eligible employees cash payments and, in some cases, available equity in the new company upon emergence from chapter 11 (the "Emergence Bonus Plan").  The cash component of the plan is payable to U.S. executives upon either the effective date of the confirmation of the plan of reorganization or a sale of all or substantially all of the company's assets (collectively, the "Effective Date").  In addition, if the Debtors achieve a successful reorganization, the equity component of the plan will allocate 10% of the equity in the reorganized company to Delphi's

---

[6]   As of the Petition Date, the non-executive Salaried Incentive Plan will also change to target EBITDAR goals.

[7]   The first period is the only nine-month period under the plan.  It was designated as such to capture the stub period of October 1 through December 31, 2005.

12

approximately 600 domestic and foreign executives. The Emergence Bonus Plan is entirely new and is designed to incentivize employees to achieve a successful restructuring and to remain loyal to the Company even after emergence. The Emergence Bonus Plan replaces the Debtors' prepetition long-term incentive plan and compares favorably to the costs under the long-term incentive plan.

29. The cash component of the Emergence Bonus Plan is available only to U.S. executives of the Company. As mentioned, the Debtors' chief executive officer has opted out of the plan. Cash payments vary from 30% to 250% of a participant's salary, based on level of responsibility in the Debtors' organization. Payments under the cash component of the Emergence Bonus Plan will be paid in one lump sum payment shortly after the Effective Date.

30. Similar to other incentive programs, a participant who voluntarily terminates employment (except in the case of a constructive termination) will <u>not</u> be eligible for any payment under the program. On the other hand, if a participant's employment is terminated involuntarily, other than for cause, the participant will receive a pro rata payment[8] contingent upon the occurrence of the Effective Date. If a participant's opportunity to receive a payment is prevented because his or her business unit is sold prior to the Effective Date, then that participant would be entitled to a pro rata payment, also contingent upon the occurrence of the Effective Date. Finally, any participant whose employment terminates because of death or disability would also be entitled to a pro rata payment, contingent upon the occurrence of the Effective Date.

31. In addition to a cash component, the Debtors have adopted an equity component as part of its Emergence Bonus Plan which is designed to cover Delphi's non-U.S.

---

[8] The pro rata payment would be equal to the former participant's opportunity multiplied by a fraction where the numerator is the number of days from (a) the filing date or (b) such participant's hire date, whichever is later, until the date his or her employment is terminated and the denominator is the number of days from the later of the (x) filing date or (y) such party's hire date to the effective date.

executives as well, for a total of approximately 600 executives. This component is designed to maintain the Debtors' long-term compensation, enable recruitment of a "Best in Class" management team, motivate and reward high performance, and incentivize executives to remain working for the Debtors during this chapter 11 period.

33. Under the equity component of the Emergence Bonus Plan, each executive's equity award is valued one-third in restricted stock and two-thirds in stock options. The Debtors propose that each option's strike price be set based on the mid-point of the valuation range in the disclosure statement accompanying the plan of reorganization approved by this Court. The particular amount of equity is based on the executive's level of responsibility with the Debtors. Equity awards will vest one-quarter (25%) at the Effective Date, with the balance vesting in equal increments on each of the first, second, and third anniversaries of the Effective Date. To the extent any eligible executive has left the Debtors prior to the Effective Date, the executive's allocation will be added to the reserve of awards available to employees who are promoted or newly hired.

33. The Debtors intend to seek creditor agreement or court approval, pursuant to a plan of reorganization to set aside 10% of the equity in the reorganized entity for approximately 600 U.S. and foreign executives.[9] The Debtors believe that this amount of equity is reasonable and necessary to ensure that management continues working with and for the Debtors through and following the duration of the chapter 11. Moreover, the Debtors believe that setting aside this amount of equity for its executives falls squarely within the range of competitive practices and will further increase the Debtors' ability to attract and retain executives while also motivating executives to create value for all stakeholders during the chapter 11 process.

---

[9] Equity awards will not be granted in the case of a sale of all or substantially all of the Debtors' assets.

14

Severance

34. During any reorganization process, when employees may be laid off or terminated, it is often difficult to recruit new employees and retain current employees. Severance plans can mitigate the anxiety felt by employees and provide employees with desired protection and security, typically in the form of salary continuation in the event employment is terminated by the company without cause.

35. During the prepetition period, the Debtors maintained a severance program for its executives and officers as disclosed in further detail in Exhibit 1 and the "Human Capital Compensation Motion" filed contemporaneously herewith.[10] In order to recruit and maintain employees, the Key Employee Compensation Program continues the Debtors' prepetition severance program.

36. Pursuant to the Debtors' prepetition severance program, U.S. executives without employment agreements are entitled to severance benefits only upon termination if (a) the executive's employment was terminated involuntarily for any reason other than for "cause," or (b) the executive's employment is terminated after a change in control for "good reason" as defined in the Delphi's formal severance plan. The severance payment under this program is made in a lump sum and consists of (x) all unused and accrued vacation time, (y) all accrued but unpaid compensation earned, and (z) a severance benefit. As described in Exhibit 1, the severance benefits under the Debtor's prepetition severance program provide that upon separation, senior executives are eligible for payments of 12 months base pay plus an additional 12 month bonus target and non-senior executives receive 12 months base pay. All such severance benefits are

---

[10] Motion for Order Under 11 U.S.C. §§ 105(a), 363, 507, 1107, and 1108 (I) Authorizing Debtors To Pay Prepetition Wages And Salaries To Employees And Independent Contractors, (II) Authorizing Debtors To Pay Prepetition Benefits And Continue Maintenance Of Human Capital Benefit Programs In The Ordinary Course, And (III) Directing Banks to Honor Prepetition Checks For Payment of Prepetition Human Capital Obligations.

contingent upon the participant signing an agreement(s) that provides for the release of claims, non-solicitation, non-compete, non-disclosure and non-disparagement.

37.     Finally, the Debtors' twenty-one U.S. officers, other than the chief executive officer, each has an employment agreement that provides for such officer to receive, upon a qualifying termination of employment, an amount equal to 1/12 of his or her annualized compensation (salary plus annual target bonus) for 18 months.  In exchange for providing the twenty-one officers with formal severance benefits in the event of termination, Delphi has agreements in place that prevent the participant from (a) competing against the Company, (b) disclosing Delphi's manufacturing methods, (c) soliciting Delphi employees to work at a new organization, and (e) disparaging the organization and its employees.

### Applicable Authority

38.     Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing.  11 U.S.C. § 363(b)(1).  Uses of estate property outside the ordinary course of business may be authorized if the debtor demonstrates a sound business justification for it.  See In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires a finding that a good business reason exists to grant a debtor's application under section 363(b)); In re Delaware Hudson Ry. Co., 124 B.R. 169, 179 (Bankr. D. Del. 1991).  Once the debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'"  In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992).

16

39. Given the importance of the Debtors' employees to the Debtors' continued operations and the ultimate success of these chapter 11 cases, this Court should approve the relief requested herein. The Debtors have determined that the costs associated with the adoption of the Key Employee Compensation Program are more than justified by the benefits that are expected to be realized by encouraging the Covered Employees to continue working for the Debtors and vigorously assisting in the Debtors' restructuring efforts. This is especially true in this case given the fact that a substantial amount of the payments under the Key Employee Compensation Program are conditioned on achievement of certain predetermined financial goals.[11]

40. Moreover, approval of the Key Employee Compensation Program will boost employee morale and forestall the loss of value that would be attendant to resignations among the Covered Employees. The proposed relief therefore will enable the Debtors to retain the knowledge, experience and loyalty of the employees who are crucial to the Debtors' reorganization efforts. If these employees were to leave their current jobs at this stage in the Debtors' chapter 11 cases, it is virtually assured that the Debtors would not be able to attract replacement employees of comparable quality, experience, knowledge and character. Indeed, suitable new employees, even if available, would not have in-depth and historical knowledge of the Debtors' business. The time and costs incurred, and the learning curve necessarily involved in hiring replacements for employees, clearly outweighs the potential costs of payments made under the Key Employee Compensation Program.

41. In sum, the Debtors have determined in the exercise of their business judgment that it is essential that the Covered Employees continue to focus their efforts on

---

[11] Since the proposed Key Employee Compensation Program is needed to retain employees -- who are in turn necessary for the preservation of the Debtors' estates -- the payment rights of the employees under the Program are "actual, necessary costs and expenses of preserving the [Debtors'] estate[s]," and should be accorded 11 U.S.C. § 503(b)(1)(A) administrative expense status to the extent they become due.

17

supporting and maintaining the Debtors' reorganization efforts in the coming months. Accordingly, the Debtors believe that granting the relief requested in this Motion is in the best interests of the Debtors' estates, their creditors, and other interested parties and should be approved. See, e.g., In re America West Airlines, Inc., 171 B.R. 674, 678 (Bankr. D. Ariz. 1994) (holding that proposal to pay bonuses on confirmation of reorganization plan was exercise of debtor's sound business judgment); In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991) (concluding that implementation of a critical employee retention plan was a proper exercise of debtor's business judgment).

## Notice

42.     Notice of this Motion has been provided by facsimile, electronic transmission, overnight delivery, or hand delivery to (i) the Office of the United States Trustee, (ii) the Debtors' 50 largest unsecured creditors, (iii) counsel for the agent under the Debtors' prepetition credit facility, and (iv) counsel for the agent under the Debtors' proposed postpetition credit facility. In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

## Memorandum Of Law

43.     Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

WHEREFORE, the Debtors respectfully request that the Court enter an order, (i) authorizing the implementation of the Key Employee Compensation Program as described herein, and (ii) granting such other and further relief as is just and proper.

Dated: New York, New York
October 8, 2005

                SKADDEN, ARPS, SLATE, MEAGHER
                   & FLOM LLP

By: /s John Wm. Butler, Jr.
    John Wm. Butler, Jr. (pro hac vice motion pending)
    John K. Lyons
    Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

    - and -

By: /s Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession