SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

- and -

O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC  20006
(202) 383-5300
Robert A. Siegel
Tom A. Jerman

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
      In re                     :   Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :   Case No. 05-_____ (___)
                                          :
                          Debtors.    :   (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR PROTECTIVE ORDER
UNDER 11 U.S.C. §§ 1113(d)(3) AND 1114(k)(3)

("PROTECTIVE ORDER MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"),[1] the debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for a protective order to protect the confidentiality of relevant information disclosed in connection with Section 1113 and 1114 Matters (as defined below). In support of this Motion, the Debtors rely on the Affidavit Of Robert S. Miller, Jr. In Support Of Chapter 11 Petitions And First Day Orders, sworn to October 8, 2005. In further support of this Motion, the Debtors respectfully represent as follows:

---

[1]     In addition to Delphi, the following entities are debtors in these related cases: ASEC Manufacturing General Partnership, ASEC Sales General Partnership, Aspire, Inc., Delco Electronics Overseas Corporation, Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems Global (Holding), Inc., Delphi Automotive Systems Human Resources LLC, Delphi Automotive Systems International, Inc., Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems LLC, Delphi Automotive Systems Overseas Corporation, Delphi Automotive Systems Risk Management Corp., Delphi Automotive Systems Services LLC, Delphi Automotive Systems Tennessee, Inc., Delphi Automotive Systems Thailand, Inc., Delphi China LLC, Delphi Connection Systems, Delphi Diesel Systems Corp., Delphi Electronics (Holding) LLC, Delphi Foreign Sales Corporation, Delphi Integrated Service Solutions, Inc., Delphi International Holdings Corp., Delphi International Services, Inc., Delphi Liquidation Holding Company, Delphi LLC, Delphi Mechatronic Systems, Inc., Delphi Medical Systems Colorado Corporation, Delphi Medical Systems Corporation, Delphi Medical Systems Texas Corporation, Delphi NY Holdings Corporation, Delphi Services Holding Corporation, Delphi Technologies, Inc., DREAL, Inc., Environmental Catalysts, LLC, Exhaust Systems Corporation, Packard Hughes Interconnect Company, Specialty Electronics, Inc., and Specialty Electronics International Ltd.

Background

A. The Chapter 11 Filings

1. On October 8, 2005 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have moved this Court for an order for joint administration of these chapter 11 cases.

2. No trustee, examiner, or creditors' committee has been appointed in the Debtors' cases.

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4. The statutory predicates for the relief requested herein are sections 1113(d)(3) and 1114(k)(3) of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B. Current Business Operations Of The Debtors

5. With more than 180,000 employees worldwide, global 2004 revenues of approximately $28.6 billion and global assets as of August 31, 2005 of approximately $17.1 billion,[2] Delphi ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations

3

without supervision from the Bankruptcy Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy Code.

6. Over the past century, the operations which are now owned by Delphi have become a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines. Today, the Company is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company's technologies and products are present in more than 75 million vehicles on the road worldwide. The Company supplies products to nearly every major global automotive original equipment manufacturer with 2004 sales to its former parent, General Motors Corporation, equaling approximately $15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

7. As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world. In the U.S., the Debtors employ approximately 50,600 people. Those employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in Delphi's worldwide headquarters and customer center located in Troy, Michigan. Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and local unions. Outside the United States, the Company's foreign entities employ more than 134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

---

[2] The aggregated financial data used in this Motion generally consists of consolidated information from

4

8. Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM. Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

9. Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle. When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base. The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base. The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

---

Delphi and its worldwide subsidiaries and affiliates.

C.   Events Leading To Chapter 11 Filing

10.   In the first two years following Delphi's separation from GM, the Company generated more than $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales. Reflective of a downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005. The Company experienced net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[3]

11.   The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12.   In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues and forward looking revenue requirements. Having concluded that pre-filing discussions with its Unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence

6

these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

13. Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses. This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned in the Company's transformation plan. The Debtors believe that a substantial segment of Delphi's U.S. business operations must be divested, consolidated, or wound-down through the chapter 11 process.

14. Upon the conclusion of this process, the Debtors expect to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

### Relief Requested

15. By this Motion, the Debtors respectfully request that this Court grant a protective order to maintain the confidentiality of relevant information provided to the unions

---

[3] Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

and that may need to be provided to this Court or other parties-in-interest in connection with sections 1113 and 1114.

## Basis For Relief

A. <u>Negotiations Pursuant to Sections 1113 and 1114 of the Bankruptcy Code</u>

16. On or before October 21, 2005, in compliance with section 1113(b)(1) and 1114(f)(1) of the Bankruptcy Code, the Debtors expect that, if circumstances require, they may be forced to provide one or more of the unions representing their employees with proposals for necessary modifications to their respective collective bargaining agreements with the Debtors, as well as any relevant information as is necessary to evaluate the respective proposals. In addition, following appointment of a Retiree Committee pursuant to section 1114 of the Bankruptcy Code, the Debtors expect to provide that Committee with one or more proposals for reduction in retiree medical benefits,[4] as well as any relevant information as is necessary to evaluate the respective proposals. Pursuant to sections 1113(d)(3) and 1114(k)(3) of the Bankruptcy Code, the Debtors respectfully request that the Court issue a protective order to prevent the disclosure of any and all confidential "relevant information" provided in connection with any proposals the Debtors may make for modifications to the collective bargaining agreements or for elimination of retiree medical benefits and any hearing or other proceeding that may arise in connection with section 1113 or section 1114 (individually, a "Section 1113 Matter" or "Section 1114 Matter," and collectively, the "Section 1113 and 1114 Matters"). A protective order is necessary to expedite and facilitate the provision and exchange of all necessary relevant information required by

---

[4] 11 U.S.C. § 1114(a) defines "retiree benefits" which shall be referred to herein as "retiree medical benefits" to mean: payments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title. 11 U.S.C. § 1114(a).

8

sections 1113 and 1114 in a manner consistent with the need to protect the confidentiality of that information.

<u>Applicable Authority</u>

17.     Section 1113 of the Bankruptcy Code governs the rejection or modification of a collective bargaining agreement ("CBA") by a Chapter 11 trustee or debtor-in-possession. <u>See</u> <u>Truck Drivers Local 807 v. Carey Transportation, Inc.</u>, 816 F.2d 82 (2d Cir. 1987). Section 1113 contains detailed substantive and procedural requirements with which a debtor must comply in order to reject a CBA. <u>Id.</u> at 891. Specifically, subsection (b)(1) of section 1113 requires that after filing a petition in bankruptcy, but before filing an application to reject a CBA, a debtor must (1) make a proposal to an authorized union representative "based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably," and (2) "provide, <u>subject to subsection (d)(3)</u>, the representative of the employees with such relevant information as is necessary to evaluate the proposal." 11 U.S.C. § 1113(b)(1) (1994) (emphasis added).

18.     Section 1114 of the Bankruptcy Code imposes the same requirements as section 1113. <u>See</u> <u>In re Horsehead Indus. Inc.</u>, 300 B.R. 573, 583 (Bankr. S.D.N.Y. 2003) ("The statutory requirements under both sections are the same").

19.     "If a debtor so requests, the court may authorize entry of a protective order . . . in order to prevent the disclosure of information furnished to the union where the disclosure could compromise the debtor's competitive position." <u>In re K & B Mounting, Inc.</u>, 50

9

B.R. 460, 467 (Bankr. N.D. Ind. 1985); see also 11 U.S.C. §§ 1113(d)(3); 1114(k)(3).[5] Here, the relevant information necessary to evaluate the Debtors' proposals to each of its unions and the Retiree Committee includes confidential, commercial, proprietary, or otherwise non-public information. Unlimited disclosure of such relevant information could compromise the Debtors' position with respect to competitors in their industry. In addition, the prosecution of any Section 1113 Matter or Section 1114 Matter might require the disclosure to the Bankruptcy Court or to other parties – i.e., an official committee – of sensitive or confidential information which, if further disclosed to the public or a competitor, could compromise the Debtors' position in the automotive and electronics industries. Accordingly, the Debtors seek sections 1113(d)(3) and 1114(k)(3) protection from this Court.

20. During its prepetition discussions with the unions, the Debtors were similarly concerned with protecting the confidentiality of sensitive information provided and therefore executed confidentiality letters of agreement with some of its unions. With the filing of a Chapter 11 petition, however, there is a heightened public interest in any information related to the Debtors' financial condition, and therefore, the likelihood of disclosure of such confidential information, inadvertent or otherwise, has also inevitably increased. Accordingly, the Debtors respectfully request that this Court provide the greater protection necessary to keep such sensitive information confidential and grant a protective order pursuant to sections 1113(d)(3)

---

[5] Section 1113(d)(3) provides:

> The court may enter such protective orders, consistent with the need of the authorized representative of the employee to evaluate the trustee's proposal and the application for rejection, as may be necessary to prevent disclosure of information provided to such representative where such disclosure could compromise the position of the debtor with respect to its competitors in the industry in which it is engaged.

11 U.S.C. § 1113(d)(3) (1994). The same language is contained in 11 U.S.C. § 1114(k)(3), although it references "retirees" rather than "employees."

10

and 1114(k)(3) of the Bankruptcy Code in the form of the proposed protective order submitted herewith.

### Notice

21. Notice of this Motion has been provided by facsimile, electronic transmission, overnight delivery, or hand delivery to (a) the relevant unions, (b) the Office of the United States Trustee, (c) the Debtors' 50 largest unsecured creditors, (d) counsel for the agent under the Debtors' prepetition credit facility, and (e) counsel for the agent under Debtors' proposed postpetition credit facility. In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

### Memorandum Of Law

22. Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

WHEREFORE, to protect the sensitive and confidential information contained in the materials that may be or have been provided to the unions and that may need to be provided to the Bankruptcy Court or other parties-in-interest, the Debtors respectfully request that this Court (a) enter the proposed protective order pursuant to sections 1113(d)(3) and 1114(k)(3) of the Bankruptcy Code and (b) granting the Debtors such other and further relief as is just.

Dated: New York, New York
October 8, 2005

        SKADDEN, ARPS, SLATE, MEAGHER
        & FLOM LLP

By: s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr. (pro hac vice motion pending)
    John K. Lyons
    Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By: s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession