SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                     :

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-_____ (___) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

MOTION FOR ORDER UNDER 11 U.S.C. §§ 105(a), 363, 364, 1107, AND 1108 AND
FED. R. BANKR. P. 6004 AND 9019 AUTHORIZING CONTINUATION OF VENDOR
RESCUE PROGRAM AND PAYMENT OF PREPETITION CLAIMS OF FINANCIALLY-
DISTRESSED SOLE SOURCE SUPPLIERS AND VENDORS WITHOUT CONTRACTS

("ESSENTIAL SUPPLIER MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the

"Affiliate Debtors"),[1] debtors and debtors-in-possession in the above-captioned cases

(collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order under 11

U.S.C. §§ 105(a), 363, 364, 1107, and 1108 and Fed. R. Bankr. P. 6004 and 9019 authorizing the

continuation of the Debtors' prepetition vendor rescue program and the payment of prepetition

claims of financially-distressed sole source suppliers and vendors without enforceable contracts.

In support of this Motion, the Debtors submit the Affidavit Of Robert S. Miller, Jr. In Support Of

Chapter 11 Petitions And First Day Orders, sworn to October 8, 2005.  In further support of this

Motion, the Debtors respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8, 2005 (the "Petition Date"), each of the Debtors filed a

voluntary petition in this Court for reorganization relief under chapter 11 of title 11 of the United

States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").  The Debtors

continue to operate their businesses and manage their properties as debtors-in-possession

---

[1]    In addition to Delphi, the following entities are debtors in these related cases: ASEC Manufacturing
General Partnership, ASEC Sales General Partnership, Aspire, Inc., Delco Electronics Overseas
Corporation, Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems Global (Holding),
Inc., Delphi Automotive Systems Human Resources LLC, Delphi Automotive Systems International, Inc.,
Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems LLC, Delphi Automotive Systems
Overseas Corporation, Delphi Automotive Systems Risk Management Corp., Delphi Automotive Systems
Services LLC, Delphi Automotive Systems Tennessee, Inc., Delphi Automotive Systems Thailand, Inc.,
Delphi China LLC, Delphi Connection Systems, Delphi Diesel Systems Corp., Delphi Electronics
(Holding) LLC, Delphi Foreign Sales Corporation, Delphi Integrated Service Solutions, Inc., Delphi
International Holdings Corp., Delphi International Services, Inc., Delphi Liquidation Holding Company,
Delphi LLC, Delphi Mechatronic Systems, Inc., Delphi Medical Systems Colorado Corporation, Delphi
Medical Systems Corporation, Delphi Medical Systems Texas Corporation, Delphi NY Holdings
Corporation, Delphi Services Holding Corporation, Delphi Technologies, Inc., DREAL, Inc.,
Environmental Catalysts, LLC, Exhaust Systems Corporation, Packard Hughes Interconnect Company,
Specialty Electronics, Inc., and Specialty Electronics International Ltd.

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have moved this

Court for an order for joint administration of these chapter 11 cases.

       2.    No trustee, examiner, or creditors' committee has been appointed in the

Debtors' cases.

       3.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2).

       4.    The statutory predicates for the relief requested herein are sections 105(a),

363, 364, 1107(a), and 1108 of the Bankruptcy Code and Rules 6004 and 9019 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.     Current Business Operations Of The Debtors

       5.    With more than 180,000 employees worldwide, global 2004 revenues of

approximately $28.6 billion and global assets as of August 31, 2005 of approximately $17.1

billion,[2] Delphi ranks as the fifth largest public company business reorganization in terms of

revenues, and the thirteenth largest public company business reorganization in terms of assets.

Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations

without supervision from the Bankruptcy Court, and will not be subject to the chapter 11

requirements of the U.S. Bankruptcy Code.

       6.    Over the past century, the operations which are now owned by Delphi

have become a leading global technology innovator with significant engineering resources and

technical competencies in a variety of disciplines.  Today, the Company is arguably the single

---

[2]    The aggregated financial data used in this Motion generally consists of consolidated information from
Delphi and its worldwide subsidiaries and affiliates.

largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company's technologies and products are present in more than 75 million vehicles on the road worldwide. The Company supplies products to nearly every major global automotive original equipment manufacturer with 2004 sales to its former parent, General Motors Corporation, equaling approximately $15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

7.     As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world. In the U.S., the Debtors employ approximately 50,600 people. Those employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in Delphi's worldwide headquarters and customer center located in Troy, Michigan. Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and local unions. Outside the United States, the Company's foreign entities employ more than 134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

8.     Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM. Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-

4

based, captive automotive supplier to a global supplier of components, integrated systems, and

modules for a wide range of customers and applications.  Although GM is still the Company's

single largest customer, today more than half of Delphi's revenue is generated from non-GM

sources.

9.      Due to the significant planning that goes into each vehicle model, Delphi's

efforts to generate new business do not immediately affect its financial results, because supplier

selection in the auto industry is generally finalized several years prior to the start of production

of the vehicle.  When awarding new business, which is the foundation for the Company's

forward revenue base, customers are increasingly concerned with the financial stability of their

supply base.  The Debtors believe that they will maximize stakeholder value and the Company's

future prospects if they stabilize their businesses and continue to diversify their customer base.

The Debtors also believe that this must be accomplished in advance of  the expiration of certain

benefit guarantees between GM and certain of Delphi's unions representing most of its U.S.

hourly employees which coincides with the expiration of the Company's U.S. collective

bargaining agreements in the fall of 2007.

C.      Events Leading To The Chapter 11 Filing

10.      In the first two years following Delphi's separation from GM, the

Company generated more than $2 billion in net income.  Every year thereafter, however, with the

exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company

reported a net operating loss of $482 million on $28.6 billion in net sales.  Reflective of a

downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six

months of 2005.  The Company experienced net operating losses of $608 million for the first six

5

months of calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1

billion less in sales than during the same time period in calendar year 2004.[3]

11.     The Debtors believe that three significant issues have largely contributed

to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S.

legacy liabilities and operational restrictions driven by collectively bargained agreements,

including restrictions preventing the Debtors from exiting non-strategic, non-profitable

operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive

U.S. vehicle production environment for domestic OEMs resulting in the reduced number of

motor vehicles that GM produces annually in the United States and related pricing pressures, and

(c) increasing commodity prices.

12.     In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

portfolio, operational issues and forward looking revenue requirements.  Having concluded that

pre-filing discussions with its Unions and GM were not leading to the implementation of a plan

sufficient to address the Debtors' issues on a timely basis, the Company determined to commence

these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and

preserve value.

13.     Through the reorganization process, the Debtors intend to achieve

competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive

legacy liabilities and burdensome restrictions under current labor agreements and realigning

Delphi's global product portfolio and manufacturing footprint to preserve the Company's core

---

[3]     Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily
related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

6

businesses. This will require negotiation with key stakeholders over their respective

contributions to the restructuring plan or, absent consensual participation, the utilization of the

chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned

in the Company's transformation plan. The Debtors believe that a substantial segment of

Delphi's U.S. business operations must be divested, consolidated, or wound-down through the

chapter 11 process.

14.    Upon the conclusion of this process, the Debtors expect to emerge from

chapter 11 as a stronger, more financially sound business with viable U.S. operations that are

well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all

of its resources to continue to deliver value and high-quality products to its customers globally.

Additionally, the Company will preserve and continue the strategic growth of its non-U.S.

operations and maintain its prominence as the world's premier auto supplier.

<u>Relief Requested</u>

15.    <u>Payment Of Essential Supplier Claims</u>. By this Motion, the Debtors seek

entry of an order authorizing but not directing the Debtors to pay prepetition claims owing to

certain of the Debtors' suppliers which are essential to the uninterrupted functioning of the

Debtors' business operations (the "Essential Suppliers," whose claims shall be identified as

"Essential Supplier Claims"). Failure to pay the Essential Supplier Claims would, in the Debtors'

business judgment, very likely result in the Essential Suppliers halting their provision of goods

and/or services to the Debtors, in most cases because the Essential Suppliers could not afford to

continue to operate their businesses if the Debtors fail to pay their prepetition claims. Payment

of the Essential Supplier Claims is vital to the Debtors' reorganization efforts because the

Essential Suppliers are the sole source from which the Debtors can procure the goods and

7

services they provide without suffering substantial delays and disruptions in the Debtors' ability

to conduct business and corresponding losses.

16.     Not paying the Essential Supplier Claims would very likely result in the

Essential Suppliers' ceasing operations, thereby forcing the Debtors to try to obtain goods and

services elsewhere.  Replacement goods and services, however, would not be available for a

prolonged period and, even then, would likely be available only at a higher price or on terms

unfavorable to the Debtors.  Such replacement goods might also be incompatible with equipment

or systems currently operated by the Debtors, or not be of the quality required by the Debtors and

their customers, thereby creating a devastating administrative burden on the Debtors and causing

tremendous disruptions to the Debtors' businesses.

17.     Indeed, the failure to pay these claims, as further described below, would

likely result in (a) the Debtors' inability to obtain necessary materials to produce their products,

(b) temporary shutdowns of the manufacturing facilities of the Debtors and the Debtors' original

equipment manufacturer customers ("OEMs") within as few as 24 hours from a vendor's failure

to timely ship parts to the Debtors (with corresponding potentially catastrophic damage claims),[4]

and (c) severe negative effects on the Debtors and the Debtors' OEM customers, which include

all of the largest vehicle producers in the United States,[5] and the Debtors' long-term business

relationships with such customers.  These effects are primarily due to the highly-integrated

---

[4]    Nothing contained herein shall be, or should be construed as, an acknowledgement by the Debtors that they
would be responsible for damages of OEM customers in the event of a supplier's failure to ship, but the
Debtors believe that such claims are likely to be asserted.

[5]    The Debtors' and their affiliates' largest OEM customers on a consolidated basis include BMW AG,
Caterpillar Inc., DaimlerChrysler AG, Ford Motor Company, General Motors Corporation ("GM"),
Hyundai Motor Company, Renault/Nissan Motor Company, Ltd., Toyota Motor Corporation, and
Volkswagen Group.  The Debtors also have significant OEM customers in the communications, computer,
energy, and medical industries.

nature of the OEM supply chain, the Debtors' central role in the supply chain, and the OEM

customers' stringent quality requirements that significantly limit the availability of alternative

sources of supply.

18.    Continuation Of Vendor Rescue Program.    The Debtors also seek

authorization but not the direction to continue their prepetition vendor rescue program (the

"Vendor Rescue Program") in the ordinary course of business.[6]    The vendors currently

participating in the Debtors' Vendor Rescue Program, and the vendors that may participate in the

Vendor Rescue Program in the future, are among the Debtors' most financially-troubled

suppliers.  Absent expedited payment or other financial support by the Debtors under the

Debtors' Vendor Rescue Program, such suppliers would likely cease operations in the near

future.  Without these vendors, the Debtors' manufacturing facilities would quickly shut down,

and, as with the Essential Suppliers, lead to similar shutdowns at certain of the Debtors' and the

Debtors' OEM customers' facilities.  This in turn would give rise to potentially staggering costs

to and damage claims against the Debtors that far exceed the cost of the Vendor Rescue Program

to the Debtors' estates.

A.    Proposed Terms And Conditions Of Payments To Essential Vendors

19.    To maintain their operations and remain competitive in the marketplace,

the Debtors seek limited discretionary authority to pay certain prepetition Essential Supplier

---

[6]    The Debtors believe that the transactions entered into in connection with the Vendor Rescue Program are
entered into in the ordinary course of the Debtors' businesses and, therefore, that the Debtors' continuation
of the Vendor Rescue Program does not require court authority.  Nevertheless, the Debtors seek approval to
continue the Vendor Rescue Program out of an abundance of caution.

Claims up to an aggregate amount of $90 million (the "Essential Supplier Claims Cap").[7]  The

Essential Supplier Claims Cap represents approximately 6.9% of the Debtors' average monthly

disbursements to trade creditors over the preceding twelve months, which are estimated to be

approximately $1.3 billion.

20.    In calculating the amount of the Essential Supplier Claims Cap, the

Debtors carefully analyzed all of their vendors to identify the Debtors' sole source suppliers,

whose products are necessary for the Debtors to continue operating their manufacturing

facilities.  The Debtors then analyzed whether the suppliers provided goods and services

pursuant to enforceable long-term contracts and, if so, whether enforcement of those contracts

could be accomplished in a timely manner without unduly disrupting the Debtors' businesses.

The Debtors also evaluated the financial and operational prospects of their suppliers which are

parties to enforceable contracts to identify those suppliers whose financial or operational position

is so precarious that if the Debtors' prepetition obligations are not paid, the suppliers' businesses

would most likely fail.

21.    The Debtors relied upon several methods of analysis to determine which

of their suppliers were so financially and/or operationally constrained.  First, the Debtors

reviewed their Financially Troubled Supplier Database ("FTSD"), which the Debtors maintain in

the ordinary course of their businesses.  The FTSD contains information on all suppliers in the

Vendor Rescue Program or which the Debtors are actively monitoring because the Debtors have

identified such suppliers as high risk.  Second, the Debtors reviewed supplier information

available through Open Ratings, an internet solution provider that uses business data from inside

---

[7]    The Essential Supplier Claims Cap does not include amounts owed for prepetition claims, including claims
of certain statutory lien holders, shippers, and foreign vendors, that the Debtors have authority to pay in the
ordinary course of business under other motions filed with this Court.

and outside the enterprise, cleans and unifies this data, and applies proprietary analytics to

deliver actionable intelligence on the performance, financial opportunities, and risks presented

by the Debtors' suppliers. Utilizing the Open Ratings software, the Debtors can quantify the

financial and operational stability of each of their suppliers. Upon development of the FTSD and

Open Ratings reports, the Debtors' personnel who are responsible for managing and tracking the

Debtors' supplier relationships, and who have an intimate knowledge of the Debtors' supplier

base, reviewed and further refined the pool of suppliers which would likely be unable or

unwilling to continue to provide critical goods and services if their prepetition claims remain

unpaid. The Debtors then estimated the amount that they believe must be paid to such suppliers

to ensure the continuing viability of their businesses and, thereby, the continued supply of critical

goods and services to the Debtors. The Essential Supplier Claims Cap represents this estimated

amount.

22.    Significantly, the cap represents only a small portion of the total amount

of prepetition trade claims outstanding for all creditors. It represents the Debtors' best estimate

as to the minimum amount that must be paid to only Essential Suppliers (a) with whom the

Debtors have no enforceable long-term contracts, (b) with whom the Debtors have contracts that

may be terminable for any reason, or (c) whose financial condition is so distressed that payments

to the vendor are necessary for the vendor to survive.[8]

23.    To minimize the amount of payments required, the Debtors request

authority to identify Essential Suppliers as circumstances warrant. Immediately identifying the

Essential Suppliers which may receive payment would likely cause all such suppliers to demand

---

[8]    The Debtors reserve the right to later seek Court authority to increase the Essential Supplier Claims Cap.

11

payment and all such demands would likely be for payment in full. When determining whether a

creditor is a Essential Supplier, the Debtors, in their sole discretion, would consider, among other

things, (a) whether the goods or services the creditor provides could be replaced or acquired on a

timely basis or on better terms, (b) whether failure to pay prepetition trade claims would require

the Debtors to incur higher costs for goods or services postpetition, (c) whether the enforcement

of a contract with a vendor which refuses to ship product could be accomplished in a timely and

cost-efficient manner without unduly disrupting the Debtors' operations in light of all relevant

circumstances, (d) whether failure to pay prepetition trade claims would cause the Debtors to

lose significant sales or future revenue, (e) whether failure to pay prepetition trade claims would

cause a disruption to the Debtors' operations, potentially incurring significant costs, (f) the

financial stress of the vendor, and (g) whether failure to pay prepetition trade claims would cause

the Debtors to be unable to meet their commitments to their OEM customers, potentially

incurring significant damage claims thereby.

B.      Continuation Of Customary Trade Terms And Entry Into Trade Agreement

              24.      The Debtors propose to condition the payment of Essential Supplier

Claims on the agreement of the individual Essential Suppliers to continue supplying goods and

services to the Debtors on MNS-2 payment terms[9] and those other terms and conditions as are

embodied in the Delphi's General Terms and Conditions or such other more favorable trade

terms, practices, and programs in effect between such supplier and the Debtors in the twelve

months prior to the Petition Date (the "Customary Trade Terms"), or such other favorable trade

---

[9]      "MNS-2" refers to the most common payment terms in the Debtors' industries, whereby payment for goods
supplied is generally due on the second business day of the second month following the receipt of such
goods. For example, under these terms, payment for goods received by the Debtors during the month of
July 2005 was due on September 2, 2005.

terms as are agreed to by the Debtors and the Essential Supplier. The Debtors reserve the right to negotiate new trade terms with any Essential Supplier as a condition to payment of any Essential Supplier Claim.

25.     To ensure that the Essential Suppliers deal with the Debtors on Customary Trade Terms, the Debtors propose that a letter substantially in the form of the letter attached hereto as Exhibit A be sent to the Essential Suppliers along with a copy of the order granting this Motion.

26.     The Debtors propose that the letter sent to Essential Suppliers include, but not be limited to, the following terms:

(a)     The amount of such Essential Supplier's estimated Essential Supplier Claims, accounting for any setoffs, other credits, and discounts thereto, will be as mutually determined in good faith by the Essential Supplier and the Debtors (but such amount will be used only for the purposes of determining such Essential Supplier's claim under the order and will not be deemed a claim allowed by the Court and the rights of all interested persons to object to such claim shall be fully preserved until further order of the Court, unless such claim is waived by the Essential Supplier pursuant to the terms of the letter);

(b)     The Customary Trade Terms between such Essential Supplier and the Debtors, or such other favorable terms as the Essential Suppliers and the Debtors may agree, and the Essential Supplier's agreement to provide goods and services in accordance with such terms;

(c)     The Essential Supplier's agreement not to file or otherwise assert against any or all of the Debtors, their estates, or any other person or entity or any of their respective assets or property (real or personal) any lien (a "Lien"), regardless of the statute or other legal authority upon which such Lien is asserted, related in any way to any remaining prepetition amounts allegedly owed to the Essential Supplier by the Debtors arising from agreements or other arrangements entered into prior to the Petition Date, and, to the extent the Essential Supplier has already obtained or otherwise asserted such a Lien, the Essential Supplier must take whatever actions are necessary to remove such Lien;

(d)     The Essential Supplier's acknowledgment that it has reviewed the terms and provisions of the Order and consents to be bound thereby; and

(e)     The Essential Supplier's agreement that it will not separately seek payment for reclamation claims outside the terms of the Order unless the Essential Supplier's participation in the program to pay Essential Supplier Claims pursuant to the Order is terminated; provided, however, that such reclamation claims will, if thereafter raised by the Essential

13

Supplier as permitted by the Order, be treated as though raised on the later of (i) the date of the Order and (ii) the date on which the Trade Agreement is executed by both parties.

Such a letter, once agreed to and accepted by a Essential Supplier, will be referred to herein as a "Trade Agreement."

27.    By this Motion, the Debtors seek only the authority to enter into Trade Agreements and not a mandate that they do so.  The Debtors submit that there may be limited circumstances in which payment to certain Essential Suppliers, prior to or in lieu of the Debtors' and such Essential Supplier's having entered into a Trade Agreement, is necessary to avoid causing irreparable harm to the Debtors' business operations.  In those cases, the Debtors seek authority to make payments on account of such Essential Supplier's claims, notwithstanding the fact that following diligent efforts to enter into a Trade Agreement with an Essential Supplier, no Trade Agreement has been reached.

28.    For those Essential Suppliers which have agreed to ship goods or render services on trade terms other than their Customary Trade Terms, the Debtors reserve the right to obtain written acknowledgment of such terms on a case-by-case basis.  Nothing in this Motion or any order of this Court approving this Motion should be construed as a waiver by any of the Debtors of their rights to contest any invoice of an Essential Supplier under applicable non-bankruptcy law.

29.    If an Essential Supplier refuses to supply goods and/or services to the Debtors on Customary Trade Terms following receipt of payment on its Essential Supplier Claims, or fails to comply with any Trade Agreement entered into between such Essential Supplier and the Debtors, then the Debtors seek authority, in their discretion and without further order of this Court or action by any person or entity, to declare that (a) any Trade Agreement between the Debtors and such Essential Supplier is terminated (if applicable) and (b) provisional

14

payments made to Essential Suppliers on account of Essential Supplier Claims be deemed to

have been made in payment of then-outstanding postpetition claims of such vendors.  In such

event, the Debtors propose that an Essential Supplier be required immediately to repay to the

Debtors any payment made to it on account of its Essential Supplier Claims to the extent that

payments on account of such Essential Supplier Claims exceed the postpetition claims of such

vendor then-outstanding without giving effect to any rights of setoff, claims, provision for

payment of reclamation or trust fund claims, or otherwise.  In sum, the Debtors seek to return the

parties to their position immediately prior to the entry of the order approving this Motion with

respect to all prepetition claims in the event that a Trade Agreement is terminated or an Essential

Supplier refuses to supply goods and/or services to the Debtors on Customary Trade Terms

following receipt of payment on its Essential Supplier Claims.

      30.     The Debtors further propose that any Trade Agreement terminated as a

result of a Essential Supplier's refusal to comply with the terms thereof may be reinstated if:

          (a)    such determination is subsequently reversed by this Court, after
notice and a hearing following a motion by the Essential Supplier, for good cause shown that the
determination was materially incorrect;

          (b)    the underlying default under the Trade Agreement was fully cured
by the Essential Supplier not later than five business days following the Debtors' notification to
the Essential Supplier that a default had occurred; or

          (c)    the Debtors, in their discretion, reach a favorable alternative
agreement with the Essential Supplier.

C.    Prefunding Transfers And Waiver And Release Of Avoidance Actions

      31.     Prior to the Petition Date, the Debtors also prefunded their obligations (the

"Prefunding Transfers") to certain suppliers (the "Prefunded Suppliers") whom the Debtors

believe would have qualified for relief under the terms of this Motion had they not received

payment of the Debtors' outstanding obligations prior to the Petition Date and whose cooperation

15

they view as being particularly essential to the uninterrupted functioning of the Debtors' businesses. The total amount of payments to Prefunded Suppliers, other than in the ordinary course of business (for instance, for amounts due on October 4, 2005, the most recent MNS-2 payment date), was less than $76 million. To ensure that the Prefunded Suppliers receive the same treatment as any of the Essential Suppliers paid pursuant to the terms of an order entered with respect to this Motion, the Debtors respectfully request that this Court require each Prefunded Supplier to enter into a Trade Agreement with the Debtors within 30 days of the Petition Date. To entice the Prefunded Suppliers to enter into Trade Agreements, the Debtors further request that they be authorized to waive and release any rights that they or their estates may have under section 547 of the Bankruptcy Code to avoid the Prefunding Transfers in exchange for a Prefunded Supplier's entry into a Trade Agreement. Absent timely entry into a Trade Agreement, the Debtors would retain all of their respective rights to avoid the Prefunding Transfers under section 547. The Debtors' waiver and release of their rights, and the rights of their estates, under section 547 of the Bankruptcy Code is consistent with the intent of the Debtors to ensure that the Prefunded Suppliers are made neither better nor worse off by the Debtors' Prefunding Transfers than such Suppliers would have been had they received payment of such obligations pursuant to the relief sought under this Motion.

D.    Limited Waiver Rights And Procedure For Court Review

32.    Given the just-in-time and sole source nature of the Debtors' businesses, as is described in detail below, and the huge disruptions of the Debtors' and their OEM customers' business operations that would be caused by a supplier's refusal to ship products to the Debtors, the Debtors are concerned that a rogue supplier may attempt to inappropriately use the sole source nature of its contract with the Debtors as leverage to receive payment on account of its

prepetition claim by threatening, notwithstanding its contractual obligations, to withhold

shipment of products to the Debtors unless such claim is paid pursuant to this Motion.

Notwithstanding that such an action would violate the automatic stay provisions of section 362

of the Bankruptcy Code, the Debtors have experienced extortive behavior by suppliers in the

past.  The Debtors anticipate that a small percentage of their suppliers which are either

unfamiliar with the provisions of the Bankruptcy Code or simply decide to be recalcitrant will

make such threats,  and that such threats will in fact be credible, despite the Debtors' belief that

such supplier does not meet the standards required for payment pursuant to this Motion and the

supplier's failure to demonstrate otherwise.  With respect to many of the Debtors' suppliers, the

Debtors would be left with no palatable short-term response to such a refusal to ship.  The

Debtors would face the shutdown of certain of their and their OEM customers' operations within

such an abbreviated time period that it would be impossible for the Debtors to receive effective

relief from this Court, even on an expedited basis.  Thus, the Debtors would be forced either to

violate an order of this Court (by paying such supplier) or to allow their plants and their OEM

customers' facilities to be idled.

    33.  Instead, to deal with such a situation, the Debtors respectfully request that

they be granted the authority but not the direction to elect, in their sole discretion, to waive the

conditions of this Motion for payment of a claim under the Essential Supplier Claims Cap (the

"Waiver") and to pay conditionally the claim of such threatening supplier (the "Rogue

Supplier"), subject to the procedures outlined herein.  In the event that the Debtors grant a

Waiver to a Rogue Supplier, the Debtors propose to file a Notice of Waiver, in substantially the

form attached hereto as Exhibit B (the "Notice of Waiver"), and a proposed Order to Show

Cause, in substantially the form attached hereto as Exhibit C (the "Order to Show Cause"), with

17

this Court within three business days of the payment pursuant to the Waiver. The Debtors

further propose to serve such Notice of Waiver and Order to Show Cause on (a) the Rogue

Supplier, (b) the Office of the United States Trustee, (c) counsel for the official committee of

unsecured creditors appointed in these cases pursuant to section 1102 of the Bankruptcy Code

(the "Creditors' Committee"), (d) counsel for the agent under the Debtors' prepetition credit

facility, and (e) counsel for the agent under Debtors' proposed postpetition credit facility. The

Debtors further request that they not be required to file a Notice of Waiver and an Order to Show

Cause if, within three business days following the grant of the Waiver, the Creditors' Committee

ratifies the Waiver in writing to the Debtors.

34.    The Debtors further propose that, at the first regularly-scheduled hearing

occurring at least five business days following entry of the Order to Show Cause by this Court,

the Rogue Supplier be required to appear before this Court and demonstrate why such Rogue

Supplier should not be held in violation of the automatic stay. Should the Court determine that,

by its conduct, the Rogue Supplier has violated the automatic stay, the Debtors respectfully

request that this Court require the Rogue Supplier to disgorge the amount of the payment made

by the Debtors pursuant to the Waiver, plus attorneys' fees and interest accrued on such amount

at the rate specified under the relevant agreements governing the Debtors' debtor-in-possession

credit facility or such other higher rate as this Court specifies, within three business days of entry

of the order holding such Rogue Supplier in violation. Furthermore, the Debtors expressly

reserve their right to file any motions, adversary complaints, or other pleadings that they

determine in their sole and absolute discretion are necessary or appropriate to pursue other

remedies including, without limitation, injunctive relief.

E.      Payment Of The Essential Supplier Claims Is Necessary For The
        Debtors' Successful Reorganization In These Chapter 11 Cases

        35.     The Debtors respectfully assert that payment of the Essential Supplier

Claims is necessary for the Debtors to reorganize successfully.  The Debtors' manufacturing

facilities use the "just-in-time" supply method for processing their products.  The just-in-time

supply method is standard in the automotive industry and is used not only by other automotive

equipment suppliers, but, more importantly, by the Debtors' OEM customers.  Use of the just-in-

time supply method means that the Debtors do not maintain a significant inventory of the

components supplied by the Essential Suppliers (in many cases, less than 24 hours) and,

accordingly, the Debtors rely upon frequent and, in many cases, daily shipments of components

from such Essential Suppliers to keep their manufacturing facilities operating.  Similarly, the

Debtors' OEM customers do not maintain a significant inventory of the Debtors' products (in

many cases, less than 24 hours) and rely instead upon frequent shipments of such products to

keep their manufacturing plants operating.

        36.     The Debtors also rely on the sole source supply method – a method under

which they purchase all their requirements for a particular part from one supplier.  All of the

Essential Suppliers are sole source suppliers of certain parts necessary for the Debtors'

manufacturing operations.  Each of these parts must meet demanding specifications imposed by

both the Debtors and their OEM customers before they can be used in manufacturing the

Debtors' products.  In this regard, numerous tests, sometimes taking place over the course of

several months, must be run to validate and qualify each of the parts.  The Debtors employ the

sole source supply method to reduce the cost of production start-up, capital investment, and

validation costs necessary to make each part (which are generally recouped by suppliers through

their per piece prices), to achieve a consistent quality of parts, and to achieve economies of scale.

19

37.    Many of the Essential Suppliers also provide favorable trade terms to the Debtors. The continued availability of trade credit in amounts and on terms consistent with those enjoyed by the Debtors prepetition clearly benefits the Debtors by permitting them to maintain liquidity for their business operations. The Debtors believe that preserving working capital through the retention or reinstatement of traditional trade credit terms will enable them to maintain their competitiveness and maximize the value of their businesses for the benefit of the Debtors, their estates, and their creditors. Conversely, a deterioration of trade credit and a disruption or cancellation in the delivery of goods or provision of services would cripple the Debtors' business operations and increase the amount of funding needed by the Debtors postpetition.

38.    To obtain an alternative source of supply for the parts currently supplied by the Essential Suppliers, the Debtors would have to undergo their OEM customers' rigorous approval processes, which involve extensive testing and evaluations and typically last one month or more. Many of the parts sold to the Debtors by the Essential Suppliers are not standard parts, but rather were custom-designed years in advance of production and built to fit the Debtors' specific needs. Even when accelerated, the delivery of capital equipment, the tooling build, and the testing and approval process for validating new suppliers typically takes three to six months or more to complete. Failure to maintain the supply of parts could therefore have a devastating impact on the Debtors' businesses as well as their customers' and other suppliers' businesses.

39.    Indeed, if the Essential Suppliers fail to ship parts, the Debtors' manufacturing facilities utilizing those parts would likely be forced to shut down less than 24 hours after the missed shipment. Within less than 24 hours after a shutdown of one of the Debtors' facilities, the Debtors' OEM customers would likely be forced to halt production of their

20

products on one or more of their assembly lines.  A shutdown of even one assembly line could

cause an affected OEM customer to assert damages against the Debtors exceeding $10 million

per day.  Besides the potential damages, which, if valid, could severely dilute if not eviscerate

stakeholder recoveries, the Debtors would also be harmed by continuing to incur the

considerable fixed costs connected to the facilities idled by the failure to receive parts without

generating any revenue to offset such fixed costs.  A line shutdown could also cause the Debtors

to suffer a loss of customer relations and goodwill.  The long-term damage caused by such

shutdowns to the Debtors' businesses would therefore be both immeasurable and irreparable.

      40.    The need for the relief sought herein is immediate.  Most of the Debtors'

Essential Suppliers require payment of their Essential Supplier Claims in order to have sufficient

liquidity to honor impending orders of raw materials and other goods necessary to their

manufacturing operations.  In some cases, this liquidity is actually necessary to cover the

Essential Supplier's employee wages.  Any delay in this Court's granting of the relief requested

herein would practically guarantee significant disruption of the operations of the Debtors and

their OEM customers and jeopardize the Debtors' chances of a successful reorganization.

F.    Continuation Of The Vendor Rescue Program Is Similarly Vital To
    The Debtors' Successful Restructuring In These Chapter 11 Cases

      41.    For some of the Debtors' suppliers (the "Troubled Suppliers"), even timely

payment of all prepetition invoices is not sufficient to ensure their financial viability.  As of the

Petition Date, the Debtors estimate that they had approximately 130 such Troubled Suppliers.

These Troubled Suppliers find themselves in such dire straits that they need the assistance of the

Debtors or other outside advisors provided by the Debtors to, among other things, (a) obtain

sufficient financing to ensure the steady flow of raw materials necessary to manufacture the

components ordered by the Debtors, (b) honor their payroll obligations and other business

expenses, and/or (c) restructure their operations so as to allow their businesses to continue to operate.

42.     The Debtors have long maintained the Vendor Rescue Program to assist these Troubled Suppliers.  The assistance provided to the Troubled Suppliers under the Vendor Rescue Program is tailored to the Troubled Suppliers' individual needs and may therefore take different forms.  The most common types of support provided to Troubled Suppliers include the following:

- The Debtors may purchase, on behalf of a Troubled Supplier, the raw materials necessary to manufacture the Debtors' parts when a Troubled Supplier lacks the available credit to purchase such materials for its own account.  The cost of such raw materials is generally debited against the invoiced amounts upon delivery of the final manufactured parts.  Therefore, the transaction has no net cash effect upon the cost of the goods to the Debtors.  Such raw materials are consigned or bailed to the Troubled Supplier upon the purchase thereof by the Debtors and, as such, remain the property of the Debtors throughout the manufacturing process.

- The Debtors may provide a lump sum subsidy to a Troubled Supplier when the Supplier is faced with an acute short-term economic problem such as excessive exchange rate exposure.

- The Debtors may lend funds to a Troubled Supplier, either by purchasing a participation (generally a "last out" participation) in the Troubled Supplier's existing credit facility or by lending funds under a promissory note.  In situations in which the Debtors purchase a participation in the Troubled Supplier's existing credit facility, the existing obligations under such facility are frequently over-collateralized such that the Debtors' investment in the facility is secured by a first-priority security interest in all or part of the Troubled Supplier's assets.  Similarly, in situations in which the Debtors lend funds to a Troubled Supplier pursuant to a promissory note, the Debtors normally require that the Troubled Supplier provide the Debtors with a security interest in all or part of the Troubled Supplier's assets to secure its obligations under such promissory note.

- The Debtors may agree to pay their obligations under invoices from a Troubled Supplier on an accelerated basis to provide such Troubled Supplier with enhanced liquidity.  The Debtors are generally on MNS-2 payment terms with their suppliers.  Depending upon the liquidity needs of the Troubled Supplier, the Debtors will agree to shorter payment terms.

- The Debtors may agree to provide the Troubled Supplier with operational assistance, either through the Debtors' own personnel or through use of an outside consulting firm. This operational assistance may include cash flow management, negotiating more lenient terms with the Troubled Supplier's own vendors, implementing manufacturing efficiencies and other cost savings initiatives and/or negotiating concessions from the Troubled Supplier's lenders.

- Some or all of the assistance described in the foregoing three bullet points will generally be provided to a Troubled Supplier under an accommodation agreement. In exchange for the Debtors' agreement to provide such support, the Troubled Supplier will commonly (a) covenant to continue supplying goods to the Debtors pursuant to its contracts, (b) agree to provide the Debtors with access to its books and records and its facilities, (c) acknowledge the Debtors' ownership of tooling provided by the Debtors for manufacture of their parts, (d) admit that it is in breach of its agreements with the Debtors, and (e) acknowledge the Debtors' right to take whatever actions the Debtors deem necessary to prepare to re-source the contract. In addition, the Troubled Supplier's lenders generally commit to continue lending to the Troubled Supplier.

- In connection with an accommodation agreement, the Debtors may enter into several related agreements, including (a) an inventory repurchase agreement, pursuant to which the Debtors agree to repurchase the Troubled Supplier's inventory upon a default under the accommodation agreement (usually at the invoice price for completed inventory; at 90% of the purchase order price, pro rated for the level of completion, for work-in-process inventory; and at supplier cost for raw materials), and (b) an access agreement, pursuant to which the Debtors have the right upon the Troubled Supplier's default under the accommodation agreement to take over operation of the Troubled Supplier's facility in exchange for payment of the operating expenses of the facility.[10]

43.    The Debtors established the Vendor Rescue Program because so many of their critical suppliers are sole source suppliers and the loss of these suppliers could have a devastating economic impact on the Debtors. Accordingly, the Debtors generally utilize the Vendor Rescue Program as part of a re-sourcing plan for the Troubled Suppliers.[11] Absent the flexibility provided by the Vendor Rescue Program, many of the Troubled Suppliers would cease

---

[10]    The Debtors do not believe that as of the Petition Date they are operating the facilities of any Troubled Suppliers under access agreements.

[11]    Re-sourcing is the process of locating, evaluating, and receiving the Debtors' and their OEM customers' approval of an alternate supplier. The re-sourcing process can take as long as 18 months to complete.

operations without the Debtors' having had the opportunity to transition the manufacture of the

parts provided by such Troubled Supplier to another, financially-viable supplier.  As noted

above, the effects of a collapse of a sole source supplier would be catastrophic to the Debtors.

The Debtors would experience a loss of business resulting from the Troubled Supplier's not

supplying critical subassemblies, incur costs attendant with a cessation of the Debtors'

operations, and potentially incur substantial claims that could be asserted by an OEM customer

against the Debtors' estates upon a shutdown of one or more of the OEM customer's

manufacturing facilities for a prolonged period.

44.    The Debtors estimate that they invest approximately $70 million annually

in the Vendor Rescue Program.  As noted above, however, many of the Debtors' investments are

partially or fully secured by the assets of a Troubled Supplier.  Therefore, the Debtors believe

that their potential exposure under the Vendor Rescue Program is significantly less than the

aggregate amount of their outstanding investments.  More importantly, the Vendor Rescue

Program also mitigates the enormous hardship that a failure to maintain access to a steady supply

of parts provided by the Troubled Suppliers would have upon the Debtors' manufacturing

operations and the manufacturing operations of the Debtors' OEM customers, which include

some of the largest automobile manufacturers in the world, given the critical nature of the

Troubled Suppliers to the Debtors' businesses during the re-sourcing process.  Therefore, the

Debtors respectfully assert that continuation of the Vendor Rescue Program is in the best

interests of the Debtors, their estates, and their creditors and request authority to continue the

Vendor Rescue Program in the ordinary course of the Debtors' businesses.

Applicable Authority

45.    The relief requested in this Motion is supported by several provisions of the Bankruptcy Code that authorize a debtor to honor prepetition obligations in certain circumstances.  Courts have recognized each of these statutory provisions as valid authority for such payments.  For instance, courts have found a basis for allowing debtors to make payments to creditors under sections 363 and 364 of the Bankruptcy Code.  See, e.g., In re UAL Corp., Case No. 02-48191 (ERW) (Bankr. N.D. Ill. Dec. 11, 2002).  Authority for such payments also may be found in sections 1107(a) and 1108 of the Bankruptcy Code, which vest debtors-in-possession with authority to continue operating their businesses.  Sometimes this duty and the concomitant fiduciary duty to maximize estate value may be fulfilled only through the pre-plan payment of certain unsecured claims.  See, e.g., In re Mirant Corp., 296 B.R. 427 (Bankr. N.D. Tex. 2003); In re CoServ, L.L.C., 273 B.R. 487, 498 (Bankr. N.D. Tex. 2002).  Finally, courts have similarly authorized payment of prepetition obligations pursuant to section 105(a) of the Bankruptcy Code, which allows a bankruptcy court to enter any order "necessary or appropriate" to carry out the provisions of the Bankruptcy Code.  See, e.g., In re Just for Feet, Inc., 242 B.R. 821 (D. Del. 1999).

A.    This Court May Authorize Payment Of The Essential Supplier Claims And Continuation Of The Vendor Rescue Program Pursuant To Sections 363 And 364 Of The Bankruptcy Code

46.    The relief requested in this Motion is authorized pursuant to sections 363 and 364 of the Bankruptcy Code.  See, e.g., In re UAL Corp. (essential trade motion relying upon section 363 is "completely consistent with the Bankruptcy Code;" payments to critical trade vendors have further support when debtor seeks "the extension of credit under section 364 on different than usual terms, terms that might include the payment of a prepetition obligation"); In

25

re Conseco, Inc., Case No. 02-49672 (CAD) (Bankr. N.D. Ill. Jan. 14, 2003); Armstrong World

Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.), 29 B.R. 391, 397 (S.D.N.Y.

1983) (under section 363, court authorized contractor to pay prepetition claims of some suppliers

who were potential lien claimants, because payments were necessary for general contractors to

release funds owed to debtors, thus benefiting estate).  Because the relief requested in this

Motion contemplates payments to be made to Essential Suppliers who agree to provide goods or

services on Customary Trade Terms, the transaction between the Debtors and such Essential

Suppliers is authorized by sections 363 and 364 of the Bankruptcy Code.

         47.    Furthermore, the requested relief meets the standards articulated by the

Seventh Circuit Court of Appeals in In re Kmart Corp., 359 F.3d 866 (7th Cir.), cert. denied, 125

S. Ct. 495 (2004).  Although not binding on this Court, the Kmart decision, in which the Seventh

Circuit acknowledged the practical business utility of allowing corporate debtors limited

authority to make prepetition Essential Supplier payments, is instructive because the Seventh

Circuit is the only appellate court that has considered the issue.

         48.    In Kmart, the Seventh Circuit identified section 363(b)(1) of the

Bankruptcy Code as a potential source of authority for Essential Supplier payments.  359 F.3d at

872-73. Section 363(b)(1) of the Bankruptcy Code authorizes a bankruptcy court, after notice

and a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of

business, property of the estate."  The court reasoned that "satisfaction of a pre-petition debt in

order to keep 'critical' supplies flowing is a use of property other than in the ordinary course of

administering an estate in bankruptcy," and thus is within the literal ambit of the statute's

language.  Id at 872.  The court, however, cautioned that "it is prudent to read, and use, §

26

363(b)(1) to do the least damage possible to the priorities established by contract and by other parts of the Bankruptcy Code."  Id.

49.    To that end, the court articulated a dual-pronged requirement that business debtors must satisfy as a condition to honoring prepetition obligations.  First, debtors must establish that the creditors whose claims are to be paid will cease dealing with the debtor if not immediately paid for prepetition goods and services.  Second, debtors must establish that "the business will gain enough from continued transactions with the favored [creditors] to provide some residual benefit to the remaining . . . creditors, or at least leave them no worse off."  Id. at 868.

50.    Both of these standards are unquestionably met with respect to the proposed treatment of the Essential Supplier Claims.  As noted above, certain of the Debtors' employees who have been responsible for maintaining, and have intimate knowledge of, the Debtors' trade relationships and who are responsible for being aware of, understanding, and responding to the needs and inner workings of the Debtors' suppliers, have conducted an extensive analysis and review of the Debtors' immediate trade needs and supplier base.  These personnel have determined that each of the Essential Suppliers is likely to be unable to meet upcoming obligations and may cease business operations in the near-term if the Essential Supplier Claims are not paid immediately.  Furthermore, the cessation of the Essential Suppliers' businesses would throw the operations of the Debtors into disarray because numerous manufacturing facilities would lack the requisite parts to meet their operational needs and would be forced to shut down.  This in turn would cause the Debtors to be unable to meet their obligations to their OEM customers, thereby causing many of the OEM customers' manufacturing facilities to shut down.

51.    As noted above, this entire sequence of events could occur in a period of 24 hours or less after cessation of even a single Essential Supplier's operations.  Not only would such an eventuality drastically affect the Debtors' revenues, cash flows, and profitability, but it could also potentially lead to the Debtors' OEM customers' asserting sizeable damage claims against the Debtors' estates, to the detriment of the Debtors' other creditors.  The Debtors assert that the amount of the Essential Supplier Claims Cap pales in comparison to the likely damage to the Debtors' businesses and the claims which would be asserted by the Debtors' OEM customers should the relief requested herein not be granted.  Accordingly, not only will the Debtors' other creditors not be impaired by payment of the Essential Supplier Claims, such creditors will in fact benefit by this Court's empowering the Debtors to negotiate payments to Essential Suppliers so as to achieve a smooth transition into bankruptcy with minimal disruption to their operations.

52.    Although the Debtors acknowledge the significant size of the Essential Supplier Claims Cap, it is important to note that (a) the size of the Essential Supplier Claims Cap relative to the overall pool of the Debtors' trade creditors is consistent with caps approved in other cases in the Debtors' industries and (b) the Debtors' supplier base has been uniquely and drastically affected by a confluence of economic factors that have severely damaged their financial stability.  The Debtors' proposed Essential Supplier Claims Cap represents approximately 6.9% of the Debtors' outstanding prepetition obligations to trade creditors.  This amount is consistent with the magnitude of other "essential supplier" or "critical vendor" claims caps in other recent industry cases.  See, e.g., In re Tower Auto., Inc., Case No. 05-10578 (ALG) (Bankr. S.D.N.Y. Mar. 14, 2005) (cap equal to approximately 10% of outstanding prepetition obligations to trade creditors); In re Meridian Auto. Sys. – Composites Operations, Inc., Case No. 05-11168 (MFW) (Bankr. D. Del. Apr. 27, 2005 and May 26, 2005) (cap equal to

28

approximately 15% of outstanding prepetition obligations to trade creditors); see also In re Delta Air Lines, Inc., Case No. 05-17923 (PCB) (Bankr. S.D.N.Y. Sept. 16, 2005) (cap equal to approximately 11% of outstanding prepetition obligations to trade creditors approved in airline reorganization case).

53.    The Debtors' suppliers, as well as the Debtors themselves, have been considerably affected by the simultaneous negative effects of several macroeconomic forces over which they have little to no control. Specifically, the profitability of the entire United States automotive component industry has been inhibited by significant decreases in the volume of automobiles being manufactured by their OEM customers – in particular, GM and Ford – combined with substantial increases in the cost of certain commodities which are key inputs into the manufacture of the Debtors' and their suppliers' products – in particular, steel and petroleum-based resins. Over the past several years, domestic automakers have seen their production volumes in North America decrease significantly. For example, GM's North American car and truck production volume decreased by approximately 4.5% from 2002 to 2004, which translates to almost 250,000 fewer GM cars and trucks being produced in North America. This trend accelerated in the first six months of 2005, with GM's North American production volume decreasing by over 11% when compared with the first six months of 2004, a decrease of more than 300,000 additional units. These decreased production volumes directly trickle down to the Debtors and to each of the Debtors' suppliers, as the demand for the Debtors' products and, in turn, their suppliers' products decrease similarly. In addition to facing significant fixed costs, the Debtors and their suppliers also rely upon economies of scale in controlling the marginal costs of producing their products. Therefore, reduced volumes significantly diminish these suppliers' operating margins. At the same time, these suppliers are also facing steep increases in the prices

of certain commodity goods which are crucial inputs in the manufacture of their products, such as steel and petroleum-based resins. This is further constraining the profitability of the automotive component supplier base. Thus, the number of the Debtors' suppliers that fall within the definition of "Essential Suppliers" has increased significantly in the last 24 to 36 months, as suggested by the large number of automotive industry suppliers which have sought chapter 11 protection or liquidated under chapter 7 within that period. It is not hyperbole to state that the Debtors' inability to pay the Essential Supplier Claims would have serious repercussions throughout the automotive sector and result in numerous other businesses failing and a substantial loss of employment. In light of these factors, payment of Essential Supplier Claims up to the amount of the Essential Supplier Claims Cap is plainly in the best interests of the Debtors' creditors and estates.

54.    The same analysis supports the Debtors' continuation of the Vendor Rescue Program. The Troubled Suppliers find themselves in even more precarious financial straits than do the Debtors' proposed Essential Suppliers. Simply put, even payment in full of the prepetition claims of these Troubled Suppliers will be insufficient to support the continuation of their businesses. Absent the financial and operational assistance provided by the Vendor Rescue Program, the Troubled Suppliers would likely have ceased operations prior to the Petition Date and, absent post-petition continuation of the Vendor Rescue Program, are practically guaranteed to cease operations in the near future.

55.    As noted above, courts in this and other jurisdictions have granted similar Essential Supplier relief in other cases. See, e.g., In re Tower Auto., Inc., Case No. 05-10578 (ALG) (Bankr. S.D.N.Y. Mar. 14, 2005); In re Spiegel Inc., Case No. 03-11540 (BRL) (Bankr. S.D.N.Y. Mar. 18, 2003); In re WorldCom, Inc., Case No. 02-13533 (AJG) (Bankr. S.D.N.Y.

30

July 22, 2002); In re Enron Corp., Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. Dec. 3, 2001);

see also In re Meridian Auto. Sys. – Composites Operations, Inc., Case No. 05-11168 (MFW)

(Bankr. D. Del. Apr. 27, 2005 and May 26, 2005); In re Jays Foods, L.L.C., Case No. 04-08681

(Bankr. N.D. Ill. Mar. 5, 2004); In re FV Steel and Wire Co., Case No. 04-22421 (SVK) (Bankr.

E.D. Wis. Feb. 27, 2004).  Furthermore, courts have allowed debtors to provide necessary

support to other entities in situations where the entity was important to the debtor's ongoing

business operations, such as the Troubled Suppliers in the Vendor Rescue Program.  See, e.g., In

re US Airways Group, Inc., Case No. 02-83984 (SSM) (Bankr. E.D. Va. Dec. 16, 2002); In re

Comdisco, Inc., Case No. 01-24795 (RB) (Bankr. N.D. Ill. Aug. 9, 2001).  Accordingly, ample

authority exists to support the Debtors' requests to pay the Essential Supplier Claims up to the

Essential Supplier Claims Cap and to continue the Vendor Rescue Program.

B.    The Court Should Authorize Payment Of The Essential Supplier Claims And
      Continuation Of The Vendor Rescue Program As A Valid Exercise Of The
      Debtors' Fiduciary Duties

56.    The Debtors, operating their businesses as debtors-in-possession pursuant

to sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy

estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value

justifies) equity owners." In re CoServ, L.L.C., 273 B.R. at 497.  Implicit in the duties of a

chapter 11 debtor-in-possession is the duty "to protect and preserve the estate, including an

operating business's going-concern value." Id.

57.    Courts have noted that there are instances in which a debtor-in-possession

can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." Id.  The

CoServ court specifically noted that preplan satisfaction of prepetition claims would be a valid

exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial

enhancement of the estate" and also when the payment was to "sole suppliers of a given

product." Id. at 497-98. The court provided a three-pronged test for determining whether a

preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary

duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it
> deals with the claimant, the debtor risks the probability of harm, or, alternatively,
> loss of economic advantage to the estate or the debtor's going concern value,
> which is disproportionate to the amount of the claimant's prepetition claim.
> Third, there is no practical or legal alternative by which the debtor can deal with
> the claimant other than by payment of the claim.

Id. at 498.

58.    Payment of the Essential Supplier Claims and continuation of the Vendor

Rescue Program undeniably meet each element of the CoServ court's standard. As described

above, the Debtors have narrowly tailored the Essential Supplier Claims Cap and the Vendor

Rescue Program to encompass only those suppliers which are the sole source of a particular good

or service without which the Debtors' manufacturing operations would be shut down for a

significant period of time. The shutdown of the Debtors' operations would cost the Debtors'

estates millions of dollars in lost revenues and, furthermore, would shut down the manufacturing

operations of the Debtors' OEM customers, thereby exposing the Debtors' estates to millions of

dollars in damage claims. The harm and economic disadvantage that would stem from the

failure of any of the Essential or Troubled Suppliers is grossly disproportionate to the amount of

the prepetition claim that would have to be paid in order to protect such Supplier's ongoing

operations and ensure the continued supply of critical goods and services to the Debtors. Finally,

with respect to each Essential and Troubled Supplier, the Debtors have examined other options

short of payment of such Supplier's prepetition claims and have determined that to avoid

significant disruption of the Debtors' business operations there exists no practical or legal

32

alternative to payment of the Essential Supplier Claims and continuation of the Vendor Rescue

Program.  As described above, the Debtors have examined the business prospects of each of the

Essential Suppliers and the Troubled Suppliers and have determined that, with respect to the

Essential Suppliers, absent payment of the Essential Supplier Claims, and, with respect to the

Troubled Suppliers, absent continuation of the Vendor Rescue Program, such Suppliers would

almost certainly go out of business in the immediate future.  Therefore, the Debtors can only

meet their fiduciary duties as debtors-in-possession under sections 1107(a) and 1108 of the

Bankruptcy Code by payment of the Essential Supplier Claims and continuation of the Vendor

Rescue Program.

C.      The Court May Rely On The "Necessity Of Payment"
        Doctrine And Its General Equitable Powers To Grant The Motion

        59.     The traditional source of authority for preplan payments of prepetition

debts is the "doctrine of necessity" or "necessity of payment" rule first recognized by the

Supreme Court more than 120 years ago in Miltenberger v. Logansport, C. & S. Ry. Co., 106

U.S. 286 (1882).  In Miltenberger, the Supreme Court acknowledged the basic duty of an equity

receiver "to protect and preserve the trust funds in his hands."  Id at 310 (quoting Wallace v.

Loomis, 97 U.S. 146, 162-63 (1878)).  More importantly, the Court held that, consistent with this

duty, "[m]any circumstances may exist which may make it necessary and indispensable to the

business . . . and the preservation of the property, for the receiver to pay pre-existing

debts . . . out of the earnings of the [debtor] . . . under the order of the court . . . ."  Id at 311-12.

        60.     This doctrine "recognizes the existence of the judicial power to authorize a

debtor in a reorganization case to pay prepetition claims where such payment is essential to the

continued operation of the debtor."  In re Ionosphere Clubs, Inc., 98 B.R. 174, 176 (Bankr.

S.D.N.Y. 1989); In re UNR Industries, Inc., 143 B.R. 506, 519-20 (Bankr. N.D. Ill 1992), rev'd

on other grounds, 173 B.R. 149, 158-59 (N.D. Ill. 1994); see also In re Lehigh & N.E. Ry. Co.,

657 F.2d 570, 581 (3d Cir. 1981) (payment of creditors' claims authorized under "necessity of

payment" doctrine); In re CAF Bindery, Inc., 199 B.R. 828 (Bankr. S.D.N.Y. 1996) (payment of

pre-petition claims warranted when critical to debtor's reorganization).  This doctrine is

consistent with the paramount goal of chapter 11 – "facilitating the continued operation and

rehabilitation of the debtor."  In re Ionosphere Clubs, 98 B.R. at 176; see also Dudley v. Mealey,

147 F.2d 268, 271 (2d Cir. 1945) ("Let it [(a hotel)] once be shut down, and it will lose much of

its value. . . .  Some priority [to the hotel's prepetition suppliers] may be essential to preservation

of the business").

> 61.    The court's general equitable powers are codified in section 105(a) of the

Bankruptcy Code.  Section 105(a) empowers the court to "issue any order, process, or judgment

that is necessary to carry out the provisions of this title."  11 U.S.C. § 105(a).  A bankruptcy

court's use of its equitable powers to "authorize the payment of prepetition debt when such

payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."  In re

Ionosphere Clubs, Inc., 98 B.R. at 175 (citing NLRB v. Bildisco & Bildisco, 465 U.S. 513, 528

(1984)).  Under section 105(a), a court "can permit pre-plan payment of a prepetition obligation

when essential to the continued operation of the debtor."  In re NVR L.P., 147 B.R. 126, 127

(Bankr. E.D. Va. 1992).  Maintaining access to the goods supplied by the Essential Suppliers and

the other vendors participating in the Vendor Rescue Program is absolutely critical to the

Debtors' successful reorganization and is in the best interests of the Debtors' estates and their

creditors.  The payment of the Essential Supplier Claims and the continuation of the Vendor

Rescue Program are essential to assure such vendors' financial viability and, further, to assure

that the Debtors continue to receive the goods and services necessary to the uninterrupted

operation of their production facilities.  This Court should therefore exercise its equitable powers to grant the relief requested in this Motion.

D.    This Court Should Authorize The Debtors' Waiver And Release Of Their And Their Estates' Rights Under Section 547 Of The Bankruptcy Code In Connection With A Prefunded Supplier's Entry Into A Trade Agreement Pursuant To Bankruptcy Rule 9019

62.    Bankruptcy Rule 9019 provides that the Court "may approve a compromise or settlement."  Compromises are tools for expediting the administration of the case, reducing administrative costs and are favored in bankruptcy.  See In re Bond, 1994 U.S. App. Lexis 1282, *9-*13 (4th Cir. 1994) ("To minimize litigation and expedite the administration of a bankruptcy estate, 'compromises are favored in bankruptcy.'"); Fogel v. Zell, 221 F.3d 955, 960 (7th Cir. 2000); Fishell v. Soltow (In re Fishell), No. 94-1109, 1995 WL 66622, at *2 (6th Cir. Feb. 16, 1995); In re Martin, 91 F.3d 389, 393 (3d Cir. 1996) (quoting 9 Collier, Bankruptcy ¶ 9019.03[1] (15th rev. ed. 1993)).  Various courts have endorsed the use of Bankruptcy Rule 9019.  See, e.g., Bartel v. Bar Harbour Airways, Inc., 196 B.R. 268 (S.D.N.Y. 1996); In re Foundation for New Era Philanthropy, 1996 Bankr. LEXIS 1892 (Bankr. E.D. Pa. Aug. 21, 1996); In re Miller, 148 B.R. 510, 516 (Bankr. N.D. Ill. 1992); In re Check Reporting Service, Inc., 137 B.R. 653 (Bankr. W.D. Mich. 1992); In re Patel, 43 B.R. 500, 504 (N.D. Ill. 1982).

63.    The standards by which this Court should evaluate a settlement are well established.  In addition to considering the proposed terms of the settlement, the Court should consider the following factors:

(a)    the probability of success in litigation;

(b)    the difficulty in collecting any judgment that may be obtained;

(c)    the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attendant to it; and

      (d)   the interest of creditors and stockholders and a proper deference to
their reasonable views of the settlement.

See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S.

414, 424-245 (1968); United States ex rel. Rahman v. Oncology Assocs., P.C., 269 B.R. 139,

152 (D. Md. 2001); In re Patel, 43 B.R. at 504-05; Fishell, 1995 WL 66622, at *3; In re

Pennsylvania Truck Lines, Inc., 150 B.R. 595, 598 (E.D. Pa. 1992), aff'd, 8 F.3d 812 (3d Cir.

1993); In re Grant Broadcasting, Inc., 71 B.R. 390, 395 (Bankr. E.D. Pa. 1987); In re Neshaminy

Office Bldg. Assocs., 62 B.R. 798, 803 (E.D. Pa. 1986).

      64.    The decision to approve a settlement or compromise is within the

discretion of the Court and is warranted when the settlement is found to be reasonable and fair in

light of the particular circumstances of the case. See TMT Trailer Ferry, 390 U.S. at 424-25.

The settlement need not be the best that the debtor could have achieved, but need only fall

"within the reasonable range of litigation possibilities." In re Telesphere Communications, Inc.,

179 B.R. 544, 553 (Bankr. N.D. Ill. 1994). In making its determination, a court should not

substitute its own judgment for that of the debtor. Neshaminy Office, 62 B.R. at 803.

      65.    The Debtors' proposed waiver and release of their and their estates' rights

to avoid the Prefunding Transfers under section 547 of the Bankruptcy Code in exchange for the

Prefunded Suppliers' entry into Trade Agreements meets these requirements. If these preference

issues are not settled, discovery, motion practice, and other litigation activities related to the

Debtors' avoidance of the Prefunding Transfers would result in additional expense for the

Debtors, risk interruption of their business operations, and distract the Debtors from other, more

pressing matters, particularly during the early days of these complex chapter 11 cases. Given the

expense associated with potential litigation or a shutdown of any of the Debtors' facilities due to

a Prefunded Supplier's failure to timely provide goods and services, and the importance of the

Prefunded Suppliers to the uninterrupted operation of the Debtors' supply chain and operations,

the Debtors have determined that it was in the best interests of the Debtors, their creditors, and

their estates to propose the settlement of the Debtors' and their estates' avoidance rights against

the Prefunded Suppliers in exchange for the Prefunded Suppliers' entry into Trade Agreements.

This Court should therefore authorize the Debtors to waive and release their respective rights,

and the rights of their respective estates, under section 547 of the Bankruptcy Code with respect

to a Prefunded Transfer to a Prefunded Supplier in exchange for such Prefunded Supplier's entry

into a Trade Agreement.

E.    This Court Should Authorize And Direct Financial Institutions To Honor And Process
      Checks And Transfers Related To Essential Supplier And Vendor Rescue Payments

                66.    The Debtors pay their Essential Suppliers with funds drawn by checks (the

"Checks") or by means of electronic funds transfers (the "Electronic Transfers").  Before the

Petition Date, the Debtors remitted Checks or Electronic Transfers on account of certain claims

that may not have cleared as of the Petition Date.  To the extent any of the Checks or Electronic

Transfers have not cleared their respective banks or other financial institutions (collectively, the

"Banks") as of the Petition Date, the Debtors request that this Court authorize and direct the

Banks, in the Debtors' sole discretion, to receive, process, honor, and pay the Checks and

Electronic Transfers, without the need for further Court approval.  If the Essential Suppliers have

not received payment for amounts in connection with the Essential Supplier Claims, the Debtors

seek authority to issue replacement Checks, resubmit Electronic Transfers, or otherwise make

payment to such Essential Suppliers on account of the Essential Supplier Claims without the

need for further Court approval.  The Debtors represent that each of the Checks and Electronic

Transfers can be readily identified as relating directly to the authorized payment of amounts

owed on account of the Essential Supplier Claims.  Accordingly, if the relief requested herein is

granted, the Checks and Electronic Transfers, other than those related to authorized payments,

will not be honored inadvertently.

F.    Relief From Bankruptcy Rule 6004(g)

        67.    Bankruptcy Rule 6004(g) provides that an "order authorizing the use, sale,

or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless

the court orders otherwise."  If delivery of goods from the Essential Suppliers is interrupted as a

result of this stay, however, or if, as noted above, the Essential Suppliers are unable to make

purchases of raw materials within their rolling order cycle, the Debtors' manufacturing

operations, and the operations of their OEM customers, would face significant disruptions.  The

uninterrupted flow of goods provided by the Essential Suppliers is critical to the Debtors'

operations and their successful reorganization.  The Debtors respectfully assert that the exigent

need for the relief sought herein makes a 10-day stay of the grant of such relief untenable.

Accordingly, the Debtors request that this Court waive the stay under Bankruptcy Rule 6004(g)

and order that the Debtors be authorized to pay Essential Supplier Claims up to the Essential

Supplier Claims Cap in the ordinary course of the Debtors' business immediately.

Notice

        68.    Notice of this Motion has been provided by facsimile, electronic

transmission, overnight delivery, or hand delivery to (a) the Office of the United States Trustee,

(b) the Debtors' 50 largest unsecured creditors, (c) counsel for the agent under the Debtors'

prepetition credit facility, and (d) counsel for the agent under Debtors' proposed postpetition

credit facility.  In light of the nature of the relief requested, the Debtors submit that no other or

further notice is necessary.

<u>Memorandum Of Law</u>

69.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order (a) authorizing but not directing them to pay Essential Supplier Claims, up to the Essential Supplier Claims Cap, (b) authorizing but not directing continuation of the Vendor Rescue Program in the ordinary course of the Debtors' businesses, (c) authorizing but not directing the Debtors to waive their rights under section 547 in exchange for a Prefunded Supplier's entry into a Trade Agreement, and (d) granting the Debtors such other and further relief as is just.

Dated:  New York, New York
        October 8, 2005

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By: s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr. (pro hac vice motion pending)
    John K. Lyons
    Ron E. Meisler
    333 West Wacker Drive, Suite 2100
    Chicago, Illinois  60606
    (312) 407-0700

- and -

By: s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
    Four Times Square
    New York, New York 10036
    (212) 735-3000

    Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

40