SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                      :
       In re                              :   Chapter 11
                                                      :
DELPHI CORPORATION, et al.,                           :   Case No. 05-_____ (___)
                                                      :
               Debtors.  :   (Jointly Administered)
                                                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. §§ 105(a), 363, 1107, AND 1108
AUTHORIZING (I) PAYMENT OF PREPETITION OBLIGATIONS
TO FOREIGN CREDITORS AND (II) FINANCIAL INSTITUTIONS
<u>TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS</u>

("FOREIGN CREDITORS MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and

affiliates (the "Affiliate Debtors"),[1] debtors and debtors-in-possession in the above-

captioned cases (collectively, the "Debtors"), hereby submit this motion (the

"Motion") for an order under 11 U.S.C. §§ 105(a), 363, 1107, and 1108 authorizing

(a) the Debtors to pay, in their sole discretion and in the ordinary course of business,

as and when due, any prepetition claims owing to certain Foreign Creditors (as

defined below) and (b) financial institutions to honor and process related checks and

transfers.  In support of this Motion, the Debtors submit the Affidavit Of Robert S.

Miller, Jr. In Support Of Chapter 11 Petitions And First Day Orders, sworn to

October 8, 2005.  In further support of this Motion, the Debtors respectfully represent

as follows:

---

[1]     In addition to Delphi, the following entities are debtors in these related cases: ASEC
        Manufacturing General Partnership, ASEC Sales General Partnership, Aspire, Inc., Delco
        Electronics Overseas Corporation, Delphi Automotive Systems (Holding), Inc., Delphi
        Automotive Systems Global (Holding), Inc., Delphi Automotive Systems Human Resources
        LLC, Delphi Automotive Systems International, Inc., Delphi Automotive Systems Korea,
        Inc., Delphi Automotive Systems LLC, Delphi Automotive Systems Overseas Corporation,
        Delphi Automotive Systems Risk Management Corp., Delphi Automotive Systems Services
        LLC, Delphi Automotive Systems Tennessee, Inc., Delphi Automotive Systems Thailand,
        Inc., Delphi China LLC, Delphi Connection Systems, Delphi Diesel Systems Corp., Delphi
        Electronics (Holding) LLC, Delphi Foreign Sales Corporation, Delphi Integrated Service
        Solutions, Inc., Delphi International Holdings Corp., Delphi International Services, Inc.,
        Delphi Liquidation Holding Company, Delphi LLC, Delphi Mechatronic Systems, Inc.,
        Delphi Medical Systems Colorado Corporation, Delphi Medical Systems Corporation, Delphi
        Medical Systems Texas Corporation, Delphi NY Holdings Corporation, Delphi Services
        Holding Corporation, Delphi Technologies, Inc., DREAL, Inc., Environmental Catalysts,
        LLC, Exhaust Systems Corporation, Packard Hughes Interconnect Company, Specialty
        Electronics, Inc., and Specialty Electronics International Ltd.

2

Background

A.    The Chapter 11 Filings

1.    On October 8, 2005 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have moved this Court for an order for joint administration of these chapter 11 cases.

2.    No trustee, examiner, or creditors' committee has been appointed in the Debtors' cases.

3.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.    The statutory predicates for the relief requested herein are sections 105(a), 363, 1107, and 1108 of the Bankruptcy Code.

B.    Current Business Operations Of The Debtors

5.    With more than 180,000 employees worldwide, global 2004 revenues of approximately $28.6 billion and global assets as of August 31, 2005 of approximately $17.1 billion,[2] Delphi ranks as the fifth largest public company

---

2      The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

3

business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations without supervision from the Bankruptcy Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy Code.

6.    Over the past century, the operations which are now owned by Delphi have become a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines. Today, the Company is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company's technologies and products are present in more than 75 million vehicles on the road worldwide. The Company supplies products to nearly every major global automotive original equipment manufacturer with 2004 sales to its former parent, General Motors Corporation, equaling approximately $15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

7.    As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world. In the U.S., the Debtors employ approximately 50,600 people. Those employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in Delphi's worldwide headquarters and customer center located in Troy, Michigan.

4

Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and local unions. Outside the United States, the Company's foreign entities employ more than 134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

8.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM. Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

9.    Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle. When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base. The Debtors

5

believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base. The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C.      Events Leading To The Chapter 11 Filing

10.    In the first two years following Delphi's separation from GM, the Company generated more than $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales. Reflective of a downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005. The Company experienced net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[3]

11.    The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors

---

[3]    Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12.   In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues and forward looking revenue requirements.  Having concluded that pre-filing discussions with its Unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

13.   Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses.  This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned in the Company's transformation plan.  The Debtors believe that a

7

substantial segment of Delphi's U.S. business operations must be divested,

consolidated, or wound-down through the chapter 11 process.

14.    Upon the conclusion of this process, the Debtors expect to

emerge from chapter 11 as a stronger, more financially sound business with viable

U.S. operations that are well-positioned to advance global enterprise objectives.  In

the meantime, Delphi will marshal all of its resources to continue to deliver value and

high-quality products to its customers globally.  Additionally, the Company will

preserve and continue the strategic growth of its non-U.S. operations and maintain its

prominence as the world's premier auto supplier.

<u>Relief Requested</u>

15.    By this Motion, the Debtors seek entry of an order (a)

authorizing but not directing the Debtors to pay, in their sole discretion and in the

ordinary course of business, as and when due, prepetition claims (the "Foreign

Claims") owing to vendors, service providers, regulatory agencies, and governments

located in foreign jurisdictions (collectively, the "Foreign Creditors"),[4] including,

without limitation, claims for payment for direct and indirect materials (collectively,

"goods")[5] and services provided to the Debtors, as well as import or tax obligations,

---

4    The term "Foreign Creditors" shall not include foreign vendors, service providers, and other
non-governmental entities if such entities are known to have assets within the United States
that would be subject to the jurisdiction of this Court and that would be available to satisfy a
judgment entered by this Court if such entities were to violate the automatic stay provisions of
section 362 of the Bankruptcy Code or otherwise take any action contrary to an order of this
Court or the provisions of the Bankruptcy Code.

5    Generally, direct materials are the materials and components used to produce the Debtors'
products.  Indirect materials include a number of different articles used in the production
process, including items such as tapes, oils and greases, cutting tools and drill bits, as well as

8

and (b) authorizing their banks to receive, process, honor, and pay checks or electronic transfers used by the Debtors to pay prepetition obligations to Foreign Creditors. The Foreign Creditors include, among others, foreign vendors and foreign governmental authorities. The Debtors have reviewed 2005 forecasted annual purchase volumes as well as actual disbursements made by the Debtors for, or related to, Foreign Creditors during the period from January through July, 2005. The average monthly payments for or related to Foreign Creditors during this period were, in the aggregate, approximately $29 million per month. Although it is difficult to estimate with precision, the Debtors estimate that the outstanding prepetition obligations owing to all Foreign Creditors as of the Petition Date is approximately $40 million.

## Basis For Relief

16.    The Debtors are one of the world's largest manufacturers of transportation components and electronics. The operations of the Debtors and their more than 160 foreign subsidiaries are truly global, with business establishments in approximately 40 countries and more than 185,000 employees worldwide. The Debtors' suppliers and other creditor constituencies are similarly diverse. As a result, the Debtors regularly transact business with numerous foreign businesses, many of which supply goods and services that are crucial to the Debtors' on-going U.S. operations.

17.    If the Foreign Claims are not paid, the Foreign Creditors may take precipitous action against the Debtors based upon an erroneous belief that they

---

maintenance items.

9

are not subject to the jurisdiction of this Court and, thus, not subject to the automatic stay provisions of 11 U.S.C. § 362(a). The Foreign Creditors could, among other things, sue in a foreign court and obtain a judgment against the Debtors to collect prepetition amounts owed to them. They could immediately seek to attach or seize the Debtors' foreign assets even prior to obtaining a judgment. In addition, foreign governmental authorities might seize the Debtors' assets in such countries, including, without limitation, parts and other goods destined for the Debtors' manufacturing plants in the U.S. The foreign governmental entities could also seek civil penalties against the Debtors. More importantly, the Debtors' foreign suppliers could refuse to do business with the Debtors. The impact of such events on the Debtors' operations would be catastrophic.

18.   Payment of the Foreign Claims is also necessary because the Debtors' manufacturing facilities use the "just-in-time" supply method for processing their products. The just-in-time supply method is standard in the automotive industry and is used not only by other automotive equipment suppliers, but, more importantly, by the Debtors' original equipment manufacturer ("OEM") customers.[6] Use of the just-in-time supply method means that the Debtors do not maintain a significant inventory of the components supplied by the Foreign Creditors which are suppliers (the "Foreign Suppliers") and, accordingly, the Debtors rely upon frequent, and in

---

6   The Debtors' and their affiliates' largest OEM customers on a consolidated basis include BMW AG, Caterpillar Inc., DaimlerChrysler AG, Ford Motor Company, General Motors Corporation ("GM"), Hyundai Motor Company, Renault/Nissan Motor Company, Ltd., Toyota Motor Corporation, and Volkswagen Group. The Debtors also have significant OEM customers in the communications, computer, energy, and medical industries.

10

many cases daily, shipments of components from such Foreign Suppliers to keep their manufacturing facilities operating. Similarly, the Debtors' OEM customers do not maintain a significant inventory of the Debtors' products (in many cases, less than 24 hours) and rely instead upon frequent shipments of such products to keep their manufacturing plants operating.

19.    The Debtors also rely on the sole source supply method – a method under which they purchase all of their requirements for a particular part from one supplier. Many of the Foreign Suppliers are sole source suppliers of certain parts necessary for the Debtors' manufacturing operations. Each of these parts must meet demanding specifications imposed by both the Debtors and their OEM customers before they can be used in manufacturing the Debtors' products. In this regard, numerous tests and verifications of manufacturing processes, sometimes taking place over the course of several months, must be run to validate and qualify each of the parts. The Debtors employ the sole source supply method to reduce the cost of production start-up, capital investment, and validation costs necessary to make each part (some of which are recouped by suppliers through their per piece prices), to achieve a consistent quality of parts, and to achieve economies of scale.

20.    To obtain an alternative source of supply for the parts currently supplied by the Foreign Suppliers, the Debtors would have to undergo their OEM customers' rigorous approval processes, which involve extensive testing and evaluations and typically last one month or more. Many of the parts sold to the Debtors by the Foreign Suppliers are not standard parts, but rather were custom-

11

designed years in advance of production and built to fit the Debtors' specific needs.

Even when accelerated, the delivery of capital equipment, the tooling, build, and the

testing, and approval process for validating new suppliers typically takes three to six

months or more to complete.  Failure to maintain the supply of parts could therefore

have a devastating impact on the Debtors' businesses as well as their customers' and

other suppliers' businesses.

21.    Indeed, if the Foreign Suppliers fail to ship goods or refuse to do

business with the Debtors because of a failure to pay the Foreign Claims, or if foreign

governmental entities seize goods from sole-source suppliers because of a failure to

pay the Foreign Claims owing to such entities, the Debtors' manufacturing facilities

utilizing those parts would likely be forced to shut down less than 24 hours after the

missed shipment.  Within less than 24 hours after a shutdown of one of the Debtors'

facilities, the Debtors' OEM customers would likely be forced to halt production of

their products on one or more of their assembly lines.  A shutdown of even one

assembly line could cause an affected OEM customer to assert damages against the

Debtors exceeding $10 million per day.  Besides the potential damages, which, if

valid, could severely dilute, if not eviserate, stakeholder recoveries, the Debtors

would also be harmed by continuing to incur the considerable fixed costs connected

to the facilities idled by the failure to receive parts without generating any revenue to

offset such fixed costs.  A line shutdown could also cause the Debtors to suffer a loss

of customer relations and goodwill.  The long-term damage caused by such

12

shutdowns to the Debtors' businesses would therefore be both immeasurable and irreparable.

22.    Furthermore, the failure to pay Foreign Claims could result in the Debtors' inability to continue their businesses in certain foreign jurisdictions.  For example, when a Brazilian supplier exports product to the United States, the export documentation and related invoice is registered at Brazil's Central Bank (the "Central Bank").  The Central Bank then expects the transaction to be closed by a payment that matches the amount of the invoice within a certain period of time.  In the absence of a payment matching the exact amount set forth in the invoice, the Central Bank has the authority to commence a proceeding against the exporter based on a presumption of an improper diversion of funds.  Such a proceeding can result in the imposition of a fine on the Brazilian entity or, more seriously, the cancellation of the authorization to conduct import/export transactions.  These legal ramifications apply regardless of whether or not the Brazilian supplier has significant ties to the United States.  Accordingly, with respect to vendors shipping goods from Brazil and other jurisdictions with similar legal provisions, the Debtors respectfully request the authority but not the direction to pay the claims of such vendors regardless of whether such vendors would be excluded from the definition of "Foreign Creditors" (as described in footnote 4 hereof).

23.    The Debtors therefore believe that it is in the best interests of their estates and creditors to satisfy the Foreign Claims.  Indeed, some of the Foreign Claims may be priority claims under section 507(a)(8) of the Bankruptcy Code.

13

Regardless of the possible application of section 507(a)(8), however, the risks associated with non-payment of Foreign Creditors justifies the payment of the Foreign Claims in the ordinary course of business.

24.    In return for payment of the prepetition Foreign Claims in the ordinary course of business, unless otherwise waived by the Debtors in their sole discretion, the Debtors propose that the Foreign Creditors continue to provide goods and services to the Debtors on the most favorable terms in effect between such supplier and the Debtors in the twelve months prior to the Petition Date or on such other favorable terms as the Debtors and the Foreign Creditor may otherwise agree ("Customary Trade Terms").  The Debtors propose that the Customary Trade Terms apply for the remaining term of the Foreign Creditor's agreement with the Debtors, as long as the Debtors agree to pay for such goods in accordance with such terms.  If any Foreign Creditor accepts payment on account of a prepetition obligation of the Debtors and thereafter does not continue to provide services to the Debtors on Customary Trade Terms, any payments made will be deemed an avoidable postpetition transfer under section 549 of the Bankruptcy Code and, therefore, will be recoverable by the Debtors in cash upon written request.  Upon recovery by the Debtors, the claim will be reinstated as a prepetition claim in the amount so recovered.  The Debtors also seek authorization but not direction to obtain written verification, before issuing payment to a Foreign Creditor, that such Foreign Creditor will continue to provide goods and services to the Debtors on Customary Trade Terms for the remaining term of the Foreign Creditor's agreement with the Debtors;

14

provided, however, that the absence of such written verification will not limit the

Debtors' rights sought hereunder.

25.    The Debtors also request that their banks honor, unless otherwise

directed by the Debtors, any and all checks or electronic transfers used by the Debtors

prepetition to pay any of the prepetition obligations owing to the Foreign Creditors

that have not cleared the banking system prior to the Petition Date and any and all

checks or electronic transfers used by the Debtors postpetition to pay any prepetition

claims of the Foreign Creditors.

## Applicable Authority

26.    The relief requested in this Motion is supported by several

provisions of the Bankruptcy Code that authorize a debtor to honor prepetition

obligations in certain circumstances.  Courts have recognized each of these statutory

provisions as valid authority for such payments.  For instance, courts have found a

basis for allowing debtors to make payments to creditors under sections 363 and 364

of the Bankruptcy Code.  See, e.g., In re UAL Corp., Case No. 02-48191 (ERW)

(Bankr. N.D. Ill. Dec. 11, 2002).  Authority for such payments also may be found in

sections 1107(a) and 1108 of the Bankruptcy Code, which vest debtors-in-possession

with authority to continue operating their businesses.  Sometimes this duty and the

concomitant fiduciary duty to maximize estate value may be fulfilled only through the

pre-plan payment of certain unsecured claims.  See, e.g., In re Mirant Corp., 296 B.R.

427 (Bankr. N.D. Tex. 2003); In re CoServ, L.L.C., 273 B.R. 487, 498 (Bankr. N.D.

Tex. 2002).  Finally, courts have similarly authorized payment of prepetition

15

obligations pursuant to section 105(a) of the Bankruptcy Code, which allows a

bankruptcy court to enter any order "necessary or appropriate" to carry out the

provisions of the Bankruptcy Code.  See, e.g., In re Just for Feet, Inc., 242 B.R. 821

(D. Del. 1999).

A.    This Court May Authorize Payment Of The Foreign Claims
      Pursuant To Sections 363 And 364 Of The Bankruptcy Code

27.    The relief requested in this Motion is authorized pursuant to

section 363 and 364 of the Bankruptcy Code.  See, e.g., In re UAL Corp. (essential

trade motion relying upon section 363 is "completely consistent with the Bankruptcy

Code;" payments to critical trade vendors have further support when debtor seeks "the

extension of credit under section 364 on different than usual terms, terms that might

include the payment of a prepetition obligation"); In re Conseco, Inc., Case No. 02-

49672 (CAD) (Bankr. N.D. Ill. Jan. 14, 2003); Armstrong World Indus., Inc. v. James

A. Phillips, Inc. (In re James A. Phillips, Inc.), 29 B.R. 391, 397 (S.D.N.Y. 1983)

(under section 363, court authorized contractor to pay prepetition claims of some

suppliers who were potential lien claimants, because payments were necessary for

general contractors to release funds owed to debtors, thus benefiting estate).  Here,

because the relief requested in this Motion contemplates payments to be made to

Foreign Creditors who agree to provide goods or services on Customary Trade

Terms, the transaction between the Debtors and such Foreign Creditors is authorized

by sections 363 and 364 of the Bankruptcy Code.

16

28.    Furthermore, the requested relief meets the standards articulated by the Seventh Circuit Court of Appeals in In re Kmart Corp., 359 F.3d 866 (7th Cir.), cert. denied, 125 S. Ct. 495 (2004).  Although not binding on this Court, the Kmart decision, in which the Seventh Circuit acknowledged the practical business utility of allowing corporate debtors limited authority to make prepetition payments, is instructive because the Seventh Circuit is the only appellate court that has considered the issue.

29.    In Kmart, the Seventh Circuit identified section 363(b)(1) of the Bankruptcy Code as a potential source of authority for payments on account of prepetition claims.  359 F.3d at 872-73.  Section 363(b)(1) of the Bankruptcy Code authorizes a bankruptcy court, after notice and a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate."  The court reasoned that "satisfaction of a pre-petition debt in order to keep 'critical' supplies flowing is a use of property other than in the ordinary course of administering an estate in bankruptcy," and thus is within the literal ambit of the statute's language.  Id at 872.  The court, however, cautioned that "it is prudent to read, and use, § 363(b)(1) to do the least damage possible to the priorities established by contract and by other parts of the Bankruptcy Code."  Id.

30.    To that end, the court articulated a dual-pronged requirement that business debtors must satisfy as a condition to honoring prepetition obligations.  First, debtors must establish that the creditors whose claims are to be paid will cease dealing with the debtor if not immediately paid for prepetition goods and services.

17

Second, debtors must establish that "the business will gain enough from continued

transactions with the favored [creditors] to provide some residual benefit to the

remaining . . . creditors, or at least leave them no worse off." Id. at 868.

31.    Both of these standards are unquestionably met with respect to

the Foreign Claims.  As noted above, the Debtors have determined that the Foreign

Creditors may take drastic action if the Foreign Claims are not paid.  It is not

uncommon for non-U.S. entities to assert that they are not subject to the jurisdiction

of a United States bankruptcy court and, as such, not subject to the automatic stay

provisions of 11 U.S.C. § 362(a).  Although the Debtors vigorously dispute any such

contentions, the Foreign Suppliers are likely to stop shipping goods to the Debtors on

a timely basis, and foreign governmental and other entities may take action to seize

assets of the Debtors or refuse to release shipments of goods to the Debtors, on the

basis of such assertions.  Irrespective of the accuracy of any Foreign Creditor's belief

that the automatic stay does not apply to these actions, the consequences of such

actions would be monumental and irreparable.  Simply put, the failure of the Debtors'

manufacturing facilities in the United States to receive timely shipments of parts

would throw the operations of the Debtors into disarray because numerous

manufacturing facilities would lack the requisite goods to be able to meet their

operational needs and would be forced to shut down.  In turn, this would cause the

Debtors to be unable to meet their obligations to their OEM customers, thereby

causing numerous of the OEM customers' manufacturing facilities to shut down.  As

noted above, this entire sequence of events could occur in a period of 48 hours or less

18

from cessation of timely deliveries from even a single supplier. Therefore, even if the Foreign Creditors' legal arguments are completely without merit, it is unlikely that the Debtors could seek and obtain orders from all the appropriate foreign courts forcing such Foreign Creditors to discontinue the offending activities within the time frame necessary to avoid irreparable harm to the Debtors' businesses -- particularly since injunctive relief is not available in all jurisdictions. Not only would such an eventuality drastically affect the Debtors' revenues, cash flows, and profitability, but it could also potentially lead to the Debtors' OEM customers' asserting sizeable damage claims against the Debtors' estates to the detriment of the Debtors' other creditors. The Debtors assert that the amount of the Foreign Claims pales in comparison to the likely damage to the Debtors' businesses and the claims which would be asserted by the Debtors' OEM customers should the relief requested herein not be granted. Not only would the Debtors' other creditors not be harmed by payment of the Foreign Claims, but such creditors would also in fact benefit from this Courts' empowering the Debtors to make payments to the Foreign Creditors so as to achieve a smooth transition into bankruptcy with minimal disruption to their operations. In light of these factors, payment of the Foreign Claims is plainly in the best interests of the Debtors' estates and their creditors.

B.      The Court Should Authorize Payment Of The Foreign Claims
        As A Valid Exercise Of The Debtors' Fiduciary Duties

        32.     The Debtors, operating their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries

19

"holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." In re CoServ, L.L.C., 273 B.R. at 497. Implicit in the duties of a chapter 11 debtor-in-possession is the duty "to protect and preserve the estate, including an operating business's going-concern value." Id.

33.    Courts have noted that there are instances in which a debtor-in-possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." Id. The CoServ court specifically noted that preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate" and also when the payment was to "sole suppliers of a given product." Id. at 497-98. The court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

Id. at 498.

34.    Payment of the Foreign Claims undeniably meets each element of the CoServ court's standard. As described above, the Debtors have narrowly tailored the definition of "Foreign Entities" to encompass only those suppliers most likely to strenuously assert that the automatic stay is inapplicable to them and thereby

20

risk interruption of the Debtors' manufacturing operations.  The shutdown of the

Debtors' operations would cost the Debtors' estates millions of dollars in lost revenues

and, furthermore, would shut down the manufacturing operations of the Debtors'

OEM customers, thereby exposing the Debtors' estates to millions of dollars in

damage claims.  The harm and economic disadvantage that would stem from the

failure of any of the Foreign Suppliers to timely ship goods is grossly

disproportionate to the amount of the prepetition claim that would have to be paid in

order to ensure the continued supply of critical goods and services to the Debtors.

Finally, with respect to each Foreign Creditor, the Debtors have examined other legal

options short of payment of such Supplier's prepetition claims and have determined

that to avoid significant disruption of the Debtors' business operations there exists no

practical or legal alternative to payment of the Foreign Claims.  Therefore, the

Debtors can only meet their fiduciary duties as debtors-in-possession under sections

1107(a) and 1108 of the Bankruptcy Code by payment of the Foreign Claims.

C.    The Court May Rely On The "Necessity Of Payment"
      <u>Doctrine And Its General Equitable Powers To Grant The Motion</u>

35.    The traditional source of authority for preplan payments of

prepetition debts is the "doctrine of necessity" or "necessity of payment" rule first

recognized by the Supreme Court more than 120 years ago in <u>Miltenberger v.</u>

<u>Logansport, C. & S. Ry. Co.</u>, 106 U.S. 286 (1882).  In <u>Miltenberger</u>, the Supreme

Court acknowledged the basic duty of an equity receiver "to protect and preserve the

trust funds in his hands."  <u>Id</u> at 310 (quoting <u>Wallace v. Loomis</u>, 97 U.S. 146, 162-63

21

(1878)).  More importantly, the Court held that, consistent with this duty, "[m]any

circumstances may exist which may make it necessary and indispensable to the

business . . . and the preservation of the property, for the receiver to pay pre-existing

debts . . . out of the earnings of the [debtor] . . . under the order of the court . . . ." Id

at 311-12.

36.    This doctrine "recognizes the existence of the judicial power to

authorize a debtor in a reorganization case to pay prepetition claims where such

payment is essential to the continued operation of the debtor." In re Ionosphere

Clubs, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); see also In re UNR Industries, Inc.,

143 B.R. 506, 519-20 (Bankr. N.D. Ill 1992), rev'd on other grounds, 173 B.R. 149,

158-59 (N.D. Ill. 1994); see also In re Lehigh & N.E. Ry. Co., 657 F.2d 570, 581 (3d

Cir. 1981) (payment of creditors' claims authorized under "necessity of payment"

doctrine); In re CAF Bindery, Inc., 199 B.R. 828 (Bankr. S.D.N.Y. 1996) (payment of

pre-petition claims warranted when critical to debtor's reorganization).  This doctrine

is consistent with the paramount goal of chapter 11 – "facilitating the continued

operation and rehabilitation of the debtor." In re Ionosphere Clubs, 98 B.R. at 176;

see also Dudley v. Mealey, 147 F.2d 268, 271 (2d Cir. 1945) ("Let it [(a hotel)] once

be shut down, and it will lose much of its value. . . .  Some priority [to the hotel's

prepetition suppliers] may be essential to preservation of the business").  Maintaining

access to the goods supplied by the Foreign Suppliers and the other vendors whose

deliveries of goods may be affected by failure to pay the Foreign Claims is absolutely

critical to the Debtors' successful reorganization and is in the best interests of the

22

Debtors' estates and their creditors. The payment of the Foreign Claims is essential to assure that the Debtors continue to receive the goods and services necessary for the uninterrupted operation of their production facilities. This Court should therefore exercise its equitable powers to grant the relief requested in this Motion.

37.    Bankruptcy courts routinely grant authorization for chapter 11 debtors to pay claims owing to foreign entities against which the automatic stay cannot be readily enforced in the United States and as to which it would be unduly time-consuming and expensive to seek to enforce an order of the bankruptcy court in the creditor's home country. See, e.g., In re Delta Air Lines, Inc., Case No. 05-17923 (PCB) (Bankr. S.D.N.Y. Sept. 16, 2005); In re Northwest Airlines Corp., Case No. 05-17930 (ALG) (Bankr. S.D.N.Y. Sept. 15, 2005); In re US Airways Group, Inc., Case No. 02-83983 (SSM) (Bankr. E.D. Va. Aug. 12, 2002); In re WorldCom, Inc., Case No. 02-13533 (AJG) (Bankr. S.D.N.Y. July 22, 2002 and Aug. 13, 2002); In re Global Crossing Ltd., Case Nos. 02-40187 through 02-40241 (REG) (Bankr. S.D.N.Y. Jan. 28, 2002); In re Kmart Corp., Case No. 02-02474 (SPS) (Bankr. N.D. Ill. Jan. 25, 2002); In re Enron Corp., Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. Dec. 4, 2001).

38.    To facilitate the payment of Foreign Creditors and, thus, the avoidance of foreign actions against the Debtors and their assets, the Debtors respectfully request that the banks that provide banking services to the Debtors be authorized and required to (a) honor any checks drawn against their accounts, but not cleared prior to the Petition Date, and (b) complete any fund transfer requests made

23

but not completed prior to the Petition Date. In addition, the Debtors respectfully request authorization to issue postpetition checks and to make postpetition fund transfer requests to replace any prepetition checks and prepetition transfers to Foreign Creditors that may be dishonored by the banks.

39.    The Debtors believe that prompt payment to the Foreign Creditors is crucial to the orderly and efficient operation of their businesses and the enhancement of their prospects for successful chapter 11 reorganization. Unless the Debtors are authorized to pay the Foreign Creditors, the Debtors' businesses will likely suffer irreparable harm.

40.    For the foregoing reasons, the Debtors believe that granting the relief requested herein is appropriate and in the best interests of the Debtors' estates, their creditors, and all parties-in-interest.

### Notice

41.    Notice of this Motion has been provided by facsimile, electronic transmission, overnight delivery, or hand delivery to (a) the Office of the United States Trustee, (b) the Debtors' 50 largest unsecured creditors, (c) counsel for the agent under the Debtors' prepetition credit facility, and (d) counsel for the agent under the Debtors' proposed postpetition credit facility. In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

### Memorandum Of Law

42.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of

24

the service and filing of a separate memorandum of law under Local Rule 9013-1(b)

be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter

an order (a) authorizing but not directing the Debtors to pay or honor prepetition

obligations to Foreign Creditors, (b) authorizing financial institutions to honor and

process related checks and transfers, and (c) granting the Debtors such other and

further relief as is just.

Dated:  New York, New York
        October 8, 2005

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By: s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr. (pro hac vice motion pending)
    John K. Lyons
    Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

- and -

By: s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

25