SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                               :
     In re                       :    Chapter 11
                               :
DELPHI CORPORATION, et al.,      :    Case No. 05-_____ (___)
                               :
               Debtors.    :    (Jointly Administered)
                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. § 503(b) CONFIRMING GRANT OF
ADMINISTRATIVE EXPENSE STATUS TO OBLIGATIONS ARISING FROM
POSTPETITION DELIVERY OF GOODS AND AUTHORIZING DEBTORS TO PAY
<u>SUCH OBLIGATIONS IN THE ORDINARY COURSE OF BUSINESS</u>

("ADMINISTRATIVE EXPENSE MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the

"Affiliate Debtors"),[1] debtors and debtors-in-possession in the above-captioned cases

(collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order under 11

U.S.C. § 503(b) confirming the grant of administrative expense status to obligations arising

from postpetition delivery of goods and authorizing the Debtors to pay such obligations in the

ordinary course of business.   In support of this Motion, the Debtors rely on the Affidavit Of

Robert S. Miller, Jr. In Support Of Chapter 11 Petitions And First Day Orders, sworn to

October 8, 2005.   In further support of this Motion, the Debtors respectfully represent as

follows:

<u>Background</u>

A.      <u>The Chapter 11 Filings</u>

1.      On October 8, 2005 (the "Petition Date"), each of the Debtors filed a

voluntary petition in this Court for reorganization relief under chapter 11 of title 11 of the

United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").   The

Debtors continue to operate their businesses and manage their properties as debtors-in-

---

[1]      In addition to Delphi, the following entities are debtors in these related cases: ASEC Manufacturing
General Partnership, ASEC Sales General Partnership, Aspire, Inc., Delco Electronics Overseas
Corporation, Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems Global
(Holding), Inc., Delphi Automotive Systems Human Resources LLC, Delphi Automotive Systems
International, Inc., Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems LLC, Delphi
Automotive Systems Overseas Corporation, Delphi Automotive Systems Risk Management Corp.,
Delphi Automotive Systems Services LLC, Delphi Automotive Systems Tennessee, Inc., Delphi
Automotive Systems Thailand, Inc., Delphi China LLC, Delphi Connection Systems, Delphi Diesel
Systems Corp., Delphi Electronics (Holding) LLC, Delphi Foreign Sales Corporation, Delphi Integrated
Service Solutions, Inc., Delphi International Holdings Corp., Delphi International Services, Inc., Delphi
Liquidation Holding Company, Delphi LLC, Delphi Mechatronic Systems, Inc., Delphi Medical
Systems Colorado Corporation, Delphi Medical Systems Corporation, Delphi Medical Systems Texas
Corporation, Delphi NY Holdings Corporation, Delphi Services Holding Corporation, Delphi
Technologies, Inc., DREAL, Inc., Environmental Catalysts, LLC, Exhaust Systems Corporation,
Packard Hughes Interconnect Company, Specialty Electronics, Inc., and Specialty Electronics
International Ltd.

2

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have

moved this Court for an order authorizing joint administration of these chapter 11 cases.

2.      No trustee, examiner, or creditors' committee has been appointed in the

Debtors' cases.

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§

157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a

core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4.      The statutory predicate for the relief requested herein is section 503(b)

of the Bankruptcy Code.

B.      Current Business Operations Of The Debtors

5.      With more than 180,000 employees worldwide, global 2004 revenues

of approximately $28.6 billion and global assets as of August 31, 2005 of approximately

$17.1 billion, [2] Delphi ranks as the fifth largest public company business reorganization in

terms of revenues, and the thirteenth largest public company business reorganization in terms

of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their

business operations without supervision from the Bankruptcy Court, and will not be subject to

the chapter 11 requirements of the U.S. Bankruptcy Code.

6.      Over the past century, the operations which are now owned by Delphi

have become a leading global technology innovator with significant engineering resources

and technical competencies in a variety of disciplines.  Today, the Company is arguably the

single largest global supplier of vehicle electronics, transportation components, integrated

---

[2]      The aggregated financial data used in this Motion generally consists of consolidated information from
Delphi and its worldwide subsidiaries and affiliates.

systems and modules, and other electronic technology. The Company's technologies and products are present in more than 75 million vehicles on the road worldwide. The Company supplies products to nearly every major global automotive original equipment manufacturer with 2004 sales to its former parent, General Motors Corporation, equaling approximately $15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

7.      As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world. In the U.S., the Debtors employ approximately 50,600 people. Those employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in Delphi's worldwide headquarters and customer center located in Troy, Michigan. Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and local unions. Outside the United States, the Company's foreign entities employ more than 134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

8.      Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM. Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems,

4

and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

9.      Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle.  When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base.  The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base.  The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C.      Events Leading To The Chapter 11 Filing

10.      In the first two years following Delphi's separation from GM, the Company generated more than $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales.  Reflective of a downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005.  The Company experienced net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, which is

approximately $1 billion less in sales than during the same time period in calendar year 2004.3

11.    The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues and forward looking revenue requirements.  Having concluded that pre-filing discussions with its Unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

13.    Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the

---

3       Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

Company's core businesses.  This will require negotiation with key stakeholders over their

respective contributions to the restructuring plan or, absent consensual participation, the

utilization of the chapter 11 process to achieve the necessary cost savings and operational

effectiveness envisioned in the Company's transformation plan.  The Debtors believe that a

substantial segment of Delphi's U.S. business operations must be divested, consolidated, or

wound-down through the chapter 11 process.

14.     Upon the conclusion of this process, the Debtors expect to emerge from

chapter 11 as a stronger, more financially sound business with viable U.S. operations that are

well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal

all of its resources to continue to deliver value and high-quality products to its customers

globally.  Additionally, the Company will preserve and continue the strategic growth of its

non-U.S. operations and maintain its prominence as the world's premier auto supplier.

## Relief Requested

15.     By this Motion, the Debtors seek entry of an order pursuant to section

503(b) of the Bankruptcy Code confirming that their subcontractors, suppliers, and vendors

(collectively, the "Vendors") will have administrative expense priority claims for those

undisputed obligations arising from prepetition purchase orders outstanding on the Petition

Date (the "Outstanding Orders") relating to materials, supplies, goods, products, and related

items (collectively, the "Goods") that are or will be received and accepted by the Debtors on

or subsequent to the Petition Date.

## Basis For Relief

16.     In the ordinary operation of the Debtors' businesses, numerous Vendors

provide the Debtors with tens of millions of dollars of Goods on a daily basis.  Indeed,

7

because of the Debtors' use of "just-in-time" inventory systems, the Debtors receive Goods

from Vendors on a continuous basis.  As of the Petition Date, and in the ordinary course of

their businesses, the Debtors had a substantial number of Outstanding Orders with the

Vendors.  As a result of the filing of the Debtors' chapter 11 cases, many of the Vendors may

be concerned that delivery or shipment of Goods after the Petition Date pursuant to a

prepetition purchase order will render that Vendor a general unsecured creditor of the

Debtors' estates.   Accordingly, without confirmation that claims for Goods shipped pursuant

to Outstanding Orders will be entitled to administrative expense priority status, Vendors may

decline to ship, or may instruct their shippers not to deliver, Goods destined for the Debtors

unless the Debtors issue substitute, postpetition purchase orders, which could impose a

significant administrative burden as it could require the Debtors to issue thousands of new

purchase orders.

    17.  Under the provisions of section 503(b)(1)(A) of the Bankruptcy Code,

all obligations that arise in connection with the postpetition delivery of Goods to the Debtors

are, by definition, administrative expenses.  Therefore, the Debtors believe that they have the

authority to make payment for Goods received postpetition regardless of the time when the

orders for such Goods were placed.  Moreover, the Debtors believe that they have authority to

make progress payments, in their discretion, to ensure such postpetition delivery of Goods,

particularly where such Vendors threaten to stop shipment of the Goods unless they receive

postpetition progress payments.  The Debtors' relationships with their Vendors are so essential

and their need for Goods to be shipped on a timely basis is so acute that the Debtors believe it

is crucial to reassure their Vendors that their valid claims will be paid by the Debtors in the

ordinary course of business.  Because the Debtors rely so heavily on "sole-source" suppliers

8

and "just in time" inventory, should one of these Vendors decide not to deliver Goods postpetition out of fear that it will not be paid, the Debtors may have to shut down one or more of their manufacturing plants.  This, in turn, could cause the shut-down of customer plants, resulting in millions of dollars of claims against the Debtors and their estates.  Moreover, because of the interconnected nature of the automotive business, this sequence of events could occur in fewer than 48 hours.

18.    Absent the relief requested in this Motion, the Debtors would be required to expend substantial time and resources to (i) convince the Vendors of the Debtors' authority to make certain payments, (ii) reissue the Outstanding Orders, or (iii) establish their right to retain the goods and products.  The attendant disruption to the continuous flow of goods, products, and supplies to the Debtors and their manufacturing facilities would likely result in the rapid deterioration of the Debtors' going concern value and, thus, undermine the Debtors' prospects for a successful reorganization.   Therefore, the Debtors request that this Court grant an order confirming administrative expense treatment for such claims.

<u>Applicable Authority</u>

19.    Section 503(b)(1)(A) of the Bankruptcy Code governs the allowance of administrative expenses, including "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case."  11 U.S.C. § 503(b)(1)(A).  Administrative expense priority status is granted when "the debt both (1) 'arise[s] from a transaction with the debtor-in-possession' and (2) is 'beneficial to the debtor-in-possession in the operation of the business.' " <u>In re Jartran, Inc.</u>, 732 F.2d 584, 587 (7th Cir. 1984) (quoting <u>In re Mammoth Mart, Inc.</u>, 536 F.2d 950, 954 (1st Cir. 1976)); <u>see also</u> <u>In re Moltech Power Sys., Inc.</u>, 273

9

B.R. 268, 271 (Bankr. N.D. Fla. 2002); In re CP III Ltd. P'ship., 224 B.R. 206, 208 (Bankr. M.D. Fla. 1998).

20.    The postpetition receipt and acceptance of the Goods satisfies the first element of the foregoing test.  With respect to the second element, not only are the Goods beneficial to the Debtors, they are absolutely critical for the uninterrupted operation of the Debtors' production facilities.  Without such Goods, the Debtors cannot manufacture and deliver Goods to their customers.  Accordingly, the Debtors' postpetition receipt of Goods on account of Outstanding Orders gives rise to postpetition claims in favor of the Vendors, claims that are entitled to administrative expense priority status under section 503(b) of the Bankruptcy Code.

21.    Relief similar to that requested herein has been granted in other large chapter 11 cases in this district.  See 'e.g., In re Delta Air Lines, Inc., Case No. 05-17923 (Bankr. S.D.N.Y. Sept. 16, 2005); In re Northwest Airlines Corp., Case No. 05-17930 (Bankr. S.D.N.Y. Sept. 15, 2005); In re Winn-Dixie Stores, Inc., Case No. 05-11063 (Bankr. S.D.N.Y. Mar. 15, 2005); In re Westpoint Stevens, Inc., Case No. 03-13532 (Bankr. S.D.N.Y. June 3, 2003); In re Fleming Co., Case No. 03-10945 (Bankr. D. Del. Apr. 3, 2003); In re Magellan Health Services, Inc., Case No. 03-40515 (Bankr. S.D.N.Y. Mar. 11, 2003); In re Enron Corp., Case No. 01-16034 (Bankr. S.D.N.Y. Dec. 3, 2001); In re Ames Dept' Stores, Inc., Case No. 01-42217 (Bankr. S.D.N.Y. Aug. 20, 2001).

22.    It is essential to the Debtors' operations and, thus, to the success of their reorganization efforts, that the relief requested herein be granted.  The Debtors' payment of their Vendors' Outstanding Orders will help ensure that the Debtors' manufacturing operations

continue seamlessly.  Accordingly, the relief requested herein is in the best interests of the Debtors, their estates, and their creditors and should be approved.

23.     Nothing contained herein is intended to be, or should be construed as, an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval, assumption, or adoption of any agreement, contract, purchase order, or lease under section 365 of the Bankruptcy Code.   Likewise, if this Court grants the relief sought herein, any payment made under this Court's order is not intended to be, and should not be construed as, an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

<u>Notice</u>

24.     Notice of this Motion has been provided by facsimile, electronic transmission, overnight delivery, or hand delivery to (a) the Office of the United States Trustee, (b) the Debtors' 50 largest unsecured creditors, (c) counsel for the agent under the Debtors' prepetition credit facility, and (d) counsel for the agent under Debtors' proposed postpetition credit facility.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

<u>Memorandum Of Law</u>

25.     Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

WHEREFORE, the Debtors respectfully request that the Court enter an order (a) confirming the grant of administrative expense status to obligations arising from the postpetition delivery of goods and (b) granting the Debtors such other and further relief as is just.

Dated:  New York, New York
        October 8, 2005

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By: s/ John Wm. Butler, Jr.  _____
    John Wm. Butler, Jr. (pro hac vice motion pending)
    John K. Lyons
    Ron E. Meisler
    333 West Wacker Drive, Suite 2100
    Chicago, Illinois  60606
    (312) 407-0700

    - and -

By: s/ Kayalyn A. Marafioti_____
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
    Four Times Square
    New York, New York 10036
    (212) 735-3000

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession