SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| In re | Chapter 11 |
| DELPHI CORPORATION, et al., | Case No. 05-_____ (___) |
| Debtors. | (Jointly Administered) |

- - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. §§ 105, 363(b), 1107, AND 1108
AUTHORIZING PAYMENT OF CERTAIN PREPETITION (I) SHIPPING AND
DELIVERY CHARGES FOR GOODS IN TRANSIT AND (II) CUSTOMS DUTIES

("SHIPPING AND CUSTOMS MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"),[1] debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order under 11 U.S.C. §§ 105, 363(b), 1107, and 1108 authorizing the Debtors to pay certain prepetition (a) shipping and delivery charges and (b) customs duties. In support of this Motion, the Debtors submit the Affidavit Of Robert S. Miller, Jr. In Support Of Chapter 11 Petitions And First Day Orders, sworn to October 8, 2005. In further support of this Motion, the Debtors respectfully represent as follows:

## Background

A.  <u>The Chapter 11 Filings</u>

1.  On October 8, 2005 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have moved this Court for an order authorizing joint administration of these chapter 11 cases.

---

[1] In addition to Delphi, the following entities are debtors in these related cases: ASEC Manufacturing General Partnership, ASEC Sales General Partnership, Aspire, Inc., Delco Electronics Overseas Corporation, Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems Global (Holding), Inc., Delphi Automotive Systems Human Resources LLC, Delphi Automotive Systems International, Inc., Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems LLC, Delphi Automotive Systems Overseas Corporation, Delphi Automotive Systems Risk Management Corp., Delphi Automotive Systems Services LLC, Delphi Automotive Systems Tennessee, Inc., Delphi Automotive Systems Thailand, Inc., Delphi China LLC, Delphi Connection Systems, Delphi Diesel Systems Corp., Delphi Electronics (Holding) LLC, Delphi Foreign Sales Corporation, Delphi Integrated Service Solutions, Inc., Delphi International Holdings Corp., Delphi International Services, Inc., Delphi Liquidation Holding Company, Delphi LLC, Delphi Mechatronic Systems, Inc., Delphi Medical Systems Colorado Corporation, Delphi Medical Systems Corporation, Delphi Medical Systems Texas Corporation, Delphi NY Holding Corporation, Delphi Services Holding Corporation, Delphi Technologies, Inc., DREAL, Inc., Environmental Catalysts, LLC, Exhaust Systems Corporation, Packard Hughes Interconnect Company, Specialty Electronics, Inc., and Specialty Electronics International Ltd.

2. No trustee, examiner, or creditors' committee has been appointed in the Debtors' cases.

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4. The statutory predicates for the relief requested herein are sections 105(a) and 363(b) of the Bankruptcy Code.

B.   Current Business Operations Of The Debtors

5. With more than 180,000 employees worldwide, global 2004 revenues of approximately $28.6 billion and global assets as of August 31, 2005 of approximately $17.1 billion,[2] Delphi ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations without supervision from the Bankruptcy Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy Code.

6. Over the past century, the operations which are now owned by Delphi have become a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines. Today, the Company is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company's technologies and products are present in more than 75 million vehicles on the road worldwide. The Company supplies products to

---

[2] The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

3

nearly every major global automotive original equipment manufacturer with 2004 sales to its former parent, General Motors Corporation, equaling approximately $15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

7. As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world. In the U.S., the Debtors employ approximately 50,600 people. Those employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in Delphi's worldwide headquarters and customer center located in Troy, Michigan. Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and local unions. Outside the United States, the Company's foreign entities employ more than 134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

8. Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM. Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

9. Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle. When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base. The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base. The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C. Events Leading To Chapter 11 Filing

10. In the first two years following Delphi's separation from GM, the Company generated more than $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales. Reflective of a downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005. The Company experienced net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[3]

---

[3] Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

5

11. The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12. In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues and forward looking revenue requirements. Having concluded that pre-filing discussions with its Unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

13. Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses. This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned in the Company's transformation plan. The Debtors believe that a substantial segment of

Delphi's U.S. business operations must be divested, consolidated, or wound-down through the chapter 11 process.

14. Upon the conclusion of this process, the Debtors expect to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

### Relief Requested

15. By this Motion, the Debtors seek entry of an order authorizing but not directing them to (a) make those payments to Shippers and Warehousemen (each as defined below) that the Debtors determine, in the exercise of their business judgment, to be necessary or appropriate in order to obtain the release of raw materials, parts, components, certain finished goods, indirect materials, tooling, machinery, and equipment (collectively, the "Goods") held by such Shippers and Warehousemen and (b) pay Customs Duties (as defined below) and such other incidental prepetition import expenses as the Debtors determine, in the exercise of their business judgment, to be necessary or appropriate to obtain Goods in transit and to satisfy the liens, if any, in respect thereof.

16. The Debtors further request that this Court authorize and direct all banks and other financial institutions on which checks are drawn or electronic funds are transferred with respect to Shipping and Warehousing Charges (as defined below) or Customs Duties to receive, process, honor, and pay any and all such checks or electronic transfers, whether such checks or transfers were issued before or after the Petition Date, upon the receipt by each such bank of notice of such authorization.

7

Basis For Relief

17. Prior to the Petition Date, as an integral part of their businesses, the Debtors used and made payments to domestic and foreign commercial common carriers, movers, shippers, freight forwarders/consolidators, delivery services, customs brokers, shipping auditing services, deconsolidators, distributors, logistics management companies, and certain other third-party service providers (collectively, the "Shippers") to ship, transport, store, move through customs, and deliver, Goods through established national and international distribution networks, as well as a network of third-party warehouses to store Goods in transit (collectively, the "Warehousemen") (such payments, the "Shipping and Warehousing Charges").

18. The automotive supply industry is shipping intensive. Goods are transferred between the Debtors' manufacturing facilities and sales offices, from suppliers and vendors to the Debtors' numerous facilities, and from the Debtors' numerous facilities to customers. Thus, the Debtors rely extensively on the Shippers and Warehousemen to transport and store Goods. The services provided by the Shippers and Warehousemen are critical to the day-to-day operations of the Debtors' businesses. At any given time, there are countless shipments en route to and from the Debtors' various facilities. Therefore, certain Shippers and Warehousemen currently are in possession of Goods that are vital to the Debtors' operations. The Debtors estimate that, as of the Petition Date, outstanding Shipping and Warehousing Charges equaled approximately $56 million.

19. Because of the filing of these chapter 11 cases, certain Shippers and Warehousemen who hold Goods for delivery to or from the Debtors may refuse to release those Goods pending payment for their prepetition services, thereby disrupting the Debtors' operations. Indeed, under some state laws, a Shipper or Warehouseman may have a lien on the Goods in its possession, which secures the charges or expenses incurred in connection with the transportation

8

or storage of such Goods.[4] Additionally, pursuant to section 363(e) of the Bankruptcy Code, the Shippers or Warehousemen, as bailees, may be entitled to adequate protection in the form of a possessory lien.

20. The Debtors have a reputation for reliability and dependability among their customers. In fact, many of the Debtors' pricing policies and marketing strategies revolve around that reliability and dependability. The Debtors rely on the timely shipment of Goods to prevent breakdowns in their supply and delivery network. Indeed, because of the nature of the Debtors' businesses, and particularly in light of the Debtors' "just in time" inventory policy resulting in low inventory reserves, even one delayed shipment could cause a plant to shut down. Accordingly, because the Debtors are, in many cases, dependent on third-party Shippers and Warehousemen, it is essential that their bankruptcy cases not be a reason or excuse for any third-party Shippers and Warehousemen to cease performing timely services or to retain products, equipment, or Goods.

21. The Debtors seek to make those payments to Shippers and Warehousemen that they determine, in the exercise of their business judgment, are necessary or appropriate, for several reasons. First, if prepetition Shipping and Warehousing Charges are not paid, many of the independent Shippers and Warehousemen may refuse to perform additional services for the Debtors. In such event, the Debtors will incur additional expenses (such as premium shipping and storage costs) to replace the Shippers and Warehousemen, the amounts of which likely will

---

[4]   For example, section 7-307 of the Uniform Commercial Code provides, in pertinent part, that a "carrier has a lien on the goods covered by a bill of lading for charges subsequent to the date of its receipt of the goods for storage or transportation (including demurrage and terminal charges) and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law." See U.C.C. § 7-307(1) (2003).

9

exceed the amount of unpaid prepetition Shipping and Warehousing Charges that the Debtors request permission to pay hereunder.

22. Second, some of the Goods at issue, although not yet received by the Debtors, are destined for ultimate delivery to the Debtors' customers. If the Goods are not made available promptly, the Debtors may frustrate the expectations of their customers and lose customer goodwill. Furthermore, failure to make payments to the Shippers and Warehousemen will impede certain supplier deliveries, which will result in additional impediments to the Debtors' operations. These outcomes would be inimical to the Debtors' efforts to reorganize.

23. With respect to any payments that are made on account of prepetition obligations, in return for payment of the Shipping and Warehousing Charges in the ordinary course of business, unless otherwise waived by the Debtors in their sole discretion, the Shippers and Warehousemen will (i) continue to provide services to the Debtors during the pendency of these chapter 11 cases on the most favorable terms that existed prior to the Petition Date and (ii) agree that they shall not be permitted to cancel on less than 90-days notice any contract or agreement pursuant to which they provide services to the Debtors. If any Shipper or Warehouseman then accepts payment on account of a prepetition obligation of the Debtors and thereafter does not continue to provide services to the Debtors on the most favorable prepetition trade terms, any payments made shall be deemed an avoidable postpetition transfer under section 549 of the Bankruptcy Code and, therefore, shall be recoverable by the Debtors in cash upon written request. Upon recovery by the Debtors, the claim shall be reinstated as a prepetition claim in the amount so recovered. The Debtors also seek authorization but not direction to obtain written verification, before issuing payment to a Shipper or Warehouseman, that such Shipper and Warehouseman will (a) continue to provide services to the Debtors during the

pendency of these chapter 11 cases on the most favorable terms that existed prior to Petition Date and (b) agree that they will not be permitted to cancel on less than 90-days notice any contract or agreement pursuant to which they provide services to the Debtors; provided, however, that the absence of such written verification shall not limit the Debtors' rights sought hereunder. Nothing in this paragraph shall preclude a Shipper or Warehouseman from contesting such treatment by making a written request to the Debtors to schedule a hearing before this Court, which hearing the Debtors shall set for the next regularly-scheduled omnibus hearing date occurring more than ten days after the date of such Shipper's or Warehouseman's request.

24. The Debtors also seek authority for the Debtors and their customs brokers, as the Debtors' agents, to continue to make necessary payments of customs duties, import-related taxes, and other incidental import expenses (collectively, the "Customs Duties") to the U.S. Customs and Border Protection Agency (the "U.S. Customs Service") and to non-U.S. customs authorities, even if the Debtors incurred the relevant liability prior to the Petition Date. In the ordinary course of their businesses, the Debtors purchase certain of the raw materials, parts, components, certain finished goods, indirect materials, tooling, machinery, and equipment that they use in the operation of their businesses from overseas, and then import such goods into the United States and other jurisdictions (collectively, the "Imported Goods"). The Debtors' purchase of the Imported Goods is vital to the operations of their businesses. Without the uninterrupted purchase and delivery of Imported Goods, the Debtors could not continue business in the ordinary course with their suppliers and maintain uninterrupted distribution of their finished products to their customers.

25. If Customs Duties are not timely paid, the U.S. Customs Service and non-U.S. customs authorities may demand liquidated damages, assess interest, or impose other

11

sanctions. Even if the Debtors are able to contest these measures, doing so would require time, effort, and expense and would distract the Debtors' management from the restructuring process. Furthermore, absent payment, the Debtors' customs brokers may, in some instances, assert shipper's and warehousemen's liens against the Imported Goods, the U.S. Customs Service may assert a lien against such goods under 19 C.F.R. § 141.1 (2005), and non-U.S. customs authorities may assert similar liens or take other action against the Debtors in their respective jurisdictions. Accordingly, the Debtors submit that it is in the best interests of the Debtors' estates and creditors that the Debtors be authorized to pay such Customs Duties as they become due, even if such payments were assessed prepetition, in order to ensure continuous manufacturing operations. The Debtors estimate that the amount of any such Customs Duties owed, but unpaid, as of the Petition Date is approximately $5 million in the aggregate. The Debtors have posted bonds to guarantee payment of certain Customs Duties in the aggregate amount of $3,775,000.

26. Moreover, a substantial portion, if not all, of the Customs Duties sought to be paid hereunder would be entitled to priority pursuant to section 507(a)(8)(F) of the Bankruptcy Code. Section 507(a)(8)(F), in pertinent part, affords eighth priority in payment to the allowed unsecured claims of governmental units for:

> a customs duty arising out of the importation of merchandise --
>
> (i)   entered for consumption within one year before the date of the filing of the petition;
>
> (ii)  covered by an entry liquidated or reliquidated within one year before the date of the filing of the petition; or
>
> (iii) entered for consumption within four years before the date of the filing of the petition but unliquidated on such date, if the Secretary of the Treasury certifies that failure to liquidate such entry was due to an investigation pending on such date into assessment of antidumping or countervailing duties or fraud, or if information needed for the proper appraisement or

> classification of such merchandise was not available to the appropriate customs officer before such date . . . .

11 U.S.C. § 507(a)(8)(F).

27. As priority claims, these Customs Duties must be paid in full before the Debtors may make any distributions to holders of general unsecured claims in connection with a chapter 11 plan. Accordingly, the proposed relief most likely will affect only the timing of the payment of the Customs Duties and, therefore, will not prejudice the rights of general unsecured creditors.

28. Thus, payment of the Customs Duties will benefit the Debtors' estates because (a) the Debtors' operations might otherwise be interrupted, (b) forfeiture of goods for which the Debtors have already become indirectly obligated will be avoided, and (c) potential liens, fines, penalties, and interest charges will be avoided. Accordingly, the Debtors request that this Court authorize the Debtors to pay prepetition Customs Duties in the approximate amount of $5 million.

<u>Applicable Authority</u>

29. The Debtors, operating their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." <u>In re CoServ, L.L.C.</u>, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the duties of a chapter 11 debtor-in-possession is the duty "to protect and preserve the estate, including an operating business's going-concern value." <u>Id.</u>

30. Courts have noted that there are instances in which a debtor-in-possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." <u>Id.</u> The <u>CoServ</u> court specifically noted that preplan satisfaction of prepetition claims would be a valid

13

exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." Id. at 497.

31. The critical need for the uninterrupted receipt and distribution of Goods and equipment that Shippers or Warehousemen may hold on the Petition Date amply justifies the grant of the relief sought herein. The prompt payment to Shippers and Warehousemen, which may be necessary to obtain delivery of the Goods and equipment in their possession, is crucial for the orderly and efficient operation of the Debtors' businesses and the enhancement of their prospects for successful chapter 11 reorganization. Unless the Debtors have the authority to pay for these essential services, their businesses likely will suffer irreparable harm.

32. While it is difficult to estimate the total amount of Shipping and Warehousing Charges that may be due and owing as of the Petition Date, based on the actual and forecasted spending for 2005, from which the Shipping and Warehousing Charges detailed above are derived, the Debtors submit that the total amount to be paid to the Shippers and Warehousemen if the requested relief is granted is not significant when compared with the importance and necessity of the Goods held by the Shippers and Warehousemen and the additional losses the Debtors may suffer if plant operations are affected. Indeed, such amount is particularly insignificant in relation to the Debtors' annual sales revenues, which could be disrupted substantially and irreparably if the Debtors cannot obtain immediately the Goods held by the Shippers and Warehousemen on the Petition Date.

33. Additionally, it is critical that the Debtors obtain relief to pay Customs Duties to avoid the levying of damages or interest, or the imposition of other sanctions, by the U.S. Customs Service or by non-U.S. customs authorities. Absent payment, the Debtors' customs brokers, the U.S. Customs Service, and non-U.S. customs authorities also might assert

liens against the Imported Goods, which could interfere with the delivery of such goods to the Debtors' manufacturing facilities and interfere with the Debtors' operations. Non-U.S. customs authorities also might take other action against the Debtors in their respective jurisdictions.

        34. Additionally, this Court may authorize the Debtors to pay the Shipping and Warehousing Charges and Customs Duties pursuant to section 363(b) of the Bankruptcy Code. That section provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under this section, a court may authorize a debtor to pay certain prepetition claims. See FV Steel and Wire Co., Case No. 04-22421 (Bankr. E.D. Wis. 2004) (authorizing the continuation of customer programs and the payment of prepetition claims under section 363 of the Bankruptcy Code); In re UAL Corp., Case No. 02-48191, 91-93 (Bankr. N.D. Ill. 2002) (authorizing payment of prepetition claims under section 363 of the Bankruptcy Code as an out-of-the-ordinary-course transaction); In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (affirming lower court order authorizing payment of prepetition wages pursuant to section 363(b) of the Bankruptcy Code). To do so, "the debtor must articulate some business justification, other than the mere appeasement of major creditors." Ionosphere Clubs, 98 B.R. at 175. As discussed above, the Debtors' request to pay the Shipping and Warehousing Charges and Customs Duties easily meets this standard because the failure to make such payments could have a material adverse impact on the day-to-day operations of their businesses.

        35. This Court also can authorize the Debtors to pay prepetition Shipping and Warehousing Charges and Customs Duties under section 105(a) of the Bankruptcy Code. Numerous courts have used their section 105(a) powers to authorize payment of a debtor-in-possession's prepetition obligations under the "doctrine of necessity" or "necessity of

15

payment" rule first recognized by the Supreme Court more than 120 years ago in Miltenberger v. Logansport, C. & S. Ry. Co., 106 U.S. 286 (1882). In Miltenberger, the Supreme Court acknowledged the basic duty of an equity receiver "to protect and preserve the trust funds in his hands." Id. at 310 (quoting Wallace v. Loomis, 97 U.S. 146, 162-63 (1877)). More importantly, the Court held that, consistent with this duty, "[m]any circumstances may exist which may make it necessary and indispensable to the business ... and the preservation of the property, for the receiver to pay pre-existing debts . . . out of the earnings of the [debtor] ... under the order of the court. . . ." Id. at 311-12.

36.  This doctrine "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor." In re UNR Industries, Inc., 143 B.R. 506, 519-20 (Bankr. N.D. Ill 1992), rev'd on other grounds, 173 B.R. 149, 158-59 (N.D. Ill. 1994); see also In re Lehigh & N.E. Ry. Co., 657 F.2d 570, 581 (3d Cir. 1981) (payment of creditors' claims authorized under "necessity of payment" doctrine); In re CAF Bindery, Inc., 199 B.R. 828 (Bankr. S.D.N.Y. 1996) (payment of prepetition claims warranted when critical to debtor's reorganization). This doctrine is consistent with the paramount goal of chapter 11 – "facilitating the continued operation and rehabilitation of the debtor." Ionosphere Clubs, 98 B.R. at 176; see also Dudley v. Mealey, 147 F.2d 268, 271 (2d Cir. 1945), cert. denied, 325 U.S. 813 (1945) ("Let it [(a hotel)] once be shut down, and it will lose much of its value. . . . Some priority [to the hotel's prepetition suppliers] may be essential to preservation of the business").

37.  The court's general equitable powers are codified in section 105(a) of the Bankruptcy Code. Section 105(a) empowers the court to "issue any order, process, or judgment that is necessary to carry out the provisions of this title." 11 U.S.C. § 105(a). A bankruptcy

16

court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." Ionosphere Clubs, 98 B.R. at 175 (citing NLRB v. Bildisco & Bildisco, 465 U.S. 513, 528 (1984)). Under section 105(a), a court "can permit pre-plan payment of a prepetition obligation when essential to the continued operation of the debtor." In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992). For example, in In re Structurlite Plastics Corp., 86 B.R. 922, 932 (Bankr. S.D. Ohio 1988), the court embraced "the principle that a bankruptcy court may exercise its equity powers under § 105(a) to authorize payment of prepetition claims where such payment is necessary to 'permit the greatest likelihood of survival of the debtor.'" Id. at 931 (citing In re Chateaugay Corp., 80 B.R. 279, 287 (S.D.N.Y. 1987)). The court explained that "a per se rule proscribing the payment of prepetition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code." Id. at 932. Flexibility of payment is particularly critical when the prepetition creditor provides vital goods or services to the debtor.

38.     Relief similar to that requested herein has been granted in other large chapter 11 cases in the district and elsewhere. See e.g., In re Tower Auto., Inc., Case No. 05-10578 (Bankr. S.D.N.Y. Feb. 3, 2005); In re Cornerstone Propane, L.P., Case No. 04-13856 (Bankr. S.D.N.Y. June 10, 2004); In re Spiegel, Inc., Case No. 03-11540 (Bankr. S.D.N.Y. Mar. 18, 2003); In re Teligent, Inc., Case No. 01-12974 (Bankr. S.D.N.Y. June 13, 2001); In re The Warnaco Group, Inc., Case No. 01-41643 (Bankr. S.D.N.Y. June 11, 2001); In re The Singer Co. N.V., Case No. 99-10578 (Bankr. S.D.N.Y. Sept. 13, 1999); In re Kmart Corp., Case No. 02-B02474 (Bankr. D. Ill. Jan. 25, 2002).

39.     Accordingly, the relief requested herein is in the best interests of the Debtors and their estates and creditors and should be approved.

### Notice

40. Notice of this Motion has been provided by facsimile, electronic transmission, overnight delivery, or hand delivery to (a) the Office of the United States Trustee, (b) the Debtors' 50 largest unsecured creditors, (c) counsel for the agent under the Debtors' prepetition credit facility, and (d) counsel for the agent under the Debtors' proposed postpetition credit facility. In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

### Memorandum Of Law

41. Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE, the Debtors request that this Court enter an order (a) authorizing but not directing the Debtors to pay certain prepetition Shipping and Warehousing Charges and Customs Duties, (b) authorizing and directing all banks and other financial institutions, on which checks are drawn or electronic funds are transferred in respect of those payments authorized herein, to receive, process, honor, and pay any and all such checks or electronic transfers, and (c) granting the Debtors such other and further relief as is just.

Dated:  New York, New York
        October 8, 2005

                SKADDEN, ARPS, SLATE, MEAGHER
                & FLOM LLP

By: /s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr. (pro hac vice motion pending)
    John K. Lyons
    Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

    - and -

By: /s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession