SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                        :

In re                           :     Chapter 11
                        :

DELPHI CORPORATION, et al.,     :     Case No. 05-_____ (___)
                        :

               Debtors.  :     (Jointly Administered)
                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. §§ 105, 363(b), 546(b), 1107, AND 1108
AUTHORIZING PAYMENT OF CONTRACTORS
AND SERVICE PROVIDERS IN SATISFACTION OF LIENS

("LIEN CLAIMANTS MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the

"Affiliate Debtors"),[1] debtors and debtors-in-possession in the above-captioned cases

(collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order under 11

U.S.C. §§ 105, 363(b), 546(b), 1107, and 1108 authorizing but not directing the Debtors to pay

the Contractor Claims (as defined below) in the ordinary course of the Debtors' businesses and

(b) authorizing and directing all applicable banks and other financial institutions to receive,

process, honor, and pay any and all checks drawn on the Debtors' accounts to pay the Contractor

Claims.  In support of this Motion, the Debtors submit the Affidavit Of Robert S. Miller, Jr. In

Support Of Chapter 11 Petitions And First Day Orders, sworn to October 8, 2005.  In further

support of this Motion, the Debtors respectfully represent as follows:

Background

A.    The Chapter 11 Filings

1.    On October 8, 2005 (the "Petition Date"), each of the Debtors filed a

voluntary petition in this Court for reorganization relief under chapter 11 of title 11 of the United

States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").  The Debtors

continue to operate their businesses and manage their properties as debtors-in-possession

---

[1]    In addition to Delphi, the following entities are debtors in these related cases:  ASEC Manufacturing
General Partnership, ASEC Sales General Partnership, Aspire, Inc., Delco Electronics Overseas
Corporation, Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems Global (Holding),
Inc., Delphi Automotive Systems Human Resources LLC, Delphi Automotive Systems International, Inc.,
Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems LLC, Delphi Automotive Systems
Overseas Corporation, Delphi Automotive Systems Risk Management Corp., Delphi Automotive Systems
Services LLC, Delphi Automotive Systems Tennessee, Inc., Delphi Automotive Systems Thailand, Inc.,
Delphi China LLC, Delphi Connection Systems, Delphi Diesel Systems Corp., Delphi Electronics
(Holding) LLC, Delphi Foreign Sales Corporation, Delphi Integrated Service Solutions, Inc., Delphi
International Holdings Corp., Delphi International Services, Inc., Delphi Liquidation Holding Company,
Delphi LLC, Delphi Mechatronic Systems, Inc., Delphi Medical Systems Colorado Corporation, Delphi
Medical Systems Corporation, Delphi Medical Systems Texas Corporation, Delphi NY Holding
Corporation, Delphi Services Holding Corporation, Delphi Technologies, Inc., DREAL, Inc.,
Environmental Catalysts, LLC, Exhaust Systems Corporation, Packard Hughes Interconnect Company,
Specialty Electronics, Inc., and Specialty Electronics International Ltd.

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have moved this

Court for an order authorizing joint administration of these chapter 11 cases.

    2.   No trustee, examiner, or creditors' committee has been appointed in the

Debtors' cases.

    3.   This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

    4.   The statutory predicates for the relief requested herein are sections 105(a),

363(b), 546(b), and 1107(a) of the Bankruptcy Code.

B.    Current Business Operations Of The Debtors

    5.   With more than 180,000 employees worldwide, global 2004 revenues of

approximately $28.6 billion and global assets as of August 31, 2005 of approximately $17.1

billion,[2] Delphi ranks as the fifth largest public company business reorganization in terms of

revenues, and the thirteenth largest public company business reorganization in terms of assets.

Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations

without supervision from the Bankruptcy Court, and will not be subject to the chapter 11

requirements of the U.S. Bankruptcy Code.

    6.   Over the past century, the operations which are now owned by Delphi have

become a leading global technology innovator with significant engineering resources and

technical competencies in a variety of disciplines.  Today, the Company is arguably the single

largest global supplier of vehicle electronics, transportation components, integrated systems and

modules, and other electronic technology.  The Company's technologies and products are present

---

[2]     The aggregated financial data used in this Motion generally consists of consolidated information from
Delphi and its worldwide subsidiaries and affiliates.

in more than 75 million vehicles on the road worldwide. The Company supplies products to

nearly every major global automotive original equipment manufacturer with 2004 sales to its

former parent, General Motors Corporation, equaling approximately $15.4 billion and sales to

each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company,

Ltd., and Volkswagen Group exceeding $850 million.

   7. As part of its growth strategy, Delphi has established an expansive global

presence with a network of manufacturing sites, technical centers, sales offices, and joint

ventures located in every major region of the world. In the U.S., the Debtors employ

approximately 50,600 people. Those employees work in approximately 44 manufacturing sites

and 13 technical centers across the country, and in Delphi's worldwide headquarters and

customer center located in Troy, Michigan. Approximately 34,750 of these individuals are

hourly employees, 96% of whom are represented by approximately 49 different international and

local unions. Outside the United States, the Company's foreign entities employ more than

134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40

countries worldwide.

   8. Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary

of GM. Prior to January 1, 1999, GM conducted the Company's business through various

divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions

and subsidiaries were transferred to Delphi and its subsidiaries and affiliates in accordance with

the terms of a Master Separation Agreement between Delphi and GM. In connection with these

transactions, Delphi accelerated its evolution from a North American-based, captive automotive

supplier to a global supplier of components, integrated systems, and modules for a wide range of

4

customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

9.   Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle. When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base. The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base. The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C.   Events Leading To Chapter 11 Filing

10.   In the first two years following Delphi's separation from GM, the Company generated more than $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales. Reflective of a downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005. The Company experienced net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[3]

---

[3]   Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

5

11.    The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues and forward looking revenue requirements. Having concluded that pre-filing discussions with its Unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

13.    Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses. This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned in the Company's transformation plan. The Debtors believe that a substantial segment of

6

Delphi's U.S. business operations must be divested, consolidated, or wound-down through the chapter 11 process.

14.    Upon the conclusion of this process, the Debtors expect to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

### Relief Requested

15.    By this Motion, the Debtors seek entry of an order pursuant to sections 105, 363(b), 546(b), 1107, and 1108 of the Bankruptcy Code (a) authorizing but not directing the Debtors to pay the Contractor Claims (as defined below) in the ordinary course of the Debtors' businesses and (b) authorizing and directing all applicable banks and other financial institutions to receive, process, honor, and pay any and all checks drawn on the Debtors' accounts or electronic transfers authorized by the Debtors to pay the Contractor Claims; provided, however, that honoring, performing, or exercising such rights and obligations will not give rise to administrative claims solely as a result of the entry of an order providing such authorization and will not be deemed an assumption of any contract.

### Basis For Relief

16.    In connection with the fabrication of equipment and with repair, maintenance, and construction activities conducted at the Debtors' premises, the Debtors employ third-party tool builders, project managers, contractors, and maintenance companies (collectively, the "Contractors") which have agreed, pursuant to contract or otherwise (collectively, the "Agreements"), to render such services.

7

17.   Generally speaking, the Debtors have developed strong, long-standing relationships with their Contractors, which have allowed the Debtors to negotiate very favorable pricing and trade credit terms. The Debtors fear that their failure to honor prepetition obligations to the Contractors would jeopardize these relationships. Because the universe of qualified Contractors is very limited, the Debtors believe that it would be extremely difficult to replace the majority of these providers with new providers on economically viable terms.

18.   Moreover, although the Debtors generally have made timely payments to the Contractors, as of the Petition Date some of the Contractors might not have been paid for certain prepetition goods and services provided. As a result, certain Contractors might refuse to perform their ongoing obligations under the Agreements. Absent the Contractors' services, the physical condition of certain of the Debtors' properties and assets would deteriorate. The Contractors' failure to provide ongoing services would adversely affect the Debtors' sales and hamper their reorganization efforts. Additionally, as discussed below, many of the Contractors currently are in possession of equipment that is vital to the Debtors' operations, and such Contractors might assert possessory liens, refusing to redeliver such equipment to the Debtors until they are paid prepetition amounts.

19.   The Debtors' failure to pay the Contractors for prepetition goods and services likely would result in many of the Contractors having a right to assert liens under applicable state mechanics', repairmans', materialmans', tool builders', and shipping lien statutes (collectively, the "Liens") against the relevant property or assets of the Debtors, which Liens may be perfected notwithstanding the automatic stay established by section 362 of the

8

Bankruptcy Code.[4]  Indeed, pursuant to section 362(b)(3) of the Bankruptcy Code, the act of

perfecting such Liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is

expressly excluded from the automatic stay otherwise established by section 362(a).  Under

section 546(b) of the Bankruptcy Code, a debtor's lien avoidance powers "are subject to any

generally applicable law that . . . permits perfection of an interest in property to be effective

against an entity that acquires rights in such property before the date of perfection."  11 U.S.C. §

546(b)(1)(A).

20.    Finally, the existence and perfection of Liens not only would disrupt the

Debtors' reorganization efforts but also could cause the Debtors to be in default under certain of

their real estate leases.

21.    Therefore, to avoid undue delay and to facilitate the continued operations of

the Debtors' businesses and the maintenance of their properties, the Debtors seek immediate

authority to pay and discharge, on a case-by-case basis and in their sole discretion, the claims of

all Contractors that have given or could give rise to Liens against the Debtors' assets, properties,

and/or offices, regardless of whether such Contractors already have perfected their interests (the

"Contractor Claims"); provided, however, that with respect to each Contractor Claim, (a) the

Debtors would not be authorized to pay a Contractor Claim unless the Contractor has perfected

or, in the Debtors' judgment, is capable of perfecting or may be capable of perfecting in the

future one or more Liens in respect of such Contractor Claim,[5] (b) such payment would not be

---

[4]    Of particular concern to the Debtors are the liens, pursuant to certain state statutes, that allow tool builders
to establish possession and ownership rights in special tools that the Debtors require for metals fabrication.
See, e.g., Mich. Comp. Laws Ann., § 570.543 (West Supp. 2005).

[5]    Contemporaneously herewith the Debtors have filed a Motion For Order Under 11 U.S.C. § 503(b)
Confirming Grant Of Administrative Expense Status To Obligations Arising From Postpetition Delivery Of
Goods And Authorizing The Debtors To Pay Such Obligations In The Ordinary Course Of Business (the
"Postpetition Delivery of Goods Motion").  In the event that certain of the Contractors have not perfected
or, in the Debtors' judgment, are not capable or might not be capable of perfecting in the future one or more

deemed to be a waiver of rights regarding the extent, validity, perfection, or possible avoidance

of the related Liens, and (c) the Contractor agreed to release promptly any Liens upon payment

of such Contractor Claim; provided, however, that should the Contractor fail to release promptly

such Liens upon payment by the Debtors, any such Liens would be deemed released and

expunged, without necessity of further action. Although it is difficult for the Debtors to estimate

the amount of prepetition Liens that might arise from the Debtors' prepetition fabrication of

equipment, repair, maintenance, and construction activities, the Debtors estimate that the Liens

resulting therefrom could be approximately $63 million[6] unless the Debtors are authorized to

continue to pay the Contractors in the ordinary course of their businesses.

22.    With respect to any payments that are made on account of prepetition

obligations, in return for payment of the Contractor Claims in the ordinary course of business,

the Debtors may require that the Contractors continue to provide services to the Debtors during

the pendency of these chapter 11 cases on the most favorable terms that existed prior to the

Petition Date. If any Contractor then accepts payment on account of a prepetition obligation of

the Debtors and thereafter does not continue to provide services to the Debtors on the most

favorable prepetition trade terms, the Debtors propose that any payment made be deemed an

avoidable postpetition transfer under section 549 of the Bankruptcy Code and, therefore, would

be recoverable by the Debtors in cash upon written request. Upon recovery by the Debtors, the

Contractor Claim would be reinstated as a prepetition claim in the amount so recovered. The

Debtors also seek authorization but not direction to obtain written verification, before issuing

---

Liens in respect of their Contractor Claims, and to the extent that such Contractor Claims relate to goods
scheduled for postpetition delivery to the Debtors, the Debtors submit that such Contractor Claims are
covered by the relief sought in the Postpetition Delivery of Goods Motion.

[6]    The Debtors estimate that this $63 million would encompass $57 million in tool builders' liens and $6
million in other Contractors' liens.

10

payment to a Contractor, that such Contractor be required to continue to provide services to the

Debtors during the pendency of these chapter 11 cases on the most favorable terms that existed

prior to the Petition Date and otherwise comply with the terms of the order sought hereunder;

provided, however, that the absence of such written verification would not limit the Debtors'

rights sought hereunder.  Nothing in this paragraph would preclude a Contractor from contesting

such treatment by making a written request to the Debtors to schedule a hearing before this

Court, which hearing the Debtors would set for the next regularly-scheduled omnibus hearing

date occurring more than ten days after the date of such Contractor's request.

Applicable Authority

23.    The Debtors, operating their businesses as debtors-in-possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy

estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value

justifies) equity owners."  In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).

Implicit in the duties of a chapter 11 debtor-in-possession is the duty "to protect and preserve the

estate, including an operating business's going-concern value."  Id.

24.    Courts have noted that there are instances in which a debtor-in-possession

can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim."  Id.  The

CoServ court specifically noted that preplan satisfaction of prepetition claims would be a valid

exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial

enhancement of the estate."  Id. at 497.

25.    Without question, failure to pay the Contractors on a timely basis would

have an immediate and detrimental impact on the Debtors' businesses.  Contractors likely would

seek to enforce Liens, which might then jeopardize the Debtors' ability to complete ongoing

repair and maintenance projects.  Moreover, failure to pay the Contractor Claims might cause

11

certain tool builders to retain tooling of the Debtors that is in the tool builders' possession, which would interfere with the Debtors' operations and prevent the Debtors from servicing certain of their customers. Accordingly, the Debtors believe that payment of the Contractors is necessary to the Debtors' reorganization efforts.

26.    In addition, this Court may authorize the Debtors to pay the Contractor Claims under section 363(b) of the Bankruptcy Code so long as a sound business purpose exists for doing so. See, e.g., Comm. of Equity Sec. Holders v. Lionel Corp., 722 F.2d 1063, 1070 (2d Cir. 1983); see also, Fulton State Bank v. Schipper, 933 F.2d 513, 515 (7th Cir. 1991); In re Global Crossing Ltd., 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003); In re Ionosphere Clubs, 98 B.R. 174 at 175 (Bankr. S.D.N.Y. 1989); In re Gulf States Steel, Inc. of Ala., 285 B.R. 497, 514 (Bankr. N.D. Ala. 2002). For the reasons discussed above, the Debtors have determined, in the exercise of their business judgment, that the failure to pay the Contractor Claims would have a material adverse impact on their operations and therefore is necessary to their restructuring efforts.

27.    Another traditional source of authority for preplan payments of prepetition debts is the "doctrine of necessity" or "necessity of payment" rule first recognized by the Supreme Court more than 120 years ago in Miltenberger v. Logansport, Crawfordsville & Southwestern Railway, 106 U.S. 286 (1882). In Miltenberger, the Supreme Court acknowledged that the basic duty of a court in appointing an equity receiver is "to protect and preserve the trust funds in its hands," Id. at 161 (quoting Wallace v. Loomis, 97 U.S. 146, 162 (1877)). More importantly, the Court held, consistent with this duty: "[M]any circumstances may exist which may make it necessary and indispensable to the business. . . and the preservation of the property,

for the receiver to pay pre-existing debts . . . out of the earnings of the [debtor] . . . under the

order of the court . . . . " 106 U.S. at 311.

28.   This doctrine recognizes the existence of the judicial power to authorize a

debtor in a reorganization case to pay prepetition claims where such payment is essential to the

continued operation of the debtor.  See, In re UNR Indus., Inc., 143 B.R. 506, 519-20 (Bankr.

N.D. Ill. 1992), rev'd on other grounds, 173 B.R. 149  (N.D. Ill. 1994); see also In re Lehigh &

New Eng. Ry., 657 F.2d 570, 581 (3d Cir. 1981) (payment of creditors' claims can be authorized

under "necessity of payment" doctrine); In re C.A.F. Bindery, Inc., 199 B.R. 828, 835 (Bankr.

S.D.N.Y. 1996) (payment of prepetition claims warranted when critical to debtor's

reorganization).  This doctrine is consistent with the paramount goal of chapter 11 – "facilitating

the continued operation and rehabilitation of the debtor."  Ionosphere Clubs, 98 B.R. at 176; see

also Dudley v. Mealey, 147 F.2d 268, 271 (2d Cir. 1945)("Let it [(a hotel)] once shut down, and

it will lose much of its value. . . .  Some priority [to the hotel's prepetition suppliers] may be

essential to the preservation of the business . . . .").

29.   The court's general equitable powers are codified in section 105(a) of the

Bankruptcy Code.  Section 105(a) empowers the court to "issue any order, process, or judgment

that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  A

bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when

such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."

Ionosphere Clubs, 98 B.R. at 175-176, 176-177 (citing NLRB v. Bildisco & Bildisco, 465 U.S.

513, 528 (1984)).  Under section 105(a), a court "can permit pre-plan payment of a prepetition

obligation when essential to the continued operation of the debtor."  In re NVR L.P., 147 B.R.

126, 127 (Bankr. E.D. Va. 1992).  For example, in In re Structurlite Plastics Corp., 86 B.R. 922,

932 (Bankr. S.D. Ohio 1988), the court embraced "the principle that a bankruptcy court may exercise its equity powers under [section] 105(a) to authorize payment of prepetition claims where such payment is necessary to 'permit the greatest likelihood of survival of the debtor . . . .'" Id. at 931 (quoting In re Chateaugay Corp., 80 B.R. 279, 287 (S.D.N.Y. 1987)). The court explained that "a per se rule proscribing the payment of pre-petition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code." Structurlite, Id. at 932. Flexibility of payment is particularly critical when the prepetition creditor provides vital goods or services to the debtor.

30.    Permitting the Debtors to discharge Liens by paying the Contractor Claims, as necessary and appropriate, promotes the expeditious administration of these cases, to the benefit of the Debtors' estates, creditors, and all parties-in-interest, by eliminating the substantial time and expense incident to obtaining Court authority to assume each Agreement.  Furthermore, because the Debtors would be making payments on account only of Contractor Claims with respect to which the Contractor would be entitled to one or more Liens, any such Contractor otherwise would be a secured creditor of the Debtors' estates.  Thus, the payments contemplated herein will not diminish assets of the Debtors' estates to the detriment of unsecured creditors.

31.    Relief similar to that requested herein has been granted in other large chapter 11 cases.  See e.g., In re Tower Auto., Inc., Case No. 05-10578 (Bankr. S.D.N.Y. Feb. 3, 2005); In re Trans World Airlines, Inc., Case No. 01-0056 (Bankr. D. Del. Jan. 10, 2001) (order authorizing payment or honoring of certain prepetition claims of outside mechanics and repairmen of approximately $19.1 million); In re Levitz Furniture Inc., et al., Case No. 97-1842 (Bankr. D. Del. Sept. 5, 1997); In re Montgomery Ward Holding Corp., Case No. 97-1409

14

(Bankr. D. Del. July 8, 1997); In re Serv. Merch. Co., Inc., Case No. 399-02649 (Bank. M.D. Tenn. Mar. 30, 1999).

32.   Finally, the Debtors request that all applicable banks and other financial institutions be authorized and directed to receive, process, honor, and pay any and all checks drawn on the Debtors' accounts or electronic transfers authorized by the Debtors to pay Contractor Claims, whether such checks were presented or transfers were made prior to, on, or after the Petition Date. The Debtors represent that such checks and transfers readily can be identified as relating directly to the authorized payment of a Contractor Claim. Accordingly, checks and transfers other than those relating to such authorized payments should not be honored inadvertently.

Notice

33.   Notice of this Motion has been provided by facsimile, electronic transmission, overnight delivery, or hand delivery to (a) the Office of the United States Trustee, (b) the Debtors' 50 largest unsecured creditors, (c) counsel for the agent under the Debtors' prepetition credit facility, and (d) counsel for the agent under the Debtors' proposed postpetition credit facility. In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

Memorandum Of Law

34.   Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

15

WHEREFORE, the Debtors respectfully request that this Court enter an order (a) authorizing but not directing the Debtors, in their sole discretion, to pay the Contractor Claims in the ordinary course of the Debtors' businesses, (b) authorizing and directing all applicable banks and other financial institutions to receive, process, honor, and pay any and all checks drawn on the Debtors' accounts to pay the Contractor Claims, whether such checks were presented prior to, on, or after the Petition Date, provided that sufficient funds are available in the applicable accounts to make such payments, and (c) granting the Debtors such other and further relief as is just.

Dated:  New York, New York
       October 8, 2005

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By: /s/ John Wm. Butler, Jr. _____
    John Wm. Butler, Jr. (pro hac vice motion pending)
    John K. Lyons
    Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

   - and -

By: /s/ Kayalyn A. Marafioti _____
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession