SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                      :
    In re                                :     Chapter 11
                                      :
DELPHI CORPORATION, et al.,    :     Case No. 05-_____ (___)
                                      :
                  Debtors.    :     (Jointly Administered)
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

MOTION FOR ORDER UNDER 11 U.S.C. §§ 363 AND 553
AUTHORIZING (I) CONTINUED MAINTENANCE OF EXISTING BANK
ACCOUNTS, (II) CONTINUED USE OF EXISTING CASH MANAGEMENT
SYSTEM, (III) CONTINUED USE OF EXISTING BUSINESS FORMS,
(IV) PRESERVATION AND EXERCISE OF INTERCOMPANY SETOFF
RIGHTS, AND (V) GRANT OF ADMINISTRATIVE STATUS
<u>FOR POSTPETITION INTERCOMPANY TRANSACTIONS</u>

("CASH MANAGEMENT MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the

"Affiliate Debtors"),[1] debtors and debtors-in-possession in the above-captioned cases

(collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order under 11

U.S.C. §§ 363 and 553, authorizing the (a) continued maintenance of existing bank accounts,

(b) continued use of their existing cash management system, (c) continued use of their existing

business forms, (d) preservation and exercise of intercompany setoff rights, and (e) grant of

administrative priority status for postpetition intercompany transactions.  In support of this

Motion, the Debtors submit the Affidavit Of Robert S. Miller, Jr. In Support Of Chapter 11

Petitions And First Day Orders, sworn to October 8, 2005.  In further support of this Motion, the

Debtors respectfully represent as follows:

---

[1]     In addition to Delphi, the following entities are debtors in these related cases: ASEC Manufacturing
General Partnership, ASEC Sales General Partnership, Aspire, Inc., Delco Electronics Overseas
Corporation, Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems Global (Holding),
Inc., Delphi Automotive Systems Human Resources LLC, Delphi Automotive Systems International, Inc.,
Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems LLC, Delphi Automotive Systems
Overseas Corporation, Delphi Automotive Systems Risk Management Corp., Delphi Automotive Systems
Services LLC, Delphi Automotive Systems Tennessee, Inc., Delphi Automotive Systems Thailand, Inc.,
Delphi China LLC, Delphi Connection Systems, Delphi Diesel Systems Corp., Delphi Electronics
(Holding) LLC, Delphi Foreign Sales Corporation, Delphi Integrated Service Solutions, Inc., Delphi
International Holdings Corp., Delphi International Services, Inc., Delphi Liquidation Holding Company,
Delphi LLC, Delphi Mechatronic Systems, Inc., Delphi Medical Systems Colorado Corporation, Delphi
Medical Systems Corporation, Delphi Medical Systems Texas Corporation, Delphi NY Holdings
Corporation, Delphi Services Holding Corporation, Delphi Technologies, Inc., DREAL, Inc.,
Environmental Catalysts, LLC, Exhaust Systems Corporation, Packard Hughes Interconnect Company,
Specialty Electronics, Inc., and Specialty Electronics International Ltd.

2

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8, 2005 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have moved this Court for an order for joint administration of these chapter 11 cases.

2.    No trustee, examiner, or creditors' committee has been appointed in the Debtors' cases.

3.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4.    The statutory predicates for the relief requested herein are sections 363 and 553 of the Bankruptcy Code.

B.    <u>Current Business Operations Of The Debtors</u>

5.    With more than 180,000 employees worldwide, global 2004 revenues of approximately $28.6 billion and global assets as of August 31, 2005 of approximately $17.1 billion,[2] Delphi ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations

---

[2]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

3

without supervision from the Bankruptcy Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy Code.

6.    Over the past century, the operations which are now owned by Delphi have become a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines.  Today, the Company is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company's technologies and products are present in more than 75 million vehicles on the road worldwide.  The Company supplies products to nearly every major global automotive original equipment manufacturer with 2004 sales to its former parent, General Motors Corporation, equaling approximately $15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

7.    As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world.  In the U.S., the Debtors employ approximately 50,600 people.  Those employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in Delphi's worldwide headquarters and customer center located in Troy, Michigan.  Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and local unions.  Outside the United States, the Company's foreign entities employ more than 134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

4

8.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

9.    Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle.  When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base.  The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base.  The Debtors also believe that this must be accomplished in advance of  the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C.    Events Leading To The Chapter 11 Filing

10.    In the first two years following Delphi's separation from GM, the Company generated more than $2 billion in net income.  Every year thereafter, however, with the exception

of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net

operating loss of $482 million on $28.6 billion in net sales.  Reflective of a downturn in the

marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005.

The Company experienced net operating losses of $608 million for the first six months of

calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion

less in sales than during the same time period in calendar year 2004.[3]

        11.    The Debtors believe that three significant issues have largely contributed to

the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S.

legacy liabilities and operational restrictions driven by collectively bargained agreements,

including restrictions preventing the Debtors from exiting non-strategic, non-profitable

operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive

U.S. vehicle production environment for domestic OEMs resulting in the reduced number of

motor vehicles that GM produces annually in the United States and related pricing pressures, and

(c) increasing commodity prices.

        12.    In light of these factors, the Company determined that it would be imprudent

and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio,

operational issues and forward looking revenue requirements.  Having concluded that pre-filing

discussions with its Unions and GM were not leading to the implementation of a plan sufficient

to address the Debtors' issues on a timely basis, the Company determined to commence these

chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and

preserve value.

---

[3]    Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

13.     Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses.  This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned in the Company's transformation plan.  The Debtors believe that a substantial segment of Delphi's U.S. business operations must be divested, consolidated, or wound-down through the chapter 11 process.

14.     Upon the conclusion of this process, the Debtors expect to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

## Relief Requested

15.     By this Motion, the Debtors respectfully request a waiver of certain of the operating guidelines established by the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") that require the Debtors to close all prepetition bank accounts, open new "Debtor-in-Possession" accounts for each Debtor, and provide new business forms, and stationery.  Specifically, the Debtors seek an order authorizing the (a) continued maintenance of existing bank accounts, (b) continued use of their existing cash management

systems, (c) continued use of their existing business forms, (d) preservation and exercise of

intercompany setoff rights, and (e) grant of administrative priority status for postpetition

intercompany transactions.

Basis For Relief

I.      Description Of The Debtors' Bank Accounts And Cash Management Systems

16.     In the ordinary course of their businesses, all but three of the Debtors utilize

an integrated, centralized cash management system (the "Integrated Cash Management System"),

under which funds collected by different operational divisions of the Debtors at various banks in

various locations throughout the world are, through a series of transactions, transferred to

concentration accounts and used, through other accounts, to pay operating expenses.[4]

17.     In addition to the foreign branch office accounts discussed below, the three

Debtors that do not participate in the Integrated Cash Management System – Delphi Integrated

Service Solutions, Inc., Delphi Medical Systems Colorado Corporation, and Specialty

Electronics, Inc. – as well as the Debtors' foreign, non-Debtor affiliates, utilize stand-alone cash

management systems and their own bank accounts (the "Independent Cash Management

Systems").  Some of the Debtors' foreign, non-Debtor affiliates do, however, participate in the

Integrated Cash Management System for processing intercompany receipts and payables through

a monthly "netting" process as described below.

A.      The Integrated Cash Management System

18.     The Integrated Cash Management System is managed primarily by the

Debtors' financial personnel in Troy, Michigan through coordination with certain third-party

processing service providers.  By utilizing the Integrated Cash Management System, the Debtors

---

[4]      A listing of the Debtors' bank accounts is set forth on Exhibit A attached hereto.  The financial institutions
where the Debtors' accounts are maintained are collectively referred to herein as the "Banks."

are able to facilitate cash forecasting and reporting, monitor collection and disbursement of funds, and maintain control over the administration of the various bank accounts required to effect the collection, disbursement, and movement of cash.

19.    The vast majority of the Debtors' operating accounts are concentrated in ten U.S. banks[5] and are centered around a treasurer account (the "Treasurer Account") held by Delphi Automotive Systems LLC ("DAS") at Bank One - MI which acts as the "hub" for the accounts comprising the Integrated Cash Management System.  Most of the ten U.S. banks have a concentration account and one or more attached zero balance accounts ("ZBAs").  The Debtors utilize a treasury management system known as "Integra-t" to manage the daily flow of funds through the Integrated Cash Management System, reconcile the concentration accounts, and post cash transactions to the general ledger in an automated fashion.  The movement of funds through the Integrated Cash Management System is described below and is illustrated in the charts attached hereto as Exhibit B.

20.    The Treasurer Account.  DAS maintains the Treasurer Account as the central concentration account in the Integrated Cash Management System.  On a daily basis, as necessary, the Treasurer Account provides funds to controlled disbursement accounts (directly or through intermediary concentration accounts) at Bank One – MI, BofA, BONY, Citibank, Comerica, JPMorgan, and Mellon.  The Treasurer account, on a daily basis, also receives funds from receipt, lockbox, investment, and custodial accounts maintained at Bank One – IL, Bank

---

[5]     The ten U.S. banks are Bank of America, N.A.  ("BofA"), Bank of New York ("BONY"), Bank One, Illinois ("Bank One - IL"), Bank One, Michigan ("Bank One - MI"), Citibank ("Citibank"), Comerica Bank ("Comerica"), Harris, N.A. ("Harris"), JPMorgan Chase Bank ("JPMorgan"), Key Bank, N.A. ("Key"), and Mellon, N.A. ("Mellon").  Following the July 2004 merger of J.P. Morgan Chase & Co. and Bank One Corporation, JPMorgan treats the Bank One - IL and Bank One - MI accounts as being held at JPMorgan. The Debtors' internal finance records, however, continue to distinguish between accounts historically held at Bank One - IL, Bank One - MI and JPMorgan.  Therefore, for consistency with the Debtors' internal records and for ease of reference, these accounts will be described herein as such accounts are maintained in the Debtors' records.

One – MI, Citibank, Citifunds, Deutsche Asset Management, Fidelity Investments, Fifth Third Bank, Harris, HSBC Bank USA, N.A. ("HSBC"), JPMorgan, JPMorgan Chase Securities ("JPM Securities"), RBS Securities, and The Reserve Fund.  In the ordinary course of business, the Treasurer Account also funds intercompany loans to the Debtors' non-U.S. subsidiaries and affiliates as necessary through accounts held by Delphi at Deutsche Bank ("Deutsche").  In addition, funds in the Treasurer Account are transferred on a daily basis into overnight investment accounts, or into other investments in accordance with the Debtors' investment guidelines,[6] and then returned to the Treasurer Account as needed.[7]

21.    Concentration Accounts.  As noted above, as part of the Integrated Cash Management System, the Debtors maintain concentration accounts at BofA, Bank One – IL, Bank One – MI, BONY, Citibank, Comerica, Harris, JPMorgan, Key, and Mellon.  Such accounts are used to (a) receive transfers from the Treasurer Account on a daily basis to process transfers to the controlled disbursement and payroll disbursement accounts, as well as any other miscellaneous disbursement accounts held at such banks, and (b) make transfers to the Treasurer Account on a daily basis to process receipts received to lockbox and receipt accounts.  In addition, the concentration account DAS maintains at Key is for the purpose of receiving miscellaneous deposits, such as for payments sent to one of the Debtors' facilities rather than the Debtors' appropriate receipt bank.  Except as noted in footnote seven above,  balances in the various concentration accounts are transferred into the Treasurer Account on a daily basis.

---

[6]    Contemporaneously herewith the Debtors have filed a Motion For Order Under 11 U.S.C. § 345 Authorizing Continued Use Of Investment Guidelines (the "Investment Guidelines Motion") in respect of the funds held in these accounts.

[7]    The Debtors, however, usually leave some funds in various concentration accounts, including the Treasurer Account, overnight.  The average overnight balance in the Treasurer Account during the period from September 1, 2005 through September 23, 2005 was approximately $52 million.

22.    <u>Controlled Disbursement Accounts</u>.  The Debtors maintain accounts at many of the banks participating in the Integrated Cash Management System for the purpose of making disbursements to, <u>inter alia</u>, employees, benefits and insurance providers, vendors, taxing authorities, and shareholders.  For the most part, disbursements are centralized and processed with the assistance of certain third party service providers, such as Affiliated Computer Services ("ACS"), which is the subcontractor to GM for the provision of vendor, tax, and payroll disbursement processing services under the Financial Services Supply Agreement between GM and DAS dated as of December 16, 1998 (the "FSS Agreement").

23.    The Debtors maintain the following disbursement accounts as part of their Integrated Cash Management System:

(a)    U.S. dollar disbursements to vendors of Delphi's domestic divisions that participate in the Integrated Cash Management System are made through disbursement accounts held at JPMorgan.  Vendor disbursements are made on a daily basis with the significant majority of disbursements made on the "MNS-2" date each month.[8]  Separate disbursement accounts are maintained at JPMorgan based on the type of disbursement to be made (e.g., checks, automated clearing house ("ACH") transfers, manual checks, and wire transfers). Payments to affiliates that are not "netted" (as described in paragraph (b) below) also are made out of accounts at JPMorgan.

(b)    Disbursement accounts at JPMorgan and the Treasurer Account provide funding to accounts at Deutsche for (i) the Debtors' (and their non-Debtor subsidiaries') weekly foreign currency settlement and monthly netting of intercompany payables and receivables ("Weekly Foreign Currency Settlements" (as described below) and "Major Netting" (as described below), and (ii) disbursements made in currencies other than U.S. dollars for the Debtors' domestic divisions (as described below).

(c)    Disbursements for the Debtors' obligations to various taxing authorities are made from disbursement accounts held at JPMorgan in the name of DAS and Delphi Automotive Systems Services LLC.

---

[8]        "MNS-2" refers to the most common payment terms in the Debtors' businesses, whereby payment for goods supplied to the Debtors is generally due on the second day of the second month following the Debtors' receipt of such goods.  As an example, under these terms, payment for goods received by the Debtors during the month of July 2005 was due on September 2, 2005.  The Debtors, however, also maintain agreements with certain suppliers that call for payment terms other than MNS-2, thereby requiring the Debtors to make daily disbursements from these accounts.

(d)   Historically, dividends generally were declared quarterly and paid from an account held at BONY (i) by electronic funds transfer on the dividend payment date and (ii) by check, on a rolling basis, as checks were presented.[9]

(e)   Disbursements for payroll obligations to hourly employees of the Debtors are made from accounts held at BofA and Comerica.  DAS maintains one account at each of BofA and Comerica that is used to meet payroll obligations owing to hourly employees employed in the State of Michigan.  Delphi Automotive Systems Services LLC maintains one account at each of BofA and Comerica to fund payroll obligations owing to all other hourly employees.  Hourly payroll is processed and disbursed on a weekly basis.

(f)   Disbursements for payroll obligations to salaried employees are made from an account held at Bank One – MI.  Salaried payroll is processed and disbursed twice per month, on the 15th and the last day of each month, unless either of these days is a weekend or holiday resulting in the payment day generally being the last business day preceding the date.

(g)   Healthcare and other employee benefit disbursements are paid through several third party service providers from (i) controlled disbursement accounts held at BofA, Bank One - MI, Citibank, and JPMorgan to pay healthcare service and other employee benefit providers, (ii) depository or special depository accounts held at Bank One - MI to process payments for workers' compensation and other benefits, and (iii) trust funding accounts, disbursement accounts, and a special depository account held at Bank One – MI to fund the Delphi–UAW Layoff Benefit Trust, the Delphi-IUE Welfare Benfit Trust Legal Services Plan, the Delphi–IUE Welfare Benefit Trust, and the Delphi Salaried Welfare Benefit Trust, and to make disbursements from such trusts to the beneficiaries thereof.

(h)   Disbursements for obligations of ASEC Manufacturing General Partnership and ASEC General Sales Partnership (together, "ASEC") are made from accounts at BofA and Mellon.

(i)   Disbursements for obligations of Delphi Diesel Systems Corp. are made from accounts held at Citibank.

(j)   Disbursements for obligations of Packard Hughes Interconnect Company are made from an account at Citibank.

(k)   Disbursements for obligations of Delphi Connection Systems are made from accounts at Citibank and BofA.

(l)   Other disbursement accounts that are part of the Integrated Cash Management System are maintained at Bank One – MI and JPMorgan in the names of Delphi Mechatronic Systems, Inc. and Delphi Medical Systems Texas Corporation, respectively.

---

[9]      On September 8, 2005, the Debtors announced that Delphi's Board of Directors had eliminated its quarterly dividend on Delphi's $0.01 par value common stock for the remainder of calendar year 2005.

24.     <u>Receipt And Lockbox Accounts</u>.  The Debtors participating in the Integrated Cash Management System are organized generally into seven operating divisions: (a) Corporate/Headquarters,[10] (b) Delphi Electronics & Safety, (c) Delphi Energy & Chassis, (d) Delphi Packard, (e) Delphi Product & Service Solutions, (f) Delphi Saginaw, and (g) Delphi Thermal & Interior.  Since receipts are collected on a divisional basis, each division holds several bank accounts for the collection of receipts.  These accounts are maintained at Bank One – IL, Bank One – MI, Harris, and JPMorgan.  Funds in the Debtors' receipt and lockbox accounts are swept into the Treasurer Account on a daily basis, frequently through an intermediary concentration account held at the same bank as the relevant receipt and/or lockbox accounts.  No disbursements are made from any receipt or lockbox account.  The Debtors' maintain the following receipt and lockbox accounts as part of their Integrated Cash Management System:

(a)     The Debtors maintain lockbox accounts at Bank One – MI, Bank One – IL, and Harris.  These lockbox accounts are used primarily to collect receipts from the Debtors' customers other than GM and are generally held in the name of either DAS or Delphi Receivables LLC ("Delphi Receivables"), a wholly-owned non-Debtor subsidiary.  Prior to the Petition Date, certain of the lockbox accounts were utilized in connection with the Debtors' U.S. accounts receivable securitization agreement and, as such, are all subject to control agreements in favor of JPMorgan, the arranger under the securitization agreement.[11]  Historically, the accounts are ZBAs and, with respect to all such accounts, funds are swept into demand deposit accounts held at the relevant bank on a periodic basis.

(b)     The Debtors and Delphi Receivables also maintain demand deposit accounts (including the demand deposit accounts referenced in the last sentence of paragraph (i) above) at Bank One – IL, Bank One – MI, and Harris for processing domestic, non-GM receipts (with the exception of GM Delphi Saginaw receipts) and accounts at JPMorgan for collection of overseas accounts receivables.  These accounts are also subject to control agreements in favor of JPMorgan, as the arranger under the U.S. securitization agreement.  Historically, the accounts are ZBAs and, with respect to all such accounts held at Bank One – IL, Harris, and JPMorgan, funds

---

[10]     This operating division includes Delphi Medical Systems Texas Corporation and Delphi Technologies, Inc.

[11]     The Debtors anticipate that the accounts receivable securitization facility will terminate upon the filing of these chapter 11 cases.  In connection therewith, the Debtors intend to seek to have the accounts held in the name of Delphi Receivables transferred into the name of DAS and to terminate the control agreements in respect of such accounts.

are swept into concentration accounts at the relevant bank, and, with respect to all such accounts held at Bank One – MI, funds are swept into the Treasurer Account on a periodic basis.[12]

        (c)   The Debtors maintain demand deposit accounts at Bank One – IL and Bank One - MI for the collection and processing of receipts from GM. The Debtors' accounts receivable from GM are not part of the U.S. securitization facility and, as such, these accounts are not subject to control agreements. These accounts are ZBAs and, with respect to all such accounts held at Bank One – IL, funds are swept into a concentration account at Bank One – IL or, with respect to all such accounts held at Bank One – MI, funds are swept into the Treasurer Account on a periodic basis.

        (d)   An account is maintained at JPMorgan for the collection of accounts receivable owing to Delphi Technologies Inc.

        (e)   The Debtors maintain lockbox and other receipt accounts at Bank One - MI that are related to specific Debtor entities and are not part of the U.S. securitization facility described in paragraphs (i) and (ii) above. Such accounts are also ZBAs and funds held therein are swept into the Treasurer Account on a daily basis. ASEC Manufacturing General Partnership, DAS, and Delphi Diesel Systems Corp. also maintain collection accounts at Bank One - MI. Amounts in such accounts are swept into the Treasurer Account on a periodic basis. In addition, Delphi Mechatronic Systems, Inc. maintains accounts at Bank One – IL.

        (f)   Packard Hughes Interconnect Company also maintains accounts at Bank One – IL for the collection of receipts.

        (g)   DAS, Delphi, Delphi Automotive Systems Overseas Corporation, Delphi Automotive Systems International, Inc., Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems Thailand, Inc., and Delphi China LLC also maintain stand-alone receipt accounts at Citibank and JPMorgan.

        25.   <u>Non-U.S. Accounts</u>. Delphi also maintains accounts with non-U.S. financial institutions for the purpose of, <u>inter alia</u>, (a) coordinating the cash management systems of the Debtors' United States operations and the Debtors' and their non-Debtor foreign subsidiaries' foreign operations through the Major Netting transactions, (b) facilitating the Debtors' prepetition foreign currency exchange rate risk management strategies, and (c) paying the Debtors' foreign suppliers through the Weekly Foreign Currency Settlements.

---

[12]    Additionally, there are additional securitized accounts at Bank One – IL and Bank One – MI for collections or repayment to the conduits and payment of securitization fees, respectively.

26.    <u>Netting Accounts</u>.  Delphi maintains one multi-currency master funding account (the "Master Funding Account"), one "Trading Account," and three related multi-currency accounts at Deutsche in Frankfurt, Germany.  These four accounts, in conjunction with various subaccounts thereof, form the basis for the Debtors' weekly settlement ("Weekly Foreign Currency Settlements") and monthly netting ("Major Netting") of intercompany payables and receivables.

27.    Delphi's Major Netting process combines over 500 monthly payments and receipts among approximately 88 affiliated entities in approximately 20 countries with receipts in approximately 12 currencies into one net payment or receipt for each entity in its local currency.  In the Major Netting process, all (a) receivables and payables due to or from the Debtors and their non-Debtor affiliates are netted into one payment to or from each non-Debtor affiliate in their respective local currency and (b) disbursements made in currencies other than U.S. dollars for the Debtors' domestic division payments to third-party foreign suppliers are converted into such supplier's local currency.  Net paying entities remit funds to the multi-currency Deutsche accounts discussed above and net receiving entities are paid from those Deutsche accounts, in each case in the appropriate local currency.  To the extent that U.S. entities are net paying entities, the amounts of such entities' required payments are transferred from an account held by DAS at JPMorgan to the Trading Account at Deutsche, through which the Debtors settle their foreign currency exposure with respect thereto.  From the Trading Account (as defined below), funds are transferred to the Master Funding Account for payment.  The Debtors' Integrated Cash Management System and other processes in place allow the Debtors to track all obligations owing between related entities and ensure that all transactions cleared through the Major Netting process are accounted for appropriately on each entity's books.

15

28.    Major Netting settles once per month on the MNS-2 date, through a process in which Delphi and its non-Debtor affiliates initiate payment instructions either (a) internally or through ACS with respect to trade receivables owing from, and trade payables owing to, non-Debtor affiliates or (b) through a third-party service provider, Electronic Data Systems Corporation ("EDS"), with respect to payments to third-party foreign suppliers, to Deutsche, which in turn processes the disbursements by wire or check to the appropriate net receiving third-party foreign suppliers.  Through Major Netting, the Debtors significantly reduce the number of intercompany transactions, transaction costs related thereto and the Debtors' overall foreign exchange rate exposure.

29.    The Weekly Foreign Currency Settlements are the process through which the Debtors' U.S. divisions make all payments to non-U.S. suppliers in such suppliers' local currencies.  This process occurs on a weekly basis for all obligations to foreign suppliers for which payment will become due in the following seven-day period.  To effectuate the Weekly Foreign Currency Settlements, the required funds are transferred from an account held by DAS at JPMorgan (the same account used in the Major Netting process) to the Trading Account.  As with the Major Netting process, the Debtors purchase foreign currencies and then transfer the funds from the Trading Account to the Master Funding Account for payment to the foreign suppliers.

30.    <u>Foreign Currency Exchange Rate Risk Management Accounts</u>.  In the ordinary course of the Debtors' businesses, the Debtors enter into swap agreements, forward contracts, and zero cost collars in order to offset each division's global net foreign currency exposure for select currency pairs.  Such transactions are crucial to the Debtors' financial

success.  Absent use of such financial instruments, the Debtors would face significant exposure to adverse changes in exchange rates.

31.    The decision to enter into a derivative transaction is made by Delphi's treasury group located in Troy, Michigan and transactions are processed through the Debtors' trade booking system – known as "IT/2."  Each trade is assigned a control number by the IT/2 system so that it is specifically identifiable.  Upon verification in IT/2, trades are uploaded into CMS (a third-party matching system) and trades are matched or cancelled with the respective counterparty.

32.    DAS maintains an account at Toronto-Dominion Bank ("TD Bank") for Canadian dollars disbursements (the "CAD Disbursements").  This account is funded from the Master Funding Account upon the issuance of payment instructions (initiated at Delphi headquarters) through IT/2 to Deutsche.  Vendor payment instructions are then sent to TD Bank via ACS through EDS and, upon receipt of such instructions, TD Bank makes the CAD Disbursements.

33.    DAS maintains one account at Bank One - Canada ("Bank One - Canada")[13] for the management of certain of its funds.  Funds are regularly transferred between the Treasurer Account and this accounts at Bank One - Canada as necessary.  The Debtors do not normally leave a balance in the account at Bank One - Canada.[14]

34.    Finally, certain of the Debtors maintain bank accounts for their foreign branch offices.  Specifically, Delco Electronics Overseas Corporation maintains an account at

---

[13]    Bank One - Canada, Citibank, N.A. (Taipei Branch), Deutsche, NatWest, TD Bank, and UBS AG are collectively referred to herein as the "Foreign Banks."

[14]    In addition, Delco Electronics LLC ("Delco") maintained an account at Bank One - Canada for the management of its funds prior to the Petition Date.  However, Delco was merged into DAS on September 30, 2005.  The Debtors believe that the Delco account at Bank One - Canada remains open.

National Westminster Bank PLC ("NatWest"), Delphi Automotive Systems Overseas Corp.

maintains accounts at Citibank, and Delphi International Services, Inc. maintains accounts at

Citibank, N.A. (Taipei Branch) and UBS AG.

B.     The Independent Cash Management Systems

35.     In addition to the ZBAs described above, three of the Debtors — Delphi

Integrated Service Solutions, Inc., Delphi Medical Systems Colorado Corporation, and Specialty

Electronics, Inc.[15] — maintain their own stand-alone cash management systems at Bank One –

MI, Branch Banking & Trust Company, JPMorgan, and UMB Bank, N.A. that are not subject to

zero balance arrangements with the Treasurer Account.  Generally, each of these Debtors may

maintain one or more (a) lockbox or deposit accounts to receive deposits, (b) ZBAs used to make

payments on account of various disbursements, and (c) stand-alone accounts used for a variety of

purposes, including, inter alia, the processing of bankcard transactions.

36.     Payroll Pay-Through Accounts.  DAS maintains one payroll pay-through

account at each of Bank of Lenawee, Brunswick Bank and Trust, Community Banking Company

of Fitzgerald, M&I Marshall and Illsley, Regions Bank, UMB Bank, N.A., and United Bank &

Trust.  These accounts are maintained solely to permit hourly employees who do not have bank

accounts to cash their payroll checks at no cost to them.

37.     Investment And Settlement Accounts.[16]  Citibank is the Debtors' investment

custodian for non-money market funds and DAS maintains both a custodial investment account

to hold investment securities and a settlement account used to receive payments on account of

---

[15]     In addition, four non-Debtor United States affiliates maintain stand-alone cash management systems that
are not the subject of this Motion:  (a) Delphi Automotive Systems – Ashimori LLC, (b) H E Microwave
LLC, (c) MobileAria, Inc., and (d) Delphi Furukawa Wiring Systems LLC.

[16]     As noted above, contemporaneously herewith the Debtors have filed the Investment Guidelines Motion in
respect of the funds held in these accounts.

commodities hedging agreements (comprised of fixed and floating swap agreements).  DAS also

maintains (a) a demand deposit account for investments at Fifth Third Bank, (b) a money market

fund at The Reserve Fund, (c) a money market fund at Fidelity Investments, (d) a money market

fund at HSBC, (e) a money market account at JPM Securities,[17] (f) a money market fund at RBS

Securities, and (g) a money market fund at Deutsche Asset Management.  In addition, Delphi

maintains a money market fund at Citifunds.

II.    The Debtors Should Be Granted Authority To Maintain Their Existing Bank Accounts

         38.    To supervise the administration of chapter 11 cases, the U.S. Trustee has

established certain operating guidelines for debtors-in-possession.  These guidelines require

chapter 11 debtors to, among other things, (a) close all existing bank accounts and open new

debtor-in-possession bank accounts, (b) establish one debtor-in-possession account for all estate

monies required for the payment of taxes, including payroll taxes, and (c) maintain a separate

debtor-in-possession account for cash collateral.

         39.    The Debtors seek a waiver of the U.S. Trustee requirement that their bank

accounts be closed and that new postpetition bank accounts be opened.  If enforced in these

cases, such requirements would cause enormous disruption in the Debtors' businesses and would

impair the Debtors' efforts to pursue alternatives to maximize the value of their estates.  Indeed,

as described in detail above, the Debtors' bank accounts comprise an established cash

management system that the Debtors need to maintain in order to ensure smooth collections and

disbursements in the ordinary course of their businesses.

         40.    Accordingly, to avoid delays in payments to administrative creditors, to

ensure as smooth a transition into chapter 11 as possible with minimal disruption, and to aid in

---

[17]    Funds deposited into the JPM Securities money market account flow into the Federated 10 Prime
Obligations Fund.

the Debtors' efforts to complete these cases successfully and rapidly, it is important that the Debtors be permitted to continue to maintain their existing bank accounts.[18]  If necessary, the Debtors should also be permitted to open new accounts wherever they are needed, regardless of whether such banks are designated depositories in this jurisdiction; provided that if such banks are not designated depositories the Debtors will give the U.S. Trustee notice of such newly-opened accounts.[19]

41.    In sum, subject to a prohibition against honoring prepetition checks without specific authorization from this Court, the Debtors request that their existing bank accounts be deemed debtor-in-possession accounts and that their maintenance and continued use, in the same manner and with the same account numbers, styles, and document forms as those employed during the prepetition period, be authorized.

42.    The accounts that the Debtors maintain at the Foreign Banks are vital to the Debtors' ongoing business operations because such accounts are integral to the Integrated Cash Management System and the Debtors' financial transactions with their foreign affiliates, vendors, and other entities.  Foreign operations constitute a material part of the Debtors' business and,

---

[18]    The Debtors have agreed to confer with the U.S. Trustee regarding the Debtors' use of accounts at financial institutions that are not designated depositories in the Southern District of New York (the "Reserved Issue").  To the extent that the Debtors and the U.S. Trustee have not reached an accommodation with respect to the Reserved Issues by February 7, 2006, the U.S. Trustee may, but shall not be required to, file a motion, in accordance with this Court's Order Under U.S.C. §§ 102(1) and 105 and Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 establishing (I) Omnibus Hearing Dates, (II) Certain Notice, Case Management, and Administrative Procedures, and (III) Scheduling Initial Case Conference In Accordance With Local Bankr. R. 107. 1007-2(e), requesting this Court to resolve the Reserved Issue at the next regularly-scheduled omnibus hearing.

[19]    Although certain of the banks at which the Debtors maintain accounts – specifically, Bank of Lenawee, Branch Banking & Trust Company, Brunswick Bank and Trust, Comerica, Community Banking Company of Fitzgerald, Fidelity Investments, Fifth Third Bank, Harris, M&I Marshall and Illsley, NatWest, RBS Securities, Regions Bank, Reserve Fund, TD Bank, UBS AG, UMB Bank, N.A., and United Bank & Trust – are not designated depositories in this jurisdiction, the Debtors believe that such institutions are financially stable and that the accounts held at such institutions are crucial to the Debtors' cash management systems.  Therefore, the Debtors respectfully request a waiver of the U.S. Trustee guidelines with respect to the accounts held at such institutions.

therefore, the Debtors simply cannot operate without the maintenance of their accounts at the

Foreign Banks.  Therefore, the Debtors respectfully request that they be authorized to maintain

their existing accounts at the Foreign Banks and open new accounts if necessary.[20]

43.    Courts in this and other districts have recognized that, in complex chapter 11

cases, strict enforcement of the requirement that a debtor-in-possession close its bank accounts

does not serve the rehabilitative process of chapter 11 and have therefore waived this

requirement and replaced it with more effective procedures similar to those requested herein.

See, e.g., In re Delta Air Lines, Inc., Case No. 05-17923 (PCB) (Bankr. S.D.N.Y. Sept. 16, 2005)

(interim order; final order pending); In re Northwest Airlines Corp., Case No. 05-17930 (ALG)

(Bankr. S.D.N.Y. Sept. 15, 2005) (interim order; final order pending); In re Aerovias Nacionales

de Colombia S.A. Avianca (In re Avianca, Inc.), Case Nos. 03-11678 and 03-11679 (ALG)

(Bankr. S.D.N.Y. Mar. 21, 2003); In re WorldCom, Inc., Case No. 02-13533 (AJG) (Bankr.

S.D.N.Y. July 22, 2002); In re Adelphia Bus. Solutions, Inc., Case No. 02-11389 (REG) (Bankr.

S.D.N.Y. Mar. 27, 2002); see also In re US Airways Group, Inc., Case No. 02-83984 (SSM)

(Bankr. E.D. Va. Aug. 12, 2002).

44.    The Debtors represent that if the relief requested in this Motion is granted,

they will not pay, and each of the Banks at which the bank accounts are maintained will be

directed not to pay, any debts incurred before the Petition Date, other than as authorized by this

Court.

III.    The Debtors Should Be Authorized To Continue
        To Use Their Existing Cash Management Systems

45.    The Debtors' Integrated Cash Management System is complex, highly

automated, and computerized.  Nonetheless, the cash management procedures employed by the

---

[20]    The Debtors will give the U.S. Trustee notice of any such newly-opened accounts.

Debtors constitute ordinary, usual, and essential business practices, and are similar to those used

by other major corporate enterprises.  The Integrated Cash Management System provides

significant benefits to all of the Debtors, including the ability to (a) control corporate funds

centrally, (b) invest idle cash, (c) ensure availability of funds when necessary, and (d) reduce

administrative expenses by facilitating the movement of funds and the development of more

timely and accurate balance and presentment information.  Furthermore, the use of a centralized

cash management system reduces interest expenses by enabling the Debtors to utilize all funds

within the system rather than relying upon short-term borrowing to fund the Debtors' and their

non-Debtor subsidiaries' cash requirements.

      46.    The operation of the Debtors' businesses requires that the cash management

systems continue during the pendency of these chapter 11 cases.  Requiring the Debtors to adopt

new, segmented cash management systems at this early and critical stage of these cases would be

expensive, would create unnecessary administrative problems, and would be much more

disruptive than productive.  Any disruption could have a severe and adverse impact upon the

Debtors' ability to reorganize.  Moreover, as a practical matter, because of the Debtors' complex

corporate and financial structure, it would not be possible to establish a new system of accounts

and a new cash management and disbursement system without substantial additional costs and

expenses to the Debtors' bankruptcy estates and a significant disruption of the Debtors' business

operations.  Consequently, maintenance of the existing cash management systems, including the

Debtors' continued ability to transfer funds among themselves, is not only essential but is in the

best interests of all creditors and other parties-in-interest.

      47.    The Debtors' Integrated Cash Management System allows the Debtors to

centrally manage all of their cash flow needs and includes the necessary accounting controls to

enable the Debtors, as well as their creditors and this Court, to trace funds through the system

and ensure that all transactions are adequately documented and readily ascertainable.  The

Debtors will continue to maintain detailed records reflecting all transfers of funds.  In

furtherance of this goal, the Debtors request that all Banks at which their accounts are maintained

be authorized and directed to continue to administer those accounts as they were maintained

prepetition, without interruption and in the usual and ordinary course.  The Banks should also be

authorized and directed to pay any and all checks, drafts, wires, and ACH transfers issued on the

bank accounts for payment of any claims arising on or after the Petition Date so long as

sufficient funds are in those accounts.

                48.    To effectuate the foregoing, the Debtors request that (a) the Banks be

authorized and directed to honor all representations from the Debtors as to which checks should

be honored or dishonored and (b) any final payment made by a Bank at which the Debtors

maintained an account prior to the Petition Date (including any ACH transfer or wire transfer

that the Banks are or become obligated to settle) against any of the Debtors' bank accounts, or

any instrument issued by a Bank on behalf of any Debtor pursuant to a "midnight deadline" or

otherwise, shall be deemed to be paid prepetition, whether or not actually debited or settled from

the Debtors' bank accounts prepetition.  To the extent that the Debtors have directed that any

prepetition checks be dishonored, they reserve the right to issue replacement checks to pay the

amounts related to such dishonored checks, consistent with the orders of this Court.

                49.    Also in furtherance of the goal of allowing the Debtors to continue to

operate their existing cash management systems without interruption, the Debtors request that,

until further order of this Court, all third-party service providers (collectively, the "Service

Providers") with whom the Debtors directly or indirectly have contracted to provide services in

connection with the operation of their cash management systems be authorized and directed to continue to provide to the Debtors the services they provided prior to the Petition Date. The Debtors further request that the order affirm the indemnification provided pursuant to the FSS Agreement.

50.    Finally, to use the property of their estates and to ensure an orderly transition into chapter 11, the Debtors also request authority to continue to use their existing cash management systems in the ordinary course of their businesses.

51.    The Debtors submit the relief requested herein is appropriate and well within the authority of this Court. The Debtors' request for authorization to continue to use their existing cash management systems has been held to be entirely consistent with section 363(c)(1) of the Bankruptcy Code, which allows a debtor-in-possession to "use property of the estate in the ordinary course of business." See In re Charter Co., 778 F.2d 617, 621 (11th Cir. 1985). Additionally, relief similar to that requested herein has been repeatedly granted by courts in this and other jurisdictions in other chapter 11 cases including In re Delta Air Lines, Inc., Case No. 05-17923 (PCB) (Bankr. S.D.N.Y. Sept. 16, 2005) (interim order; final order pending); In re Northwest Airlines Corp., Case No. 05-17930 (ALG) (Bankr. S.D.N.Y. Sept. 15, 2005) (interim order; final order pending); In re Global Crossing, Ltd., Case No. 02-40188 (REG) (Bankr. S.D.N.Y. May 17, 2002); In re Worldcom, Inc., Case No. 02-13533 (AJG) (Bankr. S.D.N.Y. Oct. 15, 2002); In re The Warnaco Group, Inc., Case No. 01-41643 (RLB) (Bankr. S.D.N.Y. June 11, 2001); In re Teligent, Inc., Case No. 01-12974 (SMB) (Bankr. S.D.N.Y. June 13, 2001); and In re The Singer Co. N.V., Case No. 99-10578 (BRL) (Bankr. S.D.N.Y. Nov. 18, 1999). Similar authorization is appropriate here.

IV.    The Debtors Should Be Allowed To Continue Certain
       Intercompany Transactions With Non-Debtor Affiliates

        52.    Prior to the Petition Date, the Debtors and certain non-Debtor affiliates

provided a number of services to, and engaged in intercompany financial transactions with, each

other in the ordinary course of their respective businesses.  Discrete transfers in the appropriate

intercompany accounts are made on account of the provision of these services.  These

transactions are recorded by each entity as an intercompany obligation and ultimately satisfied

between the entities.

        53.    In addition, in the ordinary course of business, the Debtors periodically are

required to infuse capital into certain of their foreign subsidiaries and affiliates.  This infusion of

capital usually is in the form of a loan.  The Debtors use repayment of loans as a tax efficient

method of upstreaming cash throughout their enterprise.  Because these entities are part of the

Debtors' overall corporate ownership structure, throughout the entirety of these transactions the

funds remain within the spectrum of the Debtors' control.

        54.    The Debtors believe that the continuation of these and other intercompany

services is beneficial to their estates and creditors and that corresponding transfers among the

appropriate intercompany accounts (collectively, the "Intercompany Transactions") should

therefore be permitted.  Accordingly, the Debtors seek authority to continue the Intercompany

Transactions postpetition.[21]  Specifically, in certain cases as noted above, the Intercompany

Transactions result in tax benefits to the Debtors.  Additionally, if the Intercompany Transactions

were discontinued, a number of services currently provided to the Debtors at reasonable or

---

[21]    The Debtors engaged in Intercompany Transactions on a regular basis prior to the Petition Date.  Such
transactions are common for enterprises like the Debtors.  The Debtors believe that such transactions are in
the ordinary course within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, do not
require this Court's approval.  Nonetheless, out of an abundance of caution, the Debtors are seeking express
authority to engage in such transactions.

nominal costs would be disrupted.  Accordingly, the Debtors submit that the continuation of the

Intercompany Transactions is in the best interests of the Debtors' estates and their creditors.

55.    The Debtors also seek authorization to preserve and exercise intercompany

setoff rights.  Section 553(a) of the Bankruptcy Code provides that:

> except as otherwise provided in this section and in sections 362 and 363 of this
> title, this title does not affect any right of a creditor to offset a mutual debt owing
> by such creditor to the debtor that arose before the commencement of the case
> under this title against a claim of such creditor against the debtor that arose before
> the commencement of the case . . .

11 U.S.C. § 553(a).  A creditor need only establish two elements before a setoff may be asserted:

mutuality and timing.  Official Comm. of Unsecured Creditors v. Mfrs. & Traders Trust Co. (In

re The Bennett Funding Group, Inc.), 212 B.R. 206, 212 (B.A.P. 2d Cir. 1997); see also In re

Verco Industries, 704 F.2d 1134, 1139 (9th Cir. 1983); In re Lundell Farms, 86 B.R. 582, 584

(Bankr. W.D. Wis. 1988).  Although courts have not uniformly defined the elements of

mutuality, most courts require the following elements: that the debts are (a) owed between the

same parties and (b) in the same right or capacity.  See 4 Collier, Bankruptcy § 553.03[3][a] at

553-28 to 553-29 (15th rev. ed. 2004) (citing Davidovich v. Welton (In re Davidovich), 901 F.2d

1533, 1537 (10th Cir. 1990); Lubman v. Sovran Bank, N.A. (In re A & B Homes, Ltd.), 98 B.R.

243, 248 (Bankr. E.D. Va. 1989).  Timing requires that both claims arise prepetition.  See In re

Sentinel Products Corporation, 192 B.R. 41, 45 (S.D.N.Y. 1996); In re Westchester Structures,

181 B.R. at 739.  Arnold M. Quittner, Setoff and Recoupment, 715 PLI/Comm 633, 661 (1995).

In other words, "a creditor may not set off a pre-petition claim against a post-petition debt it

owes the debtor, and likewise it may not set off a post-petition claim that it has against a pre-

petition debt it owes to a debtor."  Id. at 694 (citing In re Metco Mining and Minerals, Inc., 171

B.R. 210 (Bankr. W.D. Pa. 1994)); see also In re Westchester Structures, 181 B.R. at 739.  In

26

addition, courts have allowed the parties to offset claims postpetition in the same manner as a prepetition setoff, as long as the mutuality requirements are met. See, e.g., United States v. Gordon Sel-Way, Inc., (In re Gordon Sel-Way, Inc., 239 B.R. 741, 751 (E.D. Mich. 1999), aff'd, 270 F.3d 280 (6th Cir. 2001); In re Mohawk Indus., Inc., 82 B.R. 174, 179 (Bankr. D. Mass. 1987).

56.    As described above, a portion of the obligations arising from Intercompany Transactions are normally netted as part of the Debtors' monthly Major Netting process. Furthermore, the Debtors' Integrated Cash Management System and other processes in place allow the Debtors to track all obligations owing between related entities and thereby ensures that all setoffs of Intercompany Transactions through the Major Netting process will meet both the mutuality and timing requirements of section 553 of the Bankruptcy Code. Therefore, the Debtors respectfully request that the Debtors and their non-Debtor affiliates be expressly authorized to set off prepetition obligations arising on account of Intercompany Transactions between a Debtor and another Debtor, or between a Debtor and a non-Debtor. Furthermore, the Major Netting process provides numerous benefits to the Debtors and they therefore seek to continue Major Netting postpetition in the ordinary course of their businesses. Accordingly, the Debtors also respectfully request that the Debtors and their non-Debtor affiliates be expressly authorized to set off postpetition obligations arising on account of Intercompany Transactions between a Debtor and another Debtor, or between a Debtor and a non-Debtor.[22]

57.    If this Court authorizes the continuation of Intercompany Transactions, at any given time there may be balances due and owing from one Debtor to another. These

---

[22]    The Debtors' non-Debtor affiliates similarly will continue to set off obligations arising on account of Intercompany Transactions against one another in accordance with the requirements of mutuality. The Debtors assert, however, that the setting off of obligations owing between two non-Debtor entities does not require Court approval.

balances represent extensions of intercompany credit.  To ensure that each individual Debtor will

not, at the expense of its creditors, fund the operations of another entity, the Debtors will

continue to maintain records of such transfers, including records of all current intercompany

accounts receivable and payable.  Additionally, the Debtors respectfully request that, pursuant to

section 364(c)(1) of the Bankruptcy Code, all Intercompany Transactions arising after the

Petition Date be accorded superpriority status, with priority over any and all administrative

expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, subject and

subordinate to only the priorities, liens, claims, and security interests, if any, granted under any

debtor-in-possession financing facility to which the Debtors may become party and other valid

liens.

   58. Courts frequently have granted such superpriority status to postpetition

intercompany claims in cases such as this.  See, e.g., In re The Singer Co. N.V., Case No. 99-

10578 (BRL) (Bankr. S.D.N.Y. Nov. 18, 1999); In re Phillip Servs. (Delaware), Inc., Case No.

99-02385 (MFW) (Bankr. D. Del. June 28, 1999); In re Harneschfeger Indus., Case No. 99-2171

(PJW) (Bankr. D. Del. June 7, 1999); In re Loewen Group Int'l, Case No. 99-1244 (PJW) (Bankr.

D. Del. June 1, 1999).

V. The Debtors Should Be Granted Authority To
  Continue To Use Existing Business Forms

   59. To minimize expenses to their estates, the Debtors also request authorization

to continue to use all correspondence and business forms (including, but not limited to,

letterheads, purchase orders, and invoices) existing immediately prior to the Petition Date

without reference to the Debtors' status as debtors-in-possession.  As soon as reasonably

practicable, however, the Debtors will cause the phrase "Debtor-In-Possession" to be included on

their checks issued within the United States.

60.     Parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors-in-possession as a result of the size and notoriety of these cases, the press releases issued by the Debtors, and information circulating within the automotive industry. Moreover, each of the Debtors' vendors will receive direct notice of the commencement of these cases.

61.     Changing correspondence and business forms would be expensive, unnecessary, and burdensome to the Debtors' estates and disruptive to the Debtors' business operations and would not confer any benefit upon those dealing with the Debtors.  For these reasons, the Debtors request that they be authorized to use existing business forms without being required to place the label "Debtor-In-Possession" on each; provided, however, that the Debtors will cause the phrase "Debtor-In-Possession" to be included on their checks issued within the United States as soon as reasonably practicable.

62.     Courts in other large chapter 11 cases in this district have routinely granted the same or similar relief to chapter 11 debtors.  See, e.g., In re Delta Air Lines, Inc., Case No. 05-17923 (PCB) (Bankr. S.D.N.Y. Sept. 16, 2005) (interim order; final order pending); In re Northwest Airlines Corp., Case No. 05-17930 (ALG) (Bankr. S.D.N.Y. Sept. 15, 2005) (interim order; final order pending);  In re Genuity Inc., Case No. 02-43558 (PCB) (Bankr. S.D.N.Y. Dec. 2, 2002); In re Ogden N.Y. Servs. Inc., Case No. 02-40826 (CB) (Bankr. S.D.N.Y. Apr. 2, 2002); In re WorldCom, Inc., Case No. 02-13533 (AJG) (Bankr. S.D.N.Y. Oct. 15, 2002); In re Global Crossing, Ltd., Case No. 02-40188 (REG) (Bankr. S.D.N.Y. May 17, 2002); In re Adelphia Bus. Solutions, Inc., Case No. 02-11389 02-11394 (REG) (Bankr. S.D.N.Y. Mar. 27, 2002).

<u>Notice</u>

63.    Notice of this Motion has been provided by facsimile, electronic transmission, overnight delivery, or hand delivery to (a) the Office of the United States Trustee, (b) the Debtors' 50 largest unsecured creditors, (c) counsel for the agent under the Debtors' prepetition credit facility, and (d) counsel for the agent under the Debtors' proposed postpetition credit facility.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

<u>Memorandum Of Law</u>

64.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order (a) authorizing the (i) continued maintenance of existing bank accounts, (ii) continued use of their existing cash management systems, (iii) continued use of their existing business forms, (iv) preservation and exercise of intercompany setoff rights and (v) grant of administrative priority status for postpetition intercompany transactions, and (b) granting the Debtors such other and further relief as is just.

Dated: New York, New York
      October 8, 2005

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By: s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr. (pro hac vice motion pending)
    John K. Lyons
    Ron E. Meisler
    333 West Wacker Drive, Suite 2100
    Chicago, Illinois  60606
    (312) 407-0700

     - and -

By: s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
    Four Times Square
    New York, New York 10036
    (212) 735-3000

    Attorneys for Delphi Corporation, et al.,
     Debtors and Debtors-in-Possession