SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :
            In re                           :   Chapter 11
                                            :
DELPHI CORPORATION, et al.,                 :   Case No. 05-_____ (___)
                                            :
                            Debtors.        :   (Jointly Administered)
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x


MOTION FOR ORDER UNDER 11 U.S.C. § 345 AUTHORIZING
CONTINUED USE OF EXISTING INVESTMENT GUIDELINES

("INVESTMENT GUIDELINES MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"),[1] debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order under 11 U.S.C. § 345 authorizing continued use of existing investment guidelines. In support of this Motion, the Debtors submit the Affidavit Of Robert S. Miller, Jr. In Support Of Chapter 11 Petitions And First Day Orders, sworn to October 8, 2005. In further support of this Motion, the Debtors respectfully represent as follows:

Background

A.     The Chapter 11 Filings

1.     On October 8, 2005 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have moved this Court for an order authorizing joint administration of these chapter 11 cases.

---

[1]     In addition to Delphi, the following entities are debtors in these related cases: ASEC Manufacturing General Partnership, ASEC Sales General Partnership, Aspire, Inc., Delco Electronics Overseas Corporation, Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems Global (Holding), Inc., Delphi Automotive Systems Human Resources LLC, Delphi Automotive Systems International, Inc., Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems LLC, Delphi Automotive Systems Overseas Corporation, Delphi Automotive Systems Risk Management Corp., Delphi Automotive Systems Services LLC, Delphi Automotive Systems Tennessee, Inc., Delphi Automotive Systems Thailand, Inc., Delphi China LLC, Delphi Connection Systems, Delphi Diesel Systems Corp., Delphi Electronics (Holding) LLC, Delphi Foreign Sales Corporation, Delphi Integrated Service Solutions, Inc., Delphi International Holdings Corp., Delphi International Services, Inc., Delphi Liquidation Holding Company, Delphi LLC, Delphi Mechatronic Systems, Inc., Delphi Medical Systems Colorado Corporation, Delphi Medical Systems Corporation, Delphi Medical Systems Texas Corporation, Delphi NY Holdings Corporation, Delphi Services Holding Corporation, Delphi Technologies, Inc., DREAL, Inc., Environmental Catalysts, LLC, Exhaust Systems Corporation, Packard Hughes Interconnect Company, Specialty Electronics, Inc., and Specialty Electronics International Ltd.

2.   No trustee, examiner, or creditors' committee has been appointed in the Debtors' cases.

3.   This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.   The statutory predicate for the relief requested herein is section 345 of the Bankruptcy Code.

B.   Current Business Operations Of The Debtors

5.   With more than 180,000 employees worldwide, global 2004 revenues of approximately $28.6 billion and global assets as of August 31, 2005 of approximately $17.1 billion,[2] Delphi ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations without supervision from the Bankruptcy Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy Code.

6.   Over the past century, the operations which are now owned by Delphi have become a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines.  Today, the Company is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company's technologies and products are present in more than 75 million vehicles on the road worldwide.  The Company supplies products to nearly every major global automotive original equipment manufacturer with 2004 sales to its

---

[2]   The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

3

former parent, General Motors Corporation, equaling approximately $15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

7.    As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world.  In the U.S., the Debtors employ approximately 50,600 people.  Those employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in Delphi's worldwide headquarters and customer center located in Troy, Michigan.  Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and local unions.  Outside the United States, the Company's foreign entities employ more than 134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

8.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

9.    Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle. , When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base. The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base. The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C.    Events Leading To The Chapter 11 Filing

10.    In the first two years following Delphi's separation from GM, the Company generated more than $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales. Reflective of a downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005. The Company experienced net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[3]

11.    The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S.

---

[3]    Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

legacy liabilities and operational restrictions driven by collectively bargained agreements,

including restrictions preventing the Debtors from exiting non-strategic, non-profitable

operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive

U.S. vehicle production environment for domestic OEMs resulting in the reduced number of

motor vehicles that GM produces annually in the United States and related pricing pressures, and

(c) increasing commodity prices.

12.    In light of these factors, the Company determined that it would be imprudent

and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio,

operational issues and forward looking revenue requirements.  Having concluded that pre-filing

discussions with its Unions and GM were not leading to the implementation of a plan sufficient

to address the Debtors' issues on a timely basis, the Company determined to commence these

chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and

preserve value.

13.    Through the reorganization process, the Debtors intend to achieve

competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive

legacy liabilities and burdensome restrictions under current labor agreements and realigning

Delphi's global product portfolio and manufacturing footprint to preserve the Company's core

businesses.  This will require negotiation with key stakeholders over their respective

contributions to the restructuring plan or, absent consensual participation, the utilization of the

chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned

in the Company's transformation plan.  The Debtors believe that a substantial segment of

Delphi's U.S. business operations must be divested, consolidated, or wound-down through the

chapter 11 process.

14.    Upon the conclusion of this process, the Debtors expect to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

## Relief Requested

15.    By this Motion, the Debtors respectfully seek (a) authority to continue investing their cash in accordance with their existing investment guidelines attached hereto as Exhibit A (the "Investment Guidelines") and (b) to the extent necessary, waiver of the investment and deposit requirements of section 345(b) of the Bankruptcy Code.

## Basis For Relief

A.    Investment Accounts And Existing Policy

16.    Prior to the Petition Date, the Debtors generally invested their U.S. controlled cash and cash equivalents in accordance with the Investment Guidelines.  The goal of the Debtors' short-term investment program is to manage effectively the Debtors' cash by preserving principal, providing liquidity, and maintaining yield.  Investments for speculative purposes are not permitted.  All investments must have a maturity of 45 days or less and be denominated in U.S. dollars.

17.    Citibank, N.A. ("Citibank") is the Debtors' investment custodian for non-money market investments.  The Debtors also maintain investment funds held in a combination of the following accounts:  (a) a demand deposit account for investments at Fifth Third Bank, (b) a money market fund at The Reserve Fund, (c) a money market fund at Fidelity Investments, (d)

a money market fund at HSBC Bank USA, N.A., (e) a money market account at JPMorgan

Chase Bank ("JPMorgan"),[4] (f) a money market fund at RBS Securities, (g) a money market

fund at Citifunds, and (h) a money market fund at Deutsche Asset Management.

18.   Under the Investment Guidelines, the Debtors may invest only in:[5]

(a)   U.S. Treasuries/Government Agencies – Obligations issued or guaranteed by the United States Government or its agencies.  There are no dollar limitations or portfolio percentage holding limits on these instruments.

(b)   Bank Obligations – Obligations (including certificates of deposit ("CDs") and time deposits ("TDs")) of banks having a Fitch individual bank rating of C or higher, including domestic CDs, Yankee CDs and TDs, Eurodollar CDs of foreign and domestic banks, and offshore TDs.  These obligations are limited to $50 million per issuer and 80% of the portfolio at the time of settlement (excluding investments of under five business days).

(c)   Corporate Obligations – Obligations such as commercial paper, bonds, notes, and preferred securities issued by a company with a rating no lower than A2/P2 and BBB/Baa2 with stable or positive outlook senior debt ratings.  A1/P1 investments are limited to $50 million per issuer and 80% of the portfolio.  A2/P2 investments are limited to $30 million per issuer and 40% of the portfolio.  Combined A1/P1 and A2/P2 holdings may not exceed 80% of the portfolio.

(d)   Asset-Backed Securities ("ABS") – ABS investments, including asset-backed commercial paper, restricted to programs of greater than $1 billion that are 100% backed by bank lines.  Securities must have a credit rating of not lower than AA and commercial paper must have a rating of A1/P1 from Standard & Poor's or Moody's.  These obligations are limited to $100 million per issuer and 20% of the portfolio.

(e)   Money Market Mutual Funds – These funds must have a credit rating no lower than AAA or Aaa by Standard & Poor's, Moody's, or Fitch.  These investments are limited to $250 million with any one institution and must not exceed 5% of total assets under management in any one fund.  Furthermore, no synthetically created instruments or instruments denominated in foreign currency are permitted.

---

[4]   Funds deposited into the JPMorgan money market account flow into the Federated 10 Prime Obligations Fund.

[5]   For all categories of investments, all such investments must have a maturity of 45 days or less and be denominated in U.S. dollars.  Auction rate securities are not permitted.

B.      Cause Exists For Waiving The Investment And Deposit Guidelines Of Section 345

19.    The Debtors' assets consist of, among other things, cash, cash equivalents, short-term investments, and deposit accounts. Prior to the commencement of these chapter 11 cases, the Debtors' invested cash in accordance with conservative guidelines and with the primary goal of protecting principal and the secondary goals of maximizing yield and liquidity.

20.    Section 345(a) of the Bankruptcy Code authorizes deposits or investments of money of a bankruptcy estate, such as cash, in a manner that will "yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a). For deposits or investments that are not "insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code provides that the estate must require from the entity with which the money is deposited or invested a bond in favor of the United States secured by the undertaking of an adequate corporate surety. In the alternative, the estate may require the entity to deposit securities of the kind specified in section 9303 of title 31.[6]

21.    A court may, however, relieve a debtor-in-possession of the restrictions that section 345(b) imposes for "cause." The Debtors believe that "cause" exists to waive the investment and deposit restrictions under section 345(b) to the extent that the Debtors' cash management deposits and investments do not comply. The Debtors believe that the institutions at which their investment deposits are held are financially stable and, in the United States, most accounts held by the Debtors are FDIC insured (up to applicable maximum amounts). All such

---

[6]    31 U.S.C. § 9303 provides that where a person is required by law to give a surety bond, that person, in lieu of such surety, may obtain a government obligation.

deposits and investments are prudent and designed to yield the maximum reasonable net return on the funds invested, taking into account the safety of such deposits and investments and the Debtors' liquidity needs.

22.   To maximize the assets of their estates, the Debtors seek authority to invest monies of their estates pursuant to the Investment Guidelines.  In accordance with the Investment Guidelines, the Debtors will invest their cash in their sole discretion in the short-term investment instruments identified as permitted investments on Exhibit A hereto, in all instances subject to the sectoral, credit rating, and other limitations and restrictions set forth in those Investment Guidelines.  Compliance with these internal Investment Guidelines is guaranteed by a rigorous and daily process of internal review.

23.   The average aggregate daily balance in the Debtors' investment accounts from September 1, 2005 through September 23, 2005 was approximately $1.0 billion.

24.   The Investment Guidelines will enable the Debtors to maintain the security of their investments, as contemplated by section 345 of the Bankruptcy Code, while at the same time providing the Debtors with the flexibility required to maximize the yield on the investment and deposit of cash.

25.   The Debtors submit that, in view of the magnitude of cash that is or will be held by them, investment in strict compliance with the requirements of section 345(b) of the Bankruptcy Code is inconsistent with section 345(a), which permits a trustee or debtor-in-possession to make such investment of the money of the estate "as will yield the maximum reasonable net return on such money."  Where cash is available in amounts sufficient to permit adequate diversification of investments and such investments are invested in accordance with the proposed investment guidelines, which are restricted to securities of the United States

10

government or an agency thereof and private corporations and institutions of substantial financial

strength as evaluated by respected and well established investment rating firms, no bonds in

favor of the United States, which bonds would be required to be secured by an undertaking of a

corporate surety, need be obtained from entities with which money is deposited or invested to

afford appropriate protection to creditors of the Debtors' estates.

26.    The Debtors assert that it would be in the best interests of their estates and

creditors for them to follow the guidelines for investment of cash employed by the Debtors prior

to the commencement of these chapter 11 cases.  The yield on investments under the proposed

guidelines will be substantially greater than if the Debtors were restricted to direct investments in

government securities.  Indeed, the Debtors estimate that, given the amount of cash that is or will

be in their respective estates, the Debtors would lose a substantial amount of money if limited to

direct investment in government securities.

27.    The Debtors believe that investments made in accordance with the

Investment Guidelines as set forth on Exhibit A provide the protection required by section 345 of

the Bankruptcy Code, notwithstanding the absence of a "corporate surety" requirement.  First,

the Investment Guidelines permit investments only in government and government agency

securities and in private corporations and domestic banks of substantial financial strength, as

evaluated by renowned investment rating firms.  As to investments in securities of private

entities, any corporate surety that might be obtained to guarantee the safety of an investment

likely would not have significantly greater financial strength than the private entities in which the

Debtors would invest under the proposed guidelines.  Finally, the requirement of obtaining a

bond secured by the undertaking of a corporate surety from each of the numerous financial

institutions with which the Debtors deposit or invest funds would be prohibitively expensive and

administratively burdensome, and could offset much of the financial gain derived from investing in private as well as federal or federally guaranteed securities.

28.   In addition, the Debtors seek to modify the requirements of section 345 of the Bankruptcy Code with respect to the Foreign Banks to the limited extent set forth below. Because their deposits are not insured or guaranteed by the United States or any department, agency, or instrumentality thereof, the Foreign Banks will be unable to comply with the literal requirements of section 345(b) of the Bankruptcy Code.  The Foreign Banks also may be unwilling or unable to post the requisite bond or securities specified in section 345(b) of the Bankruptcy Code.  Nevertheless, the Foreign Banks with which the Debtors maintain accounts do comply with the legislative intent behind section 345(b) of the Bankruptcy Code.  The Foreign Banks are large, well-capitalized institutions, as evidenced by their corporate credit ratings.[7]

29.   In other large chapter 11 cases, courts have liberally construed the requirement of section 345(b) of the Bankruptcy Code that a debtor-in-possession obtain a bond from any entity with which its money is deposited or invested.  In those instances, courts have waived the requirements of section 345(b) of the Bankruptcy Code and replaced them with alternative procedures.  See, e.g., In re Delta Air Lines, Inc., Case No. 05-17923 (PCB) (Bankr. S.D.N.Y. Sept. 16, 2005) (interim order; final order pending); In re Northwest Airlines Corp., Case No. 05-17930 (ALG) (Bankr. S.D.N.Y. Sept. 15, 2005) (interim order; final order pending); In re Cornerstone Propane, L.P., Case No. 04- 13856 (RDD) (Bankr. S.D.N.Y. June 4, 2004); In

---

[7]   The Moody's long-term issuer rating for each of Citibank and NatWest is Aa1, and for each of JPMorgan Chase & Co. (the ultimate parent of Bank One - Canada) ("JPMC Co."), Deutsche, and TD Bank is Aa3, which ratings are all within Moody's second-highest category of long-term issuer ratings and generally signify that the entity has a "very strong" capacity to meet its financial commitments.  Similarly, the Standard & Poor's organization credit ratings for Citibank, Deutsche, JPMC Co., NatWest, and TD Bank are AA, AA-, A+, AA, and A+, respectively.

re NRG Energy, Inc., Case No. 03-13024 (PCB) (Bankr. S.D.N.Y. June 20, 2003); In re Teligent, Inc., Case No. 01-12974 (SMB) (Bankr. S.D.N.Y. June 13, 2001); In re Indesco Int'l, Inc., Case No. 00-15452 (REG) (Bankr. S.D.N.Y. Jan. 9, 2001); In re Safelite Glass Corp., Case No. 00-2252 (MFW) (Bankr. D. Del. July 26, 2000); In re Multicare AMC, Inc., Case No. 00-2494 (PJW) (Bankr. D. Del. July 24, 2000). A similar authorization is appropriate in these cases.

30.   Based upon all of the foregoing, the Debtors believe that sufficient cause exists under section 345(b) of the Bankruptcy Code to allow the Debtors to deviate from the approved investment practices established by the Bankruptcy Code. Accordingly, the Debtors respectfully request authority to invest and deposit funds in a safe and prudent manner in accordance with the Investment Guidelines.[8]

## Notice

31.   Notice of this Motion has been provided by facsimile, electronic transmission, overnight delivery, or hand delivery to (a) the Office of the United States Trustee, (b) the Debtors' 50 largest unsecured creditors, (c) counsel for the agent under the Debtors' prepetition credit facility, and (d) counsel for the agent under the Debtors' proposed postpetition credit facility. In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

---

[8]   The Debtors have agreed to confer with the U.S. Trustee regarding the Debtors' Investment guidelines (the "Reserved Issue"). To the extent that the Debtors and the U.S. Trustee have not reached an agreement with respect to the Reserved Issue by April 10, 2006, the U.S. Trustee may, but shall not be required to, file a motion in accordance with this Court's Order Under 11 U.S.C. § 102(1) and 105 and Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing (I) Omnibus Hearing Dates, (II) Certain Notice, Case Management, and Administrative Procedures, And (III) Scheduling Initial Case Conference In Accordance With Local Bankr. R. 1007-2(e), requesting the Court to resolve the Reserved Issue at the next regularly-scheduled omnibus hearing.

<u>Memorandum Of Law</u>

32.    Because the legal points and authorities upon which this Motion relies are

incorporated herein, the Debtors respectfully request that the requirement of the service and

filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order

(a) authorizing continued use of investment guidelines, (b) to the extent necessary, waiving the

investment and deposit requirements of section 345(b) of the Bankruptcy Code, and (c) granting

the Debtors such other and further relief as is just.

Dated:  New York, New York
        October 8, 2005

> SKADDEN, ARPS, SLATE, MEAGHER
> & FLOM LLP
>
> By: s/ John Wm. Butler, Jr.
>     John Wm. Butler, Jr. (pro hac vice motion pending)
>     John K. Lyons
>     Ron E. Meisler
> 333 West Wacker Drive, Suite 2100
> Chicago, Illinois  60606
> (312) 407-0700
>
>     - and -
>
> By: s/ Kayalyn A. Marafioti
>     Kayalyn A. Marafioti (KM 9632)
>     Thomas J. Matz (TM 5986)
> Four Times Square
> New York, New York 10036
> (212) 735-3000
>
> Attorneys for Delphi Corporation, et al.,
>     Debtors and Debtors-in-Possession