SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-_____ (___) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. §§ 105(a), 363, 1107, AND 1108
AUTHORIZING DEBTORS TO HONOR PREPETITION
OBLIGATIONS TO CUSTOMERS AND OTHERWISE CONTINUE
CUSTOMER PROGRAMS IN THE ORDINARY COURSE OF BUSINESS

("CUSTOMER PROGRAMS MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"),[1] debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order under 11 U.S.C. §§ 105(a), 363, 1107, and 1108 authorizing the Debtors to honor certain obligations to customers and to otherwise continue certain customer programs and other business practices in the ordinary course of business.  In support of this Motion, the Debtors submit the Affidavit Of Robert A. Miller, Jr. In Support Of Chapter 11 Petitions And First Day Orders, sworn to October 8, 2005.  In further support of this Motion, the Debtors respectfully represent as follows:

Background

A.    The Chapter 11 Filings

1.    On October 8, 2005 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have moved this Court for an order for joint administration of these chapter 11 cases.

---

[1]    In addition to Delphi, the following entities are debtors in these related cases: ASEC Manufacturing General Partnership, ASEC Sales General Partnership, Aspire, Inc., Delco Electronics Overseas Corporation, Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems Global (Holding), Inc., Delphi Automotive Systems Human Resources LLC, Delphi Automotive Systems International, Inc., Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems LLC, Delphi Automotive Systems Overseas Corporation, Delphi Automotive Systems Risk Management Corp., Delphi Automotive Systems Services LLC, Delphi Automotive Systems Tennessee, Inc., Delphi Automotive Systems Thailand, Inc., Delphi China LLC, Delphi Connection Systems, Delphi Diesel Systems Corp., Delphi Electronics (Holding) LLC, Delphi Foreign Sales Corporation, Delphi Integrated Service Solutions, Inc., Delphi International Holdings Corp., Delphi International Services, Inc., Delphi Liquidation Holding Company, Delphi LLC, Delphi Mechatronic Systems, Inc., Delphi Medical Systems Colorado Corporation, Delphi Medical Systems Corporation, Delphi Medical Systems Texas Corporation, Delphi NY Holdings Corporation, Delphi Services Holding Corporation, Delphi Technologies, Inc., DREAL, Inc., Environmental Catalysts, LLC, Exhaust Systems Corporation, Packard Hughes Interconnect Company, Specialty Electronics, Inc., and Specialty Electronics International Ltd.

2.      No trustee, examiner, or creditors' committee has been appointed in the Debtors' cases.

3.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4.      The statutory predicates for the relief requested herein are sections 105(a), 363(c), 1107(a), and 1108 of the Bankruptcy Code.

B.      Current Business Operations Of The Debtors

5.      With more than 180,000 employees worldwide, global 2004 revenues of approximately $28.6 billion and global assets as of August 31, 2005 of approximately $17.1 billion,[2] Delphi ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations without supervision from the Bankruptcy Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy Code.

6.      Over the past century, the operations which are now owned by Delphi have become a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines.  Today, the Company is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company's technologies and products are present in more than 75 million vehicles on the road worldwide.  The Company supplies products to

---

[2]      The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

nearly every major global automotive original equipment manufacturer with 2004 sales to its

former parent, General Motors Corporation, equaling approximately $15.4 billion and sales to

each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company,

Ltd., and Volkswagen Group exceeding $850 million.

7.      As part of its growth strategy, Delphi has established an expansive global

presence with a network of manufacturing sites, technical centers, sales offices, and joint

ventures located in every major region of the world.  In the U.S., the Debtors employ

approximately 50,600 people.  Those employees work in approximately 44 manufacturing sites

and 13 technical centers across the country, and in Delphi's worldwide headquarters and

customer center located in Troy, Michigan.  Approximately 34,750 of these individuals are

hourly employees, 96% of whom are represented by approximately 49 different international and

local unions.  Outside the United States, the Company's foreign entities employ more than

134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40

countries worldwide.

8.      Delphi was incorporated in Delaware in 1998 as a wholly-owned

subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through

various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these

divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates in

accordance with the terms of a Master Separation Agreement between Delphi and GM.  In

connection with these transactions, Delphi accelerated its evolution from a North American-

based, captive automotive supplier to a global supplier of components, integrated systems, and

modules for a wide range of customers and applications.  Although GM is still the Company's

4

single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

9.    Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle.  When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base.  The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base. The Debtors also believe that this must be accomplished in advance of  the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C.    Events Leading To The Chapter 11 Filing

10.    In the first two years following Delphi's separation from GM, the Company generated more than $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales.  Reflective of a downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005.  The Company experienced net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[3]

---

[3]    Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

5

11.     The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12.     In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues and forward looking revenue requirements.  Having concluded that pre-filing discussions with its Unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

13.     Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses.  This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned in the Company's transformation plan.  The Debtors believe that a substantial segment of

6

Delphi's U.S. business operations must be divested, consolidated, or wound-down through the chapter 11 process.

14.     Upon the conclusion of this process, the Debtors expect to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

<u>Relief Requested</u>

15.     Prior to the Petition Date and in the ordinary course of their businesses, the Debtors engaged in certain practices to develop and sustain positive reputations with their customers and in the marketplace for their products (collectively, the "Customer Programs"). Such practices include, among others, warranty programs, customer adjustments, and customer rebates and allowances, each of which is described in greater detail below.  The common goals of the Customer Programs have been to meet competitive pressures, ensure customer satisfaction, and generate goodwill for the Debtors, thereby retaining current customers, attracting new ones, and ultimately enhancing revenue and profitability.

16.     By this Motion, the Debtors request entry of an order pursuant to sections 105(a), 363(c), 1107(a), and 1108 of the Bankruptcy Code authorizing but not directing the Debtors in their business judgment to (a) perform certain of their prepetition obligations related to the Customer Programs as they determine advisable and (b) continue, renew, replace, implement new, and/or terminate those Customer Programs as they see fit, in the ordinary course of their businesses and without further application to this Court.

17.    In essence, the Debtors desire authority to continue during the postpetition period those Customer Programs that they believe were beneficial to their businesses and cost-effective during the prepetition period.  The Debtors believe that such relief is necessary to preserve their critical business relationships with their original equipment manufacturer ("OEM") customers[4] and to promote goodwill among customers purchasing Delphi-branded products at retail establishments.  The total operational and administrative cost to the Debtors to continue the Customer Programs is relatively insignificant in comparison to the revenue that such Customer Programs generate.  For the reasons set forth herein, it is in the best interests of the Debtors and their estates to continue, in the ordinary course of their businesses, those of the Customer Programs that they determine to be beneficial.

## Basis For Relief

18.    Prior to the Petition Date, in the ordinary course of their businesses and as is customary with manufacturers of electronics and other components and systems for use in transportation and other applications, the Debtors participated in the Customer Programs and received payments from customers or incurred liabilities in connection therewith.  Those payments and liabilities include, without limitation, allowances, returns, refunds, rebates, warranties, and other adjustments and credits.

19.    The Debtors wish to continue the Customer Programs because they have been successful in the past and are directly responsible for generating valuable goodwill and increased revenue and profitability for the Debtors.  The Debtors believe that maintaining these benefits throughout these chapter 11 cases is essential to the continued viability of their

---

[4]    The Debtors' and their affiliates' largest OEM customers on a consolidated basis include BMW AG, Caterpillar Inc., DaimlerChrysler AG, Ford Motor Company, General Motors Corporation ("GM"), Hyundai Motor Company, Renault/Nissan Motor Company, Ltd., Toyota Motor Corporation, and

businesses and, ultimately, to their prospects for a successful reorganization.  Absent the relief requested by this Motion, the Debtors believe that the pall cast by the chapter 11 filings could negatively influence customers' attitudes and behavior towards the Debtors' products.  In particular, the Debtors' goodwill and ongoing business relationships may suffer if their customers perceive that the Debtors are unable or unwilling to fulfill the prepetition promises – particularly those relating to refunds, returns, and warranties – that they have made through the Customer Programs.  The same would be true if customers believe that the Debtors will no longer be offering the full package of benefits or quality of products that they demand.

20.    Maintaining certain of the Debtors' Customer Programs that are provided to consumer customers is critical because the Debtors' consumer goods face significant competition in the marketplace.  Prospective purchasers of Delphi-branded consumer goods have many alternatives from which to choose.  A belief that the Debtors will not honor obligations such as product warranties could easily dissuade consumers from purchasing the Debtors' products.  Similarly, maintaining certain of the Debtors' Customer Programs that are provided to OEM customers is crucial to the Debtors' businesses.  Any doubts regarding the Debtors' ability to honor their customer commitments to the OEMs could result in OEM customers' sourcing their supply needs elsewhere.  This would have a severe impact on the Debtors' revenues and ability to preserve enterprise value.  Accordingly, the Debtors request the authority to honor all such obligations related to the Customer Programs.  Set forth below are general descriptions and examples of some (but not all) of the Customer Programs offered by the Debtors.  They include the Debtors' Warranty Programs, Customer Adjustments, and Customer Rebates and Allowances (each as defined below).

---

Volkswagen Group.  The Debtors also have significant OEM customers in the communications, computer, energy, and medical industries.

A.    Warranty Programs

21.    The Debtors' prepetition warranty programs (the "Warranty Programs")
can generally be classified into two categories: (a) warranties providing that the components
supplied to the Debtors' OEM customers and integrated into such customers' products (including
motor vehicles and medical devices), and the service parts supplied to the Debtors' OEM
customers, will be, among other things, free from defects in material and workmanship (the
"OEM Warranties" and the Debtors' obligations with respect thereto, the "OEM Warranty
Obligations") and (b) standard consumer limited warranties provided to the ultimate purchasers
of the Debtors' consumer electronics products and Delphi-branded aftermarket automotive parts,
such as satellite radio receivers, mobile video systems, and mobile navigation systems (the
"Consumer Warranties" and, collectively with the OEM Warranties, the "Warranties").[5]

22.    From an accounting perspective, the Debtors recognize expected warranty
costs for products sold at the time of sale.  The Debtors' warranty accrual is based on
management's estimate of the amount that will eventually be required to settle such warranty
obligations.  This estimate is based upon consideration of many factors, including past
experience, production changes, and industry developments.  During the eight months ended
August 31, 2005, the Debtors accrued estimated warranty costs of approximately $41 million and
settled (in cash or in kind) warranty claims of approximately $39 million.  As of August 31,
2005, the Debtors' accrued balance for estimated warranty costs was $155 million,[6] the majority

---

[5]    The Debtors' obligations with respect to the Consumer Warranties are referred to herein as the "Consumer Warranty Obligations" and the OEM Warranty Obligations and the Consumer Warranty Obligations are collectively referred to herein as the "Warranty Obligations."

[6]    This amount reflects an estimate of the Debtors' likely exposure under warranties for products sold on or prior to August 31, 2005.  It does not reflect the Debtors' maximum potential liability under such warranties, which amount could be significantly larger.  Furthermore, this amount excludes warranty accruals for the Debtors' non-Debtor foreign affiliates.

of which is for estimated OEM Warranty Obligations.  The amount of warranty accrual for OEM

Warranties is due in part to the lengthy term of these warranties which are generally coterminous

with the product warranties offered by the Debtors' OEM customers and, therefore, does not

represent the actual amount of currently-payable obligations.[7]

23.    The outstanding prepetition Consumer Warranty Obligations are

significantly smaller than the OEM Warranty Obligations because they generally cover a

relatively short period of time.[8]  Although the Debtors cannot determine with certainty the

outstanding Consumer Warranty Obligations as of the Petition Date, the Debtors accrue a reserve

for Consumer Warranty Obligations (a) in an amount equal to 5.1% of sales of consumer

electronics goods and (b) on an incident-rate basis for Delphi-branded aftermarket automotive

parts.  Based upon their past experience, the Debtors believe that the amount of the reserve is a

reasonable estimate of future Consumer Warranty Obligations.  The Debtors' accrued reserve for

Consumer Warranty Obligations as of August 31, 2005 was approximately $3.6 million.

24.    The Debtors believe that the Warranties benefit customer development

and retention, solidify customer relationships, and bolster sales of new and existing products.  As

noted above, potential purchasers of the Debtors' consumer goods have many options in the

marketplace and will be less likely to purchase the Debtors' products if such products are

perceived as not carrying the same warranties as competing products.  Furthermore, any doubts

---

[7]    Pursuant to the terms of the Debtors' agreements with their OEM customers, certain of the OEM Warranties
run for five years or longer.  In many cases, the term of the OEM Warranties may be limited by applicable
non-bankruptcy law to four years from the date of delivery of the Debtors' products to OEM customers
regardless of the terms of the underlying agreements.  Nothing contained herein shall constitute, or shall be
construed as, an admission by the Debtors that the full term of the OEM Warranties is enforceable and the
Debtors expressly reserve all of their rights with respect to this issue.

[8]    The term of the Debtors' standard consumer new product limited warranty is one year from the date of
purchase.  The term of the Consumer Warranties provided on the Debtors' aftermarket automotive parts is
generally one year from the date of installation or 12,000 miles, whichever occurs first.  A small number of
aftermarket automotive product lines, however, have limited lifetime warranties or warranties that run for
two years from the date of installation or 24,000 miles, whichever occurs first.

regarding the Debtors' ability to honor their customer commitments to the OEMs could result in

OEM customers' sourcing their supply needs elsewhere, which would negatively affect the

Debtors' revenues, long-term prospects, and ability to preserve enterprise value.  The Debtors

assert that the total likely amount of prepetition Warranty Obligations is significantly less than

the potential damage that would be done to the Debtors' businesses by a failure to honor certain

of the Warranties in the ordinary course of the Debtors' businesses.  Thus, the Debtors

respectfully request that this Court authorize but not direct the Debtors to continue to honor the

Warranties and to satisfy prepetition Warranty Obligations at their discretion.[9]

B.    Customer Adjustments

25.    As noted above, the Debtors are the single largest global supplier of

vehicle electronics, transportation components, integrated systems and modules, and other

electronic technology.  The Debtors believe that one of the many reasons that OEMs select the

Debtors' goods for their products is the consistently high quality of the Debtors' goods.

Nevertheless, and despite the Debtors' continuous focus on and dedication to quality, it is

inevitable in the production of complex electronics and other components that certain unexpected

situations will arise in which the goods supplied to the OEM customers do not conform to such

customers' specifications (the "Nonconforming Goods").  Similarly, despite the Debtors' intricate

inventory and supply chain management systems, it is inescapable that goods occasionally will

be, among other things, misdelivered, delivered in an inaccurate quantity, or damaged in transit

("Misdelivered Goods" and, collectively with the Nonconforming Goods, the "Adjusted Goods").

---

[9]    Nothing contained herein shall constitute, nor shall it be construed as, a request to assume or adopt any
executory contract with respect to any Customer Program.  The Debtors expressly reserve all rights with
respect to the continuation or cessation of any Customer Program and the assumption, adoption, or
rejection of any executory contract with respect to any Customer Program.

26.      Issues also arise with respect to the invoicing and payment system used by
the Debtors and the OEM customers.  The Debtors and their customers generally rely upon a
complex electronic data interchange system for invoicing, pricing, and payment.  Nevertheless,
errors do occur.  Such errors include duplicate invoicing (when two invoices are created for the
same shipment), improper invoicing (when the invoice created does not properly reflect the
goods shipped or is otherwise incorrect), duplicate payment (when a customer makes two
payments on account of the same shipment), mispricing (when a customer is charged or pays an
incorrect price – either too high or too low – for the Debtors' products), and various other billing
and payment errors (the "Invoicing or Payment Errors").

27.      In the event of delivery of Adjusted Goods or an Invoicing or Payment
Error, the Debtors and the affected customer will agree to adjust the amount owed by such
customer in connection with the affected shipment (the "Invoice Adjustments").  The adjustment
generally will be in such amount as is allocable to the Adjusted Goods or sufficient to correct the
Invoicing or Payment Error, as appropriate.

28.      The Debtors may also incur, directly or indirectly, additional shipping
charges in connection with expediting delivery in order to ensure timely delivery of goods (such
charges, "Premium Freight").  Alternatively, the Debtors may directly or indirectly incur charges
in connection with the sorting, rework, or repair of the Adjusted Goods if such activities are
practicable (the "Repairs" and, collectively with Invoice Adjustments and Premium Freight, the
"Customer Adjustments").[10]

29.      By this Motion, the Debtors seek the authority but not this Court's
direction to continue to honor the Customer Adjustments.  The Debtors assert that their

---

[10]      In addition to being a general policy of the Debtors, certain of the Debtors' OEM customers have
contractual rights to Customer Adjustments.

Customer Adjustment practices are standard in the Debtors' industries and are done in the

ordinary course of their businesses, such that court authority is unnecessary pursuant to section

363 of the Bankruptcy Code.  Nevertheless, out of an abundance of caution, the Debtors seek

authority to continue their Customer Adjustments.

        30.      Honoring the Customer Adjustments is undoubtedly in the best interests of

the Debtors and their estates.  While it is difficult for the Debtors to track the number of

Adjusted Goods or the cost associated with Customer Adjustments because such amounts are

generally netted against outstanding invoices and not separately settled, nevertheless, the Debtors

believe that Adjusted Goods make up a relatively insignificant percentage of all goods produced

by the Debtors.  Therefore, the amount of Customer Adjustments is similarly insignificant as a

percentage of the Debtors' total sales.  In contrast, the harm to the Debtors' goodwill and their

OEM relationships from a failure to honor Customer Adjustments would be significant.  In

essence, absent the relief requested in this Motion, the Debtors would be forced to attempt to

collect on amounts invoiced for products that were nonconforming, misdelivered, or otherwise

unusable to the customer, or to collect on invoices that are clearly and verifiably inaccurate.  Any

such attempts would undoubtedly be met with fierce resistance by customers and would likely

lead to costly and time-consuming litigation in which the Debtors' likelihood of success would

be questionable.   In addition to the costs associated with such litigation, the Debtors' adoption of

such an antagonistic policy with respect to their customers would undeniably have a negative

impact upon their ability to be awarded new programs from such customers.  The minimal

amount that could possibly be saved in the short-term through a failure to honor the Customer

Adjustments would be significantly outweighed by the long-term consequences such a position

would have on the Debtors' business prospects.  Therefore, honoring the Customer Adjustments

and the Debtors' obligations with respect thereto are clearly in the best interests of the Debtors and their estates.

C.    <u>Customer Rebates And Allowances</u>

31.    The Debtors' consumer electronics products and Delphi-branded aftermarket automotive parts are sold through various sales channels and at various retail outlets across the United States and abroad.  In connection with their relationships with the retail outlets and other participants in sales channels through which the Debtors sell such products, the Debtors generally provide these customers with certain rebates, incentives, and allowances (collectively, the "Customer Rebates and Allowances") to support the development, promotion, and marketing of the Delphi brand and the Debtors' products.[11]  The Debtors accrue expense reserves for the Customer Rebates and Allowances based upon the terms of their agreements with the relevant customers.  As of August 31, 2005, the accrued expense reserve for the Customer Rebates and Allowances was approximately $4.7 million.

32.    By this Motion, the Debtors seek the authority but not this Court's direction to continue to honor the Customer Rebates and Allowances.  As with Customer Adjustments, the Customer Rebates and Allowances practices are standard in the Debtors' industries and are done in the ordinary course of their businesses.  Accordingly, the Debtors believe that court authority to continue these practices is unnecessary pursuant to section 363 of the Bankruptcy Code.  Nevertheless, out of an abundance of caution, the Debtors seek authority to continue their Customer Rebates and Allowances in the ordinary course of the Debtors' businesses.

---

[11]    The Debtors also provide certain customers of their medical device businesses with rebates, incentives, and allowances, which programs are beneficial to the Debtors' businesses and which they seek to continue hereby.

33.     The Debtors' customers play a meaningful and irreplaceable role in the promotion, marketing, and sale of the Debtors' consumer electronics products and Delphi-branded aftermarket automotive parts.  The Customer Rebates and Allowances are an integral part of the Debtors' incentive package to their customers and ensure that these customers actively promote the Debtors' products.  Absent continued payment of the Customer Rebates and Allowances, the Debtors cannot ensure that these customers will continue to actively and effectively market their products.  The ultimate effect of a failure to honor the Customer Rebates and Allowances in the ordinary course of the Debtors' businesses would likely be to decrease the Debtors' long-term sales of their consumer electronics products and Delphi-branded aftermarket automotive parts and the long-term prospects of many important product lines, to the detriment of the Debtors' creditors and their estates.

<u>Applicable Authority</u>

34.     The relief requested in this Motion is supported by several provisions of the Bankruptcy Code that authorize a debtor to honor prepetition obligations in certain circumstances.  Courts have recognized each of these statutory provisions as valid authority for such payments.  For instance, courts have found a basis for allowing debtors to make payments to creditors under section 363 of the Bankruptcy Code.  <u>See, e.g.</u>, <u>In re UAL Corp.</u>, Case No. 02-48191 (ERW) (Bankr. N.D. Ill. Dec. 11, 2002).  Authority for such payments also may be found in sections 1107(a) and 1108 of the Bankruptcy Code, which vest debtors-in-possession with authority to continue operating their businesses.  Sometimes this duty and the concomitant fiduciary duty to maximize estate value may be fulfilled only through the pre-plan payment of certain unsecured claims.  <u>See, e.g.</u>, <u>In re Mirant Corp.</u>, 296 B.R. 427 (Bankr. N.D. Tex. 2003); <u>In re CoServ, L.L.C.</u>, 273 B.R. 487, 498 (Bankr. N.D. Tex. 2002).  Finally, courts have similarly

authorized payment of prepetition obligations pursuant to section 105(a) of the Bankruptcy

Code, which allows a bankruptcy court to enter any order "necessary or appropriate" to carry out

the provisions of the Bankruptcy Code.  See, e.g., In re Just for Feet, Inc., 242 B.R. 821 (D. Del.

1999).

A.    This Court May Authorize The Debtors To Honor Prepetition Obligations To
      Customers And Continuation Of Customer Programs Pursuant To
      Section 363 Of The Bankruptcy Code

         35.    The relief requested in this Motion is authorized pursuant to section 363 of

the Bankruptcy Code under the standards articulated by the Seventh Circuit Court of Appeals in

In re Kmart Corp., 359 F.3d 866 (7th Cir.), cert. denied, 125 S. Ct. 495 (2004).  Although not

binding on this Court, the Kmart decision, in which the Seventh Circuit acknowledged the

practical business utility of allowing corporate debtors limited authority to make payments of

certain prepetition obligations, is instructive because the Seventh Circuit is the only appellate

court that has considered the issue.

         36.    Section 363(b)(1) of the Bankruptcy Code authorizes a bankruptcy court,

after notice and a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary

course of business, property of the estate."  The court reasoned that "satisfaction of a pre-petition

debt in order to keep 'critical' supplies flowing is a use of property other than in the ordinary

course of administering an estate in bankruptcy," and thus is within the literal ambit of the

statute's language.  Id. at 872.  The court, however, cautioned that "it is prudent to read, and use,

§ 363(b)(1) to do the least damage possible to the priorities established by contract and by other

parts of the Bankruptcy Code."  Id.

         37.    To that end, the court articulated a dual-pronged requirement that business

debtors must satisfy as a condition to honoring prepetition obligations.  First, debtors must

establish that the creditors whose claims are to be paid will cease dealing with the debtor if not immediately paid for prepetition obligations. Second, debtors must establish that "the business will gain enough from continued transactions with the favored [creditors] to provide some residual benefit to the remaining . . . creditors, or at least leave them no worse off." Id. at 868.

38.    The relief requested in this Motion easily satisfies these standards. As an initial matter, the Debtors believe, as detailed above, that if they are precluded from honoring their Customer Programs, the Debtors' relationships with existing customers will be seriously jeopardized, and they will effectively lose the ability to attract new customers in the future. Stated another way, customers will, in the Debtors' opinion, "cease doing business with" the Debtors in such a scenario.   In re Kmart, 359 F.3d at 874. Customers clearly are "necessary" and "indispensible" to the profitable operation of the Debtors' businesses. In re Just for Feet, Inc., 242 B.R. at 823-24. Indeed, without them, there would be no business to reorganize.

39.    Second, the collective amount of prepetition obligations that the Debtors seek to honor in this Motion is a reasonable price to pay to maintain the Debtors' enterprise value. Indeed, the damage to the Debtors' prospects for rehabilitation and, hence, the cost to creditors as a whole would be immediate and irreparable if the Debtors were put in the position of having to advise customers that basic business obligations like Warranties and Customer Adjustments could no longer be honored. The Debtors therefore believe that these estates as a whole will be better off, and clearly will be no worse off, if the Debtors are permitted to honor these claims in the ordinary course. In re Kmart, 359 F.3d at 874.

B.     This Court May Authorize The Debtors To Honor Prepetition Obligations
       To Customers And Continuation Of Customer Programs As A Valid
       Exercise Of The Debtors' Fiduciary Duties

       40.     The Debtors, operating their businesses as debtors-in-possession pursuant
to sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy
estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value
justifies) equity owners."  In re CoServ, L.L.C., 273 B.R. at 497.  Implicit in the duties of a
chapter 11 debtor-in-possession is the duty "to protect and preserve the estate, including an
operating business's going-concern value."  Id.

       41.     Courts have noted that there are instances in which a debtor-in-possession
can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim."  Id.  The
CoServ court specifically noted that preplan satisfaction of prepetition claims would be a valid
exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial
enhancement of the estate" and also when the payment was to "sole suppliers of a given
product."  Id. at 497-98.  The court provided a three-pronged test for determining whether a
preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary
duty:

          First, it must be critical that the debtor deal with the claimant.  Second, unless it
          deals with the claimant, the debtor risks the probability of harm, or, alternatively,
          loss of economic advantage to the estate or the debtor's going concern value,
          which is disproportionate to the amount of the claimant's prepetition claim.
          Third, there is no practical or legal alternative by which the debtor can deal with
          the claimant other than by payment of the claim.

Id. at 498.

       42.     Payment of the prepetition obligations related to the Customer Programs
and continuation of the Customer Programs undeniably meet each element of the CoServ court's

19

standard.  As described above, the Debtors' customers are obviously "necessary" and

"indispensible" to the profitable operation of the Debtors' businesses.  In re Just for Feet, Inc.,

242 B.R. at 821.  Maintaining the Debtors' revenue streams will be absolutely crucial to the

Debtors' ability to propose and confirm a plan of reorganization that will provide a basis for the

long-term success and profitability of the Debtors, to the benefit of all their constituencies.

Maintenance of the Customer Programs will play an integral role in ensuring that the Debtors'

businesses continue to operate and return to profitability.  Second, the Debtors' loss of existing

and potential customers would, in their business judgment, eliminate "an economic advantage

disproportionate to the amount of the claims" sought to be honored.  In re Mirant Corp., 296 B.R.

at 427; In re CoServ, 273 B.R. at 498-99.  As described above, the damage to the Debtors'

prospects for rehabilitation if the Debtors were put in the position of having to advise customers

that basic business obligations like Consumer Warranties and Customer Adjustments could no

longer be honored is clearly disproportionate to the relatively small cost of maintaining the

Customer Programs.  Finally, there truly is simply no substitute for the Debtors' decision to

honor the Customer Programs.  As noted previously, the Debtors' consumer goods face

significant competition in the marketplace, as prospective purchasers of Delphi-branded

consumer goods have many alternatives from which to choose.  A belief that the Debtors will not

honor obligations such as product warranties could easily dissuade consumers from purchasing

the Debtors' products.  Similarly, any doubts regarding the Debtors' ability to honor their

customer commitments to the OEMs could result in OEM customers sourcing their supply needs

elsewhere.  This would have a severe impact on the Debtors' revenues and ability to preserve

enterprise value.  Therefore, the Debtors can only meet their fiduciary duties as debtors-in-

possession under sections 1107(a) and 1108 of the Bankruptcy Code by payment of the

prepetition obligations related to the Customer Programs and continuation of the Customer

Programs.

C.    The Court May Rely On The "Necessity Of Payment"
      Doctrine And Its General Equitable Powers To Grant The Motion

43.    The traditional source of authority for preplan payments of prepetition

debts is the "doctrine of necessity" or "necessity of payment" rule first recognized by the

Supreme Court more than 120 years ago in Miltenberger v. Logansport, C. & S. Ry. Co., 106

U.S. 286 (1882).  In Miltenberger, the Supreme Court acknowledged the basic duty of an equity

receiver "to protect and preserve the trust funds in its hands."  Id. at 310 (quoting Wallace v.

Loomis, 97 U.S. 146, 162-63 (1878)).  More importantly, the Court held that, consistent with this

duty, "[m]any circumstances may exist which may make it necessary and indispensable to the

business . . . and the preservation of the property, for the receiver to pay pre-existing

debts . . . out of the earnings of the [debtor] . . . under the order of the court . . . ." Id. at 311-12.

44.    This doctrine "recognizes the existence of the judicial power to authorize a

debtor in a reorganization case to pay prepetition claims where such payment is essential to the

continued operation of the debtor."  In re Ionosphere Clubs, Inc., 98 B.R. 174, 176 (Bankr.

S.D.N.Y. 1989); see also In re UNR Industries, Inc., 143 B.R. 506, 519-20 (Bankr. N.D. Ill

1992), rev'd on other grounds, 173 B.R. 149, 158-59 (N.D. Ill. 1994); see also In re Lehigh &

N.E. Ry. Co., 657 F.2d 570, 581 (3d Cir. 1981) (payment of creditors' claims authorized under

"necessity of payment" doctrine); In re CAF Bindery, Inc., 199 B.R. 828, 835 (Bankr. S.D.N.Y.

1996) (payment of prepetition claims warranted when critical to debtor's reorganization).  This

doctrine is consistent with the paramount goal of chapter 11 – "facilitating the continued

operation and rehabilitation of the debtor."  In re Ionosphere Clubs, 98 B.R. at 176; see also

Dudley v. Mealey, 147 F.2d 268, 271 (2d Cir. 1945) ("Let it [(a hotel)] once be shut down, and it

21

will lose much of its value. . . . Some priority [to the hotel's prepetition suppliers] may be essential to preservation of the business.").

45.     The court's general equitable powers are codified in section 105(a) of the Bankruptcy Code.  Section 105(a) empowers the court to "issue any order, process, or judgment that is necessary to carry out the provisions of this title."  11 U.S.C. § 105(a).  A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."  In re Ionosphere Clubs, Inc., 98 B.R. at 175 (citing NLRB v. Bildisco & Bildisco, 465 U.S. 513, 528 (1984)).  Under section 105(a), a court "can permit pre-plan payment of a prepetition obligation when essential to the continued operation of the debtor."  In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992).  The Customer Programs allow the Debtors to meet competitive pressures, ensure customer satisfaction, and generate goodwill with customers and consumers, thereby retaining current customers, attracting new ones, and ultimately enhancing revenue and profitability.  Maintaining these benefits throughout these chapter 11 cases is essential to the continued viability of the Debtors' businesses and, ultimately, to their prospects for a successful reorganization.  This Court should exercise its equitable powers to grant the relief requested in this Motion.

46.     Finally, relief similar to that requested here has been granted in other large chapter 11 cases in this and other jurisdictions.  See, e.g., In re Delta Air Lines, Inc., Case No. 05-17923 (PCB) (Bankr. S.D.N.Y. Sept. 16, 2005); In re Northwest Airlines Corp., Case No. 05-17930 (ALG) (Bankr. S.D.N.Y. Sept. 15, 2005); In re Tower Auto., Inc., Case No.05-10578 (ALG) (Bankr. S.D.N.Y. Feb. 3, 2005); In re Spiegel, Inc., Case No. 03-11540 (CB) (Bankr. S.D.N.Y. Mar. 18, 2003); In re Teligent, Inc., Case No. 01-12974 (SMB) (Bankr. S.D.N.Y. May

22

25, 2001 and June 13, 2001); In re Loews Cineplex Entm't Corp., Case No. 01-40346 (ALG)

(Bankr. S.D.N.Y. Feb. 15, 2001); see also In re Collins & Aikman Corp., Case No. 05-55927

(SWR) (Bankr. E.D. Mich. May 17, 2005); In re Meridian Auto. Sys. – Composites Operations,

Inc., Case No. 05-11168 (MFW) (Bankr. D. Del. Apr. 27, 2005); In re Hayes Lemmerz Int'l, Inc.,

Case No. 01-11490 (MFW) (Bankr. D. Del. Dec. 21, 2001 and Jan. 15, 2002).

47.    Accordingly, the Debtors respectfully request that they be authorized but

not directed, in the exercise of their reasoned business judgment, to (a) perform such of their

obligations under the Customer Programs as they deem appropriate and (b) continue, renew,

replace, implement, and/or terminate such of their Customer Programs as they judge beneficial,

in the ordinary course of their businesses and without further application to this Court.

48.    Nothing contained herein is intended to be, nor should it be construed as,

an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' rights to

dispute any claim, or an approval, adoption, or assumption of any agreement, contract, purchase

order, or lease under section 365 of the Bankruptcy Code.   Likewise, if this Court grants the

relief sought herein, any payment made under this Court's order is not intended to be, and should

not be construed as, an admission as to the validity of any claim or a waiver of the Debtors'

rights to subsequently dispute such claim.

<u>Notice</u>

49.    Notice of this Motion has been provided by facsimile, electronic

transmission, overnight delivery, or hand delivery to (a) the Office of the United States Trustee,

(b) the Debtors' 50 largest unsecured creditors, (c) counsel for the agent under the Debtors'

prepetition credit facility, and (d) counsel for the agent under the Debtors' proposed postpetition

credit facility.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

Memorandum Of Law

50.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order

(a) authorizing but not directing the Debtors, in their business judgment, to (i) perform certain of

their prepetition obligations related to the Customer Programs as they determine advisable and

(ii) continue, renew, replace, implement new, and/or terminate those Customer Programs as they

see fit, in the ordinary course of business and without further application to this Court, and

(b) granting the Debtors such other and further relief as is just.

Dated:  New York, New York
           October 8, 2005


                    SKADDEN, ARPS, SLATE, MEAGHER
                       & FLOM LLP

                    By: s/ John Wm. Butler, Jr._____
                        John Wm. Butler, Jr. (pro hac vice motion pending)
                        John K. Lyons
                        Ron E. Meisler
                    333 West Wacker Drive, Suite 2100
                    Chicago, Illinois  60606
                    (312) 407-0700

                              - and -

                    By: s/ Kayalyn A. Marafioti_____
                        Kayalyn A. Marafioti (KM 9632)
                        Thomas J. Matz (TM 5986)
                    Four Times Square
                    New York, New York 10036
                    (212) 735-3000

                    Attorneys for Delphi Corporation, et al.,
                        Debtors and Debtors-in-Possession