SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                              :
   In re                         :        Chapter 11
                              :
DELPHI CORPORATION, et al.,   :        Case No. 05-_____ (___)
                              :
                 Debtors.  :        (Jointly Administered)
                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. §§ 105(a), 363(b), 507(a)(8), 541, 1107, AND 1108
AUTHORIZING DEBTORS TO PAY PREPETITION SALES, USE,
TRUST FUND, AND OTHER TAXES AND RELATED OBLIGATIONS

("TAXES MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"),[1] debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order under 11 U.S.C. §§ 105(a), 363(b), 507(a)(8), 541, 1107, and 1108 authorizing the Debtors to pay prepetition sales, use, and other similar "trust fund" taxes and similar obligations detailed herein to the respective authorities in the ordinary course of the Debtors' businesses. In support of this Motion, the Debtors submit the Affidavit Of Robert S. Miller, Jr. In Support Of Chapter 11 Petitions And First Day Orders, sworn to October 8, 2005. In further support of this Motion, the Debtors respectfully represent as follows:

Background

A.   The Chapter 11 Filings

1.   On October 8, 2005 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession

---

[1] In addition to Delphi, the following entities are debtors in these related cases: ASEC Manufacturing General Partnership, ASEC Sales General Partnership, Aspire, Inc., Delco Electronics Overseas Corporation, Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems Global (Holding), Inc., Delphi Automotive Systems Human Resources LLC, Delphi Automotive Systems International, Inc., Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems LLC, Delphi Automotive Systems Overseas Corporation, Delphi Automotive Systems Risk Management Corp., Delphi Automotive Systems Services LLC, Delphi Automotive Systems Tennessee, Inc., Delphi Automotive Systems Thailand, Inc., Delphi China LLC, Delphi Connection Systems, Delphi Diesel Systems Corp., Delphi Electronics (Holding) LLC, Delphi Foreign Sales Corporation, Delphi Integrated Service Solutions, Inc., Delphi International Holdings Corp., Delphi International Services, Inc., Delphi Liquidation Holding Company, Delphi LLC, Delphi Mechatronic Systems, Inc., Delphi Medical Systems Colorado Corporation, Delphi Medical Systems Corporation, Delphi Medical Systems Texas Corporation, Delphi NY Holding Corporation, Delphi Services Holding Corporation, Delphi Technologies, Inc., DREAL, Inc., Environmental Catalysts, LLC, Exhaust Systems Corporation, Packard Hughes Interconnect Company, Specialty Electronics, Inc., and Specialty Electronics International Ltd.

2

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have moved this Court for an order authorizing joint administration of these chapter 11 cases.

   2. No trustee, examiner, or creditors' committee has been appointed in the Debtors' cases.

   3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

   4. The statutory predicates for the relief requested herein are sections 105(a), 363(b), 507(a)(8), 541, 1107, and 1108 of the Bankruptcy Code.

B.  Current Business Operations Of The Debtors

   5. With more than 180,000 employees worldwide, global 2004 revenues of approximately $28.6 billion and global assets as of August 31, 2005 of approximately $17.1 billion,[2] Delphi ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations without supervision from the Bankruptcy Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy Code.

   6. Over the past century, the operations which are now owned by Delphi have become a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines. Today, the Company is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and

---

[2] The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

modules, and other electronic technology. The Company's technologies and products are present in more than 75 million vehicles on the road worldwide. The Company supplies products to nearly every major global automotive original equipment manufacturer with 2004 sales to its former parent, General Motors Corporation, equaling approximately $15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

7. As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world. In the U.S., the Debtors employ approximately 50,600 people. Those employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in Delphi's worldwide headquarters and customer center located in Troy, Michigan. Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and local unions. Outside the United States, the Company's foreign entities employ more than 134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

8. Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM. Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of

4

customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

    9. Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle. When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base. The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base. The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C. <u>Events Leading To Chapter 11 Filing</u>

    10. In the first two years following Delphi's separation from GM, the Company generated more than $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales. Reflective of a downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005. The Company experienced net operating losses of $608 million for the first six months of

5

calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[3]

11. The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12. In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues and forward looking revenue requirements. Having concluded that pre-filing discussions with its Unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

13. Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses. This will require negotiation with key stakeholders over their respective

---

[3] Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

6

contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned in the Company's transformation plan. The Debtors believe that a substantial segment of Delphi's U.S. business operations must be divested, consolidated, or wound-down through the chapter 11 process.

14. Upon the conclusion of this process, the Debtors expect to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

## Relief Requested

15. By this Motion, the Debtors seek entry of an order under sections 105(a), 363(b), 507(a)(8), 541, 1107, and 1108 of the Bankruptcy Code authorizing them to pay prepetition sales, use, and other similar "trust fund" taxes, and other tax obligations detailed herein, to the respective authorities in the ordinary course of the Debtors' businesses.

## Basis For Relief

A.    <u>Types Of Taxes</u>

16. <u>Sales Taxes And Use Taxes</u>. The Debtors collect from customers and remit an assortment of state and local sales and gross receipts taxes (collectively, the "Sales Taxes") to various taxing, licensing, and other government authorities (collectively, the "Taxing Authorities"). On a periodic basis, typically monthly, the Debtors remit to the Taxing Authorities the Sales Taxes collected during the previous period. Some Taxing Authorities require the Debtors to prepay the Sales Taxes. The Debtors estimate that they owe

7

approximately $100,000 in Sales Taxes to certain of the Taxing Authorities for periods prior to and including the Petition Date.

17.     The Debtors may also be responsible for the payment of use taxes (the "Use Taxes" and, together with the Sales Taxes, the "Sales and Use Taxes") when they purchase tangible personal property from suppliers.  Use Taxes arise when the Debtors purchase equipment from a supplier for use in a state in which the supplier has no business operations.  Without such nexus, the supplier is not obligated to collect or remit sales taxes.  Nevertheless, the purchasers – in this case the Debtors – are obligated to self-assess and pay the Use Taxes to the states or local taxing jurisdictions in which the personal property is used.  The Debtors' obligations to self-assess and pay Use Taxes also arise in a number of states in which the Debtors have received authorization to self-assess and remit Use Taxes.  The Debtors generally remit the Use Taxes to Taxing Authorities on a monthly basis.  The Debtors estimate that they owe approximately $3,800,000 in Use Taxes to certain of the Taxing Authorities for periods prior to and including the Petition Date, less any payments made by the Debtors during the 30 days prior to the Petition Date.

18.     <u>Michigan Single Business Tax</u>.  Michigan law imposes personal liability on certain officers of a corporation if that corporation fails to pay the Michigan Single Business Tax (the "MSB Tax").[4]  The MSB Tax is a modified value-added tax and is the only general business tax levied by the State of Michigan.  The Debtors estimate that they owe approximately $1,200,000 in MSB Tax to the relevant Michigan taxing authority for periods prior to and including the Petition Date, less any payments made by the Debtors during the 30 days prior to the Petition Date.

---

[4]     See Mich. Comp. Laws, § 205.27a(5) (2005).

8

19.  <u>Wisconsin Partnership Withholding Tax</u>.  Wisconsin law imposes personal liability on members, officers, employees, or other responsible persons of an entity that fails to pay the Wisconsin Partnership Withholding Tax (the "WPW Tax").[5]  The WPW Tax is a withholding tax paid on behalf of the nonresident partners, members, shareholders and beneficiaries of a partnership, limited liability company, "S" corporation, estate, or trust for the privilege of doing business, or deriving income from property located, in the State of Wisconsin.  The Debtors believe that, as of the Petition Date, no WPW Tax is owed to the relevant Wisconsin taxing authority, but seek authority to pay any amounts that subsequently might be determined to be owed for periods prior to the Petition Date, not to exceed $250,000 in the aggregate.

20.  <u>Franchise Taxes</u>.  The Debtors pay franchise taxes and <u>de</u> <u>minimis</u> registration fees (collectively, the "Franchise Taxes") to certain of the Taxing Authorities so that the Debtors can operate their businesses in the applicable taxing jurisdiction.  Some states assess a flat Franchise Tax on all businesses and other states assess a Franchise Tax based upon some measure of income, gross receipts, net worth, or other measure of value.  Certain states impose personal liability on the directors, officers, and employees of a corporation if that corporation fails to pay Franchise Taxes.  Additionally, the Debtors failure to pay the Franchise Taxes could cause some states to challenge the Debtors' right to operate within their jurisdiction.  Addressing any subsequent action taken by those states would be costly, place an administrative burden on management, and divert management's attention from the reorganization process.  The Debtors estimate that they owe an aggregate amount of approximately $750,000 in Franchise Taxes to

---

[5]    See <u>Wis. Stat.</u>, § 71.775 (2005).

9

certain of the Taxing Authorities for periods prior to and including the Petition Date, less any payments made by the Debtors during the 30 days prior to the Petition Date.

21. <u>Business License Fees And Annual Report Taxes</u>. Many municipal and county governments require the Debtors to obtain a business license and to pay corresponding business license fees (collectively, the "Business License Fees"). The criteria which require a company to obtain a business license and the manner in which the Business License Fees are computed vary greatly according to local tax laws. Some jurisdictions assess Business License Fees based on a flat fee, others upon the number of employees working in the jurisdiction, and others upon gross receipts. Certain state governments also require the Debtors to pay annual report or bi-annual report taxes (collectively, the "Annual Report Taxes") in order to be in good standing for purposes of conducting business within that state. The Debtors believe that there are no prepetition Business License Fees or Annual Report Taxes owed, but seek authority to pay any amounts that subsequently might be determined to be owed for periods prior to the Petition Date, not to exceed $50,000 in the aggregate.

22. <u>Ohio Kilowatt-Hour Tax</u>. As large, industrial users of electricity, the Debtors are currently qualified and registered in certain of their locations as "self-assessing purchasers" for purposes of the Ohio Kilowatt-Hour Tax (the "KWH Tax"). In the event that the Debtors do not timely file and remit the self-assessed KWH Tax, the Ohio Commissioner of Revenue may cancel the Debtors' ability to self-assess for a period of two years, in which case the Debtors will be compelled to pay the KWH Tax at a non-self-assessment rate that is approximately 39% higher than the Debtors' current rate, or an anticipated additional amount of approximately $725,000 over the two-year period. Non-payment of the KWH Tax also risks the imposition of a 15% penalty and possibly the disruption of the delivery of electricity to the

Debtors' Ohio facilities. The Debtors believe that, as of the Petition Date, no KWH Tax is owed to the Ohio Commissioner of Revenue, but seek authority to pay any amounts that subsequently might be determined to be owed for periods prior to the Petition Date, not to exceed $100,000 in the aggregate.

B.     Method Of Payment

23.    As stated above, in connection with the normal operation of their businesses, the Debtors incur and collect Sales and Use Taxes, the MSB Tax, the WPW Tax, Franchise Taxes, Business License Fees, Annual Report Taxes, the KWH Tax and other similar taxes (collectively, the "Prepetition Taxes"). The Prepetition Taxes are paid to the Taxing Authorities on a periodic basis (monthly, quarterly, or yearly, depending on the particular Prepetition Tax) with funds drawn by checks or by means of electronic fund transfers. Accordingly, to the extent any check or electronic transfer has not cleared the banks as of the Petition Date, the Debtors request that this Court authorize and direct the banks, when requested by the Debtors in their sole discretion, to receive, process, honor, and pay such checks or electronic transfers. To the extent that the Taxing Authorities have otherwise not received payment for all Prepetition Taxes owed, the Debtors seek authorization to issue checks, or to provide for another means of payment, to the Taxing Authorities, to the extent necessary to pay all outstanding Prepetition Taxes.

24.    The Debtors believe that some, if not all, of the Taxing Authorities will cause the Debtors to be audited if the Prepetition Taxes are not paid immediately, and may even attempt to suspend the Debtors' business operations. Such audits and disruptions in business activities will materially affect the Debtors' reorganization prospects and unnecessarily divert the Debtors' attention away from the prosecution of these chapter 11 cases. Moreover, to the extent that certain of the Prepetition Taxes are "trust fund" taxes collected for third parties, the Debtors believe that such taxes are not property of the estates under section 541(d) of the Bankruptcy

11

Code (as discussed below), and that the Debtors therefore have no equitable interest in these taxes.

25.     Accordingly, by this Motion, the Debtors seek authority to pay, in their sole discretion, the Prepetition Taxes to the relevant Taxing Authorities in the ordinary course of business.  Nothing herein, however, shall preclude the Debtors from contesting, in their sole discretion, the validity and amount of Prepetition Taxes without prejudice on nonbankruptcy grounds.

## Applicable Authority

26.     The Debtors, operating their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  Implicit in the duties of a chapter 11 debtor-in-possession is the duty "to protect and preserve the estate, including an operating business's going-concern value." Id.

27.     Courts have noted that there are instances in which a debtor-in-possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." Id.  The CoServ court specifically noted that preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." Id. at 497.

28.     Without question, the payment of the Prepetition Taxes is necessary to avoid interruption of the Debtors' business activities and to prevent harm to the estates.  A withholding of the payment of the Prepetition Taxes likely would cause taxing and other authorities to take precipitous action, including a marked increase in state audits and a flurry of lien filings or

lift-stay motions, and result in significant administrative problems.  Prompt and regular payment

of the Prepetition Taxes will avoid these unnecessary governmental actions.

29.   Most importantly, payment of the Prepetition Taxes is necessary because, in

cases where the Prepetition Taxes constitute "trust fund" taxes, many states have laws providing

that certain officers and directors of the collecting entity may be held personally liable for the

payment of such funds to the taxing or other authorities in certain circumstances.  To the extent

that such Prepetition Taxes of the Debtors were unpaid as of the Petition Date in such

jurisdictions, certain of the Debtors' officers and directors may be subject to lawsuits in such

jurisdictions during the pendency of these proceedings.

30.   Such potential lawsuits would prove extremely distracting for the Debtors,

for the named officers and directors whose immediate and full-time attention to the Debtors'

reorganization process is required, and for this Court, which might be asked to entertain various

motions seeking injunctions relating to potential state court actions.  It is in the best interests of

the Debtors' estates and consistent with the reorganization policy of the Bankruptcy Code to

eliminate the possibility of such time consuming and potentially damaging distractions.

31.   In addition, the use of estate assets to pay the Prepetition Taxes should be

authorized under section 363(b) of the Bankruptcy Code so long as a sound business purpose

exists for doing so.  See, e.g., Committee of Equity Sec. Holders v. Lionel Corp., 722 F. 2d 1063,

1070 (2d Cir. 1983); see also Fulton State Bank v. Schipper, 933 F.2d 513, 515 (7th Cir. 1991);

In re Global Crossing Ltd., 295 B.R. 726, 748 (Bankr. S.D.N.Y. 2003); In re Ionosphere Clubs,

Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989); In re Gulf States Steel, Inc., 285 B.R. 497, 514

(Bankr. N.D. Ala. 2002).  The Debtors have determined, in the exercise of their business

judgment, that paying the Prepetition Taxes is in the best interests of the estates, their creditors,

13

and all parties-in-interest. As discussed above, making such payments will allow the Debtors' directors, officers, and employees to avoid incurring personal liability for nonpayment of certain of the Prepetition Taxes. Moreover, it will forestall the possibility of an interruption of the Debtors' business activities on account of governmental actions that potentially could be taken in response to nonpayment. Multiple sound business purposes, therefore, exist for the payment of the Prepetition Taxes, and such payment should be approved.

32. Another traditional source of authority for preplan payments of prepetition debts is the "doctrine of necessity" or "necessity of payment" rule first recognized by the Supreme Court more than 120 years ago in Miltenberger v. Logansport, C. & S. Ry. Co., 106 U.S. 286 (1882). In Miltenberger, the Supreme Court acknowledged the basic duty of an equity receiver "to protect and preserve the trust funds in his hands." Id. at 310 (quoting Wallace v. Loomis, 97 U.S. 146, 162-63 (1877)). More importantly, the Court held that, consistent with this duty, "[m]any circumstances may exist which may make it necessary and indispensable to the business … and the preservation of the property, for the receiver to pay pre-existing debts . . . out of the earnings of the [debtor] … under the order of the court …." Id. at 311-12.

33. This doctrine "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor." In re UNR Indus., Inc., 143 B.R. 506, 519-20 (Bankr. N.D. Ill. 1992), rev'd on other grounds, 173 B.R. 149, 158-59 (N.D. Ill. 1994); see also In re Lehigh & N.E. Ry. Co., 657 F.2d 570, 581 (3d Cir. 1981) (payment of creditors' claims authorized under "necessity of payment" doctrine); In re CAF Bindery, Inc., 199 B.R. 828 (Bankr. S.D.N.Y. 1996) (payment of prepetition claims warranted when critical to debtor's reorganization). This doctrine is consistent with the paramount goal of chapter 11 – "facilitating the continued operation and

rehabilitation of the debtor." Ionosphere Clubs, 98 B.R. at 176; see also Dudley v. Mealey, 147 F.2d 268, 271 (2d Cir. 1945), cert. denied, 325 U.S. 813 (1945) ("Let it [(a hotel)] once be shut down, and it will lose much of its value. . . . Some priority [to the hotel's prepetition suppliers] may be essential to preservation of the business").

34. The court's general equitable powers are codified in section 105(a) of the Bankruptcy Code. Section 105(a) empowers the court to "issue any order, process, or judgment that is necessary to carry out the provisions of this title." 11 U.S.C. § 105(a). A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." Ionosphere Clubs, 98 B.R. at 175 (citing NLRB v. Bildisco & Bildisco, 465 U.S. 513, 528 (1984)). Under section 105(a), a court "can permit pre-plan payment of a prepetition obligation when essential to the continued operation of the debtor." In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992). For example, in In re Structurlite Plastics Corp., 86 B.R. 922, 932 (Bankr. S.D. Ohio 1988), the court embraced "the principle that a bankruptcy court may exercise its equity powers under [section] 105(a) to authorize payment of prepetition claims where such payment is necessary to 'permit the greatest likelihood of survival of the debtor. . . .'" Id. at 931 (citing In re Chateaugay Corp., 80 B.R. 279, 287 (S.D.N.Y. 1987)). The court explained that "a per se rule proscribing the payment of prepetition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code." Structurlite, 86 B.R. at 932.

35. Because of the costs that would be involved, and because the Debtors believe there exist multiple legal bases for granting the relief requested herein, the Debtors have not conducted an exhaustive survey of all states in which the Prepetition Taxes are due to determine to what extent such amounts are deemed "trust fund" taxes in each and every such

15

jurisdiction. Nevertheless, the Debtors submit that many of these amounts likely constitute so-called "trust fund" taxes, which are required to be collected from third parties and held in trust for payment to the taxing or other appropriate authorities. See, e.g., Rosenow v. Illinois Dept. of Revenue (In re Rosenow), 715 F.2d 277, 282 (7th Cir. 1983) (sales tax required by state law to be collected by sellers from their customers is "trust fund" tax); DeChiaro v. New York State Tax Comm'n, 760 F.2d 432, 433-34 (2d Cir. 1985) (same); Shank v. Washington State Dep't of Revenue (In re Shank), 792 F.2d 829, 830 (9th Cir. 1986) (same); see also In re Columbia Gas Sys. Inc., 997 F.2d 1039 (3d Cir. 1993) (refunds required to be collected by federal law created trust fund that was not property of the debtor's estate).

36. To the extent these "trust fund" taxes and other amounts are collected for third parties, they are not property of the estates under section 541(d) of the Bankruptcy Code.[6] Begier v. I.R.S., 496 U.S. 53 (1990) (taxes such as excise taxes, FICA taxes, and withholding taxes are property held by debtor in trust for another and, as such, do not constitute property of the estate); In re Al Copeland Enters., Inc., 133 B.R. 837 (Bankr. W.D. Tex. 1991), aff'd, 991 F.2d 233 (5th Cir. 1993) (debtor obligated to pay state sales taxes plus interest because such taxes were "trust fund" taxes). The Debtors, therefore, arguably have no equitable interest at all in certain of the Prepetition Taxes and, accordingly, are obligated to make payment on such amounts.

37. Finally, most, if not all, of the Prepetition Taxes are entitled to priority status under section 507(a)(8) of the Bankruptcy Code. The Debtors' payment of the Prepetition Taxes now, in all likelihood, affects only the timing of the payments and not the amounts to be

---

[6] Even if the Prepetition Taxes do not constitute "trust fund" taxes or other amounts in a particular jurisdiction, payment of such Prepetition Taxes nonetheless should be authorized pursuant to section 105(a) of the Bankruptcy Code.

16

received by such entities. Other creditors and parties-in-interest therefore will not be prejudiced if the relief sought herein is granted by this Court.

38. The timely payment of the Prepetition Taxes therefore is necessary and in the best interest of the Debtors' estates. The relief requested herein has been granted in comparable chapter 11 cases in this district and elsewhere. See In re Tower Auto., Inc., Case No. 05-10578 (Bankr. S.D.N.Y. Feb. 3, 2005); In re Delta Air Lines, Inc., Case No. 05-17923 (Bankr. S.D.N.Y. Sept. 16, 2005); In re Choice One Communications, Inc., Case No. 04-16433 (Bankr. S.D.N.Y. Oct. 7, 2004); In re Spiegel, Inc., Case No. 03-11540 (Bankr. S.D.N.Y. Mar. 18, 2003); In re WorldCom, Inc., Case No. 02-13533 (Bankr. S.D.N.Y. Aug. 16, 2002); In re The Warnaco Group, Inc., Case No. 01-41643 (Bankr. S.D.N.Y. June 20, 2001); In re Global Crossing, Case No. 02-40188 (Bankr. S.D.N.Y. Jan. 28, 2002); In re Enron Corp., Case No. 01-16034 (Bankr. S.D.N.Y. Dec. 3, 2001). The Debtors submit that the present circumstances warrant similar relief in these chapter 11 cases.

39. Accordingly, the relief requested herein is in the best interests of the Debtors, their estates, and creditors and should be approved.

Notice

40. Notice of this Motion has been provided by facsimile, electronic transmission, overnight delivery, or hand delivery to (a) the Office of the United States Trustee, (b) the Debtors' 50 largest unsecured creditors, (c) counsel for the agent under the Debtors' prepetition credit facility, and (d) counsel for the agent under the Debtors' proposed postpetition credit facility. In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

## Memorandum Of Law

41.   Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order (a) authorizing the Debtors to pay the Prepetition Taxes and similar obligations detailed herein to the respective authorities in the ordinary course of the Debtors' businesses and (b) granting the Debtors such other and further relief as is just.

Dated: New York, New York
October 8, 2005

                SKADDEN, ARPS, SLATE, MEAGHER
                  & FLOM LLP

             By: /s/ John Wm. Butler, Jr.
                John Wm. Butler, Jr. (pro hac vice motion pending)
                John K. Lyons
                Ron E. Meisler
             333 West Wacker Drive, Suite 2100
             Chicago, Illinois 60606
             (312) 407-0700

             - and -

             By: /s/ Kayalyn A. Marafioti
                Kayalyn A. Marafioti (KM 9632)
                Thomas J. Matz (TM 5986)
             Four Times Square
             New York, New York 10036
             (212) 735-3000

             Attorneys for Delphi Corporation, et al.,
                Debtors and Debtors-in-Possession