SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                        :
        In re                                           :    Chapter 11
                                                        :
DELPHI CORPORATION, et al.,                             :    Case No. 05-_____ (___)
                                                        :
                                Debtors.                :    (Jointly Administered)
                                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. §§ 105, 362, AND
541 AND FED. R. BANKR. P. 3001 ESTABLISHING
NOTIFICATION AND HEARING PROCEDURES FOR
TRADING IN CLAIMS AND EQUITY SECURITIES

("CLAIMS TRADING MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"),[1] the debtors and debtors-in-possession in the above captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order under 11 U.S.C. §§ 105, 362, and 541 and Fed.R. Bank. P. 3001 (the "Order") (a) establishing notice and hearing procedures that must be satisfied before certain transfers of claims against, and equity securities in, the Debtors, or any beneficial interest therein, are deemed effective and (b) allowing for a hearing with respect to the prospective application of such procedures if the official committee of unsecured creditors (the "Creditors' Committee") makes a timely objection. In support of this Motion, the Debtors submit the Affidavit Of Robert S. Miller, Jr. In Support Of Chapter 11 Petitions And First Day Orders, sworn to October 8, 2005.  In further support of this Motion, the Debtors respectfully represent as follows:

Background

A.    The Chapter 11 Filings.

1.    On October 8, 2005 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended the ("Bankruptcy Code").  The Debtors continue to

---

[1]    In addition to Delphi, the following entities are debtors in these related cases: ASEC Manufacturing General Partnership, ASEC Sales General Partnership, Aspire, Inc., Delco  Electronics Overseas Corporation, Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems Global (Holding), Inc., Delphi Automotive Systems Human Resources LLC, Delphi Automotive Systems International, Inc., Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems LLC, Delphi Automotive Systems Overseas Corporation, Delphi Automotive Systems Risk Management Corp., Delphi Automotive Systems Services LLC, Delphi Automotive Systems Tennessee, Inc., Delphi Automotive Systems Thailand, Inc., Delphi China LLC, Delphi Connection Systems, Delphi Diesel Systems Corp., Delphi Electronics (Holding) LLC, Delphi Foreign Sales Corporation, Delphi Integrated Service Solutions, Inc., Delphi International Holdings Corp., Delphi International Services, Inc., Delphi Liquidation Holding Company, Delphi LLC, Delphi Mechatronic Systems, Inc., Delphi Medical Systems Colorado Corporation, Delphi Medical Systems Corporation, Delphi Medical Systems Texas Corporation, Delphi NY Holdings Corporation, Delphi Services Holding Corporation, Delphi Technologies, Inc., DREAL, Inc., Environmental Catalysts, LLC, Exhaust Systems Corporation, Packard Hughes Interconnect Company, Specialty Electronics, Inc., and Specialty Electronics International Ltd.

2

operate their businesses and manage their properties as debtors-in-possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have moved this Court for an

order for joint administration of these Chapter 11 cases.

2.       No trustee, examiner,  or creditors' committee has been appointed in the Debtors'

cases.

3.       This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  Venue is proper under 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding

under 28 U.S.C. § 157(b)(2).

4.       The statutory predicates for the relief requested herein are sections 105(a), 362,

and 541 of the Bankruptcy Code and Rule 3001 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules").

B.       Current Business Operations Of The Debtors

5.       With more than 180,000 employees worldwide, global 2004 revenues of

approximately $28.6 billion and global assets as of August 31, 2005 of approximately $17.1

billion,[2] Delphi ranks as the fifth largest public company business reorganization in terms of

revenues, and the thirteenth largest public company business reorganization in terms of assets.

Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations

without supervision from the Bankruptcy Court, and will not be subject to the chapter 11

requirements of the U.S. Bankruptcy Code.

6.       Over the past century, the operations which are now owned by Delphi have

become a leading global technology innovator with significant engineering resources and

technical competencies in a variety of disciplines.  Today, the Company is arguably the single

---

[2]       The aggregated financial data used in this Motion generally consists of consolidated information from
Delphi and its worldwide subsidiaries and affiliates.

largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company's technologies and products are present in more than 75 million vehicles on the road worldwide. The Company supplies products to nearly every major global automotive original equipment manufacturer with 2004 sales to its former parent, General Motors Corporation, equaling approximately $15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

7.    As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world. In the U.S., the Debtors employ approximately 50,600 people. Those employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in Delphi's worldwide headquarters and customer center located in Troy, Michigan. Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and local unions. Outside the United States, the Company's foreign entities employ more than 134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

8.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM. Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive

supplier to a global supplier of components, integrated systems, and modules for a wide range of

customers and applications.  Although GM is still the Company's single largest customer, today

more than half of Delphi's revenue is generated from non-GM sources.

9.        Due to the significant planning that goes into each vehicle model, Delphi's efforts

to generate new business do not immediately affect its financial results, because supplier

selection in the auto industry is generally finalized several years prior to the start of production

of the vehicle.  When awarding new business, which is the foundation for the Company's

forward revenue base, customers are increasingly concerned with the financial stability of their

supply base.  The Debtors believe that they will maximize stakeholder value and the Company's

future prospects if they stabilize their businesses and continue to diversify their customer base.

The Debtors also believe that this must be accomplished in advance of  the expiration of certain

benefit guarantees between GM and certain of Delphi's unions representing most of its U.S.

hourly employees which coincides with the expiration of the Company's U.S. collective

bargaining agreements in the fall of 2007.

C.      Events Leading To The Chapter 11 Filing

10.        In the first two years following Delphi's separation from GM, the Company

generated more than $2 billion in net income.  Every year thereafter, however, with the exception

of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net

operating loss of $482 million on $28.6 billion in net sales.  Reflective of a downturn in the

marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005.

The Company experienced net operating losses of $608 million for the first six months of

calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion

less in sales than during the same time period in calendar year 2004.[3]

11.        The Debtors believe that three significant issues have largely contributed to

the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S.

legacy liabilities and operational restrictions driven by collectively bargained agreements,

including restrictions preventing the Debtors from exiting non-strategic, non-profitable

operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive

U.S. vehicle production environment for domestic OEMs resulting in the reduced number of

motor vehicles that GM produces annually in the United States and related pricing pressures, and

(c) increasing commodity prices.

12.        In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

portfolio, operational issues and forward looking revenue requirements.  Having concluded that

pre-filing discussions with its Unions and GM were not leading to the implementation of a plan

sufficient to address the Debtors' issues on a timely basis, the Company determined to commence

these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and

preserve value.

13.        Through the reorganization process, the Debtors intend to achieve

competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive

legacy liabilities and burdensome restrictions under current labor agreements and realigning

Delphi's global product portfolio and manufacturing footprint to preserve the Company's core

businesses.  This will require negotiation with key stakeholders over their respective

---

[3]        Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily
related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

contributions to the restructuring plan or, absent consensual participation, the utilization of the

chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned

in the Company's transformation plan.  The Debtors believe that a substantial segment of

Delphi's U.S. business operations must be divested, consolidated, or wound-down through the

chapter 11 process.

14.        Upon the conclusion of this process, the Debtors expect to emerge from

chapter 11 as a stronger, more financially sound business with viable U.S. operations that are

well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all

of its resources to continue to deliver value and high-quality products to its customers globally.

Additionally, the Company will preserve and continue the strategic growth of its non-U.S.

operations and maintain its prominence as the world's premier auto supplier.

Relief Requested

15.        By this Motion, the Debtors seek authorization to protect and preserve valuable

tax attributes, including net operating loss carryforwards ("NOLs") of at least $1.5 billion,

amortizable research and experimental expenditures ("R&E Amounts") of at least $1 billion, and

other tax credits of at least $250 million ("Tax Credits," and together with the NOLs and R&E

Amounts, "Tax Attributes") by establishing, pursuant to sections 105(a), 362, and 541 of the

Bankruptcy Code, notice and hearing procedures regarding the trading of claims against, and

equity securities in, the Debtors, that must be complied with as a precondition to the

effectiveness of such trades or transfers.  If left unrestricted, such trading could severely limit the

Debtors' ability to use a valuable asset of their estates – namely their Tax Attributes – and could

have significant negative consequences for the Debtors, their estates, and the reorganization

process.  Specifically, trading of claims and equity securities could adversely affect the Debtors'

Tax Attributes if:

(a)    too many 5% or greater blocks of equity securities are created, or too many shares are added to or sold from such blocks, such that, together with previous trading by 5% shareholders during the preceding three year period, an ownership change within the meaning of section 382 of the Internal Revenue Code of 1986, as amended ("IRC"), is triggered prior to consummation, and outside the context, of a confirmed Chapter 11 plan, or

(b)    the beneficial ownership of claims against the Debtors that are currently held by "Qualified Creditors"[4] under the applicable tax regulations is transferred, prior to consummation of a plan, and those claims (either alone or when accumulated with other claims currently held by nonqualified creditors) would be converted under a plan of reorganization into a 5% or greater block of the stock of the reorganized Debtors.[5]

To preserve to the fullest extent possible the flexibility to craft a plan of reorganization that maximizes the use of their Tax Attributes, the Debtors seek limited relief that will enable them to closely monitor certain transfers of claims and equity securities, so as to be in a position to act expeditiously to prevent such transfers if necessary to preserve their Tax Attributes. Thus, the Debtors request that this Court enter an order immediately, thereby preserving the status quo in this regard, and allow for a hearing with respect to the prospective application of such procedures if the Creditors' Committee makes a timely objection.

16.    By establishing procedures for continuously monitoring claims-trading and equity-securities-trading, the Debtors can preserve their ability to seek substantive relief at the appropriate time if it appears that additional trading may jeopardize the use of their Tax Attributes. Accordingly, the Debtors request that this Court enter an order establishing the following procedures and allow for a hearing with respect to the prospective application of such procedures if the Creditors' Committee makes a timely objection.:

---

[4]    The Debtors anticipate that equity would be distributed to holders of certain classes of claims under their plan of reorganization. As discussed below, if a sufficient percentage of the holders of these claims are not Qualified Creditors (as defined below), then the Debtors will fail to qualify for relief under the safe harbor of IRC § 382(l)(5), and the Debtors' ability to use their Tax Attributes may be severely restricted. The monitoring of, and possible restrictions on, claims trading proposed herein are designed to ensure that the claimants who will or may be receiving stock under the plan are Qualified Creditors.

[5]    As described in paragraphs 24 and 25 below, the relief requested herein has been narrowly tailored in order to comply with the Qualified Creditor de minimis rules of the Treasury Regulations.

(a)     Procedure For Trading In Equity Securities

(i)     Any person or entity who currently is or becomes a Substantial Equityholder (as defined in paragraph (v) below) must file with the Court, and serve upon the Debtors and counsel to the Debtors, a notice of such status, in the form attached hereto as Exhibit 1A, on or before the later of (A) 40 days after the effective date of the notice of entry of the Order or (B) ten days after becoming a Substantial Equityholder.

(ii)     Prior to effectuating any transfer of equity securities (including options to acquire stock, as defined in paragraph (v) below) that would result in an increase in the amount of common stock of Delphi beneficially owned by a Substantial Equityholder or would result in a person or entity's becoming a Substantial Equityholder, such Substantial Equityholder must file with the Court, and serve on the Debtors and counsel to the Debtors, advance written notice, in the form attached hereto as Exhibit 1B,[6] of the intended transfer of equity securities.

(iii)     Prior to effectuating any transfer of equity securities (including options to acquire stock) that would result in a decrease in the amount of common stock of Delphi beneficially owned by a Substantial Equityholder or would result in a person or entity's ceasing to be a Substantial Equityholder, such Substantial Equityholder must file with the Court, and serve on the Debtors and counsel to the Debtors, advance written notice, in the form attached hereto as Exhibit 1C,[7] of the intended transfer of equity securities.

(iv)     The Debtors would have 30 calendar days after receipt of a Notice of Proposed Transfer to file with this Court and serve on such Substantial Equityholder an objection to any proposed transfer of equity securities described in the Notice of Proposed Transfer on the grounds that such transfer might adversely affect the Debtors' ability to utilize their Tax Attributes. If the Debtors file an objection, such transaction would not be effective unless approved by a final and nonappealable order of this Court. If the Debtors do not object within such 30-day period, such transaction could proceed solely as set forth in the Notice of Proposed Transfer. Further transactions within the scope of this paragraph must be the subject of additional notices as set forth herein, with an additional 30-day waiting period.

(v)     For purposes of this Motion and the Order: (A) a "Substantial Equityholder" is any person or entity which beneficially owns at least

---

[6]     A notice in the form of Exhibit 1B or Exhibit 2B (as described below) is hereinafter referred to as a "Notice of Intent to Purchase, Acquire, or Otherwise Accumulate."

[7]     A notice in the form of Exhibit 1C or Exhibit 2C (as described below) is hereinafter referred to as a "Notice of Intent to Sell, Trade, or Otherwise Transfer" (and, together with a Notice of Intent to Purchase, Acquire, or Accumulate, is collectively referred to as a "Notice of Proposed Transfer").

14,000,000 shares (representing approximately 2.5% of all issued and outstanding shares) of the common stock of Delphi, (B) "beneficial ownership" of equity securities includes direct and indirect ownership (e.g., a holding company would be considered to beneficially own all shares owned or acquired by its subsidiaries), ownership by such holder's family members and persons acting in concert with such holder to make a coordinated acquisition of stock, and ownership of shares which such holder has an option to acquire, and (C) an "option" to acquire stock includes any contingent purchase, warrant, convertible debt, put, stock subject to risk of forfeiture, contract to acquire stock, or similar interest, regardless of whether it is contingent or otherwise not currently exercisable.

     (b)    <u>Procedure For Trading In Claims</u>

     (i)    Any person or entity which currently is or becomes a Substantial Claimholder (as defined in paragraph (v) below) must file with this Court, and serve upon the Debtors and counsel to the Debtors, a notice of such status, in the form attached hereto as <u>Exhibit 2A</u>, on or before the later of (A) 40 days after the effective date of the notice of entry of the Order or (B) ten days after becoming a Substantial Claimholder.

     (ii)    Prior to effectuating any transfer of claims that would result in an increase in the amount of aggregate principal claims beneficially owned by a Substantial Claimholder or would result in a person or entity's becoming a Substantial Claimholder, such Substantial Claimholder must file with this Court, and serve on the Debtors and counsel to the Debtors, advance written notice, in the form attached hereto as <u>Exhibit 2B</u>, of the intended transfer of claims, regardless of whether such transfer would be subject to the filing, notice, and hearing requirements of Bankruptcy Rule 3001.

     (iii)    Prior to effectuating any transfer of claims that would result in a decrease in the amount of aggregate principal claims beneficially owned by a Substantial Claimholder or would result in a person or entity's ceasing to be a Substantial Claimholder, such Substantial Claimholder must file with this Court, and serve on the Debtors and counsel to the Debtors, advance written notice, in the form attached hereto as <u>Exhibit 2C</u>, of the intended transfer of claims, regardless of whether such transfer would be subject to the filing, notice, and hearing requirements of Bankruptcy Rule 3001.

     (iv)    The Debtors would have 30 calendar days after receipt of a Notice of Proposed Transfer to file with this Court and serve on such Substantial Claimholder an objection to any proposed transfer of claims described in a Notice of Proposed Transfer on the grounds that such transfer might adversely affect the Debtors' ability to utilize their Tax Attributes. If the Debtors file an objection, such transaction would not be effective unless approved by a final and nonappealable order of this Court. If the Debtors do not object within such 30-day period, such transaction could proceed solely as set forth in the Notice of Proposed Transfer. Further transactions within the scope of this paragraph must

10

be the subject of additional notices as set forth herein, with an additional 30-day waiting period.

(v)     For purposes of this Motion and the Order: (A) a "Substantial Claimholder" is any person or entity which beneficially owns an aggregate principal amount of claims against the Debtors equal to or exceeding $100,000,000 or any controlled entity through which a Substantial Claimholder beneficially owns an indirect interest in claims against the Debtors, (B) "beneficial ownership" of claims includes direct and indirect ownership (e.g., a holding company would be considered to beneficially own all claims owned or acquired by its subsidiaries), ownership by family members and any group of persons acting pursuant to a formal or informal understanding to make a coordinated acquisition of claims, and ownership of claims which such holder has an option to acquire, and (C) an "option" to acquire claims includes any contingent purchase, put, contract to acquire a claim(s), or similar interest, regardless of whether it is contingent or otherwise not currently exercisable.

(c)     Debtors' Right To Waive.

(i)     The Debtors may waive, in writing and in their sole and absolute discretion, any and all restrictions, stays, and notification procedures contained in this Motion or in any order entered with respect hereto.

Basis For Relief

The Significance Of The Debtors' Tax Attributes

17.     As of December 31, 2004, the Debtors had NOLs of at least $1.5 billion, R&E Amounts of at least $1 billion, and other tax credits of at least $250 million, which amounts in aggregate are likely to be substantially greater when the Debtors emerge from chapter 11.[8] These Tax Attributes could translate into potential future tax savings for the Debtors in excess of $1 billion, based on a combined federal and state income tax rate of 37 percent.

18.     Sections 39(a), 59(e), 172(b), and 904(c) of the IRC permit corporations to carry forward Tax Attributes to offset future taxable income and tax liability, thereby significantly improving their cash position. Thus, the Debtors' Tax Attributes are a valuable asset of the estates, and their availability will facilitate the Debtors' successful reorganization. The Debtors'

---

[8]     Such amounts may be adjusted as a result of the Debtors' tax analysis and planning. The Debtors believe, however, that in the aggregate this amount will be at least equal to the amounts stated above.

ability to use their Tax Attributes, however, could be severely limited under sections 382 and

383 of the IRC as a result of the trading and accumulation of claims against, and equity securities

in, the Debtors prior to consummation of a plan of reorganization.

The Provisions Of IRC § 382

19.    Section 382 of the IRC limits the amount of taxable income that can be offset by a

corporation's NOLs and R&E Amounts in taxable years (or portion thereof) following an

ownership change.[9]  Generally, an "ownership change" occurs if the percentage (by value) of the

stock of a corporation owned by one or more five-percent shareholders has increased by more

than 50 percentage points over the lowest percentage of stock owned by such shareholders at any

time during the three-year testing period ending on the date of the ownership change.[10]  For

example, an ownership change would occur in the following situation:

> An individual ("A") owns 50.1% of the stock of corporation X ("X").  A sells his
> 50.1% interest to another individual ("B"), who owns 5%.  Under IRC § 382, an
> ownership change has occurred because B's interest in X has increased more than
> 50 percentage points (from 5% to 55.1%) during the testing period.  The same
> result would follow even if B owned no X stock prior to the transaction with A
> because B both becomes a 5% shareholder and increases his ownership by more
> than 50% percentage points during the testing period.[11]

---

[9]    Similarly, section 383 of the IRC limits the amount of tax liability that can be offset by Tax Credits
following an ownership change.

[10]    In general, under IRC § 382(g)(4)(A), all stockholders who individually hold less than 5% of the stock of a
company are deemed to be a single 5% stockholder throughout the three-year testing period, and transfers
between such shareholders are disregarded for purposes of determining whether an ownership change has
occurred (the "public group rule").  Thus, so long as 50% or more of the stock is owned by less than 5%
stockholders throughout the three-year testing period, there will be no change of control under IRC § 382.
Accordingly, the Debtors do not seek to impose the requested notice and hearing procedures on trading by
stockholders holding less than 2.5% of Delphi's stock; provided, however, that such stockholders do not
have an intent to accumulate a 2.5% or greater block of stock or add or sell shares to or from such a block.

[11]    When an ownership change occurs, IRC § 382 limits the amount of a corporation's income that may be
offset by its "pre-change losses" to an annual amount equal to the value of the corporation prior to the
ownership change multiplied by the long-term tax exempt rate.  IRC § 382(b).  "Pre-change losses" would
include (i) NOLs and (ii) if the Debtors have a net unrealized built-in loss (as defined in IRC § 382(h)(3)),
R&E Amounts to the extent such R&E Amounts are allowable as a deduction in the five years following an
ownership change.  IRC § 383 limits the amount of tax liability that may be offset by "pre-change tax
credits" to the liability attributable to the amount of income that could have been offset by pre-change

12

20.     Based on the Debtors' current and projected financial condition, it is possible that

a plan of reorganization will distribute a majority of the common stock of the reorganized

Debtors to creditors of the Debtors in exchange for all or part of their claims.  Accordingly,

under any realistic plan scenario, the Debtors will likely experience an "ownership change" for

purposes of IRC § 382 because the percentage of stock that will be owned by creditors[12] will

have increased by more than 50 points over the lowest percentage of the stock of Delphi held by

such persons during the three-year testing period.[13]  IRC § 382(g)(1).  In such an event, as

described more fully below, the Debtors may avail themselves of one of the special relief

provisions applicable to an ownership change resulting from a confirmed chapter 11 plan.  IRC §

382(l)(5),(6).  Pursuant to these provisions, the Debtors anticipate that they will be exempt from

the limitation set forth in IRC § 382 or, alternatively, that they will benefit from a favorable

valuation rule that will cause the amount of their annual limitation under IRC § 382(b) to reflect

the expected increase in the value of the Debtors resulting from any surrender or cancellation of

creditors' claims in exchange for stock pursuant to the plan.  Id.

---

losses but was not so offset.  "Pre-change tax credits" would include Tax Credits.  This formulaic limitation under IRC § 382  and § 383 can severely restrict the ability to use "pre-change losses" and "pre-change tax attributes" because the value of the stock of a distressed company may be quite low.  By way of illustration, if the Debtors were to undergo an ownership change today, they would be permitted to offset with pre-change losses no more than approximately $27 million of their income in each post-change tax year, which amount is the current market capitalization of Delphi (approximately $630 million) multiplied by 4.24% (the approximate long-term tax exempt rate for October 2005).  Taxable income in excess of this amount would generally be taxable to the Debtors at a combined federal and state income tax rate of approximately of 37%.

[12]   As used herein, the term (i) "creditors" means "creditor" as defined in section 101(10) of the Bankruptcy Code, and (ii) "claims" means "claim" as defined in section 101(5) of the Bankruptcy Code.

[13]   The fact that a substantial number of creditors receiving stock pursuant to the plan may own less than 5% of the Debtors' stock upon consummation of a plan of reorganization does not provide relief from IRC § 382; instead the "public group rule" (described above) will aggregate the ownership interests of all such creditor-shareholders and treat them as a new 5% shareholder.

21.     The problem facing the Debtors, and the reason for this Motion, is that (i) if too many equity holders transfer their equity interests prior to the effective date of a plan of reorganization, such transfers may trigger an ownership change that would not fall within the ambit of these special bankruptcy provisions because such an ownership change would not occur pursuant to a confirmed bankruptcy plan and (ii) the Debtors may not qualify for the special "in bankruptcy" rules of IRC § 382(l)(5) if too many claimholders transfer their claims prior to the effective date of any plan of reorganization. The Debtors need the ability to monitor, and possibly object to, changes in ownership of claims against and equity securities in the Debtors to preserve flexibility in crafting a plan of reorganization that qualifies for relief under one of the special bankruptcy provisions and, thus, maximizes the Debtors' ability to reduce federal income taxes by offsetting their income earned after reorganization with Tax Attributes.

Special Section 382 Bankruptcy Rules

22.     The limitations imposed by IRC § 382 in the context of a change in ownership pursuant to a confirmed chapter 11 plan are significantly more relaxed than those applicable outside chapter 11.

23.     A corporation that has not previously had an ownership change is not subject to the limitations imposed by IRC § 382 with respect to an ownership change resulting from consummation of a chapter 11 plan, provided that under the plan, the debtor's pre-change shareholders (i.e., persons or entities who owned the debtor's stock immediately before the relevant ownership change) and/or Qualified Creditors emerge from the reorganization owning at least 50% of the total value and voting power of the debtor's stock immediately after the ownership change (the "IRC § 382(l)(5) safe harbor"). IRC § 382(l)(5)(A).

24.     Under IRC § 382(l)(5)(E) and Treas. Reg. § 1.382-9, a creditor whose claim is exchanged for stock under a chapter 11 plan is a "Qualified Creditor" for IRC § 382 purposes if

14

such claim either (i) has been owned by such creditor for 18 or more months prior to the date of filing of the bankruptcy petition or (ii) arose in the ordinary course of the Debtors' business and was at all times beneficially owned by such creditor.  Creditors may also be classified as "Qualified Creditors," despite not satisfying the continuous ownership requirements under either (i) or (ii) of the preceding sentence, if such creditors meet the criteria set forth in the de minimis rule described below.

26.    Under Treas. Reg. § 1.382-9(d)(3) (the "de minimis rule"), the debtor may, for purposes of the IRC § 382(l)(5) safe harbor, "treat indebtedness as always having been owned by the beneficial owner of the indebtedness immediately before the ownership change if the beneficial owner is not, immediately after the ownership change, either a five percent shareholder or an entity through which a five percent shareholder owns an indirect ownership interest" in the corporation.  Such a claimholder will always be regarded as a Qualifying Creditor under the IRC § 382(l)(5) safe harbor unless the particular claim(s) that it holds both (a) did not arise in the ordinary course of the Debtor's business and (b) was not held by such creditor 18 months prior to the filing of the bankruptcy petition.

26.    The requested relief has been narrowly tailored to apply only to claimholders that own (or would own as a result of the proposed transfer) claims with an aggregate principal amount of $100,000,000 or more, which, based upon a preliminary analysis, is the lowest amount that could reasonably be expected to lead to a distribution of 2.5% of the stock in Delphi, as reorganized.[14]  Thus, the Debtors seek to impose the notice and hearing requirements only on transfers of claims by or to those claimholders which could be expected to fall outside of the de

---

[14]    If the Debtors substantially revise their initial estimate of this amount, the Debtors shall serve a notice of such recalculated amount.

minimis rule and, thus, which could jeopardize the Debtors ability to satisfy the requirements of

the IRC § 382(l)(5) safe harbor.

27.     Although there can be no assurance that the IRC § 382(l)(5) safe harbor

ultimately will be available to the Debtors, it is important that the Debtors preserve the ability to

propose a plan of reorganization that would take advantage of that safe harbor.  Because the

determination of whether a creditor is a Qualified Creditor depends on whether such creditor has

held its claim until the effective date of the plan of reorganization, transfers of claims by

creditors before such date pose a threat to the Debtors' ability to satisfy the requirements of the

IRC § 382(l)(5) safe harbor.  Likewise, because transfers of stock by or into the hands of five

percent shareholders before the effective date of the plan of reorganization could trigger an

ownership change that would impose a severe annual limitation on the Debtors' use of their Tax

Attributes, even if the Debtors later satisfied the requirements of IRC § 382(l)(5) in connection

with a second ownership change resulting from the plan of reorganization, such transfers also

pose a threat to the value of their Tax Attributes.  The requested relief will ensure that the

Debtors have maximum flexibility to structure a plan of reorganization that meets the

requirements of IRC § 382(l)(5), and thus preserves their Tax Attributes to the fullest extent.

28.     Even if it is ultimately determined that  IRC § 382(l)(5) is unavailable to the

Debtors, it is in the best interests of the Debtors and their estates to restrict equity trading which

could result in an ownership change prior to consummation of a plan of reorganization for at

least two additional reasons.  First, an ownership change must occur pursuant to consummation

of the plan in order for the Debtors to qualify for the other IRC § 382 bankruptcy relief provision

– the favorable valuation rule of IRC § 382(l)(6).  Specifically, IRC § 382(l)(6) provides that if a

corporation undergoes an ownership change pursuant to a plan of reorganization in chapter 11

16

and IRC § 382(l)(5) does not apply (either because the corporation elects out of that provision or because its requirements are not satisfied), then under IRC § 382(l)(6), the appropriate value of the Debtors for purposes of calculating the IRC § 382 limitation shall reflect the increase in value of the Debtors resulting from any surrender or cancellation of creditors' claims in the transaction. Thus, assuming the value of the Debtors increases as a result of the reorganization, IRC § 382(l)(6) will provide for a higher annual limitation than would result under the general rules of IRC § 382 and preserve the Debtors' ability to use a greater portion of their Tax Attributes to offset any post-change income. Second, preventing an ownership change prior to effective date of a plan of reorganization will also benefit the estates by ensuring that the reorganized Debtors will have unlimited use of their Tax Attributes to offset any income arising on or prior to the effective date of the chapter 11 plan. Thus, in all circumstances, it is in the best interests of the Debtors and their estates to grant the requested relief so as to prevent an ownership change prior to consummation of a plan of reorganization.

### The Requested Relief Is Narrowly Tailored

29.    The requested relief does not bar all claims and stock trading. At this juncture, the Debtors seek to establish procedures enabling them only to monitor those types of stock and claim trading which pose a serious risk under the IRC § 382 ownership change test so as to preserve the Debtors' ability to seek substantive relief if it appears that a proposed trade will jeopardize the use of their Tax Attributes. The procedures requested by the Debtors would permit most stock and claims trading to continue subject only to Bankruptcy Rule 3001(e) and applicable securities, corporate, and other laws.

The Requested Relief Is Necessary To
Avoid Irreparable Harm To The Debtors

30.    Once a Tax Attribute is limited under IRC § 382, its use is limited forever, and

once a claim or equity interest is transferred, it cannot be undone.  The relief sought herein is

necessary to avoid an irrevocable loss of the Debtors' Tax Attributes – and the irreparable harm

which could be caused by unfettered trading in the Debtors' claims and equity securities, trading

which jeopardizes the Debtors' ability to offset taxable income freely with Tax Attributes.

31.    Absent granting the relief requested herein, the Debtors would be irreparably

harmed by the mere filing of this Motion.  If the Debtors filed this Motion in accordance with the

usual notice procedures set forth in the Bankruptcy Rules, the Debtors believe it is likely that a

flurry of trading in claims and Delphi stock would immediately follow.  Parties holding such

claims or Delphi stock might rush to transfer their claims or stock before the restrictions on such

trading are approved by this Court.  Such trading would put the Tax Attributes in jeopardy, as

described above, and would therefore be counterproductive to the Debtors' objectives in seeking

this relief.  Accordingly, the Debtors request that the procedures described herein be approved

and that a hearing be allowed with respect to the prospective application of such procedures if

the Creditors' Committee makes a timely objection.

Order

32.    Following entry of the Order, the Debtors propose to send a notice in substantially

the form attached hereto as Exhibit 3 (the "Notice of Order") to (a) the Office of the United

States Trustee, (b) any committee appointed under section 1102 of the Bankruptcy Code, (c)

counsel for the agents under the prepetition and postpetition credit facilities, (d) the Debtors' 50

largest unsecured creditors, (e) the indenture trustees or transfer agents for any class of common

stock of Delphi or any bonds or debentures of the Debtors, (f) the Securities and Exchange

Commission, and (g) the Internal Revenue Service. Upon receipt of the Notice of Order, any

indenture trustee or transfer agent for any bonds or debentures of the Debtors or any stock of

Delphi would be required to send such Notice of Order to all holders of such bonds or debentures

in excess of $50,000,000, or stock in excess of 7,000,000 shares registered with such indenture

trustee or transfer agent; provided, however, that, if any indenture trustee or transfer agent

provides the Debtors with the name and addresses of all holders of such bonds, debentures, or

stock, the Debtors would be required to deliver the Notice of Order to such holders. Any such

registered holder would be required, in turn, to provide such Notice of Order to any holder for

whose account such registered holder holds such bonds or debentures in excess of $50,000,000

or stock in excess of 7,000,000 shares, and so on down the chain of ownership. Additionally,

any person or entity or broker or agent acting on their behalf who (i) sells claims against the

Debtors in the aggregate principal amount of at least $10,000,000 or (ii) sells 2,000,000 shares of

common stock of Delphi (or an option with respect thereto) to another person or entity would be

required to provide a copy of the Notice of Order authorizing such procedures to such purchaser

or any broker or agent acting on their behalf of such claims or stock. Additionally, the Debtors

would publish the Notice of Order in The Wall Street Journal.

     33.     The entry of the Order shall be final; provided, however, that (a) within ten days

after the Creditors' Committee has been formed and retained counsel, the Creditors' Committee

may object (an "Objection") to the prospective application of the Order from and after the date of

such Objection, and (b) pending such hearing, this Order shall remain in full force and effect. If

an Objection is timely filed by the Creditors' Committee, (a) a hearing will be held at the United

States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom

House, One Bowling Green, New York, New York 10004-1408, at the next regularly-scheduled

omnibus hearing in these cases, which will be at date and time to be established by this Court

and (b) further notice will be served on order of the Court; provided, however, that if an

Objection is timely filed and such Objection is resolved prior to a hearing on such Objection in a

manner that does not require a revision of the Order, then the Notice of Order will be sent as

provided in paragraph 34 below.                                                           .

   34.  The Debtors propose that if no Objection is timely filed and served, or if an

Objection is timely filed and such Objection is resolved prior to hearing on such Objection in a

manner that does not require a revision of the Order, the Debtors will send the Notice of Order to

(a) the Office of the United States Trustee, (b) any statutory committee appointed in these cases,

(c) counsel for the agents under the prepetition and postpetition credit facilities, (d) the Debtors'

50 largest unsecured creditors, (e) the indenture trustees or transfer agents for any class of

common stock of Delphi or any bonds or debentures of the Debtors, (f) all parties who file

notices of transfers of claims under Bankruptcy Rule 3001(e)(i), (g) all known creditors, (h) the

Securities and Exchange Commission, and (i) the Internal Revenue Service. Upon receipt of the

Notice of Order, any indenture trustee or transfer agent for any bonds or debentures of the

Debtors or any stock of Delphi will be required to send such Notice of Order to all holders of

such bonds, debentures or stock registered with such indenture trustee or transfer agent; provided,

however, that if any indenture trustee or transfer agent provides the Debtors with the name and

addresses of all holders of such bonds, debentures, or stock, the Debtors would be required to

deliver the Notice of Order to such holders. Any such registered holder must, in turn, provide

such Notice of Order to any holder for whose account such registered holder holds such bonds,

debentures, or stock, and so on down the chain of ownership. Additionally, any person or entity

or broker or agent acting on their behalf who (i) sells claims against the Debtors in the aggregate

principal amount of at least $10,000,000 or (ii) sells 2,000,000 shares of common stock of Delphi

(or an option with respect thereto) to another person or entity must provide a copy of the Notice

of Order authorizing such procedures to such purchaser or any broker or agent acting on their

behalf of such claims or stock.

35.    Unless otherwise ordered by this Court, at least once every three months during

the pendency of these chapter 11 cases, all indenture trustees and transfer agents for any bonds or

debentures of the Debtors or any stock of Delphi would be required to send the Notice of Order

to all holders of such bonds or debentures in excess of $50,000,000 or stock in excess of

7,000,000 shares registered with such indenture trustee or transfer agent; provided, however, that

if any indenture trustee or transfer agent provides the Debtors with the name and addresses of all

holders of such bonds, debentures, or stock, the Debtors shall deliver the Notice of Order to such

holders.  Any such registered holder must, in turn, provide such Notice of Order to any holder for

whose account such registered holder holds such bonds or debentures in excess of $50,000,000

or stock in excess of 7,000,000 shares, and so on down the chain of ownership.

36.    The foregoing notice procedures satisfy due process and the strictures of

Bankruptcy Rule 9014 by providing the counterparties with a notice and an opportunity to object

and be heard at a hearing.  See, e.g., Flynn v. Eley (in re Colo. Mountain Cellars, Inc.), 226 B.R.

244, 246 (D. Colo. 1998) (noting that hearing is not required to satisfy Bankruptcy Rule 9014).

Furthermore, the proposed notice procedures protect the due process rights of the parties-in-

interest without unnecessarily exposing the Debtors' estates to unwanted administrative expenses.

Applicable Authority

NOLs Are Property Of A Debtor's Estate
Entitled To Court Protection

37.    Courts have uniformly held that a debtor's NOLs constitute property of the estate

under section 541 of the Bankruptcy Code and, as such, that courts have the authority to impose

measures intended to protect and preserve such NOLs.  The seminal case articulating this rule is

In re Prudential Lines, Inc., 107 B.R. 832 (Bankr. S.D.N.Y. 1989), aff'd, 119 B.R. 430 (S.D.N.Y.

1990), aff'd, 928 F.2d 565 (2d Cir. 1991), cert. denied 502 U.S. 821 (1991).  In Prudential Lines,

the Bankruptcy Court for the Southern District of New York enjoined a parent corporation from

taking a worthless stock deduction with respect to its wholly-owned debtor subsidiary on the

grounds that allowing the parent to take such a deduction would destroy its debtor-subsidiary's

NOLs.  In issuing the injunction, the court held that "debtor's potential ability to utilize NOLs is

property of an estate," 107 B.R. at 838, and that "the taking of a worthless stock deduction is an

exercise of control over a debtor's NOLs," id. at 842, and thus was properly subject to the

automatic stay of section 362 of the Bankruptcy Code.  See also Nisselson v. Drew Indus., Inc.

(In re White Metal Rolling & Stamping Corp.), 222 B.R. 417, 424 (Bankr. S.D.N.Y. 1998) ("it is

beyond peradventure that NOL carrybacks and carryovers are property of the estate of the loss

corporation that generated them"); In re Southeast Banking Corp., Case No. 91-14561-BKC-

PGH (Bankr. S.D. Fla. July 21, 1994) (debtor's interest in their NOLs "constitutes property of the

estate within the scope of 11 U.S.C. Section 541(a)(1) and is entitled to the protection of the

automatic stay imposed pursuant to 11 U.S.C. Section 362(a)(3)"); In re Phar-Mor, Inc., 152 B.R.

924 (Bankr. N.D. Ohio 1993) ("the sale of stock is prohibited by § 362(a)(3) as an exercise of

control over the NOL, which is property of the estate"); In re Grossman's, Inc., Case No. 97-695

(PJW) (Bankr. D. Del. Oct. 9, 1997) (debtors' net operating loss carryforward is property of

debtors' estates and is protected by automatic stay).  Because the Debtors' NOLs are property of
their estates, this Court has the authority under section 362 of the Bankruptcy Code to enforce
the automatic stay by restricting the transfer of claims against, and equity securities in, the
Debtors which could reduce this valuable asset.

38.     Like NOLs, R&E Amounts and Tax Credits are valuable assets of the Debtors'
estate.  R&E Amounts and Tax Credits, like NOLs, may be used by the Debtors to offset future
income and reduce future federal income taxes.  Accordingly, like NOLs, R&E Amounts and
Tax Credits constitute property of the Debtors' estate under section 541 of the Bankruptcy Code
and should be afforded the same treatment as NOLs.  As with NOLs, this Court has the authority
under section 362 of the Bankruptcy Code to enforce the automatic stay by restricting the
transfer of claims against and equity securities in the Debtors, which transfers could reduce this
valuable asset.  Courts have granted relief similar to that sought herein with respect to non-NOL
tax credits in other cases.  See, e.g., In re Delta Air Lines, Inc., Case No. 05-17923 (PCB) (Bankr.
S.D.N.Y. Sept. 16, 2005) (finding that net operating loss carryforwards and tax credit
carryforwards are property of Debtors' estate and approving notification procedures and
restrictions on certain transfers of claims against and interests in the debtors on an interim basis
to protect, inter alia, $346 million in non-NOL tax credits; final hearing pending).

Appropriateness Of Relief

39.     Courts have not hesitated to restrict or enjoin transfers of claims or equity
securities or issue other injunctive relief to protect a debtor against the possible loss of its net
operating loss carryforwards.  See, e.g., In re Delta Air Lines, Inc., Case No. 05-17923 (PCB)
(Bankr. S.D.N.Y. Sept. 16, 2005) (approving notification procedures and restrictions on certain
transfers of claims against and interests in the debtors on an interim basis; final hearing pending);
In re Northwest Airlines Corp., Case No. 05-17930 (ALG) (Bankr. S.D.N.Y. Sept. 15, 2005)

23

(approving notification procedures and restrictions on certain transfers of claims against and

interests in the debtors on an interim basis; final hearing pending); In re US Airways, Inc., Case

No. 04-13819 (SSM) (Bankr. E.D. Va. Apr. 1, 2005) (approving notification procedures and

restrictions on certain transfers of claims against and interests in debtors); In re WorldCom, Inc.,

Case No. 02-13533 (AJG) (Bankr. S.D.N.Y. March 5, 2003) (approving notification procedures

and restrictions on certain transfers of claims against and interests in debtors); In re Adelphia

Communications Corp., Case No. 02-41729 (REG) (Bankr. S.D.N.Y.  September 27, 2002)

(approving notification and hearing procedures for trading in equity interests); In re US Airways

Group, Inc., Case No. 02-83984 (SSM) (Bankr. E.D. Va. Oct. 2, 2002) (approving notification

procedures and restrictions on certain transfers of claims against and interests in the debtors); In

re Williams Communications Group, Inc., Case No. 02-11957 (BRL) (Bankr. S.D.N.Y. July 24,

2002) (debtor provided 30 days' notice to object to proposed transfers of claims against debtor

that would increase transferee's holdings to or above $200 million in aggregate face amount;

$200 million in claims was lowest amount that could reasonably be expected to lead to

distribution of 5% of stock in reorganized debtor); In re Metrocall, Case No. 02-11579 (RB)

(Bankr. D. Del. June 6, 2002) (debtor provided five business days' notice to object to proposed

transfers of stock that would result in the transferee holding 5% or more of debtor's stock or

reduction in ownership interest of existing 5% or greater shareholder); In re Casual Male Corp.,

Case No. 01-41404 (REG) (Bankr. S.D.N.Y. May 18, 2001) (enjoining transfers of common

stock and convertible notes that would result in transferee's holdings increasing to or beyond

4.99%; debtor provided 30 days' notice to object to proposed transfers of senior subordinated

notes or other general unsecured claims (excluding convertible notes) against debtor); In re

Worldtex, Inc., Case No. 01-785 (MFW) (Bankr. D. Del. Apr. 2, 2001) (debtor provided 30 days'

24

notice to object to proposed transfers that would result in transferee's holding 5% or more of

debtor's common stock or decrease ownership interest of existing 5% or greater shareholder).

40.     Courts ordering such relief generally have done so by imposing notice and

hearing requirements on any proposed transfer of claims or stock to or by a person whose

holdings of such claims or stock exceeds, or would exceed as a result of the proposed transfer, a

certain threshold amount.  To accomplish this, the court and the debtor are given notice of any

proposed transfers of claims or stock by persons whose aggregate claim or stock holdings exceed

a certain dollar or share threshold, giving the debtor an opportunity to object to such transfer at a

hearing.  The order in First Merchants Acceptance was typical in this regard.  1998 Bankr.

LEXIS 1816 (Bankr. D. Del. 1998).  There, the court entered an order imposing on any party

intending to (i) acquire, accumulate, or sell more than a prescribed number of shares of the

debtor, or to add additional shares to such a block, or (ii) acquire or sell any subordinated reset

notes or unsecured claims against the debtors, a duty to provide notice to the court and to

debtor's counsel, after which the debtor was afforded 30 days to object to such transaction and a

hearing would be held so that the court could decide whether to allow any such transfer to be

consummated.  See also In re US Airways, Inc., Case No. 04-13819 (SSM) (Bankr. E.D. Va. Apr.

1, 2005) (claims trading restrictions applied to claimholders expected to fall outside de minimis

rule); In re US Airways Group, Inc., Case No. 02-83984 (SSM) (Bankr. E.D. Va. Oct. 2, 2002)

(same);   In re Williams Communications Group, Inc., Case No. 02-11957 (BRL) (Bankr.

S.D.N.Y. July 24, 2002) (same); In re Worldtex, Inc., Case No. 01-785 (MFW) (Bankr. D. Del.

Apr. 2, 2001) (stock trading restrictions applied to persons who were, or would become as result

of proposed transfer, a 5% stockholder).  Although the relief that the Debtors request here is

similar to that granted in First Merchants Acceptance, it excludes transfers by claimholders

expected to fall under the <u>de minimis</u> rule (<u>i.e.</u>, persons who beneficially own claims with an aggregate principal amount of less than $100 million) from the scope of the notice and hearing procedures, thus making the requested relief even less burdensome than the relief granted in <u>First Merchants Acceptance</u>.

41.    The Debtors' Tax Attributes are valuable assets of their estates which will inure to the benefit of their stakeholders and facilitate their reorganization.  Unfettered trading in claims and equity securities in the Debtors, with no advance warning of such trades, jeopardizes these assets which provide a source of value to the Debtors' stakeholders.  Accordingly, this Court should grant the requested relief and establish a notice and hearing procedure governing the trading of claims against, and equity securities in, the Debtors.  The requested relief imposes a minimal burden to achieve a substantial benefit, and the Debtors believe that granting the relief requested in this Motion is in the best interests of the Debtors' estates, their creditors, and other interested parties.

Notice

42.    Notice of this Motion has been provided by facsimile, electronic transmission, overnight delivery or hand delivery to (a) the Office of the United States Trustee, (b) the Debtors' 50 largest unsecured creditors, (c) counsel for the agent under the Debtors' prepetition credit facility, and (d) counsel for the agent under the Debtors' proposed postpetition credit facility.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

<u>Memorandum Of Law</u>

43.     Because the legal points and authorities upon which this Motion relies are

incorporated herein, the Debtors respectfully request that the requirement of the service and

filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

HEREFORE, the Debtors respectfully request that this Court enter an Order (a)

authorizing the implementation of a notice and hearing procedure governing the transfer of

claims against, and equity securities in, the Debtors and (b) granting the Debtors such other and

further relief as is just.

Dated: New York, New York
       October 8, 2005


SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP

By: <u>s/ John Wm. Butler, Jr.</u>
     John Wm. Butler, Jr. (<u>pro hac vice</u> motion pending)
     John K. Lyons
     Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

            - and -

By: <u>s/ Kayalyn A. Marafioti</u>
     Kayalyn A. Marafioti (KM 9632)
     Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, <u>et al.</u>,
     Debtors and Debtors-in-Possession