SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                       :
            In re                                      :    Chapter 11
                                                       :
DELPHI CORPORATION, et al.,                            :    Case No. 05-_____ (___)
                                                       :
                            Debtors.                   :    (Jointly Administered)
                                                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR INTERIM AND FINAL ORDERS UNDER 11 U.S.C. §§ 105, 366, 503, AND
507 (I) PROHIBITING UTILITIES FROM ALTERING, REFUSING, OR DISCONTINUING
SERVICES ON ACCOUNT OF PREPETITION INVOICES AND (II) ESTABLISHING
PROCEDURES FOR DETERMINING REQUESTS FOR ADDITIONAL ASSURANCE

("UTILITIES MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates[1]

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this motion (the "Motion") for interim and final orders under 11 U.S.C. §§ 105,

366, 503, and 507 (a) prohibiting utilities from altering, refusing, or discontinuing services on

account of prepetition invoices and (b) establishing procedures for determining requests for

additional adequate assurance.  In support of this Motion, the Debtors submit the Affidavit Of

Robert S. Miller, Jr. In Support Of Chapter 11 Petitions And First Day Orders, sworn to October

8, 2005.  In further support of this Motion, the Debtors respectfully represent as follows:

Background

A.    The Chapter 11 Filings

    1.    On October 8, 2005 (the "Petition Date"), each of the Debtors filed a

voluntary petition in this Court for reorganization relief under chapter 11 of title 11 of the United

States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").  The Debtors

continue to operate their businesses and manage their properties as debtors-in-possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have moved this

Court for an order authorizing joint administration of these chapter 11 cases.

---

[1]    In addition to Delphi, the following entities are debtors in these related cases:  ASEC Manufacturing General Partnership, ASEC Sales General Partnership, Aspire, Inc., Delco Electronics Overseas Corporation, Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems Global (Holding), Inc., Delphi Automotive Systems Human Resources LLC, Delphi Automotive Systems International, Inc., Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems LLC, Delphi Automotive Systems Overseas Corporation, Delphi Automotive Systems Risk Management Corp., Delphi Automotive Systems Services LLC, Delphi Automotive Systems Tennessee, Inc., Delphi Automotive Systems Thailand, Inc., Delphi China LLC, Delphi Connection Systems, Delphi Diesel Systems Corp., Delphi Electronics (Holding) LLC, Delphi Foreign Sales Corporation, Delphi Integrated Service Solutions, Inc., Delphi International Holdings Corp., Delphi International Services, Inc., Delphi Liquidation Holding Company, Delphi LLC, Delphi Mechatronic Systems, Inc., Delphi Medical Systems Colorado Corporation, Delphi Medical Systems Corporation, Delphi Medical Systems Texas Corporation, Delphi NY Holding Corporation, Delphi Services Holding Corporation, Delphi Technologies, Inc., DREAL, Inc., Environmental Catalysts, LLC, Exhaust Systems Corporation, Packard Hughes Interconnect Company, Specialty Electronics, Inc., and Specialty Electronics International Ltd.

2.   No trustee, examiner, or creditors' committee has been appointed in the

Debtors' cases.

3.   This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

4.   The statutory predicates for the relief requested herein are sections 105(a),

366, 503, and 507 of the Bankruptcy Code.

B.      Current Business Operations Of The Debtors

5.   With more than 180,000 employees worldwide, global 2004 revenues of

approximately $28.6 billion and global assets as of August 31, 2005 of approximately $17.1

billion,[2] Delphi ranks as the fifth largest public company business reorganization in terms of

revenues, and the thirteenth largest public company business reorganization in terms of assets.

Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations

without supervision from the Bankruptcy Court, and will not be subject to the chapter 11

requirements of the U.S. Bankruptcy Code.

6.   Over the past century, the operations which are now owned by Delphi have

become a leading global technology innovator with significant engineering resources and

technical competencies in a variety of disciplines.  Today, the Company is arguably the single

largest global supplier of vehicle electronics, transportation components, integrated systems and

modules, and other electronic technology.  The Company's technologies and products are present

in more than 75 million vehicles on the road worldwide.  The Company supplies products to

---

[2]      The aggregated financial data used in this Motion generally consists of consolidated information from
Delphi and its worldwide subsidiaries and affiliates.

3

nearly every major global automotive original equipment manufacturer with 2004 sales to its former parent, General Motors Corporation, equaling approximately $15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

7.    As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world.  In the U.S., the Debtors employ approximately 50,600 people.  Those employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in Delphi's worldwide headquarters and customer center located in Troy, Michigan.  Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and local unions.  Outside the United States, the Company's foreign entities employ more than 134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

8.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

4

9.   Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle.  When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base.  The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base.  The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C.    Events Leading To Chapter 11 Filing

10.   In the first two years following Delphi's separation from GM, the Company generated more than $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales.  Reflective of a downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005.  The Company experienced net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[3]

11.   The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S.

---

[3]        Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

legacy liabilities and operational restrictions driven by collectively bargained agreements,

including restrictions preventing the Debtors from exiting non-strategic, non-profitable

operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive

U.S. vehicle production environment for domestic OEMs resulting in the reduced number of

motor vehicles that GM produces annually in the United States and related pricing pressures, and

(c) increasing commodity prices.

12.    In light of these factors, the Company determined that it would be imprudent

and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio,

operational issues and forward looking revenue requirements. Having concluded that pre-filing

discussions with its Unions and GM were not leading to the implementation of a plan sufficient

to address the Debtors' issues on a timely basis, the Company determined to commence these

chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and

preserve value.

13.    Through the reorganization process, the Debtors intend to achieve

competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive

legacy liabilities and burdensome restrictions under current labor agreements and realigning

Delphi's global product portfolio and manufacturing footprint to preserve the Company's core

businesses. This will require negotiation with key stakeholders over their respective

contributions to the restructuring plan or, absent consensual participation, the utilization of the

chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned

in the Company's transformation plan. The Debtors believe that a substantial segment of

Delphi's U.S. business operations must be divested, consolidated, or wound-down through the

chapter 11 process.

6

14.    Upon the conclusion of this process, the Debtors expect to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

### Relief Requested

15.    By this Motion, the Debtors seek entry of interim and final orders providing that the Utility Companies (as defined below) are prohibited from altering, refusing, or discontinuing services to, or discriminating against, the Debtors on the basis of the commencement of these cases or on account of any unpaid invoice for service provided prior to the Petition Date.

16.    Additionally, the Debtors request that the final order provide that any Utility Company seeking adequate assurance from the Debtors (a "Request") in the form of a deposit or other security be required to make such Request in writing, setting forth the location for which utility services were provided, so that the Request is actually received by the Debtors within 25 days of the date of service of the final order granting this Motion (the "Request Deadline").  The Debtors further request that any Request must set forth a payment history for the most recent six months, a list of any deposits or other security currently held by the Utility Company making the Request on account of the Debtors, and a description of any prior material payment delinquency or irregularity.

17.    The Debtors also request that the final order provide that the Debtors be permitted to file a Motion for Determination of Adequate Assurance of Payment (the "Determination Motion") and set such motion for hearing (the "Determination Hearing") within

7

45 days after a Request is received if a Utility Company timely and properly issues a Request to the Debtors that the Debtors believe is unreasonable. If a Determination Motion is filed or a Determination Hearing scheduled, the Utility Company shall be deemed to have adequate assurance of payment under section 366 of the Bankruptcy Code until this Court enters a final order with respect to the Determination Motion finding otherwise.

18.   Finally, the Debtors request that the final order provide that any Utility Company that does not timely request in writing additional adequate assurance pursuant to the above procedures shall be deemed to have adequate assurance under section 366 of the Bankruptcy Code. Furthermore, the Debtors shall be authorized to supplement the list of Utility Companies attached hereto as Exhibit A to add Utility Companies that are not listed on Exhibit A but subsequently discovered.

## Basis For Relief

19.   In the normal conduct of their business operations, the Debtors obtain natural gas, water, electric, telephone, fuel, sewer, cable, telecommunications, internet, paging, cellular phone, and other similar services (collectively, the "Utility Services") provided by hundreds of utility companies and other providers (each a "Utility Company" and, collectively, the "Utility Companies"), including those contained in the list attached hereto as Exhibit A.[4] The Utility Companies service the Debtors' corporate offices and operations and their numerous facilities around the country. Uninterrupted utility services are essential to ongoing operations, and, therefore, to the success of the Debtors' reorganization. Should the Utility Companies refuse or discontinue service, even for a brief period, the Debtors' business operations would be

---

[4]   The failure to include, as well as the inclusion of, any entity in Exhibit A is not an admission by the Debtors that the entity is, or is not, as the case may be, a utility within the meaning of section 366 of the Bankruptcy Code, and the Debtors reserve their rights with respect thereto. Moreover, the relief sought herein pertains to all of the Debtors' Utility Companies, whether or not included in Exhibit A.

severely disrupted. The impact on the Debtors' businesses, operations and revenue would be extremely harmful and would jeopardize the Debtors' reorganization efforts. It is therefore critical that utility services continue uninterrupted.

20.    The Debtors submit that the administrative expense priority provided pursuant to sections 503(b) and 507(a)(1) of the Bankruptcy Code, the Debtors' prepetition payment history, and the Debtors' proposed debtor-in-possession financing adequately assure continued payment for postpetition utility services provided by the Utility Companies without the need for deposits or other security. In particular, the Debtors have, or will continue to have, sufficient funds from operations and the terms of the proposed debtor-in-possession financing to make timely postpetition payments to all Utility Companies.

21.    The Debtors realize substantial cost savings by, in the ordinary course of their businesses, purchasing natural gas through the accounts of General Motors Corporation ("GM"). The Utility Companies that provide natural gas to the Debtors through GM accounts are so designated on Exhibit A. Pursuant to a Gas Services Agreement between Delphi and GM, dated January 1, 1999, Delphi has agreed to reimburse GM for amounts paid for all natural gas supply, transportation, distribution and storage, including applicable taxes, on behalf of the Debtors. The Debtors propose that, beyond the adequate assurance discussed above, the Utility Companies that provide natural gas to the Debtors through GM accounts have additional adequate assurance through their agreements with GM.

Applicable Authority

22.    Section 366 of the Bankruptcy Code provides as follows:

(a)    Except as provided in subsection (b) of this section, a utility may not alter, refuse, or discontinue service to, or discriminate against, the trustee or the debtor solely on the basis of the commencement of a case under this title or that a debt owed by the debtor to such utility for service rendered before the order for relief was not paid when due.

9

(b)      Such utility may alter, refuse, or discontinue service if neither the trustee nor the debtor, within 20 days after the date of the order for relief, furnishes adequate assurance of payment, in the form of a deposit or other security, for service after such date.  On request of a party-in-interest and after notice and a hearing, the court may order reasonable modification of the amount of the deposit or other security necessary to provide adequate assurance of payment.

11 U.S.C. § 366.

23.    Section 366 protects a debtor against termination of its utility service immediately upon the commencement of its chapter 11 case while simultaneously providing utility companies with adequate assurance of payment for postpetition utility service.  See H.R. Rep. No. 95-595, at 350 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 6306 (1977).  Whether a utility is subject to an unreasonable risk of nonpayment for postpetition services and, therefore, whether it is entitled to receive a new deposit, must be determined from the facts and circumstances of each case.  See In re Adelphia Bus. Solutions, Inc., 280 B.R. 63, 80 (Bankr. S.D.N.Y. 2002); Mass. Elec. Co. v. Keydata Corp., 12 B.R. 156, 158 (B.A.P. 1st. Cir. 1981); see also In re Woodland Corp., 48 B.R. 623, 624-25 (Bankr. D.N.M. 1985).

24.    Absent a pre-bankruptcy default, section 366(b) of the Bankruptcy Code does not require a debtor to provide deposits and/or other security to utility companies as adequate assurance of payment.  Indeed, Congress recognized that "[i]t will not be necessary to have a deposit in every case" to provide adequate assurance.  H.R. Rep. No. 95-595, at 350, reprinted in 1978 U.S.C.C.A.N. 5787, 6306; see also In re Penn Jersey Corp., 72 B.R. 981, 986 (Bankr. E.D. Pa. 1987) (utility company's request for additional security denied when debtor had not been delinquent in payment of utility bill before bankruptcy); Shirey v. Phila. Elec. Co., 25 B.R. 247, 249 (Bankr. E.D. Pa. 1982) ("section 366(b) of the Code does not permit a utility to request adequate assurance of payment for continued services unless there has been a default by the debtor on a pre-petition debt owed for services rendered"); Demp v. Phila. Elec. Co., 22 B.R.

10

331, 332 (Bankr. E.D. Pa. 1982) ("where the debtor has a history of prompt and complete

payment, in addition to being completely current in the pre-petition utility payments, a cash

deposit would be unnecessary").

26.    In particular, courts have recognized that no deposit is required when

(a) the debtor has a history of prompt and complete utility payments, (b) the debtor owes

insignificant amounts, if any, for prepetition utility services, (c) an administrative expense

priority is granted to the utility, and (d) the debtor has substantial and liquid assets.  For example,

in In re Penn Jersey Corp., a utility company sought a security deposit from a chapter 11 debtor

in an amount equal to twice the debtor's average monthly bill.  In rejecting the utility's request

for a deposit, the court concluded as follows:

> We believe that situations exist where the debtor should not be obliged to
> do anything -- except, of course, to maintain post-petition payments -- to
> continue to have a right to receive post-petition utility service.  The
> situation which quickly comes to mind as an example . . . is where the
> debtor is not and has not been delinquent in payment of utility bills
> prepetition.  This situation has been before this Court frequently, and the
> results have uniformly been that no deposit is necessary . . . .

In re Penn Jersey, 72 B.R. at 986; see also In re Utica Floor Maint., Inc., 25 B.R. 1010, 1018

(N.D.N.Y. 1982) (where the debtor "has a sufficiently substantial and liquid estate, then no

further security [other than an administrative claim] is required").

26.    The United States Court of Appeals for the Second Circuit has held that

where, as here, debtors have timely paid their utility bills before the commencement of their

chapter 11 cases, the administrative expense priority provided in sections 503(b) and 507(a)(1) of

the Bankruptcy Code constitutes adequate assurance of payment, and no deposit or other security

is required.  See Virginia Elec. & Power Co. v. Caldor, Inc.-NY, 117 F.3d 646, 650-651 (2d Cir.

1997); see also In re Adelphia Bus. Solutions, Inc., 280 B.R. at 88-89.

11

27.    Here, the Debtors' history of consistent and regular payment to the Utility

Companies, coupled with their demonstrated ability to pay future utility bills from ongoing

operations and postpetition financing, constitute adequate assurance of payment for future utility

services within the meaning of section 366 of the Bankruptcy Code.  The fact that the Debtors

have sufficient assets to pay their postpetition costs of administration on a timely basis, and will

continue to pay their utility bills as they become due, provide adequate assurance of future

payment without the need to provide additional security deposits, bonds, or any other payments

to the Utility Companies.

28.    The Debtors will serve a copy of the interim order, once entered, along with

a notice setting forth the date and time for filing objections to the proposed final order.  The

Debtors also will serve a copy of the final order, once entered, upon each Utility Company,

thereby notifying them of their rights.  The final order also authorizes the Debtors to provide

notice and a copy of the order to Utility Companies not presently on Exhibit A, but subsequently

identified by the Debtors.  It provides that a Utility Company so served is subject to the scope of

the final order from the date of service and is afforded 25 days from the date of such service to

make a Request, if any, to the Debtors for additional adequate assurance.

29.    Such a Request must comply with the requirements of the final order or

shall be deemed an untimely and invalid adequate assurance request.  Contemporaneously with

the service of the final order as described above and from time to time, as necessary, the Debtors

will file with this Court a supplement to Exhibit A adding the name of any new Utility Company

so served.

30.    Because uninterrupted utility service is vital to the continued operation of

the Debtors' businesses, the health and protection or their employees and customers, and,

12

consequently, the success of these chapter 11 cases, the relief requested herein is necessary and in the best interests of the Debtors, their estates, and creditors. The proposed method of furnishing adequate assurance of payment for postpetition utility services is in keeping with the spirit and intent of section 366 of the Bankruptcy Code, and is not prejudicial to the rights of any Utility Company. Moreover, relief similar to that requested herein has been granted in other large chapter 11 cases. See, e.g., In re Delta Airlines, Inc., Case No. 05-17923 (Bankr. S.D.N.Y. Sept. 16, 2005); In re Tower Auto., Inc., Case No. 05-10578 (Bankr. S.D.N.Y. Feb. 28, 2005); In re Choice One Commc'ns Inc., Case No. 04-16433 (Bankr. S.D.N.Y. Oct. 25, 2004); In re Cornerstone Propane, L.P., Case No. 04-13856 (Bankr. S.D.N.Y. June 10, 2004); In re Spiegel, Inc., Case No. 03-11540 (Bankr. S.D.N.Y. Apr. 4, 2003); In re NRG Energy, Inc., Case No. 03-13024 (Bankr. S.D.N.Y. May 15, 2003); In re WorldCom, Inc., Case No. 02-13533 (Bankr. S.D.N.Y. July 22, 2002); In re The Warnaco Group, Inc., Case No. 01-41643 (Bankr. S.D.N.Y. June 25, 2001); In re Global Crossing Ltd., Case No. 02-40188 (Bankr. S.D.N.Y. Jan. 28, 2002); In re Enron Corp., Case No. 01-16033 (Bankr. S.D.N.Y. Dec. 20, 2001); and In re Teligent, Inc., Case No. 01-12974 (Bankr. S.D.N.Y. May 21, 2001). The Debtors submit that, in light of the foregoing, they have provided sufficient assurances of their future performance with respect to the Utility Companies. Furthermore, the adequate assurance method proposed herein is a reasonable accommodation of the interests of the Utility Companies and the Debtors.

31.   Further, the court has the power, under section 105(a) of the Bankruptcy Code, to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The relief requested in this Motion is essential to the preservation of the Debtors' businesses, for the benefit of all parties-in-interest, and to the

Debtors' successful reorganization. This Court should therefore exercise its equitable powers to grant the requested relief.

32.    Accordingly, the relief requested herein is in the best interests of the Debtors, their estates, their creditors and other parties-in-interest and should be approved.

## Notice

33.    Notice of this Motion has been provided by facsimile, electronic transmission, overnight delivery, or hand delivery to (a) the Office of the United States Trustee, (b) the Debtors' 50 largest unsecured creditors, (c) counsel for the agent under the Debtors' prepetition credit facility, and (d) counsel for the agent under the Debtors' proposed postpetition credit facility. In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

## Memorandum Of Law

34.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter interim and

final orders (a) prohibiting the Utility Companies from altering, refusing, or discontinuing

services on account of prepetition invoices, (b) establishing procedures for determining requests

for additional assurance, and (c) granting the Debtors such other and further relief as is just.

Dated:  New York, New York
       October 8, 2005


SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By: *s/ John Wm. Butler, Jr.*
    John Wm. Butler, Jr. (pro hac vice motion pending)
    John K. Lyons
    Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

    - and -

By: *s/ Kayalyn A. Marafioti*
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession