SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                    :
        In re                       :    Chapter 11
                                    :
DELPHI CORPORATION, et al.,         :    Case No. 05-_____ (___)
                                    :
                    Debtors.        :    (Jointly Administered)
                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. §§ 105, 361, 362, 363, 364(c), 364(d), AND
364(e) AND FED. R. BANKR.  P. 2002, 4001, AND 9014 (I) AUTHORIZING DEBTORS
TO OBTAIN SECURED POSTPETITION FINANCING ON SUPERPRIORITY
SECURED AND PRIMING BASIS, (II) AUTHORIZING USE OF CASH
COLLATERAL, (III) GRANTING ADEQUATE PROTECTION TO PREPETITION
SECURED LENDERS, (IV) GRANTING INTERIM RELIEF, AND (V) SCHEDULING
A FINAL HEARING UNDER FED. R. BANKR. P. 4001(b) and (c)

("FINANCING MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"),[1] debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order:

      (a)      under 11 U.S.C. §§ 105, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and Fed. R. Bankr. P. 2002, 4001(c), and 9014 authorizing, <u>inter</u> <u>alia</u>:

            (i)      (A) Delphi to obtain secured postpetition financing as guaranteed by each of the other Debtors (the "Financing"), up to an aggregate principal amount not to exceed $2 billion, consisting of a $1,750,000,000 revolving credit facility (inclusive of a sublimit in the aggregate of $325 million for the issuance of letters of credit (the "Letters of Credit")) and a $250 million term loan facility, from JPMorgan Chase Bank, N.A., as administrative agent (in its capacity as agent for the DIP Lenders referred to below, the "Agent"), and from a syndicate of other financial institutions arranged by J.P. Morgan Securities Inc. and

---

[1]      In addition to Delphi, the following entities are debtors in these related cases:  ASEC Manufacturing General Partnership, ASEC Sales General Partnership, Aspire, Inc., Delco Electronics Overseas Corporation, Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems Global (Holding), Inc., Delphi Automotive Systems Human Resources LLC, Delphi Automotive Systems International, Inc., Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems LLC, Delphi Automotive Systems Overseas Corporation, Delphi Automotive Systems Risk Management Corp., Delphi Automotive Systems Services LLC, Delphi Automotive Systems Tennessee, Inc., Delphi Automotive Systems Thailand, Inc., Delphi China LLC, Delphi Connection Systems, Delphi Diesel Systems Corp., Delphi Electronics (Holding) LLC, Delphi Foreign Sales Corporation, Delphi Integrated Service Solutions, Inc., Delphi International Holdings Corp., Delphi International Services, Inc., Delphi Liquidation Holding Company, Delphi LLC, Delphi Mechatronic Systems, Inc., Delphi Medical Systems Colorado Corporation, Delphi Medical Systems Corporation, Delphi Medical Systems Texas Corporation, Delphi NY Holding Corporation, Delphi Services Holding Corporation, Delphi Technologies, Inc., DREAL, Inc., Environmental Catalysts, LLC, Exhaust Systems Corporation, Packard Hughes Interconnect Company, Specialty Electronics, Inc., and Specialty Electronics International Ltd.

Citigroup Global Markets, Inc. (including JPMorgan Chase Bank, N.A.,

the "DIP Lenders"), pursuant to the Revolving Credit, Term Loan and

Guaranty Agreement, dated as of October 8, 2005, substantially in the

form attached hereto as <u>Exhibit A</u>, (as amended, supplemented, or

otherwise modified from time to time, the "Credit Agreement") and the

other Loan Documents to be executed and delivered in connection

therewith;[2] and

        (ii)       the Debtors to grant the DIP Lenders, in order to secure the

Debtors' respective obligations under the Financing, (A) priority in

payment with respect to such obligations over any and all administrative

expenses of the kinds specified in 11 U.S.C. §§ 503(b) and 507(b), subject

to the Carve-Out (as defined below), (B) perfected first priority security

interests in and liens upon all unencumbered prepetition and postpetition

property of the Debtors, subject to the Carve-Out and excluding avoidance

actions, (C) perfected junior security interests in and liens upon all

prepetition and postpetition property of the Debtors that is subject to valid,

perfected, and non-avoidable liens in existence on the Petition Date (as

defined below), or to valid liens in existence on the Petition Date that are

perfected thereafter as permitted by 11 U.S.C. § 546(b), subject to the

Carve-Out; <u>provided</u>, <u>however</u>, that such security interests and liens shall

not be junior to any liens of the Prepetition Agent or the Prepetition

Secured Lenders (each as defined below), and (D) perfected liens and

---

[2]      Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the Credit Agreement.

security interests senior to all liens and security interests of the Prepetition

Agent or the Prepetition Secured Lenders in the Prepetition Collateral (as

described below), subject to the Carve-Out;

(b)     under 11 U.S.C. § 363(c), authorizing the Debtors to use the Cash

Collateral (as defined below);

(c)     under 11 U.S.C. §§ 361, 363(e), and 364(d), authorizing the Debtors to

provide adequate protection (in the form described in paragraph 17 of this

Motion) to the Prepetition Agent and the Prepetition Secured Lenders

under the Prepetition Credit Agreement (as defined below) with respect to

their prepetition secured debt (the "Prepetition Debt") under the

Prepetition Credit Agreement and all collateral and ancillary documents

executed in connection therewith (the "Existing Agreements") on account

of diminution in the value of the Prepetition Secured Lenders' interests in

the Prepetition Collateral resulting from the priming liens and security

interests sought herein to secure the Financing, the use of the Cash

Collateral, the use, sale, or lease of the Prepetition Collateral, or the

imposition of the automatic stay pursuant to 11 U.S.C. § 362(a);

(d)     subject to and effective only upon the entry of a final order granting such

relief, the limitation of the Debtors' right to surcharge against collateral

pursuant to 11 U.S.C. § 506(c), which is an "Extraordinary Provision"

("Extraordinary Provision") under General Order No. M-274 of the United

States Bankruptcy Court for the Southern District of New York (the

"General Order")

4

(e)      permission to accelerate Borrowings and the termination of the

Commitments under the DIP Credit Agreement upon (a) a Change of

Control (as each such term is defined in the DIP Credit Agreement) or (b)

the entry of an order or orders granting relief from the automatic stay

applicable under section 362 of the Bankruptcy Code to the holder or

holders of any security interest to permit foreclosure (or the granting of a

deed in lieu of foreclosure or the like) on any assets of the Borrower or

any of the Guarantors which have a value in excess of $20 million in the

aggregate, which are Extraordinary Provisions under the General Order;

(f)      subject and only effective upon the entry of a final order granting such

relief, the limitation of the Debtors' right to surcharge against collateral

pursuant to section 506(c) of the Bankruptcy Code, which is an

Extraordinary Provision under the General Order;

(g)      under Fed. R. Bankr. P. 4001, and after a preliminary hearing on the

Motion, authorizing Delphi, inter alia, to borrow from the DIP Lenders

under the DIP Credit Agreement up to an aggregate of $950 million

(inclusive of the issuance of up to an aggregate face amount of $325

million of Letters of Credit), all upon the terms and conditions set forth in

the Loan Documents and such entry of an interim order substantially in the

form of Exhibit B attached hereto (the "Interim Order") pending the Final

Hearing (as defined below); and

(h)      scheduling a final hearing (the "Final Hearing") and establishing notice

procedures in respect of the Final Hearing, by this Court, to consider entry

5

of a final order (the "Final Order") authorizing, on a final basis, <u>inter alia</u>,

the Financing.

In support of this Motion, the Debtors submit the Affidavit Of Robert S. Miller, Jr. In Support Of

Chapter 11 Petitions And First Day Orders, sworn to October 8, 2005 (the "Miller Affidavit").

In further support of this Motion, the Debtors respectfully represent as follows:

Background

A.    <u>The Chapter 11 Filings</u>

1.    On October 8, 2005 (the "Petition Date"), each of the Debtors filed a

voluntary petition in this Court for reorganization relief under chapter 11 of title 11 of the United

States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").  The Debtors

continue to operate their businesses and manage their properties as debtors-in-possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have moved this

Court for an order authorizing joint administration of these chapter 11 cases.

2.    No trustee, examiner, or creditors' committee has been appointed in the

Debtors' cases.

3.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

4.    The statutory predicates for the relief requested herein are sections 105, 361,

362, 363, and 364 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules").

B.    <u>Current Business Operations Of The Debtors</u>

5.    With more than 180,000 employees worldwide, global 2004 revenues of

approximately $28.6 billion and global assets as of August 31, 2005 of approximately $17.1

6

billion,[3] Delphi ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations without supervision from this Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy Code.

6.   Over the past century, the operations that are now owned by Delphi have become a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines.  Today, the Company is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company's technologies and products are present in more than 75 million vehicles on the road worldwide.  The Company supplies products to nearly every major global automotive original equipment manufacturer with 2004 sales to its former parent, General Motors Corporation, equaling approximately $15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

7.   As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world.  In the U.S., the Debtors employ approximately 50,600 people.  Those employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in Delphi's worldwide headquarters and customer center located in Troy, Michigan.  Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and

---

[3]      The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

local unions.  Outside the United States, the Company's foreign entities employ more than

134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40

countries worldwide.

8.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary

of GM.  Prior to January 1, 1999, GM conducted the Company's business through various

divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions

and subsidiaries were transferred to Delphi and its subsidiaries and affiliates in accordance with

the terms of a Master Separation Agreement between Delphi and GM.  In connection with these

transactions, Delphi accelerated its evolution from a North American-based, captive automotive

supplier to a global supplier of components, integrated systems, and modules for a wide range of

customers and applications.  Although GM is still the Company's single largest customer, today

more than half of Delphi's revenue is generated from non-GM sources.

9.    Due to the significant planning that goes into each vehicle model, Delphi's

efforts to generate new business do not immediately affect its financial results, because supplier

selection in the auto industry is generally finalized several years prior to the start of production

of the vehicle.  When awarding new business, which is the foundation for the Company's

forward revenue base, customers are increasingly concerned with the financial stability of their

supply base.  The Debtors believe that they will maximize stakeholder value and the Company's

future prospects if they stabilize their businesses and continue to diversify their customer base.

The Debtors also believe that this must be accomplished in advance of  the expiration of certain

benefit guarantees between GM and certain of Delphi's unions representing most of its U.S.

hourly employees which coincides with the expiration of the Company's U.S. collective

bargaining agreements in the fall of 2007.

C.    Events Leading To Chapter 11 Filing

10.    In the first two years following Delphi's separation from GM, the Company generated more than $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales.  Reflective of a downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005.  The Company experienced net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[4]

11.    The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues and forward looking revenue requirements.  Having concluded that pre-filing discussions with its Unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence these

---

[4]    Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

13.    Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses.  This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned in the Company's transformation plan.  The Debtors believe that a substantial segment of Delphi's U.S. business operations must be divested, consolidated, or wound-down through the chapter 11 process.

14.    Upon the conclusion of this process, the Debtors expect to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

<u>The Prepetition Credit Agreement</u>

15.    The Debtors' primary secured obligations arise under that certain Third Amended and Restated Credit Agreement, dated as of June 14, 2005, among Delphi, as borrower, JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, the "Prepetition Agent"), the lenders from time to time party thereto (the  "Prepetition Secured Lenders"), Citicorp USA, Inc., as syndication agent, Credit Suisse First Boston, Deutsche Bank

AG, New York Branch, and HSBC Bank USA, as co-documentation agents for the revolving facility, Deutsche Bank AG, New York Branch, as documentation agent for the term facility, J.P. Morgan Securities Inc. and Citigroup Global Markets Inc., as joint bookrunners for the revolving facility, J.P. Morgan Securities Inc., Citigroup Global Markets, Inc., and Deutsche Bank Securities Inc., as joint bookrunners for the term facility, J.P. Morgan Securities Inc. and Citigroup Global Markets, Inc., as joint lead arrangers (as amended, supplemented, or otherwise modified from time to time, the "Prepetition Credit Agreement").

16.    The Prepetition Credit Agreement provides for revolving loans, term loans, swingline loans, and the issuance of letters of credit up to an aggregate principal amount of $2,825,000,000.  Proceeds under the Prepetition Credit Agreement were used for Delphi's general corporate purposes including Investments (as such term is defined in the Prepetition Credit Agreement) to, or in, subsidiaries of Delphi.  Delphi's obligations as borrower and the Affiliate Debtors' obligations as guarantors (in the case of each Affiliate Debtor party to the Guarantee and Collateral Agreement (as defined in the Prepetition Credit Agreement), each an "Existing Guarantor") under the Prepetition Credit Agreement are secured by security interests in substantially all of the material tangible and intangible assets of Delphi and the Existing Guarantors (the "Prepetition Collateral").[5]  The Debtors note, however, that certain receivables that the Debtors estimate have a face value of approximately $1.2 billion as well as certain related security, and collections (collectively, the "Receivables Security"), generated by Delphi and Delphi Automotive Systems LLC  (including in its capacity as successor by merger to Delco Electronics Corporation) were not included in the Prepetition Collateral.[6]  In addition, the

---

[5]    Delphi pledged only 65% of the stock of its first tier foreign subsidiaries.

[6]    The Receivables Security was sold to Delphi Receivables LLC, a bankruptcy remote special purpose vehicle (and not a Debtor herein), pursuant to a receivables sales agreement and as part of a securitization program (the "Receivables Sale Agreement").  The Receivables Sales Agreement provides that to the extent the sale of Receivables Security to Delphi Receivables LLC is not deemed to be a "true sale," then Delphi

Prepetition Secured Lenders do not have a perfected security interest in (a) real property located in jurisdictions that impose material real estate recording taxes and other real property to the extent that the Prepetition Secured Lenders did not obtain a valid mortgage or deed of trust or otherwise failed to perfect their security interest therein, (b) real property with a value less than $5 million, and (c) the capital stock of foreign subsidiaries pledged under the Existing Agreements to the extent that local law requirements were not satisfied.  Further, a portion of the Revolving Loans (as defined in Prepetition Credit Agreement) may not be secured by Domestic Manufacturing Property[7] and shares of stock or indebtedness of any U.S. subsidiary of the Borrower that owns Domestic Manufacturing Property.  That portion is equal to the excess amount by which the Revolving Loans, when taken together with all other senior secured debt of Delphi and its subsidiaries, exceeds 15% of Consolidated Net Tangible Assets.[8]

17.    In conjunction with entering into the Prepetition Credit Agreement, Delphi's wholly-owned domestic subsidiaries (other than insignificant subsidiaries and subsidiaries that

---

Receivables LLC has a security interest in the Receivables Security.  This security interest was perfected by the filing of a UCC-1 financing statement.  Under the Receivables Sale Agreement and the Existing Agreements, any security interest that the Prepetition Secured Lenders could have in the Receivables Security did not arise, until the termination of the Receivables Sale Agreement, and the Prepetition Secured Lenders could not perfect any such security interest in the Receivables Security until the Receivables Sale Agreement was terminated.  As of the Petition Date, Delphi Receivables LLC had not terminated the Receivables Sale Agreement and, therefore, as of the Petition Date the Prepetition Secured Lenders did not have a security interest in the Receivables Security.  There presently are no amounts outstanding under the Receivables Sale Agreement.  Delphi gave notice on Friday, October 7, 2005 of its election to terminate the receivables program upon the earlier of Tuesday, October 11, 2005 and the occurrence of an Amortization Event (as defined in the Receivables Purchase Agreement dated as of March 31, 2003).  Delphi's filing of a voluntary petition in this Court for reorganization relief under the Bankruptcy Code constituted an Amortization Event and the program was thereby terminated.

[7]    Domestic Manufacturing Property is defined under that certain Indenture (the "Indenture") dated as of April 28, 1999 between Delphi and JPMorgan (as successor to The First National Bank of Chicago) as any manufacturing plant or facility owned by Delphi or any manufacturing subsidiary which is located within the continental United States of America and, in the opinion of the Delphi board of directors, is of material importance to the total business conducted by Delphi and its consolidated affiliates as an entity.

[8]    Consolidated Net Tangible Assets is defined in the Indenture as all amounts that would, in conformity with generally accepted accounting principles, be set forth opposite the caption "total assets" (or any like caption) on a consolidated balance sheet of Delphi and its consolidated subsidiaries less (a) all current liabilities and (b) goodwill, trade names, patents, unamortized debt discount, organization expenses, and other like intangibles of Delphi and its consolidated subsidiaries.

participate in accounts receivable financings), all of which are Debtors herein, guaranteed all of Delphi's obligations under the Prepetition Credit Agreement.

18.    As of the Petition Date, Delphi was indebted to the Prepetition Secured Lenders in the aggregate amount of approximately $2,579,783,051.85 (the "Prepetition Lender Debt"), consisting of, among other things, (a) Revolving Loans made pursuant to the Existing Agreements in the aggregate amount of principal as of the Petition Date of approximately $1.5 billion, (b) Term Loans (as defined in the Prepetition Credit Agreement) made pursuant to the Existing Agreements in the aggregate amount of principal as of the Petition Date of approximately $988,329,620.59, and (c) Reimbursement Obligations (as defined in the Prepetition Credit Agreement) in respect of Letters of Credit in an aggregate amount of approximately $91,453,431.26, in each case <u>plus</u> all interest accrued and unpaid as of the Petition Date, fees, costs, expenses, and all charges related thereto.

The Debtors' Financing Arrangements

A.    <u>The Debtors' Efforts To Obtain Financing</u>

19.    The Debtors currently do not have any available sources of funds other than the Cash Collateral (as defined below) and the proposed Financing to carry on the operation of their businesses.[9]  The Debtors urgently require working capital to continue their operations. Miller Affidavit at ¶ 299.  The uncertainty concerning the Debtors' financial condition has curtailed the Debtors' availability of credit and acceptable credit terms.  More specifically, the Debtors' ability to maintain business relationships with their vendors and suppliers, to purchase new inventory, and otherwise to finance their operations is dependent on their ability to use Cash

---

[9]    Although Delphi Receivables LLC is not a debtor herein, the commencement of the cases is a termination event under the securitization facility backed by the Receivables Security, making borrowings thereunder unavailable.

Collateral and obtain the funds that would be made available under the Financing.  Miller

Affidavit at ¶ 299.

20.    Any potential disruption of the Debtors' operations would be devastating at

this critical juncture.  The Debtors' inability to obtain sufficient liquidity and to make payments

on certain obligations on a timely basis may result in a permanent and irreplaceable loss of

business, causing a loss of value to the detriment of the Debtors and all parties-in-interest.  In

light of the foregoing, the Debtors have determined, in the exercise of their sound business

judgment, that the Financing is critical to their ongoing operations in the ordinary course.  The

Debtors therefore seek authorization from this Court to enter into the DIP Credit Agreement.

21.    The Debtors have been unable to obtain credit from any source on terms

more favorable than those offered pursuant to the Financing.  Prior to the Petition Date, the

Debtors surveyed various sources of debtor-in-possession financing from a number of global

financial institutions.  The Debtors obtained proposals for debtor-in-possession financing from

various global financial institutions.  Collectively, these institutions provided four debtor-in-

possession financing proposals that would require senior "priming" liens and four proposals that

would refinance in full the Prepetition Debt.  After exhaustive negotiations involving their

financial and legal advisors, the Debtors concluded that the Financing offered by the Agent

presented the best option available and would enable the Debtors to preserve their value as a

going concern.  Miller Affidavit at ¶ 301.  The proposal received from the Agent is competitive

and addresses the Debtors' working capital and liquidity needs.

B.    The DIP Credit Agreement

22.    Prior to the Petition Date, the Debtors engaged in good-faith and extensive,

arm's-length negotiations with the Agent and Citicorp USA, Inc. ("CUSA").  These negotiations

culminated in an agreement by the Agent and CUSA to provide debtor-in-possession financing

14

on the terms and subject to the conditions set forth in the DIP Credit Agreement and the Interim

Order. Miller Affidavit at ¶ 302.  A copy of the DIP Credit Agreement is attached hereto as

Exhibit A.

23.    The significant elements of the Loan Documents, the proposed Interim

Order, and the proposed Final Order, are as follows:[10]

(a)    **Borrower**: Delphi Corporation as debtor and debtor-in-possession.

(b)    **Guarantors**: The Affiliate Debtors.

(c)    **Commitment**:  A total commitment of $2 billion consisting of:

(i)    **Tranche A or the Revolving Facility**:  A revolving commitment of $1,750,000,000; and

(ii)    **Tranche B or the Term Loan**:  A term loan commitment of $250 million.

(d)    **Letters of Credit**:  Up to $325 million of the Revolving Facility shall be available for the issuance of Letters of Credit by JPMorgan Chase Bank, N.A. and the other Issuing Lenders.  No Letter of Credit shall have an expiration date after the earlier of (i) one year after the date of issuance and (ii) 180 days after the Maturity Date; provided, that any Letter of Credit with a one-year tenor may provide for the renewal thereof for additional one-year periods (which shall in no event extend beyond the date referred to in clause (ii) above).

(e)    **Borrowing Base**:  From and after the entry of the Final Order, the sum of (i) 85% of Eligible Receivables (other than GM Receivables), plus (ii) 85% of GM Receivables, plus (iii) Available Inventory, plus (iv) the Fixed Asset Component, minus (v) the Carve-Out, minus (vi) an amount equal to the excess (if any) of the aggregate amount of Secured Domestic Hedging Obligations (determined on a marked-to-market basis) over $75 million; provided that (x) the aggregate amount of the Fixed Asset Component shall at no time account for more than 30% of the aggregate amount of the Borrowing Base (it being understood that, solely for purposes of this clause (x), the aggregate amount of the Borrowing Base shall be calculated without giving effect to the deductions described in clauses (v) and (vi)

---

[10]    This summary is qualified in its entirety by reference to the provisions of the Loan Documents.  The General Order, requires a debtor to highlight any Extraordinary Provisions.  Sections of the Loan Documents that may include Extraordinary Provisions are included in the summary and are marked with an asterisk.  *  Unless otherwise defined herein, capitalized terms used in this paragraph 15 shall have the meanings ascribed to such terms in the Credit Agreement.

above), and (y) GM Receivables shall at no time account for more than 25% of the total Eligible Receivables included in the Borrowing Base. Notwithstanding the foregoing, until the Agents have received a third party appraisal with respect to the Fixed Asset Component, in form reasonably satisfactory to the Agents, the aggregate dollar amount of the Fixed Asset Component included in the Borrowing Base shall be $300 million. For the avoidance of doubt, for purposes of this definition, (A) the amount described in clause (ii) of the definition of "Carve-Out" shall be deemed at all times to be equal to $35 million and (B) the amount described in clause (iii)(y) of the definition of "Carve-Out" shall be deemed at all times to be equal to $5 million.  Borrowing Base standards may be fixed and revised from time to time by the Administrative Agent in its reasonable discretion with any changes in such standards to be effective 10 days after delivery of a written notice thereof to the Borrower (or immediately, without prior written notice, during the continuance of an Event of Default).

(f)     **Term**:  Borrowings and other Obligations shall be repaid in full, and the Commitment shall terminate, at the earliest of (i) the Prepayment Date, (ii) the Maturity Date, (iii) the Consummation Date, and (iv) the acceleration of the Loans and the termination of the Total Commitment in accordance with the DIP Credit Agreement.  Upon the occurrence of the Termination Date, the Loans and other obligations shall be repaid in full.

(g)     **Purpose**:  Proceeds of the Financing will be used for working capital and for other general corporate purposes of the Borrower and its Subsidiaries including the making of pension contributions, adequate protection payments to the Prepetition Secured Lenders, the payment of transaction costs, fees, and expenses in respect of the Transactions and the Cases and the payment of Restructuring Costs.

(h)     **Priority and Liens**:  Subject to the Carve-Out and the Security and Pledge Agreement, the Obligations and the Secured Obligations under the Financing, shall at all times (i) pursuant to section 364(c)(1) of the Bankruptcy Code, constitute allowed claims in the Cases having priority over any and all administrative expenses, diminution claims (including the Superpriority Claims granted to the Prepetition Secured Lenders), and all other claims against the Borrower and the Guarantors, now existing or hereafter arising, of any kind whatsoever, including all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code; (ii) pursuant to section 364(c)(2) of the Bankruptcy Code, shall at all times be secured by a valid, binding, continuing, enforceable and fully-perfected first priority senior security interest in and Lien on all tangible and intangible property of the Borrower's and the Guarantors' respective estates in the Cases that is not subject to valid, perfected, non-avoidable and enforceable Liens in existence as of the Petition Date or valid Liens in existence on the Petition Date that are

16

perfected subsequent to such date to the extent permitted by section 546(b) of the Bankruptcy Code, including all present and future accounts receivable, inventory, general intangibles, chattel paper, real property, leaseholds, fixtures, machinery and equipment, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements and other intellectual property, capital stock of any Subsidiaries of the Borrower and Guarantors and on all cash and investments maintained in the Letter of Credit Account (but excluding (x) the Borrower's and the Guarantors' rights in respect of avoidance actions under the Bankruptcy Code and (y) joint venture interests with respect to which a valid prohibition on pledging such interests or granting Liens thereon exists, it being understood that, notwithstanding such exclusion of such interests, the proceeds of such interests shall be subject to such liens under section 364(c)(2) of the Bankruptcy Code and available to satisfy the Obligations and the other Secured Obligations); (iii) pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by valid, binding, continuing, enforceable, and fully-perfected security interests in and Liens upon all tangible and intangible property of the Borrower and the Guarantors (provided that as set forth in clause (iv) of this sentence, the existing Liens that presently secure the obligations of the Borrower and the Existing Guarantors under the Prepetition Credit Agreement will be primed by the Lien in favor of the Administrative Agent and the DIP Lenders as described in clause (iv) of this sentence) that is subject to valid, perfected, and non-avoidable Liens in existence on the Petition Date or that is subject to valid Liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (other than the property referred to in clause (iv) below that is subject to the existing Liens described in clause (iv) below, as to which the Lien in favor of the Administrative Agent and the DIP Lenders will be as described in clause (iv) below), junior to such valid, perfected and non-avoidable Liens; and (iv) pursuant to section 364(d)(1) of the Bankruptcy Code, be secured by a valid, binding, continuing, enforceable, and fully-perfected first priority senior priming security interest in and senior priming Lien on all of the tangible and intangible property of the Borrower and the Guarantors that is subject to existing Liens that presently secure Borrower's and the Existing Guarantors' prepetition Indebtedness under the Prepetition Credit Agreement (but subject and subordinate to (A) the Carve-Out and (B) any Liens in existence on the Petition Date to which the Liens being primed by the Financing are subject or become subject subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code), senior to all of such Liens; provided, however, that (w) the Borrower and the Guarantors shall not be required to pledge to the Administrative Agent in excess of 65% of the voting capital stock of its direct Foreign Subsidiaries or any of the capital stock or interests of its indirect Foreign Subsidiaries (if, in the good faith judgment of the Borrower, adverse tax consequences would result to the Borrower), (x) no portion of the Carve-Out may be utilized to fund prosecution or assertion of any claims against the Administrative Agent, the DIP Lenders

17

or the Issuing Lenders, (y) following the Termination Date, amounts in the Letter of Credit Account shall not be subject to the Carve-Out and (z) except as otherwise provided in the Orders, no portion of the Carve-Out shall be utilized for the payment of professional fees and disbursements incurred in connection with any challenge to the amount, extent, priority, validity, perfection or enforcement of the indebtedness of the Borrower and the Guarantors owing to the Prepetition Secured Lenders or to the collateral securing such indebtedness.  The DIP Lenders agree that so long as no Event of Default shall have occurred and be continuing, the Borrower and the Guarantors shall be permitted to pay compensation and reimbursement of expenses allowed and payable under sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable, and the same shall not reduce the Carve-Out.

(i)      **Prepetition Agent's Recommendation for Priming Liens**:  The Prepetition Agent recommends that the Prepetition Secured Lenders consent and agree to the priming of their liens in the Prepetition Collateral, subject to this Court's approval of the adequate protection discussed herein.

(j)      **DIP Lender Consent to Prepetition Secured Lenders' Subordinate Liens**:  The DIP Lenders have agreed that the subordinated and junior lien in favor of the Prepetition Secured Lenders upon the Prepetition Collateral is a Permitted Lien under the DIP Credit Agreement.

(k)      **Carve-Out**:  The Agent's liens and the DIP Lenders' superpriority claim shall be, subject only to (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code, (ii) all fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code, (iii) after the occurrence and during the continuance of an Event of Default, the payment of allowed and unpaid professional fees and disbursements incurred by the Borrower, the Guarantors, and any statutory committees appointed in the Cases (each, a "Committee") in an aggregate amount not exceeding $35 million, and (iv) all unpaid professional fees and disbursements incurred or accrued by the Borrowers, the Guarantors and any Committees at any time when no Event of Default is continuing, in an aggregate amount not exceeding the sum of (a) such unpaid professional fees and disbursements reflected on the most recent Borrowing Base Certificate delivered to the Administrative Agent prior to such occurrence and (b) such unpaid professional fees and disbursements incurred or accrued after the date of such Borrowing Base Certificate but prior to any Event of Default that is then continuing in an aggregate amount under this clause (b) not exceeding $5 million (and with amounts included under this clause (b) to be supported by back-up documentation in respect of the amounts and dates of incurrence of such fees and

disbursements), in each of the foregoing clauses (i), (ii), (iii) and (iv) to the extent allowed by the Bankruptcy Court at any time.

(l)    **Interest Rate**:  At the option of the Borrower, either (i) Administrative Agent's Alternate Base Rate plus 1.50% or (ii) one, three, or six month LIBOR plus 2.50%; interest shall be payable monthly in arrears, on the Termination Date and thereafter on demand.

(m)    **Default Interest**:  Upon the occurrence and during the continuance of any default in the payment of principal, interest, or other amounts due under the DIP Credit Agreement (including, without limitation, in respect of Letters of Credit), interest shall be payable on demand at 2% above the then applicable rate.

(n)    **Financial Covenant**: Monthly cumulative minimum Global EBITDAR, commencing January 2006.

(o)    **Affirmative Covenants**: The DIP Credit Agreement contains certain affirmative covenants that are usual and customary for such an agreement including, without limitation, reporting requirements, delivery of a Borrowing Base Certificate (from and after the entry of a Final Order), collateral monitoring and review, and using best efforts to obtain a rating from S&P and Moody's on the Revolving Facility and the Term Facility.

(p)    **Negative Covenants:** The DIP Credit Agreement contains certain negative covenants that are usual and customary for such an agreement with appropriate exceptions and qualifications, including, but not limited to restrictions on Liens, mergers, Indebtedness, dividends, Investments, dispositions of assets, and transactions with Affiliates.  So long as the Facility Availability Amount is equal to or greater than $500 million, compliance with the restrictions on Investments, mergers, and disposition of assets do not apply (except in respect of Investments in, and dispositions to, direct or indirect domestic subsidiaries of the Borrower that are not debtors-in-possession).

(q)    **Events of Default**:  The DIP Credit Agreement contains certain Defaults and Events of Default, including without limitation:

(i)    Failure by the Borrower to pay (A) interest or fees when due and such default shall continue for more than two business days or (B) principal or any reimbursement obligation or cash collateralization in respect of Letters of Credit when due (including, without limitation, on the Prepayment Date);

19

(ii)    breach of any of the negative covenants or covenants relating to the existence and obligation to give notice of Events of Default;

(iii)    breach of any other covenant or agreement contained in the DIP Credit Agreement, any Order, or the other Loan Documents, and such breach shall continue unremedied for more than 10 days;

(iv)    failure to deliver a certified Borrowing Base Certificate when due and such default shall continue unremedied for more than three Business Days;

(v)    any material representation or warranty made by the Borrower or any Guarantor in the DIP Credit Agreement or in any Loan Document or in connection with the DIP Credit Agreement or the credit extensions thereunder or any material statement or representation made in any report, financial statement, certificate, or other document furnished by the Borrower or any Guarantor to the DIP Lenders under or in connection with the DIP Credit Agreement, shall prove to have been false or misleading in any material respect when made;

(vi)    any of the cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or the Borrower or any Guarantor shall file a motion or other pleading seeking the dismissal of any of the cases under section 1112 of the Bankruptcy Code or otherwise; a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code shall be appointed in any of the Cases and the order appointing such trustee, responsible officer, or examiner shall not be reversed or vacated within 30 days after the entry thereof, or an application shall be filed by the Borrower or any Guarantor for the approval of any other Superpriority Claim (other than the Carve-Out) in any of the Cases which is pari passu with or senior to the claims of the Administrative Agent and the DIP Lenders against the Borrower or any Guarantor hereunder, or there shall arise or be granted any such pari passu or senior Super Priority Claim or the Bankruptcy Court shall enter an order terminating the use of cash collateral under the Prepetition Credit Agreement;

20

(vii)   *the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Borrower or any of the Guarantors which have a value in excess of $20 million in the aggregate;

(viii)  *a Change of Control shall occur;

(ix)    any material provision of any Loan Document shall, for any reason, cease to be valid and binding on the Borrower or any of the Guarantors or the Borrower or any of the Guarantors shall so assert in any pleading filed in any court;

(x)     an order of this Court shall be entered (A) reversing, staying for a period in excess of 10 days, or vacating any of the Orders or (B) without the written consent of the Administrative Agent and the Required Lenders, otherwise amending, supplementing, or modifying any of the Orders in a manner that is reasonably determined by the Agents to be adverse to the Agents and the DIP Lenders, or (C) terminating the use of cash collateral by the Borrower or the Guarantors pursuant to the Orders;

(xi)    any judgment or order in excess of $20 million as to any postpetition obligation shall be rendered against any Global Entity and the enforcement thereof shall not have been stayed;

(xii)   certain ERISA-related and environment-related defaults; or

(xiii)  such other Events of Default as are customary and consistent with  the Prepetition Credit Agreement.

(r)     **Fees**:  The Borrower shall pay the fees set forth in that certain letter dated September 22, 2005 from JPMorgan Chase Bank, N.A., J.P. Morgan Securities Inc. and Citigroup Global Markets, Inc. to the Borrower with respect to the fees payable by the Borrower in connection with the Financing.

<u>Use of Cash Collateral</u>

24.   As discussed above, under the terms of the Prepetition Credit Agreement,

the Borrower and the Existing Guarantors, each a Debtor, have pledged substantially all of their

assets to the Prepetition Agent for the benefit of the Prepetition Secured Lenders.  During the ordinary course of their operations, the Debtors generate cash from their use of the Prepetition Collateral (such cash, excluding Receivables Security, the "Cash Collateral").  The Debtors use this cash in the normal course of their businesses in order to continue to finance their operations, make essential payments such as employee salaries, payroll, taxes, the purchase of goods, materials, and other general corporate and working capital purposes in the ordinary course of the Debtors' businesses generally.  As of the Petition Date, the Debtors have a cash balance of approximately $500 million.  The Debtors require continued use of this Cash Collateral in order to pay their ongoing obligations and otherwise operate their business.  The Debtors need the use of the Cash Collateral in addition to the use of the cash collateral generated by the Receivables Security.

<u>Adequate Protection</u>

25.    The Debtors and the Prepetition Agent have discussed the terms upon which the Prepetition Agent believes the Prepetition Secured Lenders would consent to the Debtors' use of the Prepetition Secured Lenders' Cash Collateral and the granting of priming liens on the Prepetition Collateral under section 364(d)(1) of the Bankruptcy Code described herein.  The parties have agreed that the Prepetition Secured Lenders and the Prepetition Agent shall receive, among other adequate protection provided for in the Interim Order, the following adequate protection:

(a)    pursuant to section 364(c)(1) of the Bankruptcy Code, superpriority claims as provided in section 507(b) of the Bankruptcy Code, limited in amount to the aggregate diminution in value of the Prepetition Secured Lenders' Prepetition Collateral, including, without limitation, any such diminution resulting from the sale, lease, or use by the Debtors (or other decline in

22

value) of Cash Collateral and any other Prepetition Collateral, the priming
of the Prepetition Agent's security interests and liens in the Prepetition
Collateral by the Agent and the DIP Lenders pursuant to the DIP
Documents and the Interim Order, and the imposition of the automatic
stay pursuant to section 362 of the Bankruptcy Code, immediately junior
to the claims under section 364(c)(1) of the Bankruptcy Code held by the
Agent and the DIP Lenders;

(b)      valid and perfected security interests and liens (the "Adequate Protection
Liens") in and on all of the Debtors' right, title, and interest in, to, and
under the Collateral securing the Debtors' Obligations under the DIP
Credit Agreement, including security interests in and junior liens on
Collateral (including without limitation, the Receivables Security) in
which the Prepetition Secured Lenders did not have a valid and perfected
security interest as of the Petition Date, such Adequate Protection Liens
being immediately junior to the priming liens granted in favor of the
Agent and the DIP Lenders;

(c)      the payment, in cash, of all accrued but unpaid interest on the Prepetition
Debt and letter of credit fees, each at the non-default rate under the
Prepetition Credit Agreement, and all other fees, costs, and charges owing
in respect thereof, under the Prepetition Credit Agreement;

(d)      cash payments on the first Business Day (as defined in the DIP Credit
Agreement) of each month in an amount equal to interest accrued and
unpaid on the "Obligations" at the non-default rate equal to (i) in the case
of Eurodollar Loans, the Eurodollar Rate plus the Applicable Margin and

(ii) in the case of ABR Loans, ABR <u>plus</u> the Applicable Margin (as each

term is defined in the Prepetition Credit Agreement); and

(e)    the payment of invoices therefor of all reasonable fees, costs, and charges

incurred by the Prepetition Agent and the Prepetition Secured Lenders

(including, without limitation, the reasonable fees and disbursements of

counsel and one financial consultant to the Prepetition Agent and the

group of Prepetition Secured Lenders, but limited to disbursements in the

case of in-house counsel to the Prepetition Agent, and subject to receipt of

reasonable back-up documentation).


<u>The Proposed Financing Arrangement Should Be Authorized</u>

A.    <u>Approval Under Section 364(c) Of The Bankruptcy Code</u>

26.    The Debtors propose to obtain financing under the DIP Credit Agreement by

providing security interests and liens as set forth above pursuant to sections 364(c) and (d) of the

Bankruptcy Code.  The statutory requirement for obtaining postpetition credit under section

364(c) is a finding, made after notice and hearing, that the debtors are "unable to obtain

unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code]." 11 U.S.C. §

364(c).

27.    Section 364(c) financing is appropriate when the trustee or debtor-in-

possession is unable to obtain unsecured credit allowable as an ordinary administrative claim.

<u>See</u> <u>In re Ames Dep't Stores, Inc.</u>, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show

that it has made a reasonable effort to seek other sources of financing under sections 364(a) and

(b) of the Bankruptcy Code); <u>In re Crouse Group, Inc.</u>, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987),

(secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and

hearing, upon showing that unsecured credit cannot be obtained).

24

28.    Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether

(a)    the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;

(b)    the credit transaction is necessary to preserve the assets of the estate; and

(c)    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Ames Dep't Stores, 115 B.R. at 37-39.  As set forth more fully herein, all of the above conditions have been met.

B.    Section 364(d): Priming Liens And Request For Adequate Protection

29.    If a debtor is unable to obtain credit under the provisions of section 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien." 11 U.S.C. § 364(d).  Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of postpetition debt secured by senior or "priming" liens, provides that the court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if–

(a)    the trustee is unable to obtain credit otherwise; and

(b)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

30.    The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis.  In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996).  "'Its application is left to the vagaries of each case . . . but its focus is protection of the secured

25

creditor from diminution in the value of its collateral during the reorganization process.'" Id.

(quoting In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).

   31. In accordance with section 364(d) of the Bankruptcy Code, and consistent

with the purposes underlying the provision of adequate protection, the proposed Interim Order

provides the Prepetition Secured Lenders the following adequate protection: (a) superpriority

claims under section 364(c)(1) of the Bankruptcy Code, junior to the superpriority claims of the

DIP Lenders and subject to the Carve-Out; (b) the Adequate Protection Liens (including, without

limitation, liens on significant assets not currently securing the Prepetition Debt); (c) payment in

cash of all accrued and unpaid interest as of the Petition Date on the Prepetition Debt at the non-

default rate; (d) so long as no Default of Event of Default has occurred, payment of current

interest on the Prepetition Debt; and (e) the payment of reasonable costs and expenses of the

Prepetition Agent and the Prepetition Secured Lenders.

   32. The Debtors' ability to fulfill their working capital needs can be satisfied

only if the Debtors are authorized to borrow under the DIP Credit Agreement and to use such

proceeds to fund the operations of the Debtors.

   33. The credit provided under the DIP Credit Agreement will enable the Debtors

to continue financing their operations, pay their employees, vendors, and suppliers, and operate

their businesses in an orderly and reasonable manner to preserve and enhance the value of their

assets and enterprise for the benefit of all parties-in-interest.  Moreover, the availability of credit

under the DIP Credit Agreement will provide employees, vendors, and suppliers and other

parties with confidence in the Debtors that will enable and encourage them to resume ongoing

credit relationships with the Debtors.  Miller Affidavit at ¶ 305.  Finally, the implementation of

the Financing will be viewed favorably by the Debtors' employees and outside parties and

thereby help promote the Debtors' successful reorganization.  Miller Affidavit at ¶ 305.

C.              Use Of Cash Collateral

34.    Section 363 of the Bankruptcy Code governs the Debtors' use of property of the estates.[11]  Section 363(c)(1) of the Bankruptcy Code provides that:

> If the business of the debtor is authorized to be operated under
> Section…1108… of this title and unless the court orders otherwise,
> the trustee may enter into transactions, including the sale or lease
> of property of the estate, in the ordinary course of business,
> without notice or a hearing, and may use property of the estate in
> the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

35.    Section 363(c)(2) of the Bankruptcy Code, however, provides an exception with respect to "cash collateral" to the general grant of authority to use property of the estate in the ordinary course set forth in section 363 of the Bankruptcy Code.  Specifically, a trustee or debtor-in-possession may not use, sell, or lease "cash collateral" under subsection (c)(1) unless:

A        each entity that has an interest in such collateral consents; or

B        the court, after notice and a hearing, authorizes such use, sale, or lease in
           accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

36.    Substantially all cash generated by the Debtors' businesses as of the Petition Date constitutes "cash collateral," as such term is defined in section 363(a) of the Bankruptcy Code, and is subject to the interest of the Prepetition Secured Lenders.

37.    The Debtors seek to use Cash Collateral during the period commencing immediately after the filing of the Debtors' chapter 11 petitions until the indefeasible payment in full in cash of the Obligations (as defined in the DIP Credit Agreement), including all Loans (as defined in the DIP Credit Agreement) and all obligations constituting unreimbursed drawings

---

[11]        Pursuant to section 1107 of the Bankruptcy Code, a debtor-in-possession has all of the rights and powers of
            a trustee with respect to property of the estate, including the right to use property of the estate in
            compliance with section 363 of the Bankruptcy Code.  See 11 U.S.C. § 1107(a).

under Letters of Credit (and the replacement or the cash collateralization of outstanding Letters

of Credit) in accordance with the DIP Credit Agreement. The Cash Collateral will be used by

the Debtors to make such essential payments as employee salaries, payroll, taxes, the purchase of

goods and materials, and other general corporate and working capital purposes in the ordinary

course of Debtors' businesses that become due and payable during the period commencing

immediately after the filing of the Debtors' chapter 11 petitions and through termination of the

DIP Credit Agreement.

38.    As discussed above, pursuant to section 363(c)(2) of the Bankruptcy Code, a

debtor-in-possession may use cash collateral with the consent of the secured party or court

approval. Section 363(e) of the Bankruptcy Code provides that upon request of an entity that has

an interest in property to be used by a debtor, the court shall prohibit or condition such use as is

necessary to provide adequate protection of such interest.

D.    The Debtors Do Not Have An Alternative To The Financing

39.    As set forth in the Miller Affidavit, a working capital facility of the type and

magnitude needed in these chapter 11 cases could not have been obtained on an unsecured basis.

Potential sources of the proposed Financing for the Debtors, obtainable on an expedited basis

and on reasonable terms, were extremely limited. In these circumstances, "[t]he statute imposes

no duty to seek credit from every possible lender before concluding that such credit is

unavailable." In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986).

40.    A debtor need only demonstrate "by a good faith effort that credit was not

available without" the protections afforded to potential lenders by sections 364(c) and (d) of the

Bankruptcy Code. Id.; see also In re Plabell Rubber Prods., Inc., 137 B.R. 897, 900 (Bankr. N.D.

Ohio 1992). Moreover, where there are few lenders likely to be able and willing to extend the

necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to

28

conduct an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr.

N.D. Ga. 1988), aff'd, 99 B.R. 117 (N.D. Ga. 1989). Thus, the evidence introduced at the interim

hearing to consider the relief requested in the Interim Order (the "Interim Hearing") will satisfy

the requirement of sections 364(c) and (d) of the Bankruptcy Code that alternative credit on more

favorable terms was unavailable to the Debtors.

E.      Application Of The Business Judgment Standard

          41.    As described above, after appropriate investigation and analysis and given

the exigencies of the circumstances, the Debtors' management has concluded that the Financing

is the only alternative available in the circumstances of these cases.  Bankruptcy courts routinely

defer to the debtor's business judgment on most business decisions, including the decision to

borrow money.  See Group of Institutional Investors v., Milwaukee St. Paul & Pac. R.R. Co.,

318 U.S. 523, 550 (1943); In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985)

("Business judgments should be left to the board room and not to this Court."); In re Lifeguard

Indus., Inc., 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).  "More exacting scrutiny would slow

the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy

Code's provision for private control of administration of the estate, and threaten the court's ability

to control a case impartially."  Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303,

1311 (5th Cir. 1985).

          42.    In general, a bankruptcy court should defer to a debtor's business judgment

regarding the need for and the proposed use of funds, unless such decision is arbitrary and

capricious.  In re Curlew Valley Assocs., 14 B.R. 506, 511-13 (Bankr. D. Utah 1981).  Courts

generally will not second-guess a debtor's business decisions when those decisions involve "a

business judgment made in good faith, upon a reasonable basis, and within the scope of [its]

authority under the [Bankruptcy] Code."  Id. at 513-14 (footnote omitted).

43.     The Debtors have exercised sound business judgment in determining that a debtor-in-possession credit facility is appropriate and have satisfied the legal prerequisites to borrow under the DIP Credit Agreement.  The terms of the DIP Credit Agreement are fair and reasonable and are in the best interests of the Debtors' estates.  Accordingly, the Debtors should be granted authority to enter into the DIP Credit Agreement and borrow funds from the DIP Lenders on the secured, administrative superpriority basis described above, pursuant to section 364(c) of the Bankruptcy Code, and take the other actions contemplated by the DIP Credit Agreement and as requested herein.

44.     Without the liquidity provided by the Financing, the Debtors will be unable to pay suppliers, employees, and other constituencies that are essential to the orderly operation of their businesses.  The Debtors' managers have exercised their best business judgment in negotiating the Financing that is presently before this Court.

F.     The Financing Is Necessary To Preserve the Assets Of The Debtors' Estates And To Operate Their Businesses

45.     No party-in-interest can contend seriously that the Debtors do not need immediate access to a working capital facility.  As with most other large businesses, the Debtors have significant cash needs.  Access to substantial credit is necessary to meet the day-to-day costs associated with maintaining business relationships with the Debtors' vendors and suppliers, purchasing new inventory, and otherwise financing their operations.  Access to sufficient cash is therefore critical to the Debtors.  In the absence of immediate access to cash and credit, the Debtors' suppliers will refuse to sell critical supplies and services to the Debtors, and the Debtors will be unable to operate their businesses.  The inability to meet payments to vendors and satisfy customers' desires for particular products would impair seriously the Debtors' prospects for reorganization.

30

46.    For these reasons, access to credit under the Financing is critical.  The

Debtors cannot wait for the beneficial effects of the Financing; any substantial delay could have

the same impact as denial of the Motion.  The Debtors' need for access to the Financing therefore

is immediate.

G.    The Terms Of The Financing Are Fair, Reasonable, And Appropriate

47.    The Debtors are unable to obtain unsecured credit allowable solely as an

administrative expense.  The proposed Financing reflects the exercise of sound and prudent

business judgment.  The Debtors would not have been able to obtain financing on an unsecured

basis, or otherwise.  In the Debtors' business judgment, the Financing is the best financing option

available in the circumstances in these chapter 11 cases.

48.    The proposed terms of the Financing are fair, reasonable, and adequate in

that these terms neither (a) tilt the conduct of these chapter 11 cases and prejudice the powers

and rights that the Bankruptcy Code confers for the benefit of all creditors, nor (b) prevent

motions by parties-in-interest from being decided on their merits.  The purpose of the Financing

is to enable the Debtors to meet ongoing operational expenses.

49.    The proposed Financing provides that the security interests and

administrative expense claims granted to the Lender are subject to the Carve-Out.  In In re Ames

Dep't Stores, 115 B.R. 34 (Bankr. S.D.N.Y. 1990), this Court found that such "carve-outs" are

not only reasonable, but are necessary to ensure that official committees and the debtor's estate

will be assured of the assistance of counsel.  Id. at 40.

50.    Likewise, the various fees and charges required by the DIP Lenders under

the Financing are reasonable and appropriate under the circumstances.  Indeed, courts routinely

authorize similar lender incentives beyond the explicit liens and other rights specified in section

364 of the Bankruptcy Code.  See In re Defender Drug Stores, Inc., 145 B.R. 312, 316 (9th Cir.

31

BAP 1992) (authorizing credit arrangement under section 364, including a lender "enhancement fee").

51.     The terms and conditions of the DIP Credit Agreement are fair and reasonable, and were negotiated by the parties in good faith and at arm's-length.  Accordingly, the DIP Lenders under the DIP Credit Agreement should be accorded the benefits of section 364(e) of the Bankruptcy Code in respect of such agreement.

52.     The fairness and reasonableness of the terms of the Financing will be further shown at the Interim Hearing and Final Hearing.

H.     Request For Modification Of Automatic Stay

53.     Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition pursuant to the Bankruptcy Code.  The proposed DIP Credit Agreement contemplates a modification of the automatic stay (to the extent applicable), to: (a) authorize, but not require, the lenders to file financing statements, deeds of trust, mortgages, or other similar documents to evidence, validate, and perfect the DIP Lenders' security interests granted to them under the Financing; (b) give the Debtors any notice provided for in the DIP Credit Agreement; (c) execute upon their security interests or exercise other remedies under the Loan Documents upon the occurrence of an Event of Default (as defined in the DIP Credit Agreement), after giving five business days notice in writing, served by hand or telefax upon this Court, Debtors' counsel, any trustee of the Debtors, if appointed, counsel for any official creditors' committee, counsel for the Prepetition Agent, and the Office of the United States Trustee (the "U.S. Trustee"); and (d) take such other actions required or permitted by the Loan Documents.  Stay modification provisions of this kind are ordinary and standard features of postpetition debtor-in-possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.

32

I.      Request For Immediate Interim Relief

54.    Bankruptcy Rule 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than 15 days after the service of such motion.  Upon request, however, this Court is empowered to conduct a preliminary expedited hearing on the motion and to authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.  In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions.  See, e.g., In re Simasko Prod. Co., 47 B.R. at 449; see also In re Ames Dep't Stores, 115 B.R. at 38.  After the 15-day period, the request for financing is not limited to those amounts necessary to prevent destruction of the debtor's business.  A debtor is entitled to borrow those amounts that it believes prudent in the operation of its business.  See, e.g., In re Simasko Prod. Co., 47 B.R. at 449; In re Ames Dep't Stores, 115 B.R. at 36.

55.    Pending the Final Hearing, the Debtors require immediate use of Cash Collateral and Financing for, among other things, their purchase of inventory, maintenance of their facilities, and other working capital needs.  It is essential that the Debtors immediately stabilize their operations and resume paying for ordinary, postpetition operating expenses, as well as the prepetition expenses approved in the first-day orders, to minimize the damage occasioned by their cash flow problems.

56.    Absent immediate use of Cash Collateral and financing, the Debtors will be unable to pay ongoing operational expenses.  Consequently, if interim relief is not obtained, the Debtors' assets will be jeopardized immediately and irreparably harmed, to the detriment of the Debtors' estates, their creditors, and other parties-in-interest.

57.     Accordingly, pursuant to Bankruptcy Rules 4001(b) and (c), the Debtors request that, pending the Final Hearing, this Court schedule the Interim Hearing as soon as practicable to consider the Debtors' request for authorization to use Cash Collateral and obtain interim credit in an amount up to $950 million under the Financing, in accordance with and pursuant to the terms and conditions contained in the DIP Credit Agreement and the Interim Order.

58.     As noted above, the Debtors are unable to obtain unsecured credit or debt allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code in an amount sufficient and readily available to maintain ongoing operations.  Nor have the Debtors been able to obtain debtor-in-possession financing on terms more favorable than those proposed herein.  Without the Financing, the Debtors' objective of prosecuting their chapter 11 cases and restructuring their business as a going concern, while maintaining value for the benefit of creditors and employees, may fail without a fair opportunity to achieve the purpose of chapter 11.  The terms and conditions of the DIP Credit Agreement are fair and reasonable, and were negotiated extensively by well-represented parties in good faith and at arm's-length.  In these circumstances and, importantly, in light of the risk of possible material irreparable harm to the Debtors' operations, the granting of the relief requested by the Motion is more than warranted.

The Financing Should Be Accorded The Benefits Of Section 364(e)

59.     No consideration is being provided to any party to, or guarantor of, obligations arising under the Financing, other than as disclosed in the Loan Documents.  Accordingly, the Financing should be accorded the benefits of section 364(e) of the Bankruptcy Code for all the reasons set forth herein.

34

<u>Notice</u>

60.    Notice of this Motion has been provided by facsimile, electronic
transmission, overnight delivery, or hand delivery to (a) the U.S. Trustee, (b) the Debtors' 50
largest unsecured creditors, (c) counsel for the Prepetition Agent, (d) the indenture trustee for the
Debtors' senior noteholders, (e) counsel for the Agent, and (f) known holders of prepetition liens
against the Debtors' property (as listed on <u>Exhibit A</u> attached hereto).  In light of the nature of the
relief requested, the Debtors submit that no other or further notice is necessary.

61.    The Debtors will, within three business days of the entry of the Interim
Order by this Court, serve by United States mail, first class postage prepaid, copies of this
Motion, the Interim Order, and a notice of the Final Hearing (the "Final Hearing Notice") to
consider entry of the proposed Final Order on: (a) the U.S. Trustee, (b) the Debtors' 50 largest
unsecured creditors, (c) counsel for the Prepetition Agent, (d) the indenture trustee for the
Debtors' senior noteholders, (e) counsel for the Agent, (f) known holders of prepetition liens
against the Debtors' property (as listed on <u>Exhibit A</u> attached hereto), (g) state and local taxing
authorities, (h) any party that theretofore has filed in these chapter 11 cases a request for special
notice with this Court and served such upon Debtors' counsel, and (i) any other parties as
directed by this Court.

<u>Memorandum Of Law</u>

62.    Because the legal points and authorities upon which this Motion relies are
incorporated herein, the Debtors respectfully request that the requirement of the service and
filing of a separate memorandum of law under Rule 9013-1(b) of the Local Bankruptcy Rules for
the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an interim order (a) authorizing the Debtors to obtain secured postpetition financing on a superpriority priming basis and modifying the automatic stay, (b) granting adequate protection to Prepetition Secured Lenders, (c) authorizing use of cash collateral, (d) granting interim relief, (e) scheduling a final hearing thereon, and (f) granting the Debtors such other and further relief as is just.

Dated:  New York, New York
        October 8, 2005

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP

By: s/ John Wm. Butler, Jr._____
    John Wm. Butler, Jr. (pro hac vice motion pending)
    John K. Lyons
    Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

    - and -

By: s/ Kayalyn A. Marafioti_____
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

    - and -

SHEARMAN & STERLING LLP


By: s/ Douglas P. Bartner_____
    Douglas P. Bartner (DB 2301)
    Constance A. Fratianni (CF 0672)
599 Lexington Avenue
New York, NY 10022-6069
Telephone:  (212) 848-4000
Facsimile:  (212) 848-7179

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

36