SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-_____ (___) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. §§ 105, 363, 1107, AND
1108 AND FED. R. BANKR. P. 4001 AUTHORIZING DEBTORS TO
ENTER INTO, CONTINUE PERFORMANCE UNDER, AND PROVIDE
CREDIT SUPPORT UNDER DERIVATIVE CONTRACTS

("DERIVATIVE CONTRACTS MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"),[1] debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order under 11 U.S.C. §§ 105, 363, 1107, and 1108 and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorizing the Debtors to enter into, continue performance under, and provide credit support under Derivative Contracts (as defined below). In support of this Motion, the Debtors submit the Affidavit Of Robert S. Miller, Jr. In Support Of Chapter 11 Petitions And First Day Orders, sworn to October 8, 2005.  In further support of this Motion, the Debtors respectfully represent as follows:

## Background

### A.    The Chapter 11 Filings

1.    On October 8, 2005 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have moved this Court for an order authorizing joint administration of these chapter 11 cases.

---

[1]     In addition to Delphi, the following entities are debtors in these related cases:  ASEC Manufacturing General Partnership, ASEC Sales General Partnership, Aspire, Inc., Delco Electronics Overseas Corporation, Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems Global (Holding), Inc., Delphi Automotive Systems Human Resources LLC, Delphi Automotive Systems International, Inc., Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems LLC, Delphi Automotive Systems Overseas Corporation, Delphi Automotive Systems Risk Management Corp., Delphi Automotive Systems Services LLC, Delphi Automotive Systems Tennessee, Inc., Delphi Automotive Systems Thailand, Inc., Delphi China LLC, Delphi Connection Systems, Inc., Delphi Diesel Systems Corp., Delphi Electronics (Holding) LLC, Delphi Foreign Sales Corporation, Delphi Integrated Service Solutions, Inc., Delphi International Holdings Corp., Delphi International Services, Inc., Delphi Liquidation Holding Company, Delphi LLC, Delphi Mechatronic Systems, Inc., Delphi Medical Systems Colorado Corporation, Delphi Medical Systems Corporation, Delphi Medical Systems Texas Corporation, Delphi NY Holding Corporation, Delphi Services Holding Corporation, Delphi Technologies, Inc., DREAL, Inc., Environmental Catalysts, LLC, Exhaust Systems Corporation, Packard Hughes Interconnect Company, Specialty Electronics, Inc., and Specialty Electronics International Ltd.

2

      2.   No trustee, examiner, or creditors' committee has been appointed in the Debtors' cases.

      3.   This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

      4.   The statutory predicates for the relief requested herein are sections 105, 363, 1107, and 1108 of the Bankruptcy Code and Bankruptcy Rule 4001.

B.      Current Business Operations Of The Debtors

      5.   With more than 180,000 employees worldwide, global 2004 revenues of approximately $28.6 billion and global assets as of August 31, 2005 of approximately $17.1 billion,[2] Delphi ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations without supervision from the Bankruptcy Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy Code.

      6.   Over the past century, the operations which are now owned by Delphi have become a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines.  Today, the Company is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company's technologies and products are present in more than 75 million vehicles on the road worldwide.  The Company supplies products to nearly every major global automotive original equipment manufacturer with 2004

---

[2]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

sales to its former parent, General Motors Corporation, equaling approximately $15.4 billion
and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan
Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

       7.   As part of its growth strategy, Delphi has established an expansive global
presence with a network of manufacturing sites, technical centers, sales offices, and joint
ventures located in every major region of the world.  In the U.S., the Debtors employ
approximately 50,600 people.  Those employees work in approximately 44 manufacturing sites
and 13 technical centers across the country, and in Delphi's worldwide headquarters and
customer center located in Troy, Michigan.  Approximately 34,750 of these individuals are
hourly employees, 96% of whom are represented by approximately 49 different international
and local unions.  Outside the United States, the Company's foreign entities employ more than
134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40
countries worldwide.

       8.   Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary
of GM.  Prior to January 1, 1999, GM conducted the Company's business through various
divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these
divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates in
accordance with the terms of a Master Separation Agreement between Delphi and GM.  In
connection with these transactions, Delphi accelerated its evolution from a North American-
based, captive automotive supplier to a global supplier of components, integrated systems, and
modules for a wide range of customers and applications.  Although GM is still the Company's
single largest customer, today more than half of Delphi's revenue is generated from non-GM
sources.

9.    Due to the significant planning that goes into each vehicle model, Delphi's

efforts to generate new business do not immediately affect its financial results, because supplier

selection in the auto industry is generally finalized several years prior to the start of production

of the vehicle.  When awarding new business, which is the foundation for the Company's

forward revenue base, customers are increasingly concerned with the financial stability of their

supply base.  The Debtors believe that they will maximize stakeholder value and the

Company's future prospects if they stabilize their businesses and continue to diversify their

customer base.  The Debtors also believe that this must be accomplished in advance of the

expiration of certain benefit guarantees between GM and certain of Delphi's unions

representing most of its U.S. hourly employees which coincides with the expiration of the

Company's U.S. collective bargaining agreements in the fall of 2007.

C.    Events Leading To Chapter 11 Filing

10.    In the first two years following Delphi's separation from GM, the

Company generated more than $2 billion in net income.  Every year thereafter, however, with

the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company

reported a net operating loss of $482 million on $28.6 billion in net sales.  Reflective of a

downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six

months of 2005.  The Company experienced net operating losses of $608 million for the first

six months of calendar year 2005 on six-month net sales of $13.9 billion, which is

approximately $1 billion less in sales than during the same time period in calendar year 2004.[3]

11.    The Debtors believe that three significant issues have largely contributed

to the deterioration of the Company's financial performance: (a) increasingly unsustainable

---

[3]    Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to
the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues and forward looking revenue requirements. Having concluded that pre-filing discussions with its Unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

13.    Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses. This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned in the Company's transformation plan. The Debtors believe that a substantial segment of Delphi's U.S. business operations must be divested, consolidated, or wound-down through the chapter 11 process.

14.    Upon the conclusion of this process, the Debtors expect to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

Relief Requested

15.    By this Motion, the Debtors seek entry of an order pursuant to sections 105, 363, 1107, and 1108 of the Bankruptcy Code and Bankruptcy Rule 4001 authorizing but not directing the Debtors to (a) continue entering into, "rolling over," adjusting, modifying, and settling Derivative Contracts for the purpose of hedging the Debtors' risk to fluctuations in foreign currency exchange rates, commodity prices, and changes in interest rates, (b) continue performing under their existing hedging and derivative contracts, and (c) perform all such other actions (the "Ancillary Transactions") necessary or appropriate to implement, execute, and perform such transactions, including, but not limited to, posting collateral or margin, and delivery of settlement, on account of Derivative Contracts.

Basis For Relief

A.    The Debtors' Financial Derivative Strategy

16.    The Debtors' businesses are sensitive to fluctuations in foreign currency exchange rates, commodity prices, and changes in interest rates.  The Debtors maintain a centralized hedging program that consists of entering into derivative contracts to mitigate the risks associated with such fluctuations.  Derivative contracts are financial contracts, the values of which are based on the price of a traditional security such as a stock or bond, an asset such as a commodity or currency, or a market index (collectively, the "Derivative Contracts").

7

17.    Derivative contracts can take a number of different forms, including forward contracts, swap contracts, option contracts, or combinations of the foregoing.  A forward contract obligates the purchaser of such contract to acquire a security or asset on a specified date in the future at a specified price.  If, on the specified date, the actual price of the security or asset is higher than the specified price in the contract, the purchaser will profit; if the actual price is lower than the price specified in the contract, the purchaser will incur a loss.

18.    A swap contract obligates each party to the contract to exchange or swap cash flows at specified intervals.  For example, an interest rate swap contract might obligate one party to pay a cash flow calculated at a fixed rate of interest on a hypothetical principal amount, known as a notional amount, while the other party might be obligated to pay a cash flow calculated at a floating rate of interest on the same notional amount.

19.    An option contract provides the purchaser the right, but not the obligation, to purchase a security or asset at a specified price on a specified date.  Each of these contracts may be used for purposes of hedging or reducing risk or for purposes of speculating on the prices of underlying securities, assets, or indices.

20.    The Debtors historically have entered into Derivative Contracts with counterparties (each, a "Counterparty" and collectively, the "Counterparties") in the ordinary course of business for the purpose of reducing or hedging existing or expected risks associated with fluctuations in foreign currency exchange rates, commodity prices, and changes in interest rates.

21.    As part of the hedging program approval process, the Debtors' management representatives are required to identify the specific financial risk which the derivative transaction will minimize, and the appropriate hedging instrument to be used to

8

reduce the risk.  The Debtors also maintain risk management control systems involving a variety of analytical techniques, including market value and sensitivity analysis, to monitor exchange and commodity risks and related hedge positions.  Purchase orders, letters of intent, capital planning forecasts, historical data, and other indices are used as the basis for determining the anticipated values of the transactions to be hedged.  The hedge positions entered into by the Debtors, as well as the correlation between the transaction risks and the hedging instruments, are reviewed by the Debtors' management on an ongoing basis.

22.    The Debtors do not hold or issue Derivative Contracts for trading or speculative purposes.

23.    Fluctuations in the price of copper, primary and secondary aluminum, platinum, palladium, and natural gas (collectively, the "Commodities") significantly affect the Debtors' operations.  Consequently, the Debtors historically have entered into derivative contracts with respect to 60% to 80% of their Commodities exposure and that of their foreign affiliates.  The Debtors have entered into swap contracts with numerous global banks,[4] for periods that typically extend for up to three years, to hedge (or reduce) the risks associated with such fluctuations in the Commodities.

24.    The amount of the Commodities that is hedged by the Debtors in any particular year and at any particular time is dependent on a variety of factors relating to the price of the Commodities and the relative cost of entering into swap contracts to hedge their exposure to fluctuations.

25.    In addition, because of the international scope of the Debtors' businesses, fluctuations in foreign currency exchange rates may significantly affect their operations.  To

---

[4]    Counterparty banks include:  Barclays Bank plc, Deutsche Bank Group, HSBC Bank USA, J. Aron & Company, JP Morgan Chase Bank, N.A., Morgan Stanely & Co International Limited, and Societe Generale.

manage or reduce the risks associated with fluctuations in foreign currency exchange rates, the

Debtors have entered into Derivative Contracts related to over 27 pairs of currencies.  The

Debtors have entered into such contracts with numerous global banks[5] for periods that typically

extend up to 24 months.

26.    As of the Petition Date, the Debtors have entered into Derivative Contracts

to hedge approximately $1.5 billion of their foreign currency exposure and that of their foreign

affiliates.  Entering into these Derivative Contracts enables the Debtors to limit substantially

their exposure to fluctuations in the foreign currency exchange rates around the world.

27.    Although the Debtors historically have entered into Derivative Contracts to

minimize the effects of changes in interest rates on their businesses, the Debtors have no

amounts outstanding under derivative instruments to manage interest rate risk or minimize

interest expense.  Nevertheless, the Debtors seek authorization to enter into Derivative

Contracts to hedge their interest rate risk should the need to do so arise during the pendency of

these chapter 11 cases.

28.    Derivative Contracts entered into to hedge exposure of both the Debtors

and certain of the Debtors' foreign affiliates are accounted for in the United States.  Because

exposure under the Derivative Contracts is consolidated, the Derivative Contracts are,

depending upon the gains or losses thereunder, either assets or liabilities of the estate.  The

Debtors propose that Derivative Contracts entered into on behalf of certain of the Debtors'

foreign affiliates benefit the estate, its creditors, and all parties-in-interest, in that the Derivative

---

[5]    Counterparty banks include:  Bank of America N.A., Barclays Bank plc, BNP Paribas, Citibank N.A., Deutsche Bank Group, HSBC Bank USA, JP Morgan Chase Bank, N.A., Merrill Lynch International Bank Limited, The Royal Bank of Scotland plc, and Scotia Capital.

Contracts remove volatility and preserve the cash flows of such affiliates, which themselves are important assets of the estate.

B.    The Derivative Contracts

29.    Recognizing the unique status of forward contracts, swap contracts, and option contracts in the financial and commodity markets, Congress has added to the Bankruptcy Code certain so-called "safe-harbor" provisions regarding Derivative Contracts to which a debtor-in-possession is a party. These provisions generally permit non-Debtor Counterparties to exercise certain rights and remedies under such derivative contracts not generally available to other contract counterparties in a bankruptcy case.

30.    Among the safe-harbor rights and protections under the Bankruptcy Code are provisions that: (a) allow the non-debtor party to terminate, liquidate, and apply collateral held under a derivative contract upon a bankruptcy filing, notwithstanding section 365(e)(1) of the Bankruptcy Code; (b) protect prepetition payments made under a derivative contract by a debtor to a non-debtor party from the avoidance powers of a trustee or debtor-in-possession, except in particular cases of actual intent to defraud other creditors; and (c) permit a non-debtor party to set off mutual debts and claims against a debtor under a derivative contract without the need to obtain relief from the automatic stay. See 11 U.S.C. §§ 362(b)(6) and (17), 546(e), 548(d)(2)(B) and (D), 553(b)(1), 556, and 560.

31.    Generally, Derivative Contracts entered into by the Debtors are documented in the form of (a) master agreements, (b) confirmations issued under general terms and conditions, or (c) single transaction agreements (collectively, the "Transaction

11

Agreements"). The Transaction Agreements set forth the terms and conditions that govern the transactions entered into between the Debtors and the Counterparties from time to time.[6]

32.    The Debtors and the Counterparties use the ISDA Master Agreement when a master agreement is employed. The Debtors and the Counterparties then enter into individual transactions under the ISDA Master Agreement. These individual transactions are customarily documented in the form of confirmations, which set forth, among other terms, notional amounts, rates, settlement dates, and counterparties to the transactions.

C.    Early Termination And Termination Payments

33.    Among the safe-harbor rights noted above is the right of a qualifying non-Debtor party to terminate a Derivative Contract due to, among other things, the commencement of a bankruptcy case by the other party. See 11 US.C. §§ 362(b)(6), 556, and 560. Such an event is generally designated under the Transaction Agreements as an "early termination event."

34.    Under the Transaction Agreements, proper termination upon an early termination event – whether the transactions under the Transaction Agreements are forward contracts, option agreements, swap agreements, or otherwise – is typically accomplished by (a) upon a default by one party, both parties ceasing all further performance under the transactions, (b) the non-defaulting party determining the amounts payable by each party to the other party at the time of termination, and (c) the "netting" of the amounts due to and from each party, thereby reaching a net settlement amount payable by one party (the "Termination Payment").

---

[6]    The Debtors, by filing the Motion, are not expressing a view as to whether any particular contract falls within the definitions of contracts in sections 556 or 560 of the Bankruptcy Code, or that any particular Counterparty is entitled to exercise rights pursuant to such sections of the Bankruptcy Code.

35.    Under many Transaction Agreements, a Termination Payment would be payable by either the defaulting party or the non-defaulting party.  Thus, termination could, and often will, result in a net payment to the Debtors.  These "in the money" agreements, where an embedded net amount due to the Debtors is present, constitute significant assets of the Debtors' estates.

36.    Moreover, many Transaction Agreements expressly address the rights of setoff and netting.  Some agreements may restrict common law setoff rights.  Other agreements may expand setoff and netting rights to include multiple Transaction Agreements and multiple affiliates of the contracting parties.

Applicable Authority

A.    Authority To Enter Into Derivative Contracts

37.    Although the Debtors believe that entering into Derivative Contracts postpetition is within the ordinary course of their businesses, Counterparties in other bankruptcy cases have taken the position that they will not do business with the debtors in such bankruptcies without specific authorization from the bankruptcy court for such transactions. See, e.g., Motion for Order (I) Establishing Procedures for Settlement of Terminated Safe Harbor Contracts and (II) Authorizing the Debtors to Enter into Derivative Contracts and to Pledge Collateral Under Derivative Contracts at 45, In re NRG Energy, Inc., Case No. 03-13024 (Bankr. S.D.N.Y. June 6, 2003); Motion for Order Authorizing Debtors to Enter into Risk Management Transactions for Limited Purposes of Protecting Existing Open Trading Contracts at 11, In re Enron Corp., Case No. 01-16034 (Bankr. S.D.N.Y. Apr. 30, 2002); Motion for Order Authorizing Debtors to Enter into Risk Management Transactions at 3-4, In re USG Corp., Case No. 01-2094 (Bankr. D. Del. Nov. 15, 2001); Motion for Order

13

Authorizing Armstrong World Industries, Inc. to Continue Its Risk Hedging Facilities at 5, In re Armstrong World Indus., Inc., Case No. 00-4471 (Bankr. D. Del. Feb. 7, 2001).

38.    Thus, out of an abundance of caution, the Debtors request that this Court determine that Derivative Contracts are "ordinary course transactions" within the meaning of section 363(c)(1) of the Bankruptcy Code, or in the alternative, allow the Debtors to continue this business practice pursuant to section 105(a) of the Bankruptcy Code.

39.    To effectively manage risks inherent in the Debtors' businesses, the Debtors must be able to enter quickly into Derivative Contracts and must be able to maintain the confidentiality of the basic terms of the Derivative Contracts.  Given the confidential and immediate nature of entering into Derivative Contracts, it is impracticable and counterproductive to require the Debtors to seek separate bankruptcy court approval of each Derivative Contract.

40.    Moreover, bankruptcy courts in previous cases have authorized debtors to enter into Derivative Contracts in a manner similar to that which is sought by the Motion. See, e.g., In re NRG Energy, Inc., Case No. 03-13024 (Bankr. S.D.N.Y. June 30, 2003); In re Enron Corp., Case No. 01-16034 (Bankr. S.D.N.Y. May 14, 2002); In re US Airways Group, Inc., Case No. 02-83984 (Bankr. E.D. Va. Nov. 8, 2002); In re USG Corp., Case No. 01-2044 (Bankr. D. Del. Dec. 6, 2001); In re Armstrong World Indus., Inc., Case No. 00-4471 (Bankr. D. Del. Mar. 7, 2001).

B.    The Derivative Contracts Are Ordinary Course Transactions

41.    Section 363 of the Bankruptcy Code provides, in relevant part, that a debtor in possession "may enter into transactions . . . in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1).

42.    Section 363 is designed to serve the "'overriding goal of maximizing the
value of the estate' by striking the optimal balance between the interests of the debtor and the
creditors." Habinger, Inc. v. Metro. Cosmetic & Reconstructive Surgical Clinic, P.A., 124 B.R.
784, 786 (Bankr. D. Minn. 1990), (quoting United States ex rel. Harrison v. Estate of
Deutscher, 115 B.R. 592, 599 (M.D. Tenn. 1990)).  Moreover, "[t]he 'ordinary course of
business' standard is intended to allow a debtor the 'flexibility it needs to run its business and
respond quickly to changes in the business climate.'" Habinger, 124 B.R. at 786 (citation
omitted).

43.    The Debtors believe that entering into, "rolling over," adjusting,
modifying, and settling Derivative Contracts are in the ordinary course of their businesses, and
therefore, that they can consummate such transactions without notice and a hearing.  See
Lavigne Med.  Malpractice Ins. Ass'n v. Hirsch (In re Lavigne), 114 F.3d 379, 384 (2d Cir.
1997) (finding that 'ordinary course of business' is meant to embrace the reasonable
expectations of interested parties of the nature of transactions that the debtor would likely enter
in the course of its normal, daily business'") (quoting Watford v. S. Cent. Form Credit, 159
B.R. 597, 599 (M.D. Ga. 1993), aff'd mem., 61 F.3d 30 (11th Cir. 1995)); accord In re Roth
Am., Inc., 975 F.2d 949, 952 (3d Cir. 1992) (stating that section 363 of the Bankruptcy Code is
designed to allow a debtor-in-possession flexibility to engage in ordinary transactions without
unnecessary oversight); In re Coordinated Apparel, Inc., 179 B.R. 40, 43 (Bankr. S.D.N.Y.
1995).  However, to provide important assurances to existing and potential Counterparties, the
Debtors are requesting that this Motion be granted.

44.    The Bankruptcy Code does not define "ordinary course of business."
"[T]hrough a synthesis of case law, [however], courts have developed a workable analytical

framework for determining whether an activity is within the debtor's 'ordinary course of business.'" In re Husting Land & Dev., Inc., 255 B.R. 772, 778 (Bankr. D. Utah 2000), aff'd, 274 B.R. 906 (D. Utah 2002); In re Johns-Manville Corp., 60 B.R. 612, 616-18 (Bankr. S.D.N.Y. 1986). The "reasonable expectations" test was first articulated by the bankruptcy court in the Southern District in New York in Armstrong World Indus., Inc. v. James A. Phillips, Inc., 29 B.R. 391 (S.D.N.Y. 1983). That court explained that "[t]he touchstone of 'ordinariness' is the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business. So long as the transactions conducted are consistent with these expectations, creditors have no right to notice and hearing." Id. at 394. Other courts have also adopted the reasonable expectations test. The court in Martino v. First National Bank of Harvay (In re Garofalo's Finer Foods, Inc., for example,

> [T]he reasonable expectations test provides the necessary standards to determine whether a specific transaction is within the ordinary course of business. The core of the reasonable expectations test is its analysis of the debtor's pre-petition conduct as a means to inform and develop expectations of its post-petition conduct.

186 B.R. 414, 425 (N.D. Ill. 1995) (footnote omitted).

45.    Creditors' reasonable expectations of a debtor's "ordinary course of business" are based on the debtor's specific prepetition business practices and norms and the expectation that the debtor will conform to those practices and norms while operating as a debtor-in-possession. See id. Thus, a fundamental characteristic of an "ordinary" postpetition business transaction is its similarity to a prepetition business practice. Marshack v. Orange Commercial Credit (In re Nat'l Lumber for Supply, Inc.), 184 B.R. 74, 79 (9th Cir. B.A.P. 9th Cir. 1995); Armstrong, 29 B.R. at 394. The size, nature, and type of business, and the size and nature of the transactions in question are all relevant to determining whether the transactions are ordinary. Harrison, 115 B.R. at 598; Johns-Manville, 60 B.R. at 617.

46.   "Accordingly, a post-petition transaction undertaken by the debtor that is similar in size and nature to pre-petition transactions undertaken by the debtor would be within the ordinary course of business." Martino, 186 B.R. at 426.  The Derivative Contracts in which the Debtors will transact postpetition are the same types of Derivative Contracts as those the Debtors transacted prepetition, with the same types of parties, and for the same reasons.

47.   The Debtors should be authorized to consummate the Derivative Contracts without further order of this Court.  Companies in the Debtors' industry routinely enter into such transactions.  Moreover, the Debtors routinely entered into such transactions prepetition.  See Delphi Corporation, Annual Report (Form 10-K), at 65-66 (June 30, 2005) (explaining that the Debtors' use of Derivative Contracts during 2004 included forward contracts, swaps, and options to reduce the Debtors' exposure to fluctuations in foreign currency exchange rates, commodity prices, and changes in interest rates.)

48.   Although the Debtors believe that entering into Derivative Contracts is within the ordinary course of their business and that they can consummate such transactions without notice and a hearing, the Debtors request that this Court enter an order authorizing the Debtors to enter into, "roll over," modify, adjust, and settle the Derivative Contracts in part because certain Counterparties may be unwilling to take any "risk" on the "ordinary course issue" fearing that the Derivative Contracts may later be avoided under section 549 of the Bankruptcy Code.  If this Court grants the relief requested in the Motion, the Counterparties will be satisfied that the Debtors will be authorized to enter into Derivative Contracts and the Debtors will be able to continue their sound, necessary hedging practices.

49.   To the extent this Court is not satisfied that entering into the Derivative Contracts is within the Debtors' ordinary course of business, the relief requested in this Motion

should be granted pursuant to section 105(a) of the Bankruptcy Code. Section 105(a) of the

Bankruptcy Code provides that the "court may issue any order, process, or judgment that is

necessary or appropriate to carry out the provisions of this title." 11 U.S.C. §105(a). Such

orders are appropriate where they are essential to the Debtors' reorganization efforts and do not

pose a burden on the Debtors' creditors. See Official Comm. of Unsecured Creditors v. PSS

S.S. Co., (In re Prudential Lines, Inc.), 928 F.2d 565, 574 (2d Cir. 1991) ("This provision has

been construed liberally to enjoin [actions] that might impede the reorganization process."

(quoting MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 93

(2d Cir.), 1988)); see also Croton River Club, Inc. v. Half Moon Bay Homeowners Ass'n, Inc.,

52 F.3d 41, 45 (2d Cir. 1995) ("Bankruptcy courts have long had broad equity power to manage

the affairs of debtors, a power now codified in Section 105 of the Bankruptcy Code.") (citation

omitted); Advisory Info. & Mgmt. Sys., Inc. v. Prime Computer Inc., 40 B.R. 1001, 1006

(M.D. Tenn. 1984) ("Section 105 [of the Bankruptcy Code] may be applied by a bankruptcy

court to avoid termination of contracts or business relations where such relief is indispensable

to reorganization . . . ."). As such, this Court is authorized to enter an order providing that the

Debtors may enter into, "roll over," modify, adjust, and settle Derivative Contracts without

further order of this Court, and the Debtors request that this Court enter such an order for the

reasons previously stated.

C.      Authority To Post Collateral Under Derivative Contracts

        50.    Certain Counterparties may, as a condition to entering into a Derivative

Contract, require the Debtors to pledge certain of the Debtors' assets to the Counterparty in

circumstances where the Debtors' obligations to the Counterparty exceeds a predetermined

threshold. Posting collateral may, under certain circumstances, enable the Debtors to obtain

more favorable pricing when entering into Derivative Contracts. In the event the Debtors post

18

collateral, the Counterparties will only realize on their collateral in the event that the Debtors

owe such Counterparties money. The Debtors will owe money to Counterparties on account of

the Derivative Contracts, and the collateral that has been posted will be at risk, when foreign

currency exchange rates, commodity prices, and changes in interest rates become favorable to

the Debtors and their foreign affiliates.[7] In such a situation, although the Debtors may owe

money on account of the Derivative Contracts, the Debtors' and their foreign affiliates'

businesses will have benefited from the favorable foreign currency exchange rates, commodity

prices, and changes in interest rates. Consequently, the losses from the Derivative Contracts, if

any, will be offset by gains in the Debtors' and their foreign affiliates' operations.

51.    For example, the Debtors enter into Derivative Contracts to hedge

fluctuations in copper prices. When the price of copper increases, the Debtors are obligated to

pay more money for the copper they consume. The additional expense of copper, however, is

offset by a corresponding benefit from the profits the Debtors and their foreign affiliates

receive on account of the Derivative Contract the Debtors entered into to hedge the price of

copper. Alternatively, when the price of copper decreases, the Debtors lose money on account

of the Derivative Contract they entered into to hedge the price of copper. The loss associated

with the Derivative Contract, however, would be offset by a corresponding benefit from the

decreased expense of copper for the Debtors and their foreign affiliates.

D.    Authority To Perform Obligations Under Prepetition Derivative Contracts

52.    The Debtors also seek to perform their obligations arising under their

prepetition Derivative Contracts, including making all payments when due. As discussed

above, the Counterparties may use the safe-harbor rights and protections contained in the

---

[7]    As discussed above, the Debtors' foreign affiliates themselves are significant assets of the estate.

Bankruptcy Code to seek to terminate the Debtors' prepetition Derivative Contracts, and

discontinue trading prospectively, out of concern that the Debtors are operating outside of the

ordinary course of business with respect to such prepetition Derivative Contracts.  The Debtors,

accordingly, believe it is necessary and appropriate to obtain from this Court an order that

confirms the Debtors' authority to continue their customary practices regarding the Derivative

Contracts to overcome the concerns of such Counterparties.

53.    Pursuant to sections 105(a), 1107, and 1108 of the Bankruptcy Code, the

Debtors are authorized to continue performing under existing Derivative Contracts.  The

Debtors, operating their businesses as debtors-in-possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy estate[s] and operating

the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners."  In

re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  Implicit in the duties of a

chapter 11 debtor-in-possession is the duty "to protect and preserve the estate, including an

operating business's going-concern value."  Id.  Pursuant to section 105(a) of the Bankruptcy

Code, this Court has broad power to authorize the Debtors to perform such actions as are

necessary to fulfill the requirements of sections 1107 and 1108.  The Debtors' existing

Derivative Contracts protect the estates against fluctuating Commodities prices and foreign

currency exchange rates, and are essential to the preservation of value for the benefit of all

parties-in-interest.

54.    Courts in this district and others have granted similar relief.  See In re

NRG Energy, Inc., Case No. 03-13024 (Bankr. S.D.N.Y. June 30, 2003); see also In re

Armstrong World Indus., Inc., Case No. 00-4471 (Bankr. D. Del. Mar. 7, 2001).

55.    Termination of the Debtors' Derivative Contracts would (a) cause disruption to the Debtors' operations, (b) divert the attention of the Debtors' management away from the reorganization process, and (c) expose the Debtors' ability to successfully reorganize to fluctuations in Commodities prices and foreign currency exchange rates.  Thus, this Court should enter an order providing that the Debtors may continue performing under the Derivative Contracts.

### Notice

56.    Notice of this Motion has been provided by facsimile, electronic transmission, overnight delivery, or hand delivery to (a) the Office of the United States Trustee, (b) the Debtors' 50 largest unsecured creditors, (c) counsel for the agent under the Debtors' prepetition credit facility, and (d) counsel for the agent under the Debtors' proposed postpetition credit facility.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

### Memorandum Of Law

57.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order (a) authorizing but not directing the Debtors to enter into Derivative Contracts, (b) authorizing but not directing the Debtors to continue performing under their existing Derivative Contracts, (c) authorizing but not directing the Debtors to perform all such other actions necessary or appropriate to implement, execute, and perform the Ancillary Transactions on account of Derivative Contracts, and (d) granting the Debtors such other and further relief as is just.

Dated:  New York, New York
       October 8, 2005

                      SKADDEN, ARPS, SLATE, MEAGHER
                      & FLOM LLP

                  By:  s/ John Wm. Butler, Jr.
                     John Wm. Butler, Jr. (pro hac vice motion pending)
                     John K. Lyons
                     Ron E. Meisler
                  333 West Wacker Drive, Suite 2100
                  Chicago, Illinois  60606
                  (312) 407-0700

                     - and -

                  By:  s/ Kayalyn A. Marafioti
                     Kayalyn A. Marafioti (KM 9632)
                     Thomas J. Matz (TM 5986)
                  Four Times Square
                  New York, New York 10036
                  (212) 735-3000

                  Attorneys for Delphi Corporation, et al.,
                     Debtors and Debtors-in-Possession