SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------ x
                               :
In re                          :   Chapter 11
                               :
DELPHI CORPORATION, et al.,    :   Case No. 05-____ (__)
                               :
            Debtors.           :   (Jointly Administered)
                               :
------------------------------ x

APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(a) AND 329
AND FED. R. BANKR. P. 2014 AND 2016 (I) AUTHORIZING EMPLOYMENT
AND RETENTION OF SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
AND AFFILIATES AS ATTORNEYS FOR DEBTORS-
IN-POSSESSION AND (II) SCHEDULING A FINAL HEARING THEREON

("SKADDEN RETENTION APPLICATION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"),[1] debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby apply (the "Application") to this Court for interim and final orders under 11 U.S.C. §§ 327(a) and 329 and Fed. R. Bankr. P. 2014 and 2016 (a) authorizing the employment and retention of Skadden, Arps, Slate, Meagher & Flom LLP and affiliates (collectively, "Skadden" or the "Firm") as counsel for the Debtors as of the Petition Date (as hereinafter defined) and (b) scheduling a final hearing thereon. In support of this Application, the Debtors submit the Declaration of John Wm. Butler, Jr. (the "Butler Declaration") and the Affidavit of Robert S. Miller, Jr. in Support of Chapter 11 Petitions and First Day Orders, sworn to October 8, 2005. In further support of this Application, the Debtors respectfully represent as follows:

---

[1] In addition to Delphi, the following entities are debtors in these related cases: ASEC Manufacturing General Partnership, ASEC Sales General Partnership, Aspire, Inc., Delco Electronics Overseas Corporation, Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems Global (Holding), Inc., Delphi Automotive Systems Human Resources LLC, Delphi Automotive Systems International, Inc., Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems LLC, Delphi Automotive Systems Overseas Corporation, Delphi Automotive Systems Risk Management Corp., Delphi Automotive Systems Services LLC, Delphi Automotive Systems Tennessee, Inc., Delphi Automotive Systems Thailand, Inc., Delphi China LLC, Delphi Connection Systems, Delphi Diesel Systems Corp., Delphi Electronics (Holding) LLC, Delphi Foreign Sales Corporation, Delphi Integrated Service Solutions, Inc., Delphi International Holdings Corp., Delphi International Services, Inc., Delphi Liquidation Holding Company, Delphi LLC, Delphi Mechatronic Systems, Inc., Delphi Medical Systems Colorado Corporation, Delphi Medical Systems Corporation, Delphi Medical Systems Texas Corporation, Delphi NY Holdings Corporation, Delphi Services Holding Corporation, Delphi Technologies, Inc., DREAL, Inc., Environmental Catalysts, LLC, Exhaust Systems Corporation, Packard Hughes Interconnect Company, Specialty Electronics, Inc., and Specialty Electronics International Ltd.

Background

A.  The Chapter 11 Filings

1. On October 8, 2005 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have moved this Court for an order for joint administration of these chapter 11 cases.

2. No trustee, examiner, or creditors' committee has been appointed in the Debtors' cases.

3. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4. The statutory predicate for the relief requested herein are sections 327(a) and 329 of the Bankruptcy Code and Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure.

B.  Current Business Operations Of The Debtors

5. With more than 180,000 employees worldwide, global 2004 revenues of approximately $28.6 billion and global assets as of August 31, 2005 of approximately $17.1 billion,[2] Delphi ranks as the fifth largest public company business reorganization in terms of

---

[2]  The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

3

revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations without supervision from the Bankruptcy Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy Code.

6. Over the past century, the operations which are now owned by Delphi have become a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines. Today, the Company is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company's technologies and products are present in more than 75 million vehicles on the road worldwide. The Company supplies products to nearly every major global automotive original equipment manufacturer with 2004 sales to its former parent, General Motors Corporation, equaling approximately $15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

7. As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world. In the U.S., the Debtors employ approximately 50,600 people. Those employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in Delphi's worldwide headquarters and customer center located in Troy, Michigan. Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and local unions. Outside the United States, the Company's foreign entities employ more than

134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

8. Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM. Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

9. Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle. When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base. The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base. The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions

representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C.     Events Leading To The Chapter 11 Filing

10.    In the first two years following Delphi's separation from GM, the Company generated more than $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales. Reflective of a downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005. The Company experienced net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[3]

11.    The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced

---

[3]    Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12. In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues and forward looking revenue requirements. Having concluded that pre-filing discussions with its Unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

13. Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses. This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned in the Company's transformation plan. The Debtors believe that a substantial segment of Delphi's U.S. business operations must be divested, consolidated, or wound-down through the chapter 11 process.

14. Upon the conclusion of this process, the Debtors expect to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal

all of its resources to continue to deliver value and high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

<u>Relief Requested</u>

15. By this Application, the Debtors seek to employ and retain the firm of Skadden, as of the Petition Date, to represent the Debtors as their principal restructuring and bankruptcy counsel in connection with the filing of their chapter 11 petitions and prosecution of their chapter 11 cases. Accordingly, the Debtors respectfully request entry of interim and final orders under sections 327(a) and 329 of the Bankruptcy Code and Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (a) authorizing each of them to employ and retain Skadden as their attorneys under a general retainer to perform the legal services that will be necessary during their chapter 11 cases and (b) scheduling a hearing to determine whether the relief should be granted on a final basis.

16. Since July 12, 2005, Skadden has performed extensive legal work for the Debtors in connection with their ongoing restructuring efforts designed to complete their transformation plan and to preserve the value of the company.

17. Prior to commencement of these chapter 11 cases, the Debtors sought the services of Skadden with respect to, among other things, advice regarding restructuring matters in general and, if required, preparation for the potential commencement and prosecution of chapter 11 cases for the Debtors pursuant to an engagement agreement with Skadden dated as of July 12, 2005 (the "Engagement Agreement").

8

## Basis For Relief

18. The Debtors believe that continued representation by their prepetition restructuring counsel, Skadden, is critical to the Debtors' efforts to restructure their businesses because Skadden has become familiar with the Debtors' business and financial and legal affairs and, accordingly, is well-suited to guide the Debtors through the chapter 11 process.

19. Since the commencement of this engagement, Skadden has assisted the Debtors and their affiliates in connection with, among other things, acting as special corporate counsel to the Debtors and providing advice regarding, without limitation, their efforts to effectuate a consensual resolution with General Motors Corporation and the Debtors' major unions, attending board of directors meetings (and various committees thereof) and internal company meetings from time to time, and the preparations for the filing of these cases.

20. The Debtors have selected Skadden as their attorneys because of its experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code. Indeed, Skadden believes it has assembled a highly qualified team of attorneys to service the Debtors during their reorganization efforts. John Wm. Butler, Jr., co-leader of Skadden worldwide corporate restructuring practice will coordinate the overall representation of the Debtors along with Peter Allan Atkins. Mr. Butler has served as counsel in transactional work with debtors, sellers, purchasers and creditors of financially troubled companies, in nonjudicial restructurings, and in chapter 11 reorganization cases in several hundred transactions across North America and in international transactions located in Asia, Australia, Europe, South America and the Middle East. Mr. Butler has also represented creditors' and equity

committees, secured lenders and chapter 7 trustees in numerous cases in this and other jurisdictions. Attached hereto as <u>Exhibit A</u> is the professional biography of Mr. Butler detailing his specific experience. In addition, other members of Skadden who have been actively involved in representing the Debtors prior to the commencement of these cases will continue to perform services for the Debtors postpetition.

21. Each of the Debtors desire to employ Skadden under a general retainer because of the extensive legal services that will be required in connection with their respective chapter 11 cases and the firm's familiarity with the business, financial and legal affairs of the Debtors and their affiliates.

Services To Be Rendered

22. The services of attorneys are necessary to enable the Debtors to execute faithfully their duties as debtors-in-possession. Subject to further order of this Court, the firm of Skadden will be required to render, among others, the following services to the Debtors as requested by the Debtors:

> (a) advise the Debtors with respect to their powers and duties as debtors and debtors-in-possession in the continued management and operation of their business and properties;
>
> (b) attend meetings and negotiate with representatives of creditors and other parties in interest;
>
> (c) advise and consult on the conduct of the case, including all of the legal and administrative requirements of operating in chapter 11;
>
> (d) advise the Debtors in connection with any contemplated sales of assets or business combinations, including the negotiation of asset, stock purchase, merger or joint venture agreements, formulate and implement bidding procedures, evaluate competing offers, draft appropriate corporate

documents with respect to the proposed sales, and counsel the Debtors in connection with the closing of such sales;

(e) advise the Debtors on matters relating to the evaluation of the assumption, rejection or assignment of unexpired leases and executory contracts;

(f) provide advice to the Debtors with respect to legal issues arising in or relating to the Debtors' ordinary course of business including attendance at senior management meetings, meetings with the Debtors' financial advisors and meetings of the board of directors, and advice on employee, workers' compensation, employee benefits, executive compensation, tax, environmental, banking, insurance, securities, corporate, business operation, contracts, joint ventures, real property, press/public affairs and regulatory matters and advise the Debtors with respect to continuing disclosure and reporting obligations, if any, under securities laws;

(g) take all necessary action to protect and preserve the Debtors' estates, including the prosecution of actions on their behalf, the defense of any actions commenced against those estates, negotiations concerning all litigation in which the Debtors may be involved and objections to claims filed against the estates;

(h) negotiate and prepare on the Debtors' behalf plan(s) of reorganization, disclosure statement(s) and all related agreements and/or documents and take any necessary action on behalf of the Debtors to obtain confirmation of such plan(s);

(i) prepare on the Debtors' behalf all petitions, motions, applications, answers, orders, reports, and papers necessary to the administration of the estates;

(j) attend meetings with third parties and participate in negotiations with respect to the above matters;

(k) appear before this Court, any appellate courts, and the U.S. Trustee, and protect the interests of the Debtors' estates before such courts and the U.S. Trustee; and

(l) perform all other necessary legal services and provide all other necessary legal advice to the Debtors in connection with these chapter 11 cases and bring the Debtors' chapter 11 cases to a conclusion.

23.  Skadden has indicated a willingness to act on behalf of, and render such services to, the Debtors.[4]

### Disinterestedness Of Professionals

24.  Except as set forth in the Butler Declaration, to the best of the Debtors' knowledge, the members, counsel and associates of the firm of Skadden (a) do not have any connection with any of the Debtors, their affiliates, their creditors, the U.S. Trustee, any person employed in the office of the U.S. Trustee, or any other party-in-interest, or their respective attorneys and accountants, (b) are "disinterested persons," as that term is defined in section 101(14) of the Bankruptcy Code, and (c) do not hold or represent any interest adverse to the Debtors' estates.

25.  More specifically, as set forth in the Butler Declaration:

(a) Neither Skadden nor any attorney at the Firm holds or represents an interest adverse to the estates.

(b) Except as set forth herein and in the Butler Declaration, neither Skadden nor any attorney at the Firm is or was a creditor, an equity holder, or an insider of the Debtors, except that Skadden previously rendered legal services to the Debtors for which it was compensated. Certain Skadden attorneys may own Delphi common stock, either directly or indirectly. Also, partners of the Firm may hold Delphi common stock in managed accounts over which they have no control over investment decisions pertaining to holdings in such accounts. Pursuant to the internal policy of Skadden, the Debtors have been placed on the firm's "restricted list" and no sale or purchase of securities or claims relating to the Debtors will be

---

[4] Concurrently herein, the Debtors have filed an application under 11 U.S.C. § 327(a) to retain Togut Segal & Segal as conflicts counsel and an application under 11 U.S.C. § 327(e) to retain Shearman & Sterling LLP as their special counsel. The Debtors will take the appropriate steps to ensure that there is no unnecessary and wasteful duplication of efforts by and between Togut Segal & Segal, Shearman & Sterling LLP and Skadden.

12

authorized or permitted during the pendency of our retention as the Debtors' counsel in the chapter 11 cases.

(c) Neither Skadden nor any attorney at the Firm is or was an investment banker for any outstanding security of the Debtors.

(d) Neither Skadden nor any attorney at the Firm is or was, within three years before the filing of the Debtors' chapter 11 cases, an investment banker for any security of the Debtors, or an attorney for an investment banker in connection with the offer, sale or issuance of any security of the Debtors.

(e) Neither Skadden nor any attorney at the Firm is or was, within two years before the Petition Date, a director, officer or employee of the Debtors or of an investment banker of the Debtors.

(f) Skadden does not have an interest materially adverse to the interests of the estates or of any class of creditors or equity security holders by reason of any direct or indirect relationship to, connection with, or interest in the Debtors or an investment banker specified in the foregoing paragraphs, or for any other reason.

26. In view of the foregoing, the Debtors believe that Skadden is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, except as set forth in the Butler Declaration.

27. In addition, the Debtors are informed by Skadden that no other attorney at Skadden is related to any United States Bankruptcy Judge for the Southern District of New York or to the United States Trustee for such district or to any employee in the office thereof, except that Adlai S. Hardin III, a Corporate Restructuring associate employed by Skadden in its New York office, is the son of Judge Adlai Hardin.

Professional Compensation

28. The Engagement Agreement provided for the implementation of a retainer program pursuant to which the Debtors paid an initial retainer of $500,000 for

professional services rendered and to be rendered and charges and disbursements incurred to Skadden on behalf of the Debtors in connection with those services described in the Engagement Agreement (the "Initial Retainer"). Thereafter, Skadden periodically invoiced the Debtors and drew down the Initial Retainer in payment of such invoices and was paid certain supplemental amounts in order to replenish the Initial Retainer (collectively, the "Supplemental Retainer") in the following amounts and on the following dates: $1,600,000 on August 19, 2005, $2,000,000 on September 8, 2005, and $1,750,000 on September 27, 2005.

29. Pursuant to the Engagement Agreement, Skadden received a filing retainer of $4,000,000 to be utilized in accordance with the Engagement Agreement to cover a portion of the projected fees, charges and disbursements to be incurred during the reorganization cases (the "Filing Retainer," and, together with the Initial Retainer and the Supplemental Retainer, the "Retainer").

30. Pursuant to the Engagement Agreement, Skadden will apply the Retainer to pay any fees, charges and disbursements which remain unpaid as of the Petition Date and will retain the remainder of the Retainer to be applied to any fees, charges and disbursements which remain unpaid at the end of the reorganization cases. As of October 7, 2005 (the last date on which the firm's books and records were reviewed in connection with the preparation of this application), after application of all prepetition fees, charges and disbursements incurred and posted as of that date (including estimated fees, charges and disbursements billed as of October 8, 2005 prior to the commencement of these cases), the amount of the Retainer was $4,033,019.

14

31. According to Skadden's books and records, for the period July 12, 2005, through October 8, 2005, the total amount of services billed to the Debtors in connection with contingency planning was $2,845,087 with an additional $227,668 for charges and disbursements. During the same period, the total aggregate amount of all services billed was $5,500,654 plus charges and disbursements in the amount of $315,327. Skadden's books and records further reflect that for the period July 12, 2005 through October 8, 2005, Skadden received an aggregate of $9,850,000 from the Debtors, including payments received for services rendered prior to the filing on October 8, 2005, and is inclusive of the Retainer balance of $4,033,019. The aggregate amount applied to fees, charges and disbursements for the same period was $5,816,981, exclusive of the Retainer balance of $4,033,019. Any portion of the prepetition amounts received by Skadden that has not yet been applied to prepetition fees and expenses will be applied when such amounts are identified. Should any balance remain after such application, the remainder will be held as a retainer for and applied against postpetition fees and expenses that are allowed by the Court.

32. Pursuant to the Engagement Agreement, Skadden provides the Debtors with periodic (no less frequently than monthly) statements for services rendered and charges and disbursements incurred. During the course of the reorganization cases, the issuance of periodic statements shall constitute a request for an interim payment against the reasonable fees to be determined at the conclusion of the representation. For professional services, Skadden's fees are based in part on its guideline hourly rates which are periodically adjusted. Skadden will be providing professional services to the Debtors under its standard bundled rate schedule and, therefore, Skadden will not be seeking to be separately compensated for certain

staff, clerical and resource charges. As of September 1, 2005, the hourly rates under the bundled rate structure range from $585 to $835 for partners and of counsel, $560 to $640 for counsel and special counsel, $295 to $540 for associates, and $90 to $230 for legal assistants and support staff. The hourly rates set forth above are subject to periodic increases in the normal course of the firm's business, often due to the increased experience of a particular professional.

33.    Skadden intends to apply to the Court for allowance of compensation for professional services rendered and reimbursement of charges and disbursements incurred in these chapter 11 cases in accordance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules for the Southern District of New York (the "Local Rules") and the United States Trustee Guidelines. Skadden will seek compensation for the services of each attorney and paraprofessional acting on behalf of the Debtors in these cases at the then-current bundled rate charged for such services on a non-bankruptcy matter.

34.    The hourly rates set forth above are the Firm's standard bundled hourly rates for work of this nature. These rates are set at a level designed to compensate Skadden fairly for the work of its attorneys and legal assistants and to cover fixed and routine overhead expenses including those items billed separately to other clients under the Firm's standard unbundled rate structure. Consistent with the Firm's policy with respect to other clients, Skadden will continue to charge the Debtors for all other services provided and for other charges and disbursements incurred in the rendition of services. These charges and disbursements include, among other things, costs for telephone charges, photocopying (at a reduced rate of $0.10 per page for black and white copies and higher commensurate charges

for color copies), travel, business meals, computerized research, messengers, couriers, postage, witness fees and other fees related to trials and hearings. Charges and disbursements are invoiced pursuant to Skadden's Policy Statement Concerning Charges and Disbursements. (The "Policy Statement Concerning Charges and Disbursements" is attached as Exhibit B to the Engagement Agreement.) Certain charges and disbursements are not separately charged for under the bundled rate structure as described in the Engagement Agreement.

35. Skadden has agreed to accept as compensation such sums as may be allowed by this Court on the basis of the professional time spent, the rates charged for such services, the necessity of such services to the administration of the estate, the reasonableness of the time within which the services were performed in relation to the results achieved, and the complexity, importance, and nature of the problems, issues or tasks addressed in these cases.

36. Other than as set forth above and in the Butler Declaration, no arrangement is proposed between the Debtors and Skadden for compensation to be paid in these cases, and no agreement or understanding exists between Skadden and any other entity for the sharing of compensation received or to be received for services rendered in or in connection with the case.

## Notice

37. Notice of this Application has been provided by facsimile, electronic transmission, overnight delivery or hand delivery to (i) the office of the United States Trustee, (ii) the Debtors' fifty (50) largest unsecured creditors, (iii) counsel for the agent to the Debtors' pre-petition credit facility, and (iv) counsel for the agent to the Debtors' proposed

post-petition credit facility. In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

## Memorandum Of Law

38.  Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter interim and final and orders (i) authorizing the Debtors' retention of Skadden upon the terms outlined in this Application, (ii) scheduling a final hearing thereon, and (iii) granting such other and further relief as is just and proper.

Dated:   New York, New York
         October 8, 2005

        Delphi Corporation, et al.,
        Debtors and Debtors-In-Possession


By: _s/ John D. Sheehan_____
Title: John D. Sheehan
Name: Vice President and Chief
        Restructuring Officer