## SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

FOUR TIMES SQUARE

NEW YORK 10036-6522

TEL: (212) 735-3000
FAX: (212) 735-2000
www.skadden.com

DIRECT DIAL
212-735-3700
GENERAL FAX
917-777-3700
EMAIL ADDRESS
PATKINS@SKADDEN.COM

FIRM/AFFILIATE OFFICES
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
—
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

As of July 12, 2005

**PRIVILEGED AND CONFIDENTIAL**

Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098

    Attention: Mr. Robert S. Miller, Jr.
         Chairman and CEO
         and
         Logan G. Robinson, Esq.
         Vice President and General Counsel

    Re:   Engagement Agreement with Skadden

Ladies and Gentlemen:

    We are pleased that Delphi Corporation, for itself and each of its subsidiaries for which there is no disqualifying conflict and which Skadden, Arps, Slate, Meagher & Flom LLP and its affiliated law practices ("Skadden" or the "Firm") has agreed to represent (collectively, the "Company"), has decided to engage Skadden as special counsel in connection with the matters described below in the "Scope of Engagement" section of this Engagement Agreement and such other matters as are assigned to us in the future and that we agree to undertake (the "Engagement"). Accordingly, the Engagement is limited to those specific matters enumerated in and/or contemplated by this Engagement Agreement.

    This letter sets forth the terms of our engagement arrangements for all matters (whether pending or prospective), including staffing, fees and waivers, the scope of our engagement, the basis on which the Firm will present its bills for fees, related charges and disbursements, and certain limitations on the Firm's services arising from

Delphi Corporation
As of July 12, 2005
Page 2

potential conflicts of interest. As usual, our Engagement is to represent the Company and not its individual directors, officers, employees or shareholders. However, we anticipate that in the course of that Engagement, we may provide information or advice to directors, officers or employees in their corporate capacities or as otherwise consented to by the Company including as described below.

## Scope of Engagement

We have agreed to represent the Company as special counsel in the Company's efforts to work out its present financial circumstances, which may include restructuring its financial affairs and capital structure and providing legal advice to the Company with respect to proposals from one or more third-party investors, in addition to future representation of the Company on matters for which the Firm may be engaged by the Company not related to the Company's efforts to work out its present financial circumstances. The services to be provided by the Firm in connection with the Engagement will encompass all services normally and reasonably associated with this type of engagement which the Firm is requested and is able to provide and which are consistent with its ethical obligations. As legal counsel, we are not in a position to, and the Company has not retained us to, provide financial advice. With respect to all matters of our Engagement, we will coordinate closely with the Company as to the nature of the services to be rendered by us and the scope of our engagement.

The Engagement may involve advice as to corporate transactions and corporate governance, negotiations, out-of-court agreements with creditors, equity holders, prospective acquirers and investors, review of documents, preparation of agreements, review and preparation of pleadings, court appearances and such other actions as both of us deem necessary and desirable. While the Company has advised us that it is actively pursuing a transformation strategy under the leadership of the Board of Directors and executive management of the Company (including through the Delphi Strategy Board) to address growth objectives, resolve certain financial issues and maximize the enterprise value of the Company for its stakeholders, we agree that the Engagement also will include advice to, and representation of the Company, as debtors and debtors-in-possession, should the Company seek relief pursuant to the provisions of the Bankruptcy Code subject to confirmation of our retention by the Board of Directors in the enabling resolutions adopted by the Board of Directors authorizing the commencement of chapter 11 cases and the approval of our retention by the Bankruptcy Court.

Delphi Corporation
As of July 12, 2005
Page 3

If the Company determines that reorganization cases under chapter 11 of the Bankruptcy Code are appropriate, we will prepare for the filing of the chapter 11 petitions, including review of documents and preparation of the petitions with supporting schedules and statements. During the cases and subject to our ethical obligations discussed above, we will advise and consult on the conduct of the cases, including all of the legal and administrative requirements of operating in chapter 11; prepare such administrative and procedural applications and motions as may be required for the sound conduct of the cases; prosecute and defend litigation that may arise during the course of the cases; consult with you concerning and participate in the formulation, negotiation, preparation and filing of a plan or plans of reorganization and disclosure statement(s) to accompany the plan(s); review and object to claims; analyze, recommend, prepare, and bring any causes of action created under the Bankruptcy Code; take all steps necessary and appropriate to bring the cases to a conclusion; and perform the full range of services normally associated with matters such as this which the Firm is in a position to provide.

In the event that chapter 11 cases are commenced and our retention is authorized, our representation will include, as noted above, serving as principal bankruptcy counsel to the debtors-in-possession under a general retainer, subject to court approval. Such representation also will encompass all out-of-court planning and negotiations attendant to these tasks. Although it is hoped that litigation can be avoided, subject to ethical constraints regarding conflicts of interest, we also will be available to serve the Company in any litigation capacities that become necessary to the extent that any required court approval is obtained.

### Case Management and Coordination of Outside Counsel

The Company is presently using more than one law firm for representation of its interests on substantive matters including, particularly, the law firm of Shearman & Sterling LLP. It is likely that more than one law firm may be needed for such representation, particularly to represent the Company in connection with the numerous labor-intensive day-to-day tasks associated with the Company's present restructuring efforts and other matters including pending litigation, government investigations and related actions and proceedings.

Other than the general representation of the Company by Skadden as restructuring counsel and in the cases, if filed (subject to confirmation of our retention by the Board of Directors in the enabling resolutions adopted by the Board of Directors authorizing the commencement of any chapter 11 cases), the Company will continue to

Delphi Corporation
As of July 12, 2005
Page 4

have discretion to assign specific tasks to co-counsel, adjunct counsel, or special counsel (collectively, "Other Counsel"), as the case may be. If, as outlined below, we are unable to obtain court approval for all matters in potential chapter 11 cases that you wish us (and we agree) to undertake, our representation would include as many of those matters as are approved.

We are committed to working with the Company and in full cooperation with Other Counsel to manage the Engagement on a cost-efficient and productive basis. To the extent possible, given the nature and magnitude of the Engagement, steps have been taken and should continue to be taken by the Company to coordinate tasks and, when practical, to divide these tasks to avoid unnecessary duplication of effort between us and Other Counsel. As of part of this case management protocol, we agree to provide periodic information to the Company and consult with the Company's executive management team regarding work plans, professional staffing, and professional fee accruals and forecasts (as discussed below) in order to assist the Company in coordinating the Engagement on a cost-efficient and productive basis.

### Engagement Personnel

Jack Butler and I will coordinate all Engagement matters on behalf of Skadden. Additional lawyers, including those in other practice areas, will be added to the Engagement on an as needed basis. We have agreed to the Company's request that, to the extent practicable under the circumstances and exigencies facing the Company, we staff the Engagement with a working group of professionals that are prepared to commit a concentrated effort to the Engagement as the Company believes that there are efficiencies of identification with, and dedication to the Engagement. We have also agreed to provide the Company with an organizational chart of lawyers assigned to the Engagement and to promptly update the organizational chart as to any changes in staffing as to which we agree to consult with and obtain the concurrence of the Company.

### Fees, Charges and Disbursements

Our fees will be based primarily on the time involved in the Engagement and our bundled hourly time charges. A list of our current bundled hourly time charges using the Firm's bundled rate structure as of January 1, 2005 is attached as Exhibit A. As part of the Firm's ordinary business practices, hourly time charges are periodically reviewed and revised, and we presently plan to do so effective as of September 1, 2005.

Delphi Corporation
As of July 12, 2005
Page 5

      If the Engagement results in one or more transactions or a direct economic benefit to the Company, with your concurrence as provided below, our fee would reflect a variety of factors. These factors include bundled hourly time charges, the overall benefit to the Company of the transaction, the Company's subjective appraisal of our contribution to the transaction, the cost-control and efficiency exercised in our execution of the Engagement in connection with the transaction, the personal contribution of the Skadden partners coordinating and managing the Engagement, our success in collaboration with the Company's management and integration with the Company's legal staff, and the views of our client. As to each of these factors, we consider it very important and would not submit a final statement for services rendered in excess of our bundled hourly time charges without having discussed our fee in advance with the Company based on the factors mentioned above and obtaining your concurrence.

      As to billing, we will submit a client level on-account statement for all Engagement matters approximating bundled hourly time charges for payment on not less than a monthly basis, and at each matter's conclusion, we will submit a final statement for services rendered which will be based upon our bundled hourly time charges and, if appropriate, the factors outlined above, and which would credit all prior payments. Each statement submitted would be accompanied by a summary of attorney time showing the time worked by each lawyer working on an Engagement matter and the guideline hourly rate for each lawyer. In addition, our billing statements will include charges and disbursements incurred by us in the course of performing legal services in accordance with our standard practice as described in the summary attached as <u>Exhibit B</u>, which may be periodically updated.

      From time to time, the Company may request a fee range estimate for a particular Engagement matter. Any such estimate would be premised upon certain assumptions, including, but not limited to, completion of the matter by a particular target date, no unusual issues or problems arising, no litigation, counsel for the other parties sufficiently experienced and competent to perform such counsel's normal functions in this type of matter and so forth. In such situations, we will respond promptly to the Company's request in writing although it is agreed that such estimates shall not constitute a fee cap or amendment of this Engagement Agreement and all such discussions and written estimates would be handled through Jack Butler or the undersigned in respect of the overall Engagement on behalf of the Firm.

Delphi Corporation
As of July 12, 2005
Page 6

### Fee Structure and Retainers

It is customary in matters of this nature for us to receive a reasonable retainer / on account payment and to be paid promptly for services rendered and charges and disbursements incurred on behalf of the Company, including payment for the services rendered and charges and disbursements incurred prior to the date hereof. Given the size and complexity of the Company's affairs, we have requested a payment in the amount of $500,000, representing a retainer / on account payment for professional services rendered and to be rendered and charges and disbursements incurred by us to the Company's account in connection with our representation of the Company including with respect to any consensual non-judicial restructuring as well as any initial preparation that you authorize for cases under chapter 11 of the Bankruptcy Code that may be filed by or against the Company (the "Initial Retainer"). The Company agrees to supplement the Initial Retainer from time to time during the course of the Engagement in such amounts as we mutually shall agree are reasonably necessary to maintain the Initial Retainer at a level that will be sufficient to fund Engagement fees, charges and disbursements to be incurred for time periods to be covered by the Initial Retainer.

Should the Company subsequently decide to seek chapter 11 relief, we will also require an additional retainer / on account payment to supplement the Initial Retainer in order to cover Engagement fees, charges and disbursements to be incurred during the initial phase of the reorganization cases (the "Filing Retainer"). We will determine and discuss the amount of the Filing Retainer with you prior to the initiation of any chapter 11 case or at such earlier time as either we or the Company deems appropriate or desirable. Of course, the reasonableness of the Filing Retainer remains subject to review by the court in any ensuing cases.

In the future, we will send the Company periodic invoices (not less frequently than monthly) for services rendered and charges and disbursements incurred on the basis discussed above. Each invoice constitutes a request for an interim payment against the reasonable fee to be determined at the conclusion of our representation. Upon transmittal of the invoice, unless the Company elects to promptly pay the presented statement by wire transfer, the Firm shall draw upon the Initial Retainer (as may be supplemented from time to time by supplemental retainers) in the amount of the invoice. The Company agrees upon submission of each such invoice, if so requested by the Firm, to wire the invoice amount to us as replenishment of the Initial Retainer (together with any supplemental amount to which the Firm reasonably requests), without prejudice to the Company's right to advise us of any differences it may have with respect to such

Delphi Corporation
As of July 12, 2005
Page 7

invoice. We have the right to apply to any outstanding invoice (including amounts billed prior to the date hereof), up to the remaining balance, if any, of the Initial Retainer (as may be supplemented from time to time by supplemental retainers) at any time subject to (and without prejudice to) the Company's opportunity to review our statements.

In the event that the Company subsequently determines to seek bankruptcy court protection and subject to the terms of any professional compensation order entered in the Company's chapter 11 cases, the issuance of our periodic invoice shall constitute a request for an interim payment against the reasonable fee to be determined at the conclusion of the representation. Although the Company may pay us from time to time for services rendered in our capacity as special counsel for various matters, some fees, charges, and disbursements incurred before the filing of bankruptcy petitions (voluntary or involuntary) may remain unpaid as of the date of the bankruptcy filings. Any portion of the Initial Retainer (as may be supplemented from time to time by supplemental retainers or the Filing Retainer) not otherwise properly applied will be held by us for the payment of any such unpaid fees, charges and disbursements (whether or not billed).

If orders for relief relating to the Company are entered, the unused portion, if any, of the Initial Retainer (as may be supplemented from time to time by supplemental retainers or the Filing Retainer) will be applied to any unpaid prepetition invoices and unbilled fees, charges and disbursements, although any requisite court permission will be obtained in advance. Postpetition fees, charges and disbursements will be due and payable immediately upon entry of an order containing such court approval or at such time thereafter as instructed by the court, it being agreed and understood that the unused portion, if any, of the Initial Retainer (as may be supplemented from time to time by supplemental retainers or the Filing Retainer) shall be held by us and applied against the final fee application filed and approved by the court. The Company understands that while the arrangement in this paragraph may be altered in whole or in part by the bankruptcy court, the Company shall nonetheless remain liable for payment of court approved postpetition fees and expenses. Such items are afforded administrative priority under 11 U.S.C. § 503 (b)(1). The Bankruptcy Code provides in pertinent part, at 11 U.S.C. § 1129(a)(9)(A), that a plan of reorganization cannot be confirmed unless these priority expenses are paid in full (unless such claimants agree to different treatment) in cash on the effective date of any reorganization plan.

If a dispute develops about our fees, you may be entitled under Part 137 of the Rules of the Chief Administrator of the New York Courts to arbitration of that

Delphi Corporation
As of July 12, 2005
Page 8

dispute if it involves more than one thousand and less than fifty thousand dollars. We acknowledge that following the substantial completion of the restructuring activities currently being pursued by the Company and in the circumstance that the scope of our Engagement is materially reduced, the retainer program described in this letter shall be superceded by an arrangement where the Firm is paid monthly in arrears for services rendered and charges and disbursements advanced.

### Confidentiality and Related Matters

Confidential communications between a client and counsel are ordinarily privileged, but the commencement of a bankruptcy case may severely limit this attorney-client privilege. Specifically, if a trustee is appointed in any case concerning a corporate debtor or partnership, the trustee will be able to obtain from us or other counsel and disclose to others information communicated by the Company to counsel. Some courts also have held that an examiner may invade the attorney-client privilege.

Because of the nature of the Firm's practice (involving more than 1,600 lawyers throughout the United States and in various international offices), from time to time we concurrently may represent one client in a particular matter and the adversary of that client in an unrelated matter. Thus, for example, while representing the Company, we may represent a third party who is adverse to the Company in a matter unrelated to the matters covered by this Engagement Agreement. In addition, while representing the Company, we may represent an account debtor of the Company as a debtor in a reorganization case or in connection with out-of-court negotiations with such entity's creditors concerning that entity's ability to pay its debts generally.

Despite any such concurrent representation, we strictly preserve all client confidences and zealously pursue the interests of each of our clients. The mutual understanding reflected in this Engagement Agreement, including the waivers set forth below, are, of course, premised on the Firm's adherence to its professional obligation not to disclose any confidential information or to use it for another party's benefit.

With respect to third parties and based on our initial discussions concerning the Company's capital structure and given the Company's business relationships, we have identified certain entities involved with the Company (or are competitors of the Company) as our clients on matters unrelated to the Company including, but not limited to Autoliv, Inc., Citicorp USA, Inc., Credit Suisse, Deutsche Bank AG New York Branch, Hayes Lemmerz International, Inc., HSBC Bank USA, National Association and

Delphi Corporation
As of July 12, 2005
Page 9

JPMorgan Chase Bank, N.A., as well as other entities that are providing financial accommodations and services to the Company or have other material relationships. We also represented JP Morgan Chase Bank, N.A. in connection with a Receivables Purchase Agreement, dated as of March 31, 2003, as amended from time to time, among Delphi Receivables LLC as Seller, Delphi Corporation as Servicer, JP Morgan, Falcon Asset Securitization Corporation, ABN AMRO Bank N.V., Amsterdam Funding Corporation, The Bank of Tokyo-Mitsubishi, Ltd., and Gotham Funding Corporation.

    While we represent certain of the Company's customers, including DaimlerChrysler Corporation and Ford Motor Company on matters unrelated to the Company, we confirm that, as of the date of this agreement, the Firm does not represent General Motors Corporation ("GM") and will not represent GM in the future prior to the termination of this agreement except on unrelated matters in accordance with the terms of this agreement and after disclosure to you of the fact of any such engagement. As previously noted to you, the Firm currently represents a subsidiary of and certain financial advisors to GM on certain limited matters unrelated to the Company, but is free to represent the Company in the Engagement on a basis adverse to GM, other than in certain non-bankruptcy litigation or proceedings, without any notice to or further consent from GM. As to the Company's directors and officers, we are representing an officer of the Company on a matter unrelated to the Company involving the officer's directorship of another company and, with the prior knowledge and consent of the Company, we are providing advice to an officer of the Company in connection with meetings, interviews, testimony, and submissions relating to the investigation of the Company by the Securities and Exchange Commission as well as the internal investigation completed prior to the date of this letter on a basis that is not adverse to the Company.

    Accordingly, while for purposes of this Engagement Agreement, the Company should assume that we represent a substantial number of the Company's creditors, customers and stakeholders on matters unrelated to the Company, we will, at the Company's request, furnish you with a list of relevant clients when we receive updated information from the Company from time to time regarding its creditors and other stakeholders. In the event that chapter 11 cases are commenced, we will prepare a disclosure summary which will be publicly disclosed and will be updated periodically thereafter in connection with the filing of interim fee applications and as otherwise required. We do not provide certain kinds of opinion letters in connection with restructuring and bankruptcy reorganization cases to clients or to others who may wish to rely upon such letters. We do not alter this policy except under very unusual circumstances and then only upon further written agreement.

Delphi Corporation
As of July 12, 2005
Page 10

### Waivers and Related Matters

The Firm represents a broad base of clients on a variety of legal matters. Accordingly, absent an effective conflicts waiver, conflicts of interest may arise that could adversely affect your ability and the ability of other clients of the Firm to choose the Firm as its counsel and preclude the Firm from representing you or other clients of our Firm in pending or future matters. Given that possibility, we wish to be fair not only to you, but to our other clients as well. Accordingly, this letter will confirm our mutual agreement that the Firm may represent other present or future parties on matters other than those for which it had been or then is engaged by the Company, whether or not on a basis adverse to the Company or any of its affiliates, including in litigation, legal or other proceedings or matters, which are referred to as "Permitted Other Representation." In furtherance of this mutual agreement, the Company agrees that it will not for itself or any other party assert the Firm's representation of the Company, either previously, in its then existing representation in the Engagement, or in any other matter in which the Company retains the Firm, as a basis for disqualifying the Firm from representing another party in any Permitted Other Representation and agrees that any Permitted Other Representation does not constitute a breach of duty. Permitted Other Representation would include, without limitation, representing a client over which the Company might be seeking to acquire influence or control, or from which the Company may wish to buy assets, or representing a client regarding its interest at the time in acquiring influence or control over an entity in which the Company then has a similar interest. Notwithstanding the foregoing waivers, the Firm agrees that, during the pendency of any chapter 11 reorganization cases involving the Company in which the Firm is acting as bankruptcy and restructuring counsel pursuant to a general retainer pursuant to 11 U.S.C. § 327 (a), the Firm will not represent present or future clients of the Firm on matters adverse to the Company in such chapter 11 reorganization cases.

Our representation of the Company is premised on the Firm's adherence to its professional obligation not to disclose any confidential information or to use it for another party's benefit without the Company's consent. Provided that the Firm acts in the manner set forth in this paragraph, the Company would not for itself or any other party assert that the Firm's possession of such information, even though it may relate to a matter for which the Firm is representing another client or may be known to someone at the Firm working on the matter, (a) is a basis for disqualifying the Firm from representing another of its clients in any matter in which the Company or any other party has an interest; or (b) constitutes a breach of any duty owed by the Firm.

Delphi Corporation
As of July 12, 2005
Page 11

       With respect to parties affiliated with the Company generally, including parties owned by the Company and parties that hold direct or indirect interests in the Company, it is our understanding that the Firm is not being asked to provide, and will not be providing, legal advice to, or establishing an attorney-client relationship with, any such affiliated party or person in their individual capacity and will not be expected to do so unless the Firm has been asked and has specifically agreed to do so. Finally, it is our understanding that if the Firm acts as counsel for any other party as to which the Company then owns completely, directly or indirectly, all of the common stock or similar voting interest (other than directors' qualifying shares, if any), the mutual agreement reflected in this letter, including the waivers, would apply to that party as well.

                                        \*       \*       \*

       The provisions of this letter will continue in effect, including if the Firm's representation of the Company was ended at your election (which, of course, the Company would be free to do at any time) or by the Firm for Good Cause (which would be subject to ethical requirements). Good Cause includes the Company's breach of this agreement (including any material change in our engagement responsibilities (which would include the commencement of chapter 11 cases in which we were not retained as primary Section 327(a) counsel) without our consent or the failure to pay any payment when due under this Engagement Agreement), the Company's refusal or failure to cooperate with us or provide us with continuing access to the Board of Directors and senior management officers of the Company as appropriate, any fact or circumstance that would render our continuing representation unlawful or unethical, or, in our reasonable judgment, resignation of the engagement becomes necessary or appropriate. Any unused portion of the retainers we have received will be applied to our outstanding fees, charges and disbursements and the Company will promptly pay to us the remaining balance owed to us, if any. To the extent that the remaining amount of the retainers exceeds the amount of such fees, charges and disbursements, we will pay such amount to the Company. In addition, the provisions of this Engagement Letter will apply to future engagements of the Firm by the Company unless we mutually agree otherwise.

       The Company agrees to make appropriate employees available to us to assist in factual inquiries and factual determinations, court hearings and appearances, transactions and dealings in relation to the subject matter with regard to which we have been retained.

Delphi Corporation
As of July 12, 2005
Page 12


       This agreement shall be governed by and interpreted in accordance with the laws of the State of New York without regard to its conflicts of laws principles. For purposes of this letter, references to Skadden or the Firm include our affiliated law practice entities. There are no representations or promises other than as expressly set forth herein.

       If the foregoing terms of our representation meet with your approval and accurately represent your understanding of the Company's retention agreement with us, we would appreciate your signing one copy of this Engagement Agreement and returning it to us.

Delphi Corporation
As of July 12, 2005
Page 13

        Again, we very much appreciate the opportunity to work with Delphi Corporation and look forward to doing so.

        With best regards,

        Sincerely yours,

        Peter Allan Atkins

Attachments

cc: John Wm. Butler, Jr., Esq.

AGREED AND ACKNOWLEDGED:

Delphi Corporation., for itself
and its subsidiaries

By: _____
Its: VP & General Counsel

Dated: As of July 12, 2005

CONFIDENTIAL

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP & AFFILIATES

## STANDARD BUNDLED HOURLY TIME CHARGE SCHEDULE*

### January 1, 2005

|  | Rate |
|---|---|
| **PARTNERS and OF COUNSEL:** | $540 - $825 |
| **COUNSEL/SPECIAL COUNSEL:** | $535 - $640 |
| **ASSOCIATES:** | |
| Level | |
| 9 | $495 |
| 8 | 495 |
| 7 | 480 |
| 6 | 460 |
| 5 | 430 |
| 4 | 395 |
| 3 | 375 |
| 2 | 335 |
| 1 | 265** |
| **LEGAL ASSISTANTS:** | $ 90 - $195 |

---

\*    These are the Firm's standard hourly fee rates for most attorneys and legal assistants in the Firm's "bundled rate" structure for clients who are not billed separately for certain charges (e.g., secretarial and word processing time preparing legal documents, proofreading, facsimile services, overtime meals and overtime travel allowances). In-house reproduction under the bundled rate structure is charged at $0.10 per page. Please note that in a limited number of cases or for specific types of work (e.g., M&A transactions, certain types of tax matters, etc.), individual rates may be higher or lower than those stated.

\*\*    First year associates will move to $295/hr. at the later of April 1st, 2005 or the date of passing bar exam.

*SKADDEN ARPS, SLATE, MEAGHER & FLOM LLP AND AFFILIATES*
*Policy Statement Concerning Charges and Disbursements*
*Under Standard Bundled Rate Structure*
*Effective 9/1/03*

*Skadden Arps bills for reasonable charges and disbursements incurred in connection with an engagement. Clients are billed for external charges at the actual cost billed by the vendor except in a few cases noted below; charges for internal support services are billed at rates derived from internal cost analyses or at rates set at or below comparable outside vendor charges.*

*I. Research Services. Charges for on-line computerized research (LexisNexis, Westlaw and financial services) and use of outside research services and materials are billed at the actual amounts charged by vendors, which have been reduced by discounts the Firm receives from vendors.*

*SEC filings retrieved using the Disclosure system in our library are charged based on standard vendor rates derived from an internal cost analysis.*

*The State of Delaware Database provides computer access to a corporations database in Dover, Delaware. The charge for this service is $50 per transaction, which is the average amount charged by outside services.*

*II. Travel-Related Expenses. Out-of-town travel expenses are billed at actual cost and include air or rail travel, lodging, car rental, taxi or car service, tips and other reasonable miscellaneous items associated with travel. Corporate and/or negotiated discounted rates are passed on to the client. Specific Firm policies for expenditures relating to out-of-town travel include:*

- *Air Travel. Coach travel is used for all U.S. domestic flights unless upgrades are available at little additional cost or prior client approval is obtained for a different class. For international flights from the United States, business class is used. Travel by attorneys based outside the United States is consistent with these policies.*

- *Lodging. Overnight accommodations are generally booked with hotels with which the Firm has a corporate rate or, when this is not possible, with hotels suggested by the client.*

*Local travel charges include commercial transportation and, when a private car is used, mileage, tolls and parking. Specific policies govern how and when a client is charged for these expenses; these include:*

- *Fares for commercial transportation (e.g., car service, taxi or rail) are charged at the actual vendor invoice amount. The charge for private car usage is the IRS rate allowance per mile (or the equivalent outside the United States) plus the actual cost of tolls and parking.*

- *Round-trip transportation to the office is not charged separately for attorneys who work weekends or holidays, nor is transportation home on business days when an attorney works past a certain hour (typically 8:30 p.m.).*

- *Local travel for support staff is not charged when a staff member works after 8:00 p.m. specifically for the client.*

*III. Word Processing and Secretarial and other Special Task-Related Services. Routine secretarial tasks (correspondence, filing, travel and/or meeting arrangements, etc.) are not charged to clients. There is no separate charge for word processing and secretarial services associated with preparing legal documents.*

*Multi-function personnel, such as qualified secretaries and word processors, may also perform other specialized tasks (such as EDGAR filings or legal assistant services). Such work is recorded in the appropriate billing category (for example, legal assistant services are recorded as fee in "Legal Assistant Support" on bills).*

*IV. Reproduction and Electronic Document Management. Photocopying services (including copying, collating, tabbing and velo binding) performed in-house is charged at 10 cents per page, which represents the average internal cost per page. Color photocopies are charged at 50 cents per page (based on outside vendor rates). Photocopying projects performed by outside vendors are billed at the actual invoice amount. Special arrangements can be made for unusually large projects.*

*Electronic Data Management services (e.g., scanning, OCR processing, printing from scanned files, and conversions) performed by outside vendors are billed at the actual invoice amount and those performed in-house are billed at rates comparable to those charged by outside vendors.*

*V. Electronic Communications: Clients are charged for communications services as follows:*

- *Telephone Charges. There is no charge for local telephone calls or facsimile services. Long distance telephone calls made from the Firm are charged based on applicable rates in tariff tables and are allocated*

within a client based on the hours worked by attorneys on various matters for that client. Collect, credit card and third party calls are charged at the vendor rate plus applicable taxes and are assigned to the specific matter for which such charges were incurred.

- *Facsimile Charges.* There is no charge for outgoing or incoming facsimiles.

**VI. *Postage and Courier Services.*** Outside messenger and express carrier services are charged at the actual vendor invoice amount which frequently involves discounts negotiated by the Firm. Postage is charged at actual mail rates. On certain occasions, internal staff may be required to act as messengers; a standard rate is charged for their time.

**VII. *UCC Filing and Searches.*** Charges for filings and searches, in most instances, are based on standard amounts determined by the vendor. Unusual filings and searches will be charged based on vendor invoice.

**VIII. *Meals.*** Business meals with a client are charged at actual cost. Luncheon and dinner meetings with the client at the Firm are charged based on the costs developed by our food service vendor. Breakfast, beverage and snack services at the Firm's offices are not charged, except in unusual circumstances. Overtime meals are not charged separately to clients.

**IX. *Direct Payment by Clients of Other Disbursements.*** Other major disbursements incurred in connection with an engagement will be paid directly by the client. (Those which are incurred and paid by the Firm will be charged to the client at the actual vendor's invoice amount.) Examples of such major disbursements that clients will pay directly include:

- *Professional Fees* (including disbursements for outside professional services such as local counsel, accountants, witness and other professional fees).

- *Filing/Court Fees* (including disbursements for agency fees for filing documents, standard witness fees, juror fees).

- *Transcription Fees* (including disbursements for outside transcribing agencies and courtroom stenographer transcripts).

- *Other Disbursements* (including any other required out-of-pocket expenses incurred for the successful completion of a matter).

\* \* \* \* \*

2

**CONFIDENTIAL**

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP & AFFILIATES

## STANDARD BUNDLED HOURLY TIME CHARGE SCHEDULE[*]

### September 1, 2005

|  | Rate |
|---|---|
| **PARTNERS and OF COUNSEL:** | $585 - $835 |
| **COUNSEL/SPECIAL COUNSEL:** | $560 - $640 |
| **ASSOCIATES:** | |
| Level | |
| 8 | $540 |
| 7 | 510 |
| 6 | 485 |
| 5 | 465 |
| 4 | 440 |
| 3 | 410 |
| 2 | 375 |
| 1 | 295[**] |
| **LEGAL ASSISTANTS:** | $ 90 - $230 |

---

[*]    These are the Firm's standard hourly fee rates for most attorneys and legal assistants in the Firm's "bundled rate" structure for clients who are not billed separately for certain charges (e.g., secretarial and word processing time preparing legal documents, proofreading, facsimile services, overtime meals and overtime travel allowances). In-house reproduction under the bundled rate structure is charged at $0.10 per page. Please note that in a limited number of cases or for specific types of work (e.g., M&A transactions, certain types of tax matters, etc.), individual rates may be higher or lower than those stated.

[**]    First year associates will move to $335/hr. after being admitted to the Bar.