Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------ x
                               :
      In re                    :    Chapter 11
                               :
DELPHI CORPORATION, et al.,    :    Case No. 05-_____ (___)
                               :
                    Debtors.   :    (Jointly Administered)
                               :
------------------------------ x

APPLICATION FOR ORDER UNDER 11 U.S.C. § 327(e) AND FED. R. BANKR. P. 2014
(I) AUTHORIZING EMPLOYMENT AND RETENTION OF
SHEARMAN & STERLING LLP AS SPECIAL COUNSEL TO
DEBTORS AND (II) SCHEDULING FINAL HEARING THEREON

("SHEARMAN & STERLING RETENTION APPLICATION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"),[1] debtors and debtors-in-possession in the above-captioned cases

---

[1] In addition to Delphi, the following entities are debtors in these related cases: ASEC Manufacturing General Partnership, ASEC Sales General Partnership, Aspire, Inc., Delco Electronics Overseas Corporation, Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems Global (Holding), Inc., Delphi Automotive Systems Human Resources LLC, Delphi Automotive Systems International, Inc., Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems LLC, Delphi Automotive Systems Overseas Corporation, Delphi Automotive Systems Risk Management Corp., Delphi Automotive Systems Services LLC, Delphi Automotive Systems Tennessee, Inc., Delphi Automotive Systems Thailand, Inc., Delphi China LLC, Delphi Connection Systems, Delphi Diesel Systems Corp., Delphi Electronics (Holding) LLC, Delphi Foreign Sales Corporation, Delphi Integrated Service Solutions, Inc., Delphi International Holdings Corp., Delphi International Services, Inc., Delphi Liquidation Holding Company, Delphi LLC, Delphi Mechatronic Systems, Inc., Delphi Medical Systems Colorado Corporation, Delphi Medical Systems Corporation, Delphi Medical Systems Texas Corporation, Delphi NY Holding Corporation, Delphi Services Holding Corporation, Delphi Technologies, Inc., DREAL, Inc., Environmental Catalysts, LLC, Exhaust Systems Corporation, Packard Hughes Interconnect Company, Specialty Electronics, Inc., and Specialty Electronics International Ltd.

(collectively, the "Debtors"), hereby submit this application (the "Application") for interim and final orders under 11 U.S.C. § 327(e) and Fed. R. Bankr. P. 2014 (a) authorizing the employment and retention of Shearman & Sterling LLP ("Shearman & Sterling") as special counsel to the Debtors and (b) scheduling a final hearing thereon. In support of this Application, the Debtors submit the Affidavit Of Robert S. Miller, Jr. In Support Of Chapter 11 Petitions And First Day Orders, sworn to October 8, 2005, and the Affidavit of Douglas P. Bartner, sworn to October 7, 2005 (the "Bartner Affidavit"). In further support of this Application, the Debtors respectfully represent as follows:

## Background

A.    The Chapter 11 Filings

1.    On October 8, 2005 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have moved this Court for an order authorizing joint administration of these chapter 11 cases.

2.    No trustee, examiner, or creditors' committee has been appointed in the Debtors' cases.

3.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.    The statutory predicates for the relief requested herein are section 327(e) of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.     Current Business Operations Of The Debtors

5.     With more than 180,000 employees worldwide, global 2004 revenues of approximately $28.6 billion and global assets as of August 31, 2005 of approximately $17.1 billion,[2] Delphi ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations without supervision from the Bankruptcy Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy Code.

6.     Over the past century, the operations which are now owned by Delphi have become a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines. Today, the Company is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company's technologies and products are present in more than 75 million vehicles on the road worldwide. The Company supplies products to nearly every major global automotive original equipment manufacturer with 2004 sales to its former parent, General Motors Corporation, equaling approximately $15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

7.     As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world. In the U.S., the Debtors employ

---

[2]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

3

approximately 50,600 people. Those employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in Delphi's worldwide headquarters and customer center located in Troy, Michigan. Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and local unions. Outside the United States, the Company's foreign entities employ more than 134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

8.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM. Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

9.    Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle. When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base. The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base.

The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C.    Events Leading To The Chapter 11 Filing

10.    In the first two years following Delphi's separation from GM, the Company generated more than $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales.  Reflective of a downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005.  The Company experienced net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[3]

11.    The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

---

[3]    Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

•

5

12. In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues and forward looking revenue requirements. Having concluded that pre-filing discussions with its Unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

13. Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses. This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned in the Company's transformation plan. The Debtors believe that a substantial segment of Delphi's U.S. business operations must be divested, consolidated, or wound-down through the chapter 11 process.

14. Upon the conclusion of this process, the Debtors expect to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

Relief Requested

15. By this Application, the Debtors request authorization under section 327(e) of the Bankruptcy Code and Bankruptcy Rule 2014 (a) to employ and retain Shearman & Sterling, as of the date of this Application, as special counsel in these chapter 11 cases to represent the Debtors as described in greater detail below and (b) scheduling a hearing to determine whether the relief should be granted on a final basis. The Debtors believe that in light of the extensive time and effort that the attorneys at Shearman & Sterling have put forth to date with regard to the Debtors' prepetition financing, their debtor-in-possession financing, European financing matters, general corporate matters, securities law matters, certain litigation and employment matters, general planning for these chapter 11 cases, and preparation of various "First Day Motions" in connection with these chapter 11 cases, Shearman & Sterling is well qualified to act as special counsel on behalf of the Debtors in these cases.

Applicable Authority

16. Section 327(e) of the Bankruptcy Code provides, in relevant part, as follows:

> The trustee, with the court's approval, may employ, for a specified special purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed.

11 U.S.C. § 327(e).

17. Bankruptcy Rule 2014 provides, in relevant part, as follows:

> An order approving the employment of attorneys . . . or other professionals pursuant to § 327 . . . of the Code shall be made only on application of the trustee or committee.

Fed. R. Bankr. P. 2014(a).

7

18.   Rule 2014-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules") provides, in relevant part, as follows:

> An application for the employment of a professional person pursuant to §§ 327 and 328 of the Bankruptcy Code shall state the specific facts showing the reasonableness of the terms and conditions of the employment, including the terms of any retainer, hourly fee, or contingent fee arrangement.

S.D.N.Y. Bankr. LR 2014-1(a).

19.   Accordingly, this Court is authorized to grant the relief requested in this Application.

### Retention Of Shearman & Sterling Is Necessary And Appropriate

20.   The Debtors seek to retain Shearman & Sterling because: (a) the Debtors believe that Shearman & Sterling is well qualified to act as special counsel; (b) prior to the Petition Date, Shearman & Sterling actively represented the Debtors with regard to their prepetition financing, their debtor-in-possession financing, European financing matters, general corporate matters, securities law matters, certain litigation and employment matters, general planning for these chapter 11 cases, and preparation of various "First Day Motions" in connection with these chapter 11 cases; and (c) the Debtors believe that continuation of such representation is in the best interests of the estates.

### Qualifications

21.   The Debtors have selected Shearman & Sterling as special counsel because Shearman & Sterling has represented the Debtors since May 10, 1999 in connection with the Debtors' prepetition financing, their debtor-in-possession financing, European financing matters, general corporate matters, securities law matters, certain litigation and employment matters, and

general planning for these chapter 11 cases. As a result of Shearman & Sterling's prepetition representation of the Debtors, Shearman & Sterling has become informed about the Debtors' businesses and legal affairs and is familiar with the Debtors' capital structure and the issues and material agreements relating to Shearman & Sterling's representation of the Debtors. The Debtors also have selected Shearman & Sterling based upon its experience in similar but unrelated matters of this type.

22.  Shearman & Sterling, a law firm of more that 900 attorneys, also has expertise and experience in other pertinent legal areas, including litigation, tax, financing, corporate, and securities law, that likely will be relevant to its role as special counsel to the Debtors. Accordingly, the Debtors believe that Shearman & Sterling has the necessary background to address effectively and efficiently many of the legal issues and problems that might arise in connection with the matters described above. The Debtors believe that, given Shearman & Sterling's familiarity with the Debtors' businesses, operations, and finances, and its prepetition representation of the Debtors on a wide variety of matters, it would be imprudent and inefficient to lose the knowledge base and experience of Shearman & Sterling with respect to these ongoing matters during these chapter 11 cases.

## Services To Be Provided

23.  Shearman & Sterling, if retained, will render services to the Debtors including the following:

    (a)    advising the Debtors, through the date of entry of the final order thereon, and coordinating with Skadden, Arps, Slate, Meagher, & Flom LLP ("327(a) Counsel" or "Skadden Arps"), which the Debtors seek to retain as their general bankruptcy counsel under section 327(a) of the Bankruptcy Code, in connection with the Debtors' postpetition financing and cash collateral arrangements and negotiating and drafting documents relating thereto;

9

(b)  providing non-bankruptcy advice to the Debtors: (i) through its Board of Directors and executive management in coordination with 327(a) Counsel, with respect to legal matters arising in or relating to the Debtors' ordinary course of business, including attendance at senior management meetings, meetings with the Debtors' financial and turnaround advisors, and meetings of the Board of Directors; and (ii) with respect to such other matters as the Debtors and 327(a) Counsel deem appropriate under the circumstances;

(c)  representing the Debtors in any litigation or arbitration matters in which Shearman & Sterling has appeared as of the commencement of these chapter 11 cases, and such other matters as shall arise from time to time assigned by the Debtors to, and accepted by, Shearman & Sterling;

(d)  attending meetings with any committees formed in these chapter 11 cases and other third parties and participating in negotiations with respect to the above matters; and

(e)  performing the full range of services normally associated with matters such as those identified above, as the Debtors' special counsel, which Shearman & Sterling is in a position to provide.

24.  Shearman & Sterling has indicated its desire and willingness to represent the Debtors as set forth herein and to render the necessary professional services as special counsel to the Debtors.

25.  The Debtors believe that Shearman & Sterling's services will not be duplicative of the services to be provided by Skadden, Arps, the Debtors' general bankruptcy counsel, O'Melveny and Meyers LLP, the Debtors' special labor counsel, Groom Law Group Chartered, the Debtors' special employee benefits counsel, and the other professionals retained by the Debtors to perform specific tasks that are unrelated to the work to be performed by Shearman & Sterling as special counsel to the Debtors. Rather, the retention of Shearman & Sterling as special counsel will enhance the employment of the Debtors' general bankruptcy counsel to represent the Debtors generally and to assist them in carrying out their duties under chapter 11. The Debtors understand that Shearman & Sterling will work with the other professionals retained by the Debtors to avoid any duplication of services.

No Adverse Interest And Disinterestedness

26. To the best of the Debtors' knowledge, except as otherwise set forth in the Bartner Affidavit, Shearman & Sterling, its members, counsel, and associates (a) do not represent entities other than the Debtors in connection with the Debtors' chapter 11 cases, (b) do not have any connections with the Debtors, their creditors or stockholders, or any other party-in-interest, (c) do not hold any interest adverse to the Debtors or their estates with respect to the matters on which Shearman & Sterling is to be retained and employed in these chapter 11 cases, and (d) are "disinterested persons" within the meaning of section 101(14) of the Bankruptcy Code.

Professional Compensation

27. Shearman & Sterling categorizes its billings by subject matter, in compliance with the applicable guidelines of the Office of the United States Trustee (the "U.S. Trustee Guidelines"). Shearman & Sterling has agreed to charge, and the Debtors have agreed to pay, subject to this Court's approval in accordance with sections 330 and 331 of the Bankruptcy Code, the U.S. Trustee Guidelines, Bankruptcy Rule 2016, and such other Local Rules as may be applicable, Shearman & Sterling's customary hourly rates and its customary reimbursements as charged to bankruptcy and non-bankruptcy clients and as adjusted to comply with this Court's Administrative Order Re: Amended Guidelines For Fees And Disbursements For Professionals In The Southern District Of New York Bankruptcy Cases dated April 15, 1995 (the "Fees Administrative Order").[4] Shearman & Sterling's hourly rates as of the Petition Date, which are

---

[4] For example, although Shearman & Sterling's customary rate for facsimiles is $1.50 per page, in accordance with the Fees Administrative Order, Shearman & Sterling will charge the Debtors $1.25 per page. Similarly, although Shearman & Sterling's guidelines for permissible overtime meals provide that an individual's meal may not exceed $25.00, in accordance with the Fees Administrative Order, Shearman & Sterling will charge the Debtors a maximum of $20.00.

adjusted from time to time, range from $610 to $795 per hour for partners, from $245 to $650 per hour for counsel and associates, and from $95 to $225 per hour for legal assistants and specialists. Shearman & Sterling customarily is reimbursed for all expenses it incurs in connection with representation of a client in a given matter. Such expenses include, without limitation, travel costs, telecommunications, express mail, messenger service, photocopying costs, document processing, temporary employment of additional staff, overtime meals, Lexis and Westlaw expenses, court fees, transcript costs and, in general, all identifiable expenses that would not have been incurred except for representation of a particular client. The Debtors submit that such rates and expense reimbursements are reasonable.

28. Inasmuch as the legal entities organizational structure supporting any one of the Debtors' projects frequently is exceedingly complex, the Debtors and Shearman & Sterling have agreed that it is appropriate to structure Shearman & Sterling's postpetition engagement relationship on the basis that all fees, charges, and disbursements incurred for all engagement matters shall be uniformly recorded, disclosed, and subject to the jurisdiction of this Court whether or not such activities are for a Debtor or a non-Debtor affiliate.

29. Shearman & Sterling has acknowledged that all amounts paid to Shearman & Sterling during these chapter 11 cases are subject to final allowance by this Court. In the event that any fees or expenses paid to Shearman & Sterling during these chapter 11 cases are disallowed by this Court, the fees and expenses will be disgorged by Shearman & Sterling and returned to the Debtors or as otherwise ordered by this Court.

30. No arrangement is proposed between the Debtors and Shearman & Sterling for compensation to be paid in these cases other than as set forth above and in the Bartner Affidavit.

### Best Interests Of The Estate

31. Shearman & Sterling's attorneys are highly skilled and have developed a familiarity with the Debtors' businesses, operations, and finances. The Debtors believe that Shearman & Sterling's expertise in the areas described above is extremely important to the Debtors' reorganization efforts. Therefore, the Debtors believe that the retention of Shearman & Sterling is in the best interests of the Debtors, their estates, and their creditors.

### Notice

32. Notice of this Application has been provided by facsimile, electronic transmission, overnight delivery, or hand delivery to (a) the U.S. Trustee, (b) the Debtors' 50 largest unsecured creditors, (b) counsel for the agent under the Debtors' prepetition credit facility, and (d) counsel for the agent under the Debtors' proposed postpetition credit facility. In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

### Memorandum Of Law

33. Because the legal points and authorities upon which this Application relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an interim order (a) authorizing the Debtors to employ and retain Shearman & Sterling as the Debtors' special counsel, (b) scheduling a final hearing to consider granting the relief on a final basis, and (c) granting the Debtors such other and further relief as is just.

Dated:   New York, New York
         October 8, 2005

                    DELPHI CORPORATION, on behalf of itself and certain of its subsidiaries and affiliates, as Debtors and Debtors-in-Possession

                    By:  /s/ John D> Sheehan
                        Name: John D. Sheehan
                        Title:  Vice President and Chief Restructuring Officer