Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
    In re                              :    Chapter 11
                                              :
DELPHI CORPORATION, et al.,                   :    Case No. 05-_____ (___)
                                              :
               Debtors.       :    (Jointly Administered)
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(e) AND 1107(a)
(I) AUTHORIZING EMPLOYMENT AND RETENTION
OF O'MELVENY & MYERS LLP AS SPECIAL LABOR COUNSEL TO
DEBTORS AND (II) SCHEDULING FINAL HEARING THEREON

("O'MELVENY & MYERS RETENTION APPLICATION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"),[1] debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this application (the "Application") for interim and

---

[1] In addition to Delphi, the following entities are debtors in these related cases: ASEC Manufacturing General Partnership, ASEC Sales General Partnership, Aspire, Inc., Delco Electronics Overseas Corporation, Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems Global (Holding), Inc., Delphi Automotive Systems Human Resources LLC, Delphi Automotive Systems International, Inc., Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems LLC, Delphi Automotive Systems Overseas Corporation, Delphi Automotive Systems Risk Management Corp., Delphi Automotive Systems Services LLC, Delphi Automotive Systems Tennessee, Inc., Delphi Automotive Systems Thailand, Inc., Delphi China LLC, Delphi Connection Systems, Delphi Diesel Systems Corp., Delphi Electronics (Holding) LLC, Delphi Foreign Sales Corporation, Delphi Integrated Service Solutions, Inc., Delphi International Holdings Corp., Delphi International Services, Inc., Delphi Liquidation Holding Company, Delphi LLC, Delphi Mechatronic Systems, Inc., Delphi Medical Systems Colorado Corporation, Delphi Medical Systems Corporation, Delphi Medical Systems Texas Corporation, Delphi NY Holding Corporation, Delphi Services Holding Corporation, Delphi Technologies, Inc., DREAL, Inc., Environmental Catalysts, LLC, Exhaust Systems Corporation, Packard Hughes Interconnect Company, Specialty Electronics, Inc., and Specialty Electronics International Ltd.

final orders under 11 U.S.C. §§ 327(e) and 1107(a) and Fed. R. Bankr. P. 2014 and 2016, (a) authorizing the employment and retention of O'Melveny & Myers LLP ("O'Melveny"), whose business and telephone numbers include Times Square Tower, 7 Times Square, New York, New York 10036, (212) 326-2000, 1625 Eye Street, N.W., Washington, D.C. 20006, (202) 383-5300, and 400 South Hope Street, 18th Floor, Los Angeles, California 90071, (213) 430-6000, as special labor counsel to the Debtors and (b) scheduling a final hearing thereon. In support of this Application, the Debtors submit the Affidavit Of Robert S. Miller, Jr. In Support Of Chapter 11 Petitions And First Day Orders, sworn to October 8, 2005, and the Affidavit of Tom A. Jerman, sworn to October 7, 2005 (the "Jerman Affidavit"). In further support of this Application, the Debtors respectfully represent as follows:

Background

A.  The Chapter 11 Filings

1. On October 8, 2005 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended, (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have moved this Court for an order authorizing joint administration of these chapter 11 cases.

2. No trustee, examiner, or creditors' committee has been appointed in the Debtors' cases.

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4. The statutory predicates for the relief requested herein are sections 327(e) and 1107(a) of the Bankruptcy Code and Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B. Current Business Operations Of The Debtors

5. With more than 180,000 employees worldwide, global 2004 revenues of approximately $28.6 billion and global assets as of August 31, 2005 of approximately $17.1 billion,[2] Delphi ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations without supervision from the Bankruptcy Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy Code.

6. Over the past century, the operations which are now owned by Delphi have become a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines. Today, the Company is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company's technologies and products are present in more than 75 million vehicles on the road worldwide. The Company supplies products to nearly every major global automotive original equipment manufacturer with 2004 sales to its former parent, General Motors Corporation, equaling approximately $15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

---

[2] The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

3

7. As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world. In the U.S., the Debtors employ approximately 50,600 people. Those employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in Delphi's worldwide headquarters and customer center located in Troy, Michigan. Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and local unions. Outside the United States, the Company's foreign entities employ more than 134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

8. Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM. Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

9. Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle. When awarding new business, which is the foundation for the Company's

4

forward revenue base, customers are increasingly concerned with the financial stability of their supply base. The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base. The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C.   Events Leading To The Chapter 11 Filing

10.   In the first two years following Delphi's separation from GM, the Company generated more than $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales. Reflective of a downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005. The Company experienced net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[3]

11.   The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of

---

[3]   Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

5

motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12. In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues and forward looking revenue requirements. Having concluded that pre-filing discussions with its Unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

13. Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses. This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned in the Company's transformation plan. The Debtors believe that a substantial segment of Delphi's U.S. business operations must be divested, consolidated, or wound-down through the chapter 11 process.

14. Upon the conclusion of this process, the Debtors expect to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally.

Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

## Relief Requested

15.   By this Application, the Debtors request entry of interim and final orders (a) authorizing the Debtors to employ and retain O'Melveny as their special labor counsel in these chapter 11 cases and (b) scheduling a final hearing to determine whether the relief should be granted on a final basis.

## Basis For Relief

16.   The Debtors submit that O'Melveny's proposed retention meets all the prerequisites for retention of special counsel under section 327(e) of the Bankruptcy Code, which permits a debtor-in-possession, with court approval, to employ counsel that has represented the Debtors prior to the commencement of their bankruptcy cases, for a "specified special purpose" if such employment is in the best interest of the Debtors.  As O'Melveny is the proposed special labor counsel to the Debtors, but not the proposed bankruptcy counsel in these chapter 11 cases, section 327(e) of the Bankruptcy Code does not require that O'Melveny or its attorneys be "disinterested persons" as defined in section 101(14) of the Bankruptcy Code.  Rather, section 327(e) of the Bankruptcy Code instead requires that O'Melveny not represent or hold any interest adverse to the estate or the Debtors with respect to the matter on which O'Melveny is to be employed.  As discussed below, the employment of O'Melveny as special labor counsel is in the best interests of the Debtors.

## The Debtors' Employment Of O'Melveny
## Is In The Best Interests Of The Estates

17.   O'Melveny will serve as special labor counsel to the Debtors during these chapter 11 cases.  O'Melveny began performing this type of work for the Debtors prior to the

7

Petition Date and is therefore familiar with the Debtors' businesses and operations. O'Melveny has significant experience in providing labor advice to companies with regard to employers' obligations and rights under sections 1113 and 1114 of the Bankruptcy Code and under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 ("ERISA"). Through these representations, O'Melveny has engaged in collective bargaining negotiations, federal court litigation, and proceedings under the National Labor Relations Act, the Railway Labor Act, and ERISA with regard to issues arising from the modification or rejection of collective bargaining agreements under section 1113 of the Bankruptcy Code as well as retiree benefits and pension termination issues arising under section 1114 of the Bankruptcy Code.

18.   More generally, O'Melveny is a full service international law firm with more than 900 lawyers throughout 12 offices located in the United States and abroad. Attorneys at O'Melveny provide legal services in virtually every major practice area, including corporate and securities, litigation, intellectual property, banking, tax, employee benefits, government regulation, and international trade.

19.   Most importantly for present purposes, several members of O'Melveny have extensive experience in labor law and its interplay with restructuring and bankruptcy law. Accordingly, the Debtors believe that O'Melveny is well qualified to serve as special labor counsel in these chapter 11 cases in an efficient and effective manner.

20.   The Debtors believe that the employment of O'Melveny will enhance and will not duplicate the employment of Skadden, Arps, Slate, Meagher, & Flom LLP ("Skadden"), the Debtors' general bankruptcy counsel, the employment of Shearman & Sterling LLP, as special counsel, the employment of Groom Law Group Chartered, as special employee benefits counsel, and the employment of other professionals retained by the Debtors to perform specific

8

tasks that are unrelated to the work to be performed by O'Melveny as special labor counsel to the Debtors. The Debtors understand that O'Melveny will work with the other professionals retained by the Debtors to avoid any such duplication.

Services To Be Rendered By O'Melveny

21. As set forth in the engagement letter attached to the proposed interim order as <u>Exhibit 1</u> (the "Engagement Letter"), the Debtors wish to engage O'Melveny to represent the Debtors in connection with general labor matters, including issues involving sections 1113 and 1114 of the Bankruptcy Code.

22. O'Melveny has indicated its desire and willingness to represent the Debtors as set forth herein and to render the necessary professional services as special labor counsel to the Debtors.

23. The Debtors may request that O'Melveny undertake specific matters beyond the scope of the responsibilities set forth above. Should O'Melveny agree in its discretion to undertake any such matter, the Debtors shall seek further order of this Court.

Disinterestedness Of Professionals

24. The Jerman Affidavit filed in support of this Application contains information available to date on O'Melveny's connections with other parties-in-interest, as required by Bankruptcy Rule 2014(a). To the best of the Debtors' knowledge, other than as set forth in the Jerman Affidavit, O'Melveny, its partners, counsel, and associates do not hold or represent any interest adverse to the Debtors, their creditors, any other party-in-interest in these chapter 11 cases, their respective attorneys and investment advisors, the Office of the United States Trustee (the "U.S. Trustee"), or any person employed therein, with respect to the matters on which O'Melveny is to be employed.

25. O'Melveny has disclosed to the Debtors that O'Melveny has in the past represented, currently represents, and will likely represent in the future, certain of the Debtors' creditors and other parties-in-interest in these chapter 11 cases in matters unrelated to the Debtors or their chapter 11 cases. O'Melveny does not believe that the foregoing raises any actual or potential conflict of interest of O'Melveny relating to the representation of the Debtors as their special labor counsel in these chapter 11 cases, but such relationships are disclosed out of an abundance of caution. In particular, O'Melveny has represented General Motors in the past, but no longer represents General Motors in any active matter. O'Melveny also currently represents GMAC or its GMAC affiliates in O'Melveny's Shanghai and Tokyo offices in corporate matters.

26. In addition, O'Melveny currently represents Alan S. Dawes, Delphi's Vice Chairman and Chief Financial Officer, in connection with the Securities and Exchange Commission investigation captioned <u>In the Matter of Delphi Corporation</u>. O'Melveny also represents Mr. Dawes in <u>Glinka v. Delphi Corp.</u>, No. 05-71291 (E.D. Mich). The complaint alleges various violations of ERISA as a result of the purchase and holding of Delphi common stock by the Delphi Savings-Stock Purchase Program for Salaried Employees of the United States. Both representations of Mr. Dawes are subject to an indemnification agreement by which Delphi is funding O'Melveny's defense of Mr. Dawes. O'Melveny will not assist Mr. Dawes in connection with discussions with the Debtors involving termination of his employment, and O'Melveny has erected a wall between the attorneys working on the existing Dawes matters and those who will be serving as special labor counsel to the Debtors.

27. The Debtors understand that, in order to vitiate any actual or potential conflicts of interest, O'Melveny will not assist the Debtors in connection with their analysis,

negotiations, and litigation, if any, with parties with whom O'Melveny has existing client relationships, and that Skadden (or other counsel if Skadden has a conflict), instead, will handle these tasks.

Professional Compensation

28. O'Melveny intends to apply to this Court for compensation and reimbursement of expenses in accordance with section 330(a) of the Bankruptcy Code, the Bankruptcy Rules and orders of this Court. O'Melveny acknowledges that all compensation will be subject to this Court's review and approval, after notice and a hearing.

29. In the 90 days leading up to the Petition Date, the Debtors paid to O'Melveny approximately $446,003 in fees and expenses for labor advice and legal services rendered to the Debtors, plus $300,000 as a retainer.

30. Under the applicable provisions of the Bankruptcy Code, and subject to the approval of this Court, the Debtors propose to pay O'Melveny its customary hourly rates and to reimburse O'Melveny for expenses according to O'Melveny's reimbursement policies. The O'Melveny attorneys that are expected to be principally responsible for the matters in these chapter 11 cases and their respective hourly rates are: Robert A. Siegel - $690, Tom A. Jerman - $680, Rachel S. Janger - $460, Jessica Kastin - $465, Heejung Heidi Son - $400, Kyra Grundeman - $270, Deepa Ambekar - $235, Melissa Janiak - $235, and Stacy Hauf - $205. These hourly rates are subject to annual adjustment in accordance with O'Melveny's standard policies.

31. Pursuant to the Engagement Letter, if O'Melveny's legal services contribute to an exceptionally successful result, the Debtors will consider paying O'Melveny (without any advance commitment from the Debtors and subject to the approval of this Court) an additional fee based on the nature and quality of O'Melveny's contribution to the results achieved rather

than a fee based solely on the time expended. The Debtors will consider such factors as the actual result, the Debtors' subjective view of O'Melveny's contribution, efficiency, and cost containment efforts, and the Debtors' perception of O'Melveny's success in integrating with and utilizing the Debtors' in-house team.

32. No arrangement is proposed between the Debtors and O'Melveny for compensation to be paid in these chapter 11 cases other than as set forth above, in the Engagement Letter, and in the Jerman Affidavit.

Arbitration And Waiver Of Jury Trial

33. Any and all disputes, claims, or controversies arising out of or relating to the Engagement Letter, the relationship between the Debtors and O'Melveny, or the services performed under the Engagement Letter, will be determined exclusively by confidential, final and binding arbitration, in accordance with the then existing Commercial Rules of the American Arbitration Association, in the City of Los Angeles. Disputes, claims and controversies subject to final and binding arbitration include, without limitation, all those that otherwise could be tried in court to a judge or jury in the absence of the agreement to arbitrate. By agreeing to submit all such disputes, claims, and controversies to binding arbitration, the Debtors and O'Melveny expressly have waived any rights to have such matters heard or tried in court before a judge or jury or in another tribunal.

Conclusion

34. For the foregoing reasons, the Debtors submit that the employment of O'Melveny as the Debtors' special labor counsel on the terms set forth herein is in the best interests of the estates.

Notice

35.  Notice of this Application has been provided by facsimile, electronic transmission, overnight delivery, or hand delivery to (a) the U.S. Trustee, (b) the Debtors' 50 largest unsecured creditors, (c) counsel for the agent under the Debtors' prepetition credit facility, and (d) counsel for the agent under the Debtors' proposed postpetition credit facility.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

Memorandum Of Law

36.  Because the legal points and authorities upon which this Application relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an interim order (a) authorizing the Debtors to employ and retain O'Melveny as their special labor counsel to perform the services set forth herein, (b) scheduling a final hearing to consider granting the relief on a final basis, and (c) granting the Debtors such other and further relief as is just.

Dated:   New York, New York
         October 8, 2005

                                      DELPHI CORPORATION, on behalf of itself and certain of its subsidiaries and affiliates, as Debtors and Debtors-in-possession

                                      By:   /s/ John D. Sheehan
                                             Name: John D. Sheehan
                                             Title:  Vice President and Chief Restructuring Officer