Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :

| | |
|---|---|
| In re | Chapter 11 |
| DELPHI CORPORATION, et al., | Case No. 05-_____ (___) |
| Debtors. | (Jointly Administered) |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

APPLICATION FOR ORDER UNDER 11 U.S.C. § 327(a) AND
FED. R. BANKR. P. 2014 AND 2016 (I) AUTHORIZING EMPLOYMENT AND
RETENTION OF FTI CONSULTING, INC. AS RESTRUCTURING AND FINANCIAL
ADVISORS TO DEBTORS AND (II) SCHEDULING FINAL HEARING THEREON

("FTI RETENTION APPLICATION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the

"Affiliate Debtors"),[1] debtors and debtors-in-possession in the above-captioned cases

---

[1]     In addition to Delphi, the following entities are debtors in these related cases:  ASEC Manufacturing General Partnership, ASEC Sales General Partnership, Aspire, Inc., Delco Electronics Overseas Corporation, Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems Global (Holding), Inc., Delphi Automotive Systems Human Resources LLC, Delphi Automotive Systems International, Inc., Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems LLC, Delphi Automotive Systems Overseas Corporation, Delphi Automotive Systems Risk Management Corp., Delphi Automotive Systems Services LLC, Delphi Automotive Systems Tennessee, Inc., Delphi Automotive Systems Thailand, Inc., Delphi China LLC, Delphi Connection Systems, Delphi Diesel Systems Corp., Delphi Electronics (Holding) LLC, Delphi Foreign Sales Corporation, Delphi Integrated Service Solutions, Inc., Delphi International Holdings Corp., Delphi International Services, Inc., Delphi Liquidation Holding Company, Delphi LLC, Delphi Mechatronic Systems, Inc., Delphi Medical Systems Colorado Corporation, Delphi Medical Systems Corporation, Delphi Medical Systems Texas Corporation, Delphi NY Holding Corporation, Delphi Services Holding Corporation, Delphi Technologies, Inc., DREAL, Inc., Environmental Catalysts, LLC, Exhaust Systems Corporation, Packard Hughes Interconnect Company, Specialty Electronics, Inc., and Specialty Electronics International Ltd.

(collectively, the "Debtors"), hereby submit this application (this "Application") for interim and

final orders under 11 U.S.C. § 327(a) and Fed. R. Bankr. P. 2014 and 2016 (a) authorizing the

employment and retention of FTI Consulting, Inc. (together with its wholly owned subsidiaries,

agents, independent contractors, and employees, "FTI") as restructuring and financial advisors to

the Debtors and (b) scheduling a final hearing thereon.  In support of this Application, the

Debtors submit the Affidavit Of Robert S. Miller, Jr. In Support Of Chapter 11 Petitions And

First Day Orders, sworn to October 8, 2005, and the Affidavit of Randall S. Eisenberg, sworn to

October 7, 2005 (the "Eisenberg Affidavit").  In further support of this Application, the Debtors

respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8, 2005 (the "Petition Date"), each of the Debtors filed a

voluntary petition in this Court for reorganization relief under chapter 11 of title 11 of the United

States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").  The Debtors

continue to operate their businesses and manage their properties as debtors-in-possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have moved this

Court for an order authorizing joint administration of these chapter 11 cases.

2.    No trustee, examiner, or creditors' committee has been appointed in the

Debtors' cases.

3.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

4.    The statutory predicates for the relief requested herein are section 327(a) of the Bankruptcy Code and Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.    Current Business Operations Of The Debtors

5.    With more than 180,000 employees worldwide, global 2004 revenues of approximately $28.6 billion and global assets as of August 31, 2005 of approximately $17.1 billion,[2] Delphi ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations without supervision from the Bankruptcy Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy Code.

6.    Over the past century, the operations which are now owned by Delphi have become a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines.  Today, the Company is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company's technologies and products are present in more than 75 million vehicles on the road worldwide.  The Company supplies products to nearly every major global automotive original equipment manufacturer with 2004 sales to its former parent, General Motors Corporation, equaling approximately $15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

---

[2]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

7.   As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world.  In the U.S., the Debtors employ approximately 50,600 people.  Those employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in Delphi's worldwide headquarters and customer center located in Troy, Michigan.  Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and local unions.  Outside the United States, the Company's foreign entities employ more than 134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

8.   Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

9.   Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle.  When awarding new business, which is the foundation for the Company's

forward revenue base, customers are increasingly concerned with the financial stability of their

supply base. The Debtors believe that they will maximize stakeholder value and the Company's

future prospects if they stabilize their businesses and continue to diversify their customer base.

The Debtors also believe that this must be accomplished in advance of the expiration of certain

benefit guarantees between GM and certain of Delphi's unions representing most of its U.S.

hourly employees which coincides with the expiration of the Company's U.S. collective

bargaining agreements in the fall of 2007.

C.    Events Leading To The Chapter 11 Filing

10.    In the first two years following Delphi's separation from GM, the Company

generated more than $2 billion in net income. Every year thereafter, however, with the exception

of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net

operating loss of $482 million on $28.6 billion in net sales. Reflective of a downturn in the

marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005.

The Company experienced net operating losses of $608 million for the first six months of

calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion

less in sales than during the same time period in calendar year 2004.[3]

11.    The Debtors believe that three significant issues have largely contributed to

the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S.

legacy liabilities and operational restrictions driven by collectively bargained agreements,

including restrictions preventing the Debtors from exiting non-strategic, non-profitable

operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive

---

[3]    Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily
related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

U.S. vehicle production environment for domestic OEMs resulting in the reduced number of

motor vehicles that GM produces annually in the United States and related pricing pressures, and

(c) increasing commodity prices.

12.    In light of these factors, the Company determined that it would be imprudent

and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio,

operational issues and forward looking revenue requirements.  Having concluded that pre-filing

discussions with its Unions and GM were not leading to the implementation of a plan sufficient

to address the Debtors' issues on a timely basis, the Company determined to commence these

chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and

preserve value.

13.    Through the reorganization process, the Debtors intend to achieve

competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive

legacy liabilities and burdensome restrictions under current labor agreements and realigning

Delphi's global product portfolio and manufacturing footprint to preserve the Company's core

businesses.  This will require negotiation with key stakeholders over their respective

contributions to the restructuring plan or, absent consensual participation, the utilization of the

chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned

in the Company's transformation plan.  The Debtors believe that a substantial segment of

Delphi's U.S. business operations must be divested, consolidated, or wound-down through the

chapter 11 process.

14.    Upon the conclusion of this process, the Debtors expect to emerge from

chapter 11 as a stronger, more financially sound business with viable U.S. operations that are

well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all

6

of its resources to continue to deliver value and high-quality products to its customers globally.

Additionally, the Company will preserve and continue the strategic growth of its non-U.S.

operations and maintain its prominence as the world's premier auto supplier.

Relief Requested

15.    By this Application, the Debtors respectfully request entry of interim and

final orders under section 327(a) of the Bankruptcy Code and Bankruptcy Rules 2014 and 2016

(a) authorizing the Debtors to employ and retain FTI as their restructuring and financial advisors

in these chapter 11 cases pursuant to the letter agreement attached to the proposed interim order

as Exhibit 1 (the "Engagement Letter") and the dispute resolution procedures attached to the

proposed interim order as Exhibit 2 (the "Dispute Resolution Procedures") and (b) scheduling a

hearing to determine whether the relief should be granted on a final basis.

Scope Of Services

16.    In accordance with the Engagement Letter, FTI will provide such

restructuring and financial advisory services as FTI and the Debtors deem appropriate and

feasible in order to advise the Debtors and their subsidiaries and affiliates in the course of these

chapter 11 cases, including but not limited to the following:

(a)    assisting the Debtors with information and analyses required pursuant to the Debtors' postpetition financing;

(b)    assisting with the identification and implementation of short-term cash management procedures;

(c)    assisting in the preparation of information and analysis necessary for the confirmation of a plan of reorganization in these chapter 11 cases, including information contained in the disclosure statement;

(d)    assisting in the preparation of financial information for distribution to creditors and others, including, but not limited to, cash receipts and disbursement analysis, analysis of various asset and liability accounts, and analysis of proposed transactions for which this Court's approval is sought;

7

(e)     assisting in developing accounting and operating procedures to segregate prepetition and postpetition business transactions;

(f)     assisting the Debtors in developing and implementing strategies to address financially troubled suppliers;

(g)     assisting the Debtors in responding to and tracking calls received from suppliers in a vendor communication room, including the production of various management reports reflecting call center activity ("Vendor Communications Process");

(h)     assisting the Debtors in the identification of executory contracts and unexpired leases and performing of cost/benefit evaluations with respect to the assumption or rejection of each;

(i)     assisting the Debtors in the preparation of financial related disclosures required by this Court, including the Schedules of Assets and Liabilities, the Statement of Financial Affairs, and Monthly Operating Reports;

(j)     assisting the Debtors in claims processing, analysis, and reporting, including plan classification modeling and claim estimation;

(k)     assisting the Debtors in responding to and tracking reclamation claims;

(l)     providing assistance with implementation of court orders;

(m)     assisting in the evaluation and analysis of avoidance actions, including fraudulent conveyances and preferential transfers;

(n)     participating in meetings and providing support to the Debtors and their other professional advisors in negotiations with potential investors, banks and other secured lenders, the creditors' committee appointed in these chapter 11 cases, the Office of the United States Trustee (the "U.S. Trustee"), other parties-in-interest, and professionals hired by the same, as requested;

(o)     assisting the Debtors with plan distribution activities;

(p)     providing assistance with tax planning and compliance issues with respect to any proposed plans of reorganization, as well as any and all other tax assistance as may be requested from time to time; and

(q)     rendering such other restructuring and general business consulting or such other assistance for the Debtors or the Debtors' subsidiaries and affiliates as the Debtors' management or counsel may request, that are not duplicative of services provided by other professionals retained in these cases.

17.    Simultaneously with the submission hereof, the Debtors have filed an Application to retain Rothschild, Inc. ("Rothschild") as financial advisors and investment bankers to the Debtors.  FTI will work closely with Rothschild to ensure that the services provided by each firm are complementary and not duplicative.

<u>Qualifications Of Professionals</u>

18.    The Debtors are familiar with the professional standing and reputation of FTI.  The Debtors understand that FTI is well experienced in providing restructuring and financial advisory services in restructurings and reorganizations, and that it is well respected for services it has rendered in large and complex chapter 11 cases on behalf of debtors and creditors throughout the United States.

19.    Prior to the Petition Date, on or about August 1, 2005, FTI was engaged to provide restructuring and financial advisory services to the Debtors.  During this engagement, FTI has developed a significant amount of institutional knowledge regarding the Debtors' operations, finances, and systems.  Such experience and knowledge will be valuable to the Debtors in their efforts to reorganize.  Accordingly, the Debtors wish to retain FTI to provide assistance during these chapter 11 cases.

20.    The services of FTI are deemed necessary to enable the Debtors to maximize the value of their estates and to reorganize successfully.  Further, FTI is well qualified and able to represent the Debtors in a cost-effective, efficient, and timely manner.

<u>Disinterestedness Of Professionals</u>

21.    The Eisenberg Affidavit filed in support of this Application contains information available to date on FTI's connections with other parties-in-interest, as required by Bankruptcy Rule 2014(a).  FTI has informed the Debtors that, except as may be set forth in the Eisenberg Affidavit, it (a) has no connection with the Debtors, its creditors, or other

9

parties-in-interest in this case, (b) does not hold any interest adverse to the Debtors' estates, and

(c) believes it is a "disinterested person" as defined in section 101(14) of the Bankruptcy Code

and is otherwise eligible to be retained under section 327(a) of the Bankruptcy Code.

22.    FTI will conduct an ongoing review of its files to ensure that no conflicts or

other disqualifying circumstances exist or arise.  If any new facts or circumstances are

discovered, FTI will supplement its disclosure to this Court.

23.    FTI has agreed not to share with any person or firm the compensation to be

paid for professional services rendered in connection with these chapter 11 cases.

<u>Terms Of Retention</u>

24.    In the 90 days leading up to the Petition Date, the Debtors paid to FTI

approximately $3.7 million in fees and expenses for restructuring and financial advisory services,

rendered to the Debtors, associated with planning for a possible chapter 11 reorganization.  FTI

is not owed any amounts with respect to its prepetition fees and expenses.

25.    The Debtors understand that FTI intends to apply to this Court for

allowances of compensation and reimbursement of expenses for restructuring and financial

advisory services in accordance with the applicable provisions of the Bankruptcy Code, the

Bankruptcy Rules, corresponding Local Bankruptcy Rules for the Southern District of New York

(the "Local Rules"), orders of this Court, and guidelines established by the U.S. Trustee (the

"U.S. Trustee Guidelines").  The customary hourly rates, subject to periodic adjustments,

charged by FTI professionals anticipated to be assigned to this case are as follows:

| | |
|---|---|
| Senior Managing Directors | $560-625 |
| Directors / Managing Directors | $415-560 |
| Associates / Consultants | $205-385 |
| Paraprofessionals | $95-168 |

In addition to the hourly rates and subject to the approval of this Court, the Debtors will

consider, in their sole discretion, a value-added fee at the conclusion of FTI's engagement that

would be based upon FTI's contribution to the successful restructuring of the Debtors.

26.    FTI will bill for reasonable expenses that are likely to be incurred on the

Debtors' behalf during the engagement, including, but not limited to, airfare, meals, hotel

accommodations, telephone, industry research, and duplicating and printing (at not more than

$0.10 per page).  FTI will not charge any markup, overhead, profit, or other fees on these

reimbursable expenses.

27.    FTI has received a retainer in connection with preparing for the filing of

these chapter 11 cases.  The unapplied residual retainer, which is estimated to total

approximately $525,000, will constitute a general retainer for postpetition services, will not be

segregated by FTI in a separate account, and will be held until the end of these chapter 11 cases

and applied to FTI's finally approved fees in these chapter 11 cases.

28.    In connection with the Vendor Communications Process noted above, FTI's

professionals providing such assistance will be performing repetitive tasks in responding to

numerous vendor calls including answering incoming calls, communicating relevant factual

information regarding these chapter 11 cases, negotiating terms of supply, and updating the

Vendor Communications Process database to reflect the outcome of calls received.  While the

Vendor Communications Process activities are directly related to these chapter 11 cases

described herein, given the nature of these tasks and the expected volume of supplier calls, it

would be impractical and would provide little monitoring insight to various parties-in-interest to

these chapter 11 cases for the professionals to maintain detailed time records for tasks performed

in connection with the Vendor Communications Process.  As such, the Debtors respectfully

11

request that this Court allow the Vendor Communications Process professionals to submit those

time details in half-hour increments.

<u>Limitation Of Liability</u>

29.    Pursuant to the limitation of liability paragraph of Section 6.1 of the

Standard Terms And Conditions section of the Engagement Letter, FTI and the Debtors have

agreed that FTI Consulting, Inc. and any of its subsidiaries and affiliates, officers, directors,

shareholders, agents, employees, subcontractors, and/or independent contractors furnished by

FTI to perform the services for which FTI is being engaged (collectively, the "Personnel") shall

not have any liability to the Debtors or to any third party claim as a result of FTI's retention, the

execution and delivery of this Application, the provision of services or other matters relating to

or arising from this Application, other than liabilities that shall have been determined by a final

non-appealable order of a court of competent jurisdiction to have resulted from the gross

negligence or willful misconduct of FTI or its Personnel in respect of whom such liability is

asserted, or as otherwise set forth in this Application or an order of this Court approving this

Application.  The Debtors and FTI also have agreed that in no event shall FTI or its Personnel be

liable for consequential, indirect, or punitive damages, damages for lost profits or opportunities

or other like damages or claims of any kind.

30.    Any requests by FTI for indemnification or other payments from the

Debtors shall be made by means of an application (interim or final, as the case may be) to this

Court and shall be subject to review by this Court, <u>provided</u>, <u>however</u>, that in no event shall FTI

be indemnified in the case of its own bad faith, self-dealing, breach of fiduciary duty (if any),

gross negligence, or willful misconduct.

31.    In no event shall FTI be indemnified nor shall its liability be limited if the

Debtors or a representative of their estates asserts a claim for, and a court determines by final

order that such claim arose out of, FTI's own bad faith, self-dealing, breach of fiduciary duty (if

any), gross negligence, or willful misconduct.

<u>Dispute Resolution Provisions</u>

32.    The Debtors and FTI have agreed, subject to this Court's approval of this

Application, that (a) any controversy or claim with respect to, in connection with, arising out of,

or in any way related to this Application or the services provided by FTI to the Debtors as

outlined in this Application, including any matters involving a successor-in-interest or agent of

any of the Debtors or of FTI, shall be brought in this Court or in the District Court for the

Southern District of New York (the "District Court") if such District Court withdraws the

reference, (b) FTI and the Debtors, and any and all successors and assigns thereof, consent to the

jurisdiction and venue of such court as the sole and exclusive forum (unless such court does not

have or retain jurisdiction over such claims or controversies) for the resolution of such claims,

causes of actions, or lawsuits, (c) FTI and the Debtors, and any and all successors and assigns

thereof, waive trial by jury, such waiver being informed and freely made, (d) if this Court, or the

District Court if the reference is withdrawn, does not have or retain jurisdiction over the

foregoing claims and controversies, FTI and the Debtors, and any and all successors and assigns

thereof, will submit first to non-binding mediation, and if mediation is not successful, then to

binding arbitration, in accordance with the Dispute Resolution Procedures, and (e) judgment on

any arbitration award may be entered in any court having proper jurisdiction.  By this

Application, the Debtors seek approval of this agreement by this Court.

33.    Further, FTI has agreed not to raise or assert any defense based upon

jurisdiction, venue, abstention, or otherwise to the jurisdiction and venue of this Court or the

District Court, if such District Court withdraws the reference, to hear or determine any

controversy or claims with respect to, in connection with, arising out of, or in any way related to this Application or the services provided hereunder.

Conclusion

34.    For the foregoing reasons, the Debtors submit that the relief requested herein is in the best interests of the Debtors and their estates and creditors and should be approved.

Notice

35.    Notice of this Application has been provided by facsimile, electronic transmission, overnight delivery, or hand delivery to (a) the U.S. Trustee, (b) the Debtors' 50 largest unsecured creditors, (c) counsel for the agent under the Debtors' prepetition credit facility, and (d) counsel for the agent under the Debtors' proposed postpetition credit facility.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

Memorandum Of Law

36.    Because the legal points and authorities upon which this Application relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an interim order (a) authorizing the Debtors to employ and retain FTI as their restructuring and financial advisors, on an interim basis, effective as of the Petition Date, pending approval of a final order, (b) scheduling a final hearing to consider granting the relief on a final basis, and (c) granting the Debtors such other and further relief as is just.

Dated:   New York, New York
         October 8, 2005

                              DELPHI CORPORATION, on behalf of itself and
                              certain of its subsidiaries and affiliates, as Debtors and
                              Debtors-in-possession

                              By:   /s/ John D. Sheehan_____
                                    Name: John D. Sheehan
                                    Title:  Vice President and Chief Restructuring
                                            Officer