Hearing Date: October 11, 2005 at _0:00 a.m.

James L. Bromley (JB 5125)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000

Attorneys for Objectors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------- X

In re:                                                                    :
                                                                          :    Chapter 11
DELPHI CORPORATION, et al.,                                               :    Case No. 05-44481
                                                                          :
                           Debtors.                                       :
------------------------------------------------------------------------- X    Jointly Administered

**OBJECTION TO DEBTORS' MOTION FOR AN ORDER UNDER 11 U.S.C.
§§105, 362 AND 541 OF THE BANKRUPTCY CODE AND FED. R. BANKR. P.
3001 ESTABLISHING NOTIFICATION AND HEARING PROCEDURES FOR
TRADING IN CLAIMS AND SECURITIES**

Citigroup Inc., Lehman Brothers Inc., Merrill Lynch & Co. and Morgan Stanley

& Co. (the "Market Maker Objectors" or "Objectors"), hereby object to the Motion For An

Order Under 11 U.S.C. §§ 105, 362 And 541 And Fed. R. Bankr. P. 3001 Establishing

Notification And Hearing Procedures For Trading In Claims And Securities (the "Motion") of

the above captioned debtors and debtors in possession ("Debtors" or "Delphi").[1]  In support

hereof, the Market Maker Objectors respectfully represent as follows:

---

[1]        Capitalized terms used but not defined herein have the meanings set forth in the Motion.

## **BACKGROUND**

1. On October 8, 2005 (the "<u>Petition Date</u>"), the Debtors commenced the above-captioned cases under chapter 11, title 11, United States Code (the "<u>Bankruptcy Code</u>") and filed a number of applications for relief, including the Motion.

2. By the Motion, the Debtors seek entry of an order to protect certain inchoate tax attributes, known as net operating loss carryovers (and analogous tax credit carryovers) ("<u>NOLs</u>"), which the Debtors claim to be property of their bankruptcy estates. The Motion seeks, among other things, to impose significant restrictions on purchases and sales of claims against the Debtors (the "<u>Delphi Debt Claims</u>", which claims, at this point in the proceedings, primarily consist of publicly held and SEC registered debt securities (for purposes of this Objection, "<u>Delphi Debt Securities</u>"). While the restrictions have serious implications for all holders, or potential holders, of Delphi Debt Claims, the relief requested by the Motion would effectively halt – except in an extraordinarily small range of circumstances – all transactions in Delphi Claims by so-called Substantial Claimholders, defined under the Motion to be entities holding, directly or indirectly, $100 million or more in claims against the Debtors[2].

3. Each of the Market Maker Objectors is a creditor and party in interest in these proceedings. In addition to their direct interests as creditors in these proceedings, each of the Market Maker Objectors (or an affiliate) is a registered broker-dealer. In that capacity, each of the Market Maker Objectors actively participates in the securities markets, buying and selling debt securities, including Delphi Debt Securities, in the ordinary course of its dealer business.

---

[2]    While the restrictions requested in the Motion would apply to trading in equity securities of Delphi as well as to debt, this Objection is limited to trading restrictions in regard to Delphi Debt Claims. The Objectors acknowledge that, while the trading restrictions sought in the Motion with respect to Delphi Debt Claims are completely unnecessary to protect the Debtors against the potential impairment of their NOLs, the Debtors could in fact suffer an impairment to their NOLs as a result of trading in the equity securities of Delphi.

[New York #1471951 v2]

Each of the Market Maker Objectors derives substantial revenue from such business activity, both from trading for its own account and trading on behalf of its customers.  The Debtors also obtain value from the activities of the Market Maker Objectors in having an orderly market for the Delphi Debt Securities. Such benefit existed prior to the Petition Date and will continue in the postpetition period unless the Debtors are successful in eliminating such trading market with the restrictions requested in the Motion.

4.    A preliminary hearing on the Motion is scheduled for Tuesday, October 11, 2005, well prior to the appointment of the official creditors committee (the "Committee").  If the pattern followed in other recent cases involving this very same issue is a guide (including the recent filings by Delta Air Lines, Inc. ("Delta") and Northwest Airlines, Inc. ("Northwest") and their respective affiliates), then in the event the Court is willing to provide some form of interim relief, a hearing will be set within several weeks for the consideration of a form of order to be entered on a final basis.  The final hearing will allow all parties in interest to have the opportunity to comment on and, if necessary, object to the final relief sought.  Notwithstanding the likelihood of a final hearing and opportunity to be heard at that time, the Market Maker Objectors have very serious concerns that require immediate attention and should be considered by this Court in fashioning any interim relief.

## PRELIMINARY STATEMENT

5.    The issues presented by the Motion are stark.  In the years leading up to their chapter 11 filings, the Debtors accumulated staggering losses. These losses, in turn, gave rise to NOLs for U.S. federal income tax purposes, which the Debtors claim might possibly be used in

3

the future to shelter billions of dollars in post-reorganization income.[3]  The Debtors want to

protect these NOLs and have requested that this Court impose extreme restrictions on the trading

of Delphi Debt Claims to do so.  The Market Maker Objectors are many of the world's leading

investment banks.  Their business is buying and selling securities, including the Delphi Debt

Securities, both for their own accounts and for the accounts of others.  The Market Maker

Objectors have present identifiable property interests in the Delphi Debt Securities and their

businesses as dealers in such securities, which depend on the securities remaining freely tradable.

6.    The ability to use NOLs to shelter future income is governed by the Internal

Revenue Code (the "Tax Code").  In particular, Section 382 of the Tax Code and associated

Treasury Regulations (collectively, "Section 382") limit a corporation's ability to utilize NOLs if

the corporation undergoes an "ownership change," which, as a general matter and subject to the

numerous complications typical of the Tax Code, is defined as a greater-than-50% shift in the

ownership of the corporation's stock over a three-year period.  Triggering the limitation of

Section 382 does not cause a loss corporation to forfeit its NOLs; instead, Section 382 imposes

an annual cap on the amount of NOLs that a corporation may utilize in taxable years after an

ownership change (with the result that a corporation subject to the limitation may be required to

spread its NOLs out over a greater number of years than would otherwise be the case).

7.    In recognition of the fact that an "ownership change" is very likely to result from

a bankruptcy reorganization and so as not to burden the rehabilitation of debtors unduly, Section

382 offers two alternative forms of relief, described briefly in the two paragraphs immediately

below.

---

[3]      The Debtors assume, in this regard, that they will generate taxable income before the NOLs expire, and that
Congress will not limit the utilization of NOLs in a manner that would restrict the Debtors' ability to use their NOLs
(as it is free to do, and has done in the past).

4

8.   First, under a special elective regime provided by Section 382(l)(5), a debtor's
ability to utilize NOLs will not be limited by Section 382 on a going-forward basis if the
following three conditions are met;

   a.   as a result of the reorganization, at least 50% of the debtor's stock is
        owned by former shareholders of the corporation or "qualified creditors."
        The term "qualified creditors" as a general matter includes (i) creditors
        that have owned their debt claims for at least 18 months prior to the
        bankruptcy filing date (so-called "old and cold" creditors), (ii) any market
        purchaser of debtor claims that will hold less than 5% of the equity of the
        debtor following the reorganization, and (iii) trade creditors[4];

   b.   the debtor does *not* undergo any subsequent "ownership change" during
        the two years following the consummation of the plan of reorganization.
        (If a corporation fails this requirement after availing itself of the benefits
        of Section 382(l)(5), the corporation's pre-change NOLs will be
        *completely eliminated*, not just subject to the general Section 382
        limitations.);

   c.   the debtor does not take a tax deduction for any interest paid or accrued
        during a period ranging from 3 to 4 years immediately preceding the
        consummation of the plan of reorganization in respect of debt that is later
        converted into stock pursuant to the plan; and

   d.   the debtor effectively elects to rely on Section 382(l)(5).

9.   As an alternative to Section 382(l)(5), Section 382(l)(6) provides relief to
corporations emerging from bankruptcy by providing that the Section 382 NOL limitation may

---

[4]      The term "qualified creditors" is defined in Treasury regulation section 1.382-9.

[New York #1471951 v2]

be calculated under a taxpayer-favorable formula that drastically reduces the effects of the limitation.  There are no ownership requirements or other special requirements that must be met in order for a corporation to utilize the benefits of Section 382(l)(6), and taxpayers otherwise meeting the requirements of Section 382(l)(5) may elect to be subject to the provisions of Section 382(l)(6) instead.

10.    Contrary to the Debtors' assertions, market trading in Delphi Debt Claims after the Petition Date *cannot* cause the Debtors to fail to meet the requirements listed in Paragraph 9 above, and thus cannot cause the Debtors to lose the benefits of Section 382(l)(5) (should they elect to employ it), provided only that the Debtors retain the ability (through an appropriate order of this Court) to require holders of Delphi Debt Claims to *dispose* of their Delphi Debt Securities prior to the consummation of a plan of reorganization as necessary to bring those holders below the 5% threshold for post-plan equity ownership described above in clause (a) of Paragraph 8 above (the so-called "sell-down remedy").  For this reason, as discussed in more detail below, the sell-down remedy, which has been advocated by The Bond Market Association (the "BMA") and the Loan Syndications and Trading Association (the "LSTA"), two of the leading securities industry organizations, and is contained in the "Model Order" endorsed by those groups, is fully adequate to protect the Debtors' legitimate interests in preserving their ability to utilize NOLs.[5]

11.    The contemplated sanction for violating the Model Order is simply that a non-complying creditor will not receive any equity securities in the reorganized company above the 5% threshold.

---

[5]    In light of the UAL and Mirant bankruptcies, discussed below, the BMA and the LSTA assembled a working group with representatives of the creditor and market making communities, including several of the Market Maker Objectors, as well as representatives of both the debtor- and creditor-side of the bankruptcy bar, to craft what has become known as the "Model Order."  The Model Order, a copy of which is annexed hereto as Exhibit A, has been widely distributed and discussed among the bankruptcy bar and was undoubtedly known to the Debtors prior to the filing of the Motion.

6

[New York #1471951 v2]

12.    It is virtually impossible to determine at the beginning of a bankruptcy process whether the bankrupt corporation would benefit more from provisions of Section 382(l)(5) or those of Section 382(l)(6).  To our knowledge, however, there has to date been only one major bankruptcy reorganization whose final plan relied on the provisions of Section 382(l)(5) since the enactment of the statute.  As is to be expected, there are many exceptions, presumptions, safe harbors and timeframes that complicate the analysis of a corporation's true position under Section 382 and make the analysis much more nuanced than is suggested by the Debtors.

13.    It is absolutely clear, however, that no amount of trading in Delphi Debt Securities following the Petition Date will cause the Debtors to lose the chance to benefit from Section 382(l)(5) in the hypothetical event that the Debtors were otherwise able to benefit from that provision and in fact chose to do so, provided only that this Court reserves the right before the confirmation of any plan to fashion a sell-down remedy incorporating the sanctions described above.

14.    By contrast, the relief proposed by the Debtors, as applied to Delphi Debt Securities, is completely unnecessary to accomplish its stated purpose.  The Debtors propose to arrogate to themselves effective veto power over secondary market trading in Delphi Debt Claims, to require market participants to wait 30 days or more to find out whether trades — which ordinarily settle in 3 days for debt securities and 20 days for bank loans  — will be permitted to be consummated, and to declare trades in violation of the Debtors' interpretation of the Order to be "null and void."  But none of this is necessary, in fact, to protect the Debtor's NOLs.

15.    The relief proposed by the Debtors is completely inconsistent with maintaining orderly markets in Delphi Debt Securities.  Corporate debt securities settle on a "T+3" basis, not

7

"T+33."  And since traders often resell what they buy, declaring one trade to be "null and void" can cause a ripple of follow-on "fails" across the markets. Finally, the Objectors today have outstanding "credit default swap" contracts and other financial derivative contracts that predate the Petition Date, and which <u>require</u> the Objectors to take delivery of Delphi Debt Securities now that Delphi has sought the protection of this Court.  The Debtors' Motion would put some Objectors into the position of dishonoring pre-existing contractual commitments, without any commensurate benefit accruing to the future viability of the Debtors' NOLs.

16.    With this background, Delphi has jumped on the increasingly large bandwagon of debtors (e.g., Delta and Northwest, in this District in the past few weeks, and UAL Corporation and Mirant Corporation, before that) that seek to impose substantial restrictions on the trading of debt securities on the first day of proceedings.

17.    Indeed, the Debtors approach the relief sought in the Motion as commonplace and suggest that requests for such relief are routinely granted.  The strong inference is that there can be no argument as to whether the Debtors' NOLs are valuable assets of the estates, whether the trading of the Delphi Debt Securities outside the requested boundaries will have an immediate and irreparable negative impact on the Debtors' NOLs, whether the Motion would impose significant burdens on trading, whether the reporting requirements requested are merely to allow monitoring and are perfectly reasonable in light of the value at stake, whether the "procedure" suggested to permit trading is both balanced and fair and whether the "proof" offered in support of the relief is unassailable.  But nothing could be farther from reality.  In fact, the relief sought is extraordinary, extreme and immensely burdensome to the Market Maker Objectors, the procedures are highly restrictive, the legal justification is minimal, if not nonexistent, and the proof of their appropriateness is wholly inadequate.

8

- The entire regime of orders protecting NOLs (the "NOL Orders") is based on a single case, a generation-old Second Circuit decision, In re Prudential Lines, Inc., 928 F.2d 565 (2d Cir. 1991), aff'g 119 B.R. 430 (S.D.N.Y. 1990), aff'g 107 B.R. 832 (Bankr. S.D.N.Y. 1989) ("Prudential Lines"), the *sui generis* facts of which have no application to the current situation.

- The relief sought is injunctive in nature and must be sought by the commencement of an adversary proceeding – requiring an application for a temporary restraining order on notice to the parties sought to be restrained, followed by a preliminary injunction hearing.  Injunctive relief simply cannot be obtained by motion, a position confirmed by the court in UAL.

- The Debtors utterly fail to meet the standards for the granting of injunctive relief, particularly of the magnitude requested.

- First, there is *no irreparable injury* despite Delphi's assertions to the contrary.  There is simply no harm to the Debtors — none — caused by trading in the Delphi Debt Securities.  As discussed briefly above and in more detail below, secondary market transactions in Delphi Debt Securities occurring prior to the consummation of a plan of reorganization are *completely irrelevant* to the Section 382(l)(5) analysis, provided that the Debtors may avail themselves of the sell-down remedy at the appropriate time.  All trading activities, however, including basic market making activities, "riskless principal" trading and derivatives activities that are the bread and butter business of the Market Maker Objectors, are subject to the severe restrictions of the proposed interim order (the "Preliminary Injunction").

- Because any potential injury to the Debtors' ability to utilize NOLs would occur in the future, *at emergence*, the sell-down remedy is sufficient to address any potential issues at such later date.  For this reason, some version of the sell-down remedy has already been adopted in UAL and Mirant, has been proposed in the Model Order, and is currently under discussion in Delta and Northwest.

- Second, the balance of harms, ignored by Delphi, is squarely in favor of the Market Maker Objectors.  Because the sell down mechanisms used in previous cases and adopted in the Model Order ensure that no irreparable injury will occur, the harm faced by the Debtors is uncertain at best.  The Market Maker Objectors, on the other hand, are in the business of buying and selling debt securities, and are currently contractually committed to perform with respect to various securities contracts.  If the relief requested is granted in whole and no waivers are granted, the Objectors face real, immediate and substantial economic loss.

- Any argument that the 30-day notice procedures impose no harm on the Market Maker Objectors or any other buyer or seller of large amounts of Delphi Debt Securities is sheer fantasy.  The securities markets are predicated on exceedingly fast trade settlement, most often at the industry standard of T (trade date) plus three.  Imposition of a 30-day waiting period, with the prospect of litigation if an

9

objection is lodged, simply destroys the ability to perform on normal market terms.

- Further tilting the balance of harms in favor of the Objectors is the $100 million threshold proposed to define a Substantial Claimholder. This woefully inadequate figure was presumably derived through an attempt to guess what amount of Delphi Debt Securities could cause the holder to receive 2.5% of Delphi's stock in a plan of reorganization (giving the Debtors an unusually ample margin for error considering that the tax rules are concerned with holdings of 5% or greater). That figure, however, completely ignores the enormous potential claims of Delphi's former parent, General Motors Corporation ("GM") estimated by GM to be as high as $10 billion, as well as the likely claims of current and former employees and retirees, whose benefits are estimated by Delphi to be in the billions of dollars, which are the *raison d'etre* of these proceedings and squarely in the Debtors' crosshairs. If Delphi were facing only the $4 billion in unsecured claims against which it measures the proposed $100 million threshold, it would not be in chapter 11.

- Third, there is no public policy argument in favor of the entry of the Preliminary Injunction. In fact, the public policy arguments against the relief are exceedingly strong.

- It is well known that orders limiting trading in claims are effective anti-takeover tools; tools that can be used to entrench management, repel unwanted suitors or meddling "vulture" investors, and generally chill the interest of outside investors. The system proposed by the Debtors will only permit accumulation of claims by investors "approved" by the Debtors and their management or those investors who wish to litigate themselves into substantial holdings. The courts should not institutionalize a substantial and unjustified bar to the maximization of creditor recoveries.

- There also is an accepted and overriding public policy in favor of the uninterrupted operation of the securities markets. This policy is strongly embodied in the safe harbors already built into the Bankruptcy Code, which will be strengthened and expanded on October 17. Nevertheless, with Delta, Northwest and now Delphi, the Southern District of New York, the home of the world's most important securities markets, is being asked to institutionalize rules that effectively freeze the debt securities markets for every large debtor that files for chapter 11 protection. There is simply no justifiable public interest being served by entry of a Preliminary Injunction that disrupts the trading markets and forces the Market Maker Objectors -- complete bystanders to the crises that have engulfed these issuers – to suspend their normal business activities and to incur substantial expense for purposes of negotiating waivers with the Debtors and adopting cumbersome compliance procedures that will enable them to resume trading.

[New York #1471951 v2]

- Moreover, the relief sought raises constitutional issues about impairment of the property rights of Substantial Claimholders that Debtors blithely ignore.

- The unspoken fourth element of injunctive relief is a demonstration of a likelihood of success on the merits. Where one party proposes that another be restrained from taking an otherwise legal action, it is axiomatic that there needs to be something to protect and something worth protecting.

- In other words, the Debtors must be required to provide strong proof in an evidentiary hearing held on notice and with an opportunity for discovery and effective cross-examination, that the NOLs exist, that the NOLs have a readily ascertainable value, and that there is a strong likelihood that they will be available in the future for use to support a confirmable plan that satisfies the limitations of Section 382(l)(5) – including limitations that restrict the trading of reorganized equity for as long as *two years* after emergence. Even if Delphi satisfies all of the other elements – which it does not – hopes, dreams and aspirations should not suffice to restrain the public securities markets.

18.    Notwithstanding the similar restrictions sought in other recent bankruptcy proceedings, the Debtors should not confuse the Court by inferring that the entry of orders restricting trading in debt and equity in major cases such as <u>In re UAL Corporation</u>, Case. No. 02-B-48191 (ERW) (Bankr. N.D. Ill. Dec. 9, 2002), and <u>In re Mirant Corporation</u>, Case No. 03-46590 (DML) (Bankr. N.D.Tex., July 21, 2003) corresponds with a widely held view, particularly among creditors or market makers, that such orders are appropriate or even necessary. Instead, the true lesson of UAL, Mirant, Delta and Northwest is that debtors routinely seek overbroad and unnecessary restrictions, necessitating time-consuming negotiations to carve back the orders to something that satisfies, some albeit reluctantly, all concerned.

19.    It was to avoid an expensive and increasingly ritualized dance of advisors in every major case that the BMA and LSTA developed the Model Order, attempting to build in the best of the heavily negotiated UAL and Mirant orders. Developed with substantial input from the debtor side of the aisle, the Model Order is a good faith attempt to balance the interests of debtors in protecting NOLs with the legitimate interests of the securities community in avoiding substantial disruption in the securities markets. It also represents a willingness to avoid litigation

11

over substantial issues, including whether the injunctive relief amounts to an unconstitutional

taking, in exchange for certainty and an agreed upon process.  The Objectors strongly urge the

Debtors and this Court to adopt the Model Order and the sell-down remedy as the best approach

going forward.

## ARGUMENT

POINT I

## THE COURT LACKS THE AUTHORITY TO APPLY THE AUTOMATIC STAY TO RESTRAIN TRANSACTIONS BY SUBSTANTIAL CLAIMHOLDERS UNDER BANKRUPTCY CODE §362

20.    The Debtors have primarily sought to justify the issuance of the Preliminary

Injunction on the basis of the automatic stay of Code Section 362.  The Debtors argue that their

NOLs constitute valuable property of the Debtors' estates under Code Section 541, and as such,

any action that could have a negative impact on the NOLs violates the automatic stay, justifying

injunctive relief.  For support, the Debtors rely primarily on Prudential Lines, Inc, the

grandfather of NOL protection.

21.    The Debtors justify their relief through a fundamentally flawed reading of

Prudential Lines and a similarly flawed understanding of the nature of the property interests that

are being restrained and impaired by the Preliminary Injunction.  In Prudential Lines, the debtor

sought to restrain its parent corporation from taking a worthless stock deduction on its (the

parent's) tax return, which it argued would "effectively eliminate the value of the [debtor's]

NOL carryforward."  Prudential Lines, 928 F.2d at 566, 574.  The Second Circuit found that

debtor's NOL was property of the debtor's estate under Section 541 and also concluded that

automatic stay barred the parent from taking the deduction.  Prudential Lines, 928 F.2d at 574.

This is not the end of the story, however.

22.   The <u>Prudential Lines</u> facts read like a soap opera.  The parent and debtor had filed consolidated tax returns for a decade prior to the chapter 11 filing by the debtor and had a <u>combined</u> NOL of $75 million, $74 million of which was attributable to the debtor's operations. <u>Id.</u> at 567.  The parent was informed by its accountants that it could take a deduction – described by the Second Circuit as "worthless" – on its tax return in connection with its loss on the stock of the debtor and that taking such a deduction would eliminate the combined NOL.  With that backdrop, the debtor filed a plan of reorganization that would utilize the NOL, but also proposed that a principal of the parent would retain a 75% ownership interest in the reorganized entity. <u>Id.</u>

23. The creditors committee predictably objected to this plan and proposed a plan of their own which would also use the NOL, but provided no recovery to the parent or its principals.  The principals of the parent, who had continued to serve on the board of the debtor and had negotiated with the creditors committee to retain an interest, resigned and declared their intention to take the worthless deduction and thus destroy the NOL.  Responding to what amounted to an attempt to torpedo the committee's proposed plan by destroying the NOL, the creditors committee immediately commenced an "*adversary proceeding seeking to have [parent] preliminarily and permanently enjoined* from taking the worthless stock deduction on its 1988 tax return." <u>Id</u>. at 568 (emphasis added).  Among the claims made against the parent was that taking the deduction would violate the automatic stay of Section 362(a)(3).

24.   It was in the face of a very specific situation where two plans had been filed that proposed the use of the debtor's NOL, where one party, an insider with the singular ability to destroy the NOL with a single act, in fact had threatened to take the act and destroy the NOL, and where an adversary proceeding had been commenced to obtain preliminary and permanent injunctive relief to prevent imminent harm that the Second Circuit upheld the bankruptcy court's

13

decision to enjoin the parent from taking the worthless deduction.  Prudential Lines can hardly be

the basis for restricting claims trading in the manner or for the purposes proposed by Delphi, yet

it is all Delphi has.

25. Here, unlike in Prudential Lines, Delphi has not filed a plan of reorganization that

will use its NOLs.  Similarly, it has not provided any proof of the size or present availability of

its NOLs, nor has it made any showing that any party (including any Substantial Claimholder)

has the power or the present intention to do anything that would irreparably damage Delphi's

NOLs or the ability to use the NOLs in a future plan of reorganization.

26.  In fact, at this early stage in the proceedings, there cannot be a direct connection

between the actions subject to restraint under the Preliminary Injunction (at least with respect to

Substantial Claimholders) and the Debtors' property interest in NOLs.  To the extent that the

Preliminary Injunction imposes restrictions on a Substantial Claimholder's right to buy and sell

claims against the Debtors, such transactions would have no direct and immediate effect on the

Debtors' NOLs, nor could they be viewed as an exercise in control over the Debtors' NOLs or

any other property of the estate.  Indeed, as discussed above, the transfer of claims to or from a

Substantial Claimholder *cannot*, in and of itself, have any immediate effect on the Debtors'

NOLs and therefore such actions do not fall within the plain language of Section 362(a)(3) or the

holding of Prudential Lines, which involved the restraint of a parent corporation from taking

deliberate action for the express purpose of destroying a debtor's NOLs  ("where a non-debtor's

action with respect to an interest that is intertwined with that of a bankrupt debtor would have the

legal effect of diminishing or eliminating property of the bankrupt estate, such action is barred by

the automatic stay."  Prudential Lines, 928 F.2d at 574 (quoting In re 48th St. Steakhouse, Inc.,

835 F. 2d 427 (2d Cir. 1987)).

[New York #1471951 v2]

27.    Quite to the contrary, the claims that are subject to restraint under the

Preliminary Injunction are property of the Substantial Claimholders, not property of the estate,

and in that respect the Debtors effectively propose to turn the automatic stay on its head by

asking the Court to use its power under Section 362(a)(3) to exercise Debtor control over

property that clearly does not belong to the Debtors.  As such, the Preliminary Injunction as

proposed effectively infringes on the Objectors' constitutionally protected property interests [6]

and may affect an improper taking of the Objectors' property under established Supreme Court

precedent.  See Babbitt v. Youpee, 519 U.S. 234 (1997) (holding that a provision restricting the

ability to descend or devise property constitutes a taking in violation of the Fifth Amendment);

see also Hodel v. Irving, 481 U.S. 704 (1987) (holding that earlier and more restrictive version of

provision found unconstitutional in Youpee violated the Fifth Amendment because it abolished

the ability to descend and devise).

28.    Consequently, given the inapplicability of Prudential Lines to the facts of the

present case, given the remote and highly contingent nature of the connection between present

trading of Delphi Debt Securities and ultimate preservation of Delphi's NOLs in an eventual plan

of reorganization, and given the plain language of  Section 362(a)(3) which only limits a direct

exercise of control over property of the estate, the Debtors have completely failed to establish

any foundation for extending the automatic stay to restrict transactions by Substantial

Claimholders in buying and selling Delphi Debt Securities.

---

[6]    The United States Constitution provides that "private property [shall not] be taken for public use, without
just compensation."  U.S. Const. amend. V.  (the "Takings Clause").  The Supreme Court has established
that determining whether the effect of a temporary regulation constitutes a taking is to be conducted under
the "Penn Central framework."   Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning
Agency, 535 U.S. 302, 321 (2002).  The Penn Central framework involves a weighing of a "complex of
factors including the regulation's economic effect on the landowner, the extent to which the regulation
interferes with reasonable investment-backed expectations, and the character of the government action."
Palazzolo v. Rhode Island, 533 U.S. 606, 617 (2001) (citing Penn Cent. Transp. Co. v. New York City, 438
U.S. 104, 124 (1978)).

POINT II

THE CLAIMS INJUNCTION CANNOT BE SUPPORTED UNDER THE GENERAL
REQUIREMENTS NECESSARY FOR INJUNCTIVE RELIEF

29.    Alternatively, the Debtors suggest that issuance of the Preliminary Injunction by
the Court is warranted under Code Section 105 as an exercise of the Court's general injunctive
powers.  As such, the present Motion is flawed because under the Federal Rules of Bankruptcy
Procedure ("Fed. R. Bankr. P.") Debtors' request for injunctive relief must be brought pursuant
to an adversary proceeding, not simply by motion [7].

30.    The Debtors contend that the usual notice requirements should not be applicable
in the present case because, they speculate, a flurry of trading activity is likely to ensue
immediately upon filing the Motion. (Mot. ¶ 31.)  How or why this justifies failing to provide
proper notice is not exactly clear from the pleadings.  But in any case, this Court should not
endorse the Debtors' patent disregard for the requirements of the Fed. R. Bankr. P.  Specifically,
Rule 7001(7) plainly stipulates that "a proceeding to obtain an injunction or other equitable
relief, except when a chapter 9, chapter 11, chapter 12, or chapter 13 plan provides for the relief"
is an adversary proceeding and therefore governed by Part VII of the Fed. R. Bankr. P.
Accordingly, Debtors should have commenced an adversary proceeding by filing a complaint
pursuant to Rule 7003 and ensured proper service of summons and complaint pursuant to Rule
7004.  Furthermore, Rule 7065 stipulates that before a preliminary injunction can be issued,
notice must be given to the adverse party.  Through their proposed Preliminary Injunction,
Debtors effectively seek to circumvent each of these procedural requirements.

---

[7]    Even in the case relied upon so heavily by Debtors, the debtor sought preliminary and permanent injunctive
relief through adversary proceeding, not motion.  Prudential Lines, 928 F.2d at 568 ("[o]n November 13,
1989, the Creditors' Committee and Cold Spring commenced an adversary proceeding in the bankruptcy
court seeking to have PSS preliminarily and permanently enjoined from taking the worthless stock
deduction on its 1998 tax return").

[New York #1471951 v2]

31.   Even assuming that the Debtors could cure procedural defects with respect to the

present action, issuance of the Preliminary Injunction is unsupported under the substantive

requirements for injunctive relief established by the Second Circuit.  Injunctive relief is "an

extraordinary remedy that should not be granted as a routine matter."  JSG Trading Corp. v.

Tray-Wrap, Inc., 917 F.2d 75, 79 (2d Cir. 1990) (citing Patton v. Dole, 806 F.2d 24, 28 (2d Cir.

1986); Med. Soc'y of N.Y. v. Toia, 560 F.2d 535, 538 (2d Cir. 1977)).  The requirements for

injunctive relief in the Second Circuit require that Debtors demonstrate "(a) that it will suffer

irreparable harm in the absence of an injunction and (b) either (i) likelihood of success on the

merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for

litigation and a balance of hardships tipping decidedly in the movant's favor."  Zervos v. Verizon

N.Y., Inc. 252 F.3d 163, 172 (2d Cir. 2001) (citing Polymer Tech. Corp. v. Mimran, 37 F.3d 74,

77-78 (2d Cir. 1994); see also Jackson Dairy at 72.  In addition, as the Preliminary Injunction

will affect public interests, the Court "should give some consideration to the balance of such

interests in deciding whether a plaintiff's threatened irreparable injury and probability of success

on the merits warrants injunctive relief."  Time Warner Cable of N.Y. City v. Bloomberg L.P.,

118 F.3d 917, 929 (2d Cir. 1997)(citations omitted).  Notwithstanding the Debtors bald

assertions to the contrary, the Debtors have failed to satisfy any of these requirements.  The

Debtors utterly fail to carry their burden with the cursory, unsupported assertion that the

Preliminary Injunction is necessary to prevent irreparable harm. (Mot. ¶ 31.)

A.   Trading Claims by Substantial Claimholders Poses No
Irreparable Harm to Debtors

32.   The Second Circuit decision in Kamerling v. Massanari, 295 F.3d 206 (2d Cir.

2002), states that "[t]he showing of irreparable harm is 'perhaps the single most important

prerequisite for the issuance of a preliminary injunction.'"  Kamerling at 214 (quoting Bell &

17

Howell: Mamiya Co. v. Masel Supply Co., 719 F.2d 42, 45 (2d Cir. 1983)).  Furthermore, the

movant must show irreparable harm "is likely before the other requirements for an injunction

will be considered."  Kamerling at 214 (citing Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d

Cir. 1999) (per curiam)).  Even more specifically, the Second Circuit has held that "irreparable

harm *must be shown to be actual and imminent, not remote or speculative*."  Kamerling at 214

(citing Rodriguez, 175 F.3d at 234; Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969,

975 (2d Cir. 1989)(emphasis added)).

        33. There is no way in which the Debtors could suffer an irreparable harm from

trading activities in the Delphi Debt Securities, because — unlike current trading in *equity*

securities of Delphi — trading in Delphi Debt Securities cannot, as a matter of law, give rise to

an ownership change within the meaning of Section 382, and thus cannot trigger an NOL

limitation prior to the exchange of such Delphi Debt Securities for stock, which in turn could

occur only upon a consummation of a plan of reorganization.   Furthermore, even at the time of

the consummation of a plan of reorganization, any injury to the Debtors resulting from current

trading in Delphi Debt Securities would be dependent on numerous contingencies, including: (i)

whether the Debtors choose to utilize the provisions of Section 382(l)(5) — and thereby forego

the relief provided by Section 382(l)(6); (ii) whether trading in Delphi Debt Securities following

the Petition Date has in fact created a situation in which more than 50% of the equity of Delphi

would be issued to persons other than former equityholders of Delphi and "qualified creditors" of

Delphi, (iii) whether there has already been an "ownership change" in respect of the Debtors,

including as a result of pre-petition actions, which would already have subjected the Debtors to

NOL limitations under Section 382 irrespective on any restrictions sought to be imposed under

the Motion; (iv) the degree to which the Debtors' NOLs will be offset by cancellation of

[New York #1471951 v2]

indebtedness income that will be generated in connection with consummation of the

reorganization plan; and (v) whether the Debtors in fact will be able to obtain confirmation of a

reorganization plan that utilizes the benefits of Section 382(l)(5). Again, even assuming that all

of these factors were to result in a potential injury to the Debtors' ability to utilize NOLs because

of trading in Delphi Debt Securities after the Petition Date, any such potential injury could be

eliminated at the appropriate time in the future through the sell-down remedy. Any potential

harm to the Debtors' NOLs is thus remote and speculative and fails to satisfy the requisite

standard for irreparable harm under the <u>Kamerling</u> test.

> B.  <u>The Balance of Harms Does Not Support Issuance of the
> Claims Injunction to Restrain Purchases and Sales of
> Claims by Substantial Claimholders</u>

34.   The Court must also conclude that the Preliminary Injunction fails to satisfy the

required showing for injunctive relief on the grounds that the balance of the harms does not

clearly weigh in the movant's favor.

35.   Parties that are Substantial Claimholders will perhaps suffer the most immediate

burden inasmuch as the prior notice requirements imposed by the Claims Injunction will severely

restrict, if not altogether eliminate, their ability to purchase and sell claims through ordinary

market transactions. As noted above, ordinary market terms typically require settlement within 3

days of the trade date for debt securities and therefore market terms cannot be reconciled with

the Debtors' 30-day prior notification requirement. Moreover, each of the Objectors will suffer

further real and immediate harm as a result of the Preliminary Injunction's adverse impact on the

trading markets. Not only will Substantial Claimholders be effectively precluded from market

activity, thereby decreasing liquidity, reducing transaction volume, and consequently reducing

revenue for the Objectors, but in order to continue trading the Objectors will be required to

implement non-standard and burdensome procedures to insure compliance with the Court's

19

order.  Additionally, if the Preliminary Injunction is granted, all market participants would be

forced to bear the continued risk and uncertainty posed by the Debtors' right to overturn market

transactions as void *ab initio,* a process that may involve unwinding multiple trades that have

occurred subsequent to any particular transaction that Debtors may seek to have voided.

36.    The Debtors' suggest that the harm to third parties from the Preliminary

Injunction has been minimized as a result of tailoring the requested relief to permit certain

trading to continue.  (Mot. ¶ 29.)  Quite to the contrary, in several key respects, the Preliminary

Injunction is overly broad and restrictive.  First, even if one were to assume – contrary to the tax

laws and to the relevant facts – that the *acquisition* of Delphi Debt Securities could present an

irreversible injury to the Debtors' NOLs (presumably on the theory that acquisitions would allow

debtholders to accumulate claims to excessive amounts of equity in a plan of reorganization and

thereby trigger an ownership change), the order requested by the Motion would also restrict *sales*

of Dephi claims, which would limit precisely those transactions by which large debtholders

could reduce their holdings in Delphi Debt Securities and thus reduce any potential future issue

to the debtors in respect of a hypothetical plan utilizing Section 382(l)(5).  Futhermore, the

standard by which the Debtors would define a "Substantial Claimholder" subject to trading

restrictions – ownership of $100 million of claims – is ridiculously low.  As discussed above, the

$100 million figure appears to be based on a guess that holders of $100 million in claims could

receive 2.5% of the equity of Delphi in a plan of reorganization.  (Mot. ¶ 26.)  Of course, that

figure takes into account only the unsecured claims of the Debtors in the amount of roughly $4

billion, and ignores the much greater potential claims against the Debtors from GM (which could

be a high as $10 billion), and claims from current and former employees and retirees.

Furthermore, as also mentioned above, the tax law looks to owners of 5% or more of the equity

of a corporation, *not* 2.5%, and so the Debtors appear to have imposed additional restrictions on the market by cutting the relevant level of potential equity ownership in half. At the same time, all claims are included for purposes of determining a party's status as Substantial Claimholder, whether secured, partially secured, priority or unsecured, even though secured claims are clearly less likely to receive equity pursuant to an eventual plan of reorganization.  Such a broadbrush approach is completely unwarranted as there is, at most, only remote risk of harm from trading unsecured claims and virtually no risk of harm from trading any type of secured or priority claim.

37.   For the foregoing reasons, the balance of hardships weighs against maintaining the Preliminary Injunction with respect the prior notice requirements and other burdens imposed on claims trading.

C.     Public Policy Does Not Favor Implementing the
         Preliminary Injunction

38.   Finally, consideration of the public interest provides further compelling basis for the Court to deny the Debtors' request for a Preliminary Injunction.  See Time Warner Cable 118 F.3d at 929.

39.   The proposed Preliminary Injunction not only directly impairs the rights and interests of Substantial Claimholders, it also has a broader negative impact on the public securities markets by seriously diminishing market liquidity, imposing compliance burdens that may effectively sideline important market participants (such as the Objectors) and creating a general overhang of uncertainty by virtue of the Debtors' general right to seek Court determination that certain trades are void *ab initio*.  Such provisions are inimical to the general public's interest in maintaining efficient and well-functioning securities markets.

[New York #1471951 v2]

40.    The Bankruptcy Code itself evidences Congressional intent that the
administration of bankruptcy proceedings should generally be conducted in a manner that will
protect and preserve the stability of the financial markets.  Numerous provisions of the
Bankruptcy Code have established exceptions for the benefit of certain financial market
transactions (generally referred to as safe harbor contracts) from the provisions of the automatic
stay, the avoidance powers, and powers relating to executory contracts.  See e.g., 11 U.S.C. §§
362(b)(6), (7), and (17), 546(e), 555, 556, 559, 560.

41.    Moreover, since the modification of Rule 3001(e) in 1991, bankruptcy courts
have been generally removed from exercising any direct authority in connection with the transfer
of claims.  Prior to 1991, Rule 3001(e)(2) "provided that the substitution of the transferee as
holder of a claim after the filing of the proof of claim required court approval after notice and a
hearing."  Hon. Robert D. Drain and Elizabeth J. Schwartz, Are Bankruptcy Claims Subject to
the Federal Securities Laws?, 10 Am. Bankr. Inst. L. Rev. 569, 578 (2002).

42.    When Rule 3001(e) was amended, the intended result was to permit the rise of a
broad and active claims trading market, unhindered by the courts.  See In re Harold, 285 B.R.
858 (Bankr. S.D.N.Y. 2002) ("[t]he 1991 Amendment to Rule 3001(e) was expressly intended to
curtail judicial oversight of the claim assignment process itself by eliminating notice to third
parties and limiting the court's role to determining disputes between assignee and assignor, the
only party entitled to notice of the purported transfer"); 9 Lawrence P. King et al., Collier on
Bankruptcy ¶ 3001.08 (15th ed. rev. 1996) ("the 1991 Amendments to Rule 3001(e) were
designed, in part, to clarify that the rule is not intended to affect trading in claims or the rights
and remedies of entities involved in such trading") (citation omitted); Drain supra at 578 ("Rule
3001(e) was amended with the express intention of curtailing judicial oversight of claim trades

22

by limiting the requirement of court approval, reducing the description of the trade to be filed with the court, and eliminating third party involvement") (citation omitted).

43.    Public policy considerations, therefore, weigh against the issuance of an injunction restricting the ability of third parties to engage in trading claims against the Debtors. Bankruptcy courts should be very wary of implementing injunctions that run against this strong trend in bankruptcy policy to promote the unhindered development of a claims trading market.

POINT III

THE COURT SHOULD ADOPT THE MODEL ORDER AS THE LESS
RESTRICTIVE APPROACH TO PROTECT NOL ASSETS

44.    As an alternative to the overly broad and unsupportable Preliminary Injunction sought by the Debtors, the Objectors propose the adoption of protections based on the Model Order, which incorporates the sell-down approach.  The sell-down approach would enable the Debtors to protect their NOLs while permitting Substantial Claimholders to continue purchasing and selling claims, and permitting the continuation of normal trading of claims generally, until a much later state in these proceedings.  Under the Model Order, a Substantial Claimholder will be compelled to reduce their holdings of claims only in the event that the Debtors subsequently file a plan of reorganization and in connection therewith are able to demonstrate that a reduction in the position by Substantial Claimholders will be reasonably necessary to preserve NOLs.

45.    While the Preliminary Injunction if granted would create immediate and substantial uncertainty for all market participants by imposing the risk that non-complying trades may be held void *ab initio*, the Model Order and sell-down approach recognize and seek to

23

preserve the benefits to be derived from maintaining normal market activity for debt claims to

the greatest extent possible, for the benefit of the Objectors and all parties in interest.[8]

46.    Finally, the Preliminary Injunction, by imposing a prior notice requirement for

acquisition of claims by Substantial Claimholders and granting the Debtors the right to seek

prohibition of any such acquisition, would shift the balance of control between the Debtors and

creditors in connection with the voting and eventual confirmation of a proposed plan of

reorganization.  This occurs because the Preliminary Injunction would effectively provide the

Debtors with a means to prevent parties from accumulating large positions in various classes of

claims.  In the absence of the Preliminary Injunction parties would be free to acquire claims and

vote such claims in acceptance or rejection of a proposed plan of reorganization pursuant to the

applicable provisions of Chapter 11.  Whether by inadvertence or design, the Preliminary

Injunction provides the Debtors with a potentially powerful means for discouraging and/or

preventing parties in interest from acquiring a potential blocking position with respect to a

particular class of claims.  In that respect, the Model Order, which provides no such right to

restrain claims acquisition, represents a more appropriate means for protecting NOLs without

tipping the playing field in the reorganization process in a manner that is inconsistent with the

general scheme of Chapter 11 as adopted by Congress.

47.    In sum, the Model Order proposed by the Objectors provides a means for the

Debtors to protect their NOLs if and when such protection can eventually be demonstrated to be

appropriate and necessary in connection with the Debtors' plan of reorganization.  As such, the

Model Order represents a proper exercise of the Court's injunctive powers because it enables

---

[8]    While the Model Order enables participants in the debt markets (including Substantial Claimholders) to
continue normal trading activity, it does impose prior notice requirements on Substantial Equityholders
identical to those set forth in the Preliminary Injunction, since changes in position by Substantial
Equityholders could give rise to an immediate ownership change within the meaning of Section 382 of the
IRC.

24

participants in the claims market to resume normal trading activity in the meantime without any

of the restrictions or burdens imposed by the Preliminary Injunction.  For all the foregoing

reasons, in the event this Court determines that the Debtors have made a sufficient showing to

support injunctive relief to protect the NOLs, the Objectors urge the Court to adopt the Model

Order based upon the sell-down approach as the only appropriate means of providing such

protection.


Dated: New York, New York
       October 10, 2005


                              CLEARY GOTTLIEB STEEN & HAMILTON LLP


                              By: __/s/ James L. Bromley_____
                                   James L. Bromley (JB-5125)
                                   A Member of the Firm
                              One Liberty Plaza
                              New York, New York 10006
                              (212) 225-2000

                              *Attorneys for the Market Maker Objectors*

[New York #1471951 v2]