**TABLE OF CONTENTS**
**(continued)**

| | | |
|---|---|---|
| SECTION 5.10 | Public Rating | 58 |
| SECTION 5.11 | Subsequently Filed Domestic Entities | 58 |
| **SECTION 6.** | **NEGATIVE COVENANTS** | **59** |
| SECTION 6.01 | Liens | 59 |
| SECTION 6.02 | Merger, etc | 61 |
| SECTION 6.03 | Indebtedness | 61 |
| SECTION 6.04 | EBITDAR. | 62 |
| SECTION 6.05 | [Reserved] | 63 |
| SECTION 6.06 | Chapter 11 Claims | 63 |
| SECTION 6.07 | Dividends; Capital Stock | 63 |
| SECTION 6.08 | Transactions with Affiliates | 63 |
| SECTION 6.09 | Investments, Loans and Advances. | 64 |
| SECTION 6.10 | Disposition of Assets | 65 |
| SECTION 6.11 | Nature of Business | 65 |
| **SECTION 7.** | **EVENTS OF DEFAULT** | **65** |
| SECTION 7.01 | Events of Default | 65 |
| **SECTION 8.** | **THE AGENTS** | **69** |
| SECTION 8.01 | Appointments; Administration by Administrative Agent; No Duties for Syndication Agent | 69 |
| SECTION 8.02 | Rights of Agents | 69 |
| SECTION 8.03 | Liability of Agents. | 69 |
| SECTION 8.04 | Reimbursement and Indemnification | 70 |
| SECTION 8.05 | Successor Administrative Agent | 70 |
| SECTION 8.06 | Independent Lenders | 71 |
| SECTION 8.07 | Advances and Payments. | 71 |
| SECTION 8.08 | Sharing of Setoffs | 71 |
| **SECTION 9.** | **GUARANTY** | **72** |
| SECTION 9.01 | Guaranty. | 72 |
| SECTION 9.02 | No Impairment of Guaranty | 73 |
| SECTION 9.03 | Subrogation | 73 |
| **SECTION 10.** | **MISCELLANEOUS** | **74** |
| SECTION 10.01 | Notices | 74 |
| SECTION 10.02 | Survival of Agreement, Representations and Warranties, etc | 74 |

(NY) 27011/094/DIPDOCS/dip.ca.doc                    10/08/05 4:49 AM

# TABLE OF CONTENTS
## (continued)

| SECTION 10.03 | Successors and Assigns | 75 |
| SECTION 10.04 | Confidentiality | 78 |
| SECTION 10.05 | Expenses; Indemnity; Damage Waiver | 79 |
| SECTION 10.06 | CHOICE OF LAW | 80 |
| SECTION 10.07 | No Waiver | 80 |
| SECTION 10.08 | Extension of Maturity | 80 |
| SECTION 10.09 | Amendments, etc. | 80 |
| SECTION 10.10 | Severability | 82 |
| SECTION 10.11 | Headings | 82 |
| SECTION 10.12 | Survival | 82 |
| SECTION 10.13 | Execution in Counterparts; Integration; Effectiveness | 83 |
| SECTION 10.14 | Prior Agreements | 83 |
| SECTION 10.15 | Further Assurances | 83 |
| SECTION 10.16 | USA Patriot Act | 83 |
| SECTION 10.17 | WAIVER OF JURY TRIAL | 83 |

| ANNEX A | | Commitment Amounts |
| EXHIBIT A | - | Form of Interim Order |
| EXHIBIT B | - | Form of Security and Pledge Agreement |
| EXHIBIT C | - | Form of Assignment and Acceptance |
| EXHIBIT D | - | Form of Exemption Certificate |
| SCHEDULE 1.01 | - | Existing Agreement |
| SCHEDULE 3.05 | - | Subsidiaries |
| SCHEDULE 3.10 | - | Litigation |
| SCHEDULE 6.01 | - | Liens |
| SCHEDULE 6.08 | - | Transactions with Affiliates |
| SCHEDULE 6.10 | - | Asset Sales |

iv

# REVOLVING CREDIT, TERM LOAN AND GUARANTY AGREEMENT
## Dated as of [●], 2005

REVOLVING CREDIT, TERM LOAN AND GUARANTY AGREEMENT, dated as of [●], 2005, among DELPHI CORPORATION, a Delaware corporation (the "Borrower"), a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code, and the subsidiaries of the Borrower signatory hereto (each a "Guarantor" and collectively the "Guarantors"), each of which Guarantors is a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code (the cases of the Borrower and the Guarantors, each a "Case" and collectively, the "Cases"), JPMORGAN CHASE BANK, N.A., a national banking association ("JPMCB"), CITICORP USA, INC. ("CUSA"), each of the other financial institutions from time to time party hereto (together with JPMCB and CUSA, the "Lenders"), JPMCB, as administrative agent (in such capacity, the "Administrative Agent") for the Lenders, and CUSA, as syndication agent (in such capacity, the "Syndication Agent"; together, the Administrative Agent and the Syndication Agent are the "Agents") for the Lenders.

## INTRODUCTORY STATEMENT

On [●], 2005, the Borrower and the Guarantors filed voluntary petitions with the Bankruptcy Court initiating the Cases and have continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The Borrower, the Existing Lenders and the Existing Agent are parties to the Existing Agreement pursuant to which the Borrower was (and the Pre-Petition Guarantors were, pursuant to the Guarantee and Collateral Agreement (as defined in the Existing Credit Agreement)) truly and justly indebted to the Existing Lenders on the Filing Date in the principal amount of $2,579,783,051.85 (including the aggregate outstanding face amount of issued but undrawn letters of credit outstanding thereunder) in respect of the extensions of credit provided for thereunder.

The Borrower has applied to the Lenders for loan facilities of $2,000,000,000, comprised of (i) a revolving credit and letter of credit facility in an aggregate principal amount of $1,750,000,000 as set forth herein and (ii) a term loan in an aggregate principal amount of $250,000,000 as set forth herein, all of the Borrower's obligations under each of which are to be guaranteed by the Guarantors.

The proceeds of the loan facilities will be used in accordance with Section 3.09 hereof.

To provide guarantees and security for the repayment of the Loans, the reimbursement of any draft drawn under a Letter of Credit and the payment of all other Secured Obligations (including the obligations of the Borrower and the Guarantors in respect of any hedging obligation permitted hereunder and Indebtedness permitted by Section 6.03(viii), in each case owing to JPMCB, any other Lender or any of their respective banking Affiliates), the Borrower and the Guarantors will provide to the Administrative Agent and the Lenders the claims and liens described in Section 2.25 of this Agreement.

Accordingly, the parties hereto hereby agree as follows:

# SECTION 1.    DEFINITIONS

SECTION 1.01    **Defined Terms**.

"ABR", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"ABR Borrowing" shall mean a Borrowing comprised of ABR Loans.

"Additional Credit" shall have the meaning given such term in Section 4.02(d).

"Adjusted LIBO Rate" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

"Administrative Agent" shall have the meaning given such term in the Introduction.

"Affiliate" shall mean, as to any Person, any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, a Person (a "Controlled Person") shall be deemed to be "controlled by" another Person (a "Controlling Person") if the Controlling Person possesses, directly or indirectly, power to direct or cause the direction of the management and policies of the Controlled Person whether by contract or otherwise.

"Agents" shall have the meaning given such term in the Introduction.

"Agreement" shall mean this Revolving Credit, Term Loan and Guaranty Agreement, as the same may from time to time be amended, modified or supplemented.

"Alternate Base Rate" shall mean, for any day, a rate per annum equal to the greater of (a) the Prime Rate in effect on such day and (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1%. Any change in the Alternate Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective from and including the effective date of such change in the Prime Rate or the Federal Funds Effective Rate, respectively.

"Approved Fund" shall have the meaning given such term in Section 10.03(b).

"Arrangers" shall have the meaning given such term in Section 10.05(a).

"Assignment and Acceptance" shall mean an assignment and acceptance entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 10.03), and accepted by the Administrative Agent. substantially in the form of Exhibit C.

2

"<u>Automotive Holdings Group</u>": a division within Delphi Automotive Systems LLC comprised of select product lines and plant sites that do not meet the Borrower's targets for net income or other financial metrics, with such additions and deletions to product lines and plant sites as the Borrower may from time to time determine (in a manner consistent with the criteria used on the date hereof to include product lines and plant sites in such division) and as such divisional name may be changed from time to time.

"<u>Availability Period</u>" shall mean the period from and including the Closing Date to but excluding the Termination Date.

"<u>Available Amount</u>" shall have the meaning given such term in Section 5.08.

"<u>Available Inventory</u>" means, at any date of determination, the lesser of (i) an amount equal to (x) 65% of Eligible Inventory *less* (y) Inventory Reserves and (ii) 85% of the product of (x) the Net Recovery Rate in effect for the Inventory (based on the then most recent independent inventory appraisal) on such date of determination *multiplied by* (y) the aggregate amount of gross Inventory (as reported in accordance with such Borrower's inventory system at such date of determination) as set forth in the most recent Borrowing Base Certificate. Notwithstanding the foregoing, until the Agents have received a third party appraisal with respect to Eligible Inventory in form and substance, and performed by an independent appraisal firm, reasonably satisfactory to the Agents, the advance rate for Eligible Inventory for purposes of calculating the amount described in clause (i) above shall be 32.5% (rather than 65%).

"<u>Bankruptcy Code</u>" shall mean The Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. Section 101 <u>et seq</u>.

"<u>Bankruptcy Court</u>" shall mean the United States Bankruptcy Court for the Southern District of New York or any other court having jurisdiction over the Cases from time to time.

"<u>Board</u>" shall mean the Board of Governors of the Federal Reserve System of the United States.

"<u>Borrower</u>" shall have the meaning given such term in the Introduction.

"<u>Borrowing</u>" shall mean (a) the incurrence, conversion or continuation of Tranche A Loans of a single Type made from all the Tranche A Lenders on a single date and having, in the case of Eurodollar Loans, a single Interest Period and (b) the incurrence of the Tranche B Loan or the conversion or continuation of a portion of the Tranche B Loan having a specified Type and having, in the case of a Eurodollar Borrowing, a specified Interest Period.

"<u>Borrowing Base</u>" shall mean, on any date, an amount (calculated based on the most recent Borrowing Base Certificate delivered to the Administrative Agent in accordance with this Agreement) that is equal to the sum of (i) 85% of Eligible Receivables (other than GM Receivables), plus (ii) 85% of GM Receivables, plus (iii) Available Inventory, plus (iv) the Fixed Asset Component, minus (v) the Carve-Out, minus (vi) an amount equal to the excess (if any) of the aggregate amount of Secured Domestic Hedging Obligations (determined on a marked-to-market basis) over $75,000,000; <u>provided</u> that (x) the aggregate amount of the Fixed Asset

3

Component shall at no time account for more than thirty percent (30%) of the aggregate amount of the Borrowing Base (it being understood that, solely for purposes of this clause (x), the aggregate amount of the Borrowing Base shall be calculated without giving effect to the deductions described in clauses (v) and (vi) above), and (y) GM Receivables shall at no time account for more than twenty-five percent (25%) of the total Eligible Receivables included in the Borrowing Base. Notwithstanding the foregoing, until the Agents have received a third party appraisal with respect to the Fixed Asset Component, in form reasonably satisfactory to the Agents, the aggregate dollar amount of the Fixed Asset Component included in the Borrowing Base shall be $300,000,000. For the avoidance of doubt, for purposes of this definition, (A) the amount described in clause (iii) of the definition of "Carve-Out" shall be deemed at all times to be equal to $35,000,000 and (B) the amount described in clause (iv)(y) of the definition of "Carve-Out" shall be deemed at all times to be equal to $5,000,000. Borrowing Base standards may be fixed and revised from time to time by the Administrative Agent in its reasonable discretion with any changes in such standards to be effective 10 days after delivery of a written notice thereof to the Borrower (or immediately, without prior written notice, during the continuance of an Event of Default).

"Borrowing Base Amendment" shall mean an amendment to this Agreement reasonably satisfactory to the Administrative Agent to be executed and delivered prior to entry of the Final Order.

"Borrowing Base Certificate" shall mean a certificate substantially in the form of an exhibit to be annexed to the Borrowing Base Amendment (with such changes therein as may be reasonably required from time to time (upon at least 10 days' notice by the Administrative Agent, except during the continuance of an Event of Default) to reflect the components of and reserves against the Borrowing Base as provided for hereunder from time to time), executed and certified by a Financial Officer of the Borrower, which shall include appropriate exhibits, schedules and collateral reporting requirements as provided for in the Borrowing Base Amendment and Section 5.08.

"Borrowing Request" shall mean a request by the Borrower for a Borrowing in accordance with Section 2.04.

"Business Day" shall mean any day other than a Saturday, Sunday or other day on which commercial banks in New York City are required or authorized to remain closed (and, for a Letter of Credit, other than a day on which the applicable Issuing Lender is closed); provided, however, that when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits on the London interbank market.

"Capitalized Lease" shall mean, as applied to any Person, any lease of property by such Person as lessee which would be capitalized on a balance sheet of such Person prepared in accordance with GAAP. The amount of obligations of such Person under a Capitalized Lease shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve-Out" shall mean (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28

4

of the United States Code, (ii) all fees and expenses incurred by a trustee under Section 726(b) of the Bankruptcy Code, (iii) after the occurrence and during the continuance of an Event of Default, the payment of allowed and unpaid professional fees and disbursements incurred by the Borrower, the Guarantors and any statutory committees appointed in the Cases (each, a "Committee") in an aggregate amount not exceeding $35,000,000 and (iv) all unpaid professional fees and disbursements incurred or accrued by the Borrowers, the Guarantors and any Committees at any time when no Event of Default is continuing, in an aggregate amount not exceeding the sum of (x) such unpaid professional fees and disbursements reflected on the most recent Borrowing Base Certificate delivered to the Administrative Agent prior to any Event of Default that is then continuing and (y) such unpaid professional fees and disbursements incurred or accrued after the date of such Borrowing Base Certificate (but at a time when no Event of Default is continuing) in an aggregate amount under this clause (y) not exceeding $5,000,000 (and with amounts included under this clause (y) to be supported by back-up documentation in respect of the amounts and dates of incurrence of such fees and disbursements), in each of the foregoing clauses (i), (ii), (iii) and (iv), to the extent allowed by the Bankruptcy Court at any time.

"Cases" shall have the meaning given such term in the Introduction.

"Cash Collateralization" shall have the meaning given such term in Section 2.03(j), and "Cash Collateralize" shall have the corresponding meaning.

"CGMI" shall have the meaning given such term in Section 10.05(a).

"Change in Law" shall mean (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender or Issuing Lender (or, for purposes of Section 2.16(b), by any lending office of such Lender or Issuing Lender or by such Lender's or Issuing Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement.

"Change of Control" shall mean (i) the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group (within the meaning of the Securities Exchange Act of 1934 and the rules of the Securities and Exchange Commission thereunder as in effect on the date hereof), of Equity Interests representing more than 50% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of the Borrower; or (ii) the occupation of a majority of the seats (other than vacant seats) on the Board of Directors of the Borrower by Persons who were neither (A) nominated by the Board of Directors of the Borrower nor (B) appointed by directors so nominated.

"Closing Date" shall mean the date on which this Agreement has been executed and the conditions precedent to the making of the initial Loans or the issuance of the initial Letter of Credit (whichever may occur first) set forth in Section 4.01 have been satisfied or waived, which date shall occur promptly upon entry of the Interim Order, but in any event not later than 15 days following the entry of the Interim Order.

5

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"Collateral" shall mean the "Collateral" as defined in the Security and Pledge Agreement.

"Commitment" shall mean either a Tranche A Commitment or a Tranche B Commitment.

"Commitment Fee" shall mean, collectively, the Tranche A Commitment Fee and the Tranche B Commitment Fee.

"Commitment Letter" shall mean that certain Commitment Letter dated September 22, 2005, among JPMCB, JPMorgan, CGMI and the Borrower.

"Consummation Date" shall mean the date of the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes of this Agreement shall be no later than the effective date) of a Reorganization Plan that is confirmed pursuant to an order of the Bankruptcy Court.

"Disclosure Filings" shall mean the following filings made by the Borrower with the Securities and Exchange Commission: (a) the Forms 8-K filed on March 4, 2005, March 22, 2005, May 16, 2005 and June 30, 2005 relating to the restatement of certain financial statements of the Borrower (and any shareholders' litigation arising out of the matters disclosed in such Forms 8-K); (b) the Form 8-K filed on May 13, 2005 relating to certain financial information of the Borrower; (c) the Forms 8-K filed on June 9, 2005, September 8, 2005 and October 3, 2005; (d) the Form 10-K for the year ended December 31, 2004; and (e) the Forms 10-Q for the quarterly periods ended March 31, 2005 and June 30, 2005.

"Dollars" and "$" shall mean lawful money of the United States of America.

"Domestic Entities" shall mean the Borrower and its direct and indirect domestic Subsidiaries on a consolidated basis.

"DPW" shall have the meaning given such term in Section 10.05(a).

"Eligible Assignee" shall mean (i) a commercial bank having total assets in excess of $1,000,000,000, (ii) a finance company, insurance company or other financial institution or fund, in each case reasonably acceptable to the Administrative Agent, which in the ordinary course of business extends credit of the type contemplated herein and has total assets in excess of $200,000,000 and whose becoming an assignee would not constitute a prohibited transaction under Section 4975 of the Code or Section 406 of ERISA, (iii) an Affiliate of the assignor Lender, (iv) an Approved Fund and (v) any other Person reasonably satisfactory to the Administrative Agent.

"Eligible Equipment" shall mean, on any date of determination, the aggregate value (as reflected on the accounting records of the Borrower or the applicable Guarantor and consistent with such Person's current and historical accounting practices) at such date of all

6

Qualified Equipment and Machinery owned by the Borrower and the Guarantors and located in any jurisdiction in the United States of America as to which Qualified Equipment and Machinery appropriate UCC financing statements have been filed naming the Borrower or the applicable Guarantor as "debtor" and JPMorgan Chase Bank, N.A., as Administrative Agent, as "secured party". As used herein, the term "Qualified Equipment and Machinery" means, with respect to the Borrower or any Guarantor, all Equipment that is owned solely by such Person and as to which such Person has good, valid and marketable and unencumbered title; *provided* that no Equipment shall be considered for inclusion as Qualified Equipment and Machinery until (i) a collateral review of such Equipment shall have been performed by the Agents or their representatives (the fees and expenses associated with such review to be paid by the Borrower in accordance with the terms of this Agreement) and (ii) the Administrative Agent shall have received a third party appraisal of such Equipment in form and substance, and prepared by an independent appraisal firm, reasonably satisfactory to the Administrative Agent (the fees and expenses associated with such appraisal to be paid by the Borrower in accordance with the terms of this Agreement).

"Eligible Inventory" shall have the meaning given such term in the Borrowing Base Amendment (it being understood that "Eligible Inventory" shall include certain Inventory owned by the Borrower and the Guarantors which is consigned to Mexican Subsidiaries of the Borrower, provided that the rights of the Borrower and the Guarantors under the agreements pursuant to which such Inventory is so consigned are subject to a first priority Lien in favor of the Administrative Agent).

"Eligible Real Estate" shall mean, on any date of determination, the aggregate value (as reflected on the accounting records of the Borrower or the applicable Guarantor and consistent with such Person's current and historical accounting practices) at such date of all Qualified Real Estate owned by the Borrower and the Guarantors and located in any jurisdiction in the United States of America as to which Qualified Real Estate (x) an appropriate mortgage, deed of trust or deed to secure debt has been recorded, to the extent required to be recorded pursuant Section 2.25(b), naming the Borrower or the applicable Guarantor as "mortgagor" or "trustor" and JPMorgan Chase Bank, N.A., as Administrative Agent, as "mortgagee" or "beneficiary" and (y) UCC financing statements have been filed naming the Borrower or the applicable Guarantor as "debtor" and JPMorgan Chase Bank, N.A., as Administrative Agent, as "secured party". As used herein, the term "Qualified Real Estate" means, with respect to the Borrower or any Guarantor, all real property that is owned solely by such Person and as to which such Person has good, valid and marketable and unencumbered title; *provided* that no real property shall be considered for inclusion as Qualified Real Estate until (i) a collateral review of such real property shall have been performed by the Agents or their representatives (the fees and expenses associated with such review to be paid by the Borrower in accordance with the terms of this Agreement) and (ii) the Administrative Agent shall have received a third party appraisal of such real property in form and substance, and prepared by an independent appraisal firm, reasonably satisfactory to the Administrative Agent (the fees and expenses associated with such appraisal to be paid by the Borrower in accordance with the terms of this Agreement).

"Eligible Receivables" shall have the meaning given such term in the Borrowing Base Amendment.

"Environmental Laws" shall mean all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating to the protection of the environment, preservation or reclamation of natural resources, the management, release or threatened release of any Hazardous Material or to health and safety matters.

"Environmental Liability" shall mean any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower or any Subsidiary directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Lien" shall mean a Lien in favor of any Governmental Authority for (i) any liability under federal or state environmental laws or regulations, or (ii) damages arising from or costs incurred by such Governmental Authority in response to a release or threatened release of a hazardous or toxic waste, substance or constituent, or other substance into the environment.

"Equipment" shall have the meaning set forth in Article 9 of the Uniform Commercial Code as in effect from time to time in the State of New York.

"Equity Interests" shall mean shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" shall mean any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" shall mean (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by the Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by the Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by the Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or

8

partial withdrawal from any Plan or Multiemployer Plan; or (g) the receipt by the Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"Eurocurrency Liabilities" shall have the meaning assigned thereto in Regulation D issued by the Board, as in effect from time to time.

"Eurodollar", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Eurodollar Borrowing" shall mean a Borrowing comprised of Eurodollar Loans.

"Event of Default" shall have the meaning given such term in Section 7.

"Excluded Taxes" shall mean, with respect to the Administrative Agent, any Lender, any Issuing Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) income, franchise, or similar taxes imposed on (or measured by) its net income as a result of a present or former connection between the Administrative Agent or such Lender and the jurisdiction of the Governmental Authority imposing such Tax or any political subdivision or Taxing authority thereof or therein (other than any such connection arising solely from the Administrative Agent or such Lender having executed, delivered or performed its obligations or received payment under, or enforced, this Agreement or any other Loan Document), (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which the Borrower is located and (c) any withholding tax that would have been imposed had such payment been made to such Lender at the time such Lender became a party to this Agreement (or designates a new lending office) or is attributable to such Lender's failure to comply with Sections 2.18(e) and (f), except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrower with respect to such withholding tax pursuant to Section 2.18(a).

"Existing Agreement" shall mean the 5-Year Third Amended and Restated Credit Agreement dated as of June 14, 2005 among the Borrower, the Existing Lenders and the Existing Agent, as amended, restated, or otherwise modified from time to time, and shall include all of the agreements providing guaranties by the Existing Guarantors and granting security interests and Liens in property and assets of the Borrower and the Existing Guarantors to the Existing Agent or the Existing Lenders, including the security agreements and other agreements listed on Schedule 1.01 hereto, each of which documents was executed and delivered (to the extent party thereto) by the Borrower and the Existing Guarantors prior to the Filing Date, as each may have been amended or modified from time to time.

"Existing Agent" shall mean JPMCB, in its capacity as administrative agent under the Existing Agreement, and its successors in such capacity.

"Existing Collateral" shall mean the "Collateral" as defined in the Existing Agreement.

"Existing Guarantors" shall mean the Subsidiaries of the Borrower that provided guarantees of the Borrower's obligations under the Existing Credit Agreement.

"Existing Indebtedness" shall mean Indebtedness and other obligations incurred by the Borrower and the Existing Guarantors under the Existing Agreement.

"Existing Lenders" shall mean the lenders from time to time holding Existing Indebtedness.

"Facility Availability Amount" means, at any time, an amount equal to (A) the lesser of (x) the Total Commitment at such time and (y) the Borrowing Base, **minus** (B) the sum of the aggregate principal amount of the outstanding Tranche A Loans, *plus* the aggregate principal amount of the outstanding Tranche B Loans, *plus* the LC Exposure, **plus** (C) an amount (up to a maximum of $500,000,000) equal to the excess (if any) of the unrestricted cash reflected on the consolidated balance sheet of the Borrower and its Subsidiaries then most recently delivered to the Lenders over $500,000,000.

"Federal Funds Effective Rate" shall mean, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Fees" shall collectively mean the Commitment Fees, Letter of Credit Fees and other fees referred to in Sections 2.21, 2.22 and 2.23.

"Filing Date" shall mean [●], 2005.

"Final Order" shall have the meaning given such term in Section 4.02(d).

"Financial Officer" shall mean the chief financial officer, acting chief financial officer or corporate treasurer of the Borrower.

"Fixed Asset Component" shall mean, on any date, an amount equal to the sum of (i) 80% of the product of Net Orderly Liquidation Value of Eligible Equipment plus (ii) 50% of the fair market value of Eligible Real Estate (as set forth in the most recent third party real estate appraisal in form and substance, and prepared by an independent appraisal firm, reasonably satisfactory to the Administrative Agent ).

"Foreign Lender" shall mean any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is located and that is not a "United States Person" as defined in Section 7701(a)(30) of the Code. For purposes of this definition and

10

Sections 2.18(e) and (f), the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Receivables Financing" means Indebtedness and other financings relating to securitizations and factoring arrangements entered into by any of the Foreign Subsidiaries.

"Foreign Subsidiary" shall mean any direct or indirect non-U.S. Subsidiary of the Borrower.

"Foreign Subsidiary Debt Limit" shall have the meaning given such term in Section 6.03.

"GAAP" shall mean generally accepted accounting principles applied in accordance with Section 1.03.

"Global EBITDAR" shall mean, for any period, all as determined in accordance with GAAP, the consolidated net income (or net loss) of the Global Entities for such period, plus (a) to the extent deducted in the calculation of consolidated net income, without duplication, the sum of (i) income tax expense, (ii) interest expense, (iii) amortization or write-off of debt discount and debt issuance costs and commissions, discounts and other fees and charges associated with Indebtedness (including the Loans), (iv) depreciation and amortization expense, (v) amortization of intangibles (including, but not limited to, goodwill) and organization costs, (vi) any extraordinary, unusual or non recurring non cash expenses or losses (including to the extent constituting Restructuring Costs) and one-time write-downs of assets, (vii) any expenses accounted by the Borrower or any of it Subsidiaries in such period for post-employment benefits under FAS 106, (viii) any cash Restructuring Costs of the Borrower and its Subsidiaries in an aggregate amount not exceeding (x) for each four fiscal quarter period ending December 31, 2005, March 31, 2006, September 30, 2006 and December 31, 2006, $175,000,000 and (y) for any four fiscal quarter period ending in 2007, $100,000,000, (ix) professional fees and other "Chapter 11 expenses" (or "administrative costs reflecting Chapter 11 expenses") attributable to the Borrower and the Guarantors for such period as shown on the Borrower's consolidated statement of income for such period, and (x) the cumulative effect of any change in accounting principles minus (b) to the extent included in the calculation of consolidated net income, the sum of (1) interest income, (2) any extraordinary, unusual or non-recurring gains, all as determined on a consolidated basis and (3) any cash payments made during such period in respect of expenses described in clause (vii) above taken in such period.

"Global Entities" shall mean the Borrower and all of its direct and indirect Subsidiaries, on a consolidated basis.

"GM Receivables" shall mean the Eligible Receivables owing from General Motors Corporation and its Affiliates.

"Governmental Authority" shall mean the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising

11

executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantor" shall have the meaning set forth in the Introduction.

"Hazardous Materials" shall mean all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Hedging Agreements" shall mean (x) foreign exchange contracts, currency swap agreements, currency future or option contracts and other similar agreements designed to hedge against fluctuations in foreign interest or exchange rates, (y) interest rate swap, cap or collar agreements and interest rate future or option contracts designed to hedge against fluctuations in interest rates and (z) commodity price protection agreements or other commodity price hedging arrangements.

"Indebtedness" shall mean, at any time and with respect to any Person, (i) all indebtedness of such Person for borrowed money, (ii) all indebtedness of such Person for the deferred purchase price of property or services (other than property, including inventory, and services purchased, trade payables that are not more than 90 days past due (or that are more than 90 days past due, if the validity or amount thereof is being contested in good faith and by appropriate proceedings or if such Person shall have set aside on its books adequate reserves therefor in accordance with GAAP) and expense accruals and deferred compensation items arising in the ordinary course of business), (iii) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments (other than performance, surety and appeal bonds and completion guarantees arising in the ordinary course of business), (iv) all indebtedness of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property, in which case such Indebtedness shall be limited to the value of the property), (v) all obligations of such Person under Capitalized Leases, (vi) (A) all reimbursement, payment or similar obligations of such Person, contingent or otherwise, under acceptance, letter of credit or similar facilities and (B) all obligations of such Person in respect of Hedging Agreements; (vii) all Indebtedness referred to in clauses (i) through (vi) above guaranteed directly or indirectly by such Person, or in effect guaranteed directly or indirectly by such Person through an agreement (A) to pay or purchase such Indebtedness or to advance or supply funds for the payment or purchase of such Indebtedness, (B) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Indebtedness or to assure the holder of such Indebtedness against loss in respect of such Indebtedness, (C) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered) or (D) otherwise to assure a creditor against loss in respect of such Indebtedness, and (viii) all Indebtedness referred to in clauses (i) through (vii) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property (including accounts and contract

12

rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness; provided, however, such Indebtedness referred to in this clause (viii) shall be the lesser of the value of such property on which a Lien is attached or the amount of such Indebtedness.

"Indemnified Taxes" shall mean Taxes other than Excluded Taxes.

"Indemnitee" shall have the meaning given such term in Section 10.05(b).

"Insufficiency" shall mean , with respect to any Plan, its "amount of unfunded benefit liabilities" within the meaning of Section 4001(a)(18) of ERISA, if any.

"Intellectual Property":   the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including copyrights, copyright licenses, patents, patent licenses, trademarks, trademark licenses, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Interest Election Request" shall mean a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.06.

"Interest Payment Date" shall mean (i) as to any Eurodollar Loan included in any Eurodollar Borrowing, the last day of each consecutive 30 day period running from the commencement of the applicable Interest Period, and (ii) as to all ABR Loans, the last calendar day of each month and the date on which any ABR Loans are converted to Eurodollar Loans pursuant to Section 2.06.

"Interest Period" shall mean, as to any Eurodollar Borrowing, the period commencing on the date of such Borrowing (including as a result of a conversion from ABR Loans) or on the last day of the preceding Interest Period applicable to such Eurodollar Borrowing and ending on the numerically corresponding day (or if there is no corresponding day, the last day) in the calendar month that is one, three or six months thereafter, as the Borrower may elect in the related notice delivered pursuant to Sections 2.04 or 2.06; provided, however, that (i) if any Interest Period would end on a day which shall not be a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, and (ii) no Interest Period shall end later than the Termination Date.

"Interim Order" shall have the meaning given such term in Section 4.01(b).

"Inventory" shall have the meaning set forth in Article 9 of the Uniform Commercial Code as in effect from time to time in the State of New York.

"Inventory Reserves" shall have the meaning given such term in the Borrowing Base Amendment (if being understood that Inventory consigned to the Borrower's Mexican Subsidiaries shall be subject to reserves in excess of those generally applicable to Inventory).

13

"Investment Credit" shall mean the amount of dividends, distributions, returns of equity, repayments of advances or similar payments paid to the Borrower or any of the Guarantors during the term of this Agreement by any Person in which Investments may be made under Section 6.09(ix).

"Investments" shall have the meaning given such term in Section 6.09.

"Issuing Lender" shall mean JPMCB, in its capacity as the issuer of Letters of Credit hereunder, and its successors in such capacity as provided in Section 2.03(i) and such other Lenders (which other Lenders shall be reasonably satisfactory to the Administrative Agent) as may agree with the Borrower to act in such capacity. Any Issuing Lender may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of such Issuing Lender, in which case the term "Issuing Lender" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"JPMorgan" shall have the meaning given such term in Section 10.05(a).

"JPMCB" shall have the meaning given such term in the Introduction.

"LC Disbursement" shall mean a payment made by the Issuing Lender pursuant to a Letter of Credit.

"LC Exposure" shall mean, at any time, the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit at such time plus (b) the aggregate amount of all LC Disbursements that have not yet been reimbursed by or on behalf of the Borrower at such time. The LC Exposure of any Tranche A Lender at any time shall be its Tranche A Commitment Percentage of the LC Exposure at such time.

"Lenders" shall have the meaning set forth in the Introduction.

"Letter of Credit" shall mean any irrevocable letter of credit issued pursuant to Section 2.03, which letter of credit shall be (i) an import documentary or a standby letter of credit, (ii) issued for purposes that are consistent with the provisions of this Agreement (including Section 3.09), (iii) denominated in Dollars and (iv) otherwise in such form as may be reasonably approved from time to time by the Administrative Agent and the applicable Issuing Lender.

"Letter of Credit Account" shall mean the account established by the Borrower under the sole and exclusive control of the Administrative Agent maintained at the office of the Administrative Agent at 270 Park Avenue, New York, New York 10017 designated as the "Delphi Letter of Credit Account" that shall be used solely for the purposes set forth herein.

"Letter of Credit Fees" shall mean the fees payable in respect of Letters of Credit pursuant to Section 2.23.

"LIBO Rate" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, the rate appearing on Page 3750 of the Dow Jones Market Service (or on any successor or substitute page of such Service, or any successor to or substitute for such Service,

14

providing rate quotations comparable to those currently provided on such page of such Service, as determined by the Administrative Agent from time to time for purposes of providing quotations of interest rates applicable to dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, as the rate for dollar deposits with a maturity comparable to such Interest Period. In the event that such rate is not available at such time for any reason, then the "LIBO Rate" with respect to such Eurodollar Borrowing for such Interest Period shall be the rate at which dollar deposits of $5,000,000 and for a maturity comparable to such Interest Period are offered by the principal London office of the Administrative Agent in immediately available funds in the London interbank market at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period.

"Lien" shall mean (a) any mortgage, deed of trust, pledge, hypothecation, security interest, encumbrance, lien or charge of any kind whatsoever, (b) the interest of a vendor or a lessor under any conditional sale, capital lease or other title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loan" shall mean, collectively, the Tranche A Loans and the Tranche B Loan.

"Loan Documents" shall mean this Agreement, the Letters of Credit, the Security and Pledge Agreement, and any other instrument or agreement executed and delivered by the Borrower or any Guarantor to the Administrative Agent or any Lender in connection herewith.

"Material Adverse Effect" shall mean a material adverse effect on (a) the business, financial condition, operations or assets of (i) the Domestic Entities taken as a whole or (ii) the Global Entities taken as a whole, (b) the validity or enforceability of this Agreement or any other Loan Documents or (c) the rights and remedies of the Administrative Agent or the Lenders hereunder or thereunder; provided that (x) the failure to make a contribution to any Plan and any Lien resulting therefrom that arises pursuant to Section 412(n) of the Code shall not be considered to have such a material adverse effect, so long as (1) any such Lien encumbering assets of a Domestic Entity shall be permitted under Section 6.01(xviii) and (2) any such Lien encumbering assets of a Foreign Subsidiary shall be permitted under Section 6.01(xix), it being understood that subsequent events, developments and circumstances relating to such failure to make a contribution to a Plan and the resulting Liens may be considered in determining whether such subsequent events, developments and circumstances have had or could reasonably be expected to have such a material adverse effect, (y) events, developments and circumstances disclosed in the Disclosure Filings and any information disclosed to the Lenders prior to the date hereof shall not be considered to have such a material adverse effect, although subsequent events, developments and circumstances relating to such disclosed matters which reveal material adverse changes in such disclosed matters may be considered in determining whether such subsequent events, developments and circumstances have had or could reasonably be expected to have such a material adverse effect and (z) the commencement of the Cases and the consequences that customarily result therefrom shall not be considered to have such a material adverse effect.

15

"<u>Maturity Date</u>" shall mean [●][to be 24 months after the Filing Date].

"<u>Minority Lenders</u>" shall have the meaning given such term in Section 10.09.

"<u>Moody's</u>" shall mean Moody's Investors Service, Inc.

"<u>Multiemployer Plan</u>" shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"<u>Net Orderly Liquidation Value</u>" shall mean, with respect to Inventory or Equipment, as the case may be, the orderly liquidation value with respect to such Inventory or Equipment, net of expenses estimated to be incurred in connection with such liquidation, based on the most recent third party appraisal in form and substance, and by an independent appraisal firm, reasonably satisfactory to the Administrative Agent.

"<u>Net Recovery Rate</u>" shall mean, with respect to Inventory at any time, the quotient (expressed as a percentage) of (i) the Net Orderly Liquidation Value of all Inventory owned by the Borrower and the Guarantors *divided by* (ii) the gross inventory cost of such Inventory, determined on the basis of the then most recently conducted third party inventory appraisal in form and substance, and performed by an independent appraisal firm, reasonably satisfactory to the Administrative Agent.

"<u>Non-Filed Domestic Entity</u>" means any Domestic Entity that is not a Guarantor.

"<u>Obligations</u>" shall mean (a) the due and punctual payment of principal of and interest on the Loans and the reimbursement of all amounts drawn under Letters of Credit, and (b) the due and punctual payment of the Fees and all other present and future, fixed or contingent, monetary obligations of the Borrower and the Guarantors to the Lenders and the Administrative Agent under the Loan Documents.

"<u>Orders</u>" shall mean the Interim Order and the Final Order.

"<u>Other Taxes</u>" shall mean any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement.

"<u>Participant</u>" shall have the meaning given such term in Section 10.03(d).

"<u>Patriot Act</u>" shall mean the USA Patriot Act, Title III of Pub. L. 107-56, signed into law on October 26, 2001.

"<u>PBGC</u>" shall mean the Pension Benefit Guaranty Corporation, or any successor agency or entity performing substantially the same functions.

"<u>Permitted Investments</u>" shall mean (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one

year from the date of acquisition; (b) certificates of deposit, time deposits, eurodollar time deposits, overnight bank deposits or bank notes having maturities of 270 days or less from the date of acquisition issued by any Lender or by any commercial bank organized under the laws of the United States or any state thereof having combined capital and surplus of not less than $250,000,000; (c) commercial paper of an issuer rated at least A-2 by S&P or P-2 by Moody's, or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within six months from the date of acquisition; (d) repurchase obligations of any Lender or of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than 30 days, with respect to securities issued or fully guaranteed or insured by the United States government; (e) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A by Moody's; (f) securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (b) of this definition; (g) money market mutual or similar funds that invest exclusively in assets satisfying the requirements of clauses (a) through (f) of this definition; (h) money market funds that (i) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, as amended, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000; or (i) in the case of any Foreign Subsidiary, (x) direct obligations of the sovereign nation (or any agency thereof) in which such Foreign Subsidiary is organized or is conducting business or in obligations fully and unconditionally guaranteed by such sovereign nation (or any agency thereof), or (y) investments of the type and maturity described in clauses (a) through (g) above of foreign obligors, which investments or obligors have ratings described in such clauses or equivalent ratings from comparable foreign rating agencies, with references in clauses (a), (b) and (d) above to the "United States" being understood to mean the sovereign nation in which such Foreign Subsidiary is organized or conducting business or other jurisdiction sharing the same currency as such sovereign nation.

"Person" shall mean any natural person, corporation, division of a corporation, partnership, limited liability company, trust, joint venture, association, company, estate, unincorporated organization or Governmental Authority or any agency or political subdivision thereof.

"Plan" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4062 of ERISA be deemed to be) a "contributing sponsor" as defined in Section 4001(a)(13) of ERISA or a member of its "controlled group" as defined in Section 4001(a)(14) of ERISA.

"Prepayment Date" shall mean the date that is forty-five (45) days after the entry of the Interim Order by the Bankruptcy Court if the Final Order has not been entered by the Bankruptcy Court prior to the expiration of such forty-five (45) day period, or if the Final Order

(NY) 27011/094/DIPDOCS/dip.ca.doc                                                    10/08/05 4:49 AM

as entered by the Bankruptcy Court does not authorize (i) credit extensions under this Agreement of up to $2,000,000,000 and (ii) such changes to the Loan Documents as the Administrative Agent and the Arrangers shall have reasonably determined are advisable in order to ensure a successful syndication of the loan facilities hereunder (subject to any limitations on such changes contained in the fee letter referred to in Section 2.21).

"Pre-Petition Payment" shall mean a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition Indebtedness or trade payables or other pre-petition claims against the Borrower or any Guarantor.

"Prime Rate" shall mean the rate of interest per annum publicly announced from time to time by JPMCB as its prime rate in effect at its principal office in New York City; each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

"Reduced Availability Period" shall have the meaning given such term in Section 5.08.

"Register" shall have the meaning given such term in Section 10.03(b)(iv).

"Related Parties" shall mean, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"Reorganization Plan" shall mean a plan of reorganization in any of the Cases.

"Required Lenders" shall mean, at any time, Lenders having Tranche A Commitments at such time (or, if the Total Tranche A Commitment has been terminated, Lenders holding Tranche A Loans and LC Exposure at such time) and Lenders holding a portion of the Tranche B Loan at such time (or, if the Tranche B Loan is not outstanding, Lenders holding Tranche B Commitments at such time) representing in excess of 50% of the sum of the Total Tranche A Commitment at such time (or, if the Total Tranche A Commitment has been terminated, the Tranche A Total Commitment Usage at such time) plus the Total Tranche B Commitment at such time.

"Restructuring Costs" shall mean any and all of (i) the costs and expenses of restructuring, consolidating or closing of any of the plants, facilities or offices of the Borrower or any of its Subsidiaries, (ii) the costs of severance or other similar payments relating to the termination of employees at such plants, facilities or offices, (iii) machine transfer costs or any similar such costs at such plants, facilities or offices, (iv) costs and expenses in respect of the termination or settlement of executory contracts and (v) other non-cash charges in respect of other pre-petition obligations.

"S&P" shall mean Standard & Poor's, a division of The McGraw-Hill Companies, Inc.

18

"Secured Domestic Hedging Obligations" shall mean on any date, all obligations of the Borrowers and the Guarantors in respect of Hedging Agreements, which obligations are secured by a Lien on any asset of any Domestic Entity.

"Secured Obligations" shall have the meaning set forth in the Security and Pledge Agreement.

"Security and Pledge Agreement" shall have the meaning set forth in Section 4.01(c).

"Single Employer Plan" shall mean a single employer plan, as defined in Section 4001(a)(15) of ERISA, that is maintained for employees of the Borrower or an ERISA Affiliate.

"Statutory Reserve Rate" shall mean a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Administrative Agent is subject for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Such reserve percentages shall include those imposed pursuant to such Regulation D. Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Subsidiary" shall mean, with respect to any Person (in this definition referred to as the "parent"), any corporation, association or other business entity (whether now existing or hereafter organized) of which at least a majority of the securities or other ownership or membership interests having ordinary voting power for the election of directors is, at the time as of which any determination is being made, owned or controlled by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Super-majority Lenders" shall have the meaning given such term in Section 10.09.

"Superpriority Claim" shall mean a claim against the Borrower and any Guarantor in any of the Cases which is an administrative expense claim having priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code.

"Taxes" shall mean any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority.

"Termination Date" shall mean the earliest to occur of (i) the Prepayment Date, (ii) the Maturity Date, (iii) the Consummation Date and (iv) the acceleration of the Loans and the termination of the Total Commitment in accordance with the terms hereof.

19

"Termination Event" shall mean (i) a "reportable event", as such term is described in Section 4043(c) of ERISA (other than a "reportable event" as to which the 30-day notice is waived under subsection .22, .23, .25, .27 or .28 of PBGC Regulation Section 4043) or an event described in Section 4068 of ERISA and excluding events which would not be reasonably likely (as reasonably determined by the Agent) to have a material adverse effect on the operations, business, properties, assets or condition (financial or otherwise) of the Borrower and the Guarantors taken as a whole, or (ii) the imposition of any Withdrawal Liability on the Borrower or any ERISA Affiliate, or (iii) providing notice of intent to terminate a Plan pursuant to Section 4041(c) of ERISA or the treatment of a Plan amendment as a termination under Section 4041 of ERISA, if such amendment requires the provision of security, or (iv) the institution of proceedings to terminate a Plan by the PBGC under Section 4042 of ERISA, or (v) any other event or condition (other than the commencement of the Cases and the failure to have made any contribution accrued as of the Filing Date but not paid) which would reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan, or the imposition of any liability under Title IV of ERISA (other than for the payment of premiums to the PBGC in the ordinary course).

"Total Commitment" shall mean, at any time, the sum of the Total Tranche A Commitment and the Total Tranche B Commitment at such time.

"Total Commitment Percentage" shall mean at any time, with respect to each Tranche A Lender or Tranche B Lender, the percentage obtained by dividing such Lender's Tranche A Commitment and/or Tranche B Commitment, as the case may be, by the Total Commitment at such time.

"Total Commitment Usage" shall mean, at any time, the sum of the Tranche A Total Commitment Usage and the outstanding principal amount of the Tranche B Loan.

"Total Tranche A Commitment" shall mean, any time, the sum of the Tranche A Commitments at such time.

"Total Tranche B Commitment" shall mean, at any time, (i) prior to the funding of the Tranche B Loan pursuant to Section 2.01(b), the sum of the Tranche B Commitments at such time and (ii) on and after funding of the Tranche B Loan pursuant to 2.01(b), the outstanding principal amount of the Tranche B Loan at such time.

"Tranche A Commitment" shall mean the commitment of each Tranche A Lender to make Tranche A Loans hereunder in the amount set forth opposite its name in Annex A hereto or as may be subsequently set forth in the Register from time to time, as the case may be, and as may be reduced from time to time pursuant to Sections 2.12 and 2.13. The initial aggregate amount of the Tranche A Commitment is $1,750,000,000.

"Tranche A Commitment Fee" shall have the meaning given such term in Section 2.22(a).

"Tranche A Commitment Percentage" shall mean, at any time, with respect to each Tranche A Lender, the percentage obtained by dividing its Tranche A Commitment at such time by the Total Tranche A Commitment or, if the Tranche A Commitments have been

20

terminated, the Tranche A Commitment Percentage of each Tranche A Lender that existed immediately prior to such termination.

"Tranche A Lender" shall mean each Lender having a Tranche A Commitment.

"Tranche A Loan" shall have the meaning set forth in Section 2.01(a).

"Tranche A Total Commitment Usage" shall mean, at any time, the sum of (i) the aggregate outstanding principal amount of all Tranche A Loans and (ii) the aggregate LC Exposure at such time.

"Tranche B Commitment" shall mean the commitment of each Tranche B Lender to make such amount of the Tranche B Loan hereunder in the amount set forth opposite its name on Annex A hereto or as may be subsequently set forth in the Register from time to time, as the case may be and as the same may be reduced from time to time pursuant to the last sentence of Section 2.01(b) and Sections 2.12 and 2.13.  The initial aggregate amount of the Tranche B Commitment is $250,000,000.

"Tranche B Commitment Fee" shall have the meaning given such term in Section 2.22(b).

"Tranche B Commitment Percentage" shall mean, at any time, with respect to each Tranche B Lender, the percentage obtained by dividing its Tranche B Commitment at such time by the Total Tranche B Commitment.

"Tranche B Lender" shall mean each Lender having a Tranche B Commitment.

"Tranche B Loan" shall have the meaning set forth in Section 2.01(b).

"Transactions" shall mean the execution, delivery and performance by the Borrower and Guarantors of this Agreement, the borrowing of Loans, the use of the proceeds thereof and the request for and issuance of Letters of Credit hereunder.

"Type", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate or the Alternate Base Rate.

"UCC" shall mean the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that if by reason of any provisions of law, the perfection or the effect of perfection or non-perfection of the security interests granted to the Administrative Agent pursuant to the applicable Loan Document is governed by the Uniform Commercial Code as in effect in a jurisdiction of the United States other than New York, then "UCC" shall mean the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions of each Loan Document.

"Uncollateralized LC Exposure" shall mean, at any time, (i) the aggregate LC Exposure at such time less (ii) the aggregate LC Exposure for which Cash Collateralization has

been made in accordance with Section 2.03(j) prior to such time and which Cash Collateralization is in effect at such time.

"<u>Unused Total Tranche A Commitment</u>" shall mean, at any time, (i) the Total Tranche A Commitment <u>less</u> (ii) the Tranche A Total Commitment Usage.

"<u>Withdrawal Liability</u>" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such term is defined in Part I of Subtitle E of Title IV of ERISA.

"<u>Wholly-Owned</u>" shall mean, as to any Guarantor (or any other Subsidiary of the Borrower), any other Person all of the capital stock (or other equivalent ownership interests) of which (other than directors' qualifying shares or nominal shares held by employees, in each case as required by law) is owned by such Guarantor (or such other Subsidiary of the Borrower) directly and or through other Wholly-Owned Subsidiaries.

SECTION 1.02  **Terms Generally**.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Section of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

SECTION 1.03  **Accounting Terms; GAAP**.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; <u>provided</u> that, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall been withdrawn or such provision amended in accordance herewith.

22

SECTION 2.    **AMOUNT AND TERMS OF CREDIT**

SECTION 2.01    **Commitments of the Lenders**.

(a)    <u>Tranche A Revolving Commitment</u>. (i) Each Tranche A Lender severally and not jointly with the other Tranche A Lenders agrees, upon the terms and subject to the conditions herein set forth, to make revolving credit loans (each a "<u>Tranche A Loan</u>" and collectively, the "<u>Tranche A Loans</u>") to the Borrower at any time and from time to time during the Availability Period in an aggregate principal amount not to exceed, when added to its LC Exposure, the Tranche A Commitment of such Lender, which Tranche A Loans may be repaid and reborrowed in accordance with the provisions of this Agreement; <u>provided</u> that (x) at no time shall the sum of the then outstanding aggregate principal amount of the Tranche A Loans <u>plus</u> the then LC Exposure exceed the Total Tranche A Commitment at such time and (y) at no time shall the sum of the then outstanding aggregate principal amount of the Tranche A Loans <u>plus</u> the then LC Exposure <u>plus</u> the then outstanding aggregate principal amount of the Tranche B Loans exceed the lesser of (i) the Total Commitment at such time and (ii) (A) prior to the entry of the Final Order, the amount permitted by the Interim Order and (B) from and after the entry of the Final Order, the Borrowing Base.

(ii)    Each Borrowing of a Tranche A Loan shall be made by the Tranche A Lenders <u>pro rata</u> in accordance with their respective Tranche A Commitments; <u>provided</u>, <u>however</u>, that the failure of any Tranche A Lender to make any Tranche A Loan shall not relieve the other Tranche A Lenders of their obligations to lend.

(b)    <u>Tranche B Term Loan Commitment</u>. (i) Each Tranche B Lender, severally and not jointly with the other Tranche B Lenders agrees, upon the satisfaction (or waiver) of the conditions set forth in Section 4.03 and upon the other terms and subject to the conditions herein set forth, to make available to the Borrower term loans in an aggregate principal amount equal to such Tranche B Lender's Tranche B Commitment (all such loans, collectively, the "<u>Tranche B Loan</u>") <u>provided</u> that at no time shall the sum of the then outstanding aggregate principal amount of the Tranche A Loans <u>plus</u> the then LC Exposure <u>plus</u> the then outstanding aggregate principal amount of the Tranche B Loans exceed the lesser of (i) the Total Commitment at such time and (ii) (A) prior to the entry of the Final Order, the amount permitted by the Interim Order and (B) from and after the entry of the Final Order, the Borrowing Base.  Once repaid, the Tranche B Loan may not be reborrowed and the Total Tranche B Commitment shall be automatically and permanently reduced by an amount equal to the amount so repaid.

(ii)    The Tranche B Loan shall be made by the Tranche B Lenders pro rata in accordance with their respective Tranche B Commitment; <u>provided</u>, <u>however</u>, that the failure of any Tranche B Lender to make its Tranche B Loan shall not in itself relieve the other Tranche B Lenders of their obligations to lend.

(c)    Other than as otherwise provided in Section 2.04(b), each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrower may request in accordance herewith. Each Lender at its option may make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Eurodollar Loan; <u>provided</u>

that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.

(d) At the commencement of each Interest Period for any Eurodollar Borrowing, such Borrowing shall be in an aggregate amount that is in an integral multiple of $1,000,000 and not less than $5,000,000. At the time that each ABR Borrowing is made, such Borrowing shall be in an aggregate amount that is an integral multiple of $500,000 and not less than $1,000,000 provided, that an ABR Borrowing may be in an aggregate amount that is equal to the entire Unused Total Tranche A Commitment or that is required to finance the reimbursement of an LC Disbursement as contemplated by Section 2.03(e). Borrowings of more than one Type may be outstanding at the same time.

(e) Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

SECTION 2.02  **Reserved**.

SECTION 2.03  **Letters of Credit**.  (a) General.  Subject to the terms and conditions set forth herein, the Borrower may request the issuance of Letters of Credit for its own account or the account of any Subsidiary, in a form reasonably acceptable to the Administrative Agent and the Issuing Lender, and the Issuing Lender hereby agrees to issue such requested Letters of Credit, at any time and from time to time during the Availability Period. In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application or other agreement submitted by the Borrower to, or entered into by the Borrower with, the Issuing Lender relating to any Letter of Credit, the terms and conditions of this Agreement shall control. At no time shall a Letter of Credit be issued if (x) the sum of the then outstanding aggregate principal amount of the Tranche A Loans plus the LC Exposure (inclusive of the amount of such proposed Letter of Credit) would exceed the Total Tranche A Commitment at such time or (y) the sum of the then outstanding aggregate principal amount of the Tranche A Loans plus the then LC Exposure (inclusive of the amount of such proposed Letter of Credit) plus the then outstanding aggregate principal amount of the Tranche B Loans would exceed the lesser of (i) the Total Commitment at such time and (ii) (A) prior to the entry of the Final Order, the amount permitted by the Interim Order and (B) from and after the entry of the Final Order, the Borrowing Base.

(b) Notice of Issuance, Amendment, Renewal, Extension; Certain Conditions. To request the issuance of a Letter of Credit (or the amendment, renewal or extension of an outstanding Letter of Credit), the Borrower shall hand deliver or telecopy (or transmit by electronic communication, if arrangements for doing so have been approved by the Issuing Lender) to the Issuing Lender and the Administrative Agent (reasonably in advance of the requested date of issuance, amendment, renewal or extension) a notice requesting the issuance of a Letter of Credit, or identifying the Letter of Credit to be amended, renewed or extended, and specifying the date of issuance, amendment, renewal or extension (which shall be a Business Day), the date on which such Letter of Credit is to expire (which shall comply with paragraph (c) of this Section), the amount of such Letter of Credit, the Person for whose account such Letter of Credit shall be issued, the name and address of the beneficiary thereof and such other

information as shall be reasonably necessary to prepare, amend, renew or extend such Letter of Credit. If requested by the Issuing Lender, the Borrower also shall submit a letter of credit application on the Issuing Lender's standard form in connection with any request for a Letter of Credit. A Letter of Credit shall be issued, amended, renewed or extended only if (and upon issuance, amendment, renewal or extension of each Letter of Credit the Borrower shall be deemed to represent and warrant that), after giving effect to such issuance, amendment, renewal or extension the LC Exposure shall not exceed $325,000,000. No Issuing Lender shall permit any such issuance, renewal, extension or amendment resulting in an increase in the amount of any Letter of Credit to occur if such Issuing Lender has received notice from the Administrative Agent or the Required Lenders that the conditions to such issuance, renewal, extension or amendment have not been met.

(c)    Expiration Date. Each Letter of Credit shall expire at or prior to the close of business on the earlier of (i) one year after the date of the issuance of such Letter of Credit (or, in the case of any renewal or extension thereof, one year after such renewal or extension) and (ii) 180 days after the Maturity Date; provided that any Letter of Credit with a one-year term may provide for the renewal thereof for additional one-year periods (which shall in no event extend beyond the date referred to in clause (ii) above).

(d)    Participations. By the issuance of a Letter of Credit (or an amendment to a Letter of Credit including any amendment increasing the amount thereof) and without any further action on the part of the Issuing Lender or the Tranche A Lenders, the Issuing Lender hereby grants to each Tranche A Lender, and each Tranche A Lender hereby acquires from the Issuing Lender, a participation in such Letter of Credit equal to such Tranche A Lender's Tranche A Commitment Percentage of the aggregate amount available to be drawn under such Letter of Credit. In consideration and in furtherance of the foregoing, each Tranche A Lender hereby absolutely and unconditionally agrees to pay to the Administrative Agent. for the account of the Issuing Lender, such Tranche A Lender's Tranche A Commitment Percentage of each LC Disbursement made by the Issuing Lender and not reimbursed by the Borrower on the date due as provided in paragraph (e) of this Section, or of any reimbursement payment required to be refunded to the Borrower for any reason. Each Tranche A Lender acknowledges and agrees that its obligation to acquire participations pursuant to this paragraph in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment, renewal or extension of any Letter of Credit or the occurrence of an Event of Default or reduction or termination of the Tranche A Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

(e)    Reimbursement. If the Issuing Lender shall make any LC Disbursement in respect of a Letter of Credit (including any Letter of Credit issued for the account of any Subsidiary), the Borrower shall reimburse such LC Disbursement by paying to the Administrative Agent an amount equal to such LC Disbursement not later than 12:00 noon, New York City time, on the Business Day immediately following the day that the Borrower receives notice of such LC Disbursement; provided, that, the Borrower may, subject to the conditions to borrowing set forth herein, request in accordance with Section 2.04(a) that such payment be financed with an ABR Borrowing in an equivalent amount and, to the extent so financed, the Borrower's obligation to make such payment shall be discharged and replaced by the resulting ABR Borrowing. If the Borrower fails to make such payment when due, the Administrative

Agent shall notify each Tranche A Lender of the applicable LC Disbursement, the payment then due from the Borrower in respect thereof and such Tranche A Lender's Tranche A Commitment Percentage thereof. Promptly following receipt of such notice, each Tranche A Lender shall pay to the Administrative Agent its Tranche A Commitment Percentage of the payment then due to the Issuing Lender from the Borrower, in the same manner as provided in Section 2.05 with respect to Tranche A Loans made by such Tranche A Lender (and Section 2.05 shall apply, mutatis mutandis, to the payment obligations of the Tranche A Lenders), and the Administrative Agent shall promptly pay to the Issuing Lender the amounts so received by it from the Tranche A Lenders. Promptly following receipt by the Administrative Agent of any payment from the Borrower pursuant to this paragraph, the Administrative Agent shall distribute such payment to the Issuing Lender or, to the extent that Tranche A Lenders have made payments pursuant to this paragraph to reimburse the Issuing Lender, then to such Tranche A Lenders and the Issuing Lender as their interests may appear. Any payment made by a Tranche A Lender pursuant to this paragraph to reimburse the Issuing Lender for any LC Disbursement (other than the funding of ABR Loans as contemplated above) shall not constitute a Tranche A Loan and shall not relieve the Borrower of its obligation to reimburse such LC Disbursement.

(f) <u>Obligations Absolute</u>. The Borrower's obligation to reimburse LC Disbursements as provided in paragraph (e) of this Section shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit or this Agreement, or any term or provision therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by the Issuing Lender under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit, or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrower's obligations hereunder. Neither the Administrative Agent, the Tranche A Lenders nor the Issuing Lender, nor any of their Related Parties, shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the Issuing Lender; <u>provided</u>, that the foregoing shall not be construed to excuse the Issuing Lender from liability to the Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law) suffered by the Borrower that are caused by the Issuing Lender's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof. The parties hereto expressly agree that, in the absence of gross negligence, bad faith or willful misconduct on the part of the Issuing Lender, its directors, officers, employees or affiliates (as finally determined by a court of competent jurisdiction), the Issuing Lender shall be deemed to have exercised care in each such determination. In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance

26

with the terms of a Letter of Credit, the Issuing Lender may, in its reasonable discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(g) <u>Disbursement Procedures</u>. The Issuing Lender shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit. The Issuing Lender shall promptly notify the Administrative Agent and the Borrower by telephone (confirmed by telecopy) of such demand for payment and whether the Issuing Lender has made or will make an LC Disbursement thereunder; <u>provided</u>, that any failure to give or delay in giving such notice shall not relieve the Borrower of its obligation to reimburse the Issuing Lender and the Tranche A Lenders with respect to any such LC Disbursement.

(h) <u>Interim Interest</u>. If the Issuing Lender shall make any LC Disbursement, then, unless the Borrower shall reimburse such LC Disbursement in full on the date such LC Disbursement is made, the unpaid amount thereof shall bear interest, for each day from and including the date such LC Disbursement is made to but excluding the date that the Borrower reimburses such LC Disbursement, at the rate per annum then applicable to ABR Loans; <u>provided</u>, that, if the Borrower fails to reimburse such LC Disbursement when due pursuant to paragraph (e) of this Section, then Section 2.09 shall apply. Interest accrued pursuant to this paragraph shall be for the account of the Issuing Lender, except that interest accrued on and after the date of payment by any Tranche A Lender pursuant to paragraph (e) of this Section to reimburse the Issuing Lender shall be for the account of such Tranche A Lender to the extent of such payment.

(i) <u>Replacement of the Issuing Lender</u>. An Issuing Lender may be replaced at any time by written agreement among the Borrower, the Administrative Agent, the replaced Issuing Lender and the successor Issuing Lender. The Administrative Agent shall notify the Tranche A Lenders of any such replacement of an Issuing Lender. At the time any such replacement shall become effective, the Borrower shall pay all unpaid fees accrued for the account of the replaced Issuing Lender pursuant to Section 2.22. From and after the effective date of any such replacement, (i) the successor Issuing Lender shall have all the rights and obligations of an Issuing Lender under this Agreement with respect to Letters of Credit to be issued thereafter and (ii) references herein to the term "Issuing Lender" shall be deemed to refer to such successor or to any previous Issuing Lender, or to such successor and all previous Issuing Lenders, as the context shall require. After the replacement of a Issuing Lender hereunder, the replaced Issuing Lender shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Lender under this Agreement with respect to Letters of Credit issued by it prior to such replacement, but shall not be required to issue additional Letters of Credit.

(j) <u>Replacement of Letters of Credit; Cash Collateralization</u>. Upon or prior to the occurrence of the Termination Date the Borrower shall (i) cause all Letters of Credit which expire after the Termination Date to be returned to the Issuing Lender undrawn and marked "cancelled" or, to the extent the Borrower is unable to return any of the Letters of Credit, (ii) either (x) provide one or more "back-to-back" letters of credit to one or more Issuing Lenders in a form reasonably satisfactory to each such Issuing Lender that is a beneficiary of such "back-to-

27

back" letter of credit and the Administrative Agent, issued by a bank reasonably satisfactory to each such Issuing Lender and the Administrative Agent, and/or (y) deposit cash in the Letter of Credit Account, the sum of (x) and (y) of the foregoing sentence to be in an aggregate amount equal to 105% of Uncollateralized LC Exposure as collateral security for the Borrower's reimbursement obligations in connection therewith, such cash to be remitted to the Borrower upon and to the extent of the expiration, cancellation or other termination or satisfaction of such reimbursement obligations ("Cash Collateralization"). The Administrative Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over such account. Other than any interest earned on the investment of such deposits, which investments shall be made at the option and sole reasonable discretion of the Administrative Agent (in accordance with its usual and customary practices for investments of this type) and at the Borrower's risk and reasonable expense, such deposits shall not bear interest. Interest or profits, if any, on such investments shall accumulate in such account. Moneys in such account shall be applied by the Administrative Agent to reimburse the Issuing Lender for LC Disbursements for which it has not been reimbursed and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of the Borrower for the LC Exposure at such time and upon expiration or cancellation (or backstop as set forth in clause (x) above) of the related Letter of Credit or other termination or satisfaction of the Borrower's reimbursement obligations with respect thereto, such cash shall be promptly remitted to the Borrower.

(k) <u>Issuing Lender Agreements</u>. Unless otherwise requested by the Administrative Agent, each Issuing Lender shall report in writing to the Administrative Agent (i) on the first Business Day of each week, the daily activity (set forth by day) in respect of Letters of Credit during the immediately preceding week, including all issuances, extensions, amendments and renewals, all expirations and cancellations and all disbursements and reimbursements, (ii) on or prior to each Business Day on which such Issuing Lender expects to issue, amend, renew or extend any Letter of Credit, the date of such issuance, amendment, renewal or extension, and the aggregate face amount of the Letters of Credit to be issued, amended, renewed, or extended by it and outstanding after giving effect to such issuance, amendment, renewal or extension occurred (and whether the amount thereof changed), it being understood that such Issuing Lender shall not permit any issuance, renewal, extension or amendment resulting in an increase in the amount of any Letter of Credit to occur if such Issuing Lender has received notice from the Administrative Agent or the Required Lenders that the conditions to such issuance, extension or amendment have not been met, (iii) on each Business Day on which such Issuing Lender makes any LC Disbursement, the date of such LC Disbursement and the amount of such LC Disbursement, (iv) on any Business Day on which the Borrower fails to reimburse an LC Disbursement required to be reimbursed to such Issuing Lender on such day, the date of such failure, the Borrower and the amount of such LC Disbursement and (v) on any other Business Day, such other information as the Administrative Agent shall reasonably request.

SECTION 2.04    **Requests for Borrowings**.

(a) <u>Tranche A Loans</u>. Unless otherwise agreed to by the Administrative Agent in connection with making the initial Loans, to request a Borrowing of Tranche A Loans, the Borrower shall notify the Administrative Agent of such request by telephone (a) in the case of a Eurodollar Borrowing, not later than 1:00 p.m., New York City time, three (3) Business Days

(NY) 27011/094/DIPDOCS/dip.ca.doc
10/08/05 4:49 AM

before the date of the proposed Borrowing and (b) in the case of an ABR Borrowing, not later than 12:00 p.m., New York City time, on the date of the proposed Borrowing; provided, that any such notice of an ABR Borrowing to finance the reimbursement of an LC Disbursement as contemplated by Section 2.03(e) may be given not later than 11:00 a.m., New York City time, on the date of the proposed Borrowing. Each such telephonic Borrowing Request shall be irrevocable and shall be confirmed promptly by hand delivery, courier or telecopy to the Administrative Agent of a written Borrowing Request in a form reasonably acceptable to the Administrative Agent and signed by the Borrower. Each such telephonic and written Borrowing Request shall specify the following information in compliance with Section 2.01(a):

>    (i)    the aggregate amount of the requested Borrowing;

>    (ii)    the date of such Borrowing, which shall be a Business Day;

>    (iii)    whether such Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing; and

>    (iv)    in the case of a Eurodollar Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period".

If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing. If no Interest Period is specified with respect to any requested Eurodollar Borrowing, then the Borrower shall be deemed to have selected an Interest Period of one month's duration. Promptly following receipt of a Borrowing Request in accordance with this Section 2.04(a), the Administrative Agent shall advise each Tranche A Lender of the details thereof and of the amount of such Tranche A Lender's Tranche A Loan to be made as part of the requested Borrowing.

>    (b)    Tranche B Loan. To request the Borrowing of the Tranche B Loan, the Borrower shall notify the Administrative Agent of such request by telephone (a) in the case of a Eurodollar Borrowing, not later than 1:00 p.m., New York City time, three (3) Business Days before the date of the proposed Borrowing and (a) in the case of an ABR Borrowing, not later than 12:00 noon, New York City time on the date of the proposed Borrowing. Such telephonic notice shall be irrevocable and shall be confirmed promptly by hand delivery, courier or telecopy to the Administrative Agent of a written Borrowing Request in a form reasonably acceptable to the Administrative Agent and signed by the Borrower. Such telephone and written Borrowing Request shall specify the following information in compliance with Section 2.01:

>    (i)    the aggregate amount of the requested Borrowing (which shall be the amount of the Total Tranche B Commitment);

>    (ii)    the date of such Borrowing, which shall be a Business Day;

>    (iii)    the portion of the Tranche B Loan that is to initially be an ABR Borrowing and that is to initially be a Eurodollar Borrowing; and

(NY) 27011/094/DIPDOCS/dip.ca.doc                                                            10/08/05 4:49 AM

(iv)    in the case of such portion of the Tranche B Loan that is a Eurodollar Borrowing, the initial Interest Period applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period".

If no election as to the Type of Borrowing is specified, then the Tranche B Loan shall initially be an ABR Borrowing. If no Interest Period is specified with respect to any portion of the Tranche B Loan that is to initially be a Eurodollar Borrowing, then the Borrower shall be deemed to have selected an Interest Period of one month's duration. Promptly following receipt of the Borrowing Request in accordance with this Section 2.04(b), the Administrative Agent shall advise each Tranche B Lender of the details thereof and of the amount of such Tranche B Lender's Loan to be made as part of the requested Borrowing (which shall be equal to such Tranche B Lender's Tranche B Commitment).

SECTION 2.05    **Funding of Borrowings.** (a) Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 2:00 p.m., New York City time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders. The Administrative Agent will make such Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to an account of the Borrower maintained with the Administrative Agent and designated by the Borrower in the applicable Borrowing Request; provided that ABR Loans made to finance the reimbursement of an LC Disbursement as provided in Section 2.03(e) shall be remitted by the Administrative Agent to the Issuing Lender.

(b)    Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section and may, in reliance upon such assumption, make available to the Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of the Borrower, the interest rate applicable to ABR Loans. If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.

SECTION 2.06    **Interest Elections**.    (a) Each Borrowing of Tranche A Loans and the Borrowing of the Tranche B Loan initially shall be of the Type or, in the case of the Tranche B Loan, Types specified in the applicable Borrowing Request and, in the case of a Eurodollar Borrowing, shall have an initial Interest Period as specified in such Borrowing Request. Thereafter, the Borrower may elect to convert such Borrowings to a different Type or to continue such Borrowing and, in the case of a Eurodollar Borrowing, may elect Interest Periods therefor, all as provided in this Section. The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably

30

among the Lenders holding the Tranche A Loans or Tranche B Loan, as the case may be, comprising such Borrowing, and the Tranche A Loans and Tranche B Loan, as the case may be, comprising each such Type shall be considered a separate Borrowing.

(b)    To make an Interest Election Request pursuant to this Section, the Borrower shall notify the Administrative Agent of such election by telephone by the time that a Borrowing Request would be required under Section 2.04(a) or Section 2.04(b) if the Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election. Each such telephonic Interest Election Request shall be irrevocable and shall be confirmed promptly by hand delivery, courier or telecopy to the Administrative Agent of a written Interest Election Request in a form reasonably acceptable to the Administrative Agent and signed by the Borrower.

(c)    Each telephonic and written Interest Election Request shall specify the following information in compliance with Section 2.01:

(i)    the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)    the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)    whether the resulting Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing; and

(iv)    if the resulting Borrowing is a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

If any such Interest Election Request requests a Eurodollar Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)    Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)    If the Borrower fails to deliver a timely Interest Election Request with respect to a Eurodollar Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be continued as a Eurodollar Borrowing having an Interest Period of one month. Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing, then, so long as an Event of Default is continuing (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing and (ii) unless repaid, each Eurodollar

31

Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

SECTION 2.07    **[Reserved]**

SECTION 2.08    **Interest on Loans**.

(a)    Subject to the provisions of Section 2.09, each ABR Loan shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days or, when the Alternate Base Rate is based on the Prime Rate, a year with 365 days or 366 days in a leap year) at a rate per annum equal to the Alternate Base Rate plus 1.50%.

(b)    Subject to the provisions of Section 2.09, each Eurodollar Loan shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days) at a rate per annum equal, during each Interest Period applicable thereto, to the Adjusted LIBO Rate for such Interest Period in effect for such Borrowing plus 2.50%.

(c)    Accrued interest on all Loans shall be payable in arrears on each Interest Payment Date applicable thereto, on the Termination Date and after the Termination Date on demand and (with respect to Eurodollar Loans) upon any repayment or prepayment thereof (on the amount prepaid).

SECTION 2.09    **Default Interest**. If the Borrower or any Guarantor, as the case may be, shall default in the payment of the principal of or interest on any Loan or in the payment of any other amount becoming due hereunder (including the reimbursement pursuant to Section 2.03(e) of any LC Disbursements), whether at stated maturity, by acceleration or otherwise, the Borrower or such Guarantor, as the case may be, shall on demand from time to time pay interest, to the extent permitted by law, on all Loans and overdue amounts up to (but not including) the date of actual payment (after as well as before judgment) at a rate per annum (computed on the basis of the actual number of days elapsed over a year of 360 days or when the Alternate Base Rate is applicable and is based on the Prime Rate, a year with 365 days or 366 days in a leap year) equal to (x) the rate then applicable for such Borrowings plus 2.0% and (y) in the case of all other amounts, the rate applicable for Alternate Base Rate plus 2.0%.

SECTION 2.10    **Alternate Rate of Interest**. In the event, and on each occasion, that on the day two Business Days prior to the commencement of any Interest Period for a Eurodollar Loan, the Administrative Agent shall have determined (which determination shall be conclusive and binding upon the Borrower absent manifest error) that reasonable means do not exist for ascertaining the applicable Adjusted LIBO Rate, the Administrative Agent shall, as soon as practicable thereafter, give written, facsimile or telegraphic notice of such determination to the Borrower and the Lenders, and any request by the Borrower for a Borrowing of Eurodollar Loans (including pursuant to a refinancing with Eurodollar Loans) pursuant to Section 2.04 shall be deemed a request for a Borrowing of ABR Loans. After such notice shall have been given and until the circumstances giving rise to such notice no longer exist, each request for a Borrowing of Eurodollar Loans shall be deemed to be a request for a Borrowing of ABR Loans.

(NY) 27011/094/DIPDOCS/dip.ca.doc                                                                    10/08/05 4:49 AM

SECTION 2.11   **Repayment of Loans; Evidence of Debt.**

(a)   The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan on the Termination Date.

(b)   Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)   The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)   The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement.

(e)   Any Lender may request that Loans made by it be evidenced by a promissory note. In such event, the Borrower shall execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) in a form furnished by the Administrative Agent and reasonably acceptable to the Borrower. Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 10.03 to the extent requested by the Lender assignee) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

SECTION 2.12   **Optional Termination or Reduction of Commitment.** Upon at least one Business Day's prior written notice to the Administrative Agent. the Borrower may at any time in whole permanently terminate, or from time to time in part permanently reduce, the Unused Total Tranche A Commitment and the Total Tranche B Commitment. Each such reduction of the Commitments shall be in the principal amount of $1,000,000 or any integral multiple thereof.   Simultaneously with each reduction or termination of the Tranche A Commitment, the Borrower shall pay to the Administrative Agent for the account of each Tranche A Lender the Tranche A Commitment Fee accrued and unpaid on the amount of the Tranche A Commitment of such Tranche A Lender so terminated or reduced through the date thereof. Simultaneously with each reduction or termination of the Tranche B Commitment prior to the date of funding of the Tranche B Loan, the Borrower shall pay to the Administrative Agent for the account of each Tranche B Lender the Tranche B Commitment Fee accrued and unpaid on the amount of the Tranche B Commitment of such Tranche B Lender so terminated or

33

reduced through the date thereof. Any reduction of any Commitment pursuant to this Section shall be applied pro rata to reduce the applicable Commitment of each Tranche A Lender or Tranche B Lender, as the case may be.

SECTION 2.13  **Mandatory Prepayment; Commitment Termination.**

(a)  If at any time the aggregate principal amount of the outstanding Tranche A Loans plus the aggregate principal amount of the outstanding Tranche B Loans plus the LC Exposure exceeds the lesser of (x) the Total Commitment at such time and (y) (A) prior to the entry of the Final Order, the amount permitted by the Interim Order and (B) from and after the entry of the Final Order, the Borrowing Base (the "Lesser Amount"), the Borrower will within one Business Day (i) make a prepayment in an amount necessary to cause the aggregate principal amount of the outstanding Tranche A Loans plus the aggregate principal amount of the outstanding Tranche B Loans plus the LC Exposure to be equal to or less than the Lesser Amount, such prepayment to be applied to repay Tranche A Loans (with no corresponding commitment reduction) and/or Tranche B Loans as directed by the Borrower, and (ii) if, after giving effect to the prepayment in full of the Tranche A Loans and the Tranche B Loans, the Uncollateralized LC Exposure exceeds the Lesser Amount, deposit into the Letter of Credit Account an amount equal to 105% of the amount by which the Uncollateralized LC Exposure so exceeds the Lesser Amount, provided that, if on any date thereafter, the Lesser Amount (as recalculated on such date) exceeds the LC Exposure plus the outstanding Tranche A Loans plus the outstanding Tranche B Loans on such date, any amount deposited into the Letter of Credit Account pursuant to subclause (ii) above shall be returned to the Borrower.

(b)  Upon the Termination Date, the Total Commitment shall be terminated in full and the Borrower shall repay the Loans in full.

SECTION 2.14  **Optional Prepayment of Loans.**

(a)  The Borrower shall have the right at any time and from time to time to prepay any Loans, in whole or in part, (x) with respect to Eurodollar Loans, upon written or facsimile notice received by 1:00 p.m. New York City time three Business Days' prior to the proposed date of prepayment and (y) with respect to ABR Loans on the same Business Day upon written or facsimile notice by 12:00 noon New York City time on the proposed date of prepayment; provided, however, that (i) each such partial prepayment (other than a prepayment of all outstanding Tranche A Loans or all outstanding Tranche B Loans) shall be in multiples of $1,000,000 and (ii) no prepayment of Eurodollar Loans shall be permitted pursuant to this Section 2.14(a) other than on the last day of an Interest Period applicable thereto unless such prepayment is accompanied by the payment of the amounts required by Section 2.17. Any prepayments under this Section 2.14(a) shall be applied, at the Borrower's option, to (x) repay the outstanding Tranche A Loans of the Tranche A Lenders (with no corresponding reduction in the Total Tranche A Commitments) and (y) repay the Tranche B Loans of the Tranche B Lenders.

(b)  Each notice of prepayment shall specify the prepayment date, the principal amount of the Loans to be prepaid and in the case of Eurodollar Loans, the Borrowing or Borrowings pursuant to which made, and, subject to the last sentence of this Section 2.14(b),

34

shall be irrevocable and shall commit the Borrower to prepay such Loan by the amount and on the date stated therein. The Administrative Agent shall, promptly after receiving notice from the Borrower hereunder, notify each Lender of the principal amount of the Loans held by such Lender which are to be prepaid, the prepayment date and the manner of application of the prepayment. Notwithstanding anything in this Section 2.14 to the contrary, if the Borrower delivers a notice of prepayment of all (but not less than all) of the outstanding Loans and other Obligations and the termination of all commitments hereunder, such notice may state that it is conditioned upon the effectiveness of other credit facilities or the occurrence of a Change of Control, and in either case, (i) such notice may be revoked by the Borrower by written notice to the Administrative Agent no later than 12 noon New York City time on the specified prepayment date if such condition is not satisfied, and (ii) such prepayment shall be accompanied by the payment of the amounts required by Section 2.17.

SECTION 2.15    **Reserved**.

SECTION 2.16    **Increased Costs**. (a) If any Change in Law (except in respect of Taxes (as to which Section 2.18 shall govern)) shall:

(i)    impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate) or the Issuing Lender; or

(ii)    impose on any Lender or the Issuing Lender or the London interbank market any other condition affecting this Agreement or Eurodollar Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to such Lender or the Issuing Lender of participating in, issuing or maintaining any Letter of Credit or to reduce the amount of any sum received or receivable by such Lender or the Issuing Lender hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender or the Issuing Lender, as the case may be, such additional amount or amounts as will compensate such Lender or the Issuing Lender, as the case may be, for such additional costs incurred or reduction suffered.

(b)    If any Lender or the Issuing Lender reasonably determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's or the Issuing Lender's capital or on the capital of such Lender's or the Issuing Lender's holding company, if any, as a consequence of this Agreement or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by the Issuing Lender, to a level below that which such Lender or the Issuing Lender or such Lender's or the Issuing Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the Issuing Lender's policies and the policies of such Lender's or the Issuing Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender or the Issuing Lender, as the case may be,

such additional amount or amounts as will compensate such Lender or the Issuing Lender or such Lender's or the Issuing Lender's holding company for any such reduction suffered.

(c)    A certificate of a Lender or the Issuing Lender setting forth the amount or amounts necessary to compensate such Lender or the Issuing Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section shall be delivered to the Borrower and shall be prima facie evidence of the obligations of the Borrower hereunder. The Borrower shall pay such Lender or the Issuing Lender, as the case may be, the amount shown as due on any such certificate within 10 Business Days after receipt thereof; provided that the failure of the Borrower to pay any amount owing to any Lender or Issuing Lender, as the case may be, pursuant to this Section 2.16 shall not be deemed to constitute a Default or an Event of Default hereunder to the extent that the Borrower is contesting in good faith its obligation to pay such amount by ongoing discussion diligently pursued with such Lender or Issuing Lender or by appropriate proceedings.

(d)    Failure or delay on the part of any Lender or the Issuing Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's or the Issuing Lender's right to demand such compensation; provided, that the Borrower shall not be required to compensate a Lender or the Issuing Lender pursuant to this Section for any increased costs or reductions incurred more than 270 days prior to the date that such Lender or the Issuing Lender, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or the Issuing Lender's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 270-day period referred to above shall be extended to include the period of retroactive effect thereof.

SECTION 2.17    **Break Funding Payments**. In the event of (a) the payment of any principal of any Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto (including as a result of an Event of Default), (c) the failure to borrow, convert, continue or prepay any Eurodollar Loan on the date specified in any notice delivered pursuant hereto or as provided in the first sentence of Section 2.06(e), or (d) the assignment of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.20, then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event. In the case of a Eurodollar Loan, such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the eurodollar market. A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay

36

such Lender the amount shown as due on any such certificate within 10 Business Days after receipt thereof.

SECTION 2.18    **Taxes.** (a) Any and all payments by or on account of any obligation of the Borrower hereunder shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes. If the Borrower shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Administrative Agent, Lender or Issuing Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions and (iii) the Borrower shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law; provided, however, that the Borrower shall not be required to increase any such amounts payable to any Administrative Agent, Lender or Issuing Lender with respect to Indemnified Taxes or Other Taxes (i) that are attributable to a Lender's failure to comply with the requirements of paragraph (e) or (f) of this Section or (ii) that are withholding taxes that would have been imposed had such payment been made to such Lender at the time such Lender became a party to this Agreement, except to the extent that such Lender's assignor (if any) was entitled, at the time of assignment, to receive additional amounts from the Borrower with respect to such Indemnified Taxes or Other Taxes pursuant to this paragraph.

(b)    In addition but without duplication of any Taxes to be paid pursuant to Section 2.18(a), the Borrower shall pay any Other Taxes to the relevant Governmental Authority (other than Other Taxes resulting solely from as assignment pursuant to Section 10.03(b) hereof) in accordance with applicable law.

(c)    The Borrower shall indemnify the Administrative Agent, each Lender and the Issuing Lender, within 10 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent, such Lender or the Issuing Lender, as the case may be, on or with respect to any payment by or on account of any obligation of the Borrower hereunder (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender or the Issuing Lender, or by the Administrative Agent on its own behalf or on behalf of a Lender or the Issuing Lender, shall be conclusive absent manifest error. Without limiting the Borrower's obligation to indemnify the Administrative Agent, each Lender and each Issuing Lender (for purposes of this sentence, each such party is a "cooperating party") for Indemnified Taxes and Other Taxes hereunder (including in accordance with any time deadlines for such indemnification set forth herein), in the event that the Borrower makes any payment under Section 2.18(a), (b) or (c) with respect to any Tax, the Borrower may, at its own expense, contest the imposition of such Tax with the relevant Governmental Authority in order to obtain a refund thereof, and the relevant cooperating party shall use commercially reasonably efforts to cooperate with the Borrower in its pursuit of any such refund, provided that (i) prior to the Borrower commencing the pursuit of any such refund or any cooperation on the part of the relevant cooperating party, the Borrower has received an opinion of counsel to the effect that

(NY) 27011/094/DIPDOCS/dip.ca.doc                                                                10/08/05 4:49 AM

there is a substantial likelihood of success in obtaining such refund (such opinion of counsel to be issued by counsel, and in form and substance, satisfactory to the relevant cooperating party) and (ii) no relevant cooperating party shall (x) be required to disclose any confidential information (including tax returns), (y) incur any unreimbursed cost or expense or (z) be otherwise disadvantaged, in each case in connection with such cooperation.

(d)    As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the Administrative Agent, for its own account or for the account of the relevant Lender as the case may be, the original or a certified copy of a receipt received by the Borrower evidencing such payment or other evidence of payment reasonably satisfactory to the Administrative Agent. Each Lender represents as of the date such Lender becomes a party to this Agreement that, to the best of its knowledge without having conducted any investigation, except for Other Taxes that may be imposed under the federal, state or local laws of the United States, it is not aware of any Other Taxes with respect to this Agreement or any other Loan Document.

(e)    (i) Each Foreign Lender shall deliver to the Borrower and the Administrative Agent (or, in the case of a Participant, to the Lender from which the related participation shall have been purchased) two copies of either U.S. Internal Revenue Service Form W-8BEN, Form W-8ECI or Form W-8EXP, or, in the case of a Foreign Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", a true and accurate statement substantially in the form of Exhibit D and a Form W-8BEN, or any subsequent versions thereof or successors thereto, that the Borrower has no knowledge or reason to know is untrue, properly completed and duly executed by such Foreign Lender claiming complete exemption from, or a reduced rate of, U.S. federal withholding tax on all payments by the Borrower under this Agreement and the other Loan Documents.

(ii)    Each Lender and Administrative Agent that is a "United States Person", as defined in Section 7701(a)(30) of the Code (other than Persons that are exempt from United States backup withholding tax) shall deliver, at the time(s) and in the manner(s) prescribed by applicable law, to the Borrower and the Administrative Agent (or, in the case of a Participant, to the Lender from which the related participation shall have been purchased) two copies of a properly completed and duly executed United States Internal Revenue Form W-9 or any subsequent version thereof or successor thereto, certifying that such Lender is exempt from United States backup withholding tax on payments made hereunder.

Such forms shall be delivered by each Lender and the Administrative Agent on or before the date it becomes a party to this Agreement (or, in the case of any Participant, on or before the date such Participant purchases the related participation).    In addition, each Lender and the Administrative Agent shall deliver such forms promptly upon the obsolescence or invalidity of any form previously delivered by such Lender or the Administrative Agent. Each  Lender and the Administrative Agent shall promptly notify the Borrower at any time it determines that it is no longer in a position to provide any previously delivered certificate to the Borrower (or any other form of certification adopted by the U.S. taxing authorities for such purpose). Notwithstanding any other provision of this paragraph, a Lender or the Administrative Agent

38

shall not be required to deliver any form pursuant to this paragraph that such Lender is not legally able to deliver.

(f)    Any Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which the Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Borrower and to the Administrative Agent, at the time or times prescribed by applicable law or reasonably requested by the Borrower, two copies of such properly completed and executed documentation prescribed by applicable law or reasonably requested by the Borrower as will permit such payments to be made without withholding or at a reduced rate; provided that such Lender is legally entitled to complete, execute and deliver such documentation in such Lender's judgment and such completion, execution or submission would not materially prejudice the legal position of such Lender.

(g)    If the Administrative Agent or a Lender determines, in its sole discretion, that it has received a refund or the equivalent from the relevant Taxing Authority of any Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 2.18, it shall pay over such refund or equivalent to the Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.18 with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund or equivalent); provided, that the Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund or equivalent to such Governmental Authority. This Section shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Borrower or any other Person.

SECTION 2.19    **Payments Generally; Pro Rata Treatment**.

(a)    The Borrower shall make each payment or prepayment required to be made by it hereunder (whether of principal, interest, fees or reimbursement of LC Disbursements, or of amounts payable under Section 2.16, 2.17 or 2.18, or otherwise) prior to 2:00 p.m., New York City time, on the date when due, in immediately available funds, without set-off or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent at its offices at 270 Park Avenue, New York, New York, except payments to be made directly to the Issuing Lender as expressly provided herein and except that payments pursuant to Sections 2.16, 2.17, 2.18 and 10.05 shall be made directly to the Persons entitled thereto. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon

shall be payable for the period of such extension. All payments hereunder shall be made in Dollars.

(b) If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, unreimbursed LC Disbursements, interest, fees and expenses then due hereunder, such funds shall be applied (i) first, towards payment of fees and expenses then due under Sections 2.21 and 10.05, ratably among the parties entitled thereto in accordance with the amounts of fees and expenses then due to such parties, (ii) second, towards payment of interest, Tranche A Commitment Fees, Tranche B Commitment Fees and Letter of Credit Fees then due on account of Tranche A Loans, Tranche B Loans, unreimbursed LC Disbursements and Letters of Credit (including any interest payable pursuant to Section 2.09), ratably among the parties entitled thereto in accordance with the amounts of such interest and fees then due to such parties, (iii) third, towards payment of principal of the Tranche A Loans, Tranche B Loans, and unreimbursed LC Disbursements then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal and unreimbursed LC Disbursements then due to such parties and (iv) fourth, towards the Cash Collateralization of Letters of Credit then outstanding in an aggregate amount equal to 105% of the Uncollateralized LC Exposure, provided, however, that the proceeds from the foreclosure of any Collateral shall be applied as set forth in the Security and Pledge Agreement.

(c) Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders or the Issuing Lender hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the Issuing Lender, as the case may be, the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders or the Issuing Lender, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or Issuing Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(d) If any Lender shall fail to make any payment required to be made by it pursuant to Sections 2.03(d) and (e), 2.05(b) and 2.19(c), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

SECTION 2.20 **Mitigation Obligations; Replacement of Lenders**. (a) If any Lender requests compensation under Section 2.16, or if the Borrower is reasonably anticipated to be required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.18, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or

40

reduce amounts payable pursuant to Section 2.16 or 2.18, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    If any Lender requests compensation under Section 2.16, or if the Borrower is reasonably anticipated to be required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.18, or if any Lender defaults in its obligation to fund Loans hereunder, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 10.03), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided, that (i) the Borrower shall have received the prior written consent of the Administrative Agent (and if a Tranche A Commitment is being assigned, the Issuing Lender), which consent shall not unreasonably be withheld or delayed, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and participations in LC Disbursements, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and (iii) in the case of any such assignment resulting from a claim for compensation under Section 2.16 or payments reasonably anticipated to be required to be made pursuant to Section 2.18, such assignment will result in a reduction in such compensation or payments. A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

SECTION 2.21   **Certain Fees**. The Borrower shall pay the fees set forth in that certain Fee Letter dated as of September 22, 2005 among JPMCB, JPMorgan, CGMI and the Borrower, to the Persons and at the times set forth therein.

SECTION 2.22   **Commitment Fees**. (a) The Borrower shall pay to the Tranche A Lenders a commitment fee (the "Tranche A Commitment Fee") for the period commencing on the earlier of the date of the Borrower's acceptance of the Commitment Letter and the Filing Date to the Termination Date or the earlier date of termination of the Tranche A Commitment, computed (on the basis of the actual number of days elapsed over a year of 360 days) at the rate of three-eighths of one percent (3/8%) per annum on the average daily Unused Total Tranche A Commitment. Such Tranche A Commitment Fee, to the extent then accrued, shall be payable (x) monthly, in arrears, on the last calendar day of each month, (y) on the Termination Date and (z) as provided in Section 2.12 hereof, upon any reduction or termination in whole or in part of the Total Tranche A Commitment.

(b)    The Borrower shall pay to the Tranche B Lenders a commitment fee (the "Tranche B Commitment Fee") for the period commencing on the earlier of the date of the Borrower's acceptance of the Commitment Letter and the Filing Date to the earlier of (i) the Termination Date and (ii) the date on which the Tranche B Loan is funded, computed (on the basis of the actual number of days elapsed over a year of 360 days) at the rate of three-eighths of

41

one percent (3/8%) per annum on the Total Tranche B Commitment. Such Tranche B Commitment Fee, to the extent then accrued, shall be payable (w) monthly, in arrears, on the last calendar day of each month, (x) on the date on which the Tranche B Loan is funded, (y) on the Termination Date and (z) as provided in Section 2.12 hereof, upon any reduction or termination in whole or in part of the Total Tranche B Commitment.

SECTION 2.23  **Letter of Credit Fees**. The Borrower shall pay with respect to each Letter of Credit (i) to the Administrative Agent on behalf of the Tranche A Lenders a fee calculated (on the basis of the actual number of days elapsed over a year of 360 days) at the rate of (x) two and one-half percent (2.50%) per annum on the daily average LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) and (ii) to the Issuing Lender such Issuing Lender's customary fees for issuance, amendments and processing referred to in Section 2.03. In addition, the Borrower agrees to pay each Issuing Lender for its account a fronting fee of one quarter of one percent (1/4%) per annum in respect of each Letter of Credit issued by such Issuing Lender, for the period from and including the date of issuance of such Letter of Credit to and including the date of termination of such Letter of Credit. Accrued fees described in this paragraph in respect of each Letter of Credit shall be due and payable monthly in arrears on the last calendar day of each month and on the Termination Date.

SECTION 2.24  **Nature of Fees**. All Fees shall be paid on the dates due, in immediately available funds, to the Administrative Agent for the respective accounts of the Administrative Agent and the Lenders, as provided herein and in the fee letter described in Section 2.21. Once paid, none of the Fees shall be refundable under any circumstances.

SECTION 2.25  **Priority and Liens**.

(a)  Subject to the Orders and the Security and Pledge Agreement, the Borrower and each of the Guarantors hereby covenants, represents and warrants that, upon entry of the Interim Order (and the Final Order, as applicable), the Obligations and the other Secured Obligations (including the obligations of the Borrower and the Guarantors in respect of any hedging obligations permitted hereunder and Indebtedness permitted by Section 6.03(viii), in each case owing to JPMCB, any other Lender or  any of their respective banking Affiliates) and subject, in each of clauses (i) through (iv) below, to the Carve-Out:

(i) pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute allowed claims in the Cases having priority over any and all administrative expenses, diminution claims (including the Superpriority Claims granted to the Existing Lenders) and all other claims against the Borrower and the Guarantors, now existing or hereafter arising, of any kind whatsoever, including all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code;

(ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, shall at all times be secured by a valid, binding, continuing, enforceable and fully-perfected first priority senior security interest in and Lien on all tangible and intangible property of the Borrower's and the Guarantors' respective estates in the Cases that is not subject to valid, perfected, non-avoidable and enforceable Liens in existence as of the Filing Date or valid Liens in existence on the Filing Date that are perfected subsequent to such date to the

extent permitted by Section 546(b) of the Bankruptcy Code, including all present and future accounts receivable, inventory, general intangibles, chattel paper, real property, leaseholds, fixtures, machinery and equipment, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements and other intellectual property, capital stock of any Subsidiaries of the Borrower and Guarantors and on all cash and investments maintained in the Letter of Credit Account (but excluding (x) the Borrower's and the Guarantors' rights in respect of avoidance actions under the Bankruptcy Code and (y) joint venture interests with respect to which a valid prohibition on pledging such interests or granting Liens thereon exists, it being understood that, notwithstanding such exclusion of such interests, the proceeds of such interests shall be subject to such liens under Section 364(c)(2) of the Bankruptcy Code and available to satisfy the Obligations and the other Secured Obligations);

(iii) pursuant to Section 364(c)(3) of the Bankruptcy Code, shall be secured by valid, binding, continuing, enforceable and fully-perfected security interests in and Liens upon all tangible and intangible property of the Borrower and the Guarantors (provided that as set forth in clause (iv) of this sentence, the existing Liens that presently secure the obligations of the Borrower and the Existing Guarantors under the Existing Agreement will be primed by the Lien in favor of the Administrative Agent and the Lenders as described in clause (iv) of this sentence) that is subject to valid, perfected and non-avoidable Liens in existence on the Filing Date or that is subject to valid Liens in existence on the Filing Date that are perfected subsequent to the Filing Date as permitted by Section 546(b) of the Bankruptcy Code (other than the property referred to in clause (iv) below that is subject to the existing Liens described in clause (iv) below, as to which the Lien in favor of the Administrative Agent and the Lenders will be as described in clause (iv) below), junior to such valid, perfected and non-avoidable Liens; and

(iv) pursuant to Section 364(d)(1) of the Bankruptcy Code, shall be secured by a valid, binding, continuing, enforceable and fully-perfected first priority senior priming security interest in and senior priming Lien on all of the tangible and intangible property of the Borrower and the Guarantors that is subject to existing Liens that presently secure Borrower's and the Existing Guarantors' pre-petition Indebtedness under the Existing Agreement (but subject and subordinate to (A) the Carve-Out and (B) any Liens in existence on the Filing Date to which the Liens being primed hereby are subject or become subject subsequent to the Filing Date as permitted by Section 546(b) of the Bankruptcy Code), senior to all of such Liens;

provided, however, that (w) the Borrower and the Guarantors shall not be required to pledge to the Administrative Agent in excess of 65% of the voting capital stock of its direct Foreign Subsidiaries or any of the capital stock or interests of its indirect Foreign Subsidiaries (if, in the good faith judgment of the Borrower, adverse tax consequences would result to the Borrower), (x) no portion of the Carve-Out may be utilized to fund prosecution or assertion of any claims against the Administrative Agent, the Lenders or the Issuing Lenders, (y) following the Termination Date, amounts in the Letter of Credit Account shall not be subject to the Carve-Out and (z) except as otherwise provided in the Orders, no portion of the Carve-Out shall be utilized for the payment of professional fees and disbursements incurred in connection with any challenge to the amount, extent, priority, validity, perfection or enforcement of the indebtedness

43

of the Borrower and the Guarantors owing to the Existing Lenders or to the collateral securing such indebtedness. The Lenders agree that so long as no Event of Default shall have occurred and be continuing, the Borrower and the Guarantors shall be permitted to pay compensation and reimbursement of expenses allowed and payable under Sections 330 and 331 of title 11 of the United States Code, as the same may be due and payable, and the same shall not reduce the Carve-Out.

(b)    Subject to the priorities set forth in subsection (a) above and to the Carve-Out, as to all real property the title to which is held by the Borrower or any of the Guarantors, or the possession of which is held by the Borrower or any of the Guarantors pursuant to leasehold interests and which secures the Existing Indebtedness, the Borrower and each Guarantor hereby assigns and conveys as security, grants a security interest in, hypothecates, mortgages, pledges and sets over unto the Administrative Agent on behalf of the Lenders all of the right, title and interest of the Borrower and such Guarantor in all of such owned real property and in all such leasehold interests, together in each case with all of the right, title and interest of the Borrower and such Guarantor in and to all buildings, improvements, and fixtures related thereto, any lease or sublease thereof, all general intangibles relating thereto and all proceeds thereof. The Borrower and each Guarantor acknowledges that, pursuant to the Orders, the Liens in favor of the Administrative Agent on behalf of the Lenders in all of such real property and leasehold instruments shall be perfected without the recordation of any instruments of mortgage or assignment. The Borrower and each Guarantor further agrees that, upon the request of the Administrative Agent following the occurrence of an Event of Default (regardless of whether such Event of Default is continuing), the Borrower and such Guarantor shall enter into separate fee or leasehold mortgages in recordable form with respect to such properties on terms reasonably satisfactory to the Administrative Agent.

SECTION 2.26    **Right of Set-Off**. Subject to the provisions of Section 7.01, upon the occurrence and during the continuance of any Event of Default, the Administrative Agent and each Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law and without further order of or application to the Bankruptcy Court, to set off and apply any and all deposits (general or special, time or demand, provisional or final but excluding deposits designated as payroll accounts and any trust accounts) at any time held and other indebtedness at any time owing by the Administrative Agent and each such Lender to or for the credit or the account of the Borrower or any Guarantor against any and all of the obligations of such Borrower or Guarantor now or hereafter existing under the Loan Documents, irrespective of whether or not such Lender shall have made any demand under any Loan Document and although such obligations may not have been accelerated. Each Lender and the Administrative Agent agrees to notify the Borrower and Guarantors in accordance with Section 7.01 prior to any such set-off and application made by such Lender or by the Administrative Agent, as the case may be. The rights of each Lender and the Administrative Agent under this Section are in addition to other rights and remedies which such Lender and the Administrative Agent may have upon the occurrence and during the continuance of any Event of Default.

SECTION 2.27    **Security Interest in Letter of Credit Account**. Pursuant to Section 364(c)(2) of the Bankruptcy Code, the Borrower and the Guarantors hereby assign and pledge to the Administrative Agent, for its benefit and for the ratable benefit of the Lenders, and hereby grant to the Administrative Agent, for its benefit and for the ratable benefit of the

Lenders, a first priority security interest, senior to all other Liens, if any, in all of the Borrower's and the Guarantors' right, title and interest in and to the Letter of Credit Account and any direct investment of the funds contained therein. Cash held in the Letter of Credit Account shall not be available for use by the Borrower, whether pursuant to Section 363 of the Bankruptcy Code or otherwise, and shall be released to the Borrower only as described in clause (ii)(y) of Section 2.03(j).

SECTION 2.28  **Payment of Obligations**. Subject to the provisions of Section 7.01, upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents of the Borrower and the Guarantors, the Lenders shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court.

SECTION 2.29  **No Discharge; Survival of Claims**. Each of the Borrower and the Guarantors agrees that (i) its obligations hereunder shall not be discharged by the entry of an order confirming a Reorganization Plan (and each of the Borrower and the Guarantors, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Superpriority Claim granted to the Administrative Agent and the Lenders pursuant to the Orders and described in Section 2.25 and the Liens granted to the Administrative Agent pursuant to the Orders and described in Sections 2.25 and 2.27 shall not be affected in any manner by the entry of an order confirming a Reorganization Plan.

SECTION 2.30  **Use of Cash Collateral**. Notwithstanding anything to the contrary contained herein, the Borrower shall not be permitted to request a Borrowing under Section 2.04 or request the issuance of a Letter of Credit under 2.03 unless the Bankruptcy Court shall have entered the Interim Order and shall at that time have granted to the Borrower use of all cash collateral, subject to the Orders, for the purposes described in Section 3.09.

SECTION 3.    **REPRESENTATIONS AND WARRANTIES**

In order to induce the Lenders to make Loans and issue and/or participate in Letters of Credit hereunder, the Borrower and each of the Guarantors jointly and severally represent and warrant as follows:

SECTION 3.01  **Organization and Authority**. Each of the Borrower and the Guarantors (i) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (ii) is duly qualified as a foreign corporation or other organization and in good standing in each jurisdiction where the conduct of its business requires such qualification, except to the extent that all failures to be duly qualified and in good standing could not, in the aggregate, reasonably be expected to have a Material Adverse Effect, (iii) subject to the entry by the Bankruptcy Court of the Interim Order (or the Final Order, when applicable) has the requisite power and authority to effect the transactions contemplated hereby, and by the other Loan Documents to which it is a party, and (iv) subject to the entry by the Bankruptcy Court of the Interim Order (or the Final Order, when applicable) has all requisite power and authority and the legal right to own, pledge, mortgage and operate its properties, and to conduct its business as now or currently proposed to be conducted, except where the failure thereof could not reasonably be expected to have a Material Adverse Effect.

45

SECTION 3.02  **Due Execution**. Upon the entry by the Bankruptcy Court of the Interim Order (or the Final Order, when applicable), the execution, delivery and performance by each of the Borrower and the Guarantors of each of the Loan Documents to which it is a party (i) are within the respective powers of each of the Borrower and the Guarantors, have been duly authorized by all necessary action including the consent of shareholders where required, and do not (A) contravene the charter or by-laws of any of the Borrower or the Guarantors, (B) violate any law (including the Securities Exchange Act of 1934) or regulation (including Regulations T, U or X of the Board), or any order or decree of any court or Governmental Authority, conflict with or result in a breach of, or constitute a default under, any material contractual obligation entered into prior to the Filing Date binding on the Borrower or the Guarantors or any of their properties except to the extent that all such violations, conflicts or breaches could not, in the aggregate, reasonably be expected to have a Material Adverse Effect, (C) conflict with or result in a breach of, or constitute a default under, any material contractual obligation entered into after the Filing Date binding on the Borrower or the Guarantors or any of their properties, or (D) result in or require the creation or imposition of any Lien upon any of the property of any of the Borrower or the Guarantors other than the Liens granted pursuant to this Agreement, the other Loan Documents or the Orders; and (ii) do not require the consent, authorization by or approval of or notice to or filing or registration with any Governmental Authority other than (A) the entry of the Orders and (B) other consents, authorizations, approvals, notices, filings or registrations the failure to obtain or make which could not, in the aggregate, reasonably be expected to have a Material Adverse Effect. Upon the entry by the Bankruptcy Court of the Interim Order (or the Final Order, when applicable), this Agreement has been duly executed and delivered by each of the Borrower and the Guarantors. This Agreement is, and each of the other Loan Documents to which the Borrower and each of the Guarantors is or will be a party, when delivered hereunder or thereunder, will be, a legal, valid and binding obligation of the Borrower and each Guarantor, as the case may be, enforceable against the Borrower and the Guarantors, as the case may be, in accordance with its terms and the Orders.

SECTION 3.03  **Statements Made**. The information that has been prepared by or at the request of the Borrower or any Guarantor and delivered in writing by the Borrower or any of the Guarantors to the Agents or to the Bankruptcy Court in connection with any Loan Document, any confidential information memorandum relating to the syndication of the credit facilities provided for herein, and any financial statement delivered pursuant hereto or thereto (other than to the extent that any such statements constitute projections), taken as a whole and in light of the circumstances in which made, contains no untrue statement of a material fact and does not omit to state a material fact necessary to make such statements not misleading in any material respect; and, to the extent that any such information constitutes projections, such projections were prepared in good faith based on assumptions believed by the Borrower or such Guarantor to be reasonable at the time such projections were furnished (it being understood that projections are inherently uncertain and that actual results may differ from the projections and such difference may be material).

SECTION 3.04  **Financial Statements**. The Borrower has furnished the Lenders with copies of (a) the audited consolidated financial statements of the Global Entities for the fiscal year ended December 31, 2004, and (b) the unaudited consolidated financial statements of the Global Entities for the fiscal quarter and six month period ended June 30, 2005. Such financial statements present fairly in all material respects, in accordance with GAAP, the financial

46

condition and results of operations of the Global Entities on a consolidated basis as of such date and for such period; such balance sheets and the notes thereto disclose all liabilities, direct or contingent, of the Global Entities as of the date thereof required to be disclosed by GAAP; such financial statements were prepared in a manner consistent with GAAP (subject, in the case if the financials described in clause (b) above, to normal year-end adjustments and the absence of footnotes). Since the audited financial statements for the fiscal year ended December 31, 2004 delivered to the Lenders prior to the Closing Date, no development or event has occurred that has had or is reasonably expected to have a Material Adverse Effect.

SECTION 3.05  **Ownership**. Other than as set forth on part A Schedule 3.05 (as such Schedule may be updated from time to time by written notice from the Borrower to the Administrative Agent to reflect transactions permitted by this Agreement), (i) each of the Persons listed on Schedule 3.05 is a wholly-owned, direct or indirect Subsidiary of the Borrower, (ii) the Borrower owns no other Subsidiaries, whether directly or indirectly and (iii) each of the Borrower's domestic Subsidiaries is a Guarantor. Each Existing Guarantor is listed on part B of Schedule 3.05.

SECTION 3.06  **Liens**.  There are no Liens on any assets of the Domestic Entities or any of the Global Entities other than Liens permitted pursuant to Section 6.01.

SECTION 3.07  **Compliance with Law**. Except for matters which could not, in the aggregate, reasonably be expected to have a Material Adverse Effect:

(i)    the operations of the Domestic Entities and the Global Entities comply in all material respects with all applicable environmental, health and safety statutes and regulations, including regulations promulgated under the Resource Conservation and Recovery Act (42 U.S.C. §§ 6901 et seq.);

(ii)    to the Borrower's and each of the Guarantor's knowledge, none of the operations of the Borrower or the Guarantors is the subject of any Federal or state investigation evaluating whether any remedial action involving a material expenditure by the Domestic Entities is needed to respond to a release of any Hazardous Waste or Hazardous Substance (as such terms are defined in any applicable state or Federal environmental law or regulations) into the environment;

(iii)    to the Borrower's and each of the Guarantor's knowledge, the Domestic Entities do not have any material contingent liability in connection with any release of any Hazardous Waste or Hazardous Substance into the environment; and

(iv)    to the Borrower's and each of the Guarantor's best knowledge, none of the Domestic Entities and none of the Global Entities are in violation of any law, rule or regulation, or in default with respect to any judgment, writ, injunction or decree of any Governmental Authority.

SECTION 3.08  **Insurance**. The Borrower and the Guarantors have in full force and effect insurance policies of a nature and providing such coverage as is consistent with sound business practice and customarily carried by companies of the size and character of the Borrower and the Guarantors.

SECTION 3.09    **Use of Proceeds**. The Letters of Credit and the proceeds of the Tranche A Loans and the Tranche B Loans shall be used for working capital and for other general corporate purposes of the Borrower and its Subsidiaries including the making of pension contributions, adequate protection payments to the Existing Lenders, the payment of transaction costs, fees and expenses in respect of the Transactions and the Cases and the payment of Restructuring Costs.

SECTION 3.10    **Litigation**. Other than as set forth on Schedule 3.10, there are no unstayed actions, suits or proceedings pending or, to the knowledge of the Borrower or the Guarantors, threatened against or affecting the Domestic Entities or the Global Entities or any of their respective properties, before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, with respect to this Agreement or any other Loan Documents or the transactions contemplated hereby or thereby, or otherwise as is, in the aggregate, reasonably expected to have a Material Adverse Effect.

SECTION 3.11    **ERISA** No ERISA Event has occurred that, when taken together with all other ERISA Events, could reasonably be expected to result in a Material Adverse Effect.

SECTION 3.12    **The Orders**. On the date of the making of the initial Loans hereunder or the issuance of the initial Letters of Credit hereunder, the Interim Order will have been entered and will not have been reversed, stayed, vacated or, without the Agents' consent, amended, supplemented or modified. On the date of the making of any Loan or the issuance of any Letter of Credit, the Interim Order or the Final Order, as the case may be, shall have been entered and shall not have been reversed, stayed, vacated or, without the Administrative Agent's consent, amended, supplemented or modified. Upon the maturity (whether by the acceleration or otherwise) of any of the Obligations of the Borrower and the Guarantor hereunder and under the other Loan Documents, the Lenders shall, subject to the provisions of Section 7.01, be entitled to immediate payment of such obligations, and to enforce the remedies provided for hereunder, without further application to or order by the Bankruptcy Court.

SECTION 3.13    **Properties**.

(a)    Each of the Borrower and the Guarantors has good title to, or valid leasehold interests in, all its real and personal property, except for such failures to have good title or valid leasehold interests as could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Each of the Borrower and the Guarantors owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property necessary, in the aggregate, for the conduct of its business as currently conducted, and the use thereof by the Borrower and the Guarantors does not infringe upon the rights of any other Person, except for any such infringement that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

SECTION 4.    **CONDITIONS OF LENDING**

SECTION 4.01    **Conditions Precedent to Initial Loans and Initial Letters of Credit**. The obligation of the Lenders to make the initial Loans or the Issuing Lender to issue the initial