Letter of Credit, whichever may occur first, is subject to the satisfaction (or waiver in accordance with Section 10.09) of the following conditions precedent:

(a) <u>Supporting Documents</u>. The Agents shall have received for each of the Borrower and the Guarantors:

(i)    a copy of such entity's articles or certificate of incorporation or formation, as amended, certified as of a recent date by the Secretary of State of the state of its incorporation or formation;

(ii)    a certificate of such Secretary of State, dated as of a recent date, as to the good standing of that entity and as to the charter documents on file in the office of such Secretary of State; and

(iii)    a certificate of the Secretary or an Assistant Secretary of that entity dated the date of the initial Loans or the initial Letter of Credit hereunder, whichever first occurs, and certifying (A) that attached thereto is a true and complete copy of the by-laws or limited liability company agreement of that entity as in effect on the date of such certification, (B) that attached thereto is a true and complete copy of resolutions adopted by the Board of Directors or managers of that entity authorizing the Borrowings and Letter of Credit extensions hereunder, the execution, delivery and performance in accordance with their respective terms of this Agreement, the Loan Documents and any other documents required or contemplated hereunder or thereunder and the granting of the security interest in the Letter of Credit Account and other Liens contemplated hereby, (C) that the articles or certificate of incorporation or formation of that entity has not been amended since the date of the last amendment thereto indicated on the certificate of the Secretary of State furnished pursuant to clause (i) above and (D) as to the incumbency and specimen signature of each officer of that entity executing this Agreement and the Loan Documents or any other document delivered by it in connection herewith or therewith (such certificate to contain a certification by another officer of that entity as to the incumbency and signature of the officer signing the certificate referred to in this clause (iii)).

(b) <u>Interim Order</u>. At the time of the making of the initial Loans or at the time of the issuance of the initial Letters of Credit, whichever first occurs, the Agents and the Lenders shall have received satisfactory evidence of the entry of an order of the Bankruptcy Court in substantially the form of Exhibit A (the "<u>Interim Order</u>") approving the Loan Documents and granting the Superpriority Claim status and senior priming and other Liens described in Section 2.25 which Interim Order (i) shall authorize extensions of credit in amounts not in excess of $950,000,000, (ii) shall authorize the payment by the Borrower of all fees provided for herein and in the fee letter described in Section 2.21, (iii) shall be in form and substance reasonably satisfactory to the Agents, (iv) shall have been entered not later than fifteen (15) days following the Filing Date, (v) shall have authorized the use by the Borrower and the Guarantors of any cash collateral in which any Existing Lender under the Existing Agreement may have an interest and shall have provided, as adequate protection for the use of such cash collateral and the priming contemplated hereby, for (A) the monthly payment of current interest and letter of credit fees (including the payment on the Closing Date of any such interest and fees that are accrued and

unpaid as of the Filing Date) at the applicable non-default rates applicable on the Filing Date (including LIBOR pricing options) pursuant to the Existing Agreement (the payments described in this clause to be without prejudice to the rights of any Existing Lender to assert a claim for the payment of additional interest and letters of credit fees calculated at any other applicable rates of interest (including at any default rates), or on any other basis, set forth in the Existing Agreement or to the rights of the Borrower or any other Person to contest such assertion), (B) a superpriority claim as contemplated by Section 507(b) of the Bankruptcy Code, limited in amount to the aggregate diminution in value of the Existing Collateral, including any such diminution resulting from the sale, lease or use by the Borrower and the Guarantors (or other decline in value) of cash collateral and any other Existing Collateral, the priming of the Existing Agent's security interests and liens in the Existing Collateral by the Agent and the Lenders pursuant to the Loan Documents and the Interim Order, and the imposition of the automatic stay pursuant to Section 362 of the Bankruptcy Code, immediately junior to the claims under Section 364(c)(1) of the Bankruptcy Code held by the Administrative Agent and the Lenders (without the requirement to file any motion or pleading or to make any demand) and subject, only in the event of the occurrence and during the continuance of an Event of Default, to the payment of the Carve-Out, (C) a Lien on substantially all of the assets of the Borrower and the Guarantors having a priority immediately junior to the priming and other Liens granted in favor of the Administrative Agent and the Lenders hereunder and under the other Loan Documents and (D) the payment on a current basis of the reasonable fees and disbursements of respective professionals (including, but not limited to, the reasonable fees and disbursements of counsel and internal and third-party consultants, including financial consultants, and auditors) for the Existing Agent (including the payment on the Closing Date or as soon thereafter as is practicable of any unpaid pre-petition fees and expenses) and the continuation of the payment to the Existing Agent on a current basis of the administration fees that are provided for under the Existing Agreement and (vi) shall not have been vacated, stayed, reversed, modified or amended in any respect; and, if the Interim Order is the subject of a pending appeal in any respect, neither the making of such Loans nor the issuance of such Letter of Credit nor the performance by the Borrower or any of the Guarantors of any of their respective obligations hereunder or under the Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.

(c) <u>Security and Pledge Agreement</u>. The Borrower and each of the Guarantors shall have duly executed and delivered to the Agents a Security and Pledge Agreement in substantially the form of Exhibit B (the "<u>Security and Pledge Agreement</u>").

(d) <u>First Day Orders</u>. All of the "first day orders" (including the cash management order) entered by the Bankruptcy Court at the time of the commencement of the Cases shall be reasonably satisfactory in form and substance to the Agents.

(e) <u>Opinion of Counsel</u>. The Agents and the Lenders shall have received the favorable written opinion of (i) Shearman & Sterling, LLP, counsel to the Borrower and the Guarantors, and (ii) in-house counsel to the Borrower, in each case dated the date of the initial Loans or the issuance of the initial Letter of Credit, whichever first occurs, and in form and substance reasonably satisfactory to the Arrangers and their counsel.

(f)  <u>Payment of Fees and Expenses</u>. The Borrower shall have paid to the Agents the then unpaid balance of all accrued and unpaid Fees due under and pursuant to this Agreement and the letter referred to in Section 2.21 and the reasonable fees and out-of-pocket expenses of counsel to the Administrative Agent and the Arrangers as to which invoices have been issued, and to the extent reasonably requested by the Borrower, together with back-up documentation supporting such invoices.

(g)  <u>Corporate and Judicial Proceedings</u>. All corporate and judicial proceedings and all instruments and agreements in connection with the transactions among the Borrower, the Guarantors, the Administrative Agent and the Lenders contemplated by this Agreement shall be reasonably satisfactory in form and substance to the Administrative Agent, and the Administrative Agent shall have received all information and copies of all documents and papers, including records of corporate and judicial proceedings, which the Administrative Agent may have reasonably requested in connection therewith, such documents and papers where appropriate to be certified by proper corporate, governmental or judicial authorities.

(h)  <u>Access; Compliance with Laws</u>. The Agents have the right to undertake reasonable due diligence on environmental matters, and shall be reasonably satisfied that the Borrower and its Subsidiaries are in compliance in all material respects with all applicable Environmental Laws and shall be reasonably satisfied with the costs of maintaining such compliance and with any other costs relating to actual or potential claims or liabilities relating to any environmental matters.

(i)  <u>UCC Searches</u>. The Agents shall have received such UCC searches (including tax liens and judgments) conducted in the jurisdictions of organization of each of the Borrower and each Guarantor and the jurisdictions in which the Borrower and the Guarantors conduct business as the Agents may reasonably request and as may be reasonably obtained (dated as of a date reasonably satisfactory to the Agents), reflecting the absence of Liens and encumbrances on the assets of the Borrower and the Guarantors other than Liens permitted under Section 6.01 and as may otherwise be reasonably satisfactory to the Agents.

(j)  <u>Closing Documents</u>. The Agents shall have received all documents required by this Section 4.01 reasonably satisfactory in form and substance to the Agents.

SECTION 4.02  <u>**Conditions Precedent to Each Loan and Each Letter of Credit**</u>. The obligation of the Lenders to make each Loan and of the Issuing Lender to issue each Letter of Credit, including the initial Loan and the initial Letter of Credit, is subject to the satisfaction (or waiver in accordance with Section 10.09) of the following conditions precedent:

(a)  <u>Notice</u>. The Administrative Agent shall have received a notice with respect to such borrowing or issuance, as the case may be, as required by Section 2.

(b)  <u>Representations and Warranties</u>. All representations and warranties contained in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the date of each Borrowing or the issuance of each Letter of Credit hereunder with the same effect as if made on and as of such date except to the extent such representations and warranties expressly relate to an earlier date.

51

(c) <u>No Default</u>. On the date of each Borrowing hereunder or the issuance of each Letter of Credit, no Event of Default or event which upon notice or lapse of time or both would constitute an Event of Default shall have occurred and be continuing.

(d) <u>Orders</u>. The Interim Order shall be in full force and effect and shall not have been stayed, reversed, modified or amended in any respect that the Agents reasonably determine to be adverse to the interests of the Agents and the Lenders without the prior written consent of the Administrative Agent and the Required Lenders, <u>provided</u>, that at the time of the making of any Loan or the issuance of any Letter of Credit the aggregate amount of either of which, when added to the sum of the principal amount of all Loans then outstanding and the LC Exposure, would exceed the amount authorized by the Interim Order (collectively, the "<u>Additional Credit</u>"), the Administrative Agent and each of the Lenders shall have received satisfactory evidence of the entry of an order of the Bankruptcy Court in substantially the form of the Interim Order (with only such modifications thereto as are reasonably satisfactory in form and substance to the Administrative Agent) (the "<u>Final Order</u>"), which, in any event, shall have been executed and delivered and entered by the Bankruptcy Court no later than forty-five (45) days after the entry of the Interim Order and at the time of the extension of any Additional Credit the Final Order shall be in full force and effect, shall authorize extensions of credit in respect of the Tranche A Loans in the aggregate amount up to $1,750,000,000 and in respect of the Tranche B Loan in the amount up to $250,000,000 and shall not have been vacated, stayed, reversed, modified or amended in any respect that the Administrative Agent and the Required Lenders reasonably determine to be adverse to their interests without the prior written consent of the Administrative Agent and the Required Lenders; and if either the Interim Order or the Final Order is the subject of a pending appeal in any respect, neither the making of the Loans nor the issuance of any Letter of Credit nor the performance by the Borrower or any Guarantor of any of their respective obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal.

(e) <u>Payment of Fees and Expenses</u>. The Borrower shall have paid to the Administrative Agent the then unpaid balance of all accrued and unpaid Fees due under and pursuant to this Agreement, the Orders and the letter referred to in Section 2.21 and the reasonable fees and out-of-pocket expenses of counsel to the Administrative Agent and the Arrangers as to which invoices have been issued, and to the extent reasonably requested by the Borrower, together with back-up documentation supporting such invoices.

(f) <u>Borrowing Base Certificate</u>. From and after the entry by the Court of the Final Order, the Administrative Agent shall have received the most recent Borrowing Base Certificate (dated no more than 30 days (seven (7) days during a Reduced Availability Period) prior to the making of any Loan or the issuance of any Letter of Credit).

(g) At or prior to the time of the extension of any Additional Credit, the Borrowing Base Amendment shall have been fully executed and delivered.

The request by the Borrower for, and the acceptance by the Borrower of, each extension of credit hereunder shall be deemed to be a representation and warranty by the Borrower that the conditions specified in this Section have been satisfied or waived at that time.

(NY) 27011/094/DIPDOCS/dip.ca.doc                                                                    10/08/05 4:49 AM

SECTION 4.03  **Conditions Precedent to the Tranche B Loan**. The obligation of the Tranche B Lenders to make the Tranche B Loan is subject to the satisfaction (or waiver in accordance with Section 10.09) of the following conditions precedent:

(a)  Notice. The Administrative Agent shall have received a notice with respect to such borrowing as required by Section 2.

(b)  Final Order. The Final Order shall have been entered by the Bankruptcy Court.

(c)  Payment of Fees and Expenses. The Borrower shall have paid to the Administrative Agent the then unpaid balance of all accrued and unpaid Fees then payable under and pursuant to this Agreement, the Orders and the letter referred to in Section 2.21 and the reasonable fees and out-of-pocket expenses of counsel to the Administrative Agent and the Arrangers as to which invoices have been issued, and to the extent reasonably requested by the Borrower, together with back-up documentation supporting such invoices.

(d)  Other Conditions. The conditions to each Loan set forth in Sections 4.01 and 4.02 shall have been satisfied or waived.

The request by the Borrower for, and the acceptance by the Borrower of, the Tranche B Loan shall be deemed to be a representation and warranty by the Borrower that the conditions specified in this Section have been satisfied or waived at that time.

SECTION 5.    **AFFIRMATIVE COVENANTS**

From the date hereof and for so long as any Commitment shall be in effect or any Letter of Credit shall remain outstanding (for which Cash Collateralization at the rate of 105% has not been made in accordance with Section 2.03(j)), or any amount shall remain outstanding or unpaid under this Agreement, the Borrower and each of the Guarantors agree that they will, and will cause each of their respective Subsidiaries to:

SECTION 5.01  **Financial Statements, Reports, etc**. Deliver to the Administrative Agent (for delivery to each Lender):

(a)  within 110 days after the end of each fiscal year (or such shorter period as the United States Securities and Exchange Commission may specify for the filing of annual reports on Form 10-K), consolidated balance sheets and related consolidated statements of income and consolidated cash flows for the Domestic Entities and the Global Entities, showing the financial condition of such entities on a consolidated basis as of the close of such fiscal year and the results of their respective operations during such year, the consolidated statements of the Global Entities to be audited by Deloitte & Touche LLP or other independent public accountants of recognized national standing and accompanied by an opinion of such accountants with respect to the financial statements and arising out of the scope of the audit (which opinion shall not be qualified in any material respect other than a going concern qualification as a result of the Cases or as a result of the Maturity Date falling less than one year from the date of such financial statements), all such consolidated financial statements to be certified by a Financial Officer of the Borrower to the effect that such financial statements fairly present in all material respects the

53

financial condition and results of operations of the Domestic Entities or the Global Entities, as the case may be, on a consolidated basis in accordance with GAAP;

(b) within 60 days after the end of each of the first three fiscal quarters (or such shorter period as the United States Securities and Exchange Commission may specify for the filing of quarterly reports on Form 10-Q), or, with respect to the fiscal quarter ending September 30, 2005, no later than December 31, 2005, the consolidated balance sheets and related consolidated statements of income and consolidated cash flows of the Domestic Entities and the Global Entities, showing the financial condition of such entities on a consolidated basis as of the close of such fiscal quarter and the results of their operations during such fiscal quarter and the then elapsed portion of the fiscal year, each certified by a Financial Officer of the Borrower as fairly presenting in all material respects the financial condition and results of operations of the Domestic Entities and the Global Entities, as the case may be, on a consolidated basis in accordance with GAAP, subject to normal year-end audit adjustments and the absence of footnotes;

(c) as soon as practicable, but in no event later than 30 days after the end of each fiscal month of the Borrower (i) monthly unaudited consolidated balance sheets of the Domestic Entities and the Global Entities and related consolidated statements of income and consolidated cash flows of such entities for the prior fiscal month (in the case of Domestic Entities, in a form consistent with the form provided to the Lenders prior to the Closing Date), each certified by a Financial Officer of the Borrower and (ii) a monthly report, consistent with the form required to be filed with the Bankruptcy Court, detailing professional fees and expenses that have been billed and paid or billed but unpaid to date and the accumulated "hold-back" of professional fees and expenses to date;

(d) commencing with the first fiscal month following the Closing Date, as soon as practicable, but (i) in no event later than 30 days after the end of each fiscal month of the Borrower, monthly financial projections and variance reports of the Domestic Entities and the Global Entities for the period from the date of such projections through the Termination Date in a form consistent with the form of projections provided to the Administrative Agent prior to the Closing Date, such projections to be updated and delivered to the Administrative Agent (x) no later than December 15, 2006, and (y) at such other times as such projections are updated by the Borrower and (ii) in no event later than 10 Business Days after the end of each fiscal month of the Borrower, a statement of projected cash receipts and cash disbursements for the Domestic Entities for each week in the period of thirteen continuous weeks commencing with the immediately following week, in a form consistent with the form provided to the Administrative Agent prior to the Closing Date, and in each case of new or updated projections furnished pursuant to clause (i) and any statements of projected cash receipts and cash disbursements pursuant to clause (ii), certified by a Financial Officer of the Borrower (it being understood that such certification in respect of projections shall be consistent with the representation and warranty as to projections in Section 3.03);

(e) concurrently with any delivery of financial statements under clauses (a), (b) and (c) above, a certificate of the Financial Officer of the Borrower certifying such statements (i) certifying that no Event of Default or event which upon notice or lapse of time or both would constitute an Event of Default has occurred, or, if such an Event of Default or event has

54

occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto and (ii) setting forth computations in reasonable detail satisfactory to the Administrative Agent demonstrating compliance with the provisions of Section 6.04;

(f)    as soon as possible, and in any event when the Borrower's and the Guarantor's statement of financial affairs and schedules of asset and liabilities are required to be filed with the Bankruptcy Court (but no later than 45 days after the Closing Date or such later date to which the Bankruptcy Court extends the filing thereof);

(g)    promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by it with the Securities and Exchange Commission, or any governmental authority succeeding to any of or all the functions of said commission, or with any national securities exchange, as the case may be;

(h)    as soon as available and in any event (a) within 30 days after the Borrower or any of its ERISA Affiliates knows or has reason to know that any Termination Event described in clause (i) of the definition of Termination Event with respect to any Single Employer Plan of the Borrower or such ERISA Affiliate has occurred and (b) within 10 days after the Borrower or any of its ERISA Affiliates knows or has reason to know that any other Termination Event with respect to any such Plan has occurred, a statement of a Financial Officer of the Borrower describing the full details of such Termination Event;

(i)    promptly and in any event within 10 days after receipt thereof by the Borrower or any of its ERISA Affiliates from the PBGC, copies of each notice received by the Borrower or any such ERISA Affiliate of the PBGC's intention to terminate any Single Employer Plan of the Borrower or such ERISA Affiliate or to have a trustee appointed to administer any such Plan;

(j)    if requested by the Agent, promptly and in any event within 30 days after the filing thereof with the Internal Revenue Service, copies of each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) with respect to each Single Employer Plan of the Borrower or any of its ERISA Affiliates;

(k)    within 10 days after notice is given or required to be given to the PBGC under Section 302(f)(4)(A) of ERISA of the failure of the Borrower or any of its ERISA Affiliates to make timely payments to a Plan, a copy of any such notice filed;

(l)    promptly and in any event within 10 days after receipt thereof by the Borrower or any ERISA Affiliate from a Multiemployer Plan sponsor, a copy of each notice received by the Borrower or any ERISA Affiliate concerning (i) the imposition of Withdrawal Liability by a Multiemployer Plan, (ii) the determination that a Multiemployer Plan is, or is expected to be, in reorganization within the meaning of Title IV of ERISA, (iii) the termination of a Multiemployer Plan within the meaning of Title IV of ERISA, or (iv) the amount of liability incurred, or which may be incurred, by the Borrower or any ERISA Affiliate in connection with any event described in clause (i), (ii) or (iii) above;

(m)    promptly and in any event within 10 days after the Borrower or any Subsidiary knows or has reason to know of the occurrence thereof, notice of (i) any material

55

adverse event or change to the business, financial condition, operations or assets of the Domestic Entities taken as a whole or the Global Entities taken as a whole and (ii) material litigation (if any), or any material adverse developments in previously disclosed material litigation (other than any of the foregoing that have been disclosed to the Administrative Agent pursuant to Section 5.01(o)), in each case since the Closing Date or such later date as of which the Borrower has furnished a report pursuant to this Section 5.01(m);

(n)   promptly, from time to time, such other information regarding the operations, business affairs and financial condition of the Domestic Entities or the Global Entities, or compliance with the terms of any material loan or financing agreements as the Administrative Agent, at the request of any Lender, may reasonably request; and

(o)   furnish to the Administrative Agent and its counsel promptly after the same is available, copies of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Borrower or any of the Guarantors with the Bankruptcy Court in the Cases, or distributed by or on behalf of the Borrower or any of the Guarantors to any official committee appointed in the Cases.

SECTION 5.02  **Existence**. Preserve and maintain in full force and effect all governmental rights, privileges, qualifications, permits, licenses and franchises necessary in the normal conduct of its business except (i) (A) if in the reasonable business judgment of the Borrower it is no longer necessary for the Borrower and the Guarantors to preserve and maintain such rights, privileges, qualifications, permits, licenses and franchises, and (B) such failure to preserve the same could not, in the aggregate, reasonably be expected to have a Material Adverse Effect and (ii) as otherwise permitted in connection with sales of assets permitted by Section 6.10.

SECTION 5.03  **Insurance**. (a) Keep its insurable properties insured at all times, against such risks, including fire and other risks insured against by extended coverage, as is consistent with sound business practice and customary with companies of the same or similar size in the same or similar businesses; and maintain in full force and effect public liability insurance against claims for personal injury or death or property damage occurring upon, in, about or in connection with the use of any properties owned, occupied or controlled by the Borrower or any of its Subsidiaries, as the case may be, in such amounts (giving effect to self-insurance) and with such deductibles as are customary with companies of the same or similar size in the same or similar businesses; and (b) maintain such other insurance or self insurance as may be required by law.

SECTION 5.04  **Obligations and Taxes**. Timely pay all material obligations arising after the Filing Date promptly and in accordance with their terms and timely pay and discharge promptly all material taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property arising after the Filing Date, as well as all material lawful claims for labor, materials and supplies or otherwise arising after the Filing Date which, if unpaid, would become a Lien or charge upon such properties or any part thereof, before the same shall become in default; provided, however, that the Borrower and each of its Subsidiaries shall not be required to pay and discharge or to cause to be paid and discharged (i) any such obligation, tax, assessment, charge, levy or claim so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings (if the Borrower or its

Subsidiaries shall have set aside on their books adequate reserves therefor) or (ii) with respect to obligations and claims related to a Plan, any such obligations or claims that could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

SECTION 5.05    **Notice of Event of Default, etc**. Promptly give to the Administrative Agent notice in writing of any Event of Default or the occurrence of any event or circumstance which with the passage of time or giving of notice or both would constitute an Event of Default.

SECTION 5.06    **Access to Books and Records**. (a) Maintain or cause to be maintained at all times true and complete books and records in a manner consistent with GAAP of the financial operations of the Borrower and its Subsidiaries; and provide the Administrative Agent and its representatives, upon their reasonable request, access to all such books and records during regular business hours, in order that the Administrative Agent may upon reasonable prior notice examine and make abstracts from such books, accounts, records and other papers for the purpose of verifying the accuracy of the various reports, including the Borrowing Base computations and supporting documentation, delivered by the Borrower or the Guarantors to the Administrative Agent or the Lenders pursuant to this Agreement or for otherwise ascertaining compliance with this Agreement.

(b) In the event that historical accounting practices, accounting systems or accounting reserves relating to the components of the Borrowing Base are modified in a manner that is adverse to the Lenders in any material respect, maintain such additional reserves (for purposes of computing the Borrowing Base) in respect to the components of the Borrowing Base and make such other adjustments (which may include maintaining additional reserves, modifying the advance rates or modifying the eligibility criteria for the components of the Borrowing Base) to its parameters for including the components of the Borrowing Base as the Administrative Agent shall reasonably require based upon such modifications.

(c) Upon the request of the Administrative Agent, provide (i) evidence reasonably satisfactory to the Administrative Agent that the Borrower and its Subsidiaries are in compliance in all material respects with all applicable Environmental Laws, (ii) information reasonably satisfactory to the Administrative Agent regarding the costs of maintaining such compliance and any other costs relating to Environmental Liabilities and (iii) the Administrative Agent or its designees with access to the properties, facilities, personnel, books and records of the Borrower and its Subsidiaries to permit the performance, at the sole cost of the Borrower, of reasonable environmental due diligence.

SECTION 5.07    **Maintenance of Concentration Account**. Continue to maintain with JPMCB or any of its Affiliates, an account or accounts to be used by the Borrower and the Guarantors as their principal concentration account for day-to-day operations conducted by the Borrower and the Guarantors.

SECTION 5.08    **Borrowing Base Certificate**. From and after the entry of the Final Order, furnish to the Administrative Agent as soon as available and in any event (a) on or before the twentieth (20th) day of each month, a monthly Borrowing Base Certificate, as of the last day of the immediately preceding month (which monthly Borrowing Base Certificate shall be furnished regardless of whether weekly Borrowing Base Certificates are required to be furnished

pursuant to the immediately succeeding clause (b)), (b) within five (5) Business Days after the end of each calendar week (each calendar week deemed, for purposes hereof, to end on a Friday) that ends during a Reduced Availability Period, a weekly Borrowing Base Certificate (it being understood that certain Borrowing Base Certificate items (to be identified in the Borrowing Base Amendment) shall be updated only monthly) and (c) if requested by the Administrative Agent at any other time when the Administrative Agent reasonably believes that the then existing Borrowing Base Certificate is materially inaccurate, as soon as reasonably available but in no event later than five (5) Business Days after such request, a Borrowing Base Certificate showing the Borrowing Base as of the date so requested, in each case with supporting documentation and additional reports with respect to the Borrowing Base as the Administrative Agent shall reasonably request. As used herein, "Reduced Availability Period" means a period beginning on each day when the Available Amount is less than $500,000,000, and ending on the earliest succeeding day on which the Available Amount has been equal to or greater than $500,000,000 for thirty (30) consecutive days. As used herein, "Available Amount" means, at any time, an amount equal to (A) the lesser of (i) the Total Commitment at such time and (ii) the Borrowing Base, *minus* (B) the sum of the aggregate principal amount of the outstanding Tranche A Loans, *plus* the aggregate principal amount of the outstanding Tranche B Loans, *plus* the LC Exposure.

SECTION 5.09  **Collateral Monitoring and Review**. At any reasonable time upon reasonable notice and upon the reasonable request of the Administrative Agent, permit the Administrative Agent or any of its agents or representatives or professionals (including internal and third party consultants, accountants and appraisers) retained by the Administrative Agent or its professionals to visit the properties of the Borrower and its Subsidiaries, to confer with officers and representatives of the Borrower and the Guarantors, to conduct evaluations and appraisals of and to monitor (i) the Collateral, (ii) the Borrower's practices in the computation of the Borrowing Base and (iii) the assets included in the Borrowing Base, and pay the reasonable fees and expenses in connection therewith (including the reasonable and customary fees and expenses associated with JPMorgan and CUSA, as forth in Section 10.05). In connection with any collateral monitoring or review and appraisal relating to the computation of the Borrowing Base, the Borrower shall make such modifications and adjustments to the Borrowing Base or the computation thereof as the Administrative Agent shall reasonably require upon at least 10 days written notice (it being understood that no such notice is required during the continuance of an Event of Default) based upon the terms of this Agreement and results of such collateral monitoring, review or appraisal (which modifications and adjustments may include maintaining additional reserves, modifying the advance rates or modifying the eligibility criteria for components of the Borrowing Base to the extent reasonably required by the Administrative Agent).

SECTION 5.10  **Public Rating**. Use their best efforts to obtain a rating from S&P and Moody's on the Tranche A Loans and Tranche B Loan in advance of the entry of the Final Order.

SECTION 5.11  **Subsequently Filed Domestic Entities**. Within ten (10) days after any Non-Filed Domestic Entity becomes a debtor in a case under the Bankruptcy Code (a "Subsequently Filed Entity"), cause (x) such Subsequently Filed Entity to become a Guarantor party to this Agreement and (y) cause such Subsequently Filed Entity to become a party to the Security and Pledge Agreement and its assets to be subject to the Lien created thereby in favor of

the Administrative Agent (which guarantees and Liens shall be Superpriority Claims) to the extent permitted under applicable law.

SECTION 6.    **NEGATIVE COVENANTS**

From the date hereof and for so long as any Commitment shall be in effect or any Letter of Credit shall remain outstanding (for which Cash Collateralization at the rate of 105% has not been made in accordance with Section 2.03(j)) or any amount shall remain outstanding or unpaid under this Agreement, the Borrower and each of the Guarantors will not, and will not permit any of their respective Subsidiaries to (and will not apply, unless in connection with an amendment to the Agreement that is reasonably likely to be approved by the Lenders required to approve such amendment, to the Bankruptcy Court for authority to):

SECTION 6.01    **Liens**. Incur, create, assume or suffer to exist any Lien on any asset of the Borrower or any of its Subsidiaries, whether now owned or hereafter acquired, other than:

(i)    (x) Liens in existence on the Filing Date as reflected on Schedule 6.01 and (y) replacement Liens that secure only refinancing of Indebtedness permitted under Section 6.03(xii), so long as such replacement Liens do not extend to or cover any property other than the property covered by the original Lien;

(ii)    Liens in existence on the Filing Date securing the Existing Indebtedness;

(iii)    Liens securing the Existing Indebtedness granted as adequate protection pursuant to the Orders and subject to the terms of the Orders which Liens are junior to the Liens contemplated hereby in favor of the Administrative Agent and the Lenders, *provided* that the Interim Order and Final Order provide that the holder of such junior Liens shall not be permitted to take any action to foreclose with respect to such junior Liens so long as any amounts shall remain outstanding hereunder or any Commitment shall be in effect;

(iv)    Liens created under the Loan Documents in favor of the Administrative Agent and the Lenders and other holders of Secured Obligations;

(v)    Liens for taxes not yet due or that are being contested in good faith by appropriate proceedings, <u>provided</u> that adequate reserves with respect thereto are maintained on the books of the Borrower or its Subsidiaries in conformity with GAAP;

(vi)    carriers', warehousemen's, mechanics', materialmen's, repairmen's, lessor's or other like Liens arising in the ordinary course of business that are not overdue for a period of more than 30 days or that are being contested in good faith by appropriate proceedings;

(vii)    pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation;

(viii)    deposits to secure the performance of bids, trade contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(ix)    easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business that, in the aggregate, are not substantial in amount and that do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the Borrower or any of its Subsidiaries;

(x)    any interest or title of a lessor under any lease entered into by the Borrower or any Subsidiary in the ordinary course of its business and covering only the assets so leased;

(xi)    Liens arising solely from precautionary filings of financing statements under the Uniform Commercial Code of the applicable jurisdictions in respect of consignments or operating leases entered into by the Borrower or any of its Subsidiaries in the ordinary course of business;

(xii)    customary rights of setoff and similar Liens in favor of depositary institutions;

(xiii)    Liens for judgments that have not yet become an Event of Default under Section 7.01(k);

(xiv)    Liens securing Indebtedness of the Borrower or any Subsidiary incurred pursuant to Section 6.03(vii) to finance the acquisition of fixed or capital assets, provided that (A) such Liens shall be created substantially simultaneously with the acquisition of such fixed or capital assets, (B) such Liens do not at any time encumber any property other than the property financed by such Indebtedness and (C) the amount of Indebtedness secured thereby is not increased;

(xv)    Liens on the assets of Foreign Subsidiaries securing Indebtedness and other obligations of any Foreign Subsidiary in an aggregate amount not to exceed $1,500,000,000;

(xvi)    Liens upon any of the property and assets existing at the time such property or asset is purchased or otherwise acquired by the Borrower or any of its Subsidiaries; provided that any such Lien was not created in contemplation of such purchase or other acquisition and does not extend to or cover any property or assets other than the property or asset being so purchased or otherwise acquired and the products and proceeds thereof; and provided further that any Indebtedness or other obligations secured by such Liens shall otherwise be permitted under Section 6.03 or this Section 6.01;

(xvii)    Liens securing Indebtedness in respect of Hedging Agreements, which Indebtedness is permitted by Section 6.03(x), so long as the aggregate amount of Indebtedness so secured (determined on a marked-to-market basis) does not exceed

60

$150,000,000 (and such Liens shall rank *pari passu* with the Liens in favor of the Administrative Agent and the Lenders and the other holders of Secured Obligations created under the Loan Documents);

(xviii) Liens on assets of the Domestic Entities that arise pursuant to Section 412(n) of the Code or Section 4068 of ERISA; provided that such Liens do not otherwise give rise to an Event of Default;

(xix)  Liens on assets of the Foreign Subsidiaries that arise pursuant to Section 412(n) of the Code or Section 4068 of ERISA, unless such Liens would otherwise give rise to an Event of Default, or unless any Person has taken steps to commence enforcement of one or more judgments, orders or enforceable mandates relating thereto, if the aggregate amount of assets in respect of which such enforcement has commenced exceeds ten percent (10%) of the aggregate amount of all assets of the Foreign Subsidiaries; and

(xx)  Liens not otherwise permitted hereunder securing Indebtedness and other obligations in an aggregate amount not to exceed $10,000,000.

SECTION 6.02  **Merger, etc.** Merge, consolidate or amalgamate with any other Person, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or dispose of all or substantially all of its property or business, except that (i) any Guarantor may merge or consolidate with any other Guarantor, (ii) any Guarantor may merge or consolidate with the Borrower if the Borrower is the surviving entity, (iii) any Foreign Subsidiary may merge or consolidate with any other Foreign Subsidiary, provided that if either such Foreign Subsidiary is a Wholly-Owned Subsidiary, the surviving entity must be a Wholly-Owned Subsidiary, (iv) any Guarantor may dispose of any or all of its assets to the Borrower or any other Guarantor (upon voluntary liquidation or otherwise), provided that any such disposition by a Wholly-Owned Guarantor must be to another Wholly-Owned Guarantor or to the Borrower, (v) any Foreign Subsidiary may dispose of any or all of its assets to another Foreign Subsidiary; provided that any such disposition by a Wholly-Owned Foreign Subsidiary must be to a Wholly-Owned Subsidiary and any such disposition by a first-tier Foreign Subsidiary must be to a first-tier Foreign Subsidiary; provided, however, that compliance with the restrictions set forth in this Section 6.02 shall not be required if, after giving effect to any transaction or activity otherwise subject to this Section 6.02, the Facility Availability Amount would be equal to or greater than $500,000,000.

SECTION 6.03  **Indebtedness**. Contract, create, incur, assume or suffer to exist any Indebtedness, except for (i) Indebtedness under the Loan Documents; (ii) Indebtedness incurred prior to the Filing Date (including existing Capitalized Leases) and outstanding on the Filing Date; (iii) intercompany Indebtedness among the Borrower and the Guarantors; (iv) guarantees by the Borrower or any Guarantor of Indebtedness of the Borrower or any Guarantor otherwise permitted by this Section 6.03; (v) intercompany Indebtedness of any Foreign Subsidiary owing to another Global Entity, provided that (A) the incurrence of such indebtedness by such Foreign Subsidiary, and the making of the related loan or advance by the relevant Global Entity, is otherwise permitted under Section 6.09 and (B) in the case of intercompany Indebtedness owing from a Foreign Subsidiary to a Domestic Entity, such Indebtedness is evidenced by one or more

promissory notes in form and substance reasonably satisfactory to the Administrative Agent and is subject to the Lien created by the Security and Pledge Agreement to the extent required by the Security and Pledge Agreement; (vi) other Indebtedness incurred after the Filing Date by any Foreign Subsidiary which, taken together with all other then outstanding Indebtedness of all Foreign Subsidiaries (excluding intercompany indebtedness described in clause (v) hereof, but including any then outstanding Indebtedness of the Foreign Subsidiaries incurred prior to the Filing Date and described in clause (ii) hereof and any Indebtedness in connection with Foreign Receivables Financings, sale-leaseback transactions and Hedging Agreements), does not exceed an aggregate amount of $1,500,000,000 (the "Foreign Subsidiary Debt Limit") at any time outstanding; (vii) Capitalized Leases and Indebtedness secured by purchase money Liens, in each case incurred after the Filing Date in an aggregate amount not to exceed $20,000,000 at any time outstanding; (viii) Indebtedness owed to JPMCB, CUSA, any other Lender or any of their respective banking Affiliates (or any Person that was a Lender or a banking Affiliate of a Lender at the time such Indebtedness was incurred) in respect of any overdrafts and related liabilities arising from treasury, depository and cash management services or in connection with any automated clearing house transfers of funds; (ix) Indebtedness (other than Indebtedness described in clause (viii)) owed to any bank in respect of any overdrafts and related liabilities arising from treasury, depository and cash management services or in connection with any automated clearing house transfers of funds; (x) Indebtedness incurred after the Filing Date by the Borrower or any Guarantor in connection with Hedging Agreements, in each case to the extent that (A) the counterparty to such agreement is a Lender or a banking Affiliate of a Lender (or was a Lender or a banking Affiliate of a Lender at the time such Indebtedness was incurred) and (B) such agreement or contract is entered into in the ordinary course of business consistent with past practices and not for speculative purposes; (xi) intercompany Indebtedness of any Domestic Entity owing to any Foreign Subsidiary so long as such Indebtedness is subordinated (on terms reasonably satisfactory to the Administrative Agent) to the Secured Obligations and the Existing Indebtedness; (xii) refinancings or replacements of Indebtedness described in clause (ii) hereof in respect of Capitalized Leases and purchase money debt obligations incurred in the ordinary course of business and, to the extent required, with the approval of the Bankruptcy Court, provided that the Liens securing such Indebtedness do not extend to or cover any additional property; and (xiii) other unsecured indebtedness of the Global Entities in an aggregate amount not to exceed $25,000,000.

SECTION 6.04  **EBITDAR**.

(a)  Permit cumulative Global EBITDAR for the Global Entities for each period beginning on January 1, 2006 and ending on the last day of each fiscal month set forth below to be less than the amount appearing opposite such month for such entity:

|  | Global Entities |
| Period Ending | Global EBITDAR |
| --- | --- |
| January 31, 2006 | $(125,000,000.00) |
| February 28, 2006 | $(100,000,000.00) |
| March 31, 2006 | $(75,000,000.00) |
| April 30, 2006 | $(50,000,000.00) |
| May 31, 2006 | $(25,000,000.00) |
| June 30, 2006 | $(25,000,000.00) |

|                        | Global Entities    |
| Period Ending          | Global EBITDAR     |
| ---------------------- | ------------------ |
| July 31, 2006          | $(50,000,000.00)   |
| August 31, 2006        | $(25,000,000.00)   |
| September 20, 2006     | $50,000,000.00     |
| October 31, 2006       | $100,000,000.00    |
| November 30, 2006      | $150,000,000.00    |

(b)   Permit cumulative Global EBITDAR for the Global Entities for each rolling twelve (12) fiscal month period ending on the last day of each fiscal month set forth below to be less than the amount appearing opposite such month for such entity:

|                        | Global Entities    |
| Period Ending          | Global EBITDAR     |
| ---------------------- | ------------------ |
| December 31, 2006      | $165,000,000.00    |
| January 31, 2007       | $200,000,000.00    |
| February 28, 2007      | $250,000,000.00    |
| March 31, 2007         | $300,000,000.00    |
| April 30, 2007         | $350,000,000.00    |
| May 31, 2007           | $400,000,000.00    |
| June 30, 2007          | $500,000,000.00    |
| July 31, 2007          | $550,000,000.00    |
| August 31, 2007        | $600,000,000.00    |
| September 30, 2007     | $650,000,000.00    |
| October 31, 2007       | $700,000,000.00    |

SECTION 6.05    **[Reserved]**.

SECTION 6.06    **Chapter 11 Claims**. Incur, create, assume, suffer to exist or permit any other Superpriority Claim which is pari passu with or senior to the claims of the Administrative Agent and the Lenders against the Borrower and the Guarantors hereunder, except for the Carve-Out.

SECTION 6.07    **Dividends; Capital Stock**. Declare or pay, directly or indirectly, any dividends or make any other distribution or payment, whether in cash, property, securities or a combination thereof, with respect to (whether by reduction of capital or otherwise) any shares of capital stock or membership interests (or any options, warrants, rights or other equity securities or agreements relating to any capital stock or membership interests), or set apart any sum for the aforesaid purposes; provided that this Section 6.07 shall not restrict dividends and distributions from the Guarantors or the Foreign Subsidiaries directly or indirectly to the Borrower or any Guarantor or from any Foreign Subsidiary to any other Foreign Subsidiary.

SECTION 6.08    **Transactions with Affiliates**. Sell or transfer any property or assets to, or otherwise engage in any other material transactions with, any of its Affiliates (other than (A) the Borrower, (B) any of the Guarantors or (C) so long as such transaction is on commercially reasonable terms consistent with past practice, any other Subsidiary of the Borrower pursuant to joint venture arrangements of such Subsidiary) or its shareholders, except for (i) transactions that

63

are entered into in good faith, and at prices and on terms and conditions not less favorable to such Person than would be obtained on an arm's-length basis from unrelated third parties, (ii) transactions solely among the Foreign Subsidiaries, (iii) transactions among the Global Entities that are entered into in the ordinary course of the relevant Global Entities' business, (iv) other transactions among the Global Entities to the extent otherwise expressly permitted under this Agreement, and (v) transactions described on Schedule 6.08.

SECTION 6.09  **Investments, Loans and Advances.**  Purchase, hold or acquire any capital stock, evidences of indebtedness or other securities of, make or permit to exist any loans or advances to, or make or permit to exist any investment in, any other Person (all of the foregoing, "Investments"), except for: (i) ownership by the Borrower or such Subsidiary, as the case may be, of the capital stock of each of the Subsidiaries listed on Schedule 3.05; (ii) Permitted Investments; (iii) advances and loans among the Borrower and the Guarantors in the ordinary course of business; (iv) advances and loans made by any Foreign Subsidiary to any other Foreign Subsidiary; (v) Investments in existence on the Filing Date; (vi) investments by Wholly-Owned Foreign Subsidiaries in other Wholly-Owned Foreign Subsidiaries; (vii) extensions of trade credit in the ordinary course of business; (viii) advances and loans by any Global Entity to the employees of any Global Entity in the ordinary course of business consistent with past practices for travel and entertainment expenses, relocation costs and similar purposes in an aggregate amount for all Global Entities not exceeding $25,000,000 at any one time outstanding; (ix) investments in (including the contribution of assets to) Foreign Subsidiaries and joint ventures, in an aggregate amount (net of the Investment Credit) not to exceed $30,000,000 at any one time outstanding; (x) to the extent constituting Investments, any Indebtedness owed to a Global Entity or any contribution of assets, issuance of Equity Interests or disposition to a Global Entity permitted to be made under Section 6.02, 6.03 or 6.10 and (xi) Investments in Equity Interests of account debtors or other assets received (and in the amount so received) pursuant to any reorganization or similar arrangement upon bankruptcy or insolvency of, or other settlement with, such account debtors; provided, however, that compliance with the restrictions set forth in this Section 6.09 shall not be required if, after giving effect to any transaction or activity otherwise subject to this Section 6.09, the Facility Availability Amount would be equal to or greater than $500,000,000, except that in no event may the Borrower or any Guarantor make any Investment in a Non-Filed Domestic Entity if, after giving effect to such Investment, the aggregate amount (calculated net of the Investment Credit) of all Investments made by the Borrower and the Guarantors in Non-Filed Domestic Entities during the term of this Agreement would exceed $25,000,000. For the avoidance of doubt, this Section 6.09 prohibits (x) the making of advances or loans from a Domestic Entity to any Foreign Subsidiary and (y) the making of any investment by a Domestic Entity in a Foreign Subsidiary and the creation of and making of any investment in a joint venture in an aggregate amount (net of the Investment Credit) for all such investments greater than $30,000,000 at any one time outstanding, in each case at any time when the Facility Availability Amount is (or, after giving effect to the relevant transaction, would be) less than $500,000,000; provided that any such transaction (other than Investments by the Borrower or any Guarantor in a Non-Filed Domestic Entity, which shall continue to be subject to the aforementioned $25,000,000 cap) shall be permitted without restriction under this Section 6.09 (but subject always to the limitations set forth in Section 6.03 in the case of any transaction pursuant to which a Foreign Subsidiary will incur Indebtedness) if, after giving effect thereto, the Facility Availability Amount would be equal to or greater than

$500,000,000); provided further that each Global Entity shall be permitted to hold any Investment made at a time when such Investment was permitted to be made.

SECTION 6.10 **Disposition of Assets**. Sell or otherwise dispose of any assets (including the sale or issuance of any capital stock of any Subsidiary), whether now owned or hereafter acquired, except for (i) the sale or other disposition of obsolete or worn out property in the ordinary course of business; (ii) the sale of inventory in the ordinary course of business; (iii) sales or other dispositions permitted by clauses (i) and (ii) of Section 6.02; (iv) sale or disposition of assets constituting all or a portion of the Automotive Holdings Group (but not including any related foreign assets except for *de minimis* foreign assets ); (v) the sale, issuance or contribution of any Subsidiary's capital stock to the Borrower or to any Wholly-Owned Guarantor or, in the case of a sale, issuance or contribution of capital stock of a Foreign Subsidiary that is not a first-tier Foreign Subsidiary, to any Wholly-Owned Subsidiary of the Borrower; (vi) sales or other dispositions consisting of the transfer of rights in Intellectual Property to third parties and/or routine patent portfolio deletions, in each case in the ordinary course of business consistent with past practice; (vii) sales or other dispositions of accounts receivables and other related assets in connection with any Foreign Receivables Financing, so long as such Foreign Receivables Financing is otherwise permitted under this Agreement (including pursuant to Section 6.01 and Section 6.03); (viii) intercompany sales or contributions among the Borrower and the Guarantors; (ix) dispositions described on Schedule 6.10; and (x) any other sale or disposition of property not otherwise expressly permitted by this Section 6.10 (A) having a fair market value of less than $500,000 or (B) having a fair market value of $500,000 or more, in which case such dispositions shall not exceed $100,000,000 in the aggregate for any fiscal year of the Borrower; provided that compliance with the restrictions set forth in this Section 6.10 shall not be required if, after giving effect to any transaction or activity otherwise subject to this Section 6.10, the Facility Availability Amount would be equal to or greater than $500,000,000, except that in no event may the Borrower or any Guarantor sell or otherwise transfer any assets, whether now owned or hereafter acquired, to a Non-Filed Domestic Entity if, after giving effect thereto, the aggregate fair market value of all assets sold or transferred by the Borrower and the Guarantors to Non-Filed Domestic Entities would exceed $15,000,000 during the term of this Agreement.

SECTION 6.11 **Nature of Business**. Modify or alter in any material manner the nature and type of its business as conducted at or prior to the Filing Date or the manner in which such business is conducted (except, in the case of the Borrower and the Guarantors, as required by the Bankruptcy Code), it being understood that asset sales permitted by Section 6.10 shall not constitute such a material modification or alteration.

SECTION 7.    **EVENTS OF DEFAULT**

SECTION 7.01 **Events of Default**. In the case of the happening of any of the following events and the continuance thereof beyond the applicable grace period, if any (each, an "Event of Default"):

(a)   any material representation or warranty made by the Borrower or any Guarantor in this Agreement or in any Loan Document or in connection with this Agreement or the credit extensions hereunder or any material statement or representation made in any report, financial statement, certificate or other document furnished by the Borrower or any Guarantor to the Lenders under or in connection with this Agreement, shall prove to have been false or misleading in any material respect when made; or

(b)   default shall be made in the payment of any (i) Fees, interest on the Loans or other amounts payable hereunder when due (other than amounts set forth in clause (ii) hereof), and such default shall continue unremedied for more than two (2) Business Days or (ii) principal of the Loans or reimbursement obligations or cash collateralization in respect of Letters of Credit, when and as the same shall become due and payable, whether at the due date thereof (including the Prepayment Date) or at a date fixed for prepayment thereof or by acceleration thereof or otherwise; or

(c)   default shall be made by the Borrower or any Guarantor in the due observance or performance of any covenant, condition or agreement contained in Section 5.02 (with respect to the Borrower), Section 5.05 or Section 6 hereof, or

(d)   default shall be made by the Borrower or any Guarantor in the due observance or performance of any other covenant, condition or agreement (other than those covered by clauses (b) and (c) above and clause (h) below) to be observed or performed pursuant to the terms of this Agreement, any of the Orders or any of the other Loan Documents and such default shall continue unremedied for more than ten (10) days; or

(e)   any of the Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or the Borrower or any Guarantor shall file a motion or other pleading seeking the dismissal of any of the Cases under Section 1112 of the Bankruptcy Code or otherwise; a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in any of the Cases and the order appointing such trustee, responsible officer or examiner shall not be reversed or vacated within 30 days after the entry thereof, or an application shall be filed by the Borrower or any Guarantor for the approval of any other Superpriority Claim (other than the Carve-Out) in any of the Cases which is pari passu with or senior to the claims of the Administrative Agent and the Lenders against the Borrower or any Guarantor hereunder, or there shall arise or be granted any such pari passu or senior Super Priority Claim or the Bankruptcy Court shall enter an order terminating the use of cash collateral under the Existing Agreement; or

(f)   the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Borrower or any of the Guarantors which have a value in excess of $20,000,000 in the aggregate; or

(g)   a Change of Control shall occur; or

(NY) 27011/094/DIPDOCS/dip.ca.doc

(h)   the Borrower shall fail to deliver a certified Borrowing Base Certificate when due and such default shall continue unremedied for more than three (3) Business Days; or

(i)   any material provision of any Loan Document shall, for any reason, cease to be valid and binding on the Borrower or any of the Guarantors, or the Borrower or any of the Guarantors shall so assert in any pleading filed in any court; or

(j)   an order of the Bankruptcy Court shall be entered (i) reversing, staying for a period in excess of 10 days, or vacating any of the Orders or (ii) without the written consent of the Administrative Agent and the Required Lenders, otherwise amending, supplementing or modifying any of the Orders in a manner that is reasonably determined by the Agents to be adverse to the Agents and the Lenders, or (iii) terminating the use of cash collateral by the Borrower or the Guarantors pursuant to the Orders; or

(k)   any judgment or order in excess of $20,000,000 as to any post-petition obligation shall be rendered against any Global Entity and the enforcement thereof shall not have been stayed; or

(l)   any non-monetary judgment or order with respect to a post-petition event shall be rendered against any Global Entity which does or would reasonably be expected to have a Material Adverse Effect; or

(m)   except as permitted by the Orders, the Borrower or the Guarantors shall make any Pre-Petition Payment other than (i) Pre-Petition Payments authorized by the Bankruptcy Court (w) in accordance with "first day" orders reasonably satisfactory to the Administrative Agent (including not in excess of the amount set forth in the essential supplier order), (x) in connection with the assumption of executory contracts and unexpired leases, (y) payments in respect of reclamation claims authorized by the Bankruptcy Court and (z) in respect of accrued payroll and related expenses and employee benefits as of the Filing Date (excluding any Pre-Petition Payment in respect of or in connection with any Termination Event), (ii) Pre-Petition Payments of Indebtedness permitted under Section 6.03(ii) made with proceeds of dispositions of assets that secure the Indebtedness so repaid, so long as (1) the Liens securing such repaid Indebtedness are not primed by the Liens of the Security and Pledge Agreement in favor of the Administrative Agent and (2) such asset dispositions are otherwise permitted under this Agreement and (iii) other Pre-Petition Payments (excluding any Pre-Petition Payments that are refunded or otherwise returned to the Borrower or the Guarantors within fifteen (15) days of the making of such payments) in an aggregate amount not to exceed $15,000,000; or

(n)   (i) any Termination Event described in clauses (iii) or (iv) of the definition of such term shall have occurred and any Lien shall arise as a result of such Termination Event or (ii) any Lien shall arise under Section 412(n) of the Code, and in each case, (x) such Lien has been perfected or (y) any Person shall have obtained relief from the automatic stay to enforce such Lien or any Insufficiency; provided that the perfection of any Liens described in clauses (i) or (ii) above shall not constitute an Event of Default so long as such perfected Liens could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or an adverse effect on the Liens in favor of the Administrative Agent on behalf of the Lenders

67

(including the priority of such Liens or the ability of the Administrative Agent and Lenders to exercise remedies in respect thereof); or

(o)  (i) any ERISA Event shall have occurred with respect to a Plan, (ii) the Borrower or any Guarantor or any ERISA Affiliate shall have been notified by the sponsor or trustee of a Multiemployer Plan that it has incurred Withdrawal Liability to such Multiemployer Plan or (iii) the Borrower or any Guarantor or any ERISA Affiliate shall have been notified by the sponsor or trustee of a Multiemployer Plan that such Multiemployer Plan is in reorganization or is being terminated, within the meaning of Title IV of ERISA, and, in any such case, such event does or would reasonably be expected to have a Material Adverse Effect; or

(p)  it shall be determined (whether by the Bankruptcy Court or by any other judicial or administrative forum) that the Borrower or any Guarantor is liable for the payment of claims arising out of any failure to comply (or to have complied) with applicable environmental laws or regulations the payment of which will have a Material Adverse Effect;

then, and in every such event and at any time thereafter during the continuance of such event, and without further order of or application to the Bankruptcy Court, the Administrative Agent may, and at the request of the Required Lenders, shall, by notice to the Borrower (with a copy to counsel for the Official Creditors' Committee appointed in the Cases, to counsel for the Existing Agent and to the United States Trustee for the Southern District of New York), take one or more of the following actions, at the same or different times (provided, that with respect to clause (iv) below and the enforcement of Liens or other remedies with respect to the Collateral under clause (v) below, the Administrative Agent shall provide the Borrower (with a copy to counsel for the Official Creditors' Committee in the Cases, to counsel for the Existing Agent and to the United States Trustee Southern District of New York) with five (5) Business Days' written notice prior to taking the action contemplated thereby and provided, further, that upon receipt of notice referred to in the immediately preceding clause with respect to the accounts referred to in clause (iv) below, the Borrower may continue to make ordinary course disbursements from such accounts (other than the Letter of Credit Account) but may not withdraw or disburse any other amounts from such accounts): (i) terminate or suspend forthwith the Total Commitment; (ii) declare the Loans or any portion thereof then outstanding to be forthwith due and payable, whereupon the principal of such Loans together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower and the Guarantors, anything contained herein or in any other Loan Document to the contrary notwithstanding; (iii) require the Borrower and the Guarantors upon demand to forthwith deposit in the Letter of Credit Account cash in an amount which, together with any amounts then held in the Letter of Credit Account, is equal to the sum of 105% of the then Uncollateralized LC Exposure (and to the extent the Borrower and the Guarantors shall fail to furnish such funds as demanded by the Administrative Agent. the Administrative Agent shall be authorized to debit the accounts of the Borrower and the Guarantors maintained with the Administrative Agent in such amount five (5) Business Days after the giving of the notice referred to above); (iv) set-off amounts in the Letter of Credit Account or any other accounts maintained with the Administrative Agent and apply such amounts to the obligations of the Borrower and the Guarantors hereunder and in the other Loan Documents; and (v) exercise any and all remedies

under the Loan Documents and under applicable law available to the Administrative Agent and the Lenders. Any payment received as a result of the exercise of remedies hereunder shall be applied in accordance with Section 2.19(b).

## SECTION 8.   THE AGENTS

SECTION 8.01   **Appointments; Administration by Administrative Agent; No Duties for Syndication Agent.** (a) Each of the Lenders and the Issuing Lender hereby irrevocably appoints each Agent as its agent and authorizes such Agent to take such actions on its behalf and to exercise such powers as are delegated to such Agent by the terms hereof, together with such actions and powers as are reasonably incidental thereto.

(b)   The general administration of the Loan Documents shall be by the Administrative Agent.

(c)   CUSA, in its capacity as Syndication Agent, shall not have any duties or obligations of any kind under this Agreement.

SECTION 8.02   **Rights of Agents.** Each institution serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if it were not an Agent hereunder.

SECTION 8.03   **Liability of Agents.**

(a)   No Agent shall have any duties or obligations except those expressly set forth herein. Without limiting the generality of the foregoing, (i) no Agent shall be subject to any fiduciary or other implied duties, regardless of whether an Event of Default has occurred and is continuing, (ii) no Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Administrative Agent is required to exercise in writing as directed by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 10.09), and (iii) except as expressly set forth herein, no Agent shall have any duty to disclose, and no Agent shall be liable for the failure to disclose, any information relating to the Borrower or any of its Subsidiaries that is communicated to or obtained by any bank serving as an Agent or any of its Affiliates in any capacity. No Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 10.09) or in the absence of its own gross negligence or willful misconduct. Each Agent shall be deemed not to have knowledge of any Event of Default unless and until written notice thereof is given to such Agent by the Borrower or a Lender, and no Agent shall be responsible for or have any duty to ascertain or inquire into (A) any statement, warranty or representation made in or in connection with this Agreement, (B) the contents of any certificate, report or other document delivered hereunder or in connection herewith, (C) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein, (D) the validity, enforceability, effectiveness or genuineness of this Agreement or any other agreement, instrument or document, or (E) the satisfaction of any condition set forth in

Section 4 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to such Agent.

(b)  Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon. Each Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

(c)  Each Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Agent. Each Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as an Agent hereunder.

SECTION 8.04  **Reimbursement and Indemnification**. Each Lender agrees (i) to reimburse the Administrative Agent for such Lender's Tranche A Commitment Percentage or Tranche B Commitment Percentage of any expenses and fees incurred for the benefit of the Lenders under this Agreement and any of the Loan Documents, including counsel fees and compensation of agents and employees paid for services rendered on behalf of the Lenders, and any other expense incurred in connection with the operations or enforcement thereof, not reimbursed by the Borrower or the Guarantors and (ii) to indemnify and hold harmless the Administrative Agent. each Issuing Lender and any of their directors, officers, employees, agents or Affiliates, on demand, in the amount of its proportionate share, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against it or any of them in any way relating to or arising out of this Agreement or any of the Loan Documents or any action taken or omitted by it or any of them under this Agreement or any of the Loan Documents to the extent not reimbursed by the Borrower or the Guarantors (except such as shall result from their respective gross negligence or willful misconduct).

SECTION 8.05  **Successor Administrative Agent**. Subject to the appointment and acceptance of a successor Administrative Agent as provided in this paragraph, the Administrative Agent may resign at any time by notifying the Lenders, the Issuing Lender and the Borrower. Upon any such resignation, the Required Lenders shall have the right, to appoint a successor, which successor agent shall (unless an Event of Default under Section 7.01(b) shall have occurred and be continuing) be subject to approval by the Borrower (which approval shall not be unreasonably withheld or delayed).  If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may, on behalf of the Lenders and the Issuing Lender, appoint a successor Administrative Agent which shall be a bank with an office in New York, New York, or an Affiliate of any such bank.

Upon the acceptance of its appointment as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder. The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the Administrative Agent's resignation hereunder, the provisions of this Article and Section 10.05 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Agent.

SECTION 8.06  **Independent Lenders**.  Each Lender acknowledges that it has, independently and without reliance upon any Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon any Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any related agreement or any document furnished hereunder or thereunder.

SECTION 8.07  **Advances and Payments**.

(a)  On the date of each Loan, the Administrative Agent shall be authorized (but not obligated) to advance, for the account of each of the Lenders, the amount of the Loan to be made by it in accordance with its Tranche A Commitment or Tranche B Commitment, as the case may be, hereunder. Should the Administrative Agent do so, each of the Lenders agrees forthwith to reimburse the Administrative Agent in immediately available funds for the amount so advanced on its behalf by the Administrative Agent. together with interest at the Federal Funds Effective Rate if not so reimbursed on the date due from and including such date but not including the date of reimbursement.

(b)  Any amounts received by the Administrative Agent in connection with this Agreement (other than amounts to which the Administrative Agent is entitled pursuant to Sections 2.20, 8.04 and 10.05), the application of which is not otherwise provided for in this Agreement shall be applied in accordance with Section 2.19(b). All amounts to be paid to a Lender by the Administrative Agent shall be credited to that Lender, after collection by the Administrative Agent. in immediately available funds either by wire transfer or deposit in that Lender's correspondent account with the Administrative Agent. as such Lender and the Administrative Agent shall from time to time agree.

SECTION 8.08  **Sharing of Setoffs**.  Each Lender agrees that if it shall, through the exercise of a right of banker's lien, setoff or counterclaim against the Borrower or a Guarantor, including, but not limited to, a secured claim under Section 506 of the Bankruptcy Code or other security or interest arising from, or in lieu of, such secured claim and received by such Lender under any applicable bankruptcy, insolvency or other similar law, or otherwise, obtain payment in respect of its Loans or unreimbursed drafts drawn under Letters of Credit as a result of which the unpaid portion of its Loans or unreimbursed drafts drawn under Letters of Credit is proportionately less than the unpaid portion of the Loans or unreimbursed drafts drawn under

Letters of Credit of any other Lender (a) it shall promptly purchase at par (and shall be deemed to have thereupon purchased) from such other Lender a participation in the Loans or unreimbursed drafts drawn under Letters of Credit of such other Lender, so that the aggregate unpaid principal amount of each Lender's Loans and unreimbursed drafts drawn under Letters of Credit and its participation in Loans and unreimbursed drafts drawn under Letters of Credit of the other Lenders shall be in the same proportion to the aggregate unpaid principal amount of all Loans then outstanding and unreimbursed drafts drawn under Letters of Credit as the principal amount of its Loans and unreimbursed drafts drawn under Letters of Credit prior to the obtaining of such payment was to the principal amount of all Loans outstanding and unreimbursed drafts drawn under Letters of Credit prior to the obtaining of such payment and (b) such other adjustments shall be made from time to time as shall be equitable to ensure that the Lenders share such payment pro-rata, provided, that if any such non-pro-rata payment is thereafter recovered or otherwise set aside such purchase of participations shall be rescinded (without interest). The Borrower expressly consents to the foregoing arrangements and agrees that any Lender holding (or deemed to be holding) a participation in a Loan or unreimbursed drafts drawn under Letters of Credit may exercise any and all rights of banker's lien, setoff (in each case, subject to the same notice requirements as pertain to clause (iv) of the remedial provisions of Section 7.01) or counterclaim with respect to any and all moneys owing by the Borrower to such Lender as fully as if such Lender was the original obligee thereon, in the amount of such participation.

## SECTION 9.    **GUARANTY**

SECTION 9.01  **Guaranty**.

(a)  Each of the Guarantors unconditionally and irrevocably guarantees the due and punctual payment by the Borrower of the Obligations. Each of the Guarantors further agrees that the Obligations may be extended or renewed, in whole or in part, without notice to or further assent from it, and it will remain bound upon this guaranty notwithstanding any extension or renewal of any of the Obligations. The Obligations of the Guarantors shall be joint and several.

(b)  Each of the Guarantors waives presentation to, demand for payment from and protest to the Borrower or any other Guarantor, and also waives notice of protest for nonpayment. The Obligations of the Guarantors hereunder shall not be affected by (i) the failure of the Administrative Agent or a Lender to assert any claim or demand or to enforce any right or remedy against the Borrower or any other Guarantor under the provisions of this Agreement or any other Loan Document or otherwise; (ii) any extension or renewal of any provision hereof or thereof, (iii) any rescission, waiver, compromise, acceleration, amendment or modification of any of the terms or provisions of any of the Loan Documents; (iv) the release, exchange, waiver or foreclosure of any security held by the Administrative Agent for the Obligations or any of them; (v) the failure of the Administrative Agent or a Lender to exercise any right or remedy against any other Guarantor; or (vi) the release or substitution of the Borrower or any other Guarantor.

(c)  Each of the Guarantors further agrees that this guaranty constitutes a guaranty of payment when due and not just of collection, and waives any right to require that any resort be had by the Administrative Agent or a Lender to any security held for payment of the

Obligations or to any balance of any deposit, account or credit on the books of the Administrative Agent or a Lender in favor of the Borrower or any other Guarantor, or to any other Person.

(d)    Each of the Guarantors hereby waives any defense that it might have based on a failure to remain informed of the financial condition of the Borrower and of any other Guarantor and any circumstances affecting the ability of the Borrower to perform under this Agreement.

(e)    Each Guarantor's guaranty shall not be affected by the genuineness, validity, regularity or enforceability of the Obligations or any other instrument evidencing any Obligations, or by the existence, validity, enforceability, perfection, or extent of any collateral therefor or by any other circumstance relating to the Obligations which might otherwise constitute a defense to this Guaranty. Neither of the Agents nor any of the Lenders makes any representation or warranty in respect to any such circumstances or shall have any duty or responsibility whatsoever to any Guarantor in respect of the management and maintenance of the Obligations.

(f)    Subject to the provisions of Section 7.01, upon the Obligations becoming due and payable (by acceleration or otherwise), the Lenders shall be entitled to immediate payment of such Obligations by the Guarantors upon written demand by the Administrative Agent. without further application to or order of the Bankruptcy Court.

SECTION 9.02    **No Impairment of Guaranty**. The obligations of the Guarantors hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense or set-off, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of the Obligations. Without limiting the generality of the foregoing, the obligations of the Guarantors hereunder shall not be discharged or impaired or otherwise affected by the failure of the Administrative Agent or a Lender to assert any claim or demand or to enforce any remedy under this Agreement or any other agreement, by any waiver or modification of any provision thereof, by any default, failure or delay, willful or otherwise, in the performance of the Obligations, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of the Guarantors or would otherwise operate as a discharge of the Guarantors as a matter of law, unless and until the Obligations are paid in full.

SECTION 9.03    **Subrogation**. Upon payment by any Guarantor of any sums to the Administrative Agent or a Lender hereunder, all rights of such Guarantor against the Borrower arising as a result thereof by way of right of subrogation or otherwise, shall in all respects be subordinate and junior in right of payment to the prior final and indefeasible payment in full of all the Obligations. If any amount shall be paid to such Guarantor for the account of the Borrower, such amount shall be held in trust for the benefit of the Administrative Agent and the Lenders and shall forthwith be paid to the Administrative Agent and the Lenders to be credited and applied to the Obligations, whether matured or unmatured.

SECTION 10.    **MISCELLANEOUS**

SECTION 10.01 **Notices**. (a) Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(i)    if to the Borrower, to it at 5725 Delphi Drive, Troy, Michigan 48098, Attention of Treasurer (Telecopy No. 248-813-2648; Telephone No. 248-813-2592; with a copy to Assistant General Counsel, Commercial and Transactions (Telecopy No. 248-816-2491; Telephone No. 248-813-2492);

(ii)    if to JPMCB (in its capacity as the Administrative Agent or as a Lender), to JPMorgan Chase Bank, N.A., 270 Park Avenue, New York, New York 10017, Attention of: Thomas F. Maher (Telecopy No. 212-270-0430; Telephone No. 212-270-0426), Richard Duker (Telecopy No. 212-270-5127; Telephone No. 212-270-3057) and Gianni Russello, (Telecopy No.:212-270-0430; Telephone No. 212-270-0547) with a copy to JPMorgan Chase Bank, N.A., Loan and Agency Services Group, 1111 Fannin, 10th Floor, Houston, Texas 77002, Attention of: Clifford Trapani, (Telecopy No. 713-750-2948 ; Telephone No. 713-750-7909);

(iii)    if to the Issuing Lender, to it at the address most recently specified by it in notice delivered by it to the Administrative Agent and the Borrower, with a copy to the Administrative Agent as provided in clause (ii) above; and

(iv)    if to any other Lender, to it at its address (or telecopy number) set forth in Annex A hereto or, if subsequently delivered, its Administrative Questionnaire.

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided, that the foregoing shall not apply to notices pursuant to Section 2 unless otherwise agreed by the Administrative Agent and the applicable Lender. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided, that approval of such procedures may be limited to particular notices or communications.

(c)    Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

SECTION 10.02 **Survival of Agreement, Representations and Warranties, etc**. All warranties, representations and covenants made by the Borrower or any Guarantor herein or in any certificate or other instrument delivered by it or on its behalf in connection with this Agreement shall be considered to have been relied upon by the Lenders and shall survive the making of the Loans herein contemplated regardless of any investigation made by any Lender or

74

on its behalf and shall continue in full force and effect (in the case of any representations and warranties, as of the date when made or deemed to be made) so long as any amount due or to become due hereunder is outstanding and unpaid and so long as the Total Commitment has not been terminated.

SECTION 10.03 **Successors and Assigns**. (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of the Issuing Lender that issues any Letter of Credit), except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Affiliate of the Issuing Lender that issues any Letter of Credit), Participants (to the extent provided in paragraph (d) of this Section) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent. the Issuing Lender and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)  (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Total Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld) of:

(A)    the Agent; and

(B)    the Issuing Lender, <u>provided</u> that no consent of the Issuing Lender shall be required for an assignment of all or any portion of a Tranche B Loan; and

(C)    the Borrower; <u>provided</u> that no consent of the Borrower shall be required for an assignment if, after giving effect thereto, the aggregate amount of the assignee's Tranche A Commitment and Tranche B Commitment and Loans would be less than ten percent (10%) of the Total Commitment in effect at such time; and <u>provided</u> <u>further</u> that no consent of the Borrower shall be required if an Event of Default has occurred and is continuing.

(ii)    Assignments shall be subject to the following additional conditions:

(A)    any assignment of any portion of the Total Tranche A Commitment and Tranche A Loans and LC Exposure shall be made to an Eligible Assignee;

(B)    except in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining

75

amount of the assigning Lender's Tranche A Commitment, Tranche B Commitment or Loans, the amount of the such commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Agent) shall not be less than $1,000,000 unless the Administrative Agent otherwise consents;

(C)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement, provided that if such assigning Lender is both a Tranche A Lender and a Tranche B Lender, this clause shall not be construed to prohibit the assignment of a proportionate part of all the assigning Lender's rights and obligations in respect of either (1) the Tranche A Commitment, Tranche A Loans and LC Exposure or (2) the Tranche B Commitment and Tranche B Loans, as the case may be;

(D)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance, together with a processing and recordation fee of $3,500;

(E)    the assignee, if it was not a Lender immediately prior to such assignment, shall deliver to the Administrative Agent an Administrative Questionnaire; and

(F)    except in the case of (x) any assignment in connection with the primary syndication of the credit facilities provided for herein and (y) any assignment to a Lender or an Affiliate of a Lender or an Approved Fund, each assignment shall be made in consultation with the Borrower.

For the purposes of this Section 10.03(b), the term "Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

(iii)    Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) of this Section, from and after the effective date specified in each Assignment and Acceptance the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Tranche A Lender or Tranche B Lender (or both), as the case may be, under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits (and, in the case of Section 2.18, subject to the obligations) of Sections 2.16, 2.17, 2.18 and 10.05). Any assignment or transfer by a Lender of rights or obligations under this Agreement that

does not comply with this Section 10.03 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (d) of this Section.

(iv)    The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal and interest amount of the Loans and LC Disbursements owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent, the Issuing Lender and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, the Issuing Lender and any Lender, at any reasonable time and from time to time upon reasonable prior notice.  This Section 10.03(b)(iv) shall be construed so that the Loans and LC Disbursements are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2), and 881(c)(2) of the Code.

(c)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register; provided, that if either the assigning Lender or the assignee shall have failed to make any payment required to be made by it pursuant to Section 2.03(d) or (e), 2.05(b), 2.19(d) or 8.04, the Administrative Agent shall have no obligation to accept such Assignment and Assumption and record the information therein in the Register unless and until such payment shall have been made in full, together with all accrued interest thereon. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(d)    (i) Any Lender may, without the consent of the Borrower, the Administrative Agent or the Issuing Lender, and without consulting the Borrower, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); provided, that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent, the Issuing Lender and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided, that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 10.09(a) that affects such Participant. Subject to paragraph (d)(ii) of this Section, the Borrower agrees that each

77

Participant shall be entitled to the benefits of Sections 2.16, 2.17 and 2.18 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 2.26 as though it were a Lender, provided such Participant agrees to be subject to Section 8.08 as though it were a Lender.

(ii)    A Participant shall not be entitled to receive any greater payment under Section 2.16 or 2.18 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent. A Participant shall not be entitled to the benefits of Section 2.18 unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with Section 2.18 as though it were a Lender.

(iii)    A Participant shall not be entitled to any funds directly from the Borrower in respect of the benefits under Section 2.16, 2.17, 2.18 or 2.26, pursuant to Section 10.03(d), until such Participant has provided information to the Borrower sufficient to satisfy the requirements of Section 10.03(b)(iv) as if such Participant had been a Lender.

(e)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; _provided_, that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(f)    Any Lender may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 10.03, disclose to the assignee or participant or proposed assignee or participant, any information relating to the Borrower or any of the Guarantors furnished to such Lender by or on behalf of the Borrower or any of the Guarantors; _provided_, that prior to any such disclosure, each such assignee or participant or proposed assignee or participant shall agree in writing to be bound by the provisions of Section 10.04.

(g)    The Borrower hereby agrees, to the extent set forth in the Commitment Letter, to actively assist and cooperate with the Agents in the Agents' best efforts to sell participations herein (as described in Section 10.03(d)) and assign to one or more Lenders or assignees meeting the requirements set forth in 10.03(b) a portion of its interests, rights and obligations under this Agreement (as set forth in Section 10.03(b)).

SECTION 10.04 **Confidentiality**. Each Lender agrees to keep any information delivered or made available by the Borrower or any of its Subsidiaries to it confidential from anyone other than persons employed or retained by such Lender who are or are expected to become engaged in evaluating, approving, structuring or administering the Loans; _provided_, that nothing herein shall prevent any Lender from disclosing such information (i) to any of its Affiliates or to any other Lender, provided such Affiliate agrees to keep such information confidential to the same extent

78

required by the Lenders hereunder, (ii) upon the order of any court or administrative agency, (iii) upon the request or demand of any regulatory agency or authority, (iv) which has been publicly disclosed other than as a result of a disclosure by any Agent or any Lender which is not permitted by this Agreement, (v) in connection with any litigation to which the any Agent, any Lender, or their respective Affiliates may be a party solely to the extent reasonably required, (vi) to the extent reasonably required in connection with the exercise of any remedy hereunder, (vii) to such Lender's legal counsel and independent auditors, and (viii) to any actual or proposed participant or assignee of all or part of its rights hereunder subject to the proviso in Section 10.03(f). Each Lender shall use reasonable efforts to notify the Borrower of any required disclosure under clauses (ii) and (v) of this Section.

SECTION 10.05 **Expenses; Indemnity; Damage Waiver**. (a)(i) The Borrower shall pay or reimburse: (A) all reasonable fees and reasonable out-of-pocket expenses of the Agents, J.P. Morgan Securities Inc. ("JPMorgan") and Citigroup Global Markets, Inc. ("CGMI"; together, CGMI and JPMorgan, the "Arrangers") (including the reasonable fees, disbursements and other charges of Davis Polk & Wardwell ("DPW"), special counsel to the Administrative Agent and the Arrangers, and any local counsel retained by DPW or the Administrative Agent or the Arrangers) associated with the syndication of the credit facilities provided for herein, and the preparation, execution, delivery and administration of the Loan Documents and any amendments, modifications or waivers of the provisions hereof (whether or not the transactions contemplated hereby or thereby shall be consummated); and (B) all fees and expenses of the Agents and the Arrangers (including the fees, disbursements and other charges of DPW, special counsel to the Administrative Agent and the Arrangers, and any local counsel retained by DPW or the Administrative Agent or the Arrangers) and the Lenders in connection with the enforcement of the Loan Documents.  In connection with the foregoing, it is understood that, subject to customary exceptions for conflicts of interest, special counsel and local counsel, the Agents and the Arrangers shall be represented by a single lead counsel.

(ii)    The Borrower shall pay or reimburse (A) all reasonable fees and reasonable expenses of the Agents and the Arrangers and their internal and third-party auditors, appraisers and consultants incurred in connection with the Agents' (1) initial and ongoing Borrowing Base examinations, (2) analyses of the systems and processes of the Borrower and analyses and valuations of the Borrowing Base assets, (3) periodic field examinations and appraisals and (4) monthly and other monitoring of assets; and (B) all reasonable fees and reasonable out-of-pocket expenses of the Issuing Lenders in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand or any payment thereunder.

All payments or reimbursements pursuant to the foregoing clauses (a)(i) and (ii) shall be payable promptly upon written demand together with back-up documentation supporting such reimbursement request.

(b)  The Borrower shall indemnify the Agents, the Arrangers, the Issuing Lenders and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the reasonable fees, charges and disbursements of any counsel for any Indemnitee (it being understood that claims for

79

expense reimbursement hereunder shall be accompanied by back-up documentation supporting such request), incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement or any agreement or instrument contemplated hereby, the performance by the parties hereto of their respective obligations hereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) any Loan or Letter of Credit or the use of the proceeds therefrom (including any refusal by the Issuing Lender to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by the Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided, that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the bad faith, gross negligence or willful misconduct of such Indemnitee (or such Indemnitee's officers, directors, employees or affiliates).

(c)    To the extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions, any Loan or Letter of Credit or the use of the proceeds thereof

SECTION 10.06 **CHOICE OF LAW**. THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL IN ALL RESPECTS BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK AND (TO THE EXTENT APPLICABLE) THE BANKRUPTCY CODE.

SECTION 10.07 **No Waiver**. No failure on the part of the Administrative Agent or any of the Lenders to exercise, and no delay in exercising, any right, power or remedy hereunder or any of the other Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

SECTION 10.08 **Extension of Maturity**. Should any payment of principal of or interest or any other amount due hereunder become due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day and, in the case of principal, interest shall be payable thereon at the rate herein specified during such extension.

SECTION 10.09 **Amendments, etc**.

(a)    No modification, amendment or waiver of any provision of this Agreement or the Security and Pledge Agreement, and no consent to any departure by the Borrower or any Guarantor therefrom, shall in any event be effective unless the same shall be in writing and

80

signed by the Required Lenders, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given; provided, however, that no such modification or amendment shall without the written consent of (i) the Super-majority Lenders (A) increase the advance rates set forth in the definition of the term "Borrowing Base", add new asset categories to the Borrowing Base or otherwise cause the Borrowing Base or availability under the credit facilities provided for herein to be increased, (B) release any of the Liens granted to the Administrative Agent hereunder, under the Orders or under any other Loan Document, other than Liens on assets that are sold or otherwise disposed of in transactions permitted pursuant to the Loan Documents, or (C) release any of the Guarantors, other than as expressly permitted pursuant to the Loan Documents, (ii) the Lender affected thereby (A) increase the Commitment of a Lender (it being understood that a waiver of an Event of Default shall not constitute an increase in the Commitment of a Lender), or (B) reduce the principal amount of any Loan or the rate of interest payable thereon, or extend any date for the scheduled payment of interest hereunder or reduce any Fees payable hereunder or extend the final maturity of the Borrower's obligations hereunder or (iii) all of the Lenders (A) amend or modify any provision of this Agreement which provides for the unanimous consent or approval of the Lenders, (B) amend this Section 10.09 or the definition of Required Lenders, (C) amend or modify the Superpriority Claim status of the Lenders contemplated by Section 2.25, (D) release all or substantially all of the Liens granted to the Administrative Agent hereunder, under the Orders or under any other Loan Document, or release all or substantially all of the Guarantors or (E) amend any provision that sets forth the priority of payment as between the Tranche A Lenders and the Tranche B Lenders. No such amendment or modification may adversely affect the rights and obligations of the Administrative Agent or any Issuing Lender hereunder or either JPMCB or CUSA in the capacity referred to in Section 6.03(viii) without its prior written consent. No notice to or demand on the Borrower or any Guarantor shall entitle the Borrower or any Guarantor to any other or further notice or demand in the same, similar or other circumstances. Each assignee under Section 10.03(b) shall be bound by any amendment, modification, waiver, or consent authorized as provided herein, and any consent by a Lender shall bind any Person subsequently acquiring an interest on the Loans held by such Lender. No amendment to this Agreement shall be effective against the Borrower or any Guarantor unless signed by the Borrower or such Guarantor, as the case may be.

Notwithstanding anything to the contrary contained in Section 10.09(a), in the event that the Borrower requests that this Agreement be modified or amended in a manner which would require the unanimous consent of all of the Lenders and such modification or amendment is agreed to by the Super-majority Lenders, then with the consent of the Borrower and the Super-majority Lenders, the Borrower and the Super-majority Lenders shall be permitted to amend the Agreement without the consent of the Lender or Lenders which did not agree to the modification or amendment requested by the Borrower (such Lender or Lenders, collectively the "Minority Lenders") to provide for (i) the termination of the Commitment of each of the Minority Lenders, (ii) the addition to this Agreement of one or more other financial institutions (each of which shall meet the requirements of Section 10.03(b)), or an increase in the Commitment of one or more of the Super-majority Lenders, so that the Total Commitment after giving effect to such amendment shall be in the same amount as the Total Commitment immediately before giving effect to such amendment, (iii) if any Loans are outstanding at the time of such amendment, the making of such additional Loans by such new financial institutions or Super-majority Lender or Lenders, as the case may be, as may be necessary to repay in full the outstanding Loans of the Minority Lenders

81

immediately before giving effect to such amendment and (iv) such other modifications to this Agreement as may be appropriate. As used herein, the term "Super-majority Lenders" shall mean, at any time, Lenders having Tranche A Commitments at such time (or, if the Total Tranche A Commitment has been terminated, Lenders holding Tranche A Loans and LC Exposure at such time) and Lenders holding Tranche B Loans at such time (or, if the Tranche B Loan is not outstanding, Lenders holding Tranche B Commitments at such time) representing in excess of 66-2/3% of the sum of the Total Tranche A Commitment at such time (or, if the Total Tranche A Commitment has been terminated, the Tranche A Total Commitment Usage at such time) plus the Total Tranche B Commitment at such time.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, Collateral shall be released automatically from the Lien of the Security and Pledge Agreement, and Guarantors shall be released automatically from their guarantee obligations hereunder, in each case to the extent necessary to effect the consummation of any transaction permitted by the Loan Documents (including any transaction that has been approved by the requisite Lenders in accordance with Section 10.09). Each Lender hereby irrevocably authorizes the Administrative Agent to take, and the Administrative Agent hereby agrees to take, at the Borrower's expense, any action reasonably requested by the Borrower to evidence any such release of Collateral or guarantee obligations, so long as the Borrower certifies to the Administrative Agent that the transaction necessitating such release has been consummated in compliance with the terms of this Agreement (and the Administrative Agent may rely conclusively on such certificate, without further inquiry).

SECTION 10.10 **Severability**. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof, and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 10.11 **Headings**. Section headings used herein are for convenience only and are not to affect the construction of or be taken into consideration in interpreting this Agreement.

SECTION 10.12 **Survival**. All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Loans and issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent. the Issuing Lender or any Lender may have had notice or knowledge of any Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid or any Letter of Credit is outstanding and so long as the Commitments have not expired or terminated. The provisions of Sections 2.16, 2.17, 2.18 and 10.05 and Section 8 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Letters of Credit and the Commitments or the termination of this Agreement or any provision hereof

(NY) 27011/094/DIPDOCS/dip.ca.doc                                                                                   10/08/05 4:49 AM

SECTION 10.13 **Execution in Counterparts; Integration; Effectiveness**. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 10.14 **Prior Agreements**. This Agreement represents the entire agreement of the parties with regard to the subject matter hereof and the terms of any letters and other documentation entered into between the Borrower or a Guarantor and any Lender or the Administrative Agent prior to the execution of this Agreement which relate to Loans to be made hereunder shall be replaced by the terms of this Agreement (except as otherwise expressly provided herein with respect to the Commitment Letter and the fee letter referred to therein, including the Borrower's agreements to actively assist the Administrative Agent in syndication efforts and with respect to interest rates, Commitment Fees and the fees referenced in Section 2.21).

SECTION 10.15 **Further Assurances**. Whenever and so often as reasonably requested by the Administrative Agent. the Borrower and the Guarantors will promptly execute and deliver or cause to be executed and delivered all such other and further instruments, documents or assurances, and promptly do or cause to be done all such other and further things as may be necessary and reasonably required in order to further and more fully vest in the Administrative Agent all rights, interests, powers, benefits, privileges and advantages conferred or intended to be conferred by this Agreement and the other Loan Documents.

SECTION 10.16 **USA Patriot Act**. Each Lender that is subject to the requirements of the Patriot Act hereby notifies the Borrower that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Patriot Act.

SECTION 10.17 **WAIVER OF JURY TRIAL**. EACH OF THE BORROWER, THE GUARANTORS, THE AGENT AND EACH LENDER HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO ANY OF THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY.

(NY) 27011/094/DIPDOCS/dip.ca.doc                                                    10/08/05 4:49 AM

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed as of the day and the year first written.

**BORROWER:**

**DELPHI CORPORATION**

By: _____

       Name:  John D. Sheehan
       Title:   Acting Chief Financial Officer, Chief
                Accounting Officer & Controller

**GUARANTORS:**

**ASEC MANUFACTURING GENERAL
    PARTNERSHIP,**

**a Delaware general partnership**


By:    _____

          Name: John M. Fuerst
          Title:   Chairman

**ASEC MANUFACTURING GENERAL
    PARTNERSHIP,**

**a Delaware general partnership**

By:    _____

         Name:  Timothy Knutson
         Title:   Assistant Treasurer

**ASEC SALES GENERAL PARTNERSHIP,**

**a Delaware general partnership**

By: _____

      Name:  John M. Fuerst

      Title:   Chairman

**ASEC SALES GENERAL PARTNERSHIP,**

**a Delaware general partnership**


By: _____
        Name:  Timothy Knutson
        Title:   Assistant Treasurer

**ASPIRE, INC.,**

**a Michigan corporation**

By: _____

      Name:  Allen D. Flowers
      Title:   Treasurer

**ASPIRE, INC.,**

**a Michigan corporation**

By: _____

      Name:  Timothy Knutson
      Title:   Assistant Treasurer

**DELCO ELECTRONIC OVERSEAS**
     **CORPORATION,**

**a Delaware corporation**


By:  _____
        Name: James P. Whitson
        Title:   Chief Tax Officer

**DELPHI AUTOMOTIVE SYSTEMS (HOLDING),
    INC.,**

**a Delaware corporation**

By:  _____

      Name: John D. Sheehan

      Title:   President

**DELPHI AUTOMOTIVE SYSTEMS GLOBAL
(HOLDING), INC.,**

**a Delaware corporation**

By: _____
      Name: John D. Sheehan
      Title:　President

**DELPHI AUTOMOTIVE SYSTEMS HUMAN
RESOURCES LLC,**

**a Delaware limited liability company**

By:    _____

        Name:  John P. Arle
        Title:   Vice President & Treasurer

**DELPHI AUTOMOTIVE SYSTEMS HUMAN**
**RESOURCES LLC,**

**a Delaware limited liability company**


By: _____
        Name: James P. Whitson
        Title:   Chief Tax Officer

**DELPHI AUTOMOTIVE SYSTEMS
INTERNATIONAL, INC.,**

**a Delaware corporation**


By: _____

        Name: Mark C. Lorenz
        Title:  Chairman and Executive Vice President

**DELPHI AUTOMOTIVE SYSTEMS**
**INTERNATIONAL, INC.,**

**a Delaware corporation**

By:    _____

      Name:  John P. Arle
      Title:   Treasurer

.

**DELPHI AUTOMOTIVE SYSTEMS KOREA, INC.,**

**a Delaware corporation**

By: _____
       Name:  John P.Arle
       Title:   Chief Executive Officer & President