SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| Debtors. | : | (Jointly Administered) |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. §§ 361 AND 363(b)
AND FED R. BANKR. P. 4001(c) AUTHORIZING DEBTORS TO
CONTINUE HONORING PREPETITION INSURANCE
PREMIUM FINANCE AGREEMENT AND CONTINUE GRANT OF
SECURITY INTEREST TO INSURANCE PREMIUM FINANCE COMPANY

("INSURANCE FINANCING MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"),[1] debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order under 11 U.S.C. §§ 361 and 363(b) and Fed. R. Bankr. P. 4001(c) authorizing the Debtors to continue honoring their obligations pursuant to a prepetition insurance premium finance agreement for the purpose of financing the purchase of several forms of insurance coverage, and continue the grant of a security interest to the insurance premium finance company in all sums payable to Delphi under the financed insurance policies. In support of this Motion, the Debtors submit the Affidavit Of Robert S. Miller, Jr. In Support Of Chapter 11 Petitions And First Day Orders, sworn to October 8, 2005. In further support of this Motion, the Debtors respectfully represent as follows:

Background

A.     The Chapter 11 Filings

1.     On October 8, 2005 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession

---

[1]     In addition to Delphi, the following entities are debtors in these related cases: ASEC Manufacturing General Partnership, ASEC Sales General Partnership, Aspire, Inc., Delco Electronics Overseas Corporation, Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems Global (Holding), Inc., Delphi Automotive Systems Human Resources LLC, Delphi Automotive Systems International, Inc., Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems LLC, Delphi Automotive Systems Overseas Corporation, Delphi Automotive Systems Risk Management Corp., Delphi Automotive Systems Services LLC, Delphi Automotive Systems Tennessee, Inc., Delphi Automotive Systems Thailand, Inc., Delphi China LLC, Delphi Connection Systems, Delphi Diesel Systems Corp., Delphi Electronics (Holding) LLC, Delphi Foreign Sales Corporation, Delphi Integrated Service Solutions, Inc., Delphi International Holdings Corp., Delphi International Services, Inc., Delphi Liquidation Holding Company, Delphi LLC, Delphi Mechatronic Systems, Inc., Delphi Medical Systems Colorado Corporation, Delphi Medical Systems Corporation, Delphi Medical Systems Texas Corporation, Delphi NY Holding Corporation, Delphi Services Holding Corporation, Delphi Technologies, Inc., DREAL, Inc., Environmental Catalysts, LLC, Exhaust Systems Corporation, Packard Hughes Interconnect Company, Specialty Electronics, Inc., and Specialty Electronics International Ltd.

2

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have moved this Court for an order authorizing joint administration of these chapter 11 cases.

2. No trustee, examiner, or creditors' committee has been appointed in the Debtors' cases.

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4. The statutory predicates for the relief requested herein are sections 361, 363(b), and 364(c) of the Bankruptcy Code and Rule 4001(c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.   Current Business Operations Of The Debtors

5. With more than 180,000 employees worldwide, global 2004 revenues of approximately $28.6 billion and global assets as of August 31, 2005 of approximately $17.1 billion,[2] Delphi ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations without supervision from the Bankruptcy Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy Code.

6. Over the past century, the operations which are now owned by Delphi have become a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines.  Today, the Company is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and

---

[2]   The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

3

modules, and other electronic technology. The Company's technologies and products are present in more than 75 million vehicles on the road worldwide. The Company supplies products to nearly every major global automotive original equipment manufacturer with 2004 sales to its former parent, General Motors Corporation, equaling approximately $15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

       7.     As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world. In the U.S., the Debtors employ approximately 50,600 people. Those employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in Delphi's worldwide headquarters and customer center located in Troy, Michigan. Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and local unions. Outside the United States, the Company's foreign entities employ more than 134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

       8.     Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM. Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of

4

customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

9.  Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle. When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base. The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base. The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C.  Events Leading To Chapter 11 Filing

10.  In the first two years following Delphi's separation from GM, the Company generated more than $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales. Reflective of a downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005. The Company experienced net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[3]

---

[3]  Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

5

11.     The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12.     In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues and forward looking revenue requirements.  Having concluded that pre-filing discussions with its Unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

13.     Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses.  This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned in the Company's transformation plan.  The Debtors believe that a substantial segment of

Delphi's U.S. business operations must be divested, consolidated, or wound-down through the chapter 11 process.

    14. Upon the conclusion of this process, the Debtors expect to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

<u>Relief Requested</u>

    15. By this Motion, the Debtors seek entry of an order under sections 361 and 363(b) of the Bankruptcy Code and Bankruptcy Rule 4001(c) authorizing the Debtors to continue honoring their obligations pursuant to a prepetition insurance premium finance agreement for the purpose of financing the purchase of several forms of insurance coverage, and continue the grant of a security interest to the insurance premium finance company in all sums payable to Delphi under the financed insurance policies.

<u>Basis For Relief</u>

A. <u>Prepetition Insurance Premium Finance And Security Agreement</u>

    16. Since February 5, 2005, Delphi has financed certain of its fiduciary, directors and officers, and employment practices liability insurance (collectively, the "Insurance Policies") pursuant to a Commercial Insurance Premium Finance and Security Agreement (the "Finance Agreement") between Delphi and Cananwill, Inc. ("Cananwill"), dated February 21, 2005. The Insurance Policies are essential to the preservation of the Debtors' businesses,

7

properties, and assets. In some cases the coverage is required by regulations, laws, and/or contracts that govern the Debtors' business obligations.[4]

17. In total, Delphi is financing approximately 20 Insurance Policies under the Finance Agreement, as set forth on Exhibit A hereto. Delphi has financed the Insurance Policies to take advantage of favorable interest rates under the Finance Agreement and to increase liquidity. Pursuant to the Finance Agreement, Cananwill agreed to pay in advance to Delphi's insurance carriers the sum of $6,099,339.65, which constitutes the full annual insurance premium for each of the Insurance Policies. In exchange, the Finance Agreement required Delphi to pay Cananwill a cash down payment of $564,992.11 and to make 11 monthly payments, each in the amount of $564,992.11, starting on March 1, 2005. The Finance Agreement further provided for Cananwill to receive a finance charge in the amount of $115,573.56. In addition, the Finance Agreement includes a security agreement which grants to Cananwill a security interest in all sums payable to Delphi under the Insurance Policies, including any gross return premiums that would be payable in the event of cancellation of the Insurance Policies (the "Unearned Premiums") and loss payments that reduce the Unearned Premiums. Thus, as discussed below, Cananwill likely is entitled to adequate protection in the form of payment under the Finance Agreement. As of the Petition Date, Delphi owed Cananwill a total of approximately $1.7 million under the Finance Agreement.

18. In the Debtors' business judgment, the terms of the Finance Agreement represent the best possible terms for financing the premiums of the Insurance Policies. Under the Finance Agreement, the Debtors are being charged an annual interest rate of just 3.77%. The

---

[4] For example, insurance coverage is required under the operating guidelines established by the Office of the United States Trustee. See 3 United States Trustee Manual § 3-3.2.3 (Oct. 1998) ("A debtor must obtain appropriate insurance coverage, and documentation regarding the existence of the coverage must be provided to the [Office of the] United States Trustee as early in the case as possible.").

8

Debtors' estates will benefit by maintaining this low-cost financing from Cananwill. Moreover, any interruption of payments might adversely affect the Debtors' ability to obtain financing for future policies on favorable terms.

19. Although the Insurance Policies cover certain of the Debtors' foreign, non-Debtor affiliates, the Debtors do not allocate any of the premiums to such affiliates. The Debtors base their allocation of their insurance costs on exposure or past losses. The vast majority of the exposure resides in the U.S. Debtors, and there is no history of a non-U.S. claim being made under the Insurance Policies in an amount that approaches the amount of the Debtors' deductible thereunder.

## Applicable Authority

B.      Section 361

20. Security interests created by premium finance agreements, such as the Finance Agreement, generally are recognized as secured claims in bankruptcy to the extent of the amount of unearned premiums financed pursuant to such agreements. Section 361 of the Bankruptcy Code specifically contemplates providing adequate protection to the extent of the diminution in value of a secured creditor's collateral, and such security interests under the Finance Agreement warrant adequate protection in the form of periodic payments pursuant to the Finance Agreement's terms. See, e.g., In re Waverly Textile Processing, Inc., 214 B.R. 476 (Bankr. E.D. Va. 1997); In re Megamarket of Lexington, Inc., 207 B.R. 527 (Bankr. E.D. Ky. 1997); TIFCO, Inc. v. U.S. Repeating Arms Co., 67 B.R. 990 (Bankr. D. Conn. 1986); Drabkin v. A.I. Credit Corp., 9 B.R. 159 (Bankr. D.C. 1981); Feinstein v AICO Credit Corp. (In re Krimbrell Trucking Co., Inc.), 3 B.R. 4 (Bankr. W.D. Wash. 1979).

21.  The Debtors' continued use of the Insurance Policies decreases the value of the Unearned Premiums that serve as the collateral for Cananwill.  This loss in value is replaced through the Debtors' payment of the monthly finance charges and related payments under the Finance Agreement.  Accordingly, Cananwill is entitled to continued payment of these amounts as adequate protection under section 361 of the Bankruptcy Code as a condition to the Debtors' continued ability to finance the Insurance Policies.

C.    Section 363

22.  In addition, the use of estate assets to pay monthly installments under the Finance Agreement constitutes a use of estate property that should be authorized under section 363(b) of the Bankruptcy Code so long as a sound business purpose exists for doing so.  See, e.g., Committee of Equity Sec. Holders v. Lionel Corp., 722 F.2d 1063, 1070 (2d Cir. 1983); see also Fulton State Bank v. Schipper, 933 F.2d 513, 515 (7th Cir. 1991); In re Global Crossing Ltd., 295 B.R. 726, 742 (Bankr. S.D.N.Y. 2003); In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989); In re Gulf States Steel, Inc., 285 B.R. 497, 514 (Bankr. N.D. Ala. 2002).  The Debtors have determined, in the exercise of their business judgment, that financing the premiums on the Insurance Policies pursuant to the Finance Agreement enables the Debtors to maintain critical insurance coverage.  Doing so is in the best interests of the Debtors' estates and their creditors and these actions should be approved.

Notice

23.  Notice of this Motion has been provided by facsimile, electronic transmission, overnight delivery, or hand delivery to (a) the Office of the United States Trustee, (b) the Debtors' 50 largest unsecured creditors, (c) counsel for the agent under the Debtors' prepetition credit facility, (d) counsel for the agent under the Debtors' proposed postpetition

credit facility, and (e) Cananwill.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

Memorandum Of Law

24.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order (a) authorizing the Debtors to continue honoring their obligations pursuant to the Finance Agreement and to continue the grant of a security interest to Cananwill, in connection with the Finance Agreement, pursuant to sections 361 and 363(b) of the Bankruptcy Code, and (b) granting the Debtors such other and further relief as is just.

Dated:  New York, New York
         October 13, 2005

                            SKADDEN, ARPS, SLATE, MEAGHER
                               & FLOM LLP

By: s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr. (pro hac vice motion pending)
    John K. Lyons
    Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

    - and -

By: s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession