**<u>EXHIBIT 1</u>**



**Delphi Corporation**

**Key Employee Compensation Programs**

October 8, 2005

WWW.WATSONWYATT.COM

Watson Wyatt
*Worldwide*



# Table of Contents

|                                  | **Page** |
|----------------------------------|----------|
| Executive Summary                | 2        |
| Introduction and Background      | 3        |
| Business Case                    | 4        |
| Revised Annual Incentive Plan    | 9        |
| Emergence Bonus Plan             | 11       |
| CEO Compensation                 | 27       |
| Pre-Petition Severance Program   | 28       |

1





# Executive Summary

| Revised Incentive Plan | Emergence Cash Plan | Emergence Equity Plan | Severance Plan | CEO Compensation Program |
|---|---|---|---|---|
| | | | | |
| EBITDAR measure, to be set by Compensation Committeee by 12/31/05 | Cash payments equaling 30 to 250% of salary | Stock option and restricted stock awards for 595 U.S. and foreign executives | Top 21 executives have severance benefit of 18 months' salary + bonus | No participation in annual incentive plan or either emergence plan |
| Six month performance cycles, except that first cycle will run from October 1, 2005- June 30, 2006. | Payments made in a lump sum at the effective date | Awards vest 1/4 at the effective date and 1/4 on each subsequent annual anniversary | Next level of executives have benefit of 12 months' salary + bonus | No employment or severance contract |
| Current annual incentive opportunities remain in place, prorated to reflect each shorter cycle | Plan covers approximately 486 U.S. executives | Total amount of awards and reserve is 10% of the restructured company | Other executives receive a benefit of 12 months' salary | Eligible for a discretionary bonus at the end of his term as CEO |
| | $88 million cost is less than that incurred historically by Delphi for its long-term incentive plan and consistent with the cost incurred by other Ch. 11 companies for their retention plans | | Estimated severance cost is $30.5 million, assuming 30% involuntary termination. | |

2





# Introduction and Background

Delphi Corporation ("Delphi" or the "Company") has been engaged in discussions with its major unions and GM concerning consensual modifications to various agreements that Delphi previously entered into with such unions and GM.  Delphi had publicly acknowledged that if these discussions do not lead to the implementation of a restructuring plan that addressed its existing legacy liabilities and the resulting high cost of its U.S. operations, the Company will consider other strategic alternatives, including a  Chapter 11 reorganization. On October 8, 2005, Delphi filed its bankruptcy petition under Chapter 11.

Delphi has asked Watson Wyatt to assist in the design and implementation of incentive compensation programs that align the interests of both program participants and Company stakeholders and to benchmark such programs against competitive practice. All such programs are generally referred to as Delphi's "Key Employee Compensation Programs" or KECP.





# Business Case

- Delphi's current situation raises substantial concerns for all employees, including:
    - Downsizing and layoffs on the horizon
    - Possibility of sale/merger
    - No equity-based long term incentive opportunity for executives
    - Potential reduction in retirement benefits

4





# **Business Case**

- A company that is financially distressed or undergoing a significant restructuring has few means to positively affect an employee's "employment proposition"

- Employment proposition is defined as the mix of tangibles (compensation and benefits) and intangibles (employer's prospects, career path, work content, work relationships, work/life balance) offered by the employer which forms the basis for a particular employee's assessment of whether he or she wishes to remain employed by a particular company

- Despite the adverse affect on the overall employment proposition, Delphi must strive to retain its executives (Band A and above) who possess unique or critical knowledge of Delphi's businesses. Such institutional knowledge, which could not be readily replaced on the open market, is necessary not only to maintain Delphi's ongoing operations, but also to assure successful completion of the restructuring.

5





# **Business Case**

- In the case of these executives more so than other employees, their actual pay for 2005 will be substantially less than market. Actual pay for 2004 was also substantially less than market.

- This pay shortfall makes them more susceptible to switching jobs.

- It is also more costly and time consuming (and possibly more difficult) to find replacements for these executives if they leave, as evidenced by the following:

  - Signing bonuses:  Since July 1, 2005, Delphi has found it necessary to pay six figure signing bonuses to top executives and signing bonuses averaging nearly $20,000 for lower level executives.

  - Salaries to new hires are often higher than those of the prior incumbents.

  - Headhunter costs, some of which have been well into six figures, in retained searches

  - Executive turnover has increased almost 75% in the last 12 months.  In the critical finance function, turnover has more than doubled. Also, 60% of the executive quits have been identified as being future high potential individuals or successors to the positions held by their immediate supervisors.

6



# Business Case

After lengthy discussions involving the Compensation Committee, management, and Company advisors, the following decisions were made regarding compensation programs going forward.

– The existing retention program (adopted in February 2005) has been terminated.

– Awards made under the current Performance Achievement  Plan (PAP) have been cancelled except the award for the 2003-2005 performance cycle . (The first day motion provides that the earned award for the 2003-2005 cycle will be paid in early 2006.) Thus, awards made under the 2004-2006 and 2005-2007 cycles will be cancelled.

– The annual incentive plan (which will not pay any bonuses for the January 1- December 31, 2005 plan year) has been modified as follows:

- EBITDAR will become the performance measure
- Each performance period will be six months rather than 12 months

7





# Business Case

– An emergence bonus program has been adopted, with cash bonuses for all executives payable upon the "effective date" (defined below).

– The emergence bonus plan also includes a set aside of 10% of the equity of restructured Delphi for equity-based compensation awards to the executive team upon the company's emergence from bankruptcy.

– A pre-petition severance program has been adopted and is to be continued to provide for competitive severance benefits for the executive team.

Each of the KECPs is discussed on the following pages.

8





# Revised Annual Incentive Plan

- The current annual incentive plan adopted for calendar year 2005 is designed to pay bonuses based on the achievement of a net earnings target. Going forward, net earnings is not an appropriate performance measure, in part, because of the inability to forecast restructuring costs.

- The Company and its advisors agree that EBITDAR* is a more relevant measure. Also, to minimize forecasting concerns, particularly at the beginning of the Ch. 11 process, the Company has decided to measure EBITDAR over a six month period, rather than annually.

---

9    * Earnings before interest, taxes, depreciation, amortization, and restructuring costs.





# Revised Annual Incentive Plan

- The first performance period will cover October 1, 2005 to June 30, 2006.* The second performance period will therefore be July 1, 2006 to December 31, 2006. The six month performance periods will continue until Delphi exits Ch 11.

- Each participant's bonus opportunity for a performance period will equal one-half of his or her current annual plan opportunity (except that for the first performance period, the opportunity will be 75% of the annual plan opportunity).

- The EBITDAR goal for the first performance period will be set by the Compensation Committee before December 31, 2005.

- The six month cost of the Annual Incentive Plan is estimated at $21.5 million.

---

*  The first period will be nine months, including the stub  period October 1 through December 31, 2005, which will ensure that the incentive period properly corresponds to the Ch. 11 period.



# Emergence Bonus Plan- Introduction

As part of the overall effort to motivate its executive team (Band A and above) through the restructuring process, management believes that an emergence bonus plan would support the company's business and people strategies.

The emergence plan would have two parts:

- A cash component, payable to participants upon either the effective date of the confirmation of the plan of reorganization or a sale of all or substantially all of the company's assets in one or more transactions (either event herein referred to as the "effective date")

- An equity component of 10% of the equity in the reorganized company

11



# Emergence Bonus Plan - Effective Date Cash Component

The key features of the cash component are:

- The participants would be all U.S. executives (except the CEO), approximately 486 employees.

- Payment would be made in a lump sum as soon as possible after the effective date.

- The chart below summarizes the various participants' opportunities.

| Name | # | Average Salary | Cash Opportunity |
|------|---|---------|------------------|
| O'Neal | | $1,150,000 | $2,750,000 |
| Wohleen | | $890,000 | $2,175,000 |
| Dellinger | | $750,000 | $2,000,000 |
| Weber | | $700,000 | $1,975,000 |
| | | | |
| 18 Officers | 18 | $495,761 | $550,000-$1,100,000 |
| All Other Executives | 464 | $120,000-$450,000 | $50,000- $475,000 |
| | | | |
| Total | 486 | | **$87,925,000** |
| | | | |

12



# Emergence Bonus Plan - Effective Date Cash Component

- Similar to other incentive programs, a participant whose employment is terminated voluntarily will not be eligible for any payment under the program. If the participant's employment is terminated involuntarily (and not for cause), he or she would receive a pro rata payment.* Payment would be deferred until the effective date.

- In the case of a participant whose business unit is sold prior to the effective date, then that participant would be entitled to a pro rata payment.* Payment also would be deferred until the effective date.

- Any participant whose employment terminated because of death or disability would be entitled to a pro rata payment. Payment would be deferred until the effective date.

_____

* The pro rated payment would be equal to the former participant's opportunity times a fraction, where the numerator is the number of days from the later of the filing date or such participant's hire date until the date employment terminated and the denominator is the number of days from the later of the filing date or such participant's hire date to the effective date.

13



## Emergence Bonus Plan- Effective Date Cash Component

- Typical market practice varies widely, but most companies have historically covered only a small number of executives (including the CEO).

- Importantly, participation and award size can be expected to increase in light of pending changes to the law regarding retention plans, as well as a debtors' continuing need to provide competitive compensation opportunities. Friedman's, which filed Ch.11 on 1/14/05 in the US Bankruptcy Court in Savannah, Georgia, provides an instructive example.

  (i) Friedman's "emergence cash plan" covers approximately 83 employees with opportunities ranging from 5 to 333% of salary.

  (ii) No retention plan in Friedman's

- Other relevant benchmarks

  (i) Both Hayes-Lemmerz and Federal Mogul (Detroit area OEM auto industry suppliers) had special incentive plans during their Ch.11 cases.

  (ii) Both plans were essentially based on value created during the Ch.11 case. Hayes covered 13 employees with uncapped opportunities and FM covered approximately 90 employees with annual opportunities ranging from 30-150% of salary.

14



# Emergence Bonus Plan- Effective Date Cash Component

We believe that the proposed cost of the cash component of the plan can be analyzed in two ways. One way would be to compare the cost to that incurred historically by Delphi under its long-term incentive compensation programs.

A second way is to compare the cost to the costs incurred by other Chapter 11 companies through their retention plans. The theory would be that such costs appropriately represent the amount that a company needs to expend to motivate and retain its employees and otherwise preserve the estate of the debtor.

15



# Emergence Bonus Plan- Effective Date Cash Component

The proposed cash plan also compares favorably with the cost incurred in prior years by Delphi to motivate and retain its executive group through the Company's long-term incentive awards. Because the cash plan will in all likelihood cover a period greater than one year, its cost should be adjusted or annualized for comparison purposes.

| | Prior Years' LTI Costs (in $ millions) | | |
| --- | --- | --- | --- |
| **Proposed Cash Cost** | **2005** | **2004** | **2003** |
| $87.9-- aggregate cost<br>$65.9-- 15 months' annualized<br>$58.6-- 18 months' annualized | $49.6* | $91.3 | $75.2 |

_____

\*  Executive LTI awards in 2005 were reduced in consideration of the Company's adoption of a $21 million
      retention program for its executives

16



# Emergence Bonus Plan - Effective Date Cash Component

The following chart illustrates how the $87.9 million aggregate and $58.6 million annualized cost of Delphi's cash emergence bonus plan compares to the costs incurred by other large companies which have put in place retention programs.

| | Revenues | Annual Cost as a Percentage of Revenues | Assets | Annual Cost as a Percentage of Assets |
|---|---|---|---|---|
| **Peer Group 25th Percentile** | $6,384,806,500 | 0.062% | $4,002,959,500 | 0.063% |
| **Peer Group 50th Percentile** | $8,414,095,000 | 0.088% | $6,638,000,000 | 0.094% |
| **Peer Group 75th Percentile** | $21,092,500,000 | 0.209% | $21,273,000,000 | 0.570% |
| **Range** | $4.9B- $185 B | 0.01% - 0.48% | $894 M  -$61.7B | 0.019% - 1.054% |
| **Delphi** | $28,622,000,000 | .31%--aggregate .20%--annualized | $16,593,000,000 | .53%--aggregate .35%--annualized |
| ***Percentile Rank*** | *79%* | *81%--aggregate 75%--annualized* | *67%* | *71%--aggregate 59%--annualized* |

**Notes:**
Peer group comprised of the following 15 companies with revenues of $5B and above:
Enron, Worldcom, Kmart, Pacific Gas and Electric, UAL, US Airways, Conseco, Ameriserve, Winn-Dixie, Mirant, Montgomery Ward, MicroAge, Washington Group, Owens Corning, Bethlehem Steel



# Emergence Bonus Plan- Effective Date Cash Component

The following chart illustrates how the $87.9 million aggregate and $58.6 million annualized cost of Delphi's emergence bonus plan compares to the costs incurred by other companies of varying sizes which have put in place retention programs.

| | Revenues | Annual Cost as a Percentage of Revenues | Assets | Annual Cost as a Percentage of Assets |
|---|---|---|---|---|
| **Peer Group 25th Percentile** | $346,875,000 | 0.201% | $512,750,000 | 0.191% |
| **Peer Group 50th Percentile** | $1,100,000,000 | 0.425% | $1,500,582,000 | 0.433% |
| **Peer Group 75th Percentile** | $3,071,000,000 | 0.882% | $3,076,725,000 | 0.754% |
| **Range** | $120M- $185B | 0.01% - 915% | $28M  -$61.7B | 0.02% - 7.11% |
| **Delphi** | $28,622,000,000 | .31%--aggregate .20%--annualized | $16,593,000,000 | .53%--aggregate .35%--annualized |
| *Percentile Rank* | 96% | *38%--aggregate 26%--annualized* | 93% | *58%--aggregate 38%--annualized* |
| | | | | |
| **Notes:** | | | | |
| Peer group comprised of 120 retention plans from 117 companies | | | | |

18



# Emergence Bonus Plan- Effective Date Cash Component

Conclusion

- The proposed cash plan for participants addresses both the concerns of the employees and the needs of Delphi.  Ultimately, the proposed program helps to balance each participant's "employment proposition" thereby preserving Delphi's enterprise value during the restructuring period.

- The proposed cash plan is consistent with the scope, purposes, and cost of retention plans implemented by other Ch. 11 companies, as well as prior long term incentive arrangements implemented by the Company. Based on the analysis above, the cost of the program is within the range of competitive practice.

19





# Emergence Bonus Plan- Equity Component

In the absence of its ability to provide equity-based compensation to its executives and key employees during the Chapter 11 process, Delphi intends to include future equity awards as part of its emergence bonus plan. Such awards are critical to an organization for the following reasons:

i. Maintain the Company's compensation promise to its current employees;

ii. Enable recruitment of a Best In Class Management Team;

iii. Motivate and reward high performance; and

iv. Retain executives during a period of volatility, such as during Chapter 11.

20





# Emergence Bonus Plan- Equity Component

As part of its plan of reorganization, Delphi will propose that 10% of the equity in the reorganized entity be set aside for its executives (both U.S. and foreign, approximately 600 individuals).  Accordingly, the company intends to seek creditor agreement or court approval during the early stages of the Ch 11 process for such a set aside.

The company believes that 10% is reasonable as well as necessary to ensure the retention of its management team through and following the duration of the Ch 11 process. Note that the 10% is set aside for management only if the company is successfully reorganized and will not get paid or awarded in the case of a sale of all or substantially all of the company's assets.

21



# Emergence Bonus Plan- Equity Component

The Company further proposes that each executive's award is valued one-third in restricted stock (or units) and two-thirds in stock options. Each award will vest as follows:  25% will be vested at the effective date, with the balance vesting in equal increments on each of the one, two, and three year anniversaries of the effective date. Each option's strike price will be set based on the mid-point of the valuation range in any disclosure statement approved by the Court.

The chart on the next page assumes that at the time of the effective date Delphi's equity value will be $4 billion. To the extent any executive included is not an employee at the effective date, then his or her allocation would be added to the reserve.

22



# Emergence Bonus Plan- Equity Component

| Name | # | Average Salary | Stock Option Face Value | Restricted Stock Face Value | Gain per indiv if stock price Doubles | Triples |
|------|---|----------------|-------------------------|-----------------------------|--------------------------------------|---------|
| CEO TBD | | -- | $10,000,000 | $5,000,000 | $20,000,000 | $35,000,000 |
| O'Neal | | $1,150,000 | $5,000,000 | $2,500,000 | $10,000,000 | $17,500,000 |
| Wohleen | | $890,000 | $4,000,000 | $2,000,000 | $8,000,000 | $14,000,000 |
| Dellinger | | $750,000 | $3,000,000 | $1,500,000 | $6,000,000 | $10,500,000 |
| Weber | | $700,000 | $3,000,000 | $1,500,000 | $6,000,000 | $10,500,000 |
| | | | | | | |
| 18 Officers | 18 | $495,761 | $1,000,000-$1,666,667 | $500,000-$833,333 | $2,000,000-$3,333,333 | $3,500,000-$5,833,333 |
| | | | | | | |
| All Other Executives | 572 | $120,000-$450,000 | $200,000 -$666,667 | $100,000-$333,333 | $400,000-$1,333,333 | $700,000-$2,333,333 |
| | 595 | | | | | |
| | | | **Estimated Award Value** | | $300,000,000 | |
| | | | **Estimated Reserve Value** | | $100,000,000 | |
| | | | **Total** | | $400,000,000 | |

**Note:  CEO awards are illustrative only. It is expected that any new CEO would separately negotiate his or her equity award package.**

23





# Emergence Bonus Plan- Equity Component

**Competitive Practice – General Industry**

One benchmark for the amount of equity that the Company proposes to set aside for compensatory purposes is potential equity dilution at peer companies. Summarized in the table below are equity dilution levels for companies in the S&P 500 Index and the Top 200 companies (based on revenues). Typically, companies intend to use the shares represented by the equity dilution over a three to five year period. Competitive practice indicates that these companies have median equity dilution levels ranging from 13% to 16%.

|  | Potential Equity Dilution | |
|---|---|---|
|  | **Median** | **Average** |
| S&P 500 Index(1) | 13.11% | -- |
| Top 200 Companies(3) |  | 16.36% |

(1)  2005 Equilar, Inc
(2)  Equity Stake- The Top 200 Companies (Pearl Meyer and Partners)

24



# Emergence Bonus Plan- Equity Component

**Competitive Practice – Emerged Companies**

We also examined Watson Wyatt's database of approximately sixty companies which have emerged from Chapter 11 to determine competitive practice regarding the percentage of shares reserved by companies for the granting of long-term incentives after emergence from Chapter 11.  The database indicates that companies generally set aside between 10% and 13% of shares outstanding within one year following emergence.

|  | Shares Reserved as a Percent of Common Stock Outstanding |
|---|---|
| 25th Percentile | 10.0% |
| 50th Percentile | 11.1% |
| 75th Percentile | 12.7% |
| 90th Percentile | 17.9% |

25



## Emergence Bonus Plan- Equity Component



- The Company's proposed 10% equity set aside for its executive team is well within the range of competitive practice. Importantly, the knowledge among the executive team regarding their future equity stake should greatly enhance the Company's retention and recruitment efforts, as well as motivate the executives to create value for all stakeholders during the Chapter 11 process.

26





# CEO Compensation Program

The current CEO, Steve Miller, will not participate in the (i) six month incentive program, (ii) the emergence cash bonus plan, or (iii) the emergence equity program. Moreover, he is not covered by an employment or severance agreement. He is an at will employee, serving at the discretion of the Board of Directors.

The Compensation Committee, subject to approval of the full Board, reserves the right, however, to compensate Mr. Miller as it deems appropriate at the end of his period of service as CEO.

27





# Pre-Petition Severance Program- Background

Because of the uncertainties of the restructuring process, employees often fear that they will lose their jobs. This, coupled with the perceived risk of working for a company undergoing a substantial financial restructuring, may cause employees to seek other employment despite continuation of existing incentive plans or even implementation of inducements such as retention bonuses.

To reduce the likelihood of losing the company's key employees, a company that is attempting to restructure outside of Chapter 11 or has filed for protection under the bankruptcy laws will typically take the necessary actions to assure employees that if their jobs are eliminated, they will at least be compensated for deferring their job search.

28



## Pre-Petition Severance Program- Officers

- Twenty-one officers have an employment agreement that specifies a severance benefit of 18 months' salary + target bonus.

- Such an arrangement is important from the company's perspective because the employment agreements include non-compete prohibitions.

- Appropriate severance protection allows the officer group to focus on the restructuring job at hand without concern that they are simply at-will employees subject to below market separation treatment at the company's convenience.

29



## Pre-Petition Severance Program- Other Executives

Those U.S. executives without employment agreements are entitled to severance benefits only upon termination of employment if (i) the executive's employment is terminated involuntarily for any reason other than for "cause," or (ii) the executive's employment is terminated after a change in control for "good reason" as defined in the Delphi Corporation Severance Plan. The payment, which will be in a lump-sum, will consist of the following:

- ❑ All unused vacation time accrued as of the participant's termination of employment

- ❑ All accrued but unpaid compensation earned as of the participant's termination, and

30



# Pre-Petition Severance Program- Other Executives

❑ The following severance benefit:

| Employee Level | Approximate Number of U.S. Employees | Severance Benefit |
|---|---|---|
| Senior Management | 89 | 12 months' base+ target bonus |
| All Other Executives | 373 | 12 months' base |
| Non-Executive Salaried | 13,000 | Length of Service (max at 25 years= 12 months' salary) |

Last, payment of any severance benefit is contingent upon the participant signing a claim release, non-solicitation, non-compete, non-disclosure, and non-disparagement agreement with the Company.

31



# Pre-Petition Severance Program- Estimated Costs

The following table compares the estimated cost of severance to the Company under two different alternatives. The first analysis assumes all executives have their employment terminated involuntarily. The second analysis assumes approximately 30% of current US executives have their employment terminated involuntarily. (All costs are in $ millions.)

| | **All Terminated** | **30% Terminated** |
|---|---|---|
| **Employee Level** | | |
| Officers | $31.0 | $7.4 |
| Sr. Management | $35.4 | $6.5 |
| All Other Executives | $79.0 | $16.6 |
| | | |
| **Total** | **$145.5** | **$30.5** |

32



# Pre-Petition Severance Program- Competitive Data

Below is a summary of the severance benefits Chapter 11 companies have implemented for the senior management or top executives and other key employees.

## Other Companies' Programs – Chapter 11 Companies

| Senior Management and Executives | Other Key Employees |
|---|---|

**Senior Management and Executives**

- For executives with contracts, they receive the balance due under the contract; typically 1-2X salary and target bonus.

- For executives without contracts, the range of benefits generally equals 6-36 months' base salary, with median benefit equal to 18 months' base salary.

**Other Key Employees**

- 1 week per year of service

- Range of benefits generally equals 1-12 months' base salary

- Median benefit equal to 8 months' base salary.



# Pre-Petition Severance Program- Competitive Data

The following table summarizes the median (i.e., 50th percentile) minimum and maximum number of weeks provided under non-Chapter 11 severance programs for industrial manufacturing companies, companies that employ more than 25,000 people, and Fortune 1000 companies.[1]  The information is broken out by employee level.  The footnotes at the bottom of the page detail the representative employees at each level.

| | Industrial Manufacturing | | More than 25,000 Employees | | Fortune 1000 Companies | |
| | Severance (weeks) | | Severance (weeks) | | Severance (weeks) | |
| Level | Min | Max | Min | Max | Min | Max |
|---|---|---|---|---|---|---|
| Sr.Executives[2] | 4 | 52 | 4 | 52 | 6 | 52 |
| Executives[3] | 4 | 26 | 4 | 39 | 4 | 52 |

34

(1) Source: Lee Hecht Harrison – Severance Benefits and Separation Benefits (2005)
(2) Represents EVP and SVP positions.
(3) Represents VP, Department Head, and Director positions.





# Pre-Petition Severance Program- Conclusion

The benefits under the Company's Severance Program for its officers and executives are within the range of competitive practice. Additionally, in exchange for providing the twenty-one officers with formal severance benefits in the event of termination, the Company has agreements in place that prevent the participant from (i) competing against the Company, (ii) disclosing Delphi's manufacturing methods, (iii) soliciting Delphi employees to work at a new organization, and (iv) disparaging the organization and its employees.

35

