**Hearing Date: October 27, 2005, 10:00 a.m.**
**Objection Deadline: October 24, 2005, 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. §§ 105, 363, 364, AND 365(a)
AUTHORIZING DEBTORS TO ASSUME OR OTHERWISE TAKE ACTIONS NECESSARY
TO CURE AND CONTINUE USE OF PURCHASE CARD AGREEMENT AND TRAVEL
CARD AGREEMENT WITH HSBC BANK USA, NATIONAL ASSOCIATION USED FOR
LOW-COST, BUSINESS-RELATED GOODS, SERVICES, AND TRAVEL

("HSBC CREDIT CARD AGREEMENTS MOTION")

    Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order under 11 U.S.C. §§ 105, 363, 364, and 365(a) authorizing the Debtors to assume or otherwise take actions necessary to cure and continue postpetition use of that certain Purchase Card Agreement (the "Purchase Card Agreement"), dated February 18, 2005, between Delphi and HSBC Bank USA, National Association ("HSBC"), and that certain Corporate Card Agreement (the "Travel Card Agreement" and, together with the Purchase Card Agreement, the "Agreements"), dated February 18, 2005, between Delphi and HSBC. In support of this Motion, the Debtors respectfully represent as follows:

Background

A. <u>The Chapter 11 Filings</u>

  1. On October 8, 2005 (the "Petition Date"), 39 of 42 Debtors, and on October 14, 2005, the remaining Debtors, filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Also on the Petition Date, this Court entered an order directing the joint administration of the Debtors' chapter 11 cases (Docket No. 28).

  2. No trustee or examiner has been appointed in the Debtors' cases. The Office of the United States Trustee today appointed a seven-member creditors' committee.

3.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.    The statutory predicates for the relief requested herein are sections 105, 363, 364, and 365(a) of the Bankruptcy Code.

B.    Current Business Operations Of The Debtors

5.    With more than 180,000 employees worldwide, global 2004 revenues of approximately $28.6 billion, and global assets as of August 31, 2005 of approximately $17.1 billion,[1] Delphi ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations without supervision from the Bankruptcy Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy Code.

6.    Over the past century, the operations which are now owned by Delphi have become a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines.  Today, the Company (as defined below) is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company's technologies and products are present in more than 75 million vehicles on the road worldwide.  The Company supplies products to nearly every major global automotive original equipment manufacturer with 2004 sales to its former parent, General Motors Corporation, equaling approximately $15.4

---

[1]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

3

billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

    7. As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world. In the U.S., the Debtors employ approximately 50,600 people. Those employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in Delphi's worldwide headquarters and customer center located in Troy, Michigan. Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and local unions. Outside the United States, the Company's foreign entities employ more than 134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

    8. Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM. Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates (collectively, the "Company") in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

4

9.      Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle.  When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base.  The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base.  The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C.      Events Leading To The Chapter 11 Filing

10.     In the first two years following Delphi's separation from GM, the Company generated more than $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales.  Reflective of a downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005.  The Company experienced net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[2]

11.     The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S.

---

[2] Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

5

legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward looking revenue requirements.  Having concluded that pre-filing discussions with its Unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

13.    Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses.  This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned in the Company's transformation plan.  The Debtors believe that a substantial segment of Delphi's U.S. business operations must be divested, consolidated, or wound-down through the chapter 11 process.

14. Upon the conclusion of this process, the Debtors expect to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

## Relief Requested

15. By this Motion, the Debtors seek authority to assume or otherwise take actions necessary to cure and continue postpetition use of the Agreements, including, among other things, the payments of any prepetition amounts due and owing and the continuance of payments of post-petition amounts due and owing in the ordinary course of business in accordance with the terms of the Agreements. The Debtors also seek authority to waive any potential preference claims in connection with approximately $6.3 million in prepetition payments made to HSBC relating to the Agreements. The Purchase Card Agreement is important to the Debtors' ongoing business operations in that it enables more than 1,080 of the Debtors' employees to conduct their day-to-day purchases of business-related goods and services in a convenient, cost-effective, and administratively efficient manner. Similarly, the Travel Card Agreement is necessary to the Debtors' business operations in that it facilitates business travel and accommodations for over 12,500 of the Debtors' employees.

## Basis For Relief

A.    The Purchase Card and Travel Card Agreements

16. Pursuant to the Purchase Card Agreement, the Debtors' duly authorized directors, officers, and employees use corporate credit cards issued by HSBC (the "Purchase Cards") to purchase non-personal, business-related goods and services in the ordinary course of

7

the Debtors' businesses. The Purchase Cards are used to transact various low-cost purchases for routine items and services such as, <u>inter alia</u>, office supplies, external business services, sales and marketing aids, repairs and facility maintenance, cafeteria services, news subscriptions, and supplies purchased over the Internet.

17. The Purchase Card program focuses primarily on the purchase of goods and services that cost $2,000 or less, and is designed to eliminate the purchase order and payment processing typically associated with frequently-occurring, high-volume, low-cost purchases such as those described above. The Purchase Card program has been highly effective in streamlining the mechanics of the purchasing process for such purchases – it has reduced paperwork and administrative costs, simplified ordering and payment processing, and shortened the time for the procurement of goods and services.

18. Pursuant to the Travel Card Agreement, the Debtors' duly authorized directors, officers, and employees use corporate credit cards issued by HSBC (the "Travel Cards") to facilitate the purchase of business travel and accommodations, such as airfare or train tickets, car rental, hotels, and other related items. As with the Purchase Card, the Travel Card significantly reduces the time, expense, and administrative burden of billing and accounting for the many travel-related expenses incurred by the Debtors' employees on a daily basis.

19. More than 1,080 of the Debtors' employees regularly use the Purchase Card, and over 12,500 use the Travel Card, in the ordinary course of the Debtors' businesses and the Debtors have sole direct liability on amounts due thereunder. Only approximately $860,000 in prepetition amounts remain outstanding under the Purchase Card program, and the Debtors have received authorization, pursuant to the Order Under 11 U.S.C. §§ 105(a), 363, 507, 1107, and 1108 (I) Authorizing Debtors to Pay Prepetition Wages and Salaries to Employees and

8

Independent Contractors; (II) Authorizing Debtors to Pay Prepetition Benefits and Continue Maintenance of Human Capital Benefit Programs in the Ordinary Course; and (III) Directing Banks to Honor Prepetition Checks for Payment of Prepetition Human Capital Obligations, previously entered by this Court, to cure all prepetition amounts owed under the Travel Card Agreement.

20.    On or about the Petition Date, the Debtors contacted HSBC and requested that HSBC continue to make the Purchase Card and the Travel Card available on a postpetition basis. In return for HSBC's continuing to make these critical credit card programs available to the Debtors, the Debtors assured HSBC that they would use best efforts to assume and cure the Agreements with HSBC's consent and that both parties would continue to perform under the Agreements as if they had been assumed. The Debtors believe in their business judgment that this arrangement is necessary because of the critical disruption that would result if the credit card programs were terminated; these programs are not likely to be replaced without significant cost and delay to the Debtors. HSBC has honored the Debtors' request based on the above commitment.

21.    Approval of the Debtors' assumption, or cure and continued postpetition use, of the Purchase Card Agreement and Travel Card Agreement is important to the Debtors' prospects for a successful reorganization, and therefore is in the best interests of the Debtors' estates, creditors, and other parties-in-interest. The Purchase Card and Travel Card programs are important to the smooth operation of the Debtors' businesses, as they facilitate the flow of numerous goods and services and the travel of the Debtors' employees required by the Debtors' day-to-day businesses. Furthermore, many of the Debtors' suppliers only accept credit cards, and many of the Debtors' employees would resist purchasing work-related supplies and services or

making travel arrangements using their personal credit cards. Even if certain employees were willing to make purchases or travel arrangements using their personal credit cards, the Debtors would incur additional cost and have to devote substantial resources to the reimbursement of such employee payments. Other suppliers would invoice the Debtors directly for their purchases, even for small procurements, which would lead to undue and costly delays relating to paperwork processing and possibly necessitate expansion of the Debtors' purchasing staff.

22. Moreover, the Debtors would incur substantial transition costs and delay if they were to enter into a new Purchase Card Agreement and Travel Card Agreement with a replacement provider, and the terms of such agreements likely would be less favorable than those under the Agreements. Thus, in the Debtors' business judgment, continued use of the Agreements is the most efficient and economical method to provide for the timely procurement of business-related supplies, services, and travel. The benefits available to the Debtors under the Agreements – reduced transaction times and costs – will enhance the Debtors' ability to reorganize and thereby benefit the Debtors' estates, creditors, and other parties-in-interest.

23. The Debtors believe that there will be little exposure with regard to administrative claims if the Agreements subsequently are terminated, as the Debtors seek to pay their postpetition obligations under the Agreements as such obligations become due.

Applicable Authority

24. The Debtors believe that the Agreements are assumable with HSBC's consent under section 365(a) of the Bankruptcy Code. However, if this Court believes that the Agreements appear to be financial accommodations for the benefit of the Debtors, the Debtors instead request that this Court authorize the cure and continuation of the Agreements under sections 105, 363, and 364 of the Bankruptcy Code.

25.     Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease." 11 U.S.C. § 365(a). The assumption or rejection of an unexpired lease by a debtor is subject to review under the business judgment standard. See Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures), 4 F.3d 1095, 1099 (2d Cir. 1993); see also In re Crystalin, L.L.C., 293 B.R. 455, 463 (B.A.P. 8th Cir. 2003) (citing In re Food Barn Stores, Inc., 107 F.3d 558, 566 (B.A.P. 8th Cir. 1997) (assumption of prepetition agreement approved under the business judgment standard)). This standard is satisfied when a debtor determines that assumption will benefit the estate. Id. See also In re Farmland Indus., Inc., 294 B.R. 903, 913 (W.D. Mo. 2003) (finding that the debtor must show merely that "the action to be taken will benefit the estate").

26.     If the debtor's business judgment has been exercised reasonably, a court should approve the assumption of an executory contact. See, e.g., NLRB v. Bildisco and Bildisco, 465 U.S. 513, 523 (1984); Group of Inst'l Investors v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co., 318 U.S. 523 (1943); Cleveland Hotel Protective Comm. v. Nat'l City Bank of Cleveland (In re Van Sweringen Corp.), 155 F.2d 1009, 1013 (6th Cir.), cert. denied, 329 U.S. 766 (1946); In re Child World, Inc., 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992); In re Ionosphere Clubs, Inc., 100 B.R. 670, 673 (Bankr. S.D.N.Y 1989).[3] Once the debtor has satisfied the business judgment standard by showing that assumption will benefit the estate, the court "should not interfere 'except upon a finding of bad faith or gross abuse of [the debtor's] business discretion.'" Id. at 465 (citing Lubrizol Enters., Inc. v. Richmond Metal Finishers Inc., 756 F.2d 1043, 1047 (4th Cir. 1985)).

---

[3]     See also, In re United Airlines, 368 F.3d 720 (7th Cir. 2004) (finding that the debtor may assume a credit card processing agreement); In re Thomas B. Hamilton Co., 969 F.2d 1013 (11th Cir. 1992).

11

27.     The business judgment rule shields a debtor's management from judicial second-guessing.  In re Farmland Indus., Inc., 294 B.R. at 913 (quoting In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986)) ("'[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.'").  Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'"  In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).

28.     Indeed, when applying the "business judgment" rule, courts show great deference to the debtor's decision-making.  See In re Crystalin, L.L.C., 293 B.R. at 464 (finding that the court need not "place itself in the position of the trustee or debtor-in-possession") (omitting citations).  See also Summit Land Co. v. Allen (In re Summit Land Co.), 13 B.R. 310, 315 (Bankr. D. Utah 1981) ("Court approval under Section 365(a), if required, except in extraordinary situations, should be granted as a matter of course.")

29.     Thus, this Court should approve the Debtors' assumption of the Agreements if the Debtors demonstrate a sound business justification for doing so.  See, e.g., Chicago, Milwaukee, St. Paul & Pacific R.R. Co., 318 U.S. at 550 (applying business judgment rule in context of assumption of a prepetition agreement); In re Van Sweringen Corp., 155 F.2d at 1013 (same); In re Cutters, Inc., 104 B.R. 886, 889 (M.D. Tenn. 1989) (same).

30.     In determining to assume the Agreements, the Debtors clearly have satisfied the requisite "business judgment" standard.  Assumption of the Agreements will allow the Debtors to continue to take advantage of the continued benefits from the Agreements – reduced

12

transaction times and costs for the procurement of various business-related goods, services, and travel – which are important to the continued operation and success of the Debtors' businesses and reorganization efforts.

31.     In the alternative, if this Court finds that the Agreements may not be assumed because they appear to be financial accommodations for the benefit of the Debtors, this Court should authorize the cure and continuation of the Agreements under sections 105 and 363 of the Bankruptcy Code. Section 105 of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The purpose of section 105(a) is "to assure the bankruptcy court's power to take whatever action is appropriate or necessary in aid of the exercise of its jurisdiction." 2 Collier Bankruptcy § 105.01, at 105-3 (15th rev. ed. 1996). Section 363(b) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The cure and continuation of the Agreements should therefore be authorized under section 363(b), so long as a sound business purpose exists for doing so. See In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983); In re Delaware Hudson Ry. Co., 124 B.R. 169, 179 (Bankr. D. Del. 1991). Accordingly, even assuming that section 363(b), rather than section 365(a), is the proper basis for the continuation of the Agreements, the "business judgment" standard for approval remains the same.

32.     The Debtors submit that the granting of an order continuing the Agreements is within the scope of this Court's authority under section 105(a), as the relief requested herein is necessary to the continued operations of the Debtors' estates, see, e.g., In re Columbia Gas Sys., Inc., 136 B.R. 930, 939-40 (Bankr. D. Del. 1992) (discussing standard for payment of prepetition

13

obligations out of estate funds as one where the result is essential to the continued operation of the debtor) and is also an appropriate exercise of the Debtors' business judgment under section 363 of the Bankruptcy Code.

33.  Section 364(a) of the Bankruptcy Code authorizes the Debtors to obtain unsecured credit in the ordinary course of business. Section 364(a) provides, in part:

> If the trustee is authorized to operate the business of the debtor under section . . . 1108 . . . of this title, unless the court orders otherwise, the trustee may obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under section 503(b)(1) of this title as an administrative expense.

11 U.S.C. § 364(a). The Debtors submit that continued use of the Purchase Card and the Travel Card is consistent with the Debtors' prepetition practices, and that authorization of the continuation of these programs is therefore appropriate under section 364(a) of the Bankruptcy Code.

34.  In the event, however, that this Court determines that continuation of the Purchase Card and Travel Card programs falls outside of the Debtors' ordinary course of business, section 364(b) of the Bankruptcy Code provides that this Court may authorize the Debtors to obtain unsecured credit after notice and hearing. Section 364(b) provides, in part:

> The court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt . . . allowable under section 503(b)(1) of this title as an administrative expense.

11 U.S.C. § 364(b). The Debtors further submit that, in light of the importance of the Purchase Card and Travel Card programs to the Debtors' businesses and successful reorganization, approval of the relief sought herein is an appropriate use of this Courts authority under section 364(b).

35.  To the extent that this Court rules that the Agreements are assumed under section 365 of the Bankruptcy Code, or should be cured as necessary and continued under

sections 105(a) and 363(b) of the Bankruptcy Code, the Debtors seek in the final order authority to waive any potential preference claims for prepetition payments made to HSBC relating to the Agreements.[4] Prepetition payments of approximately $6.3 million were made to HSBC immediately prior to the Petition Date.

36.     For the foregoing reasons, the Debtors respectfully submit that it is in the best interests of the Debtors, their estates, their creditors, and other parties-in-interest to assume or otherwise cure and continue the Agreements, that such decision reflects the Debtors' exercise of their sound business judgment, and that, accordingly, this Court should approve the relief requested herein.

### Notice

37.     Notice of this Motion has been provided in accordance with the Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing (I) Omnibus Hearing Dates, (II) Certain Notice, Case Management, And Administrative Procedures, And (III) Scheduling An Initial Case Conference In Accordance With Local Bankr. R. 1007-2(e) entered by this Court on October 14, 2005 (Docket No. 245). In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

### Memorandum Of Law

38.     Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and

---

[4] The Debtors received authorization to waive potential preference claims for prepetition payments made to certain suppliers pursuant to the Order Under 11 U.S.C. §§ 105(a), 363, 364, 1107, and 1108 and Fed. R. Bankr. P. 6004 and 9019 Authorizing Continuation of Vendor Rescue Program and Payment of Prepetition Claims of Financially-Distressed Sole Source Suppliers and Vendors Without Contracts, previously entered by this Court.

filing of a separate memorandum of law under Rule 9013-1(b) for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order (a) authorizing the Debtors to assume the Agreements or otherwise take the necessary actions set forth in this Motion to cure and continue use of the Agreements, and (b) granting the Debtors such other and further relief as is just.

Dated:  New York, New York
        October 17, 2005

                                SKADDEN, ARPS, SLATE, MEAGHER
                                  & FLOM LLP

                                By: s/ John Wm. Butler, Jr.
                                    John Wm. Butler, Jr. (JB 4711)
                                    John K. Lyons (JL 4951)
                                    Ron E. Meisler (RM 3026)
                                333 West Wacker Drive, Suite 2100
                                Chicago, Illinois  60606
                                (312) 407-0700

                                    - and -

                                By: s/ Kayalyn A. Marafioti
                                    Kayalyn A. Marafioti (KM 9632)
                                    Thomas J. Matz (TM 5986)
                                Four Times Square
                                New York, New York 10036
                                (212) 735-3000

                                Attorneys for Delphi Corporation, et al.,
                                    Debtors and Debtors-in-Possession