**Hearing Date and Time: October 27, 2005 at 10:00 a.m.**
**Objection Deadline: October 24, 2005 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
     In re                                    :    Chapter 11
                                              :
DELPHI CORPORATION et al.,                    :    Case No. 05-44481 (RDD)
                                              :
                        Debtors.              :    (Jointly Administered)
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR AN ORDER UNDER 11 U.S.C. § 363
APPROVING PROCEDURES TO SELL CERTAIN DE MINIMIS ASSETS
FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES AND
TO PAY MARKET RATE BROKER COMMISSIONS IN CONNECTION
WITH SUCH SALES WITHOUT FURTHER COURT APPROVAL

("DE MINIMIS ASSET SALE MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order under 11 U.S.C. § 363 approving procedures to sell certain <u>de minimis</u> assets free and clear of liens, claims, and encumbrances and to pay market rate broker commissions in connection with such sales without further Court approval. In support of this Motion, the Debtors respectfully represent as follows:

## BACKGROUND

A.   <u>The Chapter 11 Filings</u>

1.   On October 8, 2005 (the "Petition Date"), 39 of 42 Debtors, and on October 14, 2005, the remaining Debtors, filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Also on the Petition Date, this Court entered an order directing the joint administration of the Debtors' chapter 11 cases. (Docket No. 28)

2.   No trustee, examiner, or creditors' committee has been appointed in the Debtors' cases.

3.   This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4.      The statutory predicate for the relief requested herein is section 363 of the Bankruptcy Code.

B.      Current Business Operations Of The Debtors

5.      With more than 180,000 employees worldwide, global 2004 revenues of approximately $28.6 billion, and global assets as of August 31, 2005 of approximately $17.1 billion,[1] Delphi ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations without supervision from the Bankruptcy Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy Code.

6.      Over the past century, the operations which are now owned by Delphi have become a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines. Today, the Company (as described below) is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company's technologies and products are present in more than 75 million vehicles on the road worldwide. The Company supplies products to nearly every major global automotive original equipment manufacturer with 2004 sales to its former parent, General Motors Corporation, equaling approximately $15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

---

[1]     The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

3

7. As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world. In the U.S., the Debtors employ approximately 50,600 people. Those employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in Delphi's worldwide headquarters and customer center located in Troy, Michigan. Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and local unions. Outside the United States, the Company's foreign entities employ more than 134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

8. Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM. Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates (collectively, the "Company") in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

9. Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results,

4

because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle.  When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base.  The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base.  The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C.  <u>Events Leading To The Chapter 11 Filing</u>

10. In the first two years following Delphi's separation from GM, the Company generated more than $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales.  Reflective of a downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005.  The Company experienced net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[2]

---

[2] Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

5

11. The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12. In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward looking revenue requirements. Having concluded that pre-filing discussions with its Unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

13. Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses. This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned in the Company's transformation plan. The Debtors

believe that a substantial segment of Delphi's U.S. business operations must be divested, consolidated, or wound-down through the chapter 11 process.

14.  Upon the conclusion of this process, the Debtors expect to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

Relief Requested

15.  By this Motion, the Debtors request authority to implement procedures by which the Debtors may sell miscellaneous surplus, non-core assets from time to time and pay applicable broker commissions in the ordinary course of business in connection with such sales without need for further Court approval, but subject to the notice procedures set forth below.

Basis For Relief

16.  Prior to the Petition Date, and in furtherance of their reorganization efforts, the Debtors strove to streamline their operations by eliminating unnecessary operating expenses by exiting certain non-core business lines and dispensing of surplus assets. For example, as part of this strategy the Debtors (a) sold their interest in CEI Co., Ltd., a manufacturer of flat-pack and servo motor actuators, thermo control units, and backplate assemblies, (b) sold their interest in AMBRAKE Corporation, a manufacturer of base brake assemblies and components, and its subsidiaries, (c) over the course of the last few years, periodically sold various miscellaneous assets in connection with the

7

disposition of their generator business line, (d) sold various parcels of real property, including real property located in Anaheim, California and Olathe, Kansas, and (e) have actively marketed certain other assets and their interests in certain other subsidiaries and affiliates involved in other businesses identified by the Debtors as unnecessary to their overall business strategy.  The Debtors also continue to assess and evaluate numerous executory contracts and opportunities for further asset dispositions in an effort to optimize cash flow, maximize the value of the estates, and minimize excessive costs.

17. In connection with these and other actions related to the Debtors' restructuring efforts, the Debtors will need to dispose of excess real and personal property in and outside the ordinary course of their businesses.  The quantum of these assets is <u>de minimis</u> when considered in comparison to the size and scope of the Debtors' overall business enterprise.  Moreover, the Debtors anticipate that such dispositions will involve numerous small transactions or a related series of transactions in which the consideration that the Debtors receive will be equal to or less than $10 million for each transaction (the "<u>de minimis</u> Assets").  The Debtors believe that the use of brokers will significantly aid in the timely disposition and realization of the maximum possible value for many such assets.  Accordingly, the Debtors seek approval to pay applicable market rate broker commissions (the "Broker Commissions") for brokers utilized in the ordinary course of the Debtors' businesses in connection with certain dispositions of <u>de minimis</u> Assets.

18. The Debtors expect that a proposed buyer's offer with respect to such assets will necessarily be conditioned on the utilization of a streamlined process that can be completed in an expedited time frame and at a cost commensurate with the remuneration to be received by the Debtors and their estates.  Accordingly, the Debtors

8

have concluded that it would be more efficient, and the proceeds realized with respect to such transactions will be maximized, if the Debtors are authorized to implement procedures which allow them to sell de minimis Assets, or groups of such assets, with a purchase price of $10 million or less, and pay any applicable Broker Commissions in connection with such dispositions, on an expedited basis without incurring the delay and costs of preparing, filing, serving, and having hearings on motions for approval of each such sale.

19.     The de minimis Assets are subject to the lien(s) of the Debtors' debtor-in-possession lenders (the "DIP Lenders") pursuant to the terms of the debtor-in-possession financing agreements (collectively, the "DIP Agreement") approved by this Court in an interim order entered as of October 12, 2005, and subsequently set for a further hearing on October 27, 2005 (the "Interim DIP Order"). In addition, other creditors may have a lien against certain of the de minimis Assets (to the extent such liens are valid and properly perfected, the "Other Liens"). Any and all proceeds from the sales of de minimis Assets would be utilized consistent with the provisions of the DIP Agreement, the Interim DIP Order, and any final order with respect to the DIP Agreement, entered in these cases and, with respect to Other Liens, to the extent permitted by the Bankruptcy Code.

Sale And Notice Procedures

20.     The Debtors propose that for the sale of de minimis Assets outside of the ordinary course of business, which otherwise would require Court approval pursuant to section 363 of the Bankruptcy Code, the following procedures (the "Notice Procedures") be approved and implemented in lieu of a separate notice and a hearing for each such sale:

(a) The Debtors would give notice of each proposed sale (the "Sale Notice") to (i) the Office of the United States Trustee (the "U.S. Trustee"), (ii) counsel to any official committees appointed in these cases (the "Committee(s)"), (iii) counsel for the agent to the DIP Lenders, (iv) any other known holder of a lien, claim, or encumbrance against the specific property to be sold, and (v) any known interested party in the subject de minimis Assets (collectively, the "Notice Parties"). The Sale Notice would be served by facsimile, if possible, so as to be received by 5:00 p.m. (Eastern Time) on the date of service and by overnight mail. The Sale Notice would specify (i) the assets to be sold, (ii) the identity of the proposed purchaser (including a statement that the proposed purchaser is not an "insider" as defined in section 101(31) of the Bankruptcy Code ), (iii) the proposed sale price, (iv) a copy of any documentation executed in contemplation of the transaction, and (v) an affidavit of the broker, if any, pursuant to rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), that identifies the broker, the amount of the Broker Commission, and contains the disclosures required by Bankruptcy Rule 2014.

(b) The Notice Parties would have five business days following initial receipt of the Sale Notice to object to or request additional time to evaluate the proposed transaction and the Broker Commission. If counsel to the Debtors receives no written objection or written request for additional time prior to the expiration of such five business day period, the Debtors would be authorized to consummate the proposed sale transaction and to take such actions as are necessary to close the transaction and collect the proceeds of such sale, including, without limitation, payment of the Broker Commission.

(c) If a Notice Party objects to the proposed transaction and/or the Broker Commission within five business days after the Sale Notice is received, the Debtors and such objecting Notice Party would use good faith efforts to resolve the objection consensually. If the Debtors and the objecting Notice Party are unable to achieve a consensual resolution, the Debtors would not take any further steps to consummate the proposed transaction without first obtaining Bankruptcy Court approval of the proposed transaction, including retention of any broker, upon notice and a hearing.

(d) To the extent that a competing bid is received for the purchase of the de minimis Assets, which in the Debtor's sole discretion, in the exercise of their business judgment and in consultation with their processionals, materially exceeds the value of the purchase price contained in the Sale Notice, then the Debtors shall re-notice the proposed sale to the subsequent bidder pursuant to the Notice Procedures, provided that the proposed purchase price is still less than or equal to $10 million, and to the extent the proposed purchase price is greater than $10 million, then the Debtors would file a motion with this Court in accordance with the Case Management Order (Docket No. 164) to obtain approval for the proposed transaction.

    (e) Any valid and enforceable liens would attach to the net proceeds of the sale, subject to any claims and defenses the Debtors may possess with respect thereto, and any amounts in excess of such liens would be utilized by the Debtors in accordance with the terms of the DIP Agreement (if approved by the Court).

    21. Nothing in the foregoing procedures would prevent the Debtors, in their sole and absolute discretion, from seeking Bankruptcy Court approval at any time of any proposed transaction upon notice and a hearing, or if necessary, to comfort a purchaser, to submit a separate order to the Court along with a certificate of no objection to be entered without need for a hearing on the matter.

Applicable Authority

    22. Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." A debtor must demonstrate a sound business justification for a sale or use of assets outside the ordinary course of business. See, e.g., Licensing By Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 387 (2d Cir. 1997); Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983); In re Global Crossing Ltd., 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); In re Ionosphere Clubs, Inc., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989). As described herein, sound business reasons exist to justify selling the de minimis Assets upon the procedures set forth herein. Indeed, allowing the Debtors to sell assets in this manner constitutes the most efficient and cost-effective means of maximizing the value realized for their assets and thus is in the best interests of the Debtors' estates and their creditors.

    23. Obtaining Court approval of each such sale transaction and Broker Commission would result in administrative expenses for drafting, serving, and filing

11

pleadings, as well as time incurred by attorneys for appearing at Court hearings. The Debtors believe that the proceeds that will be generated by many of the aforementioned sale transactions do not warrant incurring such expenses.

24. The expedited procedures set forth herein would permit the Debtors to be responsive to the needs of interested purchasers, thereby guarding against lost sales due to delay, while still providing for a review of the proposed transaction by the (a) U.S. Trustee, (b) counsel to the Committee(s), (c) counsel to the agent to the DIP Lenders, (c) any other known holder of a lien, claim, or encumbrance against the specific property to be sold, and (d) known interested parties in the subject de minimis Assets. Without an expedited process for closing the Debtors' sales, these estates will, at best, incur added and unnecessary expenses and will, at worst, both be deprived of income from these sales and forced to continue to operate businesses that the Debtors have determined are neither necessary nor beneficial to their overall restructuring strategy.

25. Moreover, pursuant to section 363(f) of the Bankruptcy Code, the Court may authorize the sale of assets free and clear of existing liens, claims, and encumbrances if (a) applicable non-bankruptcy law permits the sale of such property free and clear of such interest, (b) the entity holding the lien, claim, or encumbrance consents to the proposed sale, (c) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property, (d) such interest is in bona fide dispute, or (e) such entity could be compelled in a legal or equitable proceeding to accept a money satisfaction of such interest.

26. The Debtors believe that the Notice Procedures set forth above satisfy the requirements of section 363(f). If a holder of a lien, claim, or encumbrance

receives the requisite notice and does not object within the prescribed time period, the Debtors request that such holder be deemed to have consented to the proposed sale and that the property then may be sold free and clear of such holder's liens, claims, or encumbrances.

27. Section 363(m) of the Bankruptcy Code also provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). Although the Bankruptcy Code does not define "good faith," the Second Circuit Court of Appeals in In re Gucci held that the:

> Good faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not be made. A purchaser's good faith is lost by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'

126 F.3d at 390 (quoting In re Rock Industries Machinery Corp., 572 F.2d 1195, 1198 (7th Cir. 1978) (interpreting Bankruptcy Rule 805, the precursor of section 363(m))); see also Evergreen Int'l Airlines Inc. v. Pan Am Corp. (In re Pam Am Corp.), Case Nos. 91 Civ. 8319 (LMM) to 91 Civ. 8324 (LMM), 1992 WL 154200 at *4 (S.D.N.Y. June 18, 1992); In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988). The Debtors submit that any agreement reached as a result of a sale of de minimis Assets will be an arm's-length transaction entitled to the protections of section 363(m) of the Bankruptcy Code.

28. Additionally, the procedures set forth herein would not apply to sales of de minimis Assets to an "insider" as defined in section 101(31) of the Bankruptcy

13

Code. Any such sale would continue to require an individual hearing as prescribed by section 363(b) of the Bankruptcy Code.

29. The Debtors seek this Court's authority to sell de minimis Assets to reduce indebtedness and improve liquidity, thereby facilitating the formation and ultimate confirmation of a plan of reorganization and yielding the highest possible returns to the Debtors' creditors. In light of the foregoing, the Debtors respectfully submit that dispositions of de minimis Assets are necessary and in the best interest of their creditors.

30. Procedures to dispose of de minimis assets, similar to the procedures proposed herein, have been approved in other large, complex chapter 11 cases. See, e.g., In re Delta Air Lines, Inc., Case No. 05-17923 (PCB) (Bankr. S.D.N.Y. Oct. 6, 2005) (approval of procedures governing sales of up to $10 million in assets in a single transaction); In re Fleming Cos., Case No. 03-10945 (MFW) (Bankr. D. Del. May 21, 2003) (approval of procedures governing sales of up to $6.5 million in assets in a single transaction or series of related transactions); In re UAL Corp., Case No. 02-48191 (ERW) (Bankr. N.D. Ill. Jan. 17, 2003) (approval of procedures governing sales of up to $15 million in assets in a single transaction or series of related transactions); In re WorldCom, Inc., Case No. 02-13533 (AJG) (Bankr. S.D.N.Y. Oct. 22, 2002) (approval of procedures governing sales of up to $10 million in assets in a single transaction or series of related transactions); In re Exide Technologies, Case No. 02-11125 (JCA) (Bankr. D. Del. May 10, 2002) (approval of procedures governing sales of up to $5 million in assets in a single transaction or series of related transactions).

31. For the foregoing reasons, the Debtors believe that the relief requested herein is in the best interests of the estates and should be granted.

14

Notice

32.     Notice of this Motion has been provided in accordance with the Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing (I) Omnibus Hearing Dates, (II) Certain Notice, Case Management, And Administrative Procedures, And (III) Scheduling An Initial Case Conference In Accordance With Local Bankr. R. 1007-2(e) entered by this Court on October 14, 2005 (Docket No. 245).  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

Memorandum Of Law

33.     Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

WHEREFORE, the Debtors respectfully request that the Court enter an order (a) authorizing the Debtors to sell certain de minimis Assets without further Court approval, subject to the Notice Procedures set forth herein, and (b) granting the Debtors such other and further relief as is just.

Dated: New York, New York
October 17, 2005

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By: s/ John Wm. Butler, Jr.
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By: s/Kayalyn A. Marafioti
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
Debtors and Debtors-in-Possession