**Hearing Date: October 27, 2005, 10:00 a.m.**
**Objection Deadline: October 24, 2005, 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                        :
    In re                                     :        Chapter 11
                                         :
DELPHI CORPORATION, et al.,      :        Case No. 05-44481 (RDD)
                                       :
                    Debtors.   :        (Jointly Administered)
                                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. § 365(a) AUTHORIZING REJECTION OF
<u>LICENSE AGREEMENT WITH DURASWITCH INDUSTRIES, INC.</u>

("DURASWITCH REJECTION MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order under 11 U.S.C. § 365(a) and Fed. R. Bankr. P. 6006 authorizing the Debtors to reject the Duraswitch License Agreement (as defined herein). In support of this Motion, the Debtors respectfully represent as follows:

## Background

A.   The Chapter 11 Filings

1.   On October 8, 2005 (the "Petition Date"), 39 of 42 Debtors, and on October 14, 2005, the remaining Debtors, filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Also on the Petition Date, this Court entered an order directing the joint administration of the Debtors' chapter 11 cases (Docket No. 28).

2.   No trustee or examiner has been appointed in the Debtors' cases. The Office of the United States Trustee today appointed a seven-member creditors' committee.

3.   This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.   The statutory predicates for the relief requested herein are sections 105(a) and 365(a) of the Bankruptcy Code and Rule 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

2

B.      Current Business Operations Of The Debtors

5.      With more than 180,000 employees worldwide, global 2004 revenues of approximately $28.6 billion, and global assets as of August 31, 2005 of approximately $17.1 billion,[1] Delphi ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations without supervision from the Bankruptcy Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy Code.

6.      Over the past century, the operations which are now owned by Delphi have become a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines. Today, the Company (as defined below) is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company's technologies and products are present in more than 75 million vehicles on the road worldwide. The Company supplies products to nearly every major global automotive original equipment manufacturer with 2004 sales to its former parent, General Motors Corporation, equaling approximately $15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

7.      As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world. In the U.S., the Debtors employ approximately 50,600 people. Those employees work in approximately 44 manufacturing sites

---

[1] The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

3

and 13 technical centers across the country, and in Delphi's worldwide headquarters and customer center located in Troy, Michigan.  Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and local unions.  Outside the United States, the Company's foreign entities employ more than 134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

8.     Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates (collectively, the "Company") in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

9.     Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle. When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base.  The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base.

4

The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C.     <u>Events Leading To Chapter 11 Filing</u>

10.     In the first two years following Delphi's separation from GM, the Company generated more than $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales. Reflective of a downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005. The Company experienced net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[2]

11.     The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

---

[2]     Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

5

12. In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward looking revenue requirements. Having concluded that pre-filing discussions with its Unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

13. Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses. This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned in the Company's transformation plan. The Debtors believe that a substantial segment of Delphi's U.S. business operations must be divested, consolidated, or wound-down through the chapter 11 process.

14. Upon the conclusion of this process, the Debtors expect to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

Relief Requested

15. By this Motion, the Debtors seek an order under 11 U.S.C. § 365(a) authorizing the Debtors to reject the DuraSwitch License Agreement (as defined herein) effective as of October 17, 2005.

Basis For Relief

16. On April 20, 2000, Delphi Automotive Systems LLC ("DAS") entered into a License Agreement (the "DuraSwitch License Agreement") with DuraSwitch Industries, Inc. ("DuraSwitch"), pursuant to which DuraSwitch granted Delphi an exclusive license.[3] The licensed technology facilitates electrical connections within a vehicle.

17. The DuraSwitch technology represents only one of multiple technical solutions for a specific issue in a vehicle and this technology tends to be more expensive than other solutions based on Delphi's own technology. Indeed, the DuraSwitch License Agreement requires DAS to pay at least $12 million in minimum royalty payments over the first seven years of the term of the license through June 30, 2007. Delphi can continue to service the needs of its customers without using the licensed technology at a much lower cost. Finally, the DuraSwitch License Agreement contains a highly restrictive confidentiality clause and thus the Debtors are prevented, absent an order of this Court, from disclosing any further terms of the agreement without the prior written consent of DuraSwitch.

18. Following a thorough examination of the DuraSwitch License Agreement and in light of the Debtors' restructuring objectives, the Debtors have determined that the royalty payments required by the contract greatly exceed the value being received by Delphi pursuant to

---

[3] Pursuant to the DuraSwitch License Agreement, DAS was required to pay to DuraSwitch, within 30 days of the effective date of the DuraSwitch License Agreement, $4 million as an exclusive license fee, which amount was nonrefundable and not creditable against royalties.

7

the contract. The DuraSwitch technology that is the subject of the exclusive license has proven to be of little value in connection with automotive applications without significant further investment. The Debtors have determined, in their business judgment, not to make any such additional investment in the DuraSwitch technology because the Debtors have determined that they have alternative technology and therefore this project will not provide sufficient returns to justify the investment. Thus, the DuraSwitch License Agreement constitutes an unnecessary use of the Debtors' cash resources. For these reasons, the Debtors request that this Court authorize the rejection of the DuraSwitch License Agreement.

19. The resulting savings from the rejection of the DuraSwitch License Agreement will improve the Debtors' cash flow. By rejecting the DuraSwitch License Agreement now, the Debtors will avoid incurring unnecessary additional expense for a license that not only provides no benefit to the Debtors' estates and will play no part in the Debtors' future operations but in respect of which the Debtors continue to incur substantial royalty fee charges. Accordingly, in an effort to reduce postpetition administrative costs, and in the exercise of the Debtors' sound business judgment, the Debtors have determined that the rejection of the DuraSwitch License Agreement is in the best interests of their respective estates, creditors, and other parties-in-interest.

<u>Applicable Authority</u>

20. Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). The assumption or rejection of an unexpired lease or executory contract by a debtor is subject to review under the business judgment standard. <u>See</u> <u>In re Orion Pictures Corp.</u>, 4 F.3d 1095 (2d Cir. 1993); <u>In re The Penn Traffic Co.</u>, 322 B.R. 63, 68 (Bankr. S.D.N.Y. 2005) (stating "[i]t is well established that the decision whether to assume or reject an

executory contract under Section 365(a) is a matter of business judgment to be exercised in the best interests of the debtor in possession and its creditors"). See also In re Lawson, 146 B.R. 663, 664-65 (Bankr. E.D. Va. 1992), aff'd in part, 1993 U.S. App. LEXIS 32043 (unpublished opinion) ("[t]he Fourth Circuit has adopted the 'business judgment test' as the appropriate standard in determining whether to permit a debtor to reject an executory contract …[and a] court will defer to a debtor's determination that rejection of a contract would be advantageous [to the estate] unless that decision is clearly erroneous"); Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.), 872 F.2d 36, 40 (3d Cir. 1989) (debtor's motion to reject executory contract is properly granted upon finding that rejection will benefit estate). It is enough if the debtor determines in its business judgment that a benefit will be realized. Sharon Steel Corp., 872 F.2d at 39-40 (citing In re Wheeling-Pittsburgh Steel Corp., 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987)).

21. This "business judgment" standard is satisfied when a debtor determines that rejection will benefit the estate, and in applying this standard, courts show great deference to a debtor's decision to reject an unexpired lease or executory contract. See In re G Survivor Corp., 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994) ("Generally, absent a showing of bad faith, or an abuse of discretion, the debtor's business judgment will not be altered") (citing, inter alia, In re Bildisco, 682 F.2d 72, 79 (3d Cir. 1982), aff'd sub nom. N.L.R.B. v. Bildisco, 465 U.S. 513 (1984)), aff'd, 187 B.R. 111 (S.D.N.Y. 1996); In re Bullet Jet Charter, Inc., 177 B.R. 593, 601 (Bankr. N.D. Ill. 1995) (Under the business judgment rule, "courts should approve a debtor's decision to reject ... where [the debtor] demonstrates that rejection will benefit the debtor's estate or reorganization effort.") (citation omitted); see Summit Land Co. v. Allen (In re Summit Land Co.), 13 B.R. 310, 315 (Bankr. D. Utah 1981) (absent extraordinary circumstances, court

9

approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course"); <u>In re First Wellington Canyon Associates</u>, 1989 WL 106838 (N.D. Ill. 1989) *3 ("Under this test, the debtor's business judgment on whether to reject an executory contract must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

    22. If a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract.  <u>See</u>, e.g., <u>NLRB v. Bildisco and Bildisco</u>, 465 U.S. 513, 523 (1984); <u>Group of Institutional Investors v. Chicago M. St. P. & P.R.R. Co.</u>, 318 U.S. 523 (1943); <u>Johnson v. Fairco Corporation</u>, 61 B.R. 317, 320 (Bankr. N.D. Ill. 1986).

    23. The Debtors have satisfied the "business judgment" standard in connection with their decision to reject the DuraSwitch License Agreement.  The Debtors have determined that the DuraSwitch License Agreement does not benefit the Debtors' estates as it constitutes an unnecessary drain on the Debtors' cash flow, particularly in light of the substantial ongoing royalty fee charges incurred by the Debtors on account of the exclusive license.  Accordingly, the Debtors have determined that rejection of the DuraSwitch License Agreement reflects the Debtors' exercise of sound business judgment.  The Debtors thus seek authority to reject the DuraSwitch License Agreement effective as of the date hereof and submit that this Court should approve the Debtors' Motion, and determine that such rejection is in the best interests of the Debtors' estates, their creditors, and other parties-in-interest.

Notice

    24. Notice of this Motion has been provided in accordance with the Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing (I) Omnibus Hearing Dates, (II) Certain Notice, Case Management, And

Administrative Procedures, And (III) Scheduling An Initial Case Conference In Accordance With Local Bankr. R. 1007-2(e) entered by this Court on October 14, 2005 (Docket No. 245). Notice has also been provided to DuraSwitch. In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

## Memorandum Of Law

25.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

WHEREFORE the Debtors respectfully request that this Court enter an order (a) authorizing the Debtors to reject the DuraSwitch License Agreement, and (b) granting the Debtors such other and further relief as is just.

Dated: New York, New York
October 17, 2005

        SKADDEN, ARPS, SLATE, MEAGHER
          & FLOM LLP

        By: s/ John Wm. Butler, Jr.
          John Wm. Butler, Jr. (JB 4711)
          John K. Lyons (JL 4951)
          Ron E. Meisler (RM 3026)
        333 West Wacker Drive, Suite 2100
        Chicago, Illinois 60606
        (312) 407-0700

          - and -

        By: s/ Kayalyn A. Marafioti
          Kayalyn A. Marafioti (KM 9632)
          Thomas J. Matz (TM 5986)
        Four Times Square
        New York, New York 10036
        (212) 735-3000

        Attorneys for Delphi Corporation, et al.,
          Debtors and Debtors-in-Possession