As of May 1, 2005

John Sheehan
Acting Chief Financial Officer
Delphi Corporation
5725 Delphi Drive
Troy, Michigan  48098-2815

Dear Mr. Sheehan:

This letter (this "Agreement") will confirm the terms and conditions of the agreement among Delphi Corporation (collectively with its direct and indirect subsidiaries, the "Company"), Rothschild Inc. ("Rothschild") and Rohatyn Associates LLC ("Rohatyn", and together with Rothschild, the "Advisors") regarding the retention of the Advisors as joint financial advisors and investment bankers to the Company in connection with a possible Transaction, M&A Transaction, New Capital Raise (each as defined below) and/or other transaction or series of transactions involving the Company.

Section 1    Services to be Rendered.  In connection with the formulation, analysis, negotiation and implementation of strategic alternatives relating to the Company, whether pursuant to a Transaction, an M&A Transaction, a New Capital Raise, any series or combination of transactions or otherwise, the Advisors will perform the following services, and, in connection therewith advise the Company, as requested by the Company (collectively, the "Services"):

(a)    to the extent deemed desirable by the Company, identify, review, evaluate and initiate potential Transactions, M&A Transactions, New Capital Raises or other transactions;

(b)    to the extent the Advisors deem necessary, appropriate and feasible, or as the Company may request, review and analyze the Company's assets and the operating and financial strategies of the Company;

(c)    assist the Company in developing and evaluating a range of strategic alternatives to restructure the Company's legacy liabilities, including without limitation the Company's current labor costs, liabilities for pension and other post-employment benefits (collectively, the "Legacy Liabilities");

(d)    review and analyze the business plans and financial projections prepared by the Company including, but not limited to, testing assumptions and comparing those assumptions to historical Company and industry trends;

(e)    evaluate the Company's debt capacity in light of its projected cash flows and assist in the determination of an appropriate capital structure for the Company;

(f)    assist the Company and its other professionals in reviewing and evaluating the terms of any proposed Transaction, M&A Transaction, New Capital Raise or other transaction, in

Rothschild Inc.
1251 Avenue of the Americas
New York, NY 10020
www.rothschild.com

David L. Resnick
Managing Director
Telephone 212 403-5252
Facsimile 212 403-5454
Email david.resnick@us.rothschild.com

Delphi Corporation
As of May 1, 2005
Page 2

responding thereto and, if directed, in developing and evaluating alternative proposals for a Transaction, M&A Transaction, New Capital Raise or other transaction, whether in connection with a Plan (as defined below) or otherwise;

       (g)     determine values and/or ranges of values (as appropriate) for the Company and any securities that the Company offers or proposes to offer in connection with a Transaction, M&A Transaction, New Capital Raise or other transaction;

       (h)     determine and evaluate the risks and benefits of considering, initiating and consummating any Transaction, M&A Transaction, New Capital Raise or other transaction, including, without limitation, the risks and benefits with respect to the Company's intermediate and long-term business prospects and strategic alternatives to maximize the business enterprise value of the Company, whether pursuant to a Plan or otherwise;

       (i)     review and analyze any proposals the Company receives from third parties in connection with a Transaction, M&A Transaction, New Capital Raise or other transaction, including, without limitation, any proposals for debtor-in-possession financing, as appropriate;

       (j)     assist or participate in negotiations with the parties in interest, including, without limitation, any current or prospective creditors of, holders of equity in, or claimants against the Company and/or their respective representatives in connection with a Transaction, M&A Transaction, New Capital Raise or other transaction;

       (k)     advise and attend meetings of the Company's Board of Directors, creditor groups, official constituencies and other interested parties, as the Company determines to be necessary or desirable;

       (l)     in the event the Company determines to commence Chapter 11 cases in order to pursue a Transaction, M&A Transaction, New Capital Raise or other transaction, and if requested by the Company, participate in hearings before the Bankruptcy Court in which such cases are commenced (the "Bankruptcy Court") and provide relevant testimony with respect to the matters described herein and issues arising in connection with any proposed Plan;

       (m)     render to the Board of Directors an opinion (the "Opinion") of Rothschild (Rohatyn does not provide opinions) as to the fairness from a financial point of view of the consideration to be received pursuant to a Transaction of the kind described in paragraph (b) of the definition thereof or any M&A Transaction, which is not consummated or otherwise entered into pursuant to or in connection with a Plan (if Rothschild is asked to render an Opinion, the nature and scope of the analysis as well as the form and substance of the Opinion shall be as Rothschild reasonably deems appropriate);

Delphi Corporation
As of May 1, 2005
Page 3

(n)     assist the Company's internal and external counsel to enable such counsel to provide legal advice to the Company, as contemplated under Section 7 hereof; and

(o)     render such other financial advisory and investment banking services as may be reasonably requested by the Company in connection with any of the foregoing.

As used herein, the term "Transaction" shall mean, collectively, (a) any transaction or series of related transactions that effects material amendments to or other material changes in the Company's outstanding indebtedness, trade claims, leases (both on and off balance sheet) or other liabilities, taken as a whole, pursuant to a plan of reorganization (a "Plan") confirmed in connection with any case or cases commenced by or against the Company, any of its subsidiaries, any of its affiliates or any combination thereof, whether individually or on a consolidated basis (a "Chapter 11 Case"), under Title 11 of the United States Code §§ 101 et seq. (the "Bankruptcy Code"); (b) (i) any merger, consolidation, reorganization, recapitalization, financing, refinancing, business combination or other transaction pursuant to which the Company (or control thereof) is acquired by, or combined with, any person, group of persons, partnership, corporation or other entity (an "Acquirer") or (ii) any acquisition, directly or indirectly, by an Acquirer (or by one or more persons acting in concert together with an Acquirer pursuant to a written agreement or otherwise), whether in a single transaction, multiple related transactions or a series of related transactions, of (A) a majority of the assets or operations of the Company (or a material portion of such assets or operations, if such Transaction immediately effects, or will effect over time (as evidenced by a binding written agreement), a material reduction of the Legacy Liabilities, taken as a whole; provided that any scheduled or prepaid contributions or payments with respect to pension or other post-employment obligations shall not constitute a material reduction of the Legacy Liabilities, taken as a whole) or (B) any outstanding or newly-issued shares of the Company's capital stock or any securities convertible into, or options, warrants or other rights to acquire such capital stock or other equity securities of the Company, for the purpose of effecting a recapitalization or change of control of the Company; (c) any restructuring, reorganization or similar transaction, whether or not pursuant to a Plan; or (d) any transaction similar to any of the foregoing; provided, that in the case of (a), (c) and (d), such Transaction shall immediately effect, or will effect over time (as evidenced by a binding agreement), a material reduction of the Legacy Liabilities, taken as a whole.

As used herein, the term "M&A Transaction" shall mean, collectively, whether pursuant to a Plan or otherwise, any transaction or series of transactions, involving, at the written request of the Company, the services of Rothschild or Rohatyn in which the Company sells or acquires assets, equity interests or any securities convertible into, or options, warrants or other rights to acquire, such equity interests, which sale or acquisition does not constitute a Transaction and in connection with which the Advisors (or any of them) are designated by the Company as the Company's primary advisors and investment bankers.

Delphi Corporation
As of May 1, 2005
Page 4

The Advisors recognize and acknowledge that a key inducement for the Company's selection of the Advisors pursuant to this Agreement was the assurance that the senior management of Rothschild and Rohatyn identified on Exhibit A to this Agreement will participate, to the extent appropriate and as reasonably requested by the Company, in the performance and delivery of the Services as requested by the Company during the engagement of the Advisors in order to satisfy the Company's requirement that the Services be performed in accordance with the standards of highly experienced, world-class investment banking firms.

In performing its services pursuant to this Agreement, and notwithstanding anything to the contrary herein, the Advisors are not assuming any responsibility for the Company's decision to pursue (or not to pursue) any business strategy or to effect (or not to effect) any Transaction, M&A Transaction, New Capital Raise or other transaction; provided that nothing contained herein shall increase the Company's obligations set forth in Exhibit B hereto. The Advisors shall not have any obligation or responsibility to provide accounting, audit, "crisis management" or business consultant services to the Company, and shall have no responsibility for designing or implementing operating, organizational, administrative, cash management or liquidity improvements.

<u>Section 2</u>        <u>Information Provided by the Company</u>.

(a)        The Company will cooperate with the Advisors and furnish to, or cause to be furnished to, the Advisors any and all information reasonably available to the Company which the Advisors deem appropriate to enable the Advisors to render services hereunder (all such information being the "<u>Information</u>"). The Company recognizes and confirms that the Advisors (<u>i</u>) will use and rely on the Information and on information available from generally recognized public sources in performing the services contemplated by this Agreement without having assumed any obligation to verify independently any such information; (<u>ii</u>) do not assume responsibility for the accuracy or completeness of the Information provided by the Company and such other information, and (<u>iii</u>) will not act in the official capacity of appraisers of specific assets of the Company or any other party. Each party confirms that the information to be furnished by it, when delivered, to the best of its knowledge will be true and correct in all material respects, will be prepared in good faith, and will, to the knowledge of the delivering party, not contain any material misstatement of fact or omit to state any material fact. Each party will promptly notify the other party if it learns of any material inaccuracy or misstatement in, or material omission from, any Information theretofore it delivered to the other party. The Company acknowledges that in the course of this engagement it may be necessary for the Advisors and the Company to communicate electronically.

(b)        Each party acknowledges that although it will use commercially reasonable procedures to check for the most commonly known viruses, the electronic transmission of information cannot be guaranteed to be secure or error-free. Furthermore such information could

Delphi Corporation
As of May 1, 2005
Page 5

be intercepted, corrupted, lost, destroyed, arrive late or incomplete or otherwise be adversely affected or unsafe to use. Accordingly, each party agrees that the other party shall have no liability with respect to any error or omission arising from or in connection with: (i) the electronic communication of information; or (ii) the other party's reliance on such information.

Section 3    Application for Retention of the Advisors.    In the event the Company determines to commence a Chapter 11 Case in order to pursue a Transaction, M&A Transaction, New Capital Raise or other transaction, the Company shall apply promptly to the Bankruptcy Court pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code, Rule 2014 of the Federal Rules of Bankruptcy Procedure, applicable local rules and procedural orders of the Bankruptcy Court and procedural guidelines established by the Office of the United States Trustee, for approval of (a) this Agreement and (b) each of the Advisors' retention by the Company under the terms of this Agreement, *nunc pro tunc* to the date of this Agreement, and shall seek to obtain Bankruptcy Court authorization thereof, provided that the Company and its counsel shall each be satisfied in their reasonable judgment that each of the Advisors is a "disinterested person" as such term is defined in Section 101(14) of the Bankruptcy Code. The Company shall use its best efforts to obtain such Bankruptcy Court approval and authorization subject only to the subsequent review by the Bankruptcy Court under the standard of review provided in Section 328(a) of the Bankruptcy Code, and not subject to the standard of review set forth in Section 330 of the Bankruptcy Code. The Company shall supply the Advisors and their counsel with a draft of each such application and any proposed order authorizing the Advisors' retention sufficiently in advance of the filing of such application and proposed order to enable the Advisors and their counsel to review and comment thereon. No Advisor shall have any obligation to provide any services under this Agreement following the filing of a Chapter 11 Case unless its retention under the terms of this Agreement is approved in the manner set forth above by a final order of the Bankruptcy Court no longer subject to appeal, rehearing, reconsideration or petition for certiorari, and which order is reasonably acceptable to such Advisor.

Each Advisor acknowledges that in the event that the Bankruptcy Court approves its retention by the Company pursuant to the application process described in this Section 3, payment of the Advisors' fees and expenses hereunder shall be subject to (i) the jurisdiction and approval of the Bankruptcy Court under Section 328(a) of the Bankruptcy Code and any order approving such Advisor's retention, (ii) any applicable fee and expense guidelines and/or orders and (iii) any requirements governing interim and final fee applications. In the event that the Advisors' engagements hereunder are approved by the Bankruptcy Court, the Company shall pay all fees and expenses hereunder as promptly as practicable in accordance with the terms hereof and the orders governing interim and final fee applications, and after obtaining all necessary further approvals from the Bankruptcy Court, if any. In so agreeing to seek the Advisors' retention under Section 328(a) of the Bankruptcy Code, the Company acknowledges that it believes that each of the Advisor's general professional experience and expertise, its knowledge of the industry in which the Company operates and the capital markets and its merger and acquisition capabilities will inure

Delphi Corporation
As of May 1, 2005
Page 6

to the benefit of the Company in pursuing any Transaction, M&A Transaction, New Capital Raise or other transaction, that the value to the Company of the Advisors' services hereunder derives in substantial part from that expertise and experience and that, accordingly, the structure and amount of the Monthly Fees, the Completion Fee, the M&A Fee, the New Capital Fee (as each is defined below), the expense reimbursements provided for herein and the indemnification and exculpation provisions provided herein and in Exhibit B hereto are reasonable regardless of the number of hours to be expended by the Advisors' professionals in performance of the services to be provided hereunder.

    Section 4    Fees of the Advisors.    As compensation for the services rendered hereunder, the Company, and its successors, if any, agree to pay to Rothschild (via wire transfer or other mutually acceptable means) the following fees in cash.  All amounts to which the Advisors become entitled under this Agreement, including all fees payable under this Section 4 and Exhibit C hereto, all expense reimbursements payable under Section 6 hereof and any amounts that become payable under Section 8 hereof and Exhibit B hereto, shall be paid directly to Rothschild, which amounts shall thereafter be apportioned between Rothschild and Rohatyn pursuant to a separate agreement.

    (a)    A retainer (the "Retainer") of $250,000, due and payable upon the execution of this Agreement, to be applied by Rothschild against the fees and expenses of the Advisors under this Agreement.

    (b)    Commencing as of the date hereof, and whether or not a Transaction is proposed or consummated, a cash advisory fee (the "Monthly Fee") of $250,000 per month.  The initial Monthly Fee shall be pro-rated based on the commencement of services as of the date hereof and shall be due and payable by the Company upon the execution of this Agreement by each of the parties hereto, and thereafter the Monthly Fee shall be payable by the Company in advance on the first day of each month.

    (c)    A fee (the "Completion Fee") of $15,000,000, due and payable in cash upon the earlier of (i) the effective date of a Plan that provides for, pursuant to the terms of a binding written agreement, the consummation of a Transaction or (ii) the closing of another Transaction.

    (d)    In the case of any M&A Transaction for which the Advisors are designated by the Company as the Company's primary advisors and investment bankers and does not arise out of a Transaction for which a Completion Fee is due under Section 4(c) above, a fee (the "M&A Fee") equal to the product of (i) the Aggregate Consideration times (ii) the applicable M&A Fee Percentage, each as specified in Exhibit C hereto, which M&A Fee shall be due and payable in cash at the closing of such M&A Transaction.

    (e)    A new capital fee (the "New Capital Fee") equal to (i) 1.0% of any senior secured debt raised; (ii) 3.0% of the face amount of any junior secured or senior or subordinated unsecured

Delphi Corporation
As of May 1, 2005
Page 7

debt (including any convertible debt) raised and (iii) 5.0% of any equity or hybrid capital raised (each, a "New Capital Raise"), in each case, in which the Advisors (or any of them) are designated by the Company as the Company's primary advisors and investment bankers. The New Capital Fee shall be due and payable in cash at the closing of any New Capital Raise; provided, that no New Capital Fee shall become payable in respect of any new capital raised (x) in the event the Company files a Chapter 11 Case, any debtor-in-possession financing arrangements; (y) from an entity not otherwise participating in or having expressed an interest in participating in a Transaction; or (z) from an Acquirer or an entity having expressed an interest in becoming an Acquirer in connection with the consummation of a Transaction which is intended to occur simultaneously with or within a reasonable period after the closing of such New Capital Raise.

(f)    An opinion fee, payable in cash upon notification to the Company that Rothschild is prepared to deliver its Opinion (the "Opinion Fee"), in an amount to be negotiated in good faith at the time such Opinion is requested by the Company based upon customary fees for such services.

(g)    To the extent the Company requests the Advisors to perform additional services not contemplated by this Agreement, such additional fees as shall be mutually agreed upon by the Advisors and the Company, in writing, in advance.

The Company and the Advisors acknowledge and agree that (i) the hours worked, (ii) the results achieved and (iii) the ultimate benefit to the Company of the work performed, in each case, in connection with this engagement, may be variable, and that the Company and the Advisors have taken such factors into account in setting the fees hereunder; provided, however, that with respect to the hours worked, the Advisors shall devote whatever resources as are required to fulfill the purposes of this engagement on a timely basis.

Section 5    Credit. The Advisors shall credit against the Completion Fee (a) 50% of any M&A Fees indefeasibly paid (the "M&A Fee Credit"); (b) 50% of any New Capital Fees indefeasibly paid (the "New Capital Fee Credit") and (c) to the extent not otherwise applied against the fees and expenses of the Advisors under the terms of this Agreement, the Retainer; provided that the sum of the M&A Fee Credit and the New Capital Fee Credit shall not exceed the Completion Fee.

Section 6    Expenses. Without in any way reducing or affecting the provisions of Exhibit B hereto, the Company shall reimburse the Advisors for their reasonable expenses incurred in connection with the performance of their engagement hereunder, and the enforcement of this Agreement, including without limitation the reasonable fees, disbursements and other charges of the Advisors' respective counsel; provided, that the retention of any such counsel shall only be made with the Company's consent, which shall not be unreasonably withheld except in the case of legal services which are not customarily required in connection with the performance of the Services. Reasonable expenses shall also include, but not be limited to, expenses incurred in

Delphi Corporation
As of May 1, 2005
Page 8

connection with travel and lodging, data processing and communication charges, research and courier services. In the event the Company becomes a debtor and/or a debtor-in-possession in a Chapter 11 Case, consistent with and subject to any applicable order of the Bankruptcy Court, the Company shall promptly reimburse the Advisors for such expenses under this Section 6 upon presentation of an invoice or other similar documentation with reasonable detail. The Company has advised the Advisors regarding its expense reimbursement guidelines, and the Advisors agree to make reasonable efforts, as appropriate (but shall not be obligated), to incur expenses consistent with such guidelines.

Section 7    Sharing of Information with Counsel. As you are aware, the Company also has retained the law firm of Shearman & Sterling ("Shearman") to provide legal advice to the Company in connection with the Legacy Liabilities and in connection with legal aspects of the Transactions or M&A Transactions that may occur. The Company also employs inside counsel to advise the Company on those same matters. The Company believes that from time to time information or analyses prepared by the Advisors may be required to enable Shearman and/or the Company's inside counsel to render appropriate legal services and advice to the Company. The Company also anticipates that from time to time privileged communications may need to be shared with the Advisors in order to permit the Advisors to provide the most comprehensive advice to the Company and to counsel to the Company in order to support such counsel's provision of legal advice to the Company. In addition, the Company and the Advisors share a common interest for this purpose, and the Company intends that any such sharing of privileged information will occur only in pursuit of such common interest and without waiver of the attorney-client privilege or of any other privileges that may apply.

This letter will confirm the Advisors' agreement that, to the extent directed by the Company, the Advisors will provide information or advice within their fields of expertise to assist Shearman and the Company's inside counsel in rendering legal services or advice to the Company.

This letter will also confirm the parties' agreement that, to the extent privileged information is shared with the Advisors, such sharing is made solely for the purpose of facilitating the Advisors' provision of services pursuant to this agreement and in recognition that the Advisors and the Company share a common interest for that purpose. The Advisors will maintain the confidentiality of all privileged communications that are shared with them and will not disclose such privileged matters to any other person without the consent of the Company or as required by law or by court order. In order to assist the Advisors in this regard, the Company and Shearman agree that privileged communications that are shared with the Advisors will be labeled as such.

Section 8    Indemnity. The Company agrees to the provisions of Exhibit B hereto which provides for indemnification and exculpation by the Company of the Advisors and certain related persons. Such indemnification and exculpation is an integral part of this Agreement and the terms thereof are incorporated by reference as if fully stated herein. Such indemnification and

Delphi Corporation
As of May 1, 2005
Page 9

exculpation shall survive any termination, expiration or completion of this Agreement or the Advisors' engagement hereunder.

    Section 9    Term.    The term of the Advisors' engagement shall extend until the consummation of a Transaction or the confirmation and effectiveness of a Plan, provided that this Agreement may be terminated by either the Company or Rothschild after one hundred twenty (120) days from the effective date hereof by providing thirty (30) days advance notice in writing. If terminated, the Advisors shall be entitled to payment of any fees for any monthly period which are due and owing to the Advisors upon the effective date of termination; however, such amounts will be pro-rated for any incomplete monthly period of service, and the Advisors will be entitled to reimbursement of any and all reasonable expenses described in Section 6.  Termination of the Advisors' engagement hereunder shall not affect or impair the Company's continuing obligation to indemnify the Advisors and certain related persons as provided in Exhibit B.  Without limiting any of the foregoing, if this Agreement is terminated by the Company (other than for a material breach thereof which is not cured within a reasonable period of time, after receipt by the Advisors of written notice thereof), the Completion Fee, any M&A Fee and any New Capital Fee shall be payable in the event that, in the case of the Completion Fee, a Plan or other Transaction or, in the case of any M&A Fee, an M&A Transaction for which an M&A Fee would otherwise be due under this Agreement or, in the case of any New Capital Fee, a New Capital Raise, is closed at anytime prior to the expiration of eighteen (18) months after such termination, or a letter of intent or definitive agreement with respect thereto is executed at any time prior to eighteen (18) months after such termination (which letter of intent or definitive agreement subsequently results in the consummation at any time of a Plan or other Transaction, M&A Transaction and/or New Capital Raise).

    Section 10  Miscellaneous.

    (a)    *Administrative Expense Priority.*    In the event the Company determines to commence Chapter 11 Cases in order to pursue a Transaction, M&A Transaction, New Capital Raise or other transaction, the Company agrees that the Advisors' post-petition compensation as set forth herein and payments made pursuant to reimbursement and indemnification provisions of this Agreement shall be entitled to priority as expenses of administration under Sections 503(b)(1)(A) and 507(a)(1) of the Bankruptcy Code and shall be entitled to the benefits of any "carve-outs" for professional fees and expenses in effect in such Chapter 11 Cases pursuant to one or more financing orders entered by the Bankruptcy Court.

    (b)    *Survival, Successors & Assigns.*    Sections 4 through 10 hereof, inclusive, including the provisions set forth in Exhibit A, Exhibit B and Exhibit C hereto, shall survive the termination or expiration of this Agreement.  The benefits of this Agreement and the indemnification and other obligations of the Company to the Advisors and certain related persons contained in Exhibit B hereto shall inure to the respective permitted successors and assigns of the

Delphi Corporation
As of May 1, 2005
Page 10

parties hereto and thereto and of the indemnified parties, and the obligations and liabilities assumed in this Agreement and Exhibit B by the parties hereto and thereto shall be binding upon their respective successors and assigns.  The Advisors shall not have the right to assign any of their rights under this Agreement without the prior written consent of the Company.

(c)    *Benefit of Agreement; No Reliance by Third Parties*.  The advice (oral or written) rendered by the Advisors pursuant to this Agreement is intended solely for the benefit and use of the Company and its affiliates, and their respective Officers and Directors in considering the matters to which this Agreement relates, and the Company agrees that such advice may not be relied upon by any other person, used for any other purpose or reproduced, disseminated, quoted or referred to at any time, in any manner or for any purpose without the prior written consent of the Advisors, which shall not be unreasonably withheld or delayed, provided that nothing contained herein shall prohibit disclosure of such advice in the event and only to the extent the Company has been advised by counsel that such disclosure is necessary to satisfy applicable legal or regulatory requirements.

(d)    *Nature of Relationship*.  The relationship of the Advisors to the Company hereunder shall be that of independent contractors and the Advisors shall have no authority to bind, represent or otherwise act as agent, executor, administrator, trustee, lawyer or guardian for the Company, nor shall the Advisors have the authority to manage money or property of the Company.  The parties hereto acknowledge and agree that by providing the services contemplated hereunder, the Advisors will not act, nor will they be deemed to have acted, in any managerial or fiduciary capacity whatsoever with respect to the Company or any third party including security holders, creditors or employees of the Company.

(e)    *Required Information*.  Since recently enacted Federal law requires the Advisors to obtain, verify, and record information that identifies any entity not listed on the New York Stock Exchange, the American Stock Exchange or whose common stock or equity interests have not been designated as a National Market System security listed on the NASDAQ stock market that enters into a formal relationship with it, the Company agrees to provide the Advisors with its tax or other similar identification number and/or other identifying documents, as the Advisors may request, to enable the Advisors to comply with applicable law.  For your information, the Advisors may also screen the Company against various databases to verify its identity.

(f)    *Public Announcements*.  With the prior written consent of the Company, which shall not be unreasonably withheld, the Company acknowledges that the Advisors may at their option and expense, after announcement of a Transaction, M&A Transaction, New Capital Raise or other transaction, place announcements and advertisements or otherwise publicize such transaction in such financial and other newspapers and journals as it may choose, stating that the Advisors acted as financial advisors and investment bankers to the Company in connection with such transaction.  The Company further consents to the Advisors' public use or display of the

Delphi Corporation
As of May 1, 2005
Page 11

Company's logo, symbol or trademark as part of the Advisors' general marketing or promotional activities after the announcement of a Transaction or M&A Transaction, <u>provided</u> that such use or display is in the nature of a public record or tombstone announcement in relation to such transaction, and, provided further, that the Company approves of such announcements, advertising or other publication, which approval shall not be unreasonably withheld.

(g)    *CHOICE OF LAW: JURISDICTION.*    THIS AGREEMENT HAS BEEN NEGOTIATED, EXECUTED AND DELIVERED AT AND SHALL BE DEEMED TO HAVE BEEN MADE IN NEW YORK, NEW YORK.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO SUCH STATE'S PRINCIPLES OF CONFLICTS OF LAWS.  REGARDLESS OF ANY PRESENT OR FUTURE DOMICILE OR PRINCIPAL PLACE OF BUSINESS OF THE PARTIES HERETO, EACH SUCH PARTY HEREBY IRREVOCABLY CONSENTS AND AGREES THAT ANY AND ALL CLAIMS OR DISPUTES BETWEEN THE PARTIES HERETO PERTAINING TO THIS AGREEMENT OR TO ANY MATTER ARISING OUT OF OR RELATED TO THIS AGREEMENT SHALL BE BROUGHT IN ANY OF (<u>A</u>) ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE OF NEW YORK OR (<u>B</u>) THE BANKRUPTCY COURT OR ANY COURT HAVING APPELLATE JURISDICTION OVER THE BANKRUPTCY COURT.  BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT.  EACH PARTY HERETO HEREBY WAIVES ANY OBJECTION WHICH IT MAY HAVE BASED ON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR <u>FORUM NON CONVENIENS</u> AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.  THE COMPANY CONSENTS TO THE SERVICE OF PROCESS IN ACCORDANCE WITH NEW YORK LAW, AND AGREES THAT THE GENERAL COUNSEL AND THE SECRETARY OF THE COMPANY SHALL BE AUTHORIZED TO ACCEPT SERVICE ON ITS BEHALF.

(h)    *Waiver of Jury Trial.*  Each of the parties hereto hereby knowingly, voluntarily and irrevocably waives any right it may have to a trial by jury in respect of any claim upon, arising out of or in connection with this Agreement or any Transaction, M&A Transaction, New Capital Raise or other transaction.  Each of the parties hereto hereby certifies that no representative or agent of any other party hereto has represented expressly or otherwise that such party would not seek to enforce the provisions of this waiver.  Each of the parties hereto hereby acknowledges that it has been induced to enter into this Agreement by and in reliance upon, among other things, the provisions of this paragraph.

(i)    *Entire Agreement.*  This Agreement (together with the confidentiality agreement dated April 15, 2005) embodies the entire agreement and understanding of the parties hereto and supersedes any and all prior agreements, arrangements and understandings relating to the matters

Delphi Corporation
As of May 1, 2005
Page 12

provided for herein. No alteration, waiver, amendment, change or supplement hereto shall be binding or effective unless the same is set forth in writing signed by a duly authorized representative of each of the parties hereto.

(j)    *Authority*. Each party hereto represents and warrants that it has all requisite power and authority to enter into this Agreement, including Exhibits A, B, C and D attached hereto and to consummate the transactions contemplated hereby. Each party hereto further represents that this Agreement has been duly and validly authorized by all necessary corporate action and has been duly executed and delivered by each of the parties hereto and constitutes the legal, valid and binding agreement thereof, enforceable in accordance with its terms. The Advisors will assume that any instructions, notices or requests have been properly authorized by the Company if they are given or purported to be given by a director, officer, employee or authorized agent of the Company, or by a person that is reasonably believed by an Advisor to be a director, officer, employee or authorized agent of the Company.

(k)    *Counterparts*. This Agreement may be executed in as many counterparts as may be deemed necessary and convenient, and by the different parties hereto on separate counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by telecopier shall be effective as delivery of a manually executed counterpart to this Agreement.

The Remainder of this Page intentionally left blank

Delphi Corporation
As of May 1, 2005
Page 13


If the foregoing correctly sets forth the understanding and agreement among the Advisors and the Company, please so indicate by signing the enclosed copy of this letter, whereupon it shall become a binding agreement between the parties hereto as of the date first above written.

Very truly yours,

ROTHSCHILD INC.

By: _David J. Resnick_

David L. Resnick
Managing Director

ROHATYN ASSOCIATES LLC

By: _____
        Name:
        Title:


Accepted and Agreed to as of
The date first written above:

DELPHI CORPORATION


By: _____
        Name:
        Title:

SHEARMAN & STERLING


By: _____
        Name:
        Title:



222164v8

Delphi Corporation
As of May 1, 2005
Page 13


        If the foregoing correctly sets forth the understanding and agreement among the Advisors
and the Company, please so indicate by signing the enclosed copy of this letter, whereupon it shall
become a binding agreement between the parties hereto as of the date first above written.

                                        Very truly yours,

                                        ROTHSCHILD INC.


                                        By:_____
                                            David L. Resnick
                                            Managing Director

                                        ROHATYN ASSOCIATES LLC

                                        By: _Felix Rohatyn_
                                            Name:  FELIX ROHATYN
                                            Title:  PRESIDENT

Accepted and Agreed to as of
The date first written above:

DELPHI CORPORATION


By:_____
    Name:
    Title:

SHEARMAN & STERLING


By:_____
    Name:
    Title:




222164v8

Delphi Corporation
As of May 1, 2005
Page 13


     If the foregoing correctly sets forth the understanding and agreement among the Advisors and the Company, please so indicate by signing the enclosed copy of this letter, whereupon it shall become a binding agreement between the parties hereto as of the date first above written.

Very truly yours,

ROTHSCHILD INC.


By:_____
    David L. Resnick
    Managing Director

ROHATYN ASSOCIATES LLC


By:_____
    Name:
    Title:


Accepted and Agreed to as of
The date first written above:

DELPHI CORPORATION

By:_____
    Name: John D. Sheehan
    Title: Acting Chief Financial Officer

SHEARMAN & STERLING


By:_____
    Name:
    Title:


222164v8

**<u>Exhibit A</u>**

**<u>Responsible Senior Management</u>**

Felix G. Rohatyn
Gerald Rosenfeld
David Resnick
Todd Snyder

## Exhibit B

Delphi Corporation (collectively with its direct and indirect subsidiaries, the "Company") agrees to indemnify and hold harmless Rothschild Inc. ("Rothschild") and Rohatyn Associates LLC ("Rohatyn", and together with Rothschild, the "Advisors") and their affiliates, counsel and other professional advisors, and the respective directors, officers, controlling persons, agents and employees of each of the foregoing (the Advisors and all of such other persons collectively, the "Indemnified Parties"), from and against any losses, claims or proceedings, including without limitation stockholder actions, damages, judgments, assessments, investigation costs, settlement costs, fines, penalties, arbitration awards and any other liabilities, reasonable costs, reasonable fees and reasonable expenses (collectively, "Losses") (a) directly or indirectly related to or arising out of (i) oral or written information provided by the Company, the Company's employees or other agents, which either the Company or an Indemnified Party provides to any person or entity (except to the extent that Confidential Information (as defined in the Confidentiality Agreement dated April 15, 2005 between the Company and Rothschild) is provided by an Indemnified Person to any person or entity in breach of Rothschild's obligations to the Company under such agreement) or (ii) any other action or failure to act by the Company, the Company's employees or other agents or any Indemnified Party at the Company's request or with the Company's consent, in each case in connection with, arising out of, based upon, or in any way related to the letter agreement (the "Agreement") entered into between the Company and the Advisors regarding the retention of the Advisors as financial advisors and investment bankers to the Company, the retention of and services provided by the Advisors under the  Agreement, or any Transaction, M&A Transaction, New Capital Raise or other transaction pursuant to the Agreement; or (b) otherwise directly or indirectly in connection with, arising out of, based upon, or in any way related to the engagement of the Advisors under the Agreement or any transaction or conduct in connection therewith, provided that the Company shall not be required to indemnify an Indemnified Party for such Losses if and only to the extent that it is finally judicially determined by a court of competent jurisdiction that such Losses arose (x) because of the gross negligence, willful misconduct or fraud of such Indemnified Party or (y) because of a material breach of a term or condition of the Agreement by such Indemnified Party.

The Company shall further reimburse any Indemnified Party promptly after obtaining the necessary approval of the Bankruptcy Court, if any, for any legal or other fees, disbursements or expenses as they are incurred (a) in investigating, preparing or pursuing any action or other proceeding (whether formal or informal) or threat thereof, whether or not in connection with pending or threatened litigation or arbitration and whether or not any Indemnified Party is a party, in each case to the extent relating to Losses for which indemnification is available hereunder (each, an "Action"), and (b) in connection with enforcing such Indemnified Party's rights under the  Agreement; provided, however, that in the event and only to the extent that it is finally judicially determined by a court of competent jurisdiction that the Losses of such Indemnified Party arose (x) because of the gross negligence, willful misconduct or fraud of such Indemnified Party or (y) because of a material breach of a term or condition of the Agreement by such Indemnified Party, such Indemnified Party will promptly remit to the Company any amounts reimbursed under this paragraph.

Delphi Corporation
As of May 1, 2005
Exhibit B - 2

Upon receipt by an Indemnified Party of notice of any Action, such Indemnified Party shall notify the Company in writing of such Action, but the failure to so notify shall not relieve the Company from any liability hereunder (i) if the Company had actual notice of such Action or (ii) unless and only to the extent that the Company is prejudiced thereby.  The Company shall have the right to assume the defense of any such Action including the employment of counsel reasonably satisfactory to the Advisors and will not, without the prior written consent of the Advisors (which shall not be unreasonably withheld or delayed), settle, compromise, consent or otherwise resolve or seek to terminate any pending or threatened Action (whether or not any Indemnified Party is a party thereto) unless such settlement, compromise, consent or termination (a) contains an express, unconditional release of each Indemnified Party which is a party to the Action from all liability relating to such Action and (b) does not include an admission of fault, culpability or a failure to act by or on behalf of any Indemnified Party.  Any Indemnified Party shall be entitled to retain separate counsel of its choice and participate in the defense of any Action in connection with any of the matters to which the Agreement relates, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless (x) the Company has failed promptly to assume the defense and employ counsel or (y) the named parties to any such Action (including any impleaded parties) include such Indemnified Party and the Company, and such Indemnified Party shall have been advised by counsel that there may be one or more legal defenses available to it which are different from or in addition to those available to the Company; provided, that the Company shall not in such event be responsible under the  Agreement for the fees and expenses of more than one firm of separate counsel (in addition to local counsel) in connection with any such Action in the same jurisdiction.

The Company agrees that if any right of any Indemnified Party set forth in the preceding paragraphs is finally judicially determined to be unavailable (except by reason of the gross negligence, willful misconduct or fraud of such Indemnified Party or because of a material breach of a term or condition of the Agreement by such Indemnified Party), or is insufficient to hold such Indemnified Party harmless against such Losses as contemplated herein, then the Company shall contribute to such Losses (a) in such proportion as is appropriate to reflect the relative benefits received by the Company and its creditors and stockholders, on the one hand, and such Indemnified Party, on the other hand, in connection with the transactions contemplated hereby, and (b) if (and only if) the allocation provided in clause (a) is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (a) but also the relative fault of the Company and such Indemnified Party; provided, that, in no event shall the aggregate contribution of all such Indemnified Parties exceed the amount of fees received by Rothschild under the  Agreement. Benefits received by Rothschild shall be deemed to be equal to the compensation paid by the Company to Rothschild (including on behalf of Rohatyn) in connection with the Agreement. Relative fault shall be determined by reference to, among other things, whether any alleged untrue statement or omission or any other alleged conduct relates to information provided by the Company or other conduct by the Company (or the Company's employees or other agents) on the one hand or by the Advisors on the other hand.

The Company also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company for or in connection with

Delphi Corporation
As of May 1, 2005
Exhibit B - 3

advice or services rendered or to be rendered by any Indemnified Party pursuant to the Agreement, the transactions contemplated hereby or any Indemnified Party's actions or inactions in connection with any such advice, services or transactions except for and only to the extent that such Losses of the Company are finally judicially determined by a court of competent jurisdiction to have arisen (x) because of the gross negligence, willful misconduct or fraud of, or (y) because of a material breach of a term or condition of the Agreement by such Indemnified Party in connection with any such advice, actions, inactions or services.

The rights of the Indemnified Parties and the Company hereunder shall be in addition to any other rights that any Indemnified Party or the Company may have at common law, by statute or otherwise.  Except as otherwise expressly provided for in the Agreement, if any term, provision, covenant or restriction contained in the Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in the Agreement shall all remain in full force and effect and shall in no way be affected, impaired or invalidated. The reimbursement, indemnity and contribution obligations of the Company set forth herein shall apply to any modification of the Agreement and shall remain in full force and effect regardless of any termination of, or the completion of any Indemnified Party's services under or in connection with, the Agreement.

Nothing contained in this letter agreement is intended to obligate the Company to enter into the Agreement, it being understood and agreed that the Company will not execute the Agreement unless and until the Company is satisfied, in its sole discretion, with the terms and conditions of the Agreement, and all internal approvals which the management of the Company determines are necessary or desirable have been obtained.

## Exhibit C

## ROTHSCHILD INC.

## M&A Fee Schedule

(Dollars In Millions)

| Aggregate Consideration[a] | M&A Fee Percentage [b] |
|---|---|
| Up to $100.0 | 1.75% |
| 200.0 | 1.50 |
| 300.0 | 1.25 |
| 400.0 | 1.00 |
| 500.0 | 0.90 |
| 600.0 | 0.85 |
| 700.0 | 0.80 |
| 800.0 | 0.77 |
| 900.0 | 0.74 |
| 1,000.0 and above | 0.70 |

(a)   For purposes hereof, the term "Aggregate Consideration" shall mean the total amount of all cash, securities, contractual arrangements (including any put or call agreements) and other properties paid or payable, directly or indirectly in connection with an M&A Transaction (including (i) amounts paid pursuant to covenants not to compete, employment contracts, employee benefit plans, management fees or other similar arrangements, and (ii) amounts paid to holders of any warrants, stock purchase rights or convertible securities of the Company and to holders of any options or stock appreciation rights issued by the Company, whether or not vested).   Aggregate Consideration shall also include the amount of any short-term debt and long-term liabilities of the Company (including the principal amount of any indebtedness for borrowed money and capitalized leases and the full amount of any off-balance sheet financings) (x) repaid or retired in connection with or in an effort to consummate an M&A Transaction or (y) existing on the Company's balance sheet at the time of an M&A Transaction (if such M&A Transaction takes the form of a merger, consolidation or a sale of stock or partnership interests) or assumed in connection with an M&A Transaction (if such M&A Transaction takes the form of a sale of assets).   For purposes of calculating the amount of revolving credit debt in the preceding sentence, the arithmetic mean of the amount of revolving credit debt outstanding on the last day of each month during the 12 months preceding the closing of the M&A Transaction will be used. In the event such M&A Transaction takes the form of a sale of assets, Aggregate Consideration shall include (i) the value of any current assets not purchased, minus (ii) the value of any current liabilities not assumed.   In the event such M&A Transaction takes the form of a recapitalization, restructuring, spin-off, split-off or similar transaction, Aggregate Consideration shall include the fair market value of (i) the equity securities of the Company retained by the Company's security holders following such M&A Transaction and (ii) any securities received by the Company's security holders in exchange for or in respect of securities of the Company following such M&A Transaction (all securities received by such security holders being deemed to have been paid to

Delphi Corporation
As of May 1, 2005
Exhibit C - 2

such security holders in such M&A Transaction).  The value of securities that are freely tradable in an established public market will be determined on the basis of the last market closing price prior to the consummation of a M&A Transaction.  The value of securities, lease payments and other consideration that are not freely tradable or have no established public market, or if the consideration utilized consists of property other than securities, the value of such property shall be the fair market value thereof as determined in good faith by Rothschild and the Company.  Aggregate Consideration shall be deemed to include the face amount of any indebtedness for borrowed money, including, without limitation, obligations assumed, retired or defeased, directly or indirectly, in connection with, or which survive the closing of, such M&A Transaction.  If the consideration to be paid is computed in any foreign currency, the value of such foreign currency shall, for purposes hereof, be converted into U.S. dollars at the prevailing exchange rate on the date or dates on which such consideration is payable.

(b)    Percentages rounded to two decimal places.  The applicable M&A Fee Percentage for Aggregate Consideration value amounts which fall between the amounts listed above shall be calculated based on a straight line interpolation of the percentages in the M&A Fee Schedule.

As of October 2, 2005

Mr. John Sheehan
Acting Chief Financial Officer
Delphi Corporation
5725 Delphi Drive
Troy, Michigan  48098-2815

Dear Mr. Sheehan:

Reference is made to the letter agreement, dated as of  May 1, 2005 (the "Engagement Letter"), by and among Delphi Corporation (the "Company"), Rothschild Inc. ("Rothschild") and Rohatyn Associates LLC ("Rohatyn").  This letter (this "Amendment") shall confirm the understanding of the parties regarding certain amendments to the Engagement Letter to reflect the discontinuation of Rohatyn as an Advisor thereunder.  Capitalized terms used herein without definition shall have the meanings assigned to them in the Engagement Letter.

Prior to the date hereof, Rohatyn and Rothschild have jointly provided financial advisory and investment banking services under the Engagement Letter.  In connection therewith, Rothschild and Rohatyn commenced investigations of a range of possible strategic alternatives.  Consistent with its primary expertise, Rohatyn's efforts have focused on the evaluation of proposals from private equity firms for an out-of-court investment in the Company.

Rohatyn, the Company and Rothschild have mutually agreed that Rohatyn will discontinue its engagement, and Rothschild will assume all duties under the Engagement Letter as sole financial advisor and investment banker to the Company thereunder.

Accordingly, the undersigned parties hereby agree as follows:

1.    Effective as of the date hereof, and notwithstanding the notice and other provisions contained in Section 9 of the Engagement Letter, which provisions are hereby waived for the purposes of effecting the amendments contained herein, the parties acknowledge and agree that (i) the engagement of Rohatyn as an Advisor under the Engagement Letter shall be deemed to be terminated, (ii) Rohatyn shall not be obligated to provide further services contemplated by the Engagement Letter and (iii) Rothschild shall be the sole Advisor to the Company under the Engagement Letter and the term "Advisors" in the Engagement Letter shall be deemed to refer to Rothschild exclusively for the time periods from and after the date of this Amendment.

2.       Notwithstanding any provision contained in the Engagement Letter to the contrary, including without limitation the first paragraph of Section 4 thereof, Rohatyn shall not be entitled to receive fees and reimbursement of expenses from the Company or Rothschild under the Engagement Letter, except that Rohatyn shall be entitled to receive (or to the extent already paid to Rohatyn, to retain) Monthly Fees accrued, and reimbursement of expenses incurred, in each case on or prior to the date hereof, in each case in accordance with prior arrangements between Rothschild and Rohatyn regarding apportionment of fees and expenses.

3.       Exhibit A to the Engagement Letter shall be amended by deleting the name "Felix G. Rohatyn".

4.       Rohatyn agrees that, during the pendency of the Company's Chapter 11 cases, it will not accept any engagement or perform any service for any entity or person in connection with the Company or such Chapter 11 cases.  The parties acknowledge and agree that Rohatyn may at any time provide or continue to provide professional services to entities or persons that may be creditors or equity security holders of the Company, or that may otherwise be parties in interest in the Company's Chapter 11 cases, provided, however, that such services do not relate to, or have any direct connection with, the Company or its Chapter 11 cases.

5.       Section 7 of the Engagement Letter shall be amended to include the law firm of Skadden, Arps, Slate, Meagher & Flom LLP as of July 12, 2005.

6.       Except as expressly amended hereby, the Engagement Letter is and shall remain in full force and effect, enforceable in accordance with its terms.  Without limiting the foregoing, nothing contained in this Amendment shall be construed to reduce or otherwise modify (i) the amount of any payments required to be made by the Company under the Engagement Letter, including, without limitation, pursuant to Sections 4, 5, 6, 8 and 9 thereof and Exhibits B and C thereto or (ii) the Company's continuing indemnification and exculpation obligations with respect to Rohatyn under Sections 8 and 10(b) of the Engagement Letter, including the provisions of Exhibit B thereto.

7.       This Amendment shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to such state's principles of conflicts of laws.

8.       This Amendment may be executed in counterparts and all such counterparts shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Amendment by telecopier shall be effective as delivery of a manually executed counterpart to this Amendment.  Upon the execution hereof, this Amendment and the Engagement Letter shall constitute one and the same agreement.

[SIGNATURE PAGES FOLLOW]

If the foregoing accurately reflects the agreement between the parties hereto, please countersign this Amendment in the space provided below, whereupon this Amendment shall become binding on the parties hereto in accordance with its terms, and effective as of the date first written above.

Very truly yours,

ROTHSCHILD INC.

By: _____

David L. Resnick
Managing Director

ROHATYN ASSOCIATES LLC

By:_____

Felix G. Rohatyn
President

Accepted and Agreed to as of
the date first written above:

DELPHI CORPORATION

By:_____

Name:
Title:

If the foregoing accurately reflects the agreement between the parties hereto, please countersign this Amendment in the space provided below, whereupon this Amendment shall become binding on the parties hereto in accordance with its terms, and effective as of the date first written above.

Very truly yours,

ROTHSCHILD INC.

By:_____
    David L. Resnick
    Managing Director

ROHATYN ASSOCIATES LLC

By:_____
    Felix G. Rohatyn
    President

Accepted and Agreed to as of
the date first written above:

DELPHI CORPORATION

By:_____
    Name: JOAN D. SHEEHAN
    Title: Acting CFO