SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                             :
        In re                    :   Chapter 11
                             :
DELPHI CORPORATION, et al.,    :   Case No. 05-_____  (___)
                             :
              Debtors.    :   (Jointly Administered)
                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. §§ 105, 361, 362, 363, 364(c), 364(d), AND
364(e) AND FED. R. BANKR.  P. 2002, 4001, AND 9014 (I) AUTHORIZING DEBTORS
TO OBTAIN SECURED POSTPETITION FINANCING ON SUPERPRIORITY
SECURED AND PRIMING BASIS, (II) AUTHORIZING USE OF CASH
COLLATERAL, (III) GRANTING ADEQUATE PROTECTION TO PREPETITION
SECURED LENDERS, (IV) GRANTING INTERIM RELIEF, AND (V) SCHEDULING
A FINAL HEARING UNDER FED. R. BANKR. P. 4001(b) and (c)

("FINANCING MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the

"Affiliate Debtors"),[1] debtors and debtors-in-possession in the above-captioned cases

(collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order:

(a)    under 11 U.S.C. §§ 105, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1),

and 364(e) and Fed. R. Bankr. P. 2002, 4001(c), and 9014 authorizing,

inter alia:

(i)    (A) Delphi to obtain secured postpetition financing as

guaranteed by each of the other Debtors (the "Financing"), up to an

aggregate principal amount not to exceed $2 billion, consisting of a

$1,750,000,000 revolving credit facility (inclusive of a sublimit in the

aggregate of $325 million for the issuance of letters of credit (the "Letters

of Credit")) and a $250 million term loan facility, from JPMorgan Chase

Bank, N.A., as administrative agent (in its capacity as agent for the DIP

Lenders referred to below, the "Agent"), and from a syndicate of other

financial institutions arranged by J.P. Morgan Securities Inc. and

---

[1]    In addition to Delphi, the following entities are debtors in these related cases: ASEC Manufacturing General Partnership, ASEC Sales General Partnership, Aspire, Inc., Delco Electronics Overseas Corporation, Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems Global (Holding), Inc., Delphi Automotive Systems Human Resources LLC, Delphi Automotive Systems International, Inc., Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems LLC, Delphi Automotive Systems Overseas Corporation, Delphi Automotive Systems Risk Management Corp., Delphi Automotive Systems Services LLC, Delphi Automotive Systems Tennessee, Inc., Delphi Automotive Systems Thailand, Inc., Delphi China LLC, Delphi Connection Systems, Delphi Diesel Systems Corp., Delphi Electronics (Holding) LLC, Delphi Foreign Sales Corporation, Delphi Integrated Service Solutions, Inc., Delphi International Holdings Corp., Delphi International Services, Inc., Delphi Liquidation Holding Company, Delphi LLC, Delphi Mechatronic Systems, Inc., Delphi Medical Systems Colorado Corporation, Delphi Medical Systems Corporation, Delphi Medical Systems Texas Corporation, Delphi NY Holding Corporation, Delphi Services Holding Corporation, Delphi Technologies, Inc., DREAL, Inc., Environmental Catalysts, LLC, Exhaust Systems Corporation, Packard Hughes Interconnect Company, Specialty Electronics, Inc., and Specialty Electronics International Ltd.

Citigroup Global Markets, Inc. (including JPMorgan Chase Bank, N.A.,

the "DIP Lenders"), pursuant to the Revolving Credit, Term Loan and

Guaranty Agreement, dated as of October 8, 2005, substantially in the

form attached hereto as Exhibit A, (as amended, supplemented, or

otherwise modified from time to time, the "Credit Agreement") and the

other Loan Documents to be executed and delivered in connection

therewith;[2] and

> (ii)    the Debtors to grant the DIP Lenders, in order to secure the

Debtors' respective obligations under the Financing, (A) priority in

payment with respect to such obligations over any and all administrative

expenses of the kinds specified in 11 U.S.C. §§ 503(b) and 507(b), subject

to the Carve-Out (as defined below), (B) perfected first priority security

interests in and liens upon all unencumbered prepetition and postpetition

property of the Debtors, subject to the Carve-Out and excluding avoidance

actions, (C) perfected junior security interests in and liens upon all

prepetition and postpetition property of the Debtors that is subject to valid,

perfected, and non-avoidable liens in existence on the Petition Date (as

defined below), or to valid liens in existence on the Petition Date that are

perfected thereafter as permitted by 11 U.S.C. § 546(b), subject to the

Carve-Out; provided, however, that such security interests and liens shall

not be junior to any liens of the Prepetition Agent or the Prepetition

Secured Lenders (each as defined below), and (D) perfected liens and

---

[2]    Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the Credit Agreement.

security interests senior to all liens and security interests of the Prepetition

Agent or the Prepetition Secured Lenders in the Prepetition Collateral (as

described below), subject to the Carve-Out;

(b)    under 11 U.S.C. § 363(c), authorizing the Debtors to use the Cash

Collateral (as defined below);

(c)    under 11 U.S.C. §§ 361, 363(e), and 364(d), authorizing the Debtors to

provide adequate protection (in the form described in paragraph 17 of this

Motion) to the Prepetition Agent and the Prepetition Secured Lenders

under the Prepetition Credit Agreement (as defined below) with respect to

their prepetition secured debt (the "Prepetition Debt") under the

Prepetition Credit Agreement and all collateral and ancillary documents

executed in connection therewith (the "Existing Agreements") on account

of diminution in the value of the Prepetition Secured Lenders' interests in

the Prepetition Collateral resulting from the priming liens and security

interests sought herein to secure the Financing, the use of the Cash

Collateral, the use, sale, or lease of the Prepetition Collateral, or the

imposition of the automatic stay pursuant to 11 U.S.C. § 362(a);

(d)    subject to and effective only upon the entry of a final order granting such

relief, the limitation of the Debtors' right to surcharge against collateral

pursuant to 11 U.S.C. § 506(c), which is an "Extraordinary Provision"

("Extraordinary Provision") under General Order No. M-274 of the United

States Bankruptcy Court for the Southern District of New York (the

"General Order")

4

(e)     permission to accelerate Borrowings and the termination of the

Commitments under the DIP Credit Agreement upon (a) a Change of

Control (as each such term is defined in the DIP Credit Agreement) or (b)

the entry of an order or orders granting relief from the automatic stay

applicable under section 362 of the Bankruptcy Code to the holder or

holders of any security interest to permit foreclosure (or the granting of a

deed in lieu of foreclosure or the like) on any assets of the Borrower or

any of the Guarantors which have a value in excess of $20 million in the

aggregate, which are Extraordinary Provisions under the General Order;

(f)     subject and only effective upon the entry of a final order granting such

relief, the limitation of the Debtors' right to surcharge against collateral

pursuant to section 506(c) of the Bankruptcy Code, which is an

Extraordinary Provision under the General Order;

(g)     under Fed. R. Bankr. P. 4001, and after a preliminary hearing on the

Motion, authorizing Delphi, inter alia, to borrow from the DIP Lenders

under the DIP Credit Agreement up to an aggregate of $950 million

(inclusive of the issuance of up to an aggregate face amount of $325

million of Letters of Credit), all upon the terms and conditions set forth in

the Loan Documents and such entry of an interim order substantially in the

form of Exhibit B attached hereto (the "Interim Order") pending the Final

Hearing (as defined below); and

(h)     scheduling a final hearing (the "Final Hearing") and establishing notice

procedures in respect of the Final Hearing, by this Court, to consider entry

of a final order (the "Final Order") authorizing, on a final basis, <u>inter alia</u>, the Financing.

In support of this Motion, the Debtors submit the Affidavit Of Robert S. Miller, Jr. In Support Of Chapter 11 Petitions And First Day Orders, sworn to October 8, 2005 (the "Miller Affidavit"). In further support of this Motion, the Debtors respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8, 2005 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have moved this Court for an order authorizing joint administration of these chapter 11 cases.

2.    No trustee, examiner, or creditors' committee has been appointed in the Debtors' cases.

3.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.    The statutory predicates for the relief requested herein are sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.    <u>Current Business Operations Of The Debtors</u>

5.    With more than 180,000 employees worldwide, global 2004 revenues of approximately $28.6 billion and global assets as of August 31, 2005 of approximately $17.1

6

billion,[3] Delphi ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations without supervision from this Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy Code.

6.    Over the past century, the operations that are now owned by Delphi have become a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines.  Today, the Company is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company's technologies and products are present in more than 75 million vehicles on the road worldwide.  The Company supplies products to nearly every major global automotive original equipment manufacturer with 2004 sales to its former parent, General Motors Corporation, equaling approximately $15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

7.    As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world.  In the U.S., the Debtors employ approximately 50,600 people.  Those employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in Delphi's worldwide headquarters and customer center located in Troy, Michigan.  Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and

---

[3]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

local unions.  Outside the United States, the Company's foreign entities employ more than

134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40

countries worldwide.

8.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary

of GM.  Prior to January 1, 1999, GM conducted the Company's business through various

divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions

and subsidiaries were transferred to Delphi and its subsidiaries and affiliates in accordance with

the terms of a Master Separation Agreement between Delphi and GM.  In connection with these

transactions, Delphi accelerated its evolution from a North American-based, captive automotive

supplier to a global supplier of components, integrated systems, and modules for a wide range of

customers and applications.  Although GM is still the Company's single largest customer, today

more than half of Delphi's revenue is generated from non-GM sources.

9.    Due to the significant planning that goes into each vehicle model, Delphi's

efforts to generate new business do not immediately affect its financial results, because supplier

selection in the auto industry is generally finalized several years prior to the start of production

of the vehicle.  When awarding new business, which is the foundation for the Company's

forward revenue base, customers are increasingly concerned with the financial stability of their

supply base.  The Debtors believe that they will maximize stakeholder value and the Company's

future prospects if they stabilize their businesses and continue to diversify their customer base.

The Debtors also believe that this must be accomplished in advance of  the expiration of certain

benefit guarantees between GM and certain of Delphi's unions representing most of its U.S.

hourly employees which coincides with the expiration of the Company's U.S. collective

bargaining agreements in the fall of 2007.

C.      Events Leading To Chapter 11 Filing

10.    In the first two years following Delphi's separation from GM, the Company

generated more than $2 billion in net income.  Every year thereafter, however, with the exception

of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net

operating loss of $482 million on $28.6 billion in net sales.  Reflective of a downturn in the

marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005.

The Company experienced net operating losses of $608 million for the first six months of

calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion

less in sales than during the same time period in calendar year 2004.[4]

11.    The Debtors believe that three significant issues have largely contributed to

the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S.

legacy liabilities and operational restrictions driven by collectively bargained agreements,

including restrictions preventing the Debtors from exiting non-strategic, non-profitable

operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive

U.S. vehicle production environment for domestic OEMs resulting in the reduced number of

motor vehicles that GM produces annually in the United States and related pricing pressures, and

(c) increasing commodity prices.

12.    In light of these factors, the Company determined that it would be imprudent

and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio,

operational issues and forward looking revenue requirements.  Having concluded that pre-filing

discussions with its Unions and GM were not leading to the implementation of a plan sufficient

to address the Debtors' issues on a timely basis, the Company determined to commence these

---

[4]        Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily
related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

13.    Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses.  This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned in the Company's transformation plan.  The Debtors believe that a substantial segment of Delphi's U.S. business operations must be divested, consolidated, or wound-down through the chapter 11 process.

14.    Upon the conclusion of this process, the Debtors expect to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

<u>The Prepetition Credit Agreement</u>

15.    The Debtors' primary secured obligations arise under that certain Third Amended and Restated Credit Agreement, dated as of June 14, 2005, among Delphi, as borrower, JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, the "Prepetition Agent"), the lenders from time to time party thereto (the  "Prepetition Secured Lenders"), Citicorp USA, Inc., as syndication agent, Credit Suisse First Boston, Deutsche Bank

AG, New York Branch, and HSBC Bank USA, as co-documentation agents for the revolving

facility, Deutsche Bank AG, New York Branch, as documentation agent for the term facility, J.P.

Morgan Securities Inc. and Citigroup Global Markets Inc., as joint bookrunners for the revolving

facility, J.P. Morgan Securities Inc., Citigroup Global Markets, Inc., and Deutsche Bank

Securities Inc., as joint bookrunners for the term facility, J.P. Morgan Securities Inc. and

Citigroup Global Markets, Inc., as joint lead arrangers (as amended, supplemented, or otherwise

modified from time to time, the "Prepetition Credit Agreement").

16.    The Prepetition Credit Agreement provides for revolving loans, term loans,

swingline loans, and the issuance of letters of credit up to an aggregate principal amount of

$2,825,000,000.  Proceeds under the Prepetition Credit Agreement were used for Delphi's

general corporate purposes including Investments (as such term is defined in the Prepetition

Credit Agreement) to, or in, subsidiaries of Delphi.  Delphi's obligations as borrower and the

Affiliate Debtors' obligations as guarantors (in the case of each Affiliate Debtor party to the

Guarantee and Collateral Agreement (as defined in the Prepetition Credit Agreement), each an

"Existing Guarantor") under the Prepetition Credit Agreement are secured by security interests in

substantially all of the material tangible and intangible assets of Delphi and the Existing

Guarantors (the "Prepetition Collateral").[5]  The Debtors note, however, that certain receivables

that the Debtors estimate have a face value of approximately $1.2 billion as well as certain

related security, and collections (collectively, the "Receivables Security"), generated by Delphi

and Delphi Automotive Systems LLC  (including in its capacity as successor by merger to Delco

Electronics Corporation) were not included in the Prepetition Collateral.[6]  In addition, the

---

[5]    Delphi pledged only 65% of the stock of its first tier foreign subsidiaries.

[6]    The Receivables Security was sold to Delphi Receivables LLC, a bankruptcy remote special purpose
vehicle (and not a Debtor herein), pursuant to a receivables sales agreement and as part of a securitization
program (the "Receivables Sale Agreement").  The Receivables Sales Agreement provides that to the extent
the sale of Receivables Security to Delphi Receivables LLC is not deemed to be a "true sale," then Delphi

Prepetition Secured Lenders do not have a perfected security interest in (a) real property located in jurisdictions that impose material real estate recording taxes and other real property to the extent that the Prepetition Secured Lenders did not obtain a valid mortgage or deed of trust or otherwise failed to perfect their security interest therein, (b) real property with a value less than $5 million, and (c) the capital stock of foreign subsidiaries pledged under the Existing Agreements to the extent that local law requirements were not satisfied. Further, a portion of the Revolving Loans (as defined in Prepetition Credit Agreement) may not be secured by Domestic Manufacturing Property[7] and shares of stock or indebtedness of any U.S. subsidiary of the Borrower that owns Domestic Manufacturing Property. That portion is equal to the excess amount by which the Revolving Loans, when taken together with all other senior secured debt of Delphi and its subsidiaries, exceeds 15% of Consolidated Net Tangible Assets.[8]

17.    In conjunction with entering into the Prepetition Credit Agreement, Delphi's wholly-owned domestic subsidiaries (other than insignificant subsidiaries and subsidiaries that

---

Receivables LLC has a security interest in the Receivables Security. This security interest was perfected by the filing of a UCC-1 financing statement. Under the Receivables Sale Agreement and the Existing Agreements, any security interest that the Prepetition Secured Lenders could have in the Receivables Security did not arise, until the termination of the Receivables Sale Agreement, and the Prepetition Secured Lenders could not perfect any such security interest in the Receivables Security until the Receivables Sale Agreement was terminated. As of the Petition Date, Delphi Receivables LLC had not terminated the Receivables Sale Agreement and, therefore, as of the Petition Date the Prepetition Secured Lenders did not have a security interest in the Receivables Security. There presently are no amounts outstanding under the Receivables Sale Agreement. Delphi gave notice on Friday, October 7, 2005 of its election to terminate the receivables program upon the earlier of Tuesday, October 11, 2005 and the occurrence of an Amortization Event (as defined in the Receivables Purchase Agreement dated as of March 31, 2003). Delphi's filing of a voluntary petition in this Court for reorganization relief under the Bankruptcy Code constituted an Amortization Event and the program was thereby terminated.

[7]    Domestic Manufacturing Property is defined under that certain Indenture (the "Indenture") dated as of April 28, 1999 between Delphi and JPMorgan (as successor to The First National Bank of Chicago) as any manufacturing plant or facility owned by Delphi or any manufacturing subsidiary which is located within the continental United States of America and, in the opinion of the Delphi board of directors, is of material importance to the total business conducted by Delphi and its consolidated affiliates as an entity.

[8]    Consolidated Net Tangible Assets is defined in the Indenture as all amounts that would, in conformity with generally accepted accounting principles, be set forth opposite the caption "total assets" (or any like caption) on a consolidated balance sheet of Delphi and its consolidated subsidiaries less (a) all current liabilities and (b) goodwill, trade names, patents, unamortized debt discount, organization expenses, and other like intangibles of Delphi and its consolidated subsidiaries.

participate in accounts receivable financings), all of which are Debtors herein, guaranteed all of Delphi's obligations under the Prepetition Credit Agreement.

18.    As of the Petition Date, Delphi was indebted to the Prepetition Secured Lenders in the aggregate amount of approximately $2,579,783,051.85 (the "Prepetition Lender Debt"), consisting of, among other things, (a) Revolving Loans made pursuant to the Existing Agreements in the aggregate amount of principal as of the Petition Date of approximately $1.5 billion, (b) Term Loans (as defined in the Prepetition Credit Agreement) made pursuant to the Existing Agreements in the aggregate amount of principal as of the Petition Date of approximately $988,329,620.59, and (c) Reimbursement Obligations (as defined in the Prepetition Credit Agreement) in respect of Letters of Credit in an aggregate amount of approximately $91,453,431.26, in each case _plus_ all interest accrued and unpaid as of the Petition Date, fees, costs, expenses, and all charges related thereto.

The Debtors' Financing Arrangements

A.    The Debtors' Efforts To Obtain Financing

19.    The Debtors currently do not have any available sources of funds other than the Cash Collateral (as defined below) and the proposed Financing to carry on the operation of their businesses.[9] The Debtors urgently require working capital to continue their operations. Miller Affidavit at ¶ 299. The uncertainty concerning the Debtors' financial condition has curtailed the Debtors' availability of credit and acceptable credit terms. More specifically, the Debtors' ability to maintain business relationships with their vendors and suppliers, to purchase new inventory, and otherwise to finance their operations is dependent on their ability to use Cash

---

[9]    Although Delphi Receivables LLC is not a debtor herein, the commencement of the cases is a termination event under the securitization facility backed by the Receivables Security, making borrowings thereunder unavailable.

Collateral and obtain the funds that would be made available under the Financing.  Miller

Affidavit at ¶ 299.

20.    Any potential disruption of the Debtors' operations would be devastating at

this critical juncture.  The Debtors' inability to obtain sufficient liquidity and to make payments

on certain obligations on a timely basis may result in a permanent and irreplaceable loss of

business, causing a loss of value to the detriment of the Debtors and all parties-in-interest.  In

light of the foregoing, the Debtors have determined, in the exercise of their sound business

judgment, that the Financing is critical to their ongoing operations in the ordinary course.  The

Debtors therefore seek authorization from this Court to enter into the DIP Credit Agreement.

21.    The Debtors have been unable to obtain credit from any source on terms

more favorable than those offered pursuant to the Financing.  Prior to the Petition Date, the

Debtors surveyed various sources of debtor-in-possession financing from a number of global

financial institutions.  The Debtors obtained proposals for debtor-in-possession financing from

various global financial institutions.  Collectively, these institutions provided four debtor-in-

possession financing proposals that would require senior "priming" liens and four proposals that

would refinance in full the Prepetition Debt.  After exhaustive negotiations involving their

financial and legal advisors, the Debtors concluded that the Financing offered by the Agent

presented the best option available and would enable the Debtors to preserve their value as a

going concern.  Miller Affidavit at ¶ 301.  The proposal received from the Agent is competitive

and addresses the Debtors' working capital and liquidity needs.

B.    The DIP Credit Agreement

22.    Prior to the Petition Date, the Debtors engaged in good-faith and extensive,

arm's-length negotiations with the Agent and Citicorp USA, Inc. ("CUSA").  These negotiations

culminated in an agreement by the Agent and CUSA to provide debtor-in-possession financing

14

on the terms and subject to the conditions set forth in the DIP Credit Agreement and the Interim

Order. Miller Affidavit at ¶ 302.  A copy of the DIP Credit Agreement is attached hereto as

Exhibit A.

23.    The significant elements of the Loan Documents, the proposed Interim

Order, and the proposed Final Order, are as follows:[10]

    (a)    **Borrower**: Delphi Corporation as debtor and debtor-in-possession.

    (b)    **Guarantors**: The Affiliate Debtors.

    (c)    **Commitment**: A total commitment of $2 billion consisting of:

        (i)    **Tranche A or the Revolving Facility**: A revolving commitment of $1,750,000,000; and

        (ii)    **Tranche B or the Term Loan**: A term loan commitment of $250 million.

    (d)    **Letters of Credit**: Up to $325 million of the Revolving Facility shall be available for the issuance of Letters of Credit by JPMorgan Chase Bank, N.A. and the other Issuing Lenders.  No Letter of Credit shall have an expiration date after the earlier of (i) one year after the date of issuance and (ii) 180 days after the Maturity Date; provided, that any Letter of Credit with a one-year tenor may provide for the renewal thereof for additional one-year periods (which shall in no event extend beyond the date referred to in clause (ii) above).

    (e)    **Borrowing Base**: From and after the entry of the Final Order, the sum of (i) 85% of Eligible Receivables (other than GM Receivables), plus (ii) 85% of GM Receivables, plus (iii) Available Inventory, plus (iv) the Fixed Asset Component, minus (v) the Carve-Out, minus (vi) an amount equal to the excess (if any) of the aggregate amount of Secured Domestic Hedging Obligations (determined on a marked-to-market basis) over $75 million; provided that (x) the aggregate amount of the Fixed Asset Component shall at no time account for more than 30% of the aggregate amount of the Borrowing Base (it being understood that, solely for purposes of this clause (x), the aggregate amount of the Borrowing Base shall be calculated without giving effect to the deductions described in clauses (v) and (vi)

---

[10]    This summary is qualified in its entirety by reference to the provisions of the Loan Documents.  The General Order, requires a debtor to highlight any Extraordinary Provisions. Sections of the Loan Documents that may include Extraordinary Provisions are included in the summary and are marked with an asterisk. *  Unless otherwise defined herein, capitalized terms used in this paragraph 15 shall have the meanings ascribed to such terms in the Credit Agreement.

above), and (y) GM Receivables shall at no time account for more than 25% of the total Eligible Receivables included in the Borrowing Base. Notwithstanding the foregoing, until the Agents have received a third party appraisal with respect to the Fixed Asset Component, in form reasonably satisfactory to the Agents, the aggregate dollar amount of the Fixed Asset Component included in the Borrowing Base shall be $300 million. For the avoidance of doubt, for purposes of this definition, (A) the amount described in clause (ii) of the definition of "Carve-Out" shall be deemed at all times to be equal to $35 million and (B) the amount described in clause (iii)(y) of the definition of "Carve-Out" shall be deemed at all times to be equal to $5 million. Borrowing Base standards may be fixed and revised from time to time by the Administrative Agent in its reasonable discretion with any changes in such standards to be effective 10 days after delivery of a written notice thereof to the Borrower (or immediately, without prior written notice, during the continuance of an Event of Default).

(f)     **Term**:  Borrowings and other Obligations shall be repaid in full, and the Commitment shall terminate, at the earliest of (i) the Prepayment Date, (ii) the Maturity Date, (iii) the Consummation Date, and (iv) the acceleration of the Loans and the termination of the Total Commitment in accordance with the DIP Credit Agreement.  Upon the occurrence of the Termination Date, the Loans and other obligations shall be repaid in full.

(g)     **Purpose**:  Proceeds of the Financing will be used for working capital and for other general corporate purposes of the Borrower and its Subsidiaries including the making of pension contributions, adequate protection payments to the Prepetition Secured Lenders, the payment of transaction costs, fees, and expenses in respect of the Transactions and the Cases and the payment of Restructuring Costs.

(h)     **Priority and Liens**:  Subject to the Carve-Out and the Security and Pledge Agreement, the Obligations and the Secured Obligations under the Financing, shall at all times (i) pursuant to section 364(c)(1) of the Bankruptcy Code, constitute allowed claims in the Cases having priority over any and all administrative expenses, diminution claims (including the Superpriority Claims granted to the Prepetition Secured Lenders), and all other claims against the Borrower and the Guarantors, now existing or hereafter arising, of any kind whatsoever, including all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code; (ii) pursuant to section 364(c)(2) of the Bankruptcy Code, shall at all times be secured by a valid, binding, continuing, enforceable and fully-perfected first priority senior security interest in and Lien on all tangible and intangible property of the Borrower's and the Guarantors' respective estates in the Cases that is not subject to valid, perfected, non-avoidable and enforceable Liens in existence as of the Petition Date or valid Liens in existence on the Petition Date that are

16

perfected subsequent to such date to the extent permitted by section 546(b) of the Bankruptcy Code, including all present and future accounts receivable, inventory, general intangibles, chattel paper, real property, leaseholds, fixtures, machinery and equipment, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements and other intellectual property, capital stock of any Subsidiaries of the Borrower and Guarantors and on all cash and investments maintained in the Letter of Credit Account (but excluding (x) the Borrower's and the Guarantors' rights in respect of avoidance actions under the Bankruptcy Code and (y) joint venture interests with respect to which a valid prohibition on pledging such interests or granting Liens thereon exists, it being understood that, notwithstanding such exclusion of such interests, the proceeds of such interests shall be subject to such liens under section 364(c)(2) of the Bankruptcy Code and available to satisfy the Obligations and the other Secured Obligations); (iii) pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by valid, binding, continuing, enforceable, and fully-perfected security interests in and Liens upon all tangible and intangible property of the Borrower and the Guarantors (provided that as set forth in clause (iv) of this sentence, the existing Liens that presently secure the obligations of the Borrower and the Existing Guarantors under the Prepetition Credit Agreement will be primed by the Lien in favor of the Administrative Agent and the DIP Lenders as described in clause (iv) of this sentence) that is subject to valid, perfected, and non-avoidable Liens in existence on the Petition Date or that is subject to valid Liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (other than the property referred to in clause (iv) below that is subject to the existing Liens described in clause (iv) below, as to which the Lien in favor of the Administrative Agent and the DIP Lenders will be as described in clause (iv) below), junior to such valid, perfected and non-avoidable Liens; and (iv) pursuant to section 364(d)(1) of the Bankruptcy Code, be secured by a valid, binding, continuing, enforceable, and fully-perfected first priority senior priming security interest in and senior priming Lien on all of the tangible and intangible property of the Borrower and the Guarantors that is subject to existing Liens that presently secure Borrower's and the Existing Guarantors' prepetition Indebtedness under the Prepetition Credit Agreement (but subject and subordinate to (A) the Carve-Out and (B) any Liens in existence on the Petition Date to which the Liens being primed by the Financing are subject or become subject subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code), senior to all of such Liens; provided, however, that (w) the Borrower and the Guarantors shall not be required to pledge to the Administrative Agent in excess of 65% of the voting capital stock of its direct Foreign Subsidiaries or any of the capital stock or interests of its indirect Foreign Subsidiaries (if, in the good faith judgment of the Borrower, adverse tax consequences would result to the Borrower), (x) no portion of the Carve-Out may be utilized to fund prosecution or assertion of any claims against the Administrative Agent, the DIP Lenders

or the Issuing Lenders, (y) following the Termination Date, amounts in the Letter of Credit Account shall not be subject to the Carve-Out and (z) except as otherwise provided in the Orders, no portion of the Carve-Out shall be utilized for the payment of professional fees and disbursements incurred in connection with any challenge to the amount, extent, priority, validity, perfection or enforcement of the indebtedness of the Borrower and the Guarantors owing to the Prepetition Secured Lenders or to the collateral securing such indebtedness.  The DIP Lenders agree that so long as no Event of Default shall have occurred and be continuing, the Borrower and the Guarantors shall be permitted to pay compensation and reimbursement of expenses allowed and payable under sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable, and the same shall not reduce the Carve-Out.

(i)      **Prepetition Agent's Recommendation for Priming Liens**:  The Prepetition Agent recommends that the Prepetition Secured Lenders consent and agree to the priming of their liens in the Prepetition Collateral, subject to this Court's approval of the adequate protection discussed herein.

(j)      **DIP Lender Consent to Prepetition Secured Lenders' Subordinate Liens**:  The DIP Lenders have agreed that the subordinated and junior lien in favor of the Prepetition Secured Lenders upon the Prepetition Collateral is a Permitted Lien under the DIP Credit Agreement.

(k)      **Carve-Out**:  The Agent's liens and the DIP Lenders' superpriority claim shall be, subject only to (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code, (ii) all fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code, (iii) after the occurrence and during the continuance of an Event of Default, the payment of allowed and unpaid professional fees and disbursements incurred by the Borrower, the Guarantors, and any statutory committees appointed in the Cases (each, a "Committee") in an aggregate amount not exceeding $35 million, and (iv) all unpaid professional fees and disbursements incurred or accrued by the Borrowers, the Guarantors and any Committees at any time when no Event of Default is continuing, in an aggregate amount not exceeding the sum of (a) such unpaid professional fees and disbursements reflected on the most recent Borrowing Base Certificate delivered to the Administrative Agent prior to such occurrence and (b) such unpaid professional fees and disbursements incurred or accrued after the date of such Borrowing Base Certificate but prior to any Event of Default that is then continuing in an aggregate amount under this clause (b) not exceeding $5 million (and with amounts included under this clause (b) to be supported by back-up documentation in respect of the amounts and dates of incurrence of such fees and

disbursements), in each of the foregoing clauses (i), (ii), (iii) and (iv) to the extent allowed by the Bankruptcy Court at any time.

(l)    **Interest Rate**:  At the option of the Borrower, either (i) Administrative Agent's Alternate Base Rate plus 1.50% or (ii) one, three, or six month LIBOR plus 2.50%; interest shall be payable monthly in arrears, on the Termination Date and thereafter on demand.

(m)    **Default Interest**:  Upon the occurrence and during the continuance of any default in the payment of principal, interest, or other amounts due under the DIP Credit Agreement (including, without limitation, in respect of Letters of Credit), interest shall be payable on demand at 2% above the then applicable rate.

(n)    **Financial Covenant**: Monthly cumulative minimum Global EBITDAR, commencing January 2006.

(o)    **Affirmative Covenants**: The DIP Credit Agreement contains certain affirmative covenants that are usual and customary for such an agreement including, without limitation, reporting requirements, delivery of a Borrowing Base Certificate (from and after the entry of a Final Order), collateral monitoring and review, and using best efforts to obtain a rating from S&P and Moody's on the Revolving Facility and the Term Facility.

(p)    **Negative Covenants:** The DIP Credit Agreement contains certain negative covenants that are usual and customary for such an agreement with appropriate exceptions and qualifications, including, but not limited to restrictions on Liens, mergers, Indebtedness, dividends, Investments, dispositions of assets, and transactions with Affiliates.  So long as the Facility Availability Amount is equal to or greater than $500 million, compliance with the restrictions on Investments, mergers, and disposition of assets do not apply (except in respect of Investments in, and dispositions to, direct or indirect domestic subsidiaries of the Borrower that are not debtors-in-possession).

(q)    **Events of Default**:  The DIP Credit Agreement contains certain Defaults and Events of Default, including without limitation:

    (i)    Failure by the Borrower to pay (A) interest or fees when due and such default shall continue for more than two business days or (B) principal or any reimbursement obligation or cash collateralization in respect of Letters of Credit when due (including, without limitation, on the Prepayment Date);

19

(ii)    breach of any of the negative covenants or covenants relating to the existence and obligation to give notice of Events of Default;

(iii)    breach of any other covenant or agreement contained in the DIP Credit Agreement, any Order, or the other Loan Documents, and such breach shall continue unremedied for more than 10 days;

(iv)    failure to deliver a certified Borrowing Base Certificate when due and such default shall continue unremedied for more than three Business Days;

(v)    any material representation or warranty made by the Borrower or any Guarantor in the DIP Credit Agreement or in any Loan Document or in connection with the DIP Credit Agreement or the credit extensions thereunder or any material statement or representation made in any report, financial statement, certificate, or other document furnished by the Borrower or any Guarantor to the DIP Lenders under or in connection with the DIP Credit Agreement, shall prove to have been false or misleading in any material respect when made;

(vi)    any of the cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or the Borrower or any Guarantor shall file a motion or other pleading seeking the dismissal of any of the cases under section 1112 of the Bankruptcy Code or otherwise; a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code shall be appointed in any of the Cases and the order appointing such trustee, responsible officer, or examiner shall not be reversed or vacated within 30 days after the entry thereof, or an application shall be filed by the Borrower or any Guarantor for the approval of any other Superpriority Claim (other than the Carve-Out) in any of the Cases which is pari passu with or senior to the claims of the Administrative Agent and the DIP Lenders against the Borrower or any Guarantor hereunder, or there shall arise or be granted any such pari passu or senior Super Priority Claim or the Bankruptcy Court shall enter an order terminating the use of cash collateral under the Prepetition Credit Agreement;

(vii)    *the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Borrower or any of the Guarantors which have a value in excess of $20 million in the aggregate;

(viii)    *a Change of Control shall occur;

(ix)    any material provision of any Loan Document shall, for any reason, cease to be valid and binding on the Borrower or any of the Guarantors or the Borrower or any of the Guarantors shall so assert in any pleading filed in any court;

(x)    an order of this Court shall be entered (A) reversing, staying for a period in excess of 10 days, or vacating any of the Orders or (B) without the written consent of the Administrative Agent and the Required Lenders, otherwise amending, supplementing, or modifying any of the Orders in a manner that is reasonably determined by the Agents to be adverse to the Agents and the DIP Lenders, or (C) terminating the use of cash collateral by the Borrower or the Guarantors pursuant to the Orders;

(xi)    any judgment or order in excess of $20 million as to any postpetition obligation shall be rendered against any Global Entity and the enforcement thereof shall not have been stayed;

(xii)    certain ERISA-related and environment-related defaults; or

(xiii)    such other Events of Default as are customary and consistent with the Prepetition Credit Agreement.

(r)    **Fees**: The Borrower shall pay the fees set forth in that certain letter dated September 22, 2005 from JPMorgan Chase Bank, N.A., J.P. Morgan Securities Inc. and Citigroup Global Markets, Inc. to the Borrower with respect to the fees payable by the Borrower in connection with the Financing.

<u>Use of Cash Collateral</u>

24.    As discussed above, under the terms of the Prepetition Credit Agreement, the Borrower and the Existing Guarantors, each a Debtor, have pledged substantially all of their

assets to the Prepetition Agent for the benefit of the Prepetition Secured Lenders. During the

ordinary course of their operations, the Debtors generate cash from their use of the Prepetition

Collateral (such cash, excluding Receivables Security, the "Cash Collateral"). The Debtors use

this cash in the normal course of their businesses in order to continue to finance their operations,

make essential payments such as employee salaries, payroll, taxes, the purchase of goods,

materials, and other general corporate and working capital purposes in the ordinary course of the

Debtors' businesses generally. As of the Petition Date, the Debtors have a cash balance of

approximately $500 million. The Debtors require continued use of this Cash Collateral in order

to pay their ongoing obligations and otherwise operate their business. The Debtors need the use

of the Cash Collateral in addition to the use of the cash collateral generated by the Receivables

Security.

Adequate Protection

25.    The Debtors and the Prepetition Agent have discussed the terms upon which

the Prepetition Agent believes the Prepetition Secured Lenders would consent to the Debtors' use

of the Prepetition Secured Lenders' Cash Collateral and the granting of priming liens on the

Prepetition Collateral under section 364(d)(1) of the Bankruptcy Code described herein. The

parties have agreed that the Prepetition Secured Lenders and the Prepetition Agent shall receive,

among other adequate protection provided for in the Interim Order, the following adequate

protection:

(a)    pursuant to section 364(c)(1) of the Bankruptcy Code, superpriority claims

as provided in section 507(b) of the Bankruptcy Code, limited in amount

to the aggregate diminution in value of the Prepetition Secured Lenders'

Prepetition Collateral, including, without limitation, any such diminution

resulting from the sale, lease, or use by the Debtors (or other decline in

22

value) of Cash Collateral and any other Prepetition Collateral, the priming

of the Prepetition Agent's security interests and liens in the Prepetition

Collateral by the Agent and the DIP Lenders pursuant to the DIP

Documents and the Interim Order, and the imposition of the automatic

stay pursuant to section 362 of the Bankruptcy Code, immediately junior

to the claims under section 364(c)(1) of the Bankruptcy Code held by the

Agent and the DIP Lenders;

(b)    valid and perfected security interests and liens (the "Adequate Protection

Liens") in and on all of the Debtors' right, title, and interest in, to, and

under the Collateral securing the Debtors' Obligations under the DIP

Credit Agreement, including security interests in and junior liens on

Collateral (including without limitation, the Receivables Security) in

which the Prepetition Secured Lenders did not have a valid and perfected

security interest as of the Petition Date, such Adequate Protection Liens

being immediately junior to the priming liens granted in favor of the

Agent and the DIP Lenders;

(c)    the payment, in cash, of all accrued but unpaid interest on the Prepetition

Debt and letter of credit fees, each at the non-default rate under the

Prepetition Credit Agreement, and all other fees, costs, and charges owing

in respect thereof, under the Prepetition Credit Agreement;

(d)    cash payments on the first Business Day (as defined in the DIP Credit

Agreement) of each month in an amount equal to interest accrued and

unpaid on the "Obligations" at the non-default rate equal to (i) in the case

of Eurodollar Loans, the Eurodollar Rate plus the Applicable Margin and

23

(ii) in the case of ABR Loans, ABR <u>plus</u> the Applicable Margin (as each term is defined in the Prepetition Credit Agreement); and

(e)     the payment of invoices therefor of all reasonable fees, costs, and charges incurred by the Prepetition Agent and the Prepetition Secured Lenders (including, without limitation, the reasonable fees and disbursements of counsel and one financial consultant to the Prepetition Agent and the group of Prepetition Secured Lenders, but limited to disbursements in the case of in-house counsel to the Prepetition Agent, and subject to receipt of reasonable back-up documentation).

<u>The Proposed Financing Arrangement Should Be Authorized</u>

A.     <u>Approval Under Section 364(c) Of The Bankruptcy Code</u>

26.     The Debtors propose to obtain financing under the DIP Credit Agreement by providing security interests and liens as set forth above pursuant to sections 364(c) and (d) of the Bankruptcy Code.  The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that the debtors are "unable to obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code]." 11 U.S.C. § 364(c).

27.     Section 364(c) financing is appropriate when the trustee or debtor-in-possession is unable to obtain unsecured credit allowable as an ordinary administrative claim. <u>See</u> <u>In re Ames Dep't Stores, Inc.</u>, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); <u>In re Crouse Group, Inc.</u>, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987), (secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

24

28.    Courts have articulated a three-part test to determine whether a debtor is

entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to

whether

(a)    the debtor is unable to obtain unsecured credit under section 364(b), i.e.,
by allowing a lender only an administrative claim;

(b)    the credit transaction is necessary to preserve the assets of the estate; and

(c)    the terms of the transaction are fair, reasonable, and adequate, given the
circumstances of the debtor-borrower and the proposed lender.

In re Ames Dep't Stores, 115 B.R. at 37-39.  As set forth more fully herein, all of the above

conditions have been met.

B.    Section 364(d): Priming Liens And Request For Adequate Protection

29.    If a debtor is unable to obtain credit under the provisions of section 364(c)

of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on

property of the estate that is already subject to a lien, commonly referred to as a "priming lien."

11 U.S.C. § 364(d).  Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of

postpetition debt secured by senior or "priming" liens, provides that the court may, after notice

and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or

equal lien on property of the estate that is subject to a lien only if–

(a)    the trustee is unable to obtain credit otherwise; and

(b)    there is adequate protection of the interest of the holder of the lien on the
property of the estate on which such senior or equal lien is proposed to be
granted.

30.    The determination of adequate protection is a fact-specific inquiry to be

decided on a case-by-case basis.  In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996).  "'Its

application is left to the vagaries of each case . . . but its focus is protection of the secured

creditor from diminution in the value of its collateral during the reorganization process.'" Id.

(quoting In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).

31.    In accordance with section 364(d) of the Bankruptcy Code, and consistent

with the purposes underlying the provision of adequate protection, the proposed Interim Order

provides the Prepetition Secured Lenders the following adequate protection: (a) superpriority

claims under section 364(c)(1) of the Bankruptcy Code, junior to the superpriority claims of the

DIP Lenders and subject to the Carve-Out; (b) the Adequate Protection Liens (including, without

limitation, liens on significant assets not currently securing the Prepetition Debt); (c) payment in

cash of all accrued and unpaid interest as of the Petition Date on the Prepetition Debt at the non-

default rate; (d) so long as no Default of Event of Default has occurred, payment of current

interest on the Prepetition Debt; and (e) the payment of reasonable costs and expenses of the

Prepetition Agent and the Prepetition Secured Lenders.

32.    The Debtors' ability to fulfill their working capital needs can be satisfied

only if the Debtors are authorized to borrow under the DIP Credit Agreement and to use such

proceeds to fund the operations of the Debtors.

33.    The credit provided under the DIP Credit Agreement will enable the Debtors

to continue financing their operations, pay their employees, vendors, and suppliers, and operate

their businesses in an orderly and reasonable manner to preserve and enhance the value of their

assets and enterprise for the benefit of all parties-in-interest.  Moreover, the availability of credit

under the DIP Credit Agreement will provide employees, vendors, and suppliers and other

parties with confidence in the Debtors that will enable and encourage them to resume ongoing

credit relationships with the Debtors.  Miller Affidavit at ¶ 305.  Finally, the implementation of

the Financing will be viewed favorably by the Debtors' employees and outside parties and

thereby help promote the Debtors' successful reorganization.  Miller Affidavit at ¶ 305.

C.           Use Of Cash Collateral

34.    Section 363 of the Bankruptcy Code governs the Debtors' use of property of

the estates.[11]  Section 363(c)(1) of the Bankruptcy Code provides that:

> If the business of the debtor is authorized to be operated under
> Section...1108... of this title and unless the court orders otherwise,
> the trustee may enter into transactions, including the sale or lease
> of property of the estate, in the ordinary course of business,
> without notice or a hearing, and may use property of the estate in
> the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

35.    Section 363(c)(2) of the Bankruptcy Code, however, provides an exception

with respect to "cash collateral" to the general grant of authority to use property of the estate in

the ordinary course set forth in section 363 of the Bankruptcy Code.  Specifically, a trustee or

debtor-in-possession may not use, sell, or lease "cash collateral" under subsection (c)(1) unless:

A           each entity that has an interest in such collateral consents; or

B           the court, after notice and a hearing, authorizes such use, sale, or lease in
            accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

36.    Substantially all cash generated by the Debtors' businesses as of the Petition

Date constitutes "cash collateral," as such term is defined in section 363(a) of the Bankruptcy

Code, and is subject to the interest of the Prepetition Secured Lenders.

37.    The Debtors seek to use Cash Collateral during the period commencing

immediately after the filing of the Debtors' chapter 11 petitions until the indefeasible payment in

full in cash of the Obligations (as defined in the DIP Credit Agreement), including all Loans (as

defined in the DIP Credit Agreement) and all obligations constituting unreimbursed drawings

---

[11]    Pursuant to section 1107 of the Bankruptcy Code, a debtor-in-possession has all of the rights and powers of
a trustee with respect to property of the estate, including the right to use property of the estate in
compliance with section 363 of the Bankruptcy Code. See 11 U.S.C. § 1107(a).

under Letters of Credit (and the replacement or the cash collateralization of outstanding Letters

of Credit) in accordance with the DIP Credit Agreement. The Cash Collateral will be used by

the Debtors to make such essential payments as employee salaries, payroll, taxes, the purchase of

goods and materials, and other general corporate and working capital purposes in the ordinary

course of Debtors' businesses that become due and payable during the period commencing

immediately after the filing of the Debtors' chapter 11 petitions and through termination of the

DIP Credit Agreement.

   38. As discussed above, pursuant to section 363(c)(2) of the Bankruptcy Code, a

debtor-in-possession may use cash collateral with the consent of the secured party or court

approval. Section 363(e) of the Bankruptcy Code provides that upon request of an entity that has

an interest in property to be used by a debtor, the court shall prohibit or condition such use as is

necessary to provide adequate protection of such interest.

D.  The Debtors Do Not Have An Alternative To The Financing

   39. As set forth in the Miller Affidavit, a working capital facility of the type and

magnitude needed in these chapter 11 cases could not have been obtained on an unsecured basis.

Potential sources of the proposed Financing for the Debtors, obtainable on an expedited basis

and on reasonable terms, were extremely limited. In these circumstances, "[t]he statute imposes

no duty to seek credit from every possible lender before concluding that such credit is

unavailable." In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986).

   40. A debtor need only demonstrate "by a good faith effort that credit was not

available without" the protections afforded to potential lenders by sections 364(c) and (d) of the

Bankruptcy Code. Id.; see also In re Plabell Rubber Prods., Inc., 137 B.R. 897, 900 (Bankr. N.D.

Ohio 1992). Moreover, where there are few lenders likely to be able and willing to extend the

necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to

conduct an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr.

N.D. Ga. 1988), aff'd, 99 B.R. 117 (N.D. Ga. 1989). Thus, the evidence introduced at the interim

hearing to consider the relief requested in the Interim Order (the "Interim Hearing") will satisfy

the requirement of sections 364(c) and (d) of the Bankruptcy Code that alternative credit on more

favorable terms was unavailable to the Debtors.

E.      Application Of The Business Judgment Standard

            41.    As described above, after appropriate investigation and analysis and given

the exigencies of the circumstances, the Debtors' management has concluded that the Financing

is the only alternative available in the circumstances of these cases.  Bankruptcy courts routinely

defer to the debtor's business judgment on most business decisions, including the decision to

borrow money.  See Group of Institutional Investors v., Milwaukee St. Paul & Pac. R.R. Co.,

318 U.S. 523, 550 (1943); In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985)

("Business judgments should be left to the board room and not to this Court."); In re Lifeguard

Indus., Inc., 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).  "More exacting scrutiny would slow

the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy

Code's provision for private control of administration of the estate, and threaten the court's ability

to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303,

1311 (5th Cir. 1985).

            42.    In general, a bankruptcy court should defer to a debtor's business judgment

regarding the need for and the proposed use of funds, unless such decision is arbitrary and

capricious.  In re Curlew Valley Assocs., 14 B.R. 506, 511-13 (Bankr. D. Utah 1981).  Courts

generally will not second-guess a debtor's business decisions when those decisions involve "a

business judgment made in good faith, upon a reasonable basis, and within the scope of [its]

authority under the [Bankruptcy] Code." Id. at 513-14 (footnote omitted).

43.    The Debtors have exercised sound business judgment in determining that a debtor-in-possession credit facility is appropriate and have satisfied the legal prerequisites to borrow under the DIP Credit Agreement.  The terms of the DIP Credit Agreement are fair and reasonable and are in the best interests of the Debtors' estates.  Accordingly, the Debtors should be granted authority to enter into the DIP Credit Agreement and borrow funds from the DIP Lenders on the secured, administrative superpriority basis described above, pursuant to section 364(c) of the Bankruptcy Code, and take the other actions contemplated by the DIP Credit Agreement and as requested herein.

44.    Without the liquidity provided by the Financing, the Debtors will be unable to pay suppliers, employees, and other constituencies that are essential to the orderly operation of their businesses.  The Debtors' managers have exercised their best business judgment in negotiating the Financing that is presently before this Court.

F.    The Financing Is Necessary To Preserve the Assets Of The Debtors' Estates And To Operate Their Businesses

45.    No party-in-interest can contend seriously that the Debtors do not need immediate access to a working capital facility.  As with most other large businesses, the Debtors have significant cash needs.  Access to substantial credit is necessary to meet the day-to-day costs associated with maintaining business relationships with the Debtors' vendors and suppliers, purchasing new inventory, and otherwise financing their operations.  Access to sufficient cash is therefore critical to the Debtors.  In the absence of immediate access to cash and credit, the Debtors' suppliers will refuse to sell critical supplies and services to the Debtors, and the Debtors will be unable to operate their businesses.  The inability to meet payments to vendors and satisfy customers' desires for particular products would impair seriously the Debtors' prospects for reorganization.

30

46.    For these reasons, access to credit under the Financing is critical.   The

Debtors cannot wait for the beneficial effects of the Financing; any substantial delay could have

the same impact as denial of the Motion.   The Debtors' need for access to the Financing therefore

is immediate.

G.    The Terms Of The Financing Are Fair, Reasonable, And Appropriate

47.    The Debtors are unable to obtain unsecured credit allowable solely as an

administrative expense.   The proposed Financing reflects the exercise of sound and prudent

business judgment.   The Debtors would not have been able to obtain financing on an unsecured

basis, or otherwise.   In the Debtors' business judgment, the Financing is the best financing option

available in the circumstances in these chapter 11 cases.

48.    The proposed terms of the Financing are fair, reasonable, and adequate in

that these terms neither (a) tilt the conduct of these chapter 11 cases and prejudice the powers

and rights that the Bankruptcy Code confers for the benefit of all creditors, nor (b) prevent

motions by parties-in-interest from being decided on their merits.   The purpose of the Financing

is to enable the Debtors to meet ongoing operational expenses.

49.    The proposed Financing provides that the security interests and

administrative expense claims granted to the Lender are subject to the Carve-Out.   In In re Ames

Dep't Stores, 115 B.R. 34 (Bankr. S.D.N.Y. 1990), this Court found that such "carve-outs" are

not only reasonable, but are necessary to ensure that official committees and the debtor's estate

will be assured of the assistance of counsel.   Id. at 40.

50.    Likewise, the various fees and charges required by the DIP Lenders under

the Financing are reasonable and appropriate under the circumstances.   Indeed, courts routinely

authorize similar lender incentives beyond the explicit liens and other rights specified in section

364 of the Bankruptcy Code.   See In re Defender Drug Stores, Inc., 145 B.R. 312, 316 (9th Cir.

BAP 1992) (authorizing credit arrangement under section 364, including a lender "enhancement fee").

51.    The terms and conditions of the DIP Credit Agreement are fair and reasonable, and were negotiated by the parties in good faith and at arm's-length. Accordingly, the DIP Lenders under the DIP Credit Agreement should be accorded the benefits of section 364(e) of the Bankruptcy Code in respect of such agreement.

52.    The fairness and reasonableness of the terms of the Financing will be further shown at the Interim Hearing and Final Hearing.

H.    Request For Modification Of Automatic Stay

53.    Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition pursuant to the Bankruptcy Code. The proposed DIP Credit Agreement contemplates a modification of the automatic stay (to the extent applicable), to: (a) authorize, but not require, the lenders to file financing statements, deeds of trust, mortgages, or other similar documents to evidence, validate, and perfect the DIP Lenders' security interests granted to them under the Financing; (b) give the Debtors any notice provided for in the DIP Credit Agreement; (c) execute upon their security interests or exercise other remedies under the Loan Documents upon the occurrence of an Event of Default (as defined in the DIP Credit Agreement), after giving five business days notice in writing, served by hand or telefax upon this Court, Debtors' counsel, any trustee of the Debtors, if appointed, counsel for any official creditors' committee, counsel for the Prepetition Agent, and the Office of the United States Trustee (the "U.S. Trustee"); and (d) take such other actions required or permitted by the Loan Documents. Stay modification provisions of this kind are ordinary and standard features of postpetition debtor-in-possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.

32

I.    Request For Immediate Interim Relief

54.    Bankruptcy Rule 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than 15 days after the service of such motion.  Upon request, however, this Court is empowered to conduct a preliminary expedited hearing on the motion and to authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.  In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions.  See, e.g., In re Simasko Prod. Co., 47 B.R. at 449; see also In re Ames Dep't Stores, 115 B.R. at 38.  After the 15-day period, the request for financing is not limited to those amounts necessary to prevent destruction of the debtor's business.  A debtor is entitled to borrow those amounts that it believes prudent in the operation of its business.  See, e.g., In re Simasko Prod. Co., 47 B.R. at 449; In re Ames Dep't Stores, 115 B.R. at 36.

55.    Pending the Final Hearing, the Debtors require immediate use of Cash Collateral and Financing for, among other things, their purchase of inventory, maintenance of their facilities, and other working capital needs.  It is essential that the Debtors immediately stabilize their operations and resume paying for ordinary, postpetition operating expenses, as well as the prepetition expenses approved in the first-day orders, to minimize the damage occasioned by their cash flow problems.

56.    Absent immediate use of Cash Collateral and financing, the Debtors will be unable to pay ongoing operational expenses.  Consequently, if interim relief is not obtained, the Debtors' assets will be jeopardized immediately and irreparably harmed, to the detriment of the Debtors' estates, their creditors, and other parties-in-interest.

57.    Accordingly, pursuant to Bankruptcy Rules 4001(b) and (c), the Debtors request that, pending the Final Hearing, this Court schedule the Interim Hearing as soon as practicable to consider the Debtors' request for authorization to use Cash Collateral and obtain interim credit in an amount up to $950 million under the Financing, in accordance with and pursuant to the terms and conditions contained in the DIP Credit Agreement and the Interim Order.

58.    As noted above, the Debtors are unable to obtain unsecured credit or debt allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code in an amount sufficient and readily available to maintain ongoing operations.  Nor have the Debtors been able to obtain debtor-in-possession financing on terms more favorable than those proposed herein.  Without the Financing, the Debtors' objective of prosecuting their chapter 11 cases and restructuring their business as a going concern, while maintaining value for the benefit of creditors and employees, may fail without a fair opportunity to achieve the purpose of chapter 11.  The terms and conditions of the DIP Credit Agreement are fair and reasonable, and were negotiated extensively by well-represented parties in good faith and at arm's-length.  In these circumstances and, importantly, in light of the risk of possible material irreparable harm to the Debtors' operations, the granting of the relief requested by the Motion is more than warranted.

<u>The Financing Should Be Accorded The Benefits Of Section 364(e)</u>

59.    No consideration is being provided to any party to, or guarantor of, obligations arising under the Financing, other than as disclosed in the Loan Documents. Accordingly, the Financing should be accorded the benefits of section 364(e) of the Bankruptcy Code for all the reasons set forth herein.

Notice

60.    Notice of this Motion has been provided by facsimile, electronic

transmission, overnight delivery, or hand delivery to (a) the U.S. Trustee, (b) the Debtors' 50

largest unsecured creditors, (c) counsel for the Prepetition Agent, (d) the indenture trustee for the

Debtors' senior noteholders, (e) counsel for the Agent, and (f) known holders of prepetition liens

against the Debtors' property (as listed on Exhibit A attached hereto).  In light of the nature of the

relief requested, the Debtors submit that no other or further notice is necessary.

61.    The Debtors will, within three business days of the entry of the Interim

Order by this Court, serve by United States mail, first class postage prepaid, copies of this

Motion, the Interim Order, and a notice of the Final Hearing (the "Final Hearing Notice") to

consider entry of the proposed Final Order on: (a) the U.S. Trustee, (b) the Debtors' 50 largest

unsecured creditors, (c) counsel for the Prepetition Agent, (d) the indenture trustee for the

Debtors' senior noteholders, (e) counsel for the Agent, (f) known holders of prepetition liens

against the Debtors' property (as listed on Exhibit A attached hereto), (g) state and local taxing

authorities, (h) any party that theretofore has filed in these chapter 11 cases a request for special

notice with this Court and served such upon Debtors' counsel, and (i) any other parties as

directed by this Court.

Memorandum Of Law

62.    Because the legal points and authorities upon which this Motion relies are

incorporated herein, the Debtors respectfully request that the requirement of the service and

filing of a separate memorandum of law under Rule 9013-1(b) of the Local Bankruptcy Rules for

the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an interim order (a) authorizing the Debtors to obtain secured postpetition financing on a superpriority priming basis and modifying the automatic stay, (b) granting adequate protection to Prepetition Secured Lenders, (c) authorizing use of cash collateral, (d) granting interim relief, (e) scheduling a final hearing thereon, and (f) granting the Debtors such other and further relief as is just.

Dated: New York, New York
       October 8, 2005

> SKADDEN, ARPS, SLATE, MEAGHER
> & FLOM LLP
>
> By: s/ John Wm. Butler, Jr._____
>     John Wm. Butler, Jr. (pro hac vice motion pending)
>     John K. Lyons
>     Ron E. Meisler
> 333 West Wacker Drive, Suite 2100
> Chicago, Illinois  60606
> (312) 407-0700
>
>      - and -
>
> By: s/ Kayalyn A. Marafioti_____
>     Kayalyn A. Marafioti (KM 9632)
>     Thomas J. Matz (TM 5986)
> Four Times Square
> New York, New York 10036
> (212) 735-3000
>
>        - and -
>
> SHEARMAN & STERLING LLP
>
> By: s/ Douglas P. Bartner_____
>     Douglas P. Bartner (DB 2301)
>     Constance A. Fratianni (CF 0672)
> 599 Lexington Avenue
> New York, NY 10022-6069
> Telephone:  (212) 848-4000
> Facsimile:  (212) 848-7179
>
> Attorneys for Delphi Corporation, et al.,
>     Debtors and Debtors-in-Possession

# REVOLVING CREDIT, TERM LOAN AND GUARANTY AGREEMENT

Among

## DELPHI CORPORATION
a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code

### as Borrower,

and

## THE SUBSIDIARIES OF THE BORROWER NAMED HEREIN,
Each a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code

### as Guarantors

and

## THE LENDERS PARTY HERETO,

and

## JPMORGAN CHASE BANK, N.A.

### as Administrative Agent

and

## CITICORP USA, INC.

### as Syndication Agent

## J.P. MORGAN SECURITIES INC. and CITIGROUP GLOBAL MARKETS, INC.

### as Joint Bookrunners
### and
### Joint Lead Arrangers

[and

[●]

### as Joint Bookrunners]

**Dated as of [●], 2005**

# TABLE OF CONTENTS

**Page**

SECTION 1.    **DEFINITIONS**.................................................................................. 2
  SECTION 1.01    Defined Terms. .........................................................2
  SECTION 1.02    Terms Generally...........................................................22
  SECTION 1.03    Accounting Terms; GAAP............................................22
SECTION 2.    **AMOUNT AND TERMS OF CREDIT** ........................................ 23
  SECTION 2.01    Commitments of the Lenders.......................................23
  SECTION 2.02    Reserved.......................................................................24
  SECTION 2.03    Letters of Credit..........................................................24
  SECTION 2.04    Requests for Borrowings.............................................28
  SECTION 2.05    Funding of Borrowings ...............................................30
  SECTION 2.06    Interest Elections.........................................................30
  SECTION 2.07    [Reserved] ....................................................................32
  SECTION 2.08    Interest on Loans..........................................................32
  SECTION 2.09    Default Interest.............................................................32
  SECTION 2.10    Alternate Rate of Interest .............................................32
  SECTION 2.11    Repayment of Loans; Evidence of Debt. .....................33
  SECTION 2.12    Optional Termination or Reduction of Commitment.........................33
  SECTION 2.13    Mandatory Prepayment; Commitment Termination. ..........................34
  SECTION 2.14    Optional Prepayment of Loans. .......................................34
  SECTION 2.15    Reserved.......................................................................35
  SECTION 2.16    Increased Costs ............................................................35
  SECTION 2.17    Break Funding Payments .............................................36
  SECTION 2.18    Taxes.............................................................................37
  SECTION 2.19    Payments Generally; Pro Rata Treatment.....................39
  SECTION 2.20    Mitigation Obligations; Replacement of Lenders.............................40
  SECTION 2.21    Certain Fees .................................................................41
  SECTION 2.22    Commitment Fees .........................................................41
  SECTION 2.23    Letter of Credit Fees ....................................................42
  SECTION 2.24    Nature of Fees ..............................................................42
  SECTION 2.25    Priority and Liens.........................................................42

**TABLE OF CONTENTS**
**(continued)**

SECTION 2.26    Right of Set-Off ...................................................................44

SECTION 2.27    Security Interest in Letter of Credit Account.....................44

SECTION 2.28    Payment of Obligations...........................................................45

SECTION 2.29    No Discharge; Survival of Claims ........................................45

SECTION 2.30    Use of Cash Collateral ...........................................................45

SECTION 3.    **REPRESENTATIONS AND WARRANTIES**.........................45

SECTION 3.01    Organization and Authority ...................................................45

SECTION 3.02    Due Execution...........................................................................46

SECTION 3.03    Statements Made.......................................................................46

SECTION 3.04    Financial Statements ...............................................................46

SECTION 3.05    Ownership ..................................................................................47

SECTION 3.06    Liens............................................................................................47

SECTION 3.07    Compliance with Law ..............................................................47

SECTION 3.08    Insurance ...................................................................................47

SECTION 3.09    Use of Proceeds........................................................................48

SECTION 3.10    Litigation ...................................................................................48

SECTION 3.11    ERISA .........................................................................................48

SECTION 3.12    The Orders .................................................................................48

SECTION 3.13    Properties...................................................................................48

SECTION 4.    **CONDITIONS OF LENDING** ...............................................48

SECTION 4.01    Conditions Precedent to Initial Loans and Initial Letters of Credit...48

SECTION 4.02    Conditions Precedent to Each Loan and Each Letter of Credit .........51

SECTION 4.03    Conditions Precedent to the Tranche B Loan ....................53

SECTION 5.    **AFFIRMATIVE COVENANTS** ............................................53

SECTION 5.01    Financial Statements, Reports, etc .......................................53

SECTION 5.02    Existence....................................................................................56

SECTION 5.03    Insurance ...................................................................................56

SECTION 5.04    Obligations and Taxes.............................................................56

SECTION 5.05    Notice of Event of Default, etc ..............................................57

SECTION 5.06    Access to Books and Records ................................................57

SECTION 5.07    Maintenance of Concentration Account ...............................57

SECTION 5.08    Borrowing Base Certificate....................................................57

SECTION 5.09    Collateral Monitoring and Review........................................58

(NY) 27011/094/DIPDOCS/dip.ca.doc

10/08/05 4:49 AM

# TABLE OF CONTENTS
## (continued)

| | | |
|---|---|---|
| SECTION 5.10 | Public Rating | 58 |
| SECTION 5.11 | Subsequently Filed Domestic Entities | 58 |
| **SECTION 6.** | **NEGATIVE COVENANTS** | **59** |
| SECTION 6.01 | Liens | 59 |
| SECTION 6.02 | Merger, etc | 61 |
| SECTION 6.03 | Indebtedness | 61 |
| SECTION 6.04 | EBITDAR. | 62 |
| SECTION 6.05 | [Reserved] | 63 |
| SECTION 6.06 | Chapter 11 Claims | 63 |
| SECTION 6.07 | Dividends; Capital Stock | 63 |
| SECTION 6.08 | Transactions with Affiliates | 63 |
| SECTION 6.09 | Investments, Loans and Advances. | 64 |
| SECTION 6.10 | Disposition of Assets | 65 |
| SECTION 6.11 | Nature of Business | 65 |
| **SECTION 7.** | **EVENTS OF DEFAULT** | **65** |
| SECTION 7.01 | Events of Default | 65 |
| **SECTION 8.** | **THE AGENTS** | **69** |
| SECTION 8.01 | Appointments; Administration by Administrative Agent; No Duties for Syndication Agent | 69 |
| SECTION 8.02 | Rights of Agents | 69 |
| SECTION 8.03 | Liability of Agents. | 69 |
| SECTION 8.04 | Reimbursement and Indemnification | 70 |
| SECTION 8.05 | Successor Administrative Agent | 70 |
| SECTION 8.06 | Independent Lenders | 71 |
| SECTION 8.07 | Advances and Payments. | 71 |
| SECTION 8.08 | Sharing of Setoffs | 71 |
| **SECTION 9.** | **GUARANTY** | **72** |
| SECTION 9.01 | Guaranty. | 72 |
| SECTION 9.02 | No Impairment of Guaranty | 73 |
| SECTION 9.03 | Subrogation | 73 |
| **SECTION 10.** | **MISCELLANEOUS** | **74** |
| SECTION 10.01 | Notices | 74 |
| SECTION 10.02 | Survival of Agreement, Representations and Warranties, etc | 74 |

(NY) 27011/094/DIPDOCS/dip.ca.doc
10/08/05 4:49 AM

**TABLE OF CONTENTS**
**(continued)**

| SECTION 10.03 | Successors and Assigns | 75 |
|---|---|---|
| SECTION 10.04 | Confidentiality | 78 |
| SECTION 10.05 | Expenses; Indemnity; Damage Waiver | 79 |
| SECTION 10.06 | CHOICE OF LAW | 80 |
| SECTION 10.07 | No Waiver | 80 |
| SECTION 10.08 | Extension of Maturity | 80 |
| SECTION 10.09 | Amendments, etc. | 80 |
| SECTION 10.10 | Severability | 82 |
| SECTION 10.11 | Headings | 82 |
| SECTION 10.12 | Survival | 82 |
| SECTION 10.13 | Execution in Counterparts; Integration; Effectiveness | 83 |
| SECTION 10.14 | Prior Agreements | 83 |
| SECTION 10.15 | Further Assurances | 83 |
| SECTION 10.16 | USA Patriot Act | 83 |
| SECTION 10.17 | WAIVER OF JURY TRIAL | 83 |

| ANNEX A | | Commitment Amounts |
|---|---|---|
| EXHIBIT A | - | Form of Interim Order |
| EXHIBIT B | - | Form of Security and Pledge Agreement |
| EXHIBIT C | - | Form of Assignment and Acceptance |
| EXHIBIT D | - | Form of Exemption Certificate |
| SCHEDULE 1.01 | - | Existing Agreement |
| SCHEDULE 3.05 | - | Subsidiaries |
| SCHEDULE 3.10 | - | Litigation |
| SCHEDULE 6.01 | - | Liens |
| SCHEDULE 6.08 | - | Transactions with Affiliates |
| SCHEDULE 6.10 | - | Asset Sales |

(NY) 27011/094/DIPDOCS/dip.ca.doc

# REVOLVING CREDIT, TERM LOAN AND GUARANTY AGREEMENT
## Dated as of [●], 2005

REVOLVING CREDIT, TERM LOAN AND GUARANTY AGREEMENT, dated as of [●], 2005, among DELPHI CORPORATION, a Delaware corporation (the "Borrower"), a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code, and the subsidiaries of the Borrower signatory hereto (each a "Guarantor" and collectively the "Guarantors"), each of which Guarantors is a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code (the cases of the Borrower and the Guarantors, each a "Case" and collectively, the "Cases"), JPMORGAN CHASE BANK, N.A., a national banking association ("JPMCB"), CITICORP USA, INC. ("CUSA"), each of the other financial institutions from time to time party hereto (together with JPMCB and CUSA, the "Lenders"), JPMCB, as administrative agent (in such capacity, the "Administrative Agent") for the Lenders, and CUSA, as syndication agent (in such capacity, the "Syndication Agent"; together, the Administrative Agent and the Syndication Agent are the "Agents") for the Lenders.

## INTRODUCTORY STATEMENT

On [●], 2005, the Borrower and the Guarantors filed voluntary petitions with the Bankruptcy Court initiating the Cases and have continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The Borrower, the Existing Lenders and the Existing Agent are parties to the Existing Agreement pursuant to which the Borrower was (and the Pre-Petition Guarantors were, pursuant to the Guarantee and Collateral Agreement (as defined in the Existing Credit Agreement)) truly and justly indebted to the Existing Lenders on the Filing Date in the principal amount of $2,579,783,051.85 (including the aggregate outstanding face amount of issued but undrawn letters of credit outstanding thereunder) in respect of the extensions of credit provided for thereunder.

The Borrower has applied to the Lenders for loan facilities of $2,000,000,000, comprised of (i) a revolving credit and letter of credit facility in an aggregate principal amount of $1,750,000,000 as set forth herein and (ii) a term loan in an aggregate principal amount of $250,000,000 as set forth herein, all of the Borrower's obligations under each of which are to be guaranteed by the Guarantors.

The proceeds of the loan facilities will be used in accordance with Section 3.09 hereof.

To provide guarantees and security for the repayment of the Loans, the reimbursement of any draft drawn under a Letter of Credit and the payment of all other Secured Obligations (including the obligations of the Borrower and the Guarantors in respect of any hedging obligation permitted hereunder and Indebtedness permitted by Section 6.03(viii), in each case owing to JPMCB, any other Lender or any of their respective banking Affiliates), the Borrower and the Guarantors will provide to the Administrative Agent and the Lenders the claims and liens described in Section 2.25 of this Agreement.

Accordingly, the parties hereto hereby agree as follows:

# SECTION 1.    DEFINITIONS

## SECTION 1.01    Defined Terms.

"ABR", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"ABR Borrowing" shall mean a Borrowing comprised of ABR Loans.

"Additional Credit" shall have the meaning given such term in Section 4.02(d).

"Adjusted LIBO Rate" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

"Administrative Agent" shall have the meaning given such term in the Introduction.

"Affiliate" shall mean, as to any Person, any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, a Person (a "Controlled Person") shall be deemed to be "controlled by" another Person (a "Controlling Person") if the Controlling Person possesses, directly or indirectly, power to direct or cause the direction of the management and policies of the Controlled Person whether by contract or otherwise.

"Agents" shall have the meaning given such term in the Introduction.

"Agreement" shall mean this Revolving Credit, Term Loan and Guaranty Agreement, as the same may from time to time be amended, modified or supplemented.

"Alternate Base Rate" shall mean, for any day, a rate per annum equal to the greater of (a) the Prime Rate in effect on such day and (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1%. Any change in the Alternate Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective from and including the effective date of such change in the Prime Rate or the Federal Funds Effective Rate, respectively.

"Approved Fund" shall have the meaning given such term in Section 10.03(b).

"Arrangers" shall have the meaning given such term in Section 10.05(a).

"Assignment and Acceptance" shall mean an assignment and acceptance entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 10.03), and accepted by the Administrative Agent. substantially in the form of Exhibit C.

2

"Automotive Holdings Group": a division within Delphi Automotive Systems LLC comprised of select product lines and plant sites that do not meet the Borrower's targets for net income or other financial metrics, with such additions and deletions to product lines and plant sites as the Borrower may from time to time determine (in a manner consistent with the criteria used on the date hereof to include product lines and plant sites in such division) and as such divisional name may be changed from time to time.

"Availability Period" shall mean the period from and including the Closing Date to but excluding the Termination Date.

"Available Amount" shall have the meaning given such term in Section 5.08.

"Available Inventory" means, at any date of determination, the lesser of (i) an amount equal to (x) 65% of Eligible Inventory *less* (y) Inventory Reserves and (ii) 85% of the product of (x) the Net Recovery Rate in effect for the Inventory (based on the then most recent independent inventory appraisal) on such date of determination *multiplied by* (y) the aggregate amount of gross Inventory (as reported in accordance with such Borrower's inventory system at such date of determination) as set forth in the most recent Borrowing Base Certificate. Notwithstanding the foregoing, until the Agents have received a third party appraisal with respect to Eligible Inventory in form and substance, and performed by an independent appraisal firm, reasonably satisfactory to the Agents, the advance rate for Eligible Inventory for purposes of calculating the amount described in clause (i) above shall be 32.5% (rather than 65%).

"Bankruptcy Code" shall mean The Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. Section 101 et seq.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the Southern District of New York or any other court having jurisdiction over the Cases from time to time.

"Board" shall mean the Board of Governors of the Federal Reserve System of the United States.

"Borrower" shall have the meaning given such term in the Introduction.

"Borrowing" shall mean (a) the incurrence, conversion or continuation of Tranche A Loans of a single Type made from all the Tranche A Lenders on a single date and having, in the case of Eurodollar Loans, a single Interest Period and (b) the incurrence of the Tranche B Loan or the conversion or continuation of a portion of the Tranche B Loan having a specified Type and having, in the case of a Eurodollar Borrowing, a specified Interest Period.

"Borrowing Base" shall mean, on any date, an amount (calculated based on the most recent Borrowing Base Certificate delivered to the Administrative Agent in accordance with this Agreement) that is equal to the sum of (i) 85% of Eligible Receivables (other than GM Receivables), plus (ii) 85% of GM Receivables, plus (iii) Available Inventory, plus (iv) the Fixed Asset Component, minus (v) the Carve-Out, minus (vi) an amount equal to the excess (if any) of the aggregate amount of Secured Domestic Hedging Obligations (determined on a marked-to-market basis) over $75,000,000; provided that (x) the aggregate amount of the Fixed Asset

3

Component shall at no time account for more than thirty percent (30%) of the aggregate amount of the Borrowing Base (it being understood that, solely for purposes of this clause (x), the aggregate amount of the Borrowing Base shall be calculated without giving effect to the deductions described in clauses (v) and (vi) above), and (y) GM Receivables shall at no time account for more than twenty-five percent (25%) of the total Eligible Receivables included in the Borrowing Base. Notwithstanding the foregoing, until the Agents have received a third party appraisal with respect to the Fixed Asset Component, in form reasonably satisfactory to the Agents, the aggregate dollar amount of the Fixed Asset Component included in the Borrowing Base shall be $300,000,000. For the avoidance of doubt, for purposes of this definition, (A) the amount described in clause (iii) of the definition of "Carve-Out" shall be deemed at all times to be equal to $35,000,000 and (B) the amount described in clause (iv)(y) of the definition of "Carve-Out" shall be deemed at all times to be equal to $5,000,000. Borrowing Base standards may be fixed and revised from time to time by the Administrative Agent in its reasonable discretion with any changes in such standards to be effective 10 days after delivery of a written notice thereof to the Borrower (or immediately, without prior written notice, during the continuance of an Event of Default).

"Borrowing Base Amendment" shall mean an amendment to this Agreement reasonably satisfactory to the Administrative Agent to be executed and delivered prior to entry of the Final Order.

"Borrowing Base Certificate" shall mean a certificate substantially in the form of an exhibit to be annexed to the Borrowing Base Amendment (with such changes therein as may be reasonably required from time to time (upon at least 10 days' notice by the Administrative Agent, except during the continuance of an Event of Default) to reflect the components of and reserves against the Borrowing Base as provided for hereunder from time to time), executed and certified by a Financial Officer of the Borrower, which shall include appropriate exhibits, schedules and collateral reporting requirements as provided for in the Borrowing Base Amendment and Section 5.08.

"Borrowing Request" shall mean a request by the Borrower for a Borrowing in accordance with Section 2.04.

"Business Day" shall mean any day other than a Saturday, Sunday or other day on which commercial banks in New York City are required or authorized to remain closed (and, for a Letter of Credit, other than a day on which the applicable Issuing Lender is closed); provided, however, that when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits on the London interbank market.

"Capitalized Lease" shall mean, as applied to any Person, any lease of property by such Person as lessee which would be capitalized on a balance sheet of such Person prepared in accordance with GAAP. The amount of obligations of such Person under a Capitalized Lease shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve-Out" shall mean (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28

4

of the United States Code, (ii) all fees and expenses incurred by a trustee under Section 726(b) of the Bankruptcy Code, (iii) after the occurrence and during the continuance of an Event of Default, the payment of allowed and unpaid professional fees and disbursements incurred by the Borrower, the Guarantors and any statutory committees appointed in the Cases (each, a "Committee") in an aggregate amount not exceeding $35,000,000 and (iv) all unpaid professional fees and disbursements incurred or accrued by the Borrowers, the Guarantors and any Committees at any time when no Event of Default is continuing, in an aggregate amount not exceeding the sum of (x) such unpaid professional fees and disbursements reflected on the most recent Borrowing Base Certificate delivered to the Administrative Agent prior to any Event of Default that is then continuing and (y) such unpaid professional fees and disbursements incurred or accrued after the date of such Borrowing Base Certificate (but at a time when no Event of Default is continuing) in an aggregate amount under this clause (y) not exceeding $5,000,000 (and with amounts included under this clause (y) to be supported by back-up documentation in respect of the amounts and dates of incurrence of such fees and disbursements), in each of the foregoing clauses (i), (ii), (iii) and (iv), to the extent allowed by the Bankruptcy Court at any time.

"Cases" shall have the meaning given such term in the Introduction.

"Cash Collateralization" shall have the meaning given such term in Section 2.03(j), and "Cash Collateralize" shall have the corresponding meaning.

"CGMI" shall have the meaning given such term in Section 10.05(a).

"Change in Law" shall mean (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender or Issuing Lender (or, for purposes of Section 2.16(b), by any lending office of such Lender or Issuing Lender or by such Lender's or Issuing Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement.

"Change of Control" shall mean (i) the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group (within the meaning of the Securities Exchange Act of 1934 and the rules of the Securities and Exchange Commission thereunder as in effect on the date hereof), of Equity Interests representing more than 50% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of the Borrower; or (ii) the occupation of a majority of the seats (other than vacant seats) on the Board of Directors of the Borrower by Persons who were neither (A) nominated by the Board of Directors of the Borrower nor (B) appointed by directors so nominated.

"Closing Date" shall mean the date on which this Agreement has been executed and the conditions precedent to the making of the initial Loans or the issuance of the initial Letter of Credit (whichever may occur first) set forth in Section 4.01 have been satisfied or waived, which date shall occur promptly upon entry of the Interim Order, but in any event not later than 15 days following the entry of the Interim Order.

5

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"Collateral" shall mean the "Collateral" as defined in the Security and Pledge Agreement.

"Commitment" shall mean either a Tranche A Commitment or a Tranche B Commitment.

"Commitment Fee" shall mean, collectively, the Tranche A Commitment Fee and the Tranche B Commitment Fee.

"Commitment Letter" shall mean that certain Commitment Letter dated September 22, 2005, among JPMCB, JPMorgan, CGMI and the Borrower.

"Consummation Date" shall mean the date of the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes of this Agreement shall be no later than the effective date) of a Reorganization Plan that is confirmed pursuant to an order of the Bankruptcy Court.

"Disclosure Filings" shall mean the following filings made by the Borrower with the Securities and Exchange Commission: (a) the Forms 8-K filed on March 4, 2005, March 22, 2005, May 16, 2005 and June 30, 2005 relating to the restatement of certain financial statements of the Borrower (and any shareholders' litigation arising out of the matters disclosed in such Forms 8-K); (b) the Form 8-K filed on May 13, 2005 relating to certain financial information of the Borrower; (c) the Forms 8-K filed on June 9, 2005, September 8, 2005 and October 3, 2005; (d) the Form 10-K for the year ended December 31, 2004; and (e) the Forms 10-Q for the quarterly periods ended March 31, 2005 and June 30, 2005.

"Dollars" and "$" shall mean lawful money of the United States of America.

"Domestic Entities" shall mean the Borrower and its direct and indirect domestic Subsidiaries on a consolidated basis.

"DPW" shall have the meaning given such term in Section 10.05(a).

"Eligible Assignee" shall mean (i) a commercial bank having total assets in excess of $1,000,000,000, (ii) a finance company, insurance company or other financial institution or fund, in each case reasonably acceptable to the Administrative Agent, which in the ordinary course of business extends credit of the type contemplated herein and has total assets in excess of $200,000,000 and whose becoming an assignee would not constitute a prohibited transaction under Section 4975 of the Code or Section 406 of ERISA, (iii) an Affiliate of the assignor Lender, (iv) an Approved Fund and (v) any other Person reasonably satisfactory to the Administrative Agent.

"Eligible Equipment" shall mean, on any date of determination, the aggregate value (as reflected on the accounting records of the Borrower or the applicable Guarantor and consistent with such Person's current and historical accounting practices) at such date of all

6

Qualified Equipment and Machinery owned by the Borrower and the Guarantors and located in any jurisdiction in the United States of America as to which Qualified Equipment and Machinery appropriate UCC financing statements have been filed naming the Borrower or the applicable Guarantor as "debtor" and JPMorgan Chase Bank, N.A., as Administrative Agent, as "secured party". As used herein, the term "Qualified Equipment and Machinery" means, with respect to the Borrower or any Guarantor, all Equipment that is owned solely by such Person and as to which such Person has good, valid and marketable and unencumbered title; *provided* that no Equipment shall be considered for inclusion as Qualified Equipment and Machinery until (i) a collateral review of such Equipment shall have been performed by the Agents or their representatives (the fees and expenses associated with such review to be paid by the Borrower in accordance with the terms of this Agreement) and (ii) the Administrative Agent shall have received a third party appraisal of such Equipment in form and substance, and prepared by an independent appraisal firm, reasonably satisfactory to the Administrative Agent (the fees and expenses associated with such appraisal to be paid by the Borrower in accordance with the terms of this Agreement).

"Eligible Inventory" shall have the meaning given such term in the Borrowing Base Amendment (it being understood that "Eligible Inventory" shall include certain Inventory owned by the Borrower and the Guarantors which is consigned to Mexican Subsidiaries of the Borrower, *provided* that the rights of the Borrower and the Guarantors under the agreements pursuant to which such Inventory is so consigned are subject to a first priority Lien in favor of the Administrative Agent).

"Eligible Real Estate" shall mean, on any date of determination, the aggregate value (as reflected on the accounting records of the Borrower or the applicable Guarantor and consistent with such Person's current and historical accounting practices) at such date of all Qualified Real Estate owned by the Borrower and the Guarantors and located in any jurisdiction in the United States of America as to which Qualified Real Estate (x) an appropriate mortgage, deed of trust or deed to secure debt has been recorded, to the extent required to be recorded pursuant Section 2.25(b), naming the Borrower or the applicable Guarantor as "mortgagor" or "trustor" and JPMorgan Chase Bank, N.A., as Administrative Agent, as "mortgagee" or "beneficiary" and (y) UCC financing statements have been filed naming the Borrower or the applicable Guarantor as "debtor" and JPMorgan Chase Bank, N.A., as Administrative Agent, as "secured party". As used herein, the term "Qualified Real Estate" means, with respect to the Borrower or any Guarantor, all real property that is owned solely by such Person and as to which such Person has good, valid and marketable and unencumbered title; *provided* that no real property shall be considered for inclusion as Qualified Real Estate until (i) a collateral review of such real property shall have been performed by the Agents or their representatives (the fees and expenses associated with such review to be paid by the Borrower in accordance with the terms of this Agreement) and (ii) the Administrative Agent shall have received a third party appraisal of such real property in form and substance, and prepared by an independent appraisal firm, reasonably satisfactory to the Administrative Agent (the fees and expenses associated with such appraisal to be paid by the Borrower in accordance with the terms of this Agreement).

"Eligible Receivables" shall have the meaning given such term in the Borrowing Base Amendment.

7

"Environmental Laws" shall mean all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating to the protection of the environment, preservation or reclamation of natural resources, the management, release or threatened release of any Hazardous Material or to health and safety matters.

"Environmental Liability" shall mean any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower or any Subsidiary directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Lien" shall mean a Lien in favor of any Governmental Authority for (i) any liability under federal or state environmental laws or regulations, or (ii) damages arising from or costs incurred by such Governmental Authority in response to a release or threatened release of a hazardous or toxic waste, substance or constituent, or other substance into the environment.

"Equipment" shall have the meaning set forth in Article 9 of the Uniform Commercial Code as in effect from time to time in the State of New York.

"Equity Interests" shall mean shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" shall mean any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" shall mean (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by the Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by the Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by the Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or

8

partial withdrawal from any Plan or Multiemployer Plan; or (g) the receipt by the Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"Eurocurrency Liabilities" shall have the meaning assigned thereto in Regulation D issued by the Board, as in effect from time to time.

"Eurodollar", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Eurodollar Borrowing" shall mean a Borrowing comprised of Eurodollar Loans.

"Event of Default" shall have the meaning given such term in Section 7.

"Excluded Taxes" shall mean, with respect to the Administrative Agent, any Lender, any Issuing Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) income, franchise, or similar taxes imposed on (or measured by) its net income as a result of a present or former connection between the Administrative Agent or such Lender and the jurisdiction of the Governmental Authority imposing such Tax or any political subdivision or Taxing authority thereof or therein (other than any such connection arising solely from the Administrative Agent or such Lender having executed, delivered or performed its obligations or received payment under, or enforced, this Agreement or any other Loan Document), (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which the Borrower is located and (c) any withholding tax that would have been imposed had such payment been made to such Lender at the time such Lender became a party to this Agreement (or designates a new lending office) or is attributable to such Lender's failure to comply with Sections 2.18(e) and (f), except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrower with respect to such withholding tax pursuant to Section 2.18(a).

"Existing Agreement" shall mean the 5-Year Third Amended and Restated Credit Agreement dated as of June 14, 2005 among the Borrower, the Existing Lenders and the Existing Agent, as amended, restated, or otherwise modified from time to time, and shall include all of the agreements providing guaranties by the Existing Guarantors and granting security interests and Liens in property and assets of the Borrower and the Existing Guarantors to the Existing Agent or the Existing Lenders, including the security agreements and other agreements listed on Schedule 1.01 hereto, each of which documents was executed and delivered (to the extent party thereto) by the Borrower and the Existing Guarantors prior to the Filing Date, as each may have been amended or modified from time to time.

"Existing Agent" shall mean JPMCB, in its capacity as administrative agent under the Existing Agreement, and its successors in such capacity.

"Existing Collateral" shall mean the "Collateral" as defined in the Existing Agreement.

"Existing Guarantors" shall mean the Subsidiaries of the Borrower that provided guarantees of the Borrower's obligations under the Existing Credit Agreement.

"Existing Indebtedness" shall mean Indebtedness and other obligations incurred by the Borrower and the Existing Guarantors under the Existing Agreement.

"Existing Lenders" shall mean the lenders from time to time holding Existing Indebtedness.

"Facility Availability Amount" means, at any time, an amount equal to (A) the lesser of (x) the Total Commitment at such time and (y) the Borrowing Base, **minus** (B) the sum of the aggregate principal amount of the outstanding Tranche A Loans, *plus* the aggregate principal amount of the outstanding Tranche B Loans, *plus* the LC Exposure, **plus** (C) an amount (up to a maximum of $500,000,000) equal to the excess (if any) of the unrestricted cash reflected on the consolidated balance sheet of the Borrower and its Subsidiaries then most recently delivered to the Lenders over $500,000,000.

"Federal Funds Effective Rate" shall mean, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Fees" shall collectively mean the Commitment Fees, Letter of Credit Fees and other fees referred to in Sections 2.21, 2.22 and 2.23.

"Filing Date" shall mean [●], 2005.

"Final Order" shall have the meaning given such term in Section 4.02(d).

"Financial Officer" shall mean the chief financial officer, acting chief financial officer or corporate treasurer of the Borrower.

"Fixed Asset Component" shall mean, on any date, an amount equal to the sum of (i) 80% of the product of Net Orderly Liquidation Value of Eligible Equipment plus (ii) 50% of the fair market value of Eligible Real Estate (as set forth in the most recent third party real estate appraisal in form and substance, and prepared by an independent appraisal firm, reasonably satisfactory to the Administrative Agent ).

"Foreign Lender" shall mean any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is located and that is not a "United States Person" as defined in Section 7701(a)(30) of the Code. For purposes of this definition and

10

Sections 2.18(e) and (f), the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Receivables Financing" means Indebtedness and other financings relating to securitizations and factoring arrangements entered into by any of the Foreign Subsidiaries.

"Foreign Subsidiary" shall mean any direct or indirect non-U.S. Subsidiary of the Borrower.

"Foreign Subsidiary Debt Limit" shall have the meaning given such term in Section 6.03.

"GAAP" shall mean generally accepted accounting principles applied in accordance with Section 1.03.

"Global EBITDAR" shall mean, for any period, all as determined in accordance with GAAP, the consolidated net income (or net loss) of the Global Entities for such period, plus (a) to the extent deducted in the calculation of consolidated net income, without duplication, the sum of (i) income tax expense, (ii) interest expense, (iii) amortization or write-off of debt discount and debt issuance costs and commissions, discounts and other fees and charges associated with Indebtedness (including the Loans), (iv) depreciation and amortization expense, (v) amortization of intangibles (including, but not limited to, goodwill) and organization costs, (vi) any extraordinary, unusual or non recurring non cash expenses or losses (including to the extent constituting Restructuring Costs) and one-time write-downs of assets, (vii) any expenses accounted by the Borrower or any of it Subsidiaries in such period for post-employment benefits under FAS 106, (viii) any cash Restructuring Costs of the Borrower and its Subsidiaries in an aggregate amount not exceeding (x) for each four fiscal quarter period ending December 31, 2005, March 31, 2006, September 30, 2006 and December 31, 2006, $175,000,000 and (y) for any four fiscal quarter period ending in 2007, $100,000,000, (ix) professional fees and other "Chapter 11 expenses" (or "administrative costs reflecting Chapter 11 expenses") attributable to the Borrower and the Guarantors for such period as shown on the Borrower's consolidated statement of income for such period, and (x) the cumulative effect of any change in accounting principles minus (b) to the extent included in the calculation of consolidated net income, the sum of (1) interest income, (2) any extraordinary, unusual or non-recurring gains, all as determined on a consolidated basis and (3) any cash payments made during such period in respect of expenses described in clause (vii) above taken in such period.

"Global Entities" shall mean the Borrower and all of its direct and indirect Subsidiaries, on a consolidated basis.

"GM Receivables" shall mean the Eligible Receivables owing from General Motors Corporation and its Affiliates.

"Governmental Authority" shall mean the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising

executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantor" shall have the meaning set forth in the Introduction.

"Hazardous Materials" shall mean all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Hedging Agreements" shall mean (x) foreign exchange contracts, currency swap agreements, currency future or option contracts and other similar agreements designed to hedge against fluctuations in foreign interest or exchange rates, (y) interest rate swap, cap or collar agreements and interest rate future or option contracts designed to hedge against fluctuations in interest rates and (z) commodity price protection agreements or other commodity price hedging arrangements.

"Indebtedness" shall mean, at any time and with respect to any Person, (i) all indebtedness of such Person for borrowed money, (ii) all indebtedness of such Person for the deferred purchase price of property or services (other than property, including inventory, and services purchased, trade payables that are not more than 90 days past due (or that are more than 90 days past due, if the validity or amount thereof is being contested in good faith and by appropriate proceedings or if such Person shall have set aside on its books adequate reserves therefor in accordance with GAAP) and expense accruals and deferred compensation items arising in the ordinary course of business), (iii) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments (other than performance, surety and appeal bonds and completion guarantees arising in the ordinary course of business), (iv) all indebtedness of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property, in which case such Indebtedness shall be limited to the value of the property), (v) all obligations of such Person under Capitalized Leases, (vi) (A) all reimbursement, payment or similar obligations of such Person, contingent or otherwise, under acceptance, letter of credit or similar facilities and (B) all obligations of such Person in respect of Hedging Agreements; (vii) all Indebtedness referred to in clauses (i) through (vi) above guaranteed directly or indirectly by such Person, or in effect guaranteed directly or indirectly by such Person through an agreement (A) to pay or purchase such Indebtedness or to advance or supply funds for the payment or purchase of such Indebtedness, (B) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Indebtedness or to assure the holder of such Indebtedness against loss in respect of such Indebtedness, (C) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered) or (D) otherwise to assure a creditor against loss in respect of such Indebtedness, and (viii) all Indebtedness referred to in clauses (i) through (vii) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property (including accounts and contract

12

rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness; provided, however, such Indebtedness referred to in this clause (viii) shall be the lesser of the value of such property on which a Lien is attached or the amount of such Indebtedness.

"Indemnified Taxes" shall mean Taxes other than Excluded Taxes.

"Indemnitee" shall have the meaning given such term in Section 10.05(b).

"Insufficiency" shall mean , with respect to any Plan, its "amount of unfunded benefit liabilities" within the meaning of Section 4001(a)(18) of ERISA, if any.

"Intellectual Property":  the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including copyrights, copyright licenses, patents, patent licenses, trademarks, trademark licenses, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Interest Election Request" shall mean a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.06.

"Interest Payment Date" shall mean (i) as to any Eurodollar Loan included in any Eurodollar Borrowing, the last day of each consecutive 30 day period running from the commencement of the applicable Interest Period, and (ii) as to all ABR Loans, the last calendar day of each month and the date on which any ABR Loans are converted to Eurodollar Loans pursuant to Section 2.06.

"Interest Period" shall mean, as to any Eurodollar Borrowing, the period commencing on the date of such Borrowing (including as a result of a conversion from ABR Loans) or on the last day of the preceding Interest Period applicable to such Eurodollar Borrowing and ending on the numerically corresponding day (or if there is no corresponding day, the last day) in the calendar month that is one, three or six months thereafter, as the Borrower may elect in the related notice delivered pursuant to Sections 2.04 or 2.06; provided, however, that (i) if any Interest Period would end on a day which shall not be a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, and (ii) no Interest Period shall end later than the Termination Date.

"Interim Order" shall have the meaning given such term in Section 4.01(b).

"Inventory" shall have the meaning set forth in Article 9 of the Uniform Commercial Code as in effect from time to time in the State of New York.

"Inventory Reserves" shall have the meaning given such term in the Borrowing Base Amendment (if being understood that Inventory consigned to the Borrower's Mexican Subsidiaries shall be subject to reserves in excess of those generally applicable to Inventory).

13

"Investment Credit" shall mean the amount of dividends, distributions, returns of equity, repayments of advances or similar payments paid to the Borrower or any of the Guarantors during the term of this Agreement by any Person in which Investments may be made under Section 6.09(ix).

"Investments" shall have the meaning given such term in Section 6.09.

"Issuing Lender" shall mean JPMCB, in its capacity as the issuer of Letters of Credit hereunder, and its successors in such capacity as provided in Section 2.03(i) and such other Lenders (which other Lenders shall be reasonably satisfactory to the Administrative Agent) as may agree with the Borrower to act in such capacity. Any Issuing Lender may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of such Issuing Lender, in which case the term "Issuing Lender" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"JPMorgan" shall have the meaning given such term in Section 10.05(a).

"JPMCB" shall have the meaning given such term in the Introduction.

"LC Disbursement" shall mean a payment made by the Issuing Lender pursuant to a Letter of Credit.

"LC Exposure" shall mean, at any time, the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit at such time plus (b) the aggregate amount of all LC Disbursements that have not yet been reimbursed by or on behalf of the Borrower at such time. The LC Exposure of any Tranche A Lender at any time shall be its Tranche A Commitment Percentage of the LC Exposure at such time.

"Lenders" shall have the meaning set forth in the Introduction.

"Letter of Credit" shall mean any irrevocable letter of credit issued pursuant to Section 2.03, which letter of credit shall be (i) an import documentary or a standby letter of credit, (ii) issued for purposes that are consistent with the provisions of this Agreement (including Section 3.09), (iii) denominated in Dollars and (iv) otherwise in such form as may be reasonably approved from time to time by the Administrative Agent and the applicable Issuing Lender.

"Letter of Credit Account" shall mean the account established by the Borrower under the sole and exclusive control of the Administrative Agent maintained at the office of the Administrative Agent at 270 Park Avenue, New York, New York 10017 designated as the "Delphi Letter of Credit Account" that shall be used solely for the purposes set forth herein.

"Letter of Credit Fees" shall mean the fees payable in respect of Letters of Credit pursuant to Section 2.23.

"LIBO Rate" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, the rate appearing on Page 3750 of the Dow Jones Market Service (or on any successor or substitute page of such Service, or any successor to or substitute for such Service,

14