**DELPHI INTEGRATED SERVICE SOLUTIONS, INC.,**

**a Michigan corporation**

By: _____

Name: Timothy Knutson

Title:  Assistant Treasurer

**DELPHI INTERNATIONAL HOLDINGS CORP.,**

**a Delaware corporation**

By: _____

       Name: John D. Sheehan
       Title:  President

**DELPHI INTERNATIONAL HOLDINGS CORP.,**

**a Delaware corporation**

By: _____

      Name:  Mark C. Lorenz
      Title:   Vice President

**DELPHI INTERNATIONAL SERVICES, INC.,**

**a Delaware corporation**

By: _____

        Name: John P. Arle
        Title:   Chief Financial Officer & Treasurer

**DELPHI INTERNATIONAL SERVICES, INC.,**

**a Delaware corporation**

By: _____

      Name:  Mark C. Lorenz
      Title:   Vice President

**DELPHI LIQUIDATION HOLDING COMPANY,**

**a Delaware corporation**

By: _____

      Name:  John D. Sheehan
      Title:   President

**DELPHI LLC,**

**a Delaware limited liability company**

By: _____

     Name:  John D. Sheehan
     Title:   President

**DELPHI MECHATRONIC SYSTEMS, INC.,**

**a Delaware corporation**

By: _____

      Name: John P. Arle
      Title:  Treasurer

**DELPHI MECHATRONIC SYSTEMS, INC.,**

**a Delaware corporation**

By: _____

    Name: Timothy Knutson
    Title:   Assistant Treasurer

**DELPHI MEDICAL SYSTEMS COLORADO
CORPORATION,**

**a Colorado corporation**

By: _____
        Name: John P. Arle
        Title:   Vice President & Treasurer

**DELPHI MEDICAL SYSTEMS COLORADO
CORPORATION,**

**a Colorado corporation**

By:   _____

        Name:  Timothy Knutson
        Title:   Assistant Treasurer

**DELPHI MEDICAL SYSTEMS CORPORATION,**

**a Delaware corporation**


By: _____

       Name:  John P. Arle
       Title:   Vice President & Treasurer

**DELPHI MEDICAL SYSTEMS CORPORATION,**

**a Delaware corporation**

By: _____

      Name:  Timothy Knutson
      Title:   Assistant Treasurer

**DELPHI MEDICAL SYSTEMS TEXAS
    CORPORATION,**

**a Delaware corporation**


By:    _____

    Name: John P. Arle
    Title:   Vice President & Treasurer

**DELPHI MEDICAL SYSTEMS TEXAS
CORPORATION,**

**a Delaware corporation**

By:  _____
    Name:  Timothy Knutson
    Title:   Assistant Treasurer

**DELPHI NY HOLDING CORPORATION,**

**a New York corporation**

By: _____
        Name:  John D. Sheehan
        Title:   President

**DELPHI SERVICES HOLDING CORPORATION,**

**a Delaware corporation**

By: _____
      Name: John P. Arle
      Title:  Treasurer

**DELPHI SERVICES HOLDING CORPORATION,**

**a Delaware corporation**

By: _____

      Name:  Timothy Knutson
      Title:   Assistant Treasurer

**DELPHI TECHNOLOGIES, INC.,**

**a Delaware corporation**

By: _____
      Name: Thomas N. Twomey
      Title:   Vice President Intellectual Property

**DELPHI TECHNOLOGIES, INC.,**

**a Delaware corporation**

By: _____

     Name: Timothy Knutson
     Title:  Assistant Treasurer

**DREAL, INC.,**

**a Delaware corporation**

By: _____

    Name: John A. Jaffurs
    Title:  President

**ENVIRONMENTAL CATALYSTS, LLC,**

**a Delaware limited liability company**


By: _____

       Name:  John M. Fuerst
       Title:   Vice President

**ENVIRONMENTAL CATALYSTS, LLC,**

**a Delaware limited liability company**

By: _____

      Name:  Timothy Knutson

      Title:   Assistant Treasurer

**EXHAUST SYSTEMS CORPORATION,**

**a Delaware corporation**

By: _____

     Name:  Timothy Knutson
     Title:   Assistant Treasurer

**PACKARD HUGHES INTERCONNECT
COMPANY,**

**a Delaware corporation**

By: _____
              Name: Timothy Knutson
              Title:   Assistant Treasurer

**SPECIALTY ELECTRONICS INTERNATIONAL LTD.,**

**a Virgin Islands corporation**

By: _____

      Name:  Michael T. Reagan

      Title:   Treasurer and Secretary

**SPECIALTY ELECTRONICS, INC.,**

**a South Carolina corporation**

By: _____

      Name:  Timothy Knutson
      Title:   Assistant Treasurer

**DELPHI FURUKAWA WIRING SYSTEMS LLC,**

**a Delaware limited liability company**

By: _____
        Name:
        Title:

**MOBILEARIA, INC.,**

**a Delaware corporation**

By: _____
    Name:
    Title:

**AGENTS AND LENDERS:**

**JPMORGAN CHASE BANK, N.A.**
  **Individually and as Administrative Agent**

By: _____
      Name:
      Title:

**CITICORP USA, INC.**
**Individually and as Syndication Agent**

By: _____
      Name:
      Title:

# ANNEX A

to

## REVOLVING CREDIT, TERM LOAN AND GUARANTY AGREEMENT

Dated as of [●], 2005

| Lender | Tranche A Commitment Amount ($) | Tranche A Commitment Percentage | Tranche B Commitment Amount ($) | Tranche B Commitment Percentage |
|---|---|---|---|---|
| JPMorgan Chase Bank, N.A. 270 Park Avenue New York, New York 10017 Attn: | $875,000,000 | 50% | $125,000,000 | 50% |
| Citicorp USA, Inc. [Address] | $875,000,000 | 50% | $125,000,000 | 50% |
| Total | $1,750,000,000 | 100.0000% | $250,000,000 | 100.0000% |

**EXHIBIT C**

# FORM OF
## ASSIGNMENT AND ACCEPTANCE

**Dated: [ _____ ]**

Reference is made to the Revolving Credit, Term Loan and Guaranty Agreement, dated as of [●], 2005 (as restated, amended, modified, supplemented and in effect from time to time, the "Credit Agreement"), among DELPHI CORPORATION, a Delaware corporation (the "Borrower"), as a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code, and the subsidiaries of the Borrower signatory thereto (each a "Guarantor" and collectively the "Guarantors"), JPMORGAN CHASE BANK, N.A., a national banking association ("JPMCB"), each of the other financial institutions from time to time party thereto (together with JPMCB, the "Lenders") and JPMORGAN CHASE BANK, N.A., as administrative agent (in such capacity, the "Agent") for the Lenders. Capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Credit Agreement. This Assignment and Acceptance between the Assignor (as set forth on Schedule I hereto and made a part hereof) and the Assignee (as set forth on Schedule I hereto and made a part hereof) is dated as of the Effective Date (as set forth on Schedule I hereto and made a part hereof).

1      The Assignor hereby irrevocably sells and assigns to the Assignee without recourse to the Assignor, and the Assignee hereby irrevocably purchases and assumes from the Assignor without recourse to the Assignor, as of the Effective Date, an undivided interest (the "Assigned Interest") in and to all the Assignor's rights and obligations under the Credit Agreement in a principal amount as set forth on Schedule I.

2      The Assignor (i) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Credit Agreement or any other of the Loan Documents or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement, any other of the Loan Documents or any other instrument or document furnished pursuant thereto, other than that it is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any adverse claim; (ii) makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower, or the performance or observance by the Borrower of any of its obligations under the Credit Agreement, any of the other Loan Documents or any other instrument or document furnished pursuant thereto; and (iii) requests that the Administrative Agent evidence the Assigned Interest by recording the information contained on Schedule I in the Register which reflects the assignment being made hereby (and after giving effect to any other assignments which have become effective on the Effective Date).

3      The Assignee (i) represents and warrants that it is legally authorized to enter into this Assignment and Acceptance and that it satisfies the requirements, if any, specified in Credit Agreement that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender; (ii) confirms that it has received a copy of the Credit Agreement, together with

1

copies of the most recent financial statements delivered pursuant to Section 5.01 thereof, and such other documents and information as it has deemed appropriate to make its own credit analysis; (iii) agrees that it will, independently and without reliance upon the Administrative Agent. the Assignor or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement; (iv) appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under the Credit Agreement and the other Loan Documents as are delegated to the Administrative Agent by the terms thereof, together with such powers as are reasonably incidental thereto; (v) agrees that it will be bound by the provisions of the Credit Agreement and will perform in accordance with its terms all the obligations which by the terms of the Credit Agreement are required to be performed by it as a Lender; (vi) attaches the forms prescribed by the Internal Revenue Service of the United States certifying as to the Assignee's exemption from United States withholding taxes with respect to all payments to be made to the Assignee under the Credit Agreement; and (vii) has supplied the information requested on the administrative questionnaire heretofore supplied by the Agent.

4       Following the execution of this Assignment and Acceptance, it will be delivered to the Administrative Agent for acceptance by it and recording pursuant to Section 10.03 of the Credit Agreement, effective as of the Effective Date (which Effective Date shall, unless otherwise agreed to by the Administrative Agent (in writing), be within ten (10) Business Days after the execution of this Assignment and Acceptance).

5       Upon such acceptance and recording, from and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignee, whether such amounts have accrued prior to the Effective Date or accrue subsequent to the Effective Date. The Assignor and Assignee shall make all appropriate adjustments in payments for periods prior to the Effective Date by the Administrative Agent or with respect to the making of this assignment directly between themselves.

6       From and after the Effective Date, (i) the Assignee shall be a party to the Credit Agreement and, to the extent provided in this Assignment and Acceptance, have the rights and obligations of a Lender thereunder, and (ii) the Assignor shall, to the extent provided in this Assignment and Acceptance, relinquish its rights and be released from its obligations under the Credit Agreement provided that Assignor hereby represents and warrants that the restrictions set forth in Section 10.03 of the Credit Agreement pertaining to the minimum amount of assignments have been satisfied.

7       This Assignment and Acceptance shall be governed by, and construed in accordance with, the laws of the State of New York.

**IN WITNESS WHEREOF,** the parties hereto have caused this Assignment and Acceptance to be executed by their respective duly authorized officers on Schedule I hereto.

Schedule I to Assignment and Acceptance Respecting the Revolving Credit, Term Loan and Guaranty Agreement, dated as of [●], 2005, among Delphi Corporation, the Guarantors named therein, the Lenders named therein, and JPMorgan Chase Bank, N.A., as Agent.

Legal Name of Assignor: _____

Legal Name of Assignee: _____
[and is an Affiliate/Approved Fund of [Identify Lender]]

Effective Date of Assignment: _____

<u>TRANCHE A FACILITY</u>

Principal Amount
Assigned

Percentage Assigned (to at least 8 decimals) shown as a percentage of aggregate principal amount of all Tranche A Lenders

$_____                    _____%

<u>TRANCHE B FACILITY</u>

Principal Amount
Assigned

Percentage Assigned (to at least 8 decimals) shown as a percentage of aggregate principal amount of all Tranche B Lenders

$_____                    _____%

**CONSENTED TO AND ACCEPTED:**

(NY) 27011/094/DIPDOCS/dip.ca.doc                                        10/08/05 4:49 AM

JPMORGAN CHASE BANK, N.A.
    as Administrative Agent

By: _____

    Name:

    Title:


_____

    as Issuing Lender

By: _____

    Name:

    Title:

**CONSENTED TO AND ACCEPTED:**

_____
as Assignor

By: _____
    Name:
    Title:

**CONSENTED TO AND ACCEPTED:**

_____
   as Assignee

By: _____
    Name:
    Title:

**EXHIBIT D**

## FORM OF EXEMPTION CERTIFICATE

Reference is made to the Credit Agreement, dated as of [●], 2005 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among DELPHI CORPORATION (the "Borrower"), the Lenders party thereto and JPMORGAN CHASE BANK, N.A., as administrative agent (in such capacity, the "Administrative Agent"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement. _____ (the "Non-U.S. Lender") is providing this certificate pursuant to Section [2.18(e)] of the Credit Agreement. The Non-U.S. Lender hereby represents and warrants that:

1.    The Non-U.S. Lender is the sole record and beneficial owner of the Loans in respect of which it is providing this certificate.

2.    The Non-U.S. Lender is not a "bank" for purposes of Section 881(c)(3)(A) of the Internal Revenue Code of 1986, as amended (the "Code"). In this regard, the Non-U.S. Lender further represents and warrants that:

(a)    the Non-U.S. Lender is not subject to regulatory or other legal requirements as a bank in any jurisdiction; and

(b)    the Non-U.S. Lender has not been treated as a bank for purposes of any tax, securities law or other filing or submission made to any Governmental Authority, any application made to a rating agency or qualification for any exemption from tax, securities law or other legal requirements.

3.    The Non-U.S. Lender is not a 10-percent shareholder of the Borrower within the meaning of Section 881(c)(3)(B) of the Code.

4.    The Non-U.S. Lender is not a controlled foreign corporation receiving interest from a related person within the meaning of Section 881(c)(3)(C) of the Code.

IN WITNESS WHEREOF, the undersigned has duly executed this certificate.

[NAME OF NON-U.S. LENDER]

By: _____

_____

Name:
Title:

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| DELPHI CORP., *et al.*, | ) |
| | ) Case No. 05-____ (____) |
| Debtors. | ) |
| | ) Jointly Administered |
| | ) |

**INTERIM ORDER UNDER 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e) AND FED. BANKR. P. 2002, 4001 AND 9014 (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) TO UTILIZE CASH COLLATERAL, (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES AND (III) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)**

Upon the motion (the "**Motion**"), dated October 8, 2005, of Delphi Corp. (the "**Borrower**") and its affiliated debtors, each as debtor and debtor-in-possession (collectively, the "**Debtors**"), in the above-captioned cases (the "**Cases**") pursuant to sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), seeking, among other things:

(1) authorization for the Borrower to obtain post petition financing (the "**Financing**"), and for all of the other Debtors (the "**Guarantors**") to guaranty the Borrower's obligations in connection with the Financing, up to the aggregate principal amount of $2,000,000,000 (the actual available principal amount at any time being subject to those conditions set forth in

the DIP Documents (as defined below)), pursuant to a credit facility with JPMorgan Chase Bank, N.A. (**"JPMCB"**), acting as Administrative Agent (in such capacity, the **"Agent"**) for itself and a syndicate of financial institutions (together with JPMCB and including the fronting and issuing banks for the letters of credit, the **"DIP Lenders"**), and Citicorp USA, Inc. (**"CUSA"**) as Syndication Agent, to be arranged by J.P. Morgan Securities Inc. and Citigroup Global Markets, Inc. (the **"Joint Lead Arrangers"**);

(2)  authorization for the Debtors to execute and enter into the DIP Documents and to perform such other and further acts as may be required in connection with the DIP Documents;

(3)  the granting of adequate protection to the lenders (the **"Pre-Petition Secured Lenders"**) under that certain Third Amended and Restated Credit Agreement, dated as of June 14, 2005 (as heretofore amended, supplemented or otherwise modified, the **"Pre-Petition Credit Agreement"**), among the Borrower, the several lenders from time to time party thereto, and JPMCB, as administrative agent for the Pre-Petition Secured Lenders (in such capacity, the **"Pre-Petition Agent"**), and in connection with that certain Guarantee and Collateral Agreement, dated as of June 14, 2005, by the Borrower and certain of its subsidiaries, in favor of the Pre-Petition Agent (as heretofore amended, supplemented or otherwise modified, the **"Guarantee and Collateral Agreement"** and, collectively with the Pre-Petition Credit Agreement, and the mortgages

2

and all other documentation executed in connection therewith, the

**"Existing Agreements"**), whose liens and security interests are being

primed by the Financing;

(4)  authorization for the Debtors to use cash collateral (as such

term is defined in the Bankruptcy Code) in which the Pre-Petition Secured

Lenders have an interest, and the granting of adequate protection to the

Pre-Petition Secured Lenders with respect to, inter alia, such use of their

cash collateral and all use and diminution in the value of the Pre-Petition

Collateral (as defined below);

(5)  approval of certain stipulations by the Debtors with respect to

the Existing Agreements and the liens and security interests arising

therefrom, that are **"Extraordinary Provisions"** (each an **"Extraordinary**

**Provision"**) under General Order No. M-274 of the United States

Bankruptcy Court for the Southern District of New York (the **"General**

**Order"**);

(6)  permission to accelerate Borrowings and the termination of the

Commitments under the DIP Credit Agreement upon (a) a Change of

Control (as each such term is defined in the DIP Credit Agreement) or (b)

the entry of an order or orders granting relief from the automatic stay

applicable under section 362 of the Bankruptcy Code to the holder or

holders of any security interest to permit foreclosure (or the granting of a

deed in lieu of foreclosure or the like) on any assets of the Borrower or

3

any of the Guarantors which have a value in excess of $20 million in the aggregate, which are Extraordinary Provisions under the General Order;

(7)   subject and only effective upon the entry of a final order granting such relief, the limitation of the Debtors' right to surcharge against collateral pursuant to section 506(c) of the Bankruptcy Code, which is an Extraordinary Provision under the General Order;

(8) pursuant to Bankruptcy Rule 4001, that an interim hearing (the "**Interim Hearing**") on the Motion be held before this Court to consider entry of the proposed interim order annexed to the Motion (the "**Interim Order**") (a) authorizing the Borrower, on an interim basis, to forthwith borrow or obtain letters of credit from the DIP Lenders under the DIP Documents up to an aggregate principal or face amount not to exceed $950,000,000 (subject to any limitations of borrowings under the DIP Documents), (b) authorizing the Debtors' use of cash collateral, and (c) granting the adequate protection described herein; and

(9)   that this Court schedule a final hearing (the "**Final Hearing**") to be held within 45 days of the entry of the Interim Order to consider entry of a final order authorizing the balance of the borrowings and letter of credit issuances under the DIP Documents on a final basis, as set forth in the Motion and the DIP Documents filed with this Court.

4

Due and appropriate notice of the Motion, the relief requested therein and the

Interim Hearing having been served by the Debtors on the fifty largest unsecured

creditors of the Debtors, on the Agent, the DIP Lenders, the Prepetition Agent, the

Prepetition Secured Lenders, the indenture trustee for the Debtors' senior noteholders,

known holders of prepetition liens against the Debtors' property and the United States

Trustee for the Southern District of New York.

The Interim Hearing having been held by this Court on _____, 2005.

Upon the record made by the Debtors at the Interim Hearing and after due

deliberation and consideration and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.      *Jurisdiction.*  This Court has core jurisdiction over the Cases, this Motion,

and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.

Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      *Notice.*  Under the circumstances, the notice given by the Debtors of the

Motion and the Interim Hearing constitutes due and sufficient notice thereof and

complies with Bankruptcy Rules 4001(b) and (c).

3.      *Debtors' Stipulations.*  Without prejudice to the rights of any other party

(but subject to the limitations thereon and the reservation of the Debtors' rights contained

in paragraph 16 below), the Debtors admit, stipulate and agree that:

(a)      (i) as of the filing of the Debtors' chapter 11 petitions (the

"**Petition Date**"), (x) the Borrower was indebted and liable to the Pre-Petition Secured

Lenders, without defense, counterclaim or offset of any kind, in the aggregate principal

5

amount of approximately $2,488,329,620.59 in respect of loans made and in the

aggregate face amount of approximately $91,453,431.26 in respect of letters of credit

issued, in each case, by the Pre-Petition Secured Lenders pursuant to, and in accordance

with the terms of, the Existing Agreements, plus, in each case, interest thereon and fees,

expenses (including any attorneys', accountants', appraisers' and financial advisors' fees

that are chargeable or reimbursable under the Existing Agreements), charges and other

obligations incurred in connection therewith as provided in the Existing Agreements

(collectively, the "**Pre-Petition Debt**") and (y) each Debtor other than the Borrower was

contingently liable to the Pre-Petition Secured Lenders in respect of the Pre-Petition Debt

owing by the Borrower pursuant to the Guarantee and Collateral Agreement, (ii) the Pre-

Petition Debt constitutes the legal, valid and binding obligation of the Debtors,

enforceable in accordance with its terms (other than in respect of the stay of enforcement

arising from section 362 of the Bankruptcy Code), (iii) no portion of the Pre-Petition

Debt is subject to avoidance, recharacterization, recovery or subordination pursuant to the

Bankruptcy Code or applicable nonbankruptcy law and (iv) the Debtors do not have, and

hereby forever release, any claims, counterclaims, causes of action, defenses or setoff

rights, whether arising under the Bankruptcy Code or otherwise, against the Pre-Petition

Secured Lenders, the Pre-Petition Agent and their respective affiliates, subsidiaries,

agents, officers, directors, employees and attorneys;

        (b)     the liens and security interests granted to the Pre-Petition Agent

pursuant to and in connection with the Existing Agreements (including, without

limitation, all security agreements, pledge agreements, mortgages, deeds of trust, control

6

agreements and other security documents executed by any of the Debtors in favor of the Pre-Petition Agent, for its benefit and for the benefit of the Pre-Petition Secured Lenders) in connection with the Existing Agreements, are (i) valid, binding, perfected, enforceable, first-priority liens and security interests in the personal and real property constituting "Collateral" (as defined in the Existing Agreements) immediately prior to the Petition Date (the **"Pre-Petition Collateral"**), (ii) not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law and (iii) subject and subordinate only to (A) the DIP Liens (as defined below), (B) the Carve Out (as defined below) to which the DIP Liens are subject and (C) valid, perfected and unavoidable liens permitted under the Existing Agreements to the extent such permitted liens are senior to or pari passu with the liens of the Pre-Petition Agent on the Pre-Petition Collateral; and

(c)    the aggregate value of the Pre-Petition Collateral substantially exceeds the aggregate amount of the Pre-Petition Debt.

4.    *Findings Regarding the Financing.*

(a)    Good cause has been shown for the entry of this Interim Order.

(b)    The Debtors have an immediate need to obtain the Financing and use Cash Collateral (as defined below) in order to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures and to satisfy other working capital and operational needs. The access of the Debtors to sufficient working capital and liquidity through the use of Cash Collateral, incurrence of

7

new indebtedness for borrowed money and other financial accommodations is vital to the

preservation and maintenance of the going concern values of the Debtors and to a

successful reorganization of the Debtors.

(c)    The Debtors are unable to obtain financing on more favorable

terms from sources other than the DIP Lenders under the DIP Documents and are unable

to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy

Code as an administrative expense.  The Debtors are also unable to obtain secured credit

allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code

without the Debtors granting to the Agent and the DIP Lenders, subject to the Carve Out

as provided for herein, the DIP Liens and the Superpriority Claims (as defined below)

under the terms and conditions set forth in this Order and in the DIP Documents.

(d)    The terms of the Financing and the use of Cash Collateral are fair

and reasonable, reflect the Debtors' exercise of prudent business judgment consistent

with their fiduciary duties and constitute reasonably equivalent value and fair

consideration.

(e)    The Financing has been negotiated in good faith and at arm's

length between the Debtors, the Agent and the DIP Lenders, and all of the Debtors'

obligations and indebtedness arising under, in respect of or in connection with the

Financing and the DIP Documents, including without limitation, (i) all loans made to, and

all letters of credit issued for the account of, the Debtors pursuant to the Revolving

Credit, Term Loan and Guaranty Agreement substantially in the form attached as Exhibit

A to the Motion (the "**DIP Credit Agreement**"), and (ii) any "**Obligations**" and all other

8

**"Secured Obligations"** (as each such term is defined in the DIP Credit Agreement),

including any hedging obligations of the Debtors permitted under the DIP Credit

Agreement and any Indebtedness (as defined in the DIP Credit Agreement) permitted by

Section 6.03(viii) thereof, in each case owing to JPMCB, any DIP Lender or any of their

respective banking affiliates (all of the foregoing in clauses (i) and (ii) collectively,  the

**"DIP Obligations"**), shall be deemed to have been extended by the Agent and the DIP

Lenders and their affiliates in good faith, as that term is used in section 364(e) of the

Bankruptcy Code and in express reliance upon the protections offered by section 364(e)

of the Bankruptcy Code, and shall be entitled to the full protection of section 364(e) of

the Bankruptcy Code in the event that this Order or any provision hereof is vacated,

reversed or modified, on appeal or otherwise.

(f)     The Debtors have requested entry of this Order pursuant to

Bankruptcy Rules 4001(b)(2) and 4001(c)(2).  Absent granting the relief sought by this

Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation

of the Financing and the use of Cash Collateral in accordance with this Order and the DIP

Documents is therefore in the best interest of the Debtors' estates.

5.     *Authorization of the Financing and the DIP Documents.*

(a)     The Debtors are hereby authorized to enter into the DIP

Documents.  The Borrower is hereby authorized to borrow money and obtain letters of

credit pursuant to the DIP Credit Agreement, and the Guarantors are hereby authorized to

guaranty such borrowings and the Borrower's obligations with respect to such letters of

credit, up to an aggregate principal or face amount of $950,000,000 (plus interest, fees

9

and other expenses provided for in the DIP Documents), subject to any limitations of

borrowings under the DIP Documents, and in accordance with the terms of this Order and

the DIP Documents, which shall be used solely for purposes permitted under the DIP

Documents, including, without limitation, to provide working capital for the Borrower

and the Guarantors and for other general corporate purposes and to pay interest, fees and

expenses in accordance with this Order and the DIP Documents.  In addition to such

loans and obligations, the Debtors are authorized to incur overdrafts and related liabilities

arising from treasury, depository and cash management services or in connection with

any automated clearing house fund transfers provided to or for the benefit of the Debtors

by JPMCB, CUSA, any other DIP Lender or any of their respective affiliates; *provided,*

*however*, that nothing herein shall require JPMCB or CUSA or any other party to incur

overdrafts or to provide any such services or functions to the Debtors.

> (b)    In furtherance of the foregoing and without further approval of this

Court, each Debtor is authorized and directed to perform all acts, to make, execute and

deliver all instruments and documents (including, without limitation, the execution or

recordation of security agreements, mortgages and financing statements), and to pay all

fees, that may be reasonably required or necessary for the Debtors' performance of their

obligations under the Financing, including, without limitation:

> (i)    the execution, delivery and performance of the Loan

Documents (as defined in the DIP Credit Agreement) and any exhibits attached thereto,

including, without limitation, the DIP Credit Agreement, the Security and Pledge

Agreement (as defined in the DIP Credit Agreement) and the mortgages, if any,

10

contemplated thereby (collectively, and together with the letter agreements referred to in clause (iii) below, the "**DIP Documents**"),

(ii)    the execution, delivery and performance of one or more amendments to the DIP Credit Agreement for, among other things, the purpose of adding additional financial institutions as DIP Lenders and reallocating the commitments for the Financing among the DIP Lenders, in each case in such form as the Debtors, the Agent and the DIP Lenders may agree (it being understood that no further approval of the Court shall be required for amendments to the DIP Credit Agreement that do not shorten the maturity of the extensions of credit thereunder or increase the commitments, the rate of interest or the letter of credit fees payable thereunder).  Notwithstanding any other provision hereof, without further approval of this Court, amendments to the DIP Documents may be made at any time prior to the Final Hearing, (A) as contemplated by the Fee Letter dated September 22, 2005 among the Borrower, JPMCB and the Joint Lead Arrangers (permitting certain modifications to the DIP Credit Agreement necessary or advisable to ensure a successful syndication) or (B) as contemplated by the DIP Credit Agreement with respect to the Borrowing Base Amendment (as defined in the DIP Credit Agreement),

(iii)    the non refundable payment to the Agent, the Joint Lead Arrangers or the DIP Lenders, as the case may be, of the fees referred to in the DIP Credit Agreement (and in the separate letter agreements between them in connection with the Financing) and reasonable costs and expenses as may be due from time to time,

11

including, without limitation, reasonable fees and expenses of the professionals retained

as provided for in the DIP Documents, and

(iv)    the performance of all other acts required under or in

connection with the DIP Documents.

(c)    Upon execution and delivery of the DIP Documents, the DIP

Documents shall constitute valid and binding obligations of the Debtors, enforceable

against each Debtor party thereto in accordance with the terms of the DIP Documents. No

obligation, payment, transfer or grant of security under the DIP Documents or this Order

shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under

any applicable law (including without limitation, under section 502(d) of the Bankruptcy

Code), or subject to any defense, reduction, setoff, recoupment or counterclaim.

6.    *Superpriority Claims.*

(a)    Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the

DIP Obligations shall constitute allowed claims against the Debtors with priority over

any and all administrative expenses, diminution claims (including all Adequate

Protection Obligations (as defined below)) and all other claims against the Debtors, now

existing or hereafter arising, of any kind whatsoever, including, without limitation, all

administrative expenses of the kind specified in sections 503(b) and 507(b) of the

Bankruptcy Code, and over any and all administrative expenses or other claims arising

under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114

of the Bankruptcy Code (the **"Superpriority Claims"**), whether or not such expenses or

claims may become secured by a judgment lien or other non-consensual lien, levy or

12

attachment, which allowed claims shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors and all proceeds thereof, subject only to the payment of the Carve Out to the extent specifically provided for herein.

(b)    For purposes hereof, the "**Carve Out**" means (i) all unpaid fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code, (ii) all fees and expenses incurred by a trustee under Section 726(b) of the Bankruptcy Code, (iii) after the occurrence and during the continuance of an Event of Default (as defined in the DIP Credit Agreement), all allowed and unpaid professional fees and disbursements incurred by the Debtors and any statutory committees appointed in the Cases (each, a "**Committee**"), that remain unpaid subsequent to the payment, pro rata with other nonpriority administrative creditors, of such fees and expenses from available funds remaining in the Debtors' estates for such creditors, in an aggregate amount not exceeding $35,000,000, which amount may be used subject to the terms of this Order, including, without limitation, paragraph 17 hereof, and (iv) all allowed and unpaid professional fees and disbursements incurred or accrued by the Debtors and any Committees at any time when no Event of Default is continuing, that remain unpaid subsequent to the payment, pro rata with other nonpriority administrative creditors, of such fees and expenses from available funds remaining in the Debtors' estates for such creditors, in an aggregate amount not exceeding the sum of (x) such unpaid professional fees and disbursements reflected on the most recent Borrowing Base Certificate (as defined in the DIP Credit Agreement) delivered to the Agent prior to any Event of

13

Default that is then continuing and (y) such unpaid professional fees and disbursements incurred or accrued after such Borrowing Base Certificate (but at a time when no Event of Default is continuing) in an aggregate amount under this clause (y) not exceeding $5,000,000 (and with amounts included in this clause (y), to be supported by back-up documentation in respect of the amounts and dates of incurrence of such fees and disbursements), in each of the foregoing clauses (i), (ii), (iii) and (iv), to the extent allowed by the Bankruptcy Court at any time; *provided, however*, that (A) nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement or compensation described in clauses (iii) and (iv) above and (B) following the Termination Date (as defined in the DIP Credit Agreement), cash or other amounts on deposit in the Letter of Credit Account (as defined in the DIP Credit Agreement), shall not be subject to the Carve Out.

    7.    *DIP Liens.*

    As security for the DIP Obligations, effective and perfected upon the date of this Order and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, the following security interests and liens are hereby granted to the Agent for its own benefit and the benefit of the DIP Lenders (all property identified in clauses (a), (b) and (c) below being collectively referred to as the "**Collateral**"), subject, only in the event of the occurrence and during the continuance of an Event of Default, to the payment of the Carve Out (all such liens and security interests

NYDOCS03/784835.3
(NY) 27011/094/DIPDOCS/interim.dip.order.doc

10/08/05 12:22 AM
10/08/05 12:22 AM

granted to the Agent, for its benefit and for the benefit of the DIP Lenders, pursuant to

this Order and the DIP Documents, the "**DIP Liens**"):

       (a)    First Lien on Cash Balances and Unencumbered Property.

Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing,

enforceable, fully-perfected first priority senior security interest in and lien upon all pre-

petition and post-petition property of the Debtors, whether existing on the Petition Date

or thereafter acquired, to the extent not subject to valid, perfected, non-avoidable and

enforceable liens in existence as of the Petition Date or valid liens in existence as of the

Petition Date that are perfected subsequent to such date to the extent permitted by Section

546(b) of the Bankruptcy Code (collectively, "**Unencumbered Property**"), including

without limitation, all cash and cash collateral of the Debtors (whether maintained with

the Agent or otherwise) and any investment of such cash and cash collateral, inventory,

accounts receivable, other rights to payment whether arising before or after the Petition

Date, contracts, properties, plants, equipment, general intangibles, documents,

instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade

names, other intellectual property, capital stock of subsidiaries, and the proceeds of all

the foregoing provided, however, that the Borrower and the Guarantors shall not be

required to pledge to the Agent in excess of 65% of the voting capital stock of its direct

Foreign Subsidiaries or any of the capital stock or interests of its indirect Foreign

Subsidiaries (if, in the good faith judgment of the Borrower, adverse tax consequences

would result to the Borrower). Unencumbered Property shall exclude the Debtors'

claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the

15

8.    *Protection of DIP Lenders' Rights.*

(a)    So long as there are any borrowings or letters of credit or other amounts (other than contingent indemnity obligations as to which no claim has been asserted when all other amounts have been paid and no letters or credit are outstanding) outstanding, or the DIP Lenders have any Commitment (as defined in the DIP Credit Agreement) under the DIP Credit Agreement, the Pre-Petition Agent and Pre-Petition Secured Lenders shall (i) take no action to foreclose upon or recover in connection with the liens granted thereto pursuant to the Existing Agreements or this Order, or otherwise exercise remedies against any Collateral, except to the extent authorized by an order of this Court and (ii) be deemed to have consented to any release of Collateral authorized under the DIP Documents and (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the Collateral unless solely as to this clause (iii), the DIP Lenders file financing statements or other documents to perfect the liens granted pursuant to this Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests as of the Filing Date.  Nothing herein shall be read to permit the Pre-Petition Agent or the Pre-Petition Secured Lenders to take any action in violation of the Bankruptcy Code or other applicable law.

(b)    The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the Agent and the DIP Lenders to exercise, (i) immediately upon the occurrence of an Event of Default, all

18