UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
In re:                                                         :   HEARING DATE: October 27, 2005
                                                               :   HEARING TIME:  10:00 AM
                                                               :
                                                               :   Chapter 11
DELPHI CORPORATION, et al.                                     :
                                                               :   Case No. 05-44481 (RDD)
                        Debtors.                               :
                                                               :   Jointly Administered
---------------------------------------------------------------x


# OBJECTION OF AD HOC COMMITTEE OF PREPETITION LENDERS TO DEBTORS' MOTION FOR POSTPETITION FINANCING


Dated: New York, New York          GOODWIN PROCTER LLP
       October 24, 2005

                                   Allan S. Brilliant (AB 8455)
                                   Emanuel C. Grillo (EG 1538)
                                   Brian W. Harvey (BH 2518)
                                   599 Lexington Avenue
                                   New York, New York 10022
                                   (212) 813-8800

                                   Counsel for the Ad Hoc Committee of
                                   Prepetition Lenders

LIBC/2618751.11

Allan S. Brilliant (AB 8455)
Emanuel C. Grillo (EG 1538)
Brian W. Harvey (BH 2518)
GOODWIN PROCTER LLP
Counsel for the Ad Hoc Committee
599 Lexington Avenue
New York, New York 10022
(212) 813-8800

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ---------------------------------------------------------------x | | HEARING DATE:  October 247 2005 |
| In re: | : | HEARING TIME:   10:00 AM |
| | : | |
| | : | Chapter 11 |
| DELPHI CORPORATION, et al. | : | |
| | : | Case No. 05-44481 (RDD) |
| Debtors. | : | |
| | : | Jointly Administered |
| ---------------------------------------------------------------x | | |

**OBJECTION OF AD HOC COMMITTEE OF PREPETITION
LENDERS TO DEBTORS' MOTION FOR POSTPETITION FINANCING**

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

      The Ad Hoc Committee of lenders (the "Ad Hoc Committee")[1], by their undersigned counsel, under that certain Third Amended and Restated Credit Agreement (the "Prepetition Credit Agreement"), dated as of June 14, 2005, among Delphi Corporation, as borrower ("Delphi"), the lenders from time to time party thereto (the "Prepetition Lenders"), JPMorgan Chase Bank, N.A., as administrative agent (the "Prepetition Agent"), and the other parties named therein  as and for its objection (this "Objection") to the motion (the "DIP

---

[1]    The Ad Hoc Committee consists of certain funds and managed accounts managed by DK Acquisition Partners LP, Latigo Partners, LP, Quadrangle Master Funding Ltd., Cyrus Capital Partners, Canyon Capital Partners, Concordia Advisors LLC, Avenue Capital Group, Special Situations Investing Group, Inc., D.E. Shaw & Co., L.P., Longacre Fund Management  LLC and Elliot & Associates, which hold or have economic interests in, directly or indirectly, in the aggregate, approximately $443,250,000 of Prepetition Debt (as defined below).

Motion"), dated October 8, 2005, of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") for an order, among other things, authorizing the Debtors to obtain secured postpetition financing on a superpriority and priming basis, authorizing use of cash collateral, and granting adequate protection, respectfully represents as follows:

## PRELIMINARY STATEMENT

In order to fund their huge cash losses, the Debtors through the DIP Motion seek to violate the constitutionally protected property rights of the Prepetition Lenders through a priming lien rather than obtaining more expensive alternate financing that is available to them on a junior basis. Specifically, the Debtors cavalierly seek to subordinate the $2.58 billion of senior secured indebtedness owed to the Prepetition Lenders to another $2 billion of debtor-in-possession financing. By priming the Prepetition Lenders, the Debtors would have the Court shift the risk of default from the DIP Lenders to the Prepetition Lenders without their consent, without compensation, and without compliance with section 364(d) of the Bankruptcy Code.

The record is clear that the Debtors have the ability to obtain adequate postpetition financing by either borrowing money with a first lien on unencumbered assets and a junior lien on encumbered assets, or through a loan which refinances the Prepetition Lenders. In fact, the Debtors have admitted this in the DIP Motion, in the affidavit of Robert S. Miller, Jr., and at the "first day" hearing in these cases. Apparently, in order to save interest expense, the Debtors would prefer to have the Court transform the first lien Prepetition Lenders into second lien lenders without their consent. Section 364(d) of the Bankruptcy Code, however, consistent with constitutional requirements, prohibits such a stripping of first liens where other financing is available.

2

Moreover, the relief requested in the DIP Motion also falls short because it fails to provide sufficient adequate protection. The Debtors are seeking to service $2 billion of debt senior to the Prepetition Debt (as defined below) while (1) eliminating the control and remedies of the Prepetition Lenders with respect to their collateral and (2) simultaneously failing to pay them the interest provided for under the Prepetition Credit Agreement on a current basis, much less an interest rate that reflects the additional risk that such Lenders are being asked to bear as a result of the huge losses and the billions of dollars of new borrowings. The net effect is to convert the Prepetition Lenders' first lien position into a subordinated—and silent—second lien position while maintaining an interest rate reflective of the risk for a first lien loan, a result that is unnecessary and unjust.

## FACTUAL BACKGROUND

1. <u>Prepetition Credit Agreement</u>.[2]  On June 14, 2005, the Debtors reached an agreement with their existing lenders to refinance two revolving credit lines in the aggregate amount of $3.0 billion with a $1.825 billion senior secured revolving credit facility and a $1.0 billion senior secured Term Loan. Delphi's obligations as borrower under the Prepetition Credit Agreement and the other Debtors' obligations as guarantors (the "<u>Existing Guarantors</u>") under the Guarantee and Collateral Agreement are secured by security interests in substantially all of the material tangible and intangible assets of Delphi and the Existing Guarantors (the "<u>Prepetition Collateral</u>"). The Debtors allege certain assets were excluded from the Prepetition Collateral, including 35% of the stock of Delphi's first tier foreign subsidiaries (the "<u>Excluded Stock</u>"), and certain receivables with a face value of approximately $1.2 billion (the "<u>Excluded Receivables</u>"). See DIP Motion ¶ 16. In addition, a portion of the Revolving Loans are not

---

[2]   Capitalized terms that are not defined herein shall have the meanings ascribed to such terms in the Prepetition Credit Agreement.

3

secured by certain domestic manufacturing property of the Debtors and shares of stock or indebtedness of any domestic subsidiary of Delphi that owns such property (together, the "Excluded Manufacturing Assets," and together with the Excluded Stock and Excluded Receivables, the "Excluded Collateral"). The Debtors allege that this Excluded Collateral is equal in value to the amount by which the Revolving Loans, when taken together with all other senior secured debt of Delphi and its subsidiaries, exceeds 15% of Delphi's and its subsidiaries' consolidated net tangible assets.

        2.        Immediately prior to the Petition Date, Delphi was paying interest on the Loans at a rate of (a) 400 basis points above the London Interbank Borrowing Rate ("LIBOR") with respect to the Revolving Loan and (b) 650 basis points above LIBOR with respect to the Term Loan. Section 2.12(b) of the Prepetition Credit Agreement provides that the Majority Facility Lenders may, upon an Event of Default, elect to discontinue Eurodollars Loans. This converts such Loans into ABR Loans. Interest on ABR Loans is payable at the rate of (a) 500 basis points above the Prime Rate with respect to the Revolving Loan and (b) 550 basis points above the Prime Rate with respect to the Term Loan. In addition, Section 2.14 of the Prepetition Credit Agreement provides that Loans bear interest at the applicable rate plus 2.0% if all or a portion of the Loans are not paid when due, whether by acceleration or otherwise. Pursuant to Section 8 of the Prepetition Credit Agreement, the Loans automatically accelerated upon the commencement of these cases.

        3.        The Term Loan was fully drawn as of June 30, 2005, and the Debtors drew down $1.5 billion in Revolving Loans on August 3, 2005. As of October 8, 2005, the Debtors claim that they were indebted to the Prepetition Lenders in the aggregate amount of approximately $2,579,783,052 (the "Prepetition Debt").

4

4. On Saturday, October 8, 2005 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On the Petition Date, the Debtors also filed the DIP Motion. Although there was much publicity about the Debtors intention to file chapter 11, the actual timing of the filing came as a surprise to the Prepetition Lenders as did the terms of the relief requested in the DIP Motion. In fact, even the Prepetition Agent, which also serves as the Agent under the DIP Facility, alleged to have little or no prior knowledge of the Petition Date or the relief requested in the DIP Motion earlier than the day before the Petition Date.

5. The DIP Motion. The DIP Motion seeks approval of a $2 billion debtor-in-possession financing facility (the "DIP Facility," and the lenders thereunder, the "DIP Lenders"). The DIP Lenders stand to receive, among other things, a first priority, senior priming lien on the Prepetition Collateral and the Excluded Collateral (other than the Excluded Stock) (together, the "Collateral"). On October 11, 2005, the Court held a hearing to consider entry of an order approving the DIP Motion on an interim basis. The Ad Hoc Committee—and not the Prepetition Agent—filed an objection to the relief requested, which the Court granted pursuant to an interim order dated October 12, 2005 (the "Interim Order"). Pursuant to the Interim Order, the Court set a hearing for October 27, 2005 to consider entry of an order (a "Final Order") approving the DIP Motion on a final basis.

6. Purporting to provide the Prepetition Lenders with adequate protection in accordance with the Bankruptcy Code, the Debtors agreed in the Interim Order and have proposed to provide the Prepetition Lenders in the Final Order with (1) an assortment of replacement liens and superpriority administrative expense claims, but all junior to the DIP Facility; (2) the payment of interest monthly, but at less than the full contract rate under the

5

Prepetition Credit Agreement; and (3) the fees and expenses of the Prepetition Agent (including counsel and financial advisor fees), but not the fees and expenses of the other Prepetition Lenders permitted under the Prepetition Credit Agreement.  The Interim Order also modifies and limits other critical rights of the Prepetition Lenders under the Prepetition Credit Agreement, including their right to withhold consent to asset sales sought by the Debtors (see Interim Order ¶ 8(a)) and the right to object or seek relief to the extent the DIP Lenders seek to exercise rights and remedies following a default by the Debtors (see Interim Order ¶ 8(b)).

## ARGUMENT

### I. THE DEBTORS CANNOT PRIME PREPETITION LENDERS BECAUSE SUFFICIENT POSTPETITION FINANCING IS AVAILABLE ON A NON-PRIMING BASIS

#### A. Priming the Liens of the Prepetition Lenders Without their Consent Is an Extraordinary Remedy That Implicates Their Constitutionally Protected Property Rights and Should Be Denied

7.  The "takings clause" of the Fifth Amendment to the U.S. Constitution prohibits the taking of property without just compensation. See U.S. Const. amend. V.  The Supreme Court has long held that the laws of bankruptcy are subject to this right under the Fifth Amendment.  See Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 589 (1935).  Since then, courts have held this to be true "regardless of how 'rational' the exercise of the bankruptcy power may be, as the taking of property in violation of the Fifth Amendment is a separate question."  In re Lahman Mfg. Co., Inc., 33 B.R. 681, 686 (Bankr. D.S.D. 1983) ("Reduced to its essentials, the holding in Radford precludes a bankruptcy court from constitutionally taking for the benefit of a debtor substantive rights in specific property acquired by the creditor prior to the effective date of the [a]ct in question.").

6

8.       In furtherance of the takings clause, section 364(d) of the Bankruptcy Code codifies the narrow conditions under which a court is permitted to authorize the priming of an existing lienholder.  "The ability to prime an existing lien is extraordinary."  In re Seth Co., 281 B.R. 150, 153 (Bankr. D. Conn. 2002) (citing 3 Collier On Bankruptcy ¶ 364.05 (15th Rev. ed.)).  See also In re First South Savings Ass'n, 820 F.2d 700, 710 (5th Cir. 1987) ("[Because] super priority financing displaces liens on which creditors have relied in extending credit, a court that is asked to authorize such financing must be particularly cautious. . . .");  In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) (same).  Indeed, section 364(d)(1) of the Bankruptcy Code authorizes non-consensual priming only when (a) the debtor cannot obtain credit otherwise *and* (b) "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d).

9.       Here, the Debtors seek to deprive the Prepetition Lenders of their rights to their collateral with only conclusory statements about replacement collateral and little or no evidence as to its value, or the Debtors' ability to repay borrowings under the DIP Facility or the Prepetition Credit Agreement in the face of poor product sales, mounting legacy liabilities and challenging economic markets.  Certainly, the United States Constitution cannot be interpreted to so blithely permit a deprivation of property rights.

**B.    The Debtors Have Not Met their Burden to Establish That (1) the Debtors Cannot Obtain Credit Otherwise, and (2) Existing Lienholders are Adequately Protected**

10.      The Debtors bear the burden of satisfying the elements of section 364(d)(1) of the Bankruptcy Code.  See In re Reading Tube Indus., 72 B.R. 329, 334 (Bankr. E.D. Pa. 1987) ("First, the [D]ebtor [has] to prove there was no other available financing. Second, the [D]ebtor [has] to demonstrate the existence of adequate protection"); In re Beker

7

Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) ("Section 364(d)(1) of the Bankruptcy Code permits the Court to authorize a debtor-in-possession to obtain credit secured by a lien senior or equal to a lien on property of the estate if such credit cannot be otherwise obtained…"); In re Ames Dep't Stores, Inc., 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) ("[O]btaining credit under section 364(d) may not be authorized if it appears that credit can be obtained under the other subsections of 364"). See In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994) ("A debtor has the burden to establish that the holder of the lien to be subordinated has adequate protection…"); In re Reading Tube Indus., 72 B.R. at 332 ("[s]ection 364(d) carries a much heavier burden than 364(b) since subsection (d) contemplates the priming of liens"); 11 U.S.C. § 364(d)(2) ("In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection"). The Debtors have not satisfied this burden.

### C. The Debtors Can Obtain Alternative Financing

#### (i) The Debtors Have Admitted They Can Obtain Non-Priming Financing

11. By their own admission, the Debtors elicited eight different financing proposals, four of which would have refinanced in full all indebtedness outstanding under the Prepetition Credit Agreement. See DIP Motion ¶ 21. The availability of four such alternatives demonstrates that the Debtors would be able to obtain credit under subsections of section 364 of the Bankruptcy Code other than subsection (d).

12. In addition, the Ad Hoc Committee believes, once the Debtors respond to their discovery requests, that evidence will show that the Debtors can obtain alternative financing, albeit at a higher rate of interest, secured by a first lien on unencumbered assets and a

8

junior lien on encumbered assets.[3] Because the Debtors possess the ability to obtain alternate financing, there is no basis for priming the Prepetition Lenders' liens.

        (ii)        The Cost of Alternative Financing Is Both Irrelevant and Unsubstantiated

13. Although their counsel alleged at the Debtors' first day hearing on October 11, 2005 that these alternative financing proposals were more expensive than the DIP Facility, see Transcript at 108, the cost of such financing is irrelevant under section 364(d)(1)(A). Priming is permitted only when the Debtors are "*unable* to obtain such credit otherwise," not simply when the Debtors decide that alternative financing is too expensive. The Debtors' argument that the cost savings to their estates justifies the means of obtaining those savings, *i.e.*, the priming of the Prepetition Lenders' property, is not supported by the Bankruptcy Code or the United States Constitution.

14. Even if the expense of alterative financing were relevant, the Debtors have provided the Court and the Prepetition Lenders with only conclusory statements regarding the cost of alternative financing. They have also failed, despite repeated informal inquiries followed by formal discovery requests, to produce any term sheet, proposal, commitment letter or other document that would permit this Court, the Prepetition Lenders and other parties in interest to determine whether the alternative financing proposals were any more onerous than the terms of the DIP Facility.[4]

15. Having failed to provide this Court, the Prepetition Lenders or other

---

[3] On October 21, 2005, the Ad Hoc Committee served document requests, limited interrogatories, as well as deposition notices on the Debtors with the hope of receiving the requested information and documents in advance of the Final Hearing.

[4] Debtors' counsel indicated at the same hearing that the alternative proposals that would have refinanced the Prepetition Lenders would have provided the Debtors with $500 million less liquidity than the DIP Facility. See id. at 108. That does not satisfy the Debtors' burden, however, because the Debtors have not justified why an additional $500 million is necessary for the Debtors to operate their business and preserve the value of the Debtors' estates at the expense of the priming of the Prepetition Lenders' liens, or that the Debtors could not obtain such incremental $500 million of credit from other sources at a higher interest rate secured by more junior liens.

9

LIBC/2618751.11

stakeholders with any evidence to assess, among other things, the terms of the alternative financing proposals obtained by the Debtors, the Debtors' working capital needs and the value of the Debtors' assets, the Debtors have not satisfied their burden with respect to availability of credit short of the grossly overreaching proposal presented to the Court here.  See In re Ames Dep't Stores, Inc., 115 B.R. at 37.

## II. THE PREPETITION LENDERS ARE NOT ADEQUATELY PROTECTED BY JUNIOR REPLACEMENT LIENS AND LESS THAN CURRENT PAY OF THE CONTRACT RATE OF INTEREST DUE UNDER THE CREDIT AGREEMENT

16. "[T]he whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy." In re Swedeland Dev. Group, Inc., 16 F.3d at 564 (citations omitted).  The "determination of whether there is adequate protection is made on a case by case basis." Id.  "Whether protection is adequate 'depends directly on how effectively it compensates the secured creditor for loss of value' caused by the superpriority given to the post-petition loan." Id. (finding adequate protection should "as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained for rights"); In re Phoenix Steel Corp., 39 B.R. 218, 224 (D. Del. 1984) ("The concept of adequate protection does not envision a court stripping a secured creditor of the benefit of its bargain. . . . [T]he purpose of the section is to insure that the secured creditor receives in value essentially what he bargained for."). In re Mosello, 195 B.R. at 288-89 ("[T]he [adequate protection] proposal should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition superpriority financing. . . . [T]he 'important question'… is whether the interest of the secured creditor whose lien is to be primed 'is being unjustifiably jeopardized'") (citation omitted); In re Plabell Rubber Prods., Inc., 137 B.R. 897, 901 (Bankr. N.D. Ohio 1992) ("[W]e have adopted a holistic approach . . .

10

[conducting] 'an analysis of all of the relevant facts, with a particular focus upon the value of the collateral, the likelihood that it will depreciate or appreciate over time, the prospects for successful reorganization of the Debtor's affairs by means of the Plan, and the Debtor's performance in accordance with the Plan'") (citation omitted).

17. In the unlikely event the Debtors are able to show that alternative financing on a junior basis is not available in the marketplace on better terms than they are offering to the Prepetition Lenders, then the Debtors will have demonstrated that the adequate protection offered is insufficient to ensure that the Prepetition Lenders will receive the value of their bargained-for rights. As the leading treatise succinctly states, "[I]f the debtor is offering a replacement lien to the original lender, it is reasonable to inquire why the new lender could not accept the replaced collateral instead of priming the existing lien." 3 Collier On Bankruptcy ¶ 364.05[1] (15th Rev. ed. 2005).

18. Here, the Prepetition Lenders bargained for liens on substantially all of the Debtors' assets, with pricing and protections commensurate with those commonly associated with first lien financing, but the adequate protection package will not compensate for the diminution in the value of the Prepetition Collateral and the loss of control over the Prepetition Collateral caused by the priming. The lack of logic of the adequate protection offered is evident from this disparate treatment between the Term Loan and the Revolving Loan which are now effectively identical instruments post-petition. Holders of these instruments, which have the same level of risk, inexplicably receive disparate adequate protection payments.

19. In addition, they have yet to provide, notwithstanding the Prepetition Agents' and the Ad Hoc Committee's requests, any quantitative evidence on this point. In fact, there has been no real evidence offered concerning the value of the proposed adequate protection

11

package, or the ability of the proposed adequate protection package to compensate for the decline in the value of the Prepetition Collateral that will result from the priming. The Debtors must prove that the proposed adequate protection package not only maintains the Prepetition Lenders' prepetition contractual rights, but also effectively compensates them for the decline in the value of the Prepetition Collateral occasioned by the priming. See In re Swedeland Dev. Group, Inc., 16 F.3d at 564. Simply asserting that the DIP Facility is necessary to preserve the value of the Debtors' estates is insufficient to satisfy the Debtors' burden.

20. The limited evidence that the Debtors' have put forth indicates that the Prepetition Lenders, though now oversecured, are at substantial risk of seeing the value of the Prepetition Collateral decline. According to the DIP Motion, the Debtors experienced a net operating loss of $482 million in calendar year 2004, and a net operating loss of $608 million in the first six months of 2005 on sales that were approximately $1 billion less than during the same period in calendar year 2004. See DIP Motion ¶ 10. The spate of additional borrowings within the last six months has reached the billions. In addition, the Debtors will continue to face the prospect of (a) high legacy liabilities and a dispute with their former parent, General Motors Corporation, and their unions over as to which party should be responsible for such liabilities; and (b) a downturn in the domestic automobile industry exacerbated by higher commodity prices.

21. Consequently, the Debtors' prospects at this early stage of their chapter 11 cases are uncertain. The existence of an equity cushion and payment of less than the contract rate of interest today is not enough in the face of such uncertainty. See In re Shaw Indus., Inc., 300 B.R. 861, 866 (Bankr. W.D. Pa. 2003) (finding no adequate protection where equity cushion was quickly eroding due to faltering tool and die industry and the debtor's "inherently risky"

prospects); In re Phoenix Steel Corp., 39 B.R. at 225 ("Essential to the valuation of collateral is a judgment as to how long [the debtor] will continue to operate"). In particular, as discussed in more detail below, it is crucial that the Prepetition Lenders receive the full interest payments they are entitled to under the Prepetition Credit Agreement on a current basis and substantial principal amortization while these cases are pending to avoid significant erosion in whatever equity cushion that exists. See In re Aqua Assocs., 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) (finding that the presence of an equity cushion is not in itself a determinative factor of whether there is adequate protection).

22. Without the modifications discussed below, the DIP Facility will pass nearly all of the considerable risk associated with additional lending to the Debtors onto the Prepetition Lenders, and effectively convert the Prepetition Lenders' first lien position into a subordinated—and silent—second lien position. Shockingly, this proposal is made while the Debtors propose to maintain an interest rate reflective of the risk for a first lien loan with a much larger equity cushion. This result is grossly inconsistent with the Bankruptcy Code. When the effect of the new borrowing with a senior lien is merely to pass the risk of loss to the holder of the existing lien, the request for authorization should be denied. See In re Windsor Hotel, LLC, 295 B.R. 307, 314 (Bankr. C.D. Ill. 2003) (citing, 3 Collier On Bankruptcy ¶ 364.05[1] (15th rev. ed.)).

23. Thus, rather than shift the risks to the Prepetition Lenders, the Debtors must protect the Prepetition Lenders through a meaningful adequate protection package that at least restores their prepetition rights and protects against any diminution in the value of the Prepetition Collateral caused by the priming. See In re Tower Automotive, Inc., et al., No. 05-10578 (ALG) (Bankr. S.D.N.Y. Mar. 2, 2005) (DIP Order) (amending pre-petition credit

13

agreement to pay primed second lien lenders (first lien lenders were refinanced) interest at an increased rate from LIBOR plus 7% to LIBOR plus 8.75% and conditioning priming of second lien lenders on standby purchase facility allowing second lien lenders to tender their debt for payment in full in cash to the extent they opposed priming facility).

24.     Default Interest and Amortization.  To the extent this Court finds that the Debtors have satisfied section 364(d)(1)(A), the Court should require that the Debtors provide monthly payment of interest at the default rate and principal amortization as part of any adequate protection package.[5]  See 11 U.S.C. § 364(d)(1)(B).  Under Section 2.14(c) of the Prepetition Credit Agreement, the Prepetition Lenders are entitled to the payment of interest at the default rate (i.e., the applicable rate plus 2%) resulting from the automatic acceleration of the Loans occasioned by the commencement of these chapter 11 cases.[6]  Furthermore, the contract rate here is the rate applicable to ABR Loans (i.e., Prime Rate plus 550 basis points for Term Loans and Prime Rate plus 500 basis points for Revolving Loans) assuming that the Majority Facility

---

[5]   It should be noted that the DIP Motion provides that the Prepetition Lenders are to receive interest payments monthly at (a) the Eurodollar Rate plus the Applicable Margin in the case of Eurodollar Loans and (b) ABR plus the Applicable Margin in the case of ABR Loans, see DIP Motion ¶ 25(d), but that the Interim Order provides that the Prepetition Lenders shall be paid interest monthly at the non-default contract rate, see Interim Order ¶ 12(c).  Accordingly, it is unclear which rate of interest the Debtors are offering to pay.

[6]   The Debtors have stipulated that the Prepetition Lenders are oversecured.  See Interim Order § 3(c).  This entitles the Prepetition Lenders to the payment of default interest under section 506(b) of the Bankruptcy Code.  See In re Owners Corp., 306 B.R. 763, 771 (Bankr. S.D.N.Y. 2004).  In addition, the payment of default interest pursuant to section 506(b) presumptively is warranted when the equities of a particular case justify application of the default rate.  See 4 Collier On Bankruptcy ¶ 506.04[2][b][ii] (15th rev. ed. 2002) ("Most courts have allowed, or at least recognized, a presumption of allowability for default rates of interest, provided that the rate is not unenforceable under applicable non-bankruptcy law").  See also Southland Corp. v. Toronto-Dominion (In re Southland Corp.), 160 F.3d 1054, 1059-60 (5th Cir. 1998) (allowing default interest at 2% above non-default rate, and finding that the "cases find that a default interest rate is generally allowed, unless 'the higher rate would produce an inequitable…result'") (citation omitted); In re Terry Ltd. P'ship, 27 F.3d 241, 243 (7th Cir. 1994) (recognizing presumption in favor of contract default rate subject to rebuttal based upon equitable considerations); Hepner v. PWP Golden Eagle Tree, LLC (In re K&J Properties, Inc.), 2005 WL 2589862 (Bankr. D. Col. 2005) (allowing postpetition default interest of 36%).  For the default rate to be denied to oversecured lenders, the incremental rate (above the non-default rate) must be substantially greater than two percent.  See In re Route One West Windsor Ltd. P'ship, 225 B.R. 76, 90 (Bankr. D.N.J. 1998) (surveying cases).  Accordingly, there is ample

14

Lenders will elect, in accordance with Section 2.12(b) of the Prepetition Credit Agreement, not to permit the continuation of Loans with respect to which the applicable interest rate is calculated based on LIBOR.

25. In addition, given the precarious state of the Debtors' business and the enormous size of the DIP Facility on top of the Debtors already substantial Prepetition Debt, adequate protection of the Prepetition Lenders' liens should require that the Debtors reduce the Prepetition Debt by at least $25 million per quarter, which is less than 1% of the aggregate Prepetition Debt. Indeed, Section 2.3 of the Prepetition Credit Agreement requires quarterly amortization of the Term Loan. Finally, the Debtors should be required to apply 100% of the proceeds of asset sales outside the ordinary course of business to permanently reduce the DIP Facility. Only by reducing the principal amount of the Prepetition Debt and the DIP Facility can the Prepetition Lenders be reasonably certain that they will continue to be protected by a sufficient equity cushion during the course of these cases.

26. <u>Reimbursable Expenses</u>. Any adequate protection package should also include payment of all reimbursable expenses of the Prepetition Lenders. Section 10.6 of the Prepetition Credit Agreement specifically provides that Delphi is responsible for paying the Prepetition Agent and the Prepetition Lenders for their respective costs and expenses (including the fees and disbursements of counsel) incurred in connection with the enforcement or preservation of rights under the Prepetition Credit Agreement, including "pursuant to any insolvency or bankruptcy proceeding." Under the Interim Order, however, the Debtors agreed to pay only the fees incurred by the Prepetition Agent and members of any steering committee of Prepetition Lenders. To the extent that the Prepetition Lenders are oversecured (as stipulated by

---

support for the current payment of interest to the Prepetition Lenders at the default rate under the

15

the Debtors in the Interim Order, see Interim Order § 3(c)), the Debtors should be consistent in their application of section 506(b) of the Bankruptcy Code and Section 10.6 of the Prepetition Credit Agreement and provide for the reimbursement of all expenses payable thereunder.

27.   Additional Collateral.  Because the Debtors are requesting the authorization to incur substantial additional indebtedness pursuant to the DIP Facility, the Prepetition Lenders should be granted liens and security interests in all of the Debtors' remaining assets, including a pledge of the Excluded Stock, as part of their adequate protection.  Under the DIP Facility and the existing adequate protection package, the Debtors continue to limit their pledge of stock to 65% of the voting capital stock of their first tier foreign subsidiaries. However, to better ensure that the Prepetition Lenders are no worse off despite the priming effected by the DIP Facility, the Debtors should be required to increase their pledge of stock in foreign subsidiaries to 100% unless the Debtors are able to demonstrate that the adverse tax consequences of doing so significantly outweighs the incremental benefit to the Prepetition Lenders.

28.   Rights of Prepetition Lenders Under Section 363(f).  The Final Order should not include any waiver of the right to object to any relief sought by the Debtors in respect of the property comprising the Collateral, whether as parties-in-interest in the Debtors' chapter 11 cases or as holders of interests in such Collateral under section 363(f) of the Bankruptcy Code.  Prior to the Petition Date, the Prepetition Lenders had bargained with the Debtors on an arms-length basis for rights typically afforded first priority lenders.  However, paragraph 8(a)(ii) of the Interim Order provides that the Prepetition Agent, the Prepetition Lenders and the holders of Junior Adequate Protection Liens (as defined in the Interim Order) shall be deemed to have

---

Prepetition Credit Agreement and applicable law.

consented to any release of Collateral authorized under the DIP Facility. As a result, the Debtors have sought to limit the Prepetition Lenders to rights customarily granted to deeply subordinated lenders who accept such limitations on their rights in return for a pricing premium or other value enhancement. Here, the Prepetition Lenders have not consented to limit their rights, nor have they been given, at least under the Debtors' current adequate protection proposal, enhancements that would normally be granted to a subordinated lender. Although section 364(d) allows the Court to place a senior lien on property, it does not authorize a court to take away contractual and statutory rights. Accordingly, the Final Order should expressly preserve the right of the Prepetition Agent and the Prepetition Lenders to oppose the sale, assignment or release of the Collateral.

29. <u>Right to Additional Adequate Protection</u>. Consistent with the reasoning for granting the Prepetition Lenders the right to object to any proposed release of Collateral discussed in the preceding paragraph, the Final Order should expressly reserve the rights of the Prepetition Agent and the Prepetition Lenders to request further or different adequate protection under sections 361, 363(e) and 364(d)(2) of the Bankruptcy Code.

30. <u>Junior Adequate Protection Liens</u>. The Interim Order should be clarified to reflect that the Junior Adequate Protection Liens granted to any person in respect of any valid and non-avoidable right to setoff in respect of its prepetition payables as of the Petition Date shall be subject and subordinate to (and shall not prime) all valid, enforceable, non-avoidable and fully-perfected first priority liens in existence as of the Petition Date, including the liens of the Prepetition Lenders in the Prepetition Collateral and the replacement liens granted to the Prepetition Lenders in the Collateral.

17

05-44481-rdd    Doc 553    Filed 10/24/05    Entered 10/24/05 13:36:24    Main Document
Pg 19 of 20


## RESERVATION OF RIGHTS

31.     The Ad Hoc Committee expressly reserves its right to amend or supplement this Objection, to introduce evidence supporting this objection at the final hearing with respect to the DIP Motion, and to file additional and supplemental objections at the conclusion of the discovery on the DIP Motion. [7]

## WAIVER OF MEMORANDUM OF LAW

32.     Because this Objection presents no novel issues of law and the authorities relied upon by the Ad Hoc Committee are set forth herein, the Ad Hoc Committee respectfully requests that the Court waive the requirement for the filing of a separate memorandum of law in support of this Objection pursuant to Local Bankruptcy Rule 9013-1(b).

## NOTICE

33.     Notice of this Objection will be given to (a) counsel to the Debtors, (b) counsel to the administrative agent under the DIP Facility, (c) counsel to the Prepetition Agent and (d) the Office of the United States Trustee for the Southern District of New York. The Ad Hoc Committee submits that, under the circumstances, no other or further notice is required.

---

[7]     Prior to the date hereof, the Prepetition Agent forwarded to the Debtors an informal request for documents to assist it in evaluating, among other things, the nature and terms of alternative financing proposals received by the Debtors, the value of the Collateral, the value of the adequate protection package proposed by the Debtors, and the Debtors' working capital needs in the two years following the Petition Date. The Debtors, however, were unresponsive to such request, and thus, as noted above, the Ad Hoc Committee served upon Delphi and Rothschild Inc., the Debtors' financial advisor, a formal request for documents, interrogatories and notices of deposition to depose the Debtors' chief financial officer and their financial advisor. The Debtors have refused to respond to these requests. The Ad Hoc Committee has reserved all of its rights with respect to the information sought from the Debtors, including the right to seek to compel the Debtors to produce such information.

18

WHEREFORE, the Ad Hoc Committee respectfully requests that this Court enter an order granting the relief requested herein and such other relief as may be just and proper.

Dated: New York, New York
October 24, 2005

GOODWIN PROCTER LLP

By: /s/ Allan S. Brilliant

Allan S. Brilliant (AB 8455)
Emanuel C. Grillo (EG 1538)
Brian W. Harvey (BH 2518)
599 Lexington Avenue
New York, New York 10022
(212) 813-8800
Counsel for the Ad Hoc Committee