Darryl S. Laddin (DL-5130)                          Return Date: October 27, 2005
Heath J. Vicente (Ga. Bar No. 728289)               Time: 10:00 a.m.
171 17th Street, NW, Suite 2100
Atlanta, Georgia  30363
(404) 873-8500

Attorneys for SBC Communications Inc.


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                              :
In re                                         :        Chapter 11
                                              :
DELPHI CORPORATION, et al.,                   :        Case No. 05-44481 (RDD)
                                              :        Jointly Administered
                            Debtors.          :
------------------------------------------------------------X


### OBJECTION OF SBC COMMUNICATIONS INC. TO THE DEBTORS' MOTION FOR FINAL ORDER UNDER 11 U.S.C. §§ 105, 366, 503 AND 507 (I) PROHIBITING UTILITIES FROM ALTERING, REFUSING OR DISCONTINUING SERVICES ON ACCOUNT OF PREPETITION INVOICES AND (II) ESTABLISHING PROCEDURES FOR DETERMINING REQUESTS FOR ADDITIONAL ADEQUATE ASSURANCE

SBC Communications Inc. ("SBC")[1] files this objection to the Debtors' Motion for Final

Order Under 11 U.S.C. §§ 105, 366, 503 and 507 (I) Prohibiting Utilities From Altering,

Refusing Or Discontinuing Services On Account Of Prepetition Invoices and (II) Establishing

---

[1]     "SBC" refers to, individually and collectively: SBC Communications Inc., SBC Global Services, Inc., The Ohio Bell Telephone Company, Indiana Bell Telephone Company Incorporated, Illinois Bell Telephone Company, Michigan Bell Telephone Company, Wisconsin Bell, Inc., Pacific Bell Telephone Company, Nevada Bell Telephone Company, The Southern New England Telephone Company, SBC Internet Services, a registered d/b/a of: Ameritech Interactive Media Services, Inc., Pacific Bell Internet Services, SNET Diversified Group, Inc., Southwestern Bell Internet Services, SBC DataComm, Inc., SBC DataComm, SBC Advanced Solutions, Inc., Ameritech Advanced Data Services of Illinois, Inc., Ameritech Advanced Data Services of Indiana, Inc., Ameritech Advanced Data Services of Michigan, Inc., Ameritech Advanced Data Services of Ohio, Inc., Ameritech Advanced Data Services of Wisconsin, Inc., SBC Long Distance, a registered d/b/a of Southwestern Bell Communications Services, Inc., and SNET America, Inc.

Procedures For Determining Requests For Additional Adequate Assurance (the "366 Motion"),

respectfully showing the Court as follows:

## <u>INTRODUCTION</u>

1.      In the 366 Motion, the Debtors propose that the Court deem certain procedures to

constitute "adequate assurance of payment" under section 366 of the Bankruptcy Code.   The

Debtors appear to propose that non-objecting utilities receive, as so-called adequate assurance of

payment of postpetition utility service, the right to seek payment for postpetition utility service

as an administrative expense – a right already possessed by the utilities.   Implicitly

acknowledging that an administrative expense claim does not constitute adequate assurance in

this case, the 366 Motion also seeks to establish a procedure whereby a utility company can

"request" adequate assurance from the Debtors by making such request in writing and setting

forth a six-month payment history and a description of any prior material payment delinquency

or irregularity.   (366 Motion at ¶ 16.)   Under the Debtors' proposed procedures, if the Debtors

disagree with the request, the Debtors would then be "permitted" – but not required -- to file a

motion for determination of adequate assurance and set a hearing within 45 days after the

request.   (366 Motion at ¶ 17.)

2.      As an initial matter, SBC provides an array of telecommunications and contract

information and technology management and analysis services, facilities and equipment to the

Debtors, both directly and as the Debtors' agent with respect to third party service providers,

under a series of executory contracts.   In this regard, the Debtors have noted in the 366 Motion

that they are not admitting that any entity is, or is not, a utility within the meaning of Section

366.   Similarly, SBC does not admit that all of the services and products it provides to the

Debtors can be classified as "utility service" within the meaning of Section 366.   Additionally,

although the Debtors attached to the 366 Motion an Exhibit purporting to list all of the entities

and accounts to which the 366 Motion supposedly applies, SBC has been unable to locate certain

accounts, and the Debtors must be required to provide additional information regarding these

accounts, so as to permit SBC to locate and identify them, and to identify all services, facilities

and other products provided by SBC to which the Debtors seek to apply the 366 Motion.  If the

Debtors seek an actual finding that the services, facilities and/or products that SBC provides to

the Debtors are in fact governed by Section 366, (i) the Debtors should be required to identify

them with specificity and to file a memorandum of law explaining why Section 366 applies, and

(ii) SBC should be given the opportunity, after a reasonable notice period, to respond.  Any

Order by the Court on the 366 Motion also should expressly provide that nothing contained in

such Order (i) constitutes an assumption of any executory contract pursuant to Section 365 of the

Bankruptcy Code, or (ii) constitutes a waiver by the Debtors or SBC of any right with respect to

the assumption or rejection of any executory contract or the termination of such contract

according to its terms.

        3.        As to the merits of the 366 Motion, the Debtors offer virtually no support for their

conclusory contention that the particular circumstances of this case warrant a finding by the

Court that these minimal provisions constitute adequate assurance of payment for postpetition

utility services.  To the contrary, the circumstances here – which include, among other things, the

Debtor's acknowledgment of their poor and worsening financial condition (including a net

operating loss of over $600 million for the first six months of 2005) resulting from several

complex and significant problems that are not easily resolvable or necessarily within the

Debtors' control, their lack of any unencumbered cash, the many potential events of default that

could result in the immediate loss of the Debtors' use of cash under their DIP financing

agreement, the Debtors' poor payment history with SBC, the millions of dollars that SBC could be at risk if the Debtors fail, and the stunning carve-out in the DIP facility of $35 million (in addition to the substantial retainers that have already been provided) that was deemed necessary to protect the Debtors' counsel and other professionals – all demonstrate the need for real adequate assurance of payment.

4.     In particular, the Debtors should be required to make weekly pre-payments to SBC, in amounts equal to the estimated net charges for all services and products provided to them by SBC, subject to a quarterly true-up and adjustment of such pre-payment based on actual usage for the preceding period.  Second, to the extent that the Debtors order additional services or products from SBC – that is, services and products over and above those that SBC is currently providing – then the Debtors should be required to make additional pre-payments for those services and products as well.  Third, in the event that the Debtors fail to make any of the required pre-payments, SBC should be authorized to terminate service to the Debtors after a three day notice and cure period.  Finally, the Debtors should be required to provide weekly flash reports with respect to their available cash and administrative liabilities, subject to reasonable confidentiality restrictions.

## BACKGROUND

### A.    Procedural Background

5.     On October 8, 2005 (the "Petition Date"), the Debtors filed with this Court voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").   The Debtors continue to manage their property and operate their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B.       **SBC's Relationship With the Debtors**

6.       The nature of the services and products provided by SBC is extensive, and goes well beyond the provision simply of traditional telephone service.  SBC provides the bulk of these services and products under two "Master Services Agreements."  The first such Master Services Agreement is a 1999 Master Managed Services Agreement, under which SBC provides both regulated and non-regulated services and products throughout the country to the Debtors.  The term of this agreement expires on December 31, 2005, and thus SBC will cease provision of the services and products provided to the Debtors under the agreement, as of that date, unless the parties agree in advance to an extension of that term.  SBC provides other regulated and non-regulated services and products to the Debtors under a second Master Services Agreement, which expires in 2009.  In addition, SBC provides other services and products, such as local and access services, Centrex services and internet access, through other executory contracts with the Debtors.

7.       SBC's preliminary estimates show that, as of the Petition Date, the Debtors owed SBC approximately $3.4 million.  Of this amount, over $534,000 has been past due for more than 90 days.  The Debtors also continue to accrue in excess of $1 million per month in charges owed to SBC.  In general, SBC bills the Debtors for services in arrears, and while some invoices are due within 30 days, payment is not due for a substantial portion of the SBC services until the beginning of the second month after the date on which SBC issues its bills.[2]  Thus, SBC could be

---

[2]       Because of the Debtors' delinquencies, prior to the Petition Date, SBC had begun requiring the Debtors to pay in advance for purchase of equipment.

advancing credit of close to $3 million before a default by the Debtors is even recognized or recorded on SBC's systems.[3]

### C.    The Utilities Motion

8.    Also on October 8, 2005, the Debtors filed the 366 Motion, in which they propose that the Court deem certain procedures fashioned by the Debtor to constitute "adequate assurance of payment" under section 366 of the Bankruptcy Code.

9.    The Debtors appear to propose that non-objecting utilities receive, as so-called adequate assurance of payment of postpetition utility service, the right to seek payment for postpetition utility service as an administrative expense – a right already possessed by the utilities.    Implicitly acknowledging that an administrative expense claim does not constitute adequate assurance in this case, the 366 Motion also seeks to establish a procedure whereby a utility company can "request" adequate assurance from the Debtors by making such request in writing and setting forth a six-month payment history and a description of any prior material payment delinquency or irregularity.    (366 Motion at ¶ 16.)    Under the Debtors' proposed procedures, the Debtors would then be "permitted" – but not required -- to file a motion for determination of adequate assurance and set a hearing on that motion within 45 days after a request is received, if they disagree with the adequate assurance request.    (366 Motion at ¶ 17.) In the interim, until the Court is able to conduct a hearing on a utility's request for adequate assurance, the utility would have no adequate assurance of payment.

10.    The Debtors summarily argue that the particular circumstances of this case warrant a finding by the Court that these minimal provisions constitute adequate assurance of payment for postpetition utility services.    The Debtors point to two factors that they claim

---

[3]    For example, $1 million in services provided in October would not be billed until November, and would not be due until December – by which time, for the three months, SBC would have provided $3 million in

warrant the relief they request in the 366 Motion:  (i) the Debtors' alleged history of consistent and regular payment, and (ii) the Debtors' alleged ability to pay utility bills postpetition.  (See 366 Motion at ¶ 27.)

11.    As discussed more fully below, SBC disputes the Debtors' assertions that the circumstances of this case warrant the basically non-existent adequate assurance that they contend is sufficient.  Therefore, the relief requested in the 366 Motion should be denied with respect to SBC, and instead, the Debtors should be required to provide the true adequate assurance described in paragraph three above.

## ARGUMENT

### A.    The Debtors Must be Required to Provide Additional Information, and any Order on the 366 Motion Should Contain Express Limitations

12.    The Debtors attached to the 366 Motion an Exhibit A that purports to list all of the entities and accounts to which the 366 Motion supposedly applies.  SBC notes that it is unable to locate in its records, or otherwise identify, the numerous accounts that the Debtors identify in Exhibit A as accounts with "SBC Pagers" in Farmington Hills, Michigan.  The Debtors must be required to provide additional information regarding these accounts, so as to permit SBC to locate and identify them, and to identify all services, facilities and other products provided by SBC to which the Debtors seek to apply the 366 Motion.

13.    In this regard, the Debtors have noted in the 366 Motion that the inclusion of an entity on Exhibit A is not an admission by the Debtors that the entity is, or is not, a utility within the meaning of Section 366.  (366 Motion at n. 4)  Similarly, SBC does not admit that all of the services and products it provides to the Debtors can be classified as "utility service" within the meaning of Section 366.  If the Debtors seek a finding that the services, facilities and/or products

---

services to the Debtors.

that SBC provides to the Debtors are in fact governed by Section 366, (i) the Debtors should be required to identify with specificity all such services, facilities and other products and to file a memorandum of law explaining why Section 366 applies, and (ii) SBC should be given the opportunity, after a reasonable notice period, to respond.  Any Order by the Court on the 366 Motion also should expressly provide that nothing contained in such Order (i) constitutes an assumption of any executory contract pursuant to Section 365 of the Bankruptcy Code, or (ii) constitutes a waiver by the Debtors or SBC of any right with respect to the assumption or rejection of any executory contract or the termination of such contract according to its terms.

**B.      The Debtors Bear the Burden of Proof as to Adequate Assurance and Have Not Met It.**

14.    The Debtors bear the burden of proof on adequate assurance issues.  In re Adelphia Business Solutions, Inc., 280 B.R. 63, 87 (Bankr. S.D.N.Y. 2002); see also In re Stagecoach Enterprises, Inc., 1 B.R. 732, 734 (Bankr. M.D. Fla. 1979) ("At a Section 366 hearing, the debtor, as the petitioning party, bears the burden of proof.")  Accordingly, the Debtors must demonstrate that any procedures they propose would, in fact, adequately assure SBC and other utility companies of payment for postpetition services.  The Debtors must carry their burden based on the facts and circumstances of this case, not based on the facts and circumstances of other cases.  "Whether utilities have adequate assurance of payment is determined by the individual circumstances of each case."  Adelphia, 280 B.R. at 80.

15.    Section 366 may not require that a utility be afforded an "absolute guarantee of payment."  In re Caldor, Inc. – N.Y., 199 B.R. 1, 3 (S.D.N.Y. 1996) (internal quotation marks and citation omitted), aff'd, Virginia Elec. & Power Co. v. Caldor, Inc. – N.Y., 117 F.3d 646 (2nd Cir. 1997.  But, Section 366 is not meaningless or mere surplusage, with no effect other than to

confirm the administrative expense status that any utility would in any event have under Section

503(b) for postpetition services it renders.  See, e.g., TRW Inc. v. Andrews, 534 U.S. 19, 31

(2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to

be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous,

void or insignificant.") (internal quotation marks and citations omitted).  On the contrary,

"adequate assurance" requires that the Debtors demonstrate that each utility "is not subject to an

unreasonable risk of nonpayment for postpetition services."    Adelphia, 280 B.R. at 80;

Massachusetts Elec. Co. v. Keydata Corp. (In re Keydata Corp.), 12 B.R. 156, 158 (B.A.P. 1st

Cir. 1981) ("adequate assurance" requires "that the utility be protected from an unreasonable risk

of nonpayment").

16.    The Debtors have not met, and cannot meet, their burden of demonstrating, under

the facts and circumstances of this case, that granting utilities a mere administrative expense

claim will protect them from an unreasonable risk of nonpayment.  Among other things:

- Since 2000, the Debtors have suffered substantial losses in every year except 2002.

The Debtors reported a net operating loss of $482 million in 2004, and experienced a net

operating loss of $608 million in just the first six months of 2005.  The Debtors claim that

their poor and worsening financial condition is a result of three significant issues, none of

which is easily resolvable or necessarily within the Debtors' control:  (a) the liabilities

under, and restrictions created by, their collectively bargained agreements, (b) a

competitive U.S. vehicle production environment for domestic OEMs resulting in the

reduced number of motor vehicles that General Motors produces annually in the U.S.,

and related pricing pressures, and (c) increasing commodity pressures.  If some or all of

these issues are not resolved favorably to the Debtors, the Debtors' ability to continue as a going concern could be in jeopardy.

• Unlike in certain other cases, the Debtors here have no unencumbered cash or other assets.

• Under the Interim DIP Financing Order, any one of numerous defaults can result in the Debtors' immediate loss of their right to use any cash to pay their utilities.

• The Debtors' professionals felt it necessary, for their own protection, to negotiate a stunning $35 million carve-out from the lenders' liens, which amount only begins to be reduced after an event of default under the loan.

• Unless prepayments are required, if the Debtors are unable to reorganize and must liquidate, SBC could provide as much as three months of unpaid services, totaling more than $3 million.

17.     Under comparable facts and circumstances - indeed, in cases presenting far less exposure to SBC or other utility providers than clearly exists here - courts have required debtors to provide prepayments and (often substantially greater) deposits.  In so holding, these courts have rejected the argument that a mere administrative expense claim provides adequate assurance of payment.  For example, in Hanratty v. Philadelphia Elec. Co. (In re Hanratty), 907 F.2d 1418 (3d Cir. 1990), the debtors sought to require an electric utility to provide service without the payment of a security deposit.  In rejecting the debtors' argument, the Third Circuit held that "[u]nder subsection (b), a utility is expressly authorized to request a debtor to furnish adequate assurance of payment in the form of a security deposit and may discontinue service if it is not provided within 20 days after the order for relief."  Id. at 1423.  The Court of Appeals concluded that "[w]e could only reach the result urged by the debtors by engrafting a court-

created exception on 11 U.S.C. § 366 which would not further the purpose of that section.  This we will not do."  Id. at 1424.

18.    Bankruptcy courts from around the country have similarly required debtors to post deposits, and have rejected the notion that a mere administrative expense claim could constitute adequate assurance, even under far less troublesome facts than those presented in this case.  See, e.g., In re Best Prods. Co., 203 B.R. 51, 53-54 (Bankr. E.D. Va. 1996) (concluding that, despite debtor's undisputed good prepetition payment history, $250 million in postpetition financing, and "current figures and projections indicat[ing] that the debtor is and will remain administratively solvent," the express language and context of the Bankruptcy Code provides that "adequate assurance under § 366 requires more than administrative priority," and thus the debtor was required to provide deposits for continued utility service); In re Smith, Richardson & Conroy, Inc., 50 B.R. 5, 6 (Bankr. S.D. Fla. 1985) (requiring deposit for postpetition supply of electricity); In re Sun-Tel Communications, Inc., 39 B.R. 10, 11 (Bankr. S.D. Fla. 1984) (requiring debtor/reseller of long distance telephone service to provide Southern Bell a deposit and rejecting debtor's argument that administrative expense priority and debtor's accounts receivable and business prospects provided adequate assurance of payment); In re Northwest Recreational Activities, Inc., 8 B.R. 7, 9 (Bankr. N.D. Ga. 1980) (requiring deposit as adequate assurance of payment for postpetition supply of water); Stagecoach Enters., 1 B.R. at 734-36 (requiring deposit for postpetition supply of gas service and stating that "it is not generally appropriate to give administrative expense priority . . . as 'adequate assurance of payment'" and that "[i]f the debtor is to be allowed to continue to operate its business, it should pay its utility bills on a current basis and should furnish adequate assurance of payment in the traditional forms of a cash deposit, a payment bond, or some similar device").

19.    Numerous courts in this Circuit have agreed.  See, e.g., In re Norsal Indus., Inc,
147 B.R. 85, 89 (Bankr. E.D.N.Y. 1992) (holding that electric utility was entitled to set off
debtor's prepetition deposit against utility's prepetition claim under doctrine of recoupment and
that it was also entitled to a deposit for postpetition services); In re 499 W. Warren St. Assocs.
Ltd. P'ship, 138 B.R. 363, 366 (Bankr. N.D.N.Y. 1991) (requiring deposit sufficient to cover one
month's average electricity services, even though debtor had favorable payment history, positive
net worth, and apparent administrative solvency and ability to pay for postpetition utility
service).

20.    In other cases, where entities have faced even greater exposure and the debtors
have had significant unencumbered cash, courts in this District have ordered greater protections
than what is being proposed by the Debtors.  In In re PSINet, Inc., Chapter 11 Case No. 01-
13213, for example, the debtors' assets were unencumbered (there was no DIP loan or
prepetition secured lender) and the debtors had over $300,000,000 in unrestricted cash on hand
as of the filing date.  Nevertheless, an evergreen segregated fund was set aside with $11,000,000
to cover one month of its anticipated use of utility service.

21.    In yet another case, Global Crossing, the debtors had $670,000,000 in
unencumbered cash; the Delphi Debtors have none.  Nonetheless, the court in Global Crossing
required accelerated payment (within 14 days after invoice) on all undisputed charges, required
the debtors to furnish their telecommunications providers requesting adequate assurance weekly
cash flash reports and other financial information, approved expedited procedures for the utility
providers to seek court resolution of any billing or payment disputes, authorized the utility
providers to effect setoffs of postpetition payables and receivables, and stated that the court

would reconsider whether these protections remained adequate in the event of any material change in the debtors' liquidity or other relevant circumstances.

22.     Similarly, in <u>WorldCom</u>, the debtors had approximately $800,000,000 in unencumbered cash, as well as substantial additional unencumbered real estate and other assets. And, while the WorldCom debtors did not expect to have any need to draw down on any additional financing, they had arranged for a DIP facility of at least $500,000,000, and as much as $2,000,000,000, providing additional, substantial liquidity.    Yet, even under these extraordinary circumstances -- which bear no resemblance to those presented in this case -- Judge Gonzalez not only granted most of the same protections provided in <u>Global Crossing</u>, but also went further, giving the utility providers a superpriority administrative expense claim for postpetition services, senior to all other administrative expenses other than any priority claim afforded the DIP lenders (if the DIP loan facility were ever drawn) and the administrative expense given to the estates of those WorldCom debtors that were net postpetition lenders to other WorldCom debtors.

23.     The <u>Caldor</u> case, in particular, illustrates the enormous risks inherent in any bankruptcy case to utilities and other creditors that are forced to extend postpetition credit involuntarily.    Notwithstanding the bankruptcy court's finding, uncontested on appeal, that the debtor in <u>Caldor</u> presented perhaps "the best risk customer available," the debtor in fact became <u>administratively insolvent</u>.    <u>See</u> <u>Pearl-Phil GMT (Far East), Ltd. v. Caldor Corp.</u>, 266 B.R. 575, 584 (S.D.N.Y. 2001).    <u>Caldor</u> thus serves to underscore the inherent uncertainties present in any Chapter 11 case - especially a case involving a debtor, such as Delphi, in a deeply troubled industry, with no unencumbered cash and a history of massive losses and an inability to reach

agreement with unions - and the reality that a mere administrative expense claim will rarely, if ever, truly provide "adequate assurance of payment."

24.    In sum, the Debtors have failed to offer any "adequate assurance of payment," and  the circumstances of this case require the real adequate assurance of payment described in paragraph three herein.


C.    **The Proposed Procedures For Utility Companies to Request  Adequate Assurance Are Improper.**

25.    Implicitly acknowledging that an administrative expense claim does not constitute adequate assurance in this case, the 366 Motion also seeks to establish a procedure whereby a utility company can "request" adequate assurance from the Debtors by making such request in writing and setting forth a six-month payment history and a description of any prior material payment delinquency or irregularity.   (366 Motion at ¶ 16.)   Under the Debtors' proposed procedures, the Debtors would then be "permitted" – but not required -- to file a motion for determination of adequate assurance and to set a hearing on that motion within 45 days after a request is received, if they disagree with the adequate assurance request.   (366 Motion at ¶ 17.) In the interim, until the Court is able to conduct a hearing on a utility's request for adequate assurance, the utility would have no adequate assurance of payment.

26.    The procedures proposed by the Debtors for the utility companies to seek adequate assurance simply would impose requirements on the utility companies that are not contained in Section 366.  For instance, the procedures would substantially extend the 20-day period of 366(b) while the Debtors took their time in deciding whether to take advantage of the "permission" – which obviously is not needed – to file a determination motion.  The requirement for any request for adequate assurance to include the payment history (over 6 months, no less)

and a description of any material delinquency also is not something contained within Section 366. Instead, the requirements of Section 366 are simple and straightforward: "[u]nder sub-section (b) [of Section 366], a utility is expressly authorized to request a debtor to furnish adequate assurance of payment in the form of a security deposit and may discontinue service if it is not provided within 20 days after the order for relief." Hanratty, 907 F.2d at 1423. There is absolutely no requirement in Section 366 for a utility requesting adequate assurance to submit a payment history along with the request. By trying to impose this requirement, the Debtors are trying to avoid their burden of proof to show that the utility companies are adequately assured of payment under Section 366. See Adelphia Business Solutions, 280 B.R. at 87; Stagecoach, 1 B.R. at 736. The Court simply should not permit this to occur.

## VI.    CONCLUSION

For the foregoing reasons, SBC respectfully requests that the Court deny the relief requested in 366 Motion, grant SBC the relief requested herein, and grant such other relief as may be just.

Dated: October 24, 2005.

Respectfully submitted,

ARNALL GOLDEN GREGORY LLP

/s/ Darryl S. Laddin
Darryl S. Laddin (DL-5130)
Heath J. Vicente (Ga. Bar No. 728289)
171 17th Street, NW, Suite 2100
Atlanta, Georgia   30363
(404) 873-8500
(404) 873-8121 (Fax)

Attorneys for SBC

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of October, 2005, I served the foregoing document by causing a true and correct copy to be deposited in the United States Mail, first class postage prepaid, addressed as follows:

Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098
(Att'n: General Counsel)

Skadden, Arps, Slate, Meagher & Flom LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(Att'n: John Wm. Butler, Jr.)

Shearman & Sterling LLP
599 Lexington Avenue
New York, New York 10022
(Att'n: Douglas P. Bartner)

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
(Att'n: Marissa Wesley)

Davis Polk & Wardell
450 Lexington Avenue
New York, New York 10017
(Att'n: Marlane Melican)

Robert J. Rosenberg
Latham & Watkins
885 Third Avenue
New York, NY 10022

Office of the United States Trustee
Southern District of New York
33 Whitehall Street, Suite 2100
New York, New York 10044
(Att'n: Alicia M. Leonhard)

Wilmington Trust Company
1100 North Market Street
Rodney Square North
Wilmington, Delaware 19890
(Att'n: Corporate Trust Office)

Law Debenture Trust Company
  Of New York
780 Third Avenue, 31st Floor
New York, New York 10017
(Att'n: Corporate Trust Office)

Dated:  October 24, 2005

/s/Darryl S. Laddin
Darryl S. Laddin