Thomas R. Slome (TS-0957)  HEARING DATE: October 27, 2005
Jil Mazer-Marino (JM-6470)  HEARING TIME: 10:00 a.m.
ROSEN SLOME MARDER LLP
333 Earle Ovington Boulevard
Suite 901
Uniondale, New York 11553-3622
(516) 227-1600

and

Russell R. Johnson III
2258 Wheatlands Drive
Manakin-Sabot, Virginia  23103
(804) 749-8861

*Co-Counsel for American Electric Power; Dominion East Ohio;
New York State Electric and Gas Corporation;
Niagara Mohawk Power Corporation; Public Service Electric and
Gas Company; and Rochester Gas & Electric Corporation*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **In re:** | ) Chapter 11 |
| **DELPHI CORPORATION, INC., et al.,** | ) Case No. 05-44481 (RDD) |
| Debtors. | ) (Jointly Administered) |

**OBJECTION OF CERTAIN UTILITY COMPANIES TO MOTION FOR INTERIM AND FINAL ORDERS UNDER 11 U.S.C. §§ 105, 366, 503, AND 507 (I) PROHIBITING UTILITIES FROM ALTERING, REFUSING, OR DISCONTINUING SERVICES ON ACCOUNT OF PREPETITION INVOICES AND (II) ESTABLISHING PROCEDURES FOR DETERMINING REQUESTS FOR ADDITIONAL ASSURANCE**

American Electric Power ("AEP"); Dominion East Ohio ("Dominion"), New York State Electric and Gas Corporation ("NYSEG"), Niagara Mohawk Power Corporation ("Niagara"), Public Service Electric and Gas Company ("PSEG"), and Rochester Gas & Electric Corporation ("RG&E") (collectively, the "Utilities"), by counsel, hereby object to the *Motion of Debtors for Interim and Final*

*Orders Under 11 U.S.C. §§ 105, 366, 503, and 507 (I) Prohibiting Utilities From Altering, Refusing, or Discontinuing Services on Account of Prepetition Invoices and (II) Establishing Procedures For Determining Requests For Additional Assurance* (the "Utility Motion"), and set forth the following:

### Procedural Facts

1. On October 8, 2005 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with this Court. The Debtors continue to manage their properties and operate their businesses as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these cases. These cases are being jointly administered.

2. Also on the Petition Date, the Debtors filed the Utility Motion.

3. On October 14, 2005, the Court entered the *Interim Order Under 11 U.S.C. §§ 105, 366, 503, and 507 Prohibiting Utilities From Altering, Refusing, or Discontinuing Services on Account of Prepetition Invoices* (the "Interim Utility Order").

4. Pursuant to the *Notice of Motion and Entry of Interim Order Under 11 U.S.C. §§ 105, 366, 503, and 507 Prohibiting Utilities From Altering, Refusing, or Discontinuing Services on Account of Prepetition Invoices* (the "Notice of Utility Motion"), the deadline for submitting any objections to the Utility Motion is October 24, 2005. The Notice of Utility Motion further provides that a hearing for the Utility Motion will be held on October 27, 2005 at 10:00 a.m.

5. In the Utility Motion, the Debtors request entry of a Final Order that grants, among other things, the following:

2

2. Absent any further order of this Court, each of the utility companies that provides natural gas, water, electric, telephone, fuel, sewer, cable, telecommunications, internet, paging, cellular phone, and other similar services to the Debtors (the "Utility Companies"), whether under direct relationship with the Debtors or through the Debtors' landlords or other third parties, including but not limited to the list of Utility Companies contained in <u>Exhibit 1</u> hereto, enjoined from (a) altering, refusing, or discontinuing service to, or discriminating against, the Debtors solely on the basis of the commencement of these chapter 11 cases or on account of any unpaid invoice for service provided prior to October 8, 2005 or (b) requiring the payment of a deposit or other security in connection with such Utility Company's continued provision of utility services, including, but not limited to, the furnishing of gas, heat, electricity, water, sewer, cable, telephone, telecommunications, internet, paging, cell phone, or any other service of like kind.

3. The Debtors' record of timely payment of prepetition utility bills, demonstrated ability to pay future utility bills, and, with respect to those Utility Companies that provide natural gas to the Debtors through GM accounts, such Utility Companies' agreements with GM, constitute adequate assurance of future payment for utility services pursuant to 11 U.S.C. § 366(b).

*　*　*

4. In the event the Debtors believe that a timely Request for additional assurance made by any of the Utility Companies is unreasonable and no consensual resolution of the Request is reached, the Debtors shall file a motion for determination of adequate assurance of payment with respect to such Request (the "Determination Motion") within 45 days of receiving such Request and set such Motion for hearing (the "Determination Hearing").

5. If a Determination Hearing is scheduled in accordance with the immediately preceding paragraph, the Utility Companies shall be deemed to have adequate assurance of payment until an order of this Court is entered in connection with such Determination Hearing.

Utility Motion, at pp. 2-3.

### Facts Concerning the Debtors and Other Pleadings Filed in the Case

6. As a result of the poor financial state of the U.S. automotive industry, Delphi is the latest among a number of automotive suppliers that have recently filed for bankruptcy protection (See also

3

Meridian Automotive, Tower Automotive, Intermet, Eagle Picher, Universal Automotive, Citation Corp, Oxford Automotive (twice)).

7. Delphi contends that it is the largest manufacturing and technology company ever to seek chapter 11 relief. Additionally, Delphi contends that it ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. *Affidavit of Robert S. Miller, jr. Under Local Rule 1007-2 and in Support of Chapter 11 Petitions and Various First Day Applications and Motions* at ¶ 5 (hereinafter "Miller Aff. at ¶ __").

8. News reports indicate that Delphi is expected to cut jobs and wages and close many of its 31 U.S. plants. Additionally, General Motors Corporation ("GM"), Delphi's largest customer and former parent company, has stated that it may have to assume up to $11 billion in retirement benefits for Delphi's union-represented employees. Fox News.com, *Delphi Bankruptcy Could Change Auto Industry,* http://www.foxnews.com/story/0,2933,171747,00.html

9. Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM. Prior to January 1, 1999, GM conducted Delphi's business through various divisions and subsidiaries. Utility Motion at ¶ 8.

10. Delphi claims that although GM is still Delphi's single largest customer, more than half of Delphi's revenue is generated from non-GM sources. Utility Motion at ¶ 8. GM, however, still accounts for 49% of Delphi's sales. Delphi's sales to GM were down by approximately $1.6 billion for the first six months of 2005, an 18.9% decline.

11. Delphi sales to GM in 2004 equaled approximately $15.4 billion, with sales to each of

4

Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.  Miller Aff. at ¶ 6.

12. Delphi admits that although it generated more than $2 billion in net income in the first two years following its separation from GM, Delphi has suffered losses every year thereafter, with the exception of 2002.  In calendar year 2004, Delphi reported a net operating loss of $482 million on $28.6 billion in net sales.  Additionally, Delphi admits that its financial condition had deteriorated further in the first six months of 2005, with net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.  Reported net losses in calendar year 2004 were $4.8 billion.  Utility Motion at ¶ 10.

13. Upon information and belief, the Debtors have the following Global EBITDAR targets for the first 9 months of 2006:

        A.    January 2006 – ($125,000,000);
        B.    February 2006 – ($100,000,000);
        C.    March 2006 – ($75,000,000);
        D.    April 2006 – ($50,000,000);
        E.    May and June 2006 – ($25,000,000);
        F.    July 2006 – ($50,000,000);
        G.    August 2006 – ($25,000,000); and
        H.    September 2006 - $50,000,000.

14. The Debtors' chapter 11 petitions listed consolidated global assets and liabilities, as of August 31, 2005, of approximately $17.1 billion and $22.2 billion, respectively.  Delphi had $3.9 billion in outstanding debt as of June 30, 2005, of which $3.4 billion was long-term debt.  Miller Aff. at ¶ 13.

15. The Debtors contend that three significant issues have largely contributed to the deterioration of their financial performance:  (a) increasingly unsustainable U.S. legacy liabilities and

operational restrictions driven by collective bargaining agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs; (b) a competitive U.S. vehicle production environment for domestic OEM's resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures; and (c) increasing commodity prices. Utility Motion at ¶ 11.

### Delphi's U.S. Legacy Liabilities and Operational Restrictions

16. With respect to Delphi's U.S. legacy liabilities and operational restrictions, the Debtors' assert that their collective bargaining agreements provide for wages and benefits which are well above market, costly pension plans and retiree health care and other benefits, and burdensome operating restrictions, constrain the Debtors' ability to compete with their U.S. peers. In connection with its spin-off from GM, Delphi was required to assume the terms and conditions of the collective bargaining agreements negotiated by its unions with GM. Miller Aff. at ¶ 16.

17. Delphi asserts that it is the only U.S. auto supplier with an OEM assembly pattern labor agreement, resulting in unsustainable, inflexible and uncompetitive costs and liabilities. Consequently, the Debtors compensate their hourly workers an average of approximately $64 per hour, including benefits and legacy liabilities, which is nearly three times more than the hourly labor rates of its U.S. peer companies. Miller Aff. at ¶ 16.

18. Delphi's domestic hourly pension and other post-employment benefits, including without limitation retiree health care and life insurance (collectively, "OPEB"), exposed the Debtors to $10.4 billion in unfunded liabilities at the end of calendar year 2004. During the first six months of 2005, the Debtors' cash outflow associated with its hourly pension and OPEB obligations was approximately

$485 million and $70 million, respectively. The Debtors project that cash outflows for hourly pension contributions and OPEB payments through 2007 will be approximately $1.7 billion and will increase geometrically thereafter if not addressed now as a result of the projected retirement of Delphi's U.S. workforce in the years to come. Miller Aff. at ¶ 17.

19. Due to declining business conditions, Delphi asserts that an increasing proportion of its U.S. hourly workforce is, and is expected to continue to be, in a paid but non-productive status, i.e., a fixed cost which is independent of volume and revenue. Under the terms of Delphi's collective bargaining agreements with its U.S. unions, Delphi is generally not permitted to permanently lay off idled workers, and in recent months, the number of idled hourly workers that receive nearly full pay and benefits has been as high as 4,000, although performing no work. Coupled with restrictions on the Debtors' ability to exit non-strategic, non-profitable operations, the magnitude of the cost of carrying idled, non-productive workers in the event of plant closings or wind-downs effectively prevents the Debtors from addressing poor product portfolio businesses and non-profitable manufacturing operations. Miller Aff. at ¶ 18.

20. Although the Debtors' U.S. hourly workforce was reduced by 15% over the 15-month period ended December 31, 2004, as of June 30, 2005, approximately 12% of Delphi's U.S. hourly workforce was in a non-productive status. In 2004, this cost Delphi more than $170 million, including wages and benefits. Miller Aff. at ¶ 18.

**The U.S. Vehicle Production Environment For Domestic OEMs**

21. The Debtors assert that they are facing considerable challenges due to revenue decreases and related pricing pressures stemming from a substantial slowdown in GM's North America

7

vehicle production. GM currently comprises approximately 49% of Delphi's sales, and GM sales for the first six months of 2005 were down approximately $1.6 billon, an 18% year-over-year decline, thereby adversely affecting Delphi's financial performance. Miller Aff. at ¶ 19.

### Increasing Commodity Prices

22.     During the first six months of 2005, the Debtors incurred substantial commodity cost increases, most notably for steel and petroleum-based resin products. Although the Debtors intend to pass cost increases to its customers, the Debtors claim that if they are not successful, their income in future periods will be further adversely affected. Miller Aff. at ¶ 20. Presumably, the Debtors' energy costs will also be increasing due to the effects from this year's hurricanes on energy prices.

23.     Based upon pre-filing discussions with their Unions and GM that were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Debtors decided to commence these chapter 11 cases. Utility Motion at ¶ 12.

### Post-Petition Financing

24.     On the Petition Date, the Debtors filed the *Motion For Order Under 11 U.S.C. §§ 105, 361, 362, 363, 364(c), 364(d), and 364(e) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) Authorizing Debtors to Obtain Secured Postpetition Financing on Superpriority Secured and Priming Basis, (II) Authorizing Use of Cash Collateral, (III) Granting Adequate Protection to Prepetition Secured Lenders, (IV) Granting Interim Relief, and (V) Scheduling a Final Hearing Under Fed. R. Bankr. P. 4001(b) and (c)* (the "DIP Financing Motion").

25.     Through the DIP Financing Motion, the Debtors seek a final order allowing Delphi to obtain postpetition financing up to $2 billion, consisting of a $1.75 billion revolving credit facility, and a

8

$250 million term loan facility. The Debtors also sought, on a preliminary basis, the authority to borrow up to $950 million. DIP Financing Motion at p. 2.

26. On October 12, 2005, the Court entered the *Interim Order Under 11 U.S.C. §§ 105, 361, 362, 363, 364(c), 364(d), and 364(e) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) Authorizing Debtors to Obtain Secured Postpetition Financing, (II) To Utilize Cash Collateral, (III) Granting Adequate Protection to Prepetition Secured Lenders, and (IV) Scheduling a Final Hearing Under Fed. R. Bankr. P. 4001(b) and (c)* (the "Interim DIP Financing Order").

27. Pursuant to the Interim DIP Financing Order, the Debtors were authorized to borrow up to $950 million. Interim DIP Financing Order at ¶ 5(a).

28. Although the Debtors' counsel asserts in the Utility Motion that none of the utilities need post-petition deposits or other security, that argument is weakened by that the fact that the DIP Financing Motion requests a carve-out from superpriority claim status up to $35 million for professional fees and disbursements. DIP Financing Motion at ¶ 23(k).

**Facts Concerning the Utilities**

29. Each of the Utilities provided the Debtors with pre-petition utility service and they continue to provide the Debtors with post-petition utility service.

30. In August 2005, Dominion sent the Debtors a deposit request for all of the accounts Dominion believed it had with the Debtors. In September 2005, the parties entered into confidential settlement agreement that will apply to the two accounts under that agreement. Unless the Debtors contest the validity of the foregoing agreement, Dominion will not be seeking adequate assurance of payment for those two accounts.

9

31. In the Utility Motion, Dominion learned that the Debtors are trying to claim that five accounts Dominion has with General Motors Company are somehow subject to this Court's jurisdiction. This Court has no jurisdiction to address a contract between Dominion and General Motors Company. Accordingly, Dominion objects to the Debtors' attempt to make Dominion's contract with General Motors Company subject to this bankruptcy proceeding.

32. Under the Utilities' state mandated billing cycles, the Debtors receive approximately one month of utility service before the Utility issues a bill for such service. Once a bill is issued, the Debtors have approximately 15 to 30 days to pay the applicable bill. If the Debtors fail to timely pay the bill, a past due notice is issued and a late fee is subsequently imposed on the account. If the Debtors fail to pay the bill after the issuance of the past due notice, the Utilities issue a notice that informs the Debtors that they must cure the arrearage within a certain period of time or their service will be disconnected. Accordingly, under the Utilities' billing cycles the Debtors could receive 2 to 2 1/2 months of unpaid service before their service could be terminated for a post-petition payment default.

33. Subject to a reservation of the Utilities' rights to supplement their post-petition deposit requests if additional accounts belonging to the Debtors are subsequently identified, the Utilities' estimated pre-petition losses and two-month post-petition deposit requests are currently as follows:

| Utility | No. of Accounts | Est. Pre-Petition Debt | Deposit Request |
|---|---|---|---|
| AEP | 5 | $445,284.48 | $575,625 |
| NYSEG | 13 | $210,936.19 | $219,631 |
| Niagara | 2 | $176,459.72 | $125,450 |
| PSEG | 2 | $96,053.58 | $222,000 |

10

RG&E 7                          $30,891.26[1]                     $607,173[2]

### Debtors' Proposed Adequate Assurance of Payment Procedures

34.     Section 366(b) of the Bankruptcy Code provides:

> Such utility may alter, refuse, or discontinue service if neither the trustee nor the debtor, within 20 days after the date of the order for relief, furnishes adequate assurance of payment, in the form of a deposit or other security, for service after such date. On request of a party in interest and after notice and a hearing, the court may order reasonable modification of the amount of the deposit or other security necessary to provide adequate assurance of payment.

35.     As set forth above, § 366 of the Bankruptcy Code establishes a procedure whereby a debtor is to provide a utility with "adequate assurance of payment, in the form of a deposit or other security" within the first 20 days of the bankruptcy proceeding. If the debtor fails to provide the utility with adequate assurance of payment that the utility believes is reasonable, the utility is entitled to alter, refuse or discontinue service to the debtor. If, however, either party is not satisfied with the amount of the deposit or other security that is proposed as adequate assurance of payment, they can move the Bankruptcy Court, upon notice and a hearing, to modify the amount.

36.     Under the Debtors' proposal, which completely reverses the procedure established by the clear language of § 366, the Debtors seek a 45-day period of time in which they have to respond to a demand for adequate assurances. As such, instead of having to respond to demands for adequate assurance within 20 days of the Petition Date, *i.e.*, October 28, 2005, the Debtors are seeking a 45 day period in which to respond to an adequate assurance demand, and then the Debtors' only obligations in

---

[1] This amount does not include final prepetition amounts because those figures will not be available until November, 2005.

11

response thereto is to determine if the utilities' requests were reasonable and to then file a motion for determination of additional adequate assurance of payment and notice such motion for hearing.

37.     In light of the Debtors' admitted severe financial and liquidity problems, the uncertainty as to whether the Debtors will even be able to successfully reorganize, and the exposure presented by the Utilities' state law billing cycles, any further delay in reaching an initial determination of what the Debtors should provide as adequate assurance of payment is highly prejudicial to the Utilities. Therefore, the Utilities respectfully request that the Court immediately determine what adequate assurances of payment pursuant to § 366(b) of the Bankruptcy Code should be provided to the Utilities.

## I.     THE COURT SHOULD ORDER THE DEBTORS TO PAY THE DEPOSITS REQUESTED HEREIN AS ADEQUATE ASSURANCE OF PAYMENT PURSUANT TO SECTION 366 OF THE BANKRUPTCY CODE.

Section 366(b) of the Bankruptcy Code provides:

> Such utility may alter, refuse, or discontinue service if neither the trustee nor the debtor, within 20 days after the date of the order for relief, furnishes adequate assurance of payment, in the form of a deposit or other security, for service after such date. On request of a party in interest and after notice and a hearing, the court may order reasonable modification of the amount of the deposit or other security necessary to provide adequate assurance of payment.

A determination of adequate assurance is within the court's discretion, and is made on a case-by-case basis. In re Utica Floor Maintenance, Inc., 25 B.R. 1010, 1016 (Bankr. N.D.N.Y. 1982); In re Cunha, 1 B.R. 330, 332-33 (Bankr. E.D. Va. 1979). The Utilities acknowledge that the Second Circuit Court of Appeals' decision in Virginia Electric And Power Company v. Caldor, Inc., 117 F.3d

---

[2] This includes a deposit request for delivery and supply. At this time, RG&E is not providing supply, but it is the supplier of last resort.

646 (2d Cir. 1997) is controlling authority, even though it was statutorily overruled by amendments to the Bankruptcy Code that took effect on October 17, 2005 and the legal basis for the decision is in question. Despite the foregoing, the Court in Caldor, merely held that a court is afforded reasonable discretion in determining what constitutes adequate assurance of payment in each case and that, in certain exceptional cases, adequate assurance of payment may not require anything more than the protections already afforded the utilities under the Bankruptcy Code. This case, however, does not present the "exceptional" set of circumstances that was presented in Caldor. To the contrary, under the totality of circumstances test that Caldor establishes, it is clear that the Court should impose some form of adequate assurance of payment -- in this case to require the Debtors' to pay the deposits requested herein to protect utilities from an unreasonable risk of nonpayment of post-petition invoices.

The Utilities believe that adequate assurance of payment for post-petition utility services to the Debtors for the following reasons:

a. Delphi admits that it will have significant negative EBITDAR until at least the end of August 2005;

b. Delphi is faced with significant organized labor issues that threaten the very existence of Delphi as a going concern in the future;

c. Delphi admits that it has been suffering losses since 2003;

d. Delphi admits that its financial condition had deteriorated further in the first six months of 2005, with net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004. Reported net losses in calendar year 2004 were $4.8 billion;

e. Although the Debtors' U.S. hourly workforce was reduced by 15% over the 15-month period ended December 31, 2004, as of June 30, 2005,

      approximately 12% of Delphi's U.S. hourly workforce was in a non-productive status. In 2004, this cost Delphi more than $170 million, including wages and benefits;

  f.  The Debtors' chapter 11 petitions listed consolidated global assets and liabilities, as of August 31, 2005, of approximately $17.1 billion and $22.2 billion, respectively. Delphi had $3.9 billion in outstanding debt as of June 30, 2005, of which $3.4 billion was long-term debt;

  g.  The Debtors assert that they are facing considerable challenges due to revenue decreases and related pricing pressures stemming from a substantial slowdown in GM's North America vehicle production. GM currently comprises approximately 49% of Delphi's sales, and GM sales for the first six months of 2005 were down approximately $1.6 billon, an 18% year-over-year decline, thereby adversely affecting Delphi's financial performance; and

  h.  During the first six months of 2005, the Debtors incurred substantial commodity cost increases, most notably for steel and petroleum-based resin products. Although the Debtors intend to pass cost increases to its customers, the Debtors claim that if they are not successful, their income in future periods will be further adversely affected. Moreover, the Debtors will also be facing increasing energy prices this fall and winter.

Accordingly, unless the Utilities are granted the deposits they are requesting herein, the Utilities will be subjected to an unreasonable risk of nonpayment from the Debtors for post-petition services that the Utilities provide on an arrearage basis. At a minimum, the Utilities request that they be granted the deposits they are seeking herein or some form of advance payments for at least one year to determine if the Debtors will be able to address their significant financial problems.

  Additionally, it is also clear that Debtors' counsel is concerned about the Debtors' ability to pay their bills and those of other professionals employed in connection with these bankruptcy cases, as they are seeking to obtain a super-priority carve-out for their and other professionals' post-petition fees in the amount of up to $35 million.

  Moreover, Section 366 of the Bankruptcy Code was enacted to balance a debtor's need for

utility services from a provider that holds a monopoly on such services, with the need of the utility to ensure for itself and its rate payers that it receives payment for providing these essential services. See In re Hanratty, 907 F.2d 1418, 1424 (3d Cir. 1990). The balance is struck, with respect to a debtor, by not allowing the utility to require the debtor to pay prepetition invoices or exorbitant deposits[3] in exchange for providing a debtor with an essential service. In consideration for negating the utility's bargaining power, Section 366 provides that utilities are to receive "adequate assurance of payment, in the form of a deposit or other security" from the debtor for having to assume the risk of providing the debtor with post-petition service.

The deposit or other security "should bear a reasonable relationship to expected or anticipated utility consumption by a debtor." In re Coastal Dry Dock & Repair Corp., 62 B.R. 879, 883 (Bankr. E.D.N.Y. 1986). In making such a determination, it is appropriate for the Court to consider "the length of time necessary for the utility to effect termination once one billing cycle is missed." In re Begley, 760 F.2d 46, 49 (3d Cir. 1985). Based on the Debtors' anticipated utility consumption, the minimum period of time the Debtors could receive service from the Utilities before termination of service for non-payment of bills is approximately two (2) months. Accordingly, the two-month security deposits requested by the Utilities are reasonable. See In re Stagecoach, 1 B.R. 732, 735-36 (Bankr. M.D. Fla. 1979) (two month deposit is appropriate where the debtor could receive 60 days of service before termination of services because of the utilities' billing cycle.); see also In the Matter of Robmac, Inc., 8 B.R. 1, 3-4 (Bankr. N.D. Ga. 1979).

---

[3] The Utilities are state-regulated entities that can only request a deposit or other security that is permitted by their Tariffs. Accordingly, the deposits or other security requests made by the Utilities cannot and do not exceed the amount of security they are permitted to request under their tariffs.

15

Furthermore, pursuant to their respective tariffs, the Utilities are required to pay interest on cash deposits provided by their customers such as the Debtors. The current interest rates paid on deposits held by the Utilities are as follows: AEP – 6% (Indiana accounts), 5% (Ohio accounts), and 3.95% (Oklahoma accounts); Dominion - 3%; NYSEG - 2.6%; Niagara – 2.6%; PSEG – 1.26%; and RG&E 2.6%.

WHEREFORE, the Utilities respectfully request that this Court enter an order:

(I)     Deny the Utility Motion;

(II)    Award the Utilities the post-petition adequate assurances of payment they have requested from the Debtors herein; and

    (III)    Award such other and further relief as the Court deems just and appropriate.

Dated: October 24, 2005
       Uniondale, New York

ROSEN SLOME MARDER LLP

By: ___/s/ Thomas R. Slome_____
    Thomas R. Slome (TS-0957)
    Jil Mazer-Marino (JM-6470)

333 Earle Ovington Boulevard
Suite 901
Uniondale, New York 11553-3622
(516) 227-1600

and

Russell R. Johnson III
2258 Wheatlands Drive
Manakin-Sabot, Virginia 23103
(804) 749-8861

*Co-Counsel for American Electric Power; Dominion East Ohio; New York State Electric and Gas Corporation; Niagara Mohawk Power Corporation; Public Service Electric and Gas Company; and Rochester Gas & Electric Corporation*

G:\Johnson\American\Delphi\lit\Delphi-Objectionto366Motionfinal.doc