BARNES & THORNBURG LLP
Attorneys for Bank of America, N.A.
300 Ottawa Avenue, NW, Suite 500
Grand Rapids, Michigan  49503
Telephone:  (616) 742-3930
Facsimile:  (616) 742-3999

Patrick E. Mears (PM-6473)
Telephone:  (616) 742-3936
Email:  pmears@btlaw.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | ) | Chapter 11 Case |
| DELPHI CORPORATION, *et al*. | ) | No. 05-44481 |
| Debtors. | ) | |

## OBJECTION OF BANK OF AMERICA N.A.
## TO DEBTORS' MOTION FOR POSTPETITION FINANCING
## AND FOR ADEQUATE PROTECTION

Bank of America N.A. ("Bank of America")[1], by and through its undersigned counsel, hereby submits this Objection[2] to the Motion of the Chapter 11 Debtors herein (the "Debtors") for an Order Under 11 U.S.C. §§ 105, 361, 362, 363, 364(c), 364(d), and 364(e) and Fed.R.Bankr.P. 2002, 4001, and 9014 (I) Authorizing Debtors to Obtain Secured Postpetition Financing on Superpriority Secured and Priming Basis, (II) Authorizing Use of Cash Collateral, (III) Granting Adequate Protection to Prepetition Secured Lenders, (IV) Granting Interim Relief, and (V) Scheduling a Final Hearing under Fed.R.Bankr.P. 4001(b) and (c) (the "Motion").

---

[1]  On October 10, 2005, Bank of America filed and served in these Chapter 11 cases its Objection to Debtors' Motion for Postpetition Financing and for Adequate Protection.  This earlier Objection mistakenly identified the lessor of the two aircraft described herein and therein as "Bank of America Leasing & Capital, LLC." The lessor is Bank of America, N.A.

[2]  The Debtor and all other concerned parties consented to an extension of Bank of America's time to file and serve this Objection until 4:00 p.m. (Eastern time on Monday, October 24, 2005).

Bank of America objects to the Motion on the following grounds: (i) the Debtors should not grant any lien or security interest whatsoever in the aircraft leases between Bank of America, as lessor, and Delphi Automotive Systems Human Resources LLC ("Delphi HR") nor in any of the personal property subject to these leases; and (ii) if any such lien or interest in Delphi HR's leasehold interests is granted pursuant to the Motion, such interest should only attach to Delphi HR's interests therein and should be subordinate and junior in all respects to the interests of Bank of America. In addition, Bank of America objects to the grant of any DIP Liens in the Management Agreement and the Charter Agreement and any revenues generated therefrom unless they are deemed junior and subordinate to the liens held by Bank of America in these assets and unless Bank of America's liens in these assets are granted adequate protection. Finally, Bank of America objects to any attempt in the Motion and the proposed financing order to encumber in any fashion Bank of America's rights and interests under a certain foreign exchange swap agreement with Delphi Corporation, which is a guarantor of the aircraft leases.

**I.      The Aircraft Leases and Associated Collateral**

      **A.      The Learjet Lease and Associated Collateral**

      1.      Delphi Corporation and certain of its subsidiaries and affiliates, including Delphi HR (the "Debtors"), commenced these related Chapter 11 cases by filing separate voluntary petitions with this Court on October 8, 2005.

      2.      On or about March 30, 2001, Bank of America's predecessor-in-interest, Fleet National Bank ("Fleet") entered into a certain Aircraft Lease dated such date with Delphi HR's predecessor-in-interest, SM 5105 LLC, a Delaware limited liability company ("SMLLC"), as lessee (the "Learjet Lease"). A copy of the Learjet Lease (with schedules and other attachments) is annexed hereto as Exhibit A.

      3.      The following personal property is the subject of the Learjet Lease:

2

(a) a certain Learjet 60 aircraft bearing U.S. Registration Mark N699DA and manufacturer's serial number 237 (the "Learjet Aircraft");

(b) two (2) Pratt & Whitney Canada model number PW305A aircraft engines respectively bearing manufacturer's serial numbers PCE-CA0319 and PCE-CA 0318 (collectively, the "Learjet Engines"); and

(c) all present and future parts, avionics, accessories, accessions and attachments related to the Learjet Aircraft, the Learjet Engines and any related goods, and all present and future replacements, substitutions and exchanges for the Learjet Aircraft, the Learjet Engines, any related goods (the "Learjet Accessories and Avionics").

4. Title to the Learjet Aircraft, the Learjet Engines and the Learjet Accessories and Avionics is held by Bank of America, as successor-in-interest to Fleet. A copy of the Aircraft Bill of Sale from Learjet Inc. to Fleet and recorded with the Federal Aviation Administration ("FAA") on January 29, 2002, is annexed hereto as Exhibit B. The lessor's cost of the Learjet Aircraft, the Learjet Engines and the Learjet Accessories and Avionics amounted to $11,125,200.00.

5. Pursuant to the Learjet Lease, the lease term is 144 months beginning on December 20, 2001 and expiring on December 19, 2013.

6. All of the lessee's obligations under the Learjet Lease are unconditionally guaranteed by Delphi Corporation, formerly known as "Delphi Automotive Systems Corporation", a Delaware corporation, and Delphi Automotive Systems LLC, a Delaware limited liability company, pursuant to the terms of two separate guaranties, both of which are dated March 30, 2001.

3

7. On January 29, 2002, the Learjet Lease was recorded with the FAA. A copy of a title search report evidencing this recordation is annexed hereto as Exhibit C.

8. On November 30, 2001, Fleet filed a UCC financing statement with the Delaware Secretary of State listing the Learjet Aircraft, the Learjet Engines, the Learjet Accessories and Avionics and related property. A copy of results of a UCC search conducted by the Delaware Secretary of State under the name of SMLLC and dated October 14, 2005, which results contain a copy of this financing statement and is annexed hereto as Exhibit D.

9. On May 1, 2001, Fleet filed a UCC financing statement with the Michigan Secretary of State listing this same property. A copy of results of a UCC search conducted by the Michigan Secretary of State under the name of SMLLC and dated October 15, 2005, which results contain a copy of this financing statement, is annexed hereto as Exhibit E.

10. On or about December 16, 2003, SMLLC assigned its rights and obligations under the Learjet Lease and related documents to Delphi HR pursuant to the terms of a certain Assumption/Assignment Agreement dated such date and recorded with the FAA on February 18, 2004. A copy of this Agreement is attached hereto as Exhibit F. On March 9, 2004, Fleet filed a new UCC financing statement reflecting this assignment with the Delaware Secretary of State and listing Delphi HR as the debtor. A copy of this financing statement is contained in the results of a UCC search conducted by the Delaware Secretary of State under the name of Delphi HR, which results are dated October 13, 2004, and are annexed hereto as Exhibit G.

11. Upon information and belief, lessee and Automotive Air Charter, Inc. ("Charter"), a Delaware corporation, are parties to a Charter Agreement concerning the Learjet Aircraft, the Learjet Engines and the Learjet Accessories and Avionics (the "Learjet Charter Agreement").

4

12. Upon information and belief, lessee and Pentastar Aviation, LLC ("Pentastar") are parties to a certain Aircraft Management Agreement under FAR Part 91 concerning the Learjet Aircraft, the Learjet Engines and the Learjet Accessories and Avionics (the "Learjet Management Agreement").

13. Pursuant to the terms of the Learjet Lease and a certain Consent of Aircraft Management Agreement and Charter Agreement and Assignment executed by Fleet, SMLLC, Pentastar and Charter and dated November 27, 2001 (the "Assignment"), SMLLC granted to Fleet a first priority security interest in all of SMLLC's rights under the Learjet Management Agreement and the Learjet Charter Agreement (and any extensions and renewals thereof) including any sums paid and payable to SMLLC thereunder. A copy of the Assignment is annexed hereto as <u>Exhibit H</u>. This security interest has been perfected.

14. In addition, the Learjet Lease and Assignment granted to Bank of America security interests and liens in other tangible and intangible personal property of Delphi HR including the following:

    (a) the proceeds of insurance payable to Delphi HR under the Learjet Management Agreement and Learjet Charter Agreement;

    (b) all rights and remedies of Delphi HR under the Learjet Management Agreement and all proceeds from the exercise of those rights and remedies;

    (c) any sublease of the Learjet Aircraft, the Learjet Engines and the Learjet Accessories and Avionics, all amounts payable under any such sublease, all insurance payable to Delphi HR under any such sublease and all rights and remedies of Delphi under any such sublease;

5

(d) true copies of all present and future books and records relating to the Learjet Management Agreement and the Learjet Charter Agreement including, but not limited to, all tapes, cards, computer programs, computer runs and computer data in the possession or control of Delphi HR, any computer service bureau or other third party.

15. Upon information and belief, neither the Learjet Charter Agreement nor the Learjet Management Agreement have been rejected or terminated.

### B.     The Challenger Lease and Associated Collateral

16. Also on or about March 30, 2001, Fleet entered into a certain Aircraft Lease dated such date with SMLLC, as lessee (the "Challenger Lease"). A copy of the Challenger Lease is annexed hereto as Exhibit I.

17. The following personal property is the subject of the Challenger Lease:

(a) a certain Bombardier Inc. CL-600-2B16 (Variant 604) aircraft bearing U.S. Registration Mark N599DA and manufacturer's serial number 5498 (the "Challenger Aircraft");

(b) two (2) General Electric CF 34-3B aircraft engines respectively bearing manufacturer's serial numbers 873033 and 873034 (collectively, the "Challenger Engines"); and

(c) all present and future parts, avionics, accessories, accessions and attachments related to the Challenger Aircraft, the Challenger Engines and any related goods, and all present and future replacements, substitutions and exchanges for the Challenger Aircraft, the Challenger Engines and any related goods (the "Challenger Accessories and Avionics").

18. Title to the Challenger Aircraft, the Challenger Engines and the Challenger Accessories and Avionics is held by Bank of America, as successor-in-interest to Fleet. A copy of the Aircraft Bill of Sale from Bombardier Aerospace Corporation to Fleet and recorded with the FAA on January 25, 2002, is annexed hereto as Exhibit J. The lessor's cost of the Challenger

6

Aircraft, the Challenger Engines and the Challenger Accessories and Avionics was $24,149,760.00.

19. Pursuant to the Challenger Lease, the lease term is 144 months beginning on December 20, 2001 and expiring on December 19, 2013.

20. All of the lessee's obligations under the Challenger Lease are unconditionally guaranteed by Delphi Corporation and Delphi Automotive Systems LLC pursuant to the terms of two (2) separate guaranties, both of which are dated as of March 30, 2001.

21. On January 25, 2002, the Challenger Lease was recorded with the FAA. A copy of a title search report evidencing this recordation is annexed hereto as Exhibit K.

22. On November 30, 2001, Fleet filed a UCC financing statement with the Delaware Secretary of State listing the Challenger Aircraft, the Challenger Engines, the Challenger Accessories and Avionics and related property. A copy of the original financing statement is contained in the results of a UCC search conducted by the Delaware Secretary of State under the name SMLLC and dated October 14, 2005, which results have been previously annexed hereto as Exhibit D.

23. On May 1, 2001, Fleet filed a UCC financing statement with the Michigan Secretary of State listing this same property. A copy of this financing statement is contained in the results of a UCC search conducted by the Michigan Secretary of State and dated October 15, 2005, which results have been previously annexed hereto as Exhibit E.

24. On or about December 16, 2003, SMLLC assigned all of its rights in the Challenger Lease and related documents to Delphi HR pursuant to the terms of a certain Assumption/Assignment Agreement dated such date and recorded with the FAA on February 18, 2004. A copy of this Agreement is attached hereto as Exhibit L. On March 9, 2004, Fleet filed a

7

new UCC financing statement reflecting this assignment with the Delaware Secretary of State. A copy of this financing statement is contained in the results of a UCC search conducted by the Delaware Secretary of State under the name of Delphi HR and dated October 13, 2004 which results have been previously annexed hereto as Exhibit F.

25. On or about November 26, 2001, lessee and Automotive Air Charter, Inc., a Delaware corporation, executed a certain Charter Agreement concerning the Challenger Aircraft, the Challenger Engines and the Challenger Accessories and Avionics, which agreement is dated such date (the "Challenger Charter Agreement").

26. On November 26, 2001, lessee and Pentastar Aviation, LLC executed a certain Aircraft Management Agreement under FAR Part 91, concerning the Challenger Aircraft, the Challenger Engines and the Challenger Accessories and Avionics, which agreement is dated such date and was thereafter extended/renewed on June 1, 2002 (the "Challenger Management Agreement").

27. Pursuant to the terms of the Challenger Lease and the Assignment, SMLLC granted to Fleet a first priority security interest in all of SMLLC's rights under the Challenger Management Agreement and the Challenger Charter Agreement (and any extensions and renewals thereof) including any sums paid and payable to SMLLC thereunder. A copy of the Assignment has been previously annexed hereto as Exhibit G. This security interest has been perfected.

28. In addition, the Challenger Lease and the Assignment granted to Bank of America security interests and liens in other tangible and intangible personal property:

    (a) the proceeds of insurance payable to Delphi HR under the Challenger Management Agreement and Challenger Charter Agreement;

8

(b) all rights and remedies of Delphi HR under the Challenger Management Agreement are all proceeds from the exercise of those rights and remedies;

(c) any sublease of the Challenger Aircraft, the Challenger Engines and the Challenger Accessories and Avionics, all amounts payable under any such sublease, all insurance payable to Delphi HR under such sublease and all rights and remedies of Delphi under such sublease;

(d) true copies of all present and future books and records relating to the Challenger Management Agreement and the Challenger Charter Agreement including, but not limited to, all tapes, cards, computer programs, computer runs and computer data in the possession or control of Delphi HR, any computer service bureau or other third party.

29. Upon information and belief, neither the Challenger Charter Agreement nor the Management Agreement have been rejected or terminated.

### C. The Swap Agreement

30. On or about January 18, 1999, Bank of America and Delphi Corporation entered into an ISDA Master Agreement dated such date, which agreement includes all schedules and amendments thereto (the "Swap Agreement"). Pursuant to the Swap Agreement, Bank of America and Delphi Corporation have entered into hundreds of foreign exchange transactions. On the date hereof, more than 300 foreign exchange transactions remain outstanding under the Swap Agreement. The Swap Agreement has not yet been assumed or rejected by Delphi but is presumably among the subjects of this Court's Derivative Contracts Order dated October 14, 2005, which permits the debtors to honor their "Derivative Contracts" in accordance with past practices and "to continue entering into, 'rolling over', adjusting, modifying and settling, from time to time, Derivative Contracts."

31.  The automatic stay provisions of the Bankruptcy Code do not prohibit Bank of America from terminating the Swap Agreement. 11 U.S.C. § 362(b)(17). In addition, Bank of America may enforce any *ipso facto* clauses in the Swap Agreement pursuant to Section 560 of the Federal Bankruptcy Code.

32.  Upon information and belief, in the event that the Swap Agreement is terminated now, there would be substantial sums estimated in the millions of dollars due to Delphi from the netting process involved.

33.  Any sums due to Delphi arising from a termination of the Swap Agreement (and any unmatured obligations due to the Debtor prior to any such a termination) are and would be subject to Bank of America's right to setoff against all indebtedness due by Delphi to Bank of America (including, but not limited to, the obligations of Delphi under its guaranties of the Learjet Lease and Challenger Lease obligations).

34.  Bank of America, by virtue of these setoff rights, would hold a security interest and lien in "cash collateral" arising from any termination of the Swap Agreement during the pendency of these Chapter 11 cases.

## II.  The Proposed Final DIP Financing Order

35.  On October 12, 2005, this Court entered the Interim DIP Financing Order. At the hearing on October 14, 2005, Bank of America's prior Objection to the Motion was reserved until the Final Hearing on the Motion.

36.  The proposed Final Order, if approved, will grant to the DIP Lenders[3] first priority security interests and liens as security for the Financing in all of the Debtors' real and personal

---

[3]  The defined terms used herein are those contained in the Interim DIP Financing Order.

10

property, including leasehold interests and cash collateral either in existence on the Petition Date or acquired by the Debtors thereafter (the "DIP Liens").

37.     The DIP Liens to be granted pursuant to the proposed Final Order will be junior and subordinate to any "valid and unavoidable liens in existence immediately prior to the Petition Date." Nevertheless, the proposed Final Order purports to grant first priority to the DIP Liens in cash collateral subject to Bank of America's preexisting rights, liens and interests in that same property. Interim DIP Financing Order, ¶¶ 7(a), 7(c).

### III.    Bank of America's Objections to the Proposed Final Order

#### A.    Global Objections

38.     The proposed Final Order, if entered will grant certain adequate protection to the Prepetition Lenders including replacement liens.

39.     The Learjet Lease and the Challenger Lease are true leases of personal property. Therefore, any liens granted to the DIP Lenders pursuant to any financing or adequate protection orders entered in these Chapter 11 cases cannot attach to the property that is being leased by Bank of America to Delphi HR because that property is not "property of the estate" within the meaning of 11 U.S.C. § 541.

40.     Bank of America objects to the grant of any liens of security interests, including the DIP Liens and any adequate protection liens, in Delphi HR's leasehold interests in the Learjet and Challenger aircraft subject to the two leases. The grant of any such liens or interests will unnecessarily restrict the power and judgment of Delphi HR in determining whether to assume or reject these leases and could grant to the holders of any liens a veto power over assumption or rejection. In addition, in the event that either lease is rejected or the stay is modified with respect to either aircraft, Bank of America's ability to terminate the leases and dispose of the aircraft would be unnecessarily burdened if any liens were to attach to these leasehold interests. In

11

addition, the two leases prohibit the attachment of any liens or interests in the aircraft and Delphi HR's interests therein. See Section 6(i) and 13(l) of both leases.

41. Bank of America objects to the grant of any liens or security interests, including the DIP Liens and any adequate protection liens, in any of Bank of America's collateral serving as security for the obligations of Delphi HR and the two lease guarantors which collateral includes "cash collateral" under section 363(a) of the Federal Bankruptcy Code. Cash collateral includes, but is not limited to, monies payable under the two management agreements, the two charter agreements, any subleases of the aircraft and any cash or right to receive cash held by Bank of America from the termination and netting out the Swap Agreement. All of this collateral is presently available or will soon be available to reduce any claims that Bank of America arising under the Learjet Lease and the Challenger Lease and any other indebtedness that may be due and owing by any of the debtors to Bank of America.

42. Bank of America objects to the proposed Financing Order insofar that it permits or purports to permit the debtors to use Bank of America's collateral without granting adequate protection to Bank of America's liens and security interest therein. Bank of America does not consent to the debtor's proposed use of its collateral.

43. As described herein, Bank of America holds valid, perfected and first priority security interests and liens in the Management Agreement, the Learjet Charter Agreement, the Challenger Charter Agreement and all proceeds thereof and revenues generated therefrom. Upon information and belief, Delphi HR is or may be receiving cash revenues from charters of the two aircraft pursuant to the two Charter Agreements. All of these revenues constitute "cash collateral" under 11 U.S.C. § 363(a) of the Bankruptcy Code.

44.     Bank of America does not consent to the use of this cash collateral by the Debtors in these Chapter 11 cases and Debtors have not offered any adequate protection to Bank of America for any such use.  At a minimum, Bank of America should receive periodic payments on account of any such use and replacement liens in the Charter Payments as a means of adequate protection under 11 U.S.C. § 363(e).

**B.     Specific Objections**

1.     <u>Paragraph 6(a), Pages 12-13</u>.  This provision of the proposed Final Order would grant to the DIP Obligations priority over all administrative expenses incurred by the debtors in these Chapter 11 cases.  Included in these administrative expenses are all postpetition lease obligations of Delphi HR and the two lease guarantors owing to Bank of America.  Bank of America objects to the grant of any such superpriority status to the DIP Obligations in the absence of evidence that such priming is necessary under the present circumstances.

2.     <u>Section 7(a), Pages 15-16</u>.  These provisions of the proposed Final Order purport to grant to the DIP Lenders first priority liens and security interests in all Unencumbered Property including all "cash collateral," "interests in leaseholds," "general intangibles" and "other rights to payment whether arising before or after the Petition Date."  For the reasons previously stated in Paragraphs 39 through 44, herein, Bank of America objects to the grant of any lien or security interest in Delphi HR's leasehold interest in the Learjet lease or the Challenger Lease.  Bank of America also objects to the grant, or any attempt to grant, of a lien or security interest in cash collateral subject to the existing liens and interests held by Bank of America.  This cash collateral includes, but is not limited to, any revenues or other cash proceeds derived from, generated by or arising from the management agreements and the charter agreements.  Bank of America also objects to any grant of any interest in any cash collateral, general intangibles or rights to payment subject to Bank of America's liens, security interests and

13

setoff rights including, but not limited to, any funds or rights to funds that might arise from the termination netting out of the Swap Agreement, which collateral would be subject to setoff rights and other interests held by Bank of America.

3. <u>Section 7(c), Page 17</u>.  Bank of America objects to the grant of any junior liens in Delphi's leasehold interests and other collateral for the same reasons and to the same extent as set forth in Paragraph 3 herein.

4. <u>Paragraph 8(a)(ii), Pages 18-19</u>.  This provision of the proposed Final Order should be amended to provide that its provisions do not apply to Bank of America.

5. <u>Paragraph 10(a), Pages 20-21</u>.  This provision should be amended to clarify that none of Bank of America's cash collateral, including any cash collateral that might arise from the Swap Agreement's termination, is or will be subject to any liens and interests, including setoff rights, of the creditor beneficiaries of this provision.

6. <u>Paragraph 11, Page 21</u>.  Bank of America objects to this provision of the Final Order insofar as it permits the Debtors' use of cash collateral in the absence of Bank of America's liens and without adequately protecting those liens.

7. <u>Paragraph 12(a), Pages 21-22</u>.  Bank of America objects to this provision of the Final Order in that it neglects to grant any adequate protection to Bank of America's interests in its collateral.

8. <u>Paragraph 15(a), Pages 26-27</u>.  Bank of America objects to this provision of the proposed Final Order insofar as it may affect the replacement liens to which Bank of America is entitled to and its setoff rights as previously described herein.

9. <u>Paragraph 18, Page 33</u>.  Bank of America objects to this provision of the proposed Final Order insofar as it may affect the replacement liens and setoff rights that Bank of

America holds and should be granted. In addition, Bank of America objects to this provision insofar that it does not address or grant any adequate protection to Bank of America with respect to its setoff rights under the Swap Agreement.

WHEREFORE, for the foregoing reasons, Bank of America objects to the relief requested in the Motion unless appropriate protections are granted to Bank of America as requested herein, and award such other and further relief as may be just and proper under the circumstances.

Dated: October 24, 2005

BARNES & THORNBURG LLP
Counsel to Bank of America, N.A.


By:   /s/Patrick E. Mears
        Patrick E. Mears (PM-6473)
Business Address:
300 Ottawa Avenue, NW
Suite 500
Grand Rapids, Michigan  49503
Telephone:  (616) 742-3936
Facsimile:  (616) 742-3999
Email:  pmears@btlaw.com

15