Eric Lopez Schnabel (ES5553)
KLETT ROONEY LIEBER & SCHORLING
A Professional Corporation
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, DE 19801
Phone: (302) 552-4200
Email: elschnabel@klettrooney.com
Counsel to Entergy

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| DELPHI CORPORATION., et al., | Case No. 05-44481 (RDD) |
| Debtors. | (Jointly Administered) |

**OBJECTION OF ENTERGY TO MOTION OF DEBTORS FOR INTERIM AND FINAL
ORDERS UNDER 11 U.S.C. §§ 105, 366, 503 AND 507 (I) PROHIBITING UTILITIES
FROM ALTERING, REFUSING, OR DISCONTINUING SERVICES ON ACCOUNT
OF PREPETITION INVOICES AND (II) ESTABLISHING PROCEDURES FOR
DETERMINING REQUESTS FOR ADDITIONAL ASSURANCE [DOCKET NO. 41]**

Entergy Mississippi, Inc. ("Entergy"), by its undersigned counsel, submits this

objection (the "Objection") to the Debtors' motion for interim and final orders under 11 U.S.C.

§§ 105, 366[1], 503 and 507 (i) prohibiting utilities from altering, refusing, or discontinuing

services on account of prepetition invoices and (ii) establishing procedures for determining

requests for additional assurance (the "Utility Motion"). In support of the Objection, Entergy

states as follows:

---

[1]    11 U.S.C. § 366 was amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005
(the "2005 Act"). The amendments to section 366 are effective with respect to chapter 11 cases filed on or after
October 17, 2005, nine days after the Petition Date. Accordingly, unless otherwise noted, all citations and
references to section 366 herein are to the pre-2005 Act Bankruptcy Code and relevant caselaw. Interestingly, had
the Debtors filed their petitions on or after October 17, 2005, the relief requested by the Utility Motion would not be
available to the Debtors because the 2005 Act provides, *inter alia*, that "administrative expense priority shall not
constitute an assurance of payment." 11 U.S.C. § 366 (as revised by 2005 Act). As set forth more fully herein, the
amendments to section 366 contained in the 2005 Act are instructive as to Congress' viewpoint of the current status
of section 366 as in effect prior to the 2005 Act.

## INTRODUCTION

1.     On October 8, 2005 (the "Petition Date"), the above-captioned debtors and debtors-in-possession (the "Debtors") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York.

2.     The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

3.     No trustee or examiner has been appointed in this Chapter 11 case.

4.     An Official Committee of Unsecured Creditors (the "Committee") was appointed on or about October 17, 2005.

5.     On the Petition Date, the Debtors filed the Utility Motion which requests, among other things: (i) that the Debtors' utility providers, including Entergy (collectively, the "Utility Companies") be enjoined from altering, refusing, or discontinuing services to, or discriminating against, the Debtors on the basis of the commencement of the Debtors' bankruptcy cases or on account of any unpaid pre-petition invoices, (ii) that any Utility Company seeking adequate assurance from the Debtors in the form of a deposit or other security be required to make such request in a writing containing certain information related to the Debtors account(s) with such utility, and (iii) that, if the Debtors file a request for determination with respect to any Utility Company, such Utility Company shall be deemed to have adequate assurance of payment until the Court enters a final order with respect to the motion for determination. See Utility Motion at ¶¶ 15-18.

6.     As set forth more fully below, Entergy is a utility as that term is used in Section 366 of the Bankruptcy Code. In addition, Entergy is also listed as a Utility Company in Exhibit A to the Utility Motion.

2

7.      On or about October 13, 2005, this Court entered the Interim Order under 11 U.S.C. §§ 105, 366, 503 and 507 Prohibiting Utilities from Altering, Refusing or Discontinuing Services on Account of Prepetition Invoices.

## BACKGROUND OF ENTERGY ACCOUNTS

8.      Entergy is, <u>inter alia</u>, a leading provider of electric utility services, including both retail electric service and wholesale transmission services, in several markets including those of the Debtors' operations.  Entergy provides electricity services to the Debtors under at least two open accounts with Entergy (the "<u>Entergy Accounts</u>").

9.      Pre-petition, the Debtors were required by Entergy under applicable state law to provide some sort of deposit or other form of security to ensure prompt payment of services provided pursuant to the Entergy Accounts.  The Debtors provided such security in the form of a $600,000 cash deposit as security for payment of invoices under the Entergy Accounts (the "<u>Security</u>").

10.      The Debtors' monthly charges on the Entergy Accounts at times exceed $755,471 per month.  The Security did not adequately protect Entergy because, as of the Petition Date, the Entergy Accounts had an aggregate unpaid balance of approximately $1,000,000 (the "<u>Claim</u>").  Entergy intends to recoup the extent of its pre-petition Claim through a withdrawal from the Security.

## THE INJUNCTION AGAINST ENTERGY

11.      The Utility Motion and proposed final order (the "<u>Utility Order</u>") seek that this Court make the following factual findings as the basis for deeming that Entergy is adequately assured pursuant to Section 366 and enjoining Entergy from exercising its rights thereunder:   (1) the Debtors' presumably exemplary payment history; (2) the Debtors'

3

demonstrated ability to pay for future services on account of the DIP financing; and (3) the availability of Sections 503(b) and 507(a)(1) of the Bankruptcy Code.  See Utility Motion ¶ 20.

12.     The Utility Motion also seeks to establish a prolonged and rigid procedure to the extent Entergy seeks to dispute the Debtors' assertion of adequate assurance.   Such procedure would effectively extend the statutorily created twenty-day period from the Petition Date found within Section 366 to a total of over 89 days from the Petition Date.  See proposed Utility Order ¶ 6 (19 days into these bankruptcy cases, upon the entry of the proposed order there would be a new 25 day period to object to Debtors' proposed adequate assurance under the procedures) and ¶ 7 (within 45 days after the Debtors and Entergy cannot resolve their differences and the Debtors' file a second motion, a hearing date on a "Determination Motion" will be held).

13.     Entergy is a utility as that term is used in Section 366 of the Bankruptcy Code and is also listed as a Utility Company in the Exhibit referenced by the Utility Motion. The entry of an order granting the Utility Motion would place Entergy at an even greater risk and for an even longer period of time until the issue of adequate assurance and Entergy's rights under Section 366 may be resolved.

## RELIEF REQUESTED

14.     Entergy respectfully requests an order compelling the Debtors to immediately furnish to Entergy sufficient cash of approximately $1,500,000 to replenish its soon to be depleted Security (due to the size of the Claim which Entergy will recoup) to a total of $1,500,000 as adequate assurance of payment of services pursuant to Section 366(b) of the Bankruptcy Code.  Thereafter, Entergy should find itself pursuant to Section 366 in at least the same -- and most certainly no worse -- secured position in comparison to what existed pursuant

4

to applicable state law prior to the bankruptcy filing. Should the Debtors fail to furnish such deposit immediately, Entergy should be permitted to unilaterally terminate all services to the Debtors pursuant to Section 366 of the Bankruptcy Code and applicable non-bankruptcy law.

## OBJECTIONS

### Entergy's Rights Under Section 366

15.     Section 366 provides that a utility cannot terminate services solely on the basis of the bankruptcy filing or pre-petition unpaid usage within the first 20 days after the date of the order for relief. See 11 U.S.C. § 366(a). If within that twenty-day period, however, the debtor and a utility cannot agree on what constitutes adequate assurance of future payment, the utility may discontinue services. See 11 U.S.C. § 366(b); see also In re Hanratty, 907 F.2d 1418, 1419 (3d Cir. 1990) ("If adequate assurance is not given, the utility may alter, refuse or discontinue service to the debtors."). In addition, the Debtors or any party in interest, after notice and a hearing, may also obtain an order from the court determining that the utility provider is adequately assured of future payment. See 11 U.S.C. § 366(b).

16.     Section 366 does not, however, impose any requirement that the utility first obtain permission from the Court to discontinue service for lack of adequate assurance after the twentieth day of the case. See Hanratty, 907 F.2d at 1419; see also In re Carter, 133 B.R. 110, 113 (Bankr. N.D. Ohio 1991) (Section 366 is self-executing; where debtor does not furnish utility with adequate assurance during first twenty days, utility is free to terminate); 3 Collier on Bankruptcy ¶ 366.06 at 366-6 (15th ed. rev. 1996).

17.     Furthermore, a utility may also **unilaterally terminate** services based upon a post-petition default. Section 366(a) prohibits only terminations based "solely" upon "pre-petition" arrearages. See 11 U.S.C. § 366(a). Section 366 "has no provision limiting a utility's freedom to act based upon post-petition arrearages." Begley v. PECO, 760 F.2d 46, 50

(3d Cir. 1985); see also In re Whittaker, 882 F.2d 791, 796 (3d Cir. 1989) ("Section 366 does not relieve debtors of obligations to pay for post-petition services."). In fact, a court cannot enjoin a utility from unilaterally terminating on account of a post-petition default. See MFS Telecom, Inc., et al. v. Motorola, Inc., et al. (In re Conxus Communications, Inc.), 262 B.R. 893, 898 (D. Del. 2001) (reversing bankruptcy court's injunction against utility from terminating on account of post-petition default).

18.    Section 366(b) of the Bankruptcy Code provides, in relevant part, that a "utility," such as Entergy, "may alter, refuse, or discontinue service if neither the trustee nor the debtor, within 20 days after the date of the order for relief, **furnishes adequate assurance of payment, in the form of a deposit or other security**, for services after such date." 11 U.S.C. § 366(b) (emphasis added). Thus, the plain and unambiguous language of the statute requires the Debtors to "furnish adequate assurance" and that adequate assurance must be in the form of either "a deposit or other security."

**The Debtors Have Not Furnished Adequate Assurance to Entergy**

19.    In determining what form and what level of adequate assurance a utility is entitled to receive from the Debtors, the burden of proof lies squarely with "the debtor, the petitioning party." In re Stagecoach Enters., Inc., 1 B.R. 732, 736 (Bankr. M.D. Fla. 1979).

20.    In an attempt to satisfy their burden of proving that adequate assurance exists with respect to Entergy, the Debtors offer the following grounds: (i) the harm that would come to the Debtors' operations if utility services are terminated; (ii) the protections of Sections 503(b) and 507(a)(1) of the Bankruptcy Code; (ii) the Debtors' purported "history of consistent and regular payment to the Utility Companies," and (iv) the Debtors' "demonstrated ability to

pay future utility bills from ongoing operations and postpetition financing". See Utility Motion pp. 11-12.

21.    The Debtors' arguments are not supportable. The Debtors are requesting that this Court find as a factual matter that Entergy is adequately assured by the presence of items that exist in the majority of all major corporate Chapter 11 bankruptcy cases: (1) potential harm to the estate from a termination of services; (2) the availability of Section 503(b) of the Bankruptcy Code; and (3) DIP financing. Such arguments must fail because to do otherwise would render the requirement of Section 366 for a "deposit or other security" meaningless.

22.    Indeed, 11 U.S.C. § 366, as amended by the 2005 Act, clarifies that "the term 'assurance of payment' means (i) a cash deposit; (ii) a letter of credit; (iii) a certificate of deposit; (iv) a surety bond; (v) a prepayment of utility consumption; or (vi) another form of security that is mutually agreed on between the utility and the debtor or trustee." 11 U.S.C. § 366(c)(1)(A). Although the whole of the 2005 Act amendments are not effective with respect to this bankruptcy case, the amendments to section 366 are instructive as to Congress' viewpoint of the current status of section 366 as in effect prior to the 2005 Act.

**The Debtors' Legal Authority Is Inapplicable In This Bankruptcy Case**

23.    In support of the Utility Motion, the Debtors cite the opinions of the courts in In re Caldor, Inc. and its progeny for the proposition that administrative expense priority provided by Sections 503(b) and 507(a)(1) constitutes adequate assurance of payment, without the need for a debtor to provide a utility with a deposit or other security where a debtor has paid their pre-petition utility bills in a timely manner.  See Utility Motion at ¶ 26. The Debtors' reliance on In re Caldor, 199 B.R. 1 (S.D.N.Y. 1996) aff'd sub nom Virginia Elec. & Power Co. v. Caldor, Inc., 117 F.3d 646 (2d Cir. 1997), is misplaced because in making a factual record that

cited to "Caldor's prepetition payment history and its postpetition financial condition, the [bankruptcy] court **found** that Caldor '**is probably the best risk customer available to the utilities**,' and concluded that there was '**no reason to doubt that [Caldor's] prepetition history of making [utility] payments on a [timely] and current basis [would] not continue postpetition.**'" 117 F.3d at 648-49 (quoting bankruptcy court) (emphasis added).

24.    In addition, the factual findings of the Bankruptcy Court in <u>In re Caldor</u> were never challenged on appeal to either the District Court or the Court of Appeals.  <u>See</u> <u>In re Caldor</u>, 199 B.R. at 2 ("The Utilities do not contend that the Bankruptcy Court's findings of fact were clearly erroneous, nor that it abused its discretion in determining that the Utilities received adequate assurance of payment."); <u>Caldor</u>, 117 F.3d at 650 ("The Utilities do not challenge the bankruptcy court's finding that the safeguards employed in the instant case, without more, provide them with 'adequate assurance of payment.'").

25.    Significantly, the Court in <u>Caldor</u> would not have reached such a holding if the Court had the benefit of hindsight – always impossible, but instructive today in ruling upon the Utility Motion.  Unsurprisingly, the conclusion of the Caldor bankruptcy cases is one that for good reason the Debtors fail to explain – let alone mention – in their papers.  The <u>Caldor</u> bankruptcy cases ended administratively insolvent with a liquidation of all of the estates' assets outside of a confirmed a plan under the Bankruptcy Code.  <u>See</u> Order Dismissing the Debtors' Chapter 11 Cases, Case No. 95-B-44080 (CB) [Docket No. 5638].  On or about January 22, 1999, this Court entered an order authorizing the Caldor debtors to wind-down their business and affairs so that they could liquidate their remaining assets.  <u>See</u> Order (i) Authorizing Debtors to Wind-Down Their Business Operations and Affairs, and Implement Necessary Procedures With Respect Thereto, (ii) Enjoining Collection Efforts By Operating Period Creditors, (iii)

8

Establishing a Bar Date For Filing Operating Period Claims, (iv) Scheduling Hearing On Debtors' Application For Entry of an Order, *Inter Alia*, (a) Approving Agreement With Secured Term Debt Holders and (b) Enjoining Pending Litigations and Proceedings With Respect to Certain Pre-Petition Claims, and (v) Granting Other Relief Pending Such Hearing, Case No. 95-B-44080 (CB) [Docket No. 3418].   In their application for approval for the wind-down, the Caldor debtors acknowledged that they were administratively insolvent and that certain secured lenders were threatening to seek injunctive relief to enjoin the debtors from paying their administrative creditors.   See Application For Order (i) Authorizing Debtors to Wind-Down Their Business Operations and Affairs, and Implement Necessary Procedures With Respect Thereto, (ii) Enjoining Collection Efforts By Operating Period Creditors, (iii) Establishing a Bar Date for Filing Operating Period Claims, (iv) Scheduling Hearing On Debtors' Application For Entry of an Order, *Inter Alia*, (a) Approving Agreement With Secured Term Debt Holders and (b) Enjoining Pending Litigations and Proceedings With Respect to Certain Pre-Petition Claims, and (v) Granting Other Relief Pending Such Hearing, Case No. 95-B-44080 (CB) [Docket No. 3415 at ppg. 5, 6].

26.   Accordingly, post-petition trade creditors, such as utilities, received payment of significantly less than 100% of their administrative claims. See Application For An Order (A) Scheduling Hearing To Consider the Debtors' Application for an Order, *Inter Alia*, Authorizing the Debtors to Make Final Distribution to Holders of Allowed Operating Period Claims, Dismissing the Debtors' Chapter 11 Cases Effective Upon the Filing of a Final Distribution Notice With the Court and Granting Relief Related Thereto; (B) Establishing the Bar Date for Filing Unpaid Wind-Down Claims; and (C) Fixing the Date for the Filing of Final Fee Applications and Scheduling a Hearing to Consider Same (the "Distribution Application"),

9

Case No. 95-B-44080 (CB) [Docket No. 5501 at ppg. 4, 10-14]; Order Approving Distribution

Application, Case No. 95-B-44080 (CB) [Docket No. 5632].

27.    Thus, the true lesson from <u>Caldor</u> is that Section 503(b) of the Bankruptcy

Code falls well short from providing Section 366's required adequate assurance of payment – a

fact that is especially true now in light of the Supreme Court's subsequent decision of <u>Hartford</u>

<u>Underwriters Ins. Co. v. Union Planters Bank</u>, 530 U.S. 1 (2000) which removed the standing of

a third-party, e.g., an electric utility provider, to petition for the surcharge of a secured creditor's

collateral.

28.    In contrast to the unchallenged and, in hindsight, inaccurate factual

findings in <u>In re Caldor, Inc.</u> regarding adequate assurance, the Debtors have not put forth any

record and this Court has made no factual findings indicating that the Debtors are "probably the

best risk customer available to [Entergy]."  <u>Caldor</u>, 117 F.3d at 648-49 (quoting the bankruptcy

court).  To the contrary, Entergy submits that the evidence as set forth above and which the

Court will be able to consider on a full record at the hearing on the Utility Motion will show that

the Debtors are currently one of the worst customer credit risks facing Entergy.  Accordingly, the

Debtors and their distinguishable and flawed authority cannot satisfy their burden under the clear

language of Section 366 that Entergy be provided adequate assurance without any deposit or

form of other security by virtue of some mere statements and the availability of Section 503(b) of

the Bankruptcy Code.

### The Mere Presence of a DIP Facility Is Insufficient to Satisfy the Mandate
### of Section 366(b) of the Bankruptcy Code

29.    The mere presence of a post-petition financing facility is not sufficient to

meet the mandate of Section 366(b) of the Bankruptcy Code that Entergy be furnished with

adequate assurance of a deposit or other form of other security.  The availability of a DIP facility

does not provide the Debtors with an abundance of unencumbered liquidity to provide adequate assurance to the Utility Companies. The Debtors' assertion to the contrary is largely illusory for several reasons. The interim DIP order and related motion as filed do not provide a budget that indicates how the Debtors plan to timely and sufficiently pay Entergy or the other Utility Companies. At this point, the Debtors have offered no credible evidence of how they will pay their post-petition bills. If the Debtors continue to operate unprofitably or run into other financial trouble, access to the funds of the DIP facility will very likely be impossible because such financial trouble will trigger any number of defaults under the facility's credit agreement. This possibility seems very likely, given that in the Utility Motion the Debtors admit that they have not yet solved any of the problems that caused them to be on track to suffer an annualized $1.2 billion operating loss for 2005. See Utility Motion ¶¶ 10-13.

30.    In such a default situation, the Debtors will be unable to use the cash funds from the DIP facility because all such cash will be the collateral of the post-petition lender – making the funds unavailable without the consent of the DIP lender. Because the proposed DIP facility grants no carve-out for the payment of Entergy's post-petition invoices, the moment the Debtors run into financial trouble and may become unable to pay for Entergy's post-petition services, the presence of the currently proposed DIP facility will prove meaningless to adequately assure Entergy of payment.

31.    On the other hand, if the lender were to grant Entergy a carve-out of its post-petition collateral in the amount of the requested deposit, then the presence of the DIP facility would adequately assure Entergy.

32.    Likewise, the Debtors' promise to pay Entergy is illusory if the Debtors do not have the ability to pay for the services consumed. Entergy makes its request for the deposit

pursuant to the Bankruptcy Code to protect itself from a financial loss in the event that the Debtors cannot pay. There has been no evidence presented by the Debtors -- in fact, only contrary evidence has been presented -- that sufficient liquidity exists and that operations are running at sufficient positive cash-flows to provide any comfort in the mere statement that the Debtors' promises to pay all utility bills and that the lender is committed to provide post-petition financing sufficient to meet the service requirements.

33.     Even assuming that the Debtors can show to support their promise sufficient positive cash flow from operations because of adequate liquidity from the use cash collateral or some DIP financing facility, such liquidity would only allow a "**reasonable modification of the amount of the deposit** or other security necessary." 11 U.S.C. § 366(b) (emphasis added). Even in cases where sufficient liquidity exists and the debtor has had a spotless payment history, courts have still required a modified deposit. See e.g. In re Best Products Co., 203 B.R. 51, 54 (Bankr. E.D. Va. 1996) (requiring one-half month security although debtor had no defaults, no arrearages, no history of late payments, $150 million cash from recent sale of asset and $250 million DIP facility). Entergy should not be required to wait until the Debtors' financial condition deteriorates to the point that the right to a deposit under Section 366(b) and a right to payment under Section 503(b) becomes unenforceable – the exact situation utilities faced at the end of the Caldor bankruptcy cases.

**The Debtors' Pre-Petition Payment History Does Not Support The Debtors' Request**

34.     The Debtors assert that their pre-petition payment history supports their requested relief to minimize the security and deposit requirements of Section 366(b). Such an argument cannot withstand scrutiny. Nothing in the Bankruptcy Code allows Section 366 to be waived. See Board of Transp. of Trucking Empl. Pension Fund v. Centra, 983 F.2d 495, 504 (3d

Cir. 1992) ("Without a clear congressional command to the contrary, we will not construe a statute in a way that renders a provision superfluous. We give effect, if possible, to every clause and word in a statute."). Furthermore, the Debtors have made no factual proffer with respect to the payment history as between Entergy and the Debtors – a general statement as to a class of creditors cannot form the basis of a finding against Entergy.

**Section 366's Requirements Cannot Be Satisfied
By The Mere Granting Of An Administrative Priority Claim[2]**

35.     A "contextual reading of § 366 also evinces that a debtor must provide its utility providers with more than administrative priority." In re Best Products, 203 B.R. at 53. Entergy would be entitled to a priority administrative expense claim under Sections 503(b) and 507(a) even without Section 366. The Debtors are attempting to "furnish" this form of "security" in purported compliance with Section 366, when Entergy already possesses such a right without any resort to Section 366. To deem a right under the Bankruptcy Code as adequate assurance under Section 366, when Entergy already possesses that right independent of Section 366, renders Section 366 a meaningless and unnecessary provision of the Bankruptcy Code.

36.     Furthermore, the statute requires the Debtors to "furnish adequate assurance" and that adequate assurance must be in the form of either "a deposit or other security." The phrase "deposit or other security" is plain and unambiguous and, therefore, must be interpreted literally without reference to any legislative history (even though such legislative history also supports Entergy's position as set forth more fully below). See Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 252, 112 S. Ct. 1146, 1149 (1992) ("When the words of a statute are unambiguous, then . . . judicial inquiry is complete.")(citing United States v. Ron Pair

---

[2]     Indeed, the 2005 Act explicitly clarifies that "in making a determination under this paragraph whether an assurance of payment is adequate, the court may not consider (i) the absence of security before the date of the filing

Enters., Inc., 489 U.S. 235, 241-42, 109 S. Ct. 1026, 1030-31 (1989)); Patterson v. Shumate, 112 S. Ct. 2242, 2248 (1992) ("Although courts appropriately may refer to a statute's legislative history to resolve statutory ambiguity, the clarity of the statutory language at issue in this case obviates the need for any such inquiry.").

37.    Even assuming, arguendo, that the requirement of a "deposit or other security" in Section 366(b) was somehow ambiguous when read in isolation, Section 366(b) must be read in context with other provisions of the Bankruptcy Code.  As the Supreme Court has acknowledged, "[s]tatutory construction" is a "holistic endeavor.  A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme – because the same terminology is used elsewhere in a context that makes its meaning clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law."  See United Sav. Ass'n v. Timbers of Inwood Forest, 106 S. Ct. 626, 630 (1988) (citation omitted).

38.    A comparison of the language of Section 366(b) with Sections 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code demonstrates that a "deposit" or other form of "security," as opposed to an administrative expense claim, is required under Section 366(b). As indicated above, Section 366(b) of the Bankruptcy Code plainly and unambiguously requires a debtor to provide "adequate assurance" of payment for post-petition services "in the form of a deposit or other security."  See 11 U.S.C. § 366(b).  In contrast, Sections 365(b)(1)(C) and (f)(2)(B) simply require "adequate assurance of future performance."  Sections 365(b)(1)(C) and (f)(2)(B) do not require such adequate assurance to be in the form of a "deposit or other security."  Compare 11 U.S.C. §§ 365(b)(1)(C) and (f)(2)(B) (requiring "adequate assurance of

---

of the petition; (ii) the payment by the debtor of charges for utility service in a timely manner before the date of the filing of the petition; or (iii) the availability of an administrative expense priority."  11 U.S.C. § 366(c)(3)(B).

future performance") <u>with</u> 11 U.S.C. § 366(b) (requiring "adequate assurance" in the form of a "deposit or other security"); <u>see also</u> <u>Field v. Mans</u>, 116 S. Ct. 437, 446 (1995) ("The more apparently deliberate the contrast, the stronger the inference, as applied, for example, to contrasting statutory sections originally enacted simultaneously in relevant respects.") (citation omitted).

39.     Any reading of Section 366(b) that releases a debtor from the requirement of posting a "deposit or other security" would render that phrase superfluous.  Such a reading of Section 366(b) would be contrary to well-established canons of statutory construction.  <u>See</u> <u>Centra</u>, 983 F.2d at 504 ("Without a clear congressional command to the contrary, we will not construe a statute in a way that renders a provision superfluous.  We give effect, if possible, to every clause and word in a statute.").

40.     Not only do the plain meaning of Section 366(b) and a comparison of Section 366(b) and Sections 365(b)(1)(C) and (f)(2)(B) support the position that an administrative expense claim does not constitute a "deposit or other form of security," the legislative history of Section 366 provides more evidence of that fact.  The House Report on Section 366 simply referred to adequate assurance of payment for future services.  The Senate version of the bill, however, required assurance to be given "in the form of a deposit or other security."  <u>See</u> S. 2266, 95th Cong., 2d Sess. (1978).  The language of the Senate version of Section 366 is more specific and contemplates more than just a mere administrative expense claim.

41.     By adopting the language included in the Senate's bill, Congress made a conscious decision that adequate assurance under Section 366 was to include more than just an administrative expense claim.  There is a sound public policy reason for this distinction.  Unlike

other entities that choose to extend post-petition credit to or do business with a debtor, utilities do not voluntarily deal with a debtor post-petition; they are required to do so by Section 366.   In return, Section 366 grants utilities the right to require a deposit or other security in addition to the statutory administrative expense priority as the quid pro quo for continued services post-petition. Without Section 366's mandate of a deposit or other form of security, utilities would have no ability to be in parity with other entities who may require post-petition a priming lien (like that often demanded by a prospective post-petition lender) or cash in advance payment terms (like trade vendors often require) as a condition to doing business with a debtor.

42.    In Field v. Mans, 116 S. Ct. 437 (1995), the Supreme Court declared that the utilization in the Bankruptcy Code of a term with an established meaning was meant to "incorporate the general common law" meaning of that term.   116 S. Ct. at 450 n.9.   Therefore, in the instant case, this Court should also look to the "general common law" for the meaning of the terms "deposit" or "other security" in Section 366(b).   The common law meaning of the term "deposit" denotes "[m]oney placed with a person as an earnest or security for the performance of some contract, to be forfeited if the depositor fails in his undertaking."   Black's Law Dictionary at 438 (6th ed. 1990).   At common law, the term "security" is "usually applied to an obligation, pledge, mortgage, deposit, lien, etc. given by a debtor in order to assure the payment or performance of his debt, by furnishing the creditor with a resource to be used in case of failure in the principal obligation."   Black's Law Dictionary at 1355 (6th ed. 1990).   Thus, Section 366(b) cannot be satisfied merely by proof of the purported adequate financial condition of the Debtors and by reference to Section 503(b) because to do so would render the words "a deposit or other security" mere surplusage.

**The Debtors' Improperly Seek To Impose The Burden**
**Upon Entergy To Establish A Lack Of Adequate Assurance**

43.     The Debtors' proposed final order requires that, in order to make a request for adequate assurance, Entergy must make a written request.  Such request, however, shall be deemed invalid if it does not contain the following: (i) details on the location(s) for which utility service is provided, (ii) a payment history for the most recent six months, and (iii) a description of any prior material payment delinquency or irregularity.  See Utility Order, ¶ 6.

44.     The Debtors' proposed procedure is unprecedented.    First, it impermissibly shifts the burden upon Entergy to establish that the Debtors' have not provided adequate assurance of payment to Entergy.  See Hanratty, 907 F.2d at 1419; see also In re Carter, 133 B.R. 110, 113 (Bankr. N.D. Ohio 1991) (Section 366 is self-executing; where debtor does not furnish utility with adequate assurance during first twenty days, utility is free to terminate); 3 Collier on Bankruptcy ¶ 366.06 at 366-6 (15th ed. rev. 1996).

45.     Second, it holds Entergy to a higher standard than the Debtors' hold themselves.  This Court should deny the Utility Motion as to objecting and non-objecting parties until such time as the Debtors put on their case in chief by furnishing to the Court evidence on a per facility bases the 6 month payment history and material delinquencies upon such facility -- the same information they are requiring the Utility Companies to furnish.  The Debtors should have in their own possession internal records that contain such information.  Requiring Entergy and others to furnish such information as a condition for making a request under the Utility Order while failing to do so in seeking the relief set forth in the Utility Order is a double standard that this Court should reject out of hand.

17

## Any Order Cannot Improperly Alter Congress'
## Allocation Of The Rights And Obligations Of The Parties

46.     The Utility Order cannot improperly alter the congressionally mandated
balancing of the interests between the Utility Companies, including Entergy, and the Debtors.
Section 105(a) does not authorize a bankruptcy court to create "substantive rights that would
otherwise be unavailable under the Code," U.S. v. Pepperman, 976 F.2d 123, 131 (3d Cir. 1992),
or "rights not otherwise available under applicable law." Southern Ry. Co. v. Johnson Bronze
Co., 758 F.2d 137, 141 (3d Cir. 1985); see also In re Conxus Communications, Inc., 262 B.R. at
898-99 ("While Section 105(a) gives a bankruptcy court general equitable powers, those powers
are limited by the provisions of the Bankruptcy Code."). Thus, we must look at the rights
granted the Debtors and the Utility Companies under Section 366. The limitation of any rights
thereunder of one party necessarily grants to the other party greater rights than Congress
intended under Section 366. Any such shifting of the carefully balanced rights of the Debtors
and the Utility Companies by the Utility Order is impermissible.

47.     Section 366 specifically permits a utility company to discontinue service
to a debtor on account of a lack of adequate assurance after the twentieth day of a bankruptcy
case. See 11 U.S.C. § 366(b). Additionally, Section 366 contains no provision that limits a
utility's ability to discontinue services on the basis of a post-petition default "despite the prior
security or 'assurance' deposit." See Begley v. Philadelphia Electric Co., 760 F.2d 46, 50
(3d Cir. 1985).

48.     Furthermore, "policy arguments cannot displace the plain language of the
statute; that the plain language of [a section of the Bankruptcy Code] may be bad policy does not
justify a judicial rewrite. . . . Because the statute speaks clearly and its plain language does not
produce an absurd result or contravene any clear legislative history, [this Court] must 'hold

Congress to its words.'"   See Perlman v. Catapult Entertainment, Inc. (In re Catapult Entertainment), 165 F.3d 747, 754 (9th Cir. 1999) (quoting Brooker v. Desert Hosp. Corp., 947 F.2d 412, 414-15 (9th Cir. 1991)).

49.     In addition, any Utility Order that contains no finding that Entergy is adequately assured of payment is fatally flawed.   See Ballard v. Commissioner of Internal Revenue, 125 S. Ct. 1270 (2005) (holding that the Tax Court could not exclude the factual findings of special trial judges from the record on appeal due to the evidentiary and contextual importance of those findings).   Absent such a finding, the entry of an order forbidding a utility from discontinuing service at that point in time when Congress has declared that the utility may do so directly usurps from Congress the legislative power.   See U.S. Const. Art. I, sec. 8, cl. 4.

### Entergy's Request Is Reasonable And Authorized
### Under Section 366(b) of The Bankruptcy Code

50.     In cases where a utility is found not to have adequate assurance, Courts routinely interpret Section 366(b) as requiring deposits in an amount equal to two or more billing cycles depending on the credit terms extended to a debtor.   See e.g., In re Spencer, 218 B.R. 290, 293 (Bankr. W.D.N.Y. 1998) (deposit required to cover two billing periods); Lloyd v. Campaign Tel. Co., 52 B.R. 653, 656 (Bankr. S.D. Ohio 1985) (deposit of 2.3 times average monthly usage); In re Sun-Tel Communications, Inc., 39 B.R. 10, 11-12 (Bankr. S.D. Fla. 1984) (deposit equal to charges incurred during two billing cycles); In re Santa Clara Circuits West, Inc., 27 B.R. 680, 686 (Bankr. D. Utah 1982) (same); and In re Stagecoach Enters., Inc., 1 B.R. at 736 (same).

51.     Moreover, the requirement of a two-month deposit is a typical requirement in the utilities industry.   In fact, the Mississippi Public Service Commission, a government agency that aspires to protect the public from monopolistic practices by assuring that rates and

charges for services are just and reasonable, recommends that a utility obtain a two-month

deposit from corporate customers.   Specifically, Rule 9(A)(1) of the Rules and Regulations

Governing Public Utility Service provides that:

> Each utility may require from any customer or prospective
> customer a cash deposit to guarantee the payment of any such bills
> due or which may become due from such customer and safe return
> of all property belonging to the utility installed at the customer's
> premises or elsewhere. Such required deposit shall not exceed an
> amount equivalent to a single estimated average bill in the case of
> residential customers and two estimated maximum bills for any
> other customers.

See Rule 9 Rules and Regulations Governing Public Utility Service Issued by the Mississippi

Public Service Commission (1993).   As such, Entergy's request for a deposit of $1,500,000,

which is the equivalent of the Debtors' usage for the two upcoming months, is appropriate and

reasonable.

52.     Under ordinary billing terms and pursuant to the applicable regulations

that govern the Entergy Accounts, Entergy reads and records usage on a meter located at the

Debtors' operations approximately every thirty days (30 days of exposure).   Within seven days

of a reading, a bill invoicing the past thirty day's usage is issued to the Debtors (37 days of

exposure).   The Debtors then have ten to fifteen days to make a payment on those bills (47 to 52

days of exposure).   If the Debtors miss a payment, the account can then be terminated within a

week or so of the invoice due date (54 to 60 days of exposure).   Accordingly, if the Debtors

decide or are unable to make any more payments on the Entergy Accounts, approximately sixty

days usage will be unpaid from the time the meter is read, the bill is sent, the bill becomes past

due, and the termination actually occurs.

53.     Thus, given the Debtors' historical usage, Entergy has a two-month

exposure on its accounts totaling approximately $1,500,000.   Therefore, a deposit or letter of

credit of $1,500,000 representing a two month deposit for the accounts will adequately assure Entergy that the Debtors will pay for future usage of Entergy's services.   Such a demand is nothing more than seeking to place Entergy in no worse situation that what existed prior to the Petition Date as Entergy had required and the Debtors provided the Security.

WHEREFORE, Entergy respectfully requests that this Court enter an order (i) compelling the Debtors pursuant to Section 366(b) to immediately furnish to Entergy cash sufficient to replenish the depleted Security, once the recoupment of the Claim has occurred, to an aggregate post-petition deposit of $1,500,000 pursuant to Section 366(b) of the Bankruptcy Code, and (ii) granting such further relief as is appropriate.

**KLETT ROONEY LIEBER & SCHORLING**
**A Professional Corporation**


By: _/s/ Eric Lopez Schnabel_
        Eric Lopez Schnabel (ES5553)
        The Brandywine Building
        1000 West Street, Suite 1410
        Wilmington, DE 19801
        Phone:  (302) 552-4200
        Email:  elschnabel@klettrooney.com

Dated: October 24, 2005                    Counsel to Entergy