Hearing Date and Time: October 27, 2005 @ 10:00 a.m.

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
(212) 819-8200
Gerard Uzzi (GU-2297)

Wachovia Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
(305) 371-2700
Thomas E Lauria
John K. Cunningham (JC-4661)
Frank L. Eaton (FE-1522)

ATTORNEYS FOR APPALOOSA MANAGEMENT L.P.

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 Case |
| DELPHI CORPORATION, <u>et al.</u>, | Case No. 05-44481 (RDD) |
| Debtors. | Jointly Administered |

**APPALOOSA MANAGEMENT L.P.'S (A) OBJECTION TO DEBTORS'
MOTION FOR AN ORDER UNDER 11 U.S.C. §§ 105, 362 AND 541
AND FED. R. BANKR. P. 3001 ESTABLISHING NOTIFICATION
AND HEARING PROCEDURES FOR TRADING IN CLAIMS AND
EQUITY SECURITIES OR, IN THE ALTERNATIVE, (B) MOTION
FOR RECONSIDERATION UNDER FED. R. BANKR. P. 9023 OF
INTERIM TRADING ORDER DATED OCTOBER 12, 2005**

TO:   THE HONORABLE JUDGE ROBERT D. DRAIN
       UNITED STATES BANKRUPTCY JUDGE:

Appaloosa Management L.P. ("Appaloosa") hereby files this (a) objection (the

"Objection") to the Motion For An Order Under 11 U.S.C. §§ 105, 362, And 541 And Fed. R.

Bankr. P. 3001 Establishing Notification And Hearing Procedures For Trading In Claims And

Equity Securities (the "Motion") of Delphi Corporation ("Delphi") and its affiliated debtors (collectively, with Delphi, the "Debtors") or, in the alternative and in the interest of caution, (b) motion for reconsideration under Rule 9023 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") of this Court's interim order, dated October 12, 2005, approving the Motion (the "Interim Trading Order") [Docket No. 0126], and in support of this Objection, respectfully represents as follows:

## PRELIMINARY STATEMENT

1.  Appaloosa is one of Delphi's largest shareholders, holding approximately 52 million shares of Delphi common stock, which amount represents approximately 9.3% of the total issued and outstanding common stock of Delphi. In accordance with applicable securities laws, on October 11, 2005, Appaloosa filed its form Schedule 13G with the Securities Exchange Commission, disclosing its ownership of Delphi common stock in an amount in excess of 5% of the issued and outstanding shares of Delphi common stock.

2.  The Motion seeks entry of a final order, which, in essence, will enjoin Appaloosa from liquidating its equity interests in Delphi for an unspecified period of time. Appaloosa objects to the Motion for several reasons. First, the relief requested in the Motion and the procedures outlined therein (and as granted by interim order) stretch any semblance of reasonableness and are overly broad and unduly burdensome on shareholders, such as Appaloosa. Furthermore, by enjoining Appaloosa's ability to trade Delphi shares, the Interim Trading Order, predicated on section 362 of the Bankruptcy Code, has already caused Appaloosa to suffer a loss of liquidity in its investment in Delphi shares, and interferes inappropriately with Appaloosa's right and ability to protect itself against adverse market movements through the disposition of the property. The Interim Trading Order and the Motion, however, do <u>not</u> provide adequate protection to, or otherwise compensate in any manner, Appaloosa or any other

shareholders for such risks, even though the Debtors are seeking to reap for themselves substantial alleged benefits at the expense of such shareholders by preserving approximately $2.75 billion of tax attributes identified by the Debtors as "net operating loss carryforwards ("NOLs") of at least $1.5 billion, amortizable research and experimental expenditures ("R&E Amounts") of at least $1 billion, and other tax credits of at least $250 million ("Tax Credits," and together with the NOLs and R&E Amounts, "Tax Attributes") . . . ." Motion, ¶ 15.

   3. As more fully set forth herein, this Court must deny entry of the final order (and vacate or modify the Interim Trading Order to the extent necessary) unless appropriate adequate protection against losses incurred as a result of the restrictions imposed on trading is granted. Furthermore, even with the grant of adequate protection, any relief granted to the Debtors must provide additional protections to all parties affected by such relief.[1]

## FACTUAL BACKGROUND

   4. On October 8, 2005, each of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Court"), thereby commencing the above-captioned jointly administered chapter 11 cases (collectively, the "Cases"). The Debtors continue to operate their business as debtors and debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

---

[1] Appaloosa also holds beneficially significant claims against the Debtors; however, Appaloosa is not a "Substantial Claimholder" as such term is defined in the Interim Trading Order. Although this Objection relates principally to the restrictions imposed upon the trading of equity securities, Appaloosa, as a beneficial holder of significant claims and in light of the Debtors' reservations of their rights to revise the claim thresholds for imposing trading limitations [cite], is similarly concerned about restrictions imposed upon the trading of claims and, among other things, the effect such restrictions will have on market liquidity.

5.  On the Petition Date, as a first-day motion, the Debtors filed the Motion seeking the approval of certain notification and hearing provisions for trading claims and equity interest that, in essence, enjoin the trading of claims against and equity interests in the Debtors.

6.  A hearing on the Motion was held before the Court on October 11, 2005 (the "Hearing"). The Court granted the Motion on an interim basis pursuant to its Interim Trading Order, dated October 12, 2005.

7.  The Interim Trading Order, among other things, establishes interim procedures which effectively enjoin "Substantial Equityholders,"[2] such as Appaloosa, from selling or buying equity interests in the Debtors pending thirty (30) calendar days advance written notice (the "Objection Period") filed with the Court and served on the Debtors. The proposed purchase or sale may not be consummated unless approved by the Debtors or otherwise by a final, non-appealable order of the Court.

# I.

## OBJECTION

A.  The Motion Should be Denied Unless Conditioned on
    the Grant of Adequate Protection in the Form of Liens
    and Superpriority Administrative Expense Claims

8.  Although the legal basis for the relief sought by the Debtors is tenuous, outright restrictions on equity trading in large chapter 11 cases have become nonetheless increasingly commonplace to protect and preserve a debtor's future ability to utilize favorable tax attributes, like NOLs. However, such trading restrictions, even if appropriate, should not be permitted without some form of adequate protection to shareholders to protect them against

---

[2] Substantial Equityholder includes "any person or entity which beneficially owns at least 14,000,000 shares (representing approximately 2.5% of all issued and outstanding shares) of the common stock of Delphi . . . ." Motion, at ¶ 16(a)(v). As discussed above, Appaloosa is a Substantial Equityholder under this definition.

potential losses incurred as a result of illiquidity and underdiversification caused by the trading restrictions, as outlined recently by the United States Court of Appeals for the Seventh Circuit in the United Airlines chapter 11 case in In re UAL Corporation, 412 F.3d 775 (7th Cir. 2005). Faced with an appeal from a similar trading restriction order, the Seventh Circuit expressly stated in the UAL case that, absent providing some form of adequate protection to shareholders to protect them from an erosion of their position, a bankruptcy court should not enter an order restricting the trading of equity interest in a debtor. Id. at 778.

9. Specifically, the UAL case involved the entry of an order that enjoined large shareholders, including an employee stock ownership plan (the "ESOP"), from transferring equity securities in United Airlines in an effort to prevent an "ownership change" and subsequent loss of NOLs under the United States Tax Code (the "Tax Code") that allegedly had significant value to the United's chapter 11 estate. Id. at 777. Although the Seventh Circuit in UAL ultimately recognized that the issue was rendered moot as a result of the ESOP's subsequent transfer of its United shares to their beneficial owners, it thoroughly analyzed the harm to United shareholders occasioned by the trading restriction order and the need for some form of adequate protection as a condition for entry of such orders by a bankruptcy court. Indeed, the Seventh Circuit emphasized that adequate protection must be granted at the time the trading restrictions are imposed because retroactive compensation is not otherwise available. Id. at 779.

10. In particular, the Seventh Circuit highlighted the loss of liquidity and diversification in the buying and selling of United shares suffered by shareholders as a result of the trading restriction order:

> [L]oss of liquidity is an immediate and independent injury;
> investors will pay more for tradable shares than for instruments
> that can be sold only with someone else's sufferance years in the
> future. The injunction also left investors underdiversified, and thus

> bearing uncompensated risk. . . .  For investors who needed (or wanted) cash rather than certificates, or who wanted to reduce risk by diversifying their holdings, the court's order imposed an inevitable injury.

Id. at 778.

11. Moreover, the Seventh Circuit recognized that such costs should not be borne by shareholders without compensation solely to preserve benefits to the debtor's estate:

> Requiring investors to bear the costs of illiquidity and underdiversification [is] both imprudent and unnecessary. . . . There is no reason why investors who need liquidity should be sacrificed so that other investors (principally today's debt holders) that will own [the debtor] after it emerges from bankruptcy can reap a benefit; bankruptcy is not supposed to appropriate some investors' wealth for distribution to others.  [The Debtor] should have been told to back up its assertions with cash, so that put-upon shareholders could be made whole.  If [the Debtor's] views are right, it would not have had any trouble borrowing to underwrite a bond or some other form of protection; and if lenders would *not* make such loans, that would have implied to the court that [the Debtor's] contentions are hot air.

Id.  (citations omitted).

12. The solution suggested by the Seventh Circuit was a "carefully drafted adequate-protection agreement" that would protect "stockholders against an erosion of their position."[3]  Id.  In this case, adequate protection may be granted in the form of adequate protections liens and superpriority administrative expense claims to Substantial Equityholders in the amount of the diminution, if any, in the market value of Delphi shares suffered from the time of delivery of a trade notice to the date of any agreement or order authorizing such trade.  By limiting adequate protection to the erosion in stock price, if any, during the imposition of the

---

[3] Specifically, the Seventh Circuit suggested the debtor could put up a bond or other security in favor of shareholders, with a corresponding indemnification by shareholders for the costs of such bond or other security should the market price of the stock increase and the bond or other security turn out to have been unnecessary.

trading restrictions, the Court will have adequately protected the interests of both the shareholders and the Debtors under the circumstances.

14. 13. The legal basis relied upon by the Debtors as support for the trading restrictions, namely, section 362 of the Bankruptcy Code, also supports the need for adequate protection for shareholders. Indeed, section 362(d) of the Bankruptcy Code provides that cause for relief from the automatic stay includes the lack of adequate protection. In addressing the purpose of adequate protection, Collier on Bankruptcy states: "When a court permits continuation of the automatic stay to preserve the status quo, which is often said to be the purpose of the automatic stay of section 362(a), it must determine whether there is any threat to the status quo." Collier on Bankruptcy, ¶ 361.03 [5][a] (15th ed.). The Debtors allege the trading restrictions are necessary to preserve the status quo. Motion, ¶ 15. As acknowledged by the Seventh Circuit in UAL, however, the threat to the status quo in this case is the loss of liquidity and diversification suffered by shareholders as a consequence of the trading restrictions – a loss which the Seventh Circuit described as "an immediate and independent injury." UAL, 412 F.3d at 778.

14. Relying upon the Second Circuit's decision in In re Prudential Lines Inc., 928 F.2d 565 (2d Cir. 1991), the Debtors allege: "Courts have uniformly held that a debtor's NOLs constitute property of the estate under section 541 of the Bankruptcy Code and, as such, that courts have the authority to impose measures intended to protect and preserve such NOLs." Motion, ¶ 37. The Seventh Circuit in UAL, however, openly questioned the expansion of Prudential Lines to support trading restriction orders by bankruptcy courts beyond its limited facts, as follows:

> Prudential Lines, the principal authority invoked in support of the bankruptcy court's decision, dealt with a distinct problem. A

> family of related corporations had filed consolidated tax returns until one of the firms entered bankruptcy. One non-bankrupt member of the group then proposed to take a worthless-stock deduction on account of its investment in the bankrupt entity; that tax benefit would have come in lieu of the corporate family's accumulated operating losses. Prudential Lines holds that taking the deduction would have exercised control over the debtor's operating losses; <u>there is no equivalent example of control (or consumption) of a loss carry-forward in an investor's simple sale of stock</u>. 928 F.2d at 569-70.
>
> Perhaps some other authority supports the bankruptcy court's judgment; <u>it is enough for current purposes to say that an argument based on § 105 and § 362(a)(3) is weak enough to make a bond or adequate protection undertaking obligatory before a bankruptcy judge may forbid investors to sell their stock on the market</u>.

UAL, 412 F.3d at 778-79 (emphasis added).[4] Thus, as noted by the UAL court above, the grant of adequate protections is a necessary condition precedent to the relief sought by the Debtors.

---

[4]   Presumably, the Debtors are relying on section 362(a)(3) of the Bankruptcy Code to support their contention that the automatic stay applies. Section 362(a)(3), however, neither renders the automatic stay applicable to property in which a debtor has no interest, nor provides a bankruptcy court with blanket authority to issue orders that restrict a non-debtor's use and enjoyment of its own, non-estate property. See 11 U.S.C. § 362(a)(3) (the automatic stay prevents "any act to obtain possession of <u>property of the estate</u> . . . or to exercise control over <u>property of the estate</u>." (emphasis added)). Indeed, it is well established that a corporation has no property interest in equity securities held by its stockholders. Uranga v. Geib (In re Paso Del Norte Oil Co.), 755 F.2d 421, 424 (5th Cir. 1985); First Southwest Co. v. Tex. Consumer Fin. Corp. (In re Tex. Consumer Fin. Corp.), 480 F.2d 1261 (5th Cir. 1973); In re Calamity Jane's, Inc., 22 B.R. 5 (Bankr. D.N.J. 1982) (rejecting the debtor corporation's argument that a transfer of its stock violated the automatic stay because it interfered with the rehabilitative process). The Debtors reliance on section 105(a) of the Bankruptcy Code is also misplaced as this section simply does not provide a bankruptcy court with broad equitable authority to create substantive rights in favor of a debtor. See Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206 (1988) ("whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code"); In re UAL Corp., 412 F.3d 775, 778 (7th Cir. 2005) (section 105 "is a means to enforce the Code rather than an independent source of substantive authority) (internal citations omitted).

Therefore, it is dubious at best whether section 362(a)(3) of the Bankruptcy Code and Prudential Lines provide a sound basis for the relief requested by the Motion. Indeed, Prudential Lines addresses the very narrow issue of whether a parent corporation should be permitted to unilaterally declare, on a consolidated tax return, stock of a debtor subsidiary worthless prior to consummation of a plan of reorganization canceling such stock. Thus, Prudential Lines itself

15.     Nevertheless, the Debtors' stated rationale for seeking to prevent equity trading is to prevent an "ownership change,"[5] to purportedly "protect and preserve" $2.75 billion of Tax Attributes.  Motion, at ¶ 15.  The only evidence introduced by the Debtors in support of the Motion is the Affidavit of Robert S. Miller Jr. Under Local Bankruptcy Rule 1007-2 and In Support of Chapter 11 Petitions and Various First Day Applications and Motions dated October 8, 2005 (the "Miller Affidavit").  The Miller Affidavit, however, provides no evidence whatsoever on the effects of the trading restrictions on Delphi's shareholders and the need (or lack thereof) of adequate protection to protect such shareholders against an erosion of stock value during the imposition of the requested trading injunction.[6]

16.     Consequently, in accordance with the reasoning of the UAL decision, Appaloosa requests that this Court require the Debtors to provide adequate protection in the form of a lien on all of their assets, junior only to existing liens and the liens of the debtor-in-possession facility lender, pursuant to section 361(2) of the Bankruptcy Code, as well as a superpriority administrative expense claim pursuant to section 503(b)(1)(A) of the Bankruptcy Code.

---

does not authorize the broad sweeping relief sought by the Debtors.  Nevertheless, to the extent that it is determined upon full consideration that the automatic stay as set forth in section 362 of the Bankruptcy Code appropriately restricts the public trading of securities and adequate protection is not otherwise provided, relief from the automatic stay should be granted.

[5]    According to the Debtors, "an 'ownership change' occurs if the percentage (by value) of the stock of the corporation owned by one or more five-percent shareholders has increased by more than 50 percentage points over the lowest percentage of stock owned by such shareholders at any time during the three-year testing period ending on the date of the ownership change." Motion, at ¶ 19.

[6]    In fact, it is not entirely clear whether the Debtors even need to restrict the sale of any equity securities provided such sale is not to another Substantial Equityholder or would not otherwise cause such person to become a Substantial Equityholder.

B.   The Restrictions Contained in the Interim Trading
     Order are Overly Broad and Should be Modified

17.   Although the Debtors suggest that, at least with respect to certain aspects of the Motion, the requested relief has been narrowly tailored (See Motion at 8, n.5 and ¶¶ 15 & 26), the Debtors provide little basis for such assertion. Indeed, the relief requested by the Motion is broader than what is appropriate or required to preserve the value (if any) of the Tax Attributes for the Debtors' bankruptcy estates and, in fact, goes beyond similar relief granted in other cases relied upon by the Debtors as precedent.

18.   Pursuant to Bankruptcy Rule 7065(d), which incorporates Rule 65(d) of the Federal Rules of Civil Procedure (the "Federal Rules"),[7] an injunction must not be overly broad. See also 11A CHARLES A. WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 2955 (1995) ("The primary objection to broad injunctive orders is the fear that they will impose unnecessary restraints on individual freedom and prohibit lawful and socially desirable activity. . . . Thus, orders have been found to be overbroad because they restrain permissible conduct, or, in other ways, represent impermissible uses of the [injunctive] remedy."). Put simply, the relief requested in the Motion is inappropriate because it contains overly broad and unnecessary restrictions and fails to protect confidentiality. Accordingly, any order approving the Motion must be narrowly tailored for the protection of all parties affected by such order.

---

[7]   Federal Rule 65(d) provides, in pertinent part, the following:

> [E]very order granting an injunction and every restraining order shall set forth the reasons for its issuance; **shall be specific in terms**; [and] **shall describe in reasonable detail**, and not by reference to the complaint or other document, the act or acts sought to be restrained . . . .

FED. R. CIV. P. 65(d) (emphasis added).

19.     Specifically, any final order approving the Motion should be modified such that:

a. the time during which the Debtors may oppose any proposed transaction is reduced to a period of ten (10) days and, in the event of an objection, the enjoinment of a proposed transaction terminates upon an order of this Court overruling such objection;

b. when considering any opposition to a proposed transaction, the burden should remain on the Debtors to establish the proprietary of any continued restrictions or trading;

c. consideration of any opposition to a proposed transaction should occur as soon as is practicable and in any event no later than the next available hearing date;

d. the Debtors (and any parties authorized to receive relevant information) are required to keep any and all notices, as well as any information contained therein, strictly confidential, except to the extent (i) necessary to respond to a proposed transaction, (ii) otherwise required by law, or (iii) such information is already public; and

e. relevant parties need only to serve the Debtors and their counsel with required notices.

Not only are these modifications necessary and appropriate, but they are also consistent with the provisions of the "Model NOL Order" with respect to transfer restrictions motions, which recently was promulgated by The Bond Market Association (the "BMA") and Loan Syndications and Trading Association (the "LSTA"), two of the leading securities industry organizations. See The Bond Market Association / Loan Syndications and Trading Association, Model NOL Order (Nov. 2004), available at http://www.bondmarkets.com/assets/files/final%20model%20nol%20order%20nov172004(2).pdf (last modified Nov. 22, 2004).[8]  A copy of the Model NOL Order is attached hereto as Exhibit A.

---

[8]     The express purpose of the Model NOL Order is to discourage entry of unnecessarily broad trading restrictions – such as the relief requested in the Motion – in chapter 11 cases. As the BMA and LSTA explain, "[the] model order is designed to put sufficient restrictions in place

20. First, the amount of time during which parties are enjoined from consummating proposed transactions is overly broad. In stark contrast to the Interim Trading Order's thirty-day enjoinment of proposed transactions, the Model NOL Order provides the Debtors with a maximum of ten (10) days to object to a subject transaction. Model NOL Order, at ¶ 5; see also In re Mirant Corp., Case No. 03-46590 (DML), at *14 (Bankr. N.D. Tex. Sept. 17, 2003) (approving restrictions that provided the debtors ten (10) days to seek an injunction prohibiting such trade).[9] Moreover, in the event that the Debtors do object to a proposed transaction, a party should not be forced to obtain "a final and nonappealable order of this Court" in its favor before finally consummating its transaction. Motion, at ¶ 3(d). In fact, once a notice of proposed transacting is delivered, the burden should remain on the Debtors to seek affirmative relief from the Court prohibiting such transaction based upon the facts and circumstances that exist at that time. At the very least, an order overruling such objection should be sufficient to terminate the injunction against the proposed transaction and should be considered as soon as is practicable and in any event no later than the next available hearing date. See Model NOL Order, at ¶ 5 ("[An] Entity may petition this Court for permission to consummate a proposed transaction notwithstanding the Debtors' objection, and such permission shall be granted unless the Debtors can establish that" [enjoinment is necessary to preserve substantial tax benefits].). Accordingly, the relief, if granted, should be modified such that (a) the period in which the Debtors may determine whether to oppose a proposed transaction is limited to ten (10) days, (b)

---

to achieve a reasonable degree of protection for a debtor corporation's [net operating loss] carryovers, while at the same time avoiding unnecessary disruptions to trading markets." Model NOL Order, at n.1.

[9] But see In re Delta Air Lines, Inc., Case No. 05-17923 (PCB), at *4 (Bankr. S.D.N.Y. Sept. 16, 2005) (approving restrictions granting the debtors fifteen (15) days to object); In re Northwest Airlines Corp., Case No. 05-17930 (ALG), at *3-*4 (Bankr. S.D.N.Y. Sept. 15, 2005) (same); In re UAL Corp., Case No. 02-B-48191 (EW), at *4 (Bankr. N.D. Ill. Dec. 30, 2002) (same).

the burden remains on the Debtors to establish the propriety of any continued restrictions on trading, (c) any opposition to a proposed transaction is considered as soon as is practicable and in any event no later than the next available hearing date, and (d) the requirement of a final and nonappealable order of the Court is eliminated.

21. Second, the relief as requested does not adequately protect confidential information. Under the Model NOL Order, bankruptcy debtors are required to keep the information contained in any notice received on account of such procedures strictly confidential:

> [e]xcept to the extent necessary to respond to a petition to allow consummation of a proposed transaction, to the extent otherwise required by law, or to the extent that the information contained therein is already public, the Debtors shall keep all [notices filed pursuant to the Model NOL Order] strictly confidential and shall not disclose the contents thereof to any person; provided, however, that the Debtors may, if they wish, disclose the contents thereof to their counsel and professional financial advisers and/or the counsel and professional advisers to [the official committees], who shall themselves keep all [notices filed pursuant to the Model NOL Order] strictly confidential and shall not disclose the contents thereof to any other person, including a member of an [official committee].

Model NOL Order, at ¶ 5. Given that proposed transactions in securities generally are kept confidential by parties outside of bankruptcy, and in the absence of an order restricting trading, the inclusion of a confidentiality provision is appropriate. Indeed, mere notice of a proposed transaction may have significant impacts on the market. See Model NOL Order, at n.1 (one stated purpose of the Model NOL Order being the avoidance of "unnecessary disruptions to trading markets"); see also In re Northwest Airlines Corp., Case No. 05-17930 (ALG), at *3-*4 (Bankr. S.D.N.Y. Sept. 15, 2005) (approving restrictions that required the debtors to keep all information in the holders' notices confidential). For the same reason, elimination of the requirement that notices be filed with the Court in respect of holdings and proposed transactions is appropriate and consistent with the Model NOL Order's concerns with respect to

confidentiality.  See In re Mirant Corp., Case No. 03-46590 (DML), at *14 (Bankr. N.D. Tex. Sept. 17, 2003) (approving restrictions that required holders to provide the debtors and their counsel notice, but not the bankruptcy court).

    22.  In addition, in paragraph 26 of the Motion, the Debtors state, with respect to claims trading, that a $100,000,000 claim amount is the "lowest amount that could be reasonably expected to lead to a distribution of 2.5% of the stock of Delphi, as reorganized."  As an initial matter, a 2.5% limitation on the acquisition of stock is needlessly restrictive.  The Debtors themselves concede in the motion that the trading of equity securities will only adversely affect the Debtors' Tax Attributes if "too many 5% is greater blocks of equity securities are created . . ." Motion, at ¶15(a).  Furthermore, and perhaps more importantly, the above statements are conclusions without support.  The Debtors, particularly in light of their extraordinary request, must provide adequate evidentiary support that proves the proposition that the relief is indeed narrowly tailored.

**II.**

**ALTERNATIVELY, THE COURT SHOULD
RECONSIDER THE INTERIM TRADING ORDER**

    23.  Although the Court plainly stated at the hearing on the Motion that any relief granted would be on an interim basis, based upon the language contained in the Interim Trading Order and in the interest of caution, to the extent that the Interim Trading Order is a final order, Appaloosa alternatively seeks reconsideration of the Interim Trading Order pursuant to Bankruptcy Rule 9023. [10]  "A motion for reconsideration is, as a practical matter, a motion for

---

[10] At the first-day hearing held on the Motion, J.P. Morgan, Citibank, Lehman Brothers, Inc., Morgan Stanley & Co., Merrill Lynch & Co. and Bear Stearns inquired whether the Debtors intended any order on the Motion to be final upon entry, subject solely to the ability of any committee appointed in these chapter 11 cases to later object.  In response, the Court stated: "Well, what I'm contemplating for tomorrow is something on an interim basis to give people a

amendment of judgment under FED. R. CIV. P. 59(e) as it seeks to reopen the lower court's decision on the theory that the court made mistaken findings in the first instance." In re Northeast Mgmt. Servs., Inc., 267 B.R. 492, 494 (N.D.N.Y. 2001) (citing City of Hartford v. Chase, 942 F.2d 130, 133-34 (2d Cir.1991)); see also In re Jamesway Corp., 203 B.R. 543, 546 (Bankr. S.D.N.Y. 1996) ("[T]he standard applicable to motions for reargument is identical to that applicable under Fed. R. Civ. P. 59(e) motions to alter or amend a judgment.").

24. Bankruptcy Rule 9023 specifically incorporates Federal Rule 59, which provides, in pertinent part, that:

> [a] new trial may be granted to all or any of the parties and on all or part of the issues . . . in an action tried without a jury, for any of the reasons for which rehearings have heretofore been granted in suits in equity in the courts of the United States. On a motion for a new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.

FED. R. CIV. P. 59;[11] see also FED. R. BANKR. P. 9023; In re Jamesway Corp., 203 B.R. at 545-546 (Federal Rule 59(a) permits the court to "open the judgment if one has been entered, take

---

little more time to think about it, as has happened in other cases." Notwithstanding that the Order seems to indicate that the relief sought by the Debtors with respect to Substantial Equityholders (as defined below) is a final order. Appaloosa believes that the Court's comments make clear that the Order is entirely interim pending a final hearing on the relief sought in the Motion." October 11, 2005 Hearing, at pp. 99-100.

[11] Federal Rule 59(e) provides that "[a]ny motion to alter or amend a judgment shall be filed no later than 10 days after entry of the judgment[,]" and Rule 9023-1(a) of the Local Rules for the Bankruptcy Court for the Southern District of New York (the "Local Rules"), states that "[a] motion for reargument shall be served within 10 days after the entry of the Court's determination of the original motion . . . ." See also Westdeutsche Landesbank Girozentrale v. Enron Corp. (In re Enron Corp.), 2002 WL 32156075, at *2 (Bankr. S.D.N.Y. May 16, 2002) ("Rule 9023-1 of the Local Bankruptcy Rules provides that a party has a right to file a motion for reconsideration which shall set forth the matters which counsel believes the court has not considered."). Moreover, "[c]ourts have construed the analogous rule for the United States District Courts for the Southern and Eastern Districts of New York (Local Rule 6.3) to mean that 'the Court can grant a motion to reargue for the limited purposes of considering the effect of an

additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.").

25. In general, a party seeking reconsideration of an order must "'point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court.'" In re BDC 56 LLC, 330 F.3d 111, 123 (2d Cir. 2003) (quoting Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir.1995)); see also Natural Res. Def. Council, Inc. v. U.S. E.P.A., 705 F. Supp. 698, 702 (D.D.C. 1989) (A motion to reconsider must rely on one of three major grounds: "(1) an intervening change in controlling law; (2) the availability of new evidence . . . ; or (3) the need to correct clear error [of law] or prevent manifest injustice."). Specifically, Local Rule 9023-1(a) requires the moving party to "set forth concisely the matters or controlling decisions which counsel believes the Court has not considered." In the alternative, however, reconsideration of an order is appropriate if the movant "demonstrate[s] the need to correct a clear error or prevent a manifest injustice." In re Randall's Island Family Golf Centers, Inc., 290 B.R. 55, 61 (Bankr. S.D.N.Y. 2003) (internal citations omitted).

26. Here, reconsideration of the Interim Trading Order[12] is appropriate because it does not appear that the Court ever considered the Seventh Circuit's holding in UAL.

---

overlooked matter, and after doing so may . . . clarify the original decision.'" Id. (quoting Mattel, Inc. v. Robarb's, Inc., 2001 U.S. Dist. LEXIS 9488, at *1 (S.D.N.Y. July 11, 2001)). Consequently, because the request for reconsideration was filed within ten days of the entry of the Order, Appaloosa has timely sought reconsideration.

[12] Importantly, although Federal Rule 59(e) only applies to "judgments," a term synonymous with orders appealable as of right, Local Rule 9023-1(a) is not limited to final orders. Rather, Local Rule 9023-1(a) is an adaptation of Rule 6.3 of the Local Rules for the District Court for the Southern District of New York, which provides for the "reconsideration or re-argument of a court order determining a motion. . . ." See In re Hagerstown Fiber Ltd. P'ship, 226 B.R. 353, 355, n.2 (Bankr. S.D.N.Y. 1998) ("Rule 9023-1 is derived from Rule 6.3 of the local civil rules for the United States District Court for the Southern District of New York.").

As explained in detail above, the UAL court stated that an order restricting the transfer of equity securities "based on § 105(a) and § 362(a)(3) is weak enough to make a bond or adequate-protection undertaking obligatory before a bankruptcy judge may forbid investors to sell their stock on the market." 412 F.3d at 779. The UAL decision represents the most recent and comprehensive examination of the validity of equity trading restriction orders at the circuit court level. Despite its relevance as persuasive authority, however, this decision was not presented, or even cited, to this Court by the Debtors prior to the Court's decision with respect to the Motion.[13] Consequently, reconsideration of the Interim Trading Order is appropriate to provide the Court the opportunity to consider the holding of UAL and its relevance to the Cases.

27.  Moreover, reconsideration is warranted because the Interim Trading Order should be revised to "prevent a manifest injustice." Pursuant to the Interim Trading Order, Appaloosa and all other Substantial Equityholders, are materially harmed by the restrictions on their ability to transfer their interests so that the Debtors may preserve their Tax Attributes. Yet, the Interim Trading Order provides no means to compensate such holders for this harm – a result that is simply unfair. The UAL court best highlights the manifest inequity caused by trading restriction orders that fail to compensate equity security holders for the harm caused by such orders:

> There is no reason why investors who need liquidity should be sacrificed so that other investors (principally today's debt holders) that will own [the debtor] after it emerges from bankruptcy can

---

Thus, reconsideration of the Interim Trading Order is appropriate under the Local Rules, regardless of its finality.

[13]  While the UAL bankruptcy case was cited in the objection filed by Citigroup Inc., Lehman Brothers Inc., Merrill Lynch & Co. and Morgan Stanley & Co. to the Motion, no reference was made to the portion of the UAL decision whereby the Seventh Circuit indicated that the debtor's should have adequately protected the equity holders.

> reap a benefit; **bankruptcy is not supposed to appropriate some investors' wealth for distribution to others.**

412 F.3d at 778 (emphasis added).  Simply, the present holders of equity interests in the Debtors' bankruptcy estates should not be unduly harmed simply to benefit future interests in the reorganized Debtors.  Given the "manifest injustice" caused by the Interim Trading Order entered during the first days of these chapter 11 cases, reconsideration of such order is appropriate at this time.

## **CONCLUSION**

For the reasons set forth herein, Appaloosa respectfully requests that (a) the entry of a final order on the Motion be denied unless it contains provisions providing appropriate adequate protection, and (b) any final order on the Motion contain the requested modifications set forth herein. In the alternative, Appaloosa requests that the Court reconsider and amend its Interim Trading Order to prevent the manifest injustice caused by the uncompensated harm to Appaloosa and other Substantial Equityholders, and grant such further relief as the Court deems appropriate.

Dated:  New York, New York
        October 24, 2005

                                        WHITE & CASE LLP
                                        1155 Avenue of the Americas
                                        New York, New York 10036-2787
                                        (212) 819-8200

                                        By:   /s/ Douglas P. Baumstein
                                        Douglas P. Baumstein
                                        Gerard Uzzi (GU-2297)

                                        Thomas E Lauria
                                        John K. Cunningham (JC-4661)
                                        Frank L. Eaton (FE-1522)
                                        Wachovia Financial Center
                                        200 S. Biscayne Blvd., Suite 4900
                                        Miami, Florida 33131
                                        (305) 371-2700

                                        COUNSEL TO APPALOOSA
                                        MANAGEMENT L.P.