SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)


Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
        In re                             :       Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :       Case No. 05-44481 (RDD)
                                          :
                        Debtors.          :       (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEBTORS' OMNIBUS REPLY TO
OBJECTIONS TO DIP FINANCING MOTION

        Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the

"Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively,

the "Debtors"), hereby submit this reply (the "Omnibus Reply") to the objections (each an

"Objection" filed by an "Objector", collectively, the "Objections" filed by "Objectors") to the

Motion for Order Under 11 U.S.C. §§ 105, 361, 362, 363, 364(c), 364(d) and 364(e) and Fed. R.

Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors to Obtain Postpetition Financing on

Superpriority Secured and Priming Basis, (II) Authorizing Use of Cash Collateral, (III) Granting

Adequate Protection To Prepetition Secured Lenders, (IV) Granting Interim Relief, and (V)

Scheduling A Final Hearing Under Fed. R. Bankr. P. 4001(b) and (c) (the "Motion").  In support

of this Motion, the Debtors respectfully represent as follows:[1]

<u>PRELIMINARY STATEMENT</u>

1.      The Debtors filed the Motion on October 8, 2005, seeking approval of a

$4.5 billion financing package consisting of approval of $2 billion in senior secured debtor-in-

possession (DIP) financing from a group of lenders led by JPMorgan Chase Bank and Citigroup

Global Markets, Inc. and approval of an adequate protection package for the benefit of its

prepetition lenders for the $2.5 billion borrowed from prepetition revolver and term loan

facilities.

2.      The Court conducted an interim hearing on the Motion on October 11,

2005, at which the Court authorized the Debtors to use Cash Collateral and obtain interim credit

from the DIP in an amount up to $950 million.  The Final Hearing is scheduled for October 27,

2005.

3.      The Debtors do not have an alternative to the Financing, which is

necessary to preserve the Debtors' assets and for the Debtors to operate their businesses so as to

---

[1]      Capitalized terms used but not defined herein shall have the meanings ascribed in the
Motion.

2

maximize value for all of the Debtors' stakeholders.  Moreover, the Financing is the product of

arm's length negotiation, and its terms are fair, reasonable and appropriate.

4.     As of the time and date of this Omnibus Reply, while 1,164 parties were

served with notice of the Interim Order and the final hearing, only 35 Objections had been filed

to the final relief sought in the Motion.  Of those Objections, only a single objector -- the self-

styled "Ad Hoc Committee of Prepetition Lenders" organized by the Goodwin Procter LLP law

firm (the "Goodwin Proctor Group") -- is seriously opposing the Court's approval of the Motion

on a final basis.  Upon information and belief, only one member of the Goodwin Proctor Group

owned any interest in the prepetition revolver and term facilities prior to the Petition Date and

most of the members paid par or premiums to par to acquire their interests following the Court's

approval of the Interim Order and the adequate protection package approved by the Interim

Order.  Also upon information and belief, despite their best efforts, the Goodwin Proctor Group

was unable to persuade the requisite lenders in the prepetition revolver and loan facilities to

direct the Prepetition Agent to object to the Motion or to direct the Agent not to permit the

continuation of LIBOR-based interest accruals in those facilities (assuming that such action

could have been taken in any event without violation of the automatic stay or would be otherwise

permissible or enforceable).  Indeed, the Prepetition Agent has filed a statement with the Court to

the effect that the Agent is <u>not</u> objecting to the final relief sought in the Motion (subject to its

confirmation that the Final Order incorporates certain changes agreed to with the Debtors, is

otherwise satisfactory in form and substance, and no other changes to the proposed Final Order

are adverse to the interests of the Agent on behalf of the prepetition revolver and term lenders).

5.     Other than the Goodwin Proctor Group, the balance of the objections

address discrete issues.  30 of the Objections address concerns regarding the preservation of set-

3

off rights under section 553 of the Bankruptcy Code and related discrete issues.  The Debtors

believe that these Objections should be resolved by revisions that have been made to the Final

Order to address such objections. The Pension Benefit Guaranty Corporation filed an Objection

that the Debtors were able to resolve.  Bank of America, an aircraft lessor, has filed an Objection

that raises issues unique to its circumstance but which the Debtors believe should be resolved by

revisions that have been made to the Final Order to address such objections.   The Official

Committee of Unsecured Creditors (the "Committee") filed a "Statement" rather than an

Objection and seeks certain changes to the proposed Final Order consistent with the Committee's

views but does not seek the Court's rejection of the proposed financing package.  The proposed

Final Order submitted to the Court reflects numerous comments and suggestions made by the

Committee's professionals.  While the Debtors and other stakeholders with an interest in the form

and substance of the Final Order are unable to accommodate all of the Committee's requests --

and believe some of the comments in the Statement do not comport with applicable law, the local

rules or customary practice in the Southern District of New York -- the Debtors believe that the

Committee will support approval of the relief sought in the Motion.   The Debtors believe that

any other filed Objections (including the Objection filed this morning by General Motors

Corporation) are "placeholders" to reserve rights pending review and approval of the form of the

Final Order.

6.      The Goodwin Proctor Group's objection (the "Goodwin Proctor

Objection") contends that the Financing should not be approved because financing was available

to the Debtors on a non-priming basis and, to the extent the Court disagrees with the Goodwin

Proctor Group on this point, the Prepetition Secured Lenders are not adequately protected by the

package of adequate protection offered by the Debtors.

4

7.      As set forth below, under the Prepetition Credit Agreement, the Goodwin Proctor Group has no contractual basis to object to the priming of the Prepetition Secured Lenders' liens and security interests in the Prepetition Collateral given the Prepetition Agent's consent to such priming.  Upon information and belief, the vast majority of the Goodwin Proctor Group acquired their respective claims after the Petition Date.[2]  Any lender that acquired its claim with knowledge of the Interim Order and the adequate assurance offered therein, should be deemed to have consented to the Debtor's adequate protection package.  To the extent the Court nevertheless considers the merits of the Goodwin Proctor Objection to be relevant, it is a baseless, thinly veiled attempt by the Group, acting contrary to the actions of the Prepetition Agent and majority lenders ("Required Lenders"), to receive consideration to which it is not entitled, to the detriment of the Debtors' other stakeholders.

8.      Attached hereto as Exhibit A is a blacklined copy of the revised Final Order, marked to show changes that the Debtors have made to the originally proposed Final Order in the interest of resolving certain of the Objections.  In addition, to assist the Court in analyzing the Objections, attached hereto as Exhibit B is a chart summarizing the issues raised in each Objection, the basis for the objections, the Debtors' responses to the objections and, if applicable, the revisions to the Final Order that address the objection.  As set forth above, while there are multiple Objectors, many of these raise overlapping objections.  Accordingly, attached hereto as Exhibit C is a chart that summarizes, and is organized according to, each objection raised, including the basis for the objection, the Debtors' response thereto and, if applicable, any

---

[2]      The Debtors make this assertion "upon information and belief" because the Goodwin Proctor Group has refused the Debtors' repeated requests for information concerning the make-up of the Group and their respective holdings.

revisions that have been made to the Final Order to address the objection.  Exhibits A, B and C

are incorporated herein by reference.

ARGUMENT

A.    Standards for Approval of Postpetition Secured Financing

9.    The Debtors propose to obtain financing under the DIP Credit Agreement

by providing security interests and liens as set forth in the Motion pursuant to sections 364(c)

and (d) of the Bankruptcy Code.  Because no one objects to the Debtors' obtaining financing

under section 364(c), the Debtors limit their discussion here to section 364(d).

10.    Section 364(d)(1) of the Bankruptcy Code permits this Court, after notice

and a hearing, to "authorize the obtaining of credit or the incurring of debt secured by a senior or

equal lien on property of the estate that is subject to a lien only if

(A)    the trustee is unable to obtain such credit otherwise; and

(B)    there is adequate protection of the interest of the holder of the lien on the property

of the estate on which such senior or equal lien is proposed to be granted."

11 U.S.C. § 364(d)(1).

11.    Courts in this district regularly allow debtors to prime existing lienholders

where section 364(d)(1)'s two-prong test is satisfied.  See In re Delta Air Lines, Inc., 05-

17923(PCB); In re Tower Automotive, Inc., 05-10578 (ALG); In re Adelphia Communications

Corp., 02-41729 (REG); Parmelat USA Corp., 04-11139 (RDD); In re Spiegel, Inc., 03-11540

(CB); NRG Energy, Inc., 03-13024 (PCB); In re Acterna Corp., 03-12837 (BRL); In re

Bethlehem Steel Corp., 01-15288 (BRL).  In the instant case, as discussed below, the Debtors

satisfy both prongs of the 364(d) test and, therefore, should be entitled to prime the liens and

security interests of the Prepetition Secured Lenders in the Prepetition Collateral.

6

B.       Debtors Unable to Obtain Postpetition Financing on a Non-Priming Basis

12.     The Debtors should be allowed to obtain credit through a priming facility because, as the Debtors will establish at the hearing, a working capital facility of the type and magnitude they require could not have been obtained without priming the liens of the Prepetition Secured Lenders.  The Financing is the result of a thorough, arm's length process.  Specifically, the Debtors and their advisors canvassed a number of global banks in an effort to obtain DIP financing.  As will be established at the hearing, the Debtors and their advisors generally insisted that the potential lenders provide them with the most advantageous financing proposals possible, and specifically insisted on receiving both priming and non-priming proposals from each interested lender.  In sum, the Debtors sought what the market had to offer.

13.     As will be demonstrated at the hearing, the Debtors received financing proposals from four lenders, with each providing proposals for both a facility that required priming liens and one that did not.  The "non-priming" proposals consisted principally of proposals for so-called "take-out" financing, which is designed to refinance existing credit facilities.  As is typical of this process, the Debtors and their advisors then negotiated further with each of the potential lenders over the terms and conditions of any financing.

14.     During this process, the Debtors, in consultation with their advisors, concluded to pursue a priming based DIP finance facility rather than a refinancing because, in the exercise of their business judgment, the execution risks associated with a refinancing were untenable and the Debtors would be deprived of at least $500 million in liquidity to support the reorganization and Delphi's global businesses (which are owned directly and indirectly by at least one of the Debtors).  Stated differently, the risk that a refinancing proposal would not close was deemed unacceptable.  This execution risk was attributable to market factors as well as

7

considerations specific to the Prepetition Credit Facility.  The Debtors received advise consistent

with this view from both their own financial advisors and from the marketplace through

consultations with and recommendations received from the potential lenders.

15.     While the Debtors were in discussions with potential DIP financing

lenders, a number of other major companies, including Delta Air Lines, Inc. and Northwest

Airlines Corp., were also seeking DIP financing.  Potential lenders to the Debtors indicated that

these cases risked taxing the capacity of DIP financing in the market.  There was also a great

deal of speculation in the market that the October 17, 2005 Bankruptcy Code amendments would

result in a spate of early- to mid-October filings, which would have further reduced available

liquidity.  In light of these circumstances, there was considerable doubt as to the viability of a

refinancing facility.  As significantly, prior to successfully addressing the economic realities that

gave rise to the commencement of these cases (such as unsustainable legacy liabilities), the

Debtors will continue to use a significant amount of cash in their U.S. operations.

16.     In addition, as can be established at the Final Hearing, to syndicate a term

facility to refinance the Prepetition Credit Facility would have required the participation of many

of the existing prepetition lenders.  Such participation would have been difficult to achieve, and

expensive to obtain, because the debt under the Prepetition Credit Agreement was trading above

par on or about the Petition Date.

17.     While the Goodwin Proctor Group contends that the ability to prime an

existing lien is an extraordinary remedy, the sheer size of the financing at issue here, $4.5 billion

considering the claims of the Prepetition Secured Lenders and the DIP Lenders in the aggregate,

is itself unique.  The extraordinary size of the Financing is clearly perceived in the context of

other "mega" chapter 11 cases:  WorldCom, Inc, 02-13533 (AJG) ($2 billion DIP facility), Enron

8

Corp, 01-16035 (AJG) (initial $1.5 billion DIP facility), <u>Delta Airlines, Inc.</u>, 05-17923 (PCB)

($2.25 billion facility), and <u>Adelphia Communications Corp.</u>, 02-41729 (REG) ($1.5 billion

facility).

      18.     The damage to the Debtors' businesses absent DIP financing requires

virtually no explanation.  Many of the Debtors' employees, customers, and suppliers continue to

do business with the Debtors because the ample liquidity to be provided by the Financing has

been on the horizon from the start of these cases.  It was the Debtors' business judgment that the

execution risk associated with "take out" financing rendered a priming facility the only viable

option.

C.    <u>Goodwin Proctor Group Lacks Standing To Contest Adequate Assurance</u>

      **(i)    Prepetition Agent's Consent to Priming Binds Minority Lenders**

      19.     Each lender under the Pre-Petition Credit Agreement designates and

appoints the Prepetition Agent as the agent of such lender.  Section 9.1 (Appointment) of the

Prepetition Credit Agreement provides, in relevant part:

> "Each Lender hereby irrevocably designates and appoints the Administrative
> Agent as the agent of such Lender under this Agreement and the other Loan
> Documents, and each such Lender irrevocably authorizes the Administrative
> Agent, in such capacity, to take such action on its behalf under the provisions of
> this Agreement and the other Loan Documents and to exercise such powers and
> perform such duties as are expressly delegated to the Administrative Agent by the
> terms of this Agreement and the other Loan Documents, together with such other
> powers as are reasonably incidental thereto, including, without limitation, the
> execution of intercreditor agreements in connection with transactions permitted
> under this Agreement (and each Lender hereby agrees to be bound by any such
> agreement)."

      20.     In addition, the Prepetition Credit Agreement provides that each lender is

bound by any action taken, or not taken, by the Prepetition Agent acting at the direction of

Required Lenders.  Section 9.4 (Reliance by Administrative Agent) refers to direction by

Required Lenders:

> "The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, all Lenders), **and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans**."

21.    Finally, the liens under the Prepetition Credit Agreement were granted to

the Prepetition Agent, and the Prepetition Agent is the party empowered to exercise remedies in

respect of the Collateral.  Section 6.8 of the Guarantee and Collateral Agreement provides that:

> "Notwithstanding anything to the contrary elsewhere in the Loan Documents, the Administrative Agent shall have full and complete authority and discretion (a) to determine the order in which it shall exercise remedies against any of the Collateral and (b) to alter the order set forth herein or in any other Security Document of the application to the Obligations of any proceeds realized upon the exercise of any such remedies in respect of the Collateral (including to provide for the holding of any such proceeds in any Collateral Account pending the consummation of any realization of or upon any other Collateral) as it shall determine, in each case with the objective of assuring that the ultimate realizations by the Lenders on account of all the Collateral are as ratable as is reasonably practicable."

22.    Under the relevant agreements, the actions of the Prepetition Agent as they

relate to Collateral (i.e., to accept the Debtors' adequate protection package in lieu of further

attempting to exercise remedies) binds all Prepetition Secured Lenders.  There is nothing unjust

or inequitable about this result.  The Goodwin Proctor Group freely became minority parties to a

credit facility that, like virtually every syndicated credit facility, is subject to majority lender

control.

### (ii)    Goodwin Proctor Group Acquired Their Claims Post-Petition

23.    Upon information and belief, with limited exception, the Goodwin Proctor

Group consists of funds managed by entities that acquired their claims after the Petition Date,

10

and in likely every instance after entry of the Interim Order. The Goodwin Proctor Group

contends that evidence of their trading positions is irrelevant, and have refused the Debtors'

repeated requests for information concerning the make-up of the Group and their respective

holdings. Of course, evidence that most of the Goodwin Proctor Group acquired their claims

with notice of the Interim DIP Order's adequate protection package is highly probative of the

sufficiency of such adequate protection. The Debtors question the motivation of funds that

object to an adequate protection package, where they had notice of the terms and conditions of

such package at the time that they acquired their claims.

D.      The Prepetition Lenders' Security Interest is Adequately Protected

        24.     Notwithstanding the Goodwin Proctor Groups' arguments to the contrary,

the security interests of the prepetition lenders are adequately protected. Section 361 of the

Bankruptcy Code provides that, when adequate protection is required under section 364, such

adequate protection may be provided by: "(1) requiring the [debtor] to make a cash payment or

periodic cash payments to such entity . . . (2) providing to such entity an additional or

replacement lien . . . or (3) granting such other relief . . . as will result in the realization by such

entity of the indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361.

Section 361(3) provides the parties and this Court with some degree of flexibility in fashioning

an adequate protection package. See In re Reading Tube Indus., 72 B.R. 329, 333 (E.D. Pa.

1987).

        25.     The adequate protection package proposed here more than meets the

standards set forth in section 361. First, as will be demonstrated at the Final Hearing, the

Prepetition Secured Lenders are oversecured under the Financing by an equity cushion that

exceeds their equity cushion in the Prepetition Collateral. The value of the collateral package

securing the Financing is as much as $8.45 billion, resulting in as much as an approximate $4 billion equity cushion.  The Debtors believe than an equity cushion of 25% or less of this amount would be substantially more than is required by applicable case law.  Numerous courts have held that an equity cushion satisfies the requirements of section 361.  See Id.; In re Sky Valley, Inc., 100 B.R. 107, 114 (N.D. Ga. 1988).  Moreover, "individual methods of providing protection may be combined to produce sufficiently adequate protection."  Id.  Beyond the equity cushion, the Prepetition Secured Lenders are receiving a replacement lien, a section 507(b) superpriority claim, payment of accrued and unpaid interest, payment of current monthly interest at the non-default LIBOR rate, payment of the Prepetition Agent's fees and expenses, and information rights.  The Debtors submit that the equity cushion alone would satisfy the section 364(d)(1) requirement for adequate protection.  In the aggregate, the above package more than meets the adequate protection standard.

26.    In their objection, the Goodwin Proctor Group cites to a leading treatise, which states "if the debtor is offering a replacement lien to the original lender, it is reasonable to inquire why the new lender could not accept the replacement collateral instead of priming the existing lien."  3 Collier on Bankruptcy 364.05[1] (15th Rev. Ed. 2005).  However, the Goodwin Proctor Group selectively omits a critical aspect of the of  the treatise's analysis, which provides: "[I]t is more common to prime an existing lien only when the property has sufficient value to secure adequately both lenders."  Id.  As discussed above, the collateral securing the Financing provides an equity cushion of as much as approximately $4 billion.  More than sufficient value exists to secure the DIP Lenders and the Prepetition Secured Lenders, further supporting the proposition that the Prepetition Lenders are adequately protected.

12

27.     The "determination of adequate protection is a fact-specific inquiry."  In re

Mosello, 195 B.R. 277 (Bankr.  S.D.N.Y. 1996).  See also In re Snowshoe Co., 789 F.2d 1085,

1088 (4th Cir. 1986) (determination of adequate protection is one of fact based on measurements

of value and credibility of witnesses).  As will be demonstrated at the Final Hearing, the specific

facts of this situation clearly support the conclusion that the Debtors have satisfied section

364(d)(1)'s adequate protection requirement.

E.      Goodwin Proctor Group's Remaining Objections

        1.      There is No Equitable Basis to Grant the Prepetition Secured Lenders Additional
                Interest or Amortization

                28.     The Goodwin Proctor Objection provides no basis in law or fact entitling

the Prepetition Secured Lenders to the default rate of interest or for amortization in this case.

The Goodwin Proctor Group seeks the payment of "Additional Interest" consisting of the

difference between the LIBOR and ABR rates of non-default interest in the contract (amounting

to approximately an incremental 150 basis points per annum) and imposition of an incremental

default rate of interest (amounting to an additional 200 basis points per annum).  As discussed

above, the Goodwin Proctor Group lost a vote among the holders of the prepetition revolver and

term facilities to seek to impose the ABR interest rate (and the Debtors fully reserve their rights

as to whether any such action would be enforceable and/or permissible under applicable law in

any event).  Awarding a default rate of interest is an equitable remedy that must (a) have some

connection to a lender's actual damages, and (b) be premised on evidence of the debtor's

solvency.  The Goodwin Proctor Objection fails on both counts.  Additionally, there was no

default interest asserted or payable prior to the Petition Date.  As a preliminary matter, the

default interest sought by the Goodwin Proctor Group bears no relation to their actual damages,

and amounts to nothing more than an improper penalty.  Nor has the Goodwin Proctor Group

13

presented any evidence of the Debtors' solvency to justify the default rate of interest. To the
contrary, their Objection is replete with comments as to "the precarious state of the Debtors'
business." Objection Br. at ¶ 24. Absent evidence of the Debtors' solvency, a determination that
at a minimum should be deferred until confirmation of a plan of reorganization and resolution of
a host of other infirmities to their arguments, there is no basis for awarding the Goodwin Proctor
Group the default rate of interest or amortization.

      a.      The Default Rate of Interest is an Inequitable Penalty That Bears No Connection
to the Prepetition Lenders' Actual Damages

      29.      As acknowledged in the Goodwin Proctor Objection, courts in the Second
Circuit and elsewhere grant the Bankruptcy Court enormous flexibility to balance the equities in
determining the applicability of a contract rate of default interest. See In re Liberty Warehouse
Assoc., 220 B.R. 546, 550 (Bankr. S.D.N.Y. 1998) ("As our court of appeals recently noted,
'[t]he appropriate rate of pendency interest is . . . within the limited discretion of the court'.")
(quoting In re Milham, 141 F.3d 420, 423 (2d Cir. 1998)); In re Vest Assocs., 217 B.R. 696, 702,
fn. 2 (Bankr. S.D.N.Y. 1998); see also Objections. at p. 14, fn. 6 (default interest "warranted
when the equities of a particular case justify application of default interest"). This principle,
which balances the equities between the creditor and debtor, was acknowledged by the Supreme
Court in United States v. Ron Pair Enter., Inc., 489 U.S. 235, 248 (1989) as well as in Vanston
Bondholders Protective C'tee v. Green, 329 U.S. 156, 165 (1946) ("[i]t is manifest that the
touchstone of each decision on allowance of interest in bankruptcy, receivership and
reorganization has been a balance of equities between creditor and creditor or between creditors
and the debtor.").

      30.      In determining whether the equities warrant the default rate of interest,
courts have focused on whether the default rate is a penalty rather than compensation to the

lender for the monitoring costs incurred as a result of the default losses.  As stated by the court in

In re Vest Associates, 217 B.R. 696, 702 (Bankr. S.D.N.Y. 1998), courts will refuse to enforce

default interest rates "if they are deemed to be penalties or forms of coercion instead of

compensation for injuries that the lender incurred."  Id. at 702; see also In re DWS Industries,

Inc., 121 B.R. 845, 849 (Bankr. C.D. Cal. 1990) ("a default rate of interest should not be a

penalty.  Rather, it should be a means of compensating the creditor for any loss resulting from

the non-payment of principal at maturity."); In re Johnson, 184 B.R. 570, 573 (Bankr. D.Minn.

1995) ("consideration generally hinges upon the question of whether the default rate

compensates the creditor for any loss resulting from the nonpayment or is in fact a disguised

penalty.").

        31.      In this case, the Debtors believe that the default rate sought by the

Goodwin Proctor Objection is the equivalent of a penalty that bears no relationship to the

Prepetition Lenders' damages.  The imposition of such economic penalties upon the Debtors

cannot be justified by the increased costs of administering or monitoring the loan, and is not

calculated to compensate the Prepetition Lenders for any actual damages.  As noted by the court

in Vest, 217 B.R. at 702, a large differential between the contract rate and the default rate

militates a finding that the default rate is a penalty which should not be enforced.  Moreover, the

default rate of interest is not applicable here where (i) the Prepetition Secured Lenders have a

substantial equity cushion of as much as approximately $4 billion, and (ii) the Debtors have

made timely payments of all amounts due in respect of the underlying obligation prior to the

Petition Date.  It is undeniable that the Prepetition Lenders are reasonably assured of payment

and therefore have no need to actively monitor the Debtors' bankruptcy cases to entitle them to

the default rate of interest or amortization and any monitoring that would be reasonable is more than compensated by the adequate protection package proposed in the Final Order.

32.    It is also significant to note that the Additional Interest has no connection to the alleged "harm" suffered by the Goodwin Proctor Group, most of whom the Debtors' believe acquired their claims postpetition.  As noted above, these creditors purchased their claims with full knowledge of the adequate protection package and are now insisting on additional economics to increase their own already very generous returns in order to penalize the Debtors at the expense of junior creditors.  There is no basis for these secured creditors to extract penalties out of proportion to any actual harm suffered when other creditors may receive only a fraction of their legitimate claims against the Debtors. As a court of equity, this Court should prevent such a result.

b.    There is No Showing of Solvency to Justify Default Interest

33.    It is also well-established that if the Debtors will not be able to pay, in full, all allowed claims filed against the company (in other words, the company is "insolvent"), there is no justification for the default rate of interest.  This principle is also recognized in the central case cited by the Goodwin Proctor Group in support of their claim for default interest.  See Objections at ¶ 24, fn. 6, citing In re Owners Corp., 306 B.R. 763 (Bankr. S.D.N.Y. 2004) vacated on other grounds, 313 B.R. 364,  (S.D.N.Y. 2004) ("in most circumstances it is appropriate for the bankruptcy court or superior court exercising bankruptcy jurisdiction to limit a secured creditor to its non-default contract rate of interest in order to provide a distribution to unsecured creditors.").  As set forth below, because the Goodwin Proctor Group offers no evidence of solvency to justify the relief they seek, their request for the default rate of interest should be denied, or at a minimum postponed until the end of the Debtors' chapter 11 cases.

16

34.     Courts decline to apply the default rate of interest where doing so diminishes the recovery of competing creditors.  <u>Vest</u>, 217 B.R. at 703-04; <u>In re Trinity Meadows Raceway, Inc.</u>, 252 B.R. 660, 669 (Bankr. N.D. Tex. 2000); <u>In re The Boardwalk Partners</u>, 171 B.R. 87, 92 (Bankr. D. Ariz. 1994).  In fact, the bankruptcy court in <u>In re Process Property Corp.</u>, 327 B.R. 603, 609 (Bankr. N.D. Tex. 2005), remarked that the impact on competing creditors is the most important factor in determining whether default-rate postpetition interest should be allowed in the context of section 506(b).  That inquiry is relevant where the value of the secured creditor's collateral is sufficient to entitle the creditor to postpetition interest under section 506(b), but the overall value of the debtor's estate is insufficient to pay all prepetition creditors in full (in other words, where the debtor is insolvent).

35.     Here, the Goodwin Proctor Group offers no evidence as to the Debtors' solvency to justify the default rate of interest.  On the contrary, their brief is replete with statements as to the precarious nature of the Debtors' business and the "unfair" risks and burdens that are purportedly being imposed upon them.  It would appear then that the Goodwin Proctor Group have deep reservations as to the Debtors' solvency which would contradict any claim by the Goodwin Proctor Group that the Debtors are solvent.  Accordingly, the Debtors submit that because there is no evidence presented by the Goodwin Proctor Group as to the solvency of the Debtors, there is no basis for the default rate of interest.  Alternatively, if there is a question as to solvency, such determination would be premature at this time and should be postponed until a plan of reorganization is filed.  Accordingly, the Debtors respectfully request that the Goodwin Proctor Group's request for default interest and amortization be denied.

2.      The Goodwin Proctor Group are Not Entitled to Reimbursement of Expenses

36.      Bankruptcy Code section 506(b) provides for the payment of any reasonable fees, costs, or charges only to the extent provided for under the agreement from which such claim arose.  See 11 U.S.C. 506(b) (emphasis added).  Recovery of "fees, costs, and charges, is allowed only if they are reasonable and provided for in the agreement under which the claim arose.  Therefore, in the absence of an agreement, postpetition interest is the only added recovery available" to an oversecured creditor.  United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 241 (1989); see also In re Vest Assocs., 217 B.R. 696, 700 (Bankr. S.D.N.Y. 1998) (holding the right to recover attorneys' fees under section 506(b) is "limited to those creditors who have bargained and provided for the recovery of such fees in the underlying agreement").

37.      Accordingly, for the Goodwin Proctor Group to recover their attorneys' fees, that right must be explicitly provided for in an operative agreement.  But no such agreement exists here.  The loan documents allegedly giving rise to the Group's claim for reimbursable expenses permit the recovery of expenses only in connection with the "enforcement or preservation" of rights under the prepetition loan agreements.  The Goodwin Proctor Group has merely filed an objection, not to enforce or preserve their rights, but to extract unreasonable penalties and costs from the Debtors, potentially at the expense of junior creditors.  This conduct should not be rewarded, and the Group's request for reimbursable expenses should be denied.

3.      The Goodwin Proctor Group Are Not Entitled to Additional Collateral

38.      The Goodwin Proctor Group request for additional collateral, including an increase in the Debtors pledge of the voting capital stock of their first-tier foreign subsidiaries, is unreasonable under the circumstances.  In connection with executing the Prepetition Credit Agreement and in subsequent discussions, the Debtors convinced the Prepetition Secured

Lenders that pledging more than 65% of the voting capital stock of their first-tier foreign

subsidiaries will have severe adverse tax consequences for the Debtors.  In particular, such

pledge may be deemed a triggering event that may cause the Debtors to be taxed on the earnings

and profits of their foreign subsidiaries under the Internal Revenue Code.  Such a triggering

event would result in significant payments by the Debtors without any tangible benefit for the

Prepetition Lenders.  The Debtors, therefore, submit that the adverse tax consequences that

would arise from granting the Goodwin Proctor Group the relief they seek far outweighs any

incremental benefit that would arise from granting the additional collateral.

        4.        <u>Group's Remaining Objections Adequately Addressed by Revised DIP Order</u>

        39.      The Goodwin Proctor Group's remaining Objections are that the DIP

Order should be clarified to (a) preserve the rights of the Prepetition Agent and Prepetition

Secured Lenders to oppose the sale, assignment or release of collateral securing the Prepetition

Credit Facility, (b) permit them to request further or different adequate protection, and (c) not

allow holders of setoff rights to prime the Prepetition Secured Lenders.  The Debtors submit that

each of these three concerns have been adequately addressed in the revised final DIP Order.

        40.      With respect to the Prepetition Lenders right to oppose a sale of collateral,

paragraph 8 of the revised Final Order now includes language that permits the Pre-Petition

Secured Lenders to file pleadings with respect to any proposed sale, transfer or other disposition

of the Collateral by the Debtors outside the ordinary course of business so long as such pleadings

do not contravene the provisions of the DIP Order and do not otherwise interfere with the

exercise of any right or remedy by the Agent or the DIP Lenders.

        41.      The second objection, seeking the right to request further adequate

protection, is also addressed in the revised Final Order at paragraph 13 which permits the Pre-

Petition Agent and the Pre-Petition Secured Lenders to request further or different adequate

protection under Bankruptcy Code sections 361, 363(e) and 364(d)(2) following the occurrence

of any event after the Petition Date, that (i) would reasonably be expected to have a Material

Adverse Effect (as defined in the DIP Credit Agreement but without regard to clause (y) of the

proviso of said definition) and (ii) either (A) the Debtors are not able to repay or refinance the

Pre-Petition Obligations in full in cash under a Chapter 11 plan of reorganization or (B) the

Debtors are not able to satisfy the Adequate Protection Obligations.  This additional provision

adequately addresses the Goodwin Proctor Group's concerns.

The Goodwin Proctor Group's final objection, seeking to prevent any setoff

claimants from priming the Prepetition Secured Lenders, is also addressed in the revised Final

Order.  Paragraph 18 of the Final Order now provides that liens granted to the holders of valid

setoff rights as adequate protection will be subordinated to the liens granted to the Prepetition

Secured Lenders with respect to Prepetition Collateral and rank pari passu with respect to the

additional liens granted to the  Prepetition Secured Lenders pursuant to the Final Order.

WHEREFORE the Debtors respectfully request that this Court enter an order (a)

overruling the Objections, (b) granting the Motion, and (c) granting the Debtors such other and

further relief as is just.

Dated: New York, New York
    October 26, 2005

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP


By: /s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr. (JB 4711)
    John K. Lyons (JL 4951)
    Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

- and -


By: /s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York  10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
Debtors and Debtors-in-Possession