Bruce D. Angiolillo (BA-9271)
Kenneth S. Ziman (KZ-2486)
William T. Russell, Jr. (WR-0998)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Fax: (212) 455-2502

Attorneys for the Administrative Agent for the
Prepetition Secured Lenders

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | : | |
| In re: | : | Chapter 11 |
| | : | Case No. 05-44481 (RDD) |
| | : | (Jointly Administered) |
| DELPHI CORPORATION., et al., | : | |
| Debtors. | : | |
| | : | |
| | : | |
| | : | |

**REPLY OF THE PREPETITION AGENT TO THE OBJECTIONS TO THE DIP
FINANCING MOTION AND ADEQUATE PROTECTION PROVIDED THEREIN
FILED BY THE UNSECURED CREDITORS' COMMITTEE
AND CERTAIN CUSTOMERS OF THE DEBTORS**

JPMorgan Chase Bank, N.A., in its capacity as administrative agent (in such

capacity, the "Prepetition Agent"), for itself and a syndicate of approximately 250 senior secured

lenders (collectively, the "Prepetition Lenders") to the above-captioned debtors and debtors-in-

possession herein (collectively, the "Debtors"), hereby replies to the objections to the Debtors'

motion for approval of the DIP financing motion and the adequate protection proposed therein

for the Prepetition Lenders (the "DIP Motion") filed by the Official Committee of Unsecured

Creditors (the "Committee") and certain customers asserting setoff rights against the Debtors

(collectively, the "Setoff Claimants").[1] In support hereof, the Prepetition Agent respectfully represents as follows:

**PRELIMINARY STATEMENT**

1.    The Committee's objections and, to a lesser extent, the objections of the Setoff Claimants essentially posit the following proposition: the Prepetition Secured Lenders should involuntarily finance the Debtors' reorganization – a massive, risky, complex undertaking for the benefit of parties *other* than the Prepetition Lenders – but not receive usual and customary adequate protection for the use of their prepetition collateral, including their cash collateral.  That proposition is simply untenable and should be rejected out of hand by this Court.  As the following makes clear, the proposed form of Final DIP Order provides substantially improved adequate protection for the setoff rights of the Debtors' customers from that contained in the Interim DIP Order (at the expense of the Prepetition Lenders' adequate protection), and that the adequate protection to be provided the Prepetition Lenders is the *least* that allows the Prepetition Agent to not object to the priming of its liens and the use of its Prepetition Collateral. [2]

---

[1]    Appaloosa Management, L.P. ("Appaloosa") has submitted an objection to the Debtors' motion for an order establishing notification and hearing procedures for trading in claims and equity securities.  Without taking a position on the claims trading motion (which explicity does not apply to trading of the the Debtors' pre-petition bank debt), the Prepetition Agent objects to the provision of adequate protection for affected bond or equity holders.  It is a basic tenet of bankruptcy law that "'[a]dequate protection' is mandated by certain provisions of the Code when requested by an entity *with an interest in property in which the estate has an interest.*" *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86 (2d Cir.2003) (emphasis added) (citing 3 COLLIER ON BANKRUPTCY ¶ 361.02 (15th ed. 2003)).  A holder of public equity does not possess such an interest since the Debtor lacks a property interest in its own stock. Therefore, under no circumstances is Appaloosa entitled to any form of adequate protection under the Bankruptcy Code.

[2]    Earlier today, General Motors Corporation ("GM") filed an objection to the DIP Motion attacking the adequate protection being offered to the Prepetition Lenders.  The Prepetition Agent views GM's objection as merely a placeholder based on its understanding that the terms of adequate protection for GM and other customers have been agreed upon.  For the reasons set forth herein, GM's objections are without merit.  The proposed form of the Final DIP Order accommodates the requests of GM and other customers to be provided with adequate protection of whatever interests

2.      It is plainly apparent that these Chapter 11 cases are being financed

primarily by the Prepetition Lenders but that the end game here is not for their benefit:

- Prior to the Petition Date, the Debtors transferred hundreds of millions of dollars to pay the prepetition claims of certain suppliers and customers.  The Debtors have sought and obtained authority to pay up to an additional $130 million to essential suppliers and foreign creditors on account of their prepetition claims during these Chapter 11 cases.

- The Prepetition Lenders are effectively financing this case by permitting the Debtors to continue to use the Prepetition Lenders' prepetition collateral, including the cash collateral, in the operation of their businesses and by, in most cases, not objecting to the priming of their liens by the DIP Lenders.

- The Prepetition Lenders' liens have already been primed by $950 million of DIP Financing, and the Debtors are requesting that this Court enter an order authorizing the Debtors to incur indebtedness of up to $2 billion that will be secured by liens and claims that are senior to any liens and claims of the Prepetition Agent and the Prepetition Lenders.

- The Debtors' forecasts show that the Debtors will continue to suffer losses and burn cash every day until the Debtors can implement a complex multilateral transformation plan.

- Given the systemic and industry-wide impediments to a successful reorganization here – many of which are outside the Debtors' control – their turnaround may be, at best, speculative.

- The Debtors' turnaround plan is fraught with execution risk, and it is far from certain whether the Debtors' prospects will improve even if the Debtors' turnaround plan is successfully implemented as customers are likely to demand even lower prices for the Debtors' product.

3.      While the Prepetition Lenders bear the risk that the Debtors' turnaround

plan will not be successful, the parties who are deriving the greatest benefit from these Chapter

11 cases are the Debtors' customers (who continue to receive their parts) and unsecured creditors

(at no cost or risk to themselves), and all of whom have an opportunity for a greater recovery in

---

they may have.  As a matter of law or equity, neither GM nor any other customer is entitled to more.

these Chapter 11 cases than they would otherwise have absent the Prepetition Lenders'

forbearance.  In these circumstances, any suggestion by the Committee or the Setoff Claimants –

all of whom represent the chief beneficiaries of the Debtors' efforts to transform their businesses

– that the Prepetition Lenders are entitled to less adequate protection than is being offered or that

certain claims should be elevated to a priority superior to those of the Prepetition Lenders is

simply unacceptable.

        4.        The objections filed by the Committee and the Setoff Claimants do not

dispute that the Debtors require postpetition financing and use of cash collateral to operate their

businesses during these Chapter 11 cases.  In light of the Debtors' use of cash collateral and the

priming of the Prepetition Lenders' liens, the Debtors are required under Bankruptcy Code

Sections 361, 363 and 364 to provide the Prepetition Lenders with adequate protection.   Here,

the Prepetition Agent has withheld objection to the DIP Motion in exchange for the grant of

replacement liens, superpriority claims, the current payment of interest and the reimbursement of

certain fees and expenses and other standard protections routinely granted by courts in this

jurisdiction in similar circumstances.  As the Prepetition Agent has already informed this Court,

however, it cannot refrain from objecting to the DIP Motion if the adequate protection being

proposed by the Debtors in the most recent form of the proposed Final DIP Order is modified in

a manner adverse to the Prepetition Lenders.  Although the Committee makes the

unsubstantiated allegation that the Prepetition Lenders are adequately protected by virtue of an

equity cushion, the Prepetition Agent respectfully disagrees, particularly in light of the Debtors'

projected losses and cash burn and the high execution risk and uncertainties inherent in the

Debtors' Chapter 11 cases.

5.      Accordingly, the Prepetition Agent is not objecting to the entry of the
Final DIP Order as it stands on the morning of October 26, 2005, subject to its confirmation that
such Order incorporates the agreed upon changes and is otherwise satisfactory in form and
substance (and that other changes to such Order are not in any way adverse to the interests of the
Prepetition Agent or the Prepetition Lenders).

## BACKGROUND

A.          **The Prepetition Credit Agreement and Related Collateral**

6.      Prior to the Debtors' commencement of these Chapter 11 cases on October
8, 2005 (the "Petition Date"), Delphi Corporation (the "Borrower") entered into the 5-Year Third
Amended and Restated Credit Agreement, dated as of June 14, 2005 (as amended, supplemented
or otherwise modified, the "Prepetition Credit Agreement")[3], among the Borrower, the
Prepetition Lenders and the Prepetition Agent.   As of the Petition Date, the Borrower was liable
to the Prepetition Lenders in the aggregate principal amount of approximately $2.6 billion on
account of loans, letters of credit that have been issued and are outstanding and other extensions
of credit (the "Prepetition Obligations").  The Prepetition Obligations are held by more than 250
Prepetition Lenders, which include money-center commercial banks, hedge funds and other
financial institutions.

7.      Upon the closing of the Prepetition Credit Agreement, the Prepetition
Lenders made a term loan to the Borrower in the principal amount of $1 billion (the "Term
Loans"), of which the Borrower contributed not less than $475 million its U.S. pension plans to
bring the total contributions for the quarter to $625 million.  The balance of the Term Loans was

---

[3]          Capitalized terms not otherwise defined herein shall have the meanings as defined in the
Prepetition Credit Agreement.

used to refinance existing indebtedness, pay related fees and expenses and for other general corporate purposes.

8.      In August 2005, the Debtors borrowed $1.5 billion of revolving loans (the "Revolving Loans") from the Prepetition Lenders.  Upon information and belief, more than $350 million of these loans proceeds were used to pay the prepetition claims of certain customers and suppliers.  In addition, substantial amounts of cash were transferred overseas to the Borrower's foreign subsidiaries in preparation for the Debtors' Chapter 11 filing.  As of the Petition Date, the Debtors reported that there was approximately $1 billion on hand in non-US entities and $500 million in the United States.  Affidavit of Robert S. Miller, Jr., dated October 8,2005, ¶ 26.

9.      Pursuant to the Guarantee and Collateral Agreement, dated as of June 14, 2005 (as amended, supplemented or otherwise modified, the "Guarantee and Collateral Agreement"), made by the Borrower and the subsidiary guarantors (each a "Loan Party"), other Debtors guaranteed the Prepetition Obligations under the Credit Agreement.  In addition, each Loan Party granted to the Prepetition Agent, for the ratable benefit of the Prepetition Lenders, as security for Prepetition Obligations, a first priority security interest in substantially all its personal property, including Accounts, Chattel Paper, Contracts, Deposit Accounts, Documents, Equipment, Fixtures, General Intangibles, Instruments, Intellectual Property, Inventory, Investment Property, Letter-of-Credit Rights and Proceeds of the foregoing, other than, among other exceptions, receivables sold into permitted receivables programs and Domestic Manufacturing Properties and stock and debt of Domestic Manufacturing Subsidiaries (as all such terms are defined in the Guarantee and Collateral Agreement).  Although the Prepetition Agent's security interest did not attach to receivables sold into certain permitted receivables programs, the Prepetition Agent effectively obtained a first priority security interest in the value

of such receivables by having a lien on the General Intangible intercompany obligations that arose when the originators of the receivables sold the receivables to the special purpose vehicle. As of the Petition Date, no other creditor had a superior claim to the value represented by those receivables.

10.     In addition, certain Loan Parties granted to the Prepetition Agent mortgages on certain real property and security interests in certain other assets constituting Domestic Manufacturing Properties and stock and indebtedness of Domestic Manufacturing Subsidiaries in order to secure its Prepetition Obligations in respect of the Term Loans and the "A Revolving Obligations" (*i.e.*, those Revolving Obligations that could from time to time be secured by such assets without triggering the equal and ratable sharing provisions in the 1999 bond indenture).  Upon information and belief, approximately $1.2 billion of the Prepetition Obligations are secured by this collateral.

11.     The Debtors have acknowledged and agreed that the value of the Prepetition Lenders' collateral substantially exceeds the Prepetition Obligations as of the Petition Date.  *See* Interim DIP Order ¶ 3.

**B.        <u>The Motion and the DIP Credit Agreement</u>**

12.     On the Petition Date, the Debtors filed the Motion seeking *inter alia*, approval of a $2 billion DIP facility that would prime the Prepetition Lenders' liens, authority to use the Prepetition Lenders' cash collateral and approval of the provision of adequate protection. At the "first-day" hearing, the Prepetition Agent reserved its rights and the rights of the Prepetition Lenders to object on any and all grounds to the priming or the use of the cash collateral at the hearing on a final order on the Motion.  At the conclusion of the hearing, the

Bankruptcy Court entered an interim order authorizing the DIP facility (the "Interim DIP
Order").

13.    The Interim DIP Order, *inter alia*, authorized the Debtors to obtain secured
post-petition financing (the "DIP Financing") on an interim basis up to $950 million.  The DIP
Financing contemplates that on a final basis the Debtors can borrow up to an aggregate principal
amount not to exceed $2 billion, consisting of a $1,750,000,000 revolving credit facility
(inclusive of a sublimit in the aggregate of $325 million for the issuance of letters of credit) and a
$250 million term loan facility, from a syndicate of financial institutions (collectively, the "DIP
Lenders").

14.    The Interim DIP Order further authorized the Debtors to grant the DIP
Lenders (A) superpriority administrative claims under Bankruptcy Code Section 507(b) in
respect of the Debtors' obligations under the DIP Financing, subject to the Carve Out (as defined
in the DIP Agreement), (B) perfected first priority security interests in and liens upon, all
unencumbered pre-petition and post-petition property of the Debtors, subject to the Carve Out
and excluding avoidance actions, (C) perfected junior security interests in and liens upon all pre-
petition and post-petition property of the Debtors that is subject to valid, perfected, and non-
avoidable liens in existence on the Petition Date that are perfected thereafter as permitted by
Bankruptcy Code Section 546(b), subject to the Carve-Out; *provided* that such security interests
and liens shall not be junior to any liens of the Prepetition Agent or the Prepetition Lenders and
(D) security interests senior to all liens and security interests of the Prepetition Agent or the
Prepetition Lenders in the Collateral.

15.    The Debtors offered the following in the Interim DIP Order as adequate
protection to the Prepetition Lenders: (i) current payment of interest on the Prepetition

Obligations at the applicable contractual rate under the Prepetition Credit Agreement; (ii)

replacement liens to replace the collateral being consumed by the Debtors through the ordinary

course of business; (iii) a combination of equity in prepetition collateral and unencumbered

property as of the Petition Date; (iv) a superpriority administrative claim pursuant to Section

507(b), subject and subordinate only to the 507(b) claim granted to the DIP Lenders and the

Carveout; and (v) information provided to the DIP Lenders and access to collateral.[4]

16.     In addition, the Interim DIP Order contained the following customary

terms:

- Stipulations by the Debtors as to the validity, priority, perfection and enforceability of the liens and claims of the Prepetition Lenders;

- Waiver of the Debtors' right to challenge the Prepetition Lenders' liens and claims at any time during the Debtors' Chapter 11 cases;

- A Carve-Out of $35 million;

- Subject to the entry of the Final DIP Order, waiver of the Debtors' rights to bring a Section 506(c) claim; and

- A period of 90 days within which the Committee or any other party in interest may investigate the Prepetition Junior Indebtedness and the Prepetition Junior Liens and commence an action challenging such claims and liens, with the expiration of such investigation period making the Debtors' stipulations and waivers binding on the Committee and all other parties in interest for all purposes in the Debtors' Chapter 11 cases.

17.     Since the hearing on the Interim DIP Order, the Prepetition Agent,

General Motors Corporation ("GM") – the Debtors' largest customer – and the Debtors have

sought to negotiate provisions that would permit GM and other entities asserting setoff rights to

exercise their setoff rights in the ordinary course and provide them with adequate protection in

respect of their purported setoff rights.  As contemplated by the Final DIP Order, Setoff

---

[4]      The full terms of the adequate protection are set forth in the Final DIP Order.

Claimants are entitled to exercise their setoff right solely in respect of their pre-petition payables that arose in the ordinary course of business by offsetting against post-petition payables owed by such Setoff Claimant in an amount to be determined. As adequate protection, the Setoff Claimants are being granted replacement liens (x) on such Setoff Claimant's post-petition payables, subject only to the liens granted to the DIP Lenders and the Carve-Out, (y) on the Prepetition Lenders' collateral, subject to the replacement liens granted to the Prepetition Lenders and (y) on after-acquired property (subject to certain exceptions),[5] which liens shall be *pari passu* with the replacement liens granted to the Prepetition Lenders. In addition, the Setoff Claimants will have a superpriority administrative claim under Section 507(b) *pari passu* with that of the Prepetition Lenders.

## THE OBJECTIONS

18.    More than twenty-five Setoff Claimants filed objections to the DIP Motion. In general, the Setoff Claimants objected to the DIP Motion on the ground that the DIP Financing should not be permitted to prime their setoff rights but, in any event, the Setoff Claimants are entitled to adequate protection of their setoff rights to the extent of any diminution in value. As discussed below, the Prepetition Agent believes that the Final DIP Order provides the Setoff Claimants with sufficient adequate protection to protect their interests, if any.

19.    The Committee objected to the DIP Motion on several grounds that seek to adversely modify the adequate protection to be provided to the Prepetition Agent and the Prepetition Lenders: (i) the Prepetition Lenders' superpriority claim under Section 507(b) should not have recourse to avoidance action proceeds; (ii) the provisions regarding the binding effect of

---

[5]    The *pari passu* lien does not attach to collateral that would have constituted prepetition collateral in which the Prepetition Agent would have had a valid and perfected security interest or lien but for the commencement of these cases and without further action (*e.g.*, inventory, accounts receivable).

the Debtors' stipulations on third parties should be revised; (iii) the adequate protection liens to

be granted under the Final DIP Order should be subject and subordinate to Section 551; (iv) the

Debtors should waive their rights under Section 506(c); (v) the Carveout is insufficient; and (vi)

intercompany claims should be secured by liens subordinate only to the DIP Liens.[6]  As

discussed below, these objections make arguments that are contrary to black letter law and

standard practice in this and other jurisdictions.

### THE PREPETITION AGENT'S REPLY TO THE OBJECTIONS

As demonstrated below, the relatively routine features of the Final DIP Order to

which objections have been made are plainly justified, and should be approved, particularly in

light of the fact that the Prepetition Lenders are financing these cases and bearing all of the risk

that the Debtors' turnaround plan will be unsuccessful for the benefit of constituencies with

junior claims and interests.

### A.    The Objections of the Setoff Claimants

20.    The Setoff Claimants argue that they should not be primed by the DIP

Lenders' liens and that they are entitled to adequate protection in the form of liens and claims

that would be senior to the liens and claims of the Prepetition Lenders.  As set forth above, the

most recent version of the proposed Final DIP Order provides the Setoff Claimants with the

following rights and adequate protection: (i) the Setoff Claimants may exercise their setoff rights

against post-petition payables in the ordinary course and thus get the undisputed portion of their

prepetition claims *paid* during the chapter 11 cases; (ii) the Setoff Claimants are retaining their

---

[6]    The Committee also asserts that the Final DIP Order should provide that any adequate protection
payments made by the Debtors to the Prepetition Lenders in respect of interests, fees, costs or
other charges should be subject to recharacterization as payments of principal to reduce the
Prepetition Obligations in the event that it is determined that the Prepetition Lenders are not
oversecured.  The Prepetition Agent does not object to the inclusion of such language to the
extent it is not already incorporated into the Final DIP Order.

senior position with respect to their post-petition payables, subject only to the liens being granted

to the DIP Lenders; and  (iii) to the extent of any diminution in value actually suffered, the Setoff

Claimants will get liens in certain after-acquired property  and Section 507(b) claims *pro rata*

with the Prepetition Lenders.

21.    This basket of rights and adequate protection is sufficient to compensate

the Setoff Claimants for any purported diminution in value.  In fact, many of the Setoff

Claimants likely will not suffer any diminution in value as they exercise their setoff rights each

month against post-petition payables.  Furthermore, these Setoff Claimants, who comprise the

Debtors' largest customers, stand to gain the *most* from these Chapter 11 cases – a Delphi with

much lower operating expenses and long-term liabilities.  On the other hand, the Prepetition

Lenders can only get what Delphi is able to do today but for the automatic stay – pay the

Prepetition Obligations in full.  The Prepetition Lenders' collateral is being used to fund these

Chapter 11 cases, in part, so that the Setoff Claimants and others can continue to receive the

Debtors' product without experiencing any disruption in their manufacturing operations.  In the

meantime, the Prepetition Lenders bear the risk that their collateral will erode as the Debtors'

losses mount each day.  In such circumstances, it would be inequitable – and objectionable -- to

further elevate the claims of the Setoff Claimants vis-à-vis the Prepetition Lenders.

**B.    The Objections of the Committee**

**(i) The Prepetition Lenders' Section 507(b) Claims Should Have Recourse to
Avoidance Action Proceeds.**

22.    The Committee argues without citing to any authority that the Prepetition

Lenders' Section 507(b) claims should not have recourse to any avoidance action proceeds

because the Prepetition Lenders are adequately protected.  This argument is without foundation.

23.    First, the Prepetition Lenders should not be compelled to obtain repayment of their claims from sources other than avoidance action proceeds based on the notion that such proceeds are somehow reserved for unsecured creditors.  As the Debtors have reported, hundreds of millions of dollars of the Prepetition Lenders' cash collateral were transferred to suppliers and other unsecured creditors on account of prepetition claims within the ninety-day preference period under Section 547.  In the event that such collateral is recovered during these Chapter 11 cases, there is no basis to make the proceeds thereof available solely to unsecured creditors, particularly in circumstances where the Prepetition Lenders' collateral and the replacement collateral has been so far diminished in value that the Prepetition Lenders need to assert their Section 507(b) claims in order to be repaid.

24.    Second, nothing in the law compels the Prepetition Lenders to forego recoveries from avoidance actions.  Although the Guidelines for Financing Requests in the Southern District of New York provide that it is an "Extraordinary Provision" to permit liens on, or superpriority claims to be payable from, avoidance action proceeds, such relief is routinely granted.  *See, e.g., In re Loral Space Communications Ltd.*, Case No. 03-41710, ¶ 7 (Bankr. S.D.N.Y. Aug. 22, 2003) (lien on avoidance action proceeds)(Drain, J.)[7]; *In re Enron Corp.*, 01-16034, ¶ 6 (Bankr. S.D.N.Y. July 2, 2002) (same) (Gonzalez, J.); *In re Meridian Automotive Systems- Composites Operations, Inc.*, Case No. 05-11168, ¶ 6 (Bankr. D. Del. June 30, 2005) (superpriority claims have recourse to avoidance action proceeds) (Walrath, J.). *See* Memorandum Order, dated Aug. 11, 2000 at 4, *In re Silver Cinemas, Int'l, Inc. et al.*, No. 00-

---

[7]    All DIP orders cited herein are attached hereto as Exhibit A.

1978 (Bankr. D. Del.) ("[I]n evaluating orders which authorize the use of cash collateral, federal courts have consistently found that postpetition liens may be extended to avoidance actions.").[8]

25.    In other circuits, courts have gone even farther and granted prepetition lenders liens on avoidance actions as part of their adequate protection.  *See Mellon Bank, N.A. v. Dick Corp.*, 351 F.3d 290 (7th Cir. 2003) (prepetition secured lenders were granted liens on avoidance actions as adequate protection in exchange for their agreement to forbear from exercising remedies with respect to the collateral and afford the debtor an opportunity to sell itself as a going concern); *In re Qualitech Steel Corp.*, 276 F.3d 245 (7th Cir. 2001) (prepetition lenders were granted liens on avoidance actions as part of adequate protection).  As in *Mellon Bank*, the Prepetition Lenders are being asked by the Debtors to forbear from exercising remedies while the Debtors attempt to implement their turnaround plan.  In that context, permitting the Prepetition Lenders' superpriority claims to be paid from avoidance action proceeds is for the benefit of the estate because it allows the Debtors to obtain the non-objection of the Prepetition Agent to the DIP Financing, thereby permitting the estates to have sufficient liquidity to operate in the ordinary course.

26.    The reality the Committee seems to ignore is that in these cases unsecured creditors are reaping an extraordinary benefit in the form of an enhanced opportunity for a recovery at the expense of the Prepetition Lenders.  The Prepetition Lenders are financing these cases by permitting their collateral, including their cash collateral, to be used and their liens to be primed by a $2 billion DIP Facility.   At the same time, the execution risk and uncertainties inherent in these Chapter 11 cases are being borne by the Prepetition Lenders as the Debtors' projected losses and cash burn will continue unless and until the Debtors successfully implement

---

[8]        Attached hereto as Exhibit B.

their turnaround plan.  In these circumstances, it would be inequitable – and objectionable -- to

deny the Prepetition Lenders adequate protection in the form of a superpriority claim payable

from avoidance action proceeds.  This overreach by the Committee should be rejected by the

Court.

### (ii)  The Binding Effect of Stipulations on the Committee and Other Parties is Appropriate and Standard.

27.    The Committee has posited four objections to the various stipulations and

related provisions set forth in the Final DIP Order: (a) 90 days is an insufficient period for the

Committee to investigate the liens and claims of the Prepetition Lenders; (b) the Prepetition

Lenders should not be granted a release; (c) there should not be a deadline to challenge the

Debtors' stipulation that the Prepetition Lenders are oversecured; and (d) the Final DIP Order

should explicitly grant the Committee standing to bring any claims or causes of action belonging

to the Debtors.   Each of these points will be addressed below.

28.    First, the Committee argues that 90 days is an insufficient period for the

Committee to investigate the liens and claims of the Prepetition Lenders.  The 90 day period

during which the Committee must complete its investigation and commence an action (if granted

standing by this Court) is entirely appropriate and standard.  The New York Financing

Guidelines provide that the Court will ***not*** consider as "extraordinary" the debtor's stipulation as

to validity, perfection, enforceability, priority and non-avoidability of a prepetition lender's

claim and liens, and the lack of any defense thereto, so long as the creditors' committee has 60

days (and 75 days for parties in interest if no creditors' committee is appointed) from the date of

the order approving the appointment of counsel for the committee to investigate the facts and

bring any appropriate proceeding as representative of the estate.  New York Financing

Guidelines ¶ 3.[9]    In this case, the Prepetition Lenders have consented to a more generous time period in the Final DIP Order by giving the Committee 90 days from the date of its formation to investigate the liens and claims of the Prepetition Lenders.  Final DIP Order ¶ 16; *see In re FCX, Inc.*, 54 B.R. 833, 841-42 (Bankr. E.D.N.C. 1985) (finding that 30 days from the date of the financing order for creditors to determine the amount and validity of the secured creditor's claim [and 60 days to determine the existence of claims against the secured creditor] was a reasonable period of time).

29.    The Interim DIP Order even provided the Committee with (and the proposed Final DIP Order contemplates) the right to seek an extension of the deadline to commence an action from the Bankruptcy Court if the Prepetition Agent does not consent to an extension.  *See* Interim DIP Order ¶ 13 ("or such later date (x) as has been agreed to, in writing, by the Pre-Petition Agent in its sole discretion or (y) *as has been ordered by the Court*") (emphasis added).

30.    Given the Prepetition Lenders' funding of these Chapter 11 cases for the benefit of the Debtors' customers, suppliers and other unsecured creditors, the Prepetition Lenders are entitled to certainty whether any party in interest intends to challenge their liens or claims or otherwise bring causes of action against them.  *See In re FCX, Inc.,* 54 B.R. at 842 (the

---

[9]    Similarly, Rule 4001-2 of the Local Rules for the Delaware Bankruptcy Court provides that the secured lender must give a creditors' committee a minimum of 60 days (75 days for other parties in interest) from the entry of the debtor-in-possession financing order or cash collateral order to investigate the secured creditor's liens and claims. *See also Official Committee of Unsecured Creditors of National Forge Company v. Clark (In re National Forge Company)*, 304 B.R. 214, 222 (Bankr. W.D. Pa. 2004) (debtor waived all rights it had to contest the secured creditor's claims at the beginning of the case by language in the interim and final DIP orders); *Official Committee of Unsecured Creditors of America's Hobby Center, Inc. v. Hudson United Bank (In re America's Hobby Center, Inc.)*, 223 B.R. 275, 281 (Bankr. S.D.N.Y. 1998) (court had previously approved language in cash collateral stipulation in which debtor ratified the claims and liens of the secured creditor); 3 COLLIER ON BANKRUPTCY ¶ 364.04[2][f] ("More modest waivers, binding on nondebtor parties only after the passage of a reasonable amount of time, are routinely approved.").

court reasoned that such time limitations are appropriate because the secured creditor financing the debtor's operations is entitled to know if there are challenges to the amount of its claim or the validity of its prepetition lien and whether it must defend claims).  For these reasons, courts have routinely shielded secured lenders from challenges to their liens and claims and any other causes of action that parties may have against such lenders.  *See, e.g., In re Loral Space Communications Ltd.*, No. 03-41710, ¶ 14 (Bankr. S.D.N.Y. Aug. 22, 2003) (if an adversary proceeding is not timely commenced against lenders, any claims, counterclaims or causes of action are irrevocably waived and relinquished)(Drain, J.); *In re New World Pasta Co.,* No. 04-02817, ¶24 (Bankr. M.D. Pa. July 9, 2004) (release of all claims and defenses) (France, J.).

31.    Similarly, courts have permitted the imposition of a deadline to challenge whether a secured lender is oversecured.  *See, e.g., In re Loral Space Communications Ltd.*, No. 03-41710, ¶¶ 3(c), 14 (Bankr. S.D.N.Y. Aug. 22, 2003) (finding that prepetition secured lenders were oversecured subject to investigation period)(Drain, J.); *In re Burlington Industries, Inc.,* No. 01-11282, ¶ 14 (Bankr. D. Del. Dec. 12, 2001) (committee had 75 days to challenge that prepetition lenders were oversecured).

32.    Finally, the Committee requests that it be excused in advance from the legal requirements mandated in this circuit and many others for committee standing.  It is well-settled that no provision in the Bankruptcy Code confers independent standing on creditors' committees to commence adversary proceedings.  *In re STN Enters.*, 779 F.2d 901, 904 (2d Cir. 1985) ("The Bankruptcy Code … contains no explicit authority for creditors' committees to initiate adversary proceedings.").  The Courts of Appeal in the Third, Fifth, Sixth and Ninth Circuits have reached the same conclusion.  *See Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003); *Canadian Pacific Forest Products*

*Ltd. v. J.D. Irving Ltd. (In re The Gibson Group)*, 66 F.3d 1436 (6th Cir. 1995); *In re Suffola,*

*Inc.*, 2 F.3d 977 (9th Cir.1993); *In re Fuel Oil Supply & Terminaling*, 762 F.2d 1283 (5th Cir.

1985).  Accordingly, a creditors' committee can only file a complaint alleging causes of action

that belong to the debtor if it first obtains Bankruptcy Court approval.  *See Official Committee of*

*Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003); *see also In*

*re National Forge Company*, 304 B.R. at 222 (creditors' committee needed court approval to file

complaint prior to bringing a fraudulent conveyance claim); *In re America's Hobby Center, Inc.,*

223 B.R. at 280 (prior bankruptcy court approval of creditors' committee initiated lawsuits is

required because "a creditors' committee does not have unfettered discretion to sue simply on its

say-so").

                    33.       Specifically, a bankruptcy court must make specific factual findings that

(1) a demand has been made upon the trustee (or debtor) to take action, (2) the demand is

declined, (3) a colorable claim exists, based on a cost-benefit analysis performed by the court

and (4) the trustee's inaction is an abuse of discretion in light of his duties.  *Canadian Pacific*

*Forest Products Ltd. v. J.D. Irving Ltd. (In re The Gibson Group)*, 66 F.3d 1436, 1446 (6th Cir.

1995); *see also In re Commodore Int'l Ltd.*, 262 F.3d 96, 100 (2d Cir. 2001) (a creditors'

committee may acquire standing to pursue the debtor's claims if (1) the committee has the

consent of the debtor in possession or trustee and (2) the court finds that suit by the committee is

(a) in the best interest of the bankruptcy estate and (b) is "necessary and beneficial" to the fair

and efficient resolution of the bankruptcy proceedings).  The Committee is required to establish

that, beyond simply being colorable, the claims are likely to yield benefit for the estates and,

indeed, are "necessary and beneficial" to resolution of the bankruptcy cases.  As the Second

Circuit explained in *In re STN Enterprises*:

> If the committee presents a colorable claim or claims for relief that
> on appropriate proof would support a recovery, the district (or
> bankruptcy) court's threshold inquiry will still not be at an end.   In
> order to decide whether the debtor unjustifiably failed to bring suit
> so as to give the creditors' committee standing to bring an action,
> the court must also examine, on affidavit and other submission, by
> evidentiary hearing or otherwise, whether an action asserting such
> claim(s) is likely to benefit the reorganization estate.

779 F.2d 901, 905 (2d Cir. 1985); *see also In re Sunbeam Corp.*, 284 B.R. 355 (Bankr. S.D.N.Y.

2002) ("[A] finding that allowing a committee to pursue a debtor's claim would be necessary and

beneficial to the resolution of the bankruptcy proceeding is required in all instances.").

34.     In this case, there is no justification for granting the Committee blanket

permission to launch litigation without it first satisfying the cost-benefit analysis and other legal

standards articulated by the courts in this circuit.

### (iii)  The Prepetition Lenders' Liens Should Not Be Subordinate to Section 551.

35.     The Committee also seeks to subordinate the Adequate Protection Liens

and Junior Adequate Protection Liens to any lien or security interest that is avoided and

preserved under Section 551 of the Bankruptcy Code.   However, such subordination would

produce an impermissible windfall, especially where, as here, any  property subject to such a lien

was most likely subject to the Prepetition Lenders' liens before being transferred by the Debtors.

As the court in *In re Delancy*, 94 B.R. 311, 313 (Bankr.S.D.N.Y.1988) held:

> [t]hus, when under state law, the avoided lien which is sought to be
> preserved is inferior to subsequent valid liens, the inferior lien cannot be
> enhanced by its preservation under U.S.C. §551.  If the avoided lien will
> sink below other liens against the estate, the trustee who stands in the
> shoes of the inferior avoided lien will likewise sink while in those shoes,
> because U.S.C. §551 does not create a floating lien for trustees.

In other words, "the trustee who avoids and then preserves a senior secured claim cannot acquire

greater rights in the property in question than those to which the trustee succeeded."  *Id; see also*

*In re Pearson Industries, Inc.*, 178 B.R. 753, 764 (Bankr.C.D.Ill.1995)("Without question, any property recovered by the trustee as a result of an avoided transfer must be distributed to creditors in their order of priority to the extent the estate has equity in the property recovered"). As the legislative history of Section 551 clearly indicates, the section was intended to prevent "junior lienors from improving their position at the expense of the estate when a senior lien is avoided." H.R. Rep. No. 95-595, 9[t5h] Cong., 1st Sess. 376 (1977). It was not intended to give unsecured creditors a windfall.

36.    Moreover, it turns equity (and logic) on its head to, on the one hand, use the Prepetition Lenders' collateral to fund the Debtors' reorganization and efforts to avoid any such security, primarily for the benefit of other creditors, and then effectively subordinate the Prepetition Lenders' interests to the interests of those other creditors. In fact, there are numerous examples of orders entered in this District that have required that the liens granted pursuant to such postpetition financing orders not be subordinated to any liens avoided and preserved under Section 551. *In re RCN Corp.*, No. 04-13636 at 16 (Bankr. S.D.N.Y. June 22, 2004) (Drain, J.); *In re Loral Space & Commc'ns, Ltd.*, No. 03-10417 at 26 (Bankr. S.D.N.Y. Aug. 22, 2003) (Drain, J.)[10]; *In re Tower Automotive, Inc.*, No. 05-10578 at 20 (Bankr. S.D.N.Y. Feb. 28, 2005) (Gropper, J.); *In re Adelphia Business Solutions*, No. 02-11389 at 27 (Bankr. S.D.N.Y. Aug. 9, 2002) (Gerber, J.); *In re Enron Corp.*, No. 01-16034 at 12 (Bankr. S.D.N.Y. July 2, 2002) (Gonzalez, J.); *In re Bethlehem Steel Corp.*, No. 01-15288 at 15 (Bankr. S.D.N.Y. Nov. 5, 2001) (Lifland, J.).

37.    Simply put, the avoidability of some security interests or liens should not operate to alter the priority of other security interests or liens by virtue of an improper

---

[10]       All of the DIP orders cited herein are attached hereto as <u>Exhibit A</u>.

subordination that has no basis in law.  Accordingly, the Court should overrule the Committee's objections.

**(iv) <u>The Carveout is Sufficient.</u>**

38.      The Committee also objects to the creation and establishment of an ample $35 million Carve-Out for the payment of estate professionals and certain fees.  Instead, the Committee takes the unjustifiable position that there should be an open-ended Carve Out precisely in the circumstances when secured creditors would most want the protection of the Carve Out because they are at significant risk of a rapid and severe erosion of their collateral (*i.e.*, when Events of Defaults have occurred and are continuing under the DIP Credit Agreement).  Moreover, secured creditors are not required to make *any* cash available from their collateral to pay the Debtors' and the Committee's professionals and do so only on consent.  *See In re White Glove, Inc.*, 1998 WL 731611, *6 (Bankr. E.D. Pa. Oct. 14, 1998) ("it is essential to note that the carve out is a product of an agreement between the secured party and the beneficiary of the carve out.").  In fact, secured creditors often make such carve outs available in order to obtain a Section 506(c) waiver, as discussed below.

39.      In addition, numerous orders entered in this District have contained "formulaic" caps such as the one the Committee objects to here.  *See, e.g., In re RCN Corp.*, No. 04-13638, ¶ 4 (Bankr. S.D.N.Y. Jun. 22, 2004) (Drain, J.); *In re Loral Space & Communications, Ltd.*, No. 03-41710, ¶6(e) (Bankr. S.D.N.Y. Aug. 22, 2003) (Drain, J.); *In re Tower Automotive, Inc*, No. 05-10578,  ¶ 16 (Bankr. S.D.N.Y. Feb. 28, 2005); *In re Worldcom, Inc.*, No. 02-13533,¶ 15(a) (Bankr. S.D.N.Y. Oct. 15, 2002) (Gonzalez, J.); *In re Adelphia Business Solutions, Inc*, No. 02-11389, ¶ 16 (Bankr. S.D.N.Y. Aug. 9, 2002) (Gerber, J.); *In re Enron Corp*, No. 01-16034, ¶

5(b) (Bankr. S.D.N.Y. July 2, 2002) (Gonzalez, J.); *In re Bethlehem Steel Corp.*, No. 01-15288, ¶

10 (Bankr. S.D.N.Y. Nov. 5, 2001).

40.    Therefore, it is only equitable that the DIP Lenders and Prepetition

Lenders be able to impose a cap on the level of risk that could be imposed on them as a result of

the use of their collateral and their funding of the Debtors' reorganization *after* the occurrence of

an Event of Default.

### (v)  The Debtors' Waiver of Their Rights Under Section 506(c) Is Appropriate.

41.    The Committee's opposition to the proposed waiver of Section 506(c)

claims is unsustainable on several grounds.  The right to use Section 506(c) to recover the costs

of preserving, or disposing of the collateral securing an allowed secured claim, is *expressly*

limited to a trustee (or the debtor-in-possession).  *See* 11 U.S.C. §§ 506(c) and 1107.  Section

506(c) provides:

> The *trustee* may recover from property securing an allowed secured claim
> the reasonable, necessary costs and expenses of preserving, or disposing
> of, such property to the extent of any benefit to the holder of such claim.

11 U.S.C. § 506(c) (emphasis added).

42.    Moreover, the Supreme Court, in a unanimous opinion, had "little

difficulty" in rejecting the notion that any party (including administrative claimants or parties in

interest under Section 1109) other than a trustee or Debtor in Possession can use this section to

recover on its claims.  *Hartford Underwriters Insurance Co. v. Union Planters Bank, N.A.*, 530

U.S. 1, 6, 8-9, 14 (2000) (finding that the language of the Bankruptcy Code is clear and rejecting

the arguments that pre-code practice or a lack of incentive on the part of the trustee would merit

any other interpretation).  The Court specifically noted the problematic nature of allowing other

creditors to have a say in the use of Section 506(c):

> Allowing recovery to be sought at the behest of parties other than the
> trustee could . . .impair the ability of the bankruptcy court to coordinate
> proceedings, as well as the ability of the trustee to manage the estate . . .
> Further, where unencumbered assets were scarce, creditors might attempt
> to use § 506(c) even though their claim . . .was quite weak.  The
> possibility of being targeted for such claims by various administrative
> claimants could make secured creditors less willing to provide postpetition
> financing.

*Hartford Underwriters*, 530 U.S. at 13.   And, as has been stated and re-stated several times

herein, it is the *Prepetition Lenders* who are effectively providing the postpetition financing in

this case.

43.    Here, the Debtors are well within the zone of good business judgment to

agree to waive Section 506(c) claims in order to obtain the use of the prepetition cash collateral

and to avoid a fight with the Prepetition Agent and Prepetition Lenders over the priming of their

valid liens by the proposed DIP financing.  Taking into account all of the facts and

circumstances, courts are generally disinclined to second-guess business decisions, particularly

decisions relating to incurrence of postpetition indebtedness.  *See, e.g., In the Matter of*

*Federated Department Stores, Inc.*, No. 1-90-00130, 1990 Bankr. LEXIS 472, at *8-12 (Bankr.

S.D. Ohio 1990).  This Court should allow the Debtors' business judgment to stand and overrule

the objections to the Debtors' waiver of Section 506(c) claims.

44.    Confronted with the need to use prepetition cash collateral and to obtain

priming DIP financing in order to operate their businesses, the Debtors exercised their business

judgment to waive Section 506(c) claims as part of negotiations to obtain the use of the

prepetition cash collateral. There are numerous examples in this District where courts have

entered orders approving a debtor's exercise of its business judgment to waive Section 506(c)

claims in connection with the use of prepetition cash collateral and obtaining postpetition

financing that primes prepetition liens.  *See, e.g., In re RCN Corp.*, No. 04-13638 (RDD), ¶ 14

(Bankr.S.D.N.Y. June 22, 2004)(Drain, J.); *In re Loral Space & Communications LTD, et al.*,
03-41710 (RDD), ¶ 10 (Bankr.S.D.N.Y Aug. 22, 2003); *In re Tower Automotive, Inc.*, No. 05-
10578, ¶ 7 (Bankr. S.D.N.Y. Feb. 28, 2005) (Gropper, J.); *In re FutureLink Corp.*, No. 01-14543,
¶ 20 (Bankr. S.D.N.Y. Nov. 13, 2001) (Lifland, J.); *In re Bethlehem Steel Corporation*, No. 01-
15288, ¶ 20 (Bankr. S.D.N.Y. Nov. 5. 2001) (Lifland, J.); *In re The Singer Company N.V.*, No.
99-10578, ¶ 15 (Bankr. S.D.N.Y. Oct. 21, 1999) (Lifland, J.).

   45. Likewise, automotive parts manufacturers that enter bankruptcy in other
jurisdictions have also waived Section 506(c) claims in order to use prepetition cash collateral
and to obtain postpetition financing that primes prepetition liens. *See, e.g., In re Collins Aikman
Corp.*, No. 05-55927, ¶ 20 (Bankr.E.D.Mich.2005); *In re Meridian Automotive Systems –
Composites Operations, Inc.*, No. 05-11168, ¶ 9 (Bankr. D. Del. Jun. 30, 2005) (Walrath, J.); *In
re Federal Mogul Corp.*, No. 01-10578, ¶ 20 (Bankr. D. Del. Nov. 21, 2001) (Robinson, J.).
These precedents, along with the testimony presented at the First Day Hearing evidencing the
Debtors' need to use prepetition collateral and obtain postpetition financing that primes
prepetition liens, demonstrate that the Debtors reasonably exercised their business judgment by
agreeing to the waiver of Section 506(c) claims.

   46. The Debtors' decision to waive Section 506(c) claims is further supported
by the fact that the DIP Financing permits the Debtors to utilize prepetition cash collateral in
connection with the ongoing business operations and includes an extraordinarily large Carve Out
of $35,000,000 that essentially serves the same purpose as a Section 506(c) surcharge.
Therefore, having not objected to the Carve Out, the Prepetition Agent should be protected from
surcharges for the expenses of administering the Debtors' estates, particularly since the
Prepetition Agent and Prepetition Lenders are not statutorily or otherwise responsible for

payment of such expenses.  *See In re Inteliquest Media Corporation*, 326 B.R. 825, 831 (B.A.P.

9th Cir.2005) (affirming Bankruptcy Court denial of motion to surcharge a secured creditor for

administrative expenses incurred by the Debtors, the court noted that Section 506(c) waivers "are

among the building blocks upon which successful estate administration is based" since they

induce the secured creditor to allow use of its cash collateral and that "there are other avenues by

which Appellants could have protected their attorney's fees; the collection of a prepetition

retainer and securing a carve-out of the creditor's collateral being two commonly used

methods.").

        47.     The Prepetition Agent has not objected to the $35 million Carve Out that

is available even upon the occurrence of an Event of Default on the understanding that they will

not run the risk of additional surcharges pursuant to Section 506(c).  In other words, to deny the

requested Section 506(c) waiver would result in the Prepetition Lenders paying for these

expenses twice – first by allowing proceeds from the cash collateral to be used to fund expenses,

with liens and superpriority claims subject to amounts owed under the Carve Out, then again if

the Court permits a surcharge of the prepetition collateral pursuant to Section 506(c) of the

Bankruptcy Code.  *See In re IBI Security Service, Inc.*, 133 F.3d 205, 209 (2d Cir. 1998)

(reversing Bankruptcy Court and District Court orders permitting surcharge pursuant to Section

506(c) despite existing settlement agreement that separately funded expenses of disposing

collateral, the court stated "the Expenses obviously need only be paid once.  If the Settlement

Agreement contemplated that the Expenses could be paid under §506(c) before the remaining

proceeds were applied to [secured lender's claim], there would have been no need to provide for

payment of the Expenses again [in separate provision of the Settlement Agreement]").

48.    Moreover, the Carve Out should be viewed as a superior alternative from the perspective of the Debtors and Committee since the Carve Out alone provides ample protection to the Debtors' and the Committees' professionals, as well as the United States Trustee, without requiring them to demonstrate that they have provided services which were of benefit to the Prepetition Lenders as required by Section 506(c).  *See Gen. Elec. Credit Corp. v. Peltz (In re Flagstaff Foodservice Corp.)*, 762 F.2d 10, 12 (2d Cir. 1985) (holding that administrative expenses are not recoverable under Section 506(c) absent a showing by the trustee that expenses were "primarily for the benefit of the [secured] creditor and that the creditor directly benefited from the expenditure").

49.    In addition, as previously noted, the Prepetition Lenders have not objected to being primed by the DIP Financing or the use of its prepetition cash collateral to afford the Debtors an opportunity to reorganize, thereby also allowing the Committee's constituents an enhanced opportunity for recovery.  Therefore, in light of the extraordinary concession by the Prepetition Lenders to fund the Debtors' reorganization efforts, it is entirely equitable for the Debtors to provide them with the very routine protection against additional diminution of their Prepetition Collateral by way of an involuntary surcharge.  For all of the foregoing reasons, the waiver of Section 506(c) claims should be granted.

**(vi)    Intercompany Claims Should Not be Subordinate Just to the DIP Liens.**

50.    The Committee asserts without any justification that intercompany claims should be secured by liens junior only to the liens securing the DIP Financing.[11]  Essentially, the

---

[11]    Even the Pension Benefit Guaranty Corporation – which has a vested interest in the treatment of intercompany claims – has agreed that liens securing intercompany claims shall be junior to the Superpriority Claims, the DIP Liens, the Adequate Protection Obligations, the Junior Adequate Protection Liens, the Replacement Liens and to any claims against such Beneficiary Debtor that are expressly senior to, and on a parity with, or carved out, from such liens and claims (as all such terms are defined in the Final DIP Order).  The Final DIP Order ¶ 20.

Committee is advocating the extraordinary and unprecedented notion that a borrower (the

Debtors) should be able to prime the position of its secured lender.   As of the Petition Date, the

Prepetition Lenders had valid, perfected enforceable liens on the intercompany obligations owed

to its loan parties and any proceeds thereof.   The Interim DIP Order (and proposed Final DIP

Order) operates merely to preserve the status quo by granting replacement liens in the same

collateral, subject of course to the priming liens in favor of the DIP Lenders.   The interests of

each Debtor's estate is sufficiently and appropriately protected by postpetition liens and claims

that rank behind the adequate protection to the Prepetition Lenders and the Setoff Claimants;

anything more would be both illogical and inequitable.

## **CONCLUSION**

51.    For the foregoing reasons, the Setoff Claimants' objections, to the extent

not withdrawn, and the Committee's objections, should be overruled.

Dated: New York, New York
       October 26, 2005

SIMPSON THACHER & BARTLETT LLP


By: _/s/ Kenneth S. Ziman_____
Bruce D. Angiolillo (BA-9271)
Kenneth S. Ziman (KZ-2486)
William T. Russell, Jr. (WR-0998)

425 Lexington Avenue
New York, New York 10017
Telephone:    (212) 455-2000
Facsimile:    (212) 455-2502

ATTORNEYS FOR THE PRE-PETITION AGENT