# EXHIBIT A

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) ) Chapter 11 ) |
| LORAL SPACE & COMMUNICATIONS LTD., *et al.*, | ) Case No. 03-41710 (RDD) ) ) Jointly Administered |
| Debtors. | ) ) |

### FINAL ORDER (I) AUTHORIZING DEBTORS (A) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. §363, AND (B) TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e), (II) GRANTING ADEQUATE PROTECTION TO LENDERS PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364, AND (III) GRANTING RELATING RELIEF

Upon the motion (the "**Motion**"), dated July 15, 2003, of Loral Space &

Communications Ltd. (the "**Company**") and its affiliated debtors, each as debtor and

debtor-in-possession (collectively, the "**Debtors**"), in the above-captioned cases (the

"**Cases**") pursuant to Sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3),

364(d)(1) and 364(e) of title 11 of the United States Code, 11 U.S.C. §§101, et seq. (the

"**Bankruptcy Code**"), and Rules 2002, 4001 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**"), seeking, among other things:

      (1)  authorization for the Debtors to use Cash Collateral (as defined

below) pursuant to Section 363 of the Bankruptcy Code and subject to the

terms and conditions set forth herein;

      (2)  the granting of adequate protection to the Agents and the

Lenders (each as defined below, and together, the **"Credit Agreement**

**Parties"**) with respect to, *inter alia*, such use of Cash Collateral and any diminution in the value of the Pre-Petition Collateral (as defined below) granted under or in connection with (a) that certain Amended and Restated Credit Agreement dated as of December 21, 2001 (as heretofore amended, supplemented or otherwise modified, the "**SpaceCom Credit Agreement**") among Loral SpaceCom Corporation ("**SpaceCom**"), the several banks and other financial institutions from time to time parties thereto (the "**SpaceCom Lenders**") and Bank of America, N.A., in its capacity as administrative agent for the SpaceCom Lenders (in such capacity or as Collateral Agent for the SpaceCom Lenders, the "**SpaceCom Agent**") and the related Guarantee Agreement dated as of December 21, 2001 (as heretofore amended, supplemented or otherwise modified, the "**SpaceCom Guarantee**") by Loral Space & Communications Corporation and certain subsidiaries of SpaceCom in favor of the SpaceCom Agent, (b) that certain Credit Agreement dated as of November 17, 2000 (as heretofore amended, supplemented or otherwise modified, the "**Satellite Credit Agreement**", together with the SpaceCom Credit Agreement, the "**Credit Agreements**") among Loral Satellite, Inc. ("**Satellite**"), the several banks and other financial institutions from time to time parties thereto (the "**Satellite Lenders**", together with the SpaceCom Lenders, the "**Lenders**"), and Bank of America, N.A., in its capacity as administrative agent for the Satellite Lenders (in such capacity

(NY) 02826/063/CTPAPERS/final.cashcollateral.order.doc

or as Collateral Agent for the Satellite Lenders, the "**Satellite Agent**",

together with the SpaceCom Agent in its capacity as such, the "**Agents**")

and the related Guarantee dated as of November 17, 2000 (as heretofore

amended, supplemented or otherwise modified, the "**Satellite**

**Guarantee**") by the Company in favor of the Satellite Agent, (c) that

certain Security Agreement dated as of December 21, 2001 among

SpaceCom, the other grantors party thereto and the Agents (as heretofore

amended, supplemented or otherwise modified, the "**SpaceCom Security**

**Agreement**"), (d) that certain Second Intercreditor and Subordination

Agreement dated as of March 31, 2003 among the Agents and Loral Space

& Communications Corporation (as heretofore amended, supplemented or

otherwise modified, the "**SpaceCom Intercreditor Agreement**" and

collectively with the SpaceCom Credit Agreement, the SpaceCom

Guarantee, the SpaceCom Security Agreement and the other guarantee

agreements, security agreements, pledge agreements, mortgages, deeds of

trust and all other security and other documentation executed in

connection therewith (including, for the avoidance of doubt, any

obligations under subparagraph (iii) of the definition of SpaceCom

Indebtedness in the SpaceCom Security Agreement, the "**SpaceCom**

**Existing Agreements**"), (e) (i) that certain Amended and Restated

Collateral Agreement dated as of November 17, 2000 among Satellite, the

other grantors party thereto, and the Satellite Agent (the **"Collateral**

**Agreement"**), (ii) the Amended and Restated Collateral Agency

Agreement dated as of November 17, 2000 among Satellite, the guarantors

party thereto and the Satellite Agent (the **"Collateral Agency**

**Agreement"**) and (iii) that certain Amended and Restated Cash Collateral

Agreement dated as of November 17, 2000 made by Satellite in favor of

the Satellite Agent (the **"Cash Collateral Agreement"**), ((i), (ii) and (iii),

in each case as heretofore amended, supplemented or otherwise modified,

the "**Satellite Security Agreements**"), and (f) that certain Intercreditor

and Subordination Agreement dated as of December 21, 2001 among the

Agents and SpaceCom (as heretofore amended, supplemented or

otherwise modified, the "**Satellite Intercreditor Agreement**" and

together with the SpaceCom Intercreditor Agreement, the "**Intercreditor**

**Agreements**", and, collectively with the Satellite Credit Agreement, the

Satellite Guarantee, the Satellite Security Agreements, and the other

guarantee agreements, security agreements, pledge agreements,

mortgages, deeds of trust and all other security and other documentation

executed in connection therewith (including, for the avoidance of doubt,

any Hedge Agreement (as defined in the Satellite Credit Agreement), the

"**Satellite Existing Agreements**" and together with the SpaceCom

Existing Agreements, the "**Existing Agreements**");

    (3)  authorization for SpaceCom to obtain certain limited secured

post-petition financing from Satellite in connection with the Master Lease

4

(as defined below), and for all of the SpaceCom Obligor Debtors to be jointly and severally liable for SpaceCom's obligations in connection with such financing;[1]

(4)  authorization for Cyberstar (as defined below) to obtain secured post-petition financing from SpaceCom upon the terms and conditions contained herein;

(5)  the granting of certain superpriority claims to Satellite, SpaceCom, the Agents and the Lenders payable from, and having recourse to, all pre-petition and post-petition property of the Obligor Debtors' or Cyberstar's estates and all proceeds thereof (including any proceeds of Avoidance Actions (as defined below)), subject to the Carve Out (as defined below), which is an "Extraordinary Provision" (an "**Extraordinary Provision**") under General Order No. M-274 of the United States Bankruptcy Court for the Southern District of New York (the "**General Order**");

(6)  the limitation of the Debtors' right to surcharge against Collateral pursuant to Section 506(c) of the Bankruptcy Code, which is an Extraordinary Provision under the General Order;

(7)  the inclusion of a right to terminate use of Cash Collateral if any Debtor challenges any liens granted pursuant to the Existing

---

[1] "**SpaceCom Obligor Debtors**" shall mean SpaceCom, Loral Space & Communications Corporation, Space Systems/Loral, Inc. ("**SSL**"), Loral Communications Services, Inc. and Loral Ground Services LLC.

Agreements or any prepetition conduct of the Agents or Lenders or if any

unstayed order adverse to the Credit Agreement Parties is granted as a

result of such challenge by any other person, which is an Extraordinary

Provision under the General Order;

(8)  pursuant to Bankruptcy Rule 4001, that an interim hearing (the

"**Interim Hearing**") on the Motion be held before this Court to consider

entry of the proposed interim order annexed to the Motion (a) authorizing

SpaceCom, on an interim basis, to enter into the Master Lease Loan (as

defined in the Interim Order), (b) authorizing the Debtors' use of Cash

Collateral, and (c) granting the adequate protection described herein; and

(9)  that this Court schedule a final hearing (the "**Final Hearing**")

to be held within 30 days of the entry of the Interim Order to consider

entry of a final order authorizing the Master Lease Loan, the use of Cash

Collateral and granting the adequate protection described herein on a final

basis, as set forth in the Motion.

Due and appropriate notice of the Motion, the relief requested therein and the

Final Hearing having been served by the Debtors on the twenty largest unsecured

creditors of the Debtors on a consolidated basis, the Agents and on the United States

Trustee for the Southern District of New York;

The Interim Hearing having been held by this Court on July 15, 2003 at which the

Court (a) issued and entered the Interim Order authorizing the use of Cash Collateral and

(NY) 02826/063/CTPAPERS/final.cashcollateral.order.doc

the post-petition financing (the "**Interim Order**") and (b) scheduled a Final Hearing to consider entry of a final order as set forth in the Motion and Interim Order;

The Final Hearing having been held by this Court on August 22, 2003; and

Upon the record of the Interim Hearing and the Final Hearing including the clarifications of this Order set forth on the record, and after due deliberation and consideration and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.    *Jurisdiction.* This Court has core jurisdiction over the Cases, this Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§157(b) and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    *Notice.* Under the circumstances, the notice given by the Debtors of the Motion, the Interim Hearing and the Final Hearing, constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c).

3.    *Debtors' Stipulations.* Without prejudice to the rights of any other party (but subject to the limitations thereon and the other parties' rights contained in paragraph 14 below), the Debtors admit, stipulate and agree that:

(a)    (i) as of the filing of the Debtors' chapter 11 petitions (the "**Petition Date**"), the Debtors were, under the Existing Agreements to which they are a party, indebted and liable to (A) the SpaceCom Lenders, without defense, counterclaim or offset of any kind, in the aggregate principal amount of approximately $535,000,000.00 in respect of loans made and in the aggregate principal amount of approximately $12,656,958.00 in respect of letters of credit issued (the "**Pre-Petition Letters of**

**Credit"**), in each case, by the SpaceCom Lenders pursuant to, and in accordance with the terms of, the SpaceCom Existing Agreements, plus, in each case, interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees that are chargeable or reimbursable under the SpaceCom Existing Agreements), charges and other obligations incurred in connection therewith as provided in the SpaceCom Existing Agreements and (B) the Satellite Lenders, without defense, counterclaim or offset of any kind, in the aggregate principal amount of approximately $426,500,000.00 in respect of loans made by the Satellite Lenders pursuant to, and in accordance with the terms of, the Satellite Existing Agreements, plus, in each case, interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees that are chargeable or reimbursable under the Satellite Existing Agreements), charges and other obligations incurred in connection therewith as provided in the Satellite Existing Agreements ((A) and (B) collectively, together with the obligations of any Debtors pursuant to any Bank of America Hedge Agreements and JPMorgan Chase Hedge Agreements (in each case, as defined below), the "**Pre-Petition Obligations**"), (ii) the Pre-Petition Obligations constitute legal, valid and binding obligations of the applicable Debtors, enforceable in accordance with their respective terms (other than in respect of the stay of enforcement arising from Section 362 of the Bankruptcy Code), (iii) no portion of the Pre-Petition Obligations is subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law and (iv) the Debtors do not have, and hereby forever release, any claims, counterclaims, causes of action, defenses or setoff rights, whether arising under

the Bankruptcy Code or otherwise, against the Lenders, the Agents and their respective affiliates, agents, officers, directors, employees, representatives, attorneys, and advisors arising in connection with any Pre-Petition Obligations, the Existing Agreements, any loan, letter of credit or commitment thereunder or any use of the proceeds thereof, or any other agreements, instruments, engagements or transactions contemplated by or relating to any of the foregoing;

(b)      the liens and security interests granted to the Agents pursuant to and in connection with the Existing Agreements (including, without limitation, all security agreements, pledge agreements, mortgages, deeds of trust and other security documents executed by any of the Debtors in favor of the Agents, for their benefit and for the benefit of the Lenders) are (i) valid, binding, perfected and enforceable liens and security interests, as described in the Existing Agreements, in the personal and real property specified therein (the "**Pre-Petition Collateral**"), (ii) not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law and (iii) subordinate only to (A) the Carve Out (as defined below) and (B) valid, perfected and unavoidable liens permitted under the Existing Agreements to the extent such liens are permitted to be and are senior to or *pari passu* with the liens of the Agents on the Pre-Petition Collateral; and

(c)      the aggregate value of the Pre-Petition Collateral exceeds the aggregate amount of the Pre-Petition Obligations.

4.      *Findings Regarding the Use of Collateral.*

(a)      Good cause has been shown for the entry of this Order.

9

(NY) 02826/063/CTPAPERS/final.cashcollateral.order.doc

(b)  The SpaceCom Obligor Debtors and Satellite Obligor Debtors[2]

(collectively, the "**Obligor Debtors**") have an immediate need to use Cash Collateral in

order to permit, among other things, the orderly continuation of the operation of their

businesses, to maintain business relationships with vendors, suppliers and customers, to

make payroll, to make capital expenditures and to satisfy other working capital needs.

The ability of the Obligor Debtors to obtain sufficient working capital and liquidity

through the use of Cash Collateral, incurrence of new indebtedness for borrowed money

and other financial accommodations is vital to the preservation and maintenance of the

going concern values of the Obligor Debtors and to a successful reorganization of the

Obligor Debtors.

(c)  Loral Cyberstar ("**Cyberstar**") is unable to obtain financing from

sources other than SpaceCom on more favorable terms and is unable to obtain adequate

unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an

administrative expense.  Cyberstar is also unable to obtain secured credit allowable under

Sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without Cyberstar

granting to SpaceCom, subject to the Carve Out as provided for herein, the Cyberstar

Liens and the Cyberstar Superpriority Claims (each as defined below) under the terms

and conditions set forth in this Order.  The Credit Agreement Parties have objected to the

use by the Obligor Debtors of their Pre-Petition Collateral, including Cash Collateral and

to the Cyberstar Loans (as defined below) except on the terms of this Order.

---

[2] "**Satellite Obligor Debtors**" shall mean Satellite, Loral Space and Communications Corporation ("Loral Delaware") and the Company.

(NY) 02826/063/CTPAPERS/final.cashcollateral.order.doc

(d)     The terms of the Cyberstar Loans and the use of Cash Collateral are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration.  The terms of the use of Cash Collateral and the Cyberstar Loans have been negotiated in good faith and at arm's length among the Debtors, the Agents, the Committee and the Lenders.  All of Cyberstar's obligations and indebtedness arising under, in respect of or in connection with the Cyberstar Loans shall be deemed to have been extended by SpaceCom in good faith, as that term is used in Section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by Section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of Section 364(e) of the Bankruptcy Code if this Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(e)     The Debtors have requested entry of this Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).  Absent entry of this Order, the Debtors' estates will be immediately and irreparably harmed.  Authorization of the Cyberstar Loans and the use of Cash Collateral in accordance with this Order is therefore in the best interest of the Debtors' estates.

5.     *Cash Collateral*.  Subject to parties' rights under paragraph 14 hereof, all funds of the Obligor Debtors (including any funds of such Debtors on deposit at any Lender or at any other institution) as of the Petition Date are cash collateral of the applicable Credit Agreement Parties within the meaning of Section 363(a) of the Bankruptcy Code.  In addition, all cash proceeds of Pre-Petition Collateral received after

the Petition Date are cash collateral of the Lenders within the meaning of Section 363(a)

of the Bankruptcy Code. Furthermore, to the extent that any funds of any Obligor Debtor

were on deposit with any Lender as of the Petition Date, such funds were subject to rights

of setoff. By virtue of such setoff rights, such funds are subject to a lien in favor of such

Lenders pursuant to Sections 506(a) and 553 of the Bankruptcy Code. The Lenders are

obligated, to the extent provided for in the Existing Agreements, to share the benefit of

such liens with the other Lenders party to such Existing Agreements based upon their

respective pro rata shares of the obligations under the Existing Agreements. All such

cash collateral (including with limitation, funds subject to such setoff rights) is referred to

herein as "**Cash Collateral**".

      6.    *Use of Cash Collateral.* (a) Subject to the provisions of this Order

(including the proviso of the last sentence of this subparagraph (a)) and to the condition

that the Lenders are granted adequate protection as hereinafter set forth, the Debtors

specified in the Approved Forecast (as defined below) are hereby authorized to use Cash

Collateral from the Effective Date until the Termination Date (each as defined below) to

fund the types of disbursements specified in the line items set forth in the Approved

Forecast for each entity included therein; *provided* that under no circumstance shall the

Debtors permit the aggregate amount of cash disbursements by SS/L, Loral Skynet (a

division of SpaceCom) (**"Skynet"**) or SpaceCom from July 7, 2003 (the **"Beginning

Date"**) until the last day of any week, beginning with the week ending July 25, 2003, to

exceed 110% of the aggregate amount of cash disbursements projected for the applicable

Debtor, in the Approved Forecast during the applicable period (excluding (x) in the case

(NY) 02826/063/CTPAPERS/final.cashcollateral.order.doc

of SS/L, disbursements of a type specified in line items relating to launch costs, insurance
or "known required subcontractor payments", (y) in the case of Skynet, any payments
under the Master Lease (as defined below) and (z) in the case of Satellite, any Master
Lease Loans (as defined in the Interim Order)).  As used herein, "**Approved Forecast**"
(i) means initially, the 13-week cash forecast delivered by the Company to the Agents
and the steering committee appointed by the Agents (the "**Steering Committee**") and
designated by the Company and the Agents as the Approved Forecast prior to the Petition
Date; (ii) if the Business Plan (as defined below) (including a weekly cash forecast for
the thirteen weeks ended November 14, 2003 included therein) is approved by both the
"Majority Lenders" as defined in the Satellite Credit Agreement (the "**Satellite Required**
**Lenders**") and the "Required Banks" as defined in clause (ii) of the definition thereof in
the SpaceCom Credit Agreement (the "**SpaceCom Required Lenders**"), means
thereafter, until November 14, 2003, the weekly cash forecast included in the Business
Plan and (iii) if the Final Weekly Forecast (as defined below) is approved by the Satellite
Required Lenders and SpaceCom Required Lenders, means thereafter the Final Weekly
Forecast.  The Debtors' right to use Cash Collateral shall terminate automatically on the
Termination Date; *provided* that after the Termination Date, the Debtors are hereby
authorized to use Cash Collateral to pay salaries and wages in accordance with the
Approved Forecast but solely to the extent such salaries and wages were accrued and
unpaid prior to the Termination Date and are included in the "Payroll" and "Payroll
Taxes" line items for SpaceCom, "Payroll-Baseline" line item for SS/L and "Wages &
Salaries" line item for Skynet and Cyberstar in the Approved Forecast.

13

(b)    The "**Effective Date**" shall be deemed to have occurred upon entry of the Interim Order.

(c)    The "**Termination Date**" shall occur immediately upon the occurrence of any event described in clause (i), (ii), (xvii), (xviii), (xix), (xxii) or (xxiv) below or, if any event described in any other clause below shall occur, three business days after any Agent at the request of the Satellite Required Lenders or SpaceCom Required Lenders, as applicable, shall deliver written notice to the Company (which may be delivered at any time after the occurrence of any such event) that the Termination Date has occurred (each event below, a "**Termination Event**"):

(i)    September 12, 2003 (the "**Outside Date**"); *provided* that if the Business Plan (as defined below) including the intercompany allocations, funds flows, transfers and payments contained therein is approved by the Satellite Required Lenders and SpaceCom Required Lenders prior to September 12, 2003, the Outside Date shall be extended to November 14, 2003 without further order of this Court; *provided further* that if the Final Weekly Forecast is approved by the Satellite Required Lenders and the SpaceCom Required Lenders prior to November 14, 2003, the Outside Date shall be extended to December 31, 2003 without further order of this Court;

(ii)    any Debtor shall fail to comply with paragraph 6(d) or 8(c) of this Order;

(iii)    any Debtor shall fail to comply with any of the terms or conditions of this Order other than paragraph 6(d) or 8(c);

(iv)    any Debtor shall seek any modification or extension of this Order without the prior written consent of the Agents, the Satellite Required Lenders and the SpaceCom Required Lenders (unless such modification is not material, in which case the

14

Debtors shall not seek such modification without the consent of the Agents (which consent shall not unreasonably be withheld)) or any order shall be entered, other than with the consent of the Agents, the Satellite Required Lenders and the SpaceCom Required Lenders, reversing, amending, supplementing, staying, vacating or otherwise modifying this Order in any material respect adverse to any Agents or Lenders or terminating the use of Cash Collateral by the Debtors pursuant to this Order;

(v)    the aggregate amount of cash disbursements by any of SS/L, Satellite, Skynet and SpaceCom, from the Beginning Date until the last day of any week, beginning with the week ending July 25, 2003, exceeds 110% of the aggregate amount of cash disbursements projected for the applicable Debtor in the Approved Forecast during the applicable period (excluding (x) in the case of SS/L and SpaceCom, line items related to launch vehicle costs, insurance and known required subcontractor payments and (y) in the case of Skynet and SpaceCom, any payments under the Master Lease), provided that as to Satellite, such test shall commence with the week beginning September 15, 2003;

(vi)    the aggregate amount of payments in respect of "critical vendor payments" (identified in the Approved Forecast as "Known Required Subcontractor Payments") by any Debtors, from the Beginning Date until the last day of any week, beginning with the week ending July 25, 2003, exceeds 100% of the aggregate amount of "Known Required Subcontractor Payments" projected for SS/L in the Approved Forecast during the applicable period;

(vii)    the aggregate amount of cash receipts by any of SS/L, Skynet, SpaceCom and Satellite, from the Beginning Date until the last day of any week, beginning with the week ending July 25, 2003 (or, in the case of SS/L, with the week ending August 8, 2003), is less than 90% of the aggregate amount of cash receipts projected for the applicable entity in

the Approved Forecast during the applicable period (excluding (x) in the case of SS/L and SpaceCom, line items related to launch vehicle costs and insurance, (y) in the case of SpaceCom, any Master Lease Loans and (z) in the case of Satellite, any payments related to the Master Lease), provided that as to SpaceCom and SSL, such test shall commence with the week beginning September 15, 2003;

(viii)   the cumulative aggregate disbursements made by SpaceCom (through Skynet) on behalf of Cyberstar on or after the Petition Date shall exceed the cumulative aggregate payments made by Cyberstar to SpaceCom (through Skynet) by more than $1,000,000;

(ix)   (i) SpaceCom shall fail to calculate the corporate allocation amounts owed to it by Satellite, Cyberstar, Loral Orion Inc. ("**Orion**") and Orion Data Inc. (each a "**Payor Entity**") each month in accordance with the historical formula used by Spacecom in a manner acceptable to the Agents and invoice the Payor Entities for such amounts; provided that the allocation of reorganization expenses shall not be pursuant to the historical formula or (ii) any Payor Entity shall fail to pay the corporate allocation owed by it to SpaceCom within 5 business days of the end of each month;

(x)   the Debtors transfer, loan or otherwise provide any cash or cash equivalents to Loral Skynet do Brasil ("**Brasil**") other than as expressly provided for in the Business Plan or Final Weekly Forecast;

(xi)   the Debtors shall fail to (i) calculate the amounts owed by Satellite to Skynet for items included in the "Satellite – TT&C Telstar 6&7" line item in the Approved Forecast pursuant to the Amended and Restated Agreement between Loral Satellite, Inc. and Loral SpaceCom Corporation Concerning Professional Services or (ii) pay such amounts when forecast to be paid in the Approved Forecast;

(xii)   the Debtors shall fail to (i) calculate the amounts owed by Satellite to SS/L for items included in the "Satellite – Telstar 6 (Orbitals)" line item in the Approved Forecast pursuant to Contract Amendment No. 3 to Contract No LLJ108E between Loral Skynet, a division of Loral SpaceCom Corporation and Space Systems/Loral or (ii) pay such amounts when forecast to be paid in the Approved Forecast;

(xiii)  Cyberstar shall fail to (i) pay SS/L the amounts included in the Approved Forecast in the line item "Cyberstar – Mabuhay Payments" for the weeks ended July 11 and August 1, 2003, by August 26, 2003 or (ii) make the payments included in the "Cyberstar – Mabuhay Payments" line item for the period following the week ended August 1, 2003 as shown in the Approved Forecast;

(xiv)   Orion shall fail to pay to Skynet the Orion fees calculated pursuant to the contract under which Orion pays to Skynet such fees covering the operations, management, marketing, telemetry, tracking and control of Orion's satellites on a monthly basis;

(xv)    the aggregate amount of cash or cash equivalents held (a) by Satellite at any time is less than $4 million prior to October 31, 2003 and $10 million thereafter or (b) by the Company at any time is less than $3.25 million;

(xvi)   (a) except as modified herein or with the written consent of the Agents, any Debtor shall fail to make any payment or fail to comply with any other material terms or conditions or seek rejection of the Amended and Restated Master Lease Agreement dated as of November 17, 2000 between Satellite and SpaceCom (the "**Master Lease**") or (b) the Master Lease shall be rejected pursuant to an order of this Court;

(xvii)  (a) an Asset Purchase Agreement with Intelsat, Ltd. ("Intelsat"), providing for the proposed purchase of satellites and other assets (the "**Satellite Assets**") by

Intelsat, substantially in the form and materially on the same economic terms delivered to the Agents and the Steering Committee prior to the Petition Date, is not executed by Intelsat and the applicable Debtors by the date that is five days after the Petition Date (as signed, the "**Intelsat Agreement**"); (b) the Intelsat Agreement is amended in any material respect unfavorable to any Debtor or the Lenders or the Intelsat Agreement is terminated (other than a termination because the Debtors have accepted a higher or better offer pursuant to the bid procedures previously approved by this Court); or (c) an order approving the sale of the Satellite Assets pursuant to the terms of the Intelsat Agreement (or any higher and better offer resulting from the bidding process) is not entered by November 1, 2003;

(xviii)   an application shall be filed by any Obligor Debtor for the approval of any superpriority claim or any lien in any of the Cases of any Obligor Debtor that is *pari passu* with or senior to the Adequate Protection Claims or Adequate Protection Liens, or there shall be granted any such pari passu or senior superpriority claim or lien, as to any Obligor Debtor except any such superpriority claims and liens arising hereunder or pursuant to any other financing arrangements that are approved in writing by the Agents;

(xix)    the commencement of any action by any Debtor against the Agents or any Lender with respect to the Existing Agreements, including without limitation any action to avoid or subordinate any Pre-Petition Obligations or any liens securing any Pre-Petition Obligations or, in the case of any such action commenced by any person other than a Debtor, the court enters an order granting any such relief and any such order is not subject to a stay;

(xx)     any order shall be entered granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest, lien or right of setoff to permit foreclosure (or the granting of a deed in lieu of

(NY) 02826/063/CTPAPERS/final.cashcollateral.order.doc

foreclosure or the like), possession, set-off or any similar remedy with respect to any assets of any Obligor Debtor that have a value in excess of $1,000,000 in the aggregate;

(xxi)   except as permitted by the First Day Orders (as reviewed and approved by the Agents and included in the Approved Forecast), any Obligor Debtor (including all present and future Obligor Debtors) shall make any payment in respect of a pre-petition claim in excess of $100,000 individually or $500,000 in the aggregate;

(xxii)   (A) any of the Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or any Debtor shall file a motion or other pleading seeking the dismissal of any of the Cases under Section 1112 of the Bankruptcy Code or otherwise; or (B) a trustee under Chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed or elected in any of the Cases, other than a Case in which the relevant Debtor has assets of less than $1,000,000;

(xxiii)   (A) Conway Del Genio Gries & Co., LLC shall cease to be retained as financial advisor for the Company, Satellite or SpaceCom and a replacement reasonably acceptable to the Satellite Required Lenders and SpaceCom Required Lenders shall not have been appointed within 10 days thereafter, (B) the Company shall cease to own all of the capital stock and voting interests in SpaceCom or Satellite or (C) the board of directors of SpaceCom or Satellite shall cease to consist of a majority of Continuing Directors of SpaceCom or Satellite, as applicable. **"Continuing Directors"** shall mean the directors of SpaceCom or Satellite, as applicable, on the Petition Date and each other director, if, in each case, such other director's nomination for election to the board of directors of either SpaceCom or

Satellite is recommended by at least a majority of the then Continuing Directors;

(xxiv) any material provision of this Order shall for any reason, cease to be valid and binding or any Debtor shall so assert in any pleading filed in any court;

(xxv) any failure to comply with Section 8.1, 8.2, 8.5, 8.6 or 8.8 of the SpaceCom Credit Agreement, Section 5.1, 5.2, 5.5, 5.6, 5.8 or 5.12 of the Satellite Credit Agreement, Section 5 of the SpaceCom Security Agreement, Section 6 to the Pledge Agreement dated as of December 21, 2001, Section 5 of the Second Amendment dated as of March 31, 2003 to the Satellite Credit Agreement, Section 6 of the Second Amended and Restated Pledge Agreement dated as of March 31, 2003, Section 4.4 of the Collateral Agency Agreement or Section 6 of the Cash Collateral Agreement;

(xxvi) [intentionally deleted];

(xxvii) any transponder lessee on the Telstar 6 or Telstar 7 satellite is transferred to another satellite of any Debtor (other than Telstar 6 or Telstar 7), other than for technical reasons or as requested by the lessee (not at the suggestion of any Debtor); or

(xxviii) bank concentration account number 1076-121464 held at Comerica Bank shall at any time have a balance in excess of $50,000; and any other concentration accounts of any Debtor maintained with any financial institutions in the United States shall not have their daily account balances swept into an account maintained at Bank of America, N.A.;

; *provided* that the Satellite Required Lenders may waive any Termination Event with respect to the Satellite Obligor Debtors, in which case the Termination Date shall be deemed not to have occurred with respect to the Satellite Obligor Debtors, and the SpaceCom Required Lenders may waive any Termination Event with respect to the SpaceCom Obligor Debtors, in which case the

Termination Date shall be deemed not to have
occurred with respect to the SpaceCom Obligor
Debtors. The Debtors shall immediately provide
notice to the Agents and the Committee (as defined
below) of the occurrence of any Termination Event.

(d)     On the last business day of each month commencing with August

2003, SpaceCom (through Skynet) shall pay to Satellite an amount agreed to by

SpaceCom, Satellite and the Agents, on account of the rent payable on such date in

connection with the Master Lease net of the amount agreed to between Satellite,

SpaceCom and the Agents as the appropriate monthly allocation in respect of

management, marketing, customer service and TT&C relating to the satellites that are the

subject of the Master Lease.[3]  The amount of these monthly net payments (which for

August 2003 shall be approximately $3.7 million) shall be without prejudice to the

Agents' and Committee's rights to challenge such agreed amounts.  The Debtors shall

provide the Committee with notice of the calculation of such monthly payments within 3

business days of making such payments.  Moreover, the Master Lease Loan in the

amount of $8,187,445 made by Satellite to SpaceCom in July, 2003 shall continue to

have all of the claims, rights, liens and priorities in respect of such loan set forth in the

Interim Order, all of which are incorporated herein by reference as if expressly set forth

herein.

(e)     For purposes hereof, the "**Carve Out**" means (i) all fees required to

be paid to the Clerk of the Bankruptcy Court and to the Office of the United States

_____

[3] This and the other references herein to corporate allocations shall be without prejudice to the
Agents' and Committee's rights to challenge such allocations, funds flows, transfers and payments as not
being appropriate in amount.

(NY) 02826/063/CTPAPERS/final.cashcollateral.order.doc

Trustee under section 1930(a) of title 28 of the United States Code and (ii) an amount not

exceeding $4,000,000 in the aggregate, which amount may be used after the occurrence

of the Termination Date, subject to the terms of this Order, including, without limitation,

paragraph 15 hereof, to pay fees or expenses incurred by the Obligor Debtors and the

Official Committee of Unsecured Creditors (the "**Committee**") in respect of (A)

allowances of compensation for services rendered or reimbursement of expenses awarded

by the Bankruptcy Court to the Obligor Debtors' or the Committee's professionals and

(B) the reimbursement of expenses allowed by the Bankruptcy Court incurred by

Committee members in the performance of their duties (but excluding fees and expenses

of third party professionals employed by such members) and of which amount up to

$100,000 in the aggregate may be applied towards the reasonable fees and disbursements

of a chapter 7 trustee in any liquidation of one or more Debtors pursuant to Chapter 7 of

the Bankruptcy Court, pursuant to section 726 of the Bankruptcy Code; *provided,*

*however,* that the dollar limitation in this clause 6(e)(ii) on fees and disbursements shall

neither be reduced nor increased by the amount of any compensation or reimbursement of

expenses incurred, awarded or paid to any party prior to the Termination Date or by any

fees, expenses, indemnities or other amounts paid to any Agent, Lender or their

respective attorneys and agents under the Existing Agreements or otherwise; and

*provided further* that nothing herein shall be construed to impair the ability of any party

to object to any of the fees, expenses, reimbursement or compensation described in

clauses (A) and (B) above.

22

(NY) 02826/063/CTPAPERS/final.cashcollateral.order.doc

(f)     The Carve Out shall be allocated among the Collateral and Pre-Petition Obligations of each of the Obligor Debtors as follows:  (i) to the extent the proceeds of any liquidation or foreclosure of the Collateral granted by such Obligor Debtor on a first lien basis exceeds the Pre-Petition Obligations of such Obligor Debtor, the Carve Out shall be allocated to (and satisfied from) such excess, and (ii) if after giving effect to clause (i) all or a portion of the Carve Out remains unallocated and unsatisfied, the Carve Out shall be allocated between the Collateral of and Pre-Petition Obligations owed to the SpaceCom Lenders and the Collateral of and Pre-Petition Obligations owed to the Satellite Lenders on a proportional basis calculated on the basis of the relative percentage recovery ratio for each (for example, if the recovery with respect to the Pre-Petition Obligations of the SpaceCom Lenders is 80% and the recovery with respect to the Pre-Petition Obligations of the Satellite Lenders is 40%, the relative percentage recovery ratio is 2:1 and the Carve Out will be allocated 2/3 to the Pre-Petition Obligations of the SpaceCom Lenders and 1/3 to the Pre-Petition Obligations of the Satellite Lenders).

7.     *Intercompany Transfers and Cyberstar Loans.*   No payments to or for benefit of any other Debtor or any non-Debtor affiliate shall be made by SpaceCom, SSL, Satellite, Orion, Cyberstar, Brazil or Loral Space & Communications Corporation other than those payments set forth in the Approved Forecast.  To the extent that any payments permitted under the Approved Forecast shall be made by SpaceCom (through Skynet) to Cyberstar, such payments shall be deemed to constitute loans (the "**Cyberstar Loan**") made by SpaceCom to Cyberstar.  Cyberstar shall repay the full amount of the Cyberstar

Loan to SpaceCom, in cash, on or before the Termination Date. Pursuant to Section

364(c)(1) of the Bankruptcy Code, Cyberstar's obligations to SpaceCom with respect to

the Cyberstar Loan (the "**Cyberstar Obligations**") shall constitute allowed claims with

priority over any and all administrative expenses, diminution claims and all other claims

against Cyberstar, now existing or hereafter arising, of any kind whatsoever, including,

without limitation, all administrative expenses of the kind specified in sections 503(b)

and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or

other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a),

507(b), 726, 1113 or 1114 of the Bankruptcy Code (the "**Cyberstar Superpriority**

**Claims**"), which Cyberstar Obligations shall be payable from and have recourse to all

pre- and post-petition property of Cyberstar and all proceeds thereof, subject only to the

payment of the Carve Out. As security for the Cyberstar Obligations, effective and

perfected upon the date of this Order and without the necessity of the execution or

recordation of filings of mortgages, security agreements, control agreements, pledge

agreements, financing statements or other similar documents, the following security

interests and liens are hereby granted to SpaceCom (all property identified in clauses (a)

and (b) below being collectively referred to as the "**Cyberstar Collateral**"), subject to

the provisions of paragraph 7(d) below and, after the occurrence of a Termination Event,

to the payment of the Carve Out (all such liens and security interests granted to

SpaceCom, pursuant to this Order, the "**Cyberstar Liens**"):

(a)    First Lien on Cash Balances and Unencumbered Property. Pursuant

to Section 364(c)(2) of the Bankruptcy Code, SpaceCom is hereby granted a valid,

(NY) 02826/063/CTPAPERS/final.cashcollateral.order.doc

binding, continuing, enforceable, fully-perfected first priority senior security interest in

and lien upon all pre- and post-petition property of Cyberstar (including without

limitation, all cash and cash collateral of Cyberstar (whether maintained with the Agents,

any Lender or otherwise) and any investment of such cash and cash collateral, inventory,

accounts receivable, other rights to payment whether arising before or after the Petition

Date, contracts, properties, plants, equipment, general intangibles, documents,

instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade

names, other intellectual property, capital stock of subsidiaries, and the proceeds of all

the foregoing), whether existing on the Petition Date or thereafter acquired, that, on or as

of the Petition Date is not subject to valid, perfected and non-avoidable liens

(collectively, "**Unencumbered Property**").  Unencumbered Property shall exclude

Cyberstar's claims and causes of action under Sections 502(d), 544, 545, 547, 548, 549

and 550 of the Bankruptcy Code, and any other avoidance actions under the Bankruptcy

Code (collectively, "**Cyberstar Avoidance Actions**"), but shall include any proceeds or

property recovered as a consequence of, unencumbered by or otherwise the subject of

successful Cyberstar Avoidance Actions.

      (b)   <u>Liens Junior to Certain Other Liens</u>.  Pursuant to Section 364(c)(3)

of the Bankruptcy Code, SpaceCom is hereby granted valid, binding, continuing,

enforceable, fully-perfected security interests in and liens upon all pre- and post-petition

property of Cyberstar (other than the property described in clause (a) of this paragraph 7,

as to which the liens and security interests in favor of SpaceCom will be as described in

such clause), whether now existing or hereafter acquired, that is subject to valid,

(NY) 02826/063/CTPAPERS/final.cashcollateral.order.doc

perfected and unavoidable liens in existence immediately prior to the Petition Date or to

valid and unavoidable liens in existence immediately prior to the Petition Date that are

perfected subsequent to the Petition Date as permitted by Section 546(b) of the

Bankruptcy Code, which security interests and liens in favor of SpaceCom are junior to

such valid, perfected and unavoidable liens.

(c)    Liens Senior to Certain Other Liens.  The Master Lease Loan Liens,

Cyberstar Liens and Adequate Protection Liens (as defined below) shall not be subject or

subordinate to (i) any lien or security interest that is avoided and preserved for the benefit

of the Obligor Debtors and their estates or Cyberstar, as the case may be, under Section

551 of the Bankruptcy Code, or (ii) except as provided below in paragraph 7(d), any liens

arising after the Petition Date including, without limitation, any liens or security interests

granted in favor of any federal, state, municipal or other governmental unit, commission,

board or court for any liability of the Obligor Debtors.

(d)    Relative Priority of Pre-Petition Obligations and Liens and Adequate

Protection Obligations and Liens.  The Adequate Protection Obligations of, and Adequate

Protection Liens granted by, any Obligor Debtor to the SpaceCom Lenders (and Agents

for the benefit of the SpaceCom Lenders) shall be immediately junior to any liens

securing the Pre-Petition Obligations of the SpaceCom Lenders, and the Adequate

Protection Obligations of, and Adequate Protection Liens granted by, any Obligor Debtor

to the Satellite Lenders (and Agents for the benefit of the Satellite Lenders) shall be

immediately junior to any liens securing the Pre-Petition Obligations of the Satellite

Lenders.  In each case where any Obligor Debtor owes Adequate Protection Obligations

to both the SpaceCom Lenders (and Agents for the benefit of the SpaceCom Lenders) and the Satellite Lenders (and Agents for the benefit of the Satellite Lenders), the Adequate Protection Obligations and Adequate Protection Liens of each group of Lenders will have the same relative priority as they would have if they were Pre-Petition Obligations owed to such group of Lenders and governed by the Intercreditor Agreement applicable to such Obligor Debtor.  If an Intercreditor Agreement does not apply to any Obligor Debtor, the Adequate Protection Obligations of, and Adequate Protection Liens granted by, such Obligor Debtor to the SpaceCom Lenders shall rank *pari passu* with the Adequate Protection Obligations of, and Adequate Protection Liens granted by, such Obligor Debtor to the Satellite Lenders.

8.      *Adequate Protection*.  Subject to parties' rights under paragraph 14 hereof, the Credit Agreement Parties are entitled, pursuant to Sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of their interest in the Pre-Petition Collateral, including the Cash Collateral, as to each of the Satellite Lenders and SpaceCom Lenders, for and equal in amount to the aggregate diminution in value of such Lender's interests in the Pre-Petition Collateral, including, without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of Cash Collateral and any other Pre-Petition Collateral, the granting of certain security interests and liens to Satellite pursuant to the Interim Order and the imposition of the automatic stay pursuant to Section 362 of the Bankruptcy Code (collectively, the "**Adequate Protection Obligations**").  As adequate protection, the Credit Agreement Parties are hereby granted the following:

(a)   Adequate Protection Liens.  The Agents (for themselves and for the benefit of the Lenders) are hereby granted (effective and perfected upon the date of this Order and without the necessity of the execution by the Obligor Debtors of mortgages, security agreements, pledge agreements, financing statements or other agreements) a replacement security interest in and lien upon all the Collateral[4], subject and subordinate only to (i) Master Lease Loan Liens (to the extent provided in paragraph 7(e) of the Interim Order), (ii) to the extent provided in paragraph 7(d) hereof, the Pre-Petition Obligations and (iii) the Carve Out (the "**Adequate Protection Liens**"), provided that solely in connection with Adequate Protection Obligations arising under the Satellite Existing Agreements, such Adequate Protection Liens shall not attach to any property of Loral Delaware that was not, immediately prior to the Petition Date, pledged under the Satellite Existing Agreements;

(b)   Section 507(b) Claim.  The Obligor Debtors shall be jointly and severally liable for the Adequate Protection Obligations and the Lenders are hereby granted by each such Obligor Debtor, subject to the Carve Out, a superpriority claim in the amount of the Adequate Protection Obligations, as provided for in section 507(b) of the Bankruptcy Code, provided that solely as to Loral Delaware and solely in connection with Adequate Protection Obligations arising under the Satellite Existing Agreements, such superpriority claims shall be satisfied solely from collateral pledged under the Satellite Existing Agreements immediately prior to the Petition Date.

---

[4] As used herein, "**Collateral**" shall mean all of the types of property of all of the Obligor Debtors of the type described in paragraphs 7(a) and (b) hereof as well as all property that is subject to existing liens presently securing the Pre-Petition Obligations.

(NY) 02826/063/CTPAPERS/final.cashcollateral.order.doc

(c)    Interest, Fees and Expenses.  Subject to the right of parties in

interest, to the extent permitted in paragraph 14, to seek the reallocation,

recharacterization or disgorgement of payments made to the Agents as authorized in this

paragraph and the entry of a final order of this Court ordering any of the foregoing, the

Obligor Debtors shall pay to the Agents (i) current cash payment of all accrued and

unpaid interest on the Pre-Petition Obligations and all accrued but unpaid letter of credit

fees payable in respect thereof, in each case both for the pre- and post-petition periods

and at the non-default rates provided for in and calculated in accordance with the Existing

Agreements (including LIBOR pricing options), and all other accrued and unpaid fees

and expenses payable to the Agents under the Existing Agreements and incurred prior to

the Petition Date as due under the Existing Agreements and (ii) current cash payment of

all reasonable fees and expenses payable to the Agents under the Existing Agreements,

including, but not limited to, the reasonable fees and disbursements of counsel, financial

and other consultants for the Agents (including without limitation Davis Polk &

Wardwell, Morgan, Lewis & Bockius LLP and Ernst & Young Corporate Finance LLC);

*provided* that notwithstanding the provisions of this paragraph 8(c) without prejudice to

the rights of any other party to contest such assertion, the Lenders reserve their rights to

assert claims for the payment of additional interest, letter of credit and other fees

calculated at any other applicable rates (including, without limitation, default rates), or on

any other basis, provided for in the Existing Agreements;

(d)    Monitoring of Collateral.  The Lenders shall be permitted to retain

expert consultants and financial advisors in accordance with the Existing Agreements,

which consultants and advisors shall be given reasonable access for purposes of

monitoring the business of the Debtors and the value of the Collateral;

        (e)   Information. The Debtors shall provide the following information to

the Agents, the Steering Committee and the Committee: (i) within four business days

after the end of each week, an updated rolling 13-week forecast of cash receipts and

disbursements for each Debtor for the next succeeding 13 weeks, substantially in the

form of the Approved Forecast, with a variance report comparing such updated forecast

with the Approved Forecast; (ii) within four business days after the end of each week, a

certificate signed by the Company's chief financial officer (the "CFO") (x) certifying

that no Termination Event has occurred (except with respect to a Termination Event

described in clause (viii) of paragraph 6(c) hereof, the "**Cyberstar Termination Event**")

(or, if a Termination Event has occurred, specifying the nature and extent thereof and any

corrective action taken or proposed to be taken with respect thereto) and (y) setting forth

computations in reasonable detail to demonstrate whether a Termination Event described

in clause (v), (vi), (vii), (ix), (x), (xi), (xii), (xiii), (xiv) or (xv) of paragraph 6(c) hereof

has occurred, (iii) within nine business days after the end of each week, a certificate

signed by the CFO certifying that the Cyberstar Termination Event has not occurred (or if

the Cyberstar Termination Event has occurred, specifying the nature and extent thereof

and any corrective action taken or proposed to be taken with respect thereto), (iv) by not

later than August 19, 2003, an updated business plan through June 2004 and weekly

forecast of cash receipts and disbursements for each Debtor included in the initial

Approved Forecast for the period from August 15, 2003 through November 14, 2003 (the

"**Business Plan**"); (v) by not later than November 1, 2003, a weekly forecast of cash receipts and disbursements for each Debtor included in the initial Approved Forecast for the period from November 14, 2003 through December 31, 2003 (the **"Final Weekly Forecast"**) and (vi) as and when required by the Existing Agreements, all information that is required to be provided to the Agents or any Lenders pursuant to the Existing Agreements; provided that the consolidated statements of income and cash flows for the month of July, 2003 shall be delivered by September 15, 2003.

     (f)    Payment from Proceeds of Collateral.

     (i)    On the date of any sale, lease, transfer, license or other disposition of property of any Obligor Debtor that constitutes Collateral outside the ordinary course of business (other than any individual item having a value or resulting in net proceeds of less than $50,000, or up to $250,000 in the aggregate for all such individual items disposed of since the Petition Date), the Obligor Debtors are authorized and directed to pay to the Agents, for the benefit of the Agents and Lenders with liens on such Collateral, 100% of the gross proceeds resulting therefrom, net of attorneys' fees, accountants' fees, investment banking fees, and other customary fees and expenses incurred in connection therewith and net of taxes paid or reasonably estimated to be payable as a result thereof (other than income taxes).

     (ii)    In the event of any casualty, condemnation or similar event with respect to property that constitutes Collateral, the Obligor Debtors are authorized and directed to pay to the Agents, for the benefit of the Agents and Lenders with liens on such Collateral, 100% of any insurance proceeds, condemnation award or similar payment within two business days of receipt thereof.

     (iii)    In the event any Obligor Debtor receives any proceeds pursuant to a successful Avoidance

31

Action[5], the Obligor Debtors are authorized and directed to pay to the Agents, for the benefit of the Agents and Lenders, 100% of such proceeds within two business days of receipt thereof.

(iv)   All proceeds and payments delivered to the Agents pursuant to this paragraph 8(f) shall be applied to the payment of any Pre-Petition Obligations, the Master Lease Loan Obligations, and the Adequate Protection Obligations in accordance with the priorities set forth in the Interim Order (as to the Master Lease Loan Obligations), this Order and the Existing Agreements; *provided, however*, that any proceeds and payments pursuant to paragraph 8(f)(iii) shall only be applied to the payment of any Master Lease Loan Obligations and Adequate Protection Obligations.

(g)   Hedging Agreements.  Bank of America, N.A. shall be permitted to exercise its rights of termination with respect to any foreign currency exchange agreement with any Obligor Debtor (the **"Bank of America Hedge Agreements"**) and its right of setoff pursuant to the Existing Agreements, to setoff any obligations owed by Bank of America, N.A. to such Obligor Debtor upon such termination in accordance with the provisions thereof against an equal amount of Pre-Petition Obligations owed by such Obligor Debtor to Bank of America, N.A. pursuant to the Existing Agreements and as a result of such setoff the Pre-Petition Obligations then outstanding would be reduced by such amount on a dollar for dollar basis, and the automatic stay is hereby modified and vacated to the extent necessary to permit such setoff.  JPMorgan Chase Bank shall be permitted to exercise its rights of termination with respect to any foreign currency

---

[5] As used herein, **"Avoidance Actions"** shall mean any claim or cause of action under sections 502(d), 544, 545, 547, 548, 549 or 550 of the Bankruptcy Code, and any other avoidance actions under the Bankruptcy Code.

(NY) 02826/063/CTPAPERS/final.cashcollateral.order.doc

exchange agreement with any Obligor Debtor (the **"JPMorgan Chase Hedge**

**Agreements"**) and its right of setoff pursuant to the Existing Agreements, to setoff any

obligations owed by JPMorgan Chase to such Obligor Debtor upon such termination in

accordance with the provisions thereof against an equal amount of Pre-Petition

Obligations owed by such Obligor Debtor to JPMorgan Chase pursuant to the Existing

Agreements and as a result of such setoff the Pre-Petition Obligations then outstanding

would be reduced by such amount on a dollar for dollar basis, and the automatic stay is

hereby modified and vacated to permit such setoff.

      (h)   Pre-Petition Letters of Credit. In consideration of the benefits

afforded to them pursuant to this Order, with respect to any Pre-Petition Letters of Credit,

notwithstanding any provision to the contrary in the SpaceCom Credit Agreement:

          (i)    the Issuing Bank under the SpaceCom Credit Agreement
(the "**Issuing Bank**") is hereby authorized (but not
required) and permitted to extend, renew, amend or replace
any Pre-Petition Letter of Credit (each of which is listed on
Annex A hereto) with a new letter of credit issued to the
same beneficiary, with an expiration date no later than the
earlier of one year after the expiration date of such Pre-
Petition Letter of Credit and December 31, 2004 and in an
amount no greater than the applicable Pre-Petition Letter of
Credit as set forth on Annex A (such extended, renewed,
amended or replacement Pre-Petition Letter of Credit, a
"**New Letter of Credit**") and such New Letter of Credit
shall be deemed to constitute a Letter of Credit issued
under the SpaceCom Credit Agreement, with each
Revolving Credit Bank under the SpaceCom Credit
Agreement (a "**Pre-Petition Revolving Lender**") holding
the same participation in such New Letter of Credit as it
had held in the applicable Pre-Petition Letter of Credit;

         (ii)   each Pre-Petition Revolving Lender shall be obligated to
reimburse the Issuing Bank for any payment made on any
New Letter of Credit and any other amounts due in respect

> thereof under the SpaceCom Credit Agreement on the same
> terms as contained in the SpaceCom Credit Agreement for
> the Pre-Petition Letters of Credit;
>
> (iii)   any claims (as defined in the Bankruptcy Code) that the
> Issuing Bank or any Pre-Petition Revolving Lender may
> have against any Obligor Debtor in respect of any New
> Letter of Credit (including for the reimbursement of any
> payment made on such New Letter of Credit) shall
> constitute Pre-Petition Obligations, entitled to treatment as
> pre-petition claims, *pari passu* with the loans outstanding
> under the SpaceCom Credit Agreement, and as such shall
> be entitled to the adequate protection as provided herein.

9.     *Protection of Lenders' Rights.* The automatic stay provisions of Section

362 of the Bankruptcy Code are vacated and modified to permit the Credit Agreement

Parties to exercise, upon the occurrence of the Termination Date (unless waived as

required herein), and the giving of five business days prior written notice to the Debtors

and counsel for the Committee, all rights and remedies against the Collateral provided for

in the Existing Agreements (including, without limitation, the right to setoff monies of

the Obligor Debtors in accounts maintained with the Agents or any Lender). In no event

shall the Agents or the Lenders be subject to the equitable doctrine of "marshaling" or

any similar doctrine with respect to the Collateral.

10.     *Limitation on Charging Expenses Against Collateral.* Except to the extent

of the Carve Out and as to expenses contained in the Approved Forecast actually paid

prior to the Termination Date (including, but not limited to, fees and expenses of

professionals retained by the Debtors and the Committee), no expenses of administration

of the Cases or any future proceeding that may result therefrom, including liquidation in

bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or

recovered from the Collateral pursuant to Section 506(c) of the Bankruptcy Code or any

34

similar principle of law, without the prior written consent of the Agents, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the Agents or any Lender.

11.   *Reservation of Rights of Lenders.*   Under the circumstances and given that the above described adequate protection is consistent with the Bankruptcy Code, including Section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Credit Agreement Parties. However, upon proper notice, the Credit Agreement Parties may request further or different adequate protection, and the Debtors or any other party may contest any such request. Moreover, nothing contained in this Order (including, without limitation, the authorization of the use of any Cash Collateral) shall impair or modify the right of the Agents or any Lender (i) to propose, subject to the provisions of Section 1121 of the Bankruptcy Code, a chapter 11 plan or plans of reorganization, (ii) to object, contest or appeal entry of any order or seek to modify any order, including without limitation, any order authorizing "critical vendor payments" or retention and/or severance payments to employees of any Debtor but excluding any First Day Orders or (iii) that is a party to a swap agreement, securities contract, commodity contract, forward contract or repurchase agreement with a Debtor to assert rights of setoff or other rights with respect thereto as permitted by law (or the right of the Debtors to contest such assertions).

12.   *Perfection of Liens.*

(a)   SpaceCom and the Credit Agreement Parties are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright

filings, mortgages, notices of lien or similar instruments in any jurisdiction or take any

other action in order to validate and perfect the liens and security interests granted to

them hereunder. Whether or not SpaceCom or any Agent on behalf of the Lenders shall,

in its sole discretion, choose to file such financing statements, trademark filings,

copyright filings, mortgages, notices of lien or similar instruments or otherwise confirm

perfection of the liens and security interests granted to them hereunder, such liens and

security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable

and not subject to challenge dispute or subordination, at the time and on the date of entry

of the Interim Order. Each Agent, without any further consent or other action of any

Obligor Debtor or other party, is authorized to take, execute and deliver such instruments

(in each case without representation or warranty of any kind) to enable the Agents to

further validate, perfect, preserve and enforce the Adequate Protection Liens.

      (b)    A certified copy of this Order may, in the discretion of any Agent, be

filed with or recorded in filing or recording offices in addition to or in lieu of such

financing statements, mortgages, notices of lien or similar instruments, and all filing

offices are hereby authorized to accept such certified copy of this Order for filing and

recording.

      (c)    In furtherance of the foregoing and without further approval of this

Court, each Obligor Debtor is authorized and directed to do and perform all acts, to make,

execute and deliver all instruments and documents (including, without limitation, the

execution or recordation of security agreements, mortgages and financing statements),

and to pay all fees, that may be reasonably required or necessary for the Obligor Debtors'
performance hereunder.

(d)    No obligation, payment, transfer or grant of security under this Order
shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under
any applicable law (including without limitation, under Section 502(d) of the Bankruptcy
Code), or subject to any defense, reduction, setoff or counterclaim.

13.    *Preservation of Rights Granted Under the Order.*

(a)    Except as expressly provided herein, (i) no claim or lien having a
priority superior to or pari passu with those granted by the Interim Order or this Order to
Satellite, SpaceCom, the Agents or the Lenders, respectively, shall be granted or allowed
while any Adequate Protection Obligations, Master Lease Loans or Cyberstar Obligations
remain outstanding, and (ii) the Master Lease Loan Liens, the Cyberstar Liens and
Adequate Protection Liens shall not be subordinated to or made pari passu with any other
lien or security interest, whether under Section 364(d) of the Bankruptcy Code or
otherwise.

(b)    If an order dismissing any of the Cases of the Obligor Debtors under
Section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall
provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that (i) the
Master Lease Loan Obligations, Cyberstar Obligations, Adequate Protection Obligations,
Master Lease Loan Liens, Cyberstar Liens and Adequate Protection Liens granted to
Satellite, SpaceCom, the Agents and the Lenders pursuant to this Order shall continue in
full force and effect and shall maintain their priorities as provided in this Order until all

37

Adequate Protection Obligations, Master Lease Loan Obligations and Cyberstar

Obligations shall have been indefeasibly paid in full (and that all such claims, liens and

security interests shall, notwithstanding such dismissal, remain binding on all parties in

interest) and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for

the purposes of enforcing the claims, liens and security interests referred to in (i) above.

      (c)   If any or all of the provisions of this Order are hereafter reversed,

modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect

(i) the validity of any Master Lease Loan Obligations, Cyberstar Obligations or Adequate

Protection Obligations incurred prior to the actual receipt of written notice by the Agents

of such reversal, stay, modification or vacation or (ii) the validity or enforceability of any

lien or priority authorized or created hereby.  Notwithstanding any such reversal, stay,

modification or vacation, any use of Cash Collateral and all Master Lease Loan

Obligations, Cyberstar Obligations and Adequate Protection Obligations incurred prior to

the actual receipt of written notice by the Agents of such reversal, stay, modification or

vacation shall be governed in all respects by the original provisions of this Order.

      (d)   Except as expressly provided in this Order, the Master Lease Loan

Obligations, Cyberstar Obligations, Master Lease Loan Liens, Cyberstar Liens, the

Adequate Protection Obligations and Adequate Protection Liens, the Cyberstar

Superpriority Claims and all other rights and remedies of Satellite, SpaceCom and the

Credit Agreement Parties granted by the provisions of this Order shall survive, and shall

not be modified, impaired or discharged by (i) the entry of an order converting any of the

Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint

administration of these Cases or by any other act or omission, or (ii) the entry of an order confirming a plan of reorganization in any of the Cases and, pursuant to Section 1141(d)(4) of the Bankruptcy Code, the Obligor Debtors have waived any discharge as to any remaining Master Lease Loan Obligations, Cyberstar Obligations or Adequate Protection Obligations and such waiver is hereby approved. The terms and provisions of this Order shall continue in these Cases, in any successor cases if these Cases cease to be jointly administered, or in any superceding chapter 7 cases under the Bankruptcy Code, and the Master Lease Loan Liens, Cyberstar Liens, Adequate Protection Liens, the Cyberstar Superpriority Claims and all other rights and remedies of the Credit Agreement Parties and SpaceCom granted by the provisions of this Order shall continue in full force and effect until the Master Lease Loan Obligations, Cyberstar Obligations and Adequate Protection Obligations are indefeasibly paid in full.

14.    *Effect of Stipulations on Third Parties.* The stipulations and admissions contained in this Order, including, without limitation, in paragraph 3 of this Order, shall be binding upon the Debtors in all circumstances and shall be binding upon all other parties in interest, including, without limitation, any Committee, unless (a) a party in interest has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein, including, *inter alia*, in paragraph 15) by no later than September 23, 2003, *provided* that said deadline shall be October 31, 2003 in the case of the Committee (or such later date as has been agreed to, in writing, by the Agents in their sole discretion), (i) challenging the validity, enforceability, priority or extent of the Pre-Petition Obligations or the Agents' or the Lenders' liens on the Pre-Petition Collateral or

(ii) otherwise asserting or prosecuting any action for preferences, fraudulent

conveyances, other avoidance power claims or any other any claims, counterclaims or

causes of action , objections, contests or defenses (collectively, "**Claims and Defenses**")

against the Agents or any of the Lenders or their affiliates, representatives, attorneys or

advisors in connection with matters related to the Existing Agreements, the Pre-Petition

Obligations, the Pre-Petition Collateral, and (b) there is a final order in favor of the

plaintiff sustaining any such challenge or claim in any such timely filed adversary

proceeding or contested matter; *provided* that as to the Debtors (but not as to any party

that specifically preserves any rights it may have as provided for in this paragraph), all

such Claims and Defenses are hereby irrevocably waived and relinquished as of the

Petition Date. If no such adversary proceeding or contested matter is timely filed, (x) the

Pre-Petition Obligations shall constitute allowed claims, not subject to counterclaim,

setoff, subordination, recharacterization, defense or avoidance, for all purposes in the

Cases and any subsequent chapter 7 cases, (y) the Agents' and the Lenders' liens on the

Pre-Petition Collateral shall be deemed to have been, as of the Petition Date, legal, valid,

binding and perfected, not subject to recharacterization, subordination or avoidance and

(z) the Pre-Petition Obligations, the Agents' and the Lenders' liens on the Pre-Petition

Collateral and the Credit Agreement Parties shall not be subject to any other or further

challenge by any party in interest seeking to exercise the rights of the Debtors' estates,

including, without limitation, any successor thereto (including, without limitation, any

chapter 7 or 11 trustee appointed or elected for any of the Debtors). If any such

adversary proceeding or contested matter is timely filed, the stipulations and admissions

contained in paragraph 3 of this Order shall nonetheless remain binding and preclusive
(as provided in the second sentence of this paragraph) on any official committee
(including the Creditors' Committee) and on any other person or entity, except to the
extent that such findings and admissions were expressly challenged in such adversary
proceeding or contested matter.

15.     *Limitation on Use of Collateral.*   Notwithstanding anything herein or in
any other order of this Court to the contrary, no Master Lease Loans, Cyberstar Loans,
Cash Collateral, Collateral or the Carve Out may be used to (a) object, contest or raise
any defense to, the validity, perfection, priority, extent or enforceability of any amount
due under the Existing Agreements, or the liens or claims granted under this Order or the
Existing Agreements; *provided, however,* that such limitation shall not apply to the costs
of investigation of whether any such objection, contest or defense may be brought or
asserted, (b) assert or prosecute any Claims or Defenses or causes of action against the
Agents or the Lenders or their respective agents, affiliates, officers, directors, employees,
representatives, attorneys or advisors, (c) prevent, hinder or otherwise delay the Agents'
assertion, enforcement or realization on the Cash Collateral or the Collateral in
accordance with the Existing Agreements or this Order, (d) seek to modify any of the
rights granted to the Agents or the Lenders hereunder or under the Existing Agreements,
in each of the foregoing cases without such parties' prior written consent or (e) pay any
amount on account of any claims arising prior to the Petition Date unless such payments
are (i) approved by an Order of this Court and (ii) in accordance with the Approved
Forecast.

16.     *Limits on Lenders' Liability.*  Nothing in this Order or any other documents related to this transaction shall in any way be construed or interpreted to impose or allow the imposition upon the Agents or the Lenders any liability for any claims arising from the pre-petition or post-petition activities by the Debtors or any of their affiliates in the operation of their businesses, or in connection with their restructuring efforts.

17.     *Binding Effect; Successors and Assigns.*  Except as to parties' rights under paragraph 14 hereof, the provisions of this Order, including all findings herein, shall be binding upon all parties in interest in these Cases, including, without limitation, the Agents, the Lenders, the Committee and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors) and shall inure to the benefit of the Agents, the Lenders and the Debtors and their respective successors and assigns, *provided* that the Credit Agreement Parties shall have no obligation to permit the use of Cash Collateral by any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.  In exercising any rights or remedies as and when permitted pursuant to this Order or the Existing Agreements, the Credit Agreement Parties shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).

(NY) 02826/063/CTPAPERS/final.cashcollateral.order.doc

Dated: August 22, 2003

___/s/ Robert D. Drain
UNITED STATES BANKRUPTCY JUDGE

Annex A

## Pre-Petition Letters of Credit

| LC Number | Amount |
|-----------|--------|
| 3029341 | $       45,000.00 |
| 3034724 | 693,000.00 |
| 3035160 | 6,521,191.80 |
| 3037887 | 500,000.00 |
| 3039462 | 1,239,000.00 |
| 3048556 | 407,000.00 |
| 3049998 | 1,486,000.00 |
| 3052093 | 1,100,000.00 |
| 7310438 | 334,800.00 |
| 7310427 | 330,966.00 |
| Total...................... | $12,656,957.80 |

44

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re ) | |
| ) | Chapter 11 |
| ENRON CORP., et al., ) | |
| ) | Case No. 01-16034 (AJG) |
| Debtors. ) | |
| ) | Jointly Administered |
| ) | |
| ) | |

## FINAL ORDER AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3) AND 364(d)(1)

Upon the motion dated December 3, 2001 (the "**Initial Motion**") and the Amended Motion dated

June 17, 2002 (the "**Amended Motion**" and, together with the Initial Motion, the "**Motion**"), of Enron

Corp. (the "**Borrower**") and all of its affiliated debtors that have commenced chapter 11 cases and are

debtors in these jointly administered chapter 11 proceedings[1] (such affiliates, together with any entities that

subsequently become Guarantors under the DIP Credit Agreement, collectively, the "**Guarantors**")[2], each

as debtor and debtor-in-possession (all such entities collectively, the "**Debtors**"), pursuant to sections 105,

361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1) of title 11 of the United States Code,

11 U.S.C. §§101, *et seq.* (the "**Bankruptcy Code**"), and Rules 2002, 4001 and 9014 of the Federal Rules

---

[1] For purposes of this Order, the "affiliated debtors" are all entities that have or in the future become the subject of these jointly administered chapter 11 proceedings.

[2] A list of the entities that are or will become Guarantors upon the entry of this Order is attached hereto as Exhibit A.

(NY) 04675/144/DIP.DOCS/new.final.order.wpd

2

of Bankruptcy Procedure (the "**Bankruptcy Rules**"), seeking, among other things:

(1)  authorization to obtain post-petition financing (the "**Financing**"), and for the Guarantors to guaranty the payment of such obligations, from JPMorgan Chase Bank ("**JPMC**") and Citicorp USA, Inc. ("**Citicorp**"), as co-Administrative Agents, JPMC as Collateral Agent and Citicorp as Paying Agent (collectively, the "**Agents**"), acting as Agents for themselves and a syndicate of financial institutions (together with the Agents, the "**DIP Lenders**") to be arranged by JPMorgan Securities Inc. and Salomon Smith Barney Inc.;

(2)  pursuant to Bankruptcy Rule 4001, that an interim hearing (the "**Interim Hearing**") on the Motion be held for this Court to consider entry of the proposed interim order annexed to the Motion (the "**Interim Order**") authorizing the Borrower, on an interim basis, to borrow or obtain letters of credit from the DIP Lenders under the Documents (as defined below) up to an aggregate of $250,000,000; and

(3)  that the Court schedule a final hearing (the "**Final Hearing**") to consider entry of a final order authorizing the borrowings and letter of credit issuances under the Documents on a final basis, and certain other relief, all under and as set forth in the Motion and the Documents filed with this Court and as disclosed on the record at the Interim Hearing;

The Interim Hearing having been held by this Court on December 3, 2001 at which the Court (a) issued and entered the Interim Order authorizing the Borrower to borrow or obtain letters of credit from the DIP Lenders up to an aggregate of $250,000,000 and (b) scheduled the Final Hearing to consider entry of an order authorizing the balance of the Financing, all as set forth in the Motion, the Interim Order and the

3

loan documentation described below and filed with this Court, which hearing was ultimately scheduled for and held on July 2, 2002;

As set forth in the Amended Motion, the Debtors and the DIP Lenders have agreed to amend the documentation for the Financing, and the Debtors have appended the Amended and Restated Revolving Credit and Guaranty Agreement (as such agreement has been or may be modified, the "**DIP Credit Agreement**") and the proposed final order to the Amended Motion, and filed same on the official docket of the Cases (the "**Docket**") on June 17, 2002;

Objections to the Initial Motion and the Amended Motion were filed by various parties (collectively, the "**Objections**"); and

Upon the record made by the Debtors at the Interim Hearing and the Final Hearing, and after due deliberation and consideration and sufficient cause appearing therefor;

IT IS HEREBY FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.    *Jurisdiction.*  This Court has core jurisdiction over the cases of the Debtors (the "**Cases**") and the parties and property affected hereby pursuant to 28 U.S.C. §§157(b) and 1334.

2.    *Notice.*  Under the circumstances, the notice given by the Debtors of the Motion, the Interim Hearing and the Final Hearing constitutes due and sufficient notice thereof and of the relief requested in the Motion.

3.    *Findings Regarding the Financing.*

(a)  The Debtors have an immediate need to obtain the Financing in order to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors and suppliers, and to satisfy other working capital needs. The ability of the Debtors to obtain

(NY) 04675/144/DIP.DOCS/new.final.order.wpd

4

sufficient working capital and liquidity through the incurrence of new indebtedness for letters of credit and

other financial accommodations is vital to the preservation and maintenance of the going concern values of

the Debtors and a successful reorganization of the Debtors.

(b)  The Debtors are unable to obtain adequate unsecured credit allowable under section

503(b)(1) of the Bankruptcy Code as an administrative expense, and a credit facility in the amount and on

the terms provided by the Financing is unavailable to the Debtors without the Debtors granting to the Agents,

the fronting banks for the letters of credit (the "**Fronting Banks**") and the DIP Lenders (subject to the

Carve-Out, as defined below) the Superpriority Claims and the DIP Liens (each as defined below).

(c)  The terms of the Financing are fair and reasonable, reflect the Debtors' exercise of

prudent business judgment consistent with their fiduciary duty and are supported by reasonably equivalent

value and fair consideration.

(d)  The Financing has been negotiated in good faith and at arm's-length between the Debtors

and the Agents, and all DIP Obligations (as defined below), including without limitation, all letters of credit

issued for the account of the Debtors by the Fronting Banks pursuant to the DIP Credit Agreement, any

"Obligations" (as defined in the DIP Credit Agreement), including credit extended in respect of overdrafts

and other depository, treasury, and cash management services and other clearing services shall be deemed

to have been extended by the Fronting Banks, the DIP Lenders and their affiliates in good faith, as that term

is used in section 364(e) of the Bankruptcy Code.

(e)  The Debtors have requested entry of this Order pursuant to Bankruptcy Rules 4001(b)(2)

and 4001(c)(2).  Absent entry of this Order, the Debtors' estates will be irreparably harmed.

Consummation of the Financing in accordance with this Order and the Documents is therefore in the best

5

interests of the Debtors' estates.

    4.    *Authorization of the Financing and the Documents.*

    (a) The Borrower is hereby authorized to obtain letters of credit for itself and its affiliates (including certain non-debtor affiliates) as provided in the DIP Credit Agreement, and the Guarantors are hereby authorized to guaranty the obligations of the Borrower and such affiliates in respect of such letters of credit, up to an aggregate principal amount of $250,000,000 (inclusive of amounts authorized under the Interim Order), in accordance with the terms of the DIP Credit Agreement. In addition, the Debtors are hereby authorized to incur, in addition to the amount of letters of credit obtained pursuant to the DIP Credit Agreement, overdrafts and related liabilities arising from treasury, depository and cash management services or in connection with any automated clearing house fund transfers provided to or for the benefit of the Debtors by JPMC, Citicorp or any of their affiliates, and obligations to JPMC or any of its affiliates relating to any contracts on the New York Mercantile Exchange or any other exchange executed and/or cleared by JPMC or any of its affiliates or agents on behalf of the Debtors; *provided, however*, that nothing herein shall require JPMC or Citicorp or any other party to incur overdrafts or to provide any such services or functions to the Debtors.

    (b) In furtherance of the foregoing, each Debtor is authorized and directed to do and perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, security agreements and financing statements), and to pay all fees, that may be reasonably required or necessary for the Debtors' performance of the Financing, including, without limitation:

    (i) the execution, delivery and performance of the Loan Documents (as defined in the DIP Credit Agreement) and any exhibits attached thereto, including, without limitation, the DIP Credit

(NY) 04675/144/DIP.DOCS/new.final.order.wpd

6

Agreement, and the Security and Pledge Agreement and the Portland General Pledge Agreement (each as

defined in the DIP Credit Agreement and substantially in the form attached to the Motion, and collectively,

together with the letter agreement referred to in clause (iv) below, the "**Documents**"),

(ii)  causing the Guarantors to execute, deliver and perform the Documents,

(iii)  the execution, delivery and performance of one or more amendments to the DIP

Credit Agreement for, among other things, the purpose of adding additional financial institutions as DIP

Lenders and reallocating the commitments for the Financing among the DIP Lenders in each case in such

form as the Debtors, the Agents and the DIP Lenders may agree (it being understood that no further

approval of the Court shall be required for amendments to the DIP Credit Agreement that do not (X)

shorten the maturity of the Financing, (Y) increase either the commitments or the rate of interest payable on

the reimbursement obligations thereunder or (Z) otherwise amend the DIP Credit Agreement in a manner

that is both material and unfavorable to the Debtors),

(iv)  the payment to the Agents, the Fronting Banks or the DIP Lenders, as the case

may be, of the non-refundable fees referred to in the Documents (and in the separate letter agreement dated

December 3, 2001 by and among Enron and the Agents referred to in the DIP Credit Agreement) and such

Letter of Credit Fees, Commitment Fees and reasonable costs and expenses as may be due from time to

time, including, without limitation, fees and disbursements of the professionals retained as provided for in the

Documents, all as such terms are defined in the Documents,[3] and

(v)  the performance of all other acts required under or in connection with the

_____

[3]Nothing herein or in the Documents shall, or shall be deemed to, authorize the payment, after
the date hereof, of any claims of the Agents or the DIP Lenders that arose prior to the Petition Date.
(NY) 04675/144/DIP.DOCS/new.final.order.wpd

7

Documents.

(c) Upon execution and delivery of the Documents, the Documents shall constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with their terms. No obligation, payment or transfer under the Documents shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law, or subject to any defense, reduction, offset or counterclaim.

5.    *Superpriority Claims.*

(a) Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the Debtors' obligations and indebtedness arising under, in respect of or in connection with the Financing and the Documents, and the Debtors' obligations in connection with those services described in paragraph 4 above (including, without limitation, all "Obligations" as defined in the DIP Credit Agreement) (collectively, the "**DIP Obligations**") shall constitute obligations of the Debtors with priority over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims under sections 105, 326, 328, 506(c), 507(a) or 726 of the Bankruptcy Code (the "**Superpriority Claims**"), subject only upon the occurrence and during the continuance of an Event of Default (as defined in the DIP Credit Agreement) to the payment of the Carve-Out (as hereinafter defined).

(b) For purposes hereof, the "**Carve-Out**" means (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under Section 1930(a) of title 28 of the United States Code and (ii) an amount not exceeding $12,500,000 in the aggregate, which amount may be used after the occurrence and during the continuance of an Event of Default, to pay fees or expenses incurred by the Debtors and any statutory committees appointed in the Cases (each, a "**Committee**") or any

(NY) 04675/144/DIP.DOCS/new.final.order.wpd

8

examiner appointed by this Court in these cases, in respect of (A) allowances of compensation for services

rendered or reimbursement or expenses awarded by the Bankruptcy Court to the Debtors' or any

Committee's professionals and (B) the reimbursement of expenses allowed by the Bankruptcy Court

incurred by Committee members in the performance of their duties (but excluding fees and expenses of

third-party professionals employed by such members); *provided, however,* that such dollar limitation on

fees and disbursements shall not be reduced by the amount of any compensation and reimbursement of

expenses paid prior to the occurrence of an Event of Default in respect of which the Carve-Out is invoked

or any fees, expenses, indemnities or other amounts paid to the Co-Administrative Agents, any other Agent,

any Fronting Bank or any DIP Lender and their respective attorneys and agents under the DIP Credit

Agreement or otherwise; and *provided, further,* that nothing herein shall be construed to impair the ability

of any party to object to any of the fees, expenses, reimbursement or compensation described in clauses (A)

and (B) above; and *provided, further,* that funds in the LC Cushion Account and the LC Collateral

Accounts (each as defined in the DIP Credit Agreement) shall not be subject to the Carve-Out.

6.      *DIP Liens.* As security for the DIP Obligations, effective upon the date of this Order and

without the necessity of the execution by the Debtors of mortgages, security agreements or otherwise, the

following security interests and liens are hereby granted to the Agents, the Fronting Banks and the DIP

Lenders (all property identified in clauses (a), (b) and (c) below being collectively referred to as the

"**Collateral**", and such security interests and liens being collectively referred to as the "**DIP Liens**"),

subject, in the event of the occurrence and during the continuance of an Event of Default, only to the

payment of the Carve-Out:

(a) First Lien on Cash Balances and Unencumbered Property.  Pursuant to section

(NY) 04675/144/DIP.DOCS/new.final.order.wpd

9

364(c)(2) of the Bankruptcy Code, the Agents, the Fronting Banks and the DIP Lenders are hereby granted

a perfected first priority senior security interest in and lien upon all cash of the Debtors (whether maintained

with the Agents, the Fronting Banks, the DIP Lenders or otherwise and including without limitation all funds

in the LC Cushion Account and the LC Collateral Accounts) and any investment of the funds contained

therein, and upon all pre- and post-petition property of the Debtors, whether existing on the Petition Date or

thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable

liens (collectively, "**Unencumbered Property**"), including, without limitation, cash collateral, inventory,

accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts,

property, plant, equipment, general intangibles, documents, instruments, interests in leaseholds, real property,

patents, copyrights, trademarks, trade names, other intellectual property, capital stock of subsidiaries, and

the proceeds of all the foregoing.  Unencumbered Property shall exclude the Debtors' claims and causes of

action under sections 502(d), 544, 545, 547, 548, 549, 550 or 551 of the Bankruptcy Code, or any other

avoidance actions under the Bankruptcy Code (collectively, "**Avoidance Actions**"), but shall include any

proceeds or property recovered, unencumbered or otherwise the subject of successful Avoidance Actions,

other than proceeds arising out of any Avoidance Actions against JPMC, Citicorp or their respective

affiliates.

(b)  Liens Junior to Certain Other Liens.  Pursuant to section 364(c)(3) of the

Bankruptcy Code, the Agents, the Fronting Banks and the DIP Lenders are hereby granted a perfected

junior priority security interest in and lien upon all pre- and post-petition property of the Debtors, whether

now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence

immediately prior to the Petition Date or to valid and unavoidable liens in existence immediately prior to the

(NY) 04675/144/DIP.DOCS/new.final.order.wpd

10

Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the

Bankruptcy Code (including any (i) mechanics' liens or (ii) setoff rights in favor of governmental entities, in

each case that so operate under state or federal law), junior to such valid, perfected and unavoidable liens.

(c) <u>Liens Senior to Certain Other Liens.</u> The DIP Liens shall not be subject or

subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and

their estates under section 551 of the Bankruptcy Code or (ii) any liens arising after the Petition Date

including, without limitation, any liens or security interests granted in favor of any federal, state, municipal, or

other governmental unit, commission, board or court for any liability of the Debtors; <u>provided</u>, <u>however</u>, that

nothing herein shall prevent the United States, its agencies or entities, from asserting that their post-petition

setoff rights, if any, are not, under applicable law, subject to the DIP Liens, which DIP Liens are a prior

perfected security interest.

7.   *Protection of DIP Lenders' Rights.*

(a) <u>Automatic Stay and Certain Remedies.</u> Subject only to the provisions of the DIP Credit

Agreement, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified

to the extent necessary to permit the Agents, the Fronting Banks and the DIP Lenders to exercise, upon any

honor of a letter of credit or upon the occurrence and during the continuance of an Event of Default, all rights

and remedies against the Collateral provided for in the Documents (including, without limitation, the right to

setoff monies of the Debtors in accounts maintained with the Agents, the Fronting Banks or any DIP

Lender). In any hearing regarding any exercise of remedies, the only issue that may be raised by any party in

opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing or whether

any letter of credit has been honored, and the Debtors hereby waive their right to seek relief, including,

11

without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way

impair or restrict the rights and remedies of the Agents, the Fronting Banks or the DIP Lenders set forth in

this Order or the Documents. In no event shall the Agents, the Fronting Banks or the DIP Lenders be

subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

(b) <u>Limitation on Charging Expenses Against Collateral.</u> Except to the extent of the

Carve-Out, no expenses of administration of the Cases or any future proceeding that may result therefrom

(including liquidation in bankruptcy or other proceedings under the Bankruptcy Code), to the extent such

expenses are incurred prior to repayment in full of all DIP Obligations, shall be charged against or recovered

from the Collateral, pursuant to section 506(c) of the Bankruptcy Code or any similar principal of law,

without the prior written consent of the Agents, the Fronting Banks and the DIP Lenders, and no such

consent shall be implied from any other action, inaction, or acquiescence by the Agents, the Fronting Banks

or the DIP Lenders.

(c) <u>No Exercise of Option.</u> The Debtors shall take all necessary steps to ensure that an

indirect subsidiary of the Borrower, Enron Northwest Assets, LLC, does not exercise any of its rights under

the Option Agreement dated as of May 7, 2001 with the Borrower, including, without limitation, the right to

purchase any shares of common stock of Portland General Electric Company.

8.      *Perfection of DIP Liens.* The Agents, the Fronting Banks and the DIP Lenders that have

been granted the DIP Liens hereunder shall not be required to file or record financing statements, mortgages,

notices of lien or similar instruments in any jurisdiction or take any other action in order to validate and

perfect the DIP Liens. If the Agents on behalf of the Fronting Banks and the DIP Lenders shall, in their sole

discretion, choose to file such financing statements, notices of lien or similar instruments or otherwise confirm

(NY) 04675/144/DIP.DOCS/new.final.order.wpd

12

perfection of the DIP Liens, the DIP Liens shall be deemed perfected at the time and on the date of entry of the Interim Order.

     9.    *Preservation of Rights Granted Under the Order.*

     (a)  No claim having a priority superior to or *pari passu* with that granted by this Order to the Agents and the DIP Lenders shall be granted while any portion of the Financing or any other DIP Obligation (or any refinancing thereof) or any commitment thereunder, remains outstanding, and the DIP Liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 364(d) of the Bankruptcy Code or otherwise.

     (b)  Unless all DIP Obligations have been satisfied and the DIP Credit Agreement has terminated, the Debtors shall not seek, and it shall constitute an Event of Default if any of the Debtors seek, or if there is entered, an order dismissing any of the Cases. If an order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (i) the superpriority claims, liens and security interests granted to the Agents, the Fronting Banks and the DIP Lenders pursuant to this Order shall continue in full force and effect and shall maintain their priorities as provided in this Order until all DIP Obligations shall have been paid and satisfied in full (and that such superpriority claims shall, notwithstanding such dismissal, remain binding on all parties in interest) and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in (i) above.

(NY) 04675/144/DIP.DOCS/new.final.order.wpd

13

(c) If any or all of the provisions of this Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity of any DIP Obligation incurred by the Debtors to the Agents, the Fronting Banks or the DIP Lenders prior to written notice to the Agents of the effective date of such reversal, stay, modification or vacation or (ii) the validity, enforceability or priority of any DIP Lien with respect to any DIP Obligation. Notwithstanding any such reversal, stay, modification or vacation, any DIP Obligation incurred by the Debtors to the Agents, the Fronting Banks or the DIP Lenders prior to the actual receipt of written notice by the Agents of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this Order, and the Agents, the Fronting Banks and DIP Lenders shall be entitled to all the rights, remedies, privileges and benefits granted in this Order and/or pursuant to the DIP Credit Agreement with respect to the DIP Obligations.

(d) The DIP Obligations shall not be discharged by the entry of an order confirming a plan of reorganization in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived such discharge with respect to the DIP Obligations.

10.    *Limitation on Use of Financing Proceeds and Collateral.*  Notwithstanding anything herein to the contrary, no letters of credit, Collateral or the Carve-Out may be used to (a) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the Documents, or the liens granted under this Order, (b) assert any claims, counterclaims, defenses or causes of action against the Agents, the Fronting Banks or the DIP Lenders, or their respective affiliates with respect to or in connection with the DIP Obligations, (c) prevent, hinder or otherwise delay the Agents' assertion, enforcement or realization on the Collateral by the Agents, the Fronting Banks or the DIP Lenders in

14

accordance with the Documents or this Order or (d) seek to modify any of the rights granted to the Agents, the Fronting Banks or the DIP Lenders hereunder or under the Documents, in each of the foregoing cases without such parties' prior written consent. Nothing herein shall be construed to prevent any party in interest from reviewing, investigating or challenging any pre-petition transaction involving JPMC, Citicorp or their respective affiliates, or from using any Collateral in connection therewith.

11.   *Order Governs.*  In the event of any inconsistency between the provisions of this Order and of the Documents, the provisions of this Order shall govern.

12.   *Successors and Assigns.*  The Documents and the provisions of this Order shall be binding upon the Agents, the Fronting Banks, the DIP Lenders and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors) and inure to the benefit of the Agents, the Fronting Banks, the DIP Lenders and the Debtors and their respective successors and assigns.

13.   *Additional Debtors.*  With the sole exceptions of Enron LNG Shipping Company, Enron Wind Corp., Enron Wind Systems, Inc., Enron Wind Energy Systems Corp., Enron Wind Maintenance Corp., Enron Wind Constructors Corp., EREC Subsidiary I, LLC, EREC Subsidiary II, LLC, EREC Subsidiary III, LLC, EREC Subsidiary IV, LLC, EREC Subsidiary V, LLC, Enron Wind Development LLC, ZWHC LLC, Zond Pacific, LLC, EES Service Holdings, Inc. and San Juan Gas Company, Inc., this Order is binding on all Debtors that filed Cases on or prior to the date that is 15 days prior to the date of the Final Hearing. To the extent any affiliates of the Borrower have filed or file a chapter 11 petition subsequent to such date and become Debtors in cases procedurally consolidated with the bankruptcy cases of the Debtors, twenty days after service of notice of this Order on the twenty largest creditors of such affiliates

(NY) 04675/144/DIP.DOCS/new.final.order.wpd

15

(with the filing of an objection within such twenty day period triggering a hearing), all provisions of this Order, including, without limitation, those pertaining to the DIP Liens and the priority of the DIP Obligations, shall automatically and without further action of the Court become applicable to such affiliates and their pre- and post-petition property as a Debtor hereunder.

14.    Without limiting the joint and several liability of each of the Debtors for the DIP Obligations, the Debtors shall use their reasonable best efforts to ensure that Debtors that receive the benefit of funds advanced under the DIP Credit Agreement or the services contemplated thereunder or hereunder repay their share thereof on a dollar for dollar basis.  To the extent a Debtor (a "**Beneficiary Debtor**") incurs any of the DIP Obligations (including as a result of intercompany balances incurred after the Petition Date to the extent such balances arise from the incurrence of DIP Obligations) and such DIP Obligations are repaid (including from cash collateral) ("**Advance**") by any other Debtor (an "**Adequately Protected Debtor**"), the Advance shall be deemed a Junior Reimbursement Claim as set forth in the Amended Cash Management Order entered in these cases and dated as of Feburary 25, 2002 ("**Cash Management Order**") and the Adequately Protected Debtor shall have the same rights, liens, claims, and priority status for the Advance as given to Junior Reimbursement Claims under the Cash Management Order.  Within 10 business days of the making of an Advance, the Beneficiary Debtor shall notify, in writing, the ENA Examiner and the Creditors' Committee of (a) the circumstances relating to the making of the Advance, including the amount thereof, and (b) how and when the Advance will be repaid to the respective Adequately Protected Debtor.

15.    Notwithstanding anything contained herein, the DIP Credit Agreement or the Loan Documents to the contrary, the terms and conditions set forth in the Cash Management Order as in effect on

16

the date hereof shall remain unmodified and in full force and effect, and the Debtors' compliance with the

Cash Management Order as in effect on the date hereof shall not constitute a breach of, or a default under

the DIP Loan Agreement or the Loan Documents, or a violation of this Order.

16. If a Debtor ("**First Entity**") intends to incur a DIP obligation on behalf of another Debtor or

non-Debtor (collectively, "**Second Entity**") it must first comply with the lending formulas set forth in the

Cash Management Order, and if the DIP Obligations are repaid by the First Entity, the same shall be

deemed an Advance made by the First Entity to the Second Entity, and the provisions of paragraph 14

hereof shall apply with respect thereto.

17. *Objections.* All Objections not withdrawn are hereby overruled.

Dated:   July 2, 2002
         New York, New York

                              **s/Arthur J. Gonzalez**
                              UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | ) |
| | ) |
| Meridian Automotive Systems – Composites | ) Chapter 11 |
| Operations, Inc., *et al.*, | ) |
| | ) Case No. 05-11168(MFW) |
| Debtors. | ) |
| | ) Jointly Administered |
| | ) |

**Ref. Docket Nos. 254 & 307**

## FINAL ORDER (I) AUTHORIZING DEBTORS (A) TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e) AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, AND (II) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364

Upon the amended motion (the "**Motion**"),[1] dated June 27, 2005, of Meridian

Automotive Systems – Composites Operations, Inc. and its affiliated debtors, each as debtor and

debtor-in-possession (collectively, the "**Debtors**"),[2] in the above-captioned cases (the "**Cases**")

pursuant to sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and

364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy**

**Code**"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**"), seeking, among other things:

      (1)     authorization for Meridian Automotive Systems, Inc. (the "**Borrower**") to

obtain replacement post-petition financing (the "**Financing**"), and for all of the other

---

[1]     This Motion amends the "Motion of the Debtors for a Final Order (I) Authorizing the Debtors (A) to Obtain Debtor-in-Possession Financing Pursuant to 11 U.S.C. §§ 105(a), 361, 364(c), and 364(d)(1) and (B) to Use Cash Collateral Pursuant to 11 U.S.C. § 363 and (II) Granting Adequate Protection to Certain Prepetition Secured Parties" dated June 14, 2005 (the "**Original Motion**").

[2]     The Debtors are:  Meridian Automotive Systems – Composites Operations, Inc., Meridian Automotive Systems, Inc., Meridian Automotive Systems – Angola Operations, Inc., Meridian Automotive Systems – Construction, Inc., Meridian Automotive Systems – Detroit Operations, Inc., Meridian Automotive Systems – Grand Rapids Operations, Inc., Meridian Automotive Systems – Heavy Truck Operations, Inc., Meridian Automotive Systems – Shreveport Operations, Inc., and Meridian Automotive Systems – Mexico Operations, LLC.

Debtors (the "**Guarantors**") to guaranty the Borrower's obligations in connection with

the Financing, up to the aggregate principal amount of $75,000,000 (the actual available

principal amount at any time being subject to those conditions set forth in the DIP

Documents (as defined below)), from Credit Suisse, Cayman Islands Branch ("**Credit**

**Suisse**"), acting as Administrative Agent (in such capacity, the "**Agent**"), for itself and a

syndicate of financial institutions (together with Credit Suisse and including, without

limitation, the fronting and issuing banks for the Letters of Credit (as defined below), the

"**DIP Lenders**");

      (2)    authorization for the Debtors to execute and enter into the DIP Documents

(as defined below) and to perform such other and further acts as may be required in

connection with the DIP Documents;

      (3)    the granting of adequate protection to (a) the lenders under the (i) first lien

credit facility evidenced by the First Lien Credit Agreement, dated as of April 28, 2004

(as amended, restated, modified or waived from time to time, the "**First Lien Credit**

**Agreement**"), among the Borrower, the lenders listed therein, Credit Suisse, as First Lien

Administrative Agent (the "**First Lien Administrative Agent**") and First Lien Collateral

Agent (the "**First Lien Collateral Agent**"), and Goldman Sachs Credit Partners L.P., as

Syndication Agent (such Agents, collectively, the "**First Lien Agents**") for the Lenders

thereunder (the "**First Lien Secured Lenders**"), and (ii) the Master Agreement, dated

May 7, 2004 (including the schedule thereto and each confirmation related thereto, as

amended restated, modified or waived from time to time, the "**First Lien Hedge**

**Agreement**") between the Borrower and Goldman Sachs Capital Markets, L.P. (the

"**First Lien Hedge Provider**," and, collectively with the First Lien Secured Lenders, the

"**First Lien Secured Parties**"), (b) the lenders under the second lien credit facility evidenced by the Second Lien Credit Agreement, dated as of April 28, 2004 (as amended, restated, modified or waived from time to time, the "**Second Lien Credit Agreement**"), by and among the Borrower, the lenders party thereto, (the "**Second Lien Secured Lenders**"), Credit Suisse, as Second Lien Administrative Agent and Second Lien Collateral Agent, and Goldman Sachs Credit Partners LP, as Syndication Agent (such Agents together with any replacement or successor agents appointed in accordance with the terms of the Second Lien Credit Agreement or, in the absence thereof, such representatives as may be appointed by the Second Lien Secured Lenders holding a majority of the principal amount of indebtedness outstanding under the Second Lien Credit Agreement, collectively, the "**Second Lien Agents**" and the Second Lien Agent serving as Administrative Agent being the "**Second Lien Administrative Agent**" and the Second Lien Agent serving as Collateral Agent being the "**Second Lien Collateral Agent**") and (c) the holders (the "**Third Lien Secured Lenders**") of the Series B Notes under the Fourth Amended and Restated Subordinated Note Agreement, dated as of April 28, 2004 (the "**Subordinated Note Agreement**"), entered into by the Borrower, the Borrower's subsidiaries party thereto, U.S. Bank, National Association, as collateral agent (the "**Third Lien Agent**," and together with the First Lien Agents and Second Lien Agents, the "**Pre-Petition Agents**")(the agreements identified in this subparagraph (3), together with each other instrument or document executed and delivered in connection therewith, being hereinafter referred to collectively as the "**Existing Agreements**," all the lenders or counterparties under the Existing Agreements (but excluding the holders of the Series A Notes under and as defined in the Subordinated Note Agreement) being

-3-

hereinafter referred to collectively as the **"Pre-Petition Secured Lenders,"** and all of the
Borrower's indebtedness to the Pre-Petition Secured Lenders in respect of hedges entered
into, loans made and letters of credit issued by the Pre-Petition Secured Lenders pursuant
to, and in accordance with the terms of, the Existing Agreements, plus, in each case,
interest thereon and fees, expenses (including, without limitation, any attorneys',
accountants', appraisers' and financial advisors' fees that are chargeable or reimbursable
under the Existing Agreements), charges and other obligations incurred in connection
therewith as provided in the Existing Agreements being hereinafter referred to
collectively as the **"Pre-Petition Debt"**), whose liens and security interests are being
primed by the Financing;

(4)   authorization for the Debtors to use cash collateral (as such term is defined
in the Bankruptcy Code) in which the Pre-Petition Secured Lenders have an interest, and
the granting of adequate protection to the Pre-Petition Secured Lenders with respect to,
*inter alia*, such use of their cash collateral and all use and diminution in the value of the
liens and security interests (the **"Pre-Petition Liens"**) in the personal and real property
described in the Existing Agreements (the **"Pre-Petition Collateral"**);

(5)   the granting of certain liens and superpriority claims to the DIP Lenders
payable from, and having recourse to, all pre-petition and post-petition Property of the
Debtors' estates, including, with respect to the superpriority claims, Avoidance Action
Proceeds (as defined below), in each case subject to the Carve Out (as defined below);

(6)   limiting the Debtors' and their estates' right to surcharge against Collateral
(as defined below) pursuant to section 506(c) of the Bankruptcy Code; and

-4-

(7)    authorization for the Debtors to (a) apply a portion of the proceeds of the Financing on the closing thereof to repay in full in cash all of the Debtors' obligations outstanding under the existing Revolving Credit, Term Loan and Guaranty Agreement (as amended from time to time the "**Existing DIP Credit Agreement**") dated as of April 28, 2005 among the Borrower, the subsidiaries named therein as guarantors, the financial institutions party thereto, JPMorgan Chase Bank, N.A., as administrative agent (the "**Existing DIP Administrative Agent**") for the Lenders thereunder (the "**Existing DIP Lenders**") and the other documents, agreements, notes and instruments executed and/or delivered from time to time in connection therewith (collectively, the "**Existing DIP Documents**") and (b) return to the issuer, cash collateralize or support all undrawn letters of credit issued under the Existing DIP Credit Agreement (the "**Existing Letters of Credit**") in accordance with the terms of the Existing DIP Agreement, which Existing Letters of Credit will be replaced or supported in accordance with the terms of the Existing DIP Credit Agreement by letters of credit issued under the DIP Credit Agreement (any letters of credit issued under the DIP Credit Agreement, "**Letters of Credit**"); all obligations arising under or relating to the Existing DIP Documents, whether contingent, matured, liquidated, unliquidated, legal or equitable shall be referred to herein as the "**Existing DIP Obligations**."

Due and appropriate notice under the circumstances having been given in accordance with Rules 4001(b), (c) and (d) of the Motion, the Original Motion and the relief requested therein, and the notice of the final hearing (the "**Final Hearing**") having been served by the Debtors on the Agent, the Existing DIP Administrative Agent, the Existing DIP Lenders, the Pre-

Petition Agents, the official committee of unsecured creditors appointed in the Cases (the "**Creditors' Committee**") and on the United States Trustee for the District of Delaware.

The Final Hearing having been held on June 29, 2005 and June 30, 2005, upon the record made by the Debtors at the Final Hearing and after due deliberation and consideration and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.  Jurisdiction. This Court has core jurisdiction over the Cases, this Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.  Notice. Under the circumstances, the notice given by the Debtors of the Motion and the Final Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Code Sections 102(l), 363(c) and 364, Bankruptcy Rules 2002, 4001(b), (c), and (d), 9007, 9014 and applicable local rules.

3.  Debtors' Stipulations. The Debtors admit, stipulate, and agree without prejudice to the rights of any other party in interest, that as of April 26, 2005, the date on which the Cases were commenced (the "**Petition Date**"), (a) the aggregate value of the Pre-Petition Collateral covered by Pre-Petition Liens securing the Pre-Petition Debt owing by the Debtors to the First Lien Secured Parties (the "**Pre-Petition First Lien Debt**") under the Existing Agreements related to the Pre-Petition First Lien Debt, including, without limitation, (i) the First Lien Credit Agreement, (ii) the First Lien Guarantee and Collateral Agreement, dated as of April 28, 2004, among the Borrower and the First Lien Collateral Agent, and (iii) each instrument or document executed and delivered in connection therewith, exceeded (b) the aggregate amount of the Pre-Petition First Lien Debt.

-6-

4.    Findings Regarding the Financing.

(a)    Good cause has been shown for the entry of this Order.  Pursuant to the

Supplemental Interim Order (I) Authorizing Debtors (A) To Obtain Post-Petition Financing

Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) And 364(e),

(B) To Utilize Cash Collateral Pursuant To 11 U.S.C. § 363 And (C) To Enter Into The Waiver

Dated As Of May 26, 2005 Under The Revolving Credit, Term Loan And Guaranty Agreement

And (II) Granting Adequate Protection To Prepetition Secured Parties Pursuant To 11 U.S.C. §§

361, 362, 363 and 364 entered May 27, 2005 (the "**Supplemental Interim Order**"), the

Debtors' authorization to use Cash Collateral (as defined below) expires on June 30, 2005.  Thus,

the Debtors have an immediate need to obtain the Financing and continue to use Cash Collateral,

in each case as set forth in this Order,  in order to permit, among other things, the orderly

continuation of the operation of their businesses, to maintain business relationships with vendors,

suppliers and customers, to make payroll, to make capital expenditures and to satisfy other

working capital and operational needs.  The access of the Debtors to sufficient working capital

and liquidity through the use of Cash Collateral, incurrence of new indebtedness for borrowed

money and other financial accommodations is vital to the preservation and maintenance of the

going concern values of the Debtors, to a successful reorganization of the Debtors and to avoid

irreparable harm to the Debtors, their estates and their creditors.

(b)    The Debtors are unable to obtain financing on more favorable terms from

sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate

unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative

expense. The Debtors are also unable to obtain secured credit allowable under sections

364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the Debtors granting to the

-7-

Agent and the DIP Lenders, subject to the Carve Out as provided for herein, the DIP Liens and

the Superpriority Claims (each as defined below) under the terms and conditions set forth in this

Order and in the DIP Documents. The terms of the Financing and the use of Cash Collateral are

fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with

their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(c)     The Financing has been negotiated in good faith and at arm's length

among the Debtors, the Agent and the DIP Lenders, and all of the Debtors' obligations and

indebtedness arising under, in respect of or in connection with the Financing and the DIP

Documents, including, without limitation, (i) all loans made to, and all Letters of Credit issued

for the account of, the Debtors pursuant to the Revolving Credit, Term Loan and Guaranty

Agreement substantially in the form filed with the Court prior to the date hereof (the "**DIP**

**Credit Agreement**"), and (ii) any Obligations (as defined in the DIP Credit Agreement) and any

Secured Obligations (as defined in the DIP Credit Agreement), including, without limitation,

credit extended in respect of overdrafts and related liabilities arising from depository, treasury,

and cash management services or in connection with any automated clearing house transfer of

funds provided by Credit Suisse, or any other DIP Lender or any of their respective affiliates (or

any person that was a DIP Lender or an affiliate of a DIP Lender at the time so provided) (all of

the foregoing in clauses (i) and (ii), collectively, the "**DIP Obligations**"), shall be deemed to

have been extended by the Agent, the DIP Lenders and their respective affiliates in good faith, as

that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the

protections offered by section 364(e) of the Bankruptcy Code, and shall be entitled to the full

protection of section 364(e) of the Bankruptcy Code in the event that this Order or any provision

hereof is vacated, reversed or modified, on appeal or otherwise.

(d)    The Debtors have requested entry of this Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) based on the Motion and Original Motion. Consummation of the Financing and the use of Cash Collateral in accordance with this Order and the DIP Documents is therefore in the best interest of the Debtors' estates.

5.    Authorization of the Financing and the DIP Documents.

(a)    The Motion is granted, all objections not previously withdrawn are hereby overruled and the DIP Documents and the transactions contemplated thereby are approved in all respects and the performance of the Debtors' obligations thereunder and relating thereto is hereby approved and authorized in all respects. Other than as to the protections granted to the Existing DIP Administrative Agent and to the Existing DIP Lenders (as expressly modified hereby), this Order supersedes the Supplemental Interim Order and the order dated April 27, 2005 (the "**Prior Order**") authorizing the financing incurred pursuant to the Existing DIP Credit Agreement in all respects for all periods on and after the date of this Order.

(b)    The Debtors are hereby authorized to enter into the DIP Documents. The Borrower is hereby authorized to borrow money and the Debtors are authorized to obtain Letters of Credit pursuant to the DIP Credit Agreement, and the Guarantors are hereby authorized to guaranty such borrowings and the Borrower's obligations with respect to such Letters of Credit, up to an aggregate principal or face amount of $75,000,000 (plus interest, fees and other expenses provided for in the DIP Documents), with a $30,000,000 letter of credit aggregate sublimit, subject to any borrowing base or other limitations of borrowings under the DIP Documents, upon the terms of this Order and the DIP Documents, which shall be used solely for purposes permitted under the DIP Documents, including, without limitation, to provide working capital for the Borrower and the Guarantors, to pay interest, fees and expenses in accordance

with this Order and/or the DIP Documents, to repay, in full in cash the Existing DIP Obligations

and to issue Letters of Credit in replacement or support of the Existing Letters of Credit.  In

addition to such loans and obligations under the DIP Documents and subject to the terms thereof,

the Debtors are authorized to incur as additional DIP Obligations overdrafts and related liabilities

arising from treasury, depository and cash management services or in connection with any

automated clearing house transfer of funds provided to or for the benefit of the Debtors by Credit

Suisse or any other DIP Lender or any of their respective affiliates; *provided, however*, that

nothing herein shall require Credit Suisse or any other party to incur overdrafts or to provide any

such services or functions to the Debtors.

        (c)     This Order shall become effective immediately upon its entry.

Contemporaneously with the execution and delivery thereof, the DIP Documents shall constitute

valid and binding obligations of each Debtor, enforceable against each Debtor in accordance

with the terms of the DIP Documents.  Unless otherwise expressly provided herein, no

obligation, payment, transfer or grant of security under the DIP Documents or this Order shall be

stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable

law (including, without limitation, under section 502(d) of the Bankruptcy Code), or subject to

any defense, reduction, setoff, recoupment or counterclaim.

        (d)     In furtherance of the foregoing and without further approval of this Court,

each Debtor is authorized and directed to do and perform all acts, to make, execute and deliver

all instruments and documents (including, without limitation, the execution or recordation of

security agreements, mortgages and financing statements), and to pay all fees and expenses, that

may be reasonably required or necessary for the Debtors' performance of their obligations under

the Financing, including, without limitation:

(i)      the execution, delivery and performance of the Loan Documents (as defined in the DIP Credit Agreement) and any exhibits attached thereto, including, without limitation, the DIP Credit Agreement, the Security and Pledge Agreement (as defined in the DIP Credit Agreement), the Fee Letter (as defined in the DIP Credit Agreement) and the Letters of Credit (collectively, the "**DIP Documents**");

(ii)     the execution, delivery and performance of one or more amendments or other modifications to, or implementation of waivers or consents under, the DIP Credit Agreement for, among other things, the purpose of (A) adding additional financial institutions as DIP Lenders, (B) reallocating the commitments for the Financing among the DIP Lenders, and (C) changing the terms, conditions and structure of the Financing if the Agent determines, after consultation with the Debtors, that such changes are advisable in order to ensure a successful syndication of the Financing, or to effectuate the change contemplated in Section 8.05(b) of the Credit Agreement relating to the replacement of Credit Suisse as collateral agent *provided, however,* that the Agent shall not be entitled to make any changes to the financial covenants, pricing, tenor or amount of the Financing; and it is understood that (x) no further approval of this Court shall be required for amendments or other modifications to, or implementation of waivers or consents under, the DIP Credit Agreement that do not shorten the maturity of the extensions of credit thereunder, increase the commitments, increase the maximum aggregate amount of indebtedness that may be incurred thereunder above $75,000,000, increase the rate of interest, letter of credit fees or other fees

-11-

payable thereunder, or otherwise materially change the terms of the Financing and

(y) the Debtors shall provide such notice of any such proposed or adopted

amendments to counsel to the First Lien Agents, the Second Lien Agents and the

Creditors' Committee as may be reasonably practicable under the circumstances

(but any failure to provide such notice shall have no impact on the effectiveness

of any such amendment);

      (iii)    the non-refundable payment to the Agent or the DIP Lenders, as

the case may be, of (A) the fees referred to in the DIP Credit Agreement and the

Fee Letter (as defined in the DIP Credit Agreement) and (B) reasonable costs and

expenses as may be due from time to time, including, without limitation, fees and

expenses of the professionals retained as provided for in the DIP Documents; and

      (iv)    the performance of all other acts required under or in connection

with the DIP Documents or reasonably requested by the Agent consistent with the

intent of this Order.

    6.    Superpriority Claims.

    (a)    Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP

Obligations shall constitute allowed claims against the Debtors with priority over any and all

administrative expenses, the JPM Claim (as defined below), the Special Priority Pre-Petition

First Lien Debt (as defined below), the Adequate Protection Priorities (as defined below) and

any other diminution claims, and all other claims against the Debtors, now existing or hereafter

arising, of any kind whatsoever, including, without limitation, all administrative expenses of the

kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all

administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b),

507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (the "**Superpriority Claims**"),

whether or not such expenses or claims may become secured by a judgment lien or other

consensual or non-consensual lien, levy or attachment, which allowed claims shall be payable

from and have recourse to all pre- and post-petition Property of the Debtors, including, without

limitation, proceeds of Avoidance Actions (the "**Avoidance Action Proceeds**"), subject only to

the payment of the Carve Out (as defined below).

(b)      For purposes hereof, the "**Carve Out**" means (i) all fees required to be

paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under

section 1930(a) of title 28 of the United States Code and (ii) after the occurrence and during the

continuance of an Event of Default (as defined in the DIP Credit Agreement), an amount not

exceeding $5,000,000 in the aggregate, which amount may be used subject to the terms of this

Order to pay any fees or expenses incurred at any time by the Debtors and any statutory

committees appointed in the Cases (each, a "**Committee**") in respect of (A) allowances of

compensation for services rendered or reimbursement of expenses awarded by the Bankruptcy

Court to the Debtors' or any Committee's professionals and (B) the reimbursement of expenses

allowed by the Bankruptcy Court incurred by Committee members in the performance of their

duties (but excluding fees and expenses of third-party professionals employed by such

members); *provided, however,* (1) that the dollar limitation in this clause 6(b)(ii) on fees and

disbursements shall neither be reduced nor increased by the amount of any compensation or

reimbursement of expenses incurred, awarded or paid prior to the occurrence of an Event of

Default in respect of which the Carve Out is invoked or by any fees, expenses, indemnities or

other amounts paid to the Agent, any Lender or their respective attorneys and agents under the

DIP Credit Agreement or otherwise, (2) to the extent the dollar limitation in this clause 6(b)(ii)

on fees and disbursements is reduced by any amount as a result of payment of such fees and

disbursements during the continuance of an Event of Default, and such Event of Default is

subsequently cured or waived and no other Event of Default then exists, then effective as of the

effectiveness of such cure or waiver, such dollar limitation shall be increased by an amount equal

to the amount by which it has been so reduced, (3) that nothing herein shall be construed to

impair the ability of any party to object to any of the fees, expenses, reimbursement or

compensation described in clauses (A) and (B) above, and (4) that any cash or other amounts on

deposit in the Letter of Credit Account (as defined in the DIP Credit Agreement), shall not be

subject to the Carve Out.

      7.    DIP Liens. As security for the DIP Obligations, effective and perfected upon the

date of this Order, the Payment in Full of the Existing DIP Obligations in accordance with

paragraph 20 below, and without the necessity of the execution, recordation or filing by the

Debtors or the DIP Lenders of mortgages, security agreements, control agreements, pledge

agreements, financing statements or other similar documents, the following security interests and

liens are hereby granted to the Agent for its own benefit and the benefit of the DIP Lenders (all

property identified in clauses (a), (b) and (c) below being collectively referred to as the

"**Collateral**"), subject, only in the event of the occurrence and during the continuance of an

Event of Default, to the payment of the Carve Out (all such liens and security interests granted to

the Agent, for its benefit and for the benefit of the DIP Lenders, pursuant to this Order and the

DIP Documents, the "**DIP Liens**"):

      (a)    First Lien on Cash Balances and Unencumbered Property. Pursuant to

section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully

perfected, unavoidable first priority senior security interest in and lien upon all pre- and post-

-14-

petition property of the Debtors, whether existing on the Petition Date or thereafter acquired,

including, without limitation, all cash and cash collateral of the Debtors (whether maintained

with the Agent or otherwise) and any investment of such cash and cash collateral, inventory,

accounts receivable, other rights to payment, tax refund claims, insurance proceeds and tort

claims whether arising before or after the Petition Date, contracts, properties, plants, equipment,

general intangibles, documents, instruments, interests in leaseholds, real properties, chattel paper,

fixtures, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license

agreements and other intellectual property, capital stock of subsidiaries of the Borrower and the

Guarantors, all cash maintained in the Letter of Credit Account, and the proceeds of all the

foregoing (all of such property collectively, "**Property**") that, on or as of the Petition Date, is not

subject to valid, perfected and unavoidable liens.  Notwithstanding the foregoing, the Collateral

(a) shall not include the Debtors' claims and causes of action under sections 502(d), 544, 545,

547, 548, 549 and 550 of the Bankruptcy Code, or any other avoidance actions under the

Bankruptcy Code  (collectively, "**Avoidance Actions**") or Avoidance Actions Proceeds and (b)

shall include 65% (but no greater percentage) of the voting stock of each foreign subsidiary of

the Debtors.

(b)      Liens Priming Pre-Petition Liens.  Pursuant to section 364(d)(1) of the

Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, unavoidable first

priority senior priming security interest in and lien upon all pre- and post-petition Property of the

Debtors), whether now existing or hereafter acquired, that is subject to the Pre-Petition Liens

(including, without limitation, in respect of issued but undrawn letters of credit).  Such security

interests and liens shall be senior in all respects to the interests in such property of the Pre-

Petition Secured Lenders arising from the Pre-Petition Liens and liens of the Pre-Petition

-15-

Secured Lenders arising after the Petition Date (including, without limitation, the Adequate

Protection Liens (as defined below) ), but shall not be senior to any valid, perfected and

unavoidable interests of other parties arising out of liens, if any, on such property existing

immediately prior to the Petition Date, or to any valid and unavoidable liens in existence

immediately prior to the Petition Date that are perfected or continued subsequent to the Petition

Date as permitted by section 546(b) of the Bankruptcy Code to which the liens of the Pre-

Petition Secured Lenders become subject.

(c)     Liens Junior to Certain Other Liens. Pursuant to section 364(c)(3) of the

Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected and unavoidable

security interest in and lien upon all pre- and post-petition Property of the Debtors (other than the

Property described in clauses (a) or (b) of this paragraph 7, as to which the liens and security

interests in favor of the Agent will be as described in such clauses), whether now existing or

hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence

immediately prior to the Petition Date or to valid and unavoidable liens in existence immediately

prior to the Petition Date that are perfected or continued subsequent to the Petition Date as

permitted by section 546(b) of the Bankruptcy Code, which security interests and liens in favor

of the Agent are junior to such valid, perfected and unavoidable liens (including any such liens

that had so arisen in favor of Walbridge Aldinger Company and its subcontractors in connection

with their work on the Fowlerville, Michigan facility of the Debtors).

(d)     Liens Senior to Certain Other Liens. The DIP Liens and the Adequate

Protection Liens (as defined below) shall not be subject or subordinate to (i) any lien or security

interest that is avoided and preserved for the benefit of the Debtors and their estates under

section 551 of the Bankruptcy Code or (ii) any liens arising after the Petition Date including,

-16-

without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors, other than any valid, perfected and unavoidable post-petition liens that may have arisen or arise in favor of (x) Walbridge Aldinger Company and its subcontractors in an amount not to exceed $5,000,000 in connection with their work on the Fowlerville, Michigan facility of the Debtors and (y) Omega Tool Corporation and Wings Tool Technology, Inc. in an amount not to exceed $1,000,000 in the aggregate in connection with the building of new tooling for the Debtors, which liens, if any, shall be senior to the DIP Liens.

    8.    Protection of DIP Lenders' Rights.

    (a)    So long as there are any borrowings or Letters of Credit or other amounts outstanding (other than contingent indemnity obligations as to which no claim has been asserted when all other amounts have been paid and no Letters of Credit are outstanding), or the DIP Lenders have any Commitment (as defined in the DIP Credit Agreement) under the DIP Credit Agreement, the Pre-Petition Agents and Pre-Petition Secured Lenders shall (i) take no action to foreclose upon or recover in connection with the liens granted thereto pursuant to the Existing Agreements or this Order, or otherwise exercise remedies against any Collateral or seek court authorization to exercise remedies against any Collateral or seek to lift the automatic stay to exercise any remedies against any Collateral, (ii) not seek additional adequate protection that is senior to or *pari passu* with the DIP Liens or the Superpriority Claims or provides for cash payments greater in amount or different in timing than those provided for such Pre-Petition Agent or Pre-Petition Secured Lenders pursuant to paragraph 12 of this Order, (iii) be deemed to have consented to any release of Collateral authorized under the DIP Documents and (iv) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien

-17-

or similar instruments, or otherwise take any action to perfect their security interests in the

Collateral unless required by applicable state law to continue the perfection of valid and

unavoidable liens or security interests as of the Filing Date (it being understood that the Pre-

Petition Agents and the Pre-Petition Secured Lenders shall be expressly permitted to take any

action or make any filing in connection with any change in collateral agents as and to the extent

permitted under the relevant Existing Agreements); *provided, further*, that the Pre-Petition

Secured Lenders shall otherwise maintain their respective rights as creditors to file motions or

take positions with respect to motions or applications pending in the Bankruptcy Court.

        (b)     Until the DIP Pay-Out (as defined below) shall have occurred, each

Debtor holding an administrative claim against another Debtor pursuant to an order of this Court

or otherwise, shall not exercise any right or remedy with respect to such administrative claim and

shall forbear from exercising, and shall not be entitled to exercise, any right or remedy granted

post-petition including, without limitation, seeking any sale, realization upon or liquidation of

any Property of any Debtor, or taking any position with respect to any disposition of the

Property, the business operations, or the reorganization of the Debtors that could reasonably be

expected to interfere with or adversely affect the ability of the Agent or the DIP Lenders to

exercise any right or remedy or obtain satisfaction in full of the Obligations.

        (c)     The automatic stay provisions of section 362 of the Bankruptcy Code are

vacated and modified to the extent necessary to permit the Agent and the DIP Lenders to

exercise, (i) immediately upon the occurrence of an Event of Default or the Maturity Date (in

each case as defined in the DIP Credit Agreement), all rights and remedies under the DIP

Documents other than those rights and remedies against the Collateral as provided in clause (ii)

below and (ii) upon the occurrence and during the continuance of an Event of Default or the

Maturity Date and (except to the extent that the Maturity Date is caused by the Scheduled Termination Date or any extension thereof in accordance with the DIP Credit Agreement) the giving of five business days' prior written notice to the Borrower, counsel to the Creditors' Committee, counsel to the First Lien Administrative Agent, First Lien Counsel (but only so long as First Lien Counsel has provided prior written notice to counsel to the DIP Agent of its status as First Lien Counsel), Crossover Counsel (but only so long as Crossover Counsel has provided prior written notice to counsel to the DIP Agent of its status as Crossover Counsel), counsel to the Second Lien Administrative Agent, counsel to the Third Lien Agent, and the United States Trustee for the District of Delaware, all rights and remedies against the Collateral provided for in the DIP Documents (including, without limitation, the right to set off monies of the Debtors in accounts maintained with the Agent or any DIP Lender); provided, however, that the Debtors shall be permitted to use Cash Collateral during such five business day notice period for ordinary course expenses. In any hearing regarding the entitlement of the Agent or the DIP Lenders to any exercise of rights or remedies set forth in this Order or in the DIP Documents, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Debtors and the Pre-Petition Secured Lenders hereby waive their right to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way delay or otherwise impair or restrict the rights and remedies of the Agent or the DIP Lenders set forth in this Order or the DIP Documents. In no event shall the Agent, the DIP Lenders, the First Lien Agents, the First Lien Secured Parties, the Second Lien Agents or the Second Lien Secured Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral or the Pre-Petition Collateral.

-19-

9.      Limitation on Charging Expenses Against Collateral.  Except to the extent of the

Carve Out, no expenses of administration of the Cases or any future proceeding that may result

therefrom, including, without limitation, liquidation in bankruptcy or other proceedings under the

Bankruptcy Code, shall be charged against or recovered from the DIP Lenders or their Collateral

or from the First Lien Agents, the First Lien Secured Parties, the Second Lien Agents, the

Second Lien Secured Lenders, their respective Pre-Petition Collateral or their respective

Collateral subject to Adequate Protection Liens, in each case pursuant to section 506(c) of the

Bankruptcy Code or any similar principle of law, without the prior written consent of the Agent,

the First Lien Administrative Agent and/or the Second Lien Administrative Agent, as the case

may be, and no such consent shall be implied from any other action, inaction, or acquiescence by

the Agent or the DIP Lenders, the First Lien Agents, the First Lien Secured Parties, the Second

Lien Agents or the Second Lien Secured Lenders; *provided*, that for the avoidance of doubt, the

foregoing waiver of the Debtors' and their estates' right to seek to surcharge the Collateral or the

Pre-Petition Collateral shall apply solely for the benefit of the Agent, the DIP Lenders, the First

Lien Agents, the First Lien Secured Parties, the Second Lien Agents and the Second Lien

Secured Lenders.

10.      The Cash Collateral.  To the extent any funds were on deposit with the Pre-

Petition Secured Lenders immediately prior to the Petition Date, including, without limitation, all

funds deposited in, or credited to, an account of any Debtor with any Pre-Petition Secured

Lender immediately prior to the filing of the Debtors' bankruptcy petitions (the **"Petition**

**Time"**) (regardless of whether, as of the Petition Time, such funds had been collected or made

available for withdrawal by any such Debtor), such funds (the **"Deposited Funds"**) are subject to

rights of setoff.  By virtue of such setoff rights, the Deposited Funds are subject to a lien in favor

-20-

of such Pre-Petition Secured Lenders pursuant to sections 506(a) and 553 of the Bankruptcy

Code. Any proceeds of the Pre-Petition Collateral (including, without limitation, the Deposited

Funds or any other funds on deposit at the Pre-Petition Secured Lenders or at any other

institution as of the Petition Time) are cash collateral of the Pre-Petition Secured Lenders within

the meaning of section 363(a) of the Bankruptcy Code. The Deposited Funds, all such proceeds

of Pre-Petition Collateral and any proceeds of Pre-Petition Collateral received by any Debtor

after the Petition Date are referred to in this Order as **"Cash Collateral."**

11.     Use of Cash Collateral. The Debtors are hereby authorized to use all Cash

Collateral, and the Pre-Petition Secured Lenders are directed promptly to turn over to the

Debtors all Cash Collateral received or held by them; *provided*, that the Pre-Petition Secured

Lenders are granted adequate protection as hereinafter set forth. The Debtors' right to use Cash

Collateral shall terminate automatically on the Scheduled Termination Date (or any extension

thereof in accordance with the DIP Credit Agreement) or otherwise in accordance with

paragraph 8(c) hereof.

12.     Adequate Protection.

(a)     Adequate Protection Afforded to First Lien Secured Parties. The First

Lien Agents and First Lien Secured Parties shall be afforded the following benefits as adequate

protection pursuant to sections 361, 363(e), 364(c)(1) and 364(d)(1) of the Bankruptcy Code and

in settlement of all other issues related to the priming and use of Cash Collateral contemplated by

this Order:

(i)     Special Priority Pre-Petition First Lien Debt. In addition to, and

irrespective of, the adequate protection provided in paragraph 12(a)(ii) hereof,

approximately $136,470,000 (the exact amount being the sum of $135,000,000

-21-

plus 43.548% of the allowed principal amount of the Pre-Petition First Lien Debt

arising under the First Lien Hedge Agreement) principal amount of the Pre-

Petition First Lien Debt, including amounts arising under the First Lien Credit

Agreement and the First Lien Hedge Agreement (the "**Special Priority Pre-**

**Petition First Lien Debt**," and the remaining principal of the Pre-Petition First

Lien Debt that is not afforded priority under this clause (i), the "**Unaffected Pre-**

**Petition First Lien Debt**"), shall be afforded priority over any and all

administrative expenses, the Adequate Protection Priorities (as defined below)

and any other diminution claims, and all other claims against the Debtors, now

existing or hereafter arising, of any kind whatsoever, including, without

limitation, all administrative expenses of the kind specified in sections 503(b) and

507(b) of the Bankruptcy Code, and over any and all administrative expenses or

other claims arising under sections 105, 326, 328, 330, 331, 503(b), 507(a),

507(b), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses

or claims may become secured by a judgment lien or other consensual or non-

consensual lien, levy or attachment, which allowed claims shall be payable from

and have recourse to all pre- and post-petition Property of the Debtors, including,

without limitation, Avoidance Action Proceeds (but excluding Avoidance Action

Proceeds against the First Lien Secured Parties), subject only to the payment of

the Superpriority Claims, the JPM Claims and the Carve Out. For purposes of

application of section 364(c)(1) of the Bankruptcy Code, a portion of the Pre-

Petition First Lien Debt equal in amount to the Special Priority Pre-Petition First

Lien Debt shall be deemed by this Order to have been repaid by the Debtors to the

First Lien Secured Parties and reborrowed immediately by the Debtors from the
First Lien Secured Parties, in each case after the Petition Date and such Special
Priority Pre-Petition First Lien Debt shall be deemed First Lien Obligations (as
defined in that certain Intercreditor Agreement by and among certain parties to the
First Lien Credit Agreement and the Second Lien Credit Agreement). Reference
is made to (A) paragraph 12(b)(ii) below for provisions that are applicable to
cramdown of a portion of the Special Priority Pre-Petition First Lien Debt and (B)
paragraph 16(d) below for defeasance provisions that are applicable to the priority
afforded to the Special Priority Pre-Petition First Lien Debt. The Special Priority
Pre-Petition First Lien Debt (and the Subject Debt component thereof referred to
below) and the Unaffected Pre-Petition First Lien Debt shall be allocated among
the First Lien Secured Parties in proportion to the principal amount of their
respective holdings of Pre-Petition First Lien Debt.

(ii)     Adequate Protection Liens and Priority. Solely to the extent of any
diminution in the value of the valid, perfected and unavoidable Pre-Petition Liens
of the First Lien Agents and the First Lien Secured Parties on and after the
Petition Date, (A) replacement liens (the "**First Lien Adequate Protection
Liens**") securing the Pre-Petition First Lien Debt (including the Special Priority
Pre-Petition First Lien Debt and the Unaffected Pre-Petition First Lien Debt) on
all of the Collateral, junior only to the DIP Liens, any liens to which the DIP
Liens are junior and the Carve Out and (B) priority status (the "**First Lien
Adequate Protection Priority**") under section 507(b) of the Bankruptcy Code for
the Pre-Petition First Lien Debt (including the Special Priority Pre-Petition First

-23-

Lien Debt and the Unaffected Pre-Petition First Lien Debt), junior only to the
Superpriority Claims, the JPM Claim, the Special Priority Pre-Petition First Lien
Debt and the Carve Out.

      (iii)     Adequate Protection Payments. The Debtors shall pay (A) on the
first business day of each month to the First Lien Administrative Agent, for the
benefit of itself and the First Lien Secured Lenders, all post-petition interest
accrued and accruing on the Pre-Petition First Lien Debt arising under the First
Lien Credit Agreement, (x) with respect to all periods prior to the date of this
Order, at the applicable rate and payable as provided in the Prior Order and (y)
with respect to all periods on and after the date of this Order, at the Adjusted
LIBO Rate (as defined in the First Lien Credit Agreement) plus 7.00% per
annum, of which 5.00% per annum shall be payable in cash and 2.00% per annum
shall accrue and be capitalized as additional principal on each interest payment
date (interest accrued on Special Priority Pre-Petition First Lien Debt shall be
capitalized as additional Special Priority Pre-Petition First Lien Debt principal,
and interest accrued on Unaffected Pre-Petition First Lien Debt shall be
capitalized as additional Unaffected Pre-Petition First Lien Debt principal), (B) on
the first business day of each month to the First Lien Hedge Provider, all post-
petition interest on the outstanding balance of the Pre-Petition Debt under the
First Lien Hedge Agreement, (x) with respect to all periods prior to the date of
this Order, at the applicable rate and payable as provided in the First Lien Hedge
Agreement and (y) with respect to all periods on and after the date of this Order,
at the rate and paid or accrued in the same manner and to the same extent as

-24-

applicable above to the First Lien Secured Lenders, and (C) when and to whom

payable under the First Lien Credit Agreement, all fees, expenses, costs and other

amounts payable in accordance with the terms of the First Lien Credit Agreement

(but, except as set forth herein, not the fees and expenses of any professionals

representing entities other than the First Lien Administrative Agent), including

within 10 days of submission to the Borrower of each invoice therefor (and

without being required to submit any application to this Court), the reasonable

fees and expenses of counsel and financial advisor to the First Lien

Administrative Agent. As additional adequate protection, the Debtors will pay (i)

the reasonable fees and expenses accrued through June 30, 2005, not to exceed

$250,000, of Milbank, Tweed, Hadley & McCloy LLP ("Milbank") as counsel to

the "Informal Committee" of First Lien Secured Lenders without Milbank's need

to file a fee application, and with such fees and expenses to be paid within a

reasonable period of time (not to exceed thirty days following the Debtors' receipt

of an invoice(s) and supporting detail) and (ii) the reasonable fees and expenses of

(a) one law firm (if any) as counsel (the "**First Lien Counsel**") to an ad hoc

committee of First Lien Secured Lenders that hold only Pre-Petition First Lien

Debt, and (b) one law firm (if any) as counsel (the "**Crossover Counsel**") to an ad

hoc committee of First Lien Secured Lenders that hold both Pre-Petition First

Lien Debt and Pre-Petition Second Lien Debt; *provided, however,* that (I) neither

the First Lien Counsel nor the Crossover Counsel fees and expenses shall exceed

$75,000 in any calendar month; *provided, further,* that, from and after October 1,

2005, to the extent that the First Lien Counsel or the Crossover Counsel fees and

expenses are less than $75,000 in a calendar month, the difference between

$75,000 and such amount may be carried forward by the First Lien Counsel or the

Crossover Counsel, as the case may be, to any successive calendar month, (II)

neither the First Lien Counsel nor the Crossover Counsel shall be entitled to

reimbursement from the Debtors for any fees or expenses incurred prior to the

time at which the First Lien Counsel or the Crossover Counsel serves upon the

Debtors, the Committee, the DIP Agent, the First Lien Agent and the Second Lien

Agent a letter in which the First Lien Counsel or the Crossover Counsel, as

applicable, verifies to each of the parties above that such counsel is acting as legal

counsel for holders of 25% or more in amount of the Pre-Petition First Lien Debt

and (a) in the case of the First Lien Counsel, that each such holder included in

calculating such percentage holds only Pre-Petition First Lien Debt and not Pre-

Petition Second Lien Debt or (b) in the case of the Crossover Counsel, that each

such holder included in calculating such percentage holds both Pre-Petition First

Lien Debt and Pre-Petition Second Lien Debt; (III) the First Lien Counsel and the

Crossover Counsel shall only be entitled to receive reimbursement of reasonable

fees and expenses for professional services relating to intercreditor issues, and

then only to the extent that such services are not duplicative of professional

services being provided by counsel to the First Lien Agent, (IV) the First Lien

Counsel and the Crossover Counsel shall each be required to file fee applications

as required of professionals engaged pursuant to Section 327(a) of the Bankruptcy

Code and they will be paid the reasonable fees and expenses compensable

hereunder pursuant to the same procedures as professionals retained pursuant to

Section 327(a) in the Debtors' bankruptcy cases, and (V) the First Lien Counsel

and the Crossover Counsel will represent, in each fee application that such

counsel submits, that it is acting, and has acted throughout the applicable period

in respect of the fee application, as legal counsel for holders of 25% or more in

amount of the Pre-Petition First Lien Debt, and (a) in the case of the First Lien

Counsel, that each such holder included in calculating such percentage holds only

Pre-Petition First Lien Debt and not Pre-Petition Second Lien Debt, and (b) in the

case of the Crossover Counsel, that each such holder included in calculating such

percentage holds both Pre-Petition First Lien Debt and Pre-Petition Second Lien

Debt.  If the foregoing representations are not made in any fee application, the

First Lien Counsel or the Crossover Counsel, as applicable, shall not be entitled to

be paid the fees and expenses requested in such application.

(b)    Provisions Relating to Adequate Protection Afforded to First Lien Secured

Parties.

(i)    Application of Payments on the Pre-Petition First Lien Debt.  All

payments or other distributions in respect of the Pre-Petition Collateral subject to

valid, perfected and unavoidable liens as of the Petition Date (other than fees and

interest provided for as adequate protection above) and First Lien Adequate

Protection Liens prior to the effective date of a chapter 11 plan for the Cases shall

be applied first to the Unaffected Pre-Petition First Lien Debt and, after the

Unaffected Pre-Petition First Lien Debt shall have been paid in full, then to the

Subject Debt (as defined below) and, after the Subject Debt shall have been paid

-27-

in full, finally to the remainder of the Special Priority Pre-Petition First Lien

Debt.

(ii)　　Special Voting Rule; Subject Debt.  Notwithstanding the priority

afforded to the Special Priority Pre-Petition First Lien Debt, the First Lien

Adequate Protection Priority and the provisions of Section 1129(a)(9)(A) of the

Bankruptcy Code, (A) a vote in favor of any chapter 11 plan of the Debtors by the

holders of Pre-Petition First Lien Debt shall be sufficient to accept the treatment

of the Pre-Petition First Lien Debt under such plan for purposes of Section 1129

of the Bankruptcy Code if such vote satisfies the requirements for acceptance of a

plan by a class of claims set forth in Section 1126(c) of the Bankruptcy Code

(after giving effect to any designation of claims under Section 1126(e) of the

Bankruptcy Code) and (B) $50,000,000 of the Special Priority Pre-Petition First

Lien Debt (the "Subject Debt") shall be subject to cramdown under section

1129(b) of the Bankruptcy Code as if it were additional Unaffected Pre-Petition

First Lien Debt provided that, in applying section 1129(b)(2)(A)(i)(II) of the

Bankruptcy Code in any such cramdown of the Subject Debt and Unaffected Pre-

Petition First Lien Debt of any holder, the term "the value of such holder's

interest in the estate's interest in such property" shall be deemed to refer to the

sum of (x) the value of the relevant holder's interest in the estate's interest in the

Collateral plus (y) the amount of the recovery (the "Priority Recovery") to which

such relevant holder's Subject Debt would be entitled from all available assets of

the Debtors' estates, including Avoidance Action Proceeds (giving effect to the

priority status of the Subject Debt but not to the requirements of section

1129(a)(9)(A)). For the avoidance of doubt, any portion of the Subject Debt that exceeds the sum of (I) the Priority Recovery and (II) the value of the First Lien Adequate Protection Liens and valid, perfected and unavoidable Pre-Petition Liens allocable to such Subject Debt shall be treated as a non-priority unsecured claim for cramdown purposes.

(iii)    Assignments of Pre-Petition First Lien Debt. Any assignments or other dispositions of Pre-Petition First Lien Debt and claims therefor must be effected in strips consisting of proportionate amounts of Special Priority Pre-Petition First Lien Debt (including a proportionate amount of Subject Debt) and Unaffected Pre-Petition First Lien Debt.

(c)    Adequate Protection Afforded to Second and Third Lien Secured Lenders. The Second Lien Agents, the Second Lien Secured Lenders, the Third Lien Agent and the Third Lien Secured Lenders shall be afforded the following benefits as adequate protection pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code and in settlement of all other issues related to the priming and use of Cash Collateral contemplated by this Order:

(i)    Second Lien Adequate Protection Liens and Priority. Solely to the extent of any diminution in the value of the valid, perfected and unavoidable Pre-Petition Liens of the Second Lien Agents and the Second Lien Secured Lenders on and after the Petition Date, the Second Lien Agents and the Second Lien Secured Lenders shall be afforded (A) replacement liens ("**Second Lien Adequate Protection Liens**") on all of the Collateral, junior only to the valid, perfected and unavoidable Pre-Petition Liens securing the Pre-Petition First Lien Debt, the First Lien Adequate Protection Liens, any liens to which the First Lien

-29-

Adequate Protection Liens are junior as set forth in paragraph 12(a)(ii) above and the Carve Out and (B) priority status (**"Second Lien Adequate Protection Priority"**) under section 507(b) of the Bankruptcy Code, junior only to the First Lien Adequate Protection Priority, any claims to which the First Lien Adequate Protection Priority is junior as set forth in paragraph 12(a)(ii) above and the Carve Out.

   (ii) <u>Third Lien Adequate Protection Liens and Priority</u>. Solely to the extent of any diminution in the value of the valid, perfected and unavoidable Pre-Petition Liens of the Third Lien Agent and the Third Lien Secured Lenders on and after the Petition Date, the Third Lien Agent and the Third Lien Secured Lenders shall be afforded (A) replacement liens (such liens, together with the First Lien Adequate Protection Liens and the Second Lien Adequate Protection Liens, the **"Adequate Protection Liens"**) on all of the Collateral, junior only to the valid, perfected and unavoidable Pre-Petition Liens securing the Pre-Petition Second Lien Debt (as defined below), the Second Lien Adequate Protection Liens, any liens to which the Second Lien Adequate Protection Liens are junior as set forth in paragraph 12(c)(i) above and the Carve Out and (B) priority status (such priority, together with the First Lien Adequate Protection Priority and the Second Lien Adequate Protection Priority, the **"Adequate Protection Priorities"**) under section 507(b) of the Bankruptcy Code, junior only to the Second Lien Adequate Protection Priority, any claims to which the Second Lien Adequate Protection Priority is junior as set forth in paragraph 12(c)(i) above and the Carve Out.

(iii)    Accrual of Interest on Pre-Petition Second Lien Debt. Post-

petition interest shall accrue on the Pre-Petition Debt owing to the Second Lien

Agents and the Second Lien Secured Lenders ("**Pre-Petition Second Lien Debt**")

at LIBOR plus 11.00% per annum, which interest shall accrue and be capitalized

monthly as additional Pre-Petition Second Lien Debt principal.

(iv)    Adequate Protection Payments. The Debtors shall pay the

reasonable fees, costs and expenses of the Second Lien Agents in accordance with

the Second Lien Credit Agreement (without duplication of amounts previously

paid), including within 10 days of submission to the Borrower of each invoice

therefor (and without being required to submit any application to this Court), the

reasonable fees and expenses (other than success fees) of Jones Day, as counsel,

local bankruptcy counsel and Houlihan, Lokey, Howard & Zukin ("Houlihan"), as

financial advisor to the Second Lien Administrative Agent, subject, in the case of

the fees payable to Houlihan, to a cap of $150,000 per month; provided, however,

that in the event of successor Second Lien Agents, the fees actually payable by

the Debtors to the Second Lien Agents under the Second Lien Credit Agreement

shall not be increased nor duplicated as a result of there being successor Second

Lien Agents.

(v)    Reporting Requirements. The First Lien Agents, the Second Lien

Agents and the Creditors' Committee shall receive from the Debtors the same

periodic financial reports and notices provided under the DIP Documents at the

same time and in the same manner as such reports are provided to the DIP Agent.

(vi)    Successor Agents. Any successor collateral agent to Credit Suisse
First Boston, in its capacity as Second Lien Collateral Agent (in such capacity,
**"CSFB as Second Lien Collateral Agent"**), shall be deemed to have valid,
perfected and unavoidable security interests in and liens on the collateral securing
the Pre-Petition Second Lien Debt only to the same extent and with the same
priority that CSFB as Second Lien Collateral Agent had, as of the Petition Date,
valid, perfected and unavoidable security interests and liens thereon (in the same
priority), without the need for filings of financing statements, mortgages or any
other records, or the execution of any agreements, control agreements, pledge
agreements or other similar documents or the taking of any other action to
maintain, evidence and perfect its liens.  Nevertheless, a successor agent may, but
is not required to, take such actions or execute such documents.

(d)    Restrictions on Payment of Pre-Petition Debt. Except for the payments of
fees and interest as adequate protection and the Adequate Protection Liens expressly provided
for above in this paragraph 12, (i) the Pre-Petition Agents and the Pre-Petition Secured Lenders
shall not receive or retain any payments, Property or other amounts in respect of the Pre-Petition
Debt (including, without limitation, cash payments in respect of the Special Priority Pre-Petition
First Lien Debt, the Adequate Protection Liens and the Adequate Protection Priorities) unless
and until the DIP Pay-Out shall have occurred, and (ii) except as permitted herein, the Second
Lien Agents, the Second Lien Secured Lenders, the Third Lien Agent and the Third Lien
Secured Lenders shall not receive or retain any adequate protection payments.

(e)    No Prejudice; Reservations of Rights; Invoices. The adequate protection
payments provided for in this paragraph 12 shall be without prejudice to the rights of the Pre-

Petition Agents and the Pre-Petition Secured Lenders to assert that they are entitled to allowance, but not current payment, of claims (including, without limitation, claims for post-petition interest and fees) in amounts in excess of the amounts provided for as adequate protection above. Except as may be required to permit the Second Lien Agents and the Second Lien Secured Lenders to receive and retain the adequate protection provided for in paragraph 12(c) hereof, the provisions of this Order shall not be deemed to supersede or terminate the provisions of any pre-petition intercreditor agreements. If it is asserted that, prior to the effective date of a confirmed plan of reorganization, the Second Lien Agents or the Second Lien Secured Lenders have received Pre-Petition Collateral or proceeds thereof in contravention of any pre-petition intercreditor agreement, this Court may exercise its jurisdiction over any dispute regarding the provisions of such pre-petition intercreditor agreement with respect to such receipt of Pre-Petition Collateral or such payments; provided, however, that the adequate protection payments and distributions expressly provided for in this Order shall not be deemed to contravene any such pre-petition intercreditor agreement. The accrual and payment of post-petition interest and fees under this paragraph 12 in respect of Pre-Petition Debt shall be provisional and subject to disallowance, disgorgement or recharacterization under section 506(b) of the Bankruptcy Code, and the failure of this Order to provide adequate protection payments shall not prejudice any party-in-interest in seeking the allowance of a claim for post-petition interest and fees under section 506(b) of the Bankruptcy Code. Counsel and financial advisors seeking payment of fees and expenses as adequate protection payments in accordance with this paragraph 12 shall send a copy of each invoice to the United States Trustee and counsel to the Creditors' Committee contemporaneously with submission of such invoice to the Debtors.

(f)    Clarification.  For the sake of clarity, the exclusion of Avoidance Action Proceeds against the First Lien Secured Parties from the Special Priority Pre-Petition First Lien Debt shall not apply to the Adequate Protection Priorities.

13.    Reservation of Rights of Pre-Petition Secured Lenders.  The holders of a majority in amount of the Pre-Petition First Lien Debt have consented to the entry of this Order.  Under the circumstances and given that the above described adequate protection is consistent with the Bankruptcy Code, including, without limitation, section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Pre-Petition Secured Lenders.

14.    Perfection of DIP Liens and Adequate Protection Liens.

(a)    Subject to the provisions of paragraph 8(a) of this Order, the Agent, the DIP Lenders, the Pre-Petition Agents and the Pre-Petition Secured Lenders are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction or take any other action in order to validate and perfect the liens and security interests granted to them hereunder. Whether or not the Agent on behalf of the DIP Lenders or the Pre-Petition Agents on behalf of the Pre-Petition Secured Lenders shall, in its or their sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments or otherwise confirm perfection of the liens and security interests granted hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of this Order. Upon the request of the Agent, each of the Pre-Petition Agents and Pre-Petition Secured Lenders, without any further consent of any party, is authorized to take, execute and

-34-

deliver such instruments (in each case without representation or warranty of any kind) to enable the Agent to further validate, perfect, preserve and enforce the DIP Liens.

(b)     A certified copy of this Order may, in the discretion of the Agent or any of the Pre-Petition Agents, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Order for filing and recording.

(c)     Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, license, contract or other agreement or other post-petition collateral related thereto, shall be deemed to have no force and effect with respect to the transactions granting post-petition liens or Adequate Protection Liens, in such leasehold interest, license, contract or other agreement in favor of the DIP Lenders or the Pre-Petition Agents, respectively, in accordance with the terms of the DIP Credit Agreement or this Order.

15.     Preservation of Rights Granted Under the Order.

(a)     Except for the liens and priorities expressly created under this Order (and solely to the extent expressly provided for herein), no claim or lien having a priority superior to or *pari passu* with those granted by this Order to the Agent, the DIP Lenders, the Existing DIP Administrative Agent, the Existing DIP Lenders, the First Lien Agents, the First Lien Secured Parties, the Second Lien Agent or the Second Lien Lenders (including the respective DIP Liens, the Superpriority Claims, the JPM Claim, the First Lien Adequate Protection Liens, the Second Lien Adequate Protection Liens, the Special Priority Pre-Petition First Lien Debt, the First Lien

-35-

Adequate Protection Priority and the Second Lien Adequate Protection Priority) shall be granted

or allowed prior to the DIP Pay-Out (as defined below). The DIP Liens and the Adequate

Protection Liens shall not be (i) subject or junior to any lien or security interest that is avoided

and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or

(ii) subordinated to or made *pari passu* with any other lien or security interest, whether under

section 364(d) of the Bankruptcy Code or otherwise. For the avoidance of doubt, it is understood

that the First Lien Agents, the First Lien Secured Parties, the Second Lien Agents and the Second

Lien Secured Lenders retain all rights to object to and/or seek additional adequate protection in

respect of any such other liens or priorities that may be sought to be created after the Financing,

such Commitments and the DIP Obligations are no longer outstanding.

      (b)    Unless all DIP Obligations shall have been paid in full (other than

contingent indemnity obligations as to which no claim has been asserted when all other amounts

have been paid and no Letters of Credit are outstanding), the commitments under the DIP Credit

Agreement have terminated, all Letters of Credit have expired or been cancelled (or, with respect

to outstanding Letters of Credit or other contingent DIP Obligations, cash collateralized in

accordance with the provisions of the DIP Credit Agreement or any other applicable agreement)

(the occurrence of all such events, the "**DIP Pay-Out**"), the Debtors shall not seek, and it shall

constitute an Event of Default and a termination of the right to use Cash Collateral if any of the

Debtors seek, or if there is entered, (i) any modifications or extensions of this Order without the

prior written consent of the Agent and, in the case of paragraphs 11, 12 and 16, the prior written

consent of the First Lien Secured Parties and the Second Lien Administrative Agent, and no such

consent shall be implied by any other action, inaction or acquiescence by the Agent, the Lenders,

the First Lien Agents, the First Lien Secured Parties, the Second Lien Administrative Agent or

the Second Lien Secured Lenders, as applicable; provided, however, that a new financing facility

agented by a lender other than Credit Suisse shall not constitute a modification or extension of

this Order for purposes of this clause (i), (ii) any order converting any of the Cases to a chapter 7

case under the Bankruptcy Code, or (iii) an order dismissing any of the Cases. If an order

dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any

time entered, such order shall provide (in accordance with sections 105 and 349 of the

Bankruptcy Code) that (x) the Superpriority Claims, the JPM Claim, the Special Priority Pre-

Petition First Lien Debt, the Adequate Protection Priorities (in each case to the greatest extent

permitted by applicable law), the DIP Liens and the Adequate Protection Liens granted pursuant

to this Order shall continue in full force and effect and shall maintain their priorities as provided

in this Order until the DIP Pay-Out shall have occurred and all Pre-Petition Debt having the

benefit of such liens and priorities shall have been paid and satisfied in full (and that such

Superpriority Claims, JPM Claim, Special Priority Pre-Petition First Lien Debt, Adequate

Protection Priorities, DIP Liens and Adequate Protection Liens shall, notwithstanding such

dismissal, remain binding on all parties in interest and have the priorities set forth herein) and (y)

this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing

the claims, liens and priorities referred to in clause (x) above.

        (c)    If any or all of the provisions of this Order are hereafter reversed,

modified, vacated or stayed, such reversal, stay, modification or vacatur shall not affect (i) the

validity of any DIP Obligations or obligations of the Debtors under paragraph 12 above (the

"**Adequate Protection Obligations**") incurred prior to the actual receipt of written notice by the

Agent or the Pre-Petition Agents, as applicable, of the effective date of such reversal, stay,

modification or vacatur or (ii) the validity or enforceability of any security interest, lien or

-37-

priority authorized or created hereby or pursuant to the DIP Credit Agreement with respect to

any DIP Obligations or the Adequate Protection Obligations, including the Superpriority Claims,

the JPM Claim, the Special Priority Pre-Petition First Lien Debt, the Adequate Protection

Priorities, the DIP Liens and the Adequate Protection Liens. Notwithstanding any such reversal,

stay, modification or vacatur, any use of Cash Collateral, any DIP Obligations, or Adequate

Protection Obligations incurred by the Debtors to the Agent, the DIP Lenders, the Pre-Petition

Agents or the Pre-Petition Secured Lenders prior to the actual receipt of written notice by the

Agent or the Pre-Petition Agents of the effective date of such reversal, stay, modification or

vacatur shall be governed in all respects by the original provisions of this Order, and the Agent,

the DIP Lenders, the Pre-Petition Agents and the Pre-Petition Secured Lenders shall be entitled

to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy

Code, this Order and pursuant to the DIP Documents with respect to all uses of Cash Collateral,

DIP Obligations and Adequate Protection Obligations.

(d)    Except as expressly provided in this Order or in the DIP Documents, the

DIP Liens, the Adequate Protection Liens, the Superpriority Claims, the JPM Claim, the Special

Priority Pre-Petition First Lien Debt, the Adequate Protection Priorities and all other rights and

remedies of the Agent, the DIP Lenders, the Existing DIP Administrative Agent, the Existing

DIP Lenders, the Pre-Petition Agents and the Pre-Petition Secured Lenders granted by the

provisions of this Order and the DIP Documents shall survive, and shall not be modified,

impaired or discharged by the entry of an order converting any of the Cases to a case under

chapter 7, dismissing any of the Cases, terminating the joint administration of these Cases or by

any other act or omission, nor shall the DIP Liens, the Superpriority Claims, the JPM Claim, the

Special Priority Pre-Petition First Lien Debt or any of the other rights and remedies of the Agent

and the DIP Lenders (and the First Lien Secured Parties with respect to the Special Priority Pre-

Petition First Lien Debt, and the Existing DIP Lenders with respect to the JPM Claim) granted

by the provisions of this Order and the DIP Documents be modified, impaired or discharged by

the entry of an order confirming a chapter 11 plan in any of the Cases and, pursuant to section

1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining

DIP Obligations.  The terms and provisions of this Order and the DIP Documents shall continue

in these Cases, in any successor cases if these Cases cease to be jointly administered, or in any

superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the Superpriority

Claims and all other rights and remedies of the Agent and the DIP Lenders granted by the

provisions of this Order and the DIP Documents shall continue in full force and effect until the

DIP Obligations are indefeasibly paid in full.

      16.     Limitation on Use of Financing Proceeds and Collateral / Bar Date.

      (a)     Notwithstanding anything herein or in any other order by this Court to the

contrary, no borrowings, Letters of Credit, Cash Collateral, Collateral or the Carve Out may be

used by any party in interest to (i) object, contest, or raise any defense to, the validity, perfection,

priority, extent or enforceability of any amount due under the DIP Documents, the liens or

claims granted under this Order or the DIP Documents, or the JPM Claim, (ii) assert any

Avoidance Action or any other claims, counterclaims or causes of action, objections, contests or

defenses against the Agent, the DIP Lenders, the Existing DIP Administrative Agent, the

Existing DIP Lenders or their respective agents, affiliates, representatives, attorneys, advisors,

predecessors and successors, that relate in any way to the DIP Documents, the Existing DIP

Documents, the Financing or the financing under the Existing DIP Documents, (iii) prevent,

hinder or otherwise delay the Agent's assertion, enforcement or realization on the Cash

-39-

Collateral or the Collateral in accordance with the DIP Documents or this Order, (iv) seek to

modify any of the rights granted to the Agent, the DIP Lenders, the Existing DIP Administrative

Agent or the Existing DIP Lenders, or under the DIP Documents or the Existing DIP Documents,

(v) pay any professional fees and disbursements incurred in connection with any of the actions

described in the foregoing clauses (i) through (iv), in each of the foregoing cases without the

Agent's prior written consent or (vi) prior to the effective date of a chapter 11 plan, pay any

amount on account of any claims arising prior to the Petition Date unless such payments on

account of such pre-petition claims are (x) approved by an order of this Court and (y) in

accordance with the business plan heretofore delivered by the Debtors to the Agent, as such

business plan may be updated from time to time and approved by the Lenders.

(b)    In addition to and not in limitation of the foregoing, no borrowings,

Letters of Credit, Cash Collateral, Collateral, or the Carve Out may be used by any party in

interest to (i) object, contest or raise any defense to, the validity, perfection, priority, extent or

enforceability of the Pre-Petition First Lien Debt, the Pre-Petition Second Lien Debt or the Pre-

Petition Liens securing the foregoing, or, subject to the proviso below, the Special Priority Pre-

Petition First Lien Debt, First Lien Adequate Protection Liens, First Lien Adequate Protection

Priorities or other Adequate Protection Obligations granted to the First Lien Agents, the First

Lien Secured Parties, the Second Lien Agents and the Second Lien Secured Lenders under this

Order, (ii) assert any Avoidance Action or any other claims or causes of action, objections or

defenses against the First Lien Agents, the First Lien Secured Parties, the Second Lien Agents or

the Second Lien Secured Lenders, or their respective agents, affiliates, representatives, attorneys,

advisors, predecessors and successors, that relate in any way to the Pre-Petition First Lien Debt,

the Pre-Petition Second Lien Debt or the Existing Agreements evidencing any of such debt, (iii)

-40-

prevent, hinder or otherwise delay the First Lien Agents', the First Lien Secured Parties', the

Second Lien Agents' or the Second Lien Secured Lenders' assertion or enforcement of any of

their respective rights and remedies granted pursuant to this Order, (iv) seek to modify any of the

adequate protection and other rights granted hereunder to the First Lien Secured Parties or the

Second Lien Secured Parties, or (v) pay any professional fees and disbursements incurred in

connection with any of these actions described in the foregoing clauses (i) through (iv), in each

of the foregoing cases without the affected parties' prior written consent; provided, however, that

the foregoing limitations in this subparagraph shall not apply to (A) any actions taken by the

Debtors or other parties in interest in opposition to any requests by any of the Pre-Petition

Secured Lenders for additional adequate protection or other relief, (B) subject to the Debtors'

stipulations in paragraph 3 of this Order, assuming the relevant Pre-Petition Liens are valid,

perfected and unavoidable, any action or proceeding asserting that the value of the Pre-Petition

Collateral securing the Pre-Petition First Lien Debt is less than the amount of the Pre-Petition

First Lien Debt, or (C) claims for services rendered by the professionals retained by the

Creditors' Committee or other party in interest with requisite standing in an amount not to

exceed, in the aggregate, $150,000, from the Petition Date, in connection with the investigation

of the validity, extent, priority, avoidability, or enforceability (but excluding from this limit any

services rendered in respect of valuation) of the Pre-Petition Liens securing the Pre-Petition First

Lien Debt and Pre-Petition Second Lien Debt, to the extent such fees and expenses are allowed

pursuant to 11 U.S.C. §§ 330, 331 and 503(b).

(c)     The Committee or other party in interest with the requisite standing shall

have 60 days from the date of this Order (which period (the "Challenge Period") shall be

subject to extension solely upon (x) the prior written consent of the First Lien Administrative

-41-

Agent or the Second Lien Administrative Agent, as applicable or (y) further order of this Court

solely based on the circumstances described by the Court at the June 30, 2005 hearing to approve

this Order) to file on behalf of the Debtors' estates, and to file and serve upon counsel for the

First Lien Administrative Agent or counsel for the Second Lien Administrative Agent, as

applicable, objections or complaints respecting the validity, extent, priority, avoidability or

enforceability of the Pre-Petition First Lien Debt, the First Lien Agents' or First Lien Secured

Parties' Pre-Petition Liens, the Pre-Petition Second Lien Debt or the Second Lien Agents' or

Second Lien Secured Lenders' Pre-Petition Liens, respectively (each, a **"Challenge"**).  In the

event that (and except as set forth below), with respect to either the First Lien Agents, the First

Lien Secured Parties, the Second Lien Agents or the Second Lien Secured Lenders (i) a

Challenge is not filed within the Challenge Period and promptly served thereafter or (ii) a final

order is entered denying all such Challenges, then the Debtors, any Committee and any other

party in interest shall thereafter be forever barred from bringing any Challenge, and the Pre-

Petition First Lien Debt and the liens and security interests of the First Lien Agents and the First

Lien Secured Parties, or the Pre-Petition Second Lien Debt and the liens and security interests of

the Second Lien Agents and the Second Lien Secured Lenders, as applicable, shall be deemed

allowed claims and shall be deemed valid, enforceable, perfected, unavoidable and not subject to

offset, reduction, counterclaim, subordination or recharacterization of debt to equity under

applicable nonbankruptcy law or the Bankruptcy Code.  Notwithstanding anything herein, the

Challenge Period limitation shall not apply to, assuming the relevant Pre-Petition Liens are

otherwise valid, perfected and unavoidable, any Challenge asserting that the value of the

respective interests of the First Lien Agents and First Lien Secured Lenders or the Second Lien

Agents and Second Lien Secured Lenders in the Pre-Petition Liens securing the Pre-Petition First

Lien Debt or the Pre-Petition Second Lien Debt, respectively, is less than the amount of the Pre-Petition First Lien Debt or the Pre-Petition Second Lien Debt, respectively. The Debtors have agreed that they shall not bring any Challenge, except that the Debtors expressly reserve the right and shall be entitled to assert any Challenge within the scope of the foregoing proviso as to any Second Lien Agents or Second Lien Secured Lenders. The Creditors' Committee shall be and hereby is authorized and empowered to bring any Challenge on behalf of the Debtors within the Challenge Period.

      (d)    In the event of a successful Challenge, the Court shall fashion the appropriate remedy after hearing from all parties, provided, however that (i) the priority afforded to the Special Priority Pre-Petition First Lien Debt shall be subject to defeasance to the extent that (and only if and to the extent that) it is determined by this Court (or an appropriate appellate court) in a non-appealable final order that, as of the Petition Date, the amount of the Pre-Petition First Lien Debt exceeded the value of the valid, perfected and unavoidable liens securing such debt and (ii) any defeasance of such priority shall first reduce the Subject Debt. Nothing contained in this Order shall prevent a court from determining that a portion of the Pre-Petition Debt is not a secured claim, and instead determining that such portion is an unsecured claim, in accordance with Section 506(a) of the Bankruptcy Code. For sake of clarity, and without limiting the foregoing, nothing in this Order shall be construed to permit the holders of the First Lien Pre-Petition Debt to receive an allowed secured claim greater in amount than such holders would be entitled to receive under Section 506(a) of the Bankruptcy Code.

    17.    Pre-Petition Collateral Agent. To the extent any Pre-Petition Agent or the Existing DIP Administrative Agent is the secured party under any Blocked Account or Securities Account Control Agreements (as such terms are defined in the First Lien Guaranty and Collateral

-43-

Agreement (as defined in the First Lien Credit Agreement)), listed as loss payee under any of the Debtors' insurance policies, or is the secured party under any other Existing Agreement, such party is deemed agent for the DIP Lenders, and shall act in that capacity and distribute any proceeds recovered or received first, to the Agent for the benefit of the DIP Lenders in accordance with the DIP Credit Agreement and second, subsequent to the DIP Pay-Out, in such manner as may be provided by further order of the Court.

18.      Order Governs. In the event of any conflict between the provisions of this Order and the DIP Documents, the provisions of this Order shall govern.

19.      Binding Effect; Successors and Assigns. The DIP Documents and the provisions of this Order, including, without limitation, all findings herein, shall be binding upon all parties in interest in these Cases, including, without limitation, the Agent, the DIP Lenders, the Pre-Petition Agents, the Pre-Petition Secured Lenders, the Existing DIP Administrative Agent, the Existing DIP Lenders, the Creditors' Committee and any other committee appointed in these Cases, and the Debtors and their respective successors and assigns (including, without limitation, any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors) and shall inure to the benefit of the Agent, the DIP Lenders, the Pre-Petition Agents, the Pre-Petition Secured Lenders and the Debtors and their respective successors and assigns; provided, however, that the Agent and the DIP Lenders shall have no obligation to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors. In determining to make any loan under the DIP Credit Agreement, the Agent and the DIP Lenders shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive

-44-

Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).

    20.    <u>Existing DIP Obligations and Liens</u>.

    (a)    On the closing of the DIP Credit Agreement, all Existing DIP Obligations (other than contingent indemnity obligations as to which no claim has been asserted when all other amounts have been paid) shall be irrevocably repaid in full, in cash, including, without limitation, all outstanding loans, fees and expenses.  Moreover, the Debtors shall, at their option, in accordance with the Existing DIP Credit Agreement, either (i) cause all Existing Letters of Credit to be returned to the issuing lender under the Existing DIP Credit Agreement (**"Issuing Lender"**) undrawn and marked "cancelled" with a confirming writing from the beneficiary of such letters of credit consenting to such cancellation or (ii) either (x) provide one or more "back to back" letters of credit to the Issuing Lenders in a form reasonably satisfactory to each Issuing Lender that is a beneficiary of such "back to back" letter of credit and to the Existing DIP Administrative Agent, issued by the Agent or another bank reasonably satisfactory to each such Issuing Lender and the Existing DIP Administrative Agent, and/or (y) deposit cash in the Letter of Credit Account (as defined in the Existing DIP Credit Agreement), the sum of (x) and (y) to be in an aggregate amount equal to 105% of Uncollateralized LC Exposure (as defined in the Existing DIP Credit Agreement) as collateral security for the Debtors' reimbursement obligations in connection therewith, such cash to be remitted to the Debtors upon and to the extent of the expiration, cancellation or other termination or satisfaction of such reimbursement obligations (net of any fees or expenses accrued under the Existing DIP Documents for which the Debtors have failed to provide timely reimbursement).  "Paid in Full" or "Payment in Full", with respect to the Existing DIP Obligations, shall mean the date on which the Debtors'

obligations in the two immediately preceding sentences have been satisfied. In no event shall the principal amount of the loans and the face amount of the Existing Letters of Credit outstanding under the Existing DIP Credit Agreement exceed $30,000,000. On the closing of the DIP Credit Agreement and the Payment in Full of all Existing DIP Obligations, all Commitments (as defined in the Existing DIP Credit Agreement) under the Existing DIP Credit Agreement shall be deemed irrevocably terminated and the Existing DIP Administrative Agent and the Existing DIP Lenders shall have no further rights with respect to the Debtors, the Collateral or any claims or liens relating thereto (all of which liens shall be deemed automatically terminated without further action), whether such claims or liens arise under the Existing DIP Documents, the Prior Order or otherwise and the Debtors and their estates shall have no further obligations to the Existing DIP Administrative Agent and the Existing DIP Lenders in connection with the Existing DIP Documents; provided, however that all (a) contingent indemnity obligations arising under provisions of the Existing DIP Documents which, by their terms, survive payment in full of the Existing DIP Obligations, (b) claims for professional fees and expenses incurred by the Existing DIP Administrative Agent pursuant to the terms of the Existing DIP Documents (including, without limitation, with respect to contingent indemnity obligations referred to in clause (a)) and (c) fees and expenses accruing and reimbursement obligations in connection with any outstanding letters of credit (the amounts described in clauses (a) through (c) collectively, the "**JPM Claim**") shall constitute administrative expenses against these estates with superpriority under section 364(c)(1) of the Bankruptcy Code, junior only to the Superpriority Claims. Any JPM Claim of a kind described in clause (b) or (c) of the immediately preceding sentence shall be paid currently by the Debtors, and any JPM Claim of a kind described in clause (a) of such sentence shall be paid by the Debtors promptly after such claim becomes fixed and non-

contingent. Without limiting the generality of the foregoing, upon Payment in Full of the Existing DIP Obligations, the Existing DIP Administrative Agent and the Existing DIP Lenders (I) authorize the Debtors to file Uniform Commercial Code financing statements in order to evidence the release of the liens held by the Existing DIP Administrative Agent and the Existing DIP Lenders and (II) will take all such action and deliver all such other instruments and documents as may be reasonably requested by the Debtors or the Agent to effectuate or evidence the termination of all liens and claims of the Existing DIP Administrative Agent and the Existing DIP Lenders, in each case, at the sole cost and expense of the Debtors.

(b)     In consideration for, inter alia, the release of the liens held by the Existing DIP Administrative Agent and the Existing DIP Lenders, the Debtors (on behalf of their estates) and any successor thereto (the "Releasing Parties") shall, and shall be deemed to have, as of the date hereof, fully and forever released, relieved, waived, relinquished and discharged the Existing DIP Administrative Agent and the Existing DIP Lenders and each of their directors, officers and employees serving in any capacity or function, including as a fiduciary, agents, advisors, shareholders, subsidiaries, affiliates, heirs executors, administrators, attorneys, advisors, successors and assigns from, against and with respect to any and all actual or potential demands, claims, actions, causes of action (including derivative causes of action), suits assessments, liabilities, losses, costs, damages, penalties, fees, charges, expenses and all other forms of liability whatsoever, in law or equity, whether asserted or unasserted, known or unknown, foreseen or unforeseen, arising under the Bankruptcy Code, state law or otherwise now existing or hereafter arising that any Releasing Party ever had, now has or hereafter may have based in whole or in part upon any agreement, act, omission or other occurrence taking place on or prior to the date of this Order and directly or indirectly related to the Existing DIP

-47-

Credit Agreement, the Existing DIP Documents, and any and all dealings between the Existing DIP Administrative Agent and the Releasing Parties in connection with the Existing DIP Documents (collectively, the "DIP Released Claims"). The release contained in this paragraph shall apply to all Released Claims, whether known or unknown, including, without limitation, (i) claims which if known by a Releasing Party might materially affect its decision to abide by this Order and (ii) all fees and expenses paid to or incurred by the Existing DIP Administrative Agent pursuant to the terms of the Existing DIP Documents prior to or subsequent to the date hereof. Without limiting the generality of the foregoing, each Releasing Party is hereto deemed to expressly waive any and all rights conferred upon it by any statute or rule of law that provides that a release does not extend to claims of which the releasing party does not know or suspect to exist in its favor at the time of executing the release, which if known by the releasing party would have materially affected the releasing party's settlement with the released parties. The release shall be full and final, and shall constitute a complete defense against the DIP Released Claims with respect to any and all parties who may seek to assert such claims derivatively or otherwise on behalf of or in the name or stead of the Debtors, their estates or any successor thereto (including, without limitation, under chapter 5 of the Bankruptcy Code).

21.    Proofs of Claim. The Agent and the DIP Lenders are hereby relieved of the requirement to file proofs of claim in these Cases with respect to any DIP Obligations and any other claims or liens granted hereunder or created hereby.

22.    Capacity. Any reference in this Order to an entity through a defined term refers to such entity solely in its capacity indicated by such defined term.

Dated: June 30, 2005
    Wilmington, Delaware

                                 MARY F. WALRATH
                                 CHIEF UNITED STATES BANKRUPTCY JUDGE

-48-

# ORIGINAL

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------------X

In re:                                    :        **Chapter 11**

**Burlington Industries, Inc., et al,**               **Case Nos. 01-11282 (PJW)**
                                                   **(Jointly Administered)**

                                         :

                **Debtors.**

--------------------------------------------------------------X

### FINAL ORDER (I) AUTHORIZING DEBTORS TO (A) OBTAIN
### POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§105,
### 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1), (B) UTILIZE
### CASH COLLATERAL PURSUANT TO 11 U.S.C. §363 AND (C) REPURCHASE
### RECEIVABLES PURSUANT TO 11 U.S.C. §§ 105 AND 363, AND (II) GRANTING
### ADEQUATE PROTECTION TO PRE-PETITION SECURED PARTIES
### PURSUANT TO 11 U.S.C. §§ 361, 362 AND 363

Upon the motion (the "Motion"), dated November 15, 2001, of Burlington Industries, Inc., as a debtor and debtor-in-possession (the "Borrower"), and the Guarantors listed on Schedule I hereto, each as a debtor and debtor-in-possession (hereinafter referred to collectively as the "Guarantors"; and together with the Borrower, the "Debtors"):

(i)        seeking this Court's authorization, pursuant to Sections 105, 361, 362, 363 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1) of the United States Bankruptcy Code, 11 U.S.C. §§101, et seq. (the "Code"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the Borrower to (1) obtain post-petition financing (the "Post-Petition Financing") up to the principal amount of $190,000,000 from JPMorgan Chase Bank ("JPMorgan Chase" or the "Post-Petition Agent"), 270 Park Avenue, New York, New York 10017 and a syndicate of financial institutions (together with JPMorgan Chase, the "Post-

1-NY/1362080.3

Petition Lenders"), to be arranged by J.P. Morgan Securities Inc. with JPMorgan Chase acting as Post-Petition Agent for itself and the Post-Petition Lenders, with such Post-Petition Financing

(w) having priority, subject to a carve-out (the "Carve-Out") (as defined below at paragraph 10), pursuant to Section 364(c)(1) of the Code, over any and all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Code,

(x) to be secured, subject to the Carve-Out, pursuant to Section 364(c)(2) of the Code, by perfected first priority security interests in and liens upon all pre- and post-petition property of the Debtors that on the date of the filing of the petitions herein (the "Filing Date") is not subject to valid, perfected and non-avoidable liens (the "Unencumbered Property"), including, without limitation, cash collateral, inventory, accounts receivable, other rights to payment whether arising before or after the Filing Date, property, plant, equipment, general intangibles, instruments, interests in leaseholds, real property, patents, copyrights, trademarks, trade names, other intellectual property, capital stock of subsidiaries, and the proceeds of all the foregoing, but excluding the Debtors' claims and causes of action under Sections 502(d), 544, 545, 547, 548, 549, 550 or 551 of the Code, or any other avoidance actions under the Code (the "Avoidance Actions"), provided, however, that Unencumbered Property shall not include, and the Debtors shall not be required to pledge to the Post-Petition Agent, (i) the membership interests in and/or the capital stock of Nano-Tex LLC and Nano-Tex Inc. owned by them or (ii) in excess of 65% of the capital stock of any entity that

is a controlled foreign corporation under Section 957 of the Internal Revenue Code,

(y) to be secured, subject to the Carve-Out, pursuant to Section 364(c)(3) of the Code, by perfected junior security interests and liens upon all pre- and post-petition property of the Debtors (other than property that is subject to the existing liens that secure obligations under the Existing Agreements referred to in clause (z) below, which liens referred to in clause (z) below shall be primed pursuant to Section 364(d)(1) of the Code by the liens to be granted to the Post-Petition Agent as described in such clause) that is subject to valid, perfected and non-avoidable liens in existence on the Filing Date, or to valid liens in existence on the Filing Date that are perfected subsequent to the Filing Date as permitted by Section 546(b) of the Code, and

(z) to be secured, subject to the Carve-Out, pursuant to Section 364(d)(1) of the Code, by perfected first priority senior priming security interests in and liens upon all pre- and post-petition property of the Debtors (including, without limitation, inventory, accounts receivable, property, plant, equipment, general intangibles, instruments, interests in leaseholds, real property, patents, copyrights, trademarks, trade names and other intellectual property, capital stock of subsidiaries, and the proceeds of the foregoing), that is subject to existing liens (the "Primed Liens") presently securing the Debtors' indebtedness owing (including issued but undrawn letters of credit issued pursuant to the Existing Credit Agreement (as defined below)) to certain lenders under or in connection with the Credit Agreement dated as of September 30, 1988, as amended and

restated as of December 5, 2000 (as amended, the "Existing Credit Agreement", and together with the other documentation executed in connection therewith, the "Existing Agreements"), among the Borrower, the secured lenders from time to time party thereto (collectively, the "Pre-Petition Secured Lenders") and The Chase Manhattan Bank ("Chase" or the "Pre-Petition Agent") as administrative and collateral agent, Chase Manhattan Bank USA, N.A., as Fronting Bank, Bank of America, N.A., as Syndication Agent, Chase Securities, Inc., as arranger, senior in all respects to the Primed Liens (but not to liens, if any, to which such Primed Liens are subject on the Filing Date) and senior in all respects to any liens granted on or after the Filing Date to provide adequate protection to the Pre-Petition Secured Lenders,

(all of the foregoing property specified in clauses (x), (y) and (z) above being hereinafter collectively referred to in this Order as the "Collateral"); and (2) provide adequate protection to the Pre-Petition Secured Lenders whose liens and security interests are being primed by the Post-Petition Financing,

(ii)             seeking this Court's authorization, pursuant to Sections 361, 362 and 363 of the Code, for the use of cash collateral (as such term is defined in the Code) and other collateral in which the Pre-Petition Secured Lenders have an interest and for the provision of adequate protection to the Pre-Petition Secured Lenders as a result of the imposition of the automatic stay of actions against such collateral, the use of cash collateral and other collateral and the grant of priming liens hereunder,

(iii)            requesting, pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim Hearing") on the Motion be held for this Court to consider entry of an interim order

annexed to the Motion (the "Interim Order") (a) authorizing the Borrower, on an interim basis, to forthwith borrow or obtain letters of credit under the Post-Petition Financing from the Post-Petition Lenders up to an aggregate of $125,000,000 (comprised of an amount not in excess of $50,000,000 for working capital and other general corporate purposes of the Debtors, with the balance thereof not used for working capital and other general corporate purposes to be used to repurchase the Receivables Portfolio hereinafter referred to), (b) authorizing the use by the Debtors of cash collateral, (c) granting the adequate protection hereinafter described and (d) authorizing the repurchase of the Receivables Portfolio, and

(iv)        requesting that within 20 days of the entry of the Interim Order this Court schedule a final hearing (the "Final Hearing") to consider entry of a final order authorizing the balance of the Post-Petition Financing on a final basis, as set forth in the Motion and the loan documentation filed with this Court;

and pursuant to Bankruptcy Rules 4001(b) and 4001(c)(1), due and sufficient notice under the circumstances of the Motion and the Final Hearing having been given by the Debtors as set forth in the Motion and to the United States Trustee for the District of Delaware, the Interim Hearing having been conducted on November 15, 2001, the Interim Order having been signed at the conclusion of the Interim Hearing, and upon all the pleadings filed with this Court, and upon the record made by the Debtors at the Interim Hearing and the Final Hearing and after due deliberation and consideration and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.          Jurisdiction.  This Court has core jurisdiction over these proceedings and the
parties and property affected hereby pursuant to 28 U.S.C. §§157(b) and 1334.

2.          Stipulations Concerning Pre-Petition Indebtedness.  Without prejudice to the
rights of any other party (but subject to the limitations thereon described below in paragraph 23),
the Debtors admit that, in accordance with the terms of the Existing Credit Agreement, the
Debtors are truly and justly indebted to the Pre-Petition Secured Lenders, without defense,
counterclaim or offset of any kind, and that as of the Filing Date (A) the Borrower was (i) liable
to the Pre-Petition Secured Lenders in respect of loans made by the Pre-Petition Secured Lenders
pursuant to the Existing Credit Agreement in the aggregate principal amount of not less than
$472,000,000 plus interest and fees (x) accrued but unpaid as of the Petition Date and (y)
accrued and accruing subsequent to the Petition Date and (ii) contingently liable to the Pre-
Petition Secured Lenders and Chase Manhattan Bank USA, N.A., as Fronting Bank (the
"Fronting Bank"), in the aggregate face amount of not less than $20,000,000 in respect of the
Borrower's reimbursement obligations with respect to letters of credit issued pursuant to the
Existing Credit Agreement plus (x) interest that will accrue at the rates set forth in the Existing
Credit Agreement subsequent to any draw on the letters of credit and (y) fees to the Pre-Petition
Secured Lenders and the Fronting Bank (a) accrued but unpaid as of the Filing Date and (b)
accrued and accruing subsequent to the Filing Date (collectively, the "Pre-Petition Debt"), (B)
each Debtor party to a guarantee executed and delivered in respect of the Pre-Petition Debt was
contingently liable to the Pre-Petition Agent and Pre-Propitiation Secured Lenders pursuant to
such guarantee and (C) acknowledge and agree that no portion of the Pre-Petition Debt is subject
to avoidance or subordination pursuant to the Code or applicable nonbankruptcy law and that the

1-NY/1362080.3                          6

Debtors do not have any claims or causes of action against the Pre-Petition Secured Lenders or the Pre-Petition Agent.

3.        Stipulations Concerning Pre-Petition Liens. Without prejudice to the rights of any other party (but subject to the limitations thereon described below in paragraph 23), the Debtors further (A) admit that the liens and security interests granted to Pre-Petition Agent for the ratable benefit of itself and the Pre-Petition Secured Lenders pursuant to the Existing Agreements and all mortgages, deeds of trust and other security documents executed by the Debtors for the benefit of the Pre-Petition Secured Lenders in connection with the Existing Agreements, are valid, binding, perfected, enforceable, first-priority liens and security interests in substantially all of the personal and real property described in the Existing Agreements and in such mortgages, deeds of trust and other security documents (the "Pre-Petition Collateral"), junior and subject to only (i) the liens and security interests granted to the Post-Petition Agent pursuant to this Order and the Revolving Credit and Guaranty Agreement dated as of November 15, 2001 (the "DIP Credit Agreement") and (ii) liens permitted under the Existing Agreements to the extent such permitted liens are senior to the liens of the Pre-Petition Agent on the Pre-Petition Collateral and (B) acknowledge and agree that the Pre-Petition Agent's liens and security interests in the Pre-Petition Collateral are not subject to avoidance or subordination pursuant to the Code or applicable nonbankruptcy law.

4.        Cash Collateral. As of the Filing Date, all cash and cash equivalents of the Debtors constituted Pre-Petition Collateral. As of the Filing Date, funds on deposit at Chase and various of the other Pre-Petition Secured Lenders were also subject to rights of set-off under the Existing Agreements and applicable law and, by virtue of such set-off rights, are subject to a lien in favor of such Pre-Petition Secured Lenders pursuant to Sections 506(a) and 553 of the Code.

Pursuant to the Existing Agreements, the Pre-Petition Secured Lenders are obligated to share the benefit of such lien with the other Pre-Petition Secured Lenders party to such Existing Agreements based upon their respective pro rata shares of the obligations under such Existing Agreements.  Accordingly, any proceeds of the Pre-Petition Collateral (including all cash and cash equivalents of the Debtors and all cash on deposit at Chase or any of the Pre-Petition Secured Lenders as of the Filing Date) are cash collateral of the Pre-Petition Secured Lenders within the meaning of Section 363(a) of the Code herein (the "Cash Collateral").  The Pre-Petition Secured Lenders are entitled, pursuant to Sections 361, 363(e) and 364(d)(1) of the Code, to adequate protection of their interest in the Pre-Petition Collateral, including the Cash Collateral, for any diminution in value of the Pre-Petition Collateral, including, without limitation, resulting from the use of the Cash Collateral, the incurrence by the Debtors of post-petition financing secured by priming liens on the Pre-Petition Collateral, or the use, sale or lease of the Pre-Petition Collateral and the imposition of the automatic stay.

5.          Existing Receivables Facility.  Pursuant to that certain Amended and Restated Receivables Purchase Agreement (the "Receivables Purchase Agreement"), dated as of December 10, 1997 (as heretofore amended), among non-debtor B.I. Funding, Inc. ("B.I. Funding"), the Borrower and certain of the other Debtors, the Borrower and such Debtors validly sold, assigned and transferred to B.I. Funding all of their right, title and interest in and to the accounts receivables referred to therein (the "Receivables Portfolio").  B.I. Funding financed its purchase of the Receivables Portfolio pursuant to that certain Loan Agreement (the "Receivables Loan Agreement", and together with the Receivables Purchase Agreement, the "Existing Receivables Facility") dated as of December 10, 1997 (as heretofore amended) among B.I. Funding, certain financial institutions party thereto, Blue Ridge Asset Funding Corporation and

Wachovia Bank, N.A. ("Wachovia"), as agent for the lenders party thereto and, pursuant thereto, granted to Wachovia, as collateral agent, perfected security interests in, among other things, all of its right, title and interest in, to and under the Receivables Purchase Agreement and in the Receivables Portfolio and the proceeds thereof.

6.        Need for Financing.  The Borrower has an immediate need to obtain financing to permit, among other things, the orderly continuation of the operation of its business and the businesses of the Guarantors, to maintain business relationships with vendors and suppliers, to make certain strategic capital expenditures, to satisfy other working capital needs and to repurchase the Receivables Portfolio sold to B.I. Funding pursuant to the Existing Receivables Facility (so that the receivables comprising the Receivables Portfolio will be available to support extensions of credit to the Borrower to be made pursuant to the Post-Petition Financing).  The Borrower is unable to obtain adequate unsecured credit allowable under Section 503(b)(1) of the Code as an administrative expense.  A facility in the amount provided by the Post-Petition Financing is unavailable to the Borrower without the Debtors granting to the Post-Petition Agent and the Post-Petition Lenders, subject to the Carve-Out, the claims and liens described in the Motion and set forth in the Documents (as defined in paragraph 9 below).  The ability of the Debtors to obtain sufficient working capital and liquidity through the use of the cash collateral, incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the Debtors.  The preservation and maintenance of the going concern value of the Debtors is integral to a successful reorganization of the Debtors pursuant to the provisions of Chapter 11 of the Code.

7.        Negotiation of Post-Petition Financing.  The terms of the Post-Petition Financing are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent

1-NY/1362080.3                                9

with their fiduciary duties and are supported by reasonably equivalent value and fair consideration. The Post-Petition Financing has been negotiated in good faith and at arm's-length among the Debtors, the Post-Petition Agent and the Post-Petition Lenders and any credit extended, letters of credit issued for the account of and loans made to the Borrower or the Guarantors by the Post-Petition Lenders pursuant to the DIP Credit Agreement, and any credit extended in respect of overdrafts referred to in the DIP Credit Agreement, shall be deemed to have been extended by the Post-Petition Lenders in good faith, as that term is used in Section 364(e) of the Code.

8.          Approval of Documents and Receivables Repurchase.    The Documents (as defined in paragraph 9 below) and the Post-Petition Financing are hereby approved as set forth in this Order and the Borrower is immediately authorized to borrow or obtain letters of credit pursuant to the DIP Credit Agreement, and the Guarantors may guaranty such borrowings, up to an aggregate of $190,000,000 (inclusive of amounts borrowed and letters of credit issued pursuant to the Interim Order) which shall be used for the purpose of providing working capital for the Borrower and the Guarantors and for the repurchase of the Receivables Portfolio sold to B.I. Funding pursuant to the Existing Receivables Facility (which occurred following the entry of the Interim Order) and payment of any related transactions costs, fees and expenses, in accordance with the DIP Credit Agreement. In addition, the Debtors are immediately authorized to incur overdrafts and related liabilities arising from treasury, depository and cash management services or in connection with any automated clearing house fund transfers provided to or for the benefit of the Debtors referred to in Section 6.03(vi) of the DIP Credit Agreement (in addition to the amount of borrowings and letters of credit obtained pursuant to the DIP Credit Agreement). Notwithstanding anything herein to the contrary, no borrowings, letters of credit, Cash

1-NY/1362080.3                                          10

Collateral, Collateral or the Carve-Out (as defined below) may be used to object to, contest or raise any defense to the validity, perfection, priority, extent or enforceability of the Pre-Petition Debt, the Post-Petition Financing, or the liens securing the Pre-Petition Debt or the Post-Petition Financing, nor to assert any claims or causes of action against the Pre-Petition Agent, the Pre-Petition Secured Lenders, the Post-Petition Agent, or the Post-Petition Lenders.

9.        Authorizations.  The Debtors are expressly authorized and empowered to execute and deliver, among other documents, the DIP Credit Agreement and the Security and Pledge Agreement (as defined in the DIP Credit Agreement) in substantially the forms heretofore filed with this Court (collectively, and together with the letter agreement referred to in paragraph 20 (iii) hereof, the "Documents").  The Debtors are hereby authorized to perform and do all acts that may be required in connection with the Documents and to repurchase the Receivables Portfolio. Upon execution and delivery of the Documents, the Documents shall constitute valid and binding obligations of the Debtors, enforceable against each of the Debtors in accordance with their terms.

10.       Post-Petition Claims.  For all of the Debtors' Obligations arising under and in connection with the Post-Petition Financing and the Documents (and in respect of overdrafts and related liabilities, referred to in Section 6.03(vi) of the DIP Credit Agreement), the Post-Petition Agent and the Post-Petition Lenders are granted pursuant to Section 364(c)(1) of the Code an allowed superpriority claim (which allowed claim shall be payable from and have recourse to, in addition to the property of the Debtors that are made subject to security interests and liens in favor of the Post-Petition Agent on behalf of the Post-Petition Lenders as set forth in paragraph 12 of this Order, any amounts that are recovered or otherwise received by the Debtors in respect of Avoidance Actions) having priority over any and all administrative expenses of the kind

specified in Sections 503(b) and 507(b) of the Code, subject only to (x) in the event of the occurrence and during the continuance of an Event of Default or an event that would constitute an Event of Default with the giving of notice or lapse of time or both, the payment of allowed and unpaid professional fees and disbursements incurred by the Debtors and by any statutory committees (each, a "Committee") appointed in the Debtors' Chapter 11 cases (the "Cases") in an aggregate amount not in excess of $3,000,000 (plus all unpaid professional fees and disbursements incurred prior to the occurrence of an Event of Default or an event that would constitute an Event of Default with the giving of notice or lapse of time or both to the extent allowed by the Bankruptcy Court at any time) and (y) the payment of fees pursuant to 28 U.S.C. §1930 and to the Clerk of the Court (collectively, the "Carve-Out"). The Carve-Out may not be asserted by any party other than in the event of the occurrence and during the continuance of an Event of Default or an event that would constitute an Event of Default with the giving of notice or lapse of time or both. The superpriority claims granted to the Post-Petition Agent and the Post-Petition Lenders hereunder shall not be subordinated to or made pari passu with any other superpriority claim under Section 364(c) of the Code or otherwise.

11.         Payment of Administrative Expenses. So long as an Event of Default (or an event that would constitute an Event of Default with the giving of notice or lapse of time or both) shall not have occurred and be continuing, (i) the Debtors shall be permitted to pay administrative expenses allowed and payable under Sections 330 and 331 of the Code, as the same may be due and payable, and (ii) such payments shall not be applied against the Carve-Out. Except to the extent of the Carve-Out, no expenses of administration of the Cases or any future proceeding or case which may result therefrom, including liquidation in bankruptcy or other proceedings under the Code, shall be charged pursuant to Section 506(c) of the Code or otherwise against the

1-NY/1362080.3                    12

Collateral without the prior written consent of the Pre-Petition Agent and the Post-Petition Agent, and no such consent shall be implied from any other action, inaction, or acquiescence by the Pre-Petition Agent, the Post-Petition Agent, the Pre-Petition Secured Lenders or the Post-Petition Lenders.

12.        Post-Petition Liens.  As security for all of the Debtors' Obligations arising under the Post-Petition Financing and the Documents (and in respect of overdrafts and related liabilities referred to in Section 6.03(vi) of the DIP Credit Agreement), the Post-Petition Agent on behalf of the Post-Petition Lenders is hereby granted (effective as of the Filing Date and without the necessity of the execution or recordation of mortgages, security agreements, financing statements or otherwise), (x) pursuant to Section 364(c)(2) of the Code, perfected first priority senior security interests in and liens upon all Unencumbered Property of the Debtors; (y) pursuant to Section 364(c)(3) of the Code and to the fullest extent permitted by law, perfected junior priority security interests in and liens upon all pre- and post-petition property of the Debtors (other than property that is subject to the existing liens that secure obligations under the Existing Agreements referred to in clause (z) below which shall be primed by the liens to be granted to the Post-Petition Agent as described in such clause), that is subject to valid, perfected and non-avoidable liens in existence on the Filing Date or to valid liens in existence on the Filing Date that are perfected subsequent to the Filing Date as permitted by Section 546(b) of the Code; and (z) pursuant to Section 364(d)(1) of the Code, perfected first priority senior priming security interests in and liens upon all pre- and post-petition property of the Debtors (including, without limitation, inventory, accounts receivable, property, plant, equipment, patents, copyrights, trademarks, trade names, general intangibles, instruments, interests in leaseholds, real property and other intellectual property and capital stock of subsidiaries, and the proceeds of all of the

1-NY/1362080.3                              13

foregoing), that is subject to the existing liens presently securing the Debtors' indebtedness owing to the Pre-Petition Secured Lenders (including any issued and undrawn letters of credit), such security interests and liens in favor of the Post-Petition Agent being senior in all respects to any and all present and future liens, if any, of the Pre-Petition Secured Lenders which encumber such security interests and liens referred to in this clause (z) (but not to liens, if any, to which the liens of the Pre-Petition Secured Lenders are subject on the Filing Date or become subject subsequent to the Filing Date as permitted by Section 546(b) of the Code) and any liens granted after the Filing Date to provide adequate protection to the Pre-Petition Secured Lenders, in each case subject only to the Carve-Out. The security interests and liens granted to the Post-Petition Agent on behalf of the Post-Petition Lenders hereunder shall not be subordinated to or made pari passu with any other lien or security interest under Section 364(d) of the Code or otherwise.

13.        Use of Cash Collateral. The Debtors are hereby authorized to use Cash Collateral of the Pre-Petition Secured Lenders; provided, that the Pre-Petition Secured Lenders are granted adequate protection as hereinafter set forth.

14.        Grant of Adequate Protection. As adequate protection for any diminution in value of the Pre-Petition Secured Lenders' interests in the Pre-Petition Collateral resulting from (x) the use by the Debtors of Cash Collateral and any other Pre-Petition Collateral (commencing with the Debtors' use of Cash Collateral pursuant to the Interim Order Authorizing Use of Cash Collateral and Providing Adequate Protection under 11 U.S.C. §§ 105, 361 and 363 dated November 15, 2001), (y) the priming of the Pre-Petition Agent's and the other Pre-Petition Secured Lenders' security interests and liens in the Pre-Petition Collateral by the Post-Petition Agent and the Post-Petition Lenders pursuant to the Post-Petition Financing and this Order and the transfer of the Receivables Portfolio pursuant to the terms of this Order, and (z) the

imposition of the automatic stay pursuant to Section 362 of the Code, the Pre-Petition Agent and

the Pre-Petition Secured Lenders (A) shall receive the monthly payment of current interest and

letter of credit fees (including the payment promptly after the entry of this Order of any such

interest and fees that are accrued and unpaid as of the Filing Date) at the applicable non-default

rates (including LIBOR pricing options) provided for pursuant to the Existing Agreements (the

payments described in this clause to be without prejudice to the rights of the Pre-Petition Secured

Lenders to assert a claim for the payment of additional interest and letter of credit fees calculated

at any other applicable rates of interest (including, without limitation, at any default rates), or any

other basis, set forth in the Existing Agreements or to the rights of the Borrower to contest such

assertion), (B) are granted (effective upon the Filing Date and without the necessity of the

execution or recordation of mortgages, security agreements, pledge agreements, financing

statements or other agreements) a security interest and lien upon all of the Collateral (i)

immediately junior to the security interests and liens granted to the Post-Petition Agent for the

benefit of the Post-Petition Lenders in this Order and pursuant to the Documents and (ii) subject

to the Carve-Out and Permitted Liens as defined in the Credit Agreement, (C) are granted

(without the need to file any further motion or pleading or make any demand) a superpriority

allowed claim pursuant to Section 507(b) of the Code, immediately junior to the claims under

Section 364(c)(1) of the Code held by the Post-Petition Agent and the Post-Petition Lenders as

set forth in paragraph 10 (and subject to the Carve-Out) and senior to all other priority or

superpriority claims in the Cases, (D) shall receive the payment on a current basis of the

reasonable fees and disbursements (including, but not limited to, the reasonable fees and

disbursements of counsel, investment bankers and internal and third-party consultants, including

financial consultants and auditors but excluding costs incurred in any unsuccessful defense of

1-NY/1362080.3                                  15

any challenge by a committee to the Pre-Petition Lenders' claims or liens) incurred before or after the Filing Date by the Pre-Petition Agent under the Existing Agreements (including any unpaid pre-petition fees and expenses to be paid on the date of the entry of this order or as soon thereafter as is practicable) and continuation of the payment to the Pre-Petition Agent under the Existing Agreements on a current basis of the administrative and collateral agent fees that are provided for thereunder and (E) shall be entitled to the receipt of all financial statements and other reports that are furnished to the Post-Petition Lenders. As additional adequate protection, so long as no Event of Default and no condition which would constitute an Event of Default with the giving of notice or lapse of time or both shall exist, the Pre-Petition Secured Lenders shall (a) receive the payment of 50% of the Net Proceeds (as defined in the DIP Credit Agreement) of sales of assets constituting Pre-Petition collateral of such lenders and (b) be entitled to an escrow of 50% of the Net Proceeds of all other sales, in each case provided such sales are permitted by Section 6.11 (iv) of the DIP Credit Agreement. Such escrow shall be for the sole and exclusive benefit of the Pre-Petition Secured Lenders and the proceeds thereof shall be for the sole and exclusive purpose of providing additional adequate protection to the Pre-Petition Secured Lenders in accordance with the terms of this Order. All of the foregoing provisions of this paragraph are hereinafter collectively referred to as "Adequate Protection Obligations." The post Filing Date current payment of interest, fees and expenses as adequate protection under this Order is without prejudice to the right of the Official Committee of Unsecured Creditors (the "Committee") to file a motion, at any time prior to the date that is 75 days after the formation of the Committee, for entry of an order determining, pursuant to Section 506(b) of the Code, that the Pre-Petition Secured Lenders are not oversecured and that the adequate protection amounts previously paid and to be paid in respect of such interest, fees and expenses under this Order

instead be applied (in whole or in part) solely in reduction of the principal amount of the obligations under the Existing Credit Agreement (and to any interest, fees and expenses and other charges thereunder but only to the extent accrued and unpaid through the Filing Date).

15.     Findings with Respect to Adequate Protection. Under the current circumstances, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Pre-Petition Secured Lenders, without prejudice to the rights of the Pre-Petition Secured Lenders to request additional adequate protection.

16.     Restriction on Additional Claims and Liens. No other claim or lien having a priority superior to or pari passu with those granted by this Order (i) to the Post-Petition Agent and the Post-Petition Lenders and (ii) to the Pre-Petition Agent and the Pre-Petition Secured Lenders (other than claims and liens referenced in clause (i) of this paragraph), respectively, shall be granted while any portion of the Obligations arising under the Post-Petition Financing or any Adequate Protection Obligations remain outstanding.

17.     Perfection of Liens. The Post-Petition Agent, the Post-Petition Lenders, the Pre-Petition Agent and the Pre-Petition Secured Lenders shall not be required to file or record financing statements, mortgages, notices of lien or similar instruments in any jurisdiction or take any other action in order to validate and perfect the security interests and liens granted to them pursuant to this Order. If the Post-Petition Agent on behalf of the Post-Petition Lenders or the Pre-Petition Agent on behalf of the Pre-Petition Secured Lenders shall, in its sole discretion, choose to file such financing statements, mortgages, notices of lien or similar instruments or otherwise confirm perfection of such security interests and liens, all such documents shall be deemed to have been filed or recorded as of the Filing Date to the extent permitted by law. The Pre-Petition Agent shall not file such financing statements, mortgages, notices of lien or similar

instruments, or otherwise confirm perfection of such security interests and liens, unless the Post-Petition Agent on behalf of the Post-Petition Lenders shall theretofore have done so.

18.     Further Assurances. Upon the request of the Post-Petition Agent, the Pre-Petition Secured Lenders are authorized to make, execute and deliver such instruments (in each case without representation or warranty of any kind) to enable the Post-Petition Agent to further perfect, preserve and enforce the security interests and liens granted to the Post-Petition Agent for the benefit of the Post-Petition Lenders by the Documents and this Order.

19.     Actions by Pre-Petition Secured Lenders. The Pre-Petition Secured Lenders are directed (i) to promptly turn over to the Debtors all Cash Collateral received or held by them, and (ii) so long as there are any borrowings or letters of credit outstanding, or the Post-Petition Lenders have any Commitment (as defined in the DIP Credit Agreement) under the DIP Credit Agreement, to take no action to foreclose upon the liens granted to the Pre-Petition Secured Lenders pursuant to the Existing Agreements and this Order, or otherwise exercise remedies against the Collateral, in each case to the extent not authorized by an order of this Court.

20.     Debtors' Performance. The Debtors are authorized and directed to do and perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution of security agreements, mortgages and financing statements), and to pay fees, which may be reasonably required or necessary for the Debtors' performance under the Post-Petition Financing, including, without limitation: (i) the execution of the Documents, (ii) the execution of one or more amendments to the DIP Credit Agreement for, among other things, the purpose of adding additional financial institutions as Post-Petition Lenders, reallocating the Commitments for the Post-Petition Financing among the current Post-Petition Lenders and such additional financial institutions and increasing the interest rates and Commitment fees applicable

1-NY/1362080.3                                    18

to the Post-Petition Financing to the extent provided for in the separate letter agreement referred to below (it being understood that no further approval of the Court shall be required for amendments to the DIP Credit Agreement that do not shorten the maturity of the extensions of credit thereunder or increase either the commitments or, except as set forth in such letter agreement, the rate of interest payable thereunder), and (iii) the non-refundable payment to JPMorgan Chase or the Post-Petition Lenders, as the case may be, of the Fees referred to in the DIP Credit Agreement (and in the separate letter agreement dated November 7, 2001, between the Borrower and JPMorgan Chase referred to in the DIP Credit Agreement) and such Letter of Credit Fees, Commitment Fees and reasonable costs and expenses as may be due from time to time including, without limitation, reasonable attorneys' fees and disbursements as provided in the Documents, all as such terms are defined in the Documents.

21.         Automatic Stay.  Subject only to the provisions of the DIP Credit Agreement, the automatic stay provisions of Section 362 of the Code are vacated and modified to the extent necessary so as to permit the Post-Petition Agent and the Post-Petition Lenders to exercise, upon the occurrence of an Event of Default and the giving of the 5 business days' written notice to any official committee, the Office of the United States Trustee, the Debtor and the Debtors' counsel as provided for in the DIP Credit Agreement, all rights and remedies provided for in the Documents (including, without limitation, the right to set off monies of the Debtors in accounts maintained with the Post-Petition Agent or any Post-Petition Lender).  In any hearing after the giving of the aforementioned notice, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing.  In no event shall the Post-Petition Agent be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the Collateral.  Except as otherwise provided in Article VII of the DIP

1-NY/1362080.3                    19

Credit Agreement, the Debtors' right to use Cash Collateral shall terminate automatically on the Termination Date (as defined in the DIP Credit Agreement).

22.      Successors and Assigns. The Documents and the provisions of this Order shall be binding upon the Post-Petition Agent, the Post-Petition Lenders, the Pre-Petition Agent, the Pre-Petition Secured Lenders and the Debtors and their respective successors and assigns (including any Chapter 7 or Chapter 11 trustee hereinafter appointed or elected for the estate(s) of the Debtors or an examiner appointed pursuant to Code Section 1104) and inure to the benefit of the Post-Petition Agent, the Post-Petition Lenders, the Pre-Petition Agent, the Pre-Petition Secured Lenders and the Debtors and (except with respect to any trustee hereinafter appointed or elected for the estate of the Debtors) their respective successors and assigns.

23.      Findings and Admissions Binding. The findings and admissions contained in this Order, including, without limitation, the findings and admissions contained in paragraphs 2, 3 and 5 of this Order, shall be binding upon all parties in interest, including any Committee, unless (i) a party in interest has timely filed an adversary proceeding or contested matter by no later than the date that is 75 days after the formation of the Committee in the Cases, (x) challenging the validity, enforceability, priority or extent of the Pre-Petition Debt or the Pre-Petition Agent's or the Pre-Petition Secured Lenders' liens on the Pre-Petition Collateral, or (y) otherwise asserting any claims or causes of action against the Pre-Petition Agent or the Pre-Petition Secured Lenders on behalf of the Debtors' estate, or (z) challenging the validity of the liens granted by B.I. Funding to Wachovia prior to the Filing Date relating to its right, title and interest in and to the Receivables Portfolio or the perfection of the transfers contemplated thereby, and (ii) the Court rules in favor of the plaintiff in any such timely filed adversary proceeding or contested matter. If no such adversary proceeding or contested matter is timely filed as of such

1-NY/1362080.3                               20

date, (a) the Pre-Petition Debt and related obligations of the Debtors (the "Pre-Petition Obligations") shall constitute allowed claims, not subject to counterclaim, offset, subordination or avoidance, for all purposes of the Debtors' Chapter 11 Cases and any subsequent Chapter 7 Cases, (b) the Pre-Petition Agent's and the Pre-Petition Secured Lenders' liens on the Pre-Petition Collateral shall be deemed to have been, as of the Filing Date, legal, valid, binding, perfected, not subject to recharacterization, subordination and otherwise unavoidable for all purposes of the Debtors' Chapter 11 Cases and any subsequent Chapter 7 Cases and (c) the Pre-Petition Obligations, the Pre-Petition Agent's and the Pre-Petition Secured Lenders' liens on the Pre-Petition Collateral, the transfer of the Receivables Portfolio to B.I. Funding prior to the Filing Date and the Pre-Petition Agent and the Pre-Petition Secured Lenders shall not be subject to any other or further challenge by any party in interest seeking to exercise the rights of the Debtors' estate, including, without limitation, any successor thereto (including any Chapter 11 or Chapter 7 trustee).

24.        Dismissal; Appeal. Unless all Obligations owing to the Post-Petition Agent and the Post-Petition Lenders under the DIP Credit Agreement shall theretofore have been paid in full in accordance with the terms of the DIP Credit Agreement (and, with respect to outstanding Letters of Credit issued pursuant to the DIP Credit Agreement, collateralized with cash or back-to-back letters of credit in accordance with the provisions of the DIP Credit Agreement), or all material assets of the Debtors shall have been liquidated and the proceeds thereof distributed in accordance with the priorities established by this Order and the Code, the Debtors shall not seek, and it shall constitute an Event of Default if the Debtors seek, or if there is entered, an order dismissing any of the Cases, unless same is otherwise permitted under the DIP Credit Agreement. If an order dismissing any of the Cases under Section 1112 of the Code or otherwise

1-NY/1362080.3                     21

is at any time entered, such order shall provide (in accordance with Sections 105 and 349 of the Code) that (x) the priming liens and security interests and replacement security interests granted to the Post-Petition Agent and the Post-Petition Lenders and the Pre-Petition Secured Lenders, as the case may be, pursuant to this Order shall continue in full force and effect and shall maintain their priorities as provided in this Order until all obligations in respect thereof shall have been paid and satisfied in full (and that such priming liens and replacement liens, shall, notwithstanding such dismissal, remain binding on all parties in interest) and (y) this Court shall retain jurisdiction to the extent permitted by law, notwithstanding such dismissal, for the limited purpose of validating the priority of the liens and security interests referred to in (x) above. If any or all of the provisions of this Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity of any obligation, indebtedness or liability incurred by the Debtors to the Post-Petition Lenders prior to written notice to the Post-Petition Agent of the effective date of such reversal, stay, modification or vacation, or (ii) the validity and enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Credit Agreement with respect to any such obligations, indebtedness or liability. Notwithstanding any such reversal, stay, modification or vacation, any use of Cash Collateral or any indebtedness, obligation or liability incurred by the Debtors to the Post-Petition Lenders prior to written notice to the Post-Petition Agent of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this Order, and the Post-Petition Agent, the Post-Petition Lenders, the Pre-Petition Agent and the Pre-Petition Secured Lenders shall be entitled to all the rights, remedies, privileges and benefits, granted herein and/or pursuant to the DIP Credit Agreement with respect to the Post-Petition Financing and all uses of Cash Collateral and such indebtedness, obligation or liability. The

1-NY/1362080.3                                22

obligations of the Debtors under this Order and the Post-Petition Financing shall not be discharged by the entry of an order confirming a plan of reorganization in the Cases and, pursuant to Section 1141(d)(4) of the Code, the Debtors have waived such discharge (such obligations being payable in accordance with the terms of this Order and the Post-Petition Financing).

25.     Interim Order.     This Order supersedes in its entirety the Interim Order Authorizing Use of Cash Collateral and Providing Adequate Protection under 11 U.S.C. §§ 105, 361 and 363 dated November 15, 2001.

26.     Notice of Final Hearing.     The notice given by the Debtors of the Motion and of the Final Hearing constitutes adequate notice under Bankruptcy Rule 4001(c)(2).

27.     Order Controls.     This Order shall supersede and govern over the terms of the Documents, to the extent that such terms are inconsistent with this Order.

Dated: Wilmington, Delaware
December 12, 2001

_____
UNITED STATES BANKRUPTCY JUDGE

SCHEDULE 1

## GUARANTORS

1.  B. I. Transportation, Inc.
2.  BH/M-II Inc.
3.  BI Properties Inc.
4.  BI Properties I Inc.
5.  BII Mexico Holdings I, Inc.
6.  BII Mexico Holdings II, Inc.
7.  BII Mexico Laundry Holding Co.
8.  BII Mexico Yarns Holding Co.
9.  Burlington Apparel Services Company
10. Burlington Fabrics Inc.
11. Burlington Fabritex USA, Inc.
12. Burlington Industries I, LLC
13. Burlington Industries II, LLC
14. Burlington Industries III, LLC
15. Burlington Industries IV, LLC
16. Burlington Industries V, LLC
17. Burlington International Services Company
18. Burlington Investment Inc.
19. Burlington Investment II Inc.
20. Burlington Mills Corporation
21. Burlington Mills, Inc.
22. Burlington Worldwide Inc.
23. Burlington Worsteds Inc.
24. Distributex, Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------x
In re:                                    :  Chapter 11
                                          :
RCN CORPORATION, et al.,                  :  Case No. 04-13638 (RDD)
                                          :
              Debtors.                    :  (Jointly Administered)
                                          :
                                          :
-----------------------------------------------------------------x
```

**FINAL ORDER (I) AUTHORIZING THE USE OF**
**LENDERS' CASH COLLATERAL AND (II) GRANTING ADEQUATE PROTECTION**
**PURSUANT TO 11 U.S.C. §§ 361 AND 363**

Upon the motion (the "Motion"), dated as of May 27, 2004, of RCN Corporation

("RCN"), TEC Air, Inc. and Hot Spots Productions, Inc. (together, the "Obligors") and RLH

Property Corporation and RCN Finance LLC (with RCN and the Obligors, each a "Debtor",

collectively, the "Debtors"), (a) seeking this Court's authorization, pursuant to Section 363(c) of

Title 11, United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code"), to

use the Cash Collateral (as defined below) and, pursuant to Sections 361 and 363 of the

Bankruptcy Code, to provide adequate protection to the Lenders (as defined below) with respect

to any diminution in the value of the Lenders' interests in the Prepetition Collateral (as defined

below), including for the use of the Cash Collateral (as defined below), the use, sale, lease,

depreciation, decline in market price or other diminution in value of the Prepetition Collateral

other than the Cash Collateral, or the imposition of the automatic stay pursuant to Section 362(a)

of the Bankruptcy Code; (b) seeking a preliminary hearing (the "Preliminary Hearing") on the

Motion to consider entry of an interim order pursuant to Bankruptcy Rule 4001(b) (the "Interim

Order") authorizing the Debtors to use the Lenders' Cash Collateral; and (c) requesting that a final hearing (the "Final Hearing", and together with the Preliminary Hearing, the "Hearings") be scheduled, and that notice procedures in respect of the Final Hearing be established by this Court to consider entry of a final order (this "Order") authorizing on a final basis the Debtors' use of the Cash Collateral; and this Court having entered the Interim Order at the conclusion of the Preliminary Hearing held before this Court on June 2, 2004 authorizing the Debtors to use the Cash Collateral subject to the terms and conditions of the Interim Order, and granting adequate protection to the Administrative Agent and the Lenders with respect to any diminution in value of the Lenders' interest in the Prepetition Collateral; and due and sufficient notice of the Motion and the Hearings under the circumstances having been given; and  cooperative and National Cable Television having filed an objection to the Motion (the "Objection"); and the Final Hearing on the Motion having been held before this Court on June 22, 2004; and upon the entire record at the Hearings including representatives counsel, and the Objection being denied by the Court for the reasons stated b the Court on the record at the Final Hearing and this Court having found good and sufficient cause appearing therefor,

### THE COURT HEREBY FINDS THAT:

A.    On May 27, 2004 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11, United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York.  The Debtors are continuing to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  On June 10, 2004, the United States Trustee appointed an official committee of unsecured creditors (the

"Committee") in these Chapter 11 cases.  No request has been made for the appointment of a trustee or examiner.

        B.     This Court has jurisdiction over these Chapter 11 cases and the Motion pursuant to 28 U.S.C. § 157(b) and 1334.  Consideration of this Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).

        C.     Pursuant to the Credit Agreement dated as of June 3, 1999 (as amended, supplemented or otherwise modified prior to the Petition Date, the "Credit Agreement"),[1] among RCN, certain subsidiaries of RCN (collectively, the "Borrowers"), the several lenders party thereto (collectively, the "Lenders") and JPMorgan Chase Bank, as administrative agent and collateral agent for the Lenders (in such capacity, the "Administrative Agent"), the Lenders made loans and other financial accommodations to or for the benefit of RCN and the Borrowers. All such loans, financial accommodations and other amounts owing by RCN and the Borrowers to the Administrative Agent under, or in connection with, the Credit Agreement including, without limitation, the Hedge Obligations (as defined below) and the Cash Management Obligations (as defined below), and all collateral and ancillary documentation executed in connection therewith (collectively, the "Loan Documents"), are hereinafter referred to as the "Prepetition Obligations".

        D.     The Lenders assert that as of the Petition Date the Lenders had made loans and financial accommodations such that as a result of the Company Guarantee Agreement dated as of June 3, 1999 (as amended, supplemented or otherwise modified prior to the Petition Date), RCN and the Obligors were contingently liable (i) to the Lenders in respect of loans made by the Lenders to the Borrowers pursuant to the Credit Agreement in the aggregate principal amount of

not less than $432,453,581.65 (plus accrued and unpaid interest thereon), (ii) to the

Administrative Agent and the Lenders in the aggregate face amount of approximately

$15,000,000 on account of the RCN and the Obligors' reimbursement obligations with respect to

letters of credit issued pursuant to the Credit Agreement which remained outstanding as of the

Petition Date, (iii) to the Administrative Agent and the Lenders for fees and expenses incurred in

connection with such loans and letters of credit as provided in the Credit Agreement, (iv) to

certain of the Lenders in respect of interest rate protection agreements, foreign currency

exchange agreements, commodity price protection agreements or other interest or currency

exchange rate or commodity price hedging arrangement to which RCN or one of the Borrowers

was a party (the "Hedge Obligations") and (v) to certain of the Lenders in respect of fees and

expenses arising in connection with cash management services for RCN and its subsidiaries and

affiliates (the "Cash Management Obligations").

      E.     The Lenders assert that, pursuant to the (i) Security Agreement, dated as

of June 3, 1999, (ii) the Company Guarantee Agreement, dated as of June 3, 1999, (iii) the

Subsidiary Guarantee Agreement, dated as of June 3, 1999, and (iv) the Indemnity, Subrogation

and Contribution Agreement, dated June 3, 1999 (as each of the foregoing agreements may have

been amended, supplemented or otherwise modified prior to the Petition Date), the Prepetition

Obligations are secured by perfected, valid and enforceable first priority liens and security

interests granted by RCN and the Obligors pursuant to the Loan Documents to the

Administrative Agent for the ratable benefit of the Lenders, upon the following assets and

property of RCN and the Obligors (as such terms are defined in the Loan Documents), which

---

1     Unless otherwise defined herein, each capitalized term used herein shall have the
     meaning assigned thereto in the Credit Agreement.

includes without limitation, Accounts Receivable, Documents, Equipment, General Intangibles,

Instruments, Inventory, Pledged Interests and Proceeds and other tangible and intangible

personal property and the proceeds thereof (including the setoff rights described in the Loan

Documents and arising by operation of law, collectively the "Prepetition Collateral"). The

Lenders assert that (i) the Prepetition Obligations are not subject to defense, counterclaim or

offset of any kind, and (ii) the Administrative Agent's liens and security interests have been

properly filed or recorded, as applicable, so as to be perfected in accordance with applicable law.

The Lenders further assert that the cash of RCN and the Obligors, including without limitation,

all cash and other amounts on deposit or maintained at PNC Bank N.A., Account Number

9009700493 (the "Chapter 11 Account") and any similar account or accounts that currently exist

or may be opened by the Debtors, and any amounts generated by the collection of accounts

receivable, sale of inventory or other dispositions of the Prepetition Collateral constitute

proceeds of the Prepetition Collateral and, therefore, are cash collateral of the Lenders within the

meaning of Section 363(a) of the Bankruptcy Code (the "Cash Collateral").[2]  The Lenders have

objected to the use by the Debtors of the Prepetition Collateral, including the Cash Collateral,

except on the terms of this Order (or other order that may be entered by the Court with the

Administrative Agent's consent). In addition, the Lenders are entitled, pursuant to Sections 361

and 363(e) of the Bankruptcy Code, to adequate protection of their interest in the Prepetition

---

[2]      The term "Cash Collateral" and the authorization to use Cash Collateral pursuant to the
terms of this Order does not include any cash held in demand deposit account no. 323-
247415 established at the office of the JPMorgan Chase Bank at 270 Park Avenue, New
York, New York 10017 pursuant to the Cash Collateral Agreement dated as of June 20,
2002, made by RFM 2, LLC, a Delaware limited liability company, in favor of JPMorgan
Chase Bank as issuer of various letters of credit (the "Bilateral LCs"), which cash is
maintained by JPMorgan Chase Bank as collateral for the Bilateral LCs (the "LC Cash
Collateral"). Notwithstanding anything to the contrary set forth in this Order, JPMorgan

Collateral to the extent of the diminution in value, including for the use of the Cash Collateral,

the use, sale, lease, depreciation, decline in market price or other diminution in value of the

Prepetition Collateral other than the Cash Collateral, and the imposition of the automatic stay.

F.      Good cause has been shown for the entry of this Order. The Debtors do

not have sufficient available sources of working capital and financing to carry on the operation

of their businesses without the use of Cash Collateral. Among other things, entry of this Order

will minimize disruption of the Debtors' businesses and operations and permit them to pay

operating expenses, maintain business relationships with their vendors and retain customer and

vendor confidence by demonstrating an ability to maintain normal operations. The use of the

Cash Collateral is therefore of the utmost significance and importance to the preservation and

maintenance of the going concern value of the Debtors and their estates, and will enhance the

prospects for a successful reorganization of the Debtors under Chapter 11 of the Bankruptcy

Code.

G.      The Administrative Agent and the Debtors have negotiated at arms' length

and in good faith regarding the Debtors' use of Cash Collateral to fund the administration of the

Debtors' estates and continued operation of their businesses. The Administrative Agent and the

Lenders have agreed to permit the Debtors to use Cash Collateral for the period through the

Termination Date (as defined below), all subject to the terms and conditions set forth herein,

including the protection afforded a party acting in "good faith" pursuant to Section 363(m) of the

Bankruptcy Code.

---

Chase Bank shall continue to maintain the LC Cash Collateral in the above referenced
account.

H.      The Debtors represent that notice of the Final Hearing and the relief requested in the Motion has been given to (i) the Office of the United States Trustee, (ii) counsel to the Administrative Agent, (iii) the Debtors' largest unsecured creditors as set forth in the consolidated list accompanying the Debtors' petitions, (iv) counsel to HSBC Bank USA, as agent for the lenders under the Commercial Term Loan and Credit Agreement dated as of June 6, 2003, (v) counsel to HSBC Bank USA, as trustee pursuant to the indenture for the Senior Discount Notes and the Senior Notes issued by RCN, (v) counsel for the Committee, and (vi) all other parties who have requested service pursuant to Bankruptcy Rule 2002. Based on such representation, such notice of the Final Hearing satisfies the requirements of Sections 102(1) and 363 of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001(b), the local rules of this District and the Interim Order.

I.      The terms of the Debtors' use of the Lenders' Cash Collateral are fair and reasonable, and reflect the Debtors' and their respective directors' exercise of prudent business judgment consistent with their fiduciary duties.

J.      The permission granted herein to use the Lenders' Cash Collateral is necessary to avoid immediate and irreparable harm to the Debtors. This Court concludes that entry of this Order is in the best interest of the Debtors' estates and creditors.

Based upon the foregoing findings and conclusions, and upon the record made before this Court at the Hearings, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED** that:

1.  The Motion is granted. The Debtors are hereby authorized to use the Cash Collateral during the period from the Petition Date through and including the Expiration Date (as defined below), subject to the earlier occurrence of the Termination Date (as defined below), for

general corporate purposes and costs and expenses related to these Chapter 11 cases in accordance with the terms and conditions of this Order; provided that all uses of cash by the Debtors for the costs and expenses of administering the Chapter 11 cases (a) shall be deemed to be first from cash that is not Cash Collateral and thereafter from Cash Collateral and (b) shall be used in accordance with the procedures contained in paragraph 2 of this Order and subject to the limitations contained in paragraph 15 of this Order and the other conditions contained herein. The term "Expiration Date" shall mean October 31, 2004 (or such later date if the Administrative Agent consents, which extension thereof shall be effective without further Court approval).

2.   The Debtors shall only use the Cash Collateral for the payment of the costs and expenses associated with the conduct of their Chapter 11 cases of the types specified for the Debtors on a Budget (as defined below). The term "Budget" shall mean a thirteen-week rolling cash flow forecast prepared on a book basis and presented separately for (A) the Debtors, (B) the Debtors' non-Debtor subsidiaries and affiliates on a consolidated basis and (C) Debtors and their subsidiaries on a consolidated basis, and containing weekly minimum cash balances for such thirteen-week rolling period, prepared by the Debtors and in form and substance acceptable to the Administrative Agent, substantially in the form of Exhibit A hereto, which shall specify, by individual line item, each category of expenditures ("Weekly Expenditures") for operating disbursements, financial disbursements, capital expenditures and other required disbursements, as such Budget may be amended, modified or supplemented from time to time without further Court approval but with the consent of the Administrative Agent. The Debtors shall use (a) Cash Collateral to make Weekly Expenditures relating to the cost and expenses of conducting their Chapter 11 cases (the "Chapter 11 Expenditures") in accordance with the terms of this Order, and (b) the cash of non-Debtor subsidiaries and affiliates to make Weekly Expenditures that

relate to the operation of the non-Debtor subsidiaries' and affiliates' businesses and that are not

costs and expenses of administering the Debtors' Chapter 11 cases (the "Operations

Expenditures") pursuant to any existing contractual arrangements among such non-Debtors and

the Lenders.  As to any line item of the Budget, subject to Court approval if required by the

Bankruptcy Code, and subject to the next sentence regarding timing of payments and obligations,

the Debtors may use Cash Collateral to make Chapter 11 Expenditures, in any given week to be

determined on a book basis, in excess of the amount set forth in such line item of the Budget for

such week without the prior approval of the Administrative Agent only if the amount of the

excess per line item is 15% or less, and cumulatively for the Budget period for any line item,

10% or less.  Notwithstanding anything to the contrary herein, the Debtors shall be authorized to

pay Chapter 11 Expenditures and incur liabilities at times other than set forth in the Budget

provided that, except as expressly agreed by the Administrative Agent, the timing of such

payments or incurring of such liabilities does not increase the total amount of expenditures

and/or liabilities in the Budget beyond the percentages set forth in the previous sentence.  No

later than Wednesday of each week, the Debtors shall prepare and deliver to the Lenders, the

Administrative Agent and its advisors, a report, for the week ending as of the preceding Friday,

of actual receipts and expenditures (on a consolidated basis and separately for the Debtors)

compared to the applicable Budget with a report of any material variances and the reasons

therefor, in a form reasonably satisfactory to the Administrative Agent.  To the extent any

additional affiliates of the Debtors become Chapter 11 debtors after the date of entry of this

Order, the Debtors shall file an amended Budget reasonably acceptable to the Administrative

Agent that provides for any additional projected Chapter 11 Expenditures as a result of the filing

of additional Chapter 11 petitions.  Except as otherwise provided herein and notwithstanding any

limitation herein on advances to non-Debtor subsidiaries and affiliates, the Debtors shall

maintain their pre-Petition Date cash management and accounts receivable collection system to

the extent authorized by and subject to the terms of any order of this Court governing the

Debtors' cash management system.  Except as expressly set forth herein, this Order does not

address the disposition of any Prepetition Collateral outside the ordinary course of business or

the Debtors' use of the Cash Collateral resulting therefrom.

3.   (a) As adequate protection for, and to the extent of, any diminution in the

value of the Lenders' interest in the Prepetition Collateral resulting from (x) the use of the Cash

Collateral pursuant to Section 363(c) of the Bankruptcy Code, (y) the use, sale, lease,

depreciation, decline in market price or other diminution in value of the Prepetition Collateral

(other than the Cash Collateral) pursuant to Section 363(c) of the Bankruptcy Code and (z) the

imposition of the automatic stay pursuant to Section 362(a) of the Bankruptcy Code (the amount

of any such diminution being referred to hereinafter as the "Adequate Protection Obligations"):

(i)        the Administrative Agent and the Lenders are hereby granted (effective as of the Petition Date and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements or otherwise), valid and perfected, replacement security interests in, and liens (the "Replacement Liens") on all of the right, title and interest of the Debtors in, to and under all present and after-acquired property of the Debtors of any nature whatsoever including, without limitation, all cash contained in any account of the Debtors (collectively, with the proceeds and products of any and all of the foregoing, the "Postpetition Collateral"). Subject to the Carveout (as defined below), said Replacement Liens shall be (x) a first priority perfected lien upon all of the Postpetition Collateral that is not otherwise encumbered by a validly perfected, non-avoidable security interest or lien on the Petition Date, (y) a first priority, senior, priming and perfected lien upon (a) that portion of the Postpetition Collateral that is comprised of the Prepetition Collateral and (b) Postpetition Collateral subject to a lien that is junior to the liens securing the Prepetition Obligations and (z) a second priority, junior perfected lien upon all Postpetition Collateral (other than the portion described in the preceding clause (y)), which is subject to a validly perfected lien as of the Petition Date; and

(ii)    to the extent not otherwise paid by the Debtors' non-debtor subsidiaries and affiliates, the Debtors are authorized and directed to (a) immediately pay as adequate protection an amount equal to all accrued and unpaid interest on the Prepetition Obligations and letter of credit fees at the non-default contract rates provided for in the Loan Documents, and all other accrued and unpaid fees and disbursements owing to the Administrative Agent under the Loan Documents and incurred prior to the Petition Date, (b) on the first business day of each month, pay as adequate protection an amount equal to all accrued but unpaid interest on the Prepetition Obligations at a rate per annum equal to ABR plus the Applicable Spread as of the day immediately prior to the Petition Date, and letter of credit and agency, administrative and other fees and disbursements, as and when due, all at the non-default contract rates provided for in the Loan Documents and in full satisfaction of any claim under the Loan Documents or applicable law for default or similar interest, and (c) pay as adequate protection any and all scheduled principal payments pursuant to the terms of the Credit Agreement (collectively, "Adequate Protection Payments").

(b)  As further adequate protection hereunder, the Debtors shall provide the following reporting to the Administrative Agent (the "Reporting Requirements"), each of which must be in form and substance satisfactory to the Administrative Agent: (i) commencing on Wednesday, June 2, 2004, and within 35 days of the end of every month thereafter, 13-week rolling cash flow projections, prepared on a book basis and substantially in the form of Exhibit A hereto, presented separately for (A) the Debtors, (B) the Debtors' non-Debtor subsidiaries and affiliates on a consolidated basis and (C) Debtors and their subsidiaries on a consolidated basis with comparisons to any previously forecasted cash flows or balances for such period, (ii) within 15 days of June 1, 2004, and within 15 days of the end of every month thereafter, a report on the connections by product (voice, video, data) and market for residential and commercial segments for the Debtors and their subsidiaries as a whole with comparisons to any previously forecasted connections for such period, (iii) within 40 days of May 1, 2004, and within 40 days of the end of every month thereafter, (A) consolidated financial statements (including an income statement, balance sheet and statement of cash flows) for the Debtors and their subsidiaries as of the end of the preceding month, all as certified by an officer of the Debtors, with comparisons to the most

recent business plan delivered to the Administrative Agent or its advisors pursuant to clause 3(b)(vi) hereof or otherwise, and written explanations for any material variances (including variances for capital expenditures, by major category) and (B) a monthly statement summarizing all ordinary course asset dispositions effected by the Debtors within the preceding month other than in respect of inventory, (iv) within 45 days of the end of each fiscal quarter (other than the fourth fiscal quarter) and within 105 days of the end of each fiscal year, deliver to the Administrative Agent consolidated financial statements (including an income statement, balance sheet and statement of cash flows) for the Debtors and their subsidiaries as of the end of the preceding fiscal quarter or year, as the case may be, together with (x) in each case, a certificate of an officer of the Debtors attesting that such financial statements fairly reflect the financial condition of the applicable entity in accordance with GAAP and (y) with respect to the year-end consolidated financial statements, an audit by PricewaterhouseCoopers LLP or other independent certified public accountants of nationally recognized standing (which accountant's retention shall have been previously approved by this Court) reporting on such financial statements without any material qualifications other than with respect to the Debtors' Chapter 11 cases or a going concern qualification, (v) commencing on or before five (5) business days after June 1, 2004, and on or before five (5) business days after the end of every month thereafter, monthly updates on the status of any non-ordinary course asset sales, and (vi) on every anniversary after December 31, 2003, an annual business plan with consolidated financial statements (including an income statement, balance sheet and statement of cash flows) for the Debtors and their subsidiaries.  In addition, the Debtors shall permit representatives, agents and/ or employees of the Administrative Agent or the Lenders to have reasonable access to their premises and non-privileged records during normal business hours (without unreasonable interference with the

proper operation of the Debtors' businesses) and shall cooperate, consult with and provide to such persons all such non-privileged information as they may reasonably request from time to time, including periodic updates provided to the Administrative Agent of efforts to obtain third party financing.  The Debtors shall provide the Reporting Requirements to the Committee at the time and in the same format as delivered to the Administrative Agent.

(c)  As additional adequate protection, to the extent not paid by the Debtors' non-Debtor subsidiaries and affiliates, the Debtors are authorized and directed, within 20 days of the submission of invoices therefor, to pay or reimburse all reasonable fees, costs and charges incurred prepetition and postpetition by the Lenders and the Administrative Agent (including, without limitation, the administration fees payable to the Administrative Agent under the Credit Agreement and the reasonable fees and out-of-pocket disbursements of Capstone Corporate Recovery, LLC, Balfour Associates or any successor financial consultants and Simpson Thacher & Bartlett LLP, or any successor outside counsel advising the Administrative Agent), in each case, in connection with matters relating to the Credit Agreement, the Prepetition Obligations, the monitoring of the Debtors' Chapter 11 cases or the enforcement and protection of the rights and interests of the Administrative Agent and the Lenders in these Chapter 11 cases.  None of the fees, costs and expenses payable pursuant to this paragraph shall be subject to separate approval by this Court (but the Court shall resolve any dispute as to the reasonableness of any such fees, costs and expenses), and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto.  Nothing contained herein shall be deemed to be a waiver by any party in interest of the right to object to the reasonableness of any fees, costs and charges incurred by the Lenders or the Administrative Agent.  As additional adequate protection, to the extent not paid by the Debtors' non-debtor subsidiaries and affiliates, the Debtors are also

authorized and directed to pay any fees and expenses of JPMorgan Chase Bank arising in connection with the Bilateral LCs, as required pursuant to the terms of the Bilateral LCs and related documentation.

(d)  Under the circumstances (and consistent with the rights of the Lenders under section 506(b) of the Bankruptcy Code), and based upon the Lenders' consent, the adequate protection provided herein is reasonable and sufficient to protect the interests of the Lenders. Notwithstanding any other provision hereof, the grant of adequate protection to the Administrative Agent and the Lenders pursuant hereto is (i) without prejudice to the rights of any party in interest (other than the Debtors) to assert that the Adequate Protection Payments constitute repayments of principal on unpaid Prepetition Obligations because such Prepetition Obligations are not oversecured and (ii) without prejudice to the right of the Administrative Agent or the Lenders to seek modification of the grant of adequate protection provided hereby so as to provide different or additional adequate protection, and without prejudice to the right of the Debtors or any other party in interest to contest any such modification.

4.  As used in this Order, "Carveout" means (a) the unpaid fees of the clerk of the Bankruptcy Court and of the United States Trustee pursuant to 28 U.S.C. § 1930(a) and (b) (the "Statutory Fees"), (b) following the occurrence of an Event of Default (as defined below), the payment of allowed professional fees and disbursements (the "Professional Fees and Disbursements") incurred by the professionals retained by the Debtors, the Committee, or any other statutory committee appointed in these Chapter 11 cases not to exceed $2,500,000 in the aggregate, plus unpaid Professional Fees and Disbursements previously incurred prior to the occurrence of such Event of Default and (c) costs and administrative expenses permitted to be incurred by any Chapter 7 trustee pursuant to an order of this Court following any conversion of

the Debtors' Cases pursuant to Section 1112 of the Bankruptcy Code in an amount not to exceed $150,000; provided however that Carveout amounts for Professional Fees and Disbursements and costs and expenses pursuant to clauses (b) and (c) are subject to the limitations and restrictions set forth in paragraph 15 herein. So long as no Event of Default shall have occurred and be continuing, the Debtors shall be permitted to pay without reduction of the Carveout (x) the Statutory Fees and (y) the Professional Fees and Disbursements, as the same may be due and payable. Nothing herein shall be construed as a waiver of the right of the Administrative Agent or any Lender to object to the allowance of any Professional Fees and Disbursements.

5.    Subject to the Carveout, the Adequate Protection Obligations shall constitute expenses of administration under Sections 503(b)(1), 507(a) and 507(b) of the Bankruptcy Code (the "507(b) Claims") with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code including, without limitation, Sections 105, 326, 328, 330, 331 and 726 of the Bankruptcy Code, and shall at all times be senior to the rights of the Debtors, and any successor trustee or any creditor, in these Chapter 11 cases or, to the extent permitted by applicable law, any subsequent proceedings under the Bankruptcy Code. Subject to the Carveout, no cost or expense of administration under Sections 105, 503(b) or 507(b) or otherwise, including those resulting from the conversion of these Chapter 11 cases pursuant to Section 1112 of the Bankruptcy Code, shall be senior to, or pari passu with, the 507(b) Claims of the Lenders arising out of the Adequate Protection Obligations. Notwithstanding anything to the contrary herein, neither the Replacement Liens nor the 507(b) Claims shall attach to or be paid from any cause of action (or the proceeds thereof) arising under Sections 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code.

6.   Except as expressly set forth in this Order, the liens granted pursuant to the Interim Order and this Order shall not be (i) subject to any lien that is avoided and preserved for the benefit of the Debtors' estates under Section 551 of the Bankruptcy Code or (ii) subordinated to or made _pari passu_ with any other lien under Sections 363 and 364 of the Bankruptcy Code. Subject to the Carveout, the Replacement Liens shall be prior and senior to all liens and encumbrances of all other secured creditors in and to such Postpetition Collateral granted, or arising, after the Petition Date (including, without limitation, liens and security interests, if any, granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors).  The Replacement Liens granted pursuant to the Interim Order and this Order shall constitute valid and duly perfected security interests and liens, and the Administrative Agent and the Lenders shall not be required to file or serve financing statements, notices of lien or similar instruments which otherwise may be required under federal or state law in any jurisdiction, or take any action, including taking possession, to validate and perfect such security interests and liens; and the failure by the Debtors to execute any documentation relating to the Replacement Liens shall in no way affect the validity, perfection or priority of such Replacement Liens.  If, however, the Administrative Agent, in its sole discretion, shall determine to file any such financing statements, notices of lien or similar instruments, or to otherwise confirm perfection of such Replacement Liens, the Debtors are directed to cooperate with and assist in such process, the stay imposed by Section 362(a) of the Bankruptcy Code is hereby lifted to allow the filing and recording of a certified copy of this Order or any such financing statements, notices of lien or similar instruments, and all such documents shall be deemed to have been filed or recorded at the time of and on the date of the Interim Order.

7.    The Debtors' right to use the Cash Collateral shall terminate (the date of any

such termination, the "Termination Date") on the earliest to occur of (x) consummation of a plan

of reorganization in these Chapter 11 cases or (y) upon written notice to the Debtors after the

occurrence and continuance of any of the following events ("Events of Default") beyond any

applicable grace period and subject to the applicable notice periods set forth in paragraph 8

hereof:

a.    Failure of the Debtors to make a payment to the Administrative Agent or the Lenders as and when required by this Order or other failure to comply in any material respect with the terms of this Order and such failure shall continue unremedied for more than five business days after written notice thereof;

b.    Failure of the Debtors to comply with any other covenant or agreement specified in this Order (other than those described in clause (a) above) and such failure shall continue unremedied for more than five business days after written notice thereof;

c.    Failure of the Debtors to comply with any covenant or agreement specified in the Loan Documents (except to the extent modified by this Order, waived pursuant to any written waiver or amendment to the Credit Agreement, or otherwise prohibited by the Bankruptcy Code), including provisions relating to payment of principal, interest, fees and mandatory prepayments (determined without giving effect to the acceleration of any such amounts arising solely as the result of the commencement of these Chapter 11 cases), and such failure shall continue unremedied for more than the applicable grace period set forth in the Loan Documents (or if no grace period shall be applicable, more than five business days); provided, however, that during the period covered by the Budget and during which the Debtors are using Cash Collateral pursuant to this Order, the restrictions on the use of Net Proceeds of any asset sales set forth in Sections 2.10 and 6.05 of the Credit Agreement, the Side Letter, dated March 10, 2003, with respect to the NJ Cash Collateral Agreement (as defined therein) and the Side Letter, dated March 9, 2004, with respect to the Carmel Cash Collateral Agreement (as defined therein) shall be replaced by the covenants set forth herein and in the Budget as to the Debtors;

d.    On any day of any week, cash and cash equivalents on hand (including Cash Collateral) at RCN and its Restricted Subsidiaries in the aggregate determined on a book basis shall be less than the corresponding weekly minimum amounts set forth in the Budget, as such amounts may be reduced to accommodate payment of scheduled principal and interest as Adequate Protection Payments as set forth in the Budget; provided, that the Debtors, on a one-time basis only, shall be permitted to remedy a deficiency within two business days of the occurrence thereof if (and only if) such deficiency does not exceed $2 million; provided

further, that proceeds of any post-Petition Date asset sales outside the ordinary course of business exceeding $1 million shall not be counted in the calculation of cash on hand for purposes of this requirement;

e.   Any representation or warranty made by the Debtors in connection with the Reporting Requirements (other than with respect to projected financial information) shall prove to have been incorrect in any material respect when made;

f.   Any of the Chapter 11 cases shall be dismissed or converted to a Chapter 7 case; or a Chapter 11 Trustee with plenary powers, a responsible officer, or an examiner with enlarged powers relating to the operation of the businesses of the Debtors (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the Chapter 11 cases; provided that the appointment by the Court of a trustee or other fiduciary of any of the Debtors' estates for the limited purpose of investigating, commencing or prosecuting an Adversary Proceeding on behalf of any of the Debtors' estates shall not constitute a default under this subparagraph;

g.   Failure to substantially consummate by October 31, 2004 or such later date as may be extended by the Administrative Agent, a plan of reorganization or liquidation in form and substance satisfactory to the Administrative Agent;

h.   The Court shall enter an order granting relief from the automatic stay to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Debtors which have an aggregate value in excess of $1,000,000;

i.   An order shall be entered reversing, amending, supplementing, staying for a period in excess of 3 days, vacating or otherwise modifying this Order without the consent of the Administrative Agent;

j.   Any Debtor shall create, incur or suffer to exist any postpetition liens or security interests other than (i) those in favor of the Administrative Agent, (ii) carriers', warehousemen's, repairmen's or other similar liens, (iii) pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation and (iv) deposits to secure the payment of postpetition utilities, the performance of bids, trade contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business; provided that the aggregate value of the liens, pledges or deposits referred to in clauses (iii) and (iv) above shall not exceed $10,000,000 at any one time; or any other claim which is pari passu with or senior to the claims of the Administrative Agent and the Lenders shall be granted in these Chapter 11 cases;

k.   Any judgment in excess of $2,000,000 as to any postpetition obligation not covered by insurance shall be rendered against the Debtors and the enforcement

thereof shall not be stayed; or there shall be rendered against the Debtors a non-monetary judgment with respect to a postpetition event which has or could reasonably be expected to have a material adverse effect on the ability of the Debtors to perform their obligations under this Order;

l.  A filing by any of the Debtors (or any of their successors and assigns, it being understood that the Committee shall not be considered a successor or assign of the Debtors for the purpose of this provision) of (x) any motion or application or adversary proceeding challenging the validity, enforceability, perfection or priority of any of the Loan Documents or any such liens and security interests or any other cause of action against and/or with respect to the Prepetition Obligations, the prepetition liens securing such Prepetition Obligations, the Administrative Agent or the Lenders in their respective capacities as such under the Loan Documents and relating to any of the foregoing matters or (y) any plan of reorganization not providing for the repayment in full in cash on the effective date of such plan, of the Prepetition Obligations under the Loan Documents and otherwise reasonably acceptable to the Administrative Agent; and

m.  There shall occur any condition or event after the Petition Date that could reasonably be expected to have a material adverse effect on the property, business, condition (financial or otherwise) or prospects of the Debtors taken as a whole.

The Debtors shall promptly provide notice to the Administrative Agent (with a copy to counsel for the Committee and any other statutory committee appointed in these Chapter 11 cases and the United States Trustee) of the occurrence of any Event of Default.

8.  On the Termination Date, upon five (5) business days' written notice to the Debtors (with a copy to counsel for the Committee and any other statutory committee appointed in these Chapter 11 cases and the United States Trustee) (i) the Administrative Agent may terminate the Debtors' right to use the Cash Collateral, (ii) the Adequate Protection Obligations shall become immediately due and payable, (iii) the Administrative Agent and each Lender may setoff amounts in any account of the Debtors maintained with the Administrative Agent or each Lender, respectively and (iv) the Administrative Agent and the Lenders may exercise the rights and remedies available under the Loan Documents, this Order or applicable law, including, without limitation, foreclosing upon and selling all or a portion of the Prepetition Collateral or

Postpetition Collateral in order to collect the Adequate Protection Obligations. The actions described in clauses (iii) and (iv) above may be taken without further order of or application to the Court as the Administrative Agent or the Lenders shall, in its discretion, elect, and the automatic stay is hereby deemed modified and vacated to the extent necessary to permit such actions, provided that no order prohibiting such action is entered by this Court during the above-referenced five (5) business day period. The Administrative Agent and the Lenders shall be entitled to apply the payments or proceeds of the Prepetition Collateral in accordance with the provisions of the Loan Documents, and in no event shall the Administrative Agent or any of the Lenders be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral, Postpetition Collateral or otherwise.
Notwithstanding the occurrence of the Termination Date or anything herein, all of the rights, remedies, benefits and protections provided to the Administrative Agent and the Lenders under this Order shall survive the Termination Date. Notwithstanding anything to the contrary contained herein, upon the occurrence of any of the Events of Default set forth in subsections (a), (d), (f), (j) and (m) of paragraph 7, the Debtors' right to use Cash Collateral hereunder shall terminate immediately.

9.   The provisions of this Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (a) confirming any plan of reorganization in these Chapter 11 cases; (b) converting any of these Chapter 11 cases to Chapter 7 cases; or (c) dismissing any of these Chapter 11 cases. If an order dismissing these Chapter 11 cases under Section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that (a) the Replacement Liens granted pursuant to this Order to the Administrative Agent and the Lenders

shall continue in full force and effect, shall remain binding on all parties in interest notwithstanding such dismissal until the obligations secured thereby shall have been paid and satisfied in full and (b) this Court shall retain jurisdiction, notwithstanding such dismissal, for the limited purposes of enforcing such Replacement Liens.

10. The Debtors and any of their successors in interest (including, without limitation, any trustee appointed or elected in any of these Chapter 11 cases or following the conversion of any of these cases to cases under Chapter 7 or any representative(s) of the Debtors' estates appointed pursuant to Section 1123(b)(3) of the Bankruptcy Code or otherwise) shall be deemed to have waived and released, on behalf of themselves and their estates, all claims and causes of action under Sections 544, 545, 547 or 548 of the Bankruptcy Code seeking to recover or avoid any liens granted to, transfers to or for the benefit of, or other obligations incurred in favor of the Administrative Agent or any Lender, as well as any objection or defense to, the validity, perfection, priority, extent or enforceability of any amount due under the Loan Documents (collectively, the "Adversary Proceedings") and (a) the Prepetition Obligations shall constitute allowed claims, not subject to defense, counterclaim, offset of any kind or subordination for all purposes in these Chapter 11 cases and any subsequent Chapter 7 cases, (b) the liens and security interests of the Administrative Agent for the ratable benefit of the Lenders upon the Prepetition Collateral shall be deemed legal, valid, binding, enforceable, perfected and unavoidable and (c) the Administrative Agent and the Lenders shall not be subject to any other or further claims or causes of action by any party in interest seeking to exercise the rights of the Debtors' estates, except to the extent (and only to the extent) of any claims or causes of action that are the subject of an adversary proceeding or contested matter commenced by the Debtors or any other party authorized or permitted under applicable law to do so (including any statutory

committee appointed in these Chapter 11 cases), against the Administrative Agent or any Lender no later than October 8, 2004, without prejudice to the rights of parties in interest to be heard with respect to extensions of the deadline referred to in this paragraph.

11. Entry of this Order shall be without prejudice to any and all rights, remedies, claims and causes of action which the Administrative Agent or the Lenders may have against the Debtors or third parties, and without prejudice to the right of the Administrative Agent and the Lenders to seek relief from the automatic stay in effect pursuant to Bankruptcy Code Section 362, or any other relief in the Chapter 11 cases, and the right of the Debtors to oppose any such relief. The provisions of this Order shall be binding upon and inure to the benefit of the Administrative Agent, the Lenders, the Debtors, and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in these Chapter 11 cases as a legal representative of the Debtors or the Debtors' estates.

12. (a) In order to facilitate the processing of claims, to ease the burden upon the Court and to reduce any unnecessary expense to the Debtors' estates, the Administrative Agent is authorized to file a master proof of claim on behalf of itself and the Lenders on account of their claims arising under the Loan Documents and hereunder against the Obligors (the "Master Proof of Claim") to the extent the Lenders are required to file a proof of claim on account of such claims, and the Administrative Agent shall not be required to file a verified statement pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure.

(b) Upon the filing of the Master Proof of Claim against the Obligors, the Administrative Agent and each Lender, and each of their respective successors and assigns, shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claims against each of the Obligors arising under the Loan Documents, and the

claim of the Administrative Agent and each Lender (and each of their respective successors and assigns), named in the Master Proof of Claim shall be allowed or disallowed as if such entity had filed a separate proof of claim in each applicable Chapter 11 case in the amount set forth opposite each name in the Master Proof of Claim; provided that the Administrative Agent may but shall not be required to amend the Master Proof of Claim from time to time to, among other things, reflect a change in the holders of claims set forth therein or a reallocation among such holders of the claims asserted therein resulting from any transfer of any such claims.

(c) The provisions set forth of this paragraph and the Master Proof of Claim are intended solely for the purpose of administrative convenience and, except to the extent set forth herein or therein, neither the provisions of this paragraph nor the Master Proof of Claim shall affect the substantive rights of the Debtors, any statutory committee appointed in these Chapter 11 cases, the Administrative Agent or the Lenders or any other party in interest or their respective successors in interest including, without limitation, the right of each Lender (or their successors in interest) to vote separately on any plan of reorganization proposed in the Debtors' Chapter 11 cases.

13. Pursuant to Sections 105, 361 and 363 of the Bankruptcy Code, the Administrative Agent and the Lenders are hereby found to be entities that have acted in "good faith" in connection with the negotiation and entry of this Order, and each is entitled to the protection provided to such entities under Section 363(m) of the Bankruptcy Code.

14. Except on the terms of this Order, the Debtors shall be enjoined and prohibited from at any time (i) using the Cash Collateral, or (ii) using the Postpetition Collateral. Notwithstanding any provision in other "first day" orders entered by this Court authorizing the Debtors to make payments in respect of prepetition obligations, the provisions in this Order

24

conditioning the payment of such amounts or limiting the amount of such payments are controlling. Except for the Carveout, no expenses of administration of these Chapter 11 cases or any future proceeding or case which may result therefrom, including (without limitation) liquidation under Chapter 7, shall be charged pursuant to Section 506(c) of the Code against the Prepetition Collateral or the Postpetition Collateral without the prior written consent of the Administrative Agent and the Lenders, and no such consent shall be implied from any action, inaction or acquiescence by the Administrative Agent or the Lenders or otherwise.

15. Notwithstanding anything herein to the contrary, neither the Cash Collateral nor the Carveout may be used to (a) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the Loan Documents, or the liens or claims granted under this Order or the Loan Documents (but may be used for the investigation in connection with the Loan Documents), (b) assert any claims, counterclaims, defenses or causes of action against the Administrative Agent or the Lenders or their respective affiliates, (c) prevent, hinder or otherwise delay the Administrative Agent's foreclosure on the Cash Collateral, the Prepetition Collateral or the Postpetition Collateral in accordance with the Loan Documents or this Order (but may be used solely to contest whether an Event of Default hereunder shall have occurred); or (d) seek to modify any of the rights granted to the Administrative Agent or the Lenders hereunder or under the Loan Documents, in each of the foregoing cases without such parties' prior written consent (it being understood that this clause (d) shall not apply to any actions by the Debtors or the Committee to contest, pursuant to paragraph 3(d) of this Order, any requested modification by the Administrative Agent or the Lenders of the grant of adequate protection provided to them under this Order).

16. Except as specifically amended, supplemented or otherwise modified hereby, all of the provisions of the Interim Order shall remain in effect and are hereby ratified by this Order. In the event of any inconsistency between the terms of this Order and the terms of the Interim Order, the terms of this Order shall govern.

Dated: June 22, 2004
       New York, New York

/s/Robert D. Drain
The Honorable Robert D. Drain
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

—————————————————————————————————

In re                                                    )       Chapter 11
                                                         )
TOWER AUTOMOTIVE, INC., *et al.*,                        )       Case No. 05-10578 (ALG)
                                                         )
                        Debtors.                         )       Jointly Administered
                                                         )
—————————————————————————————————)

## FINAL ORDER (I) AUTHORIZING DEBTORS (A) TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e) AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, AND (II) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364

Upon the motion (the "Motion"), dated February 2, 2005, of R. J. Tower Corporation

(the "Borrower") and its affiliated debtors party to the DIP Credit Agreement (as hereinafter

defined), each as debtor and debtor-in-possession (collectively, the "Debtors"), in the

above-captioned cases (the "Cases") pursuant to sections 105, 361, 362, 363(c)(2),

364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11 of the United States Code,

11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and Rules 2002, 4001 and 9014 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking, among other

things:

(1)     authorization for the Borrower to obtain post petition financing (the

"Financing"), and for all of the other Debtors (the "Guarantors") to guaranty the

Borrower's obligations in connection with the Financing, up to the aggregate principal

amount of $725 million, comprised of a $300 million revolving credit facility (the "DIP

Revolving Facility") and a $425 million term loan (the "Term Loan" and together with

the DIP Revolving Facility, the "DIP Loans") (the actual available principal amount at

any time being subject to those conditions set forth in the DIP Documents (as defined

below)), from JPMorgan Chase Bank, N.A. ("JPMCB"), acting as Administrative

Agent (in such capacity, the "Agent"), for itself and a syndicate of financial institutions

(together with JPMCB and including the issuing lenders for letters of credit, the "DIP

Lenders") to be arranged by J.P.Morgan Securities Inc. ("JPMorgan");

     (2)    authorization for the Debtors to execute and enter into the DIP

Documents and to perform such other and further acts as may be required in connection

with the DIP Documents;

     (3)    the granting of adequate protection to the lenders under or in connection

with (x) that certain Credit Agreement, dated as of May 24, 2004 (as heretofore

amended, supplemented or otherwise modified, the "Pre-Petition Credit Agreement"),

among the Borrower, Silver Point Capital Fund LP, as successor agent to Morgan

Stanley Senior Funding, Inc. (the "Pre-Petition Agent"), the lenders party thereto and

the letter of credit issuing bank(s) named therein (collectively, the "Pre-Petition Secured

Lenders"); (y) that certain First Lien Pledge and Security Agreement, dated as of May

24, 2004, between Borrower and Standard Federal Bank ("Standard"), on behalf of

certain Pre-Petition Secured Lenders (the "First Lien Lenders") (heretofore amended,

supplemented or otherwise modified, the ("First Lien Pre-Petition Security Agreement")

and (z) that certain Second Lien Pledge and Security Agreement, dated as of May 24,

2

2004 between Borrower and Standard on behalf of certain Pre-Petition Secured

Lenders (the "Second Lien Lenders") (as heretofore amended, supplemented or

otherwise modified, the "Second Lien Pre-Petition Security Agreement" and,

collectively with the First Lien Pre-Petition Security Agreement, the Pre-Petition Credit

Agreement, and the mortgages and all other documentation executed in connection

therewith (including, for the avoidance of doubt, any rate protection agreement, or

hedge agreements as set forth in the Pre-Petition Credit Agreement), the "Existing

Agreements"), whose liens and security interests are being primed by the Financing;

    (4)    authorization for the Debtors to use cash collateral (as such term is

defined in the Bankruptcy Code) in which the Pre-Petition Secured Lenders have an

interest, and the granting of adequate protection to the Pre-Petition Secured Lenders

with respect to, *inter alia*, such use of their cash collateral and all use and diminution in

the value of the Pre-Petition Collateral (as defined below);

    (5)    the granting of superpriority claims to the DIP Lenders, subject to the

Carve Out (as defined below),

    (6)    authorization for the Debtors to execute a certain Back-Stop

Commitment Letter with Silver Point Finance, LLC ("Silver Point") in substantially the

form of Exhibit "A" to the Interim Order (the "Back-Up Commitment Letter"), with

respect to the priming of the Second Lien Lenders;

    (7)    pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim

Hearing") on the Motion be held before this Court to consider entry of the proposed

interim order annexed to the Motion (the "Interim Order") authorizing the Borrower, on

an interim basis, to forthwith (a) execute the DIP Documents in connection with the DIP

Revolving Facility and borrow or obtain letters of credit from the DIP Lenders under

the DIP Documents up to an aggregate principal or face amount not to exceed

$125,000,000 under the DIP Revolving Facility for working capital and other general

corporate purposes of the Debtors (subject to any limitations of borrowings under the

DIP Documents), (b) authorizing the Debtors' use of cash collateral of the Pre-Petition

Secured Lenders, (c) granting the Pre-Petition Secured Lenders the adequate

protection described therein, and (d) executing the Back-Stop Commitment Letter with

Silver Point and performing thereunder; and

(8)      that this Court schedule a final hearing (the "Final Hearing") to be held

within 30 days of the entry of the Interim Order to consider entry of a final order (the

"Final Order") authorizing the balance of the borrowings and letter of credit issuances

under the DIP Documents on a final basis, as set forth in the Motion and the DIP

Documents filed with this Court; including without limitation, authorizing the Debtors to

(x) waive the right to charge, pursuant to Bankruptcy Code § 506, any costs of

administration of these cases (except as permitted by the Carve Out) against any Pre-

Petition Collateral and Collateral; (y) borrow or obtain letters of credit from the DIP

Lenders under the DIP Documents up to (i) an aggregate principal or face amount not

to exceed $300 million (inclusive of amounts authorized pursuant to the Interim Order)

under the DIP Revolving Facility for working capital and other general corporate

purposes of Debtors; and (ii) an aggregate principal amount not to exceed $425 million

under the DIP Term Loan to refinance the First Lien Pre-Petition Secured Debt

outstanding as of February 2, 2005 (the "Petition Date").

Due and appropriate notice of the Motion, the relief requested therein and the Final Hearing
having been given by the Debtors, as set forth in the Motion and in the Interim Order.

The Interim Hearing and the Final Hearing (the "Hearings") having been held by this Court on
February 2, 2005 and February 28, 2005, respectively,

Upon the record made by the Debtors at the Hearings and upon all the pleadings and
documents filed with the Court, and after due deliberation and consideration and sufficient cause
appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1. *Jurisdiction.* This Court has core jurisdiction over the Cases, this Motion, and the
parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper
before this Court pursuant to 11 U.S.C. §§ 1408 and 1409.

2. *Notice.* Under the circumstances, the notice given by the Debtors of the Motion and
the Hearings constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001 (b)
and (c).

3. *Debtors' Stipulations.* Without prejudice to the rights of any other party including any
Committee (as defined below) authorized to assert any claims on behalf of the estates (but subject to the
limitations thereon contained in paragraphs 15 and 16 below), the Debtors admit, stipulate and agree
that:

(2) (i) as of the Petition Date, the Borrower and Guarantors party to the Pre-
Petition Credit Agreement were indebted and liable: (x) to the First Lien Lenders, without defense,

counterclaim or offset of any kind, in the aggregate principal amount of approximately $425 million in

respect of loans made and letters of credit issued, in each case, by the First Lien Lenders pursuant to,

and in accordance with the terms of, the Existing Agreements, including, in each case, interest thereon

and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees that

are chargeable or reimbursable under the Existing Agreements), charges and other obligations incurred

in connection therewith as provided in the Existing Agreements (collectively, the "First Lien Pre-Petition

Secured Debt"), and (y) to the Second Lien Lenders, without defense, counterclaim or offset of any

kind, in the aggregate principal amount of approximately $155 million in respect of loans made and/or

letters of credit issued, or supported or other obligations incurred, in each case, by the Second Lien

Lenders pursuant to, and in accordance with the terms of, the Existing Agreements, plus, in each case,

interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial

advisors' fees that are chargeable or reimbursable under the Existing Agreements), charges and other

obligations incurred in connection therewith as provided in the Existing Agreements (collectively, the

"Second Lien Pre-Petition Secured Debt" and together with the First Lien Pre-Petition Secured Debt,

the "Pre-Petition Secured Debt"), (ii) the Pre-Petition Secured Debt constitutes the legal, valid and

binding obligation of the Debtors, enforceable in accordance with its terms (other than in respect of the

stay of enforcement arising from section 362 of the Bankruptcy Code), and (iii) no portion of the

Pre-Petition Secured Debt is subject to avoidance, recharacterization, recovery or subordination

pursuant to the Bankruptcy Code or applicable nonbankruptcy law;

(3)        the liens and security interests granted to Standard, in its capacity as Collateral

Agent for the Lenders (as such terms are defined in the Pre-Petition Agreement) for its benefit and for

the benefit of the Pre-Petition Agent and (x) the First Lien Lenders pursuant to and in connection with the Existing Agreements (including, without limitation, all security agreements, pledge agreements, mortgages, deeds of trust and other security documents executed by any of the Debtors in favor of and for the benefit of the First Lien Lenders) in connection with the Existing Agreements, are (i) valid, binding, perfected, enforceable, first-priority (subject to certain permitted exceptions in the Existing Agreements) liens and security interests in the personal and real property described in the Existing Agreements (including the set off rights described in the Existing Agreements and arising by operation of law, collectively, the "First Lien Pre-Petition Collateral"), (ii) not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law and (iii) after giving effect to this Order and until the transactions set forth in the DIP Credit Agreement with respect to the payment in full of the First Lien Pre-Petition Secured Debt are closed, subject and subordinate only to (A) the DIP Liens (as defined below), (B) the Carve Out (as defined below) and (C) valid, perfected and unavoidable liens permitted under the Existing Agreements to the extent such permitted liens are senior to or pari passu with the liens of the First Lien Lenders on the First Lien Pre-Petition Collateral; and (y) the Second Lien Lenders pursuant to and in connection with the Existing Agreements (including, without limitation, all security agreements, pledge agreements, mortgages, deeds of trust and other security documents executed by any of the Debtors in favor of and for the benefit of the Second Lien Lenders) in connection with the Existing Agreements, are (i) valid, binding, perfected, enforceable, liens and security interests in the personal and real property described in the Existing Agreements (including the set off rights described in the Existing Agreements and arising by operation of law, collectively the "Second Lien Pre-Petition Collateral" and together with the First Lien Pre-Petition Collateral, the "Pre-Petition Collateral"), (ii) not subject to avoidance, re-characterization or

subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law and (iii) after giving

effect to this Order subject and subordinate only to (A) until the transactions set forth in the DIP Credit

Agreement with respect to the payment in full of the First Lien Pre-Petition Secured Debt are closed,

liens and security interests of the First Lien Lenders, (B) the DIP Liens, (C) the Carve Out to which the

DIP Liens are subject and (D) valid, perfected and unavoidable liens permitted under the Existing

Agreements to the extent such permitted liens are senior to or *pari passu* with the liens of the Second

Lien Lenders on the Second Lien Pre-Petition Collateral;

(4)        The (i) aggregate value of the Pre-Petition Collateral provided to the First Lien

Lenders pursuant to the First Lien Pre-Petition Security Agreement and related security documentation

exceeds the aggregate amount of the First Lien Pre-Petition Secured Debt; and (ii) the aggregate value

of the Pre-Petition Collateral provided to the Second Lien Lenders pursuant to the Second Lien Pre-

Petition Security Agreement and related security documentation exceeds the aggregate amount of the

Second Lien Pre-Petition Secured Debt.

(5)        *Stipulations Concerning Receivables Portfolio*. Without prejudice to the

rights of any other party, including any Committee authorized to assert any claims on behalf of the

estates (but subject to the limitations thereon described below in paragraphs 15 and 16 below), the

Debtors admit that, pursuant to that certain Receivables Sale Agreement, dated as of December 30,

2004 (the "Receivables Sale Agreement") between certain of the Debtors and Tower Automotive

ASC, LLC, such subsidiaries sold, assigned and transferred to Tower Automotive ASC, LLC all of

their right, title and interest in and to the accounts receivable referred to therein (the "Receivables

Portfolio"). Pursuant to the Receivables Funding Agreement, dated December 30, 2004, as amended,

(the "Receivables Funding Agreement" and together with the Receivables Sale Agreement, the "Existing

Receivables Facility"), among Tower Automotive ASC, LLC, R.J. Tower Corporation, as servicer,

certain financial institutions from time to time party thereto (the "accounts receivable lenders"), and

General Electric Credit Corporation ("GECC"), as administrative agent and swingline lender

("Administrative Agent") for the accounts receivable lenders thereunder, Tower Automotive ASC,

LLC, pursuant thereto granted to the Administrative Agent perfected security interests in, among other

things, all of its right, title and interest in, to and under the Receivables Sale Agreement certain related

documents in the Receivables Portfolio, certain collection accounts, lockboxes, deposits and the

proceeds thereof.

4.        *Findings Regarding the Financing.*

(6)        Good cause has been shown for the entry of this Final Order.

(7)        The Debtors have an immediate need to obtain the Financing and use Cash

Collateral (as defined below) in order to permit, among other things, the orderly continuation of the

operation of their businesses, to maintain business relationships with vendors, suppliers and customers,

to make payroll, to make capital expenditures and to satisfy other working capital and operational

needs. The access of the Debtors to sufficient working capital and liquidity through the use of Cash

Collateral, incurrence of new indebtedness for borrowed money and other financial accommodations is

vital to the preservation and maintenance of the going concern values of the Debtors and to a successful

reorganization of the Debtors.

(8)        The Debtors are unable to obtain financing on more favorable terms from

sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate

unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative

expense. The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1),

364(c)(2) and 364(c)(3) of the Bankruptcy Code without the Debtors granting to the Agent and the DIP Lenders, subject to the Carve Out as provided for herein, the DIP Liens and the Superpriority Claims (as defined below) under the terms and conditions set forth in this Order and in the DIP Documents.

(9)        The terms of the Financing and the use of Cash Collateral are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(10)        The Financing has been negotiated in good faith and at arm's length between the Debtors, the Agents and the DIP Lenders, and all of the Debtors' obligations and indebtedness arising under, in respect of or in connection with the Financing and the DIP Documents, including without limitation, (i) DIP Loans made pursuant to the Revolving Credit, Term Loan and Guaranty Agreement substantially in the form attached as Exhibit A to the Motion (the "DIP Credit Agreement"), (ii) and any "Obligations" (as defined in the DIP Credit Agreement), including credit extended in respect of overdrafts and related liabilities and other depository, treasury, and cash management services and other clearing services provided by JPMCB, other DIP Lenders, or their respective affiliates (all of the foregoing in clauses (i) and (ii) collectively, the DIP Obligations"), shall be deemed to have been extended by the Agent and the DIP Lenders and their affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(11)        The Debtors have requested entry of this Order pursuant to Bankruptcy Rules

4001(b)(2) and 4001(c)(2).  Absent granting the relief sought by this Order, the Debtors' estates will be

immediately and irreparably harmed.  Consummation of the Financing and the use of Cash Collateral in

accordance with this Order and the DIP Documents is therefore in the best interest of the Debtors'

estates.

5.        *Authorization of the Financing and the DIP Documents.*

(12)        The DIP Documents and the Financing are hereby approved as set forth in this

Order.  The Debtors are hereby authorized to enter into the DIP Documents (as defined below)

including without limitation, the DIP Credit Agreement. The Borrower is hereby authorized to borrow

money and obtain letters of credit under the DIP Credit Agreement, and the Guarantors are hereby

authorized to guaranty such borrowings and the Borrower's obligations with respect to such letters of

credit, up to an aggregate principal or face amount of $725,000,000 (inclusive of amounts authorized

pursuant to the Interim Order), plus interest, fees and other expenses provided for in the DIP

Documents, in accordance with the terms of this Order and the DIP Documents, which shall be used for

all purposes permitted under the DIP Documents, including, without limitation, (i) to provide working

capital for the Borrower and the Guarantors and to pay interest, fees and expenses in accordance with

this Order and the DIP Documents and (ii) to refinance the First Lien Pre-Petition Secured Debt in the

approximate principal amount of $425,000,000.  In addition to such loans and obligations, the Debtors

are authorized to incur overdrafts and related liabilities arising from treasury, depository and cash

management services including any automated clearing house fund transfers provided to or for the

benefit of the Debtors by JPMCB or any of the DIP Lenders or any of their respective affiliates;

*provided*, *however*, that nothing herein shall require JPMCB or any other party to incur overdrafts or to provide any such services or functions to the Debtors.

(13)        In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized and directed to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees, that may be reasonably required or necessary or desirable for the Debtors' performance of its obligations under the Financing, including, without limitation:

(1)        the execution, delivery and performance of the Loan Documents (as defined in the DIP Credit Agreement) and any exhibits attached thereto, including, without limitation, the DIP Credit Agreement, the Security and Pledge Agreement (as defined in the DIP Credit Agreement) and the mortgages contemplated thereby (collectively, and together with the letter agreements referred to in clause (iii) below, the "DIP Documents"),

(2)        the execution, delivery and performance of one or more amendments to the DIP Credit Agreement for, among other things, the purpose of adding additional financial institutions as DIP Lenders and reallocating the commitments for the Financing among the DIP Lenders, executing a Borrowing Base Amendment, establishing financial covenants and negative covenants under the DIP Credit Agreement, in each case in such form as the Debtors, the Agent and the DIP Lenders may agree (it being understood that no further approval of the Court shall be required for amendments to the DIP Credit Agreement that do not change the maturity of the extensions of credit thereunder or increase the commitments, the rate of interest or the letter of credit fees payable thereunder, provided that such amendments shall, promptly after the effectiveness thereof, be filed on the Court's docket). Notwithstanding any other provision hereof, without further approval of this Court, amendments to the

DIP Documents may be made not later than before the conclusion of the Final Hearing as contemplated by the separate letter agreements entered into in connection with the Financing (permitting modifications to the structure, terms or pricing of the DIP Credit Agreement advisable to ensure successful syndication, including, without limitation, increasing the interest rate, commitment fees and fees to market with respect to the DIP Revolving Facility and the Term Loan, in each case in such form as the Debtors, the Agent and the DIP Lenders may agree),

(3)      the non refundable payment to the Agent or the DIP Lenders, as the case may be, of the fees referred to in the DIP Credit Agreement (and in the separate letter agreement in connection with the Financing) and reasonable costs and expenses as may be due from time to time, including, without limitation, fees and expenses of the professionals retained as provided for in the DIP Documents, or fees of rating agencies related to the DIP Facility, and

(4)      the performance of all other acts required under or in connection with the DIP Documents.

(14)      Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with the terms of the DIP Documents. No obligation, payment, transfer or grant of security under the DIP Documents or this Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under section 502(d) of the Bankruptcy Code), or subject to any defense, reduction, setoff, recoupment or counterclaim.

6.      *Superpriority Claims.*

(15)      Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed claims against the Debtors with priority over any and all

administrative expenses, diminution claims (including all Adequate Protection Obligations (as defined

below)) and all other claims against the Debtors, now existing or hereafter arising, of any kind

whatsoever, including, without limitation, all administrative expenses of the kind specified in sections

503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other

claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or

1114 of the Bankruptcy Code (the "Superpriority Claims"), which allowed claims shall be payable from

and have recourse to all pre- and post-petition property of the Debtors and all proceeds thereof

(including, without limitation, any proceeds or property recovered in connection with any Avoidance

Actions (as defined herein)), subject only to the payment of the Carve Out.

      (16)      For purposes hereof, the "Carve Out" means (i) all fees required to be paid to

the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a)

of title 28 of the United States Code; (ii) after the occurrence and during the continuance of an Event of

Default (as defined in the DIP Credit Agreement) an amount not exceeding $7,000,000 (plus the

amount of the unpaid professional fees and expenses incurred by the Debtors and any statutory

committee appointed in the Cases (each, a "Committee") prior to the occurrence of a Default or Event

of Default (as defined in the DIP Credit Agreement), which amount may be used subject to the terms of

this Order, including, without limitation, paragraphs 15  and 16 hereof, to pay any fees or expenses

incurred by the Debtors and any Committee in respect of (A) allowances of compensation for services

rendered or reimbursement of expenses awarded by the Bankruptcy Court to the Debtors' or any

Committee's professionals and (B) the reimbursement of expenses allowed by the Bankruptcy Court

incurred by Committee members in the performance of their duties (but excluding fees and expenses of

third party professionals employed by such members); *provided, however*, (x) that the dollar limitation

in this clause 6(b)(ii) on fees and disbursements shall neither be reduced nor increased by the amount of any compensation or reimbursement of expenses incurred, awarded or paid prior to the occurrence of an Event of Default in respect of which the Carve Out is invoked or by any fees, expenses, indemnities or other amounts paid to any Agent, Lender or their respective attorneys and agents under the DIP Credit Agreement or otherwise and (y) that nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement or compensation described in clauses (A) and (B) above; and (iii) in the event of the conversion of these cases to cases under chapter 7 of the Bankruptcy Code, to pay fees and expenses incurred by a trustee and any professionals retained by such trustee, in an amount not exceeding $50,000 in respect of allowances of compensation for services rendered and reimbursement of expenses awarded by the Bankruptcy Court to the trustee or any professional retained by such trustee.

7.        *Waiver of Section 506(c) Expenses.*  Except to the extent of the Carve Out, no expenses of administration of the Cases or any future proceeding or case which may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged pursuant to Section 506(c) of the Bankruptcy Code or otherwise against the Pre-Petition Collateral and the Collateral without the prior written consent of the Agent and the Pre-Petition Agent and no such consent shall be implied from any other action, inaction, or acquiescence by the Agent, the Pre-Petition Agent, the DIP Lenders, or the Pre-Petition Lenders.

8.        *DIP Liens.*  As security for the DIP Obligations (including any indebtedness to JPMCB or any other DIP Lender or any of their respective affiliates arising from overdrafts and related liabilities

arising from treasury, depository and cash management services, automated clearing house transfers and

hedging transactions, as set forth in Section 6.03(vi) and 6.03(viii) of the DIP Credit Agreement),

effective and perfected upon the date of this Order and without the necessity of the execution,

recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge

agreements, financing statements or other similar documents, the following security interests and liens are

hereby granted to the Agent for its own benefit and the benefit of the DIP Lenders (all property

identified in clauses (a), (b) and (c) below being collectively referred to as the "Collateral"), provided,

however, that notwithstanding anything to the contrary herein, Collateral shall not include (i) Second

Lien Deposits (as defined in Section 2.1.5 of the Pre-Petition Credit Agreement), or (ii) any equipment

leases entered into by any of the Debtors as lessee or sublessee, the equipment subject to such leases,

or any insurance or other proceeds of such equipment including, without limitation (u) the Master Lease

Agreement dated as of December 12, 2000 by and between Fleet Capital Corporation and Tower

Automotive Products Company, Inc., as amended (the "Fleet Lease"), and all of its related schedules,

riders, exhibits, and all equipment subject to the Fleet Lease, as defined therein and the proceeds

thereof, (v) Master Lease Agreement dated December 28, 1999 between Lasalle National Leasing

Company, Inc. and Tower Automotive Products Company, Inc., as amended and all of its related

schedules, exhibits and all equipment as defined therein and (w) those certain leases between one or

more of the Debtors and GECC or any of its affiliates (in its or their capacity as lessor, sublessor,

successor or otherwise), including as described on the record at the Interim Hearing, (x) that certain

Equipment Lease dated as of September 25, 2001, as amended and supplemented, among Tower

Automotive Products Company, Inc., General Foods Credit Investors No. 2 Corporation ("GFCI")

and Wells Fargo Bank Northwest, N.A. ("Wells Fargo") not in its individual capacity, but solely as

16

Owner Trustee under that certain Trust Agreement, dated as of September 25, 2001 as amended and

supplemented (the "GFCI Lease") and all related schedules and exhibits to the GFCI Lease, and all

equipment subject to the GFCI Lease, (y) the Lease Agreement dated February 27, 1998 between

Tower Automotive Tool, LLC, as successor by merger to Active Tool & Manufacturing Co., Inc., and

The CIT Group/Equipment Financing, Inc., as assignee of GSC Leasing Corp., and all of its related

documents, schedules and exhibits (the "CIT Lease"), and all Equipment subject to the CIT Lease,

including the Press Equipment and the Enhancements, as each is defined in the CIT Lease, and (z)

Master Leases dated December 27, 2000 (as amended between Guaranty Capital Corporation a/k/a

American Finance Group, Inc. ("GCC") and Tower Automotive Technology Products, Inc., and

between GCC and Tower Automotive Tool LLC, respectively, and all equipment described in such

leases, rental schedules, and related documents or (iii) those certain non-residential real property leases

dated as of April 10, 2002 between Tower Automotive Products Company, Inc. and Tower

Automotive Tool LLC on the one hand at Module (DE) Limited Partnership and Chasis (DE) Limited

Partnership, respectively, on the other hand (collectively, the "Module/Chasis Leases"); provided,

however, that Collateral shall include (1) any Debtor's interest in any equipment lease or the Module

Chasis Leases if such equipment lease or the Module/Chasis Leases do not by their respective terms

(without reference to applicable law that may limit the effect of any prohibition) prohibit the grant of a

security interest by such Debtor; (2) any proceeds of a Debtor's interest in such equipment lease or in

the Module/Chasis Leases in the event of any proposed assumption and assignment by the Debtor of

such leasehold interest (subject to the rights of the lessor in such lease under applicable law); and (3)

any Debtor's right in the equipment subject to any lease or in the Module/Chasis Leases that are

recharacterized as a mortgage or security agreement and not a true lease, but any lien in the Debtor's

right as described in this clause (3) shall be junior to the interests of the senior lienholder-lessor under

such recharacterized mortgage or lease (provided that such recharacterized security interests or

mortgages are perfected and not voidable) as provided in Paragraph 8(c) of this Order, all of which

granted security interests and liens in the Collateral shall be subject, only in the event of the occurrence

and during the continuance of an Event of Default, to the payment of the Carve Out (all such liens and

security interests granted to the Agent, for its benefit and for the benefit of the DIP Lenders, pursuant to

this Order and the DIP Documents, the "DIP Liens"):

      (17)          First Lien on Cash Balances and Unencumbered Property.  Pursuant to section

364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority

senior security interest in and lien upon all pre- and post-petition property of the Debtors, whether

existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date (or as a result of

the refinancing of the First Lien Pre-Petition Secured Debt) is not subject to valid, perfected and non-

avoidable liens, including without limitation, all cash and cash collateral of the Debtors (whether

maintained with the Agent or otherwise including all cash maintained in the Letter of Credit Account)

and any investment of such cash and cash collateral, inventory, accounts receivable (other than

receivables in the Receivables Portfolio as of the Petition Date which are subject to the Existing

Receivables Facility), other rights to payment whether arising before or after the Petition Date,

contracts, properties, plants, equipment, general intangibles, documents, instruments, interests in the

proceeds of leaseholds (subject, however, to the provisos contained in paragraphs 8(ii) **and (iii)),** real

properties, patents, copyrights, trademarks, trade names, other intellectual property, capital stock of

subsidiaries, and the proceeds of all the foregoing (collectively, "Property").  However, Property shall

exclude (a) the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549

and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code

(collectively, "Avoidance Actions"), and shall exclude any proceeds or property recovered, in

connection with any Avoidance Actions, (b) in excess of 65% of the capital stock of any entity that is a

controlled foreign corporation under Section 957 of the Internal Revenue Code ("957 Stock"), and (c)

joint venture interests and related assets to the extent excluded under the terms of the DIP Credit

Agreement (but including the proceeds received from any disposition of such interests and assets).

(18)        Liens Priming Pre-Petition Secured Lenders' Liens.  Pursuant to section

364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority

senior priming security interest in and lien upon all pre- and post-petition property of the Debtors

(including, without limitation, cash collateral, inventory, accounts receivable (other than receivables in the

Receivables Portfolio as of the Petition Date which are subject to the Existing Receivables Facility),

other rights to payment whether arising before or after the Petition Date, contracts, properties, plants,

equipment, general intangibles, documents, instruments, interests in the proceeds of leaseholds (subject,

however, to the provisos contained in paragraphs 8(ii) **and (iii)),** real properties, patents, copyrights,

trademarks, trade names, other intellectual property, capital stock of subsidiaries (other than 957

Stock) , and the proceeds of all the foregoing), whether now existing or hereafter acquired, that is

subject to the existing liens presently securing the Pre-Petition Secured Debt (including in respect of

issued but undrawn letters of credit).  Such security interests and liens shall be senior in all respects to

the interests in such property of the Pre-Petition Secured Lenders arising from current and future liens of

the Pre-Petition Secured Lenders (including, without limitation, adequate protection liens granted

hereunder), but shall not be senior to any valid, perfected and unavoidable interests of other parties

arising out of liens, if any, on such property existing immediately prior to the Petition Date, only to the

extent that such liens are senior to the liens of the First Lien Lenders and Second Lien Lenders, or to any valid, perfected and unavoidable interests in such property arising out of liens to which the liens of the Pre-Petition Secured Lenders become subject subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code.

(19)     Liens Junior to Certain Other Liens. Pursuant to section 364(c)(3) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully-perfected security interests in and liens upon all pre- and post-petition property of the Debtors (other than the property described in clauses (a) or (b) of this paragraph 8, as to which the liens and security interests in favor of the Agent will be as described in such clauses), whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which security interests and liens in favor of the Agent are junior to such valid, perfected and unavoidable liens. For the avoidance of doubt, no junior liens shall be granted pursuant to this section with respect to (a) receivables in the Receivables Portfolio as of the Petition Date which are subject to the Existing Receivables Facility, (b) the 957 Stock or (c) the joint venture interests and other assets to the extent set forth in paragraph 8(a) hereof.

(20)     Liens Senior to Certain Other Liens. The DIP Liens and the Adequate Protection Liens (as defined below) shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (ii) any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors, to the extent permitted by law.

9.          *Protection of DIP Lenders' Rights.*

**(21)**          So long as there are any borrowings or letters of credit or other amounts (other than contingent indemnity obligations as to which no claim has been asserted) outstanding, or the DIP Lenders have any Commitment (as defined in the DIP Credit Agreement) under the DIP Credit Agreement, the Pre-Petition Agent, and the Pre-Petition Secured Lenders shall (i) take no action to foreclose upon or recover in connection with the liens granted thereto pursuant to the Existing Agreements or this Order, or otherwise exercise remedies against any Collateral, except to the extent authorized by an order of this Court and (ii) be deemed to have consented to any release of Collateral authorized under the DIP Documents, (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the Collateral unless solely as to this clause (iii), the DIP Lenders file financing statements or other documents to perfect the liens granted pursuant to this Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests as of the Filing Date, and (iv) not seek to terminate or modify the use of Cash Collateral, obtain additional (or different) adequate protection than that set forth in this Order or seek to litigate or relitigate the priming of the Pre-Petition Secured Lenders' liens and the grant of the Superpriority Claims of the DIP Lenders granted by this Order; provided, however, that the Pre-Petition Secured Lenders shall otherwise have the rights as creditors to file motions or take positions with respect to any motions or applications in the Bankruptcy Court, including the right to argue that any proposed modification, amendment or waiver to the terms of the DIP Loans (other than those permitted pursuant to paragraph 5(b)(ii) of this Order for which no Bankruptcy Court approval is sought) constitutes a priming of the Pre-Petition Secured Lenders not consented to pursuant to the terms of this Order, provided that if such

non-consented priming argument is sustained by the Court, the superpriority and priming lien status of the aggregate principal amount that is outstanding (including letters of credit) at that time shall not be modified or otherwise affected.

(22)     The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified (i) to permit the Agent and the DIP Lenders to exercise, upon the occurrence of an Event of Default, all rights and remedies under the DIP Documents(other than those rights and remedies against the Collateral as provided in clause (ii) below) and (ii) to the extent necessary to permit the Agent and the DIP Lenders to exercise, upon the occurrence and during the continuance of an Event of Default and the giving of five business days prior written notice to counsel for the Debtors, the Pre-Petition Agent, any Committee and the Office of the United States Trustee, **and the parties specifically identified in paragraphs 8 (ii) and (iii), supra,** to the extent provided for in the DIP Credit Agreement, all rights and remedies against the Collateral provided for in the DIP Documents (including, without limitation, the right to setoff monies of the Debtors in accounts maintained with the Agent or any DIP Lender). In any hearing regarding any exercise of rights or remedies, the only issues that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and **in the case of the Committee, whether the stay should be reimposed, on which issue the Committee shall have the burden of proof.** ~~all parties hereby waive any right to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, in connection with the exercise by the Agent or the DIP Lenders of rights and remedies under this Order or the DIP Documents.~~ In no event shall the Agent, the DIP Lenders, the Pre-Petition Agent or the Pre-Petition Secured Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Pre-Petition Collateral and the Collateral.

10.      *Cash Collateral.* To the extent any funds were on deposit with the Pre-Petition

Secured Lenders as of the Petition Date, including, without limitation, all funds deposited in, or credited

to, an account of any Debtor with any Pre-Petition Secured Lender immediately prior to the filing of the

Debtors' bankruptcy petitions (the "Petition Time") (regardless of whether, as of the Petition Time, such

funds had been collected or made available for withdrawal by any such Debtor), such funds (the

"Deposited Funds") are subject to rights of setoff.  By virtue of such setoff rights, the Deposited Funds

are subject to a lien in favor of such Pre-Petition Secured Lenders pursuant to sections 506(a) and 553

of the Bankruptcy Code.  The Pre-Petition Secured Lenders are obligated, to the extent provided in the

Existing Agreements, to share the benefit of such liens and setoff rights with the other Pre-Petition

Secured Lenders party to such Existing Agreements.  Any proceeds of the Pre-Petition Collateral

(including the Deposited Funds or any other funds on deposit at the Pre-Petition Secured Lenders or at

any other institution as of the Petition Date) are cash collateral of the Pre-Petition Secured Lenders

within the meaning of section 363(a) of the Bankruptcy Code.  The Deposited Funds and all such

proceeds of Pre-Petition Collateral are referred to herein as "Cash Collateral."  For the avoidance of

doubt, in no event shall Second Lien Deposits, as defined above, constitute Cash Collateral and

Standard, in its capacity as escrow agent for the Second Lien Lenders and Second Lien Issuer (as

defined in the pre-petition Credit Agreement) is authorized to reimburse the Second Lien Issuer in

accordance with the terms of the Second Lien Deposit Account Agreement, dated May 24, 2004,

among Morgan Stanley Senior Funding Inc., as the Administrative Agent for the Lenders, Standard

Federal Corporate & Institutional Trust, a division of La Salle Bank, National Association, as the

Escrow Agent, and Second Lien Issuer.

11.      *Use of Cash Collateral.*  Subject to the limitations contained in this Order, the Debtors

are hereby authorized to use all Cash Collateral of the Pre-Petition Secured Lenders, and Pre-Petition

Secured Lenders are directed promptly to turn over to the Debtors all Cash Collateral received or held

by them, *provided* that the Pre-Petition Secured Lenders are granted adequate protection as hereinafter

set forth.

12.      *Adequate Protection.*  The Debtors have requested that the Pre-Petition Secured

Lenders consent to, among other things, (i) the Debtors' use of the Cash Collateral and the other Pre-

Petition Collateral, and (ii) the incurrence of the Financing and the Debtors' granting of priming liens in

connection therewith.  The Debtors' acknowledge and stipulate that the Pre-Petition Secured Lenders

are entitled, pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate

protection of their interest in the Pre-Petition Collateral, including the Cash Collateral, for and equal in

amount to the aggregate diminution in value of the Pre-Petition Secured Lenders' Pre-Petition

Collateral, including, without limitation, any such diminution resulting from the sale, lease or use by the

Debtors (or other decline in value) of Cash Collateral and any other Pre-Petition Collateral, the priming

of the Pre-Petition Secured Lenders' security interests and liens in the Pre-Petition Collateral by the

Agent and the DIP Lenders pursuant to the DIP Documents and this Order, and the imposition of the

automatic stay pursuant to section 362 of the Bankruptcy Code.  As adequate protection (except with

respect to the permanent increased interest rate on the Second Lien Pre-Petition Secured Debt which,

in addition to constituting adequate protection, is the result of certain compromises between Debtors

and the Second Lien Lenders), the Pre-Petition Agent and the Pre-Petition Secured Lenders are hereby

granted the following (collectively, the "Adequate Protection Obligations"):

(23)       Adequate Protection Liens.  The Pre-Petition Agent (for itself and in the

respective order of priority for the benefit of (x) first, the First Lien Lenders and (y) second, the Second

Lien Lenders) is hereby granted (effective and perfected upon the date of this Order and without the

necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements,

financing statements or other agreements) a replacement security interest in and lien upon all the

Collateral, subject and subordinate only to (i) the security interests and liens granted to the Agent for the

benefit of the DIP Lenders in this Order and pursuant to the DIP Documents and any liens on the

Collateral to which such liens so granted to the Agent are junior and (ii) the Carve Out (the "Adequate

Protection Liens");

(24)       Section 507(b) Claim.  The Pre-Petition Agent, First Lien Lenders and the Second

Lien Lenders are hereby granted, subject to the payment of the Carve Out, and subject to the respective

order of priority between the First Lien Lenders and the Second Lien Lenders, an allowed superpriority

claim as provided for in section 507(b) of the Bankruptcy Code, immediately junior to the Superpriority

Claims under section 364(c)(1) of the Bankruptcy Code held by the Agent and the DIP Lenders *provided,*

*however*, that the Pre-Petition Agent and the Pre-Petition Secured Lenders shall not receive or retain any

payments, property or other amounts in respect of the superpriority claims under section 507(b) of the

Bankruptcy Code granted hereunder or under the Existing Agreements unless and until the DIP Obligations

have indefeasibly been paid in cash in full and the DIP Lenders shall have no further commitment to lend

under the DIP Credit Agreement;

(25)       Interest, Fees and Expenses, Back-Stop Commitment. (i) The Pre-Petition Agent

shall receive from the Debtors (i) immediate cash payment of all accrued and unpaid interest on and

Participation Fees (as defined in the Pre-Petition Credit Agreement as amended hereby) in respect of the

Pre-Petition Secured Debt and letter of credit fees at the non-default rates provided for in the Existing

Agreements, and all other accrued and unpaid fees and disbursements (including, but not limited to, fees

owed to the Pre-Petition Agent and any and all fees of Milbank, Tweed, Hadley & McCloy LLP

("Milbank")) owing to the Pre-Petition Agent under the Existing Agreements and incurred prior to the

Petition Date, (ii) current cash payments of all fees and expenses payable to the Pre-Petition Agent under

the Existing Agreements, including, but not limited to, the reasonable fees and disbursements of counsel and

other consultants (including Milbank) for the Pre-Petition Agent provided, however, that in any event, if an

adversary proceeding or other challenge of the type described in paragraph 15 is commenced, the Pre-

Petition Agent shall be entitled to retain the services of a financial advisor, and (iii) with respect to First Lien

Pre-Petition Secured Debt, current monthly payment of all accrued but unpaid interest on such First Lien

Pre-Petition Secured Debt until repayment in full of such debt; with respect to the Second Lien Pre-Petition

Secured Debt, the Second Lien Pre-Petition Secured Debt shall be deemed to have been permanently

amended pursuant to the terms of this Order on a prospective basis to provide that all such Second Lien

Pre-Petition Secured Debt shall bear interest/accrue Participation Fees (as defined in the Pre-Petition Credit

Agreement as amended hereby) at a rate per annum equal to (i) 7.75% above the Alternate Base Rate (as

defined in the Pre-Petition Credit Agreement as amended hereby) from time to time in effect or (ii) 8.75%

above the LIBO Rate (Reserve Adjusted) (as defined in the Pre-Petition Credit Agreement as amended

hereby), which interest or Participation Fees shall be payable in cash on a current monthly basis until such

time as the substantial consummation (as defined in Section 1101 of the Bankruptcy Code) of a confirmed

plan or reorganization and thereafter shall be payable as specified in such plan, provided that if the Second

Lien Pre-Petition Secured Debt is reinstated pursuant to a consummated plan of reorganization, the interest

rate per annum prospectively shall be equal to (i) 6.00% above the Alternate Base Rate or (ii) 7.00% above

the LIBOR Rate (Reserve Adjusted); and the First Lien Pre-Petition Secured Debt and the Second Lien

Pre-Petition Secured Debt shall be deemed to have been permanently amended pursuant to the terms of this

Order to give effect to the provisions of Exhibit A to the Back-Stop Commitment Letter entitled "Reference

Rates". All Second Lien Pre-Petition Secured Debt assigned to Silver Point pursuant to its commitment set

forth in the Back-Stop Commitment Letter shall be treated identically to all other Second Lien Pre-Petition

Secured Debt  pursuant to this Order.  The Pre-Petition Agent may determine the LIBO Rate pursuant to

the terms of the Outline of Terms attached to the Back-Stop Commitment Letter.  With respect to all

interests, fees, and expenses described in this paragraph, the Second Lien Lenders waive any right to assert

claims for the payment of additional interest or fees calculated at any other applicable rate (including,

without limitation, default rates), or on any other basis, provided for in the Existing Agreements or otherwise

provided, however, that nothing contained herein shall be deemed to affect the rights of any Second Lien

Lender under sections 3.1.1 and **Article IV** 4.4 of the Pre-Petition Credit Agreement; and

(26)    The Second Lien Lenders may, subject to the terms of the Silver Point Back-

Stop Commitment Letter, cause Silver Point to purchase in full the Debtors' obligations owed to such

Second Lien Lender under the Second Lien Facility at the purchase price detailed in the Silver Point

Back-Stop Commitment Letter attached to the Interim Order.

(27)    Additional Adequate Protection.  No security interest or lien shall be granted on

any 957 Stock.  Moreover, the Debtors shall comply with the informational requirements contained in

the Back-Stop Commitment Letter.

(28)    Under the circumstances and given that the above described adequate

protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that

the adequate protection provided herein is reasonable and sufficient to protect the interests of the
Pre-Petition Secured Lenders.

(29)        Upon the closing of the refinancing of the First Lien Pre-Petition Secured Debt,
the claims and liens granted to the First Lien Lenders and the obligations of the Debtors thereto pursuant
to this Order and the Interim Order shall (subject as provided below in this clause (g)) be extinguished
and the Debtors' obligation to the First Lien Lenders shall (subject as provided below in this clause (g))
be deemed satisfied in full; provided that nothing herein shall be construed as a waiver of any First Lien
Lenders' right to seek funding losses associated with the aforesaid repayment in accordance with
**Article IV** ~~Section 4.4~~ of the Pre-Petition Credit Agreement, and each First Lien Lender's right to
seek the same is expressly preserved.  Interest due on the First Lien Pre-Petition Secured Debt on the
date of its repayment pursuant to the DIP Credit Agreement shall be calculated at a rate of 4.25% per
annum plus the relevant LIBO Rate (Reserve Adjusted) (as defined in, and determined in accordance
with, the Prep-Petition Credit Agreement as amended by this Final Order) for the relevant interest
period. Notwithstanding the foregoing, any First Lien Lender who wishes to assert a claim for a higher
rate of interest (whether due on the date of the aforesaid repayment or on any prior interest payment
date) may do so ~~within 30 days of the entry of this Final Order~~ by filing a proof of claim with the Court
on or before March 30, 2005; provided, that the rights of the Debtors, the Creditors' Committee, and
any party in interest to object to such claims for additional interest shall be preserved expressly and that
this Court shall retain exclusive jurisdiction on the issue of whether First Lien Lenders are entitled to
seek additional interest; and provided further that to the extent that this Court determines that any such
First Lien Lenders is entitled to receive additional interest, such additional interest shall be deemed to be
an administrative expense claim under section 503(b) of the Bankruptcy Code.

13.        *Perfection of DIP Liens and Adequate Protection Liens.*

(30)        Subject to the provisions of paragraph 9 above, the Agent, the DIP Lenders, the Pre-Petition Agent and the Pre-Petition Secured Lenders are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the Agent on behalf of the DIP Lenders or the Pre-Petition Agent on behalf of the Pre-Petition Secured Lenders shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge dispute or subordination, at the time and on the date of entry of this Order.  Upon the request of the Agent, each of the Pre-Petition Agent and Pre-Petition Secured Lenders, without any further consent of any party, is authorized to take, execute and deliver such instruments (in each case without representation or warranty of any kind) to enable the Agent to further validate, perfect, preserve and enforce DIP Liens.

(31)        A certified copy of this Order may, in the discretion of the Agent, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Order for filing and recording.

14.        *Preservation of Rights Granted Under the Order.*

(32)        Except for the Carve Out, and as otherwise provided herein, no claim or lien

having a priority superior to or *pari passu* with those granted by this Order to the Agent and the DIP

Lenders or to the Pre-Petition Agent and the Pre-Petition Secured Lenders, respectively, shall be

granted or allowed while any portion of the Financing (or any refinancing thereof) or the Commitments

thereunder or the DIP Obligations or the Adequate Protection Obligations remain outstanding, and the

DIP Obligations, DIP Liens and the Adequate Protection Liens shall not be (i) subject or junior to any

lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under

section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other lien or

security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(33)     Unless all DIP Obligations shall have been paid in full (and, with respect to

outstanding letters of credit issued pursuant to the DIP Revolving Facility Credit Agreement, cash

collateralized in accordance with the provisions of the DIP Revolving Facility Credit Agreement) and the

Adequate Protection Obligations shall have been paid in full, the Debtors shall not seek, and it shall

constitute an Event of Default and a termination of the right to use Cash Collateral if any of the Debtors

seek, or if there is entered, (i) any modifications or extensions of this Order without the prior written

consent of the Agent, or with respect to the rights and benefits granted to, and interests of, the Pre-

Petition Secured Lenders, the Pre-Petition Agent and no such consent shall be implied by any other

action, inaction or acquiescence by the Agent or the Pre-Petition Agent or (ii) an order dismissing any of

the Cases. If an order dismissing any of the Cases under section 1112 of the Bankruptcy Code or

otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of

the Bankruptcy Code) that (i) the Superpriority Claims, priming liens, and security interests granted to

the Agent pursuant to this Order shall continue in full force and effect and shall maintain their priorities as

provided in this Order until all DIP Obligations shall have been paid and satisfied in full (and that such

Superpriority Claims and priming liens shall, notwithstanding such dismissal, remain binding on all parties

in interest) and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of

enforcing the claims, liens and security interests referred to in (i) above.

(34)     If any or all of the provisions of this Order are hereafter reversed, modified,

vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity of any DIP

Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice by

the Agent or Pre-Petition Agent, as applicable, of the effective date of such reversal, stay, modification

or vacation or (ii) the validity or enforceability of any lien or priority authorized or created hereby or

pursuant to the DIP Documents with respect to any DIP Obligations or Adequate Protection

Obligations. Notwithstanding any such reversal, stay, modification or vacation, any use of Cash

Collateral, or DIP Obligations or Adequate Protection Obligations incurred by the Debtors to the

Agent, the DIP Lenders, the Pre-Petition Agent or the Pre-Petition Secured Lenders prior to the actual

receipt of written notice by the Agent and the Pre-Petition Agent of the effective date of such reversal,

stay, modification or vacation shall be governed in all respects by the original provisions of this Order,

and the Agent, DIP Lenders, the Pre-Petition Agent and Pre-Petition Secured Lenders shall be entitled

to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this

Order and pursuant to the DIP Documents with respect to all uses of Cash Collateral, DIP Obligations

and Adequate Protection Obligations.

(35)        Except as expressly provided in this Order or in the DIP Documents, the DIP

Liens, the Superpriority Claims and all other rights and remedies of the Agent, the DIP Lenders, the

Pre-Petition Agent and the Pre-Petition Secured Lenders granted by the provisions of this Order and

the DIP Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of

an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating

the joint administration of these Cases or by any other act or omission, or (ii) the entry of an order

confirming a plan of reorganization in any of the Cases and, pursuant to section 1141(d)(4) of the

Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations. The

terms and provisions of this Order and the DIP Documents shall continue in these Cases, in any

successor cases if these Cases cease to be jointly administered, or in any superceding chapter 7 cases

under the Bankruptcy Code, and the DIP Liens, the Superpriority Claims and all other rights and

remedies of the Agent, the DIP Lenders, the Pre-Petition Agent and the Pre-Petition Secured Lenders

granted by the provisions of this Order and the DIP Documents shall continue in full force and effect until the DIP Obligations and the Adequate Protection Obligations are indefeasibly paid in full.

15.     *Effect of Stipulations on Third Parties.*  The stipulations and admissions contained in this Order, with respect to the Pre-Petition Secured Debt and the liens in respect thereof including, without limitation, in paragraph 3 of this Order, shall be binding upon the Debtors in all circumstances and upon all other parties in interest, including, without limitation, any Committee, unless and to the extent (a) a party in interest has timely filed a motion with the Court with **a summary as to its position with respect to the complaint to be brought in accordance with** ~~the proposed complaint attached to~~ the motion  seeking authority to commence an adversary proceeding or contested matter (subject to the limitations contained herein, including, *inter alia*, in this paragraph and paragraph 16 below) by no later than the date that is 120 days after the initial selection of counsel by the Official Committee of Unsecured Creditors (the "Creditors' Committee") in the Cases (or such later date (x) as has been agreed to, in writing, by the Pre-Petition Agent in its sole discretion or (y) as has been ordered by the Court) challenging the validity, enforceability, priority or extent of any of the Pre-Petition Secured Debt, the Pre-Petition Agent's or the Pre-Petition Secured Lenders' liens on the Pre-Petition Collateral, and (b) there is a final order in favor of the plaintiff sustaining any such challenge or claim in any such timely filed adversary proceeding or contested matter.  In the event of such successful challenge by plaintiff as described in (y) above, **the Court shall** —— ~~nothing in the Order shall preclude the Court from fashioning~~ an appropriate remedy with respect to the Pre-Petition Agent or Pre-Petition Secured Lenders **after hearing from all parties**, including without limitation, disgorgement of amounts received by such lender in connection with the refinancing of the First Lien Pre-Petition Secured Debt.  If no such

adversary proceeding or contested matter is timely filed or to the extent such adversary proceeding is timely filed with respect to less than the entire Pre-Petition Secured Debt or less than all of the Pre-Petition Collateral, (x) the Pre-Petition Secured Debt and all related obligations of the Debtors (the "Pre-Petition Obligations") with respect to which no adversary proceeding has been commenced or relates shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, defense or avoidance, for all purposes in the Cases and any subsequent chapter 7 cases, (y) the Pre-Petition Agent's and the Pre-Petition Secured Lenders' liens on the Pre-Petition Collateral with respect to which no adversary proceeding has been commenced or relates shall be deemed to have been, as of the Petition Date, legal, valid, binding and perfected, not subject to recharacterization, subordination or avoidance and (z) with respect to which no adversary proceeding has been commenced or relates, the Pre-Petition Obligations, the Pre-Petition Agent's and the Pre-Petition Secured Lenders' liens on the Pre-Petition Collateral and the Pre-Petition Agent and the Pre-Petition Secured Lenders and the admissions, stipulations and agreements contained in paragraph 3 hereof shall not be subject to any other or further challenge by any party in interest , including a party, seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor or assign thereto (including, without limitation, any chapter 7 or 11 trustee appointed or elected for any of the Debtors, examiner appointed pursuant to Bankruptcy Code §1104 or responsible person or officer).

No order entered in connection with any proceeding commenced pursuant to paragraph 15 shall require the DIP Lenders to return any payments to the estate or shall in any way affect the amount, validity, extent or priority of the claims and liens granted to the DIP Lenders pursuant to this Order, including without limitation, if it is determined that proceeds of the Financing were paid to such

Pre-Petition Secured Lenders as adequate protection or as part of the refinancing of the First Lien Pre-Petition Secured Debt or otherwise.

16.          *Limitation on Use of Financing Proceeds and Collateral.*  Notwithstanding anything herein or in any other order by this Court to the contrary, no borrowings, letters of credit, Cash Collateral, Collateral or the Carve Out may be used to (a) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the DIP Documents or the Existing Agreements (it being understood that the determination of whether any amount is due under the Existing Agreements shall be determined by the Bankruptcy Court or other court of competent jurisdiction), or the liens or claims granted under this Order, the DIP Documents or the Existing Agreements, (b) assert any Claims or Defenses or causes of action against the Agent, the Pre-Petition Agent, or the DIP Lenders, or the Pre-Petition Secured Lenders, or their respective agents, affiliates, representatives, attorneys or advisors, (c) prevent, hinder or otherwise delay the Agent's, enforcement or realization on the Cash Collateral or the Collateral in accordance with the DIP Documents or this Order, (d) seek to modify any of the rights granted to the Agent or the DIP Lenders or the Pre-Petition Agent or the Pre-Petition Secured Lenders hereunder or under the DIP Documents or the Existing Agreements, in each of the foregoing cases without such parties' prior written consent or (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are approved by an order of this Court; provided that nothing in this Paragraph 16 shall prohibit the use of the Collateral and DIP proceeds by the Committee to investigate the matters described **in paragraph 15 hereof**.

17.       *Order Governs.*  In the event of any inconsistency between the provisions of this

Order, the Interim Order, and the DIP Documents, the provisions of this Order shall govern, provided

that nothing contained herein shall be deemed to affect the findings of fact or conclusions of law

contained in the Interim Order regarding the Back-Up Commitment Letter, which shall remain in full

force and effect.

18.       *Binding Effect; Successors and Assigns.*  The DIP Documents and the provisions of

this Order, including all findings herein, shall be binding upon all parties in interest in these Cases,

including, without limitation, the Agent, the DIP Lenders, the Pre-Petition Agent, the Pre-Petition

Secured Lenders, any Committee appointed in these Cases and the Debtors and their respective

successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected

for the estate of any of the Debtors, examiner or responsible person or officer) and shall inure to the

benefit of the Agent, the DIP Lenders, the Pre-Petition Agent, the Pre-Petition Secured Lenders and

the Debtors and their respective successors and assigns; *provided, however*, that the Agent and the

DIP Lenders shall have no obligation to extend any financing to any chapter 7 trustee or similar

responsible person appointed for the estates of the Debtors.

19.       *Limits on DIP Lenders' Liability.*  Nothing in this Order or in any of the DIP

Documents or any other documents related to this transaction shall in any way be construed or

interpreted to impose or allow the imposition upon the Agent or the DIP Lenders any liability for any

claims arising from the pre-petition or post-petition activities by the Debtors or Debtors-in-Possession

and their Affiliates in the operation of their businesses, or in connection with their restructuring efforts.

Dated:   February 28, 2005
         New York, New York

                          ___/s/ Allan L. Gropper___
                          UNITED STATES BANKRUPTCY JUDGE

37