

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

In re                                                Chapter 11 Case No.

ADELPHIA BUSINESS SOLUTIONS, INC., et al.,           02-11389 (REG)

        Debtors.                                  (Jointly Administered)

-----------------------------------------------------------------X

### FINAL ORDER PURSUANT TO SECTIONS 105(a), 361, 362, 364(c) AND 364(d) OF THE BANKRUPTCY CODE (A) AUTHORIZING DEBTORS TO OBTAIN SENIOR DIP FINANCING WITH ADMINISTRATIVE SUPERPRIORITY AND SECURED BY SENIOR LIENS ON AND SECURITY INTERESTS IN SUBSTANTIALLY ALL ASSETS OF THE DEBTORS; (B) PROVIDING ADEQUATE PROTECTION TO CERTAIN SECURED CREDITORS; (C) SUBORDINATING LIENS, SECURITY INTERESTS AND CLAIMS, INCLUDING SUPERPRIORITY ADMINISTRATIVE CLAIMS, GRANTED PURSUANT TO INTERIM ORDER DATED <u>APRIL 4, 2002; AND (D) GRANTING RELATED RELIEF</u>

Upon the Motion dated  July 2, 2002 (the "Motion") of Adelphia Business

Solutions, Inc. ("ABIZ") and the other above-captioned debtors, each a debtor and debtor in

possession (each a "Debtor" and collectively, the "Debtors"), for a final order pursuant to

sections 105(a), 361, 362, 364 (c) and 364 (d) of title 11 of the United States Code (the

"Bankruptcy Code") (a) authorizing the Debtors to obtain postpetition financing by entering into

(i) a certain Senior DIP Credit Agreement (as defined herein) with Beal Bank, S.S.B. and certain

guarantors party thereto, and (ii) other Senior DIP Loan Documents (as defined herein); (b)

granting mortgages, security interests, liens and superpriority administrative claims to the Senior

DIP Lender (as defined below), including superpriority administrative claims pursuant to section

364(c)(1) of the Bankruptcy Code, liens pursuant to sections 364(c)(2) and (3) of the Bankruptcy

Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on substantially all of

the assets of the Debtors; (c) providing adequate protection to certain prepetition secured

creditors; (d) subordinating liens, security interests and claims, including superpriority

administrative claims, granted pursuant to the April Interim Order (as defined herein); and (e)

granting related relief; and the Court having considered the relief requested in the Motion and the

exhibits thereto, including the Senior DIP Credit Agreement and the Subordination and

Intercreditor Agreement (as defined herein); and the Court having considered the Limited

Objection of the Official Committee of Unsecured Creditors (the "Committee Objection"), the

Objection of the Texas Tax Authorities (the "Texas Tax Authorities Objection"), the Limited

Objection (the "CIT Objection") of CIT Communications Finance ("CIT"), the Limited

Objection of Southwestern Bell Telephone Company, et al. (the "SBC Objection"), the Limited

Objection (the "Lucent Objection") of Lucent Technologies Inc. ("Lucent"), the Limited

Objection of Electronic Data Systems Corporation (the "EDS Objection"), the Conditional

Objection and Preservation of Rights of ACC Debtors (the "ACC Objection"), and the Objection

of the United States Trustee (the "UST Objection"); and a hearing (the "Hearing") having been

held before the Court on July 17, 2002 to consider the Motion; and the Court having considered

the Motion and the Objections thereto and the Court having considered the offers of proof,

testimony, and the statements of counsel at the Hearing; and it appearing to the Court that

granting the relief herein will provide necessary and beneficial support to the Debtors' core

operations and businesses; and the  SBC Objection having been withdrawn and the EDS

Objection having been denied and each of the CIT Objection and the Committee Objection

having been granted in part and denied in part, and each of the Texas Tax Authorities Objection,

the Lucent Objection, the ACC Objection and the UST Objection having been consensually

resolved; and certain issues between the Creditors' Committee (as defined herein) and the holders

of the 12 ¼% Senior Secured Notes (as defined herein) with respect to adequate protection

-2-

having been resolved; and due deliberation having been had; and good cause appearing therefor; and good and sufficient notice having been given; and no further notice being required,

IT IS HEREBY FOUND:

A.    On March 27, 2002 (the "ABIZ Commencement Date"), each of ABIZ, Adelphia Business Solutions Atlantic, Inc., Adelphia Business Solutions of Tennessee, Inc., Adelphia Business Solutions of Vermont, Inc., Adelphia Business Solutions of Kentucky, Inc., Adelphia Business Solutions of Florida, Inc. and Adelphia Business Solutions Operations, Inc. (collectively, the "Initial Debtors") commenced in this Court a voluntary case under chapter 11 of the Bankruptcy Code and on June 18, 2002 each of Adelphia Business Solutions, LLC, Adelphia Business Solutions of Virginia LLC, Adelphia Business Solutions of Louisiana, Inc., Adelphia Business Solutions of South Carolina, Inc., Adelphia Business Solutions International LLC, Adelphia Business Solutions Investment, LLC, Adelphia Business Solutions Investment East, LLC, Adelphia Business Solutions of Jacksonville, Inc., Adelphia Business Solutions of Nashville, L.P., Adelphia Business Solutions Long Haul, L.P., and Adelphia Business Solutions of Louisiana, LLC (collectively, the "Subsequent Debtors") commenced a voluntary case under chapter 11 of the Bankruptcy Code (the "Subsequent Commencement Date" and with the ABIZ Commencement Date, the "Commencement Dates"). The Debtors are continuing to operate their respective businesses and manage their respective properties as debtors in possession pursuant to section 1107 and 1108 of the Bankruptcy Code. An official committee of unsecured creditors (the "Creditors' Committee") has been appointed in these cases.

B.    Pursuant to an Order of this Court, the Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered.

-3-

C.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334. This is a "core" proceeding as defined in 28 U.S.C. §157(b)(2). The statutory predicates for the relief granted herein are sections 105, 361, 362, and 364 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure. Venue of the Debtors' cases in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

D.      Pursuant to the "Interim Order Pursuant To Section 364(c) Of The Bankruptcy Code (A) Authorizing Debtors To Obtain Senior DIP Financing, (B) Providing Adequate Protection To Certain Secured Creditors, and (C) Scheduling A Final Hearing On The Motion Pursuant To Bankruptcy Rule 4001," dated April 4, 2002 (the "April Interim Order"), the Court, inter alia, authorized the Initial Debtors to obtain interim borrowings of up to $27,000,000 (the "Subordinate Interim Financing") under that certain "Secured Debtor In Possession Credit And Security Agreement," dated as of March 27, 2002 (the "Subordinate DIP Credit Agreement" and together with the other "Loan Documents" as defined therein, the "Subordinate DIP Loan Documents") among the borrowers thereto, certain non-debtor subsidiaries of the Initial Debtors (such entities collectively, the "Subordinate Guarantors"), Adelphia Communications Corporation ("ACC") and Highland 2000, L.P. and any other lender that may have become party to the Subordinate DIP Credit Agreement from time to time (the "Subordinate DIP Lenders"), and ACC, as administrative agent for the Subordinate DIP Lenders (the "Subordinate DIP Agent" and with the Subordinate Lenders, the "Subordinate DIP Creditors"). All of the Subordinate Guarantors, other than Adelphia Business Solutions of Pennsylvania, Inc. and Adelphia Business Solutions Capital, Inc. (collectively, the "Guarantors"), are Subsequent Debtors.

NEWYORK 808199v15 20722-00644 08/08/02
A:\FINAL ABIZ DIP ORDER.DOC

E.      Pursuant to the April Interim Order, as security for the payment and

performance of all liabilities and obligations of the Initial Debtors to the Subordinate DIP

Creditors arising under the Subordinate DIP Credit Agreement and the April Interim Order (such

obligations collectively, the "Subordinate DIP Obligations"), the Subordinate DIP Creditors were

granted (for their equal and ratable benefit), first priority, perfected security interests in and liens

on all of the property and assets of each of the Initial Debtors and their estates of every kind or

type whatsoever, tangible, intangible, real, personal and mixed, whether then owned or existing

or thereafter acquired or arising, and regardless of where located, including, but not limited to all

causes of action and recoveries under section 549 of the Bankruptcy Code on account of

collateral as to which the Subordinate DIP Creditors have postpetition liens (other than claims of

the Debtors under sections 544, 545, 547 and 548 of the Bankruptcy Code and any other claims

of the Debtors under section 549 of the Bankruptcy Code), rights to payments, including tax

refund claims, insurance proceeds, tort claims and all products and proceeds thereof

(collectively, the "Initial Debtors' Subordinate DIP Collateral"), subject only to (a) valid,

perfected, enforceable, and nonavoidable liens existing immediately prior to the ABIZ

Commencement Date or granted prior to the ABIZ Commencement Date and perfected

subsequent to such date pursuant to section 546(b) of the Bankruptcy Code, (b) the Carve-Out

(as defined in the April Interim Order, the "ACC Carve-Out"), and (c) Customary Permitted

Liens of each Loan Party and its Subsidiaries (as those terms are defined in the Subordinate DIP

Credit Agreement).  Pursuant to the Subordinate DIP Credit Agreement, both the Initial Debtors

and the Subordinate Guarantors (including the Subsequent Debtors) granted to the Subordinate

DIP Creditors first priority, perfected security interests in and liens on the same collateral (the

"Subordinate Guarantors' Prepetition Collateral").  The Initial Debtors' Subordinate DIP

Collateral and the Subordinate Guarantors' Prepetition Collateral are collectively referred to herein as the "Subordinate Collateral".

F.    The April Interim Order provided that the Subordinate DIP Obligations constitute, in accordance with section 364(c)(1) of the Bankruptcy Code, claims against each of the Initial Debtors in its chapter 11 case which claims are administrative expense claims having priority over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to sections 105, 326, 328, 330, 331, 503 (b), 507(a), 507(b), 546(c) and 1114 of the Bankruptcy Code subject only to the ACC Carve-Out. The April Interim Order also provided that except for the ACC Carve-Out, no costs or administrative expenses which have been or may be incurred in the Initial Debtors' chapter 11 cases or in subsequent cases under chapter 7 of the Bankruptcy Code as a result of a conversion pursuant to section 1112 of the Bankruptcy Code, and no priority claims, are or will be prior to or on a parity with the claims of the Subordinate DIP Creditors with respect to the Subordinate DIP Obligations. The April Interim Order further provided that except for the ACC Carve-Out, no other claim having a priority superior to or pari passu with that granted by the April Interim Order or the Subordinate Loan Documents to the Subordinate DIP Creditors shall be granted in the Initial Debtors' chapter 11 cases under "section 364[c](1) of the Bankruptcy Code or otherwise" unless and until all Subordinate DIP Obligations have been indefeasibly and unconditionally paid in full in cash.

G.    The April Interim Order provides, among other things, that unless the Subordinate DIP Agent provides its prior written consent or all Subordinate DIP Obligations have been or will simultaneously be indefeasibly and unconditionally paid in full, there shall not be entered in the chapter 11 cases of the Initial Debtors or in any successor cases, any order

-6-

which, other than as permitted under the Subordinate DIP Credit Agreement, authorizes, among other things, the obtaining of credit or the incurring of indebtedness that is (i) secured by a security, mortgage, or collateral interest in or lien on, all or any portion of the collateral that is senior or _pari passu_ to the liens granted by the Initial Debtors pursuant to the Subordinate DIP Credit Agreement or the April Interim Order or any junior lien which has enforcement rights against the Subordinate DIP Collateral unless the Subordinate DIP Agent is also seeking to foreclose against the same collateral, or (ii) entitled to priority administrative status which is equal or senior to the superpriority administrative expense claim of the Subordinate DIP Creditors against the estates of the Initial Debtors.

H.    The April Interim Order provides that if, at any time prior to the indefeasible payment in full of all Subordinate DIP Obligations and the termination of the Subordinate DIP Creditors' obligation to make loans and advances under the Subordinate DIP Credit Agreement, any of the Initial Debtors, or trustee subsequently appointed, shall obtain credit or incur debt pursuant to sections 364(b), 364(c) or 364(d) of the Bankruptcy Code, then except as permitted or contemplated by the Subordinate DIP Credit Agreement, all of the consideration for such credit or debt shall immediately be turned over to the Subordinate DIP Agent in reduction of the Subordinate DIP Obligations.

I.    The Subordinate DIP Lenders have advanced only $15,000,000 in principal amount of the Subordinate Interim Financing and have not advanced $12,000,000 of Subordinate Interim Financing authorized under the April Interim Order, and have indicated that they do not intend to advance the remaining $120,000,000 contemplated by the Subordinate DIP Credit Agreement. The Debtors, therefore, require additional postpetition financing.

-7-

J.        The Debtors are unable to obtain the funds they require in the form of

unsecured credit or unsecured debt allowable under section 503(b)(1) of the Bankruptcy Code as

an administrative expense pursuant to section 364(a) or (b) of the Bankruptcy Code, unsecured

debt having the priority afforded by section 364(c)(1) or debt secured as described in section

364(c)(2) or (3) of the Bankruptcy Code.  The Debtors have attempted, but have been unable, to

obtain financing on terms more favorable than under the Secured Debtor in Possession Priming

Credit and Security Agreement, dated as of August 9, 2002 ( as the same may be amended from

time to time pursuant to this Order, the "Senior DIP Credit Agreement"[1] ) among the Debtors, the

Guarantors and Beal Bank, S.S.B. (the "Senior DIP Lender").  New credit is unavailable to the

Debtors without their (a) granting to the Senior DIP Lender administrative claims having priority

over that of all other administrative expenses including, without limitation, those of the

Subordinate DIP Creditors, of the kind specified in sections 503(b) and 507(b) of the Bankruptcy

Code (other than the Carve-Out (as hereinafter defined) or otherwise expressly provided for

herein), and (b) securing such loans and other obligations with security interests in and liens on

substantially all of the pre-petition and post-petition properties and interests in property of the

Initial Debtors and the Subsequent Debtors on a first priority basis senior, inter alia, to the liens

granted to the Subordinate DIP Agent for the benefit of the Subordinate DIP Lenders under the

Subordinate DIP Credit Agreement and the April Interim Order, and subject only to certain liens

of other parties as described herein and in the Senior DIP Loan Documents.

K.        Harris County, City of Houston, Houston ISD, North Forest ISD, Hidalgo

County, City of McAllen, Dallas County and Bexar County (the "Texas Tax Authorities") have

---

[1] Capitalized terms not otherwise defined in this Order shall have the meanings ascribed to such terms in the Senior
DIP Credit Agreement.

asserted pre-petition liens on certain property located in Texas (such property, the "Texas Property") of certain of the Debtors arising out of personal property taxes that were assessed by the Texas Tax Authorities against those Debtors effective January 1, 2002. The respective Debtors assert that they have timely protested the valuation of the Texas Property by the Texas Tax Authorities. The Debtors are willing and the Senior DIP Lender has consented that in the event that a claim on account of such assessments is allowed in whole or in part, the Texas Tax Authorities shall have a lien on such Texas Property prior to the liens of the Senior DIP Lender in such Texas Property in an amount not to exceed the lesser of (i) the value of such Texas Property, or (ii) the amount of the secured claim, if any, of the respective Texas Tax Authorities as ultimately allowed.

L.      Lucent has agreed that the lien of the Senior DIP Lender with respect to property set forth on Exhibit A hereto (the "Lucent Collateral") shall be prior to the lien asserted by Lucent on the Lucent Collateral which secured claim of Lucent shall be in an amount not to exceed the lesser of (1) the value of the Lucent Collateral and (2) Lucent's claim in respect thereof (as the same is ultimately allowed); provided that, as adequate protection, the Senior DIP Lender shall not in any foreclosure on the Senior DIP Collateral sell the Lucent Collateral until it has sold or otherwise realized (including, but not limited to, by credit bid) upon all other Senior DIP Collateral in which the Senior DIP Lender has a first priority lien and security interest; and provided further that the lien of Lucent on the Lucent Collateral shall be junior to that of the Senior DIP Lender on the Lucent Collateral but prior to the lien of the Subordinate DIP Creditors on the Lucent Collateral.

M.      To the extent that it is ultimately determined by the Court that the claim of CIT referred to on Exhibit B hereto is (i) in respect of a secured financing; and (ii) the amount of

-9-

CIT's allowed claim exceeds $16,109,251 and the value of the CIT Collateral exceeds $16,109,251, then in addition to the first priority lien on and security interest in the property which secures the CIT claim (the "CIT Collateral") in an amount up to $16,109,251, as adequate protection for the portion, if any, of the CIT secured claim which exceeds $16,109,251, CIT is granted a lien junior to the lien of the Senior DIP Lender but senior to the lien of the Subordinate DIP Creditors and all other creditors of any of the Debtors, (except for any nonconsensual lien creditors which may exist) on the 5ESS Switch located at 953 Donnelly Avenue, Atlanta Georgia (the "CIT Substitute Collateral"). The Debtors represent that at the date hereof, the CIT Substitute Collateral is presently unencumbered except for the liens and security interest granted under this Order to the Senior DIP Lender, the liens and security interests granted under the April Interim Order to the Subordinate DIP Creditors, and any unknown nonconsensual lien of any creditor of any of the Debtors' estates.

N.     Prior to the ABIZ Commencement Date, pursuant to that certain Indenture dated as of August 27, 1997 (as amended through the date hereof, the "12 ¼% Senior Secured Indenture"), ABIZ issued $250,000,000 in aggregate principal amount of 12 ¼% Senior Secured Notes due 2004 (the "12 ¼% Senior Secured Notes").

O.     The Debtors believe that the holders of the 12 ¼% Senior Secured Notes have a first priority lien on and security interest in the shares of stock of certain of the direct subsidiaries of ABIZ (the "12 ¼% Pledged Stock")[2]. Pursuant to the Senior DIP Credit Agreement and this Order, ABIZ will grant the Senior DIP Lender a second priority lien on and

---

[2] Such subsidiaries are Adelphia Business Solutions Atlantic, Inc., Adelphia Business Solutions of Tennessee, Inc., Adelphia Business Solutions of Vermont, Inc., Adelphia Business Solutions of Kentucky, Inc., and Adelphia Business Solutions of Florida, Inc.

-10-

security interest in the 12 ¼% Pledged Stock. The first priority liens and security interests granted under the Senior DIP Credit Agreement and this Order will encumber, among other things, the assets of the Debtors listed in footnote 2 hereof whose stock is pledged to secure the obligations owed to the holders of the 12 ¼% Senior Secured Notes (the "Underlying Assets").

P.    The Debtors, the Creditors' Committee and the informal committee of holders of the 12 ¼% Senior Secured Notes (the "12 ¼% Committee") have agreed and the Senior DIP Lender has consented that the holders of the 12 ¼% Senior Secured Notes shall be afforded adequate protection, as set forth in paragraph 30 below.

Q.    Pursuant and subject to the terms of the Subordinate DIP Credit Agreement Amendment (as defined below) and the Subordination and Intercreditor Agreement (as defined below), the Subordinate DIP Creditors have consented and agreed to the Initial Debtors, the Subsequent Debtors and the Guarantors entering into (1) the financing arrangements contemplated by this Order including, but not limited to, the Senior DIP Credit Agreement substantially in the form attached to this Order, and (2) an amendment (the "Subordinate DIP Credit Agreement Amendment"), substantially in the form attached to this Order, to the Subordinate DIP Credit Agreement and the Subordinate Loan Documents which amends the terms thereof, inter alia, to convert the Subordinate DIP Loan into a term loan having a maturity not earlier than the maturity of the Senior DIP Loan. The Subordinate DIP Creditors have consented and agreed to enter into the Subordination and Intercreditor Agreement, dated as of August 9, 2002 with the Senior DIP Lender (the "Subordination and Intercreditor Agreement") substantially in the form attached to this Order. The Senior DIP Lender has indicated a willingness to consent and agree to provide financing to the Debtors subject to the conditions set forth herein and in the other Senior DIP Loan Documents and the provisions of this Order,

-11-

including, but not limited to, (i) the entry of this Order in a form and substance satisfactory to the Senior DIP Lender in its sole discretion, (ii) the terms and conditions of the Senior DIP Credit Agreement and the other Senior DIP Loan Documents, (iii) findings by the Court that such financing is beneficial to the Debtors, their estates and creditors and is made in good faith, and a holding that the Senior DIP Lender's security interests, liens, encumbrances, claims (including, without limitation, superpriority administrative claims) and other protections granted pursuant to this Order, the Senior DIP Credit Agreement and the other Senior DIP Loan Documents will not be affected by any subsequent reversal, modification, vacatur or amendment of this Order or any other order, as provided in section 364(e) of the Bankruptcy Code, (iv) consent of the Subordinate DIP Creditors to the terms hereof and to the Senior DIP Credit Agreement and the other Senior DIP Loan Documents and execution by the Subordinate DIP Creditors of the Subordinate DIP Credit Agreement Amendment and the Subordination and Intercreditor Agreement, (v) the approval of the same by the Court, (vi) findings by the Court that the Subordinate DIP Creditors are adequately protected pursuant to sections 361 and 364(d) of the Bankruptcy Code and that the Subordinate DIP Credit Agreement Amendment and the Subordination and Intercreditor Agreement are being entered into in good faith, at arm's length, for reasonably equivalent value and fair consideration, and (vii) modification of the April Interim Order as set forth herein.

R.      The Senior DIP Lender has acted in good faith and at arm's length in consenting to and agreeing to provide the Senior DIP Financing contemplated by this Order and the other Senior DIP Loan Documents and in entering into the Subordinate DIP Credit Agreement Amendment and the Subordination and Intercreditor Agreement, and the reliance of the Senior DIP Lender on the assurances referred to above is in good faith within the meaning of

-12-

section 364(e) of the Bankruptcy Code. There is adequate protection of the interests of the Subordinate DIP Creditors in the Subordinate Collateral within the meaning of sections 361 and 364(d) of the Bankruptcy Code.

S.      The Subordinate DIP Creditors received reasonably equivalent value and fair consideration with respect to the Subordinate DIP Credit Agreement Amendment and the Subordination and Intercreditor Agreement and their consent to the terms hereof and the other Senior DIP Loan Documents.

T.      Pursuant to the Bankruptcy Code and in light of the foregoing, the Debtors, with the consent of the Senior DIP Lender, are willing to provide to the Texas Tax Authorities, Lucent, the Subordinate DIP Creditors and the holders of the 12 ¼% Senior Secured Notes with the agreed-upon protections set forth herein. The Court has ordered that the Debtors provide adequate protection to CIT on the terms set forth below.

U.      Sufficient notice of the Hearing on the Motion and this Order has been provided by the Debtors in these cases and by ACC and its affiliated debtors in their cases and such notice is sufficient notice under Rule 4001 of the Federal Rules of Bankruptcy Procedure and no other or further notice is required.

V.      Good cause has been shown for entry of this Order. The ability of the Debtors to enhance their operations and the availability to them of a source of working capital through the incurrence of new indebtedness for borrowed money and other financial accommodations is in the best interests of the Debtors and their respective creditors and estates. Among other things, entry of this Order will complement the cash flow generated from the Debtors' business and operations and permit them to maintain customer, vendor and supplier confidence by demonstrating an ability to maintain normal operations. The financing authorized

-13-

hereunder will provide a significant enhancement to the Debtors' existing cash flow sources and facilitate the orderly continuation of the Debtors' business.

W.     The Senior DIP Credit Agreement, the Subordinate DIP Credit Agreement Amendment, the Subordination and Intercreditor Agreement and the other Senior DIP Loan Documents have been negotiated in good faith and at arm's length between the Debtors, the Senior DIP Lender, and the Subordinate DIP Creditors and the terms of such are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration, and any credit extended, loans made and other financial accommodations extended to the Debtors by the Senior DIP Lender shall be deemed to have been or will be extended or made, as the case may be, in good faith within the meaning of section 364(e) of the Bankruptcy Code and the Senior DIP Lender is entitled to the protection of Section 364(e) of the Bankruptcy Code.

X.     This Court has concluded that entry of this Order is in the best interest of the Debtors, their estates and creditors as its implementation will, among other things, facilitate the continued operation and rehabilitation of the Debtors' businesses.

THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.     The record in these cases and the findings of fact and conclusions of law set forth above are incorporated by this reference.[3]

2.     The Debtors be, and hereby are, authorized and directed (a) to enter into the Senior DIP Credit Agreement (the "Senior DIP Credit Agreement", together with all

-14-

agreements, documents and instruments delivered pursuant hereto or thereto or in connection

herewith or therewith, including, without limitation, this Order, the Business Plan (as defined in

the Senior DIP Credit Agreement), the Cash Budget (as defined in the Senior DIP Credit

Agreement), the Subordination and Intercreditor Agreement, and the Subordinate DIP Credit

Agreement Amendment, (and all other Senior DIP Loan Documents (as defined in the Senior

DIP Credit Agreement) are collectively referred to herein as the "Senior DIP Loan Documents"))

and, as applicable, the other Senior DIP Loan Documents, in substantially the form attached to

this Order, and (b) to borrow money and perform their obligations hereunder and thereunder in

accordance with, and subject to, the terms of this Order, the Senior DIP Credit Agreement, the

Business Plan and the other Senior DIP Loan Documents.  The Debtors are authorized to enter

into such non-material modifications and amendments to the Senior DIP Loan Documents as

may be agreed upon in writing by the Debtors and the Senior DIP Lender, provided, however,

that after the Closing Date of the Senior DIP Facility, the 12 ¼% Noteholders Committee and

Creditors' Committee shall be given 3 business days prior notice of any such non-material

modification or amendment and shall have the right to an expedited hearing in connection with

the same.  Upon execution and delivery of the Senior DIP Loan Documents, the Senior DIP Loan

Documents shall constitute valid and binding obligations of the Debtors and their estates, and in

the case of the Subordination and Intercreditor Agreement and the Subordinate DIP Credit

Agreement Amendment shall constitute valid and binding obligations of the Subordinate DIP

Creditors and their estates, as applicable, and shall be enforceable against the Debtors and their

estates and, in the case of the Subordination and Intercreditor Agreement and the Subordinate

---

[3] To the extent any finding of fact is more properly characterized as a conclusion of law, it shall be so deemed, and
vice versa.

NEW YORK 808199v15 20722-00644 08/08/02
A:\FINAL ABIZ DIP ORDER.DOC

DIP Credit Agreement Amendment, against the Subordinate DIP Creditors and their estates, as applicable.

3.    Subject to the terms and conditions of this Order and the other Senior DIP Loan Documents, the Senior DIP Lender agrees to make a single-draw term loan credit facility (the "Senior DIP Facility") in the aggregate principal amount of $15,000,000. In the event that the closing of the Senior DIP Facility shall not have occurred on or before August 30, 2002, the Senior DIP Lender shall have no obligation to make any loan or advance under the Senior DIP Facility or otherwise. The Senior DIP Lender's obligation to make such Senior DIP Loan shall be subject to the satisfaction of the conditions set forth in Section 3.1 of the Senior DIP Credit Agreement (each a "Condition Precedent" and collectively, the "Conditions Precedent"), provided, however, that the Senior DIP Lender may, in accordance with the Senior DIP Credit Agreement waive temporarily, indefinitely or permanently any of the Conditions Precedent. The Conditions Precedent include, among other things, the following:

(a)    The Debtors and the Guarantors shall have executed the Senior DIP Credit Agreement and other Senior DIP Loan Documents, including, without limitation, any and all related promissory notes, collateral documents and other instruments and agreements relating thereto.

(b)    The Subordinate DIP Creditors (i) shall have (x) consented in writing to the superpriority administrative claim, and priming lien, granted to the Senior DIP Lender, (y) consented in writing to the Senior DIP Facility in accordance with Paragraph 14 of the April Interim Order and (z) waived the requirement under Paragraph 15 of the April Interim Order to be paid in full from the proceeds of the Facility, (ii) shall have entered into an amendment to the Subordinate DIP Credit Agreement and an Subordination and Intercreditor Agreement with Senior DIP Lender on terms satisfactory to Senior DIP Lender in its sole discretion, pursuant to which, among other things, (A) all lending commitments thereunder would be terminated and no further borrowings thereunder would be permitted, (B) all Loans (as defined in the Subordinate DIP Credit Agreement) outstanding under the Subordinate DIP Facility in the approximate amount of $15,000,000 in principal amount shall be and become the Subordinate Term Loan having a maturity no earlier than the scheduled Maturity Date (or such later date to which the Maturity Date is extended with the consent of the Senior DIP Lender), (C)

-16-

covenant compliance shall be stayed subject to certain exceptions as the Senior
DIP Lender may permit in its discretion in favor of compliance with the Senior
DIP Credit Agreement, and (D) the exercise by the Subordinate DIP Creditors of
their rights and remedies thereunder shall be stayed, subject to certain exceptions
set forth in Sections 12, 13, 14 and 16 of the Subordinate DIP Credit Agreement
Amendment pending full repayment of all amounts owing under the Senior DIP
Facility, (iii) such Subordinate Term Loan shall bear interest at the same rate as
that provided in the Subordinate DIP Credit Agreement, payable upon maturity
(and subject to the subordination). Pursuant to said Subordination and
Intercreditor Agreement, the Subordinate Term Loan and other obligations and all
liens granted as security for such Subordinate Term Loan and the payment of all
principal, interest and fees owing in respect of the Subordinate DIP Credit
Agreement, shall be subordinate in priority of lien and right of payment (together
with any superpriority administrative expense claims arising in favor of the
Subordinate DIP Creditors in any of the Initial Debtors' cases pursuant to the
April Interim Order) to the prior payment in full of all amounts at any time due
and payable to the Senior DIP Lender pursuant to the Senior DIP Loan
Documents or pursuant to this Order relating to the Senior DIP Facility. The
Subordination and Intercreditor Agreement with the Subordinate DIP Creditors
shall include appropriate protections for the Senior DIP Lender with respect to the
collateral that is the subject of the Permitted Wachovia Liens.

(c)      This Order, in form and substance satisfactory to the Senior DIP Lender in
its sole discretion, shall have become a final order and shall be in full force and
effect and shall not have been stayed, reversed, vacated or otherwise modified
without the prior written consent of the Senior DIP Lender.

(d)      Payment of all costs, fees (including, without limitation, the Closing Fee
(as defined below), and the Senior DIP Lender's attorneys', financial advisors' and
other professionals' fees) and expenses owing to the Senior DIP Lender as
referenced herein or in the Senior DIP Credit Agreement.

(e)      Receipt by the Senior DIP Lender of the Cash Budget, the Business Plan
and other financial information, asset ownership and value information, and other
information that the Senior DIP Lender may request, all in form and substance
satisfactory to the Senior DIP Lender in its sole discretion.

(f)      The Debtors and the Guarantors and, as applicable, the Subordinate DIP
Creditors shall have executed the Subordinate DIP Credit Agreement
Amendment, the Subordination and Intercreditor Agreement and all other
documentation with respect thereto, in each case in form and substance
satisfactory to the Senior DIP Lender in its sole discretion.

(g)      There shall have occurred no material adverse change in (i) the business,
condition (financial or otherwise), operations, performance, properties or
prospects of the Debtors and the Guarantors, taken as a whole, since December
31, 2001 (other than as described in the next sentence), (ii) the ability of the

-17-

Debtors and the Guarantors to perform their respective obligations under the loan documentation or (iii) the ability of the Senior DIP Lender to enforce the loan documentation (any of the foregoing being a "Material Adverse Change"). Exceptions to clause (i) above would be made for (A) non-payment of interest on March 1, 2002 with respect to the 12 ¼% Senior Secured Notes, (B) commencement of the above-captioned cases and the events in connection therewith, (C) market closures preceding the Closing Date (to the extent disclosed on a schedule to the Senior DIP Credit Agreement and acceptable to the Senior DIP Lender in its reasonable discretion), (D) the director and officer changes referenced in subsections (q) and (r) below and (E) the Subordinate DIP Creditors not continuing to fund the Subordinate DIP Obligations.

(h)    Governmental and third party consents and approvals necessary in connection with the Senior DIP Facility and the transactions contemplated thereby shall have been obtained and shall remain in effect (other than consents and approvals not relating to material assets and otherwise not material to the business of the Debtors and Guarantors); and no law or regulation shall be applicable in the judgment of the Senior DIP Lender that restrains, prevents or imposes materially adverse conditions upon the Senior DIP Facility or the transactions contemplated thereby.

(i)    ACC shall have obtained such approvals of this Court in its bankruptcy case (relating to lien and claim priorities and subordinations and other matters pertaining to ACC) as the Senior DIP Lender determines in its sole discretion is appropriate.

(j)    Any objections of the 12 ¼% Noteholders' Committee (as defined below) and The Bank of New York, as the 12 ¼% Senior Secured Notes indenture trustee (the "Secured Notes Trustee"), the United States Trustee, the Creditors' Committee, or of any other person, to the Final Order shall have been withdrawn or resolved in a manner satisfactory to the Senior DIP Lender in its sole discretion.

(k)    The arrangements for the payroll system for ABIZ and its subsidiaries shall be satisfactory to the Senior DIP Lender in its reasonable discretion, provided that deposits and disbursements of funds for payroll and related taxes (including all funds on deposit as of June 10, 2002 or thereafter) shall be made to and from ABIZ (rather than ACC) payroll accounts.

(l)    ABIZ shall have provided the Senior DIP Lender with evidence reasonably acceptable to the Senior DIP Lender demonstrating that reasonably acceptable progress has been made in connection with the modifications to the ABIZ/ACC Management Services Agreement in the manner specified by the Senior DIP Lender in its reasonable discretion.

(m)    No Default or Event of Default (as defined in the Senior DIP Credit Agreement) shall exist under any of the Senior DIP Loan Documents.

-18-

(n)    All representations and warranties in the Senior DIP Loan Documents shall be true and correct in all respects as of the Closing Date.

(o)    The making of the Senior DIP Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

(p)    Evidence acceptable to the Senior DIP Lender shall have been furnished of the liquidation and dissolution of Structus Technologies, Inc., a South Carolina corporation.

(q)    The resignations of John R. Rigas, James P. Rigas, Michael J. Rigas and Timothy J. Rigas, and each other member of their family (collectively, the "Rigas Family Members"), as directors and officers of the Borrowers and the Guarantors, shall have occurred.

(r)    The appointment of Robert Guth and Edward E. Babcock, respectively, or other persons reasonably acceptable to the Senior DIP Lender, as the chief executive officer and chief financial officer of each of the Debtors and each Guarantor, and Mr. Guth's election or appointment as a director of each such entity, shall have been completed and, to the extent required by law, approved by final order of the Bankruptcy Court.

4.    Each officer of each of the Debtors as may be so authorized by its Board of Directors, acting singly, is hereby authorized to execute and deliver the Senior DIP Credit Agreement and the other Senior DIP Loan Documents, and such execution and delivery shall be conclusive of their respective authority to act in the name of and on behalf of the Borrowers.

5.    The Debtors shall promptly reimburse the Senior DIP Lender for its reasonable costs and expenses on the Closing Date (as defined in the Senior DIP Credit Agreement), in accordance with Section 12.3 of the Senior DIP Credit Agreement to the extent not already paid. None of such costs and expenses incurred prior to the Closing Date shall be subject to further order of or the prior approval of this Court, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court. In the case of any fees and expenses of counsel to the Senior DIP Lender incurred subsequent to the Closing Date, bills for such fees and expenses, together with reasonable documentation, shall be submitted to the Debtors, the Creditors' Committee and the 12 ¼%

-19-

Noteholders' Committee. Provided no written objections to the payment of such fees and expenses are made within ten (10) days of receipt of such bills, the Debtors are authorized and directed to promptly pay such fees and expenses to the Senior DIP Lender without further order of the Court. If any of the Debtors, the Creditors' Committee or the 12 ¼% Noteholders' Committee objects in writing within such ten (10) day period, the Debtors are authorized and directed promptly to pay the Senior DIP Lender on account of any non disputed portion of such fees and expenses, and the Court will hold an expedited hearing to consider any such objection and the Debtors shall be authorized and directed to pay the Senior DIP Lender promptly after allowance of any fees and expenses subject to any such objection.

6.    The Senior DIP Obligations shall be due and payable and shall be repaid in full at the earliest to occur of (i) July 31, 2003 (the "Maturity Date"), (ii) the Termination Date (as defined herein), and (iii) the effective date of a plan of reorganization or liquidation for any of the Debtors. The Senior DIP Loan shall be subject to certain earlier mandatory repayments as set forth in Paragraph 8 below.

7.    Interest shall accrue monthly on the Senior DIP Obligations (as defined herein) and be paid in cash monthly in arrears. The non-default rate of interest with respect to the Senior DIP Obligations shall be the Prime Rate (as defined in the Senior DIP Credit Agreement) plus 4% per annum, but in no event less than 12% per annum (the "Non-Default Rate"). The default rate of interest with respect to the Senior DIP Obligations (applicable after the occurrence of an Event of Default) shall be the Non-Default Rate plus 4% per annum. A "Closing Fee" equal to 6% of the aggregate Senior DIP Facility (i.e., $900,000), fully earned as of the Closing Date, shall be paid on the Closing Date to the Senior DIP Lender without further order of the Court. A monthly administrative fee of $15,000 shall be paid, without further order

-20-

of the Court, to the Senior DIP Lender on the Closing Date and the first day of each month thereafter so long as any Senior DIP Obligation is outstanding.

        8.     Mandatory repayment of the Senior DIP Loan under the Senior DIP Facility shall be required in an amount equal to 100% of Net Cash Proceeds (as defined in the Senior DIP Credit Agreement) arising from, derived or related to any Property Loss Event (as defined in the Senior DIP Credit Agreement), in each case received by any of the Debtors or the Guarantors. Except for "Paydown Permitted Asset Sales" and "Non-Paydown Permitted Asset Sales" (each as described below) and total service resale lines, in bona fide transactions, any sale of assets shall be subject to the approval of the Senior DIP Lender, not to be unreasonably withheld or delayed. As a condition to such approval, the Senior DIP Lender may require that the net sale proceeds thereof shall be applied to repayment of the Senior DIP Loan. "Paydown Permitted Asset Sales" means sales of equipment and inventory (each as defined below) of the Debtors which shall be permitted with notice to, but without prior approval of, the Senior DIP Lender, subject to the following: (A) all such sales shall be for fair value, in bona fide arm's-length transactions with third party purchasers (any ABIZ entity or ACC entity or member of the Rigas family, or any of their respective affiliates, shall not be eligible purchasers); (B) the gross purchase price for any item must not exceed $500,000, and must be payable entirely in cash at closing; (C) the net purchase price for any item must equal at least 25% of the net book value of such item; (D) such sale otherwise must be permitted without further order of the Bankruptcy Court, in accordance with the Omnibus Sale Order (as defined below); and (E) all net proceeds of any such sale shall be applied to repayment of the Senior DIP Loan. The Senior DIP Lender retains the right to object to any such sale in accordance with the Omnibus Sale Order. For purposes of this Order, the Omnibus Sale Order means the "Order Pursuant to Sections 105(a),

-21-

363(b) and 1146 of the Bankruptcy Code Approving Procedures to Sell Certain Equipment Free and Clear of Liens, Claims Encumbrances Without Further Court Approval," dated July 2, 2002. "Non-Paydown Permitted Asset Sales" means sales of equipment and inventory (each as defined below) of the Debtors pertaining to specified noncontinuing markets which shall be permitted with notice to, but without prior approval of, the Senior DIP Lender and without requiring that the net sale proceeds of such Non-Paydown Permitted Assets Sales be applied to the repayment of the Senior DIP Loan, subject to the following: (A) all such sales shall be for fair value, in bona fide arm's-length transactions with third party purchasers (any ABIZ entity or ACC entity or member of the Rigas family, or any of their respective affiliates, shall not be eligible purchasers); (B) the gross purchase price for any item must not exceed $50,000, and must be payable entirely in cash at closing; (C) the aggregate gross purchase price of all such sales in any calendar month must not exceed $400,000; and (D) all net proceeds shall be retained by the Debtors and applied to the expenses detailed in the Cash Budget. Non-Paydown Permitted Asset Sales are limited to equipment and inventory that at all times since the ABIZ Commencement Date have been located in such specified noncontinuing markets, except that sales also shall be permitted as to any such equipment and inventory that has since been relocated to centralized warehouses. For purposes of delineating permitted asset sales, "equipment" and "inventory" shall be defined by reference to the New York Uniform Commercial Code ("NYUCC") and, for clarification purposes, would specifically include desks, chairs, lamps, file cabinets, computer equipment and telecommunications equipment. However, "fixtures" (as defined in the NYUCC) would be excluded. If any asset sale would satisfy the criteria both for Paydown Permitted Asset Sales and Non-Paydown Permitted Asset Sales, depending on the application of net sale proceeds, then the Debtors may elect to treat such sale as one or the other, and shall apply net

sale proceeds accordingly. Any such election, once made, shall be irrevocable. The Cash Budget shall be reduced by the amount of any expenses associated with assets sold under Subsections (a), (b), (c) or (f) of Section 7.7 of the Senior DIP Credit Agreement and this Paragraph 8, unless the Senior DIP Lender otherwise agrees in its reasonable discretion. Notwithstanding the foregoing, any net proceeds from the sale of the Debtors' personal property located in Texas which property is encumbered by the lien of the Texas Tax Authorities (i.e., the Texas Property) shall be excluded from the net proceeds that otherwise would be applied to the Senior DIP Obligations and shall be paid instead to the Texas Tax Authorities. Any such net proceeds paid to the Texas Tax Authorities shall be deemed to have been paid by Debtors under protest in respect of any potential claims the Texas Tax Authorities have asserted for personal property taxes due for the 2002 tax year (the "2002 Personal Property Taxes"), until such time as the Texas Tax Authorities' asserted claim for such taxes is resolved consensually by the parties or allowed by the Court. In the event that the amount of the net proceeds paid to the Texas Tax Authorities is greater than the allowed amount of its claim for the 2002 Personal Property Taxes, the Texas Tax Authorities shall pay to the Senior DIP Lender the amount by which the net proceeds received in respect of the 2002 Personal Property Taxes exceeds such allowed claim within 21 days following written notice by the Debtors to Linebarger Goggan Blair Pena & Sampson LLP of the allowed amount of the claim for the 2002 Personal Property Taxes.

9.    As security for all loans, advances and any other indebtedness and/or obligations, contingent or absolute, which may now or from time to time hereafter be owing by the Debtors to the Senior DIP Lender under any of the Senior DIP Credit Agreement, this Order, or the other Senior DIP Loan Documents, (all such loans, advances, indebtedness or obligations collectively, the "Senior DIP Obligations"), the Senior DIP Lender is hereby granted, effective

-23-

immediately, first priority, valid, binding, enforceable and perfected security interests in and liens on (the "Senior DIP Liens") all of the existing and after acquired assets of each of the Debtors and their estates including, without limitation, all cash, cash equivalents, bank accounts, accounts, other receivables, chattel paper, contract rights, contracts, real estate, leasehold interests, inventory, capital stock in subsidiaries, investment property, instruments, documents, securities (whether or not marketable and specifically including the stock, limited liability company and partnership interests of each direct and indirect subsidiary of ABIZ but not including the pledge of Adelphia Business Solutions of Pennsylvania, Inc.'s partnership interest in PECO Hyperion Telecommunications and Susquehanna Adelphia Business Solutions or the pledge of any assets of those two partnerships), equipment, vehicles, fixtures, franchise rights, patents, tradenames, copyrights, intellectual property, general intangibles, rights to payment including tax refund claims, insurance proceeds, tort claims, causes of action, (except that such security interest and lien shall not extend to actions for preferences, actions for fraudulent conveyances, and any other avoidance power claims (including, without limitation, all claims under sections 542, 544, 545, 547, 548, 549, 550, 552(b) and 553 of the Bankruptcy Code) and any proceeds of such actions under sections 542, 544, 545, 547, 548, 549, 550, 552(b) and 553 of the Bankruptcy Code) and all substitutions, accessions, products, proceeds, rents and profits of the foregoing (all of the foregoing, the "Senior DIP Collateral"), in each case (i) subject only to (a) the Carve-Out (as defined herein), (b) any valid, perfected and enforceable liens of record as of the ABIZ Commencement Date and only to the extent set forth in Schedule 8.2 to the Subordinate DIP Credit Agreement (the "Permitted Prepetition Liens"), (c) to the extent that a claim on account of personal property taxes assessed by the Texas Tax Authorities against certain of the Debtors effective January 1, 2002 are allowed in whole or in part, the pre-petition

-24-

liens asserted by the Texas Tax Authorities on the Texas Property shall be prior to the liens of the Senior DIP Lender on the Texas Property in the amount not to exceed the lesser of (1) the value of such Texas Property, or (2) the amount of the claim, if any, of the Texas Tax Authorities as ultimately allowed; and (d) the Permitted Wachovia Liens (as defined in the Senior DIP Credit Agreement) in favor of Wachovia on cash collateral then being held by Wachovia, provided, however, that so long as any obligations remain outstanding in respect of the Permitted Wachovia Liens, Wachovia shall not release any such cash collateral securing the reimbursement obligations of certain of the Loan Parties under existing Letters of Credit without the prior written consent of the Senior DIP Lender other than to apply such cash collateral to unreimbursed reimbursement obligations owed to Wachovia in connection with such Letters of Credit and, provided, however, that the Senior DIP Lender shall not have a lien on any cash that is subject to the Permitted Wachovia Liens and (ii) senior and superior pursuant to section 364(d) of the Bankruptcy Code to the liens, security interests and claims of the Subordinate DIP Creditors and all other present and future liens on, security interests in and claims in respect of the Senior DIP Collateral other than those granted the Senior DIP Lender subject to (a) the Permitted Prepetition Liens and (b) any lien of the Texas Tax Authorities on the Texas Property, as to which Senior DIP Collateral the Senior DIP Lender is granted a second priority lien and security interest and (c) the Permitted Wachovia Liens.

          10.     The Debtors shall maintain, at all times, Eligible Collateral (as defined in the Senior DIP Credit Agreement) having an aggregate "collateral value" (calculated as set forth in Section 6.12 of the Senior DIP Credit Agreement) that, at all times from and after the time of the entry of this Order until all Senior DIP Obligations have been fully paid and satisfied, at least equals the greater of: (i) $35,000,000 (which amount shall be reduced on a dollar-for-dollar basis

automatically upon any prepayment or repayment of the principal amount of the Senior DIP Loan); or (ii) an amount equal to 200% of the Senior DIP Obligations then outstanding (whether or not then due or payable).

11.    The liens and security interests granted to the Senior DIP Lender pursuant to this Order and the Senior DIP Credit Agreement and the other Senior DIP Loan Documents shall be and are senior to all liens and security interests granted by the Debtors to the Subordinate DIP Creditors pursuant to the April Interim Order, the Subordinate DIP Loan Agreement or otherwise.  All liens and security interests granted to the Subordinate DIP Creditors pursuant to the April Interim Order, the Subordinate DIP Credit Agreement or otherwise shall be and hereby are subordinated in all respects to the liens and security interests granted to the Senior DIP Lender pursuant to this Order, the Senior DIP Credit Agreement, and the other Senior DIP Loan Documents, but, subject to the provisions of this Order, the Subordination and Intercreditor Agreement and the Subordinate DIP Credit Agreement Amendment, shall otherwise retain their priority and lien rights specified in the April Interim Order.

12.    All claims of the Subordinate DIP Creditors against any of the Debtors pursuant to the April Interim Order, the Subordinate Loan Documents, or otherwise, including, but not limited to, the superpriority administrative expense claim granted by the Initial Debtors to the Subordinate DIP Creditors pursuant to the April Interim Order, shall be, and hereby are, subordinated in all respects and for all purposes to the claims of the Senior DIP Lender pursuant to this Order, the Senior DIP Credit Agreement, the other Senior DIP Loan Documents or otherwise relating to the Senior DIP Loan Documents, including, but not limited to, the superpriority administrative expense claim granted to the Senior DIP Lender pursuant to this

-26-

Order; but, subject to the provisions of this Order, the Subordination and Intercreditor Agreement and the Subordinate DIP Credit Agreement Amendment, shall otherwise retain all priority and lien rights specified in the April Interim Order.

13.    The April Interim Order is hereby amended by this Order and the amendment of the Subordinate DIP Loan Documents as provided in the Subordination and Intercreditor Agreement and the Subordinate DIP Credit Agreement Amendment is hereby authorized and approved.

14.    The automatic stay imposed under section 362(a)(4) of the Bankruptcy Code is hereby lifted to permit the Debtors to grant the aforesaid security interests and liens and to perform the Senior DIP Obligations.

15.    Except as expressly set forth in this Order, the liens granted in this Order shall not be (a) subject to any lien of any person other than the Senior DIP Lender which is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (b) subordinated or made pari passu with any other lien under section 364(d) of the Bankruptcy Code or otherwise.

16.    As used in this Order, "Carve-Out" means (i) any unpaid fees of the United States Trustee and/or the Clerk of the Court payable pursuant to 28 U.S.C § 1930(a), (ii) any allowed claims for fees and expenses of any chapter 7 trustee or duly retained professional representing such chapter 7 trustee for services rendered by such chapter 7 trustee or duly retained professional representing such chapter 7 trustee after a conversion of any chapter 11 case of any of the Borrowers to a case under chapter 7 of the Bankruptcy Code which allowed claims have priority under section 726(b) of the Bankruptcy Code, and (iii) the aggregate allowed unpaid fees and expenses payable under sections 330 and 331 of the Bankruptcy Code to

-27-

professional persons (the "Estate Professionals") retained pursuant to an order of this Court by

the Debtors, the Creditors' Committee or any other statutory committee appointed in these Cases

(other than the fees and expenses, if any, of any Estate Professionals incurred, directly or

indirectly in respect of, arising from or relating to, the initiation, assertion or prosecution of any

claims, causes of action, motions, adversary proceedings or objections, interests or other

litigation or action to obtain any relief of any type or nature, at law or in equity, relating to the

Senior DIP Loan Documents, the Senior DIP Facility, or the transactions contemplated hereby or

thereby (including, without limitation, any action for preferences, fraudulent conveyances, other

avoidance power claims or any other claims or causes of action) against or involving the Senior

DIP Lender or any of its affiliates, including challenging the amount, validity, perfection,

priority or enforceability of or asserting defense, counterclaim or offset to the Senior DIP

Obligations or the liens of the Senior DIP Lender), and the reasonable expenses of members of

the Creditors' Committee or any other statutory committee appointed in these cases allowed

under section 503(b)(3)(F) of the Bankruptcy Code, all such amounts not to exceed $1,500,000,

with any such amounts to be distributed pari passu among the Estate Professionals unless

otherwise provided by order of the Court. The Carve-Out will only be available to pay the Estate

Professionals after the occurrence and during the continuance of a Default or an Event of

Default. So long as no Default or Event of Default shall have occurred and be continuing, the

Debtors shall be permitted to pay compensation and reimbursement of expenses allowed by

order of the Court and payable to the Estate Professionals under sections 330 and 331 of the

Bankruptcy Code, as the same may be due and payable, and the same shall not reduce the Carve-

Out. The foregoing shall not be construed as a consent to the allowance of any fees and

expenses referred to above and shall not affect the right of the Debtors or the Senior DIP Lender to object to the allowance and payment of such amounts.

17.     Subject only to the Carve-Out and the superpriority administrative expense claim, if any, of Wachovia pursuant to the "Final Order Pursuant to Section 105, 363(b) and 364 of the Bankruptcy Code and Bankruptcy Rule 4001, Authorizing the Debtors to Replace an Expired Performance Bond With a Secured Letter of Credit," dated July 8, 2002, (the "Wachovia Order") for their actual, reasonable fees and expenses incurred in connection with enforcement of Wachovia's rights, liens and claims in respect of the Wachovia Order in an aggregate amount not to exceed $500,000 (the "Wachovia Superpriority Claim"), the Senior DIP Obligations shall constitute, in accordance with Section 364(c)(1) of the Bankruptcy Code, claims against each of the Debtors in its chapter 11 case which are administrative expense claims, have priority in accordance with section 364(c)(1) of the Bankruptcy Code over all administrative expenses of any kind including those specified in or ordered pursuant to section 105, 329, 330, 331, 503(b), 506(c), 507(a), 507(b) or any other provision of the Bankruptcy Code or otherwise (whether in any of the Debtors' chapter 11 cases or any subsequent case), including, without limitation, any claims of the Subordinate DIP Creditors, and shall, at all times, be senior to the rights of any other person including, without limitation, any Debtor, and any trustee or estate representative in these chapter 11 cases or subsequent or successor case. Except for the Carve-Out and the Wachovia Superpriority Claim, no costs or administrative expenses which have been or may be incurred in the Debtors' chapter 11 cases or in any case under the Bankruptcy Code commenced by or against any of the Guarantors, including, without limitation, any claims of the Subordinate DIP Creditors, or in any subsequent cases under chapter 7 of the Bankruptcy Code, and no priority claims are or will be prior to or on a parity with the claims of

the Senior DIP Lender with respect to the Senior DIP Obligations. Except for the Carve-Out and the Wachovia Superpriority Claim, no other claim having a priority superior to or *pari passu* with that granted by this Order or the Senior DIP Loan Documents to the Senior DIP Lender shall be granted under section 364(c)(1) of the Bankruptcy Code in these cases, any subsequent case of any of the Debtors or any case under the Bankruptcy Code commenced by or against any of the Guarantors or otherwise unless and until all Senior DIP Obligations have been indefeasibly and unconditionally paid in full in cash. Notwithstanding the foregoing, the superpriority administrative claim of the Senior DIP Lender shall not extend to proceeds of any avoidance actions under sections 542, 544, 545, 547, 548, 549, 550, 552(b) and 553 of the Bankruptcy Code, provided, however, that in the event that the secured and superpriority administrative claims of the Senior DIP Lender shall not have resulted in the Senior DIP Obligations being indefeasibly and unconditionally paid in full in cash, the Senior DIP Lender's administrative expense claims shall be on a parity with all administrative expense claims under section 503(a) of the Bankruptcy Code with respect to the proceeds, *inter alia*, from any such avoidance actions under sections 542, 544, 545, 547, 548, 549, 550, 552(b) and 553 of the Bankruptcy Code. No costs or expenses of administration or other charge, lien, assessment or claim of any person or entity (whether incurred in these chapter 11 cases or any subsequent or successor case) shall be imposed against the Senior DIP Lender, its claims or the Senior DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise except for up to $5,000 of expenses of a chapter 7 trustee and any duly retained professionals of such chapter 7 trustee, if a chapter 7 trustee is appointed in any or all of the Debtors' cases.

NEWYORK 808199v15 20722-00644 08/08/02
A:\FINAL ABIZ DIP ORDER.DOC

18.    The Debtors may use the proceeds of the loans and advances made pursuant to the Senior DIP Credit Agreement only for the purposes specifically set forth in Section 6.7 of the Senior DIP Credit Agreement and only in accordance with this Order.

19.    The Senior DIP Lender shall not be required to file financing statements, mortgages, deeds of trust, notices of lien, security agreements, other filings or recordations customarily made or similar instruments in any jurisdiction or with any regulatory authority or effect any other action to immediately and without any act or deed, including but not limited to, taking possession of stock certificates, to attach or perfect the security interests and liens granted under this Order, the Senior DIP Credit Agreement or any other Senior DIP Loan Documents. Notwithstanding the foregoing, the Senior DIP Lender may, in its sole discretion, file such financing statements, mortgages, deeds of trust, notices of lien or similar instruments or otherwise confirm perfection of such liens, security interests and mortgages without seeking modification of the automatic stay under section 362 of the Bankruptcy Code and all such documents shall be deemed to have been filed or recorded at the time and on the Commencement Date.  The Senior DIP Lender may file a copy of this Order as a mortgage, financing statement or similar perfection document with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which the Debtors have real or personal property.

20.    Events of Default under the Senior DIP Credit Agreement shall include, inter alia,: (i) the entry of an order dismissing any Debtor's bankruptcy case or conversion of any Debtor's chapter 11 case to a chapter 7 case, (ii) the entry of an order appointing a chapter 11 trustee in Debtor's bankruptcy cases, (iii) the entry of an order granting any other claim superpriority status or a lien or security interest equal or superior to that granted to the Senior

-31-

DIP Lender in any of the Debtors' bankruptcy cases, (iv) the entry of an order that in any respect

stays, reverses, vacates or otherwise modifies the Senior DIP Credit Agreement, the

Subordination and Intercreditor Agreement, this Order or any other Senior DIP Loan Documents

without the prior written consent of the Senior DIP Lender, (v) the entry of an order in any

Debtor's bankruptcy case appointing an examiner having enlarged powers beyond those set forth

under section 1106(a)(3) and (4) of the Bankruptcy Code, (vi) the failure of any of the Debtors to

pay (a) interest or fees when due and such default shall continue for two business days; or (b)

principal when due, (vii) the failure of any of the Debtors or Guarantors to comply with any

negative covenant, collateral covenant, collateral value covenant or accounts receivable covenant

or the covenants pertaining to the Permitted Wachovia Liens, (viii) the actual or substantive

consolidation or combination of any Debtor with any other person (other than a Debtor), (ix) the

ABIZ/ACC Management Services Agreement shall be terminated or rejected, unless within 60

days thereafter the services provided thereunder by ACC shall have been replaced by

substantially equivalent services under arrangements satisfactory to the Senior DIP Lender in its

reasonable discretion, (x) the failure of any of the Debtors or Guarantors to perform or comply

with any other term or covenant and such default shall continue unremedied for a period of 10

days, (xi) any representation or warranty by any of the Debtors or Guarantors shall be incorrect

or misleading in any material respect when made, (xii) an unfavorable variance in "Cumulative

Free Cash Flow," (as defined in the Senior DIP Credit Agreement), shall occur, (xiii) approval

by the Court of any disclosure statement in connection with a plan which fails to provide for the

Senior DIP Obligations to be Indefeasibly Paid in full upon the effective date of confirmation of

such plan(s) of reorganization, and (xiv) any other event which constitutes an Event of Default

under the Subordinate DIP Loan Agreement. Cure periods (such as the 60-day cure period in

clause (ix) above) will not stay the occurrence of Events of Default under other subclauses even if arising out of or related to the same circumstance or event that is the subject of such cure.

21.    Notwithstanding section 362 of the Bankruptcy Code and without further order of the Court, upon the occurrence of an Event of Default, the Senior DIP Lender, upon five business days written notice to the Debtors, the Guarantors, the United States Trustee any statutory committee appointed in the Debtors' cases, counsel for ACC and counsel to the Official Committee to Unsecured Creditors of ACC, may terminate the Senior DIP Facility (the date of any such termination, the "Termination Date"), declare the Senior DIP Obligations to be immediately due and payable, set off immediately any and all amounts in any cash collateral account and exercise all rights and remedies under the Senior DIP Credit Agreement, this Order and the other Senior DIP Loan Documents. Immediately upon receipt of such notice, the Debtors shall have no right to use any proceeds of the Senior DIP Collateral or the Subordinate DIP Collateral other than (i) in satisfaction of any lien (such as the lien of the Texas Tax Authorities on the Texas Property) having priority over the liens granted to Senior DIP Lender pursuant to this Order and only to the extent permitted hereunder, (ii) towards the satisfaction of the Senior DIP Obligations due to the Senior DIP Lender under the Senior DIP Credit Agreement and this Order, and (iii) the Carve-Out. If the Event of Default precipitating the giving of such notice arises from a default in compliance with Section 6.12 of the Senior DIP Credit Agreement, pertaining to the "Collateral Value" of "Eligible Collateral" (each as defined therein), then such notice shall be accompanied by a summary of the calculation (by collateral category) made by Senior DIP Lender in determining the existence of such default. Senior DIP Lender shall be required to furnish the United States Trustee, the Creditors' Committee and the 12¼% Noteholders' Committee a copy of any notice it delivers to the Debtors under Section

6.121(f) or Section 12.2(e) of the Senior DIP Credit Agreement, in each case currently with the giving of such respective notice to the Debtors.

22.    Unless the Senior DIP Lender has provided its prior written consent or all Senior DIP Obligations have been or will simultaneously be indefeasibly and unconditionally paid in full, there shall not be entered in these proceedings or in any successor cases or in any case under the Bankruptcy Code commenced by or against any of the Guarantors, any order which, other than as permitted under the Senior DIP Credit Agreement, authorizes:

(a)    the obtaining of credit or the incurring of indebtedness that is (i) secured by a security, mortgage, or collateral interest in or other lien on, all or any portion of the Senior DIP Collateral that is senior or pari passu to the liens granted pursuant to the Senior DIP Credit Agreement and this Order or any junior liens which has enforcement rights against the Senior DIP Collateral or (ii) entitled to priority administrative status which is equal or senior to the superpriority administrative expense claim of the Senior DIP Lender; or

(b)    the dismissal of any of the Debtor's chapter 11 cases under section 1112 of the Bankruptcy Code or otherwise, pursuant to which this Court does not provide the Senior DIP Lender with an adequate opportunity to realize on the Senior DIP Collateral, including, without limitation, through sales conducted under sections 363 and 365 of the Bankruptcy Code and to take other actions contemplated by this Order and the Senior DIP Credit Agreement.

23.    Without limiting the provisions and protections of this Order, if at any time prior to the indefeasible payment in full of all Senior DIP Obligations and the termination of the Senior DIP Lender's obligation to make Senior DIP Loans and advances under the Senior DIP Credit Agreement, any Debtor or any trustee subsequently appointed or any Guarantor who

-34-

becomes a debtor under the Bankruptcy Code or any trustee for such Guarantor shall obtain

credit or incur debt pursuant to sections 364(b), 364(c) or 364(d) of the Bankruptcy Code, then,

except as permitted or contemplated by the Senior DIP Credit Agreement, all of the

consideration for such credit or debt shall immediately be turned over to the Senior DIP Lender

in reduction of the Senior DIP Obligations.

24.    The Debtors shall execute and deliver to the Senior DIP Lender all such

agreements, financing statements, instruments or other documents as the Senior DIP Lender may

reasonably request to evidence, confirm, validate or perfect the liens granted pursuant hereto.

25.    The time and manner of payment of the Senior DIP Obligations pursuant

to the Senior DIP Credit Agreement, the Senior DIP Liens upon the Senior DIP Collateral and

the Senior DIP Lender's superpriority administrative claims shall not be altered or impaired by

any plan of reorganization which may hereafter be confirmed or by any further order which may

hereafter be entered without the consent of the Senior DIP Lender; *provided*, *however*, that so

long as the Senior DIP Obligations are indefeasibly and unconditionally repaid in full upon the

effective date of a confirmed plan of reorganization, nothing in this Order to the contrary shall

impair, prejudice or alter any right of a party in interest to seek and obtain confirmation of a plan

of reorganization in accordance with sections 1129(a) and (b) or any other applicable provisions

of the Bankruptcy Code.

26.    The provisions of this Order and any actions taken pursuant hereto shall

survive the entry of any order (a) confirming any plan of reorganization in any of the chapter 11

cases and, to the extent not satisfied in full, the Senior DIP Obligations shall not be discharged

by the entry of any such order, or pursuant to section 1141(d)(4) of the Bankruptcy Code, each of

-35-

the Debtors having hereby waived such discharge, (b) converting any of the Debtors' chapter 11 cases to a chapter 7 case, or (c) dismissing any of the Debtors' chapter 11 cases.

27.     Without limiting the rights of access and information afforded the Senior DIP Lender under the Senior DIP Loan Documents, each of the Debtors shall permit representatives, agents and/or employees of the Senior DIP Lender to have reasonable access to such entity's premises and its records during normal business hours and upon prior reasonable notice (without unreasonable interference with the proper operation of the Debtors' businesses) and shall cooperate, consult with, and provide to such persons all such non-privileged information as they may reasonably request.

28.     Upon entry of this Order, the Senior DIP Lender shall be and shall be deemed to be, without any further action or notice, named as additional insured on each insurance policy maintained by the Debtors which in any way relates to the Senior DIP Collateral.

29.     If any or all of the provisions of this Order, the Senior DIP Credit Agreement, the Subordination and Intercreditor Agreement or any other Senior DIP Loan Documents are hereafter modified, vacated, amended or stayed by subsequent order of this Court or any other Court, such modification, vacatur, amendment or stay shall not affect the validity of any obligation to the Senior DIP Lender or any subordination that is or was incurred prior to the effective date of such modification, vacatur, amendment or stay, or the validity and enforceability of any security interest, lien or priority authorized or created by this Order, the Senior DIP Credit Agreement, the Subordination and Intercreditor Agreement or any other Senior DIP Loan Document and, notwithstanding any such modification, vacatur, amendment or stay, any obligations of the Debtors and any subordination pursuant to this Order or the Senior

-36-

DIP Credit Agreement, the Subordination and Intercreditor Agreement and any other Senior DIP

Loan Document arising prior to the effective date of such modification, vacatur, amendment or

stay shall be governed in all respects by the original provisions of this Order and the Senior DIP

Credit Agreement, the Subordination and Intercreditor Agreement, and other Senior DIP Loan

Documents and the validity of any such credit extended or security interest or lien or

subordination granted pursuant to any of this Order, the Senior DIP Credit Agreement,

Subordination and Intercreditor Agreement and the other Senior DIP Loan Documents is subject

to the protection accorded under section 364(e) of the Bankruptcy Code, and shall not be subject

to subordination or recharacterization or avoidance.  Nothing in this Paragraph 29 shall affect the

rights of the Debtors and their estates or ACC and its estate in respect of the Subordinate DIP

Loan Documents, provided that the rights of the Senior DIP Lender under the Subordination and

Intercreditor Agreement and the Senior DIP Credit Agreement Amendment shall not be affected

or impaired.

   30. As adequate protection for any diminution in the value, as of the ABIZ

Commencement Date, of the collateral interest of the holders of 12¼% Senior Secured Notes in

the 12¼% Pledged Stock to the extent such collateral interest is valid and perfected as of the

ABIZ Commencement Date caused by any of (a) the grant of liens to the Senior DIP Lender; and

(b) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code, the

holders of the 12¼% Senior Secured Notes are hereby granted and the Debtors consent to the

following protections as of the ABIZ Commencement Date:

     (a) the Debtors shall make payment in cash on a monthly basis of the
reasonable fees and expenses of Akin Gump Strauss Hauer & Feld and Houlihan,
Lokey, Howard & Zukin, the professionals retained by the 12¼% Noteholders'
Committee, in a manner that is consistent with the terms and conditions of the
arrangements entered into by the Debtors and such advisors prior to the ABIZ
Commencement Date; provided, however, that such payment are contingent upon

-37-

(i) the delivery to counsel to the Debtors, counsel to the Creditors' Committee and counsel to the Senior DIP Lender of fee statements which set forth the fees and expenses of such advisors not less than fifteen days before the Debtors shall be authorized to pay such fees and expenses, and (ii) the right of the Debtors, the Creditors' Committee and the Senior DIP Lender to send written notice of an objection or objections to the payment of such fees, and if such objection(s) are delivered within fifteen (15) days of receipt of such fee statements, the Debtors shall withhold payment of that portion of the fee statement to which the objection is directed until all objections are settled or resolved or determined by Court order and promptly pay the remainder of the fees and disbursements;

(b)    the Debtors shall make payment in cash on a monthly basis of the reasonable fees and expenses of the indenture trustee for the 12¼% Senior Secured Notes, including, without limitation, the reasonable fees and expenses of the legal advisor retained by the Senior Secured Notes Trustee, provided however, that such payments are contingent upon (i) the delivery to counsel to the Debtors, counsel to the Creditors' Committee and counsel to the Senior DIP Lender of fee statements which set forth the fees and expenses of such advisors not less than fifteen days before the Debtors shall first be authorized to pay such fees and expenses, and (ii) the right of the Debtors, the Creditors' Committee and the Senior DIP Lender to send written notice of an objection or objections to the payment of such fees and if such objection(s) are delivered, the Debtors shall withhold payment of that portion of the fee statement to which the objection is directed until all objections are settled, resolved or determined by Court order and promptly pay the remainder of the fees and disbursements;

(c)    the Debtors will provide the legal and financial advisors retained by the 12¼% Noteholders' Committee with copies of any and all financial reports provided by the Debtors to the Senior DIP Lender pursuant to Section 5.6 of the Senior DIP Credit Agreement; and

(d)    nothing herein shall diminish the rights, if any, of the holders of the 12¼% Senior Secured Notes to assert a claim pursuant to 11 Section 507(b) of the Bankruptcy Code, and to receive the benefits of such claim if such claim is allowed; provided, however, such rights are subject to the priority liens and superpriority administrative expense claims and rights of the Senior DIP Lender and the Subordinate DIP Creditors, the superpriority administrative expense claims of Wachovia (to the extent applicable) and the Carve-Out.

31.    Due to the difficulty in accurately accounting for the fair allocation of the costs and expenses of the respective Debtors vis-à-vis the other Debtors and the proper allocation of post-petition intercompany claims among the Debtors, the Debtors shall enact the following protections and procedures as of the ABIZ Commencement Date with respect to the

-38-

Debtors whose stock is pledged to secure the 12¼% Senior Secured Notes (the "Collateral

Subsidiaries") and all other Debtor subsidiaries, (the Non-Collateral Debtor Subsidiaries"):

    (a)    Allocation – The Debtors shall allocate fees and expenses among the Debtors as follows (the following allocations shall remain binding notwithstanding a subsequent discovery that justifies a different allocation. The Debtors, the 12¼% Noteholders' Committee and the Creditors' Committee each reserve all rights with respect to determining eventual distributions to creditors pursuant to a plan of reorganization):

    i.    Corporate Overhead (including, sales, general and administrative expenses): 81.5% to be allocated to the Non-Collateral Debtor Subsidiaries, 18.5% to the allocated to the Collateral Subsidiaries;

    ii.    Severance and retention: corporate personnel expenses to be allocated 81.5% to the Non-Collateral Debtor Subsidiaries, 18.5% to the Collateral Subsidiaries, with "market" level personnel expenses to be allocated to the markets served by their respective personnel;

    iii.    Wind-down & Restructuring Costs: expenses incurred in connection with the wind-down of markets to be closed will be allocated to the applicable markets being closed;

    iv.    Fees and Expenses of Professionals to the 12¼% Noteholders' committee: 10% to be allocated to the Non-Collateral Debtor Subsidiaries, 90% to be allocated to the Collateral Subsidiaries;

    v.    Fees and Expenses of Professionals to the Creditors' Committee: 99.5% to be allocated to the Non-Collateral Debtor Subsidiaries, 0.5% to be allocated to the Collateral Subsidiaries; and

    vi.    Fees and Expenses of Professionals to the Debtors: 81.5% to be allocated to the Non-Collateral Debtor Subsidiaries, 18.5% to be allocated to the Collateral Subsidiaries.

    (b)    Subrogation – In the event that any Borrower (each, a "Payor Borrower") makes a payment to any lender on account of obligations arising under the Senior DIP Credit Agreement or Subordinate DIP Credit Agreement, respectively, on account of principal of, interest on, or payment obligations fairly allocable to, loans or advances received by any other Borrower under either the Senior DIP Credit Agreement or the Subordinate DIP Credit Agreement (such loan repayments, "Intercompany Advances" and each Borrower who is the recipient of such Intercompany Advances, a "Benefited Borrower"), each Payor Borrower shall thereupon have a direct right of subrogation from each Benefited Borrower to the extent of any Intercompany Advances extended by such Payor Borrower to such Benefited Borrower (a "Subrogation Right"). Each Payor Borrower's

-39-

Subrogation Right shall be accorded Section 364(c)(1) priority status in the estates of the respective Benefited Borrower(s), as applicable, subject only to the superpriority administrative expense claims of the Senior DIP Lender, Wachovia and the Subordinate DIP Lender, and the Carve-Out. Amounts payable to the Payor Borrower under this paragraph shall bear interest at the rates provided for under the Senior DIP Credit Agreement or Subordinate DIP Credit Agreement depending upon as to which agreement such payment has been made by the Payor Borrower. Each Payor Borrower's Subrogation Right and other rights and claims under this subparagraph (b) if any, (i) shall not be exercisable unless and until the claims of the Senior DIP Lender, Subordinate DIP Lenders and/or Wachovia, as applicable, have been Indefeasibly Paid in full and (ii) shall be subject to Section 9.6 of the Senior DIP Credit Agreement;

(c)     Accrual For Equipment Use – the 12¼% Noteholders' Committee asserts that certain Debtors are using equipment that, prior and subsequent to the petition date for certain Debtors, was and is property of ABIZ Atlantic and that ABIZ Atlantic is entitled to compensation for such use. The Creditors' Committee disputes these assertions. To protect the rights of ABIZ Atlantic and its estates, there shall accrue, on an aggregate basis, an administrative claim against the Debtors that are using the equipment of no less than $450,000 and no more than $2.25 million per month (the "Monthly Administrative Accrual"). ABIZ Atlantic shall have no right to receive payment with respect to the Monthly Administrative Accrual unless and until an order is entered, following notice and hearing, deeming the Monthly Administrative Accrual an allowed expense of administration. Any such allowed administrative expense claim shall be subject and subordinate to the superpriority administrative expense claims of the Senior DIP Lender, the Subordinate DIP Lender, and Wachovia (to the extent applicable).

(d)     Reimbursement Rights – In the event that any Debtor (each, a "Payor Debtor") makes payment on account of payment obligations fairly allocable to any other Debtor or loans or advances any funds to any other Debtor other than on account of intercompany advances under the Senior DIP Facility or Subordinate DIP Facility (such repayments, loans and advances, "Non-DIP Intercompany Advances" and each Debtor who is the recipient of such Non-DIP Intercompany advances, a "Benefited Debtor"), commencing after the date hereof, each Payor Debtor shall thereupon have a direct right of reimbursement from each Benefited Debtor to the extent of any Non-DIP Intercompany Advances extended by such Payor Debtor to such Benefited Debtor (a "Reimbursement Right"). Each Payor Debtor's Reimbursement Right shall be accorded Section 364(c)(1) priority status in the estates of the other Benefited Debtors, as applicable, subject only to the superpriority administrative expense claims of the Senior DIP Lender, Wachovia and the Subordinate DIP Lender and the Carve-Out. Each Payor Borrower's Reimbursement Rights, if any, and other rights and claims under this subparagraph (d) (i) shall not be exercisable unless and until the claims of the Senior DIP Lender, Subordinate DIP Lenders and/or Wachovia, as applicable,

-40-

have been Indefeasibly Paid in full and (ii) shall be subject to Section 9.6 of the Senior DIP Credit Agreement.

32.    The liens and superpriority administrative expense claims granted to the Senior DIP Lender under the Senior DIP Credit Agreement, the other Senior DIP Loan Documents and this Order, and the priority thereof, and any payments made pursuant thereto or hereto, shall be binding (subject to the terms hereof) on each of the Debtors, the Guarantors, and any affiliate of any of the Debtors or any of the Guarantors, any successor or trustee for any of the Debtors, and all creditors of each of the Debtors, the Guarantors and any affiliate of any of the Debtors or any of the Guarantors, and any other person as provided in section 364(e) of the Bankruptcy Code.

33.    The Senior DIP Lender's failure to seek relief or otherwise exercise its rights and remedies under the Senior DIP Credit Agreement, this Order or any other Senior DIP Loan Documents shall not constitute a waiver of any of the Senior DIP Lender's rights hereunder, thereunder, or otherwise.

34.    With the exception of the Carve-Out, neither the Senior DIP Collateral nor the Senior DIP Lender shall be subject to surcharge, pursuant to sections 105(a) or 506(c) of the Bankruptcy Code or otherwise, by any of the Debtors or any other party in interest, except for any charge of up to $5,000 for the fees and expenses of a chapter 7 trustee and its duly retained professionals, if one is appointed in any or all of the Debtors' cases, until all Senior DIP Obligations are indefeasibly paid in full in cash, unless the Senior DIP Lender shall have given its prior written consent, and no consent to a charge against the Senior DIP Collateral pursuant to sections 506(c) or 105(a) of the Bankruptcy Code or otherwise shall be implied from any action, inaction, or acquiescence by the Senior DIP Lender in these Cases.  In no event shall the Senior DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with

-41-

respect to the Senior DIP Collateral, except with respect to the Lucent Collateral as provided in

paragraph 39 of this Order if the provisions of paragraph 39 of this Order become applicable.

35.    In making the decision to make the Senior DIP Loan and to extend other

financial accommodations to the Debtors under the Senior DIP Credit Agreement or to collect

the indebtedness and obligations of the Debtors, the Senior DIP Lender shall not be deemed to be

in control of the operations of the Debtors or to be acting as a responsible person or owner or

operator with respect to the operation or management of the Debtors (as such terms, or any

similar terms, are used in the United States Comprehensive Environmental Response,

Compensation and Liability Act, as amended, or any similar federal or state statute).

36.    Subject to the provisions of the Senior DIP Credit Agreement and

adequate notice to the Creditors' Committee and 12 ¼% Noteholders' Committee and absent any

objection by the Creditors' Committee or the 12 ¼% Noteholders' Committee, the Debtors and

the Senior DIP Lender may amend, and the Senior DIP Lender may waive, any provision of the

Senior DIP Credit Agreement and the other Senior DIP Loan Documents (other than the

Subordination and Intercreditor Agreement or this Order) without seeking the approval of this

Court; provided, however, that such amendment or waiver, in the judgement of the Debtors and

the Senior DIP Lender, is either nonprejudicial to the rights of third parties or is not material, and

provided that no such amendment shall provide for the aggregate principal amount of the loans

outstanding under the Senior DIP Facility to exceed the sum of (a) the aggregate principal

amount of the Senior DIP Loan outstanding plus (b) the face amount of letters of credit issued by

the Senior DIP Lender which replace any Wachovia Letters of Credit under the Wachovia Letter

of Credit Facility and (c) any unreimbursed reimbursement obligations arising under the

Wachovia Letter of Credit Facility refinanced by the Senior DIP Lender in connection with a

-42-

replacement of the Wachovia Letters of Credit if such amendment would increase the principal amount above such sum then the amendment shall be subject to appropriate court approval on notice and a hearing. Nothing in this Order shall preclude the Senior DIP Lender from amending the Senior DIP Credit Agreement and the Senior DIP Loan Documents to provide for a letter of credit facility which would replace all or a portion of the Wachovia Letter of Credit Facility approved pursuant to the Wachovia Order (so long as the Senior DIP Lender does not charge an additional fee for entering into such letter of credit facility, does not seek reimbursement for fees and expenses in connection with the documentation, negotiation and closing of any replacement(s) of all or a portion of the Wachovia Letter of Credit Facility in excess of $32,500 and such letter of credit facility is on terms substantially similar to the terms of the Wachovia Letter of Credit Facility and in accordance with Paragraph 21 of the Wachovia Order) whereupon the liens and superpriority claims granted pursuant to the respective Wachovia Letters of Credit that are being replaced shall apply to the letter of credit facility and all loans from time to time outstanding under the Senior DIP Credit Agreement. Except as otherwise set forth in the penultimate sentence preceding this sentence, no waiver, modification, or amendment of any of the provisions hereof or of the Senior DIP Credit Agreement or the other Senior DIP Loan Documents shall be effective unless set forth in writing, signed by the parties hereto and approved by the Court.

37.     In the event that it is determined by the Court that (i) CIT has an allowed claim that exceeds $16,109,251; and (ii) the value of the CIT Collateral exceeds $16,109,251, as adequate protection for such secured claim of CIT, CIT shall be granted a lien on and security interest in the CIT Substitute Collateral in the amount equal to the amount by which the value of the CIT Collateral exceeds $16,109,251 but in no event more than the difference between the

-43-

amount of the allowed claim and $16,109,251. Such lien and security interest will be junior to the Senior DIP Lender's liens on and security interests in the CIT Substitute Collateral but shall be senior to the Subordinate DIP Creditors' liens on and security interest in the CIT Substitute Collateral and the liens of any other creditors of the Debtors except for any non-consensual liens of such creditors which may exist on the CIT Substitute Collateral.

38.     Based on the findings set forth in this Order, and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the Senior DIP financing arrangement contemplated by this Order and the Senior DIP Loan Documents, in the event any or all provisions of this Order are hereafter modified, amended or vacated by a subsequent order of this or any other Court, no such modification, amendment or vacation shall affect the validity and enforceability of any lien, claim, priority or subordination authorized or created hereby. Notwithstanding any such modification, amendment or vacation, any claim granted to the Senior DIP Lender hereunder arising prior to the effective date of such modification, amendment or vacation shall be governed in all respects by the original provisions of this Order, and the Senior DIP Lender shall be entitled to all of the rights, remedies, privileges and benefits, including the liens and priorities granted herein, with respect to any such claim.

39.     As adequate protection on account of the priming by the Senior DIP Lender of Lucent's liens on the Lucent Collateral pursuant to this Order, (i) the Senior DIP Lender shall not, in any foreclosure on the Senior DIP Collateral sell the Lucent Collateral until it has sold or otherwise realized upon (including but not limited to by credit bid) all the other Senior DIP Collateral in which the Senior DIP Lender has a first priority lien and security interest, and (ii) Lucent shall continue to have a lien on the Lucent Collateral prior to the lien of the Subordinate DIP Creditors on the Lucent Collateral.

NEWYORK 808199v15 20722-00644 08/08/02
A:\FINAL ABIZ DIP ORDER.DOC

40.    Nothing contained in this Order or any of the other Senior DIP Loan Documents or otherwise shall constitute a waiver or in any way alter or impair (a) any rights and remedies the Debtors and their estates may have to proceed against the Subordinate DIP Creditors, including, without limitation, filing a proof of claim against the estate of ACC or ACC's affiliated debtors in the ACC chapter 11 cases or otherwise pursuing any remedy for any damages suffered by the Debtors and their estates as a consequence of any default by any of the Subordinate DIP Creditors in respect of the Subordinate Interim Financing or (b) any rights, claims or defenses of the Subordinate DIP Creditors with respect to the foregoing. Nothing in this Order or any of the other Senior DIP Loan Documents shall be deemed to constitute (a) allowance of or a waiver of the rights of the Debtors or their estates to challenge any claims of the Subordinate DIP Creditors arising under or related to the April Interim Order, the Subordinate DIP Loan Documents or the transactions contemplated thereby, or the validity, enforceability or priority of such claims relative to any party in interest other than the Senior DIP Lender or (b) the waiver of any right, claim, or defense of ACC with respect to the foregoing. Notwithstanding the foregoing, all of the rights of the Senior DIP Lender under the Subordination and Intercreditor Agreement and the Subordinate DIP Credit Amendment Agreement shall not be altered or impaired at any time.

41.    The Debtors shall provide to the attorneys for the Creditors' Committee copies of all information and reports provided to the Senior DIP Lender pursuant to Section 5.6 of the Senior DIP Credit Agreement or this Order. The Senior DIP Lender and the Debtors agree to include the Creditors' Committee in the negotiation and documentation of any Collateral Document pertaining to Real Property. To the extent the Creditors' Committee disputes the reasonableness of any provision of such Collateral Document, including, but not limited to, the

-45-

"events of default" provision of such documents, the Creditors' Committee shall be afforded a period of five business days following the completion of the preparation of such Collateral Document before the same may be executed by the applicable Debtor and become effective. During such 5-business-day period the Creditors' Committee shall be entitled to file an objection with this Court with regard to such Collateral Document, which period may be waived by the Creditors' Committee by written notice delivered to counsel to the applicable Debtor and to the Senior DIP Lender.

42.    This Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof. In the event of any inconsistency between the terms of this Order and the terms of any other Senior DIP Loan Documents, the terms of this Order shall control.

Dated:  New York, New York
        August *9*, 2002

                        */s/ Robert E. Gerber*
                        United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **BETHLEHEM STEEL CORPORATION, et al.,** | : | **Jointly Administered** |
| | : | **Case No. 01-15288(BRL)** |
| | : | **through 01-15302, 01-15308** |
| **Debtors.** | : | **through 01-15315 (BRL)** |

**FINAL ORDER (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION
FINANCING PURSUANT TO 11 U.S.C. §§105, 361, 362, 363, 364(c)(1), 364(c)(2),
364(c)(3) and 364(d), (II) AUTHORIZING USE OF CASH COLLATERAL
PURSUANT TO 11 U.S.C. §363 AND GRANTING ADEQUATE PROTECTION
TO THE HOLDERS OF EXISTING OBLIGATIONS REFERRED TO BELOW, AND
(III) AUTHORIZING BETHLEHEM STEEL CORPORATION TO PURCHASE
<u>ACCOUNTS RECEIVABLE FROM ITS SPECIAL PURPOSE SUBSIDIARY</u>**

Upon the motion (the "<u>Motion</u>"),[1] dated October 15, 2001, of Bethlehem Steel

Corporation, <u>et al.</u>,[2] as debtors and debtors in possession jointly and severally (each a "<u>Borrower</u>" or

"<u>Debtor</u>" and, collectively the "<u>Borrowers</u>" or the "<u>Debtors</u>"), in the above captioned jointly

administered bankruptcy cases (the "<u>Cases</u>"):

---

[1]      Capitalized terms used in this Order, unless otherwise defined, shall have the meaning set forth in the Credit
Agreement, as defined herein.

[2]      The Debtors are Bethlehem Steel Corporation, Bethlehem Cold Rolled Corporation, Chicago Cold Rolling,
LLC, Alliance Coatings Company, LLC, Ohio Steel Service Company, LLC, Mississipi Coatings Line Corporation,
Mississippi Coatings Limited Corporation, Bethlehem Development Corporation, Bethlehem Rail Corporation, Encoat-
North Arlington, Inc., Kenacre Land Corporation, Primeacre Land Corporation, Bethlehem Steel Export Company of
Canada, Limited., Bethlehem Steel Export Corporation, Bethlehem Steel de Mexico, S.A. de C.V., BethEnergy Mines,
Inc., Eagle Nest, Inc., HPM Corporation, Energy Coatings Company, Greenwood Mining Corporation, Marmoraton
Mining Company, Ltd., BethPlan Corporation and LI Service Company.

1.    seeking this Court's authorization, pursuant to Sections 105, 361, 362, 363,

364(c)(1), 364(c)(2), 364(c)(3) and 364(d) of the United States Bankruptcy Code, 11 U.S.C.

§§ 101, et seq. (the "Code"), and Rules 2002, 4001 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), for the Borrowers to obtain post-petition

financing (the "Financing") pursuant to that certain Revolving Credit and Guaranty Agreement,

dated as of October 15, 2001 (the "Credit Agreement") of up to the principal amount of

$450,000,000 from General Electric Capital Corporation ("GECC" or "Agent") with GECC

acting as Agent for itself and a syndicate of financial institutions to be arranged by GECC

(together with GECC, the "DIP Lenders"), as well as authority to incur overdrafts and related

liabilities owing to its primary cash concentration account bank The Chase Manhattan Bank

(solely in its capacity as cash concentration account bank, "CMB"), arising from treasury,

depositary and cash management services (including automated clearing house fund transfers)

provided to or for the benefit of the Borrowers (such amounts owing to CMB, collectively,

"Overdrafts"),

(w)    with priority over any and all administrative expenses of the kind specified in

Sections 503(b) and 507(b) of the Code (other than the Carve-Out (as defined below))

pursuant to Section 364(c)(1) of the Code,

(x)    to be secured pursuant to Section 364(c)(2) of the Code by a perfected first

priority security interest in and lien upon (aa) all cash maintained in the Letter of Credit Account

(as defined in the Credit Agreement) and any investment of the funds contained therein,

provided that following the Termination Date (as defined in the Credit Agreement) amounts in

2

the Letter of Credit Account shall not be subject to the Carve-Out (all of such property referred

to in this clause (aa) being hereinafter referred to as the "Credit Agreement Cash Collateral")

and (bb) all property of the Borrowers not subject to valid, perfected and non-avoidable liens in

existence at the time of the commencement of the Cases or to valid, non-avoidable liens in

existence at the time of such commencement that are perfected subsequent to such

commencement as permitted by Section 546(b) of the Code (other than interests of the

Borrowers listed on Schedule 2.23(b) of the Credit Agreement) (collectively with the Credit

Agreement Cash Collateral, the "Unencumbered Collateral"),

      (y)     to be secured pursuant to Section 364(c)(3) of the Code by a perfected junior

lien on all property of the Borrowers that is subject to valid, perfected and non-avoidable liens

in existence at the time of the commencement of the Cases or to valid, non-avoidable liens in

existence at the time of such commencement that are perfected subsequent to such

commencement as permitted by Section 546(b) of the Code, including, without limitation, any

valid, perfected and non-avoidable liens of Bank of America, N.A. ("B of A"), as agent for

certain lenders to Chicago Cold Rolling, L.L.C., one of the Debtors herein ("CCR"), in assets

of CCR, but excluding all property (other than Inventory (as defined in the Uniform Commercial

Code for the State of New York) existing on the Petition Date (the "Petition Date Inventory")),

that is subject to the existing liens that secure obligations under the Existing Credit Agreement

Documents (as hereinafter defined), which liens (other than in respect of Inventory) shall be

primed by the liens granted to the Agent as described in clause (z) below (all of such property

referred to in this clause (y) upon which junior liens will be granted being hereinafter referred to

as the "Encumbered Collateral"), and

3

(z)        to be secured, subject to the first priority lien in Inventory granted as adequate

protection pursuant to paragraph 19(a) and the lien pari passu to such adequate protection lien

granted pursuant to paragraph 27 hereof, pursuant to Section 364(d)(1) of the Code by a

perfected first priority, senior priming lien on all of the property of the Borrowers (including,

without limitation, receivables (including, without limitation, receivables securing the Existing

Credit Agreement, as hereinafter defined, as proceeds of Inventory), notes, rights under license

agreements, property, plant and equipment, interests in leaseholds and capital stock of

subsidiaries limited, in the case of an entity that is a controlled foreign corporation under Section

957 of the Internal Revenue Code, to 66% of the voting stock of such entity) but excluding

Petition Date Inventory, that is subject to the existing liens (the "Primed Liens") which secure

the indebtedness pursuant to the Existing Credit Agreement (as defined below), plus related

interest, fees, costs and charges owed to the Prepetition Agent (as defined below) and the

Existing Lenders (as defined below) arising under, or in connection with, that certain Inventory

Credit Agreement, dated as of September 12, 1995 (as heretofore amended, supplemented or

otherwise modified, the "Existing Credit Agreement"), among Bethlehem Steel Corporation, as

borrower, the several Lenders and other financial institutions from time to time party thereto, as

lenders (the "Existing Lenders"), Morgan Guaranty Trust Company of New York, as

administrative agent  and structuring and collateral agent for the Existing Lenders (in such

capacities, the "Prepetition Agent"), all of which Primed Liens shall be primed by and made

subject and subordinate to the perfected first priority senior liens to be granted to the Agent,

which senior priming liens in favor of the Agent shall, except as specifically provided in

paragraph 19(a) below, also prime any liens granted after the commencement of the Cases to

4

provide adequate protection in respect of any of the Primed Liens (it being understood that, as a condition precedent to the transactions contemplated hereby, such senior priming liens shall be granted with the consent or non-objection, as determined by the Agent in its sole judgment, of a preponderance of the holders of the Primed Liens) (all property referred to in this clause (z) being hereinafter referred to as the "Primed Collateral"; collectively, the Unencumbered Collateral, the Encumbered Collateral and the Primed Collateral are referred to herein as the "Collateral"); and

2.        seeking this Court's authorization, pursuant to Section 363(c) of the Code, to use the Cash Collateral (as defined below) and, pursuant to Sections 361, 363 and 364 of the Code, to provide adequate protection (on the terms set forth below) to the Prepetition Agent and Existing Lenders with respect to any diminution in the value of their interests in the Collateral securing the obligations to the Prepetition Agent and the Existing Lenders under the Existing Credit Agreement, whether from the priming described above, the use of the Cash Collateral or the use, sale, lease, depreciation, decline in market price or otherwise of the Primed Collateral; and

3.        requesting, pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim Hearing") on the Motion be held for this Court to consider entry of an interim order authorizing (aa) the Borrowers to forthwith borrow funds and obtain letters of credit up to an aggregate of $400,000,000 of the Financing from the DIP Lenders, which borrowings and letters of credit to be authorized at the Interim Hearing will be used for the purpose of providing working capital, other general corporate purposes of the Borrowers, the acquisition of accounts receivable, as may be necessary, in connection with the refinancing and termination at the time

5

the Credit Agreement becomes effective of securitization arrangements existing pursuant to that

certain Receivables Purchase Agreement, dated as of September 12, 1995, among Bethlehem

Steel Corporation, as servicer, Bethlehem Steel Funding, LLC ("Funding"), Bethlehem Steel

Credit Affiliate One, Inc. ("Affiliate One"), Bethlehem Steel Credit Affiliate Two, Inc. ("Affiliate

Two"), and Morgan Guaranty Trust Company of New York, as administrative agent and

structuring and collateral agent (the "Receivables Collateral Agent"), and the financial institutions

party thereto, as buyers, (as amended, supplemented or otherwise modified, the "Receivables

Agreement"), and payment of any related transaction costs, fees and expenses, and (bb) the use

of the Cash Collateral and the providing of adequate protection as described above;

4.      seeking this Court's authorization for Bethlehem Steel Corporation

("Bethlehem") to (a) refinance the Receivables Agreement by purchasing from its direct and

indirect special purpose subsidiary, Funding, all of the accounts receivable sold by Bethlehem to

Funding prior to the Petition Date for a combination of cash in an amount sufficient to complete

the refinancing and the cancellation of that certain junior subordinated note issued by Funding in

favor of Bethlehem (the "Funding Note"), (b) cause Funding to sell such accounts receivable to

Bethlehem, and (c) merge Affiliate One, Affiliate Two and Funding into Bethlehem; and

5.      requesting that a final hearing (the "Final Hearing") thereafter be held for this

Court to consider entry of an order authorizing the balance of the Financing, as set forth in the

Motion and the loan documentation filed with this Court, and authorizing the Debtors' continued

use of Cash Collateral; and pursuant to Bankruptcy Rules 4001(b) and 4001(c)(1), notice of

the Motion and the Interim Hearing as authorized by Bankruptcy Rule 4001(c)(2) having been

given by the Debtors on October 15, 2001, to the United States Trustee, the Debtors' 30

6

largest unsecured creditors, on a consolidated basis and listed on schedules filed pursuant to Bankruptcy Rule 1007(d) with the Debtors' petitions and the Prepetition Agent, the Interim Hearing having been held on October 15, 2001;

6. and upon all of the pleadings filed with this Court, and the Interim Order having been entered on October 15, 2001, and due notice of the Final Hearing having been given, and the objections of Bank of America, N.A. and RZB Finance LLC having been resolved, and upon the record made by the Debtors at the Final Hearing, and after due deliberation and consideration and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1. This Court has core jurisdiction over these proceedings and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. The statutory predicates for the relief sought herein are Sections 105, 361, 362, 363, 364 and 507 of the Code and Bankruptcy Rules 4001(b), (c) and (d).

2. Pursuant to the Existing Credit Agreement and all collateral and ancillary documentation executed in connection therewith (collectively, the "Existing Credit Agreement Documents"), the Existing Lenders made loans and other financial accommodations to or for the benefit of Bethlehem Steel Corporation. All such loans, financial accommodations and other amounts owing to the Prepetition Agent and the Existing Lenders under, or in connection with, the Existing Credit Agreement are hereinafter referred to as the "Existing Obligations". Without prejudice to the rights of any other party (but subject to the limitations thereon described below in decretal paragraph 25), the Debtors admit that, in accordance with the terms of the Existing Credit Agreement Documents, Bethlehem is truly and justly indebted to the Existing Lenders, without defense, counterclaim or offset of

any kind, and that as of the Petition Date (i) Bethlehem was liable to the Existing Lenders in respect of

loans made pursuant to the Existing Credit Agreement in the aggregate principal amount of

approximately $290 million (plus interest accrued and unpaid thereon), and (ii) Bethlehem was liable to

the Prepetition Agent and the Existing Lenders for agency, letter of credit, facility and other fees and

expenses incurred in connection therewith as provided in the Existing Credit Agreement, plus accrued

and unpaid interest thereon.

        3.      Without prejudice to the rights of any other party (but subject to the limitations

thereon described below in decretal paragraph 25), the Debtors further admit that, and agree that they

will not challenge the fact that, the Existing Obligations are secured by valid, perfected, enforceable,

non-avoidable first priority liens and security interests granted by Bethlehem pursuant to the Existing

Credit Agreement Documents to the Prepetition Agent, for the ratable benefit of the Existing Lenders, to

secure such Existing Obligations, upon and in the Debtors' (other than CCR's) inventory, certain

intercompany obligations, the Debtors' equity interests in certain subsidiaries and the proceeds of each

of the foregoing (including receivables owned by the Debtors at the time of the commencement of these

Cases and the setoff rights described in the Existing Credit Agreement Documents and arising by

operation of law), the Funding Note and the stock of certain subsidiaries (collectively, the "Existing

Obligations Collateral").

        4.      The Debtors' (other than CCR's) cash constitutes Existing Obligations

Collateral or the proceeds thereof and, therefore, is cash collateral of the Existing Lenders within the

meaning of Section 363(a) of the Code (the "Cash Collateral"). The Existing Lenders have objected to

the use by the Debtors of the Existing Obligations Collateral, including the Cash Collateral, except on

the terms of this Order. In addition, such parties are entitled, pursuant to Sections 361, 363(e) and

8

364(d) of the Code, to adequate protection of their interests in the Existing Obligations Collateral,

including for the priming of the Existing Obligations Collateral, the use of the Cash Collateral, the use,

sale, lease, depreciation, decline in market price or other diminution in value of the Existing Obligations

Collateral from and after the Petition Date (other than the Cash Collateral), and the imposition of the

automatic stay.

        5.      As of the Petition Date, Funding owned approximately $308 million of accounts

receivable sold to Funding by Bethlehem, an undivided interest in which has been sold by Funding under

the Receivables Agreement. It was a condition to advances under the Credit Agreement that

simultaneous with the initial funding of the Interim Financing, all accounts receivable owned by Funding

on the Petition Date immediately be acquired by Bethlehem free and clear of all liens, claims and

encumbrances. Funding had outstanding undivided interests held by the purchasers (the "Funding

Purchasers") under the Receivables Agreement of approximately $212 million (plus $45 million in

contingent reimbursement obligations associated with undrawn letters of credit), plus yield, fees,

expenses and other amounts payable from time to time under the Receivables Agreement, and, as

evidenced by the Funding Note, Funding was indebted to Bethlehem in the principal amount of

approximately $27.8 million as of September 30, 2001. The Funding Purchasers and their

administrative and collateral agent (the "Funding Agent") held undivided interests in the accounts

receivable owned by Funding. In accordance with the Interim Order, Funding sold to Bethlehem all

accounts receivable owned by Funding for a purchase price comprised of (a) cash in an amount

sufficient for Funding to both satisfy all amounts owed by Funding to the Funding Purchasers and cash

collateralize the reimbursement obligations associated with outstanding letters of credit, and (b) the

cancellation of the indebtedness evidenced by the Funding Note. The Funding Note and the equity of

Funding and the subsidiaries of the Borrower that own its equity had been pledged by Bethlehem to the Existing Lenders.

6.    Based on the record before the Court, it appears that:

(a) the Borrowers have an immediate need to obtain financing and use the Cash Collateral in order to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors and suppliers, to purchase accounts receivable from Funding, to make certain strategic capital expenditures and to satisfy other working capital needs;

(b) the Borrowers are unable to obtain adequate unsecured credit allowable under Section 503(b)(1) of the Code as an administrative expense;

(c) a facility in the amount provided by the Financing or Overdrafts are unavailable to the Borrowers without the Debtors granting to the Agent and the DIP Lenders and, with respect to Overdrafts, CMB (i) pursuant to Section 364(c)(1) of the Code, allowed claims, with respect to all indebtedness and obligations of the Debtors under the Credit Agreement, having priority over any and all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Code (other than the Carve-Out), (ii) pursuant to Section 364(c)(2) of the Code, security for such obligations by the granting of a perfected first priority senior security interest in and lien upon the Unencumbered Collateral, (iii) pursuant to Section 364(c)(3) of the Code, security for such obligations by the granting of a perfected junior lien on all Encumbered Collateral, and (iv) pursuant to Section 364(d)(1) of the Code, security for such obligations by the granting of a perfected first priority, senior priming lien on all Primed Collateral (such grants being limited in the case of Overdrafts, as described below, to Overdrafts not exceeding $10,000,000);

(d)  the ability of the Debtors to obtain sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations and the use of the Cash Collateral is vital to the Debtors;

(e)  the preservation and maintenance of the going concern values of the Debtors is integral to a successful reorganization of the Debtors pursuant to the provisions of Chapter 11 of the Code; and

(f)  the terms of the Financing and the use of the Cash Collateral and any Overdrafts are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duty and are supported by reasonably equivalent value and fair consideration.

7.    The Financing and the use of the Cash Collateral has been negotiated in good faith and at arm's-length between the Debtors, the Agent and the Prepetition Agent, as applicable, and any credit extended, letters of credit issued for the account of and loans made to the Debtors by the DIP Lenders pursuant to the Credit Agreement, and any Overdrafts shall be deemed to have been extended by the DIP Lenders or CMB, as the case may be, in "good faith," as that term is used in Section 364(e) of the Code.

8.    The Borrowers are authorized and empowered to borrow or obtain letters of credit under the provisions of the Credit Agreement up to an aggregate (including amounts previously borrowed as part of the Interim Financing, as defined in the Interim Order) of $450,000,000.  The Borrowers are also authorized to incur the Overdrafts.  The Financing shall be used for the purpose of providing working capital, other general corporate purposes of the Borrowers, the purchase of accounts receivable from Funding and the cash collateralization of reimbursement obligations in respect of

undrawn letters of credit, as may be necessary, in connection with the refinancing and termination of

securitization arrangements existing pursuant to the Receivables Agreement, and payment of any related

transactions costs, fees, expenses and other amounts owing thereunder, all in accordance with the

Credit Agreement. Without limiting the foregoing in any respect, the Borrowers are authorized, at any

time during the term of the Financing, to exchange newly issued replacement or "back to back" letters

of credit acceptable to the Funding Agent for cash delivered by Bethlehem to Funding (or the Funding

Agent) on the Petition Date to secure payment of Funding's reimbursement obligations in respect of

undrawn letters of credit. Notwithstanding anything herein to the contrary, no borrowings, letters of

credit, Cash Collateral, Collateral or the Carve-Out may be used, directly or indirectly, to initiate or

prosecute any action for preferences, fraudulent conveyances, other avoidance power claims or any

other claims or causes of action against the Agent, the DIP Lenders, the Prepetition Agent, the Existing

Lenders, the Funding Purchasers or the Funding Agent (it being understood, however, that fees and

expenses incurred by the Committee to investigate the validity and priority of the liens securing the

Existing Obligations are not so excluded).

        9.      The Debtors are expressly authorized and empowered to execute and deliver,

among other documents, the Credit Agreement and the Security and Pledge Agreement (as defined in

the Credit Agreement) to which the Debtors are parties, in substantially the forms heretofore filed with

this Court (collectively, and together with the letter agreement referred to in paragraph 17(iii) hereof, the

"Documents"). The Documents are approved, and the Debtors are hereby authorized to perform and

do all acts that may be required in connection with the Documents. The Documents shall constitute

valid and binding obligations of the Debtors that are parties thereto, enforceable against each Debtor

that is a party thereto in accordance with their terms.

10.     For all of the Debtors' obligations and indebtedness arising under the Financing

and the Documents or in respect of Overdrafts, the Agent, the DIP Lenders and CMB are granted,

pursuant to Section 364(c)(1) of the Code, an allowed claim having priority over any and all

administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Code (such

superpriority claim in respect of Overdrafts to be limited to $10,000,000 (with the balance thereof

having the priority of an ordinary expense of administration) ranking *pari passu* with the allowed

superpriority claim of the Agent and the DIP Lenders), subject only to (x) to the extent B of A is

granted in these proceedings a superpriority administrative claim against the estate of CCR, the Agent,

the DIP Lenders and CMB will not object to such superpriority claim, and the superpriority claim of the

Agent, the DIP Lenders and CMB granted herein shall be junior to the superpriority claim of B of A

against the estate of CCR, (y) in the event of the occurrence and during the continuance of an Event of

Default (as defined in the Credit Agreement), the payment of unpaid professional fees and

disbursements incurred by the Borrowers and the Official Committee of Unsecured Creditors (the

"Committee") appointed in the Cases and allowed by Order of this Court, in an aggregate amount not

in excess of $4,975,000 (plus $25,000 for Chapter 7 trustee fees) (plus amounts, if any, for which the

Borrowers' request, and the Agent establishes in accordance with Section 2.23(a) of the Credit

Agreement, a professional fee reserve against availability for the purpose of funding accrued but unpaid

professional fees and expenses incurred prior to the occurrence of such Event of Default that are

allowed by the Court), and (z) payment of fees pursuant to 28 U.S.C. § 1930 (the foregoing

$5,000,000 and 28 U.S.C. §1930 fees shall be referred to collectively as the "Carve-Out"), provided

that (i) no portion of the Carve-Out shall be utilized for payment of the fees and expenses, if any, of any

professional persons incurred, directly or indirectly, in respect of, arising from or relating to, the initiation

or prosecution of any action for preferences, fraudulent conveyances, other avoidance power claims or

any other claims or causes of action against the Agent, the DIP Lenders, the Prepetition Agent, the

Existing Lenders, the Funding Purchases or the Funding Agent (it being understood, however, that fees

and expenses incurred by the Committee to investigate the validity and priority of the liens securing the

Existing Obligations are not so excluded from the Carve-Out), and (ii) following the Termination Date,

amounts in the Letter of Credit Account shall not be subject to the Carve-Out. Except as set forth in

this Order, no other claim having a priority superior or *pari passu* with that granted by this Order to the

Agent, the DIP Lenders or CMB shall be granted while any portion of the Financing (or refinancing

thereof by the DIP Lenders during the pendency of these cases) or the commitment thereunder remains

outstanding.

11.    So long as an Event of Default shall not have occurred and be continuing, the

Borrowers shall be permitted to pay compensation and reimbursement of expenses allowed and

payable under Sections 330 and 331 of the Code, as the same may be due and payable, and such

payments shall not be applied against the Carve-Out.

12.    As security for all of the Debtors' obligations and indebtedness owing to the

Agent and the DIP Lenders and as security for Overdrafts of up to $10,000,000 owing to CMB, the

Agent, on behalf of the DIP Lenders and on behalf of CMB with respect to Overdrafts of up to

$10,000,000, is hereby granted (effective upon the date of the Interim Order and without the necessity

of the execution by the Debtors of mortgages, security agreements or otherwise), pursuant to Sections

364(c)(2), (3) and 364(d) of the Code, (x) a perfected first priority senior security interest in and lien

upon the Unencumbered Collateral, (y) a perfected junior priority lien on all Encumbered Collateral, and

(z) subject to paragraph 19(a) below, a perfected first priority, senior priming lien on all Primed Collateral.

13.    The security interests and liens granted hereunder to the Agent on behalf of the DIP Lenders and CMB, to the Prepetition Agent on behalf of the Existing Lenders and to the Funding Agent on behalf of the Funding Purchasers shall not be (i) subject to any lien or security interest which is avoided and preserved for the benefit of the Debtors' estates under Section 551 of the Code or (ii) except as provided herein *inter se*, subordinated to or made pari passu with any other lien or security interest under Sections 364(c) or (d) of the Code. The Collateral shall not include any of the Debtors' avoidance actions under Sections 544 - 549 of the Code. The Collateral shall also be limited, solely to the extent provided in the Credit Agreement, in the case of an entity that is a controlled foreign corporation under Section 957 of the Internal Revenue Code, to 66% of the voting stock of such entity.

14.    To the extent any Borrower makes aggregate payments to the DIP Lenders in excess of the aggregate amount of all loans and advances received by such Borrower from the DIP Lenders after the commencement of the Cases, then such Borrower, after the payment in full of all obligations of the Borrowers in respect of the Financing and the termination of the Financing, shall be entitled to a claim under Section 364(c)(1) of the Code against each other Borrower, in such amount as may be determined by the Court taking into account the relative benefits received by each such Borrower. Such claims of the Borrowers shall be deemed to be subordinate and junior in all respects to the liens and superpriority claims of (i) the Agent and the DIP Lenders and, in respect of Overdrafts, CMB, and (ii) the Prepetition Agent, on behalf of Existing Lenders, granted as adequate protection hereunder.

15.    None of the Agent, the DIP Lenders, CMB, the Prepetition Agent, the Funding Purchasers or the Funding Agent shall be required to file or record financing statements, mortgages, notices of lien or similar instruments in any jurisdiction or take any other action in order to validate and perfect the security interests and liens granted to them pursuant to this Order or the Interim Order.  If any such party, shall, in its business judgment, choose to file such financing statements, mortgages, notices of lien or similar instruments or otherwise confirm perfection of such security interests and liens, all such documents shall be deemed to have been filed or recorded at the time and on the date of entry of this Order, but subject in all respects to the priorities set forth in this Order.

16.    Each of the Debtors is authorized and empowered to use proceeds of the Financing in accordance with the terms of the Credit Agreement, including, without limitation, for the purpose of purchasing receivables from Funding in connection with refinancing and termination of the Receivables Agreement.

17.    Each of the Debtors is authorized and directed to do and perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution of security agreements, mortgages and financing statements), and to pay fees, which may be reasonably required or necessary for the Debtors' performance under the Financing, including, without limitation: (i) the execution of the Documents, (ii) the execution of one or more amendments to the Credit Agreement for, among other things, the purpose of adding additional financial institutions as DIP Lenders, reallocating the commitment for the Financing among the DIP Lenders, reallocating the amounts of the commitments (and sublimits therein) in the separate tranches of loans and financial accommodations under the Credit Agreement, in each case in such form as the Debtors, the Agent and the Bank may agree, and (iii) the non-refundable payment to the Agent or the DIP Lenders, as the case may be, of the

16

Fees referred to in the Credit Agreement (and in the separate letter agreement, dated October 14,

2001, between the Borrowers and the Agent referred to in the Credit Agreement) and such Letter of

Credit Fees, Commitment Fees and reasonable costs and expenses as may be due from time to time

including, without limitation, reasonable attorneys' fees and disbursements as provided in the

Documents, all as such terms are defined in the Documents.

      18.    Subject to and conditioned upon the provision of adequate protection as

provided in paragraph 19(a) below, the Debtors other than CCR are hereby authorized to use all Cash

Collateral of the Existing Lenders for the same purposes as the Debtors are to use the Financing and in

a manner consistent with the Credit Agreement.

      19. (a)    The Prepetition Agent shall retain, for the benefit of the Existing

Lenders, a first priority lien upon and security interest in all Petition Date Inventory other than Inventory

of CCR, to which the liens of the Agent, the DIP Lenders and CMB shall be subject and subordinate.

As adequate protection for the priming (except as to Inventory) of the Existing Obligations Collateral

(including priming in favor of the Agent in respect of accounts generated from the sale or other

disposition of Inventory sold or disposed of after the Petition Date, including all Petition Date

Inventory), the use of the Cash Collateral, the use, sale, lease, depreciation, decline in market price or

other diminution in value of the Existing Obligations Collateral (other than the Cash Collateral) and the

imposition of the automatic stay, the Prepetition Agent and the Existing Lenders are hereby granted, to

secure payment of the Existing Obligations in an amount equal to the aggregate diminution, from and

after the Petition Date, in value (if any) of the Existing Obligations Collateral (excluding any portion

thereof in respect of which the liens of the Existing Lenders are avoided in these proceedings) whether

by the priming of the Existing Obligations Collateral, the cancellation of the Funding Note, the use, sale,

17

lease, depreciation, decline in market price or otherwise of the Existing Obligations Collateral (including

the Cash Collateral) or the imposition of the automatic stay (such amount, the "Adequate Protection

Obligations"; which Adequate Protection Obligations shall be allocated ratably to the Existing Lenders),

(i) valid, binding and enforceable first priority security interests in and liens upon all Inventory held,

acquired or produced by the Debtors other than CCR from and after the Petition Date, which liens shall

be subject to the Carve-Out, but to which the liens of the Agent, the DIP Lenders and CMB shall be

subject and subordinate, (ii) valid, binding and enforceable security interests in and liens on all other

Collateral, which liens shall be subject to valid, binding and enforceable security interests and liens

existing on the Petition Date in favor of parties other than the Existing Lenders and to the Carve-Out

and immediately junior to the security interests and liens granted to the Agent, the DIP Lenders and

CMB pursuant to this Order, and (iii) superpriority claims as contemplated by Section 507(b) of the

Code immediately junior to the claims under Section 364(c)(1) of the Code held by the Agent, the DIP

Lenders and CMB (and junior to any superpriority claim that may be granted to B of A in the case of

CCR and to the Carve-Out).  As additional adequate protection, the Existing Lenders shall receive

(consistent with the rights of the Existing Lenders under Section 506(b) of the Code) (x) the current

monthly payment to the Existing Lenders under the Existing Credit Agreement of interest (and the

payment of all interest and fees that are accrued and unpaid as of the commencement of the Cases) at

the applicable non-default rates provided for pursuant to the Existing Credit Agreement (which

payments and pricing options shall be without prejudice to the rights of any Existing Lender or letter of

credit issuer to assert a claim for the payment of additional interest calculated at any other applicable

rates of interest, or on any other basis, set forth in the Existing Credit Agreement Documents), and (y)

the payment to the Prepetition Agent, on a current basis, of administration fees and the reasonable fees

and expenses (including, but not limited to, the reasonable fees and disbursements of counsel and

internal and third-party consultants, including financial consultants, and auditors) incurred by the

Prepetition Agent (including any unpaid prepetition fees and expenses) in connection with matters

relating to the Existing Credit Agreement Documents, the Existing Obligations, the monitoring of the

Cases or the enforcement and protection of the rights and interests of the Prepetition Agent.  As

additional adequate protection, the Debtors shall at all times maintain Inventory with an aggregate book

value of at least $500 million (the "Inventory Threshold").  So long as the Debtors maintain the

Inventory Threshold, the Agent shall, consistent with the provisions of paragraph 12 above, enjoy a first

priority, priming lien upon all accounts generated from the sale of Inventory.  If the Debtors at any time

fail to maintain the Inventory Threshold, the first priority lien held by the Existing Lenders upon Inventory

shall, notwithstanding the provisions of paragraph 12 above, continue as a first priority lien upon

accounts receivable generated from the sale of Inventory subsequent to the date upon which the

Debtors failed to maintain the Inventory Threshold unless (1) the Agent, in its discretion, agrees that the

Existing Lenders and the Prepetition Agent have a security interest in an undivided interest in the

Debtors' accounts receivable, ranking equally with the secured obligations owing to the DIP Lenders

and CMB, in the same proportion that an amount equal to the difference between the Inventory

Threshold and the book value of owned Inventory bears to the sum of such amount and such secured

obligations, or (2) the Agent, in its discretion and after consulting with the Borrowers, advances to the

Prepetition Agent, for the benefit of the Existing Lenders, sums for the repayment of the Existing

Obligations such that, after giving effect to such repayment, the unpaid Existing Obligations represent no

more than 57% of the book value of the owned Inventory, or (3) the Agent, in its discretion, both

permits liens upon accounts receivable and repays a portion of the Existing Obligations, as provided in

19

clauses 1 and 2 above, such that the unpaid Existing Obligations, after giving effect to the operation of

clauses 1 and 2, represent no more than 57% of the aggregate book value of owned Inventory and

accounts receivable subject to the Existing Lenders' liens. If the book value of the Debtors' owned

Inventory increases after any accounts receivable are permitted to be encumbered in favor of the

Existing Lenders in accordance with clauses 1 or 3 above, the Agent shall have the right from time to

time to reduce the amount of the undivided interest in accounts receivable subject to the Existing

Lenders' liens so as to reflect the increase in the book value of Inventory. If the Debtors at any time fail

to maintain the Inventory Threshold but thereafter acquire sufficient Inventory so as to satisfy the

Inventory Threshold, any and all liens on accounts receivable then encumbered in favor of the

Prepetition Agent for the benefit of the Existing Lenders shall automatically become subordinate in

priority to the liens held by the Agent, the DIP Lenders and CMB to the same extent as prior to the

failure of the Debtors to satisfy the Inventory Threshold. The Agent and the Prepetition Agent shall

employ good faith efforts to negotiate a mutually acceptable intercreditor agreement consistent with the

foregoing provisions of this paragraph 19(a). Any amounts advanced by the Agent to repay a portion

of the Existing Obligations in accordance with this paragraph shall constitute Obligations under the

Credit Agreement. None of the fees, costs and expenses payable pursuant to this paragraph shall be

subject to the approval of this Court, and no recipient of any such payment shall be required to file with

respect thereto any interim or final fee application with this Court. As additional adequate protection,

the Debtors shall provide the Prepetition Agent and the Existing Lenders with copies of all reports and

other materials delivered to the Agent and the DIP Lenders under the Credit Agreement and such other

reports, information and materials as reasonably requested by the Prepetiton Agent. Based upon the

facts and circumstances presented to the Court during the Interim Hearing and the Final Hearing and the

non-objection of the Existing Lenders, the adequate protection provided herein is reasonable and sufficient to protect the interests of such parties.

(b)    In order to provide RZB Finance LLC ("RZB") with adequate protection of any valid, perfected, non-avoidable lien it may have in certain equipment owned by Bethlehem and located at its New Cold Sheet Mill Complex (the "RZB Collateral") as a result of the liens to be granted to the Agent, the DIP Lenders, CMB and the Existing Lenders hereunder, (i) RZB is hereby granted, to secure an amount equal to the diminution in value of the RZB Collateral from and after the Petition Date, a first priority lien against any and all post-petition renewals, replacements, additions and/or improvements made with respect to the RZB Collateral; provided, that the first priority lien granted hereby shall be limited to post-petition renewals, replacements, additions and/or improvements with an aggregate value not to exceed $7,000,000 (the "Post-Petition RZB Collateral"), and (ii) notwithstanding any other provision of this Order or the Interim Order, the liens of the Agent, the DIP Lenders, CMB and the Existing Lenders granted pursuant to this Order and the Interim Order against the RZB Collateral and the Post-Petition RZB Collateral, and the proceeds of either of the foregoing (to the extent not duplicative), shall at all times be junior and subordinate to the liens of RZB. The foregoing is intended to provide adequate protection to RZB in connection with the liens granted to the Agent, the DIP Lenders, CMB and the Existing Lenders, and does not constitute a finding that RZB's interest in its collateral is otherwise adequately protected. Nothing contained herein shall be deemed to preclude RZB from seeking adequate protection in connection with Bethlehem's post-petition use of the RZB Collateral or the imposition of the automatic stay.

21

(c)     Nothing contained herein shall be deemed to preclude B of A from seeking

adequate protection in connection with the use of any of its collateral or the imposition of the automatic

stay.

20.     Except to the extent of the Carve-Out, no expenses of administration of the

Cases or any future proceeding or case which may result therefrom, including liquidation in bankruptcy

or other proceedings under the Code, shall be charged against the Collateral, pursuant to Section

506(c) of the Code or otherwise, without the prior written consent of the Agent or the Prepetition

Agent, as applicable, and no such consent shall be implied from any other action, inaction, or

acquiescence by the Agent, the DIP Lenders or the Prepetition Agent, as applicable.

21.     So long as there are any borrowings or Letters of Credit outstanding, or the

Financing is in effect, the Existing Lenders and the Funding Purchasers shall not be permitted to take any

action in the Court or otherwise to exercise any remedies in respect of such adequate protection claims

or liens (including, without limitation, requests for the current payment of interest at rates in excess of the

non-default rates specified above); provided, that the foregoing shall not prevent the Existing Lenders

and the Funding Purchasers (or the Prepetition Agent and the Funding Agent on their behalf), following

the occurrence and during the continuance of any Event of Default under the Credit Agreement, from

seeking additional adequate protection or modification thereof (as long as such additional adequate

protection shall at all times be subject and junior to the claims and liens of the Agent, the DIP Lenders

and CMB) or terminating the use of cash collateral upon five (5) business days' notice to counsel for the

Debtors, counsel to the Agent, counsel for the U.S. Trustee, and counsel for the Committee without

further order of this Court.  As more fully set forth in the Credit Agreement, the Debtors shall have no

right to use Cash Collateral without the consent of the Agent following the fifth business day after the

22

occurrence of an Event of Default under the Credit Agreement and thereafter during the continuance of
such Event of Default.  If, notwithstanding the Agent's consent to the use of Cash Collateral, the Existing
Lenders seek to terminate the Debtors' authority to use Cash Collateral following the occurrence and
during the continuance of any Event of Default under the Credit Agreement, the Debtors shall have the
right to request authority to use Cash Collateral over the objection of the Existing Lenders.

22.    The Debtors, the Agent and the DIP Lenders may amend, modify, supplement
or waive any provision of the Documents if such amendment, modification, supplement or waiver is
permitted under the terms of the Documents and is not material (in the good faith judgment of the
Debtors and the Agent) without the need to apply to, or receive further approval from, the Court.

23.    Subject only to the provisions of the Credit Agreement, the automatic stay
provisions of Section 362 of the Code are vacated and modified to the extent necessary so as to permit
the Agent and the DIP Lenders to exercise, upon the occurrence of an Event of Default and the giving
of five (5) business days' written notice to counsel for the Debtors, counsel to the Prepetition Agent,
counsel for the U.S. Trustee, and counsel for the Committee, all rights and remedies provided for in the
Documents.

24.    The Documents and the provisions of this Order shall be binding upon the
Agent, the DIP Lenders, CMB, the Prepetition Agent, the Existing Lenders, the Funding Purchasers,
the Funding Agent and the Debtors and their respective successors and assigns (including any Chapter 7
or Chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors) and inure to
the benefit of the Agent, the DIP Lenders, CMB, the Prepetition Agent, the Existing Lenders, and the
Debtors and their respective successors and assigns (except with respect to any trustee hereinafter
appointed or elected for the estate of any of the Debtors).

25.    The admissions contained in paragraphs 2 and 3 shall also extend to the

Receivables Agreement, the obligations and liens in respect thereof, the Funding Agent and the Funding

Purchasers, and shall be binding upon the Debtors under all circumstances, and shall be binding upon all

other parties in interest, including without limitation, the Committee, except (a) a party in interest

(including the Committee) that (i) has properly filed an adversary proceeding or contested matter

(subject to the limitation set forth in paragraphs 8 and 10) challenging the validity, enforceability or

priority of the Existing Obligations or the liens on the Existing Obligations Collateral in respect thereof,

or otherwise asserting any claims or causes of action against the Prepetition Agent, the Existing Lenders,

the Funding Agent or the Funding Purchasers on behalf of the Debtors' estates, no later than the date

that is 60 days after the date on which the Committee has been appointed, and (ii) has obtained from

the Court a ruling in favor of the plaintiff in any such timely and properly filed adversary proceeding or

contested matter.  If no such adversary proceeding or contested matter is commenced as of such date,

the Existing Obligations shall constitute allowed claims, not subject to subordination and otherwise

unavoidable, for all purposes in these Chapter 11 cases and any subsequent Chapter 7 cases, the liens

securing the Existing Obligations on the Existing Obligations Collateral shall be deemed legal, valid,

binding, perfected, not subject to defense, counterclaim, offset of any kind, subordination and otherwise

unavoidable, and the Prepetition Agent, the Existing Lenders, the Funding Agent and the Funding

Purchasers, the Existing Obligations and the liens on the Existing Obligations Collateral securing the

Existing Obligations shall not be subject to any other or further challenge by any party in interest seeking

to exercise the rights of the Debtors' estates, including without limitation, any successor thereto.  If any

such adversary proceeding or contested matter is timely commenced as of such date, the admissions

contained in paragraphs 2 and 3 shall nonetheless remain binding and preclusive (as provided in this

24

paragraph) except to the extent that such acknowledgments and agreements were expressly challenged in such adversary proceeding or contested matter.

26.     Unless all obligations and indebtedness owing to the Agent and the DIP Lenders under the Credit Agreement shall theretofore have been paid in full (and, with respect to outstanding Letters of Credit issued pursuant to the Credit Agreement, cash collateralized in accordance with the provisions of the Credit Agreement) and the Adequate Protection Obligations shall have been paid in full and there shall be no outstanding Overdrafts, the Debtors shall not seek, and it shall constitute an Event of Default if any of the Debtors seek, or if there is entered, an order dismissing any of the Cases.  If an order dismissing any of the Cases under Section 1112 of the Code or otherwise is at any time entered, such order shall provide (in accordance with Sections 105 and 349(b) of the Code) that (x) the superpriority claims, liens and security interests granted pursuant to this Order shall continue in full force and effect and shall maintain their priorities as provided in this Order until all obligations in respect thereof shall have been paid and satisfied in full (and that such superpriority claims, liens and security interests, shall, notwithstanding such dismissal, remain binding on all parties in interest) and (y) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in (x) above.

27.     Bethlehem is hereby granted final authorization to purchase and to cause Funding to sell all accounts receivable owned by Funding for a purchase price comprised of (a) the total cash required to satisfy the obligations owed by Funding to the Funding Purchasers (including all amounts needed to cash collateralize reimbursement obligations in respect of undrawn letters of credit), and (b) the cancellation of the Funding Note.  Upon such termination, Bethlehem is hereby granted final authorization immediately thereafter to merge Affiliate One, Affiliate Two and Funding into Bethlehem.

In addition, as consideration for the release of the accounts receivable acquired by Bethlehem from Funding as contemplated by the Interim Order, the Debtors shall indemnify and hold harmless the Funding Purchasers and the Funding Agent for and against any and all claims, losses, costs or expenses suffered or incurred by them arising out of or relating to the Receivables Agreement and their respective interests in accounts receivable acquired from Funding thereunder (including, without limitation, all administration fees, letter of credit fees and other charges). Without limiting the generality of the foregoing, Bethlehem shall pay to the Funding Agent on a current basis all fees and charges payable under the Receivables Agreement and the reasonable fees and expenses (including, without limitation, the reasonable fees and disbursements of counsel) incurred by the Funding Agent in connection with the Receivables Agreement and the enforcement and protection of the rights and interests of the Funding Agent and the Funding Purchasers. To secure the foregoing indemnity, the Funding Agent and the Funding Purchasers are hereby granted, pari passu with the Adequate Protection Obligations, a lien on the Collateral securing the Adequate Protection Obligations.

28.     If any or all of the provisions of this Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (x) the validity of any obligation, indebtedness or liability incurred by the Debtors to the DIP Lenders in connection with the Financing, to CMB in connection with Overdrafts, to the Existing Lenders in respect of Adequate Protection Obligations or to the Funding Purchasers in respect of the protections provided to them hereunder prior to written notice to the Agent and the Prepetition Agent of the effective date of such reversal, stay, modification or vacation, or (y) the validity and enforceability of any lien or priority authorized or created hereby or pursuant to the Credit Agreement with respect to any such obligations, indebtedness or liability. Notwithstanding any such reversal, stay, modification or vacation, any

indebtedness, obligation or liability incurred by the Debtors to the DIP Lenders in connection with the
Financing, to CMB in connection with Overdrafts, to the Existing Lenders in respect of Adequate
Protection Obligations or to the Funding Purchasers in respect of the protections provided to them
hereunder prior to written notice to the Agent and the Prepetition Agent of the effective date of such
reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this
Order, and the DIP Lenders and CMB shall be entitled to all the rights, remedies, privileges and
benefits, granted herein and/or pursuant to the Credit Agreement with respect to such indebtedness,
obligation or liability. The obligations of the Debtors under this Order and the Financing shall not be
discharged by the entry of an order confirming a plan of reorganization in any of the Cases and, pursuant
to Section 1141(d)(4) of the Code, the Debtors have waived such discharge.

29.    The notice given of the Motion and the Final Hearing constitutes due and
sufficient notice of the Motion and the Final Hearing in accordance with Bankruptcy Rule 4001(c)(2).

Dated: New York, New York
      November 5, 2001

                      /s/ Burton R. Lifland
                      HONORABLE BURTON R. LIFLAND
                      UNITED STATES BANKRUPTCY JUDGE

NYI 5046759v4

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------------x
                                          :
In re                                     :      Chapter 11 Case Nos.
                                          :
WORLDCOM, INC., et al.,                   :      02-13533 (AJG)
                                          :
                   Debtors.               :      (Jointly Administered)
-----------------------------------------------------------------x
```

## FINAL ORDER (I) AUTHORIZING POSTPETITION SECURED SUPER-PRIORITY FINANCING PURSUANT TO SECTIONS 105(a), 362, 364(c)(1), 364(c)(2), AND 364(c)(3) OF THE BANKRUPTCY CODE AND (II) GRANTING INTERCOMPANY SUPER-PRIORITY CLAIMS AND JUNIOR LIENS PURSUANT TO SECTIONS 361, 363(e), 364(c)(1), 364(c)(3) AND 507(B) OF THE BANKRUPTCY CODE

Upon the motion, dated July 21, 2002 (the "**Motion**"), of WorldCom, Inc. (the "**Borrower**" or "**WorldCom**"), and all of its affiliated debtors that have commenced chapter 11 cases and are debtors in these jointly administered chapter 11 cases[1] (such affiliates, together with any entities that subsequently commence jointly administered chapter 11 cases and become guarantors under the DIP Credit Agreement (as defined below), the "**Guarantors**"), as debtors and debtors in possession (collectively, the "**Debtors**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), seeking entry of an order (this "**Order**"):

---

[1]      For purposes of this Order, the "affiliated debtors" are all entities that are the subject of these jointly administered chapter 11 proceedings.

(a)       authorizing the Debtors to incur postpetition senior secured financing (the

"**DIP Credit Facility**") in accordance with that certain Debtor-in-Possession Credit

Agreement dated as of July 21, 2002 (as heretofore amended, restated, supplemented or

otherwise modified, including as amended and restated, and dated as of October 15,

2002, the "**DIP Loan Agreement**") among the Borrower, the Guarantors, Citicorp, USA,

Inc., as Administrative Agent (the "**Administrative Agent**"), J.P. Morgan Securities

Inc., as Syndication Agent (the "**Syndication Agent**"), General Electric Capital

Corporation, as Documentation Agent and Collateral Monitoring Agent (the "**Collateral**

**Monitoring Agent**," and, together with the Administrative Agent and the Syndication

Agent, the "**Agents**"), acting as Agents for themselves, Citibank, N.A., as Initial L/C

Issuer (the "**Initial L/C Issuer**"), and a syndicate of financial institutions (together with

the Agents, and the Initial L/C Issuer, the "**Lenders**") to be arranged by Salomon Smith

Barney Inc., J.P. Morgan Securities Inc. and GECC Capital Markets Group, Inc., and

incur the obligations as provided for in the DIP Loan Agreement (the "**Obligations**");

(b)       authorizing the Debtors, pursuant to sections 364(c)(2) and 364(c)(3) of

the Bankruptcy Code, to provide the Administrative Agent (for the ratable benefit of the

Lenders) with Liens (as defined in the DIP Loan Agreement) upon property of the

Debtors' estates as provided in, and as contemplated by, the DIP Loan Agreement (the

DIP Loan Agreement and all such instruments and documents as may be executed and

delivered in connection therewith or which relate thereto are referred to herein

collectively as the "**DIP Loan Documents**"), as supplemented by this Order, subject to

the Carve-Out (as defined below);

(c)       authorizing the Debtors, pursuant to section 364(c)(1) of the Bankruptcy
Code, to grant the Administrative Agent (for the ratable benefit of the Lenders) a Super-
Priority Claim (as defined below) over any and all administrative expenses, subject to the
Carve-Out; and

(d)       granting adequate protection, pursuant to sections 361, 363(e), 364(c)(1),
364(c)(3), and 507(b) of the Bankruptcy Code, to each Debtor for the continued use of
the Centralized Cash Management System (as defined in the Motion);

and it appearing that the relief requested therein is necessary to provide the Debtors with
sufficient capital to continue operations and to preserve the going concern value of their
businesses; and it further appearing that notice of the Motion is sufficient and complies with the
requirements of Bankruptcy Rules 4001(b), 4001(c) and 4001(d); and for good cause shown;

### THE COURT HEREBY FINDS THAT:

A.  On July 21, 2002 (the "**Petition Date**"), the Debtors commenced these chapter
11 cases (the "**Cases**") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy
Code in the United States Bankruptcy Court for the Southern District of New York (the
"**Court**").

B.  The Debtors have continued in the management and operation of their
businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.
Pursuant to its authority under section 1102 of the Bankruptcy Code, on July 29, 2002, the U.S.
Trustee (as defined below) formed the official committee of unsecured creditors (the "**Creditors'
Committee**").

C.  This Court has jurisdiction, pursuant to 28 U.S.C §§ 157(b) and 1334, over these Cases, and over the persons and property affected hereby.  Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C § 157(b)(2).  The statutory predicates for the relief sought herein are sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code and Rule 4001(b), (c) and (d) of the Federal Rules of Bankruptcy Procedure.  Venue of the Cases in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

D.  An immediate need exists for the Debtors to obtain funds and financial accommodations with which to continue their operations, meet their payroll and other necessary, ordinary course business expenditures, acquire goods and services, and administer and preserve the value of their estates.  The ability of the Debtors to finance their operations requires the availability of additional working capital, the absence of which would immediately and irreparably harm the Debtors, their estates, and their creditors.

E.  The Debtors are unable to obtain unsecured credit allowable only as an administrative expense allowable under section 503(b)(1) of the Bankruptcy Code.

F.  The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code except under the terms and conditions provided in this Order.  The Debtors are unable to obtain credit for borrowed money without the Debtors' granting to the Administrative Agent (for the ratable benefit of the Lenders) (i) Liens on various of the assets of the Debtors pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, and (ii) super-priority administrative expense claim status pursuant to section 364(c)(1) of the Bankruptcy Code, in each case as provided by this Order.

G.  The ability of the Debtors to finance their operations and the availability of sufficient working capital through the incurrence of indebtedness for borrowed money and other

financial accommodations is vital to the Debtors' ability to preserve and maintain their going
concern value.

H.    The relief requested in the Motion is necessary, essential, and appropriate for
the continued operation of the Debtors' businesses and the preservation of their estates.

I.    It is in the best interest of Debtors' estates to establish the DIP Credit Facility
contemplated by the DIP Loan Agreement and the other DIP Loan Documents.

J.    The terms and conditions of the DIP Credit Facility, as described in the
Motion and as set forth at the hearing on the Motion, including those which provide for the
payment of interest to, and fees of, the Agents and the Lenders at the times, and in the manner
provided under the DIP Credit Facility, are fair, reasonable and the best available under the
circumstances.

K.    Based on the record presented to the Court by the Debtors at the Hearings (as
defined below), the DIP Loan Agreement was negotiated in good faith and at arm's length
between the Debtors, on the one hand, and the Agents and the Lenders, on the other hand.  Credit
to be extended under the DIP Credit Facility will be so extended in good faith, in consequence of
which the Agents and the Lenders are entitled to the protection and benefits of section 364(e) of
the Bankruptcy Code.

L.    On July 22, 2002, an interim hearing (the "**Interim Hearing**") on the Motion
was held before the Court resulting in an interim order (the "**Interim Order**") entered by the
Court on July 23, 2002, authorizing, subject to a final hearing (the "**Final Hearing**" and,
together with the Interim Hearing, the "**Hearings**") on the Motion, the relief requested in the
Motion, including *inter alia* the Debtors' right to borrow, pursuant to the terms of the DIP Loan

Agreement, up to $750,000,000 with a sublimit of $250,000,000 with respect to letters of credit pending the Final Hearing.

M. Pursuant to the terms of the Interim Order, notice of the Final Hearing and the relief requested in the Motion was given to (i) the United States Trustee for the Southern District of New York (the "**U.S. Trustee**"); (ii) Shearman & Sterling, counsel to the Agents (on behalf of themselves and the Lenders), 599 Lexington Avenue, New York, New York 10022, Attn: Douglas P. Bartner, Esq. and Marc B. Hankin, Esq.; (iii) counsel to the Creditors' Committee; (iv) the Debtors' fifty (50) largest unsecured creditors; (v) O'Melveny & Myers LLP, Citigroup Center, 153 East 53rd Street, New York, New York 10022-4611, Attention: Bob White, Esq.; (vi) Paul, Weiss, Rifkind, Wharton & Garrison, 1285 Avenue of the Americas, New York, New York, 10019-6064, Attention: Allan W. Kornberg; (vii) Kasowitz, Benson, Torres & Friedman LLP, 1633 Broadway New York, New York 10019, Attention: David S. Rosner, Esq.; (viii) all applicable state and local taxing authorities; (ix) parties who have filed, as of July 30, 2002, a request for service of notices in the Cases; and (x) any secured parties as shown on any UCC searches conducted as of the Petition Date. Such notice constitutes good and sufficient notice of the Final Hearing under the circumstances in accordance with Bankruptcy Rules 4001(b), 4001(c) and 4001(d) and section 102(1) of the Bankruptcy Code, as required by sections 363(c), 363(e) and 364(c) of the Bankruptcy Code.

N. Based upon the record presented to the Court by the Debtors at the Hearings, good and sufficient cause has been shown for the entry of this Order. Among other things, the entry of this Order: (i) will enable the Debtors to continue the operation of their business and avoid immediate and irreparable harm to the Debtors' estates; (ii) will permit the Debtors to meet payroll and other operating expenses; (iii) will enable the Debtors to obtain needed supplies and

to pay employees; and (iv) is in the best interests of the Debtors, their creditors, and their estates. The financing arrangement authorized hereunder is vital to avoid immediate and irreparable harm to the Debtors' estates. In view of the foregoing, the Debtor's obtaining the DIP Financing is a prerequisite to the Debtors' ability to confirm and consummate a plan or plans of reorganization. Consummation of such financing therefore is in the best interests of the Debtors' estates.

NOW, THEREFORE, based upon the Motion and the record before the Court with respect to the Motion made by the Debtors at the Final Hearing, and good cause appearing,

IT IS ORDERED that:

## APPROVAL OF AND AUTHORIZATION AS TO BORROWING

1. The Debtors are authorized (and to the extent previously authorized in the Interim Order, such authorization hereby is reaffirmed as set forth herein) to:

(a) establish the DIP Credit Facility;

(b) execute and deliver to the Agents each of the DIP Loan Documents to which any Debtor is a party;

(c) with respect to the Borrower, borrow up to $1,100,000,000 under the DIP Credit Facility with a sublimit of $250,000,000 with respect to letters of credit; and

(d) make the non-refundable payments to the Agents or the Lenders, as the case may be, of the fees provided for in the DIP Loan Documents in accordance with the DIP Loan Documents (including, but not limited to, the separate fee letter dated July 21, 2002, among the Borrower, Citicorp USA, Inc., Salomon Smith Barney Inc., JP Morgan Chase

Bank, J.P. Morgan Securities Inc., and General Electric Capital Corporation (the "**Fee
Letter**")).

2.    The Debtors are hereby authorized and empowered (and to the extent
previously authorized in the Interim Order, such authorization hereby is reaffirmed as set forth
herein) to do and perform all acts and to make, execute and deliver all instruments and
documents which may be required or necessary for the performance by the Debtors under the
DIP Loan Documents and the creation and perfection of the Liens described in and provided for
by the DIP Loan Documents.  The Debtors are further authorized and empowered, without
further approval of the Court, to execute and deliver one or more amendments to the DIP Loan
Agreement that:  (i) add additional financial institutions as Lenders, (ii) reallocate the
commitments for the DIP Credit Facility among the Lenders, (iii) do not shorten the maturity of
the extension of credit thereunder, (iv) do not increase either the fees, commitments or the rate of
interest payable thereunder, or (v) are not both material and adverse to the Debtors.  The Debtors
shall provide ten (10) calendar days' prior written notice of any amendment entered into pursuant
to this Paragraph 2 to each statutory committee appointed in the Cases (each a "**Committee**")
and the U.S. Trustee.

3.    The Debtors are hereby authorized (and to the extent previously authorized in
the Interim Order, such authorization hereby is reaffirmed as set forth herein) to grant to the
Administrative Agent (for the ratable benefit of the Lenders) and the Administrative Agent is
hereby granted (and to the extent granted in the Interim Order, such grant hereby is continued as
provided herein), for the ratable benefit of the Lenders, pursuant to sections 364(c)(2) and (c)(3)
of the Bankruptcy Code, valid, binding, enforceable and perfected security interests in, and Liens

upon, all collateral security (the "**DIP Collateral**") to be provided pursuant to the DIP Loan

Documents to secure all of the Obligations, including, without limitation,

> all stock of the Borrower and Guarantors and their respective present and future
> subsidiaries (except that with respect to any present or future foreign subsidiaries of the
> Borrower or Guarantors, the DIP Collateral shall not include more than 65% of all voting
> stock of such subsidiaries; and except that if, as a result of any subsequent change in U.S.
> tax laws, the pledge of any additional shares of such subsidiaries would not result in an
> imbalance in the aggregate consolidated tax liabilities of the Borrower and Guarantors,
> then all such additional shares of stock shall be so pledged), all debt of the Borrower and
> Guarantors and such other property and interests, real and personal, tangible and
> intangible, whether now owned or hereafter acquired, of the Debtors including, without
> limitation, all inventory, accounts, deposit accounts, instruments, letter-of-credit rights,
> general intangibles, investment property, chattel paper, goods, furniture, fixtures,
> equipment, intellectual property, books and records, cash (respectively, if and as defined
> in the Uniform Commercial Code), and rights to payment, including payments under
> insurance, any indemnity, warranty or guaranty and tort claims, now owned or in which
> the Debtors have any interest or hereafter acquired or in which the Debtors obtain an
> interest; all real property owned by the Debtors or in which the Debtors have an interest
> and the proceeds thereof (in each case without regard to whether acquired prior or
> subsequent to the Petition Date).

Notwithstanding the foregoing, the DIP Collateral shall not include the Debtors' claims and

causes of action under sections 502(d), 544, 545, 547, 548, 549, 550 or 551 of the Bankruptcy

Code, or any avoidance action under the Bankruptcy Code (collectively, the "**Avoidance**

**Actions**"), but shall include any proceeds or property recovered, unencumbered, or otherwise the

subject of successful Avoidance Actions (collectively, the "**Avoidance Proceeds**"). The

Administrative Agent shall not, however, seek recovery from Avoidance Proceeds unless after

reasonable attempts to have the outstanding Obligations repaid from the DIP Collateral, any

Obligations remain unpaid; *provided, however*, that Avoidance Proceeds shall be held in a

segregated account and shall not be distributed to other creditors of the Debtors until all

Obligations have indefeasibly been paid in cash in full.

> 4.    Subject to the Carve-Out, the Liens granted to the Administrative Agent (for

the ratable benefit of the Lenders), as provided in Paragraph 3 above, are (a) first priority Liens

created pursuant to section 364(c)(2) of the Bankruptcy Code on all property of any of the Debtors' estates that was not subject to valid and perfected liens on the Petition Date, and (b) Liens created pursuant to section 364(c)(3) of the Bankruptcy Code on all property of any of the Debtors' estates that, on the Petition Date, was subject to a valid and perfected lien on or becomes subject to a valid lien perfected (but not granted) after the Petition Date to the extent such post-Petition Date perfection in respect of pre-petition claims is expressly permitted under the Bankruptcy Code (the "**Permitted Prior Liens**"). In addition, the Liens granted to the Administrative Agent (for the ratable benefit of the Lenders) are senior to all liens arising after the Petition Date (including, without limitation, any Liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors) other than Permitted Liens (as defined in the DIP Loan Agreement). Notwithstanding any provision of this Order or the DIP Loan Documents, the Liens granted to the Administrative Agent (for the ratable benefit of the Lenders) (i) shall not, subject to Section 9-404 of the Uniform Commercial Code and applicable non-bankruptcy law, affect any valid rights of setoff and/or recoupment that arose or may arise after the Petition Date and prior to the first day on which the Administrative Agent is entitled to exercise its rights and remedies under the DIP Loan Documents after an Enforcement Notice (as defined below) is given in accordance with this Order (the "**Remedies Entitlement Date**"), and (ii) notwithstanding Section 9-404 of the Uniform Commercial Code and applicable non-bankruptcy law, shall be expressly subject and subordinate to any valid rights of setoff and/or recoupment that arose prior to the Petition Date or that arise on or after the Remedies Entitlement Date.

5. The automatic stay imposed under section 362(a)(4) of the Bankruptcy Code is hereby lifted to permit (i) the Debtors to grant the Liens and to perform the Debtors'

obligations to the Agents and the Lenders under the DIP Credit Facility, and (ii) the delivery by the Administrative Agent of an Enforcement Notice (as defined below) and the exercise of remedies by the Administrative Agent following an Event of Default (as defined in the DIP Loan Agreement) in accordance with Paragraph 20 below.

(a) Except as otherwise agreed in writing between the Debtors and the Administrative Agent, the Debtors shall use Advances (as defined in the DIP Loan Agreement), or proceeds of any DIP Collateral only as provided in the DIP Loan Documents and in accordance with the DIP Budget (as defined in the DIP Loan Agreement) subject to Budget Variance Reports (as defined in the DIP Loan Agreement). For purposes of this Order, "proceeds" of any collateral shall mean proceeds (as defined in the Uniform Commercial Code) of such collateral as well as (i) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Debtors from time to time with respect to any of such collateral, (ii) any and all payments (in any form whatsoever) made or due and payable to the Debtors in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of such collateral by any governmental body, authority, bureau or agency (or any person under color of governmental authority), and (iii) any other payments, dividends, interest or other distributions on or in respect of any of such collateral.

(b) The Debtors shall not be permitted to make any payments on any prepetition debt prior to the effective date of a plan of reorganization, except as provided in the First Day Orders (as defined in the DIP Loan Agreement), or as otherwise provided in the DIP Loan Agreement or to provide adequate protection or cure to any third party.

11

6.   In addition to the Liens granted herein, the Obligations under the DIP Credit Facility shall be an allowed administrative expense claim with priority, subject only to the Carve-Out, under section 364(c)(1) of the Bankruptcy Code and otherwise, over all administrative expense claims and unsecured claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), and 1114 of the Bankruptcy Code (the "**Super-Priority Claim**").

7.   All amounts applied to the payment of the Obligations under the DIP Credit Facility shall be applied thereto in the manner set forth in the DIP Loan Documents.

8.   (a)   This Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of (i) the Administrative Agent's Liens (for the ratable benefit of the Lenders) upon the DIP Collateral to secure all Obligations without the necessity of filing or recording any financing statement, mortgage or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the Liens of the Administrative Agent upon the DIP Collateral, or to entitle the Administrative Agent and the Lenders to the priority granted herein (including, in respect of cash, any requirement that the Administrative Agent or a Lender have possession of, or dominion and control over, any such cash in order to perfect an interest therein); *provided,* that the Debtors may execute and the Administrative Agent may file or record financing statements, mortgages or other instruments to evidence and to perfect the Liens authorized hereby; and *provided, further,* that no such filing or recordation shall be necessary or required in order to create or perfect any such Lien, and (ii) the Junior Liens (as defined below) upon the DIP Collateral to secure all Junior Reimbursement Claims and Contribution Rights (each as defined below) without the

necessity of filing or recording any financing statement, mortgage, or other instrument or

document which may otherwise be required under the law of any jurisdiction or the taking of any

other action to validate or perfect the Junior Liens, or to entitle the holder of a Junior Lien to the

priority granted herein (including, in respect of cash, any requirement that the holder of a Junior

Lien have possession of, or dominion and control over, any such cash in order to perfect an

interest therein).  This Order shall be sufficient and conclusive evidence of the validity of

Intercompany Loans (as defined below), Junior Reimbursement Claims, and Contribution

Rights.

(b) The Debtors (i) hereby are authorized and directed to pay all reasonable costs,

fees and out of pocket expenses of the Agents, including reasonable costs, fees and expenses

incurred in connection with the negotiation, documentation and administration of the DIP Credit

Facility and the matters set forth in this Order and all other matters arising in or in connection

with the Cases, and all reasonable attorneys' fees and expenses and reasonable financial

advisors' fees and expenses incurred by the Agents in connection therewith, and (ii) shall

promptly reimburse the Agents for such other reasonable costs and expenses provided for in

section 10.04 of the DIP Loan Agreement, including, without limitation, the reasonable costs and

expenses incurred in connection with any predecessor transaction contemplated to have been

entered into with the Agents.  The Agents shall provide copies of any invoices in respect of any

such costs and expenses to each Committee; *provided*, the invoices of the Agents' primary

counsel submitted after the date of this Order shall include a list of attorneys and

paraprofessionals who worked on the matter, their respective hourly rates, and the number of

hours that each such professional or paraprofessional worked during the applicable time period.

None of the costs and expenses payable pursuant to this Paragraph 8 shall be subject to the

approval of the Court, and no recipient of any such payment shall be required to file with respect

thereto any interim or final fee application with this Court.

      9.   Each officer of the Debtors as may be so authorized by the Board of Directors

of each of the Debtors, acting singly, is hereby authorized (and to the extent previously

authorized in the Interim Order, such authorization hereby is reaffirmed as set forth herein) to

execute and deliver each of the DIP Loan Documents, such execution and delivery to be

conclusive of their respective authority to act in the name of and on behalf of the Debtors.

      10. The Administrative Agent may file a xerographic copy of this Order as a

mortgage, financing statement or similar perfection document with any recording officer

designated to file financing statements or with any registry of deeds or similar office in any

jurisdiction in which the Debtors have real or personal property.

      11. Pursuant to sections 105(a) and 1146(c) of the Bankruptcy Code, the granting

of security over real property owned by the Debtors, and the making or delivery by any Debtor

of any mortgage or security instrument in connection therewith, is exempt from any and all

stamp taxes, transfer taxes or similar taxes.

      12. The DIP Loan Agreement and each of the DIP Loan Documents, respectively,

shall constitute and evidence the valid and binding Obligations of each of the Debtors, which

Obligations shall be enforceable against each of the Debtors in accordance with their terms and

the terms of this Order.

      13. Interest on the Obligations under the DIP Credit Facility shall accrue at the

rates (including applicable default rates) and shall be paid at the times as provided in the DIP

Loan Documents. All Obligations under the DIP Credit Facility shall become due and payable, without notice or demand, on the Termination Date.

14. Except for the Carve-Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 330 and 331 of the Bankruptcy Code that have been or may be incurred in these Cases, and no priority claims to the DIP Collateral are, or will be, prior to or on a parity with the Obligations under the DIP Credit Facility or the Super-Priority Claim.

15. (a)  The term **"Carve-Out"** means (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code, and (ii) an amount not exceeding $12,500,000 in the aggregate, which amount may be used after the occurrence and during the continuance of an Event of Default, to pay fees or expenses first incurred after an Event of Default by the Borrower, any Guarantor, or any Committee in respect of (A) allowances of compensation for services rendered or reimbursement or expenses awarded by the Court to the Borrower's, any Guarantor's, or any Committee's professionals, any chapter 11 or chapter 7 trustees or examiners appointed in these Cases, and (B) the reimbursement of expenses incurred by Committee members in the performance of their duties that are allowed by the Court; *provided*, *however*, that the Borrower and each Guarantor shall be permitted to pay compensation and reimbursement of expenses allowed and payable under sections 330 and 331 of the Bankruptcy Code or the Order Pursuant to Sections 105(a) and 331 of the Bankruptcy Code Establishing Procedures for Interim Monthly Compensation and Reimbursement of Expenses of Professionals, dated July 22, 2002, and the Carve-Out shall not be reduced by the amount of any compensation and reimbursement of expenses paid or incurred (to the extent ultimately allowed by the Court) prior to the occurrence

of an Event of Default in respect of which the Carve-Out is invoked or any fees, expenses, indemnities or other amounts paid to the Administrative Agent or the Lenders and their respective attorneys and agents under the DIP Loan Documents or otherwise; *provided, further,* that, in the event of the conversion of any of these Cases to chapter 7, then a maximum of up to $1,000,000 of the Carve-Out may be used to satisfy the fees or expenses of any chapter 7 trustee appointed (the **"Chapter 7 Carve-Out"**) and upon such a conversion the Chapter 7 Carve-Out shall be reserved for payment of the fees and expenses of a chapter 7 trustee; *provided*, that to the extent the full amount of the Chapter 7 Carve-Out is not used, the remainder of such amount shall be reallocated to the Carve-Out and used in accordance with the terms of this Order; and *provided, further,* that nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement or compensation described in clauses (A) or (B) above.

(b) Notwithstanding anything herein to the contrary, no Advances or any proceeds of DIP Collateral may be used by any Committee for or in connection with any assertion or prosecution of claims or causes of action against any Agent or any Lender in their capacity, as applicable, as an Agent or a Lender, including, without limitation, any objection to, the contesting in any manner of, or the raising of any defenses to, the validity, perfection, priority or enforceability of the Obligations under the DIP Credit Facility or the Administrative Agent's Liens upon the DIP Collateral.

(c) So long as no Event of Default shall have occurred and be continuing under the DIP Loan Agreement, the Debtors shall be permitted to pay administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code incurred in the ordinary course of business of the Debtors, subject to the maximum amounts for such type of expenditures

contained in the DIP Budget (subject to Budget Variance Reports) in the aggregate and the limitations set forth in Paragraph 14(b) above, as the same may be due and payable.

16. The Debtors agree that no cost or expense which is incurred by the Debtors in connection with or on account of the preservation or disposition of any DIP Collateral or which otherwise could be chargeable to the Agents or the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise, shall be chargeable to the Agents or the DIP Collateral, except for the Carve-Out.

17. Without limiting the provisions and protections of Paragraph 16 above, if at any time prior to (i) the indefeasible repayment in full in cash of all Obligations under the DIP Credit Facility, and (ii) the termination of the Commitments, any Debtor or any trustee subsequently appointed shall obtain credit or incur debt pursuant to section 364(b), 364(c) or 364(d) of the Bankruptcy Code and outside of the applicable Debtor's ordinary course of business, then, except as permitted or contemplated by the DIP Loan Agreement, all of the consideration for such credit or debt shall immediately be applied to the indefeasible payment in full in cash of the Obligations under the DIP Credit Facility (including cash collateralization of outstanding Letters of Credit) in accordance with the DIP Loan Documents.

18. All Obligations of the Debtors to the Agent and the Lenders under the DIP Credit Facility are due and payable, without notice and demand, upon the earliest to occur of (the "**Termination Date**"):

(a) the date of termination in whole of the Commitments pursuant to section 2.05 or section 6.01 of the DIP Loan Agreement; or

(b)  two years after the date of the Initial Extension of Credit (as defined in the DIP Loan Agreement); or

(c)  the effective date of any plan of reorganization for any of the Borrower or a Material Guarantor (as defined in the DIP Loan Agreement); or

(d)  upon the occurrence of an Event of Default (as defined in the DIP Loan Agreement) (including, but not limited to, the dismissal of any of the cases of the Borrower or a Material Guarantor, or an order of this Court shall be entered reversing, amending, supplementing, staying for a period in excess of 10 days, vacating or otherwise modifying in a manner that is adverse to the Lenders either of the DIP Financing Orders (as defined in the DIP Loan Agreement)), subject in each case to the actions described in Paragraph 20 below.

Unless and until the Obligations (other than contingent indemnification obligations) under the DIP Credit Facility are unconditionally and indefeasibly repaid in full in cash, the protections afforded to the Agents under the DIP Loan Documents and hereunder, and any actions taken pursuant thereto and hereto, and the Carve-Out (as to pre-conversion or pre-effective date services), shall survive the entry of any order confirming a plan of reorganization, converting any of these Cases to chapter 7 of the Bankruptcy Code or dismissing any of these Cases, and the Liens of the Administrative Agent upon the DIP Collateral and the Super-Priority Claim shall continue in these Cases, or upon conversion of any of these Cases to chapter 7, and such Liens of the Administrative Agent and the Super-Priority Claim shall maintain their priority as provided by this Order until the Obligations (other than contingent indemnification obligations) under the DIP Credit Facility have been repaid indefeasibly in full in cash.  Notwithstanding the foregoing,

the Super-Priority Claim against a particular Debtor shall not survive, as to such Debtor, an order

dismissing such Debtor's Case or the conversion of such Debtor's Case to chapter 7.

19. The time and manner of payment of the Obligations pursuant to the DIP

Credit Facility, the Liens upon the DIP Collateral and the Super-Priority Claim shall not be

altered or impaired by any plan of reorganization which hereafter may be confirmed or by any

further order which hereafter may be entered without the consent of the Agents and the Lenders.

## REMEDIES UPON AN EVENT OF DEFAULT

20. Upon the occurrence of an Event of Default and at any time thereafter during

the continuance thereof, with five (5) business days' prior written notice (an "**Enforcement**

**Notice**") of any such occurrence, in each case given to the Borrower and the Debtors' counsel,

counsel to each Committee, and the U.S. Trustee, the Administrative Agent, at the request or

with the consent of the Required Lenders (as defined in the DIP Loan Agreement), shall be

entitled to exercise the Administrative Agent's rights and remedies as set forth in the DIP Loan

Documents. Such Enforcement Notice shall also be filed with the Court. Immediately upon

receipt of such notice, the Debtors shall have no right to use any cash collateral or any other

proceeds of the DIP Collateral other than towards the satisfaction of the Obligations due to the

Agents and the Lenders under the DIP Credit Facility, the Carve-Out and the items set forth in

the DIP Budget. In any hearing after the giving of the Enforcement Notice, the only issues that

may be raised by any party in opposition thereto shall be whether, in fact, (i) an Event of Default

has occurred and is continuing or (ii) such Event of Default is primarily due to, or primarily

arises from, the willful misconduct of the Agents or the Lenders; *provided, further,* that, subject

to the foregoing, the Debtors hereby waive their right to seek relief including, without limitation,

under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or

restrict the rights and remedies of the Administrative Agent set forth in this Order or the DIP

Loan Documents.  Except as provided in Paragraph 3 with respect to Avoidance Proceeds, in no

event shall the Administrative Agent be subject to the equitable doctrine of "marshaling" or any

similar doctrine with respect to the DIP Collateral.  In addition, immediately following the

occurrence and during the continuance of any Event of Default:

> (a)  the Debtors shall continue to deliver and cause the delivery of the proceeds of
> DIP Collateral to the Administrative Agent, as provided in the DIP Loan Documents;

> (b)  the Administrative Agent shall continue to apply such proceeds in accordance
> with the provisions of the DIP Loan Agreement and in accordance with this Order; and

> (c)  subject to the giving of an Enforcement Notice and upon the request or
> consent of the Required Lenders, any obligation otherwise imposed on the Agents or the
> Lenders to provide any loan or advance pursuant to the DIP Credit Facility shall be
> terminated.

21. Nothing included herein shall prejudice, impair, or otherwise affect the rights

of the Agents or the Lenders to seek any other or supplemental relief in respect of the Debtors

consistent with and subject to the provisions of this Order, including the Agents' or the Lenders'

rights, as provided in the DIP Loan Agreement, during the continuance of a Default or an Event

of Default, to seek to limit the Debtors' use of cash collateral, or to suspend or terminate the

making of Advances under the DIP Loan Agreement.

## MISCELLANEOUS DIP CREDIT FACILITY PROVISIONS

22. If any provision of this Order is hereafter modified, vacated or stayed by

subsequent order of this or any other Court for any reason, such modification, vacation, or stay

shall not affect the validity of any liability incurred pursuant to this Order and prior to the later of
(a) the effective date of such modification, vacation, or stay, or (b) the entry of the order pursuant
to which such modification, vacation, or stay was established, nor the validity, priority, or
enforceability of any Lien granted by the Debtors to the Administrative Agent.

23. The Liens and Super-Priority Claim granted to the Administrative Agent
under the DIP Loan Documents and this Order, and the priority thereof, and any payments made
pursuant thereto, shall be binding (subject to the terms of this Order) on the Debtors and any
successor trustee for the Debtors to the fullest extent permitted by applicable law.

24. Any Agent's or any Lender's failure to seek relief or otherwise exercise its
rights and remedies under the DIP Credit Facility or this Order shall not constitute a waiver of
any of the Agents' or any Lender's rights hereunder, thereunder, or otherwise.

25. In the event of any inconsistency between the terms and conditions of (i) any
DIP Loan Document, the Cash Management Order, or any order of this Court entered prior to or
on the date hereof, and (ii) this Order, the provisions of this Order shall govern and control.

## JUNIOR REIMBURSEMENT CLAIMS AND JUNIOR LIENS

26. As adequate protection for each Debtor for the continued use of the
Centralized Cash Management System to the extent that any Debtor transfers property (including
cash) following the Petition Date (the "**Adequately Protected Debtor**") to or for the benefit of
any other Debtor (the "**Beneficiary Debtor**"), with an aggregate fair value in excess of the
aggregate fair value of property (including cash) or benefit received by the Adequately Protected
Debtor from the Beneficiary Debtor following the Petition Date, then the following shall apply:

21

(a) the Adequately Protected Debtor shall have (i) an allowed claim against the Beneficiary Debtor equal to the amount by which the fair value of property (including cash) or benefit transferred (net of any reasonable expenses for overhead or other services reasonably allocated or reasonably charged to the Adequately Protected Debtor), or repayment of such Beneficiary Debtor's Obligation under the DIP Credit Facility exceeds the aggregate fair value of property (including cash), benefit received, or repayment of such Adequately Protected Debtors' Obligation under the DIP Credit Facility, under sections 364(c)(1) and 507(b) of the Bankruptcy Code, having priority over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, which claim shall bear interest at LIBOR plus 350 basis points calculated as of each month end accruing from and after the date such claim arises until repayment thereof (collectively, the "**Junior Reimbursement Claim**"); (ii) a joint and several right of contribution (a **"Contribution Right"**) against every Debtor other than the Beneficiary Debtor (collectively, the **"Contributing Debtors"**) in an amount equal to the applicable Junior Reimbursement Claim to the extent that such claim is not paid in full and the applicable Junior Lien is insufficient to satisfy such claim; and (iii) a lien on all property of the Beneficiary Debtor's and the Contributing Debtors' estate(s) under section 364(c)(3) of the Bankruptcy Code securing such Junior Reimbursement Claim and Contribution Rights, as applicable ("**Junior Lien**");

(b) all Junior Reimbursement Claims, Junior Liens, and Contribution Rights shall be junior, subject and subordinate only to the Carve-Out, the Super-Priority Claim and the Liens granted to the Administrative Agent (for the ratable benefit of the Lenders), and

22

to any claims against such Beneficiary Debtor that are expressly senior to, or carved out from, such claims of the Administrative Agent and the Lenders;

(c)  unless and until (i) the Obligations under the DIP Credit Facility have been unconditionally and indefeasibly repaid in full in cash, (ii) all commitments of the Lenders under the DIP Loan Documents have terminated, and (iii) all obligations under any subsequent debtor in possession financing approved by the Court have been unconditionally and indefeasibly repaid in full in cash and all commitments under such facility have been terminated, the Adequately Protected Debtor shall forbear from exercising, and shall not be entitled to exercise, any right or remedy relating to a Junior Lien, Junior Reimbursement Claim or Contribution Right including, without limitation, seeking relief from the automatic stay, or seeking any sale, foreclosure, realization upon or repossession or liquidation of any property of another Debtor, or taking any position with respect to any disposition of the property, the business operations, or the reorganization of another Debtor;

(d)  prior to the satisfaction of the conditions set forth in clauses (i) and (ii) of subparagraph (c) above, the Administrative Agent shall have the exclusive right to manage, perform and enforce all such rights and remedies described in subparagraph (c) and under the DIP Loan Documents, and the Adequately Protected Debtor shall immediately, upon the request of the Administrative Agent, release or otherwise terminate its Junior Lien, to the extent that the property subject to such Junior Lien is sold or otherwise disposed of by the Administrative Agent or the other Debtors, in the case of each of subparagraphs (b) and (c) above, this subparagraph, or the DIP Loan Documents; and

(e) with respect to effect of Junior Liens on any sale of property by the Debtors,

(i) the Debtors may sell property, in accordance with section 363 of the Bankruptcy

Code, free and clear of any Junior Lien with such lien attaching to the proceeds of sale in

the same priority as existed in respect of the property sold, (ii) the provisions of section

363(k) of the Bankruptcy Code shall not apply, and (iii) except as provided in

Paragraph 3 with respect to Avoidance Proceeds, in no event shall the Administrative

Agent be subject to the doctrine of "marshaling" or similar equitable doctrine.

## NON-DEBTOR INTERCOMPANY CLAIMS

27. To the extent that any Debtor transfers property (including cash) following the

Petition Date to or for the benefit of any non-Debtor affiliate, with an aggregate fair value in

excess of the aggregate fair value of property (including cash) or benefit received by the

transferring Debtor from such non-debtor affiliate, the transferring Debtor shall be deemed to

have made an intercompany loan to such non-debtor affiliate in the principal amount equal to the

net fair value of property (including cash) or benefit transferred (net of any reasonable expenses

for overhead or other services allocated or charged to the transferring Debtor) following the

Petition Date (an "**Intercompany Loan**"). Each Intercompany Loan shall accrue interest at

LIBOR plus 350 basis points calculated as of each month end accruing from and after the date

such claim arises until repayment thereof. Each Intercompany Loan shall be evidenced by a

book entry as a debt obligation payable by such non-Debtor affiliate. The Debtors shall inform

the Creditors' Committee of the Debtors' methodology in determining the allocation of expenses

among the Debtors as reflected in postpetition intercompany month-end balances. To the extent

the Creditors' Committee or any member of the Creditors' Committee objects to such

methodology, such party may file such objection with the Court; *provided*, that such party shall

file such objection under seal, unless the Court orders otherwise. The Debtors agree, without

waiving any arguments, defenses, or claims that they may have in response to such objection

(other than as set forth in this Paragraph 27), that the Court shall have jurisdiction to hear and

determine such objection. As further adequate protection for each Debtor for the continued use

of the Debtors' Centralized Cash Management System, the Debtors acknowledge that they will

not request any modification to section 5.02(h) of the DIP Loan Agreement that would make

such section less restrictive without the prior written consent of the Creditors' Committee, which

consent shall not be unreasonably withheld; *provided,* that the provisions of section 5.02(h) of

the DIP Loan Agreement shall survive the termination of the DIP Credit Facility and the Debtors

will not take any action counter to such provisions without the prior written consent of the

Creditors' Committee; *provided, further,* that this Paragraph 27 shall not impose any obligations

or duties on the Administrative Agent or the Lenders, and shall not impair or affect the rights or

remedies of the Administrative Agent or the Lenders under the DIP Loan Documents or this

Order.

## REPORTING REQUIREMENTS

28. As additional adequate protection for each Debtor for the continued use of the

Debtors' Centralized Cash Management System, and as a condition thereof:  (a) the Debtors

shall keep a detailed accounting recording all intercompany transfers of property (including cash)

and intercompany benefit conferred, and reflecting all Junior Reimbursement Claims (including

interest thereon); (b) the Debtors shall provide details and summary information regarding

(i) cash disbursements of the Debtors, and (ii) the use of any borrowings or letter of credit

issuances under the DIP Credit Facility, on a confidential basis to the Administrative Agent and

the Creditors' Committee; (c) the Debtors shall provide a monthly report within forty-five (45)

days after the last day of the prior calendar month on a confidential basis to the Creditors'

Committee (*provided* that the first report required hereunder shall be for the month of November

2002) setting forth (i) postpetition intercompany month-end balances, reflecting outstanding

Junior Reimbursement Claims and Contribution Rights of each Debtor against each other Debtor

and the amount of outstanding Intercompany Loans by each Debtor to each non-Debtor affiliate;

and (d) the Debtors shall provide the Creditors' Committee with notice and copies of any

waivers or other modifications received or requested in respect of the DIP Credit Facility as soon

as practicable (but in no event later than two business days) thereafter.

29. Junior Reimbursement Claims, Contribution Rights, and Intercompany Loans

shall not be subject to recoupment or setoff on account of any debt of a Debtor arising prior to

the Petition Date.

30. Nothing in this Order shall prevent any party in interest from seeking an

adjustment or modification of the adequate protection for Junior Reimbursement Claims granted

herein.

31. Notwithstanding any provision of this Order and the rights granted in this

Order, the rights, arguments, claims, and defenses of all parties with respect to any issues

regarding distributions, inter-estate conflict, or prepetition inter-estate claims are expressly

reserved; *provided*, that this Paragraph 31 shall not impair or affect the rights or remedies of the

Administrative Agent or the Lenders under the DIP Loan Documents or this Order.

32. Nothing in this Order shall affect the rights of a surety in the proceeds of bonded projects under applicable non-bankruptcy law.

33. Nothing in this Order shall affect the right of any utility company or telecommunications vendor to seek a modification of or additional adequate assurance pursuant to that certain order dated August 14, 2002, as amended from time to time.

34. This Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon execution hereof.

Dated:  New York, New York
        October 15, 2002

                              s/Arthur J. Gonzalez
                              HONORABLE ARTHUR J. GONZALEZ
                              UNITED STATES BANKRUPTCY JUDGE

Andrew I. Silfen (AS-1264)
Schuyler G. Carroll (SC-0100)
Maria A. Bove (MB-8687)
OLSHAN GRUNDMAN FROME ROSENZWEIG & WOLOSKY LLP
505 Park Avenue
New York, New York
(212) 753-7200

Attorneys for the Official Committee of Unsecured Creditors

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

In re:

FutureLink Corp., a Delaware corporation,
FutureLink Micro Visions Corp., a Delaware
corporation, FutureLink Async Corp., a Delaware
corporation, FutureLink Pleasanton Corp., a
Delaware corporation, FutureLink Madison Corp.,
a Delaware corporation, FutureLink VSI Corp., a
Maryland corporation,

    Debtors and Debtors-in-possession.

-----------------------------------------------------------x

Chapter 11

Case Nos. 01-14543 (BRL)
  through 01-14548 (BRL)
(Jointly Administered)

### FIFTH INTERIM STIPULATED ORDER AUTHORIZING DEBTORS: (A) TO USE CASH COLLATERAL; (B) TO GRANT ADEQUATE PROTECTION AND PROVIDE SECURITY; AND (C) TO PAY-OFF AND SATISFY THE CLAIMS OF FOOTHILL CAPITAL CORPORATION

       FutureLink Madison Corp., a Delaware corporation, FutureLink Corp., a

Delaware corporation, FutureLink Micro Visions Corp., a Delaware corporation, FutureLink

Async Corp., a Delaware corporation, FutureLink Pleasanton Corp., a Delaware corporation,

FutureLink VSI Corp., a Maryland corporation, debtors and debtors in possession herein

(collectively, the "Debtors") having filed with this Court their petitions for relief under chapter

11 of the Bankruptcy Code (the "Code") on August 14, 2001; and having filed an emergency

motion, dated August 14, 2001 (the "Motion"), seeking, inter alia: (a) authorizing the Debtors to

obtain interim and final use of Cash Collateral of Foothill Capital Corporation ("Foothill") and

Pequot Private Equity Fund II, L.P. ("Pequot"); (b) providing adequate protection; (c) scheduling

interim and final hearings and prescribing form and manner of notice thereof; and (d) granting

related relief.

The Debtors having requested in the Motion, pursuant to Rule 4001(b) of the

Federal Rules of Bankruptcy Procedure (the "Rules"), that the Court consider the proposed

interim use of cash collateral requested in the Motion; and pursuant to Rule 4001(b) and the local

rules of this Court, it appearing that all necessary notice of this interim hearing (the "Interim

Hearing") on the Motion was duly provided; and upon the record of the Interim Hearings on the

Motion held before the Court on August 20, 2001, August 22, 2001, September 24, 2001,

October 2, 2001, October 4, 2001, November 1, 2001 and November 13, 2001; and the Court

having noted the appearances of all parties in interest; and all objections to the relief requested in

the Motion, as evidenced by this stipulation and order (the "Fifth Interim Cash Collateral Order")

having been resolved or overruled by the Court; and it appearing that the relief requested in the

Motion is in the best interests of the Debtors and its creditors and is essential to maximize the

value of the Debtors' assets in an orderly liquidation; and due deliberation having been had; and

sufficient cause appearing therefor;

THE COURT HEREBY FINDS THAT:

A.      Capitalized terms used in this Fifth Interim Cash Collateral Order and not

otherwise defined herein have the meanings ascribed to them in the Pre-Petition Credit

Agreement (as defined below).

B.      Notice of the Interim Hearing on the Motion has been given in accordance with

the provisions of Rules 4001(b), 9006 and 9014. This is a core proceeding as defined in 28

17306995\V-2

U.S.C. §§ 157(b)(2)(A), (D), (G), (K), (M), and (O).

C.    On August 14, 2001 (the "Petition Date"), the Debtors filed their voluntary petitions for chapter 11 reorganization with the United States Bankruptcy Court for the Southern District of New York (the "Court").

D.    Debtors have continued in the management and possession of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Code.

E.    Pursuant to that certain Loan and Security Agreement (as amended, modified, and supplemented from time to time, the "Pre-Petition Credit Agreement"), dated as of November 16, 2000, among the Debtors and Foothill, Foothill provided certain loans and other financial accommodations to the Debtors.

F.    Foothill asserts that it terminated the obligations of Foothill to extend credit under the Pre-Petition Credit Agreement as a result of the occurrence of numerous Events of Default. Foothill has represented that, as of the Petition Date, the Debtors were indebted to Foothill for all of the Debtors' Obligations and Indebtedness (collectively, the "Pre-Petition Obligations") arising under the Pre-Petition Credit Agreement and related documents (collectively, the "Loan Documents") in the aggregate amount of approximately $4,585,972 (including principal and accrued interest, unpaid fees, costs, and expenses, and the dollar amount of issued and outstanding letters of credit). Foothill represents that the Foothill Indebtedness (as defined herein) is as set forth in the amounts set forth in Exhibit 1 delivered hereto.

G.    Pursuant to the Loan Documents, and as more fully described therein, the Debtors granted to Foothill security interests in and liens upon (the "Pre-Petition Liens") substantially all of the Debtors' property, then owned or thereafter acquired by the Debtors (as more fully described in the Pre-Petition Credit Agreement, hereinafter collectively referred to as the

17306/995.V-2

"Pre-Petition Collateral"), and all profits, income, and proceeds derived from the Pre-Petition
Collateral.

     H.     The Debtors believe that the orderly liquidation value of the Pre-Petition
Collateral exceeds the amount of outstanding Pre-Petition Obligations.

     I.     The Debtors further admit, acknowledge and stipulate that, subject to the
Committee's rights as set forth in Paragraph 26 herein, to the extent Foothill's liens are valid,
perfected, enforceable and unavoidable, all of the cash proceeds of Pre-Petition Collateral
constitute Foothill's "cash collateral" as that term is defined in section 363(a) of the Code (the
"Cash Collateral").

     J.     In April and May 2001, the Debtors raised $5 million of additional capital through
the issuance to Pequot of a bridge note (the "April Bridge Note"). The Debtors raised an
additional $300,000 through the issuance of a second bridge note in June 2001 (the "June Bridge
Note" and together with the April Bridge Note, the "Bridge Notes"). The Bridge Notes have a
maturity date of August 31, 2001 and are convertible at Pequot's option into units of senior
subordinated convertible promissory notes and warrants to purchase common stock of
FutureLink Corporation.

     K.     Pursuant to a Subordination Agreement, dated April 20, 2001, between Foothill
and Pequot (the "Pequot Subordination Agreement), Pequot agreed to subordinate its relative
rights, obligations and priorities under the Bridge Notes to the relative rights, priorities and
obligations due Foothill under the Pre-Petition Credit Agreement. Pursuant to a security
agreement, dated April 20, 2001, FutureLink Corporation's obligations to Pequot under the
Bridge Notes are secured by a pledge of stock in certain of FutureLink Corporation's subsidiaries
and all assets of FutureLink Corporation and such subsidiaries. Pequot asserts that it has

17306995\V-2

perfected its security interests in the assets of the Debtors.

L.     On August 15, 2001, this Court entered the Interim Stipulated Order Authorizing Debtors: (A) To Use Cash Collateral, and (B) To Grant Adequate Protection and Provide Security to Foothill Capital Corporation and Pequot, pursuant to which this Interim Hearing was Scheduled.

M.     On August 22, 2001 this Court entered the Second Interim Order Authorizing The Use of Cash Collateral Pursuant to Section 363(c) of the Bankruptcy Code, which was extended by the Third Interim Order Authorizing the Use of Cash Collateral Pursuant to Section 363(c) of the Bankruptcy Code, dated September 24, 2001.

N.     On October 23, 2001 this Court entered the Fourth Interim Order Authorizing The Use of Cash Collateral Pursuant to Section 363(c) of the Bankruptcy Code.

O.     Debtors have prepared a revised cash Forecast, dated November 12, 2001 (the "Revised Supplemental Budget"), a copy of which is annexed hereto to this Stipulation and Order as Exhibit "2", setting forth Debtors' actual cash receipts and disbursements for the period through October 21, 2001 and projected weekly cash receipts and disbursements for the period through December 31, 2001.

P.     The Debtors, Foothill, Pequot and Committee have reached the agreement set forth in this Fifth Interim Cash Collateral Order as to those terms and conditions applicable to the use by the Debtors of the Cash Collateral and to otherwise satisfy the claims of Foothill under the Loan Documents.

Q.     The Debtors have determined that the agreements set forth in this Fifth Interim Cash Collateral Order are necessary to permit the Debtors to maintain current operations in the short term which are necessary to ensure an orderly liquidation of their assets for the maximum

17306995\V-2

realizable value and to otherwise preserve, maintain, and maximize the value of their estates.

R.      Upon consideration of this Fifth Interim Cash Collateral Order, the Court has determined that the relief requested herein is necessary and appropriate to grant adequate protection to Pequot and to avoid immediate and irreparable harm to the Debtors and the Debtors' estates.

S.      After reviewing this Fifth Interim Cash Collateral Order, the Court has determined that the provisions hereof are in the best interests of the Debtors and the Debtors', creditors and estates.

WHEREUPON, this Court makes the following conclusions of law:

I.      Pequot, as holder of Pre-Petition Liens (to the extent such liens are valid, perfected, enforceable and unavoidable) in the Pre-Petition Collateral, is entitled to adequate protection of its interests in the Cash Collateral under sections 361, 362, 363, 364(d) and 506(b) of the Code, to protect Pequot against the diminution in the value of its interests in the Cash Collateral.

II.     The entry of this Fifth Interim Cash Collateral Order is in the best interest of the Debtors and their creditors and bankruptcy estates.

III.    Good and sufficient notice of the Interim Hearing, as continued, on the Motion, with respect to the request therein for the entry of this Fifth Interim Cash Collateral Order, has been provided in accordance with sections 102(1) and 363(c)(2) of the Code, Rules 2002 and 4001, and the local rules of the Court, and any requests for other and further notice shall be and are hereby dispensed with and waived.

IV.     The relief granted by this Court pursuant to this Fifth Interim Cash Collateral Order is necessary to maximize the value of the Debtors' assets in an orderly liquidation.

17306995\V-2

Accordingly, it is hereby stipulated and agreed by and between Foothill, Pequot, the Debtors, and the Committee and it is

ORDERED, DETERMINED AND DECREED by the Court, as follows:

1.    Limitations on Use of Cash Collateral and Pre-Petition Collateral. The Debtors shall not use, sell or expend, directly or indirectly, the Pre-Petition Collateral or the Cash Collateral without the written consent of Pequot and Committee, except upon the terms and conditions set forth in this Fifth Interim Cash Collateral Order, or as otherwise ordered by this Court. The consent of Pequot to the use of Cash Collateral pursuant to the terms and conditions of this Fifth Interim Cash Collateral Order shall not be deemed to be a consent to any further or other use of the Pre-Petition Collateral or Cash Collateral upon the termination hereof.

2.    The Debtors shall not make any expenditures not otherwise allowed or covered in the Budget without the consent of the Committee.

3.    Term. Unless extended by agreement of the parties to this Fifth Interim Cash Collateral Order, upon notice to counsel to the Official Committee of Unsecured Creditors (the "Committee"), the term of this Fifth Interim Cash Collateral Order shall expire on the date (the "Maturity Date") which is the earlier to occur of (a) 5:00 p.m. (New York time) on December 31, 2001, provided that expiration on this date is without prejudice to the Debtors' right to apply to the Bankruptcy Court for further use of cash collateral thereafter, (b) subject to paragraphs 23 and 24, the occurrence of an Event of Default hereunder, or (c) the dismissal or suspension of any of the Debtors' Chapter 11 bankruptcy cases, the conversion of any of the Debtors' Chapter 11 bankruptcy cases to a Chapter 7 case, or the appointment of a Chapter 11 trustee or examiner in any of the Debtors' Chapter 11 bankruptcy cases. The Maturity Date only terminates the

17306995.V-2

rights of the Debtors to further use of the Cash Collateral hereunder, but does not in any manner affect the validity, priority, enforceability or perfected status of any replacement lien or security interest granted to Pequot pursuant hereto.

4.    Budget.  The Debtors shall use the Cash Collateral and incur expenses strictly in accordance with the Revised Supplemental Budget.  The Debtors shall not use the Cash Collateral for any period following the period covered in the Revised Supplemental Budget as to which Pequot and Committee have agreed, or for any expense not specifically provided for in the Revised Supplemental Budget.  Notwithstanding the generality of the foregoing, and in the absence of written consent by Pequot and Committee, or further order of this Court, no portion of the Cash Collateral shall be used , directly or indirectly, inter alia: (x) to finance or make any payment or disposition that is not expressly permitted hereunder; (y) to pay any fees or similar amounts payable to any Person who has proposed or may propose to purchase interests in the Debtor (including so-called "topping fees," "break-up fees," "exit fees," and similar amounts); or (z) to fund, facilitate or pay for any investigation, research, consideration, commencement, maintenance or prosecution of any claims, rights, defenses or actions against Pequot or any Affiliate of the foregoing, including any claims, rights, defenses or actions arising from the pre-petition acts involving Pequot.

5.    [Intentionally Omitted].

6.    Post-Petition Replacement Liens.  Subject to the provisions of this Order, to the extent necessary and in an amount necessary to provide adequate protection to Pequot for the use of the Cash Collateral (to the extent Pequot's liens are valid, perfected, enforceable and unavoidable), Pequot is hereby granted a lien and security interest in and on all Pre-Petition Collateral and a replacement lien on all personal property and other assets of the Debtors' estates

17306995\V-2

of any kind or nature, wherever located, acquired post-petition, including, without limitation, inventory, accounts and deposit accounts and any and all proceeds and products of the foregoing other than claims or causes of action arising under Chapter 5 of the Bankruptcy Code or the proceeds thereof (collectively, the "Post-Petition Collateral").

7.    Perfection of Replacement Liens.  The replacement liens on and security interests in the Post-Petition Collateral granted to Pequot pursuant to paragraph 5 above shall be valid and perfected, effective immediately, without the need for the execution or filing of any further documents or instruments otherwise required to be executed or filed under applicable non-bankruptcy law.  Notwithstanding that no documents need to be executed or filed to create or perfect the replacement liens granted to Pequot, each of the Debtors, its officers and any agents acting on such Debtor's behalf, are hereby authorized and directed to execute and deliver, or cause to be executed and delivered, without further order of the Court, such further documents as Pequot may prepare or reasonably request to evidence and provide notice of the liens and security interests in the Post-Petition Collateral granted hereunder.

8.    [Intentionally Omitted].

9.    Superpriority Claim.  To the extent that any payments, liens or security interests are insufficient to adequately protect Pequot's interest from any diminution in value, Pequot shall be entitled, to the extent provided by law, to a super-priority administrative expense claim (the "Superpriority Claim") under section 507(b) of the Bankruptcy Code to the extent of such insufficiency and diminution in value with the priority in each of the Debtors' bankruptcy cases as set forth in such section 507(b) provided that any super-priority administrative expense claim granted in favor of Pequot shall not extend to claims and causes of action arising under Chapter 5 of the Bankruptcy Code and the proceeds thereof and is junior, subordinate and subject to the

17306/995\V-2

indefeasible payment in full of any super-priority administrative expense claim granted in favor of Foothill.

      10.    [Intentionally Omitted].

      11.    [Intentionally Omitted].

      12.    Value of Collateral. The Debtors believe that the orderly liquidation value of the Pre-Petition Collateral exceeds the amount of outstanding Pre-Petition Obligations, provided, such acknowledgment shall be without prejudice to the right of Pequot or the Committee to: (a) assert that Pequot'ss interest in the Pre-Petition Collateral lacks adequate protection, or (b) seek a different valuation of the Pre-Petition Collateral.

      13.    Limited Authorization. The Debtors shall be authorized to use the Pre-Petition Collateral and the Cash Collateral in accordance with this Fifth Interim Cash Collateral Order, subject to (a) the Court's entry of this Fifth Interim Cash Collateral Order, and (b) the Debtors' continued adequate protection of the interests of Pequot in the Cash Collateral in accordance with terms and conditions of this Fifth Interim Cash Collateral Order, and (c) the absence of any Event of Default hereunder. The Debtor shall (a) on or before November 18, 2001 surrender possession and occupancy of all leased properties (other than (i) Lake Forest, California and (ii) Beltsville, Maryland, and (b) on or before November 15, 2001 terminate all of the Debtors' employees other than those employees set forth on the record in open court with respect to this Order.

      14.    Reporting. The Debtors shall provide to each of Pequot and the Committee during the term hereof, all information required to be provided by the Debtors pursuant to the terms of the Loan Documents, in accordance with the time-frames specified therein, including but not limited to:

17306995:V-2

(a)    On a daily basis, a schedule reflecting (i) all cash received by the Debtors, which reflects the amount received, the payee, the customer number and the invoice to which it was applied and (ii) all checks written, and all disbursements actually made by the Debtors with respect to each line item in the Budget;

(b)    On or before the 15th of each month, commencing on November 1, 2001, the Debtors' proposed monthly operating report required to be filed with the Court;

(c)    Such additional information as Pequot or the Committee shall reasonably request from the Debtors.

15.    <u>Cash Management and Application of Proceeds</u>. The Debtors are authorized but not obligated: (i) to continue the existing Cash Management Agreements, as set forth in the Loan Documents and, consistent with the Loan Documents, establish and maintain all of its existing disbursement accounts (the "Bank Accounts"), with payroll withholding to be deposited directly into a separate payroll disbursement account; (ii) except as otherwise provided herein, to deposit or cause to be deposited, or to remit, in kind, immediately to the Blocked Account (as defined in the Loan Agreement) at Wells Fargo Bank N.A. ("Wells"), all monies, checks and any other payments or proceeds of the Pre-Petition Collateral, including, without limitation, the proceeds from the sale or other disposition of Debtors' assets, including the sale of the stock or assets of Debtors' British subsidiaries (the "British Foreign Asset Proceeds") and Canadian subsidiaries (the "Canadian Foreign Asset Proceeds", together with the "British Foreign Asset Proceeds", collectively, the "Foreign Asset Proceeds") and Post-Petition Collateral; and (iii) to exercise its reasonable best efforts to collect all proceeds of the Pre-Petition Collateral and Post-Petition Collateral.  Upon payment to Foothill of the Foothill Indebtedness (as hereinafter defined) any obligations of Foothill under the existing lockbox account, subject to an accounting, shall be terminated and Foothill shall have no liability with respect to any items or costs and expenses

17306995/V-2

incurred in connection with the lockbox account. The Debtors are hereby authorized to execute

such documents as may be necessary to effectuate Foothill's termination and release of all

obligations and liabilities with respect to the lockbox account.

16.     Modification of Automatic Stay. The automatic stay imposed by section 362 of

the Code shall be deemed modified solely to the extent necessary to implement and effectuate

the terms and conditions of this Fifth Interim Cash Collateral Order, and to the extent authorized

in paragraphs 21 through 23 herein.

17.     Reservation of Rights. Subject to the Debtors' acknowledgments herein, nothing

contained in this Fifth Interim Cash Collateral Order shall prejudice or limit the rights of Pequot

to seek at any future time adequate protection pursuant to sections 361, 362, 363 or 364 of the

Code, any relief from the automatic stay imposed by section 362 of the Code or otherwise, or

any other relief available to Pequot under the Loan Documents or applicable law. If the Debtors

fail to comply with any term and/or condition of this Fifth Interim Cash Collateral Order, the

required written consent of Pequot and the Committee to the continued use by the Debtors of the

Cash Collateral in accordance with the terms and conditions of this Fifth Interim Cash Collateral

Order shall not constitute a waiver by Pequot, Committee or the Debtors of any of their rights, or

prevent or prejudice the Debtors or Pequot from filing any motions or commencing any

adversary proceedings or taking any other actions concerning the Debtors' use of the Cash

Collateral.

18.     Validity. If any or all of the provisions of this Fifth Interim Cash Collateral Order

are hereafter reversed, modified, vacated or stayed by subsequent order of this Court or by any

other court, such reversal, modification, vacatur or stay shall not affect the validity of any

obligations of the Debtors to Foothill or to Pequot that are or were incurred by the Debtors

17306995 V-2

pursuant to this Fifth Interim Cash Collateral Order and that are or were incurred prior to the effective date of such reversal, modification, vacatur or stay, and shall not affect the validity and enforceability of any security interest, lien or priority authorized, created, affirmed or granted herein. Notwithstanding such reversal, modification, vacatur or stay, any obligations of the Debtors under this Fifth Interim Cash Collateral Order and the Loan Documents arising prior to the effective date of such reversal, modification, vacatur or stay shall be governed in all respects by the provisions of this Fifth Interim Cash Collateral Order and the Loan Documents.

19.    [Intentionally Omitted].

20.    Limited Waiver of Right to Surcharge Collateral. In consideration for the professional fees funded from the Budget, during the term of this Fifth Interim Cash Collateral Order, (a) nothing contained in this Fifth Interim Cash Collateral Order shall be deemed a consent by Foothill or Pequot to any Lien, charge, assessment or claim against the Pre-petition Collateral or the Post-Petition Collateral under Section 506(c) of the Bankruptcy Code or otherwise, (b) (i) no costs or expenses of administration that have been or may be incurred in these proceedings, or upon conversion of these proceedings pursuant to Section 1112 of the Bankruptcy Code, or in any other proceeding related thereto shall have priority over the Superpriority Claim granted to Foothill or Pequot, and (ii) no Liens (other than prior and valid senior Liens existing on the petition date to the extent such liens are prior, valid and enforceable) or priority claims are or will be prior to or on a parity with the Liens or claims of Foothill (to the extent such liens are valid and enforceable) against the Debtors, the Debtors' estate, any representative of any of the Debtors' estate, or with respect to the Pre-Petition Collateral and Post-Petition Collateral; and (c) no cost or expense of administration shall be imposed against Foothill or Pequot, their claims, or the Pre-Petition Collateral and Post-Petition Collateral

17306995\V-2

pursuant to Section 506(c) of the Bankruptcy Code or otherwise by, on behalf of, or with respect
to, any Person, professional, or entity.

21.    Acknowledgment of Claim. Each Debtor on behalf of itself and its estate, and any
successor representative of such Debtor's estate hereby agrees, without further Court order, to
the allowance of the claims of Foothill pursuant to Sections 502 and 506 of the Bankruptcy Code
on account of the Pre-Petition Obligations, as fully secured claims in the amount due Foothill
and according to Foothill's books and records (a) as of the Petition Date, the amount of which is
not less than $4,585,972, plus any other fees, costs, and expenses (subject only to verification as
to the amount calculated) and (b) as of the date hereof, as set forth in Exhibit 1 attached hereto.

22.    Events of Default. Each of the following shall constitute an event of default
("Event of Default") under this Fifth Interim Cash Collateral Order:

(a)    Improper Use of Cash Collateral. The Debtors shall fail to use the
Cash Collateral strictly in accordance with the Budget (subject to
the requirements of paragraph 3 hereof);

(b)    Reporting. The Debtors shall have failed to deliver to Foothill or
Pequot any of the documents, reports, financial statements, or
certificates required to be provided pursuant to paragraph 13
hereof;

(c)    Conversion. The entry of an order by the Court converting any of
the Debtors' bankruptcy cases to a case under chapter 7 of the
Bankruptcy Code;

(d)    Dismissal. The entry of an order by the Court dismissing any of
the Debtors' bankruptcy cases pursuant to sections 1112(b) or 305
of the Code or otherwise;

(e)    Appointment of Trustee. The entry of an order by the Court
authorizing the election of a trustee pursuant to section 1104 of the
Code or otherwise, or an examiner or other responsible person with
expanded powers, in any of the Debtors' bankruptcy cases;

(f)    Compliance with this Order. Any of the Debtors' failure to comply

with any provision of this Fifth Interim Cash Collateral Order; or

(g)    Disposal of Assets. Debtors have failed by December 15, 2001, to complete the sale or other disposition of their furniture, inventory, machinery, computers, equipment and other personality and Debtors' interests in their British and Canadian subsidiaries and the return to landlords of all leased real property interests and the surrender of possession thereof.

23.    Hearing to Determine Adequate Protection and Debtors' Right to Continued Use of Cash Collateral. At the conclusion of the third business day following fax or hand-delivery notice by Pequot of the occurrence of an Event of Default under subsections (a), (b), or (f) of paragraph 21 above (the "Notice Period"), which notice shall be provided to Debtors' counsel, the Committee's counsel and the United States Trustee, the consent of Pequot, as the case may be, to the Debtors' continued use of Cash Collateral shall be deemed immediately withdrawn and the Debtors shall not be permitted to use the Cash Collateral except upon the written consent of Pequot, as the case may be, or further order of the Court. A hearing (the "Default Hearing") shall be held on an emergency basis for sole purpose of determining whether any of the Debtors are in default of the terms of this Fifth Interim Cash Collateral Order. If the Court finds that any of the Debtors are in default, and that determination is not stayed by the Court, any rights granted to the Debtors hereunder to use the Cash Collateral shall be terminated and deemed vacated immediately as of the date of such finding or determination. If the Court finds that the Debtors are not in default, then any rights granted to the Debtors hereunder to use Cash Collateral shall remain enforceable subject to the terms hereof.

24.    Termination of Debtor's Right to Use Cash Collateral. Upon the occurrence of an Event of Default under subsections (c) through (e) of paragraph 21 above, any rights granted to the Debtors hereunder to use the Cash Collateral shall immediately be terminated, expired and

17306995:V-2

deemed vacated without the necessity of providing notice to any party in interest.

     25.    <u>Professional Fee Carve-Out</u>. Pequot's security interests in and liens upon any of

the Collateral and super-priority administrative claims shall be subordinate <u>only</u> to (i) the fees

and expenses of the Clerk of this Court and the Office of the United States Trustee pursuant to 28

U.S.C. § 1930(a); (ii) the amount of any outstanding and unpaid fees of the professionals (the

"Professionals") retained by the Debtors and the Committee pursuant to orders of this Court

pursuant to Sections 327 and 1103 of the Bankruptcy Code, which fees and expenses have been

awarded or allowed by order of this Court in accordance with Sections 326, 330 and 331 of the

Bankruptcy Code, (a) in an amount not to exceed $550,000 (the "Debtors Professional Fee

Carve-Out") and (b) in an amount not to exceed $275,000, subject to the limitations set forth

herein (the "Committee's Professional Fee Carve-Out", together with the Debtors' Professional

Fee Carve-Out, collectively, the "Professional Fee Carve-Out"), (iii) the amount of any

outstanding Retention Bonuses, as authorized by this Court pursuant to an Order, dated

September 24, 2001, in an amount not to exceed $300,000 (the "Retention Bonus Carve-Out"),

and (iv) the amount of any wages and out-of-pocket expenses that have accrued and remain

unpaid as of the Maturity Date in an amount not to exceed $105,000 (the "Employee Wage

Carve-Out"), subject to the terms and conditions set forth below.  Notwithstanding anything to

the contrary herein, the Committee's Professional Fee Carve-Out shall be paid as follows: (y) the

Pre-Petition Collateral and the Post-Petition Collateral, exclusive of the Canadian Assets, shall

be subject to a maximum carve-out for the Committee in the amount of $200,000, and (z) the

Canadian Assets shall be subject to a maximum additional carve-out in the amount of $75,000

which sum shall be allocated and earmarked for counsel for the Committee and such amounts

shall be held in escrow and reserved until paid to the Committee Professional as provided herein

17306995\V-2

("Canadian Carve Out Amount"). Canadian Assets shall mean and include the assets located in

or related to Canada, including obligations owing to the Debtors and their Canadian subsidiaries

and Debtors' equity interests in the Canadian subsidiaries. The Employee Wage Carve-Out, and

Pequot's liability therefore, shall be funded within thirty (30) days of the Maturity Date, unless

extended pursuant to paragraph 2 of this Order. The Professional Fee Carve-Out and the

Retention Bonus Carve-Out, and Foothill's and Pequot's liability therefor, shall be funded by

Foothill and/or Pequot upon the earlier of the conclusion of the liquidation of the assets and, if

necessary, properties of the Debtors or sixty (60) days after the Maturity Date, unless such

Maturity Date is extended pursuant to paragraph 2 of this Order, or otherwise paid in accordance

with orders of this Court in accordance with the Budget. Foothill and/or Pequot shall only be

obligated to disburse to Debtors, in trust for the Professionals and employees specified in the

Retention Bonus Program (the "Specified Employees"), the proceeds of the Professional Fee

Carve-Out and the Retention Bonus Carve-Out in the event there are insufficient proceeds

available to pay the allowed professional fees and the Retention Bonuses, and provided that

Pequot, shall only be obligated to fund the respective carve-outs from proceeds of Collateral. All

fees, expenses and claims paid to the Professionals and the Specified Employees post-petition by

Debtors (excluding the application of any pre-petition retainers) shall be applied to and reduce

the available Professional Fee Carve-Out and the Retention Bonus Carve-Out. All prepetition

retainers of any Professional shall be applied first before the Professional Fee Carve-Out is

utilized to pay such Professionals' fees. Furthermore, the Professional Fee Carve-Out cannot be

used for the payment or reimbursement of any fees or disbursements of Debtors or the

Committee incurred in connection with the assertion or joinder in any claim, counter-claim,

action, proceeding, application, motion, objection, defense or other contested matter, the purpose

17306995\V-2

of which is to seek any order, judgment, determination or similar relief: (i) invalidating, setting aside, avoiding, subordinating, in whole or in part, the Obligations or the liens and security interests in any of the Collateral granted in favor of Foothill; or (ii) preventing, hindering or delaying Pequot's assertion or enforcement of its liens or realization upon any Collateral (other than pursuant to paragraph 22 of this Order). Other than with respect to the Professional Fee Carve-Out and the Retention Bonus Carve-Out as aforesaid, Foothill shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professionals or the retention bonuses of any employees or officers of Debtors incurred in connection with these Chapter 11 cases or any succeeding cases under the Bankruptcy Code and nothing in this paragraph shall be construed to obligate Foothill in any way, to pay compensation or expense reimbursement to Professionals or Specified Employees or to assure that the Debtors have sufficient funds on hand to pay such compensation or expense reimbursement. Notwithstanding anything to the contrary, Foothill, its claims and its collateral shall not be subject to any carve-out provided for herein.

26.    Committee's Investigation Period. The amount, extent, validity, perfection, priority and enforceability of (i) the pre-petition obligations due Pequot or the pre-petition claims of Pequot against the Debtors and (ii) the pre-petition liens and security interests in the pre-petition collateral granted in favor of Pequot, are for all purposes subject only to the rights of the Committee for a period, commencing on October 24, 2001, of sixty (60) days (the "Investigation Period"), to file a complaint pursuant to Bankruptcy Rule 7001 or commence a contested matter, seeking to invalidate, vacate, subordinate, set aside, disallow or otherwise challenge or contest the amount, validity, enforceability, perfection or priority of the pre-petition debt due Pequot and/or Pequot's pre-petition liens upon the security interests in the pre-petition collateral granted in favor of Pequot or otherwise asserting any claims or causes of action against Pequot on behalf

17306995\V-2

of the Debtors' estates. If such complaint(s) or contested matter(s) is not timely filed within the

Investigation Period, (a) the pre-petition obligations due Pequot and Pequot's security interests in

and liens upon the Pre-Petition Collateral shall be recognized and allowable as valid, binding, in

full force and effect, not subject to any claims, counterclaims, setoff or defenses, perfected and

senior to all other liens upon and claims against the Pre-Petition Collateral with respect to all

parties in this case, except for the senior liens of Foothill and other senior liens in existence on

the Petition Date (to the extent such liens are valid, perfected, enforceable and non-avoidable),

(b) Pequot and its and their respective agents, officers, directors and employees shall be deemed

released and discharged from all claims and causes of action arising out of the Loan Documents

entered into with Debtors prior to the entry of this Fifth Interim Cash Collateral Order, (c) the

pre-petition obligations due Pequot and Pequot's security interests in and liens upon the Pre-

Petition Collateral shall be recognized and allowable as valid, binding, in full force and effect,

not subject to any claims, counterclaims, setoff or defenses, perfected and senior to all other liens

upon and claims against the Pre-Petition Collateral with respect to all parties in this case, except

for the senior liens of Pequot and other senior liens in existence on the Petition Date (to the

extent such liens are valid, perfected, enforceable and non-avoidable), (d) Pequot and its and

their respective agents, officers, directors and employees shall be deemed released and

discharged from all claims and causes of action arising out of the Loan Documents entered into

with Debtors prior to the entry of this Fifth Interim Cash Collateral Order. The Committee is

hereby authorized to commence an adversary proceeding, within the Investigation Period,

pursuant to the provisions of this paragraph on behalf of the Debtors' estates without further

order of this court.

     27.    Notwithstanding anything to the contrary contained herein or in any other order

entered in the within Chapter 11 case, upon entry of this Order, the Debtors shall remit to

Foothill, in full satisfaction of Foothill's claims against the Debtors, payment of the remaining

unpaid balance of the Pre-Petition Obligations plus any unpaid obligations incurred after the

Petition Date (the "Post-Petition Obligations") including fees, costs and expenses as provided for

in the Loan Documents (the Pre-Petition Obligations and the Post-Petition Obligations

collectively the "Foothill Indebtedness"). Until the full satisfaction of the Foothill Indebtedness

has occurred, the terms of the Fourth Interim Cash Collateral Order, as it pertains to the rights

and obligations of Foothill and Pequot shall control. The Debtors are authorized to use proceeds

of Pre-Petition Collateral and/or Post-Petition Collateral, including, without limitation, the

Foreign Asset Proceeds, and proceeds in any other accounts maintained by the Debtors or their

agents, whether maintained as escrow accounts or otherwise, but excluding Trust Fund Accounts

and Reserve Claims Fund, to pay the Foothill Indebtedness. The Debtors, the Committee,

Foothill and Pequot, and their respective agents, are authorized and directed to take such steps

and execute such documents as necessary to effectuate the terms and provisions hereof. Upon

receipt of payment of the Foothill Indebtedness by Foothill, the Debtors, their estates, and the

Committee, on one hand, and Foothill, on the other hand, shall each be released from any and all

claims and causes of action, whether arising prior to or subsequent to the Petition Date and

whether related to the transactions set forth in the Loan Documents or otherwise. Such releases

shall be binding on the parties successors, agents and assigns, including any Chapter 7 trustee of

the Debtors' estate that may hereinafter be appointed.

      28.     Within two business days of receiving payment of the Foothill Indebtedness,

Foothill shall pay to Olshan Grundman, Frome, Rosenzweig & Wolosky, LLP, as escrow agent

and counsel for the Committee, the sum of $300,000 dollars (the "Unsecured Creditors

17306995\V-2

Payment"), on behalf of and in trust and benefit for the Debtors' unsecured creditors. The Unsecured Creditors Payment shall be held in trust, subject to the right of Pequot to asserts that such funds represent property of the estate and/or payments of the Professional Fee Carve-Out, and shall not be distributed absent further order of this Court. Notwithstanding the release provided in paragraph 26 of this Order, the Committee shall have twenty (10) days after delivery of invoices for legal services of Foothill's counsel within which to review the fees, costs, and expenses of Foothill's counsel to the extent that such fees are included in and constitute part of the Foothill Indebtedness. In the event the Committee objects to the inclusion of such costs, fees and expenses in the Foothill Indebtedness, the Committee shall follow the procedures for asserting objections, applicable under the Administrative Order Establishing Procedures For Interim Compensation And Reimbursement Of Expenses Of Professionals, entered on October 31, 2001. Except as specifically provided for herein, upon payment of the Unsecured Creditors Payment, Foothill's release shall be full and final, without exception. The Unsecured Creditors Payment shall be distributed to the Debtors' unsecured creditors only upon further order of this Court or under a confirmed plan of liquidation in these proceedings.

29.    Binding Effect.  Upon approval by the Court, the terms and provisions of this Fifth Interim Cash Collateral Order shall be binding upon each of the Debtors and such Debtor's successors and assigns, as well as any trustee appointed in any of the Debtors' bankruptcy cases, in any superseding case or in any case related hereto, and shall inure to the benefit of Foothill, Pequot and the Debtors until all obligations of the Debtors to Foothill under the Loan Documents, Pequot under the Bridge Notes and this Fifth Interim Cash Collateral Order are satisfied in full.

30.    Notices.  All written notices in connection with this Fifth Interim Cash Collateral

17306905:V-2

Order shall be delivered by hand delivery, facsimile or overnight courier as follows:

If to Foothill:

Foothill Capital Corporation
2450 Colorado Avenue
Suite 3000 West
Santa Monica, California  90404
Attention:  John Nocita

with copies to:

Otterbourg, Steindler, Houston & Rosen, P.C.
230 Park Avenue
New York, New York 10169
Attention: Andrew M. Kramer, Esq.
         Stanley L. Lane, Jr., Esq.

If to the Debtors:

FutureLink Corp.
2 South Point Drive
Lake Forest, California 92630
Attention:  Jay Davis, Esq.

with copies to:

Sonnenschein, Nath & Rosenthal
1221 Avenue of the Americas
New York, New York 10020
Attention:  Peter D. Wolfson, Esq.
         Richard G. Downing II, Esq.

If to the Committee:

Olshan, Grundman, Frome, Rosenzweig
   & Wolosky LLP
505 Park Avenue
New York, New York 10022
Attention:  Andrew I. Silfen, Esq.

If to Pequot:

Dewey, Ballantine LLP
1301 Avenue of the Americas
New York, New York 10019
Attention: Stuart Hirshfield, Esq.

31.    Inspection of Debtors' Records and Operations.  The Debtors shall upon twenty-four (24) hours' prior written notice, or (i) upon shorter notice as required by the terms of the Pre-Petition Credit Agreement following the occurrence of an Event of Default hereunder, provide Foothill and Pequot, their respective attorneys, accountants, employees and agents with access to the Debtors' premises during the Debtors' normal business hours for the purpose of examining and inspecting Debtors' detailed books and records (including all relevant supporting documentation) and observation of the Debtors' operations.

32.    Headings.  The headings used within this Fifth Interim Cash Collateral Order are for the convenience of reference only, do not constitute a part hereof, and shall not affect the meaning or construction of any provision hereof.

33.    Execution.  This Fifth Interim Cash Collateral Order may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same document.

34.    Rule 4001 Requirements.  In accordance with Rule 4001, the Court finds that the Debtors' authorization to use Cash Collateral pursuant to this Fifth Interim Cash Collateral Order is necessary to avoid immediate and irreparable harm to the Debtors' estate pending the Final Hearing.  Within two (2) business days of the entry hereof, the Debtors shall serve a copy of this Fifth Interim Cash Collateral Order on each party entitled to receive notice pursuant to Rule 4001(b)(1), including the U.S. Trustee, by first class mail, postage prepaid.

35.    Hearing. This Fifth Interim Cash Collateral Order shall constitute a further

interim order for the use of Cash Collateral under Rule 4001(b) of the Bankruptcy Rules. The

Final Hearing on the continued use of Cash Collateral shall be held before the undersigned on

January 8, 2001 at 10:00 a.m. (the "Final Hearing"). Oppositions to approval of the Motion on a

final basis shall be filed and served so that such oppositions are received by the Debtors, Pequot

and the Committee, and their respective counsel, and filed with the Court, no later than 1:00 p.m.

on January 3, 2001. Debtors, Pequot and the Committee shall file and serve any replies in

support of the Motion so that such replies are received by parties opposing the Motion and filed

with the Court no later than 1:00 p.m. on January 7, 2001.


Dated:  New York, New York
        November 13, 2001

                                    _/s/Burton R. Lifland_____
                                    The Honorable Burton R. Lifland
                                    United States Bankruptcy Judge


Agreed and so Stipulated:

SONNENSCHEIN, NATH & ROSENTHAL

By: ___/s/Peter D. Wolfson_____
        Peter D. Wolfson
        Attorneys for the Debtors and Debtors in Possession


OTTERBOURG, STEINDLER, HOUSTON & ROSEN, P.C.

By: _/s/Andrew M. Kramer___by SAS_____
        Andrew M. Kramer
        Counsel for Secured Creditor, Foothill Capital Corporation

DEWEY BALLANTINE LLP

By: _/s/Stuart Hirshfield_____ by EK w/permission___
      Stuart Hirshfield
      Attorneys for Pequot Private Equity Fund II, L.P.

OLSHAN, GRUNDMAN, FROME,
ROSENZWEIG & WOLOSKY, LLP

By: __/s/Andrew Silfen_____
      Andrew Silfen
      Counsel for the Official Committee
      of Unsecured Creditors

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------- x

In Re:                                    :          Case Nos. **99-10578 through**
                                                     **99-10607 and 99-10613**
THE SINGER COMPANY N.V., et al.,          :          **through 99-10629 (BRL)**
                                                     Chapter 11
          Debtors                         :          (Jointly Administered)

---------------------------------------- x

FINAL ORDER (I)
AUTHORIZING POST-PETITION SECURED SUPER-PRIORITY FINANCING
PURSUANT TO SECTIONS 364(C)(1), 364(C)(2) AND 364(C)(3) OF THE
BANKRUPTCY CODE, (II) GRANTING RELIEF FROM THE AUTOMATIC STAY
PURSUANT TO SECTION 362(D) OF THE BANKRUPTCY CODE AND (III) SETTING
FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001

THIS MATTER having come before the Court upon the Motion (the "**Motion**")
of The Singer Company, N.V. ("**Singer**") and certain of its affiliates, all as debtors and debtors
in possession (collectively, the "**Debtors**"), seeking entry of an order:

(a)      authorizing the Debtors to obtain credit and incur debt secured by liens (as
defined in Section 101 (37) of Title 11, U.S.C., as amended (the "**Bankruptcy Code**"), and
referred to herein as "**Liens**") on property of the Debtors' estates pursuant to Sections 364(c)(2)
and 364(c)(3) of the Bankruptcy Code and with priority, as to administrative expenses, as
provided in Section 364(c)(1) of the Bankruptcy Code,

(b)      authorizing the Debtors to establish that certain financing arrangement
(the "**DIP Credit Facility**") with The Bank of Nova Scotia (the "**Bank**"), which is contemplated
by a Note (the "**DIP Loan Agreement**" and, collectively with all agreements, instruments and
documents as may be executed and delivered in connection therewith or which relate thereto, the
"**DIP Loan Documents**"), substantially in the form annexed to the Motion, and incur the
obligations (including without limitation the obligations to pay principal, interest, fees, costs,
charges and expenses) and liabilities as provided for in the DIP Loan Documents (the "**DIP
Obligations**"),

(c)      authorizing the Debtors to provide the Bank with Liens upon the Debtors'
property as provided in and as contemplated by the DIP Loan Documents and this Order,

(d)      authorizing the Debtors to grant to the Bank a Super-Priority Claim (as
hereinafter defined), and

(e)      granting to the Bank relief from the automatic stay under Section 362(d)
of the Bankruptcy Code so as to permit the Bank to set off against a portion of the cash collateral

held by the Bank in Toronto, Canada (the "**Cash Collateral**") and apply the same against the outstanding Foreign Subsidiary Debt Obligations and the Singer Guaranty (each as hereinafter defined).

It appearing that absent the relief requested herein, the Debtors will suffer immediate and irreparable harm; and it further appearing that notice of the Motion is sufficient and complies with the requirements of Bankruptcy Rules 4001 (c) and 4001 (d); and for good cause shown;

## IT HEREBY APPEARS THAT:

A.    On September 12 and 13, 1999 (collectively, the "**Commencement Date**"), each of the Debtors filed a voluntary petition under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§101 et seq.

B.    The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this case. An official committee of unsecured creditors (an "**Official Creditors' Committee**") has been formed. On or about September 23, 1999 this Court entered that certain Interim Order (I) authorizing Post-Petition Secured Super-Priority Financing Pursuant to Sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code, (II) Granting Relief from the Automatic Stay Pursuant to Section 362(d) of the Bankruptcy Code and (III) Setting Final Hearing Pursuant to Bankruptcy Rule 4001 (the "**Interim Order**").

C.    This Court has jurisdiction, pursuant to 28 U.S.C. §§157(b) and 1334, over these proceedings, and over the persons and property affected hereby.

D.    An immediate need exists for the Debtors to obtain funds with which to continue their operations, and administer and preserve the value of their estates. The ability of the Debtors to finance their operations requires the additional availability of financing, the absence of which would immediately and irreparably harm the Debtors, their estates, and their creditors and the possibility for a successful reorganization.

E.    The Debtors are unable to obtain unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense.

F.    The Debtors are also unable to obtain secured credit, allowable only under Sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, except under the terms and conditions provided in this Order. The Debtors are unable to obtain credit for borrowed money without the Debtors' granting to the Bank (i) Liens on various of the assets of the Debtors pursuant to Sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and (ii) a super-priority administrative expense claim status pursuant to Sections 364(c)(1) of the Bankruptcy Code and as provided by this Order.

G.    The ability of the Debtors to finance their operations and the availability of sufficient financing through the incurrence of indebtedness for borrowed money and other financial accommodations is vital to the Debtors' ability to preserve and maintain their going concern value and their ability to consummate a successful reorganization.

-2-

H.      The relief requested in the Motion is necessary, essential, and appropriate for the continued operation of the Debtors' business and the management and preservation of their property.

I.      It is in the best interest of Debtors' estates to be allowed to establish the DIP Credit Facility contemplated by the DIP Loan Documents.

J.      The terms and conditions of the DIP Credit Facility, including without limitation those which provide for the payment of interest to, and fees and expenses of, the Bank at the times, and in the manner provided under the DIP Credit Facility, are fair, reasonable, and the best available under the circumstances.

K.      The DIP Loan Documents were negotiated in good faith and at arms length between the Debtors, on the one hand, and the Bank. Credit to be extended under the DIP Credit Facility will be so extended in good faith, in consequence of which the Bank is entitled to the protection and benefits of Section 364(e) of the Bankruptcy Code.

L.      As of the Commencement Date, Singer and certain of its subsidiaries and the Bank are parties to that certain Credit Agreement dated October 30, 1998 (as amended, the **"Pre-Petition Credit Agreement"**). As of the Commencement Date, the aggregate amount due and owing to the Bank under the Pre-Petition Credit Agreement was approximately U.S.$64,205,156, plus interest, fees, costs, charges and expenses.

M.      The Debtors' liabilities under the Pre-Petition Credit Agreement are secured as follows (the **"Pre-Petition Credit Agreement Collateral"**):

aa.     Pursuant to, among other things, that certain (a) Trademark Security Agreement dated as of October 30, 1998 between Singer and the Bank and (b) Trademark Security Agreement dated as of October 30, 1998 between the Singer Company Limited and the Bank (collectively, as amended, the **"Trademark Security Agreements"**), the Bank was granted a first priority Lien upon the Trademarks (as defined in the Trademark Security Agreements).

bb.     Pursuant to that certain Share Charge dated as of February 10, 1999 (the **"Share Charge"**), between The Singer Sewing Machine Company Ltd. and the Bank, the Bank was granted a first priority Lien (the **"Pre-Petition Bangladeshi Lien"**) upon the Bangladeshi Shares (as hereinafter defined).

cc.     Pursuant to the Pre-Petition Credit Agreement, the Bank was granted a first priority Lien upon the Cash Collateral.

dd.     Pursuant to that certain Share Pledge Agreement dated November 5, 1998 (the **"Share Pledge Agreement"**) between ROSEG Household Products GMBH, Luchtmolen GMBH, Singer and the Bank, the Bank was granted a first priority Lien upon the shares and other collateral described therein.

N.      As of the Commencement Date, the Bank and/or certain of its subsidiaries and Pfaff Canada Corporation, Singer Sewing Machine Company of Canada Limited, Singer GMBH, and the Singer Hong Kong, Singer Guyana, Singer Jamaica, Singer St. Lucia, Singer

-3-

Taiwan and Singer Trinidad branches of the Singer Sewing Machine Company Ltd. (Bermuda) (collectively, the **"Foreign Subsidiaries"**) were parties to various notes, loan agreements, credit agreements and/or other similar documents (as amended, collectively, the "**Foreign Subsidiary Debt Agreements**"). Pursuant to certain Guarantee(s) executed by Singer (collectively, as amended, the "**Singer Guaranty**"), Singer guaranteed the obligations (the "**Foreign Subsidiary Debt Obligations**") of the Foreign Subsidiaries under the Foreign Subsidiary Debt Agreements. As of the Commencement Date, the aggregate amount due and owing to the Bank under the Foreign Subsidiary Debt Agreements was approximately U.S. $21,000,000 plus interest, fees, costs, charges and expenses. The Foreign Subsidiary Debt Agreements, the Singer Guaranty, the Pre-Petition Credit Agreement, the Trademark Security Agreements, the Share Charge, the Share Pledge Agreement and all agreements, instruments and documents (including without limitation collateral agreements and documents) entered into in connection therewith are hereinafter referred to as the "**Pre-Petition Agreements**".

O.    Pursuant to the Pre-Petition Credit Agreement and the Trademark Security Agreements, the obligations of Singer under the Singer Guaranty are secured by a first priority Lien upon the Cash Collateral and the Trademarks. The collateral described in this Paragraph O and in Paragraph M, above, is hereinafter referred to as the "**Pre-Petition Collateral**." The Lien on the Trademarks described in this Paragraph O and Paragraph M, above, are hereinafter further referred to collectively as the "**Pre-Petition Trademark Lien**."

P.    The Debtors have acknowledged and agreed that (i) the Bank has a valid, perfected, first priority and unavoidable Lien in such of the Debtors' properties and assets which constitute Pre-Petition Collateral, (ii) the Debtors have no offsets, subordination rights, defenses, claims or counterclaims against the Bank with respect to the Pre-Petition Claim (as hereinafter defined), (iii) as of the Commencement Date, the Bank's pre-petition claim is an allowed secured claim within the meaning of Section 506 of the Bankruptcy Code in an aggregate amount that is not less than U.S.$64,205,156, plus the amounts outstanding under the Foreign Subsidiary Debt Agreements, and all interest, fees, costs, charges and expenses (including without limitation any of the same incurred or accruing on or after the Commencement Date) (the "**Pre-Petition Claim**"), and (iv) the Debtors have waived and released any right they may have to challenge, object to or assert any claim or cause of action against the Bank with respect to the validity, sufficiency, priority, extent, perfection or any other aspect whatsoever of the Pre-Petition Claim, the Bank's Lien on the Pre-Petition Collateral, or the Bank's pre-Commencement Date relationship with the Debtors (or any of them). Nothing contained in this Paragraph shall, however, be deemed to limit the rights of an Official Creditors' Committee under Paragraph 7, below, of this Order.

Q.    The Debtors have represented that one or more of the Debtors owns directly (and not through any subsidiary, affiliate or other person or entity) all right, title (other than, as to certain of the following, legal title) and interest in and to the following assets (the "**Foreign Subsidiary Shares**"), free and clear of any and all Liens whatsoever (except, in the case of the Bangladesh Shares, for the Pre-Petition Bangladeshi Lien):

aa.    Shares of capital stock, partnership interests or other ownership interests or rights (collectively, "**Ownership Interests**") representing 80% of the aggregate Ownership Interests of Singer Bangladesh Limited, an entity organized under the laws of Bangladesh (the "**Bangladeshi Shares**").

bb.      Ownership Interests representing 99.99% of the aggregate
Ownership Interests of Singer A.E.E. Home Appliances, an entity organized
under the laws of Greece.

cc.      Ownership Interests representing 99.85% of the aggregate
Ownership Interests of Singer Mexicana S.A. de C.V., an entity organized under
the laws of Mexico.

dd.      Ownership Interests representing 99.99% of the aggregate
Ownership Interests of Singer Maroc S.A., an entity organized under the laws of
Morocco.

ee.      Ownership Interests representing 70.07% of the aggregate
Ownership Interests of Singer Pakistan Ltd., an entity organized under the laws of
Pakistan.

ff.      Ownership Interests representing 99.9% of the aggregate
Ownership Interests of Singer Industries Philippines Inc., an entity organized
under the laws of the Philippines.

gg.      Ownership Interests representing 100% of the aggregate
Ownership Interests of Singer Europa S.G.P. S., S.A., an entity organized under
the laws of Portugal.

hh.      Ownership Interests representing 83.5% of the aggregate Owner-
ship Interests of Singer Industries (Ceylon) Ltd., an entity organized under the
laws of Sri Lanka.

ii.      Ownership Interests representing 81% of the aggregate Ownership
Interests of Singer (Sri Lanka) Ltd., an entity organized under the laws of Sri
Lanka.

jj.      Ownership Interests representing 49.5% of the aggregate Owner-
ship Interests of Singer Regnis (Lanka) Limited, an entity organized under the
laws of Sri Lanka.

kk.      Ownership Interests representing 48% of the aggregate Ownership
Interests of Singer Thailand Public Company (PCL), an entity organized under the
laws of Thailand.

The companies described in paragraphs (aa)-(kk), above, are hereinafter referred
to as the "**Relevant Subsidiaries**".  The Debtors have further represented and agreed that (a) the
Relevant Subsidiaries conduct all of the business and operations, and own all of the assets, of the
Debtors and their affiliates (subject to the limitations of certain minority ownership interests held
by third parties in affiliated companies in Bangladesh, Sri Lanka, The Philippines, Mexico and
Thailand) in the countries identified in such paragraphs (the "**Relevant Countries**"), (b) except
as otherwise provided herein, the Debtors have delivered to the Bank all share certificates and
other similar physical evidence ("**Certificates**") of their Ownership Interests in the Relevant
Subsidiaries, (c) the Certificates for the Ownership Interests described in paragraphs (bb) and

-5-

(dd) above have been lost by the Debtors, and replacement Certificates will be issued to one or more of the Debtors and delivered to the Bank prior to the hearing on this Order (in the case of paragraph (bb)) or no later than the thirtieth day immediately following the entry of this Order (in the case of paragraph (dd)), (d) Certificates for the Ownership Interests described in paragraph (gg) above do not exist as of the date hereof, but will be issued to one or more of the Debtors and delivered to the Bank prior to the hearing on this Order and (e) to the extent that legal title to the Debtors' Ownership Interests in the Relevant Subsidiaries is not held by the Debtors, it is held by one or more non-Debtor subsidiaries thereof and will be pledged to the Bank prior to the hearing on this Order. In the event that, notwithstanding such representation, the business, operations or assets of the Debtors and their affiliates in a Relevant Country are conducted or owned by an entity other than a Relevant Subsidiary, (a) the Foreign Subsidiary Shares shall automatically be deemed to include all Ownership Interests of the Debtors and their affiliates in such entity and (b) the Debtors shall immediately deliver the Certificates therefor to the Bank.

R.     The notice of the Hearing at which this Order was presented, which notice was provided by the Debtors to the United States Trustee and the Bank, constitutes adequate notice under the circumstances in accordance with Bankruptcy Rule 4001(c) and Section 102(l) of the Bankruptcy Code, as required by Section 364(c) of the Bankruptcy Code in light of the emergency nature of the relief requested in the Motion.

S.     Good and sufficient cause has been shown for the entry of this Order. Among other things, the entry of this Order will enable the Debtors to continue the operation of their business; increase the possibility for a successful reorganization; and be in the best interest of the Debtors, their creditors, and their estates.

T.     This Order is the Final Order referred to in the Interim Order and the DIP Loan Agreement.

NOW, THEREFORE, on the Motion of the Debtors and the record before the Court with respect to the Motion made by the Debtors, and with the consent of the Debtors and the Bank to the form and entry of this Order, and good cause appearing,

IT IS ON THIS 21st day of October, 1999 ORDERED that:

### APPROVAL OF AND AUTHORIZATION
### AS TO BORROWING AND RELIEF FROM STAY

1.     The terms and the conditions of the DIP Credit Facility are hereby approved. The Debtors are hereby authorized to:

(a)     Establish the DIP Credit Facility.

(b)     Execute each of the DIP Loan Documents to which any Debtor is a party.

(c)     Borrow up to U. S. $ 10,000,000 subject to the terms and conditions of the DIP Loan Documents, the Interim Order and this Order (including without limitation that the Debtors shall have delivered the Certificates to the Bank).

2.    The Debtors are hereby authorized and empowered to do and perform all acts and to make, execute, and deliver all instruments and documents which may be requisite or necessary for the performance by the Debtors under this Order and the DIP Loan Documents.

3.    The Debtors are hereby authorized and empowered to grant to the Bank, and the Bank is hereby granted, a valid, binding, enforceable and perfected Lien in and to the Foreign Subsidiary Shares, the Trademarks and all proceeds, products, rents and profits thereof (collectively, the "**Post-Petition Collateral**") to secure all DIP Obligations.

4.    The automatic stay imposed under Section 362(a) of the Bankruptcy Code is hereby vacated to permit (a) the Debtors to grant the aforesaid Lien and to pay and perform the DIP Obligations and (b) the Bank to set off against the Cash Collateral in an amount equal to the Set-Off Amount (as hereinafter defined), and to apply the Set-Off Amount irrevocably to the outstanding Foreign Subsidiary Debt Obligations and the Singer Guaranty in partial satisfaction thereof (and the Bank is hereby authorized to do so without further order of this Court or notice to, or consent from, the Debtors or any other person or entity) it being understood and agreed that the amounts so set off and applied by the Bank, shall be applied to the Foreign Subsidiary Debt Obligations (other than those of Pfaff Canada Corporation and Singer GmbH) as the Bank may elect in its sole discretion and that amounts so applied will not be available for reborrowing. Unless otherwise agreed by the Bank in its sole discretion and the Debtors, (a) until the Termination Date (as hereafter defined), (i) the Cash Collateral in excess of the Set-Off Amount (the "**Remaining Cash Collateral**") shall remain in the Cash Collateral Account and (ii) the Bank shall not set-off or otherwise foreclose against the Remaining Cash Collateral unless the Bank shall have obtained the authority to do so by this Court or another court of competent jurisdiction on notice to the Debtors (a "**Remedial Notice**") as required by applicable law (and the Bank reserves the right to seek such authority at any time), (b) the Debtors shall have no right to use, or to seek authority to use, the Remaining Cash Collateral until the Termination Date; provided, however, that if the Bank gives a Remedial Notice to the Debtors pursuant to the preceding clause (a), the Debtors shall thereafter have the right to seek authority of this Court to use Remaining Cash Collateral on notice to the Bank as required by applicable law; and (c) after the Termination Date, the rights and defenses of the Debtors and the Bank under applicable law with respect to the use or application of the Remaining Cash Collateral shall be restored and in full force and effect (but subject to the Debtors' acknowledgment in Paragraph P, above, as to the Bank's Lien in the Cash Collateral). As used herein, the "**Set-Off Amount**" means the sum of (a) U.S.$10,000,000 (the "**Initial Set-Off Amount**") plus (b) the amounts, if any (the "**Subsequent Set-Off Amount**"), advanced by the Bank (including without limitation by way of extensions or renewals of letters of credit that might otherwise expire by their terms) from and after the date hereof to the Foreign Subsidiaries under the Foreign Subsidiary Debt Agreements (collectively, "**Foreign Subsidiary Advances**"), except for Foreign Subsidiary Advances constituting re-advances of amounts, if any, paid to the Bank by the Foreign Subsidiaries from and after the date hereof under the Foreign Subsidiary Debt Agreements (it being understood that the Bank has agreed to make Foreign Subsidiary Advances up to the maximum amount(s) contemplated by the Foreign Subsidiary Debt Agreements (after application of the Cash Collateral as contemplated by this Paragraph 4), but only so long as no default or event of default exists under the Foreign Subsidiary Debt Agreements (other than a default or event of default caused by the Borrowers' chapter 11 cases)). The Bank shall be permitted to set-off against the Cash Collateral (a) on the date hereof in an amount equal to the Initial Set-Off Amount and

-7-

(b) on the date of each Foreign Subsidiary Advance, if any, in an amount equal to such Foreign Subsidiary Advance.

5.       Each officer of the Debtors as may be so authorized by the Board of Directors (or equivalent governing board, person or committee) of each of the Debtors, acting singly, is hereby authorized to execute and deliver each of the DIP Loan Documents, such execution and delivery to be conclusive of their respective authority to act in the name of and on behalf of the Debtors.

6.       Unless otherwise agreed by the Bank in its sole discretion, the Debtors shall use the proceeds of the DIP Loans solely for the limited purpose of paying the expenses (including professional fees and expenses) in the amounts and for the time periods (on a cumulative basis, with amounts not spent during a particular month being carried over to the succeeding months within the budget period) reflected on the budget annexed hereto as Exhibit A (the "**Budget**"). The Debtors shall not make any expenditures to pay expenses, to make capital expenditures, to purchase inventory or otherwise, except for expenditures during the periods and in the aggregate amounts specified in the Budget, unless otherwise agreed by the Bank in its sole discretion. An authorized representative of the Debtors shall deliver in writing to the Bank a weekly statement (a "**Budget Compliance Certificate**") that (i) the proceeds of the DIP Loans to be used during the upcoming week are for one of the types of expenditures set forth above and in compliance with the maximum amounts permitted to be expended therefor for the relevant time period, as set forth above and (ii) no Termination Date has occurred, or, if a Termination Date has occurred, that a Termination Date has occurred together with a description of the event(s) causing such Termination Date, and provide such other information related to the use of DIP Loans or the occurrence or non-occurrence of such events as is requested by the Bank. On Thursday of every week, commencing with the week following the date of this Order, Singer shall furnish to the Bank a detailed written report or reports in a form acceptable to the Bank which shall set forth such information as is reasonably requested by the Bank, including, without limitation, all cash receipts actually received by, and all expenditures actually made by, Singer during the week ending on the immediately preceding Saturday, with a statement comparing the actual cash receipts and disbursements made by the Debtors during that period to those anticipated in the Budget.

7.       The provisions of Paragraph P, above, and the set-off by the Bank permitted by Paragraph 4(b), above, shall be without prejudice to the right of any Official Creditors' Committee appointed in these proceedings to seek to (a) disallow the Pre-Petition Claim, (b) avoid any Lien claimed by the Bank in Pre-Petition Collateral, (c) otherwise challenge the validity, priority or extent of the Pre-Petition Claim or the Bank's Liens in the Pre-Petition Collateral, or (d) obtain any other relief, legal or equitable, against the Bank or otherwise recover from the Bank on account of its relationship with the Debtors (or any of them) prior to the commencement of these proceedings; provided, however, that the Official Creditors' Committee shall have one hundred and twenty (120) days from the date of appointment of the Official Creditors' Committee within which to file an objection or commence an action with respect to the foregoing. Any such objection or action shall set forth with reasonable particularity the basis for the objection or action. If no such objection or action is filed on or before one hundred and twenty (120) days after the date of appointment of the Official Creditors' Committee, the Pre-Petition Claim shall be allowed as a secured claim within the meaning of Section 506 of the Bankruptcy Code for all purposes in connection with these proceedings (including without

-8-

limitation any case under Chapter 7 of the Bankruptcy Code), without necessity of further order of this Court. Thereafter, any and all challenges, objections, claims or causes of action (including, but not limited to, those under Sections 544, 547 and/or 548 of the Bankruptcy Code) by any party (including, without limitation, the Official Creditors' Committee and any subsequently appointed Chapter 11 or Chapter 7 trustee for the estates of the Debtors (or any of them)), to the validity, sufficiency, priority, extent, perfection or any other aspect whatsoever of the Bank's Liens in the Pre-Petition Collateral or the Pre-Petition Claim, or the Bank's pre-Commencement Date relationship with the Debtors (or any of them), shall be forever barred.

8.      The Liens created and granted to the Bank, as provided in Paragraph 3, above, are created and granted pursuant to Sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code. With the exception of (a) the Carve Out (as hereinafter defined), (b) the statutory fees of the United States Trustee as provided in 28 U.S.C. §1930(a) and fees to the clerk of the Bankruptcy Court (collectively, the "**Mandatory Fees**"), (c) in the case of the Bangladeshi Shares, the Pre-Petition Bangladeshi Lien, and (d) in the case of the Trademarks, the Pre-Petition Trademark Lien, the Liens created and granted to the Bank, as provided in Paragraph 3, above, (i) are first, prior, perfected, and superior to any Lien or claim on or to the Post-Collateral and (ii) shall not be subject to any Lien which is avoided and preserved for the benefit of the estates of the Debtors (or any of them) under Section 551 of the Bankruptcy Code.

9.      The Debtors shall be enjoined and prohibited from at any time granting Liens in the Post-Petition Collateral or any portion thereof to any other parties pursuant to Section 364(d) of the Bankruptcy Code or otherwise, which Liens are senior to the Liens of the Bank granted in the Post-Petition Collateral hereunder, unless immediately upon the incurrence thereof, the DIP Obligations are indefeasibly paid in full and the DIP Credit Facility is terminated. Prior to the Termination Date, the Debtors shall be entitled (upon entry of a further order of this Court under Section 364 of the Bankruptcy Code) to grant Liens ("**Third-Party DIP Liens**") in the Post-Petition Collateral or any portion thereof, to any third party (a "**Third-Party DIP Lender**") who provides debtor-in-possession financing to the Debtors, which Third-Party DIP Liens are on a parity with or junior to the Liens of the Bank granted in the Post-Petition Collateral, but only so long as (i) the Bank's right to have the DIP Obligations repaid in full on the Termination Date is not affected thereby, (ii) such third parties shall have executed and delivered to the Bank intercreditor agreements reasonably satisfactory to the Bank with respect to the exercise of remedies against the Post-Petition Collateral and (iii) the provisions of Paragraph 11, below, are satisfied. Except on the terms hereof and of the DIP Loan Agreement, and except, in the case of the Foreign Subsidiary Shares, in the ordinary course of business as equity owners thereof, the Debtors shall be enjoined and prohibited from at any time (i) using the Post-Petition Collateral, and (ii) applying to the Bankruptcy Court or any Judge of any United States District Court for an order authorizing the use of the Post-Petition Collateral. Notwithstanding the foregoing, the Debtors may collect and use royalties and dividends constituting Post-Petition Collateral prior to the Termination Date in accordance with the Budget.

10.     The Debtors shall be enjoined and prohibited from at any time granting Liens in the Pre-Petition Collateral or any portion thereof to any other parties pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, which Liens are senior, on a parity with or junior to the Liens of the Bank thereon, unless immediately upon the incurrence thereof, the outstanding Pre-Petition Claims are indefeasibly paid in full. Except on the terms hereof, the Debtors shall be enjoined and prohibited from at any time (i) using the Pre-Petition

Collateral, and (ii) applying to the Bankruptcy Court or any Judge of any United States District Court (or any other court of competent jurisdiction) for an order authorizing the use of the Pre-Petition Collateral.  Notwithstanding the foregoing, the Debtors may collect and use royalties and dividends constituting Pre-Petition Collateral prior to the Termination Date in accordance with the Budget.

        11.    Notwithstanding herein to the contrary, Liens may be granted in favor of any third party (including without limitation Third-Party DIP Liens) in the Trademarks or the Bangladeshi Shares if, but only if, (a) such Liens are junior to the Liens of the Bank therein securing the Pre-Petition Claim, (b) the holders of such Liens have no remedial rights whatsoever with respect to the Trademarks or the Bangladeshi Shares, (c) if such Liens are Third-Party DIP Liens, such Liens are pari passu with, or junior to, the Liens of the Bank securing the DIP Obligations, (d) if such Liens are not Third-Party DIP Liens, such Liens are junior to the Liens of the Bank securing the DIP Obligations and (e) the Bank's right to have the DIP Obligations repaid in full on the Termination Date is not affected thereby.

        12.    This Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the Bank's Liens upon the Post-Petition Collateral to secure all DIP Obligations, without the necessity of executing, filing or recording any financing statement or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the Liens of the Bank in and to the Post-Petition Collateral or to entitle the Bank to the priorities granted herein; provider, however, the Debtors may execute and the Bank may file or record financing statements or other instruments, and the Debtors and/or the Bank may take other action, to evidence and to perfect the Liens authorized hereby; provided further, however, no such filing, recordation or other action shall be necessary or required in order to create or perfect any such Lien.

        13.    The Bank, in its discretion, may file a xerographic copy of this Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which the Debtors have real or personal property.

        14.    The DIP Loan Agreement and each of the other DIP Loan Documents, respectively, shall constitute and evidence the valid and binding DIP Obligations of each of the Debtors, which DIP Obligations shall be enforceable against each of the Debtors in accordance with their terms.

        15.    No administrative claims, including fees and expenses of professionals, shall be assessed against or attributed to the Bank or its interests in the Pre-Petition Collateral or the Post-Petition Collateral pursuant to the provisions of Section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of Bank, and no such consent shall be implied from any action, inaction or acquiescence by the Bank or otherwise.

## ADMINISTRATIVE CLAIM

        16.    The Obligations under the DIP Credit Facility shall be an allowed administrative expense claim (the "**Super-Priority Claim**") with priority (subject and subordinate to the Carve-Out (including the Retained Payments (as hereinafter defined)) and the Mandatory Fees) under Section 364(c)(1) of the Bankruptcy Code and otherwise over all

-10-

administrative expense claims and unsecured claims against the Debtors, now existing or
hereafter arising, of any kind or nature whatsoever including, without limitation, administrative
expenses of the kinds specified in or ordered pursuant to Sections 105, 326, 330 (except as
otherwise provided in Paragraph 17, below, with respect to the Mandatory Fees and Carve-Out
(including the Retained Payments)), 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d),
and 1114 of the Bankruptcy Code.

      17.    Except for

      (a)    the Mandatory Fees; and

      (b)    the Carve Out, including the Retained Payments;

no costs or expenses of administration including, without limitation, professional fees allowed
and payable under Sections 330 and 331 of the Bankruptcy Code that have been or may be
incurred in these Chapter 11 cases or in any Chapter 7 cases with respect to the estates of the
Debtors (or any of them), and no priority claims to the Post-Petition Collateral are, or will be,
prior to or on a parity with the DIP Obligations.

      18.    In the event that the Bank, following the occurrence of the Termination
Date, exercises the Bank's rights and remedies as a secured creditor by selling or otherwise
disposing of the Post-Petition Collateral (a "**Carve Out Event**"):

      (a)    The Bank shall deliver to Singer or such other party as may be
designated by the Court (the "**Escrow Agent**") in trust for the benefit of all professionals (the
"**Professionals**") employed at the expense of the Debtors' estates in the course of these Chapter
11 cases pursuant to Sections 327 or 1103 of the Bankruptcy Code and for the reimbursement of
all reasonable and documented out-of-pocket expenses of members of the Official Creditors
Committee, one hundred percent (100%) of the proceeds (net of the Bank's expenses) received
by the Bank from the sale, liquidation, collection, or other disposition of the Collateral until such
time as the Escrow Agent has received the Carve Out.

      (b)    The Carve Out shall be available for distribution for those fees and
expenses of the Professionals as are allowed by this Court.

      (c)    The Bank shall not have any duties or responsibilities with respect
to the distribution of the Carve Out to the Professionals by the Escrow Agent and shall have no
liability on account of any distribution, misdistribution, or nondistribution thereof.

      (d)    The balance of the Carve Out (if any) not distributed following
final awards of compensation on account of such fees and expenses of the Professionals shall be
distributed to the Bank to the extent of any then remaining deficiency in the DIP Obligations,
and then as this Court may determine.

      (e)    The term "**Carve Out**" means U.S.$1,000,000. Any amounts paid
to the Professionals prior to the occurrence of the Carve Out Event (the "**Retained Payments**")
shall not be credited or applied against said U.S.$ 1,000,000 sum and shall be deemed "carved
out" from the Bank's Liens and Super-Priority Claim. The Carve Out shall in any event exclude
any fees and expenses (x) arising out of or related to the investigation or prosecution of any

claims or causes of action against the Bank and (y) arising as to services rendered after conversion of the Chapter 11 cases to cases under Chapter 7 of the Bankruptcy Code. The payment of the Carve Out and the Retained Payments shall not reduce, or be deemed applied in reduction of, the Bank's claims against the Debtors.

19.     All DIP Obligations are due and payable, and the Debtors shall no longer be entitled or authorized to borrow funds under the DIP Credit Facility (and the obligation of the Bank to advance the same shall terminate) upon the earliest to occur of (the **"Termination Date"**):

(a)     March 31, 2000; or

(b)     the occurrence of an Event of Default (as defined in the DIP Loan Agreement); or

(c)     the effective date of any plan of reorganization for any of the Debtors in these Chapter 11 cases.

20.     Notwithstanding the occurrence of the Termination Date, all of the rights, remedies, benefits and protections provided to the Bank under this Order and the DIP Loan Documents shall survive the Termination Date.

21.     The time and manner of payment of the DIP Obligations, the Liens in the Post-Petition Collateral and the Super-Priority Claim shall not be altered or impaired by any plan of reorganization which may hereafter be confirmed or by any further order which may hereafter be entered.

REMEDIES UPON AN EVENT OF DEFAULT

22.     Any stay otherwise applicable to the Bank under Section 362 of the Bankruptcy Code or otherwise is hereby modified so that upon the occurrence of the Termination Date and at any time thereafter upon five (5) Business Days' prior written notice of such occurrence, in each case given to the Debtors, counsel to the Official Creditors' Committee, and the United States Trustee, the Bank shall be entitled to exercise the Bank's rights and remedies upon default under the DIP Loan Documents and/or applicable law (including without limitation the right to sell or otherwise dispose of the Post-Petition Collateral). In the exercise of the Bank's rights and remedies upon default, the Bank may retain one or more agents to sell, lease, or otherwise dispose of the Post-Petition Collateral.

23.     In any exercise of such rights and remedies upon default, the Bank and/or such agent, are authorized to proceed under or pursuant to the documentation which relates to the DIP Credit Facility.

24.     Nothing included herein shall prejudice, impair, or otherwise affect the Bank's right to seek any other or supplemental relief in respect of the Debtors.

25.     Prior to the Termination Date, the Bank shall not exercise any of its rights and remedies against Singer Sewing Machine Company Ltd. (Bermuda) and Singer Mexicana

S.A. de C.V. under their respective guaranties of the Pre-Petition Credit Agreement without giving five Business Days' prior written notice to the Debtors.

## MISCELLANEOUS PROVISIONS

26.    If any provision of this Order is hereafter modified, vacated or stayed by subsequent order of this or any other Court for any reason, such modification, vacation, or stay shall not affect the validity of any liability incurred, or any action taken by the Bank, pursuant to this Order and prior to the later of (a) the effective date of such modification, vacation, or stay, or (b) the entry of the order pursuant to which such modification, vacation, or stay was established, nor the validity, priority, or enforceability of any Lien or Super-Priority Claim granted by the Debtors to the Bank.

27.    The payments made, and the Liens and Super-Priority Claims granted to the Bank under the DIP Credit Facility and this Order, and the priority thereof, shall be binding on the Debtors, any successor trustee for the Debtors, and all creditors of the Debtors, as provided in Section 364(e) of the Bankruptcy Code.

28.    The Bank's failure to seek relief or otherwise exercise its rights and remedies under the DIP Credit Facility or this Order shall not constitute a waiver of any of the Bank's rights hereunder, thereunder, or otherwise.

29.    The Bank shall not be required to file any fee application with, or otherwise seek the approval of, this Court, for any fees or expenses (including legal, accountant's, and financial adviser's fees and expenses) to which the Bank is entitled under the DIP Loan Documents.

30.    The Debtors and the Bank may amend or waive any provision of the DIP Credit Facility in writing, provided that such amendment or waiver, in the judgment of the Debtors and the Bank, is either nonprejudicial to the rights of third parties or is not material. Except as otherwise provided herein, no waiver, modification, or amendment of any of the provisions hereof shall be effective unless set forth in writing, signed by the Debtors and the Bank and approved by the Court.

31.    In the event of any inconsistency between the terms and conditions of any DIP Loan Document and the Interim Order, on the one hand, and of this Order, on the other, the provisions of this Order shall govern and control.

32.    This Court's "Administrative Order Pursuant to 11 U.S.C. 105(a) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals", dated September 13, 1999, is hereby amended by adding the Bank and Chaim J. Fortgang, counsel to the Bank, to the Joint Fee Review Committee described in paragraph 2 thereof.

33.    This Court's "Interim Order Authorizing Debtors' Use of Cash Collateral and Granting Adequate Protection Pursuant to 11 U.S.C. 105, 361 and 363 and Fed R. Bankr. P. 4001 dated September 13, 1999, is hereby amended by

(a)    deleting the last sentence of paragraph 2 thereof and replacing the same with the following: "Any such replacement liens shall be subject and subordinate to (i) existing valid, perfected and unavoidable liens and (ii) liens granted to secure debtor in possession financing and any DIP carveout contained therein.

(b)    adding to following immediately after paragraph 5 thereof: "6. Nothing in this Order shall authorize the Debtors to use Cash Collateral (as defined in this Court's "Interim Order (1) Authorizing Post-Petition Secured Super-Priority Financing Pursuant to Sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code, (ii) Granting Relief From the Automatic Stay Pursuant to Section 362(d) of the Bankruptcy Code and (iii) Setting Final Hearing Pursuant to Bankruptcy Rule 4001," dated September 23, 1999)."

34.    Notwithstanding anything herein, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair, (a) any of the rights of the Bank under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the rights of the Bank, if any, to (i) request adequate protection of its interests in the Pre-Petition Collateral or the Post-Petition Collateral or relief from or modification of the automatic stay extant under Section 362 of the Bankruptcy Code, or to object to any other proposed post-petition financing of the Debtors, (ii) request conversion of any or all of the Debtors' Chapter 11 cases to Chapter 7 of the Bankruptcy Code, (iii) propose, subject to the provisions of Section 1121 of the Bankruptcy Code, a chapter 11 plan or plans, or (iv) assert that the laws of jurisdictions other than the United States of America or any state or territory thereof apply to the Pre-Petition Agreements, the Pre-Petition Collateral, the Bank's relationship with the Debtors (or any of them) and any other matter or issue related thereto or otherwise arising in these proceedings, or (b) any of the rights, claims or privileges (whether legal, equitable or otherwise) of the Bank.

SO ORDERED by the Court this **21st** day of October, 1999.

/s/ **Burton R. Lifland**
U.S. Bankruptcy Judge

FILED

2005 JUL 28 P 5: 11

U.S. BANKRUPTCY COURT
E.D. MICHIGAN DETROIT

## IN THE UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:

COLLINS & AIKMAN CORPORATION, et al.

Debtors.

) Chapter 11
)
) Case No. 05-55927-R
) (Jointly Administered)
)
) (Tax Identification #13-3489233)
)
) Honorable Steven W. Rhodes

## FINAL ORDER (I) AUTHORIZING DEBTORS (A) TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e) AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. §363 AND (II) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364

Upon the motion (the "**Motion**"), dated May 17, 2005, of Collins & Aikman Products

Co. (the "**Borrower**"), Collins & Aikman Corporation (the "**Parent Guarantor**") and certain of

its domestic subsidiaries (together, with the Parent Guarantor, collectively, the "**Guarantors**"),

each as debtor and debtor-in-possession (collectively, the "**Debtors**"), in the above-captioned

cases (the "**Cases**") pursuant to sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2),

364(c)(3), 364(d)(1) and 364(e) of title 11 of the United States Code, 11 U.S.C. §§101, et seq.

(the "**Bankruptcy Code**"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**"), seeking, among other things:

(1)  authorization for the Borrower to obtain post petition financing (the

"**Financing**"), jointly and severally guaranteed by the Guarantors, up to the

aggregate principal amount of $150,000,000 (the actual available principal

amount at any time being subject to those conditions set forth in the DIP

Documents (as defined below)), from JPMorgan Chase Bank, N.A. ("**JPMC**"),

509265-0843-10731-NY01.2488240.17

acting as Administrative Agent (in such capacity, the **"Agent"**), for itself and a
syndicate of financial institutions (together with JPMC and including the fronting
banks for the letters of credit, the **"DIP Lenders"**) to be arranged by J.P. Morgan
Securities Inc.;

(2) authorization for the Debtors to execute and enter into the DIP
Documents and to perform such other and further acts as may be required in
connection with the DIP Documents;

(3) the granting of adequate protection to the lenders (the **"Pre-Petition
Secured Lenders"**) under or in connection with that certain Credit Agreement,
dated as of December 30, 2001, as amended and restated as of September 1, 2004
(as heretofore amended, supplemented or otherwise modified, the **"Pre-Petition
Credit Agreement"**), among the Borrower, the lenders listed therein and JPMC
(formerly The Chase Manhattan Bank), as administrative agent for the Pre-
Petition Secured Lenders (in such capacity, the **"Pre-Petition Agent"**), and the
collateral and security agreements related thereto (collectively with the Pre-
Petition Credit Agreement, and the mortgages and all other documentation
executed in connection with the Pre-Petition Credit Agreement, the **"Existing
Agreements"**), whose liens and security interests are being primed by the
Financing;

(4) authorization for the Debtors to use cash collateral (as such term is
defined in the Bankruptcy Code) in which the Pre-Petition Secured Lenders have
an interest, and the granting of adequate protection to the Pre-Petition Secured

2

Lenders with respect to, *inter alia*, such use of their cash collateral and all use and

diminution in the value of the Pre-Petition Collateral (as defined below);

(5) approval of certain stipulations by the Debtors with respect to the

Existing Agreements and the liens and security interests arising therefrom;

(6) the granting of certain liens and superpriority claims to the DIP

Lenders payable from, and having recourse to, all pre-petition and post-petition

property of the Debtors' estates and all proceeds thereof (including any proceeds

of Avoidance Actions (as defined below)), in each case subject to the Carve Out

(as defined below); and

(7) the limitation of the Debtors' right to surcharge against collateral

pursuant to section 506(c) of the Bankruptcy Code;

An interim hearing on the Motion having been held by this Court on May 17, 2005 (the **"Interim**

**Hearing"**); the Financing having been approved on an interim basis by this Court's Interim

Order (I) Authorizing Debtors (A) To Obtain Post-Petition Financing Pursuant To 11 U.S.C.

§§105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) To Utilize Cash

Collateral Pursuant To 11 U.S.C. §363, (II) Granting Adequate Protection To Pre-Petition

Secured Parties Pursuant To 11 U.S.C. §§ 361, 362, 363 and 364 and (III) Scheduling Final

Hearing Pursuant to Bankruptcy Rules 4001(B) and (C), entered on May 17, 2005, together with

that certain Stipulation and Order with respect to Amendments to the Interim Order entered on

May 26, 2005 (collectively, the **"Interim Order"**), the notice requirements set forth in the

Interim Order having been complied with; upon the following objections having been filed (i) the

Objection of General Electric Capital Corporation to Motion Authorizing Debtors to Obtain

Post-Petition Financing from JPMC, (ii) the Objection of the Official Committee of Unsecured

3

Creditors (the **"Creditors Committee"**) to Debtors' Motion for a Final Order, (iii) the Limited

Objection of Fabric (DE) GP to Debtors' Emergency Motion for Final Order, (iv) the Limited

Objection of Empire Electronics, Inc. to Interim Order and to Proposed Final Order and (v) all

other objections raised by any party in interest (collectively, the **"Objections"**); and a final

hearing having been held on July 25, 2005 (the **"Final Hearing"**); upon the record made at the

Interim Hearing and the Final Hearing on the Motion and all pleadings filed with this Court; and

after due deliberation and consideration, and good and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.      *Jurisdiction.* This Court has core jurisdiction over the Cases, the Motion, and the

parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper

before this Court pursuant to 11 U.S.C. §§ 1408 and 1409.

2.      *Notice and Granting of Motion.*  Under the circumstances, the notice given by the

Debtors of the Motion, the Interim Hearing and the Final Hearing constitutes due and sufficient

notice thereof and complies with Bankruptcy Rules 4001(b) and (c).  The Motion is hereby

granted, as modified by this Order, and, following the Final Hearing, pursuant to further

agreements between the Debtors, the Agent, the Pre-Petition Agent and the Creditors Committee

with respect to paragraph 5(b)(ii) of this Order and Section 7.01(t) of the DIP Credit Agreement

(as defined below).  Except to the extent set forth on the record of the Final Hearing and as

reflected herein, all Objections are overruled.

3.      *Debtors' Stipulations.*  Without prejudice to the rights of any other party (but

subject to the limitations thereon contained in paragraph 15 below), the Debtors admit, stipulate

and agree that:

4

(a)    (i) as of the filing of the Debtors' chapter 11 petitions on May 17, 2005 (the

"**Petition Date**"), the Debtors were indebted and liable to the Pre-Petition Secured Lenders,

without defense, counterclaim or offset of any kind, in the aggregate principal amount of

approximately $686,776,384.06 in respect of loans made, and in the aggregate principal amount

of approximately $61,223,615.94 in respect of letters of credit issued, in each case by the Pre-

Petition Secured Lenders pursuant to, and in accordance with the terms of, the Existing

Agreements, plus interest thereon and other fees, expenses (including any attorneys',

accountants', appraisers' and financial advisors' fees that are chargeable or reimbursable under

the Existing Agreements), charges and other obligations incurred in connection therewith as

provided in the Existing Agreements (collectively, the "**Pre-Petition Debt**"), (ii) the Pre-Petition

Debt constitutes legal, valid and binding obligations of the Debtors, enforceable in accordance

with its terms (other than in respect of the stay of enforcement arising from section 362 of the

Bankruptcy Code), (iii) no portion of the Pre-Petition Debt is subject to avoidance,

recharacterization or subordination pursuant to the Bankruptcy Code or applicable

nonbankruptcy law and (iv) the Debtors do not have any claims, counterclaims, causes of action,

defenses or setoff rights, whether arising under the Bankruptcy Code or otherwise, against the

Pre-Petition Secured Lenders, the Pre-Petition Agent and their respective affiliates, agents,

officers, directors, employees and attorneys pursuant to or in connection with the Existing

Agreements;

(b)    pursuant to (i) the Amended and Restated Receivables Purchase Agreement

dated as of December 20, 2001 (as amended from time to time prior to the Petition Date, the

"RPA") among Collins & Aikman Products Co. and its wholly owned direct and indirect

subsidiaries named therein, as sellers (the "Sellers"), and Carcorp, Inc., as purchaser, the Sellers

5

sold, assigned and transferred to Carcorp, Inc. all of their right, title and interest in and to the

"Receivables," the "Related Security," the "Collections" and the "Proceeds" (as each such term

is defined in the RTA, which is defined below).  Pursuant to the Receivables Transfer Agreement

dated as of December 20, 2001 (as amended and restated as of September 20, 2002 and as further

amended from time to time prior to the Petition Date, the "RTA") among Carcorp, Inc., as

transferor, Collins & Aikman Products Co., individually and as collection agent, and General

Electric Capital Corporation ("GECC"), as administrative agent and committed purchaser,

Carcorp, Inc. transferred to GECC, as committed purchaser, and granted to GECC, as

administrative agent, perfected security interests in, the "Receivables," the "Related Security,"

the "Collections" and the "Proceeds" (collectively, the "Pre-Petition Receivables Facility

Interests"); and

> (c)    the liens and security interests granted to the Pre-Petition Agent pursuant to

and in connection with the Existing Agreements (including, without limitation, all security

agreements, pledge agreements, mortgages, deeds of trust and other security documents executed

by any of the Debtors in favor of the Pre-Petition Agent, for its benefit and for the benefit of the

Pre-Petition Secured Lenders in connection with the Existing Agreements), are (i) valid, binding,

perfected and enforceable first priority security interests in the personal and real property

described in the Existing Agreements (the "Pre-Petition Collateral"), subject only to the liens

and security interests permitted to be senior under the Existing Agreements to the extent such

permitted liens are valid, perfected and unavoidable liens and are senior to the liens of the Pre-

Petition Agent on the Pre-Petition Collateral, (ii) not subject to avoidance, recharacterization or

subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law and (iii) subject

and subordinate only to (A) the DIP Liens (as defined below), (B) the Carve Out (as defined

below) to which the DIP Liens are subject, (C) the Adequate Protection Liens (as defined

below), (D) to the extent the Pre-Petition Receivables Facility Interests or Pre-Petition GECC

Lease Interests are held to be property of the Debtors' estates, valid, perfected and unavoidable

liens in all Pre-Petition Receivables Facility Interests arising under the RTA and the RPA and all

Pre-Petition GECC Lease Interests (as defined below), regardless whether permitted under the

Existing Agreements, and (E) valid, perfected and unavoidable liens permitted under the Existing

Agreements to the extent such permitted liens are senior to or pari passu with the liens of the Pre-

Petition Agent on the Pre-Petition Collateral.

4.    *Findings Regarding the Financing.*

(a)    Good cause has been shown for the entry of this order (this **"Order"**).

(b)    The Debtors have a need to obtain the Financing and use Cash Collateral (as

defined below) in order to permit, among other things, the orderly continuation of the operation

of their businesses, to maintain business relationships with vendors, suppliers, carriers and

customers, to make payroll, to make capital expenditures and to satisfy other working capital

needs. The ability of the Debtors to obtain sufficient working capital and liquidity through the

use of Cash Collateral (as defined below), incurrence of new indebtedness for borrowed money

and other financial accommodations is critical to the preservation and maintenance of the going

concern values of the Debtors and to a successful reorganization of the Debtors.

(c)    The Debtors are unable to obtain financing from sources other than the DIP

Lenders on more favorable terms than under the DIP Documents and are unable to obtain

adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an

administrative expense. The Debtors are also unable to obtain secured credit allowable under

sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the Debtors granting

7

to the Agent and the DIP Lenders, subject to the Carve Out as provided for herein, the DIP Liens

and the Superpriority Claims (as defined below) under the terms and conditions set forth in this

Order and in the DIP Documents.

(d)    The terms of the Financing and the use of Cash Collateral appear to be fair

and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their

fiduciary duties and are supported by reasonably equivalent value and fair consideration.

(e)    The Financing has been negotiated in good faith and at arm's length among

the Debtors, the Agent and the DIP Lenders, and all of the Debtors' obligations and indebtedness

arising under, in respect of or in connection with the Financing and the DIP Documents,

including without limitation, (i) all loans made to, and all letters of credit issued for the account

of, the Debtors pursuant to the Revolving, Term Loan and Guaranty Credit Agreement, dated as

of May 17, 2005 (as amended by the Amended and Restated Revolving Credit, Term Loan and

Guaranty Agreement, dated as of July 25, 2005, the "**DIP Credit Agreement**"), and (ii) any

other "**Secured Obligations**" (as defined in the DIP Credit Agreement), including (x) credit

extended in respect of overdrafts and related liabilities and arising from treasury, depository and

cash management services or in connection with automated clearing house fund transfers

provided by JPMC or its affiliates, (y) indebtedness in connection with foreign exchange

contracts, currency swap agreements, currency future or option contracts and other similar

agreements designed to hedge against fluctuations in foreign exchange rates, commodity prices

protection agreements or other commodity hedging agreements and interest rate swap, cap or

collar agreements and interest rate future or option contracts designed to hedge against

fluctuations in interest rates and (z) the obligations of the Debtors in respect of indebtedness

owing to JPMC, any DIP Lender and any of their affiliates as permitted by Section 6.03 of the

8

DIP Credit Agreement (all of the foregoing in clauses (i) and (ii) collectively, the "**DIP Obligations**"), shall be deemed to have been extended by JPMC, the DIP Lenders and their affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(f)    The Debtors have requested entry of this Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2). Absent entry of this Order, the Debtors' estates will be immediately and irreparably harmed. Consummation of the Financing and the use of Cash Collateral in accordance with this Order and the DIP Documents are therefore in the best interest of the Debtors' estates.

5.    *Authorization of the Financing and the DIP Documents*.

(a)    The Debtors are hereby authorized to enter into the DIP Documents and the Debtors are hereby authorized to borrow and obtain letters of credit pursuant to the DIP Credit Agreement up to the full aggregate principal or face amount of $150,000,000 (plus interest, fees and other expenses provided for in the DIP Documents), with a $25,000,000 letter of credit sublimit in the aggregate to support foreign and/or domestic operations, all in accordance with the terms of this Order and the DIP Documents, which shall be used for all purposes permitted under the DIP Documents and to provide working capital for the Debtors and to pay interest, fees and expenses in accordance with this Order and the DIP Documents. In addition to such amounts and obligations, the Debtors are authorized to incur overdrafts and related liabilities arising from treasury, depository and cash management services or in connection with any automated clearing house fund transfers provided to or for the benefit of any Debtor by JPMC or

9

any of its affiliates; provided, however, that nothing herein shall require JPMC or any other party

to incur overdrafts or to provide any such services or functions to the Debtors.

(b)    In furtherance of the foregoing, without further approval of this Court and in

accordance with the terms of this Order and section 303 of the Delaware General Corporation

Law and other similar laws in the relevant jurisdictions of incorporation, each Debtor (acting

through its authorized officers) is authorized and obligated in accordance with the terms of the

DIP Documents to do and perform all acts, to make, execute and deliver all instruments and

documents (including, without limitation, the execution or recordation of security agreements,

mortgages, financing statements, and amendments to certificates of organization, designation or

incorporation), and to pay all fees, that may be reasonably required or necessary for the Debtors'

authorization and performance of the Financing, including, without limitation:

(i)    the execution, delivery and performance of the Loan Documents

(as defined in the DIP Credit Agreement) and any exhibits attached thereto, including, without

limitation, the DIP Credit Agreement, the Security and Pledge Agreement (as defined in the DIP

Credit Agreement), Letters of Credit (as defined in the DIP Credit Agreement) and the

mortgages contemplated thereby (collectively, and together with the letter agreement referred to

in clause (ii) below, the **"DIP Documents"**);

(ii)    the execution, delivery and performance of one or more

amendments or other modification to, or implementation of waivers or consents under, the DIP

Credit Agreement for the purpose of adding additional financial institutions as DIP Lenders and

reallocating the commitments for the Financing among the DIP Lenders, in each case in such

form as the Debtors, the Agent and the DIP Lenders may agree, it being understood that approval

of the Court shall be required for any other amendments or other modifications to the DIP Credit

Agreement. Notwithstanding the foregoing or any other provision hereof, without further approval of this Court, amendments or other modification to, or implementation of waivers or consents under, the DIP Documents may be made as contemplated by that certain letter agreement dated as of July 25, 2005 between the Debtors and the Agent and delivered on a confidential basis to counsel to the Creditors' Committee (permitting modifications to the DIP Credit Agreement necessary or advisable to ensure successful syndication, including, without limitation, increasing the interest rate, commitment fee or fees to market);

        (iii)    the non-refundable payment to the Agent or the DIP Lenders, as the case may be, of the fees referred to in the DIP Credit Agreement (and in the separate letter agreements between them in connection with the Financing) and reasonable costs and expenses as may be due from time to time, including, without limitation, reasonable fees and expenses of the professionals retained as provided for in the DIP Documents; provided that professionals retained by the Agent shall provide copies of invoices to counsel to the Debtors, any Committee (as defined below) and the Office of the United States Trustee and the Debtors shall pay such invoices within twenty (20) days unless an objection by any of the foregoing parties is received by the Agent and filed with the Court setting forth in detail the nature of such party's objection; and

        (iv)    the performance of all other acts required under or in connection with the DIP Documents.

        (c)    The DIP Documents constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with the terms of the DIP Documents. No obligation, payment, transfer or grant of security under the DIP Documents or this Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or

11

under any applicable law (including without limitation, under section 502(d) of the Bankruptcy Code), or subject to any defense, reduction, setoff or counterclaim.

6.    *Superpriority Claims.*

(a)    Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed claims against the Debtors with priority over any and all administrative expenses, diminution claims (including all Adequate Protection Obligations (as defined below)) and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (the **"Superpriority Claims"**), which allowed claims shall be payable from and have recourse to all pre- and post-petition property of the Debtors and all proceeds thereof, subject only to the payment of the Carve Out to the extent specifically provided for herein.

(b)    For purposes hereof, the **"Carve Out"** means (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code, and (ii) after the occurrence and during the continuance of an Event of Default (as defined in the DIP Documents) an amount not exceeding $7,000,000 in the aggregate (plus the amount of unpaid professional fees and expenses incurred by the Debtors and any statutory committees appointed in the cases, including the Creditors' Committee (each, a **"Committee"**) and the reasonable expenses incurred by members of any Committee, prior to the occurrence of an Event of Default, provided that after the Customer Financing Period (as defined in the DIP Documents) any unpaid professional fees and expenses

509265-0843-10731-NY01.2488240.17

that accrue after the Customer Financing Period and prior to the occurrence of an Event of

Default shall increase the amount of the Carve-Out only to the extent reserved against

availability, if any, under the Borrowing Base (as defined in the DIP Documents), provided

further that the amounts in respect of both paid and unpaid professional fees and expenses

incurred by the Debtors' estates and any Committee, including the reasonable expenses incurred

by members of any Committee, whether before or after the Customer Financing Period, shall be

provided on a monthly basis in writing by Debtors' counsel to the Agent), which amount may be

used subject to the terms of this Order to pay any fees or expenses incurred by the Borrower and

the Guarantors and any Committee, including the reasonable expenses incurred by members of

any Committee, in respect of (A) allowances of compensation for services rendered or

reimbursement of expenses awarded by the Bankruptcy Court to the Borrower's or any

Guarantor's or any Committee's professionals and (B) the reimbursement of expenses allowed

by the Bankruptcy Court incurred by Committee members in the performance of their duties (but

excluding fees and expenses of third party professionals employed by such members); provided

that (w) except as set forth herein, the dollar limitation in this paragraph 6(b)(ii) on professional

fees and disbursements shall neither be reduced nor increased by the amount of any

compensation or reimbursement of expenses incurred, awarded or paid prior to the occurrence of

an Event of Default in respect of which the Carve Out is invoked or by any fees, expenses,

indemnities or other amounts paid to the Agent, any Lender or their respective attorneys and

agents under the DIP Credit Agreement or otherwise, (x) to the extent the dollar limitation in this

paragraph 6(b)(ii) on professional fees and disbursements is reduced by any amount as a result of

payment of such fees and disbursements during the continuance of an Event of Default, and such

Event of Default is subsequently cured or waived, then effective as of the effectiveness of such

cure or waiver, such dollar limitation shall be increased by an amount equal to the amount by which it has been so reduced, (y) nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement or compensation described in clauses (A) and (B) above, and (z) cash or other amounts on deposit in the Letter of Credit Account (as defined in the DIP Credit Agreement), shall not be subject to the Carve Out. Amounts in the Carve-Out Account (as defined in the DIP Documents) shall be held by Debtors in a segregated account at JPMC in trust to pay any unpaid professional fees and expenses incurred by the Debtors and any Committee (including the members thereof). The DIP Lenders shall not have any Lien on or right to the amounts deposited in the Carve-Out Account, except (1) with respect to funds on deposit therein in excess of the professional fees and expenses referenced in the previous sentence, and (2) to the extent of any amounts deposited in the Carve-Out Account after the occurrence and during the continuance of an Event of Default (unless such amounts are funded from the proceeds of the subordinated loans under the Debtors' customer financing arrangement).

7.    *DIP Liens.* As security for the DIP Obligations, effective and perfected as of the Petition Date and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, the following security interests and liens are hereby granted to the Agent, for its own benefit and the benefit of JPMC, the DIP Lenders and any affiliates thereof (the "**Secured Parties**") (all property identified in clauses (a), (b) and (c) below being collectively referred to as the "**Collateral**"), subject, only in the event of the occurrence and during the continuance of an Event of Default or a Default, to the payment of the Carve Out (all

such liens and security interests granted to the Agent, for its benefit and for the benefit of the

Secured Parties, pursuant to this Order and the DIP Documents, the "**DIP Liens**"):

(a)    First Lien on Cash Balances and Unencumbered Property. Pursuant to

section 364(c)(2) of the Bankruptcy Code and subject to the terms of the DIP Documents, the

Agent is hereby granted (for the benefit of the Secured Parties) a valid, binding, continuing,

enforceable, fully-perfected first priority senior security interest in and lien upon all pre- and

post-petition property of the Debtors, whether existing on the Petition Date or thereafter

acquired, that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable

liens (collectively, "**Unencumbered Property**"), including without limitation, all cash and cash

collateral of the Debtors (whether maintained with the Agent or otherwise) and any investment

of such cash and cash collateral, inventory, accounts receivable, other rights to payment whether

arising before or after the Petition Date, contracts, properties, plants, equipment, general

intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights,

trademarks, trade names, other intellectual property, capital stock of subsidiaries, and the

proceeds of all the foregoing, but excluding any equipment, insurance or other proceeds of such

equipment subject to any equipment leases entered into by any of the Debtors as lessee or

sublessee with GECC or any of its affiliates, including, without limitation, the Master Lease

Agreement dated as of May 7, 1993, as amended, between GECC and Becker Group, Inc., the

Aircraft Lease Agreement dated as of August 18, 1999, as amended, between GECC and Collins

& Aikman Products Co., the Master Lease Agreement dated as of August 7, 2001, as amended,

between GECC and Collins & Aikman Products Co., the Master Lease Agreement dated as of

December 20, 2001, as amended, between GECC and Collins & Aikman Products Co., the

Master Lease Agreement dated as of June 25, 2004, as amended between GECC and Collins &

15

Aikman Products Co. (collectively, the "Pre-Petition GECC Lease Interests"), and all Pre-Petition Receivables Facility Interests to the extent the Pre-Petition GECC Lease Interests and the Pre-Petition Receivables Facility Interests do not constitute property of the Debtors' estates. Without limiting the scope of Superpriority Claims of the DIP Lenders, Unencumbered Property shall exclude (i) the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, **"Avoidance Actions"**) and the proceeds thereof, and (ii) a pledge of 35% of the voting capital stock of the Debtors' respective direct Foreign Subsidiaries or any of the capital stock of the interests of its indirect Foreign Subsidiaries that is not Pre-Petition Collateral, if adverse tax consequences would result to the Debtors from such pledge.

(b)    Liens Priming Pre-Petition Secured Lenders' Liens. Pursuant to section 364(d)(1) of the Bankruptcy Code, the Agent (for the benefit of the Secured Parties) is hereby granted a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all pre- and post-petition property of the Debtors (including, without limitation, cash collateral, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, equipment, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, capital stock of subsidiaries, and the proceeds of all the foregoing), whether now existing or hereafter acquired, that is subject to the existing liens presently securing the Pre-Petition Debt (including in respect of issued but undrawn letters of credit), but excluding all Pre-Petition GECC Lease Interests and all Pre-Petition Receivables Facility Interests to the extent the Pre-Petition GECC Lease Interests and the Pre-Petition Receivables Facility Interests do not constitute property of the Debtors' estates.

16

Such security interests and liens shall be senior in all respects to the interests in such property of

the Pre-Petition Secured Lenders arising from liens of the Pre-Petition Secured Lenders existing

immediately prior to the Petition Date and future liens of the Pre-Petition Secured Lenders

(including, without limitation, adequate protection liens granted hereunder), but shall not be

senior to any valid, perfected and unavoidable interests of other parties arising out of liens, if

any, on such property existing immediately prior to the Petition Date, or to any valid, perfected

and unavoidable interests in such property arising out of liens to which the liens of the Pre-

Petition Secured Lenders become subject subsequent to the Petition Date as permitted by section

546(b) of the Bankruptcy Code; provided, however, the Debtors shall not be required to pledge

to the Agent in excess of 65% of the voting capital stock of their respective direct Foreign

Subsidiaries or any of the capital stock of the interests of its indirect Foreign Subsidiaries (if

adverse tax consequences would result to the Debtors).

(c)    Liens Junior to Certain Other Liens.  Pursuant to section 364(c)(3) of the

Bankruptcy Code, the Agent (for the benefit of the Secured Parties) is hereby granted valid,

binding, continuing, enforceable, fully-perfected security interests in and liens upon all pre- and

post-petition property of the Debtors (other than the property described in clauses (a) or (b) of

this paragraph 7, as to which the liens and security interests in favor of the Agent will be as

described in such clauses), whether now existing or hereafter acquired, that is subject to valid,

perfected and unavoidable liens in existence immediately prior to the Petition Date or to valid

and unavoidable liens in existence immediately prior to the Petition Date that are perfected

subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code or to

Permitted Liens (as defined in the DIP Credit Agreement), which security interests and liens in

favor of the Agent are junior to such valid, perfected and unavoidable liens.  For the avoidance

17

509265-0843-10731-NY01.2488240.17

of doubt, no liens shall be granted pursuant to this Paragraph with respect to the Pre-Petition

Receivables Facility Interests or the Pre-Petition GECC Lease Interests, to the extent the Pre-

Petition GECC Lease Interests and the Pre-Petition Receivables Facility Interests do not

constitute property of the Debtors' estates.

(d)    Liens Senior to Certain Other Liens.  The DIP Liens and the Adequate

Protection Liens (as defined below) shall not be subject or subordinate to (i) any lien or security

interest that is avoided and preserved for the benefit of the Debtors and their estates under

section 551 of the Bankruptcy Code or (ii) any liens arising after the Petition Date, except as

otherwise provided in the DIP Documents.

8.    *Protection of DIP Lenders' Rights.*

(a)    So long as there are any borrowings or letters of credit or other amounts

(other than contingent indemnity obligations as to which no claim has been asserted when all

other amounts have been paid and no letters of credit are outstanding) outstanding under the DIP

Documents, or the DIP Lenders have any Commitment (as defined in the DIP Credit Agreement)

under the DIP Credit Agreement, the Pre-Petition Agent and Pre-Petition Secured Lenders shall

(a) take no action to foreclose upon or recover in connection with the liens granted thereto

pursuant to the Existing Agreements or the Adequate Protection Liens granted pursuant to this

Order, or otherwise exercise remedies against any Collateral, except to the extent authorized by

an order of this Court, (b) be deemed to have consented to any release of Collateral authorized

under the DIP Documents and (c) not file any further financing statements, trademark filings,

copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action

to perfect their security interests in the Collateral.

(b)    The automatic stay provisions of section 362 of the Bankruptcy Code are
vacated and modified (i) to permit the Agent and the DIP Lenders to exercise, upon the
occurrence of an Event of Default, all rights and remedies under the DIP Documents other than
those rights and remedies against the Collateral and (ii) to the extent necessary to permit the
Agent and the DIP Lenders to exercise, upon the occurrence and during the continuance of an
Event of Default and the giving of five (5) business days' prior written notice to the extent
provided for in the DIP Credit Agreement, all rights and remedies against the Collateral provided
for in the DIP Documents (including, without limitation, the right to setoff monies of the Debtors
in accounts maintained with the Agent or any DIP Lender).  In no event shall the Agent, the DIP
Lenders, the Pre-Petition Agent or the Pre-Petition Secured Lenders be subject to the equitable
doctrine of "marshaling" or any similar doctrine with respect to the Collateral; provided,
however, that the Pre-Petition Secured Lenders shall otherwise have the right as creditors to file
motions or take positions with respect to any motions or applications in the Bankruptcy Court,
including the right to argue that any proposed modification, amendment or waiver to the terms of
the DIP Documents constitutes the priming of the Pre-Petition Secured Lenders not consented to
pursuant to the terms of this Order.  The Agent shall provide counsel to any Committee with
copies of any notices delivered to the Debtors by the Agent pursuant to the DIP Documents.  The
Debtors shall provide counsel to any Committee with copies of any notices, deliverables, or any
amendments, modifications, supplements or waivers to or under the DIP Documents.

9.    *The Cash Collateral*.  To the extent any funds were on deposit with the Pre-
Petition Secured Lenders as of the Petition Date, including, without limitation, all funds
deposited in, or credited to, an account of any Debtor with any Pre-Petition Secured Lender
immediately prior to the filing of the Debtors' bankruptcy petitions (the **"Petition Time"**)

19

509265-0843-10731-NY01.2488240.17

(regardless of whether, as of the Petition Time, such funds had been collected or made available

for withdrawal by any such Debtor), such funds (the **"Deposited Funds"**) are subject to rights of

setoff. By virtue of such setoff rights, the Deposited Funds are subject to a lien in favor of such

Pre-Petition Secured Lenders pursuant to sections 506(a) and 553 of the Bankruptcy Code. Any

proceeds of the Pre-Petition Collateral (including the Deposited Funds or any other funds on

deposit at the Pre-Petition Secured Lenders or at any other institution as of the Petition Date) are

cash collateral of the Pre-Petition Secured Lenders within the meaning of section 363(a) of the

Bankruptcy Code. The Deposited Funds, all such proceeds of Pre-Petition Collateral and any

proceeds of Pre-Petition Collateral received by any Debtor after the Petition Time are referred to

herein as **"Cash Collateral."**

10.    *Use of Cash Collateral.* Subject to the right of any Committee to seek relief

under section 105 of the Bankruptcy Code, the Debtors are hereby authorized to use all Cash

Collateral of the Pre-Petition Secured Lenders, and the Pre-Petition Secured Lenders are directed

promptly to turn over to the Debtors all Cash Collateral received or held by them, provided that

the Pre-Petition Secured Lenders are granted adequate protection as hereinafter set forth. The

Debtors' right to use Cash Collateral shall terminate automatically upon one (1) business days'

written notice from the Agent or the Pre-Petition Agent to the Debtors and any Committee

following the earlier of (a) the Termination Date (as defined in the DIP Credit Agreement) or (b)

the occurrence and continuation of a Default or an Event of Default. In addition, if the Debtors

voluntarily terminate the Commitment prior to the Maturity Date (as each such term is defined in

the DIP Credit Agreement), the Debtors shall, for the benefit of the Pre-Petition Secured

Lenders, continue to comply with the requirements of Sections 5 and 6 of the DIP Credit

Agreement and, upon any failure by the Debtors to observe any such requirement or upon the

20

occurrence of any event that would have constituted an Event of Default under the DIP Credit

Agreement prior to the termination of the Commitment, the Pre-Petition Agent on behalf of the

Pre-Petition Secured Lenders shall have the immediate right upon one (1) business days' written

notice to unilaterally terminate the Debtors' right to use Cash Collateral.

11.    *Adequate Protection.*  The Pre-Petition Secured Lenders are entitled, pursuant to

sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their

interest in the Pre-Petition Collateral, including the Cash Collateral, for and equal in amount to

the aggregate diminution in value of the Pre-Petition Secured Lenders' interests in the Pre-

Petition Collateral, including, without limitation, any such diminution resulting from the sale,

lease or use by the Debtors (or other decline in value) of Cash Collateral and any other Pre-

Petition Collateral, the priming of the Pre-Petition Agent's security interests and liens in the Pre-

Petition Collateral by the Agent and the DIP Lenders pursuant to the DIP Documents and this

Order, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.

As adequate protection, the Pre-Petition Agent and the Pre-Petition Secured Lenders are hereby

granted the following (collectively, the **"Adequate Protection Obligations"**):

(a)    Adequate Protection Liens.  The Pre-Petition Agent (for itself and for the

benefit of the Pre-Petition Secured Lenders) is hereby granted (effective and perfected upon the

date of this Order and without the necessity of the execution by the Debtors of mortgages,

security agreements, pledge agreements, financing statements or other agreements) a

replacement security interest in and lien upon all the Collateral, subject and subordinate only to

(i) the security interests and liens granted to the Agent for the benefit of the DIP Lenders in this

Order and pursuant to the DIP Documents and any liens on the Collateral to which such liens so

granted to the Agent are junior and (ii) the Carve Out (the **"Adequate Protection Liens"**);

21

(b)    Section 507(b) Claim. The Pre-Petition Agent and the Pre-Petition Secured

Lenders are hereby granted, subject to the payment of the Carve Out, a superpriority claim as

provided for in section 507(b) of the Bankruptcy Code, immediately junior to the claims under

section 364(c)(1) of the Bankruptcy Code held by the Agent and the DIP Lenders, provided,

however, that the Pre-Petition Agent and the Pre-Petition Secured Lenders shall not receive or

retain any payments, property or other amounts in respect of the superpriority claims under

section 507(b) of the Bankruptcy Code granted hereunder or under the Existing Agreements

unless and until the DIP Obligations have indefeasibly been paid in cash in full and provided,

further, that notwithstanding anything to the contrary herein, to the extent that a plan of

reorganization proposes to repay the Pre-Petition Secured Lenders holding Adequate Protection

Obligations, on account of such Adequate Protection Obligations, other than in full in cash, the

Pre-Petition Secured Lenders holding such Adequate Protection Obligations shall be entitled to

vote on such plan of reorganization as a class of creditors under 1126 of the Bankruptcy Code;

(c)    Interest, Fees and Expenses. The Pre-Petition Agent (i) has received from

the Debtors on June 1, 2005, payment in full in cash of all accrued and unpaid interest on the

Pre-Petition Debt at the non-default rate provided for in the Existing Agreements, (ii) has

received from the Debtors payment in full in cash of all accrued and unpaid letter of credit fees

(at the non-default rate provided for in the Existing Agreements), commitment fees, and all other

fees and disbursements owing to the Pre-Petition Agent or the Pre-Petition Secured Lenders, as

the case may be, in each case incurred prior to the Petition Date and payable under the Existing

Agreements, (iii) shall receive from the Debtors payment in full in cash of all reasonable fees

and expenses incurred by the Pre-Petition Agent to the extent payable or reimbursable under the

Existing Agreements, including, but not limited to, the reasonable prepetition and post-petition

22

fees and disbursements of counsel and third-party consultants, including financial and other

consultants for the Pre-Petition Agent, and the continuation of the payment to the Pre-Petition

Agent of the administration fees that are provided for under the Existing Agreements; provided

that (x) professionals retained by the Pre-Petition Agent shall provide copies of invoices to

counsel to the Debtors, any Committee and the Office of the United States Trustee and the

Debtors shall pay such invoices within twenty (20) days unless an objection by any of the

foregoing parties is received by the Pre-Petition Agent and filed with the Court setting forth in

detail the nature of such party's objection and (y) none of the fees, costs and expenses of the Pre-

Petition Agent's advisors payable pursuant to this clause (iii) shall be subject to the approval of

this Court, and no recipient of any such payment shall be required to file with respect thereto any

interim or final fee application with this Court, and (iv) shall receive from the Debtors on the

first business day of each month, all accrued but unpaid interest on the Pre-Petition Debt

(including all similar obligations under swap and other agreements secured pursuant to the

Existing Agreements), at the prevailing LIBOR rate for each tranche outstanding as of the

Petition Time, which shall convert to the non-default ABR rate set forth in the Existing

Agreements upon the expiration of the term of each LIBOR tranche, and all accrued but unpaid

letter of credit and other fees, provided that, without prejudice to the rights of any other party to

contest such assertion, the Pre-Petition Secured Lenders reserve their rights to assert claims for

the payment of additional interest, letter of credit fees and any other fees described in the

Existing Agreements calculated at any other applicable rate of interest (including, without

limitation, default rates), or on any other basis, provided for in the Existing Agreements;

(d)    Monitoring of Collateral.  The Pre-Petition Secured Lenders shall be

permitted to retain expert consultants and financial advisors at the expense of the Debtors, which

consultants and advisors shall be given reasonable access for purposes of monitoring the

business of the Debtors and the value of the Collateral; and

(e)    Other Adequate Protection. The Debtors shall provide the Pre-Petition

Agent with any written financial information or periodic reporting that is provided to, or required

to be provided to, the Agent or the DIP Lenders and any of the financial reporting required

pursuant to the Pre-Petition Credit Agreement. The Debtors shall retain a chief restructuring

officer reasonably satisfactory to the Pre-Petition Agent on terms reasonably satisfactory to the

Pre-Petition Agent. Notwithstanding any other provision herein, this paragraph 11 shall not be

amended or modified without the prior consent of the Pre-Petition Agent.

12.    *Reservation of Rights of Pre-Petition Secured Lenders*. Under the circumstances

and given that the above described adequate protection is consistent with the Bankruptcy Code,

including section 506(b) thereof, the Court finds that the adequate protection provided herein is

reasonable and sufficient to protect the interests of the Pre-Petition Secured Lenders. However,

the Pre-Petition Agent and the Pre-Petition Secured Lenders may request further or different

adequate protection, and the Debtors or any other party may contest any such request. Moreover,

except as otherwise provided herein, nothing contained in this Order (including, without

limitation, the authorization of the use of any Cash Collateral) shall impair or modify the rights

of the Pre-Petition Agent, the Agent, any DIP Lender or any Pre-Petition Secured Lender.

13.    *Perfection of DIP Liens and Adequate Protection Liens.*

(a)    Subject to paragraph 8(a) of this Order, the Agent, the DIP Lenders, the Pre-

Petition Agent and the Pre-Petition Secured Lenders are hereby authorized, but not required, to

file or record Uniform Commercial Code financing statements, trademark filings, copyright

filings, mortgages, notices of lien or similar instruments in any jurisdiction or take any other

24

action in order to validate and perfect the liens and security interests granted to them hereunder.

Whether or not the Agent on behalf of the DIP Lenders or the Pre-Petition Agent on behalf of the

Pre-Petition Secured Lenders shall, in their sole discretion, choose to file such financing

statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments

or otherwise confirm perfection of the liens and security interests granted to them hereunder,

such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-

avoidable and not subject to challenge dispute or subordination, as of the Petition Date. Upon

the request of the Agent, each of the Pre-Petition Agent and Pre-Petition Secured Lenders,

without any further consent of any party, is authorized to take, execute and deliver such

instruments (in each case without representation or warranty of any kind) to enable the Agent to

further validate, perfect, preserve and enforce DIP Liens.

(b)    A certified copy of this Order may, in the discretion of the Agent, be filed

with or recorded in filing or recording offices in addition to or in lieu of such financing

statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby

authorized to accept such certified copy of this Order for filing and recording.

14.    *Preservation of Rights Granted Under the Final Order*.

(a)    Except for the Carve Out or as otherwise provided in the DIP Documents,

no claim or lien having a priority superior to or *pari passu* with those granted by this Order to the

Agent and the DIP Lenders or to the Pre-Petition Agent and the Pre-Petition Secured Lenders,

respectively, shall be granted or allowed while any portion of the Financing (or any refinancing

thereof) or the Commitments thereunder or the DIP Obligations or the Adequate Protection

Obligations remain outstanding, and the DIP Liens and the Adequate Protection Liens shall not

be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit

of the Debtors' estates under section 551 of the Bankruptcy Code or (ii) subordinated to or made pari passu with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(b)    Unless all DIP Obligations shall have been paid in full (and, with respect to outstanding letters of credit issued pursuant to the DIP Credit Agreement, cash collateralized in accordance with the provisions of the DIP Credit Agreement) and the Adequate Protection Obligations shall have been paid in full, the Debtors shall not seek, and it shall constitute an Event of Default and a termination of the right to use Cash Collateral if any of the Debtors seek, or if there is entered, (i) any modifications or extensions of this Order without the prior written consent of the Agent and, in the case of paragraphs 11, 15 and 16, the prior written consent of the Pre-Petition Agent, and no such consent shall be implied by any other action, inaction or acquiescence by the Agent or the Pre-Petition Agent, as applicable, (ii) an order converting any of the Cases to a case under chapter 7 of the Bankruptcy Code or (iii) an order dismissing any of the Cases.  If an order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code), to the fullest extent permitted by law, that (x) the Superpriority Claims, priming liens, security interests and replacement security interests granted to the Agent and, as applicable, the Pre-Petition Agent pursuant to this Order shall continue in full force and effect and shall maintain their priorities as provided in this Order until all DIP Obligations and Adequate Protection Obligations shall have been paid and satisfied in full (and that such Superpriority Claims, priming liens and replacement security interests, shall, notwithstanding such dismissal, remain binding on all parties in interest) and (y) this Court shall retain

jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in (x) above.

(c)    If any or all of the provisions of this Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the Agent or Pre-Petition Agent, as applicable, of the effective date of such reversal, stay, modification or vacation or (ii) the validity or enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Credit Agreement with respect to any DIP Obligations or Adequate Protection Obligations.  Notwithstanding any such reversal, stay, modification or vacation, any use of Cash Collateral, or DIP Obligations or Adequate Protection Obligations incurred by the Debtors to the Agent, the DIP Lenders, the Pre-Petition Agent or the Pre-Petition Secured Lenders prior to the actual receipt of written notice by the Agent and Pre-Petition Agent of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this Order, and the Agent, DIP Lenders, Pre-Petition Agent and Pre-Petition Secured Lenders shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Order and pursuant to the DIP Documents with respect to all uses of Cash Collateral, DIP Obligations and Adequate Protection Obligations.

(d)    Except as expressly provided in this Order or in the DIP Documents, the DIP Liens, the Superpriority Claims and all other rights and remedies of the Agent and the DIP Lenders granted by the provisions of this Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of

27

these Cases or by any other act or omission, or (ii) the entry of an order confirming a plan of

reorganization in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code,

the Debtors have waived any discharge as to any remaining DIP Obligations and such waiver is

hereby approved. The terms and provisions of this Order and the DIP Documents shall continue

in these Cases, in any successor cases if these Cases cease to be jointly administered, or in any

superceding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the Superpriority

Claims and all other rights and remedies of the Agent and the DIP Lenders granted by the

provisions of this Order and the DIP Documents shall continue in full force and effect until the

DIP Obligations are indefeasibly paid in full.

15.    *Effect of Stipulations on Third Parties.* The stipulations and admissions contained

in this Order, including, without limitation, in paragraph 3 of this Order, shall be binding upon

the Debtors in all circumstances and shall be binding upon all other parties in interest, including,

without limitation, any Committee, unless (a) a party in interest that has been duly authorized to

do so shall have timely filed an adversary proceeding or contested matter (subject to the

limitations contained herein, including, *inter alia,* in paragraph 16) by no later than September

21, 2005 (or, for the Creditors Committee, but no other party in interest, such later date as

(x) agreed among the Pre-Petition Agent and counsel to the Creditors Committee or (y) ordered

by the Court for cause shown, <u>provided</u> that any motion for an extension must be filed by the

Creditors Committee so as to be heard on regular (not expedited or shortened) notice prior to

September 21, 2005), (b) a chapter 7 trustee appointed or elected for any of the Debtors in any

subsequent chapter 7 cases shall have timely filed an adversary proceeding or contested matter

(subject to the limitations contained herein, including, *inter alia,* paragraph 16) by no later than

the date that is sixty (60) days after such appointment or election, and (c) there is a final order in

favor of the plaintiff sustaining any such challenge or claim in any such timely filed adversary

proceeding or contested matter. If no such adversary proceeding or contested matter is timely

filed, (x) the Pre-Petition Debt and all related obligations of the Debtors (the "**Pre-Petition**

**Obligations**") shall constitute allowed claims, not subject to counterclaim, setoff, subordination,

recharacterization, defense or avoidance, for all purposes in the Cases and any subsequent

chapter 7 cases, (y) the Pre-Petition Agent's and the Pre-Petition Secured Lenders' liens on the

Pre-Petition Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding

and perfected, not subject to recharacterization, subordination or avoidance and (z) the Pre-

Petition Obligations, any payments made prepetition in respect thereof, the Pre-Petition Agent's

and the Pre-Petition Secured Lenders' liens on the Pre-Petition Collateral and the Pre-Petition

Agent and the Pre-Petition Secured Lenders shall not be subject to any other or further challenge

by any party in interest seeking to exercise the rights of the Debtors' estates, including, without

limitation, any successor thereto (including, without limitation, any chapter 7 or 11 trustee

appointed or elected for any of the Debtors). Notwithstanding any contrary provision contained

herein, no stipulation or admission under this Order shall be deemed to be or to effect any

release, waiver or discharge of any claims, actions, causes of action, losses, obligations,

demands, attorneys' fees, or liabilities, of whatsoever kind, nature, character or description that

do not belong to the Debtors or their estates but instead belong solely to one or more non-Debtor

third parties.

16.    *Limitation on Use of Financing Proceeds and Collateral*. Notwithstanding

anything herein or in any other order by this Court to the contrary, no borrowings, letters of

credit, Cash Collateral, Collateral or the Carve Out may be used to (a) object, contest or raise any

defense to, the validity, perfection, priority, extent or enforceability of any amount due under the

DIP Documents or the Existing Agreements, or the liens or claims granted under this Order, the

DIP Documents or the Existing Agreements, (b) assert any Claims or Defenses or causes of

action against the Agent, the DIP Lenders, the Pre-Petition Agent or the Pre-Petition Secured

Lenders or their respective agents, affiliates, representatives, attorneys or advisors (other than for

fraud, gross negligence or willful misconduct), (c) prevent, hinder or otherwise delay the Agent's

or the Pre-Petition Agent's assertion, enforcement or realization on the Cash Collateral or the

Collateral in accordance with the DIP Documents, the Existing Agreements or this Order, (d)

seek to modify any of the rights granted to the Agent, the DIP Lenders, the Pre-Petition Agent or

the Pre-Petition Secured Lenders hereunder or under the DIP Documents or the Existing

Agreements, in each of the foregoing cases without such parties' prior written consent, (e) pay

any professional fees and disbursements incurred in connection with any of the actions described

in the foregoing clauses (a) through (d), and (f) pay any amount on account of any claims arising

prior to the Petition Date unless such payments are (i) approved by an Order of this Court and (ii)

in accordance with the Budget (as defined in the DIP Credit Agreement) as approved by the

Agent in its sole discretion, provided, however, that notwithstanding anything to the contrary

contained herein, (a) all Committees appointed in these cases shall be permitted up to $200,000,

in the aggregate, to perform such investigations with respect to the stipulations and admissions

referenced in paragraph 15 as the Committees may determine and (b) any fees or expenses paid

in respect of the assertion of any Claims or Defenses or causes of action against the Agent, the

DIP Lenders, the Pre-Petition Agent or the Pre-Petition Secured Lenders or their respective

agents, affiliates, representatives, attorneys or advisors for fraud, gross negligence or willful

misconduct shall be disgorged and repaid to the Debtors by the respective recipients thereof if

and to the extent the relevant court enters a final order resolving such Claims, Defenses or causes

30

of action that does not find such alleged fraud, gross negligence or willful conduct actually occurred.

17.    *JPMC as Agent*.  To the extent JPMC, in its role as Pre-Petition Agent under the Existing Agreements, is the secured party under any Collateral Documents (as defined in the Existing Agreements), listed as loss payee under the Debtors' insurance policies as required under the Existing Agreements or is the secured party under any other Existing Agreement, JPMC, in its role as Agent under the DIP Credit Agreement, is also deemed to be the secured party under such Collateral Documents, loss payee under the Debtors' insurance policies and the secured party under any other Existing Agreement and shall act in that capacity and, unless otherwise provided in the DIP Documents, distribute any proceeds recovered or received <u>first</u>, for the benefit of the DIP Lenders in accordance with the DIP Credit Agreement and <u>second</u>, subsequent to indefeasible payment in full of all DIP Obligations, for the benefit of the Pre-Petition Secured Lenders under the Existing Agreements.

18.    *Final Order Governs*.  In the event of any inconsistency between the provisions of this Order and the DIP Documents, the provisions of this Order shall govern.

19.    *Binding Effect; Successors and Assigns*.  The DIP Documents and the provisions of this Order, including all findings herein, shall be binding upon all parties in interest in these Cases, including, without limitation, the Agent, the DIP Lenders, the Pre-Petition Agent, the Pre-Petition Secured Lenders, any Committee appointed in these Cases, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors) and shall inure to the benefit of the Agent, the DIP Lenders, the Pre-Petition Agent, the Pre-Petition Secured Lenders and the Debtors and their respective successors and assigns, <u>provided, however,</u> that the Agent and the

DIP Lenders shall have no obligation to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors. In determining to make any loan under the DIP Credit Agreement or in exercising any rights or remedies as and when permitted pursuant to this Order or the DIP Documents, the Agent and the DIP Lenders shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).

20.    *Waiver of Claims Under 11 U.S.C. § 506(c).*  All claims under section 506(c) of the Bankruptcy Code are hereby waived such that, except to the extent of the Carve Out, no expenses of administration of the Cases or any future proceeding or case that may result therefrom, including liquidation in bankruptcy or any other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the Agent or the Pre-Petition Agent, as the case may be, and no such consent shall be implied from any other action, inaction, or acquiescence by the Agent, the DIP Lenders, the Pre-Petition Agent or the Pre-Petition Secured Lenders.

21.    *Reclamation Claims.*  The Debtors shall not, without the consent of the Agent (i) make any payments or transfer any property on account of the claims asserted by any vendor of the Debtors for reclamation rights in accordance with section 2-702 of the Uniform Commercial Code and Section 546(c) of the Bankruptcy Code or (ii) enter into any agreement to return any inventory to any of their creditors for application against any pre-petition indebtedness under

32

Section 546(g) of the Bankruptcy Code or consent to any creditor taking any set-off against any

of its pre-petition indebtedness based upon any such return pursuant to Section 553(b)(1) of the

Bankruptcy Code or otherwise.  Nothing in this Order prohibits any vendor of the Debtors from

asserting reclamation rights in accordance with the Order (A) Establishing Procedures for

Treatment of Valid Reclamation Claims and (B) Prohibiting Third Parties From Interfering With

Delivery of the Debtors' Goods, as entered by the Court on June 9, 2005, and all parties reserve

their rights as to the effect of prepetition and postpetition liens on otherwise valid reclamation

claims.

22.    *Proofs of Claim.*  (i) The Pre-Petition Agent and the Pre-Petition Secured Lenders

are hereby relieved of the requirement to file proofs of claim in these Cases with respect to the

Pre-Petition Debt and any other claims or liens granted hereunder or created hereby and (ii) the

Agent and the DIP Lenders are hereby relieved of the requirement to file proofs of claim in these

Cases with respect to any DIP Obligations and any other claims or liens granted hereunder or

created hereby.

23.    *The Interim Order.*  This Order supersedes the Interim Order and shall be deemed

effective as of the date and time of entry of the Interim Order.

24.    *Service of Final Order.*  The Debtors shall promptly mail or otherwise provide

copies of this Order to the parties having been given notice of the Final Hearing, to any other

party that has filed a request for notices with this Court and to the Creditors' Committee and its

counsel.

Dated: July 28, 2005

_____

UNITED STATES BANKRUPTCY JUDGE

33

509265-0843-10731-NY01.2488240.17