**Hearing Date: November 4, 2005**
                 **Hearing Time:  10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

  - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | : | |
|   In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
|        Debtors. | : | (Jointly Administered) |
| | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | | |

DEBTORS' RESPONSE TO STATEMENT OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN RESPONSE TO (A) DEBTORS' MOTION FOR ORDER UNDER 11 U.S.C. §§ 105(a), 363, 364, 1107 AND 1108 AND FED. R. BANKR. P. 6004 AND 9019 AUTHORIZING CONTINUATION OF VENDOR RESCUE PROGRAM AND PAYMENT OF PREPETITION CLAIMS OF FINANCIALLY DISTRESSED SOLE SOURCE SUPPLIERS AND VENDORS WITHOUT CONTRACTS AND (B) MOTION FOR ORDER UNDER 11 U.S.C. §§ 105(a), 363, 1107 AND 1108 AUTHORIZING (I) PAYMENT OF PREPETITION OBLIGATIONS TO FOREIGN CREDITORS AND (II) FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this response (the "Response") to the Statement of the Official Committee of Unsecured Creditors (the "Committee") in Response to (a) Debtors' Motion for Order Under 11 U.S.C. §§ 105(a), 363, 364, 1107, and 1108 and Fed. R. Bankr. P. 6004 and 9019 Authorizing Continuation of Vendor Rescue Program and Payment of Prepetition Claims of Financially Distressed Sole Source Suppliers Without Contracts [sic] and (b) Motion for Order Under 11 U.S.C. §§ 105(a), 363, 1107, and 1108 Authorizing (i) Payment of Prepetition Obligations to Foreign Creditors and (ii) Financial Institutions to Honor and Process Related Checks and Transfers (the "Statement"). In support of this Response, the Debtors respectfully represent as follows:[1]

Preliminary Statement

1. On October 8, 2005 (the "Petition Date"), the Debtors filed each of (a) the Motion for Order Under 11 U.S.C. §§ 105(a), 363, 364, 1107 and 1108 and Fed. R. Bankr. P. 6004 and 9019 Authorizing Continuation of Vendor Rescue Program and Payment of Prepetition Claims of Financially Distressed Sole Source Suppliers and Vendors Without Contracts (the

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Essential Supplier Motion or the Foreign Creditor Motion (each as defined below), as appropriate.

2

"Essential Supplier Motion") and (b) the Motion for Order Under 11 U.S.C. §§ 105(a), 363, 1107, and 1108 Authorizing (i) Payment of Prepetition Obligations to Foreign Creditors and (ii) Financial Institutions to Honor and Process Related Checks and Transfers (the "Foreign Creditor Motion" and, collectively with the Essential Supplier Motion, the "Motions").  Pursuant to the Motions, the Debtors, as is necessary and reasonable for chapter 11 debtors of this size and in this industry, sought, among other things, the ability to make payments on account of prepetition obligations owed to certain narrowly-tailored categories of creditors.  See, e.g., In re Tower Auto., Inc., Case No. 05-10578 (ALG) (Bankr. S.D.N.Y. Mar. 14, 2005); In re Meridian Auto. Sys. – Composites Operations, Inc., Case No. 05-11168 (MFW) (Bankr. D. Del. Apr. 27, 2005 and May 26, 2005).

    2.  Specifically, pursuant to the Essential Supplier Motion, the Debtors requested authority to pay those of its suppliers (the "Essential Suppliers") that both (a) were the sole source from which the Debtors could currently purchase the particular good or service provided thereby and (b) met one of the following three criteria: (i) had no enforceable long-term contracts with the Debtors, (ii) had contracts with the Debtors that may be terminable for any reason, or (iii) are so financially distressed that payments to the vendor are necessary for the vendor to survive and production to continue.  The relief sought under the Essential Supplier Motion is much more limited than that sought under a typical "critical vendor" motion.

    3.  As described more fully below, the Debtors maintain only minimal inventories of parts and often have only one source from which they purchase any given part. Therefore, when considering requests under the Essential Supplier Motion received from suppliers that are experiencing severe financial distress, the Debtors frequently do not have the luxury of making decisions as to whether to pay the claims of an Essential Supplier on an open-

3

ended timeframe. The Debtors' manufacturing facilities will quickly be idled by a delay in the receipt of parts from a supplier. Furthermore, an interruption of one of the Debtors' manufacturing facilities will rapidly affect the operations of the Debtors' customers, thereby jeopardizing the Debtors' goodwill with their customers and exposing the Debtors' estates to significant damage claims.

        4.        Pursuant to the Foreign Creditors Motion, the Debtors requested authority to pay certain prepetition claims (the "Foreign Claims") owing to vendors, service providers, regulatory agencies, and governments located in foreign jurisdictions (collectively, the "Foreign Creditors"). In an effort to ensure that they sought only the relief as was absolutely necessary, the Debtors narrowed the definition of "Foreign Creditors" from that commonly used in similar motions filed in comparable cases by expressly excluding any foreign vendors, service providers, and other non-governmental entities that are known to have substantial assets within the United States that would be subject to the jurisdiction of this Court and that would be available to satisfy a judgment entered by this Court if such entities were to violate the automatic stay provisions of section 362 of the Bankruptcy Code or otherwise take any action contrary to an order of this Court or the provisions of the Bankruptcy Code.

        5.        The Court conducted a hearing on the Motions on October 11, 2005, when the Court granted the Motions, subject to limited look back rights granted to, <u>inter</u> <u>alia</u>, the Committee, once appointed. Although 170 parties were served with notice of the Motions -- including the Debtors' top 50 creditors, the agent to the Debtors' prepetition and postpetition facilities, and the Debtors' unions -- only the Committee filed a written opposition to the Foreign

4

Creditor Motion and only one other party filed a written objection to the Essential Supplier Motion, which was resolved at the first day hearing.[2]

      6.      In accordance with the Committee's right to review the order approving the Essential Supplier Motion (the "Essential Supplier Order") and the order approving the Foreign Creditor Motion (the "Foreign Creditor Order" and, collectively, the "Orders"), on October 25, 2005, the Committee filed its Statement. Specifically, the Committee generally supports the relief sought in the Motions and granted by the Court in the Orders, but has requested that its financial advisor, Mesirow Financial Consulting LLC ("Mesirow"), be notified in advance of (i) any payment or transfer made pursuant to either of the Orders in excess of $1 million or (ii) any payment or transfer made in excess of the aggregate estimate of claims identified in the Foreign Creditors Motion ($40 million) or in excess of the cap provided in the Essential Supplier Order ($90 million) (the "Essential Supplier Claims Cap").[3]

      7.      The Debtors believe that the Committee's request, if granted, would be harmful to the Debtors' efforts to reorganize. As noted above, the Debtors have narrowly tailored the relief sought under the Motions and granted under the Orders so as to seek only that relief which was absolutely necessary to be able to sustain their on-going operations. The Committee's proposed changes to the Orders would add another layer of complexity to the Debtors' carefully organized and streamlined processes for reviewing requests for payment under the Orders and for making determinations as to whether such payments are justified. Such added

---

[2]    The agent for the Debtors' prepetition facility had "look back" rights similar to the Committee's, but did not file an objection to either Motion.

[3]    While other issues were raised by the Committee, those issues have been resolved consensually and therefore this Response deals only with the Committee's open issues.

5

complexity could delay the decision making process, which in turn could endanger the Debtors' ability to avoid interruptions in their supply chain.

        8.      Furthermore, the Debtors and their advisors have reviewed in detail with the Committee and its advisors the processes used by the Debtors to evaluate requests for payment under the Orders. The Committee has advised the Debtors that it is comfortable with the propriety of those processes. The Debtors respectfully assert that the Committee's role is properly limited to the review of the processes, which the Committee has completed, and the monitoring of the Debtors' compliance with these processes. What the Committee seeks, however, is to usurp the role of the Debtor in the process and to insert itself into the processes in such a way as to limit the Debtors' ability to effectively exercise their business judgment. Simply put, the Committee's requested pre-notification rights will potentially put the Debtors' management in the untenable position of being forced to elect whether to pay an Essential Supplier or Foreign Creditor based upon extensive diligence completed by the Debtors and their advisors but over the objection of the Committee and its advisors, based upon a much more limited review of the situation. Given the importance of the Debtors' ability to exercise their business judgment in a timely and effective manner, the Debtors' management cannot be put into the position of having each decision subject to the second-guessing that would evolve from such a scenario. As such and in light of the fact that the Committee's financial advisors have reviewed the process that the Debtors' have established for utilizing the authority under the Orders, the Committee's requests in the Statement are simply not justified in the instant case.

6

Argument

9.     As described at length in the Motions, the Debtors' manufacturing facilities rely upon the "just-in-time" and sole source supply methods for processing their products. These methods are each standard practice in the automotive industry and are used not only by other automotive equipment suppliers, but, more importantly, by the Debtors' original equipment manufacturer ("OEM") customers. Use of the just-in-time supply method means that the Debtors do not maintain a significant inventory of the components supplied by the Essential Suppliers and Foreign Creditors (in many cases, less than 24 hours) and, accordingly, the Debtors rely upon frequent shipments and, in many cases, multiple shipments each day of components from such suppliers to keep their manufacturing facilities operating. Similarly, the Debtors' OEM customers do not maintain a significant inventory of the Debtors' products (in many cases, less than 24 hours) and rely instead upon frequent shipments of such products to keep their manufacturing plants operating. A shutdown of even one assembly line could cause an affected OEM customer to assert damages against the Debtors exceeding $10 million per day.

10.    Under the sole source supply method, the Debtors purchase all of their requirements for a particular part from one supplier. Each of these parts must meet demanding specifications imposed by both the Debtors and their OEM customers before they can be used in manufacturing the Debtors' products. In this regard, numerous tests, sometimes taking place over the course of several months, must be run to validate and qualify each of the parts. The Debtors employ the sole source supply method to reduce the cost of production start-up, capital investment, and validation costs necessary to make each part, to achieve a consistent quality of parts, and to achieve economies of scale. However, use of the sole source supply method also means that the Debtors cannot quickly replace a supplier that stops performing under its

7

agreements with the Debtors (as would potentially be the case with an unpaid Foreign Creditor) or that cannot continue its business operations because of financial difficulty (which would almost certainly be the case for each Essential Supplier if not paid). Even when accelerated, the delivery of capital equipment, the tooling build, and the testing and approval process for validating new suppliers typically takes three to six months or more to complete.

11. It is these realities which lead the Debtors to request the relief granted under the Orders and it is under these constraints that the Debtors have successfully operated since the Petition Date. Despite having a supplier base of thousands of separate companies, some of which have been forced to file for chapter 11 themselves as a result of the Debtors' filings, the Debtors have managed to honor their promise to their customers that the Debtors' chapter 11 filings will not adversely impact their customers' operations. The relief granted under the Orders has been instrumental in enabling the Debtors to achieve this result to date, a result which is no small feat given the nature of their businesses.

12. One key element of the Debtors' ability to maintain all of their operations, and to protect their relationships with their customers by ensuring that their customers' operations are not interrupted, has been the Debtors' ability to react quickly and decisively. Many of the companies that make up the Debtors' supplier base are small, privately-held companies that were either (a) unable to adequately prepare contingency plans to deal with the Debtors' filing and concomitant inability to pay prepetition claims to such suppliers or (b) unable to mitigate their exposure to the Debtors because business from the Debtors makes up such a substantial portion of such suppliers' overall book of business. While many suppliers quickly faced a dire financial situation following the Debtors' filing, other suppliers likely have yet to realize the full impact of the Debtors' chapter 11 filings, because such suppliers sell goods to the

Debtors on MNS-2 payment terms. Accordingly, suppliers being paid under such terms did not experience a missed payment on account of the Debtors' filings until yesterday, which was the November payment date.[4] As such, the Debtors' supply base has not yet stabilized and the Debtors still anticipate facing numerous crisis situations on a daily basis.

        13.    While the flexibility provided under the Orders to make payments as the Debtors see fit has been invaluable in protecting the Debtors' on-going operations, the Debtors have exercised the discretion granted to them extremely judiciously. As of the close of business on October 28, 2005, the Debtors had approved payment of claims of less than four percent of all suppliers requesting payment under the Essential Supplier Order and claims of less than twenty percent of all creditors requesting payment under the Foreign Creditor Order. On a dollar basis, the Debtors have utilized less than 24% of the authority granted to them under the Essential Supplier Order and less than 60% of the amount of Foreign Creditor claims estimated in the Foreign Creditor Motion, despite being nearly a month into these chapter 11 cases. As such, it should be clear to all parties-in-interest, including the Committee, that the Debtors have not sought to abuse the authority granted to them by this Court.

        14.    Moreover, the Debtors' Vendor Rescue Program has been in place for many years and is an ordinary course program that is typical in the auto industry. Such program exists for those suppliers for whom even timely payments of all prepetition invoices is not sufficient to ensure their financial viability. These Troubled Suppliers find themselves in such dire straits that they need the assistance of the Debtors or other outside advisors provided by the

---

[4] "MNS-2" refers to the most common payment terms in the Debtors' industries, whereby payment for goods supplied is generally due on the second business day of the second month following the receipt of such goods. Therefore, under these terms, payment for goods received by the Debtors during the month of September 2005 was due on November 2, 2005.

Debtors to, among other things, (a) obtain sufficient financing to ensure the steady flow of raw materials necessary to manufacture the components ordered by the Debtors, (b) honor their payroll obligations and other business expenses, and/or (c) restructure their operations so as to allow their businesses to continue to operate.

15.     In part, out of the abundance of caution, the Debtors sought Bankruptcy Court approval to continue this program. If a vendor is so severely distressed to be in this program, then there is no time to prepare for and provide the Committee with prior notification. Indeed, these suppliers are typically so distressed that they are usually on the verge of liquidation. Because so many of these critical suppliers are sole source suppliers, absent the Debtors' quick response under their Vendor Rescue Program, the supply of critical parts may cease, which could shut down a customer. This cannot be allowed to happen.

16.     The Debtors therefore assert that the relief sought by the Committee in the Statement is both unjustified and unreasonable. There is simply no need for pre-notification by the Committee and, more importantly, any incremental benefit that the Committee may believe would be provided by their proposal would be outweighed by the potential harm to the Debtors' business operations by the potential delay that the Committee's requested involvement may entail. As noted above, the failure by just one of the Debtors' thousands of suppliers to provide parts to the Debtors on a timely basis could begin shutting down the assembly lines of the Debtors' OEM customers almost immediately. Such a shutdown could lead to a customer's assertion of tens of millions of dollars in damages related to such shutdown and surely cause irreparable damage to the Debtors' business relationships that are crucial to the Debtors' ability to formulate and execute a successful reorganization strategy.

17. The Debtors have been unable to achieve a workable compromise to address the Committee's concerns. The Debtors propose that: (a) the Debtors will provide the Committee with a weekly tracking report summarizing payments and requests for payment under the Orders and (b) the Debtors and their financial advisors (FTI Consulting Inc.) will participate in a regularly-scheduled conference call with the Committee and/or Mesirow to review payments in excess of $2 million made pursuant to the Orders on a post-disbursement basis.[5] The Debtors respectfully assert that this proposal should address the Committee's concerns while maintaining the Debtors' ability to respond quickly to potential disruptions of its supply chain. Such disruptions would, if not addressed on an expedited basis, potentially cause harm far in excess of the cost of remedying such issues through the authority provided under the Orders and jeopardize the future recoveries of all creditors of the Debtors, including those to which the Committee owes a fiduciary duty.

---

[5] The Debtors have proposed that such calls be held on a weekly basis through December 31, 2005 and on a monthly basis thereafter.

11

       WHEREFORE the Debtors respectfully request that this Court enter an order (a) overruling the objections contained in the Statement, (b) granting the Motions on a final basis, and (c) granting the Debtors such other and further relief as is just.

Dated: New York, New York
       November 3, 2005

       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

       By: /s/ John Wm. Butler, Jr.
          John Wm. Butler, Jr. (JB 4711)
          John K. Lyons (JL 4951)
          Ron E. Meisler (RM 3026)
       333 West Wacker Drive, Suite 2100
       Chicago, Illinois  60606
       (312) 407-0700

       - and -

       By: /s/ Kayalyn A. Marafioti
          Kayalyn A. Marafioti (KM 9632)
          Thomas J. Matz (TM 5986)
       Four Times Square
       New York, New York  10036
       (212) 735-3000

       Attorneys for Delphi Corporation, et al.,
       Debtors and Debtors-in-Possession