# **<u>EXHIBIT K</u>**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
          In re                               :        Chapter 11
                                              :
DELPHI CORPORATION, et al.,                   :        Case No. 05-44481 (RDD)
                                              :
                          Debtors.            :        (Jointly Administered)
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO DIP FINANCING MOTION

        Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the

"Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively,

the "Debtors"), hereby submit this reply (the "Omnibus Reply") to the objections (each an

"Objection" filed by an "Objector", collectively, the "Objections" filed by "Objectors") to the

Motion for Order Under 11 U.S.C. §§ 105, 361, 362, 363, 364(c), 364(d) and 364(e) and Fed. R.

Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors to Obtain Postpetition Financing on

Superpriority Secured and Priming Basis, (II) Authorizing Use of Cash Collateral, (III) Granting

Adequate Protection To Prepetition Secured Lenders, (IV) Granting Interim Relief, and (V)

Scheduling A Final Hearing Under Fed. R. Bankr. P. 4001(b) and (c) (the "Motion").  In support

of this Motion, the Debtors respectfully represent as follows:[1]

<u>PRELIMINARY STATEMENT</u>

1.      The Debtors filed the Motion on October 8, 2005, seeking approval of a

$4.5 billion financing package consisting of approval of $2 billion in senior secured debtor-in-

possession (DIP) financing from a group of lenders led by JPMorgan Chase Bank and Citigroup

Global Markets, Inc. and approval of an adequate protection package for the benefit of its

prepetition lenders for the $2.5 billion borrowed from prepetition revolver and term loan

facilities.

2.      The Court conducted an interim hearing on the Motion on October 11,

2005, at which the Court authorized the Debtors to use Cash Collateral and obtain interim credit

from the DIP in an amount up to $950 million.  The Final Hearing is scheduled for October 27,

2005.

3.      The Debtors do not have an alternative to the Financing, which is

necessary to preserve the Debtors' assets and for the Debtors to operate their businesses so as to

---

[1]      Capitalized terms used but not defined herein shall have the meanings ascribed in the
        Motion.

maximize value for all of the Debtors' stakeholders.  Moreover, the Financing is the product of

arm's length negotiation, and its terms are fair, reasonable and appropriate.

4.        As of the time and date of this Omnibus Reply, while 1,164 parties were

served with notice of the Interim Order and the final hearing, only 35 Objections had been filed

to the final relief sought in the Motion.  Of those Objections, only a single objector -- the self-

styled "Ad Hoc Committee of Prepetition Lenders" organized by the Goodwin Procter LLP law

firm (the "Goodwin Proctor Group") -- is seriously opposing the Court's approval of the Motion

on a final basis.  Upon information and belief, only one member of the Goodwin Proctor Group

owned any interest in the prepetition revolver and term facilities prior to the Petition Date and

most of the members paid par or premiums to par to acquire their interests following the Court's

approval of the Interim Order and the adequate protection package approved by the Interim

Order.  Also upon information and belief, despite their best efforts, the Goodwin Proctor Group

was unable to persuade the requisite lenders in the prepetition revolver and loan facilities to

direct the Prepetition Agent to object to the Motion or to direct the Agent not to permit the

continuation of LIBOR-based interest accruals in those facilities (assuming that such action

could have been taken in any event without violation of the automatic stay or would be otherwise

permissible or enforceable).  Indeed, the Prepetition Agent has filed a statement with the Court to

the effect that the Agent is <u>not</u> objecting to the final relief sought in the Motion (subject to its

confirmation that the Final Order incorporates certain changes agreed to with the Debtors, is

otherwise satisfactory in form and substance, and no other changes to the proposed Final Order

are adverse to the interests of the Agent on behalf of the prepetition revolver and term lenders).

5.        Other than the Goodwin Proctor Group, the balance of the objections

address discrete issues.  30 of the Objections address concerns regarding the preservation of set-

off rights under section 553 of the Bankruptcy Code and related discrete issues.  The Debtors

believe that these Objections should be resolved by revisions that have been made to the Final

Order to address such objections. The Pension Benefit Guaranty Corporation filed an Objection

that the Debtors were able to resolve.  Bank of America, an aircraft lessor, has filed an Objection

that raises issues unique to its circumstance but which the Debtors believe should be resolved by

revisions that have been made to the Final Order to address such objections.   The Official

Committee of Unsecured Creditors (the "Committee") filed a "Statement" rather than an

Objection and seeks certain changes to the proposed Final Order consistent with the Committee's

views but does not seek the Court's rejection of the proposed financing package.  The proposed

Final Order submitted to the Court reflects numerous comments and suggestions made by the

Committee's professionals.  While the Debtors and other stakeholders with an interest in the form

and substance of the Final Order are unable to accommodate all of the Committee's requests --

and believe some of the comments in the Statement do not comport with applicable law, the local

rules or customary practice in the Southern District of New York -- the Debtors believe that the

Committee will support approval of the relief sought in the Motion.   The Debtors believe that

any other filed Objections (including the Objection filed this morning by General Motors

Corporation) are "placeholders" to reserve rights pending review and approval of the form of the

Final Order.

         6.      The Goodwin Proctor Group's objection (the "Goodwin Proctor

Objection") contends that the Financing should not be approved because financing was available

to the Debtors on a non-priming basis and, to the extent the Court disagrees with the Goodwin

Proctor Group on this point, the Prepetition Secured Lenders are not adequately protected by the

package of adequate protection offered by the Debtors.

7.     As set forth below, under the Prepetition Credit Agreement, the Goodwin
Proctor Group has no contractual basis to object to the priming of the Prepetition Secured
Lenders' liens and security interests in the Prepetition Collateral given the Prepetition Agent's
consent to such priming.  Upon information and belief, the vast majority of the Goodwin Proctor
Group acquired their respective claims after the Petition Date.[2]  Any lender that acquired its
claim with knowledge of the Interim Order and the adequate assurance offered therein, should be
deemed to have consented to the Debtor's adequate protection package.  To the extent the Court
nevertheless considers the merits of the Goodwin Proctor Objection to be relevant, it is a baseless,
thinly veiled attempt by the Group, acting contrary to the actions of the Prepetition Agent and
majority lenders ("Required Lenders"), to receive consideration to which it is not entitled, to the
detriment of the Debtors' other stakeholders.

8.     Attached hereto as <u>Exhibit A</u> is a blacklined copy of the revised Final
Order, marked to show changes that the Debtors have made to the originally proposed Final
Order in the interest of resolving certain of the Objections.  In addition, to assist the Court in
analyzing the Objections, attached hereto as <u>Exhibit B</u> is a chart summarizing the issues raised in
each Objection, the basis for the objections, the Debtors' responses to the objections and, if
applicable, the revisions to the Final Order that address the objection.  As set forth above, while
there are multiple Objectors, many of these raise overlapping objections.  Accordingly, attached
hereto as <u>Exhibit C</u> is a chart that summarizes, and is organized according to, each objection
raised, including the basis for the objection, the Debtors' response thereto and, if applicable, any

---

[2]     The Debtors make this assertion "upon information and belief" because the Goodwin
Proctor Group has refused the Debtors' repeated requests for information concerning the
make-up of the Group and their respective holdings.

revisions that have been made to the Final Order to address the objection.  Exhibits A, B and C

are incorporated herein by reference.

ARGUMENT

A.    Standards for Approval of Postpetition Secured Financing

9.    The Debtors propose to obtain financing under the DIP Credit Agreement

by providing security interests and liens as set forth in the Motion pursuant to sections 364(c)

and (d) of the Bankruptcy Code.  Because no one objects to the Debtors' obtaining financing

under section 364(c), the Debtors limit their discussion here to section 364(d).

10.    Section 364(d)(1) of the Bankruptcy Code permits this Court, after notice

and a hearing, to "authorize the obtaining of credit or the incurring of debt secured by a senior or

equal lien on property of the estate that is subject to a lien only if

(A)    the trustee is unable to obtain such credit otherwise; and

(B)    there is adequate protection of the interest of the holder of the lien on the property

of the estate on which such senior or equal lien is proposed to be granted."

11 U.S.C. § 364(d)(1).

11.    Courts in this district regularly allow debtors to prime existing lienholders

where section 364(d)(1)'s two-prong test is satisfied.  See In re Delta Air Lines, Inc., 05-

17923(PCB); In re Tower Automotive, Inc., 05-10578 (ALG); In re Adelphia Communications

Corp., 02-41729 (REG); Parmelat USA Corp., 04-11139 (RDD); In re Spiegel, Inc., 03-11540

(CB); NRG Energy, Inc., 03-13024 (PCB); In re Acterna Corp., 03-12837 (BRL); In re

Bethlehem Steel Corp., 01-15288 (BRL).  In the instant case, as discussed below, the Debtors

satisfy both prongs of the 364(d) test and, therefore, should be entitled to prime the liens and

security interests of the Prepetition Secured Lenders in the Prepetition Collateral.

6

B.     Debtors Unable to Obtain Postpetition Financing on a Non-Priming Basis

12.     The Debtors should be allowed to obtain credit through a priming facility because, as the Debtors will establish at the hearing, a working capital facility of the type and magnitude they require could not have been obtained without priming the liens of the Prepetition Secured Lenders.  The Financing is the result of a thorough, arm's length process.  Specifically, the Debtors and their advisors canvassed a number of global banks in an effort to obtain DIP financing.  As will be established at the hearing, the Debtors and their advisors generally insisted that the potential lenders provide them with the most advantageous financing proposals possible, and specifically insisted on receiving both priming and non-priming proposals from each interested lender.  In sum, the Debtors sought what the market had to offer.

13.     As will be demonstrated at the hearing, the Debtors received financing proposals from four lenders, with each providing proposals for both a facility that required priming liens and one that did not.  The "non-priming" proposals consisted principally of proposals for so-called "take-out" financing, which is designed to refinance existing credit facilities.  As is typical of this process, the Debtors and their advisors then negotiated further with each of the potential lenders over the terms and conditions of any financing.

14.     During this process, the Debtors, in consultation with their advisors, concluded to pursue a priming based DIP finance facility rather than a refinancing because, in the exercise of their business judgment, the execution risks associated with a refinancing were untenable and the Debtors would be deprived of at least $500 million in liquidity to support the reorganization and Delphi's global businesses (which are owned directly and indirectly by at least one of the Debtors).  Stated differently, the risk that a refinancing proposal would not close was deemed unacceptable.  This execution risk was attributable to market factors as well as

7

considerations specific to the Prepetition Credit Facility.  The Debtors received advise consistent

with this view from both their own financial advisors and from the marketplace through

consultations with and recommendations received from the potential lenders.

15.    While the Debtors were in discussions with potential DIP financing

lenders, a number of other major companies, including Delta Air Lines, Inc. and Northwest

Airlines Corp., were also seeking DIP financing.  Potential lenders to the Debtors indicated that

these cases risked taxing the capacity of DIP financing in the market.  There was also a great

deal of speculation in the market that the October 17, 2005 Bankruptcy Code amendments would

result in a spate of early- to mid-October filings, which would have further reduced available

liquidity.  In light of these circumstances, there was considerable doubt as to the viability of a

refinancing facility.  As significantly, prior to successfully addressing the economic realities that

gave rise to the commencement of these cases (such as unsustainable legacy liabilities), the

Debtors will continue to use a significant amount of cash in their U.S. operations.

16.    In addition, as can be established at the Final Hearing, to syndicate a term

facility to refinance the Prepetition Credit Facility would have required the participation of many

of the existing prepetition lenders.  Such participation would have been difficult to achieve, and

expensive to obtain, because the debt under the Prepetition Credit Agreement was trading above

par on or about the Petition Date.

17.    While the Goodwin Proctor Group contends that the ability to prime an

existing lien is an extraordinary remedy, the sheer size of the financing at issue here, $4.5 billion

considering the claims of the Prepetition Secured Lenders and the DIP Lenders in the aggregate,

is itself unique.  The extraordinary size of the Financing is clearly perceived in the context of

other "mega" chapter 11 cases:  <u>WorldCom, Inc</u>, 02-13533 (AJG) ($2 billion DIP facility), <u>Enron</u>

Corp, 01-16035 (AJG) (initial $1.5 billion DIP facility), <u>Delta Airlines, Inc.</u>, 05-17923 (PCB)

($2.25 billion facility), and <u>Adelphia Communications Corp.</u>, 02-41729 (REG) ($1.5 billion

facility).

18.    The damage to the Debtors' businesses absent DIP financing requires

virtually no explanation.  Many of the Debtors' employees, customers, and suppliers continue to

do business with the Debtors because the ample liquidity to be provided by the Financing has

been on the horizon from the start of these cases.  It was the Debtors' business judgment that the

execution risk associated with "take out" financing rendered a priming facility the only viable

option.

C.    <u>Goodwin Proctor Group Lacks Standing To Contest Adequate Assurance</u>

**(i)    Prepetition Agent's Consent to Priming Binds Minority Lenders**

19.    Each lender under the Pre-Petition Credit Agreement designates and

appoints the Prepetition Agent as the agent of such lender.  Section 9.1 (Appointment) of the

Prepetition Credit Agreement provides, in relevant part:

> "Each Lender hereby irrevocably designates and appoints the Administrative
> Agent as the agent of such Lender under this Agreement and the other Loan
> Documents, and each such Lender irrevocably authorizes the Administrative
> Agent, in such capacity, to take such action on its behalf under the provisions of
> this Agreement and the other Loan Documents and to exercise such powers and
> perform such duties as are expressly delegated to the Administrative Agent by the
> terms of this Agreement and the other Loan Documents, together with such other
> powers as are reasonably incidental thereto, including, without limitation, the
> execution of intercreditor agreements in connection with transactions permitted
> under this Agreement (and each Lender hereby agrees to be bound by any such
> agreement)."

20.    In addition, the Prepetition Credit Agreement provides that each lender is

bound by any action taken, or not taken, by the Prepetition Agent acting at the direction of

Required Lenders.  Section 9.4 (Reliance by Administrative Agent) refers to direction by

Required Lenders:

> "The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, all Lenders), **and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans**."

21.    Finally, the liens under the Prepetition Credit Agreement were granted to

the Prepetition Agent, and the Prepetition Agent is the party empowered to exercise remedies in

respect of the Collateral.  Section 6.8 of the Guarantee and Collateral Agreement provides that:

> "Notwithstanding anything to the contrary elsewhere in the Loan Documents, the Administrative Agent shall have full and complete authority and discretion (a) to determine the order in which it shall exercise remedies against any of the Collateral and (b) to alter the order set forth herein or in any other Security Document of the application to the Obligations of any proceeds realized upon the exercise of any such remedies in respect of the Collateral (including to provide for the holding of any such proceeds in any Collateral Account pending the consummation of any realization of or upon any other Collateral) as it shall determine, in each case with the objective of assuring that the ultimate realizations by the Lenders on account of all the Collateral are as ratable as is reasonably practicable."

22.    Under the relevant agreements, the actions of the Prepetition Agent as they

relate to Collateral (i.e., to accept the Debtors' adequate protection package in lieu of further

attempting to exercise remedies) binds all Prepetition Secured Lenders.  There is nothing unjust

or inequitable about this result.  The Goodwin Proctor Group freely became minority parties to a

credit facility that, like virtually every syndicated credit facility, is subject to majority lender

control.

### (ii)    Goodwin Proctor Group Acquired Their Claims Post-Petition

23.    Upon information and belief, with limited exception, the Goodwin Proctor

Group consists of funds managed by entities that acquired their claims after the Petition Date,

and in likely every instance after entry of the Interim Order.  The Goodwin Proctor Group

contends that evidence of their trading positions is irrelevant, and have refused the Debtors'

repeated requests for information concerning the make-up of the Group and their respective

holdings.  Of course, evidence that most of the Goodwin Proctor Group acquired their claims

with notice of the Interim DIP Order's adequate protection package is highly probative of the

sufficiency of such adequate protection.  The Debtors question the motivation of funds that

object to an adequate protection package, where they had notice of the terms and conditions of

such package at the time that they acquired their claims.

D.    The Prepetition Lenders' Security Interest is Adequately Protected

24.    Notwithstanding the Goodwin Proctor Groups' arguments to the contrary,

the security interests of the prepetition lenders are adequately protected.  Section 361 of the

Bankruptcy Code provides that, when adequate protection is required under section 364, such

adequate protection may be provided by:  "(1) requiring the [debtor] to make a cash payment or

periodic cash payments to such entity . . . (2) providing to such entity an additional or

replacement lien . . . or (3) granting such other relief . . . as will result in the realization by such

entity of the indubitable equivalent of such entity's interest in such property."  11 U.S.C. § 361.

Section 361(3) provides the parties and this Court with some degree of flexibility in fashioning

an adequate protection package.  See In re Reading Tube Indus., 72 B.R. 329, 333 (E.D. Pa.

1987).

25.    The adequate protection package proposed here more than meets the

standards set forth in section 361.  First, as will be demonstrated at the Final Hearing, the

Prepetition Secured Lenders are oversecured under the Financing by an equity cushion that

exceeds their equity cushion in the Prepetition Collateral.  The value of the collateral package

securing the Financing is as much as $8.45 billion, resulting in as much as an approximate $4 billion equity cushion.  The Debtors believe than an equity cushion of 25% or less of this amount would be substantially more than is required by applicable case law.  Numerous courts have held that an equity cushion satisfies the requirements of section 361.  See Id.; In re Sky Valley, Inc., 100 B.R. 107, 114 (N.D. Ga. 1988).  Moreover, "individual methods of providing protection may be combined to produce sufficiently adequate protection."  Id.  Beyond the equity cushion, the Prepetition Secured Lenders are receiving a replacement lien, a section 507(b) superpriority claim, payment of accrued and unpaid interest, payment of current monthly interest at the non-default LIBOR rate, payment of the Prepetition Agent's fees and expenses, and information rights.  The Debtors submit that the equity cushion alone would satisfy the section 364(d)(1) requirement for adequate protection.  In the aggregate, the above package more than meets the adequate protection standard.

26.    In their objection, the Goodwin Proctor Group cites to a leading treatise, which states "if the debtor is offering a replacement lien to the original lender, it is reasonable to inquire why the new lender could not accept the replacement collateral instead of priming the existing lien."  3 Collier on Bankruptcy 364.05[1] (15th Rev. Ed. 2005).  However, the Goodwin Proctor Group selectively omits a critical aspect of the of  the treatise's analysis, which provides: "[I]t is more common to prime an existing lien only when the property has sufficient value to secure adequately both lenders."  Id.  As discussed above, the collateral securing the Financing provides an equity cushion of as much as approximately $4 billion.  More than sufficient value exists to secure the DIP Lenders and the Prepetition Secured Lenders, further supporting the proposition that the Prepetition Lenders are adequately protected.

27.    The "determination of adequate protection is a fact-specific inquiry."  In re

Mosello, 195 B.R. 277 (Bankr.  S.D.N.Y. 1996).  See also In re Snowshoe Co., 789 F.2d 1085,

1088 (4th Cir. 1986) (determination of adequate protection is one of fact based on measurements

of value and credibility of witnesses).  As will be demonstrated at the Final Hearing, the specific

facts of this situation clearly support the conclusion that the Debtors have satisfied section

364(d)(1)'s adequate protection requirement.

E.    Goodwin Proctor Group's Remaining Objections

1.    There is No Equitable Basis to Grant the Prepetition Secured Lenders Additional
Interest or Amortization

28.    The Goodwin Proctor Objection provides no basis in law or fact entitling

the Prepetition Secured Lenders to the default rate of interest or for amortization in this case.

The Goodwin Proctor Group seeks the payment of "Additional Interest" consisting of the

difference between the LIBOR and ABR rates of non-default interest in the contract (amounting

to approximately an incremental 150 basis points per annum) and imposition of an incremental

default rate of interest (amounting to an additional 200 basis points per annum).  As discussed

above, the Goodwin Proctor Group lost a vote among the holders of the prepetition revolver and

term facilities to seek to impose the ABR interest rate (and the Debtors fully reserve their rights

as to whether any such action would be enforceable and/or permissible under applicable law in

any event).  Awarding a default rate of interest is an equitable remedy that must (a) have some

connection to a lender's actual damages, and (b) be premised on evidence of the debtor's

solvency.  The Goodwin Proctor Objection fails on both counts.  Additionally, there was no

default interest asserted or payable prior to the Petition Date.  As a preliminary matter, the

default interest sought by the Goodwin Proctor Group bears no relation to their actual damages,

and amounts to nothing more than an improper penalty.  Nor has the Goodwin Proctor Group

13

presented any evidence of the Debtors' solvency to justify the default rate of interest. To the
contrary, their Objection is replete with comments as to "the precarious state of the Debtors'
business." Objection Br. at ¶ 24. Absent evidence of the Debtors' solvency, a determination that
at a minimum should be deferred until confirmation of a plan of reorganization and resolution of
a host of other infirmities to their arguments, there is no basis for awarding the Goodwin Proctor
Group the default rate of interest or amortization.

     a.     The Default Rate of Interest is an Inequitable Penalty That Bears No Connection
               to the Prepetition Lenders' Actual Damages

     29.     As acknowledged in the Goodwin Proctor Objection, courts in the Second
Circuit and elsewhere grant the Bankruptcy Court enormous flexibility to balance the equities in
determining the applicability of a contract rate of default interest. See In re Liberty Warehouse
Assoc., 220 B.R. 546, 550 (Bankr. S.D.N.Y. 1998) ("As our court of appeals recently noted,
'[t]he appropriate rate of pendency interest is . . . within the limited discretion of the court'.")
(quoting In re Milham, 141 F.3d 420, 423 (2d Cir. 1998)); In re Vest Assocs., 217 B.R. 696, 702,
fn. 2 (Bankr. S.D.N.Y. 1998); see also Objections. at p. 14, fn. 6 (default interest "warranted
when the equities of a particular case justify application of default interest"). This principle,
which balances the equities between the creditor and debtor, was acknowledged by the Supreme
Court in United States v. Ron Pair Enter., Inc., 489 U.S. 235, 248 (1989) as well as in Vanston
Bondholders Protective C'tee v. Green, 329 U.S. 156, 165 (1946) ("[i]t is manifest that the
touchstone of each decision on allowance of interest in bankruptcy, receivership and
reorganization has been a balance of equities between creditor and creditor or between creditors
and the debtor.").

     30.     In determining whether the equities warrant the default rate of interest,
courts have focused on whether the default rate is a penalty rather than compensation to the

lender for the monitoring costs incurred as a result of the default losses.  As stated by the court in

In re Vest Associates, 217 B.R. 696, 702 (Bankr. S.D.N.Y. 1998), courts will refuse to enforce

default interest rates "if they are deemed to be penalties or forms of coercion instead of

compensation for injuries that the lender incurred."  Id. at 702; see also In re DWS Industries,

Inc., 121 B.R. 845, 849 (Bankr. C.D. Cal. 1990) ("a default rate of interest should not be a

penalty.  Rather, it should be a means of compensating the creditor for any loss resulting from

the non-payment of principal at maturity."); In re Johnson, 184 B.R. 570, 573 (Bankr. D.Minn.

1995) ("consideration generally hinges upon the question of whether the default rate

compensates the creditor for any loss resulting from the nonpayment or is in fact a disguised

penalty.").

       31.     In this case, the Debtors believe that the default rate sought by the

Goodwin Proctor Objection is the equivalent of a penalty that bears no relationship to the

Prepetition Lenders' damages.  The imposition of such economic penalties upon the Debtors

cannot be justified by the increased costs of administering or monitoring the loan, and is not

calculated to compensate the Prepetition Lenders for any actual damages.  As noted by the court

in Vest, 217 B.R. at 702, a large differential between the contract rate and the default rate

militates a finding that the default rate is a penalty which should not be enforced.  Moreover, the

default rate of interest is not applicable here where (i) the Prepetition Secured Lenders have a

substantial equity cushion of as much as approximately $4 billion, and (ii) the Debtors have

made timely payments of all amounts due in respect of the underlying obligation prior to the

Petition Date.  It is undeniable that the Prepetition Lenders are reasonably assured of payment

and therefore have no need to actively monitor the Debtors' bankruptcy cases to entitle them to

the default rate of interest or amortization and any monitoring that would be reasonable is more than compensated by the adequate protection package proposed in the Final Order.

32.    It is also significant to note that the Additional Interest has no connection to the alleged "harm" suffered by the Goodwin Proctor Group, most of whom the Debtors' believe acquired their claims postpetition.  As noted above, these creditors purchased their claims with full knowledge of the adequate protection package and are now insisting on additional economics to increase their own already very generous returns in order to penalize the Debtors at the expense of junior creditors.  There is no basis for these secured creditors to extract penalties out of proportion to any actual harm suffered when other creditors may receive only a fraction of their legitimate claims against the Debtors. As a court of equity, this Court should prevent such a result.

b.    There is No Showing of Solvency to Justify Default Interest

33.    It is also well-established that if the Debtors will not be able to pay, in full, all allowed claims filed against the company (in other words, the company is "insolvent"), there is no justification for the default rate of interest.  This principle is also recognized in the central case cited by the Goodwin Proctor Group in support of their claim for default interest.  See Objections at ¶ 24, fn. 6, citing In re Owners Corp., 306 B.R. 763 (Bankr. S.D.N.Y. 2004) vacated on other grounds, 313 B.R. 364,  (S.D.N.Y. 2004) ("in most circumstances it is appropriate for the bankruptcy court or superior court exercising bankruptcy jurisdiction to limit a secured creditor to its non-default contract rate of interest in order to provide a distribution to unsecured creditors.").  As set forth below, because the Goodwin Proctor Group offers no evidence of solvency to justify the relief they seek, their request for the default rate of interest should be denied, or at a minimum postponed until the end of the Debtors' chapter 11 cases.

16

34.     Courts decline to apply the default rate of interest where doing so diminishes the recovery of competing creditors.  <u>Vest</u>, 217 B.R. at 703-04; <u>In re Trinity Meadows Raceway, Inc.</u>, 252 B.R. 660, 669 (Bankr. N.D. Tex. 2000); <u>In re The Boardwalk Partners</u>, 171 B.R. 87, 92 (Bankr. D. Ariz. 1994).  In fact, the bankruptcy court in <u>In re Process Property Corp.</u>, 327 B.R. 603, 609 (Bankr. N.D. Tex. 2005), remarked that the impact on competing creditors is the most important factor in determining whether default-rate postpetition interest should be allowed in the context of section 506(b).  That inquiry is relevant where the value of the secured creditor's collateral is sufficient to entitle the creditor to postpetition interest under section 506(b), but the overall value of the debtor's estate is insufficient to pay all prepetition creditors in full (in other words, where the debtor is insolvent).

35.     Here, the Goodwin Proctor Group offers no evidence as to the Debtors' solvency to justify the default rate of interest.  On the contrary, their brief is replete with statements as to the precarious nature of the Debtors' business and the "unfair" risks and burdens that are purportedly being imposed upon them.  It would appear then that the Goodwin Proctor Group have deep reservations as to the Debtors' solvency which would contradict any claim by the Goodwin Proctor Group that the Debtors are solvent.  Accordingly, the Debtors submit that because there is no evidence presented by the Goodwin Proctor Group as to the solvency of the Debtors, there is no basis for the default rate of interest.  Alternatively, if there is a question as to solvency, such determination would be premature at this time and should be postponed until a plan of reorganization is filed.  Accordingly, the Debtors respectfully request that the Goodwin Proctor Group's request for default interest and amortization be denied.

17

2.      The Goodwin Proctor Group are Not Entitled to Reimbursement of Expenses

36.      Bankruptcy Code section 506(b) provides for the payment of any reasonable fees, costs, or charges only to the extent provided for under the agreement from which such claim arose.  See 11 U.S.C. 506(b) (emphasis added).  Recovery of "fees, costs, and charges, is allowed only if they are reasonable and provided for in the agreement under which the claim arose.  Therefore, in the absence of an agreement, postpetition interest is the only added recovery available" to an oversecured creditor.  United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 241 (1989); see also In re Vest Assocs., 217 B.R. 696, 700 (Bankr. S.D.N.Y. 1998) (holding the right to recover attorneys' fees under section 506(b) is "limited to those creditors who have bargained and provided for the recovery of such fees in the underlying agreement").

37.      Accordingly, for the Goodwin Proctor Group to recover their attorneys' fees, that right must be explicitly provided for in an operative agreement.  But no such agreement exists here.  The loan documents allegedly giving rise to the Group's claim for reimbursable expenses permit the recovery of expenses only in connection with the "enforcement or preservation" of rights under the prepetition loan agreements.  The Goodwin Proctor Group has merely filed an objection, not to enforce or preserve their rights, but to extract unreasonable penalties and costs from the Debtors, potentially at the expense of junior creditors.  This conduct should not be rewarded, and the Group's request for reimbursable expenses should be denied.

3.      The Goodwin Proctor Group Are Not Entitled to Additional Collateral

38.      The Goodwin Proctor Group request for additional collateral, including an increase in the Debtors pledge of the voting capital stock of their first-tier foreign subsidiaries, is unreasonable under the circumstances.  In connection with executing the Prepetition Credit Agreement and in subsequent discussions, the Debtors convinced the Prepetition Secured

18

Lenders that pledging more than 65% of the voting capital stock of their first-tier foreign

subsidiaries will have severe adverse tax consequences for the Debtors.  In particular, such

pledge may be deemed a triggering event that may cause the Debtors to be taxed on the earnings

and profits of their foreign subsidiaries under the Internal Revenue Code.  Such a triggering

event would result in significant payments by the Debtors without any tangible benefit for the

Prepetition Lenders.  The Debtors, therefore, submit that the adverse tax consequences that

would arise from granting the Goodwin Proctor Group the relief they seek far outweighs any

incremental benefit that would arise from granting the additional collateral.

    4.    <u>Group's Remaining Objections Adequately Addressed by Revised DIP Order</u>

        39.    The Goodwin Proctor Group's remaining Objections are that the DIP

Order should be clarified to (a) preserve the rights of the Prepetition Agent and Prepetition

Secured Lenders to oppose the sale, assignment or release of collateral securing the Prepetition

Credit Facility, (b) permit them to request further or different adequate protection, and (c) not

allow holders of setoff rights to prime the Prepetition Secured Lenders.  The Debtors submit that

each of these three concerns have been adequately addressed in the revised final DIP Order.

        40.    With respect to the Prepetition Lenders right to oppose a sale of collateral,

paragraph 8 of the revised Final Order now includes language that permits the Pre-Petition

Secured Lenders to file pleadings with respect to any proposed sale, transfer or other disposition

of the Collateral by the Debtors outside the ordinary course of business so long as such pleadings

do not contravene the provisions of the DIP Order and do not otherwise interfere with the

exercise of any right or remedy by the Agent or the DIP Lenders.

        41.    The second objection, seeking the right to request further adequate

protection, is also addressed in the revised Final Order at paragraph 13 which permits the Pre-

Petition Agent and the Pre-Petition Secured Lenders to request further or different adequate
protection under Bankruptcy Code sections 361, 363(e) and 364(d)(2) following the occurrence
of any event after the Petition Date, that (i) would reasonably be expected to have a Material
Adverse Effect (as defined in the DIP Credit Agreement but without regard to clause (y) of the
proviso of said definition) and (ii) either (A) the Debtors are not able to repay or refinance the
Pre-Petition Obligations in full in cash under a Chapter 11 plan of reorganization or (B) the
Debtors are not able to satisfy the Adequate Protection Obligations.  This additional provision
adequately addresses the Goodwin Proctor Group's concerns.

The Goodwin Proctor Group's final objection, seeking to prevent any setoff
claimants from priming the Prepetition Secured Lenders, is also addressed in the revised Final
Order.  Paragraph 18 of the Final Order now provides that liens granted to the holders of valid
setoff rights as adequate protection will be subordinated to the liens granted to the Prepetition
Secured Lenders with respect to Prepetition Collateral and rank pari passu with respect to the
additional liens granted to the  Prepetition Secured Lenders pursuant to the Final Order.

WHEREFORE the Debtors respectfully request that this Court enter an order (a)
overruling the Objections, (b) granting the Motion, and (c) granting the Debtors such other and
further relief as is just.

Dated: New York, New York
        October 26, 2005

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP


By: /s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr. (JB 4711)
    John K. Lyons (JL 4951)
    Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

- and -


By: /s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York  10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
Debtors and Debtors-in-Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                     :

In re                                :     Chapter 11
                                     :

DELPHI CORPORATION, et al.,        :     Case No. 05-44481 (RDD)
                                     :

                     Debtors.    :     (Jointly Administered)
                                     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

~~INTERIM~~**FINAL** ORDER UNDER 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), AND 364(e) AND FED. BANKR. P. 2002, 4001 AND 9014 (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) TO UTILIZE CASH COLLATERAL~~,~~**, AND** (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES ~~AND (III) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)~~

("~~INTERIM~~**FINAL** DIP FINANCING ORDER")

Upon the motion, dated October 8, 2005 (the "Motion"), of Delphi Corporation (the "Borrower") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), for interim and final orders under sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking, among other things:

           (1)  authorization for the Borrower to obtain post petition financing (the "Financing"), and for all of the other Debtors (the "Guarantors") to guaranty the Borrower's obligations in connection with the Financing, up to the aggregate principal amount of $2,000,000,000 (the actual available

NYDOCS03/785799.9

principal amount at any time being subject to those conditions set forth in the DIP Documents (as defined below)), pursuant to a credit facility with JPMorgan Chase Bank, N.A. ("JPMCB"), acting as Administrative Agent (in such capacity, the "Agent") for itself and a syndicate of financial institutions (together with JPMCB and including the fronting and issuing banks for the letters of credit, the "DIP Lenders"), and Citicorp USA, Inc. ("CUSA") as Syndication Agent, to be arranged by J.P. Morgan Securities Inc. and Citigroup Global Markets, Inc. (the "Joint Lead Arrangers");

(2)  authorization for the Debtors to execute and enter into the DIP Documents and to perform such other and further acts as may be required in connection with the DIP Documents;

(3)  the granting of adequate protection to the lenders (the "Pre-Petition Secured Lenders") under that certain Third Amended and Restated Credit Agreement, dated as of June 14, 2005 (as heretofore amended, supplemented or otherwise modified, the "Pre-Petition Credit Agreement"), among the Borrower, the several lenders from time to time party thereto, and JPMCB, as administrative agent for the Pre-Petition Secured Lenders (in such capacity, the "Pre-Petition Agent"), and in connection with that certain Guarantee and Collateral Agreement, dated as of June 14, 2005, by the Borrower and certain of its subsidiaries, in favor of the Pre-Petition Agent (as heretofore amended, supplemented or otherwise

2

modified, the "Guarantee and Collateral Agreement" and, collectively with the Pre-Petition Credit Agreement, and the mortgages and all other documentation executed in connection therewith, the "Existing Agreements"), whose liens and security interests are being primed by the Financing;

(4)  authorization for the Debtors to use cash collateral (as such term is defined in the Bankruptcy Code) in which the Pre-Petition Secured Lenders have an interest, and the granting of adequate protection to the Pre-Petition Secured Lenders with respect to, *inter alia*, such use of their cash collateral and all use and diminution in the value of the Pre-Petition Collateral (as defined below);

(5)  approval of certain stipulations by the Debtors with respect to the Existing Agreements and the liens and security interests arising therefrom, that are "Extraordinary Provisions" (each an "Extraordinary Provision") under General Order No. M-274 of the United States Bankruptcy Court for the Southern District of New York (the "General Order");

(6)  permission to accelerate Borrowings and the termination of the Commitments under the DIP Credit Agreement upon (a) a Change of Control (as each such term is defined in the DIP Credit Agreement) or (b) the entry of an order or orders granting relief from the automatic stay

3

applicable under section 362 of the Bankruptcy Code to the holder or

holders of any security interest to permit foreclosure (or the granting of a

deed in lieu of foreclosure or the like) on any assets of the Borrower or any

of the Guarantors which have a value in excess of $20 million in the

aggregate, which are Extraordinary Provisions under the General Order;

(7)   subject and only effective upon the entry of a final order

granting such relief, the limitation of the Debtors' right to surcharge against

collateral pursuant to section 506(c) of the Bankruptcy Code, which is an

Extraordinary Provision under the General Order;

(8) pursuant to Bankruptcy Rule 4001, that an interim hearing (the

"Interim Hearing") on the Motion be held before this Court to consider

entry of the proposed interim order annexed to the Motion (the "Interim

Order") (a) authorizing the Borrower, on an interim basis, to forthwith

borrow or obtain letters of credit from the DIP Lenders under the DIP

Documents up to an aggregate principal or face amount not to exceed

$950,000,000 (subject to any limitations of borrowings under the DIP

Documents), (b) authorizing the Debtors' use of cash collateral, and (c)

granting the adequate protection described ~~herein~~**therein**; and

(9)   that this Court schedule a final hearing (the "Final Hearing") to

be held within 45 days of the entry of the Interim Order to consider entry of

a final order authorizing the balance of the borrowings and letter of credit

4

issuances under the DIP Documents on a final basis, as set forth in the

Motion and the DIP Documents filed with this Court (the "Final Order").

The Interim Hearing having been held by this Court on October 11, ~~2005 at 4:00~~

~~p.m.~~**2005, at which the Court issued and entered the Interim Order (a) authorizing**

**the Borrower to borrow or obtain letters of credit up to an aggregate principal or**

**face amount of $950,000,000 of the Financing from the DIP Lenders as provided for**

**in the Interim Order and (b) scheduling the Final Hearing to consider entry of an**

**order authorizing the balance of the Financing, all as set forth in the Motion, the**

**Interim Order, this Final Order and the loan documentation filed with this Court.**

**The Final Hearing having been held by this Court on October 27, 2005 at**

**10:00 a.m.**

Due and appropriate notice of the Motion, the relief requested therein**, the Interim**

**Hearing** and the ~~Interim~~**Final** Hearing having been served by the Debtors on the fifty

largest unsecured creditors of the Debtors, on the Agent, the DIP Lenders, the Prepetition

Agent, the Prepetition Secured Lenders, the indenture trustee for the Debtors' senior

noteholders, known holders of prepetition liens against the Debtors' property and the

United States Trustee for the Southern District of New York.

The Interim Hearing having been held by this Court on October 11, 2005 at 4:00

p.m.

**Objections to the Motion having been filed by Bank of America Leasing &**

**Capital, LLC, the Ad Hoc Committee of Prepetition Secured Lenders, Venture**

5

**Plastics, Inc., Gibbs Die Casting Corporation, DaimlerChrysler Corporation, Mercedes-Benz U.S. International, Inc., Autocam Corporation, Lorentson Manufacturing Southwest Inc., Lorentson Manufacturing Company, Inc., Calsonic Kansei North America, Inc., Decatur Plastic Products, Inc., Pension Benefit Guaranty Corporation, Ford Motor Company, Freescale Semiconductor, Inc., Nissan North America, Inc., Fujikura America, Inc., Murata Electronics North America, Inc., Flextronics International Asia Pacific Ltd and Flextronics Technology (M) Sdn. Bhd., Multek Flexible Circuits, Inc., Sheldahl de Mexico S.A. de C.V. and Northfield Acquisition Co., Omega Tool Corp., L&W Engineering Co., Southtec, LLC, DOTT Industries, Inc., ALPS Automotive, Inc., Pioneer Automotive Technologies, Inc., Lakeside Plastics Limited, Android Industries, Inc., Ai-Doraville, LLC, Ai-Genesee, LLC, Honda of America Manufacturing, Inc., OSRAM Opto Semiconductors Inc., Worthington Steel Company and Worthington Steel of Michigan, Inc., Hitachi Automotive Products, National Molding Corp., Security Plastics Division/NMC, LLC, Arneses Electronics Automotrices, S.A. de C.V., Cordaflex, S.A. de C.V., Neuman Aluminum Automotive, Inc., Neuman Aluminum Impact Extrusion, Inc., Magna International, Inc. and certain of its foreign and domestic affiliates, A. Schulman, Inc., the Creditors' Committee (as hereinafter defined), Textron Fastening Systems, Inc., ARC Automotive, Inc., XM Satellite Radio Inc., General Motors Corporation,  and Robert Bosch Corporation (collectively, the "Objections").**

Upon the record made by the Debtors at the Interim Hearing **and the Final Hearing,** and after due deliberation and consideration and sufficient cause appearing therefor;

6

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.      *Jurisdiction*.  This Court has core jurisdiction over the Cases, this Motion,

and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.

Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      *Notice*.    Under the circumstances, the notice given by the Debtors of the

Motion**, the Interim Hearing,** and the ~~Interim~~**Final** Hearing constitutes due and sufficient

notice thereof and complies with Bankruptcy Rules 4001(b) and (c).

3.      *Debtors' Stipulations*.  Without prejudice to the rights of any other party

(but subject to the limitations thereon and the reservation of the Debtors' rights contained

in paragraph 16 below), the Debtors, for themselves and not for their estates, admit,

stipulate, and agree that:

(a)      (i) as of the filing of the Debtors' chapter 11 petitions (the "Petition

Date"), (x) the Borrower was indebted and liable to the Pre-Petition Secured Lenders,

without defense, counterclaim or offset of any kind, in the aggregate principal amount of

approximately $2,488,329,620.59 in respect of loans made and in the aggregate face

amount of approximately $91,453,431.26 in respect of letters of credit issued, in each case,

by the Pre-Petition Secured Lenders pursuant to, and in accordance with the terms of, the

Existing Agreements, plus, in each case, interest thereon and fees, expenses (including any

attorneys', accountants', appraisers' and financial advisors' fees that are chargeable or

reimbursable under the Existing Agreements), charges and other obligations incurred in

connection therewith **including, without limitation, amounts owing under "Specified**

7

NYDOCS03/785799.9

**Swap Agreements" (as defined in the Pre-Petition Credit Agreement),** as provided in

the Existing Agreements (collectively, the "Pre-Petition Debt") and (y) each Debtor other

than the Borrower was contingently liable to the Pre-Petition Secured Lenders in respect of

the Pre-Petition Debt owing by the Borrower pursuant to the Guarantee and Collateral

Agreement, (ii) the Pre-Petition Debt constitutes the legal, valid and binding obligation of

the Debtors, enforceable in accordance with its terms (other than in respect of the stay of

enforcement arising from section 362 of the Bankruptcy Code), (iii) no portion of the

Pre-Petition Debt is subject to avoidance, recharacterization, recovery or subordination

pursuant to the Bankruptcy Code or applicable nonbankruptcy law and (iv) the Debtors do

not have, and hereby forever release, any claims, counterclaims, causes of action, defenses

or setoff rights, whether arising under the Bankruptcy Code or otherwise, against the

Pre-Petition Secured Lenders, the Pre-Petition Agent and their respective affiliates,

subsidiaries, agents, officers, directors, employees and attorneys;

    (b)  the liens and security interests granted to the Pre-Petition Agent

pursuant to and in connection with the Existing Agreements (including, without limitation,

all security agreements, pledge agreements, mortgages, deeds of trust, control agreements

and other security documents executed by any of the Debtors in favor of the Pre-Petition

Agent, for its benefit and for the benefit of the Pre-Petition Secured Lenders) in connection

with the Existing Agreements, are (i) valid, binding, perfected, enforceable, first-priority

liens and security interests in the personal and real property constituting "Collateral" (as

defined in the Existing Agreements) immediately prior to the Petition Date (the

8

"Pre-Petition Collateral"), (ii) not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law and (iii) subject and subordinate only to (A) the DIP Liens (as defined below), (B) the Carve Out (as defined below) to which the DIP Liens are subject and (C) valid, perfected and unavoidable liens permitted under the Existing Agreements to the extent such permitted liens are senior to or pari passu with the liens of the Pre-Petition Agent on the Pre-Petition Collateral; and

(c)    the aggregate value of the Pre-Petition Collateral substantially exceeds the aggregate amount of the Pre-Petition Debt.

4.    *Findings Regarding The Financing.*

(a)    Good cause has been shown for the entry of this ~~Interim~~**Final** Order.

(b)    The Debtors ~~have an immediate need to obtain~~**require the remainder of** the Financing and use Cash Collateral (as defined below) in order to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures and to satisfy other working capital and operational needs.  The access of the Debtors to sufficient working capital and liquidity through the use of Cash Collateral, incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the going concern values of the Debtors and to a successful reorganization of the Debtors.

(c)    The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to

9

obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the Debtors granting to the Agent and the DIP Lenders, subject to the Carve Out as provided for herein, the DIP Liens and the Superpriority Claims (as defined below) under the terms and conditions set forth in **the Interim Order,** this Order and in the DIP Documents.

(d)     The terms of the Financing and the use of Cash Collateral are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)     The Financing has been negotiated in good faith and at arm's length between the Debtors, the Agent and the DIP Lenders, and all of the Debtors' obligations and indebtedness arising under, in respect of or in connection with the Financing and the DIP Documents, including without limitation, (i) all loans made to, and all letters of credit issued for the account of, the Debtors pursuant to the Revolving Credit, Term Loan and Guaranty Agreement substantially in the form attached as Exhibit A to the Motion **(, as amended by the Amendment No. 1 thereto dated as of October [26], 2005, a copy of which was filed with the Court prior to commencement of the Final Hearing (as so amended,** the "DIP Credit Agreement"), and (ii) any "Obligations" and all other "Secured Obligations" (as each such term is defined in the DIP Credit Agreement), including any hedging obligations of the Debtors permitted under the DIP Credit Agreement and any

10

Indebtedness (as defined in the DIP Credit Agreement) permitted by Section 6.03(viii)

thereof, in each case owing to JPMCB, any DIP Lender or any of their respective banking

affiliates (all of the foregoing in clauses (i) and (ii) collectively,  the "DIP Obligations"),

shall be deemed to have been extended by the Agent and the DIP Lenders and their

affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in

express reliance upon the protections offered by section 364(e) of the Bankruptcy Code,

and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the

event that this Order or any provision hereof is vacated, reversed or modified, on appeal or

otherwise.

(f)      The Debtors have requested entry of this Order pursuant to

Bankruptcy Rules 4001(b)(2) and 4001(c)(2).  Absent granting the relief sought by this

Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation of

the Financing and the use of Cash Collateral in accordance with this Order and the DIP

Documents is therefore in the best interest of the Debtors' estates.

5.      *Authorization Of The Financing And The DIP Documents.*

(a)      The Debtors are hereby authorized to ~~enter into~~**be a party to** the

DIP Documents.  The Borrower is hereby authorized to borrow money and obtain letters of

credit pursuant to the DIP Credit Agreement, and the Guarantors are hereby authorized to

guaranty such borrowings and the Borrower's obligations with respect to such letters of

credit, up to an aggregate principal or face amount**, inclusive of amounts authorized by**

**the Interim Order,** of $~~950,000,000~~**2,000,000,000** (plus interest, fees and other expenses

11

NYDOCS03/785799.9

provided for in the DIP Documents), subject to any limitations of borrowings under the DIP Documents, and in accordance with the terms of this Order and the DIP Documents, which shall be used solely for purposes permitted under the DIP Documents, including, without limitation, to provide working capital for the Borrower and the Guarantors and for other general corporate purposes and to pay interest, fees and expenses in accordance with this Order and the DIP Documents.  In addition to such loans and obligations, the Debtors are authorized to incur overdrafts and related liabilities arising from treasury, depository and cash management services or in connection with any automated clearing house fund transfers provided to or for the benefit of the Debtors by JPMCB, CUSA, any other DIP Lender or any of their respective affiliates; *provided, however*, that nothing herein shall require JPMCB or CUSA or any other party to incur overdrafts or to provide any such services or functions to the Debtors.

(b)    In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized and directed to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees, that may be reasonably required or necessary for the Debtors' performance of their obligations under the Financing, including, without limitation:

(i)    the execution, delivery and performance of the Loan Documents (as defined in the DIP Credit Agreement) and any exhibits attached thereto, including, without limitation, the DIP Credit Agreement, the Security and Pledge

12

Agreement (as defined in the DIP Credit Agreement) and the mortgages, if any,

contemplated thereby (collectively, and together with the letter agreements referred to in

clause (~~iii~~**iv**) below, the "DIP Documents"),

(ii)    the execution, delivery and performance of one or more

amendments to the DIP Credit Agreement for, among other things, the purpose of adding

additional financial institutions as DIP Lenders and reallocating the commitments for the

Financing among the DIP Lenders, in each case in such form as the Debtors, the Agent and

the DIP Lenders may agree (it being understood that no further approval of the Court shall

be required for amendments to the DIP Credit Agreement that do not shorten the maturity

of the extensions of credit thereunder or increase the commitments, the rate of interest or

the letter of credit fees payable thereunder~~)~~. **, amend the financial covenants in Section**

**6.04 therein to be more restrictive on the Debtors or amend the notice provisions of**

**Section 7.01 therein (i.e., notice of exercise of remedies after the occurrence of an**

**Event of Default).** Notwithstanding any other provision hereof, without further approval

of this Court, amendments to the DIP Documents may be made at any time **(x)** prior to the

~~Final Hearing, (A)~~ **Successful Syndication (**as ~~contemplated~~**defined** ~~by~~**in** the **Amended**

**and Restated** Fee Letter dated ~~September~~**October** ~~22,~~**14,** 2005 among the Borrower,

JPMCB and the Joint Lead Arrangers (**the "Fee Letter")), to the extent contemplated by**

**the Fee Letter (**permitting certain modifications to the DIP Credit Agreement necessary or

advisable to ensure a successful syndication)**,** ~~or~~**and** (~~B~~**y**) as contemplated by the DIP

13

Credit Agreement with respect to the Borrowing Base Amendment (as defined in the DIP Credit Agreement),.

           (iii)    **In addition, Section 2.13 of the DIP Credit Agreement shall be amended to provide for the application of net cash proceeds from asset sales to be subject to mandatory prepayments and permanent reductions of commitments under the Facility or to be held in a cash collateral account maintained with the DIP Agent for the benefit of holders of the other liens and claims granted hereunder in the manner set forth below.  Notwithstanding anything to the contrary in this Order or the DIP Credit Agreement, the amendments to Section 2.13 of the DIP Credit Agreement set forth in this paragraph 5(b)(iii), (x) are intended, in part, for the benefit of the Pre-Petition Agent and the Pre-Petition Secured Lenders, (y) may be enforced by the Pre-Petition Agent and the Pre-Petition Secured Lenders as though they were parties to the DIP Credit Agreement solely for such purposes and (z) shall survive and remain in full force and effect regardless of the permanent repayment in full of the DIP Obligations or the termination of the DIP Credit Agreement or any provision hereof.  This paragraph 5(b)(iii) shall not be amended, supplemented, waived or otherwise modified without the prior written consent of the Pre-Petition Agent.  Specifically, Section 2.13 will be amended to (i) reorder subsection "(b)" to be subsection "(c)" and (ii) adding a new subsection (b) to read as follows:**

        **"If on any date the Borrower or any Guarantor shall receive Net Cash Proceeds from (i) any Asset Sale or (ii) any Recovery Event (except to the extent that Net Cash Proceeds received in connection with such Recovery Event are applied within 180 days of receipt thereof to the replacement or repair of the assets giving rise thereto), and in each case, the aggregate**

14

amount of all Net Cash Proceeds from Asset Sales and Recovery Events received by the Borrower and the Guarantors from Asset Sales and Recovery Events occurring on and after the Closing Date exceeds $125,000,000 then (without duplication of any reduction to the Borrowing Base as a result of such Asset Sale or Recovery Event), an amount equal to 66-2/3% of such Net Cash Proceeds received on such date shall be promptly, and in any event, within 10 days after such date either (i) first, applied to the prepayment of the Tranche B Loans (with a corresponding permanent reduction of the Total Tranche B Commitments) and second, applied to the prepayment of the Tranche A Loans (with a corresponding permanent reduction of the Total Tranche A Commitments) or (ii) deposited into a cash collateral account maintained with the DIP Agent for the benefit of the holders of Liens and claims granted under the Final DIP Order in the order of priority set forth therein; *provided* that the Borrower shall be permitted to use such proceeds with the approval of the Bankruptcy Court for purposes permitted by Section 363 of the Bankruptcy Code so long as such uses are permitted under the DIP Credit Agreement."

The following related definitions will also be added to the DIP Credit Agreement:

"Asset Sale":  any Disposition of property or series of related Dispositions of property by the Borrower or any Guarantor (excluding any such Disposition permitted by clauses (i), (ii), (iii), (v), (vii) and (viii) of Section 6.10).

"Disposition":  with respect to any property, any sale, lease, sale and leaseback, assignment (other than for security or collection in the ordinary course of business), conveyance, transfer or other disposition thereof.  The terms "Dispose" and "Disposed of" shall have correlative meanings.

"Net Cash Proceeds":  in connection with any Asset Sale or any Recovery Event, the proceeds thereof in the form of cash and Permitted Investments, net of attorneys' fees, accountants' fees, investment banking fees, commissions, premiums, amounts required to be applied to the repayment of Indebtedness secured by a Lien permitted hereunder on any asset that is the subject of such Asset Sale or Recovery Event (other than any Lien pursuant to the Security and Pledge Agreement) and other customary fees and expenses actually incurred in connection therewith and net of taxes paid or reasonably estimated to be payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements) and a reasonable reserve for purchase price adjustments and indemnification payments that could reasonably be expected to arise during the term of the Tranche A Loans and the Tranche B Loans; *provided* that in the case of any Asset Sale or Recovery Event in respect of which the Net Cash Proceeds do not exceed $2,500,000, such Net Cash Proceeds shall not be deemed to constitute "Net Cash Proceeds" for purposes of Section 2.13 until

15

**the aggregate amount of all such excluded Net Cash Proceeds is at least
$10,000,000.**

**"Recovery Event":  any settlement of or payment in respect of any property
or casualty insurance claim or any condemnation proceeding relating to any
asset of the Borrower or any Guarantor, in each case in an amount in excess
of $5,000,000.**

**(iv)**(iii) the non refundable payment to the Agent, the Joint Lead

Arrangers or the DIP Lenders, as the case may be, of the fees referred to in the DIP Credit

Agreement (and in the separate letter agreements between them in connection with the

Financing) and reasonable costs and expenses as may be due from time to time, including,

without limitation, reasonable fees and expenses of the professionals retained as provided

for in the DIP Documents, and

**(v)** (iv) the performance of all other acts required under or in

connection with the DIP Documents.

(c)        Upon execution and delivery of the **The** DIP Documents, the DIP

Documents shall constitute valid and binding obligations of the Debtors, enforceable

against each Debtor party thereto in accordance with the terms of the DIP Documents.   No

obligation, payment, transfer or grant of security under the DIP Documents or this Order

shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under

any applicable law (including without limitation, under section 502(d) of the Bankruptcy

Code), or subject to any defense, reduction, setoff, recoupment or counterclaim.

6.        *Superiority Claims.*

16

(a)    Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP

Obligations shall constitute allowed claims against the Debtors with priority over any and

all administrative expenses, diminution claims (including all Adequate Protection

Obligations**, Replacement Liens** and Junior Adequate Protection Liens (each as defined

below)) and all other claims against the Debtors, now existing or hereafter arising, of any

kind whatsoever, including, without limitation, all administrative expenses of the kind

specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all

administrative expenses or other claims arising under sections 105, 326, 328, 330, 331,

503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (the

"Superpriority Claims"), whether or not such expenses or claims may become secured by a

judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall

be payable from and have recourse to all pre-petition and post-petition property of the

Debtors and all proceeds thereof, subject only to the payment of the Carve Out to the extent

specifically provided for herein.

(b)    For purposes hereof, the "Carve Out" means (i) all unpaid fees

required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United

States Trustee under section 1930(a) of title 28 of the United States Code, (ii) all fees and

expenses incurred by a trustee under Section 726(b) of the Bankruptcy Code, (iii) after the

occurrence and during the continuance of an Event of Default (as defined in the DIP Credit

Agreement), all allowed and unpaid professional fees and disbursements incurred by the

Debtors and any statutory committees appointed in the Cases (each, a "Committee"), that

17

NYDOCS03/785799.9

remain unpaid subsequent to the payment, pro rata with other nonpriority administrative

creditors, of such fees and expenses from available funds remaining in the Debtors' estates

for such creditors, in an aggregate amount not exceeding $35,000,000, which amount may

be used subject to the terms of this Order, including, without limitation, paragraph 17

hereof, and (iv) all allowed and unpaid professional fees and disbursements incurred or

accrued by the Debtors and any Committees at any time when no Event of Default is

continuing, that remain unpaid subsequent to the payment, pro rata with other nonpriority

administrative creditors, of such fees and expenses from available funds remaining in the

Debtors' estates for such creditors, in an aggregate amount not exceeding the sum of (x)

such unpaid professional fees and disbursements reflected on the most recent Borrowing

Base Certificate (as defined in the DIP Credit Agreement) delivered to the Agent prior to

any Event of Default that is then continuing and (y) such unpaid professional fees and

disbursements incurred or accrued after such Borrowing Base Certificate (but at a time

when no Event of Default is continuing) in an aggregate amount under this clause (y) not

exceeding $5,000,000 (and with amounts included in this clause (y), to be supported by

back-up documentation in respect of the amounts and dates of incurrence of such fees and

disbursements), in each of the foregoing clauses (i), (ii), (iii) and (iv), to the extent allowed

by the Bankruptcy Court at any time; *provided*, *however*, that (A) nothing herein shall be

construed to impair the ability of any party to object to any of the fees, expenses,

reimbursement or compensation described in clauses (iii) and (iv) above and (B) following

the Termination Date (as defined in the DIP Credit Agreement), cash or other amounts on

18

deposit in the Letter of Credit Account (as defined in the DIP Credit Agreement), shall not be subject to the Carve Out.

7.    *DIP Liens*.

As security for the DIP Obligations, effective and perfected upon the date of ~~this~~**entry of the Interim** Order and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, the following security interests and liens are hereby granted to the Agent for its own benefit and the benefit of the DIP Lenders (all property identified in clauses (a), (b) and (c) below being collectively referred to as the "Collateral"), subject, only in the event of the occurrence and during the continuance of an Event of Default, to the payment of the Carve Out (all such liens and security interests granted to the Agent, for its benefit and for the benefit of the DIP Lenders, pursuant to this Order and the DIP Documents, the "DIP Liens"):

(a)    First Lien On Cash Balances And Unencumbered Property. Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all pre-petition and post-petition property of the Debtors, whether existing on the Petition Date or thereafter acquired, to the extent not subject to valid, perfected, non-avoidable and enforceable liens in existence as of the Petition Date or valid liens in existence as of the Petition Date that are perfected subsequent to such date to the extent permitted by ~~Section~~**section** 546(b) of the Bankruptcy Code (collectively, "Unencumbered Property"),

19

including without limitation, all cash and cash collateral of the Debtors (whether maintained with the Agent or otherwise) and any investment of such cash and cash collateral, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, equipment, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, capital stock of subsidiaries, and the proceeds of all the foregoing, *provided*, *however*, that the Borrower and the Guarantors shall not be required to pledge to the Agent in excess of 65% of the voting capital stock of its direct Foreign Subsidiaries or any of the capital stock or interests of its indirect Foreign Subsidiaries (if, in the good faith judgment of the Borrower, adverse tax consequences would result to the Borrower).  Unencumbered Property shall exclude the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "Avoidance Actions"), and any proceeds or property recovered, unencumbered or otherwise the subject of successful Avoidance Actions.

        (b)        <u>Liens Priming Pre-Petition Secured Lenders' Liens</u>.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all pre-petition and post-petition property of the Debtors (including, without limitation, cash collateral, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, equipment, general intangibles,

20

documents, instruments, interests in leaseholds, real properties, patents, copyrights,

trademarks, trade names, other intellectual property, capital stock of subsidiaries, and the

proceeds of all the foregoing), whether now existing or hereafter acquired, that is subject to

the existing liens presently securing the Pre-Petition Debt (including in respect of issued

but undrawn letters of credit).  Such security interests and liens shall be senior in all

respects to the interests in such property of the Pre-Petition Secured Lenders arising from

current and future liens of the Pre-Petition Secured Lenders (including, without limitation,

adequate protection liens granted hereunder), and shall be subject and subordinate to (i) the

Carve Out (except as provided in paragraph 6 hereof), and (ii) any valid, perfected and

unavoidable interests of other parties arising out of liens, if any, on such property existing

immediately prior to the Petition Date, or to **(iii)** any valid, perfected and unavoidable

interests in such property arising out of liens to which the liens of the Pre-Petition Secured

Lenders become subject subsequent to the Petition Date as permitted by section 546(b) of

the Bankruptcy Code **and (iv) statutory liens or security interests arising after the**

**Petition Date and permitted under the DIP Credit Agreement that by operation of**

**law would have priority over a previously perfected security interest**.

(c)    Liens Junior To Certain Other Liens.  Pursuant to section 364(c)(3)

of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security

interests in and liens upon all pre-petition and post-petition property of the Debtors (other

than the property described in clauses (a) or (b) of this paragraph 7, as to which the liens

and security interests in favor of the Agent will be as described in such clauses), whether

21

now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens **and, as to Pre-Petition Payables (as hereinafter defined) Setoffs (as hereinafter defined)** in existence immediately prior to the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which security interests and liens in favor of the Agent and the Lenders are junior to such valid, perfected and unavoidable liens **and Setoffs**.

(d)    <u>Liens Senior To Certain Other Liens</u>.  The DIP Liens, the Adequate Protection Liens ~~(as defined below)~~, **the Replacement Liens** and the Junior Adequate Protection Liens **(each as defined below)** shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (ii) any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors other than with respect to any liens or security interests arising after the Petition Date and permitted under the DIP Credit Agreement to be senior to the DIP Liens.

8.    *Protection Of DIP Lenders' Rights.*

(a)    So long as there are any borrowings or letters of credit or other amounts (other than contingent indemnity obligations as to which no claim has been asserted when all other amounts have been paid and no letters or credit are outstanding)

22

outstanding, or the DIP Lenders have any Commitment (as defined in the DIP Credit

Agreement) under the DIP Credit Agreement, the Pre-Petition Agent, the Pre-Petition

Secured Lenders, **the holders of Replacement Liens** and holders of Junior Adequate

Protection Liens shall (i) take no action to foreclose upon or recover in connection with the

liens granted thereto pursuant to the Existing Agreements or this Order, or otherwise

exercise remedies against any Collateral, except to the extent authorized by an order of this

Court and (ii) be deemed to have consented to any release of Collateral authorized under

the DIP Documents**, *provided* that the Pre-Petition Agent and any Pre-Petition

Secured Lender may appear and be heard as a party in interest in connection with

any proceeding relating to the sale, transfer or other disposition of any Collateral** and

(iii) not file any further financing statements, trademark filings, copyright filings,

mortgages, notices of lien or similar instruments, or otherwise take any action to perfect

their security interests in the Collateral unless solely as to this clause (iii), the DIP Lenders

file financing statements or other documents to perfect the liens granted pursuant to this

Order, or as may be required by applicable state law to continue the perfection of valid and

unavoidable liens or security interests as of the ~~Filing Date~~**Petition Date.**

**Notwithstanding the foregoing, the Pre-Petition Secured Lenders shall be permitted**

**to file pleadings with respect to any proposed sale, transfer or other disposition of the**

**Collateral by the Debtors outside the ordinary course of business so long as such**

**pleadings do not contravene the provisions of this paragraph 8 and do not otherwise**

**interfere with the exercise of any right or remedy by the Agent or the DIP Lenders.**

23

**NYDOCS03/785799.9**

Nothing herein shall be read to permit the Pre-Petition Agent, the Pre-Petition Secured Lenders, or the holders of **Replacement Liens or** Junior Adequate Protection Liens to take any action in violation of the Bankruptcy Code or other applicable law**. This paragraph 8(a) defines the relative rights of the DIP Agent and the DIP Lenders, on the one hand, and the Pre-Petition Agent and the Pre-Petition Secured Lenders, on the other, and is not intended to confer any rights on the Debtors**.

(b)    The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the Agent and the DIP Lenders to exercise, (i) immediately upon the occurrence of an Event of Default, all rights and remedies under the DIP Documents other than those rights and remedies against the Collateral as provided in clause (ii) below and (ii) upon the occurrence and during the continuance of an Event of Default and the giving of five business days prior written notice to the extent provided for in the DIP Credit Agreement, all rights and remedies against the Collateral provided for in the DIP Documents (including, without limitation, the right to setoff monies of the Debtors in accounts maintained with the Agent or any DIP Lender).  In any hearing regarding any exercise of rights or remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Debtors, the Pre-Petition Agent, the Pre-Petition Secured Lenders, and the holders of **Replacement Liens or** Junior Adequate Protection Liens hereby waive **in such capacities, but not in capacities of holders of general unsecured claims,** their right to seek relief, including, without limitation, under section

24

105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict

the rights and remedies of the Agent or the DIP Lenders set forth in this Order or the DIP

Documents.  In no event shall the Agent, the DIP Lenders, the Pre-Petition Agent, the

Pre-Petition Secured Lenders, or the holders of **Replacement Liens or** Junior Adequate

Protection Liens be subject to the equitable doctrine of "marshaling" or any similar

doctrine with respect to the Collateral.

9.      *Limitation On Charging Expenses Against Collateral*.  ~~Subject to and~~

~~effective only upon entry of a final order granting such relief, except~~**Except** to the extent of

the Carve Out, no expenses of administration of the Cases or any future proceeding that

may result therefrom, including liquidation in bankruptcy or other proceedings under the

Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to

section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior

written consent of the Agent or the Pre-Petition Agent, as the case may be, and no such

consent shall be implied from any other action, inaction, or acquiescence by the Agent, the

DIP Lenders, the Pre-Petition Agent or the Pre-Petition Secured Lenders.

10.     *The Cash Collateral*.  To the extent any funds of any Debtor party to the

Existing Agreements (other than funds in accounts subject to lock-box arrangements under

the Debtors' receivables financing) were on deposit with the Pre-Petition Secured Lenders

as of the Petition Date, including, without limitation, all such funds deposited in, or

credited to, an account of any Debtor party to the Existing Agreements with any

Pre-Petition Secured Lender immediately prior to the filing of the Debtors' bankruptcy

25

petitions (the "Petition Time") (regardless of whether, as of the Petition Time, such funds

had been collected or made available for withdrawal by any such Debtor), such funds (the

"Deposited Funds") are subject to rights of setoff.  By virtue of such setoff rights, the

Deposited Funds are subject to a lien in favor of such Pre-Petition Secured Lenders

pursuant to sections 506(a) and 553 of the Bankruptcy Code.  The Pre-Petition Secured

Lenders are obligated, to the extent provided in the Existing Agreements, to share the

benefit of such liens and setoff rights with the other Pre-Petition Secured Lenders party to

such Existing Agreements.  The cash of the Debtors party to the Existing Agreements,

including, without limitation, the Deposited Funds or any other funds on deposit at the

Pre-Petition Secured Lenders as of the Petition Date, and any proceeds generated by the

collection of accounts receivable, sale of inventory or other disposition of the Pre-Petition

Collateral are cash collateral of the Pre-Petition Secured Lenders within the meaning of

section 363(a) of the Bankruptcy Code, and all such "cash collateral" is referred to herein

as "Cash Collateral."  The Pre-Petition Secured Lenders have objected to the use by the

Debtors of the Pre-Petition Collateral, including ~~the~~ Cash Collateral, except on the terms of

this Order.

   11. *Use Of Cash Collateral.*  The Debtors are hereby authorized to use all Cash

Collateral of the Pre-Petition Secured Lenders **and of the holders of Replacement Liens**

**or Junior Adequate Protection Liens**, and the Pre-Petition Secured Lenders **and the**

**holders of Replacement Liens or Adequate Protection Liens** are directed promptly to

turn over to the Debtors all Cash Collateral received or held by them, *provided* that the

26

Pre-Petition Secured Lenders **and the holders of Replacement Liens or Adequate Protection Liens** are granted adequate protection as hereinafter set forth.  The Debtors' right to use Cash Collateral shall terminate automatically upon the occurrence of the Termination Date or the voluntary reduction by the Borrower of the Total Commitments to zero (as each such term is defined in the DIP Credit Agreement).

12.     *Adequate Protection*.  The Pre-Petition Secured Lenders are entitled, pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their interest in the Pre-Petition Collateral, including the Cash Collateral, for and equal in amount to the aggregate diminution in value of the Pre-Petition Secured Lenders' Pre-Petition Collateral, including, without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of Cash Collateral and any other Pre-Petition Collateral, the priming of the Pre-Petition Agent's security interests and liens in the Pre-Petition Collateral by the Agent and the DIP Lenders pursuant to the DIP Documents and this Order, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.  As adequate protection, the Pre-Petition Agent and the Pre-Petition Secured Lenders are hereby granted the following (collectively, the "Adequate Protection Obligations"):

(a)     Adequate Protection Liens.  As security for the payment of the Adequate Protection Obligations, the Pre-Petition Agent (for itself and for the benefit of the Pre-Petition Secured Lenders) is hereby granted (effective and perfected ~~upon~~**as of** the ~~date of this Order~~**Petition Date** and without the necessity of the execution by the Debtors

27

**NYDOCS03/785799.9**

of mortgages, security agreements, pledge agreements, financing statements or other

agreements) a replacement security interest in and lien upon all the Collateral, subject and

subordinate only to (i) the security interests and liens granted to the Agent for the benefit of

the DIP Lenders in this Order and pursuant to the DIP Documents and any liens on the

Collateral to which such liens so granted to the Agent are junior**, (ii) the Replacement**

**Lien (as hereinafter defined)** and ~~(ii)~~**(iii)** the Carve Out**, *provided* that the security**

**interest in and lien granted to the Pre-Petition Agent pursuant to this paragraph 12(a)**

**upon Collateral that is not (x) Pre-Petition Collateral or (y) Collateral that would**

**have constituted Pre-Petition Collateral in which the Pre-Petition Agent would have**

**had a valid and perfected security interest or lien but for the commencement of these**

**cases and without further action shall be *pari passu* with the Junior Adequate**

**Protection Liens granted to any Setoff Claimant in such Collateral pursuant to this**

**Order** (the "Adequate Protection Liens");

       (b)    Section 507(b) Claim.  The Pre-Petition Agent and the Pre-Petition

Secured Lenders are hereby granted, subject to the payment of the Carve Out, a

superpriority claim as provided for in section 507(b) of the Bankruptcy Code **equal in**

**priority to the priority granted to the Setoff Claimants in paragraph 18(b) below**,

limited in amount to the aggregate diminution in value of the Pre-Petition Secured

Lenders' Pre-Petition Collateral, including, without limitation, any such diminution

resulting from the sale, lease or use by the Debtors (or other decline in value) of Cash

Collateral and any other Pre-Petition Collateral, the priming of the Pre-Petition Agent's

28