Program has two principal components and calls out a third program that the Company

implemented prepetition: (a) an annual incentive plan, (b) an emergence bonus plan, and (c) a

prepetition severance plan that was modified during the third quarter of 2005.  Noticeably absent

from Exhibit 1 is any form of retention plan.  The debtors are not going to make periodic payments

to employees to reward them merely for staying with the company.  In addition, the company has

determined to eliminate an unrelated retention plan, already approved by the Compensation

Committee of the Board of Directors in early 2005 and, the unvested, unfunded portion of the

Debtors' long-term incentive programs.  The Debtors believe that the program described herein

will serve in part to replace the former retention plan with a thoughtful program which will likely

create better opportunities for the Company and its Covered Employees.  Indeed, payments to

Covered Employees are tied to specific performance and emergence targets, and therefore are

geared so as to incentivize employees to work towards an early and successful emergence from

chapter 11.

Annual Incentive Plan

26.    The annual incentive plan is designed to promote the Company's business

turnaround by conditioning payments on the Debtors' achievement of certain financial objectives.

Specifically, the plan was developed in order to encourage participants to increase the Debtors'

enterprise value, and thus increase value and returns for all stakeholders during the Debtors'

chapter 11 cases.  This particular component of the Key Employee Compensation Program is

designed to replace the Debtors' prepetition annual incentive program.  In doing so, the Debtors

have adopted a plan that is a fairly similar in concept to the prepetition plan, but with modifications

to certain of the components.  In particular, the performance targets track EBITDAR goals rather

than net earnings targets and the performance periods have been shortened to increase the incentive to meet the targeted goals.[6]

27.      Under the annual incentive plan, employees' eligibility to receive annual bonuses is dependent on whether the Debtors reach their projected business plan EBITDAR levels over performance periods, generally covering six months as well as an acceptable level of personal performance.  The EBITDAR levels for the first performance period, covering October 1, 2005 to June 30, 2006,[7] will be set before December 31, 2005, by the Compensation Committee, an independent committee of the Debtors' Board of Directors.  The second performance period will run from July 1, 2006 to December 31, 2006.  Six month performance periods will continue thereafter until the Debtors exit chapter 11.  Each participant's bonus opportunity for a performance period will equal one-half of his or her current annual plan opportunity (except for the first performance period where the opportunity will be 75% of the prepetition annual plan opportunity) to reflect the shortened performance periods.

Emergence Bonus Plan

28.      As outlined in Exhibit 1, the Key Employee Compensation Program will afford eligible employees cash payments and, in some cases, available equity in the new company upon emergence from chapter 11 (the "Emergence Bonus Plan").  The cash component of the plan is payable to U.S. executives upon either the effective date of the confirmation of the plan of reorganization or a sale of all or substantially all of the company's assets (collectively, the "Effective Date").  In addition, if the Debtors achieve a successful reorganization, the equity component of the plan will allocate 10% of the equity in the reorganized company to Delphi's

---

[6]     As of the Petition Date, the non-executive Salaried Incentive Plan will also change to target EBITDAR goals.

[7]     The first period is the only nine-month period under the plan.  It was designated as such to capture the stub period of October 1 through December 31, 2005.

approximately 600 domestic and foreign executives. The Emergence Bonus Plan is entirely new and is designed to incentivize employees to achieve a successful restructuring and to remain loyal to the Company even after emergence. The Emergence Bonus Plan replaces the Debtors' prepetition long-term incentive plan and compares favorably to the costs under the long-term incentive plan.

29.    The cash component of the Emergence Bonus Plan is available only to U.S. executives of the Company. As mentioned, the Debtors' chief executive officer has opted out of the plan. Cash payments vary from 30% to 250% of a participant's salary, based on level of responsibility in the Debtors' organization. Payments under the cash component of the Emergence Bonus Plan will be paid in one lump sum payment shortly after the Effective Date.

30.    Similar to other incentive programs, a participant who voluntarily terminates employment (except in the case of a constructive termination) will <u>not</u> be eligible for any payment under the program. On the other hand, if a participant's employment is terminated involuntarily, other than for cause, the participant will receive a pro rata payment[8] contingent upon the occurrence of the Effective Date. If a participant's opportunity to receive a payment is prevented because his or her business unit is sold prior to the Effective Date, then that participant would be entitled to a pro rata payment, also contingent upon the occurrence of the Effective Date. Finally, any participant whose employment terminates because of death or disability would also be entitled to a pro rata payment, contingent upon the occurrence of the Effective Date.

31.    In addition to a cash component, the Debtors have adopted an equity component as part of its Emergence Bonus Plan which is designed to cover Delphi's non-U.S.

---

[8]    The pro rata payment would be equal to the former participant's opportunity multiplied by a fraction where the numerator is the number of days from (a) the filing date or (b) such participant's hire date, whichever is later, until the date his or her employment is terminated and the denominator is the number of days from the later of the (x) filing date or (y) such party's hire date to the effective date.

13

executives as well, for a total of approximately 600 executives.  This component is designed to maintain the Debtors' long-term compensation, enable recruitment of a "Best in Class" management team, motivate and reward high performance, and incentivize executives to remain working for the Debtors during this chapter 11 period.

32.    Under the equity component of the Emergence Bonus Plan, each executive's equity award is valued one-third in restricted stock and two-thirds in stock options. The Debtors propose that each option's strike price be set based on the mid-point of the valuation range in the disclosure statement accompanying the plan of reorganization approved by this Court. The particular amount of equity is based on the executive's level of responsibility with the Debtors. Equity awards will vest one-quarter (25%) at the Effective Date, with the balance vesting in equal increments on each of the first, second, and third anniversaries of the Effective Date.  To the extent any eligible executive has left the Debtors prior to the Effective Date, the executive's allocation will be added to the reserve of awards available to employees who are promoted or newly hired.

33.    The Debtors intend to seek creditor agreement or court approval, pursuant to a plan of reorganization to set aside 10% of the equity in the reorganized entity for approximately 600 U.S. and foreign executives.[9]  The Debtors believe that this amount of equity is reasonable and necessary to ensure that management continues working with and for the Debtors through and following the duration of the chapter 11.  Moreover, the Debtors believe that setting aside this amount of equity for its executives falls squarely within the range of competitive practices and will further increase the Debtors' ability to attract and retain executives while also motivating executives to create value for all stakeholders during the chapter 11 process.

---

[9]    Equity awards will not be granted in the case of a sale of all or substantially all of the Debtors' assets.

14

Severance

34.    During any reorganization process, when employees may be laid off or terminated, it is often difficult to recruit new employees and retain current employees.  Severance plans can mitigate the anxiety felt by employees and provide employees with desired protection and security, typically in the form of salary continuation in the event employment is terminated by the company without cause.

35.    During the prepetition period, the Debtors maintained a severance program for its executives and officers as disclosed in further detail in Exhibit 1 and the "Human Capital Compensation Motion" filed contemporaneously herewith.[10]  In order to recruit and maintain employees, the Key Employee Compensation Program continues the Debtors' prepetition severance program.

36.    Pursuant to the Debtors' prepetition severance program, U.S. executives without employment agreements are entitled to severance benefits only upon termination if (a) the executive's employment was terminated involuntarily for any reason other than for "cause," or (b) the executive's employment is terminated after a change in control for "good reason" as defined in the Delphi's formal severance plan.  The severance payment under this program is made in a lump sum and consists of (x) all unused and accrued vacation time, (y) all accrued but unpaid compensation earned, and (z) a severance benefit.  As described in Exhibit 1, the severance benefits under the Debtor's prepetition severance program provide that upon separation, senior executives are eligible for payments of 12 months base pay plus an additional 12 month bonus target and non-senior executives receive 12 months base pay.  All such severance benefits are

---

[10]    Motion for Order Under 11 U.S.C. §§ 105(a), 363, 507, 1107, and 1108 (I) Authorizing Debtors To Pay Prepetition Wages And Salaries To Employees And Independent Contractors, (II) Authorizing Debtors To Pay Prepetition Benefits And Continue Maintenance Of Human Capital Benefit Programs In The Ordinary Course, And (III) Directing Banks to Honor Prepetition Checks For Payment of Prepetition Human Capital Obligations.

contingent upon the participant signing an agreement(s) that provides for the release of claims, non-solicitation, non-compete, non-disclosure and non-disparagement.

37.    Finally, the Debtors' twenty-one U.S. officers, other than the chief executive officer, each has an employment agreement that provides for such officer to receive, upon a qualifying termination of employment, an amount equal to 1/12 of his or her annualized compensation (salary plus annual target bonus) for 18 months.  In exchange for providing the twenty-one officers with formal severance benefits in the event of termination, Delphi has agreements in place that prevent the participant from (a) competing against the Company, (b) disclosing Delphi's manufacturing methods, (c) soliciting Delphi employees to work at a new organization, and (e) disparaging the organization and its employees.

<u>Applicable Authority</u>

38.    Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing.  11 U.S.C. § 363(b)(1).  Uses of estate property outside the ordinary course of business may be authorized if the debtor demonstrates a sound business justification for it.  <u>See</u> <u>In re Lionel Corp.</u>, 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires a finding that a good business reason exists to grant a debtor's application under section 363(b)); <u>In re Delaware Hudson Ry. Co.</u>, 124 B.R. 169, 179 (Bankr. D. Del. 1991).  Once the debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'"  <u>In re Integrated Resources, Inc.</u>, 147 B.R. 650, 656 (S.D.N.Y. 1992).

16

39.    Given the importance of the Debtors' employees to the Debtors' continued operations and the ultimate success of these chapter 11 cases, this Court should approve the relief requested herein.  The Debtors have determined that the costs associated with the adoption of the Key Employee Compensation Program are more than justified by the benefits that are expected to be realized by encouraging the Covered Employees to continue working for the Debtors and vigorously assisting in the Debtors' restructuring efforts.  This is especially true in this case given the fact that a substantial amount of the payments under the Key Employee Compensation Program are conditioned on achievement of certain predetermined financial goals.[11]

40.    Moreover, approval of the Key Employee Compensation Program will boost employee morale and forestall the loss of value that would be attendant to resignations among the Covered Employees.  The proposed relief therefore will enable the Debtors to retain the knowledge, experience and loyalty of the employees who are crucial to the Debtors' reorganization efforts.  If these employees were to leave their current jobs at this stage in the Debtors' chapter 11 cases, it is virtually assured that the Debtors would not be able to attract replacement employees of comparable quality, experience, knowledge and character.  Indeed, suitable new employees, even if available, would not have in-depth and historical knowledge of the Debtors' business.  The time and costs incurred, and the learning curve necessarily involved in hiring replacements for employees, clearly outweighs the potential costs of payments made under the Key Employee Compensation Program.

41.    In sum, the Debtors have determined in the exercise of their business judgment that it is essential that the Covered Employees continue to focus their efforts on

---

[11]    Since the proposed Key Employee Compensation Program is needed to retain employees -- who are in turn necessary for the preservation of the Debtors' estates -- the payment rights of the employees under the Program are "actual, necessary costs and expenses of preserving the [Debtors'] estate[s]," and should be accorded 11 U.S.C. § 503(b)(1)(A) administrative expense status to the extent they become due.

supporting and maintaining the Debtors' reorganization efforts in the coming months.

Accordingly, the Debtors believe that granting the relief requested in this Motion is in the best

interests of the Debtors' estates, their creditors, and other interested parties and should be

approved.  See, e.g., In re America West Airlines, Inc., 171 B.R. 674, 678 (Bankr. D. Ariz. 1994)

(holding that proposal to pay bonuses on confirmation of reorganization plan was exercise of

debtor's sound business judgment); In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)

(concluding that implementation of a critical employee retention plan was a proper exercise of

debtor's business judgment).

### Notice

42.    Notice of this Motion has been provided by facsimile, electronic

transmission, overnight delivery, or hand delivery to (i) the Office of the United States Trustee, (ii)

the Debtors' 50 largest unsecured creditors, (iii) counsel for the agent under the Debtors'

prepetition credit facility, and (iv) counsel for the agent under the Debtors' proposed postpetition

credit facility.  In light of the nature of the relief requested, the Debtors submit that no other or

further notice is necessary.

### Memorandum Of Law

43.    Because the legal points and authorities upon which this Motion relies are

incorporated herein, the Debtors respectfully request that the requirement of the service and filing

of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

18

WHEREFORE, the Debtors respectfully request that the Court enter an order, (i) authorizing the implementation of the Key Employee Compensation Program as described herein, and (ii) granting such other and further relief as is just and proper.

Dated:  New York, New York
            October 13, 2005

SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP

By: s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr. (pro hac vice motion pending)
    John K. Lyons
    Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

    - and -

By: s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

19

**<u>EXHIBIT 1</u>**



**Delphi Corporation**

**Key Employee**
**Compensation Programs**

October 8, 2005

WWW.WATSONWYATT.COM

**W**atson Wyatt
*Worldwide*



# **Table of Contents**

|  | **Page** |
|---|---|
| Executive Summary | 2 |
| Introduction and Background | 3 |
| Business Case | 4 |
| Revised Annual Incentive Plan | 9 |
| Emergence Bonus Plan | 11 |
| CEO Compensation | 27 |
| Pre-Petition Severance Program | 28 |





# Executive Summary

| Revised Incentive Plan | Emergence Cash Plan | Emergence Equity Plan | Severance Plan | CEO Compensation Program |
|---|---|---|---|---|
| | | | | |
| EBITDAR measure, to be set by Compensation Committeee by 12/31/05 | Cash payments equaling 30  to 250% of salary | Stock option and restricted stock awards for 595 U.S. and foreign executives | Top 21 executives have severance benefit of 18 months' salary + bonus | No participation in annual incentive plan or either emergence plan |
| Six month performance cycles, except that first cycle will run from October 1, 2005- June 30, 2006. | Payments made in a lump sum at the effective date | Awards vest 1/4 at the effective date and 1/4 on each subsequent annual anniversary | Next level of executives have benefit of 12 months' salary + bonus | No employment or severance contract |
| Current annual incentive opportunities remain in place, prorated to reflect each shorter cycle | Plan covers approximately 486 U.S. executives | Total amount of awards and reserve is 10% of the restructured company | Other executives receive a benefit of 12 months' salary | Eligible for a discretionary bonus at the end of his term as CEO |
| | $88 million cost is less than that incurred historically by Delphi for its long-term incentive plan and consistent with the cost incurred by other Ch. 11 companies for their retention plans | | Estimated severance cost is $30.5 million, assuming 30% involuntary termination. | |

2





# Introduction and Background

Delphi Corporation ("Delphi" or the "Company") has been engaged in discussions with its major unions and GM concerning consensual modifications to various agreements that Delphi previously entered into with such unions and GM.  Delphi had publicly acknowledged that if these discussions do not lead to the implementation of a restructuring plan that addressed its existing legacy liabilities and the resulting high cost of its U.S. operations, the Company will consider other strategic alternatives, including a  Chapter 11 reorganization. On October 8, 2005, Delphi filed its bankruptcy petition under Chapter 11.

Delphi has asked Watson Wyatt to assist in the design and implementation of incentive compensation programs that align the interests of both program participants and Company stakeholders and to benchmark such programs against competitive practice. All such programs are generally referred to as Delphi's "Key Employee Compensation Programs" or KECP.

3





# **Business Case**

- Delphi's current situation raises substantial concerns for all employees, including:
  - Downsizing and layoffs on the horizon
  - Possibility of sale/merger
  - No equity-based long term incentive opportunity for executives
  - Potential reduction in retirement benefits

4





# **Business Case**

- A company that is financially distressed or undergoing a significant restructuring has few means to positively affect an employee's "employment proposition"

- Employment proposition is defined as the mix of tangibles (compensation and benefits) and intangibles (employer's prospects, career path, work content, work relationships, work/life balance) offered by the employer which forms the basis for a particular employee's assessment of whether he or she wishes to remain employed by a particular company

- Despite the adverse affect on the overall employment proposition, Delphi must strive to retain its executives (Band A and above) who possess unique or critical knowledge of Delphi's businesses. Such institutional knowledge, which could not be readily replaced on the open market, is necessary not only to maintain Delphi's ongoing operations, but also to assure successful completion of the restructuring.





# Business Case

- In the case of these executives more so than other employees, their actual pay for 2005 will be substantially less than market. Actual pay for 2004 was also substantially less than market.

- This pay shortfall makes them more susceptible to switching jobs.

- It is also more costly and time consuming (and possibly more difficult) to find replacements for these executives if they leave, as evidenced by the following:

  – Signing bonuses:  Since July 1, 2005, Delphi has found it necessary to pay six figure signing bonuses to top executives and signing bonuses averaging nearly $20,000 for lower level executives.

  – Salaries to new hires are often higher than those of the prior incumbents.

  – Headhunter costs, some of which have been well into six figures, in retained searches

  – Executive turnover has increased almost 75% in the last 12 months.  In the critical finance function, turnover has more than doubled. Also, 60% of the executive quits have been identified as being future high potential individuals or successors to the positions held by their immediate supervisors.

6



# **Business Case**

After lengthy discussions involving the Compensation Committee, management, and Company advisors, the following decisions were made regarding compensation programs going forward.

– The existing retention program (adopted in February 2005) has been terminated.

– Awards made under the current Performance Achievement  Plan (PAP) have been cancelled except the award for the 2003-2005 performance cycle . (The first day motion provides that the earned award for the 2003-2005 cycle will be paid in early 2006.) Thus, awards made under the 2004-2006 and 2005-2007 cycles will be cancelled.

– The annual incentive plan (which will not pay any bonuses for the January 1-December 31, 2005 plan year) has been modified as follows:

  • EBITDAR will become the performance measure
  • Each performance period will be six months rather than 12 months

7





# **Business Case**

– An emergence bonus program has been adopted, with cash bonuses for all executives payable upon the "effective date" (defined below).

– The emergence bonus plan also includes a set aside of 10% of the equity of restructured Delphi for equity-based compensation awards to the executive team upon the company's emergence from bankruptcy.

– A pre-petition severance program has been adopted and is to be continued to provide for competitive severance benefits for the executive team.

Each of the KECPs is discussed on the following pages.

8





# Revised Annual Incentive Plan

- The current annual incentive plan adopted for calendar year 2005 is designed to pay bonuses based on the achievement of a net earnings target. Going forward, net earnings is not an appropriate performance measure, in part, because of the inability to forecast restructuring costs.

- The Company and its advisors agree that EBITDAR* is a more relevant measure. Also, to minimize forecasting concerns, particularly at the beginning of the Ch. 11 process, the Company has decided to measure EBITDAR over a six month period, rather than annually.

9    * Earnings before interest, taxes, depreciation, amortization, and restructuring costs.





# Revised Annual Incentive Plan

- The first performance period will cover October 1, 2005 to June 30, 2006.* The second performance period will therefore be July 1, 2006 to December 31, 2006. The six month performance periods will continue until Delphi exits Ch 11.

- Each participant's bonus opportunity for a performance period will equal one-half of his or her current annual plan opportunity (except that for the first performance period, the opportunity will be 75% of the annual plan opportunity).

- The EBITDAR goal for the first performance period will be set by the Compensation Committee before December 31, 2005.

- The six month cost of the Annual Incentive Plan is estimated at $21.5 million.

---

\* The first period will be nine months, including the stub period October 1 through December 31, 2005, which will ensure that the incentive period properly corresponds to the Ch. 11 period.

10



# Emergence Bonus Plan- **Introduction**

As part of the overall effort to motivate its executive team (Band A and above) through the restructuring process, management believes that an emergence bonus plan would support the company's business and people strategies.

The emergence plan would have two parts:

- A cash component, payable to participants upon either the effective date of the confirmation of the plan of reorganization or a sale of all or substantially all of the company's assets in one or more transactions (either event herein referred to as the "effective date")

- An equity component of 10% of the equity in the reorganized company



# Emergence Bonus Plan- Effective Date Cash Component

The key features of the cash component are:

- The participants would be all U.S. executives (except the CEO), approximately 486 employees.

-  Payment would be made in a lump sum as soon as possible after the effective date.

- The chart below summarizes the various participants' opportunities.

| Name | # | Average Salary | Cash Opportunity |
|---|---|---|---|
| O'Neal | | $1,150,000 | $2,750,000 |
| Wohleen | | $890,000 | $2,175,000 |
| Dellinger | | $750,000 | $2,000,000 |
| Weber | | $700,000 | $1,975,000 |
| | | | |
| 18 Officers | 18 | $495,761 | $550,000- $1,100,000 |
| All Other Executives | 464 | $120,000- $450,000 | $50,000- $475,000 |
| | | | |
| Total | 486 | | **$87,925,000** |
| | | | |

12



# Emergence Bonus Plan- Effective Date Cash Component

- Similar to other incentive programs, a participant whose employment is terminated voluntarily will not be eligible for any payment under the program. If the participant's employment is terminated involuntarily (and not for cause), he or she would receive a pro rata payment.* Payment would be deferred until the effective date.

- In the case of a participant whose business unit is sold prior to the effective date, then that participant would be entitled to a pro rata payment.* Payment also would be deferred until the effective date.

- Any participant whose employment terminated because of death or disability would be entitled to a pro rata payment. Payment would be deferred until the effective date.

_____

* The pro rated payment would be equal to the former participant's opportunity times a fraction, where the numerator is the number of days from the later of the filing date or such participant's hire date until the date employment terminated and the denominator is the number of days from the later of the filing date or such participant's hire date to the effective date.

13



# Emergence Bonus Plan- Effective Date Cash Component

- Typical market practice varies widely, but most companies have historically covered only a small number of executives (including the CEO).

- Importantly, participation and award size can be expected to increase in light of pending changes to the law regarding retention plans, as well as a debtors' continuing need to provide competitive compensation opportunities. Friedman's, which filed Ch.11 on 1/14/05 in the US Bankruptcy Court in Savannah, Georgia, provides an instructive example.

  (i) Friedman's "emergence  cash plan" covers approximately 83 employees with opportunities ranging from 5 to 333% of salary.

  (ii) No retention plan in Friedman's

- Other relevant benchmarks

  (i) Both Hayes-Lemmerz and Federal Mogul (Detroit area OEM auto industry suppliers) had special incentive plans during their Ch.11 cases.

  (ii) Both plans were essentially based on value created during the Ch.11 case. Hayes covered 13 employees with uncapped opportunities and FM covered approximately 90 employees with annual opportunities ranging from 30-150% of salary.

14



## Emergence Bonus Plan- Effective Date Cash Component

We believe that the proposed cost of the cash component of the plan can be analyzed in two ways. One way would be to compare the cost to that incurred historically by Delphi under its long-term incentive compensation programs.

A second way is to compare the cost to the costs incurred by other Chapter 11 companies through their retention plans. The theory would be that such costs appropriately represent the amount that a company needs to expend to motivate and retain its employees and otherwise preserve the estate of the debtor.

15



# Emergence Bonus Plan - Effective Date Cash Component

The proposed cash plan also compares favorably with the cost incurred in prior years by Delphi to motivate and retain its executive group through the Company's long-term incentive awards. Because the cash plan will in all likelihood cover a period greater than one year, its cost should be adjusted or annualized for comparison purposes.

| | Prior Years' LTI Costs (in $ millions) | | |
|---|---|---|---|
| **Proposed Cash Cost** | **2005** | **2004** | **2003** |
| $87.9-- aggregate cost<br>$65.9-- 15 months' annualized<br>$58.6-- 18 months' annualized | $49.6* | $91.3 | $75.2 |

_____

\*  Executive LTI awards in 2005 were reduced in consideration of the Company's adoption of a $21 million retention program for its executives



# Emergence Bonus Plan- Effective Date Cash Component

The following chart illustrates how the $87.9 million aggregate and $58.6 million annualized cost of Delphi's cash emergence bonus plan compares to the costs incurred by other large companies which have put in place retention programs.

| | Revenues | Annual Cost as a Percentage of Revenues | Assets | Annual Cost as a Percentage of Assets |
|---|---|---|---|---|
| **Peer Group 25th Percentile** | $6,384,806,500 | 0.062% | $4,002,959,500 | 0.063% |
| **Peer Group 50th Percentile** | $8,414,095,000 | 0.088% | $6,638,000,000 | 0.094% |
| **Peer Group 75th Percentile** | $21,092,500,000 | 0.209% | $21,273,000,000 | 0.570% |
| **Range** | $4.9B- $185 B | 0.01% - 0.48% | $894 M  -$61.7B | 0.019% - 1.054% |
| **Delphi** | $28,622,000,000 | .31%--aggregate .20%--annualized | $16,593,000,000 | .53%--aggregate .35%--annualized |
| *Percentile Rank* | *79%* | *81%--aggregate 75%--annualized* | *67%* | *71%--aggregate 59%--annualized* |

**Notes:**
Peer group comprised of the following 15 companies with revenues of $5B and above:
Enron, Worldcom, Kmart, Pacific Gas and Electric, UAL, US Airways, Conseco, Ameriserve, Winn-Dixie, Mirant, Montgomery Ward, MicroAge, Washington Group, Owens Corning, Bethlehem Steel



# Emergence Bonus Plan - Effective Date Cash Component

The following chart illustrates how the $87.9 million aggregate and $58.6 million annualized cost of Delphi's emergence bonus plan compares to the costs incurred by other companies of varying sizes which have put in place retention programs.

| | Revenues | Annual Cost as a Percentage of Revenues | Assets | Annual Cost as a Percentage of Assets |
|---|---|---|---|---|
| **Peer Group 25th Percentile** | $346,875,000 | 0.201% | $512,750,000 | 0.191% |
| **Peer Group 50th Percentile** | $1,100,000,000 | 0.425% | $1,500,582,000 | 0.433% |
| **Peer Group 75th Percentile** | $3,071,000,000 | 0.882% | $3,076,725,000 | 0.754% |
| **Range** | $120M- $185B | 0.01% - 915% | $28M  -$61.7B | 0.02% - 7.11% |
| **Delphi** | $28,622,000,000 | .31%--aggregate .20%--annualized | $16,593,000,000 | .53%--aggregate .35%--annualized |
| *Percentile Rank* | *96%* | *38%--aggregate 26%--annualized* | *93%* | *58%--aggregate 38%--annualized* |
| | | | | |
| **Notes:** | | | | |
| Peer group comprised of 120 retention plans from 117 companies | | | | |

18



# Emergence Bonus Plan - Effective Date Cash Component

Conclusion

- The proposed cash plan for participants addresses both the concerns of the employees and the needs of Delphi.  Ultimately, the proposed program helps to balance each participant's "employment proposition" thereby preserving Delphi's enterprise value during the restructuring period.

- The proposed cash plan is consistent with the scope, purposes, and cost of retention plans implemented by other Ch. 11 companies, as well as prior long term incentive arrangements implemented by the Company. Based on the analysis above, the cost of the program is within the range of competitive practice.

19





# Emergence Bonus Plan- Equity Component

In the absence of its ability to provide equity-based compensation to its executives and key employees during the Chapter 11 process, Delphi intends to include future equity awards as part of its emergence bonus plan. Such awards are critical to an organization for the following reasons:

  i. Maintain the Company's compensation promise to its current employees;

  ii. Enable recruitment of a Best In Class Management Team;

  iii. Motivate and reward high performance; and

  iv. Retain executives during a period of volatility, such as during Chapter 11.

20





# Emergence Bonus Plan- Equity Component

As part of its plan of reorganization, Delphi will propose that 10% of the equity in the reorganized entity be set aside for its executives (both U.S. and foreign, approximately 600 individuals).  Accordingly, the company intends to seek creditor agreement or court approval during the early stages of the Ch 11 process for such a set aside.

The company believes that 10% is reasonable as well as necessary to ensure the retention of its management team through and following the duration of the Ch 11 process. Note that the 10% is set aside for management only if the company is successfully reorganized and will not get paid or awarded in the case of a sale of all or substantially all of the company's assets.

21



# Emergence Bonus Plan- Equity Component

The Company further proposes that each executive's award is valued one-third in restricted stock (or units) and two-thirds in stock options. Each award will vest as follows:  25% will be vested at the effective date, with the balance vesting in equal increments on each of the one, two, and three year anniversaries of the effective date. Each option's strike price will be set based on the mid-point of the valuation range in any disclosure statement approved by the Court.

The chart on the next page assumes that at the time of the effective date Delphi's equity value will be $4 billion. To the extent any executive included is not an employee at the effective date, then his or her allocation would be added to the reserve.

22



# Emergence Bonus Plan- Equity Component

| Name | # | Average Salary | Stock Option Face Value | Restricted Stock Face Value | Gain per indiv if stock price Doubles | Triples |
|------|---|---------|-------------|----------------|---------|---------|
| CEO TBD | | -- | $10,000,000 | $5,000,000 | $20,000,000 | $35,000,000 |
| O'Neal | | $1,150,000 | $5,000,000 | $2,500,000 | $10,000,000 | $17,500,000 |
| Wohleen | | $890,000 | $4,000,000 | $2,000,000 | $8,000,000 | $14,000,000 |
| Dellinger | | $750,000 | $3,000,000 | $1,500,000 | $6,000,000 | $10,500,000 |
| Weber | | $700,000 | $3,000,000 | $1,500,000 | $6,000,000 | $10,500,000 |
| | | | | | | |
| 18 Officers | 18 | $495,761 | $1,000,000-$1,666,667 | $500,000-$833,333 | $2,000,000-$3,333,333 | $3,500,000-$5,833,333 |
| | | | | | | |
| All Other Executives | 572 | $120,000-$450,000 | $200,000 -$666,667 | $100,000-$333,333 | $400,000-$1,333,333 | $700,000-$2,333,333 |
| | 595 | | | | | |
| | | | **Estimated Award Value** | | $300,000,000 | |
| | | | **Estimated Reserve Value** | | $100,000,000 | |
| | | | **Total** | | $400,000,000 | |

**Note:  CEO awards are illustrative only. It is expected that any new CEO would separately negotiate his or her equity award package.**





# Emergence Bonus Plan- Equity Component

***Competitive Practice – General Industry***

One benchmark for the amount of equity that the Company proposes to set aside for compensatory purposes is potential equity dilution at peer companies. Summarized in the table below are equity dilution levels for companies in the S&P 500 Index and the Top 200 companies (based on revenues). Typically, companies intend to use the shares represented by the equity dilution over a three to five year period.  Competitive practice indicates that these companies have median equity dilution levels ranging from 13% to 16%.

|  | Potential Equity Dilution | |
| --- | --- | --- |
|  | **Median** | **Average** |
| S&P 500 Index(1) | 13.11% | -- |
| Top 200 Companies(3) |  | 16.36% |

(1)  2005 Equilar, Inc
(2)  Equity Stake- The Top 200 Companies (Pearl Meyer and Partners)

24



# Emergence Bonus Plan- Equity Component

**Competitive Practice – Emerged Companies**

We also examined Watson Wyatt's database of approximately sixty companies which have emerged from Chapter 11 to determine competitive practice regarding the percentage of shares reserved by companies for the granting of long-term incentives after emergence from Chapter 11.  The database indicates that companies generally set aside between 10% and 13% of shares outstanding within one year following emergence.

| | Shares Reserved as a Percent of Common Stock Outstanding |
| --- | --- |
| 25th Percentile | 10.0% |
| 50th Percentile | 11.1% |
| 75th Percentile | 12.7% |
| 90th Percentile | 17.9% |

25



# Emergence Bonus Plan- Equity Component

- The Company's proposed 10% equity set aside for its executive team is well within the range of competitive practice. Importantly, the knowledge among the executive team regarding their future equity stake should greatly enhance the Company's retention and recruitment efforts, as well as motivate the executives to create value for all stakeholders during the Chapter 11 process.

26





# CEO Compensation Program

The current CEO, Steve Miller, will not participate in the (i) six month incentive program, (ii) the emergence cash bonus plan, or (iii) the emergence equity program. Moreover, he is not covered by an employment or severance agreement. He is an at will employee, serving at the discretion of the Board of Directors.

The Compensation Committee, subject to approval of the full Board, reserves the right, however, to compensate Mr. Miller as it deems appropriate at the end of his period of service as CEO.

27





# Pre-Petition Severance Program- Background

Because of the uncertainties of the restructuring  process, employees often fear that they will lose their jobs. This, coupled with the perceived risk of working for a company undergoing a substantial financial restructuring, may cause employees to seek other employment despite continuation of existing incentive plans or even implementation of inducements such as retention bonuses.

To reduce the likelihood of losing the company's key employees, a company that is attempting to restructure outside of Chapter 11 or has filed for protection under the bankruptcy laws will typically take the necessary actions to assure employees that if their jobs are eliminated, they will at least be compensated for deferring their job search.

28





## Pre-Petition Severance Program- Officers

- Twenty-one officers have an employment agreement that specifies a severance benefit of 18 months' salary + target bonus.

- Such an arrangement is important from the company's perspective because the employment agreements include non-compete prohibitions.

- Appropriate severance protection allows the officer group to focus on the restructuring job at hand without concern that they are simply at-will employees subject to below market separation treatment at the company's convenience.

29



# Pre-Petition Severance Program- Other Executives

Those U.S. executives without employment agreements are entitled to severance benefits only upon termination of employment if (i) the executive's employment is terminated involuntarily for any reason other than for "cause," or (ii) the executive's employment is terminated after a change in control for "good reason" as defined in the Delphi Corporation Severance Plan. The payment, which will be in a lump-sum, will consist of the following:

- ❑ All unused vacation time accrued as of the participant's termination of employment
- ❑ All accrued but unpaid compensation earned as of the participant's termination, and

30



# Pre-Petition Severance Program- Other Executives

❑The following severance benefit:

| Employee Level | Approximate Number of U.S. Employees | Severance Benefit |
|---|---|---|
| Senior Management | 89 | 12 months' base+ target bonus |
| All Other Executives | 373 | 12 months' base |
| Non-Executive Salaried | 13,000 | Length of Service (max at 25 years= 12 months' salary) |

Last, payment of any severance benefit is contingent upon the participant signing a claim release, non-solicitation, non-compete, non-disclosure, and non-disparagement agreement with the Company.

31



# Pre-Petition Severance Program- Estimated Costs

The following table compares the estimated cost of severance to the Company under two different alternatives. The first analysis assumes all executives have their employment terminated involuntarily. The second analysis assumes approximately 30% of current US executives have their employment terminated involuntarily. (All costs are in $ millions.)

| | All Terminated | 30% Terminated |
|---|---|---|
| **Employee Level** | | |
| Officers | $31.0 | $7.4 |
| Sr. Management | $35.4 | $6.5 |
| All Other Executives | $79.0 | $16.6 |
| | | |
| **Total** | **$145.5** | **$30.5** |

32



# Pre-Petition Severance Program- Competitive Data

Below is a summary of the severance benefits Chapter 11 companies have implemented for the senior management or top executives and other key employees.

## Other Companies' Programs – Chapter 11 Companies

| Senior Management and Executives | Other Key Employees |
|---|---|

**Senior Management and Executives**

- For executives with contracts, they receive the balance due under the contract; typically 1-2X salary and target bonus.

- For executives without contracts, the range of benefits generally equals 6-36 months' base salary, with median benefit equal to 18 months' base salary.

**Other Key Employees**

- 1 week per year of service

- Range of benefits generally equals 1-12 months' base salary

- Median benefit equal to 8 months' base salary.



# Pre-Petition Severance Program- Competitive Data

The following table summarizes the median (i.e., 50th percentile) minimum and maximum number of weeks provided under non-Chapter 11 severance programs for industrial manufacturing companies, companies that employ more than 25,000 people, and Fortune 1000 companies.[1]  The information is broken out by employee level.  The footnotes at the bottom of the page detail the representative employees at each level.

| | Industrial Manufacturing | | More than 25,000 Employees | | Fortune 1000 Companies | |
|---|---|---|---|---|---|---|
| | Severance (weeks) | | Severance (weeks) | | Severance (weeks) | |
| Level | Min | Max | Min | Max | Min | Max |
| Sr.Executives[2] | 4 | 52 | 4 | 52 | 6 | 52 |
| Executives[3] | 4 | 26 | 4 | 39 | 4 | 52 |

34

(1) Source: Lee Hecht Harrison – Severance Benefits and Separation Benefits (2005)
(2) Represents EVP and SVP positions.
(3) Represents VP, Department Head, and Director positions.





# Pre-Petition Severance Program- Conclusion

The benefits under the Company's Severance Program for its officers and executives are within the range of competitive practice. Additionally, in exchange for providing the twenty-one officers with formal severance benefits in the event of termination, the Company has agreements in place that prevent the participant from (i) competing against the Company, (ii) disclosing Delphi's manufacturing methods, (iii) soliciting Delphi employees to work at a new organization, and (iv) disparaging the organization and its employees.

35



UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- x
                                                           :
        In re                                              :
                                                           :    Chapter 11
DELPHI CORPORATION, et al.,                                :
                                                           :    Case No. 05–44481 (RDD)
                Debtors.                                    :
                                                           :    (Jointly Administered)
                                                           :
---------------------------------------------------------- x

ORDER AUTHORIZING DEBTORS TO
IMPLEMENT A KEY EMPLOYEE COMPENSATION PROGRAM

("KECP ORDER")

        Upon the motion, dated October 8, 2005 (the "Motion"), of Delphi Corporation

and certain of its domestic subsidiaries and affiliates, debtors and debtors-in-possession in the

above-captioned cases (collectively, the "Debtors"), for an order under 11 U.S.C. §§ 105(a) and

363(b)(1) authorizing the Debtors to implement a key employee compensation program (the

"Key Employee Compensation Program"); and upon the Affidavit Of Robert S. Miller, Jr. In

Support Of Chapter 11 Petitions And First Day Orders, sworn to October 8, 2005; and upon the

record of the hearing held on the Motion; and this Court having determined that the relief

requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and

other parties-in-interest; and it appearing that proper and adequate notice of the Motion has been

given and that no other or further notice is necessary; and after due deliberation thereon; and

good and sufficient cause appearing therefor,

IT IS HEREBY FOUND AND DETERMINED THAT:

A.       A sound business justification exists for entering into the Key Employee Compensation Program identified on <u>Exhibit 1</u> attached hereto;

B.       The Key Employee Compensation Program is fair and reasonable and was proposed in good faith; and

C.       The implementation of the Key Employee Compensation Program is in the best interest of the Debtors, their estates, creditors, and parties-in-interest and is necessary to the Debtors' reorganization efforts.

ORDERED, ADJUDGED, AND DECREED THAT:

1.       The Motion is GRANTED.

2.       The Key Employee Compensation Program is approved in all respects and the Debtors are authorized, pursuant to 11 U.S.C. §§ 105(a) and 363(b)(1), to take all necessary actions to implement the Key Employee Compensation Program on the terms and conditions set forth in the Motion and as detailed in <u>Exhibit 1</u> attached hereto.

3.       The Debtors' key executives (the "Covered Employees") are entitled to payments under the Key Employee Compensation Program.

4.       The payment to which a Covered Employee is entitled under the Key Employee Compensation Program shall be accorded administrative expense status and priority under 11 U.S.C. §§ 503(b)(1)(A) and 507(a)(1).

5.       This Court shall retain jurisdiction over the Debtors and the Covered Employees participating in the Key Employee Compensation Program, including without limitation for the purposes of interpreting, implementing, and enforcing the terms and conditions of the Key Employee Compensation Program.

6.      The requirement under Rule 9013-1(b) of the Local Rules for the United

States Bankruptcy Court for the Southern District of New York for the service and filing of a

separate memorandum of law is deemed satisfied by the Motion.

Dated:       New York, New York
             October __, 2005


                                    _____

                                    UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT J</u>**

In re Delphi Corporation, et al.
Bank List - Overnight

| Company | Contact | Address 1 | Address 2 | City | State | Zip | Country | Fax |
|---|---|---|---|---|---|---|---|---|
| Bank Of America Na | Howe Pete Wheelock Brian Swanson | 335 Madison Ave 9th Fl | | New York | NY | 10017 | US | 212-503-7080 & 704-602-3693 |
| Bank Of Lenawee | Carol Mcintyre | 135 East Maumee | | Adrian | MI | 49221 | US | 517-265-9826 |
| Bank Of New York | Kevin Higgins and Chris Stevenson | Cash Mgmt Div | | New York | NY | 10286 | US | 212-635-7978 |
| Bank One Canada | Richard Huttenlocher David Gerdis | 611 Woodward Ave Ste Mi 1 8074 | 7th Fl | Detroit | MI | 48226 | US | 313-225-2290 & 313-226-1455 |
| Bank One Illinois | Richard Huttenlocher David Gerdis | 611 Woodward Ave Ste Mi 1 8074 | 7th Fl | Detroit | MI | 48226 | US | 313-225-2290 & 313-226-1455 |
| Bank One Michigan | Richard Huttenlocher David Gerdis | 611 Woodward Ave Ste Mi 1 8074 | 7th Fl | Detroit | MI | 48226 | US | 313-225-2290 & 313-226-1455 |
| Branch Banking and Trust Company | Kathy Pike | 301 N Main St | | Greenville | SC | 29601 | US | 864-282-3319 |
| Brunswick Bank And Trust | Kimberly Tokarz | 1060 Aaron Rd | | North Brunswick | NJ | 08902 | US | 732-951-0632 |
| Citibank | Wayne Beckmann and Kathy Collins | 388 Greenwich St 23rd Fl | | New York | NY | 10013 | US | 7-095-725-6700 |
| Citibank | Wayne Beckmann K Collins G Roberts | 388 Greenwich St 23rd Fl | | New York | NY | 10013 | US | 212-816-5702 & 212-816-3107 |
| Citibank | Julia Sadokhina | Gashek St 8 10 | | Moscow | | 125047 | Russia | 212-816-5702 & 212-816-3107 |
| Citibank Na | Taipei Branch | PO Box 3343 | | Taipei | ROC | | | 212-816-5702 & 212-816-3107 |
| Citifunds | Wayne Beckmann and Carol Festa | 125 Broad St 11th Fl | | New York | NY | 10004 | US | 646-862-9621 |
| Comerica Bank | Robert Ramirez & Colleen Hollerbach | PO Box 75000 | Mc 3265 Mc 7618 | Detroit | MI | 48275 | US | |
| Comm Banking Cmpny Of Fitzgerald | Sandra Anderson | 102 West Roanoke Dr | PO Box 130 | Fitzgerald | GA | 31750 | US | 229-423-6656 |
| Deutsche Asset Management | John Larkin | 1 South St 18 Fl | | Baltimore | MD | 21202 | US | 410-895-3721 |
| Deutsche Bank | Thomas Maloney and Andreas Rohde | Global Corporate Finance | 60 Wall St 45th Fl | New York | NY | 10005 | US | 212-797-0085 & 49 69 910 22023 |
| Fidelity Investments | Peter Zielinski | 100 Crosby Pkwy Mail Zone Kc1g | | Covington | KY | 41015 | US | 617-385-1738 |
| Fifth Third Bank | Michael Blackburn | Corporate Treasury Mgmt | 1000 Town Ctr Ste 1400 | Southfield | MI | 48075 | US | 248-603-0752 |
| Harris Na | Linda Schmidt and Laura Hunt | 111 W Monroe St 9e | 9th Fl Ctr | Chicago | IL | 60603 | US | 312-461-6339 & 312-293-5222 |
| Hsbc Bank Usa Na | Christopher Samms and Jay Bialecki | 452 Fifth Ave 5th Fl | | New York | NY | 10018 | US | 212-642-4081 & 888-499-3958 |
| Jpmorgan Chase Bank | Richard Huttenlocher David Gerdis | 611 Woodward Ave Ste Mi 1 8074 | 7th Fl | Detroit | MI | 48226 | US | 313-225-2290 |
| Jpmorgan Chase Bank | Richard Huttenlocher Pat Flemister | 611 Woodward Ave Ste Mi 1 8074 | 7th Fl | Detroit | MI | 48226 | US | 313-225-2290 |
| Jpmorgan Chase Bank | Richard Huttenlocher Wm Bitonti | 611 Woodward Ave Ste Mi 1 8074 | 7th Fl | Detroit | MI | 48226 | US | 313-225-2290 & 313-225-1730 |
| Jpmorgan Chase Securities | Richard Huttenlocher Julie Benson | 611 Woodward Ave Ste Mi 1 8074 | 7th Fl | Detroit | MI | 48226 | US | 313-225-2290 & 214-965-2255 |
| Key Bank Na | Peter Moore and Kevin Hennessy | Large Corporate Group | 127 Public Square | Cleveland | OH | 44114 | US | 216-689-4654 & 216-689-4421 |
| Mandi Marshall And Illsley | James Miller | Commercial Banking | Nw18 770 North Water St | Milwaukee | WI | 53202 | US | 414-765-7625 |
| Mellon Na | Robert Ladley | 500 Ross St Ste 1360 | | Pittsburgh | PA | 15262 | US | 412-236-0485 |
| Natwest Bank Luton Market | Jo Pyman | Hill Branch | 31 George St | Luton | | LU1 2AH | Uk | 020 7375 6106 |
| Rbs Securities | Richard Simon | 101 Pk Ave 10th Fl | | New York | NY | 10178 | US | 212-401-3604 |
| Regions Bank | Dawn Smith | PO Box 10247 | 8th Fl | Birmingham | MI | 35203 | US | |
| Reserve Fund | Brandon Semilof | 1250 Broadway 32nd Fl | | New York | NY | 10001 | US | 212-401-5958 |
| Toronto Dominion Bank | Malle Nagy Cash Mgmt Services | 100 Wellington St 27th Fl | West CP Towers | Toronto | ON | M5K 1A2 | Canada | 416-944-5891 |
| Ubs Ag | Michael Walter Schmid | Zuggerstrasse 22 | | Horgen | | 08810 | Switzerland | |
| Umb Bank Na | Kent Workman | 1010 Grand Blvd | | Kansas City | MO | 64106 | US | 816-860-4838 |
| United Bank and Trust | Tammy Hall | 1422 S Winter St | | Adrian | MI | 49221 | US | 517-264-0709 |

In re Delphi Corporation, et al.
Case No. 05-44481                                Page 1 of 1

10/10/2005 9:14 AM
Bank Service List