**Hearing Date and Time: November 29, 2005 at 10:00 a.m.**
**Objection Deadline: November 22, 2005 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------ X
                                        :
    In re                            :    Chapter 11
                                        :
DELPHI CORPORATION, et al.,   :    Case No. 05-44481 (RDD)
                                        :
                                        :    (Jointly Administered)
         Debtors.              :
------------------------------ X

MOTION FOR ORDER UNDER 11 U.S.C. § 365(d)(4) EXTENDING DEADLINE TO
ASSUME OR REJECT LEASES OF NONRESIDENTIAL REAL PROPERTY

("365(d)(4) DEADLINE EXTENSION MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order under 11 U.S.C. § 365(d)(4) extending the deadline to assume or reject unexpired leases of nonresidential real property. In support of this Motion, the Debtors respectfully represent as follows:

Background

A.   The Chapter 11 Filings

1.   On October 8, 2005, Delphi and certain of its U.S. subsidiaries (the "Initial Filers") filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). On October 14, 2005, three additional U.S. subsidiaries of Delphi (together with the Initial Filers, collectively, the "Debtors") filed voluntary petitions in this Court for reorganization relief under the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. This Court entered orders directing the joint administration of the Debtors' chapter 11 cases (Dockets Nos. 28 and 404).

2.   On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee"). No trustee or examiner has been appointed in the Debtors' cases.

3.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.  The statutory predicate for the relief requested herein is section 365(d)(4) of the Bankruptcy Code.

B.  Current Business Operations Of The Debtors

5.  With more than 180,000 employees worldwide, global 2004 revenues of approximately $28.6 billion, and global assets as of August 31, 2005 of approximately $17.1 billion,[1] Delphi ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations without supervision from the Bankruptcy Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy Code.

6.  Over the past century, the operations which are now owned by Delphi have developed leading global technology innovations with significant engineering resources and technical competencies in a variety of disciplines. Today, the Company (as defined below) is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company's technologies and products are present in more than 75 million vehicles on the road worldwide. The Company supplies products to nearly every major global automotive original equipment manufacturer with

---

[1] The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

2004 sales to its former parent, General Motors Corporation ("General Motors" or "GM"), equaling approximately $15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

       7.      As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world. In the U.S., the Debtors employ approximately 50,600 people. These employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in Delphi's worldwide headquarters and customer center located in Troy, Michigan. Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and local unions. Outside the United States, the Company's foreign entities employ more than 134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

       8.      Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM. Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates (collectively, the "Company") in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM

4

is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

   9. Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle. When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base. The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base. The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C. <u>Events Leading To Chapter 11 Filing</u>

   10. In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales. Reflective of a downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005. The Company experienced net operating losses of $608 million for the first

six months of calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[2]

11. The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12. In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward looking revenue requirements. Having concluded that pre-filing discussions with its unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

13. Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning

---

[2] Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses. This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned in the Company's transformation plan. The Debtors believe that a substantial segment of Delphi's U.S. business operations must be divested, consolidated, or wound-down through the chapter 11 process.

    14.  Upon the conclusion of this process, the Debtors expect to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

<u>Relief Requested</u>

    15.  By this Motion, the Debtors request entry of an order, pursuant to section 365(d)(4) of the Bankruptcy Code, extending the date on or before which the Debtors may assume or reject unexpired leases of nonresidential real property to and including June 7, 2007, a date which is approximately 18 months from the initial deadline within which the Debtors are required to assume or reject nonresidential real property leases, without prejudice to the Debtors' right to seek a further extension of such deadline and without prejudice to a lessor's right to seek a shortening of such deadline.

### Basis For Relief

16.     Under section 365(d)(4) of the Bankruptcy Code, the initial 60-day period within which the Debtors must assume or reject nonresidential real property leases expires on December 7, 2005.  As of the Petition Date, the Debtors were lessors or lessees with respect to approximately 90 unexpired leases of nonresidential real property (the "Real Property Leases").

17.     As part of the Debtors' restructuring efforts, the Debtors are in the process of evaluating all owned and leased real estate, including the Real Property Leases.  In considering their options with respect to the Real Property Leases, the Debtors are evaluating a variety of factors to determine whether it is appropriate to assume, assume and assign, or reject a particular Real Property Lease.  In most instances, however, before the Debtors can properly evaluate which of their Real Property Leases to assume and which to reject, among other things, the Debtors must first (a) conclude their negotiations with their unions to ease certain "no-close" restrictions in the Debtors' collective bargaining agreements ("CBAs") and (b) make final determinations as to the company's ultimate product portfolio, which will affect the location of the Debtors' facilities.

18.     In particular, the Debtors are currently negotiating certain terms of the CBAs, including, without limitation, operational restrictions, which prevent the Debtors from exiting non-strategic, non-profitable operations and restrict the Debtors ability to permanently lay off idled workers for whom the Debtors must provide space during the working hours.  A large number of the Debtors' Real Property Leases are affected by these terms and therefore at this time the Debtors are unable to determine which leases should be assumed and which should

be rejected. Accordingly, until these issues are resolved, it would be premature for the Debtors to assume or reject all of the Real Property Leases.

19. Moreover, through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by realigning Delphi's global product portfolio and manufacturing footprint to preserve the Debtors' core businesses. These determinations will affect the Debtors' evaluation of which of their Real Property Leases to assume and which to reject. The Debtors are striving to meet these goals and emerge from chapter 11 by early to mid-2007.

20. Thus, by this Motion, the Debtors request an extension of the section 365(d)(4) deadline so as to fully and adequately determine whether to assume or reject particular Real Property Leases. If the period, under section 365(d)(4) the Bankruptcy Code, is not extended beyond December 7, 2005, the Debtors may be compelled, prematurely, to assume substantial, long-term liabilities under the Real Property Leases or forfeit benefits associated with some Real Property Leases to the detriment of the Debtors' ability to operate and preserve the going-concern value of their business for the benefit of all creditors and other parties-in-interest.

<u>Applicable Authority</u>

21. Section 365(d)(4) of the Bankruptcy Code provides:

> Notwithstanding paragraphs (1) and (2), in a case under any chapter of this title, if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, <u>or within such additional time as the court, for cause, within such 60-day period, fixes</u>, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.

1 l U.S.C. § 365(d)(4) (emphasis added).

9

22. The term "cause" as used in section 365(d)(4) is not defined in the Bankruptcy Code. In <u>South Street Seaport L.P. v. Burger Boys, Inc.</u>, 94 F.3d 755 (2d Cir. 1996), the United States Court of Appeals for the Second Circuit held that the following factors would establish whether "cause" existed to extend the statutory period under section 365(d)(4) of the Bankruptcy Code:

    (a)    whether the debtor was paying for the use of the property;

    (b)    whether the debtor's continued occupation could damage the lessor beyond the compensation available under the Bankruptcy Code;

    (c)    whether the lease is the debtor's primary asset; and

    (d)    whether the debtor has had sufficient time to formulate a plan of reorganization.

<u>Id.</u> at 761. The court enumerated additional factors that may merit consideration, including the complexity of the case and the number of leases that the debtor must evaluate. <u>Id.</u> <u>See also</u> 130 Cong. Rec. S8891, 58,894-95 (daily ed. June 29, 1984) ("cause" includes large number of leases) (statement of Sen. Hatch), <u>reprinted in</u> 1984 U.S.C.C.A.N. 590, 597; <u>In re Unit Portions of Del., Inc.</u>, 53 B.R. 83, 85 (Bankr. E.D.N.Y. 1985) ("Congress recognized that there may be times when it is not possible for the trustee to make a careful and informed assessment of the benefits and burdens of the lease within this 60-day period. Accordingly, it empowered the court to grant a trustee who demonstrates cause for an extension additional time to make this assessment.").

23. The Debtors satisfy all of these requirements. First, in compliance with section 365(d)(3) of the Bankruptcy Code, the Debtors fully intend to remain current with respect to all outstanding postpetition rental obligations under the Real Property Leases.

10

24. Second, the relief requested herein will not affect any lessor's rights in a manner inconsistent with the provisions of the Bankruptcy Code.  See Edward J. Debartolo Corp. v. Child World, Inc., 146 B.R. 89, 92 (S.D.N.Y. 1992) (holding that extension of debtors' time to assume or reject its unexpired leases of nonresidential real property is appropriate when leaseholders are not "irreparably injured in the interim").  The Debtors have the financial ability to and intend to perform all of their obligations under the Real Property Leases as required by section 365(d)(3) of the Bankruptcy Code.  The significant cash revenues from the Debtors' operations, plus the final court approval on October 27, 2005 of a $4.5 billion financing package for the Debtors, afford the Debtors such financial ability.

25. Third, certain of the Real Property Leases are among the Debtors' primary assets and are vital to their reorganization efforts.  The Debtors' manufacturing sites, technical centers, and sales offices are fundamental to its reorganization efforts.  These premises consequently comprise an integral component of the Debtors' strategic business plans.

26. Fourth, given the complexity of theses cases, the Debtors have not had sufficient time to formulate a plan of reorganization.  These large, complex cases are currently among the largest pending before any bankruptcy court in the United States.  As noted above, at the time the Debtors filed these cases:

(a) Forty-two affiliated entities sought chapter 11 relief.

(b) The Debtors employ approximately 50,600 people in the U.S. at approximately 44 manufacturing sites and 13 technical centers. Ninety-six percent of the company's 34,750 hourly employees are represented by approximately 49 different international and local unions under various CBAs.  The Company's foreign entities employ more than 134,000 people supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

   (c) The Debtors' global 2004 revenues were approximately $28.6 billion, and global assets as of August 31, 2005 were approximately $17.1 billion.

   (d) The Debtors supply products to nearly every major global automotive original equipment manufacturer, including its former parent, GM, with approximately $15.4 billion in sales annually to GM alone.

  27. Additionally, as stated above, if the section 365(d)(4) period is not extended, the Debtors may be compelled to assume liabilities prematurely under the Real Property Leases or risk forfeiting benefits associated with certain Real Property Leases. To prevent this difficult choice without sufficient information, this Court should exercise its discretion to extend the section 365(d)(4) deadline to and including June 7, 2007, a date consistent with the Debtors' current projections regarding the timing of plan confirmation.

  28. Courts in this circuit and others have granted similar relief to the relief requested herein in other large, complex chapter 11 cases. See, eg., In re UAL Corp., Case No. 02-B-48191 (ERW) (Bankr. N.D. Ill. Feb. 6, 2003, July 21, 2003, Sept. 21, 2005) (extension through plan confirmation); In re WorldCom, Inc., Case No. 02-13533 (AJG) (Bankr. S.D.N.Y. Sept. 19, 2002, Sept. 24, 2003) (extended through plan confirmation); In re Enron Corp., Ch. 11 Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. Jan. 31, 2002, Dec. 19, 2002) (first extension of approximately eleven months; second extension of additional year); In re Ames Dep't Stores, Inc., Case No. 01-4227 (REG) (Bankr. S.D.N.Y. Oct. 3, 2001, Dec. 5, 2001) (extended through confirmation); In re Nextwave Personal Commc'ns Inc., Case No. 98 B 21529 (ASH) (Bankr. S.D.N.Y. July 10, 1998) (extended through confirmation); In re Maidenform Worldwide, Inc., Case No. 97 B 44869 (CB) (Bankr. S.D.N.Y. Sept. 12, 1997) (extended through confirmation).

29. Accordingly, this Court should extend the time within which the Debtors may assume or reject any Real Property Lease to and including June 7, 2007, without prejudice to the Debtors' rights to seek a further extension of such deadline.

Notice

30. Notice of this Motion has been provided in accordance with the Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing (I) Omnibus Hearing Dates, (II) Certain Notice, Case Management, And Administrative Procedures, And (III) Scheduling An Initial Case Conference In Accordance With Local Bankr. R. 1007-2(e), entered by this Court on October 14, 2005 (Docket No. 245). In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

Memorandum Of Law

31. Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (a) extending the deadline to assume or reject unexpired leases of nonresidential real property to and including June 7, 2007, without prejudice to the Debtors' right to request an additional extension of such time, and (b) granting the Debtors such other further relief as is just.

Dated: New York, New York
       November 9, 2005

                SKADDEN, ARPS, SLATE, MEAGHER
                  & FLOM LLP

                By: /s/ John Wm. Butler, Jr.
                   John Wm. Butler, Jr. (JB 4711)
                   John K. Lyons (JL 4951)
                   Ron E. Meisler (RM 3026)
                333 West Wacker Drive, Suite 2100
                Chicago, Illinois 60606
                (312) 407-0700

                      - and -

                By: /s/ Kayalyn A. Marafioti
                   Kayalyn A. Marafioti (KM 9632)
                   Thomas J. Matz (TM 5986)
                Four Times Square
                New York, New York 10036
                (212) 735-3000

                Attorneys for Delphi Corporation, et al.,
                  Debtors and Debtors-in-Possession