**Hearing Date: November 29, 2005, 10:00 a.m.**
**Objection Deadline: November 22, 2005, 4:00 p.m.**

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :

In re                             :     Chapter 11
                                              :

DELPHI CORPORATION, et al.,    :     Case No. 05-44481 (RDD)
                                              :

                   Debtors.    :     (Jointly Administered)
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(a) 328 AND FED. R. BANKR. P. 2014(a) AUTHORIZING EMPLOYMENT AND RETENTION OF JONES LANG LASALLE AMERICAS, INC. AS REAL ESTATE <u>ADMINISTRATIVE AND TRANSACTION SERVICES PROVIDER TO DEBTORS</u>

### ("JLL RETENTION APPLICATION")

        Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors" or the "Company"), hereby submit this application (the "Application") for an order under 11 U.S.C. §§ 327(a) and 328 and Fed. R. Bankr. P. 2014(a) authorizing the employment and retention of Jones Lang LaSalle Americas, Inc. ("JLL") as real estate administrative and transactional services provider to the Debtors.  In support of this Application, the Debtors submit the Declaration of James Becker, dated November 9, 2005 (the "Becker Declaration").  In further support of this Application, the Debtors respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8, 2005, Delphi and certain of its U.S. subsidiaries filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").  On October 14, 2005, three additional U.S. subsidiaries of Delphi filed voluntary petitions in this Court for reorganization relief under the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have moved this Court for an order authorizing joint administration of these chapter 11 cases.

2.    On October 17, 2005, the Office of the United States Trustee appointed an official committee of unsecured creditors.  No trustee or examiner has been appointed in the Debtors' cases.

3.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.    The statutory predicates for the relief requested herein are section 327(a) of the Bankruptcy Code and Bankruptcy Rule 2014(a).

B.    <u>Current Business Operations Of The Debtors</u>

5.    With more than 180,000 employees worldwide, global 2004 revenues of approximately $28.6 billion and global assets as of August 31, 2005 of approximately $17.1 billion,[1] Delphi ranks as the fifth largest public company business reorganization in terms of

---

[1]    The aggregated financial data used in this Application generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

revenues, and the thirteenth largest public company business reorganization in terms of assets.

Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations

without supervision from the Bankruptcy Court, and will not be subject to the chapter 11

requirements of the U.S. Bankruptcy Code.

6.    Over the past century, the operations which are now owned by Delphi have

developed leading global technology innovations with significant engineering resources and

technical competencies in a variety of disciplines.  Today, the Company is arguably the single

largest global supplier of vehicle electronics, transportation components, integrated systems and

modules, and other electronic technology.  The Company's technologies and products are present

in more than 75 million vehicles on the road worldwide.  The Company supplies products to

nearly every major global automotive original equipment manufacturer with 2004 sales to its

former parent, General Motors Corporation ("General Motors" or "GM"), equaling

approximately $15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler

Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850

million.

7.    As part of its growth strategy, Delphi has established an expansive global

presence with a network of manufacturing sites, technical centers, sales offices, and joint

ventures located in every major region of the world.  In the U.S., the Debtors employ

approximately 50,600 people.  These employees work in approximately 44 manufacturing sites

and 13 technical centers across the country, and in Delphi's worldwide headquarters and

customer center located in Troy, Michigan.  Approximately 34,750 of these individuals are

hourly employees, 96% of whom are represented by approximately 49 different international and

local unions.  Outside the United States, the Company's foreign entities employ more than

3

134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

8.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

9.    Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle.  When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply source.  The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base.  The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C.    Events Leading To The Chapter 11 Filing

10.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales.  Reflective of a downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005.  The Company experienced net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[2]

11.    The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues and forward looking revenue requirements.  Having concluded that pre-filing discussions with its Unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence

---

[2]    Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

13.    Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses.  This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned in the Company's transformation plan.  The Debtors believe that a substantial segment of Delphi's U.S. business operations must be divested, consolidated, or wound-down through the chapter 11 process.

14.    Upon the conclusion of this process, the Debtors expect to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

Relief Requested

15.    By this Application, the Debtors request entry of an order authorizing the Debtors to employ and retain JLL pursuant to that certain Real Estate Services Agreement between Delphi Automotive Systems LLC and JLL, dated September 2, 2005, as amended by that certain First Amendment to Real Estate Services Agreement, attached hereto as Exhibit 1

6

(the "Engagement Agreement"), as the Debtors' real estate administrative and transaction services provider in these chapter 11 cases.  Accordingly, the Debtors respectfully request entry of an order pursuant to sections 327(a) and 328 of the Bankruptcy Code and Fed. R. Bankr. P. 2014(a) authorizing each of them to employ and retain JLL as their real estate administrative and transaction services provider to perform certain services that will be necessary during their chapter 11 cases as described below, nunc pro tunc to November 3, 2005.

Basis For Relief

16.    The Debtors require a qualified global real estate service provider to maintain and administer the more than 400 owned or leased parcels of real property containing a total of 86 million square feet in nearly 40 countries worldwide.  Currently, the Debtors do not have the resources to perform either the real estate administration or transactional services contemplated by the Engagement Agreement.  Historically, the Debtors have outsourced these activities.  The previous real estate service provider terminated its relationship with Delphi at the beginning of November when its contract terminated.  In its place, JLL will provide the crucial day-to-day real estate support services as described below.

17.    JLL is a global integrated real estate services provider, specializing in facility services, transactional services, and lease administration.  Its services also include advising companies in complex restructuring assignments concerning the reduction of real estate operating and occupancy costs, increasing operating efficiency of real estate assets, and advising on all real estate matters during restructuring, reorganization, or liquidation efforts. Notwithstanding JLL's restructuring experience, the Debtors had decided to retain JLL prior to October 8, 2005 to provide them with real estate administration services and advice.  Therefore, JLL's restructuring experience is now an added benefit to the retention of JLL.

18.     The Debtors had intended to retain JLL as an ordinary course professional according to the Order Under 11 U.S.C §§ 327, 330, And 331 Authorizing Retention Of Professionals Utilized By Debtors In Ordinary Course Of Business ("Ordinary Course Professionals Order") (Docket No. 883).  The Debtors, however, are concerned that JLL will exceed the fee cap established in the Ordinary Course Professionals Order.  Therefore, the Debtors request that JLL be formally retained as real estate administrative and transaction services provider in these chapter 11 cases.

<u>Services To Be Rendered</u>

19.     The Debtors desire to employ and retain JLL, pursuant to the Engagement Agreement, as the Debtors' real estate administrative and transactional services provider in these chapter 11 cases.  JLL will provide integrated real estate services, including transactional services, lease administration, and assistance in the evaluation of real property owned by the Debtors.

20.     Specifically, JLL will

(a)     maintain the Debtor's real property information database containing key data of all owned and leased locations;

(b)     coordinate all leased real estate related payables including rent and property tax payments;

(c)     issue notice and recommendations relating to notice provisions, expiration dates, or other dates for action by the Debtors;

(d)     perform an initial evaluation and abstract of all real property interests and provide strategic planning services; and

(e)     provide leasing, subleasing, lease termination, or other lease disposition services;

(f)     provide real property purchase and sale services;

(g)     assist with all facility planning and strategy; and

8

(h)    provide field review of each location, analysis of market costs, and comparison of lease rates by facility.

<u>Disinteredness Of Professionals</u>

21.    Except as set forth in the Becker Declaration, to the best of the Debtors' knowledge, JLL and their respective principals and professionals (a) do not have any connection with the Debtors, their creditors, or any other party-in-interest, or their respective attorneys or accountants, (b) are "disinterested persons" under section 101(14) of the Bankruptcy Code and as required under section 327(a) of the Bankruptcy Code, and (c) do not hold or represent an interest adverse to the estate.

22.    The Debtors reserve their right to retain a different real estate services provider, at their election, to handle the matter or matters that cannot be appropriately handled by JLL because of a potential conflict of interest.

<u>Professional Compensation</u>

23.    Subject to this Court's approval, JLL will charge Delphi for the costs of the salaries of all dedicated administrative personnel plus an overhead allocation profit factor equal to 75% of such salaries.  JLL has informed the Debtors that this amount will be approximately $16,375 per month, with a one time set-up fee of approximately $27,000.  JLL will also charge Delphi for the costs of the salaries of all dedicated transaction services personnel (excluding bonuses, benefits, and payroll taxes) in accordance with a salary schedule acceptable to Delphi plus an overhead allocation profit factor equal to 55% of such transactional services salaries.  JLL has informed the Debtors that this fee will be approximately $46,000 per month.

24.    According to the Engagement Agreement, JLL will be entitled to a fee commission as agreed to by Delphi for leasing/subleasing, sales, purchases, expansions, and renewals that would be subject to customary market commissions, <u>provided</u>, <u>however</u>, that in no

event will the fee commission due JLL exceed the commission cap scale identified in <u>Schedule I</u> of <u>Exhibit B</u> to the Engagement Agreement.  JLL has also agreed to give Delphi a discount on the fee commissions based upon the revenue sharing procedure described in the Engagement Agreement and the revenue sharing schedule.

25.    The Debtors have also agreed to reimburse the actual and reasonable out-of-pocket costs and expenses incurred by JLL in connection with the services to be provided pursuant to the Engagement Agreement.  In that regard, JLL will maintain detailed records of any actual and necessary costs and expenses incurred in connection with its services to be provided under the Engagement Agreement.

26.    The actual amount of fees and expenses to be paid to JLL will be as determined and allowed by the Court.  JLL will file with the Court interim application(s) for the payment of fees and expenses, in accordance with the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and the guidelines approved by the orders entered by the Court in these chapter 11 cases, including but not limited to, the Administrative Order Pursuant to 11 U.S.C. §331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals, entered by this Court on November 4, 2005 (Docket No. 869).

27.    The Debtors believe that the compensation structure described herein is fair and reasonable in light of industry practice, market rates both inside and outside chapter 11 cases, and the scope of work to be performed pursuant to this retention.

28.    Furthermore, at the Debtors' request, JLL has assisted the Company in connection with real estate issues since November 3, 2005 and hence, the Debtors request that JLL's retention be effective <u>nunc</u> <u>pro</u> <u>tunc</u> to November 3, 2005.

## Notice

29.    Notice of this Application has been provided in accordance with the Order
Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014
Establishing (I) Omnibus Hearing Dates, (II) Certain Notice, Case Management, And
Administrative Procedures, And (III) Scheduling An Initial Case Conference In Accordance
With Local Bankr. R. 1007-2(e), entered by this Court on October 14, 2005 (Docket No. 245).
In light of the nature of the relief requested, the Debtors submit that no other or further notice is
necessary.

## Memorandum Of Law

30.    Because the legal points and authorities upon which this Application relies
are incorporated herein, the Debtors respectfully request that the requirement of the service and
filing of a separate memorandum of law under Rule 9013-1(b) of the Local Bankruptcy Rules for
the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order (a)

authorizing the Debtors to employ and retain JLL as their real estate advisor to perform the

services set forth herein, and (b) granting the Debtors such other and further relief as is just.

Dated:    New York, New York
          November 9, 2005

                              DELPHI CORPORATION, on behalf of itself and
                              certain of its subsidiaries and affiliates, as Debtors and
                              Debtors-in-possession

                              By:   s/ Karen Healy_____
                                    Name: Karen Healy
                                    Title:  Vice President Corporate Affairs,
                                            Marketing Communications and
                                            Facilities

Exhibit 1

## REAL ESTATE SERVICES AGREEMENT

**THIS REAL ESTATE SERVICES AGREEMENT** (this "**Agreement**") is made as of **September 2, 2005** between **JONES LANG LASALLE AMERICAS, INC.,** a Maryland corporation ("**Jones Lang LaSalle**") and **DELPHI AUTOMOTIVE SYSTEMS LLC,** a Delaware limited liability company ("**Delphi**").

In consideration of the promises, covenants and agreements set forth below, the parties agree as follows:

### ARTICLE I
### RELATIONSHIP AND SCOPE OF SERVICES

**1.1**    **Scope.**  Delphi hereby retains Jones Lang LaSalle to provide the specific services described on Exhibit A and such other services as Delphi reasonably determines are related thereto or Delphi otherwise requests (the "**Services**") with respect to real estate in which Delphi has or desires to acquire an ownership, leasehold or subleasehold interest ("**Properties**").  Jones Lang LaSalle agrees to provide the Services upon the terms and conditions set forth in this Agreement.  Except as set forth in this Agreement, Jones Lang LaSalle shall be the exclusive provider to Delphi of the Services.  Nothing in this Agreement shall be construed as prohibiting Delphi from, and Delphi shall have the right to engage any entities to provide, services which are not within the Scope of Services described on Exhibit A.

**1.2**    **Standard of Conduct.**  Jones Lang LaSalle shall perform the Services in accordance with this Agreement and all applicable laws, codes, ordinances, regulations and other requirements of governmental authorities and with a level of skill and diligence which is consistent with the highest applicable professional standards for firms of national reputation providing similar services.

### ARTICLE II
### FEES AND EXPENSES

Fees and expenses payable to Jones Lang LaSalle for the Services are set forth on Exhibit B.  Fees and expenses shall be paid at the times set forth on Exhibit B.  The parties shall, in good faith, negotiate reasonable fees and costs to be paid to Jones Lang LaSalle on account of any services performed by Jones Lang LaSalle which Delphi has authorized but which are not within the scope of the Services described on Exhibit A. The fees payable hereunder are exclusive of all applicable sales, use, value-added and other similar taxes (all of which shall be borne by Delphi).

## ARTICLE III
## OBLIGATIONS AND COOPERATION

**3.1   In General.**  Delphi shall provide Jones Lang LaSalle with the equipment, support and work space described on Exhibit C.  Additionally, Delphi shall provide to designated personnel of Jones Lang LaSalle such information and access to personnel and facilities of Delphi as Delphi determines is necessary or desirable in furtherance of the provision of Services.  Delphi shall cooperate with Jones Lang LaSalle and use reasonable efforts to facilitate Jones Lang LaSalle's efficient performance of the Services.

**3.2   Account Personnel:**

A.   During the term of this Agreement, Jones Lang LaSalle shall employ capable individuals sufficient to enable Jones Lang LaSalle to provide the Services to Delphi in the manner required under this Agreement ("**Account Personnel**").  Said Account Personnel shall be composed of employees of Jones Lang LaSalle that shall be reimbursed for their compensation by Delphi per Exhibit B ("Reimbursable Account Personnel") and non-reimbursable employees of Jones Lang LaSalle ("Non-Reimbursable Account Personnel").  Reimbursable Account Personnel will not work on non-Delphi matters.  Non-Account Personnel will work on Delphi matters only as expressly permitted under this Agreement or otherwise agreed to by Delphi.

B.   All matters pertaining to the employment, supervision, compensation, promotion and discharge of Account Personnel are the full responsibility of Jones Lang LaSalle.  Jones Lang LaSalle will fully comply with all laws and regulations applicable to worker's compensation, social security, unemployment insurance, hours of labor, wages, working conditions and all other employer-employee matters.   Jones Lang LaSalle will require Account Personnel, when on Delphi's premises and performing services for Delphi under this Agreement, to comply with all of Delphi's rules, regulations and policies.  Jones Lang LaSalle is likewise responsible for any affiliates, subcontractors and other agents Jones Lang LaSalle uses to perform services under this Agreement.

C.   Delphi may bar Account Personnel from Delphi's premises for failure to obey Delphi's rules, regulations and policies.  Delphi may require: (i) Jones Lang LaSalle to replace any Account Personnel barred for failure to obey Delphi's rules, regulations and policies or any Account Personnel who, in Delphi's opinion, fails to perform his or her responsibilities in accordance with Delphi's expectations; and (ii) upon mutual review and agreement by Jones Lang LaSalle and Delphi, Jones Lang LaSalle to make other changes in the Account Personnel (e.g., the total number of Account Personnel and the expertise or qualifications of individual Account Personnel).  Delphi will provide Jones Lang LaSalle with reasonable notice of any required changes to Account Personnel which, in no event, will be required to exceed thirty (30) days' notice.

D.   The parties agree that, based on the level of the Services, which are actually provided under the Agreement, they will reasonably cooperate in modifying the resources, including Account Personnel, provided hereunder.

E.    Delphi agrees not to, directly or indirectly, hire or engage, or arrange for or attempt to arrange for or persuade any other person to hire or engage, any Non-Reimbursable Account Personnel while such person is employed by Jones Lang LaSalle.

3.3    **Independent Contractors.**    The parties are and shall remain independent contractors, contracting with each other solely for the purpose of carrying out the provisions of this Agreement. It is expressly understood and agreed that Account Personnel furnished by Jones Lang LaSalle will be and remain the employees of Jones Lang LaSalle. Under no circumstances may such Account Personnel be considered Delphi's employees or agents with any rights to compensation or benefits other than those provided by Jones Lang LaSalle. Nothing herein shall constitute either party as the partner, agent or legal representative of the other, for any purpose whatsoever, and in no event shall Jones Lang LaSalle make any commitments of any nature whatsoever which may be binding upon Delphi.

**ARTICLE IV**
**TERM**

The term of this Agreement shall commence on a date designated by Delphi upon at least ten (10) business days' notice to Jones Lang LaSalle (the "**Effective Date**") and shall terminate on the second (2nd) anniversary of the Effective Date. Such Effective Date shall in no event be prior to the date the Real Estate Service Agreement dated May 16, 2000, between Delphi Automotive Systems LLC and Equis Corporation is terminated and has no further effect. Either party may earlier terminate this Agreement for any reason, provided that such party has given ninety (90) days prior written notice of termination to the non-terminating party in accordance with Section 8.4 hereof. Such early termination shall not become effective until the last day of the third full month following such notice. Notwithstanding the foregoing, either party may terminate this Agreement at any time In the event of a breach of this Agreement by the other party which is not cured within thirty (30) days of written notice sent to the breaching party; provided that, in the event of: (i) any recurring breach by Jones Lang LaSalle of which Jones Lang LaSalle has previously been notified in writing; (ii) the negligent performance of Jones Lang LaSalle's duties under this Agreement of which Jones Lang LaSalle has previously been notified in writing; or (iii) any breach of the confidentiality restrictions of this Agreement, Delphi shall have the right to terminate this Agreement effective upon notice to Jones Lang LaSalle.

**ARTICLE V**
**INDEMNIFICATION**

5.1    **Indemnification by Jones Lang LaSalle.**  Except for the negligence of Delphi and its affiliates and their respective agents and employees, Jones Lang LaSalle shall defend (with counsel reasonably acceptable to Delphi), indemnify and hold harmless Delphi and its affiliates, shareholders, directors, officers, employees and agents from and against all losses, damages, expenses (including reasonable attorney's fees), claims, suits and liabilities of any nature whatsoever arising out of or in connection with its negligent acts or omissions or those of its affiliates or their respective agents, employees, contractors, subcontractors and independent real estate representatives, the failure of Jones Lang LaSalle to comply with the terms and conditions of this Agreement, or premised upon an allegation that Delphi is the employer of Account Personnel;

3

provided, however, Jones Lang LaSalle shall have no liability for severance costs owed to Account Personnel their previous employer, Equis Corporation. Delphi shall notify Jones Lang LaSalle of any claim, loss or damage for which Jones Lang LaSalle is responsible under this article, promptly after Delphi becomes aware of such claim, loss or damage.

**5.2    Indemnification by Delphi.** Except for the negligence of Jones Lang LaSalle and its affiliates and their respective agents, employees, contractors, subcontractors and independent real estate representatives, Delphi shall defend (with counsel reasonably acceptable to Jones Lang LaSalle), indemnify and hold harmless Jones Lang LaSalle and its affiliates, shareholders, directors, officers, employees and agents from and against all losses, damages, expenses (including reasonable attorney's fees), claims, suits and liabilities of any nature whatsoever arising out of or in connection with its negligent acts or omissions or those of its affiliates or their respective agents and employees or the failure of Delphi to comply with the terms and conditions of this Agreement. Jones Lang LaSalle shall notify Delphi of any claim, loss or damage for which Delphi is responsible under this article, promptly after Jones Lang LaSalle becomes aware of such claim, loss or damage.

**5.3    Limitation on Liability.** Each party's liability hereunder shall be limited to its assets; and no partner, director, officer, agent, servant, employee, representative or affiliate of either party shall have any personal liability in connection with this Agreement. In no event will either party be liable to the other for any loss of or damage to revenues, profits or goodwill or other special, incidental, indirect, consequential or punitive damage of any kind resulting from its performance or failure to perform the terms of this Agreement or from the provision of Services, including, without limitation, any interruption of business, even if it has been advised of the possibility of such damages; and in no event shall each party's liability under this Agreement (a) in connection with Administrative Services (defined below) exceed One Hundred Thousand Dollars ($100,000) per year and (b) in connection with any Transaction Services (defined below) exceed One Million Dollars ($1,000,000) per year; provided however, that such limitation on liability will not apply to losses arising (i) from the indemnifying party's gross negligence, willful, fraudulent or criminal misconduct, or (ii) third-party claims.

**5.4    Survival of Indemnification.** The provisions of this article shall survive the termination of this Agreement.

### ARTICLE VI
### CONFIDENTIALITY

**6.1    Confidential Information Regarding Delphi:**

A.    Jones Lang LaSalle acknowledges that, in connection with the performance of the Services, Delphi shall provide Jones Lang LaSalle with information Delphi believes is necessary to permit Jones Lang LaSalle to understand Delphi's requirements with respect to particular Properties and Delphi may provide Jones Lang LaSalle with other information relating to Delphi and the Properties that is not generally known to the public or which Delphi considers to be confidential or proprietary. Jones Lang LaSalle further acknowledges that information regarding: (i) Delphi's interest in Properties; (ii) the business plans, needs and requirements of Delphi; and (iii) terms which may be acceptable to

Delphi under prospective leasing and purchase agreement is highly confidential and is maintained by Delphi as trade secrets. (All information identified in the preceding two (2) sentences is hereafter referred to as **"Delphi Confidential Information".**)

B.    Jones Lang LaSalle shall not: (i) disclose Delphi Confidential Information to any person or entity other than employees who have a need to know such information; (ii) use Delphi Confidential Information for the benefit of any person or entity other than Delphi; or (iii) assert any right, title or other interest in Delphi Confidential Information. Jones Lang LaSalle shall also take appropriate actions by instruction or agreement to advise employees of their obligations with respect to use, copying, protection and security of Delphi Confidential Information. Notwithstanding anything contained in this Agreement, Jones Lang LaSalle shall have the right to disclose such information which: (i) is or becomes available to the public other than as a result of a breach by Jones Lang LaSalle under this Section 6.1; (ii) becomes available to Jones Lang LaSalle from a third party not known by Jones Lang LaSalle to be under any obligation of confidentiality to Delphi; (iii) Jones Lang LaSalle is legally required to disclose or as is necessary or desirable in any litigation or dispute resolution proceedings between Delphi and Jones Lang LaSalle; or (iv) is, in Delphi's sole and exclusive judgment, reasonably necessary for Jones Lang LaSalle to perform its services hereunder.

**6.2    Confidential Information Regarding Jones Lang LaSalle.**    Delphi acknowledges that source codes and operating features of software programs developed and to be developed by Jones Lang LaSalle may be confidential or proprietary and may be maintained by Jones Lang LaSalle as trade secrets if they were developed at no cost to Delphi and outside of the performance of the Services. (All programs and information identified in the preceding sentence, which are proprietary or confidential and have been developed at no cost to Delphi and outside of the performance of the Services shall be referred to as **"Jones Lang LaSalle Confidential Information"**).    Delphi shall use reasonable efforts to respect and observe the confidential or proprietary nature of Jones Lang LaSalle Confidential Information if Jones Lang LaSalle has advised Delphi of its confidential or proprietary nature at the time the applicable information is disclosed to Delphi. Delphi shall not use Jones Lang LaSalle Confidential Information for the benefit of any person or entity other than Jones Lang LaSalle or Delphi. Notwithstanding anything contained in this Agreement, Delphi shall have the right to disclose such information which: (i) is or becomes available to the public other than as a result of a breach by Delphi under this Section 6.2; (ii) becomes available to Delphi from a third party not known by Delphi to be under any obligation of confidentiality to Jones Lang LaSalle; or (iii) Delphi is legally required to disclose or as is necessary or desirable in any litigation or dispute resolution proceedings between Delphi and Jones Lang LaSalle.

**6.3.**   **Advertisement and Publication:**

A.     Jones Lang LaSalle shall not, without the written approval of Delphi, advertise or publish the fact that Jones Lang LaSalle has contracted with Delphi to furnish services to Delphi.  In addition, Jones Lang LaSalle shall not make any explicit or implicit statement that would allow a listener, observer or reader to infer or conclude that Delphi approves of, endorses, favors or supports Jones Lang LaSalle, or its quality, in any manner whatsoever.

B.     Without the prior written approval of Delphi, Jones Lang LaSalle shall not issue any press statements or speak directly with the media about any services provided under this Agreement or its relationship with Delphi.  Any press inquiries Jones Lang LaSalle receives regarding this Agreement or the Services or any other matter pertaining to Delphi must be reported immediately by Jones Lang LaSalle to Delphi.

C.     In locating Properties, Jones Lang LaSalle shall not advise any owner or any other third party of Jones Lang LaSalle's relationship to Delphi, except as Delphi directs in writing.  Unless Delphi otherwise requests, Jones Lang LaSalle shall advise owners and their representatives and agents that Jones Lang LaSalle is acting on behalf of an undisclosed principal; provided, however, in no event shall Jones Lang LaSalle be required to sign any agreements as an undisclosed principal.

D.     Neither party shall disclose the economic terms of this Agreement, except: (i) as is legally required; or (ii) is necessary or desirable in any litigation or dispute resolution proceedings that involve the parties.

**6.4**   **Use of Software and Similar Property:**

A.     Jones Lang LaSalle may use or develop software and similar and related materials in the course of its performance of the Services.  However, Jones Lang LaSalle may change any database or software used to maintain Delphi's information database without Delphi's prior written approval if such changes do not adversely affect the storage of or reasonable access to Delphi's data.   Delphi shall own any such software (and related source codes or documentation) and all similar materials, which are developed at Delphi's cost or expense.  Delphi agrees that it has no right in any such software (or related source codes or documentation) or any similar materials, including, without limitation, any right to purchase, license, use or restrict the use of any such software or similar materials if they have been developed without cost to Delphi. Without limiting the above, upon termination of this Agreement, Jones Lang LaSalle shall cooperate in transferring the data/information in the database managed by Jones Lang LaSalle to Delphi in a machine readable form.  Except as set forth herein, no right is granted Delphi in any software upon which the database has been constructed.  Jones Lang LaSalle shall be reimbursed its reasonable costs, expenses and time (at hourly rates negotiated between the parties) incurred pursuant to said transfer.

B.    Jones Lang LaSalle will maintain the Delphi+ Lease Administration System to permit Jones Lang LaSalle to manage Delphi's worldwide owned and leased real property portfolio. The fee for the Delphi+ Lease Administration System is Eighteen Thousand Dollars ($18,000.00) per annum. In addition, Delphi shall pay Jones Lang LaSalle a one-time setup fee of Twenty-Five Thousand Dollars ($25,000.00) for the setup and implementation of the lease administration database, Delphi+ Lease Administration, and its successors. This fee covers establishment of Delphi's specific website utilized by the system, migration of data from the previously existing database, establishment of a base set of lease administration reports, creation of user ID's for accessing the system and one (1) web-based training class on system usage. The aforementioned services include the scanning or imaging of Delphi's leases and other lease related documents at no additional charge to Delphi as time permits and as long as Delphi provides the necessary scanning or imaging equipment needed to complete said tasks.

**6.5    Survival.** The provisions of this article shall survive the termination of this Agreement.

### ARTICLE VII
### REPRESENTATIONS

**7.1    Jones Lang LaSalle's Representations.**    Jones Lang LaSalle represents that:

A.    Jones Lang LaSalle has the full power and authority to: (i) execute, deliver and perform this Agreement; and (ii) carry out its business as now conducted and contemplated hereby.

B.    This Agreement has been duly authorized, executed and delivered by Jones Lang LaSalle and constitutes the legal, valid and binding obligation of Jones Lang LaSalle, enforceable against Jones Lang LaSalle in accordance with the terms hereof, subject, however, to limitations imposed by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting the enforcement of creditors' rights generally and to general principles of equity.

C.    Jones Lang LaSalle is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Maryland. Jones Lang LaSalle is fully qualified and is or will, prior to the time required, be licensed to perform all of its obligations and duties hereunder, to the extent required by applicable law in each State, Province, Territory and Country in which the Services will be performed or Jones Lang LaSalle shall work through a local real estate broker, at its expense, who is so licensed.

**7.2    Delphi's Representations.** Delphi represents that:

A.    Delphi has the full power and authority to: (i) execute, deliver and perform this Agreement; and (ii) carry out its business as now conducted and contemplated hereby.

7

B.    This Agreement has been duly authorized, executed and delivered by Delphi and constitutes the legal, valid and binding obligation of Delphi, enforceable against Delphi in accordance with the terms hereof, subject, however, to limitations imposed by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting the enforcement of creditors' rights generally and to general principles of equity.

C.    Delphi is a limited liability company duly formed and validly existing and in good standing under the laws of the State of Delaware. Delphi is authorized to conduct business, to the extent required by applicable law, in each State in which it currently conducts its business.

## ARTICLE VIII
## GENERAL PROVISIONS

**8.1    Entire Agreement.**    This Agreement supersedes any and all prior agreements, whether oral or in writing, and sets forth the entire understanding and agreement between Jones Lang LaSalle and Delphi regarding the subject matter hereof. This Agreement may be amended, modified or supplemented only in writing as agreed to and signed by authorized representatives of Jones Lang LaSalle and Delphi.

**8.2    No Waiver.**    No forbearance, delay or indulgence by either party in enforcing the provisions of this Agreement shall prejudice or restrict the rights of that party, nor shall any waiver of its rights operate as a waiver of any subsequent breach.

**8.3    Severability.**    If any provision of this Agreement is held invalid or unenforceable and a court refuses to modify or reform any such provision, such provision shall be eliminated from this Agreement but each of the remaining provisions shall remain in full force and effect. The provisions contained in this Agreement are deemed separate and severable.

**8.4    Notices.**    All notices required hereunder shall be in writing and delivered to the address of the recipient set forth below its signature hereto or such other address as the recipient may designate by notice given in accordance with this section. Any notice shall be delivered by hand, overnight courier service or by certified first class mail return receipt requested, postage prepaid and shall be deemed to have been served upon receipt or refusal to accept receipt.

**8.5    Counterparts.**    This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original. Such counterparts shall together constitute one and the same document. Signatures transmitted by facsimile shall be considered authentic and legally binding.

**8.6    Assignment.**    Except for assignment to affiliates of Delphi, Delphi shall not assign any of its rights or obligations hereunder, whether in whole or in part, without the prior written consent of Jones Lang LaSalle, which consent may be unreasonably withheld, provided that Delphi may require that Jones Lang LaSalle continue to perform Services under this Agreement with respect to any business unit or property that is sold, disposed of or otherwise transferred by Delphi. Jones Lang LaSalle may not assign any of its rights or obligations hereunder, whether in whole or in part, without the prior written consent of Delphi, except that Jones Lang LaSalle may assign its rights and obligations

under this Agreement to any successor to Jones Lang LaSalle's entire business operations as a result of any merger, consolidation or sale of substantially all of its assets, provided the assignee assumes all of Jones Lang LaSalle's obligations hereunder and Delphi receives at least thirty (30) days' prior written notice of the assignment. If Jones Lang LaSalle assigns this Agreement, Jones Lang LaSalle shall remain liable under this Agreement.

### 8.7   Conflicts of Interest:

A.      Jones Lang LaSalle acknowledges and agrees that, although Jones Lang LaSalle is not an agent of Delphi in performing the Services under this Agreement, Jones Lang LaSalle shall be obligated to: (i) exercise the good faith, loyalty and honesty that an agent owes to its principal; (ii) disclose to Delphi all potential conflicts of interest that may arise between Delphi and Jones Lang LaSalle; and (iii) act in the best interest of Delphi at all times.

B.      In furtherance of its duties as set forth in Section 8.7A above, Jones Lang LaSalle shall inform Delphi in writing if Jones Lang LaSalle or any affiliate, contractor or independent real estate representative of Jones Lang LaSalle is a party or desires to become a party to any agreement by which Jones Lang LaSalle is the listing agent of a property in which Delphi is a tenant or prospective tenant or prospective purchaser or any other arrangement in which Jones Lang LaSalle would have a conflict of interest with Delphi, including, without limitation: (i) Jones Lang LaSalle recommending a site to Delphi where Jones Lang LaSalle is already a listing agent; (ii) Jones Lang LaSalle representing a prospective tenant or purchaser of a Property that is owned by Delphi; (iii) Jones Lang LaSalle representing a prospective third party purchaser that is seeking a parcel or leasehold that has similar characteristics to a parcel or leasehold in which Delphi has expressed an interest; or (iv) Jones Lang LaSalle's use of any vendors, consultants, real estate brokers or other service providers in which Account Personnel has a direct or indirect interest or from which Account Personnel may derive any direct or indirect economic or other benefit. If Jones Lang LaSalle represents both Delphi and another party to a specific transaction and Jones Lang LaSalle is unable to disclose the identity of the other party to a transaction to Delphi due to a confidentiality agreement with the other party, then Jones Lang LaSalle shall withdraw from representing Delphi in Delphi's negotiations with that party.

C.      If Jones Lang LaSalle notifies Delphi that Jones Lang LaSalle desires to enter into any agreement which may involve a conflict of interest, Delphi will have ten (10) days to respond in writing if Delphi wishes Jones Lang LaSalle to decline any such proposed agreement and if Delphi does not respond within such ten (10) day period, Jones Lang LaSalle will be prohibited from entering into such an agreement. If Jones Lang LaSalle is already the listing agent or representative of a prospective tenant or purchaser of a property at the time of the notice given to Delphi pursuant to this Section 8.7 (or if other circumstances which give rise to a potential conflict of interest already existing at the time of such notice), Jones Lang LaSalle shall deliver to Delphi a copy of Jones Lang LaSalle's (or its affiliate's, contractor's or independent real estate representative's) agreement with the owner or prospective tenant or purchaser of the Property (or a copy of the other agreement which gives rise to the potential

9

conflict of interest) except to the extent Jones Lang LaSalle is prohibited from doing so under its confidentiality obligations to its other clients; provided, however, Jones Lang LaSalle still must provide notice of the potential conflict of interest. After Delphi receives a copy of any agreement between Jones Lang LaSalle (or its affiliate, contractor or independent sales representative) and the owner, prospective tenant or prospective purchaser, Delphi may elect to withdraw the Property to which the conflict or potential conflict of interest relates from the terms of this Agreement and to engage a different broker (the "**Unrelated Broker**") to act as Delphi's representative with respect to such Property. After Delphi receives a copy of any agreement between Jones Lang LaSalle and any vendor, consultant, real estate broker or other service provider in which Jones Lang LaSalle or any employee of Jones Lang LaSalle has a direct or indirect interest or from which Jones Lang LaSalle or any employee of Jones Lang LaSalle may derive any direct or indirect economic or other benefit, Delphi may require that Jones Lang LaSalle submit the work to be performed by the applicable service provider to competitive bidding, require that the payments to such service provider be determined on an arms-length basis or require that any economic benefit to Jones Lang LaSalle arising out of the performance of services by the applicable service provider be credited against the payments due under this Agreement from Delphi or paid directly to Delphi.

D.     If Delphi withdraws a Property from the terms of this Agreement and Jones Lang LaSalle or its affiliate are the listing broker, then Jones Lang LaSalle or the applicable affiliate shall enter into an agreement with the Unrelated Broker for the sharing of commissions arising out of the leasing or sale of such Property on terms and conditions customarily used for sharing commissions between a procuring broker and a listing broker in the area in which such Property is located. If Delphi withdraws a Property from the terms of this Agreement and Jones Lang LaSalle or its affiliate are not the listing broker but would be entitled to a commission in connection with the acquisition of an interest in the applicable Property by Delphi, then Jones Lang LaSalle shall assign (or cause its affiliate to assign) to the Unrelated Broker Jones Lang LaSalle's (or the affiliate's) rights to receive a portion of such commission. If Jones Lang LaSalle fully and timely discloses to Delphi Jones Lang LaSalle's (or its affiliate's, contractor's, or independent real estate representative's) relationship with the owner of a particular Property for which Jones Lang LaSalle (or its affiliate, contractor or independent real estate representative) is the listing broker, and Delphi does not exclude the applicable Property from the terms of this Agreement, then, subject to the terms of this Agreement (which shall remain binding upon Jones Lang LaSalle), Jones Lang LaSalle (or the applicable affiliate, contractor or independent real estate representative) shall be permitted to act as a dual agent.

E.     Notwithstanding any of the foregoing, Delphi can, at any time, discontinue Jones Lang LaSalle's performance of the Services on behalf of Delphi in any transaction which Delphi believes involves a conflict of interest, and withdraw the applicable Property from the terms of this Agreement

**8.8     Exceptions to Exclusivity.** Jones Lang LaSalle's exclusive rights to provide the Services under this Agreement shall not apply to the following:

A.     Transactions with respect to Properties for which Delphi has entered into agreements, negotiations or discussions with third parties prior the date hereof.

B.     Agreements with third parties which are entered into by Delphi as a result of the acts of employees or agents of Delphi who are not consciously and intentionally seeking to circumvent Jones Lang LaSalle's rights under this Agreement; except that Delphi will make best efforts to ensure that the nature of this contract and relationship is communicated as part of a global mandate to consolidate real estate services.

C.     Non-routine transactions for which Delphi determines in good faith that it is uneconomical or impracticable for Jones Lang LaSalle to provide the services Delphi requires; and

D.     Transactions for which this Agreement provides that Jones Lang LaSalle's compensation is to be negotiated or is to be "customary", if Delphi in good faith determines that Delphi and Jones Lang LaSalle will not reach agreement on Jones Lang LaSalle's compensation in a timely manner.

E.     Transactions that are primarily financial in nature, i.e. synthetic leases, property financing, sale-leasebacks, etc except for those which have been identified or initiated by Jones Lang LaSalle in an approved TIA form.

**8.9     Interpretation and Construction:**

A.     Except as to words or phrases specifically defined in this Agreement and designated by initial capitalization, the parties agree that all words and phrases in this Agreement have their plain and generally prevailing meaning and not any different meaning.

B.     Subject to the provisions of Section 8.6 of this Agreement, this Agreement is intended solely for the benefit of the parties and the affiliates and subsidiaries of Delphi and is not intended to inure, and will not inure, to the benefits of any other person or entity.

**8.10     Governing Law; Jurisdiction.** This Agreement has been negotiated, executed by Delphi and delivered in the State of Michigan. This Agreement and the respective rights and obligations of the parties under this Agreement shall be governed by, and shall be determined under, the internal laws of the State of Michigan applicable to contracts between residents of the State of Michigan to be performed solely in the State of Michigan, i.e., without regard to choice of law principles. Without limitation of the parties' agreement to arbitrate disputes as set forth in Section 8.11 below, the parties hereto agree that, in the event any legal action involving or relating to this Agreement is instituted as a result of, in connection with our outside of arbitration, such action shall be brought and maintained solely in a court of the State of Michigan or a Federal court sitting in the State of Michigan. Jones Lang LaSalle hereby consents and agrees to cause each affiliate of Jones Lang LaSalle and each subcontractor, agent, representative and independent real estate representative that performs any of the Services under this Agreement to consent to the exclusive jurisdiction of the courts of the State of Michigan and Federal courts sitting in the State of Michigan.

**8.11   <u>Arbitration</u>.** Any dispute or issue of interpretation between Jones Lang LaSalle and Delphi arising out of this Agreement shall be resolved in the following manner: Notwithstanding the submission to jurisdiction set forth in Section 8.10 above, either party may (as the exclusive remedy available to it) seek binding arbitration in Southfield, Michigan (or such other location in the Detroit, Michigan metropolitan area as the offices of the American Arbitration Association may be relocated), in accordance with the commercial arbitration rules of the American Arbitration Association.   A single arbitrator shall be jointly selected by the parties to this Agreement.   If the parties to this Agreement fail to agree on a single arbitrator within sixty (60) days of the filing of a demand for arbitration, the American Arbitration Association shall select the arbitrator. The arbitration shall be conducted at the offices of the American Arbitration Association in Southfield, Michigan.   The arbitrator has the authority to order, and the parties agree to submit to discovery under, procedures consistent with the Michigan Court Rules of 1985, as amended Subchapter 2.300, Discovery, or any hereinafter promulgated amendment or replacement provision.   Jones Lang LaSalle hereby consents and agrees to cause each affiliate of Jones Lang LaSalle and each subcontractor, agent, representative and independent real estate representative that performs any of the Services under this Agreement to consent to the authority of an arbitrator selected in accordance with this Section 8.11.   The award of the arbitrator shall be binding upon all parties, an a judgment upon the award may be entered by any court of competent jurisdiction.   The substantially prevailing party in the arbitration shall be entitled to recover from the non-prevailing party its reasonable expenses incurred in connection with any such arbitration proceeding.

**8.12   <u>Audit</u>.** Delphi shall have the right, at any time and from time to time, upon reasonable prior written notice to Jones Lang LaSalle, to review, audit and make copies of all relevant books, records, payroll data, receipts, agreements, documents and other materials, including Jones Lang LaSalle's administrative and accounting policies, guidelines, practices and procedures, which relate to the Services being performed under this Agreement, in order to substantiate any charges and other matters arising under this Agreement.   Jones Lang LaSalle will maintain and preserve all such documents for a period of two (2) years following final payment for the Services to which the documents relate.   Jones Lang LaSalle will provide Delphi with reasonable access to its facilities and otherwise cooperate and facilitate any such review and audits by Delphi.

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date first set forth above.

JONES LANG LASALLE AMERICAS, INC.        DELPHI AUTOMOTIVE SYSTEMS LLC

By: _____            By: _____

Its: MANAGING DIRECTOR                    Its: John A. Jaffurs
                                               Executive Director
535 GRISWOLD                              5825 Delphi Drive Services Group
Suite 825                                 Facilities Services Group
Detroit, MI 48226                         Troy, Michigan 48098-2815
Attn: JAMES C. BECKER                     Attn: Director of Facility Services Group

**EXHIBIT A**

**DESCRIPTION OF SERVICES**

I.    **ADMINISTRATIVE SERVICES.**  Jones Lang LaSalle shall perform the following administrative services (the **"Administrative Services"**) on an exclusive basis for all of Delphi's Properties worldwide:

A.    **Information Management.**  Information management, including abstracting for the Properties, data entry, database updating, financial calculations, third party lease tracking, reporting, maintenance of database and other information management.  Information on the Properties will be maintained by Jones Lang LaSalle on the Delphi+ Lease Administration System.  Typical information management reports (to the extent permitted by Delphi's system) will include:

(i)    Monthly Activity;

(ii)    Quarterly Summary;

(iii)    Annual Comprehensive; and

(iv)    Additional reports on an as requested basis.

B.    **Summary Reports and General Information.**  Jones Lang LaSalle will provide to Delphi regular reports of Jones Lang LaSalle's activities in connection with the performance of the Services, in form and with content as Delphi requires.    Reports summarizing Jones Lang LaSalle's activities in connection with the Services shall be provided to Delphi on a weekly, monthly and quarterly basis (or on such other basis as Delphi reasonably requests).  These reports shall identify activities on a regional basis (with separate reports for North American and International activities), and shall identify all individual projects, the Jones Lang LaSalle personnel (and any other service providers) who are working on such projects, the work performed on each project (including hours worked to the extent that the information relating to the hours worked is applicable and readily available), total hours worked by all Reimbursable Account Personnel and all non-Accounting Personnel (on each project and on a cumulative basis).  In addition to the regular reports to be provided to Delphi, Jones Lang LaSalle shall provide to Delphi any other reports or information as Delphi requests.

C.    **Specific Property Information.**    Jones Lang LaSalle's information managers shall provide advance notice and recommendation to Delphi regarding any notice provisions, expiration dates or other dates for action by Delphi with respect to the Properties.    Commencing as promptly as practicable following the Effective Date, such advance notice shall include a recommendation of appropriate action which shall be in Delphi's best interests, and shall be given in sufficient time to permit Delphi to evaluate its options prior to such time as they must be exercised. Jones Lang LaSalle will provide monthly reports that identify the information regarding Delphi's Properties as

14

contemplated under this Section IC, which reports shall identify critical dates over the twelve (12) month period following the date of the report and will be prioritized by both date and level of importance to Delphi.

    **D.**   **Initial Evaluation.**  Jones Lang LaSalle will perform an initial overall evaluation of Delphi's Properties for planning of services hereunder.

    **E.**   **Strategic Planning Services.**  Jones Lang LaSalle shall aid in the development of long-term and short-term strategic plans, develop policies and procedures, identify cost savings systems and procedures and develop benchmarks to evaluate success of Services. Jones Lang LaSalle shall also fully inform Delphi of any potential real estate transactions, which may create opportunities for costs savings, consolidation or other benefits to Delphi.

    **F.**   **Account Performance.**  Jones Lang LaSalle shall provide quarterly reports which evaluate Jones Lang LaSalle's performance under this Agreement and the degree of satisfaction of goals which are established by Delphi for the Delphi account. Jones Lang LaSalle's quarterly account performance reports shall identify actions, which Jones Lang LaSalle proposes to improve performance on the Delphi account and achievement of Delphi's goals.

    **II.**   **TRANSACTION SERVICES.**  Jones Lang LaSalle shall perform all leasing, subleasing, lease termination or other lease disposition and purchase and sale services ("**Transaction Services**") for Delphi, on an exclusive basis, with respect to all of Delphi's Properties. Each time Delphi has need for the Transaction Services in connection with a Property, Jones Lang LaSalle shall prepare a Transaction Initiation Authorization (a "**TIA**") and provide the completed TIA to Delphi in a form reasonably acceptable to Delphi, for Delphi's review and, if acceptable to Delphi, Delphi shall approve the TIA in writing. In jurisdictions where Jones Lang LaSalle provides its services through affiliates, the TIA shall provide for the rendering of the Services through such affiliates; and, in the event of any conflict between this Agreement and a TIA, the terms of this Agreement shall govern, unless the parties specifically agree in writing that a specific TIA will control in specific circumstances. Delphi and Jones Lang LaSalle shall mutually agree upon any changes in format and content to the TIA form. Upon authorized execution of a TIA by Delphi, Jones Lang LaSalle shall provide the following Transaction Services in conformance with this Agreement:

    **A.**   **Facility Planning and Strategy.**  Facility planning and strategy for transactional work including field review of each location, analysis of market costs and comparison to current lease rates for facility costs. The analysis also includes a building review/summary and ownership status report. Following this review/summary, a facility model will be created by Jones Lang LaSalle to use as a guide throughout the particular action. While Jones Lang LaSalle may be doing a survey of building systems for Delphi's comfort purposes at any property Delphi intends to purchase or lease, Delphi acknowledges and agrees that Jones Lang LaSalle is not an expert in and would not be doing an in-depth review of any environmentally hazardous materials (including, but not limited to, asbestos and/or PCB's), engineering matters (structural or otherwise) or legal, regulatory or other technical issues and that Jones Lang LaSalle is not providing any advice with respect to such materials, matters or issues. Delphi agrees to hire such

experts as it deems necessary to investigate any environmental matters, engineering matters, legal or regulatory matters or other technical matters at any property it intends to lease, purchase or occupy. Jones Lang LaSalle, however, will, if requested, assist Delphi in identifying, selecting and negotiating for these services.

     **B.**    **New Leases, Renewals, Expansions and Purchases**. Jones Lang LaSalle will perform the following Transaction Services in connection with these transactions:

     **1.**    **Financial Factors/Total Occupancy Costs**. Jones Lang LaSalle will estimate cumulative financial liability associated with office leasing or "Total Occupancy Cost".

     **2.**    **Geographic Criteria**. Jones Lang LaSalle will assist Delphi in the determination of geographic criteria. Geographic issues which must be explored in developing a facility model from a Delphi requirement include: proximity to employee base, desired public image/identification, proximity to suppliers, customers and related businesses and preferred building and neighborhood amenities.

     **3.**    **Market Survey and Screening**. Jones Lang LaSalle will provide Delphi with a market report on space/land availabilities consistent with the facility model.

     **4.**    **Comparative Analysis**. After considering potential options, Jones Lang LaSalle will request initial proposals from selected building/land owners. Based on initial building proposals, Jones Lang LaSalle will provide financial analyses of competing economic transactions for Delphi's approval. These analyses will compare the annual costs and total occupancy costs of every proposed transaction to each other and against the established model. Expected cash outflows will be projected on a monetary and present value basis. Jones Lang LaSalle shall provide such analyses in form and content reasonably satisfactory to Delphi.

     **5.**    **Candidate Pool Development**. Jones Lang LaSalle and Delphi will identify viable alternatives that can adequately address Delphi physical and other requirements. This will lead to the development of the candidate pool.

     **6.**    **Negotiating Strategy**. Subject to Jones Lang LaSalle's obligations to coordinate the performance of Services with the "Delphi Staffs" (as defined in Section IVB of this Exhibit A) Jones Lang LaSalle will negotiate on Delphi's behalf to strategically position Delphi to maximize Delphi's leverage in the marketplace.

     **7.**    **Negotiation of Terms**. Subject to Section IVB of this Exhibit A, Jones Lang LaSalle will negotiate on behalf of Delphi to achieve the facility criteria developed in the facility model through a

process of proposals and counter-proposals. For each round of negotiations, additional financial analyses will be prepared and delivered to Delphi so that Delphi understands each proposal as compared to alternatives, the established model, existing occupancy terms and a renew/reconstruct scenario. Without limiting the foregoing, Delphi agrees to make its best efforts to ensure that all inquiries are referred to Jones Lang LaSalle and to conduct all negotiations subject to this agreement through Jones Lang LaSalle. Notwithstanding the foregoing, Delphi shall have the right to negotiate directly where it sees fit, provided said direct negotiations do not affect Jones Lang LaSalle's right to a fee or commission.

**8.    Negotiation Flexibility.**  Subject to Section IVB of this Exhibit A, Jones Lang LaSalle will negotiate all transaction documents. Jones Lang LaSalle will also prepare/process and record all Delphi internal approval documents for each transaction. All negotiations (other than initial economic negotiations) shall be conducted in coordination with and, at such stage in the negotiations as Delphi elects, subject to the approval of, Delphi's legal staff or outside counsel that has been retained by Delphi.

**9.    Vacated Space Review.**  Follow-up on all expired, terminated and relocated space will be completed after each respective activity. This will include all necessary review of documentation, follow-up with landlords and assessment of any disputes.

**10.    Finalize Transaction.**  Once agreement has been reached on proposed business terms, Jones Lang LaSalle will provide the information to Delphi for final authorization to complete the transaction. Once final authorization has been obtained, Jones Lang LaSalle and legal counsel retained or provided by Delphi will finalize the appropriate documentation, in coordination with the Delphi Staffs, and Jones Lang LaSalle will provide the completed documents to Delphi for signature.

**C.    Lease Dispositions:**

**1.    Strategy Development.**  Jones Lang LaSalle will determine lease liability and cost and potential subleasing revenues. Once defined and integrated with owner/lender needs, a budget will be established for a potential buyout and submitted to Delphi for approval. The plan will involve all costs, marketing options, prospect targets and lender profiles. A time frame will accompany each option within the strategy unless Delphi otherwise requests.

**2.    Implementing Strategy.**  All strategic disposition options will be pursued simultaneously.

**3.    Finalize Transaction.**  Once agreement has been reached on proposed business terms, Jones Lang LaSalle will provide the information to Delphi for final authorization to complete the transaction. Once final authorization has been obtained, Jones Lang LaSalle and legal

17

counsel retained or provided by Delphi will finalize the appropriate documentation, in coordination with the Delphi Staffs, and Jones Lang LaSalle will provide the completed documents to Delphi for signature.

**D.**     **Owned Property Dispositions & Third Party Leasing:**

**1.**     **Property Evaluation and Valuations.**     Jones Lang LaSalle shall assist Delphi in the evaluation of property to determine its highest and best use. Jones Lang LaSalle valuation assistance includes market analysis of leasing and development trends and other market conditions. Jones Lang LaSalle will position the property in the context of the overall market.

**2.**     **Strategy Development.**     The primary objective is to develop the maximum number of qualified prospects for Delphi in the shortest possible period of time. The Jones Lang LaSalle strategy will establish and identify all options and opportunities, define budgets, create the appropriate marketing theme and timeframe for successful project execution. Depending on the nature of the assignment and its location and subject to Delphi's approval, a listing agent may be retained by Jones Lang LaSalle to assist in the process.

**3.**     **Implementing Strategy.**     All potential prospects will be contacted, qualified and, when interest arises, lead in an orderly manner to successful conclusion. During the process, there will be an ongoing review of each prospect along with updates indicating status or changes affecting the outcome versus the targets.

**4.**     **Finalize Transaction.**     Jones Lang LaSalle will coordinate the contract process between Delphi (including the Delphi Staffs), the sublessee or buyer and their respective counsel.

**III.**     **GENERAL CONSULTING.**     Jones Lang LaSalle will consult with Delphi regarding issues which are of concern to Delphi and information requested by Delphi on an on-going basis. In addition, Jones Lang LaSalle will cause its employees who have expertise in particular areas to share such expertise with the Account Personnel, in order to assure that Delphi, through the Account Personnel, receives the maximum benefit of the relationship with Jones Lang LaSalle under this Agreement. Jones Lang LaSalle shall perform this general consulting work and sharing of readily available expertise and information without additional charge to Delphi, It being understood that the profit and overhead fee to Jones Lang LaSalle as identified in Section 1A of Exhibit B is intended to compensate Jones Lang LaSalle for such services. In the event said consulting work shall require unusual or excessive investigation or analysis to develop the required report then Jones Lang LaSalle shall notify Delphi in writing with the accompanying scope of required work, consulting fee and estimate for reimbursable expenses.

**IV.**     **COORDINATION OF SERVICES:**

**A.**     Jones Lang LaSalle: (i) acknowledges that the exclusive nature of its engagement does not apply to services and functions that are performed by Delphi's non-real estate staff, including, without limitation, Delphi's financial,

18

treasury, facilities, environmental, governmental relations and legal staffs (the "**Delphi Staffs**"); and (ii) agrees that Jones Lang LaSalle will coordinate its performance of the Services with the functions that are performed by the various Delphi Staffs.

B.      In order to assure efficient and timely coordination of Jones Lang LaSalle's services with the functions that are performed by the various Delphi Staffs, Delphi may designate an employee as the "**Delphi Manager**", who will be the main representative of Delphi for the administration of the Agreement and the receipt and delivery of communications between the parties (unless the Delphi Manager or another employee of Delphi designated by the Delphi Manager directs Jones Lang LaSalle to communicate with other employees, agents or representatives of Delphi). Jones Lang LaSalle will notify the Delphi Manager in writing before Jones Lang LaSalle delivers to any third parties any proposals, term sheets or similar documents regarding any Properties or otherwise enters into substantive negotiations with any third parties. Jones Lang LaSalle's notice to Delphi must identify any potential issues for which the involvement of particular Delphi Staffs may be necessary or desirable. Before Jones Lang LaSalle delivers any such proposals, terms sheets or other documents (and any amendments or modifications thereof) to any third parties or otherwise enters into substantive negotiations with any third parties. Jones Lang LaSalle must obtain the written consent of the Delphi Manager, and of the representatives of any Delphi Staffs that the Delphi Manager informs Jones Lang LaSalle must be involved in the particular project. Jones Lang LaSalle will comply with all directions of the Delphi Staffs regarding the projects in which they are involved.

## EXHIBIT B

## FEES AND COSTS – PAYMENTS TERMS

I.    **FEES – ADMINISTRATIVE SERVICES**.  Jones Lang LaSalle will be entitled, as its sole compensation for Administrative Services, to receive the fees and reimbursements identified in this Section I.  Administrative Services will be performed by Account Personnel unless Delphi otherwise requests or agrees.

    **A.**    **Fees and Payments**.  Jones Lang LaSalle will be entitled to a fee for Administrative Services in an amount equal to the sum of: (i) the cost of salary of all Administrative Services Account Personnel working exclusively on the Delphi account (excluding bonuses, benefit expenses and payroll taxes) in accordance with a salary schedule acceptable to Delphi (as the same may be amended with Delphi's prior written approval); and (ii) an overhead allocation and profit factor equal to seventy-five (75%) percent for Administrative Services Account Personnel of (i) above.  Within thirty (30) days of receipt of request for payment in the form approved by Delphi (including all supporting documentation required by Delphi), Delphi shall pay the fee for Administrative Services for the prior month; provided, however, any reimbursement of employee expenses shall be due on the date of payment of any such expenses for Administrative Services Account Personnel by Jones Lang LaSalle and shall be made through an ACH Electronic Funds Transfer or other such electronic payment method.  Any and all amounts due to Delphi under the provisions of this Agreement shall be credited against the fee for Administrative Services (unless paid to Delphi or DREAL, Inc., pursuant to Delphi's request).

    **B.**    **Expense Reimbursement**.    All reasonable out-of-pocket expenses directly related to performing the Administrative Services by Account Personnel (including necessary travel, accommodations, apartment rentals, etc., but excluding costs of Jones Lang LaSalle's home office and other overhead expenses) shall be reimbursed to Jones Lang LaSalle, provided that Delphi shall have approved such out-of-pocket expenses in writing, either in an approved annual budget or in a specific approval of a particular expense.    Such reimbursements shall be made thirty (30) days following receipt of request for reimbursement in the form approved by Delphi (including all supporting documentation required by Delphi).  Jones Lang LaSalle will comply with Delphi's policies regarding expense reimbursements, as the same may be modified from time to time.    Jones Lang LaSalle shall also comply with the requirements regarding travel arrangements set forth on Schedule 1 to this Exhibit B.

    **C.**    **Assignment of Account Personnel**.  Jones Lang LaSalle, in consultation with Delphi, shall determine the number, qualification and total cost of employment of the Account Personnel and any other personnel necessary to perform the Administrative Services.  Jones Lang LaSalle alone shall determine the other elements of engagement of persons providing the Services, provided such other elements of engagement do not affect Delphi's costs or other obligations under the Agreement.

20

II.    **FEES AND COSTS – TRANSACTION SERVICES.**  Jones Lang LaSalle will be entitled, as its sole compensation for Transaction Services, to receive the fees and reimbursements identified in this Section II.  Transaction Services will be performed by Reimbursable Account Personnel and Non-Reimbursable Account Personnel.

A.    **Fees and Payments.**  Jones Lang LaSalle will be entitled to a fee for Transaction Services Account Personnel in an amount equal to the sum of: (i) the cost of salary of all Transaction Services Account Personnel working exclusively on the Delphi account (excluding bonuses, benefit expenses and payroll taxes) in accordance with a salary schedule acceptable to Delphi (as the same may be amended with Delphi's prior written approval); and (ii) an overhead allocation and profit factor equal to fifty-five (55%) percent for Transaction Services Account Personnel of (i) above.  Within thirty (30) days of receipt of request for payment in the form approved by Delphi (including all supporting documentation required by Delphi), Delphi shall pay the fee for Transaction Services Account Personnel for the prior month; provided, however, any reimbursement of employee expenses for Transaction Services Account Personnel shall be due on the date of payment of any such expenses by Jones Lang LaSalle and shall be made through an ACH Electronic Funds Transfer or other such electronic payment method..  Any and all amounts due to Delphi under the provisions of this Agreement shall be credited against the fee for Transaction Services (unless paid to Delphi or DREAL, Inc., pursuant to Delphi's request).

B.    **Expense Reimbursement.**  All reasonable out-of-pocket expenses directly related to performing the Transaction Services by Account Personnel (including necessary travel, accommodations, apartment rentals, etc., but excluding costs of Jones Lang LaSalle's home office and other overhead expenses) shall be reimbursed to Jones Lang LaSalle, provided that Delphi shall have approved such out-of-pocket expenses in writing, either in an approved annual budget or in a specific approval of a particular expense.  Such reimbursements shall be made thirty (30) days following receipt of request for reimbursement in the form approved by Delphi (including all supporting documentation required by Delphi).  Jones Lang LaSalle will comply with Delphi's policies regarding expense reimbursements, as the same may be modified from time to time.  Jones Lang LaSalle shall also comply with the requirements regarding travel arrangements set forth on Schedule 1 to this Exhibit B.

C.    **Assignment of Account Personnel.**  Jones Lang LaSalle, in consultation with Delphi, shall determine the number, qualification and total cost of employment of the Account Personnel and any other personnel necessary to perform the Transaction Services. Jones Lang LaSalle alone shall determine the other elements of engagement of persons providing the Services, provided such other elements of engagement do not affect Delphi's costs or other obligations under the Agreement.

D.    **Delphi Commission Responsibilities.**  In addition to the fees and reimbursements for Transaction Services Account Personnel above, Jones Lang LaSalle will be entitled to differing fees for Transaction Services rendered to Delphi. Depending on the Transaction Service performed, Jones Lang LaSalle's commission or fee shall be paid by Delphi or a third party, as is customary.

Delphi will be responsible for the payment of commissions or fees for the following activities:

1.      Leases/Subleases where Delphi is the landlord and, under special circumstances agreed upon by Delphi in the TIA, where Delphi is tenant.

2.      Sales: customary commissions for the area where property is located as agreed upon by Delphi and Jones Lang LaSalle in good faith.

3.      Purchases as negotiated on a case-by-case basis, but only under special circumstances agreed to by Delphi.

4.      Expansions and Renewals where Delphi is the lessor (subject to customary leasing commission for the area where the Property is located).

5.      Consulting on Special Projects and other Requested Services.  The fees for such consulting services shall be on a flat fee basis plus reasonable reimbursable expenses, based on agreed-upon scope of work.

The commissions and fees due to Jones Lang LaSalle for the above Transaction Services as are set forth above.  Commissions and fees due from Delphi are earned and due: (i) when leases, subleases, amendments or contracts are signed by both parties; or (ii) when contracts for purchase or sale are closed and proceeds disbursed.  Jones Lang LaSalle shall not be entitled to fees on an hourly rate basis in connection with transactions listed above which identify Jones Lang LaSalle's compensation as being commission-based.  In no event shall any fees or commissions be earned by or payable to Jones Lang LaSalle in connection with any residential transactions (excluding assemblages), sale – leaseback, "synthetic-lease" or secured or unsecured financing transactions of any nature, or in connection with any real estate purchases or dispositions that occur in connection with the acquisition or sale of a business or business unit, unless specifically agreed upon in writing by Delphi.

   **E.      Use of Reimbursable Account Personnel for Transaction Services.**  Notwithstanding anything contained in this Agreement, to the extent Reimbursable Account Personnel are available to perform any Services for which Jones Lang LaSalle would otherwise be entitled to payment on a non-commission basis, the Reimbursable Account Personnel shall be used for such purpose without additional charge to Delphi (and Jones Lang LaSalle shall provide the Reimbursable Account Personnel with supervision, advice and guidance in connection therewith, at no additional cost to Delphi).

   **F.      Third Party Payment.**  Commissions or fees for other Transaction Services performed by Jones Lang LaSalle shall be paid by the third party customarily responsible for the payment of such.  The amount of these fees and commissions shall be set by Jones Lang LaSalle and the third party responsible for payment.  Commissions and fees due from third parties are earned according

to the commission agreement in place with the paying party. If any third party from which a commission would customarily be paid (including, if applicable, a lessor on a renewal or expansion) is unwilling to agree to pay Jones Lang LaSalle a commission (or such third party's broker or agent is unwilling to share its commission with Jones Lang LaSalle), Jones Lang LaSalle shall nonetheless perform all Services with respect to the applicable transaction as would be provided if the third party had agreed to pay a commission, unless Delphi and Jones Lang LaSalle otherwise agree. Delphi agrees to support Jones Lang LaSalle's request for payment of the commission or fee by the third party at no additional cost to Delphi. If Delphi and Jones Lang LaSalle determine that the Services addressed by this Paragraph IIC should be performed by non-Account Personnel, then the compensation to Jones Lang LaSalle for the performance of Services in connection with such transaction shall be negotiated by Delphi and Jones Lang LaSalle.

G.    **Revenue Sharing.** Jones Lang LaSalle will partner with Delphi to deliver Global Transaction Services on an open book basis. Global transaction activity and fees will be tracked centrally and accessible by Delphi at all times and reported out on a quarterly basis. In consideration for Jones Lang LaSalle representing Delphi in its global Transaction Services, Jones Lang LaSalle hereby agrees to pay Delphi or, at Delphi's election, pay to DREAL, Inc., a portion of the commission to be received by Jones Lang LaSalle or any affiliate of Jones Lang LaSalle relating to the Properties, per the schedule below:

| Transaction Commission Fee | Marginal Discount Paid to Delphi | Cumulative Discount Paid to Delphi |
|---|---|---|
| Up to $50,000 | 20% | 20% |
| $50,001 to $100,000 | 25% | 22.5% |
| $100,001 to $250,000 | 30% | 27% |
| $250,001 to $400,000 | 35% | 30% |
| $400,001 + | 50% | N/A |

- In the case of Transaction Services that are performed by Reimbursable Account Personnel, fifty percent(50%) of commissions and/or fees received by Jones Lang LaSalle or any affiliate of Jones Lang LaSalle in connection with any such Transaction Services shall be paid to Delphi or, at Delphi's election, paid to DREAL, INC. Notwithstanding anything contained in this Agreement, Delphi shall determine the extent and degree to which Reimbursable Account Personnel will be utilized to provide the Services under this Agreement, provided that Delphi will consider Jones Lang LaSalle's recommendations regarding which personnel should be used to provide particular Services.

- 

III.    **LEASE AUDITS.** Desktop Audits of Delphi payables administered by Account Personnel are provided at no-cost to Delphi. If approved in writing by Delphi in advance, and following the performance of a Desktop Audit by Account Personnel (at no cost to Delphi), Field Audits for Delphi payables are to be performed by separate Jones Lang LaSalle personnel at twenty-seven and one-half (27.5%) percent of the savings

received by Delphi from the Field Audits. Jones Lang LaSalle shall be accorded commercially reasonable time periods to collect any savings due Delphi from Field Audits. However, in no event shall the time period for compensation to Jones Lang LaSalle for Field Audits be more than ninety (90) days after the date of termination of this Agreement.

IV.   **PAYMENT OF CERTAIN COSTS.**   In connection with Jones Lang LaSalle's performance of the Service, Jones Lang LaSalle may be required to retain outside vendors and/or consultants to perform services on Jones Lang LaSalle's behalf. Jones Lang LaSalle is hereby authorized to hire such persons, provided that the provider of the Service, the cost of the Service and the scope of the Service is known and approved by Delphi prior to engagement.

A.   **Invoice Payment by Delphi.**   Upon presentation of a Jones Lang LaSalle invoice for the vendor's or consultant's services, in the form approved by Delphi (including all supporting documentation required by Delphi), Delphi agrees to remit payment within thirty (30) days.

B.   **Reimbursement of Jones Lang LaSalle.**   Delphi shall reimburse Jones Lang LaSalle for all invoices for vendor and consultant services which have been paid by Jones Lang LaSalle within thirty (30) days of presentment of an invoice in the form approved by Delphi (including all supporting documentation required by Delphi).

V.   **OFFSET AND RECOVERY.**   Delphi may: (i) offset any monetary obligations of Jones Lang LaSalle or any of Jones Lang LaSalle's affiliates any sums owing from Delphi under this Agreement; and (ii) recover any such monetary obligations from any amounts paid to Jones Lang LaSalle or any of Jones Lang LaSalle's affiliates.

VI.   **EARLY TERMINATION.**   In the event of any early termination of this Agreement in accordance with Article IV of this Agreement, Jones Lang LaSalle shall, as of the Effective Date of such early termination, no longer be obligated to perform hereunder and Delphi shall pay Jones Lang LaSalle for all Services performed by Jones Lang LaSalle through the date of termination. Jones Lang LaSalle shall be accorded commercially reasonable time periods to complete Transaction Services where a TIA was executed by both parties prior to the termination date of this Agreement for compensation under the terms of this Agreement, however in no event shall the time period for completion be more than ninety (90) days.   ("Protection Period") Notwithstanding the foregoing, Delphi shall have no obligation to pay Jones Lang LaSalle any compensation if a valid contract by Delphi is entered into with any other licensed real estate broker or any real estate service provider for any properties during the term of said Protection Period, even if Delphi and Jones Lang LaSalle executed a TIA regarding a Property during the term of the Agreement; provided however that if a binding purchase agreement is executed between Delphi and a third party regarding the sale or purchase of a Property during the term of the Agreement then Jones Lang LaSalle shall be entitled to the compensation under the terms of this Agreement, even if the closing of the sale or purchase of that Property did not occur under after the expiration of either the term of the Agreement or the Protection Period.

VII.   **SHARED   COMMISSION   ARRANGEMENTS.**   Delphi   hereby acknowledges that Jones Lang LaSalle may, in the course of the performance of its

24

Services, contract or otherwise deal with other real estate brokers in connection with the Properties. Jones Lang LaSalle may, from time to time, split commissions with other brokers and, from time to time, may be entitled to a refund of a portion of a commission split with another broker. Delphi consents to Jones Lang LaSalle's entering into such shared commission arrangements, provided all shared commissions and refunded commission splits shall be applied in accordance with Section IIG of this <u>Exhibit B</u>.

     **VIII.**    **TAXES**. Delphi shall be responsible for all taxes due and payable on any compensation or any other payments to Jones Lang LaSalle in connection with the Services to the extent such taxes are not paid by a third party, including any sales tax, value-added tax or gross receipts tax; provided, however, in no event shall Delphi be responsible for any net income, franchise or property tax assessed against Jones Lang LaSalle, all of which shall be the responsibility of Jones Lang LaSalle.

**SCHEDULE 1
TO
EXHIBIT B**

**TRAVEL REIMBURSEMENT**

A.    If Jones Lang LaSalle employees (including, without limitation, Account Personnel) are required by Delphi to travel as an incidental requirement in performing services for Delphi, then such travel expenses, subject to prior written approval of Delphi, will be reimbursable as follows:

1. Air Travel

Economy/Coach class only.  Business class is permitted for travel only to the Asia Pacific region and upon prior written consent by Delphi.

2. Hotel

Jones Lang LaSalle will exercise good, sound business judgment and discretion in choosing hotels, such as moderately priced chain hotels or hotels that offer discounted corporate rates.  Where extended travel is involved, reduced rates may be available and should be requested.

3. Rental cars

Compact or intermediate class only.  The cost of collision damage waiver and personal accident insurance is the responsibility of Jones Lang LaSalle.

4. Mileage Allowance

Reimbursement will be at $0.32 per mile, or no less than whatever Delphi reimburses on a regional basis to its employees, which are in excess of his or her normal commute from home to work and back.  When permanently assigned to another location, even if the new location is temporary, Jones Lang LaSalle will not be reimbursed for excess miles, additional driving time, etc.

5. Expense Reports

Customarily available receipts for all reimbursable expenses must be attached to expense reports Jones Lang LaSalle submits.  Detailed receipts are required for all meals and other expenditures of $25.00 or more.

6. Meals

Meals will not be reimbursed for non-overnight trips, except in the case of late return occasioned by travel outside normal working hours.  Reimbursement for meals will be the actual and reasonable expenses paid by Jones Lang LaSalle.

7. Extended Travel

Jones Lang LaSalle should review the home visit policy prior to a trip.  Generally, the following provisions apply:

If the travel expense is less than the living expense in the temporary location, Jones Lang LaSalle will be reimbursed for travel to the permanent location every week.

If the travel expense is more than the living expense in the

26

temporary location, Jones Lang LaSalle will be reimbursed for travel to the permanent location every two weeks.

Excess expenses due to frequent travel or stays will not be reimbursed by Delphi without its prior written approval.

8. Miscellaneous

When Jones Lang LaSalle (or its employee) chooses an alternative method of transportation, *e.g.,* to drive instead of fly, reimbursement, including meals and lodging, will not exceed the lesser of the two costs. Documentation to support the lesser cost must be attached to expense report. Travel time must also be limited if on working hours.

The employee, his or her immediate supervisor, and an authorized Delphi representative must sign the expense report form.

Jones Lang LaSalle is responsible for travel reservations, hotel/motel accommodations and rental cars. If directed by Delphi, Jones Lang LaSalle will make all travel arrangements through Global Experts in Travel (GET) using a special account set up for such purposes.

Any cash advance by Jones Lang LaSalle to its employee is the responsibility of Jones Lang LaSalle.

B.      All travel for which Jones Lang LaSalle seeks reimbursement will be submitted to Delphi on standard vouchers, with substantiating documentation, and will accompany the monthly invoices.

## EXHIBIT C

Delphi will provide office space, computers, telephones, office equipment and supplies to the Account Personnel.

## FIRST AMENDMENT TO THE REAL ESTATE SERVICES AGREEMENT

**THIS FIRST AMENDMENT TO THE REAL ESTATE SERVICES AGREEMENT,** made this *9th* day of November, 2005 (this "Amendment"), between **JONES LANG LASALLE AMERICAS, INC.,** a Maryland corporation ("**Jones Lang LaSalle**") and **DELPHI AUTOMOTIVE SYSTEMS LLC,** a Delaware limited liability company ("**Delphi**").

**WHEREAS,** Jones Lang LaSalle and Delphi are parties to that certain Real Estate Services Agreement dated September 2, 2005 (the "Agreement"); and

**WHEREAS,** Delphi and certain of its affiliates (collectively, the "Debtors") filed voluntary petitions under chapter 11 of the United States Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on October 8, 2005; and

**WHEREAS,** Jones Lang LaSalle and Delphi now desire to amend certain terms of the Agreement.

**NOW, THEREFORE,** in exchange for the mutual covenants and promises contained herein and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Jones Lang LaSalle and Delphi agree as follows:

All capitalized terms used herein, but not otherwise defined, shall have the respective meanings as set forth in the Agreement.

2   The Effective Date of this Agreement pursuant to Article IV is November 3, 2005.

3   Sections 5.1, 5.2 and 5.4 of Article V of the Agreement shall be deleted in its entirety and of no further force or effect.

4   Exhibit B of the Agreement shall be amended to include the following language and the attached schedule at the end of Section II (D):

"Notwithstanding anything to the contrary in the Agreement, the commission due to Jones Lang LaSalle for Transaction Services provided for under this Agreement shall be the customary market rate specific to each transaction which is not to exceed the commissions listed in Schedule 1 attached thereto (the "Commission Cap"). The Commission Cap listed in table 1 shall apply to each single asset sale and the Commission Cap listed in table 2 shall apply to group asset sales. Jones Lang LaSalle acknowledges that it may utilize the cooperation and assistance of third party brokers, including buyers' representatives, in connection with the disposition of the properties and that Delphi shall not be responsible for the fees of any such third party. Jones Lang LaSalle shall be solely responsible for any payments to third party brokers and shall indemnify, defend and hold Delphi harmless from and against any and all claims for commissions made by any third parties in connection with any disposition pursuant to this Agreement.

5    The parties acknowledge that the Agreement and this Amendment remain subject to approval by a final order of the Bankruptcy Court.

6    This Amendment may be executed in multiple counterparts, all of which taken together shall constitute one and the same instrument, and any of the parties may execute this Amendment by signing any such counterpart.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF,** the parties have executed this Amendment as of the day and year first above written.

JONES LANG LASALLE AMERICAS, INC.

By: JAMES C. BECKER

Its: MANAGING DIRECTOR

DELPHI AUTOMOTIVE SYSTEMS, LLC

By: JOHN A. JAFFURS

Its: EXECUTIVE DIRECTOR DELPHI FACILITIES SERVICES GROUP

3

## SCHEDULE 1

TABLE 1: Commission Cap of commission due to Jones Lang LaSalle for Transaction Services for Single Asset Sales

| Asset Sale Price | Commission Cap on the Percentage of Sale Price |
|---|---|
| For the first $0 - $5.00 Million of Sales Price | 5% |
| For the next $5.01 - $10.00 Million of Sales Price | 4% |
| For the next $10.01 – 20.00 Million of Sales Price | 3% |
| For the next $20.01 Million - $100 Million of Sales Price | 2% |
| For Remaining Sales Price over $100 Million | 1% |

TABLE 2: Commission Cap of commission due to Jones Lang LaSalle for Transaction Services for Group Asset Sales

| Asset Sale Price | Commission Cap on the Percentage of Sale Price for Group Asset Sales |
|---|---|
| For the first $0 - $5.00 Million of Sales Price | 5 % |
| For the next $5.01 - $10.00 Million of Sales Price | 4 % |
| For the next $10.01 – 20.00 Million of Sales Price | 3 % |
| For the next $20.01 Million - $100 Million of Sales Price | 2 % |
| For Remaining Sales Price over $100 Million | 1 % |

4