**Hearing Date and Time: November 29, 2005 at 10:00 a.m.**
**Objection Deadline: November 22, 2005 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
|  |  |  |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. §§ 105(a) AND 365 AUTHORIZING THE
DEBTORS TO OBTAIN PREFERENTIAL
POWER RATES PURSUANT TO LETTER AGREEMENT WITH NIAGARA
<u>MOHAWK POWER CORPORATION AND ASSUMPTION THEREOF</u>

("MOTION TO OBTAIN PREFERENTIAL POWER RATES WITH NIAGARA
MOHAWK LETTER AGREEMENT")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned

chapter 11 cases, hereby submit this motion (the "Motion") for an order under 11 U.S.C.

§§ 105(a) And 365 Authorizing the Debtors to Obtain Preferential Power Rates Pursuant

to Letter Agreement With Niagara Mohawk Power Corporation ("NIMO") and

Assumption Thereof.  In support of this Motion, the Debtors submit the Affidavit of

Matthew J. Zarnosky, sworn to November 9, 2005.  In further support of this Motion, the

Debtors respectfully represent as follows:

Background

A.    The Chapter 11 Filings

1.    On October 8, 2005, Delphi and certain of its U.S. subsidiaries

filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11

of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").

On October 14, 2005, three additional U.S. subsidiaries of Delphi filed voluntary

petitions in this Court for reorganization relief under the Bankruptcy Code.  The Debtors

continue to operate their businesses and manage their properties as debtors-in-possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.    On October 17, 2005, the Office of the United States Trustee

appointed an official committee of unsecured creditors.  No trustee or examiner has been

appointed in the Debtors' cases.

3.    This Court has jurisdiction over this matter pursuant to 28 U.S.C.

§§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter

is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2

4.    The statutory predicates for the relief requested herein are sections 105(a) and 365 of the Bankruptcy Code.

B.    Current Business Operations Of The Debtors

5.    With more than 180,000 employees worldwide, global 2004 revenues of approximately $28.6 billion, and global assets as of August 31, 2005 of approximately $17.1 billion,[1] Delphi ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations without supervision from the Bankruptcy Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy Code.

6.    Over the past century, the operations which are now owned by Delphi have developed a leading global technology innovations with significant engineering resources and technical competencies in a variety of disciplines.  Today, the Company (as defined below) is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company's technologies and products are present in more than 75 million vehicles on the road worldwide.  The Company supplies products to nearly every major global automotive original equipment manufacturer with 2004 sales to its former parent, General Motors Corporation, equaling approximately $15.4 billion and

---

[1]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

3

sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan

Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

7.      As part of its growth strategy, Delphi has established an expansive

global presence with a network of manufacturing sites, technical centers, sales offices,

and joint ventures located in every major region of the world.  In the U.S., the Debtors

employ approximately 50,600 people.  These employees work in approximately 44

manufacturing sites and 13 technical centers across the country, and in Delphi's

worldwide headquarters and customer center located in Troy, Michigan.  Approximately

34,750 of these individuals are hourly employees, 96% of whom are represented by

approximately 49 different international and local unions.  Outside the United States, the

Company's foreign entities employ more than 134,000 people, supporting 120

manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

8.      Delphi was incorporated in Delaware in 1998 as a wholly-owned

subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business

through various divisions and subsidiaries.  Effective January 1, 1999, the assets and

liabilities of these divisions and subsidiaries were transferred to Delphi and its

subsidiaries and affiliates (collectively, the "Company") in accordance with the terms of a

Master Separation Agreement between Delphi and GM.  In connection with these

transactions, Delphi accelerated its evolution from a North American-based, captive

automotive supplier to a global supplier of components, integrated systems, and modules

for a wide range of customers and applications.  Although GM is still the Company's

single largest customer, today more than half of Delphi's revenue is generated from non-

GM sources.

4

9.     Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle.  When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base.  The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base.  The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C.     Events Leading To Chapter 11 Filing

10.     In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales.  Reflective of a downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005.  The Company experienced net operating losses of $608 million for the first six months of calendar year 2005 on six-

5

month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[2]

11.    The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward looking revenue requirements.  Having concluded that pre-filing discussions with its Unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

13.    Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve

---

[2]    Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

the Company's core businesses.  This will require negotiation with key stakeholders over

their respective contributions to the restructuring plan or, absent consensual participation,

the utilization of the chapter 11 process to achieve the necessary cost savings and

operational effectiveness envisioned in the Company's transformation plan.  The Debtors

believe that a substantial segment of Delphi's U.S. business operations must be divested,

consolidated, or wound-down through the chapter 11 process.

        14.     Upon the conclusion of this process, the Debtors expect to emerge

from chapter 11 as a stronger, more financially sound business with viable U.S.

operations that are well-positioned to advance global enterprise objectives.  In the

meantime, Delphi will marshal all of its resources to continue to deliver value and high-

quality products to its customers globally.  Additionally, the Company will preserve and

continue the strategic growth of its non-U.S. operations and maintain its prominence as

the world's premier auto supplier.

Relief Requested

        15.     By this Motion, the Debtors seek an order under 11 U.S.C.

§§105(a) and 365 authorizing the Debtors to obtain preferential power rates pursuant to

that certain letter agreement, dated September 20, 2005, between Delphi Automotive

Systems LLC ("DAS LLC"), a wholly-owned subsidiary of Delphi and a chapter 11

debtor in these cases, and NIMO, (the "Letter Agreement") and authorizing the

assumption thereof.[3]  The Debtors have filed this Motion as they have determined that the

preferential energy rates offered will save significant sums of money for the benefit of

their creditors and estates.  This transaction is subject to the terms and conditions set forth

---

[3]      A copy of the Letter Agreement is attached hereto as Exhibit A.

below and described in further detail in the term sheet between DAS LLC and NIMO (the "Term Sheet"), a copy of which is attached hereto as <u>Exhibit B</u>.

<u>Basis For Relief</u>

16.     Pursuant to the Power Contracts (as defined below), NIMO provided low-cost energy to Ultra Tool & Plastics, Inc. ("Ultra Tool"). Following the execution of the Power Contracts, Ultra Tool became severely distressed and filed for chapter 11 bankruptcy protection. Either as part of, or contemporaneous with such bankruptcy proceeding, Par Industries, LLC ("Par") acquired all or some portion of the assets of Ultra Tool, including the operations of the manufacturing facility located at 500 Commerce Drive, Amherst, New York (the "Facility"). Under various purchase orders and supply agreements, Par manufactured and supplied component parts to DAS LLC, which component parts were critical to the continuation of uninterrupted production at other Delphi manufacturing operations.

17.     Subsequently, Par experienced financial and operational problems that threatened Par's financial viability and the supply of component parts. In response, DAS LLC, extended a secured loan to Par. Despite the loan and other accommodations provided to Par by DAS LLC, Par's financial viability and the supply of the component parts remained threatened and Par determined that it was no longer able to meet its obligations to supply the component parts to DAS LLC. As a result of exercising its rights with respect to the collateral provided in connection with the secured loan extended to Par, the Debtors obtained ownership in certain equipment and commenced its own operations at the Facility for the continued manufacture and supply of component parts.

18.     Delphi and DAS LLC determined, in the exercise of their business judgment that the low-cost rates provided to Par, as a successor of interest to Ultra Tool,

8

were highly beneficial rates and were essential element of the cost structure of the

Facility.  Accordingly, on September 20, 2005, DAS LLC entered into the Letter

Agreement with NIMO, which provided for the assignment of the underlying energy

contracts.  Pursuant to the Letter Agreement, DAS LLC was to pay NIMO the sum of

$60,000 (the "Assumption Price") in consideration for NIMO's assent to the assignment

of the following agreements (collectively, the "Power Contracts"):

      (a)      Replacement Power Allocation Agreement among NIMO, Power Authority of the State of New York ("NYPA") and Ultra Tool, dated May 1, 1988,

      (b)      Expansion Power Allocation and Service Agreement among NYPA, NIMO, and Ultra Tool, dated July 13, 1992,

      (c)      Replacement Power Agreement between NYPA and Ultra Tool, dated October 17, 1994, and

      (d)      Power For Jobs Service Allocation Agreement between NYPA and Ultra Tool, dated May 21, 1999.

19.    In consideration for the Assumption Price, and subject to a

separate approval of NYPA Board of Trustees, DAS LLC previously agreed to assume all

the rights and obligations of Par and/or Ultra Tool under the Power Contracts and the

supply and cost of electricity to the Facility.  NYPA's Board of Trustees has scheduled a

hearing on November 22, 2005 to consider the approval of the assignment of the Power

Contracts to DAS LLC and NIMO has agreed to support such approval.

20.    Although the Letter Agreement was executed, the Debtors sought

chapter 11 protection before they were able to issue payment to NIMO in connection with

the assignment of the Power Contracts under the Letter Agreement.  The Debtors have

reviewed the Letter Agreement and the energy rates related thereto and have confirmed

that the assumption of the Letter Agreement will provide the Debtors with significant

savings on energy costs.  Moreover, the Power Contracts, which provide for the distribution of hydro-electric energy, are very difficult to obtain from other sources.  The Debtors project that assumption of the Power Contracts pursuant to the Letter Agreement will save the estates approximately $50,000 per month over the term of these contracts -- an average of $12,500 per contract per month.  The term of these contracts range from 10 months to 7 years from today's date.  Moreover, the terms of each contract can be extended if certain conditions are met.

21.    In addition, NIMO's assent to the assignment of the Power Contracts is conditioned upon the Debtors' payment of the defaults existing under the Power Contracts.  The Debtors estimate that the amount necessary to cure the defaults existing under the Power Contracts is $96,888.70, (collectively with the Assumption Price, the "Cure Amount"), which is the total amount due for actual services rendered, but unbilled by NIMO for periods during which DAS LLC was operating the Facility prior to October 8, 2005.  The savings will exceed the payment of the Cure Amount within 3 months.  The Debtors believe that even with the payment of the Cure Amount, the assumption of the Power Contracts is beneficial to their estates and constitutes substantial savings on energy costs.

22.    Authorizing the Debtors to consummate this transaction and to assume the existing Letter Agreement on the negotiated terms described above will allow the Debtors to obtain valuable, low-cost electricity at significantly discounted rates for the duration of the Power Contracts.  The negotiated terms are favorable to the Debtors and are in the best interest of their estates.

10

<u>Applicable Authority</u>

23.    Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the Court's approval, may . . . assume any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).

24.    The standard to be applied by a court in determining whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which is premised upon the debtor's business judgment that assumption would be beneficial to its estate.  <u>See</u> <u>Orion Pictures Corp. v. Showtime Networks, Inc.</u> (In re Orion Pictures Corp.), 4 F.3d 1095, 1098-99 (2d Cir. 1993);  <u>see</u> <u>also</u> <u>In re Child World, Inc.</u>, 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992) (debtor may assume or reject an unexpired lease under § 365(a) in the exercise of its "business judgment"); <u>In re Roman Crest Fruit, Inc.</u>, 35 B.R. 939, 949 (S.D.N.Y. 1983); <u>Control Data Corp. v. Zelman</u>, 602 F.2d 38, 42 (2d Cir.1979); <u>see</u> <u>also</u> <u>In re Crystalin, L.L.C.</u>, 293 B.R. 455, 463 (B.A.P. 8th Cir. 2003) (citing <u>In re Food Barn Stores, Inc.</u>, 107 F.3d 558, 566 (B.A.P. 8th Cir. 1997) (assumption of prepetition agreement approved under the business judgment standard). This standard is satisfied when a debtor determines that assumption will benefit the estate. <u>Id.</u>  <u>See</u> <u>also</u>, <u>In re Farmland Indus., Inc.</u>, 294 B.R. 903, 913 (W.D. Mo. 2003) (finding that the debtor must show merely that "the action to be taken will benefit the estate").

25.    If the debtor's business judgment has been exercised reasonably, a court should approve the assumption of an executory contact.  <u>See</u>, <u>e.g.</u>, <u>NLRB v. Bildisco and Bildisco</u>, 465 U.S. 513, 523 (1984); <u>Group of Inst'l. Investors v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co.</u>, 318 U.S. 523 (1943); <u>Cleveland Hotel Protective Comm. v. Nat'l City Bank of Cleveland</u> (In re Van Sweringen Corp, 155 F.2d 1009, 1013

(6th Cir.), cert. denied, 329 U.S. 766 (1946); In re Ionosphere Clubs, Inc., 100 B.R. 670,

673 (Bankr. S.D.N.Y 1989); see also In re Orion Pictures Corp. 4 F.3d at 1098-99; In re

RCN Corp., Case No. 04-13638 (RDD).    Once the debtor has satisfied the business

judgment standard by showing that assumption will benefit the estate, the court "should

not interfere 'except upon a finding of bad faith or gross abuse of [the debtor's] business

discretion.'"  Id. at 465 (citing Lubrizol Enters., Inc. v. Richmond Metal Finishers Inc.,

756 F.2d 1043, 1047 (4th Cir. 1985).

        26.    The business judgment rule shields a debtor's management from

judicial second-guessing.  In re Farmland Indus., Inc., 294 B.R. at 913 (quoting In re

Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986)) ("'[T]he Code

favors the continued operation of a business by a debtor and a presumption of

reasonableness attaches to a debtor's management decisions.'").  Once the Debtors

articulate a valid business justification, "[t]he business judgment rule 'is a presumption

that in making a business decision the directors of a corporation acted on an informed

basis, in good faith and in the honest belief that the action was in the best interests of the

company.'"  In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting

Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).

        27.    Indeed, when applying the "business judgment" rule, courts show

great deference to the debtor's decision-making.  See In re Crystalin, L.L.C., 293 B.R. at

464 (finding that the court need not "place itself in the position of the trustee or debtor-in-

possession") (omitting citations).  See also Summit Land Co. v. Allen (In re Summit

Land Co.), 13 B.R. 310, 315 (Bankr. D. Utah 1981) ("Court approval under Section

365(a), if required, except in extraordinary situations, should be granted as a matter of course.")

28.    Upon finding that the Debtors have exercised their sound business judgment in determining that assumption of Letter Agreement on the negotiated terms described above is in the best interests of their estates, this Court should approve assumption under section 365(a) of the Bankruptcy Code.  In re Gucci, 193 B.R. 411, 415-17 (S.D.N.Y. 1996) (affirming bankruptcy court's approval of assumption of executory contract upon determining that assumption "was in the best interest of the estate"); Blue Cross Blue Shield of Conn. v. Gurski (In re Gurski), Nos. 94-51202 & 3:95CV1883, 1996 WL 684397, at *2 (D. Conn. Jan. 25, 1996) (affirming bankruptcy court's determination that executory contracts were beneficial to debtor such that debtor could assume them under section 365(a)).

29.    Bankruptcy Code section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor.  That subsection provides:

(b)(1)  If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee-

(A)    cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B)    compensates, or provides adequate assurance that the trustee  will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

30.     The Debtors submit that the statutory requirements of section 365(b)(1) of the Bankruptcy Code have been satisfied because there are no monetary defaults existing under the Letter Agreement to be assumed other than payment of the Cure Amount.  Such payment will be made based upon the conditions set forth above and in accordance with Bankruptcy Code section 365(b).

31.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction."  See, e.g., In re Adelphia Bus. Solutions, Inc., 280 B.R. 63, 80 (Bankr. S.D.N.Y. 2002); EBG Midtown South Corp. v. McLaren/Hart Env. Engineering Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 593 (S.D. N.Y. 1992); In re Prime Motor Inns Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994)  ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance"); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D. N.J. 1988).

32.     The United States Court of Appeals for the Second Circuit has held that where, as here, debtors have timely paid their bills before the commencement of their chapter 11 cases, the administrative expense priority provided in sections 503(b) and 507(a)(1) of the Bankruptcy Code constitutes adequate assurance of payment, and no deposit or other security is required.  See Virginia Elec. & Power Co. v. Caldor, Inc.-NY, 117 F.3d 646, 650-651 (2d Cir. 1997); see also In re Adelphia Bus. Solutions, Inc., 280 B.R. at 88-89.  Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D. N.Y. 1986) (adequate

14

assurance is present when prospective assignee of lease from debtor has financial

resources and has expressed willingness to devote sufficient funding to business to give it

strong likelihood of succeeding).

33.    Further, the Debtors believe that there is adequate assurance that

the Debtors will continue to perform under the terms of the Power Contracts as required

by section 365(b)(1)(C) of the Bankruptcy Code.  The administrative expense priority

provided by the Bankruptcy Code and the $2 billion debtor-in-possession credit facility

adequately assure continued performance under the Power Contracts.

34.    In determining to assume the Letter Agreement, the Debtors

clearly have satisfied the requisite "business judgment" standard.  Assumption of the

Letter Agreement will allow the Debtors to take advantage of the low prices available to

them through Letter Agreement, which are important to the continued operation and

success of the Debtors' businesses and reorganization efforts.  The Debtors believe that

assumption of the requested Letter Agreement on the negotiated terms described above is

in the best interests of the estates and should be granted.

35.    Thus, this Court should approve the assumption of the Letter

Agreement since the Debtors have demonstrated that the decision to assume the Letter

Agreement represents a sound exercise of their business judgment.  See, e.g., Chicago,

Milwaukee, St. Paul & Pacific R.R. Co., 318 U.S. at 550 (applying business judgment

rule in context of assumption of a prepetition agreement); In re Van Sweringen Corp.,

155 F.2d at 1013 (same); In re Cutters, Inc., 104 B.R. 886, 889 (M.D. Tenn. 1989) (same).

<u>Notice</u>

36.    Notice of this Motion has been provided in accordance with the

Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007,

And 9014 Establishing (I) Omnibus Hearing Dates, (II) Certain Notice, Case

Management, And Administrative Procedures, And (III) Scheduling An Initial Case

Conference In Accordance With Local Bankr. R. 1007-2(e), which was entered by this

Court on October 14, 2005 (Docket No. 245).  In light of the nature of the relief requested,

the Debtors submit that no other or further notice is necessary.

<u>Memorandum Of Law</u>

        37.     Because the legal points and authorities upon which this Motion

relies are incorporated herein, the Debtors respectfully request that the requirement of the

service and filing of a separate memorandum of law under Local Rule 9013-1(b) be

deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order (a) authorizing the Debtors to obtain preferential power rates pursuant to the Letter Agreement with Niagara Mohawk Power Corporation, (b) approving the assumption of the Letter Agreement and (c) granting the Debtors such other and further relief as is just.

Dated: New York, New York
    November 9, 2005

       SKADDEN, ARPS, SLATE, MEAGHER
        & FLOM LLP

       By: s/ John Wm. Butler, Jr. _____
        John Wm. Butler, Jr. (JB 4711)
        John K. Lyons (JL 4951)
        Ron E. Meisler (RM 3026)
       333 West Wacker Drive, Suite 2100
       Chicago, Illinois  60606
       (312) 407-0700

         - and -

       By: s/ Kayalyn A. Marafioti_____ _____
        Kayalyn A. Marafioti (KM 9632)
        Thomas J. Matz (TM 5986)
       Four Times Square
       New York, New York 10036
       (212) 735-3000

       Attorneys for Delphi Corporation, et al.,
        Debtors and Debtors-in-Possession

Exhibit A
Letter Agreement



**DELPHI**                                            Thermal and Interior

September 20, 2005

Mr. Dennis Elsenbeck, Vice President
Niagara Mohawk Power Corporation
144 Kensingston Avenue
Buffalo, NY 14214

Re: Delphi Corporation, 500 Commerce Drive

Dear Mr. Elsenbeck:

In furtherance of recent discussions between our respective organizations, Delphi Automotive Systems, LLC has agreed to pay $60,000 as consideration in full for Niagara Mohawk's assent to the assignment of that certain Replacement Power Allocation Agreement among Niagara Mohawk Power Corporation ("NIMO"), Power Authority of the State of New York ("NYPA") and Ultra Tool & Plastics, Inc. ("Ultra Tool") dated May 1, 1988, that certain Expansion Power Allocation and Service Agreement among NYPA, NIMO and Ultra Tool dated July 13, 1992, that certain Replacement Power Agreement between NYPA and Ultra Tool dated October 17, 1994, and that certain Power For Jobs Service Allocation Agreement between NYPA and Ultra Tool dated May 21, 1999 (the "Power Contracts"). The $60,000 payment will be billed to Delphi in a separate bill that will be paid by Delphi. In consideration of this payment, and subject to the separate approval of the New York Power Authority Board of Trustees, Delphi Automotive Systems, LLC ("Delphi") will assume all of the rights and obligations under the Power Contracts, and the supply and cost of electricity to the manufacturing facility located at 500 Commerce Drive, Amherst, New York, shall be governed by those Contracts. The parties hereto acknowledge that the payment set forth herein is solely made in exchange for Niagara Mohawk's assent, and that no other consideration is being received by Delphi.

Please sign below to confirm Niagara Mohawk's agreement to the terms set forth herein.


Niagara Mohawk Power Corporation                     Delphi Automotive Systems, Inc.


By:                                                  By:

Enclosure

_APPROVED AS TO FORM_

Exhibit B
Term Sheet

## TERM SHEET

This term sheet describes the principal terms of the agreement reached by Delphi Corporation ("Delphi"), on behalf of Delphi Automotive Systems LLC ("DAS LLC") and Niagara Mohawk Power Corporation  ("NIMO" and together with Delphi, the "Parties").  Until the conditions precedent set forth below are satisfied, this term sheet is not intended and does not create any binding legal obligation upon either party hereto, other than the following: NIMO shall provide services to DAS LLC at the same rates and upon the same terms as provided prepetition until 1/6/06.  If all terms are not satisfied by that date, this term sheet shall expire.

**The Motion**                  Delphi will file a motion (the "Motion"), to be heard at the 11/29/05 omnibus hearing, in its bankruptcy case seeking an order (the "Order") authorizing DAS LLC to assume the letter agreement (the "Letter Agreement"), dated September 20, 2005, between DAS LLC and NIMO and approving the terms of this term sheet.

**Assignment Of Power Contracts**     Pursuant to the Letter Agreement and this term sheet, and upon entry of the Order, the Letter Agreement will be assumed by Delphi and accordingly NIMO shall assent to the assignment to DAS LLC of the following agreements (collectively, the "Power Contracts"):

1. Replacement Power Allocation Agreement among NIMO, Power Authority of the State of New York ("NYPA"), and Ultra Tool & Plastics, Inc. ("Ultra Tool"), dated May 1, 1988,
2. Expansion Power Allocation and Service Agreement among NYPA, NIMO, and Ultra Tool, dated July 13, 1992,
3. Replacement Power Agreement between NYPA and Ultra Tool, dated October 17, 1994, and
4. Power For Jobs Service Allocation Agreement between NYPA and Ultra Tool, dated May 21, 1999.

Subject to (a) payment of (i) the Assumption Price (as defined below), (ii) the Prepetition Accrual (as defined below) and (b) the condition precedent (as described below), DAS LLC will assume all of the rights and obligations under the Power Contracts, and the supply and cost of electricity to the manufacturing facility located at 500 Commerce Drive, Amherst, New York, will be governed by the Power Contracts.

| | |
|---|---|
| **Payment Of Assumption Price and Cure** | Within 10 business days of the Final Order, (as defined below) Delphi shall pay, or cause to be paid, $60,000 to NIMO, which constitutes the total amount due under the Letter Agreement (the "Assumption Price").<br>Within 10 business days of the Final Order, Delphi shall pay, or cause to be paid, $96,888.70 to NIMO, which is the total amount due for actual services rendered, but unbilled, by NIMO to DAS LLC before October 8, 2005, the petition date (the "Prepetition Accrual").  Payment of the Assumption Price together with the Prepetition Accrual shall satisfy the requirement to cure defaults as required pursuant to 11 U.S.C. § 365(b) and no further prepetition amounts shall be owing or paid. |
| **Power Contracts Terms** | NIMO shall continue to provide services to Delphi and DAS LLC under the Power Contracts and shall continue to invoice DAS LLC in the same manner as was customary prior to October 8, 2005, the petition date.  NIMO shall cause DAS LLC to become the customer of record in connection with the applicable account(s) related to the Letter Agreement and the Power Contracts.  These terms are also subject to final approval by the court and NYPA on or before 1/6/06 and NIMO reserves all rights if such approvals are not obtained by that date and/or the payments are not received by that date and/or any term of this term sheet is not met by that date. |
| **Condition Precedent** | This term sheet as well as the assumption of the Letter Agreement and the assignment of the Power Contracts is subject to (a) entry of the Final Order authorizing Delphi to assume the Letter Agreement and approving the terms of this term sheet and (b) the separate consent of NYPA's Board of Trustees to the assignment at the hearing scheduled for November 22, 2005.  Final Order as used herein shall be defined as entry of the Order pursuant to which no appeal has been filed during the 10 day period described in Rule 6006(d) of the Federal Rules of Bankruptcy Procedure.  To the extent an appeal has been filed, the Order shall be a Final Order upon the final resolution and exhaustion of all appeals in connection with the Order. |
| **Best Efforts** | The Parties will use their best efforts to attempt to gain NYPA's approval of the assumption of the Power Contracts. |
| **Reservation Of Rights** | Except as expressly provided herein, NIMO and Delphi reserve and preserve all rights under applicable agreements, the |

2

Bankruptcy Code, and applicable laws.  NIMO further reserves
the right to object to Delphi's first-day motion regarding
treatment of a utility company's request for adequate assurance.
In addition, NIMO reserves the right to request adequate
assurance of future payment pursuant to section 366 of the
Bankruptcy Code.  Nothing in the Final Order is intended to
supersede any applicable state or federal statute, regulation, or
tariff governing the provision of services provided by NIMO.