**Hearing Date and Time: November 29, 2005 at 10:00 a.m.**
**Objection Deadline:  November 22, 2005 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | : | |
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | | |

MOTION FOR ORDER UNDER 11 U.S.C. §§ 105(a), 363, AND 365
AUTHORIZING THE DEBTORS TO PRESERVE OPTION TO ENTER
INTO NEW POWER CONTRACT WITH PREFERENTIAL RATES
WITH CONSUMERS ENERGY COMPANY AND ANCILLARY
<u>ASSUMPTION OF RELATED POWER CONTRACTS</u>

("MOTION TO PRESERVE PREFERENTIAL RATES WITH CEC")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order under 11 U.S.C. §§ 105(a), 363, And 365 Authorizing The Debtors To Preserve Option To Enter Into New Power Contract With Preferential Rates With Consumers Energy Company And Ancillary Assumption Of Related Power Contracts. In support of this Motion, the Debtors submit the Affidavit of Donald S. Poole, sworn to November 9, 2005. In further support of the Motion, the Debtors respectfully represent as follows:

### Background

A. The Chapter 11 Filings

    1.    On October 8, 2005, Delphi and certain of its U.S. subsidiaries filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). On October 14, 2005, three additional U.S. subsidiaries of Delphi filed voluntary petitions in this Court for reorganization relief under the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

    2.    On October 17, 2005, the Office of the United States Trustee appointed an official committee of unsecured creditors. No trustee or examiner has been appointed in the Debtors' cases.

    3.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

                4.      The statutory predicates for the relief requested herein are sections 105(a), 363, and 365 of the Bankruptcy Code.

B.      <u>Current Business Operations Of The Debtors</u>

                5.      With more than 180,000 employees worldwide, global 2004 revenues of approximately $28.6 billion, and global assets as of August 31, 2005 of approximately $17.1 billion,[1] Delphi ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations without supervision from the Bankruptcy Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy Code.

                6.      Over the past century, the operations which are now owned by Delphi have developed leading global technology innovations with significant engineering resources and technical competencies in a variety of disciplines. Today, the Company (as defined below) is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company's technologies and products are present in more than 75 million vehicles on the road worldwide. The Company supplies products to nearly every major global automotive original equipment manufacturer, with 2004 sales to its former parent, General Motors Corporation, equaling approximately $15.4 billion

---

[1]      The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

7. As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world. In the U.S., the Debtors employ approximately 50,600 people. Those employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in Delphi's worldwide headquarters and customer center located in Troy, Michigan. Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and local unions. Outside the United States, the Company's foreign entities employ more than 134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

8. Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM. Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates (collectively, the "Company") in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

9. Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle. When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base. The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base. The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C.    Events Leading To Chapter 11 Filing

10. In the first two years following Delphi's separation from GM, the Company generated more than $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales. Reflective of a downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005. The Company experienced net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of

$13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[2]

11. The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12. In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward looking revenue requirements. Having concluded that pre-filing discussions with its Unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

13. Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve

---

[2] Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

the Company's core businesses.  This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned in the Company's transformation plan.  The Debtors believe that a substantial segment of Delphi's U.S. business operations must be divested, consolidated, or wound-down through the chapter 11 process.

        14.     Upon the conclusion of this process, the Debtors expect to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

Relief Requested

        15.     By this Motion, the Debtors seek entry of an order under 11 U.S.C. §§105(a), 363, and 365 for Delphi Automotive Systems LLC ("DAS LLC") to assume that certain Special Manufacturing Contract, dated October 13, 1995, as amended by that Partial Assignment Agreement, dated December 22, 1998 (together, the "Power Contracts") with Consumers Energy Company ("CEC"), copies of which are attached hereto as <u>Exhibit A</u> and <u>Exhibit B</u>, respectively, on the terms and conditions set forth herein.  This will entitle DAS LLC to preferential rates with respect to a New Power Contract (as defined below) for power services to certain DAS LLC sites for a two to four year period commencing in January 2006.  The Debtors respectfully submit that the

decision to assume the Power Contracts represents the sound exercise of their business judgment.

## Basis For Relief

16. CEC is one of the Debtors' largest power suppliers, providing electric power to six of the Debtors' sites at reduced rates pursuant to the Power Contracts. The Power Contracts are valuable, low-cost, below-market contracts which provide substantial savings that would be difficult to procure from other sources. The Power Contracts will expire on December 31, 2005 and DAS LLC has been notified by CEC that DAS LLC will not be eligible for preferential rates for the two to four year period commencing in January 2006 unless it assumes the Power Contracts and pays the cure amount thereunder, which is approximately $3.6 million (the "Cure Amount"). Paying the Cure Amount, however, is a necessary condition for the Debtors to enter into a New Power Contract for the period commencing in January 2006. Moreover, the Debtors stand to save more than $10 million per year under the preferential rates, an amount that far exceeds the Cure Amount that will be paid in connection with the assumption of the Power Contracts.

17. According to CEC, only a "current customer taking Primary Voltage Service under a Special Contract approved by the Michigan Public Service Commission (MPSC) and whose special contract terminates on December 31, 2005" is eligible for the preferential rates set forth by the Michigan Public Service Commission ("MPSC") for the contract year beginning in 2006. It is anticipated that the MPSC will publish the preferential rates in late November, and that eligible customers must elect such rates within fifteen calendar days. The preferential rates will not be available following the close of the fifteen-day period thereafter. CEC is not obligated to provide

preferential power rates to the Debtors, and CEC has made clear through numerous contacts and correspondence that it will not do so if the Power Contracts are not assumed prior to their expiration. Thus, unless DAS LLC assumes the Power Contracts, it will not have the opportunity to elect to receive the preferential rates provided to "current customers" when negotiating a New Power Contract.

18. Because MPSC will not publish its new rates until the late November, the Debtors cannot yet enter into a New Power Contract. Nor can the Debtors simply assume the Power Contracts and pay the Cure Amount until they have received and analyzed the rates to be published by the MPSC and determined that it would be prudent to assume the contracts. Nevertheless, the Debtors have determined, in their business judgment, that preserving their eligibility for the CEC preferential rates by assuming the Power Contracts is in the best interests of the estates, the Debtors' creditors, and all parties-in-interest. The Debtors anticipate that the preferred Transitional Primary Rate published by the MPSC (the "Transitional Power Rate") will result in an annual savings of approximately $5 million compared to the standard bundled tariff rates. Moreover, participation in the Transitional Primary Rate will enable the Debtors to obtain additional power at a 60% discount, for an additional $5 million in annual savings. If the Debtors are not allowed to negotiate with CEC under the preferential rates published by MPSC, the power allotted to the Debtors at this discounted rate might be furnished to another large industrial power consumer.

19. The Debtors therefore seek an order for the assumption of the Power Contracts, subject to the terms and conditions set forth herein. Moreover, the

Debtors see the authority, but not the direction, to pay the Cure Amount subject to the following conditions:

(i) DAS LLC's being allowed to fully participate in negotiations on the new Transitional Primary Rate and Interruptible Rate I, as published by the MPSC, with GM and CEC in connection with the procurement of electric power services for the period beginning January 1, 2006;

(ii) DAS LLC's entering into a new contract (the "New Power Contract") for electric and power services with CEC at rates acceptable to DAS LLC, the acceptability of which shall be determined in DAS LLC's sole discretion; and

(iii) Notice of DAS LLC's decision to enter into the New Power Contract and to pay the Cure Amount to be given to all interested parties.

20. Further terms and conditions include: upon satisfaction of the conditions set forth herein and entry into the New Power Contract, DAS LLC will pay, or cause to be paid, the Cure Amount of $3.6 million, which constitutes the total amount due under the Power Contracts; provided, however, that in the event DAS LLC determines, in its sole discretion, not to enter into a New Power Contract, or a New Power Contract is not entered into by January 31, 2006, the Cure Amount shall not be paid and the assumption of the Power Contracts will be deemed null and void.

21. The relief requested in this Motion – assumption of the Power Contracts and entering into a New Power Contract on the negotiated terms described above – allows the Debtors to obtain valuable, low-cost electricity at significantly discounted rates for the duration of such contracts. CEC has stated that DAS LLC's assumption of the Power Contracts is a necessary condition to CEC's entering into the New Power Contract with DAS LLC at the discount rate on a going forward basis. These

preferential rates are estimated to save the Debtors more than $10 million per year during the proposed term of the New Power Contract.

## Applicable Authority

22.     The Debtors believe that the Power Contracts may be assumed, with CEC's consent, under sections 105, 363, and 365 of the Bankruptcy Code.  Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the Court's approval, may . . . assume any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).

23.     The standard to be applied by a court in determining whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which is premised upon the debtor's business judgment that assumption would be beneficial to its estate.  See Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098-99 (2d Cir. 1993); see also In re Child World, Inc., 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992) (a debtor may assume or reject an unexpired lease under § 365(a) in the exercise of its "business judgment"); In re Roman Crest Fruit, Inc., 35 B.R. 939, 949 (S.D.N.Y. 1983); Control Data Corp. v. Zelman, 602 F.2d 38, 42 (2d Cir. 1979). "More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."  Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

24.     If the debtor's business judgment has been exercised reasonably, a court should approve the assumption of an executory contact.  See, e.g., NLRB v. Bildisco and Bildisco, 465 U.S. 513, 523 (1984); Group of Inst'l. Investors v. Chicago,

Milwaukee, St. Paul & Pacific R.R. Co., 318 U.S. 523 (1943); Cleveland Hotel Protective Comm. v. Nat'l City Bank of Cleveland (In re Van Sweringen Corp.), 155 F.2d 1009, 1013 (6th Cir.), cert. denied, 329 U.S. 766 (1946); In re Child World, Inc., 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992); In re Ionosphere Clubs, Inc., 100 B.R. 670, 673 (Bankr. S.D.N.Y 1989); see also In re Orion Pictures Corp., 4 F.3d at 1098-99; In re RCN Corp., Case No. 04-13638 (RDD), June 22, 2004 Hr'g Tr. ¶¶ 50:24–50:2, at 46.  Once the debtor has satisfied the business judgment standard by showing that assumption will benefit the estate, the court "should not interfere 'except upon a finding of bad faith or gross abuse of [the debtor's] business discretion.'"  Id. at 465 (citing Lubrizol Enters., Inc. v. Richmond Metal Finishers Inc., 756 F.2d 1043, 1047 (4th Cir. 1985).

    25. The business judgment rule shields a debtor's management from judicial second-guessing.  In re Farmland Indus., Inc., 294 B.R. at 913 (quoting In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986)) ("'[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.'").  Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'"  In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).

    26. Upon finding that the Debtors have exercised their sound business judgment in determining that assumption of Power Contracts on the negotiated terms described above is in the best interests of their estates, this Court should approve

assumption under section 365(a) of the Bankruptcy Code.  In re Gucci, 193 B.R. 411, 415-17 (S.D.N.Y. 1996) (affirming bankruptcy court's approval of assumption of executory contract upon determining that assumption "was in the best interest of the estate"); Blue Cross Blue Shield of Conn. v. Gurski (In re Gurski), Nos. 94-51202 & 3:95CV1883, 1996 WL 684397, at *2 (D. Conn. Jan. 25, 1996) (affirming bankruptcy court's determination that executory contracts were beneficial to debtor such that debtor could assume them under section 365(a)).

27.    The Debtors further believe that paying the Cure Amount on the condition set forth herein satisfies the requirements set forth under section 365(b)(1). Bankruptcy Code section 365(b)(1) codifies the requirements for assuming an unexpired lease or executory contract of a debtor.  That subsection provides:

> (b)(1)   If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee-
>
> (A)   cures, or provides adequate assurance that the trustee will promptly cure, such default;
>
> (B)   compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C)   provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

28.    The Debtors submit that the statutory requirements of section 365(b)(1) of the Bankruptcy Code have been satisfied because there are no monetary defaults existing under the Power Contracts to be assumed other than payment of the Cure Amount.  As negotiated with CEC, such payment will be made by the Debtors on

the condition that the Debtors, in their sole discretion, approve of the new rates published by the MPSC and enter into a New Power Contract with CEC for the two to four year period commencing in January 2006. In the event DAS LLC determines, in its sole discretion, not to enter into a New Power Contract, or a New Power Contract is not entered into by January 31, 2006, the assumption of the Power Contract will be deemed null and void and the Cure Amount will not be paid. The Debtors respectfully submit that their commitment to pay the Cure Amount upon execution of the New Power Contract, along with the ample liquidity available under their debtor-in-possession financing facility, constitutes adequate assurance that it will cure any defaults under the Power Contracts. Based on the foregoing, believe that the requirements of 365 have been satisfied and that this Court should grant the relief requested in the Motion.

29. In the alternative, the Debtors also rely on sections 105 and 363 of the Bankruptcy Code to assume the Power Contracts. Bankruptcy Code section 363(c)(1) authorizes a debtor-in-possession to use property of the estate in the ordinary course of business without court approval. Bankruptcy Code section 363(b) permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing. Additionally, Bankruptcy Code section 105(a) allows a court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."

30. Similar to the analysis under section 365, courts in this district and elsewhere consistently have held that transactions pursuant to 363(b) should be approved if there is a sound business justification for implementing them. See In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983); In re Delaware Hudson Ry. Co., 124 B.R. 169, 179

(Bankr. D. Del. 1991). Once the debtor articulates a valid business justification, "'[there is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)); see also In re RCN Corp., June 22, 2004 Hr'g Tr. ¶¶ 51:3–12 (approving exit financing commitments pursuant to 363(b) of the Bankruptcy Code).

        31.     Section 105(a) of the Bankruptcy Code also gives this Court broad authority under its equitable powers to fashion any order or decree that would preserve or protect the value of the debtor's assets. See, e.g., Adelphia Communs. Corp. v. Rigas, 2003 U.S. Dist. LEXIS 9349, at *12 (S.D.N.Y. 2003) ("Section 105 of Title 11 provides the bankruptcy courts with a broad range of equitable powers over cases within its jurisdiction"); Griffin v. Bonapfel (In re All American of Ashburn, Inc.), 805 F.2d 1515, 1517 (11th Cir. 1986) (per curiam) (noting that section 105(a) provides authority for bankruptcy courts to protect estate property).

        32.     In light of the benefits expected to accrue to the Debtors by assuming the Power Contracts and the continuation of the preferential rates that the Debtors' would be entitled to under the New Power Contracts, this Court should grant the relief requested in this Motion. As noted above, assuming the Power Contracts is a necessary condition to receiving preferential rates with respect to any New Power Contract with CEC. Without the preferential rates, the Debtors stand to lose up to $10 million per year over a two to four year period. Such savings far exceed the Cure Amount that will be paid in connection with the assumption of the Power Contracts.

Accordingly, assumption of the Power Contracts on the negotiated terms set forth herein represents a sound exercise of the Debtors' business judgment, is in the best interests of the estates, and should be granted.

### Notice

33.     Notice of this Motion has been provided in accordance with the Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing (I) Omnibus Hearing Dates, (II) Certain Notice, Case Management, And Administrative Procedures, And (III) Scheduling An Initial Case Conference In Accordance With Local Bankr. R. 1007-2(e), which was entered by this Court on October 14, 2005 (Docket No. 245).  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

### Memorandum Of Law

34.     Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order (a) authorizing and approving the assumption of the Power Contract on the terms and conditions set forth herein, and (b) granting the Debtors such other and further relief as is just.

Dated: New York, New York
       November 9, 2005

                          SKADDEN, ARPS, SLATE, MEAGHER
                              & FLOM LLP

                          By: s/ John Wm. Butler, Jr.
                              John Wm. Butler, Jr. (JB 4711)
                              John K. Lyons (JL 4951)
                              Ron E. Meisler (RM 3026)
                          333 West Wacker Drive, Suite 2100
                          Chicago, Illinois 60606
                          (312) 407-0700

                                  - and -

                          By: s/ Kayalyn A. Marafioti
                              Kayalyn A. Marafioti (KM 9632)
                              Thomas J. Matz (TM 5986)
                          Four Times Square
                          New York, New York 10036
                          (212) 735-3000

                          Attorneys for Delphi Corporation, et al.,
                              Debtors and Debtors-in-Possession