Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
    In re                                 :    Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :    Case No. 05-44481 (RDD)
                                          :
                           Debtors.       :    (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEBTORS' APPLICATION FOR ENTRY OF ORDER UNDER 11 U.S.C. §§ 327(e) AND
1107(b) AUTHORIZING EMPLOYMENT AND RETENTION OF WILMER CUTLER
PICKERING HALE AND DORR LLP AS SPECIAL REGULATORY COUNSEL

("WCPHD RETENTION APPLICATION")

Delphi Corporation ("Delphi" or the "Company") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this application (the "Application") for an order under 11 U.S.C. §§ 327(e) and 1107(b) and Fed. R. Bankr. P. 2014 authorizing the employment and retention of Wilmer Cutler Pickering Hale and Dorr LLP ("WCPHD") as special regulatory counsel to the Audit Committee of the Company's Board of Directors (the "Audit Committee"), nunc pro tunc to October 7, 2005. In support of this Application, the Debtors submit the Declaration of Charles Davidow, sworn to November 7, 2005 (the "Davidow Declaration"). In further support of this Application, the Debtors respectfully represent as follows:

Background

A.     The Chapter 11 Filings

        1.      On October 8, 2005 (the "Petition Date"), Delphi and certain of its U.S. subsidiaries filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). On October 14, 2005, three additional U.S. subsidiaries of Delphi filed voluntary petitions in this Court for reorganization relief under the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors' cases are being jointly administered.

        2.      On October 17, 2005, the Office of the Unites States Trustee appointed an official committee of unsecured creditors. No trustee or examiner has been appointed in the Debtors' cases.

        3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

        4.      The statutory predicates for the relief requested herein are sections 327(e), and 1107(b) of the Bankruptcy Code and Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.     Current Business Operations Of The Debtors

        5.      With more than 180,000 employees worldwide, global 2004 revenues of approximately $28.6 billion and global assets as of August 31, 2005 of approximately $17.1

billion,[1] Delphi ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations without supervision from the Bankruptcy Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy Code.

6. Over the past century, the operations which are now owned by Delphi have developed leading global technology innovations with significant engineering resources and technical competencies in a variety of disciplines. Today, the Company is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company's technologies and products are present in more than 75 million vehicles on the road worldwide. The Company supplies products to nearly every major global automotive original equipment manufacturer with 2004 sales to its former parent, General Motors Corporation ("GM"), equaling approximately $15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

7. As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world. In the U.S., the Debtors employ approximately 50,600 people. These employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in Delphi's worldwide headquarters and customer center located in Troy, Michigan. Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and

---

[1] The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

3

local unions. Outside the United States, the Company's foreign entities employ more than 134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

8.   Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM. Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

9.   Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle. When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply source. The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base. The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C.      Events Leading To The Chapter 11 Filing

10.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales. Reflective of a downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005. The Company experienced net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[2]

11.    The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward looking revenue requirements. Having concluded that pre-filing discussions with its Unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to

---

[2]    Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

5

commence these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

13.   Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses.  This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned in the Company's transformation plan.  The Debtors believe that a substantial segment of Delphi's U.S. business operations must be divested, consolidated, or wound-down through the chapter 11 process.

14.   Upon the conclusion of this process, the Debtors expect to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

Relief Requested

15.   Since 2004, as previously disclosed by the Company, the Securities and Exchange Commission ( the "SEC") and other government authorities have been investigating Delphi's accounting and adequacy of disclosures for a number of transactions (the "SEC Investigation"). The transactions being investigated include ones in which Delphi received rebates or other lump-sum payments from suppliers, certain off-balance sheet financings of

indirect materials and inventory, and the payment in 2000 of $237 million in cash, and the subsequent receipt in 2001 of $85 million in credits, as a result of certain settlement agreements entered into between Delphi and GM.  The Audit Committee of the Company's Board of Directors (the "Audit Committee") undertook to examine the circumstances giving rise to the SEC Investigation and to take appropriate actions with respect thereto, including disciplinary actions against certain employees and communicating and cooperating fully with the SEC and other government authorities.  The Company retained WCPHD to represent the Audit Committee for these purposes under the terms an engagement letter dated August 24, 2004 (the "Engagement Letter"), a copy of which is annexed hereto as Exhibit B.  In connection with the SEC Investigation, WCPHD has reviewed documents, interviewed relevant personnel, advised the Audit Committee and the Board of Directors, communicated with the SEC and other authorities, and performed related tasks.

16.    Pursuant to section 327(e) of the Bankruptcy Code, the Debtors request that the Court authorize the employment of WCPHD, as special counsel to the Audit Committee with respect to the SEC Investigation in these chapter 11 cases, effective as of the Petition Date, in accordance with the terms set forth in this Application, the Davidow Declaration annexed hereto as Exhibit A, the Engagement Letter, and any applicable order of this Court.

17.    The Audit Committee selected WCPHD as its counsel with respect to the SEC Investigation because of the firm's reputation and extensive experience and knowledge, and in particular, its national reputation and recognized expertise in the field of securities law.  In connection therewith, WCPHD has become familiar with the factual and legal issues relevant to the SEC Investigation.  The Debtors therefore believe that WCPHD is both well-qualified and uniquely able to represent the Audit Committee in connection with the SEC Investigation.  The

Debtors further believe that WCPHD will provide the most effective and efficient representation available to the Audit Committee.

## Basis For Relief

18.   The Debtors submit that WCPHD's proposed retention meets all the prerequisites for retention of special counsel under section 327(e) of the Bankruptcy Code, which permits a debtor-in-possession, with court approval, to employ counsel that has represented the Debtors prior to the commencement of their chapter 11 cases for a "specified special purpose" if such employment is in the best interest of the Debtors.  Because WCPHD is the proposed special regulatory counsel to Audit Committee, but not the proposed bankruptcy counsel in these chapter 11 cases, section 327(e) does not require that WCPHD and its attorneys be "disinterested persons" as defined in section 101(14) of the Bankruptcy Code.  Rather, section 327(e) instead requires that WCPHD not represent or hold any interest adverse to the Audit Committee or the Debtors or their estates with respect to the matters on which WCPHD is to be employed herein.  As discussed below, the employment of WCPHD as special regulatory counsel is in the best interests of the Audit Committee and the Debtors and their estates.

## The Employment Of WCPHD Is In The Best Interests Of The Estates

19.   WCPHD will serve as special regulatory counsel to the Audit Committee during these chapter 11 cases.  WCPHD performed similar work prior to the Petition Date and is therefore familiar with the Debtors' businesses and operations and certain regulatory issues affecting the Company.  In particular, WCPHD is especially attuned to the unique securities law issues that have arisen and may arise with respect to the SEC Investigation.

20.   WCPHD is a full-service, international law firm of more than 1,100 attorneys with offices in Washington, DC, New York City, and 11 other locations worldwide.

8

WCPHD provides legal services in virtually every major practice area, including corporate, business restructuring, trial and appellate litigation, intellectual property, banking, tax, employee benefits, and international trade. Most importantly for present purposes, WCPHD has extensive experience in securities law and regulatory matters and, in particular, the SEC Investigation. Accordingly, the Debtors believe that WCPHD is well-qualified to serve the Audit Committee as special regulatory counsel in these chapter 11 cases in an efficient and effective manner.

21. The Debtors believe that the employment of WCPHD will enhance and will not duplicate the efforts of Skadden, Arps, Slate, Meagher, & Flom LLP ("Skadden, Arps"), the Debtors' general bankruptcy counsel, Shearman & Sterling LLP, the Debtors' special labor counsel, the Debtors' special employee benefits counsel, and the other professionals retained by the Debtors to perform specific tasks that are unrelated to the work to be performed by WCPHD as special regulatory counsel herein. The Debtors understand that WCPHD will work with the other professionals retained by the Debtors to avoid any such duplication.

### Services To Be Rendered By WCPHD

22. As set forth in the Engagement Letter and the Davidow Declaration, the Debtors wish to engage WCPHD to provide legal services to the Audit Committee in connection with the SEC Investigation. The Debtors anticipate that such services will include the following:

(a) reviewing documents, interviewing relevant personnel, and reporting to the Audit Committee and the Board regarding the SEC Investigation;

(b) advising the Company's Board of Directors on securities law and other issues relating to the SEC Investigation;

(c) advising and assisting the Company in meetings and communications with the SEC and other regulators and governmental authorities; and

9

(d) performing the full range of services normally associated with matters such as those identified above, as special regulatory counsel.

23. WCPHD has indicated its desire and willingness to represent the Audit Committee as set forth herein and to render the necessary professional services as special regulatory counsel.

24. The Debtors may request that WCPHD undertake specific matters beyond the scope of the responsibilities set forth above. Should WCPHD agree in its discretion to undertake any such matter, the Debtors shall seek further order of this Court.

WCPHD's Connections To Parties-In-Interest

25. As required by Bankruptcy Rule 2014(a), the Davidow Declaration filed in support of this Application sets forth information concerning WCPHD's connections with the Audit Committee, the Debtors, and certain other parties-in-interest in these chapter 11 cases. To the best of the Debtors' knowledge, and based on the information in the attached Davidow Declaration, neither WCPHD nor any of its partners, junior partners, counsel, or associates holds or represents any interest adverse to the Audit Committee or the Debtors or their estates with respect to the matters on which WCPHD is to be employed.

26. As set forth in the Davidow Declaration, WCPHD has in the past represented, currently represents, and will likely in the future represents certain creditors and other parties-in-interest herein in matters unrelated to the Audit Committee or the Debtors or their chapter 11 cases. WCPHD does not believe that the foregoing raises any actual or potential conflict of interest of WCPHD relating to its engagement as special regulatory counsel in these chapter 11 cases, but such connections are disclosed out of an abundance of caution. The Debtors understand that to vitiate any actual or potential conflicts of interest, WCPHD will not assist the Audit Committee or the Debtors in connection with their analysis, negotiations, and

10

litigation, if any, with parties with whom WCPHD has existing client relationships, and that Skadden, Arps (or other counsel if Skadden, Arps has a conflict), instead, will handle these tasks.

Professional Compensation

27.  WCPHD intends to apply to this Court for compensation and reimbursement of expenses in accordance with section 330(a) of the Bankruptcy Code, the Bankruptcy Rules, applicable guidelines established by the U.S. Trustee, and the Local Rules and orders of this Court.  WCPHD acknowledges that all compensation will be subject to this Court's final review and approval, following notice and opportunity for a hearing.

28.  In the 90 days leading up to the Petition Date, the Company paid WCPHD approximately $1,081,835 in fees and expenses for securities and regulatory advice and other legal services rendered in connection with the SEC Investigation.

29.  The Debtors propose to pay WCPHD its standard hourly rates for matters of this type and to reimburse WCPHD for its expenses according to WCPHD's reimbursement policies, subject to the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the guidelines established by the U.S. Trustee, and the Local Rules and orders of this Court. WCPHD's hourly rates for matters of this type range from $425 to $815 for partners, from $420 to $515 for junior partners, from $400 to $600 for most counsel, from $270 to $470 for associates, from $220 to $405 for attorneys/specialists, and from $80 to $245 for most categories of paraprofessionals.  As indicated in the Engagement Letter, WCPHD's hourly rates are adjusted from time to time.

30.  No arrangement is proposed between WCPHD and the Debtors or the Audit Committee, for compensation to be paid in these chapter 11 cases other than as set forth above, in the Engagement Letter, and in the Davidow Declaration.

11

31.     At the Audit Committee's request, WCPHD has continued to assist the Company in connection with the SEC Investigation since October 7, 2005 and hence, the Debtors request that WCPHD's retention be effective <u>nunc</u> <u>pro</u> <u>tunc</u> to October 7, 2005.

<u>Conclusion</u>

32.     For the foregoing reasons, the Debtors submit that the employment of WCPHD as special regulatory counsel to the Audit Committee on the terms set forth herein is in the best interests of the Debtors and their estates.

<u>Notice</u>

33.     Notice of this Application has been provided in accordance with the Order Under 11 U.S.C. §§ 102(1) and 105 and Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing (I) Omnibus Hearing Dates, (II) Certain Notice, Case Management, and Administrative Procedures, and (III) Scheduling an Initial Case Conference in Accordance with Local Bankr. R. 1007-2(e), entered by this Court on October 14, 2005 (Docket No. 245).  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

<u>Memorandum Of Law</u>

34.     Because the legal points and authorities upon which this Application relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order (a) authorizing the Debtors to employ and retain WCPHD as their special regulatory counsel to perform the services set forth herein and (b) granting the Debtors such other and further relief as is just.

Dated:   New York, New York
         November 9, 2005

                                        DELPHI CORPORATION, on behalf of itself and
                                        certain of its subsidiaries and affiliates, as Debtors and
                                        Debtors-in-possession

                                        By:   s/ Marjorie H. Loeb_____
                                              Name: Marjorie H. Loeb
                                              Title:  Assistant Secretary

# WILMER CUTLER PICKERING
# HALE AND DORR LLP

August 24, 2004

Charles E. Davidow

2445 M STREET NW
WASHINGTON, DC 20037
+1 202 663 6241
+1 202 663 6363 fax
charles.davidow@wilmerhale.com

DELPHI
M/C 483-400-603
5725 Delphi Drive
Troy, MI 48098-2815

Attn: Joseph E. Papelian

Dear Joe:

We are pleased that Delphi Corporation has asked Wilmer Cutler Pickering Hale and Dorr LLP to serve as your counsel, and look forward to the opportunity to serve you. This letter will confirm our discussion with you regarding the engagement and describe the basis on which our firm will provide legal services to you. If you have any questions about any of these provisions, do not hesitate to call, and if any of these terms is not acceptable to you, please notify me immediately.

1. *Client; Scope of Representation.* Our client in this matter will be Delphi Corporation (the "Company"). We will be engaged to advise the Company in connection with the pending SEC investigation into the accounting surrounding the 2001 payment to Delphi by EDS (the "Matter"). Our acceptance of this engagement does not involve an undertaking to represent you or your interests in any other matter.

2. *Fees and Expenses.* Our fees are ordinarily based on hourly rates for lawyers and, where applicable, other professionals and paraprofessionals. We review and may revise our billing rates periodically, and changes in billing rates for personnel working on your case may occur during the course of the representation. My current billing rate for this matter is $720. I would expect to add staff to this matter as appropriate and in accordance with your authorization.

Delphi
August 24, 2004
Page 2

Our current rates for matters such as this range from $465 to $820 for partners, $350 to $450 for junior partners, $415 to $605 for most counsel, $275 to $485 for associates, $250 to $430 for attorneys/specialists, and $65 to $235 for most categories of paraprofessionals.

Our statements will include separate charges for disbursements made and internal charges incurred on your behalf. These may include such items as travel expenses, postage and delivery service fees, charges for long distance telephone calls and faxes, duplicating charges, computer network services and computerized research charges, filing fees, and expenses associated with overtime work. We will bill you at cost for charges paid to third parties, and charges for internal services will be billed at our usual and customary rates for such services. Fees and expenses of others (such as consultants, experts, and local counsel) generally will not be paid by us, but will be billed directly to you, unless other arrangements are agreed to between us.

We will ordinarily send you monthly statements for work performed and expenses recorded on our books during the previous month. If you have any special policies with respect to information you want to have included in our statements, please advise us promptly. Please review our statements when you receive them so that any questions you may have are raised in a timely fashion. All such statements are due and payable within 15 days of your receipt of our statement, and we reserve the right to discontinue providing legal services, after notice, if our statements are not paid within that time. Additional details concerning billing arrangements, terms of payment, and other matters related to the engagement are set forth in the attached Terms of Engagement, which are incorporated herein by reference.

3. *Conflicts.* We are a large firm with offices in a number of cities in the United States and abroad, and we represent many other companies and individuals. Given the breadth

05-44481-rdd    Doc 999    Filed 11/09/05    Entered 11/09/05 21:01:57    Main Document
Pg 16 of 17

Delphi
August 24, 2004
Page 3

of our practice, it is possible that during the time we are representing the Company, some of our present or future clients will be engaged in transactions, or encounter disputes, with the Company. The Company agrees that we may continue to represent, and may undertake in the future to represent, existing or new clients in any matter that is not substantially related to our work for you even if the interests of such clients in those matters are directly adverse to you. At no time would we use or disclose any confidential or proprietary information relating to your representation in connection with our representation of another client without your written consent.

It is also our mutual understanding that we are being engaged by, and will represent, only the Company and not any parent, subsidiary, joint venture partner or other affiliated entities and that our representation of the Company in this matter will not give rise to any conflict of interest in the event other clients of the firm are or become adverse to any such parent, subsidiary or affiliate. Further, this will confirm that, unless specifically confirmed otherwise in writing, our representation is not a representation of any officers, directors or employees of the Company.

4. *Conclusion of Representation*. Either of us may terminate the engagement at any time for any reason by written notice, subject on our part to our professional obligations to you under applicable rules of professional conduct. Unless previously terminated, our representation of the Company will terminate upon completion of the services for the Matter described above in paragraph 1. Unless you engage us after termination of this matter, we will have no continuing obligation to advise you with respect to future legal developments, such as changes in the applicable laws or regulations, that could have an impact on your future rights and liabilities.

Delphi
August 24, 2004
Page 4

    Following the conclusion of our representation, we will keep confidential any non-public information you have supplied to us which we retain in accordance with applicable rules of professional conduct. At your request, we will return your papers and property to you promptly upon receipt of payment for outstanding fees and costs. The firm will retain its own files pertaining to the matter in accordance with the firm's records retention program. For various reasons, including the minimization of unnecessary storage expenses, we reserve the right to destroy or otherwise dispose of any such documents or other materials after a reasonable time following the termination of the engagement.

    Finally, I would like to confirm that our representation of your interests in the Matter shall not encompass advice concerning insurance matters (including evaluations of insurance claims, notices to brokers, agents, or insurers, procurement of insurance, or coverage issues). In the event that you would like us to represent you concerning insurance or disclosure matters, we would need to discuss the nature and scope of any such representation and it would need to be the subject of a separate retention agreement.

    Once again, we are pleased to have this opportunity to work with you. Please call me whenever you have questions or comments during the course of our representation.

    Very truly yours,

WILMER CUTLER PICKERING HALE AND
DORR LLP

By: _____
    Charles E. Davidow
    Partner