UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                               :
       In re                            :     Chapter 11
                               :
DELPHI CORPORATION et al.,         :     Case No. 05-44481 (RDD)
                               :
                Debtors.     :     (Jointly Administered)
                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ORDER UNDER 11 U.S.C. §§ 105(a) AND 365
AUTHORIZING THE DEBTORS TO OBTAIN PREFERENTIAL POWER RATES
PURSUANT TO LETTER AGREEMENT WITH NIAGARA MOHAWK POWER
CORPORATION AND ASSUMPTION THEREOF

("ORDER TO OBTAIN PREFERENTIAL POWER RATES WITH NIAGARA
MOHAWK LETTER AGREEMENT")

Upon the motion, dated November 9, 2005 (the "Motion"), of Delphi

Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-

in-possession in the above-captioned cases (collectively, the "Debtors"), for an order (the

"Order") under 11 U.S.C. §§ 105(a) And 365 Authorizing the Debtors to Obtain

Preferential Power Rates Pursuant to the Letter Agreement With Niagara Mohawk Power

Corporation ("NIMO") and the Assumption Thereof; and upon the Affidavit Of Matthew

Zarnosky in support of the Motion; and upon the record of the hearing held on the Motion;

and this Court having determined that the relief requested in the Motion is in the best

interests of the Debtors, their estates, their creditors, and other parties-in-interest; and it

appearing that proper and adequate notice of the Motion has been given and that no other

or further notice is necessary; and after due deliberation thereon; and good and sufficient

cause appearing therefor,

IT IS HEREBY FOUND AND DETERMINED THAT:

A.    The Debtors have exercised reasonable business judgment in deciding to assume that certain letter agreement, dated September 20, 2005, between Delphi Automotive Systems LLC and NIMO (the "Letter Agreement").

B.    The assumption of the Letter Agreement, the payment of $60,000 (the "Assumption Price") in consideration for NIMO's assent to the assignment, and the cure of the existing defaults under the Power Contracts (as defined below) underlying the Letter Agreement are reasonable and appropriate under the circumstances.

C.    The cure of the outstanding prepetition obligations under the Power Contracts, together with the Debtors' financial wherewithal, satisfy the statutory requirements of section 365(b)(1) of the Bankruptcy Code.

ORDERED, ADJUDGED, AND DECREED THAT:

1.    The Motion is GRANTED.

2.    The Debtors are authorized to take any and all actions necessary or desirable to assume the Letter Agreement between Delphi Automotive Systems LLC and NIMO, which provides for the assumption of all rights and obligations of Ultra Tool & Plastics, Inc. under the following contracts (collectively, the "Power Contracts"):

(a)    Replacement Power Allocation Agreement among NIMO, Power Authority of the State of New York ("NYPA"), and Ultra Tool, dated May 1, 1988,

(b)    Expansion Power Allocation and Service Agreement among NYPA, NIMO, and Ultra Tool, dated July 13, 1992,

(c)    Replacement Power Agreement between NYPA and Ultra Tool, dated October 17, 1994, and

(d)    Power For Jobs Service Allocation Agreement between NYPA and Ultra Tool, dated May 21, 1999.

2

3.      The Debtors are authorized to pay the existing defaults under the

Power Contracts, which equals $96,888.70, plus the Assumption Price (collectively, the

"Cure Amounts").  Upon payment of the Cure Amounts all prepetition defaults shall be

deemed cured.

4.      This Court shall retain jurisdiction to hear and determine all

matters arising from the implementation of this Order.

5.      The requirement under Rule 9013-1(b) of the Local Bankruptcy

Rules for the United States Bankruptcy Court for the Southern District of New York for

the service and filing of a separate memorandum of law is deemed satisfied by the

Motion.

Dated:    New York, New York
          November __, 2005


_____
UNITED STATES BANKRUPTCY JUDGE

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                        :
        In re                           :       Chapter 11
                                        :
DELPHI CORPORATION et al.,              :       Case No. 05-44481 (RDD)
                                        :
                    Debtors.            :       (Jointly Administered)
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x


AFFIDAVIT OF MATTHEW J. ZARNOSKY IN SUPPORT OF
MOTION FOR ORDER UNDER 11 U.S.C. §§ 105(a) AND 365
AUTHORIZING THE DEBTORS TO OBTAIN PREFERENTIAL
POWER RATES PURSUANT TO LETTER AGREEMENT WITH NIAGARA
MOHAWK POWER CORPORATION AND ASSUMPTION THEREOF


STATE OF NEW YORK              )
                              ) ss:
COUNTY OF NEW YORK            )

I, Matthew J. Zarnosky, being duly sworn, state that the following is true to the best of my knowledge, information, and belief:

1.    I am a Facility Plant Engineer of Delphi Corporation ("Delphi"), debtor and debtor-in-possession in the above-captioned chapter 11 cases. I have been on this position for five years. I am familiar with the Debtors operations, their process of obtaining electrical services, and the prices customarily charged for such services in the industry.

2.    I submit this affidavit in support of the motion (the "Motion") for an order under 11 U.S.C. §§ 105(a) And 365 Authorizing the Debtors to Obtain Preferential Power Rates Pursuant to Letter Agreement With Niagara Mohawk Power Corporation ("NIMO") and Assumption Thereof, dated November 9, 2005. Pursuant to the Motion, the Debtors seek to assume the Letter Agreement, dated September 20, 2005, between Delphi Automotive Systems LLC ("DAS LLC") and NIMO (the "Letter Agreement") on the terms and conditions described in the Motion and the term sheet between DAS LLC and NIMO.

3.    Pursuant to the Power Contracts (as defined below), NIMO provided low-cost energy to Ultra Tool & Plastics, Inc. ("Ultra Tool"). At some time following the execution of the Power Contracts, Ultra Tool became severely distressed and filed for chapter 11 bankruptcy protection. Either as part of, or contemporaneous with such bankruptcy proceeding, Par Industries, LLC ("Par") acquired all or some portion of the assets of Ultra Tool, including the operations of the manufacturing facility located at 500 Commerce Drive, Amherst, New York (the "Facility"). Under various purchase orders and/or supply agreements, Par manufactured and supplied component parts to DAS LLC, which component parts were critical to the continuation of uninterrupted production at other Delphi manufacturing operations.

4.    Subsequently, Par experienced financial and operational problems that threatened Par's financial viability and the supply of component parts.  In response, DAS LLC, extended a secured first priority loan to Par.  Despite the loan and other accommodations provided to Par by DAS LLC, Par's financial viability and the supply of the component parts remained threatened and Par determined that it was no longer able to meet its obligations to supply the component parts to DAS LLC.  As a result of exercising its rights with respect to the collateral provided in connection with the secured first priority loan extended to Par, the Debtors obtained ownership in certain equipment and commenced its own operations at the Facility for the continued manufacture and supply of component parts.

5.    The low-cost rates provided to Par, as a successor of interest to Ultra Tool, were highly beneficial rates and were essential element of the cost structure of the Facility.  Accordingly, on September 20, 2005, DAS LLC entered into the Letter Agreement with NIMO which provided for the assignment of the underlying energy contracts (collectively, the "Power Contracts").  Pursuant to the Letter Agreement, DAS LLC was to pay NIMO the sum of $60,000 (the "Assumption Price") in consideration for NIMO's assent to the Power Contracts which consist of the:

(i)    Replacement Power Allocation Agreement among NIMO, Power Authority of the State of New York ("NYPA"), and Ultra Tool, dated May 1, 1988,

(ii)    Expansion Power Allocation and Service Agreement among NYPA, NIMO, and Ultra Tool, dated July 13, 1992,

(iii)    Replacement Power Agreement between NYPA and Ultra Tool, dated October 17, 1994, and

(iv)    Power For Jobs Service Allocation Agreement between NYPA and Ultra Tool, dated May 21, 1999.

6.    Although the Letter Agreement was executed, the Debtors sought chapter 11 protection before they were able to issue payment to NIMO in connection with the

assignment.  I have reviewed the Letter Agreement, the Power Contracts, and the energy

rates related thereto.  The assumption of the Letter Agreement will provide the Debtors with

significant energy cost savings.  The assumption will save the Debtors at least $50,000 per

month over the term of these contracts - an average of $12,500 per contract per month. The

term of these contracts range from 10 months to 7 years from today's date.  In addition, the

terms of each contract  can be extended if certain conditions are met.  There are no

alternative means of obtaining such low prices.  Moreover, the Power Contracts, which

provide for the distribution of hydro-electric energy, are very difficult to obtain from other

sources.

7.    I understand that the amount necessary to cure the defaults existing

under the Power Contracts is $ 96,888.70, (collectively with the Assumption Price, the "Cure

Amount"), which is the total amount due for actual services rendered but unbilled by NIMO

for periods during which DAS LLC operated the Facility prior to October 8, 2005.  The

savings will exceed the payment of the Cure Amount within 3 months.


By: s/ Matthew J. Zarnosky
        MATTHEW J. ZARNOSKY


Sworn to and subscribed
before me this 9th day
of November, 2005


_____
 Notary Public

# EXHIBIT F

**Hearing Date and Time: November 29, 2005 at 10:00 a.m.**
**Objection Deadline:  November 22, 2005 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

         - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
     Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                                          :
         In re                                            :    Chapter 11
                                                          :
DELPHI CORPORATION, et al.,                               :    Case No. 05-44481 (RDD)
                                                          :
                                 Debtors.                 :    (Jointly Administered)
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

NOTICE OF MOTION FOR ORDER UNDER 11 U.S.C. §§ 105(a), 363, AND 365
AUTHORIZING THE DEBTORS TO PRESERVE OPTION TO ENTER INTO NEW
POWER CONTRACT WITH PREFERENTIAL RATES WITH CONSUMERS ENERGY
COMPANY AND ANCILLARY ASSUMPTION OF RELATED POWER CONTRACTS

PLEASE TAKE NOTICE that on November 9, 2005, Delphi Corporation

("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in

the above-captioned cases, filed the Motion Order Under 11 U.S.C. §§ 105(a), 363, And

365 Authorizing The Debtors To Preserve Option To Enter Into New Power Contract With

Preferential Rates With Consumers Energy Company And Ancillary Assumption Of

Related Power Contracts. (the "Motion").

PLEASE TAKE FURTHER NOTICE that a hearing to consider approval of

the Motion will be held on November 29, 2005, at 10:00 a.m. (Prevailing Eastern Time)

(the "Hearing") before the Honorable Robert D. Drain, United States Bankruptcy Court for

the Southern District of New York, One Bowling Green, Room 610, New York, New York,

10004.

PLEASE TAKE FURTHER NOTICE that objections, if any, to approval of

the Motion (a) must be in writing, (b) must conform to the Federal Rules of Bankruptcy

Procedure, the Local Bankruptcy Rules for the Southern District of New York and the

Order Under 11 U.S.C. §§ 102 (1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007,

And 9014 Establishing (I) Omnibus Hearing Dates, (II) Certain Notice, Case Management,

And Administrative Procedures, And (III) Scheduling An Initial Case Conference In

Accordance With Local Bankr. R. 1007-2(e) (the "Case Management Order") (Docket No.

245), (c) must be filed with the Bankruptcy Court in accordance with General Order M-242

(as amended) – registered users of the Bankruptcy Court's case filing system must file

electronically, and all other parties-in-interest must file on a 3.5 inch disk (preferably in

Portable Document Format (PDF), WordPerfect, or any other Windows-based word

2

processing format), (d) must be submitted in hard-copy form directly to the chambers of the

Honorable Robert D. Drain, United States Bankruptcy Judge, and (e) and must be served

upon (i) Delphi Corporation, 5725 Delphi Drive, Troy, Michigan 48098 (Att'n: General

Counsel), (ii) counsel to the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 333

West Wacker Drive, Suite 2100, Chicago, Illinois 60606 (Att'n: John Wm. Butler, Jr.), (iii)

counsel for the agent under the Debtors' prepetition credit facility, Simpson Thacher &

Bartlett LLP, 425 Lexington Avenue, New York, New York 10017 (Att'n:  Kenneth S.

Ziman), (iv) counsel for the agent under the Debtors' postpetition credit facility, Davis Polk

& Wardell, 450 Lexington Avenue, New York, New York 10017 (Att'n:  Marlane Melican),

(v) counsel for the official committee of unsecured creditors, Latham & Watkins, 885 Third

Avenue, New York, New York, 10022 (Att'n:  Robert J. Rosenberg and Mark A. Broude),

and (vi) the Office of the United States Trustee for the Southern District of New York, 33

Whitehall Street, Suite 2100, New York, New York 10004 (Att'n: Alicia M. Leonhard), in

each case so as to be **received** no later than **4:00 p.m. (Prevailing Eastern Time)** on

**November 22, 2005** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that only those objections made in writing, in accordance with the Case Management Order, and timely filed and received by the Objection Deadline will be considered by the Bankruptcy Court at the Hearing.  If no objections to the Motion are timely filed and served in accordance with the procedures set forth herein, the Bankruptcy Court may enter an order granting the Motion **without further notice.**

Dated: New York, New York
      November 9, 2005

      SKADDEN, ARPS, SLATE, MEAGHER
        & FLOM LLP

By: /s/ John Wm. Butler, Jr.
     John Wm. Butler, Jr. (JB 4711)
     John K. Lyons (JL 4951)
     Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

- and -

By: /s/ Kayalyn A. Marafioti
     Kayalyn A. Marafioti (KM 9632)
     Thomas J. Matz (TM 5986)
Four Times Square
New York, New York  10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

**Hearing Date and Time: November 29, 2005 at 10:00 a.m.**
**Objection Deadline:  November 22, 2005 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :
        In re                               :    Chapter 11
                                            :
DELPHI CORPORATION et al.,                  :    Case No. 05-44481 (RDD)
                                            :
                        Debtors.            :    (Jointly Administered)
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. §§ 105(a), 363, AND 365
AUTHORIZING THE DEBTORS TO PRESERVE OPTION TO ENTER
INTO NEW POWER CONTRACT WITH PREFERENTIAL RATES
WITH CONSUMERS ENERGY COMPANY AND ANCILLARY
ASSUMPTION OF RELATED POWER CONTRACTS

("MOTION TO PRESERVE PREFERENTIAL RATES WITH CEC")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order under 11 U.S.C. §§ 105(a), 363, And 365 Authorizing The Debtors To Preserve Option To Enter Into New Power Contract With Preferential Rates With Consumers Energy Company And Ancillary Assumption Of Related Power Contracts.  In support of this Motion, the Debtors submit the Affidavit of Donald S. Poole, sworn to November 9, 2005.  In further support of the Motion, the Debtors respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8, 2005, Delphi and certain of its U.S. subsidiaries filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").  On October 14, 2005, three additional U.S. subsidiaries of Delphi filed voluntary petitions in this Court for reorganization relief under the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.    On October 17, 2005, the Office of the United States Trustee appointed an official committee of unsecured creditors.  No trustee or examiner has been appointed in the Debtors' cases.

3.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4.       The statutory predicates for the relief requested herein are sections

105(a), 363, and 365 of the Bankruptcy Code.

B.       Current Business Operations Of The Debtors

5.       With more than 180,000 employees worldwide, global 2004

revenues of approximately $28.6 billion, and global assets as of August 31, 2005 of

approximately $17.1 billion,[1] Delphi ranks as the fifth largest public company business

reorganization in terms of revenues, and the thirteenth largest public company business

reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11

debtors, will continue their business operations without supervision from the Bankruptcy

Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy

Code.

6.       Over the past century, the operations which are now owned by

Delphi have developed leading global technology innovations with significant

engineering resources and technical competencies in a variety of disciplines.  Today, the

Company (as defined below) is arguably the single largest global supplier of vehicle

electronics, transportation components, integrated systems and modules, and other

electronic technology.  The Company's technologies and products are present in more

than 75 million vehicles on the road worldwide.  The Company supplies products to

nearly every major global automotive original equipment manufacturer, with 2004 sales

to its former parent, General Motors Corporation, equaling approximately $15.4 billion

---

[1]      The aggregated financial data used in this Motion generally consists of
consolidated information from Delphi and its worldwide subsidiaries and
affiliates.

and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

7.      As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world.  In the U.S., the Debtors employ approximately 50,600 people.  Those employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in Delphi's worldwide headquarters and customer center located in Troy, Michigan.  Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and local unions.  Outside the United States, the Company's foreign entities employ more than 134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

8.      Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates (collectively, the "Company") in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

9.     Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle.  When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base.  The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base.  The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C.     Events Leading To Chapter 11 Filing

10.     In the first two years following Delphi's separation from GM, the Company generated more than $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales.  Reflective of a downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005.  The Company experienced net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of

$13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[2]

11.     The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12.     In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward looking revenue requirements.  Having concluded that pre-filing discussions with its Unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

13.     Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve

---

[2]     Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

the Company's core businesses.  This will require negotiation with key stakeholders over

their respective contributions to the restructuring plan or, absent consensual participation,

the utilization of the chapter 11 process to achieve the necessary cost savings and

operational effectiveness envisioned in the Company's transformation plan.  The Debtors

believe that a substantial segment of Delphi's U.S. business operations must be divested,

consolidated, or wound-down through the chapter 11 process.

14.    Upon the conclusion of this process, the Debtors expect to emerge

from chapter 11 as a stronger, more financially sound business with viable U.S.

operations that are well-positioned to advance global enterprise objectives.  In the

meantime, Delphi will marshal all of its resources to continue to deliver value and high-

quality products to its customers globally.  Additionally, the Company will preserve and

continue the strategic growth of its non-U.S. operations and maintain its prominence as

the world's premier auto supplier.

<u>Relief Requested</u>

15.    By this Motion, the Debtors seek entry of an order under 11 U.S.C.

§§105(a), 363, and 365 for Delphi Automotive Systems LLC ("DAS LLC") to assume

that certain Special Manufacturing Contract, dated October 13, 1995, as amended by that

Partial Assignment Agreement, dated December 22, 1998 (together, the "Power

Contracts") with Consumers Energy Company ("CEC"), copies of which are attached

hereto as <u>Exhibit A</u> and <u>Exhibit B</u>, respectively, on the terms and conditions set forth

herein.  This will entitle DAS LLC to preferential rates with respect to a New Power

Contract (as defined below) for power services to certain DAS LLC sites for a two to four

year period commencing in January 2006.  The Debtors respectfully submit that the

decision to assume the Power Contracts represents the sound exercise of their business

judgment.

Basis For Relief

16.    CEC is one of the Debtors' largest power suppliers, providing

electric power to six of the Debtors' sites at reduced rates pursuant to the Power Contracts.

The Power Contracts are valuable, low-cost, below-market contracts which provide

substantial savings that would be difficult to procure from other sources.  The Power

Contracts will expire on December 31, 2005 and DAS LLC has been notified by CEC

that DAS LLC will not be eligible for preferential rates for the two to four year period

commencing in January 2006 unless it assumes the Power Contracts and pays the cure

amount thereunder, which is approximately $3.6 million (the "Cure Amount").  Paying

the Cure Amount, however, is a necessary condition for the Debtors to enter into a New

Power Contract for the period commencing in January 2006.  Moreover, the Debtors

stand to save more than $10 million per year under the preferential rates, an amount that

far exceeds the Cure Amount that will be paid in connection with the assumption of the

Power Contracts.

17.    According to CEC, only a "current customer taking Primary

Voltage Service under a Special Contract approved by the Michigan Public Service

Commission (MPSC) and whose special contract terminates on December 31, 2005" is

eligible for the preferential rates set forth by the Michigan Public Service Commission

("MPSC") for the contract year beginning in 2006.  It is anticipated that the MPSC will

publish the preferential rates in late November, and that eligible customers must elect

such rates within fifteen calendar days.  The preferential rates will not be available

following the close of the fifteen-day period thereafter.  CEC is not obligated to provide

preferential power rates to the Debtors, and CEC has made clear through numerous contacts and correspondence that it will not do so if the Power Contracts are not assumed prior to their expiration.  Thus, unless DAS LLC assumes the Power Contracts, it will not have the opportunity to elect to receive the preferential rates provided to "current customers" when negotiating a New Power Contract.

18.    Because MPSC will not publish its new rates until the late November, the Debtors cannot yet enter into a New Power Contract.  Nor can the Debtors simply assume the Power Contracts and pay the Cure Amount until they have received and analyzed the rates to be published by the MPSC and determined that it would be prudent to assume the contracts.  Nevertheless, the Debtors have determined, in their business judgment, that preserving their eligibility for the CEC preferential rates by assuming the Power Contracts is in the best interests of the estates, the Debtors' creditors, and all parties-in-interest.  The Debtors anticipate that the preferred Transitional Primary Rate published by the MPSC (the "Transitional Power Rate") will result in an annual savings of approximately $5 million compared to the standard bundled tariff rates. Moreover, participation in the Transitional Primary Rate will enable the Debtors to obtain additional power at a 60% discount, for an additional $5 million in annual savings.  If the Debtors are not allowed to negotiate with CEC under the preferential rates published by MPSC, the power allotted to the Debtors at this discounted rate might be furnished to another large industrial power consumer.

19.    The Debtors therefore seek an order for the assumption of the Power Contracts, subject to the terms and conditions set forth herein.  Moreover, the

Debtors see the authority, but not the direction, to pay the Cure Amount subject to the

following conditions:

> (i)    DAS LLC's being allowed to fully participate in negotiations on the new Transitional Primary Rate and Interruptible Rate I, as published by the MPSC, with GM and CEC in connection with the procurement of electric power services for the period beginning January 1, 2006;

> (ii)    DAS LLC's entering into a new contract (the "New Power Contract") for electric and power services with CEC at rates acceptable to DAS LLC, the acceptability of which shall be determined in DAS LLC's sole discretion; and

> (iii)    Notice of DAS LLC's decision to enter into the New Power Contract and to pay the Cure Amount to be given to all interested parties.

20.    Further terms and conditions include: upon satisfaction of the

conditions set forth herein and entry into the New Power Contract, DAS LLC will pay, or

cause to be paid, the Cure Amount of $3.6 million, which constitutes the total amount due

under the Power Contracts; provided, however, that in the event DAS LLC determines, in

its sole discretion, not to enter into a  New Power Contract, or a New Power Contract is

not entered into by January 31, 2006, the Cure Amount shall not be paid and the

assumption of the Power Contracts will be deemed null and void.

21.    The relief requested in this Motion – assumption of the Power

Contracts and entering into a New Power Contract on the negotiated terms described

above – allows the Debtors to obtain valuable, low-cost electricity at significantly

discounted rates for the duration of such contracts.  CEC has stated that DAS LLC's

assumption of the Power Contracts is a necessary condition to CEC's entering into the

New Power Contract with DAS LLC at the discount rate on a going forward basis.  These

preferential rates are estimated to save the Debtors more than $10 million per year during
the proposed term of the New Power Contract.

<u>Applicable Authority</u>

22.     The Debtors believe that the Power Contracts may be assumed ,
with CEC's consent, under sections 105, 363, and 365 of the Bankruptcy Code.  Section
365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the
Court's approval, may . . . assume any executory contract or unexpired lease of the
debtor."  11 U.S.C. § 365(a).

23.     The standard to be applied by a court in determining whether an
executory contract or unexpired lease should be assumed is the "business judgment" test,
which is premised upon the debtor's business judgment that assumption would be
beneficial to its estate.  <u>See</u> <u>Orion Pictures Corp. v. Showtime Networks, Inc.</u> (In re Orion
Pictures Corp.), 4 F.3d 1095, 1098-99 (2d Cir. 1993); <u>see</u> <u>also</u> <u>In re Child World, Inc.</u>,
142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992) (a debtor may assume or reject an unexpired
lease under § 365(a) in the exercise of its "business judgment"); <u>In re Roman Crest Fruit,
Inc.</u>, 35 B.R. 939, 949 (S.D.N.Y. 1983); <u>Control Data Corp. v. Zelman</u>, 602 F.2d 38, 42
(2d Cir. 1979). "More exacting scrutiny would slow the administration of the debtor's
estate and increase its cost, interfere with the Bankruptcy Code's provision for private
control of administration of the estate, and threaten the court's ability to control a case
impartially."  <u>Richmond Leasing Co. v. Capital Bank, N.A.</u>, 762 F.2d 1303, 1311 (5th Cir.
1985).

24.     If the debtor's business judgment has been exercised reasonably, a
court should approve the assumption of an executory contact.  <u>See</u>, <u>e.g.</u>, <u>NLRB v.
Bildisco and Bildisco</u>, 465 U.S. 513, 523 (1984); <u>Group of Inst'l. Investors v. Chicago,</u>

Milwaukee, St. Paul & Pacific R.R. Co., 318 U.S. 523 (1943); Cleveland Hotel Protective

Comm. v. Nat'l City Bank of Cleveland (In re Van Sweringen Corp.), 155 F.2d 1009,

1013 (6th Cir.), cert. denied, 329 U.S. 766 (1946); In re Child World, Inc., 142 B.R. 87,

89 (Bankr. S.D.N.Y. 1992); In re Ionosphere Clubs, Inc., 100 B.R. 670, 673 (Bankr.

S.D.N.Y 1989); see also  In re Orion Pictures Corp., 4 F.3d at 1098-99; In re RCN Corp.,

Case No. 04-13638 (RDD), June 22, 2004 Hr'g Tr. ¶¶ 50:24–50:2, at 46.  Once the debtor

has satisfied the business judgment standard by showing that assumption will benefit the

estate, the court "should not interfere 'except upon a finding of bad faith or gross abuse of

[the debtor's] business discretion.'"  Id. at 465 (citing Lubrizol Enters., Inc. v. Richmond

Metal Finishers Inc., 756 F.2d 1043, 1047 (4th Cir. 1985).

       25.     The business judgment rule shields a debtor's management from

judicial second-guessing.  In re Farmland Indus., Inc., 294 B.R. at 913 (quoting In re

Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986)) ("'[T]he Code

favors the continued operation of a business by a debtor and a presumption of

reasonableness attaches to a debtor's management decisions.'").  Once the Debtors

articulate a valid business justification, "[t]he business judgment rule 'is a presumption

that in making a business decision the directors of a corporation acted on an informed

basis, in good faith and in the honest belief that the action was in the best interests of the

company.'"  In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting

Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).

       26.     Upon finding that the Debtors have exercised their sound business

judgment in determining that assumption of Power Contracts on the negotiated terms

described above is in the best interests of their estates, this Court should approve

assumption under section 365(a) of the Bankruptcy Code.  In re Gucci, 193 B.R. 411,

415-17 (S.D.N.Y. 1996) (affirming bankruptcy court's approval of assumption of

executory contract upon determining that assumption "was in the best interest of the

estate"); Blue Cross Blue Shield of Conn. v. Gurski (In re Gurski), Nos. 94-51202 &

3:95CV1883, 1996 WL 684397, at *2 (D. Conn. Jan. 25, 1996) (affirming bankruptcy

court's determination that executory contracts were beneficial to debtor such that debtor

could assume them under section 365(a)).

      27.    The Debtors further believe that paying the Cure Amount on the

condition set forth herein satisfies the requirements set forth under section 365(b)(1).

Bankruptcy Code section 365(b)(1) codifies the requirements for assuming an unexpired

lease or executory contract of a debtor.  That subsection provides:

> (b)(1)  If there has been a default in an executory contract or unexpired lease
> of the debtor, the trustee may not assume such contract or lease
> unless, at the time of assumption of such contract or lease, the trustee-
>
> > (A)    cures, or provides adequate assurance that the trustee will
> > promptly cure, such default;
> >
> > (B)    compensates, or provides adequate assurance that the trustee  will
> > promptly compensate, a party other than the debtor to such
> > contract or lease, for any actual pecuniary loss to such party
> > resulting from such default; and
> >
> > (C)    provides adequate assurance of future performance under such
> > contract or lease.

11 U.S.C. § 365(b)(1).

      28.    The Debtors submit that the statutory requirements of section

365(b)(1) of the Bankruptcy Code have been satisfied because there are no monetary

defaults existing under the Power Contracts to be assumed other than payment of the

Cure Amount.  As negotiated with CEC, such payment will be made by the Debtors on

the condition that the Debtors, in their sole discretion, approve of the new rates published

by the MPSC and enter into a New Power Contract with CEC for the two to four year

period commencing in January 2006.  In the event DAS LLC determines, in its sole

discretion, not to enter into a New Power Contract, or a New Power Contract is not

entered into by January 31, 2006, the assumption of the Power Contract will be deemed

null and void and the Cure Amount will not be paid.  The Debtors respectfully submit

that their commitment to pay the Cure Amount upon execution of the New Power

Contract, along with the ample liquidity available under their debtor-in-possession

financing facility, constitutes adequate assurance that it will cure any defaults under the

Power Contracts.  Based on the foregoing,  believe that the requirements of 365 have

been satisfied and that this Court should grant the relief requested in the Motion.

29.     In the alternative, the Debtors also rely on sections 105 and 363 of

the Bankruptcy Code to assume the Power Contracts.  Bankruptcy Code section 363(c)(1)

authorizes a debtor-in-possession to use property of the estate in the ordinary course of

business without court approval.  Bankruptcy Code section 363(b) permits a debtor-in-

possession to use property of the estate "other than in the ordinary course of business"

after notice and a hearing.  Additionally, Bankruptcy Code section 105(a) allows a court

to "issue any order, process, or judgment that is necessary or appropriate to carry out the

provisions of [the Bankruptcy Code]."

30.     Similar to the analysis under section 365, courts in this district and

elsewhere consistently have held that transactions pursuant to 363(b) should be approved

if there is a sound business justification for implementing them.  See In re Lionel Corp.,

722 F.2d 1063, 1071 (2d Cir. 1983); In re Delaware Hudson Ry. Co., 124 B.R. 169, 179

(Bankr. D. Del. 1991).  Once the debtor articulates a valid business justification, "'[there

is a presumption that in making a business decision the directors of a corporation acted

on an informed basis, in good faith and in the honest belief that the action taken was in

the best interests of the company.'" In re Integrated Resources, Inc., 147 B.R. 650, 656

(S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)); see

also In re RCN Corp., June 22, 2004 Hr'g Tr. ¶¶ 51:3–12 (approving exit financing

commitments pursuant to 363(b) of the Bankruptcy Code).

       31.    Section 105(a) of the Bankruptcy Code also gives this Court broad

authority under its equitable powers to fashion any order or decree that would preserve or

protect the value of the debtor's assets.  See, e.g., Adelphia Communs. Corp. v. Rigas,

2003 U.S. Dist. LEXIS 9349, at *12 (S.D.N.Y. 2003) ("Section 105 of Title 11 provides

the bankruptcy courts with a broad range of equitable powers over cases within its

jurisdiction"); Griffin v. Bonapfel (In re All American of Ashburn, Inc.), 805 F.2d 1515,

1517 (11th Cir. 1986) (per curiam) (noting that section 105(a) provides authority for

bankruptcy courts to protect estate property).

       32.    In light of  the benefits expected to accrue to the Debtors by

assuming the Power Contracts and the continuation of the preferential rates that the

Debtors' would be entitled to under the New Power Contracts, this Court should grant the

relief requested in this Motion.  As noted above, assuming the Power Contracts is a

necessary condition to receiving preferential rates with respect to any New Power

Contract with CEC.  Without the preferential rates, the Debtors stand to lose up to $10

million per year over a two to four year period.  Such savings far exceed the Cure

Amount that will be paid in connection with the assumption of the Power Contracts.

Accordingly, assumption of the Power Contracts on the negotiated terms set forth herein represents a sound exercise of the Debtors' business judgment, is in the best interests of the estates, and should be granted.

## Notice

33.     Notice of this Motion has been provided in accordance with the Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing (I) Omnibus Hearing Dates, (II) Certain Notice, Case Management, And Administrative Procedures, And (III) Scheduling An Initial Case Conference In Accordance With Local Bankr. R. 1007-2(e), which was entered by this Court on October 14, 2005 (Docket No. 245).  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

## Memorandum Of Law

34.     Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order (a) authorizing and approving the assumption of the Power Contract on the terms and conditions set forth herein, and (b) granting the Debtors such other and further relief as is just.

Dated: New York, New York
        November 9, 2005

                        SKADDEN, ARPS, SLATE, MEAGHER
                            & FLOM LLP

                        By: s/ John Wm. Butler, Jr.
                            John Wm. Butler, Jr. (JB 4711)
                            John K. Lyons (JL 4951)
                            Ron E. Meisler (RM 3026)
                        333 West Wacker Drive, Suite 2100
                        Chicago, Illinois  60606
                        (312) 407-0700

                                    - and -

                        By: s/ Kayalyn A. Marafioti
                            Kayalyn A. Marafioti (KM 9632)
                            Thomas J. Matz (TM 5986)
                        Four Times Square
                        New York, New York 10036
                        (212) 735-3000

                        Attorneys for Delphi Corporation, et al.,
                            Debtors and Debtors-in-Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                        :

In re                        :     Chapter 11
                        :

DELPHI CORPORATION et al.,    :     Case No. 05-44481 (RDD)
                        :

             Debtors.    :     (Jointly Administered)
                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ORDER UNDER 11 U.S.C. §§ 105(a), 363, AND 365 AUTHORIZING
THE DEBTORS TO PRESERVE OPTION TO ENTER INTO NEW
POWER CONTRACT WITH PREFERENTIAL RATES WITH
CONSUMERS ENERGY COMPANY AND ANCILLARY
<u>ASSUMPTION OF RELATED POWER CONTRACTS</u>

("ORDER TO PRESERVE PREFERENTIAL RATES WITH CEC")

        Upon the motion, dated November 9, 2005 (the "Motion"), of Delphi

Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-

in-possession in the above-captioned cases (collectively, the "Debtors"), for an order (the

"Order") under 11 U.S.C. §§ 105(a), 363, And 365 Authorizing The Debtors To Preserve

Option To Enter Into New Power Contract With Preferential Rates With Consumers

Energy Company And Ancillary Assumption Of Related Power Contracts; and upon the

affidavit of Donald S. Poole, sworn to November 9, 2005 in support of the Motion; and

upon the record of the hearing held on the Motion; and this Court having determined that

the relief requested in the Motion is in the best interests of the Debtors, their estates, their

creditors, and other parties-in-interest; and it appearing that proper and adequate notice of

the Motion has been given and that no other or further notice is necessary; and after due

deliberation thereon; and good and sufficient cause appearing therefor,

IT IS HEREBY FOUND AND DETERMINED THAT:

A.      The Debtors have exercised reasonable business judgment in
deciding to assume that certain Special Manufacturing Contract, dated October 13, 1995,
as amended by that Partial Assignment Agreement, dated December 22, 1998 (together,
the "Power Contracts") subject to the conditions set forth in this Order.

ORDERED, ADJUDGED, AND DECREED THAT:

1.      The Motion is GRANTED.

2.      The Power Contracts are assumed, subject to the terms of the
Order, as of the date hereof.

3.      The Debtors are authorized, but not directed, to pay the cure
amount in the amount of approximately $3.6 million (the "Cure Amount"), upon
satisfaction of the following conditions, at which time all prepetition defaults shall be
deemed cured:

(a)      Delphi Automotive Systems LLC ("DAS LLC") being
allowed to fully participate in negotiations on the new Transitional Primary Rate and
Interruptible Rate I, as published by the Michigan Power Services Commission
("MPSC"), with General Motors and CEC in connection with the procurement of electric
power services for the period beginning January 1, 2006;

(b)      DAS LLC entering into a new contract (the "New Power
Contract") for electric and power services with CEC at rates acceptable to DAS LLC, the
acceptability of which shall be determined in DAS LLC's sole discretion; and

(c)      Notice of DAS LLC's decision to enter into the New Power
Contract and to pay the Cure Amount to be given to all interested parties.

4.      Until such time as (a) the Cure Amount is paid or (b) until the
assumption is deemed null and void, CEC is deemed adequately assured of payment of
the Cure Amount.

5.      In the event DAS LLC determines, in its sole discretion, not to enter into a  New Power Contract, or a New Power Contract is not entered into by January 31, 2006 the Cure Amount shall not be paid and the assumption of the Power Contracts will be deemed null and void.

6.      This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

7.      The requirement under Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York for the service and filing of a separate memorandum of law is deemed satisfied by the Motion.

Dated:    New York, New York
          November __, 2005


_____
  UNITED STATES BANKRUPTCY JUDGE

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AFFIDAVIT OF DONALD S. POOLE IN SUPPORT OF
MOTION FOR ORDER UNDER 11 U.S.C. §§ 105(a), 363, AND 365
AUTHORIZING THE DEBTORS TO PRESERVE OPTION TO ENTER
INTO NEW POWER CONTRACT WITH PREFERENTIAL RATES
WITH CONSUMERS ENERGY COMPANY AND ANCILLARY
ASSUMPTION OF RELATED POWER CONTRACTS

I, Donald S. Poole, being duly sworn, state that the following is true to the best of my knowledge, information, and belief:

1.      I am  the Manager of Utilities Supply of Delphi Corporation ("Delphi"), debtor and debtor-in-possession in the above-captioned chapter 11 cases.  I am familiar with the Debtors' operations, their process of obtaining electrical services and the prices customarily charged for such services in the industry.  I have held this position in Delphi since 1999 and have worked with electrical utility companies on industrial plant power delivery for over 35 years.  I have a B.A. degree in Electrical Engineering from the University of Akron and am a registered Professional Engineer in the State of Ohio.

2.      I submit this affidavit in support of the motion  for an order under 11 U.S.C. §§ 105(a), 363, And 365 Authorizing The Debtors To Preserve Option To Enter Into New Power Contract With Preferential Rates With Consumers Energy Company And Ancillary Assumption Of Related Power Contracts, dated November 9, 2005 (the "Motion").  Pursuant to the Motion, the Debtors seek to have Delphi Automotive Systems LLC ("DAS LLC") assume that certain Special Manufacturing Contract, dated October 13, 1995, as amended by the Partial Assignment Agreement, dated December 22, 1998 (the "Power Contracts"), attached to the Motion as <u>Exhibit A</u> and <u>Exhibit B</u>, respectively, on the terms and conditions set forth below.  By assuming the Power Contracts, DAS LLC will be entitled to preferential rates with respect to a New Power Contract (as defined below) for power services to certain DAS LLC sites for a two to four period, commencing on January 2006, on terms that would provide the Debtors with significant savings.

The Power Contracts With Consumers Energy Corporation

3.      With operations throughout the United States, the Debtors use
electric services from hundreds of utility companies.  Consumers Energy Company
("CEC") is one of the Debtors' largest electrical providers, providing services to six
Delphi sites located in Michigan.  Prior to Delphi's separation from General Motors
("GM") in 1999, the six Delphi sites obtained electrical power through a Special
Manufacturing Contract, dated October 13, 1995, between General Motors and CEC (the
"Special Manufacturing Contract").  Upon Delphi's separation from GM, Delphi, GM and
CEC entered into a Partial Assignment Agreement, dated December 22, 1998, in which
DAS LLC became directly obligated to CEC under the Special Manufacturing Contract.
The Power Contracts expire on December 31, 2005.

4.      The Power Contracts entitle the Debtors to obtain electricity at
preferential rates.  The Power Contracts are valuable, low-cost, below-market contracts
which provide substantial savings that would be difficult to procure from other sources.
CEC has informed DAS LLC that DAS LLC will not be eligible for preferential rates for
the contract year commencing in 2006 unless it assumes the Power Contracts and pays
the cure amount thereunder, which is approximately $3.6 million (the  "Cure Amount").

5.      According to CEC, only a "current customer taking Primary
Voltage Service under a Special Contract approved by the Michigan Public Service
Commission (MPSC) and whose special contract terminates on December 31, 2005" will
be eligible for the preferential rates set forth by the Michigan Public Service Commission
("MPSC") for the contract year beginning in 2006.  It is anticipated that the MPSC will
publish the preferential rates in late November 2005, and that eligible customers must

elect such rates within fifteen calendar days thereafter.  The preferential rates may not be

available following the close of the fifteen-day period.  CEC is not obligated to provide

preferential power rates to the Debtors, and CEC has made clear through numerous

contacts and correspondence that it will not do so if the Power Contracts are not assumed

prior to their expiration.  Thus, unless DAS LLC assumes the Power Contracts, it will not

be entitled to receive the preferential rates provided to "current customers."

6.      As indicated above, the negotiations are complicated by the fact

that the MPSC will not publish its new rates until late November, which prevents DAS

LLC from entering into a New Power Contract at this time.  Nor can DAS LLC simply

assume the Power Contracts and pay the Cure Amount until we have received and

analyzed the rates to be published by the MPSC and determined that it is prudent to do so.

Nevertheless, the Debtors have  determined, in their business judgment, that preserving

their eligibility for CEC's preferential rates in 2006 and beyond by assuming the Power

Contracts is in the best interests of the estates, the Debtors' creditors, and all parties-in-

interest.

Savings Under The Preferential Rates

7.      DAS LLC anticipates that entering into a New Power Contract

under the preferential rates will result in substantial savings for DAS LLC.  The preferred

Transitional Primary Rate will result in an annual savings of approximately $5 million

compared to the standard bundled tariff rates.  Moreover, participation in the Transitional

Primary Rate will enable DAS LLC to obtain additional power at a 60% discount, for an

additional $5 million in annual savings.  If DAS LLC is not allowed to negotiate with

CEC with respect to the preferential rates, the power allotted to the Debtors at this

discounted rate might be furnished to another large, industrial power consumer.  Because

CEC can only offer a certain amount of electricity at the preferential rate, in the event

DAS LLC's allotment is provided to another customer, DAS LLC may not be able to

obtain electricity at the preferential rate in the future from CEC.

    8.  As a result of DAS LLC's negotiations with CEC, the assumption

of the Power Contracts will be rendered null and void, and the Cure Amount will not be

paid, if DAS LLC determines, not to enter into a New Power Contract, or a New Power

Contract is not entered into by January 31, 2006.

    9.  Accordingly, I believe that the relief requested in this Motion –

assumption of the Power Contracts on the negotiated terms described in the Motion –

allows the Debtors to obtain valuable, low-cost electricity at significantly discounted

rates for the duration of such contracts.  Of greater significance is that assuming the

Power Contracts is a necessary condition to entering into the New Power Contract at a

preferential rate on a going forward basis.  It is anticipated that these preferential rates

will save the Debtors more than $10 million each year over a two to four year period.

10.    I believe that the rates available to the Debtors under the Power

Contracts, and the rates to be made available to the Debtors beginning in January 2006 on

a going forward basis, would be very difficult, if not impossible, to obtain from other

providers.  In my experience, the assumption of the Power Contracts represents a proper

exercise of the Debtors' business judgment and is in the best interests of the estates, the

Debtors' creditors, and all parties-in-interest.


_s/ Donald S. Poole_____
DONALD S. POOLE

Sworn to before
me this 9th day
of November 2005

s/ Susan Wade
Notary Public

# **EXHIBIT G**

**Hearing Date: November 29, 2005, 10:00 a.m.**
**Objection Deadline: November 22, 2005, 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

     - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :
          In re                         :     Chapter 11
                                        :
DELPHI CORPORATION, et al.,             :     Case No. 05-44481 (RDD)
                                        :
                          Debtors.      :     (Jointly Administered)
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NOTICE OF DEBTORS' APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(a) AND 328
AND FED. R. BANKR. P. 2014(a) AUTHORIZING THE EMPLOYMENT AND RETENTION
OF  JONES LANG LASALLE AMERICAS, INC. AS REAL ESTATE
ADMINISTRATIVE AND TRANSACTION SERVICES PROVIDER TO DEBTORS

1

PLEASE TAKE NOTICE that on November 9, 2005, Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), filed the Application For Order Under 11 U.S.C. §§ 327(a) and 328 and Fed. R. Bankr. P. 2014(a) Authorizing Employment And Retention Of Jones Lang LaSalle Americas, Inc. ("JLL"), as real estate administrative and transactional services provider, <u>Nunc</u> <u>Pro</u> <u>Tunc</u> To November 3, 2005 (the "Application").

PLEASE TAKE FURTHER NOTICE that a hearing to consider approval of the Application will be held on November 29, 2005, at 10:00 a.m. (Prevailing Eastern Time) (the "Hearing") before the Honorable Robert D. Drain, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 610, New York, New York, 10004.

PLEASE TAKE FURTHER NOTICE that objections, if any, to approval of the Application (a) must be in writing, (b) must conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and the Order Under 11 U.S.C. §§ 102 (1) and 105 and Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing (I) Omnibus Hearing Dates, (II) Certain Notice, Case Management, and Administrative Procedures, and (III) Scheduling an Initial Case Conference in Accordance with Local Bankr. R. 1007-2(e) (the "Case Management Order") (Docket No. 245), (c) must be filed with the Bankruptcy Court in accordance with General Order M-242 (as amended) – registered users of the Bankruptcy Court's case filing system must file electronically, and all other parties-in-interest must file on a 3.5 inch disk (preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format), (d) must be submitted in hard-copy form directly to the chambers of the Honorable Robert D. Drain, United States Bankruptcy Judge, and (e) and must be served upon (i) Delphi Corporation, 5725 Delphi Drive,

2

Troy, Michigan 48098 (Att'n: General Counsel), (ii) counsel to the Debtors, Skadden, Arps,

Slate, Meagher & Flom LLP, 333 West Wacker Drive, Suite 2100, Chicago, Illinois 60606

(Att'n: John Wm. Butler, Jr.), (iii) counsel for the agent under the Debtors' prepetition credit

facility, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017

(Att'n: Kenneth S. Zimar), (v) counsel for the agent under the postpetition credit facility, Davis

Polk & Wardwell, 450 Lexington Avenue, New York, New York 10017 (Att'n:  Marlane

Melican), (vi) counsel for the Official Committee of Unsecured Creditors, Latham & Watkins,

885 Third Avenue, New York, New York 10022 (Att'n: Mark A. Broude), (vii) the Office of the

United States Trustee for the Southern District of New York, 33 Whitehall Street, Suite 2100,

New York, New York 10004 (Att'n:  Alicia M. Leonhard), and (viii) Jones Lang LaSalle

Americas, Inc., 200 East Randolph, Chicago, Illinois 60601 (Att'n: James Becker) in each case

so as to be **received** no later than **4:00 p.m. (Prevailing Eastern Time) on November 22, 2005**

(the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that only those objections made in writing, in accordance with the Case Management Order, and timely filed and received by the Objection Deadline will be considered by the Bankruptcy Court at the Hearing.  If no objections to the Motion are timely filed and served in accordance with the procedures set forth herein, the Bankruptcy Court may enter an order granting the Application without further notice.

Dated:  New York, New York
          November 9, 2005

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By: s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr. (JB 4711)
    John K. Lyons (JL 4951)
    Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

    - and -

By:  s/Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

4

**Hearing Date: November 29, 2005, 10:00 a.m.**
**Objection Deadline: November 22, 2005, 4:00 p.m.**

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :
        In re                           :     Chapter 11
                                              :
DELPHI CORPORATION, et al.,      :     Case No. 05-44481 (RDD)
                                              :
                   Debtors.    :     (Jointly Administered)
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(a) 328 AND FED. R.
BANKR. P. 2014(a) AUTHORIZING EMPLOYMENT AND RETENTION OF
JONES LANG LASALLE AMERICAS, INC. AS REAL ESTATE
<u>ADMINISTRATIVE AND TRANSACTION SERVICES PROVIDER TO DEBTORS</u>

("JLL RETENTION APPLICATION")

          Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the

"Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases

(collectively, the "Debtors" or the "Company"), hereby submit this application (the

"Application") for an order under 11 U.S.C. §§ 327(a) and 328 and Fed. R. Bankr. P.

2014(a) authorizing the employment and retention of Jones Lang LaSalle Americas, Inc. ("JLL")

as real estate administrative and transactional services provider to the Debtors.  In support of this

Application, the Debtors submit the Declaration of James Becker, dated November 9, 2005 (the

"Becker Declaration").  In further support of this Application, the Debtors respectfully represent

as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

       1.    On October 8, 2005, Delphi and certain of its U.S. subsidiaries filed
voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the
United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").  On October
14, 2005, three additional U.S. subsidiaries of Delphi filed voluntary petitions in this Court for
reorganization relief under the Bankruptcy Code.  The Debtors continue to operate their
businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and
1108 of the Bankruptcy Code.  The Debtors have moved this Court for an order authorizing joint
administration of these chapter 11 cases.

       2.    On October 17, 2005, the Office of the United States Trustee appointed an
official committee of unsecured creditors.  No trustee or examiner has been appointed in the
Debtors' cases.

       3.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157
and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core
proceeding under 28 U.S.C. § 157(b)(2).

       4.    The statutory predicates for the relief requested herein are section 327(a) of
the Bankruptcy Code and Bankruptcy Rule 2014(a).

B.    <u>Current Business Operations Of The Debtors</u>

       5.    With more than 180,000 employees worldwide, global 2004 revenues of
approximately $28.6 billion and global assets as of August 31, 2005 of approximately $17.1
billion,[1] Delphi ranks as the fifth largest public company business reorganization in terms of

---

[1]    The aggregated financial data used in this Application generally consists of consolidated information from
Delphi and its worldwide subsidiaries and affiliates.

2

revenues, and the thirteenth largest public company business reorganization in terms of assets.

Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations

without supervision from the Bankruptcy Court, and will not be subject to the chapter 11

requirements of the U.S. Bankruptcy Code.

6.    Over the past century, the operations which are now owned by Delphi have

developed leading global technology innovations with significant engineering resources and

technical competencies in a variety of disciplines.  Today, the Company is arguably the single

largest global supplier of vehicle electronics, transportation components, integrated systems and

modules, and other electronic technology.  The Company's technologies and products are present

in more than 75 million vehicles on the road worldwide.  The Company supplies products to

nearly every major global automotive original equipment manufacturer with 2004 sales to its

former parent, General Motors Corporation ("General Motors" or "GM"), equaling

approximately $15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler

Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850

million.

7.    As part of its growth strategy, Delphi has established an expansive global

presence with a network of manufacturing sites, technical centers, sales offices, and joint

ventures located in every major region of the world.  In the U.S., the Debtors employ

approximately 50,600 people.  These employees work in approximately 44 manufacturing sites

and 13 technical centers across the country, and in Delphi's worldwide headquarters and

customer center located in Troy, Michigan.  Approximately 34,750 of these individuals are

hourly employees, 96% of whom are represented by approximately 49 different international and

local unions.  Outside the United States, the Company's foreign entities employ more than

134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

8.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

9.    Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle.  When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply source.  The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base.  The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C.    Events Leading To The Chapter 11 Filing

10.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales.  Reflective of a downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005.  The Company experienced net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[2]

11.    The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues and forward looking revenue requirements.  Having concluded that pre-filing discussions with its Unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence

---

[2]    Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

5

these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and
preserve value.

13.    Through the reorganization process, the Debtors intend to achieve
competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive
legacy liabilities and burdensome restrictions under current labor agreements and realigning
Delphi's global product portfolio and manufacturing footprint to preserve the Company's core
businesses.  This will require negotiation with key stakeholders over their respective
contributions to the restructuring plan or, absent consensual participation, the utilization of the
chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned
in the Company's transformation plan.  The Debtors believe that a substantial segment of
Delphi's U.S. business operations must be divested, consolidated, or wound-down through the
chapter 11 process.

14.    Upon the conclusion of this process, the Debtors expect to emerge from
chapter 11 as a stronger, more financially sound business with viable U.S. operations that are
well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all
of its resources to continue to deliver value and high-quality products to its customers globally.
Additionally, the Company will preserve and continue the strategic growth of its non-U.S.
operations and maintain its prominence as the world's premier auto supplier.

Relief Requested

15.    By this Application, the Debtors request entry of an order authorizing the
Debtors to employ and retain JLL pursuant to that certain Real Estate Services Agreement
between Delphi Automotive Systems LLC and JLL, dated September 2, 2005, as amended by
that certain First Amendment to Real Estate Services Agreement, attached hereto as Exhibit 1

6

(the "Engagement Agreement"), as the Debtors' real estate administrative and transaction

services provider in these chapter 11 cases.  Accordingly, the Debtors respectfully request entry

of an order pursuant to sections 327(a) and 328 of the Bankruptcy Code and Fed. R. Bankr. P.

2014(a) authorizing each of them to employ and retain JLL as their real estate administrative and

transaction services provider to perform certain services that will be necessary during their

chapter 11 cases as described below, nunc pro tunc to November 3, 2005.

Basis For Relief

16.    The Debtors require a qualified global real estate service provider to

maintain and administer the more than 400 owned or leased parcels of real property containing a

total of 86 million square feet in nearly 40 countries worldwide.  Currently, the Debtors do not

have the resources to perform either the real estate administration or transactional services

contemplated by the Engagement Agreement.  Historically, the Debtors have outsourced these

activities.  The previous real estate service provider terminated its relationship with Delphi at the

beginning of November when its contract terminated.  In its place, JLL will provide the crucial

day-to-day real estate support services as described below.

17.    JLL is a global integrated real estate services provider, specializing in

facility services, transactional services, and lease administration.  Its services also include

advising companies in complex restructuring assignments concerning the reduction of real estate

operating and occupancy costs, increasing operating efficiency of real estate assets, and advising

on all real estate matters during restructuring, reorganization, or liquidation efforts.

Notwithstanding JLL's restructuring experience, the Debtors had decided to retain JLL prior to

October 8, 2005 to provide them with real estate administration services and advice.  Therefore,

JLL's restructuring experience is now an added benefit to the retention of JLL.

18.    The Debtors had intended to retain JLL as an ordinary course professional according to the Order Under 11 U.S.C §§ 327, 330, And 331 Authorizing Retention Of Professionals Utilized By Debtors In Ordinary Course Of Business ("Ordinary Course Professionals Order") (Docket No. 883).  The Debtors, however, are concerned that JLL will exceed the fee cap established in the Ordinary Course Professionals Order.  Therefore, the Debtors request that JLL be formally retained as real estate administrative and transaction services provider in these chapter 11 cases.

<u>Services To Be Rendered</u>

19.    The Debtors desire to employ and retain JLL, pursuant to the Engagement Agreement, as the Debtors' real estate administrative and transactional services provider in these chapter 11 cases.  JLL will provide integrated real estate services, including transactional services, lease administration, and assistance in the evaluation of real property owned by the Debtors.

20.    Specifically, JLL will

(a)    maintain the Debtor's real property information database containing key data of all owned and leased locations;

(b)    coordinate all leased real estate related payables including rent and property tax payments;

(c)    issue notice and recommendations relating to notice provisions, expiration dates, or other dates for action by the Debtors;

(d)    perform an initial evaluation and abstract of all real property interests and provide strategic planning services; and

(e)    provide leasing, subleasing, lease termination, or other lease disposition services;

(f)    provide real property purchase and sale services;

(g)    assist with all facility planning and strategy; and

(h)      provide field review of each location, analysis of market costs, and comparison of lease rates by facility.

<u>Disinteredness Of Professionals</u>

21.    Except as set forth in the Becker Declaration, to the best of the Debtors' knowledge, JLL and their respective principals and professionals (a) do not have any connection with the Debtors, their creditors, or any other party-in-interest, or their respective attorneys or accountants, (b) are "disinterested persons" under section 101(14) of the Bankruptcy Code and as required under section 327(a) of the Bankruptcy Code, and (c) do not hold or represent an interest adverse to the estate.

22.    The Debtors reserve their right to retain a different real estate services provider, at their election, to handle the matter or matters that cannot be appropriately handled by JLL because of a potential conflict of interest.

<u>Professional Compensation</u>

23.    Subject to this Court's approval, JLL will charge Delphi for the costs of the salaries of all dedicated administrative personnel plus an overhead allocation profit factor equal to 75% of such salaries.  JLL has informed the Debtors that this amount will be approximately $16,375 per month, with a one time set-up fee of approximately $27,000.  JLL will also charge Delphi for the costs of the salaries of all dedicated transaction services personnel (excluding bonuses, benefits, and payroll taxes) in accordance with a salary schedule acceptable to Delphi plus an overhead allocation profit factor equal to 55% of such transactional services salaries. JLL has informed the Debtors that this fee will be approximately $46,000 per month.

24.    According to the Engagement Agreement, JLL will be entitled to a fee commission as agreed to by Delphi for leasing/subleasing, sales, purchases, expansions, and renewals that would be subject to customary market commissions, <u>provided</u>, <u>however</u>, that in no

9

event will the fee commission due JLL exceed the commission cap scale identified in <u>Schedule I</u> of <u>Exhibit B</u> to the Engagement Agreement.  JLL has also agreed to give Delphi a discount on the fee commissions based upon the revenue sharing procedure described in the Engagement Agreement and the revenue sharing schedule.

25.    The Debtors have also agreed to reimburse the actual and reasonable out-of-pocket costs and expenses incurred by JLL in connection with the services to be provided pursuant to the Engagement Agreement.  In that regard, JLL will maintain detailed records of any actual and necessary costs and expenses incurred in connection with its services to be provided under the Engagement Agreement.

26.    The actual amount of fees and expenses to be paid to JLL will be as determined and allowed by the Court.  JLL will file with the Court interim application(s) for the payment of fees and expenses, in accordance with the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and the guidelines approved by the orders entered by the Court in these chapter 11 cases, including but not limited to, the Administrative Order Pursuant to 11 U.S.C. §331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals, entered by this Court on November 4, 2005 (Docket No. 869).

27.    The Debtors believe that the compensation structure described herein is fair and reasonable in light of industry practice, market rates both inside and outside chapter 11 cases, and the scope of work to be performed pursuant to this retention.

28.    Furthermore, at the Debtors' request, JLL has assisted the Company in connection with real estate issues since November 3, 2005 and hence, the Debtors request that JLL's retention be effective <u>nunc</u> <u>pro</u> <u>tunc</u> to November 3, 2005.

10

## Notice

29.    Notice of this Application has been provided in accordance with the Order

Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014

Establishing (I) Omnibus Hearing Dates, (II) Certain Notice, Case Management, And

Administrative Procedures, And (III) Scheduling An Initial Case Conference In Accordance

With Local Bankr. R. 1007-2(e), entered by this Court on October 14, 2005 (Docket No. 245).

In light of the nature of the relief requested, the Debtors submit that no other or further notice is

necessary.

## Memorandum Of Law

30.    Because the legal points and authorities upon which this Application relies

are incorporated herein, the Debtors respectfully request that the requirement of the service and

filing of a separate memorandum of law under Rule 9013-1(b) of the Local Bankruptcy Rules for

the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order (a)

authorizing the Debtors to employ and retain JLL as their real estate advisor to perform the

services set forth herein, and (b) granting the Debtors such other and further relief as is just.


Dated:    New York, New York
          November 9, 2005


                                 DELPHI CORPORATION, on behalf of itself and
                                 certain of its subsidiaries and affiliates, as Debtors and
                                 Debtors-in-possession

                                 By:    s/ Karen Healy_____
                                        Name: Karen Healy
                                        Title:  Vice President Corporate Affairs,
                                                Marketing Communications and
                                                Facilities