**LOWENSTEIN SANDLER PC**
Michael S. Etkin, (ME 0570)
Ira M. Levee (IL 9958)
1251 Avenue of the Americas, 18th Floor
New York, New York 10020
(212) 262-6700  (Telephone)
(212) 262-7402  (Facsimile)
            and
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2481 (Facsimile)

Hearing Date: November 29, 2005 at 10:00 a.m.
Objection Deadline: November 23, 2005 at 4:00 p.m.

*Bankruptcy Counsel to Lead Plaintiffs and the Prospective Class*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | : |
| DELPHI CORPORATION, et al., | : |
| | : Case No. 05-44481 (RDD) |
| Debtors. | : |
| | : (Jointly Administered) |

**LEAD PLAINTIFFS' MOTION FOR A LIMITED**
**MODIFICATION OF THE AUTOMATIC STAY**

**TO THE HONORABLE ROBERT D. DRAIN**
**UNITED STATES BANKRUPTCY JUDGE**

### PRELIMINARY STATEMENT

Pursuant to 11 U.S.C. § 362(d) and Fed. R. Bankr. P. ("Rule") 4001, Teachers'

Retirement System Of Oklahoma, Public Employees' Retirement System Of Mississippi,

Raiffeisen Kapitalanlage-Gesellschaft m.b.H. and Stichting Pensioenfonds ABP

(collectively, "Lead Plaintiffs"), the Court-appointed Lead Plaintiffs in the securities class

action entitled *In re Delphi Corp. Securities Litigation*, Master File No. 1:05-CV-2637

(NRB)(SDNY), respectfully move for a limited modification of the automatic stay as to

the debtor, Delphi Corporation ("Delphi" or the "Debtor"), to permit Lead Plaintiffs to

18692/2
11/15/2005 1810840.01

obtain from Delphi a copy of all documents and materials Delphi has produced or provided, in connection with any inquiries or investigations relating to Delphi's accounting practices or business affairs, to any of the following: (a) the Executive branch of the United States Government (including but not limited to the United States Department of Justice and the Securities and Exchange Commission)("SEC") or (b) Wilmer, Cutler, Pickering, Hale & Dorr ("Wilmer, Cutler") in connection with its representation of the Special Investigative Committee of Delphi's Board of Directors.

As discussed further below, modifying the stay in the manner requested would impose virtually no additional burden upon the Debtor, which has already gathered and produced the materials that Lead Plaintiffs seek. Further, given the massive accounting improprieties that Delphi has acknowledged occurred, requiring Delphi to produce a copy of the aforementioned documents to Lead Plaintiffs is clearly in the interests of justice. Finally, the relief requested herein is consistent with the relief previously granted under similar circumstances in the Chapter 11 proceedings in *In re Enron Corp.*, Case No. 01-16034 (AJG) (Bankr. S.D.N.Y.), and *In re WorldCom, Inc.*, Case No. 02-13533 (AJG) (Bankr. S.D.N.Y.).

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The predicates for the relief requested are 11 U.S.C. § 362(d) and Rules 4001 and 9014.

## BACKGROUND

2.      On October 8, 2005, and subsequently on October 14, 2005, the Debtor and substantially all of its active U.S. subsidiaries (42 total debtors) filed voluntary petitions for relief pursuant to Chapter 11 of the United States Bankruptcy Code. The Lead Plaintiffs are, and represent, creditors, equity holders and parties-in-interest in the bankruptcy proceeding by virtue of the fact that Lead Plaintiffs and the Prospective Class

lost millions of dollars as a result of their purchases of Delphi common stock and debt securities.   On June 27, 2005, the Honorable Naomi Reice Buchwald, United States District Judge for the Southern District of New York, appointed the aforementioned institutional investors as Lead Plaintiffs and subsequently, on September 23, 2005, consolidated the pending putative securities class actions as *In re Delphi Corp. Securities Litigation*, Master File No. 1:05-CV-2637 (NRB) (SDNY) (the "Securities Litigation"). On September 30, 2005, Lead Plaintiffs filed their Consolidated Class Action Complaint (the "Complaint") asserting damages for violations of certain federal securities laws against, among others, Delphi and Delphi's current and former officers and directors, underwriters, auditors, and certain other parties.  Although the Securities Litigation is proceeding as against the non-debtor defendants, it is stayed as against Delphi pursuant to the automatic stay.  11 U.S.C. § 362(a).

3.      The Securities Litigation and Delphi's bankruptcy filing were occasioned by what has been exposed as a massive accounting fraud.  Specifically, by participating in a series of multi-million dollar transactions disguised to appear as something other than what the participants knew to be true, Delphi had for years presented the investing public with a materially false and misleading picture of Delphi's cash flow, earnings, debt and/or inventory.  As alleged in the Complaint, Lead Plaintiffs claim that the Debtor violated the federal securities laws because, among other things:

a.      In 1999, 2000 and 2001, Delphi improperly accounted for financing transactions as sales of inventory or indirect materials.  In each such transaction, Delphi obtained substantial loans secured by certain Delphi assets and recorded the proceeds of those loans in a manner designed to inflate its income artificially;

b.      Delphi improperly accounted for more than $240 million in transactions with General Motors Corporation ("GM") by deferring expenses that should have been recognized immediately and by immediately recognizing offsets to expenses that should have been deferred;

c.      Delphi improperly accounted for nearly $110 million in transactions with various service providers by prematurely recognizing reductions to

expenses, improperly deferring the recognition of expenses and improperly failing to recognize obligations;

d.    Delphi overstated its pre-tax income by $14 million in 2002 and by $34 million in 2003 by improperly recording obligations and adjustments before they accrued; and

e.    Delphi improperly accounted for its direct materials by understating the value of its direct materials inventory on a monthly, quarterly and yearly basis.

4.    To date, Lead Plaintiffs are aware of the following governmental investigations and/or inquiries into the fraud at Delphi. In each such investigation, Delphi has been asked to, and has produced, documents relating to the fraud:

a.    On September 29, 2004, Delphi announced that the SEC had served a subpoena on Delphi and certain of its suppliers of information technology services, including Electronic Data Systems ("EDS"). In the press release issued that day, Delphi revealed that it had received the SEC subpoena in July 2004 and a copy of the SEC's formal order of investigation in August 2004. Delphi stated that the SEC was investigating several transactions between EDS and Delphi from 2001-03, as well as at least one transaction between Delphi and an unnamed supplier.

b.    Three weeks later, on October 18, 2004, Delphi filed a Form 8-K, publishing its quarterly financial information. At the same time, however, Delphi announced that it was not filing its Form 10-Q because Delphi's Audit Committee had launched a formal internal investigation in response to the SEC's investigation. Delphi also announced that its independent auditor, Deloitte & Touche LLP ("Deloitte"), had informed Delphi that it could not complete its review of the quarterly financial information due to the internal review by the Audit Committee and the SEC's investigation.

c.    On December 8, 2004, Delphi announced to the public that the Audit Committee had hired outside counsel Wilmer, Cutler and another accounting firm, PriceWaterhouseCoopers ("PWC") to conduct its internal review. Delphi further

-4-

disclosed that the initial review process had unearthed substantial accounting irregularities and internal control issues. Shortly thereafter, on February 23, 2005, Delphi announced that its Chief Executive Officer and Chairman, J.T. Battenberg III, was retiring.

d.      On March 3, 2005, Delphi released certain preliminary findings by the Audit Committee, and filed a Form 8-K with the SEC the following day. Delphi announced that the Audit Committee had determined that Delphi's audited financial statements and related independent auditor's reports from 2001 and subsequent periods could no longer be relied upon. Delphi also announced that it would restate its financial statements. Moreover, the Company announced that the Audit Committee had interviewed numerous members of management and other supervisory level employees who were involved in, or had knowledge regarding, the transactions at issue. The Audit Committee announced that Delphi's Chief Financial Officer and Vice-Chairman, Alan Dawes, resigned because the Audit Committee had expressed a "loss of confidence" in him after these meetings. The Audit Committee also announced that it had fired Delphi's Chief Accountant and Controller, Paul R. Free, and demoted Delphi's Vice President of Treasury, Mergers and Acquisitions, John G. Blahnik.

e.      On March 30, 2005, the Federal Bureau of Investigation ("FBI") and the United States Postal Inspection Service confirmed that they had initiated a criminal investigation into the transactions at issue.

f.      On June 30, 2005, the *Detroit News* reported that the scope of the SEC's investigation into Delphi's accounting practices had expanded to include Bank One and Deloitte, in addition to GM, EDS and BBK Ltd. ("BBK"), and that all five companies had produced records to federal investigators. The report also stated that Delphi already had produced thousands of pages of records to the investigators and that they had interviewed at least twelve current and former Delphi employees. The *Detroit News* further reported that the Justice Department's fraud section issued a "target letter" to a former Delphi executive. On June 30, 2005, Delphi restated its reported financial results

for Fiscal Years 2002 and 2003, and selected financial data for Fiscal Years 2000 and 2001, in its Form 10K for the year ended December 31, 2004 (the "Restatement").

        g.      On September 29, 2005, the *Detroit News* reported that Delphi and several other entities had gathered and produced substantial evidence to federal investigators regarding the financial transactions at issue in this case. According to this report,

    i.      Delphi created a database of over one million company emails in response to SEC and FBI subpoenas. Delphi was asked to search this database for emails containing such terms as "fraud" "accounting" and "jail" as well as searches regarding certain transactions that made the basis of the claims set forth in the Complaint. Delphi has produced thousands of documents to the SEC and/or FBI responsive to these searches;

    ii.     After Delphi's Audit Committee hired Wilmer, Cutler, to conduct a review of the Company's accounting violations, Delphi waived the potential protections afforded by the attorney-client privilege between Delphi and Wilmer, Cutler. Delphi has allowed Wilmer, Cutler to give investigators regular oral briefings, written summaries of its findings, and interview memoranda from interviews with present and former employees;

    iii.    The SEC has issued new subpoenas to at least twelve present and former Delphi employees, including Defendants Dawes, Free, and Blahnik and Pamela Geller (Delphi's Treasurer), regarding their stock trading records for transactions dating back to Delphi's spinoff from GM in 1999;

    iv.    The SEC has questioned numerous present and former employees, some of whom were questioned for two days;

    v.     GM, EDS, Bank One, Deloitte, and BBK produced documents to the SEC and/or FBI pursuant to these federal investigations regarding the transactions at issue in the Complaint; and

    vi.    Pursuant to these investigations, the SEC has obtained hundreds of thousands of documents regarding the transactions at issue in the Complaint.

        5.     On information and belief, Delphi has maintained a complete set of all documents that have been produced in these investigations, and can easily provide a copy

of these documents to the Lead Plaintiffs with minimal, if any, burden. Specifically, Lead

Plaintiffs seek permission to obtain from Delphi the following materials:

a.    A copy of all documents gathered in conjunction with the internal
investigation conducted by the Delphi Audit Committee of its Board of
Directors, represented by Wilmer, Cutler, and PWC, including but not
limited to: (a) all e-mails and any other documents gathered and/or
produced during the course of this investigation; and (b) all documents
relating to Delphi's Restatement of June 30, 2005; and

b.    A copy of all documents produced in conjunction with the SEC and FBI
investigations, including but not limited to: (a) the results of Delphi's
internal investigation turned over to the SEC in June 2005; (b) the database
created by Delphi containing more than a million company e-mails, created
by "imaging" or copying the hard drives of computers of executives; (c)
the results of the searches of the aforementioned database for specific
phrases, including, but not limited to searches for the terms "fraud" and
"accounting" or "jail" and "accounting"; (d) any other records produced by
Delphi or any present or former Delphi employee to federal authorities;
and (e) documents produced in connection with and leading up to the
Department of Justice's issuance of a "target letter" to any current or
former Delphi employee, meaning that the government has "substantial
evidence" linking him or her to the commission of a crime.

6.    Section 362(d)(1) gives the Court broad discretion to terminate, modify,

annul, or condition a stay to protect the rights of parties in interest. Lead Plaintiffs are

aware that in the securities and ERISA class actions relating to the frauds at both

WorldCom and Enron, lead plaintiffs in those actions made applications to this Court

similar to the one made here by Lead Plaintiffs, *i.e.*, for a limited modification of the

automatic stay to allow production by the respective debtors to the respective lead

plaintiffs of documents that the debtors had already provided to the federal government in

connection with investigations into those companies.[1]

7.    On February 25, 2002, the Bankruptcy Court in *In re Enron Corp*, granted

the stay relief motion filed by the ERISA plaintiffs, and on May 22, 2002, the Bankruptcy

Court granted the stay relief motion filed by the lead plaintiff in the securities class action.

---

[1] The request made here is narrower than those made in the *WorldCom* and *Enron* proceedings in that Lead
Plaintiffs are not seeking copies of interview memoranda or notes of witness interviews.

*See* Exhibits A and B, annexed hereto. These Orders directed Enron to produce documents, including, *inter alia*, copies of documents produced to various government agencies or branches and copies of all transcripts of witness interviews taken or conducted by Wilmer, Cutler in connection with its representation of the Special Investigative Committee of Enron's Board of Directors, as requested by the lead plaintiffs therein. *See* Exhibit B.

8.    On November 8, 2002, the Bankruptcy Court in *In re WorldCom, Inc.*, *supra*, granted the stay relief motion filed by the lead plaintiffs in the WorldCom securities class action, thereby directing WorldCom to produce documents (similar to the type produced by the debtor in *Enron* and requested here). *See* Exhibit C, annexed hereto.

9.    In addition to *Enron* and *Worldcom*, the automatic stay has been modified in other cases to permit the production of documents by debtors. *See, e.g., Norton Co. v. Johns Manville Corp. (In re Johns-Mansville Corp.)*, 39 B.R. 659, 663 (S.D.N.Y.) 1984); *Teledyne Industries, Inc. v. Eon Corporation*, 373 F. Supp. 191, 203 (S.D.N.Y. 1974); *Sioux City Foundry Co. v. Penrod (In re Dakota's Farm Mfg. Co.)*, 31 B.R. 92, 95 (Bkrtcy. D.S.D. 1983).

10.    In *Johns-Manville*, a co-defendant sought production of the debtor's records. The court rejected the debtor's claim that production of documents would divert the attention of the debtor from its reorganization or that the debtor would incur expenses that would imperil its reorganization. 39 B.R. at 661-662. Neither of those situations are factors here.

11.    In *Dakota's Farm Mfg.*, a party sought discovery of the debtor in order to pursue its action in another court against a non-debtor. The court modified the stay to permit the party to obtain the documents so long as the production did not interfere with the bankruptcy proceeding. 32 B.R. at 94-95.

12.    Acknowledging that the automatic stay is intended "to prevent interference with, or diminution of, the debtor's property … [and] to prevent a creditor from defeating

the jurisdiction of the bankruptcy court over the debtor's property," the *Teledyne* court, concluded that "so long as the purpose served by the stay, the preservation of [the debtors'] property from adverse judgment, is observed in these proceedings," modification of the stay is warranted. *Teledyne*, 373 F. Supp. at 203 (citations omitted). The relief sought here will not impact upon the purpose and/or sanctity of the automatic stay, especially where the information sought will be used in the prosecution of an action against parties other than the Debtor. *Teledyne*, 373 F. Supp. at 203.

13.    As in *Enron* and *WorldCom*, there will be no impact on the Debtor's reorganization as a result of the limited modification of the automatic stay requested herein. The Debtor has already produced the requested documents and, upon information and belief, has segregated copies of such documents. Thus, there will be no interference or additional burden. Indeed, even if some minor intrusion is shown, any such alleged interference "cannot properly be the sole consideration, to the exclusion of legitimate fair interests of third parties." *Johns-Manville*, 39 B.R. at 662.

14.    In *Norton Co. v. Johns-Manville*, the Court permitted the requested discovery, noting that there was no evidence that any expenses incurred by the debtor would impact adversely the reorganization of the debtor or the interests of the creditors. 39 B.R. at 662. Similarly, in this matter, the Debtors will incur *no* additional expense. Lead Plaintiffs agree to pay the copying costs for those documents that are ultimately copied.

15.    As Lead Plaintiffs demonstrated above, there will be no additional burden to the Debtor if the requested relief is granted. The ultimate decision as to whether the Debtor would be required to produce the requested documents would lie exclusively with Judge Buchwald, who is presiding over the Securities Litigation in the District Court. Indeed, if this requested relief is granted, Lead Plaintiffs will then move before Judge Buchwald for an order lifting the PSLRA discovery stay to allow Delphi to produce the documents requested herein. In *Enron* and in *WorldCom*, after this Court granted lead

plaintiffs relief from the automatic stay, lead plaintiffs made similar motions in the District Court, which were granted in each instance.

16.    Pursuant to Local Bankruptcy Rule for the Southern District of New York 9013-1(6), because there are no novel issues of law presented, the Lead Plaintiffs request that the Court waive the requirement that the Lead Plaintiffs file a memorandum in support of this Motion.

## CONCLUSION

WHEREFORE, the Lead Plaintiffs respectfully request entry of an Order modifying the automatic stay to the limited extent set forth herein, and granting such other relief as the Court deems just and proper.

Dated:  November 15, 2005

Respectfully submitted,

**LOWENSTEIN SANDLER PC**

By: /s/ Michael S. Etkin
Michael S. Etkin, Esq. (ME-0570)
Ira M. Levee, Esq. (IL-9958)
1251 Avenue of the Americas, 18th Floor
New York, New York 10019
(212) 262-6700  (Telephone)
(212) 262-7402  (Facsimile)
             and
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2481 (Facsimile)

*Bankruptcy Counsel for Lead Plaintiffs and the Prospective Class*

**NIX, PATTERSON & ROACH, L.L.P.**
Jeffrey J. Angelovich
Bradley E. Beckworth
Susan Whatley
205 Linda Drive
Daingerfield, Texas 75638
Telephone:    (903) 645-7333
Facsimile:    (903) 645-4415

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
John P. Coffey
Hannah E. Greeenwald
Mark D. Debrowski
1285 Avenue of the Americas
New York, NY 10019
Telephone:    (212) 554-1400
Facsimile:    (212) 554-1444

**GRANT & EISENHOFER, P.A.**
Jay W. Eisenhofer
45 Rockefeller Center
650 Fifth Avenue
New York, NY 10111
Telephone:    (212) 755-6501
Facsimile:    (212) 755-6503
-and-
Geoffrey C. Jarvis
Sharan Nirmul
1201 North Market Street, Suite 2100
Wilmington, DE 19801
Telephone:    (302) 622-7000
Facsimile:    (302) 622-7100

**SCHIFFRIN & BARROWAY, L.L.P.**
Michael Yarnoff
Sean M. Handler
Jodi Murland
280 King of Prussia Road
Radnor, PA 19087
Telephone:    (610) 667-7056
Facsimile:    (610) 667-7706

*Co-Lead Counsel for Lead Plaintiffs and the
Prospective Class*