1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF NEW YORK
2

3
                                          .
4     IN RE:                              .    Case No. 05-44481 (RDD)
                                          .
5     DELPHI CORPORATION, et al,          .    New York, New York
                                          .    Thursday, October 27, 2005
6                        Debtors.         .    10:35 a.m.
      . . . . . . . . . . . . . . .
7

8
                       TRANSCRIPT OF OMNIBUS HEARING
9             BEFORE THE HONORABLE ROBERT D. DRAIN
                   UNITED STATES BANKRUPTCY JUDGE
10

11    APPEARANCES:  (On the Record)

12    For the Debtors:              John Wm. Butler, Jr., Esq.
                                    SKADDEN, ARPS, SLATE, MEAGHER
13                                   & FLOM, LLP
                                    333 West Wacker Drive, Suite 2100
14                                  Chicago, Illinois 60606
                                    (312)407-0700
15
                                    Kayalyn A. Marafioti, Esq.
16                                  Thomas J. Matz, Esq.
                                    SKADDEN, ARPS, SLATE, MEAGHER
17                                   & FLOM, LLP
                                    Four Times Square
18                                  New York, New York, 10036
                                    (212)735-3000
19
      Court Recorder:               Electronically Recorded
20                                  by Maria E. Rodriguez

21    Transcription Company:        Rand Transcript Service, Inc.
                                    311 Cheyenne Road
22                                  Lafayette, New Jersey  07848
                                    (973) 383-6977
23
      Proceedings recorded by electronic sound recording, transcript
24    produced by transcription service.

25

```
 1    APPEARANCES:   (Continued)

 2    For the Debtors:   (Continued)      Douglas P. Bartner, Esq.
                                          William J.F. Roll, III, Esq.
 3                                        SHEARMAN and STERLING, LLP
                                          599 Lexington Avenue
 4                                        New York, New York 10022
                                          (212) 849-4000
 5

 6    For the Creditors' Committee:       Robert J. Rosenberg, Esq.
                                          LATHAM & WATKINS, LLP
 7                                        885 Third Avenue
                                          New York, New York 10222
 8                                        (212) 906-1200

 9    For Pension Benefit Guarantee:      Mark R. Somerstein, Esq.
                                          KELLEY DRYE
10                                        101 Park Avenue
                                          New York, New York 10178
11                                        (212) 808-7580

12    For the Ad Hoc Committee of
      Prepetition Lenders:                Allan S. Brilliant, Esq.
13                                        GOODWIN PROCTER
                                          599 Lexington Avenue
14                                        New York, New York 10022
                                          (212) 813-8900
15
      For the DIP Lenders:                Laureen F. Bedell, Esq.
16                                        DAVIS POLK & WARDWELL
                                          450 Lexington Avenue
17                                        New York, New York 10017
                                          (212) 450-4000
18
      For Prepetition Agent
19    J.P. Morgan Chase Bank:             Kenneth S. Ziman, Esq.
                                          SIMPSON, THACHER & BARTLETT,
20                                          LLP
                                          425 Lexington Avenue
21                                        New York, New York 10017
                                          (212) 455-3979
22
      For General Motors Corp.:           Martin J. Bienenstock, Esq.
23                                        WEIL, GOTSHAL & MANGES, LLP
                                          767 Fifth Avenue
24                                        New York, New York 10153
                                          (212) 310-8530
25
```

```
1    APPEARANCES:   (Continued)

2    For Bank of America, NA:          Patrick E. Mears, Esq.
                                       BARNES & THORNBURG, LLP
3                                      300 Ottawa Avenue NW
                                       Suite 500
4                                      Grand Rapids, Michigan 49503
                                       (616) 742-3936
5
     For Omega Tool, et al:           Max J. Newman, Esq.
6                                      SCHAFER AND WEINER, PLLC
                                       40950 Woodward Avenue
7                                      Suite 1000
                                       Bloomfield Hills, Michigan 48304
8
     No Appearance:                    Joel Applebaum, Esq.
9
     For Lear Corporation:             Ralph E. McDowell, Esq.
10                                     BODMAN, LLP
                                       34th Floor
11                                     100 Renaissance Center
                                       Detroit, Michigan 48243
12                                     (313) 259-7777

13   For Ford Motor Company:           Timothy A. Fusco, Esq.
                                       MILLER, CANFIELD, PADDOCK
14                                      & STONE, PLC
                                       150 West Jefferson, Suite 2500
15                                     Detroit, Michigan 48226
                                       (313) 963-6420
16
     For Flextronics:                  Steven J. Reisman, Esq.
17                                     CURTIS, MALLET-PREVOST, COLT
                                        & MOSLE, LLP
18                                     101 Park Avenue
                                       New York, New York 10178
19                                     (212) 696-6065

20   For Robert Bosch Corp.:           Gordon J. Toering, Esq.
                                       WARNER, NORCROSS & JUDD, LLP
21                                     900 Fifth Third Center
                                       111 Lyon Street NW
22                                     Grand Rapids, Michigan 49503
                                       (616) 752-2185
23

24

25
```

4

1                                I N D E X

2
                                                              Page
3    INTERIM COMPENSATION ORDER
     (Item No. 1 on Agenda)
4        Form of Order Discussion/Adjourned to 11/4/05          6

5    RETENTION OF DEBTORS' PROFESSIONALS
     (Item Nos. 2 through 8 on Agenda)
6        Form of Order Discussion/Adjourned to 11/4/05          7

7    RETENTION ORDINARY COURSE PROFESSIONALS
     (Item No. 9 on Agenda)
8        Form of Order Discussion/Adjourned to 11/4/05          8

9    PROCEDURES FOR CLAIMS AND SECURITIES TRADING
     (Item No. 10 on Agenda)
10       Adjourned to 11/29/05                                  9

11

12   RETENTION OF FINANCIAL ADVISOR ROTHSCHILD, INC.
     (Item No. 11 on Agenda)
13       Adjourned to 11/29/05                                 10

14   CONTINUATION OF INSURANCE FINANCING AGREEMENTS
     (Item No. 12 on Agenda)
15       Motion for Order by Mr. Butler                        10
         Approval by the Court                                 10
16
     CONTINUATION OF HSBC PURCHASE CARD
17   (Item No. 13 on Agenda)
         Motion for Order by Mr. Butler                        10
18       Approval by the Court                                 11

19   REJECTION OF PACIFIC RIM LEASE
     (Item No. 14 on Agenda)
20       Motion for Order by Mr. Butler                        11
         Approval by the Court                                 12
21
     SALE OF DE MINIMIS ASSETS
22   (Item No. 15 on Agenda)
         Motion for Order by Mr. Butler                        12
23       Approval by the Court with Modifications              16

24   INTERIM/FINAL ORDERS RE:  UTILITIES
     (Item No. 16 on Agenda)
25       Motion for Order by Mr. Butler                        16
         Approval by the Court with Modifications              19

5

1                          I N D E X
                          (Continued)
2
                                                              Page
3    REJECTION OF LICENSE AGREEMENT/DURASWITCH
     (Item No. 17 on Agenda)
4         Motion for Order by Mr. Butler                        19
          Approval by the Court                                 20
5
     CONTINUED USE OF CASH MANAGEMENT, ET CETERA
6    (Item No. 18 on Agenda)
          Motion for Order by Mr. Butler                        20
7         Response by Mr. Rosenberg                             21
          Argument                                              22
8         Response by Mr. Somerstein                            24

9    DIP FINANCING
     (Item No. 19 on Agenda)
10        Motion for Order by Mr. Butler                        27
              J.P. Morgan/Citibank Financing
11            By Mr. Butler                                     28
              Response By Mr. Brilliant                         42
12
              Intercompany liens, Carve-outs, Waivers, et cetera
13            By Mr. Butler
               44
14            Clarification by Ms. Bedell for DIP Lenders       45
              Clarification by Mr. Ziman                        55
15            Response by Mr. Rosenberg                         56
              Response by Mr. Ziman                             57
16            Response by Mr. Bienenstock                       60

17            Objections from Set-off and Lien claimants, et cetera
              By Mr. Butler                                     63
18            Objections argued by Mr. Mears                    64
                  Court Decision                                70
19            Objections argued by Mr. Newman                   71

20
              Alternative Dispute Resolution Objections, et cetera
21            By Mr. Butler                                     73
              Response by Mr. McDowell                          79
22            Response by Mr. Fusco                             81
              Response by Mr. Reisman                           83
23            Response by Mr. Toering                           86
              Court Decision                                    87
24
       Evidentiary Hearing                                      89
25
       Approval by the Court with Modifications                105

1        (Proceedings commence at 10:35 a.m.)

2        THE COURT:  Please be seated.  All right.

3        <u>Delphi Corporation</u>?

4        MR. BUTLER:  Your Honor, good morning.  My name is

5   Jack Butler from the law firm of Skadden, Arps, Slate, Meagher

6   & Flom, L.L.P., here with my partner Kayalyn Marafioti and our

7   special counsel Doug Bartner, for purposes of our October 27th

8   omnibus hearing.  This is the monthly omnibus hearing for the

9   month of October.

10       Your Honor, we have filed and served a proposed

11  omnibus hearing agenda, and with Your Honor's permission, we'll

12  follow that agenda.

13       THE COURT:  Okay.

14       MR. BUTLER:  Your Honor, the first item on that

15  agenda, Item No. 1, is the interim compensation order at Docket

16  No. 11.  We have been in discussions with the creditors'

17  committee and with the United States Trustee regarding the form

18  of that order.

19       With respect to the interim comp arrangements we

20  believe we have a proposed form of final order.  We're going to

21  be dealing with that over the next week, ask Your Honor to take

22  that up at the November 4th adjourned hearing so we can get a

23  sign-off from the U.S. Trustee on the form of order.

24       THE COURT:  Okay.  And are those same people talking

25  about, you know, a fee committee?

1           MR. BUTLER:  Yes, Your Honor.  And, in fact, the

2    United States Trustee observed to us that even under the

3    interim comp order the first monthly statements in this case

4    aren't generated until November 30th, and that the November

5    20th omnibus hearing would be an appropriate time to take that

6    up.  And they wanted to consider certain matters further and

7    consult with the committee.

8           THE COURT:  Okay.

9           MR. BUTLER:  So that portion, Your Honor -- the fee

10   committee portion would come up at the November 29th hearing.

11          THE COURT:  Okay.

12          MR. BUTLER:  Your Honor, the next items, and I'll just

13   take Items 2 all the way through Item 8, are retention

14   applications for the debtors' professionals that have been --

15   pursuant to which interim orders have been entered.

16          The creditors' committee is in the process of

17   completing their review of these things.  They were appointed

18   last Monday, Your Honor, a week ago.  I should report to the

19   Court the following appointment in an organizational meeting

20   held I think on the 17th of October.

21          We held our first full committee meeting with the

22   committee on the 25th, this Tuesday, the debtors did, and had a

23   full agenda with the committee.

24          The committee asked us if we would adjourn all of

25   these to November 4th so they can complete their review, given

1   the press of other matters.  The U.S. Trustee has also advised

2   us that they expect to have completed their review for purposes

3   of a final order on November 4th.

4          THE COURT:  All right.  Okay.

5          MR. BUTLER:  Your Honor, the next item on the agenda

6   is Item No. 9.  This is the ordinary course of professionals

7   item.

8          We have had discussions with the United States Trustee

9   about the OCP order.  Essentially, the form of relief that

10  we're going to request in this motion is going to change.  And,

11  rather than having a multi-tiered order, there will be an order

12  that will basically say that any professional who exceeds

13  50,000 a month or $500,000 for the aggregate case will have to

14  file a retention application and go through the normal 327(a)

15  or (e) approach.  Anyone less than that can be governed by the

16  OCP order.  We're working on the final form of order with the

17  U.S. Trustee and intend to present it to Your Honor at the

18  November 4th adjourned hearing.

19         THE COURT:  All right.

20         MR. BUTLER:  Your Honor, Number 10 on the agenda is

21  the claims trading -- final hearing on the claims trading

22  motion.  This is the motion that is intended to help preserve

23  our NOL and other -- our tax positions and other asset

24  position.

25         This, by agreement with the Cleary firm, was moved to

1    the November 29th hearing.  There is continued working on

2    trying to work on a consensual final order.

3              THE COURT:  Okay.  That's fine.

4              MR. BUTLER:  And, finally, Your Honor, also on the

5    agenda is Number 11 is the Rothschild retention.  This is --

6    has a success unit.  It's subject to the forty-five-day rule

7    here in the Southern District and it will, therefore, be heard

8    for a final hearing at the November 29th omnibus hearing.

9              THE COURT:  Right.

10             MR. BUTLER:  Your Honor, now moving on to the matters

11   that we believe are uncontested, agreed, or otherwise resolved,

12   the first matter is Item No. 12.  This deals with insurance

13   financing.

14             It's our motion seeking authority to continue honoring

15   prepetition insurance premium finance agreements and related

16   matters.

17             Your Honor, we request authorization from the Court to

18   continue to honor obligations to an entity called Kenwal, Inc.

19   (phonetic), pursuant to a prepetition insurance premium

20   financing agreement.  We have reviewed -- the terms of the

21   agreement have been provided to the creditors' committee.

22   Neither the committee nor any of the party has objected to the

23   relief requested.  Unless Your Honor has any questions, we rely

24   on the papers.

25             THE COURT:  No.  I reviewed the papers.  Unless --

Omnibus Hearing                                                      10

1    does anyone else want to be heard on this matter?  Hearing no

2    one, and based on my review of the motion, I'll approve it.

3              MR. BUTLER:  Thank you.  Your Honor, the next matter,

4    Matter No. 13, is our motion to assume the HSBC purchase card

5    and to continue to use the purchase card agreement and travel

6    card agreement with HSBC Bank USA National Association.

7              And, Your Honor, essentially, we have in this

8    agreement asked to assume and take various actions with respect

9    to the agreement that we use to deal with about 1,080 of our

10   employees who use this as a purchase card through our plant

11   facilities in the U.S. and elsewhere, and about 12,500 of our

12   employees who use this card in the ordinary course of the

13   debtors' business in connection with travel-related expenses.

14             Again, Your Honor, there's a variety of relief sought

15   in the motion with respect to HSBC.  We assume already this

16   matter has been presented to the committee and other parties.

17   No one has filed an objection.  Unless Your Honor has any

18   particular questions, we'd ask the -- we have authority to

19   assume and take the actions outlined in the motion.

20             THE COURT:  The debtors couldn't get a replacement

21   card?

22             MR. BUTLER:  Your Honor, we didn't -- candidly, we

23   didn't seek to try to get a replacement card here.  The fact is

24   that trying to go through a process of taking all these cards

25   out, reissuing all the other cards, we actually, as I think I

1    explained to Your Honor the first day, we pre-funded a good

2    portion of this going into this.  So I don't believe as of the

3    -- well, there was a potential preference claim here which we

4    talked to the -- advised the committee about.  I don't think

5    there was anything owed as of the petition date --

6              THE COURT:  Okay.

7              MR. BUTLER:  -- the way in which we structured this

8    particular transaction.

9              THE COURT:  All right.  And this is generally paid --

10   these payments are made generally by the debtors pretty

11   regularly?

12             MR. BUTLER:  Yes, Your Honor.  They're paid -- made in

13   a monthly basis.  And some of these are made directly and

14   others of them may be reimbursed through expense agreements.

15   But they're all in the process -- this is basically used for

16   two purposes:  For travel and in our plants when people need --

17   and facilities people need to go out and get some de minimis

18   sort of asset kind of -- that's how they go out and acquire

19   them.

20             THE COURT:  Okay.  Does anyone want to be heard on

21   this motion?  All right.

22             Based on my review of the motion and Mr. Butler's

23   comments and there being no objections, I'll approve it.

24             MR. BUTLER:  Thank you, Your Honor.

25             Your Honor, the next motion is -- matter on the agenda

Omnibus Hearing                                                                    12

1    is Matter No. 14.  This is a motion seeking authority to reject

2    what we called a "Pacific Rim lease."

3          And in this motion what we're trying to accomplish, we

4    no longer need to use the master lease agreement with Pacific

5    Rim, Inc.  This is a master agreement which involved the lease

6    of assorted machinery, equipment, and other items.  And we no

7    longer need to use these items, particularly because of the

8    reasons set forth in the motion having to do with our

9    operations in Foley, Alabama.

10         Your Honor, as a result of the debtors' exercise of

11   its business judgment, we have determined it's appropriate to

12   reject this lease at this time.  There have been no objections

13   filed either by the lessor, by the committee, or any other

14   party.

15         THE COURT:  Okay.  I reviewed the motion and it

16   appears to be well within the debtors' business judgment, so

17   I'll approve it.

18         MR. BUTLER:  Thank you, Your Honor.

19         Your Honor, Matter No. 15 on the agenda is our motion

20   for an order to sell certain de minimis assets free and clear

21   of liens.  It's essentially -- and to pay market rate broker

22   commissions.  This is essentially a de minimis procedures order

23   that allows us to operate in the ordinary course of business

24   with the disposition of de minimis assets.

25         There's a proposed procedure here that would require

1   that we send notice in advance to the U.S. Trustee, the

2   unsecured creditors' committee, the DIP lenders, any one holder

3   of a lien on the assets proposed to be sold, and any other

4   known interested party with respect to the particular asset

5   involved.

6          There is a procedure that requires that if we don't

7   get a written objection or a request for additional time within

8   five business days, we can complete the transaction.  And,

9   otherwise, if there is an objection raised and we can't resolve

10  it, we need to come to court and deal with that resolution.

11         There is a purchase price limitation here of greater

12  than -- anything greater than $10 million that requires to come

13  to court.  Given a company of our size with our asset base, we

14  think that's an appropriate level.

15         We have agreed with the creditors' committee, our

16  financial advisors of the debtors and the committee working

17  together on a protocol so that the committee is comfortable in

18  how that $10 million is analyzed.  You know, Mr. Rosenberg has

19  used to me the example of, you know, you've got a hundred-

20  million-dollar asset on the books at book value and you're

21  going to get $10 million for it, that's probably not the kind

22  of transaction that should be a de minimis asset sale.

23         THE COURT:  That's definitely not.  Actually, I put in

24  here, because the 10 million only works if it's an arm's length

25  market-driven sale.  So I put in without further Court

Omnibus Hearing                                                    14

1   approval, and I added the words, "arm's length sale."  And then

2   you and the committee can work out beyond that.  But the debtor

3   has to be comfortable it's an arm's length sale.

4          That's separate and apart from it not being to

5   insiders.

6          MR. BUTLER:  Right.  And, Your Honor, on that point,

7   we would work out a protocol with our financial advisors.  I

8   think we've had pretty good success even in the last week or

9   ten days on our -- the financial advisors working very closely

10  together -- I mean professionals for the debtors and the

11  committee working closely together.

12         In the unlikely event that we couldn't agree on a

13  protocol, I said to Mr. Rosenberg, you can come back to court

14  here with respect to this order subsequently.  But I can't

15  imagine that's the -- would be the case.

16         THE COURT:  Okay.  Anyone want to -- I had a couple of

17  other comments on this.  Maybe I should give you those before I

18  hear from anyone.

19         In Paragraph 4 I think the broker's affidavit should

20  include an affirmation by the broker that the commission is at

21  or lower than in his or her reasonable belief market

22  commissions for similar sales.

23         And then Paragraph C, which is the paragraph that

24  gives a right to come -- whoever is on the call, it's not on

25  mute.  Please put it on mute or get off the call.

1   Paragraph C is a paragraph that lets people go to

2   court if their -- if you can't resolve an objection.  And I

3   just want to make it clear that the broker would be routine

4   nunc pro tunc given the rules in this Circuit.  There shouldn't

5   be any concern on the broker's part about that.

6   And then, lastly, on Paragraph 6, which is the

7   paragraph that says that the notice procedures shall not apply

8   to sales of assets that involve an insider, I also added this

9   concept, and you can -- if you're not comfortable with the

10   language, you can adjust it.  But what I had in mind was:

11   "Or any sale that because of the integral nature of

12   the asset would require the debtor subsequently to sell

13   additional assets for an aggregate sum in excess of 10

14   million."

15   And that wouldn't be covered by this, either.  You'd

16   have to go to court for that.

17   MR. BUTLER:  I understand that, Your Honor.  And I

18   should point out we also agreed to give counsel to the debtors

19   prepetition credit facility notice of these transactions.

20   THE COURT:  Right.  Okay.  So -- okay.  So does anyone

21   else -- does anyone want to be heard on this motion?

22   UNIDENTIFIED ATTORNEY:  Your Honor, only to say that

23   we were troubled by the ten-million-dollar number for the

24   reason Mr. Butler said.  But I will report that I think that

25   FTI, the debtors' financial advisor, and Mezero (phonetic), the

1    committee's financial advisor, have already established an

2    excellent working relationship and I have every anticipation

3    that we will be able to work through what $10 million really

4    should mean, particularly in the context of Your Honor's

5    comments.

6         THE COURT:  Okay.  And, again, if for some reason the

7    committee or the banks or anyone else feels this program isn't

8    working as intended, then you can come back to court and seek

9    modification of the order.

10        UNIDENTIFIED ATTORNEY:  Very good, sir.  Thank you.

11        THE COURT:  Okay.  But with those changes and caveats,

12   I will permit it.

13        MR. BUTLER:  Thank you, Your Honor.

14        Matter No. 16 on the agenda is a utilities motion.

15   This is our -- the final hearing on our motion for an interim

16   and final order under Section 366 to deal with putting

17   essentially alternative dispute resolution procedures and to

18   deal with utility deposits, perhaps the last of this kind

19   drafted this way that Your Honor will be hearing.  Given the

20   changes in the new Code, I think there will be, as I mentioned

21   at the first day hearings, I think there will be a slightly

22   evolved version of these procedures that will come back, even

23   under the new statute.

24        But as to these matters, we have an alternative

25   dispute resolution process here that essentially tries to work

1   out the deposit issue between the utility and the company and

2   sort of that be adequate assurance issues prior to coming to

3   court.

4        There were very few objectors to that relief.  We did

5   serve this as required by Your Honor in the interim order.

6   There were very few objectors that -- overall that filed an

7   objection.  And with respect to those objectors, we were able

8   to resolve on or two of the objections and, more importantly,

9   all the other objectors agreed that they wanted to continue to

10  work on this with the debtors and ask that -- and agreed that

11  the order could enter on a final basis as to all others.

12       But then -- and we would continue to work with them

13  and deal with them on November 29th if we can't come to a

14  satisfactory resolution.

15       The form of black-lined order we submitted, Your

16  Honor, reflects that agreement.

17       THE COURT:  Okay.  I had a couple of changes to this

18  one, also, consistent with how I've done these.  And I know

19  that different courts have different procedures for this type

20  of motion.

21       They basically have to do with the provision that you

22  have in here in Paragraph 6 and in Paragraph 9 which I think

23  works for an interim order, but not for a final order.  The

24  provision says that unless the utility makes a request within

25  twenty-five days of the receipt of this order they can't make

Omnibus Hearing                                                    18

1   any other requests.

2          And since I think the statute contemplates changed

3   circumstances and the utility's rights and other changed

4   circumstances, I would change that in the third line.  So

5   instead of saying:

6          "Within twenty-five days of the date of service hereof

7   request deadline," I just said:

8          "Based on materially changed circumstances from the

9   date hereof."

10         A similar concept is baked into Paragraph 9 for the

11  utilities that you discover in the future that you might have

12  had that didn't get notice of this.

13         MR. BUTLER:  Yes, sir.

14         THE COURT:  And it -- again, consistent with the case

15  law on this pre-October 17th in the Circuit, this order

16  provides that the utility companies can't unilaterally

17  terminate service, even the ones that you discover in the

18  future for -- unless there's a court order.  But I think they

19  should be free to come in to ask for that type of relief.

20         The other change is in Paragraph 7 it gives the

21  debtors forty-five days to set up a determination hearing.  And

22  I've just added:

23         "Consistent with the Court's Case Management Order,

24  the utility company may seek an earlier hearing."

25         In all likelihood, it probably would be within that

1    time frame anyway, but if there's some emergency they could do

2    that.

3          But seeing no objections and hearing none, I'm going

4    to approve it on that basis.

5          MR. BUTLER:  We'll make those changes, Your Honor, and

6    submit the order.

7          THE COURT:  Okay.

8          MR. BUTLER:  Thank you.

9          Your Honor, the next matter on the agenda is Matter

10   No. 17.  This is a motion for an order authorizing the

11   rejection of a license agreement with DuraSwitch Industries,

12   Inc.

13         Again, Your Honor, another rejection motion dealing

14   with in this case a license agreement that was entered into in

15   April of 2000.  It was an exclusive license agreement for

16   technology that facilitated electrical connections within a

17   vehicle.  And, rather than go through a litany of what's in the

18   motion or on a presentation letter, the basic punch line in

19   this one is that we end up -- Counsel Nagerse (phonetic) which

20   have agreed on a brief form of rejection order, we have -- and

21   we have submitted it to the Court.

22         THE COURT:  Okay.  I reviewed the motion.  It's

23   clearly within the debtors' business judgment and also the

24   revised order, which looks fine.

25         MR. BUTLER:  Thank you.

1        THE COURT:  Does anyone want to be heard on this?  All

2    right.  Hearing no one, I'll approve it for the reasons stated

3    in the motion.

4        MR. BUTLER:  Thank you, Your Honor.

5        Your Honor, the next matter on the agenda is the final

6    hearing on our cash management motion.  There were two

7    objections that were filed.  Both of them, perhaps it shouldn't

8    be surprising to any of us, dealt with the same thing we talked

9    about at the interim hearing, which was that pesky paragraph

10   dealing with what should happen in the event that in

11   intercompany transfers there is a net borrower and a net lender

12   and what the relationship should be between the two entities

13   within the debtors' system.

14       Your Honor may recall that the subject -- the

15   discussion and the debate at the first hearing had to do with

16   whether that -- there should be an administrative claim and

17   what priority that will have, be it super administrative --

18   super priority or other.  That has evolved now into the view

19   that there actually -- it shouldn't be a -- just a claim, it

20   should be a lien.

21       And we have actually -- we've actually entered into an

22   agreement with the Pension Benefit Guarantee Corporation as to

23   the language that's in the order that's acceptable to them.  It

24   is a lien.  They're the entity that has a control group

25   liability claim against all those entities.  And the priority

1   of that lien is determined by the financing order.

2           The creditors' committee has reserved or objected on

3   the issue, I think it was actually a statement that was

4   submitted so I'll call it reserve for the moment, but had

5   raised an issue as to whether that lien ought to have a higher

6   priority.  They would prefer the priority be right below the

7   DIP lenders and the DIP financing order calls for that priority

8   to be junior to various categories of claim.  It's the DIP

9   lenders, the prepetition lenders and the set-off claimants.

10          That is the only issue I think that exists with

11  respect to the cash management order that I'm aware of.  And

12  the -- and my suggestion would be, Your Honor, that we -- the

13  Court reserve on that matter until you hear the DIP financing

14  motion because I think, ultimately, Your Honor is going to be

15  dealing with the DIP financing issues and, depending on how you

16  come out on those, I think Mr. Rosenberg and I will be able to

17  work this one out.

18          MR. ROSENBERG:  Yeah.

19          THE COURT:  Okay.

20          MR. ROSENBERG:  Your Honor, I have no problem as far

21  as Mr. Butler goes.  Obviously, the two have to be consistent

22  in terms of the priority of the liens and I will argue

23  passionately for that priority at the appropriate time.

24          THE COURT:  Okay.

25          MR. ROSENBERG:  We did raise another issue, however,

1   in our statement which was that a lien is only as good as the

2   assets and cash flow backing it up.  And we do want and need a

3   mechanism to assure that however it is secured it can be

4   repaid.

5          I would hope that we can do that via some kind of a

6   protocol, but it is not the case that if Your Honor simply

7   grants a lien we go away happy.

8          THE COURT:  Right.  I actually had the same concern.

9   And it comes up in a cash management context.  But there is

10  some point where intercompany transfers really do turn into

11  serious lending decisions.  Maybe that never happened in this

12  case because everything balances out.

13         But there should be a process whereby the appropriate

14  professionals for the committee are kept up to speed on the net

15  balances and I guess also, you know, the same type of

16  information that a board would consider in continuing to

17  authorize its debtor to extend credit to another debtor.  That

18  is, I guess, the financial health of the other debtor.

19         I expect that such a analytical process will be

20  undertaken by each credit provider anyway.  So I would hope and

21  expect really that whether it's the committee's -- a particular

22  person like the committee's financial advisor or counsel will

23  be kept informed of those decisions on a, you know, a

24  reasonably current basis, like every month or maybe even every

25  two weeks.

Omnibus Hearing                                                                23

1           And if there's any -- particularly, what I have in my

2    mind is any large increase in exposure by an intercompany

3    lender or substantial decline in the fortunes of an

4    intercompany borrower that would raise a red flag about

5    lending.

6           MR. BUTLER:  Your Honor, on that part, we -- I agree

7    with Mr. Rosenberg.  I don't view this protocol as being a

8    difficult one for us to resolve.  We counted on this being part

9    of the monthly reporting package to the committee.

10          Your Honor should know we've already established

11   between us a consensual schedule of meetings that normally go

12   out all the way to next March in terms of dates.  We're meeting

13   every month as a full group of debtors and committee

14   representatives.  And we'll make sure this is part of the

15   monthly reporting package.

16          THE COURT:  Okay.  But I'm serious about this.  I

17   don't think there should be a sort of an automatic yes by a

18   particular debtors' management which overlaps, obviously, to a

19   borrowing request.  I mean, it's not just simply, we need, you

20   know, $10 million; okay, here it is.  There needs to be some

21   analysis of the ability to repay that.

22          MR. BUTLER:  All right.  Well, Your Honor, and I think

23   tempered with that is the fact that the -- you know, these are

24   -- as you look at these inter-companies, the vast majority of

25   them are wholly owned.  And the benefit of the -- of that

1   enterprise inures to the overall benefit of the business.

2           THE COURT:  Well, that's -- you know, it depends on

3   who the creditors are.  If there's a lot of overlapping debt

4   then maybe it's not much of an issue.

5           MR. BUTLER:  And, in fact, Your Honor, the -- that I

6   think is -- and we'll -- this is for another day.  But the

7   reality is the -- we'll eventually get to a point in this case

8   where we'll look at where all the debt is.  The majority of the

9   debt, say the liens that attach from the banks and now some of

10  the replacement liens granted in the proposed financing order

11  and the PPGC's position.  The majority of the other debt of the

12  company is not at these entities.

13          THE COURT:  Well --

14          MR. BUTLER:  That will be for another day.

15          THE COURT:  -- that should make the protocol easier.

16  I mean, there's no reason the committee needs to get into this

17  in a great deal of detail if, in fact, no creditors are even

18  potentially hurt by a loan from one company to another.

19          So let's reserve on the lien priority issue until the

20  discussion of the DIP.  The language is the same in both

21  orders, right?

22          MR. BUTLER:  Yes, Your Honor.

23          MR. SOMERSTEIN:  Good morning, Your Honor.  Good

24  morning, Your Honor.  Mark Somerstein, Kelley Drye, for Pension

25  Benefit Guarantee Corporation.

1        Your Honor, I would just note that PPGC is not a

2   member of the creditors' committee and we'd appreciate the

3   opportunity to participate with Mr. Butler and his team and Mr.

4   Rosenberg and his team in reviewing the protocol so that we

5   could see the information on the intercompany borrowings.

6        THE COURT:  Okay.

7        MR. SOMERSTEIN:  I'm sure that's something that can be

8   done.

9        THE COURT:  Well, maybe -- yeah.  Again, I would just

10  urge you to focus in on the borrowers that are of concern to

11  your client.

12       MR. BUTLER:  Your Honor, I know the PPGC and we're

13  actually at some point -- we're waiting on that.  We've been

14  working with the PPGC in terms of their efforts to seek

15  membership on the committee.

16       But we don't want to get in a position of saying what

17  the committee gets to do, other people get to do.

18       THE COURT:  No.  I agree with that.  I agree with

19  that.  But I think this is a specific issue that really only

20  the PPGC is focused on besides the committee.  And if it can be

21  done in a way that really focuses in on their obligers in an

22  efficient way, then I think you could do that.

23       MR. BUTLER:  That's exactly what we're talking about,

24  Your Honor.  Thank you.

25       THE COURT:  Okay.

1       MR. BUTLER:  Your Honor, that brings us to the only

2  other matter on the agenda, Matter 19, which is the DIP

3  financing hearing which is contested.

4       Your Honor, we'd like to ask for a brief recess so

5  that we can set up for the hearing and try and resolve a few

6  additional issues.  You know, no more than thirty minutes,

7  hopefully less.

8       THE COURT:  Okay.  So why don't I come back here at

9  11:30?

10      MR. BUTLER:  Thank you, Your Honor.

11      THE COURT:  Okay.  Thanks.  The operator is reminding

12 me that unless you turn your Blackberries off, your words,

13 which I know are very important to you, are not going to be in

14 the transcript.  And when I say "you," I mean everybody.  I

15 know that kind of makes you feel like you're missing, you know,

16 a key item of clothing or something, but it can wait for half

17 an hour.  The messages will still be there when we leave the

18 courtroom.

19              (Recess taken at 11:04 a.m.)

20              AFTERNOON SESSION

21          (Proceedings resume at 1:51 p.m.)

22      THE COURT:  Please be seated.  Okay.  We're back on

23 the record in Delphi Corporation.

24      MR. BUTLER:  Your Honor, thank you for allowing us to

25 take an extended lunch recess.  I hope the Court will believe

Omnibus Hearing                                                    27

1  it was constructive; the debtor certainly believed it was.

2         With the help of a number of our principal

3  stakeholders, we've been able to resolve a number of the

4  objections to the DIP financing motion, which is the next

5  matter on the agenda and our last matter for today, and the

6  resolution will also resolve Matter 18, the cash management

7  motion that has been reserved.

8         THE COURT:  Okay.

9         MR. BUTLER:  Your Honor, what I'd like to do is

10 reorganize the hearing slightly, and report to the Court on a

11 number of the settlements, and then move to an abbreviated

12 evidentiary record.

13        THE COURT:  All right.

14        MR. BUTLER:  I believe we've resolved all of the

15 objections that went to the issues as to whether there should

16 be a DIP financing put in place, I think there are -- and I

17 think we have addressed the majority of objections that relate

18 to adequate protection.  I believe that some of the set-off

19 claimants may still raise issues; and I believe Bank of

20 America, as an aircraft lessor, may raise certain issues.

21 Those issues, I don't believe, based on a review of the

22 objections, go to the heart of whether or not the -- you know,

23 we've complied with 364(d) and those kinds of issues.

24        So what I propose to do is describe in general terms

25 the settlements that have been reached, so that everyone is

1  informed.  I also am able to answer any questions the Court has

2  and then move to an evidentiary record, the admission of

3  exhibits, and a proffer for the Court.  We have the witnesses

4  available, but I don't know, unless Your Honor wants to get

5  live testimony, whether anyone else will seek it.

6         THE COURT:  Okay.  Well, I'll take a proffer, and then

7  I'll just see if someone wants to cross-examine, then they can

8  do that.

9         MR. BUTLER:  So I'm -- this is, as the Court knows, a

10 motion that we have filed; this is the final hearing before the

11 Court on approval of our authority to obtain and move forward

12 on $2 billion of committed DIP financing from J.P. Morgan Chase

13 Bank, NA, as administrative agent, and Citicorp USA, Inc. as

14 syndication agent, along with a group of other financial

15 institutions that have been arranged by J.P. Securities, Inc.

16 and Citigroup Global Markets, Inc.

17        The DIP facility that is before the Court today

18 included both a two-hundred-and-fifty-nine-dollar (sic) term

19 loan and a 1.7-billion-dollar revolver.  There's a sub-limit,

20 as I advised the Court at the interim hearing, about $325

21 million for letters of credit.  And under the terms of this

22 financing, it would prime approximately $2.59 billion worth of

23 prepetition revolver and term loan facilities under the terms

24 of the order.

25        And we also have dealt with in this order how set-off

1   and related rights, including recruitment issues, would be

2   addressed going forward in this case in an orderly manner.

3          It is the company's view, Your Honor, that we have hit

4   what we believe to be in a very complex set of issues what I'll

5   call "the sweet spot" of an order that balances the interests

6   of all parties here in an orderly manner and allows the company

7   to move forward in these cases.

8          Your Honor, there was only one objection that was

9   filed, and I should point out -- if I may, to begin with, Your

10  Honor, I'll move the admission of these exhibits at the

11  evidentiary portion of this, but I think it could be useful to

12  make some references now.  May I present an exhibit book to the

13  Court?

14         THE COURT:  Sure.

15         MR. BUTLER:  Your Honor, the transaction that we're

16  asking the Court to approve is a transaction that is evidenced

17  by several documents, and they are marked as Debtors 1, 2, and

18  3:  A commitment letter; a post-petition DIP financing

19  agreement, which is Exhibit 2, and Exhibit 2A, which is a first

20  amendment to the revolving credit term loan and guarantee

21  agreement, which includes an agreement as to the borrowing-base

22  element of this transaction.

23         We have also filed with the Court a proposed financing

24  order, which has been black-lined on several occasions, and

25  which we will suggest some other changes to in this hearing.

1   But the current form of that order, in terms of black-lined, is

2   at Exhibit 4; that's the black-line which represents the

3   current state of the order, subject to the comments that we

4   made on this record.

5           THE COURT:  But are those documents are the same as

6   the ones provided in my chambers, I guess last night or this

7   morning?

8           MR. BUTLER:  Yes, Your Honor.

9           THE COURT:  Okay.

10          MR. BUTLER:  There was a proposed order attached to

11  the original motion; that was updated with a final financing

12  order that was filed with our omnibus reply, it was an exhibit

13  to the omnibus reply.  It was black-lined against the Court's

14  interim order.  We then had further negotiations, and late last

15  evening we reached agreement with the post-petition lenders,

16  the prepetition agent, General Motors Corporation, and the

17  company about the form of order.  We black-lined that, and we

18  served it out last night, overnight.  We now had filed with the

19  Court, we put it out on the docket, we put it out on the

20  website, and we served all the parties with it overnight.

21          THE COURT:  Okay.  Okay.

22          MR. BUTLER:  There will be some changes to that order

23  today, although they are relatively discreet, to resolve some

24  of the issues that we have before the Court.  So the documents

25  we're asking Your Honor to approve would be the loan agreements

1   on 2 and 3 -- you know, 2 and 2A, and the financing order as we

2   make changes on the record today.

3           THE COURT:  And the loan agreements reflect the

4   amendments that went out last night, too?

5           MR. BUTLER:  Yeah.  Your Honor, yes.  There were no --

6   the loan agreements didn't really need much in the way of

7   changing.  This was the other issues -- the issues -- there

8   were issues more about priorities and relationships than

9   anything else.

10          THE COURT:  Okay.

11          MR. BUTLER:  Your Honor, also, Exhibit 28 and 29 to

12  Debtors 28 and 29 set forth a summary of all of the objections

13  that were filed as of 12 noon yesterday, and the debtors' views

14  on those.  Those actually were Exhibit 28, Debtors' Exhibit 28

15  is actually -- was also Exhibit B to our omnibus reply, and

16  Debtors' 29 was Exhibit C to our omnibus reply.  It basically

17  laid out the objections that had been, to the debtors'

18  perspective, timely filed, and some others that had not been

19  timely filed, but which we were aware of prior to the 12 noon

20  deadline we had with chambers to submit our omnibus reply.

21          Of all the objections listed in Debtors' 28 and 29, I

22  believe the only objection that went to the issue solely of

23  whether or not the debtors could enter into this priming

24  facility was the objection filed by the self-styled ad hoc

25  committee of prepetition lenders; the group we refer to as the

1   "Goodwin Procter Group," represented by Mr. Brilliant and his

2   colleagues, which had filed objections really alleging,

3   essentially, that the company couldn't sustain its burden under

4   Section 364 of the bankruptcy code; and, further, even if it

5   could, that the company hadn't offered adequate protection.

6          In connection with that transaction, with those

7   objections we also filed a reply, and there are a couple of

8   items and some changed circumstances that I want to reflect on

9   this record, so the record here is complete.

10         In connection with that transaction -- and that is the

11  DIP lending, along with the priming position to the -- with

12  respect to the $2.59 billion of prepetition debt, there was a

13  notice, there was a position that the prepetition agent took,

14  and that was communicated to all of the members of the

15  prepetition bank group, and the members of the prepetition bank

16  group then took votes on two discreet elements which are

17  relevant to today, and perhaps relevant to the case.

18         And the notice that the prepetition agent sent out is

19  Debtors' 22, which was the actual notice, in which the debtor -

20  - the prepetition agent took two positions:

21         First, it took a position that, absent instruction to

22  the contrary, it was not going to object to the debtors'

23  request to enter into this transaction, and it asked the

24  members of the group to give a -- reflect on that.

25         And, second, it asked -- or it told the group that it

Omnibus Hearing                                                    33

1   intended to inform the debtors that the debtors would not be

2   able to renew LIBOR-based interest contract arrangements, as

3   they expired, I believe beginning on or around November 15th of

4   this year, and also sought direction from the lenders on those

5   issues.

6            With respect to the first matter, there were 42.88

7   percent of the members --

8            THE COURT:  I'm going to interrupt you just for a

9   second.  Please turn off your Blackberries.  Every time that

10  sound, it sounds like a little bee buzzing, the transcript gets

11  interrupted by your Blackberries.

12           Okay.  Go ahead, Mr. Butler.

13           MR. BUTLER:  Okay.  Your Honor, in that vote that was

14  taken, 42.88 percent of the holders of the prepetition debt

15  affirmatively agreed with the position of the -- of the

16  prepetition agent not to object to this transaction.

17  Approximately 14 percent of the holders objected and directed

18  the agent to object to this transaction, and approximately

19  somewhere in the neighborhood of 33 percent did not vote, but

20  under the terms of the solicitation from the agent were deemed

21  to have consented to the agent's approach, not consented to the

22  priming, but to the actions to be contemplated by the agent,

23  which meant that, essentially, about 86 percent of the bank

24  group concurred or are deemed to have concurred with the

25  agent's decision not to object to this transaction.

Omnibus Hearing                                                    34

1       However, with respect to the issue of ADR -- and this

2  is different than what was reflected in our papers, because we

3  had different information and it was incorrect, and I want the

4  record to be correct -- 56 percent of the members of the bank

5  group concurred with the agent's determination to no longer

6  permit LIBOR agreements, LIBOR-based interest rate agreements

7  with the debtors.  And the balance did not vote, but were

8  deemed to have concurred under the terms of the solicitation.

9  So, essentially, at least as far as -- insofar as the

10 prepetition agent was concerned, there was consensus among the

11 bank group that the agent would inform the debtors that, when

12 our LIBOR-based contracts expire on or about November 15th,

13 that they would not seek to renew them.

14      Now the debtors' position is that that action may or

15 may not be enforceable under the terms of that agreement, and

16 given the fact we're in Chapter 11 at the moment.  And therein

17 obviously lies one of the -- one of the issues that ultimately

18 may need to be determined by this Court.  But it is, I think, a

19 significant, materially changed fact from the state of the

20 papers for the Court that there was unanimous consensus, at

21 least deemed consensus, among the prepetition holders to move

22 to an ABR rate.

23      Now the ABR rate, Your Honor, the difference between

24 the two rates is about 160 basis points; it's about thirty-

25 seven and a half million dollars a year on an annualized basis,

1   something along that way, and additional interest costs.  And

2   that would be the contract rate interest.  And, Your Honor,

3   those items are discussed in some detail in Debtors' 17, 18,

4   and 19 of the -- in terms of the exhibits that are before the

5   Court, about how those particular transactions work.

6          In addition, there are other claims under the

7   prepetition loan agreement that could, according to at least

8   some holders of the prepetition debt, be claimed for both

9   default interest, an incremental 200 basis points, and other

10  damages and costs or claims associated with any prepayment or

11  payment of the term loan not in accordance with the terms of

12  that term loan, the prepayment premiums or call premiums or

13  damages or whatever the claims may be.

14         Essentially, what we have entered into an agreement to

15  do, which we understand was, in all respects, any objection by

16  Mr. Brilliant's clients to this hearing, is we have agreed that

17  the -- and I'll read some language in a moment.  But

18  essentially we have agreed that the prepetition agent can put

19  up on what's called "Interlinks," the internet-based

20  application, in which it communicates with its two-hundred-and-

21  fifty-odd-plus lenders, an opportunity for any holder to waive

22  its claim on a permanent basis to default interest under the

23  prepetition facility, and waive its claim under any basis to

24  any call premium, prepayment premium, other kind of claim

25  against the company for the prepayment, other than in

Omnibus Hearing                                                    36

1  accordance with the contract, of amounts owed under the

2  prepetition instrument.

3          Anyone who -- any holder which waives those two claims

4  would then be entitled to receive the ABR rate for the balance

5  of this case -- or I should say, for the balance of the time

6  the indebtedness is outstanding in according with the terms of

7  the loan agreement.  But the applicable rate paid to that

8  holder would be ABR, as opposed to LIBOR.

9          If someone does not waive those claims, they would be

10  paid as adequate protection the LIBOR right.  They would retain

11  their rights to argue that the differential accrued, and we

12  would also fight about whatever other claims they'd have,

13  including default interest claims and other kinds of

14  compensatory claims at the end of the case in the proof-of-

15  claim process.  And that was the fundamental agreement reached.

16          We've also agreed under the terms of adequate

17  protection package to pay the reasonable expenses of the

18  prepetition agent and, through the date of this hearing only,

19  the reasonable expenses incurred by Mr. Brilliant's group, in

20  terms of the fees of his firm; the fees and expenses of his

21  firm.

22          THE COURT:  In connection with opposing the debt?

23          MR. BUTLER:  Correct.  But only in connection with

24  that matter, and only through the date of this hearing.

25          MR. BRILLIANT:  Your Honor, if I may, just, you know,

1   two minor issues.  It's ABR, plus applicable margin, and it's

2   the fees of my firm, and we've hired, you know, conference

3   counsel is going to be de minimis to serve some of the

4   subpoenas with respect to what -- we had a conflict, and that's

5   covered in the order, as well.

6           THE COURT:  Okay.

7           MR. ROSENBERG:  (Not identified) And, Mr. Butler, I

8   assume that we will get notice of the fee requests and have a

9   say in the reasonableness of both?

10          MR. BUTLER:  Absolutely.

11          MR. ROSENBERG:  Thank you, sir.

12          THE COURT:  Okay.

13          MR. BUTLER:  The change to the order occurs, Your

14  Honor, on this particular point, and I want to be specific

15  because this was reviewed with a number of the parties.

16          The change in the order here occurs in Paragraph

17  12(c).  And if the Court uses -- it refers to Debtors' 4, and

18  uses that black-line, and it goes to Page 30.  And this is the

19  same black-line that's been distributed to virtually everyone

20  in the courtroom, where people have at least had access to it.

21  It's also been -- it's also posted on adelphidocket.com for

22  those participating by telephone.

23          If you go to Page 30, there is an insert that occurs

24  in Romanette iii, about eight, nine lines down.  There's a

25  phrase and it says:

1    "And letter of credit and other fees at the non-

2    default contract rate," and then the word -- and then there's

3    the word "applicable."

4         Between the word "rate" and "applicable," there is the

5    following insertion:

6         "Including, at the option of the borrower, the

7    Eurodollar rate, plus the applicable margin."

8         And then on the next -- on the next line, where it

9    says, "Provided that."  And after the word "that," we insert

10   the symbol "X paren. X," because we're now going to be a Y in a

11   moment.

12        And then we continue down until just before Romanette

13   iv, and we add there a Y in the hole, and insert the following

14   statements:

15        "Notwithstanding anything to the contrary in this

16   order or the prepetition credit agreement, as to each

17   prepetition secured lender which executes and delivers a

18   written consent in the form to be provided by the prepetition

19   agent (which consent shall be, in form and substance,

20   reasonably satisfactory to the borrower), waiving and releasing

21   all claims, if any, in respect of default interest, and any

22   claims related to the prepayment of the prepetition debt,

23   including any prepayment premium under the prepetition credit

24   agreement, interest shall accrue and be paid by the borrower on

25   the first business day of each month at ADR plus the applicable

1   margin in respect to the prepetition loans held by such

2   prepetition secured lender, from and after the later of:  (a)

3   expiry of existing LIBOR contracts, and (b) The delivery of

4   such release and waiver."

5            THE COURT:  Okay.

6            MR. BUTLER:  And then --

7            THE COURT:  Sorry.  Go ahead.

8            MR. BUTLER:  Your Honor, and then on Page 31, there is

9   a statement that says that, at the end of (e), Paragraph (e) --

10  or excuse me -- Paragraph C, before we go to Paragraph Sub (d),

11  it says, quote:

12           "The debtor shall pay the reasonable and documented

13  fees and expenses of counsel to the ad hoc committee of

14  prepetition secured lenders in connection with the motion."

15           And we have an agreement as to a cap on that, which we

16  have discussed off the record, Your Honor, with the -- with

17  that group, and will obviously share with the parties in

18  interest.  But even if -- you know, the reasonable fees cannot

19  exceed a cap, a capped amount.

20           THE COURT:  And these are just legal fees, right?

21           MR. BUTLER:  Yes, Your Honor.

22           THE COURT:  Okay.

23           MR. BUTLER:  And then, Your Honor, we would insert an

24  insert there that would say -- also say:

25           "During the pendency of the Chapter 11 case, and

1   except as otherwise set forth in any confirmed reorganization

2   plan, the prepetition debt of any prepetition secured lender

3   shall not be repaid or refinanced in whole, unless it is part

4   of a transaction in which the obligations under the DIP credit

5   agreement and the prepetition credit agreement are repaid or

6   refinanced in whole, or such prepetition secured lender

7   consents to such repayment."

8              THE COURT:  Okay.

9         MR. BUTLER:  Your Honor, that represents the entire

10  agreement between Mr. Brilliant's clients and the debtors, and

11  further resolves their objection.  I'd like Mr. Brilliant to

12  confirm that on the record.

13             THE COURT:  Actually, before we do that -- I apologize

14  for interrupting -- because -- well, do I understand right

15  that, if there is the waiver, then the debtor agrees that they

16  won't object to the interest that's being received, except if

17  for some reason you're totally under-secured?

18             MR. BUTLER:  Yeah.  Your Honor, this is in addition --

19  what we've agreed to is there are other rights that inure to

20  the benefit of the creditors' committee which have been

21  negotiated, and I'll get to in a few minutes.  But for example,

22  payments received by -- payments received under this order are

23  subject to re-characterization, and we'll get to that, you

24  know, if under the appropriate circumstances re-

25  characterization is appropriate.  That right has been reserved,

Omnibus Hearing                                                                    41

1    and Mr. Rosenberg and I will talk about that a little bit later

2    on, so it's --

3             THE COURT:  Well, the reason I'm raising this is that,

4    in Paragraph 16 on 38 and 39, in addition to the reservation of

5    rights for the committee:

6             "The debtors reserve their rights to argue the

7    appropriateness of any interest rate charged or claimed by the

8    prepetition secured lenders."

9             And I'm wondering whether -- do you need to have some

10   cross-reference now to this new agreement, at least with

11   respect to the waivers, or not?  I -- I'm just raising that for

12   you.

13            MR. ROSENBERG:  (Not identified) As always, Your

14   Honor, you're the best lawyer in the courtroom, and you're

15   absolutely right.  The only re-characterization would be if we

16   were under-secured; and, otherwise, there would be --

17            THE COURT:  Right.

18            MR. ROSENBERG:  -- not opportunity to challenge the

19   ADR-plus-applicable-margin rate on a going-forward basis.

20            THE COURT:  Well, I know I got a lot smarter when I

21   became a judge, but let's make sure Mr. --

22                            (Laughter)

23            THE COURT:  -- Mr. Butler agrees that, once the waiver

24   comes in, then you're not going to be able to object.

25            MR. BUTLER:  That's correct, Your Honor.  That's why I

1    said in my presentation --

2                THE COURT:  Okay.

3                MR. BUTLER:  -- that's the end, that's the agreement.

4                THE COURT:  All right.  So you probably have to have

5    some cross-reference then in Paragraph 16.

6                MR. BUTLER:  We'll make that cross-reference then,

7    Your Honor.

8                THE COURT:  Okay.  Okay.

9                MR. BUTLER:  Mr. Brilliant?

10               MR. BRILLIANT:  Thank you, Your Honor.  Allan

11   Brilliant from Goodwin Procter on behalf of the ad hoc

12   committee of prepetition secured lenders.

13               Your Honor, the agreement read into the record by Mr.

14   Butler accurately reflects the agreement; and, upon approval of

15   such settlement by Your Honor, our committee would withdraw our

16   objection.

17               THE COURT:  Okay.

18               MR. BRILLIANT:  Your Honor, I'd also like to thank

19   Your Honor and your chambers for your accommodations over the

20   last week.  It's obviously been a very hectic week for Your

21   Honor with just -- not just this case, but other things, and we

22   really appreciate your accommodating us --

23               THE COURT:  Okay.

24               MR. BRILLIANT:  -- in the telephonic hearing

25   yesterday.

Omnibus Hearing                                                                    43

1            THE COURT:  That's fine.

2            Speaking of accommodating, are the people who got the

3    trial subpoenas, have they been released at this point?

4            MR. BRILLIANT:  Yes, Your Honor.  When we reached the

5    settlement agreement, we immediately released them.

6            THE COURT:  Okay.

7            MR. BRILLIANT:  Everybody was happy to go except for

8    one counsel, GE's counsel, who apparently wants to leave open

9    their right to seek, you know, sanctions for the filing of the

10   subpoena.  I believe that your clerk has given them a -- you

11   know, a further date; and, if we have to, we'll come back and

12   respond to that.

13           THE COURT:  All right.  Well, I hope we don't have to

14   deal with that.

15           MR. BUTLER:  Your Honor, the next item that I'd like

16   to deal with is the agreement that has been reached, in which a

17   number of parties played a role, but it includes -- it resolves

18   -- the objection that it resolves is the objection of the

19   creditors' committee that was filed, or the statement of the

20   creditors' committee, I should say, that was filed.  And

21   there's a package of information here that I want to get out,

22   and I know Mr. Rosenberg will help me if I get it wrong, but I

23   think I have -- I think I have the understanding.  And Mr.

24   Ziman's interests were implicated, and I think he will address

25   these, as well.

1        But the agreements reached -- have been reached as

2   follows.  And these agreements, which will be reflected in the

3   order, will result in the withdrawal of the statement, or at

4   least the committee's agreement that the order ought to be

5   entered with these changes.

6        First, the DIP agent will agree that it does not have

7   the right to waive the intercompany liens that were the subject

8   of the cash management order and the subject -- Your Honor

9   talked about, the subject of this order.  There was some --

10  there was a suggestion in the order that they had that right,

11  and that's being modified.

12       THE COURT:  Okay.

13       MR. BUTLER:  Second, that, to the extent that there's

14  going to be a change in borrowing base or in the financial

15  covenants, we will give -- the debtors will give reasonable

16  advance notice to the creditors' committee of those actions, of

17  those events.  And seeing as we provide information to them on

18  a monthly basis, I don't see that as a burden, Your Honor.

19       The third --

20       THE COURT:  Can I interrupt you there?

21       MR. BUTLER:  Yes.

22       THE COURT:  There was a suggestion -- and I don't know

23  if this actually is the case, but that the carve-out could be

24  affected by modification to the borrowing base, at least when I

25  read it.  Is that possible?

1          MR. BUTLER:  I don't believe it is.  I'll ask counsel

2     for the DIP lenders whether they agree with that.  I don't

3     think the carve-out can be changed in any respect on accounting

4     of the borrowing base.

5          MS. BEDELL:  No, the borrowing base --

6          THE COURT:  Please identify yourself.

7          MS. BEDELL:  I'm sorry.  Laureen Bedell for the DIP

8     lenders, Davis Polk.

9          The borrowing base certificate just gives you the

10    amount of -- accrued and paid.  I think that's the only

11    relationship between the two, so --

12         THE COURT:  Okay.  Thank you.

13         MS. BEDELL:  Just one moment.

14         The carve-out can impact the borrowing base, but not

15    vice-versa.

16         THE COURT:  Okay.  All right.

17         MR. BUTLER:  Your Honor, the next item is, to the

18    extent that the debtors receive notice from the DIP lenders

19    that there is a triggering event in connection with a carve-

20    out, we have agreed to provide a copy of that written notice

21    immediately to the creditors' committee counsel.

22         THE COURT:  Okay.

23         MR. BUTLER:  Fourth, Your Honor, to the extent that

24    there's a triggering event of the carve-out, and that

25    triggering event is later resolved or waived, so that there's

1   not a continuing event of default, the agreement is that the

2   carve-out would be refreshed or would spring back to the

3   original amount that Your Honor is considering approval of

4   today.

5           THE COURT:  Okay.

6           MR. BUTLER:  Your Honor, I'll mention also on the

7   record that there was an inconsistency  between the credit

8   agreement and the draft order with respect to the carve-out

9   language.  The credit agreement was correct; the order was

10  incorrect.  There are a few words that have to be modified in

11  connection with that, but it will be consistent with the

12  negotiated carve-out language that's in the credit agreement.

13          THE COURT:  Okay.

14          MR. BUTLER:  Your Honor, the next item goes to the

15  investigatory periods with respect to matters relating to the

16  prepetition lenders.  Currently, all of the matters have --

17  under the order, propose to have a ninety-day window, which can

18  be extended, I believe it's for cause, upon motion to the

19  Court.

20          There are two -- some of those rights are going to be

21  carved out and put in separate buckets and extended for 180

22  days, subject to the same motion that can be filed to extend

23  for cause.  And that would have to do with the committee's

24  review of any causes of action and/or leases the debtors have

25  given under these agreements and under the order; and, second,

1    the question as to the over-secured status of the prepetition

2    lenders.

3           MR. ROSENBERG:  (Not identified) Correct.

4           THE COURT:  And that will be 180 days.

5           MR. BUTLER:  That will be 180 days.

6           THE COURT:  Plus the opportunity to come to court.

7           MR. BUTLER:  Correct, Your Honor.

8           THE COURT:  Okay.

9           MR. BUTLER:  Your Honor, there have been -- there are

10   a few places in the order where, in talking about adequate

11   protection of the prepetition interests, the phrase that we're

12   going to -- we're going to correct it to make sure it tracks

13   the statute and refers to value, to it -- to their interest in

14   the collateral.

15          THE COURT:  Okay.

16          MR. BUTLER:  Just to -- it's a --

17                      (Counsel confer)

18          MR. BUTLER:  Your Honor, also, in connection with the

19   review rights or investigatory rights being granted to the

20   committee, the parties would agree that the committee, if they

21   determined there was a basis to file an action, they would have

22   agreed or deemed standing to do so.  The thought process behind

23   there is the debtors have already waived their interest in that

24   respect; and, therefore, it would be futile to make demand on

25   the debtors to prosecute before and then seek the Court's

1   approval.  So they would have agreed standing to file the

2   complaint before this Court.

3         THE COURT:  All right.  People still have the right to

4   say, once it's filed, we don't need to pursue it on a fast

5   track or something like that.

6         UNIDENTIFIED ATTORNEY:  I'm sorry, Your Honor?

7         THE COURT:  I'm sorry.  The parties in interest still

8   have the opportunity to go to -- try and persuade me that, once

9   it's filed, it doesn't have to be pursued on a fast track or --

10  you know, the scheduling issues are reserved, right?

11        UNIDENTIFIED ATTORNEY:  Certainly, Your Honor.

12        THE COURT:  Okay.

13        MR. BUTLER:  Your Honor, the next -- I hope I get this

14  correct.  The next issue is -- or the next agreement is a

15  bundling issue of rights that are either waived or not waived,

16  vis-a-vis what the committee wanted and the prepetition lenders

17  want as part of the adequate protection package, and they

18  implicate Sections 506(c), 507(b), and -- excuse me -- 506(c),

19  Section 551 of the code, and interest in the proceeds

20  (indiscernible) actions.

21        The agreement would be that the existing 506(c) waiver

22  proposed in the financing order will stand as drafted; however,

23  the creditors' committee objection with respect to Section 551

24  would be sustained, and they would -- on that particular point.

25  And there would be an agreement, in terms of any interest the

Omnibus Hearing                                                        49

1  prepetition lenders would have in avoidance proceeds (sic)

2  under the terms -- or anyone else would have under 507(b), in

3  the interest of avoidance proceeds, that that -- that the first

4  thing that would be paid in priority would be the

5  administrative costs of the estate in generating that fund or

6  those proceeds.

7          So there would be, before any kind of intervening

8  interest could occur, the administrative costs would be paid

9  first.

10         THE COURT:  So that's the super-duper -- okay.

11         MR. BUTLER:  As someone described it to me, Your

12  Honor, this afternoon, Your Honor, as a 506(c) interest in

13  507(b).

14         THE COURT:  Okay.

15         MR. BUTLER:  I'm not quite sure that's the right

16  answer.

17         THE COURT:  Well --

18         MR. BUTLER:  I don't want to confuse the record, but

19  the idea is --

20         THE COURT:  All right.

21         MR. BUTLER:  -- that it's that basic concept.

22         THE COURT:  Okay.  On that general topic, I don't know

23  if this was omitted on purpose or inadvertently, but the

24  avoidance actions that are listed don't include 553, the

25  avoidance provision for set-off rights.  Is that, you know,

1    improper set-offs?  Was that intentional, or was that just a --

2         MR. BUTLER:  I think that was a drafting glitch, Your

3    Honor.

4         THE COURT:  Okay.

5         MR. BUTLER:  We'll correct it.

6         THE COURT:  So that should go in that list then.

7         MR. BUTLER:  Your Honor, I believe that the statements

8    that I have made on the record reflect the understandings

9    between the debtors, the prepetition agent, the post-petition

10   agent, and the creditors' committee on these matters; and, if

11   accepted and approved in the final order to be submitted, would

12   result in the creditors' committee deeming their statement to

13   have been withdrawn or satisfied, or however one wants to

14   characterize it.  And I'll ask Mr. Rosenberg to confirm that on

15   the record, after making one additional statement, and that is:

16        If Your Honor is in a position to grant the changes we

17   set on the record today, it is important to get a final order

18   in place.  And we'd like, Your Honor, if you -- when we get to

19   the end of this hearing, if Your Honor is prepared to grant

20   this relief -- because we still have a ways to go -- we would

21   like Your Honor -- to be able to have Your Honor indicate that

22   the financing has been granted, so we can issue the appropriate

23   press releases this evening, if we get there.

24        But I think we would like to submit the order tomorrow

25   morning to chambers, so that -- there's a number of people, but

Omnibus Hearing                                                    51

1   at least the committee wanted the opportunity to make sure that

2   we -- that they got all the wording correctly.  We're not -- by

3   doing this, inviting, you know, fifty-five or seventy people to

4   a drafting session tonight, we've had a number of those,

5   because our intention is to simply conform -- conform the order

6   to the agreements placed on this record, not to redraft or

7   renegotiate it.

8           And, Your Honor, our request would be that, to the

9   extent there was any disagreement about that by any party, we

10  would come back for purposes of settling the order, not in

11  terms of revisiting the substance of the approval of the

12  transaction, if we get there.

13          THE COURT:  Okay.  Okay.

14          MR. BUTLER:  Mr. Rosenberg?

15          THE COURT:  Well, before he --

16          MR. BUTLER:  I'm sorry.

17          THE COURT:  Well, maybe you'll raise this.  But the --

18  am I right then that the resolution that the borrowing base

19  point, which was just limited to reporting, does that mean that

20  other material modifications of the debt do come back for court

21  approval?  That was the issue, I think, the committee raised.

22  And I understood the bank's point about the borrowing base, but

23  given a change, anything less material would come back here?

24          MR. BUTLER:  Well, Your Honor, if we were making

25  material change in the negative covenants, the financial

1    covenants, or those issues that we didn't have the consent of

2    the committee, I think we would come back here.  If there's

3    agreement between the two parties, you know, unless we thought

4    -- you know, you've asked us in the beginning of this case to

5    use some judgment about --

6              THE COURT:  Right.

7              MR. BUTLER:  -- what we think you'd want to hear

8    about.  And if either of us thought that were the case, we of

9    course would bring it back to a monthly omnibus hearing.

10             THE COURT:  Yeah, I understand there's the point about

11   successful syndication, and maybe things will change there, in

12   connection with the syndication, but --

13             MR. BUTLER:  And that's -- but that's part of the

14   approved flex arrangement, Your Honor, in any event.

15             THE COURT:  Right.  Right.

16             MR. BUTLER:  You know, we would not come back to Court

17   for that.

18             THE COURT:  Right.

19                       (Counsel confer)

20             MR. BUTLER:  May I have a moment, Your Honor?

21             THE COURT:  Yes.

22                       (Counsel confer)

23             MR. BUTLER:  Your Honor, one clarification.  There was

24   -- one of the agreements that -- I mentioned the words

25   "negative covenants" on the record.  I should strike that.

1    That was not the arrangement with the DIP lenders, and the

2    committee agrees with that.  It was the financial covenants

3    that were implicated there, and I just want to make sure the

4    record is clear.

5              THE COURT:  Okay.  That's fine.  All right.  Well --

6              MR. BUTLER:  And, Your Honor --

7              THE COURT:  I think you may need to do something on

8    Page 3, Little Roman ii, just to -- I'm sorry.  Page 13, Little

9    Roman ii, to deal with that issue.  I think it's -- the way

10   it's worded now is a little different than what's been stated

11   on the record.

12             MR. BUTLER:  Your Honor, I should also point out that

13   the agreement -- we'll make that change, Your Honor.  The other

14   thing I want to point out on the record is -- Your Honor, is

15   that, in consideration for this package, the committee has

16   agreed that the priority for intercompany claims and liens that

17   is set forth in the cash management order that was submitted,

18   Your Honor and in the proposed DIP financing order are no

19   longer objectionable to the committee.

20             THE COURT:  Okay.  So that language is fine for both

21   orders then.

22             MR. BUTLER:  Correct.  The language that was

23   negotiated with the Pension Benefit Guarantee Corporation is

24   now acceptable to the committee.

25             THE COURT:  Okay.

1      MR. BUTLER:  Your Honor, I believe that --

2      THE COURT:  Just a second.  The -- I guess you

3  confirmed, or it was confirmed on the record that -- just about

4  the recital about being over-secured and the hundred-and-

5  eighty-day look-back period (sic).  These -- the payments

6  themselves that are made are subject to re-characterization, to

7  the extent that 506(b) would require them to be made to

8  principal instead of interest?

9      MR. BUTLER:  That is correct.

10     THE COURT:  Okay.  And I think that's particularly

11 relevant on Page 15, which is the mechanisms we worked out for

12 paying down a portion of the principal on the prepetition debt,

13 with asset sales.  I think at the end of the first full

14 paragraph that's quoted on Page 50, and we should have a

15 proviso that:

16     Provided further that such prepayments shall be made

17 only to the extent that such loans are allowed secured claims

18 under Section 506(b) of the Bankruptcy Code.

19     MR. ZIMAN:  Your Honor, may I be heard on this point?

20     THE COURT:  Sure.

21     MR. ZIMAN:  Ken Ziman, Simpson, Thacher & Bartlett, on

22 behalf of J.P. Morgan Chase Bank as prepetition agent.

23     The language Your Honor focused on is actually a

24 prepayment of the DIP financing.

25     THE COURT:  Oh, that's the DIP?

1          MR. ZIMAN:  Yeah.

2          THE COURT:  All right.

3          MR. ZIMAN:  The resolution of this issue that was an

4    issue that was raised with the debtors to provide greater

5    protection for the holders of prepetition secured claims was to

6    either require one of two things:

7          After a hundred-and-twenty-five-million-dollar basket

8    the debtors can use from asset sale proceeds, to take two-

9    thirds of the excess and to apply that, either to reduce the

10   DIP permanently, thereby reducing the priming, or to hold as

11   cash collateral for the benefit of not only the DIP lenders --

12         THE COURT:  All right.

13         MR. ZIMAN:  -- but the prepetition lenders.

14         THE COURT:  So it's not -- so this language --

15         MR. ZIMAN:  And also the set-off claims, yeah.

16         THE COURT:  That's fine.

17         MR. ZIMAN:  And I'd also point out for Your Honor, I

18   believe, on Page 31 of the version you're looking at in the

19   last sentence of "C," before the insert Mr. Butler read,

20   there's language there:

21         "Preserving the rights of parties in interest

22   regarding the characterization point" --

23         THE COURT:  Right.

24         MR. ZIMAN:  -- or the "de-characterization point."

25         THE COURT:  Right.  Okay.  All right.  The last point

1    on the -- on these -- on I think this basket of issues is,

2    again, on the debtors' reservation of rights in Paragraph 16.

3    If I read the pleadings right and if I heard you right today,

4    the debtors are reserving on the interest that we're talked

5    about -- we talked about, you know, to object if it's claimed

6    outside of the LIBOR scenario.

7         Why don't you also -- is there anyone that would like

8    to object to the fees and expenses asserted by someone other

9    than the agent?

10        UNIDENTIFIED ATTORNEY:  Yes, Your Honor.

11        THE COURT:  And I think, as I read this, this just

12   covered interest.

13        MR. ZIMAN:  I thought earlier up it dealt with the --

14   what was allowed, but certainly, Your Honor, that is correct.

15        THE COURT:  No, no, no.  If you could take a look at

16   that because I think both on Page 38 and 39, at least, it seems

17   just to cover the interest rate.

18        MR. BUTLER:  So we'll revise that, Your Honor.

19        THE COURT:  Okay.

20        MR. BUTLER:  Your Honor, then with those statements,

21   I'd like Mr. Rosenberg to confirm that we have satisfied the

22   requirements of the creditors' committee with respect to this

23   motion.

24        MR. ROSENBERG:  Your Honor, I'm pleased to report that

25   we have.  Our own objections have been satisfied and with, I

1    think, a reasonable compromise here.  And I think, given where

2    we came out, including such issues in particular as the

3    preservation of the right to seek re-characterization, which

4    had not been in the earlier documents, the agreement with the

5    prepetition lenders, Mr. Brilliant's clients, that makes a lot

6    of sense.  So we are generally happy and pleased with the

7    outcome this afternoon.

8              THE COURT:  Okay.

9              MR. ZIMAN:  Your Honor, Ken Ziman again for the

10   record.

11             The agent, too, is supportive of the resolution as

12   described by Mr. Butler, with just one clarification.  The time

13   period for the committee to review the value is without

14   prejudice to the agent's rights or the rights of the lenders to

15   make a 506(a) motion, if and when they determine that to be

16   appropriate.

17             THE COURT:  Right.

18             MR. ZIMAN:  And the "super-duper claim" that was

19   described, regarding reimbursing essentially the estate for the

20   cost of obtaining avoidance proceeds before they would be

21   available to satisfy any diminution in value claim, that's to

22   the extent not already paid, since it's our property that's

23   going to pay a lot of the expenses of the estate already.  It's

24   not a double-dip; it's the same concept.

25             THE COURT:  Okay.  Very well.  Well, I agree that it's

1    a reasonable compromise and resolution of this basket of

2    issues, and so I would approve it.

3            MR. BUTLER:  Your Honor, we --

4            THE COURT:  Subject to the whole order, of course.

5            MR. BUTLER:  Your Honor, moving along, I think the

6    next person that wants to be heard is Mr. Ziman wants to talk

7    about General Motors.

8            THE COURT:  I'm sorry.  There was one small thing,

9    because I looked at this a little differently in one respect.

10   And Mr. Ziman's comment about "double-dipping" made me remember

11   it.

12           Right now, on Page 41, the committee is limited to

13   $250,000 to perform the investigation contemplated by its

14   charge to look at the bank's liens and claims.  And that seemed

15   reasonable to me for avoidance actions and other causes of

16   action.  But (indiscernible) charge.

17           I would assume that the work of the committee's

18   financial advisor in determining what the value of the debtor

19   is, and hence what the collateral is, probably wouldn't be

20   covered in that 250,000, would it?  I mean, investment bankers

21   eat that up in about a month and a half.

22           MR. ZIMAN:  Acknowledging that we may all be in a long

23   line of (indiscernible), I guess I would agree with that.

24           THE COURT:  Okay.

25           MR. ZIMAN:  And I don't think we have a problem.  If

1    we go and commence litigation, clearly they need to be able to

2    respond, in terms of the 506(a) motion.  And to do their

3    investigation, I think this is -- oh, I'm sorry.  I'm --

4                THE COURT:  Okay.

5                MR. ZIMAN:  You know, from our perspective, you know,

6    I think the debtors have a vested interest in this, as well,

7    because this is a case where there, we all hope, is substantial

8    unencumbered property.

9                THE COURT:  This is probably all academic in my mind -

10   -

11               MR. ZIMAN:  Yeah.

12               THE COURT:  -- but just thinking ahead to the

13   possibility.

14               MR. ZIMAN:  Hope so.  Hope so, Judge.  So I think I

15   agree with Your Honor that, to the extent that the committee is

16   put to the test to either determine the value for their own

17   benefit to be able to waive on this, or being put to the test

18   because we filed a 506(a) motion, I don't see the two fifty as

19   barring that.

20               THE COURT:  Okay.  All right.  All right.  Sorry to

21   interrupt you, Mr. Butler.

22               MR. BUTLER:  Your Honor, I believe the next person

23   that wants to talk about it, I believe Mr. Bienenstock is

24   rising to indicate that his objection is also resolved, the

25   General Motors Corporation.

1          (Laughter)

2          MR. BIENENSTOCK:  Your Honor, I'm sorry.  I didn't

3   know this machine made that sound.

4          (Laughter)

5          MR. BIENENSTOCK:  Good afternoon.  Martin Bienenstock

6   of Weil, Gotshal & Manges for General Motors Corporation.

7          Your Honor, coming in to this hearing, General Motors

8   Corporation had agreed on a proposed order with the debtor as -

9   - in its capacity as a customer, and we were hoping that that

10  would be approved as it is.  Of course, there were subsequent

11  arrangements that Mr. Butler has described to the Court, which

12  are going to require some additional language.

13         There is one particular comment about conforming

14  language on adequately protecting interest and collateral,

15  which we felt, if made, might, in certain sections of the order

16  and not in others, might have a negative implication.  So after

17  discussing it with the debtor, we determined the best thing was

18  to simply clarify this on the record.  It arises under Section

19  -- Paragraph 18 of the proposed order, which is applicable to

20  all customers.

21         In general, Your Honor, what Paragraph 18 does is it

22  provides customers, first, a replacement lien for their

23  allowable set-offs on their post-petition payables because

24  they'll be paying their prepetition payables into the estate.

25  But the post-petition lien may or may not have any value

1    because it's second to the DIP lenders' first lien.  So if it

2    is insufficient to fully protect the customer's allowable set-

3    off claims, Paragraph 18 provides for the customers to have

4    other liens:  Some are third liens on property of the state

5    behind the prepetition lenders; some are second, equal liens

6    with the prepetition lenders on property that had not

7    previously been part of a collateral package.

8           There's a provision in Paragraph 18 that provides for

9    what I've just described and 507(b) claims in a certain

10   priority to back up the liens.  The clarification I wanted to

11   make -- and I think General Motors would want, and I suspect

12   all of the customers would want the debtors or any party in

13   interest to speak up if they don't think -- if this is the

14   meaning of the order is this:

15          If, hypothetically, a customer has an allowable set-

16   off claim of a million dollars as of the petition date.  And it

17   turns out that the replacement liens are worth $800,000.  The

18   other liens, the second and third liens are the 507(b) are

19   supposed to protect the two-hundred-thousand-dollar diminution;

20   that's the diminution of the allowable set-off claim as of the

21   beginning.

22          We think it's plain that's what we intended, we think

23   that's what the debtor intended and the prepetition banks

24   understood and the committee understood.  But lest there be any

25   confusion on that, we thought it's important to put it on the

1   record.

2              THE COURT:  Okay.  Well, I certainly read all of the

3   grants of adequate protection here, not just for set-off

4   claims, but for the other secured creditors, petitioned secured

5   creditors, to cover diminution only.

6              MR. BIENENSTOCK:  Right.

7              THE COURT:  To cover diminution.

8              MR. BIENENSTOCK:  But our point is it's diminution

9   from the value of our allowable set-off claim as of

10             THE COURT:  Diminution of the set-off claim.

11             MR. BIENENSTOCK:  That's right.

12             THE COURT:  Yes.

13             MR. BIENENSTOCK:  Okay.  Thank you, Your Honor.

14                         (Counsel confer)

15             THE COURT:  And just to make sure I understand this

16  interplay, this sort of still provides the mechanism for --

17  without trying to add more core set-offs, more (indiscernible)

18  to let that hearing, right?

19             MR. BIENENSTOCK:  Yes.  So that will, in effect,

20  reduce at least some customers' allowable set-off claims that

21  would need protection.

22             THE COURT:  All right.  So it's important, obviously,

23  to keep a record of what their claims were at each point, so

24  they can -- so this can be tracked.

25             MR. BIENENSTOCK:  I have no doubt that -- well, at

1    least with General Motors, we will do it, and I'm quite sure

2    Delphi will have a counter-record.

3          THE COURT:  Okay.

4          MR. BIENENSTOCK:  Which hopefully will match up.

5          THE COURT:  Okay.

6          MR. BIENENSTOCK:  Thank you, Your Honor.

7          MR. BUTLER:  And I'm not sure I followed exactly how

8    much Mr. Bienenstock got at the conclusion.  I will confirm to

9    the Court on the record that the conclusion he reached is one

10   that the debtors concur with.

11         THE COURT:  Okay.

12         MR. BUTLER:  As the Court also stated.

13         Your Honor, moving now to some other issues, if we

14   may, I think we have resolved -- I don't know -- is Mr.

15   Somerstein still in the courtroom?

16                    (Counsel confer)

17         MR. BUTLER:  I believe he now resolved any issues that

18   the DIP lenders have, the prepetition agent has, the Goodwin

19   Procter Group has as part of the prepetition bank group, the

20   creditors' committee has, and General Motors has as to the

21   order that was filed as the Debtors' 4, with the changes that

22   we have thus far placed on the record.

23         That leaves us with a -- turning to Debtors' --

24   turning to Debtors' 28 and 29, in terms of the objections that

25   are left, that leaves us with objections from various set-off

1   and lien claimants, the vast majority of which have been

2   resolved based on the treatment that we propose here, and

3   others who still want to address the Court.  And I'm going to

4   ask us to get to those in a few moments, but I want to address

5   any other objections first.

6          And I think the only other objection that has not been

7   fully resolved, other than getting off into the set-off bucket,

8   if you will, or basket, is that of Bank of America, as it

9   relates to their interest as an aircraft lessor.  And in that

10  respect, they had filed an objection that wanted to make it

11  clear that the interest being -- the interests that were being

12  given here today did not negatively implicate the aircraft

13  leases and certain personalty and other matters relating to

14  that.

15         And, in fact, there is language in Paragraph 25 of the

16  order, Page 54 of Debtors' 4, that is quite explicit in that

17  regard, and I think frankly stated -- Your Honor stated it at

18  the first day hearing, in terms of Your Honor's expectation

19  with aircraft leases and property that wasn't necessarily

20  property of the estate.  But even beyond that, it is now

21  explicit as to personal property that's subject to aircraft

22  leases and so forth.

23         I believe that that language as it stands is

24  acceptable to Bank of America.  But I believe Mr. Mears is on

25  the phone, and there were other things that they wanted the

1   debtors to do beyond this language that I believe Mr. Mears

2   still wanted to address the Court.  We simply couldn't

3   accommodate the needs.

4           THE COURT:  Okay.

5           MR. MEARS:  (Via telephone) Your Honor, thank you very

6   much, this is Pat Mears.

7           We have had long conversations with the debtors

8   counsel.  We've really narrowed the issues down to three:

9           Number one, there are -- there is some ancillary

10  property that includes cash collateral generated by the

11  aircraft that we are asking that it not be subject to a lien,

12  and I think that's the understanding.  We have asked that --

13          THE COURT:  How does the aircraft generate cash

14  collateral --

15          MR. MEARS:  Your Honor, there are --

16          THE COURT:  -- is it leased out?

17          MR. MEARS:  There are charter agreements --

18          THE COURT:  Okay.

19          MR. MEARS:  -- and there are revenues payable under

20  the charter agreements.  There potentially are subleases,

21  although I'm not sure that there are any in existence right

22  now, but the charter agreements are pledged to us as all of the

23  revenues therefrom.

24          THE COURT:  Okay.

25          MR. MEARS:  So what we'd ask is that -- and we

Omnibus Hearing                                                                66

1   understand that the debtors are using whatever cash collateral

2   that is, generated by the -- that's generated by the charter

3   agreements.  We just want to make clear, we've asked for the

4   insertion of a phrase in Paragraph 25 that I've sent on to Mr.

5   Butler and also to Davis Polk, just to make sure that the liens

6   do not cover property that is subject to the lease agreements

7   or as security for.  I haven't heard them on that, but I --

8   based on what Mr. Butler says, I think that tells us that he's

9   willing to do that.

10          The second item is we are objecting to the

11  subordination of our 365(b)(10) claim.

12          THE COURT:  Can we take them one -- well, let's take

13  them one at a time, Mr. Mears.

14          MR. MEARS:  Okay.

15          MR. BUTLER:  I think the issue -- and I know counsel

16  for the DIP lenders has risen as well.  I think the issues that

17  the debtors have and we believe that this already is covered by

18  the order, is that as it relates to this particular issue --

19  and I think I have it right -- that if, in fact, there's a

20  valid lien in that particular property, then it is not

21  negatively impacted by this order.

22          THE COURT:  Right.  That's covered by the general

23  language granting the DIP lender a lien.

24          MR. BUTLER:  And therefore, we thought nothing else

25  was needed, and one of the things --

1          THE COURT:  What kind of existing liens are not primed

2     if they were -- as laid out in the graph?  I forget what it is?

3                    (Counsel confer)

4          MR. BUTLER:  There are about seventeen, I believe,

5     Your Honor.

6          UNIDENTIFIED ATTORNEY:  Seventeen.

7          MS. BEDELL:  Sixteen.

8          MR. BUTLER:  7(c), right?  Seven Charlie?

9          MR. MEARS:  Your Honor, on that point -- and, you

10    know, if it's necessary to file a motion for adequate

11    protection, we will, but we would just ask that continuing

12    liens granted on what I'm calling "ancillary property" --

13         THE COURT:  No, the debtors can't use -- can't use

14    collateral without your consent, so -- or showing of adequate

15    protection.  So you're stating to them now you don't consent.

16         MR. MEARS:  That's correct.

17         THE COURT:  So the ball is in your court now, at this

18    point.

19         MR. MEARS:  Okay.  That's fair enough, Your Honor.

20    Thank you.

21         THE COURT:  Okay.

22         MR. MEARS:  Then the only other point is that we are

23    getting to the subordination of our 365(d)(10) claims, any

24    other claims that might be granted pursuant to this order.  The

25    debtor is getting use of the planes during the Chapter 11 case.

Omnibus Hearing                                                                    68

1    There is an elevated test given to 3659(d)(10) claims, and we

2    wish to have that (indiscernible) --

3           THE COURT:  Well, are these secured -- I thought these

4    were secured -- or are these true leases?

5           MR. MEARS:  These are true leases.  But as security

6    for the lease obligations, there is a small -- a small part of

7    what I call "collateral," the charter remnants, the

8    (indiscernible) agreements, subleases that are separately

9    pledged to secure the lease, the true lease obligations.

10          MR. BUTLER:  Your Honor, the debtors' problem with the

11   language Mr. Mears client wanted him to pursue here is that it

12   really attempted to have the debtors agree with lots of things:

13   That these are true leases; that this part is secure; that this

14   -- and the relationships between them, and we weren't prepared,

15   simply, to do that.  We understand Your Honor's admonition

16   about cash collateral, but I don't believe that this order is

17   drafted -- if Mr. Mears's client has that which he claims that

18   they have -- that they are negatively impacted.

19          MR. MEARS:  No, I -- just to respond, Your Honor, I am

20   not asking for -- I understand Mr. Butler's point.  I guess all

21   I'm asking is that, to the extent that we do have true

22   365(d)(10) claims, then those not be subordinated into any

23   other claims that are -- that would arise from this order.

24                          (Counsel confer)

25          THE COURT:  You know, Mr. Mears, was that a part of

1   your objection?  I have to confess, this is -- I have to rely

2   on -- because I didn't look at this issue until about ten

3   seconds ago.

4          MR. BUTLER:  Well, I've never heard that raised by Mr.

5   Mears in your objection.  Was it raised?

6          MR. MEARS:  I think it was raised in discussions.

7          MR. BUTLER:  Well --

8          MR. MEARS:  If we had any objection, certainly in

9   discussions with Mr. (indiscernible) on this.

10          MR. BUTLER:  Because I think what you're asking for is

11  not acceptable, probably, to anybody in the courtroom, in terms

12  of the lenders or anybody else.  And, Your Honor, he didn't

13  raise it in any objection before the Court.

14          THE COURT:  Well, I don't -- I guess I still don't

15  understand the objection.  This isn't as to the specific

16  assignment that you've been given of a lease, because that

17  would be the debtors' -- that wouldn't be covered by 365(10) --

18          MR. MEARS:  (Indiscernible.)

19          THE COURT:  You're talking about in the event that

20  these leases are --

21          MR. MEARS:  No, we are -- Your Honor, we believe these

22  are true leases, and the lease obligations are monthly lease

23  payments that are due the Bank of America by the debtor.  And

24  under 365(d)(10), a performance of lease obligations, at least

25  as to the sixty-day grace period, are given such a priority.

1         The DIP order does provide for subordination of

2    administrative expenses.  We are asking that our 365(d)(10)

3    claims, and to the extent that they are made -- this is based

4    on a true lease, would not be subordinated.

5         MR. BUTLER:  Your Honor, I don't know if this is a

6    subordination.  Mr. Mears is saying as though we're giving a

7    super-priority claim to the DIP lenders, and the answer is:

8    You bet.  And it is a super-priority, it's intended to be;

9    they're not going to give it up for this or any other kind of

10   administrative claim outside of what's said in the order.  And

11   this, you know, objection is untimely, among other things, Your

12   Honor.

13        THE COURT:  Yeah.  I'm going to deny this objection

14   for that reason, unless you're prepared to have a whole trial

15   today on the 364(c), which I think highlights the untimeliness

16   of the objection.  This isn't an issue of adequate protection;

17   this is just whether the debtors could get financing on a

18   simple non-priming, non-super-priority basis.

19        MR. MEARS:  Other than that, all of our other

20   objections are withdrawn.

21        THE COURT:  Okay.  All right.

22        MR. BUTLER:  Well, I think -- and just so I ask in the

23   courtroom on the phone, to see if I have missed anyone.  Other

24   than set-off claimants, is there any other party who has an

25   objection to this matter?

Omnibus Hearing                                                                     71

1              THE COURT:  I'm only going to say this once more.

2    Please turn off your Blackberries, it affects the transcript.

3    This is on a digital recording system.  Everything else about

4    the system is superior to the prior system.  So that, if you

5    have your Blackberry on and you get an e-mail, there's static

6    on the CD; and, therefore, the people who transcribe it won't

7    be able to hear it.  So please turn off your Blackberry's.

8              MR. ROSENBERG:  Your Honor, I wonder if it's somebody

9    on the telephone because it also affects it on that end.  You

10   might --

11             THE COURT:  All right.  Well, I'm guessing it does.

12   It's all the way back, but maybe that is the case.  If you're

13   on the telephone, you must turn it off, too.

14                           (Laughter)

15             THE COURT:  Well, you'll have to do your conference

16   calls in --

17             MR. BUTLER:  Your Honor, one other party wants to be

18   heard before we get to set-off.

19             MR. NEWMAN:  Your Honor, very, very briefly, Max

20   Newman of Schafer & Weiner, on behalf of nine parties.  We

21   filed a joint objection relating, on part, to tooling liens

22   (sic), and we had a discussion during the break with respect to

23   resolving that with some additional language in Section -- in

24   Paragraph 6 of the financing order, relating to the

25   administrative expense claim of the DIP lenders.

1            They had put a carve-out in Section 7(d) of the order,

2    with respect to liens of the type -- it's on the top of Page 22

3    of the red-line.

4            THE COURT:  Right.

5            MR. NEWMAN:  And that carve-out was not in place, also

6    with respect to the super-priority administrative claim.  And

7    it was my understanding that there was an agreement to import

8    that same carve-out, that same exception into the super-

9    priority lien status.

10           THE COURT:  I'm sorry.  Super-priority lien or super-

11   priority claim?

12           MR. NEWMAN:  Super-priority claim.  I'm sorry, Your

13   Honor, that's my mistake.

14           THE COURT:  Is there such an agreement?

15           MR. BUTLER:  Your Honor, there is.

16           THE COURT:  Okay.

17           MR. BUTLER:  And there's language that's going to go

18   into 6(a), Paragraph 6(a), that is going to make sure it -- the

19   issue is raised here.  The language -- and the DIP lenders

20   agreed to this, I'm told.  The language that appears on Page

21   22, at the top of Page 22, in Romanette iv, involving:

22           "Statutory liens or secured interests arising after

23   the petition date and permitting of the DIP credit agreement,

24   that by operation of law would have priority over previously

25   perfected security interests."

1           That language is going to also appear in Paragraph

2   6(a) in the fifth line.

3           THE COURT:  Okay.

4           MR. NEWMAN:  Thank you, Your Honor.  With that, my

5   clients support the entry of the order as drafted.

6           THE COURT:  Okay.

7           MR. BUTLER:  Now I ask if anyone other than set-off

8   claimants, if there's any other objector on the phone or in the

9   courtroom who has an issue with the order.

10          Your Honor, I think that, with the Court's permission,

11  we'll now then turn to set-off, the last remaining bucket,

12  which is the set-off claimants.

13          Your Honor, there are a series of matters I want to

14  read into the record, much like Mr. Bienenstock's

15  clarification.  I would point out to Your Honor that we're now

16  focused primarily on Paragraph 18 of the order, which I concede

17  to Your Honor is the longest paragraph I have ever seen in a

18  financing order, but it is the product of extraordinarily

19  lengthy negotiations between all of the major stakeholders in

20  this case, I think, that had a direct interest in this, other

21  than -- I should be candid about this -- other than the

22  creditors' committee, which did not participate directly in the

23  immediate negotiations relating to this, but now support entry

24  of the order.

25          And with respect to that language -- and I don't think

1   we propose to make any changes to that language because it is

2   so delicately negotiated, but I do want to read some

3   clarifications, which I understand resolve the objections of

4   maybe twenty or twenty-five of the parties on board.

5         The first, Your Honor, is just a statement that,

6   notwithstanding the fact that there is a series of alternative

7   dispute approaches in this order that basically say --

8   basically say, first, go work out your set-offs with the

9   company and the committee; second, go to mediation; third, go

10  to arbitration, you know, or you can also come to court.  It's

11  not intended -- we'll certainly clarify if there's any language

12  clarification we need to, but I'll say it on this record.  It's

13  not intended to prevent anyone from coming to court at any

14  time.

15        Now it also means that there may be -- some of us will

16  come before Your Honor and say that Your Honor ought not grant

17  the relief they're seeking, without having gone through all of

18  that, so we reserve all of our rights; the committee reserves

19  its rights, but -- and other parties do.  But the fact is, if

20  an individual, you know, set-off claimant wants to come to

21  court, then they can come to court.

22        THE COURT:  Subject to the other parties' rights to

23  argue that they should go through these other alternative

24  dispute mechanisms.

25        MR. BUTLER:  Right, right.  But the order doesn't

1   require them to do it, Your Honor.

2          THE COURT:  Okay.

3          MR. BUTLER:  And that's -- I want to make that clear.

4          THE COURT:  I'd like the parties to look at it really

5   carefully because I've got a -- I mean, I don't have any

6   problem with it, requiring it.  But if that's the deal, I think

7   -- especially given the fact that, clearly, not every set-off

8   claimant is here, just the objectors are here.  You ought to

9   make it clear that, A, they have the right to come to court,

10  notwithstanding the other procedures; and, B, everyone else has

11  the right to request that alternative dispute resolution

12  procedures be field first.

13         MR. APPLEBAUM:  (Via telephone) Your Honor, just as to

14  -- Joel Applebaum (indiscernible).  Does that include binding

15  arbitration?  We believe that that should be included in that

16  directive?

17         THE COURT:  Now, what I'm saying -- well, I'm not sure

18  I understand you.  What I'm saying is just -- repeating what

19  Mr. Butler was saying, which is that, although these

20  alternative dispute resolution mechanisms are in the agreement,

21  set-off claimants are not bound to follow that sequence; and

22  can, instead, at any time come to court --

23         MR. BUTLER:  Right.

24         THE COURT:  -- before they go forward with any of that

25  sequence, subject, of course, to other parties' rights,

1   including Delphi's rights, to argue to the Court that the Court

2   should abstain and require the alternative -- ADR.

3           MR. BUTLER:  And, Your Honor, I should point out that

4   Paragraph 18(a) on Page 40 of Debtors' 4 does have language in

5   it to that effect.

6           THE COURT:  Okay.  That's fine.

7           MR. BUTLER:  The bottom line.  I mean, we put it in,

8   but I will make sure it's very clear --

9           THE COURT:  All right.

10          MR. BUTLER:  -- but I wanted to state it on the

11  record.

12          THE COURT:  All right.  I just wanted to make sure it

13  was clear because I wasn't sure.

14          MR. BUTLER:  Your Honor, the next item -- and this,

15  again, we're on Paragraph 18 on all of these.  With respect to

16  Paragraph 18(a)(4), we want to clarify that nothing in the

17  order affects the right of any party to exercise post-petition

18  set-offs or recoupment rights with respect to these post-

19  petition matters.

20          Second, with respect to Section eight -- Paragraph

21  18(a)(1), to the extent that any party has a valid prepetition

22  set-off right, nothing in the order affects such party's

23  rights.  However, with respect to valid prepetition recoupment,

24  nothing in the order diminishes such recoupment right, but

25  channels such rights into the program defined in Paragraph 18.

1          Third, with -- and this is with respect to Paragraph

2   18(a)(3).  There is no cap in the ordinary course set-off or

3   recoupment rights of any party other than General Motors

4   Corporation, which is as defined in the order.

5          Fourth, with respect to Paragraph 18(a)(1), similar to

6   the point -- one of the earlier points I just made.  The

7   prepetition set-off or recoupment rights of any party, which is

8   a valid set-off or recoupment right, will be permitted under

9   Section -- Paragraph 18, irrespective of the financial

10  condition of the debtors.

11         And, finally, with respect to Paragraph 7(c), the

12  prepetition and post-petition set-off and recoupment rights of

13  any party are senior to the rights of the DIP lenders.

14         THE COURT:  Well, okay.  And are the DIP lenders in

15  agreement with that statement?

16                        (Counsel confer)

17         UNIDENTIFIED ATTORNEY:  May I have a moment, Your

18  Honor, please?

19         THE COURT:  Yes.

20                        (Counsel confer)

21         MR. BUTLER:  Your Honor, like I used the word

22  "negative covenant" earlier, when I shouldn't have, I used a

23  couple of extra words I shouldn't have either, I'm told by

24  everybody.

25         And Paragraph 7(c), and I'll read it again, the words

1   again:

2           "The prepetition set-off and recoupment rights of any

3   party are senior to the rights of the DIP lenders."

4           That's what Paragraph 7(c) says.

5           THE COURT:  Okay.

6           MR. BUTLER:  And the DIP agent agrees with that

7   statement, correct?

8           THE COURT:  All right.

9           MR. BUTLER:  Correct?  You --

10          UNIDENTIFIED ATTORNEY:  Yes.

11          MS. BEDELL:  I'm sorry, Your Honor.  Laureen Bedell

12  again, on behalf of the DIP agent.  We'd like to consult with

13  this, we're just not sure we agree and (indiscernible) --

14                        (Counsel confer)

15          THE COURT:  You're talking about prepetition rights,

16  right?

17          MR. BUTLER:  Yes, Your Honor.

18                        (Counsel confer)

19          THE COURT:  They're not being primed.

20                        (Counsel confer)

21          THE COURT:  For example, this doesn't reorder the

22  adequate protection loan (sic).

23          MS. BEDELL:  Right.

24          THE COURT:  This just states that they're not being

25  primed by the DIP loan.

1        MR. BUTLER:  Right.

2        THE COURT:  All right.  Well, I think all of those

3   things implicit in the order, and -- all right.  So to the

4   extent that they help clarify the order, that's fine.  I think

5   the record will reflect that.

6        MR. BUTLER:  Your Honor, I believe there are some

7   parties -- some prepetition -- some set-off claimants or

8   alleged plaintiffs that still want to address the Court.

9        THE COURT:  Okay.

10       MR. BUTLER:  And, Your Honor, it would be helpful, if

11   they do so, if people would identify what their objection is,

12   so we can track to it, please.

13       THE COURT:  Okay.

14       MR. MC DOWELL:  (Via telephone) Your Honor, my name is

15   Ralph McDowell, I represent Lear Corporation.  I'm sorry

16   (indiscernible).

17       THE COURT:  You have to speak up a little louder, sir.

18       MR. MC DOWELL:  Okay.  If I understood the

19   clarification, which I appreciated, especially with respect to

20   the priming and the arbitration, the goal of this paragraph is

21   (indiscernible) not intended to alter the substantive factual

22   language (indiscernible) with respect to the set-off

23   (indiscernible), regardless of whether those are prepetition or

24   post-petition.  And I listened to Mr. Butler, he went through

25   them, and I believe that this (indiscernible).

1    But that would be -- that is the only remaining

2 objection that we have, is that the financing order does not

3 take substantive contractual life and alter them

4 (indiscernible).

5    THE COURT:  Only to the extent that, ultimately, you

6 still have to prove your claim under the Bankruptcy Code and

7 your right to set-off under the Bankruptcy Code.

8    MR. MC DOWELL:  Understood, and -- understood

9 (indiscernible), Your Honor.

10    THE COURT:  Okay.

11    MR. BUTLER:  Your Honor, the only point I'd say is, I

12 mean, Paragraph 18, which has been so careful negotiated, it

13 says what it says.  You know, and I don't want to sort of have

14 these blatant, you know, sort of -- I understand what the Court

15 said, and I understand what the -- you know, and I believe that

16 to be the case, that they have to prove their matters, and

17 there's a process here on how they can deal with these matters

18 under the DIP financing order.

19    THE COURT:  Right.

20    MR. MC DOWELL:  But, Your Honor, Paragraph 18 says

21 what it says, and the language and the first provision of it

22 could be argued also (indiscernible) contractual right.  That's

23 the reason for my objection and the reason for the

24 clarification.

25    THE COURT:  Well, the reason, I think, that I'm having

1  problems with your statement is that, for example, Section 362

2  alters, you know, substantive contractual rights.  So if you're

3  accepting the existence of the Bankruptcy Code, then I agree

4  with you.

5          MR. MC DOWELL:  Right.  So with the extension of 362,

6  I agree, absolutely.

7          THE COURT:  You know, the Bankruptcy Code, generally,

8  right.  It's not just 362.

9          MR. MC DOWELL:  Right.

10          THE COURT:  Okay.  All right.

11          MR. MC DOWELL:  (Indiscernible) file a motion

12  (indiscernible).

13          THE COURT:  Okay.  All right.

14          MR. MC DOWELL:  Thank you.

15          THE COURT:  Sure.

16          MR. FUSCO:  (Via telephone) Your Honor, this is

17  Timothy Fusco from Miller, Canfield, Paddock & Stone, on behalf

18  of Ford Motor Company.

19          THE COURT:  Yes.

20          MR. FUSCO:  Your Honor, our issue is with the

21  inclusion of recoupment in the definition of a set-off.  We

22  have no problem with true set-offs.  Obviously, the exercise of

23  set-offs are stayed under 362, but recoupment rights are not.

24  And essentially ordinary course recoupment, which are nothing

25  but a (indiscernible) between the customer and the supplier,

1   are not affected by the automatic stay.  And it is proper in an

2   order like this to restrict recoupment rights, even in the

3   context of DIP financing.

4           We object to going through all of the procedures that

5   are set forth in here to exercise a right that is simply not

6   affected by the automatic stay, and any -- as, again, it's all

7   ordinary business process.  We're talking about the way we do

8   business, and we think it's absolutely fair that we should be

9   allowed to continue our recoupment, as opposed to our set-off

10  rights.

11          THE COURT:  Well, I guess I have two things to say in

12  respect to that:

13          First, as I read this, and as clarified further by Mr.

14  Butler on the record, nothing in this Paragraph 18 is intended

15  to change the substantive rights that -- as far as doing

16  business, that Delphi have in respect of true recoupment claims

17  or recoupment rights.

18          That being said, there's also recognition, not only as

19  to recoupment rights, but also as to set-off rights, that

20  ordinary course rights of that nature will not subject to the

21  automatic stay.  But they are subject to a procedure which

22  seems reasonable to me, particularly in light of the right of

23  any such party to try to expedite that procedure by coming

24  straight to court to determine whether, in fact, what someone

25  claims is a recoupment right or a set-off claim is, in fact, a

Omnibus Hearing                                                        83

1   recoupment right or a set-off claim.

2         And the cases are, unfortunately, pretty many, and

3   they go up to the circuit level, as to what a recoupment claim

4   is, a recoupment right is.  And, frequently, what a party says

5   is a recoupment right, the Court finds is not; and, of course,

6   any bankruptcy lawyer worth his or her salt is going to tell

7   the client if there's any doubt, let's not exercise self-help.

8         So I would -- I view this procedure as one that is

9   beneficial to both sides on this transaction, and that it lays

10  out a rational way for the debtors, with input from the

11  creditors' committee, to make those decisions in the first

12  instance on something that's really clear very quickly, and on

13  something that's not very clear whether it's a recoupment right

14  or not or a set-off right or not, to do it in an organized way.

15  If it turns out that they're jerking people around, then those

16  people have a chance to come to the -- to have it stopped.

17        But I don't view this order as somehow taking away

18  people's rights to recoup.  But of course, "rights to recoup"

19  begs the question as to whether you really do have the right,

20  and I think that's all this does, is lay out a procedural

21  mechanism for making that clear.

22        MR. FUSCO:  All right.  Thank you, Your Honor.

23        THE COURT:  Okay.

24        MR. REISMAN:  Your Honor, Steven Reisman with the firm

25  of Curtis Mallet-Prevost, on behalf of Flextronics, which is

Omnibus Hearing                                                        84

1   the largest trade creditor in this case.

2          I really have three points to make -- really four

3   points to make:  One, I compliment the debtor on their efforts

4   with respect to the set-off provisions and the mediation

5   arbitration protocol that they're trying to put in place.

6          The first point I'd like to make Your Honor is with

7   respect -- this is a substantive point -- a substantive point

8   with respect to 18(a)(2), the last sentence.  It's a little

9   unclear to me -- and I'm looking from a black-line, Your Honor,

10  so I apologize, but 18(a)(2), last sentence, Page 45 of the

11  black-line.  It says:

12         "Notwithstanding any award in any such arbitration, in

13  no event shall the set-off claimant be permitted to exercise

14  its set-off right against any payables other than prepetition

15  payables, except as herein after set forth."

16         I'd just ask for a modification of that to say, except

17  as set forth in this Paragraph 18, because it talks about

18  before then and after that sentence about the ability to set

19  off against post-petition payables, as well.

20         THE COURT:  Okay.

21         MR. REISMAN:  This --

22         THE COURT:  That sounds like it makes sense to me.

23         MR. BUTLER:  Yeah.  I mean, Your Honor -- something,

24  Your Honor, I tried to avoid with all these parties is -- you

25  know, there are literally fifty people that want to word-smith

1   this.

2           THE COURT:  Right.

3           MR. BUTLER:  I mean, it is -- Paragraph 18 deals with

4   set-off, this is all --

5           THE COURT:  But if there's any remedy as to post-

6   petition payables that actually precede this paragraph, then I

7   think Mr. Reisman is right, so maybe you should -- just check

8   to see whether there are.  He'll show you if there are.  If

9   there are, then I think his fix is fine.

10          MR. REISMAN:  Your Honor, the second point I have to

11  make -- and it's really the second and third -- I think it's

12  appropriate for the debtor to put in place some type of

13  protocol on this mediation set-off.  For example, they say that

14  notice is to be given to the committee, the debtor, the agent,

15  but no one really knows who to send the notice to, and, you

16  know, we don't want to -- we want to get the right people, to

17  try and work through the issues.  As a first line, we'll work

18  through the businesspeople in trying to work through this, but

19  if we can't, I think people should have the right to know, you

20  know, who gets that notice.

21          And it should also set forth, with respect to the

22  mediation and the arbitration, who's going to bear the cost and

23  the process for dealing with that.  And I leave it to the

24  debtors to propose something in that regard for the various

25  parties that have the set-off rights.

1          THE COURT:  All right.  Well, as least as to the first

2     point, I'm sure the debtors will work out, probably

3     (indiscernible) a process to accomplish this, and it's probably

4     going to be at -- you know, at a couple of different levels.

5     The easy ones are probably dealt with at a -- you know, one

6     level, and the harder ones go to a different level when you get

7     into actually contesting these things, so -- but I leave that

8     to them.  They've been pretty busy, so that's the next thing to

9     turn to.

10          MR. REISMAN:  Okay.  Thank you.

11          MR. TOERING:  Gordon Toering, Your Honor, on behalf of

12     Robert Bosch Corporation.  I just want to confirm -- there has

13     been a lot of discussion about the particular Paragraph 18.  I

14     just want to make sure that all of us are clear, and I

15     understood what the Court said, and just wanted to verify that

16     I understood correctly.

17          My understanding of this is that this procedure in

18     Paragraph 18 is a -- it is a procedure; and that, at any point,

19     a set-off claimant could come into this court, file a motion

20     for leave from the stay, and at that point the debtor and any

21     other party in interest could say, not that your ordered under

22     this order to go through this arbitration/mediation procedure,

23     but rather that it would be expedient that the Court should

24     abstain on the basis of any number of factors.  Is that

25     correct?  Is that --

1          THE COURT:  Yeah.

2          MR. TOERING:  Okay.

3          THE COURT:  Yeah.  Well, obviously, I'm giving people

4    warning.  If you get into a procedure and you're coming here

5    because you just don't like how it's done, you're going to know

6    pretty quickly that I'm going to send you back to the

7    procedure, unless I think it's fundamentally unfair, so -- I'm

8    not giving people an option to pursue mediation and

9    arbitration, and then change their mind in the middle of it.  I

10   mean, I guess you could do it, but it wouldn't be a very

11   pleasant hearing.

12          MR. TOERING:  Sure.

13                         (Laughter)

14          MR. TOERING:  That wouldn't be our intent, Your Honor.

15   The other part --

16          THE COURT:  I'm sure it wouldn't.

17          MR. TOERING:  The other part is just to verify on the

18   post-petition.  My understanding is that our post-petition set-

19   off rights -- and this does affect going-forward shipments

20   because Bosch is both a supplier and a customer of Delphi.

21          THE COURT:  Right.

22          MR. TOERING:  My understanding is that, as to post-

23   petition set-off rights, that those would prime the DIP lenders

24   and anybody else; and that was, I thought, an understanding

25   that had been reached.  Because that does affect whether or not

Omnibus Hearing                                                    88

1  we're willing to extend credit to the debtor and so forth.  So

2  I'd like some clarification on that.

3          MR. BUTLER:  Your Honor, I don't want to get into the

4  exercise of what's prime or what's not prime.  They're

5  permitted, post-petition set-off rights can be exercised.  I'll

6  leave it at that.

7          MR. TOERING:  Well, Your Honor, just to follow that

8  up, I guess that leaves it someone open there.  My

9  understanding -- I just don't want a situation where a lender

10 is coming in and saying, worst-case scenario, the case starts

11 crumbling, and the lender comes in and says your set-off rights

12 are subordinate to our rights.  And that's what I'm trying to -

13 - trying to get at, at this point.

14         And we can work this out, I guess that's just

15 something we can manage, in terms of the credit issue.  But it

16 is something that if we clarify it today, I think it would be

17 helpful.

18         MR. BUTLER:  I think it's clarified on Page 43 of the

19 order, which says that:

20         "Nothing contained herein shall limit the discretion

21 of the debtors to pay warranty and/or product recall claims.

22 In accordance with those, the Court will limit the right of any

23 party in interest to exercise a post-petition set-off or

24 recoupment against a post-petition payable."

25         And the right goes on to other things.  So I mean, I

1   think it's described right in the order.

2           MR. TOERING:  Described, but doesn't --

3           MR. BUTLER:  Post against post.

4           MR. TOERING:  Described, but it doesn't talk about

5   priority.  That's my point, Your Honor.

6           THE COURT:  Well, I guess it is what it is, including

7   nine four oh four (indiscernible).

8           MR. BUTLER:  Is there anyone else who wants to address

9   the Court before we go to the evidentiary record?

10          Your Honor, recognizing that when a debtor asks a

11  bankruptcy court to consider Section 364(d) of the bankruptcy

12  code, we have an affirmative obligation to place evidence in

13  the record, irrespective of the existence of any objection.

14          I'd like, with the Court's permission, to first move

15  the admission of Debtors' Exhibits 1 through 29.

16          THE COURT:  All right.  That's from that -- the binder

17  you gave me, which 1 through 5 are the final financing

18  documents, 6 through 12 are alternative financing proposals by

19  other groups to the debtor, and 13 through 16 are collateral

20  evaluation materials, 17 through 22 are the prepetition

21  financing documents, 23 through 27 are various Securities and

22  Exchange Commission filings, and the last two are already in

23  the record; those were attached.

24          MR. BUTLER:  Yes.

25          THE COURT:  Those were summaries of the objections.

1          MR. BUTLER:  Yes, Your Honor.

2          THE COURT:  So does anyone have any objection to those

3   being admitted?  They're admitted.

4          MR. BUTLER:  Thank you, Your Honor.

5      (Debtors' Exhibits 1 through 29 admitted into evidence)

6          MR. BUTLER:  Your Honor, I think the Court earlier

7   indicated that it would be acceptable for the debtors to

8   present brief proffers?  These people are here?  Your Honor,

9   they're all here.  I'll ask them to stand when I introduce

10  them.

11         The first witness that I would call would be David

12  Resnick.  Mr. Resnick is standing in the courtroom and is the

13  debtors' investment banker, Your Honor.

14         THE COURT:  Okay.

15         MR. BUTLER:  The second witness, Your Honor, we would

16  call is Mr. Scott King.  Mr. King?  From FTI.  And the third is

17  the debtors' chief restructuring officer, Mr. John Sheehan.

18         THE COURT:  Okay.

19         MR. BUTLER:  Your Honor, in support of the motion, the

20  debtors would offer the testimony of David Resnick, he's the

21  Managing Director of Rothschild, Inc.  Mr. Resnick is present;

22  if called, would testifies as follows:

23         First, he would testify as to his background and his

24  familiarity with the debtors' operations.  He would testify

25  that the debtors' board of directors authorized Rothschild,

Omnibus Hearing                                                    91

1   Inc., its financial advisor and investment banker, to seek

2   post-petition DIP financing from its prepetition secured

3   lenders and other third-party lending institutions.

4         Mr. Resnick would testify that he and other persons,

5   including the debtors' financial advisors FTI Consulting, Inc.,

6   determined that a DIP credit agreement, generally in the terms

7   of that proposed, was critical to the debtors' ability to

8   operate in Chapter 11, and for the debtors' successful

9   reorganization.

10         Mr. Resnick would testify that, in his view, the DIP

11   credit agreement is necessary for the debtors to operate the

12   business.  He would testify that he participated in the

13   negotiations of the terms and conditions of the agreement, and

14   that they were negotiated at arm's length and in good faith.

15         Mr. Resnick would testify that, with the credit

16   provided in the DIP facility, it is the debtors' and his view

17   that the debtors would be able to maintain, or should be able

18   to maintain adequate cash balances customary and necessary for

19   companies of this size and in this industry to operate their

20   businesses, in order to preserve the ongoing value of their

21   businesses for the benefits of all parties in interest.

22         Mr. Resnick would testify that -- also testify that

23   he, in participating with the debtors' management team, ran a

24   process to evaluate potential proposals, and met with four

25   major money-settler (sic) institutions, all of whom produced

1   proposals.

2        And, finally, he would testify that the final

3   proposals, and he would identify those proposals as the

4   proposals set forth in Debtors' 1, and the alternative

5   financing proposals not accepted by the debtors as Debtors' 6

6   through 12.

7        Mr. Resnick would testify that when the debtors

8   approached these financial institutions, that they made

9   presentations at the institutions and asked them to provide

10  both priming facilities and non-priming facilities, takeout

11  facilities, in as significant amount of money as the

12  institutions could provide or would provide, but in the case of

13  a takeout refinancing, not less than 4 billion.

14       He would testify that the -- in evaluating these

15  proposals, that the debtors and their financial advisors

16  analyze carefully the structures, discuss the structures with

17  the different institutions, and ultimately reached the

18  determination that there were -- was essentially three gating

19  elements (sic) that, in the view of the debtors and in the view

20  of Mr. Resnick as the debtors' investment banker, were the

21  tantamount considerations in determining what was an acceptable

22  facility that could, in fact, meet the requirements of the

23  debtors' financing needs.

24       And those -- Mr. Resnick would testify that those

25  three factors included execution risk issues, issues relating

1   to size and liquidity of the facility, and issues relating to

2   the economics of the facility proposed.

3           Mr. Resnick would testify as to execution risk that,

4   in his view, this is, if not the largest, among the largest

5   total packages, financing packages sought in the history of the

6   federal system; it's four and a half billion dollars in total.

7   And the debtors recognized that, in trying to do takeout

8   financing of 4 billion, which was the maximum the debtors had

9   obtained among the proposals, Mr. Resnick would testify that,

10  as to the four-billion-dollar facilities, that the debtors took

11  into consideration the complexities of actually executing that

12  takeout facility, which would have been the largest in Mr.

13  Resnick's, at least, experience, ever been considered in the

14  federal bankruptcy system.

15          Mr. Resnick would also testify that he and others at

16  Rothschild, together with members of management, consulted with

17  the senior managers and advisors at the various -- at both J.P.

18  Morgan and at Citibank, in particular, and were advised at the

19  end of the day that those institutions believed that the

20  execution risk was significantly lower in the priming facility

21  than it was in the takeout facility.  In addition -- and that's

22  reflected in the rates and in the economic terms and in other

23  provisions that are in the record at this point.

24          Mr. Resnick would also testify that, in the final

25  structure that was agreed, the priming facility generated an

1  additional half a billion dollars worth of liquidity for the

2  company because the other proposals, the non-priming proposals,

3  the takeout proposals, required a pay-down of the prepetition

4  loans in the amount of approximately $500 million.  So that the

5  net available would have been -- in a takeout, would have been

6  4 billion.  And in this particular structure, where there was a

7  priming of the two-and-a-half-billion-dollar prepetition, that

8  in fact there would be an additional half a billion or more of

9  additional liquidity available to the company.

10          Mr. Resnick would testify that, in terms of economics,

11  that Rothschild benchmarked economics in this facility against

12  those in its database; that Rothschild, as a part of its

13  ordinary course of business, maintains a database of similar

14  DIP financings; that Mr. Resnick, on behalf of Rothschild, has

15  participated in many refinancings and DIP facilities; and that,

16  when they reviewed their competitive database, that the

17  economics in this database actually were benchmarked extremely

18  favorably to that which was in the marketplace and in

19  appropriate prior DIPs that would be appropriately comparative.

20          Your Honor, and Mr. Resnick would also testify that he

21  has reviewed the terms and conditions of this DIP, and believes

22  that the DIPs -- that he determines that they're fair and

23  reasonable; and, as I indicated, would testify that his opinion

24  is based in part on the database of selected historical DIP

25  facilities that is maintained by Rothschild.

Omnibus Hearing                                                    95

1            In terms of the debtors' needs, Mr. Resnick would also

2    point to the debtors' DIP facility projections, which are

3    included in the record at Debtors' 13, and would point to the

4    fact that the four-and-a-half-billion-dollar facility, based on

5    the forward projections, would suggest that at the end of the

6    period, about a half a billion dollars of liquidity would be

7    available, based on the projections there.

8            Mr. Resnick would testify that, in his experience, a

9    company of this size and complexity, one of the Fortune 50

10   Companies in the country, would, in fact, require a very

11   substantial excess availability in order to operate its

12   business and maintain the confidence of its suppliers and

13   customers.

14           Finally, Mr. Resnick would testify about the structure

15   of Delphi and the structure of this restructuring, and -- which

16   involve a bimodal message, where the company's U.S. entities

17   are involved in this Chapter 11 case, but its global businesses

18   are operating outside of Chapter 11, even though many of the

19   products that it maintains were operated on a horizontal --

20   horizontal, as opposed to vertical, sort of structure,

21   globally.

22           And Mr. Resnick would testify that, in dealing with

23   customers located outside the United States, dealing with

24   suppliers outside the United States, dealing with suppliers and

25   customers that have potential set-off claims and recoupment

1   claims and other actions that could be taken in connection with

2   the company, that it was extremely important in his judgment to

3   -- for stabilizing the business, that the company have the DIP

4   facility that is put in place; and that, in his professional

5   opinion, there was no other facility made available to the

6   debtors that met the debtors' needs and requirements.

7          Your Honor, that would be the sum and substance of Mr.

8   Resnick's testimony.

9          THE COURT:  Okay.  Does anyone wish to cross-examine

10  Mr. Resnick on his testimony?

11         All right.  You can move on to the next witness then.

12         MR. BUTLER:  Your Honor, the next witness would be Mr.

13  Scott King.  Mr. King, if called to testify, would testify that

14  he is employed by FTI Consulting, Inc. as a Senior Managing

15  Director; that he leads FTI's metals restructuring practice;

16  and that, prior to August of 2002, he was a partner for five

17  years at PriceWaterhouseCooper's business recovery practice and

18  held various positions prior to that date.

19         Mr. King would testify that he has spent more than

20  twenty years of experience in developing and implementing

21  improvement strategies for companies experiencing financial

22  distress, and that his role at FTI is -- in this assignment, is

23  to provide, among other things, on-site assistance at the

24  company, in connection with its Chapter 11 case, and dealing

25  with essential suppliers, and working with the creditors'

1   committee, and working with the company in connection with its

2   relationships with its lenders, its -- the formulation of its

3   forward-going projections, the formulation of its business

4   plan, and other matters.

5       Mr. King would testify that he prepared the document

6   that has been admitted into evidence as Debtors' 14; that that

7   document was prepared by him based on his examination of the

8   debtors' books and records and based on his examination of

9   various reports that were provided to him, including reports

10  that have been admitted into evidence in the debtors' exhibits

11  relating to various valuations of the debtors' collateral.

12      Mr. King would testify that, in his opinion, based on

13  a build-up, and this is on a going-concern basis, that there is

14  as much as $9.6 billion worth of collateral available to

15  support the adequate protection packages here, which would

16  consist of a two-and-a-half-billion-dollar prepetition lender

17  claim, a two-billion-dollar DIP lender claim, and as much as a

18  five-billion-dollar equity cushion that would be available,

19  based on the book values of PP&E -- property, plant, and

20  equipment -- assessing the valuation of the foreign stock,

21  assessing the valuation of the inventory, and assessing the

22  valuation of receivables and cash and the performance of those

23  assets in the debtors' ordinary course of business on an

24  historical basis.

25      Mr. King would also acknowledge that he examined and

1   relied on the -- in preparing his testimony, relied on the

2   Debtors' 16, which is an appraisal prepared by Hillcall

3   Appraisal Services (phonetic), with respect to Delphi PP&E,

4   which attributed an eight-hundred-and-fifty-million-dollar

5   liquidation value to PP&E, as opposed to the two-point-nine-

6   billion-dollar book value that the debtors currently assign to

7   the PP&E.  And if you assigned a liquidation value to PP&E,

8   which Mr. King would suggest is, of all the various collateral

9   items, the one that is the -- that we acknowledge would have

10  perhaps more speculative amounts, in terms of whether

11  liquidation or -- going to turn out to be involved, that if you

12  assign liquidation value to that particular bucket of

13  collateral, that the total value of the collateral will be

14  somewhere in the seven-point-six-billion-dollar range, still

15  providing an ample cushion to the $4.5 billion worth of

16  prepetition and post-petition proposed claims.

17          Your Honor, Mr. King would also testify similar to Mr.

18  Resnick's testimony with respect to the key items of execution

19  risk, size of the facility, and economics; however, Mr. King

20  would qualify his testimony with a much stronger emphasis on

21  size of the facility.  It is Mr. King's view, and in fact he

22  would testify that he was very active during the consideration

23  of these proposals in pushing the company to get as large a

24  facility as the company could procure because it is Mr. King's

25  professional opinion that the company needed as much excess

Omnibus Hearing                                                             99

1   liquidity as possible, given the uncertainties of the

2   automotive sector, the transformation challenges of the

3   company, in terms of the transformation plan and strategies

4   that it has announced publicly, and the extingencies dealing

5   with the sort of bimodal arrangement of trying to make sure

6   that all the customers and suppliers wore a wide hat (sic) and

7   understood the company had all of the liquidity that it

8   reasonably thought necessary to address its issues.  So Mr.

9   King would testify that his principle focus was:  How much

10  money could the company get?  And he viewed that as the most

11  important factor involved here.

12       He would also testify that he participated in the

13  examination of all of the proposals and participated, along

14  with other members of FTI, in aspects of the negotiations of

15  the transaction, and would testify that, in his professional

16  opinion, there was no other financing available to the company

17  that would meet the company's needs and requirements.

18       And that would be the sum and substance, Your Honor,

19  of Mr. King's testimony.

20       THE COURT:  Okay.  Does anyone want to cross-examine

21  Mr. King on his testimony?

22       All right.  Hearing no one, you can move on to the

23  last witness.

24       MR. BUTLER:  Your Honor, the last witness who would

25  testify would be Mr. John Sheehan.  He would testify that he is

1    the Vice President and Chief Restructuring Officer at Delphi;

2    and he would testify that, from the period of March 4th, 2005

3    through October 8th, he also acted as the Interim Chief

4    Financial Officer, Chief Accounting Officer, and Controller of

5    Delphi Corporation, having joined Delphi in July of 2002 as

6    Chief Accounting Officer and Controller.

7            Mr. Sheehan would describe his role at Delphi as being

8    involved and being tasked with the principal responsibility of

9    all aspects of the company's restructuring; and, as part of

10   those duties, he would say he's responsible for reviewing and

11   analyzing the company's assets and operating and financial

12   strategies, as well as the company's business plan and

13   financial projections, and being responsible for the review and

14   analysis and negotiation of proposals to the company in

15   connection with third-party transactions, including proposals

16   for DIP financing.

17           Mr. Sheehan would testify that he is familiar with the

18   company's cash needs and that he developed that understanding

19   during his period of responsibility at the company as Chief

20   Accounting Officer and Controller, and that he is very familiar

21   with requirements of how the company operates globally, its

22   need for financing, the operations of the enterprise, the need

23   for dealing with central suppliers and customers, and operating

24   the debtors' business.

25           He would testify that he was involved in the process,

1    which resulted in the procurement of the DIP financing that's

2    before the Court, as evidenced in Debtors' Exhibits 1 through 2

3    and 2A.  He would describe that that process began earlier this

4    year on a contingency basis, as the board considered various

5    alternatives involving a consensual restructuring of the

6    company's operations in the United States.  And as part of that

7    analysis, the company retained financial advisors to assist it

8    and its board of directors in evaluating its options.

9          Mr. Sheehan would testify that Delphi first retained

10   Rothschild, Inc., and Rowatan Associates as the company's

11   financial advisors and investment bankers, and subsequently

12   retained legal counsel, and then retained -- and also retained

13   FTI Consulting.

14         He would testify that, Rothschild was engaged in part

15   to assist the company in soliciting and evaluating various

16   financing proposals, both originally outside of Chapter 11, and

17   ultimately inside of Chapter 11, and that they were tasked with

18   helping him and others at the company negotiate the best

19   financing transaction that would be available to the company to

20   meet its needs, and would also give the company the maximum

21   amount of flexibility when considering various alternatives.

22         Mr. Sheehan would testify that, in August of this

23   year, that he, after consultation with other members of

24   management and a presentation at the Board of Directors of the

25   company, directed Rothschild to begin to reach out and begin a

1   process for considering DIP financing proposals on a

2   contingency basis.  That occurred at approximately the same

3   time that the debtors issued public statements about a Path A

4   and Path B sort of, if you will, approach to evaluating and

5   dealing with their legacy liabilities and other -- and

6   portfolio restructuring requirements here in the United States.

7   Those public announcements were made in early August, and Mr.

8   Rothschild -- excuse me -- Mr. Sheehan would testify that

9   Rothschild was asked to begin this contingency process shortly

10  thereafter.

11          Mr. Sheehan would testify that Rothschild, at the

12  direction of the company, approached J.P. Morgan Chase and a

13  number of other global financial institutions, including

14  Citibank, Deutsche Bank, and G.E. Capital, with respect to

15  debtor-in-possession financing.  He would testify that that

16  process resulted in a competitive process that concluded in the

17  proposals that had been admitted into evidence as Debtors' 1

18  and Debtors' 6 through 12.

19          Mr. Sheehan would testify that, in negotiating with

20  those lenders, Mr. Sheehan was personally involved in -- along

21  with Rothschild, in describing the company's situation, and was

22  familiar with the materials that were provided in the proposals

23  that were obtained from each of the lenders and the various

24  structures that were involved.

25          Mr. Sheehan would also testify that he was similarly

1   concerned on behalf of the company about the three sort of

2   principal criteria for evaluating these proposals; again, those

3   criteria being the cost of the facility, the structure and size

4   of the facility, and its execution risk.

5           Mr. Sheehan would testify that his weighting of those

6   issues was generally similar to that of his advisors, but that

7   initially he spent some time and focus on the cost of the

8   facility, feeling a need to ensure that the company was

9   appropriately committing its financial resources, and that he

10  was extremely concerned based on his involvement with the

11  essential suppliers and customers of the business on making

12  sure that the proposal could be executed successfully; that

13  those were among his principal focuses.

14          Mr. Sheehan would testify that he participated in the

15  negotiations as a principal from time to time, and throughout

16  the process; that he ultimately recommended to management --

17  the other members of management and the Board of Directors the

18  commitment letter that is set forth at Debtors' 1; that, in Mr.

19  Sheehan's judgment, that proposal was the only financing

20  available to the debtors, that could meet the debtors

21  requirements going forward; that Mr. Sheehan believes that

22  those -- that proposal was negotiated in good faith, on arm's

23  length basis between the company and J.P. Morgan Chase, and

24  eventually Citibank.

25          Your Honor, Mr. Sheehan would also testify that he's

1    familiar with the general terms and conditions of the financing

2    transaction; that, in his judgment, those terms are, in the

3    business judgment of the debtors, fair and reasonable and

4    appropriate under the circumstances; that, in his view, this

5    financing transaction represents the culmination of what Mr.

6    Sheehan viewed to be an exhaustive solicitation process for

7    financing conducted by the company, and that was designed to

8    meet the company's needs in these unusual circumstances.

9           Mr. Sheehan would also testify that he has reviewed

10   the DIP projections that formed the basis of the DIP financing

11   case that was presented to the debtors, and which is

12   represented in part in Debtors' 13; and that he believes the

13   size of the facility, the 4.5 billion overall, is required,

14   again, because of the debtors' contemplated needs as they move

15   through the process.

16          Your Honor, that would be the sum and substance of Mr.

17   Sheehan's testimony.

18          THE COURT:  All right.  Does anyone wish to cross-

19   examine, Mr. Sheehan?

20          All right.  Hearing no one, I'll accept his testimony.

21          MR. BUTLER:  Your Honor, that would represent the

22   evidentiary record that the debtors' have:

23          The testimony of those three witnesses and the twenty-

24   nine exhibits admitted into evidence, and we would rest on that

25   record.

1    THE COURT:  Okay.  I'm assuming, in light of the first

2  part of the hearing, that no one else has any evidence they

3  want to submit?  Okay.  I'll close the evidentiary portion of

4  the hearing then.

5    MR. BUTLER:  Your Honor, and given the presentation we

6  had earlier, I think at this point we would simply rest on the

7  papers.  There's a proposed order we'd like Your Honor to

8  consider, and we would intend to reflect the changes that we

9  have discussed on the record that were indicated to actually

10  be changes to the order.  We have -- while we know others will

11  want to look at it, we have committed to the creditors'

12  committee that they and we will take our time this evening to

13  get it right.  We have language, much of which we've read into

14  the record.  There is not much actually left to be done.  But

15  we want to make sure that we have a chance to fly-spec. the

16  order, and we'll get it over -- the committee and the debtors

17  will get the order over to you in the morning.

18    We would like, Your Honor, if you're inclined to

19  improve the financing, to approve it on the record today, so

20  we'd be in a position to announce publicly it's been approved,

21  and also to make clear that, to the extent somehow there is

22  some disagreement in what the form of the order says, all that

23  would be brought back to Your Honor tomorrow is a settlement of

24  the order, rather than a revisiting of the merits in this case.

25    THE COURT:  All right.  I do approve the financing and

Omnibus Hearing                                            106

1   adequate protection provisions set forth in the black-lined

2   order, as modified and clarified on the record at today's

3   hearing.  And the record will reflect that the parties are

4   moving forward to complete the order in reliance on that

5   ruling, and that all I'm looking for is an order that embodies

6   the agreed order, as set forth on the record.

7        It is clear to me that this is, at this point, a

8   consensual DIP financing and adequate protection order, which I

9   think -- and I extend praise to all of the professionals

10  involved in resolving the issues, which were not, in all

11  respects, easy to resolve, and to resolve them fairly and

12  creatively.  And I also applaud the fact that the various

13  parties in interest were each prepared to sacrifice important

14  elements of their positions to get to that point.

15       Based on the proffered testimony, I find that the DIP

16  agreement was negotiated at arm's length after a competitive

17  process and in good faith; and, therefore, merits treatment

18  under Section 364(e) of the Bankruptcy Code.

19       And I also further find that the debtors have

20  satisfied their burden under Section 364(c) and 364(d) for the

21  priority claims, super-priority claims, and liens and priority

22  liens provided in this order.

23       And one of my original reactions to this motion was to

24  question whether, in fact, the debtors needed such a large

25  facility.  I'm hopeful that they will not need to draw down on

1   it significantly, but I am now convinced that the facility

2   adequately satisfies the debtors' needs and provides them with

3   sufficient and abundant availability to conduct their

4   bankruptcy case; and, more importantly, to conduct their

5   businesses in the ordinary course.

6          So I'll look forward to getting the order, and we'll

7   review it in light of the record.

8          MR. BUTLER:  Your Honor, thank you very much, and

9   thank you to you and everyone in chambers for the assistance

10  over the last few days as we've moved forward towards this

11  hearing.

12         Your Honor, I would point out that Matter 18 on the

13  agenda, which is the cash management matter, in light of the

14  disposition of this order and the agreement of the committee,

15  I'd ask Your Honor to approve the cash management order as

16  negotiated with the Pension Benefit Guarantee Corporation on a

17  final basis.

18         THE COURT:  And the committee.

19         MR. BUTLER:  And the committee.

20         THE COURT:  So --

21         MR. BUTLER:  The committee withdrew its objection to

22  that matter.  There's --

23                    (Counsel confer)

24         MR. BUTLER:  Okay.  You know, we'll be happy to submit

25  the order -- and we'll submit the order tomorrow morning.

1    THE COURT:  All right.  But it will reflect the same

2  language with respect to the inter-company loan treatment as

3  the DIP order.

4    MR. BUTLER:  Yes, Your Honor.

5    THE COURT:  Okay.  That's fine, and I will approve

6  that.

7    MR. ROSENBERG:  Yes.  And I'd like to add, Your Honor,

8  the review language (indiscernible) --

9    THE COURT:  Oh, yes, that goes without saying.  Okay.

10    MR. FUSCO:  Your Honor?

11    THE COURT:  Yes?

12    MR. FUSCO:  This is Timothy Fusco representing Ford

13  Motor Company.  Will Mr. Butler submit a copy of the revised

14  order to the objecting parties, as well?

15    MR. BUTLER:  Well, there's fifty or sixty objecting

16  parties.  I mean, we want to be able to submit -- use the

17  committee to submit this in accordance with the record.

18    THE COURT:  I think -- again, I don't want this to

19  turn into a negotiating session.  It really is to set forth

20  what is set forth on the record.

21    MR. FUSCO:  (Indiscernible).

22    THE COURT:  But give me just a second.  I think -- I

23  don't have any problem with it.  I would like someone to e-mail

24  it to the objectors, if you can -- if you have the e-mail

25  address.  If you don't, I would instruct the objectors to

Omnibus Hearing                                                    109

1   provide -- who?  Who should they send the e-mail address to?

2          MR. BUTLER:  You know, one of the -- why don't we just

3   make it easy, and I'll give it to the right people.  Send it to

4   JButler, J-B-u-t-l-e-r, @Skadden.com.  Okay?

5                       (Laughter)

6          MR. BUTLER:  And I'll make sure it gets to where it

7   needs to go.

8          THE COURT:  All right.  But, again, I intend to review

9   it in light of today's record, and I think it's important to

10  get it in tomorrow, by the end of the day tomorrow.  So rather

11  than negotiate provisions, if there's something that you think

12  that has been left out, you can send me a short letter to that

13  effect, but I don't want to get people hung up on negotiating

14  language again.

15         MR. FUSCO:  And again, thank you.

16         THE COURT:  Mr. Ziman, one brief thing.  With the

17  waiver language -- you don't have to stand up.  The waiver

18  language, in light of the fact that this debt is traded a lot,

19  I just urge the agents that somehow keep a record of what

20  waivers and elections people have made, so that when it's

21  traded, and sometimes traded in pieces, you don't have

22  confusion at the end of the case.

23         MR. ZIMAN:  We will, Your Honor.

24         THE COURT:  Okay.  All right.  Thank you.

25         MR. BUTLER:  Your Honor, thank you very much.  That

1    completes the agenda for today.

2              COUNSEL:   Thank you, Your Honor.

3                   (Proceedings concluded at 3:50 p.m.)

4                        CERTIFICATION

5    I certify that the foregoing is a true and accurate transcript

6    from the electronic sound recording of the proceedings in the

7    above-entitled matter.

8
     _____                 October 31, 2005
9    Coleen Rand
     Rand Transcript Service, Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25