# APPENDIX 1

Hearing Date: November 29, 2005, 10:00 a.m.
Objection Deadline: November 26, 2005, 4:00 p.m.

KIRKPATRICK & LOCKHART NICHOLSON
  GRAHAM LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222-2312
(412) 355-6500
George M. Cheever (PA 18184)

 - and –

KIRKPATRICK & LOCKHART NICHOLSON
  GRAHAM LLP
599 Lexington Avenue
New York, NY 10022-6030
(212) 536-3900
Robert N. Michaelson (RM 5925)

Attorneys for Sensus Precision Die Casting, Inc.


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                                             :    Chapter 11
In re:                                                       :
                                                             :    Case No. 05-44481 (RDD)
DELPHI CORPORATION, et al.,                                  :    (Jointly Administered)
                                                             :
        Debtors                                              :
------------------------------------------------------------x

## AMENDED MOTION FOR ORDER UNDER 11 U.S.C. § 365(d)(2) DIRECTING THE DEBTORS TO DETERMINE WITHIN 30 DAYS WHETHER TO ASSUME OR REJECT THEIR EXECUTORY CONTRACTS WITH SENSUS PRECISION DIE CASTING, INC.

Sensus Precision Die Casting, Inc. ("Sensus") hereby submits this amends and restates its previously filed motion (the "Motion") (Docket No. 1028)[1]   for an order under 11 U.S.C. §

---

[1]   A "red-lined" version of the relevant pages of the Motion is attached hereto as Appendix 1 to highlight the changes that have been made to the Motion.

PI-1460583 v34

365(d)(2) and Fed. R. Bankr. P. 6006 directing the Debtors to determine whether to assume or reject their executory contracts with Sensus within 30 days. In support of this Motion, Sensus respectfully represents as follows:

### The Parties

1. The Debtors in these jointly administered cases under Chapter 11 of the Bankruptcy Code comprise Delphi Corporation and 41 of its domestic subsidiaries and affiliates (collectively, "Delphi" or the "Debtors"). As stated in the "Affidavit of Robert S. Miller, Jr. Under Local Bankruptcy Rule 1007-2 and in Support of Chapter 11 Petitions and Various First Day Applications and Motions," filed on October 8, 2005 (Docket #No. 7) (the "Miller Affidavit"):

> Delphi is the largest manufacturing and technology company ever to seek Chapter 11 relief. ... [It] is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. ... [It] supplies products to nearly every major global automotive original equipment manufacturer (each, an "OEM"), with 2004 sales to its former parent, General Motors Corporation ("GM") equaling approximately $15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

*Id.* ¶¶ 5 and 6.

2. Sensus (formerly known as Invensys Precision Die Casting) is a major supplier of aluminum components to Delphi. Delphi is Sensus' largest customer. Sensus' annual sales to Delphi are approximately $25 million, and include compressor housings and steering racks that are installed in approximately 70% of the car and truck platforms manufactured by GM. Of the approximately 55 different components that Sensus currently supplies to Delphi, only two are currently available from other sources.

2

7.  The statutory predicates for the relief requested herein are sections 105(a) and 365(d)(2) of the Bankruptcy Code.

**B.  Current Business Operations Of The Debtors**

8.  In the Miller Affidavit and numerous other submissions to this Court, Delphi has represented as follows:

(a)  With more than 180,000 employees worldwide, global 2004 revenues of approximately $28.6 billion, and global assets as of August 31, 2005 of approximately $17.1 billion,[2] Delphi ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets.

(b)  Over the past century, the operations that Delphi now owns have become a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines. As noted, Delphi is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. Delphi's technologies and products are present in more than 75 million vehicles on the road worldwide. Delphi supplies products to nearly every major global automotive original equipment manufacturer.

(c)  As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world. In the United States, the Debtors employ approximately 50,600 people. Those employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in Delphi's worldwide headquarters and

---

[2] Sensus is informed and believes the aggregated financial data on which Delphi based its representations generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates, including foreign affiliates that are not in bankruptcy.

4

customer center located in Troy, Michigan. Outside the United States, Delphi's foreign entities employ more than 134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries ~~available~~worldwide.

### C.     Events Leading To Chapter 11 Filing

9.      In its submissions to this Court, and in a lengthy press release issued on the Petition Date, Delphi has further represented as follows:

(a)     Delphi believes that three significant issues have largely contributed to the deterioration of Delphi's financial performance: (a) increasingly unsustainable United States legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing Delphi from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive United States vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

(b)     In light of these factors, Delphi determined that it would be imprudent and irresponsible to defer addressing and resolving its United States legacy liabilities, product portfolio, operational issues, and forward looking revenue requirements. Having concluded that pre-filing discussions with its ~~Unions~~unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, Delphi determined to commence these Chapter 11 cases for its United States businesses to complete the Debtors' transformation plan and preserve value.

(c)     Through the reorganization process, Delphi intends to achieve competitiveness for its core United States operations by modifying or eliminating non-

5

competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning its global product portfolio and manufacturing footprint to preserve ~~the Company~~<u>Delphi</u>'s core businesses. Delphi has further stated its belief that a substantial segment of its United States business operations must be divested, consolidated, or wound-down through the Chapter 11 process.

(d)    Delphi expects to complete its United States based restructuring and emerge from Chapter 11 in early to mid-2007.

### The Sensus Contracts

10.    Sensus supplies Delphi with aluminum die castings under long term requirements contracts. These contracts are embodied in two basic forms of agreement: (i) "Long Term Contracts" and (ii) blanket purchase orders, which are denominated "Requirements Contracts."

11.    There are ~~two~~<u>three</u> "Long Term Contracts." ~~One~~<u>The first</u> is between Sensus and Delphi LLC (the Debtor in Case No. 05-44615), and has a term extending from July 1, 2003 through June 30, 2006. This Contract covers components ordered by "Delphi Thermal & Interior Systems." The ~~other~~<u>second</u> "Long Term Contract" is between Sensus and Delphi Automotive Systems LLC (the Debtor in Case No. 05-44640) and has a term running from January 1, 2004 through December 31, 2006. This Contract covers components ordered by "Delphi Saginaw Steering Systems." <u>The third "Long Term Contract" purports to be between Sensus and an entity named "Delphi Corporation LLC"</u>[3]    <u>acting through its Thermal & Interior Division. This Contract covers purchases of two new components over a term extending from calendar year 2006 through calendar year 2009.</u> Each of these "Long Term Contracts" requires Sensus to sell,

---

[3]    <u>"Delphi Corporation LLC" is not the name of any of the Debtors in these jointly administered Chapter 11 cases. So far as Sensus has been able to determine, there is no entity bearing this name currently in existence.</u>

6

and the applicable Debtor to purchase, "approximately one hundred percent (100%) of Buyer's production and service requirements" for certain specified products. Each contract specifies an initial price for each product, and certain adjustments in the prices of such products to become effective on certain specified dates. Copies of the Delphi LLC Long Term Contract ~~and~~, the Delphi Automotive Systems LLC Long Term Contract, and the Delphi Corporation LLC Long Term Contract are attached hereto as Exhibits A ~~and~~, B, and C, respectively.

12. There are five "Requirements Contracts," covering the sale of Sensus products to be delivered to Delphi plants in Moraine, Ohio, Athens, Alabama and Saginaw, Michigan and to a third-party subcontractor in Indiana. Each "Requirements Contract" is in the form of a blanket purchase order, requiring Sensus to supply, and the applicable Debtor to purchase, all of the applicable Debtor's requirements for a variety of different components. The three ~~contracts~~ Contracts covering components ordered by Delphi Thermal & Interior Systems bear Purchase Order Numbers 550056783 (dated June 29, 2005), 550057027 (dated July 6, 2004), and 550057041 (dated July 6, 2004). ~~The two contracts~~ Copies of these three Contracts are attached hereto as Exhibits D, E, and F. The two Contracts covering components ordered by Delphi Saginaw Steering Systems bear Purchase Order Numbers SAG90I495 (dated August 14, 2002) and SAG90I509 (dated April 14, 2003). ~~The term of each "Requirements Contract" ends on December 31, 2006. Each Requirements Contract sets forth a price for each component during specified portions of the term of the contract for that component. Prices are adjusted periodically to reflect changes in the price of aluminum as reflected in a specified index. Historically, from time to time, the parties have amended their "Requirements Contracts" to add new components, or to delete obsolete components. Many, but not all components sold by Sensus to Delphi are covered by both a "Requirements Contract" and by a "Long Term Contract". Copies of the~~

~~"Requirements Contracts"~~Copies of these two Contracts are attached hereto as Exhibits ~~C through G.~~G and H.

13. The term of each "Requirements Contract" ends on December 31, 2006.[4] Each Requirements Contract sets forth a price for each component during specified portions of the term of the contract for that component. Prices are adjusted periodically to reflect changes in the price of aluminum as reflected in a specified index. Historically, from time to time, the parties have amended their "Requirements Contracts" to add new components, or to delete obsolete components. Many, but not all components sold by Sensus to Delphi are covered by both a "Requirements Contract" and by a "Long Term Contract".

14. ~~13.~~ From time to time, the Debtors have entered into contracts with Sensus for the manufacture or acquisition of tooling, to be used by Sensus in producing components for sale to Delphi. These contracts are in the form of purchase orders, and generally contemplate a period of several months for the manufacture of each particular tooling item. There ~~are four~~is one tooling purchase ~~orders~~order outstanding at the present time: Purchase Order Number ~~S3S30151, dated December 21, 2004; Purchase Order Number 450142740, dated September 28, 2005; Purchase Order Number S3S33295, dated September 28, 2005; and Purchase Order Number~~ DYS82048, dated July 13, 2005. ~~Copies~~A copy of ~~the Sensus~~this Tooling ~~Contracts are~~Contract is attached hereto as ~~Exhibits H through K~~Exhibit I.

15. ~~14.~~ Delphi is in default under ~~each~~most of the Sensus Requirements Contracts, having failed to make full payment for components sold and delivered to Delphi ~~and for tooling~~

---

[4] After the Petition Date, Sensus received a proposed amendment to Purchase Order No. 550056783 (Exhibit D), purporting to provide for the purchase of the two new components covered by the Delphi Corporation LLC Long Term Contract (Exhibit C), and to extend the term of the purchase order to December 31, 2008 with respect to those two components.

8

~~manufactured or acquired at Delphi's request~~ both prior to and after the Petition Date.[5] The total balance due for Sensus' pre-petition performance under the Sensus Requirements Contracts (exclusive of the balance due for components supplied to Delphi's Mexican plant, discussed in the next paragraph) is not less than $2,801,923.96. This balance includes but is not limited to the price of components delivered under the Sensus Contracts between September 1 and October 8, 2005.

16. ~~15.~~ Two of the Sensus Requirements Contracts (SAG90I509 and SAG90I~~495, relevant portions of which are attached as Exhibits L and M, respectively~~495) cover components delivered to Delphi's Mexico plant. Although Sensus is informed and believes that Delphi's foreign affiliates are not in bankruptcy, Sensus has not received payment for components delivered to the Mexico plant between September 1 and October 8, 2005. The unpaid balance due for these deliveries is approximately $192,756.70.

17. ~~16.~~ Although Delphi has made some payments to Sensus for Sensus' post-petition performance under the Contracts, Sensus has not been fully compensated for that performance. Specifically, Purchase Order Numbers 55006783, dated June 29, 2004 (Exhibit ~~C~~D), 550057027, dated July 6, 2004 (Exhibit ~~D~~E), and 550057041, dated July 6, 2004 (Exhibit ~~E~~F) all provide that, to reflect changes in the price of aluminum, "Adjustments to [Sensus'] selling price will be made every other month (6 times/year) as determined by the change in the average of the published prices (midpoint) in "Metals Week," under "Daily Prices," during the first ten (10) calendar days of the month prior to the two month price effective period." In fact, Delphi has adjusted its contract payments by reference to a different index which is less favorable to

---

[5] The only exception is the Delphi Corporation LLC Long Term Contract attached hereto as Exhibit C. That Contract does not require deliveries before July, 2006.

| Sensus.[26] As a result, Delphi has underpaid Sensus for goods delivered both prior to and after the Petition Date. The underpayment for the period from May, 2004 through October, 2005 totals $260,321.42. The underpayment for each month during this period is set forth on Exhibit ~~N~~I.

18. ~~17.~~ The Sensus Contracts are each and all "executory contracts" within the purview of section 365 of the Bankruptcy Code, 11 U.S.C. § 365. Each Sensus Contract has the essential characteristic of an executory contract: i.e., "performance remains due to some extent on both sides." H.R. Rep. No. 95 – 595, at 347 (1977); S. Rep. No. 95 -989, at 58 (1978), quoted in *The Penn Traffic Company v. Cor Route 5 Company, LLC* (*In re The Penn Traffic Company*), 2005 WL 2276879 (S.D. N.Y.) at page 2. Specifically, Sensus has an unperformed obligation to sell goods to Delphi, and Delphi has an unperformed obligation to pay for them.

### Basis for Relief

**A.    Applicable Authority**

19. ~~18.~~ The Bankruptcy Code generally permits debtors to determine whether to assume or reject executory contracts at any time before confirmation of a plan of reorganization. However, pursuant to 11 U.S.C. § 365(d)(2), a party to an executory contract may request an order compelling a debtor to determine whether to assume or reject the contract within a specified period of time. Section 365(d)(2) provides in pertinent part as follows:

> In a case under Chapter 9, 11, 12, or 13 of this title, the trustee may assume or reject an executory contract ... of the debtor at any time before the confirmation of a plan *but the court, on request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract ...*

11 U.S.C. § 365(d)(2) (emphasis added).

---

[26]    Delphi refers to this index as "LME NASSAC." This is probably intended to be a reference to what is known in the industry as the "~~NAASAC~~LME NASAAC" Index. "~~NAASAC~~LME NASAAC" is an acronym for "London Metal Exchange North American Special Aluminum ~~Alloys~~Alloy Contract."

pre-petition payment obligations represents a substantial amount of revenue to Sensus. On the other hand, curing its contractual defaults would not impose severe burden on Delphi. Indeed, Delphi has already set aside a vastly larger amount ($90 million dollars) to pay the pre-petition claims of other suppliers who qualify as "Essential Suppliers" under Delphi's essential supplier motion. Moreover, in the longer run, failure to assume the Contracts may hurt Delphi as well as Sensus, since Delphi will be unable to amend the Contracts to add new products that it anticipates Sensus will supply. The "overall good to be achieved" is the stabilization of this valuable relationship, so that Delphi can concentrate on the root of causes of its financial distress and achieve a successful reorganization.

28.    27. *Whether the Debtors have had sufficient time to appraise their financial situation and the potential value of their assets in formulating a plan.*

At first glance, this factor might seem to weigh against requiring early assumption or rejection of the Contracts. The Debtors' Chapter 11 cases are still in the very early stage, and the formulation of a plan of reorganization is many months, if not years, away. However, on a closer analysis, Sensus believes this factor cuts the other way. Delphi's relationships with its suppliers in general and with Sensus in particular are not the source of its economic woes. As Delphi has acknowledged, its financial stress stems from other causes, including legacy liabilities, onerous collective bargaining agreements, the competitive United States vehicle production environment for domestic OEMs, and rising commodity prices. The determination as to whether or not the Sensus Contracts are advantageous to the Debtors is a simple matter, in which the Debtors should have no difficulty in undertaking. If, contrary to Sensus' belief, the Contracts are disadvantageous to Delphi, then the quicker they are shed the better. On the other hand, if the Contracts are advantageous to Delphi, then the sooner they are assumed the better.

14

29. ~~28.~~ *The safeguards afforded to the litigants.*

This factor also weighs in favor of requiring a prompt decision to assume or reject the Contracts. So long as the Contracts are neither assumed nor rejected, Sensus remains at substantial risk. This risk extends beyond the question of what, if anything, Sensus will ever recover on its pre-petition claims. The current uncertain state of affairs severely hampers Sensus' ability to rationally deploy its own assets. This is particularly true with respect to the Tooling ~~Contracts~~Contract which ~~require~~requires substantial current ~~investments~~investment of capital by Sensus. On the other hand, requiring Delphi to make up its mind whether to assume or reject the Contracts would not place Delphi in any particular jeopardy. In the usual case, a debtor would like to defer the decision to assume or reject a contract for as long as possible, because a premature decision to assume the contract might saddle the estate with substantial improvident administrative expenses. Delphi runs no particular risk in this regard, however. Since most of the Contracts are "requirements" contracts, under which Delphi's purchase obligations are pegged to its own ~~need~~needs, there is little risk associated with the Contracts. Moreover, Delphi's "General Terms and Conditions" that are incorporated in all its contracts contain a "Termination for Convenience" provision, which provides Delphi with the ability to exit from any disadvantageous contract at a modest cost.[7]

30. ~~29.~~ *The damage the non-debtor will suffer beyond the compensation available under the Bankruptcy Code.*

This factor overlaps with several other factors previously discussed. It weighs in favor of a prompt decision to assume or reject the Contracts. For the reasons stated above, the "compensations available under the Bankruptcy Code" are woefully inadequate to protect Sensus

---

[7] The Delphi Corporation LLC Long Term Contract provides that this provision "will be inapplicable to this Contract until July 1, 2007."

15

against the significant damage it will suffer if no prompt decision is made to assume or reject the Contracts.

> 31. ~~30.~~ *Whether there is a need for judicial determination as to whether an executory contract exists.*

This factor also weighs in favor of a prompt decision to assume or reject the Contracts. There is clearly no need for such a determination, and thus no reason to defer the decision to assume or reject.

> 32. ~~31.~~ *Whether exclusivity has been terminated.*

This factor is entitled to little weight in the circumstances of this case. Of course, the Debtors' "exclusivity" rights under 11 U.S.C. § 1121 have not expired or been terminated, and, as noted above, a plan is many months if not years away. However, as also noted above, the Sensus Contracts are far removed from the basic issues that any plan must address. *See Adelphia*, 291 B.R. at 300 ("the [subject contract] is not so critical to the Debtors' operations that their ability to reorganize (or their exclusive right to file a reorganization plan) will be affected in any significant way by their decision to assume or reject it.") Indeed, although the Contracts all have many months to run, ~~they~~ all of them (with the possible exception of the Delphi Corporation LLC Long Term Contract) will ~~all~~ undoubtedly expire before the Debtors' Chapter 11 plan is confirmed. This in itself is a compelling reason to set an early deadline for assumption or rejection of the Contracts.

> 33. ~~32.~~ *Whether the action to be taken is so in derogation of Congress' scheme that the Court may be said to be arbitrary.*

This factor weighs in favor of requiring a prompt decision to assume or reject. It requires little elaboration. Any reasoned decision to set such a deadline, made in light of the

16

Dated: New York, New York
November ~~11,~~18, 2005

                                      KIRKPATRICK & LOCKHART NICHOLSON
                                        GRAHAM LLP

                                      By: /s/ George M. Cheever
                                      Henry W. Oliver Building
                                      535 Smithfield Street
                                      Pittsburgh, PA  15222-2312
                                      (412) 355-6500
                                      George M. Cheever (PA 18184)

                                                  - and –

                                      KIRKPATRICK & LOCKHART NICHOLSON
                                        GRAHAM LLP

                                      By: /s/ Robert N. Michaelson

                                      599 Lexington Avenue
                                      New York, NY  10022-6030
                                      (212) 536-3900
                                      Robert N. Michaelson (RM 5925)

                                      Attorneys for Sensus Precision Die Casting, Inc.