**Hearing Date and Time: November 29, 2005 at 10:00 a.m.**
**Objection Deadline: November 25, 2005 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                 :
      In re                          :    Chapter 11
                                   :
DELPHI CORPORATION, et al.,     :    Case No. 05-44481 (RDD)
                                 :
                  Debtors.    :    (Jointly Administered)
                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR AN ORDER UNDER 11 U.S.C. §§ 363(b) AND 365(a) AND FED. R.
BANKR. P. 9019 APPROVING PROCEDURES TO ASSUME CERTAIN
<u>AMENDED AND RESTATED SOLE SOURCE SUPPLIER AGREEMENTS</u>

("SUPPLIER AGREEMENT ASSUMPTION PROCEDURES MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order under 11 U.S.C. §§ 363(b) and 365(a) and Fed. R. Bankr. P. 9019 approving procedures to assume, in connection with an extension and certain other provisions, certain agreements (the "Assumable Agreements"), pursuant to which the Debtors receive goods which the Debtors believe are critical to their on-going manufacturing operations (collectively, the "Goods"), with those of the Debtors' suppliers which are the sole source from which the Debtors can currently obtain sufficient quantities of the Goods to avoid interruptions of the Debtors' manufacturing operations (the "Covered Suppliers").  In support of this Motion, the Debtors respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8, 2005 (the "Petition Date"), 39 of 42 Debtors, and on October 14, 2005, the remaining Debtors, filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This Court entered orders directing the joint administration of the Debtors' chapter 11 cases (Docket Nos. 28 and 404).

2.    On October 17, 2005, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee") in these cases.  No trustee or examiner has been appointed.

2

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C.

§§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter

is a core proceeding under 28 U.S.C. § 157(b)(2).

4.      The statutory predicates for the relief requested herein are sections

363 and 365 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules").

B.      Current Business Operations Of The Debtors

5.      With more than 180,000 employees worldwide, global 2004

revenues of approximately $28.6 billion, and global assets as of August 31, 2005 of

approximately $17.1 billion,[1] Delphi ranks as the fifth largest public company business

reorganization in terms of revenues, and the thirteenth largest public company business

reorganization in terms of assets as of the Petition Date.  Delphi's non-U.S. subsidiaries

are not chapter 11 debtors, will continue their business operations without supervision

from the Bankruptcy Court, and will not be subject to the chapter 11 requirements of the

U.S. Bankruptcy Code.

6.      Over the past century, the operations which are now owned by

Delphi have become a leading global technology innovator with significant engineering

resources and technical competencies in a variety of disciplines.  Today, the Company (as

defined below) is arguably the single largest global supplier of vehicle electronics,

transportation components, integrated systems and modules, and other electronic

technology. The Company's technologies and products are present in more than 75

---

[1]      The aggregated financial data used in this Motion generally consists of
consolidated information from Delphi and its worldwide subsidiaries and
affiliates.

million vehicles on the road worldwide.  The Company supplies products to nearly every

major global automotive original equipment manufacturer with 2004 sales to its former

parent, General Motors Corporation ("General Motors" or "GM"), equaling

approximately $15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler

Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding

$850 million.

   7.  As part of its growth strategy, Delphi has established an expansive

global presence with a network of manufacturing sites, technical centers, sales offices,

and joint ventures located in every major region of the world.  In the U.S., the Debtors

employ approximately 50,600 people.  These employees work in approximately 44

manufacturing sites and 13 technical centers across the country, and in Delphi's

worldwide headquarters and customer center located in Troy, Michigan.  Approximately

35,000 of these individuals are hourly employees, 96% of whom are represented by

approximately 49 different international and local unions.  Outside the United States, the

Company's foreign entities employ more than 134,000 people, supporting 120

manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

   8.  Delphi was incorporated in Delaware in 1998 as a wholly-owned

subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business

through various divisions and subsidiaries.  Effective January 1, 1999, the assets and

liabilities of these divisions and subsidiaries were transferred to Delphi and its

subsidiaries and affiliates (collectively, the "Company") in accordance with the terms of a

Master Separation Agreement between Delphi and GM.  In connection with these

transactions, Delphi accelerated its evolution from a North American-based, captive

automotive supplier to a global supplier of components, integrated systems, and modules

for a wide range of customers and applications.  Although GM is still the Company's

single largest customer, today more than half of Delphi's revenue is generated from non-

GM sources.

9.    Due to the significant planning that goes into each vehicle model,

Delphi's efforts to generate new business do not immediately affect its financial results,

because supplier selection in the auto industry is generally finalized several years prior to

the start of production of the vehicle.  When awarding new business, which is the

foundation for the Company's forward revenue base, customers are increasingly

concerned with the financial stability of their supply base.  The Debtors believe that they

will maximize stakeholder value and the Company's future prospects if they stabilize

their businesses and continue to diversify their customer base.  The Debtors also believe

that this must be accomplished in advance of  the expiration of certain benefit guarantees

between GM and certain of Delphi's unions representing most of its U.S. hourly

employees which coincides with the expiration of the Company's U.S. collective

bargaining agreements in the fall of 2007.

C.    Events Leading To The Chapter 11 Filing

10.    In the first two years following Delphi's separation from GM, the

Company generated approximately $2 billion in net income.  Every year thereafter,

however, with the exception of 2002, the Company has suffered losses.  In calendar year

2004, the Company reported a net operating loss of $482 million on $28.6 billion in net

sales.  Reflective of a downturn in the marketplace, Delphi's financial condition has

deteriorated further in the first six months of 2005.  The Company experienced net

operating losses of $608 million for the first six months of calendar year 2005 on six-

month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[2]

11.    The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward looking revenue requirements.  Having concluded that pre-filing discussions with its Unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

13.    Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve

---

[2]    Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

the Company's core businesses.  This will require negotiation with key stakeholders over

their respective contributions to the restructuring plan or, absent consensual participation,

the utilization of the chapter 11 process to achieve the necessary cost savings and

operational effectiveness envisioned in the Company's transformation plan.  The Debtors

believe that a substantial segment of Delphi's U.S. business operations must be divested,

consolidated, or wound-down through the chapter 11 process.

14.    Upon the conclusion of this process, the Debtors expect to emerge

from chapter 11 as a stronger, more financially sound business with viable U.S.

operations that are well-positioned to advance global enterprise objectives.  In the

meantime, Delphi will marshal all of its resources to continue to deliver value and high-

quality products to its customers globally.  Additionally, the Company will preserve and

continue the strategic growth of its non-U.S. operations and maintain its prominence as

the world's premier auto supplier.

<u>Relief Requested</u>

15.    By this Motion, the Debtors request authority to implement

procedures by which the Debtors may assume the Assumable Agreements without need

for further Court approval, subject to the mandatory contract provisions described below.

The scope of the relief sought herein is limited, focused, and narrowly-tailored.  The

Debtors seek only the authority to assume agreements covering the supply of goods that

the Debtors determine are absolutely critical to their on-going business operations; in

other words, those goods that are not readily available from another supplier in quantities

sufficient to avoid an interruption in the Debtors' manufacturing operations and the

Debtors' supply of products to their customers (generally sole sourced Goods) and

without which the Debtors would face an imminent shutdown of business operations at

one or more of the Debtors' business locations that would affect the operations of the

Debtors' customers.  Importantly, the Debtors seek authority pursuant to this Motion to

assume only those agreements which meet all of the above-listed criteria.  Therefore, if

the Debtors are able to re-source on a timely basis the supply of the goods without

disrupting the continuity of the supply of the Debtors' products to their customers, or if a

disruption of the goods will not affect the Debtors' supply of products to their customers,

the Debtors will not assume the relevant agreement pursuant to the Motion.  Furthermore,

the Debtors do not seek to assume any agreements, or pay any prepetition claims related

thereto, under which a supplier sold all or some of its prepetition claims arising under

such otherwise Assumable Agreement to one or more third parties.  Instead, the Debtors

propose to allow all such contracts to expire and will negotiate new agreements with such

suppliers, because such suppliers would not receive the economic benefits of

assumption.[3]  In short, the Debtors seek and will utilize only the authority to assume

those agreements that would have otherwise expired and that are absolutely critical to the

Debtors' on-going operations.

<u>Basis For Relief</u>

16.    The business realities driving the necessity of the relief requested

herein can be simply stated.  In the Debtors' businesses, they typically do not buy

commodities from their suppliers, but rather buy sophisticated customized components,

each of which require extensive and time-consuming testing and validation, including

contractual approvals from the Debtors' customers.  Therefore, with very few exceptions,

---

[3]    The Debtors believe that the negotiation and entry into such new agreements are
transactions in the ordinary course of their businesses that do not require Court
approval pursuant to section 363 .  The Debtors request that the Court confirm
that position in an order authorizing the relief requested in this Motion.

re-sourcing the Goods in the short term is impossible.  Further, the failure to timely

receive even a very inexpensive part can quickly shut down the Debtors' assembly lines

and expose these estates to millions of dollars in potential damage claims.

17.    The Debtors have already established extensive programs to

address issues arising under enforceable contracts with suppliers and to manage concerns

related to special supplier groups covered by certain of the Debtors' "first day" motions,

including financially-distressed suppliers, foreign creditors, logistics providers and

tooling manufacturers, among others.  In contrast, this Motion deals exclusively with the

amendment, restatement and extension of expiring contracts that would otherwise

jeopardize the Debtors' supply chain or could potentially expose the Debtors to hostage

bargaining situations with sole source suppliers that have no obligation to continuing

supplying the Debtors with necessary products.

18.    As noted above, the Debtors are, depending on foreign currency

exchange rates, either the largest or second largest global supplier of vehicle electronics,

transportation components, integrated systems and modules, and other electronic

technology.  The Debtors produce thousands of separate products, the production of

which requires the timely receipt of components and raw materials from the Debtors'

thousands of dedicated suppliers.  Such components and raw materials are provided to the

Debtors pursuant to tens of thousands of separate agreements with their suppliers, many

of which have a yearly term.

19.    The Debtors preliminarily estimate over 11,000 of these supply agreements are due to expire on or about December 31, 2005, absent a further extension.[4] The Debtors further estimate that more than 3,000 of such agreements are either at the end of the product cycle, and thus do not require extension, or are otherwise not sufficiently critical to the Debtors' on-going operations to necessitate extension.  The Debtors' inability to reach agreement with the Covered Suppliers on the continued provision of the goods after December 31, 2005 under the remaining agreements, however, could be damaging to their business prospects because such Covered Suppliers, absent extension of their agreements, would be under no continuing obligation to provide such goods to the Debtors.  Without the Goods, the Debtors' manufacturing process, and the entire automotive industry as a whole, could face imminent shutdown following expiration of the agreements.

20.    Accordingly, the Debtors have determined that a process should be established to facilitate the resolution of the myriad expiring Assumable Agreements on a time frame and in a manner that ensures the continuity of supply of Goods to the Debtors and, thereby, the continuity of the Debtors' supply of products to their customers.  The Debtors have determined that the most efficient and cost effective manner in which to achieve these goals, enhance the Debtors' likelihood of a successful restructuring, and preserve the Debtors' going-concern value for all constituents is through assumption of the Assumable Agreements in exchange for a package of mandatory minimum provisions from the Covered Suppliers that provide the Debtors' continuity of supply at market terms.

---

[4]    These amounts do not include information for seven Debtor entities that do not utilize the Debtors' centralized contract management systems.

10

A.    <u>The Procedures For The Debtors' Assumption Of The Assumable Agreements</u>

21.    The Debtors propose that the Court approve the following

procedures governing the process by which the Debtors would be authorized to assume

the Assumable Agreements (collectively, the "Procedures"):

(a)    The Debtors would be authorized, but not directed, to assume
each Assumable Agreement pursuant to section 365(a) of the Bankruptcy Code within a
reasonable time prior to the date of expiration of such Assumable Agreement (the
"Assumption Date"); <u>provided</u>, <u>however</u>, that nothing contained in the Procedures would
limit the Debtors' right to move separately to assume an agreement. [5]

(b)    The relevant Covered Supplier's entry into an Assumption
Agreement (as defined below) evidencing such Covered Supplier's agreement to comply
with all of the Required Minimum Provisions (as defined below) would be a condition
precedent to the Debtors' exercise of the authority to assume an Assumable Agreement.
Upon a Covered Supplier's entry into such an Assumption Agreement, the Debtors would
be authorized to assume the relevant Assumable Agreement or Agreements without
further notice or order of this Court.

(c)    Notwithstanding subparagraph (c) above, should a Covered
Supplier not consent to entry into an Assumption Agreement or refuse to consent to any
Required Minimum Provision (each such Covered Supplier, a "Non-Consenting
Supplier"), the Debtors shall not be authorized to assume such Supplier's Assumable

---

[5]    Each Covered Supplier who had already accepted a new agreement or an
extension of the term of its Assumable Agreement (the "Previously Extended
Agreements") after the Petition Date shall be eligible to request that the Debtors
assume its prepetition Previously Extended Agreement in accordance with these
Procedures, which request must be made in writing, so as to be actually received
not later than 4:00 p.m. (prevailing Eastern time) on the forty-fifth day following
entry of a final order approving the relief sought in this Motion, or as otherwise
agreed by the Debtors in their sole discretion, by each of the following parties: (a)
Delphi Corporation, 5725 Delphi Drive, Troy, Michigan 48098-2815 (Att'n:
Karen J. Craft, Esq. and Michael J. Orris); (b) Skadden, Arps, Slate, Meagher &
Flom LLP, 333 West Wacker Drive, Suite 2100, Chicago, Illinois 60606 (Att'n:
John Wm. Butler, Jr., Esq. and John K. Lyons, Esq.); and (c) Latham & Watkins
LLP, 885 Third Avenue, Suite 1000, New York, New York 10022-4068 (Att'n:
Robert J. Rosenberg, Esq.); <u>provided</u>, <u>however</u>, that nothing contained herein or
in the order granting the relief requested herein would obligate the Debtors to
grant such a request; <u>provided</u> <u>further</u> that a Covered Supplier's failure to strictly
comply with the Procedures would constitute a full and final waiver of its right to
seek assumption of the relevant Previously Extended Agreements pursuant to the
terms of an order approving the relief sought in this Motion.

Agreement or Agreements without prior approval of the Creditors' Committee or, absent Creditors' Committee approval, order of this Court.  Upon the Debtors' election to assume one or more Assumable Agreements of a Non-Consenting Supplier (each, a "Non-Conforming Assumption"), the Debtors would be required to provide written notice of such Non-Conforming Assumption to designated representatives of the Creditors' Committee; provided, however, that the Debtors would be authorized to serve such written notice on such designated representative of the Creditors' Committee by facsimile or electronic mail.  The Creditors' Committee will have three business days from the date of receipt of the notice of Non-Conforming Assumption in which to file with the Court and serve upon counsel to the Debtors any objection that it might have to such Non-Conforming Assumption; provided, however, that if the Creditors' Committee does not timely file and serve an objection, the Creditors' Committee would be deemed not to object to the Non-Conforming Assumption and such assumption would become effective on the Assumption Date without further notice or Court order.  If a timely objection were filed and served upon the Debtors' counsel, this Court would then schedule a hearing to consider the Non-Conforming Assumption as soon as practicable.

B.    The Required Minimum Provisions

22.    As provided above, the Debtors propose that it be a condition precedent to the Debtors' authorization to assume any Assumable Agreement under an order granting the relief sought herein that the relevant Covered Supplier agree to certain modifications of the Assumable Agreement and to certain other provisions (collectively, the "Required Minimum Provisions") in exchange for the benefits proposed to be provided to such Covered Supplier hereby.  Specifically, the Debtors request that their authority to assume any Assumable Agreement pursuant to this Motion be predicated upon the relevant Covered Supplier's written agreement to each of the following Required Minimum Provisions:

(a)    The term of the relevant Assumable Agreement would be extended for a period of two years from the date of expiration of the Assumable Agreement, unless the Debtors earlier reject or otherwise terminate the Assumable Agreement (the "Extension").

(b)    All costs payable under the terms of these Procedures and Required Minimum Provisions related to cure of prepetition defaults under the assumed Assumable Agreements pursuant to section 365(b) of the Bankruptcy Code ("Cure") would be paid in cash in six equal installments at the end of each of the six calendar quarters (i.e., March 31, June 30, September 30 and December 31) ending on or after the

Assumption Date; provided, however, that Cure would not constitute an administrative expense pursuant to section 503 of the Bankruptcy Code.

(c)    The relevant Assumable Agreement, and all of the terms thereof including Delphi's General Terms and Conditions (a copy of which is attached hereto as Exhibit B), including, without limitation, the termination for convenience provisions contained in Section 11 thereof, would be enforceable by the Debtors against such Covered Supplier.

(d)    The Covered Supplier would be required to supply the Debtors with the goods provided under the relevant Assumable Agreement during the term of the Extension on MNS-2 payment terms[6] and those other terms and conditions as are embodied in the Assumable Agreement (including Delphi's General Terms and Conditions) and such other more favorable trade terms, practices, and programs (including, without limitation, pricing terms) in effect between such supplier and the Debtors in the twelve months prior to the Petition Date (collectively, the "Customary Trade Terms"), or such other favorable trade terms as are agreed to by the Debtors and the Covered Supplier.

(e)    The Covered Supplier would be adequately assured of future performance for the term of the Extension and waive any right to seek further adequate assurance of future performance, whether pursuant to section 365(b)(1)(C) of the Bankruptcy Code or otherwise.

(f)    Cure, with respect to each assumed Assumable Agreement, in an amount up to 75% of the outstanding prepetition liabilities of the Debtors under such Assumable Agreement as of the Assumption Date reflected in the Debtors' books and records or as otherwise reconciled by the parties; provided, however, that the Covered Supplier will receive an allowed general unsecured claim against the relevant Debtor for the remaining balance of the amount of the outstanding prepetition liabilities of the Debtors under such Assumable Agreement as of the Assumption Date reflected in the Debtors' books and records or as otherwise reconciled between the parties, which general unsecured claim will be addressed pursuant to the terms of the plan of reorganization which is confirmed and consummated in the Debtors' chapter 11 cases.

(g)    In the event of any termination of any assumed Assumable Agreement, the Covered Supplier would not receive any payments of Cure that are to be paid on or after the effective date of such termination (the "Remaining Cure"); provided, however, that upon any termination or rejection of any assumed Assumable Agreement, the Covered Supplier would receive an allowed general unsecured claim against the

---

[6]    "MNS-2" refers to the payment terms under Delphi's General Terms and Conditions, whereby payment for goods supplied is generally due on the second business day of the second month following the receipt of such goods.  For example, under these terms, payment for goods received by the Debtors during the month of September 2005 was due on November 2, 2005.

relevant Debtor for the amount of the Remaining Cure, which general unsecured claim would be addressed pursuant to the terms of the plan of reorganization which is confirmed and consummated in the Debtors' chapter 11 cases; provided further that, upon any termination of any assumed Assumable Agreement, the amount of damages which the Covered Supplier could assert against the relevant Debtor on account of such termination or rejection could not exceed the amount of damages arising upon a termination for convenience in accordance with the terms of Section 11 of Delphi's General Terms and Conditions.

(h)    Upon a breach by the Covered Supplier of its obligations under the Assumption Agreement, the Covered Supplier would be liable to the Debtors for any and all consequential damages resulting from such breach.  Furthermore, upon written notice of such breach from the Debtors, the Covered Supplier would not be entitled to further payments of Cure until further order of Court.  In the event that the Court determined that the Covered Supplier was in breach of the Assumption Agreement or the terms set forth in an order granting the relief requested herein, the Covered Supplier would be required to immediately disgorge all payments of Cure received and the Debtors' avoidance rights under chapter 5 of the Bankruptcy Code would immediately be reinstated without further order of this Court.  The assumption of the Covered Supplier's Assumable Agreement(s) pursuant to an order approving this motion shall constitute irrevocable consent of the Covered Supplier to the Debtors' ability to sue for injunctive relief in this Court to compel specific performance under the Assumable Agreement upon a breach under any Assumable Agreement or Assumption Agreement.

23.    To ensure that the Covered Suppliers that have their Assumable Agreements assumed comply with the Procedures and the Required Minimum Provisions, the Debtors propose that a letter substantially in the form of the letter attached hereto as Exhibit A (each such letter, an "Assumption Agreement") be sent to such Covered Suppliers along with a copy of the order granting this Motion; provided, however, that the Debtors further propose that such Covered Suppliers be conclusively deemed to consent to and be irrevocably bound by the Procedures and each of the Required Minimum Provisions, notwithstanding its failure to enter into an Assumption Agreement, upon its first shipment of Goods to the Debtors following the Assumption Date for the relevant assumed Assumable Agreement and payment of the first installment of Cure. The Debtors propose that the Assumption Agreements include, but not be limited to, the Required Minimum Provisions outlined above.

14

24.    Nothing in this Motion or any order of this Court approving this Motion should be construed as a waiver by any of the Debtors of their rights to contest any invoice of a Covered Supplier under applicable non-bankruptcy law.

25.    Finally, the Debtors anticipate that the issues raised in this Motion will be an on-going concern because Assumable Agreements continue to expire during the course of these chapter 11 cases.  Therefore, the Debtors request that the Procedures to be applicable to all Assumable Agreements prior to their expiration, to the extent that the Debtors determine that it is in the best interests of the Debtors and their estates for such Assumable Agreements to be assumed in exchange for the Covered Supplier's agreement to the Procedures and the Required Minimum Provisions.

C.    The Necessity Of The Requested Relief

26.    As described in depth in several of the Debtors' "first day" motions,[7] the continued performance of the Debtors' Covered Suppliers is absolutely crucial to the Debtors' prospects for a successful restructuring and emergence from these chapter 11 cases.  The Debtors' manufacturing facilities use the "just-in-time" supply method for processing their products.  The just-in-time supply method is standard in the automotive industry and use of the just-in-time supply method means that the Debtors do not maintain a significant inventory of the components supplied by many of their suppliers (in many cases, fewer than 24 hours).  Accordingly, the Debtors rely upon frequent and, in many cases, daily shipments of components from such suppliers to keep

---

[7]    See, e.g., Motion for Order Under 11 U.S.C. §§ 105(a), 363, 364, 1107, and 1108 and Fed. R. Bankr. P. 6004 and 9019 Authorizing Continuation of Vendor Rescue Program and Payment of Prepetition Claims of Financially-Distressed Sole Source Suppliers and Vendors Without Contracts, dated October 13, 2005 (Docket No. 17) (the "Essential Suppliers Motion").

their manufacturing facilities operating.  Similarly, the Debtors' original equipment

manufacturer ("OEM") customers do not maintain a significant inventory of the Debtors'

products (in many cases, less than 24 hours) and rely instead upon frequent shipments of

such products to keep their manufacturing plants operating.

        27.     The Debtors also rely heavily on the sole source supply method – a

method under which in many but not all cases, they purchase all their requirements for a

particular part from one supplier.  Each of these Goods must meet demanding

specifications imposed by both the Debtors and their OEM customers before they can be

used in manufacturing the Debtors' products.  In this regard, numerous tests, sometimes

taking place over the course of several months, must be run to validate and qualify each

of the parts and the applicable manufacturing process.  The Debtors employ the sole

source supply method to reduce the cost of production start-up, capital investment, and

validation costs necessary to make each part (which are generally recouped by suppliers

through their per piece prices), to achieve a consistent quality of parts, and to achieve

economies of scale.

        28.     Therefore, to obtain an alternative source of supply for the Goods

currently supplied by the Covered Suppliers, the alternate suppliers would have to

undergo the OEM customers' rigorous approval processes, which involve extensive

testing and evaluations and typically last several months.  Even when accelerated, the

delivery of capital equipment, the tooling build, and the testing and approval process for

validating new suppliers typically takes three to six months or more to complete.  Failure

to maintain the supply of Goods could therefore have a devastating impact on the

Debtors' businesses as well as their customers' and other suppliers' businesses.

29.    Indeed, if Covered Suppliers fail to ship Goods, the Debtors'
manufacturing facilities utilizing those parts would in many instances be forced to shut
down less than 24 hours after the missed shipment. Within less than 24 hours after a
shutdown of one of the Debtors' facilities, the Debtors' OEM customers would likely be
forced to halt production of their products on one or more of their assembly lines. A
shutdown of a customer's manufacturing operations could cause the affected customer to
assert claims against the Debtors exceeding $10 million per day. In addition to the
potential damages, which, if valid, could severely dilute stakeholder recoveries, the
Debtors would also be harmed by continuing to incur the considerable fixed costs
connected to the facilities idled by the failure to receive parts without generating any
revenue to offset such fixed costs. A line shutdown would also cause the Debtors to
suffer a loss of important customer relations and goodwill. The long-term damage caused
by such shutdowns to the Debtors' businesses would therefore be both immeasurable and
irreparable.

30.    The Debtors believe that the cost of implementing the relief
requested by this Motion will likely be offset by the positive cash flow that will be
generated as a result of the Covered Suppliers' acceptance of the Required Minimum
Provisions. The Debtors preliminarily estimate that, of the approximately $1 billion in
prepetition payables outstanding as of the Petition Date, approximately $587 million may
be attributable to contracts expiring over the course of the next year and beyond that
would be eligible for assumption under the Procedures. Approximately 52% of the
Debtors' direct material annual purchase volume is associated with contracts that expire
by December 31, 2005 with the balance expiring throughout 2006 or later. As a result,

17

the expected average quarterly payment of prepetition payables during 2006 pursuant to this Motion, if approved, is estimated to be approximately $50 million.

31.    Because one of the Required Minimum Provisions requires a Covered Supplier to return to MNS-2 payment terms upon the Debtors' assumption of its Assumable Agreement, however, the Debtors expect, based on their preliminary estimate, a cash flow improvement of approximately $560 million by the end of 2006.  Based on these assumptions the Debtors anticipate that this Court's approval of the relief requested herein would generate a net improvement in cash flow of approximately $310 million by the end of 2006.

32.    Furthermore, the Debtors had been anticipating price increases during 2006 and beyond as a result of supplier reaction to the Debtors' chapter 11 filings. However, to the extent that Covered Suppliers participate in the Procedures and, thereby, agree to maintain current pricing pursuant to the terms of the Required Minimum Provisions, the Debtors expect to avoid a significant proportion of the negative cash impact of these Covered Suppliers' anticipated price increases.

33.    Moreover, and most importantly, the relief sought herein will mitigate, to the greatest extent possible, the risk that the Covered Suppliers will refuse to perform beyond December 31, 2005 and will thereby avoid the shutdown of the Debtors' and their customers' operations that would result from such precipitous action.  Given the nature of the Debtors' businesses and supply chain, the Debtors cannot predict with any certainty which of the Covered Suppliers may cause such a shutdown absent the relief sought herein, but any one of the Covered Suppliers could likely do so.  As noted above, the negative impact on the Debtors' businesses and their prospects for a successful

18

restructuring from such a shutdown would be significant.  Further, the damage claims

that would be asserted by a customer on account of such a shutdown would potentially

dwarf the costs associated with the assumptions contemplated hereby, even ignoring the

cash savings generated by the Required Minimum Provisions.  Finally, the Debtors also

believe that they will realize significant litigation cost savings from implementation of

the Procedures, which the Debtors believe will facilitate prompt consensual resolutions

with the vast majority of their Covered Suppliers.

        34.      In summary, the relief requested herein is necessary to the Debtors'

ability to manage the challenges presented by the expiration of the Assumable

Agreements while minimizing the risk of supply interruption.  In additional to the

operational necessity of the relief sought by this Motion, the Debtors' financial position

will be strengthened significantly through implementation of the Procedures, to the

benefit of all constituencies.  As such, the Debtors believe that the relief requested herein

is in the best interests of the Debtors, their estates, their creditors, and all other parties-in-

interest.

D.      <u>Limited Waiver Of Avoidance Rights</u>

        35.      Finally, the Debtors note that many Covered Suppliers are parties

to numerous agreements with the Debtors and that such agreements may have differing

expiration dates.  Based upon the Debtors' negotiations with suppliers to date, the Debtors

believe that certain Covered Suppliers may be unwilling to extend the term of expiring

Assumable Agreements and to continue providing Goods to the Debtors pursuant to such

Assumable Agreements, notwithstanding payment of Cure, unless and until the Debtors

agree to waive and release any rights that they or their estates may have under section

19

547 of the Bankruptcy Code to avoid payments made to such Covered Supplier in the 90

days prior to the Petition Date under the later-expiring agreements (the "Preference

Waivers").  Given the Debtors' likely inability to receive Court approval of such waivers

and releases on a "one off" basis prior to December 31, 2005, the absolute necessity of

the Debtors' timely receipt of Goods, and the Debtors' inability to compel such Covered

Suppliers to provide Goods after December 31, 2005 pursuant to expired Assumable

Agreements, the Debtors respectfully request that they be authorized, but not directed, to

provide such Covered Suppliers with the Preference Waivers in exchange for their entry

into Assumption Agreements with respect to each relevant Assumable Agreement that

the Debtors have elected at that time to assume pursuant to the Procedures.

<u>Applicable Authority</u>

36.     The Debtors believe that the Procedures described herein may be

approved, and the Assumable Agreements, as modified by the Required Minimum

Provisions, may be assumed pursuant to such Procedures without further order of the

Court, under sections 363(b) and 365 of the Bankruptcy Code.  Section 365(a) of the

Bankruptcy Code provides that a debtor in possession, "subject to the Court's approval,

may . . . assume any executory contract or unexpired lease of the debtor."  11 U.S.C. §

365(a).

37.     The standard to be applied by a court in determining whether an

executory contract or unexpired lease should be assumed is the "business judgment" test,

which is premised upon the debtor's business judgment that assumption would be

beneficial to its estate.  <u>See</u> <u>Orion Pictures Corp. v. Showtime Networks, Inc.</u> (In re Orion

Pictures Corp.), 4 F.3d 1095, 1098-99 (2d Cir. 1993); <u>see also</u> <u>In re Child World, Inc.</u>,

142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992) (debtor may assume or reject an unexpired lease

under § 365(a) in the exercise of its "business judgment"); In re Roman Crest Fruit, Inc.,

35 B.R. 939, 949 (S.D.N.Y. 1983); Control Data Corp. v. Zelman, 602 F.2d 38, 42 (2d

Cir. 1979). "More exacting scrutiny would slow the administration of the debtor's estate

and increase its cost, interfere with the Bankruptcy Code's provision for private control of

administration of the estate, and threaten the court's ability to control a case impartially."

Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

       38.     If the debtor's business judgment has been exercised reasonably, a

court should approve the assumption of an executory contact.  See, e.g., NLRB v.

Bildisco and Bildisco, 465 U.S. 513, 523 (1984); Group of Inst'l. Investors v. Chicago,

Milwaukee, St. Paul & Pacific R.R. Co., 318 U.S. 523 (1943); Cleveland Hotel Protective

Comm. v. Nat'l City Bank of Cleveland (In re Van Sweringen Corp.), 155 F.2d 1009,

1013 (6th Cir.), cert. denied, 329 U.S. 766 (1946); In re Child World, Inc., 142 B.R. 87,

89 (Bankr. S.D.N.Y. 1992); In re Ionosphere Clubs, Inc., 100 B.R. 670, 673 (Bankr.

S.D.N.Y 1989); see also  In re Orion Pictures Corp., 4 F.3d at 1098-99; In re RCN Corp.,

Case No. 04-13638 (RDD), June 22, 2004 Hr'g Tr. ¶¶ 50:24–50:2, at 46.  Once the debtor

has satisfied the business judgment standard by showing that assumption will benefit the

estate, the court "should not interfere 'except upon a finding of bad faith or gross abuse of

[the debtor's] business discretion.'"  Id. at 465 (citing Lubrizol Enters., Inc. v. Richmond

Metal Finishers Inc., 756 F.2d 1043, 1047 (4th Cir. 1985).

       39.     The business judgment rule shields a debtor's management from

judicial second-guessing.  In re Farmland Indus., Inc., 294 B.R. at 913 (quoting In re

Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986)) ("'[T]he Code

favors the continued operation of a business by a debtor and a presumption of

reasonableness attaches to a debtor's management decisions.'").  Once the Debtors

articulate a valid business justification, "[t]he business judgment rule 'is a presumption

that in making a business decision the directors of a corporation acted on an informed

basis, in good faith and in the honest belief that the action was in the best interests of the

company.'"  In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting

Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).

       40.    Upon finding that the Debtors have exercised their sound business

judgment in determining that assumption of the Assumable Agreements, subject to the

Required Minimum Provisions, is in the best interests of their estates, this Court should

approve assumption under section 365(a) of the Bankruptcy Code.  In re Gucci, 193 B.R.

411, 415-17 (S.D.N.Y. 1996) (affirming bankruptcy court's approval of assumption of

executory contract upon determining that assumption "was in the best interest of the

estate"); Blue Cross Blue Shield of Conn. v. Gurski (In re Gurski), Nos. 94-51202 &

3:95CV1883, 1996 WL 684397, at *2 (D. Conn. Jan. 25, 1996) (affirming bankruptcy

court's determination that executory contracts were beneficial to debtor such that debtor

could assume them under section 365(a)).

       41.    The Debtors assert that the Procedures may be approved by this

Court, and the Assumable Agreements may be assumed in compliance therewith,

pursuant to section 365 of the Bankruptcy Code given the necessity of the relief sought

herein to the Debtors' ability to maintain their on-going business operations without

interruption.  As described above and in the Essential Suppliers Motion, the Debtors

cannot withstand even a short interruption in the flow of Goods from the Covered

Suppliers.  As of January 1, 2006, absent a consensual agreement (including deemed

22

acceptance by performance or otherwise) with the relevant Covered Suppliers, the

Debtors will have no ability to compel deliveries of Goods that are currently provided

pursuant to thousands of separate Assumable Agreements.  The Debtors have determined

that, without the relief sought herein and the ability to provide Covered Suppliers with

the benefits to be provided pursuant to the Procedures, certain of the Covered Suppliers

will not continue to provide Goods to the Debtors.  Furthermore, a Covered Supplier that

is willing to continue providing Goods after January 1 could attempt to extract significant

price increases, credit support, or other concessions from the Debtors as a condition of

the agreement to continue supplying the Goods.

42.    Therefore, the Debtors have determined, in the exercise of sound

business judgment, that the relief sought herein is necessary and appropriate to stabilize

the supply chain which is essential to preserve and enhance the value of their estates to

the benefit of all creditors.  Although the Debtors acknowledge that there will be a

significant cost associated with the payment of Cure to the Covered Suppliers, the

Debtors have sought to mitigate the impact of the payment of Cure by paying such

amounts over six calendar quarters, not paying the full amount of prepetition claims, and

requiring market pricing and normal payment terms.  Additionally, the economic impact

of a shutdown of the Debtors' and their OEM customers' assembly lines from the failure

of a Covered Supplier to continue supplying Goods after January 1 (which the Debtors

would be unable to timely replace) would far exceed the amount of Cure that will be

payable with respect to any Assumable Agreement.  As noted above, the economic

impact from such a shutdown could include, without limitation, (a) damage claims

asserted by the affected OEM customer against the Debtors exceeding $10 million per

23

day, (b) the Debtors' incurrence of considerable fixed costs connected to the facilities

idled by the failure to receive parts without generating any revenue to offset such fixed

costs, and (c) most importantly, a loss of important customer relations and goodwill.  In

short, the shutdown of the Debtors' and their OEM customers' assembly lines would

quickly imperil the Debtors' prospects for a successful reorganization.

        43.     The Debtors further believe that paying Cure as provided herein

satisfies the requirements set forth under section 365(b)(1).  Bankruptcy Code section

365(b)(1) codifies the requirements for assuming an unexpired lease or executory

contract of a debtor.  That subsection provides:

> (b)(1)  If there has been a default in an executory contract or unexpired lease
> of the debtor, the trustee may not assume such contract or lease
> unless, at the time of assumption of such contract or lease, the trustee-
>
> (A)    cures, or provides adequate assurance that the trustee will
> promptly cure, such default;
>
> (B)    compensates, or provides adequate assurance that the trustee  will
> promptly compensate, a party other than the debtor to such
> contract or lease, for any actual pecuniary loss to such party
> resulting from such default; and
>
> (C)    provides adequate assurance of future performance under such
> contract or lease.

11 U.S.C. § 365(b)(1).

        44.     The Debtors submit that the statutory requirements of section

365(b)(1) of the Bankruptcy Code have been satisfied because the Debtors are providing

assurances that the Debtors will cure all extant defaults as agreed by the parties and the

Debtors' Covered Suppliers are adequately assured of the Debtors' future performance by,

inter alia, this Court's approval of the debtor-in-possession financing facility.  See, e.g.,

Transcript of Oct. 11, 2005 Hearing at p. 107 ("I am now convinced that the facility

adequately satisfies the debtors' needs and provides them with sufficient and abundant

availability to conduct their bankruptcy case; and, more importantly, to conduct their

businesses in the ordinary course.").  Therefore, the Debtors' proposed Cure is

appropriate pursuant to section 365(b)(1).

45.     Furthermore, the Debtors' decision to extend the term of the

Assumable Agreements and modify the provisions of the Assumable Agreements

pursuant to the Procedures and the Required Minimum Provisions is authorized pursuant

to section 363(b) of the Bankruptcy Code.  Similar to the analysis under section 365,

courts in this district and elsewhere consistently have held that transactions pursuant to

363(b) should be approved if there is a sound business justification for implementing

them.  See In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983); In re Delaware

Hudson Ry. Co., 124 B.R. 169, 179 (Bankr. D. Del. 1991).  Once the debtor articulates a

valid business justification, "'[there is a presumption that in making a business decision

the directors of a corporation acted on an informed basis, in good faith and in the honest

belief that the action taken was in the best interests of the company.'"  In re Integrated

Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488

A.2d 858, 872 (Del. 1985)); see also In re RCN Corp., June 22, 2004 Hr'g Tr. ¶¶ 51:3–12

(approving exit financing commitments pursuant to 363(b) of the Bankruptcy Code).

46.     As described above, the continued flow of Goods to the Debtors is

necessary to the Debtors' manufacturing operations and adoption of the Procedures will

help to ensure that the Debtors can maintain a continuous flow of the Goods during the

course of these chapter 11 cases.  Furthermore, approval of the Required Minimum

Provisions will ensure that the Debtors receive Customary Trade Terms from Covered

Suppliers going-forward and that the Debtors will maintain the necessary flexibility to terminate the Assumable Agreements as and when appropriate in light of their future restructuring decisions without causing the Debtors' estates to incur significant administrative liabilities.  As such the Debtors' respectfully assert that their decision to extend the term of the Assumable Agreements and modify the provisions of the Assumable Agreements pursuant to the Procedures and the Required Minimum Provisions is supported by valid business justifications and authorized under section 363(b) of the Bankruptcy Code.

47.    Bankruptcy Rule 9019 provides that the Court "may approve a compromise or settlement."  Compromises are tools for expediting the administration of the case, reducing administrative costs and are favored in bankruptcy.  See In re Bond, 1994 U.S. App. Lexis 1282, *9-*13 (4th Cir. 1994) ("To minimize litigation and expedite the administration of a bankruptcy estate, 'compromises are favored in bankruptcy.'"); Fogel v. Zell, 221 F.3d 955, 960 (7th Cir. 2000); Fishell v. Soltow (In re Fishell), No. 94-1109, 1995 WL 66622, at *2 (6th Cir. Feb. 16, 1995); In re Martin, 91 F.3d 389, 393 (3d Cir. 1996) (quoting 9 Collier, Bankruptcy ¶ 9019.03[1] (15th rev. ed. 1993)).  Various courts have endorsed the use of Bankruptcy Rule 9019.  See, e.g., Bartel v. Bar Harbour Airways, Inc., 196 B.R. 268 (S.D.N.Y. 1996); In re Foundation for New Era Philanthropy, 1996 Bankr. LEXIS 1892 (Bankr. E.D. Pa. Aug. 21, 1996); In re Miller, 148 B.R. 510, 516 (Bankr. N.D. Ill. 1992); In re Check Reporting Service, Inc., 137 B.R. 653 (Bankr. W.D. Mich. 1992); In re Patel, 43 B.R. 500, 504 (N.D. Ill. 1982).

48.    The standards by which this Court should evaluate a settlement are
well established.  In addition to considering the proposed terms of the settlement, the
Court should consider the following factors:

the probability of success in litigation;

the difficulty in collecting any judgment that may be obtained;

the complexity of the litigation involved, and the expense,
      inconvenience, and delay necessarily attendant to it; and

the interest of creditors and stockholders and a proper deference to
      their reasonable views of the settlement.

See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,
390 U.S. 414, 424-245 (1968); United States ex rel. Rahman v. Oncology Assocs., P.C.,
269 B.R. 139, 152 (D. Md. 2001); In re Patel, 43 B.R. at 504-05; Fishell, 1995 WL 66622,
at *3; In re Pennsylvania Truck Lines, Inc., 150 B.R. 595, 598 (E.D. Pa. 1992), aff'd, 8
F.3d 812 (3d Cir. 1993); In re Grant Broadcasting, Inc., 71 B.R. 390, 395 (Bankr. E.D. Pa.
1987); In re Neshaminy Office Bldg. Assocs., 62 B.R. 798, 803 (E.D. Pa. 1986).

49.    The decision to approve a settlement or compromise is within the
discretion of the Court and is warranted when the settlement is found to be reasonable
and fair in light of the particular circumstances of the case.  See TMT Trailer Ferry, 390
U.S. at 424-25.  The settlement need not be the best that the debtor could have achieved,
but need only fall "within the reasonable range of litigation possibilities."  In re
Telesphere Communications, Inc., 179 B.R. 544, 553 (Bankr. N.D. Ill. 1994).  In making
its determination, a court should not substitute its own judgment for that of the debtor.
Neshaminy Office, 62 B.R. at 803.

50.    The Debtors' proposed Preference Waivers in exchange for the
Covered Suppliers' entry into Assumption Agreements meet these requirements.  If these

27

preference issues are not settled, discovery, motion practice, and other litigation activities related to the Debtors' avoidance of potentially preferential transfers would result in additional expense for the Debtors, risk interruption of their business operations, and would distract the Debtors from other, more pressing matters, particularly during the current critical period in these complex chapter 11 cases.  Given the expense associated with potential litigation or a shutdown of any of the Debtors' facilities due to a Covered Supplier's refusal to timely provide Goods, and the importance of the Covered Suppliers to the uninterrupted operation of the Debtors' supply chain and operations, the Debtors have determined that it is  in the best interests of the Debtors, their creditors, and their estates to propose the Preference Waivers in exchange for the Covered Suppliers' entry into Assumption Agreements.  This Court should therefore authorize, but not direct, the Debtors to provide the Preference Waivers to Covered Suppliers in exchange for such Covered Suppliers' entry into Assumption Agreements.

51.    For the foregoing reasons, the Debtors believe that the relief requested herein is in the best interests of the estates and should be granted.

<u>Notice</u>

52.    Notice of this Motion has been provided in accordance with the Order Under 11 U.S.C. §§ 102(1) and 105 and Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing (I) Omnibus Hearing Dates, (II) Certain Notice, Case Management, and Administrative Procedures, and (III) Scheduling an Initial Case Conference in Accordance with Local Bankr. R. 1007-2(e) entered by this Court on October 14, 2005 (Docket No. 245).  Given the expense and administrative difficulties of providing service to all of the Debtors' suppliers by overnight mail, the Debtors are serving notice of this Motion on suppliers that are not on either the Debtors' Master Service List or 2002 List

28

by first class mail as soon as is reasonably practicable.  To ensure that each Covered

Supplier receives reasonable notice and a meaningful opportunity to object, the Debtors

propose that any order of this Court granting the relief requested in this Motion include

negative notice provisions with respect to the Covered Suppliers, thereby providing such

Covered Suppliers with an additional ten-day period within which to object to the relief

sought herein.  In light of the nature of the relief requested, the Debtors submit that the

notice provisions described herein are appropriate and that no other or further notice is

necessary.  Out of an abundance of caution, the Debtors respectfully request that this

Court confirm the adequacy of such notice pursuant to an order granting the relief

requested in this Motion.

Memorandum Of Law

53.    Because the legal points and authorities upon which this Motion

relies are incorporated herein, the Debtors respectfully request that the requirement of the

service and filing of a separate memorandum of law under Local Rule 9013-1(b) be

deemed satisfied.

WHEREFORE, the Debtors respectfully request that the Court enter an order (a) approving the Procedures, (b) approving the Debtors' assumption of Assumable Agreements in accordance with the Procedures without further order of this Court, (c) authorizing the Debtors to grant the Preference Waivers, (d) confirming the adequacy of the Debtors' notice of this Motion, and (e) granting the Debtors such other and further relief as is just.

Dated: New York, New York
         November 18, 2005

                    SKADDEN, ARPS, SLATE, MEAGHER
                       & FLOM LLP

                    By: s/ John Wm. Butler, Jr.
                        John Wm. Butler, Jr. (JB 4711)
                        John K. Lyons (JL 4951)
                        Ron E. Meisler (RM 3026)
                    333 West Wacker Drive, Suite 2100
                    Chicago, Illinois  60606
                    (312) 407-0700

                            - and -

                    By: s/ Kayalyn A. Marafioti
                        Kayalyn A. Marafioti (KM 9632)
                        Thomas J. Matz (TM 5986)
                    Four Times Square
                    New York, New York 10036
                    (212) 735-3000

                    Attorneys for Delphi Corporation, et al.,
                        Debtors and Debtors-in-Possession