Michael L. Cook (MC 7887)
Carol Weiner Levy (CAW 6252)
SCHULTE ROTH & ZABEL LLP
Attorneys for D.C. Capital Partners, L.P.
919 Third Avenue
New York, New York 10022
Telephone:  (212) 756-2000
Facsimile:  (212) 593-5955

Hearing Date:  November 29, 2005 at 10:30 a.m.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                                             :
In re                                                        :        Chapter 11
                                                             :
DELPHI CORPORATION, et al.                                   :        Case No. 05-44481 (RDD)
                                                             :
                                                             :
                                    Debtors.                 :
                                                             :
-------------------------------------------------------------x

### OBJECTION OF D.C. CAPITAL PARTNERS, L.P. TO ENTRY OF FINAL ORDER ESTABLISHING PROCEDURES FOR TRADING IN EQUITY SECURITIES AND CLAIMS AND REQUEST FOR VACATUR OF INTERIM TRADING PROCEDURES ORDER

D.C. Capital Partners, L.P. ("D.C. Capital"), the holder of approximately 10 million shares[1] of common stock of Delphi Corporation, one of the above-captioned chapter 11 debtors ("Delphi" and, together with its affiliated debtors, the "Debtors"):  (i) objects to the Debtors' motion, dated October 8, 2005 (the "Motion"), for an order under Bankruptcy Code (the "Code") §§ 105, 362, and 541 and Fed. R. Bankr. P. 3001 establishing notification and hearing procedures for trading in claims and equity securities,  and (ii) requests vacatur of the order, dated October 12, 2005 (the "Interim Trading Procedures Order"), granting the Motion on an interim basis, and represents as follows:

---

[1]        D.C. Capital holdings represent approximately 1.8% of the Debtors' issued and outstanding common stock.

## PRELIMINARY STATEMENT

1.      The Debtors seek to use Section 105(a) of the Code to usurp shareholders'
corporate governance rights, stifle shareholders' ability to use and protect their own property,
and control the market, all in the name of protecting tax attributes that the Debtors have not yet
proven exist or are in jeopardy.  The relief the Debtors seek is extraordinary and unwarranted
and, if granted, would set the stage for future debtors in the Southern District of New York to
assume that the mere mention of net operating losses gives the Court powers never intended by
the drafters of the Code.  Indeed, the issue of whether a debtor may restrict its shareholders'
trading has been in the press and debated among practitioners for quite some time now and, yet,
when Congress recently amended the Code, it made no mention of expanding a chapter 11
debtor's rights over shareholders, its powers to circumvent normal corporate governance
procedures, or its ability to manipulate the markets.  The relief the Debtors request in the Motion
is not expressly provided in the Code.  Nor is it in keeping with the policies recently enunciated
by Congress.

2.      It is significant that in the years leading up to the commencement of these
cases, the Debtors destroyed shareholder value, and the restrictions requested in the Motion are a
transparent attempt by the Debtors to avoid accountability for these losses by silencing equity
holders and limiting their ability to protect themselves.  In fact, the Debtors have already
strongly suggested in pleadings submitted to this Court and in public filings with the Securities
Exchange Commission, that they are likely to propose a plan distributing equity to certain
creditor classes, resulting in "holders of Delphi's stock receiving no distribution on account of
their interests and cancellation of their existing stock."  Delphi Form 10-Q, dated November 9,
2005; see also Motion, at 8.  Even more troubling, the Debtors' proposed key employee
compensation program, submitted to the Court on the Petition Date, seeks to award top

management with 10% of the outstanding shares of the reorganized company upon emergence. See Motion for order authorizing Debtors to implement key employee compensation program, dated October 8, 2005, at ¶ 33.  With this fact taken into consideration, it becomes apparent that the Debtors' true motivation may not be protection of their tax attributes, but instead to use the requested restrictions as an anti-takeover tool to entrench management and prevent outside investors from gaining leverage.  Indeed, given their role in Delphi's recent troubles, the Debtors' top executives have considerable incentive to shield themselves from shareholders.  See Morgenson, Gretchen, Oohs and Ahs at Delphi's Circus, N.Y. Times, Nov. 13, 2005, at 3-1 (although documents filed with Court "draw a picture of a company that has been managed splendidly…," Delphi's "accounting practices are under investigation" by SEC and "the company has recorded losses of $6.3 billion over the last seven quarters").  This Court must, therefore, question both the motives of the Debtors in filing the Motion and the necessity of the relief requested therein.

3.    D.C. Capital objects to entry of a final order granting the relief requested in the Motion and requests that the Interim Trading Order be vacated because:  (i) there is no legal basis to enjoin non-debtor third parties from trading in securities that are not property of the Debtors' estates, (ii) there is no factual basis for enjoining such trading and (iii) the Motion is procedurally defective because the requested relief is injunctive and thus must be sought through an adversary proceeding.  To the extent the Court enters an order, it must and should be narrowly tailored to protect the interests of shareholders and only upon an evidentiary showing by the Debtors so that the Court has an opportunity to fully develop the record.

**BACKGROUND**

4.    On October 8, 2005 (the "Petition Date"), the Debtors commenced the above-captioned jointly administered chapter 11 cases.  The Debtors filed the Motion on the

Petition Date, with no notice to shareholders, seeking approval of certain draconian notification

and hearing procedures for trading claims and equity securities.

5.      The Court held an hearing to consider the Motion on October 11, 2005,

and granted the Interim Trading Procedures Order on October 12, 2005.

6.      The Interim Trading Procedures Order, among other things, establishes

procedures that severely restrict the ability of shareholders to trade in Delphi's common stock

and essentially enjoin "Substantial Equityholders"[2] from purchasing or selling their equity

interest in Delphi pending 30 days' prior written notice to the Debtors, during which time the

Debtors can object to the proposed trade.  While the Debtors are deciding whether to object or

not, the Substantial Equityholder is placed in market limbo, neither able to move with or respond

to adverse changes in the market.  If the Debtors object to the trade, the equityholder has the

burden of obtaining a final order of the Court approving the transaction – a burden that should be

borne by the Debtors, who are the parties seeking the injunctive relief.

7.      The Debtors maintain that the requested relief will protect certain inchoate

federal income tax attributes known as net operating loss carryovers and analogous tax credit

carryovers (the "Tax Attributes"), which the Debtors assert are property of their estates.  The

Debtors have not, however, presented any evidence to the Court to support their allegations or to

show what value the Tax Attributes may be to the estates and whether they will be in jeopardy if

the Motion is not granted.

## OBJECTION AND REASONS THEREFOR

8.      D.C Capital objects to the relief requested in the Motion because the

assumptions upon which the Debtors rely are wrong as a matter of law and of fact.  The Debtors

---

[2]      Substantial Equityholders are defined in the Motion to include "any person or entity which beneficially
owns at least 14,000,000 shares (representing approximately 2.5% of all issued and outstanding shares) of the
common stock of Delphi…"  Motion, at ¶ 16(a)(v).

maintain that the requested relief should be granted because these pre-bankruptcy Tax Attributes <u>may</u> be used to shelter their future income upon emergence from reorganization. They argue that the relief requested in the Motion is common practice, suggesting that, because similar trading procedures have been established in recent large chapter 11 cases, the relief is now routine. The relief the Debtors seek is far from routine but is a drastic measure that affects numerous known and unknown shareholders. It is not based on any provision of the Code, is not supported by legislative history, has not been approved by the Second Circuit and rests on speculative assumptions. Accordingly, the Court should not grant the Motion.

## A.    <u>There is No Legal Basis for Granting the Relief Requested</u>

9.    There is no legal basis for allowing the Debtors to unilaterally alter their certificates of incorporation, usurp their shareholders rights to dispose of their shares and otherwise control the trading of their stock. The Delphi shares are not property of the estate and trading of those shares is solely a non-debtor third party transaction. The <u>only</u> nexus between the trading of Delphi shares and the Debtors is the unproved and speculative assertion by the Debtors that trading may diminish the Tax Attributes in connection with a plan of reorganization that has not yet been negotiated or proposed.[3] There is nothing express or implied in the Code that gives the Debtors such far-reaching power.

---

[3]    Section 382 of the Internal Revenue Code ("<u>Section 382</u>") prescribes the use of NOLs to shelter future income. Section 382 limits a corporation's ability to use NOLs if it undergoes an "ownership change," which is generally defined as a greater-than-50% increase over the lowest percentage of stock in a corporation owned by shareholders holding 5% or more of aggregate outstanding shares over a three year period. An ownership change is measured only after any change in the percentage of stock held by a 5% or more shareholder. However, triggering Section 382's limitation does not cause the corporation to forfeit its NOLs; rather, it imposes only an annual cap on the amount of NOLs the corporation can use in taxable years after the change in ownership. The corporation thus would be required to spread the NOLs over a greater number of years than would otherwise be the case.

1.      __The Court lacks jurisdiction to grant the relief requested.__

10.      The equity interests of non-debtor third-party shareholders in Delphi are not property of the estates and the trading of those securities involves only non-debtor, third-party transactions.  The Debtors have failed to show that the Court has even "related to" jurisdiction over these transactions.  Mere speculation that unrestricted trading <u>may</u> harm the Debtors' tax attributes is too tenuous and remote to serve as a basis for exercising control over property that does not belong to the estates.  <u>See</u> <u>Torkelsen v. Maggio (In re Guild & Gallery Plus, Inc.)</u>, 72 F.3d 1171, 1181 (3d Cir. 1996) (if "the action does not involve property of the estate, then not only is it a noncore proceeding, it is an unrelated matter completely beyond the bankruptcy court's subject-matter jurisdiction") (quoting <u>In re Gallucci</u>, 931 F.2d 738, 742 (11th Cir. 1991)).  The Court thus lacks jurisdiction to restrict the use and disposition of these securities by shareholders such as D.C. Capital.

2.      __No precedent exists in this Circuit to grant the relief requested.__

11.      The Second Circuit has never addressed the propriety of the trading restrictions requested in the Motion.  Indeed, the only Court of Appeals to have addressed issue, the Seventh Circuit, questioned the bankruptcy court's ability to grant such restrictions.  <u>See</u> <u>In re UAL</u>, 412, F.3d 775 (7th Cir. 2005) (finding bankruptcy court's injunction "problematic on the merits," and questioning court's reliance on Bankruptcy Code §§ 105(a) and 362 in issuing the trading procedures order).  There, the Seventh Circuit considered an appeal by the trustee of United Airlines Employee Stock Option Plan ("<u>ESOP</u>"), who had been enjoined by the bankruptcy court's trading procedures order from selling slightly more than one half of United Airlines common stock held by the ESOP.  <u>Id.</u> at 775.  According to the court, regardless of whether the debtors' NOLs are property of the estate, "an ESOP's sale of stock does not obtain

possession,…or exercise control" over that property. Id. at 778 (emphasis in original). Under

UAL, therefore, bankruptcy courts are not routinely authorized to enjoin shareholders from

trading in the debtor's equity interests.

12.    The UAL court also distinguished In Prudential Lines, Inc., 928 F.2d 565

(2d Cir. 1991), the case that the Debtors primarily rely on in support of the Motion. In

Prudential Lines, the debtor sought to bar its parent company from taking a worthless stock

deduction on the parent's tax return. The debtor argued that if its parent was permitted to take

the deduction, it would "effectively eliminate the value of the [debtor's] NOL[s]." Id. at 574.

The court found that the debtor's NOL was property of the estate, and that the automatic stay

thus enjoined the parent from taking the deduction. Id. As the UAL court noted, however, the

holding of Prudential Lines is specific to the facts in that case -- a two-party dispute between a

parent and its subsidiary. UAL, 412 F.3d at 779 ("Prudential Lines holds taking the deduction

would have exercised control over the debtor's operating losses; there is no equivalent example

of control (or consumption) of a loss carry-forward in an investor's simple sale of stock.").

13.    The Debtors attempt to extend the Second Circuit's analysis of the two-

party intercompany dispute in Prudential Lines to a universal trading freeze affecting securities

that are not property of the Debtors' estates. They would expand the holding of that case beyond

the bounds of reasonableness. Unlike Prudential Lines, where the debtor showed direct harm

from the parent's proposed deduction, the Debtors here have not shown that simple securities

trading by investors will, in fact, immediately and irreparably harm their estates. Prudential

Lines provides no legal basis for enjoining the rights of third party non-debtors to buy, sell or

otherwise dispose of Delphi's securities.

14.    Further, the trading restrictions requested in the Motion seek to impair the rights of unknown non-insiders to sell, dispose of or otherwise use their property for an unrestricted period of time.  This broad restraint on shareholders' property rights may violate the Fifth Amendment of the Constitution as an unlawful taking without just compensation.  See Babbitt v. Youpee, 519 U.S. 704 (1997) (provision restricting ability to descend or devise property is a taking in violation of Fifth Amendment).  Indeed, the UAL court found that it would have been appropriate for the Court to require the debtors to provide a cash bond or other adequate protection to affected security holders in order to protect their property rights.  UAL, 412 F.3d at 778 (observing that it was too late there to provide shareholders with monetary compensation because the "controversy ha[d] come and gone

**B.      There is No Factual Basis for Granting the Relief Requested.**

15.    Even if the Court were to find some legal basis for granting the relief requested in the Motion, the Debtors have failed to show that there is any real factual basis for restricting trading in these cases.  They simply recite in the Motion that they have $2.75 billion in Tax Attributes, including NOLs "of at least $1.5 billion, amortizable research and experimental expenditures ("R&E Amounts") of at least $1 billion, and other tax credits of at least $250 million…,"  but offer no evidence to support the statement.  Motion, at ¶ 15.  The Debtors assert that the Tax Attributes may be lost if trading is not restricted, but they do not show what their potential tax savings might be if relief were granted and how, or if, that may change if shareholders are permitted to trade freely.

16.    At a minimum, the Court should require the Debtors to show: (i) the existence and amount of Tax Attributes; (ii) the likelihood that sufficient Tax Attributes could, in

fact, survive confirmation of a reorganization plan to warrant the requested restrictions;[4] (iii) a

reasonable prospect that the Debtors will propose a plan that meets requirements of Section

382(1)(5) and/or 382(1)(6);[5] and (iv) a likelihood of any such plan being confirmed in a

reasonable period of time.  The Court should not enter any final order until it has conducted a

full evidentiary hearing and the Debtors have made the requisite showing to warrant the

requested relief.

## C.    The Motion is Procedurally Defective

        17.    The Debtors base their Motion on section 362 of the Code and the "catch-

all" provision of section 105(a).  Trading in Delphi stock is not a violation of the automatic stay

and, therefore, Code section 362 cannot serve as a basis for granting the requested relief.  Nor

can section 105(a) of the Code serve as the statutory ground for relief.  While it is often used as a

means for providing all kinds of equitable relief, it is not a license to create powers where none

otherwise exist in the Code.  See In re Smart World Techs, LLC, 423 F.3d 166, 184 (2d Cir.

2005) (quoting In re Dairy Mart Convenience Stores, Inc., 351 F.3d 86,091-92 (2d Cir. 2003)

("[t]he equitable power conferred ... by section 105(a) is the power to exercise equity in carrying

out the provisions of the Bankruptcy Code, rather than to further the purposes of the Code

generally, or otherwise to do the right thing.  This language suggests that an exercise of section

105 power be tied to another Bankruptcy Code section and not merely to a general bankruptcy

concept or objective.")  Because there is no independent basis for the extraordinary relief

requested by the Debtors, Code section 105(a) cannot be used to create one.

---

[4]    Under Section 382(1)(5), the amount of NOLs available to offset against future income will be reduced by interest paid or accrued by the Debtors on any debt converted to stock.

[5]    Sections 382(1)(5) and (6) provide certain relief from the limitations imposed by the Tax Code for corporations that undergo a change in stock ownership pursuant to a plan of reorganization upon emergence from bankruptcy.

18.     In reality, the Debtors are seeking to enjoin third party trading of claims

and equity securities.  Under Fed. R. Bankr. P. 7001, injunctive relief must be sought through an

adversary proceeding.  The Debtors are thus required to commence an adversary proceeding and

ensure proper service of a summons and complaint in accordance with Fed. R. Bankr. P. 7004.

Indeed, even in <u>Prudential Lines</u>, the case on which the Debtors rely so heavily in support of the

Motion, the debtor sought the requested injunctive relief through an adversary proceeding.  <u>See</u>

<u>Prudential Lines</u>, 928 F.2d at 568.  Because the Motion is procedurally flawed, the requested

relief should be denied.

19.     Even if the Debtors were to cure the procedural defects, they fail to meet

the substantive requirements for issuing the requested permanent injunction, because they fail to

show that: (i) they are likely to suffer immediate irreparable harm if the requested relief is not

granted; (ii) they are likely to succeed on the merits of the case; and (iii) the balance of hardships

weighs in the Debtors' favor.  <u>See</u> <u>Register.com, Inc. v. Verio, Inc.</u>, 356 F.3d 393, 423 (2d Cir.

2004) (citing <u>Genesee Brewing Co. v. Stroh Brewing Co.</u>, 124 F.3d 137, 141 (2d Cir. 1997).

20.     The Debtors have not shown that unrestricted trading in Delphi equity

securities will immediately and irreparably harm the Debtors' estates.  Any injury to the estates

would occur only upon consummation of a reorganization plan -- an event that is nowhere in

sight at this early stage of the case.  Moreover, such harm is dependent on numerous facts,

including, among other things, (i) the terms of the plan of reorganization that the Debtors

ultimately propose for confirmation; (iii) the Debtors' ability to, in fact, gain confirmation of a

plan that uses the benefits afforded by Section 382(1)(5) and the extent and value of those

benefits; and (iii) whether there was any prepetition "ownership change" within the three years

prior to plan consummation that would have already subjected the Debtors to Section 382's NOL

limitations.  Thus, any potential harm to the Debtors' estate is, at best, remote and contingent, hardly meeting the requisite showing of irreparable harm necessary to obtain injunctive relief.

21.     Nor have the Debtors shown that the balance of hardships weighs in favor of granting the requested injunction.  Unlike the contingent loss of Tax Attributes that the Debtors may arguably incur without trading restrictions, holders of Delphi equity interests will suffer immediate and concrete harm if the Court enters the Final Trading Procedures Order.  The proposed trading restrictions will severely restrict, and in some cases enjoin entirely, shareholders' ability to liquidate holdings and diversify interests to protect their property.  Indeed, Substantial Equityholders will be enjoined from participating in market activity during the 30-day notice period, and may be subject to being frozen from trading long after the 30 days if the Debtors object to the transaction and a Court order must first be obtained.  These shareholders thus will be forced to bear the risk of downturns in the value of Delphi's stock without the ability to liquidate their holdings.  The speculative impact on the Debtors' use of Tax Attributes simply does not outweigh the immediate and irreparable harm that shareholders will face if they are restricted from freely buying, selling or otherwise disposing of Delphi securities.

22.     Finally, the Debtors have not shown that they are likely to succeed on the merits -- i.e., that they will lose the value of their Tax Attributes unless the requested relief is granted.  As shown above, the Debtors can, at most, show that they may arguably suffer some contingent loss at some point in the future.  But this kind of mere speculation is hardly grounds for granting a permanent injunction that will chill the market and force shareholders to bear losses in excess of what they have already been forced to bear.

D.    __Any Relief Granted Must be Narrowly Tailored__

23.    Even if the Court were to grant the relief requested in the Motion, the order must be narrowly tailored to balance the harm to investors against the protection of the Debtors' Tax Attributes.  The Interim Trading Procedures Order in its current form is far too restrictive and forces shareholders to bear an unfair burden while the Debtors may only reap speculative benefits.

24.    Specifically, the threshold for determining status as a "Substantial Equityholder" must be raised.  Currently, the Interim Trading Procedures Order defines Substantial Equityholders as "any person or entity which beneficially owns at least 14,000,000 shares (representing approximately _2.5%_ of all issued and outstanding shares) of the common stock of Delphi…"  Motion, at ¶ 16(a)(v) (emphasis added).  This threshold is unreasonably low, and is needlessly restrictive.  In fact, most other courts that have approved similar restrictions have set the threshold at between 4.5% and 4.75% ownership.  See, e.g., In re Delta Airlines, et al., 05-17923 (PCB) [D.I. #195] (Bankr. S.D.N.Y. Sept. 16, 2005) (substantial equityholder threshold set at 4.75%); In re Northwest Airlines, et al., 05-17930 (ALG) [D.I. #836] (Bankr. S.D.N.Y. October 28, 2005) (substantial equityholder threshold set at 4.75%); In re Worldcom, Inc., et al., 02-13533 (AJG) [D.I. #3613] (Bankr. S.D.N.Y. March 4, 2003) (substantial equityholder threshold set at 4.75%); In re Adelphia Communications Corporation, 02-41729 (REG) [D.I. #768] (Bankr. S.D.N.Y. Sept. 27, 2002) (substantial equityholder threshold set at 4.5%); In re Flyi, Inc. et al., 05-20011 (MFW) [D.I. # 21] (Bankr. D. Del. Nov. 10, 2005) (substantial equityholder threshold set at 4.5%).

25.    In addition, the period during which parties are enjoined from consummating proposed transactions should be shortened to 10 –15 days.  The 30-day notice and

objection period requested by the Debtors will unnecessarily delay the closing of transactions, and is inconsistent with the time periods approved by courts in other cases.  See, e.g., In re Delta Airlines, et al., 05-17923 (PCB) [D.I. #195] (Bankr. S.D.N.Y. Sept. 16, 2005) (15 day objection period); In re Northwest Airlines, et al., 05-17930 (ALG) [D.I. #836] (Bankr. S.D.N.Y. October 28, 2005) (15 day objection period); In re U.S. Airways, Inc., 04-13819 (SSM) [D.I. #2034] (Bankr. E.D. Va. April 1, 2005) (10 day objection period).

26.    Finally, the Debtors improperly seek to impose the burden of obtaining approval to consummate a proposed transaction on third-party non-debtor shareholders.  In the Motion, the Debtors propose that, in the event that they object to a proposed transaction, the shareholder or other trading party should be required to obtain a "final and nonappealable order of this Court" authorizing the transaction before it may be consummated.  Motion, at ¶ 3(d). Instead, the Debtors should bear the burden of seeking to enjoin proposed transactions, rather than requiring shareholders to obtain a Court order permitting the trade.  Thus, once an equity holder delivers notice of a proposed transaction, the Debtors should be required to seek affirmative relief from the Court to enjoin the transaction.  If the Debtors fail to do so within the prescribed time period, the transaction should be automatically permitted to proceed.

27.    The relief requested by the Debtors is overly restrictive, and has no legal or evidentiary basis.  The Court should thus deny entry of an order granting the relief requested in the Motion and vacate the Interim Trading Procedures Order.  At a minimum, the Debtors should be required to provide evidentiary proof that the relief is necessary and, if the Court finds that the Debtors have met their burden of proof, any resulting order must be narrowly tailored to address the concerns described in this Objection.

**WHEREFORE**, D.C. Capital respectfully requests that the Court: (i) deny the

relief requested in the Motion; (ii) vacate the Interim Trading Procedures Order, and (iii) grant

D.C. Capital such other and further relief as the Court deems just.


Dated:    New York, New York
          November 21, 2005

                              SCHULTE ROTH & ZABEL LLP
                              Attorneys for D.C. Capital Partners, L.P.


                              By   /s/ Michael L. Cook
                              Michael L. Cook (MC 7887)
                              (A Member of the Firm)
                              919 Third Avenue
                              New York, New York 10022
                              Telephone: (212) 756-2000
                              Facsimile: (212) 593-5955
                              E-mail: michael.cook@srz.com