| | |
|---|---|
| KIRKPATRICK & LOCKHART<br>NICHOLSON GRAHAM LLP<br>Edward M. Fox (EF1619)<br>599 Lexington Avenue<br>New York, New York 10022<br>Telephone (212) 536-3900 | Hearing Date: November 29, 2005<br>10:00 a.m. |

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
In re:                                                              :            Chapter 11
                                                                        :            Case No. 05-44481 (RDD)
DELPHI CORPORATON, *et al.*,               :            (Jointly Administered)
                                                                        :
                                    Debtors.                  :
---------------------------------------------------------X

**OBJECTION OF WILMINGTON TRUST COMPANY, AS INDENTURE TRUSTEE, TO
DEBTORS' MOTION FOR ORDER UNDER §§ 105 AND 363 AUTHORIZING THE
DEBTORS TO IMPLEMENT A KEY EMPLOYEE COMPENSATION PROGRAM**

Wilmington Trust Company ("WTC"), in its capacity as indenture trustee with respect to the $2 billion of senior notes and debentures issued by Delphi Corporation ("Delphi"), by and through its undersigned attorneys, Kirkpatrick & Lockhart Nicholson Graham LLP ("K&LNG"), hereby objects to the Motion for Order Under §§ 105 and 363 Authorizing Debtors to Implement a Key Employee Compensation Program (the "Motion") filed by Delphi and its affiliated debtors (collectively, the "Debtors") in these jointly administered Chapter 11 cases, stating as follows:

**PRELIMINARY STATEMENT**

1.      Although the Debtors' stated goal in the Motion is to implement "a special incentive compensation program that aligns the interests of both program participants and the Debtors' stakeholders,"[1] the Debtors' Key Employee Compensation Program (the "KECP

---
[1]    Motion, ¶ 18.

NY-401088 v1

Program") falls well short of that goal in several important respects. Consequently, the Debtors' current Motion should be denied.[2]

2.  First, the Debtors' decision to implement a broad-based, and extremely generous, executive compensation program comes at a uniquely inopportune time. The Debtors are currently engaged in labor negotiations in which, according to publicly available accounts, the Debtors are asking thousands of their hourly employees, whose continued commitment and productivity is vital to the Debtors' successful reorganization, to accept substantial reductions in compensation and benefits.

3.  Second, the Debtors' Annual Incentive Plan, which is estimated to cost $21.5 million every six months, and relies on EBITDAR[3] targets in evaluating executive performance rewards the Debtor's executives for labor and related cost savings which will result from the Bankruptcy Code imposed Section 1113 and 1114 processes, as well as from the sale of underperforming assets and the rejection of burdensome executory contracts, rather than from other, more relevant, performance metrics, such as top line revenue growth. Moreover, the proposed EBITDAR targets, which have not even been determined yet by the Debtors' compensation committee, would provide no incentive to the Debtors' executives to control reorganization or interest costs that will have a substantial impact on the recoveries enjoyed by the Debtors' creditors.

4.  Third, under the cash portion of the Emergence Bonus Plan, which will cost $87.9 million, the Debtors will make substantial cash payments to their executives upon the sale of all or substantially all of the Debtors' assets or the effective date of a plan of reorganization,

---

[2]  Denial of the Motion would not prevent the Debtors from seeking approval of a different plan which is more appropriate under the circumstances of this case.

[3]  Earnings before interest, taxes, depreciation, amortization and restructuring costs.

05-44481-rdd    Doc 1133    Filed 11/22/05    Entered 11/22/05 15:36:33    Main Document
Pg 3 of 15


apparently without any attainment of any performance goals. Thus, this portion of the KECP Program provides no incentive for the Debtors' executives to maximize the value of the Debtors' assets in connection with any future sale or plan of reorganization.

5.      Under the equity component of the Emergence Bonus Plan, the Debtors propose to set aside for 600 of the Debtor's U.S. and foreign executives, 10% of the equity of the reorganized Debtors, worth an estimated $400 million.[4] One third of the equity award will be in restricted stock and the remaining two-thirds in stock options, with a strike price set as the midpoint of the valuation range set forth in the Debtors' court approved disclosure statement. 25% of each award will vest each year. Although the Debtors assert that they intend to seek creditor agreement or court approval of this part of the KECP Programs, they are, in effect, seeking approval for the disposition of 10% of the equity of the reorganized company now, completely outside of the plan process. This represents an unlawful attempt to short circuit the regular chapter 11 plan approval process by predetermining the disposition of an estimated $400 million in value under a future plan of reorganization.

6.      For all of these reasons, which are discussed in greater detail below, implementation of the KECP Program in its present form does not represent a sound exercise of the Debtors' business judgment. Consequently, the Debtors' Motion must be denied, at least until the KECP Programs can be revised to align more closely the interests of the Debtors' executives with the interests of the Debtors' creditors.

---

[4] The equity component of the Emergence Bonus Plan is not awarded in the event of a sale of all or substantially all of the Debtors' assets, thus giving the Debtors' executives a powerful incentive to favor a plan of reorganization over an asset sale.

**FACTUAL BACKGROUND**

7. WTC serves as indenture trustee for approximately $2 billion worth of senior notes issued by Delphi. Accordingly, it has a keen interest in ensuring the ultimate success of the Debtors' reorganization cases, and the maximization of the value available for distribution to creditors in connection therewith.

8. On October 8, 2005 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code (11 U.S.C. §§ 101 et seq.) (the "Bankruptcy Code"). Since the Petition Date, the Debtors have continued to operate their businesses and remained in possession of their assets as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

9. On the Petition Date, the Debtors filed the Motion seeking authorization to implement the KECP Program for the benefit of 486 of the Debtors' executive employees (collectively, "Covered Employees"), at a total estimated cost of more than $500 million.

10. As described by the Motion, the KECP Program consists of the following principal elements:

- a semi-annual incentive plan, pursuant to which Covered Employees will be eligible to receive payments (the "Semi-Annual Incentive Awards") based on the Debtors' attainment of presently unspecified EBITDAR targets, at an estimated cost of $21.5 million per six-month period.

- an Emergence Bonus Plan, pursuant to which Covered Employees will be entitled to receive, upon the occurrence of the effective date of a plan of reorganization, or the closing of a sale of substantially of the Debtors' assets:
    - cash payments estimated at $87,925,000; and
    - 10% of the equity of the Reorganized Debtors, with an estimated value of approximately $400 million.

- continuation of the Debtors' pre-petition severance plans (the "Severance Plan"), at an estimated cost of between $30.5 million and $145.5 million.

**GROUNDS FOR THE OBJECTION**

11.     The proposed KECP Program does not represent a reasonable exercise of the Debtors' business judgment, and does not align the interests of the Covered Employees with the interests of the Debtors' creditors.  Accordingly, while the implementation of some form of incentive compensation program by the Debtors may be appropriate, the KECP Program, in its present form, is manifestly not in the best interest of the Debtors' creditors, and the Motion should therefore be denied.

**A.     Implementation of the KECP Programs in Their Current Form
Does Not Represent a Sound Exercise of the Debtors' Business Judgment**

12.     Section 363(b) of the Bankruptcy Code provides that the Debtors "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).

13.     Under section 363(b), the Debtors bear the burden of demonstrating that there is "a good business reason" for implementing the KECP.  In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983).  In considering whether the Debtors have met that burden, the Court may not blindly defer to the Debtors' collective business judgment, but must, instead "consider all salient factors pertaining to the proceeding, and . . . act to further the diverse interests of the debtor, creditors and equity holders, alike." Id.

14.     In this case, the Debtors offer a two-fold justification for implementing the KECP Program – namely, "to retain and incentivize Covered Employees." Motion ¶ 15.

        1.     A Retention Program Is Not Required

15.     The Debtors assert that, in the absence of the KECP Program, they expect to suffer a high level of attrition in their executive ranks, and observe that "more than 25 executives have left the [Debtors'] employ since January 1, 2005." Motion ¶ 15.

16. Based on the number of Covered Employees who would participate in the KECP Program, however, it appears that the Debtor has at least 500 executive-level employees, so the loss of 25 executives appears to represent an attrition rate of only 5%, which hardly appears to be cause for alarm or the implementation of a costly executive retention program. Moreover, according to the KECP Program prepared by Watson Wyatt (the "Watson Wyatt Report") and attached as an Exhibit to the Motion, "executive turnover has increased almost 75% in the last 12 months." Watson Wyatt Report, page 6. Although this is intended to sound dire, it actually means that of the 25 executives who have departed since January 1, 2005, approximately 14 of them would have been expected to leave anyway through normal attrition.[5] Consequently, despite the turmoil of the past months as the Debtors' decision to file for bankruptcy played out almost daily in the media, only 11 more executives than normal left the Debtors' employ.

17. Further, there is no indication why these executives departed, that the Debtors suffered any harm as a result of their departure, or that other executives or new hires were unable to fill the positions left vacant by the departing executives.

18. Indeed, although the Debtors assert that replacing the departing executives has been difficult and expensive, the Debtors appear to have exacerbated this alleged problem in at least one instance involving an executive search firm. Accordingly to the Motion for Order Fixing Deadline for the Debtors to Assume or Reject Executory Contract with Russell Reynolds Associates, Inc. (Docket No. 986) (the "RRA Motion"), the Debtors retained Russell Reynolds Associates, Inc. ("RRA") prepetition to conduct an executive search for a Director of Global Architecture and Infrastructure. According to RRA, it have provided candidates to the Debtors whom the Debtors have interviewed and has continued to provide ongoing search services for

---

[5] $14 + (14 \times .75) = 24.5$.

this position. Nevertheless, the Debtors have refused RRA's request that the Debtor assume its contract and make a cure payment of $75,504.94. Instead, the Debtors have insisted that RRA continue to perform their executory contract without assurance of payment. Moreover, RRA has refused to take on two additional executive searches because, according to RRA, the Debtors had represented to RRA that RRA would be included in the First Day Orders as an ordinary course professional and this representation turned out to be false. RIZA Motion ¶¶ 7, 12, 14.

19. Stripped of hyperbole, it therefore appears that the Debtors' executive attrition is relatively minor, and that the Debtors' own actions may have exacerbated its problems.

**B. The KECP Program would Be Prohibited Under The Amended Bankruptcy Code**

20. Recognizing that recent changes in the Bankruptcy Code would prohibit approval of employee retention plans except under very certain limited circumstances, the Debtors assert that

> The Key Employee Compensation Program does not include a retention or stay component which differentiates it from other incentive programs and the issues raised in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCA").

Motion ¶ 20.

21. It is abundantly clear from the Debtors' Motion, however, that despite the manner in which payments are structured under the KECP Programs, the KECP Program is a retention program:

- the purpose of the program " is to <u>retain</u> and incentivize . . . ." Motion ¶ 15 (emphasis added);

- "the commencement of a bankruptcy case heightens employee concerns regarding possible job loss . . . ." Motion ¶ 15;

Debtors "required a program that would not only incentivize covered employees to <u>remain</u> in the Debtors employ . . . . Motion ¶ 22 (emphasis added);

- 7 -

>   Equity component of Emergence Bonus Plan designed to "incentivize executives to <u>remain</u> working for the Debtors during this chapter 11 period." Motion ¶ 31 (emphasis added);
>
> -   Since the proposed Key Employee Compensation Program is needed to <u>retain</u> employees . . . ." Motion ¶ 39, fn. 11 (emphasis added).

22.  Newly added section 503(c) of the Bankruptcy Code provides:

(c) Notwithstanding subsection (b), there shall neither be allowed, nor paid –

>   (1) a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business, absent a finding by the court based on evidence in the record that –
>
>   >   (A) the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;
>   >
>   >   (B) the services provided by the person are essential to the survival of the business; and
>   >
>   >   (C) either –
>   >
>   >   >   (i) the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or
>   >   >
>   >   >   (ii) if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred;
>
>   (2) a severance payment to an insider of the debtor, unless –
>
>   >   (A) the payment is part of a program that is generally applicable to all full-time employees; and

- 8 -

        (B) the amount of the payment is not greater than 10 times the amount of the mean severance pay given to nonmanagement employees during the calendar year in which the payment is made; or

        (3) other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

11 U.S.C. § 503(c).

    23.    Although this newly added provision applies to cases filed on or after October 17, 2005, it certainly reflects the disfavor into which not only retention plans, covered in subsection (1), but other transfers or obligations outside the ordinary course of business covered in subsection (3), have fallen in the eyes of Congress.

    24.    Accordingly, the Debtors' Motion, and particularly its comparison to programs approved in other large bankruptcy cases, should be viewed in the context of a Congressional determination that such programs should be prohibited.

    25.    While incentivizing employees to perform may be a legitimate business purpose, the Debtors' offer no reason to believe that the proposed KECP Programs will, in fact, improve the Debtors' recent track record of posting significant net operating losses.

### C. The Proposed KECP Programs Are Not Closely Tied To the Actual Performance of the Covered Employees

#### 1. EDITDAR Is an Inappropriate Measure of Executive Performance

    26.    Even assuming, *arguendo,* that the Debtors' desire to incentivize their employees is a sufficient business justification for implementation of some kind of an incentive compensation plan at this time, the criteria governing the Semi-Annual Incentive Awards cannot be evaluated because the EBITDAR targets have not yet been fixed by the Debtors' compensation committee. Moreover, in this case, EBITDAR targets provide a significantly skewed basis for measuring the actual performance of the Covered Employees.

27.  While the Debtors' decision to rely on EBITDAR targets for its Semi-Annual Incentive Awards may seem an intuitive choice, it ignores the fact that, in the context of a chapter 11 case, the unique rights and remedies provided by the Bankruptcy Code, not the efforts of the Debtors' executives, will be the main drivers in decreasing the Debtors' expenses (and hence increasing its earnings).

28.  For instance, if the Debtors succeed in modifying or rejecting their collective bargaining agreement with the UAW pursuant to section 1113 of the Bankruptcy Code, the Debtors would presumably experience a marked increase in EBITDAR because of the Debtors' significantly reduced labor costs, but such an earnings increase cannot fairly be attributed to the efforts of the Covered Employees.  The same is true of Section 363 sales of non-performing or underperforming assets.

29.  The Debtors attempt to justify their use of EBITDAR in lieu of gross revenues, net earnings, or some other metric, "because of the inability to forecast restructuring costs."[6] While restructuring costs may be difficult to forecast, they are clearly well within the control of competent management.  Nevertheless, by proposing to remove restructuring costs from the calculation of the relevant earnings targets, the Debtors would effectively eliminate any financial incentive for the Covered Employees to attempt to limit the Debtors' restructuring costs.[7]

---

[6]  Proposed Order, <u>Exhibit 1</u>, at 9.

[7]  The Debtors' Motion for Order Under 11 U.S.C. §§363(b) and 365(a) and Fed. R. Bankr. P. 9019 Approving Procedures to Assume Certain Amended and Restated Sole Source Supplier Agreements (the "Assumption Procedures Motion") seeks authorization to pay as much as $587 million in pre-petition claims outstanding under more than 11,000 critical vendor contracts.  If such relief is granted, the Debtors should be required to confirm that payments of unsecured claims held by the Debtors' "critical" vendors will be considered as part of the Debtors' cost of goods sold, for EBITDAR purposed, and not characterized as "restructuring costs," or in any other way that would artificially inflate EBITDAR and permit the Debtors' Covered Employees to receive a windfall under the KECP Program.

30.     Likewise, the Debtors' Covered Employees have the capacity to exert control over the Debtors' interest-related expenses by ensuring that the Debtors obtain the most favorable financing terms available, and by ensuring that the post-petition credit available to the Debtors is used in a responsible and fiscally prudent fashion.  Accordingly, it is inappropriate to insulate the Debtors' Covered Employees from the costs associated with the Debtors' borrowing activities.

31.     In short, the Debtors' proposal to use EBITDAR targets for its Semi-Annual Incentive Awards is not properly tailored to this case because it provides no incentive for the Covered Employees to control restructuring or interest costs, and would give the Covered Employees credit for cost-savings that have not been achieved by their efforts.

32.     Thus, if the Debtors' Semi-Annual Incentive Awards are to be paid at all, they should be based on a more appropriate metric, such as revenue increases, that actually reflect the contributions made by the Covered Employees in growing the Debtors' business.

### 2.     **The Emergence Plan Contains No Performance-Based Criteria at All**

33.     Upon the sale of substantially all of the Debtors' assets, or the effective date of a plan of reorganization for the Debtors, the Debtors' Emergence Plan provides for cash payments of $87,925,000 to the Covered Employees, apparently without regard to: (i) the sale price realized for the Debtors' assets; (ii) the enterprise value of the Reorganized Debtors; or (iii) the return provided to the Debtors' creditors.

34.     In short, the Debtors propose to provide substantial cash payouts to the Covered Employees at the end of the Debtors' chapter 11 cases regardless of the level of success achieved, as long as the cases are not dismissed or converted to chapter 7.

35. As currently drafted, the Emergence Plan does not require the Covered Employees to meet any meaningful performance standards – it only requires that they bring the Debtors' cases to a conclusion. In the absence of some meaningful qualitative standards governing what constitutes a successful resolution of the Debtors' cases, the Emergence Plan is a profoundly wasteful use of estate assets, and should not be approved.

**D.      The Debtors Cannot Predetermine the Contents of
         Their Plan Without an Affirmative Creditor Vote**

36. Finally, the Debtors' proposal to set aside 10% of the equity of the Reorganized Debtors for the benefit of the Covered Employees under an as yet unfiled and unapproved plan of reorganization is contrary to law and cannot be sanctioned.

37. Under applicable law, it is clear that "[w]hen a proposed transaction specifies terms for adopting a reorganization plan, 'the parties and the district court must scale the hurdles erected in Chapter 11.'" In re Continental Airlines, Inc., 780 F.2d 1223, 1226 (5th Cir. 1986).

38. In this case, the Debtors have not yet even filed a plan of reorganization for consideration by their creditors, let alone garnered sufficient support for that plan to support confirmation. Nevertheless, the Motion proposes to give away 10% of the equity interests of the Reorganized Debtors, with an estimated value of $400 million, supposedly as an incentive for the Covered Employees to do their jobs well and expeditiously.

39. WTC shares the Debtors' goal of accomplishing a speedy reorganization that maximizes the value of the Debtors' assets for the benefit of the Debtors' creditors and other parties in interest. However, at this early stage of the case, it is entirely inappropriate for the Debtors to attempt to short-circuit the ordinary plan negotiation and development, solicitation, and voting process in an attempt to secure a substantial benefit to their insiders.

40.     Although the Motion states that "the Debtors intend to seek creditor agreement or court approval, pursuant to a plan of reorganization to set aside 10% of the equity in the reorganized entity for approximately 600 U.S. and foreign executives," Motion ¶ 33, the Motion was made on the first day of this case and there was no negotiation whatsoever with creditors. Although a negotiation with creditors over what, if any, equity participation management would have in a reorganized debtor would be appropriate when plan negotiations begin, the Debtors are seeking approval of the KECP Programs now, so the Debtors' suggestion of negotiations as part of a plan process is meaningless.

41.     At present, however, the Court cannot approve the equity component of the Emergence Bonus Plan, because it is seriously flawed. The Debtors assume that the reorganized debtor will have a value of $4 billion. Consequently, the 10% equity component will be worth $400 million which, the Debtors apparently believe, is the amount necessary to incentivize management without unduly reducing creditor recoveries. The problem with this argument is that there is no way to project at this time what the value of the reorganized entity will be. If it is only $1 billion, then the $100 million value of the equity component will presumably be too small to incentivize management, while if the value of the reorganized debtor is more than $4 billion, then management that presumably would have been satisfied with $400 million will have been overpaid.

42.     Furthermore, if the assumption is that the reorganized debtor will be worth $4 billion upon emergence, then a grant of 10% of that value today provides management little incentive to increase that value. If management will receive $400 million to stay the course and remain employed until emergence, there is little incentive to take risks or exert substantial additional effort in order to increase that already substantial value.

43.    The equity component also provides a serious disincentive for the Debtors' executives to consider, or work to effectuate, a sale of all or substantially all of the Debtors' assets.

44.    Under the KECP Program, the cash component of the Emergence Bonus Plan is paid upon a sale or confirmation of a plan of reorganization. In contrast, the $400 million of value received by management under the equity component of the Emergence Bonus Plan is only received if a plan is confirmed. This gives management a $400 million incentive to prefer a plan of reorganization over an asset sale, even if an asset sale would be better for the estate and its creditors.

45.    Accordingly, the Debtors' proposal to set aside 10% of the equity of the Reorganized Debtors must be rejected.

E.    **Approval of the KECP Program May Harm Labor Negotiations**

46.    Moreover, in light of the Debtors' current circumstances, any benefits to be gained by providing increased compensation to the Covered Employees must be weighed against the potential detriments resulting from increased strain on the Debtors' already tenuous relationship with their hourly employees, from whom, accordingly to recent press reports, they have requested substantial wage and benefit cuts.

47.    The continuing productivity of the Debtors' hourly employees is clearly vital to a successful reorganization by the Debtors. Yet, there is no indication in the Motion that the Debtors ever gave any meaningful consideration to the negative impact that the KECP Programs might have on the Debtors' labor relations, and hence on the productivity of the Debtors' rank-and-file employees.

48.    Based on the information set forth in the Motion, the Debtors simply have not met their burden of demonstrating that a sound business justification exists for implementation of the

KECP Programs in their present form. The Motion identifies no evidence of a serious executive retention problem, and the Debtors have failed to explain how the speculative benefits of implementing the KECP Programs outweigh the certain harm to the Debtors' relationship with their non-executive employees that will result from their implementation. Accordingly, the Motion should be denied.

WHEREFORE, WTC respectfully requests entry of an Order denying the Debtors' Motion, disapproving implementation of the KEPC Programs in their current form, and granting such other and further relief as this Court deems just and proper.

Dated: New York, New York
       November 22, 2005

Respectfully submitted,

KIRKPATRICK & LOCKHART
NICHOLSON GRAHAM LLP

By: */s/ Edward M. Fox*
   Edward M. Fox (EF1619)
   A Member of the Firm
Counsel for Wilmington Trust Company, as
Indenture Trustee
599 Lexington Avenue
New York, NY 10022
(212) 536-3900