MEYER, SUOZZI, ENGLISH & KLEIN, P.C.
Attorneys for United Steelworkers
1350 Broadway, Suite 501
New York, New York 10018
212 239 4999
Lowell Peterson (LP 5405)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

In re:

DELPHI CORPORATION, et al.                    Case Nos. 05-44481 (RDD)
                                              Jointly Administered

                        Debtors.
------------------------------------------------------------x

## OBJECTIONS OF USW TO DEBTORS' MOTION FOR ORDER UNDER SECTIONS 105 AND 363 AUTHORIZING THE DEBTORS TO IMPLEMENT A KEY EMPLOYEE COMPENSATION PROGRAM

The United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union (USW), AFL-CIO (the "USW" or "United Steelworkers") objects to the Debtors' Motion for Order Under Sections 105 and 363 Authorizing the Debtors to Implement a Key Employee Compensation Program dated October 13, 2005 (the "KECP Motion").

1.      The USW is the exclusive bargaining representative of between 900 and 1,000 hourly employees employed at two of the Debtors' facilities at or around Dayton, Ohio. Among the international unions that represent Delphi employees, the USW represents the third largest complement. In addition, the USW is the "authorized representative" for purposes of Section 1114 of those persons receiving retiree benefits pursuant to the collective bargaining agreements between the Debtors and the USW.

2. The Debtors' collective bargaining strategy is known both to this Court and the national media. Among other things, the Debtors seek to reduce by almost two-thirds the wages paid to its hourly employees, to freeze and then terminate its defined benefit pension plans, and to eliminate its retiree benefit programs. The Debtors have been nothing if not blunt about its labor relations strategy. In what must be a first, the Debtors filed among its first day motions a pleading to establish a hearing schedule months in the future for hearings pursuant to Sections 1113 and 1114, this before the Debtors had even engaged in earnest collective bargaining. The USW comprehends from its experience representing employees in dozens of bankruptcies in the steel, iron ore, aluminum, metals, glass, and other industries that some degree of sacrifice is always possible. Nevertheless, most debtors understand that shared sacrifice is the norm. Delphi, and its CEO, Robert "Steve" Miller, are apparently the exception.

3. Placed in context, the KECP is the overreaching product of corporate hubris. At a time when it asks its workers and retirees to make unfathomable sacrifices, the denizens of Delphi's corporate suite seeks to line the pockets of a small number of top executives and arrogate to themselves 10% of the equity of the reorganized operation before even the first step is taken toward stabilization. Mr. Miller does not seek to reduce the salaries and benefits of those who surround him in the corporate offices and in the plants, and no one suggests that any manager will miss a paycheck in the bankruptcy case.[1]

4. The KECP consists of three components - a Revised Annual Incentive Plan which will provide cash payments to executives every six months; an Emergence Plan

---

[1] Although Mr. Miller is currently willing to allow the Debtors' Board of Directors set the "salary" component of his compensation retroactively at some point in the future, the Court should not lose sight of the fact that he received a $3million "signing bonus" earlier this year. He would also be eligible for the lucrative Emergence Bonus under the KECP.

2

which includes hefty cash payments and an astonishing 10% equity stake upon reorganization; and continuation of the generous severance pay plan. While the applicable standard of review is whether the Debtors' are acting within their business judgment, the KECP, when placed in context, fails to satisfy even that standard.

### The Revised Annual Incentive Plan

5. A central fallacy of the Debtors' request is reflected in the KECP Motion itself. Paragraph 16 of the KECP Motion describes the Debtors' "incentive based compensation programs" which, because of "the Debtors' historic financial performance", allegedly failed to pay salaried and executive personnel enough to keep pace with "the industry norm". That, of course, is precisely how incentive based compensation programs are supposed to work. People earn more money if the company meets defined financial targets, which the Debtors and its management have failed to do. These compensation programs should not provide rewards if the company falls short of its targets and fails to make money. Presumably, if the Debtors had met their financial targets - if the company had made money - then they would not be in Chapter 11.

6. It is possible (although there is no record evidence of this) that salaried and executive employees of other companies in the automotive industry receive higher compensation at this moment in time.[2] If those employees are paid pursuant to incentive based compensation programs, the logical conclusion is that they are making more money because their companies are making more money. These Chapter 11 cases should not be the opportunity for management to catch-up to their industry cohorts.

---

[2] Exhibit "A" to the KECP Motion compares certain features of the Program with programs at other employers as a percentage of revenues. These comparisons yield no information with respect to the actual pay received by executives.

3

7. In any event, and perhaps most importantly, neither the KECP Motion nor the Program description which is Exhibit "A" to the Motion offer any indication of what the EBITDAR targets will be, or how often they will be revised. This lack of definition invites manipulation by top management. The only thing we can judge for certain is that, because the Debtors believe their executives are being underpaid under the current system, the goal will be to ensure that executives receive substantial payments under the Revised Incentive Plan.

8. Exhibit "A" to the KECP Motion estimates the payouts to be $21.5 million every six months. Page 10. It will be relatively easy for the Compensation Committee, without further review by this Court or any other responsible party, to fashion targets to meet that objective.

9. Thus the KECP Motion seeks authorization for a Revised Annual Incentive that will provide many tens of millions of dollars in extra compensation for executives based on as yet undefined targets, with the sole purpose of putting more pay into those executives' pockets. This is not in the interest of the creditors and should not be approved.

Emergence Bonus Plan

10. The KECP provides for substantial cash payments to executives solely on the basis that they have not quit before reorganization. Executives of debtor entities which are sold would share in the cash, as would executives who are terminated. The KECP would also hand over 10% of the reorganized company to a small number of executives.

11. The KECP Motion asserts that the KECP "does not include a retention or stay component which differentiates it from other incentive programs and the issues raised in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005." Paragraph 20. This intriguing contention is belied by the KECP description which is Exhibit "A" to the KECP

4

Motion. Beginning with page 17 of the Exhibit, the Debtors analyze the KECP by comparing with "other large companies which have put in place retention programs." (Emphasis added.) One of the stated goals of the Program is to "motivate and retain" its employees. Exhibit "A" at p. 15. (Emphasis added.) .

12.     These admissions are not surprising. To receive the Emergence Bonus, all an executive has to do is to refrain from quitting. These are retention payments, pure and simple. But, Delphi still insists that the KECP is not a retention program

13.     Contrary to the Debtors' assertion, the Emergence Bonus is precisely the kind of program which would be prohibited by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.[3] While the BAPCPA does not apply, this Court should examine the Debtors' conduct through the lens of this statement of public policy. The relevant provisions have been codified at 11 U.S.C. Section 503(c), which prohibits payments to insiders (which includes many of the "key employees" covered by the KECP) for the purpose of inducing the person to remain with the debtor's business unless the court finds "based on evidence in the record" that the payment is "essential to the retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation" and that the person's services "are essential to the survival of the business". 11 U.S.C. Section 503(c)(1)(A), (B). Moreover, the payments cannot be made if there were no similar payments to nonmanagement employees in the calendar year.

---

[3]     In numerous news articles published before the petition date in these cases, Mr. Miller expressed that it was desirous for the Debtors to file chapter 11 petitions before the BACPA took effect on October 17, 2005. As the KECP would most likely fail to pass muster under the BACPA, it appears that one of the main reasons, if not the sole reason, for Mr. Miller's timing related to enhancing the possibility of the approval of the KECP.

5

14. The Emergence Bonus is not conditioned on any job offers or on any finding that the recipients' service are "essential to the survival of the business", and the Debtors will certainly not be paying any similar amounts to nonmanagement employees. To the contrary, it is uncontroverted that management has made it clear that it seeks to slash the compensation of hourly employees in every conceivable fashion.

15. Perhaps the Debtors think that, because the Emergence Bonuses will not be paid immediately, they would pass muster under BAPCPA. This would ignore the fact that the Emergence Bonuses in effect vest upon approval of the KECP. The executives covered by the KECP are entitled to receive the Bonuses simply by sticking around until their divisions are terminated or until reorganization.

16. The Debtors have provided cost figures for this component of the KECP - nearly $88 million, almost $9 million of which would go to four executives. Another 18 executives would receive cash payments of between $550,000 and $1.1 million each.

17. One might think that this amount of cash might be a sufficient retention bonus. But the Debtors also propose to give 600 executives 10% of the equity in the reorganized company. According to Exhibit "A", assuming an overall equity value of $4 billion, the top five officers will receive a breathtaking $25 million worth of stock options and $12.5 million in restricted stock.

18. Moreover, it is far too early in these proceedings to permit the Debtors to commit any amount of the equity in a reorganized entity, let alone a full 10%. Given the deep and slashing concessions that the Debtors demand of its hourly employees and retirees, it is altogether possible that the workers and retirees could merit obtaining large equity stakes in the reorganized company. As other creditors likewise could demand large equity positions in light

6

of their significant claims, the equity that management wishes to deal to itself in the first six weeks of the case could impede any reorganization. Moreover, it would appear that management would have an irreconcilable conflict in considering any possible sale of assets which would eliminate their individual interest in receiving 10% of the equity of reorganized Delphi.

19. The equity award is not in exchange for a release of valid claims against the estate, or a compromise of a dispute between the Debtors and any creditors. It is simply a gift to executives by executives.

### Severance Program

20. One might think that the affected executives would be quite satisfied with the extraordinary payments they can receive under the Revised Annual Bonus and Emergence Bonus portions of the KECP. Apparently not.

21. On top of these lucrative packages, the executives would retain their severance packages of 12 to 18 months of compensation (including the target bonus for many). These payments would be on top of the cash portion of the Emergence Bonus. Assuming 30% of the executives are terminated, the severance pay alone would cost the estate another $30.5 million according to Exhibit "A".

22. Thus, the executives of what is apparently (if the Debtors' statements to the press are to be believed) one of the most colossal failures of a manufacturing firm in American history stand to become quite wealthy simply by staying on the job. If they are terminated, they will still receive hefty severance pay on top of their generous Revised Annual Incentives. If their operating entities are sold off or shuttered, they will receive pro rata Emergence Bonuses in addition to severance pay. Within the executive suite the Debtors' largess seems to know no bounds.

23.     The Debtors apparently do not contend that the severance plan would comport with BAPCPA. It certainly would not. Under 11 U.S.C. Section 503(c)(2), insiders cannot be paid severance except pursuant to "a program that is generally applicable to all full-time employees". 11 U.S.C. Section 503(c)(2)(A). The severance amounts cannot be greater than 10 times the mean severance paid to nonmanagement employees in the same calendar year. 11 U.S.C. Section 503(c)(2)(B). The Debtors would not meet either of these requirements.

### General Observations

24.     The Second Circuit in In re Lionel Corporation, 722 F.2d 1063 (2d Cir. 1983), instructed that in considering whether a debtor has exercised its business judgment,

> ". . . a bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest groups; rather, he should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike."

In re Lionel Corp., 722 F.2d at 1071. See Stephens Industries, Inc. v. McClung, 789 F.2d 386, 389 (6th Cir. 1986) (adopting the Lionel reasoning). Here, the vocal special interest group that is advocating the approval of the KECP is management itself. The Debtor did not discuss the KECP with the USW prior to filling the Motion, thus illustrating the Debtor's failure to appropriately exercise their business judgment. See In re Geneva Steel Co., 236 B.R. 770, 773 (Bankr. D. Utah 1999) (finding that "to propose [a] retention program without having discussed its provisions with [the union] is not an example of sound business judgment").

25.     The "bottom line" is that the Debtors seek authorization to pay a relatively small number of executives hundreds of millions of dollars in compensation above and beyond their regular salaries and benefits. The lion's share of that fortune would be directed to the top two dozen officers.

8

26.     This incredible bounty -- hundreds of millions of dollars -- will be paid out regardless of an individual executive's actual contribution to the Estate. Many millions of dollars will be paid out even if the Debtors crumble and liquidate. If they make it to reorganization, the executives will become even wealthier, regardless of whether the reorganized entity is sickly or robust.

27.     The KECP Motion has not been submitted in a vacuum. The Debtors' CEO, Steve Miller, has stated repeatedly in the press that the non-executive employees will be expected to endure pay and benefit reductions of absolutely horrendous magnitude. He has made it clear that, if the various unions which represent most of the hourly employees do not agree to these draconian cuts, he expects this Court to impose them. Indeed, that process has begun and is right on schedule. See Geneva Steel, 236 B.R. at 733 (stating that "[t]he court views the support and participation of the [union] as being equally critical to [the doctor's] successful reorganization as the support and participation of the key employees").

28.     In the context of this well-orchestrated campaign to bludgeon the tens of thousands of men and women who have devoted their careers to the Debtors' business out of the middle class and into the ranks of the working poor, the extraordinary largesse which the KECP would ladle into the executive suites simply shocks the conscience.

29.     To the extent that the Debtors are actually interested in reaching agreements with the USW and the other unions to modify wages, benefits, and other terms and conditions of employment -- as opposed to merely pretending to try as an annoying predicate to judicial rejection of the collective bargaining agreements -- the fact is that the unions' members have to vote to ratify any changes. We respectfully suggested that the prospects of ratification would be significantly imperiled by the incredibly rich payments executives would receive under

9

the KECP. This Court should place itself in the shoes of workers who may be asked to ratify deep concessions to their own wages and benefits (as well as the retiree benefits paid to their retired colleagues, many of whom may be parents, uncles and aunts, and other loved ones), while management seeks to line its pockets. It is untenable to suggest that the workers could or should set aside the outrages embodied in the KECP. Given the manner in which the KECP could imperil ratification, it goes without saying that the failure of the parties to agree on contract modifications would not be helpful to reorganization. Nevertheless, the Debtors and Mr. Miller are willfully blind to the consequences of their decisions.

30. For all of the reasons set forth herein, the KECP Motion must be denied.

Dated: November 22, 2005

MEYER, SUOZZI, ENGLISH & KLEIN, P.C.

By: _____/s/ LOWELL PETERSON
    Lowell Peterson (LP 5405)

1350 Broadway, Suite 501
New York, New York 10018
212 239 4999
212 239 1311 (fax)
lpeterson@msek.com

David R. Jury
Assistant General Counsel
United Steelworkers
Five Gateway Center, Room 807
Pittsburgh, Pennsylvania 15222
(412) 562-2545
(412) 562-2429 (fax)
djury@steelworkers-usw.org

Attorneys for United Steelworkers