Babette A. Ceccotti (BC 2690)
Joseph J. Vitale (JV-0415)
COHEN, WEISS AND SIMON LLP
330 West 42nd Street, 25th Floor
New York, New York 10036-6976
(212) 563-4100

- and -

Niraj R. Ganatra
International Union, UAW
8000 East Jefferson Avenue
Detroit, MI 48214
(212) 926-5216

Attorneys for International Union, UAW

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| DELPHI CORPORATION, *et al.*, | ) |
| | ) Case No. 05-44481 (RDD) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**OBJECTION AND MEMORANDUM OF UAW IN OPPOSITION TO
DEBTORS' MOTION FOR AN ORDER AUTHORIZING DEBTORS
TO IMPLEMENT A KEY EMPLOYEE COMPENSATION PROGRAM**

International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW" or the "Union"), by its undersigned counsel, objects as follows to the Motion for Order Under §§ 105 and 363 Authorizing Debtors to Implement a Key Employee Compensation Program (the "KECP Motion"):

**Introductory Statement**

1. The UAW is the exclusive collective bargaining representative of 24,000 hourly production and maintenance employees employed at twenty-one Delphi facilities located throughout the country. UAW also serves as the authorized representative of nearly 10,000

00082847.DOC.1

retirees. UAW-represented workers represent almost half of the company's U.S. workforce. Delphi is the largest of fourteen automotive supply companies that have filed bankruptcy cases in recent years. UAW represents approximately 12,000 workers combined at these companies and has participated actively in the bankruptcy cases in this sector.

    2. Delphi's high profile bankruptcy case takes broad aim at its hourly work force.[1] The company has repeatedly made known its determination use the chapter 11 process to cut back its retiree ("legacy") liabilities and modify its labor agreements with the UAW. *See, e.g.*, KECP Motion, ¶ 13. Amidst threats of plant closures and declarations that its hourly workers must accept dramatic cuts in wages and benefits, Delphi asks the Court to approve a rich package of bonus, incentive and severance payments and stock grants for selected executives that would commit the estate to $42 million a year in payouts for the duration of the bankruptcy case and cash emergence payments of $89 million. Severance commitments, including enhanced severance for some 21 executives, could add payments of up to $145 million. In addition, without even a proposed business plan, and before any meaningful participation by creditors and key stakeholders in the reorganization process, the KECP would grant 10% of the equity in reorganized Delphi to 600 chosen executives on emergence, a component of the program valued at an astonishing $400 million. An up-front grant of this scope and magnitude is clearly inappropriate and may well be unprecedented.

    3. UAW opposes the KECP Motion because it is grossly excessive and an imprudent use of estate assets. In addition, the KECP destroys any notion that Delphi's bankruptcy will require shared sacrifice. The damage to employee morale--already volatile as a result of the bankruptcy filing and the company's pronounced and very public assault on the

---

[1] *See* "Passing the Bucks," *The New York Times*, Editorial, A26, October 13, 2005.

labor agreements--would unduly and unnecessarily complicate an already difficult reorganization by impeding the Union's ability to reach a consensual restructuring agreement with Delphi. Word of the KECP has already provoked widespread anger and resentment in the workforce, where the company's message has been that the reorganization will mean difficult economic sacrifices for hourly and non-executive salaried employees.[2] Designed to handsomely reward a select few with oversized payments, the KECP is decidedly the "wrong message" to send to Delphi's workers.  The motion should be denied.

### The Proposed KECP

4.     The KECP Motion covers three types of compensation.  An annual incentive bonus program would offer six-month bonus "opportunities," based upon undefined EBITDAR levels, for the duration of the bankruptcy.  Expressed in six-month costs estimated at $21.5 million, this component would cost $43 million per year until exit from bankruptcy.  *See* KECP Motion, Ex. A, p. 10.  The performance targets have not been set, and the target for only the first performance period will be set before year end.  The EBITDAR measure excludes restructuring charges, thus eliminating an incentive to reign in costly cash expenses in a category susceptible to manipulation.  The program's cost is expressed in aggregate terms, so that individual amounts (or the manner in which they will be awarded) are not described and cannot be evaluated.

5.     Second, the program proposes an Emergence Bonus plan consisting of cash and equity.  The cash component consists of payments estimated at $88 million for some 486 managers.  Lump sum payments would be made upon the effective date of plan of

---

[2] *See* Declaration of Steve A. Grandstaff in Support of Objection and Memorandum of UAW in Opposition to Debtors' Motion for an Order Authorizing Debtors to Implement a Key Employee Compensation Program, ("Grandstaff Dec."), submitted herewith, ¶¶ 3-5.

- 3 -

reorganization, or any sale of substantially all of the assets. There is no performance requirement for receipt of these payments.[3] The allocation and amounts are only generally described to be based upon level of responsibility in the company's organization. KECP Motion, ¶ 29. Some payments would be as much as 280% of salary. *See* KECP Motion, Ex. A, p. 12. In addition to the emergence cash bonus, the KECP proposes to grant 10% of the reorganized Delphi's equity to some 595 executives, including some in non-Debtor entities. The estimated value of the equity component (one third of which would be granted as restricted stock and the remainder in stock options) is $400 million, including $25 million in stock options and $12.5 million in restricted stock for the top five officers. Again, the allocation method cannot be evaluated.

6. The third component refers to a pre-petition severance program, including an enhancement made just prior to the bankruptcy filing that increased the severance entitlements for 21 executives from 12 months' salary (base pay plus target bonuses) to 18 months' salary. Total severance estimates for the 13,000 employees and executives covered by the severance program range from $30 million to $145 million.

**A Deferential Standard of Review is Not Appropriate Because the
Program Seeks to Reward the Debtors' Insiders and Top Executives**

7. Although the Debtors have sought relief under Section 363(b)(1) and contend that they are entitled to a presumption regarding their business judgment, *see* KECP Motion, ¶ 38, courts have undertaken an independent review of programs of this type, regardless of the standard articulated. Programs such as the KECP have, as the *U.S. Airways* court noted,

> something of a shady reputation. All too often they have been
> used to lavishly reward--at the expense of the creditor body--the

---

[3] Although the Debtors state that the program "does not include a retention or stay component," KECP Motion, ¶ 20, the emergence payments appear to be based solely on retention.

- 4 -

>        very executives whose bad decisions or lack of foresight were
>        responsible for the debtor's financial plight. But even where
>        external circumstances rather than the executive are to blame, there
>        is something inherently unseemly in the effort to insulate the
>        executives from the financial risks all other stakeholders face in the
>        bankruptcy process."

*In re U.S. Airways, Inc.*, 329 B.R. 793, 797 (Bankr. E.D. Va. 2005). *See also*, *id.*, at 799-800 (court declined to approve a severance program in advance of plan confirmation, applying a "fair and reasonable" test requiring "careful consideration of" objections by the unions and the U.S. Trustee); *In re Regensteiner Printing Co.*, 122 B.R. 323 (N.D. Ill. 1990) (rejecting the business judgment test for executive compensation program and requiring proponents to prove fairness to the estate and to creditors). An objection by the union representing the debtors' hourly employees caused the court in *Geneva Steel* to decline approval of a key employee incentive and severance plan. The court rejected the routine application of the business judgment rationale under the circumstances and concluded that proposing the plan without consulting with the union whose support and participation in the bankruptcy is critical "is not an example of sound business judgment." *In re Geneva Steel Co.*, 236 B.R. 770, 773 (Bankr. D. Utah 1999).

        8.     As a transaction involving compensation to insiders, the KECP should be subject to "rigorous scrutiny." *See Pepper v. Litton*, 308 U.S. 295, 308 (1939). The program should be reviewed for "inherent fairness" and good faith and whether it "carries the earmarks of an arms' length transaction." *Id.* Debtors have been subjected to heightened scrutiny in other types of transactions where the beneficiaries are insiders or fiduciaries of the debtor. *E.g., In re Trident Shipworks, Inc.*, 247 B.R. 856, 865-66 (M.D. Fla. 2000) (lease transaction involving insider); *In re Angelica Films 57th, Inc.*, 1997 WL 283412, at *4 (S.D.N.Y. May 29, 1997) (lease purchase agreement with insider); *In re Bidermann Industries*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997) (leveraged buyout to insider's firm). Nominal input by the Board of Directors

- 5 -

should not insulate a compensation program, particularly one of this magnitude, from an independent review by the Court.

9. Congress has increased judicial review of programs of this type in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8 § 331, 119 Stat. 23, 102-03 (April 20, 2005), *codified as* Section 503(c) of the Bankruptcy Code. These amendments to the Bankruptcy Code were effective October 17, 2005, only days after Delphi's bankruptcy filing. Under newly effective Section 503(c), a retention-type obligation incurred for the benefit of an insider "shall neither be allowed nor paid" absent findings by the court, based upon evidence in the record, that the individual has a job offer at the same or greater rate of compensation, that the services provided by the individual are "essential to the survival of the business" and that the payments meet a strict monetary test. 11 U.S.C. § 503(c)(1).

10. Severance payments to insiders must be part of a program generally applicable to the workforce and also must be limited in amount. *Id.* at § 503(c)(2). Other obligations outside of the ordinary course of business, such as other types of compensation arrangements for officers and managers, must be "justified by the facts and circumstances of the case." *Id.* at § 503(d). Congress' purpose in enacting new Section 503(c) could not be more clear: key employee programs should be limited and based upon actual, demonstrable need rather than on speculation and largess. Even if they are not technically applicable to Delphi's bankruptcy by virtue of Delphi's filing date, the new provisions support rigorous scrutiny of the KECP given Congress' intent that such obligations be subject to specific, strict standards rather than a presumptive reliance on the Debtors' rationale.[4]

---

[4] Despite the Debtors' claim to the contrary, *see* KECP Motion, ¶ 20, the KECP is not distinct from the kinds of obligations covered by the new amendments. As noted above, the emergence bonus is simply a "stay" bonus and severance payments are expressly covered by new Section 503(c). The incentive bonus is also a type of retention payment since it is, presumably, designed to induce the Covered Employees to remain with Delphi, even though

## The KECP Is Excessive

11. According to the KECP Motion, the Debtors developed the KECP using outside compensation consultants and other professionals, and considered programs implemented by other chapter 11 companies. *See* KECP Motion, ¶ 19-22. But executive compensation scholars have criticized the use of survey data and so-called competitive analyses, and instead favor internal equity analyses that focus on company-specific factors. Overly generous benchmarking and other tactics contributed to a skepticism of consultants' surveys. *See* Lucian Bebchuk, et al., Symposium: *Executive Compensation and Takeovers,* 69 U. Chi. L. Rev. 751, 790-91 (2002) (describing "ratcheting" in executive pay surveys used by consultants).[5] The Debtors' effort to justify the KECP using the consultant's rankings of the components against various selected peer group companies cannot be considered persuasive, particularly as a principal basis for approval of the program.[6]

12. Moreover, the KECP would commit the estate to costly emergence payments and a significant grant of the equity of reorganized Delphi not even two months into the bankruptcy case. The emergence bonuses are not conditioned on any performance criteria and depend only upon the recipient's retention until confirmation or (in the case of the cash payments) a sale of assets. Delphi has not identified any other reorganization goals with the specificity that it has focused on labor costs. Yet it proposes a blanket gift of cash and stock to several hundred executives in the midst of investigations into accounting practices and without

---

certain unspecified performance criteria are also applied. The amendments do not exclude performance-based payments from scrutiny.

[5] *See also* Lucian Bebchuk and Jesse Fried, *Pay Without Performance* 71 (Harvard University Press 2004) (describing the "Lake Wobegon" effect, where everyone's pay is considered "above average"); Gretchen Morgenson, "Oohs and Ahs and Delphi's Circus," *The New York Times*, Nov. 13, 2005, § 3, atl.

[6] The peer group comparison presented in the survey includes companies in vastly different industries and reorganization circumstances. KECP Motion, Ex. A, p. 17. Thus, the reported compensation levels are likely inappropriate comparators in any event.

05-44481-rdd    Doc 1135    Filed 11/22/05    Entered 11/22/05 15:48:06    Main Document
        Pg 8 of 11

identifying any other reorganization initiatives or other costs (such as unprofitable supply contracts or excessive sales or other general administrative costs) that will be targeted for restructuring. Emergence payments and other consideration should be addressed in the context of plan negotiation, based upon outcomes and the recipients' contributions. Delphi's plan is backwards: the KECP presumes that the promise of payments and stock at emergence will lead the selected individuals to engage in reorganization-enhancing activities (and--other than the assault on the labor contracts--without defining what those activities might be).

          13.      Confirmation bonuses can be reasonably evaluated only at the end of the case, in the context of the outcome and other relevant criteria. In *America West*, for example, the court approved confirmation bonuses after considering the history of the case and the recipients' contributions to the reorganization. In addition, the court noted the "unique" bonus fund to be divided up among rank and file workers. *In re America West Airlines*, 171 B.R. 674, 677-8 (Bankr. D. Az. 1994). The court in *U.S. Airways* declined to approve severance payments for executives in advance of confirmation in order to avoid committing the estate to costly severance arrangements prior to the anticipated merger with America West. *In re U.S. Airways*, 329 B.R at 800-801 (finding that the significant severance liabilities could preclude or limit the consideration of alternative plans and were premature in advance of the intended merger).

          14.      The KECP suffers from other deficiencies as well. The performance measure for the annual incentive payments, based upon EBITDAR levels, is unreviewable since they have not been set. As noted above, there is no incentive to conserve reorganization costs, nor is there an incentive to progress toward emergence from bankruptcy or any other specific result that would enhance the prospects for reorganization. Delphi would simply continue to pay bonuses at $43 million per year for as long as the company remains in bankruptcy. Moreover, there is no basis to conclude that the level of payments proposed will have the intended effect of

inducing the Covered Employees to remain with Delphi in any event.[7] The untested presumption is that the Covered Employees will stay if promised the grants in the program. KERP programs are always speculative (and therefore deeply flawed) in this respect and this one involves rather costly speculation. If premised on the turnover rate, then the Debtors have not made the case for a talent flight to other companies. They cite a turnover increase of 75% among "executives," but no details. The departures may reflect any number of circumstances and may not be an indication of future departures of necessary talent.[8]

15. Although detail is lacking, the severance benefit does not appear to provide a mitigation requirement. *See U.S. Airways*, 329 B.R. at 800-801 (noting that severance "should not provide a windfall" to an employee who finds work shortly after termination). *See also Geneva Steel*, 236 B.R. at 773. Also, the cost of the prepetition enhancement of the severance benefit for the twenty one executives is not disclosed and therefore cannot be evaluated for reasonableness.

16. The KECP is poorly conceived and wasteful and an emergence program is certainly premature. Accordingly, the motion should be denied.

### The KECP is Detrimental to Employee Morale

17. The Debtors are apparently tone deaf to the effects of implementing a generous bonus and severance program for a select group on the remainder of the workforce. At a time when Delphi is proposing deep cuts in wages and benefits, and contemplating a severe contraction of its domestic operations that could leave tens of thousands of employees (both

---

[7] Without the details regarding the group of Covered Employees, it is not possible to evaluate whether this is an over-inclusive group (particularly given Delphi's plans to contract its operations) or whether their positions and duties in the enterprise merit rewarding retention.

[8] Watson Wyatt describes 60% of the executive quits as "future high potential individuals" or "successors" to positions held by immediate supervisors, signifying a turnover among subordinate ranks. KECP Motion, Ex. A, p. 6.

hourly and salaried) without jobs, deep resentment and anger over a program valued at over $500 million can neither be understated nor should it be ignored. Delphi is critically dependent on the participation of the UAW and UAW-represented employees for the success of its reorganization. The parties' ability to reach a consensual restructuring agreement is already significantly challenged. Delphi scheduled its Section 1113 proceedings as part of its first day motions [Docket No. 14] and is less than one month away from the date it intends to file labor contract rejection motions absent a consensually modified labor agreement. The company could not have picked a less hospitable time to seek approval of a rich payment package for its executives. Any negotiated modifications to the UAW labor agreements would require membership ratification. It is unlikely that the UAW will be able to garner the necessary support among its membership for a negotiated agreement if the employees view the process as tainted by large awards for a select few while they bear the brunt of the cost-cutting. *See* Grandstaff Dec., ¶¶ 4, 5. *See also U.S. Airways*, 329 B.R. at 799 (court notes that the "most compelling" objection to the bonus and severance program is employees' objection "that it represents a betrayal of the principle of 'shared sacrifice'").[9]

        18.    Union support in a difficult reorganization is an essential element of its success, a factor that is directly pertinent to consideration of the KECP. In *Geneva Steel*, the court declined to approve incentive and severance benefits because the company had proposed the program without consulting with the Steelworkers. The court found that, while there was evidence supporting the need for a retention program, there was also evidence that the program would jeopardize the union's continued support for the reorganization effort. The court

---

[9] At no point prior to, or since filing its chapter 11 petitions, has Delphi discussed or sought input, suggestions or guidance on either its pre-petition enhancement of severance packages for twenty-one enterprise-level executives or its much broader KECP.

- 10 -

concluded that proposing the program without consulting with the union was not an example of "sound business judgment," and noted that the union's support for the reorganization was "equally critical" to the participation by the key employees. *Geneva Steel*, 236 B.R. at 773-74 (citing other deficiencies as well, including the lack of a mitigation provision). Because of the damage to employee morale, and because UAW's ability to achieve a resolution with Delphi will be significantly hindered by the KECP, the Motion should be denied.

## **Conclusion**

For the foregoing reasons, the Debtors' Motion should be denied.

Dated: November 22, 2005

  /s/ Babette A. Ceccotti
Babette A. Ceccotti (BC 2690)
Joseph J. Vitale (JV-0415)
COHEN, WEISS AND SIMON LLP
330 West 42nd Street
New York, NY 10036
(212) 563-4100

- and -

Niraj R. Ganatra
International Union, UAW
8000 East Jefferson Avenue
Detroit, MI 48214
(313) 926-5216

Attorneys for International Union, UAW