# The New York Times
nytimes.com

November 13, 2005

## Oohs and Ahs at Delphi's Circus

By **GRETCHEN MORGENSON**

IT'S not every day that investors can view the contortions performed by compensation consultants trying to justify the monster executive pay packages that they recommend to corporate clients. And when these exercises in absurdity are done for executives asking for great sacrifices from workers, retirees, creditors and former shareholders because they manage a company in Chapter 11 bankruptcy protection, the entertainment is unmatched.

The ringside seat for this show comes courtesy of the Delphi Corporation, the automotive parts giant that filed for Chapter 11 on Oct. 8. The performers are Delphi's lawyers, Skadden, Arps, Slate, Meagher & Flom, and its compensation consultant, Watson Wyatt. The consultant said it was hired to devise incentive plans for the company's executives that would "align the interests of both program participants and company stakeholders and to benchmark such programs against competitive practice."

Brian Foley, a compensation expert in White Plains who scoured the Delphi plan, is dubious. "It starts off with usual alignment rationale, but the reality is it provides no explanation as to how that rationale works when the only people receiving payments are the 500 to 600 chosen," he said. "At the end of the day, you have shareholders, retirees, union employees and nonunion workers who get nothing under this. Align that."

The Watson Wyatt plan - 35 pages in all - was filed with the bankruptcy court overseeing the Delphi case in New York. Accompanying the plan was a brief from Delphi's lawyers arguing that the company's managers must be "appropriately incentivized to maximize the financial performance" of the company. A hearing on the plan is scheduled for Nov. 29.

Delphi, which has 185,000 employees, argues that its woes are a result of high union wages, a fiercely competitive industry and rising commodity prices. The company plans to turn itself around, according to its lawyers, by improving its manufacturing and "eliminating noncompetitive legacy liabilities and burdensome restrictions under current labor agreements." Put in plain English, that means dumping its pension liabilities on American taxpayers and cutting its workers' wages and retirees' health and life insurance.

Workers at Delphi earn good money - $26 to $30 an hour in many cases. And the company is bizarrely forced to pay 4,000 current workers who no longer have jobs.

But when a company jettisons a pension that is underfunded by $11 billion, according to the Pension Benefit Guaranty Corporation, and proposes cuts of up to two-thirds in workers' pay and deep reductions in retiree benefits, you would think that its executives might want to share the pain.

You would, however, be mostly wrong.

Yes, Robert S. Miller, Delphi's chief executive, has accepted annual compensation of $1, starting Jan. 1. And, yes, some of the company's highest-ranking officials who were at Delphi before its bankruptcy filing have agreed to take a 10 percent or 20 percent cut in salary. (To make ends meet, Mr. Miller will have to rely on the $3 million signing bonus he received upon his arrival at Delphi in July.)

But the mountain of money that will remain on the Delphi executives' table if the plan goes through makes those give-ups look meager.

Interestingly, nowhere in the plan filings does Delphi concede that mismanagement in the executive suite had anything to do with its problems. In fact, the documents draw a picture of a company that has been managed splendidly over the years. Never mind that Delphi accounting practices are under investigation by the Securities and Exchange Commission or that the company has recorded losses of $6.3 billion in the last seven quarters.

And pay no attention to the fact that the company itself has turned up accounting irregularities from 2000 to 2003 relating to its dealings with suppliers like EDS. One effect of the irregularities was to enhance Delphi's earnings.

ALL of these facts are irrelevant to the matter at hand: taking care of those at the top.

And how the money stacks up. The salaries first: even accounting for the pay cuts, the top four executives at Delphi, not counting Mr. Miller, would receive a total of $3.1 million a year.

Then come incentive bonuses, to be awarded by using a new and unimproved performance hurdle at the company: earnings before interest, taxes, depreciation, amortization and restructuring costs. Interesting to remove restructuring costs from the equation - it means that management no longer has an incentive to keep control of those expenses. "Shouldn't somebody be responsible for that, or is this supposed to be a feeding frenzy?" Mr. Foley asked.

It is impossible to determine what the performance goal is for Delphi executives hoping to earn their incentive bonuses. Under the terms of the plan, the company's compensation committee of the board has until year-end to set the hurdle rate. That seems like a detail the bankruptcy court may want to have as it ponders the package.

The incentive bonus program, to be divided among an unspecified number of Delphi executives, has an estimated cost of $21.5 million for the first six months, Watson Wyatt said. That amount equals the entire compensation paid for all of last year to Toyota's 33 top executives, a group that oversees a highly profitable company in the automotive business.

But wait, there's more. An additional $88 million in cash would go to Delphi's top 500 employees when it emerged from bankruptcy proceedings or if the company's assets were sold. The top four executives - again, excluding Mr. Miller - would receive a total of $8.9 million of this, or 10.1 percent.

"The cash part of the plan goes to the executives either on the effective date of a reorganization or on the sale of substantially all the assets," Mr. Foley pointed out. "But there is no floor on the sale of assets, so if they conduct a real fire sale, they still get the $88 million. Why is that a good deal for bondholders, retirees and workers?"

Then there is the stock to be handed to 600 managers after the reorganization is successful: 10 percent

of the shares outstanding. Because some of this would be available for immediate sale after the reorganization, it resembles a gift more than an incentive plan, Mr. Foley said.

In the illustration used by Watson Wyatt, the four high-ranking executives, plus a new chief executive, would together receive stock options worth $25 million and restricted shares worth $12.5 million. One-quarter of the restricted stock would vest immediately.

Add to this a severance program under which 21 officers would receive 18 months of salary and target bonuses, 89 senior managers would get a year of pay and target bonuses and 373 executives would receive a year's salary. If all of the executives were terminated and took their severance, the cost to Delphi would be $145.5 million, the filing estimated. If 30 percent left, the cost would be $30.5 million.

Watson Wyatt declined to comment on the Delphi plan. Claudia Baucus, a Delphi spokeswoman, argued that the company must retain its executives who possess knowledge of Delphi's business that is not easily replaced in the open market.

But isn't the automotive business contracting? Aren't there legions of industry executives who would work for food?

"We need the knowledge base that is here now to get us through the next 12 months," Ms. Baucus said.

The filing also makes an oblique reference to "six-figure signing bonuses" that the company has paid to attract new executives. This troubles Mr. Foley. "They reference the sign-ons but conveniently forget to tell the court how much they were," he said. "In the real world, when you get a sign-on you usually agree to give it back if you leave. So aren't those people locked in?" In other words, why does anyone in receipt of such a bonus need further inducements to stay?

Delphi's advisers also argue that in recent years, its executives have had to endure pay that was "substantially less than market." Yes, and isn't that what pay for performance is supposed to be about? This was a company generating losses not only in its books, but also for its investors.

But Ms. Baucus said that while certain elements of Delphi's compensation were performance-based, others had to be based on industry standards, and therefore increased.

The consultant justifies the incentive payouts to Delphi executives by comparing the numbers with higher figures of previous years. But Mr. Foley asked: "In good times you pay management a lot of money, and in bad times you pay them a lot of money based on what you paid them in good times?"

But the funniest rationale is the firm's disclosure, apparently deadpan, that the pay program must take effect or the terrible brain drain at Delphi will continue. "Executive turnover has increased almost 75 percent in the last 12 months," the filing noted. "In the critical finance function, turnover has more than doubled."

Could this finance turnover have been directly related to the accounting irregularities at Delphi? Since March, five finance executives have either resigned or been replaced. Ms. Baucus said that it was difficult to determine why these executives left.

ONE Delphi finance executive who remains at the company and is in line to receive some of the pay

pile if the bankruptcy court approves the plan is John D. Sheehan, the chief restructuring officer. A former chief accounting officer, Mr. Sheehan is a defendant in a class-action suit, filed against Delphi, its directors, former executives, underwriters and auditor. The suit, filed on behalf of the Teachers Retirement System of Oklahoma, Public Employees' Retirement System of Mississippi and other Delphi stockholders and bondholders, contends that Delphi engaged in a broad and complex scheme to defraud investors and to hide bad financial results at the company for five years beginning March 2000. The suit cites interviews with former Delphi employees and current and former employees of companies that had dealings with Delphi during the years that the accounting irregularities occurred.

Ms. Baucus said that neither the company nor Mr. Sheehan would comment on the litigation.

In summarizing why Delphi's executives deserve what can only be described as a fat pay package, the company's lawyers made this one last pitch: "Approval of the key employee compensation program will boost employee morale," the filing said.

Truly a Marie Antoinette moment.

Copyright 2005 The New York Times Company  | Home  | Privacy Policy  | Search  | Corrections  |  XML  | !