**Exhibit B**

FILED

2005 11 P 3 00

U.S. BANKRUPTCY COURT
SAVANNAH, GA.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION

| | |
|---|---|
| In re: | ) Case No. 05-40129 |
| | ) |
| FRIEDMAN'S INC., et al., | ) Chapter 11 |
| | ) Jointly Administered |
| | ) |
| | ) Hon. Lamar W. Davis, Jr. |
| Debtors. | ) |

## MOTION FOR ORDER AUTHORIZING THE DEBTORS
## TO IMPLEMENT A KEY EMPLOYEE COMPENSATION PROGRAM

Friedman's Inc. ("Friedman's") and seven of its subsidiaries and

affiliates, debtors and debtors-in-possession in the above-captioned cases (collec-

tively, the "Debtors"), hereby move (the "Motion") for an order, substantially in the

form attached hereto as <u>Exhibit 1</u>, pursuant to sections 105(a) and 363(b)(1) authoriz-

ing the Debtors to implement a key employee compensation program.  In support of

this Motion, the Debtors respectfully represent as follows:

### BACKGROUND

1.      On January 14, 2005 (the "Petition Date"), the Debtors each filed a

voluntary petition in this Court for reorganization relief under chapter 11 of the

United States Code, 11 U.S.C. §§ 101-1330 (as amended, the "Bankruptcy Code").

The Debtors continue to operate their businesses and manage their properties as

debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

358

2.      On January 24, 2005, the United States Trustee appointed an official committee of unsecured creditors (the "Creditors' Committee") in these cases.  No trustee or examiner has been appointed.

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

4.      The statutory predicates for the relief requested herein are sections 105(a) and 363(b)(1) of the Bankruptcy Code.

RELIEF REQUESTED

5.      By this Motion, the Debtors seek authority, under sections 105(a) and 363(b)(1) of the Bankruptcy Code, to implement a key employee compensation program (the "Key Employee Compensation Program"), as described herein, and as more fully set forth in Exhibit 2 attached hereto.  The purpose of the Key Employee Compensation Program is to retain and incentivize Key Employees (as defined below) during the Debtors' restructuring period. The Debtors have worked closely with the Creditors' Committee on the development of the Key Employee Compensation Program and understand that the sub-committee of the Creditors' Committee created to review such program fully supports the relief requested herein.

BASIS FOR RELIEF

A.    Importance of Key Employees

6.    As the Debtors restructure, retaining key personnel with an understanding of the Debtors' operations and relationships with vendors, customers and other employees is crucial to the Debtors' ability to successfully emerge from chapter 11 protection.  Because the Debtors anticipate conducting a stand-alone reorganization, it is also crucial that those employees who are best able to guide the Debtors to a successful turnaround be appropriately incentivized to maximize the financial performance of the Debtors' operations.  The ability of the Debtors to execute their restructuring strategy will be impaired severely if they cannot retain key management employees.

7.    In addition, the commencement of a bankruptcy case heightens employee concerns regarding possible job loss, and often increases employee responsibilities, creates longer hours and imposes other burdens as a result of a debtor's status as a debtor-in-possession.  Thus, at a time when the Debtors most need the continued efforts and loyalty of Key Employees, they must ensure that they do not lose those employees to competitors or other employers who may be perceived as providing more stable employment opportunities.  In order to address these concerns, the Debtors have developed the proposed Key Employee Compensation Program.

3

8.     The Key Employee Compensation Program has been negotiated extensively with the Creditors' Committee, and the Debtors delayed the filing of this Motion in order to provide information to the Creditors' Committee and to obtain the support of the Creditors' Committee  As a result of this collaborative effort, the relief requested herein has been approved by the key employee compensation sub-committee of the Creditors' Committee.

B.     Development of the Key Employee Compensation Program

9.     In order to address the problems related to potential Key Employee turnover during these cases, the Debtors began the process analyzing and developing a cost sensitive, yet effective, overall employee program.   The Debtors first evaluated their existing compensation structure and incentive plans and obtained input from their board and senior executives to identify the Key Employees and consider the appropriate levels of incentives.  The Debtors also received input from certain financial advisors, legal advisors and compensation experts, including Jefferies & Co., Inc. ("Jefferies"), Kroll Zolfo Cooper ("Kroll"), Watson Wyatt Worlwide ("Watson") and their counsel, Skadden, Arps, Slate, Meagher & Flom, LLP ("Skadden").

10.     The Key Employee Compensation Program differs from other incentive programs and the issues raised in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 in that the Key Employee Compensation Program does not

4

include a retention or stay component. The primary reason for the elimination of a

retention component and the inclusion of a fully developed exit plan that has been

approved by the Creditors' Committee is to focus the Key Employees and encourage

them to complete an efficient and successful reorganization.

11.    In developing the Key Employee Compensation Program, the Debtors

considered specific incentive programs implemented by other retail companies in

chapter 11, including, but not limited to, the following: The Athlete's Foot Stores,

LLC, AmeriKing, Inc., Ames Department Stores, Inc., Bradlees Stores, Inc.,

Breuners Home Furnishings Corporation, Core-Mark Holdings Co., Factory 2-U

Stores, Inc., Footstar, Inc., Frank's Nursery & Crafts, Inc., Gadzooks, Inc., Heilig-

Meyers Company, KB Toys, Inc., Kmart Corp., New Weathervane Retail

Corporation, Samuel Jewels, Inc., Spalding Holdings, Inc., Spiegel, Inc. and ZB

Company, Inc.

12.    For example, the key employee retention program approved in Ames

Department Stores, Inc.[1] had three components. First, key employees could receive a

retention bonus of up to 15% to 50% of annual base salaries. These bonuses were

designed to incent employees to stay with the company through its reorganization.

Second, the debtors modified the pre-petition incentive plan by reducing the amount

---

[1]In re Ames Department Stores, Inc., Case No. 01-42217 (REG) (Bankr.
S.D.N.Y. December 2001)

5

of awards to just over half of the cost of the pre-petition program. Bonuses under the incentive plan were based on financial targets which, if met, would have allowed employees to receive a bonus between 3% and 20% of their annual base salary. If targets were exceeded, employees would receive a bonus between 6% and 40%. Third, the debtors implemented a severance plan which provided for severance payments of up to three times base salary for Ames' top executives.

13.     In the experience of the Debtors' restructuring professionals, the structure of the Ames key employee retention programs are typical of most programs adopted by other chapter 11 debtors. Reviewing these and similar programs was helpful in developing a basis from which the Debtors could develop a plan suitable to their needs. Based on their analysis of the various programs, the Debtors, with the assistance of Jefferies, Watson, Kroll and Skadden, undertook the development of the Key Employee Compensation Program. As stated above, the Debtors also worked closely with the Creditors' Committee on the development of the Key Employee Compensation Program.

14.     The Debtors determined that they required a program that would not only cause Key Employees to remain in the Debtors' employ during the chapter 11 cases, but which would also align the Key Employee's interests with the Debtors' stakeholders to encourage maximum effort and performance during the cases. To achieve those goals, the Debtors created an overall incentive program that

6

incorporates the most effective incentive components of the other employee plans the

Debtors reviewed.    Thereafter, the Debtors calculated the appropriate levels of

compensation that would strike the correct balance between the Debtors' goals of

retaining and motivating Key Employees while also being mindful of the duty to

manage these estates in a fiscally responsible manner and maximize stakeholder

recoveries.

15.    As discussed above, the Debtors began to develop the Key Employee

Compensation Program during January 2005 and over the past two months, the

Debtors worked through their board of directors, the Company's advisors and the

Creditors' Committee to refine the Key Employee Compensation Program.

Specifically, the Debtors have crafted the Key Employee Compensation Program to

ensure that the appropriate employees were included and were assigned levels of

compensation designed to achieve the desired goals.  Based on this analysis, the

Debtors believe that (a) the Key Employee Compensation Program is reasonable in

general and when compared against other plans approved in similar chapter 11 cases,

(b) the value of the Key Employee Compensation Program to the eligible employees

and the cost to the Debtors is consistent with the retention plans implemented by

other chapter 11 companies of comparable size, and (c) the Key Employee

Compensation Program strikes an appropriate balance between the employees' and

the Debtors' concerns.

7

C.    Summary of Key Employee Compensation Program[2]

Covered Employees

16.    The proposed Key Employee Compensation Program covers two subsets of the Debtors' employees.  One subset is comprised of 83, predominantly senior management-level employees who work at the company's headquarters, or "support center," in Savannah, Georgia (collectively, "Management").  The other subset of employees is comprised of approximately 3,000 non-management employees, including regional vice presidents, district managers, store managers, assistant store managers, sales personnel, and collections personnel and supervisors.

17.    The proposed Key Employee Compensation Program as it relates to the 83 members of Management, is described in Exhibit 2 attached hereto.  The proposed Key Employee Compensation Program as it relates to the approximately 3,000 non-management employees is described in Exhibit 3 attached hereto.  In this motion, the Debtors only request authority to implement the Key Employee Compensation Program as it relates to Management described in Exhibit 2.  The Debtors believe that the Program as it relates to non-management employees described in Exhibit 3 may be implemented in the ordinary course of business without Court approval.  However, the Debtors have shared with the Creditors' Committee information

---

[2]The description of the Key Employee Compensation Program is intended as a summary only.  The actual terms of the Key Employee Compensation Program set forth in Exhibit 2 shall control.

8

relating to this aspect of the Key Employee Compensation Program, and have
included it as an attachment to this Motion, in the interests of full disclosure.

18.    As can be seen in Exhibit 2, the Key Employee Compensation Program
as it relates to Management has three components:  (i) an annual incentive plan, (ii) a
severance plan, and (iii) an exit plan.  Noticeably absent from Exhibit 2 is any form
of retention plan which, as noted above, would afford periodic payments to
employees to reward them for staying with the company.  The Debtors' board and
senior executives considered and rejected the idea of including any such component
in the Key Employee Compensation Program.  Eligible employees therefore are not
entitled to any additional compensation merely by staying with the company.  Rather,
their payments are tied to specific performance and emergence targets, and therefore
are geared so as to incentivize employees to work towards an early and successful
emergence from chapter 11.

Annual Incentive Plan

19.    The annual incentive plan is designed to promote the Company's
business turnaround by conditioning payments on employees' achievement of certain
financial objectives.  Specifically, the performance targets were developed in order to
encourage participants to increase the Debtors' enterprise value, and thus increase
value and returns for all stakeholders during the Debtors' chapter 11 cases.  This
particular component of the Key Employee Compensation Program is similar to the

9

Debtors' pre-petition annual incentive program previously approved by this Court.[3]

However, the performance targets have been increased to further incentivize

employees to create value.

20.    Under the annual incentive plan, employees' eligibility to receive

annual bonuses is dependent on whether Friedman's reaches its projected business

plan EBITDAIR levels for the year.  It is common under such plans, including many

of those implemented by other retailers in chapter 11, to establish three levels of

targeted performance based on 50%, 100%, and 150% of EBITDAIR.  In other

words, eligible employees are entitled to receive a bonus in a set amount if actual

EBITDAIR is 50% of targeted EBITDAIR; their bonus increases if the company

achieves 100% of targeted EBITDAIR; and their bonus is higher still if actual

EBITDAIR is 150% of targeted EBITDAIR.

21.    Here, because the 2005 business plan EBITDAIR levels were relatively

modest, the Debtors have establishing higher targets that Management much reach

before they will be eligible to receive any annual incentive bonuses.  The targets here

are 100%, 170%, and 200% of 2005 business plan EBITDAIR, respectively.  Thus, if

------------------------------------------------

[3]The pre-petition program was approved pursuant to this Court's Order (i)
Authorizing the Debtors to Pay Prepetition Wages, Salaries, Directors' Fees and
Employee Benefits, (ii) Authorizing the Debtors to Continue the Maintenance of
Employee Benefit Programs in the Ordinary Course; and (iii) Directing All Banks to
Honor Prepetition Checks for Payment of Prepetition Employee Obligations, entered
January 20, 2005 (Docket No. 52).

Friedman's achieves 100% of 2005 business plan EBIDTAIR, eligible employees

will receive a bonus as indicated in Exhibit 2 and described as "Threshold Incentive

Bonus." If Friedman's achieves 170% of 2005 business plan EBIDTAIR, eligible

employees will receive a bonus as indicated in Exhibit 2 and described as "Target

Incentive Bonus." And if Friedman's achieves 200% of 2005 business plan

EBITDAIR, eligible employees will receive a bonus as indicated in Exhibit 2 and

described as "Stretch Incentive Bonus."

  22. As an example, Exhibit 2 indicates that if Friedman's achieves 100% of

2005 business plan EBITDAIR, the chief executive officer is not entitled to any

bonus. The same is true for each of the chief administrative officer, the executive

vice president of stores, the chief merchant officer, the chief financial officer, and

certain vice presidents. Rather, in order to be eligible for an incentive bonus, they

must achieve 170% of projected business plan EBITDAIR for 2005. It is not the

case, however, that if actual EBITDAIR is only 169% of 2005 business plan

EBITDAIR, that they will receive no bonus. Rather, their entitlement to a bonus will

be pro-rated if and as actual 2005 business plan EBITDAIR exceeds 100% of plan.

This pro-ration will occur for all eligible members of Management described in

Exhibit 2.

  23. As another example, employees who are identified in Exhibit 2 as

Level VI employees, are entitled to a bonus equal to 10% of their annual pay if

Friedman's achieves its 2005 business plan EBITDAIR projection. They will receive 20% of base pay if actual EBITDAIR is 170% of 2005 business plan EBITDAIR, and 35% of base pay if EBITDAIR is 200% of the 2005 business plan projected amount. If Friedman's achieves its business plan EBITDAIR for 2005, the total amount of annual incentive bonuses payable to all members of Management will be equal to $700,000, which is about 8.4% of the total amount of all such persons' base pay. The amount increases to $2.7 million and $4.2 million if actual EBITDAIR is 170% and 200%, respectively, of 2005 business plan EBITDAIR. There is clearly an incentive to outperform the projections.

<u>Severance</u>

24.      During any reorganization process, when employees may be laid off or terminated, it is often difficult to recruit new employees and maintain current employees. Severance plans can mitigate the anxiety felt by employees and provide employees with certain desired protection and security, typically in the form of salary and health benefit continuation in the event employment is terminated by the company without cause and, in certain circumstances, may include other benefits such as job referral, reimbursement of relocation expenses and continued health insurance coverage.

25.      In order to recruit and maintain employees, the Key Employee Compensation Program includes a severance component. The terms of the severance

12

plan are substantially similar to the Debtors' pre-petition program previously

approved by this Court.[4]  The differences between the pre-petition plan and the post-

petition plan concerns employees in Levels V-VII on Exhibit 2 and in total amounts

to approximately $1,550,000.   As a general matter, under the plan, an employee who

is involuntarily terminated as a result of a restructuring, a reduction in workforce, or

a position elimination will be paid a portion of the employee's base salary.

     26.    As can be seen in Exhibit 2, severance payments for employees in the

top three category levels are equal to 200% of annual base salary.   Severance

payments range in amounts equal to between two and twelve months of annual base

pay for other employees.   The Key Employee Compensation Program originally

provided that severance payments for employees in the top three tiers also would

include an amount equal to 200% of any bonuses earned in previous years.   However,

the Debtors have modified this provision so that in the event that the Company

liquidates while in chapter 11 on or before December 31, 2006, such bonuses will be

excluded from all severance calculations.

Exit Plan

     27.    Finally, as outlined in Exhibit 2, the Key Employee Compensation

Program will afford eligible employees cash payments and, in some cases, options to

---

[4] See this Court's Final Order Authorizing the Debtors to Honor Certain
Severance Obligations and to Maintain the Severance Program Going Forward,
entered February 18, 2005 (Docket No. 243)

acquire stock in the new company upon emergence from chapter 11. The exit

compensation plan is entirely new and is designed to incentivize employees to

achieve a successful restructuring and to stay with the Company after emergence in

order to continue its go-forward operations.

28.    A total of 50% of the cash awards are payable upon emergence from

chapter 11; 25% is payable six months thereafter; and the remaining 25% is payable

on the first year anniversary of emergence. The exit plan payments also include

granting options constituting up to 10% of the equity in the reorganized company to

eligible employees. As illustrated in Exhibit 2, 8% of such options will be granted

pursuant to assigned percentages to the chief executive officer, the chief

administrative officer, the executive vice president of stores, the chief merchant

officer, the chief financial officer and certain vice presidents. The remaining 2% will

be reserved for employees covered under the Key Employee Compensation Program

as approved by the compensation committee of the company's board of directors.

29.    The exit plan further provides that in the event that certain objectives

are achieved with respect to economic distributions to existing common

stockholders, employees in Levels I-III as set forth in Exhibit 2 may be eligible for

additional awards. These awards would be in the form of cash payments or

additional stock options. The Key Employee Compensation Program provides that

any criteria developed to determine eligibility for such awards must be approved by

14

the compensation committee of the company's board of directors and a Creditors'
Committee.

30.     The Key Employee Compensation Program contemplates that 100% of
the options under the exit plan will be granted upon emergence, 50% of the options
will vest at emergence at a nominal strike price, and 25% will vest on each of the
first and second anniversaries of the emergence date at a strike price equivalent to the
mid-point of the valuation range established by Jefferies in any disclosure statement
approved by this Court.

31.     Finally, the exit plan component of the Key Employee Compensation
Program includes the establishment of a discretionary fund of $500,000 for use by
the chief executive officer to offer cash awards to employees upon emergence to
recognize their contribution to the reorganization efforts.

APPLICABLE AUTHORITY

32.     Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to
use property of the estate "other than in the ordinary course of business" after notice
and a hearing.  11 U.S.C. § 363(b)(1).  Uses of estate property outside the ordinary
course of business may be authorized if the debtor demonstrates a sound business
justification for it.  See In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983)
(business judgment rule requires a finding that a good business reason exists to grant
a debtor's application under section 363(b)); In re Delaware Hudson Ry. Co., 124

15

B.R. 169, 179 (Bankr. D. Del. 1991). Once the debtor articulates a valid business

justification, "[t]he business judgment rule 'is a presumption that in making a

business decision the directors of a corporation acted on an informed basis, in good

faith and in the honest belief that the action was in the best interests of the

company.'" In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992).

33.    Given the importance of the Debtors' employees to the Debtors'

continued operations and the ultimate success of these chapter 11 cases, this Court

should approve the relief requested herein. The Debtors have determined that the

costs associated with the adoption of the Key Employee Compensation Program are

more than justified by the benefits that are expected to be realized by encouraging the

Key Employees to continue working for the Debtors and vigorously assisting in the

Debtors' restructuring efforts. This is especially true in this case given the fact that a

substantial amount of the payments under the Key Employee Compensation Program

are conditioned on achievement of certain predetermined financial goals.[5]

34.    Moreover, approval of the Key Employee Compensation Program will

boost employee morale and forestall the loss of value that would be attendant to

---

[5]Since the proposed Key Employee Compensation Program is needed to retain employees -- who are in turn necessary for the preservation of the Debtors' estates -- the payment rights of the employees under the Program are "actual, necessary costs and expenses of preserving the [Debtors'] estate[s]," and should be accorded 11 U.S.C. § 503(b)(1)(A) administrative expense status to the extent they become due.

16

resignations among the Key Employees. The proposed relief therefore will enable

the Debtors to retain the knowledge, experience and loyalty of the employees who

are crucial to the Debtors' reorganization efforts. If these employees were to leave

their current jobs at this stage in the Debtors' chapter 11 cases, it is virtually assured

that the Debtors would not be able to attract replacement employees of comparable

quality, experience, knowledge and character. Indeed, suitable new employees, even

if available, would not have in-depth and historical knowledge of the Debtors'

business. The time and costs incurred, and the learning curve necessarily involved in

hiring replacements for employees, clearly outweighs the potential costs of payments

made under the Key Employee Compensation Program.

35.    In sum, the Debtors have determined in the exercise of their business

judgment that it is essential that the Key Employees continue to focus their efforts on

supporting and maintaining the Debtors' reorganization efforts in the coming

months. Accordingly, the Debtors believe that granting the relief requested in this

Motion is in the best interests of the Debtors' estates, their creditors, and other

interested parties and should be approved. See, e.g., In re America West Airlines,

Inc., 171 B.R. 674, 678 (Bankr. D. Ariz. 1994) (holding that proposal to pay bonuses

on confirmation of reorganization plan was exercise of debtor's sound business

judgment); In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991) (concluding

17

that implementation of a critical employee retention plan was a proper exercise of

debtor's business judgment).

36.     No previous request for the relief sought herein has been made to this

Court or any other court.

18

WHEREFORE, the Debtors respectfully request that the Court enter an

order, substantially in the form attached hereto as <u>Exhibit 1</u>, (i) authorizing the

implementation of the Key Employee Compensation Program as described herein,

and (ii) granting such other and further relief as is just and proper.

Dated: Savannah, Georgia
       March 11, 2005

Respectfully submitted

John Wm. Butler, Jr.
George N. Panagakis
Timothy P. Olson
SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606-1285
(312) 407-0700

and

By:_____
Kathleen Horne (Ga. Bar No. 367456)
Dolly Chisholm (Ga. Bar No. 124922)
Matthew Mills (Ga. Bar No. 509718)
INGLESBY, FALLIGANT, HORNE,
COURINGTON & CHISHOLM,
  A Professional Corporation
17 West McDonough Street, P.O. Box 1368
Savannah, Georgia 31402-1368
(912) 232-7000


Attorneys for Debtors and
  Debtors-in-Possession

19

# EXHIBIT 1

## PROPOSED ORDER

(Without Exhibits)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 05-40129 |
| | ) | |
| FRIEDMAN'S INC., et al., | ) | Chapter 11 |
| | ) | Jointly Administered |
| | ) | |
| | ) | Hon. Lamar W. Davis, Jr. |
| Debtors. | ) | |

## ORDER AUTHORIZING THE DEBTORS TO
## IMPLEMENT A KEY EMPLOYEE COMPENSATION PROGRAM

Upon the motion dated March 11, 2005 (the "Motion")[1] wherein Friedman's

Inc. ("Friedman's") and seven of its subsidiaries and affiliates (the "Affiliate

Debtors"), debtors and debtors-in-possession in the above-captioned cases

(collectively, the "Debtors" or the "Company"), moved for an order pursuant to

sections 105(a) and 363(b)(1) authorizing the Debtors to implement a key employee

compensation program; and it appearing to the Court that (i) it has jurisdiction over

the matters raised in the Motion pursuant to 28 U.S.C. §§ 157 and 1334; (ii) this is a

core proceeding pursuant to 28 U.S.C. § 157(b)(2); (iii) the relief requested in the

Motion is in the best interests of the Debtors, their estates and their creditors; and (iv)

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings given such terms in the Motion.

proper and adequate notice of the Motion and the hearing thereon has been given and

that no other or further notice is necessary

IT IS HEREBY FOUND AND DETERMINED THAT:

A.      A sound business justification exists for entering into the Key

        Employee Compensation Program ;

B.      The Key Employee Compensation Program is fair and reasonable and

        was proposed in good faith; and

C.      The implementation of the Key Employee Compensation Program is in

        the best interest of the Debtors, their estates, creditors and interest

        holders and necessary to the Debtors' reorganization efforts; and it is

        therefore

ORDERED, ADJUDGED, AND DECREED THAT

1.      The Motion is GRANTED.

2.      The Key Employee Compensation Program is approved in all respects

and the Debtors are authorized, pursuant to 11 U.S.C. §§ 105(a) and 363(b)(1), to

take all necessary actions to implement the Key Employee Compensation Program

on the terms and conditions set forth in the Motion and as detailed in Exhibit 1

attached hereto.

3.      The Key Employees are entitled to payments under the Key Employee

Compensation Program.

4.      The payment to which a Key Employee is entitled under the Key

Employee Compensation Program shall be accorded administrative expense status

and priority under sections 503(b)(1)(A) and 507(a)(1) of the Bankruptcy Code.

5.      The Court shall retain jurisdiction over the Debtors and the Key

Employees participating in the Key Employee Compensation Program including,

without limitation, for the purposes of interpreting, implementing and enforcing the

terms and conditions of the Key Employee Compensation Program.

So Ordered in Savannah, Georgia this ___ day of March, 2005

_____
Honorable Lamar W. Davis, Jr.
United States Bankruptcy Judge

3

Order prepared by:

John Wm. Butler, Jr.
George N. Panagakis
Timothy P. Olson
SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606-1285
(312) 407-0700

and

Kathleen Horne (Ga. Bar No. 367456)
Dolly Chisholm (Ga.. Bar No. 124922)
Matthew Mills (Ga. Bar No. 509718)
INGLESBY, FALLIGANT, HORNE, COURINGTON
 & CHISHOLM, A Professional Corporation
17 West McDonough Street, P.O. Box 1368
Savannah, Georgia 31402-1368
(912) 232-7000


Attorneys for Debtors and
 Debtors-in-Possession

4

**EXHIBIT 2**

**OVERVIEW OF KEY EMPLOYEE COMPENSATION PROGRAM**

# Overview of Key Employee Compensation Program ("KECP")(1)

| Level | Position | Approx. Positions Eligible | Annual Incentive Plan (2) | | | | Severance | | Exit Plans (3) | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Total Base Pay(4) | Threshold Base Pay % | Target Base Pay % | Stretch Base Pay % | Average Months | Dollars (5) | Cash Payment Base Pay | Options Per Position |
| I | CEO | 1 | $ 750,000 | – | 100% | 125% | – | $ 1,500,000 | 167% | 3.250% |
| II | CAO | 1 | 300,000 | – | 40% | 75% | – | 600,000 | 125% | 1.375% |
| III | EVP Stores, CMO, CFO | 3 | 900,000 | – | 40% | 75% | – | 1,800,000 | 83% | 0.875% |
| IV | VP Level II | 3 | 550,000 | – | 35% | 60% | 12 | 550,000 | 50% | 0.250% |
| V | VP Level I | 12 | 1,600,000 | 20% | 35% | 50% | 12 | 1,600,000 | 20% | 0.000% |
| VI | Director | 23 | 2,000,000 | 10% | 20% | 35% | 6 | 1,000,000 | 10% | 0.000% |
| VII | Buyer/Loss Prevention | 11 | 700,000 | 10% | 20% | 35% | 6 | 350,000 | 10% | 0.000% |
| VIII | Manager | 29 | 1,500,000 | 5% | 10% | 20% | 2 | 250,000 | 5% | 0.000% |
| | Reserve Grants | | | | | | | | $500,000(6) | 2.000%(7) |
| | Estimated Total | 83 | $ 8,300,000 | $ 700,000 | $2,700,000 | $4,200,000 | | $ 7,650,000 | $3,300,000 | 10.000% |
| | Percent of Total Base Pay | | | 8.4% | 32.5% | 50.6% | | 92.2% | 40.0% | |

(1) The compensation plans for the Stores and Collection Center Organizations were developed in the ordinary course by the Company and were described in the Motion for disclosure purposes only and will be implemented without further order of the Bankruptcy Court. Any awards for new positions are not included in the KECP and must be approved by the Compensation Committee of the Board and are incremental to the KECP.

(2) For 2005, the EBITDAIR targets at each of Threshold, Target and Stretch Base Pay amounts are 100%, 170% and 200% of projected 2005 Business Plan EBITDAIR, respectively. These bonuses will be prorated once 2005 Business Plan EBITDAIR has been achieved.

(3) Additional award gives a maximum of 1x cash emergence payment and 0.5x stock option emergence grants to each position in Tiers I – III if certain objectives are accomplished that would result in economic recovery to existing common stock of the Company. Any criteria developed must be approved by the Compensation Committee of the Board and the Official Committee of Unsecured Creditors.

(4) Base pay for individual employees is adjusted from time-to-time in the ordinary course by the Company.

(5) For Levels I, II, and III Severance is based on (1) Two times Annual Base Salary, plus (2) The greater of (a) Most recent annual incentive bonus, or (2) Mean of annual incentive bonus for two most recent years. For Level IV Severance is based on: (1) One times Annual Base Salary, plus (2) The greater of (a) Most recent annual incentive bonus, or (b) Mean of annual incentive bonus for two most recent years. Other support center associates have approximately $400,000 of severance benefits. In the unlikely event bonuses are paid by the Company winds down operations in current Ch. 11 cases prior to December 31, 2006, severance calculations shall be modified to exclude any bonuses paid by the Company in connection with the KECP.

(6) This represents a CEO discretionary fund of $500,000 for emergence awards.

(7) Reserve option grants are subject to approval by the Compensation Committee of the Board.

# Detail Re: Key Employee Compensation Program

| Plan | Timing | Purpose | Eligibility | Performance Measurement Period | Performance Measures | Performance Levels and Award Opportunity | Payout Form | Vesting and Payout Schedule |
|---|---|---|---|---|---|---|---|---|
| **ANNUAL INCENTIVE PLAN** (1) | Authorized in First Day Order | Focus participant attention on financial turnaround/business improvement. | Tier I CEO; II CAO; III EVP Stores, CMO, CFO; IV VP Level II; V VP Level I; VI Director; VII Buyer/LP; VIII Manager | Annual Concurrent with Company's Business Plan | EBITDA & functional Department objectives | Tier / Threshold / Target / Stretch — I: - / 100% / 125%; II: - / 40% / 75%; III: - / 40% / 75%; IV: - / 35% / 60%; V: 20% / 35% / 50%; VI: 10% / 20% / 35%; VII: 10% / 20% / 35%; VIII: 5% / 10% / 20% | Cash | Vesting Schedule December 31. Payout Schedule On or before March 15 |
| **RETENTION / STAY PAYMENTS** | None | None | None | None | None | None | None | None |
| **INCENTIVE PLAN AT EXIT** | | | | | | | | |
| ■ CHAPTER 11 EMERGENCE PAYMENTS | To be filed after Creditors' Committee is appointed | Reward key associates for successful exit from Chapter 11 | Tier I CEO; II CAO; III EVP Stores, CMO, CFO; IV VP Level II; V VP Level I; VI Director | Duration of court supervised restructuring | Successful exit from bankruptcy reorg. | Tier / Percent of Base Salary (2) — I: 167%; II: 125%; III: 83%; IV: 50%; V: 20%; VI: 10%; VII: 10%; VIII: 5% | Cash | Vesting Schedule 50% Upon exit; 25% Six months after exit; 25% One year after exit |
| ■ CHAPTER 11 EMERGENCE EQUITY GRANTS | To be filed after Creditors' Committee is appointed | Reward key associates for successful exit from Chapter 11 and create management ownership in reorganized Company | Tier I CEO; II CAO; III EVP Stores, CMO, CFO; IV VP Level II | Duration of court supervised restructuring | Successful exit from bankruptcy reorg. | Position / Percent of New Equity Per Position (3) — CEO: 3.25%; CAO: 1.375%; EVP Stores, CMO, CFO: 0.875%; VP Level II: 0.25%; Reserve Grants: 2.00% (3); Total: 10.00% | Options | Granted upon exit Vesting Schedule: 50% Upon exit; 25% One year after exit; 25% Two years after exit |

(1)  For 2005, the EBITDAIR targets at each of Threshold, Target and Stretch Base Pay amounts are 100%, 170% and 200% of projected 2005 Business Plan EBITDAIR, respectively.  These bonuses will be pro-rated once 2005 Business Plan EBITDAIR has been achieved.

(2)  Additional award program gives a maximum of 1x cash emergence payment and 0.5x stock option emergence grants to each position in Tiers I – III if certain objectives are accomplished that would result in economic recovery to existing common stock of the Company.  Any criteria developed must be approved by the Compensation Committee of the Board and the Official Committee of Unsecured Creditors.

(3)  Reserve option grants are subject to approval by the Compensation Committee of the Board.

# Detail Re: Key Employee Compensation Program (Cont'd)

| Plan | Timing | Purpose | Eligibility | Benefit Levels | | | | Payout Form | Vesting and Payout Schedule |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Performance Measurement Period / Tier | Performance Measures / Position Title | | Performance Levels and Award Opportunity / Severance Formula [1] | | |
| SEVERANCE PLAN | Authorized in First Day Order; KECP enhanced severance for Tiers 5 – 7 | Provides protection to eligible Associates in the event of job loss | Associates terminated by the Company without cause | I | CEO | | 2.0 x Total Cash Compensation | Lump Sum Cash | **Vesting** Upon termination |
| | | | | II | CAO | | 2.0 x Total Cash Compensation | | **Payout** Within 30 business days of termination date. |
| | | | Ineligibility | III | EVP Stores, CMO, CFO | | 2.0 x Total Cash Compensation | | |
| | | | Associates: | IV | VP Level II | | 1 x Total Cash Compensation | | |
| | | | (1) Terminated by the Company with cause | V | VP Level I | | ½ x Annual Base Salary | | |
| | | | | VI | Support Center Director | | ½ x Annual Base Salary | | |
| | | | (2) Who voluntarily resign | VII | Buyer/Loss Prevention | | ¼ x Annual Base Salary | | |
| | | | | VIII | Support Center Manager | | Based on years of service | | |
| | | | | IX | All Other Associates | | Based on years of service | | |
| | | | | Levels I – IV receive continuation of medical benefits for up to one year. | | | | Premium Reimbursement | Duration of severance period or until receipt of benefits upon re-employment |

(1) For Level I, II, and III Severance is based on: (1) Two times Annual Base Salary, plus (2) Two times the the greater of (a) Most recent annual incentive payment, or (b) Mean of annual incentive payment for two most recent years
For Level IV Severance is based on: (1) One times Annual Base Salary, plus (2) One times the greater of (a) Most recent annual incentive payment, or (b) Mean of annual incentive payment for two most recent years
* No annual incentive payment paid to any incumbents at these levels

**EXHIBIT 3**

**OVERVIEW OF COMPENSATION PLAN FOR STORES AND**

**COLLECTION CENTER ORGANIZATIONS**

# Overview of Key Employee Compensation Program ("KECP")[1]

| Level | Position | Approx. Positions Eligible | Total Base Pay[4] | Annual Incentive Plan[2] | | | Severance | | Exit Plans[3] | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Threshold Base Pay % | Target Base Pay % | Stretch Base Pay % | Average Months | Dollars[5] | Cash Payment Base Pay | Options Per Position |
| I | CEO | 1 | $ 750,000 | – | 100% | 125% | – | $ 1,500,000 | 167% | 3.250% |
| II | CAO | 1 | 300,000 | – | 40% | 75% | – | 600,000 | 125% | 1.375% |
| III | EVP Stores, CMO, CFO | 3 | 900,000 | – | 40% | 75% | – | 1,800,000 | 83% | 0.875% |
| IV | VP Level II | 3 | 550,000 | – | 35% | 60% | 12 | 550,000 | 50% | 0.250% |
| V | VP Level I | 12 | 1,600,000 | 20% | 35% | 50% | 12 | 1,600,000 | 20% | 0.000% |
| VI | Director | 23 | 2,000,000 | 10% | 20% | 35% | 6 | 1,000,000 | 10% | 0.000% |
| VII | Buyer/Loss Prevention | 11 | 700,000 | 10% | 20% | 35% | 6 | 350,000 | 10% | 0.000% |
| VIII | Manager | 29 | 1,500,000 | 5% | 10% | 20% | 2 | 250,000 | 5% | 0.000% |
| | Reserve Grants | | | | | | | | $500,000[6] | 2.000%[7] |
| | Estimated Total | 83 | $ 8,300,000 | $ 700,000 | $2,700,000 | $4,200,000 | | $ 7,650,000 | $3,300,000 | 10.000% |
| | Percent of Total Base Pay | | | 8.4% | 32.5% | 50.6% | | 92.2% | 40.0% | |

(1) The compensation plans for the Stores and Collection Center Organizations were developed in the ordinary course by the Company and were described in the Motion for disclosure purposes only and will be implemented without further order of the Bankruptcy Court. Any awards for new positions are not included in the KECP and must be approved by the Compensation Committee of the Board and are incremental to the KECP.

(2) For 2005, the EBITDAIR targets at each of Threshold, Target and Stretch Base Pay amounts are 100%, 170% and 200% of projected 2005 Business Plan EBITDAIR, respectively. These bonuses will be pro-rated once 2005 Business Plan EBITDAIR has been achieved.

(3) Additional award gives a maximum of 1x cash emergence payments and 0.5x stock option emergence grants to each position in Tiers I – III if certain objectives are accomplished that would result in economic recovery to existing common stock of the Company. Any criteria developed must be approved by the Compensation Committee of the Board and the Official Committee of Unsecured Creditors.

(4) Base pay for individual employees is adjusted from time-to-time in the ordinary course by the Company.

(5) For Levels I, II, and III Severance is based on (1) Two times Annual Base Salary, plus (2) Two times the greater of (a) Most recent annual incentive bonus, or (2) Mean of annual incentive bonus for two most recent years. For Level IV Severance is based on: (1) One times Annual Base Salary, plus (2) One times the greater of (a) Most recent annual incentive bonus, or (b) Mean of annual incentive bonus for two most recent years. Other support center associates have approximately $400,000 of severance benefits. In the unlikely event that the Company winds down operations in current Ch. 11 case prior to December 31, 2006, severance calculations shall be modified to exclude any bonuses paid by the Company in connection with the KECP.

(6) This represents a CEO discretionary fund of $500,000 for emergence awards.

(7) Reserve option grants are subject to approval by the Compensation Committee of the Board.

# Detail Re: Key Employee Compensation Program

| Plan | Timing | Purpose | Eligibility | Performance Measurement Period | Performance Measures | Performance Levels and Award Opportunity | Payout Form | Vesting and Payout Schedule |
|---|---|---|---|---|---|---|---|---|
| ANNUAL INCENTIVE PLAN [1] | Authorized in First Day Order | Focus participant attention on financial turnaround/business improvement | Tier<br>I CEO<br>II CAO<br>III EVP Stores, CMO, CFO<br>IV VP Level I<br>V VP Level II<br>VI Director<br>VII Buyer/LP<br>VIII Manager | Annual Concurrent with Company's Business Plan | EBITDA & functional Department objectives | Tier / Threshold / Target / Stretch<br>I / -- / 100% / 125%<br>II / -- / 40% / 75%<br>III / -- / 40% / 75%<br>IV / -- / 35% / 60%<br>V / 20% / 35% / 50%<br>VI / 10% / 20% / 35%<br>VII / 10% / 20% / 35%<br>VIII / 5% / 10% / 20% | Cash | Vesting Schedule December 31<br>Payout Schedule On or before March 15 |
| RETENTION / STAY PAYMENTS | None | None | None | None | None | None | None | None |

### INCENTIVE PLAN AT EXIT

| Plan | Timing | Purpose | Eligibility | Performance Measurement Period | Performance Measures | Performance Levels and Award Opportunity | Payout Form | Vesting and Payout Schedule |
|---|---|---|---|---|---|---|---|---|
| CHAPTER 11 EMERGENCE PAYMENTS | To be filed after Creditors' Committee is appointed | Reward key associates for successful exit from Chapter 11 | Tier<br>I CEO<br>II CAO<br>III EVP Stores, CMO, CFO<br>IV VP Level I<br>V VP Level II<br>VI Director | Duration of court supervised restructuring | Successful exit from bankruptcy reorg. | Tier / Percent of Base Salary<br>I / 167%<br>II / 125%<br>III / 83%<br>IV / 50%<br>V / 20%<br>VI / 10%<br>VII / 10%<br>VIII / 5% | Cash | Vesting Schedule<br>50% Upon exit<br>25% Six months after exit<br>25% One year after exit |
| CHAPTER 11 EMERGENCE EQUITY GRANTS | To be filed after Creditors' Committee is appointed | Reward key associates for successful exit from Chapter 11 and create management ownership in reorganized Company | Tier<br>I CEO<br>II CAO<br>III EVP Stores, CMO, CFO<br>IV VP Level II | Duration of court supervised restructuring | Successful exit from bankruptcy reorg. | Position / Percent of New Equity Per Position<br>CEO / 3.25%<br>CAO / 1.375%<br>EVP Stores, CMO, CFO / 0.875%<br>VP Level II / 0.25%<br>Reserve Grants / 2.00% [3]<br>Total / 10.00% | Options | Granted upon exit<br>Vesting Schedule:<br>50% Upon exit<br>25% One year after exit<br>25% Two years after exit |

(1) For 2005, the EBITDAR targets at each of Threshold, Target and Stretch Base Pay amounts are 100%, 170% and 200% of projected 2005 Business Plan EBITDAR, respectively. These bonuses will be pro-rated once 2005 Business Plan EBITDAR has been achieved.

(2) Additional award gives a maximum of 1x cash emergence payments and 0.5x stock option emergence payments and 0.5x stock option emergence payments where individual objectives are accomplished that would result in economic recovery to existing common stock of the Company. Any criteria developed must be approved by the Compensation Committee of the Board and the Official Committee of Unsecured Creditors.

(3) Reserve option grants are subject to approval by the Compensation Committee of the Board.

# Detail Re: Key Employee Compensation Program (Cont'd)

| Plan | Timing | Purpose | Eligibility | Tier | Position Title | Performance Levels and Award Opportunity — Severance Formula [1] | Payout Form | Vesting and Payout Schedule |
|---|---|---|---|---|---|---|---|---|
| SEVERANCE PLAN | Authorized in First Day Order; KECP enhanced severance for Tiers 5 – 7 | Provide protection to eligible Associates in the event of job loss | Associates terminated by the Company without cause | I | CEO | 2.0 x Total Cash Compensation | Lump Sum Cash | **Vesting** — Upon termination; **Payout** — Within 30 business days of termination date. |
| | | | | II | CAO | 2.0 x Total Cash Compensation | | |
| | | | Ineligibility | III | EVP Stores, CMO, CFO | 2.0 x Total Cash Compensation | | |
| | | | Associates: | IV | VP Level II | 1 x Total Cash Compensation | | |
| | | | (1) Terminated by the Company with cause | V | VP Level I | 1 x Annual Base Salary | | |
| | | | | VI | Support Center Director | ½ x Annual Base Salary | | |
| | | | (2) Who voluntarily resign | VII | Buyer/Loss Prevention | ½ x Annual Base Salary | | |
| | | | | VIII | Support Center Manager | Based on years of service | | |
| | | | | IX | All Other Associates | Based on years of service | Premium Reimbursement | Duration of severance period or until receipt of benefits upon re-employment |

Levels I – IV receive continuation of medical benefits for up to one year.

(1) For Level I, II, and III Severance is based on: (1) Two times Annual Base Salary, plus (2) Two times the greater of (a) Most recent annual incentive payment, or (b) Mean of annual incentive payment for two most recent years
For Level IV Severance is based on: (1) One times Annual Base Salary, plus (2) One times the greater of (a) Most recent annual incentive payment, or (b) Mean of annual incentive payment for two most recent years
* No annual incentive payment paid to any incumbents at these levels