**LOWENSTEIN SANDLER PC**
Michael S. Etkin, (ME 0570)
Ira M. Levee (IL 9958)
Thomas A. Pitta (TP 3018)
1251 Avenue of the Americas, 18th Floor
New York, New York 10020
(212) 262-6700  (Telephone)
(212) 262-7402  (Facsimile)
          and
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2481 (Facsimile)

Hearing Date: November 29, 2005 at 10:00 a.m.
Objection Deadline:  November 22, 2005 at 4:00 p.m.

*Bankruptcy Counsel to Lead Plaintiffs and the Prospective Class*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ——————————————————— : | | |
| In re: | : | Chapter 11 |
| DELPHI CORPORATION, et al., | : | |
| | : | Case No. 05-44481 (RDD) |
| Debtors. | : | |
| | : | (Jointly Administered) |
| ——————————————————— : | | |

**LEAD PLAINTIFFS' OBJECTION TO DEBTORS' MOTION FOR
ORDER UNDER §§ 105 AND 363 AUTHORIZING DEBTORS TO
IMPLEMENT A KEY EMPLOYEE COMPENSATION PROGRAM**

**TO THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE**

The Teachers' Retirement System Of Oklahoma, the Public Employees'
Retirement System Of Mississippi, Raiffeisen Kapitalanlage-Gesellschaft m.b.H. and
Stichting Pensioenfonds ABP (collectively, "Lead Plaintiffs"), the Court-appointed Lead
Plaintiffs in the consolidated securities class action entitled *In re Delphi Corp. Securities
Litigation*, Master File No. 1:05-CV-2637 (NRB)(SDNY), hereby object to the motion by
Delphi Corporation ("Delphi") and its affiliated debtors (collectively, the "Debtors") for

an Order under 11 U.S.C. §§ 105(a) and 363(b)(1) authorizing the Debtors to implement

a key employee compensation program (the "KECP") (the motion is hereinafter referred

to as the "KECP Motion").  In support of their objection, Lead Plaintiffs represent as

follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this motion pursuant to 28 U.S.C.

§§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## PRELIMINARY STATEMENT

2.      The KECP Motion should be denied because it seeks to reward executives

who knowingly participated in Delphi's massive accounting fraud, or who inexcusably

tolerated or ignored that fraud as it impelled the Company's slide toward bankruptcy.

Indeed, the KECP Motion fails to offer any explanation as to why those who occupied the

executive suite during one of the largest corporate frauds of our era should be allowed to

keep their positions – let alone be enticed to stay – as tens of thousands of honest Delphi

workers face the loss of their jobs and shareholders face the loss of their investment. To

answer that question, of course, the KECP Motion would have had to at least mention the

fraud that brought Delphi to its knees.  But, remarkably, and tellingly, there is no mention

of the historic debacle over which these supposed "key employees" presided.

3.      As explained more fully below, the Court should deny the KECP Motion

because (i) it is not supported by the facts in that the recent executive departures cited as

a basis for the plan were in fact the result of Delphi's massive accounting fraud and not,

as the Debtor represents, the benign fallout of being associated with a Company in

bankruptcy; (ii) it does not constitute the exercise of sound business judgment, as it bestows substantial monetary benefits on the very executives who were involved in, tolerated, or missed this massive fraud; and (iii) it fails to provide basic details about the operation of the KECP, including the identity of the executives involved and the triggering performance goals.

4.      If not denied outright, the KECP Motion should not be entertained before the Debtors produce evidence showing just what the intended beneficiaries of the plan did, and did not do, as Delphi engaged in its pervasive accounting chicanery.  As shown below, Lead Plaintiffs, in the course of their investigation, have assembled ample evidence that many of the executives who would presumably profit from the KECP were directly involved in the sham transactions, inventory-manipulating, and book-cooking that triggered Delphi's bankruptcy.  At a minimum, Delphi must be compelled to disclose documents, and provide testimony, concerning the links between the executives covered by the KECP and the corporate fraud that took place on their watch.

## BACKGROUND

### Procedural Background

5.      On October 8, 2005, and subsequently on October 14, 2005, Delphi and substantially all of its active U.S. subsidiaries (forty-two total Debtors) filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  On October 8, 2005, the Debtors filed the KECP Motion.

6.      Lead Plaintiffs are, and represent, creditors, equity holders and parties-in-interest in the bankruptcy proceeding because Lead Plaintiffs and the Prospective Class lost over a billion dollars as a result of their purchases of Delphi's common stock and

debt securities.  On June 27, 2005, the Honorable Naomi Reice Buchwald, United States District Judge for the Southern District of New York, appointed the aforementioned institutional investors as Lead Plaintiffs and subsequently, on September 23, 2005, consolidated the pending putative securities class actions as *In re Delphi Corp. Securities Litigation*, Master File No. 1:05-CV-2637 (NRB) (SDNY) (the "Securities Litigation"). On September 30, 2005, Lead Plaintiffs filed their Consolidated Class Action Complaint (the "Complaint") asserting damages for violations of certain federal securities laws against, among others, Delphi and Delphi's current and former officers and directors, underwriters, auditors, and certain other parties.  Although the Securities Litigation is proceeding against the non-debtor defendants, it is stayed against Delphi pursuant to the automatic stay.  11 U.S.C. § 362(a).[1]

**Factual Background**

7.      The Securities Litigation and Delphi's bankruptcy filing are the result of a massive accounting fraud perpetrated by, among others, Delphi and its senior executives, on the investing public for years.  In the Securities Litigation, Lead Plaintiffs allege that, by improperly accounting for a series of multi-million dollar financing transactions as "sales," and by manipulating the recognition of Delphi's credits, expenses and obligations, Delphi and its senior executives presented the investing public with materially false and misleading information about Delphi's cash flow, earnings, debt and/or inventory.

---

[1] On November 15, 2005, Lead Plaintiffs moved the Court for a limited modification of the automatic stay for the narrow purpose of obtaining from Delphi a copy of documents and materials that Delphi has already produced or provided in connection with any inquiries or investigations relating to Delphi's accounting practices or business affairs.  On November 21, 2005, pursuant to a request from Debtor's counsel, Lead Plaintiffs agreed to adjourn consideration of this motion from November 29, 2005 until January 5, 2005 in order to relieve Debtor's burden of responding to the motion at the present time.

8.      Specifically, as alleged in the Complaint (attached hereto as Exhibit "1"), Lead Plaintiffs claim that Delphi and its senior executives violated the federal securities laws because, among other things:

    a.   Delphi and its senior executives disguised $441 million in financing transactions as sales of inventory or indirect materials.[2]  (¶122). [3]  In each such transaction, Delphi obtained substantial loans secured by certain Delphi assets and recorded the proceeds of those loans in a way designed to artificially inflate its income and materially understate its debt obligations.  (¶¶119-121).  In particular, Delphi improperly accounted for (i) $145 million in financing transactions with third party defendant Setech, Inc. ("Setech") as income from sales of indirect materials (¶¶123-44); (ii) $89 million in financing transactions with third party defendant BBK, Ltd. ("BBK") as income from sales of inventory (¶¶147-51); and (iii) $200 million in financing transactions with Bank One Corporation ("Bank One") as income from sales of precious metals (¶¶152-54).[4]

    b.   Delphi and its senior executives improperly accounted for more than $240 million in transactions with General Motors Corporation by deferring expenses that should have been recognized immediately and by immediately recognizing offsets to expenses that should have been deferred (¶¶155-68);

---

[2]  Indirect materials are materials used in production, but that do not end up as part of the finished product.
[3]  Unless otherwise stated, all references to "¶_" are to the Complaint.
[4]  Bank One entered into a $200 million financing transaction with Delphi in December 2000.  Thereafter, on July 1, 2004, Bank One merged with JPMorgan Chase & Co. ("JPMorgan"), and ceased to exist as an independent entity.  JPMorgan is named as a defendant in the Securities Litigation as the successor-in-interest to Bank One.

    c.   Delphi and its senior executives improperly accounted for millions of dollars in transactions with various service providers, including $68 million in transactions with Electronic Data Systems ("EDS"), one of Delphi's information technology service providers, by prematurely recognizing reductions to expenses, improperly deferring the recognition of expenses and improperly failing to recognize obligations (¶¶173-84);

    d.   Delphi and its senior executives overstated the Company's pre-tax income by $14 million in 2002 and by $34 million in 2003 by improperly recording obligations and adjustments before they accrued (¶¶185-87); and

    e.   Delphi and its senior executives improperly accounted for its direct materials by understating the value of its direct materials inventory on a monthly, quarterly and yearly basis.  In this regard, Delphi and its senior executives routinely set inventory level targets, instructed subordinates not to record high-dollar supplies as inventory and directed subordinates to delay delivery of inventory (¶¶190-99).

9.    The fraud perpetrated by Delphi and its senior executives is the subject of numerous governmental investigations and inquiries, including a formal investigation by the Securities and Exchange Commission ("SEC"); and criminal investigations by the U.S. Department of Justice, the Federal Bureau of Investigation and the United States Postal Inspection Service. (¶¶205, 217).   In addition, as reported by the *Detroit News* on June 30, 2005, the SEC has conducted interviews of at least twelve current and former

Delphi employees and the Justice Department's Fraud Section has issued a "target letter" to at least one former Delphi executive.

10.    On October 18, 2004, in response to the SEC's investigation, Delphi's Audit Committee launched a formal internal investigation into the fraud perpetrated by Delphi and its senior executives. (¶206).  At the same time, Delphi also announced that its outside auditor, Deloitte & Touche LLP, had informed Delphi that it would not complete its review of the quarterly financial information due to the internal review by the Audit Committee and the SEC's investigation.  (*Id.*).  Thereafter, on December 8, 2004, Delphi announced that the Audit Committee had hired outside counsel Wilmer, Cutler, Pickering, Hale & Dorr ("Wilmer, Cutler") and another accounting firm, PriceWaterhouseCoopers, to assist its internal review.  (¶207).  Delphi further disclosed that the initial review process had uncovered substantial accounting irregularities and internal control issues. (*Id.*).  Shortly thereafter, on February 23, 2005, Delphi announced that its Chief Executive Officer and Chairman, J.T. Battenberg III ("Battenberg"), was retiring.  (¶208).

11.    On March 3, 2005, barely a week after the announcement of Battenberg's resignation, Delphi's Audit Committee released certain preliminary findings of its internal investigation.  (¶209).  The Audit Committee pointed to widespread accounting irregularities in Delphi's transactions dating back to 1999, and determined that Delphi's audited financial statements and related independent auditor's reports from 2001 and subsequent periods could no longer be relied upon, triggering a need to restate the Company's financial statements.  (*Id.*).

12.     On March 4, 2005, Delphi filed a Form 8-K with the SEC, announcing that the Audit Committee had interviewed numerous members of management and other supervisory level employees who were involved in, or had knowledge regarding, the transactions at issue (¶213).   The Audit Committee announced that Delphi's Chief Financial Officer and Vice-Chairman, Alan Dawes ("Dawes"), resigned because the Audit Committee had expressed a "loss of confidence" in him after these meetings. (¶214).   The Audit Committee also announced that it had fired Delphi's Chief Accountant and Controller, Paul R. Free ("Free"), and demoted Delphi's Vice President of Treasury, Mergers and Acquisitions, John G. Blahnik ("Blahnik").   (*Id.*).

13.     On May 16, 2005, Delphi announced that, in connection with the Company's ongoing probe of improper accounting transactions, certain lower and middle level executives in Delphi's finance staff would be resigning from the Company.  (¶219). In addition, the Audit Committee demoted Atul Pashricha from the position of Vice President, Executive Director Business Lines to a non-officer position.  (*Id.*).   Thereafter, on June 8, 2005, Delphi announced that, following its review, the Audit Committee had accepted the resignations of Pam Geller, the Company's then-current Treasurer, and the recently demoted Blahnik.  (¶220).

14.     On June 30, 2005, Delphi restated its reported financial results for Fiscal Years 2002 and 2003, and selected financial data for Fiscal Years 2000 and 2001, in its Form 10K for the year ended December 31, 2004 (the "Restatement") as well as Form 10-Q/A Amended Quarterly Reports for the three month periods ending March 31, 2004 and June 30, 2004, in which it restated its financial statements for those periods. (*Id.*).

## **ARGUMENT**

## **DEBTOR'S KECP IS NOT THE RESULT OF SOUND BUSINESS JUDGMENT**

15.     Delphi bears the "burden of establishing its exercise of sound business judgment and that its proposal is fair and reasonable" before the Court can approve a key employee compensation program pursuant to § 363 of the Bankruptcy Code.  See, e.g., In re Georgetown Steel Company, LLC, 306 B.R. 549, 556 (Bankr. D.S.C. 2004); see also In re Aerovox, Inc., 269 B.R. 74, 81-82 (Bankr. D. Ma. 2001); In re Montgomery Ward Holding Corp., 242 B.R. 147, 155 (D. Del. 1999).  The KECP should be reviewed in light of the "particular facts and circumstances" present in this case.  Georgetown Steel, 306 B.R. at 555; see also Montgomery Ward, 242 B.R. at 154; In re America West Airlines, Inc., 171 B.R. 674, 678-79 (Bankr. D. Az. 1994).

16.     In the instant Motion, the Debtors request the Court to enter an Order approving the KECP, an employee compensation program that serves to reward the very executives whose fraudulent conduct or willful blindness precipitated the Debtors' collapse and necessitated this bankruptcy proceeding.  Under the proposed KECP, the Debtors would provide, among other benefits, substantial monetary rewards to 486 executive, including bonuses every six months from a pool of $21.5 million for meeting unspecified performance goals and a lump sum cash payment from a pool of $87.9 million on the date when the Debtors' reorganization plan is approved or when all or substantially all of the Debtors' assets are sold.  The stated purpose of this highly generous KECP is "to retain and incentivize Covered Employees [defined as Delphi's executives] during the Restructuring Period."  (KECP Motion at 7).  However, as demonstrated below, this purpose is at best dubious.

17.    The Court should deny the KECP Motion.  The KECP Motion fails to provide evidence demonstrating that the proposed KECP is the result of sound business judgment.  Indeed, the proposed KECP is (i) not supported by sufficient facts; (ii) unconscionable because many of the senior executives who were involved in the fraud are still managing the Company and stand to profit under the KECP; and (iii) not specific regarding key details of the plan, including the identity of the executives covered under the KECP and the specific performance levels that trigger the KECP.  In the alternative, as discussed below, the Court should permit limited discovery of the Debtors to identify which executives stand to profit from the KECP and to ensure that none of the executives covered under the KECP participated in or willfully ignored the massive accounting fraud that pervaded Delphi for years.

### The KECP Lacks Adequate Factual Support

18.    First, the KECP is not supported by sufficient facts or evidence.  The Debtors' argument in support of instituting the KECP – that it needs to retain ostensibly "key personnel" – is based upon misleading, nonspecific statements concerning executives whose tenure at Delphi ended not for want of career advancement or compensation, but because many, if not all, of those executives participated in the fraudulent conduct that led to the Debtors' collapse.  For instance, the Debtors argue that the KECP is needed in part because "more than 25 executives have left the Company's employ since January 1, 2005."  (KECP Motion at 7).  The Debtors also argue that "[e]xecutive turnover has increased almost 75% in the last 12 months."  (KECP Motion, Ex. 1 at 6).

19.    In making these arguments, the Debtors fail to state the undeniable fact that several, if not most, of these departed executives left because they were terminated or forced to resign in the wake of the disclosure of the Debtors' massive accounting improprieties.  Indeed, the KECP Motion tellingly omits <u>any</u> mention of the accounting scandal whatsoever. The Debtors have publicly disclosed that four of the senior executives who "left the Company's employ since January 1, 2005" – Geller, Blahnik, Dawes and Free – were terminated because of misconduct associated with the Debtors' accounting improprieties.  And as to two other senior executives who "resigned" since January 1, 2005 – former Chairman, President and Chief Executive Officer Battenberg and Vice Chairman and Chief Technology Officer Donald Runkle – the notion that their departures, approximately one week before the Audit Committee's preliminary findings were released, was somehow independent of Delphi's massive accounting fraud is preposterous.

20.    In its Motion, the Debtors fail to provide any additional information regarding the nineteen other executives who terminated their employment at Delphi since January 1, 2005, including their identity and the reasons for their departures.  However, the Debtors' May 16, 2005 announcement that, in connection with the Company's ongoing probe of improper accounting transactions, certain lower and middle level executives in Delphi's finance staff would be resigning from the Company, suggests that some – if not all – of these unidentified executives also terminated their employment as a direct result of their own misconduct.

21.    Plainly, the Debtors have not met their burden of establishing the reasonableness of the KECP.  In fact, the Debtors have failed to (i) identify the eligible

executives, (ii) give the Court and the stakeholders any ability to determine that the participating executives were not involved in the fraud that precipitated Delphi's bankruptcy or (iii) adduce any evidence that the eligible executives are likely to leave their jobs with Delphi.

**The KECP Should Be Denied Because It Compensates Wrongdoers**

22.      Second, the KECP is unsupportable because it would further enrich some of the very executives who perpetrated the Debtors' massive accounting fraud at the expense of Delphi's employees, more than 33,000 of whom are faced with losing their jobs and/or suffering a 65% reduction in wages and other benefits, as well as Delphi's other stakeholders.   As discussed in more detail below, a substantial number of the executives who stand to profit under the KECP were involved in, tolerated or ignored Delphi's accounting fraud.

23.      Indeed, after disclosure of the widespread accounting fraud that implicated a broad range of the Company's operations over the course of several years, Delphi terminated the employment of only a handful of the executive wrongdoers.  Delphi thus left the majority of the very executives who had fostered the Company's fraudulent culture and accounting practices, or had blithely ignored them in the face of mysteriously increasing earnings, at the helm of the Company.  As detailed below, many of the very executives who were directly or indirectly responsible for the fraud continue to run Delphi.  Even harder to comprehend, however, is the fact that the Debtors now seek to lavishly <u>reward</u> these executive wrongdoers through the KECP.  It is inconceivable – and clearly contrary to sound business judgment – to further compensate those who perpetrated, tolerated or ignored Delphi's accounting fraud.

24.     With respect to the 486 executives covered under the KECP, the Debtors have identified only four: Rodney O'Neal ("O'Neal"), Delphi's President and Chief Operating Officer; David Wohleen ("Wohleen"), Delphi's Vice Chairman; Robert J. Dellinger ("Dellinger"), Delphi's Executive Vice President and Chief Financial Officer; and Mark R. Weber ("Weber"), Executive Vice President, Operations, Human Resource Management & Corporate Affairs.  Excluding Dellinger, who joined Delphi on October 8, 2005, after the fraud was perpetrated, Lead Plaintiffs allege that, based on their extensive investigation performed to date, each of these executives was involved in Delphi's fraudulent accounting practices.  Specifically,

   a.  <u>O'Neal</u> knew that Delphi improperly accounted for its inventory.  (¶¶195, 198).  Specifically, O'Neal was a recipient of a May 3, 2004 internal Delphi document entitled Audit Report: Energy & Chassis Divisional Production, Control & Logistics (the "May 2004 Audit Report") from Derek Kolano, Director of Delphi Corporate Audit Services to William Elia, Director of Production, Control and Logistics of Delphi's Energy & Chassis Systems. (¶¶195, 198).   The May 2004 Audit Report set forth the results of a risk-based audit conducted by Delphi's Corporate Audit Services and detailed Delphi's improper inventory recording practices. (¶196).  In particular, the Report stated that (i) Delphi consistently failed to record materials received as inventory in a timely fashion, and (ii) Delphi's failure to timely record inventory may render its financial statements to be misstated or not prepared in accordance with GAAP. (¶¶196-7);

b. <u>Wohleen</u>, as President of the Electrical, Electronics & Safety Division –
one of the divisions that fraudulently disguised financing transactions with
Setech as sales of indirect materials to get worthless, obsolete inventory
off its books (¶¶130, 141-42) – either directed, knew or disregarded
Delphi's fraudulent transactions with Setech.  Further, as the head of the
Division, Wohleen knew and/or directed the recording of obsolete
inventory on Delphi's books as valuable inventory. (¶137).    Indeed,
according to Lead Plaintiff's investigation, the financial people in
Company headquarters in Troy, Michigan, and at the Electronics & Safety
Division's headquarters in Kokomo, Indiana ordered employees to record
worthless, obsolete inventory as valuable inventory on Delphi's books.
(<i>Id.</i>); and

c. <u>Weber</u> knew that Delphi improperly accounted for inventory by
intentionally not recording receipt of high-dollar inventory supplies as he
was a recipient of the May 2004 Audit Report.  Weber also knew or
disregarded Delphi's fraudulent financing transactions with Setech as he
supervised and received regular reports from Mark Lorenz, who issued a
Company-wide memo regarding the Electronics & Safety Division's
indirect materials disposal program.  (¶143).    According to Lead
Plaintiff's investigation, the indirect materials disposal program included
off-balance sheet financing transactions with third parties like Setech
disguised as sales of indirect materials.  (¶¶123-143).

-14-

25.     While Debtor fails to provide any information regarding the remaining executives covered under its KECP, Lead Plaintiffs, through their extensive investigation, have identified several of them and, moreover, have uncovered their involvement in Delphi's accounting fraud.  Specifically,

a.  <u>John D. Sheehan</u> ("Sheehan") is Delphi's current Vice President, Corporate Restructuring, Acting Chief Financial Officer, Chief Accounting Officer and Controller.  From July 2002 until March 2005, Sheehan was Delphi's Chief Accounting Officer and Controller, and was responsible for all of Delphi's regulatory reporting functions, budgeting and overall financial accounting processes. (¶31).  By virtue of these positions, Sheehan is, and was, intimately familiar with Delphi's financial position and accounting practices, including its accounting for warranties, rebates and rebate credits from suppliers and inventory financing transactions.  (¶605).  Specifically, Sheehan knew that Delphi improperly accounted for inventory by intentionally not recording receipt of high-dollar inventory supplies as he was a recipient of the May 2004 Audit Report.  (¶¶195, 198).  Remarkably, Sheehan was introduced to the Court at the First Day Hearing as the person who would lead Delphi's restructuring efforts;

b.  <u>John P. Arle</u> ("Arle") is Delphi's current Vice President and Treasurer.  In March 2002, Arle was named Vice President in charge of Corporate Audit Services.  In this position, Arle was intimately familiar with Delphi's accounting practices and, in particular, its inventory accounting practices.

Arle knew that Delphi improperly accounted for inventory by intentionally not recording receipt of high-dollar inventory supplies as he was a recipient of the May 2004 Audit Report.  (¶¶195, 198);

c.  <u>Rick Birch</u> ("Birch"), Delphi's Global Director of Production, Control and Logistics, directed and orchestrated schemes to understate Delphi's inventory levels.   For instance, Birch required Delphi's divisional management to commit to achieving certain inventory levels and targets, which based on Lead Plaintiff's investigation resulted in improper inventory manipulations. (¶194).   Birch's direct subordinates also instructed Delphi employees to delay delivery of inventory from freight holders to receiving plants.  (¶193(b)).   In addition, Birch knew that Delphi improperly accounted for inventory by intentionally not recording receipt of high-dollar inventory supplies as he was a recipient of the May 2004 Audit Report.  (¶¶195, 198);

d.  <u>Rajib Chakravarty</u> ("Chakravarty") as a Manager in the Energy and Chassis Division – one of the divisions that fraudulently disguised financing transactions with Setech as sales of indirect materials to get worthless, obsolete inventory off its books (¶¶130, 141-42) – either directed, knew or disregarded Delphi's fraudulent transactions with Setech. (¶¶130, 132).  Chakravarty was also a recipient of the May 2004 Audit Report and therefore knew about the Company's improper inventory accounting practices. (¶¶195, 198);

e.  <u>William P. Elia</u> ("Elia") is a Plant Manager for Delphi's Energy and Chassis Division.  Elia, as part of the Energy and Chassis Division – one of the divisions that fraudulently disguised financing transactions with Setech as sales of indirect materials to get worthless, obsolete inventory off its books (¶¶130, 132, 139) – either directed, knew or disregarded Delphi's fraudulent transactions with Setech.  (¶¶130, 132).  Elia also knew that Delphi improperly accounted for inventory by intentionally not recording receipt of high-dollar inventory supplies as he was the addressee of the May 2004 Audit Report.  (¶¶195-97);

f.  <u>Guy C. Hatchey</u> ("Hatchey") is Vice President of Delphi and President of the Energy and Chassis Division.  As President of the Energy and Chassis Division – one of the divisions that fraudulently disguised financing transactions with Setech as sales of indirect materials to get worthless, obsolete inventory off its books (¶¶130, 132, 139) – Hatchey either directed, knew or disregarded Delphi's fraudulent transactions with Setech.  (¶¶130, 132).  Hatchey also knew that Delphi improperly accounted for inventory by intentionally not recording receipt of high-dollar inventory supplies as he was a recipient of the May 2004 Audit Report.  (¶¶195, 198);

g.  <u>Alison Jones</u> ("Jones"), a divisional Production Control & Logistics Director, knew of Delphi's improper financing transactions with Setech as she visited the Electronics & Safety Division as part of a company-wide program to learn how to effectively dispose of indirect materials through,

among other things, off-balance sheet financing transactions disguised as sales. (¶143);

h. <u>Derek Kolano</u> ("Kolano") is the Director of Delphi Corporate Audit Services. In this position, Kolano was intimately familiar with Delphi's accounting practices and, in particular, its inventory accounting practices. Further, as the author of the May 2004 Audit Report, Kolano knew that Delphi improperly accounted for inventory by intentionally not recording receipt of high-dollar inventory supplies. (¶¶195, 198);

i. <u>Mark Lorenz</u> ("Lorenz"), Delphi's Vice President of Operations and Logistics, orchestrated and directed schemes to understate Delphi's inventory levels. For instance, Lorenz required Delphi's divisional management to commit to achieving certain inventory levels and targets, which based on Lead Plaintiff's investigation resulted in improper inventory manipulations. (¶194). In addition, Lorenz knew of Delphi's improper financing transactions with Setech as he issued a Company-wide memo regarding the Electronics & Safety Division's indirect materials disposal program. (¶143). According to Lead Plaintiff's investigation, the indirect materials disposal program included off-balance sheet financing transactions with third parties like Setech disguised as sales of indirect materials. (¶¶123-143);

j. <u>Laura Marion</u> ("Marion") is the Director of Delphi's Financial Reporting and Accounting Division. In this position, Marion was privy to and had access to all details regarding Delphi's accounting and financial reporting

practices. In particular, based on information obtained through Lead Plaintiff's investigation, Marion knew that Delphi had fraudulently disguised the $200 million financing transaction with Bank One as a "sale" of precious metals in December 2000. Further, because she was responsible for closing Delphi's books and publishing the Company's financials, Marion also knew that, shortly after the books had been closed for the year ended December 31, 2000, Delphi re-opened the books and made additional entries related to the fraudulent sale of the precious metals to Bank One;

k.  Atul Pashricha ("Pashricha") was demoted by the Audit Committee on May 16, 2004 from his position as Delphi's Vice President, Executive Director of Business Lines to a non-officer position because of his involvement in the Debtors' accounting fraud. (¶219). According to Lead Plaintiff's investigation, Pashricha participated in Delphi's fraudulent financing transactions with BBK;

l.  Dan Renick ("Renick"), a Director of Plant Production, Control and Logistics for Delphi's Electronics Safety Division, participated in Delphi's schemes to understate Delphi's inventory levels. For instance, Renick instructed Delphi logistics employees to have freight forwarders hold freight and not send it on to the receiving plant despite the fact that the material had already been ordered and that a Just-In-Time was sent for replenishment. (¶193). According to Lead Plaintiff's investigation, Renick also manipulated Delphi's inventory balances in order to satisfy

commitments he made to Lorenz and Birch to achieve certain inventory
level targets.  (¶194);

m.  <u>John Rotko</u> ("Rotko") is the Head of Indirect Materials in Mexico for
Delphi's Electronics and Safety Division.   In this position, Rotko
participated in Delphi's fraudulent financing transactions with Setech in
order to get millions of dollars of obsolete, worthless inventory maintained
at Delphi's facilities in Mexico off the Company's books.  (¶¶136-38).
Further, Rotko was, in part, responsible for the obsolete and worthless
inventory which was carried on Delphi's books because, at the direction of
the financial team in Troy and the Electronics and Safety Division's
headquarters, Rotko recorded the inventory as valuable.  (¶137); and

n.  <u>Bette Walker</u> ("Walker") is a Vice President and Chief of Information
Officer.   Prior to this, Walker served as Executive Director of Delphi's
Business Operation, leading Delphi Information Systems and Services'
Global Cost Management initiatives.  In these positions, according to Lead
Plaintiff's investigation, Walker was involved in every aspect of Delphi's
information technology systems.   In particular, Walker negotiated and
structured the Delphi contract with EDS and was the executive in control
of the Delphi – EDS relationship.  Further, Walker, along with Pete Janak,
directed and controlled the accounting and finances for Delphi's
information technology systems, including Delphi's improper accounting
for payments and credits received from EDS.  For instance, Walker was

directly involved in Delphi's improper accounting for a $20 million payment against future services received from EDS as revenue.

26.       While the executives identified above are just a sampling of the executives covered under the KECP, their involvement in Delphi's accounting fraud undoubtedly demonstrates that executives at all levels and in all business sectors of the Company either participated in or willfully ignored the Debtors' massive accounting fraud.  It is incomprehensible that, in the wake of such misconduct, these executives stand to be generously rewarded under the KECP.    Clearly, the KECP serves to further enrich executive wrongdoers and therefore is contrary to sound business judgment.

**The KECP Motion Lacks Vital Detail**

27.       Lastly, the KECP Motion fails to supply even the barest specificity regarding fundamental aspects of the program, including the executives covered under the KECP, the methodology used to select covered executives, the maximum dollar amount that can be paid to any one participant, the performance targets and the allocation methodologies contemplated by the KECP.  Even if one were to ignore the accounting scandal (as the KECP Motion does), the absence of any detail makes it impossible to evaluate the reasonableness of the KECP.

28.       First, as described above, the Debtors fail to provide any identifying information – name, position, or tenure at Delphi – for 482 of the 486 covered employees.  The KECP states only that it encompasses "all U.S. executives (except the CEO), approximately 486 employees."  (KECP Motion, Ex. 1 at 12).  The KECP fails to provide any detail as to why and how the 486 executives were selected for coverage.

29.    Second, the KECP lacks fundamental clarity on the triggering performance targets of its annual incentive plan.  For example, the Debtors ask permission to pay their executives bonuses every six months according to a "revised incentive plan" equaling one-half of their current annual "bonus opportunity."  (KECP Motion, Ex. 1 at 10).  These bonuses are to be contingent upon the attainment of an earnings target.  However, the KECP fails to set the performance goal or set forth the factors that will be used to set the performance goals, saying only that "the EBITAR goal for the first performance period will be set by the Compensation Committee before December 31, 2005."  (*Id.*).

30.    Third, the KECP is vague as to what methodology governs the allocation of the cash component of the KECP's emergence bonus plan.  The KECP provides that this bonus is to be triggered "upon either confirmation of the plan of reorganization or a sale of all or substantially all of the company's assets."  (KECP Motion, Ex. 1 at 12).  It then lists dollar amounts to be paid to four executives, and two classes of executives.  However, it omits any discussion of why these executives are to receive the proposed amounts.  Nor does it indicate, with regard to the two classes (unhelpfully characterized as "18 Officers" and "All Other Executives") how individual bonuses will be fixed within the necessarily huge ranges.  Moreover, the KECP does not contain any feature designed to discourage the covered executives from triggering the cash component bonus injudiciously, as in the instance of a fire sale.  The absence of a minimum sales price is contrary to sound business judgment, as it pits the controlling executives' interests against the interests of the Debtors' employees and stakeholders.

31.    Without knowing (i) which employees are eligible to receive bonuses under the KECP, (ii) whether the thresholds for receiving the "performance-based" benefits are reasonable or (iii) what events will give rise to the payment of bonuses under the KECP, the Court and the stakeholders cannot possibly determine whether the KECP is "fair and reasonable".  See, Georgetown Steel, 306 B.R. at 556; Aerovox, 269 B.R. at 81; In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991).

**The Debtors Should Be Required To Provide Evidence In Support Of The KECP**

32.    For the reasons set forth above, the Court should deny the KECP Motion. In the alternative, the Court should permit limited discovery of the Debtors to assess whether the proposed KECP is the product of sound business judgment.  To this end, Lead Plaintiffs request that the Debtors be required to produce evidence, in the form of both documents and testimony by Sheehan, O'Neal, Weber and/or Wohleen, regarding:

    a.    The identity of the executives covered under the KECP;

    b.    The processes and safeguards employed, if any, by the Debtors to determine whether the executives covered under the KECP were involved in or knew of Dephi's accounting fraud, sham transactions and/or inventory manipulations;

    c.    The results and conclusions reached by the Debtors in determining whether the executives covered under the KECP were involved in or knew of Delphi's accounting fraud, sham transactions and/or inventory manipulations;

d.   The individuals involved in determining whether the executives covered under the KECP were involved in or knew of Delphi's accounting fraud, sham transactions and/or inventory manipulations;

e.   The identity of the twenty-five executives who have departed the Debtors' employ since January 1, 2005 and the reasons for the departures;

f.   The performance goals used to trigger the bonuses offered under the KECP's annual incentive plan, including the methodology used in setting the performance goals;

g.   The methodology underlying the allocation of the cash component of the KECP's emergence bonus plan;

h.   Any application for employment submitted to the Debtors on behalf of a person who sought (or seeks) one or more of the positions presently held by the 486 executives who would be covered under the KECP.

33.   Lead Plaintiffs believe that absent such evidence, the Court should not approve the KECP.

## CONCLUSION

WHEREFORE, Lead Plaintiffs respectfully request that this Court deny the KECP Motion or, in the alternative, require the Debtors to produce evidence sufficient to evaluate the reasonableness of the proposed KECP, and grant Lead Plaintiffs such other and further relief as is just.

Dated: November 22, 2005

Respectfully submitted,

**LOWENSTEIN SANDLER PC**

By: /s/ Michael S. Etkin
Michael S. Etkin, Esq. (ME 0570)
Ira M. Levee, Esq. (IL 9958)
Thomas A. Pitta, Esq. (TP 3018)
1251 Avenue of the Americas, 18th Floor
New York, New York 10019
(212) 262-6700  (Telephone)
(212) 262-7402  (Facsimile)
                    and
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2481 (Facsimile)

*Bankruptcy Counsel for Lead Plaintiffs and
the Prospective Class*

**NIX, PATTERSON & ROACH, L.L.P.**
Jeffrey J. Angelovich
Bradley E. Beckworth
Susan Whatley
205 Linda Drive
Daingerfield, Texas 75638
Telephone:      (903) 645-7333
Facsimile:      (903) 645-4415

**BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP**
John P. Coffey (JC-3832)
Hannah E. Greenwald (HG-5180)
Mark D. Debrowski (MD-3968)
1285 Avenue of the Americas
New York, NY 10019
Telephone:      (212) 554-1400
Facsimile:      (212) 554-1444

**GRANT & EISENHOFER, P.A.**
Jay W. Eisenhofer (JE-5503)
45 Rockefeller Center
650 Fifth Avenue
New York, NY 10111
Telephone:      (212) 755-6501
Facsimile:      (212) 755-6503
-and-
Geoffrey C. Jarvis
Sharan Nirmul
1201 North Market Street, Suite 2100
Wilmington, DE 19801
Telephone:      (302) 622-7000
Facsimile:      (302) 622-7100

**SCHIFFRIN & BARROWAY, L.L.P.**
Michael Yarnoff
Sean M. Handler
Jodi Murland
280 King of Prussia Road
Radnor, PA 19087
Telephone:      (610) 667-7056
Facsimile:      (610) 667-7706

*Co-Lead Counsel for Lead Plaintiffs and the
Prospective Class*