Thomas M. Kennedy (TK-0993)
Susan Jennik (SJ-4607)
Larry Magarik (LM-3748)
KENNEDY, JENNIK & MURRAY, P.C.
113 University Place
New York, NY 10003
(212) 358-1500

    *- and -*

Hanan B. Kolko (HBK-1307)
MEYER, SUOZZI, ENGLISH & KLEIN, P.C.
1350 Broadway, Suite 501
New York, NY 10018
(212) 239-4999

Attorneys for International Union of Electronic,
Electrical, Salaried, Machine and Furniture Workers,
Communications Workers of America (IUE-CWA)

**Omnibus Scheduled Return Date:
November 29, 2005, 10:00 am**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | |
| | ) | **Chapter 11** |
| In re DELPHI CORPORATION, et al., | ) | |
| | ) | **05-44481 (RDD)** |
| Debtors. | ) | **(Jointly Administered)** |

## OBJECTION AND MEMORANDUM OF LAW IN SUPPORT OF OBJECTION OF IUE-CWA TO MOTION FOR ORDER UNDER §§ 105 AND 363 AUTHORIZING THE DEBTORS TO IMPLEMENT A KEY EMPLOYEE COMPENSATION PROGRAM ("KECP MOTION")

The International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-

Communications Workers of America ("IUE-CWA"), the labor union representing 8,500 hourly

employees of Delphi Corporation, et al. ("Debtor" or "Delphi"), hereby objects and submits this

Memorandum of Law in Support of its Objection to Debtor's Motion for Order Under §§ 105 and

363 Authorizing the Debtors to Implement a Key Employee Compensation Program ("KECP").

Debtor entered Chapter 11 for the primary purpose of securing the cooperation and agreement of its

34,000 represented workers and their Unions to drastically cut these workers' wages and benefits.

Debtor asks the Court to begin this process by offering its approximately 500 top executives

enormous compensation bonuses and increases – without and before any negotiations with the

Unions, and before any plan of reorganization is confirmed or even proposed.

Implementation of the KECP would be unnecessary, inappropriate, unsound business

judgment, unreasonable and imprudent, and would almost certainly lead to the failure of collective

bargaining negotiations in which the Debtor is engaged with IUE-CWA and other unions, as well

as the 11 U.S.C. §§ 1113 and 1114 processes. Furthermore, the proposed KECP constitutes bad faith

self-dealing, clearly violates the new provisions of 11 U.S.C. § 503(c), and is manifestly inequitable.

Approval of the Motion would ensnare the Court in what is, and will appear to the public to be, an

insider scheme, and will certainly undermine confidence in the judiciary and this Court in particular.

The Motion should be denied or deferred until the conclusion of this Chapter 11 proceeding.


### Standard

The proposed KECP may not be approved unless the Court finds that it is "necessary or

appropriate to carry out the provisions" of Chapter 11 under 11 U.S.C. § 105(a). Additionally, since

the proposed KECP expenditure, estimated at $600 million, is admittedly outside the "ordinary

course of business," the Court may not approve it without an evidentiary hearing and findings of fact

under 11 U.S.C. § 363(b)(1). The burden of proof is upon the Debtor to demonstrate "good business

justification" that the KECP is "necessary to aid the reorganization." **In re Lionel Corp.,** 722 F.2d

1063, 1070 (2d Cir. 1983); **In re Ionosphere Clubs, Inc.**, 100 BR 670, 675 (Bankr. SDNY 1989).

Additionally, Debtor must actually demonstrate good faith in the proposed transaction, **In re M**

**Capital Corp.**, 290 BR 743, 747 (9th Cir. BAP 2003), *cf.* **In re Adams Apple, Inc.**, 829 F.2d 1484

(9th Cir. 1987), particularly here where the proposed compensation package is directed toward

insiders and would amount to self-dealing, **The Official Committee of Subordinated Bondholders**

**v. Integrated Resources, Inc.**, 147 BR 650, 657 (Bankr. SDNY 1992), *appeal dismissed*, 3 F.3d 49

(2d Cir. 1993) (business judgment rule incorporates question of whether proposal is "tainted by self-

dealing or manipulation").

Additionally, "Implicit in the grant of authority of 11 U.S.C. § 363(b)(1) ... is the further

requirement that the ... debtor ... justify the proposed transaction with sound business reasons in

order to satisfy the estate representative's fiduciary duty to the debtor, creditor, and equity holders.

Thus, ... a bankruptcy judge must expressly find from the evidence presented at the hearing a sound

business reason justifying the proposed transaction." Bassano, Joseph M., et al., 9B **Am.Jur.2d**

**Bankruptcy** § 1539 (August 2005) and cases cited therein. The Court of Appeals in **In re Lionel**

**Corporation**, *supra* at 1071, rejected a proposed distribution and held that a bankruptcy judge must

"expressly find from the evidence presented before him at the hearing a good business reason to

grant such an application." **Lionel** held that the critical factor is the impact on a plan of

reorganization, and reiterated that the burden of proof is on the debtor in such an application. The

District Court in **In re Integrated Resources**, 147 BR 650, 657 (Bankr. SDNY 1992), explained that

a Court should itself assess the merits and fairness of a business transaction such as this one

involving a management proposal in which the corporation's executives have direct financial

interests. In the context of proposed payments to the top corporate insiders, "good faith" is a

necessary element of inquiry, 2C **Bankr. Service L.Ed** (September 2005) § 20:119 and cases cited

therein; **In re Gucci**, 126 F.3d 380, 390 (2d Cir. 1997).

Finally, "[i]t is well settled that bankruptcy courts are courts of equity, empowered to invoke

equitable principles to achieve fairness and justice in the reorganization process." **In re Momentum**

**Mfg. Corp.**, 25 F.3d 1132, 1135 (2d Cir. 1994); Norton, William L., 1 **Norton Bankr. L. & Prac.**

**2d** § 4:5 (July 2005); **In re Charles & Lillian Brown's Hotel Inc.**, 93 BR 49, 54 (Bankr. SDNY

1988); **In re Amarex Inc.**, 30 BR 763, 767 (Bankr. W.D. Okla. 1983) (Bankruptcy Court is a court

of equity which may, in its discretion, deny even that relief which is within its power to grant based

on equitable principles.)

The KECP Motion does not meet these standards and should be denied or deferred for the

following reasons:

**Objections**

1.    **Approval of the KECP Will Prevent Successful Collective Bargaining with Debtor's**
      **Workers' Unions and Preclude a Viable Reorganization Plan.**

Approval of a KECP which offers 500 top executives millions of dollars in bonus money will

anger, humiliate and alienate 34,000 Delphi represented workers and prevent their unions from

having any reasonable chance to negotiate modifications in their collective bargaining agreements

with Debtor. According to the Debtor (Motion ¶¶ 12-13), the main purpose of this Chapter 11

proceeding is to get the unions to agree to reduce their members' wages, benefits and labor costs.

In order for the unions to reach agreement, they will need the acceptance and ratification of these

workers. Granting the Motion will antagonize these workers, destroy their morale, turn them against

any meaningful concessions, and thwart the very 11 U.S.C. §§ 1113 process on which Debtor

focuses the Chapter 11 proceeding. The Motion will, therefore, not aid, but defeat the possibility

of a reorganization plan.

For just this reason, the Court denied a similar motion in **In re Geneva Steel Company**, 236

BR 770 (Bankr. D. Utah 1999). In **Geneva**, as here, Debtor did not consult with any of its Unions

while formulating a retention program for a small group of top executives, *id.* at 773, n.4. In denying

the Motion, the Court stated in terms ringingly applicable here:

> While there is evidence that retention of the key employees is critical
> to Geneva's survival, there is also evidence that granting the Motion
> as prayed may jeopardize the continuing support of the Steelworkers
> in Geneva's reorganization process. Indeed, evidence was presented
> that some plumbers and electricians have already left Geneva's
> employment. The court views the support and participation of the
> Steelworkers as being equally critical to Geneva's successful
> reorganization as the support and participation of the key employees.
> The tension created by these opposing interests creates a significant
> dilemma for the court. To deny the Motion in full increases the risk
> that Geneva's management team may be lost or further reduced.
> However, to grant the Motion in full risks alienating the Steelworkers
> and their support of Geneva's efforts to reorganize. In an effort to
> fashion a compromise between these competing interests, the court
> will comment on the relative merits of the proposed retention
> program and invite Geneva to renew its Motion if it so desires.

*Id.* at 773.

Debtor walked into this Chapter 11 proceeding with a KECP Motion as its first order of

substantial business, and without ever consulting, bargaining with or including the unions in the

matter. In no reported decision has a court approved a compensation increase to executives to begin

a Chapter 11 proceeding focused on obtaining its workers' and unions' acquiescence to pay and

benefit cuts.

Without a successful § 1113 process, there can be no effective reorganization plan, so the Motion must be denied. The prerequisite for approving such a Motion is a finding that it would "help develop a reorganization plan," **In re Bethlehem Steel Corp.**, ___ F.Supp.2d ___, 2003 WL 21738964 at *11 (SDNY 2003), which is impossible here. In **Bethlehem Steel**, the Court approved financial professionals' fees so the unions could intelligently bargain and participate in discussions concerning the restructuring of the debtor, including negotiations regarding possible modifications to their existing labor and benefits agreements. Here, however, Debtor seeks the reverse: it unilaterally proposes a set of expensive increases for its key executives, the granting of which will prejudice and block meaningful negotiations with the unions and prevent a successful reorganization plan.

IUE-CWA herewith submits an Affidavit of Henry Reichard ("Reichard") detailing the ways in which implementation of the KECP will undermine the collective bargaining process. Reichard concludes:

> The process of negotiating a concessionary agreement is, under the best of circumstances, extremely difficult. What I have learned is that it takes cooperation, a feeling of shared sacrifice, and the perception that "everyone is in the same boat" to have a chance of success. The KECP Program will make this process impossible. Based on this, I urge the Court to reject the KECP Program. Unless rejected or seriously modified, it will be an insurmountable hurdle to the IUE reaching an agreement with Delphi to modify the collective bargaining agreement. It will make it impossible for the IUE to reach such an agreement, will make it impossible for the IUE to recommend that the members vote to accept such an agreement, it will make it impossible for such an agreement to be ratified, and will make it far more likely that the workers would strike if the current agreement is rejected.

Reichard Affidavit, ¶ 19.

We intend to present testimony at the hearing that a KECP would doom any hopes of reaching an agreement under § 1113 to failure.

Debtor cites the need to "take proactive steps to ensure that mechanics are in place to allow their employees to remain loyal" (Motion ¶ 18). The KECP will undermine the loyalty of the over 34,000 employees whose compensation is being threatened with cuts while a generous package of goodies is offered to the Debtors' top executives.

Moreover, the Motion manifests complete ignorance (or disregard) for the sentiments of some 15,000 salaried managerial or supervisory employees who would not be included in the KECP. Far from improving employee morale, the well-publicized KECP will ensure defection and disloyalty.

**2.    The Motion Should Be Deferred to the End of Chapter 11 Proceeding.**

The Motion, which seeks to reward executives for carrying through a successful Chapter 11 reorganization, should be denied or deferred to the end of the Chapter 11 proceeding. A successful conclusion to the process is the logical prerequisite for a bonus or reward.

The court in **In re America West Airlines, Inc.**, 171 BR 674, 677 (Bankr. D. Ariz. 1994) approved bonus awards to executives who successfully completed a reorganization and propelled the debtor through plan confirmation. The court in **In re US Airways Inc.**, 329 BR 793, 801 (Bankr. E.D. Va. 2005) refused to approve such a program for key executives prior to confirmation of a merger plan, and only approved such a program for lower-level management employees after collective bargaining negotiations under § 1113 were successfully completed. The court in **Interco Inc.**, 128 BR 229, 233 (Bankr. E.D. Mo. 1991) noted: "In most Chapter 11 cases ... emergence

-7-

bonuses should not be authorized until at least the framework of a plan of reorganization has been prepared." For the same reasons, the court in **In re New Hampshire Elective Cooperative Inc.**, 131 BR 249, 252 (Bankr. D.N.H. 1991) denied such a motion as "premature" pending the disclosure statement and confirmation process.

Moreover, the adoption of a KECP may become relevant in a Section 1113 or 1114 process, including the questions as to whether the Debtor's proposal assures that all parties are treated "fairly and equitably"; see 11 U.S.C. § 1113(b)(1)(A); **In re Jefly, Inc.**, 219 BR 88, 93-94 (Bankr. E.D. Pa. 1998).[*] In this case, the reorganization plan may be dependent on the § 1113 process. The Court should certainly defer this Motion until after the §§ 1113 and 1114 proceedings are resolved or completed.

### 3.    The Motion is Neither Necessary, Appropriate Nor Sound Business Judgment, But is Arbitrary and Unreasonable.

The Motion is neither necessary, appropriate nor the exercise of sound business judgment. Rather, it is selfish, arbitrary and unreasonable. The shortsightedness of the KECP Motion was given eloquent expression in a timely article, Morgenson, Gretchen, "Oohs and Ahs At Delphi's Circus," *New York Times Sunday Business*, November 13, 2005, Section 3, pp. 1 and 4, 2005 WLNR 18334017, which begins as follows:

> It's not every day that investors can view the contortions
> performed by compensation consultants trying to justify the monster

---

[*] Courts have increasingly recognized the importance of the union's role in reorganization, see **In re Biderman Industries USA**, 241 BR 76 (Bankr. SDNY) (union formally named by bankruptcy court as one of the "Plan Parties" to be consulted concerning various reorganization plan processes); Seltzer, Richard M., "Critical Employment Issues During Restructuring – A Union Perspective," 050601 ABI-CLE  223, *2 (2001).

> executive pay packages that they recommend to corporate clients. And when these exercises in absurdity are done for executives asking for great sacrifices from workers, retirees, creditors and former shareholders because they manage a company in Chapter 11 bankruptcy protection, the entertainment is unmatched.

A copy of this article is appended hereto.

The Motion is sparse and provides little support for its assertions. Among the inconsistencies in the Motion's premises and reasoning are the following:

— Management by these key executives has resulted in losses by the Company in almost every year since separation from GM. (Motion ¶ 10.) It makes little sense to reward or "incentivize" long-term executives who have consistently failed in the past.

— The Debtors' explanation for the losses is three-fold: excess labor costs, reduced market for motor vehicles and increased commodity prices. (Motion ¶ 11). The Debtor does <u>not</u> explain its losses based on any purported drain, exodus or flight of key executives. (Motion ¶ 11). There is absolutely <u>nothing</u> crucial about retaining any of them.

— Since the industry itself is contracting, according to Debtor (Motion ¶ 11), there is little fear that these executives will find other positions or flee the Debtor. If they do, the Debtor may be better off without them.

— In fact, the alleged departure of 25 executives in 2005 (Motion ¶ 17) is a remarkably <u>low</u> rate of turnover. Delphi has approximately 600 executives (¶ 31). If 2.5 executives left per month up through the end of October, the expected total executive departure in 2005 would be approximately 30. A turnover rate of 30 executives out of a total of 600 works out to an annual rate of 5%. This is a <u>low</u> turnover rate. In addition, there is no evidence that these executives left because their compensation was inadequate, and there is no evidence that these executives left voluntarily.

— A premise of the Motion (¶¶ 16-17) is that Debtor's "salaried and executive workforce" is below the industry norm in compensation. The Motion provides no evidence that this is so. Moreover, the KECP does not even provide any improvement in the compensation of most salaried or managerial employees.

— A premise of this Bankruptcy proceeding is that Delphi does not have enough money to pay the wages and benefits of its employees. It is not possible to square that premise with a grant of substantial increases to its top executives. No amount of double-talk will make sense of this absurdity or convince Delphi's employees that they should agree to compensation reductions while executives are granted large increases.

— Delphi CEO Robert Miller's voluntary "opt-out" from the KECP (Motion ¶ 17 n.4, ¶ 24) demonstrates that a KECP is <u>not</u> necessary to retain or incentivize executives. Rather, as with

Miller, a reward should be determined later "based on the merit of [the executives'] performance" (¶ 24).[*]

— No proof is given that executives would resign if the KECP were not offered, nor that they could not be replaced if they did resign. (Motion ¶ 40.)

— The process of adoption of the KECP is general and vague. (Motion ¶¶ 19, 21, 22, 23.)

— The Motion (¶ 16) asserts that because of Delphi's "historical financial performance," "incentive based compensation programs failed to provide salaried and executive work force with total compensation that is competitive with the industry norm." This claim has no supporting detail or back-up. It is unclear which of the management and salaried employees are allegedly receiving "below norm" compensation, and for how long these employees have been receiving compensation below the industry norm. Why this should suddenly be remedied after the filing of a bankruptcy petition is not explained.

— The notion that executives at a large company losing lots of money should be earning at or above the market rate is also absurd. As detailed in the Motion ¶ 10, Delphi has lost money every

---

[*] Page 2 of the Watson document states that Mr. Miller will not participate either in the incentive plan or the emergence plan, and he recently announced that he will be working for a salary of $1.00 per year as of January 1, 2006. However, Miller has not given back any prior salary or payments which he received as a sign-on bonus. By declining to participate in KECP, Miller is simultaneously making himself look selfless and magnanimous but shielding from any judicial review what he will ultimately get paid. The Motion (¶ 24) states that Miller has "opted out" of KECP and page 2 of the Watson report states that Miller will not participate in the emergence bonus plan, the charge on page 23 of the Watson report states that the "CEO" is to receive stock options with a face value of $10 million and restricted stock with face value of $5 million.

year it existed except for the first two years after it was spun off from GM and 2002; and had net

losses of $4.8 billion in 2004, and operating losses of $608 million in the first 6 months of 2005.

Given these massive losses, why would executives be paid salaries equal to or above the industry

norm?  The Motion does not even state what these people are being paid, let alone explain why any

of them needs to be "incentivized."

     –  The Motion (¶ 21) wishes to "encourage maximum effort."  No evidence exists that the

KECP is required to "encourage maximum" effort as opposed to some other level of effort by these

employees.  At best, the Motion is an admission that these executives are not amply motivated and

should be replaced.  Indeed, some of them would doubtless be in line for simple retrenchment.

     –  The emergence bonus seems to provide that the covered executives will get 10% of the

equity in Delphi regardless of what happens in the bankruptcy, regardless of the recovery for the

unsecured creditors, regardless of how long it takes for the company to emerge from bankruptcy,

regardless of whether the bankruptcy goes smoothly or is disrupted by labor strife, regardless of the

post-bankruptcy GM-Delphi relationship, and regardless of the capital structure of the post-

bankruptcy Delphi.

     –  The Motion (¶ 29) states that as part of the emergence bonus plan, cash payments varying

from 30 to 250% of the participant salary will be paid to participants shortly after the Debtor exits

bankruptcy.  This cash component, available to 486 U.S. executives, will pay an estimated total

amount of $87.9 million.  The average amount of cash paid per participant will be $179,000 and the

-12-

payments range from $50,000 to $2.75 million. Based on the Watson document, it is not clear how any individual payment is calculated, it is not clear who sets the payments, it is not clear when the payments are to be set, and it is not clear whether the payments are subject to the Unsecured Creditors' Committee comment or court approval. In addition, it is not clear that there is any connection between performance and the individual's cash payments. There is no evidence that the cash payment varies with how successful the bankruptcy is, and no evidence of any link between a covered employee's "cash opportunity" under the program and that employee's performance. It appears that the covered executives will receive this cash component regardless of how long it takes to get the case out of bankruptcy, no matter how difficult the bankruptcy proceeding is, no matter how contentious labor relations are during the bankruptcy, regardless of how much the unsecured creditors receive, and regardless of the extent to which bargaining unit employees are forced to take severe pay cuts. Thus, it is not clear how this cash component "aligns" the executives with any other stakeholders in the case.

    —  On page 16 of the Watson study, there is a chart purporting to compare the cost of the emergency plan cash component with the costs of prior years' Long Term Incentive Plan ("LTI") payments. These charts reflect that in 2003, 2004 and 2005, the LTI paid out a total of about $236 million. In those years, Delphi had huge losses. It makes little sense to pay out $236 million in bonuses to management in a three-year period when, during that period, Delphi lost hundreds of millions of dollars and ended up filing for bankruptcy.

–    Page 18 of the Watson report compares the Delphi cash component with "retention programs" in place at 117 other companies. There is no evidence that these are companies in bankruptcy, and the comparison unfairly ignores the equity component of the emergence bonus plan.

–    The Motion (¶ 33) states that "debtors intend to seek creditor agreement or court approval, pursuant to a plan of reorganization, to set aside 10% of the equity in the reorganized entity for approximately 600 U.S. and foreign executives." This supports the notion that the entire KECP should be deferred until the confirmation process. With regard to the stock option portion of the emergence bonus plan, Delphi proposes a strike price in the "mid point of the valuation range in the disclosure statement accompanying the plan of reorganization approved by this court." This seems to permit manipulation of the strike price – a valuation range with a low bottom will result in a lower strike price and a more valuable stock option.

–    The Motion (¶ 32) states that an executive will receive a "particular amount of equity" based on "the executive's level of responsibility with the Debtors." There are no performance standards.

–    The Motion (¶ 32) states that "to the extent any eligible executive has left the Debtor prior to the effective date, the executive's allocation will be added to the reserve of awards available to employees who are promoted or newly hired." Some of the stock could be allocated to employees who are hired shortly before Delphi exits bankruptcy, and have had almost no role in any reorganization. This makes no sense.

– Despite generalities (¶¶ 34-36), no evidence of actual retention or recruitment difficulties is presented.

Indeed, where as here, employees have been with the Debtor for many years, additional payments to them make no sense and are not reasonably related to or necessary for a reorganization, as the Court found in **In re Levinson Steel Company**, 117 BR 194, 196 (Bankr. W.D. Pa. 1990).

Moreover, any claim of "business necessity" is belied by the actual history of executive retention programs, as detailed by Keach, Robert J., "The Case Against KERPs," **American Bankruptcy Institute 2003 Annual Spring Meeting**, 041003 ABI-CLE 9 (2003). The empirical evidence establishes that there is no evidence that executive retention programs actually result in the retention of employees who would otherwise leave, while there is considerable evidence to the contrary. These programs do not work better than cheaper alternatives and are often unnecessary. They are upside down, because in fact the senior-most executives are the most replaceable. Executive retention programs have a negative impact on employee morale, and breed a lack of faith in and lack of respect for the bankruptcy system, the study found.

In short, the KECP Motion is unreasonable and aimed at feathering the nests of Debtor's key insiders. The bottom-line question is why Debtor's top executives should not face the same choice and same risks as are being posed to all of Debtor's other employees.

**4.**     **The Court Should Measure the Motion Against 11 U.S.C. § 503(c).**

In the past, the Bankruptcy Code offered no specific instructions on executive retention

programs, and the case law on the topic is scant. Congress has now enacted the Bankruptcy Abuse

Prevention and Consumer Protection Act of 2005, which includes 11 U.S.C. § 503(c), a provision

offering the Court guidance on the process of considering this Motion. In addition to the factors

discussed above, the Court should adopt this guidance, measure the Motion against 11 U.S.C.

§ 503(c), and deny the Motion based on Debtor's failure to meet the standard it outlines.

Section 503(c) provides:

> (c)     Notwithstanding subsection (b), there shall neither be allowed, nor paid –
>
> (1)     a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business, absent a finding by the court based on evidence in the record that –
>
> (A)     the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;
>
> (B)     the services provided by the person are essential to the survival of the business; and
>
> (C)     either –
>
> (I)     the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or

(ii)      if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred;

(2)      a severance payment to an insider of the debtor, unless –

(A)      the payment is part of a program that is generally applicable to all full-time employees; and

(B)      the amount of the payment is not greater than 10 times the amount of the mean severance pay given to nonmanagement employees during the calendar year in which the payment is made; or

(3)      other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition."

As part of its overall consideration of the KECP, the Court should measure the Motion against § 503(c) for three reasons:

First, Section 503(c) codifies the discretionary authority which the Court already enjoyed and the standards already exercised. The Legislative History of the provision includes the following explanation:

"Sec. 331. Limitation on Retention Bonuses, Severance Pay, and Certain Other Payments. Section 331 amends Bankruptcy Code section 503 to prohibit the allowance or payment of certain transfers or obligations, unless otherwise authorized by the court. It applies to transfers made to or obligations incurred for the benefit of an insider of the debtor for the purpose of inducing such person to remain with

> the debtor's business, unless the court makes certain specified
> findings. In addition, it prohibits a severance payment to an insider
> of a debtor, unless it satisfies certain criteria. Further, it prohibits the
> payment of other transfers or obligations that are outside the ordinary
> course of business and not justified by the facts and circumstances of
> the case, including transfers made to, or obligations incurred for the
> benefit of, officers, managers, or consultants hired after the date of
> the filing of the petition."

P.L. 109-8 Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, House Report

N. 109-31 (Judiciary Committee) (To Accompany S. 256) Cong. Record Vol. 151, p. 150 (April 8,

2005). As Professor A. Mechele Dickerson, "Approving Employee Retention and Severance

Programs: Judicial Discretion Run Amuck?" 11 **Am. Bankr. L. Inst. L. Rev.** 93, 105 (Spring 2003)

noted: "[B]ankruptcy courts typically consider the same factors when deciding these programs" as

are outlined in the new § 503(c). Professor Dickerson, who was actually an opponent of the

legislation, reviewed the case law and practice and concluded that the legislation continued the

central factor guiding the courts: "whether making the payments is necessary to help the debtor

achieve a successful reorganization or efficient liquidation." *Id.* at 93. Concrete evidence of

turnover, threats of resignation, the length of time an employee must stay to receive the

compensation, other employees' sacrifice, the post-petition turnover rates and similar factors are all

part of court consideration, *Id.* 99-102. As Professor Dickerson notes, "The only factors the Act adds

to those that courts already consider are the numerical caps." *Id.* at 107. A similar conclusion is

reached by the panelists in the American Bankruptcy Institute, **10th Annual Southeast Bankruptcy**

**Workshop** 072705 ABI-CLE 567 (July 27-30, 2005).

Second, even though Section 503(c) is not technically effective until October 17, 2005,

Congress has expressed the public will and policy. Though the Court's discretion remains – even

-18-

under § 503(c) – the Court has no reason to disregard the expressed legislative will in its exercise.

Debtor's cynical filing of the Petition prior to the effective date of § 503(c) to ease adoption of a

lucrative KECP to its executive insiders[*] should not receive the Court's imprimatur.

Third, Debtor's Motion (¶ 20) itself attempts to distinguish its KECP from § 503(c), and thus

effectively relies on and incorporates the § 503(c) standard.

In the hearing on the Motion, evidence pertinent to the § 503(c) standard should not only be

admitted but adduced by the Court. The Court should evaluate the Motion against § 503(c), and

accordingly deny the Motion.


**5.    Equity and Respect for Judicial Integrity Compel Rejection or Deferral of this Motion.**

An advance promise of reward to 500 top executives for carrying through a Chapter 11

bankruptcy, the focus of which is to strip 34,000 hourly workers of most of their wages and benefits,

is unconscionable. The Court should deny such a Motion as a matter of equity. Approval of this

Motion would undermine public faith in and respect for the judicial system. At the very least, it will

erode worker morale and lead to a costly confrontation and the failure of any reorganization.

---

[*] There were reports that the bankruptcy filing on October 8, 2005 was designed to avoid the provisions of the new law. See *Newsday*, Oct. 11, 2005, 2005 WLNR 16538873, *2-3; *Kansas City Star*, Oct. 13, 2005, 2005 WLNR 16573972 (copies attached).

## Conclusion

For the foregoing reasons, the Motion should be denied or deferred until the completion of

the Chapter 11 proceeding.

**Dated: New York, New York**
      **November 18, 2005**

**Respectfully submitted,**

**Thomas M. Kennedy (TK-0993)**
**Susan M. Jennik (SJ-4607)**
**Larry Magarik (LM-3748)**
**KENNEDY, JENNIK & MURRAY, P.C.**
**113 University Place**
**New York, NY 10003**
**(212) 358-1500**

Citation                          Search Result              Rank 3 of 3              Database
11/13/05 NYT 31                                                                       NYT

11/13/05 N.Y. Times 31
2005 WLNR 18334017

New York Times (NY)
Copyright (c) 2005 The New York Times. All rights reserved.

**November 13, 2005**


Section: 3

Oohs and Ahs At Delphi's Circus

### GRETCHEN MORGENSON

IT'S not every day that investors can view the contortions performed by compensation consultants trying to justify the monster executive pay packages that they recommend to corporate clients. And when these exercises in absurdity are done for executives asking for great sacrifices from workers, retirees, creditors and former shareholders because they manage a company in Chapter 11 bankruptcy protection, the entertainment is unmatched.

The ringside seat for this show comes courtesy of the Delphi Corporation, the automotive parts giant that filed for Chapter 11 on Oct. 8. The performers are Delphi's lawyers, Skadden, Arps, Slate, Meagher & Flom, and its compensation consultant, Watson Wyatt. The consultant said it was hired to devise incentive plans for the company's executives that would "align the interests of both program participants and company stakeholders and to benchmark such programs against competitive practice."

Brian Foley, a compensation expert in White Plains who scoured the Delphi plan, is dubious. "It starts off with usual alignment rationale, but the reality is it provides no explanation as to how that rationale works when the only people receiving payments are the 500 to 600 chosen," he said. "At the end of the day, you have shareholders, retirees, union employees and nonunion workers who get nothing under this. Align that."

The Watson Wyatt plan -- 35 pages in all -- was filed with the bankruptcy court overseeing the Delphi case in New York. Accompanying the plan was a brief from Delphi's lawyers arguing that the company's managers must be "appropriately incentivized to maximize the financial performance" of the company. A hearing on the plan is scheduled for Nov. 29.

Delphi, which has 185,000 employees, argues that its woes are a result of high union wages, a fiercely competitive industry and rising commodity prices. The

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11/13/05 NYT 31

company plans to turn itself around, according to its lawyers, by improving its manufacturing and "eliminating noncompetitive legacy liabilities and burdensome restrictions under current labor agreements." Put in plain English, that means dumping its pension liabilities on American taxpayers and cutting its workers' wages and retirees' health and life insurance.

Workers at Delphi earn good money -- $26 to $30 an hour in many cases. And the company is bizarrely forced to pay 4,000 current workers who no longer have jobs.

But when a company jettisons a pension that is underfunded by $11 billion, according to the Pension Benefit Guaranty Corporation, and proposes cuts of up to two-thirds in workers' pay and deep reductions in retiree benefits, you would think that its executives might want to share the pain.

You would, however, be mostly wrong.

Yes, Robert S. Miller, Delphi's chief executive, has accepted annual compensation of $1, starting Jan. 1. And, yes, some of the company's highest-ranking officials who were at Delphi before its bankruptcy filing have agreed to take a 10 percent or 20 percent cut in salary. (To make ends meet, Mr. Miller will have to rely on the $3 million signing bonus he received upon his arrival at Delphi in July.)

But the mountain of money that will remain on the Delphi executives' table if the plan goes through makes those give-ups look meager.

Interestingly, nowhere in the plan filings does Delphi concede that mismanagement in the executive suite had anything to do with its problems. In fact, the documents draw a picture of a company that has been managed splendidly over the years. Never mind that Delphi accounting practices are under investigation by the Securities and Exchange Commission or that the company has recorded losses of $6.3 billion in the last seven quarters.

And pay no attention to the fact that the company itself has turned up accounting irregularities from 2000 to 2003 relating to its dealings with suppliers like EDS. One effect of the irregularities was to enhance Delphi's earnings.

ALL of these facts are irrelevant to the matter at hand: taking care of those at the top.

And how the money stacks up. The salaries first: even accounting for the pay cuts, the top four executives at Delphi, not counting Mr. Miller, would receive a total of $3.1 million a year.

Then come incentive bonuses, to be awarded by using a new and unimproved performance hurdle at the company: earnings before interest, taxes, depreciation, amortization and restructuring costs. Interesting to remove

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11/13/05 NYT 31

restructuring costs from the equation -- it means that management no longer has an incentive to keep control of those expenses. "Shouldn't somebody be responsible for that, or is this supposed to be a feeding frenzy?" Mr. Foley asked.

It is impossible to determine what the performance goal is for Delphi executives hoping to earn their incentive bonuses. Under the terms of the plan, the company's compensation committee of the board has until year-end to set the hurdle rate. That seems like a detail the bankruptcy court may want to have as it ponders the package.

The incentive bonus program, to be divided among an unspecified number of Delphi executives, has an estimated cost of $21.5 million for the first six months, Watson Wyatt said. That amount equals the entire compensation paid for all of last year to Toyota's 33 top executives, a group that oversees a highly profitable company in the automotive business.

But wait, there's more. An additional $88 million in cash would go to Delphi's top 500 employees when it emerged from bankruptcy proceedings or if the company's assets were sold. The top four executives -- again, excluding Mr. Miller -- would receive a total of $8.9 million of this, or 10.1 percent.

"The cash part of the plan goes to the executives either on the effective date of a reorganization or on the sale of substantially all the assets," Mr. Foley pointed out. "But there is no floor on the sale of assets, so if they conduct a real fire sale, they still get the $88 million. Why is that a good deal for bondholders, retirees and workers?"

Then there is the stock to be handed to 600 managers after the reorganization is successful: 10 percent of the shares outstanding. Because some of this would be available for immediate sale after the reorganization, it resembles a gift more than an incentive plan, Mr. Foley said.

In the illustration used by Watson Wyatt, the four high-ranking executives, plus a new chief executive, would together receive stock options worth $25 million and restricted shares worth $12.5 million. One-quarter of the restricted stock would vest immediately.

Add to this a severance program under which 21 officers would receive 18 months of salary and target bonuses, 89 senior managers would get a year of pay and target bonuses and 373 executives would receive a year's salary. If all of the executives were terminated and took their severance, the cost to Delphi would be $145.5 million, the filing estimated. If 30 percent left, the cost would be $30.5 million.

Watson Wyatt declined to comment on the Delphi plan. Claudia Baucus, a Delphi spokeswoman, argued that the company must retain its executives who possess knowledge of Delphi's business that is not easily replaced in the open market.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11/13/05 NYT 31

But isn't the automotive business contracting? Aren't there legions of industry executives who would work for food?

"We need the knowledge base that is here now to get us through the next 12 months," Ms. Baucus said.

The filing also makes an oblique reference to "six-figure signing bonuses" that the company has paid to attract new executives. This troubles Mr. Foley. "They reference the sign-ons but conveniently forget to tell the court how much they were," he said. "In the real world, when you get a sign-on you usually agree to give it back if you leave. So aren't those people locked in?" In other words, why does anyone in receipt of such a bonus need further inducements to stay?

Delphi's advisers also argue that in recent years, its executives have had to endure pay that was "substantially less than market." Yes, and isn't that what pay for performance is supposed to be about? This was a company generating losses not only in its books, but also for its investors.

But Ms. Baucus said that while certain elements of Delphi's compensation were performance-based, others had to be based on industry standards, and therefore increased.

The consultant justifies the incentive payouts to Delphi executives by comparing the numbers with higher figures of previous years. But Mr. Foley asked: "In good times you pay management a lot of money, and in bad times you pay them a lot of money based on what you paid them in good times?"

But the funniest rationale is the firm's disclosure, apparently deadpan, that the pay program must take effect or the terrible brain drain at Delphi will continue. "Executive turnover has increased almost 75 percent in the last 12 months," the filing noted. "In the critical finance function, turnover has more than doubled."

Could this finance turnover have been directly related to the accounting irregularities at Delphi? Since March, five finance executives have either resigned or been replaced. Ms. Baucus said that it was difficult to determine why these executives left.

ONE Delphi finance executive who remains at the company and is in line to receive some of the pay pile if the bankruptcy court approves the plan is John D. Sheehan, the chief restructuring officer. A former chief accounting officer, Mr. Sheehan is a defendant in a class-action suit, filed against Delphi, its directors, former executives, underwriters and auditor. The suit, filed on behalf of the Teachers Retirement System of Oklahoma, Public Employees' Retirement System of Mississippi and other Delphi stockholders and bondholders, contends that Delphi engaged in a broad and complex scheme to defraud investors and to hide bad financial results at the company for five years beginning March 2000. The suit cites interviews with former Delphi employees and current and former employees of companies that had dealings with Delphi during the years

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11/13/05 NYT 31

that the accounting irregularities occurred.

Ms. Baucus said that neither the company nor Mr. Sheehan would comment on the litigation.

In summarizing why Delphi's executives deserve what can only be described as a fat pay package, the company's lawyers made this one last pitch: "Approval of the key employee compensation program will boost employee morale," the filing said.

Truly a Marie Antoinette moment.

Photo: John D. Sheehan and other executives at Delphi are in line for some large pay packages. (Photo by Agence France-Presse -- Getty Images)(pg. 4)

---- INDEX REFERENCES ----

COMPANY: TOYOTA MOTOR CORP; DELPHI CORP; SKADDEN ARPS SLATE MEAGHER AND FLOM

NEWS SUBJECT: (HR & Labor Management (1HR87); Business Management (1BU42); Financially Distressed Companies (1FI85); Compensation (1CO80))

INDUSTRY: (Investment Management (1IN34); Financial Services (1FI37); Accounting, Consulting & Legal Services (1AC73); Accounting (1AC78))

REGION: (USA (1US73); Americas (1AM92); North America (1NO39))

Language: EN

OTHER INDEXING: (DELPHI; DELPHI CORP; MARIE ANTOINETTE; PENSION BENEFIT GUARANTY CORP; SECURITIES AND EXCHANGE COMMISSION; SKADDEN ARPS; SLATE MEAGHER FLOM; TOYOTA; WHITE PLAINS) (Add; Baucus; Brian Foley; Claudia Baucus; Foley; John D. Sheehan; Miller; Oohs; Photo; Robert S. Miller; Sheehan; Shouldn; Watson Wyatt; Wyatt)

EDITION: Late Edition - Final

Word Count: 2115
11/13/05 NYT 31


END OF DOCUMENT


© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.                                                                              NewsRoom

10/11/05 NWSDAY A43                                                                         Page 1

10/11/05 Newsday A43
2005 WLNR 16538873

Newsday (USA)
Copyright © 2003 Newsday Inc. All rights reserved.

**October 11, 2005**

Section: BUSINESS & TECHNOLOGY

**Bankruptcy** court beck onsGrowing numbers rush to file before new law takes effect

SUSAN HARRIGAN. STAFF WRITER

With just a few days left before a new law will make it harder and more expensive
to go broke in the legal sense, a growing number of consumers are rushing to the
courthouse to file for **bankruptcy** protection from creditors. **Bankruptcy** filings by
businesses also are up in advance of the new law, which takes effect Monday,
although not as much as some experts expected.

"In September we filed about 60  individual **bankruptcy**) cases; in October I've
already filed 50, and I expect we'll file another 60 or 70 between now and Sunday
night," Gary Fischoff, an attorney for the firm Steinberg Fineo Berger and
Fischoff in Woodbury, said yesterday. "Everybody who was ever thinking about
filing for **bankruptcy** has pulled their head out of the sand and come running in."

In a normal year, Fischoff said, his firm handles 40 to 50 personal **bankruptcies**
per month.

In Nassau, Suffolk and Queens as a whole, "we've had a major spike in filings
this month," said Bill Milkman, administrative analyst for the Eastern District
U.S. **Bankruptcy** Court in Brooklyn. Last month, 2,275 individuals filed for
**bankruptcy** in Nassau, Suffolk and Queens, a 44 percent increase over August 2005,
and up 76 percent compared with September 2004.

Nationally, consumer filings for the week ended Oct. 8 set a new record,
averaging more than 20,000 filings per day, according to Lundquist Consulting Inc.
The Burlingame, Calif.-based financial research firm said that so far this year,
such filings are up 19.4 percent over the same period in 2004.

The new **bankruptcy** law, titled the **Bankruptcy** Abuse Prevention and Consumer
Protection Act and signed by President George W. Bush in April, will make it more
difficult for individuals to get free of many debts, including most credit card
bills. People who earn more than the median income for their state will be able to
seek Chapter 7 elimination of debts only if they meet a "means test," which must

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

be certified by their lawyers. Otherwise, they will have to file for Chapter 13 **bankruptcy**, which requires setting up a plan to pay back debt over five years.

The new law also is expected to raise the cost of consumer **bankruptcy** filings by making more work for their lawyers and requiring financial counseling.

J. Stanley Shaw, of the Garden City law firm Shaw, Licitra, Gulotta, Esernio & Schwartz, called the new measure "a terrible thing" for consumers.

"For a legitimate person who has lost his job because of illness or something, the chances of getting a new start are almost nil," he said. "The banks have won."

Shaw also said that because of the hordes of last-minute filers and what he considers the law's openness to varying interpretations, the changes in **bankruptcy** rules will "create a havoc" in the courts.

The American Bankers Association, a Washington, D.C.-based trade group, has said that the new rules provide for "greater fairness" and are targeted at people who have the means to pay but have been "abusing the system."

A number of individual filers trying to beat the deadline in recent months may be owners of small businesses who have used their credit cards or personal loans to finance operations, according to Neil Geschwind, an accountant who consults with small to medium companies at the Melville firm Holtz Rubenstein Reminick.

But overall, the new law "is not as significant" a change for most businesses as it is for consumers, said Nathalie Martin, a law professor at the University of New Mexico who is resident scholar at the American **Bankruptcy** Institute.

Although business **bankruptcy** filings have risen in recent months, "there hasn't been the rush to file that we anticipated," said Thomas Califano, a Manhattan-based attorney with DLA Piper Rudnick Gray Cary.

One reason, Califano said, is that "there's still a lot of lending" from banks and hedge funds willing to help a company avoid **bankruptcy**. Fischoff, who works for businesses as well as individuals, said that in general, small companies don't plan ahead for **bankruptcy**, instead waiting until the last minute when "their backs are against the wall."

For Nassau, Suffolk and Queens, filings by businesses in the Eastern District **Bankruptcy** Court grew to 32 last month compared with 18 in September 2004. In August, the number was 17, compared with 12 a year earlier.

One of the more recent filers in the Eastern District was Brooklyn Hospital Center, which petitioned for Chapter 11 **bankruptcy** Sept. 30. Michael Geczi, a spokesman, said that although the hospital had been contemplating **bankruptcy** for a while, it was "clearly ... aware of the changes" in **bankruptcy** law due to take effect Oct. 17.

Other recent high-profile **bankruptcies** include those of **Delphi** Corp., Delta Air Lines and Northwest, all filed in U.S. **Bankruptcy** Court for the Southern District in Manhattan. **Delphi**, which declared **bankruptcy** Oct. 8, had said it would file

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

before the effective date of the new law if it didn't get concessions from its
unions, and a spokesman for Northwest told Bloomberg News that the new law was
"one of several factors" in deciding to file Sept. 14. Delta, which also filed
Sept. 14, has said that the changes didn't influence its **timing**.

   The Southern District court, along with most other federal courts, hasn't
released its total **bankruptcy** filings for the most recent quarter.

   For businesses in **bankruptcy**, the new law shifts the "balance of power"
slightly from the debtor to the creditor, according to Louis A. Scarcella, a
**bankruptcy** lawyer with Farrell Fritz in Uniondale. It does so, among other ways,
by:

   Shortening the time that a debtor has to decide whether to assume or reject
leases;

   Shrinking the window in which the debtor has the sole right to propose a
reorganization plan;

   Increasing the amount of cash that a company will have to have on hand to pay
utilities and suppliers in order to keep operating. Race against the clock As the
Oct. 17 date for a change in the **bankruptcy** law has grown closer, **bankruptcy**
filings by both individuals and businesses have risen in Nassau, Suffolk and
Queens. Here are the numbers for August and September, compared with the same
months last year. Aug. '04 1,085 1,073 personal, 12 business Aug. '05 1,592 1,575
personal, 17 business Sept. '04 1,311 1,293 personal. 18 business Sept. '05 2,307
2,275 personal, 32 business

Newsday photo/Viorel Florescu - The U.S. **Bankruptcy** Court in Lower Manhattan Chart
- Race against the clock (see end of text)

                     ---- INDEX REFERENCES ----

COMPANY: **DELPHI** CORP; DELTA AIR LINES INC

NEWS SUBJECT:  (Corporate Financial Data (1XO59); Financially Distressed Companies
(1FI85))

REGION:  (USA (1US73); Americas (1AM92); North America (1NO39); New York (1NE72))

Language:  EN

OTHER INDEXING:  (AMERICAN BANKERS ASSOCIATION; AMERICAN **BANKRUPTCY** INSTITUTE;
**BANKRUPTCY** ABUSE PREVENTION; BLOOMBERG; BROOKLYN HOSPITAL CENTER; **DELPHI; DELPHI**
CORP; DELTA AIR LINES; DLA PIPER RUDNICK GRAY; FARRELL FRITZ; HOLTZ RUBENSTEIN
REMINICK; LUNDQUIST CONSULTING INC; NORTHWEST; QUEENS; SOUTHERN DISTRICT;
STEINBERG FINEO BERGER; US **BANKRUPTCY** COURT; UNIVERSITY OF)  (Bill Milkman;
Califano; Esernio Schwartz; Fischoff; Gary Fischoff; George W. Bush; J. Stanley
Shaw; Louis A. Scarcella; Nathalie Martin; Nationally; Neil Geschwind; Newsday;
Race; Shaw; Thomas Califano)  (**BANKRUPTCY**)

EDITION: ALL EDITIONS

           © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

**News**Room

10/13/05 KCSTAR C1

Page 1

10/13/05 Kan. City Star C1
2005 WLNR 16573972

Kansas City Star (MO)
Copyright 2005 The Kansas City Star

**October 13, 2005**

Section: C

Firms file before new Chapter 11 rules take effect Monday: **Bankruptcy** deadline dash

By JENNIFER MANN, U.S. **Bankruptcy** Judge Jerry W. Venters

When auto parts maker **Delphi** Corp. filed for **bankruptcy** last Saturday, its **timing** was tied in part to changes to Chapter 11 rules that will take effect Monday.

**Delphi** isn't the only company believed to have taken the coming changes into consideration in deciding whether to file for **bankruptcy** before the new rules take effect.

"The underlying philosophy up until now is that **bankruptcy** should provide protection and relief for companies and people who are in financial difficulty. The new law is not written in that manner."

Airline analyst Helane Becker with the Benchmark Group in New York cited the recent **bankruptcy** filings by Delta Air Lines and Northwest Airlines as other examples. Becker said both carriers were being squeezed by soaring jet fuel costs, "but I definitely think the coming changes also came into play."

While much attention has been focused on how new **bankruptcy** rules, pushed by the banking and credit card industries, will be more onerous for consumers, little has been noted about changes to Chapter 11 codes.

There are a number of changes, from how quickly companies must decide what real estate leases to cancel, to restrictions on paying so-called retention bonuses to keep key employees from bolting, to how quickly companies must put into writing a plan for paying debts and becoming profitable again.

While not creating the rush of debtors trying to beat the deadline that changes in the personal **bankruptcy** rules have caused, a recent uptick in Chapter 11 filings suggests some companies have decided they would rather reorganize under current rules. Last-quarter filings in the busiest jurisdictions were up almost 20 percent, according to data compiled by Bloomberg News, while filings in all jurisdictions were up 8.3 percent in the same period.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In all, the changes to Chapter 11 laws represent a hodgepodge of interests, said
Ben Mann, a **bankruptcy** attorney with Blackwell Sanders Peper Martin in Kansas City.

"Unlike the consumer side, which was very focused, there wasn't an overall goal
with these changes," Mann said. "Each change in Chapter 11 has its own mini-goal."

The changes are generally viewed as making the **bankruptcy** process more onerous and
expensive for companies seeking protection from creditors. Some **bankruptcy** experts
also believe it is an effort by Congress to curtail judicial discretion.

"The sense that is overarching is that Congress was distrustful of the
discretionary powers that **bankruptcy** judges have," said Karen Gross, a law
professor at New York University. "And then some of the changes come from the
perception that Chapter 11 has been too debtor-friendly."

U.S. **Bankruptcy** Judge Jerry W. Venters agreed with Gross' characterization of
Congress' intent.

One change gives a company 18 months to file its plan to reorganize. After 18
months, any interested party can file its own plan, which shifts some power away
from the company to those owed money. Under current rules, companies have 120 days
to file a plan, but judges have the discretion to extend the deadline indefinitely
and often do.

"This (change) is reflective of Congress' desire to take away some more discretion
from the court to let (the parties) work things out," Venters said. "The
underlying philosophy up until now is that **bankruptcy** should provide protection
and relief for companies and people who are in financial difficulty. The new law
is not written in that manner."

John Penn, president of the American **Bankruptcy** Institute and a lawyer in Fort
Worth, Texas, said he wouldn't be too surprised to see at least a few large,
high-profile companies file for reorganization before Monday to beat the changes
in the law that he thinks companies will find taxing.

For instance, the new rules dictate that any goods delivered to a company in the
20 days before filing for Chapter 11 are administrative claims and may have to be
paid in cash in the early stages of the case.

Under current rules, those bills are general unsecured claims and are paid at the
end of the **bankruptcy** process after secured lenders are paid -- if there is any
money left over.

Penn used Interstate Bakeries Corp., which filed for Chapter 11 a year ago, as an
example of how the rule changes may affect companies. "Think of all the flour and
sugar delivered in the 20 days before they filed," Penn said. "That would be a lot
of money they'd have to pay out during the start of the **bankruptcy** process."

Another change Penn noted that will make the process more expensive and arduous
deals with utilities. Under current rules, at the beginning of the process, a
company has to provide so-called adequate assurance to utilities that it will
continue to pay its bills. Normally, courts rule it is adequate for a company to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

simply show it has money to pay utility bills.

The new law typically will have companies make a cash deposit, issue letters of credit or secure surety bonds equal to two months to each utility. Again, using Interstate as an example, it would have had to make arrangements and cash outlays to the hundreds of utilities that service its approximately 50 plants, 1,000-plus thrift stores and about 700 distribution depots. Interstate spends $1 million to $2.2 million monthly on utilities, meaning it would have needed to pony up $2 million to $4.4 million at the start of its reorganization.

Another change to the code deals with the time a company has to assume or reject leases. Now a company has 60 days to decide what leases to keep and which to reject. But they often ask for and are granted time extensions by the courts. The new law gives a company a maximum of 210 days, unless it asks for and receives permission from landlords to delay such decisions.

Again, Interstate would have likely had to make all decisions within that time frame, when in reality it would have been at best only halfway through that process more than a year after its filing.

Yet another change deals with bonuses paid to so-called key employees, often the top executives, to stay with a company through its reorganization process. Previously, a company could identify people it said were key to successfully reorganizing and ask the courts to let them pay them bonuses to stay on so the company would not lose institutional knowledge useful in reorganizing. Under the new rules, a key employee would have to receive a bona fide offer from another company for an amount equal to or more than the bonus amount before the court could approve such payments.

This change, said Gross of NYU, "is an effort to root out certain kinds of wrongdoing by corporate officers," citing Enron as an example. On the eve of Enron's **bankruptcy** filing in 2001, 292 executives collected bonuses as large as $8 million. Shortly after it filed, it asked for and was granted approval to pay up to $45 million to key employees.

Last week, on the eve of its Chapter 11 filing, **Delphi** sweetened severance packages for 21 top executives and then filed a motion with the court for bonuses for key employees that would give them cash and a stake of up to 10 percent of the company that could add up to $87.9 million.

But Venters said the changes to the retention bonuses are troublesome to him. In his experience overseeing **bankruptcy** cases, keeping key employees has often made **bankruptcies** run more efficiently.

"I sat in Delaware handling larger cases than we typically have around here, and given the experience with Farmland and Interstate, that's bothersome because I'm convinced it's important to keep the people who know the business," Venters said. "Now they'll have to find another way to keep those key employees."

---- INDEX REFERENCES ----

COMPANY: BENCHMARK GROUP PLC; ENRON CORP; **DELPHI** CORP; INTERSTATE BAKERIES CORP

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

NEWS SUBJECT: (Legislation (1LE97); Financially Distressed Companies (1FI85);
Government (1GO80))

INDUSTRY: (Banking (1BA20); Telecom (1TE27); Retail Banking Services (1RE38);
Financial Services (1FI37); Consumer Finance (1CO55))

REGION: (USA (1US73); Americas (1AM92); New York (1NE72); North America (1NO39);
Texas (1TE14))

Language: EN

OTHER INDEXING: (Judge Jerry W. Venters; Ben Mann; Karen Gross; Judge Jerry W.
Venters; John Penn) (AMERICAN **BANKRUPTCY** INSTITUTE; BENCHMARK GROUP; BLACKWELL
SANDERS PEPER; BLOOMBERG; CONGRESS; **DELPHI**; **DELPHI** CORP; DELTA AIR LINES NORTHWEST
AIRLINES; ENRON; INTERSTATE BAKERIES CORP; NEW YORK UNIVERSITY; NYU; US **BANKRUPTCY**
) (Becker; Ben Mann; Firms; Gross; Helane Becker; Interstate; Jerry W. Venters;
John Penn; Karen Gross; Mann; Penn; Venters) (Kansas City; Fort Worth;
us.mo.kcity; us.mo; us; us.mo.kancty; us.tx.ftwort; us.tx)

KEYWORDS: (XC/NASDAQ-OTCBB); (XC/NYSE); (CT/ebf.bus.bkt);
(CT/ebf.bus.dev.cac); (CT/ebf.bus.dev); (CT/ebf.bus); (CT/ebf.fin.sec.hiy);
(CT/ebf.fin.sec); (CT/ebf.fin); (CT/ebf); (NT/**Bankruptcy**);
(NT/Corporate_Action); (NT/Debt); (NT/Stocks)

TICKER SYMBOL: NYSE:DPH; NASDAQ-OTCBB:IBCIQ

EDITION: 1

Word Count: 1518
10/13/05 KCSTAR C1

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.