Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                        :
    In re                               :    Chapter 11
                                                        :
DELPHI CORPORATION, et al.,                             :    Case No. 05-44481 (RDD)
                                                        :
                   Debtors.   :    (Jointly Administered)
                                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(a), 328(a), AND
1107(b) AUTHORIZING EMPLOYMENT AND RETENTION OF
DELOITTE & TOUCHE LLP AS INDEPENDENT AUDITORS AND ACCOUNTANTS
TO DEBTORS, EFFECTIVE NUNC PRO TUNC TO OCTOBER 8, 2005

("DELOITTE & TOUCHE RETENTION APPLICATION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this application (the "Application") for entry of an order under 11 U.S.C.

§§ 327(a), 328(a), and 1107(b) and Fed. R. Bankr. P. 2014 authorizing the employment and

retention of Deloitte & Touche LLP ("Deloitte & Touche") as independent auditors and

accountants to the Debtors, effective nunc pro tunc to October 8, 2005.  In support of this

Application, the Debtors submit the Affidavit of Brocke E. Plumb, sworn to November 9, 2005

(the "Plumb Affidavit").  In further support of this Application, the Debtors respectfully

represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8, 2005 (the "Petition Date"), Delphi and certain of its U.S.

subsidiaries filed voluntary petitions in this Court for reorganization relief under chapter 11 of

title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").

On October 14, 2005, three additional U.S. subsidiaries of Delphi filed voluntary petitions in this

Court for reorganization relief under the Bankruptcy Code.  The Debtors continue to operate

their businesses and manage their properties as debtors-in-possession pursuant to sections

1107(a) and 1108 of the Bankruptcy Code.  Also on the Petition Date, this Court entered an order

directing the joint administration of the Debtors' chapter 11 cases (Docket No. 28).

2.    On October 17, 2005, the Office of the United States Trustee (the "U.S.

Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").

No trustee or examiner has been appointed in the Debtors' cases.

3.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

4.    The statutory predicates for the relief requested herein are sections 327(a),

328(a), and 1107(b) of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules").

B.    <u>Current Business Operations Of The Debtors</u>

5.    With more than 180,000 employees worldwide, global 2004 revenues of

approximately $28.6 billion, and global assets as of August 31, 2005 of approximately $17.1

billion,[1] Delphi ranks as the fifth largest public company business reorganization in terms of

revenues, and the thirteenth largest public company business reorganization in terms of assets.

Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations

without supervision from the Bankruptcy Court, and will not be subject to the chapter 11

requirements of the U.S. Bankruptcy Code.

      6.   Over the past century, the operations which are now owned by Delphi have

become a leading global technology innovator with significant engineering resources and

technical competencies in a variety of disciplines.  Today, the Company (as defined below) is

arguably the single largest global supplier of vehicle electronics, transportation components,

integrated systems and modules, and other electronic technology.  The Company's technologies

and products are present in more than 75 million vehicles on the road worldwide.  The Company

supplies products to nearly every major global automotive original equipment manufacturer with

2004 sales to its former parent, General Motors Corporation, equaling approximately $15.4

billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan

Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

      7.   As part of its growth strategy, Delphi has established an expansive global

presence with a network of manufacturing sites, technical centers, sales offices, and joint

ventures located in every major region of the world.  In the U.S., the Debtors employ

approximately 50,600 people.  Those employees work in approximately 44 manufacturing sites

and 13 technical centers across the country, and in Delphi's worldwide headquarters and

customer center located in Troy, Michigan.  Approximately 34,750 of these individuals are

hourly employees, 96% of whom are represented by approximately 49 different international and

---

[1]    The aggregated financial data used in this Application generally consists of consolidated information from
Delphi and its worldwide subsidiaries and affiliates.

local unions.  Outside the United States, the Company's foreign entities employ more than

134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40

countries worldwide.

   8. Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary

of GM.  Prior to January 1, 1999, GM conducted the Company's business through various

divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions

and subsidiaries were transferred to Delphi and its subsidiaries and affiliates (collectively, the

"Company") in accordance with the terms of a Master Separation Agreement between Delphi

and GM.  In connection with these transactions, Delphi accelerated its evolution from a North

American-based, captive automotive supplier to a global supplier of components, integrated

systems, and modules for a wide range of customers and applications.  Although GM is still the

Company's single largest customer, today more than half of Delphi's revenue is generated from

non-GM sources.

   9. Due to the significant planning that goes into each vehicle model, Delphi's

efforts to generate new business do not immediately affect its financial results, because supplier

selection in the auto industry is generally finalized several years prior to the start of production

of the vehicle.  When awarding new business, which is the foundation for the Company's

forward revenue base, customers are increasingly concerned with the financial stability of their

supply base.  The Debtors believe that they will maximize stakeholder value and the Company's

future prospects if they stabilize their businesses and continue to diversify their customer base.

The Debtors also believe that this must be accomplished in advance of the expiration of certain

benefit guarantees between GM and certain of Delphi's unions representing most of its U.S.

hourly employees which coincides with the expiration of the Company's U.S. collective

bargaining agreements in the fall of 2007.

C.    Events Leading To Chapter 11 Filing

10.    In the first two years following Delphi's separation from GM, the Company

generated more than $2 billion in net income.  Every year thereafter, however, with the exception

of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net

operating loss of $482 million on $28.6 billion in net sales.  Reflective of a downturn in the

marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005.

The Company experienced net operating losses of $608 million for the first six months of

calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion

less in sales than during the same time period in calendar year 2004.[2]

11.    The Debtors believe that three significant issues have largely contributed to

the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S.

legacy liabilities and operational restrictions driven by collectively bargained agreements,

including restrictions preventing the Debtors from exiting non-strategic, non-profitable

operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive

U.S. vehicle production environment for domestic OEMs resulting in the reduced number of

motor vehicles that GM produces annually in the United States and related pricing pressures, and

(c) increasing commodity prices.

12.    In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

portfolio, operational issues, and forward looking revenue requirements.  Having concluded that

---

[2]    Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily
related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

pre-filing discussions with its unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

13.    Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses.  This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned in the Company's transformation plan.  The Debtors believe that a substantial segment of Delphi's U.S. business operations must be divested, consolidated, or wound-down through the chapter 11 process.

14.    Upon the conclusion of this process, the Debtors expect to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

<u>Relief Requested</u>

15.    By this Application, the Debtors request authorization to employ and retain Deloitte & Touche as their independent auditors and accountants in these chapter 11 cases,

6

effective <u>nunc pro tunc</u> to October 8, 2005.  Specifically, the Debtors respectfully request entry

of an order under sections 327(a), 328(a), and 1107(b) of the Bankruptcy Code and Bankruptcy

Rule 2014 authorizing Deloitte & Touche to perform independent auditing and accounting

services that will be necessary during these chapter 11 cases, as described below and in

accordance with the terms of the engagement letter attached hereto as <u>Exhibit A</u> (the "Audit

Services Engagement Letter") and the engagement letter attached hereto as <u>Exhibit B</u> (the

"Government Reports Engagement Letter," and together with the Audit Services Engagement

Letter, the "Engagement Letters").

Scope Of Services

16.    In accordance with the Engagement Letters, and as may be agreed to by

Deloitte & Touche, Deloitte & Touche will provide independent auditing and accounting

services in order to assist the Debtors and their subsidiaries and affiliates in the course of these

chapter 11 cases, including but not limited to the following:

Under the Audit Services Engagement Letter:

(a)    auditing the consolidated annual financial statements of the Debtors for the fiscal year ending December 31, 2005 and thereafter;

(b)    expressing an opinion on management's assessment of the effectiveness of the Debtors' internal controls over financial reporting as of December 31, 2005 and thereafter;

(c)    performing reviews of interim financial statements for the three-month and nine-month periods ended September 30, 2005 and thereafter; and

(d)    rendering such other audit and accounting services, including assistance in connection with reports requested of the Debtors by this Court, the U.S. Trustee, or parties-in-interest, as the Debtors, their attorneys, or financial advisors may from time to time request.

Under the Government Reports Engagement Letter:

(a)    assisting the Debtors in their preparation of certain mandatory governmental reports.

17.    The services to be provided by Deloitte & Touche to the Debtors will not be
unnecessarily duplicative of those provided by any other of the Debtors' professionals, and
Deloitte & Touche will seek to coordinate any services performed at the Debtors' request with
the Debtors' other professionals, including financial advisors and counsel, as appropriate, to
avoid duplication of effort.  If the Debtors seek to expand the scope of Deloitte & Touche's
retention, a supplemental affidavit will be filed with the Court and served on the U. S. Trustee
and the Creditors' Committee.

18.    Subject to this Court's approval of the Application, Deloitte & Touche is
willing to serve as the Debtors' independent auditors and accountants and to perform the services
described in the Engagement Letters on the terms set forth therein.

### Qualifications Of Professionals

19.    Deloitte & Touche is a national professional services firm with more than
1,200 partners and principals and thousands of professional staff.  Since the inception of their
business operations, the Debtors have employed Deloitte & Touche as their independent auditors
and accountants, and Deloitte & Touche or its affiliates have in the past provided tax and
consulting services to the Debtors or their affiliates.  On account of these previous engagements
by the Debtors, Deloitte & Touche has considerable knowledge concerning the Debtors and is
already familiar with the Debtors' business affairs to the extent necessary for the scope of the
proposed services.  Such experience and knowledge will be valuable to the Debtors in their
efforts to reorganize in a cost-effective, efficient, and timely matter.  Further, Deloitte & Touche
is also well-qualified by reason of its experience in delivering accounting and auditing services
in chapter 11 cases.  Deloitte & Touche thus has significant qualifications and broad and relevant
experience in performing the scope of work described herein.  The Debtors believe that Deloitte

& Touche's unique experience, factual knowledge of the Debtors' operations, and economies of

scale could not be replicated elsewhere, even at substantially greater cost to the Debtors.

<u>Disinterestedness Of Professionals</u>

20.    The Plumb Affidavit filed in support of this Application contains

information available to date on Deloitte & Touche's connections with other parties-in-interest,

as required by Bankruptcy Rule 2014(a).  Based on the information in the Plumb Affidavit,

which is incorporated herein by reference, the Debtors submit that Deloitte & Touche and the

professionals in the firm are "disinterested persons," as that term is used in section 101(14) of the

Bankruptcy Code, and are otherwise eligible to be retained under section 327(a) of the

Bankruptcy Code.

<u>Professional Compensation</u>

21.    Subject to this Court's approval, except as specified below, Deloitte &

Touche will charge its then-current regular hourly billing rates in performing the aforementioned

services.  The range of Deloitte & Touche's applicable hourly billing rates by classification of

personnel under the Audit Services Engagement Letter currently is as follows:

| Personnel Classification | Hourly Billing Rate |
| --- | --- |
| Partner/Principal/Director | $600 to $750 |
| Senior Manager | $350 to $525 |
| Manager | $340 to $600 |
| Senior Staff | $240 to $390 |
| Staff | $100 to $340 |
| Administrative Staff | $70 to $100 |

Deloitte & Touche's applicable hourly billing rate under the Government Reports Engagement Letter is $75 per hour.

22.    The range of billing rates reflects, among other things, differences in experience levels within classifications, geographic differentials, and differences between types of services being provided.  In the normal course of business, Deloitte & Touche's hourly rates are adjusted from time to time.  Accordingly, Deloitte & Touche requests that the aforementioned rates be revised to the adjusted hourly rates that may come into effect from time to time.  Deloitte & Touche will advise the Debtors no later than 30 days in advance if a rate adjustment is being made.

23.    The professional fees charged for Deloitte & Touche's services are calculated from the actual hours expended in providing the services described herein multiplied by the applicable hourly billing rates for the specific personnel involved.  In addition, consistent with this Court's guidelines and those established by the U.S. Trustee, expenses, including, without limitation, telephone, computer usage, travel, messengers, and photocopying, will be included in the total amount billed.

24.    Deloitte & Touche intends to invoice the Debtors on a monthly basis and to apply to this Court for compensation and reimbursement of expenses in accordance with section 330(a) of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"), guidelines established by the U.S. Trustee, and orders of this Court.  Deloitte & Touche acknowledges that all compensation will be subject to this Court's review and approval after notice and a hearing.

25.    Deloitte & Touche recently completed a reorganization of some of its business units, including its financial advisory services, tax services, solutions, human capital, and outsourcing business functions.  This reorganization is intended to align the organizational structure more closely with the manner in which business is conducted.  These business functions now are being conducted by entities affiliated with Deloitte & Touche, including Deloitte Financial Advisory Services LLP ("Deloitte FAS"), Deloitte Consulting LLP ("Deloitte Consulting") and Deloitte Tax LLP ("Deloitte Tax").  Accordingly, some services incidental to the tasks to be performed by Deloitte & Touche in these chapter 11 cases may be performed by personnel now employed by or associated with one of the three above-mentioned affiliates and/or their respective subsidiaries, including subsidiaries located outside of the United States. The fees and expenses with respect to such services will be included in the fee applications of Deloitte & Touche.  The relationships of Deloitte FAS, Deloitte Consulting, and Deloitte Tax are described in the Plumb Affidavit or in Attachment A thereto.

26.    In the 90 days leading up to the Petition Date, the Debtors paid Deloitte & Touche approximately $5,840,000 in fees and expenses for services provided to the Debtors and for preparing certain of the Debtors' mandatory government reports and filings, and, in the last annual period, the Debtors paid Deloitte & Touche approximately $18.3 million.  These amounts also include amounts paid by certain benefit plans of the Debtors with respect to services thereto. Deloitte & Touche is owed approximately $62,490 by certain of those benefit plans of the Debtors.  It is the Debtors understanding that Deloitte & Touche will not seek recovery of such amount, subject to and contingent upon Court approval of Deloitte & Touche's retention hereunder.

27.     At the Debtors' request, Deloitte & Touche has continued to perform necessary audit services since October 8, 2005, and, hence, the Debtors request that Deloitte & Touche's retention be effective nunc pro tunc to October 8, 2005.

28.     Deloitte & Touche has received a retainer in connection with the services to be performed under the Engagement Letters.  Deloitte & Touche intends to request that the unapplied residual retainer, which is estimated to total $400,000, be applied to the amount that Deloitte & Touche seeks in its first interim fee application.  Pursuant to conversations with the U.S. Trustee, any party-in-interest will have the right to raise the issue of the application of Deloitte & Touche's prepetition retainer to postpetition fees and expenses.

29.      The Debtors believe that Deloitte & Touche's fees are fair and reasonable in light of industry practice, market rates both in and out of chapter 11 proceedings, Deloitte & Touche's experience in reorganizations, and Deloitte & Touche's importance to these cases.

<u>Indemnification</u>

30.     Pursuant to the Government Reports Engagement Letter, the Debtors will indemnify and hold harmless Deloitte & Touche and its personnel from all claims, liabilities, and expenses relating to the Government Reports Engagement Letter, provided, however, that in no event shall Deloitte & Touche be indemnified for its own bad-faith, self-dealing, breach of fiduciary duty (if any), gross negligence, or willful misconduct.

<u>Limitation On Liability</u>

31.     Pursuant to the Government Reports Engagement Letter, Deloitte & Touche shall not be liable to the Debtors for any delays resulting from circumstances or causes beyond its reasonable control.  In addition, the Debtors agree that Deloitte & Touche's liability will be limited to the amount of fees paid by the Debtors to Deloitte & Touche under the Government

Reports Engagement Letter with respect of services provided thereunder, except to the extent

that any claims, liabilities, or expenses relating to the Government Reports Engagement Letter

are finally judicially determined to have resulted from the bad-faith, self-dealing, breach of

fiduciary duty (if any), gross negligence, or willful misconduct of Deloitte & Touche.  In no

event will Deloitte & Touche be liable for consequential loss or damages relating to the

Government Reports Engagement Letter.

## Conclusion

32.    For the foregoing reasons, the Debtors submit that the relief requested

herein is in the best interests of the Debtors and their estates and creditors and should be

approved.

## Notice

33.    Notice of this Application has been provided in accordance with the Order

Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014

Establishing (I) Omnibus Hearing Dates, (II) Certain Notice, Case Management, And

Administrative Procedures, And (III) Scheduling An Initial Case Conference In Accordance

With Local Bankr. R. 1007-2(e) entered by this Court on October 14, 2005 (Docket No. 245).  In

light of the nature of the relief requested, the Debtors submit that no other or further notice is

necessary.

## Memorandum Of Law

34.    Because the legal points and authorities upon which this Application relies

are incorporated herein, the Debtors respectfully request that the requirement of the service and

filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order

(a) authorizing the Debtors to employ and retain Deloitte & Touche to provide independent

auditing and accounting services pursuant to the terms and conditions set forth in the

Engagement Letters, effective <u>nunc pro tunc</u> to October 8, 2005, and (b) granting such other and

further relief as is just.

Dated:    New York, New York
          November 23, 2005


                                        DELPHI CORPORATION, on behalf of itself and
                                        certain of its subsidiaries and affiliates, as Debtors
                                        and Debtors-in-possession

                                        By:    <u>s/ John D. Sheehan</u>
                                               Name: John D. Sheehan
                                               Title: Vice President and Chief Restructuring
                                                      Officer

Exhibit A

# Deloitte.

Deloitte & Touche LLP
Suite 900
600 Renaissance Center
Detroit, MI 48243-1895
USA

Tel: +1 313 396 3000
Fax: +1 313 396 3618
www.deloitte.com

August 29, 2005

Mr. Robert H. Brust, Chairman
The Audit Committee of Delphi Corporation
5725 Delphi Dr.
Troy, MI 48098

Mr. John Sheehan, Acting Chief Financial Officer,
Chief Accounting Officer and Controller
Delphi Corporation
5725 Delphi Dr.
Troy, MI 48098

Dear Sirs:

Deloitte & Touche LLP ("D&T" or "we" or "us") is pleased to serve as the independent registered public accounting firm for Delphi Corporation (the "Company"). Mr. Brock E. Plumb will be responsible for the services that we perform for the Company. He will be assisted by Mr. Jeffery S. Aughton and Mr. Mark J. Crowley. Mr. Steve Van Arsdell will serve as Office of the Chairman Advisory Partner. Mr. Plumb will, as he considers necessary, call on other individuals with specialized knowledge, either in this office or elsewhere within D&T, to assist in the performance of our services.

In addition to the audit and review services we are engaged to provide under this engagement letter, we would also be pleased to assist the Company on issues as they arise throughout the year. Hence, we hope that you will call Mr. Plumb whenever you believe D&T can be of assistance. This assistance will require approval by the Company's audit committee (the "Audit Committee") in accordance with its preapproval policies and procedures.

We will perform this engagement subject to the terms and conditions set forth herein and in the accompanying appendices.

## Audit of Financial Statements and the Effectiveness of the Company's Internal Control Over Financial Reporting

Our engagement is to perform an integrated audit in accordance with the standards of the Public Company Accounting Oversight Board (United States) (the "PCAOB Standards"). The objectives of an integrated audit conducted in accordance with the PCAOB Standards are:

- To express an opinion on the fairness of the presentation of the Company's financial statements for the year ending December 31, 2005 in conformity

l

Member of
Deloitte Touche Tohmatsu

with accounting principles generally accepted in the United States of America ("generally accepted accounting principles"), in all material respects

- To express an opinion on management's assessment of the effectiveness of the Company's internal control over financial reporting as of December 31, 2005 based on the criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (the "COSO Framework")

- To express an opinion on the effectiveness of the Company's internal control over financial reporting as of December 31, 2005 based on the COSO Framework.

Appendix A contains a description of an integrated audit under the PCAOB Standards.

Our ability to express such opinions and the wording thereof will, of course, be dependent on the facts and circumstances at the date of our reports. If, for any reason, we are unable to complete the integrated audit or are unable to form or have not formed such opinions, we may decline to express any opinion or decline to issue any report as a result of this engagement. If we are unable to complete our integrated audit or if any report to be issued by D&T as a result of this engagement requires modification, the reasons therefor will be discussed with the Audit Committee and the Company's management.

## Reviews of Interim Financial Information and Performance of Quarterly Procedures

We will also perform reviews of the Company's interim financial information in accordance with the PCAOB Standards for the three-month and nine-month periods ended September 30, 2005, prepared for submission to the Securities and Exchange Commission (the "SEC"). The objective of reviews of interim financial information performed in accordance with the PCAOB Standards is to provide us with a basis for communicating whether we are aware of any material modifications that should be made to the interim financial information for it to conform with generally accepted accounting principles.

In conjunction with this review, we will perform the quarterly procedures under the PCAOB Standards to provide us with a basis for determining whether we are aware of any material modifications that, in our judgment, should be made to the disclosures about changes in internal control over financial reporting that have materially affected or are reasonably likely to materially affect the Company's internal control over financial reporting for such disclosures to be accurate and to comply with Section 302 of the Sarbanes Oxley Act of 2002 and related SEC rules and regulations.

Appendix B contains a description of an interim review and quarterly procedures under the PCAOB Standards.

2

If we become aware of material modifications that should be made to the interim financial information for it to conform with generally accepted accounting principles or if we become aware of deficiencies in internal control over financial reporting so significant that they would preclude management's preparation of interim financial information in conformity with generally accepted accounting principles, we may be precluded from completing our review. However, should such circumstances arise, we would advise the Audit Committee and the Company's management that we are unable to complete the review and identify the deficiencies that preclude the completion of our review.

In addition, at your request, we will read the quarterly earnings releases, consider whether they are consistent with the related interim financial information, and provide recommendations for improving the communication.

## Management's Responsibilities

Appendix C describes management's responsibilities for (1) the financial statements and the effectiveness of internal control over financial reporting, (2) representation letters, (3) the process for obtaining preapproval of services, (4) independence matters as a result of restrictions on providing certain services, and (5) independence matters relating to hiring.

## Audit Committee's Responsibility and Auditor Communications

As the independent registered public accounting firm of the Company, we acknowledge that the Audit Committee is directly responsible for the appointment, compensation, and oversight of our work and, accordingly, except as otherwise specifically noted, we will report directly to the Audit Committee. You have advised us that the services to be performed under this engagement letter, including, where applicable, the use by D&T of affiliates or related entities as subcontractors in connection with this engagement, have been approved by the Audit Committee in accordance with the Audit Committee's established preapproval policies and procedures.

Under the PCAOB Standards and Rule 2-07 of SEC Regulation S-X, we are required to communicate with the Audit Committee about various matters in connection with our integrated audit and reviews. Appendix D describes such communications.

## Fees

We have provided to you a separate fee estimate for your review at the September 7, 2005, Audit Committee meeting which presents our fees for the audit of the Company's financial statements, for the audit of the Company's internal control over financial reporting, and the reviews of the related interim financial information. Until September 7, 2005 our fees will be billed according to the prearranged billing schedule which has been previously provided to the Company. This schedule will be updated to reflect final approved fees after the September 7 meeting.

Payments of our invoices are due 45 days from the date of the invoice.

Our continued service on this engagement is dependent upon payment of our invoices in accordance with these terms. To the extent that certain circumstances, as listed in Appendix E, arise during the engagement, our fee estimates also may be significantly affected and additional fees may be necessary. We will notify you promptly of any circumstances we encounter that could significantly affect our estimates and discuss with you any additional fees, as necessary. Additional services provided beyond the scope of services described herein will be billed separately.

## Inclusion of D&T Reports or References to D&T in Other Documents or Electronic Sites

If the Company intends to publish or otherwise reproduce in any document any report issued as a result of this engagement, or otherwise make reference to D&T in a document that contains other information in addition to the audited financial statements (e.g., in a periodic filing with the SEC or other regulator, in a debt or equity offering circular, or in a private placement memorandum), thereby associating D&T with such document, the Company agrees that its management will provide D&T with a draft of the document to read and obtain our approval for the inclusion or incorporation by reference of any of our reports, or the reference to D&T, in such document before the document is printed and distributed. The inclusion or incorporation by reference of any of our reports in any such document would constitute the reissuance of such reports. The Company also agrees that its management will notify us and obtain our approval prior to including any of our reports on an electronic site (except for filings made with the SEC that are posted directly to our website).

Our engagement to perform the services described herein does not constitute our agreement to be associated with any such documents published or reproduced by or on behalf of the Company. Any request by the Company to reissue any report issued as a result of this engagement, to consent to any such report's inclusion or incorporation by reference in an offering or other document, or to agree to any such report's inclusion on an electronic site will be considered based on the facts and circumstances existing at the time of such request. The estimated fees outlined herein do not include any services that would need to be performed in connection with any such request; fees for such services (and their scope) would be subject to the mutual agreement of the Company and D&T at such time as D&T is engaged to perform the services.

## Requests for Production of Documents or Information

The Company acknowledges its obligations under the waiver agreement relating to D&T's cooperation with the Public Company Accounting Oversight Board (United States) and the SEC under Sections 102 and 106 of the Sarbanes-Oxley Act of 2002.

* * * * * *

This engagement letter, including the appendices attached hereto and made a part hereof, constitutes the entire agreement between the parties with respect to this engagement and supersedes all other prior and contemporaneous agreements or understandings between the parties, whether written or oral, relating to this engagement.

If the above terms are acceptable and the services described are in accordance with your understanding, please sign the copy of this engagement letter in the space provided and return it to us.

Yours truly,

*Deloitte & Touche LLP*

**Acknowledged and approved on behalf of
the Audit Committee of Delphi Corporation:**

By: _____

Title: *Chair – Audit Comm*

Date: *9/8/05*

**Accepted and agreed to by Delphi Corporation:**

By: _____

Title: *Acting CFO, Controller & Chief Accounting officer.*

Date: *9/7/05*

5

PAGE 5/18 * RCVD AT 11/3/2005 4:48:38 PM [Eastern Standard Time] * SVR:USDET0011/1 * DNIS:3927638 * CSID:2488133380 * DURATION (mm-ss):05-20

**APPENDIX A**

**DESCRIPTION OF AN INTEGRATED AUDIT UNDER THE PCAOB STANDARDS**
**Delphi Corporation**
**Year Ending December 31, 2005**

**Components of an Integrated Audit**

An integrated audit includes the following:

- Examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements

- Inquiring directly of the Audit Committee regarding its views about the risk of fraud and whether the Audit Committee has knowledge of any fraud or suspected fraud affecting the Company

- Assessing the accounting principles used and significant estimates made by management

- Evaluating the overall financial statement presentation

- Evaluating management's assessment of the Company's internal control over financial reporting and evaluating the effectiveness of the Company's internal control over financial reporting

- Examining, on a test basis, evidence supporting the design and operating effectiveness of the Company's internal control over financial reporting.

**Reasonable Assurance**

An integrated audit is planned and performed to obtain reasonable, rather than absolute, assurance about whether (1) the financial statements are free of material misstatement, whether caused by error or fraud, and (2) the Company has maintained, in all material respects, effective internal control over financial reporting as of the date specified in management's assessment. Because of the characteristics of fraud, a properly planned and performed audit may not detect a material misstatement. Accordingly, there is some risk that a material misstatement of the financial statements or a material weakness in internal control over financial reporting would remain undetected. Also, an integrated audit is not designed to detect error or fraud that is immaterial to the financial statements or deficiencies in internal control over financial reporting that, individually or in combination, are less severe than a material weakness.

6

## Inherent Limitations of Internal Control Over Financial Reporting

Because of the inherent limitations of internal control over financial reporting, including
the possibility of collusion or management override of controls, material misstatements
due to error or fraud may occur and not be detected. Also, projections of any evaluation
of the internal control over financial reporting to future periods are subject to the risk that
the internal control may become inadequate because of changes in conditions, or that the
degree of compliance with the policies or procedures may deteriorate.

7

## APPENDIX B

### DESCRIPTION OF AN INTERIM REVIEW AND QUARTERLY PROCEDURES UNDER THE PCAOB STANDARDS
**Delphi Corporation**
**Year Ending December 31, 2005**

A review of interim financial information is substantially less in scope than an audit in accordance with the PCAOB Standards, the objective of which is to express an opinion on the financial statements taken as a whole. Accordingly, a review will not result in the expression of an opinion concerning the fairness of the presentation of the interim financial information in conformity with generally accepted accounting principles and cannot be relied on to reveal all significant matters that would be disclosed in an audit.

A review consists principally of applying analytical procedures to pertinent financial data and making inquiries of and evaluating responses from certain management personnel of the Company who have responsibility for financial and accounting matters.

A review also includes obtaining sufficient knowledge of the Company's business and its internal control as it relates to the preparation of both annual and interim financial information to identify the types of potential material misstatements in the interim financial information, to consider the likelihood of their occurrence, and to select the inquiries and analytical procedures that will provide us with a basis for communicating whether we are aware of any material modifications that should be made to the interim financial information for it to conform with generally accepted accounting principles. A review is not designed to provide assurance on internal control or to identify control deficiencies.

The performance of the limited quarterly procedures required by the PCAOB Standards with respect to management's disclosures of material changes in internal control over financial reporting is intended to provide us with a basis for communicating whether we are aware of any modifications that, in our judgment, should be made to such disclosures for such disclosures to be accurate and to comply with Section 302 of the Sarbanes Oxley Act of 2002 and related SEC rules and regulations. These procedures, which consist principally of observation and inquiries, are substantially less in scope than an audit of internal control over financial reporting in accordance with the PCAOB Standards. Accordingly, the limited quarterly procedures cannot be relied on to reveal all significant matters that would be disclosed in an audit of internal control over financial reporting, and we will not express an opinion on the effectiveness of internal control over financial reporting.

8

# APPENDIX C

## MANAGEMENT'S RESPONSIBILITIES
Delphi Corporation
Year Ending December 31, 2005

### Financial Statements and the Effectiveness of Internal Control Over Financial Reporting

The overall accuracy of the financial statements, including interim financial information, and their conformity with generally accepted accounting principles is the responsibility of the Company's management. In this regard, management has the responsibility for, among other things:

- Establishing and maintaining effective internal control over financial reporting and informing D&T of all deficiencies in the design or operation of internal control over financial reporting identified as part of management's assessment, including separately disclosing to D&T all deficiencies that management believes to be significant deficiencies or material weaknesses in internal control over financial reporting

- Informing D&T of any changes in the Company's internal control over financial reporting that occurred during each fiscal quarter that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting

- Identifying and ensuring that the Company complies with the laws and regulations applicable to its activities and informing us of any known material violations of such laws or regulations

- Adjusting the financial statements to correct material misstatements

- Making all financial records and related information available to us.

As required by the PCAOB Standards, for D&T to complete its audit of the Company's internal control over financial reporting, management must:

- Accept responsibility for the effectiveness of the Company's internal control over financial reporting

- Evaluate the effectiveness of the Company's internal control over financial reporting using suitable control criteria

- Support its evaluation with sufficient evidence, including documentation

9

- Present a written assessment of the effectiveness of the Company's internal control over financial reporting as of December 31, 2005.

The PCAOB Standards describe additional responsibilities of management in its process of evaluating the effectiveness of the Company's internal control over financial reporting.

## Representation Letters

We will make specific inquiries of the Company's management about the representations embodied in the financial statements and management's assessment of the effectiveness of the Company's internal control over financial reporting. Additionally, we will request that management provide to us the written representations the Company is required to provide to its independent registered public accounting firm under the PCAOB Standards. As part of our integrated audit procedures, we will request that management provide us with a representation letter that includes, among other things:

- Acknowledgment of management's responsibility for the preparation of the financial statements and for establishing and maintaining effective internal control over financial reporting.

- Affirmation of management's belief that the effects of any uncorrected financial statement misstatements aggregated by us during the current audit engagement and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the financial statements taken as a whole.

- Acknowledgment that management disclosed to us all deficiencies in the design or operation of internal control over financial reporting identified as part of management's assessment, including separately disclosing to us all such deficiencies that management believes to be significant deficiencies or material weaknesses in internal control over financial reporting.

We will also request that management confirm certain representations made to us during our audit. The responses to those inquiries and related written representations of management required by the PCAOB Standards are part of the evidential matter that D&T will rely on in forming its opinions.

We will request a similar representation letter as part of our interim review and quarterly procedures, including representations about the disclosures related to changes in internal control over financial reporting that have materially affected, or are reasonably likely to materially affect internal control over financial reporting.

PAGE 10/18 * RCVD AT 11/3/2005 4:48:38 PM [Eastern Standard Time] * SVR:USDET0011/1 * DNIS:3927638 * CSID:2488133380 * DURATION (mm-ss):05-20

## Process for Obtaining Preapproval of Services

Management is responsible for the coordination of obtaining the preapproval of the Audit Committee, in accordance with the Audit Committee's preapproval process, for any services to be provided by D&T to the Company.

## Independence Matters as a Result of Restrictions on Providing Certain Services

In connection with our engagement, D&T, management, and the Audit Committee will assume certain roles and responsibilities in an effort to assist D&T in maintaining independence and ensuring compliance with the securities laws and regulations. D&T will communicate to its partners, principals, and employees that the Company is an attest client. Management of the Company will ensure that the Company, together with its subsidiaries and other entities that comprise the Company for purposes of the consolidated financial statements, has policies and procedures in place for the purpose of ensuring that neither the Company nor any such subsidiary or other entity will act to engage D&T or accept from D&T any service that either has not been subjected to their preapproval process or that under SEC or other applicable rules would impair D&T's independence. All potential services are to be discussed with Mr. Plumb.

## Independence Matters Relating to Hiring

Management will coordinate with D&T to ensure that D&T's independence is not impaired by hiring former or current D&T partners, principals, or professional employees for certain positions. Management of the Company will ensure that the Company, together with its subsidiaries and other entities that comprise the Company for purposes of the consolidated financial statements, also has policies and procedures in place for purposes of ensuring that D&T's independence will not be impaired by hiring a former or current D&T partner, principal, or professional employee in an accounting role or financial reporting oversight role that would cause a violation of securities laws and regulations. Any employment opportunities with the Company for a former or current D&T partner, principal, or professional employee should be discussed with Mr. Plumb and approved by the Audit Committee before entering into substantive employment conversations with the former or current D&T partner, principal, or professional employee, if such opportunity relates to serving (1) as chief executive officer, controller, chief financial officer, chief accounting officer, or any equivalent position for the Company or in a comparable position at a significant subsidiary of the Company; (2) on the Company's board of directors; (3) as a member of the Audit Committee; or (4) in any other position that would cause a violation of securities laws and regulations.

For purposes of the preceding three paragraphs, "D&T" shall mean Deloitte & Touche LLP and its subsidiaries; Deloitte Touche Tohmatsu, its member firms, the affiliates of

11

Deloitte & Touche LLP, Deloitte Touche Tohmatsu and its member firms; and, in all cases, any successor or assignee.

PAGE 12/18 * RCVD AT 11/3/2005 4:48:38 PM [Eastern Standard Time] * SVR:USDET0011/1 * DNIS:3927638 * CSID:2488133380 * DURATION (mm-ss):05-20

## APPENDIX D

**AUDIT COMMITTEE COMMUNICATIONS**
**Delphi Corporation**
**Year Ending December 31, 2005**

## Independence Communications

We have the responsibility to comply with the requirements of the securities laws and
regulations administered by the SEC regarding auditor independence. To demonstrate
compliance with those requirements and in accordance with Independence Standards
Board Standard No. 1, *Independence Discussions with Audit Committees* ("Independence
Standard No. 1"), we will disclose to the Audit Committee, in writing, all relationships
between D&T and the Company and its related entities, that in our professional judgment
may reasonably be thought to bear on our independence and confirm to the Audit
Committee in such letter whether, in our professional judgment, we are independent of
the Company within the meaning of the securities laws and regulations. We also will
discuss our independence with the Audit Committee in accordance with Independence
Standard No. 1. For purposes of this paragraph, "D&T" shall mean Deloitte & Touche
LLP and its subsidiaries; Deloitte Touche Tohmatsu, its member firms, the affiliates of
Deloitte & Touche LLP, Deloitte Touche Tohmatsu and its member firms; and, in all
cases, any successor or assignee.

## Other Communications Arising From the Audit or Reviews

### *Fraud and Illegal Acts*

We will report directly to the Audit Committee any fraud of which we become aware that
involves senior management, and any fraud (whether caused by senior management or
other employees) of which we become aware that causes a material misstatement of the
financial statements. We will report to senior management any fraud perpetrated by
lower level employees of which we become aware that does not cause a material
misstatement of the financial statements; however, we will not report such matters
directly to the Audit Committee, unless otherwise directed by the Audit Committee.

We will inform the appropriate level of management of the Company and determine that
the Audit Committee is adequately informed with respect to illegal acts that have been
detected or have otherwise come to our attention in the course of our audit unless the
illegal acts are clearly inconsequential.

### *Internal Control Matters*

We will report directly to management and the Audit Committee all significant
deficiencies and material weaknesses identified during the integrated audit prior to the

13

issuance of our report on the effectiveness of the Company's internal control over financial reporting. Our written communication will distinguish clearly between those matters considered by D&T to be significant deficiencies and those considered by D&T to be material weaknesses. If a significant deficiency or material weakness exists because the oversight of the Company's external financial reporting and internal control over financial reporting by the Audit Committee is ineffective, we will also communicate that specific significant deficiency or material weakness in writing to the Company's board of directors, as required by the PCAOB Standards.

In addition, we will communicate to management, in writing, all deficiencies in internal control over financial reporting (that is, including those deficiencies in internal control over financial reporting that are of a lesser magnitude than significant deficiencies) identified during the integrated audit and inform the Audit Committee when such a communication has been made. When making this communication, we will not repeat information about such deficiencies that has been included in previously issued written communications, whether those communications were made by us, internal auditors, or others within the Company. Furthermore, because we are not required to perform procedures sufficient to identify all control deficiencies, we will communicate deficiencies in internal control over financial reporting of which we become aware as a result of this engagement.

## Other Matters

We will communicate matters required by PCAOB Interim Standard AU 380, *Communications with Audit Committees*, and Rule 2-07 of SEC Regulation S-X prior to the Company filing our report or consent with the SEC.

## Communications Related to Interim Reviews

At the Audit Committee's request, we will not issue a written review report upon completion of our reviews; however, we will report to the Audit Committee and the Company's management (1) matters that cause us to believe that material modifications should be made to the interim financial information for it to conform with generally accepted accounting principles or (2) that the Company filed the Form 10-Q before the completion of our review. When conducting our review of interim financial information, we will also determine whether any other matters required by regulations or the PCAOB Standards as they relate to interim financial information have been identified. If such matters have been identified, we will communicate them to the Audit Committee prior to the filing of interim financial information with the SEC or, if such communication cannot be made before the filing, as soon as practicable under the circumstances.

# APPENDIX E

## CIRCUMSTANCES AFFECTING TIMING AND FEE ESTIMATE
## DELPHI CORPORATION
## YEAR ENDING DECEMBER 31, 2005

The fees quoted for the integrated audit are based on certain assumptions. Circumstances may arise during the engagement that may significantly affect the targeted completion dates and our fee estimate. As a result, additional fees may be necessary. Such circumstances include but are not limited to the following:

### Audit Facilitation

1. Changes to the timing of the engagement at the Company's request. Changes to the timing of the engagement usually require reassignment of personnel used by D&T in the performance of services hereunder. However, because it is often difficult to reassign individuals to other engagements, D&T may incur significant unanticipated costs.

2. All audit schedules, including documentation of the Company's internal control over financial reporting, are not (a) provided by the Company on the date requested, (b) completed in a format acceptable to D&T, (c) mathematically correct, or (d) in agreement with the appropriate Company records (e.g., general ledger accounts). D&T will provide the Company with a separate listing of required schedules, information requests, and the dates such items are needed.

3. Significant delays in responding to our requests for information such as reconciling variances or providing requested supporting documentation (e.g., invoices, contracts, and other documents).

4. Deterioration in the quality of the Company's accounting records during the current-year engagement in comparison with the prior-year engagement.

5. A completed trial balance, referenced to the supporting analyses and schedules and financial statements, is not provided timely by the Company.

6. Draft financial statements with appropriate supporting documentation are not prepared accurately and timely by the Company's personnel.

7. Electronic files in an appropriate format and containing the information requested are not provided by the Company on the date requested for our use in performing file interrogation. D&T will provide the Company with a separate listing of the required files and the dates the files are needed.

8. The engagement team, while performing work on the Company's premises, is not provided with high-speed access to the Internet via the Company's existing network or through a T1, DSL, or cable connection for purposes of conducting the engagement.

## Significant Issues or Changes

To the extent not contemplated in our report dated June 30, 2005:

9. Significant deficiencies or material weaknesses in the design or operating effectiveness of the Company's internal control over financial reporting are identified during our audit that result in either an expansion of the scope of our testing procedures related to internal control over financial reporting and/or an expansion of our audit procedures on the related financial-statement accounts.

10. A significant level of proposed audit adjustments is identified during our audit.

11. A significant number of drafts of the financial statements are submitted for our review or we identify a significant level of deficiencies in the draft financial statements.

12. Significant new issues or changes as follows:

    a. Significant new accounting issues.

    b. Significant changes in accounting policies or practices from those used in prior years.

    c. Significant events or transactions not contemplated in our budgets.

    d. Significant changes in the Company's financial reporting process or IT systems.

    e. Significant changes in the Company's accounting personnel, their responsibilities, or their availability.

    f. Significant changes in auditing standards.

    g. Significant change in the Company's use of specialists or the specialists or their work product does not meet the qualifications required by generally accepted auditing standards for our reliance upon their work.

13. Changes in audit scope caused by events that are beyond our control, including changes to the audit scope and timing that could result from the Company filing for Chapter 11 reorganization pursuant to the U.S. Bankruptcy Code.

**Payment for Services Rendered**

14. Without limiting its rights or remedies, D&T may halt or terminate its services entirely if payment is not received within 45 days of the date of the invoice.

PAGE 17/18 * RCVD AT 11/3/2005 4:48:38 PM [Eastern Standard Time] * SVR:USDET0011/1 * DNIS:3927638 * CSID:2488133380 * DURATION (mm-ss):05-20

## APPENDIX F

**GENERAL BUSINESS TERMS**
**Delphi Corporation**
**Year Ending December 31, 2005**

1.  <u>Independent Contractor.</u> It is understood and agreed that D&T is an independent contractor and that D&T is not, and will not be considered to be, an agent, partner, fiduciary, or representative of the Company or the Audit Committee.

2.  <u>Survival.</u> The agreements and undertakings of the Company and the Audit Committee contained in the engagement letter to which these terms are attached (the "engagement letter"), together with the appendices to the engagement letter including these terms, will survive the completion or termination of this engagement.

3.  <u>Assignment.</u> Except as provided below, no party may assign, transfer, or delegate any of its rights or obligations relating to this engagement (including, without limitation, interests or claims relating to this engagement) without the prior written consent of the other parties. The Company and the Audit Committee hereby consent to D&T assigning or subcontracting any of D&T's rights or obligations relating to this engagement to any affiliate or related entity, whether located within or outside of the United States.

4.  <u>WAIVER OF JURY TRIAL.</u> THE PARTIES HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM (WHETHER IN CONTRACT, STATUTE, TORT (SUCH AS NEGLIGENCE), OR OTHERWISE) RELATING TO THIS ENGAGEMENT.

Exhibit B

# Deloitte.

Deloitte & Touche LLP
Suite 900
600 Renaissance Center
Detroit, MI 48243-1895
USA

Tel: +1 313 396 3000
Fax: +1 313 396 3618
www.deloitte.com

January 24, 2005

Ms. Jeanine E. Deluca
Manager Financial Processes & Services
Delphi Corporation
World Headquarters and Customer Center
Mail Code 483-400-141
5725 Delphi Drive
Troy, Michigan  48098-2815

Dear Ms. Deluca:

This letter is to confirm our engagement to provide assistance to Delphi Corporation ("Delphi" or the "Company") in preparing certain mandatory government reports as listed in Appendix I and certain filings of State Unclaimed Property reports (collectively the "Reports"), requested by Delphi and agreed to by Deloitte & Touche LLP ("Deloitte & Touche"). Mr. Duane K. Higgins will be responsible for the services we provide to you in connection with this engagement.

We will prepare the Reports based solely on the information, representations, data and records furnished by Delphi and its personnel. We will rely on the information that you supply to be accurate and complete and will make no audit or other verification of the data you submit, although we may need to ask you for clarification of some of the information. Services provided are subject to the scope provided in the following paragraph and the limitation that personnel will not be assigned any services that Deloitte & Touche or Delphi believes would cause Deloitte & Touche to not be independent of Delphi under current or future professional standards. It is understood and agreed that each of the parties hereto is an independent contractor and that neither party is, nor will be considered to be, an agent, partner, fiduciary or representative of the other. Deloitte & Touche will not perform any management functions or make management decisions.

In connection with the Reports, the Company's and Deloitte & Touche's responsibilities are as follows:

Deloitte & Touche is responsible for:

> ➢ Preparing the Reports in compliance with the mandated format based on the information provided by Delphi;
> ➢ Sending the Reports and any other required attachments to Delphi on the dates requested for review and approval.

January 24, 2005
Delphi Corporation
Page 2


Delphi is responsible for:

  ➢ Identifying the required Reports;
  ➢ Making all management decisions and performing all management functions;
  ➢ Designating a competent management employee to oversee the services and review and
    approve all Reports;
  ➢ Evaluating the adequacy and results of the services performed;
  ➢ Accepting responsibility for the results of the services;
  ➢ Establishing and maintaining internal controls, including monitoring ongoing activities;
  ➢ Identifying its unclaimed property;
  ➢ Forwarding requested information, including unclaimed property listing information, to
    Deloitte & Touche in a timely manner in an agreed-upon format;
  ➢ For unclaimed property, reviewing the items selected for escheat and providing
    management sign-off;
  ➢ Identifying records to be removed from the escheat process;
  ➢ Signing Reports, any affidavits and transferring funds, as may be required;
  ➢ Preparation and posting of any accounting entries;
  ➢ Maintaining the original source documents.


Deloitte & Touche's services will not constitute an engagement to provide audit, review or
attestation services as described in the pronouncements on professional standards issued by the
Public Company Accounting Oversight Board or the American Institute of Certified Public
Accountants and, accordingly, Deloitte & Touche will not provide any assurance concerning the
reliability of any assertion that is the responsibility of another party. The services will not result
in the issuance of any written or oral communications by Deloitte & Touche to Delphi or a third
party expressing a conclusion or any form of assurance with respect to financial data, internal
controls or compliance with laws, regulations or other matters.

Management has the final responsibility for the Reports and, therefore, should review them
carefully before signing and filing them.

Deloitte & Touche shall not be liable for any delays resulting from circumstances or causes
beyond its reasonable control, including, without limitation, acts or omissions or the failure to
cooperate pursuant to this Agreement by the Company (including, without limitation, entities or
individuals under its control, or any of their respective officers, directors, employees, other
personnel and agents), acts or omissions or the failure to cooperate by any third party, fire or
other casualty, act of God, strike or labor dispute, war or other violence, or any law, order or
requirement of any governmental agency or authority.

Delphi agrees that Deloitte & Touche and its personnel will not be liable to Delphi for any
claims, liabilities or expenses relating to this engagement for an aggregate amount in excess of
the fees paid by Delphi to Deloitte & Touche pursuant to this engagement, except to the extent
finally judicially determined to have resulted from the bad faith or intentional misconduct of

January 24, 2005
Delphi Corporation
Page 3

Deloitte & Touche. In no event will Deloitte & Touche or its personnel be liable for consequential loss or damages relating to this engagement. Delphi will indemnify and hold harmless Deloitte & Touche and its personnel from all claims, liabilities and expenses relating to this engagement, except to the extent finally judicially determined to have resulted from the bad faith or intentional misconduct of Deloitte & Touche. The limitation on liability and indemnification provisions of this engagement letter will apply to the fullest extent of the law, whether in contract, statute, tort (such as negligence) or otherwise, and will survive the completion or termination of this engagement.

## Waiver of Jury Trial

The parties hereby irrevocably waive, to the fullest extent permitted by law, all rights to trial by jury in any action, proceeding, or counterclaim (whether in contract, statute, tort (such as negligence), or otherwise) relating to this engagement.

## Working Papers

All working papers and the Reports prepared by Deloitte & Touche personnel in connection with the services hereunder will be the property of Delphi; provided, however, that Deloitte & Touche shall be entitled to retain copies of such working papers.

## Use of Software

Deloitte & Touche may utilize software that is currently licensed to Deloitte & Touche in connection with the performance of its services. If Delphi would like us to use other software, such software is to be acquired by and licensed to Delphi, with Deloitte & Touche as a sub-licensee for use in connection with the performance of its services to Delphi. With respect to software that is owned and/or licensed to Deloitte & Touche, if Delphi personnel will access or use software, Delphi agrees to become a licensee in accordance with terms established by Deloitte & Touche.

## Fees and Other Services     $75 00 (corrected per D. Huggins 2-3-05)

Fees for this engagement will be billed at $80 per hour, plus out-of-pocket expenses, payable upon receipt of our invoices.

This engagement may be terminated by either party, at any time, by giving written notice to the other party. During the term of this engagement, Delphi may request that Deloitte & Touche perform additional services that are not encompassed by this engagement letter. Deloitte & Touche may perform such additional services upon receipt of a separate signed engagement letter with terms and conditions that are acceptable to Delphi and Deloitte & Touche.

January 24, 2005
Delphi Corporation
Page 4

"Deloitte & Touche" shall mean Deloitte & Touche LLP and its subsidiaries; to the extent providing services under the engagement letter, Deloitte Touche Tohmatsu, its member firms, and the affiliates of Deloitte & Touche LLP, Deloitte Touche Tohmatsu and its member firms; all of their partners, principals, members, owners, directors, staff and agents; and in all cases any successor or assignee. Deloitte & Touche may, without the consent of the Company, assign or subcontract its rights and obligations hereunder to any affiliate or related entity.

This engagement letter, and Appendix I attached hereto and made a part hereof, constitute the entire agreement between the parties with respect to this engagement and supersede all prior and contemporaneous agreements or understandings between the parties, whether written or oral, relating to this engagement. If these terms are acceptable to you, please indicate your acceptance of this agreement by signing in the space provided below and returning a copy of this engagement letter to us.

Yours truly,

*Deloitte & Touche LLP*

Accepted and agreed to by Delphi Corporation:

By: _____

Title: _____CAO/ Controller_____

Date: _____2/10/05_____

## SUMMARY OF GOVERNMENTAL REPORTS TO BE PREPARED

| Report Description | Due Date |
|---|---|
| • BE-11 Annual Survey of U.S. Direct Investment Abroad | Annual (August 31) |
| • BE-577 Quarterly Survey of U.S. Direct Investment Abroad | Quarterly (January 30, April 30) (July 30, October 30) |
| • Research and Development | Annual (June 30) |
| • QFR-101 Manufacturing, Mining & Wholesale Trade Quarterly Financial Report | Quarterly (January 30, April 30) (July 30, October 30) |
| • Various Annual Census Reports | Annual |
| • MQ-C1 – Survey of Plant Capacity Utilization | Annual (April 30) |
| • MA-1000 Reports to Census | Annual (May 31) |
| • Hart-Scot-Rodino | Annual (June) |
| • NC-9901 Report of Organization | Annual (May 31) |
| • ACE-1 Annual Capital Expenditures Survey | Annual (May 31) |
| • ICT-1 Information & Communication Technology Survey | Annual (June 30) |
| • MA33M Refrigeration, Air Conditioning, Warm Air Heating Equipment (Harrison) | Annual (June 1) |
| • MA331E Nonferrous Casting Report (Energy) | Annual (April 30) |
| • MA334M Consumer Electronics (Delco) | Annual (April 30) |
| • MA200 Pollution Abatement Cost & Expenditures | (Annual) (August 30) |
| • Trade Assistance Requests | As required |
| • State Unclaimed Property Returns | Annual (May 1, November 1) |