KIRKPATRICK & LOCKHART
NICHOLSON GRAHAM LLP
Edward M. Fox (EF1619)
599 Lexington Avenue
New York, New York 10022
Telephone (212) 536-3900

Hearing Date: November 29, 2005
10:00 A.M.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re:<br><br>DELPHI CORPORATON, *et al*.,<br><br>Debtors. | :<br>:<br>:<br>:<br>: | Chapter 11<br>Case No. 05-44481 (RDD)<br>(Jointly Administered) |

**AMENDED OBJECTION OF WILMINGTON TRUST COMPANY, AS INDENTURE TRUSTEE, TO DEBTORS' MOTION FOR ORDER UNDER 11 U.S.C. §§ 363(b) AND 365(a) AND FED. R. BANKR. P. 9019 APPROVING PROCEDURES TO ASSUME CERTAIN AMENDED AND RESTATED SOLE SOURCE SUPPLIER AGREEMENTS**

Wilmington Trust Company ("WTC"), in its capacity as indenture trustee with respect to certain senior notes and debentures in the aggregate principal amount of $2 billion issued by Delphi Corporation ("Delphi"), by and through its undersigned attorneys, Kirkpatrick & Lockhart Nicholson Graham LLP ("K&LNG"), hereby objects to the Motion for Order Under 11 U.S.C. §§ 363(b) and 365(a) and Fed. R. Bankr. P. 9019 Approving Procedures to Assume Certain Amended and Restated Sole Source Supplier Agreements (the "Motion") filed by Delphi and its affiliated debtors in these jointly administered cases (collectively, the "Debtors"), and in support thereof states as follows:

## PRELIMINARY STATEMENT

1. The Debtors' Motion seeks authorization to assume as many as 8,000 executory contracts (the "Subject Contracts"), pay up to $440 million in outstanding pre-petition claims and waive preference claims the Debtors may have against parties to the Subject

Contracts,[1] all without any opportunity for the Court to review the wisdom of the Debtors' decisions.

2. This request for a blanket dispensation from judicial oversight is fundamentally inconsistent with the express provisions of the Bankruptcy Code and the Bankruptcy Rules, which provide that a debtor's decision to assume or reject an executory contract is "subject to the court's approval," 11 U.S.C. § 365(a), which must be sought by motion. See Fed. R. Bankr. P. 6006(a) ("A proceeding to assume, reject, or assign an executory contract . . . is governed by Rule 9014."); Fed. R. Bankr. P. 9014 (a) ("In a contested matter not otherwise governed by these rules, relief shall be requested by motion . . . .").

3. The relief requested by the Debtors' Motion is equally inconsistent with the fundamental nature of the assumption process as reflected in the decisions of the United States Court of Appeals for the Second Circuit, which recognize that "in reviewing a . . . debtor-in-possession's decision to assume an executory contract . . . a bankruptcy court sits as an overseer of the wisdom with which the bankruptcy estate's property is being managed by the trustee or debtor-in-possession . . . ." Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993). If the Debtors' Motion is granted, however, there would be absolutely no judicial oversight whatsoever of the Debtors' assumption decisions.

---

[1] It is unclear from the Motion how these payment would be accounted for in connection with the Debtors' proposed key employee compensation plan (the "KECP"), which excludes "reorganization costs," among other things, from the calculation of EBITDAR on which bonuses payable to the Debtor's executives are based. In order to ensure that the Debtors' executives do not have any inappropriate incentives to classify vendors as "critical" for the purposes of the Motion or the Debtors' proposed program (the "Vendor Assumption Program"), the Debtors should clarify that the costs of this program, if approved, will be fully included on the Debtors' profit and loss statement as costs of goods sold for purposes of the calculation of any earnings targets established under the KECP.

4. Furthermore, while the Debtors' Motion is captioned as a motion to assume executory contracts, it is, in reality, a thinly-veiled "critical vendor" motion that seeks discretionary authority to prioritize and pay more than $587 million in pre-petition, non-priority claims based on nothing more than the Debtors' unilateral and unreviewable determination that certain vendors (the "Covered Suppliers") may not be willing to continue to supply goods to the Debtors in the absence of satisfaction of their pre-petition claims.

5. The Debtors' Motion is factually and legally indistinguishable from the "critical vendor" order that was rejected by the Seventh Circuit in In re Kmart Corp., 359 F.3d 866 (7th Cir. 2004), and suffers from the same fatal defects that mandate its denial, including:

(i) the lack of any basis for the court to conclude that each of the supposedly critical vendors would cease doing business with the Debtors in the absence of payment of their pre-petition claims;

(ii) the lack of any basis for the court to conclude that creditors other than covered suppliers would not be prejudiced by the preferences granted to critical vendors; and

(iii) the lack of any basis for the court to conclude that discrimination among unsecured creditors proposed by the Motion is actually necessary to the Debtors' reorganization.

Id. at 874.

6. The absence of any concrete facts supporting the Debtors' decision to pay the prepetition claims of the Covered Suppliers likewise dooms the Debtors' request for blanket authorization to grant Preference Waivers to the Covered Suppliers. See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 437 (1968) ("To make an informed and independent judgment [concerning approval of a settlement] . . . the court needs facts, not allegations.").

7. The complete elimination of judicial oversight over the Debtors' assumption, claims allowance and settlement decisions would undoubtedly make the Debtors'

decision-making process more streamlined and efficient, and would accommodate the Debtors' supposed need for flexibility in responding to the many challenges it supposedly faces with respect to its vendors. As the Supreme Court observed in TMT Trailer, however, "the need for expedition . . . is not a justification for abandoning proper standards." 390 U.S. at 450.

8. Accordingly, because the relief requested by the Debtors is fundamentally inconsistent with the procedures and standards established by applicable law for the assumption of executory contracts and the approval of settlements, and will not, in any event, enable the Debtors to obtain the support of any truly critical vendors, the Motion must be denied.

## FACTUAL BACKGROUND

9. WTC serves as indenture trustee for approximately $2 billion worth of senior notes and debentures issued by Delphi. Accordingly, it has a keen interest in ensuring the ultimate success of the Debtors' reorganization, and in maximizing the value available for distribution to the holders of the notes and debentures for whom it acts as indenture trustee.

10. On October 8, 2005 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code (11 U.S.C. §§ 101 et seq.) (the "Bankruptcy Code"). Since the Petition Date, the Debtors have continued to operate their businesses and remained in possession of their assets as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

11. On October 13, 2005, at the request of the Debtors, the Court entered the following orders authorizing the Debtors to expend approximately $191 million to address issues relating to their supply chain:

- Order Under 11 U.S.C. §§ 105(a), 363, 364, 1107 and 1108 and Fed. R. Bankr. P. 6004 and 9019 Authorizing Continuation of Vendor Rescue Program and Payment of Prepetition Claims of Financially-Distressed Sole Source Suppliers and Vendors Without Contracts (the "Vendor Rescue Order"), authorizing the Debtors "to pay all, a portion, or none of the prepetition claims . . . owing to

certain of the Debtors' suppliers that are essential to the uninterrupted functioning of the Debtors' business operations . . . up to an aggregate amount of $90 million."[2]

- Order Under 11 U.S.C. §§ 105(a), 363, 1107 and 1108 Authorizing (I) Payment of Prepetition Obligations to Foreign Creditors and (II) Financial Institution to Honor and Process Related Checks and Transfers (the "Foreign Creditors Order"), authorizing the Debtors "to pay, in their discretion and in the ordinary course of business, as and when due, any claim held by a Foreign Creditor."[3] In their motion requesting entry of the Foreign Creditors Order, the Debtors estimated that approximately $40 million in foreign claims were outstanding as of the Petition Date.[4]

- Order Under 11 U.S.C. §§ 105(a), 363(b), 1107 and 1108 Authorizing Payment of Certain Prepetition (I) Shipping ad Delivery Charges for Goods in Transit and (II) Customs Duties (the "Shipping and Customs Order"), authorizing the Debtors "to make such payments to (a) domestic and foreign commercial common carriers, movers, shippers, freight forwarders/consolidators, delivery services, customs brokers, shipping audit services, deconsolidators, distributors, logistics management companies, and certain other third-party service providers (collectively, the "Shippers") and (b) third-party warehouses (collectively, the "Warehousemen") as the Debtors determine, in the exercise of their business judgment, to be necessary or appropriate to obtain the release of raw materials, parts, components, certain finished goods, indirect materials, tooling, machinery, and equity held by such Shippers and Warehousemen."[5] In their motion requesting entry of the Shipping and Customs Order, the Debtors estimated that the total amount of shipper, warehousemen and customs claims outstanding as of the Petition Date was approximately $61 million.[6]

12. On November 18, 2005, the Debtors filed the instant Motion, seeking that this Court's approval for a set of procedures that would allow the Debtors, without further notice

---

[2] Vendor Rescue Order, ¶ 2.

[3] Foreign Creditors Order, ¶ 2.

[4] Motion for Order Under 11 U.S.C. §§ 105(a), 363, 1107 and 1108 Authorizing (I) Payment of Prepetition Obligations to Foreign Creditors and (II) Financial Institution to Honor and Process Related Checks and Transfers, ¶ 15.

[5] Shipping and Customs Order, ¶ 2.

[6] Motion for Order Under 11 U.S.C. §§ 105(a), 363(b), 1107 and 1108 Authorizing Payment of Certain Prepetition (I) Shipping ad Delivery Charges for Goods in Transit and (II) Customs Duties, ¶¶ 18 and 25.

to creditors or approval by the Court, to, among other things: (i) assume as many as 8,000 Subject Contracts covering "the supply of goods that the Debtors determine are absolutely critical to their on-going business operations;"[7] (ii) pay up to 75% of the outstanding prepetition arrearages owing under the Subject Contracts over a period of six calendar quarters in exchange for the Covered Suppliers' agreement to extend the term of their supply contracts with the Debtors for a period of two years; (iii) grant releases to the Covered Suppliers of any potential preference liability under section 547 of the Bankruptcy Code.

13. The Motion, if granted, would also give the Debtors the authority to resolve claims of Covered Suppliers without any judicial or creditor oversight. Moreover, rather than treating payments of Covered Suppliers' claims under this proposed Vendor Assumption Program as advances against ultimate claim recoveries, the Debtors propose that the balance of any claims of Covered Suppliers not paid as part of this proposed Vendor Assumption Program, would remain outstanding and be paid under a plan as unsecured claims.[8]

14. The Vendor Rescue Order, Foreign Creditors Order, the Shipping and Customs Order, and, if entered, the order requested by the instant Motion, collectively will have authorized the Debtors to pay more than $630 million in prepetition claims against their estates and, in addition, to waive potentially valuable preference claims of an undetermined amount.

---

[7] Motion, ¶ 15.

[8] The Debtors' proposed method increases the already generous percentage recovery proposed to be offered to Covered Suppliers. As an example, a Covered Supplier under the Debtors' proposal with a $50 million claim would receive a 75% recovery now, worth $37.5 million, and a claim for $12.5 million. Assuming a plan recovery of 50 cents on the dollar, the Covered Supplier would thus receive an additional $6.25 million on the $12.5 million remaining claim, for a total recovery of $43.75 million. If, instead, the $37.5 million was credited against the Covered Supplier's ultimate plan recovery (with no obligation to return overpayments) the Covered Supplier's $50 million claim would entitle it to $25 million under the Plan and the Debtors' obligation to the Covered Supplier would be capped at the $37.5 million already advanced , thereby saving the estate substantial funds.

15. On November 19, 2005, WTC filed a preliminary objection to the Debtors' Motion for the purpose of creating a contested matter under Bankruptcy Rule 9014 sufficient to allow WTC to take discovery with respect to the Motion, and expressly reserved the right to file this amended objection.

## THE DEBTORS' PROPOSED ASSUMPTION PROCEDURES MUST BE REJECTED

### A. The Debtors Cannot Be Authorized to Assume Executory Contracts Without Bankruptcy Court Approval

16. Section 365(a) of the Bankruptcy Code provides, in pertinent part, that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).

17. In considering a debtor's motion to assume an executory contract, the Second Circuit has instructed bankruptcy courts "to examine a contract and the surrounding circumstances and apply its best 'business judgment' to determine if it would be beneficial or burdensome to the estate to assume it." Orion, 4 F.3d at 1099 (citation omitted).

18. Under Orion, then, it is not the debtor's, but ***the bankruptcy court's*** business judgment that determines whether a motion to assume should be granted since the "bankruptcy court sits as an overseer of the wisdom with which the bankruptcy estate's property is being managed by the trustee or debtor-in-possession." Id.; accord Nostas Assoc. v. Costich (In re Klein Sleep Prods., Inc.), 78 F.3d 18, 25 (2d Cir. 1996) (noting that a bankruptcy court's decision to allow assumption of an unexpired lease "required a judicial finding – up front – that it was in the best interests of the estate (and the unsecured creditors) for the debtor to assume the lease."); In re F.W. Restaurant Assoc., Inc., 190 B.R. 143, 149 (Bankr. D. Conn. 1995) (denying motion to assume where the court concluded "using its 'best business judgment,' that it would

not be beneficial to the bankruptcy estate for the Debtor-In-Possession to assume the Concession Agreement.”).

19. The express provisions of the Bankruptcy Code and Bankruptcy Rules require that a debtor seek authorization to assume an executory contract by filing a motion with the court and giving reasonable notice to interested parties. Furthermore, the Second Circuit’s decision in Orion instructs courts to exercise their own business judgment in deciding whether a debtor’s decision to assume a particular contract should be approved -- something that cannot possibly occur if the Debtors do not file a motion with respect to each contract to be assumed describing their evaluation of the benefits and burdens of assuming the specific contracts they wish to assume and any terms pursuant to which they seek to assume them.

20. The Debtors’ Motion, however, seeks this Court’s approval for a set of assumption procedures that would allow the Debtors to assume literally thousands of soon-to-expire executory contracts without giving notice to anyone of the specific terms of each assumption, and without allowing this Court to fulfill its role as the “overseer of the wisdom with which the bankruptcy estate’s property is being managed.” Orion, 4 F.3d at 1099.

21. Under applicable law, this Court cannot simply take it on faith that the Debtors will make appropriate decisions regarding the assumption of the Subject Contracts. Accordingly, because the assumption procedures proposed by the Debtors’ Motion fail to comply with the procedural and substantive standards governing assumption of executory contracts under applicable law, the Debtors’ Motion must be denied.

**B. The Debtors Cannot Be Authorized to Settle Potential Preference Claims Without Bankruptcy Court Approval**

22. The Debtors' request for authority to grant Preference Waivers to the Covered Suppliers without specific notice to creditors or approval by the Court is likewise deficient and must be denied.

23. Bankruptcy Rule 9019(a) provides as follows:

> On motion by the trustee and after notice and hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019(a) (emphasis added).

24. As the Debtors note in their Motion, courts typically consider the following four factors, enumerated by the Supreme Court's decision in TMT Trailer, in deciding whether to approve a proposed compromise: (i) the probability of success in litigation (ii) the complexity, expense, and likely duration of litigation; (iii) possible difficulties in collection; and (iv) other factors bearing on the wisdom of the compromise. 390 U.S. at 424-25.

25. Before a court can apply the TMT Trailer factors, however, the court must first apprise itself "of all facts necessary for an intelligent and objective opinion." Id. In other words, in order for the Court to make the "informed and independent judgment" that TMT Trailer requires, "the court needs facts, not allegations." Id. at 437.

26. Consequently, before it can approve a settlement, the Court must "be apprised of those facts that are necessary to enable it to evaluate the settlement and to make a considered and independent judgment about the settlement." In re Adelphia Communications Corp., 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005). The Debtors' request for pre-authorization to enter into future settlements containing Preference Waivers without any knowledge of even the

claims or amounts at issue, however, is entirely inconsistent with this requirement, and would deprive this Court of the ability to reach the "considered and independent judgment" that the case law requires.

27. Accordingly, that portion of the Debtors' Motion seeking advance approval to grant Preference Waivers to Covered Suppliers without the necessity of obtaining prior court approval on a case by case basis must also be denied.

**C. The Debtors Motion Is Logically Inconsistent**

28. Even assuming, *arguendo*, that the relief requested by the Debtors' Motion were otherwise consistent procedurally with applicable law, the Debtors' Motion and arguments are logically inconsistent and do not support the extraordinary relief they seek.

29. Although the Debtors' Motion is certainly filled with dire predictions of what the Covered Suppliers *might* do if denied immediate payment of their pre-petition claims, or what they *might* ask for as a condition to continuing their business relationship with the Debtors, notably absent from the Motion is any concrete evidence that any, much less each, of the Covered Suppliers would terminate their business relationships with the Debtors absent payment of their prepetition claims. See In re United American, Inc., 327 B.R. 776, 783 (Bankr. E.D. Va. 2005) (refusing to grant a critical vendor motion based on threats of non-delivery, noting that a vendor's "mere statement that that he will not supply the goods or services is rarely sufficient. Anyone can ***say*** that. The real question is whether he ***means*** it, that is, his ***actual*** intent.") (emphasis in original).[9]

---

[9] Threatening to discontinue deliveries to a debtor for the purpose of coercing payment of a prepetition debt violates the automatic stay and should expose offending vendors to sanctions, not entitle them to preferential treatment. See In re Sportfame of Ohio, Inc., 40 B.R. 47, 50 (Bankr. N.D. Ohio 1984) (holding that "the defendant's sole animus in refusing to ship goods to debtor for cash was its desire to coerce the debtor's repayment of its prepetition indebtedness and

30. The real problem with the Debtors' Motion, however, is that it argues both too much, and too little.

31. On one hand, no rational economic actor would be expected to refuse to enter into a profitable transaction with the Debtor solely because of the existence of a prepetition claim. As the Seventh Circuit noted in K-Mart:

> Nor was Fleming likely to walk away even if it had a legal right to do so. Each new delivery produced a profit; as long as Kmart continued to pay for new product, why would any vendor drop the account? That would be a self-inflicted wound. To abjure new profits because of old debts would be to commit the sunk-cost fallacy; well-managed businesses are unlikely to do this. Firms that disdain current profits because of old losses are unlikely to stay in business. They might as well burn money or drop it into the ocean.

In re K-Mart, 359 F.3d at 873.

32. The same is true here. Indeed, it is apparent from footnote 5 at page 11 of the Motion that some vendors have, in fact, already accepted new agreements or extended the terms of an assumable agreement. Nevertheless, the Debtors, inexplicably, seek authority to pay the pre-petition claims of those Covered Suppliers, as well.

33. Moreover, there are doubtless Covered Vendors who cannot afford to walk away from their relationship with the Debtors because the Debtors purchases a large enough portion of the Covered Vendors' products that a refusal to supply the Debtors would be economic suicide. As the Seventh Circuit explained in K-Mart:

> When Kmart stopped buying its products after the contract expired, Fleming collapsed (Kmart had accounted for more than 50% of its business) and filed its own bankruptcy petition. Fleming was hardly likely to have quit selling of its own volition, only to expire the sooner.

---

that this act, albeit a passive one, was 'an act to collect, assess, or recover a claim against the debtor' in contravention of 11 U.S.C. 362(a)(6).").

In re K-Mart, 359 F.3d at 873.

34. On the other hand, if the Covered Vendors, or at least some of them, have the leverage to shut down the Debtors' production lines and cause the Debtors to incur significant damage claims from their customers, then there is no reason to believe that those Covered Vendors will be satisfied with the Debtors' proposed Vendor Assumption Program or, indeed, anything less than a King's Ransom for their products.[10]

35. In the case of Covered Vendors making such extortionate demands, those demands would not only fall outside the Debtors' proposed Vendor Assumption Program, but would also fall outside the ordinary course of the Debtors' business and would be subject to this Court's approval, in any event, at a later date. Consequently, the Motion does not even serve the interests of judicial economy.

36. It also makes little sense to permit the Debtors to extend their proposed Vendor Assumption Program to contracts expiring in the future. There is ample time for the Debtors to negotiate an acceptable renewal agreement or, if one cannot be negotiated, seek a different source of supply. Consequently, there is no rational basis for paying the prepetition claims of Covered Vendors whose contracts expire in the future.

37. Although liquidity concerns could provide a legitimate basis for otherwise willing vendors to refuse to ship, the Debtors have, in the court's words "abundant" liquidity and vendors have been shipping to the Debtors on credit, albeit in some cases on shorter than normal

---

[10] The reason the Debtors are presumably not generally subject to such extortionate demands, however, is that elephants never forget. Any Covered Supplier, in the abstract, who plays such a game will only be able to play it once. The Debtors would then presumably re-source the part and never do business with that supplier again, who might also fall into disfavor with other customers as word of the Covered Supplier's behavior got around. Thus, the Covered Supplier commits a different, slower form of suicide.

terms. The value of the increased liquidity the Debtors hope to garner from approval of the Motion is not guaranteed, however, and comes at a heavy price.

38. Even if the sort of discrimination among unsecured creditors proposed by the Debtors' Motion were permissible in theory, there can be no factual showing, in the abstract, if at all, sufficient to justify the extraordinary relief requested by the Motion. See Kmart, 359 F.3d at 874 ("Even if § 362(b)(1) (sic) allows critical-vendors orders in principle, preferential payments to a class of creditors are proper only if the record shows the prospect of benefits to the other creditors.").

39. By filing their Motion and telling the World that every one of its Covered Vendors allegedly has the ability to derail the Debtors' reorganization effort, the Debtors have, at least if their assertions are true, given up any leverage they might otherwise have had to negotiate reasonable contract renewals with their Covered Vendors.

40. Accordingly, the Court must intervene to protect not only the creditors, but the Debtors, from the Debtors' own hand. Only by taking the checkbook away from the Debtors and keeping it under judicial lock and key can any semblance of the Debtors' ability to negotiate with its Covered Vendors be restored.

41. To the extent the Debtors are nevertheless unable to negotiate an ordinary course renewal with a Covered Vendor, the renewal that is negotiated will have to be approved by the Court and creditors and the Court will then have the ability to determine, on a case by case basis, whether any such transaction should be approved.

**D. The Debtors Are Not Entitled to an Advisory Opinion Concerning Their Ability to Enter into Postpetition Contacts**

42. In addition to the more substantive relief requested by the Motion, the Debtors also request, in a footnote, that the Court confirm their belief that the negotiation and

entry into new contracts with their suppliers is a transaction in the ordinary course of their respective businesses for which court approval is not required under section 363(b) of the Bankruptcy Code. See Motion, p. 8 n.3.

43. While it is not clear precisely what advantage the Debtors seek to gain by having this Court enter an order restating the settled legal principle that a debtor may engaged in transactions in the ordinary course of its business without court approval, it is clear that the Court lacks authority to enter such an advisory opinion concerning whether hypothetical future contracts that the Debtors wish to, or might, enter into are, or are not, subject to the requirement of court approval under section 363(b) of the Bankruptcy Code. See In re Wright, 220 B.R. 543, 545 (S.D.N.Y. 1998) (holding that court lacked authority to issue an advisory opinion determining "the legal effect of future testimony in a context where the testimony is as yet unspecified.").

44. Accordingly, since the precise details of the Debtors' future contracting activities remain unknowable at this time, the Debtors' request for an advisory declaration concerning the ordinary course character of their contract negotiations must be denied.

WHEREFORE, WTC respectfully requests entry of an order denying the Debtors' Motion, and granting such other and further relief as this Court deems just and proper.

Dated: New York, New York
November 23, 2005

Respectfully submitted,

KIRKPATRICK & LOCKHART
NICHOLSON GRAHAM LLP

By: */s/ Edward M. Fox*
Edward M. Fox (EF1619)
A Member of the Firm

Counsel for Wilmington Trust Company, as Indenture Trustee
599 Lexington Avenue
New York, NY 10022
(212) 536-3900