LATHAM & WATKINS LLP
885 Third Avenue, Suite 1000
Telephone: (212) 906-1200
Robert J. Rosenberg (RR-9585)
Mitchell A. Seider (*pro hac vice*)
Mark A. Broude (MB-1902)
Email: robert.rosenberg@lw.com
       mitchell.seider@lw.com
       mark.broude@lw.com

Proposed Attorneys for the Official Committee of Unsecured Creditors

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------x
                        :
   In re               :        Chapter 11
                        :
Delphi Corporation, et al.,   :        Case No. 05-44481 (RDD)
                        :
          Debtors    :        Jointly Administered
---------------------------------------------x

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION FOR AN ORDER UNDER 11 U.S.C. §§ 363(b) AND 365(a) AND FED. R. BANKR. P. 9019 APPROVING PROCEDURES TO ASSUME CERTAIN AMENDED AND RESTATED SOLE SOURCE SUPPLIER AGREEMENTS**

        The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 cases of Delphi Corporation and certain of its affiliates (collectively, the "Debtors"), by and through its proposed attorneys, hereby objects (the "Objection") to the Debtors' Motion for an Order Under 11 U.S.C. §§ 363(b) and 365(a) and Fed. R. Bankr. P. 9019 Approving Procedures to Assume Certain Amended and Restated Sole Source Supplier Contracts (the "Motion"). In support hereof, the Committee respectfully represents as follows:

NY\1083593.7

**PRELIMINARY STATEMENT**

Regardless of the spin which the Debtors attempt to put on this Motion, it is an unsupported and unsupportable critical vendor motion seeking the authority to pay, potentially, all pre-petition trade claims outside a plan of reorganization with no further review by this Court.[1]  The Debtors suggest that the extraordinarily little diligence they have undertaken satisfies the business judgment standard, and yet they admit that they have not yet undertaken anything close to sufficient analysis to support the relief requested in their Motion.

On the Petition Date, the Debtors sought emergency authority to make substantial payments to certain suppliers on account of pre-petition claims.  To support that extraordinary relief, the Debtors told the Court of the great depth with which they had studied their supply chain, and of how they had identified for the Court the universe of claims that were critical to the Debtors' on-going operations.  Now, 41 days after the Petition Date, the Debtors seek authority to make up to $1 billion in additional payments on account of supplier claims.

The Committee recognizes the critical nature of the Debtors' supply chain, and supports the preservation of that chain.  The Committee objects, however, to the proposal – that amounts to a billion-dollar blank check -- that the Debtors be authorized to pay all outstanding amounts to their pre-petition suppliers under unidentified contracts with unidentified parties (at what must be a substantial premium to the market price for suppliers' claims), and to do so under the guise of "assumption" without any meaningful analysis, standards, or caps, and without any oversight by the Court.  The Committee objects to the inexplicable waiver of unidentified

---

[1] Although the Debtors estimate they may use "only" $500 million under the Motion (itself a shocking number), they admit that there is absolutely no factual basis for that estimate. The Motion seeks authority to pay any trade claim the Debtors want to pay, and the Debtors estimate that the outstanding trade balance is approximately $1.1 billion.

2

avoidance claims against unidentified parties. And the Committee objects to the Debtors' extraordinary refusal to supply the Committee with any material information in support of the Motion.

The bottom line is that the Motion is not a well-tailored response to what the Debtors have represented is a real business problem. Instead, the Motion is part of a theme in these chapter 11 cases that the Committee (and, with respect, the Court) need to correct: the Debtors spot what they perceive to be a problem with their supply chain, and insist they must throw fistfuls of their unsecured creditors' money at it to fix it.

## BACKGROUND

1. On October 8 and 11, 2005, respectively (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under the Bankruptcy Code. The Committee was appointed on October 17, 2005,[2] and shortly thereafter selected Latham & Watkins LLP as its proposed counsel, Mesirow Financial Consulting LLC as its proposed financial advisor, and Jefferies & Company, Inc. as its proposed investment banker.

2. Since the very first days of these cases, the Debtors have worked hard to appease their supply chain. The Debtors have sought and received, among other things, authority to pay approximately $90 million in pre-petition claims to certain "essential suppliers," $40 million to certain "foreign vendors," $20 million to certain "contract labor," $63 million to certain lien holders, and $61 million to certain shippers and warehousemen. In addition, the Debtors sought and received authority to waive claims against certain vendors arising from $73 million in "pre-payments" and against a credit card supplier for a $6.3 million preferential

---

[2] The members of the Committee are: (a) Capital Research and Management Company; (b) Electronic Data Systems Corp.; (c) Flextronics International Asia-Pacific, Ltd.; (d) Freescale Semiconductor, Inc.; (e) General Electric Company; (f) IUE-CWA and (g) Wilmington Trust Company, as Indenture Trustee.

NY\1083593.7

payment. Although the Committee had obvious concerns about these extraordinary proposed payments, following receipt of information allowing it to do appropriate due diligence, the Committee did not object. The total of these programs – between post-petition cash payments and waivers of avoidance claims for pre-petition payments – is at least $350 million, an extraordinary gift for a subset of the pre-petition unsecured creditors and one that, with the Motion, the Debtors now seek to more than triple.

3. Notably, the Committee's consent in each case was due in large part to the prior analysis undertaken by the Debtors, and by the Debtors' willingness to share that analysis with the Committee on a timely basis.

The Motion

4. Pursuant to the Motion, the Debtors seek an order by which they would be authorized, but not directed, to assume certain supply contracts that the Debtors believe to be "absolutely crucial to . . . a successful restructuring and emergence from these chapter 11 cases." However, instead of actually assuming such contracts and satisfying their burden under the Bankruptcy Code, the Debtors ask for the authority to utilize "procedures" (the "Procedures") pursuant to which they unilaterally pick which supply contracts to assume.[3] The Debtors do not identify any contracts that would be part of the Procedures, but propose to implement the Procedures as described in the Motion on an ongoing, discretionary basis, "without need for further court approval."

5. The proposed Procedures would allow the Debtors the unilateral discretion to assume any contract (i) that involved goods that "are not readily available from another

---

[3]  Although the Debtors assert that there are approximately 11,000 supply contracts due to expire in December 2005, the Procedures would apply to all vendor contracts, not just these 11,000.

4

supplier in quantities sufficient to avoid" a manufacturing interruption, and (ii) for which the loss of the product related to such agreement would lead to an "imminent shutdown" of operations that would "affect the operations of the Debtors' customers." Since the Debtors have not demonstrated which of their contracts fulfill these requirements, the Committee assumes that the Debtors believe that *all* of them do – an extraordinary proposition that is usupported by even a scintilla of evidence.

6. Although the Debtors assert that the Procedures are "limited, focused, and narrowly-tailored," Motion, P. 7, the Motion itself shows otherwise. The Debtors estimate (with no factual basis for such estimate) that 11,000 supply contracts will expire in December 2005, and that another 10,000 will expire sometime thereafter. As admitted in the Motion, the proposed Procedures would apply to almost all such contracts, "with very few exceptions." Motion, P. 8. A motion that applies to essentially all contracts is hardly limited, focused, or narrowly tailored.

7. Any party to a contract that the Debtors chose to assume would have to agree to certain contract provisions (the "Required Minimum Provisions") as a prerequisite for assumption. In the event that a supplier declines to agree to those provisions, however, the Debtors would have authority to negotiate terms different than the Required Minimum Provisions following three business days negative notice to the Committee.[4]

8. The Debtors also request the authority to grant unilateral waivers of avoidance rights under section 547 of the Bankruptcy Code ("Preference Waivers"). As with the Procedures, the Debtors seek authority to offer Preference Waivers as they see fit, without

---

[4] Considering the Debtors' "estimates" as to how many contracts are expiring in the next five weeks, that schedule contemplates requiring the Committee to review potentially enormous numbers of contracts on only three business days notice.

5

NY\1083593.7

further review of this Court, without any participation by any other party, and without actually identifying any claims that they seek authority to waive.

9.  Given the magnitude of the relief being requested, it is astounding how little information and analysis the Debtors have provided to the Committee to justify the Motion. The Debtors first informed the Committee of this "issue" on November 11. The financial professionals for the Committee and the Debtors then met on November 15, at which the Debtors' professionals made a presentation on the Debtors' proposed solution to the "issue," but gave the Committee's professionals not a <u>single piece of paper</u> with any analysis to support the Debtors' proposal (and even refused to provide a hard copy of the presentation). At that meeting the Committee's professionals provided a list of the information and analysis that they needed to evaluate the issue and the proposed solution. The Debtors and the Committee (with their professionals) then met on November 16 and 17 and spent several hours discussing the Debtors' approach to its supply chain concerns, and the Committee again reiterated its need for immediate information and analysis. Following the Debtors' filing of the Motion late in the evening on November 18, the Committee served its discovery request the next business day. Yet as of the morning of November 23 (the day before the holiday, and the second to last business day before the hearing), the Committee's professionals had received exactly two pages (one mostly blank) of purported analysis supporting the Motion. What is clear is that the Debtors have not provided any analysis to the Committee either because they are hiding it from the Committee or because they have none and are now scrambling to generate "back fill" analysis to support a program that they have proposed without any support.[5]

---

[5]  In that regard, the Debtors provided some further cursory information by e-mail mid-morning on the date hereof, and explicitly admitted in the cover e-mail that they STILL had not done even the most rudimentary analysis to support the Motion. Because the data

6

**OBJECTION**

10. The Committee objects to the Motion on three basic grounds: the Motion is wholly contrary to bankruptcy law, it is not based on sound or reasonable business judgment (in fact, as admitted throughout the Motion, it is not based on hard facts at all), and proposes "Procedures" which are fundamentally flawed both conceptually and in their details.

<u>The Motion is in Direct Violation of the Bankruptcy Code</u>

11. Although couched in terms of assumption and business judgment, the Motion does not actually seek the assumption of any contracts. The Motion instead seeks authority to establish "Procedures" by which the Debtors can freely, unilaterally, and privately determine which contracts to "assume" and amend, what cure payments to make, and which vendors to prefer. Not surprisingly, the Debtors do not and cannot offer any statutory basis for such extraordinary "Procedures," and do not and cannot purport to suggest any legal basis for the Court to abdicate its responsibilities under the Bankruptcy Code.

12. Nevertheless, even under the inapt code sections by which the Debtors seek to proceed, the Motion clearly fails. To be sure, a debtor can assume executory contracts subject to review under the business judgment rule, <u>see</u>, <u>e.g.</u>, <u>In re Orion Pictures Corp</u>, 4 F.3d 1095, 1099 (2d Cir. 1993)(stating that a court should apply "its best 'business judgment'" to reviewing motions to assume or reject contracts under § 365), but the debtor bears the burden of proving that it has satisfied that standard. <u>See</u>, <u>e.g.</u>, <u>In re Anglo Energy Ltd.</u>, 41 B.R. 337, 340 (Bankr. S.D.N.Y. 1984) (emphasizing that a "debtor [is] required to demonstrate" the financial merit of the transaction under consideration); <u>In Re Riodizio, Inc</u>. 204 B.R. 417, 424 (Bankr. S.D.N.Y. 1997). Most courts, including notably the Second Circuit, have applied their own

---

included in the e-mail was again designated as for "professional's eyes only," and the Debtors may assert that the e-mail itself is therefore also restricted, it is not attached hereto as an exhibit.

NY\1083593.7

"business judgment" in determining whether a debtor has met that burden. 7 Colliers on Bankruptcy ¶ 1108.07[3] at 1108–19 (15 Ed. 2005) (stating that "the standard that has evolved has permitted courts to go beyond the traditional corporate law scope of inquiry and superimpose their own business judgment upon that of" a debtor, and citing judicial emphasis on "[t]he bankruptcy court's 'business judgment'"(citing Orion, 4 F.3d at 1099)); In re Gucci, 193 B.R. 411, 415 (S.D.N.Y. 1996) (explaining that "[a] bankruptcy court . . . should apply its best business judgment" to a motion under Section 365 (internal quotation marks omitted)).

13.     Moreover, the Court must make this determination based on the actual benefit to the estate. In re Victory Markets, Inc. 221 B.R. 298, 309 (B.A.P. 2d Cir, 1998)("Questions of assumption or rejection of leases and executory contracts . . . require, under the plain language of § 365(a), *actual* consideration by the bankruptcy court," which cannot authorize assumption when there has been "no showing pursuant to the business judgment test"(emphasis in original)).  Met with vague assertions about financial peril, courts have found that debtors have "utterly fail[ed] to address much less demonstrate to [the] Court how the estate would be benefited through" assumption or rejection under § 365.  In re Kong, 162 B.R. 86, 96-97 (denying debtor's cross-motion to reject a lease) (Bankr. E.D.N.Y. 1993).

14.     There is no question that the Debtors have not satisfied the business judgment rule, under any level of review, and will not do so in the future.  In fact, there is no question that the Debtors have not even tried to do so.  The Debtors have not identified and will not in the future identify to the Court the contracts they request authority to "assume," or the terms, conditions, or costs of any such contracts.  In fact, the Debtors have not even established (and again will not in the future establish) that any of these documents are even executory contracts subject to assumption or rejection.

8

15. The Debtors' failure even to identify the contracts they seek to "assume" is reason enough to deny the relief they seek. The Debtors, however, are seeking not only to assume contracts under Section 365 of the Bankruptcy Code but to *extend* and *modify* them under Section 363(b) of the Code. They seek to extend the assumed contracts for two years and to modify the contracts to include, *inter alia*, a payment schedule for pre-petition debt and an agreement on credit terms. See Motion PP 12-13, 25. The Motion, therefore, is nothing more than a thinly veiled – and massive – critical vendor motion[6] of the sort considered and rejected in In re Kmart Corp., 359 F.3d 866 (7th Cir. 2004). In that case, Kmart sought authority to pay certain "critical vendors" in full in exchange for the vendors' agreement to furnish goods on "customary trade terms" for two years. Id. at 868-69. In evaluating this request under Section 363(b) of the Code, which governs transactions outside the ordinary course of business, the Kmart Court found, among other things, that for critical vendor payments to be approved:

> it is necessary to show not only that the disfavored creditors will be as well off with reorganization as with liquidation--a demonstration never attempted in this proceeding--but also that the supposedly critical vendors would have ceased deliveries if old debts were left unpaid while the litigation continued. If vendors will deliver against a promise of current payment, then a reorganization can be achieved, and all unsecured creditors will obtain its benefit, without preferring any of the unsecured creditors.

Id. at 873.

16. Under Kmart, therefore, unless the Debtors can "demonstrate" that cure payments and Preference Waivers have been demanded as prerequisites to continued deliveries, and that vendors will not deliver their products even if their failure to do so will result in the loss

---

[6] Although the Debtors admit that the largest critical vendor motion ever approved in this District is $70 million in WorldCom (See October 11, 2005 Transcript, Page 56, line 7 through 12), in the Motion the Debtors seek authority to pay up to $1 billion in vendor claims – almost 15 times the WorldCom amount, on top of the massive vendor payment programs that this Court has already approved.

9

of a $20 billion customer, the Debtors cannot have this relief as critical vendor payments. As the Debtors have not conducted the vendor-level analysis that would be required to make this showing, the Motion cannot be approved as proposed.

17. It bears emphasizing that the Debtors have already sought and received a broad "essential supplier" order based on their insistence to the Court that payments to certain "essential suppliers" met the stringent Kmart requirements. When the "essential supplier" motion was heard, counsel for the Debtors represented to the Court that the Debtors had evaluated the risk of supplier disruption and crafted a remedy for it. See e.g., October 11, 2005 Transcript, Page 55 line 25 through Page 56 line 6 ("We actually went through, and FTI could testify if Your Honor wants the testimony, FTI and our global purchasing organization and Mr. Sheehan went through and did an analysis and said, you know, the number's probably $130 to $150 million to get this thing to make sure that we can move seamlessly and protect the value of this business"). The instant Motion cannot be squared with counsel's statements to the Court and to the Committee regarding the level of blackmail payments that would be needed to protect the Debtors' enterprises.

The Motion is Based on Guesses and Unsupported Estimates, and has no Factual Basis

18. Aside from the violence that this Motion does to the Bankruptcy Code, it cannot and should not be approved because there is absolutely no factual support for the relief requested.

19. Although the Debtors purport to provide estimates of aggregate payments, the number of contracts subject to the proposed Procedures, and the asserted "benefit to the estate," they offer only guesses. The Debtors do not know how many contracts are subject to the Motion. While the Debtors estimate that they owed approximately $1.1 billion in outstanding payables to their vendors as of the Petition Date, they have no idea how much of that relates to

10

annual supply contracts coming due in December 2005, December 2006, or otherwise. The Debtors do not know which contracts relate to facilities targeted for closure, which contracts relate to products nearing the end of a production cycle, which contracts relate to non-plant suppliers, or which contracts relate to products which can be easily and quickly re-sourced. The Debtors do not know which vendors, if any, will cease shipments and increase prices upon expiration of their contracts, and which vendors rely so heavily on the Debtors for business that they could not even consider doing so. While the Debtors have repeatedly stressed that "a substantial segment of Delphi's U.S. business operations must be divested, consolidated, or wound-down," Motion, P. 7, the Debtors do not know which contracts relate to businesses that are subject to divestiture, consolidation, or winding-down.

20. On each of the several occasions that the Debtors have discussed the issues underlying the Motion with the Committee or its advisors the Debtors have offered materially different numbers (and have never once offered factual backup for the numbers). In three different contexts, the Debtors have offered three different estimates as to the credit "terms" currently being received from their vendors.

21. More to the point, some of the "estimated" numbers that the Debtors assert justify the Motion actually require its denial. The purported "cash flow" benefits are not just simple guesses (again, with no basis in fact), but are entirely misleading. The Debtors currently have no balance on their $1.75 billion post-petition revolving credit facility (within which, this Court noted, was built $500 million in additional liquidity above and beyond the Debtors' purported needs), and have acknowledged that they have received materially better terms from their suppliers than they had anticipated. The only benefit that the Debtors will receive from increased trade terms under the "Procedures" will be the cash flow benefit derived from having

11

more time to pay for supplies.[7]  However, this benefit to cash flow is merely a one time adjustment in timing; eventually, any amounts deferred pursuant to increased trade terms will have to be paid, and such incremental benefit should not mask the true cost of the proposed relief.  Considering the current cash flow reflected in the Debtors' 13 week budget, the detrimental impact on the ultimate enterprise value of the Debtors more than offsets any purported one-time incremental cash flow benefits.

22.  The Committee has worked hard to gather the information necessary to adequately analyze the relief requested in the Motion.  The Committee has repeatedly asked the Debtors for detailed information supporting the requested relief, along with the basic underlying cost-benefit analyses, and the Debtors have consistently stated that they do not have such information or were simply unable to create or provide it.

23.  Given the magnitude and purported importance of the relief being sought, the Debtors' refusal or inability to cooperate has been astounding.  The Debtors have even refused to provide the Committee's professionals with a hard copy of the presentation that the Debtors previously gave to those same professionals, and stated that the factual support for the Motion <u>that</u> <u>was</u> <u>already</u> <u>filed</u> was unavailable.  The little information that has been provided makes reference to other and further schedules that the Debtors refuse to provide, and has been designated (the Committee believes unreasonably) for "professionals eyes only," hindering the Committee's ability to reasonably evaluate such material.

24.  As a result, each of the most basic claims upon which this Motion is based fails. The Debtors cannot prove that the vendors will refuse to ship absent the relief requested in the Motion because they have absolutely no idea if they will do so.  The Debtors cannot establish

---

[7]  In addition, the gradual reinstatement of trade terms is customary in large chapter 11 cases.  The Debtors ignore this reality in their comparison.

that the cost to pay the associated cure will be less than the purported benefit to the Debtors' cash flow because they have no idea what the cure costs will be or what the economic benefit to the Debtors will be (if any).

25. In short, the Debtors cannot establish that the Procedures are in the best interests of the estates because they have no idea if they actually are.

The Procedures Themselves are Fundamentally Flawed

26. Finally, aside from the blatant disregard for the Bankruptcy Code and the shocking lack of factual support, the Motion fails due to the fundamental flaws in the proposed Procedures.

27. The most critical and fatal flaw in these Procedures is the (presumably unintended) "adverse selection" consequence. The Debtors have created a process which, by its very nature, will accomplish the <u>exact</u> <u>opposite</u> of its intended aim (or at least the opposite of its stated aim). Each of the Debtors' vendors fall into one of two categories: those with the leverage to insist upon unique terms and conditions, and those without such leverage. It is only those vendors in the first category that must be addressed (the others have no leverage with which to insist upon anything from the Debtors). Vendors that have little leverage will accept what is offered to them because the result will be payment that those vendors would not otherwise receive. Those vendors that do have leverage, on the other hand, almost certainly will not sign up for the "Procedures" because they will be able (and the Motion will allow them) to demand better terms both in cure payments and in supply terms.

28. In other words, the proposed Procedures establish a floor by which the least aggressive and most amenable vendors will likely receive payments on account of pre-

13

petition claims, but do not affect even minimally the aggressive, leverage wielding vendors the Debtors purport to target.

29. Moreover, by deeming any silent vendor to have consented as a result of future shipments (which the Committee thinks, but is not certain, Paragraph 23 of the Motion suggests), the "adverse selection" process has the additional perverted effect of insisting that otherwise silent vendors accept payment on account of pre-petition claims. In fact, the Procedures may actually cause the very disruption that the Debtors claim they want to avoid – any party that is not willing to enter into the prohibitive Assumption Agreement proposed by the Debtors will have no choice but to refuse shipment lest it be "deemed to" consent to such terms.

30. While this "adverse selection" process is the most obvious flaw in the Procedures, the Procedures are filled with other equally inappropriate and objectionable provisions. Among other things:

   A. The Procedures propose only three business days' notice to the Committee for approval of any arrangements made for those vendors that refuse to enter into the program. These will be most likely the most cost critical arrangements. The Debtors have stated thousands of contracts are subject to the Procedures and must be dealt with by year's end. If the Debtors can force the Committee to approve or disapprove 20, 200, or 2000 contracts within three business days, then objections (even if only placeholder objections) and delay are almost guaranteed. Indeed, this aspect of the Procedures makes the supposed benefits of the Motion (slim as they may be) *entirely* illusory, since they give the Debtors the right to waive the requirements of the program and put the Committee in the impossible position of saying "no";

14

    B. The Debtors state that the costs and expenses of seven Debtors who do not utilize the Debtors' centralized contract management system, and are therefore not included in the Debtors' "best guess" numbers, will nevertheless be part of this Motion.  In response to the Committee's questions, the Debtors explained that the numbers for these seven Debtors are not automotive related and are not material, and could not explain further.  Clearly, non-automotive non-material contracts are not critical to the on-going business operations of the Debtors, and should not be included in the Procedures (in addition, as a matter of course, any contract for which the Debtors continue to refuse information should likewise be excluded); and

    C. The Debtors seek to apply this program retroactively such that vendors that have already agreed to new terms for 2006 will still be entitled to payments on account of pre-petition claims.  Again, payment of pre-petition claims for vendors that have already agreed to supply material in 2006 are not critical to the survival of the Debtors' business.

    31. As a result of these and other flaws in the Procedures, the Motion should not be approved as proposed.

The Motion is Entirely Unnecessary

    32. The Debtors have stated that they will only allow participation in the program by vendors that satisfy a two pronged test, and will hold each such vendor to a very strict regimen of new terms (unless, as described above, the vendor elects to pursue better terms). This means that the Debtors will have to analyze each contract to determine if it satisfies the tests, and then will have to negotiate with each and every vendor to implement such terms.[8]  As a result of this necessary analysis and negotiation, the Debtors should be able to easily address both the requirements of the Bankruptcy Code and the needs and interests of each vendor, and should be able to do so in the exact same time frame contemplated in the Motion.

---

[8] Obviously, if the Debtors intend to assume and cure any contract without actually doing the appropriate analysis, that is even more compelling justification to deny the Motion.

15

NY\1083593.7

33. Moreover, to the extent any vendor refuses to ship or increases its prices in order to pressure the Debtors into making payments on pre-petition debt, the Debtors can hold such vendor accountable for violations of the automatic stay. See, e.g., In re Sportfame, 40 B.R. 47, 51 (Bankr. N.D. Ohio 1984) (finding that a supplier had "violated the automatic stay by refusing to enter into cash transactions with the debtor absent payments of its prepetition debt"); Divane v. A and C Electric Co., 193 B.R. 856, 861–62 (N.D. Ill 1996) (finding that trustees of a health plan had violated the automatic stay by notifying employees of debtor that health benefits would be suspended due to delinquent payments, despite the fact that terms of health plan clearly allowed such notification and suspension).

34. In fact, the Debtors already have in place the exact procedures described above. The Debtors insisted that the original "Essential Supplier Order" include a "waiver" provision, whereby the Debtors could pay any vendor that did not qualify for payment under that order but that nonetheless threatened termination without immediate payment, and could then bring such a vendor before the Court on order to show cause. See Essential Supplier Order, PP. 5 - 6. In fact, Debtors' counsel was very clear on the record before this Court that the Debtors intended to enforce this provision because it was the right thing to do:

> We believe that if a vendor forces us to give them money to keep something operating when they didn't meet the criteria that we have reviewed with our stakeholders here and that we believe is appropriate under these circumstances, financially-distressed soul [sic] – supplier kind of folks or don't have contracts, if they don't comply with that and they want to be outside of the box and they require us to pay them in order to keep the plant open, which we will do, Your Honor, if you give us the authority, we will use it if we have to. We want them back in front of Your Honor so they can explain because we think that's not the way the game ought to be played and we want to discourage people public [sic] from doing it. Our supply chain has to work together and we have to do this in a responsible way.

October 11, 2005 Transcript, Page 59, lines 9 – 22.

16

NY\1083593.7

35. In Mr. Robert S. Miller's sworn affidavit to this Court, dated October 8, 2005 (the "First Day Affidavit"), Mr. Miller also identifies this exact scenario, states that the analysis underlying the Essential Supplier Motion contemplates paying such vendors pursuant to that Order and bringing each such vendor before the Court by Order to Show Cause, and acknowledges that such action would be a violation of the automatic stay. See First Day Affidavit, Pages 80 – 82.

The Preference Waivers are Inappropriate

36. Finally, the inexplicable "Preference Waivers" cannot be approved pursuant to Bankruptcy Rule 9019. Federal Rule of Bankruptcy Procedure 9019(a) provides that "on motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. Proc. 9019(a) (2005). Any proposed settlement or compromise requires approval according to the "'informed, independent judgment' of the bankruptcy court." Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc., v. Anderson, 390 U.S. 414, 424 (1968) ("TMT Trailer"). "[T]he burden of persuading the Court that the settlement should be approved rests with the proponents of the settlement," In re Matco Electronics Group, 287 B.R. 68, 76 (Bankr. N.D.N.Y 2002), however a Bankruptcy Court need not "conduct an independent investigation," and need only assure itself that a proposed settlement fits a "range of reasonableness." In re Drexel Burnham Lambert Group, Inc., 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991); In re Adelphia Communications Corp., 327 B.R. 143 159 (Bankr. S.D.N.Y. 2005). However, even under this relaxed standard of review, courts stress the need to "make a considered and independent judgment about the settlement." Adelphia. 327 B.R. at 159.

37. As explained in TMT Trailer, in evaluating a settlement or compromise under Rule 9019, a bankruptcy court should "form an educated estimate of the complexity,

17

expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained," as well as whether the compromise would be "fair and equitable to the debtor, the other creditors, and the stockholders." TMT Trailer, 390 U.S. at 424–25. Drawing from TMT Trailer, courts in the Second Circuit have developed a set of factors to consider:

> [the Second] Circuit has set forth various factors to be considered on a Rule 9019(a) motion: (1) the probability of success in the litigation; (2) the difficulties associated with collection; (3) the complexity of the litigation, and the attendant expense, inconvenience, and delay; and (4) the paramount interests of the creditors.

Nellis v. Shugrue, 165 B.R. 115, 122 (S.D.N.Y. 1994).

38.    Here, there simply is no underlying litigation to apply the Rule 9019 standard to. As the test demonstrates, Federal Rule of Bankruptcy Procedure 9019 is not intended to support relief for speculative harm arising from speculative developments.

**CONCLUSION**

39.    The Motion as it is currently presented cannot be approved. The Debtors have not even attempted to justify under the Bankruptcy Code the "Procedures" they propose, the $1 billion in payments on account of pre-petition claims they seek authority to make, or the "assumption" of any contracts. To the extent that the Debtors do seek authority to assume contracts, the Committee does not waive its right to notice and an opportunity to be heard on each such assumption, and this Court should not abdicate its obligations of review and approval thereof under Section 365.

40.    The Debtors have identified what they perceive to be a critical problem in their supply chain. It is the responsibility of the Debtors to manage that problem without seeking carte blanche authority to lavish money on it. The Committee remains committed to working with the Debtors on this issue. The relief requested in the Motion, however, is not the answer.

18

Once the Debtors provide the Committee with the appropriate diligence (which obviously presumes the Debtors will at some point conduct the proper diligence), the Committee will work with the Debtors to identify a comprehensive and rational program to protect the Debtors' supply chain.  Until then, the Motion must be denied.

    **WHEREFORE,** the Committee respectfully requests that this Court (a) deny the Motion and (b) grant the Committee such other relief as is just and proper.

Dated: November 23, 2005
    New York, New York

            **LATHAM & WATKINS LLP**

            By: /s/ Robert J. Rosenberg
              Robert J. Rosenberg (RR-9585)
              Mitchell A. Seider
              Mark A. Broude (MB-1902)
              885 Third Avenue, Suite 1000
              New York, New York 10022
              Telephone:  (212) 906-1200

            Proposed Attorneys for the Official
            Committee of Unsecured Creditors