SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
| | : | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DECLARATION OF RANDALL S. EISENBERG IN SUPPORT
OF THE MOTION FOR AN ORDER UNDER 11 U.S.C. §§ 363(b)
AND 365(a) AND FED. R. BANKR. P. 9019 APPROVING
PROCEDURES TO ASSUME CERTAIN AMENDED AND
<u>RESTATED SOLE SOURCE SUPPLIER AGREEMENTS</u>

**I, RANDALL S. EISENBERG, DECLARE:**

1. I am a Senior Managing Director at FTI Consulting, Inc. ("FTI"), which maintains an office at 3 Times Square, New York, NY 10036 and in other cities. I submit this declaration in support of the Motion for an Order under 11 U.S.C. §§ 363(b) and 365(a) and Fed. R. Bankr. P. 9019 Approving Procedures to Assume Certain Amended and Restated Sole Source Supplier Agreements (the "Motion") prepared and submitted by Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession (collectively, the "Debtors"). Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

2. Except as otherwise indicated, I have personal knowledge or am otherwise competent to testify as to the matters set forth herein. I am authorized to submit this declaration.

3. I have held the position of Senior Managing Director of FTI since 2002. Prior to this, I was a Partner in PricewaterhouseCoopers LLP's Business Recovery Services practice. I have served as the engagement leader for numerous large and complex restructurings and have represented numerous large multinational companies in and out of chapter 11 including, without limitation, US Airways, Kmart, Planet Hollywood International, Interpool and RSL Communications, Ltd.

4. FTI was retained by Delphi, on or about August 1, 2005, to provide restructuring and financial advisory services in connection with preparing for a chapter 11 filing. FTI's assistance to Delphi included, but was not limited to, the preparation of "first day" motions, obtaining debtor-in-possession financing, vendor management and

advising on various strategic issues associated with the potential filing. In addition, FTI continues to serve as restructuring and financial advisor to the Debtors, advising on a myriad of aspects associated with the Debtors' chapter 11 reorganization. FTI has worked closely with the Debtors in relation to their supply chain, including the establishment and management of a supplier call center, evaluating suppliers for eligibility under various first day supplier orders and assisting the Debtors in negotiating with suppliers with respect to payment terms. Such activities have provided FTI with extensive knowledge of the Debtors' supply chain and the various vendor issues and concerns that they are facing.

I. **DELPHI SUPPLY AGREEMENTS**

5. Delphi is one of the largest producers of auto parts globally and the largest supplier to General Motors Corporation. The Debtors produce thousands of separate products, the production of which requires the timely receipt of components and raw materials from the Debtors' thousands of dedicated suppliers. Such components and raw materials are provided to the Debtors pursuant to thousands of separate agreements with their suppliers, many of which have a yearly term. The Debtors estimate that over 11,000 of these supply agreements are due to expire on or about December 31, 2005. Moreover, the Debtors estimate that a substantial number of supply agreements are set to expire in 2006.

6. If the Debtors' are unable to reach agreements for the continued provision of goods covered under the expiring agreements, it would be damaging to their business prospects because such suppliers, absent extension of their agreements, would be under no continuing obligation to provide such goods to the Debtors or provide them

at the favorable terms and conditions (including pricing) currently agreed to. Moreover, the Debtors would be faced with the prospect of paying substantially higher prices, agreeing to other less favorable terms or re-sourcing goods, which in the short term would be nearly impossible in most cases.

## II.    DELPHI SUPPLY CHAIN

7.    Delphi has a highly sophisticated supply management system. As is common among most of the automobile industry, Delphi fulfills much of its requirements through the use of sole source suppliers, pursuant to which all of the Debtors' requirements for a particular part are purchased from one supplier. The Debtors employ the sole source supply method to reduce the cost of production start-up, capital investment, and validation costs necessary to make each part, achieve a consistent quality of parts, and to achieve economies of scale. However, customization of parts provided by sole source suppliers means that the supplier's approval process with Delphi's customers can take many months to achieve, making it very difficult to replace suppliers in a timely manner. Moreover, the disruption by one supplier could potentially cause a shut-down in one or more Delphi manufacturing plants, ultimately resulting in shut-downs at original equipment manufacturer ("OEM") customers' production facilities.

8.    In addition to the use of sole source suppliers, Delphi uses a "just-in-time" inventory management system, as is customary in the industry and used by other auto suppliers as well as OEMs. Just-in-time inventory systems seek to minimize the amount of inventory on hand at any given time throughout the supply chain while allowing the company to maintain production. This system benefits Delphi by reducing the amount of capital invested in inventory and storage facilities, as well as by reducing

the costs associated with storing and handling additional, unnecessary inventory. The just-in-time inventory system requires Delphi to rely on frequent shipments from its suppliers in order to continue production. Indeed, for many of its parts, Delphi maintains less than 24 hours worth of goods on hand. Similarly, Delphi's OEM customers using just-in-time inventory systems often have less than 24 hours' worth of goods on hand as well. The use of sole source suppliers and just-in-time inventory systems means that even a limited disruption in shipments to Delphi could cause a shut-down of Delphi's production facilities, followed shortly thereafter by the shut-down of customer OEM production facilities.

### III.    OVERRIDING NEED TO ASSUME SUPPLIER AGREEMENTS

9. The U.S. automotive supplier industry is fragile, having been negatively impacted by numerous factors, including declining U.S. OEM market share, rising commodity prices, product portfolio issues, high legacy costs and pressures at OEMs to improve their own financial performance. As a result, many suppliers are experiencing financial strain and numerous automotive companies have filed for chapter 11, including, among others, Federal Mogul, Tower Automotive, Collins & Aikman and Meridian. Many of Delphi's suppliers have already incurred losses as a result of the bankruptcies in the industry over the past few years.

10. As previously discussed, Delphi is one of the world's largest suppliers of automotive parts. It supplies essential components to many of the largest OEMs and is the largest supplier of components to General Motors Corporation. In this role, Delphi also purchases materials and components from thousands of suppliers.

11. Delphi's chapter 11 filing has raised significant anxiety among OEMs and suppliers, its employees and other industry stakeholders.  It has been reported that Delphi's restructuring plan contemplates a substantial reduction in its cost structure, which may result in the reduction of U.S. manufacturing facilities through consolidation, sales and/or wind-downs.  Many of Delphi's suppliers who incurred losses in previous chapter 11 proceedings have now incurred additional losses as a result of Delphi's filing.  Many of these suppliers, whose business may be further injured as a result of the aforementioned potential plant rationalization, have contracts with the Debtors that expire in 2005 and 2006.

12. These factors have combined to create a high degree of anxiety and uncertainty in the Debtors' supply base.  To successfully effectuate its restructuring and to maximize recoveries to stakeholders, it is absolutely essential that the Debtors ensure continuity of supply throughout the pendancy of its chapter 11 proceedings.

## IV.    POTENTIAL COSTS ASSOCIATED WITH THE ABSENCE OF AN APPROVED CONTRACT ASSUMPTION MOTION

13. Without a structured mechanism with which to deal with the vast number of expiring supply agreements, there is a high likelihood that the Debtors will incur substantial costs to replace such agreements or possibly be without materials required for production.  Indeed, some suppliers have already indicated an intent to dramatically increase pricing or not provide future price deductions once the existing agreements expire.  Based upon recent communications with various suppliers, it is plausible that the aggregate cost of such price increases could approximate or exceed the supplier prepetition accounts payable balances over time.  Indeed, even a 3-5% price increase, or failure to receive similar contemplated price-downs, for two years would

approximate or exceed the estimated maximum payment on prepetition supplier payables under the procedures outlined in the Motion.

14. In a scenario where the refusal of certain suppliers to ship results in the shut-down of Delphi's and, subsequently, certain OEM customers' plants, Delphi believes that damages could be substantial. The Debtors believe that a supply disruption could result in the shut-down of OEM customers' manufacturing facilities, which could result in asserted claims by the affected customers of up to $10 million per plant per day. A shut-down of even a handful of OEM customer facilities could result in damage claims against the Debtors of hundreds of millions of dollars or more. Moreover, during the plant shut-downs, the Debtors would also be harmed by continuing to incur the considerable fixed costs connected to the facilities idled by the failure to receive parts without generating any revenue to offset such fixed costs. In addition, the Debtor's relationships with these customers would be damaged, resulting in the possible loss of future contract awards, which would negatively affect the value of the Debtors' businesses going forward. Particularly in this industry, it is imperative that customers remain confident in the Debtors' ability to deliver product on schedule and without interruption.

## V.    LIQUIDITY ENHANCEMENT RESULTING FROM CONTRACT ASSUMPTION

15. Implementation of the relief sought in the motion, under the terms contemplated, is likely to have a positive effect on liquidity as payment terms would return to MNS-2, suppliers seeking assumption would provide market pricing and interest costs would be reduced due to lower borrowings.

16. The Debtors estimate that approximately $587 million of prepetition payables are outstanding to vendors whose contracts expire in 2005 and 2006 and whose contracts would be eligible for assumption under the motion (the "Eligible Prepetition Balance"). In addition, the Debtors believe that approximately 52% of these agreements, based on annual purchase volume, expire by December 31, 2005, and much of the remainder expire in 2006. Payments made under the motion would be paid over six quarters. Without waivers from the Unsecured Creditors' Committee or a court order, such payments would not exceed 75% of the Eligible Prepetition Balance (an estimated maximum spend of approximately $440 million) and would be distributed over a period extending through the first quarter of 2008.

17. Upon assumption of the contracts, the vendors would return to normal MNS-2 terms, which would provide an estimated cumulative cash-flow benefit to the Debtors that could approximate $800 million by the first quarter of 2007, presuming the Debtors and the respective suppliers agreed to assume all eligible contracts on the terms outlined in the motion. At the same time, net interest savings as a result of lower borrowings due to an improved working capital position are projected to approximate $35 million. The net cash improvement, after considering payments to cure prepetition defaults as discussed previously, could exceed $500 million by the end of the first quarter of 2007. In addition, the elimination of price increases designed by suppliers to recoup their prepetition balances would further benefit the liquidity position of the Debtors and also avoid duplicative recoveries by these suppliers where they could potentially recover on prepetition claims both through the aforementioned price increases and the receipt of distributions through the bankruptcy claims process.

18. The Debtors employ hundreds of buyers, lead negotiators, commodity managers and commodity directors in managing the purchase and supply of products through their Global Supply Management ("GSM") processes. These processes have been effectively used to manage the Debtors' supply needs throughout this case, including the successful implementation of the authority granted by the Bankruptcy Court under various First Day Orders issued following commencement of the cases. In this capacity, the Debtors have negotiated aggressively with suppliers and, as a result, have minimized payments under these motions. The Debtors intend to use a similarly rigorous process, which will include important procedural checks and balances, to implement the assumption procedures outlined in the Motion, taking into account a number of factors to ensure continuity of supply on a cost effective basis.

19. I believe that the most efficient and cost effective manner to resolve the challenges associated with the expiring supply agreements, enhance the Debtors' likelihood of a successful restructuring, and preserve the Debtors' going-concern value for all constituents is through assumption of supply agreements that qualify under the Motion in exchange for a package of mandatory minimum provisions from the applicable suppliers that provide the Debtors' with continuity of supply through their restructuring, as set forth in the Motion.

20. Based on the foregoing, in my opinion, the Motion is in the best interests of the Debtors, their estates, their creditors, and all other parties-in-interest.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on November 26, 2005.

/s/ Randall S. Eisenberg

Randall S. Eisenberg