SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                    :
    In re                             :     Chapter 11
                                    :
DELPHI CORPORATION et al.,     :     Case No. 05-44481 (RDD)
                                    :
                        Debtors.   :     (Jointly Administered)
                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DECLARATION OF R. DAVID NELSON IN SUPPORT OF
MOTION FOR AN ORDER UNDER 11 U.S.C. §§ 363(b) AND
365(a) AND FED. R. BANKR. P. 9019 APPROVING
PROCEDURES TO ASSUME CERTAIN AMENDED AND
<u>RESTATED SOLE SOURCE SUPPLIER AGREEMENTS</u>

I, R. David Nelson, declare:

1. I am the Vice President of Global Supply Management for Delphi Corporation ("Delphi" and, collectively with those of its subsidiaries and affiliates as are debtors and debtors-in-possession in the above-captioned chapter 11 cases, the "Debtors"). I am familiar with the Debtors' supply chain, their contractual relationships with their suppliers and the circumstances giving rise to the Debtors' determination that procedures allowing for the assumption of certain agreements (the "Assumable Agreements"), pursuant to which the Debtors receive goods which the Debtors believe are critical to their on-going manufacturing operations (collectively, the "Goods"), with those of the Debtors' suppliers which are the sole source from which the Debtors can currently obtain sufficient quantities of the Goods to avoid interruptions of the Debtors' manufacturing operations (the "Covered Suppliers") are necessary to the Debtors' successful restructuring. I joined Delphi in February 2002 and have held this position with Delphi since that date. (A copy of my bio is attached hereto.)

2. I submit this declaration in support of the Motion for an Order Under 11 U.S.C. §§ 363(b) and 365(a) and Fed. R. Bankr. P. 9019 Approving Procedures to Assume Certain Amended and Restated Sole Source Supplier Agreements, dated November 18, 2005 (the "Motion"). Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion. Except as otherwise indicated, I have personal knowledge of the matters set forth herein and, if called as a witness, would testify competently thereto. I am authorized to submit this declaration.

3. Pursuant to the Motion, the Debtors have requested authority to implement procedures by which they may assume the Assumable Agreements without need for further Court approval, subject to the mandatory contract provisions described

2

therein. The Motion deals exclusively with the amendment, restatement and extension of expiring contracts that I believe would otherwise jeopardize the Debtors' supply chain or could potentially expose the Debtors to hostage bargaining situations with sole source suppliers that have no obligation to continue supplying the Debtors with Goods.

4. I believe that the relief requested in the Motion is necessitated by several aspects of the Debtors' businesses. In the Debtors' businesses, they typically do not buy commodities from their suppliers, but rather buy sophisticated customized components, each of which require extensive and time-consuming testing and validation, including contractual approvals from the Debtors' customers. This rigorous testing and validation process is required, among other things, to insure product safety for the millions of consumers that drive automobiles containing Delphi safety related components. Therefore, with very few exceptions, re-sourcing the Goods in the short term is impossible. Further, the failure to timely receive even a very inexpensive part can quickly shut down the Debtors' assembly lines and those of their customers.

5. The Debtors employ hundreds of buyers, managers, directors, and commodity directors in managing the purchase and supply of products through their Global Supply Management ("GSM") process. This process has been effectively used to manage the Debtors' supply needs throughout this case including the successful implementation of the authority granted by the Bankruptcy Court under various First Day Orders issued following commencement of the cases. The Debtors intend to use the GSM process to implement the assumption procedures requested in the Motion, taking into account a number of factors to insure continuity of supply on a cost effective basis.

6. The Debtors are, depending on foreign currency exchange rates, either the largest or second largest global supplier of vehicle electronics, transportation

3

components, integrated systems and modules, and other electronic technology. The Debtors produce thousands of separate products, and the production of those products requires the timely receipt of components and raw materials from thousands of suppliers. Such components and raw materials are provided to the Debtors pursuant to tens of thousands of separate agreements with their suppliers, many of which agreements have a yearly term.

7. The Debtors' preliminary estimate is that over 11,000 of these supply agreements are due to expire on or about December 31, 2005, absent a further extension.[1] The Debtors further estimate that more than 3,000 of such agreements are either at the end of the product cycle, and thus do not require extension, or are otherwise not sufficiently critical to the Debtors' on-going operations to necessitate extension. I believe that the Debtors' inability to reach agreement with the Covered Suppliers on the continued provision of the goods after December 31, 2005 under the remaining agreements, however, could be damaging to their business prospects because such Covered Suppliers, absent extension of their agreements, would be under no continuing obligation to provide such goods to the Debtors. Without the Goods, I further believe that the Debtors' manufacturing process, and the automotive industry as a whole, could face imminent shutdown following expiration of the agreements.

8. Accordingly, the Debtors determined that a process should be established to facilitate the resolution of the myriad expiring Assumable Agreements on a time frame and in a manner that ensures the continuity of supply of Goods to the Debtors and, thereby, the continuity of the Debtors' supply of products to their customers. I

---

[1] These amounts do not include information for seven Debtor entities that do not utilize the Debtors' centralized contract management systems.

4

believe that the most efficient and cost effective manner in which to achieve these goals, enhance the Debtors' likelihood of a successful restructuring, and preserve the Debtors' going-concern value for all constituents is through assumption of the Assumable Agreements in exchange for a package of mandatory minimum provisions from the Covered Suppliers that provide the Debtors continuity of supply at market terms. I believe the transparency of the process requested in the motion will assist the Debtors in responding to the legitimate concerns of their suppliers on a fair and equitable basis while minimizing the potential costs to the estates as a whole.

9. I believe that the continued performance of the Covered Suppliers is crucial to the Debtors' prospects for a successful restructuring. The Debtors' manufacturing facilities use the "just-in-time" supply method for processing their products. The just-in-time supply method is standard in the automotive industry, and use of the just-in-time supply method means that the Debtors do not maintain a significant inventory of the components supplied by many of their suppliers (in many cases, fewer than 24 hours). Accordingly, the Debtors rely upon frequent and, in many cases, daily shipments of components from such suppliers to keep their manufacturing facilities operating. Similarly, the Debtors' original equipment manufacturer ("OEM") customers do not maintain a significant inventory of the Debtors' products (in many cases, less than 24 hours) and rely instead upon frequent shipments of such products to keep their own manufacturing plants operating.

10. The Debtors also rely heavily on the sole source supply method – a method under which in many, but not all, cases, they purchase all their requirements for a particular part from one supplier. Each of these parts must meet demanding specifications imposed by both the Debtors and their OEM customers before they can be

used in manufacturing the Debtors' products. In this regard, numerous tests, sometimes taking place over the course of several months, must be run to validate and qualify each of the parts and the applicable manufacturing process. The Debtors employ the sole source supply method to reduce the cost of production start-up, capital investment, and validation costs necessary to make each part (which are generally recouped by suppliers through their per piece prices), to achieve a consistent quality of parts, and to achieve economies of scale.

11. Therefore, to obtain an alternative source of supply for the Goods currently supplied by the Covered Suppliers, the alternate suppliers would have to undergo the OEM customers' rigorous approval processes, which involve extensive testing and evaluations and typically last several months. Even when accelerated, the delivery of capital equipment, the tooling build, and the testing and approval process for validating new suppliers typically takes three to six months or more to complete. In my opinion, the failure to maintain the supply of Goods could therefore have a devastating impact on the Debtors' businesses as well as their customers' and other suppliers' businesses.

12. Indeed, if Covered Suppliers fail to ship Goods, the Debtors' manufacturing facilities utilizing those parts would in many instances be forced to shut down less than 24 hours after the missed shipment. Within less than 24 hours after a shutdown of one of the Debtors' facilities, the Debtors' OEM customers would likely be forced to halt production of their products on one or more of their assembly lines. I believe that a shutdown of a customer's manufacturing operations could cause the affected customer to assert claims against the Debtors of up to $10 million per plant per day. In addition to the potential damages, the Debtors would also be harmed by

6

continuing to incur the considerable fixed costs connected to the facilities idled by the failure to receive parts without generating any revenue to offset such fixed costs. A line shutdown would also cause the Debtors to suffer a loss of important customer relations and goodwill. I believe that the long-term damage caused by such shutdowns to the Debtors' businesses would therefore be both immeasurable and irreparable.

13. Furthermore, I believe that the cost of implementing the relief requested in the Motion will likely be offset by the positive cash flow that will be generated as a result of the Covered Suppliers' acceptance of the Required Minimum Provisions. In particular, without the program anticipated by the Motion in place, I believe that most Covered Supplier will attempt to recover their prepetition balances by imposing significant price increases on the Company for their products under new contracts. Moreover, and most importantly, I believe that the relief sought in the Motion will mitigate, to the greatest extent possible, the risk that the Covered Suppliers will refuse to perform beyond December 31, 2005 and will thereby avoid the shutdown of the Debtors' and their customers' operations that would result from such precipitous action. Given the nature of the Debtors' businesses and supply chain, I cannot predict with any certainty which of the Covered Suppliers may cause such a shutdown absent the relief sought herein, but any one of the Covered Suppliers could likely do so. As noted above, I believe that the negative impact on the Debtors' businesses and their prospects for a successful restructuring from such a shutdown would be significant. Further, I believe that the damage claims that would be asserted by a customer on account of such a shutdown could dwarf the costs associated with the assumptions contemplated by the Motion, even ignoring the cash savings generated by the Required Minimum Provisions.

14. Finally, many Covered Suppliers are parties to numerous agreements with the Debtors and such agreements may have differing expiration dates. Based upon the Debtors' negotiations with suppliers to date, I believe that certain Covered Suppliers may be unwilling to extend the term of expiring Assumable Agreements and to continue providing Goods to the Debtors pursuant to such Assumable Agreements unless and until the Debtors agree to waive and release any rights that they or their estates may have under section 547 of the Bankruptcy Code to avoid payments made to such Covered Supplier in the 90 days prior to the Petition Date under the later-expiring agreements (the "Preference Waivers"). Given the absolute necessity of the Debtors' timely receipt of Goods and the Debtors' inability to compel such Covered Suppliers to provide Goods after December 31, 2005 pursuant to expired Assumable Agreements, I believe that it is in the best interests of the Debtors and their estates for this Court to authorize the Debtors to provide such Covered Suppliers with the Preference Waivers in exchange for their entry into Assumption Agreements with respect to each relevant Assumable Agreement that the Debtors have elected at that time to assume pursuant to the Procedures.

15. In summary, I believe that the relief requested in the Motion is necessary to the Debtors' ability to manage the challenges presented by the expiration of the Assumable Agreements while minimizing the risk of supply interruption. In addition to the operational necessity of such relief, I believe that the Debtors' financial position will be strengthened significantly through implementation of the Procedures, to the benefit of all constituencies. As such, I believe that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and all other parties-in-interest.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on November 26, 2005, at Rochester, Michigan.


                    /s/ R. David Nelson_____
                    R. David Nelson



# R. DAVID NELSON

## Vice President, Delphi Corporation
## Global Supply Management

R. David Nelson, born December 29, 1937, is a vice president of Delphi Corporation, global supply management. He is also a member of the Delphi Strategy Board, the company's top policy-making group. Additionally, Nelson serves as the executive champion for Delphi's Global Supply Management Task Team.

From 1957 to 1987, Nelson worked for TRW Inc. in various manufacturing, quality control metallurgy, materials, sales and marketing positions, in addition to purchasing.

Following, Nelson served for 10 years as a corporate officer of Honda of America Manufacturing in Marysville, Ohio, as vice president of purchasing and later as senior vice president of purchasing and corporate affairs. He was promoted to the Board of Directors of Honda of America Manufacturing in 1997. During his tenure at Honda he saw the company's purchasing division grow from 100 to 400 associates and North American purchases increase from $600 million to $6 billion. Honda of America was the 1995 recipient of the Medal of Professional Excellence from *Purchasing Magazine.*

After Nelson's time at Honda, he served as vice president of worldwide supply management at Deere & Company in Moline, Ill., for four years. Under his direction, Deere became known for implementing world-class supply management processes and best practices. In 2001, those efforts were recognized when *Purchasing Magazine* awarded Deere the Medal of Professional Excellence, the purchasing industry's highest award. Nelson joined Delphi and was named to his current position effective February 2002.

Nelson has long been involved in advancing the purchasing and supply management profession and holds a Certified Purchasing Manager certification. He is chair emeritus of the Institute of Supply Management (formerly the National Association of Purchasing Management). He also serves as a member of the Board of Trustees of CAPS Research, promoting academic research in strategic issues involving supply management. He also chairs the OESA Chief Purchasing Officer's Council. Nelson was named to the *Automotive News* All-Stars team for 2003 and 2004.

Nelson has co-authored a book on Honda and another on managing supply chains at 10 top companies.

June 6, 2005