# EXHIBIT A

Form No. SMFM001 Rev. 10A1

# ORIGINAL

**Aircraft Management Agreement
Under FAR Part 91**

**Between**

**Pentastar Aviation, Inc.**
And
**SM 5105 LLC**

**June 1, 2002**

Note:
One execution copy of agreement for Fleet National Bank shall be marked *"Secured Party's Original"*. All other execution copies shall be marked *"Copy. No interest herein may be created on the aircraft subject hereto through the transfer and/or possession hereof."*

To the extent, if any, this instrument constitutes chattel paper under the UCC, no security interest herein may be created through the transfer and/or possession of any counterpart other than the counterpart marked *"Secured Party's Original"*.

*Please indicate:*

☐   *Secured Party's Original. (One execution copy only may be so marked.)*

☐   *Copy. No interest herein may be created on the aircraft subject hereto through the transfer and/or possession hereof.*

Troy 275337_2

Form No. SMFM001 Rev. 10A1

# ORIGINAL

## AIRCRAFT MANAGEMENT AGREEMENT
## UNDER FAR PART 91
## BETWEEN
## PENTASTAR AVIATION, LLC
## AND
## SM5105, LLC

This Agreement ("Agreement") dated June 1, 2002  ("Commencement Date") is entered by and between **PENTASTAR AVIATION, LLC** a Michigan limited liability company, with its principal offices located at 7310 Highland Road, Waterford, MI 48327("Pentastar") and **SM5105, LLC** a Delaware Limited Liability Company, whose address is 5725 Delphi Drive, Troy, Michigan 48098-2915 ("Owner").

### WITNESSETH

WHEREAS, Owner is the lessee and rightfully possesses a certain aircraft (as defined below); and

WHEREAS Pentastar is in the business of managing, operating and maintaining aircraft; and

WHEREAS Owner desires to operate the aircraft carrying its officers, directors, employees and guests as authorized by FAR Part 91; and

WHEREAS, to support Owner's operation of the Aircraft, Owner wishes to engage the services of Pentastar and Pentastar wishes to provide its services in connection with the management, administration and maintenance of the aircraft in accordance with the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and promises herein contained and other good and valuable consideration, Owner and Pentastar hereby agree as follows:

### Section 1
### Definitions

1.1     "Aircraft" means the aircraft identified by model, serial number and registration number on the Exhibit(s).

1.2     "Base of Operations" means Oakland County International Airport (PTK), Waterford, Michigan.

2

**ORIGINAL**

Form No. SMFM001 Rev. 10A1

1.3    "Exhibit(s)" means the Exhibit(s) attached hereto and any other exhibits which the parties may agree in writing to add to this Agreement.

1.4    "FAA" means the United States Federal Aviation Administration.

1.5    "FAR" means regulations promulgated or amended by the FAA from time to time.

1.6    "Lessor" shall mean Fleet National Bank and its successors and assigns.

1.7    "Management Services" has the meaning provided in Section 2.2.

1.8    "Part 135 Charter Agreement" means any agreement between Owner and Automotive Air Charter, Inc., a Delaware Corporation ("Automotive Air Charter") executed simultaneously herewith or after the date of this Agreement under which Automotive Air Charter will operate the aircraft for third party charters in accordance with FAR Part 135.

1.9    "Term" has the meaning provided in Section 8.

**Section 2**
**Management Services**

2.1    <u>Scope</u>. Owner hereby engages Pentastar to provide Management Services to support Owner's operation of the Aircraft during the Term of this Agreement for flights conducted under Part 91 of the FAR, commencing on the later of the Commencement Date or the date when the Aircraft are delivered to the Base of Operations.

2.2    <u>Services</u>. In return for the fees paid by Owner in accordance with Section 6 herein, Pentastar agrees to provide and to perform, or cause to be performed, on behalf of Owner the following services ("Management Services"):

    (a)    Employment, training and supervision of flight crew personnel to be supplied to Owner for its operations, in accordance with Section 3 herein:

    (b)    Aircraft and crew scheduling, passenger services, and travel support services, as set forth in Section 4 herein;

    (c)    Maintenance and related maintenance support functions in accordance with Section 5 herein:

    (d)    Coordinating Aircraft and other insurance as provided in Section 9 herein;

3

ORIGINAL

Form No. SMFM001 Rev. 10A1

(e)    Liaison with the FAA and other pertinent governmental entities and
monitoring compliance with applicable statutes, rules and regulations
enforced by such entities;

(f)    Securing, maintaining and providing aircraft hangar facilities;

(g)    Recordkeeping, reporting, budgeting, payment of Aircraft related invoices
and expenses, and other administrative functions as set forth herein;

(h)    Consultation with Owner and management supervision concerning the
operation, maintenance, and administration of the Aircraft.

2.3    <u>Standard of Performance</u>.  Pentastar will use its commercially reasonable skills,
resources and judgment to perform the Management Services in an efficient and
economical manner and in accordance with applicable professional standards.  If any
Management Services are not completed to Delphi's reasonable satisfaction, Pentastar
will take reasonable steps to correct any deficiencies.

2.4    <u>Independent Contractor</u>.  Pentastar will provide the Management Services as an
independent contractor.  Nothing contained in this Agreement shall be construed to
create an employment or principal-agent relationship or joint venture between Pentastar
and Delphi, and neither party shall have the right, power or authority to obligate or bind
the other party, except as specifically provided in this Agreement.

**Section 3
Program Management**

3.1    <u>Management Policy</u>.  Pentastar will be responsible for the maintenance, flight
services and management of the Aircraft and provide safe, comfortable air travel,
customer service and cost management to meet the reasonable requirements of the
Owner.  Pentastar will recommend appropriate staffing levels for flight crews and
maintenance personnel for the maintenance, operation and management of the Aircraft
in accordance with applicable laws and FAR's aviation industry standards, crew duty
hour limits, travel patterns and frequency of daily travel.  Owner will advise Pentastar of
the trip itineraries at times as they are finalized and as far in advance of each trip as is
reasonably practicable to facilitate Pentastar's services.  Pentastar will communicate
and coordinate with the Owner any restrictive logistics imposed by FAR, international
civil aviation regulations, or local and/or regional airport restrictions concerning hours of
operation, and other matters which could affect flight itineraries. The parties will
familiarize themselves with and follow the advance planning requirements for
international travel, so as not to impose any undue delays in securing proper authority
from countries which impose operating restraints.  Pentastar shall not be liable for failure
to obtain authorizations which Pentastar has diligently applied for and pursued.

4

ORIGINAL

Form No. SMFM001 Rev. 10A1

3.2    <u>Customer Account Manager</u>. Pentastar will assign a Customer Account Manager to serve as the liaison and focal point with the Owner. The Customer Account Manager will coordinate all initial program start up and unique customer requirements with the Owner. The Customer Account Manager will also be responsible to review and oversee the monthly Aircraft reports which will provide detailed information with respect to flight operations, maintenance of the Aircraft and other services provided under this Agreement and review and provide active cost controls and budget information to the Owner.

3.3    <u>Audit</u>. Pentastar will make available for inspection and copying by Owner and Owner's representative all Aircraft records and expense records concerning the flight operations of the Aircraft, maintenance of the Aircraft and other services provided under this Agreement and all other records related to the Aircraft or the services hereunder which are required to be kept by Pentastar under this Agreement or under applicable laws or FAR's. All such records shall be made available by Pentastar upon five (5) day's notice during regular business hours and at such other reasonable times requested by Owner throughout the Term and for the period ending two (2) years after the termination thereof. Pentastar agrees not to destroy or dispose of such records prior to the time when Owner's right to inspect and audit terminates. Pentastar further agrees that if it desires to destroy or dispose of such records prior to the expiration of the seven (7) year period following the date to which such records pertain, Pentastar will provide the Owner with notice and a reasonable opportunity to retain such records. Pentastar agrees to schedule and conduct quarterly reviews between Owner and Edsel B. Ford II and Tom Seeber.

3.4    <u>Reports</u>. Owner shall be provided regular quarterly budgets of the estimated cost of the Management Services provided to it hereunder and regular monthly reports containing such information as reasonably may be requested by Owner. The parties hereby undertake to review periodically the costs incurred by Pentastar and reimbursable by Owner in connection with the Management Services provided to Owner hereunder and to use their reasonable efforts to reduce the cost of such services. Owner may upon notification to Pentastar require that certain services no longer be performed or may request that additional services be performed related to the Aircraft, subject to Pentastar's agreement.

3.5    <u>Recordkeeping</u>. Pentastar shall maintain on behalf of Owner all flight, passenger and cost records in a neat and current condition in accordance with applicable legal requirements and accepted accounting practices.

**Section 4**
**Operation of Aircraft**

4.1    <u>Flight Operation</u>. Pentastar will ensure that the Aircraft is operated with due and reasonable care and in accordance with Pentastar's published guidelines for the safe

5

Form No. SMFM001 Rev. 10A1

ORIGINAL

operation of the Aircraft, applicable FAA regulations, including FAR Part 91, and all other applicable domestic and international laws and regulations and the capabilities established by the Aircraft manufacturer.

4.2    Flight Dispatch.  Owner will schedule all flights through Pentastar's Flight Dispatch Office and Pentastar will record and coordinate all trip requests from Owner. Pentastar will perform on behalf of Owner the scheduling, dispatching, coordination, flight operation and flight of the Aircraft.  Pentastar will use commercially reasonable efforts to accommodate all trip requests received from the Owner; provided, however, that in the event the Aircraft is unavailable due to maintenance or otherwise cannot be operated in accordance with the FARs or other governing law, Pentastar shall, at Owner's request, use commercially reasonable efforts to arrange equivalent transportation for Owner, at Owner's expense.  Owner has entered into this Agreement based on Pentastar's intent to secure the amount of charter business for the Owner aircraft as requested by the Owner from time to time and Pentastar will use commercially reasonable efforts to secure the requested amount of charter business for the Owner aircraft.  Owner and Pentastar also recognize that Pentastar's ability to secure the desired amount of charter is contingent upon market demand and Owner aircraft availability.

4.3    Flight Crew/Maintenance Personnel.  Pentastar will supply qualified flight crew personnel and maintenance personnel ("Personnel") as required for the agreed scope of operation to meet the Owner's requirements.  Subject to Section 6, Pentastar shall be solely responsible to the taxing authorities and the Personnel for any and all taxes, withholdings, employment benefits, workers' compensation insurance, disability insurance or unemployment payments of any nature ("Charges") in respect of the Personnel.  Pentastar further agrees that it will indemnify and hold Owner harmless for any Charges which may be incurred with regard to the Personnel, including but not limited to, any Charges which may accrue as a result of Pentastar' failure to pay the Personnel.  The flight crew shall be trained according to a program of systematic training and checks and using Flight Safety International or such other facilities as are acceptable to Owner and Pentastar warrants that the flight crew will meet or exceed FAR requirements with respect to flight proficiency, safety and aviation knowledge.  The flight crew shall be appropriately certificated, trained, and rated as required by the governing regulations, and shall meet such additional requirements for employment as Pentastar or the U.S. Government may, from time to time, establish, as well as Owner's reasonable requirements.

(a)    Notwithstanding Pentastar's initial selection and employment of the Personnel, it is expressly agreed that the flight crew shall be advised that they are under the exclusive direction and control of Owner for all Owner flights under this Agreement. Owner shall have in its absolute discretion the unrestricted right to reject at any time, any Personnel as unsatisfactory and remove such Personnel from its service.  Upon such notice of removal, Pentastar shall have

6

Form No. SMFM001 Rev. 10A1

ORIGINAL

thirty (30) days to designate a replacement, such replacement to be reasonably acceptable to Owner.

(b)    On behalf of Owner, Pentastar will arrange training for the flight crew that meets or exceeds the requirements of the governing regulations and such reasonable additional standards as may be required by Owner.  Such training shall include all training necessary to ensure that the flight crew is qualified to operate the Aircraft in accordance with the FAR Part 135 requirements applicable to Automotive Air Charter.  The cost associated with such training shall be passed on to Owner in accordance with Section 6.2.

(c)    On behalf of Owner, Pentastar will monitor the qualifications and performance of the Personnel through a process of recordkeeping, supervision, and, in the case of flight crew, flight checks.  Without limiting the foregoing, Pentastar supervisory personnel shall annually observe, on behalf of Owner, line operation of the flight crew to confirm crew performance and adherence to required procedures.

(d)    In the event that any member of the flight crew is unavailable for an Owner flight on the Aircraft due to circumstances such as sickness, training, vacation, personal emergency, or crew duty limits (whether imposed by governing regulations or Pentastar's or Owner's policies), Pentastar will supply replacement personnel satisfactory to Owner meeting the standards set forth in this Section 4.3 herein.

(e)    During the Term, the flight crew shall be the employees of Pentastar and not Owner and, subject to Section 6, all of their compensation shall be paid by Pentastar.

4.4    Trip Data.  Pentastar will file all required flight plans and will maintain an accurate record of each trip flown consisting of route flown, time enroute, fuel consumed, miscellaneous expenses, and names of flight crew, in accord with FAR requirements for log book entries.

4.5    Flight Safety.  Pentastar shall not undertake any flight which is not in compliance with the procedural guidelines referred to in Section 3.1, the terms and conditions of the insurance referred to in Section 9.1, or which may otherwise result in the termination or cancellation of such insurance, or which Pentastar or the flight crew personnel in their sole discretion consider dangerous by reason of weather conditions, war, hostilities, warlike operations, civil war, civil commotions, revolution, inappropriate landing facilities or any other significant risk to life, health or property.  In the event that the flight crew becomes aware of any dangerous conditions during the course of a flight, the crew may proceed to any reasonable destination which they consider to be safe or advisable under the circumstances. Whenever in his or her sole discretion the pilot-in-command determines that safety of flight may be compromised, the pilot-in-command may

7

**ORIGINAL**

Form No. SMFM001 Rev. 10A1

terminate a flight, refuse to commence a flight, or take any other action required for safety without liability for loss, injury, damage, or delay.

4.6    Control of Aircraft.  During the Term of this Agreement for all Owner flights, Owner will retain possession and control of the Aircraft, however, the pilot-in-command of the Aircraft will be directly responsible for, and is the final authority as to the operation of the Aircraft.

4.7    Countries of Operation.  The Aircraft will not be operated in any country in which United States citizens are at such time, restricted from traveling by applicable United States law, regulation or directive or which would violate the terms of this Agreement in any country excluded from coverage by any insurance policy in effect with respect to such Aircraft or Part or Engine, in areas that are war zones or in Owner's determination areas of actual or threatened hostilities or in areas which to a prudent operator of similar aircraft would present an unreasonable risk of harm to such Aircraft or passengers.

4.8    Licensing and Registration.  Pentastar will advise Owner as to all requirements of licensing and registration.  Owner will at all times during the duration of this Agreement maintain in effect, with Pentastar's assistance, all required licenses and registrations.

4.9    Aircraft Services and Scheduling.  On behalf of Owner, Pentastar will perform the following services in connection with scheduling the Aircraft:

  (a)    Receive trip requests from Owner and produce a log of each trip made, passengers carried and time en route;

  (b)    Arrange for catering for Aircraft passengers as requested by Owner;

  (c)    Position and schedule the Personnel and provide supplies required by the Personnel for the performance of their duties;

  (d)    Provide information on flight and weather conditions which might affect a flight;

  (e)    Arrange for any required landing permits, clearances, and ground handling for domestic and international destinations;

  (f)    Coordinate Aircraft positioning; and

  (g)    Accommodate other reasonable special requests by Owner.

4.10    Trip Information.  Owner agrees to provide to Pentastar on a reasonable basis the current information available on Owner's travel requirements and the Aircraft's proposed trip schedule, to facilitate the provision of services by Pentastar.

8

ORIGINAL

Form No. SMFM001 Rev. 10A1

## Section 5
## Maintenance of Aircraft

5.1    Aircraft Maintenance.  Pentastar shall maintain, inspect, service, repair, overhaul and test the Aircraft in accordance in all material respects with all applicable laws, including, without limitation, FAR 135 standards, and under any provisions and guidelines of the applicable manufacturer's Warranty and Maintenance Service Program that are in effect for the Aircraft, and Owner's reasonable requirements that do not conflict with the above standards, provisions and guidelines, at Owner's expense subject to Section 5.1.1.  Pentastar will maintain the required maintenance records in accordance with all applicable FAR 135 requirements and the Aircraft shall be maintained in an airworthy condition in accordance with the requirements of the Aircraft manufacturer and applicable FARs.  Pentastar shall promptly furnish Owner such information as may be required to enable Owner or Lessor to file any reports required by any governmental authority as a result of Lessor's ownership of the Aircraft or Owner's leasing of the Aircraft from Lessor.  Pentastar may, with Owner's prior written approval, subcontract maintenance or other services to third parties on terms mutually acceptable to Pentastar, Owner and such third party, provided that no such subcontract will relieve Pentastar of its obligations hereunder.  Pentastar shall not amend, renew or extend such subcontracts without the Owner's prior written approval, nor shall it waive any material rights under such subcontracts without Owner's written approval.  Pentastar shall manage and carry out all such subcontracts in the best interest of Owner.  Owner shall not be obligated to reimburse Pentastar for costs incurred pursuant to such contracts which result from Pentastar's negligence or breach of the subcontract, and Pentastar shall indemnify Owner against costs incurred by Owner as a result of such negligence or breach.  In connection with the execution and delivery of this Agreement, Owner has entered into, or will shortly hereafter enter into, certain maintenance or parts agreements with third parties for maintenance of the Aircraft and certain parts or subsystems of the Aircraft.  Pentastar shall manage and administer such third party agreements in accordance with their terms, the requirements of this Agreement and in the best interest of Owner.  Pentastar shall also use its reasonable efforts to cause such third party agreements to be carried out in accordance with the requirements of the Lease and the requirements of any other agreements related to the Aircraft of which Pentastar is advised of the terms.  Owner may, with Pentastar's prior written approval, which approval will not unreasonably be withheld, enter into additional maintenance or parts agreements with third parties for maintenance of the Aircraft or any parts or subsystems of the Aircraft during the term of this Agreement, and Pentastar's obligations contained in this Agreement with respect to maintenance or parts agreements with third parties entered into in connection with the execution and delivery of this Agreement shall also apply to such additional agreements.

5.1.1   Pentastar shall have authority to expend or commit funds on Owner's behalf for unscheduled maintenance up to $25,000 without obtaining the Owner's prior written approval, provided that such expenditures and commitments are at all times reasonable and necessary in the maintenance of the Aircraft.  If an item

9

ORIGINAL

Form No. SMFM001 Rev. 10A1

or items are needed to be purchased in excess of such amounts then written approval from Owner will be required. If an unscheduled maintenance problem arises requiring immediate attention which is estimated to cost over $25,000, and an Owner contact is not available, then Pentastar shall act in a commercially reasonable manner to resolve the problem and shall notify Owner immediately when a contact becomes available.

5.1.2   Owner agrees to cooperate with Pentastar in scheduling all maintenance requirements. Pentastar will schedule maintenance, to the extent practical, to minimize conflicts with Owner's use of the Aircraft. The parties agree that no period of required maintenance, preventive maintenance, inspection, or overhaul shall be delayed or postponed beyond grace periods approved in accordance with the governing regulations.

5.1.3   Nothing in this Contract will be deemed to modify in any way limitations of liability, specific exclusions and disclaimers of warranty set forth in any manufacturer's warranty applicable to the Aircraft or standard maintenance work authorization forms. Pentastar shall ensure that all maintenance on the Aircraft shall be performed by such parties and in such fashion as shall avoid any denial of warranty coverage.

5.2   Records.   Pentastar will maintain or cause to be maintained on Owner's behalf, records on the Aircraft, engines, and systems in accordance with the applicable governing regulations. Such records shall become part of the Aircraft and the property of Owner shall be subject to this Agreement and shall be available to Owner and its representatives upon three (3) days' notice during business hours and at all other reasonable times requested by Owner. All such records shall be returned to Delphi promptly upon termination of this Agreement; provided, however, that Pentastar may retain copies thereof.

5.3   Upgrades.   All upgrades or modifications beyond the scope of ordinary maintenance that are required to be performed on the Aircraft or equipment initially installed therein by the manufacturer, or the FAA or other governmental authority during the term of this Agreement will be at the expense of the Owner. Pentastar will notify the Owner and obtain the Owner's written approval prior to undertaking any upgrade or modification. Any such upgrade or modification will be scheduled per Section 5.1.2. In no event shall Pentastar be liable hereunder for the nonperformance of any upgrade or modification caused by Owner's refusal or delay.

5.4   Maintenance and Operation.   All maintenance procedures shall be performed in accordance with all FAA and manufacturer's standards and procedures by properly trained, licensed and certified maintenance sources and maintenance personnel utilizing replacement parts approved by the FAA and the manufacturer, so as to keep the airframe and each engine and part in good operating condition, ordinary wear and tear

Troy 275337_2

ORIGINAL

Form No. SMFM001 Rev. 10A1

alone excepted, and to enable the airworthiness certificate for the Aircraft to be continually maintained.

In the event any engine is damaged or is being inspected or overhauled, Pentastar, at its option, may substitute another engine of the same make and model as the engine being repaired or overhauled provided such engine is approved by the FAA and the manufacturer of the airframe for use on the Aircraft (any such substitute engine being hereinafter referred to as a "Loaner Engine") during the period of such repair or overhaul and provided further (i) installation of the Loaner Engine is performed by an FAA and manufacturer certified mechanic with respect to an aircraft of the type of the Aircraft, (ii) the Loaner Engine is removed and the repaired or overhauled original engine is reinstalled on the airframe promptly upon completion of the repair or overhaul of the original engine but in no event later than the expiration, cancellation or earlier termination of this Agreement, and (iii) the Loaner Engine is free and clear of all liens and is maintained in accordance herewith.

5.5    Markings.  Pentastar agrees, at Owner's cost and expense, to affix and maintain in the airframe adjacent to the airworthiness certificate and on each engine a two-inch by four-inch plaque made of metal or other permanent material or permanently painted stencil bearing the following legend:

> "This property is Owned and Leased from Fleet National Bank, c/o Fleet Capital Corporation, One Financial Plaza, Fifth Floor, Providence, Rhode Island 02903.  Any removal, alteration, disposal or other change in the condition or location of this property must be approved by the Owner-Lessor."

and such other markings as from time to time may be required by law or otherwise deemed necessary or advisable by Owner.

## Section 6
## Fees and Payments

6.1    Management Fee.  Owner will pay Pentastar a Management Fee as set forth in the Exhibit(s) in accord with this Agreement.

6.2    Costs of Operating the Aircraft.  Notwithstanding anything to the contrary herein Owner will pay Pentastar all fees and expenses for crew salaries and benefits, crew expenses, crew training, administrative support, insurance and operational expenses as provided in the Exhibit(s).  Pentastar will keep a record of all charges incurred during the term of this Agreement and make such records available to Owner in accordance with Section 3 of this Agreement.

6.3    Payments.  Payment is due by the 25th day of the month following the month in which the invoice is forwarded to Owner; provided, however, payment of fixed fees and

11

Troy 275337_2

ORIGINAL

Form No. SMFM001 Rev. 10A1

expenses for any portion of the current month during which the Commencement Date of this Agreement occurs and the immediately succeeding month shall be paid on the Commencement Date of this Agreement. Pentastar will invoice Owner as follows:

6.3.1 <u>Fixed Costs</u>. Pentastar will invoice the Owner one month in advance for the monthly fixed cost and fees to include: Management Fee, flight crew personnel salaries and benefits, administrative support, training cost, hangar lease or rental, insurance cost, and other fixed costs set forth in the Exhibit(s).

6.3.2 <u>Operational Expenses</u>. Operational expenses are variable to the actual operation of the Aircraft and will be invoiced to Owner on a monthly summary invoice from Pentastar. Operational expenses include but are not limited to those described in the Exhibit(s). Pentastar shall make available for Owner's inspection original invoices for all operational expenses provided by third parties.

6.3.3 <u>Excess Charges</u>. Invoices will include any applicable sales tax, shipping charges, overtime charges and similar charges (hereinafter collectively referred to as "Excess Charges"). Such Excess Charges will also be the responsibility of the Owner.

6.4    <u>Insurance</u>. The Owner will reimburse Pentastar for the premiums for the insurance in accordance with this Agreement, including the Exhibit(s).

6.5    <u>Major Maintenance, Upgrades, and Modifications</u>. In the event that major maintenance, upgrades or modifications to be performed by third parties are required and approved by the Owner, then Pentastar will invoice the Owner according to the payment terms and requirements of the repair facility or service center performing the major maintenance, upgrades, or modifications, which invoice amount will include a charge for Pentastar's administrative expenses calculated at Pentastar's published hourly rate for actual work performed. Additionally, Owner will pay Pentastar for services that may be performed by Pentastar in connection with such work, such as Pentastar personnel who accompany the Aircraft to a repair facility to observe such work.

6.6    <u>Taxes</u>. Fees for services provided hereunder do not include sales, use, personal property taxes or other similar taxes. The Owner will pay all such taxes, whether imposed by a U.S. or foreign jurisdiction. Such taxes will be invoiced by Pentastar as incurred on account of the operation of the Owner's Aircraft. Owner will not be responsible for any net income taxes, gross receipts taxes, capital stock taxes, franchise taxes, net worth taxes, or single business-type taxes, such as the Michigan Single Business Tax, based on the income or gross receipts of Pentastar. Owner will not be responsible for any penalties and/or interest on any taxes for which it is responsible to the extent such penalties and/or interest are imposed as a result of any negligent action taken by Pentastar.

12

ORIGINAL

Form No. SMFM001 Rev. 10A1

## Section 7
## Customer Commitments

7.1    Ownership and Registration of the Aircraft.  Owner represents and warrants that: Lessor holds legal title to and is the registered owner of the Aircraft; Owner is the lessee of the Aircraft and has lawful possession thereof; the Aircraft is, and will remain at all times the sole and exclusive property of Lessor; and that Owner shall be the rightful lessee of the Aircraft.  Pentastar has no rights in the Aircraft except as expressly provided in this Agreement.

7.2    Work Authorization.  The Owner authorizes Pentastar to execute the standard work authorization form of the repair facility where repairs or maintenance are performed in accord with this Agreement when and as such work is authorized under this Agreement.

## Section 8
## Term and Termination

8.1    Term of Agreement.  The term of this Agreement (the "Term") will commence on the Commencement Date and will continue until April 30, 2003, unless terminated in accordance with this Section 8.  Beginning May 1, 2003 (the "Renewal Date"), this Agreement may be renewed from year to year thereafter upon the written agreement of Pentastar and Owner.  Effective as of the Renewal Date, the Management Fee, Administration Support Fee and the Hangar Rental/Office Space Fee, as set forth in the Exhibit(s) will be increased by that percentage, if any, by which the Consumer Price Index on the Renewal Date or the annual anniversary of the Renewal Date, as applicable, exceeds the Consumer Price Index on the Commencement Date (with respect to the first one (1) year renewal term) or the immediately preceding Renewal Date or annual anniversary date thereof (as applicable).  For the purpose of this Section 8.1, the Consumer Price Index shall be the United States Bureau of Labor Statistics' Consumer Price Index, United States city Average for Urban Consumers (base year 1982-1984=100), All Items, or, if such index is materially changed or ceases to be published, such successor index as is most comparable to the foregoing index.  Termination of this Agreement in accord with this Section will not result in the cancellation of any trip commitments made prior to termination by Pentastar or Owner or the Owner's obligation to pay for those services at the rate in effect immediately prior to the last anniversary date.  At termination, Pentastar shall return promptly to Owner the Aircraft, the log books, maintenance manuals, flight and operations manuals and all other documents, manuals and records relating to the Aircraft, all in the condition required hereunder.  Notwithstanding anything herein to the contrary, this Agreement shall terminate immediately upon the termination of Owner's right to possess the Aircraft under the terms of its lease.

8.2    Event of Default/Termination.

8.2.1    This Agreement may be terminated by Pentastar:

13

ORIGINAL

Form No. SMFM001 Rev. 10A1

(a) Upon Owner's failure to make those payments under the terms stated in Section 6.2 of this Agreement provided that such non-payment continues for a period of ten (10) days after Delphi receives notice from Pentastar;

(b) Immediately upon Owner's use of the Aircraft for illegal activities;

(c) Upon breach or default of Owner of any condition of this Agreement and the failure of the Owner to cure or remedy such breach or default within 30 days after receiving notice from Pentastar;

(d) Upon the occurrence of any of the following events:

    (i) a proceeding under bankruptcy, reorganization, arrangement of debts, insolvency or receivership law or assignment for the benefit of creditors filed by Owner or such a proceeding filed against Owner if not dismissed within 60 days; or

    (ii) if Owner voluntary or involuntary dissolves or is dissolved as a corporate entity and this Agreement is not assigned as provided in Section 10.13; or

    (iii) expiration or termination of Owner's lease of the Aircraft with Lessor or other event causing Owner to lose operational control of the Aircraft; provided that in either event, Owner shall provide Pentastar with as much prior notice as is reasonably practical under the circumstance; or

(e) In accord with Section 8.1; or

(f) Upon a lapse of insurance coverage as required by this Agreement.

8.2.2 This Agreement may be terminated by Owner:

(a) Upon breach or default by Pentastar of any of the conditions of this Agreement and the failure of Pentastar to cure or remedy such breach or default within thirty (30) days after receipt of notice thereof from Owner unless an earlier time is provided for herein;

(b) Immediately upon Pentastar's use of the Aircraft for illegal activities;

(c) Upon the occurrence of any of the following events:

14

Troy 275337_2

ORIGINAL

Form No. SMFM001 Rev. 10A1

(i)    a proceeding under bankruptcy, reorganization, arrangement of debts, insolvency or receivership law or assignment for the benefit of creditors filed by Pentastar or such a proceeding filed against Pentastar if not dismissed within 60 days;

(ii)    if Pentastar voluntary or involuntary dissolves or is dissolved as a corporate entity and this Agreement is not assigned as provided in Section 10.13;

(iii)    expiration or termination of Owner's lease of the Aircraft with Lessor or other event causing Owner to lose operational control of the Aircraft; provided that in either event, Owner shall provide Pentastar with as much prior notice as is reasonably practical under the circumstance;

(d)    In accord with Section 8.1; or

(e)    Upon operation of the Aircraft where Pentastar has knowledge that there is a lapse of insurance coverage as required by this Agreement.

8.3    Termination by Pentastar. Upon the termination of this Agreement by Pentastar in accordance with the terms set forth in Section 8.2.1, Pentastar will have the right to pursue collection of any arrearage payments through any legal remedies available, and will be entitled to all reasonable and documented costs incurred through the termination of this Agreement, and any early termination penalties paid by Pentastar under contracts entered into on the Owner's behalf and with Owner's written approval. Upon the written request of Owner and subject to the terms and conditions of such contracts, Pentastar will assign to Owner or any designee of Owner, at Owner's cost, any or all contracts, as determined by Owner, which were entered into for the benefit of Owner and with Owner's approval and which are capable of assignment. Owner will be reimbursed by Pentastar for advanced payments to Pentastar, that have not yet been expended under the terms of this Agreement, and for any reimbursements received from service providers or subcontractors in relation to payments previously made by Owner to Pentastar hereunder. When information on all costs and expenses through the termination date has been received, Pentastar will issue a termination statement setting forth the amounts due by the Owner and attaching supporting documentation, which will be due within forty-five (45) business days after receipt of the termination statement and all supporting documentation relating to amounts expended under this Agreement.

8.4    Termination by the Owner. Upon the termination of this Agreement by the Owner for any of the events set forth in Section 8.2.2, Owner will be responsible for all costs incurred through the date of termination in accordance with this Agreement. Upon the written request of Owner and subject to the terms and conditions of such contracts,

15

ORIGINAL

Form No. SMFM001 Rev. 10A1

Pentastar will assign to Owner or any designee of Owner, at Owner's cost, any or all contracts, as determined by Owner, which were entered into for the benefit of Owner and with Owner's approval and which are capable of assignment. Owner will be reimbursed by Pentastar for advanced payments to Pentastar, that have not yet been expended under the terms of this Agreement, and for any reimbursements received from service providers or subcontractors in relation to payments previously made by Owner to Pentastar hereunder. Owner will have the right to pursue collection of any such sums through any legal remedies available. When information on all costs and expenses through the termination date has been received, Pentastar will issue a termination statement setting forth the amounts due to the Owner for sums paid, but not yet expended, which will be paid together with delivery of the termination statement and will provide all supporting documentation relating to amounts expended under this Agreement.

8.5    Return of Equipment.  Under any termination provided for in this Section 8, all equipment owned or leased by one party hereto and in the possession of the other party shall be returned to the rightful owner in as good condition as when received, normal wear and tear excepted.

### Section 9
### Insurance and Indemnification

9.1    Insurance.  Pentastar will obtain Aircraft Liability insurance (including war risk up to $50,000,000) with a limit of Three Hundred Million Dollars ($300,000,000.00) per occurrence and Hull insurance for the Aircraft in the amount of value ("Hull Value") set forth on the applicable Exhibit ("Policy").  The Policy shall (i) with respect to liability insurance, name Lessor, Owner, Pentastar, Automotive Air Charter, Inc. and any other entity shown on the Aircraft registration or as reasonably requested by Owner, as additional insureds and (ii) waive any and all rights of subrogation which the insurers may have or may acquire against Owner or Lessor.  The Policy will provide for thirty (30) days written notice to the additional insureds of cancellation or amendment of the Policy; provided, however, that no notice shall be given for any amendment of the policy consisting solely of the addition or deletion of an aircraft (other than the Aircraft).  The Policy will permit subrogation in favor of Pentastar to the extent of its reasonable liability not to exceed Three Hundred Million Dollars ($300,000,000.00).  The policy will have a nil deductible and coverage for foreign object damage and will provide that the insurance shall not be invalidated, as against any of the additional insureds, by any action or inaction of Pentastar or any other person and shall insure each of the additional insureds regardless of any breach or violation by Pentastar or any other person or any warranties, declarations or conditions contained in the policies evidencing such insurance or in applications for such insurance.  Approaching the renewal anniversary date of this Agreement, Pentastar and Owner will determine the various options for the Hull Value of the Aircraft and adjust the Hull insurance coverage (and related premium) accordingly.  Pentastar shall provide to Owner prior to the first

16

ORIGINAL

Form No. SMFM001 Rev. 10A1

operation of the Aircraft hereunder an insurance certificate reflecting the coverage required by the Agreement.

9.2    Occurrence Basis.    All insurance shall be on an occurrence basis rather than a claims made basis and will operate with respect to the additional insureds as a separate policy, except as to the limits of liability. All insurance coverage required herein shall be primary insurance up to and including the stated policy limits and not excess over other coverage. There shall be no right of contribution with respect to any insurance maintained by Lessor, Owner or any other person. Lessor and Owner shall have the right to carry additional insurance at its own expense, provided that such additional insurance does not increase the cost to Owner or Pentastar of carrying the required insurance.

9.3    Invalidation.    In the event that any insurance on the Aircraft which is required by Section 9 herein is invalidated for any reason, the Aircraft shall not be operated until such time as all such insurance is again valid and in full force and effect.

9.4    Indemnification.    Pentastar and Owner will defend, indemnify and hold harmless the other party, including such party's parents, affiliates, officers, directors, subsidiaries, shareholders, agents, and employees of each of them, from all liabilities, damages, penalties, actions, suits, costs and claims including reasonable attorney's fees resulting from the misconduct or negligence on the part of Pentastar or Owner as the case may be, in the performance of any obligation required by such party under this Agreement. The Owner will defend, indemnify and hold harmless Pentastar, its parents, affiliates, officers, directors, subsidiaries, shareholders, agents and employees from all liabilities, damages, penalties, actions, suits, costs and claims, including reasonable attorney's fees, incurred by or assessed against Pentastar arising from the Owner's ownership of the Aircraft or a condition existing in the Aircraft at the commencement of this Agreement that would not otherwise be the responsibility of Pentastar under this Agreement. In no event will either party be liable to the other party in a breach of contract claim for incidental, special or consequential damages.

**Section 10**
**Miscellaneous**

10.1    Compliance with Law.    Neither Pentastar nor Owner will undertake any flight which could expose any of Owner, Pentastar, or the flight crew to any penalty, fine, sanction, or other liability, whether civil or criminal, under any applicable law, rule, treaty, or convention. In no event will Pentastar or Owner undertake any act which does not comply in all material respects with all applicable laws.

10.2    Force Majeure.    Neither Pentastar nor Owner will be liable for a failure to perform any part of this Agreement when the failure is due to acts of God, strike, lockout, fire, flood, war, riot, civil disturbance or other event beyond the reasonable control of the party from whom performance is required.

17

ORIGINAL

Form No. SMFM001 Rev. 10A1

10.3  _Further Acts_.  The parties will, from time to time, do and perform any other act and execute and deliver any other instrument required by law or reasonably requested by the other to carry out and effect the intents and purposes of this Agreement.

10.4  _Notices_.  All notices, demands, or other communications to be delivered or given hereunder will be in writing and will be delivered personally, by facsimile (confirmed in the case of a facsimile, by prepaid first class letter sent within 24 hours of dispatch) or by overnight courier as follows:

>       To Pentastar:        Pentastar, LLC
>                            7310 Highland Road
>                            Waterford, Michigan  48327-1616
>                            PH:  (248) 666-3630  FAX (248) 666-8296
>                            Attn: Stephen Taylor
>
>       To: Owner:
>                            SM5105 LLC
>                            5725 Delphi Drive, M/C 483-400-216
>                            Troy, MI 48098-2815
>                            ATTN: Corporate Aviation Manager
>                            Ph. (248) 813-2564
>                            Fax: (248) 813-2610

or to such other address or facsimile numbers as is notified by one party to the other provided in accordance herewith, and shall be deemed to have been received in the case of a facsimile, 24 hours after dispatch (provided that if the date of dispatch is not a business day it shall be deemed to have been received at the opening of business on the next business day), and in the case of personal delivery, upon actual delivery or the intended recipient's refusal to accept delivery.

10.5  _Applicable Law_.  This Agreement will in all respects be governed by the laws of the State of Michigan without regard to its conflicts of laws principles.

10.6  _Entire Agreement_. This Agreement and the Exhibit(s) hereto supersede all prior agreements, understandings, and negotiations, written or oral, between the parties with respect to the subject matter hereof, and cannot be amended or modified except by a writing signed by the parties hereto.  In the case of Pentastar, such an amendment or modification must be signed by its President, Treasurer or Vice President, to be effective.  This Agreement is subject and subordinate to the rights of the Lessors under the Aircraft Leases between Owner and Lessors dated March 30, 2001 (the "Leases") in and to the Aircraft.  Lessors, Pentastar and Owner shall execute a consent and acknowledgement of this Agreement, along with such other instruments (including,

18

Troy 275337_2

ORIGINAL

Form No. SMFM001 Rev. 10A1

without limitation, FAA recording documents and UCC financing statements) as Owner
may reasonably require for Lessors.  Pentastar shall take all reasonable actions
requested by Owner to allow Owner to conform to the terms of the Leases.

10.7  Severability.  The provisions of this Agreement shall be deemed independent
and severable and the invalidity, partial invalidity or unenforceability of any one provision
or portion of this Agreement shall not affect the validity or enforceability of any other
provision of this Agreement.  Any provision of this Agreement which is prohibited or
unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent
of such prohibition or unenforceability and any prohibition or unenforceability in any
particular jurisdiction shall not invalidate or render unenforceable such provision in any
other jurisdiction.

10.8  Headings.  The headings of the Sections and Paragraphs contained in this
Agreement are inserted for convenience only and will not constitute a part hereof.

10.9  Survival.  The provisions of Section 6.3, Payments, and Section 9.6,
Indemnification, all survive the termination of this Agreement.  The termination of this
Agreement shall not affect any party's liabilities or obligations under this Agreement that
arose prior to the date of termination including, without limitation, any obligation to pay
amounts due under this Agreement.

10.10  Customer Survey.  Pentastar or its designee, will, from time to time, contact the
Owner to communicate directly concerning customer satisfaction with Pentastar and to
review the repair or maintenance that is being performed  under the terms of this
Agreement.

10.11  Restriction of Hiring.  Neither party will hire nor solicit for hire, any individual
employed by the other party or any individual who is hereafter employed by the other
party within a period of one (1) year of the termination of their employment with the other
party, without the prior written consent of the other party.

10.12  Confidentiality.  Each party agrees to hold in confidence any information it may
gain regarding the other party's itinerary, passengers, techniques, publications, security
or business plans.  Upon reasonable notice to the other party, either party shall be
entitled to divulge such information to the extent required by law or legal process.

10.13  Assignment.  Neither Owner nor Pentastar may assign this Agreement without the
prior written consent of the other, which consent shall not be unreasonably withheld,
delayed or conditioned.  Notwithstanding the foregoing, this Agreement may be
assigned by either party, upon prior notice, to any entity to which such party may
transfer all, or substantially all, of its assets and business pursuant to a merger,
acquisition or other such reorganization, or to an affiliate of such party and any rights
and obligations hereunder may be assigned by Owner, upon prior notice, to any affiliate
of Owner or to Lessor.  Without limiting the generality of the foregoing, this Agreement

Troy 275337_2

ORIGINAL

Form No. SMFM001 Rev. 10A1

and all of the provisions hereof will be binding upon and will inure to the benefit of the parties hereto and their respective successors and assigns.

10.14 Counterparts; Facsimile Transmission. This Agreement may be executed in one or more counterparts each of which shall be deemed an original, all of which together shall constitute one and the same agreement, and this Agreement may be executed and delivered by facsimile transmission with the same effect as if a manually signed original were personally delivered.

10.15 Waiver. A waiver, whether oral or in writing, expressed or implied, by either party of any failure by the party in the observance and performance of any of the terms, conditions, obligations, responsibilities, or duties set forth in this Agreement shall not constitute or be construed as a waiver of any subsequent or other failure.

## SIGNATURES ON NEXT PAGE

20

Troy 275337_2

ORIGINAL

Form No. SMFM001 Rev. 10A1

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by
their duly authorized representatives as of the 1st day of June 2002.

**SM5105, LLC**

By: *Mark C. Lorenz*

Name: *MARK C. LORENZ*

Its: *VICE PRESIDENT - OPERATIONS*


**Pentastar Aviation, LLC**

By; *Stephen Taylor*

Name: *STEPHEN TAYLOR*

Its: *VP - SALES + MARKETING*

21

Troy 275337_2

ORIGINAL

Form No. SMFM001 Rev. 10A1

## EXHIBIT A
### Expenses To Be Paid By the Owner

Aircraft

Bombardier Challenger 604, Serial Number, 5498
Registration Number N599DA.

### FIXED COSTS

Management Fee

$100,000 per year, payable $8,334 per month in
advance.

Flight Crew/Salaries
and Benefits

$429,708 per year, payable $35,809 per month in
advance, subject to adjustment to reflect any increase
or decrease in Pentastar's cost for flight crew salaries
and benefits subsequent to the date of this
Agreement.

Administration Support

$30,000 per year, payable $ 2,500 per month in
advance. Includes flight operation management
oversight, twenty-four hour dispatch coverage,
maintenance management and administration, and
guarantee of the full flight crew complement relief
during training, vacation, and illness of flight crew
members. Travel expenses invoiced separately.

FlightSafety International/
SimuFlite

Training fees for pilots and cabin attendants beginning
August 2002 at the rate of $121,952 per year, payable
$10,163 per month in advance, subject to adjustment
to reflect any increase or decrease in Pentastar's cost
for pilot training from Flight Safety
International/SimuFlite subsequent to the date of this
Agreement.  Travel expenses for four (4) pilots will be
invoiced at $1,308 per month.

Additional Training

Additional training costs as required to meet
Pentastar's obligations under this Agreement will be
invoiced as incurred.  Travel expenses will be invoiced
separately.

Hangar Rental/Office Space

$52,260 per year, payable $4,355/month in advance.

Insurance

Fleet rate insurance for Hull Value in the amount of
$25,034,000, at the rate of $ 141,352 per year,
payable $11,780 monthly in advance subject to
adjustment if Hull Value is adjusted under Section 9.1

22

Troy 275337_2

ORIGINAL

Form No. SMFM001 Rev. 10A1

or to reflect a rate increase or decrease by Pentastar's insurer subsequent to the date of this Agreement, and subject to elimination if Owner obtains its own insurance pursuant to Section 9.

Miscellaneous Fixed Cost | Other fixed cost like Navigation Chart Service, Computerized Maintenance Programs, Weather Service Subscription, (etc.) will be invoiced as incurred.

## OPERATIONAL EXPENSES

Operational Expenses.  Operational expenses include but are not limited to fuel, oil and additives used by the Aircraft; Aircraft upgrades, maintenance, replacement of consumable parts, maintenance labor and engine/airframe maintenance service plan fees; landing, parking, handling, customs, airways, and overflight fees, security, hangar fees and tie down costs at airports other than the base, and computer flight plans for Owner's flights and monthly laptop computer expenses; plane stock and catering (i.e., food and beverages), passenger ground transportation and reasonable pilot overnight expenses (i.e., lodging, meals) and other expenses reasonably incurred in the operation of the Aircraft for Owner's flights.

Except as otherwise provided in this Agreement or in the Exhibit(s), third party expenses will be invoiced by Pentastar to the Owner without any price markups.

Taxes: | Owner will be and remain responsible for any and all federal, state, local and foreign taxes, charges, imposts, duties and excise taxes, and other similar assessments, including associated interest and penalties (except income or any other similar taxes imposed upon the income of Pentastar) relating to the ownership, operation, maintenance or use of the Aircraft.

Fuel Rate: | Pentastar's cost at Waterford facility (which includes flowage, Federal Excise Tax and certain state taxes) plus Michigan Sales Tax, plus a labor charge of $.50 per gallon.  Michigan Sales Tax will be applied to the $.50 per gallon labor charge.  On the road, purchases will be passed along at actual cost.

Troy 278337_2

ORIGINAL

Form No. SMFM001 Rev. 10A1

## EXHIBIT B
### Expenses To Be Paid By the Owner

Aircraft                                Learjet 60, Serial Number, 237
                                        Registration Number N699DA.

### FIXED COSTS

Management Fee                          $60,000 per year, payable $5,000/month in advance.

Flight Crew/Salaries
and Benefits                            $276,045 per year, payable $23,004 per month in
                                        advance, subject to adjustment to reflect any increase
                                        or decrease in Pentastar's cost for flight crew salaries
                                        and benefits subsequent to the date of this
                                        Agreement.

Administration Support                  $25,000 per year, payable $ 2,084 per month in
                                        advance. Includes flight operation management
                                        oversight, twenty-four hour dispatch coverage,
                                        maintenance management and administration, and
                                        guarantee of the full flight crew complement relief
                                        during training, vacation, and illness of flight crew
                                        members. Travel expenses invoiced separately.

FlightSafety International/
SimuFlite                               Training fees for pilots beginning August 2002 at the
                                        rate of $96,552 per year, payable $8,046 per month in
                                        advance, subject to adjustment to reflect any increase
                                        or decrease in Pentastar's cost for pilot training from
                                        Flight Safety International/SimuFlite subsequent to the
                                        date of this Agreement.  Travel expenses for four (4)
                                        Pilots will be invoiced at $1,308 per month.

Additional Training                     Additional training costs as required to meet
                                        Pentastar's obligations under this Agreement will be
                                        invoiced as incurred.  Travel expenses invoiced
                                        separately.

Hangar Rental/Office Space              $30,252 per year, payable $2,521 per month in
                                        advance.

Insurance                               Fleet rate insurance for Hull Value in the amount of
                                        $11,125,000, at the rate of $ 99,626 per year, payable
                                        $8,302 monthly in advance subject to adjustment if·
                                        Hull Value is adjusted under Section 9.1 or to reflect a

24

Troy 275337_2

ORIGINAL

Form No. SMFM001 Rev. 10A1

rate increase or decrease by Pentastar's insurer subsequent to the date of this Agreement, and subject to elimination if Owner obtains its own insurance pursuant to Section 9.

**Miscellaneous Fixed Cost**    Other fixed cost like Navigation Chart Service, Computerized Maintenance Programs, Weather Service Subscription, (etc.) will be invoiced as incurred.

## OPERATIONAL EXPENSES

<u>Operational Expenses</u>.   Operational expenses include but are not limited to fuel, oil and additives used by the Aircraft; Aircraft upgrades, maintenance, replacement of consumable parts, maintenance labor and engine/airframe maintenance service plan fees; landing, parking, handling, customs, airways, and overflight fees, security, hangar fees and tie down costs at airports other than the base, and computer flight plans for Owner's flights and monthly laptop computer expenses; plane stock and catering (i.e., food and beverages), passenger ground transportation and reasonable pilot overnight expenses (i.e., lodging, meals) and other expenses reasonably incurred in the operation of the Aircraft for Owner's flights.

Except as otherwise provided in this Agreement or in the Exhibit(s), third party expenses will be invoiced by Pentastar to the Owner without any price markups.

Taxes:    Owner will be and remain responsible for any and all federal, state, local and foreign taxes, charges, imposts, duties and excise taxes, and other similar assessments, including associated interest and penalties (except income or any other similar taxes imposed upon the income of Pentastar) relating to the ownership, operation, maintenance or use of the Aircraft.

Fuel Rate:    Pentastar's cost at Waterford facility (which includes flowage, Federal Excise Tax and certain state taxes) plus Michigan Sales Tax, plus a labor charge of $.50 per gallon.  Michigan Sales Tax will be applied to the $.50 per gallon labor charge.  On the road, purchases will be passed along at actual cost.

25

ORIGINAL

Form No. SMFM001 Rev. 10A1

## EXHIBIT C
## Expenses To Be Paid By the Owner

Aircraft                          Gulfstream III, Serial Number, 445,
                                  Registration Number N590DA.

### FIXED COSTS

Management Fee                    $100,000 per year, payable $8,334 per month in
                                  advance.

Flight Crew/Salaries
and Benefits                      $444,335 per year, payable $37,028 per month in
                                  advance, subject to adjustment to reflect any increase
                                  or decrease in Pentastar's cost for flight crew salaries
                                  and benefits subsequent to the date of this
                                  Agreement.

Administration Support            $30,000 per year, payable $ 2,500 per month in
                                  advance.  Includes flight operation management
                                  oversight, twenty-four hour dispatch coverage,
                                  maintenance management and administration, and
                                  guarantee of the full flight crew complement relief
                                  during training, vacation, and illness of flight crew
                                  members.  Travel expenses will be invoiced
                                  separately.

FlightSafety International/
SimuFlite                         Training fees for pilots and cabin attendants at the
                                  rate of $113,652 per year, payable $9,471 per month
                                  in advance, subject to adjustment to reflect any
                                  increase or decrease in Pentastar's cost for pilot
                                  training from Flight Safety International/SimuFlite
                                  subsequent to the date of this Agreement.  Travel
                                  expenses for four (4) Pilots will be invoiced at $1,308
                                  per month.

Additional Training               Additional training costs as required to meet
                                  Pentastar's obligations under this Agreement will be
                                  invoiced as incurred.  Travel expenses will be invoiced
                                  separately.

Hangar Rental/Office Space        $76,332 per year, payable $6,361/month in advance.

Insurance                         Fleet rate insurance for Hull Value in the amount of
                                  $12,650,000, at the rate of $ 104,200 per year,
                                  payable $8,683 monthly in advance subject to

26

Troy 275337_2

# ORIGINAL

Form No. SMFM001 Rev. 10A1

adjustment if Hull Value is adjusted under Section 9.1 or to reflect a rate increase or decrease by Pentastar's insurer subsequent to the date of this Agreement, and subject to elimination if Owner obtains its own insurance pursuant to Section 9.

Miscellaneous Fixed Cost      Other fixed cost like Navigation Chart Service, Computerized Maintenance Programs, Weather Service Subscription, (etc.) will be invoiced as incurred.

## OPERATIONAL EXPENSES

Operational Expenses.   Operational expenses include but are not limited to fuel, oil and additives used by the Aircraft; Aircraft upgrades, maintenance, replacement of consumable parts, maintenance labor and engine/airframe maintenance service plan fees; landing, parking, handling, customs, airways, and overflight fees, security, hangar fees and tie down costs at airports other than the base, and computer flight plans for Owner's flights and monthly laptop computer expenses; plane stock and catering (i.e., food and beverages), passenger ground transportation and reasonable pilot overnight expenses (i.e., lodging, meals) and other expenses reasonably incurred in the operation of the Aircraft for Owner's flights.

Except as otherwise provided in this Agreement or in the Exhibit(s), third party expenses will be invoiced by Pentastar to the Owner without any price markups.

Taxes:      Owner will be and remain responsible for any and all federal, state, local and foreign taxes, charges, imposts, duties and excise taxes, and other similar assessments, including associated interest and penalties (except income or any other similar taxes imposed upon the income of Pentastar) relating to the ownership, operation, maintenance or use of the Aircraft.

Fuel Rate:      Pentastar's cost at Waterford facility (which includes flowage, Federal Excise Tax and certain state taxes) plus Michigan Sales Tax, plus a labor charge of $.50 per gallon. Michigan Sales Tax will be applied to the $.50 per gallon labor charge. On the road, purchases will be passed along at actual cost.

Troy 275337_2