# EXHIBIT B

Form No. AACI 005 Rev. -_

ORIGINAL

## Agreement For FAR 135 Operation

### between

### Automotive Air Charter, Inc.

### and

### SM 5105 LLC

## November 26, 2001

Note:
One execution copy of agreement for Lessor shall be marked *"Secured Party's Original"*. All other execution copies shall be marked *"Copy. No interest herein may be created on the aircraft subject hereto through the transfer and/or possession hereof."*

To the extent, if any, this instrument constitutes chattel paper under the UCC, no security interest herein may be created through the transfer and/or possession of any counterpart other than the counterpart marked *"Secured Party's Original"*.

*Please indicate:*

☐    *Secured Party's Original. (One execution copy only may be so marked.)*

☒    *Copy. No interest herein may be created on the aircraft subject hereto through the transfer and/or possession hereof.*

1

Troy 275799_1

Form No. AACI 005 Rev. -'

## Agreement For FAR 135 Operation
## between
## Automotive Air Charter, Inc.
## and
## SM 5105 LLC

This Agreement dated November 26, 2001 ("Commencement Date"), exists between **Automotive Air Charter, Inc.**, 7310 Highland Road, Waterford, Michigan 48327, a Delaware corporation ("Certificate Holder") and **SM 5105 LLC,** 5725 Delphi Drive, Troy, Michigan, a Delaware limited liability company ("Owner").

### WITNESSETH:

WHEREAS, Owner is the lessee and rightfully possesses a certain Learjet 60 aircraft (as defined below); and

WHEREAS, Certificate Holder holds Air Carrier Operating Certificate Number UG8A235J issued by the Federal Aviation Administration under Part 135 ("FAA Certificate") of the Federal Aviation Regulations ("FARs") and is registered with the U. S. Department of Transportation as an on-demand air taxi operator (the "DOT Registration") in commercial operations and is otherwise authorized to charter aircraft to third parties as an air taxi operator; and

WHEREAS, during such periods as shall be determined by Owner, Owner desires to have Certificate Holder charter the Aircraft to third parties for compensation and hire in Certificate Holder's capacity as an on-demand air taxi operator and Certificate Holder desires to operate the Aircraft in such commercial capacity; and

WHEREAS, Owner desires to grant to Certificate Holder exclusive use, possession and operational control of Owner's aircraft for the periods of time determined by Owner when Certificate Holder uses the aircraft to engage in flights under Part 135 of the FAR and for such ancillary flights as may be necessary to position and reposition the aircraft for such flights, such grant to be in accordance with the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and promises herein contained and other good and valuable consideration, Certificate Holder and Owner hereby agree as follows:

### Section 1.
2

Form No. AACI 005 Rev. -_

### Definitions

For the purpose of this Agreement and consistent with the requirements of the FAR, the following terms have the following respective meanings:

1.1.  "Aircraft" -- means a Learjet 60 aircraft, Serial Number 237, Registration Number N699DA.

1.2.  "Base" -- Pursuant to FAR Section 119.47, Certificate Holder establishes and maintains its Principal Base of Operations, Main Operations Base and Main Maintenance Base at Oakland County International Airport, 7310 Highland Road, Waterford, MI 48327.

1.3.  "Charter Flights" -- means flights conducted by Certificate Holder hereunder in accordance with FAR Part 135.

1.4.  "Charter Rate" -- has the meaning set forth in Exhibit A.

1.5.  "FAA" -- means Federal Aviation Administration.

1.6.  "FARs" -- means Federal Aviation Regulations, as they may be amended from time to time.

1.7.  "Flight Crew" -- means such flight crew members (as defined in FAR Section 1.1) under the exclusive direction and control of Certificate Holder that hold current and valid appropriate pilot certificates with appropriate ratings issued under FAR Part 61.  There shall be a designated Pilot in Command (Captain) and a Second in Command (Co-Pilot) assigned to each Flight Crew.

1.8.  "Lessor" -- means Fleet National Bank.

1.9.  "Maintenance" -- shall have the meaning set forth in FAR Section 1.1.  For the purpose of this Agreement, the term Maintenance also includes preventive maintenance and alterations (as defined in FAR Section 1.1).

1.10.  "Manager" -- means Pentastar Aviation, LLC.

1.11.  "Operational Control" -- Operational control includes, but is not limited to, command and control of the Aircraft, and shall also include, without limitation, exclusive control over:

    (a)    all crew members;

    (b)    determinations whether any particular flight may be safely operated;

3

Form No. AACI 005 Rev. -_

    (c)    assignment of crew members to particular flights;
    (d)    initiation and termination of all flights;
    (e)    directions to crew members to conduct flights; and
    (f)    dispatch or release of flights.

Certificate Holder will have Operational Control and shall be the operator of all flights conducted under this Agreement.

1.12.  "Revenue" -- means the Charter Rate multiplied by the actual hours flown, defined as "time in service", as recorded on the official Certificate Holder Aircraft flight log, or the daily minimum flight requirements, whichever is greater, exclusive of any discounts or commissions provided to Certificate Holder's customers, which will be borne by the Certificate Holder. The daily minimum flight requirements are set by Certificate Holder to encourage maximum utilization of the Aircraft by the charter customers.

## Section 2.
## Operation of the Aircraft
## Under FAR Part 135

2.1.  Charter Representative. Owner appoints Certificate Holder as Owner's exclusive representative to market the Aircraft for charter to third parties.

2.2.  Flight Operation. The Certificate Holder will place the Aircraft on the Certificate Holder's Air Carrier Certificate, No. UG8A235J and applicable operation specifications, at Owner's expense, as described herein. For flight operation under FAR Part 135, the Aircraft and Flight Crew will be under Certificate Holder's Operational Control. Certificate Holder has prepared procedural precepts for the safe operation of the Aircraft and will operate the Aircraft in accordance with applicable FAA regulations, the capabilities established by the Aircraft manufacturer, and the safety and operational standards and policies of the Certificate Holder. Owner will in no case operate the Aircraft under Part 135. The Certificate Holder will at all times maintain a current and valid Air Carrier Certificate issued by the FAA and the Certificate Holder shall at all times be in full compliance with FAR Part 135 and any other applicable statutes, laws, rules, regulations and parts with respect to the use and operation of the Aircraft. Certificate Holder will use its commercially reasonable skills, resources and judgement to charter the Aircraft and carry out its other obligations hereunder in the best interests of Owner.

2.3.  Aircraft Acquisition, Licensing and Certification. Owner will be responsible for the acquisition, financing, equipping, licensing and certification of the

Troy 275799_1

Form No. AACI 005 Rev. -_

Aircraft. Owner will have the Aircraft modified at its own expense, if necessary, to meet FAR requirements.

2.4.  <u>Flight Crew</u>.  Certificate Holder shall employ Flight Crew personnel qualified to conduct Part 135 Operations in the Aircraft.  Owner may recommend qualified Flight Crew but Certificate Holder shall not be required to employ such Flight Crew.  All Flight Crew personnel operating the Aircraft under Part 135 will be under the exclusive supervision, direction, and control of Certificate Holder at all times in preparation for, in connection with, and during the operation of all Part 135 flights.

2.4.1.  <u>Selection of Flight Crew</u>.  Certificate Holder shall provide qualified Flight Crew for Part 135 operations.  All flight crew personnel will be appropriately certificated, rated, and trained as required by the FAA and to Certificate Holder's standards and requirements.  Certificate Holder will not select any Flight Crew until they have been trained in, and satisfactorily completed Certificate Holder's systematic training program and flight checks that meet or exceed FAR Part 135 standards for flight proficiency, safety and aviation knowledge. Owner shall have no right to require or direct Certificate Holder to use any particular crewmember to conduct operations in the Aircraft for flights operated pursuant to Part 135.

2.4.2  <u>Flight Crew Certification</u>.  No Flight Crew personnel shall operate the Aircraft under Part 135 until successful completion of Certificate Holder's indoctrination course and ground school required for certification. Owner will, at its own expense, provide the Aircraft for any flight training or FAA required flight checks necessary to certify flight crew personnel recommended by Owner for Part 135 operations and shall be responsible for the cost of travel and reasonable subsistence of Certificate Holder's personnel used in such training or FAA flight checks.

2.4.3  <u>Flight Crew - Initial and Recurrent Training</u>.  Certificate Holder will not select or approve any Flight Crew personnel recommended by Owner until they have successfully completed initial and recurrent ground training, as required by FAR Part 135.  Owner is responsible for all costs associated with the required semi-annual simulator training for Flight Crew personnel recommended by Owner. Owner shall make the Aircraft available for required recurrent flight training and will bear the expenses associated with the operation of the Aircraft arising therefrom.

2.5.  <u>Marketing</u>.  Certificate Holder agrees to market the Aircraft for charter with emphasis in Owner's locale.  Certificate Holder will bear the cost of its

5

Troy 275799_1

Form No. AACI 005 Rev. -_

marketing effort, and will provide to Owner at its request marketing materials used by Certificate Holder.

2.6.  Aircraft Pricing.  The Charter Rate for the Aircraft is listed in Exhibit A. Certificate Holder reserves the right to make adjustments to the Charter Rate to reflect market conditions; provided, however that unless otherwise authorized by Owner, Owner shall at all times receive, at a minimum, the percentage specified in Section 2.7.1 of the then current Charter Rate as listed on Certificate Holder's published rate sheet then in effect.  Owner shall have the right to specify a preferred rate for certain charter customers referred by Owner; provided, however, that in the event of such preferred rate, Certificate Holder shall receive its percentage based on the Charter Rate specified in Exhibit A.

2.7.  Operating Costs; Division of Revenue.  Owner will be responsible for all costs pertaining to the operation of the Aircraft, including, but not by way of limitation, the costs of fuel, flight crew, insurance, training (emergency, ground and flight), taxes, and maintenance.  Operational expenses which include, but are not limited to, catering to first class airline standards, parking, landing fees and aircraft de-icing are also the Owner's responsibility.  Operational expenses relating to parking and landing fees shall be paid initially by the Owner but shall be billed to the charter customer based on  policies agreed upon in writing by the parties.

2.7.1.  Revenue generated from the charter operation of the Aircraft to a third party will be divided between the Owner and Certificate Holder as follows: Owner receives eighty-five percent (85%) and Certificate Holder receives fifteen percent (15%).

2.8.  Charter Invoicing.  Certificate Holder will invoice all charter customers promptly.  Owner understands that the invoicing of all charter customers must be done by Certificate Holder and that the invoicing of charter customers by any other party will be a breach of this Agreement.

2.8.1  Certificate Holder will be responsible, as part of the charter invoicing process, for billing, collection, return filing and remittance of all taxes related to charter activities, including without limitation Federal Excise Taxes.  Certificate Holder will also be responsible for any penalties and interest on taxes for which it is responsible.

2.9.  Payments.  Subject to Section 2.10 below, Certificate Holder will pay amounts owing to Owner for charter of the aircraft during a month on the 10th business day of the month following the month in which the Certificate Holder has received payment.

6

Troy 275799_1

Form No. AACI 005 Rev. -_

2.10. <u>Payments from Third Party Charter Customers</u>. Certificate Holder will assume risk of non-collection of third party charter customers' invoices. In the event that the charter customer is in default, the Certificate Holder will pay to the Owner revenues due, thirty days after the default has occurred, or sixty days following the month during which the charter flights occurred, whichever is less. Certificate Holder has the sole responsibility to determine the payment for all third party charter customers in accordance with its credit policy. Certificate Holder will use reasonable efforts to give Owner timely cancellation notice of any scheduled charter flight.

2.11. <u>FAR Part 135 Scheduling Commitment</u>. Certificate Holder must obtain Owner's approval prior to scheduling any Charter Flights. Owner shall take into consideration Charter Flights that have previously been approved when scheduling Owner's use of the Aircraft and shall use reasonable commercial efforts to give Certificate Holder at least five (5) days notice of any scheduling that would conflict with a scheduled Charter Flight. Notwithstanding the foregoing, Owner shall have the absolute right to use the Aircraft at any time and shall have no liability for cancellation of Charter Flights.

2.12 <u>Countries of Operation</u>. The Aircraft will not be operated in any country in which United States citizens are at such time, restricted from traveling by applicable United States law, regulation or directive or which would violate the terms of this Agreement, in any country excluded from coverage by any insurance policy in effect with respect to such Aircraft, in areas that are war zones or in Owner's determination areas of actual or threatened hostilities or in areas which to a prudent operator of similar aircraft would present an unreasonable risk of harm to such Aircraft or passengers.

2.13 <u>Flight Safety</u>. Certificate Holder shall not undertake any flight which is not in compliance with the terms and conditions of the insurance referred to in Section 4.2 or which may otherwise result in the termination or cancellation of such insurance, or which Certificate Holder or the flight crew personnel in their sole discretion consider dangerous by reason of weather conditions, war, hostilities, warlike operations, civil war, civil commotions, revolution, inappropriate landing facilities or any other significant risk to life, health or property. In the event that the flight crew becomes aware of any dangerous conditions during the course of a flight, the crew may proceed to any reasonable destination which they consider to be safe or advisable under the circumstances. Whenever in his or her sole discretion the pilot-in-command determines that safety of flight may be compromised, the pilot-in-command may terminate a flight, refuse to commence a flight, or take any other action required for safety without liability for loss, injury, damage, or delay.

7

Form No. AACI 005 Rev. -_

2.14    Audit. Certificate Holder will make available for inspection and copying by Owner and Owner's representative all Aircraft records, payment records and expense records concerning the flight operations of the Aircraft and other services provided under this Agreement and all other records related to the Aircraft or the services hereunder which are required to be kept by Certificate Holder under this Agreement or under applicable laws or FAR's. All such records shall be made available by Certificate Holder upon five (5) day's notice during regular business hours and at such other reasonable times requested by Owner throughout the Term and for the period ending two (2) years after the termination thereof. Certificate Holder agrees not to destroy or dispose of such records prior to the time when Owner's right to inspect and audit terminates. Certificate Holder further agrees that if it desires to destroy or dispose of such records prior to the expiration of the seven (7) year period following the date to which such records pertain, Certificate Holder will provide the Owner with notice and a reasonable opportunity to retain such records.

2.15    Recordkeeping. Certificate Holder shall maintain on behalf of Owner all flight, passenger and payment records in a neat and current condition in accordance with applicable legal requirements and accepted accounting practices.

2.16    Trip Data. Certificate Holder will file all required flight plans and will maintain an accurate record of each trip flown consisting of route flown, time enroute, fuel consumed, miscellaneous expenses, and names of flight crew, in accord with FAR requirements for log book entries.

## Section 3.
## Maintenance of the Aircraft

3.1.    Governing Maintenance Regulations. Owner and Certificate Holder agree that regardless of the type of operation conducted with the Aircraft, it shall be maintained under the requirements of FAR Part 135, Subpart J at all times.

3.2.    Maintenance Provider. Owner shall enter into an agreement with a qualified Part 145 certificated repair station ("Maintenance Provider") to perform maintenance, preventative maintenance, and alteration of the Aircraft in accordance with this Section 3.2. The parties agree that the Aircraft Management Agreement dated as of November 26, 2001, by and between Owner and Manager (the "Maintenance Agreement"), shall serve as a maintenance agreement required by this Section 3.2.

8

Form No. AACI 005 Rev. -_

3.2.1. The initial Maintenance Provider is named and described in Exhibit B attached hereto and Certificate Holder hereby accepts and acknowledges the qualifications of Maintenance Provider; provided, however, that Owner shall have the right to change the Maintenance Provider upon sixty (60) days notice to Certificate Holder as long as such replacement Maintenance Provider meets the requirements set forth in Section 3.2.2. below.

3.2.2  In the event that Owner shall seek to appoint a replacement Maintenance Provider, such replacement Maintenance Provider shall be subject to the prior written approval of the Certificate Holder and the Certificate Holder shall have the right to require an independent safety audit of the replacement Maintenance Provider to be conducted by a person selected by the Certificate Holder at the sole expense of Owner.

3.2.3. In the event the agreement between Owner and the initial Maintenance Provider or any subsequent Maintenance Provider is canceled or suspended, the Aircraft shall be ineligible for use under the terms of this Agreement for such period of time as Owner shall not have an agreement with a Maintenance Provider meeting the requirements of Section 3.2.2. above.

3.2.4. Owner shall make available to Certificate Holder any agreement entered in to with the Maintenance Provider.

**Section 4.**
**General Provisions**

4.1.  <u>Ownership and Registration of the Aircraft</u>.  Owner represents and warrants that Lessor holds legal title to and is the registered owner of the Aircraft and that Owner is the lessee of the Aircraft and has lawful possession thereof.  The parties acknowledge that the Aircraft is, and will remain at all times the sole and exclusive property of Lessor, unless notified otherwise by Owner in writing, and that Certificate Holder has no rights therein except as expressly provided in this Agreement.

4.2.  <u>Owner's Insurance</u>.  Owner shall obtain and maintain, or cause to be maintained, the following types of insurance coverage, with minimum limits as set forth below:

4.2.1. Commercial General Liability covering liability arising from premises, operations, independent contractors, personal and advertising injury, and blanket contractual liability - $5,000,000 each occurrence.

9

Troy 275799_1

Form No. AACI 005 Rev. -_

4.2.2. Business Automobile Liability covering all owned, hired, and non-owned vehicles - $5,000,000 each occurrence, including all statutory coverage for all states of operation.

4.2.3 Aircraft Liability insurance covering liability for bodily injury (including passengers) and property damage arising out of the ownership, maintenance or use of the Aircraft and liability under contractual agreements - per occurrence limit equal to $10,000,000 per passenger seat or $100,000,000 each occurrence, whichever is greater. The policy must be modified to provide the following additional coverage extensions:

(a)    The "use" provision of the policy must be amended to include carriage of passengers and cargo for hire.

(b)    The "pilot warranty" provision of the policy must be on an "open" basis covering any pilot meeting the requirements of this Agreement.

(c)    Medical payments coverage for all reasonable expense of medical, surgical, ambulance, hospital, nursing, and related services and, in the event of death, reasonable funeral expense on behalf of passengers (including pilot and other crewmembers) injured while riding in the Aircraft - $25,000 per passenger.

(d)    Passenger voluntary settlement coverage for the benefit of each passenger (including pilot and other crewmembers) who sustains bodily injury caused by an accident arising out of the ownership, maintenance or use of the Aircraft - $250,000 per passenger.

(e)    Personal effects (baggage) liability insurance covering loss of passengers' baggage or personal effects - $25,000 per passenger.

4.2.4. Aircraft Physical Damage (Hull) insurance covering the full replacement cost value of the Aircraft for "all risk" perils. Such insurance shall contain a waiver of subrogation against the Certificate Holder, its contractors (including pilot and other crewmembers) and Charter Flight customers and passengers.

All policies of insurance procured by Owner herein shall be written as primary policies, not contributing with nor in excess of coverage that the Certificate

10

Troy 275798_1

Form No. AACI 005 Rev. -_

Holder may carry.  If the Owner's liability policies do not contain the standard separation of insureds provision, or a substantially similar clause, they shall be endorsed to provide cross-liability coverage.

Owner shall provide the Certificate Holder with a certificate of insurance evidencing compliance with the insurance requirements set forth above. Certificate(s) will provide that the Certificate Holder, its contractors (including pilot and other crewmembers) and Charter Flight customers and passengers shall be named an additional insured on all liability policies.  The certificate(s) shall provide that the Company will receive thirty (30) days' prior written notice from the insurer of any termination or material reduction in the amount or scope of coverage.

Such certificates shall be in a form acceptable to, and underwritten by insurance company(ies) reasonably satisfactory to, the Certificate Holder.  By requiring insurance herein, the Certificate Holder does not represent that coverage and limits will necessarily be adequate to protect the Owner.  The purchase of appropriate insurance coverage by the Owner or the furnishing of certificate(s) of insurance shall not release the Owner from its respective obligations or liabilities under this Agreement.

4.3.   Indemnification.

4.3.1.  Owner will indemnify, defend, and hold Certificate Holder, its parents, subsidiaries, affiliated companies, officers, directors, shareholders, agents and employees, harmless from all liabilities, damages, penalties, actions, suits, costs and claims, including reasonable attorney's fees, of whatever kind and nature, imposed or incurred by or asserted against Certificate Holder because of the ownership of the Aircraft, a condition affecting the Aircraft existing at the commencement of this Agreement or misconduct or negligence of the Owner relating to the Aircraft.

4.3.2.  Certificate Holder will defend, indemnify and hold the Owner and the Lessor, including such party's parents, subsidiaries, affiliated companies, officers, directors, shareholders, agents and employees of each of them harmless from all liabilities, damages, penalties, actions, suits, costs and claims, including reasonable attorney's fees, of whatever kind and nature, resulting during any period when Certificate Holder has Operational Control of the Aircraft, or from the misconduct or negligence on the part of Certificate Holder in the performance of any obligation required under this Agreement.

4.4.   Term and Termination.

11

Troy 275799_1

Form No. AACI 005 Rev. -_

4.4.1  Term of Agreement.  The term of this Agreement will commence on the effective date provided above and will continue until April 30, 2002, unless earlier terminated pursuant to the provisions of this Section 4.4.  Beginning May 1, 2002, this Agreement may be renewed from year to year thereafter upon the written agreement of Owner and Certificate Holder.  Either party may terminate this Agreement upon sixty (60) days written notice to the other party. Either party may terminate this Agreement immediately upon the termination of the Aircraft Lease dated March 30, 2001, between Fleet National Bank and Owner (the "Lease") or such other event causing Owner to lose operational control of the Aircraft; provided that in either event, Owner shall provide Certificate Holder with as much prior notice as is reasonably practical under the circumstances.

4.4.2  This Agreement may be terminated by Owner:

(a)    Upon breach or default by Certificate Holder of any of the conditions of this Agreement and the failure of Certificate Holder to cure or remedy such breach or default within thirty (30) days after receipt of notice thereof from Owner unless an earlier time is provided for herein;

(b)    Immediately upon Certificate Holder's use of the Aircraft for illegal activities;

(c)    Upon the occurrence of any of the following events:

(i)    a proceeding under bankruptcy, reorganization, arrangement of debts, insolvency or receivership law or assignment for the benefit of creditors filed by Certificate Holder or such a proceeding filed against Certificate Holder if not dismissed within 60 days;

(ii)    if Certificate Holder voluntary or involuntary dissolves or is dissolved as a corporate entity;

(d)    Upon operation of the Aircraft where Certificate Holder has knowledge that there is a lapse of insurance coverage as required by this Agreement.

4.4.3  This Agreement may be terminated by Certificate Holder:

Troy 275799_1

Form No. AACI 005 Rev. -_

(a)    Immediately upon Owner's use of the Aircraft for illegal activities;

(b)    Upon breach or default of Owner of any condition of this Agreement and the failure of the Owner to cure or remedy such breach or default within 30 days after receiving notice from Certificate Holder;

(c)    Upon the occurrence of any of the following events:

(i)    a proceeding under bankruptcy, reorganization, arrangement of debts, insolvency or receivership law or assignment for the benefit of creditors filed by Owner or such a proceeding filed against Owner if not dismissed within 60 days; or

(ii)    if Owner voluntary or involuntary dissolves or is dissolved as a corporate entity; or

(d)    Upon a lapse of insurance coverage as required by this Agreement.

4.5.    <u>Further Acts</u>. The parties will, from time to time, perform such other and further acts, and execute and deliver such other and further instruments as may be required by law or reasonably requested by the other to carry out and effect the intents and purposes of this Agreement.

4.6.    <u>Notices</u>. All notices, demands, or other communications to be delivered or given hereunder will be in writing and will be deemed to be duly given if delivered personally or sent by facsimile transfer or overnight courier as follows:

To: Certificate Holder:    Automotive Air Charter, Inc.
7310 Highland Road
Waterford, Michigan 48327
Attn: Mr. Thomas D. Seeber
Ph.:    248-666-8200
Fax:    248-666-8270

To: Owner:    SM 5105 LLC
5725 Delphi Drive, MC 483.400.216
Troy, MI 48098
Attn:    Corp. Aviation Manager
Ph:    (248) 813-2564

13

Troy 275799_1

Form No. AACI 005 Rev. -_

Fax:  (248) 813-2610

or at such other addresses as may have been furnished by either party to the other in writing in accordance herewith. All notices will be deemed received on the date of delivery.

4.7.   **Binding Effect**. This Agreement and all of the provisions hereof will be binding upon and will inure to the benefit of the parties hereto and their respective heirs, distributees, legal representatives and successors.

4.8.   **Amendment**. This Agreement may be modified, altered and amended from time to time by the mutual written agreement of the parties.

4.9.   **Applicable Law**. This Agreement will in all respects be governed by the laws of the State of Michigan without regard to its conflicts of laws principles.

4.10.   **Entire Agreement**. This Agreement and the attachments hereto supersede all prior agreements, understandings, and negotiations, written or oral, between the parties with respect to the subject matter hereof, and cannot be amended or modified except by a writing signed by the parties hereto and, except for renewals that don't extend beyond the term of the Lease, prior written consent of the Lessor. This Agreement is subject and subordinate to the rights of the Lessor under the Aircraft Lease between Owner and Lessor dated March 30, 2001 (the "Lease") in and to the Aircraft. Lessor, Certificate Holder and Owner shall execute a consent and acknowledgement of this Agreement in mutually acceptable form, along with such other instruments (including, without limitation, FAA recording documents and UCC financing statements) as Owner may reasonably require for Lessor. Certificate Holder shall take all reasonable actions requested by Owner to allow Owner to conform to the terms of the Lease.

4.11.   **Severability**. In case any one or more of the provisions contained in this Agreement are for any reason held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect any other provision thereof.

4.12.   **Headings**. The headings of the Sections and Paragraphs contained in this Agreement are inserted for convenience only and will not constitute a part hereof.

4.13.   **Survival**. The provisions of Section 2.14 Audit and Section 4.3, Indemnification, will survive the termination of this Agreement.

14

Troy 275799_1

Form No. AACI 005 Rev. -_

4.14.  Assignability.  Neither party may assign this Agreement without the prior written consent of the other party, which consent shall not be unreasonably withheld, delayed or conditioned.  Notwithstanding the foregoing, this Agreement may be assigned by either party, upon prior notice, to any entity to which such party may transfer all or substantially all, of its assets and business pursuant to a merger, acquisition or other such reorganization or to an affiliate of such party and any rights and obligations hereunder may be assigned by Owner, upon prior notice, to any affiliate of Owner or to Lessor.  Without limiting the generality of the foregoing, this Agreement and all of the provisions hereof will be binding upon and will inure to the benefit of the parties hereto and their respective successors and assigns.

4.15.  Waiver.  No waiver of any breach of any provision of this Agreement will constitute a waiver of any prior, concurrent or subsequent breach of any provision of this Agreement.

4.16.  Independent Contractor.  Certificate Holder is, and will be at all times during the term of this Agreement, an independent contractor.  All personnel supplied by Certificate Holder will be employees of Certificate Holder.  Certificate Holder will have no authority to bind or obligate Owner by contract or otherwise except as provided for in this Agreement.

4.17.  Delegation of Duties.  Either party may delegate its duties hereunder to a qualified agent, provided that each of the parties will remain responsible for the performance of its duties hereunder.

4.18  Compliance with Law.  Certificate Holder shall not undertake any flight which could expose any of Owner, Certificate Holder, or the flight crew to any penalty, fine, sanction, or other liability, whether civil or criminal, under any applicable law, rule, treaty, or convention.  In no event will Certificate Holder or Owner undertake any act which does not comply in all material respects with all applicable laws.

4.19  Counterparts and Fax Signatures.  This Agreement may be executed in one or more counterparts each of which shall be deemed an original, all of which together shall constitute one and the same agreement.  Facsimile signatures shall be binding upon the parties hereto with the same force and effect as original signatures.

## [SIGNATURES ON THE NEXT PAGE]

15

Troy 275799_1

Form No. AACI 005 Rev. -_

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives as of the 26ᵗʰ day of November, 2001.

**SM 5105 LLC**

By: _Mark C. Lorenz_

Name: _MARK C. LORENZ_

Title: _VICE PRESIDENT -OPERATIONS_

**AUTOMOTIVE AIR CHARTER, INC.**

By: _____

Name: _Thomas D. Secher_

Title: _President_

16

Form No. AACI 005 Rev. -

EXHIBIT A

## Agreement For FAR 135 Operation
### between
### Automotive Air Charter, Inc.
### and
### SM 5105 LLC

### Aircraft Description

## Learjet 60, Serial Number 237, Registration Number N699DA

### Operational Rates and Fees

**Charter Rate:**

$2,800 per flight hour (subject to Section 2.6, except such hours for charter customers referred by Owner to Certificate Holder for which Owner shall specify a preferred rate), with a two hour daily minimum. The two-hour daily minimum may be waived, with Owner's prior approval, for charter flights for Manager, or customers designated by Owner.

**Division of Revenue:**

Revenue generated from flight hours for charter operations will be divided between Owner receiving eighty-five percent (85%) and Certificate Holder receiving fifteen percent (15%), subject to Sections 2.6 and 2.7.

**Crew and Operational Expenses:**

To be collected by Certificate Holder and paid to Owner for each Charter Flight. Domestic and international overnight rates in addition to operational expenses will be determined as quoted by the Charter Sales Representative, for the specified Charter Flight.

Troy 275799_1

Form No. AACI 005 Rev. -_

EXHIBIT B

**Agreement For FAR 135 Operation
Between
Automotive Air Charter, Inc.
and
SM 5105 LLC**

MAINTENANCE PROVIDER DESCRIPTION

Maintenance Provider to Owner

NAME:            Pentastar Aviation, LLC
                 FAA Approved Repair Station BTVR626C

ADDRESS:         7002 Highland Road
                 Waterford, MI  48327

Troy 275799_1

Form No. AACI 001 Rev. A – amended

EXECUTION COPY_
01/10/02

# FILE COPY

### Agreement For FAR 135 Operation

### between

### Automotive Air Charter, Inc.

### and

### SM 5105 LLC

As amended January 10, 2002

(See Section 3)

N599DA

1

Form No. AACI 001 Rev. A – amended

EXECUTION COPY
01/10/02

## Agreement For FAR 135 Operation
### between
### Automotive Air Charter, Inc.
### and
### SM 5105 LLC

This Agreement dated January 10, 2002 ("Commencement Date"), exists between **Automotive Air Charter, Inc.**, 7310 Highland Road, Waterford, Michigan 48327, a Delaware corporation ("Certificate Holder") and **SM 5105 LLC,** 5725 Delphi Drive, Troy, Michigan, a Delaware limited liability company ("Owner").

### WITNESSETH:

WHEREAS, Owner is the lessee and rightfully possesses a certain Bombardier Challenger 604 aircraft (as defined below); and

WHEREAS, Certificate Holder holds Air Carrier Operating Certificate Number UG8A235J issued by the Federal Aviation Administration under Part 135 ("FAA Certificate") of the Federal Aviation Regulations ("FARs") and is registered with the U. S. Department of Transportation as an on-demand air taxi operator (the "DOT Registration") in commercial operations and is otherwise authorized to charter aircraft to third parties as an air taxi operator; and

WHEREAS, during such periods as shall be determined by Owner, Owner desires to have Certificate Holder charter the Aircraft to third parties for compensation and hire in Certificate Holder's capacity as an on-demand air taxi operator and Certificate Holder desires to operate the Aircraft in such commercial capacity; and

WHEREAS, Owner desires to grant to Certificate Holder exclusive use, possession and operational control of Owner's aircraft for the periods of time determined by Owner when Certificate Holder uses the aircraft to engage in flights under Part 135 of the FAR and for such ancillary flights as may be necessary to position and reposition the aircraft for such flights, such grant to be in accordance with the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and promises herein contained and other good and valuable consideration, Certificate Holder and Owner hereby agree as follows:

### Section 1.
### Definitions

2

Form No. AACI 001 Rev. A – amended

EXECUTION COPY_
01/10/02

For the purpose of this Agreement and consistent with the requirements of the FAR, the following terms have the following respective meanings:

1.1.  "Aircraft" -- means a Bombardier Inc. CL-600-2B16 aircraft, Serial Number 5498, Registration Number N599DA.

1.2.  "Base" -- Pursuant to FAR Section 119.47, Certificate Holder establishes and maintains its Principal Base of Operations, Main Operations Base and Main Maintenance Base at Oakland County International Airport, 7310 Highland Road, Waterford, MI 48327.

1.3.  "Charter Flights" -- means flights conducted by Certificate Holder hereunder in accordance with FAR Part 135.

1.4.  "Charter Rate" -- has the meaning set forth in Exhibit A.

1.5.  "FAA" -- means Federal Aviation Administration.

1.6.  "FARs" -- means Federal Aviation Regulations, as they may be amended from time to time.

1.7.  "Flight Crew" -- means such flight crew members (as defined in FAR Section 1.1) under the exclusive direction and control of Certificate Holder that hold current and valid appropriate pilot certificates with appropriate ratings issued under FAR Part 61. There shall be a designated Pilot in Command (Captain) and a Second in Command (Co-Pilot) assigned to each Flight Crew.

1.8.  "Lessor" -- means Fleet National Bank.

1.9.  "Maintenance" -- shall have the meaning set forth in FAR Section 1.1. For the purpose of this Agreement, the term Maintenance also includes preventive maintenance and alterations (as defined in FAR Section 1.1).

1.10.  "Manager" -- means Pentastar Aviation, LLC.

1.11.  "Operational Control" -- Operational control includes, but is not limited to, command and control of the Aircraft, and shall also include, without limitation, exclusive control over:

    (a)  all crew members;
    (b)  determinations whether any particular flight may be safely operated;
    (c)  assignment of crew members to particular flights;
    (d)  initiation and termination of all flights;
    (e)  directions to crew members to conduct flights; and

Form No. AACI 001 Rev. A – amended
EXECUTION COPY
01/10/02

    (f)    dispatch or release of flights.

Certificate Holder will have Operational Control and shall be the operator of all flights conducted under this Agreement.

1.12.   "Revenue" -- means the Charter Rate multiplied by the actual hours flown, defined as "time in service", as recorded on the official Certificate Holder Aircraft flight log, or the daily minimum flight requirements, whichever is greater, exclusive of any discounts or commissions provided to Certificate Holder's customers, which will be borne by the Certificate Holder. The daily minimum flight requirements are set by Certificate Holder to encourage maximum utilization of the Aircraft by the charter customers.

## Section 2.
## Operation of the Aircraft
## Under FAR Part 135

2.1.   Charter Representative.  Owner appoints Certificate Holder as Owner's exclusive representative to market the Aircraft for charter to third parties.

2.2.   Flight Operation.  The Certificate Holder will place the Aircraft on the Certificate Holder's Air Carrier Certificate, No. UG8A235J and applicable operation specifications, at Owner's expense, as described herein.  For flight operation under FAR Part 135, the Aircraft and Flight Crew will be under Certificate Holder's Operational Control.  Certificate Holder has prepared procedural precepts for the safe operation of the Aircraft and will operate the Aircraft in accordance with applicable FAA regulations, the capabilities established by the Aircraft manufacturer, and the safety and operational standards and policies of the Certificate Holder.  Owner will in no case operate the Aircraft under Part 135.  The Certificate Holder will at all times maintain a current and valid Air Carrier Certificate issued by the FAA and the Certificate Holder shall at all times be in full compliance with FAR Part 135 and any other applicable statutes, laws, rules, regulations and parts with respect to the use and operation of the Aircraft.  Certificate Holder will use its commercially reasonable skills, resources and judgement to charter the Aircraft and carry out its other obligations hereunder in the best interests of Owner.

2.3.   Aircraft Acquisition, Licensing and Certification.  Owner will be responsible for the acquisition, financing, equipping, licensing and certification of the Aircraft. Owner will have the Aircraft modified at its own expense, if necessary, to meet FAR requirements.

2.4.   Flight Crew.  Certificate Holder shall employ Flight Crew personnel qualified to conduct Part 135 Operations in the Aircraft.  Owner may

Form No. AACI 001 Rev. A – amended                          EXECUTION COPY_
01/10/02

recommend qualified Flight Crew but Certificate Holder shall not be required to employ such Flight Crew. All Flight Crew personnel operating the Aircraft under Part 135 will be under the exclusive supervision, direction, and control of Certificate Holder at all times in preparation for, in connection with, and during the operation of all Part 135 flights.

2.4.1. <u>Selection of Flight Crew</u>. Certificate Holder shall provide qualified Flight Crew for Part 135 operations. All flight crew personnel will be appropriately certificated, rated, and trained as required by the FAA and to Certificate Holder's standards and requirements. Certificate Holder will not select any Flight Crew until they have been trained in, and satisfactorily completed Certificate Holder's systematic training program and flight checks that meet or exceed FAR Part 135 standards for flight proficiency, safety and aviation knowledge. Owner shall have no right to require or direct Certificate Holder to use any particular crewmember to conduct operations in the Aircraft for flights operated pursuant to Part 135.

2.4.2 <u>Flight Crew Certification</u>. No Flight Crew personnel shall operate the Aircraft under Part 135 until successful completion of Certificate Holder's indoctrination course and ground school required for certification. Owner will, at its own expense, provide the Aircraft for any flight training or FAA required flight checks necessary to certify flight crew personnel recommended by Owner for Part 135 operations and shall be responsible for the cost of travel and reasonable subsistence of Certificate Holder's personnel used in such training or FAA flight checks.

2.4.3 <u>Flight Crew - Initial and Recurrent Training</u>. Certificate Holder will not select or approve any Flight Crew personnel recommended by Owner until they have successfully completed initial and recurrent ground training, as required by FAR Part 135. Owner is responsible for all costs associated with the required semi-annual simulator training for Flight Crew personnel recommended by Owner. Owner shall make the Aircraft available for required recurrent flight training and will bear the expenses associated with the operation of the Aircraft arising therefrom.

2.5. <u>Marketing</u>. Certificate Holder agrees to market the Aircraft for charter with emphasis in Owner's locale. Certificate Holder will bear the cost of its marketing effort, and will provide to Owner at its request marketing materials used by Certificate Holder.

2.6. <u>Aircraft Pricing</u>. The Charter Rate for the Aircraft is listed in Exhibit A. Certificate Holder reserves the right to make adjustments to the Charter Rate to reflect market conditions; provided, however that unless otherwise authorized by Owner, Owner shall at all times receive, at a minimum, the

5

Form No. AACI 001 Rev. A – amended

EXECUTION COPY_
01/10/02

percentage specified in Section 2.7.1 of the then current Charter Rate as listed on Certificate Holder's published rate sheet then in effect. Owner shall have the right to specify a preferred rate for certain charter customers referred by Owner; provided, however, that in the event of such preferred rate, Certificate Holder shall receive its percentage based on the Charter Rate specified in Exhibit A.

2.7.   <u>Operating Costs; Division of Revenue</u>.   Owner will be responsible for all costs pertaining to the operation of the Aircraft, including, but not by way of limitation, the costs of fuel, flight crew, insurance, training (emergency, ground and flight), taxes, and maintenance. Operational expenses which include, but are not limited to, catering to first class airline standards, parking, landing fees and aircraft de-icing are also the Owner's responsibility. Operational expenses relating to parking and landing fees shall be paid initially by the Owner but shall be billed to the charter customer based on policies agreed upon in writing by the parties.

   2.7.1.   Revenue generated from the charter operation of the Aircraft to a third party will be divided between the Owner and Certificate Holder as follows: Owner receives eighty-five percent (85%) and Certificate Holder receives fifteen percent (15%).

2.8.   <u>Charter Invoicing</u>.   Certificate Holder will invoice all charter customers promptly. Owner understands that the invoicing of all charter customers must be done by Certificate Holder and that the invoicing of charter customers by any other party will be a breach of this Agreement.

   2.8.1   Certificate Holder will be responsible, as part of the charter invoicing process, for billing, collection, return filing and remittance of all taxes related to charter activities, including without limitation Federal Excise Taxes. Certificate Holder will also be responsible for any penalties and interest on taxes for which it is responsible.

2.9.   <u>Payments</u>.   Subject to Section 2.10 below, Certificate Holder will pay amounts owing to Owner for charter of the aircraft during a month on the 10th business day of the month following the month in which the Certificate Holder has received payment.

2.10.   <u>Payments from Third Party Charter Customers</u>.   Certificate Holder will assume risk of non-collection of third party charter customers' invoices. In the event that the charter customer is in default, the Certificate Holder will pay to the Owner revenues due, thirty days after the default has occurred, or sixty days following the month during which the charter flights occurred, whichever is less. Certificate Holder has the sole responsibility to determine the payment for all third party charter customers in accordance with its credit policy. Certificate Holder will use reasonable efforts to give Owner timely cancellation notice of any scheduled charter flight.

Troy 275801_1

Form No. AACI 001 Rev. A – amended

EXECUTION COPY_
01/10/02

2.11.  FAR Part 135 Scheduling Commitment.  Certificate Holder must obtain
Owner's approval prior to scheduling any Charter Flights.  Owner shall
take into consideration Charter Flights that have previously been
approved when scheduling Owner's use of the Aircraft and shall use
reasonable commercial efforts to give Certificate Holder at least five (5)
days notice of any scheduling that would conflict with a scheduled Charter
Flight. Notwithstanding the foregoing, Owner shall have the·absolute right
to use the Aircraft at any time and shall have no liability for cancellation of
Charter Flights.

2.12  Countries of Operation.  The Aircraft will not be operated in any country in
which United States citizens are at such time, restricted from traveling by
applicable United States law, regulation or directive or which would violate
the terms of this Agreement, in any country excluded from coverage by
any insurance policy in effect with respect to such Aircraft, in areas that
are war zones or in Owner's determination areas of actual or threatened
hostilities or in areas which to a prudent operator of similar aircraft would
present an unreasonable risk of harm to such Aircraft or passengers.

2.13  Flight Safety.  Certificate Holder shall not undertake any flight which is not
in compliance with the terms and conditions of the insurance referred to in
Section 4.2 or which may otherwise result in the termination or
cancellation of such insurance, or which Certificate Holder or the flight
crew personnel in their sole discretion consider dangerous by reason of
weather conditions, war, hostilities, warlike operations, civil war, civil
commotions, revolution, inappropriate landing facilities or any other
significant risk to life, health or property.  In the event that the flight crew
becomes aware of any dangerous conditions during the course of a flight,
the crew may proceed to any reasonable destination which they consider
to be safe or advisable under the circumstances. Whenever in his or her
sole discretion the pilot-in-command determines that safety of flight may
be compromised, the pilot-in-command may terminate a flight, refuse to
commence a flight, or take any other action required for safety without
liability for loss, injury, damage, or delay.

2.14  Audit.  Certificate Holder will make available for inspection and copying by
Owner and Owner's representative all Aircraft records, payment records
and expense records concerning the flight operations of the Aircraft and
other services provided under this Agreement and all other records related
to the Aircraft or the services hereunder which are required to be kept by
Certificate Holder under this Agreement or under applicable laws or
FAR's.  All such records shall be made available by Certificate Holder
upon five (5) day's notice during regular business hours and at such other
reasonable times requested by Owner throughout the Term and for the
period ending two (2) years after the termination thereof.  Certificate
Holder agrees not to destroy or dispose of such records prior to the time

7

Form No. AACI 001 Rev. A – amended

EXECUTION COPY
01/10/02

when Owner's right to inspect and audit terminates. Certificate Holder further agrees that if it desires to destroy or dispose of such records prior to the expiration of the seven (7) year period following the date to which such records pertain, Certificate Holder will provide the Owner with notice and a reasonable opportunity to retain such records.

2.15   Recordkeeping.  Certificate Holder shall maintain on behalf of Owner all flight, passenger and payment records in a neat and current condition in accordance with applicable legal requirements and accepted accounting practices.

2.16   Trip Data.  Certificate Holder will file all required flight plans and will maintain an accurate record of each trip flown consisting of route flown, time enroute, fuel consumed, miscellaneous expenses, and names of flight crew, in accord with FAR requirements for log book entries.

## Section 3.
## Maintenance of the Aircraft

3.1.   Governing Maintenance Regulations.  Owner and Certificate Holder agree that regardless of the type of operation conducted with the Aircraft, it shall be maintained under the requirements of Title 14 CFR Part 135, Subpart J at all times. Certificate Holder will at all times be responsible and shall have the Aircraft maintained and inspected under the requirements of FAR Part 135, Subpart J.

3.2.   Maintenance Provider.  Certificate Holder shall enter into an agreement with a qualified Title 14 CFR Part 145 certified repair station ("Maintenance Provider") to perform maintenance, preventative maintenance, and alteration of the aircraft.

   3.2.1. The initial Maintenance Provider is named and described in Exhibit B attached hereto and Certificate Holder hereby accepts and acknowledges the qualifications of Maintenance Provider; provided, however, that Owner shall have the right to change the Maintenance Provider upon sixty (60) days notice to Certificate Holder as long as such replacement Maintenance Provider meets the requirements set forth in Section 3.2.2. below.

   3.2.2 In the event that Owner shall seek to appoint a replacement Maintenance Provider, such replacement Maintenance Provider shall be subject to the prior written approval of the Certificate Holder and the Certificate Holder shall have the right to require an independent safety audit of the replacement Maintenance Provider to be conducted by a person selected by the Certificate Holder at the sole expense of Owner.

8

Form No. AACI 001 Rev. A – amended

EXECUTION COPY_
01/10/02

3.2.3. In the event the agreement between Certificate Holder and the initial Maintenance Provider or any subsequent Maintenance Provider is canceled or suspended, the Aircraft shall be ineligible for use under the terms of this Agreement for such period of time as Owner shall not have an agreement with a Maintenance Provider meeting the requirements of Section 3.2.2. above.

3.2.4. Owner shall make available to Certificate Holder any agreement entered in to with the Maintenance Provider.

### Section 4.
### General Provisions

4.1.   Ownership and Registration of the Aircraft.  Owner represents and warrants that Lessor holds legal title to and is the registered owner of the Aircraft and that Owner is the lessee of the Aircraft and has lawful possession thereof.  The parties acknowledge that the Aircraft is, and will remain at all times the sole and exclusive property of Lessor, unless notified otherwise by Owner in writing, and that Certificate Holder has no rights therein except as expressly provided in this Agreement.

4.2.   Owner's Insurance.  Owner shall obtain and maintain, or cause to be maintained, the following types of insurance coverage, with minimum limits as set forth below:

4.2.1. Commercial General Liability covering liability arising from premises, operations, independent contractors, personal and advertising injury, and blanket contractual liability - $5,000,000 each occurrence.

4.2.2. Business Automobile Liability covering all owned, hired, and non-owned vehicles - $5,000,000 each occurrence, including all statutory coverage for all states of operation.

4.2.3 Aircraft Liability insurance covering liability for bodily injury (including passengers) and property damage arising out of the ownership, maintenance or use of the Aircraft and liability under contractual agreements - per occurrence limit equal to $10,000,000 per passenger seat or $100,000,000 each occurrence, whichever is greater.  The policy must be modified to provide the following additional coverage extensions:

(a)    The "use" provision of the policy must be amended to include carriage of passengers and cargo for hire.

9

Form No. AAC1 001 Rev. A – amended

EXECUTION COPY_
01/10/02

(b)    The "pilot warranty" provision of the policy must be on an "open" basis covering any pilot meeting the requirements of this Agreement.

(c)    Medical payments coverage for all reasonable expense of medical, surgical, ambulance, hospital, nursing, and related services and, in the event of death, reasonable funeral expense on behalf of passengers (including pilot and other crewmembers) injured while riding in the Aircraft - $25,000 per passenger.

(d)    Passenger voluntary settlement coverage for the benefit of each passenger (including pilot and other crewmembers) who sustains bodily injury caused by an accident arising out of the ownership, maintenance or use of the Aircraft - $250,000 per passenger.

(e)    Personal effects (baggage) liability insurance covering loss of passengers' baggage or personal effects - $25,000 per passenger.

4.2.4.  Aircraft Physical Damage (Hull) insurance covering the full replacement cost value of the Aircraft for "all risk" perils. Such insurance shall contain a waiver of subrogation against the Certificate Holder, its contractors (including pilot and other crewmembers) and Charter Flight customers and passengers.

All policies of insurance procured by Owner herein shall be written as primary policies, not contributing with nor in excess of coverage that the Certificate Holder may carry. If the Owner's liability policies do not contain the standard separation of insureds provision, or a substantially similar clause, they shall be endorsed to provide cross-liability coverage.

Owner shall provide the Certificate Holder with a certificate of insurance evidencing compliance with the insurance requirements set forth above. Certificate(s) will provide that the Certificate Holder, its contractors (including pilot and other crewmembers) and Charter Flight customers and passengers shall be named an additional insured on all liability policies. The certificate(s) shall provide that the Company will receive thirty (30) days' prior written notice from the insurer of any termination or material reduction in the amount or scope of coverage.

Such certificates shall be in a form acceptable to, and underwritten by insurance company(ies) reasonably satisfactory to, the Certificate Holder. By requiring insurance herein, the Certificate Holder does not represent that coverage and limits will necessarily be adequate to protect the Owner. The purchase of appropriate insurance coverage by the Owner or the furnishing of certificate(s) of

10

Form No. AACI 001 Rev. A – amended

EXECUTION COPY
01/10/02

insurance shall not release the Owner from its respective obligations or liabilities under this Agreement.

4.3.    Indemnification.

    4.3.1. Owner will indemnify, defend, and hold Certificate Holder, its parents, subsidiaries, affiliated companies, officers, directors, shareholders, agents and employees, harmless from all liabilities, damages, penalties, actions, suits, costs and claims, including reasonable attorney's fees, of whatever kind and nature, imposed or incurred by or asserted against Certificate Holder because of the ownership of the Aircraft, a condition affecting the Aircraft existing at the commencement of this Agreement or misconduct or negligence of the Owner relating to the Aircraft.

    4.3.2. Certificate Holder will defend, indemnify and hold the Owner and the Lessor, including such party's parents, subsidiaries, affiliated companies, officers, directors, shareholders, agents and employees of each of them harmless from all liabilities, damages, penalties, actions, suits, costs and claims, including reasonable attorney's fees, of whatever kind and nature, resulting during any period when Certificate Holder has Operational Control of the Aircraft, or from the misconduct or negligence on the part of Certificate Holder in the performance of any obligation required under this Agreement.

4.4.    Term and Termination.

    4.4.1   Term of Agreement.  The term of this Agreement will commence on the effective date provided above and will continue until April 30, 2002, unless earlier terminated pursuant to the provisions of this Section 4.4.  Beginning May 1, 2002, this Agreement may be renewed from year to year thereafter upon the written agreement of Owner and Certificate Holder.  Either party may terminate this Agreement upon sixty (60) days written notice to the other party. Either party may terminate this Agreement immediately upon the termination of the Aircraft Lease dated March 30, 2001, between Fleet National Bank and Owner (the "Lease") or such other event causing Owner to lose operational control of the Aircraft; provided that in either event, Owner shall provide Certificate Holder with as much prior notice as is reasonably practical under the circumstances.

    4.4.2   This Agreement may be terminated by Owner:

        (a)    Upon breach or default by Certificate Holder of any of the conditions of this Agreement and the failure of Certificate

11

Form No. AACI 001 Rev. A – amended
EXECUTION COPY_
01/10/02

Holder to cure or remedy such breach or default within thirty (30) days after receipt of notice thereof from Owner unless an earlier time is provided for herein;

(b)    Immediately upon Certificate Holder's use of the Aircraft for illegal activities;

(c)    Upon the occurrence of any of the following events:

   (i)    a proceeding under bankruptcy, reorganization, arrangement of debts, insolvency or receivership law or assignment for the benefit of creditors filed by Certificate Holder or such a proceeding filed against Certificate Holder if not dismissed within 60 days;

   (ii)    if Certificate Holder voluntary or involuntary dissolves or is dissolved as a corporate entity;

(d)    Upon operation of the Aircraft where Certificate Holder has knowledge that there is a lapse of insurance coverage as required by this Agreement.

4.4.3    This Agreement may be terminated by Certificate Holder:

(a)    Immediately upon Owner's use of the Aircraft for illegal activities;

(b)    Upon breach or default of Owner of any condition of this Agreement and the failure of the Owner to cure or remedy such breach or default within 30 days after receiving notice from Certificate Holder;

(c)    Upon the occurrence of any of the following events:

   (i)    a proceeding under bankruptcy, reorganization, arrangement of debts, insolvency or receivership law or assignment for the benefit of creditors filed by Owner or such a proceeding filed against Owner if not dismissed within 60 days; or

   (ii)    if Owner voluntary or involuntary dissolves or is dissolved as a corporate entity; or

(d)    Upon a lapse of insurance coverage as required by this Agreement.

12

Form No. AACI 001 Rev. A – amended

4.5.    Further Acts. The parties will, from time to time, perform such other and
further acts, and execute and deliver such other and further instruments
as may be required by law or reasonably requested by the other to carry
out and effect the intents and purposes of this Agreement.

4.6.    Notices. All notices, demands, or other communications to be delivered or
given hereunder will be in writing and will be deemed to be duly given if
delivered personally or sent by facsimile transfer or overnight courier as
follows:

To:  Certificate Holder:    Automotive Air Charter, Inc.
7310 Highland Road
Waterford, Michigan 48327
Attn: Mr. Thomas D. Seeber
Ph.:   248-666-8200
Fax:   248-666-8270

To: Owner:    SM 5105 LLC
5725 Delphi Drive, MC 483.400.216
Troy, MI  48098
Attn:   Corp. Aviation Manager
Ph:    (248) 813-2564
Fax:   (248) 813-2610

or at such other addresses as may have been furnished by either party to
the other in writing in accordance herewith.  All notices will be deemed
received on the date of delivery.

4.7.    Binding Effect. This Agreement and all of the provisions hereof will be
binding upon and will inure to the benefit of the parties hereto and their
respective heirs, distributees, legal representatives and successors.

4.8.    Amendment. This Agreement may be modified, altered and amended
from time to time by the mutual written agreement of the parties.

4.9.    Applicable Law. This Agreement will in all respects be governed by the
laws of the State of Michigan without regard to its conflicts of laws
principles.

4.10.  Entire Agreement. This Agreement and the attachments hereto
supersede all prior agreements, understandings, and negotiations, written
or oral, between the parties with respect to the subject matter hereof, and
cannot be amended or modified except by a writing signed by the parties
hereto and, except for renewals that don't extend beyond the term of the
Lease, prior written consent of the Lessor. This Agreement is subject and

13

Form No. AACI 001 Rev. A – amended

EXECUTION COPY_
01/10/02

subordinate to the rights of the Lessor under the Aircraft Lease between Owner and Lessor dated March 30, 2001 (the "Lease") in and to the Aircraft. Lessor, Certificate Holder and Owner shall execute a consent and acknowledgement of this Agreement in mutually acceptable form, along with such other instruments (including, without limitation, FAA recording documents and UCC financing statements) as Owner may reasonably require for Lessor. Certificate Holder shall take all reasonable actions requested by Owner to allow Owner to conform to the terms of the Lease.

4.11.  Severability.  In case any one or more of the provisions contained in this Agreement are for any reason held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect any other provision thereof.

4.12.  Headings.  The headings of the Sections and Paragraphs contained in this Agreement are inserted for convenience only and will not constitute a part hereof.

4.13.  Survival.  The provisions of Section 2.14 Audit and Section 4.3, Indemnification, will survive the termination of this Agreement.

4.14.  Assignability.  Neither party may assign this Agreement without the prior written consent of the other party, which consent shall not be unreasonably withheld, delayed or conditioned.  Notwithstanding the foregoing, this Agreement may be assigned by either party, upon prior notice, to any entity to which such party may transfer all or substantially all, of its assets and business pursuant to a merger, acquisition or other such reorganization or to an affiliate of such party and any rights and obligations hereunder may be assigned by Owner, upon prior notice, to any affiliate of Owner or to Lessor.  Without limiting the generality of the foregoing, this Agreement and all of the provisions hereof will be binding upon and will inure to the benefit of the parties hereto and their respective successors and assigns.

4.15.  Waiver.  No waiver of any breach of any provision of this Agreement will constitute a waiver of any prior, concurrent or subsequent breach of any provision of this Agreement.

4.16.  Independent Contractor.  Certificate Holder is, and will be at all times during the term of this Agreement, an independent contractor.  All personnel supplied by Certificate Holder will be employees of Certificate Holder.  Certificate Holder will have no authority to bind or obligate Owner by contract or otherwise except as provided for in this Agreement.

4.17.  Delegation of Duties.  Either party may delegate its duties hereunder to a qualified agent, provided that each of the parties will remain responsible for the performance of its duties hereunder.

14

Form No. AACI 001 Rev. A – amended

EXECUTION COPY_
01/10/02

4.18    <u>Compliance with Law</u>. Certificate Holder shall not undertake any flight which could expose any of Owner, Certificate Holder, or the flight crew to any penalty, fine, sanction, or other liability, whether civil or criminal, under any applicable law, rule, treaty, or convention. In no event will Certificate Holder or Owner undertake any act which does not comply in all material respects with all applicable laws.

4.19    <u>Counterparts and Fax Signatures</u>. This Agreement may be executed in one or more counterparts each of which shall be deemed an original, all of which together shall constitute one and the same agreement. Facsimile signatures shall be binding upon the parties hereto with the same force and effect as original signatures.

**[SIGNATURES ON THE NEXT PAGE]**

Troy 275801_1

Form No. AACI 001 Rev. A – amended

EXECUTION COPY_
01/10/02

IN WITNESS WHEREOF, the parties have caused this Agreement to be
executed by their duly authorized representatives as of the 10th day of January, 2002.

**SM 5105 LLC**

By: _Mark C. Troy_

Name: _MARK C. LORENZ_

Title: _VICE PRESIDENT -OPERATIONS_

**AUTOMOTIVE AIR CHARTER, INC.**

By: _Stephen Taylor_

Name: _STEPHEN TAYLOR_

Title: _VP- CHARTER SERVICES_

16

Troy 275801_1

Form No. AACI 001 Rev. A – amended                                    EXECUTION COPY_
01/10/02

EXHIBIT A


# Agreement For FAR 135 Operation
## between
## Automotive Air Charter, Inc.
## and
## SM 5105 LLC


## Aircraft Description

### Bombardier Inc. CL-600-2B16, Serial Number 5498, Registration Number N599DA


## Operational Rates and Fees

| | |
|---|---|
| Charter Rate: | $5,000 per flight hour (subject to Section 2.6, except such hours for charter customers referred by Owner to Certificate Holder for which Owner shall specify a preferred rate), with a two hour daily minimum. The two-hour daily minimum may be waived, with Owner's prior approval, for charter flights for Manager, or customers designated by Owner. |
| Division of Revenue: | Revenue generated from flight hours for charter operations will be divided between Owner receiving eighty-five percent (85%) and Certificate Holder receiving fifteen percent (15%), subject to Sections 2.6 and 2.7. |
| Crew and Operational Expenses: | To be collected by Certificate Holder and paid to Owner for each Charter Flight. Domestic and international overnight rates in addition to operational expenses will be determined as quoted by the Charter Sales Representative, for the specified Charter Flight. |

Form No. AACI 001 Rev. A – amended

EXECUTION COPY
01/10/02

EXHIBIT B

**Agreement For FAR 135 Operation
Between
Automotive Air Charter, Inc.
and
SM 5105 LLC**

MAINTENANCE PROVIDER DESCRIPTION

Maintenance Provider to Owner

NAME:         Pentastar Aviation, LLC
              FAA Approved Repair Station BTVR626C

ADDRESS:      7002 Highland Road
              Waterford, MI  48327