**Hearing Date: November 29, 2005**
**Hearing Time:  10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
          In re                               :        Chapter 11
                                              :
DELPHI CORPORATION, et al.,                   :        Case No. 05-44481 (RDD)
                                              :
                            Debtors.          :        (Jointly Administered)
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEBTORS' OMNIBUS RESPONSE TO OBJECTIONS TO
MOTION FOR AN ORDER UNDER 11 U.S.C. §§ 363(b) AND
365(a) AND FED. R. BANKR. P. 9019 APPROVING
PROCEDURES TO ASSUME CERTAIN AMENDED AND
RESTATED SOLE SOURCE SUPPLIER AGREEMENTS

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the

"Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively,

the "Debtors"), hereby submit this omnibus response (the "Response") to the objections

(collectively, the "Objections") to the Motion for an Order Under 11 U.S.C. §§ 363(b) and 365(a)

and Fed. R. Bankr. P. 9019 Approving Procedures to Assume Certain Amended and Restated

Sole Source Supplier Agreements, dated November 18, 2005 (the "Motion").  In support of this

Response, the Debtors respectfully represent as follows:[1]

Preliminary Statement

1.      The Debtors filed the Motion on November 18 to address the impending

threat to the continuity of the Debtors' supply chain posed by thousands of contracts that will

expire during the restructuring process, a great number of which are due to expire on or around

December 31, 2005.  Without a method in place to address the expiration of certain of these

agreements -- specifically, those agreements (the "Assumable Agreements") pursuant to which

the Debtors receive goods that the Debtors believe are critical to their on-going manufacturing

operations (collectively, the "Goods"), with those of the Debtors' suppliers which are the sole

source from which the Debtors can currently obtain sufficient quantities of the Goods to avoid

interruptions of the Debtors' manufacturing operations (the "Covered Suppliers") -- the Debtors'

manufacturing process, and the automotive industry as a whole, could face imminent shutdown.

---

[1]      Capitalized terms used but not defined herein have the meanings ascribed to them in the
         Motion.

See Declaration of R. David Nelson in Support of Motion for an Order Under 11 U.S.C. §§

363(b) and 365(a) and Fed. R. Bankr. P. 9019 Approving Procedures to Assume Certain

Amended and Restated Sole Source Supplier Agreements, dated November 26, 2005 (the

"Nelson Declaration") at ¶7.

2.    As of November 28, 2005 at 9:00 a.m. (Eastern Standard Time), the

Debtors had received 46 timely-filed objections and joinders (collectively, the "Objections") to

the Motion.[2]  Of such objections, 44 were filed by suppliers to the Debtors (collectively, the

"Supplier Objections").  The remaining two Objections were filed by the Official Committee of

Unsecured Creditors (the "Creditors' Committee") and Wilmington Trust Company ("WTC"), a

member of the Creditors' Committee and the indenture trustee with respect to certain senior notes

and debentures issued by Delphi.  For the Court's convenience, a chart summarizing the

Objections by objector is attached hereto as Exhibit A and a chart summarizing the Objections

by grounds for objection is attached hereto as Exhibit B.

3.    Notably, many of the Debtors' significant constituencies have expressed,

publicly or privately, their support for the Motion.  Specifically, the Debtors' two largest labor

unions, the International Union, United Automobile, Aerospace and Agricultural Implement

Workers of America (the "UAW") and the International Union of Electronic, Electrical, Salaried,

Machine and Furniture Workers-Communications Workers of America (the "IUE-CWA"), and

the administrative agent for the Debtors' postpetition lenders, JPMorgan Chase Bank, N.A.

("JPMC"), each filed a statement in support of the relief requested by the Motion.  In addition,

---

[2]    In addition, the joint objection of Hydro Aluminum Adrian, Inc. and Hydro Aluminum
       Rockledge, Inc. was entered on the docket twice, at Docket Nos. 1208 and 1211.

counsel for the administrative agent for the Debtors' prepetition lenders and counsel for General

Motors Corporation will appear at the November 29th omnibus hearing in support of the Motion.

4. Attached as <u>Exhibit C</u> is a proposed revised Order (the "Revised Order")

granting the relief sought by the Debtors in the Motion as modified by those acknowledgments,

limitations, and modifications to which the Debtors believe they can and should agree in the

exercise of their reasonable business judgment and fiduciary responsibilities as debtors-in-

possession in these cases.  In the Debtors' view, the Revised Order addresses and reasonably

disposes of all of the cognizable objections filed in opposition to the Motion.  The principal

acknowledgments, limitations and modifications include:

> -- For the avoidance of doubt, supply agreements that are not related to the
> continuation of the supply chain at the Debtors' automotive manufacturing
> facilities (except with respect to agreements related to the Debtors' obligations to
> provide manufactured goods on account of direct and indirect government
> contracts) are excluded from the scope of the Order.  (Paragraph 1)

> -- The Creditors' Committee is authorized to monitor the Debtors' conduct and
> performance with respect to this Order by providing continuing access during
> regular business hours to the global supply management group at the Company's
> worldwide headquarters by a designated representative of Mesirow.  (Paragraph 1)

> -- The Prepetition Agent is afforded the same right of review as the Creditors
> Committee.  In addition, the definition of Non-Conforming Assumption has been
> expanded to include any Assumable Agreement or Agreements which include a
> waiver under section 547 of the Bankruptcy Code pursuant to paragraph 12 of the
> Order with respect to any later-expiring Assumable Contracts that are not part of
> the proposed Assumption as well as any Assumable Agreement that is classified
> by the Debtors as an indirect supply agreement.  These additional categories of
> Agreements will now be subject the specific review and objection of the
> Committee and the Prepetition Agent.  (Paragraph 6)

> -- The Required Minimum Provisions of an Assumable Agreement has been
> further limited to require that Covered Suppliers grant the most favorable trade
> terms, practices and programs in effect between such supplier and the Debtors in
> the twelve months prior to the Petition Date consistent with and subject to current
> market conditions as of the Assumption Date.  The Cure costs payment schedule
> has been refined so that the first installment is paid as soon as reasonably
> practicable following the Assumption Date of an Assumable Agreement and the

remaining five installments are paid at the end of the five calendar quarters beginning with the first calendar quarter following the calendar quarter in which the Assumption Date occurs.  (Paragraph 8)

-- A Covered Supplier will be conclusively deemed to consent to an be irrevocably bound by the terms of the Order <u>only</u> in the event that the Covered Supplier actually executes and delivers to the Debtors an Assumption Agreement or similar document.  (Paragraph 10)

-- The Committee (as well as the Prepetition Agent) are granted a reservation of rights to file a supplemental objection as to the prospective application of the Order on or after March 1, 2006 or at any other time prior to March 1, 2006 should the aggregate amount of Cure contractually committed to be paid by the Debtors pursuant to paragraph 8f of the Order exceed $150,000,000 exclusive of Cure amounts associated with Non-Conforming Assumptions (which Cure amounts are already subject to the review and objection process in paragraph 6 of the Order).  (Paragraph 14)

-- To the extent that the Court subsequently authorizes the Debtors to implement a Key Executive Compensation Program ("KECP") which includes any component that would exclude restructuring expenses from the calculation of incentive payments under such program, the Revised Order requires that the Debtors not classify any expenses under generally accepted accounting principles incurred by the Debtors as a result of the assumption of an Assumable Agreement under the Revised Order as restructuring expenses under a KECP.  (Paragraph 15)

5.     The primary objection to the Motion raised in the Supplier Objections is the concern of certain suppliers that they could become bound to the Required Minimum Provisions without their prior written consent.  As described above, the Debtors have modified the Revised Order to require suppliers to sign an Assumption Agreement to be bound by, and receive benefits under, the Procedures and, with that modification, the Debtors believe that most, if not all, of the Supplier Objections should be resolved.

6.     The Objections of the Creditors' Committee and WTC center around their assertions that the relief requested by the Motion is too expensive, provides creditors with little oversight, and is not supported by evidence.  With respect to the potential cost of the program, the Debtors first note that implementation of the relief requested in the Motion may generate

positive cash flow for the Debtors and other significant economic benefits which could substantially offset the cost of curing prepetition defaults under the Assumable Agreements which are actually assumed.  See Declaration of Randall S. Eisenberg in Support of Motion for an Order Under 11 U.S.C. §§ 363(b) and 365(a) and Fed. R. Bankr. P. 9019 Approving Procedures to Assume Certain Amended and Restated Sole Source Supplier Agreements, dated November 26, 2005 (the "Eisenberg Declaration"), at ¶17.  More importantly, any cost that may result from such program is far outweighed by the dire consequences if the program proposed by the Motion is not implemented, which would likely include the interruption of the Debtors' supply chain and then likely lead to the idling of their manufacturing facilities, the loss of revenue from such production halts, the assertion of tens of millions of dollars in damage claims by the Debtors' customers, and the loss of future business from such customers because of a loss of goodwill and confidence in the Debtors' prospects for a successful restructuring.[3]

   7. With respect to the remaining concerns expressed by the Creditors' Committee and WTC, following the filing of the Motion, the Debtors have provided extensive discovery to each such objector.  Specifically, following conferences between counsel for the

---

[3] The Debtors have further limited the scope of the relief requested under the Motion to exclude any agreements that are not related to the continuation of the supply chain at the Debtors' automotive manufacturing facilities (except with respect to agreements related to the Debtors' obligations to provide manufactured goods on account of direct and indirect government contracts).  Additionally, the Debtors have modified the Revised Order so that all (a) proposed assumptions including a grant of a Preference Waiver with respect to any later-expiring Assumable Agreements that are not part of the proposed assumption or (b) proposed assumptions of Assumable Agreements classified by the Debtors as indirect supply agreements will constitute Non-Conforming Assumptions and will be subject to scrutiny by the Creditors' Committee and Prepetition Agent or this Court on a contract-by-contract basis.

Debtors and the Creditors' Committee and WTC, respectively,[4] beginning on Wednesday, November 23, 2005 and continuing on Friday, November 25, 2005, the Debtors provided copies of all reasonably-available documents supporting the relief requested in the Motion to counsel to the Creditors' Committee and WTC.  In addition, on Saturday, November 26, 2005, counsel to the Creditors' Committee and WTC were each provided with the Eisenberg Declaration, the Nelson Declaration, and the Declaration of John D. Sheehan in Support of Motion for an Order Under 11 U.S.C. §§ 363(b) and 365(a) and Fed. R. Bankr. P. 9019 Approving Procedures to Assume Certain Amended and Restated Sole Source Supplier Agreements (the "Sheehan Declaration").  Finally, on Monday, November 28, 2005, the Debtors made each of the declarants available to be deposed by counsel to the Creditors' Committee and WTC. Accordingly, the Debtors believe that the Creditors' Committee and WTC have each been provided with more than adequate factual support for the relief requested and to demonstrate the sound exercise of the Debtors' business judgment.  Therefore, in light of the exigent circumstances underlying the Motion and the revisions made unilaterally by the Debtors in the Revised Order, the Debtors assert that the Objections of the Creditors' Committee and WTC are without merit and should be overruled.

---

[4]     At a "meet and confer" conference with counsel for WTC, WTC and the Debtors agreed on the scope and parameters of the Debtors proposed production of documents and witnesses.  The Debtors believe that they have fulfilled their discovery obligations in this regard.  Unfortunately, the Creditors' Committee refused to limit the scope and parameters of its discovery requests and, accordingly, the Debtors and the Creditors' Committee were unable to reach an agreement on the proposed discovery.  Nonetheless, the Debtors produced the same documents and made available the same witnesses to the Creditors' Committee as they did to WTC.  On the other hand, the Creditors' Committee provided limited document responses to the Debtors' discovery requests served on the Committee following the filing of the Committee's objection and provided only one of the three deponents requested by the Debtors for deposition testimony.

<u>Argument</u>

A.    <u>The Supplier Objections</u>

8.    Those of the Debtors suppliers that have objected to the Motion have objected primarily on either or both of the following two bases: (a) certain provisions of paragraph 10 of the proposed order attached to the Motion (the "November 18 Order") could be construed as binding a supplier to the Required Minimum Provisions without its express consent; and (b) the supplier requests that notice of any proposed assumption in accordance with the Procedures be directed to specific individuals.  Notably, the Debtors' suppliers have not objected to this Court's approval of the Motion, so long as any assumptions in accordance with the Procedures are consensual (as was always the underlying premise of the Motion).

9.    With respect to the first base for many of the Supplier Objections, the Revised Order provides that a supplier will only be bound to the terms of, and receive benefits under, an Assumption Agreement upon execution thereof, and not through performance.[5]  To avoid any confusion and to resolve the Supplier Objections to paragraph 10 of the November 18 Order, the Debtors propose that the order entered by this Court approving the Motion be revised to read as follows:

> The Debtors are hereby authorized, but not directed, to provide an Assumption Agreement substantially in the form of the letter attached hereto as <u>Exhibit 1</u> to each Covered Supplier whose Assumable Agreement(s) are being assumed pursuant to the terms hereof along with a copy of the order granting this Motion; <u>provided</u>, <u>however</u>, that a Covered Supplier will be conclusively deemed to consent to and be irrevocably bound by the terms of this Order only in event that

---

[5]    Consistent with historical practice, the Debtors and their suppliers routinely enter into agreements by performance as allowed under the Uniform Commercial Code.  To avoid any misunderstanding, however, the Debtors will require execution of Assumption Agreements before a supplier will become subject to the provisions of the Order.

8

the Covered Supplier actually executes and delivers to the Debtors an Assumption Agreement or similar document.

10.    The Debtors believe that this revision eliminates any possibility that a Covered Supplier's continued performance under an Assumable Agreement, alone, could cause inadvertent acceptance of the Required Minimum Provisions -- notwithstanding that acceptance through performance is customary in the automotive industry and in the context of the Debtors' global supply management arrangements with the Debtors' suppliers  Instead, the Debtors would only be authorized to assume an Assumable Agreement upon the relevant Covered Supplier's entry into an Assumption Agreement containing the Required Minimum Provisions or, to the extent that the Debtors and the relevant Covered Supplier agree to terms containing less than all of the Required Minimum Provisions, with the review and absence of objection by the Creditors' Committee and the administrative agent under the Debtors' prepetition credit facility (the "Prepetition Agent") or, if the Creditors' Committee or the Prepetition Agent does object, this Court.

11.    The second main objection raised in the Supplier Objections is that certain suppliers request that a copy of a proposed Assumption Agreement be provided to such supplier's counsel prior to execution thereof.  The Debtors believe that this concern is, for most objecting suppliers, tied to their concern that such supplier could be deemed to consent to the Required Minimum Provisions.  Therefore, the Debtors believe that the proposed change to paragraph 10 of the Revised Order should resolve these concerns and the issue of whether and how an individual supplier involves outside counsel in its principal-to-principal communications should be decided by each supplier and not by the Court.  Thus, the Debtors respectfully request that, to the extent any Supplier Objection seeks to require the Debtors to provide notice of a

proposed Assumption Agreement to anyone not normally responsible for a Covered Supplier's Assumable Agreements with the Debtors, such Objection be overruled.

12.    Several of the Supplier Objections raise minor additional issues.  Several Supplier Objections request clarification as to whether any agreements between the Debtors and such supplier may qualify for assumption under the Procedures.  The Debtors believe that this request for clarification is likely related to such suppliers' concerns that they could be bound without their prior written consent, which the Debtors have addressed as described above.  Therefore, all such suppliers will be given notice of the Debtors' proposed assumption when the Debtors elect to assume the Assumable Agreement and seek entry into an Assumption Agreement.

13.    Certain suppliers have expressed concern that the Debtors intend by the Procedures to limit the waiver of avoidance actions that is inherent in the assumption of an executory contract.  The Debtors propose to add the following language to paragraph 12 of the Revised Order to resolve this issue: "Upon the occurrence of the Assumption Date as to a particular Assumable Agreement, the rights of the Debtors and their respective estates shall be waived under chapter 5 of the Bankruptcy Code to avoid payments made to a Covered Supplier with respect to the Assumable Agreement actually assumed on the Assumption Date."

14.    Certain suppliers have objected to the Motion to the extent that certain language contained in footnote 5 thereof could be deemed to restrict a Covered Supplier's right to file a motion to compel the Debtors to assume or reject an executory contract by a date certain.  As provided in paragraph 5 of the November 18 Order, a Covered Supplier's right to seek to compel assumption is limited solely with respect to Previously-Extended Agreements and solely with respect to a Covered Supplier's right to seek to compel the Debtors to assume such an

Agreement under the Procedures if the Supplier has not complied with the proposed terms of paragraphs 4 and 5 of the November 18 Order.

15.    Finally, a supplier has objected on the basis that the Procedures would not allow a supplier to object to the assumption of the Assumable Agreements of other Covered Suppliers in accordance with the Procedures.  Such concerns will be addressed by the ability of the Creditors' Committee to object to any Non-Conforming Assumption, the definition of which will be expanded to provide that all (a) proposed assumptions including a grant of a Preference Waiver with respect to any later-expiring Assumable Agreements that are not part of the proposed assumption or (b) proposed assumptions of Assumable Agreements classified by the Debtors as indirect supply agreements will constitute Non-Conforming Assumptions.  To require the Debtors to provide notice and an opportunity to object to the individual proposed assumptions under the Procedures to every other supplier would be administratively impossible in the required time frame.  Moreover, suppliers could inappropriately use this process to gain undue negotiating leverage over the Debtors by enabling such suppliers to compare their potential Assumption Agreements to those previously entered into by the Debtors.  As described below in responding to the Objections of the Creditors' Committee and WTC, the Debtors assert that they have made ample showings of the valid exercise of their business judgment and request that this objection be overruled.

B.    The Creditors' Committee And WTC Objections

16.    Apart from the Supplier Objections, only two parties have objected to the Motion -- the Creditors' Committee and WTC.  Because these Objections raise similar grounds, the Debtors will respond to such Objections together.  The Creditors' Committee expressly recognizes the "critical nature of the Debtors' supply chain" (see Creditors' Committee Objection

at p. 2) but then asserts that the procedures outlined by the Debtors will be too expensive. WTC makes similar assertions. Neither the Creditors' Committee nor WTC, however, supports these assertions with any concrete factual support or offers any other viable alternative to address the critical issues facing the Debtors. Thus, the Debtors respectfully assert that the Objections of the Creditors' Committee and WTC are baseless and should be overruled.

17.    The Creditors' Committee and WTC each derides the Procedures as being a disguised "critical vendor" program, which they clearly are not. The Creditors' Committee's description of the Procedures is particularly surprising given that one of the alternative methods suggested by the Creditors' Committee's professionals for addressing the issue of expiring contracts was to seek expanded "critical vendor" authority under the Essential Supplier Order.[6] The Debtors declined to adopt this proposal because they did not believe that it would provide sufficient protection of the continuity of their supply chain on a go-forward basis nor offer the additional protections that the Procedures provide. In reality, for the convenience of a convenient legal argument, the objectors inappropriately seek to try to fit the "square peg" of Section 365 contract assumption into the "round hole" of First Day supplier orders.

18.    As described in the Motion, the Debtors are faced with a watershed event in these chapter 11 cases -- namely, the expiration of thousands of supply contracts by the end of December. In response to this event, the Debtors and their advisors explored numerous options and ultimately determined that the Procedures were the most efficient and cost-effective method of protecting their supply chain during the reorganization and, thereby, maintaining their going-

---

[6]    Order Under 11 U.S.C. §§ 105(a), 363, 364, 1107 and 1108 and Fed. R. Bankr. P. 6004 and 9019 Authorizing Continuation of Vendor Rescue Program and Payment of Prepetition Claims of Financially Distressed Sole Source Suppliers and Vendors Without Contracts (Docket No. 197).

concern value for the benefit of all constituencies.  See Eisenberg Decl. at ¶19; Nelson Decl. at ¶15; Sheehan Decl. at ¶7.  As described in the Motion, the Eisenberg Declaration, and the Nelson Declaration, the Debtors have determined that implementation of the relief requested in the Motion may even generate positive cash flow for the Debtors and other economic benefits which could substantially offset the cost of curing prepetition defaults under the Assumable Agreements which are actually assumed.  See Eisenberg Decl. at ¶17; Nelson Decl. at ¶13.  Implementation of the Procedures will provide the Debtors with a continuous supply of Goods on favorable pricing and payment terms.  The Procedures will also give the Debtors potent legal remedies to enforce the suppliers' obligations under such agreements.

19.     Nevertheless, the Creditors' Committee assails these benefits as being illusory and unsupported.  This assertion is without merit.  As is clearly laid out in the Motion, the Required Minimum Provisions require a return to customary trade terms, including MNS-2 payment terms and pricing terms.  Although the Creditors' Committee acknowledges the cash flow impact of a return to MNS-2 payment terms, it asserts that the benefit is merely one of timing and therefore inconsequential.  Contrary to its assertions, the Creditors' Committee greatly underestimates the benefit of the Required Minimum Provisions.  As noted in the Eisenberg Declaration, the Debtors will recognize a cumulative cash flow benefit that could approximate $800 million by the first quarter of 2007, leading to projected net interest savings of $35 million.  See Eisenberg Decl. at ¶17.  This benefit is much more significant than one of just timing.  Furthermore, the Debtors expect to achieve significantly better pricing under assumed Assumable Agreements than would be possible otherwise.  See Eisenberg Decl. at ¶¶13, 17; Nelson Decl. at ¶13.  In this way, the Procedures provide a multiple benefit to unsecured creditors -- more profitable operations with a smaller pool of unsecured claims.  Without the

Procedures, the Debtors would face a very real risk of significant operational disruption and a

higher cost structure as suppliers raise prices to recoup unpaid prepetition obligations. <u>Id</u>.

Because suppliers would attempt (as has been demonstrated by demands already made upon the

Debtors) to retain their prepetition claims in such instances, the Debtors could potentially pay

such suppliers' prepetition claims twice -- first, through higher pricing, and second, through

distributions under a plan of reorganization. <u>See</u> Eisenberg Decl. at ¶17.

   20. The Creditors' Committee and WTC further argue that the Debtors have

not provided sufficient evidentiary support for the relief sought under the Motion to the

Creditors' Committee or WTC to allow them to independently review the Debtors' exercise of

their reasonable business judgment. Over the past several days, however, the Debtors have

provided to the Creditors' Committee's and WTC's professionals hundreds of pages of

documentation, declarations in support of the Motion from John D. Sheehan, the Vice President

of Corporate Restructuring, Chief Accounting Officer and Controller for Delphi Corporation, R.

David Nelson, the Vice President of  Global Supply Management for Delphi Corporation, and

Randall S. Eisenberg, a Senior Managing Director at FTI Consulting, Inc., and made all three

declarants available to be deposed. To the extent that the Debtors have not responded to all of

the requests for production of documents propounded by the Creditors' Committee and WTC it is

because the requests were hopelessly overbroad. For example, each of the Creditors' Committee

and WTC requested all documents related to the Debtors' negotiations relating to each of the

over 11,000 expiring contracts. As stated in the Eisenberg Declaration, the Debtors employ

hundreds of buyers, directors, and commodity directors in managing the purchase and supply of

products through their Global Supply Management process. <u>See</u> Eisenberg Decl. at ¶18. To

expect the Debtors to produce the entire files of hundreds of employees, many of whom are not

14

even centrally located at the Debtors' headquarters, is unreasonable and unnecessary to the

Creditors' Committee's and WTC's reviewing the factual basis for the Motion.[7]

21.     Nevertheless, the Creditors' Committee and WTC each argue that the

Debtors are required to provide a supplier-by-supplier or contract-by-contract analysis to support

the relief requested in the Motion.  That assertion is both impractical and not in accordance with

the practice of this Court in large chapter 11 cases.  First, if this Court were to accept this

position, the Debtors would essentially be required to file thousands of individualized

assumption motions and receive Court approval of each such motion within the next month.

Quite clearly, such a process would be impossible and a gross waste of the Debtors' resources

which could more appropriately be directed to other matters.  More importantly, such a process

is completely unnecessary.  As described in the Nelson and Eisenberg Declarations, the damages

arising from an interruption of the Debtors' supply chain will be significant.  If an interruption of

the Debtors' supply chain disrupts the manufacturing operations of one of the Debtors' customers,

such customer is likely to assert claims for damages exceeding $10 million per plant per day.

See Eisenberg Decl. at ¶14; Nelson Decl. at ¶12.  Of the Debtors' approximately 2,000 suppliers

that are implicated in the contemplated December, 2005 assumptions alone, the Debtors have

fewer than ten suppliers holding prepetition trade claims in excess of $10 million.  A shut down

of one plant of one customer for only one day is likely to lead to asserted damages far in excess

of the potential cure payments (which would be paid at 75% or less of the prepetition trade claim

---

[7]     The Debtors believe that the Creditors' Committee recognizes this fact and that any
remaining objections of the Creditors' Committee as to the factual support provided relate
solely to the format in which such information was provided and not the substance.
Specifically, the Debtors have been unable to provide certain of the information
requested by the Creditors' Committee in the format requested.  Nevertheless, the
substantive information requested has been provided in the format accessible by the
Debtors.

over 18 months and only so long as the Debtors' estates benefited from the Assumed Agreement).

Furthermore, even the total maximum cure amount (approximately $30.6 million) for the

Debtors' largest prepetition trade claim (approximately $40.8 million) could quickly be dwarfed

by the potential asserted damages arising from a shutdown of a customer's manufacturing

facilities. This comparison ignores the further damages borne by the Debtors because of the

shutdown of the Debtors' manufacturing facilities in the form of lost revenues, while continuing

to incur significant costs. See Eisenberg Decl. at ¶14; Nelson Decl. at ¶12.

22.    Similarly, the damages would further include a particularly pernicious

additional cost of allowing a customer's operations to be interrupted -- the potential loss of future

programs from such customers, the lifeblood of any restructured business. As the Debtors have

previously noted to this Court, new business programs are sourced by the Debtors' OEM

customers well in advance of the beginning of production because of the extensive planning and

approval necessary. Many programs run for the life of a given platform, which is normally

several years at a minimum. Therefore, the Debtors' failure to meet their current commitments to

their customers (or any perceived risk of the Debtors not being able to do so) may harm the

Debtors' businesses for years to come in the form of lost business. See Eisenberg Decl. at ¶14.

This future business will be necessary to the viability of the Debtors' reorganization plan.

Putting the Debtors' supply chain and their relationships with their customers at risk at this early

stage of these chapter 11 cases is not in the best interests of any interested parties, including the

Debtors' unsecured creditors.

23.    As noted in the Motion and in the Eisenberg and Nelson Declarations, the

just-in-time and sole source nature of the Debtors' and the automotive industry's supply chains

make these justifications much more than "vague assertions about financial peril." This is the

16

reality of the Debtors' industries and this is a reality which must be addressed to ensure a

successful reorganization of the Debtors.  See Eisenberg Decl. at ¶8; Nelson Decl. at ¶¶9-12.

This is a reality of which all of the Debtors' suppliers are well aware, despite the Creditors'

Committee's assertion that the Debtors have somehow brought this situation to the attention of

unwitting suppliers by filing the Motion.  The Creditors' Committee's further attempts to

compare this situation to the situation with "Non-Conforming Suppliers" under the Essential

Suppliers Order similarly misses the mark.  Non-Conforming Suppliers are under a contractual

obligation to continue supplying goods and services to the Debtors and refuse to provide such

goods or services in violation of such obligation.  By contrast, as of January 1, 2006, many of the

Covered Suppliers will be under no obligation to continue doing business with the Debtors and

will be free to walk away if they so choose.  The Debtors would have no recourse against such

Covered Suppliers for electing to walk away, even if such decision caused a shutdown of the

Debtors' and their customers' operations.[8]

        24.     The Debtors have demonstrated, through the factual bases provided in the

Motion, the Eisenberg, Nelson and Sheehan Declarations and the additional documents produced

---

[8]     The Creditors' Committee and WTC also object to the Debtors' request for the authority
to assume the Previously Extended Agreements.  The Debtors assert that such provisions
are necessary to ensure that the Procedures are fair and equitable to the Debtors' Covered
Suppliers and, further, that the Debtors and their estates would receive significant
benefits from such assumptions.  Furthermore, absent application of the Procedures to the
Previously Extended Agreements, the Debtors will have to face these same suppliers
when the extended agreements are up for renewal and, in the case of suppliers with both
expiring and nonexpiring contracts, may even have to face them sooner to negotiate
contracts that expire in 2006.  If such suppliers believe that they have been treated
unfairly in this process, some will no doubt penalize the Debtors in future contract
negotiations through price increases or more onerous concessions.  Therefore, the
Debtors believe that all of the bases described herein are also applicable to the Previously
Extended Agreements and serve to justify the assumption thereof on the terms provided
in the Motion.

to the Creditors' Committee and WTC that this relief is necessary, beneficial and in the best

interests of the Debtors' estates on a macroeconomic level.  Given the great disparity between the

damages caused by a disruption of the Debtors' supply chain and the costs of assuming each

individual agreement (which will be spread over time), the virtual certainty that many Covered

Suppliers could shut down important parts of the Debtors' on-going operations, and the

significant financial benefits to the Debtors' estates from the terms of the Required Minimum

Provisions, it is facially evident that the assumption of any given Assumable Agreement in

accordance with the Procedures would constitute a valid exercise of the Debtors' business

judgment.  Although the objections attempt to characterize the Motion as seeking approval of a

blanket assumption, the Motion instead seeks this Court's approval of Procedures to allow the

Debtors to exercise their business judgment on a case-by-case basis in an efficient manner.

Indeed, the Revised Order now limits the Debtors to spending up to only $150,000,000 in Cure

costs related to the assumption of Assumable Contracts for which the Creditors' Committee and

Prepetition Agent do not have specific objection rights and the opportunity to bring either

individual contracts or the entire prospective authority under the Motion and Revised Order back

to this Court for further adjudication.  Where agreements are clearly necessary to the Debtors'

continuing operations and successful reorganization, courts in this District have routinely

allowed blanket assumptions of broad categories of executory contracts without undertaking a

contract-by-contract or vendor-by-vendor analysis -- in particular, pursuant to plans of

reorganization.  See, e.g., In re Enron Corp., Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. July 15,

2004) (as part of confirmation of supplemental modified fifth amended joint plan of

reorganization, approving assumption of approximately 1,500 executory contracts and unexpired

leases); In re WorldCom, Inc., Case No. 02-13533 (JAG) (Bankr. S.D.N.Y. Oct. 21, 2003)

(approving assumption of all executory contracts not specifically listed on schedule of contracts to be rejected as part of confirmation of the debtors' modified second amended joint plan of reorganization); In re The Warnaco Group, Inc., Case No. 01-41643 (RLB) (Bankr. S.D.N.Y. Jan. 16, 2003) (approving, as part of confirmation of the first amended joint plan of reorganization, assumption of hundreds of executory contracts); In re The Singer Company N.V., Case No. 99-10578 (BRL) (Bankr. S.D.N.Y. Aug. 24, 2000) (as part of the confirmation of first amended joint plan of reorganization, approving assumption of over 1,000 executory contracts and unexpired leases).  Furthermore, nothing contained in the Orion decision requires a different result.  Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095 (2d. Cir. 1993).  Therein, the court noted that an assumption proceeding is "summary" in nature and "intended to efficiently review the trustee's or debtor's decision . . . in the course of the swift administration of the bankruptcy estate."  Id at 1098.  Approval of the Procedures and assumption of the Assumable Agreements is clearly a valid exercise of the Debtors' business judgment and necessary for the swift administration of these estates for all f the reasons provided in the Motion, in the Eisenberg, Nelson, and Sheehan Declarations, and herein.  The Orion decision does not require this Court to undertake an individualized analysis of each particular Assumable Agreement, particularly given the evidentiary showings already made by the Debtors. The Creditors' Committee's assertion that the Court may not approve procedures allowing for assumption of agreements under defined criteria is without support.

   25. Each of the Creditors' Committee and WTC attempts to draw parallels between the Motion and the critical vendor program proposed by Kmart Corporation and ultimately rejected by the Seventh Circuit Court of Appeals.  See In re Kmart Corp., 359 F.3d 866 (7th Cir. 2004).  First and foremost, the proposed payment of prepetition claims under the

Procedures is made pursuant to the mandatory cure provisions of section 365 of the Bankruptcy

Code, not the less clearly defined provisions of sections 105 and 363 of Bankruptcy Code

involved in <u>Kmart</u>.

    26. Moreover, the factual basis for the relief requested in the Motion is much

more apparent.  Kmart, as an operator of retail stores selling to general consumers, did not face

the same critical supply chain issues that confront the Debtors.  A failure by one of Kmart's

suppliers to continue providing goods to Kmart would only have kept Kmart from stocking those

particular goods on its shelves; it would not have forced Kmart to close its stores.  In contrast,

the failure by one of the Debtors' suppliers to ship Goods may quickly shut down one or more of

the Debtors' manufacturing plants -- a drastically different outcome.  <u>See</u> Nelson Decl. at ¶12.

The damages resulting from a supplier's failure to ship to Kmart would only have been the

incremental lost profits on the sales of such goods.  The damages resulting from a supplier

failing to timely ship to the Debtors, however, would include not only lost profits, but also

potentially significant damages claims asserted by the Debtors' customers.  <u>Id</u>; <u>see</u> <u>also</u> Eisenberg

Decl. at ¶14.  Kmart could afford to depend upon its suppliers to act rationally and to deal with

those suppliers who chose to act irrationally on a one-off basis without causing significant harm

to its prospects for reorganization; the Debtors do not have that luxury.  On the other hand, the

objectors conveniently fail to acknowledge that Kmart assumed very early in its chapter 11 cases

virtually all of its executory contracts relating to its merchandising brands which involved the

payments of millions of dollars of cure costs and, unlike here, the imposition of very substantial

administrative liability on Kmart's chapter 11 estates.  Here, it is not mere speculation that

certain of the Debtors' suppliers will act irrationally -- one needs only consider the fact that this

Court has already entered multiple Orders to Show Cause with respect to suppliers which refused

to ship without receiving payment of prepetition claims, notwithstanding their contractual

obligations and the requirements of the automatic stay.  To assume that all suppliers will quietly

get into line and continue shipping on January 1, 2006 (when they no longer have a contractual

obligation to do so) would be reckless and inappropriate, particularly given the risks to the

Debtors' businesses that would be attendant with such a decision.[9]

27.     Further, although the Creditors' Committee in its objection recognizes an

important issue -- the Debtors' public statements regarding potential closure or divestiture of

certain of the Debtors' operations -- the Creditors' Committee ignores the full import of that issue

and misapprehends the means by which the Debtors' proposed Procedures proactively address

that issue.  The Creditors' Committee notes this issue in objecting that certain Assumable

Agreements may relate to businesses that the Debtors may divest or winddown over the next 24

months (the term of the extension) and argues that assumption of such Assumable Agreements

would therefore be inappropriate.  The Creditors' Committee, however, conveniently ignores the

further implications of this situation -- namely, the fact that certain businesses may be wound

down or divested puts the Debtors in the unique and unenviable position of attempting to

negotiate extensions of agreements that many Covered Suppliers realize may not be necessary to

the Debtors at confirmation of a plan of reorganization.  See Eisenberg Decl. at ¶11.  Normally, a

---

[9]     The Debtors also note that another of the "critical vendor" cases cited by WTC similarly
        does not support its position.  In In re United American, Inc., 327 B.R. 776 (Bankr. E.D.
        Va. 2005), the court denied approval of a "critical vendor" payment under the doctrine of
        necessity, but allowed the debtor to assume the same contract when the services provided
        under the contract were necessary to the debtor's on-going business operations and were
        not able to be quickly or inexpensively replaced from an alternate source.  The United
        American case demonstrates both that the Motion does not represent a "critical vendor"
        program to which 11 U.S.C. § 363 and the Kmart line of cases would apply and that other
        courts have viewed assumption as a reasonable alternative when presented with similar
        issues.

debtor's suppliers will support the debtor during the course of its reorganization because such

suppliers can recoup their prepetition losses over time.  Many of the Debtors' suppliers, however,

have no such assurance in light of these disclosures.  The numerous other recent chapter 11

filings in the automotive supply industry have further exacerbated the anxiety and uncertainty of

many of the Debtors' suppliers.  See Eisenberg Decl. at ¶¶11-12.  Therefore, the Creditors'

Committee's blind faith that these Covered Suppliers will agree to continue performing and not

attempt to utilize their leverage over the Debtors currently (when they realize that their leverage

is potentially fleeting) is misplaced.[10]  Furthermore, in order for the Debtors to maximize the

value of their estates with respect to those business lines that will be wound down or divested,

the Debtors must be able to effectuate either an orderly winddown or a sale of the business as a

going concern.  Absent a guarantee of continued supply of Goods during that period, there can be

no assurance that the Debtors will be able to realize the maximum value of these businesses for

the benefit of all constituencies.  Furthermore, the Procedures actively address this concern in a

number of ways.  The Debtors have protected their flexibility to terminate agreements to the

extent that they become unnecessary through the explicit agreement to the terms of their General

Terms and Conditions, which include a Termination for Convenience provision.  The Debtors

have also actively sought to limit the damages arising upon a termination and to limit payments

---

[10]    The Debtors do agree with the assertions of the Creditors' Committee and WTC that they
have significant leverage over some of their suppliers whose businesses are particularly
reliant upon the Debtors.  The Procedures already take this fact into account by providing
the Debtors with the discretion to not elect to assume such Covered Suppliers' Assumable
Agreements or to assume such Assumable Agreements only upon terms which are even
more favorable to the Debtors.  However, the Debtors do not agree that the fact that some
such suppliers exist can provide a basis for arguing that the Procedures are unnecessary
for the Debtors to deal with the remaining Covered Suppliers that do not fall within this
category.

on account of cure under assumed agreements to only those payments that come due while the

agreement continues to be necessary to the Debtors' on-going operations.

28.    There are two final objections raised solely by WTC -- that any payments

made pursuant to the relief requested in the Motion not be treated as "restructuring costs" in

calculating payments under a key employee compensation plan ("KECP") approved in these

chapter 11 cases and that the Debtors' request for confirmation that entry into new supply

contracts constitute transaction in the ordinary course of business constitutes a request for an

advisory opinion.  As to the first objection, the Debtors have modified the Revised Order to

provide that, to the extent that this Court subsequently authorizes the Debtors to implement a

KECP including a component excluding restructuring expenses from the calculation of incentive

payments, the Debtors will not classify any expenses under generally accepted accounting

principles incurred by the Debtors as a result of the assumption of Assumable Agreements under

an order granting the relief requested in the Motion as restructuring expenses under a KECP.  As

to the second issue raised by WTC, the Debtors note that such relief is necessitated by the oft-

stated concern of the Debtors' suppliers regarding the scope of the Debtors' authority to enter into

agreements without receiving further authority of this Court.  The Debtors believe, and WTC

apparently concurs, that entry into such agreements is clearly within the ordinary course of the

Debtors' businesses.  Thus, this provision constitutes little more than a comfort order such as has

previously been entered by this Court with respect to certain provisions of sections 362, 503, and

525 of the Bankruptcy Code.

29.    In essence, the objections of the Creditors' Committee and WTC amount

to the suggestion that the Debtors "play chicken" with their global supply chain and await on

pins and needles for January 1, 2006 to see which of their suppliers are willing to shut down the

Debtors' and their customers' operations and to then deal with such a situation once a supplier

has conclusively demonstrated that it will shut down the Debtors and cause the damages

described in the Motion -- recognizing that a hostile response by even as much as 1% of the

suppliers involved could irrevocably impair the prospects for the Debtors' reorganization and

related business enterprise value.  As fiduciaries of these Chapter 11 estates, the Debtors are

unwilling to adopt such a strategy; it would be a reckless exercise of business judgment which

would put at risk the Debtors' potential for a successful restructuring, their ability to successfully

win new business from their customers, and the interests of the Debtors' thousands of

stakeholders, including the jobs of thousands of employees and recoveries of all creditors.  As

the Debtors have repeatedly demonstrated to the Creditors' Committee (and which the Creditors'

Committee acknowledges), the continuity of the Debtors' supply chain is critical to there being a

viable business to restructure at the conclusion of these chapter 11 cases.  This fact is further

evidenced by the statements in support of the Motion filed by the Debtors' two largest labor

unions, the UAW and the IUE-CWA, and the administrative agent to their postpetition lender

group, JPMC -- and the commitment made to the Debtors by the Prepetition Agent and General

Motors Corporation to appear and support entry of the Revised Order at the November 29th

omnibus hearing.   The Debtors view the Creditors' Committee's failure to support a reasonable

solution to these risks (while offering no other proposal for addressing these concerns) to be

extremely disappointing and a disservice to their constituents.  Furthermore, the Creditors'

Committee's failure to offer a workable alternative (and to object to this Motion on the apparent

grounds that it is too similar to an alternative -- expanded relief under the Essential Supplier

Order -- previously suggested by the Creditors' Committee's own professionals) demonstrates the

24

difficulty of this situation and the minimal likelihood that another alternative can be agreed to and implemented in the time frame necessary (fewer than 20 working days).

30.    While the Debtors remain committed to working with the Creditors' Committee and others in developing a process that at once serves the interests of the Debtors and protects the value of their estates and also recognizes and addresses the legitimate concerns of creditor constituencies, the Debtors must be able to begin addressing these critical issues immediately and no other viable alternative to the Procedures has been proposed.  Specifically, the Debtors have proposed that they will permit the Creditors' Committee to monitor the Debtors' conduct and performance with respect to an order granting the relief requested in the Motion by providing continuing access during regular business hours to the Global Supply Management group at the Debtors' worldwide headquarters by a designated representative of the financial advisor retained by the Creditors' Committee, subject to certain confidentiality protections. Furthermore, the Debtors also propose that the Creditors' Committee be allowed to file a supplemental objection as to the prospective application of an order granting the relief requested in the Motion on or after March 1, 2006 or at any other time prior to March 1, 2006 should the aggregate amount of Cure contractually committed to be paid by the Debtors exceed $150 million excluding payments made under Non-Conforming Assumptions to which the Creditors' Committee has an independent ability to object.  The Debtors believe that these concessions will provide the Creditors' Committee with meaningful oversight of the Debtors' implementation and exercise of the authority sought.  Therefore, the Debtors respectfully request that the Court overrule the Objections of the Creditors' Committee and WTC and grant the relief requested in the Motion.

WHEREFORE the Debtors respectfully request that this Court enter an order (a) overruling the Objections, except to the extent described herein, (b) granting the Motion, subject to the modifications described herein, and (c) granting the Debtors such other and further relief as is just.

Dated: New York, New York
       November 28, 2005

                SKADDEN, ARPS, SLATE, MEAGHER
                  & FLOM LLP

                By:  /s/ John Wm. Butler, Jr.
                    John Wm. Butler, Jr. (JB 4711)
                    John K. Lyons (JL 4951)
                    Ron E. Meisler (RM 3026)
                333 West Wacker Drive, Suite 2100
                Chicago, Illinois  60606
                (312) 407-0700

                - and -

                By:  /s/ Kayalyn A. Marafioti
                    Kayalyn A. Marafioti (KM 9632)
                    Thomas J. Matz (TM 5986)
                Four Times Square
                New York, New York  10036
                (212) 735-3000

                Attorneys for Delphi Corporation, et al.,
                 Debtors and Debtors-in-Possession