Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                               :

In re                          :     Chapter 11
                               :

DELPHI CORPORATION, et al.,    :     Case No. 05-44481 (RDD)
                               :

                 Debtors.  :     (Jointly Administered)
                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(a), 328(a), AND 1107(b)
AUTHORIZING EMPLOYMENT AND RETENTION OF ERNST & YOUNG LLP
AS SARBANES-OXLEY, VALUATION, AND TAX SERVICES PROVIDERS
TO DEBTORS, EFFECTIVE NUNC PRO TUNC TO OCTOBER 8, 2005

("ERNST & YOUNG RETENTION APPLICATION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this application (the "Application") for entry of an order under 11 U.S.C.

§§ 327(a), 328(a), and 1107(b) and Fed. R. Bankr. P. 2014 authorizing the employment and

retention of Ernst & Young LLP ("E&Y") as Sarbanes-Oxley, valuation, and tax services

providers to the Debtors, effective nunc pro tunc to October 8, 2005.  In support of this

Application, the Debtors submit the Affidavit of Randall J. Miller, sworn to November 28, 2005

(the "Miller Affidavit").  In further support of this Application, the Debtors respectfully represent

as follows:

<u>Background</u>

A.      <u>The Chapter 11 Filings</u>

1.      On October 8, 2005 (the "Petition Date"), Delphi and certain of its U.S.

subsidiaries filed voluntary petitions in this Court for reorganization relief under chapter 11 of

title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").

On October 14, 2005, three additional U.S. subsidiaries of Delphi filed voluntary petitions in this

Court for reorganization relief under the Bankruptcy Code.  The Debtors continue to operate

their businesses and manage their properties as debtors-in-possession pursuant to sections

1107(a) and 1108 of the Bankruptcy Code.  Also on the Petition Date, this Court entered an order

directing the joint administration of the Debtors' chapter 11 cases (Docket No. 28).

2.      On October 17, 2005, the Office of the United States Trustee (the "U.S.

Trustee") appointed an official committee of unsecured creditors.  No trustee or examiner has

been appointed in the Debtors' cases.

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

4.      The statutory predicates for the relief requested herein are sections 327(a),

328(a), and 1107(b) of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules").

B.      <u>Current Business Operations Of The Debtors</u>

5.      With more than 180,000 employees worldwide, global 2004 revenues of

approximately $28.6 billion, and global assets as of August 31, 2005 of approximately $17.1

billion,[1] Delphi ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations without supervision from the Bankruptcy Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy Code.

6.    Over the past century, the operations which are now owned by Delphi have developed leading global technology innovations with significant engineering resources and technical competencies in a variety of disciplines.  Today, the Company (as defined below) is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company's technologies and products are present in more than 75 million vehicles on the road worldwide.  The Company supplies products to nearly every major global automotive original equipment manufacturer with 2004 sales to its former parent, General Motors Corporation, equaling approximately $15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

7.    As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world.  In the U.S., the Debtors employ approximately 50,600 people.  Those employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in Delphi's worldwide headquarters and customer center located in Troy, Michigan.  Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and

---

[1]      The aggregated financial data used in this Application generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

3

local unions.  Outside the United States, the Company's foreign entities employ more than

134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40

countries worldwide.

        8.   Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary

of GM.  Prior to January 1, 1999, GM conducted the Company's business through various

divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions

and subsidiaries were transferred to Delphi and its subsidiaries and affiliates (collectively, the

"Company") in accordance with the terms of a Master Separation Agreement between Delphi

and GM.  In connection with these transactions, Delphi accelerated its evolution from a North

American-based, captive automotive supplier to a global supplier of components, integrated

systems, and modules for a wide range of customers and applications.  Although GM is still the

Company's single largest customer, today more than half of Delphi's revenue is generated from

non-GM sources.

        9.   Due to the significant planning that goes into each vehicle model, Delphi's

efforts to generate new business do not immediately affect its financial results, because supplier

selection in the auto industry is generally finalized several years prior to the start of production

of the vehicle.  When awarding new business, which is the foundation for the Company's

forward revenue base, customers are increasingly concerned with the financial stability of their

supply base.  The Debtors believe that they will maximize stakeholder value and the Company's

future prospects if they stabilize their businesses and continue to diversify their customer base.

The Debtors also believe that this must be accomplished in advance of the expiration of certain

benefit guarantees between GM and certain of Delphi's unions representing most of its U.S.

hourly employees which coincides with the expiration of the Company's U.S. collective

bargaining agreements in the fall of 2007.

C.      Events Leading To Chapter 11 Filing

          10.      In the first two years following Delphi's separation from GM, the Company

generated more than $2 billion in net income.  Every year thereafter, however, with the exception

of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net

operating loss of $482 million on $28.6 billion in net sales.  Reflective of a downturn in the

marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005.

The Company experienced net operating losses of $608 million for the first six months of

calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion

less in sales than during the same time period in calendar year 2004.[2]

          11.      The Debtors believe that three significant issues have largely contributed to

the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S.

legacy liabilities and operational restrictions driven by collectively bargained agreements,

including restrictions preventing the Debtors from exiting non-strategic, non-profitable

operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive

U.S. vehicle production environment for domestic OEMs resulting in the reduced number of

motor vehicles that GM produces annually in the United States and related pricing pressures, and

(c) increasing commodity prices.

          12.      In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

portfolio, operational issues, and forward looking revenue requirements.  Having concluded that

[2]      Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily
         related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

pre-filing discussions with its unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

13.    Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses.  This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned in the Company's transformation plan.  The Debtors believe that a substantial segment of Delphi's U.S. business operations must be divested, consolidated, or wound-down through the chapter 11 process.

14.    Upon the conclusion of this process, the Debtors expect to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

<u>Relief Requested</u>

15.    By this Application, the Debtors request authorization to employ and retain E&Y as one of their Sarbanes-Oxley, valuation, and tax services providers in these chapter 11

6

cases, effective <u>nunc</u> <u>pro</u> <u>tunc</u> to October 8, 2005.  Specifically, the Debtors respectfully request

entry of an order under sections 327(a), 328(a), and 1107(b) of the Bankruptcy Code and

Bankruptcy Rule 2014 authorizing E&Y to perform Sarbanes-Oxley, valuation, and tax services

that will be necessary during these chapter 11 cases, as described below and in accordance with

the terms set forth in (i) the engagement letter attached hereto as <u>Exhibit A</u> (the "Sarbanes-Oxley

Engagement Letter"), (ii) the engagement letter attached hereto as <u>Exhibit B</u> (the "Valuation

Engagement Letter"), (iii) the engagement letter attached hereto as <u>Exhibit C</u> (the "Skadden Tax

Engagement Letter"), and (iv) the engagement letter attached hereto as <u>Exhibit D</u> (the "Delphi

Tax Engagement Letter", and together with the Sarbanes-Oxley Engagement Letter, the

Valuation Engagement Letter, and the Skadden Tax Engagement Letter, the "Engagement

Letters").  The Debtors had retained E&Y as an ordinary course professional according to the

Order Under 11 U.S.C. §§ 327, 330, And 331 Authorizing Retention Of Professionals Utilized

By Debtors In Ordinary Course Of Business (Docket No. 883) (the "Ordinary Course

Professionals Order").  The Debtors, however, are concerned that E&Y likely will exceed the fee

cap established in the Ordinary Course Professionals Order.  Therefore, the Debtors request that

E&Y be retained formally as one of their Sarbanes-Oxley, valuation, and tax services providers

in these chapter 11 cases.

Scope Of Services

16.    As set forth in further detail in the Engagement Letters and in the Miller

Affidavit, subject to approval of this Court, E&Y has agreed to provide certain Sarbanes-Oxley,

valuation, and tax services to the Debtors, including the following:

(a)    **Functional Testing.**  Assisting the Debtors' management in the planning
and execution of its functional testing of internal controls over financial
reporting for the Debtors' significant accounts and processes and reporting
any findings and recommendations for improvements.

7

(b)     **IT Sarbanes-Oxley Section 404 Support And Segregation Of Duties ("IT SOX 404 And SOD").** (i) Assisting Delphi IT in assessing, testing, and remediating the IT General Computer Controls environment for applications supporting financial processes in accordance with compliance to Section 404 of the Sarbanes-Oxley Act of 2002; (ii) assisting in the remediation of segregation of duties, which includes organizing and analyzing relevant end user security data against defined business conflicts, providing subject matter expertise on the required user access/profile clean-up, and supporting the design and implementation of preventive and detective processes/tools; and (iii) providing resources to support the Debtors with certain deliverables as required.

(c)     **Assistance With Delphi Corporate Accounting Policies.** Assisting in the development of the organization, format, and content update of the Delphi Corporate Accounting Policies manual.

(d)     **Certus Implementation Assistance.** (i) Assisting the Debtors in the implementation of the Certus Sarbanes Compliance Tool; (ii) assisting in the completion of the following activities: (a) general project management responsibilities with direction from the Debtors; (b) documenting the functional, technical, and system requirements; (c) designing the tool functionality according to the company's specifications; (d) design and execution of integrated testing; and (e) development and deployment of user training; and (iii) providing resources to support the Debtors with developing deliverables deemed appropriate for the project.

(e)     **Loan Staff.** Assisting the Debtors by providing certain professional personnel of E&Y for the purpose of assisting the Debtors with special project work as mutually agreed by E&Y and the Debtors. E&Y will provide the personnel to perform the following services and such other related services as requested by appropriate members of the Debtors' management and agreed to by E&Y: (i) supporting the Debtors' management in its Sarbanes-Oxley Section 404 remediation activities related to contract administration, including assistance under the direction of the Debtors in documentation of the contract administration process; (ii) interviews with stakeholders; and (iii) related administrative processes and documentation.

(f)     **Valuation Services.** Providing services relating to the Debtors' Financial Accounting Standard Board's ("FASB") Statement No. 142 ("SFAS 142") Goodwill and Other Intangible Assets analysis, including: (i) assessing the fair value of two Delphi divisions, with the overall goal being to assist Debtors' management in assessing the total value of the divisions for the purpose of adhering to SFAS 142 for financial reporting purposes; and (ii) estimating the fair value of certain assets identified by the Debtors to assist in the goodwill impairment tests for the purpose of restating goodwill according to FASB's fair value standards.

(g)    **Tax Services.**  Providing research, compilation of data, and analysis with respect to the application of Section 382 of the Internal Revenue Code. During the term of this engagement, E&Y and the Company may mutually agree that E&Y shall provide certain additional tax services to the Company, in accordance with past practices; <u>provided</u>, that any such additional tax services do not give rise to any auditor independence issues.

17.    The services to be provided by E&Y to the Debtors will not be unnecessarily duplicative of those provided by any other of the Debtors' professionals, and E&Y will coordinate any services performed at the Debtors' request with the Debtors' other professionals, including financial advisors and counsel, as appropriate, to avoid duplication of effort.

18.    Subject to this Court's approval of the Application, E&Y is willing to serve as the Debtors' Sarbanes-Oxley, valuation, and tax services providers and to perform the services described in the Engagement Letters on the terms set forth therein.

<u>Qualifications Of Professionals</u>

19.    The Debtors are familiar with the professional standing and reputation of E&Y.  The Debtors understand that E&Y is well-experienced in providing Sarbanes-Oxley, valuation, and tax services in restructurings and reorganizations, and that E&Y is well-respected for services it has rendered in large, complex chapter 11 cases on behalf of debtors and creditors throughout the United States.

20.    Prior to the Petition Date, on or about February 23, 2005, the Debtors engaged E&Y to provide Sarbanes-Oxley, valuation, and tax advisory services.  During this engagement, E&Y has developed a significant amount of institutional knowledge regarding the Debtors' businesses, operations, finances, and systems.  Such experience and knowledge will be valuable to the Debtors in their efforts to reorganize.  Accordingly, the Debtors wish to retain E&Y to provide assistance during these chapter 11 cases.

9

21.    As set forth in the Miller Affidavit, Randall J. Miller, the coordinating partner for E&Y's engagement in these cases, has more than 17 years of experience serving clients in the manufacturing, automotive, and other industries.  He is E&Y's North Central area practice leader for Business Risk Services (BRS), which provides risk-oriented services, including internal audit co-sourcing and outsourcing, Sarbanes-Oxley compliance support, and special projects, and includes practices in Ohio, Michigan, Pennsylvania, Kentucky, and New York.  He has a Bachelor of Business Administration from the University of Michigan and is a member of the Institute of Internal Auditors.

22.    The services of E&Y are deemed necessary to enable the Debtors to maximize the value of their estates and to reorganize successfully.  The Debtors submit that E&Y is well-qualified and able to represent the Debtors in a cost-effective, efficient, and timely manner.

## Disinterestedness Of Professionals

23.    The Miller Affidavit filed in support of this Application contains information available to date on E&Y's connections with other parties-in-interest, as required by Bankruptcy Rule 2014(a).  Based on the information in the Miller Affidavit, which is incorporated herein by reference, the Debtors submit that E&Y and the professionals in the firm are "disinterested persons," as that term is used in section 101(14) of the Bankruptcy Code, and are otherwise eligible to be retained under section 327(a) of the Bankruptcy Code.

## Professional Compensation

24.    Subject to this Court's approval and pursuant to the terms and conditions of the Engagement Letters, E&Y intends to charge the Debtors for services rendered based on its hourly rates for such services, as set forth below, plus reimbursement of actual expenses.

**Functional Testing And Assistance With The Delphi Corporate Accounting Policies:**

| Level | Hourly Rate |
|---|---|
| Partner/Principal | $330 |
| Senior Manager | $285 |
| Manager | $260 |
| Senior | $145 |
| Staff | $116 |
| International Rates | See Appendix A-1 to the Sarbanes-Oxley Engagement Letter. |

**IT SOX 404 And SOD Support And Certus Implementation Assistance:**

| Level | Hourly Rate |
|---|---|
| Partner/Principal | $330 |
| Senior Manager | $285 |
| Manager | $260 |
| Senior | $215 |
| Staff | $155 |
| International Rates | 10% above the listed rates. |

**Loan Staffing Services:**

| Level | Hourly Rate |
|---|---|
| Partner | $330 |
| Senior Manager | $285 |

| | |
|---|---|
| BRS Manager | $260 |
| Core Assurance Senior | $180 |
| BRS Senior | $145 |
| Staff | $116 |

**Valuation Services:**

| Level | Hourly Rate |
|---|---|
| Partner/Principal | $425 |
| Senior Manager | $350 |
| Manager | $275 |
| Senior | $225 |
| Staff | $175 |

**Tax Services:**

| Level | Hourly Rate |
|---|---|
| Partner/Principal | $650 – 750 |
| Senior Manager | $550 – 650 |
| Manager | $500 – 600 |
| Senior | $400 – 500 |
| Staff | $200 – 300 |

25.    E&Y's hourly rates are revised periodically in the ordinary course of E&Y's

business, generally on May 1st of each year.  E&Y will advise the Debtors, the U.S. Trustee, and

the committee designated to review fee applications (if any) of its new rates once they are established if a rate change is effective during the course of this engagement.

26.    E&Y intends to invoice the Debtors on a monthly basis and to apply to this Court for compensation and reimbursement of expenses in accordance with section 330(a) of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"), the guidelines established by the U.S. Trustee, and orders of this Court.  E&Y acknowledges that all compensation will be subject to this Court's review and approval after notice and a hearing.

27.    <u>Exhibits B</u> to the Sarbanes-Oxley Engagement Letter and Valuation Engagement Letter provide that, in rendering services to the Debtors under those engagement letters, E&Y may subcontract a portion of its responsibilities to certain other member firms of Ernst & Young Global Limited ("EYGL"), as described in greater detail in the Miller Affidavit. Prior to the Petition Date, E&Y provided Sarbanes-Oxley services to the Debtors under the same subcontracting arrangement with the EYGL member firms and, at the Debtors' request, have continued this arrangement under the Sarbanes-Oxley and Valuation Engagement Letters.

28.    E&Y shall be solely responsible for all of its liabilities and obligations under the Engagement Letters, whether or not performed, in whole or part, by E&Y (or an affiliate thereof) or any EYGL member firm (or an affiliate, a subcontractor, or personnel thereof), and the Debtors shall have no recourse, and shall bring no claim, against any EYGL member firm other than E&Y, or against any of their subcontractors, members, shareholders, directors, officers, managers, partners, agents, representatives or employees (or any of their respective successors or permitted assigns), or any of their respective assets, with respect to the services provided pursuant to the Engagement Letters or otherwise under the Engagement Letters.

13

29.    EYGL member firms will assist E&Y in the provision of services under the

Engagement Letters, an arrangement that is beneficial to the estate for the following reasons: (i)

through an integrated approach to the provision of professional services, E&Y and the other

EYGL member firms providing services under the Engagement Letters are able to provide a

cohesive network worldwide of quality and efficiency to the Debtors; and (ii) having E&Y act as

the clearinghouse for invoices submitted by the EYGL member firms will be more convenient to

the Debtors by allowing billing to be centralized through a single invoice that settles budgeting

and foreign currency issues.  This subcontracting arrangement is far more beneficial to the

estates and conservative of their resources than would be the case if each EYGL member firm

were required to seek separate retention by the Debtors.  Although the EYGL member firms are

not undertaking full-fledged conflicts and connections checks under this arrangement, no

bankruptcy policies should be offended because their work has little or no relationship to the

administration of these chapter 11 cases.

30.    In the event that other EYGL member firms assist E&Y in the rendering of

services under the Engagement Letters, E&Y intends to pay such EYGL member firms directly

for their services, and to apply to this Court for reimbursement by the Debtors of any such

payments made by E&Y to the EYGL member firms.  This Application therefore requests

approval of an exception for the EYGL member firms (other than E&Y), providing services to

the Debtors under the Engagement Letters, to use category codes to describe the services

rendered, rather than the more detailed descriptions usually required for fee applications.

31.    In the 90 days leading up to the Petition Date, the Debtors paid E&Y

approximately $6,272,138 in fees and expenses for Sarbanes-Oxley, valuation, and tax services

provided to the Debtors, and in the 12 months immediately preceding the Petition Date, the

Debtors paid E&Y approximately $8,907,968 for such services. As of the Petition Date, E&Y had an outstanding balance of $72,302 due from the Debtors for prepetition Sarbanes-Oxley, valuation, and tax services rendered and expenses incurred by E&Y (the "Prepetition Balance"). This Application proposes that $66,746 in overpayments made by the Debtors to E&Y on or before July 1, 2005 be applied toward the Prepetition Balance, which would result in an adjusted outstanding balance of $5,556 due from the Debtors for prepetition services and expenses rendered (the "Adjusted Prepetition Balance"). As a condition of its retention by the Debtors, E&Y will waive and not have a claim for the Adjusted Prepetition Balance.

32.    At the Debtors' request, on November 1, 2005, E&Y provided the Debtors with an invoice for postpetition fees and expenses in the amount of $649,714 for the Sarbanes-Oxley and valuation services rendered to the Debtors between October 8, 2005 and October 31, 2005. E&Y has not received this or any other postpetition payments from the Debtors.

33.    The Debtors believe that E&Y's fees are fair and reasonable in light of industry practice, market rates both inside and outside of chapter 11 proceedings, E&Y's experience in reorganizations, and E&Y's importance to these cases.

<u>Dispute Resolution</u>

34.    Pursuant to the Engagement Letters, the Debtors and E&Y (collectively, the "Parties") have agreed that any controversy or claim with respect to, in connection with, arising out of, or in any way related to the Engagement Letters or the services provided thereunder (including any such matter involving a parent, subsidiary, affiliate, successor-in-interest, or agent of any member of the Parties) shall be brought in this Court, or in the District Court if such District Court withdraws the reference, and the Parties, and any and all successors and assigns thereof, consent to the jurisdiction and venue of such court as the sole and exclusive forum

15

(unless such court does not have jurisdiction and venue of such claims or controversies) for the

resolution of such claims, causes of action, or lawsuits.  The Parties, and any and all successors

and assigns thereof, also have agreed to waive trial by jury, such waiver being informed and

freely made.  If this Court, or the District Court upon withdrawal of the reference, does not have

or retain jurisdiction over the foregoing claims or controversies, the Parties, and any and all

successors and assigns thereof, agree to submit first to non-binding mediation and, if mediation

is not successful, then to binding arbitration, in accordance with the dispute resolution

procedures set forth in Exhibits B, C, and D to the Delphi Tax, Sarbanes-Oxley, and Valuation

Engagement Letters, respectively, and attached to the Skadden Tax Engagement Letter.

Judgment on any arbitration award may be entered in any court having proper jurisdiction.  The

foregoing is binding upon the Parties and any and all successors and assigns thereof.

Indemnification

35.    Pursuant to the Sarbanes-Oxley, Valuation, and Delphi Tax Engagement

Letters, to the fullest extent permitted by applicable law, the Debtors shall indemnify, defend,

and hold harmless E&Y from and against all (a) claims and causes of action, pending or

threatened, of any kind (whether based on contract, tort, or otherwise) by third parties, including

any affiliate of the Debtors, related to or arising out of (i) the use, disclosure of, or reliance on

any reports, materials, presentations, or other communications, written or otherwise, in draft or

final form, provided by E&Y (the "Reports"), or any portion, abstract, or summary thereof by

any person or entity that obtains access to such Reports, directly or indirectly, from, through, or

at the request of the Debtors, (ii) the performance of any services under the Sarbanes-Oxley,

Valuation, and Delphi Tax Engagement Letters, or (iii) the Debtors' failure to provide timely,

accurate, and complete information and resources as necessary for E&Y to perform services in

accordance with the Sarbanes-Oxley, Valuation, and Delphi Tax Engagement Letters

(collectively, the "Claims") and (b) liabilities, losses, damages, costs, and expenses (including,

without limitation, reasonable outside attorneys' fees and the allocable costs of in-house counsel)

suffered or incurred by E&Y in connection with any Claims; provided, however, that the Debtors

shall have no indemnification obligation under the Sarbanes-Oxley, Valuation, and Delphi Tax

Engagement Letters to the extent that a court of competent jurisdiction finally determines that a

Claim by the Debtors or a representative of the Debtors' estates has arisen out of E&Y's bad

faith, self-dealing, breach of fiduciary duty (if any), gross negligence, or willful misconduct.

36.    Additionally, pursuant to the Sarbanes-Oxley and Delphi Tax Engagement

Letters, E&Y shall indemnify, defend, and hold harmless the Debtors, including their directors,

officers, employees, agents, and representatives, from any and all claims, demands, actions,

damages, liabilities, costs, and expenses, including reasonable attorney fees and expenses, to the

extent arising out of or resulting from the negligence, illegal acts or willful misconduct of E&Y

and/or E&Y Personnel (as defined below) in connection with the performance of services under

the Sarbanes-Oxley and Delphi Tax Engagement Letters; provided, however, that E&Y will have

no obligation to indemnify Delphi to the extent that any such claims or damages arise out of or

result from third party claims (other than claims by governmental authorities) against the Debtors

based on any of E&Y's written or verbal work product prepared pursuant to the Sarbanes-Oxley

and Delphi Tax Engagement Letters (such as reports, analyses, projections, advice,

recommendations, and other data).  With respect to the indemnifications described in this and the

previous paragraphs, the indemnifying party shall also pay to the indemnified party any and all

costs and expenses incurred in connection with the enforcement of these indemnification

provisions.

<u>Limitation On Liability</u>

37.    Pursuant to the Sarbanes-Oxley, Valuation, and Delphi Tax Engagement
Letters, the total aggregate liability of E&Y in connection with the services to be provided
thereunder shall be limited to three times the professional fees paid by the Debtors to E&Y in
respect of those services.  Also, neither the Debtors nor E&Y, its partners, principals, directors,
officers, employees, agents, subcontractors, and/or independent contractors who are performing
services on behalf of E&Y under the Sarbanes-Oxley, Valuation, and Delphi Tax Engagement
Letters (collectively, the "E&Y Personnel") will be liable for consequential, punitive, or special
damages (including loss of profits, data, business, or goodwill), even if advised of the likelihood
of such damages.  Notwithstanding anything to the contrary otherwise set forth in the
Sarbanes-Oxley, Valuation, and Delphi Tax Engagement Letters, the preceding limitations will
not apply (a) in the event of any breach of the terms concerning the non-disclosure of Delphi
Proprietary Information (as such term is defined in the Sarbanes-Oxley, Valuation, and Delphi
Tax Engagement Letters) set forth in the Sarbanes-Oxley, Valuation, and Delphi Tax
Engagement Letters, or (b) if E&Y is found to be grossly negligent, to have acted in bad faith,
willfully or fraudulently, or to have engaged in self-dealing or a breach of fiduciary duty (if any).
Delphi's recourse with respect to any liability or obligation of E&Y under the Sarbanes-Oxley,
Valuation, and Delphi Tax Engagement Letters will be limited to the assets of E&Y, and Delphi
shall have no recourse against, and shall bring no claim against, any individual partner of E&Y
or any of the assets of such individuals.  The limitations of liability described in this paragraph
will operate for the benefit of, and will be enforceable by, any member or affiliated firm of Ernst
& Young International or any E&Y Personnel that is, together with E&Y, providing the services
under the Sarbanes-Oxley, Valuation, and Delphi Tax Engagement Letters.

38.    Pursuant to the Skadden Tax Engagement Letter, except in cases of bad faith, willful misconduct, or gross negligence by E&Y or where E&Y has engaged in self-dealing or breach of fiduciary duty (if any), the total aggregate liability of E&Y to the Debtors in connection with the performance of services or otherwise thereunder shall be limited to the professional fees actually paid to E&Y in respect of those services.  In addition, except in cases of bad faith, willful misconduct, or gross negligence by E&Y, or where E&Y has engaged in self-dealing or breach of fiduciary duty (if any), neither E&Y nor its subcontractors will be liable to the Debtors for any consequential, incidental, indirect, or special damages (including loss of profits, data, business, or goodwill), even if E&Y is advised of the likelihood of such damages.  In no event will E&Y or its subcontractors be liable to the Debtors for any punitive damages in connection with the performance of services under the Skadden Tax Engagement Letter.  E&Y will be solely responsible for the performance of the services and all other liabilities and obligations of E&Y under the Skadden Tax Engagement Letter, whether or not performed, in whole or in part, by E&Y, any affiliate of E&Y, or any subcontractor or personnel of any E&Y entity.  The Debtors shall have no recourse against any E&Y entity other than E&Y, or against any subcontractors, members, shareholders, directors, officers, managers, partners, or employees of E&Y or any other E&Y entity, or any of the assets of any thereof, with respect to any liability or obligations in connection with the performance of the services or otherwise under the Skadden Tax Engagement Letter.

39.    E&Y's indemnification of the Debtors and its limitation of liability, as set forth in the above paragraphs, are substantially the same as provisions previously agreed to by the Debtors and E&Y under the prepetition engagement letters for Sarbanes-Oxley and valuation services (with the exception that the Engagement Letters now provide that E&Y's limitation of

19

liability will not apply to bad faith, self-dealing or a breach of fiduciary duty, if any).  The

Application seeks an order approving the terms of these provisions, along with the Engagement

Letters.

Conclusion

40.    For the foregoing reasons, the Debtors submit that the relief requested

herein is in the best interests of the Debtors and their estates and creditors and should be

approved.

Notice

41.    Notice of this Application has been provided in accordance with the Order

Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014

Establishing (I) Omnibus Hearing Dates, (II) Certain Notice, Case Management, And

Administrative Procedures, And (III) Scheduling An Initial Case Conference In Accordance

With Local Bankr. R. 1007-2(e) entered by this Court on October 14, 2005 (Docket No. 245).  In

light of the nature of the relief requested, the Debtors submit that no other or further notice is

necessary.

Memorandum Of Law

42.    Because the legal points and authorities upon which this Application relies

are incorporated herein, the Debtors respectfully request that the requirement of the service and

filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order

(a) authorizing the Debtors to employ and retain E&Y to provide Sarbanes-Oxley, valuation, and

tax advisory services pursuant to the terms and conditions set forth in the Engagement Letters,

effective nunc pro tunc to October 8, 2005, and (b) granting such other and further relief as is

just.

Dated:    New York, New York
          November 28, 2005


DELPHI CORPORATION, on behalf of itself and
certain of its subsidiaries and affiliates, as Debtors
and Debtors-in-possession

By:   /s John D. Sheehan_____
      Name: John D. Sheehan
      Title: Vice President and Chief Restructuring
            Officer

Exhibit A

**≡ıı ERNST & YOUNG**

■

101 West Big Beaver Road
Suite 1200
Troy, Michigan  48084

**Ernst & Young LLP** ■
Phone: (248) 457-3800
www.ey.com

November 23, 2005

Ms. Jennifer Williams
Director of Technical Accounting & Reporting
Delphi Corporation
5725 Delphi Drive
Troy, MI 48098

Dear Ms. Williams:

This letter, together with the attached Exhibits (collectively, this "Agreement"), sets forth the terms and conditions on which Ernst & Young LLP ("E&Y") will provide project assistance to Delphi Corporation and its affiliates (the "Company," "Delphi" or "Debtor") related to the requirements of Section 404 of the Sarbanes-Oxley Act of 2002 ("Section 404") as described in Project Exhibits A-1 through A-5 attached hereto (collectively, the "Services") subsequent to the Company's filing of a Chapter 11 petition in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

We have agreed to provide such services, contingent upon the Bankruptcy Court approving our retention in accordance with the terms and conditions which are set forth in this Agreement.

The Services are advisory in nature. E&Y will perform the Services in accordance with the applicable standards of the U.S. Public Company Accounting Oversight Board ("PCAOB").

With respect to the scope of the Services, management of the Company acknowledges that it is solely responsible for the sufficiency of the Services for its purposes and for the sufficiency of the documentation, and testing and evaluation of the Company's controls for purposes of its assessment under Section 404.  Accordingly, E&Y makes no representations or warranties regarding the sufficiency of the Services for the purposes for which this assistance was requested

A Member Practice of Ernst & Young Global

**ЭI ERNST & YOUNG**                    ■ Ernst & Young LLP

or for any other purpose. The Company will designate one or more management-level individuals to oversee the Services being provided. Throughout performance of the Services, as well as upon completion of the Services, E&Y will meet with the Company's management to discuss E&Y's findings and recommendations resulting from the Services.

Management of the Company is responsible for (a) establishing and maintaining effective internal controls, including monitoring ongoing activities, (b) ensuring the adequacy of its internal control documentation and the maintenance thereof and (c) identifying all laws and regulations applicable to the Company's activities and ensuring the Company's compliance therewith.

The Services and the information, records, data, advice or recommendations contained in any reports, materials, presentations or other communications, written or otherwise, in draft or final form, provided by E&Y are referred to herein, collectively, as "Reports". Except where compelled by legal process (of which the Company shall promptly inform E&Y and tender to E&Y, if E&Y so elects, the defense) the Company may not disclose, orally or in writing, any Report or any portion, abstract or summary thereof, or make any reference to E&Y in connection therewith, to any third party without obtaining the prior written consent of E&Y (which is hereby deemed given in the case of disclosure to the Company's external auditors) . Notwithstanding the foregoing, the Company shall not be required to obtain E&Y's consent in order to disclose without limitation the flowcharts, narrative descriptions or other similar documentation ("Factual Documentation") prepared by E&Y reflecting factual representations of the Company's internal control systems (including, without limitation, the risks and controls identified by the Company pertaining to those systems) when such Factual Documentation (a) does not identify or reference E&Y in any way, (b) does not contain any observations, advice, findings or recommendations of E&Y, and (c) is (i) approved by the Company as a true, complete and accurate representation of its internal control systems which are the subject of such documentation and (ii) adopted by the Company as if it were prepared by the Company in the first instance.

The restrictions in the last three sentences of the preceding paragraph shall not apply to any Report or other materials provided by E&Y containing any tax advice. The Company and its officers, directors, employees, agents and advisors may freely disclose any tax advice provided to the Company by E&Y, including with respect to the U.S. tax treatment of any transaction, together with all facts that may be relevant to understanding such tax advice. In any event, because all such advice is provided solely for the benefit of the Company, the Company shall inform those to which it discloses such information that they may not rely upon any such advice for any purpose without E&Y's prior written consent.

**ᴬᴵ ERNST & YOUNG**                              ■ Ernst & Young LLP

E&Y shall be solely responsible for all of the liabilities and obligations of E&Y under this Agreement, whether or not performed, in whole or part, by E&Y, any affiliate of E&Y, any other member of the global Ernst & Young network or any of their respective affiliates (collectively, the "E&Y Entities," and any of them, an "E&Y Entity"), or any subcontractor or personnel of any E&Y Entity.  The Company shall have no recourse, and shall bring no claim, against any E&Y Entity other than E&Y, or against any subcontractors, members, shareholders, directors, officers, managers, partners, agents, representatives or employees of any E&Y Entity (or any of their respective successors or permitted assigns), or any of their respective assets, with respect to the Services or otherwise under this Agreement.

In the event E&Y is requested or authorized by the Company or is required by government regulation, subpoena, or other legal process to produce its documents or its personnel as witnesses with respect to the Services, the Company will, so long as E&Y is not a party to the proceeding in which the information is sought, reimburse E&Y for its professional time and expenses, as well as the fees and expenses of its counsel (including the allocable cost of in-house counsel), incurred in responding to such requests. These requests will be documented with the appropriate receipts or supporting data provided.

The fees for our Services are as set forth in the respective Project Exhibits.  The Services will be provided in accordance with the Terms and Conditions set forth in Exhibit B, which are incorporated herein by reference. E&Y acknowledges that payment of its fees and expenses hereunder is subject to (i) the jurisdiction and approval of the Bankruptcy Court under Sections 328(a), 330 and 331 of the Bankruptcy Code and any order of the Bankruptcy Court approving the retention of E&Y, (ii) any applicable fee and expense guidelines and/or orders, including the U.S. Trustee Guidelines, and (iii) any requirements governing interim and final fee applications.

We will request payment of our fees in accordance with the Bankruptcy Code, the Bankruptcy Rules, local bankruptcy rules for the Southern District of New York, the guidelines of the U.S. Trustee, and any relevant administrative orders. In addition, we will request reimbursement of our actual expenses related to this engagement, as well as fees for any time (including any time or reasonable expenses of legal counsel) we may incur in considering or responding to discovery requests or participating as a witness or otherwise in any legal, regulatory, or other proceeding as a result of our performance of these services. These requests will follow normal Delphi payment approvals as well as above.

Any controversy or claim with respect to, in connection with arising out of, or in any way related to this Agreement or the Services provided hereunder (including any such matter involving any parent, subsidiary, affiliate, successor in interest or agent of the Company or of E & Y) shall be brought in the Bankruptcy Court, or the District Court if such District Court withdraws the reference and the parties to this Agreement, and any and all successors and assigns thereof,

**≡JI ERNST & YOUNG**                    ■ Ernst & Young LLP

consent to the jurisdiction and venue of such court as the sole exclusive forum (unless such court does not have jurisdiction and venue of such claims or controversies) for the resolution of such claims, causes of action or lawsuits.  The parties to this Agreement, and any and all successors and assigns thereof, hereby waive trial by jury, such waiver being informed and freely made.  If the Bankruptcy Court, or the District Court upon withdrawal of the reference does not have or retain jurisdiction over the foregoing claims or controversies, the parties to this Agreement and any and all successors and assigns thereof, agree to submit first to non-binding mediation; and, if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures set forth in Exhibit C to this Agreement.  Judgment on any arbitration award may be entered in any court having proper jurisdiction.  The foregoing is binding upon the Company, E & Y and any all successors and assigns thereof.

By agreement to the provision of the Services set forth in the Agreement, E & Y is not providing a guarantee to the Company that E & Y's performance of those services pursuant to the terms and conditions set forth in the Agreement will guarantee the Company's successful reorganization under Chapter 11 of Title 11 of the United States Code.

The benefits of this Agreement shall inure to the respective successors and assigns of the parties hereto and the obligations and liabilities assumed in this Agreement by the parties hereto shall be binding upon their respective successors and assigns.

Yours very truly,

*Ernst & Young LLP*

AGREED TO AND ACCEPTED BY:

DELPHI CORPORATION

By: _____
Mr. John D. Sheehan
Vice President &
Chief Restructuring Officer,
Chief Accounting Officer & Controller

Date: _____11/25/05_____

**Project Exhibit A-1**

**Functional Testing**

## Scope of Services

The objective of Project A-1 is to assist management of the Company in the planning and execution of its functional testing of internal controls over financial reporting for the Company's significant accounts and processes, as identified by the Company, and to report any findings and recommendations for improvements in the controls we may identify as a result of this assistance.

The Services will include the following:

- Assistance with the planning and execution of testing of certain specific controls. We will provide you our findings and recommendations for those transaction flows and controls assigned to E&Y. E&Y will assist with the scoping of the project and integration with D&T's audit approach. E&Y will assist in conducting "404 plus one" planning sessions to help Delphi confirm the scope of testing and identify opportunities to reduce the overall scope of testing.

- E&Y will also assist management in (1) prioritizing the findings and recommendations from testing as necessary to enable management to perform its due diligence, and (2) any retesting efforts, and provide management with an additional report outlining areas for improvement at the business unit and entity level. The Services will not result in an opinion or any form of assurance on internal controls and will not constitute an audit or examination made in accordance with generally accepted auditing or attestation standards, the objective of which is the expression of an opinion on the elements, accounts, or items of a financial statement. However, E&Y will provide management of the Company with our findings and recommendations in those areas where we observe internal controls that, in our view, could be improved. The Company will designate a management-level individual or individuals to be responsible for overseeing the Services being provide. Upon completion of the Services, E&Y will meet with the Company to discuss the findings and recommendations resulting from the Services.

## Timing

- The work associated with Project A-1 will begin upon mutual agreement of the parties. E&Y will issue its report(s) periodically Or within 3 weeks of completion if appropriate.

- The summary of estimated hours by country and location within countries is as set forth in a testing plan (the "Testing Plan") to be agreed between E&Y and the Company. Any estimated hours set forth in the Testing Plan will be based upon, wants to delete those words, E&Y's preliminary discussions with the Company as to the state of the

Company's records and  also will be dependent upon the Company's personnel providing adequate and timely assistance. Should E&Y's assumptions with respect to these matters be incorrect or should the condition of the current documentation, degree of cooperation, or other matters beyond E&Y's reasonable control require additional commitments by E&Y beyond those upon which the estimates are based, E&Y may be required to adjust its fees and planned completion dates. These changes would be subject to Delphi business contact approval as needed.

## Deliverables

- The product of E&Y's Services under this Project A-1 will be written status reports (the "Reports") to the Company  resulting from the performance of the Services. It is the responsibility of management of the Company to review and approve the Reports and to design and implement the recommendations contained therein at its discretion.

## Management's Responsibilities and Assumptions

- E&Y assumes that the scope of this Project A-1 is primarily coordination and execution of testing as determined by Delphi.

- A sponsor at Delphi should be identified and readily available to assist with scheduling meetings, and to promptly provide us with any necessary documentation. David Bayles, Director of Sarbanes-Oxley Compliance & Internal Control will serve in this role for this project.

- E&Y will have access and provide periodic reporting regarding testing progress and results to Derek Kolano, Acting Director of Corporate Audit Services.

- Delphi team members required for meetings should be available when scheduled.

- Testing strategy will be developed by Delphi, testing work programs will be in the appropriate format to execute prior to starting the testing, testing requirements in terms of sample sizes, evidence required, etc will be developed by Delphi.

- Field level reviews only will be conducted by E&Y seniors and staff as part of executing test plans. Delphi project management will be responsible for overall reviews of testing results to verify that testing meets management's requirements.

## Project Team

Randy Miller will be the Coordinating Partner, responsible for the provision of Sarbanes Oxley related work. Advisory partners including Sam Johnson, and others as determined by E&Y and Delphi will be included as required. John Enright, Senior Manager, will work closely with management in performing the Sarbanes Oxley services.  If one or more of these individuals ceases to provide services pursuant to this agreement, Ernst & Young will so advise the Company and, if that professional is replaced, provide the Company with the name of that professional's replacement. Other staff, not identified herein, may be utilized as required to conduct our work in most efficient manner. Key personnel would be replaced by like skills and competency where appropriate.

## Fees and Billings

E&Y's fees for the services described in this Project Exhibit A-1 will be on a time and materials basis at the rate per hour outlined below.

| Level | |
|---|---|
| Partner | $330 |
| Senior Manager | $285 |
| Manager | $260 |
| Senior | $145 |
| Staff | $116 |
| International Rates | See Appendix A1 |

- Estimated EY executive time (partner and senior (site) manager) for coordination of testing is estimated to be an additional 8% of total hours estimated in the timing section above. Fees for this time will be applied at the hourly rates outlined in the table in Appendix A1 for the US team.

- E&Y will submit invoices monthly.  Expenses such as travel, meals, and accommodations will be charged as incurred according to the Exhibit D.

- License fees for use of third party software technology and software and costs associated with hardware needed by the Company for purposes of complying with Section 404 will be borne by the Company.

- E&Y is responsible for travel reservations, hotel/motel accommodations and rental cars. E&Y should make reasonable efforts to make all travel arrangements originating in U.S., Mexico or Canada through Global Experts in Travel (GET), using a special account set up for such purposes.

## Appendix A 1

### Functional Testing Global Rates

| Country | Staff | Senior | Staff | Senior | Applied Exchange Rate (Euro/Dollar Local Currency) | Local Currency |
|---|---|---|---|---|---|---|
| | Dollars | | Local Currency | | | |
| Argentina | $60 | $98 | 73 | 119 | 0.344 | Peso (ARS) |
| Australia | $140 | $190 | 183 | 248 | 0.760 | Dollar (AUD) |
| Austria | $140 | $195 | 108 | 150 | 1.300 | EURO |
| Brazil | $60 | $98 | 161 | 263 | 0.372 | Real (BRL) |
| China | $95 | $192 | 786 | 1,589 | 0.121 | Yuan (CNY) |
| Czech Republic | $111 | $209 | 2,555 | 4,840 | 30.0636 (EURO) | Koruny (CZK) |
| France | $115 | $162 | 88 | 125 | 1.300 | EURO |
| Germany | $148 | $195 | 114 | 150 | 1.300 | EURO |
| India | $64 | $119 | 2,800 | 5,200 | 0.023 | Rupee (INR) |
| Italy | $76 | $148 | 58 | 114 | 1.300 | EURO |
| Japan | $108 | $179 | 12,000 | 20,000 | 0.009 | Yen (JPY) |
| Korea | $80 | $120 | 82,474 | 123,711 | 0.001 | Won (KRW) |
| Mexico | $70 | $100 | 791 | 1,130 | 0.089 | Peso (MXP) |
| Morocco | $74 | $115 | 671 | 952 | 0.111 | Dirham (MAD) |
| Netherlands | $148 | $195 | 114 | 150 | 1.300 | EURO |
| Poland | $104 | $208 | 325 | 650 | 4.06189 (EURO) | Zlotych (PLN) |
| Portugal | $75 | $115 | 58 | 88 | 1.300 | EURO |
| Romania | $65 | $111 | 1,915,605 | 3,256,529 | 38312.1 (EURO) | Lei (ROL) |
| Singapore | $100 | $165 | 164 | 271 | 0.610 | Dollar (SGD) |
| Spain | $74 | $115 | 57 | 81 | 1.300 | EURO |
| Turkey | $66 | $120 | 90 | 164 | 1.3408 | New Lira (TRY) |
| UK | $145 | $190 | 78 | 102 | 1.860 | Pound (GBP) |
| USA | $116 | $145 | $116 | $145 | 1.000 | USD |

**US Project Management Rates**

| Partner | $330 |
|---|---|
| Site Manager | $260 |

AGREED TO AND ACCEPTED BY:

DELPHI CORPORATION

By: _____

Mr. John D. Sheehan
Vice President & Chief Restructuring Officer,
Chief Accounting Officer & Controller

Date: _____

By: _____

Mr. Derek Kolano
Acting Director
Corporate Audit Services

Date: _____

**Project Exhibit A-2**

## IT SOX 404 Support and SOD

### Project Identification & Specific Description of Services

E&Y will assist Delphi IT in assessing, testing and remediating the IT General Computer Controls environment for applications supporting financial process in accordance with compliance to Sarbanes Oxley Section 404 legislation. Application controls will be considered as required throughout the process. Additionally, E&Y will assist Delphi with their remediation effort of the Segregation of Duties (SOD) issue raised during the 2004 404 assessment. The work associated with this Project Exhibit A- 2 ("Project 2") will begin subsequent to the Company's filing of a Chapter 11 petition in the Bankruptcy Court.

E&Y will also assist in the remediation of Segregation of Duties, which includes organizing and analyzing relevant end user security data against defined business conflicts, providing subject matter expertise on the required user access/profile clean-up, and supporting the design and implementation of preventive and detective processes/tools.

E&Y will provide resources to support Delphi with the following deliverables and others as required by the teams:

Pertaining to the 2005 SOX IT 404 management testing:

- Project approach and plan to ensure adequate preparation to meet Sarbanes-Oxley Section 404 compliance requirements and project milestone dates.
- Training the IT organization to complete self assessment documents and conduct testing
- Validation of controls through testing of assigned critical sites (which includes retesting of remediate sites)
- Report on identification of control gaps and remediation recommendations

Pertaining to the 2005 SOD issue resolution:

- Project guidance and subject matter expertise to support the SOD remediation requirements and project milestone dates
- Report of structured analysis of SOD conflict data to support remediation tracking and management reporting
- Training the organization on new processes to prevent/detect SOD conflicts
- Report on validation of SOD IT controls through testing and analysis

The deliverables, other than the templates, described in this Project Exhibit A-2 shall be deemed to be "works made for hire" under the federal copyright laws. However, the Deliverables include data, modules, components, designs, utilities, subsets, objects, program listings, tools, models,

methodologies, programs, systems, analysis frameworks, leading practices, and specifications ("Technical Elements") owned or developed by E&Y prior to, or independently from, its engagement hereunder and E&Y retains all rights thereto.  Accordingly, to the extent that any Technical Elements are integrated into any Deliverables, E&Y hereby grants to the Company a license to use, copy and modify such Technical Elements as integrated into such Deliverables for internal purposes only.   Notwithstanding anything to the contrary in this section, the Reports shall be subject to the limitations on distribution set forth in the Agreement to which this Exhibit is attached.

## Timeline and Work Plans

- E&Y and the Company shall mutually agree upon a time frame for Project A-2.

## Management Responsibilities and Assumptions

- A sponsor at Delphi should be identified and readily available to assist with scheduling meetings, and to promptly provide us with any necessary documentation. Mr. Lynn Eady, Director of Global Process - IT will serve this role for this project.
- E&Y will have access and provide periodic reporting regarding testing progress and results to Derek Kolano, Acting Director of Corporate Audit Services.
- Delphi team members required for meetings should be available when scheduled;
- Requests for changes in the project scope, timing and/or approach will be communicated between the parties on a timely basis. These changes would be subject to Delphi business contact approval as needed.

Tammy Izzo will be the engagement Partner, responsible for the provision of the IT Sarbanes Oxley related work. Advisory partners as determined by E&Y will be included as required. Andrew Tanner, Senior Manager, will work closely with management in performing the IT Sarbanes Oxley services.  If one or more of these individuals ceases to provide services pursuant to this agreement, Ernst & Young will so advise the Company and, if that professional is replaced, provide the Company with the name of that professional's replacement. Other staff, not identified herein, may be utilized as required to conduct our work in most efficient manner. Key personnel would be replaced by like skills and competency where appropriate.

## Fee Arrangements

The services set forth in this Project Exhibit A-2 shall be provided at hourly rates for the US E&Y resources staffing this project.  International rates will be 10% above the listed rates. The currently applicable US rates are set forth below.

| RESOURCE LEVEL | Currently Applicable US Hourly Rates |
|---|---|
| Partner/Principal | $330 |
| Senior Manager | $285 |
| Manager | $260 |
| Senior | $215 |
| Staff | $155 |

The domestic and international resources will be agreed upon with Delphi and E&Y as required and as resources are available. The total fees will be billed based upon the hours incurred at this discounted rate, plus expenses.  Travel expenses to Detroit and other locations may be required.

E&Y will provide Delphi with monthly billing information of its fees and expenses and forecasted fees for the following month.

AGREED TO AND ACCEPTED BY:

DELPHI CORPORATION

By: _____
Mr. John D. Sheehan

Vice President &
Chief Restructuring Officer,
Chief Accounting Officer &
Controller

Date: __11/25/05__

By: _____
Ms. Bette Walker

Chief Information Officer

Date: __11/28/05__

By: _____
Mr. Derek Kolano

Acting Director
Corporate Audit Services

Date: __11/28/05__

**Project Exhibit A-3**

**Assistance in connection with Delphi Corporate Accounting Policies ("DCAP")**

<u>**Scope of Services**</u>

The objectives of this Project A-3 are to assist management of Delphi in the development of the organization, format and content update of its Delphi Corporate Accounting Policies manual. The primary emphasis of this Project A-3 will involve providing the Company with recommended updates to the DCAP to reflect references to and or descriptions of current US Generally Accepted Accounting Principles that may be applicable to the Company.

The Services will include the following:

- Assistance with the development of the overall organization of the policies within the DCAP, and the content and format of the policies with the objective of improving the functionality of the DCAP for Delphi users.

- Recommendations as to references to and/or descriptions and examples of US GAAP that should be considered by management for inclusion in the DCAP.

- Recommendations relative to the means of distributing the DCAP to Delphi personnel on a global basis, for training and development programs using the DCAP and ongoing maintenance of the DCAP.

<u>**Timing**</u>

- E&Y and the Company shall mutually agree upon a time frame for Project A-3. E&Y and the Company will co-develop the taxonomy of the DCAP as well as the standard policy content and layout and work on the policies designated by the Company.

<u>**Deliverables**</u>

The product of the Project A-3 services will be written recommendations as to proposed revisions to the DCAP. The proposed revisions will provide references to or descriptions of US GAAP that may be applicable to the Company. E&Y will also provide recommended examples illustrating the US GAAP principles in those policies where we jointly agree it will be of benefit to the DCAP users. It is the responsibility of management of the Company to review and approve the proposed DCAP revisions. E&Y will not render an attestation or assurance report or opinion under this Project A-3, nor will the services constitute (1) an audit, review or examination of financial statements in accordance with generally accepted auditing standards, (2) an engagement to issue a report or reports in accordance with Statement on Auditing Standards (SAS) No. 50, "Reports on the Application of Accounting Principles" as amended by SAS No. 97, (3) an

examination of prospective financial statements in accordance with standards established by the AICPA or (4) a review to detect fraud or illegal acts. The services will not include preparation of Reports relating to the effectiveness of internal controls over financial reporting under Section 404 of the Sarbanes-Oxley Act. The Services will not include any procedures to test compliance with the laws or regulations of any jurisdiction. None of the Services or any Reports will constitute any legal opinion or advice.

## Management's Responsibilities, Assumptions and Other Matters

- A sponsor at Delphi should be identified and readily available to assist with scheduling meetings, and to promptly provide us with any necessary documentation. Jennifer Williams, Director of Technical Accounting & Reporting, will serve in this role for this project.

- Delphi will review and approve the overall organization and content of the DCAP and all proposed DCAP revisions. Delphi will also assume sole responsibility for the conclusions as to the interpretation and applicability of US GAAP to its transactions and financial reporting. Jennifer Williams, Director of Technical Accounting & Reporting, will serve as the project lead for coordinating both Delphi's process for the review and approval of all DCAP revisions proposed as part of this scope of work, and for the determination of the applicability and interpretation of US GAAP.

- Delphi project team members will take responsibility for the evaluation of the completeness and accuracy of any internal controls documentation, business policy documentation, closing schedule information, inter company allocations, charges and other transfers, or chart of account references included in the DCAP.

- Delphi project team members will assess the need for clarification of or additions to its existing DCAP based on inputs from internal sources including but not limited to, the results of its external integrated audit, the results of internal audits, new business or transaction activities that were not previously contemplated in the DCAP, documented inquiries of or interviews with DCAP users, and other sources as appropriate.

- Delphi team members required for meetings should be available when scheduled.

Jeff Henning will be the engagement Partner, responsible for the provision of the services. Advisory partners as determined by E&Y will be included as required. Matt Pagac, manager, will work closely with management in performing the services. If one or more of these individuals ceases to provide services pursuant to this agreement, Ernst & Young will so advise the Company and, if that professional is replaced, provide the Company with the name of that professional's replacement. Other staff, not identified herein, may be utilized as required to conduct our work in most efficient manner. Key personnel would be replaced by like skills and competency where appropriate.

**<u>Fees and Billings</u>**

- Our fees for these services will be on a time and materials basis, at the rate per hour outlined below.

| Level | |
|---|---|
| Partner | $330 |
| Senior Manager | $285 |
| Manager | $260 |
| Senior | $145 |
| Staff | $116 |

- E&Y will conduct the initial planning, including the co-development of the design of standard policy content, the overall organization of the DCAP and the mutual agreement as to the approach, priorities and timing at our cost.

- E&Y will submit our invoices monthly. Expenses such as travel, meals, and accommodations will be charged as incurred according to the Agreement, including Exhibit D.

AGREED TO AND ACCEPTED BY:

DELPHI CORPORATION

By: _____

Mr. John D. Sheehan
Vice President &
Chief Restructuring Officer,
Chief Accounting Officer & Controller

Date:_____

**Project Exhibit A-4**

**Certus Implementation Assistance**

<u>**Project Identification & Specific Description of Services**</u>

E&Y will assist the Company in the implementation of the Certus Sarbanes Compliance Tool. The Company requires assistance in identifying functional / technical requirements, and working with Certus and Management of the Company to implement the application in accordance with those requirements. E&Y will provide two resources for assisting in this effort; these resources will be allocated according to the project plan developed by the Company not to exceed two full-time equivalents. The Company will provide executive oversight for this project.

E&Y will assist in the completion of the following activities:

- General project management responsibilities with direction from the Company
- Assist in documenting the functional, technical, and system requirements
- Assist in designing the tool functionality according to the company's specifications
- Assist in the design and execution of integrated testing
- Assist in the development and deployment of user training

E&Y will provide resources to support the Company with developing the deliverables the Company deems appropriate for the project. The engagement is based on time and materials, not deliverables. The deliverables are a guide to the overall project.

<u>**Timeline and Resources**</u>

E&Y and the Company shall mutually agree upon a time frame for Project A-4.

<u>**Management Responsibilities, Assumptions and Other Matters**</u>

- A sponsor at the Company should be identified and readily available to assist with scheduling meetings, and to promptly provide us with any necessary documentation.
- The Company team members required for meetings should be available when scheduled;
- Requests for changes in the project scope, timing and/or approach will be communicated between the parties on a timely basis.
- The person signing this scope change has the appropriate authority to sign this scope change.

Tammy Izzo will be the engagement Partner, responsible for the provision of the IT Sarbanes Oxley related work. Advisory partners as determined by E&Y will be included as required. Andrew Tanner, Senior Manager, will work closely with management in performing the IT Sarbanes Oxley services. If one or more of these individuals ceases to provide services pursuant

to this agreement, Ernst & Young will so advise the Company and, if that professional is replaced, provide the Company with the name of that professional's replacement. Other staff, not identified herein, may be utilized as required to conduct our work in most efficient manner. Key personnel would be replaced by like skills and competency where appropriate.

**Fee Arrangements**

The fees for the approved services set forth in this Project Exhibit A-4 will be at the hourly rates set forth below, plus expenses. Travel expenses to Detroit and other locations may be required. Travel is subject to the terms and conditions set forth in Exhibit D.

Such hourly rates may be increased after December 31, 2005.

| RESOURCE LEVEL | Current US Hourly Rates |
|---|---|
| Partner/Principal | $330 |
| Senior Manager | $285 |
| Manager | $260 |
| Senior | $215 |
| Staff | $155 |

E&Y will provide Delphi with monthly billing information of our fees and expenses and forecasted fees for the following month.

AGREED TO AND ACCEPTED BY:

DELPHI CORPORATION

By: _____

Mr. John D. SheehanVice President & Chief Restructuring Officer, Chief Accounting Officer & Controller

Date: _____

**Project Exhibit A-5**

## Loan Staffing

<u>**Scope of Services**</u>

E&Y will provide certain professional personnel of E&Y (the "Personnel") for the purpose of assisting the Company with the documentation process related to specific projects as mutually agreed by E&Y and the Company (collectively, such activities hereinafter referred to as "Project A-5"). With respect to Project A-5, E&Y will provide the Personnel to perform the services described below and such other related services as requested by appropriate members of the Company's management and agreed to by E&Y.

For its initial project under Project A-5, E&Y will provide Personnel to Delphi to support Delphi's management in its SOX 404 remediation activities related to contract administration. This support will include assistance under the direction of Delphi in documentation of the contract administration process, interviews with stakeholders, and related administrative processes and documentation.   The timing of this project will be from the date of approval by the Bankruptcy Court of the retention of E&Y for approximately six weeks with the option to extend this timing based on mutual concurrence from E&Y and Delphi.

The Personnel will support the activities of the Company's employees in connection with the Project A-5, on a "loaned staff" basis.  Accordingly, the Company will designate a management-level employee to be responsible for providing general directions to, and supervising the work of, the Personnel in connection with each project.  In providing the Services, the Personnel will not perform any management functions or undertake any managerial responsibilities for the Company, including (without limitation) establishing and maintaining an effective internal control system, record keeping, supervising Company personnel or making decisions on behalf of the Company. Documents and other work product produced by the Personnel in connection with the Services will constitute the internal work product of the Company, and the Company shall not reference E&Y (including, without limitation, by using E&Y's name or the names of any global E&Y-associated firm) in any way with respect to such work product.  Given the loaned staff nature of the Services, E&Y will not subject the work product to its normal practices of partner level review and quality control, and E&Y assumes no responsibility with respect to the final work product.  To the extent that any of the Personnel signs or initials any work product (including, without limitation, work papers), it will be deemed to be for identification purposes only.  No Reports will be provided under this Project A-5.

**Fees and Expenses**

The Company shall pay E&Y's fees for the Services, which are based on the hourly rates set forth below.

| Hourly Rates | |
| --- | --- |
| Partner | $330 |
| Senior Manager | $285 |
| BRS Manager | $260 |
| Core Assurance Senior | $180 |
| BRS Senior | $145 |
| Staff | $116 |

AGREED TO AND ACCEPTED BY:

DELPHI CORPORATION

By: _____

John D. Sheehan Vice President &
Chief Restructuring Officer,
Chief Accounting Officer & Controller

Date: _____

**Exhibit B**
**Revised Delphi/EY Previously Agreed to Terms and Conditions on file with**
**Delphi General Auditor**


GENERAL TERMS AND CONDITIONS

1.    Agreement.

Upon approval by the Bankruptcy Court of the retention of E&Y by the Company and the terms
and conditions of this Agreement, this Agreement will supersede any and all prior agreements or
arrangements between the Company and E&Y with respect to the Services or other matters
contemplated by this Agreement, including, specifically, the engagement letters dated February
23, 2005,_April 18, 2005, and April 20, 2005. It is agreed that Ernst & Young LLP ("E&Y") will
provide to the Company the services (the "Services") described in the Project Exhibits as defined
in the accompanying engagement letter (the "Engagement Letter") to which this Exhibit B is
attached (the Engagement Letter, the Project Exhibits, this Exhibit B and Exhibits C and D are
collectively referred to as this "Agreement").  For purposes of this Agreement, the terms "E&Y"
include any affiliates of E&Y identified in any Project Exhibit as performing any of the Services,
and the term "Delphi" includes any subsidiaries and affiliates of Delphi for which the Services
are performed.  This Agreement constitutes the entire and sole agreement between Delphi and
E&Y (and merges all prior and contemporaneous communications) with respect to the subject
matter of this Agreement.

2.    Conduct of E&Y Personnel.

E&Y will take all reasonable steps to assure that all of its partners, principals, directors, officers,
employees, agents, subcontractors and/or independent contractors who are performing Services
on behalf of E&Y (collectively, "E&Y Personnel") are competent to perform the Services.  E&Y
will require all E&Y Personnel who are performing any work on Delphi's premises to comply
with all of Delphi's regulations and policies that have been provided to E&Y in writing.  Delphi,
in its sole discretion, has the right to: (a) bar any of E&Y Personnel from Delphi's premises for
failure to observe Delphi's regulations or policies, (b) require that E&Y promptly remove from
Delphi's premises any of E&Y Personnel who violate any of Delphi's regulations or policies, and
(c) require that E&Y cease using any of E&Y Personnel to perform the Services who are
reasonably unacceptable to Delphi.  Delphi will confer with E&Y to discuss Delphi's concerns
prior to requiring removal of any E&Y Personnel.  E&Y will replace any barred or removed
E&Y Personnel with E&Y Personnel reasonably acceptable to Delphi.

3.    Right to Employ.

Either party is free, at any time after prior discussions and consultation with the other party,
without compensation to the other, to offer employment to or to employ the employees of the
other party; provided, however, that if any E&Y Personnel that are performing Services under
this Agreement accept employment with Delphi during the term of this Agreement, the schedule

for E&Y's performance of the Services will be equitably adjusted to the extent necessary to address any resulting material adverse impact on E&Y's ability to continue to perform Services in accordance with this Agreement.

4.    E&Y Personnel.

E&Y Personnel furnished by E&Y to perform the Services are and will remain E&Y's employees and/or independent contractors and, under no circumstances, will any E&Y Personnel furnished by E&Y be deemed to be Delphi's employees or agents.  E&Y is solely responsible, at E&Y's sole cost and expense, for (i) the fulfillment of all obligations to E&Y Personnel and (ii) the compliance by E&Y and E&Y Personnel with all laws, regulations, orders and other governmental requirements applicable to performance of the Services.

5.    Professional Fees.

Subject to Bankruptcy Court approval, Delphi will compensate E&Y for actual Services performed as set forth in the Agreement and the respective Project Exhibits.

6.    Expenses.

Subject to Bankruptcy Court approval, Delphi will reimburse E&Y for all reasonable costs and expenses E&Y incurs in connection with the Services as set forth in the Agreement and the respective Project Exhibits; provided, however, that E&Y must obtain prior approval of Delphi for any individual reimbursable expenses in excess of $2,500 or for reimbursable expenses which exceed or are anticipated to exceed an aggregate of $10,000 during any calendar month.  E&Y will not charge any markup, overhead, profit or other fees on the reimbursable expenses.  The provisions of Exhibit D will govern Delphi's reimbursement obligations.

7.    Taxes.

Unless otherwise agreed in a Project Exhibit, any applicable taxes imposed on E&Y in connection with the performance of the Services (except for taxes imposed on income) will be invoiced to, and paid by, Delphi in addition to fees and expenses.

8.    Standard of Performance.

E&Y will exercise due professional care and competence in the performance of the Services, and all of the Services will be performed in accordance with applicable professional standards.

EXCEPT AS STATED ABOVE, E&Y MAKES NO WARRANTIES OF ANY KIND OR NATURE, WHETHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, OR WARRANTIES OF ANY PRODUCTS OR SERVICES PROVIDED BY A THIRD PARTY VENDOR.

9.              Limitation of Liability.

The total aggregate liability of E&Y in connection with the Services or otherwise arising out of this Agreement, regardless of whether such liability is based on breach of contract, tort, strict liability, breach of warranty, failure of essential purpose or otherwise, shall be limited to three (3) times the professional fees paid by Delphi to E&Y in respect of the Services.  Also, E&Y, E&Y Personnel, or Delphi will not be liable for consequential, punitive or special damages (including loss of profits, data, business or goodwill), regardless of whether such liability is based on breach of contract, tort, strict liability, breach of warranties, failure of essential purpose or otherwise, and even if advised of the likelihood of such damages.  Notwithstanding anything to the contrary otherwise set forth herein, the preceding limitations shall not apply (i) in the event of any breach of Section 11 below relating to Delphi Proprietary Information or (ii) if E&Y is found to be grossly negligent or to have acted in bad faith, willfully or fraudulently, or to have engaged in self-dealing or breach of fiduciary duty (if any).  Delphi's recourse with respect to any liability or obligation of E&Y hereunder shall be limited to the assets of E&Y, and Delphi shall have no recourse against, and shall bring no claim against, any individual partner of E&Y or any of the assets of such individuals.  The provisions of this Section 9 shall operate for the benefit of, and shall be enforceable by, any Ernst & Young International member or affiliated firm or any E&Y Personnel that is, together with E&Y, providing the Services hereunder.

To the fullest extent permitted by applicable law, the Company shall indemnify, defend and hold harmless E&Y, from and against all (A) claims and causes of action, pending or threatened, of any kind (whether based on contract, tort or otherwise) by third parties, including any affiliate of the Company, related to or arising out of (i) the use, disclosure of or reliance on, any Report or any portion, abstract or summary thereof by any person or entity that obtains access to it, directly or indirectly, from, through or at the request of the Company, (ii) the performance of any services under this Agreement, or (iii) the Company's failure to provide timely, accurate and complete information and resources as necessary for E&Y to perform services in accordance herewith (collectively, "Claims") and (B) liabilities, losses, damages, costs and expenses (including, without limitation, reasonable outside attorneys' fees and the allocable costs of in-house counsel) suffered or incurred by E&Y in connection with any Claims, provided, however, that the Company shall have no indemnification obligation hereunder to the extent that a court of competent jurisdiction finally determines that a Claim by the Company or a representative of the Debtors' estate has arisen out of E&Y's bad faith, self-dealing, breach of fiduciary duty (if any), gross negligence or willful misconduct.

E&Y shall indemnify, defend and hold harmless Delphi, including its directors, officers, employees, agents and representatives, from any and all claims, demands, actions, damages, liabilities, costs and expenses, including reasonable attorney fees and expenses, to the extent arising out of or resulting from the negligence, illegal acts or willful misconduct of E&Y and/or E&Y Personnel in connection with the performance of Services under this Agreement, provided, however, that E&Y will have no obligation to indemnify Delphi to the extent that any such claims or damages arise out of or result from third party claims (other than claims by governmental authorities) against Delphi based on any of E&Y's written or verbal work product

prepared pursuant to this Agreement (such as reports, analyses, projections, advice, recommendations and other data).

In each case, the indemnifying party shall also pay to the indemnified party any and all costs and expenses incurred in connection with the enforcement of these indemnification provisions.

10.    Federal Confidential Communications Privilege.

A confidentiality privilege under Internal Revenue Code Section 7525 may pertain to certain communications between E&Y personnel and Delphi regarding federal tax advice provided pursuant to this engagement. By retaining E&Y, Delphi agrees that E&Y is instructed to claim the privilege on Delphi's behalf, with respect to any applicable communications, up to and until such time as Delphi may waive any such privilege in writing. As disclosure of any such confidential communications to the Internal Revenue Service or other third party may cause any confidentiality privilege to be waived, each party shall notify the other party if the Internal Revenue Service or other third party requests information about any tax advice or tax advice documents provided by E&Y.

Delphi understands that E&Y makes no representation, warranty, or promise, and offers no opinion with respect to the applicability of such confidentiality privilege to any communication. Delphi agrees to indemnify E&Y for any attorney's fees and other costs and expenses incurred by E&Y in defending the confidentiality privilege on Delphi's behalf. E&Y agrees to promptly notify Delphi of any claim for which E&Y seeks indemnification and Delphi shall have the right to conduct the defense or settlement of any such claim at Delphi's sole expense, and E&Y shall cooperate with Delphi. E&Y shall nonetheless have the right to participate in such defense at its own expense and to approve the settlement of any claim hereunder that imposes liability or obligation.

11.    Non-Disclosure of Proprietary Information.

"Delphi Proprietary Information" means any information concerning the business and affairs of Delphi which is not publicly available at the time disclosed to or learned by E&Y or any of E&Y Personnel and which is identified by Delphi as "Confidential" and/or "Proprietary" or which is known, or under all of the facts and circumstances should reasonably have been known, by E&Y to be considered by Delphi as confidential and/or proprietary. Delphi Proprietary Information includes, without limitation, this Agreement, trade secrets, product specifications, data, know-how, formulas, compositions, processes, designs, sketches, photographs, samples, inventions, concepts, ideas, information, past, current and planned research and development, past, current and planned manufacturing or distribution methods and processes, price lists, business plans, reports, computer software and programs (including object code and source code), databases, notes, analyses, compilations, studies and other materials or intangibles. Delphi Proprietary Information also includes any materials or information that contain or are based on any other Delphi Proprietary Information, whether prepared by E&Y, Delphi, E&Y Personnel or any other person.

In connection with E&Y's performance of Services, Delphi may disclose Delphi Proprietary Information to E&Y. All Delphi Proprietary Information disclosed, furnished or made available to E&Y or to E&Y Personnel and all Delphi Proprietary Information generated or developed by E&Y or E&Y Personnel will be treated as confidential by E&Y and E&Y Personnel, and E&Y and E&Y Personnel will use reasonable efforts to avoid and prevent disclosure of Delphi Proprietary Information to third parties, either in whole or in part, except upon Delphi's prior written authorization. E&Y will be responsible and liable to Delphi for the violation by any of E&Y Personnel of these confidentiality obligations.

E&Y retains the right to use its knowledge, experience, and know-how, including processes, ideas, concepts and techniques developed in the course of performing the Services. If, during the course of performing the Services, E&Y discloses to Delphi any proprietary algorithms, formulae, tools, techniques, methods, processes, computer software or programs of E&Y ("E&Y Proprietary Information"), Delphi agrees to treat such E&Y Proprietary Information as confidential and use reasonable efforts to avoid and prevent disclosure of such E&Y Proprietary Information to third parties, provided that (i) E&Y informs Delphi of the proprietary nature of such E&Y Proprietary Information in advance of any such disclosure, (ii) E&Y marks all documents or other physical media containing E&Y Proprietary Information as "Confidential" or "Proprietary", (iii) E&Y discloses such information only to those personnel of Delphi which have a reasonable need to know such E&Y Proprietary Information and (iv) does not include such E&Y Proprietary Information (as opposed to the results generated by use or application of the E&Y Proprietary Information) in any work product delivered to Delphi under this Agreement.

If this engagement relates to a strategy offered by E&Y to Delphi that is designed to reduce or defer federal income tax for a direct or indirect corporate participant, pursuant to Treasury Regulation section 301.6111-2(c), Delphi (and each employee, representative, or other agent of Delphi) is expressly authorized to disclose the structure and tax aspects of the strategy with any and all persons, without limitation of any kind.

Written advice provided by E&Y to Delphi is for the information and use of Delphi only and may not be relied upon by any third party without the express written permission of E&Y.

The foregoing obligations under this Section 11 shall not apply to the extent that any information (i) is at the time of disclosure, or thereafter becomes, part of the public domain through a source other than the receiving party, (ii) is subsequently learned by the receiving party from a third party that has a legal right to make such disclosure and does not impose an obligation of confidentiality on the receiving party, (iii) was known to the receiving party at the time of disclosure by the disclosing party, (iv) was generated independently by the receiving party before disclosure by the disclosing party, or (v) is required to be disclosed by the receiving party by law, regulation, subpoena or other process, or applicable professional regulations.

12.    Subcontracting.

E&Y may subcontract a portion of its responsibilities under this Agreement without Delphi's prior written approval to any of the E&Y Entities; provided, however, that E&Y shall remain fully and solely responsible for all liabilities and obligations, including fiduciary duty (if any), of E&Y under this Agreement.

13.    Changes and Delays.

In the event that (i) Delphi requires a change in the scope of the Services, (ii) any change of applicable law or regulation affects the timing or performance of the Services or (iii) any action by Delphi or a third party (other than E&Y Personnel) affects the timing or performance of the Services, the fees and/or schedule for performance for the Services will be equitably adjusted by the parties subject to receipt of all necessary Bankruptcy Court approvals and notification to the U.S. Trustee's office and any committee designated to review fee applications (the "Fee Review Committee").

If either party is unable to perform its obligations in accordance with this Agreement as a result of an event or occurrence beyond the reasonable control of the affected party and without the affected party's fault or negligence, then any delay or failure to perform under this Agreement that results from such event or occurrence will be excused for so long as such event or occurrence continues, provided, however, that the affected party gives written notice of such delay (including the anticipated duration of the delay) to the other party as soon as possible after the event or occurrence (but in no event more than three (3) days thereafter). Such events and occurrences may include, by way of example and not limitation, natural disasters, fires, floods, windstorms, severe weather, explosions, riots, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), equipment breakdowns and power failures. If the affected party fails to provide adequate assurances that any delay will not exceed thirty (30) days or if any delay lasts more than thirty (30) days, the other party may terminate this Agreement without further liability.

To the extent that any Project Exhibit provides that E&Y's performance under this Agreement is contingent upon specific action or cooperation of Delphi, including the supply to E&Y of specific resources, approvals, and information, any delays in E&Y's performance which occur as a result of the failure or untimely performance by Delphi shall be excused to the extent of any such delay or untimely performance by Delphi and E&Y shall not incur any liability to Delphi as a result of any such delay or untimely performance by Delphi. If any such delay or untimely performance by Delphi lasts for thirty (30) days or more, E&Y shall be entitled to terminate this Agreement by giving written notice to Delphi, such termination to be effective on the date indicated in said notice.

14.    Term and Termination.

This Agreement may be terminated at any time by the Company or E&Y, but in any event this Agreement will expire upon the earlier of (i) completion of the Services or (ii) the effective date of the Company's confirmed plan of reorganization, or liquidation of the Company's assets under Chapter 11 or 7 of Title 11 of the United States Code, or otherwise. If either party terminates this Agreement, in addition to notice to the other party, the terminating party shall provide not less than three (3) days' prior written notice to the Bankruptcy Court, the U.S. Trustee's office, the Creditor's Committee and the Fee Review Committee (if any). The provisions of this Agreement relating to indemnification, limitation of liability, fees and expenses and alternative dispute resolution will remain operative and in full force and effect regardless of any termination or expiration of this Agreement and shall survive completion of the Company's bankruptcy whether through a confirmed plan of reorganization, liquidation of the Company's assets under Chapter 11 or 7 of Title 11 of the United States Code, or otherwise. If any portion of this Agreement is held to be void, invalid, or otherwise unenforceable, in whole or in part, the remaining portions of this Agreement shall remain in full force and effect.

15.    Conflict.

In the event of any conflict, ambiguity or inconsistency between this Agreement and any other agreement relating to the Services, including any preprinted terms and conditions on Delphi's purchase orders, the terms and conditions of this Agreement shall govern.

16.    Survival.

The provisions of this Agreement which give the parties rights beyond termination of this Agreement will survive any termination of this Agreement.

17.    Severability.

If any portion of this Agreement is held to be void, invalid, or otherwise unenforceable, in whole or part, the remaining portions of this Agreement shall remain in effect.

# EXHIBIT C

## Dispute Resolution Procedures

### *Mediation*

A party shall submit a dispute to mediation by written notice to the other party or parties. The mediator shall be selected by the parties. If the parties cannot agree on a mediator, the CPR Institute for Dispute Resolution ("CPR") shall designate a mediator at the request of a party. Any mediator must be acceptable to all parties.

The mediator shall conduct the mediation as he/she determines, with the agreement of the parties. The parties shall discuss their differences in good faith and attempt, with the mediator's assistance, to reach an amicable resolution of the dispute. The mediation shall be treated as a settlement discussion and shall therefore be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. The mediation proceedings shall not be recorded or transcribed.

Each party shall bear its own costs in the mediation. The parties shall share equally the fees and expenses of the mediator.

If the parties have not resolved a dispute within 90 days after written notice beginning mediation (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute shall be settled by arbitration. In addition, if a party initiates litigation, arbitration, or other binding dispute resolution process without initiating mediation, or before the mediation process has terminated, an opposing party may deem the meditation requirement to have been waived and may proceed with arbitration.

### *Arbitration*

The arbitration will be conducted in accordance with the procedures in this document and the CPR Rules for Non-Administered Arbitration ("Rules") as in effect on the date of the Agreement, or such other rules and procedures as the parties may agree. In the event of a conflict, the provisions of this document will control.

The arbitration will be conducted before a panel of three arbitrators, to be selected in accordance with the screened selection process provided in the Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of any of these procedures, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator may be appointed unless he or she has agreed in writing to these procedures.

The arbitration panel shall have no power to award non-monetary or equitable relief of any sort. Damages that are inconsistent with any applicable agreement, that are punitive in nature, or that are not measured by the prevailing party's actual damages, shall be unavailable in arbitration or any other forum. The parties expressly waive the right to such damages, and the arbitrators shall

have no power to award them unless the foregoing waiver is invalid or unenforceable. The arbitration panel shall have no power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

Discovery shall be permitted in connection with the arbitration only to the extent, if any, expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. The parties and the arbitration panel may disclose the existence, content or results of the arbitration only in accordance with the Rules or applicable professional standards. Before making any such disclosure, a party shall give written notice to all other parties and shall afford them a reasonable opportunity to protect their interests, except to the extent such disclosure is necessary to comply with applicable law, regulatory requirements or professional standards.

The result of the arbitration shall be binding on the parties, and judgment on the arbitration award may be entered in any court having jurisdiction.

**Exhibit D**

**Travel and Per Diem Reimbursement**

A.     If E&Y Personnel are required by Delphi to travel as an incidental requirement in performing services for Delphi, then such travel and per diem expenses, subject to prior written approval of Delphi, and subject to any guidelines established by the Bankruptcy Court or the U.S. Trustee, will be reimbursable as follows:

1.  Air Travel - Economy/Coach class only for U.S. travel. Business class is permitted for international travel.

2.  Hotel - E&Y will exercise good, sound business judgment and discretion in choosing hotels, such as a moderately priced chain hotels or hotels that offer discounted corporate rates. Where extended travel is involved, reduced rates may be available and should be requested.

3.  Rental cars - Compact or intermediate class only. The cost of collision damage waiver and personal accident insurance is the responsibility of E&Y.

4.  Mileage Allowance - Reimbursement will be at $0.405 per mile for the miles which are in excess of his or her normal commute from home to work and back. When permanently assigned to another location, even if the new location is temporary, E&Y will not be reimbursed for excess miles, additional driving time, etc.

5.  Expense Reports - Customarily available receipts must be attached to expense reports E&Y submits. Detailed receipts, other than restaurant tabs, are required for all meals and other expenditures of $25.00 or more.

6.  Meals - Meals will not be reimbursed for non-overnight trips, except in the case of late return occasioned by travel outside normal working hours. Reimbursement for meals will be the actual and reasonable expenses paid by E&Y.

7.  Extended Travel - E&Y should review the home visit policy prior to a trip. Generally, the following provisions apply:

    - If the travel expense is less than the living expense in the temporary location, E&Y will be reimbursed for travel to the permanent location every week.

    - If the travel expense is more than the living expense in the temporary location, E&Y will be reimbursed for travel to the permanent location every two weeks.

    - Excess expenses due to frequent travel or stays will not be reimbursed by Delphi without its prior written approval.

8. Miscellaneous - When E&Y chooses an alternative method of transportation, e.g., to drive instead of fly, reimbursement, including meals and lodging, will not exceed the lesser of the two costs. Documentation to support the lesser cost must be attached to expense report. Travel time must also be limited if on working hours.

The employee, his or her immediate supervisor, and an authorized Delphi representative must sign the expense report form.

E&Y is responsible for travel reservations, hotel/motel accommodations and rental cars. If directed by Delphi, E&Y will make all travel arrangements through Global Experts in Travel, using a special account set up for such purposes.

Any cash advance by E&Y to its employee is the responsibility of E&Y.

9. Per Diem. - In certain instances, a per diem will be paid to E&Y in accordance with Delphi's standard per diem policy.

B.    All travel and per diem for which E&Y seeks reimbursement will be submitted to Delphi on standard vouchers, with substantiating documentation, and will accompany the monthly invoices.

Exhibit B

**≡ll ERNST & YOUNG**

■ Ernst & Young LLP
Global Automotive Center
Suite 1200
101 West Big Beaver Road
Troy, Michigan 48084

■ Phone: (248) 457-38 00
www.ey.com

November 23, 2005

Ms. Laura Marion
Executive Director, Financial Results
Delphi Corporation
5725 Delphi Drive
Troy, Michigan  48098

**SFAS 142 Valuation of Saginaw Steering Systems and Thermal & Interior
Reporting Units**

Dear Ms. Marion:

This letter shall constitute an engagement agreement (the "Agreement") between Delphi
Corporation ("Delphi" or the "Company") and Ernst & Young LLP ("Ernst & Young" or
"E&Y").  You have requested that Ernst & Young provide services relating to Delphi's Financial
Accounting Standard Board's ("FASB") Statement No. 142 ("SFAS 142") Goodwill and Other
Intangible Assets analysis to be performed as of a current date to be determined by Delphi
management (the "Date of Valuation"), subsequent to Delphi's filing of a Chapter 11 petition in
the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy
Court").

We have agreed to provide such services, contingent upon the Bankruptcy Court approving our
retention in accordance with the terms and conditions which are set forth in this Agreement.

**Purpose and Scope**

Ernst & Young will assess the fair value of two Delphi divisions each with manufacturing
facilities in North America, Europe, Asia Pacific and South America.  Emphasis will be on the
valuation of fixed assets (Land Buildings, Improvements, and Equipment); however, the overall
goal is to assist Delphi management in assessing the total value of the divisions for the purpose
of adhering to SFAS 142.  The fixed asset valuation will be at the plant level.  We understand
that our valuation analysis will be used solely for financial reporting purposes under the standard
of fair value, which is defined as:

> ... *the amount at which an entity could be bought or sold in a current transaction
> between willing parties, that is, other than in a forced or liquidation sale[1].*

---

[1] Financial Accounting Standards Board, Statement of Financial Accounting Standards No. 142, Goodwill and Other
Intangible Assets, June 2001:  page 117.

A Member Practice of Ernst & Young Global

**⧎ ERNST & YOUNG**                                        ■ Ernst & Young LLP

Page 2
November 23, 2005

Ernst & Young will estimate the fair value of certain assets identified by the Company to assist in the goodwill impairment tests for the purpose of restating goodwill according to FASB's fair value[2] standards.

## Presentation of Results

Our analysis and recommendations will be documented in a summary narrative report ("Report") discussing our methodologies and recommendations and that will include supporting exhibits. The recommendations expressed in our Report will be based on methods and techniques that Ernst & Young considers appropriate under the circumstances.

We will provide you with three copies of the final report. Our proposed service and fee anticipates that we will receive your editorial comments within 10 business days of your receipt of the draft. Any subsequent changes in the report beyond those required to address the initial comments or any additional copies of the final report are outside the scope of our proposed service and fee.

Any summary of, or reference to, the Report or any oral presentation with respect thereto, any submission of the Report, in whole or in part, to the shareholders of Delphi or to any third party, or any reference to Ernst & Young will be subject in each instance to our prior review and written approval. Neither our recommendations nor the Report will be used for any purpose other than as stated herein. You agree that all services hereunder and the Report shall be solely for Delphi's informational purposes and internal use, and are not intended to be and should not be used by any person or entity other than Delphi. Delphi further agrees that such services and the Report shall not be circulated, quoted, disclosed, or distributed to, nor shall reference to such services or Report be made to, any other person or entity other than Delphi.

Furthermore, it is understood and agreed that Ernst & Young's services may include advice or recommendations, but all decisions in connection with the implementation of such advice or recommendations shall be the responsibility of, and made by, Delphi. Additionally, you acknowledge that the analysis should not be construed as a fairness opinion or investment advice and should not be used as the sole basis to set a transaction price.

You acknowledge that no reliance shall be placed on draft reports, draft conclusions, or advice, whether oral or written, issued by us as the same may be subject to further work, revision, and other factors which may mean that such drafts are substantially different from any final Report or advice issued.

---

[2] FASB Statement of Financial Concepts 7, "Using Cash Flow Information and Present Value in Accounting Measurements."

**≡IJ ERNST & YOUNG**                                      ■ Ernst & Young LLP

Page 3

November 23, 2005

It should be noted that our Report will include a statement of limiting conditions.   Exhibit C details the limiting conditions that we are aware of currently.  If, during our engagement, we determine that changes to these limiting conditions will be required, we will notify you of those changes.

## Information and Timing

E&Y began work on this project on or about June 3, 2005, and has completed a preliminary analysis and provided preliminary conclusions to Delphi.  Remaining services to be provided include verification of several locations' fixed asset data, reconciliation of this data to balance sheet information, quality review and drafting of a narrative report.

You agree that all information required by Ernst & Young regarding Delphi will be provided to Ernst & Young within a mutually agreeable period of time, and shall be accurate and complete in all material respects.  The recommendations rendered in the Report shall only represent the recommendations of Ernst & Young based upon the information furnished by Delphi management and other sources, and said recommendations shall be considered as advisory in nature. .  Furthermore, unless otherwise directed, at the conclusion of this engagement, we may disclose our role as financial advisors in future marketing documents and materials.

You recognize and acknowledge that in rendering services hereunder, Ernst & Young has been and will be, using and relying on and assuming, the accuracy of, without independent verification, data, material and other information (including, without limitation, financial forecasts and projections), with respect to Delphi, furnished to Ernst & Young by or on behalf of Delphi and its agents, counsel, employees and representatives (the "Information").  Ernst & Young does not assume responsibility for the accuracy and completeness of the Information, including, but not limited to, the disclosure materials related to the Transaction, and Ernst & Young shall not be obligated to conduct any independent study or investigation as to the accuracy or completeness of the Information.

Delphi represents that the Information will not contain any untrue statement of a material fact nor omit to state any material fact necessary to make the statements therein, in light of the circumstances in which they were made, not false or misleading, and that the Information will be true, complete and correct in all material respects.

## Professional Fees

Our professional fees will be based on the actual time incurred at the hourly rates in Exhibit A. Ernst & Young will request payment of its fees in accordance with the Bankruptcy Code, the Bankruptcy Rules, local bankruptcy rules for the Southern District of New York, any relevant administrative orders and the U.S. Trustee Guidelines. In addition, Ernst & Young will request

**ERNST & YOUNG**                                    ■ Ernst & Young LLP

reimbursement of its actual expenses related to this engagement, as well as fees for any time (including any time or reasonable expenses of legal counsel) it may incur in considering or responding to discovery requests or participating as a witness or otherwise in any legal, regulatory, or other proceeding as a result of its performance of these services.

Ernst &Young acknowledges that payment of its fees and expenses hereunder is subject to (i) the jurisdiction and approval of the Bankruptcy Court under Sections 328(a), 330 and 331 of the Bankruptcy Code,any order of the Bankruptcy Court approving the retention of Ernst &Young and the U.S. Trustee Guidelines, (ii) any applicable fee and expense guidelines and/or orders, and (iii) any requirements governing interim and final fee applications.

**Engagement Team**

Ted Keuchel, Partner; Jon Mason, Principal; and Loren Garruto, Senior Manager; will lead E&Y's team in providing valuation services and will work closely with management in providing such valuation services. If any of these individuals ceases to provide valuation services to the Company pursuant to this Agreement, Ernst & Young will so advise the Company and, if that person is replaced, provide the Company with the name of that professional's replacement. Other staff, not identified herein, may be utilized as required to conduct our work in the most efficient manner possible.

**Other Matters**

The Company represents and warrants to Ernst &Young that the person signing this Agreement is expressly authorized to execute it on behalf of the Company. The performance of the Services and the parties' obligations in connection therewith are subject to the additional terms and conditions set forth in Exhibit B which are an integral part of this Agreement and are incorporated herein by this reference.

E&Y shall be solely responsible for all of the liabilities and obligations of E&Y under this Agreement, whether or not performed, in whole or part, by E&Y, any affiliate of E&Y, any other member of the global Ernst & Young network or any of their respective affiliates (collectively, the "E&Y Entities," and any of them, an "E&Y Entity"), or any subcontractor or personnel of any E&Y Entity. The Company shall have no recourse, and shall bring no claim, against any E&Y Entity other than E&Y, or against any subcontractors, members, shareholders, directors, officers, managers, partners, agents, representatives or employees of any E&Y Entity (or any of their respective successors or permitted assigns), or any of their respective assets, with respect to the Services or otherwise under this Agreement.

In the event E&Y is requested or authorized by the Company or is required by government regulation, subpoena, or other legal process to produce its documents or its personnel as witnesses with respect to the Services, the Company will, so long as E&Y is not a party to the

≡ℐℐ *ERNST & YOUNG*                    ■ Ernst & Young LLP

Page 5
November 23, 2005

proceeding in which the information is sought, reimburse E&Y for its professional time and expenses, as well as the fees and expenses of its counsel (including the allocable cost of in-house counsel), incurred in responding to such requests.

To the fullest extent permitted by applicable law, the Company shall indemnify, defend and hold harmless E&Y, from and against all (A) claims and causes of action, pending or threatened, of any kind (whether based on contract, tort or otherwise) by third parties, including any affiliate of the Company, related to or arising out of (i) the use, disclosure of or reliance on, any Report or any portion, abstract or summary thereof by any person or entity that obtains access to it, directly or indirectly, from, through or at the request of the Company, (ii) the performance of any services under this Agreement, or (iii) the Company's failure to provide timely, accurate and complete information and resources as necessary for E&Y to perform services in accordance herewith (collectively, "Claims") and (B) liabilities, losses, damages, costs and expenses (including, without limitation, reasonable outside attorneys' fees and the allocable costs of in-house counsel) suffered or incurred by E&Y in connection with any Claims, provided, however, that the Company shall have no indemnification obligation hereunder to the extent that a court of competent jurisdiction finally determines that a Claim by the Company or a representative of the Debtors' estate has arisen out of E&Y's bad faith, self-dealing, breach of fiduciary duty (if any), gross negligence or willful misconduct.

Any controversy or claim with respect to, in connection with arising out of, or in any way related to this Agreement or the services provided hereunder (including any such matter involving any parent, subsidiary, affiliate, successor in interest or agent of the Company or of Ernst & Young) shall be brought in Bankruptcy Court, or the District Court if such District Court withdraws the reference and the parties to this Agreement, and any and all successors and assigns thereof, consent to the jurisdiction and venue of such court as the sole exclusive forum (unless such court does not have jurisdiction and venue of such claims or controversies) for the resolution of such claims, causes of action or lawsuits. The parties to this agreement, and any and all successors and assigns thereof, hereby waive a trial by jury, such waiver being informed and freely made. If the Bankruptcy Court, or the District Court upon withdrawal of the reference does not have or retain jurisdiction over the foregoing claims or controversies, the parties to this Agreement and any and all successors and assigns thereof, agree to submit first to non-binding mediation; and, if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures set forth in Exhibit D to this Agreement. Judgment on any arbitration award may be entered in any court having proper jurisdiction. The foregoing is binding on the Company, Ernst & Young and any and all successors and assigns thereof.

**ᴇᴜ ERNST & YOUNG**                        ■ Ernst & Young LLP

Page 6
November 23, 2005

By agreement to the provision of the services set forth in the Agreement, Ernst & Young is not providing a guarantee to the Company that Ernst & Young's performance of those services pursuant to the terms and conditions set forth in the Agreement will guarantee the Company's successful reorganization under Chapter 11 of Title 11 of the United States Code.

The benefits of this Agreement shall inure to the respective successors and assigns of the parties hereto and the obligations and liabilities assumed in this Agreement by the parties hereto shall be binding upon their respective successors and assigns.

*   *   *   *   *

We trust that the foregoing terms and provisions are agreeable to you, and request that you sign and return the enclosed copy of this Agreement to Ted Keuchel of Ernst & Young LLP at the address on the first page of this letter. We look forward to working with you on this engagement.

Very truly yours,

*Ernst & Young LLP*

**Delphi Corporation**

The foregoing has been read, understood and approved, and the undersigned does hereby agree to retain Ernst & Young LLP upon the terms and provisions contained herein.

By: _____

John D. Sheehan
Vice President &
Chief Restructuring Officer, Chief Accounting Officer & Controller

Date: ___11/25/05_____

**EXHIBIT A**

**Valuation Services Fee Schedule**

| Hourly Rates | |
|---|---|
| Partner/Principal | $425 |
| Senior Manager | $350 |
| Manager | $275 |
| Senior | $225 |
| Staff | $175 |

**EXHIBIT B**
VALUATION SERVICES
TERMS & CONDITIONS

1.    Agreement.

Upon approval by the Bankruptcy Court of the retention of E&Y by the Company and the terms and conditions of this Agreement, this Agreement will supersede any and all prior agreements or arrangements between the Company and E&Y with respect to the Services or other matters contemplated by this Agreement, including, specifically, the engagement letter dated June 3, 2005. It is agreed that E&Y will provide to Delphi the services (the "Services") described the accompanying engagement letter (the "Engagement Letter") to which this Exhibit B is attached (the Engagement Letter, this Exhibit B, Exhibits A, B2, C and D are collectively referred to as this "Agreement").

2.    Conduct of E&Y Personnel.

E&Y will take all reasonable steps to assure that all of its partners, principals and employees who are providing Services (the "Personnel") are competent to perform the Services. E&Y will require the Personnel who are performing any work on Delphi's premises to comply with all of Delphi's regulations and policies that have been provided to E&Y in writing. Delphi, in its sole discretion, has the right to: (a) bar any of the Personnel from Delphi's premises for failure to observe Delphi's regulations or policies, (b) require that E&Y promptly remove from Delphi's premises any of the Personnel who violate any of Delphi's regulations or policies, and (c) require that E&Y cease using any of the Personnel to perform the Services who are reasonably unacceptable to Delphi. Delphi will confer with E&Y to discuss Delphi's concerns prior to requiring removal of any of the Personnel. E&Y will replace any barred or removed Personnel with Personnel reasonably acceptable to Delphi.

EXHIBIT B
Page 2
November 23, 2005

3.      Non-Solicitation of Personnel.

Delphi shall not, during the term of this Agreement and for 12 months following its termination for any reason, solicit for employment, or hire, any of the Personnel involved in the performance of the Services, except as otherwise agreed in writing by E&Y.

4.      The Personnel.

The Personnel furnished by E&Y to perform the Services are and will remain E&Y's employees and/or independent contractors and, under no circumstances, will any of the Personnel furnished by E&Y be deemed to be Delphi's employees or agents.  E&Y is solely responsible, at E&Y's sole cost and expense, for (i) the fulfillment of all obligations to the Personnel and (ii) the compliance by E&Y and the Personnel with all laws, regulations, orders and other governmental requirements applicable to performance of the Services.

5.      Professional Fees.

Subject to Bankruptcy Court approval, Delphi will compensate E&Y for actual Services performed in accordance with the terms of the Engagement Letter.

6.      Expenses.

Subject to Bankruptcy Court approval, Delphi will reimburse E&Y for all reasonable costs and expenses E&Y incurs in connection with the Services; provided, however, that E&Y must obtain prior approval of Delphi for any individual reimbursable expenses in excess of $2,500 or for reimbursable expenses which exceed or are anticipated to exceed an aggregate of $10,000 during any calendar month.  E&Y will not charge any markup, overhead, profit or other fees on the reimbursable expenses.  The provisions of Exhibit B2 will govern Delphi's reimbursement obligations.

7.    Taxes.

Unless otherwise agreed in this Agreement, any applicable taxes imposed on E&Y in connection with the performance of the Services (except for taxes imposed on income) will be invoiced to, and paid by, Delphi in addition to fees and expenses.

8.    Standard of Performance

E&Y will exercise due professional care and competence in the performance of the Services, and all of the Services will be performed in accordance with applicable professional standards.

EXCEPT AS STATED ABOVE, E&Y MAKES NO WARRANTIES OF ANY KIND OR NATURE, WHETHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, OR WARRANTIES OF ANY PRODUCTS OR SERVICES PROVIDED BY A THIRD PARTY VENDOR.

9.    Limitation of Liability

The total aggregate liability of E&Y in connection with the Services or otherwise arising out of this Agreement, regardless of whether such liability is based on breach of contract, tort, strict liability, breach of warranty, failure of essential purpose or otherwise, shall be limited to three (3) times the professional fees paid by Delphi to E&Y in respect of the Services. Also, E&Y, E&Y Personnel, or Delphi will not be liable for consequential, punitive or special damages (including loss of profits, data, business or goodwill), regardless of whether such liability is based on breach of contract, tort, strict liability, breach of warranties, failure of essential purpose or otherwise, and even if advised of the likelihood of such damages. Notwithstanding anything to the contrary otherwise set forth herein, the preceding limitations shall not apply (i) in the event of any breach of Section 11 below relating to Delphi Proprietary Information or (ii) if E&Y is found to be grossly negligent or to have acted in bad faith, willfully or fraudulently, or to have engaged in self-dealing or breach of fiduciary duty, if any.

Delphi's recourse with respect to any liability or obligation of E&Y hereunder shall be limited to the assets of E&Y, and Delphi shall have no recourse against, and shall bring no claim against, any individual partner of E&Y or any of the assets of such individuals. The provisions of this Section 9 shall operate for the benefit of, and shall be enforceable by, any Ernst & Young International member or affiliated firm or any E&Y Personnel that is, together with E&Y, providing the Services hereunder.

10.    Federal Confidential Communications Privilege

A confidentiality privilege under Internal Revenue Code Section 7525 may pertain to certain communications between E&Y personnel and Delphi regarding federal tax advice provided pursuant to this engagement.  By retaining E&Y, Delphi agrees that E&Y is instructed to claim the privilege on Delphi's behalf, with respect to any applicable communications, up to and until such time as Delphi may waive any such privilege in writing.  As disclosure of any such confidential communications to the Internal Revenue Service or other third party may cause any confidentiality privilege to be waived, each party shall notify the other party if the Internal Revenue Service or other third party requests information about any tax advice or tax advice documents provided by E&Y.

Delphi understands that E&Y makes no representation, warranty, or promise, and offers no opinion with respect to the applicability of such confidentiality privilege to any communication. Delphi agrees to indemnify E&Y for any attorney's fees and other costs and expenses incurred by E&Y in defending the confidentiality privilege on Delphi's behalf. E&Y agrees to promptly notify Delphi of any claim for which E&Y seeks indemnification and Delphi shall have the right to conduct the defense or settlement of any such claim at Delphi's sole expense, and E&Y shall cooperate with Delphi.  E&Y shall nonetheless have the right to participate in such defense at its own expense and to approve the settlement of any claim hereunder that imposes liability or obligation.

11.    Non-Disclosure of Proprietary Information

"Delphi Proprietary Information" means any information concerning the business and affairs of Delphi which is not publicly available at the time disclosed to or learned by E&Y or any of the Personnel and which is identified by Delphi as "Confidential" and/or "Proprietary" or which is known, or under all of the facts and circumstances should reasonably have been known, by E&Y to be considered by Delphi as confidential and/or proprietary.  Delphi Proprietary Information includes, without limitation, this Agreement, trade secrets, product specifications, data, know-how, formulas, compositions, processes, designs, sketches, photographs, samples, inventions, concepts, ideas, information, past, current and planned research and development, past, current and planned manufacturing or distribution methods and processes, price lists, business plans, reports, computer software and programs (including object code and source code), databases, notes, analyses, compilations, studies and other materials or intangibles.  Delphi Proprietary Information also includes any materials or information that contain or are based on any other Delphi Proprietary Information, whether prepared by E&Y, Delphi, the Personnel or any other person.

EXHIBIT B
Page 5
November 23, 2005

In connection with E&Y's performance of Services, Delphi may disclose Delphi Proprietary Information to E&Y. All Delphi Proprietary Information disclosed, furnished or made available to E&Y or to the Personnel and all Delphi Proprietary Information generated or developed by E&Y or the Personnel will be treated as confidential by E&Y and the Personnel, and E&Y and the Personnel will use reasonable efforts to avoid and prevent disclosure of Delphi Proprietary Information to third parties, either in whole or in part, except upon Delphi's prior written authorization. E&Y will be responsible and liable to Delphi for the violation by any of the Personnel of these confidentiality obligations.

E&Y retains the right to use its knowledge, experience, and know-how, including processes, ideas, concepts and techniques developed in the course of performing the Services. If, during the course of performing the Services, E&Y discloses to Delphi any proprietary algorithms, formulae, tools, techniques, methods, processes, computer software or programs of E&Y ("E&Y Proprietary Information"), Delphi agrees to treat such E&Y Proprietary Information as confidential and use reasonable efforts to avoid and prevent disclosure of such E&Y Proprietary Information to third parties, provided that (i) E&Y informs Delphi of the proprietary nature of such E&Y Proprietary Information in advance of any such disclosure, (ii) E&Y marks all documents or other physical media containing E&Y Proprietary Information as "Confidential" or "Proprietary", (iii) E&Y discloses such information only to those personnel of Delphi which have a reasonable need to know such E&Y Proprietary Information and (iv) does not include such E&Y Proprietary Information (as opposed to the results generated by use or application of the E&Y Proprietary Information) in any work product delivered to Delphi under this Agreement.

If this engagement relates to a strategy offered by E&Y to Delphi that is designed to reduce or defer federal income tax for a direct or indirect corporate participant, pursuant to Treasury Regulation section 301.6111-2(c), Delphi (and each employee, representative, or other agent of Delphi) is expressly authorized to disclose the structure and tax aspects of the strategy with any and all persons, without limitation of any kind.

Written advice provided by E&Y to Delphi is for the information and use of Delphi only and may not be relied upon by any third party without the express written permission of E&Y.

The foregoing obligations under this Section 11 shall not apply to the extent that any information (i) is at the time of disclosure, or thereafter becomes, part of the public domain through a source other than the receiving party, (ii) is subsequently learned by the receiving party from a third party that has a legal right to make such disclosure and does not impose an obligation of confidentiality on the receiving party, (iii) was known to the receiving party at the time of disclosure by the disclosing party, (iv) was generated independently by the receiving party before disclosure by the disclosing party, or (v) is required to be disclosed by the receiving party by law, regulation, subpoena or other process, or applicable professional regulations.

12.    Subcontracting

E&Y may subcontract a portion of its responsibilities under this Agreement without Delphi's prior written approval to any of the E&Y Entities; provided, however, that E&Y shall remain fully and solely responsible for all liabilities and obligations, including fiduciary duty (if any), of E&Y under this Agreement.

13.    Changes and Delays

In the event that (i) Delphi requires a change in the scope of the Services, (ii) any change of applicable law or regulation affects the timing or performance of the Services or (iii) any action by Delphi or a third party (other than the Personnel) affects the timing or performance of the Services, the fees and/or schedule for performance for the Services will be equitably adjusted by the parties, subject to receipt of all necessary Bankruptcy Court approvals and notification to the U.S. Trustee's office and any committee designated to review fee applications (the "Fee Review Committee").

If either party is unable to perform its obligations in accordance with this Agreement as a result of an event or occurrence beyond the reasonable control of the affected party and without the affected party's fault or gross negligence, then any delay or failure to perform under this Agreement that results from such event or occurrence will be excused for so long as such event or occurrence continues, provided, however, that the affected party gives written notice of such delay (including the anticipated duration of the delay) to the other party as soon as possible after the event or occurrence (but in no event more than three (3) days thereafter). Such events and occurrences may include, by way of example and not limitation, natural disasters, fires, floods, windstorms, severe weather, explosions, riots, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), equipment breakdowns and power failures. If the affected party fails to provide adequate assurances that any delay will not exceed thirty (30) days or if any delay lasts more than thirty (30) days, the other party may terminate this Agreement without further liability.

To the extent that this Agreement provides that E&Y's performance is contingent upon specific action or cooperation of Delphi, including the supply to E&Y of specific resources, approvals, and information, any delays in E&Y's performance which occur as a result of the failure or untimely performance by Delphi shall be excused to the extent of any such delay or untimely performance by Delphi and E&Y shall not incur any liability to Delphi as a result of any such delay or untimely performance by Delphi. If any such delay or untimely performance by Delphi lasts for thirty (30) days or more, E&Y shall be entitled to terminate this Agreement by giving written notice to Delphi, such termination to be effective on the date indicated in said notice.

14.    Term and Termination

This Agreement may be terminated at any time by the Company or E&Y, but in any event this Agreement will expire upon the effective date of the Company's confirmed plan of reorganization, or liquidation of the Company's assets under Chapter 11 or 7 of Title 11 of the United States Code, or otherwise. . If either party terminates this Agreement, in addition to notice to the other party, the terminating party shall provide not less than three (3) days' prior written notice to the Bankruptcy Court, the U.S. Trustee's office, the Creditor's Committee and the Fee Review Committee (if any). The provisions of this Agreement relating to indemnification, limitation of liability, fees and expenses and alternative dispute resolution will remain operative and in full force and effect regardless of any termination or expiration of this Agreement and shall survive completion of the Company's bankruptcy whether through a confirmed plan of reorganization, liquidation of the Company's assets under Chapter 11 or 7 of Title 11 of the United States Code, or otherwise. If any portion of this Agreement is held to be void, invalid, or otherwise unenforceable, in whole or in part, the remaining portions of this Agreement shall remain in full force and effect.

15.    Conflict

In the event of any conflict, ambiguity or inconsistency between this Agreement and any other agreement relating to the Services, including any preprinted terms and conditions on Delphi's purchase orders, the terms and conditions of this Agreement shall govern.

16.     Severability

If any portion of this Agreement is held to be void, invalid, or otherwise unenforceable, in whole or part, the remaining portions of this Agreement shall remain in effect.

## EXHIBIT B2

## Travel and Per Diem Reimbursement

A.     If the Personnel are required by Delphi to travel as an incidental requirement in performing services for Delphi, and subject to any guidelines established by the Bankruptcy Court or the U.S. Trustee, then such travel and per diem expenses, subject to prior written approval of Delphi, will be reimbursable as follows:

1. Air Travel - Economy/Coach class only for U.S. travel.  Business class is permitted for international travel.

2. Hotel - E&Y will exercise good, sound business judgment and discretion in choosing hotels, such as a moderately priced chain hotels or hotels that offer discounted corporate rates.  Where extended travel is involved, reduced rates may be available and should be requested.

3. Rental cars - Compact or intermediate class only.  The cost of collision damage waiver and personal accident insurance is the responsibility of E&Y.

4. Mileage Allowance - Reimbursement will be at $0.405 per mile for the miles which are in excess of his or her normal commute from home to work and back.  When permanently assigned to another location, even if the new location is temporary, E&Y will not be reimbursed for excess miles, additional driving time, etc.

5. Expense Reports - Customarily available receipts must be attached to expense reports E&Y submits.  Detailed receipts, other than restaurant tabs, are required for all meals and other expenditures of $25.00 or more.

6. Meals - Meals will not be reimbursed for non-overnight trips, except in the case of late return occasioned by travel outside normal working hours.  Reimbursement for meals will be the actual and reasonable expenses paid by E&Y.

7. Extended Travel - E&Y should review the home visit policy prior to a trip.  Generally, the following provisions apply:

- If the travel expense is less than the living expense in the temporary location, E&Y will be reimbursed for travel to the permanent location every week.

- If the travel expense is more than the living expense in the temporary location, E&Y will be reimbursed for travel to the permanent location every two weeks.

- Excess expenses due to frequent travel or stays will not be reimbursed by Delphi without its prior written approval.

8.  Miscellaneous - When E&Y chooses an alternative method of transportation, e.g., to drive instead of fly, reimbursement, including meals and lodging, will not exceed the lesser of the two costs.  Documentation to support the lesser cost must be attached to expense report.  Travel time must also be limited if on working hours.

The employee, his or her immediate supervisor, and an authorized Delphi representative must sign the expense report form.

E&Y is responsible for travel reservations, hotel/motel accommodations and rental cars.  E&Y will make all travel arrangements through Delphi's travel agency Global Experts in Travel, using a special account set up for such purposes unless there are extenuating circumstances.

Any cash advance by E&Y to its employee is the responsibility of E&Y.

9.  Per Diem. - In certain instances, a per diem will be paid to E&Y in accordance with Delphi's standard per diem policy.

B.      All travel and per diem for which E&Y seeks reimbursement will be submitted to Delphi on standard vouchers, with substantiating documentation, and will accompany the monthly invoices.

C.      Eligibility is based on direct reimbursement from Delphi Corporation for qualifying travel expenditures verification of eligibility will be confirmed through the Delphi Corporation purchasing contact and PO Number information required for enrollment. Contract suppliers will be reimbursed for travel expenses at the Delphi Corporation rate only and shall be billed at actual cost (no mark-up allowed). To obtain Delphi Corporation rates, contractors must be properly enrolled in the Delphi Corporation travel program, and all travel (air, hotel, and car) on behalf of and paid for by Delphi Corporation must be arranged through Global Experts in Travel (GET) via Cliqbook, GET's on-line booking tool. Click the Cliqbook link on this site for instructions on how to get started with Cliqbook: http://www.globalconnected.net/delphi/index2.asp.  Go to supplier enrollment then documentation and finally profile.

# Exhibit C:
## Statement of Limiting Conditions

1.    Nothing has come to our attention to cause us to believe that the facts and data set forth in this report are not correct.

2.    Provision of valuation recommendations and considerations of the issues described herein are areas of regular valuation practice for which we believe that we have, and hold ourselves out to the public as having, substantial knowledge and experience.  The services provided are limited to such knowledge and experience and do not represent audit, advisory or tax-related services that may otherwise be provided by Ernst & Young LLP.

3.    No investigation of the title to the subject assets has been made, and the owner's claim to the subject assets are assumed to be valid.  To the extent that Ernst & Young LLP's services include assets, properties or business interests, Ernst & Young LLP shall assume no responsibility for matters of legal description or title, and Ernst & Young LLP shall be entitled to make the following assumptions: (i) title is good and marketable, (ii) there exist no liens or encumbrances, (iii) there is full compliance with all applicable Federal, state, local and national regulations and laws (including, without limitation, zoning regulations), and (iv) all required licenses, certificates of occupancy, consents, or legislative or administrative authority from any Federal, state, local, or national government, private entity or organization have been or can be obtained or renewed for any use on which Ernst & Young LLP services are to be based.

4.    This report has been prepared solely for the purpose stated, and should not be used for any other purpose.  Neither this report nor any portions thereof shall be copied or disseminated through advertising, public relations, news, sales, Securities and Exchange Commission disclosure documents or any other public (or private) media without the express written approval of Ernst & Young LLP.

5.    The recommendations of value contained herein are not intended to represent the values of the subject assets at any time other than the effective date that is specifically stated in this report.  Changes in market conditions could result in recommendations of value substantially different than those presented at the stated effective date.  We assume no responsibility for changes in market conditions or for the inability of the owner to locate a purchaser of the subject assets at the values stated herein.

6.    No responsibility is assumed for information furnished by others (including management), and such information is believed to be reliable.

7.    In the course of our analysis, we were provided with written information, oral information, and/or data in electronic form (e.g., computer diskettes), related to the structure, operation, and financial performance of the subject assets. We have relied upon

this information in our analyses and in the preparation of this report, and have not independently verified its accuracy or completeness.

8.    Certain historical financial data used in our valuation engagement were derived from audited financial statements and are the responsibility of management. The financial statements include disclosures required by generally accepted accounting principles. Those disclosures required are not repeated herein, and those who are not informed about such matters should refer to the audited financial statements. In addition, certain historical financial data used in our valuation engagement were provided by management and are unaudited. We have not independently verified the accuracy or completeness of the data provided and do not express an opinion or offer any form of assurance regarding its accuracy or completeness.

9.    The estimates of cash flow data provided by the subject company, and included herein, are solely for use in the valuation analysis and are not intended for use as forecasts or projections of future operations. We have not performed an examination or compilation of the accompanying cash flow data in accordance with standards prescribed by the American Institute of Certified Public Accountants, and, accordingly, do not express an opinion or offer any form of assurance on the accompanying cash flow data or their underlying assumptions. Furthermore, there will usually be differences between estimated and actual results because events and circumstances frequently do not occur as expected, and those differences may be material.

10.   Our report assumes full compliance with all applicable federal, state and local zoning, usage, environmental and similar laws and regulations, unless otherwise stated.

11.   We assume no responsibility for any financial and tax reporting judgments, which are appropriately those of management. It is our understanding that management accepts the responsibility for any financial statement and tax reporting issues with respect to the assets covered by our analysis, and for the ultimate use of our analysis and report.

12.   Ernst & Young LLP, by reason of its services hereunder, is not required to furnish additional work or services, or to give testimony, or be in attendance in court with reference to the assets, properties, or business interest in question or to update any report, recommendation, analysis, conclusion or other document relating to its services for any events or circumstances unless arrangements acceptable to Ernst & Young LLP have been separately agreed upon with Delphi Corporation.

**EXHIBIT D**
**Dispute Resolution Procedures**

*Mediation*

A party shall submit a dispute to mediation by written notice to the other party or parties. The mediator shall be selected by the parties. If the parties cannot agree on a mediator, the CPR Institute for Dispute Resolution ("CPR") shall designate a mediator at the request of a party. Any mediator must be acceptable to all parties.

The mediator shall conduct the mediation as he/she determines, with the agreement of the parties. The parties shall discuss their differences in good faith and attempt, with the mediator's assistance, to reach an amicable resolution of the dispute. The mediation shall be treated as a settlement discussion and shall therefore be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. The mediation proceedings shall not be recorded or transcribed.

Each party shall bear its own costs in the mediation. The parties shall share equally the fees and expenses of the mediator.

If the parties have not resolved a dispute within 90 days after written notice beginning mediation (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute shall be settled by arbitration. In addition, if a party initiates litigation, arbitration, or other binding dispute resolution process without initiating mediation, or before the mediation process has terminated, an opposing party may deem the mediation requirement to have been waived and may proceed with arbitration.

*Arbitration*

The arbitration will be conducted in accordance with the procedures in this document and the CPR Rules for Non-Administered Arbitration ("Rules") as in effect on the date of the Agreement, or such other rules and procedures as the parties may agree. In the event of a conflict, the provisions of this document will control.

The arbitration will be conducted before a panel of three arbitrators, to be selected in accordance with the screened selection process provided in the Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of any of these procedures, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator may be appointed unless he or she has agreed in writing to these procedures.

The arbitration panel shall have no power to award non-monetary or equitable relief of any sort. Damages that are inconsistent with any applicable agreement, that are punitive in nature, or that are not measured by the prevailing party's actual damages, shall be unavailable in arbitration or any other forum. The parties expressly waive the right to such damages, and the arbitrators shall have no power to award them unless

**EXHIBIT D:**

**Dispute Resolution Procedures**

November 23 2005

Page 2 of 2

the foregoing waiver is invalid or unenforceable. The arbitration panel shall have no power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

Discovery shall be permitted in connection with the arbitration only to the extent, if any, expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. The parties and the arbitration panel may disclose the existence, content or results of the arbitration only in accordance with the Rules or applicable professional standards. Before making any such disclosure, a party shall give written notice to all other parties and shall afford them a reasonable opportunity to protect their interests, except to the extent such disclosure is necessary to comply with applicable law, regulatory requirements or professional standards.

The result of the arbitration shall be binding on the parties, and judgment on the arbitration award may be entered in any court having jurisdiction.

Exhibit C

**ΞII ERNST & YOUNG**

■ Ernst & Young LLP
101 West Big Beaver Road
Suite 1200
Troy, Michigan 48084

■ Phone: (248) 457-3800
www.ey.com

November 28, 2005

Mr. Cliff Gross
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Ave., N.W.
Washington, DC 20005

Dear Cliff:

This letter will confirm the engagement of Ernst & Young LLP ("E&Y") by Skadden, Arps,
Slate, Meagher & Flom LLP ("Skadden") and Delphi Corporation (together with its subsidiaries,
"Delphi") to provide the services set forth in Section I below (the "Services") to assist Skadden in
its provision of legal advice to Delphi subject to the terms provided herein, including the
Supplemental Terms and Conditions attached to this letter (collectively, the "Agreement"). The
Services will also be subject to the terms of a separate engagement letter between E&Y and
Delphi dated November 18, 2005 (the "Delphi Agreement").. This Agreement shall supersede
the prior agreement between E&Y and Skadden dated October 17, 2005, and such prior
agreement shall be terminated as of the date hereof.

## I.   RESPONSIBILITIES AND AUTHORIZED SCOPE OF SERVICES

E&Y's services pursuant to this engagement are limited to providing research, compilation of
data, and analysis with respect to the application of Section 382 of the Internal Revenue Code.
During the term of this engagement, E&Y and Delphi may mutually agree that E&Y shall provide
certain additional tax services to Delphi, in accordance with past practices; provided that any such
additional tax services do not give rise to any auditor independence issues.. Pursuant to this
engagement, E&Y will not make any accounting determinations or judgments with respect to the
tax matters that are within the scope of this engagement. E&Y, in its sole professional judgment,
reserves the right to refuse to undertake any procedure or take any action that could be construed
as making management decisions or performing management functions. E&Y will not perform
management functions or make management decisions on behalf of Skadden or Delphi. In
connection with E&Y's provision of the Services hereunder, Delphi agrees to make all

Mr. Cliff Gross                                                              Page 2
November 28, 2005

management decisions and perform all management functions and maintain internal controls over
the related processes of Delphi.

**Any activities whose performance is not authorized by Skadden will be considered outside
the scope of this Agreement.**

E&Y will perform the Services in accordance with applicable professional standards, including the
Statements on Standards for Tax Services issued by the American Institute of Certified Public
Accountants.

## II. FEE

E&Y shall bill Delphi for the Services in accordance with terms of the Delphi Agreement.

## III. OTHER TERMS AND CONDITIONS

None of the work that we will perform under this engagement will constitute an attest
engagement in accordance with generally accepted auditing standards or advice and/or
documentation related to the effectiveness of internal controls over financial reporting under
Section 404 of the Sarbanes-Oxley Act. We assume no responsibility to keep Skadden apprised
of developments in the tax law relative to this engagement after it has been completed.

In the event we are requested or authorized by Skadden or are required by government
regulation, summons, subpoena or other legal process to produce our documents or personnel as
witnesses with respect to our engagement by Skadden pursuant to this Agreement, Delphi will, so
long as we are not a subject of the investigation or proceeding in which the information is sought,
reimburse us, at our standard billing rates for our professional time and expenses, as well as the
reasonable and documented fees and expenses of our counsel, incurred in responding to such
requests.

Any controversy or claim with respect to, in connection with arising out of, or in any way related
to this Agreement or the Services provided hereunder (including any such matter involving any
parent, subsidiary, affiliate, successor in interest or agent of Skadden or of E & Y) shall be
brought in the Bankruptcy Court, or the District Court if such District Court withdraws the
reference and the parties to this Agreement, and any and all successors and assigns thereof,
consent to the jurisdiction and venue of such court as the sole exclusive forum (unless such court
does not have jurisdiction and venue of such claims or controversies) for the resolution of such
claims, causes of action or lawsuits. The parties to this Agreement, and any and all successors
and assigns thereof, hereby waive trial by jury, such waiver being informed and freely made. If
the Bankruptcy Court, or the District Court upon withdrawal of the reference does not have or

Mr. Cliff Gross                                                                                          Page 3
November 28, 2005

retain jurisdiction over the foregoing claims or controversies, the parties to this Agreement and
any and all successors and assigns thereof, agree to submit first to non-binding mediation; and, if
mediation is not successful, then to binding arbitration, in accordance with the dispute resolution
procedures set forth in the attachment to this Agreement. Judgment on any arbitration award may
be entered in any court having proper jurisdiction. The foregoing is binding upon Skadden, E&Y
and any all successors and assigns thereof.

Except as expressly provided herein, this engagement letter does not modify the terms or
provisions of any engagement letter for other professional services that were agreed to prior to
the date noted below.

This agreement shall be governed by, and construed in accordance with, the laws of the State of
New York applicable to agreements made and fully to be performed therein by residents thereof.

If these arrangements are acceptable, please sign one copy of this letter and return it to Jacob
Blank.

If you have any questions concerning our engagement, please call Mr. Blank at 212-773-1589.

We very much appreciate the opportunity to perform these tax services for Skadden.

                                        Very truly yours,

                                        *Ernst + Young LLP*


Skadden, Arps, Slate, Meagher & Flom LLP

By: _Cliff Gross, Partner_          _11/28/205_
       Cliff Gross, Partner                Date


Delphi Corporation

By: _____          _28 Nov 2005_
                                                    Date

                        JAMES P. WHITSON
Attachments            CHIEF TAX OFFICER

SUPPLEMENTAL TERMS AND CONDITIONS

I.     Certain Services.

E&Y will not, in connection with the performance of the Services or otherwise, (i) act as a broker of the sale of any securities, (ii) solicit either Skadden or potential buyers to engage in any transaction, or (iii) act as a negotiator of a transaction. E&Y will not render any opinion as to the fairness of any transaction or whether the parties ought to enter into any transaction.

II.    Changes and Delays. Changes in the type or extent of the Services requested by Skadden or that are required for any other reason, including any change in applicable law or professional standards, schedule delays or other events beyond a party's reasonable control, but without its fault or negligence (collectively, "Unexpected Events"), may affect the fees for, and/or timing of performance of, the Services, revisions to which must be agreed by both parties, and, if applicable, approved by Delphi's Audit Committee subject to receipt of all necessary Bankruptcy Court approvals and notification to the U.S. Trustee's office and any committee designated to review fee applications (the "Fee Review Committee"). If either party's performance is delayed or suspended as a result of Unexpected Events, then the period during which the Services are to be performed shall be extended by such delay. Neither party shall incur any liability to the other party as a result of such delay or suspension.

III.   Information. Skadden acknowledges and agrees that it will timely provide, or cause to be provided timely, to E&Y all data, information and resources in its possession reasonably required by E&Y in connection with the performance of the Services. E&Y's advice and services shall be based solely upon such data and information furnished by or on behalf of Skadden, and E&Y will not evaluate, nor will it have any responsibility to verify independently, the accuracy or completeness thereof or the sufficiency of such data and information for Skadden's purposes.

IV.    Limitation of Liability.

A. Except in cases of bad faith, willful misconduct or gross negligence by E&Y or where E&Y has engaged in self-dealing or breach of fiduciary duty (if any), to the fullest extent permitted by applicable law, the total aggregate liability of E&Y (and its subcontractors) to Skadden and to Delphi (and to any affiliate thereof for or in respect of which the Services may be performed), regardless of whether such liability is based on breach of contract, tort, strict liability, breach of warranty, failure of essential purpose or otherwise, in connection with the performance of the Services or otherwise under this Agreement, shall be limited to three (3) times the professional fees actually paid to E&Y in respect of such Services. In the event E&Y becomes Delphi's external auditor at any time while the Services are being performed, or within the time during which any claim relating thereto must be brought against E&Y by Delphi, this Agreement shall automatically be deemed to be amended, as of the date hereof, to eliminate this Section IV.A. If so amended, all of the other terms and conditions of this Agreement shall remain in full force and effect.

B. Except in cases of bad faith, willful misconduct or gross negligence by E&Y or where E&Y has engaged in self-dealing or breach of fiduciary duty (if any), in no event will E&Y (or its subcontractors) be liable to Skadden (or to any affiliate thereof for or in respect of which the Services may be performed or to Delphi) for any consequential, incidental, indirect, or special damages (including loss of profits, data, business or good will) in connection with the performance of the Services or otherwise under this Agreement, whether or not liability is based on breach of contract, tort, strict liability, breach of warranty, failure of essential purpose or otherwise, and even if E&Y is advised of the likelihood of such damages. In no event will E&Y (or its subcontractors) be liable to Skadden  or to Delphi (or to any affiliate thereof for or in respect of which the Services may be performed) for any punitive damages  in connection with the performance of the Services or otherwise under this Agreement

C. E&Y shall be solely responsible for the performance of the Services and all of the other liabilities and obligations of E&Y under this Agreement including fiduciary duty (if any), whether or not performed, in whole or part, by E&Y, any affiliate of E&Y, any other member of the global Ernst & Young network or any of their respective affiliates (all such members, including E&Y and its affiliates, collectively, the "E&Y Entities," and any

4

of them, an "E&Y Entity"), or any subcontractor or personnel of any E&Y Entity. Skadden and its affiliates for or in respect of which any of the Services are provided and Delphi shall have no recourse, and shall bring no claim, against any E&Y Entity other than E&Y, or against any subcontractors, members, shareholders, directors, officers, managers, partners or employees of any of E&Y or any other E&Y Entity, or any of the assets of any thereof, with respect to any liability or obligations in connection with the performance of the Services or otherwise under this Agreement.

### V. Technical Elements; Tools.

A. In connection with performing the Services, E&Y may use certain data, modules, components, designs, utilities, subsets, objects, program listings, tools, models, methodologies, programs, systems, analysis frameworks, leading practices, and specifications developed or used by E&Y or its licensors, or to which E&Y otherwise has rights, including enhancements or improvements developed in the course of performing the Services (collectively, "Technical Elements"). Skadden shall have no rights in or to the Technical Elements, except that Skadden may use the Technical Elements owned by E&Y solely to the extent necessary for Skadden to use the opinions, reports or other documents resulting from these services as permitted by this Agreement. E&Y retains the right to use its knowledge, experience and know-how, including the Technical Elements in providing services to other clients.

B. In connection with the performance of the Services, E&Y may utilize, and may, subject to additional terms and conditions, including license agreements, to be agreed by the parties, permit authorized representatives of Skadden to utilize, certain software and collaborative tools, including PM Toolkit and QuickPlace® (collectively, the "Engagement Tools"). In no event shall Skadden copy or modify, or permit others to copy or modify, any Engagement Tools, nor shall it decompile, reverse engineer, or in any way derive any source code from, or create any derivative work of, any Engagement Tools. Skadden's use of QuickPlace shall be subject to and governed by the terms and conditions of the applicable license agreement, the terms and conditions of which are required to be agreed to by an authorized representative of Skadden prior to Skadden's access to QuickPlace. A copy of the license agreement can be provided to you upon request.

THE ENGAGEMENT TOOLS ARE PROVIDED "AS IS," AND NONE OF E&Y OR ANY OTHER PARTY INVOLVED IN THE CREATION, PRODUCTION OR DELIVERY OF ANY ENGAGEMENT TOOL MAKES ANY WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO ANY ENGAGEMENT TOOL OR TITLE THERETO, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OR USE, OR ANY WARRANTY THAT THE OPERATION OF ANY ENGAGEMENT TOOL WILL BE UNINTERRUPTED, ERROR FREE OR THAT IT WILL BE COMPATIBLE WITH ANY HARDWARE OR SOFTWARE USED BY SKADDEN. E&Y MAKES NO COMMITMENT TO SUPPORT, MAINTAIN OR UPGRADE ANY ENGAGEMENT TOOL. SKADDEN ASSUMES SOLE RESPONSIBILITY FOR THE USE OF, AND RESULTS OBTAINED FROM, ANY ENGAGEMENT TOOL.

C. To the extent that Skadden or its authorized representatives are permitted to use any Engagement Tool, Skadden acknowledges and agrees that such use is not a substitute for any documentation or system of records created or maintained pursuant to law, including, without limitation, Internal Revenue Code Section 6001. Skadden shall be solely responsible for maintaining separate copies of any documentation it inputs into any Engagement Tool.

D. E&Y's research and preparation of all work papers, exhibits, schedules, written memoranda, and other papers and writings will be solely for the benefit of and at the direction of Skadden, will be a part of Skadden's privileged attorney work product, and will be owned by Skadden.

### VI. Confidentiality.

A. Except as otherwise provided in this Agreement, without the prior written consent of Skadden, E&Y shall not disclose Confidential Information (as defined below) of Skadden or Delphi received in connection with

5

the performance of the Services. E&Y shall use the same degree of care that it uses to protect its own confidential information of like nature, but no less than a reasonable degree of care, to maintain in confidence the Confidential Information of the disclosing party. All documents and other materials generated or prepared by E&Y or its affiliates in connection with the Services shall be marked "Privileged and Confidential". The foregoing provisions shall not apply to any information that (i) is, at the time of disclosure, or thereafter becomes, available to the general public through a source other than E&Y, (ii) is subsequently learned from a third party that, to the knowledge of E&Y after reasonable inquiry, is not under an obligation of confidentiality to the disclosing party, (iii) was known to E&Y at the time of disclosure (from a third party that, to the knowledge of E&Y after reasonable inquiry, was not under an obligation of confidentiality to the disclosing party), as can be demonstrated by contemporaneous written evidence (iv) is generated independently by E&Y, as can be demonstrated by contemporaneous written evidence; or (iv) is disclosed as required by applicable professional obligations. In the event that the E&Y receives a request to disclose all or any part of Skadden's or Delphi's Confidential Information under the terms of a subpoena or order issued by a court or governmental body of competent jurisdiction, or E&Y is otherwise required by law or regulation to disclose all or any part of Skadden's or Delphi's Confidential Information, E&Y may, notwithstanding any provision of this Agreement to the contrary, disclose such information; however, E&Y agrees, unless it is prohibited by law from doing so to (i) promptly notify Skadden and Delphi of the existence, terms and circumstances surrounding such a request, so that Skadden and/or Delphi may seek an appropriate protective order before the due date of any such disclosure by E&Y (and, if Skadden and/or Delphi seeks such an order, to provide such cooperation as Skadden and/or Delphi shall reasonably request at Delphi's expense) and (ii) if disclosure of such information is required in the opinion of E&Y's counsel, exercise its reasonable best efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to such of the disclosed information which Skadden or Delphi so designates.

B. For purposes of this Section VI, Confidential Information shall mean any proprietary information relating to the business, operations, methodologies or procedures of Skadden or Delphi that is not generally known to the public and which is identified by Skadden of Delphi as "Confidential" and/or "Proprietary," or which, under all of the circumstances, ought reasonably to be treated as confidential and/or proprietary, including material subject to the attorney-client privilege and/or work product protection. E&Y confirms that it has been informed by Skadden that material subject to the attorney-client privilege and/or work product protection includes E&Y's research and preparation of all work papers, exhibits, schedules, written memoranda, and other papers and writings pursuant to this Agreement.

C. To the extent any information obtained from Skadden or Delphi constitutes protected health information under the Health Insurance Portability and Accountability Act (including any amendments or successor litigation) and any regulations promulgated thereunder (together, "HIPAA"), this Agreement shall be deemed to incorporate all terms that HIPAA requires to be included in a business associate contract pertaining to such information. E&Y shall use such information in compliance with applicable law.

D. Notwithstanding anything contained herein to the contrary, E&Y may disclose Skadden's or Delphi's Confidential Information, including, without limitation, tax return information, to E&Y Entities for the purpose of rendering the Services and any other services heretofore or hereafter requested by Skadden or Delphi. It is E&Y's policy not to disclose client information to unaffiliated third parties or persons other than E&Y Entities, except as required by law, without Skadden's or Delphi's consent. E&Y personnel and contractors working under E&Y's supervision are required to observe E&Y's policies concerning confidential client information, and E&Y employs security systems designed to protect against unauthorized access and use of confidential information.

E. Notwithstanding anything contained herein to the contrary, E&Y may transmit information to Skadden or Delphi or their respective representatives by e-mail over the Internet. Skadden and Delphi agree that, unless it specifically instructs E&Y in writing not to use such transmissions, any breach of confidentiality that occurs thereby shall not be deemed a breach of E&Y's obligations under this Section VI.

F. Our advice and services are only applicable to the specific facts and circumstances presented to us. Notwithstanding anything contained herein to the contrary, Skadden and Delphi and their respective officers, partners, directors, employees, agents and advisors may disclose to any person or entity, without limitation, the

6

U.S. tax treatment and tax structure or any other tax position with respect to which E&Y provides advice pursuant to this Agreement.

VII.    Term; Termination; Survival. This Agreement will commence on the date hereof and shall terminate upon completion of the Services, unless earlier terminated as set forth below. Either party may terminate this Agreement and its obligations hereunder upon written notice, if the other party breaches any of its material obligations hereunder and such breach is not cured within 15 days following receipt of written notice thereof. E&Y may terminate this Agreement, upon written notice to Skadden, if (A) delays due to Unexpected Events aggregate more than 30 days or (B) E&Y reasonably determines that it can no longer provide the Services in accordance with applicable professional obligations. Skadden may terminate this Agreement at any time upon written notice to E&Y.. If either party terminates this Agreement, in addition to notice to the other party, the terminating party shall provide not less than three (3) days' prior written notice to the Bankruptcy Court, the U.S. Trustee's office, the Creditor's Committee and the Fee Review Committee (if any). Skadden shall pay for work-in-progress, completed Services and expenses incurred by E&Y through the effective date of any termination upon payment of those amounts by Delphi as set forth above. The provisions of this Agreement that give the parties rights beyond termination hereof will survive any such termination.

VIII.    Non-Solicitation of Personnel. Skadden shall not, during the term of this Agreement and for 12 months following its termination for any reason, solicit for employment, or hire, any E&Y personnel involved in the performance of the Services, except as otherwise agreed in writing by E&Y.

IX.    Use of Names. Except as expressly permitted by this Agreement, neither party shall use or publicize the other party's name, trademark, service mark or logo in connection with the Services or any reports without the prior written consent of such other party.

X.    Entire Agreement; Severability; Assignability.

    A. This Agreement constitutes the entire agreement between Skadden and E&Y, and merges all prior and contemporaneous communications, with respect to the Services and the other matters contemplated hereby. This Agreement may not be modified except in a writing signed by both parties. If any portion of this Agreement is held to be void, invalid, or otherwise unenforceable, in whole or part, the remainder shall not be affected thereby.

    B. None of a party's rights or obligations under this Agreement may be assigned, in whole or in part, by either party without the prior written consent of the other party, provided, that E&Y may assign any of its rights or obligations under this Agreement to, and may perform the Services together with, an affiliate of E&Y or any other E&Y Entity. The provisions of this Agreement shall operate for the benefit of, and may be enforced by, any assignee or subcontractor that is providing any of the Services in accordance herewith.

7

Dispute Resolution Procedures

## *Mediation*

A party shall submit a dispute to mediation by written notice to the other party or parties. The mediator shall be selected by the parties. If the parties cannot agree on a mediator, the CPR Institute for Dispute Resolution ("CPR") shall designate a mediator at the request of a party. Any mediator must be acceptable to all parties.

The mediator shall conduct the mediation as he/she determines, with the agreement of the parties. The parties shall discuss their differences in good faith and attempt, with the mediator's assistance, to reach an amicable resolution of the dispute. The mediation shall be treated as a settlement discussion and shall therefore be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. The mediation proceedings shall not be recorded or transcribed.

Each party shall bear its own costs in the mediation. The parties shall share equally the fees and expenses of the mediator.

If the parties have not resolved a dispute within 90 days after written notice beginning mediation (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute shall be settled by arbitration. In addition, if a party initiates litigation, arbitration, or other binding dispute resolution process without initiating mediation, or before the mediation process has terminated, an opposing party may deem the meditation requirement to have been waived and may proceed with arbitration.

## *Arbitration*

The arbitration will be conducted in accordance with the procedures in this document and the CPR Rules for Non-Administered Arbitration ("Rules") as in effect on the date of the Agreement, or such other rules and procedures as the parties may agree. In the event of a conflict, the provisions of this document will control.

The arbitration will be conducted before a panel of three arbitrators, to be selected in accordance with the screened selection process provided in the Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of any of these procedures, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator may be appointed unless he or she has agreed in writing to these procedures.

The arbitration panel shall have no power to award non-monetary or equitable relief of any sort. Damages that are inconsistent with any applicable agreement, that are punitive in nature, or that are not measured by the prevailing party's actual damages, shall be unavailable in arbitration or any other forum. The parties expressly waive the right to such damages, and the arbitrators shall have no power to award them unless the foregoing waiver is invalid or unenforceable. The arbitration panel shall have no power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

Discovery shall be permitted in connection with the arbitration only to the extent, if any, expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. The parties and the arbitration panel may disclose the existence, content or results of the arbitration only in accordance with the Rules or applicable professional standards. Before making any such disclosure, a party shall give written notice to all other parties and shall afford them a reasonable opportunity to protect their interests, except to the extent such disclosure is necessary to comply with applicable law, regulatory requirements or professional standards.

8

The result of the arbitration shall be binding on the parties, and judgment on the arbitration award may be entered in any court having jurisdiction.

Exhibit D

**ΞIΙ ERNST & YOUNG**

■ Ernst & Young LLP
101 West Big Beaver Road
Suite 1200
Troy, Michigan 48084

■ Phone: (248) 457-3800
www.ey.com

November 28, 2005

Mr. James P. Whitson
Chief Tax Officer
Delphi Corporation
5725 Delphi Drive
Troy, MI 48098

Dear Mr. Whitson:

This letter, together with the attached Exhibits (collectively, this "Agreement"), sets forth the
terms and conditions pursuant to which Ernst & Young LLP ("E&Y") will provide the tax
services described herein (the "Services") to Delphi Corporation and its affiliates (the "Company,"
"Delphi" or "Debtor") to assist Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") in its
provision of legal advice to the Company subsequent to the Company's filing of a Chapter 11
petition in the United States Bankruptcy Court for the Southern District of New York (the
"Bankruptcy Court"). The Services will be performed under the direction of Skadden, and will
also be subject to the terms of a separate engagement letter between E&Y and Skadden dated
November 28, 2005 (the "Skadden Letter"). Any activities whose performance is not authorized
by Skadden will be considered outside the scope of this Agreement.

We have agreed to provide such Services, contingent upon the Bankruptcy Court approving our
retention in accordance with the terms and conditions that are set forth in this Agreement.

The Services are limited to research, compilation of data, and analysis with respect to the
application of Section 382 of the Internal Revenue Code. During the term of this engagement,
E&Y and the Company may mutually agree that E&Y shall provide certain additional tax services
to the Company, in accordance with past practices; provided that any such additional tax
services do not give rise to any auditor independence issues. Pursuant to this engagement, E&Y
will not make any accounting determinations or judgments with respect to the tax matters that are
within the scope of this engagement. E&Y, in its sole professional judgment, reserves the right to
refuse to undertake any procedure or take any action that could be construed as making

management decisions or performing management functions on behalf of Delphi. In connection with E&Y's provision of the Services, Delphi agrees to perform the following functions:

- Make all management decisions and perform all management functions, including determining account codings and approving all proposed journal entries;
- Assign a competent employee to oversee the tax services and evaluate the adequacy and results of the services;
- Accept responsibility for the results of the tax services; and
- Establish and maintain internal controls over the Company's tax processes.

E&Y will perform the Services in accordance with applicable professional standards, including the Statements on Standards for Tax Services issued by the American Institute of Certified Public Accountants.

None of the work that we will perform under this engagement will constitute an attest engagement in accordance with generally accepted auditing standards or advice and/or documentation related to the effectiveness of internal controls over financial reporting under Section 404 of the Sarbanes-Oxley Act. We assume no responsibility to keep Skadden or the Company apprised of developments in the tax law relative to this engagement after it has been completed.

E&Y shall be solely responsible for all of the liabilities and obligations of E&Y under this Agreement, whether or not performed, in whole or part, by E&Y, any affiliate of E&Y, any other member of the global E & Y network or any of their respective affiliates (collectively, the "E&Y Entities," and any of them, an "E&Y Entity"), or any subcontractor or personnel of any E&Y Entity. The Company shall have no recourse, and shall bring no claim, against any E&Y Entity other than E&Y, or against any subcontractors, members, shareholders, directors, officers, managers, partners, agents, representatives or employees of any E&Y Entity (or any of their respective successors or permitted assigns), or any of their respective assets, with respect to the Services or otherwise under this Agreement.

In the event E&Y is requested or authorized by Skadden or the Company or is required by government regulation, subpoena, or other legal process to produce its documents or its personnel as witnesses with respect to the Services, the Company will, so long as E&Y is not a party to the proceeding in which the information is sought, reimburse E&Y for its professional time and expenses, as well as the fees and expenses of its counsel (including the allocable cost of in-house counsel), incurred in responding to such requests. These requests will be documented with the appropriate receipts or supporting data provided.

E&Y shall bill Delphi for the Services based on the time of E&Y professionals expended in performing the Services. E&Y shall also bill Delphi for all applicable taxes incurred in connection with the delivery of the Services or any reports thereon (except for taxes imposed on E&Y's income).

E&Y's fees for the services described in this Agreement will be on a time and materials basis at the rates per hour outlined below.

| Level | Hourly rate |
|---|---|
| Partner / Principal | $650 - $750 |
| Senior Manager | $550 - $650 |
| Manager | $500 - $600 |
| Senior | $400 - $500 |
| Staff | $200 - $300 |

In addition, E&Y shall bill Delphi for reasonable and documented direct expenses incurred in connection with the performance of the Services. Direct expenses include reasonable and customary out-of-pocket expenses for items such as travel, meals, accommodations and other expenses specifically related to this engagement and in accordance with Exhibit A.7. and Exhibit C. E&Y may receive rebates from various vendors in connection with such expenses that it incurs, which rebates shall be used (on a full dollar-for-dollar basis) to reduce the amount that is billed pursuant to this Agreement.

The Services will be provided in accordance with the Terms and Conditions set forth in Exhibit A, which are incorporated herein by reference. E&Y acknowledges that payment of its fees and expenses hereunder is subject to (i) the jurisdiction and approval of the Bankruptcy Court under Sections 328(a), 330 and 331 of the Bankruptcy Code and any order of the Bankruptcy Court approving the retention of E&Y, (ii) any applicable fee and expense guidelines and/or orders, including the U.S. Trustee Guidelines, and (iii) any requirements governing interim and final fee applications.

We will request payment of our fees in accordance with the Bankruptcy Code, the Bankruptcy Rules, local bankruptcy rules for the Southern District of New York, the guidelines of the U.S. Trustee, and any relevant administrative orders. In addition, we will request reimbursement of our actual expenses related to this engagement, as well as fees for any time (including any time or reasonable expenses of legal counsel) we may incur in considering or responding to discovery requests or participating as a witness or otherwise in any legal, regulatory, or other proceeding as a result of our performance of these services. These requests will follow normal Delphi payment approvals as well as above.

Howard Tucker will be the Engagement Partner, responsible for the provision of Services provided hereunder. Jacob Blank, Partner, Richard Ward, Principal, and Molly Ericson, Senior, will also work closely with Skadden in performing the Services. If one or more of these individuals ceases to provide Services pursuant to this agreement, E & Y will so advise Skadden and, if that professional is replaced, provide Skadden with the name of that professional's replacement. Other staff, not identified herein, may be utilized as required to conduct our work in most efficient manner. Key personnel would be replaced by personnel with like skills and competency where appropriate.

Any controversy or claim with respect to, in connection with arising out of, or in any way related to this Agreement or the Services provided hereunder (including any such matter involving any parent, subsidiary, affiliate, successor in interest or agent of the Company or of E & Y) shall be brought in the Bankruptcy Court, or the District Court if such District Court withdraws the reference and the parties to this Agreement, and any and all successors and assigns thereof, consent to the jurisdiction and venue of such court as the sole exclusive forum (unless such court does not have jurisdiction and venue of such claims or controversies) for the resolution of such claims, causes of action or lawsuits. The parties to this Agreement, and any and all successors and assigns thereof, hereby waive trial by jury, such waiver being informed and freely made. If the Bankruptcy Court, or the District Court upon withdrawal of the reference does not have or retain jurisdiction over the foregoing claims or controversies, the parties to this Agreement and any and all successors and assigns thereof, agree to submit first to non-binding mediation; and, if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures set forth in Exhibit B to this Agreement. Judgment on any arbitration award may be entered in any court having proper jurisdiction. The foregoing is binding upon the Company, E & Y and any all successors and assigns thereof.

By agreement to the provision of the Services set forth in the Agreement, E & Y is not providing a guarantee to Skadden or the Company that E & Y's performance of those services pursuant to the terms and conditions set forth in the Agreement will guarantee the Company's successful reorganization under Chapter 11 of Title 11 of the United States Code.

The benefits of this Agreement shall inure to the respective successors and assigns of the parties hereto and the obligations and liabilities assumed in this Agreement by the parties hereto shall be binding upon their respective successors and assigns.

Yours very truly,

Ernst + Young LLP

AGREED TO AND ACCEPTED BY:

DELPHI CORPORATION

By:

JAMES P. WHITSON
CHIEF TAX OFFICER

Name: ĴAMES P. WHITSON

Title: CHIEF TAX OFFICER

Date: 28 Nov 2005

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: _____   11/28/2005

Cliff Gross, Partner        Date

**Exhibit A**
**Revised Delphi/EY Previously Agreed to Terms and Conditions on file with**
**Delphi General Auditor**

GENERAL TERMS AND CONDITIONS

1.    Agreement.

Upon approval by the Bankruptcy Court of the retention of E&Y by the Company and the terms and conditions of this Agreement, this Agreement will supersede any and all prior agreements or arrangements between the Company and E&Y with respect to the Services or other matters contemplated by this Agreement, including the agreement between E&Y and Skadden dated October 17, 2005. It is agreed that Ernst & Young LLP ("E&Y") will provide the Services described in the accompanying engagement letter (the "Engagement Letter") to which this Exhibit A is attached (the Engagement Letter, this Exhibit A and Exhibits B and C are collectively referred to as this "Agreement"). For purposes of this Agreement, the terms "E&Y" include any affiliates of E&Y identified in the Agreement as performing any of the Services, and the term "Delphi" includes any subsidiaries and affiliates of Delphi for which the Services are performed.

2.    Conduct of E&Y Personnel.

E&Y will take all reasonable steps to assure that all of its partners, principals, directors, officers, employees, agents, subcontractors and/or independent contractors who are performing Services on behalf of E&Y (collectively, "E&Y Personnel") are competent to perform the Services. E&Y will require all E&Y Personnel who are performing any work on Delphi's premises to comply with all of Delphi's regulations and policies that have been provided to E&Y in writing. Delphi, in its sole discretion, has the right to: (a) bar any of E&Y Personnel from Delphi's premises for failure to observe Delphi's regulations or policies, (b) require that E&Y promptly remove from Delphi's premises any of E&Y Personnel who violate any of Delphi's regulations or policies, and (c) require that E&Y cease using any of E&Y Personnel to perform the Services who are reasonably unacceptable to Delphi. Delphi will confer with E&Y to discuss Delphi's concerns prior to requiring removal of any E&Y Personnel. E&Y will replace any barred or removed E&Y Personnel with E&Y Personnel reasonably acceptable to Delphi.

3.    Non-Solicitation of Personnel.

The Company shall not, during the term of this Agreement and for 12 months following its termination for any reason, solicit for employment, or hire, any E&Y personnel involved in the performance of the Services, except as otherwise agreed in writing by E&Y; provided that the Company shall not breach its obligation hereunder by generally advertising available positions or hiring E&Y personnel who either respond to such advertisements or come to the Company on

their own initiative without direct or indirect encouragement from the Company. In addition, without the prior written consent of E&Y, the Company will not solicit for a position on its Board of Directors, nor hire, any current or former partner or professional employee of E&Y or any other E&Y Entity, if such solicitation, hiring or employment may impair the independence of E&Y under the Sarbanes-Oxley Act or under any other law, regulation, rule, listing requirement or professional standard governing the independence of accountants. Without limiting the foregoing, the Company agrees not to solicit, hire or employ, without the prior written consent of E&Y, any current or former partner or professional employee of E&Y or any E&Y Entity: (a) in a financial reporting oversight role, if such partner or professional employee has been involved in the performance of more than ten (10) hours of (or, in the case of the lead and concurring partner, any) audit, review, or attest service for or relating to the Company since the date of filing of the Company's most recent periodic annual report with the SEC or during the one year period preceding that date; or (b) in an accounting role, unless such partner or professional employee does not influence E&Y's operations or financial policies and has no capital balances or other financial arrangements with E&Y; or (c) if such partner or employee has not been retired from E&Y in the 36 months preceding the date of this agreement and that person will become a member of the board of directors. In order to effectuate this provision, the Company agrees to give E&Y written notice prior to soliciting or hiring any such person in order to allow E&Y to assess and advise the Company whether, in E&Y's judgment, such solicitation or hiring may impair E&Y's independence under the Act or under any other law, regulation, rule, listing requirement or professional standard governing the independence of accountants. The Company shall not hire any such person in the event E&Y has advised the Company, within 30 days of receiving such notice, of its determination that independence may be impaired

4.   E&Y Personnel.

E&Y Personnel furnished by E&Y to perform the Services are and will remain E&Y's employees and/or independent contractors and, under no circumstances, will any E&Y Personnel furnished by E&Y be deemed to be Delphi's employees or agents. E&Y is solely responsible, at E&Y's sole cost and expense, for (a) the fulfillment of all obligations to E&Y Personnel and (b) the compliance by E&Y and E&Y Personnel with all laws, regulations, orders and other governmental requirements applicable to performance of the Services.

5.   Professional Fees.

Subject to Bankruptcy Court approval, Delphi will compensate E&Y for actual Services performed as set forth in the Agreement.

6.   Expenses.

Subject to Bankruptcy Court approval, Delphi will reimburse E&Y for all reasonable costs and expenses E&Y incurs in connection with the Services as set forth in the Agreement; provided, however, that E&Y must obtain prior approval of Delphi for any individual reimbursable expenses in excess of $2,500 or for reimbursable expenses which exceed or are anticipated to exceed an aggregate of $10,000 during any calendar month. E&Y will not charge any markup, overhead,

profit or other fees on the reimbursable expenses. The provisions of Exhibit C will govern Delphi's reimbursement obligations.

7.     Taxes.

Unless otherwise agreed by the parties, any applicable taxes imposed on E&Y in connection with the performance of the Services (except for taxes imposed on income) will be invoiced to, and paid by, Delphi in addition to fees and expenses.

8.     Standard of Performance.

E&Y will exercise due professional care and competence in the performance of the Services, and all of the Services will be performed in accordance with applicable professional standards.

EXCEPT AS STATED ABOVE, E&Y MAKES NO WARRANTIES OF ANY KIND OR NATURE, WHETHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, OR WARRANTIES OF ANY PRODUCTS OR SERVICES PROVIDED BY A THIRD PARTY VENDOR.

9.     Limitation of Liability.

The total aggregate liability of E&Y in connection with the Services or otherwise arising out of this Agreement, regardless of whether such liability is based on breach of contract, tort, strict liability, breach of warranty, failure of essential purpose or otherwise, shall be limited to three (3) times the professional fees paid by Delphi to E&Y in respect of the Services. Also, E&Y, E&Y Personnel, or Delphi will not be liable for consequential, punitive or special damages (including loss of profits, data, business or goodwill), regardless of whether such liability is based on breach of contract, tort, strict liability, breach of warranties, failure of essential purpose or otherwise, and even if advised of the likelihood of such damages. Notwithstanding anything to the contrary otherwise set forth herein, the preceding limitations shall not apply (a) in the event of any breach of Section 11 below relating to Delphi Proprietary Information or (b) if E&Y is found to be grossly negligent or to have acted in bad faith, willfully or fraudulently, or to have engaged in self-dealing or breach of fiduciary duty (if any). Delphi's recourse with respect to any liability or obligation of E&Y hereunder shall be limited to the assets of E&Y, and Delphi shall have no recourse against, and shall bring no claim against, any individual partner of E&Y or any of the assets of such individuals. The provisions of this Section 9 shall operate for the benefit of, and shall be enforceable by, any Ernst & Young International member or affiliated firm or any E&Y Personnel that is, together with E&Y, providing the Services hereunder.

To the fullest extent permitted by applicable law, the Company shall indemnify, defend and hold harmless E&Y, from and against all (i) claims and causes of action, pending or threatened, of any kind (whether based on contract, tort or otherwise) by third parties, including any affiliate of the Company, related to or arising out of (A) the use, disclosure of or reliance on, any E&Y report or any portion, abstract or summary thereof by any person or entity that obtains access to it, directly or indirectly, from, through or at the request of the Company, (B) the performance of any services

under this Agreement, or (C) the Company's failure to provide timely, accurate and complete information and resources as necessary for E&Y to perform services in accordance herewith (collectively, "Claims") and (ii liabilities, losses, damages, costs and expenses (including, without limitation, reasonable outside attorneys' fees and the allocable costs of in-house counsel) suffered or incurred by E&Y in connection with any Claims, provided, however, that the Company shall have no indemnification obligation hereunder to the extent that a court of competent jurisdiction finally determines that a Claim by the Company or a representative of the Debtors' estate has arisen out of E&Y's bad faith, self-dealing, breach of fiduciary duty (if any), gross negligence or willful misconduct.

E&Y shall indemnify, defend and hold harmless Delphi, including its directors, officers, employees, agents and representatives, from any and all claims, demands, actions, damages, liabilities, costs and expenses, including reasonable attorney fees and expenses, to the extent arising out of or resulting from the negligence, illegal acts or willful misconduct of E&Y and/or E&Y Personnel in connection with the performance of Services under this Agreement, provided, however, that E&Y will have no obligation to indemnify Delphi to the extent that any such claims or damages arise out of or result from third party claims (other than claims by governmental authorities) against Delphi based on any of E&Y's written or verbal work product prepared pursuant to this Agreement (such as reports, analyses, projections, advice, recommendations and other data).

In each case, the indemnifying party shall also pay to the indemnified party any and all costs and expenses incurred in connection with the enforcement of these indemnification provisions.

In the event E&Y becomes Delphi's external auditor at any time while the Services are being performed, or within the time during which any claim relating thereto must be brought against E&Y by Delphi, this Agreement shall automatically be deemed to be amended, as of the date hereof, to eliminate this Section 9. If so amended, all of the other terms and conditions of this Agreement shall remain in full force and effect.

10.    Federal Confidential Communications Privilege.

A confidentiality privilege under Internal Revenue Code Section 7525 may pertain to certain communications between E&Y personnel and Delphi regarding federal tax advice provided pursuant to this engagement. By retaining E&Y, Delphi agrees that E&Y is instructed to claim the privilege on Delphi's behalf, with respect to any applicable communications, up to and until such time as Delphi may waive any such privilege in writing. As disclosure of any such confidential communications to the Internal Revenue Service or other third party may cause any confidentiality privilege to be waived, each party shall notify the other party if the Internal Revenue Service or other third party requests information about any tax advice or tax advice documents provided by E&Y.

Delphi understands that E&Y makes no representation, warranty, or promise, and offers no opinion with respect to the applicability of such confidentiality privilege to any communication. Delphi agrees to indemnify E&Y for any attorney's fees and other costs and expenses incurred by

E&Y in defending the confidentiality privilege on Delphi's behalf. E&Y agrees to promptly notify Delphi of any claim for which E&Y seeks indemnification and Delphi shall have the right to conduct the defense or settlement of any such claim at Delphi's sole expense, and E&Y shall cooperate with Delphi. E&Y shall nonetheless have the right to participate in such defense at its own expense and to approve the settlement of any claim hereunder that imposes liability or obligation.

11. Non-Disclosure of Proprietary Information.

"Delphi Proprietary Information" means any information concerning the business and affairs of Delphi which is not publicly available at the time disclosed to or learned by E&Y or any of E&Y Personnel and which is identified by Delphi as "Confidential" and/or "Proprietary" or which is known, or under all of the facts and circumstances should reasonably have been known, by E&Y to be considered by Delphi as confidential and/or proprietary. Delphi Proprietary Information includes, without limitation, this Agreement, trade secrets, product specifications, data, know-how, formulas, compositions, processes, designs, sketches, photographs, samples, inventions, concepts, ideas, information, past, current and planned research and development, past, current and planned manufacturing or distribution methods and processes, price lists, business plans, reports, computer software and programs (including object code and source code), databases, notes, analyses, compilations, studies and other materials or intangibles. Delphi Proprietary Information also includes any materials or information that contain or are based on any other Delphi Proprietary Information, whether prepared by E&Y, Delphi, E&Y Personnel or any other person.

In connection with E&Y's performance of Services, Delphi may disclose Delphi Proprietary Information to E&Y. All Delphi Proprietary Information disclosed, furnished or made available to E&Y or to E&Y Personnel and all Delphi Proprietary Information generated or developed by E&Y or E&Y Personnel will be treated as confidential by E&Y and E&Y Personnel, and E&Y and E&Y Personnel will use reasonable efforts to avoid and prevent disclosure of Delphi Proprietary Information to third parties, either in whole or in part, except upon Delphi's prior written authorization. E&Y will be responsible and liable to Delphi for the violation by any of E&Y Personnel of these confidentiality obligations.

E&Y retains the right to use its knowledge, experience, and know-how, including processes, ideas, concepts and techniques developed in the course of performing the Services. If, during the course of performing the Services, E&Y discloses to Delphi any proprietary algorithms, formulae, tools, techniques, methods, processes, computer software or programs of E&Y ("E&Y Proprietary Information"), Delphi agrees to treat such E&Y Proprietary Information as confidential and use reasonable efforts to avoid and prevent disclosure of such E&Y Proprietary Information to third parties, provided that (a) E&Y informs Delphi of the proprietary nature of such E&Y Proprietary Information in advance of any such disclosure, (b) E&Y marks all documents or other physical media containing E&Y Proprietary Information as "Confidential" or "Proprietary", (c) E&Y discloses such information only to those personnel of Delphi which have a reasonable need to know such E&Y Proprietary Information and (d) does not include such E&Y Proprietary Information (as opposed to the results generated by use or application of the E&Y Proprietary Information) in any work product delivered to Delphi under this Agreement.

If this engagement relates to a strategy offered by E&Y to Delphi that is designed to reduce or defer federal income tax for a direct or indirect corporate participant, pursuant to Treasury Regulation section 301.6111-2(c), Delphi (and each employee, representative, or other agent of Delphi) is expressly authorized to disclose the structure and tax aspects of the strategy with any and all persons, without limitation of any kind.

Written advice provided by E&Y to Delphi is for the information and use of Delphi only and may not be relied upon by any third party without the express written permission of E&Y.

The foregoing obligations under this Section 11 shall not apply to the extent that any information (i) is at the time of disclosure, or thereafter becomes, part of the public domain through a source other than the receiving party, (ii) is subsequently learned by the receiving party from a third party that has a legal right to make such disclosure and does not impose an obligation of confidentiality on the receiving party, (iii) was known to the receiving party at the time of disclosure by the disclosing party, (iv) was generated independently by the receiving party before disclosure by the disclosing party, or (v) is required to be disclosed by the receiving party by law, regulation, subpoena or other process, or applicable professional regulations.

12.    Subcontracting.

E&Y may subcontract a portion of its responsibilities under this Agreement without Delphi's prior written approval to any of the E&Y Entities; provided, however, that E&Y shall remain fully and solely responsible for all liabilities and obligations, including fiduciary duty (if any), of E&Y under this Agreement.

13.    Changes and Delays.

In the event that (i) Delphi requires a change in the scope of the Services, (ii) any change of applicable law or regulation affects the timing or performance of the Services or (iii) any action by Delphi or a third party (other than E&Y Personnel) affects the timing or performance of the Services, the fees and/or schedule for performance for the Services will be equitably adjusted by the parties subject to receipt of all necessary Bankruptcy Court approvals and notification to the U.S. Trustee's office and any committee designated to review fee applications (the "Fee Review Committee").If either party is unable to perform its obligations in accordance with this Agreement as a result of an event or occurrence beyond the reasonable control of the affected party and without the affected party's fault or negligence, then any delay or failure to perform under this Agreement that results from such event or occurrence will be excused for so long as such event or occurrence continues, provided, however, that the affected party gives written notice of such delay (including the anticipated duration of the delay) to the other party as soon as possible after the event or occurrence (but in no event more than three (3) days thereafter). Such events and occurrences may include, by way of example and not limitation, natural disasters, fires, floods, windstorms, severe weather, explosions, riots, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), equipment breakdowns and power failures. If the affected party fails to provide adequate assurances that any delay will not exceed thirty (30) days or if any delay lasts more than thirty (30) days, the other party may terminate this Agreement without further liability.

To the extent this Agreement provides that E&Y's performance under this Agreement is contingent upon specific action or cooperation of Delphi, including the supply to E&Y of specific resources, approvals, and information, any delays in E&Y's performance which occur as a result of the failure or untimely performance by Delphi shall be excused to the extent of any such delay or untimely performance by Delphi and E&Y shall not incur any liability to Delphi as a result of

any such delay or untimely performance by Delphi. If any such delay or untimely performance by Delphi lasts for thirty (30) days or more, E&Y shall be entitled to terminate this Agreement by giving written notice to Delphi, such termination to be effective on the date indicated in said notice.

14.     Term and Termination.

This Agreement may be terminated at any time by the Company or E&Y, but in any event this Agreement will expire upon the earlier of (a) the completion of the Services or (b) the effective date of the Company's confirmed plan of reorganization, or liquidation of the Company's assets under Chapter 11 or 7 of Title 11 of the United States Code, or otherwise. If either party terminates this Agreement, in addition to notice to the other party, the terminating party shall provide not less than three (3) days' prior written notice to the Bankruptcy Court, the U.S. Trustee's office, the Creditor's Committee and the Fee Review Committee (if any). The provisions of this Agreement relating to indemnification, limitation of liability, fees and expenses and alternative dispute resolution will remain operative and in full force and effect regardless of any termination or expiration of this Agreement and shall survive completion of the Company's bankruptcy whether through a confirmed plan of reorganization, liquidation of the Company's assets under Chapter 11 or 7 of Title 11 of the United States Code, or otherwise. If any portion of this Agreement is held to be void, invalid, or otherwise unenforceable, in whole or in part, the remaining portions of this Agreement shall remain in full force and effect.

15.     Conflict.

In the event of any conflict, ambiguity or inconsistency between this Agreement and any other agreement relating to the Services, including any preprinted terms and conditions on Delphi's purchase orders, the terms and conditions of this Agreement shall govern.

16.     Survival.

The provisions of this Agreement which give the parties rights beyond termination of this Agreement will survive any termination of this Agreement.

17.     Severability.

If any portion of this Agreement is held to be void, invalid, or otherwise unenforceable, in whole or part, the remaining portions of this Agreement shall remain in effect.

## EXHIBIT B

### Dispute Resolution Procedures

*Mediation*

A party shall submit a dispute to mediation by written notice to the other party or parties. The mediator shall be selected by the parties. If the parties cannot agree on a mediator, the CPR Institute for Dispute Resolution ("CPR") shall designate a mediator at the request of a party. Any mediator must be acceptable to all parties.

The mediator shall conduct the mediation as he/she determines, with the agreement of the parties. The parties shall discuss their differences in good faith and attempt, with the mediator's assistance, to reach an amicable resolution of the dispute. The mediation shall be treated as a settlement discussion and shall therefore be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. The mediation proceedings shall not be recorded or transcribed.

Each party shall bear its own costs in the mediation. The parties shall share equally the fees and expenses of the mediator.

If the parties have not resolved a dispute within 90 days after written notice beginning mediation (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute shall be settled by arbitration. In addition, if a party initiates litigation, arbitration, or other binding dispute resolution process without initiating mediation, or before the mediation process has terminated, an opposing party may deem the meditation requirement to have been waived and may proceed with arbitration.

*Arbitration*

The arbitration will be conducted in accordance with the procedures in this document and the CPR Rules for Non-Administered Arbitration ("Rules") as in effect on the date of the Agreement, or such other rules and procedures as the parties may agree. In the event of a conflict, the provisions of this document will control.

The arbitration will be conducted before a panel of three arbitrators, to be selected in accordance with the screened selection process provided in the Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of any of these procedures, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator may be appointed unless he or she has agreed in writing to these procedures.

The arbitration panel shall have no power to award non-monetary or equitable relief of any sort. Damages that are inconsistent with any applicable agreement, that are punitive in nature, or that are not measured by the prevailing party's actual damages, shall be unavailable in arbitration or any other forum. The parties expressly waive the right to such damages, and the arbitrators shall

have no power to award them unless the foregoing waiver is invalid or unenforceable. The arbitration panel shall have no power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

Discovery shall be permitted in connection with the arbitration only to the extent, if any, expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. The parties and the arbitration panel may disclose the existence, content or results of the arbitration only in accordance with the Rules or applicable professional standards. Before making any such disclosure, a party shall give written notice to all other parties and shall afford them a reasonable opportunity to protect their interests, except to the extent such disclosure is necessary to comply with applicable law, regulatory requirements or professional standards.

The result of the arbitration shall be binding on the parties, and judgment on the arbitration award may be entered in any court having jurisdiction.

**Exhibit C**

**Travel and Per Diem Reimbursement**

A.  If E&Y Personnel are required by Delphi to travel as an incidental requirement in performing services for Delphi, then such travel and per diem expenses, subject to prior written approval of Delphi, and subject to any guidelines established by the Bankruptcy Court or the U.S. Trustee, will be reimbursable as follows:

1.  Air Travel - Economy/Coach class only for U.S. travel. Business class is permitted for international travel.

2.  Hotel - E&Y will exercise good, sound business judgment and discretion in choosing hotels, such as a moderately priced chain hotels or hotels that offer discounted corporate rates. Where extended travel is involved, reduced rates may be available and should be requested.

3.  Rental cars - Compact or intermediate class only. The cost of collision damage waiver and personal accident insurance is the responsibility of E&Y.

4.  Mileage Allowance - Reimbursement will be at $0.405 per mile for the miles which are in excess of his or her normal commute from home to work and back. When permanently assigned to another location, even if the new location is temporary, E&Y will not be reimbursed for excess miles, additional driving time, etc.

5.  Expense Reports - Customarily available receipts must be attached to expense reports E&Y submits. Detailed receipts, other than restaurant tabs, are required for all meals and other expenditures of $25.00 or more.

6.  Meals - Meals will not be reimbursed for non-overnight trips, except in the case of late return occasioned by travel outside normal working hours. Reimbursement for meals will be the actual and reasonable expenses paid by E&Y.

7.  Extended Travel - E&Y should review the home visit policy prior to a trip. Generally, the following provisions apply:

    - If the travel expense is less than the living expense in the temporary location, E&Y will be reimbursed for travel to the permanent location every week.

    - If the travel expense is more than the living expense in the temporary location, E&Y will be reimbursed for travel to the permanent location every two weeks.

    - Excess expenses due to frequent travel or stays will not be reimbursed by Delphi without its prior written approval.

8.  Miscellaneous - When E&Y chooses an alternative method of transportation, e.g., to drive instead of fly, reimbursement, including meals and lodging, will not exceed the lesser of

the two costs. Documentation to support the lesser cost must be attached to expense report. Travel time must also be limited if on working hours.

The employee, his or her immediate supervisor, and an authorized Delphi representative must sign the expense report form.

E&Y is responsible for travel reservations, hotel/motel accommodations and rental cars. If directed by Delphi, E&Y will make all travel arrangements through Global Experts in Travel, using a special account set up for such purposes.

Any cash advance by E&Y to its employee is the responsibility of E&Y.

9. Per Diem. - In certain instances, a per diem will be paid to E&Y in accordance with Delphi's standard per diem policy.

B.    All travel and per diem for which E&Y seeks reimbursement will be submitted to Delphi on standard vouchers, with substantiating documentation, and will accompany the monthly invoices.