Return Date:
November 29, 2005

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:                                              )
                                                    )     **Chapter 11 Case No.**
In re DELPHI CORPORATION, et al., Debtors   )     **05-44481 (RDD)(Jointly**
                                                          **Administered)**

AFFIDAVIT IN SUPPORT OF
OBJECTION OF IUE-CWA TO MOTION FOR ORDER UNDER
§§ 105 AND 363 AUTHORIZING THE DEBTORS TO IMPLEMENT A
KEY EMPLOYEE COMPENSATION PROGRAM ("KECP")

1. My name is Henry Reichard. I am employed by the IUE - CWA, AFL-CIO (the "IUE") as the Chairman of the IUE - CWA Automotive Conference Board. I have had this job since May 2005. Between 2001 and May, 2005, I was the Director of Safety & Ergonomics for the Conference Board. Between January 1997 and October 2000, I worked as a full-time safety representative for IUE Local 755. Between 1982 and 1994, I worked for Local 755, first as a full-time Attendance Coordinator and then as a second shift Committeeman. In the IUE, the Committeeman title is the equivalent of the Business Agent title used by many other unions. Between 1983 and 2000, I served as an Executive Board Member of Local 755, and between 1998 and 2000, I also served as the Vice President of Local 755. Between 1969 and 1982, and again between 1994 and the end of 1996, I worked as a Millwright at the GM/Delco Chassis Plant in Kettering, Ohio.

2. As a Local Committeeman, I was involved in national and local bargaining in 1987,

1990, and 1993. Since 2001, when I started working for the Conference Board, I've been involved in national bargaining with Delphi, Visteon, General Motors and D-MAX Limited, a joint venture between General Motors and Isuzu. In addition, since I've been on the Conference Board, I have also been involved in local bargaining.

3. Since I have been on the Conference Board, I have also been actively involved in the administration of the IUE - Delphi national collective bargaining agreement, and the various Local supplements. In that regard, I have been involved in settlements of grievances with all of the IUE Local unions which represent Delphi employees -- Local 416 in New Brunswick, New Jersey, Local 755 in Kettering, Ohio, Local 698 in Clinton, Mississippi, Local 711 in Gadsden, Alabama, Local 717 in Warren, Ohio, Local 718 in Brookhaven, Mississippi, Local 801 in Moraine, Ohio, and Local 1111 in Ontario, California.

4. In my current job as Chairman of the Automotive Conference Board, I am responsible for negotiating and administering all Automotive Conference Board collective bargaining agreements. The Conference Board is composed of the IUE Local unions representing employees at Delphi, Vistion, General Motors, D-MAX, and Valeo. Conference Board collective bargaining agreements cover approximately 16,000 active employees, and there are approximately 25,000 Conference Board retirees. Conference Board employees currently work at 13 locations in seven states. As to Delphi, the IUE represents approximately 8,500 active employees, working at eight locations in four states. There are about 3,000 IUE Delphi retirees.

5. A single national collective bargaining agreement between Delphi and the IUE sets the terms and conditions of employment for all IUE-represented Delphi employees. This national

agreement is subject to certain modifications contained in local supplements.

6. Each Delphi location faces a different set of circumstances, reflecting various factors including the product produced by the location, the customers supplied by the location, competitive pressures facing Delphi with regard to the product produced by the location, the history of the location, operational issues unique to the location, and the history, demographics, and experiences of the employees there. The local supplements are very often the product of bargaining which reflects and addresses these factors.

7. The Automotive Conference Board negotiates the national agreement with Delphi and, along with the locals, negotiates the local supplements. In addition, it must approve all "waivers" to the national agreement. Within the IUE, a waiver is an instance where a specific term of the national agreement will not apply in a local situation, and instead will be replaced by a provision of the local supplement.

8. While working for the Conference Board, I have been involved in national bargaining and local supplement bargaining. Both before and after Delphi was spun off from General Motors, I spent a great deal of time in negotiations with Delphi and, since starting to work for the Conference Board, I have spent a great deal of time working with the various locals to help them reach local supplements. As a result of this work, I have come to meet and know many of the employees at these plants, as well as local union officials and bargaining committee membership at these plants. In addition, in order to learn about these plants and their unique circumstances, and to keep abreast of the changes in these circumstances, I have spent and continue to spend a great deal of time speaking to local leadership, bargaining committee members, and rank and file employees

of the various plants about their concerns and the unique circumstances facing their plants. Indeed, rank and file employees communicate with me about their concerns and views often -- I receive phone calls, voice mail messages, and emails from them daily.

9. Since the summer of 2005, when the notion of possible Delphi bankruptcy began to surface quite publicly, IUE-represented Delphi employees throughout the country have expressed their concern to me about their own future and the future of Delphi. Many of these employees have spent their entire working lives with Delphi, have unique knowledge of their plant's operation which is critical to the productive operations of those plants, and feel a deep sense of commitment to Delphi and to its ability to succeed on a going forward basis. They express concern about Delphi's future, and about the effect which a bankruptcy would have on Delphi, their communities, and Delphi's customers, the people who buy the products they produce. Indeed, these concerns reflect the IUE culture at Delphi, which recognizes "basic operating principles" -- equality, customer satisfaction, and working safely to deliver products to our customers on a timely basis, and at a competitive price.

10. When, shortly after the bankruptcy was announced, Delphi management announced publicly that it intended, through the bankruptcy, to dramatically slash hourly employees compensation - in amounts exceeding 50% - these employees were, obviously, concerned for their families. In general, it was difficult for them to understand how they could possibly continue to support their families if their wages and benefits were cut dramatically. Further, they were concerned that, during the bankruptcy, the plants where they worked would be shuttered.

11. In response to these concerns, and on behalf of the IUE, I told them that the IUE would do everything it could within its power to work to protect their jobs, their families, their

4

standards of living and their ability to continue to work productively at Delphi. I also explained to them the process that I understand is required under Section 1113 of the bankruptcy law. As I explained it to them, under 1113, Delphi would supply the Union with critical information concerning its financial position, Delphi and the Union would make every effort to reach an agreement to modify the collective bargaining agreement, it would be likely that the IUE would be called upon to make proposals that would involve cuts in their living standards, and that the IUE's goal was to voluntarily reach an agreement with Delphi modifying the collective bargaining agreement. I also explained to them that if there was no voluntary agreement reached, Delphi would have the right to ask the Court to reject the collective bargaining agreement, the IUE would resist that effort, and that the ultimate decision would be made by a Bankruptcy Court judge. I explained that, ideally, under Section 1113, voluntarily reached agreements would enable the IUE and Delphi to move forward, make their plants as productive and efficient as possible, maintain their families' standard of living, and enable Delphi to produce high quality products. While the employees were not happy about this, they understood that this was the reality of the situation that they faced.

12. When I would speak to and hear from the rank and file employees, bargaining committee members, and local union leadership, I was almost always asked the following question: if we are being asked to make such dramatic sacrifices on behalf of the company, how is it that top management of the company is simultaneously asking to be paid tens of millions of dollars in bonuses and stock awards on top of their regular salaries? These employees had heard and read that Delphi management had asked the Court to approve large bonus payments and stock awards to close to 500 Delphi executives, and they expressed great bewilderment and bitterness about this.

13. They wondered how Delphi could have it both ways: how could Delphi ask them

to sacrifice and, at the same time, ask the Court for permission to dramatically increase the amount of monies paid to the executives? I had no answer for them. What I heard over and over from them was the opinion that they shouldn't be asked to sacrificed for the company when the executives who put the company in the position that it is in now were refusing to sacrifice and, indeed, were demanding dramatic bonuses. I remember at least one person asking me how it was that the "guys who drove the boat into the dock" were going to be rewarded.

14. They gave me a simple message: if Delphi wants them to sacrifice, if the company wants them to continue to be productive and hard working in exchange for dramatically lower wages, then everyone needs to be in the same boat -- everyone needs to share the pain.

15. The IUE is a democratic Union. Its members have always voted to ratify collective bargaining agreements, and when IUE locals have, as a result of bankruptcies, been asked to modify their collective bargaining agreements, the affected workers have voted on whether or not to ratify collective bargaining agreements made under the 1113 process.

16. Local union officials made it clear to me that it would be impossible for them to negotiate wage and benefit cuts within the 1113 context if the proposed executive bonuses and stock awards stay the way they were. They told me that even though they understood the need for change and concessions, a concessionary agreement would never be ratified by the membership because the membership would never believe that there was a need to make concessions unless they saw management sharing the pain. They told me that if management wasn't willing to make sacrifices, the rank and file employees would not believe that sacrifices were necessary. In short, they viewed

it as a question of leadership -- if management wasn't going to "walk the walk" and lead by example, there would no way that the rank and file employees would be willing to ratify an agreement cutting their own wages and benefits. This simply echoed what I had been hearing from the rank and file workers, who kept asking me how management could ask them to take a 50% pay cut but, at the same time, ask for bonuses for the people who, in their view, ruined the company. These local leaders all said that they would not and could not take back any concessionary agreements for ratification if the executive bonuses being proposed were in place. I recall one Local official telling me that he had to "look at himself in the mirror" and couldn't ask his people to take wage and benefit cuts while management was being rewarded.

17. The message I got was clear. Today, Local leadership would not be willing to take concessions back to the membership for a vote because, in their view, the members were being asked to shoulder the entire burden. If a concessionary agreement was taken back to the membership for a ratification vote, it couldn't possibly be ratified because the membership was being asked to shoulder the entire burden.

18. Negotiating committee members - who ultimately would be responsible for speaking to individual rank and file members and convincing them to ratify any new agreement - told me that their job of attempting to convince the members to vote to ratify any modifications to the agreement would be impossible if top management were receiving millions of dollars in bonuses. Almost to a man, rank and file members who spoke to me about ratification told me that they could not and would not vote to ratify any agreement that cut their wages or benefits while management was receiving large bonuses.

7

19. The process of negotiating a concessionary agreement is, under the best of circumstances, extremely difficult. What I have learned is that it takes cooperation, a feeling of shared sacrifice, and the perception that "everyone is in the same boat" to have a chance of success. The KECP Program will make this process impossible. Based on this, I urge the Court to reject the KECP Program. Unless rejected or seriously modified, it will be an insurmountable hurdle to the IUE reaching an agreement with Delphi to modify the collective bargaining agreement. It will make it impossible for the IUE to reach such an agreement, will make it impossible for the IUE to recommend that the members vote to accept such an agreement, it will make it impossible for such an agreement to be ratified, and will make it far more likely that the workers would strike if the current agreement is rejected.

_____
Henry Reichard

Sworn to before me this
17th day of November, 2005

_____
Notary Public

LARRY MAGARIK
NOTARY PUBLIC, State of New York
No. 02MA5082506
Qualified in Kings County
Certificate Filed in Kings County
Commission Expires July 28, 2009