## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                 :

|  |  |
|---|---|
| In re | : Chapter 11 |
| | : |
| DELPHI CORPORATION et al., | : Case No. 05-44481 (rdd) |
| | : |
| Debtors. | : (Jointly Administered) |
| | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### AFFIDAVIT OF SERVICE

I, Evan Gershbein, being duly sworn according to law, deposes and says that I am employed by Kurtzman Carson Consultants, LLC, proposed claims and noticing agent for the Debtors in the above-captioned cases.

On November 29, 2005, I caused to be served, via overnight mail the document listed in Section 1 on the parties attached hereto as <u>Exhibit A</u> and via facsimile on the parties attached hereto as <u>Exhibit B</u>:

### *Section 1*

**I.** Notice of Proposed Sale of Assets Pursuant to Order Under 11 U.S.C. §363 Approving Procedures to Sell Certain De Minimis Assets Free and Clear of Liens, Claims, and Encumbrances and to Pay Market Rate Broker Commissions in Connection With Such Sales Without Further Court Approval **[Attached hereto as Exhibit C]**

Dated: November 30, 2005

                                  */s/ Evan Gershbein*
                                  Evan Gershbein

Sworn to and subscribed before
me on November 30, 2005

   */s/ Amy Lee Huh*
Notary Public

My Commission Expires:     *3/15/09*

# EXHIBIT A

Delphi Corporation
Special Parties - Overnight Mail

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Davis Polk & Wardwell | Donald Bernstein | 450 Lexington Avenue | | New York | NY | 10017 | 212-450-4092 | 212-450-3092 | donald.bernstein@dpw.com | Postpetition Administrative Agent |
| Latham & Watkins LLP | Robert J. Rosenberg | 885 Third Avenue | | New York | NY | 10022 | 212-906-1370 | 212-751-4864 | robert.rosenberg@lw.com | UCC Professional |
| Simpson Thatcher & Bartlett LLP | Kenneth S. Ziman, Robert H. Trust, William T. Russell, Jr. | 425 Lexington Avenue | | New York | NY | 10017 | 212-455-2000 | 212-455-2502 | kziman@stblaw.com rtrust@stblaw.com wrussell@stblaw.com | Prepetition Administrative Agent |
| United States Trustee | Alicia M. Leonard | 33 Whitehall Street | 21st Floor | New York | NY | 10004-2112 | 212-510-0500 | 212-668-2255 does not take service via fax | | United States Trustee |
| United States Trustee | Deirdre A. Martini | 33 Whitehall Street | Suite 2100 | New York | NY | 10004 | 212-510-0500 | 212-668-2256 | deirdre.martini@usdoj.gov | United States Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 1

11/30/2005 8:43 AM
Foley Special Party list (fax and overnight)

# EXHIBIT B

Delphi Corporation
Special Parties - Facsimile

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Davis Polk & Wardwell | Donald Bernstein | 450 Lexington Avenue | | New York | NY | 10017 | 212-450-4092 | 212-450-3092 | donald.bernstein@dpw.com | Postpetition Administrative Agent |
| Latham & Watkins LLP | Robert J. Rosenberg | 885 Third Avenue | | New York | NY | 10022 | 212-906-1370 | 212-751-4864 | robert.rosenberg@lw.com | UCC Professional |
| Simpson Thatcher & Bartlett LLP | Kenneth S. Ziman, Robert H. Trust, William T. Russell, Jr. | 425 Lexington Avenue | | New York | NY | 10017 | 212-455-2000 | 212-455-2502 | kziman@stblaw.com rtrust@stblaw.com wrussell@stblaw.com | Prepetition Administrative Agent |
| United States Trustee | Deirdre A. Martini | 33 Whitehall Street | Suite 2100 | New York | NY | 10004 | 212-510-0500 | 212-668-2256 | deirdre.martini@usdoj.gov | United States Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 1

11/30/2005 8:44 AM
Foley Special Party list (fax and overnight)

# EXHIBIT C

**Objection Deadline: December 6, 2005 at 4:00 p.m.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - x
                                    :
    In re                    :    Chapter 11
                                    :
DELPHI CORPORATION, et al.,         :    Case No. 05-44481 (RDD)
                                    :
             Debtors.        :    (Jointly Administered)
                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - x

NOTICE OF PROPOSED SALE OF ASSETS PURSUANT TO ORDER UNDER
11 U.S.C. §363 APPROVING PROCEDURES TO SELL CERTAIN DE MINIMIS ASSETS
FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES AND TO PAY
MARKET RATE BROKER COMMISSIONS IN CONNECTION WITH SUCH SALES
WITHOUT FURTHER COURT APPROVAL

       1.   In accordance with the Order Under 11 U.S.C. § 363 Approving

Procedures To Sell Certain De Minimis Assets Free And Clear of Liens, Claims, And

Encumbrances And To Pay Market Rate Broker Commissions In Connection With Such

Sales Without Further Court Approval (the "De Minimis Asset Sale Order"), Packard Hughes

Interconnect Company (the "Debtor") hereby gives notice of its intention to sell certain

assets, as described more fully below (the "Assets"), to Larry Wireman (the "Purchaser") for

the purchase price of approximately $2,000,000.

       2.   The Assets to be sold to the Purchaser include without limitation 19.44

acres of land and personal property that is located in the City of Foley, County of Baldwin,

State of Alabama, as more particularly described in that certain Real Property Purchase

Agreement made and entered into on July 28, 2005, by and between Purchaser and Seller,

which is attached hereto as Exhibit A (the "Purchase and Sale Agreement"). The terms of the

purchase and sale shall be substantially as set forth in the Purchase and Sale Agreement.

3.    The Purchaser is not an insider of the Debtor as such term is defined in section 101(31) of the Bankruptcy Code and has no other connections to the Debtor.

4.    The Debtor believes that the purchase price accurately reflects the current market value of the Assets. The Debtor has determined, in its business judgment, that the Purchase and Sale Agreement provides for fair and appropriate terms and is a favorable price for the Assets.

5.    Pursuant to the De Minimis Assets Sale Order, the Debtor shall consummate the sale of the Assets, free and clear of liens, claims, and encumbrances, and take such actions as are necessary to close the transaction, including but not limited to collection of proceeds of the sale of Assets and payment of the broker commission provided for in the Broker Affidavit attached hereto as Exhibit B, provided that counsel to the Debtor does not receive from a party that receives this Notice a written objection or written request for additional time within five business days from the date following initial receipt of this Notice.

Dated: New York, New York
      November 29, 2005

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By: /s/ John Wm. Butler, Jr
   John Wm. Butler, Jr.
   John K. Lyons
   Ron E. Meisler
  333 West Wacker Drive, Suite 2100
  Chicago, Illinois  60606
  (312) 407-0700

  - and -

By: /s/ Kayalyn Marafioti
   Kayalyn A. Marafioti (KM 9632)
   Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

3

**Exhibit A**

Rev.062305

## REAL PROPERTY PURCHASE AGREEMENT

THIS REAL PROPERTY PURCHASE AGREEMENT (this "Agreement") is being entered into on _____July 28_____, 2005, between    PACKARD    HUGHES INTERCONNECT COMPANY, a Delaware corporation, having an address of 1750 Von Karman Avenue, Irvine, CA 92714 ("Seller"), and LARRY WIREMAN, having an address at 28103 Perdido Beach Blvd., Ste. 100, Orange Beach, Alabama  36561  ("Purchaser") based upon the following:

A.      Seller owns a parcel of improved real property consisting of approximately 19.44 acres of land that is located in the City of Foley, County of Baldwin, State of Alabama (the "State") and has a street address of 17195 Highway US 98 West, Foley, Alabama (the "Real Property").  An outline or preliminary legal description of the Property is attached to this Agreement as Exhibit A.

B.      Purchaser desires to purchase from Seller and Seller desires to sell to Purchaser the Property and the "Personal Property" (as defined in Paragraph 10 of this Agreement), in accordance with the provisions of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, promises, and agreements contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged, Seller and Purchaser agree as follows:

1.    Agreement to Purchase and Sell.  Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, the Real Property and the Personal Property (collectively, the "Property") upon the terms set forth in this Agreement.

2.    Purchase Price.  The purchase price to be paid by Purchaser to Seller for the Property (the "Purchase Price") is Two Million and 00/100 DOLLARS ($2,000,000.00) (U.S. currency).  The Purchase Price, less any credits or pro-

rations set forth in this Agreement, will be paid in full by Purchaser to Seller at the time of closing by means of, at Seller's option, a certified or cashier's check made payable to Seller and drawn on a bank which is acceptable to Seller or a federal wire transfer of immediately available funds to an account designated in writing by Seller, in accordance with this Agreement.

3.     <u>Earnest Money Deposit</u>.  Simultaneously with Purchaser's execution and delivery of this Agreement, Purchaser will deliver to the "Title Insurer" (as defined in Paragraph 5(b) of this Agreement), the sum of Twenty Thousand  DOLLARS ($20,000) as an earnest money deposit under this Agreement (the "Deposit"), to be held in accordance with the terms of this Agreement.  If the closing occurs, the Deposit will be applied to the Purchase Price.  If Purchaser terminates this Agreement pursuant to Paragraph 5 or Paragraph 9 of this Agreement, and Purchaser is not at that time in default beyond applicable notice and cure period set forth in Paragraph 9 of this Agreement, then the entire Deposit will be returned to Purchaser.  If this Agreement is terminated  due to a default by the Purchaser pursuant to Paragraph 9 of this Agreement, then the Deposit will be delivered to Seller, at Seller's option, as liquidated damages.

4.     <u>Inspection Period</u>.  (a) The closing of the sale of the Property to Purchaser (the "Closing")  will occur within ~~twenty (20)~~ thirty (30) days following the later of (i) Purchaser's receipt of the Survey of the Property  that Seller is obligated to obtain pursuant to Paragraph 5 of this Agreement, (ii) the date on which Seller has delivered to Purchaser a commitment for a policy of title insurance covering the Property in accordance with Paragraph 5 of this Agreement, and (iii) the date on which Seller notifies Purchaser that all governmental  approvals required under Paragraph 11 of this Agreement have been obtained, subject to Seller's right to extend the Closing date in connection with the curing of any "Defects" in accordance with Paragraph 5 of this Agreement.  The Closing will occur on a date designated by Seller, but in no event later than ~~August xx~~ October 15 2005 and will be accomplished through an escrow closing at the offices of the "Title Insurer" (as defined in Paragraph 5(b) of this

2

Agreement) unless Purchaser and Seller otherwise agree in writing.   Seller shall give Purchaser written notice of the Closing date, at least ten (10) business days prior to the Closing date.

(b)   The obligation of Purchaser to purchase of the Property is subject to Purchaser's determination, no later than the date which is ~~thirty (30)~~ Forty-five (45) days after the date of this Agreement, that Purchaser is satisfied with the Property, including the environmental condition of the Property.

(c)   If Purchaser determines, in Purchaser's sole discretion, not to acquire the Property on or before the date which is ~~thirty (30)~~ Forty-five (45) days after the date of this Agreement, then Purchaser may, at its option, terminate this Agreement by written notice to Seller on or before the expiration of that ~~thirty (30)~~ Forty-five (45) day period. Upon such termination by Purchaser, the entire Deposit shall be returned to Purchaser, after which neither party will have any further obligation or liability under this Agreement (except as may be otherwise expressly provided in this Agreement).  If Purchaser does not deliver such a notice of termination to Seller on or before the date which is ~~thirty (30)~~ Forty-five (45) days after the date of this Agreement, Purchaser shall be deemed to have waived its right to terminate this Agreement (except under Paragraph 9(b) of this Agreement) and to have elected to proceed to the closing.

(d)   Subject to the terms and conditions of the "Protective Agreements" (as defined in Paragraph 4(e) of this Agreement), Purchaser shall have the right to enter upon the Property to investigate the Property and to conduct environmental studies, engineering studies, land use and planning feasibility studies, and such other investigations at Purchaser's sole expense, for a period expiring on the date which is ~~thirty (30)~~ Forty-five (45) days after the date of this Agreement.  Purchaser shall provide copies of all such environmental studies, engineering studies, land use and planning feasibility studies, and such other investigations to Seller upon written request from Seller.  In the event this Agreement is terminated for a reason other than Seller's default, Purchaser shall assign to Seller all of

Purchaser's right, title and interest in such studies and, at Seller's election, any related agreements.

(e)     Purchaser has executed and delivered to Seller a Right of Access Agreement in the form attached to this Agreement as Exhibit "B" and a confidentiality letter agreement in the form attached to this Agreement as Exhibit "C" (collectively, the "Protective Agreements", which Protective Agreements are incorporated in this Agreement by reference as though more fully set forth in this Agreement).  A default by Purchaser under either of the Protective Agreements will be deemed a default by Purchaser under this Agreement, and vice versa. Notwithstanding anything contained in this Agreement or in the Protective Agreements to the contrary, all of Purchaser's obligations under the Protective Agreements will survive any termination of this Agreement.

5.     <u>Survey and Evidence of Title</u>.  (a) Seller, at its sole cost and expense, will obtain a metes and bounds survey of the Property (the "Survey").  The Survey must be (i) prepared by a land surveyor that is licensed by the State, (ii) certified to Seller, Purchaser, and the Title Insurer and (iii) delivered to Seller and Purchaser within thirty (30) days after the date of this Agreement.  The legal description in the Survey will be the legal description of the Property for the purposes of this Agreement.

(b)   As soon as practicable after the date of this Agreement, Seller, at Seller's sole cost and expense, will obtain and deliver to Purchaser a commitment for an owner's policy of title insurance (the "Title Commitment") with respect to the Property, in the amount of the Purchase Price, issued by Land America Title Insurance Company or an affiliate thereof that is authorized to do business in the State of Alabama (the "Title Insurer"). The Title Commitment will contain the standard exceptions included by the Title Insurer in commitments for owner's policies of title insurance that are common in the Foley, Alabama area.  Seller will request that the Title Insurer deliver, together with the Title Commitment, copies of all documents referred to as exceptions in the Title Commitment.

(c)    If the Survey or the Title Commitment shows any encroachment, lien, encumbrance, or other defect in title to the Property (a "Defect"), Purchaser will, within ten (10) business days after the date on which the latter of the Survey or Title Commitment is delivered to Purchaser, deliver to Seller a  written notice which specifies each alleged Defect (a "Defect Notice").   Any Defects which are not identified in a Defect Notice that is delivered to Seller within the ten (10) day period required under the preceding sentence will be deemed to have been waived by Purchaser.  If Purchaser timely sends Seller a Defect Notice that objects to any such Defect(s), then Seller shall have thirty (30) days from the date of receipt  of the Defect Notice within which to notify Purchaser whether Seller intends to attempt to cure any Defect.   If Seller elects to attempt to cure all Defects identified in the Defect Notice, then Seller may, by written notice to Purchaser, extend the Closing date for such period of time as is reasonably necessary to cure the Defects. Seller will give written notice to Purchaser when the Defects are cured and the Closing will occur on the later of (i) the otherwise applicable date under Paragraph 4 of this Agreement or (ii) the tenth (10th) business day after Seller notifies Purchaser that all Defects identified in the Defect Notice are cured.  If Seller declines to cure any Defect, or if any Defect is not cured within a reasonable period of time after Seller receives a Defect Notice, then Purchaser may, at its option, (i) waive the Defect and proceed to Closing as provided in this Agreement or (ii) terminate this Agreement, in which case the Deposit will be refunded to Purchaser and each party will be released from all further obligations under this Agreement (except as may otherwise be set forth in this Agreement), as Purchaser's sole and exclusive remedy. If, within ten (10) business days after Purchaser receives notice from Seller that Seller declines to attempt to cure any Defect (or is ceasing its attempts to cure any Defect), Purchaser does not notify Seller that Purchaser is terminating this Agreement, then Purchaser will be deemed to have waived each Defect which Seller declines to attempt to cure (or is ceasing to attempt to cure) and to have elected to proceed to Closing.  If Seller elects to attempt to cure any Defect but the Defect is not cured within ninety (90) days after Purchaser receives notice from Seller that Seller intends to attempt to

cure the Defect, then Purchaser will be deemed to have elected to terminate this Agreement unless Purchaser notifies Seller that Purchaser waives the Defect prior to the expiration of the ninety (90) day period.

(d)    If any "cloud" or defect on Seller's title that is not disclosed in the Title Commitment or Survey delivered pursuant to Paragraphs 5(a) and (b) of this Agreement is discovered prior to Closing (a "New Defect"), Seller shall have a reasonable time in which to remove or cure each New Defect,  not  to exceed sixty (60) days.  If Seller is unable or elects not to cure  any New Defect(s), Purchaser will have the right to treat the applicable New Defect as "Defects" under Paragraph 5(c) of this Agreement, with the time periods for Purchaser's objections,  Seller's  election  to  cure,  and  Purchaser's  right  to  terminate commencing upon the date of discovery of the applicable New Defect, as if it were the date on which the Title Commitment and Survey were delivered for the purposes of Paragraph 5(c).

6.    Deliveries at the Closing.  At the Closing, (i) Seller will convey to Purchaser title to the Property by a limited warranty deed (with a covenant against grantor's acts only) in the form attached to this Agreement as Exhibit D (the "Deed"), (ii) Purchaser and Seller will execute a closing statement setting forth the Purchase Price and any prorations or other disbursements and payments, (iii) Purchaser will pay to Seller the Purchase Price in the manner provided in this Agreement, and (iv) Purchaser will pay any the closing fee charged by Title Insurer in connection with the Closing.   Seller and Purchaser will also execute and deliver any further documents or instruments as are required by the Title Insurer necessary to accomplish the Closing, provided such documents do not impose any additional liability upon Seller.

7.    Prorations; Costs.  (a) Seller will pay all taxes and assessments with respect to the Property which are due and payable prior to the date of closing.  Current taxes and assessments  for  the  period  in  which  the  Closing  occurs  will  be  prorated  in

accordance with prevailing local practice on a per diem basis as of the date of
Closing based upon the most recent tax bills.  If the Property is assessed as a part
of a tract that includes other land, the taxes and assessments will be allocated to
the Property and the other land based upon the respective acreage of the Property
and the other land (and any improvements on the Property and the other land).  No
adjustments will be made after closing.

(b)  Purchaser will pay any local or state transfer taxes, revenue or documentary
stamps and the recording fees for recording the Deed.

(c)  Any closing fee charged by the Title Insurer will be paid by Purchaser at the
time of closing.

(d) Seller will pay for the cost of preparation of the Deed, Owner's title insurance
premium in the amount of the Purchase Price, Real Estate Commissions due in
accordance with paragraph 13,  cost of the Survey, and cost associated with the
environmental audit described in paragraph 12.

8.    Disclaimer of Warranties.  Purchaser acknowledges that neither Seller nor any
agent, employee, attorney, or representative of Seller has made any statements,
agreements, promises, assurances, representations, or warranties, whether
express, implied, or otherwise, regarding the condition of the Property, the
suitability of the Property for any uses or purposes contemplated by Purchaser, the
zoning of the Property, the right to occupy the Property, the environmental condition
of the Property, the state of title to the Property or any other matter pertaining to the
Property. Purchaser agrees that (i) at Closing Purchaser will have fully examined
and investigated to its full satisfaction the physical nature and condition of the
Property and all other matters pertaining to the Property, including, without
limitation, the environmental condition of the Property, (ii)    Purchaser will have
ample  opportunity to inspect the  Property  prior to Closing and if a Closing
occurs agrees to  accept  the  condition  of said Property in  its  "AS  IS,"

7

"WHERE IS" and "WITH ALL FAULTS"  condition,  (iii) Seller will not be responsible for making (or contributing in any way to the cost of making) any changes or improvements to the Property, and (iv) Purchaser has not relied upon any statement, promise, representation, or warranty that is not expressly set forth in this Agreement which has been made or given directly or indirectly, orally, or in writing, by Seller or any person or entity acting on behalf of Seller or whose acts or statements are attributable to or binding upon Seller.  Both Seller and Purchaser waive any right of rescission and all claims for damages by reason of any statement, representation, warranty, assurance, promise, or agreement that is not expressly contained in this Agreement.

9.   Default. (a)  If Purchaser defaults under the terms of this Agreement, and such default is not remedied within ten (10) business days after Seller notifies Purchaser in writing, then Seller ~~may, at its option,~~ as its SOLE AND ONLY REMEDY, terminate this Agreement, ~~in which event~~ and the Deposit will be delivered to Seller as liquidated damages and not as a penalty (it being understood that Seller's actual damages may be extremely difficult to calculate) after which neither party will have any further obligation or liability under this Agreement (except as may be otherwise expressly provided in this Agreement).

(b)  If Seller defaults under the terms of this Agreement, and such default is not remedied within ten (10) business days after Purchaser notifies Seller in writing, then Purchaser may,  at its option (and as its exclusive remedies), (i) terminate this Agreement, in which event the Deposit will be delivered to Purchaser and neither party will have any further obligation or liability under this Agreement (except as may be otherwise expressly provided in this Agreement), or (ii) bring any action or claim against Seller for damages, provided, that in no event will the damages for which Seller is obligated exceed the amount of the Deposit.

10.   Conveyance of Personal Property and Trade Fixtures.  (a) Seller agrees to convey to the Purchaser all of Seller's right, title and interest in the tangible

personal property and trade fixtures identified on Exhibit E to this Agreement, which are owned by Seller and which Seller has the unrestricted right to convey (collectively, the "Personal Property"),   In no event shall the Personal Property include any business records of any nature, any leased equipment or any licensed software or other materials or information or any personal property that is specialized or directly related to production by Seller. Seller agrees to convey the Personal Property to Purchaser at Closing, free and clear of all liens or encumbrances created by Seller.

(b)   The conveyance of the Personal Property will be made pursuant to a Bill of Sale in the form of Exhibit F to this Agreement.

(c)   Seller and Purchaser acknowledge that Seller is not obligated to assign, and Purchaser is not obligated to accept or assume, any equipment or other leases with respect to the Personal Property.

11.   Governmental Approvals.  If the Property is a part of a larger tract of land that is under common ownership, then as soon as possible after the date of this Agreement, Seller will apply for any and all governmental approvals required for (i) the division of the Property from the remainder of any adjacent property and (ii) the creation of a new tax identification number for the Property.  Seller will pay all costs and expenses incurred in connection with obtaining such approvals.

12.   Brokers.  Purchaser and  Seller acknowledge  to each other that there is no real estate commission due  any   real estate broker in connection with this transaction, other than Heggeman Realty Company (Seller's/Listing Broker) and Caribe Realty, Inc. (Purchaser's Broker).   Seller agrees to be responsible for the payment of the real estate commissions due to Heggeman Realty Company at the time of Closing, pursuant to a separate written agreement between Seller and Heggeman Realty Company, Heggeman Realty Company and Caribe Realty, Inc. will share the commission pursuant to a separate agreement between such

brokers. Seller shall indemnify and hold harmless Purchaser from and against all liabilities, cost, damages and expenses (including reasonable attorney's fees), arising from any claims for brokerage commissions or other similar fees in connection with the transaction covered by this Agreement insofar as such claim or claims shall be based upon alleged arrangements or agreements made by Seller. Purchaser shall indemnify and hold harmless Seller from and against all liabilities, cost, damages and expenses (including reasonable attorney's fees), arising from any claims for brokerage commissions or other similar fees in connection with the transaction covered by this Agreement insofar as such claim or claims shall be based upon alleged arrangements or agreements made by Purchaser or on Purchaser's behalf. Such indemnities shall survive the Closing contemplated herein and not be merged therein.

13.   <u>Seller's Representations and Warranties</u>. As a material inducement for Purchaser to enter into this Agreement, Seller makes the following representations and warranties to Purchaser. These representations and warranties will be true and correct (i) on the date of this Agreement and (ii) on the date of the Closing as though made at and as of the date of the Closing.

(a)   Seller has the full power and authority to execute and deliver this Agreement and all other documents or instruments that this Agreement obligates Seller to execute or deliver (collectively, the "Seller's Documents") and to perform and carry out all covenants and obligations arising under this Agreement and Seller's Documents; and,

(b)   Seller is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware and has the requisite power and authority to enter into this Agreement and into Seller's Documents and to carry out the transactions contemplated by this Agreement. The person that signs this

Agreement on behalf of Seller has, and any person that signs Seller's Documents on behalf of Seller will have, full power and authority to bind Seller.

(c)    Seller has duly authorized (i) the execution and delivery of this Agreement, (ii) the sale and transfer of the Property to Purchaser pursuant to this Agreement, and (iii) the performance of the other covenants and obligations to be performed by Seller under this Agreement; and,

(d)    The execution, delivery, and performance of this Agreement and Seller's Documents by Seller do not and will not result in any violation of, conflict with, or constitute a default under any provision of Seller's Articles of Incorporation; and,

(e)    This Agreement and Seller's Documents do not and will not conflict with or contravene any provision of any present judgment, order, decree, writ, or injunction, or any provision of any currently applicable law or regulation affecting Seller. The conveyance of the Property and the execution, delivery and performance of this Agreement and Seller's Documents by Seller will not result in a breach of, constitute a default under, interfere with, or require consent pursuant to any credit agreement, lease, indenture, mortgage, deed of trust, purchase agreement, guaranty, security agreement, or other instrument to which Seller is presently a party or by which Seller or Seller's assets are bound or affected.

14.    Purchaser's Representations and Warranties.  As a material inducement for Seller to enter into this Agreement, Purchaser makes the following representations and warranties to Seller.  These representations and warranties will be true and correct (i) on the date of this Agreement and (ii) on the date of the Closing as though made at and as of the date of the Closing.

(a)    Purchaser has the full power and authority to execute and deliver this Agreement and all other documents or instruments that this Agreement obligates Purchaser to execute or deliver (collectively, the "Purchaser's

Documents") and to perform and carry out all covenants and obligations arising under this Agreement and Purchaser's Documents.

(b)     If applicable, Purchaser is a limited liability company and/or corporation, duly organized, validly existing, and in good standing under the laws of the State of Alabama and has the requisite power and authority to enter into this Agreement and into Purchaser's Documents and to carry out the transactions contemplated by this Agreement. The persons signing this Agreement on behalf of Purchaser have, and any person that signs Purchaser's Documents on behalf of Purchaser will have, full power and authority to bind Purchaser.

(c)     Purchaser has duly authorized (i) the execution and delivery of this Agreement and Purchaser's Documents, (ii) the purchase of the Property from Seller pursuant to this Agreement, and (iii) the performance of the other covenants and obligations to be performed by Purchaser under this Agreement.

(d)     The execution, delivery, and performance of this Agreement and Purchaser's Documents by Purchaser do not and will not result in any violation of, conflict with, or constitute a default under any provision of Purchaser's by-laws or articles of organization.

(e)     This Agreement and Purchaser's Documents do not and will not conflict with or contravene any provision of any present judgment, order, decree, writ, or injunction, or any provision of any currently applicable law or regulation affecting Purchaser. The purchase of the Property and the execution, delivery and performance of this Agreement and Purchaser's Documents by Purchaser will not result in a breach of, constitute a default under, interfere with, or require consent pursuant to any credit agreement, lease, indenture, mortgage, deed of trust, purchase agreement, guaranty, security agreement,

or other instrument to which Purchaser is presently a party or by which Purchaser or Purchaser's assets are bound or affected.

15.    <u>Agreement Not to be Recorded</u>.  Each party agrees that it will not cause or permit this Agreement or any notice of this Agreement to be recorded.

16.    <u>Notices</u>.  All notices or other communications provided for under this Agreement must be in writing and signed on behalf of the party that sends the notice or other communication.  Notices and other communications must be personally delivered, sent by certified or registered mail, return receipt requested, or sent by a reputable national overnight delivery service, and will be effective upon the earlier of receipt or refusal or failure to accept receipt if sent to the following addresses:

If to Seller:              Packard Hughes Interconnect Company
                           c/o Delphi Automotive Systems LLC
                           5825 Delphi Drive
                           MC:  480-410-174
                           Troy, Michigan 48098
                           Attention:  Executive Director, Facilities Services Group

    With a Copy to:        Delphi Automotive Systems LLC
                           5825 Delphi Drive
                           MC:  480-410-174
                           Troy, Michigan 48098
                           Attention:  Dennis Lukasik – Equis Corp.
                           Transaction Manager

    With a Copy to:        Delphi Automotive Systems
                           5725 Delphi Drive
                           MC:  483-400-603
                           Troy, Michigan  48098
                           Attention:  Assistant General Counsel
                                       Commercial & Transactional

If to Purchaser:           Larry Wireman
                           28103 Perdido Beach Blvd., Ste. 100
                           Orange Beach, AL  36561

With a Copy to:      Thomas W. Klyce
                     Post Office Box 2301
                     Gulf Shores, AL  36547

Each party will have the right to designate other or additional addresses or addressees for the delivery of notices, by giving notice of the same to the other party to this Agreement.

17.   Entire Agreement.  This Agreement represents the entire understanding between the parties with respect to the subject matter of this Agreement, and all prior agreements and understandings between the parties with respect to the subject matter of this Agreement are merged in this Agreement.  The exhibits attached to this Agreement are made a part of and incorporated in this Agreement.

18.   No Oral Amendment or Modification.  No amendments, waivers, or modifications of this Agreement will be made or deemed to have been made unless in writing and executed by both Seller and Purchaser.

19.   Assignability.   Neither this Agreement nor the rights of Purchaser under this Agreement may be assigned or transferred, in whole or in part, to any other party without the prior consent of Seller, provided that Seller shall not unreasonably withhold its approval of an assignment by Purchaser to an entity which is wholly-owned by Purchaser.  Purchaser shall not be relieved of any liability under this Agreement upon any such assignment and will remain primarily liable for all of the obligations of the purchaser under this Agreement following any such assignment.

20.   Successors and Assigns.  Subject to Paragraph 19, this Agreement will be binding upon and inure to the benefit of the parties to this Agreement and their respective heirs, representatives, successors, and assigns.

14

21.   <u>Captions for Convenience</u>.  All headings and captions used in this Agreement are
for convenience only and have no meaning in the interpretation or effect of this
Agreement.

22.   <u>Applicable Law</u>.  This Agreement shall be subject to, interpreted, and governed
by the laws of the State of Alabama.

23.   <u>No Waivers</u>.  Any waiver of a breach of any provision contained in this Agreement
must be in writing.  No waiver of any breach will be deemed a waiver of any
preceding or succeeding breach, nor of any other breach of a provision contained in
this Agreement.

24.   <u>Construction</u>.  Seller and Purchaser acknowledge that both parties participated
equally in the negotiation of this Agreement and that no court construing this
Agreement will construe it more stringently against one party than against the other,
regardless of which party's counsel drafted this Agreement.

25.   <u>Time of the Essence</u>.  Time is of the essence with respect to performance required
under this Agreement.

26.   <u>Survival</u>.  The covenants and agreements of Seller and Purchaser set forth in this
Agreement will survive the Closing of the transaction contemplated under this
Agreement.

27.   <u>Binding Effect</u>.   This document is not an offer by Seller, and under no
circumstances will this Agreement have any binding effect upon Purchaser or Seller
unless and until Purchaser and Seller will each have executed this Agreement and
delivered executed counterparts hereof to each other.

28.   <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which
shall constitute an original although not fully executed, but all of which when taken

together, shall constitute but one agreement.  Delivery by facsimile of this Agreement or an executed counterpart hereof shall be deemed a good and valid execution and delivery hereof.

29.   <u>Acceptance and Effective Date</u>. The parties acknowledge they have read and understand each and every part of this Agreement.  Only upon execution by both Purchaser and Seller will this document become binding upon the parties hereto, their heirs, successors, and assigns ("Acceptance").  Should either the Purchaser or Seller fail to execute this Agreement by _Aug 1st_ , 2005, and fax or otherwise deliver an executed copy to the other party, any signature hereto may be rescinded at any time prior to delivery of a copy of this Agreement which has been countersigned by the other party hereto.  For the purposes of this Agreement, the date of Acceptance and the Effective Date is the last date set out in this Agreement on the line provided below the signatures of the parties.

IN WITNESS WHEREOF, Seller and Purchaser have signed this Real Property Purchase Agreement as of the time, day and year set forth below.

SELLER:

In the presence of:

PACKARD HUGHES INTERCONNECT COMPANY,
a Delaware corporation

By: _____

Its: _John A. Jaffurs_

Date/Time Executed: _7/28/05_  _2:00 P.M. East_

PURCHASER:

_Larry Wreman_
Larry Wireman
Date/ Time Executed: _7/18/05_

# EXHIBIT "A"

[DEPICTION AND/OR PRELIMINARY LEGAL DESCRIPTION OF THE PROPERTY]

## SUBJECT TO REVISION AFTER SURVEY IS COMPLETED

*p 1. of 2*

EXHIBIT "A"

Property Description:

Commence at the Southeast Corner of the Southwest Quarter of the Northwest Quarter of Section 25, Township 7 South. Range 3 East and run North 00 degrees 00 minutes 47 seconds East a distance of 50 feet to a concrete monument on the Southwest Corner of Lot One of Sunset Subdivision, unit one (unrecorded subdivision) and on the North Right-of-Way of Alabama Highway # 98, also being the Point of Beginning. Thence run North 89 degrees 59 minutes 20 Seconds West along said Right-of-Way a distance of 675.6 feet to a concrete monument: thence run North 01 degrees 43 minutes 19 seconds East a distance of 500.4 feet to a concrete monument: thence run North 00 degrees 00 minutes 44 seconds West a distance of 776.1 feet to a concrete monument: thence run North 89 degrees 58 minutes 02 seconds East a distance of 661.0 feet to a concrete monument: thence run South 00 degrees 00 minutes 47 seconds West a distance of 1276.7 feet to the Point of Beginning.

Containing 19.44 acres more or less and being located in the Southwest Quarter of the Northwest Quarter of Section 25, Township 7 South. Range 3 East Baldwin County, Alabama.

P. 2 of 2

Exhibit A



WOODED

WOODED
UNDEVELOPED
LAND

GRASS

APPROXIMATELY 600 FEET
(DISTANCE NOT TO SCALE)

B-5

B-6

B-7

GRASS

B-4

PAVED
PARKING

TREE

PAVED
PARKING

AIR COMPRESSOR

NITROGEN AST

VACANT
(FORMER
GREENHOUSE/
PLANT NURSERY)

PACKARD - HUGHES
INTERCONNECT, INC.
BUILDING

IRRIGATION WELL

PARKING SPACES

PARKING SPACES

B-3

B-2        B-1

GRASS

GRASS

GAS
STATION

COMMERCIAL

U.S. HIGHWAY 98

**LEGEND**

B-5 ■  BOREHOLE        — — —  FENCE LINE

▢ ▢ ▢  SEPTIC
▢ ▢ ▢  SYSTEM

—  ·  —  PROPERTY LINE

N

0    50    100ft

(APPROXIMATE)

Figure 2
SITE PLAN
17195 U.S. HIGHWAY 98
*Foley, Alabama*

GRA

39350-00(003)GN-TV001 MAY 31/2005

**Exhibit B**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                    :
    In re                         :     Chapter 11
                                    :
DELPHI CORPORATION, et al.,         :     Case No. 05-44481 (RDD)
                                    :
                 Debtors. :     (Jointly Administered)
                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x


### AFFIDAVIT OF GREGORY M. TRUSSO IN SUPPORT NOTICE OF PROPOSED SALE OF ASSETS PURSUANT TO ORDER UNDER 11 U.S.C. §363 APPROVING PROCEDURES TO SELL CERTAIN DE MINIMIS ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES AND TO PAY MARKET RATE BROKER COMMISSIONS IN CONNECTION WITH SUCH SALES WITHOUT FURTHER COURT APPROVAL

STATE OF ILLINOIS    )
                     ) ss:
COUNTY OF COOK    )

        Gregory M. Trusso, being duly sworn, deposes and says:

        1.    I am a Senior Vice President of Equis Corporation ("Broker"),

which maintains offices at 161 North Clark Street, Chicago, Illinois.

        2.    Neither I, nor any partner, auditor or other member of Broker,

insofar as I have been able to ascertain, has any connection with the above-captioned

debtors and debtors-in-possession (the "Debtors"), their creditors, or any other party

in interest, their respective attorneys and accountants, the United Trustee, or any

person employed in the office of the United States Trustee, except as set forth in this affidavit.

3.     Broker has represented and acted as broker for the Debtors in conjunction with Heggeman Realty Co ("Local Co-Broker") with respect to the marketing and sale of the Assets[1] (the "Brokerage Services").

4.     In addition to the Brokerage Services, Equis Corporation is also a party to a certain Real Estate Services Agreement with Delphi Corporation, dated May 16, 2000, as amended by a First Amendment to Real Estate Services Agreement dated January 28, 2003 (collectively the "Agreement"). The Agreement was terminated effective November 2, 2005.

5.     In connection with the sale of the Assets, Broker and Local Co-Broker engaged in extensive marketing of the Assets for approximately six months. The Assets were marketed on a local and regional basis through targeted direct mailings to companies with similar businesses, as well as through the local commercial multi-listing service. The Assets also received national marketing exposure via continuous listings on the NAI Network and Loopnet, both national commercial multi listing services.

---

[1] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the Notice of Proposed Sale of Assets.

2

6.    As a result of the foregoing, Broker and Local Co-Broker received more than five indications of interest regarding the Assets. Broker and Local Co-Broker provided further information regarding the Assets to these interested parties. To the extent that a particular party remained interested, Broker and Local Co-Broker and the Debtors commenced negotiations designed to solicit an offer. Broker and Local Co-Broker received three proposals to purchase the Assets.

7.    Broker and Local Co-Broker and the Debtors evaluated the terms and benefits of each proposal and determined that the offer from the Purchaser represents the highest and best offer for the Assets under the circumstances. Broker and Local Co-Broker and the Debtors negotiated with the Purchaser in good faith and at arm's length. Broker and Local Co-Broker have received no further offers for the Assets.

8.    The Debtors have agreed to pay Broker a commission in the amount of seven percent of the gross sales price, or $140,000.00.

9.    This fee arrangement is fair based on the services rendered and is normal and customary in the commercial real property brokerage industry.

10.    Broker has agreements to share the compensation received by Broker with Broker's Local Co-Broker as well as with the broker representing the

3

Purchaser. Broker also has an agreement to share twenty percent of Broker's compensation with DREAL, one of the Debtors.

11.    Broker asserts a prepetition claim against Debtors in the approximate amount of $173,000.00 for work performed pursuant to the Agreement.

12.    Broker and its partners, auditors, and other members may have in the past represented, currently represent, and may in the future represent entities which are creditors of the Debtors in matters unrelated to these pending chapter 11 cases.  Broker does not and will not represent any such entity in connection with these pending chapter 11 cases and does not have any relationship with any such entity, attorneys, or accountants that would be adverse to the Debtors or their estates.

13.    Neither Broker, nor any partner, auditor, or other member thereof, insofar as I have been able to ascertain, holds or represents any interest adverse to the Debtors or their estates in the matters upon which Broker is to be engaged.

14.    The foregoing constitutes the statement of Broker pursuant to Bankruptcy Rules 2014.

4

FURTHER AFFIANT SAYETH NOT.


GREGORY M. TRUSSO


Sworn to and subscribed before me
this 28 day of November, 2005


Notary Public

Official Seal
Linda Gamino
Notary Public State of Illinois
My Commission Expires 04/22/08

5