Hearing Date:  January 5, 2006 at 10:00 a.m.
Objection Deadline:  December 2, 2005 at 4:00 p.m.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| DELPHI CORPORATION, *et al.*,<br>　　　　　　　　　　　Debtors. | Case No. 05-44481-RDD |
| | (Jointly Administered) |
| | Re: Document No. 1222 |

**LEAD PLAINTIFFS' OBJECTION TO DEBTORS' APPLICATION**
**FOR ORDER UNDER 11 U.S.C. §§ 327(A), 328(A), AND 1107(B)**
**AUTHORIZING EMPLOYMENT AND RETENTION, NUNC PRO**
**TUNC TO OCTOBER 8, 2005, OF DELOITTE & TOUCHE LLP AS**
**INDEPENDENT AUDITORS AND ACCOUNTANTS TO DEBTORS**

TO THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

　　　　The Teachers' Retirement System of Oklahoma, the Public Employees' Retirement

System of Mississippi, Raiffeisen Kapitalanlage-Gesellschaft m.b.H. and Stichting

Pensioenfonds ABP (collectively, "Lead Plaintiffs"), the Court-appointed Lead Plaintiffs in the

consolidated securities class action entitled *In re Delphi Corp. Securities Litigation*, Master File

No. 1:05-CV-2637 (NRB)(SDNY) (the "Securities Litigation"), hereby object to the Application

by Delphi Corporation ("Delphi") and its Affiliated Debtors (collectively, the "Debtors") for an

Order under 11 U.S.C. §§ 327(a), 328(a), 1107(b), and Fed. R. Bankr. P. 2014, authorizing the

employment and retention of Deloitte & Touche LLP ("Deloitte") as independent auditor and

accountant to Debtors (hereinafter referred to as the "Retention Application" or the

"Application"). In the alternative, Lead Plaintiffs object to any senior member of the audit team from Deloitte that was involved in Delphi's pre-petition audits having continuing involvement in the audit of the post-petition entity. In support of their objection, Lead Plaintiffs represent as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## PRELIMINARY STATEMENT

2.      Despite Deloitte's utter failure to detect, let alone prevent, one of the more notorious accounting frauds of our time, Debtors have applied to retain Deloitte as their accountant and auditor in this chapter 11 reorganization. Debtors' Retention Application should be denied on several grounds.

3.      First, as explained more fully below, Deloitte's competence has been seriously called into question vis-à-vis its work for Delphi because it has failed to conduct audits according to Generally Accepted Auditing Standards ("GAAS"), and has contributed to, or participated in, the Debtors' recently disclosed securities fraud. Tellingly, the Retention Application itself does not discuss Deloitte's status as a defendant in the Securities Litigation, along with current officers and directors of Delphi, and the conflict created by that status. Nor does the application disclose Deloitte's role as a "gatekeeper" when it served as Delphi's pre-petition auditor and accountant. Instead, an affidavit of the proposed Deloitte engagement partner attached to the Application casually notes that Deloitte and several of its clients are defendants in several securities fraud-related lawsuits, including the Securities Litigation.

4.      Second, retaining Deloitte would create a number of unsustainable conflicts of interest: (i) because of its status as a defendant in a multi-billion dollar securities lawsuit, Deloitte has no incentive to detect and correct Debtors' pre-petition accounting improprieties and, in fact, has strong incentive to conceal shortcomings in its own pre-petition audits; (ii) Deloitte has incentive to limit inquiry into sham transactions between Delphi and co-defendants Setech, Inc. ("Setech") and J.P. Morgan/Bank One, which are Deloitte clients; (iii) Deloitte has incentive to conceal fraudulent transactions between Delphi and other parties Deloitte represents; (iv) under the Debtors' proposed Order, Debtors also will retain several "entities affiliated" with Deloitte, an arrangement under which Deloitte entities will receive generous compensation for both auditing and non-auditing work; and, (v) the prospect for the assertion of cross-claims between Deloitte and Delphi's officers and directors as well as indemnification claims against Delphi itself (not to mention claims Delphi may assert against Deloitte) is manifest.

5.      Finally, the Retention Application should be denied because it fails to provide basic and essential details about the relationship, if any, between Deloitte's proposed engagement team and the personnel and teams that participated in Deloitte's failed pre-petition Delphi engagements.  The Application also neglects to indicate whether Deloitte modified its audit plan in response to Debtors' chapter 11 petition, or even in response to the admitted (by Delphi), massive failures in Delphi's accounting and internal controls.  Deloitte's audits completely failed when Delphi was (or appeared to be) solvent, and Deloitte does not explain whether or how it will proceed differently going forward.

6.      If the Court does not deny the Application outright, it should withhold any decision on the Retention Application until the Debtors: (i) produce evidence that reveals the nature and extent of Deloitte's pre-petition audit work for Delphi, including its role in the

fraudulent accounting transactions and practices in which Delphi has admitted engaging; (ii)
disclose pre-petition communications among Debtors and Deloitte concerning the proposed audit
engagement, including contingencies for Delphi's chapter 11 petition; (iii) disclose the identities
of Deloitte personnel who worked on Deloitte's pre-petition Delphi engagement, and of those
proposed to be retained for the Debtors' engagement, as well as the terms of such engagements
pre and post-petition; and (iv) disclose pre and post-petition communications and negotiations
among Debtors (Delphi and affiliates), Deloitte, and Deloitte affiliates - Deloitte Financial
Advisory Services LLP ("Deloitte FAS"), Deloitte Consulting LLP ("Deloitte Consulting"), and
Deloitte Tax LLP ("Deloitte Tax") - concerning non-audit work to be performed, including the
terms of such proposed work and the personnel to be engaged.

## BACKGROUND

### Procedural Background

7.    On October 8, 2005, and subsequently on October 14, 2005, Delphi and
substantially all of its active U.S. subsidiaries (forty-two total Debtors) filed voluntary petitions
for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). On
November 23, 2005, the Debtors filed the Retention Application.

8.    Lead Plaintiffs are, and represent, creditors, equity holders and parties-in-interest
in the bankruptcy proceeding because Lead Plaintiffs and the Prospective Class lost many
billions of dollars as a result of their purchases of Delphi's common stock and debt securities.

9.    On June 27, 2005, the Honorable Naomi Reice Buchwald, United States District
Judge for the Southern District of New York, appointed the aforementioned institutional
investors as Lead Plaintiffs and subsequently, on September 23, 2005, consolidated the pending
putative securities class actions as *In re Delphi Corp. Securities Litigation*, Master File No. 1:05-

CV-2637 (NRB) (SDNY).  On September 30, 2005, Lead Plaintiffs filed their Consolidated
Class Action Complaint (the "Complaint") asserting damages for violations of certain federal
securities laws against, among others, Delphi and Delphi's current and former officers and
directors, Deloitte, certain underwriters, and other parties.  Although the Securities Litigation is
proceeding against the non-debtor defendants, it is stayed against Delphi pursuant to the
automatic stay prescribed by 11 U.S.C. § 362(a).[1]

**Factual Background**

      A.     **Deloitte's Role At Delphi**

    10.    As alleged in the Complaint,[2] Deloitte was directly involved in auditing Delphi
and its affiliated and subsidiary companies and played an integral part in the conduct, acts and
omissions at the heart of the alleged fraud at Delphi.  At all times, Deloitte provided auditing
services to Delphi, including conducting audits of the Company's year-end financial statements
and review of its quarterly reports. (¶ 67).

    11.    For this service to Delphi, and for numerous other non-audit services, Deloitte
was highly compensated. (¶¶ 532-34).  For example, from 2000 through 2003, Deloitte was paid
at least $30.3 million in auditing fees, and its parent received $76.1 million in non-auditing fees,
including fees from consulting arrangements. *Id*.  As is discussed in greater detail below, Delphi
paid Deloitte $53.3 million ($41.3 million in 2000 and $12 million in 2001) to create and
implement Delphi's financial information systems.

---

[1]    On November 15, 2005, Lead Plaintiffs moved the Court for a limited modification of the automatic stay
for the narrow purpose of obtaining from Delphi a copy of documents and materials that Delphi has already
produced or provided in connection with any inquiries or investigations relating to Delphi's accounting practices or
business affairs.  On November 21, 2005, pursuant to a request from Debtor's counsel, Lead Plaintiffs agreed to
adjourn consideration of this motion from November 29, 2005 until January 5, 2006 to discuss a potential
consensual resolution of that motion.
[2]    All references to "¶" are to the Complaint. Lead Plaintiffs assume that the Court is already familiar with the
events at Delphi underlying the Securities Litigation. For additional background, they refer the Court to the
Complaint and to Lead Plaintiffs' Objection to Debtors' Motion For Order Under §§ 105 and 363 Authorizing
Debtors to Implement a Key Employee Compensation Program, at 4-8. (Docket Item #1161).

12.    As Delphi's outside auditor, Deloitte was charged with the responsibility of opining upon whether Delphi prepared its financial statements in accordance with generally accepted accounting principles ("GAAP").    (¶ 531).    However, as evidenced by Delphi's enormous restatement of its reported financial results for Fiscal Years 2002 and 2003 and selected financial data for Fiscal Years 2000 and 2001 in its Form 10-K for the year ended December 31, 2004 (the "Restatement"), Delphi failed to comply with GAAP in many respects. (¶ 220).  Indeed, the Restatement establishes a pervasive dereliction by Delphi's management in complying with GAAP.    (¶ 531).    Therefore, Deloitte's unqualified opinions during these periods, stating that Delphi's financial statements did comply with GAAP, were false and reflect a complete failure on Deloitte's part to perform its critical gatekeeping function.

## B.    Deloitte & Touche's Fraudulent Auditing Of Delphi

### 1.    Delphi's Inadequate Internal Controls

13.    Deloitte failed to carry out its responsibilities under GAAP and GAAS in several respects.  First, Deloitte clearly failed to consider the sufficiency of Delphi's internal controls. (¶544).    Delphi's Audit Committee investigated Delphi's internal controls as part of its investigation into Delphi's fraudulent accounting practices, in response to a formal investigation by the Securities and Exchange Commission ("SEC"), and concluded that Delphi's internal controls were rife with "material weaknesses." (¶ 545).  In particular, the Audit Committee concluded that:

> The Company's accounting policies were inadequate or insufficiently comprehensive to ensure proper and consistent application throughout the organization and did not have effective controls related to the administration and accounting for contracts. In particular, the Company does not have adequate controls to identify and analyze the terms and conditions, both written and unwritten, of new contracts, or procedures to identify, analyze, and

> properly record the impact of amendments, supplement letters, or
> other agreements related to existing contracts.

(¶ 546).  For five years, it was Deloitte who approved these admittedly inadequate internal controls.

### 2.    Deloitte Failed To Detect Blatant Accounting Manipulation

14.    The lack of internal controls at Delphi and the failure of Deloitte's oversight are evidenced by the blatant accounting manipulations that were rampant at the Company from the moment Delphi was spun-off from GM.  Examples of Delphi's pervasive improper accounting practices that Deloitte failed to detect include, among others:

a.    improperly disguising $441 million in financing transactions as sales of inventory or indirect materials  (¶ 122);

b.    improperly accounting for more than $240 million in transactions with General Motors Corporation by misclassifying warranty payments to GM as adjustments to pension obligations as well as by immediately recognizing offsets to warranty expenses that should have been deferred (¶¶ 155-68);

c.    improperly accounting for millions of dollars in transactions with various service providers, including $68 million in transactions with Electronic Data Systems ("EDS"), one of Delphi's information technology service providers, by prematurely recognizing reductions to expenses, improperly deferring the recognition of expenses and improperly failing to recognize obligations (¶¶ 173-84);

d.    improperly overstating the Company's pre-tax income by $14 million in 2002 and by $34 million in 2003 through the improper recording of obligations and adjustments before they accrued (¶¶ 185-87); and

e.      improperly understating the value of its direct materials inventory by, among other things, failing to record high-dollar supplies as inventory and intentionally delaying delivery of inventory (¶¶ 190-99).

The millions of dollars in expenses that Delphi failed to accrue, improper deferrals of expenses, and improper income recognition, through various schemes, further underscore the lack of controls over Delphi's accounting.  *Id.*  Indeed, Delphi management's ability to manipulate inventory through fictitious asset and inventory disposal transactions and to record millions of dollars in illusory income evidences further deficiencies in internal controls at Delphi and the ease with which senior management was able to circumvent the few internal controls that did exist.  (¶ 549).

15.    A simple review of the contracts and documentation underlying these disposal transactions would have revealed that the accounting for these transactions was entirely manipulative.  For example, the contract governing Delphi's transaction with Setech clearly set forth that the parties were engaging in a financing transaction and not a sale.  According to the Lead Plaintiffs' investigation, the terms requiring Delphi to buy back the materials from Setech were explicit.  (¶126).

16.    Delphi paid Deloitte over $53 million to design and implement Delphi's financial information systems.  Delphi awarded Deloitte the contract for this non-audit service because Delphi purportedly needed to establish a stand-alone financial information system upon its spin-off from GM.  Despite the fact that Deloitte was paid to design and implement this system - and was paid to audit Delphi's books at the same time - Deloitte recklessly failed to catch, or knowingly signed off on, Delphi's materially false and misleading financial statements.

17.    It is apparent from the conclusions by Delphi's Audit Committee that any meaningful scrutiny of Delphi's internal controls would have revealed that such controls were wholly lacking at the Company. (¶ 553). Yet, Deloitte, in the course of auditing Delphi's 1999 through 2003 financial statements, blatantly disregarded weaknesses and deficiencies in Delphi's internal control structure. *Id.*

### 3.    Deloitte Ignored A Number Of Red Flags

18.    Deloitte also ignored myriad "red flags" that auditors need to consider in determining audit risk relating to misstatements arising from fraudulent reporting. (¶ 554).[3] For example, Delphi's senior executives received huge bonuses, usually more than 100% of their annual income, if the Company met or exceeded certain targeted financial metrics, including levels of earnings, earnings per share, operating income and numerous other metrics. (¶ 556). The strong incentive for Delphi's management to meet or exceed these goals at all costs, and Delphi's consistent ability to meet earnings targets in the declining auto industry, should have served as a red flag to Deloitte to scrutinize the accounting supporting these indicators. *Id.* Management's unwavering ability to meet expectations is a substantial red flag. *Id.*

19.    Moreover, Delphi's public filings and earnings reports touted new "aggressive" inventory management initiatives and other cost-cutting efforts that allowed Delphi to meet financial targets despite a slowing economy. (¶ 557). Much of this so-called aggressive inventory management and cost-cutting was achieved through fraudulent transactions, including temporarily disposing of inventory in financing transactions recorded as sales, manipulating the

---

[3]    GAAS identifies various "red flags" that auditors need to consider in determining the risk relating to material misstatements arising from fraudulent financial reporting. These include: a) a known history of securities law violations or claims against the entity or its senior management alleging fraud or violations of securities laws; (b) intentional misapplication of accounting principles; (c) alteration of supporting documents for amounts in the financial statements; (d) pressure to commit fraud; (e) significant related party transactions; (f) domination of management by individuals or by a select group; (g) complex or out of ordinary transactions; (h) and management setting aggressive financial goals. *See* Appendix to Statement of Auditing Standards ("SAS") 99.

receipt and recording of inventories, and failing to accrue expenses in the proper reporting periods, or in some cases, at all.   The number and significance of these transactions, and the fact that some were quickly reversed, served as a substantial red flag to Deloitte that there were serious issues in Delphi's accounting.  *Id.*

20.     Significantly, at the very end of the fourth quarter of 2000, Delphi engaged in an enormous, illicit inventory disposal with Bank One involving precious metals, which had the effect of almost quadrupling Delphi's cash provided by operating activities for the fourth quarter (from $68 million to $268 million) and also allowed Delphi to reduce inventory levels.  (¶ 558). According to Lead Plaintiffs' investigation, Delphi re-opened its books for the year-ended December 31, 2000 in order to record entries related to its purported sale of the precious metals to Bank One.  Moreover, this transaction was reversed only a few weeks into the new reporting period, during a time when Deloitte's audit of Delphi's 2000 financials should have been ongoing. *Id.* This transaction was a clear red flag that should have put Deloitte on notice that there were problems with Delphi's accounting.  *Id.*  Deloitte should have inquired into this transaction and in doing so it would have discovered that Delphi was engaged in fictitious "sale" transactions with numerous companies that were designed to inflate income by temporarily moving inventory off its books at critical reporting times.  *Id.*

21.     In addition, Delphi's transactions with GM also highlighted certain red flags that deserved additional scrutiny.  (¶ 561).  GM was Delphi's former parent and Delphi's senior executives were all former GM employees with strong ties to that company. *Id.* Delphi's payment to General Motors in the fall of 2000 of $237 million was a significant expense, critical to the Company's bottom line, and which Deloitte should have scrutinized in order to ensure proper accounting for the transaction.  *Id.*  As is now evident, Delphi fraudulently misclassified

the transaction as a payment for pension obligations, recorded with almost no immediate income statement effect, rather than merely as a current charge for warranty obligations. *Id.* Similarly, in late 2001, Delphi improperly recognized $30 million in warranty credits received from GM as a reduction to expenses before any actual warranty claims had occurred or been made. Had Deloitte applied any scrutiny to Delphi's transactions with GM, it would have discovered Delphi's fraudulent accounting for these transactions. *Id.* This issue is particularly revealing because the same Deloitte office that audited Delphi also audited GM, and GM had, in fact, accounted for the payment differently than Delphi. (¶ 562). Thus, because two parties to the transaction were accounting for it in different manners, and both were audited by the same Deloitte office, this should have been a substantial red flag to Deloitte that something was improper with Delphi's accounting. *Id.*

### 4.   Deloitte's Audit Plan Was Inadequate

22.   Deloitte failed to comply with applicable accounting standards by failing to design its audit plan to provide reasonable assurance that it would detect material errors at Delphi. (¶ 565). Deloitte was required to obtain knowledge of Delphi's business, to apply analytical procedures and to assess the risk of material misstatement in planning for its audit. Deloitte failed to consider or overlooked the existence of the red flags, and other risk factors, or failed to design properly or modify its planned audit procedures to mitigate those risks. (¶ 566). Thus, Deloitte failed to develop an adequate strategy for the conduct and scope of the audit of the Company's inventory, warranty reserves, separation obligations to GM, and other accrued expenses. *Id.* Had Deloitte properly planned its audit, it would have identified areas in which Delphi's internal control protocols were deficient and areas in which Delphi's accounting was subject to manipulation. (¶ 570).

23.    Also, in the course of auditing Delphi's financial statements during the relevant time period, Deloitte failed to obtain sufficient competent evidential matter to afford a reasonable basis for expressing unqualified opinions on Delphi's financial statements.  Deloitte's staff was frequently present at Delphi's offices and presumably had access to Delphi's internal corporate books and records particularly during its annual audits.  (¶ 571).  In addition, Deloitte's staff had access to Delphi's private and confidential financial and business information.  (¶ 573).  Given the availability of such records and information, Deloitte either obtained, through inspection, observations, inquiries, and other audit procedures, sufficient competent evidential matter to compel it to issue qualified or adverse opinions on Delphi's financial statements, or it recklessly failed to utilize the available records and information in the performance of its audits and failed to issue qualified or adverse opinions on Delphi's financial statements.  *Id.*

24.    It is inconceivable that Deloitte could have inquired about, observed, inspected, confirmed and physically examined the available documentation and failed to detect Delphi's pervasive fraudulent activities and the associated concealment actions undertaken by the Company's management.  (¶ 574).  Accordingly, Deloitte either performed audits that were so deficient that they amounted to no audits at all, or it identified and ignored, or recklessly failed to investigate, extremely questionable transactions and documents, and made audit judgments that no reasonable auditor would have made if confronted with the same facts.  *Id.*

## ARGUMENT

I.   **DEBTORS DO NOT AND CANNOT DEMONSTRATE THAT DELOITTE IS COMPETENT TO SERVE AS DEBTORS' AUDITOR AND OR ACCOUNTANT**

25.    As the moving parties, Debtors have the burden to prove that the terms and conditions of a proposed professional engagement are reasonable and in the interests of the estate.  11 U.S.C. 327(a); *see, e.g.*, *In re Thermadyne Holdings Corp.*, 283 B.R. 749, 756-7 (8th Cir. 2002) (upholding district court's denial of unsecured creditor committee's application to engage financial advisor based on unreasonableness of indemnification clause); *In re C & P Auto Transport, Inc.*, 94 B.R. 682, 686 (Bankr. E.D. Cal. 1988).  A debtor must also demonstrate that its proposed auditor and accountant is competent to serve in those capacities.  *In re Keren Ltd. P'ship,* 225 B.R. 303, 306.  (S.D.N.Y. 1998) (denying realtor's *nunc pro tunc* retention motion and stating: "[P]rofessionals who contemplate rendering service to estates [must] first demonstrate relevant qualifications including competence, disinterest, [and] efficiency...."); *In re Seeburg Prods. Corp.*, 215 B.R. 175, 178-81 (Bankr. N.D. Ill. 1997) (rejecting debtor's motion to employ attorney whose pre and post-petition behavior "deepened the suspicions surrounding" the debtor); *In re Doors and More Inc.*, 126 B.R. 43, 46-47 (Bankr. E.D. Mich. 1991) (rejecting motion to approve appointment of attorney who failed to perform duties competently); *see also* GAAS, AU § 150, General Standard No. 1 (requiring audit be performed by person or persons having adequate technical training and proficiency as auditor); General Standard No. 3 (requiring that due professional care be exercised in the performance of an audit and the preparation of a report).

26.    Debtors have not met and cannot meet their burden to show that Deloitte is competent to serve as their auditor and accountant.  Given the circumstances surrounding

Deloitte's pre-petition engagement with Delphi, one would expect that the Debtors would have addressed the inevitable questions about Deloitte's ability to perform competently in the future. They did not do so. Instead, the Debtors represent only the following about Deloitte's qualifications:

> Deloitte & Touche is a national professional services firm with more than 1,200 partners and principals and thousands of professional staff. Since the inception of their business operations, the Debtors have employed Deloitte & Touche as their independent auditors and accountants, and

> Deloitte & Touche or its affiliates have in the past provided tax and consulting services to the debtors or their affiliates. On account of these previous engagements by the Debtors, Deloitte & Touche has considerable knowledge concerning the Debtors and is already familiar with the Debtors' business affairs to the extent necessary for the scope of the proposed services. Such experience and knowledge will be valuable to the Debtors in their efforts to reorganize in a cost-effective, efficient, and timely manner. Further, Deloitte & Touche is also well-qualified by reason of its experience in delivering accounting and auditing services in chapter 11 cases. Deloitte & Touche thus has significant qualifications and broad and relevant experience in performing the scope of work described herein. The Debtors believe that Deloitte & Touche's unique experience, factual knowledge of the Debtors' operations, and economies of scale could not be replicated elsewhere, even at substantially greater cost to the Debtors.

Retention Application at 8-9.

27. Moreover, despite Deloitte's integral involvement with Delphi's alleged pre-petition fraud, Debtors make no mention of Deloitte's alleged involvement in that fraud. In fact the only such mention in Debtors' Retention Application is found in the attached Affidavit of Brock E. Plumb, a Deloitte partner, which notes, in pertinent part:

> Deloitte & Touche has been named as a defendant in a class action lawsuit against Delphi, among others, which has been recently filed in the United States District Court for the Southern District of New York (*In re Delphi Corp. Securities Litigation*, Case No. 1:05-CV-2637 (NRB) (the "Class Action Suit")). The Class

> Action Suit asserts claims under the federal securities laws against
> numerous defendants, including Deloitte & Touche. Setech, Inc., a
> named defendant in the Class Action Suit, is a Deloitte & Touche
> client, as are certain other of the named defendants or their
> affiliates.... As is publicly known, the Securities and Exchange
> Commission has commenced an investigation regarding Delphi;
> Deloitte & Touche has received subpoenas in such investigation.

*See* Affidavit Of Brock E. Plumb In Support Of Application For Order Under 11 U.S.C. §§
327(A), 328(A), and 1107(B) Authorizing Employment And Retention Of Deloitte & Touche
LLP As Independent Auditors And Accountants To Debtors, Effective Nunc Pro Tunc To
October 8, 2005 (the "Plumb Affidavit") at 6.

28.     The Debtors have thus wholly failed to justify – in fact, have even refrained from
explaining – their decision to retain post-petition an accounting firm that (i) repeatedly issued
false unqualified audit opinions stating that Delphi had prepared its financial statements in
accordance with GAAP, (ii) failed to scrutinize Delphi's admittedly poor internal controls, (iii)
completely failed to see bright and obvious "red flags," including, among others, incentive and
bonus driven compensation plans, post-closing entries, and end-of-year and end-of-quarter sham
transactions, and (iv) failed under GAAS to design and execute an audit plan that would provide
reasonable assurance of detecting material errors at Delphi. *See, supra,* pgs. 6-11.

29.     Given that Deloitte was unable to carry out its duties honestly and competently
for the five years of Delphi's solvency, Debtors should be made to present persuasive support for
the notion that Deloitte can now somehow perform those duties honestly and competently. They
have simply not done so, and their Application should be denied.

## II.    DELOITTE IS NOT "DISINTERESTED" UNDER SECTION 327(A) OF THE BANKRUPTCY CODE DUE TO ITS GLARING CONFLICTS OF INTEREST

### A.    LEGAL STANDARD

30.    Debtors have not demonstrated, as required by the Bankruptcy Code, that Deloitte is a "disinterested" person with no interests adverse to the Debtors' estate.[4] Title 11 U.S.C. § 101(14)(C) defines a disinterested person as, in pertinent part:

> A person that ... does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

31.    Courts agree that to hold an adverse interest to the estate means "(1) to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) to possess a predisposition under circumstances that render such a bias against the estate." *In re Roberts*, 46 B.R. 815, 827 (Bankr. Utah 1985), *aff'd in part*, *rev'd in part on other grounds*, 75 B.R. 402 (D. Utah 1987).

32.    A professional cannot be employed in a chapter 11 proceeding where it has conflicts of interest. *See, e.g., In re Andover Togs, Inc.*, Nos. 96 Civ. 7601(DAB), 97 Civ. 6710(DAB), 2001 WL 262605, at *2 (S.D.N.Y. March 15, 2001) (Bankruptcy Court abused discretion in granting debtor's application to retain Deloitte & Touche where Deloitte, having pre-petition claims against debtor, was not disinterested).[5]

---

[4]    The Plumb Affidavit contains a description of Deloitte's qualifications almost identical to that found in the Retention Application, with the following addition: "At the Debtors' request, Deloitte & Touche has continued to perform necessary audit services since the date of the chapter 11 filing, and, hence, the Debtors have requested that the Court authorize Deloitte & Touche's retention effective as of the Petition Date."  Plumb Affidavit at 3.

[5]    Title 11 U.S.C. § 327(a) provides: "Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title."

33.    The Court must take care to maintain the disinterestedness of professionals not only from the outset but throughout bankruptcy proceedings. *In re Angelika Films 57th, Inc.*, 246 B.R. 176, 179-80 (S.D.N.Y. 2000) (affirming Bankruptcy Court's decision to deny all compensation to interested debtor's counsel); *In re Vebeliunas*, 231 B.R. 181 (S.D.N.Y. 1999) (disqualifying debtor's counsel for lack of disinterestedness and appearance of impropriety). Even the appearance of conflict or impropriety must be avoided when appointing professionals in bankruptcy. *In re Martin*, 817 F.2d 175, 180 (1st Cir. 1987) (reversing award of compensation to interested attorney); *Vebeliunas*, 231 B.R. at 191 citing COLLIER BANKRUPTCY MANUAL § 101.13 ("[P]rofessionals engaged in the conduct of a bankruptcy case should be free of the slightest personal interest which might be reflected in their decisions concerning matters of the debtor's estate or which might impair the high degree of impartiality and detached judgment expected of them during the course of administration."); *In the Matter of CODESCO, Inc.*, 18 B.R. 997, 999 (Bankr. S.D.N.Y. 1982) ("There is no question that the purpose of the incorporation of the disinterest requirement in 11 U.S.C. § 327 was to prevent even the appearance of a conflict irrespective of the integrity of the person or firm under consideration. Certainly a "disinterested" person should be divested of any scintilla of personal interest which might be reflected in his decision concerning estate matters.")

**B.    DELOITTE'S CONFLICTS OF INTEREST**

34.    Debtors assert Deloitte's disinterestedness based on the Plumb Affidavit, which purports to list Deloitte's "connections with other parties-in-interest." Retention Application at 9. The Plumb Affidavit in turn contains a laundry list of relationships Deloitte holds with creditors and other parties-in-interest, as well as the above-mentioned disclosure of its status as a co-defendant in the Securities Litigation. Plumb Affidavit at 3-9.

35.     Notwithstanding these disclosures, Debtors assert that Deloitte is somehow disinterested in this bankruptcy proceeding.  That assertion rings hollow for several reasons. First, Deloitte has no incentive to uncover, disclose and fix Debtors' pre-petition accounting improprieties, and was not stirred to look into these matters until the SEC initiated its investigation.  The more Deloitte were to discover about Delphi's past accounting problems, the more it would implicate itself for having failed to detect them at that time.  In fact, Deloitte has a strong incentive to conceal pre-petition accounting and auditing problems, and to minimize its own liability.

36.     Deloitte's conflicts present more than a theoretical concern or a matter of appearances.  Exhibit A to the Retention Application, Deloitte's August 29, 2005 engagement letter (the "Engagement Letter"), sets forth the services Deloitte plans to provide Delphi Corporation for its audit of financial statements for the year-ending December 31, 2005. Deloitte's essential task is to perform an "integrated audit" that will "obtain reasonable, rather than absolute, assurance about whether (1) the financial statements are free of material misstatement, *whether caused by error or fraud*, and (2) the Company has maintained, in all material respects, effective internal control over financial reporting as of the date specified in management's assessment." Engagement Letter at 6 (emphasis added).  By August 29, 2005, Delphi had admitted that its past financial statements could not be relied upon and that its internal controls were poor.  Nevertheless, the Engagement Letter gives no indication that there had been any problems with their past arrangement.

37.     More to the point, Debtors' reliance upon this pre-petition Engagement Letter shows that both parties believed then – weeks before Delphi filed for bankruptcy protection and

just months after it admitted to accounting fraud and having poor internal controls – and still believe that it is business as usual between Deloitte and Delphi.

38.      It is difficult to imagine a more interested party, or one with a greater appearance of impropriety.  Deloitte has a disincentive to perform its job well.

39.      Second, Deloitte has significant incentive to cover-up the details of sham pre-petition inventory transactions between Delphi and co-defendant Setech, another Deloitte client. Plumb Affidavit at 6, 16.  In 1999 and 2000, Delphi and Setech engaged in sham transactions that helped Delphi to boost its income by approximately $145 million and to reduce its reported inventory levels.  (¶¶ 123-44).  Because Setech is also a Deloitte client, should the Retention Application be granted, Deloitte would be placed in the untenable position of having to investigate and potentially implicate one client in fraudulent transactions as part of its duties towards another.

40.      Third, Deloitte has significant incentive to conceal and cover-up fraudulent pre-petition transactions between Delphi and other parties it represents.  The Plumb Affidavit notes that "certain other of the named defendants" in the Securities Litigation are its clients, and lists "JPMorgan Chase Bank or affiliates" among these clients.  Plumb Affidavit at 6, 15.  JPMorgan Chase & Co. is the successor to Bank One, and is also a defendant in the Securities Litigation. (¶ 2).  In December 2000, Delphi disguised a loan for $200 million from Bank One as a sale of precious metals from its inventory.  By doing so, Delphi was able to report record cash provided by operating activities of $268 million for 2000, rather than the actual amount of $68 million. (¶ 668).  The Plumb Affidavit does not explain the scope of Deloitte's representation of Bank One and JPMorgan Chase.  Nevertheless, like Setech, the sham transactions between Delphi and

Bank One create a clear conflict of interest for Deloitte. To represent one client diligently it will be forced to investigate matters that may harm or expose another client.

41.     In addition to Setech and JPMorgan Chase, the Plumb Affidavit lists the following "parties-in-interest," defendants or affiliates of defendants in the Securities Litigation: Bank of America, Barclay's Bank PLC, John G. Blahnik, Citigroup, Credit Suisse (CFSB), Roger S. Penske, Union Bank of Switzerland (UBS), and Wachovia Bank. Plumb Affidavit at 13-16. (for complete list of defendants, *see* Complaint at ¶2). Although Deloitte does not set forth in detail the nature and scope of its relationship with these parties, similar concerns raised in connection with its representation of Setech and Bank One arise with respect to these parties. Should the Retention Application be granted, Deloitte will have an obligation to investigate Delphi's accounting and, thus, to uncover and report information that may be adverse to any or all of these other Deloitte clients.

42.     The Retention Application further promises that, under the proposed Order, Deloitte will retain on behalf of the Debtors "entities affiliated" with Deloitte, namely, Deloitte Deloitte FAS, Deloitte Consulting, and Deloitte Tax, to perform services incidental to the chapter 11 proceedings.[6]  Retention Application at 11. As mentioned above, from 2000 through 2003, Deloitte's parent received approximately $76 million in non-auditing fees from Delphi, including fees from consulting arrangements. (¶¶ 532-34). Thus, the Retention Application proposes to re-create one of the troubling arrangements that undermined Deloitte's pre-petition independence.

---

[6]     Deloitte's website states that Deloitte, Deloitte FAS, Deloitte Consulting, and Deloitte Tax are each subsidiaries of Deloitte & Touche USA LLP, which, in turn, is a member firm of Deloitte Touche Tohmatsu, a Swiss Verein. *See* http://www.deloitte.com/dtt.

43.    As this Court is aware, Debtors are or have been in negotiations with other firms to provide external auditing services.    Randall J. Miller, a partner at Ernst & Young LLP ("E&Y"), swore in an affidavit to this Court on November 22, 2005:

> E&Y LLP and the Debtors have been engaged in discussions regarding the potential engagement of E&Y LLP to provide external auditing services for the Debtors.  As of the date of this Affidavit, no formal agreements have been entered between the parties regarding such external auditing services and E&Y LLP has not provided any such services for the Debtors.  In connection with this potential engagement, E&Y LLP will submit a formal proposal to the Debtors on or about November 18, 2005....

See Affidavit Of Randall J. Miller In Support Of Application For Order Under 11 U.S.C. §§ 327(A), 328(A), And 1107(B) Authorizing Employment And Retention Of Ernst & Young LLP As Sarbanes-Oxley, Valuation And Tax Services Providers To Debtors, Effective *Nunc Pro Tunc* To October 8, 2005 (the "Miller Affidavit"), at 22.[7]    Lead Plaintiffs infer from Debtors' negotiations with E&Y that Debtors are no longer confident in Deloitte's ability to serve as their external auditor.[8] This revelation further undermines Debtors' position that "Deloitte & Touche's unique experience, factual knowledge of the Debtors' operations, and economics of scale could not be replicated elsewhere, even at substantially greater cost to the Debtors." Retention Application at 8-9.

44.    Finally, as a co-defendant in the Securities Litigation along with several current officers and directors of Delphi, the prospects for a finger pointing exercise are obvious, leading to the assertion of cross-claims that would preclude disinterestedness.  More significantly, the existence of claims by Deloitte against the Debtors for, at least, indemnification and contribution

---

[7]    Docket item #1317, Attach. 1.
[8]    Although Lead Plaintiffs express no opinion at this time with respect to Debtors' application to retain E&Y *nunc pro tunc*, they note that the Miller Affidavit provides a far more exhaustive discussion and analysis of E&Y's disinterestedness and potential for conflict than the Plumb Affidavit provides for Deloitte.

and claims by the Debtors against Deloitte are disabling factors which the Court cannot ignore. It has been held that if it is plausible that another interest may cause the professional to act differently than they would without that interest, then that professional would have a conflict and an interest adverse to the estate. *See In re Leslie Fay Cos., Inc.*, 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994). These adverse interests are not mere speculation, for Delphi has admitted the accounting improprieties, senior officers have resigned as a result, an SEC investigation is ongoing and Deloitte and current Delphi officers and directors are co-defendants in the Securities Litigation which would be proceeding against Delphi as well but for the automatic stay.

45.      For these reasons, Debtors cannot possibly maintain that Deloitte is a disinterested party, a competent professional without conflicts of interest. At best, Deloitte's representation of eleven co-defendants creates an undeniable appearance of impropriety that should disqualify it from serving as Debtors' auditor and accountant. At worst, Deloitte has a strong, cross-cutting conflict of interest, pitting the interests of its clients not only against one another, but also against its own interests, and those of the Debtors' stakeholders.

## III.   THE RETENTION APPLICATION LACKS DETAILS NECESSARY TO DETERMINE ITS REASONABLENESS

46.      The Retention Application also should be rejected because it fails to provide basic and essential details about the relationship between Debtors and Deloitte, which are required to determine its reasonableness and Deloitte's alleged disinterestedness. The Application does not divulge the connection, if any, between Deloitte's proposed auditing and accounting teams and the personnel and teams that participated in Deloitte's pre-petition engagements. It does not even indicate whether Deloitte modified its audit plan in any way following Debtors' chapter 11 petition, or in response to the startling revelations about Delphi's fraud and subsequent financial collapse.

47.    The August 29, 2005 Engagement Letter states:

> Mr. Brock E. Plumb will be responsible for the services that we perform for the Company. He will be assisted by Mr. Jeffrey S. Aughton and Mr. Mark J. Crowley. Mr. Steve Van Arsdell will serve as Office of the Chairman Advisory Partner. Mr. Plumb will, as he considers necessary, call on other individuals with specialized knowledge, either in this office or elsewhere within D&T, to assist in the performance of our services.

Engagement Letter at 1.

48.    Based on this letter, Lead Plaintiffs and other stakeholders have no means of knowing from the record whether Messrs. Plumb, Aughton, Crowley, and Arsdell were among the Deloitte personnel who worked on Delphi's past-years' audits. Debtors' representation that "Deloitte & Touche has considerable knowledge concerning the Debtors and is already familiar with the Debtors' business affairs to the extent necessary for the scope of the proposed services," Retention Application at 8, does imply strongly that the proposed engagement would be managed and or staffed by Deloitte personnel who have worked on past Delphi audits. But this is only so much speculation, for the Debtors fail to provide the necessary information regarding the prior roles at Delphi of the proposed senior audit team members.

49.    Second, the Retention Application does not indicate how or whether Deloitte will modify its audit plan should the Application be granted. As mentioned above, the Engagement Letter appears to have been executed on September 8, 2005,[9] four weeks before Debtors filed their chapter 11 petition. Engagement Letter at 5. Nothing in the letter indicates that Debtors and or Deloitte knew whether Delphi intended to file for bankruptcy protection. Nor does the letter spell out how and whether Deloitte's obligations would change in the event of a

---

[9]    The Engagement Letter was executed between August 29, 2005 and September 8, 2005 by Securities Litigation defendants Deloitte, Sheehan and Brust.

bankruptcy.  Given that there was loud public speculation about Delphi's intentions to file for chapter 11 at that time, it would be shocking if Delphi and Deloitte did not contemplate and or discuss how their relationship would be affected by a chapter 11 filing.  Debtors have provided no information about any negotiations that took place during this period.

50.    Delphi paid Deloitte $5,840,000 in fees and expenses in the 90 days leading up to bankruptcy and approximately $18.3 million during the last annual period, Retention Application at 11.  Debtors have offered no additional information about these compensation arrangements.[10]

51.    Simply stated and based upon the foregoing, the Court should not approve Debtors' proposed auditing and accounting arrangement, which engages the fox as foreman in the Debtors' henhouse renovation project.

## IV.    DEBTORS' RETENTION APPLICATION SHOULD BE DENIED, OR DEBTORS AND DELOITTE SHOULD BE REQUIRED TO PRODUCE EVIDENCE IN SUPPORT OF THE PROPOSED ENGAGEMENT

52.    Lead Plaintiffs request that the Court deny Debtors' Retention Application outright as an improvident proposal, lacking evidentiary support that would create impermissible conflicts of interest to the detriment of many of Debtors' stakeholders.

53.    Should the Court choose not to deny the Application outright, it should withhold its decision on the Retention Application pending the Debtors' and Deloitte's production of additional evidence.

---

[10]    The Retention Application also notes that Deloitte is presently a creditor of certain Debtors' affiliates in the amount of $62,490, but adds: "It is the Debtors' understanding that Deloitte & Touche will not seek recovery of such amount, subject to and contingent upon Court approval of Deloitte & Touche's retention hereunder." Retention Application at 11. Such a vague representation does not reveal whether Deloitte is in fact a creditor, which would raise additional questions about its disinterestedness. *See, e.g., In re Andover Togs*, 2001 WL 262605, at *2 (Deloitte not disinterested where it had pre-petition claim against Debtor); *In re Hub Business Forms, Inc.*, 146 B.R. 315, 321-22 (Bankr. D. Mass. 1992) (rejecting Debtors' application, *nunc pro tunc*, to hire non-disinterested auditor that served for twenty years pre-petition and held unsecured claim against Debtors).

54.     Lead Plaintiffs request that Debtors and Deloitte be required to produce evidence, in the form of documents and testimony, that fully discloses:

a.      the nature and extent of Deloitte's pre-petition audit work for Delphi, including its role in the fraudulent accounting transactions and practices in which Delphi has admitted engaging;

b.      pre-petition communications and negotiations among Debtors (Delphi and affiliates) and Deloitte concerning the proposed audit engagement, including contingencies for Delphi's chapter 11 petition;

c.      the identities of Deloitte personnel who worked on Deloitte's pre-petition Delphi engagement, and of those proposed to be retained for the Debtors' engagement, as well as the terms of such engagements pre and post-petition;

d.      pre and post-petition communications and negotiations among Debtors (Delphi and affiliates), Deloitte, and Deloitte's affiliates – Deloitte FAS, Deloitte Consulting and Deloitte Tax - concerning non-audit work to be performed, including the terms of such proposed work and the personnel to be engaged; and

e.      any other necessary and relevant information that this Court deems appropriate to determine the appropriateness of Debtors' Retention Application.

55.     Lead Plaintiffs believe that absent such evidence, the Court should reject the Debtors' Retention Application.

## CONCLUSION

WHEREFORE, Lead Plaintiffs respectfully request that this Court deny the Debtors' Retention Application, *nunc pro tunc* to October 8, 2005, or, in the alternative, require the Debtors to produce evidence to ascertain its appropriateness, and grant Lead Plaintiffs such other and further relief as is just.

Dated: December 2, 2005

Respectfully submitted,

**LOWENSTEIN SANDLER, PC**

By:  /s/ Michael S. Etkin
Michael S. Etkin, Esq. (ME 0570)
Ira M. Levee, Esq. (IL 9958)
Thomas A. Pitta, Esq. (TP 3018)
1251 Avenue of the Americas, 18th Floor
New York, New York 10019
(212) 262-6700 (Telephone)
(212) 262-7402 (Facsimile)
              and
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Bankruptcy Counsel for Lead Plaintiffs and the Prospective Class*

**NIX, PATTERSON & ROACH, L.L.P.**
Jeffrey J. Angelovich, Esq.
Bradley E. Beckworth, Esq.
Susan Whatley, Esq.
205 Linda Drive
Daingerfield, Texas 75638
(903) 645-7333 (Telephone)
(903) 645-4415 (Facsimile)

**BERNSTEIN    LITOWITZ    BERGER    &
GROSSMAN, LLP**
John P. Coffey, Esq. (JC 3832)
Hannah E. Greenwald, Esq. (HG 5180)
Mark D. Debrowski, Esq. (MD 3968)
1285 Avenue of the Americas
New York, New York 10019
(212) 554-1400 (Telephone)
(212) 554-1444 (Facsimile)

**GRANT & EISENHOFER, P.A.**
Jay W. Eisenhofer, Esq. (JE 5503)
Stuart M. Grant, Esq. (SG 8157)
45 Rockefeller Center
650 Fifth Avenue
New York, New York 10111
(212) 755-6501 (Telephone)
(212) 755-6503 (Facsimile)
and
Geoffrey C. Jarvis, Esq.
Sharan Nirmul, Esq.
Benjamin J. Hinerfeld, Esq.
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
(302) 622-7000 (Telephone)
(302) 622-7100 (Facsimile)

**SCHIFFRIN & BARROWAY, L.L.P.**
Michael Yarnoff, Esq.
Sean M. Handler, Esq.
Jodi Murland, Esq.
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7056 (Telephone)
(610) 667-7706 (Facsimile)

*Co-Lead Counsel for Lead Plaintiffs and the
Prospective Class*