**Hearing Date and Time: January 5, 2006 at 10:00 a.m.**
**Objection Deadline: December 29, 2005 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

     - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
     Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                        :
     In re                                              :     Chapter 11
                                                        :
DELPHI CORPORATION, et al.,                             :     Case No. 05-44481 (RDD)
                                                        :
                                                        :     (Jointly Administered)
                                                        :
                         Debtors.                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. § 1121(d) EXTENDING
DEBTORS' EXCLUSIVE PERIODS WITHIN WHICH TO FILE
<u>AND SOLICIT ACCEPTANCES OF PLAN OF REORGANIZATION</u>

("1121(d) EXCLUSIVITY EXTENSION MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates

(the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases

(collectively, the "Debtors"), with the support of their committee of unsecured creditors

and pre-and postpetition bank agents, hereby submit this motion (the "Motion") for an

order under 11 U.S.C. § 1121(d) extending the Debtors' exclusive periods within which to

file and solicit acceptances of a plan of reorganization.  In support of this Motion, the

Debtors respectfully represent as follows:

<u>Background</u>

A.      <u>The Chapter 11 Filings</u>

1.      On October 8, 2005, Delphi and certain of its U.S. subsidiaries (the

"Initial Filers") filed voluntary petitions in this Court for reorganization relief under

chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the

"Bankruptcy Code").  On October 14, 2005, three additional U.S. subsidiaries of Delphi

(together with the Initial Filers, collectively, the "Debtors") filed voluntary petitions in this

Court for reorganization relief under the Bankruptcy Code.  The Debtors continue to

operate their businesses and manage their properties as debtors-in-possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code.  This Court entered orders directing

the joint administration of the Debtors' chapter 11 cases (Dockets Nos. 28 and 404).

2.      On October 17, 2005, the Office of the United States Trustee (the

"U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors'

Committee").  No trustee or examiner has been appointed in the Debtors' cases.

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§

157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a

core proceeding under 28 U.S.C. § 157(b)(2).

4.      The statutory predicate for the relief requested herein is section

1121(d) of the Bankruptcy Code.

B.      Current Business Operations Of The Debtors

5.      With more than 180,000 employees worldwide, global 2004

revenues of approximately $28.6 billion, and global assets as of August 31, 2005 of

approximately $17.1 billion,[1] Delphi ranks as the fifth largest public company business

reorganization in terms of revenues, and the thirteenth largest public company business

reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11

debtors, will continue their business operations without supervision from the Bankruptcy

Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy Code.

6.      Over the past century, the operations which are now owned by

Delphi have developed leading global technology innovations with significant engineering

resources and technical competencies in a variety of disciplines.  Today, the Company (as

defined below) is arguably the single largest global supplier of vehicle electronics,

transportation components, integrated systems and modules, and other electronic

---

[1]    The aggregated financial data used in this Motion generally consists of consolidated information from
Delphi and its worldwide subsidiaries and affiliates.

technology.  The Company's technologies and products are present in more than 75 million

vehicles on the road worldwide.  The Company supplies products to nearly every major

global automotive original equipment manufacturer, with 2004 sales to its former parent,

General Motors Corporation ("General Motors" or "GM"), equaling approximately $15.4

billion, and sales to each of Ford Motor Company, DaimlerChrysler Corporation,

Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

7.       As part of its growth strategy, Delphi has established an expansive

global presence with a network of manufacturing sites, technical centers, sales offices, and

joint ventures located in every major region of the world.  In the U.S., the Debtors employ

approximately 50,600 people.  These employees work in approximately 44 manufacturing

sites and 13 technical centers across the country, and in Delphi's worldwide headquarters

and customer center located in Troy, Michigan.  Approximately 34,750 of these

individuals are hourly employees, 96% of whom are represented by approximately 49

different international and local unions.  Outside the United States, the Company's foreign

entities employ more than 134,000 people, supporting 120 manufacturing sites and 20

technical centers across nearly 40 countries worldwide.

8.       Delphi was incorporated in Delaware in 1998 as a wholly-owned

subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business

through various divisions and subsidiaries.  Effective January 1, 1999, the assets and

liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries

and affiliates (collectively, the "Company") in accordance with the terms of a Master

Separation Agreement between Delphi and GM.  In connection with these transactions,

4

Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

9.    Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle.  When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base.  The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base.  The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C.    Events Leading To Chapter 11 Filing

10.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales.  Reflective of a downturn in the marketplace, Delphi's financial condition

deteriorated further in the first six months of 2005.  The Company experienced net

operating losses of $608 million for the first six months of calendar year 2005 on six-

month net sales of $13.9 billion, which is approximately $1 billion less in sales than during

the same time period in calendar year 2004.[2]

11.　　　The Debtors believe that three significant issues have largely

contributed to the deterioration of the Company's financial performance: (a) increasingly

unsustainable U.S. legacy liabilities and operational restrictions driven by collectively

bargained agreements, including restrictions preventing the Debtors from exiting non-

strategic, non-profitable operations, all of which have the effect of creating largely fixed

labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs

resulting in the reduced number of motor vehicles that GM produces annually in the

United States and related pricing pressures, and (c) increasing commodity prices.

12.　　　In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities,

product portfolio, operational issues, and forward looking revenue requirements.  Having

concluded that pre-filing discussions with its unions and GM were not leading to the

implementation of a plan sufficient to address the Debtors' issues on a timely basis, the

Company determined to commence these chapter 11 cases for its U.S. businesses to

complete the Debtors' transformation plan and preserve value.

---

[2]　　Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge,
primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of
December 31, 2004.

13.    Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses.  This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned in the Company's transformation plan.  The Debtors believe that a substantial segment of Delphi's U.S. business operations must be divested, consolidated, or wound-down through the chapter 11 process.

14.    Upon the conclusion of this process, the Debtors expect to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

## Relief Requested

15.    Section 1121(b) of the Bankruptcy Code provides for an initial period of 120 days after the date of the order for relief during which a debtor has the exclusive right to file a plan of reorganization.  Section 1121(c) of the Bankruptcy Code also provides that if the debtor files a plan within the 120-day exclusive period, it has the

balance of 180 days after the date of the order for relief to solicit and obtain acceptances of such plan.  In these cases, the Debtors' exclusive period to file a plan expires on February 6, 2006, and the attendant solicitation period expires on April 7, 2006 (collectively, the "Exclusive Periods").[3]  As the Debtors  have stated repeatedly -- in the October 8, 2005 affidavit of Robert S. Miller, Jr. in support of the Debtors' chapter 11 petitions, at the earliest hearings held before the Court in these cases, at the organizational meeting of creditors, and in Delphi's November 9, 2005 Quarterly Report (Form 10-Q) -- the Debtors' strategic reorganization timetable targets emergence from reorganization in the first half of 2007, approximately 14-16 months beyond the current expiration of the plan exclusivity period.

16.    Accordingly, the Debtors believe that a 14-month or longer extension of their exclusivity period is appropriate and warranted in these cases. Nonetheless, the Debtors have reached an agreement with the Creditors' Committee that their initial exclusivity request will be limited to 180 days beyond the current scheduled expiry dates in February and April, 2006.  The administrative agent under the Debtors' prepetition credit facility, the administrative agent to the Debtors' postpetition lending group, and the Creditors' Committee have each informed the Debtors that they support this requested 180-day extension.  Pursuant to section 1121(d) of the Bankruptcy Code, the Debtors thus seek entry of an order extending the Debtors' Exclusive Periods to file and solicit acceptances of a plan until August 5, 2006 and October 4, 2006, respectively, without prejudice to the Debtors' right to seek further extensions.  Granting such an

---

[3]    Although the stated Exclusive Periods apply only to the Initial Filers, the requested relief is sought for all of the Debtors.

8

extension will allow the Debtors to focus substantially all of their energy on operating and transforming their business, including stabilizing their supply chain, addressing legacy issues, and reaching agreements with GM.

Basis For Relief

17.     The Exclusive Periods are intended to afford chapter 11 debtors a full and fair opportunity to rehabilitate their business and to negotiate and propose a reorganization plan without the deterioration and disruption of their business that might be caused by the filing of competing reorganization plans by nondebtor parties.

18.     As discussed above, the Debtors' operations are extensive and complex.  The sheer size and complexity of the Debtors' cases alone justifies an extension of the Exclusive Periods.  The Debtors' cases, however, have been further complicated by other factors including their long history with GM, their former parent and still their largest customer, and the disadvantageous labor contracts the Debtors inherited from GM upon separation in 1999.  In addition to navigating through this complicated framework, during the first two months of these cases the Debtors have expended much time and many resources to stabilize their supply base.  Given the Debtors' use of sole source suppliers and just-in-time inventory that is common in the automotive industry, the Debtors' suppliers have the ability to significantly affect the operations of the Debtors and their customers.  Thus, the Debtors have focused significant attention on their suppliers to ensure that the Debtors' businesses continue to run smoothly in the postpetition period.

19.     A credible long-term business plan is essential to the assessment of a reasonable range of values for the Debtors' reorganized businesses and the determination

9

of how much debt and equity those businesses will be able to support.  The Debtors are in

the midst of formulating their business plans.  Before the Debtors may propose a plan of

reorganization, the Debtors must negotiate with their unions to address numerous issues,

including increasingly unsustainable U.S. legacy liabilities and operational restrictions

driven by collectively bargained agreements that prevent the Debtors from exiting non-

strategic, non-profitable operations.  Such negotiations are ongoing but, depending on how

negotiations proceed, it is possible that resolution of these difficult issues may be achieved

only through a process under section 1113 of the Bankruptcy Code.

          20.     After gaining flexibility under their labor contracts, the Debtors

must then realign Delphi's global product portfolio and manufacturing footprint to preserve

Delphi's core U.S. operations.  This may involve closing certain unprofitable facilities or

selling certain segments of Delphi's businesses to permit the Debtors to emerge from

chapter 11 with a stronger, more financially sound business.

          21.     To ensure that realizing these objectives is possible, the Debtors

require more time than the initial exclusive period allowed under the Bankruptcy Code to

position their businesses and formulate, promulgate, and build consensus for a plan.  Once

the Debtors have formulated a long-term business plan, the Debtors anticipate testing the

business plan and engaging in discussions with all of the Debtors' constituents regarding a

plan of reorganization.  Certainly, however, given the size and complexity of these cases,

the Debtors will not have time to complete this process prior to the end of the Exclusive

Periods.  The requested extension will not prejudice other parties, but will allow the

Debtors to concentrate their efforts on systematically working towards a viable business and reorganization plan.

22.    The Debtors submit that under these circumstances the Debtors' requested extension of the Exclusive Periods through August 5, 2006 and October 4, 2006 is justified.

Applicable Authority

23.    Section 1121(d) of the Bankruptcy Code permits the court to extend a debtor's Exclusive Periods upon a demonstration of cause:

> On request of a party in interest made within the respective periods specified in subsections (b) and (c) of this section and after notice and a hearing, the court may for cause reduce or increase the 120-day period or the 180-day period referred to in this section.

11 U.S.C. § 1121(d).  Although the term "cause" is not defined in the statute, the legislative history indicates that it is intended to be a flexible standard to balance the competing interests of a debtor and its creditors.  See H.R. Rep. No. 95-595 at 232 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6191 (bankruptcy courts are given flexibility to increase the 120-day period depending on the circumstances of the case).  Moreover, whether "cause" exists to extend a debtors' exclusive periods to file and solicit acceptances of a plan is a decision committed to the sound discretion of the bankruptcy court based upon the facts and circumstances of each particular case.  See In re Texaco, Inc., 76 B.R. 322, 325 (Bankr. S.D.N.Y. 1987).  In determining whether a debtor has had an adequate opportunity to negotiate a plan of reorganization and solicit acceptances thereof, a court should consider a variety of factors to assess the totality of circumstances.  See In re Ames

11

Dep't Stores, Inc., 1991 WL 259036, at *2 (S.D.N.Y. Nov. 25, 1991); In re McLean Indus.,

Inc., 87 B.R. 830, 833-34 (Bankr. S.D.N.Y. 1987).

      24.     The court in McLean Indus. identified the following factors as

relevant to the determination of "cause" to extend a debtor's Exclusive Periods:

      (a)     the size and complexity of the debtor's case;

      (b)     the existence of good faith progress towards reorganization;

      (c)     a finding that the debtor is not seeking to extend exclusivity
to pressure creditors "to accede to [the Debtor's]
reorganization demands";

      (d)     existence of an unresolved contingency; and

      (e)     the fact that the debtor is paying its bills as they come due.

In re McLean Indus., 87 B.R. at 834; accord In re Hoffinger Indus., Inc., 292 B.R. 639, 644

(B.A.P. 8th Cir. 2003) (stating that not all factors "are relevant in every case" and court has

discretion to "decide which factors are relevant and give the appropriate weight to each").

When evaluating these factors, the goal is to determine whether a debtor has had a

reasonable opportunity to negotiate an acceptable plan with various interested parties and

to prepare adequate financial and non-financial information concerning the ramifications of

any proposed plan for disclosure to creditors.  See, e.g., In re UNR Industries, Inc., 72 B.R.

789, 792 (Bankr. N.D. Ill 1987) (court granted UNR's second request for extension of

exclusivity deadline to file plan of reorganization over objections of committee and other

parties in interest to leave open possibility of filing consensual plan);  In re McLean, 87

B.R. at 833-34; In re Texaco, 76 B.R. at 326.

      25.     In other cases of similar size and complexity to the Debtors' cases,

courts extended debtors' exclusivity rights to propose a plan of reorganization for periods

similar to those requested by the Debtors.  See, e.g., In re Delaco Co., Case No. 04-10899

(PCB) (Bankr. S.D.N.Y. 2004) (granting initial extension of five months and total

extensions of approximately 16 months);  In re Enron, Case. No. 01-16034 (AJG) (Bankr.

S.D.N.Y. 2001) (granting initial extension of six months and total extensions of

approximately 15 months); In re Bethlehem Steel, Case No. 01-15288 (BRL) (Bankr.

S.D.N.Y. 2001) (granting initial extension of five and a half months and total extensions of

more than 17 months); In re Kmart Corporation, Case No. 02-02474 (Bankr. N.D. Ill.

2002) (granting initial extension of nine months and aggregate exclusivity for more than 17

months);  In re Kaiser Aluminum Corp., Case No. 02-10429 (Bankr. D. Del. 2002)

(granting initial extension of six months and total extensions of approximately 43 months);

In re Service Merchandise Co., Inc., Case. No. 399-02649 (Bankr. M.D. Tenn. 1999)

(granting initial extension of seven months and total extensions of approximately 43

months, including one extension of 14 months).  In this case, based upon the preceding

factors and in line with other cases of similar size and complexity, sufficient cause exists

for the extension of the Exclusive Periods as requested by the Debtors in this Motion.

A.    These Cases Are Large And Complex

26.    The size and complexity of the Debtors' chapter 11 cases alone

constitute sufficient cause to extend the Exclusive Periods.  See, e.g., In re Express One

Int'l, Inc., 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996) ("The traditional ground for cause is

the large size of the debtor and the concomitant difficulty in formulating a plan of

reorganization"); In re Texaco Inc., 76 B.R. 322, 326 (Bankr. S.D.N.Y. 1987); see also

H.R. Rep. No. 595, 95th Cong., 1st Sess. 231, 232, 406 (1978), reprinted in 1978

U.S.C.C.A.N. 5787, 6191, 6362 ("[I]f an unusually large company were to seek

13

reorganization under Chapter 11, the Court would probably need to extend the time in order to allow the debtor to reach an agreement."). These and other authorities show that in large, complex chapter 11 cases courts consistently extend the debtor's exclusive periods to afford the debtor time to stabilize its business, analyze reliable information to diagnose problems, and formulate a long-term business plan before commencing the plan of reorganization process.

      27.    Here, the Debtors' cases are certainly large and complex. In fact, the cases are currently among the largest pending before any bankruptcy court in the United States. At the time the Debtors filed these cases:

    (a)    Forty-two affiliated entities sought chapter 11 relief.

    (b)    The Debtors employed approximately 50,600 people in the U.S. at approximately 44 manufacturing sites and 13 technical centers. Ninety-six percent of the company's 34,750 hourly employees were represented by approximately 49 different international and local unions under various collective bargaining agreements. The company's foreign entities employed more than 134,000 people supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

    (c)    The Debtors' global 2004 revenues were approximately $28.6 billion, and global assets as of August 31, 2005 were approximately $17.1 billion.

    (d)    The Debtors supplied products to nearly every major global automotive original equipment manufacturer, with 2004 sales to the Debtors' former parent, General Motors Corporation, equaling approximately $15.4 billion, and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

      28.    A debtor's chapter 11 case need not even approach the size of these cases to justify an extension of the exclusive periods based on size and complexity. See,

14

e.g., In re United Press Int'l, 60 B.R. 265, 270 (Bankr. D.D.C. 1986) ($40 million company

granted extension of exclusive periods based on size and complexity of case; "In many

much smaller cases, involving far less complications, two or three years go by before the

debtor is in a position to file a plan").  Thus, by any measure, the Debtors' chapter 11 cases

are sufficiently large and complex to warrant an extension of the Exclusive Periods under

the foregoing authorities.  Moreover, in addition to the typical issues that can be

anticipated to arise in a large chapter 11 case, the Debtors will face numerous very

significant issues that are unique to the automobile industry, an industry which, as a whole,

is experiencing instability that will affect the Debtors' ability to formulate and execute a

viable business plan.

B.      The Debtors Have Made Good Faith Progress Toward Reorganization

            29.      An extension of a debtor's exclusive periods also is justified by a

debtor's progress in resolving issues facing its creditors and estates. In re Amko Plastics,

Inc., 197 B.R. 74, 77 (Bankr. S.D. Ohio 1996).  The Debtors' progress in these cases thus

far is significant and compels an extension of the Exclusive Periods.

            30.      Since the Petition Date, the Debtors' management has expended

enormous efforts responding to the many exigencies and other matters which are incidental

to the commencement of any chapter 11 case, but which are compounded given the size

and complexity of these cases.  The Debtors have been consumed with the task of

responding to a multitude of inquiries and information requests made by the Creditors'

Committee, the postpetition lenders, vendors, customers, bondholders, shareholders, and

other parties in interest.  As the Court is aware, in particular, the Debtors have spent a great

deal of time and energy stabilizing their supplier base.  With numerous suppliers and

15

nearly 11,000 contracts expiring at the end of 2005, the Debtors have been in constant

negotiations with suppliers to ensure that the Debtors' operations continue to run, a

difficult task given the Debtors' use of sole-source suppliers and just-in-time inventory and

the sophistication of their suppliers.

31.    Further, the Debtors must modify or eliminate non-competitive

legacy liabilities and burdensome restrictions under current labor agreements.  The Debtors

are currently negotiating certain terms of their collective bargaining agreements, including,

without limitation, operational restrictions, which prevent the Debtors from exiting non-

strategic, non-profitable operations and restrict the Debtors' ability to permanently lay off

idled workers for whom the Debtors must provide space during working hours.  Before

being able to restructure the Debtors' businesses and thus envision a feasible plan of

reorganization, the Debtors must address these obstacles.  Consequently, in the first days

of these cases the Debtors filed a Motion For Scheduling Order To Establish Notice

Procedures, Briefing Schedule, And Hearing Date Regarding Debtors' Conditional

Applications For Relief Under 11 U.S.C. § 1113 If Voluntary Modifications To Collective

Bargaining Agreements Cannot Be Reached (Docket #14).  An order establishing

December 16, 2005 as the date that the Debtors would file a motion to reject their

collective bargaining agreements was entered and a related hearing date was set for

January 22, 2006.

32.    Subsequently, on November 28, 2005, the Debtors announced that

they had reached an agreement with GM to accelerate discussions regarding the Debtors'

restructuring efforts.  Moreover, the Debtors announced that they would suspend their

16

previously contemplated December 16, 2006 deadline to file a motion to reject their

collective bargaining agreements and modify retiree health care benefits under sections

1113 and 1114 of the Bankruptcy Code at least until January 20, 2006.

33.    In addition to the foregoing and among other things, since the filing

of these chapter 11 cases, the Debtors have accomplished the following:

(a)    obtained court approval of the Debtors' postpetition
financing package, which is comprised of $4.5 billion in debt
facilities, including $2.5 billion borrowed from the Debtors'
prepetition revolver and term loan facilities and $2 billion in
senior secured debtor-in-possession (DIP) financing from a
group of lenders led by JPMorgan Chase Bank and Citigroup
Global Markets, Inc.;

(b)    made meaningful progress in the preparation of their
schedules and statements of financial affairs which they
expect to file timely on or before the January 22, 2006
deadline established by order of this Court;

(c)    held frequent meetings and conference calls with the
Creditors' Committee;

(d)    implemented the many forms of relief granted by this Court
during the first days of these cases to preserve the Debtors'
relationships with their employees, customers, suppliers,
lenders and others; and

(e)    negotiated terms for implementation of supplier agreement
assumption procedures.

34.    Thus, the Debtors are clearly making good faith progress towards

their reorganization during the first two months of these cases. Nevertheless, given the

size and the complexity of these cases, there is still significant progress to be made.

C.    The Debtors Are Using Exclusivity For A Proper Purpose

35.    Courts have denied extensions of exclusive periods when plan

negotiations among parties in interest have broken down and the continuation of

17

exclusivity would merely give the debtor unfair bargaining leverage over the other parties in interest.  See Lake in the Woods, 10 B.R. 338, 345 (Bankr. E.D. Mich. 1981).  Here, the Debtors' request for an extension of the Exclusive Periods is not a negotiation tactic, but instead, merely a reflection of the fact that these cases still are not yet ripe for the formulation and confirmation of a viable plan of reorganization.  The most important goal to be achieved in the launch phase of this case is operational and financial stability, the groundwork for which the Debtors have just begun to lay.

36.     Furthermore, the Debtors have kept sight of the need to deal with all parties in interest in these cases.  The Debtors and their professionals have consistently conferred with their constituencies on all major substantive and administrative matters in these cases, often altering their positions in deference to the views of the Creditors' Committee, the U.S. Trustee, or the postpetition lenders.  The Debtors will, of course, continue to do so.

D.     Resolution Of An Important Contingency

37.     Courts also have cited the need to resolve an important contingency as justification for extending a debtor's exclusivity periods.  In this case, as described in detail above, such a contingency exists because the success of the Debtors' reorganization efforts will depend heavily on the Debtors' ability to address and resolve their U.S. legacy liabilities, product portfolio, and operational issues.  Only after the Debtors address their union and legacy issues through the use of sections 1113 and 1114 of the Bankruptcy Code, if necessary, may the Debtors truly focus on developing the framework for the post-chapter 11 global footprint of Delphi.  After that process, Delphi must have adequate time to develop its plan, including, without limitation, determining which operations must be

18

sold, deciding which contracts to assume or reject, and evaluating and classifying the universe of claims that have been and will be asserted against these Debtors.

E.     The Debtors Are Paying Their Bills As They Come Due

38.     Courts considering an extension of exclusivity may also assess a debtor's liquidity and solvency.  See In re Ravenna Indus., 20 B.R. 886, 890 (Bankr. N.D. Ohio 1982).  Clearly, these Debtors have sufficient liquidity because this court has approved for use by the Debtors a $4.5 billion financing package.  In addition, the Debtors are paying their bills as they come due.

39.     As described above, cause exists to extend the Exclusive Periods without prejudice to the Debtors' rights to seek a further extension of the Exclusive Periods.  Further, there is no harm in granting the requested extensions now because they will be without prejudice to the right of any party to request a termination of exclusivity at any time.  Moreover, three of the Debtors' primary parties-in-interest in these cases, the Creditors' Committee, the administrative agent under the Debtors' prepetition credit facility, and the administrative agent to the Debtors' postpetition lending group, support this relief.  Accordingly, the Debtors submit that the relief requested herein in the best interests of the Debtors, their estates, and other parties-in-interest.

Notice

40.     Notice of this Motion has been provided in accordance with the Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing (I) Omnibus Hearing Dates, (II) Certain Notice, Case Management, And Administrative Procedures, And (III) Scheduling An Initial Case Conference In

19

Accordance With Local Bankr. R. 1007-2(e), entered by this Court on October 14, 2005

(Docket No. 245).  In light of the nature of the relief requested, the Debtors submit that no

other or further notice is necessary.

Memorandum Of Law

41.    Because the legal points and authorities upon which this Motion

relies are incorporated herein, the Debtors respectfully request that the requirement of the

service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the

Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District

of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an

order (i) extending the Debtors' exclusive periods to file and solicit acceptance of a plan of

reorganization through and including August 5, 2006 and October 4, 2006, respectively,

and (ii) granting the Debtors such other further relief as is just.

Dated: New York, New York
      December 16, 2005

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By: s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr. (JB 4711)
    John K. Lyons (JL 4951)
    Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

- and -

By: s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession