**Hearing Date and Time: January 5, 2006 at 10:00 a.m.**
**Objection Deadline: December 29, 2005 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                   :
    In re                             :     Chapter 11
                                   :
DELPHI CORPORATION, et al.,      :     Case No. 05-44481 (RDD)
                                   :
                       Debtors.  :     (Jointly Administered)
                                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. §§ 365(a) AND 554 AND
FED. R. BANKR. P. 6006 APPROVING PROCEDURES FOR
REJECTING UNEXPIRED REAL PROPERTY LEASES AND AUTHORIZING
DEBTORS TO ABANDON CERTAIN FURNITURE, FIXTURES, AND EQUIPMENT

("LEASE REJECTION PROCEDURES MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order under 11 U.S.C. §§ 365(a) and 554 and Fed. R. Bankr. P. 6006 approving procedures for the future rejection of certain nonresidential unexpired real property leases or subleases (the "Leases") and authorizing the Debtors to abandon certain personal property including, without limitation, furniture, fixtures, and equipment (the "Expendable Property"), without further Court approval. In support of this Motion, the Debtors respectfully represent as follows:

## Background

A.    The Chapter 11 Filings

1.    On October 8, 2005 (the "Petition Date"), 39 of 42 Debtors, and on October 14, 2005, the remaining Debtors, filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This Court entered orders directing the joint administration of the Debtors' chapter 11 cases (Dockets Nos. 28 and 404).

2.    On October 17, 2005, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "Creditors' Committee") in these cases.  No trustee or examiner has been appointed in the Debtors' cases.

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.      The statutory predicates for the relief requested herein are sections 365 and 554 of the Bankruptcy Code and Rule 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.      Current Business Operations Of The Debtors

5.      With more than 180,000 employees worldwide, global 2004 revenues of approximately $28.6 billion, and global assets as of August 31, 2005 of approximately $17.1 billion,[1] Delphi ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations without supervision from the Bankruptcy Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy Code.

6.      Over the past century, the operations which are now owned by Delphi have developed leading global technology innovations with significant engineering resources and technical competencies in a variety of disciplines.  Today, the Company (as defined below) is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company's technologies and products are present in more than 75 million vehicles on the road worldwide.  The Company supplies products to nearly every major global automotive original equipment manufacturer, with

---

[1] The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

3

2004 sales to its former parent, General Motors Corporation ("General Motors" or "GM"), equaling approximately $15.4 billion, and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

        7.      As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world.  In the U.S., the Debtors employ approximately 50,600 people.  Those employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in Delphi's worldwide headquarters and customer center located in Troy, Michigan.  Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and local unions.  Outside the United States, the Company's foreign entities employ more than 134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

        8.      Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates (collectively, the "Company") in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM

4

is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

9.  Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle. When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base. The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base. The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C.  Events Leading To Chapter 11 Filing

10. In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales. Reflective of a downturn in the marketplace, Delphi's financial condition deteriorated further in the first six months of 2005. The Company experienced net operating losses of $608 million for the first six

5

months of calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[2]

11.     The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12.     In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward looking revenue requirements.  Having concluded that pre-filing discussions with its Unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

13.     Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core

---

[2]     Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

6

businesses. This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned in the Company's transformation plan. The Debtors believe that a substantial segment of Delphi's U.S. business operations must be divested, consolidated, or wound-down through the chapter 11 process.

14. Upon the conclusion of this process, the Debtors expect to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

### Relief Requested

15. By this Motion, the Debtors seek an order under sections 365(a) and 554 of the Bankruptcy Code and Bankruptcy Rule 6006 approving procedures for rejecting certain Leases and authorizing the Debtors to abandon any Expendable Property associated with the Leases, without further Court approval.

### Basis For Relief

16. The Debtors are party to approximately 90 Leases. As part of the Debtors' ongoing restructuring efforts, the Debtors are undertaking a comprehensive evaluation of the economic value of the Leases. In connection with the Debtors' transformation plan, the Debtors intend to achieve competitiveness by realigning Delphi's global product portfolio and manufacturing footprint. In so doing, the Debtors may reject certain Leases. Accordingly, the

Debtors seek approval of an orderly process to reject the Leases and abandon any Expendable Property associated with the Leases, without further Court approval.

17.   The Debtors believe that the costs associated with the administrative process of drafting, filing, and serving pleadings and sending required notice to all parties-in-interest to reject a Lease and abandon Expendable Property will, in many cases, reduce the benefit that the Debtors and their estates would otherwise gain by rejecting such Lease.  The procedures set forth below will expedite the rejection process by eliminating the necessity for a hearing on uncontested rejections of Leases and abandonment of Expendable Property while still protecting the rights of the parties-in-interest.  Moreover, the Debtors will consult with their advisors -- including, without limitation, Jones Lang LaSalle, the Debtors' retained real estate advisors -- to assist in the evaluations of the marketability and value of unwanted Leases.  Those unwanted Leases that have insufficient economic value may be rejected pursuant to the procedures described below.

Proposed Procedures For Rejection Of Leases And
Abandonment Of Expendable Property

18.   The Debtors seek approval of an orderly process to reject Leases and to abandon Expendable Property which the Debtors determine to be burdensome or of inconsequential value or benefit to their estates without further court approval.  The proposed procedures are as follows:

    a.   The Debtors would be authorized but not directed to reject any Lease determined by the Debtors, in the exercise of their business judgment, to be unnecessary or burdensome to their ongoing business operations.  The Debtors would be authorized but not directed to abandon any Expendable Property determined to be burdensome or of inconsequential value and benefit to the Debtors.

  b.  The rejection, if any, of a Lease would become effective (the "Rejection Date") as of ten calendar days following the issuance by the Debtors of a notice of rejection, substantially in the form attached hereto as <u>Exhibit A</u> (a "Rejection Notice"). The Rejection Notice would include a copy of the order granting this Motion.

  c.  The Debtors would serve the Rejection Notice by e-mail, facsimile, overnight delivery, or hand delivery, along with a copy of the order approving this Motion, on (i) each lessor of the Lease (each, a "Lessor") to be rejected (and, to the extent that the Debtor is the sublessor, on the sublessee), (ii) any additional parties entitled to notice pursuant to the terms of the rejected Lease, (iii) all parties known to the Debtors as having a direct interest in any Expendable Property proposed to be abandoned; (iv) the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"), (v) counsel for the Creditors' Committee, (vi) counsel for the agent under the Debtors' prepetition credit facility, and (vii) counsel for the agent under the postpetition credit facility (collectively, the "Notice Parties").

  d.  The rejection of a Lease and abandonment of Expendable Property would become effective on the Rejection Date without further court order unless an objection (the "Objection") and request for hearing is served by one of the Notice Parties so as to be <u>received</u> within the ten-day period referenced in subparagraph "b" above. The objecting party would serve the Objection on (i) the Debtors, (ii) the undersigned counsel for the Debtors, (iii) counsel for the agent under the Debtors' prepetition credit facility, (iv) counsel for the agent under the Debtors' post petition credit facility, (v) counsel for the Creditors' Committee, and (vi) the U.S. Trustee. In the event that a proper and timely Objection is served in accordance with this paragraph, the Debtors and the objecting party would meet and confer in an attempt to negotiate a consensual resolution. Should either party determine that an impasse exists, then the Debtors would schedule a hearing on the Objection with the Court and provide notice of the hearing to the objecting party and other parties-in-interest. In the event the Court overrules the Objection or the Objection relates only to rejection damages or Expendable Property, such Lease would still be deemed rejected as of the Rejection Date.

  e.  The Debtors would have until the later of the Rejection Date or the date provided in each Lease to remove property from the leased premises. To the extent any Expendable Property remains in the leased premises after the Rejection Date or such later date as provided for in the Lease, the Expendable Property would be

9

        deemed abandoned to the landlord of the Lease, which landlord would be entitled to remove or dispose of such property in its sole discretion without liability to any party which might claim an interest in the Expendable Property and which was served with a copy of the Rejection Notice.

f.      A Lessor would be deemed to have consented to the abandonment of any Expendable Property if a Lessor does not file with the Court and serve an Objection to such abandonment prior to the Rejection Date.

g.      Unless a party files and serves an Objection in accordance with the procedures set forth above, any expense incurred by a Lessor in the removal or disposal of Expendable Property would not be treated as an administrative expense under section 503(b)(1) of the Bankruptcy Code.  If a party properly serves an Objection, then the nature and priority of any claim asserted in the Objection would be agreed to consensually by the parties or determined by a subsequent order of this Court.  Notwithstanding the foregoing, the effectiveness of the Rejection Date as stated in the applicable Rejection Notice would not be effected by the Debtors attempt to resolve any disputes relating to such Expendable Property.

h.      Parties would have until the later of the general bar date for filing prepetition general unsecured claims as may be established in these cases or 30 days from the Rejection Date to file a proof of claim for damages arising from such rejection for each respective Lease.  Any claims not timely filed would be forever barred.

i.      The Debtors would pay rent on a per diem basis as charges accrue under the Lease for the month in which the Rejection Date of a Lease occurs.

j.      If any Debtor has deposited monies with a Lessor as a security or other kind of deposit or pursuant to another similar arrangement, such Lessor would not be permitted to set off or otherwise use the monies from such deposit or other arrangement without the prior order of the Court unless such amounts can be set off pursuant to paragraph 18 of the Order Under 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), And 364(e) and Fed.R.Bankr.P. 2002, 4001 And 9014 (I) Authorizing Debtors To Obtain Postpetition Financing, (II) To Utilize Cash Collateral And (III) Granting Adequate Protection to Prepetition Secured Parties (Docket No. 797).

10

Applicable Authority

19.     Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  The assumption or rejection of an executory contract or unexpired lease by a debtor is subject to review under the business judgment standard.  See Orion Pictures Corp. v. Showtime Networks, Inc., 4 F.3d 1095, 1099 (2d Cir. 1993); In re The Penn Traffic Co., 322 B.R. 63, 68 (Bankr. S.D.N.Y. 2005) (stating "[i]t is well established that the decision whether to assume or reject an executory contract under section 365(a) is a matter of business judgment to be exercised in the best interests of the debtor in possession and its creditors"); In re Stable Mews Assocs., Inc., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984).

20.     The business judgment standard is satisfied when a debtor determines that rejection will benefit the estate.  See In re Child World, Inc., 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992); In re Ionosphere Clubs, Inc., 100 B.R. 670, 673 (Bankr. S.D.N.Y. 1989).  In applying this standard, courts show great deference to a debtor's decision to reject an unexpired lease or executory contract.  See In re G Survivor Corp., 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994) ("Generally, absent a showing of bad faith, or an abuse of business discretion, the debtor's business judgment will not be altered." (citing, inter alia, In re Bildisco, 682 F.2d 72, 79 (3d Cir. 1982), aff'd sub nom. NLRB v. Bildisco & Bildisco, 465 U.S. 513 (1984), aff'd sub nom. John Forsyth Co. v. G Licensing, Ltd., 187 B.R. 111 (S.D.N.Y. 1996))).

21.     If a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract.  See, e.g., NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984); Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co., 318 U.S. 523, 550 (1943); Johnson v. Fairco

<u>Corp.</u>, 61 B.R. 317, 320 (Bankr. N.D. Ill. 1986). Thus, to reject a contract or lease, a debtor would have to get court approval, which would ordinarily be granted if the decision to reject has satisfied the business judgment test.

   22. The Debtors seek approval of the procedures to reject the Leases to facilitate the reduction in their obligations under such Leases that are not benefiting the estates and that cannot be assumed and assigned to a third party. The Debtors submit that the immediate reduction in the estates' administrative costs that will result from the implementation of the proposed procedures reflects the Debtors' exercise of sound business judgment. Additionally, in determining which Leases will be rejected the Debtors will exercise their business judgment. The Debtors' financial and real estate advisors will be involved and will advise the Debtors as to the marketability and value of their Leases. As part of such process, the Debtors will evaluate whether a Lease might be assumed and assigned to a third party to maximize value for the estates.

   23. Furthermore, the Lessors will not be prejudiced by these procedures because they will have the opportunity to object to the proposed rejection upon receipt of notice.

   24. Section 554(a) of the Bankruptcy Code provides that a debtor-in-possession may abandon, subject to Court approval, "property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. § 554(a). The Debtors submit that they will abandon only (i) property that is burdensome to the estate or (ii) property that is both of inconsequential value and inconsequential benefit to the estate. The Debtors believe that the proposed abandonment procedures also provide for an efficient process for disposing of the Expendable Property at the leased locations that are subject to this Motion while at the same time affording interested parties with an opportunity to object.

12

25. In addition, the notice requirements under the procedures satisfy Bankruptcy Rule 6006 by providing Lessors with notice and an opportunity to object and be heard.  See, e.g., In re Drexel Burnham Lambert, 160 B.R. 729, 733 (S.D.N.Y. 1993) (indicating that providing interested parties an opportunity to present objections satisfies due process).  In light of the foregoing, the Debtors submit that the procedures balance the Debtors' need for expeditious reduction of burdensome costs with providing due notice of the proposed rejection and abandonment to the affected Lessors.

26. Finally, the proposed procedures for rejection of Leases and abandonment of Expendable Property are fair and equitable and consistent with recent decisions in this circuit. See, e.g., In re Delta Air Lines, Inc., Case No. 05-17923 (PCB) (Bankr. S.D.N.Y. Nov. 10, 2005); In re WorldCom, Inc., Case No. 02-13533 (AJG) (Bankr. S.D.N.Y. Sept. 25, 2002); In re Enron Corp., Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. Jan. 9, 2002).

### Notice

27. Notice of this Motion has been provided in accordance with the Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing (I) Omnibus Hearing Dates, (II) Certain Notice, Case Management, And Administrative Procedures, And (III) Scheduling An Initial Case Conference In Accordance With Local Bankr. R. 1007-2(e) entered by this Court on October 14, 2005 (Docket No. 245).  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

### Memorandum Of Law

28. Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and

filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that this Court enter an order (a) a approving procedures for rejecting the Real Property Leases and (b) granting the Debtors such other and further relief as is just.

Dated: New York, New York
December 16, 2005

                      SKADDEN, ARPS, SLATE, MEAGHER
                        & FLOM LLP

By: s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr. (JB 4711)
    John K. Lyons (JL 4951)
    Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

   - and -

By: s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession