**Hearing Date and Time: January 5, 2006 at 10:00 a.m.**
**Objection Deadline: December 29, 2005 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| In re : | Chapter 11 |
| DELPHI CORPORATION, et al., : | Case No. 05-44481 (RDD) |
|  : | (Jointly Administered) |
| Debtors. : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER
11 U.S.C. § 365(a) AUTHORIZING DEBTORS TO ASSUME
EXECUTORY CONTRACT WITH PILLARHOUSE (U.S.A.), INC.

("PILLARHOUSE ASSUMPTION MOTION")

      Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order pursuant to 11 U.S.C. § 365(a) authorizing the debtors to assume an executory contract with Pillarhouse (U.S.A.), Inc. ("Pillarhouse"). In support of this Motion, the Debtors respectfully represent as follows:

Background

A.    The Chapter 11 Filings

      1.    On October 8, 2005, Delphi and certain of its U.S. subsidiaries (the "Initial Filers") filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). On October 14, 2005, three additional U.S. subsidiaries of Delphi (together with the Initial Filers, collectively, the "Debtors") filed voluntary petitions in this Court for reorganization relief under the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. This Court entered orders directing the joint administration of the Debtors' chapter 11 cases (Dockets Nos. 28 and 404).

      2.    On October 17, 2005, the Office of the United States Trustee appointed an official committee of unsecured creditors. No trustee or examiner has been appointed in the Debtors' cases.

    3.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

    4.  The statutory predicate for the relief requested herein is section 365(a) of the Bankruptcy Code.

B.  Current Business Operations Of The Debtors

    5.  With more than 180,000 employees worldwide, global 2004 revenues of approximately $28.6 billion, and global assets as of August 31, 2005 of approximately $17.1 billion,[1] Delphi ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations without supervision from the Bankruptcy Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy Code.

    6.  Over the past century, the operations which are now owned by Delphi have developed leading global technology innovations with significant engineering resources and technical competencies in a variety of disciplines. Today, the Company (as defined below) is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company's technologies and products are present in more than 75 million vehicles on the road worldwide. The Company supplies products to nearly every major global automotive original equipment manufacturer, with 2004 sales to its former parent, General Motors Corporation ("General Motors" or "GM"),

---

[1] The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

equaling approximately $15.4 billion, and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

7. As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world. In the U.S., the Debtors employ approximately 50,600 people. These employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in Delphi's worldwide headquarters and customer center located in Troy, Michigan. Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and local unions. Outside the United States, the Company's foreign entities employ more than 134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

8. Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM. Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates (collectively, the "Company") in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

9.      Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle.  When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base.  The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base.  The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C.      Events Leading To Chapter 11 Filing

10.     In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales.  Reflective of a downturn in the marketplace, Delphi's financial condition deteriorated further in the first six months of 2005.  The Company experienced net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[2]

---

[2] Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

5

11.     The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12.     In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward looking revenue requirements.  Having concluded that pre-filing discussions with its unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

13.     Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses.  This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned in the Company's transformation plan.  The Debtors believe that a substantial segment of

Delphi's U.S. business operations must be divested, consolidated, or wound-down through the chapter 11 process.

14. Upon the conclusion of this process, the Debtors expect to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

## Relief Requested

15. By this Motion, the Debtors seek authority to assume the Purchase Order Number 450104879, between Delphi and Pillarhouse (U.S.A.), Inc., dated as of May 19, 2005 (the "Contract"), a copy of which is attached hereto as Exhibit A.

## Basis For Relief

A. Summary Of The Contract

16. Pursuant to the Contract, on May 19, 2005 Delphi, through Delphi Electronics and Safety, purchased two pieces of equipment from Pillarhouse: an in-line module pre-heater and an in-line module fluxer. Pillarhouse agreed to fabricate the equipment and delivered the equipment to Delphi's plant in Mexico pre-bankruptcy. The Contract also requires Pillarhouse to install the equipment in Delphi's plant. The total Contract price is $77,535.60, including $27,465.00 for the in-line module pre-heater, $46,129.60 for the in-line module fluxer, and $3,950.00 for the installation charges.

B. Assumption Of The Contract

17. On November 7, 2005, Pillarhouse filed a Motion for Order Fixing a Deadline for the Debtors to Assume or Reject an Executory Contract with Pillarhouse (U.S.A.),

Inc. (Docket No. 917).  On December 1, 2005, this Court entered the Order Under 11 U.S.C. § 365(d)(2) Fixing Deadline For Debtors To Assume Or Reject Executory Contract With Pillarhouse (U.S.A.) Inc. (Docket No. 1377), which required the Debtors to determine, within ten days, whether to assume or reject the Contract.  Thereafter, the Debtors evaluated the Contract and any available alternatives to the Contract, and on December 9, 2005, the Debtors notified Pillarhouse that they intended to assume the Contract.

    18. Currently there are amounts outstanding under the Contract that must be cured in connection with the proposed assumption.  The Debtors owe Pillarhouse the sum of $73,594.60, which represents the Contract price for the equipment, which was delivered to the Debtors prior to the filing of the chapter 11 petition.  Accordingly, the total cure cost associated with the assumption of the Contract is $73,594.60 (the "Cure Amount").  Moreover, upon installation of the equipment the Debtors will pay Pillarhouse the sum of $3,950 for installation charges.

    19. The equipment covered by the Contract is used in the production of certain electronic components at one of Delphi's plants in Mexico and is necessary for production of those components.  At the time the Contract was issued, Delphi bargained for Pillarhouse to install the equipment, which was an important aspect of the Contract for Delphi.  If the Debtors were to find another party to install the equipment at a similar price, installation by anyone other than Pillarhouse could subject the Debtors and their estates to unnecessary risks because any delay caused by improper installation of the equipment could result in disrupted production of goods.  Due to the relatively small amounts necessary to cure all defaults under the Contract, the Debtors have determined that the costs that could be incurred on account of improperly installed equipment might quickly exceed the total cure costs under the Contract.

20. Moreover, the Debtors also bargained for a warranty on the equipment in connection with the Contract. That warranty could, however, be rendered void if anyone other than Pillarhouse were to perform the installation, thus subjecting the Debtors and their estates to additional administrative costs in the event of future equipment failures. Finally, assumption of the Contract will not impose upon the Debtors additional administrative risks. After assumption of the Contract and installation of the equipment, Delphi will have performed all of its obligations to Pillarhouse under the Contract, therefore, the likelihood of a breach or rejection by the Debtors after assumption is minimal.

21. The Debtors believe that rejection of the Contract could pose greater administrative risks than assumption. Assumption of the Contract would ensure that the equipment is installed properly, allowing for uninterrupted production of goods. For the foregoing reasons, the Debtors believe that assumption of the Contract is in the best interests of the estates because it will ensure continued production and minimize risks to the Debtors and their estates.

## Applicable Authority

22. Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the Court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). The standard to be applied by a court in determining whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which is premised upon the debtor's business judgment that assumption would be beneficial to its estate. See Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098-99 (2d Cir. 1993); see also In re Child World, Inc., 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992) (debtor may assume or reject an unexpired lease under § 365(a) in the exercise of its "business judgment"); In re Roman Crest Fruit, Inc., 35 B.R. 939, 949

9

(S.D.N.Y. 1983); Control Data Corp. v. Zelman, 602 F.2d 38, 42 (2d Cir. 1979). "More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

23. If the debtor's business judgment has been exercised reasonably, a court should approve the assumption of an executory contact. See, e.g., NLRB v. Bildisco and Bildisco, 465 U.S. 513, 523 (1984); Group of Inst'l. Investors v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co., 318 U.S. 523 (1943); Cleveland Hotel Protective Comm. v. Nat'l City Bank of Cleveland (In re Van Sweringen Corp.), 155 F.2d 1009, 1013 (6th Cir.), cert. denied, 329 U.S. 766 (1946); In re Child World, Inc., 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992); In re Ionosphere Clubs, Inc., 100 B.R. 670, 673 (Bankr. S.D.N.Y. 1989); see also In re Orion Pictures Corp., 4 F.3d at 1098-99; In re RCN Corp., Case No. 04-13638 (RDD), June 22, 2004 Hr'g Tr. ¶¶ 50:24–50:2, at 46. Once the debtor has satisfied the business judgment standard by showing that assumption will benefit the estate, the court "should not interfere 'except upon a finding of bad faith or gross abuse of [the debtor's] business discretion.'" Id. at 465 (citing Lubrizol Enters., Inc. v. Richmond Metal Finishers Inc., 756 F.2d 1043, 1047 (4th Cir. 1985).

24. The business judgment rule shields a debtor's management from judicial second-guessing. In re Farmland Indus., Inc., 294 B.R. at 913 (quoting In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986)) ("'[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.'"). Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a

10

corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).

25.    Upon finding that the Debtors have exercised their sound business judgment in determining that assumption of the Contract is in the best interests of their estates, this Court should approve assumption under section 365(a) of the Bankruptcy Code. In re Gucci, 193 B.R. 411, 415-17 (S.D.N.Y. 1996) (affirming bankruptcy court's approval of assumption of executory contract upon determining that assumption "was in the best interest of the estate"); Blue Cross Blue Shield of Conn. v. Gurski (In re Gurski), Nos. 94-51202 & 3:95CV1883, 1996 WL 684397, at *2 (D. Conn. Jan. 25, 1996) (affirming bankruptcy court's determination that executory contracts were beneficial to debtor such that debtor could assume them under section 365(a)).

26.    In determining to assume the Contract, the Debtors clearly have satisfied the requisite "business judgment" standard. As stated above, the Debtors have determined that rejection of the Contract could pose greater administrative risks than assumption. Moreover, although the Debtors will have to pay a nominal amount to cure the defaults under the Contract, doing so will ensure that the equipment is installed properly, allowing for uninterrupted production of goods. For all of the foregoing reasons, the Debtors have determined to assume the Contract.

27.    The Debtors submit that the statutory requirements of section 365(b)(1) of the Bankruptcy Code have been satisfied because there are no monetary defaults existing under the Contract to be assumed other than payment of the Cure Amount. Based on the foregoing,

the Debtors believe that the requirements of 365 have been satisfied and that this Court should grant the relief requested in the Motion.

## Notice

28. Notice of this Motion has been provided in accordance with the Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing (I) Omnibus Hearing Dates, (II) Certain Notice, Case Management, And Administrative Procedures, And (III) Scheduling An Initial Case Conference In Accordance With Local Bankr. R. 1007-2(e), entered by this Court on October 14, 2005 (Docket No. 245). In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

## Memorandum Of Law

29. Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (a) authorizing the assumption of the Contract, and (b) granting the Debtors such other further relief as is just.

Dated: New York, New York
December 16, 2005

                SKADDEN, ARPS, SLATE, MEAGHER
                  & FLOM LLP

                By: s/ John Wm. Butler, Jr.
                    John Wm. Butler, Jr. (JB 4711)
                    John K. Lyons (JL 4951)
                    Ron E. Meisler (RM 3026)
                333 West Wacker Drive, Suite 2100
                Chicago, Illinois 60606
                (312) 407-0700

                        - and -

                By: s/ Kayalyn A. Marafioti
                    Kayalyn A. Marafioti (KM 9632)
                    Thomas J. Matz (TM 5986)
                Four Times Square
                New York, New York 10036
                (212) 735-3000

                Attorneys for Delphi Corporation, et al.,
                  Debtors and Debtors-in-Possession