SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

       - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
     Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :
         In re                              :    Chapter 11
                                            :
DELPHI CORPORATION et al.,                  :    Case No. 05-44481 (RDD)
                                            :
                       Debtors.             :    (Jointly Administered)
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


MOTION FOR ORDER UNDER 11 U.S.C. §§ 363, 1107, AND 1108
APPROVING PROCEDURES TO ENTER INTO OR RENEW REAL PROPERTY
LEASES WITHOUT FURTHER COURT APPROVAL

("LEASE PROCEDURES MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order under 11 U.S.C. §§ 363, 1107, and 1108 approving procedures to enter into new or renew existing non-residential leases or subleases of real property (each a "Lease," or collectively, the "Leases") without further Court approval.  In support of this Motion, the Debtors respectfully represent as follows:

Background

A.    The Chapter 11 Filings

1.    On October 8, 2005 (the "Petition Date"), 39 of 42 Debtors, and on October 14, 2005, the remaining Debtors, filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This Court entered orders directing the joint administration of the Debtors' chapter 11 cases (Dockets Nos. 28 and 404).

2.    On October 17, 2005, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "Creditors' Committee") in these cases.  No trustee or examiner has been appointed in the Debtors' cases.

3.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.    The statutory predicates for the relief requested herein are sections 363, 1107, and 1108 of the Bankruptcy Code.

2

B.    Current Business Operations Of The Debtors

5.    With more than 180,000 employees worldwide, global 2004 revenues of approximately $28.6 billion, and global assets as of August 31, 2005 of approximately $17.1 billion,[1] Delphi ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations without supervision from the Bankruptcy Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy Code.

6.    Over the past century, the operations which are now owned by Delphi have developed leading global technology innovations with significant engineering resources and technical competencies in a variety of disciplines.  Today, the Company (as defined below) is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company's technologies and products are present in more than 75 million vehicles on the road worldwide.  The Company supplies products to nearly every major global automotive original equipment manufacturer with 2004 sales to its former parent, General Motors Corporation ("General Motors" or "GM"), equaling approximately $15.4 billion, and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

---

[1]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

7.      As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world.  In the U.S., the Debtors employ approximately 50,600 people.  Those employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in Delphi's worldwide headquarters and customer center located in Troy, Michigan.  Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and local unions.  Outside the United States, the Company's foreign entities employ more than 134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

8.      Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates (collectively, the "Company") in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

9.      Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results,

4

because supplier selection in the auto industry is generally finalized several years prior to

the start of production of the vehicle.  When awarding new business, which is the

foundation for the Company's forward revenue base, customers are increasingly

concerned with the financial stability of their supply base.  The Debtors believe that they

will maximize stakeholder value and the Company's future prospects if they stabilize

their businesses and continue to diversify their customer base.  The Debtors also believe

that this must be accomplished in advance of  the expiration of certain benefit guarantees

between GM and certain of Delphi's unions representing most of its U.S. hourly

employees which coincides with the expiration of the Company's U.S. collective

bargaining agreements in the fall of 2007.

C.      Events Leading To Chapter 11 Filing

        10.      In the first two years following Delphi's separation from GM, the

Company generated approximately $2 billion in net income.  Every year thereafter,

however, with the exception of 2002, the Company has suffered losses.  In calendar year

2004, the Company reported a net operating loss of $482 million on $28.6 billion in net

sales.  Reflective of a downturn in the marketplace, Delphi's financial condition

deteriorated further in the first six months of 2005.  The Company experienced net

operating losses of $608 million for the first six months of calendar year 2005 on six-

month net sales of $13.9 billion, which is approximately $1 billion less in sales than

during the same time period in calendar year 2004.[2]

---

[2]     Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1
        billion tax charge, primarily related to the recording of a valuation allowance on
        the U.S. deferred tax assets as of December 31, 2004.

5

11.     The Debtors believe that three significant issues have largely
contributed to the deterioration of the Company's financial performance: (a) increasingly
unsustainable U.S. legacy liabilities and operational restrictions driven by collectively
bargained agreements, including restrictions preventing the Debtors from exiting non-
strategic, non-profitable operations, all of which have the effect of creating largely fixed
labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs
resulting in the reduced number of motor vehicles that GM produces annually in the
United States and related pricing pressures, and (c) increasing commodity prices.

12.     In light of these factors, the Company determined that it would be
imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities,
product portfolio, operational issues, and forward looking revenue requirements.  Having
concluded that pre-filing discussions with its Unions and GM were not leading to the
implementation of a plan sufficient to address the Debtors' issues on a timely basis, the
Company determined to commence these chapter 11 cases for its U.S. businesses to
complete the Debtors' transformation plan and preserve value.

13.     Through the reorganization process, the Debtors intend to achieve
competitiveness for Delphi's core U.S. operations by modifying or eliminating non-
competitive legacy liabilities and burdensome restrictions under current labor agreements
and realigning Delphi's global product portfolio and manufacturing footprint to preserve
the Company's core businesses.  This will require negotiation with key stakeholders over
their respective contributions to the restructuring plan or, absent consensual participation,
the utilization of the chapter 11 process to achieve the necessary cost savings and
operational effectiveness envisioned in the Company's transformation plan.  The Debtors

6

believe that a substantial segment of Delphi's U.S. business operations must be divested,

consolidated, or wound-down through the chapter 11 process.

14.    Upon the conclusion of this process, the Debtors expect to emerge

from chapter 11 as a stronger, more financially sound business with viable U.S.

operations that are well-positioned to advance global enterprise objectives.  In the

meantime, Delphi will marshal all of its resources to continue to deliver value and high-

quality products to its customers globally.  Additionally, the Company will preserve and

continue the strategic growth of its non-U.S. operations and maintain its prominence as

the world's premier auto supplier.

<u>Relief Requested</u>

15.    Prior to the filing of their chapter 11 cases, the Debtors routinely

entered into non-residential real property Leases and renewed existing Leases. Although

the Debtors believe their entering into or renewing the Leases is within the ordinary

course of their business and that therefore no court approval to continue doing so is

required, out of an abundance of caution, by this Motion, the Debtors request authority

under Bankruptcy Code sections 363(c), 1107, and 1108, to implement procedures by

which the Debtors may enter into or renew the Leases without the need for further Court

approval.

<u>Basis For Relief</u>

16.    The Debtors are parties to approximately 90 Leases of non-

residential real property.  As a part of the Debtors' ongoing restructuring efforts, the

Debtors are undertaking a comprehensive evaluation of all leased real property locations

in an effort to reduce overall occupancy costs and maximize the efficient utilization of the

7

Debtors' real property assets.  This process will require renewing certain leases that are

necessary for the Debtors' reorganization, including Leases that provide for less or

differently configured space, while exiting other Leases that no long fit the Debtors'

needs.  The Debtors estimate that they will enter into approximately ten new Leases and

renew approximately ten Leases annually for the next two years based on the number of

current Leases up for renewal and the anticipated needs of future projects.

17.    To ensure that all Leases are at or below market rates, the Debtors'

real estate advisor, Jones Lang LaSalle, will conduct a market valuation for each Lease.

The market valuation will include, among other information, an analysis of the Lease

obligations, a determination as to whether the terms of the Lease are standard, and a

market assessment of other similarly situated leased locations.

18.    In making their business decision to enter into or renew a Lease,

the Debtors will analyze and consider the economics underlying each Lease and the

Debtors' corresponding need for space to ensure the Lease will be beneficial to the

Debtors' operations.

19.    As noted above, the Debtors believe that they may enter into Leases

in the ordinary course of business and that no court approval to do so is required pursuant

to Bankruptcy Code sections 363(c), 1107, and 1108.  To the extent that Bankruptcy

Court approval is necessary, however, the Debtors believe that the costs associated with

the administrative process of drafting, filing, and serving pleadings and sending notice to

all parties-in-interest to seek Court approval to enter into or renew each Lease will

become burdensome to the Debtors and their estates.  Out of an abundance of caution, the

Debtors request approval of the procedures set forth below which will expedite this

process by eliminating the necessity for a hearing on the Debtors' undisputed decisions to

enter into or renew Leases.

Proposed Procedures For Entering Into And Renewing Leases

20.    The Debtors seek approval of an orderly process to enter into or

renew Leases according to the following procedures (the "Procedures"):

(a)    For a Lease with average lease obligations of $200,000 or less per annum or Lease obligations of $1 million or less in the aggregate, the Debtors would be authorized but not directed to enter into or renew the Lease without further notice to any Notice Party (as defined below) or Bankruptcy Court approval.

(b)    For a Lease with average lease obligations of $200,001 or more per annum or Lease obligations in excess of $1 million up to and including $5 million in the aggregate, the Debtors would give notice of the proposed Lease (the "Lease Notice") to (i) the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"), (ii) counsel to the Creditors' Committee, (iii) counsel for the agent under the Debtors' prepetition credit facility, and (iv) counsel for the agent under the Debtors' postpetition credit facility (collectively, the "Notice Parties").  The Lease Notice would be served by facsimile, overnight delivery, or hand delivery.  The Lease Notice would include the following information:  (i) the proposed Lease to be entered into or renewed, (ii) the identity of the lessor (including a statement that the proposed lessor is not an "insider" as defined in section 101(31) of the Bankruptcy Code ), and (iii) a description of the terms of the proposed Lease.  The Notice Parties would have five business days following initial receipt of the Lease Notice to object to or request additional time to evaluate the proposed Lease.  If counsel to the Debtors receives no written objection or written request for additional time prior to the expiration of such five business day period, the Debtors would be authorized to enter into or renew the Lease.  If a Notice Party objects to the proposed Lease within five business days after the Lease Notice is received, the Debtors and such objecting Notice Party would meet and confer in an attempt to negotiate a consensual resolution.  Should either party determine that an impasse exists, then the Debtors would move the Bankruptcy Court for authority to enter into or renew the Lease, as the case may be, upon notice to the objecting party and other parties-in-interest in accordance with the Court's Case Management Order  entered on October 14, 2005 ("Case Management Order").

(c)    For a Lease with lease obligations in excess of $5 million in the aggregate, the Debtors would be authorized to enter into such a Lease only after obtaining Bankruptcy Court approval of the proposed Lease after notice and a hearing.

9

## Applicable Authority

21.     Sections 1107(a) and 1108 of the Bankruptcy Code vest debtors-in-possession with authority to continue operating their businesses.  The Debtors, operating their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners."  In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  Implicit in the duties of a chapter 11 debtor-in-possession is the duty "to protect and preserve the estate, including an operating business's going-concern value."  Id.

22.     Section 1107(a) of the Bankruptcy Code provides that the debtor-in-possession shall have the duties of a trustee in a chapter 11 case with all the rights and powers of a trustee.  11 U.S.C. § 1107.  Accordingly, to understand the rights and powers of the debtor-in-possession, section 1107 of the Bankruptcy Code must be read in conjunction with those provisions of chapters 3, 5, and 11 of the Bankruptcy Code which confer certain rights and powers on trustees.  7 Collier, Bankruptcy ¶ 1107.03 (15th rev. ed. 2003).  Section 363(c) of the Bankruptcy Code provides in pertinent part: "[T]he [debtor-in-possession] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1).

23.     Through the Procedures, the Debtors seek to enter into or renew the Leases which are typical of those which the Debtors regularly enter into in the course of their business.  The Debtors intend to enter into or renew Leases which are standard,

10

non-residential real property Leases that will enable the Debtors to continue operating in currently leased locations and other locations beneficial to the Debtors' ongoing business operations. The Debtors do not anticipate that any of the terms of the new or renewed Leases will differ materially from their other 90 or so non-residential real property leases.

24.    To the extent that the Debtors' decision to enter into or renew Leases constitutes a transaction outside of the ordinary course of business, section 363(b)(1) of the Bankruptcy Code requires that "there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business." Institutional Creditors of Continental Airlines, Inc. v. Continental Airlines, Inc. (In re Continental Airlines, Inc.), citing In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983); accord Stephens Indus., Inc. v. McClung (In re McClung), 789 F.2d 386, 390 (6th Cir. 1986); Fulton State Bank v. Schipper (In re Schipper), 109 B.R. 832, 836 (Bankr. N.D. Ill. 1989); In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1988).

25.    Sound business reasons exist to justify allowing the Debtors to enter into or renew Leases using the procedures set forth herein. The Debtors need to enter into or renew Leases both to continue their operations and to reduce the costs of their real property assets. The Debtors are in the process of evaluating their real estate portfolio and they need the flexibility to enter into or renew Leases to accomplish their goal of overall cost reduction for leased space.

26.    Although the Debtors believe that all proposed Leases will be entered into or renewed in the ordinary course of business, the Debtors' internal practices require approval from the Debtors' treasury department for Leases with Lease obligations exceeding $1 million in the aggregate. For these Leases, the Notice Parties would receive

11

notice and have an opportunity to object.  For each Lease with average lease obligations of $200,000 or less per annum or lease obligations of $1 million or less in the aggregate, the Debtors would be authorized to enter into or renew the Lease without further notice to any Notice Party or Bankruptcy Court approval.  Obtaining Court approval of each such new or renewed Lease would result in administrative expenses for drafting, serving, and filing pleadings, as well as time incurred by attorneys for appearing at Court hearings. The Debtors believe that the Court should approve these procedures to acknowledge the Debtors' ability to enter into or renew the Leases pursuant to the Procedures set forth herein.

27.    The Procedures will provide the Debtors with both flexibility and a framework in which to enter into and renew Leases, while still providing for a review of the Leases requiring approval from the Debtors' treasury department by some of the major constituents of these cases.  Without a process for entering into or renewing Leases, the Debtors and their estates would incur added and unnecessary expenses and delay in entering into Leases for space that is needed to operate the Debtors' business.

28.    The Debtors seek this Court's authority to enter into and renew Leases pursuant to the Procedures set forth herein to reduce the costs associated with seeking Court approval of each individual Lease and to reduce the time required to obtain that approval.  The Debtors respectfully submit that entering into and renewing the Leases is necessary for the operation of their business.

29.    For the foregoing reasons, the Debtors believe that the relief requested herein is in the best interests of the estates and should be granted.

<u>Notice</u>

30.    Notice of this Motion has been provided in accordance with the Case Management Order.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

<u>Memorandum Of Law</u>

31.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE, the Debtors respectfully request that the Court enter an

order (a) authorizing the Debtors to enter into Leases without further Court approval,

subject to the Procedures set forth herein, and (b) granting the Debtors such other and

further relief as is just.

Dated: New York, New York
       December 16, 2005

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By: s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr. (JB 4711)
    John K. Lyons (JL 4951)
    Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

          - and -

By: s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

14