Hearing Date and Time: January 5, 2006, 10:00 a.m.
Objection Deadline: December 29, 2005, 4:00 p.m.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                            :
        In re                     :    Chapter 11
                            :
DELPHI CORPORATION, et al.,      :    Case No. 05-44481 (RDD)
                            :
              Debtors.    :    (Jointly Administered)
                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. §§ 362,
363, 365,1107, AND 1108 AUTHORIZING RENEWAL OF INSURANCE
COVERAGE AND CERTAIN RELATED RELIEF

("INSURANCE AGREEMENT MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order under 11 U.S.C. §§ 362, 363, 365, 1107, and 1108 authorizing renewal of insurance coverage provided by ACE American Insurance Company and its affiliates (collectively, the "Insurers") and certain related relief.  In support of this Motion, the Debtors respectfully represent as follows:

Background

A.    <u>The Chapter 11 Filings</u>

1.    On October 8, 2005, Delphi and certain of its U.S. subsidiaries (the "Initial Filers") filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").  On October 14, 2005, three additional U.S. subsidiaries of Delphi (together with the Initial Filers, collectively, the "Debtors") filed voluntary petitions in this Court for reorganization relief under the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This Court entered orders directing the joint administration of the Debtors' chapter 11 cases (Dockets Nos. 28 and 404).

2.    On October 17, 2005, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "Creditors' Committee").  No trustee or examiner has been appointed in the Debtors' cases.

3.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.      The statutory predicate for the relief requested herein are sections

362, 363, 365, 1107, and 1108 of the Bankruptcy Code.

B.      Current Business Operations Of The Debtors

5.      With more than 180,000 employees worldwide, global 2004

revenues of approximately $28.6 billion, and global assets as of August 31, 2005 of

approximately $17.1 billion,[1] Delphi ranks as the fifth largest public company business

reorganization in terms of revenues, and the thirteenth largest public company business

reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11

debtors, will continue their business operations without supervision from the Bankruptcy

Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy

Code.

6.      Over the past century, the operations which are now owned by

Delphi have developed leading global technology innovations with significant

engineering resources and technical competencies in a variety of disciplines.  Today, the

Company (as defined below) is arguably the single largest global supplier of vehicle

electronics, transportation components, integrated systems and modules, and other

electronic technology.  The Company's technologies and products are present in more

than 75 million vehicles on the road worldwide.  The Company supplies products to

nearly every major global automotive original equipment manufacturer, with 2004 sales

to its former parent, General Motors Corporation ("General Motors" or "GM"), equaling

approximately $15.4 billion, and sales to each of Ford Motor Company, DaimlerChrysler

---

[1]      The aggregated financial data used in this Motion generally consists of
consolidated information from Delphi and its worldwide subsidiaries and
affiliates.

Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

7.    As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world.  In the U.S., the Debtors employ approximately 50,600 people.  These employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in Delphi's worldwide headquarters and customer center located in Troy, Michigan.  Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and local unions.  Outside the United States, the Company's foreign entities employ more than 134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

8.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates (collectively, the "Company") in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

9.      Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle.  When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base.  The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base.  The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C.      Events Leading To Chapter 11 Filing

10.      In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales.  Reflective of a downturn in the marketplace, Delphi's financial condition deteriorated further in the first six months of 2005.  The Company experienced net operating losses of $608 million for the first six months of calendar year 2005 on six-

month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[2]

11.     The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12.     In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward looking revenue requirements.  Having concluded that pre-filing discussions with its unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

13.     Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve

---

[2]     Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

the Company's core businesses.  This will require negotiation with key stakeholders over

their respective contributions to the restructuring plan or, absent consensual participation,

the utilization of the chapter 11 process to achieve the necessary cost savings and

operational effectiveness envisioned in the Company's transformation plan.  The Debtors

believe that a substantial segment of Delphi's U.S. business operations must be divested,

consolidated, or wound-down through the chapter 11 process.

        14.     Upon the conclusion of this process, the Debtors expect to emerge

from chapter 11 as a stronger, more financially sound business with viable U.S.

operations that are well-positioned to advance global enterprise objectives.  In the

meantime, Delphi will marshal all of its resources to continue to deliver value and high-

quality products to its customers globally.  Additionally, the Company will preserve and

continue the strategic growth of its non-U.S. operations and maintain its prominence as

the world's premier auto supplier.

Relief Requested

        15.     By this Motion, the Debtors seek entry of an Order pursuant to

U.S.C. § 363(b) authorizing, but not directing, the Debtors to renew or enter into new

insurance policies with the Insurers and to execute and deliver all related documents and

agreements.

        16.     The Debtors request that the Court authorize, but not direct, the

Debtors, pursuant to 11 U.S.C §§ 365 to assume insurance policies and related

agreements between Delphi and the Insurers (collectively, the "Agreements") including,

but not limited to the following:

        (a)     that certain Multi-Line Deductible Program Agreement
                   effective as of October 1, 2000 by and between Pacific
                   Employers Insurance Company and Delphi (formerly

7

known as Delphi Automotive Systems Corporation) and all amendments and addenda thereto (collectively, the " Multi-Line Deductible Program Agreement");

(b)    All General Liability Policies issued to Delphi or the other Debtors by one or more of the Insurers and all renewals, extensions, and endorsements thereto (collectively, the "General Liability Policy");

(c)    All Automobile Liability Policies issued to Delphi or the other Debtors by one or more of the Insurers and all renewals, extensions, and endorsements thereto (the "Automobile Liability Policy");

(d)    All Workers' Compensation Policies issued to Delphi or the other Debtors by one or more of the Insurers and all renewals, extensions, and endorsements thereto (the "Workers' Compensation Policy" and, collectively with the General Liability Policy and the Automobile Liability Policy, the "Insurance Policies");

(e)    the binder related to the Insurance Policies; and

(f)    the claims administration agreements related to the Insurance Policies.

17.    In addition, the Debtors seek entry of an Order pursuant to 11 U.S.C. § 363(b) authorizing, but not directing, the Debtors to replace the existing Cash Collateral (as defined below) with an irrevocable letter of credit in an amount equal to the Cash Collateral.

18.    Finally, the Debtors request that this Court grant the Insurers relief from the automatic stay provisions of 11 U.S.C. § 362, conditioned on the Debtors' assumption of the Agreements, to allow the Insurers to draw against the Collateral (as defined below) in accordance with the Agreements and to take other actions permitted under applicable non-bankruptcy law and in accordance with the Agreements without further order of this Court.

<u>Basis For Relief</u>

19.    Shortly prior to the Petition Date, the Debtors were faced with the expiration of the policy period of certain insurance policies provided by the Insurers, which policies expired by their terms on October 1, 2005. The Insurance Policies provide the Debtors with the first tier of a layered insurance program. The failure by the Debtors to renew such policies or to enter into replacement policies would have left the Debtors and their estates exposed to significant potential liabilities. To avoid this exposure, the Debtors explored their options with respect to such renewal or replacement policies and determined that entry into the Insurance Policies represented the Debtors' best option and, therefore, that it was in their best interests to renew the Insurance Policies and enter into that certain Amendment 1 to the Multi-Line Deductible Program Agreement (the "Amendment").

20.    The Insurers were willing to provide a term continuing only through January 1, 2006 under each Insurance Policy, however, and insisted upon Delphi's agreement to the terms of the Amendment as a condition to their willingness to provide the Debtors with the insurance coverage embodied in the Insurance Policies. (A copy of the Amendment is attached hereto as Exhibit A.)[3] In addition to extending the insurance coverage under substantially the same terms that had previously existed, the Amendment, among other terms, requires that the Debtors seek approval of the relief

---

[3]    The Debtors and the Insurers entered into a 90-day extension of the Amendment that currently extends coverage from January 1, 2006, through April 1, 2006 (the "Extension") to allow time for the Insurers to complete their binding offer for coverage through September 30, 2006. The parties intend to cancel the Extension upon the renewal or entry into new insurance policies.

sought herein as a condition precedent to the Insurers' agreement to provide any renewal
of the Insurance Policies beyond January 1, 2006.  (Exhibit A ¶ 2.1.)

21.    Subsequent to the Petition Date, the Debtors have actively sought
competitive bids for replacement of the Insurance Policies on January 1, 2006.
Unfortunately, because of the size and breadth of the Debtors' needs, the Debtors have
determined that only a limited number of insurance companies have the ability and/or
willingness to provide policies which would be suitable to replace the Insurance Policies.
The Debtors have evaluated their options and selected the Insurers' proposal as the best
option.  Among other terms, the Insurers' proposal for insurance coverage for the period
January 1, 2006 through September 30, 2006 requires that the Debtors pay an additional
premium of approximately $1.98 million and post approximately $9.31 million of
collateral, in addition to the collateral posted prepetition.

22.    If the Debtors were to assume the Agreements, as is required under
the Insurers' proposal, then section 365(b) of the Bankruptcy Code requires the Debtors
to cure or provide adequate assurance that they will promptly cure any defaults under the
Agreements.  Article I of the Multi-Line Deductible Program Agreement requires the
Debtors to pay the Insurers "all amounts the Insured is or may be obligated to pay to
other parties but which are paid by the [Insurers]."  (A copy of the Multi-Line Deductible
Program Agreement is attached hereto as Exhibit B.)  Thus, the Debtors' cost to cure the
Insurers' claim is predicated on an unknown amount, which is the amount that the
Insurers pay out in the future pursuant to the terms of the Agreements that otherwise the
Debtors were obligated to pay.  As of the date of this Motion, the Debtors submit that
there are no defaults under the Agreements.

23.    The Debtors have sought the professional advice of their insurance broker, Aon Risk Services ("Aon"), to provide, among other things, an estimate of the Debtors' liability under the Agreements, which subsequently can be used to estimate the value of the Insurers' potential cure claim.[4]  Significantly, the calculations provided by Aon are based on a snap-shot of the data at the time this Motion is filed.  Moreover, the estimates contain a high level of variance.  Nevertheless, this information is the best information that is available to the Debtors at this time, and the uncertainty in these estimates factored into the Debtors' analysis and evaluation of the Debtors' options for insurance coverage.  A copy of the table summarizing estimates of the Debtors' liability under the Agreements is attached hereto as Exhibit C.

24.    As part of this analysis, it also is important to note that the Insurers currently hold $19.1 million in collateral and security posted by the Debtors (the "Collateral"), which is comprised of an irrevocable letter of credit in the amount of approximately $13.7 million (the "Letter of Credit") and cash collateral of $5,388,967 (the "Cash Collateral").  The Collateral was provided to the Insurers prior to the Petition Date.  In analyzing the size of the Insurers' potential cure claim, the Debtors' analyzed the likelihood that the claim exceeds the value of theCollateral.  In addition, the Debtors took the estimated cure amount into account when comparing the Insurers' bid against the Debtors' other options.

25.    If the Debtors continue paying the prepetition workers' compensation claims, the estimated liability to the Insurers arising from the Agreements

---

[4]    Aon's estimate of the Insurers' potential cure claim is for information purposes only, and the Debtors do not request an order estimating the Insurers' claim. Aon's estimate has not been reviewed, approved, or accepted by, and is not binding on, the Insurers or any other parties in interest.

(as described above in paragraph 22) would be approximately $16.6 million.[5]  This

estimate falls between the 55 and 60 percent confidence interval.[6]  Aon's estimate is more

conservative than the median liability, which by definition, would be represented by the

50 percent confidence interval.   Because that estimated liability to the Insurers is less

than the value of the Collateral, the Debtors estimate that Insurers' cure claim would be

zero.

26.     Under this Court's October 13, 2005 order authorizing the Debtors

to pay prepetition wages, salaries, and benefits (Docket No. 198) (the "Human Capital

Obligations Order"), however, the Debtors are "authorized, but not directed" to pay or

otherwise honor their workers' compensation program.  Thus, the Debtors are not

required under the Human Capital Obligations Order to continue paying their prepetition

workers' compensation liability claims.  If the Debtors were to stop paying prepetition

workers' compensation claims, then according to Aon, the estimated liability arising from

the indemnification provision would increase by $3.3 million, to approximately $19.8

---

[5]     The Debtors' workers compensation liability under the Agreements represents a
small percentage of the Debtors' total workers' compensation liability.  The
Debtors maintained first dollar workers' compensation insurance coverage only in
the states where they do not have a high concentration of employees.  In the states
where the Debtors have a high concentration of employees, such as Michigan, the
Debtors are self-insured for workers' compensation claims.  In the self-insured
states, the Debtors maintain excess workers' compensation insurance coverage
with the Insurers for claims in excess of the respective state's self-insured
retention.  By this Motion, he Debtors also seek to assume and renew their excess
workers' compensation insurance coverage.

[6]     Confidence interval is a statistical range with a specified probability that a given
parameter lies within that range.  Applied in this context, the confidence interval
provides the probability that the estimated liability to the Insurers is less than or
equal to $X.

million.  With $19.1 million of prepetition collateral posted, the estimated amount of the Insurers' potential cure claim would therefore be approximately $700,000.

27.     Because this calculation has a high rate of variance, the Debtors project that their liability under the Agreements ranges from $8.2 million to $22.2 million if the Debtors' were to continue paying workers' compensation claims and from $9.7 million to $27.2 million if they were to stop paying such claims.  Under the worst case scenario projected by these estimates (i.e., the 99 percent confidence interval that liability will not exceed these amounts), the Insurers could apply all of the collateral posted and have a remaining cure claim of approximately $8.1 million, again assuming that the Debtors stop paying prepetition workers' compensation claims. [7]  If the Debtors were to continue paying workers' compensation claims, the liability to the Insurers would fall by approximately $5.0 million, and the Debtors' estimated liability to the Insurers would be approximately $22.2 million, resulting in a 1% chance (under the 99% confidence interval) that the cure claim would exceed the Collateral by approximately $3.1 million.

28.     The Debtors have attempted to negotiate a waiver of the requirements of the Amendment, so as to obviate the need for the assumption of the Agreements.  The Insurers, however, have refused to waive the assumption requirement in the Amendment.  Nevertheless, the Debtors have determined that the relief sought herein is necessary because the proposal from the Insurers, even including the estimated costs associated with assuming the Agreements, is a more attractive proposal than the Debtors' other options.  Without the relief sought by this Motion, the Insurers stated that

---

[7]     Aon's estimate of the worst case scenario is based on data available at the time of this Motion.  Data not currently available may arise subsequent to the filing of this Motion, which could positively or negatively affect this estimate.

they would not be willing to renew the Insurance Policies.  This would severely limit the
Debtors' potential sources of insurance in the future, and without a viable source of
alternative insurance, the Debtors anticipate that their insurance costs would increase
substantially following expiration of the Insurance Policies.

      29.      The Debtors also have considered the possibility of self-insuring
the first-tier layer of insurance coverage offered by the Insurers, thus foregoing any need
to replace insurance policies as of January 1, 2006.  The Debtors have determined,
however, that such action would impose too much risk upon their estates.  The Debtors'
failure to secure a renewal of the Insurance Policies or replacement policies would
expose the Debtors' estates to the risk of violating statutory and contractual insurance
requirements in certain states where the Debtors have on-going operations.  Therefore,
the Debtors have determined that renewal of the Insurance Policies or entry into
replacement insurance policies is necessary and in their best interests.

      30.      The Debtors have also agreed, as a condition of the Insurers'
willingness to provide renewals of the Insurance Policies, that they will seek to replace
the Cash Collateral with an irrevocable letter of credit in the same amount as the Cash
Collateral, in form and substance acceptable to the Insurers, and issued by a financial
institution acceptable to the Insurers (the "New Letter of Credit").[8]  Although the Debtors
recognize that issuance of a New Letter of Credit involves the use of assets of the estate
to secure a prepetition claim of the Insurers against the Debtors under the Agreements,
the Debtors believe that the issuance of the New Letter of Credit would be significantly

---

[8]      As previously stated, the Debtors will also post a letter of credit of approximately
$9.31 million for the new insurance coverage for the policy period January 1,
2006 through September 30, 2006.

cheaper for the Debtors than continuing to maintain the Cash Collateral.  In addition,

upon assumption of the Agreements, the Insurers' prepetition claim against the Debtors

under the Agreements will become an administrative expense claim.  Thus, the issuance

of a New Letter of Credit will not change the priority of the Insurers' prepetition claim.

   31. Furthermore, pursuant to the Amendment, as a condition of the

Insurers' willingness to provide renewals of the Insurance Policies, the Debtors seek

certain additional relief.  Specifically, the Debtors request that the Court: (a) authorize,

but not direct, the Debtors to renew or enter into insurance policies and to execute all

related documents and agreements between the Debtors and the Insurers pursuant to

section 363 of the Bankruptcy Code; (b) authorize, but not direct, the Debtors to agree to

future renewals of the insurance programs and to provide collateral and security pursuant

to any such programs without further order of this Court;[9] (c) authorize the Insurers to

draw against the Collateral, apply the Collateral to the Debtors' obligations under the

Agreements, and take other actions permitted under applicable non-bankruptcy law and

in accordance with the Agreements without further order of this Court (upon prior written

notice, not to exceed five business days, to the Debtors and counsel for the Creditors'

Committee, if and to the extent that prior notice is required by the applicable rules of this

Court; provided that no notice shall be required for draws under letters of credit due to

the expiration or non-renewal thereof); (d) authorize relief from the automatic stay

pursuant to section 362(d) of the Bankruptcy Code, conditioned on the assumption of the

Agreements, for the sole and limited purpose of effectuating the relief described in

---

[9]  The Debtors believe that entering into new insurance programs and posting
collateral as a prerequisite for such programs are ordinary course transactions.
Because this condition, however, was listed in the Amendment, the Debtors have
agreed to seek authorization for such actions.

subparagraph (c) above; (e) confirm, conditioned upon the assumption of the Agreements,

administrative priority treatment for all payment and reimbursement obligations owing to

the Insurers under the Agreements; (f) confirm, conditioned on the assumption of the

Agreements, that the Insurers' claims with respect to the Agreements will be paid by the

Debtors in the ordinary course of their businesses; and (g) confirm that the Agreements

and an order of this Court approving this Motion shall not be altered by any plan of

reorganization confirmed in these chapter 11 cases or by subsequent order of this Court.

32.    Aside from the assumption of the Agreements and the rights

conditioned upon such assumption and the replacement of the Cash Collateral with the

New Letter of Credit, the Debtors believe that the transactions described in this Motion

constitute ordinary course transactions by the Debtors that do not require approval of this

Court pursuant to sections 363(c), 1107, and 1108 of the Bankruptcy Code.  Nevertheless,

out of an abundance of caution and to ensure full compliance with the terms of the

Amendment, the Debtors respectfully request that an order approving this Motion be

granted.

<u>Applicable Authority</u>

33.    The Debtors believe that the Agreements may be assumed pursuant

to section 365 of the Bankruptcy Code.  Section 365(a) of the Bankruptcy Code provides

that a debtor in possession, "subject to the Court's approval, may . . . assume any

executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).

34.    The standard to be applied by a court in determining whether an

executory contract or unexpired lease should be assumed is the "business judgment" test,

which is premised upon the debtor's business judgment that assumption would be

beneficial to its estate.  <u>See</u> <u>Orion Pictures Corp. v. Showtime Networks, Inc.</u> (In re Orion

Pictures Corp.), 4 F.3d 1095, 1098-99 (2d Cir. 1993); see also In re Child World, Inc.,

142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992) (a debtor may assume or reject an unexpired

lease under § 365(a) in the exercise of its "business judgment"); In re Roman Crest Fruit,

Inc., 35 B.R. 939, 949 (S.D.N.Y. 1983); Control Data Corp. v. Zelman, 602 F.2d 38, 42

(2d Cir. 1979). "More exacting scrutiny would slow the administration of the debtor's

estate and increase its cost, interfere with the Bankruptcy Code's provision for private

control of administration of the estate, and threaten the court's ability to control a case

impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir.

1985).

        35.     If the debtor's business judgment has been exercised reasonably, a

court should approve the assumption of an executory contact. See, e.g., NLRB v.

Bildisco and Bildisco, 465 U.S. 513, 523 (1984); Group of Inst'l Investors v. Chicago,

Milwaukee, St. Paul & Pacific R.R. Co., 318 U.S. 523 (1943); Cleveland Hotel Protective

Comm. v. Nat'l City Bank of Cleveland (In re Van Sweringen Corp.), 155 F.2d 1009,

1013 (6th Cir.), cert. denied, 329 U.S. 766 (1946); In re Child World, Inc., 142 B.R. at 89;

In re Ionosphere Clubs, Inc., 100 B.R. 670, 673 (Bankr. S.D.N.Y 1989); see also In re

Orion Pictures Corp., 4 F.3d at 1098-99; In re RCN Corp., Case No. 04-13638 (RDD),

June 22, 2004 Hr'g Tr. ¶¶ 50:24–50:2, at 46. Once the debtor has satisfied the business

judgment standard by showing that assumption will benefit the estate, the court "should

not interfere 'except upon a finding of bad faith or gross abuse of [the debtor's] business

discretion.'" Id. at 465 (citing Lubrizol Enters., Inc. v. Richmond Metal Finishers Inc.,

756 F.2d 1043, 1047 (4th Cir. 1985).

36.     The business judgment rule shields a debtor's management from judicial second-guessing. In re Farmland Indus., Inc., 294 B.R. 903, 913 (Bankr. W.D. Mo. 2003) (quoting In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986)) ("'[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.'"). Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).

37.     Upon finding that the Debtors have exercised their sound business judgment in determining that assumption of the Agreements is in the best interests of their estates, this Court should approve assumption under section 365(a) of the Bankruptcy Code. In re Gucci, 193 B.R. 411, 415-17 (S.D.N.Y. 1996) (affirming bankruptcy court's approval of assumption of executory contract upon determining that assumption "was in the best interest of the estate"); Blue Cross Blue Shield of Conn. v. Gurski (In re Gurski), Nos. 94-51202 & 3:95CV1883, 1996 WL 684397, at *2 (D. Conn. Jan. 25, 1996) (affirming bankruptcy court's determination that executory contracts were beneficial to debtor such that debtor could assume them under section 365(a)).

38.     The Debtors assert that the Agreements may be assumed pursuant to section 365 of the Bankruptcy Code given the Debtors' need to maintain appropriate insurance coverage. As described above, the Debtors have considered all potential options short of assumption of the Agreements and have determined that all such options

are either not viable or are less favorable to the Debtors' estates.  Therefore, the Debtors

have determined, in the exercise of sound business judgment, that the relief sought herein

is necessary and appropriate to the maintenance of their businesses and to preserve and

enhance the value of their estates to the benefit of all creditors.

      39.    As noted above, the monetary payments necessary upon

assumption of the Agreements have an estimated value of zero.[10]  Bankruptcy Code

section 365(b)(1) codifies the requirements for assuming an unexpired lease or executory

contract of a debtor.  That subsection provides:

> (b)(1)  If there has been a default in an executory contract or unexpired lease
> of the debtor, the trustee may not assume such contract or lease
> unless, at the time of assumption of such contract or lease, the trustee-
>
>   (A)    cures, or provides adequate assurance that the trustee will
> promptly cure, such default;
>
>   (B)    compensates, or provides adequate assurance that the trustee  will
> promptly compensate, a party other than the debtor to such
> contract or lease, for any actual pecuniary loss to such party
> resulting from such default; and
>
>   (C)    provides adequate assurance of future performance under such
> contract or lease.

11 U.S.C. § 365(b)(1).

      40.    The Debtors submit that the statutory requirements of section

365(b)(1) of the Bankruptcy Code have been satisfied because the Insurers are secured up

to $19.1 million by the Letter of Credit and the Cash Collateral[11] for potential monetary

defaults or future obligations of the Debtors under the Agreements.  If the Insurance

---

[10]    As noted above, the estimate falls between the 55 and 60 percent confidence
interval.

[11]    As previously stated, the Debtors seek to replace the Cash Collateral with the
New Letter of Credit.

Policies are assumed, the Insurers also would be permitted to file an administrative

expense priority claim, although the Debtors currently estimate that the liability will not

exceed the posted collateral.  The value of any potential administrative expense claim

would be the difference between the Debtors' liability under the assumed Agreements and

the Collateral.

       41.     The Debtors, operating their businesses as debtors-in-possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding

the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors

and (if the value justifies) equity owners."  In re CoServ, L.L.C., 273 B.R 487, 497

(Bankr. N.D. Tex. 2002).  Implicit in the duties of a chapter 11 debtor-in-possession is

the duty "to protect and preserve the estate, including an operating business's going-

concern value."  Id.

       42.     Courts have noted that there are instances in which a debtor-in-

possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a

prepetition claim."  Id.  The CoServ court specifically noted that preplan satisfaction of

prepetition claims would be a valid exercise of a debtor's fiduciary duty when the

payment "is the only means to effect a substantial enhancement of the estate."  Id. at 497-

98.  The court provided a three-pronged test for determining whether a preplan payment

on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant.  Second,
> unless it deals with the claimant, the debtor risks the probability of harm,
> or, alternatively, loss of economic advantage to the estate or the debtor's
> going concern value, which is disproportionate to the amount of the
> claimant's prepetition claim.  Third, there is no practical or legal
> alternative by which the debtor can deal with the claimant other than by
> payment of the claim.

Id. at 498.

43.    Here, because of the size and breadth of the Debtors' needs, only a limited number of insurance companies have the ability to provide the Debtors with insurance coverage.  If the Debtors do not continue their long-standing relationship with the Insurers, it is quite possible that the Insurers will not offer coverage to the Debtors in the future, leaving the Debtors with even fewer potential insurers.  The harm to the estate under this scenario far outweighs the cost of assuming the Insurance Policies.  As previously stated, assuming the Debtors continue paying their workers' compensation claims, the estimated value of the Insurers' cure claim is zero.  Finally, the Insurers' requirement, as memorialized in the Amendment, that the Debtors assume the Insurance Policies as a condition of renewal coverage was bargained for by the Insurers prior the Petition Date.  The Insurers have stated that they are not willing to waive this requirement. Because of the long-term effect of rejecting the Insurers' proposal, the Debtors believe that they have no option but to accept this requirement.  Therefore, the Debtors can meet their fiduciary duties as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code only by assuming the Insurance Policies as a condition of renewing insurance coverage with the Insurers.

44.    Furthermore, pursuant to the Amendment, the Debtors have also agreed to seek authorization to lift the automatic stay pursuant to section 362(d) of the Bankruptcy Code for the purpose of allowing the Insurers to draw against the Collateral, apply the Collateral to the Debtors' obligations under the Agreements, and take other actions permitted under applicable non-bankruptcy law and the Agreements without further order of this Court.  This relief is conditioned on the Debtors' assumption of the Agreements.

45.    Section 362(d) of the Bankruptcy Code provides that the Court

shall grant relief from the automatic stay of section 362(a) in the following situations:

> (1)    for cause, including the lack of adequate protection of an interest in
> property of such party in interest; [or]
>
> (2)    with respect to a stay of an act against property under subsection (a) of this
> section, if – (A) the debtor does not have an equity in such property; and (B) such
> property is not necessary to an effective reorganization[.]

11 U.S.C. § 362(d).  Courts in this circuit have noted that, "the grounds for relief from

stay are presented in subsections (1), (2) and (3) in the disjunctive; thus, if any one

subsection applies, the Court must grant a motion for relief from stay."  In re Zeoli, 249

B.R. 61, 63 (Bankr. S.D.N.Y. 2000).  The Debtors have agreed to consent to conditional

relief from the automatic stay being granted to the Insurers with respect to the Collateral

in this instance because the claims of the Insurers that will be satisfied thereby would

otherwise constitute either cure claims or administrative priority claims against the

Debtors, either of which would have to be paid in full.  As such, the relief from the

automatic stay is economically neutral to the Debtors.  Additionally, the Insurers

probably could obtain relief from the stay anyway or otherwise would get the Collateral

upon emergence.

46.    The Debtors are required, pursuant to the terms of the Amendment,

to seek authority from this Court to renew or enter into insurance policies and to execute

all related documents and agreements between the Debtors and the Insurers pursuant to

section 363 of the Bankruptcy Code.  Similar to the analysis under section 365, courts in

this district and elsewhere consistently have held that transactions pursuant to 363(b)

should be approved if there is a sound business justification for implementing them.  See

In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983); In re Delaware Hudson Ry. Co.,

124 B.R. 169, 179 (Bankr. D. Del. 1991).  Once the debtor articulates a valid business

justification, "'[there is a presumption that in making a business decision the directors of a

corporation acted on an informed basis, in good faith and in the honest belief that the

action taken was in the best interests of the company.'"  In re Integrated Resources, Inc.,

147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872

(Del. 1985)); see also In re RCN Corp., June 22, 2004 Hr'g Tr. ¶¶ 51:3–12 (approving

exit financing commitments pursuant to 363(b) of the Bankruptcy Code).

        47.     Although the Debtors believe that no authority is necessary under

section 363 of the Bankruptcy Code to renew or enter into insurance policies, to execute

all related documents and agreements between the Debtors and the Insurers and to post

collateral as a prerequisite for the issuance of the new insurance coverage, as such actions

constitute ordinary course transactions for the Debtors, such relief, to the extent outside

the ordinary course, is clearly appropriate pursuant to 11 U.S.C. § 363.  As noted above,

the Debtors would subject their estates to significant potential costs absent renewal of the

Insurance Policies or entry into new replacement policies covering the period following

expiration of the Insurance Policies.

        48.     Furthermore, the Debtors' failure to renew or replace the Insurance

Policies would potentially result in a violation of applicable non-bankruptcy laws

specifying mandatory minimum insurance coverages in certain jurisdictions where the

Debtors operate.  The Debtors respectfully assert that the renewal or replacement of the

Insurance Policies constitutes an exercise of sound business judgment on the part of the

Debtors and therefore should be approved pursuant to section 363 of the Bankruptcy

Code.

49.     For the foregoing reasons, the Debtors believe that the relief requested herein is in the best interests of the estates and should be granted.

### Notice

50.     Notice of this Motion has been provided in accordance with the Order Under 11 U.S.C. §§ 102(1) and 105 and Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing (I) Omnibus Hearing Dates, (II) Certain Notice, Case Management, and Administrative Procedures, and (III) Scheduling an Initial Case Conference in Accordance with Local Bankr. R. 1007-2(e) entered by this Court on October 14, 2005 (Docket No. 245).  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

### Memorandum Of Law

51.     Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

WHEREFORE, the Debtors respectfully request that the Court enter an order (a) approving the Debtors' assumption of Agreements, (b) lifting the automatic stay pursuant to section 362(d) of the Bankruptcy Code for the purpose of allowing the Insurers to draw against the Collateral, apply the Collateral to the Debtors' obligations under the Agreements, and take other actions permitted under applicable non-bankruptcy law and the Agreements without further order of this Court, (c) authorizing the Debtors to renew or enter into insurance policies and to execute all related documents and agreements pursuant to section 363 of the Bankruptcy Code without further order of this

Court, and (d) granting such other relief as is described in paragraphs 30 and 31 hereof,

and (e) granting the Debtors such other and further relief as is just.

Dated: New York, New York
   December 16, 2005

        SKADDEN, ARPS, SLATE, MEAGHER
        & FLOM LLP

       By: s/ John Wm. Butler, Jr.
         John Wm. Butler, Jr. (JB 4711)
         John K. Lyons (JL 4951)
         Ron E. Meisler (RM 3026)
       333 West Wacker Drive, Suite 2100
       Chicago, Illinois  60606
       (312) 407-0700

          - and -

       By: s/ Kayalyn A. Marafioti
         Kayalyn A. Marafioti (KM 9632)
         Thomas J. Matz (TM 5986)
       Four Times Square
       New York, New York 10036
       (212) 735-3000

       Attorneys for Delphi Corporation, et al.,
        Debtors and Debtors-in-Possession

**<u>EXHIBIT A</u>**

**THE AMENDMENT**

## **EXHIBIT B**

## **MULTI-LINE DEDUCTIBLE PROGRAM AGREEMENT**

<u>**EXHIBIT C**</u>

**ESTIMATED LIABILITY UNDER
ASSUMED AGREEMENTS**