SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                            :
   In re                       :        Chapter 11
                            :
DELPHI CORPORATION, et al.,     :        Case No. 05-44481 (RDD)
                            :
                   Debtors.   :        (Jointly Administered)
                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

      AFFIDAVIT OF WILLIAM D. TELGEN IN SUPPORT OF MOTION
      FOR ORDER UNDER 11 U.S.C. §§ 362, 363, 365, 1107, AND 1108
        AUTHORIZING RENEWAL OF INSURANCE COVERAGE
                <u>AND CERTAIN RELATED RELIEF</u>

1

State of Michigan        )
                         ) s.s.:
County of Oakland        )

        William D. Telgen, being duly sworn, deposes and says:

        1.     I am the Risk Manager for Delphi Corporation ("Delphi"), debtor and debtor-in-possession in the above-captioned chapter 11 cases. I am familiar with the Debtors' operations, their insurance policies generally, their relationship and agreements with ACE American Insurance Company and its affiliates (collectively, the "Insurers"), the Agreements (as defined below), and the market for insurance of the types provided by the Insurers pursuant to the Insurance Policies (as defined below). I have held this position with Delphi since September 1, 2005 and have worked in the automotive industry on insurance and risk management issues for more than 11 years. I have a Masters of Business Administration from University of Detroit-Mercy, and a Bachelors Degree in Chemical Engineering from the University of Michigan.

        2.     I submit this affidavit in support of Delphi's Motion For An Order Under 11 U.S.C. §§ 362, 363, 365, 1107, And 1108 Authorizing Renewal of Insurance Coverage And Certain Related Relief, dated December 16, 2005 (the "Motion"). Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Motion. Except as otherwise indicated, I have personal knowledge of the matters set forth herein and, if called as a witness, would testify competently thereto. I am authorized to submit this affidavit.

        3.     <u>Relief Sought</u>.  Pursuant to the Motion, the Debtors seek entry of an Order authorizing, but not directing, the Debtors to renew or enter into new insurance policies with the Insurers and to execute and deliver all related documents and agreements. The Debtors also request authority to assume the agreements and policies

between Delphi and the Insurers (collectively, the "Agreements"), including but not limited to the following:

    (a)    that certain Multi-Line Deductible Program Agreement effective as of October 1, 2000 by and between Pacific Employers Insurance Company and Delphi (formerly known as Delphi Automotive Systems Corporation) and all amendments and addenda thereto (collectively, the " Multi-Line Deductible Program Agreement");

    (b)    All General Liability Policies issued to Delphi or the other Debtors by one or more of the Insurers and all renewals, extensions, and endorsements thereto (collectively, the "General Liability Policy");

    (c)    All Automobile Liability Policies issued to Delphi or the other Debtors by one or more of the Insurers and all renewals, extensions, and endorsements thereto (the "Automobile Liability Policy");

    (d)    All Workers' Compensation Policies issued to Delphi or the other Debtors by one or more of the Insurers and all renewals, extensions, and endorsements thereto (the "Workers' Compensation Policy" and, collectively with the General Liability Policy and the Automobile Liability Policy, the "Insurance Policies");

    (e)    the binder related to the Insurance Policies; and

    (f)    the claims administration agreements related to the Insurance Policies.

4.    The Debtors also have agreed, as a condition of the Insurers' willingness to provide renewals of the Insurance Policies, that they will seek to replace the Cash Collateral with the New Letter of Credit.

5.    As a condition of the Insurers' willingness to provide renewals of the Insurance Policies, the Debtors seek certain additional relief.  Specifically, the Debtors request that the Court: (a) authorize, but not direct, the Debtors to renew or enter into insurance policies and to execute all related documents and agreements between the Debtors and the Insurers pursuant to section 363 of the Bankruptcy Code; (b) authorize,

3

but not direct, the Debtors to agree to future renewals of the insurance programs and to provide collateral and security pursuant to any such programs without further order of this Court; (c) authorize the Insurers to draw against the Collateral, apply the Collateral to the Debtors' obligations under the Agreements, and take other actions permitted under applicable non-bankruptcy law and in accordance with the Agreements without further order of this Court (upon prior written notice, not to exceed five business days, to the Debtors and counsel for the official committee of unsecured creditors (the "Creditors' Committee"), if and to the extent that prior notice is required by the applicable rules of this Court; provided that no notice shall be required for draws under letters of credit due to the expiration or non-renewal thereof); (d) authorize relief from the automatic stay pursuant to section 362(d) of the Bankruptcy Code, conditioned on the assumption of the Agreements, for the sole and limited purpose of effectuating the relief described in subparagraph (c) above; (e) confirm, conditioned upon the assumption of the Agreements, administrative priority treatment for all payment and reimbursement obligations owing to the Insurers under the Agreements; (f) confirm, conditioned on the assumption of the Agreements, that the Insurers' claims with respect to the Agreements will be paid by the Debtors in the ordinary course of their businesses; and (g) confirm that the Agreements and an order of this Court approving this Motion shall not be altered by any plan of reorganization confirmed in these chapter 11 cases or by subsequent order of this Court.

      6.      <u>Expiration of policies; efforts to replace</u>.  Prior to the Petition Date, the Debtors were faced with the expiration of the policy period of certain insurance policies provided by the Insurers, which expired by their terms on September 30, 2005. The Insurance Policies provided the Debtors with the first tier of a layered insurance program. The failure by the Debtors to renew such policies or to enter into replacement

4

policies would have left the Debtors and their estates exposed to significant potential liabilities. To avoid this exposure, the Debtors explored their options with respect to such renewal or replacement policies and determined that entry into the Insurance Policies represented the Debtors' best option and, therefore, that it was in their best interests to renew the Insurance Policies and enter into that certain Amendment 1 to the Multi-Line Deductible Program Agreement (the "Amendment").

7. The Insurers were willing to provide a term continuing only through January 1, 2006 under each Insurance Policy, however, and insisted upon Delphi's agreement to the terms of the Amendment as a condition to their willingness to provide the Debtors with the insurance coverage embodied in the Insurance Policies. In addition to extending the insurance coverage under substantially the same terms as had previously existed, the Amendment, among other terms, requires that the Debtors seek approval of the relief sought in the Motion as a condition precedent to the Insurers' agreement to provide any renewal of the Insurance Policies beyond January 1, 2006. Because of the need to obtain the relief requested in the Motion, the Debtors and the Insurers agreed to enter into a 90-day extension of the Amendment that currently extends coverage from January 1, 2006, through April 1, 2006 (the "Extension") to allow time for the Insurers to complete their binding offer for coverage through September 30, 2006. The parties intend to cancel the Extension upon the renewal or entry into new insurance policies.

8. Subsequent to the Petition Date, the Debtors have actively sought competitive bids for replacement of the Insurance Policies covering the nine-month period beginning January 1, 2006. Unfortunately, because of the size and breadth of the

5

Debtors' needs, only a limited number of insurance companies have the ability and/or willingness to provide policies that would be suitable to replace the Insurance Policies.

9. <u>Analysis of options</u>.  The Debtors have evaluated their options and selected the Insurers' proposal as the best option.  Among other terms, the Insurers' proposal for insurance coverage for the period January 1, 2006 through September 30, 2006 requires that the Debtors pay a premium of approximately $1.98 million and post approximately $9.31 million of collateral, in addition to the collateral previously posted prepetition.

10. The Debtors have sought the professional advice of their insurance broker, Aon Risk Services ("Aon"), to provide, among other things, an estimate of the Debtors' liability under the Agreements, which subsequently can be used to estimate the value of the Insurers' potential cure claim stemming from the Debtors' assumption of the Agreements.  As of the date of the Motion, the Debtors submit that there are no defaults under the Agreements.  The calculations provided by Aon are based on a snap-shot of the data at the time the Motion was filed.  In addition, the estimates contain a high level of variance.  Nevertheless, Aon's calculations are the best information available to the Debtors at this time, and the Debtors factored the uncertainty of these estimates into their analysis and evaluation of the Debtors' options for insurance coverage.

11. The Insurers currently hold $19.1 million in collateral and security posted by the Debtors (the "Collateral"), which is comprised of an irrevocable letter of credit in the amount of approximately $13.7 million (the "Letter of Credit") and cash collateral of $5,388,967 (the "Cash Collateral").  The Collateral was provided to the Insurers prior to the Petition Date.  In analyzing the size of the Insurers' potential cure claim, the Debtors analyzed the likelihood that the cure claim exceeds the Collateral.  In

6

addition, the Debtors took the potential cure amount into account when comparing the Insurers' bid against the Debtors' other options.

12. If the Debtors were to continue paying the prepetition workers' compensation claims, the estimated liability to the Insurers arising from the Agreements (as described in paragraph 22 of the Motion) would be approximately $16.6 million. This estimate falls between the 55 and 60 percent confidence interval.[1] Aon's estimate is more conservative than the median liability, which by definition, would be represented by the 50 percent confidence interval. Because that estimated liability to the Insurers is less than the value of the Collateral, the Debtors estimate that Insurers' cure claim would be zero.

13. Under the Human Capital Obligations Order, however, the Debtors are not required to continue paying their prepetition workers' compensation liability claims. If the Debtors were to stop paying these claims, Aon estimates that the liability arising from the indemnification provision would increase by $3.3 million, to approximately $19.8 million. With $19.1 million of prepetition collateral posted, the estimated amount of the Insurers' potential cure claim would therefore be approximately $700,000.

14. Because this calculation has a high rate of variance, the Debtors project that their liability under the Agreements ranges from $8.2 million to $22.2 million if the Debtors were to continue paying workers' compensation claims and from $9.7 million to $27.2 million if they were to stop paying workers' compensation claims.

---

[1] Confidence interval is a statistical range with a specified probability that a given parameter lies within that range. Applied in this context, the confidence interval provides the probability that the estimated liability to the Insurers is less than or equal to $X.

7

Under the worst case scenario projected by these estimates (i.e., the 99 % confidence interval that liability will not exceed these amounts), the Insurers could draw on all of the collateral posted and still have a cure claim of approximately $8.1 million, again assuming that the Debtors were to stop paying prepetition workers' compensation claims. If the Debtors continue paying workers' compensation claims, the liability to the Insurers would fall by approximately $5.0 million, and the Debtors' estimated liability to the Insurers would be approximately $22.2 million, resulting in a 1% chance that the cure claim would equal or exceed approximately $3.1 million.

15. The Debtors have attempted to negotiate a waiver of the requirements of the Amendment, so as to obviate the need for the assumption of the Agreements. The Insurers, however, have refused to waive the assumption requirement in the Amendment. Therefore, I believe that the relief sought in the Motion is necessary because the Insurers' proposal, even including the estimated costs associated with assuming the Agreements, is more attractive than the Debtors' other options. Without the relief sought by the Motion, the Insurers stated that they would not be willing to renew the Insurance Policies. This failure to renew would severely limit the Debtors' potential sources of insurance, and without a viable source of alternative insurance, the Debtors anticipate that their insurance costs would substantially increase following the expiration of the Insurance Policies.

16. The Debtors also have considered the possibility of self-insuring this layer of liability and thus foregoing any replacement insurance policies as of January 1, 2006. The Debtors have determined, however, that such action would impose too much risk upon the estates. The Debtors' failure to secure a renewal of the Insurance Policies or replacement policies would expose the Debtors' estates to the risk of putting

8

the Debtors in violation of statutory and contractual insurance requirements in certain states where the Debtors have on-going operations.  Therefore, I believe that renewal of the Insurance Policies or entry into replacement insurance policies is necessary and in the Debtors' best interests.

        17.    <u>Replacement of cash collateral with new letter of credit</u>.  The Debtors have also agreed, as a condition of the Insurers' willingness to provide renewals of the Insurance Policies, that they will seek to replace the Cash Collateral with an irrevocable letter of credit in the same amount as the Cash Collateral, in form and substance acceptable to the Insurers, and issued by a financial institution acceptable to the Insurers (the "New Letter of Credit").  Although the Debtors recognize that this transaction involves the use of assets of the estate to secure a prepetition claim, the Debtors believe that the issuance of the New Letter of Credit is in the best interest of the Debtors and their estates because a draw on a letter of credit is significantly cheaper for the Debtors than continuing to maintain the Cash Collateral.

        18.    <u>Additional requirements under the Amendment</u>.  Furthermore, pursuant to the Amendment, the Debtors have also agreed, as a condition of the Insurers' willingness to provide renewals of the Insurance Policies, that they will seek the following additional relief, and hereby request that the Court: (a) authorize, but not direct, the Debtors to renew or enter into insurance policies and to execute all related documents and agreements between the Debtors and the Insurers pursuant to section 363 of the Bankruptcy Code; (b) authorize, but not direct, the Debtors to agree to future renewals of the insurance programs and to provide collateral and security pursuant to any such

programs without further order of this Court;[2] (c) authorize the Insurers to draw against the Collateral, apply the Collateral to the Debtors' obligations under the Agreements, and take other actions permitted under applicable non-bankruptcy law and in accordance with the Agreements without further order of this Court (upon prior written notice, not to exceed five business days, to the Debtors and counsel for the Creditors' Committee, if and to the extent that prior notice is required by the applicable rules of this Court; provided that no notice shall be required for draws under letters of credit due to the expiration or non-renewal thereof); (d) authorize relief from the automatic stay pursuant to section 362(d) of the Bankruptcy Code, conditioned on the assumption of the Agreements, for the sole and limited purpose of effectuating the relief described in subparagraph (c) above; (e) confirm, conditioned upon the assumption of the Agreements, administrative priority treatment for all payment and reimbursement obligations owing to the Insurers under the Agreements; (f) confirm, conditioned on the assumption of the Agreements, that the Insurers' claims with respect to the Agreements will be paid by the Debtors in the ordinary course of their businesses; and (g) confirm that the Agreements and an order of this Court approving the Motion will not be altered by any plan of reorganization confirmed in these chapter 11 cases or by subsequent order of this Court.

19. In the ordinary course of business, the Debtors routinely enter into new insurance policies and post collateral as a condition precedent to binding the Insurers to the terms of such insurance policies.

---

[2]  The Debtors believe that entering into new insurance programs and posting collateral as a prerequisite for such programs are ordinary course transactions. Because this condition, however, was listed in the Amendment, the Debtors have agreed to seek authorization for such actions.

20. I believe that the benefits to the Debtors from the relief sought in the Motion far outweigh any costs associated with the Motion.

                                        s/ William D. Telgen
                                        WILLIAM D. TELGEN

Sworn to before
me this 16th day
of December 2005

s/ *Barbara L. Rybinski*
Notary Public
State of Michigan
County of Macomb
Commission Expires 12/05/11
Acting in County of Oakland

11