Omnibus Hearing Date and Time: January 5, 2006 @ 10:00 a.m.
Objection Deadline Date and Time: January 2, 2006 @ 4:00 p.m.

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
(212) 819-8200
Gerard Uzzi (GU-2297)

Wachovia Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
(305) 371-2700
Thomas E Lauria (Admitted *Pro Hac Vice*)
John K. Cunningham (JC-4661)
Linda M. Leali

ATTORNEYS FOR APPALOOSA
MANAGEMENT L.P.

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re | ) | Chapter 11 |
| | ) | |
| Delphi Corporation, <u>et al.</u> | ) | Case No. 05-44481 |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |

**MOTION OF APPALOOSA MANAGEMENT L.P. PURSUANT TO 11 U.S.C.
§ 1102(a)(2) FOR AN ORDER DIRECTING THE UNITED STATES TRUSTEE
TO APPOINT AN EQUITY COMMITTEE IN THESE CHAPTER 11 CASES**

TO:    THE HONORABLE ROBERT D. DRAIN,
         UNITED STATES BANKRUPTCY JUDGE:

Appaloosa Management L.P. ("Appaloosa"), collectively with and through certain of its

affiliates, one of Delphi Corporation's ("Delphi") largest shareholders, owning beneficially

approximately 9.3% of Delphi's issued and outstanding shares, by and through its undersigned

counsel, hereby files this motion (the "Motion") for entry of an order pursuant to section

1102(a)(2) of title 11 of the United States Code, 11 U.S.C. §§ 101, <u>et.</u> <u>seq.</u>, (as amended, the

"Bankruptcy Code") directing the United States Trustee for the Southern District of New York

(the "U.S. Trustee") to appoint an official committee of equity security holders to serve in the

above-captioned jointly administered cases (the "Cases") of Delphi and its affiliated debtors and

debtors in possession (collectively, with Delphi, the "Debtors") and in support of the Motion,

respectfully represents as follows:

## PRELIMINARY STATEMENT

1.       The Debtors have stated publicly their position that an official committee of

equity security holders should not be appointed, relying principally on the premises that such

committees are "rarely appointed in chapter 11 cases" and Delphi is "hopelessly insolvent."  See

Delphi Corp., Current Report (Form 8-K) (December 21, 2005), attached as Exhibit "A".  Such

statements, while convenient mantra for all opposed to the appointment of an equity committee,

are misleading as used by the Debtors.  As an initial matter, a review of the ten largest chapter 11

cases of public companies (other than primarily financial companies), demonstrates that in four

of these ten cases, official equity committees were appointed – hardly a rare occurrence.[1]  See

The 2005 Bankruptcy Yearbook & Almanac 58 (Christopher M. McHugh et al. eds., 2005).

Looking deeper, Enron and WorldCom were anomalies of pervasive fraud and Pacific Gas &

Electric Company was and remains a wholly owned subsidiary of a non-debtor public parent

whereby formation of an equity committee was simply not a relevant consideration.  Thus, when

---

[1]       A committee of equity security holders was appointed in In re Texaco, Inc., Case No. 87-20142 (ASH) (Bankr. S.D.N.Y. Apr. 12, 1987), In re Adelphia Communications Corp., Case No. 02-41729 (REG) (Bankr. S.D.N.Y. June 25, 2002), In re Mirant Corp., Case No. 03-46590 (DML) (Bankr. N.D. Tex. July 14, 2003), and In re Kmart Corp., Case No. 02-02474 (SPS) (Bankr. N.D. Ill. Jan. 22, 2002).  A committee of equity security holders was not appointed in In re WorldCom, Inc., Case No. 02-13533 (AJG) (Bankr. S.D.N.Y. July 21, 2002), In re Enron Corp., Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. Dec. 2, 2001), In re Conseco, Inc., Case No. 02-49672 (CAD) (Bankr. N.D. Ill. Dec. 18, 2002), In re Global Crossing, Ltd., Case No. 02-40188 (REG) (Bankr. S.D.N.Y. Jan. 28, 2002), In re Pacific Gas & Electric Co., Case No. 01-30923 (DM) (Bankr. N.D. Cal. Apr. 6, 2001) and In re UAL Corp., Case No. 02-48191 (ERW) (Bankr. N.D. Ill. Dec. 9, 2002).

compared to cases of similar size and complexity as these, appointment of an equity committee is more common than not.

2.      With respect to hopeless insolvency, in typical and mostly substantially smaller chapter 11 cases, little doubt exists from the outset that the debtor is hopelessly insolvent.  In such typical chapter 11 cases, the recognition of equity's plight is often reflected in the slow and steady erosion of shareholder market value in the period prior to the commencement of the bankruptcy proceedings.  In other extreme circumstances, such as those present in Enron, WorldCom and Adelphia, an announcement of previously undisclosed and often fraudulently concealed facts has precipitated the chapter 11 filings.  Under such circumstances, equity is often presumed correctly to be out of the money.[2]  None of these circumstances are present here.

3.      Far from being typical, as stated by Delphi's Chief Executive Officer, Delphi's chapter 11 filings were not predicated upon any immediate or looming liquidity crisis.  Instead, Delphi's chapter 11 filings were commenced solely because Delphi identified a strategic advantage, in light of its inability to reach timely agreement with its organized labor unions, in commencing chapter 11 cases prior to the effectiveness of the recent amendments to the Bankruptcy Code.  Although Delphi clearly has substantial employee related legacy obligations that must be addressed, the circumstances surrounding the filings call into question whether the bankruptcy filings were at all necessary to address such obligations and hardly serve as a basis for presuming that equity is out of the money.  Therefore, no basis exists to disenfranchise equity from meaningful participation in this process.

4.      Indeed, the market placed substantial value in Delphi's equity in the days and weeks preceding the filings and continues to do so post-filing.  In fact, on October 4, 2005, just a

---

[2]      Notably, notwithstanding the disclosure of pervasive fraud, equity was not presumed to be out of the money in Adelphia and was provided with the opportunity to have meaningful participation in the cases through estate representation.

few days before the bankruptcy filings, Delphi's market capitalization was approximately $1.5

billion and its market capitalization has remained at an average value of more than $215 million

since the bankruptcy filings.  A record of Delphi's historical share price and trading volume

since October 4, 2005 is attached as Exhibit "B".  Importantly, Delphi's own board of directors

endorsed the market's determination that equity is in the money.  Just two months prior to the

bankruptcy filing, Delphi paid a dividend on its common stock.  As more fully set forth herein,

under Delaware law, such payment required as a condition precedent, a determination by

Delphi's board that Delphi had a surplus or in other words that Delphi's net assets exceeded its

capital.

     5.     The Debtors and Creditors' Committee dismiss the notion of solvency by

reference to Delphi's consolidated balance sheet.  As more fully set forth herein, however,

reliance on the consolidated balance sheet is misplaced.  Notably, these Debtors are organized

with substantial non-debtor affiliates under a complex corporate structure.  From a review of

publicly available information, it appears that substantial unencumbered assets or assets with

substantial residual value exist within legal entities with relatively little debt, particularly with

respect to the company's foreign and emerging new operations.  In contrast, the major liabilities

contributing to the deterioration of the company's recent financial performance, namely,

unsustainable U.S. employee related legacy obligations, are in respect of operations isolated

within certain U.S. Debtor subsidiaries, which have no claims against or rights of distribution

from other valuable Delphi businesses.  Thus, there remains substantial value within Delphi's

capital structure outside of and unrelated to the Debtors' legacy obligations.  Due to the complex

legal structure, not only is the total amount of liabilities within the Delphi enterprise an important

fact to ascertain, but where such liabilities appropriately reside within the capital structure must

be thoroughly explored as well.  Simply, ensuring that creditors are satisfied only from the

estates against which they have legal entitlements is paramount to protecting the rights of equity

shareholders – a function that may be performed only by a body charged with the fiduciary duty

to advance the interests of such shareholders.

6.      What is now clear is that the manner in which Delphi deals with its obligations,

including its substantial employee related legacy obligations, will have a substantial impact on

equity value and may even be dispositive of whether equity gets to participate meaningfully in a

plan of reorganization.  Delphi has indicated a desire to act quickly and decisively with respect to

restructuring its obligations to organized labor.  As more fully set forth herein, however, due to a

complex relationship with General Motors Corporation ("GM"), Delphi's former parent

company, premature restructuring of the employee legacy obligations may be harmful to

shareholders as it may, in essence, convert unvested obligations owing to employees to vested

obligations owing to GM.

7.      In addition, because GM is also the Debtors' primary US based customer and self-

proclaimed largest creditor, with apparent substantial influence over the Debtors' operations and

decision making, a central issue in these cases will be the validity, enforceability and appropriate

treatment of GM's claims, if any, against the Debtors.  Simply put, GM has been historically and

continues to be in a position of substantial influence to improve its own position to the detriment

of shareholders.  Even if GM's actions do not lead to direct claims against the Debtors, GM,

because of its own relationships with organized labor, is in the position to compromise Delphi's

equity for its own benefit.  Thus, it is imperative that shareholders be provided with an

immediate meaningful and balancing voice that only official committee representation can

provide.

8.      Appaloosa is mindful of concerns about costs, but the Bankruptcy Code provides

adequate means for controlling costs.  In a case of this magnitude where assets exceed $17

billion and net sales are over $26 billion, the benefits of committee representation of

shareholders' interests far outweigh any additional costs to the Debtors' estates.  Indeed, it would

be a terrible injustice to deny today adequate representation to equity security holders only to

later discover, perhaps too late, that for relatively modest costs in the context of the whole,

equity security holders should have been represented.

9.      In light of the foregoing, the motives of any party opposing the appointment of an

official committee of equity security holders must be viewed with a great deal of skepticism.

Indeed, any suggestion that individual equity holders acting on their own, without the imprimatur

of official committee status, can otherwise participate meaningfully without disadvantage in any

chapter 11 case of significant magnitude, no less one of this size and complexity, so obviously

ignores the practical realities of bankruptcy practice as to be facially disingenuous.  Absent

official representation, equity holders will be effectively shut out of the process, through a

practical lack of access to management and other necessary resources from the Debtors and/or

through simple attrition.  Thus, at the very least, if there is any doubt, this Court should err on the

side of caution and not permit others to gain strategic advantage to improve their positions or

advance agendas through the de facto exclusion of equity security holders that will result from a

denial of this Motion.  Accordingly, this Court should direct the U.S. Trustee to appoint an

official committee of equity security holders.

## **BACKGROUND**

10.      On October 8, 2005, each of the Debtors filed voluntary petitions for relief under

chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern

District of New York (the "Court"), thereby commencing the Cases.  The Debtors continue to

operate their business as debtors and debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

11.    The Debtors are some of the largest global suppliers of vehicle electronics, transportation components, and integrated systems and modules.  The Debtors' bankruptcy filing – the largest filing of a manufacturing company in American history – involves complex issues affecting, among others, the 49 unions with whom the Debtors' employees belong, the hundreds of thousands of employees who work for Delphi worldwide, and the hundreds of thousands of beneficial shareholders of Delphi stock.

12.    According to the Affidavit of Robert S. Miller Jr. under Local Bankruptcy Rule 1007-2 and in support of Chapter 11 Petitions and Various First Day Applications and Motions dated October 8, 2005 (the "Miller Affidavit"), Delphi's domestic corporate structure consists of (a) 43 directly and indirectly wholly-owned subsidiaries, and (b) eight directly and indirectly partially-owned joint ventures, with ownership ranging from 19% to 80%.  The Debtors have various foreign subsidiaries, but none of the Debtor's foreign subsidiaries is a debtor in these chapter 11 Cases and, outside of the United States, Delphi's non-debtor subsidiaries do not plan to commence any reorganization, bankruptcy or insolvency cases.

Consolidated Financial Condition

13.    Assets and Liabilities.  According to Delphi's filings with the Securities and Exchange Commission, for the fiscal year ending December 31, 2004, Delphi and its subsidiaries (collectively, the "Company") reported total assets of approximately $16.59 billion and total liabilities of approximately $19.93 billion.  For the nine months ending September 30, 2005, the Company reported total assets of $17.21 billion and total liabilities of approximately $22.36 billion.  As mentioned above, to date the Debtors have not provided any financial information on a non-consolidated basis or that simply excludes non-Debtors.

14.    Revenues.  For the fiscal year ending December 31, 2004, the Company reported

operating revenues of approximately $28.62 billion, operating expenses of $29.10 billion, and a

net loss of $4.75 billion.  The vast majority of this loss was generated from a $4.7 billion income

tax expense (a valuation allowance against U.S. deferred tax assets).  The operating loss for 2004

was $482 million compared to operating income of $89 million in 2003.  For the nine months

ending September 30, 2005, the Company reported operating revenues of approximately $20.17

billion, operating expenses of $21.47 billion, and a net loss of $1.53 billion.

Legacy Employee Obligations

15.    Prior to January 1, 1999, Delphi was a wholly owned subsidiary of GM.

Effective January 1, 1999, the assets and liabilities of the Company were spun-off in accordance

with the terms of a Master Separation Agreement between GM and Delphi (the "Spin-Off").

After the Spin-Off, GM entered into separate agreements (the "Benefit Guarantees") with the

International Union, United Automobile, Aerospace and Agricultural Implement Workers of

America ("UAW"), International Union of Electronic, Electrical, Salaried, Machine and

Furniture Workers – Communications Workers of America and the United Steel Workers of

America pursuant to which GM guaranteed certain pension benefits and post retirement health

care and life insurance benefits to certain of its former GM U.S. hourly employees who

transferred to Delphi as part of the Spin-Off.  Copies of the Benefit Guarantees are annexed

hereto as Exhibit "C".  Delphi subsequently agreed to indemnify GM for any amounts that GM

was obligated to pay to employees under its benefit guarantee who were covered by the UAW

collective bargaining agreement (the "Indemnification Agreement").  A copy of the

Indemnification Agreement is annexed hereto as Exhibit "D".  GM's liabilities related to these

Benefit Guarantees may exceed $11 billion.  See GM, Auto Workers Reach Agreement To Slash

Billions, Cin. Post, Oct. 18, 2005, at B8 available at 2005 WL 16923346.  A copy of this article

is attached as "E".

Proposed Rejection of Collective Bargaining Agreements

16.     In the Motion for Scheduling Order on Debtors' Motions to (i) Reject Collective

Bargaining Agreements under Section 1113(c) and (ii) Eliminate Retiree Medical and Life

Insurance Benefits for Union-Represented Retirees Under Section 1114(g), dated October 8,

2005 (the "Scheduling Motion"), the Debtors have cited as one of the major causes of the

Company's deterioration over recent years as "the increasingly unsustainable U.S. legacy

liabilities and operational restrictions driven by collective bargaining agreements, including

restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all

which have the effect of creating largely fixed labor costs . . ."  Scheduling Mot.  ¶ 11.

Accordingly, on the first day of these Cases, the Debtors filed the Scheduling Motion seeking

among other things, the entry of an order pursuant to which a hearing would be scheduled to

consider the Debtors' motion, to be filed no later than December 16, 2005, to reject certain of the

Debtor's various collective bargaining agreements.  On or around October 13, 2005, the Court

entered an order approving the Scheduling Motion (the "Scheduling Order") pursuant to which

in the event that the Debtors and the affected unions do not reach an agreement on the terms of

any modifications to these collective bargaining agreements, the Debtors will file a motion to

reject these collective bargaining agreements to be heard on January 24, 2006.  Notwithstanding

the Scheduling Order, according to a press release issued by Delphi, Delphi has indicated that it

will not file a motion to reject the collective bargaining agreements prior to February 17, 2006.

See Press Release, Delphi Corp. (December 19, 2005).  Attached as Exhibit "F" is a copy of this

press release.  Additionally, Delphi has also stated that "in light of GM's recent engagement and

discussions with the UAW, Delphi is withdrawing its November 15 proposal which had been based solely on Delphi's financial restraints." Id.  Delphi has further stated in respect of resolving its wage and benefit disputes that "it will continue to work toward creating effective solutions acceptable to Delphi and its stakeholders, as well as to the UAW, GM and other unions." Id.

Request for Extension of Exclusive Periods

17.    Pursuant to section 1121(b) of the Bankruptcy Code, the Debtors' exclusive period to file a plan expires on February 6, 2006 and the attendant solicitation period expires on April 7, 2006 (collectively, the "Exclusive Periods").   By motion, dated November 16, 2006 (the "Exclusivity Motion"), the Debtors have requested that the Court extend the Exclusive Periods to file and solicit acceptances of a plan until August 6, 2006 and October 4, 2006, respectively.

Appaloosa's Request to U.S. Trustee for Appointment
of Official Committee of Equity Security Holders

18.    By Letter from Thomas E Lauria, Esq., Counsel to Appaloosa, White & Case LLP, to Alicia M. Leonhard, Esq. & Tracy H. Davis, Esq., Office of the U.S. Trustee (Nov. 7, 2005) (the "Request Letter"), Appaloosa formally requested that the U.S. Trustee appoint an official committee of equity security holders in these Cases pursuant to section 1102(a)(1) of the Bankruptcy Code.  Attached, as Exhibit "G" is a copy of the Request Letter.  To date, the U.S. Trustee has not responded formally to the letter, but has indicated that a response will be forthcoming.  Both the Debtors and Creditors' Committee have communicated to the U.S. Trustee their respective opposition to the appointment of an official equity committee.  See Delphi Corp., Current Report (Form 8-K), supra, containing Letter from John Wm. Butler, Jr., Esq., Debtors' Counsel, Skadden, Arps, Slate, Meagher & Flom LLP, to Alicia M. Leonhard, Esq., Trial Attorney, U.S. Department of Justice (Dec. 19, 2005), and Letter from Robert J.

Rosenberg, Esq., Creditors' Committee Counsel, Latham & Watkins LLP, to Deirdre A. Martini,

Esq. et al., Office of the U.S. Trustee (Dec. 12, 2005), attached as Exhibit "H". Appaloosa

remains optimistic that the U.S. Trustee will determine to appoint an official committee of equity

security holders without Court intervention, which determination would render this Motion

moot.  Given, however, that the Debtors and Creditors' Committee oppose the appointment of an

official equity committee and the Debtors, with the apparent support of the Creditors'

Committee, have embarked on a stated course of action that may impair substantially the rights

of equity security holders in the very near future, in the interest of caution and to ensure that this

Court and parties in interest have sufficient notice of the relief sought herein, Appaloosa has filed

this Motion to protect against any further prejudice that would otherwise ensue from continued

delay in the event the U.S. Trustee fails to appoint an official committee of equity security

holders.

## JURISDICTION

19.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and

1334.  Venue is proper pursuant to §§ 1408 and 1409.  This is a core proceeding pursuant to 28

U.S.C. § 157(b)(2).

## RELIEF REQUESTED

20.     As the facts set forth herein make clear, shareholders are entitled to, and

Appaloosa respectfully requests, the entry of an Order pursuant to section 1102(a) of the

Bankruptcy Code and Bankruptcy Rules 2020 and 9014 directing the United States Trustee to

appoint an official committee comprised of Delphi's shareholders.

## BASIS FOR RELIEF

21.     Bankruptcy Code section 1102(a) provides the means for the Delphi shareholders

to obtain an order of this Court appointing an official committee of equity security holders in the

event that the United States Trustee does not appoint such a committee.  It provides that "on

request of a party in interest, the court may order the appointment of additional committees . . .

of equity security holders if necessary to assure adequate representation of . . . equity security

holders." 11 U.S.C. § 1102(a)(2).  The Court's determination of the need for an additional

committee is unfettered and de novo, without regard to any prior determination of the United

States trustee.  In re Enron Corp., 279 B.R. 671, 684 (Bankr. S.D.N.Y. 2002); In re Texaco, Inc.,

79 B.R. 560, 566 (Bankr. S.D.N.Y. 1987); In re McLean Indus., Inc., 70 B.R. 852, 856-57

(Bankr. S.D.N.Y. 1987).

22.     Congress recognized the vulnerability of public investors in chapter 11

bankruptcy cases when it provided for the ability to seek appointment of additional committees

of shareholders in section 1102(a)(2) of the Bankruptcy Code.[3]  11 U.S.C. § 1102(a)(2).  The

legislative history of section 1102 indicates that Congress understood the important purpose an

equity committee could serve "to counteract the natural tendency of a debtor in distress to pacify

large creditors, with whom the debtor would expect to do business, at the expense of small and

scattered investors."  S. Rep. No. 95-989, at 10 (1978).

23.     The Bankruptcy Code itself affords no test for determining "adequate

representation."  Courts have generally applied a set of factors in analyzing the adequacy of a

committee's representation, including (i) the ability of the committee to function; (ii) the nature

---

[3]        In enacting the Bankruptcy Code of 1978, Congress viewed reorganization proceedings as "literally the last
clear chance to conserve for [shareholders] values that corporate financial stress or insolvency have placed in
jeopardy."  S. Rep. No. 95-989, at 10 (1978).

of the case, and (iii) the standing and desires of the various constituencies.  See Enron Corp., 279

B.R. at 685.  The analysis of what constitutes "adequate representation" is determined on a case-

by-case basis.  Id.  Courts consider a variety of factors, including:

> (i) whether the interests of shareholders are otherwise already adequately
> represented;
>
> (ii) whether the debtor appears to be hopelessly insolvent;
>
> (iii) the complexity of the case;
>
> (iv) whether the stock is widely held and actively traded;
>
> (v) the timing of the request; and
>
> (vi) whether the cost of the additional committee significantly outweighs the
> concerns for adequate representation.

See, e.g., In re Williams Commc'ns Group, Inc., 281 B.R. 216 (Bankr. S.D.N.Y. 2002); Albero

v. Johns-Manville Corp. (In re Johns-Manville Corp.), 68 B.R. 155 (S.D.N.Y. 1986), appeal

dismissed 824 F.2d 176 (2d Cir. 1987); In re Kalvar Microfilm, 195 B.R. 599 (Bankr. D. Del.

1996); In re Wang Labs., Inc., 149 B.R. 1 (Bankr. D. Mass. 1992) (appointing equity committee

over objections of United States Trustee and official committee of unsecured creditors even

while debtor had negative book equity of several hundred million dollars); In re Beker Indus.

Corp., 55 B.R. 945 (Bankr. S.D.N.Y. 1985) (equity committee appointed); In re Exide

Technologies, Case No. 02-11125 (Bankr. D. Del. 2002) (appointing equity committee over

objections of debtor and official committee of unsecured creditors).  Each of these factors favors

the establishment of an official committee of equity security holders in these Cases.

Equity will not be Adequately
<u>Represented without an Official Committee</u>

24.     The Debtors' public shareholders are not and cannot be adequately represented by

any other constituency in these Cases.  Although the unsecured creditors and shareholders

possess a general identity of interest in seeing that the unsecured creditors are paid because of the

"absolute priority" rule's mandate that junior interests retain nothing unless senior debt is paid in

full, <u>see</u> 11 U.S.C. § 1129(b)(2)(B), such interests are not always aligned and often diverge.  <u>See,</u>

<u>e.g.</u>, <u>In re Saxon Indus., Inc.</u>, 29 B.R. 320, 321 (Bankr. S.D.N.Y. 1983) (unsecured creditors

committees and equity committees "are separate and distinct entities with the members of the

unsecured creditors and equity creditors class possessing variant priorities and interests with

respect to their relationship with the debtor"); <u>In re Evans Prods. Co.</u>, 58 B.R. 572, 575 (Bankr.

S.D. Fla. 1985) ("[t]he interests of creditors and shareholders are likely to conflict over the

course of a Chapter 11 proceeding").  Furthermore, the official committee of unsecured creditors

(the "Creditors' Committee") has neither a duty nor incentive in these Cases to choose strategic

alternatives that maximize value for equity.  In fact, due to the complex legal structure, in these

Cases, the interests of equity will likely diverge from the interests of at least certain unsecured

creditors.  Simply, ensuring that creditors are satisfied only from the estates against which they

have legal entitlements is paramount to protecting the rights of equity shareholders – a function

that a creditors' committee is neither charged with fulfilling nor motivated to fulfill.

25.     Further, while Delphi's directors and managers have a fiduciary responsibility to

look after shareholders' interests, conflicting concerns often arise which make it difficult for

such directors and management to follow the best course for non-insider public shareholders.

Among other things, as noted in commentary:

> Another conflict can arise from the desire of directors and
> management to retain their jobs and maximize their compensation.
> If a proposed plan contemplates the distribution of the majority of
> the equity in the debtor to creditors, the debtor's directors and
> management will realize that, upon implementation of the plan,
> their employment will be controlled by these creditors (who, by
> virtue of the newly obtained equity majority, will control the
> election of directors and, in turn, the hiring of management by such
> directors). This realization may lead to favoritism to creditors in
> the plan formulation process, in an effort to stay in the creditors'
> good graces.

Thomas H. Coleman & David E. Woodruff, Looking Out for Shareholders: the Role of the

Equity Committee in Chapter 11 Reorganization Cases of Large, Publicly Held Companies, 68

Am. Bankr. L.J. 295, 301 (Summer 1994).

26.    It is hard to imagine a case that demands more clearly the appointment of an

official equity committee to counteract the "natural tendency", as Congress feared, of this Debtor

"in distress" to pacify its largest creditor – GM. As the former parent of Delphi and purchaser of

more than 50% of every Delphi product sold, GM is publicly rumored to have urged Delphi into

filing these Cases so that GM would gain leverage over the UAW in its own labor negotiations.

See Corporate America's legacy costs: Now for the reckoning, 950 Economist 65, Oct. 15, 2005,

available at 2005 WL 16692334; see also Danny Hakim et al., G.M. and Union In a Deal To Cut

Health Benefits, N.Y. Times, Oct. 18, 2005, § A, at C4 (on October 18, 2005, GM reported

substantial concessions from the UAW (saving GM approximately $1 billion annually) following

its labor negotiations). Copies of these articles are attached as Exhibit "I" and Exhibit "J",

respectively. Such reports are not inconsistent with Delphi's prior pronouncements (and ultimate

later actions) that it would file for chapter 11 protection if no agreement was reached with its

organized labor and GM prior to the effectiveness of the new bankruptcy amendments

notwithstanding that there was no clear indication that chapter 11 protection would ever be

necessary no less immediately required.[4]  Indeed, as previously mentioned, the Debtors have

already determined solely in light of GM's recent "engagement and discussions" with the UAW

that they do not currently intend to pursue their November 15th proposal to modify their

collective bargaining agreements.  Even if GM had no influence on Delphi's filing, the mere

appearance that Delphi management may be catering to the needs of its potential largest creditor

at the expense of Delphi shareholders warrants active meaningful participation by shareholders

that may occur only through official representation.

Delphi is Not Hopelessly Insolvent

27.     There is no litmus test for determining when a debtor appears hopelessly

insolvent.  Williams Commc'ns, 281 B.R. at 220.  "[Insolvency] is not a simple matter of

statutory construction where the Court can rest with citation to the balance sheet test of 11

U.S.C. § 101(32)."  Wang Labs., 149 B.R. at 3.  Instead, the determination is a "practical

conclusion, based upon a confluence of factors."  Williams Commc'ns, 281 B.R. at 221.

28.     Although upon a mere cursory review of the balance sheet, Delphi appears

insolvent, the consolidated balance sheet fails to tell the whole story as it relates to equity value.

As an initial matter, book value of assets is not dispositive of fair market value.  More

importantly, however, when viewing the liability side of the balance sheet, the single largest line

item as reflected in Delphi's Form 10-Q for the period ending September 30, 2005, relates to

approximately $6.7 billion of apparently unvested future U.S. based employee legacy

---

[4]      Perhaps most telling that management cannot adequately represent Delphi shareholders, is Delphi's Chief
Executive Officer Steve Miller's ("CEO Miller") public statements that the Debtors commenced their chapter 11
Cases simply to avoid a potential filing under the Bankruptcy Act of 2005 that came into effect on October 17, 2005.
In particular, CEO Miller indicated that he did not want Delphi to be the "guinea pig" under the new, less debtor
friendly law.  See Labour costs cripple component makers, Sunday Times (London), Sept. 18, 2005, at 65, available
at 2005 WL 14706425. A copy of this article is attached as Exhibit "K".

obligations.  A copy of the balance sheet from this 10-Q is attached at Exhibit "L".  As such, if the Debtors were to orderly liquidate the U.S. business such that the unvested employee obligations never vest, Delphi, at least on a book basis, would have sufficient residual value to make a distribution to equity security holders.  Although Appaloosa does not at this time advocate the liquidation of the U.S. business, the foregoing is one of many examples of why equity cannot be presumed to be out of the money by merely relying on book numbers reported on the balance sheet.  On the other hand, orderly liquidation and other options perhaps unpopular with management must be considered and ultimately pursued if it would otherwise be in the best interest of shareholders.

29.    The consolidated balance sheet also obscures the complexity of the corporate structure.  Because a substantial amount of value resides outside of the Debtor legal entities, particularly relating to Delphi's foreign and emerging new operations, it is inappropriate to make a determination concerning the solvency of any Debtor entity, including the parent, based upon a consolidated balance sheet.  Instead, assets and liabilities must be mapped to the specific legal entities in which they reside and recoveries determined on a non-consolidated basis.  After such analysis, it is possible and in fact likely that certain Debtor subsidiaries are insolvent although Delphi, the parent corporation, remains solvent.

30.    Perhaps most telling, however, are the actions of Delphi itself shortly before the commencement of these Cases.  As recently as June 22, 2005, Delphi declared a $0.015 dividend on Delphi $0.01 par value common stock.  This dividend was paid on August 2, 2005.  Under Delaware law, however, dividends may be declared *and* paid only (i) out of surplus, or (ii) in the case where no surplus exists, out of the company's profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year.  Del. Code Ann. tit. 8, § 170 (2003).  As

Delphi has not reported any profits in the current and preceding years, payment of the August 2,

2005 dividend must have been from Delphi's surplus.  Surplus is defined under Delaware law as

the excess of the net assets (total assets minus total liabilities) of the corporation over its capital.

Id. at § 154.  Thus, as of August 2, 2005, just two months prior to Delphi's filing, Delphi's board

of directors had determined that the value of Delphi's assets exceeded its liabilities.  See also, In

re Heilig-Meyers Co., 328 B.R. 471 (Bankr. E.D. Va. 2005) (court considered debtor's payment

of dividend as factor in determining solvency of debtor as payment of dividend while insolvent

violated Virginia law).  This determination that the value of Delphi's assets exceeded its

liabilities cannot be disregarded simply because Delphi has now filed for bankruptcy protection,

particularly in light of the strategic reasons given by Delphi for commencing the Cases.

     31.    Nevertheless, the ultimate value of Delphi equity now depends in large part on the

resolution of material issues currently being addressed by the Debtors without any apparent

consideration to shareholder value, including:

    (a)    the total amount of actual employee related liabilities and where such
liabilities reside in the capital structure;

    (b)    the manner in which employee related liabilities are restructured,
including pursuant to sections 1113 & 1114 of the Bankruptcy Code;

    (c)    the amount, enforceability, treatment and appropriate characterization of
any claims asserted by GM, including claims, if any, asserted for
indemnification of GM's obligations under the Benefit Guarantees;

    (d)    the extent to which Delphi may mitigate or avoid the accrual of any
enforceable claims to GM for indemnification; and

    (e)    whether intercompany claims exist in favor of Delphi for, among other
things, the advancement of substantial funds raised in the capital markets
for the purpose of addressing certain Debtor legacy obligations.

     32.    For instance, as previously mentioned, it has been widely reported that GM may

be liable under the Benefit Guarantees for in excess of $11 billion in pension and other employee

benefit costs for Delphi workers who had been GM employees before the 1999 spin-off.  Once

accrued, the Benefit Guarantees require GM to continue to pay employee obligations

notwithstanding the expiration of the Debtors' own underlying responsibility to pay such

obligations.  GM may assert, although Appaloosa would contest such interpretation, that Delphi

is required to reimburse GM for all obligations incurred under the Benefit Guarantees, even if the

Debtors have been relieved of the underlying obligations owing directly to the employees.  If not

otherwise triggered, however, the Benefit Guarantees and any corresponding claim against

Delphi for indemnification relating to the Benefit Guarantees expire in 2007.  Accordingly,

before taking any actions that may trigger accrual of indemnification obligations relating to the

Benefit Guarantees, Delphi must explore, with meaningful participation from shareholders, all

alternatives with consideration given to the consequences any actions may have on shareholder

value.

33.     Troubling, however, is that the Debtors have provided no indication that any such

alternatives are being considered.  In fact, the opposite appears true.  In their Exclusivity Motion,

the Debtors state, without reference to Delphi's indemnification obligations or any further

support, that the stabilization of the business "must be accomplished in advance of the expiration

of certain benefit guarantees between GM and certain Delphi unions representing most of the

U.S. hourly employees which coincides with the expiration of the Company's U.S. collective

bargaining agreements in the fall of 2007."  Exclusivity Mot. ¶ 9.  It is unclear, however, why

anything must, no less should, occur prior to the expiration of the Benefit Guarantees as such

Benefit Guarantees are private agreements to which Delphi is not a party and GM has asserted

indemnification claims against Delphi for any amounts GM may owe under the Benefit

Guarantees.  Indeed, absent a definitive determination that the indemnification obligations are

not enforceable or will not otherwise be triggered, arguably, it is in the best interests of

shareholders to wait until *after* the Benefit Guarantees expire before any major actions are taken

with respect to the legacy employee obligations. Only an official equity committee can

meaningfully advance these concerns. Indeed, these concerns have been raised already by

Appaloosa in the Request Letter and have apparently been summarily dismissed by the Debtors

and Creditors' Committee.

34.    Further, it appears that GM is controlling or at least possesses substantial

influence over the Debtors' union negotiations, as currently the UAW is reported to be dealing

only with GM relating to its wage and benefit issues between the Debtors and UAW. See UAW,

GM talk about strike threat at Delphi, St. Louis Post-Dispatch, Dec. 14, 2005. A copy of this

article is attached hereto as Exhibit "M". Given GM's entanglements with the Debtors and its

well publicized issues with the very same union, GM's interests are simply not aligned with

those of Delphi shareholders. Whether it does so intentionally or not, GM alone is in the

position to compromise Delphi's equity to improve its own position not only against Delphi, but

more importantly, with respect to its own relationship with organized labor. Shareholders must

be given a proverbial seat at the table, which only comes with official committee status, to

protect equity value and balance potential undue influence.

The Cases are Large and Complex

35.    It is unquestionable that the Debtors' Cases are sufficiently large and complex to

justify the appointment of an official equity committee. According to the most recent 10-Q, for

the period ending September 30, 2005, the Debtors and their non-debtor subsidiaries and

affiliates collectively possess $17.21 billion in total assets and $22.36 billion in total liabilities.

$10.4 billion of the stated liabilities are actuarial estimates of future employee obligations, which

obligations are subject to substantial reduction either through negotiation or through the chapter

11 process.  Miller Aff. ¶ 17.  In addition, as set forth in the Miller Affidavit, the Debtors are

arguably the single largest global supplier of vehicle electronics, transportation components,

integrated systems and modules, and other electronic technology.  The Debtors' technologies are

present in more than 75 million vehicles on the road worldwide.  The Debtors and their affiliates

employ more than 180,000 employees worldwide, with global 2004 revenues of approximately

$28.6 billion.  By their own admission, the Debtors' bankruptcy ranks as the fifth largest public

company chapter 11 in terms of revenues, the thirteenth largest public company business

reorganization in terms of assets, and represents the third largest bankruptcy filing in 2005.

36.     Moreover, these Cases will involve a high degree of complexity.  The Debtors

have operations in 40 countries, and ownership in more than 100 subsidiaries and affiliates

around the globe.  Only 41 of these U.S.-based subsidiaries filed for chapter 11 protection.

Significant time and effort will need to be spent analyzing the differences in the asset/liability

mix of each of the Debtors' business lines and subsidiaries and where the enterprises' liabilities

appropriately reside within the capital structure.  The vast size and complexity of these Cases is

therefore not in question and support the appointment of an official equity committee.

Delphi Trading and Number of Shareholders

37.     It is unquestionable that Delphi's shares are widely traded and widely held by the

investing public.  According to the Miller Affidavit, as of August 26, 2005, there were

561,781,590 shares outstanding with 331,202 holders of record.  While the actual number of

beneficial holders of Delphi common stock that will be impacted by Delphi's chapter 11 Cases is

unknown, with over 300,000 holders of record that number is presumably substantially higher

than the number of the record holders.  Active and ongoing participation by shareholders, such as

that provided by an official equity committee, is necessary to ensure that the interests of public

shareholders are adequately protected.

38.    Courts have directed the appointment of equity committees in other chapter 11

cases where the number of shareholders present was significantly less than in the present

circumstances.  See e.g., Wang Labs., 149 B.R. 1 (court directed appointment of equity

committee where estimated number of beneficial holders of shares was 70,000); Beker Indus., 55

B.R. at 947 (court directed appointment of equity committee where common stock was held by

2,148 shareholders); In re Baldwin-United Corp., 45 B.R. 375 (Bankr. S.D. Ohio 1983) (court

directed appointment of equity committee where common stock was held by approximately

15,000 shareholders).  Moreover, an official equity committee will provide the most efficient

means throughout the restructuring process to ensure that public shareholders, who share a

commonality of interest, are adequately represented.

39.    As set forth above, Delphi common stock is also actively traded.  Over the past 90

days, an average of nearly 22 million shares have traded per day.  In December 2005, the average

daily trading volume has ranged from approximately 1.7 million to 11.9 million shares with an

approximate market capitalization of $200 million.

The Request Comes on a Timely Basis

40.    This request comes on a timely basis.  One of an equity committee's most

important functions is to negotiate a reorganization plan and an equity "committee will most

effectively exercise its responsibilities at the beginning of a reorganization, prior to the

formulation of a plan."  Johns-Manville Corp., 68 B.R. at 161.  Accordingly, courts typically

decline to appoint a committee based upon the untimeliness of a request where substantial

progress had already been made in a debtor's chapter 11 case or some other harm can be found.

For example, in Kalvar Microfilm the bankruptcy court denied a request, filed two months after

commencement of the debtor's chapter 11 case, where the debtor's chapter 11 case was the

product of extensive prepetition negotiations with the their prepetition unsecured debt holders;

the debtor filed along side the petition a pre-negotiated plan embodying the prenegotiated

agreement with its unsecured debt holders; a disclosure statement was filed a week after the case

had commenced; and the petitioning shareholders had been aware of these prepetition

negotiations.  195 B.R. at 601.  Additionally, in the case of <u>Johns-Manville Corp.</u>, the district

court affirmed a bankruptcy court's determination that a request to appoint an equity committee

was untimely where the chapter 11 case was in its final stages where after a long negotiation

period a plan had already been filed and the appointment of an equity committee at that point

would only delay the debtors' confirmation.  68 B.R. at 163-164; <u>see also</u>, <u>Williams Commc'ns</u>,

281 B.R. at 223 (request for order directing trustee to appoint an equity committee denied where

further delay would result in further devaluation of the debtor's assets).

41.    Here, Appaloosa's request is timely as the Debtors are still in the process of

stabilizing their business operations and have yet to make any real progress on key issues that

will impact the Debtors' ability to successfully reorganize.  Indeed, the Debtors' only efforts on a

key issue, <u>i.e.</u>, to gain wage and benefits concessions from the UAW, the Debtors' largest union,

have been called "ridiculous" by the UAW's president.  Tom Krisher, <u>Delphi Makes Another</u>

<u>Proposal in Bid to Win Concessions; Union Leaders Call Offer 'Ridiculous'</u>, Nov. 16, 2005,

http://biz.yahoo.com/ap/051116/delphi_uaw.html.   A copy of this article is attached as Exhibit

"N".

42.    While the Debtors have acknowledged that the restructuring of their employee

related obligations is a necessary precursor to the proposal of a chapter 11 plan, the Debtors are

already in the midst of formulating their business plan without input from one of their key

constituents, i.e., shareholders.  Exclusivity Mot. ¶ 19.  Thus, the time for the appointment of an

official equity committee is now, when these Cases and issues are only in their infant stages.

Additionally, as shareholder value may likely depend upon the manner in which the Debtors

restructure their employee related obligations, time is of the essence.

Cost of Additional Committee is De Minimis
Given the Compelling Need for Adequate Representation
of the Company's Public Shareholders

43.    Appaloosa is mindful of concerns regarding the additional expense associated

with the formation of an official equity committee, but "[c]ost alone cannot, and should not,

deprive . . .  security holders of representation."  McLean Indus., 70 B.R. at 860; see also, Enron

Corp., 279 B.R. at 694 ("[a]dded cost alone does not justify the denial of appointment of an

additional committee where it is warranted.").  Additional cost must be weighed against the need

for adequate representation of public shareholders.  See Wang Labs., 149 B.R. at 3-4; Beker

Indus., 55 B.R. at 949-51.  "Essentially, the courts employ a balancing test to weigh the cost of

an equity committee versus the 'concern for adequate representation.'"  Williams Commc'ns,

281 B.R. at 220.  In this analysis, the court may consider intangible costs, such as delay, as well

as examining whether other committees are already representing the shareholders' interests.

Johns-Manville, 68 B.R. at 160, 162-164; Baldwin-United, 45 B.R. at 375-376.  Once the need

for adequate representation is established, "the burden shifts to the opponent of the motion [to

appoint an official equity committee] to show that the cost of the additional committee sought

significantly outweighs the concern for adequate representation and cannot be alleviated in other

ways."  Beker Indus., 55 B.R. at 949; 4 Norton Bankr. L. & Prac. § 78:5 (2d ed. 2005) ("Should

the moving party be successful in showing that an additional committee is required, the burden

then shifts to the opponent to demonstrate that the cost of such an additional committee notably outweighs the interest in adequate representation.").

44.     As set forth above, it is abundantly clear that the interests of the Debtors' approximately 331,202 shareholders are not adequately represented in these Cases within the meaning of section 1102(a)(2) of the Bankruptcy Code.  In a case of this magnitude, where consolidated assets exceed $17 billion and net sales are over $26 billion, the benefits of committee representation of shareholders' interests far outweigh any relatively modest costs to the Debtors' estates.

45.     Additionally, while there is always a tension between the need for official committee representation and the cost to the estate of such representation, the Bankruptcy Code contains adequate means for controlling costs.  <u>See</u> 11 U.S.C. §§ 328, 330(a)(1).  Indeed, the Bankruptcy Code prohibits courts from compensating professionals for "unnecessary duplication of services; or services that were not reasonably likely to benefit the debtor's estate; or necessary to the administration of the case."  11 U.S.C. § 330(a)(4)(A).  Bankruptcy courts have relied upon these provisions to caution equity committees and their professionals from incurring unnecessary costs and expenses.  <u>See</u> <u>Wang Labs.</u>, 149 B.R. at 4.  Thus, if necessary, the Court is adequately equipped to address any concerns about costs.

## <u>WAIVER OF MEMORANDUM OF LAW</u>

46.     Pursuant to Local Bankruptcy Rule for the Southern District of New York 9013-1(b), because there are no novel issues of law presented herein, Appaloosa requests that the Court waive the requirement that Appaloosa file a memorandum of law in support of this Motion.

**CONCLUSION**

WHEREFORE, for the foregoing reasons, Appaloosa respectfully requests that the Court

enter an order, substantially in the form annexed hereto as Exhibit "O", directing the U.S.

Trustee to appoint an additional committee comprised of shareholders of Delphi.


Dated: December 22, 2005
　　　Miami, Florida

WHITE & CASE LLP
Gerard Uzzi (GU-2297)
1155 Avenue of the Americas
New York, New York 10036-2787
(212) 819-8200

Thomas E Lauria (Admitted *Pro Hac Vice)*
Linda M. Leali
Wachovia Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
(305) 371-2700

By: /s/ John K. Cunningham
John K. Cunningham (JC-4661)


COUNSEL TO APPALOOSA
MANAGEMENT L.P.