# EXHIBIT "G"

WHITE & CASE

White & Case LLP  
Wachovia Financial Center, Suite 4900  
200 South Biscayne Boulevard  
Miami, Florida 33131-2352

Tel  + 1 305 371 2700  
Fax  + 1 305 358 5744/5768  
www.whitecase.com

Direct Dial + 305-995-5282     tlauria@whitecase.com

November 7, 2005

SENT VIA FACSIMILE TRANSMISSION

Alicia M. Leonhard, Esq.  
Tracy H. Davis, Esq.  
Office of the United States Trustee  
for the Southern District of New York  
33 Whitehall Street, 21st Floor  
New York, New York 10004

Re:  In re Delphi Corporation, et al., 05-44481(RDD)  
     (Jointly Administered)

Attorneys Leonhard and Davis:

We represent Appaloosa Management L.P. ("Appaloosa"), which, collectively with certain of its affiliates, is one of Delphi Corporation's ("Delphi") largest shareholders, owning approximately 9.3% of Delphi's issued and outstanding shares.

For the reasons set forth below, Appaloosa believes that the appointment of an official committee is required to provide adequate and appropriate representation of the interests of all shareholders of Delphi and to ensure that they receive the value to which they are entitled under the chapter 11 process. Accordingly, we hereby request the appointment of an official committee of equity security holders (an "Equity Committee") in the chapter 11 cases of Delphi and its affiliated debtors and debtors in possession (collectively, the "Debtors").

According to the Affidavit of Robert S. Miller Jr. under Local Bankruptcy Rule 1007-2 and in support of Chapter 11 Petitions and Various First Day Applications and Motions dated October 8, 2005 (the "Miller Affidavit"), the Debtors estimated that there were 331,202 shareholders as of August 26, 2005. According to the Miller Affidavit, the Company has 1.35 billion shares of

ALMATY   ANKARA   BANGKOK   BEIJING   BERLIN   BRATISLAVA   BRUSSELS   BUDAPEST   DRESDEN   DÜSSELDORF   FRANKFURT   HAMBURG   HELSINKI
HO CHI MINH CITY   HONG KONG   ISTANBUL   JOHANNESBURG   LONDON   LOS ANGELES   MEXICO CITY   MIAMI   MILAN   MOSCOW   MUMBAI   NEW YORK   PALO ALTO
PARIS   PRAGUE   RIYADH   ROME   SAN FRANCISCO   SÃO PAULO   SHANGHAI   SINGAPORE   STOCKHOLM   TOKYO   WARSAW   WASHINGTON, DC

MIAMI 612793 [612793_8.DOC] (2K)

Alicia M. Leonhard, Esq.
Tracy H. Davis, Esq.

WHITE & CASE

November 7, 2005

authorized common stock and of this amount 561,781,590 shares were outstanding as of August 26, 2005.

The Relevant Criteria for Establishing
an Equity Committee are Satisfied Here

We believe all of the criteria for the appointment of an Equity Committee under 11 U.S.C. § 1102(a)(1) are present in this matter:

(a) the interests of shareholders are not otherwise adequately represented;

(b) Delphi is not hopelessly insolvent, such that Appaloosa appears to have a real economic interest at stake;

(c) the case is large and complex;

(d) the stock is widely held and actively traded; and

(e) the timing of the request is appropriate.

See generally In re Williams Commc'ns Group, Inc., 281 B.R. 216 (Bankr. S.D.N.Y. 2002); In re Johns-Manville Corp., 68 B.R. 155 (S.D.N.Y. 1986); In re Kalvar Microfilm, 195 B.R. 599 (Bankr. D. Del. 1996); In re Wang Labs., Inc., 149 B.R. 1 (Bankr. D. Mass. 1992) (appointing equity committee over objections of United States Trustee and official committee of unsecured creditors even while debtor had negative book equity of several hundred million dollars); In re Beker Indus. Corp., 55 B.R. 945 (Bankr. S.D.N.Y. 1985) (equity committee appointed); In re Evans Prods. Co., 58 B.R. 572 (S.D. Fla. 1985); In re Emons Indus., Inc., 50 B.R. 692 (Bankr. S.D.N.Y. 1985); In re Exide Technologies, Case No. 02-11125 (Bankr. D. Del. 2002) (appointing equity committee over objections of debtor and official committee of unsecured creditors).

*Equity Will Not is Adequately*
*Represented without an Official Committee.*

Although the unsecured creditors and shareholders possess a general identity of interest in seeing that the unsecured creditors are paid because of the "absolute priority" rule's mandate that junior interests retain nothing unless senior debt is paid in full, see 11 U.S.C. § 1129(b)(2)(B), such interests are not always aligned and often diverge. Furthermore, the official committee of unsecured creditors (the "Creditors' Committee") has neither a duty nor incentive in these cases to choose strategic alternatives that maximize value for equity. In fact, these Debtors are organized with substantial non-debtor affiliates under a complex corporate structure. From a review of publicly available information, it appears that substantial unencumbered assets or assets with substantial residual value exist within legal entities with relatively little debt,

2

Alicia M. Leonhard, Esq.
Tracy H. Davis, Esq.

WHITE & CASE

November 7, 2005

particularly with respect to the company's foreign and emerging new operations. In contrast, the major liabilities contributing to the deterioration of the company's recent financial performance, namely, unsustainable U.S. employee related legacy obligations, are in respect of operations isolated within certain U.S. Debtor subsidiaries, which have no claims against or rights of distribution from other valuable Delphi businesses. While we recognize that these Debtors have substantial obligations that need to be addressed in the context of these bankruptcy cases, there remains substantial value within Delphi's capital structure outside of and unrelated to the Debtors' legacy obligations. Thus, due to the complex legal structure, not only is the total amount of liabilities within the Delphi enterprise an important fact to ascertain, but where such liabilities appropriately reside within the capital structure must be thoroughly explored as well. Simply, ensuring that creditors are satisfied only from the estates against which they have legal entitlements is paramount to protecting the rights of equity shareholders – a function that may be performed only by a body charged with the fiduciary duty to advance the interests of such shareholders. Clearly, the interests represented by the Creditors' Committee conflict with the interests of shareholders on these points.

Further, while Delphi's directors and managers have a fiduciary responsibility to look after shareholders' interests, conflicting concerns often arise which make it difficult for such directors and management to follow the best course for non-insider public shareholders. Accordingly, the shareholders are the only major constituency not independently represented at this time. The shareholders are entitled to an official role in these cases to advance and preserve equity value, equity that a few days before the Delphi filing had a market value in excess of $1.7 billion. Shareholder exclusion without official representation will hamper their ability to effectively participate in the chapter 11 cases and ultimate plan formulation. An Equity Committee should be appointed to enable shareholders to participate fully and actively in these cases.

*Delphi Corporation is not Hopelessly Insolvent.*

These are not the typical chapter 11 cases where equity should be presumed to be out of the money. In fact, the opposite needs to be presumed here, that is, equity is in the money and therefore entitled to have meaningful participation in these cases. Indeed, the actions of Delphi itself shortly before the commencement of these cases require a presumption that Delphi is solvent. As recently as June 22, 2005, Delphi declared a $0.015 dividend on Delphi $0.01 par value common stock. This dividend was paid on August 2, 2005. Under Delaware law, however, dividends may be declared *and* paid only (i) out of surplus or (ii) in the case where no surplus exists, out of the company's profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year. Del. Cod. Ann. Tit. 8, § 170 (2003). As Delphi has not reported any profits in the current and preceding years, payment of the August 2, 2005 dividend must have been from Delphi's surplus. Surplus is defined as the excess of the net assets (total assets minus total liabilities) of the corporation over its capital, which, if determined to be available, necessarily requires a determination that the corporation is balance sheet solvent. Id. at § 154. Thus, as of August 2, 2005, just two months prior to Delphi's filing, Delphi's board of directors had determined that it was balance sheet solvent. See also, In re Heilig Meyers

3

Alicia M. Leonhard, Esq.
Tracy H. Davis, Esq.

WHITE & CASE

November 7, 2005

Company, 329 B.R. 471 (Bankr. E.D. Va. 2005) (court considered debtor's payment of dividend as factor in determining solvency of debtor as payment of dividend while insolvent violated Virginia law).

Perhaps more importantly, Delphi's Chief Executive Officer has stated clearly that the Debtors commenced their chapter 11 cases simply to avoid a potential filing under the Bankruptcy Act of 2005 that came into effect on October 17, 2005. In particular, he indicated that he did not want Delphi to be the "guinea pig" under the new, less debtor friendly law. See The Sunday Times (UK), September 18, 2005, at 65, available at 2005 WLNR 14706425. There were, however, no reports of any impending liquidity crisis or any other matters compelling a filing. In fact, the expectation was that Delphi, along with General Motors, would continue to negotiate with their respective union employees and reach a consensual agreement or agreements outside of chapter 11. Recently, however, there have been reports that General Motors urged Delphi to commence chapter 11 proceedings to gain a strategic advantage in its negotiations with its own union employees. See Economist, October 15, 2005, at 65, available at 2005 WLNR 16692334. Thus, unlike other recent large chapter 11 cases commenced on the eve of the effectiveness of the new bankruptcy amendments, a chapter 11 filing for Delphi was not inevitable (and it could not have been inevitable, otherwise Delphi's board of directors could not have declared a dividend just two months prior). Simply, Delphi is in chapter 11 today and shareholders are disenfranchised not because Delphi is insolvent or unable to pay its obligations as they come due; Delphi is in chapter 11 solely because it made a calculated determination, perhaps at the urging of its self proclaimed largest creditor, that the current legal construct offered certain benefits that would otherwise soon be unavailable.

Moreover, the value of Delphi's current equity will depend in large part on the resolution of material issues currently being addressed by the Debtors without meaningful participation from shareholders, including:

(a) the total amount of actual employee related liabilities and where such liabilities reside in the capital structure;

(b) the manner in which employee related liabilities are restructured, including pursuant to sections 1113 & 1114 of the Bankruptcy Code;

(c) the amount, enforceability, treatment and appropriate characterization of any claims asserted by General Motors, including claims, if any, asserted pursuant to the Indemnification Agreement, dated December 22, 1999, between Delphi and General Motors;

(d) the extent to which Delphi may mitigate or avoid the accrual of any enforceable claims to General Motors under the Indemnification Agreement; and

4

Alicia M. Leonhard, Esq.
Tracy H. Davis, Esq.

WHITE & CASE

November 7, 2005

> (e) whether intercompany claims exist in favor of Delphi Corporation for, among other things, the advancement of substantial funds raised in the capital markets for the purpose of addressing certain Debtor legacy obligations.

For instance, under the Indemnification Agreement, if enforceable, Delphi must indemnify General Motors for any liabilities it incurs under those certain Benefit Guarantees issued by General Motors to certain of the Debtors' employees. Once accrued, the Benefit Guarantees require General Motors to continue to pay employee obligations notwithstanding the expiration of the Debtors' own underlying responsibility to pay such obligations. General Motors may assert, although Appaloosa would contest such interpretation, that the Indemnification Agreement requires Delphi to reimburse General Motors for all obligations incurred, even if the Debtors have been relieved of the underlying obligations owing directly to the employees. If not otherwise triggered, however, the Benefit Guarantees and Delphi's obligations, if any, under the Indemnification Agreement, terminate in 2007. Accordingly, before taking any actions that may trigger accrual of obligations owing under the Indemnification Agreement, Delphi must explore all alternatives with consideration given to the consequences any actions may have on shareholder value. Delphi has already begun the process of restructuring its employee obligations. Although Appaloosa does not dispute that such obligations need to be restructured, disturbingly, there is no evidence in the public record that Delphi has given any consideration to how the manner in which it does so affects shareholder value.

These factors combined make it clear that Delphi is far from hopelessly insolvent, and shareholders have a real economic interest at stake in these cases.

### *These Cases are Large and Complex.*

According to the Debtors' petitions and the Miller Affidavit, the Debtors and their non-debtor subsidiaries and affiliates collectively possess $17.1 billion in total assets and $22.1 billion in total liabilities. $10.4 billion of the stated liabilities are actuarial estimates of future employee obligations, which obligations are subject to substantial reduction. In addition, as set forth in the Miller Affidavit, the Debtors are arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Debtors' technologies are present in more than 75 million vehicles on the road worldwide. The Debtors and their affiliates employ more than 180,000 employees worldwide, with global 2004 revenues of approximately $28.6 billion and global assets as of August 31, 2005 of approximately $17.1 billion. By their own admission, the Debtors' bankruptcy ranks as the fifth largest public company chapter 11 in terms of revenues, the thirteenth largest public company business reorganization in terms of assets, and represents the second largest bankruptcy filing in 2005. The vast size and complexity of these cases is therefore not in question.

5

Alicia M. Leonhard, Esq.
Tracy H. Davis, Esq.

WHITE & CASE

November 7, 2005

*The Stock is Widely Held and Actively Traded.*

As of August 26, 2005, Delphi had more than 561,781,590 million shares of common stock outstanding and 331,202 shareholders. As of the close of business on November 4, 2005, over 4.5 million shares of Delphi were traded, closing at approximately $0.39 per share with a market capitalization of nearly $217 million. The average daily trading volume over the past three months was nearly 22 million shares. On October 4, 2005, just a few days before the bankruptcy filing, Delphi's market capitalization was approximately $1.7 billion.

While the depth and breadth of ownership of Delphi equity securities does not guarantee necessarily that Delphi shareholders are entitled to a distribution under a restructuring plan, the active trading in the stock, its market capitalization, and the large number of holders and potential beneficial holders does heavily weigh in favor of the appointment of an Equity Committee.

*This Request Comes on a Timely Basis.*

The Debtors only commenced these cases on October 8, 2005. Accordingly Appaloosa's request is timely. More importantly, as shareholder value may likely depend upon the manner in which the Debtors restructure their employee related obligations, as noted above, time is of the essence.

Appaloosa is mindful of concerns regarding the additional expense associated with the formation of an Equity Committee, but "[c]ost alone cannot, and should not, deprive . . . security holders of representation." In re McLean Indus., Inc., 70 B.R. 852, 860 (Bankr. S.D.N.Y. 1987). The Bankruptcy Code contains adequate means for controlling costs. See 11 U.S.C. § 330(a)(1). In a case of this magnitude where assets exceed $17 billion and net sales are over $26 billion, the benefits of committee representation of shareholders' interests far outweigh any additional costs to the Debtors' estates.

In sum, the Debtors have commenced one of the largest bankruptcies in American history. In the span of a few days prior to the Delphi filing, more than $1.5 billion of the market value of Delphi equity evaporated. The filing, on the verge of the Bankruptcy Reform Act of 2005, will affect, at a minimum, hundreds of thousands of beneficial holders of equity. Because of the sheer size of the bankruptcy, it has sent shockwaves throughout the automotive industry and unionized labor. One analyst has compared the Delphi bankruptcy to the former Chrysler Corp.'s brush with bankruptcy in the early 1980s -- only bigger. "I see this as a bigger event than if Chrysler had filed," said Glenn Reynolds, an analyst with the New York research firm CreditSights. "This affects the 800-pound gorilla -- GM. It's probably the biggest event in the auto industry in 25 years."

Accordingly, Appaloosa believes it would be grossly unjust to permit the Debtors to engage in the process of developing a business plan, including negotiations in respect of its employee related obligations, and formulating an exit strategy without any meaningful input from

6

Alicia M. Leonhard, Esq.
Tracy H. Davis, Esq.

WHITE & CASE

November 7, 2005

shareholders who clearly have a large and valuable stake in the Debtors' enterprise. For the foregoing reasons, we respectfully request that you appoint an Equity Committee at your earliest possible opportunity.[1]

Very truly yours,

Thomas E Lauria

cc:  Ronald Goldstein
     David Tepper
     John Wm. Butler
     Robert J. Rosenberg

---

[1] Nothing contained herein shall constitute an admission or a waiver of any rights or remedies by Appaloosa, all such rights and remedies being expressly reserved.

7

MIAMI 612795 [612795_8.DOC] (2K)