# EXHIBIT "I"

10/15/05 Economist 65
2005 WLNR 16692334

Economist
Copyright 2005 Economist Newspaper

October 15, 2005

Issue 950

Section: The Economist 15 Oct 2005

Corporate America's legacy costs: Now for the reckoning

Retirement benefits promised to employees are becoming a crippling burden for a growing number of firms, especially in America

YOU didn't need an oracle to know that Delphi would end up in America's bankruptcy courts, which is where it sought protection from its creditors on October 8th. The world's biggest maker of car parts has been crushed not least by the legacy of generous pension and health-care promises made in the past to its American employees. Despite Delphi's annual revenues of $28 billion, in a market increasingly served by low-cost workers in places like China and with raw-material costs soaring these benefits are no longer affordable. Delphi's future pension obligations alone are valued at $8.5 billion. Some $4.3 billion of that is "unfunded"--ie, the firm has failed to put aside enough money to meet its obligations. Its unfunded health-care promises are even larger.

Delphi's bankruptcy may have painful consequences for its workers and retirees, who, under Chapter 11 of America's bankruptcy code, could see their benefits slashed as the company restructures its liabilities in the hope of becoming profitable again. The bankruptcy will also affect General Motors (GM), the world's biggest carmaker, from which Delphi was spun off in 1999. Having declined to rescue Delphi, GM faces disruption to its supply chain. It might also have to honour guarantees it made in the event that Delphi ever came under "financial distress"--that presumably encompasses bankruptcy.

Estimates of GM's potential liability to Delphi range from $1.5 billion to $11 billion. Alas for the carmaker, such numbers are dwarfed by its own existing pension and health-care burden, now so large that there is increasingly talk in Detroit that it too may be driven into bankruptcy. Steve Miller, Delphi's boss and a veteran of bankruptcy wrangles in other industries, predicted this week that GM would go bust inside the next three years unless it can win huge concessions from its trade unions--something Delphi failed to do.

The numbers are awful. GM's credit rating was lowered again by Standard & Poor's on October 10th. GM expects to spend over $5 billion this year on health care alone, up by $1 billion since last year. That adds up to about $1,500 for each car made by GM, or some 3% of the firm's revenues. Much of this money is for GM's former workers: it now provides health insurance to over 1m retired Americans.

GM says that its current pension-fund liabilities are fully funded, but that claim is controversial. Outsiders think that the firm's pension obligations are underfunded to the tune of $31 billion. Its unfunded liability for what are known as "other post-employment

benefits" (OPEBs), which consist mostly of retiree health care, are estimated by industry analysts at almost $70 billion. That compares with GM's current stockmarket capitalisation of $15 billion.

What is bad for GM is bad for much of corporate America. Within the motor industry, Ford and Chrysler also face massive problems from "legacy costs" resulting from past promises to employees. Chrysler's prospects look least crippling, but then it was acquired by deep-pocketed Daimler a few years ago.

The motor industry is following a well-trodden path. Four of America's leading airlines are now flying whilst bankrupt; in each case, the opportunity to shed unaffordable pension and health-care costs has been a crucial factor in the decision to enter Chapter 11. America's steel industry went through a similar process a few years ago, emerging less burdened with legacy costs, but far smaller. Already, Wall Street analysts are starting to worry whether telecoms will be next, especially if the spread of low-cost internet telephony drives down the revenues of the remnants of the old Bell companies. Although their pension liabilities appear to be well funded for now, AT& T and SBC, which are currently merging, have combined unfunded OPEB liabilities of $20 billion.

Such high-profile financial difficulties are forcing many Americans to pay attention. Company bosses fear that they too may find themselves heading for bankruptcy or, if not, that legacy costs will at least make them uncompetitive. Workers fear that they will lose benefits that they are counting on in old age.

Politicians are fearful too, suspecting that taxpayers may end up having to pick up the bill. The Treasury secretary, John Snow, is worried that a meltdown of corporate pension funds could become the "next Savings & Loan crisis", a reference to the scandals among thrift banks at the end of the 1980s that ended in a $200 billion government bail-out.

Already this year the Pension Benefit Guaranty Corporation (PBGC), the federal-government-backed insurer of company pension plans, has agreed to take on an unprecedented $6.6 billion in unfunded pension liabilities from bankrupt United Airlines, prompting allegations in Congress that airlines are trying to "dump" their pension obligations on taxpayers. The PBGC's liabilities now far exceed its assets, making it technically insolvent, though it has cash reserves that will keep it afloat for a few years yet.

Dealing with pension and health-care problems is distracting America's bosses from their core business--assuming managing legacy costs has not become just that: GM has been described, not wholly in jest, as a pension hedge fund and health-insurance business that happens to make cars.

Suffering smokestacks

The burden of legacy costs is heavily concentrated in older manufacturing firms with (at least until recently) large workforces and unions strong enough to negotiate generous retirement benefits. Those firms are thus at a big cost disadvantage both to their younger domestic rivals--Southwest, America's most successful airline, has no pension fund to restrain it--and to competitors from countries that either lack pension and health-care provision or have it provided by the state.

In pensions, most of the problems lie in "defined-benefit" plans, under which the employer promises to pay a pre-agreed pension (usually a proportion of each employee's final salary).

In the past 20 years, firms have been closing such funds, at least to new workers. They now favour "defined-contribution" schemes, whereby the firm promises to make regular payments into a pot that will pay a pension that reflects the market performance of the money invested. This gives the employer certainty about its costs, whereas the employee--unlike in a funded defined-benefit scheme--faces uncertainty about what pension he will have.

Despite this trend, some three-quarters of the companies in America's S&P 500 index have a defined-benefit pension fund. The total liabilities of these funds were around $1.4 trillion at the end of 2004 and, according to Credit Suisse First Boston (CSFB), these were underfunded by 13%, or some $165 billion. The more cautious PBGC reckons that the total obligations of America's single-company defined-benefit plans were underfunded by over $450 billion at the end of 2004. According to CSFB, in the S&P 500 these liabilities are concentrated in relatively few firms, airlines and carmakers prominent among them.

Equally worrying are multi-employer pension funds, says Trevor Harris of Morgan Stanley. They are administered by the unions--the Teamsters, for example, runs one for the trucking industry called Central State--but funded by employers. They are opaque even to the PBGC, but certainly are seriously underfunded. It is unclear which firms owe how much. If that were not bad enough, continues Mr Harris, corporate pensions are but a leading indicator of what lies ahead for state and local-government defined-benefit plans, which are even more severely underfunded.

Of course, corporate America is by no means alone in its pension crisis. Many British firms have similar problems, including British Airways and Corus, which includes what was once British Steel. Worries about pension liabilities have helped to scupper takeover bids for two prominent British retailers, Marks & Spencer and WH Smith, and caused wobbles in this year's acquisition of Allied Domecq by Pernod Ricard, another drinks firm.

America is unique however in the central role played by employers in financing health care. In most countries, health care is largely funded by the taxpayer and is thus much less of a direct burden on companies. Rick Wagoner, GM's boss, spoke for many American executives earlier this year when he said that the "cost of health care in the US is making American business extremely uncompetitive versus our global counterparts". Strikingly, as if to prove his point, the car industry has been booming in Canada in recent years as Detroit's Big Three and their suppliers have shifted operations north of the border in search of savings.

Hurt by health

True, the competitiveness problem can be overstated. After all, in theory, state funding of health care abroad should mean a higher tax burden compared with America, some of which is likely to be felt, one way or another, by the corporate sector. But legacy health-care costs, in particular, probably do hurt American firms.

Unlike pensions, which have funding requirements under the 1974 Employee Retirement Income Security Act, there is no legal obligation to set money aside for future health-care promises. Health care for retirees is largely paid out of current cashflow, adding to a firm's costs relative to its foreign rivals but not to its output that year. Future OPEB obligations can affect the perceived creditworthiness of American firms and thus their cost of capital, by more than the impact of potentially higher future tax bills or labour costs on foreign rivals in countries with state-financed health care.

CSFB estimates that two-thirds of S&P 500 companies have some OPEB obligations, and that these are underfunded by well over $300 billion, more than 80% of the total promised benefits. (Some firms have put money into "voluntary employees' beneficiary associations"; for example, GM's contains several billion dollars.) Again, the burden is heavily concentrated in older, unionised firms. (Union-unfriendly Wal-Mart's health plan covers less than half of its American workers and does not extend into retirement.)

Worse, estimates of OPEB liabilities rely even more on guesswork than defined-benefit pensions, points out Olivia Mitchell of the Wharton School. Companies have simply promised to pay for whatever health care is required, regardless of the cost. At least a defined-benefit pension has a pre-agreed relation to final salary. In forecasting future health-care costs, actuaries "tend to assume 10-11% growth next year, trending down to, say, 5% in year five", says Ms Mitchell, "but there is no actual evidence of health-care inflation ever trending down."

So what went wrong? In pensions, three trends came together, says Dambisa Moyo, an economist at Goldman Sachs. First, companies were caught out by the decline in equity prices and lower interest rates after 2000 that reduced the value of pension-fund assets and, by lowering the discount rate, increased the present value of future liabilities. Second, firms failed to match the risk profile of their assets (which often consisted mainly of equities) with that of their liabilities, which are equivalent to a long-term bond. As a result, "lower interest rates have had a bigger impact on pension liabilities than on assets," she says. Third, companies underestimated the life expectancy of their employees and thus the size of their liabilities. In America, until recently, many firms have used mortality tables from 1983, since when life expectancy has risen sharply.

Retiree health-care promises first started to grow in the 1970s as a way to circumvent President Nixon's wage controls. Managers subsequently came to see them as a relatively painless way of giving something to the unions during negotiations without having any impact on current costs. Considerable blame falls on how America has accounted for pensions and OPEBs. This has made it hard for anyone to understand the sort and magnitude of risks being taken, whilst at the same time creating incentives for managers to behave imprudently. For instance, firms are allowed to "smooth" out movements in asset prices, so that their profits are not excessively volatile. This is done by simply assuming in any given year that the assets earn a particular rate of return, and equities a higher return than bonds.

Fooled by arbitrage

These rules create a "fallacious arbitrage opportunity", says Zvi Bodie, an economist at Boston University, by encouraging firms to issue bonds and buy equities for their pension fund. This is what GM did a few years ago when it borrowed $18.5 billion for its pension fund and promptly reported a big improvement in the fund's health by assuming that the equities it bought earned a higher return than the interest it was paying on the bonds.

Mr Bodie points out that the rules reflect the mistaken idea, "actually believed by actuaries, that equities are basically not risky if you hold them for the long term". A good start to sorting out this mess would be to adopt accounting rules that make sense, for example by insisting on the use of true current market valuations. Britain has taken a big step in this direction with a rule called FRS 17, and the result has been a move of pension fund assets out of equities into bonds, which offer a better match to the relatively fixed obligations of defined-benefit pensions. However, hoping perhaps for a rise in share prices and/or interest

rates, most firms have been reluctant to go as far as Boots, which in 2001 switched its fund entirely to bonds (a move that was subsequently watered down). That may prove to be a mistake, says Mr Bodie.

America's Financial Accounting Standards Board (FASB), has said it intends to improve pension-fund accounting, though it remains to be seen if it can do a better job of resisting hostile lobbying from companies than it did when it proposed tougher accounting for employee share options. The Securities and Exchange Commission is also taking an interest in this area.

Further, the Bush administration has proposed raising the premiums charged to firms by the PBGC, which is supposed to be self-financing. Ideally, premiums should reflect the riskiness of individual pension funds. However, this idea is facing considerable opposition, not least from unions, which argue that charging higher premiums to firms already unable fully to fund their pensions will push more of them over the edge into bankruptcy.

Tackling the OPEB burden may be even harder. A growing number of firms are trying to find ways to reduce health-care inflation by getting consumers to bear more of the cost, giving hospitals a financial incentive to be efficient and by promoting healthier lifestyles. So far, there is not much evidence of success. More company bosses are calling for a greater role for government in financing retiree health care, and are hopeful that the new Medicare prescription benefit, which should reduce their legacy costs a bit, is the start of a trend. Whether that view is shared in Washington, DC, remains to be seen.

Failing that, companies may simply have to be less generous. Sears, for instance, recently announced that it would no longer subsidise health insurance for retirees (though existing retirees have their subsidies grandfathered). There is much debate about whether OPEB promises are legally binding in the way that pensions are. In the past 15 years, many firms have couched their promises in legalese that appears to give them wiggle room.

Yet cutting OPEBs may be far harder than many firms believe, particularly where they are the result of a union negotiation, says Christine Lutgens, a lawyer at Kramer Levin. Although courts across America differ in their view of how binding union OPEB promises are, particularly in a bankruptcy, those serving Detroit (unlike in New York and Texas) have tended to favour the rights of union employees and retirees over employers, she says.

At those firms where legacy costs are creating a genuine risk of bankruptcy there is no shortage of opportunities for headline-grabbing short-term strategies, such as strikes by the unions or threatened bankruptcy filings by management. Chapter 11 is a useful card for bosses, because the PBGC does not guarantee the full amount of most pensions. On the other hand, firms have no automatic right to dump their pension funds on the PBGC even in bankruptcy, unless it is clearly necessary in order for them to survive.

Chapter 11 has actually made matters worse in many industries--most recently, for airlines--by giving a new lease of life to the worst performing firms that allows them to hurt their solvent and better-run rivals. A powerful case can be made for reforming Chapter 11 so that true basket-cases can be put out of their misery before they bankrupt entire industries. Unfortunately, Congress seems more intent on finding ways to help airlines postpone their day of reckoning. For instance, it has been proposed that Delta and Northwest, which filed for bankruptcy last month, be given a 14-year grace period in which to restore their pensions to full funding.

Tough talks ahead

 Intriguingly, one reason why Delphi entered bankruptcy when it did was to avoid modestly tougher Chapter 11 rules that take effect on October 17th. Another reason suspected by  many in Detroit was that GM urged Delphi to enter Chapter 11 in order to send a signal to the United Auto Workers union. The theory has it that GM would like to soften up the UAW ahead of contract negotiations that may determine its future viability.

The UAW is apparently receiving high-level advice on strategy from the Union of Steel Workers. Wilbur Ross, a financier who made an impasse-breaking deal with the USW that enabled the bankrupt steel industry to consolidate and leave Chapter 11 in good shape, notes two important lessons from that experience that the UAW--and others, too--might do well to heed. First, American firms need to be globally competitive and can no longer afford to award pay and fringe benefits solely according to American norms. Secondly, "at the end of the day, the only job worth having is one at a solvent company. What's the point of a gold-plated contract with a firm that is going bust?"

---- INDEX REFERENCES ----

COMPANY: UAL CORP; BRITISH AIRWAYS PLC; CREDIT SUISSE GROUP; GENERAL MOTORS CORP; WAL MART STORES INC; SBC COMMUNICATIONS INC; CREDIT SUISSE; GOLDMAN SACHS GROUP INC (THE); CREDIT SUISSE FIRST BOSTON (USA) INC; MARKS AND SPENCER GROUP PLC; MORGAN STANLEY; DAIMLERCHRYSLER AG; ALLIED DOMECQ PLC; UNITED AIR LINES INC; PERNOD RICARD

NEWS SUBJECT: (Corporate Financial Data (1XO59); HR & Labor Management (1HR87); Mature Market (1MA73); Business Management (1BU42); Sales & Marketing (1MA51); Financially Distressed Companies (1FI85); Major Corporations (1MA93); Benefits (1BE71); Employee Healthcare Benefits (1EM44); Target Markets (1TA03))

INDUSTRY: (Investment Management (1IN34); Retail Banking Services (1RE38); Manufacturing (1MA74); Transportation (1TR48); Banking (1BA20); Financial Services (1FI37); Health Insurance (1HE18); Land Transportation (1LA43); Group Insurance (1GR98); Automotive Models (1AU61); Passenger Transportation (1PA35); Pension Fund Management (1PE01); Automobiles (1AU45); Retirement Investment (1RE05); Automotive (1AU29); Consumer Finance (1CO55))

REGION: (North America (1NO39); Americas (1AM92); New England (1NE37); Massachusetts (1MA15); USA (1US73); Michigan (1MI45))

Language: EN

OTHER INDEXING: (ALLIED DOMECQ; BOSTON UNIVERSITY; BRITISH; BRITISH AIRWAYS; BUSH; CHRYSLER; CONGRESS; CREDIT SUISSE; CSFB; DAIMLER; DELPHI; DELTA; FASB; FINANCIAL ACCOUNTING STANDARDS BOARD; FUTURE OPEB; GENERAL MOTORS; GM; GOLDMAN SACHS; MARKS SPENCER; MORGAN STANLEY; NORTHWEST; OPEB; PBGC; PENSION BENEFIT GUARANTY CORP; PERNOD RICARD; SBC; SECURITIES AND EXCHANGE COMMISSION; STEEL WORKERS; TEAMSTERS; TREASURY; UAW; UNITED AIRLINES; UNITED AUTO WORKERS; USW; WAL MART; WHARTON SCHOOL) (Alas; Bodie; Chapter; Christine Lutgens; Dambisa Moyo; Equally; Ford; Harris; Ideally; Intriguingly; John Snow; Mitchell; Nixon; Olivia Mitchell; Rick Wagoner; Standard Poor; Steve Miller; Suffering; Trevor Harris; Wilbur Ross; Zvi Bodie) (US) (United States)

EDITION: The Economist

Word Count: 3669
10/15/05 ECONOMIST 65
END OF DOCUMENT
More Like This | More Like Selected Text

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

© 2005 Dialog, a Thomson business.                                **News**Room

10/15/05 ECONOMIST 65 ()