**Hearing Date: January 5, 2006 at 10:00 a.m.**
**Objection Deadline: January 2, 2006 at 4:00 p.m.**

**BROWN RUDNICK BERLACK ISRAELS LLP**
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
Robert Stark (#3575)

- and -

**BROWN RUDNICK BERLACK ISRAELS LLP**
One Financial Center
Boston, Massachusetts 02111
Telephone: (617) 856-8200
Facsimile: (617) 856-8201
Peter J. Antoszyk

Counsel for Law Debenture Trust Company of New York,
As successor Indenture Trustee and Property Trustee
for the 8.25% Junior Subordinated Note Due 2033
and the Adjustable Rate Junior Subordinated Note Due 2033

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| | ) | Case No. 05-44481 (RDD) |
| DELPHI CORPORATION, et al., | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |

**MOTION OF LAW DEBENTURE TRUST COMPANY OF NEW YORK**
**REQUESTING AN ORDER TO CHANGE THE MEMBERSHIP OF**
**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

**TO THE HONORABLE ROBERT D. DRAIN,**
**UNITED STATES BANKRUPTCY JUDGE:**

Law Debenture Trust Company of New York ("Law Debenture"), the

successor Indenture Trustee and Property Trustee for the (i) 8.25% Junior Subordinated

Note Due 2033 and (ii) adjustable Rate Junior Subordinated Note Due 2033 (together, the

"Subordinated Notes") issued by Delphi Corporation ("Delphi" and, together with its

Chapter 11 affiliates, the "Debtors"), by and through its counsel, Brown Rudnick Berlack

Israels LLP, hereby submits this motion requesting an Order changing the membership of

the official committee of unsecured creditors (the "Motion"). In support of its Motion,

Law Debenture respectfully states as follows:

## PRELIMINARY STATEMENT

1. The Subordinated Notes have an aggregate principal amount of

$412,371,975. The beneficiaries of these notes represent, as a class, one of the seven

largest unsecured claims against the Debtors. Notwithstanding the fact that they

collectively hold one of the seven largest claims against the Debtors, the beneficiaries of

these notes are entirely unrepresented on the Official Committee of Unsecured Creditors

(the "Official Committee").

2. The United States Trustee has refused to appoint Law Debenture as

a member of the Official Committee presumably acting under the mistaken assumption

that the Official Committee is adequately representative of the interests of the

Subordinated Notes. However, no current member of the Official Committee holds a

claim of the same nature or purported priority as the Subordinated Notes. Therefore, this

Court should enter an order directing the United States Trustee to appoint Law Debenture

to the Official Committee.

## JURISDICTION AND VENUE

3.    This Court has jurisdiction, pursuant to 28 U.S.C. §§157(b) and 1334, over these proceedings and over the persons and property affected hereby. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. §157(b)(2).

4.    Venue for the above-captioned Chapter 11 cases (the "Cases") and proceedings under this Motion is proper in this district pursuant to 28 U.S.C. §§1408 and 1409.

## BACKGROUND

### I.    The Subordinated Notes.

5.    The Subordinated Notes were issued by Delphi pursuant to that certain *Indenture*, dated as of October 28, 2003 (the "Indenture"). A true and correct copy of the Indenture is attached hereto as Exhibit A. Law Debenture serves as successor Indenture Trustee under the Indenture.

6.    The Subordinated Notes are purportedly contractually subordinate to $2 billion in senior notes issued pre-petition by the Debtors (the "Senior Notes"), as well as any Delphi trade debt. See Indenture § 17.01.[1] Moreover, upon information and

---

[1]    Section 17.01 of the Indenture provides, in pertinent part, that "the indebtedness evidenced by the Debt Securities of each series or any Coupons appurtenant thereto is subordinate and junior in right of payment to all Senior Debt to the extent provided herein." Indenture ¶17.01. The Indenture defines "Senior Debt" to include "any obligation of [Delphi] to its creditors whether now outstanding or subsequently incurred other than (i) any obligation as to which, in the instrument creating or evidencing the same or pursuant to which the same is outstanding, it is provided that such obligation ranks equal or subordinate to the Debt Securities, (ii) obligations evidenced by the Debt Securities, and (iii) obligations that are expressly stated in the terms of the Debt Securities (or in this Indenture, any indenture supplement, or any Officers' Certificate delivered under Section 2.01 hereof with respect to such Debt Securities) not to be Senior Debt." Indenture §

belief, the Subordinated Notes were not guaranteed by any operating Debtors. Consequently, the Subordinated Notes are purportedly structurally subordinate to the claims of trade creditors of the operating Debtors.[2]

7.    The Subordinated Notes are presently held by two Delaware statutory trusts: Delphi Trust I; and Delphi Trust II (together, the "Statutory Trusts").  A true and correct copy of that certain *Amended and Restated Declaration of Trust*, dated as of October 28, 2003, establishing Delphi Trust I (the "Declaration of Trust I"), is attached hereto as Exhibit B.  A true and correct copy of that certain *Amended and Restated Declaration of Trust*, dated as of November 21, 2003, establishing Delphi Trust II (the "Declaration of Trust II" and, together with Declaration of Trust I, the "Declarations of Trust"), is attached hereto as Exhibit C.  Law Debenture serves as successor Property Trustee for both of the Statutory Trusts and, as such, is currently the sole holder of the Subordinated Notes.

8.    The Statutory Trusts in turn issued publicly-held trust preferred securities (sometimes colloquially referred to as "Topper" securities, they are referred to herein as the "TPRS"), which are backed by the Subordinated Notes.  Pursuant to the

---

1.01.  This definition would appear to include the Senior Notes and trade claims against Delphi Corporation as "Senior Debt".

[2]    Law Debenture, on behalf of itself as Indenture and Property Trustee, and on behalf of the Statutory Trusts and the Subordinated Noteholders, expressly reserves all rights to challenge the validity, nature, enforceability and extent of any purported subordination of the Subordinated Notes, and nothing contained herein is intended, nor shall it be deemed, to be an admission, waiver, or compromise respecting such rights.  By way of example only, there appears to be significant issues that may ultimately need to be raised before this Court respecting the extent of subordination to the Senior Notes in light of language infirmities in the Indenture pertaining to the "rule of explicitness," as well as an "x-clause" in the subordination provision of the Indenture.

Declarations of Trust, Law Debenture is obligated to deliver distributions with respect to the Subordinated Notes to holders of the TPRS.[3]

9.    One member of the Official Committee, Wilmington Trust Company ("Wilmington Trust"), is the Delaware Statutory Trustee for the two Statutory Trusts, but is not positioned to represent the interests of the Subordinated Noteholders. Under the Declarations of Trust, Wilmington Trust's role is only administrative (i.e., it is a "statutory" trustee, with only ministerial rights and responsibilities, like receiving service of process in Delaware), meaning that it has absolutely no authority under those documents to act for or protect the interests of the Subordinated Noteholders (i.e., it is not the Indenture Trustee or the Property Trustee, with substantive rights to act for its constituency). Also, the Statutory Trusts likely soon will be dissolved and liquidated and, thereafter, Wilmington Trust will not have any connection with the Subordinated Notes or the Subordinated Noteholders.[4]   Perhaps most importantly, Wilmington Trust is the Indenture Trustee for the $2 billion in Senior Notes. Pursuant to the Trust Indenture Act, Wilmington Trust cannot, as a matter of law and practicality,[5] protect the interests of the

---

[3]    For convenience, the term "Subordinated Noteholders" shall be used to refer to the ultimate beneficiaries of the Subordinated Notes, notwithstanding the technical fact that Law Debenture, as Property Trustee, is currently the sole holder of the Subordinated Notes.

[4]    Pursuant to the Declarations of Trust, the Delphi's Chapter 11 filing constitutes an "early termination event."  As a result, it is likely that both Statutory Trusts will soon be liquidated and dissolved in accordance with the Declarations of Trust. Upon liquidation and dissolution of the Statutory Trusts, the holders of the TPRS will be allocated *pro rata* interests in the Subordinated Notes. Thereafter, Law Debenture will continue to represent the individual holders of the Subordinated Notes as Indenture Trustee.

[5]    Among other things, as noted in footnote 2, there appears to be significant issues respecting the extent of subordination to the Senior Notes in light of language

Subordinated Noteholders while, at the same time, serving as Indenture Trustee for the Senior Notes, as such dual role would create an illegal conflict of interest requiring Wilmington Trust to resign one such role. See 15 U.S.C. § 77jjj(b).

## II.    The Chapter 11 Cases.

10.    On October 8, 2005 (the "Petition Date"), the Debtors each filed with this Court voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The Debtors have continued to manage and operate their businesses and property as debtors-in-possession pursuant to Bankruptcy Code Sections 1107 and 1108. Neither a trustee nor an examiner has been appointed in the Cases.

11.    The Debtors assert that they have more than 180,000 employees worldwide, global 2004 revenues of approximately $28.6 billion, and global assets as of August 31, 2005 of approximately $17.1 billion (based upon aggregated consolidated financial data). The Cases represent the largest manufacturing and technology filing in the history of the federal bankruptcy system and ranked on the Petition Date as (i) the fifth largest public company business reorganization in terms of revenues and (ii) the thirteenth largest public company reorganization in terms of assets. According to the Debtors, the Cases will involve substantial restructuring, including divestiture, consolidation and wind-down of a substantial segment of the Debtors' U.S. business operations.

---

infirmities in the Indenture pertaining to the "rule of explicitness," as well as an "x-clause" in the subordination provision of the Indenture.

12.     The Debtors' unsecured debt can generally be categorized as follows: (i) Senior Notes; (ii) Subordinated Notes; (iii) general unsecured claims, consisting of trade claims, employee claims, pension liabilities and other general unsecured claims arising from the Debtors' operations.

### III.     The Official Committee.

13.     Shortly after the Petition Date, on or about October 20, 2005, the United States Trustee conducted an organizational meeting of the Debtors' general unsecured creditors.  Prior to and during the organizational meeting, the United States Trustee solicited creditors' expressions of interest in serving as members of the Official Committee.  Law Debenture submitted a request to serve on the Official Committee at that time.  Although the United States Trustee met personally with representatives of the Debtors and other creditors during the organizational meeting, she was not interested in meeting with Law Debenture.

14.     Thereafter, the United States Trustee appointed a seven member committee.  The Official Committee, as constituted by the United States Trustee, presently consists of four trade creditors, one labor union, the Indenture Trustee for the Senior Notes, and an institutional investor in the Debtors' bond debt.  The members are:

- Electronic Data Systems Corp., a trade creditor.
- General Electric Company, a trade creditor.
- Flextronics International Asia-Pacific, Ltd., a trade creditor.
- Freescale Semiconductor, Inc., a trade creditor.
- IUE-CWA, a labor union representative.
- Wilmington Trust Company, the Indenture Trustee for the Senior Notes.
- Capital Research and Management Company, an institutional investor.

Law Debenture was not selected by the United State Trustee to serve on the Official Committee.

15.     Thus, all unsecured creditor constituencies are represented on the Official Committee except for the Subordinated Noteholders.  The four trade creditors represent unsecured trade debt claims that are purportedly contractually or structurally senior to the Subordinated Notes.    The labor union represents employee claims and interests, also purportedly structurally senior to the Subordinated Notes.  Wilmington Trust, as the Indenture Trustee for the Senior Notes, can only represent the interests of Senior Noteholders, as a matter of law.

16.     That leaves only Capital Research and Management Company ("Capital Research").    In a recent filing titled *Notice of Status as Substantial Claimholder*, dated November 11, 2005 (the "Capital Research Claims Notice"), Capital Research declared that it holds approximately $530 million in Senior Notes and Subordinated Notes.  A true and correct copy of the Capital Research Claims Notice is attached hereto as Exhibit D.

17.     The Capital Research Claims Notice does not specify the precise breakdown of Capital Research's holdings between the Senior Notes and the Subordinated Notes, and Law Debenture does not independently have such knowledge.[6] Nevertheless, in a letter to United States Trustee dated December 2, 2005 (described more fulsomely below and attached hereto as Exhibit L), the Debtors state that Capital Research holds 5%-10% of the Subordinated Notes, which would be approximately 3.5%-7.5% of their combined holdings of Senior Notes and Subordinated Notes.  Stated differently, Capital Research holds between $20-40 million of Subordinated Notes versus

---

[6]     Law Debenture made due inquiry into Capital Research's holdings, but Capital Research has refused to make this information available.  If necessary, Law Debenture will seek such information from Capital Research through discovery propounded in connection with this Motion.

between $490-$510 million of Senior Notes.

IV.    **Law Debenture's Numerous Requests**
       **To Participate On The Official Committee.**

   A.    **Law Debenture's Request To**
         **Participate On An *Ex Officio* Basis.**

18.    Almost immediately following the formation meeting, Law Debenture approached the Official Committee, through counsel, requesting that it be afforded an *ex officio* (i.e., non-voting) seat on the Official Committee.  The Official Committee responded by asking Law Debenture to write it a letter addressing two questions: (1) why the Official Committee, as presently constituted, does not adequately represent the interests of the Subordinated Noteholders; and (2) why Law Debenture's request for an *ex officio* seat should be considered at this time and not at some later stage in the Chapter 11 proceedings.  On November 3, 2005, Law Debenture sent a letter to the Official Committee's counsel addressing both questions.  A true and correct copy of Law Debenture's November 3, 2005 letter is attached hereto as Exhibit E, and is incorporated herein by reference.

19.    Some time thereafter, counsel to the Official Committee telephoned Law Debenture's counsel and informed him that the Official Committee would not permit Law Debenture to participate in these cases as an *ex officio* member of the Official Committee.

   B.    **Law Debenture's Written Requests**
         **To Be Added To the Official Committee.**

20.    Also promptly following the formation meeting, Law Debenture requested that the United States Trustee reconsider her decision not to appoint Law

9

Debenture to the Official Committee.  In fact, on October 25, 2005 (i.e., only a few days after the formation meeting), Law Debenture's counsel sent a letter to the United States Trustee specifying the reasons why she should appoint Law Debenture to the Official Committee.  A true and correct copy of Law Debenture's October 25, 2005 letter is attached hereto as <u>Exhibit F</u>, and is incorporated herein by reference.

21.    On November 2, 2005, the United States Trustee forwarded this letter (and similar letters sent by other creditors) to the Debtors and the Official Committee, inviting them to comment on Law Debenture's request.  The United States Trustee requested responses from the Debtors and the Official Committee in two weeks time, by November 15, 2005.    A true and correct copy of the United States Trustee's November 2, 2005 letter to the Debtors and the Official Committee is attached hereto as <u>Exhibit G</u>.

22.    On November 15, 2005, the Official Committee sent a letter advising the United States Trustee that it does not believe that Law Debenture should be added to the Official Committee because it "hold[s] or represent[s] claims similar in origin and priority to those of current Committee members."  The letter is completely devoid of any factual basis for this perfunctory assertion.  Moreover, the letter states that the Official Committee "will work with" certain other parties also requesting appointment to the Official Committee "to facilitate the Debtors' reorganization," but no such sentiment was expressed with respect to Law Debenture.  A true and correct copy of the Official Committee's November 15, 2005 letter to the United States Trustee is attached hereto as <u>Exhibit H</u>.

23.     On November 22, 2005, Law Debenture sent a letter to the United States Trustee specifically responding to the Official Committee's November 15th letter rebutting the Official Committee's perfunctory conclusion that Law Debenture should not be added to the Official Committee.  A true and correct copy of Law Debenture's November 22, 2005 rebuttal letter to the United States Trustee is attached hereto as Exhibit I, and is incorporated herein by reference.  Law Debenture has not received from the Official Committee a response to this letter.

24.     The Debtors apparently did not think that Law Debenture's request was particular important and/or that it was time sensitive because, unlike the Official Committee, the Debtors failed to respond by November 15, 2005 (again, the date requested by the United States Trustee).  Starting on November 15th, Law Debenture's counsel contacted the United States Trustee several times requesting that she act promptly notwithstanding the Debtors' lack of action, and requesting an in-person meeting to discuss the merits of the request.  The United States Trustee steadfastly refused to act on Law Debenture's request prior to receiving a response from the Debtors or to meet with Law Debenture to discuss the request.  On November 29, 2005, Law Debenture sent a letter to the office of United States Trustee confirming these facts.  A true and correct copy of Law Debenture's November 29, 2005 letter to the United States Trustee is attached hereto as Exhibit J, and is incorporated herein by reference.  Law Debenture has not received from the United States Trustee a response to this letter.

25.     Eventually, more than one month after Law Debenture first approached the United States Trustee, the Debtors responded to the appointment request.  By letter dated December 2, 2005, the Debtors summarily dismissed the request by

pointing to Wilmington Trust and Capital Research as Subordinated Noteholder representatives on the Official Committee.  The letter went on, however, to argue in favor of adding two other creditor representatives to the Official Committee, not because they are needed for purpose of providing due creditor representation on the Official Committee, but because it would serve the Debtors' parochial and strategic interests in the Cases.  A true and correct copy of the Debtors' December 2, 2005 letter to the United States Trustee is attached hereto as Exhibit K.

26.    On December 5, 2005, Law Debenture sent a letter to the United States Trustee specifically responding to the Debtors' December 2nd letter and rebutting its summary dismissal of Law Debenture's appointment request.  In this letter, Law Debenture, among other things, questioned the propriety and wisdom in placing any emphasis on the Debtors' views respecting Official Committee appointments, especially where the Debtors have made so abundantly clear their interest in using Official Committee membership as a means to advance their parochial and strategic goals.  A true and correct copy of Law Debenture's December 5, 2005 letter to the United States Trustee is attached hereto as Exhibit L, and is incorporated herein by reference.

27.    No having received a response to its December 5, 2006 letter, by letter dated December 12, 2006, Law Debenture again reminded the United States Trustee of the lengthy time that Law Debenture's request has been pending and the importance of an immediate decision.  A true and correct copy of Law Debenture's December 12, 2005 letter to the United States Trustee is attached hereto as Exhibit M, and is incorporated herein by reference.  On December 14, 2005, Law Debenture received a letter from a Trial Attorney working for the United States Trustee, which letter

stated that "[t]he request of Law Debenture is still under advisement." A true and correct copy of this letter is attached hereto as <u>Exhibit N</u>.

**V.      The Delay Becomes Untenable.**

28.      As this Court is aware, labor costs and employee-related claims are a critical issue in the Cases, and Law Debenture has been watching (from the outside) news about developments in the negotiations with the Debtors' labor representatives and with General Motors Corporation. Resolution of that issue will likely be the single most important determinant respecting the amount of estate value available for distribution to the Subordinated Noteholders. Thus, Law Debenture is keenly interested in participating in such negotiations, as a member of the Official Committee.

29.      On December 19, 2005, the Debtors issued a press release strongly suggesting that they moving forward with in-depth negotiations with their labor representatives and with General Motors Corporation. A true and correct copy of this press release is attached hereto as <u>Exhibit O</u>. Thus, the United States Trustee's two month delay in reaching a decision on Law Debenture's appointment request has become untenable. Telephone calls to the United States Trustee urging action based on this press release were not answered. Faced with a "pocket veto" of its appointment request, Law Debenture was left with no choice but to file this Motion.

**<u>RELIEF REQUESTED</u>**

30.      By this Motion, Law Debenture requests that this Court enter an Order directing the United States Trustee to appoint Law Debenture as a full voting member of the Official Committee. For the reasons discussed herein, ample cause exists for        the        granting        of        this        request.

## STANDARD OF REVIEW

I.    **The Court is Authorized to Review the**
      **United States Trustee's Appointment Decisions.**

31.    Section 1102 of the Bankruptcy Code governs the appointment of official committees in Chapter 11 proceedings.  Section 1102(a)(1) provides in pertinent part that "as soon as practicable after the order for relief under chapter 11 of this title, the United States trustee shall appoint a committee of creditors holding unsecured claims." 11 U.S.C. §1102(a)(1).  Section 1102(b)(1) states that "[a] committee appointed under subsection (a) of this section shall ordinarily consist of the persons, willing to serve, that hold the seven largest claims against the debtor of the kinds represented by the committee." 11 U.S.C. § 1102(b)(1).

32.    Thus, the United States Trustee is, in the first instance, vested with the administrative authority to form and appoint creditors to committees.  However, courts, including bankruptcy courts in this circuit, have almost uniformly found that courts have the authority, upon motion of a party-in-interest, to review the composition of committees.

33.    Courts have found that they have such authority pursuant to Section 1102(a)(2) of the Bankruptcy Code as wells as pursuant to Section 105(a) of the Bankruptcy Code, and as a consequence of their inherent equitable authority.  See, e.g., In re Enron, 279 B.R. 671, 684 (Bankr. S.D.N.Y 2002)(Section 1102(a)(2) of the Bankruptcy Code mandates that courts conduct an "independent" review of the adequacy of committee representation); In re Barney's, Inc., 197 B.R. 431, 439 (Bankr. S.D.N.Y. 1996)(Section 105(b) authorizes review of United States Trustee's committee

appointment decisions); In re Texaco Inc., 79 B.R. 560, 566 (Bankr. S.D.N.Y. 1987)(Section 1102(a)(2) of the Bankruptcy Court afforded the court authority to order the expansion of a committee); In re Mercury Finance Co., 240 B.R. 270, 277 (Bankr. N.D. Ill. 1999)(adopting "majority view" that court has inherent authority under Section 105 of the Bankruptcy Code to conduct such a review); In re Dow Corning Corp., 194 B.R. 121 (Bankr. E.D. Mich. 1996), rev'd on other grounds, 212 B.R. 258 (E.D. Mich 1997)(court has inherent power to review committee appointments); In re Value Merchants, Inc., 202 B.R. 280, 285 (E.D. Wis. 1996)(Section 1102 authorizes courts to review United State Trustee's "administrative function" to assure adequacy of committee representation); In re Lykes Bros. S.S. Co., 200 B.R. 933, 939-40 (M.D. Fla. 1996)(Section 105(b) can be invoked to review composition of creditor committees); In re Plabell Rubber Products, 140 B.R. 170, 180-81 (Bankr. N.D. Ohio 1992)(Section 1102(a) and Section 105(a) of the Bankruptcy Code allows courts to review the adequacy of committee representation); In re Columbia Gas System, Inc., 133 B.R. 174, 175-76 (Bankr. D. Del. 1991)(Court may review the United States Trustee's refusal to appoint creditor to official committee and may order "necessary or appropriate relief" under Section 105(b)); In re Public Service Co. of New Hampshire, 89 B.R. 1014, 1020-21 (Bankr. D.N.H. 1988)(in ordering the expansion of a committee, court noted that "the Court necessarily has the inherent power to provide 'a lesser included remedy' of simply directing the expansion of the existing committee.").[7] See also Fed. R. Bankr. Pro.

---

[7]    Prior to 1986, Section 1102(c) expressly authorized the courts to, on request of a party in interest, change the size or membership of a creditors' or equity security holders' committee if the committee was not sufficiently representative. In 1986, Section 1102(c) was repealed. Section 1102(a)(2) provided that "[o]n request of a party in interest, the court may order the appointment of additional committees of

2007(c).[8]

34.    The exercise of this judicial review is consistent with sound public policy which strongly favors judicial review of the United States Trustee's appointment of committee members.  As one court observed, absent judicial review, the United States Trustee would have "unbridled discretion over the appointment of creditor committees." Lykes Bros., 200 B.R. at 940.

**II.    The Standard Of This Court's Review Of United States Trustee Appointment Decisions Is *De Novo*.**

35.    In exercising their power of review of committee composition, bankruptcy courts in this circuit have adopted the majority view that such a review should be conducted *de novo*.  Enron, 279 B.R. at 684 (court reviews adequacy of representation

---

creditors or of equity security holders if necessary to ensure adequate representation of creditors or of equity security holders.  The United States Trustee shall appoint any such committee."  Thus, the repeal of Section 1102(c) coupled with the language of Section 1102(a)(2) created a question as to whether Congress intended to deprive courts the power to review the composition of committees and only allow courts to order the appointment of additional committees.   This question has almost uniformly been resolved in favor of court review of committee membership.   In re McLean Industries, Inc., 70 B.R. 852, 856 (Bankr. S.D.N.Y. 1987) (noting power to alter committee membership was taken from courts and given to the U.S. trustee by the 1986 amendments). Congress recently enacted Section 1102(a)(4) of the Bankruptcy Code, which expressly authorizes court review of the committee composition.   11 U.S.C. §1102(a)(4).  While not applicable to the case at hand (because the Cases were commenced prior to October 17, 2005, the effective date of the amendment), this new section reinforces the conclusion that Congress intends courts to oversee of committee formation.

[8]    This rule empowers a court to vacate the appointment of a pre-petition committee. However the Advisory Committee noted that the rule does not preclude judicial review under Rule 2020 regarding the appointment of other committees. Advisory Committee Note to Rule 2007 (1991); Dow Corning Corp., 194 B.R. at 133 (Advisory Note supports view that court has authority to review committee composition).

*de novo*); <u>Texaco</u>, 70 B.R. at 566 (applying *de novo* standard after the administrative task of appointing the committee is performed); <u>In re McLean Industries, Inc.</u>, 70 B.R. 852, 860-863 (Bankr. S.D.N.Y. 1987)(an abuse of discretion standard does not apply with respect to the United States Trustee's initial exercise of discretion because the concept of adequate representation is a legal issue that must be judicially resolved).   <u>See also</u> <u>Dow Corning</u>, 194 B.R. at 131 (court has *de novo* authority to alter an existing committee); <u>In re First RepublicBank Corp.</u>, 95 B.R. 58, 59 (Bankr. N.D. Tex 1988)(applying *de novo* standard of review to determine adequacy of representation); <u>Value Merchants</u>, 202 B.R. at 284 (applying *de novo* standard of review).

36.    Judge Gonzalez recently addressed this standard of review in a well-reasoned opinion in the <u>Enron</u> case.   <u>Enron</u>, 279 B.R. 671.   In <u>Enron</u>, Judge Gonzalez, reviewing the adequacy of representation on an existing committee, stated that "this Court must necessarily conduct an independent review of whether there is adequate representation by an existing committee by the mandate of 11 U.S.C. §1102(a)(2).   It stands to reason that the determination of adequate representation is thus a legal determination, and the U.S. Trustee's decision is subject to *de novo* review." <u>Enron</u>, 279 B.R. at 684 (*citing* <u>Texaco</u>, 79 B.R. at 566 (noting that whether request for additional committee is made to United States Trustee or not, the court must arrive on its own judgment)).

37.    The new Section 1102(a)(4) reinforces the fact that the review of the adequacy of committee representation should be *de novo*.   The express language of Section 1102(a)(4) imposes no restriction on the ability of courts to review the composition of committees on the motion of any party in interest and validates the *de*

*novo* standard of review previously adopted by bankruptcy courts in this circuit. Accordingly, this Court should review the United States Trustee's refusal to appoint Law Debenture to the Official Committee *de novo*.

## FACTUAL AND LEGAL BASES
## FOR THE RELIEF REQUESTED

38.    Courts consider the following factors when reviewing the make-up of an unsecured creditors' committee and the committee members' adequate representation of the interests of the general unsecured creditors of a debtor:  (a) the ability of the existing committee to function; (b) the nature of the case; and (c) the standing and desires of the various constituencies.  Enron, 279 B.R. at 685; see Dow Corning, 194 B.R. at 142.  While case law is a helpful guide, courts consider adequate representation on a case by case basis.  Enron, 279 B.R. at 685.  Here, all three factors militate in favor of the appointment of Law Debenture to the Official Committee.

I.    **The Court Should Order Law Debenture's Appointment Because All Three of the Enron Factors Militate In Favor Of Such Appointment.**

    A.    **The Court Should Order Law Debenture's Appointment Because The Official Committee, As Presently Constituted, Does Not Adequately Represent The Subordinated Noteholders.**

39.    The first factor for the Court to consider is whether the Official Committee can function properly as presently constituted.   The present Official Committee may be functioning, in the sense that it holds productive meetings, votes and reaches consensus on matters and is otherwise operating in the normal course of these Cases.  However, a proper functioning committee goes beyond these issues:

> The problem is that a committee may function just fine, reaching consensus on all issues, and still not adequately represent a

particular group.  This can occur, for instance, if the committee is so dominated by one group of creditors that a separate group has virtually no say in the decision-making process.  Consequently, courts look to see whether conflicts of interest on the committee effectively disenfranchise particular groups of creditors.

Enron, 279 B.R. at 686 (quoting Dow Corning, 194 B.R. at 142 (citations omitted)).

40.    The Official Committee, as presently configured, cannot function to adequately protect the interests of the Subordinated Noteholders because no current member of the Official Committee represents their interests.

### 1.    Six of the Seven Members of the Official Committee Have Interests Unrelated to Those of the Subordinated Noteholders.

41.    As stated above, the Official Committee presently consists of four trade creditors, two Senior Noteholder representatives, and one labor union.  None of these creditors hold claims that are of similar origin or priority to those held by the Subordinated Noteholders.  The four trade creditors represent unsecured trade debt claims that are purportedly structurally senior to the Subordinated Notes because the trade claims are owed by the Debtors' operating companies.  The labor union represents employee claims and interests, which are also purportedly structurally senior to the Subordinated Notes, but in any event, which are in nature very different than the claims of the Subordinated Noteholders.

42.    As noted above, Wilmington Trust is the "statutory trustee" under the Declaration of Trusts for the Subordinated Notes, but is also – and more importantly - the Indenture Trustee for the Senior Notes.  As "statutory trustee," Wilmington Trust has no statutory or contractual authority to represent the interests of the holders of the Subordinated Notes.  Delaware statutes limit the function of Wilmington Trust, as

19

statutory trustee, to being able to accept service of process on behalf of the Statutory

Trusts.  Del. Code Ann. tit. 12, § 3807 (2005).  Likewise, the Declarations of Trust do not

vest Wilmington Trust with any fiduciary power to represent the interests of the

Subordinated Noteholders.  If they did so, Wilmington Trust would be legally obligated

to resign its position as statutory trustee due to its role as Indenture Trustee for the Senior

Notes.  See 15 U.S.C. § 77jjj(b).  Furthermore, assuming *arguendo* that Wilmington

Trust had some legal authority to represent Subordinated Noteholder interests, it would as

a practical matter be hopelessly conflicted serving both Senior and Subordinated

Noteholder interests.[9]

43.    Thus, none of these creditors can represent the interests of the

Subordinated Noteholders.

### 2.    Capital Research Cannot Effectively Represent the Interests of the Subordinated Noteholders Because it is Hopelessly Conflicted.

44.    The only remaining member of the Committee, and the member

upon whom the United States Trustee is presumably relying upon to represent the

interests of the Subordinated Noteholders, is Capital Research.  Notwithstanding Law

Debenture's specific request, Capital Research has refused to disclose the exact

breakdown of its holdings between the Senior Notes and the Subordinated Notes.

According to Capital Research's Notice of Status as a Substantial Claimholder filed in

the Cases, however, Capital Research holds interests in four different Senior Notes and

---

[9]    Among other things, it could not voice any opinion respecting enterprise valuation or the extent of the Subordinated Notes' subordination to the Senior Notes in light of language infirmities in the Indenture pertaining to the "rule of explicitness," as well as an "x-clause" in the subordination provision of the Indenture.

an undisclosed portion of the Subordinated Notes.  In their letter to the United States

Trustee (attached hereto as Exhibit L), the Debtors submitted that Capital Research holds

5%-10% of the Subordinated Notes, which would be approximately 3.5%-7.5% of their

total holdings of Senior Notes and Subordinated Notes (or approximately $20-40 million

of Subordinated Notes versus over $500 million of Senior Notes).  Capital Research's

relatively small investment in Subordinated Notes, which it probably holds as merely a

"hedge" for its Senior Notes, gives it little incentive to protect the interests of the

Subordinated Noteholders at the expense of its much more significant interest in the

Senior Notes.

45.    More importantly, Capital Research's interest will be to maximize

the recovery on account of the Senior Notes, to the necessary detriment of the

Subordinated Notes.  Pursuant to the terms of the Indenture, the Subordinated Notes are

purportedly junior in right to the prior payment of Senior Notes.  Therefore, any action,

result or position which benefits the Senior Notes necessarily harms and reduces the

return to the holders of the Subordinated Notes.

46.    Because its position seems so heavily weighted in favor of the

Senior Notes, Capital Research has every incentive to compromise the position of the

Subordinated Notes in order to maximize the return on the Senior Notes.  Thus, Capital

Research holds claims of purportedly opposing priorities and is, in turn, hopelessly

conflicted.[10]   Capital Research cannot meaningfully represent the interests of the

Subordinated Noteholders while also representing the opposing interests of the Senior

Noteholders.  This conflict manifests itself in virtually every decision of the Official

---

[10]    In this regard, Capital Research and Wilmington Trust are in precisely the same
conflicted position.

Committee because the maximization of return to subordinated indebtedness is fundamentally contrary to the maximization of recovery of senior indebtedness. <u>McLean Industries</u>, 70 B.R. at 861 (noting the conflicting goals of maximizing recovery for senior and subordinate lenders).

47.    The Subordinated Noteholders cannot rely upon a purportedly adverse party to protect their interests and advocate on their behalf. Only by having their own, non-conflicted and independent representative on the Official Committee can the Subordinated Noteholders be assured that the Official Committee will functionally and vigorously represent the interests of the Subordinated Noteholders. <u>See</u>, <u>e.g.</u>, <u>Value Merchants</u>, 202 B.R. 280 (affirming Bankruptcy Court ruling that the United States Trustee abused its discretion in failing to appoint indenture trustee for subordinated debentures as voting member of the official creditors' committee where official committee comprised only of trade creditors and equipment financiers was not representative of a large segment of the debtor's unsecured debt).

48.    Thus, even if Capital Research can provide some representation of the interests of the Subordinated Noteholders (which Law Debentures does not believe it can), the addition of Law Debenture would be "more adequately" representative of Subordinated Noteholders' interests. <u>See</u> <u>Public Service</u>, 89 B.R. at 1019 (Court ordered appointment of additional individual debenture holders to creditors committee to make it *more* representative).

**B.** **The Court Should Order Law Debenture's Appointment
Because The Nature Of The Cases Necessitates Such Relief.**

49.    Courts consider the second factor, the nature of the case, in the context of whether multiple committees are necessary, with the size and complexity of a case often being cited as the bases for multiple committees. Enron, 279 B.R. at 689 (citations omitted). In Enron, Judge Gonzalez, however, refused to appoint an additional creditors' committee and, in so doing, recognized an important principle relevant to the case at hand: a single, representative committee, which adequately represents *all* constituents, is crucial to protect the interests of creditor constituencies and foster compromise and resolution of creditor conflicts. Id. at 698-690. As Judge Gonzalez recognized, a primary function of a creditors' committee is to be a "catalyst for negotiation and compromise" among creditor constituencies. The principle applies with equal force in this large complex case, and is particularly relevant to the Subordinated Noteholders.

50.    Delphi has more than 180,000 employees worldwide, global 2004 revenues of approximately $28.6 billion and global assets as of August 31, 2005 of approximately 17.1 billion (based upon aggregated consolidated financial data). The Debtors' Chapter 11 filings represent the largest manufacturing and technology filing in the history of the federal bankruptcy system and ranked on the petition date as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company reorganization in terms of assets. This is a large and complex case which will, as stated by the Debtors in their letter to the United States Trustee, involve substantial restructuring, including divestiture, consolidation and wind-down of a substantial segment of the Debtors' U.S. business operations.

51.    The size and complexity of these Cases mandates that the Subordinated Noteholders have a voice in Official Committee deliberations.  Thus, the relief requested should be granted.

**C.    The Court Should Order Law Debenture's Appointment Notwithstanding The Self-Serving Views Expressed By The Debtors And The Official Committee.**

52.    The third and final factor is the standing and desires of the various constituencies.  Enron, 279 B.R. at 690.  Both the Debtors and the Official Committee have taken the position that Law Debenture need not be appointed to the Official Committee.  Law Debenture submits that this Court should give little if any weight to the "standing and desires" of these constituents.  Analysis of this factor is relevant when determining whether multiple committees are required or whether the existing committee can function.  See, e.g., id. at 689-690.  If this Court determines that the Subordinated Noteholders are not adequately represented on the Official Committee, the "standing and desires" of other constituents should be irrelevant.  In this regard, this case is distinguishable from Enron.

53.    In Enron, Judge Gonzalez considered numerous parties' objections to the formation of an additional committee and found that the existing committee, containing several members of the objecting creditors' constituency, adequately represented the interests of that constituency.  He determined that the real basis for the request for a separate committee was to provide compensation for professionals taking action for one objecting constituency.    Judge Gonzalez held that the objecting constituency was not prevented from being independently represented and not prejudiced because it was in any event represented on the committee.  Id. at 693-94.  The

Subordinated Noteholders in this case have no effective representative on the existing committee. Thus, this case is distinguishable from Enron and their disenfranchisement should override any objection by any other constituency.

54.     The Official Committee does not state the basis of its objection to adding Law Debenture to its membership (or its refusal to permit Law Debenture *ex officio* membership for that matter). In the absence of an articulated basis for the Official Committee's objection, this Court should give it little or no weight. Indeed, it is not out the bounds of credulity to question whether the members of the Official Committee rejected inclusion of a Subordinated Noteholder voice in its deliberations (even on a non-voting basis) because they want to ensure the purportedly contractually or structurally senior debt takes all estate value under a plan. Such a Machiavellian approach would, after all, be entirely consistent with their individual economic interests, the law notwithstanding.

55.     The Debtors suggest that the interests of the Subordinated Noteholders are adequately represented by either by Wilmington Trust or Capital Research. Law Debenture submits that this Court should give the Debtors' opinion little or no weight as their views are so obviously guided by strategic considerations concerning the Cases rather than equitable concerns regarding the adequacy of creditor representation. Moreover, the Debtors' letter to the United States Trustee fails to address the legal infirmities, and the irreconcilable and debilitating conflicts, which prevent both Wilmington Trust and Capital Research from adequately representing the interests of the Subordinated Noteholders. Consequently, this Court should reject the position of the Debtors and find that the Official Committee as presently configured does not adequately

represent the interests of the Subordinated Noteholders.

**II.      The Court Should Order Law Debenture's
         Appointment Because Discretionary Factors
         Also Militate In Favor Of Such Appointment.**

56.      Judge Gonzalez in Enron found that, once representation is deemed inadequate, the court may consider additional "discretionary" factors. Id. at 685. Such discretionary factors include: (i) costs associated with the appointment; (ii) timing of the application; (iii) potential for added complexity; and (iv) presence of other avenues for creditor participation. Id. However, Law Debenture submits that these discretionary factors are typically applied in consideration of the appointment of a new separate committee to cure the inadequacy of representation. In the case at hand, Law Debenture is merely seeking to be appointed to the existing Official Committee -- the least disruptive, least expensive, and most appropriate remedy under the circumstances. The discretionary factors enumerated by Judge Gonzalez in Enron therefore should not be of particular import in this context.    Nonetheless, each of these discretionary factors, if considered by the Court in the instant case, likewise militate in favor of the appointment of Law Debenture to the Official Committee.

**A.      The Court Should Order Law Debenture's
         Appointment Because Its Inclusion On
         The Official Committee Will Reduce Costs.**

57.      Unlike the appointment of a separate committee, adding a committee member does not increase cost – it actually decreases costs. The committee forum will afford Law Debenture access to information regarding the Debtors without requiring the Debtors to respond to separate information requests from Law Debenture

and the Official Committee.  Moreover, disputes will be more efficiently resolved within the committee structure than by objections, court hearings and costly litigation.[11]

58.    Moreover, regardless of the priority of their claims, the Subordinated Noteholders may have a very different perspective on numerous other key issues in the Cases, the resolution of which are core to the Debtors' reorganization plans, necessarily impact the recovery of other creditor constituencies, and directly impact the ultimate recovery of the Subordinated Noteholders.   Appointing Law Debenture to the Official Committee will allow all other creditors presently represented on the Official Committee and Law Debenture to negotiate and perhaps resolve these potentially contentious issues without the attendant cost and delay of litigation.   Therefore, appointment of Law Debenture to the Official Committee will promote more time and cost efficient administration of the Cases.

## B.    The Court Should Order Law Debenture's Appointment Because The Request Was Timely.

59.    As evidenced by the attached correspondence between Law Debenture and the United States Trustee, as well as between Law Debenture and the Official Committee, Law Debenture has been timely in its application for appointment to the Official Committee.  Law Debenture has diligently pursued its request since the initial organizational meeting.  The Cases are still in the very early stages; therefore, adding Law Debenture to the Official Committee will not be overly disruptive.

---

[11]    For instance, the Subordinated Noteholders may assert that the subordination language contained in the Indenture is defective for a number of reasons, not the least of which is that it may violate the "rule of explicitness."  See In re Ionosphere Clubs, Inc., 134 B.R. 528 (Bankr. S.D.N.Y. 1991).  They also might have a view respecting value allocation in light of the "x-clause" contained in the Indenture's subordination provision.

C.    **The Court Should Order Law Debenture's
Appointment Because It Will Reduce Case Complexity.**

60.    Unlike the formation of a separate committee, appointing Law
Debenture to the Official Committee will not add any complexity to the Cases; rather, it
will enhance the most important function of the committee, which is to provide a forum
for negotiation and compromise among various creditor constituencies.  The formulation
of settlements and resolutions within the context of the Official Committee will, if
anything, decrease costs, streamline administration and reduce the complexity of the
Cases.

D.    **The Court Should Order Law Debenture's
Appointment Because Failure To Do So Will
Unfairly Prejudice the Subordinated Noteholders.**

61.    Finally, failure to appoint Law Debenture to the Official
Committee will unfairly prejudice the interests of the Subordinated Noteholders.  Law
Debenture will be forced to monitor and participate in the Cases from the "outside,"
incurring all of the attendant costs and expenses.   No other significant creditor
constituency is put in this disadvantaged position.

62.    While Law Debenture could attempt to monitor the Cases from the
outside, make appearances and be heard on matters, it would not (i) have the benefit of
advice and analysis from the many professionals retained by the Official Committee, (ii)
be privy to the same "inside" information, discussions and negotiations as other
committee members, and (iii) have strategic input on par with other committee members.
Its only real remedy will be to pursue a more litigious route in order to protect its
interests.  Law Debenture's creditor constituency would be unfairly burdened by the very
substantial costs of having to participate in these Cases in this manner, a burden not

shared by any other creditor constituency presently represented by the Official Committee. Thus, while there is "another avenue" by which Law Debenture could participate in the Cases, namely to attempt to monitor and participate in the case from the "outside" and litigate accordingly, such an avenue is not a substitute for committee representation.[12] As a practical matter, there is no other avenue for participation by Law Debenture that can redress the lack of adequate representation on the Official Committee.

## REQUEST FOR WAIVER OF MEMORANDUM OF LAW

63.    This Motion includes citations to the applicable authorities and does not raise any novel issues of law. Accordingly, Law Debenture respectfully requests that the Court waive the requirement contained in Rule 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York that a separate memorandum of law be submitted.

## NOTICE

64.    Notice of this Motion has been provided to all parties in interest, as set forth in the annexed service list. Law Debenture submits that no other or further notice need be provided.

65.    No previous request for the relief sought herein has been made to this or any other Court.

---

[12]    Indeed, taken to its logical conclusion, this argument could apply to any and all creditor constituencies, thereby eliminating the need for a creditor's committee entirely.

## <u>CONCLUSION</u>

**WHEREFORE,** Law Debenture respectfully requests that the Court enter an order directing the United States Trustee to appoint Law Debenture as a full, voting member to the Official Committee, and that this Court grant such other relief to Law Debenture as may be just and appropriate under the circumstances.

Dated:  New York, New York
       December  22, 2005

Respectfully submitted,

**BROWN RUDNICK BERLACK ISRAELS LLP**


By:    /s/ Robert J. Stark, Esq.
      Robert Stark (#3575)

Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile:  (212) 209-4801

- and -

Peter J. Antoszyk, Esq.
One Financial Center
Boston, Massachusetts 02111
Telephone: (617) 856-8200
Facsimile:  (617)  856-8201

Counsel for Law Debenture Trust Company of New York, as successor Indenture Trustee and Property Trustee for the 8.25% Junior Subordinated Note Due 2033 and the Adjustable Rate Junior Subordinated Note Due 2033

30