**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| DELPHI CORPORATION, *et al*., | Case No. 05-44481-RDD |
| Debtors. | (Jointly Administered) |

**LEAD PLAINTIFFS' MOTION TO COMPEL DEPOSITION TESTIMONY AND THE PRODUCTION OF DOCUMENTS IN CONNECTION WITH THE DEBTORS' APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(a), 328(a), AND 1107(b) AUTHORIZING EMPLOYMENT AND RETENTION OF DELOITTE & TOUCHE LLP AS INDEPENDENT AUDITORS AND ACCOUNTANTS TO DEBTORS, EFFECTIVE NUNC PRO TUNC TO OCTOBER 8, 2005 AND OBJECTIONS FILED THERETO**

**TO THE HONORABLE ROBERT D. DRAIN**
**UNITED STATES BANKRUPTCY JUDGE**

The Teachers' Retirement System of Oklahoma, the Public Employees' Retirement System of Mississippi, Raiffeisen Kapitalanlage-Gesellschaft m.b.H. and Stichting Pensioenfonds ABP (collectively, "Lead Plaintiffs"), the Court-appointed Lead Plaintiffs in the consolidated securities class action entitled *In re Delphi Corp. Securities Litigation*, Master File No. 1:05-CV-2637 (NRB)(SDNY) (the "Securities Litigation"), in connection with Lead Plaintiffs' Objection (the "Objection") to The Debtors' Application For Order Under 11 U.S.C. §§ 327(A), 328(A), And 1107(B) Authorizing Employment And Retention Of Deloitte & Touche LLP As Independent Auditors And Accountants To Debtors, Effective Nunc Pro Tunc To October 8, 2005 (the "Deloitte Application") hereby move for entry of an order, under Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") 7034 and 7037, made applicable hereto by Bankruptcy Rule 9014(c) and Fed. R. Civ. P. 37(a) to compel Delphi Corporation ("Delphi") and its Affiliated Debtors (collectively, the "Debtors") to: (1) produce documents in

response to Lead Plaintiffs' Discovery Requests; (2) provide answers to certain questions posed

to Robert J. Dellinger, Delphi's Chief Financial Officer, during his December 20, 2005

deposition, in which he was instructed by counsel not to answer or otherwise unlawfully asserted

claims of attorney-client privlege; and (3) compel the depositions, and appearance at trial, of

members of Delphi's Audit Committee, who possess exclusive knowledge of facts necessary to

resolve the Objection to the Deloitte Application.  In support of their Motion, Lead Plaintiffs

represent as follows:

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding

pursuant to 28 U.S.C. § 157(b)(2).

2.     The statutory predicates for the relief sought herein are Bankruptcy Rules 7034,

7037 and 9014(c).

## PRELIMINARY STATEMENT

3.     On November 23, 2005, Debtors filed their Application for Order Under 11

U.S.C. §§ 327(a), 328(a) and 1107(B), Authorizing Employment and Retention, Nunc Pro Tunc

to October 8, 2005, of Deloitte & Touche LLP as Independent Auditors and Accountants to

Debtors (Deloitte & Touche LLP hereinafter is referred to as "Deloitte," and Debtors'

application to retain Deloitte will be referred to as the "Deloitte Application").  (*In re Delphi

Corp*., Dkt # 1222).  On December 2, 2005, Lead Plaintiffs timely filed their Objection to the

Deloitte Application.  (Dkt #1401).

4.     On December 15, 2005, in an effort to ascertain information relevant to their

Objection, Lead Plaintiffs propounded limited discovery on Debtors and requested a handful of

depositions.  This discovery sought information on one topic:  whether Debtors properly

considered Deloitte's pre-petition performance as auditor – which culminted in a massive, five-

year accounting restatement and an admission by Delphi that it lacked internal controls – in

asking this Court to approve its application to retain Deloitte as its auditor for 2005 and

thereafter.  Remarkably, Debtors responded to these straightforward requests with an outright

refusal to provide Lead Plainitffs any of this highly germaine information.

5.      Debtors' tactics included:  (1) objecting wholesale to Lead Plaintiffs' narrowly

tailored document requests; (2) repeatedly questioning Lead Plaintiffs' motives in filing the

Objection, insisting it was merely a hopeful end-run around the Private Securites Litigation

Reform Act of 1995 ("PSLRA") discovery stay, even though Lead Plaintiffs have executed

without modification Debtors' Confidentiality Order; (3) refusing to produce the Audit

Committee members – the actual decision-makers regarding the retention of Deloitte – for

deposition; and (4) coaching a deponent via baseless claims of attorney-client privilege and

instructing a deponent not to answer questions concerning Deloitte's pre-petition conduct as

beyond the scope of the Objection.

6.      This Court cannot countenance such obstructionist tactics by Debtors.  In light of

Deloitte's recent performance, for which Delphi is the subject of ongoing investigations by the

Securities Exchange Commission ("SEC"), United States Department of Justice and Federal

Bureau of Investigation, among others, permitting Debtors to avoid providing such basic

information would effectively convert the application process into a rubber-stamp.  It is difficult

to conceive of a more appropriate inquiry into a decision of a debtor to retain a professional than

the case of Debtors' application to retain Deloitte.

7.      As such, Lead Plaintiffs have been compelled to file this Motion.

**<u>BACKGROUND</u>**

8.        On November 23, 2005, Delphi filed the Deloitte Application and sought a

hearing date on the application of January 5, 2005.  In the Deloitte Application, Debtors

requested authoritzation to "employ and retain Deloitte and Touche as their independent auditors

and accountants in these Chapter 11 cases, effective nunc pro tunc to October 8, 2005."  Deloitte

Application at 6-7.  According to Debtors, the reasons for seeking authorization to employ

Deloitte were, in sum, that Deloitte "has considerable knowledge concerning the Debtors and is

already familiar with the Debtor's business affairs to the extent necessary for the scope of the

proposed services . . . Deloitte is also well-qualified by reasons of its experience in delivering

accounting and auditing services in chapter 11 cases" and "Debtors believe that Deloitte &

Touche's unique experience, factual knowledge of the Debtor's operations, and economies of

scale could not be replicated elsewhere, even at substantially greater cost to the Debtors."  *Id*. at

8.

9.        Omitted from the Deloitte Application is any mention by Debtors that they had

been actively soliciting bids from the other "Big Four" accounting firms (including their eventual

selection, Ernst & Young) to perform their external audits for 2006 and thereafter.  Dellinger Tr.

at 16:22 – 17:5.  Even more conspicuous is the absence of any mention that, on Deloitte's watch,

Delphi engaged in one of the largest corporate frauds of our era, a fraud harming tens of

thousands of workers and shareholders.

10.        On December 2, 2005, alarmed that Debtors' application to rehire Deloitte for

2005 and thereafter lacked any indication that Delphi had considered the full implications of

Deloitte's retention, Lead Plaintiffs filed their Objection to the Deloitte Application.  In their

Objection, Lead Plaintiffs maintain that the Deloitte Application must be denied because: 1)

4

Debtors have not met their burden of demonstrating Deloitte's competence to serve as auditors given their grave, repeated failure to conduct Delphi audits in accordance with Generally Accepted Auditing Standards ("GAAS"); 2) Debtors have not shown that Deloitte is a "disinterested" person under 11 U.S.C. §101(14)(C), as Debtors' retention of Deloitte raises fundamental cross-cutting conflicts of interest; and 3) the Application fails to provide the most basic details concerning the relationship between Deloitte's current engagement team and the teams involved in Debtors' pre-petition engagements.

11.    On December 13, 2005, Delphi announced that it had hired Ernst & Young to perform its audit for the year-ended December 31, 2006.  Thus, despite having sought permission in the Deloitte Application to retain Deloitte to audit its financial statements during the pendency of the bankruptcy and touted Deloitte's expertise with respect to auditing clients in Chapter 11 proceedings, Debtor replaced Deloitte with Ernst & Young as auditor for 2006.  *See* Form 8-K, annexed as Exhibit A.  The announcement indicated that Delphi still sought to retain Deloitte for the 2005 audit.  However, Debtors failed to modify their Application to account for this change or, provide any justification for retaining Deloitte for 2005.

12.    On December 15, 2005, pursuant to Local Rule 7007-1, Lead Plaintiffs and Debtors held a telephonic meet and confer in an attempt to resolve discovery issues in advance of the January 5, 2006 hearing.  In addition, the parties discussed Lead Plaintiffs' Objection, whether the Debtors would agree to withdraw their Application in light of the Objection and the decision to retain Ernst & Young for the 2006 audit.

13.    During the meet and confer, Lead Plaintiffs requested depositions of members of Delphi's Audit Committee – the individuals who decided to retain Deloitte for the 2005 audit. Rather than make any members of the Audit Committee available for deposition, separately,

5

Debtors offered to only make Robert J. Dellinger, Delphi's recently appointed Chief Financial

Officer, available for a deposition on December 20, 2005 from 1 p.m. to 5 p.m.. Delphi refused

to make the Audit Committee members available, asserting that Dellinger could testify as to all

information germaine to the Deloitte Application and the Objection.

14.     On December 15, 2005, shortly after the meet and confer, Lead Plaintiffs wrote to

Debtors with a focused discovery request, containing several interrogatories and document

requests, to obtain basic information relating to the Objection.  *See* Letter from James J. Sabella,

Esq. to John Wm. Butler, Jr., Esq. *et al* of Dec. 15, 2005 (attached as Exhibit B) (hereinafter the

"Discovery Request").

15.     The Discovery Request sought, *inter alia*: (1) the identities of the Deloitte

personnel who worked on Deloitte's pre-petition engagements and those that Debtors anticipated

would work on Deloitte's post-petition engagement; (2) documents relied upon by Delphi's

Audit Committee in concluding that Delphi did not have adequate controls relating to accounting

for certain transactions as stated in various SEC filings; (3) documents relating to Deloitte's pre-

petition audits of Delphi, including documents relating to Delphi's June 30, 2005 restatement of

its financial statments; and (4) documents relating to Delphi's decision not to retain Deloitte

through December 31, 2006.  In addition, the Discovery Request reiterated the request made at

the meet and confer that Delphi's counsel inform Lead Plaintiffs' counsel whether they would

accept trial subpoenas for the members of Delphi's Audit Committee.

16.     On December 19, 2005, Debtors provided responses and objections to Lead

Plaintiffs' Discovery Requests.  *See* Letter from Lynette C. Kelly, Esq. to Stuart M. Grant, Esq.

and James J. Sabella, Esq. of December 19, 2005 (attached as Exhibit C) (hereinafter "Debtors'

Responses and Objections").  Specifically, Debtors generally objected to all requests claiming

that such requests were an "improper attempt to obtain discovery of the Debtors for purposes of

*In re Delphi Corp. Securities Litigation* . . . which action has been stayed  . . . by operation of

Section 362(a) of the Bankruptcy Code and which discovery has been stayed generally by the

operation of the Private Securities Litigation Reform Act." *Id.* at 2.  Debtors also reiterated their

refusal to produce any member of Delphi's Audit Committee for deposition by Lead Plaintiffs.

*Id.* at 3.  In addition, Debtors represented that they would only accept trial subpoenas for

members of the Audit Committee if Lead Plaintiffs waived their right to discovery.  However,

Debtors stated they would consider the subpoenas served on the members of the Audit

Committee at their respective personal residences, and that Debtors would preserve all objections

to trial subpoenas.  This clearly signaled Debtors' intent to preclude Lead Plaintiffs' access to the

Audit Committee.

        17.    With respect to the proposed deposition of Robert Dellinger, Debtors indicated

that Dellinger would be available only to answer questions "regarding the subjects that will be

addressed in his affidavit to be filed in support of the Deloitte Application, i.e., the necessity of

retaining Deloitte & Touche to complete the 2005 audit and the severe prejudice to the Debtors if

the Deloitte Application is denied." *Id.* at 3-4.  In other words, Dellinger would not testify

regarding any questions posed that, in Debtors' opinion, exceeded the scope of Lead Plaintiffs'

Objection.

        18.    On December 20, 2005, mere hours before the scheduled Dellinger deposition,

Debtors hurriedly circulated a Stipulation and Agreed Protective Order Governing Production

and Use of Confidential and Highly Confidential Information in Connection with the Debtors'

Application and Lead Plaintiffs' Objection (attached as Exhibit D) (hereinafter the

"Confidentiality Order").  Debtors demanded the signatures of Lead Plaintiffs' counsel as a

condition to the deposition occurring as scheduled.

19.    The Confidentiality Order included language precluding disclosure of information "in connection with *In re Delphi Corp. Securities Litigation*."  Confidentiality Order at 4-5. Despite this, Lead Plaintiffs proceeded with the deposition of Robert J. Dellinger on December 20, 2005, at 1:00 p.m. at the offices of Debtors' Counsel.[1]  (Transcript of the Dellinger Deposition attached as Exhibit E.)

20.    At the commencement of the deposition, Debtors' counsel defined the scope of the deposition as follows:

> First of all, I would just like to say that clarify that Mr. Dellinger is appearing today not as a 30(b)(6) witness, but rather in his individual capacity.  In addition, we forwarded the lead plaintiffs a letter stating some objections regarding the scope of discovery stating that Mr. Dellinger would  be produced today to answer questions regarding the application for retention of Deloitte & Touche, and the topics we believe fell within that scope were the topics we will be submitting an affidavit on, which are the necessity of the retention and its hardship to the debtors in the absence of that retention if it was denied.

Dellinger Tr. at 5:6 - 20.

21.    Thus, not only did Debtors admit that Dellinger was not the person with knowledge of the substance of the Deloitte Application, they also refused to permit any questioning relating to the substance of the Objection.

22.    During the deposition, as set forth more fully below, counsel for Debtors lodged repeated objections based on their unilateral determination of the deposition's scope, and on the ground that Lead Plaintiffs' questions called for testimony protected under the attorney/client privilege.  Moreover, rather than object and permit their client to answer, Debtors' counsel repeatedly instructed Dellinger not to answer Lead Plaintiffs' questions.

---

[1]  Debtors' Counsel refers to Shearman & Sterling LLP.

## **RELIEF REQUESTED**

23.     Lead Plaintiffs request that this Court compel Debtors to provide the following:

a.      Documents responsive to the document requests contained in Lead Plaintiffs' Discovery Request;

b.      Complete responses to the interrogatories contained in Lead Plaintiffs' Discovery Request;

c.      A second deposition of Robert J. Dellinger (or another qualified deponent) to provide full and accurate answers to Lead Plaintiffs' questions about the following topics:

    i.      the content of pre and post-petition Audit Committee meetings about the process used either for hiring Deloitte for Debtors' 2005 audit, or for replacing Deloitte with another auditor for Debtors' 2006 audit and thereafter;

    ii.     the content of pre and post-petition Audit Committee meetings and communications about any outside investigations into the Company's accounting procedures, its internal controls, and Deloitte's audit(s) thereof;

    iii.    the content of pre and post-petition Audit Committee meetings and communications about any outside investigations into the Company's accounting and Deloitte's audit(s) thereof;

    iv.     the content of pre and post-petition Audit Committee meetings and communications about or with Deloitte referring to Deloitte's safeguards,

before, during and after the June 30, 2005 Restatement, against the

recurrence of those accounting problems, manipulations and / or frauds

detailed in the June 30, 2005 Restatement;

    v.    pre and post-petition discussions at Delphi regarding Deloitte's failure to

identify weaknesses in Delphi's internal controls, which are clearly

relevant to Deloitte's competence to continue as Debtors' auditor; and

    vi.    pre and post-petition discussions at Delphi regarding the Audit

Committee's investigation that eventually led to the Company's 2005

restatement of its financial statements.

    d.    an order compelling the Debtors' to make available members of its Audit

Committee for deposition by Lead Plaintiffs relating to the Objection, and, if necessary, for the

hearing on the Deloitte Application.

## BASIS FOR RELIEF

    24.    Lead Plaintiffs simply need to know whether Debtors properly considered

Deloitte's pre-petition performance as auditor – which culminated in a massive, five-year

accounting restatement and an admission by Delphi that it lacked adequate internal controls – in

asking this Court to approve its application to retain Deloitte for 2005 and thereafter.   Yet,

Debtors have prevented any meaningful inquiry by Lead Plaintiffs.  First, Debtors have

improperly objected to Lead Plaintiffs' narrowly tailored document requests by impermissibly

limiting the scope of Lead Plaintiffs' inquiry into Deloitte's qualifications to serve as auditor,

and its ability to conduct a conflict-free audit of the Company's financials; second, Debtors have

sought to shield their decision-making processes regarding the retention of Deloitte by

disingenuously asserting that Lead Plaintiffs are attempting to avoid the PSLRA discovery stay;

third, Debtors have refused to permit the deposition of members of the Company's Audit

Committee, who were the primary decision-makers in retaining Deloittte, in an effort to conceal

the deliberations regarding the appropriateness of Deloitte's retention; and fourth, to the extent

that Debtors have unilaterally offered a witness—Delphi's Chief Financial Officer—to speak to

the decision to retain Deloitte, they have improperly limited his testimony through baseless

objections.

### I.    Debtors Have Improperly Objected To Lead Plaintiffs' Discovery Requests

25.    Lead Plaintiffs served Debtors with Discovery Requests narrowly tailored to

obtain evidence clearly relevant to Lead Plaintiffs' contentions that Deloitte is neither

sufficiently disinterested nor demonstrably competent to serve as Debtors' auditor and

accountant.  Specifically, Lead Plaintiffs requested, *inter alia*: (1) documents pertaining to

Delphi's March 2005 admission that it had poor internal controls; (2) documents pertaining to

Delphi's admission that it was required to restate its financial statements, which had been audited

by Deloitte; (3) Audit Committee minutes; (4) documents pertaining to passages containing

specific audit-related admissions in Delphi's June 30, 2005 restatement of its financial

statements (the "2005 Restatement"); (5) documents reviewed by Deloitte relating to transactions

discussed in the 2005 Restatement; and (6) engagement letters and documents pertaining to

Deloitte's retention and its review of Delphi's financial reporting systems.  *See* Lead Plaintiffs'

Discovery Requests (Exhibit B) at 2-7.  Each of these requests was intended to obtain evidence

relevant to the Deloitte Application – evidence that could either undermine or support the

Deloitte Application.

26.    In response, Debtors did not produce a single document.  Rather, they responded

by condensing an astonishing thirteen separate (but equally unavailing) objections into the

following single paragraph:

> The Debtors object to providing the information in documents
> sought in request number 3 (including all sub parts thereof) as an
> apparent but improper attempt to obtain discovery of the Debtors
> for purposes of *In re Delphi Corp. Securities Litigation*… which
> action has been stayed against the Debtors by operation of Section
> 362(a) of the Bankruptcy Code and which discovery has been
> stayed generally by operation of the Private Securities Litigation
> Reform Act.  The matters sought are also beyond the scope of
> permissible discovery on the Deloitte Application, and the requests
> are unduly burdensome and oppressive, especially in light of the
> lack of relevance to the Deloitte Application and the legal
> standards applicable thereto.  The requests are also unduly
> burdensome to the extent that they seek potentially thousands of
> documents over a number of years to be produced in
> approximately one business day.  The Debtors further object to the
> extent that the requests are vague, ambiguous and overbroad, or
> call for the production of documents that are protected by the
> attorney-client privilege, the attorney work product doctrine, or
> that are protected by any other applicable privilege, doctrine or
> immunity.

Debtors Responses and Objections (Exhibit C) at 2.

27.     Several of Debtors' boilerplate objections – those pertaining to vagueness,
ambiguity and, in particular, privilege – merit little discussion, as Lead Plaintiffs' document
requests are straightforward and do not remotely contemplate that Debtors should produce
privileged materials.  Those relating to scope and to the bankruptcy and PSLRA discovery stays
are discussed below.

28.     With respect to Debtors' relevance objection, the Discovery Request is designed
to obtain information relevant to and probative of a determination whether Debtors have met
their burden of showing that Deloitte is competent and disinterested.  Indeed, the Federal Rules
provide, in pertinent part, that a party may obtain discovery "regarding any matter, not
privileged, which is relevant to the subject matter involved in the pending action…."  Fed. R.
Civ. P. 26(b)(1), made applicable by Bankruptcy Rule 7026.  Lead Plaintiffs' interrogatories and

document requests go directly to the heart of whether Debtors properly considered Deloitte's

highly suspect pre-petition conduct in applying to retain the auditors for 2005.

29.     Lead Plaintiffs have asked Debtors to identify "(a) Deloitte professional personnel

who worked on Deloitte's pre-petition Delphi engagements" and "(b) Deloitte professional

personnel who it is anticipated will work on Deloitte's engagements for the Debtor." Discovery

Request (Exhibit B) at 2. This information is necessary to ascertain whether: (1) Debtors' claim

that Deloitte is uniquely qualified to perform the 2005 audit based on its institutional knowledge

of Debtors' business is valid; and (2) the individuals who are responsible for the 2005

Restatement are the same individuals that Debtors intend to retain for the 2005 audit.

30.     In response to this interrogatory, Debtors list only the names of three Deloitte

partners and otherwise object to this simple interrogatory as "overbroad and unduly burdensome

to the extent it seeks the identity of each and every Deloitte & Touche professional that has at

any time worked or will work on Deloitte's engagements for the Debtors…." Responses and

Objections (Exhibit C) at 2. Debtors need only compile Deloitte's annual or quarterly invoices

to Delphi to provide the information Lead Plaintiffs have requested. Instead, they posture as if

beset by a Herculean feat of fact discovery. The Court should reject Debtors' disingenuous

objection and compel them to respond fully to Lead Plaintiffs' straightforward interrogatory.

## II.     Debtors Have Sought to Shield its Decision-Making Processes Regarding the Retention of Deloitte by Disingenuously Asserting that Lead Plaintiffs are Attempting to Avoid the PSLRA Discovery Stay

31.     As a basis for withholding discovery from Lead Plaintiffs, Debtors assert that

Lead Plaintiffs are seeking to circumvent the automatic discovery stay provisions of the PSLRA.

This assertion is unfounded. First, at Debtors' insistence, on December 20, 2005, Lead Plaintiffs

signed the Confidentiality Order. With respect to the use of "discovery requested and other

information provided in connection with" these proceedings, the Confidentiality Order provides,

in pertinent part, as follows:

> 7.      Confidential Information and Highly Confidential
> Information, or any information derived therefrom, shall be used or
> disclosed by a receiving Party solely for the purpose of the D&T
> Application, including litigation or negotiation of any objections
> thereto, and not for any other purpose whatsoever**. For the
> avoidance of doubt, Confidential Information and Highly
> Confidential Information, or any information derived
> therefrom, shall not be used or disclosed in connection with *In
> re Delphi Corp. Securities Litigation*, Master File No. 1:05-CV-
> 2637 (NRB)(SDNY).**  Any person receiving Confidential
> Information or Highly Confidential Information shall not reveal or
> discuss such information to or with any person who is not entitled
> to receive such information.

Confidentiality Order (Exhibit D) at 1, 4-5 (emphasis added).

32.      The Debtors specifically inserted the phrase "For the avoidance of doubt"

presumably to avoid any doubt over the Lead Plaintiffs' use of information in the ongoing

Securities Litigation.[2]  Nonetheless, having demanded and received the executed Confidentiality

Order from Lead Plaintiffs, Debtors still refuse to produce evidence that is clearly relevant to the

Objection.  Given the protections Debtors have secured, there is no plausible justification for

their continued intransigence.  The Confidentiality Order was written and prepared by Debtors

specifically for the purpose of dealing with discovery related to the Deloitte Application.  Lead

Plaintiffs have signed this document.  Thus, any concerns raised in connection with the use of

---

[2] Debtors even modified the Confidentiality Order specifically for this objection.  *See* email, Jill
Frizzley, Esq., Shearman & Sterling LLP to James J. Sabella, Esq., *et al*, December 20, 2005,
attaching Confidentiality Order and stating that it "is identical to the stipulation and order that
was executed in connection with your client's objection to the KECP Motion, other than one
**additional sentence in paragraph 7:  "For the avoidance of doubt, Confidential
Information and Highly Confidential Information, or any information derived therefrom,
shall not be used or disclosed in connection with In re Delphi Corp. Securities Litigation,
Master File No. 1:05-CV-2637 (NRB)(SDNY).**" Please execute and return your signature pages
to me in advance of the Dellinger deposition scheduled for today at 1:00 pm." (attached as
Exhibit F) (emphasis added).

documents and information requested through Lead Plaintiffs' Discovery Request are resolved

by the execution of the Confidentiality Order.  Moreover, the mere fact that Lead Plaintiffs are

prosecuting the Securities Litigation does not preclude them, as creditors and parties in interest

in this Chapter 11 proceeding, from demanding relevant information in connection with their

bona fide objection to the Deloitte Application.  Accordingly, Debtors' objections on this basis

are devoid of merit and should be overruled.

### III.    Debtors Have Refused to Permit the Deposition of the Company's Audit Committee in an Effort to Conceal Debtors' Deliberations Regarding Deloitte's Suitability

33.    Lead Plaintiffs requested that Debtors make available the members of the Audit

Committee for deposition in order to ascertain whether any consideration was given to the issues

raised in Lead Plaintiffs' Objection, namely the competency of Deloittte in light of the audit

deficiencies that resulted in the 2005 Restatement, and the disinterestedness of Deloitte, given

that (a) it has been named in a securities fraud suit arising from its failure to properly audit

Delphi's financial statements; and (b) that there are pending governmental investigations

regarding the Debtors' accounting practices.  Rather than permit Lead Plaintiffs to depose the

Audit Committee, the primary decision-makers regarding matters relating to the retention of

outside auditors, Debtors merely allowed Lead Plaintiffs to depose Robert Dellinger, Delphi's

CFO as of October 10, 2005.

34.    In offering Dellinger for deposition, Debtors indicated that Dellinger would be

available only to answer questions "regarding the subjects that will be addressed in his affidavit

to be filed in support of the Deloitte Application, i.e., the necessity of retaining Deloitte &

Touche to complete the 2005 audit and the severe prejudice to the Debtors if the Deloitte

Application is denied."  Exhibit C at 3-4.  In other words, Dellinger would simply not testify

regarding any questions posed that, in Debtors' opinion, exceeded the scope of Lead Plaintiffs'

Objection.

35.     Notwithstanding Debtors' improper limitation on the scope of Dellinger's

deposition, it is clear from Dellinger's testimony that he is unable to provide critical information

relevant to Lead Plaintiffs' Objection and that this information is solely within the knowledge of

the members of Delphi's Audit Committee.

36.     For example, Dellinger testifed that he had no personal knowledge of why the

Deloitte Application sought the appointment of Deloitte for 2005 and thereafter, when in fact, he

testified, a process had begun two months prior to his arrival to replace Deloitte as 2006 auditor.

*See* Dellinger Tr. at 16:22 – 17:5.

37.     When asked about his involvement in the decision to retain Deloitte for 2005,

Dellinger conceded that his involvement with this decision and interaction with the Audit

Committee on this point was limited to the "last maybe week and a half, two weeks."  Dellinger

Tr. at 34:19-20.

38.     Regarding this recent dialogue, Dellinger could not recall conversations he

*admitted* having with the Chairman of the Audit Committee concerning his personal assurance to

Deloitte that they would be hired for 2005.  He testified that he had conversations with the Audit

Committee and with Brock Plumb, the Deloitte audit partner, outside audit committee meetings

"because Deloitte expressed concerns about whether or not they're going to get retained and paid

for work performed in 2005."  Dellinger Tr. at 34:25-35:3, 36:3-7.  He testified that he conveyed

Deloitte's concerns to Bob Brust, Chairman of the Audit Committee, but could not recall what

Brust said to him.  Dellinger Tr. at 38:1-8.

39.     As for documents, other than his supposedly forthcoming affidavit concerning

Debtors' purported hardship if Deloitte is not retained, Dellinger could not identify and has not

produced a single document or memorandum that discussed the retention of Deloitte as auditor

for 2005.  Dellinger Tr. at 32:25 – 33:6.

40.    **[REDACTED PURSUANT TO CONFIDENTIALITY ORDER]**

41.    In short, Dellinger, has no personal knowledge relevant to the measures that the

Debtors have taken, if any, to adddress the competency and conflict issues raised in Lead

Plaintiffs' Objection.  For this reason, it is necessary for Lead Plaintiffs to depose the members

of Delphi's Audit Committee.

**IV.    To the Extent that Debtors Have Unilaterally Offered a Witness—Delphi's Chief Financial Officer—to Speak to the Decision to Retain Deloitte, They Have Improperly Shielded his Testimony through Improper Objections Based on Attorney Client Privilege and the Scope of Relevant Inquiry**

42.    In an effort to further shield Lead Plaintiffs (and the Court) from relevant

information concerning Debtors' deliberations and ultimate decision to retain Deloitte for the

2005 audit, counsel for Debtors instructed Dellinger not to answer numerous relevant questions

by baselessly invoking the attorney-client privilege and limiting the scope of his responses.

43.    On four separate instances, Dellinger was instructed not to answer a question

purportedly because an attorney was merely present during the discussion.  Dellinger Tr. at 19:4-

12; 22:2-6; 22:15-16; 29:18-30:10.  For example, Lead Plaintiffs attempted to inquire into the

details of Debtors' December 6-7, 2005 Audit Committee meetings, during which Debtors

apparently reached the decision to retain Ernst & Young, rather than Deloitte, to perform their

2006 year-end audit.  After noting that two of Debtors' in-house counsel – Marjorie Loeb and

David Sherbin - were present at the meeting, Dellinger answered several questions about the

content of those meetings without objection from Debtors' counsel.  When Lead Plaintiffs'

counsel asked a follow-up question, Debtors' counsel objected, stating:

I'll object to that question to the extent that it would require the

> witness to reveal attorney-client communications, from his
> previous description of the meeting he attended, I believe it was a
> meeting with counsel.  So I would caution the witness not to reveal
> any such information.  And I object to the question and instruct the
> witness not to answer to the extent that it does**.  I instruct the
> witness not to answer** as the question calls for the disclosure of
> communications protected by the attorney client privilege.

Dellinger Tr. at 16.

44.    In response to Lead Plaintiffs' counsel's question, "Was it the subject of any discussion [by the Audit Committee] as to whether or not there was any question of retaining Deloitte for the 2005 audit," counsel for Debtors instructed Dellinger not to answer the question on grounds that an attorney was present during the discussion.  Dellinger Tr. at 21:23-22:6.

45.    In response to the question of whether at the December 6, 2005 audit committee meeting, which Dellinger testified to attending, "was there anyone who advocated staying with Deloitte for the 2006 audit," counsel for Debtors once again baldly asserted that "the answer to the question would necessarily reveal attorney-client communications.  The people present were counsel and the audit committee and Mr. Dellinger, and so we would believe that is a privileged communication."  Dellinger Tr. at 30:3-8.

46.    Indeed, taking a cue from his counsel's repeated objections, when asked, "Prior to, or apart from the audit committee meeting on December 6th, did you have any conversations with anyone other than counsel concerning the question of whether or not Deloitte should be retained for the 2005 audit", Mr. Dellinger immediately answered, "Those conversations would have been with counsel present."  Dellinger Tr. at 22:15-16.

47.    It is clear that Debtors' counsel's objections based simply on the presence of counsel at these audit committee meetings were improper.  A party seeking to invoke a privilege has the burden of demonstrating its applicability to particular communications.  *Renner v. Chase*

18

*Manhattan Bank*, no. 98 Civ. 926, 2001 WL 388044, *1 (S.D.N.Y. April 17, 2001).  In cutting

off Dellinger's testimony on this and several other occasions, Debtors' counsel did not assert, as

the Bankruptcy Rules and Federal Rules require, that the allegedly privileged communications

were made to obtain legal advice.[3]  Of course, such an assertion would have been highly

implausible, as the purpose for the meeting was to choose an auditor, a quintessential business

decision, not a legal question.

48.      Even Debtors would concede that the mere presence of an attorney is no basis for

asserting privilege over communications conveyed during a meeting.  *See Duttle v. Bandler &*

*Kass*, 127 F.R.D. 46, 52 (S.D.N.Y. 1989) (requiring production of documents and holding that

"the mere presence of an attorney at a meeting does not render the notes of the discussion

privileged unless they reflect communciations made to obtain his advice."); *Renner*, 2001 WL

388044, at * 1 (same, citing *Duttle*, *supra*); *Hal. Pollock v. U.S*., 202 F.2d 281, 286 (2d Cir.

1953) ("The privilege accorded to communications between attorney and client does not apply

except where the attorney acts in his professional capacity.  Where the attorney is a mere

scrivener… it has been held that communcations to an attorney are not privileged.").  But this

was exactly the basis for Debtors' repeated objections.  *See, e.g.,* Dellinger Tr. at 21:21-25; 22:9-

10; 46:11-17; 48:17-23.  To go one step further, as Debtors' counsel did, and instruct a witness

not to answer on this spurious legal basis is a flagrant violation of the provisions of Bankruptcy

Rule 7030 and Fed. R. Civ. P. 30(d)(1).  The Court should not ratify Debtors' improper

instructions.

49.      Counsel for Debtors not only improperly invoked the attorney-client privilege in

---

[3]  Fed. R. Civ. P. Rule 30(d)(1) provides: "Any objection during a deposition must be stated concisely and in a non-argumentative and non-suggestive manner.  A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation directed by the court, or to present a motion under Rule 30(d) (4)."

shielding relevant information from Lead Plaintiffs, they also instructed Dellinger was instructed

not to answer relevant questions based on counsel's unilateral assessment that the inquiry was

outside the scope of permissible discovery.   In fact, none of these objections were proper as

Lead Plaintiffs' inquiries, as set forth below, were narrowly tailored to seek information

regarding Deloitte's competency to conduct the 2005 audit.  For example, in response to Lead

Plaintiffs' question, "Do you have any idea why Deloitte failed to uncover the true nature of the

inventory disposal transactions referred to on page 22 of the 10-K?", counsel for Dellinger

interposed the following objection: "I will object to form to the extent that this is misstating this

document. Counsel is rephrasing it. And I will also further object that it would call for the

witness to reveal attorney-client communication. Further, that this and similar questions are

outside the scope of appropriate discovery on the retention application."  Following this cue,

Dellinger responded, " **I will elect not to answer as it is outside the scope on the advice of**

**counsel."** Dellinger Tr. at 55:1-11.

50.     Counsel for Debtors also instructed Dellinger not to answer questions regarding

the Audit Committee's conclusions about actual deficiencies in Delphi's internal controls even

though these internal controls should have been reviewed and tested by Delphi: "This whole line

of questioning regarding internal controls we believe is outside the scope and relates rather to --

if to anything, to your lawsuit and, therefore, you know, we believe it's objectionable. And we

would -- if we go forward on this -- we would -- I'd have to instruct the witness not to answer

and to make a motion under 70 30 D 4 . . . **I'll have to instruct the witness not to answer."**

Dellinger Tr. at 68:10-18.

51.     Indeed, despite the relevance of whether Deloitte adequately performed its audit

for 2004, counsel for Debtors maintained their spurious objections.  In response to the following

question, "Now, for the years 2002 and 2003, did Deloitte provide to Delphi management letters or other similar reports on Delphi's internal financial controls?", counsel for Debtors responded as follows: "I will object to that question as outside the scope of discovery on the Deloitte & Touche application for retention for 2005.  **And, again, instruct the witness not to answer so that we can seek a protective order under 70 30 D 4."**  Dellinger Tr. at 69:21-70:1.

52.    Similarly, in response to the question, "Are you aware, sir, whether or not Deloitte called to the company's attention in its management letters for 2002 and 2003 and 2004, the material weaknesses in internal controls that are described in the 10-K which we marked as Exhibit 3?", counsel for Debtors responded, " **I have the same objection and the same instruction."**  Dellinger Tr. at 70:8-9.

53.    The relevance of the information sought in the above inquiries to the competence of Deloitte in performing the 2005 audit, or its potential conflicts in uncovering further evidence of its failures to properly audit previous years financials, cannot be disputed.  It is abundantly clear that if Deloitte failed to discover major weaknesses in internal controls at Delphi during the period of its audit engagement, it should not be performing Delphi's audit for 2005, or thereafter. Thus, at a minimum, in order to properly evaluate Deloitte's competance before Debtors incur further unnecessary expenses by retaining Deloitte, Debtors should be required to answer whether it has properly considered Deloitte's competency to peform its 2005 audit, or address Deloitte's conflicts that may impact its ability to conduct its audit.

## <u>WAIVER OF MEMORANDUM OF LAW</u>

54.    The legal points and authorities upon which this Motion relies are set forth and incorporated herein.  Accordingly, Lead Plaintiffs respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local

Rules for the United States Bankruptcy Court for the Sothern District of New York be deemed

satisfied.

## CONCLUSION

WHEREFORE, Lead Plaintiffs respectfully request that this Court provide the relief

requested above, and any other relief as is just and proper.

Dated:  December 23, 2005                           Respectfully submitted,

**LOWENSTEIN SANDLER, PC**

By:  /s/ Michael S. Etkin
Michael S. Etkin, Esq. (ME 0570)
Ira M. Levee, Esq. (IL 9958)
Thomas A. Pitta, Esq. (TP 3018)
1251 Avenue of the Americas, 18th Floor
New York, New York 10019
(212) 262-6700 (Telephone)
(212) 262-7402 (Facsimile)
                and
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Bankruptcy Counsel for Lead Plaintiffs and the*
*Prospective Class*
**NIX, PATTERSON & ROACH, L.L.P.**
Jeffrey J. Angelovich, Esq.
Bradley E. Beckworth, Esq.
Susan Whatley, Esq.
205 Linda Drive
Daingerfield, Texas 75638
(903) 645-7333 (Telephone)
(903) 645-4415 (Facsimile)

**BERNSTEIN LITOWITZ BERGER &**
**GROSSMAN, LLP**
John P. Coffey, Esq. (JC 3832)
Hannah E. Greenwald, Esq. (HG 5180)
Mark D. Debrowski, Esq. (MD 3968)
1285 Avenue of the Americas
New York, New York 10019

(212) 554-1400 (Telephone)
(212) 554-1444 (Facsimile)

**GRANT & EISENHOFER, P.A.**
Stuart M. Grant, Esq. (SG 8157)
James J. Sabella, Esq. (JS 5454
45 Rockefeller Center
650 Fifth Avenue
New York, New York 10111
(212) 755-6501 (Telephone)
(212) 755-6503 (Facsimile)
                    and
Geoffrey C. Jarvis, Esq.
Sharan Nirmul, Esq.
Benjamin J. Hinerfeld, Esq.
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
(302) 622-7000 (Telephone)
(302) 622-7100 (Facsimile)

**SCHIFFRIN & BARROWAY, L.L.P.**
Michael K. Yarnoff, Esq.
Sean M. Handler, Esq.
Jodi Murland, Esq.
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7056 (Telephone)
(610) 667-7706 (Facsimile)
*Co-Lead Counsel for Lead Plaintiffs and the*
*Prospective Class*