## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                         :

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| DELPHI CORPORATION et al., | : | Case No. 05-44481 (rdd) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

### AFFIDAVIT OF SERVICE

      I, Amber M. Cerveny, being duly sworn according to law, deposes and says that I am employed by Kurtzman Carson Consultants, LLC, court appointed claims and noticing agent for the Debtors in the above-captioned cases.

      On December 16, 2005, I caused to be served, via overnight mail the documents listed in Section 1 on Margery N. Reed, Duane Morris LLP, 30 South 17th St., Philadelphia, PA 19103:

### *Section 1*

I.  Notice of Motion for Order Under Under 11 U.S.C. §§ 362, 363, 365, 1107, and 1108 Authorizing Renewal of Insurance Coverage and Certain Related Relief **(Docket No. 1559) [Attached hereto as Exhibit A]**

II.  Motion for Order Under Under 11 U.S.C. §§ 362, 363, 365, 1107, and 1108 Authorizing Renewal of Insurance Coverage and Certain Related Relief **(Docket No. 1559) [Attached hereto as Exhibit A]**

Dated: December 27, 2005

                             */s/ Amber M. Cerveny*
                             Amber M. Cerveny

Sworn to and subscribed before
me on December 27, 2005

 */s/ Evan Gershbein*
Notary Public

My Commission Expires:   *1/19/07*

# EXHIBIT A

**Hearing Date and Time: January 5, 2006, 10:00 a.m.**
**Objection Deadline: December 29, 2005, 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

     - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                          :
         In re                                            :     Chapter 11
                                                          :
DELPHI CORPORATION, et al.,                               :     Case No. 05-44481 (RDD)
                                                          :
                                   Debtors.               :     (Jointly Administered)
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NOTICE OF MOTION FOR ORDER UNDER 11 U.S.C. §§ 362, 363, 365,
1107, AND 1108 AUTHORIZING RENEWAL OF INSURANCE
COVERAGE AND CERTAIN RELATED RELIEF

PLEASE TAKE NOTICE that on December 16, 2005, Delphi Corporation

("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the

above-captioned cases (collectively, the "Debtors"), filed a Motion For Order Under 11 U.S.C.

§§ 362, 363, 365, 1107, And 1108 Authorizing Renewal Of Insurance Coverage And Certain

Related Relief (the "Motion").

PLEASE TAKE FURTHER NOTICE that a hearing to consider approval of the

Motion will be held on January 5, 2006, at 10:00 a.m. (Prevailing Eastern Time) (the "Hearing")

before the Honorable Robert D. Drain, United States Bankruptcy Court for the Southern District

of New York, One Bowling Green, Room 610, New York, New York 10004.

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion must

(a) be in writing, (b) conform to the Federal Rules of Bankruptcy Procedure, the Local

Bankruptcy Rules for the Southern District of New York, and the Order Under 11 U.S.C. §§ 102

(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing (I) Omnibus

Hearing Dates, (II) Certain Notice, Case Management, And Administrative Procedures, And (III)

Scheduling An Initial Case Conference In Accordance With Local Bankr. R. 1007-2(e) (the

"Case Management Order") (Docket No. 245), (c) be filed with the Bankruptcy Court in

accordance with General Order M-242 (as amended) – registered users of the Bankruptcy Court's

case filing system must file electronically, and all other parties-in-interest must file on a 3.5 inch

disk (preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based

word processing format), (d) be submitted in hard-copy form directly to the chambers of the

Honorable Robert D. Drain, United States Bankruptcy Judge, and (e) be served upon (i) Delphi

Corporation, 5725 Delphi Drive, Troy, Michigan 48098 (Att'n: General Counsel), (ii) counsel to

the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Suite 2100,

2

Chicago, Illinois 60606 (Att'n: John Wm. Butler, Jr.), (iii) counsel for the agent under the

Debtors' prepetition credit facility, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue,

New York, New York 10017 (Att'n: Kenneth S. Ziman), (iv) counsel for the agent under the

postpetition credit facility, Davis Polk & Wardwell, 450 Lexington Avenue, New York, New

York 10017 (Att'n:  Marlane Melican), (v) counsel for the Official Committee of Unsecured

Creditors, Latham & Watkins, 885 Third Avenue, New York, New York 10022 (Att'n: Mark A.

Broude), and (vi) the Office of the United States Trustee for the Southern District of New York,

33 Whitehall Street, Suite 2100, New York, New York 10004 (Att'n:  Alicia M. Leonhard), in

each case so as to be **received** no later than **4:00 p.m. (Prevailing Eastern Time) on December

29, 2005** (the "Objection Deadline").

3

PLEASE TAKE FURTHER NOTICE that only those objections made as set forth

herein and in accordance with the Case Management Order will be considered by the Bankruptcy

Court at the Hearing.  If no objections to the Motion are timely filed and served in accordance

with the procedures set forth herein and in the Case Management Order, the Bankruptcy Court

may enter an order granting the Motion without further notice.


Dated: New York, New York
        December 16, 2005

                        SKADDEN, ARPS, SLATE, MEAGHER
                          & FLOM LLP

                        By:  _s/ John Wm. Butler, Jr._____
                             John Wm. Butler, Jr. (JB 4711)
                             John K. Lyons (JL 4951)
                             Ron E. Meisler (RM 3026)
                        333 West Wacker Drive, Suite 2100
                        Chicago, Illinois  60606
                        (312) 407-0700

                               - and -

                        By:  _s/ Kayalyn A. Marafioti_____
                             Kayalyn A. Marafioti (KM 9632)
                             Thomas J. Matz (TM 5986)
                        Four Times Square
                        New York, New York 10036
                        (212) 735-3000

                        Attorneys for Delphi Corporation, et al.,
                          Debtors and Debtors-in-Possession

**Hearing Date and Time: January 5, 2006, 10:00 a.m.**
**Objection Deadline: December 29, 2005, 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

     - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
     Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                   :
       In re                        :     Chapter 11
                                     :
DELPHI CORPORATION, et al.,      :     Case No. 05-44481 (RDD)
                                     :
                 Debtors.     :     (Jointly Administered)
                                     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. §§ 362,
363, 365,1107, AND 1108 AUTHORIZING RENEWAL OF INSURANCE
COVERAGE AND CERTAIN RELATED RELIEF

("INSURANCE AGREEMENT MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order under 11 U.S.C. §§ 362, 363, 365, 1107, and 1108 authorizing renewal of insurance coverage provided by ACE American Insurance Company and its affiliates (collectively, the "Insurers") and certain related relief.  In support of this Motion, the Debtors respectfully represent as follows:

Background

A.      The Chapter 11 Filings

1.      On October 8, 2005, Delphi and certain of its U.S. subsidiaries (the "Initial Filers") filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").  On October 14, 2005, three additional U.S. subsidiaries of Delphi (together with the Initial Filers, collectively, the "Debtors") filed voluntary petitions in this Court for reorganization relief under the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This Court entered orders directing the joint administration of the Debtors' chapter 11 cases (Dockets Nos. 28 and 404).

2.      On October 17, 2005, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "Creditors' Committee").  No trustee or examiner has been appointed in the Debtors' cases.

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.      The statutory predicate for the relief requested herein are sections

362, 363, 365, 1107, and 1108 of the Bankruptcy Code.

B.      Current Business Operations Of The Debtors

5.      With more than 180,000 employees worldwide, global 2004

revenues of approximately $28.6 billion, and global assets as of August 31, 2005 of

approximately $17.1 billion,[1] Delphi ranks as the fifth largest public company business

reorganization in terms of revenues, and the thirteenth largest public company business

reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11

debtors, will continue their business operations without supervision from the Bankruptcy

Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy

Code.

6.      Over the past century, the operations which are now owned by

Delphi have developed leading global technology innovations with significant

engineering resources and technical competencies in a variety of disciplines.  Today, the

Company (as defined below) is arguably the single largest global supplier of vehicle

electronics, transportation components, integrated systems and modules, and other

electronic technology.  The Company's technologies and products are present in more

than 75 million vehicles on the road worldwide.  The Company supplies products to

nearly every major global automotive original equipment manufacturer, with 2004 sales

to its former parent, General Motors Corporation ("General Motors" or "GM"), equaling

approximately $15.4 billion, and sales to each of Ford Motor Company, DaimlerChrysler

---

[1]      The aggregated financial data used in this Motion generally consists of
consolidated information from Delphi and its worldwide subsidiaries and
affiliates.

Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

7.      As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world.  In the U.S., the Debtors employ approximately 50,600 people.  These employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in Delphi's worldwide headquarters and customer center located in Troy, Michigan.  Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and local unions.  Outside the United States, the Company's foreign entities employ more than 134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

8.      Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates (collectively, the "Company") in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

9.      Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle.  When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base.  The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base.  The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C.      Events Leading To Chapter 11 Filing

10.      In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales.  Reflective of a downturn in the marketplace, Delphi's financial condition deteriorated further in the first six months of 2005.  The Company experienced net operating losses of $608 million for the first six months of calendar year 2005 on six-

month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[2]

11.    The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward looking revenue requirements.  Having concluded that pre-filing discussions with its unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

13.    Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve

---

[2]    Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

the Company's core businesses.  This will require negotiation with key stakeholders over

their respective contributions to the restructuring plan or, absent consensual participation,

the utilization of the chapter 11 process to achieve the necessary cost savings and

operational effectiveness envisioned in the Company's transformation plan.  The Debtors

believe that a substantial segment of Delphi's U.S. business operations must be divested,

consolidated, or wound-down through the chapter 11 process.

14.      Upon the conclusion of this process, the Debtors expect to emerge

from chapter 11 as a stronger, more financially sound business with viable U.S.

operations that are well-positioned to advance global enterprise objectives.  In the

meantime, Delphi will marshal all of its resources to continue to deliver value and high-

quality products to its customers globally.  Additionally, the Company will preserve and

continue the strategic growth of its non-U.S. operations and maintain its prominence as

the world's premier auto supplier.

Relief Requested

15.      By this Motion, the Debtors seek entry of an Order pursuant to

U.S.C. § 363(b) authorizing, but not directing, the Debtors to renew or enter into new

insurance policies with the Insurers and to execute and deliver all related documents and

agreements.

16.      The Debtors request that the Court authorize, but not direct, the

Debtors, pursuant to 11 U.S.C §§ 365 to assume insurance policies and related

agreements between Delphi and the Insurers (collectively, the "Agreements") including,

but not limited to the following:

(a)      that certain Multi-Line Deductible Program Agreement
effective as of October 1, 2000 by and between Pacific
Employers Insurance Company and Delphi (formerly

7

known as Delphi Automotive Systems Corporation) and all
amendments and addenda thereto (collectively, the " Multi-
Line Deductible Program Agreement");

(b)    All General Liability Policies issued to Delphi or the other
Debtors by one or more of the Insurers and all renewals,
extensions, and endorsements thereto (collectively, the
"General Liability Policy");

(c)    All Automobile Liability Policies issued to Delphi or the
other Debtors by one or more of the Insurers and all
renewals, extensions, and endorsements thereto (the
"Automobile Liability Policy");

(d)    All Workers' Compensation Policies issued to Delphi or the
other Debtors by one or more of the Insurers and all
renewals, extensions, and endorsements thereto (the
"Workers' Compensation Policy" and, collectively with the
General Liability Policy and the Automobile Liability
Policy, the "Insurance Policies");

(e)    the binder related to the Insurance Policies; and

(f)    the claims administration agreements related to the
Insurance Policies.

17.    In addition, the Debtors seek entry of an Order pursuant to 11

U.S.C. § 363(b) authorizing, but not directing, the Debtors to replace the existing Cash

Collateral (as defined below) with an irrevocable letter of credit in an amount equal to the

Cash Collateral.

18.    Finally, the Debtors request that this Court grant the Insurers relief

from the automatic stay provisions of 11 U.S.C. § 362, conditioned on the Debtors'

assumption of the Agreements, to allow the Insurers to draw against the Collateral (as

defined below) in accordance with the Agreements and to take other actions permitted

under applicable non-bankruptcy law and in accordance with the Agreements without

further order of this Court.

<u>Basis For Relief</u>

19.     Shortly prior to the Petition Date, the Debtors were faced with the

expiration of the policy period of certain insurance policies provided by the Insurers,

which policies expired by their terms on October 1, 2005.  The Insurance Policies provide

the Debtors with the first tier of a layered insurance program.  The failure by the Debtors

to renew such policies or to enter into replacement policies would have left the Debtors

and their estates exposed to significant potential liabilities.  To avoid this exposure, the

Debtors explored their options with respect to such renewal or replacement policies and

determined that entry into the Insurance Policies represented the Debtors' best option and,

therefore, that it was in their best interests to renew the Insurance Policies and enter into

that certain Amendment 1 to the Multi-Line Deductible Program Agreement (the

"Amendment").

20.     The Insurers were willing to provide a term continuing only

through January 1, 2006 under each Insurance Policy, however, and insisted upon

Delphi's agreement to the terms of the Amendment as a condition to their willingness to

provide the Debtors with the insurance coverage embodied in the Insurance Policies.  (A

copy of the Amendment is attached hereto as Exhibit A.)[3]  In addition to extending the

insurance coverage under substantially the same terms that had previously existed, the

Amendment, among other terms, requires that the Debtors seek approval of the relief

---

[3]     The Debtors and the Insurers entered into a 90-day extension of the Amendment
that currently extends coverage from January 1, 2006, through April 1, 2006 (the
"Extension") to allow time for the Insurers to complete their binding offer for
coverage through September 30, 2006.  The parties intend to cancel the Extension
upon the renewal or entry into new insurance policies.

sought herein as a condition precedent to the Insurers' agreement to provide any renewal of the Insurance Policies beyond January 1, 2006.  (Exhibit A ¶ 2.1.)

21.    Subsequent to the Petition Date, the Debtors have actively sought competitive bids for replacement of the Insurance Policies on January 1, 2006. Unfortunately, because of the size and breadth of the Debtors' needs, the Debtors have determined that only a limited number of insurance companies have the ability and/or willingness to provide policies which would be suitable to replace the Insurance Policies. The Debtors have evaluated their options and selected the Insurers' proposal as the best option.  Among other terms, the Insurers' proposal for insurance coverage for the period January 1, 2006 through September 30, 2006 requires that the Debtors pay an additional premium of approximately $1.98 million and post approximately $9.31 million of collateral, in addition to the collateral posted prepetition.

22.    If the Debtors were to assume the Agreements, as is required under the Insurers' proposal, then section 365(b) of the Bankruptcy Code requires the Debtors to cure or provide adequate assurance that they will promptly cure any defaults under the Agreements.  Article I of the Multi-Line Deductible Program Agreement requires the Debtors to pay the Insurers "all amounts the Insured is or may be obligated to pay to other parties but which are paid by the [Insurers]."  (A copy of the Multi-Line Deductible Program Agreement is attached hereto as Exhibit B.)  Thus, the Debtors' cost to cure the Insurers' claim is predicated on an unknown amount, which is the amount that the Insurers pay out in the future pursuant to the terms of the Agreements that otherwise the Debtors were obligated to pay.  As of the date of this Motion, the Debtors submit that there are no defaults under the Agreements.

10

23.     The Debtors have sought the professional advice of their insurance

broker, Aon Risk Services ("Aon"), to provide, among other things, an estimate of the

Debtors' liability under the Agreements, which subsequently can be used to estimate the

value of the Insurers' potential cure claim.[4]  Significantly, the calculations provided by

Aon are based on a snap-shot of the data at the time this Motion is filed.  Moreover, the

estimates contain a high level of variance.  Nevertheless, this information is the best

information that is available to the Debtors at this time, and the uncertainty in these

estimates factored into the Debtors' analysis and evaluation of the Debtors' options for

insurance coverage.  A copy of the table summarizing estimates of the Debtors' liability

under the Agreements is attached hereto as Exhibit C.

24.     As part of this analysis, it also is important to note that the Insurers

currently hold $19.1 million in collateral and security posted by the Debtors (the

"Collateral"), which is comprised of an irrevocable letter of credit in the amount of

approximately $13.7 million (the "Letter of Credit") and cash collateral of $5,388,967

(the "Cash Collateral").  The Collateral was provided to the Insurers prior to the Petition

Date.  In analyzing the size of the Insurers' potential cure claim, the Debtors' analyzed the

likelihood that the claim exceeds the value of theCollateral.  In addition, the Debtors took

the estimated cure amount into account when comparing the Insurers' bid against the

Debtors' other options.

25.     If the Debtors continue paying the prepetition workers'

compensation claims, the estimated liability to the Insurers arising from the Agreements

---

[4]     Aon's estimate of the Insurers' potential cure claim is for information purposes
only, and the Debtors do not request an order estimating the Insurers' claim.
Aon's estimate has not been reviewed, approved, or accepted by, and is not
binding on, the Insurers or any other parties in interest.

(as described above in paragraph 22) would be approximately $16.6 million.[5]  This

estimate falls between the 55 and 60 percent confidence interval.[6]  Aon's estimate is more

conservative than the median liability, which by definition, would be represented by the

50 percent confidence interval.    Because that estimated liability to the Insurers is less

than the value of the Collateral, the Debtors estimate that Insurers' cure claim would be

zero.

        26.      Under this Court's October 13, 2005 order authorizing the Debtors

to pay prepetition wages, salaries, and benefits (Docket No. 198) (the "Human Capital

Obligations Order"), however, the Debtors are "authorized, but not directed" to pay or

otherwise honor their workers' compensation program.  Thus, the Debtors are not

required under the Human Capital Obligations Order to continue paying their prepetition

workers' compensation liability claims.  If the Debtors were to stop paying prepetition

workers' compensation claims, then according to Aon, the estimated liability arising from

the indemnification provision would increase by $3.3 million, to approximately $19.8

---

[5]      The Debtors' workers compensation liability under the Agreements represents a
small percentage of the Debtors' total workers' compensation liability.  The
Debtors maintained first dollar workers' compensation insurance coverage only in
the states where they do not have a high concentration of employees.  In the states
where the Debtors have a high concentration of employees, such as Michigan, the
Debtors are self-insured for workers' compensation claims.  In the self-insured
states, the Debtors maintain excess workers' compensation insurance coverage
with the Insurers for claims in excess of the respective state's self-insured
retention.  By this Motion, he Debtors also seek to assume and renew their excess
workers' compensation insurance coverage.

[6]      Confidence interval is a statistical range with a specified probability that a given
parameter lies within that range.  Applied in this context, the confidence interval
provides the probability that the estimated liability to the Insurers is less than or
equal to $X.

million.  With $19.1 million of prepetition collateral posted, the estimated amount of the

Insurers' potential cure claim would therefore be approximately $700,000.

27.      Because this calculation has a high rate of variance, the Debtors

project that their liability under the Agreements ranges from $8.2 million to $22.2 million

if the Debtors' were to continue paying workers' compensation claims and from $9.7

million to $27.2 million if they were to stop paying such claims.  Under the worst case

scenario projected by these estimates (i.e., the 99 percent confidence interval that liability

will not exceed these amounts), the Insurers could apply all of the collateral posted and

have a remaining cure claim of approximately $8.1 million, again assuming that the

Debtors stop paying prepetition workers' compensation claims. [7]  If the Debtors were to

continue paying workers' compensation claims, the liability to the Insurers would fall by

approximately $5.0 million, and the Debtors' estimated liability to the Insurers would be

approximately $22.2 million, resulting in a 1% chance (under the 99% confidence

interval) that the cure claim would exceed the Collateral by approximately $3.1 million.

28.      The Debtors have attempted to negotiate a waiver of the

requirements of the Amendment, so as to obviate the need for the assumption of the

Agreements.  The Insurers, however, have refused to waive the assumption requirement

in the Amendment.  Nevertheless, the Debtors have determined that the relief sought

herein is necessary because the proposal from the Insurers, even including the estimated

costs associated with assuming the Agreements, is a more attractive proposal than the

Debtors' other options.  Without the relief sought by this Motion, the Insurers stated that

---

[7]      Aon's estimate of the worst case scenario is based on data available at the time of
this Motion.  Data not currently available may arise subsequent to the filing of
this Motion, which could positively or negatively affect this estimate.

they would not be willing to renew the Insurance Policies.  This would severely limit the

Debtors' potential sources of insurance in the future, and without a viable source of

alternative insurance, the Debtors anticipate that their insurance costs would increase

substantially following expiration of the Insurance Policies.

29.    The Debtors also have considered the possibility of self-insuring

the first-tier layer of insurance coverage offered by the Insurers, thus foregoing any need

to replace insurance policies as of January 1, 2006.  The Debtors have determined,

however, that such action would impose too much risk upon their estates.  The Debtors'

failure to secure a renewal of the Insurance Policies or replacement policies would

expose the Debtors' estates to the risk of violating statutory and contractual insurance

requirements in certain states where the Debtors have on-going operations.  Therefore,

the Debtors have determined that renewal of the Insurance Policies or entry into

replacement insurance policies is necessary and in their best interests.

30.    The Debtors have also agreed, as a condition of the Insurers'

willingness to provide renewals of the Insurance Policies, that they will seek to replace

the Cash Collateral with an irrevocable letter of credit in the same amount as the Cash

Collateral, in form and substance acceptable to the Insurers, and issued by a financial

institution acceptable to the Insurers (the "New Letter of Credit").[8]  Although the Debtors

recognize that issuance of a New Letter of Credit involves the use of assets of the estate

to secure a prepetition claim of the Insurers against the Debtors under the Agreements,

the Debtors believe that the issuance of the New Letter of Credit would be significantly

---

[8]     As previously stated, the Debtors will also post a letter of credit of approximately
$9.31 million for the new insurance coverage for the policy period January 1,
2006 through September 30, 2006.

cheaper for the Debtors than continuing to maintain the Cash Collateral.  In addition,

upon assumption of the Agreements, the Insurers' prepetition claim against the Debtors

under the Agreements will become an administrative expense claim.  Thus, the issuance

of a New Letter of Credit will not change the priority of the Insurers' prepetition claim.

    31.    Furthermore, pursuant to the Amendment, as a condition of the

Insurers' willingness to provide renewals of the Insurance Policies, the Debtors seek

certain additional relief.  Specifically, the Debtors request that the Court: (a) authorize,

but not direct, the Debtors to renew or enter into insurance policies and to execute all

related documents and agreements between the Debtors and the Insurers pursuant to

section 363 of the Bankruptcy Code; (b) authorize, but not direct, the Debtors to agree to

future renewals of the insurance programs and to provide collateral and security pursuant

to any such programs without further order of this Court;[9] (c) authorize the Insurers to

draw against the Collateral, apply the Collateral to the Debtors' obligations under the

Agreements, and take other actions permitted under applicable non-bankruptcy law and

in accordance with the Agreements without further order of this Court (upon prior written

notice, not to exceed five business days, to the Debtors and counsel for the Creditors'

Committee, if and to the extent that prior notice is required by the applicable rules of this

Court; provided that no notice shall be required for draws under letters of credit due to

the expiration or non-renewal thereof); (d) authorize relief from the automatic stay

pursuant to section 362(d) of the Bankruptcy Code, conditioned on the assumption of the

Agreements, for the sole and limited purpose of effectuating the relief described in

---

[9]    The Debtors believe that entering into new insurance programs and posting
collateral as a prerequisite for such programs are ordinary course transactions.
Because this condition, however, was listed in the Amendment, the Debtors have
agreed to seek authorization for such actions.

subparagraph (c) above; (e) confirm, conditioned upon the assumption of the Agreements,

administrative priority treatment for all payment and reimbursement obligations owing to

the Insurers under the Agreements; (f) confirm, conditioned on the assumption of the

Agreements, that the Insurers' claims with respect to the Agreements will be paid by the

Debtors in the ordinary course of their businesses; and (g) confirm that the Agreements

and an order of this Court approving this Motion shall not be altered by any plan of

reorganization confirmed in these chapter 11 cases or by subsequent order of this Court.

      32.      Aside from the assumption of the Agreements and the rights

conditioned upon such assumption and the replacement of the Cash Collateral with the

New Letter of Credit, the Debtors believe that the transactions described in this Motion

constitute ordinary course transactions by the Debtors that do not require approval of this

Court pursuant to sections 363(c), 1107, and 1108 of the Bankruptcy Code.  Nevertheless,

out of an abundance of caution and to ensure full compliance with the terms of the

Amendment, the Debtors respectfully request that an order approving this Motion be

granted.

<u>Applicable Authority</u>

      33.      The Debtors believe that the Agreements may be assumed pursuant

to section 365 of the Bankruptcy Code.  Section 365(a) of the Bankruptcy Code provides

that a debtor in possession, "subject to the Court's approval, may . . . assume any

executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).

      34.      The standard to be applied by a court in determining whether an

executory contract or unexpired lease should be assumed is the "business judgment" test,

which is premised upon the debtor's business judgment that assumption would be

beneficial to its estate.  <u>See</u> <u>Orion Pictures Corp. v. Showtime Networks, Inc.</u> (In re Orion

16

Pictures Corp.), 4 F.3d 1095, 1098-99 (2d Cir. 1993); see also In re Child World, Inc.,

142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992) (a debtor may assume or reject an unexpired

lease under § 365(a) in the exercise of its "business judgment"); In re Roman Crest Fruit,

Inc., 35 B.R. 939, 949 (S.D.N.Y. 1983); Control Data Corp. v. Zelman, 602 F.2d 38, 42

(2d Cir. 1979). "More exacting scrutiny would slow the administration of the debtor's

estate and increase its cost, interfere with the Bankruptcy Code's provision for private

control of administration of the estate, and threaten the court's ability to control a case

impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir.

1985).

        35.    If the debtor's business judgment has been exercised reasonably, a

court should approve the assumption of an executory contact. See, e.g., NLRB v.

Bildisco and Bildisco, 465 U.S. 513, 523 (1984); Group of Inst'l Investors v. Chicago,

Milwaukee, St. Paul & Pacific R.R. Co., 318 U.S. 523 (1943); Cleveland Hotel Protective

Comm. v. Nat'l City Bank of Cleveland (In re Van Sweringen Corp.), 155 F.2d 1009,

1013 (6th Cir.), cert. denied, 329 U.S. 766 (1946); In re Child World, Inc., 142 B.R. at 89;

In re Ionosphere Clubs, Inc., 100 B.R. 670, 673 (Bankr. S.D.N.Y 1989); see also In re

Orion Pictures Corp., 4 F.3d at 1098-99; In re RCN Corp., Case No. 04-13638 (RDD),

June 22, 2004 Hr'g Tr. ¶¶ 50:24–50:2, at 46. Once the debtor has satisfied the business

judgment standard by showing that assumption will benefit the estate, the court "should

not interfere 'except upon a finding of bad faith or gross abuse of [the debtor's] business

discretion.'" Id. at 465 (citing Lubrizol Enters., Inc. v. Richmond Metal Finishers Inc.,

756 F.2d 1043, 1047 (4th Cir. 1985).

36.     The business judgment rule shields a debtor's management from

judicial second-guessing.  In re Farmland Indus., Inc., 294 B.R. 903, 913 (Bankr. W.D.

Mo. 2003) (quoting In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y.

1986)) ("'[T]he Code favors the continued operation of a business by a debtor and a

presumption of reasonableness attaches to a debtor's management decisions.'").  Once the

Debtors articulate a valid business justification, "[t]he business judgment rule 'is a

presumption that in making a business decision the directors of a corporation acted on an

informed basis, in good faith and in the honest belief that the action was in the best

interests of the company.'"  In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992)

(quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).

37.     Upon finding that the Debtors have exercised their sound business

judgment in determining that assumption of the Agreements is in the best interests of

their estates, this Court should approve assumption under section 365(a) of the

Bankruptcy Code.  In re Gucci, 193 B.R. 411, 415-17 (S.D.N.Y. 1996) (affirming

bankruptcy court's approval of assumption of executory contract upon determining that

assumption "was in the best interest of the estate"); Blue Cross Blue Shield of Conn. v.

Gurski (In re Gurski), Nos. 94-51202 & 3:95CV1883, 1996 WL 684397, at *2 (D. Conn.

Jan. 25, 1996) (affirming bankruptcy court's determination that executory contracts were

beneficial to debtor such that debtor could assume them under section 365(a)).

38.     The Debtors assert that the Agreements may be assumed pursuant

to section 365 of the Bankruptcy Code given the Debtors' need to maintain appropriate

insurance coverage.  As described above, the Debtors have considered all potential

options short of assumption of the Agreements and have determined that all such options

are either not viable or are less favorable to the Debtors' estates.  Therefore, the Debtors

have determined, in the exercise of sound business judgment, that the relief sought herein

is necessary and appropriate to the maintenance of their businesses and to preserve and

enhance the value of their estates to the benefit of all creditors.

39.    As noted above, the monetary payments necessary upon

assumption of the Agreements have an estimated value of zero.[10]  Bankruptcy Code

section 365(b)(1) codifies the requirements for assuming an unexpired lease or executory

contract of a debtor.  That subsection provides:

(b)(1)  If there has been a default in an executory contract or unexpired lease
of the debtor, the trustee may not assume such contract or lease
unless, at the time of assumption of such contract or lease, the trustee-

(A)    cures, or provides adequate assurance that the trustee will
promptly cure, such default;

(B)    compensates, or provides adequate assurance that the trustee  will
promptly compensate, a party other than the debtor to such
contract or lease, for any actual pecuniary loss to such party
resulting from such default; and

(C)    provides adequate assurance of future performance under such
contract or lease.

11 U.S.C. § 365(b)(1).

40.    The Debtors submit that the statutory requirements of section

365(b)(1) of the Bankruptcy Code have been satisfied because the Insurers are secured up

to $19.1 million by the Letter of Credit and the Cash Collateral[11] for potential monetary

defaults or future obligations of the Debtors under the Agreements.  If the Insurance

---

[10]    As noted above, the estimate falls between the 55 and 60 percent confidence
interval.

[11]    As previously stated, the Debtors seek to replace the Cash Collateral with the
New Letter of Credit.

Policies are assumed, the Insurers also would be permitted to file an administrative

expense priority claim, although the Debtors currently estimate that the liability will not

exceed the posted collateral.  The value of any potential administrative expense claim

would be the difference between the Debtors' liability under the assumed Agreements and

the Collateral.

        41.      The Debtors, operating their businesses as debtors-in-possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding

the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors

and (if the value justifies) equity owners."  In re CoServ, L.L.C., 273 B.R 487, 497

(Bankr. N.D. Tex. 2002).  Implicit in the duties of a chapter 11 debtor-in-possession is

the duty "to protect and preserve the estate, including an operating business's going-

concern value."  Id.

        42.      Courts have noted that there are instances in which a debtor-in-

possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a

prepetition claim."  Id.  The CoServ court specifically noted that preplan satisfaction of

prepetition claims would be a valid exercise of a debtor's fiduciary duty when the

payment "is the only means to effect a substantial enhancement of the estate."  Id. at 497-

98.  The court provided a three-pronged test for determining whether a preplan payment

on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant.  Second,
> unless it deals with the claimant, the debtor risks the probability of harm,
> or, alternatively, loss of economic advantage to the estate or the debtor's
> going concern value, which is disproportionate to the amount of the
> claimant's prepetition claim.  Third, there is no practical or legal
> alternative by which the debtor can deal with the claimant other than by
> payment of the claim.

Id. at 498.

43.     Here, because of the size and breadth of the Debtors' needs, only a limited number of insurance companies have the ability to provide the Debtors with insurance coverage.  If the Debtors do not continue their long-standing relationship with the Insurers, it is quite possible that the Insurers will not offer coverage to the Debtors in the future, leaving the Debtors with even fewer potential insurers.  The harm to the estate under this scenario far outweighs the cost of assuming the Insurance Policies.  As previously stated, assuming the Debtors continue paying their workers' compensation claims, the estimated value of the Insurers' cure claim is zero.  Finally, the Insurers' requirement, as memorialized in the Amendment, that the Debtors assume the Insurance Policies as a condition of renewal coverage was bargained for by the Insurers prior the Petition Date.  The Insurers have stated that they are not willing to waive this requirement. Because of the long-term effect of rejecting the Insurers' proposal, the Debtors believe that they have no option but to accept this requirement.  Therefore, the Debtors can meet their fiduciary duties as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code only by assuming the Insurance Policies as a condition of renewing insurance coverage with the Insurers.

44.     Furthermore, pursuant to the Amendment, the Debtors have also agreed to seek authorization to lift the automatic stay pursuant to section 362(d) of the Bankruptcy Code for the purpose of allowing the Insurers to draw against the Collateral, apply the Collateral to the Debtors' obligations under the Agreements, and take other actions permitted under applicable non-bankruptcy law and the Agreements without further order of this Court.  This relief is conditioned on the Debtors' assumption of the Agreements.

21

45.     Section 362(d) of the Bankruptcy Code provides that the Court shall grant relief from the automatic stay of section 362(a) in the following situations:

> (1)     for cause, including the lack of adequate protection of an interest in property of such party in interest; [or]
>
> (2)     with respect to a stay of an act against property under subsection (a) of this section, if – (A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization[.]

11 U.S.C. § 362(d).  Courts in this circuit have noted that, "the grounds for relief from stay are presented in subsections (1), (2) and (3) in the disjunctive; thus, if any one subsection applies, the Court must grant a motion for relief from stay."  In re Zeoli, 249 B.R. 61, 63 (Bankr. S.D.N.Y. 2000).  The Debtors have agreed to consent to conditional relief from the automatic stay being granted to the Insurers with respect to the Collateral in this instance because the claims of the Insurers that will be satisfied thereby would otherwise constitute either cure claims or administrative priority claims against the Debtors, either of which would have to be paid in full.  As such, the relief from the automatic stay is economically neutral to the Debtors.  Additionally, the Insurers probably could obtain relief from the stay anyway or otherwise would get the Collateral upon emergence.

46.     The Debtors are required, pursuant to the terms of the Amendment, to seek authority from this Court to renew or enter into insurance policies and to execute all related documents and agreements between the Debtors and the Insurers pursuant to section 363 of the Bankruptcy Code.  Similar to the analysis under section 365, courts in this district and elsewhere consistently have held that transactions pursuant to 363(b) should be approved if there is a sound business justification for implementing them.  See In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983); In re Delaware Hudson Ry. Co.,

124 B.R. 169, 179 (Bankr. D. Del. 1991).  Once the debtor articulates a valid business

justification, "'[there is a presumption that in making a business decision the directors of a

corporation acted on an informed basis, in good faith and in the honest belief that the

action taken was in the best interests of the company.'"  In re Integrated Resources, Inc.,

147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872

(Del. 1985)); see also In re RCN Corp., June 22, 2004 Hr'g Tr. ¶¶ 51:3–12 (approving

exit financing commitments pursuant to 363(b) of the Bankruptcy Code).

47.    Although the Debtors believe that no authority is necessary under

section 363 of the Bankruptcy Code to renew or enter into insurance policies, to execute

all related documents and agreements between the Debtors and the Insurers and to post

collateral as a prerequisite for the issuance of the new insurance coverage, as such actions

constitute ordinary course transactions for the Debtors, such relief, to the extent outside

the ordinary course, is clearly appropriate pursuant to 11 U.S.C. § 363.  As noted above,

the Debtors would subject their estates to significant potential costs absent renewal of the

Insurance Policies or entry into new replacement policies covering the period following

expiration of the Insurance Policies.

48.    Furthermore, the Debtors' failure to renew or replace the Insurance

Policies would potentially result in a violation of applicable non-bankruptcy laws

specifying mandatory minimum insurance coverages in certain jurisdictions where the

Debtors operate.  The Debtors respectfully assert that the renewal or replacement of the

Insurance Policies constitutes an exercise of sound business judgment on the part of the

Debtors and therefore should be approved pursuant to section 363 of the Bankruptcy

Code.

23

49.     For the foregoing reasons, the Debtors believe that the relief

requested herein is in the best interests of the estates and should be granted.

<u>Notice</u>

50.     Notice of this Motion has been provided in accordance with the

Order Under 11 U.S.C. §§ 102(1) and 105 and Fed. R. Bankr. P. 2002(m), 9006, 9007,

and 9014 Establishing (I) Omnibus Hearing Dates, (II) Certain Notice, Case Management,

and Administrative Procedures, and (III) Scheduling an Initial Case Conference in

Accordance with Local Bankr. R. 1007-2(e) entered by this Court on October 14, 2005

(Docket No. 245).  In light of the nature of the relief requested, the Debtors submit that

no other or further notice is necessary.

<u>Memorandum Of Law</u>

51.     Because the legal points and authorities upon which this Motion

relies are incorporated herein, the Debtors respectfully request that the requirement of the

service and filing of a separate memorandum of law under Local Rule 9013-1(b) be

deemed satisfied.

WHEREFORE, the Debtors respectfully request that the Court enter an

order (a) approving the Debtors' assumption of Agreements, (b) lifting the automatic stay

pursuant to section 362(d) of the Bankruptcy Code for the purpose of allowing the

Insurers to draw against the Collateral, apply the Collateral to the Debtors' obligations

under the Agreements, and take other actions permitted under applicable non-bankruptcy

law and the Agreements without further order of this Court, (c) authorizing the Debtors to

renew or enter into insurance policies and to execute all related documents and

agreements pursuant to section 363 of the Bankruptcy Code without further order of this

24

Court, and (d) granting such other relief as is described in paragraphs 30 and 31 hereof,

and (e) granting the Debtors such other and further relief as is just.

Dated:  New York, New York
       December 16, 2005

                           SKADDEN, ARPS, SLATE, MEAGHER
                             & FLOM LLP

                     By:  s/ John Wm. Butler, Jr.
                         John Wm. Butler, Jr. (JB 4711)
                         John K. Lyons (JL 4951)
                         Ron E. Meisler (RM 3026)
                     333 West Wacker Drive, Suite 2100
                     Chicago, Illinois  60606
                     (312) 407-0700

                           - and -

                     By:  s/ Kayalyn A. Marafioti
                         Kayalyn A. Marafioti (KM 9632)
                         Thomas J. Matz (TM 5986)
                     Four Times Square
                     New York, New York 10036
                     (212) 735-3000

                     Attorneys for Delphi Corporation, et al.,
                       Debtors and Debtors-in-Possession

**<u>EXHIBIT A</u>**

**THE AMENDMENT**

Amendment 1, effective as of September 30, 2005 ("Amendment")
by and between
ACE American Insurance Company
(hereinafter with Pacific Employers Insurance Company and their affiliates, the
"Company")
and
Delphi Corporation, formerly known as Delphi Automotive Systems Corporation
(hereinafter the "Insured")
to
**MULTI-LINE DEDUCTIBLE PROGRAM AGREEMENT**
effective the 1st day of October, 2000, by and between the Company and the
Insured, as amended or supplemented pursuant to various amendments or
addendums
(hereinafter the "Agreement")

WHEREAS, the Insured has requested that the Company issue or renew certain policies
and to amend Article IV of the Agreement to specifically reference cash collateral.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of
which are hereby acknowledged, and intending to be legally bound hereby, the parties
hereto agree as follows:

1.      Amendments. Article IV of the Agreement is hereby amended by adding and
inserting the following new provisions at the end of Article IV:

> "The Insured shall deliver to the Company the amount of $5,388,967 ("Cash
> Collateral") by wire transfer of immediately available funds, which shall be
> received by the Company by September 30, 2005. As security for the payment
> and performance of the Insured's Obligation (as such term is defined in the
> Agreement), the Insured hereby grants to the Company a security interest in and
> lien on all of its right, title and interest, whether now existing or hereafter arising,
> in and to the Cash Collateral and all proceeds thereof. Cash Collateral shall
> include, without limitation, any and all Paid Loss Deposit Funds. The Company
> may hold the Cash Collateral as part of the collateral securing the Insured's
> Obligation in any account in the Company's name and with any financial
> institution as the Company determines in its sole discretion. The Company may
> commingle the Cash Collateral with the Company's own funds or the funds of
> other insureds.

> The Company is authorized to use the Cash Collateral to pay any and all of the
> Insured's Obligation owing under the Agreement without further notice to, or
> demand of, the Insured.

1

The Company shall have no duty to invest the Cash Collateral, and may hold the Cash Collateral in an interest bearing or non-interest bearing account as the Company determines in its sole discretion."

2.    <u>Renewal</u>. Any proposed future renewal of the Policies will be subject to terms and conditions acceptable to the Company, in its sole discretion, which shall include, without limitation, the following terms and conditions to be satisfied prior to the proposed effective date of any such future renewal ("Renewal Date"):

2.1    <u>Order</u>. If a petition for relief under the United States Bankruptcy Code ("Bankruptcy Code") is filed by or against the Insured prior to the Renewal Date, then the Bankruptcy Court that has jurisdiction over the Insured ("Bankruptcy Court") shall have entered an Order, in form and substance satisfactory to the Company and its counsel, which provides the following:

A.    the Insured is authorized to, and upon entry of the Order shall, assume the Agreement, all policies listed in the Addenda to the Agreement, the binder, and the claims administration agreement related thereto (collectively, the "Program") pursuant to Section 365 of the Bankruptcy Code;

B.    the Insured is authorized to renew or enter into insurance policies and to execute all related documents and agreements between the Insured and the Company or any of its affiliates as part of the Program pursuant to Section 363 of the Bankruptcy Code;

C.    the Insured is authorized to provide the collateral and security pursuant to the Program;

D.    the Insured may agree to future renewals of the Program without further Order of the Court;

E.    the Company shall have the right to draw against the Cash Collateral, apply the Cash Collateral to the Insured's Obligation, and take other actions permitted under applicable non-bankruptcy law and the Program without further order of the Court (upon prior written notice, not to exceed 5 business days, to the Insured and any statutorily appointed committee of creditors of the Insured, if and to the extent that prior notice is required by the applicable rules of the Bankruptcy Court), and for this purpose, the automatic stay is deemed lifted pursuant to Section 362(d) of the Bankruptcy Code;

F.    all payment and reimbursement obligations owing to the Company under the Program shall be entitled to priority under Section 503(b)(1)(A) of the Bankruptcy Code;

G.    the Company's claims with respect to the Program, including the renewal shall be paid in the ordinary course; and

H.    the Program and the Order shall not be altered by any plan of reorganization or subsequent order of the Court.

2.2.    The Insured shall deliver to the Company the full collateral and security requirement in a Letter of Credit in form, amount and substance and issued by a financial

institution acceptable to the Company, in its sole discretion, to replace any unused Cash Collateral and to provide any additional required security to the Company.

2.3.    All premiums must be received by the Company.

2.4.    The fully executed program agreements must be received by the Company.

3.    <u>Representation and Warranty</u>. The Insured represents and warrants to the Company, after consultation with its counsel, that it has the power and authority to execute and enter into this Amendment and deliver the Cash Collateral to the Company.

4.    <u>Miscellaneous</u>.
4.1    Except as expressly set forth in this Amendment, all terms and conditions of the Agreement remain in full force and effect.

4.2    All capitalized terms used without being defined herein shall have the meanings given to such terms in the Agreement.

4.3    All notices, demands, requests, consents, approvals and other communications required or permitted hereunder must be in writing and be delivered in accordance with the notice provisions of the Agreement.

4.4    No delay or omission on the part of the Company to exercise any right or power arising hereunder will impair any such right or power or be considered a waiver of any such right or power or any acquiescence therein, nor will the action or inaction of the Company impair any right or power arising hereunder. The Company's rights and remedies hereunder are cumulative and not exclusive of any other rights or remedies which the Company may have under other agreements, at law or in equity.

4.5    If any one or more of the provisions contained in this Amendment should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

4.6    No modification, amendment or waiver of any provision of this Amendment nor consent to any departure by the Insured therefrom, will in any event be effective unless the same is in writing and signed by the Company, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.

4.7    This Amendment may be signed in any number of counterpart copies transmitted by facsimile and by the parties hereto on separate counterparts transmitted by facsimile, but all such copies shall constitute one and the same Amendment.

4.8    This Amendment shall be binding upon and inure the benefit of and be enforceable by the parties hereto and their respective successors and assigns.

3

4.9    This Amendment shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.

**IN WITNESS WHEREOF**, this Amendment to the Agreement has been executed by the parties hereto, and shall be effective on the date first written above.

Delphi Corporation
f/k/a Delphi Automotive Systems Corporation

By: _____ 9/30/05

Name: WILLIAM D. TELGEN

Title: RISK MANAGER - DELPHI CORP.


ACE American Insurance Company
on behalf of the Company

By: _____

Name: _____

Title: 9-30-05

4

## EXHIBIT B

# MULTI-LINE DEDUCTIBLE
# PROGRAM AGREEMENT

<u>**MULTI-LINE DEDUCTIBLE PROGRAM AGREEMENT**</u>
(hereinafter "<u>this Agreement</u>")

effective the **1st day of October, 2000**

by and between
**Pacific Employers Insurance Company**

(hereinafter the "<u>Company</u>")

and

# Delphi Automotive Systems Corporation,
(hereinafter the "<u>Insured</u>")

**WHEREAS,** the Insured is the Named Insured under the policy(ies) of General Liability, Automobile Liability, and/or Workers' Compensation insurance listed on the respective Addenda hereto (including Addenda that may be added after the effective date hereof) issued by the Company (which together with all extensions thereof and endorsements thereto, are hereinafter collectively referred to as the "Policies" or as the "General Liability Policies," "Automobile Liability Policies," and "Workers' Compensation Policies," respectively), which Policies each include a Deductible Endorsement; and

**WHEREAS,** the Company is willing to issue such Policies only if the Insured provides collateral security to the Company; and

**WHEREAS,** the Company has entered and may in the future enter into one or more contracts with the Insured's preferred claims administrator (hereinafter, the "Claims Adjusting Service") to provide claims adjusting and related services for claims arising under the Policies;

**NOW, THEREFORE,** in consideration of the mutual promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and in accordance with the terms and conditions of the Policies, the Company and the Insured agree as follows:

## ARTICLE I

<u>**INSURED'S PAYMENTS**</u>

The Insured agrees to pay or reimburse the Company for:

a)  all premiums payable to the Company under the Policies, including audit of the Policies and any recalculation of premium as provided therein, as described in greater detail in the respective Addenda hereto;

b)  Paid Loss Deposit Funds as provided in Article III of this Agreement;

c)  all other amounts the Insured is or may in the future be required to pay or reimburse to the Company in accordance with the terms and conditions of the Policies or this Agreement, including without limitation the Insured's share of Paid Losses and  Allocated Loss Adjustment Expense;

d)  Claim Administration Expense as provided in the respective Addenda hereto;

e)  all amounts the Insured is or may be obligated to pay to other parties but which are paid by the Company;

and to provide collateral to the Company to secure the Insured's Obligation as provided herein.

The Company will bill the Insured monthly for Company Expenses and any amounts described above in b), c) or d), which are payable or reimbursable to the Company pursuant to the Workers' Compensation Policies. The Company will also bill the Insured for any amounts described above which are payable or reimbursable to the Company pursuant to the General Liability Policies and Automobile Liability Policies if and when such payment obligations arise.  Insured's payment of each such bill shall be due and payable no later than the Required Payment Date.  If the Insured does not pay an amount billed by the Required Payment Date,

(i)  the Company shall have the right to bill the Insured for, and to collect, the Interest Charge applied to any such unpaid amount; and

(ii) the Company shall have the right to increase the amount of any Paid Loss Deposit Fund to an amount determined by the Company, which amount may exceed the required amount as specified in Article III of this Agreement.

All payments made by the Insured under this Agreement and the Policies shall be allocated first to collateral security, then to other amounts owed to the Company other than premiums, then finally to premiums for the Policies, regardless of the designation of the payment.

All terms and conditions of each Addendum hereto are a part of this Agreement and are here incorporated by reference in their entirety.

The Insured and the Company agree that this Agreement is not intended to, and does not, amend or alter any of the terms and conditions of any of the Policies.  In the event of any inconsistencies between this Agreement and any Policy, the terms and conditions of the Policy shall control.

## ARTICLE II

## DEFINITIONS

"Allocated Loss Adjustment Expense" shall mean such claim expenses, costs and any interest incurred in connection with the investigation, administration, adjustment, settlement or defense of any claim or lawsuit that the Company, under its accounting practices, directly allocates to a particular claim, whether or not a payment indemnifying the claimant(s) is made. Such expenses include, but are not limited to, subrogation, all court costs, fees and expenses; fees for service of process; fees and expenses to attorneys for legal services; the cost of services of undercover operations and detectives; fees to obtain medical cost containment services; the cost of employing experts for the purpose of preparing maps, photographs, diagrams, and chemical or physical analysis, or for expert advice or opinion; the cost of obtaining copies of any public records; and the cost of depositions and court reporters or recorded statements, provided, however, that Allocated Loss Adjustment Expense shall not include the salaries and traveling expenses of the Company's employees (except for amounts allocated to a specific claim by any of the Company's Field Litigation Offices or Legal Services Offices), or the Company's overhead and adjusters' fees.

"Claim Administration Expense" shall mean the amounts the Company and the Claims Adjusting Service determine are needed to cover expenses of administering claims under the Policies.

"Company Expenses" shall mean that amount the Company determines it needs to cover its expenses to administer the Insured's casualty insurance program pursuant to the Policies, including but not limited to the following:
   a.  general and administrative expense;
   b.  insurance charges;
   c.  premium taxes;
   d.  variable expenses, including but not limited to residual market assessments, boards and bureaus, non-subject state surcharges and assessments and other related fees; and
   e.  other services provided by the Company.

"Deductible Premium" shall mean the premium after the application of the deductible credit factor, as shown on the Workers' Compensation Deductible Policies.

"Insured's Obligation" shall mean all amounts the Insured is or may in the future be required to pay or to reimburse to the Company pursuant to this Agreement or the Policies. The amount of the Insured's Obligation shall be calculated by the Company based on Ultimate Losses.

"Interest Charge" shall mean the amount of interest for which the Insured is liable to the Company, payable at the monthly rate of one and one-half percent (1.5%) (or, if such rate is impermissible under applicable law, the maximum lawful, non-usurious rate that may be charged) on any amount payable by the Insured to the Company under this Agreement, but not paid by the Insured by the Required Payment Date, said charge to commence on the day next following the Required Payment Date for any such unpaid amount.

3

"Paid Losses" shall mean all amounts paid for losses (exclusive of Allocated Loss Adjustment Expense) under the Policies; provided, however, that the amount payable or reimbursable by the Insured for each Paid Loss shall be subject to the amount of the deductible as provided in the respective Policies.

"Required Payment Date" shall mean a date not later than ten (10) calendar days after the date of the Company's invoice for any amount billed by the Company to the Insured under this Agreement.

"Ultimate Losses" shall mean losses incurred under the Policies within the respective deductibles plus future loss development and the amount of losses incurred but not reported, as estimated by the Company. Ultimate Losses may include Allocated Loss Adjustment Expense as estimated by the Company.

## ARTICLE III

## PAID LOSS DEPOSIT FUND

As of the effective date of this Agreement, and of each Addendum hereto, the Insured will be required to pay the Company, on or before the Required Payment Date therefor, the amount specified as "Initial Paid Loss Deposit Fund" in each respective Addendum. Such payments will establish and initially fund, for the Policies listed on each of the respective Addenda, a Paid Loss Deposit Fund. Each of such "Initial Paid Loss Deposit Fund" amounts shall represent the Company's estimate of the average amount the Company will pay under the Policies listed on the respective Addenda during a sixty (60) day period for the amount of the Insured's share of (a) Paid Losses (b) Allocated Loss Adjustment Expense, and (c) Claim Administration Expense.

In the event of any single payment of a large Paid Loss and/or Allocated Loss Adjustment Expense under any Policy in an amount equal to or greater than the amount specified as "Single Payment of Paid Loss and/or Allocated Loss Expense" on the Addendum on which such Policy is listed, the Company shall have the right to require the Insured to pay immediately the amount of such single payment into the Paid Loss Deposit Fund.

The Company may from time to time recalculate the required amount of any Paid Loss Deposit Fund, based upon the Company's revised estimate of the average of the amounts it will pay as described above, and require the Insured to adjust the amount of such Paid Loss Deposit Fund accordingly, provided, that the minimum required amount of each Paid Loss Deposit Fund shall be $1,000.

## ARTICLE IV

## SECURITY FOR INSURED'S OBLIGATION

As security for payment of the Insured's Obligation under this Agreement, the Insured will provide to the Company, as beneficiary thereof, a clean irrevocable evergreen letter of credit (hereinafter, the "LOC") issued by a bank or other financial institution, and in an amount and form, acceptable to the Company; and/or such other forms of collateral as the Insured and the Company may agree in writing from time to time.

The Insured will continue to provide the Company with an LOC (and/or other collateral) as security for payment of the Insured's Obligation, until the Company determines that there is no longer any need for security. If there shall be a material deterioration in the financial condition of the bank or other financial institution which has issued the LOC, the Company shall have the right to require the Insured to replace the LOC with a new LOC issued by a bank or other financial institution then acceptable to the Company.

The Company shall have the right to draw against the LOC and/or other collateral in each instance where the Insured's Obligation, or any portion thereof, for any reason is not fulfilled.

Not less than thirty days prior to any termination or expiration of the LOC, the Insured will deliver to the Company a replacement LOC in an amount and form acceptable to the Company, issued by a bank or other financial institution acceptable to the Company.

Annually, the Company shall review and redetermine the amount of the Insured's Obligation and the amount of collateral security required pursuant to this article. At such time, the Insured will provide audited financial statements, interim financial statements, and any other financial information requested by the Company for the purpose of evaluating the financial condition of the Insured. The Insured will provide any needed increases in the amount of the LOC (and/or other collateral if acceptable to the Company) within thirty days of the Company's request for any additional required amount of the LOC. The Company will effect any decreases in the amount of the LOC (and/or other collateral) promptly, provided that the Insured is not in breach of any of its obligations under this Agreement or any of the Policies.

If the Insured fails to provide the Company with a replacement LOC or to provide the Company with any additional required amount of the LOC (and/or other collateral if acceptable to the Company), the Company will have the right to draw the full amount of the existing LOC and/or other collateral. The Insured recognizes that the Company may continue to require collateral as security for the payment of the Insured's Obligation after any cancellation, non-renewal, conversion or replacement of the Policies.

The Insured agrees that the Company shall have no obligation to remit to the Insured or to apply in reduction of the Insured's Obligation any increase or profits (including without limitation any interest or money) received by the Company from the proceeds of any LOC or from any other collateral provided by the Insured.

The Insured and the Company agree that nothing in this Agreement will constitute or be construed as a waiver of any rights the Company may have in each instance in which the Insured's Obligation for any reason is not fulfilled.

## ARTICLE V

## CANCELLATION/TERMINATION OF THE POLICIES

Cancellation of the Policies or any Policy by either the Insured or the Company will not terminate this Agreement. The parties' rights, duties and obligations under this Agreement will continue after any cancellation, non-renewal or replacement of the Policies.

This Agreement shall continue in full force and effect until the Company and the Insured mutually agree that it shall terminate.

## DIVIDEND CONSIDERATION

The Board of Directors for one or more of the companies that are parties to this Agreement may declare dividends in accordance with the provisions for participating companies on some of the policies under this agreement. The applicability of any and all dividends will be described in greater detail in the respective Addendum hereto.

## ARTICLE VI

1.    **Applicable Law.**  This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.  No amendments or modification of this Agreement shall have any force or effect unless in writing and signed by the parties hereto.

2.    **Successors and Assigns.**  All the terms of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns, whether so expressed or not; provided, however, that no party hereto shall assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the other parties hereto.

3.    **Severability.**  Any provision hereof which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or enforceability without invalidating the remaining provisions and without affecting the validity or enforceability of such provision in any other jurisdiction.

MULTTPA                                    6
12/18/98

4.    **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which together shall constitute but one and the same instrument.

5.    **Arbitration.** Any controversy, dispute, claim or question arising out of or relating to this Agreement, including without limitation its interpretation, performance or non-performance by any party, or any breach thereof (hereinafter, collectively, "Controversy") shall be referred to and resolved exclusively by three arbitrators through private, confidential arbitration conducted in Philadelphia, PA. Such arbitrators shall be disinterested, neutral individuals who have experience and qualifications in the subject matter of the Controversy. One arbitrator shall be chosen by each party and the third by the two so chosen. If either party refuses or neglects to appoint an arbitrator within thirty (30) days after receipt of written notice from the other party requesting it to do so, the requesting party may choose a total of two arbitrators who shall choose the third. If the arbitrators fail to select the third arbitrator within ten (10) days after both have been named, each arbitrator shall name three candidates, of whom the other shall decline two, and the decision shall be made by drawing lots. In the event of the death, disability or incapacity of any arbitrator, a replacement shall be named pursuant to the process, which resulted in the selection of the arbitrator to be replaced. The arbitrators may abstain from following the strict rules of law, and shall make their decision with regard to the custom and usage of the insurance business as at the effective date of this Agreement. The majority decision of the panel shall be final and binding upon the parties to this Agreement. Judgment may be entered upon the award of the arbitrators in any court of competent jurisdiction. Except as otherwise specifically provided in this paragraph, the arbitration of any controversy shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association.

**IN WITNESS WHEREOF,** this Multi-Line Deductible Agreement has been executed by the parties hereto, to be effective on the date first written above.

Delphi Automotive Systems, Inc.                  Pacific Employers Insurance Company
THE INSURED                                      THE COMPANY

Name: _____                   Name: _____
                                                        Ric Pena

Title: _RISK MANAGER_____                    Title: Senior Vice President

Date: _06/19/2002_____                     Date: _6/24/02_____

# 2000 ADDENDUM TO
## MULTI-LINE DEDUCTIBLE PROGRAM AGREEMENT
### (the "Addendum")

for **Delphi Automotive Systems Corporation**

Effective <u>October 1, 2000</u>

The terms and conditions stated in this **2000** Addendum apply only to the Policies listed below. All other terms and conditions of the Agreement are here incorporated by reference in their entirety.

**Policy Listing**

**DEDUCTIBLE POLICIES**

| Policy Number | Policy Period | Deductible Limit | Issuing Company |
|---|---|---|---|
| GENERAL LIABILITY<br>HDOG20307043 | 10/01/2000<br>to<br>10/01/2001 | $1,000,000 | *Pacific Employers Insurance Company |
| AUTOMOBILE LIABILITY<br>ISAHO7682360 | 10/01/2000<br>to<br>10/01/2001 | $1,000,000 | *Pacific Employers Insurance Company |
| WORKERS' COMPENSATION<br>WLRC43013191<br>WLRC4301299A<br>WLRC43013038 | 10/01/2000<br>to<br>10/01/2001 | $2,000,000 Workers' Compensation<br>($1,240,000 in Minnesota)<br>$1,000,000 Employers Liability | *Pacific Employers Insurance Company |
| | | | **\* denotes Participating Compan** |

MULTTPA
12/18/98

8

## WORKERS' COMPENSATION DEDUCTIBLE POLICIES

**1. Company Expenses:** Commencing on the effective date of this Addendum and for five months thereafter, the Insured will make a monthly payment to the Company by the Required Payment Date related to the above listed Workers' Compensation Deductible Policies. The first such payment shall be **$24,213.13** and the five subsequent payments shall be **$20,095.97** each. The total of all payments shall be the initial Company Expenses.

**2. Recalculation of Company Expenses:** At the time of audit, the Company will recalculate and the Insured will pay Company Expenses related to the Workers' Compensation Deductible Policies based on the following components:

    a.  **$80,000** flat charge – not subject to adjustment; plus
    b.  **$30,000** flat charge.

**3. Allocated Loss Adjustment Expense:** For the Workers' Compensation Policies listed on this Addendum, the Insured will pay or will reimburse the Company for all Allocated Loss Adjustment Expense related to Claims under the Policies.

## GENERAL LIABILITY DEDUCTIBLE POLICIES/ AUTOMOBILE LIABILITY DEDUCTIBLE POLICIES

**1.  General Liability Premium and Automobile Liability Premium:**  Commencing on the effective date of this Addendum and for five months thereafter, the Insured will make a monthly payment to the Company by the Required Payment Date related to the above listed General Liability Policies and Automobile Liability Policies.  The first such] payment shall be **$44,000** and the five subsequent payments shall be **$13,200** each.

**2.  Adjustment of General Liability and Automobile Liability Premium:**   The General Liability and Automobile Liability premiums are flat charges and not subject to adjustment.

**3.  Allocated Loss Adjustment Expense:** For General Liability and Automobile Liability, the Insured's share of the Allocated Loss Adjustment Expense is stated on the respective Policies listed in this Addendum.

## CLAIM ADMINISTRATION EXPENSE:

The Company will engage **Sedgwick CMS**  (the "Claims Adjusting Service") to investigate, adjust, settle and provide for the defense of claims in all states, except the Designated Adjuster states listed below and Texas, arising under the Policies listed on this Addendum. The Insured and the Claims Adjusting Service will separately contract to effectuate recovery dollars for any appropriate claim.

9

The Company will provide such claims adjusting services for claims arising in the Designated Adjuster States.

The Insured will pay to the Company the Claim Administration Expense, comprised of:
   (i)   Claim Handling Fee incurred according to actual claims count, at prices set forth in fee schedules, below;
   (ii)  Claim Supervision Fee.

Claim Handling Fees are set forth in the following fee schedules:

(1)  For Designated Adjuster States ( Idaho, Maryland, Oregon and Virginia) and Texas:

| TYPE OF CLAIMS | FEE PER CLAIM |
|---|---|
| Workers' Compensation - Medical Only | $135 |
| Workers' Compensation - Indemnity | $945 – first two years claim is open $900 annual charge thereafter |
| Workers' Compensation - Managed Medical Only | $445 |

(2)  For all states other than Designated Adjuster States listed above: (As outlined in Claim Service Agreement with ~~Crawford~~ Sedgwick – Exhibit A attached) (nurs) R.P.

As used in this Addendum, the following terms shall be defined as set forth below:

"Indemnity" shall mean any claim for which benefits may be payable under a Policy (I) to repay all or a portion of wages lost due to a compensable injury or disease and/or (ii) to compensate for disfigurement.

"Medical Only" shall mean any claim other than Indemnity, including claims for which the claimant did not receive lost wage payments from the Company.

"Managed Medical Only'" shall mean any claim other than Indemnity, including claims for which the claimant did not receive lost wage payments from the Company, for which the total accumulated amount of medical payments by the Company exceeded $1,000.

MULTTPA
12/18/98

**IN WITNESS WHEREOF,** this **2000** Addendum to the Multi-line Deductible Program Agreement dated **October 1, 2000** has been duly executed by the parties hereto, each of which intends by its execution hereof to be legally bound by the terms of this Addendum and of the Agreement.

**Delphi Automotive Systems Corporation**
THE INSURED

By ; _____

Title: _____

Date: _____

**Pacific Employers Insurance Company**
THE COMPANY

By _____
Ric Pena

Title: _Senior Vice President_

Date: _6/24/02_

## 2001 ADDENDUM TO
## MULTI-LINE DEDUCTIBLE PROGRAM AGREEMENT
### (the "Addendum")

### for **Delphi Automotive Systems Corporation**

### Effective <u>October 1, 2001</u>

The terms and conditions stated in this **2001** Addendum apply only to the Policies listed below. All other terms and conditions of the Agreement are here incorporated by reference in their entirety.

### Policy Listing

| DEDUCTIBLE POLICIES | | | |
|---|---|---|---|
| **Policy Number** | **Policy Period** | **Deductible Limit** | **Issuing Company** |
| GENERAL LIABILITY HDOG20307043 | 10/01/2001 to 10/01/2002 | $1,000,000 | *Pacific Employers Insurance Company |
| AUTOMOBILE LIABILITY ISAHO7682360 | 10/01/2001 to 10/01/2002 | $1,000,000 | *Pacific Employers Insurance Company |
| WORKERS' COMPENSATION WLRC43111322 WLRC43111449 WLRC4311136A | 10/01/2001 to 10/01/2002 | $2,000,000 Workers' Compensation ($1,240,000 in Minnesota) $1,000,000 Employers Liability | *Pacific Employers Insurance Company |
| | | | **\* denotes Participating Company** |

## WORKERS' COMPENSATION DEDUCTIBLE POLICIES

**1. Company Expenses:**  Commencing on the effective date of this Addendum and for five months thereafter, the Insured will make a monthly payment to the Company by the Required Payment Date related to the above listed Workers' Compensation Deductible Policies.  The first such payment shall be **$27,245**  and the five subsequent payments shall be **$21,793**  each.  The total of all payments shall be the initial Company Expenses.

**2. Recalculation of Company Expenses:** At the time of audit, the Company will recalculate and the Insured will pay Company Expenses related to the Workers' Compensation Deductible Policies based on the following components:

    a.  **$92,000** flat charge – not subject to adjustment; plus
    b.  **$30,000** flat charge.

**3. Allocated Loss Adjustment Expense:** For the Workers' Compensation Policies listed on this Addendum, the Insured will pay or will reimburse the Company for all Allocated Loss Adjustment Expense related to Claims under the Policies.

## GENERAL LIABILITY DEDUCTIBLE POLICIES/ AUTOMOBILE LIABILITY DEDUCTIBLE POLICIES

**1. General Liability Premium and Automobile Liability Premium:** Commencing on the effective date of this Addendum and for five months thereafter, the Insured will make a monthly payment to the Company by the Required Payment Date related to the above listed General Liability Policies and Automobile Liability Policies. The first such payment shall be **$44,000** and the five subsequent payments shall be **$13,200** each.

**2. Adjustment of General Liability and Automobile Liability Premium:** The General Liability and Automobile Liability premiums are flat charges and not subject to adjustment.

**3. Allocated Loss Adjustment Expense:** For General Liability and Automobile Liability, the Insured's share of the Allocated Loss Adjustment Expense is stated on the respective Policies listed in this Addendum.

## CLAIM ADMINISTRATION EXPENSE:

The Company will engage **Sedgwick CMS** (the "Claims Adjusting Service") to investigate, adjust, settle and provide for the defense of claims in all states, except the Designated Adjuster states listed below and Texas, arising under the Policies listed on this Addendum. The Insured and the Claims Adjusting Service will separately contract to effectuate recovery dollars for any appropriate claim.

The Company will provide such claims adjusting services for claims arising in the Designated Adjuster States.

The Insured will pay to the Company the Claim Administration Expense, comprised of:
    (i)  Claim Handling Fee incurred according to actual claims count, at prices set forth in fee schedules, below;

(ii)  Claim Supervision Fee.

Claim Handling Fees are set forth in the following fee schedules:

(1)  For Designated Adjuster States (Idaho, Maryland, Oregon and Virginia) and Texas:

| TYPE OF CLAIMS | FEE PER CLAIM |
|---|---|
| Workers' Compensation - Medical Only | $135 |
| Workers' Compensation - Indemnity | $1,000 |
| Workers' Compensation - Managed Medical Only | $500 |

(2)  For all states other than Designated Adjuster States listed above: (As outlined in Claim Service Agreement with ~~Crawford~~ *Sedgwick* Exhibit A attached)  *mwg* *R.P.*

As used in this Addendum, the following terms shall be defined as set forth below:

"Indemnity" shall mean any claim for which benefits may be payable under a Policy (I) to repay all or a portion of wages lost due to a compensable injury or disease and/or (ii) to compensate for disfigurement.

"Medical Only" shall mean any claim other than Indemnity, including claims for which the claimant did not receive lost wage payments from the Company.

"Managed Medical Only'" shall mean any claim other than Indemnity, including claims for which the claimant did not receive lost wage payments from the Company, for which the total accumulated amount of medical payments by the Company exceeded $1,000.

**IN WITNESS WHEREOF,** this **2001** Addendum to the Multi-line Deductible Program Agreement dated **October 1, 2000** has been duly executed by the parties hereto, each of which intends by its execution hereof to be legally bound by the terms of this Addendum and of the Agreement.

<u>**Delphi Automotive Systems Corporation**</u>    <u>**Pacific Employers Insurance Company**</u>

THE INSURED                                  THE COMPANY

By ; _Mike W. Bol_                           By _____

                                              Ric Pena

Title: _Risk Manager_                    Title: <u>Senior Vice President</u>

Date: _06/19/2002_                   Date: _6/24/02_

**<u>EXHIBIT C</u>**

# ESTIMATED LIABILITY UNDER
# ASSUMED AGREEMENTS

**Table Of The Debtors' Estimated Liability**
**Under The Assumed Agreements (12/16/05)**

| Confidence Interval | Workers' Compensation ("WC") Liability | General Liability | Products Liability | Automobile Liability | Total Liability | Cure Claim (Debtors paying WC Liability)* | Cure Claim (Debtors not paying WC Liability)* |
|---|---|---|---|---|---|---|---|
| 5% | $1,485,079 | $2,973,547 | $4,979,140 | $229,002 | $9,666,768 | $0 | $0 |
| 10% | $1,794,771 | $3,529,913 | $5,904,383 | $295,208 | $11,524,275 | $0 | $0 |
| 15% | $2,028,288 | $3,909,658 | $6,590,136 | $343,950 | $12,872,032 | $0 | $0 |
| 20% | $2,221,683 | $4,213,186 | $7,119,137 | $387,312 | $13,941,318 | $0 | $0 |
| 25% | $2,387,475 | $4,501,997 | $7,554,118 | $428,105 | $14,871,695 | $0 | $0 |
| 30% | $2,557,075 | $4,772,246 | $7,940,131 | $464,789 | $15,734,241 | $0 | $0 |
| 35% | $2,695,285 | $5,002,833 | $8,303,871 | $498,493 | $16,500,482 | $0 | $0 |
| 40% | $2,837,116 | $5,228,215 | $8,647,565 | $533,505 | $17,246,401 | $0 | $0 |
| 45% | $2,968,482 | $5,441,121 | $8,972,499 | $567,024 | $17,949,126 | $0 | $0 |
| 50% | $3,105,979 | $5,653,289 | $9,303,754 | $600,160 | $18,663,182 | $0 | $0 |
| 55% | $3,229,015 | $5,857,427 | $9,601,748 | $634,658 | $19,322,848 | $0 | $222,848 |
| 60% | $3,372,778 | $6,060,624 | $9,923,111 | $671,602 | $20,028,115 | $0 | $928,115 |
| 65% | $3,512,633 | $6,265,443 | $10,212,688 | $709,550 | $20,700,314 | $0 | $1,600,314 |
| 70% | $3,648,083 | $6,482,903 | $10,513,144 | $744,820 | $21,388,950 | $0 | $2,288,950 |
| 75% | $3,794,438 | $6,711,761 | $10,797,688 | $788,040 | $22,091,927 | $0 | $2,991,927 |
| 80% | $3,954,709 | $6,937,001 | $11,087,255 | $832,177 | $22,811,142 | $0 | $3,711,142 |
| 85% | $4,128,936 | $7,179,454 | $11,424,918 | $883,412 | $23,616,720 | $387,784 | $4,516,720 |
| 90% | $4,349,517 | $7,457,922 | $11,785,575 | $942,083 | $24,535,097 | $1,085,580 | $5,435,097 |
| 95% | $4,598,217 | $7,796,325 | $12,244,125 | $1,023,081 | $25,661,748 | $1,963,531 | $6,561,748 |
| 99% | $4,981,411 | $8,260,582 | $12,761,989 | $1,157,244 | $27,161,226 | $3,079,815 | $8,061,226 |

| Selected Estimate** | $3,163,311 | $5,924,382 | $10,141,789 | $580,337 | $19,809,819 | $0 | $709,819 |
|---|---|---|---|---|---|---|---|

\*  The Debtors currently have $19.1 million in collateral posted with the Insurers.

\*\* The selected estimates are based on a review performed by Aon's Actuarial and Analytics Practice.
   The estimated liability is approximately at the 58th percentile for the total of all coverages.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                        :

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AFFIDAVIT OF WILLIAM D. TELGEN IN SUPPORT OF MOTION
FOR ORDER UNDER 11 U.S.C. §§ 362, 363, 365, 1107, AND 1108
AUTHORIZING RENEWAL OF INSURANCE COVERAGE
AND CERTAIN RELATED RELIEF

1

State of Michigan       )
                        )  s.s.:
County of Oakland       )

       William D. Telgen, being duly sworn, deposes and says:

       1.     I am the Risk Manager for Delphi Corporation ("Delphi"), debtor

and debtor-in-possession in the above-captioned chapter 11 cases.  I am familiar with the

Debtors' operations, their insurance policies generally, their relationship and agreements

with ACE American Insurance Company and its affiliates (collectively, the "Insurers"),

the Agreements (as defined below), and the market for insurance of the types provided by

the Insurers pursuant to the Insurance Policies (as defined below).  I have held this

position with Delphi since September 1, 2005 and have worked in the automotive

industry on insurance and risk management issues for more than 11 years.  I have a

Masters of Business Administration from University of Detroit-Mercy, and a Bachelors

Degree in Chemical Engineering from the University of Michigan.

       2.     I submit this affidavit in support of Delphi's Motion For An Order

Under 11 U.S.C. §§ 362, 363, 365, 1107, And 1108 Authorizing Renewal of Insurance

Coverage And Certain Related Relief, dated December 16, 2005 (the "Motion").

Capitalized terms not otherwise defined herein have the meanings ascribed to them in the

Motion.  Except as otherwise indicated, I have personal knowledge of the matters set

forth herein and, if called as a witness, would testify competently thereto.  I am

authorized to submit this affidavit.

       3.     <u>Relief Sought</u>.  Pursuant to the Motion, the Debtors seek entry of

an Order authorizing, but not directing, the Debtors to renew or enter into new insurance

policies with the Insurers and to execute and deliver all related documents and

agreements.  The Debtors also request authority to assume the agreements and policies

2

between Delphi and the Insurers (collectively, the "Agreements"), including but not

limited to the following:

    (a)    that certain Multi-Line Deductible Program Agreement effective as of October 1, 2000 by and between Pacific Employers Insurance Company and Delphi (formerly known as Delphi Automotive Systems Corporation) and all amendments and addenda thereto (collectively, the " Multi-Line Deductible Program Agreement");

    (b)    All General Liability Policies issued to Delphi or the other Debtors by one or more of the Insurers and all renewals, extensions, and endorsements thereto (collectively, the "General Liability Policy");

    (c)    All Automobile Liability Policies issued to Delphi or the other Debtors by one or more of the Insurers and all renewals, extensions, and endorsements thereto (the "Automobile Liability Policy");

    (d)    All Workers' Compensation Policies issued to Delphi or the other Debtors by one or more of the Insurers and all renewals, extensions, and endorsements thereto (the "Workers' Compensation Policy" and, collectively with the General Liability Policy and the Automobile Liability Policy, the "Insurance Policies");

    (e)    the binder related to the Insurance Policies; and

    (f)    the claims administration agreements related to the Insurance Policies.

    4.    The Debtors also have agreed, as a condition of the Insurers'

willingness to provide renewals of the Insurance Policies, that they will seek to replace

the Cash Collateral with the New Letter of Credit.

    5.    As a condition of the Insurers' willingness to provide renewals of

the Insurance Policies, the Debtors seek certain additional relief.  Specifically, the

Debtors request that the Court: (a) authorize, but not direct, the Debtors to renew or enter

into insurance policies and to execute all related documents and agreements between the

Debtors and the Insurers pursuant to section 363 of the Bankruptcy Code; (b) authorize,

3

but not direct, the Debtors to agree to future renewals of the insurance programs and to

provide collateral and security pursuant to any such programs without further order of

this Court; (c) authorize the Insurers to draw against the Collateral, apply the Collateral to

the Debtors' obligations under the Agreements, and take other actions permitted under

applicable non-bankruptcy law and in accordance with the Agreements without further

order of this Court (upon prior written notice, not to exceed five business days, to the

Debtors and counsel for the official committee of unsecured creditors (the "Creditors'

Committee"), if and to the extent that prior notice is required by the applicable rules of

this Court; provided that no notice shall be required for draws under letters of credit due

to the expiration or non-renewal thereof); (d) authorize relief from the automatic stay

pursuant to section 362(d) of the Bankruptcy Code, conditioned on the assumption of the

Agreements, for the sole and limited purpose of effectuating the relief described in

subparagraph (c) above; (e) confirm, conditioned upon the assumption of the Agreements,

administrative priority treatment for all payment and reimbursement obligations owing to

the Insurers under the Agreements; (f) confirm, conditioned on the assumption of the

Agreements, that the Insurers' claims with respect to the Agreements will be paid by the

Debtors in the ordinary course of their businesses; and (g) confirm that the Agreements

and an order of this Court approving this Motion shall not be altered by any plan of

reorganization confirmed in these chapter 11 cases or by subsequent order of this Court.

      6.    <u>Expiration of policies; efforts to replace</u>.  Prior to the Petition Date,

the Debtors were faced with the expiration of the policy period of certain insurance

policies provided by the Insurers, which expired by their terms on September 30, 2005.

The Insurance Policies provided the Debtors with the first tier of a layered insurance

program.  The failure by the Debtors to renew such policies or to enter into replacement

policies would have left the Debtors and their estates exposed to significant potential

liabilities.  To avoid this exposure, the Debtors explored their options with respect to such

renewal or replacement policies and determined that entry into the Insurance Policies

represented the Debtors' best option and, therefore, that it was in their best interests to

renew the Insurance Policies and enter into that certain Amendment 1 to the Multi-Line

Deductible Program Agreement (the "Amendment").

        7.     The Insurers were willing to provide a term continuing only

through January 1, 2006 under each Insurance Policy, however, and insisted upon

Delphi's agreement to the terms of the Amendment as a condition to their willingness to

provide the Debtors with the insurance coverage embodied in the Insurance Policies.  In

addition to extending the insurance coverage under substantially the same terms as had

previously existed, the Amendment, among other terms, requires that the Debtors seek

approval of the relief sought in the Motion as a condition precedent to the Insurers'

agreement to provide any renewal of the Insurance Policies beyond January 1, 2006.

Because of the need to obtain the relief requested in the Motion, the Debtors and the

Insurers agreed to enter into a 90-day extension of the Amendment that currently extends

coverage from January 1, 2006, through April 1, 2006 (the "Extension") to allow time for

the Insurers to complete their binding offer for coverage through September 30, 2006.

The parties intend to cancel the Extension upon the renewal or entry into new insurance

policies.

        8.     Subsequent to the Petition Date, the Debtors have actively sought

competitive bids for replacement of the Insurance Policies covering the nine-month

period beginning January 1, 2006.  Unfortunately, because of the size and breadth of the

5

Debtors' needs, only a limited number of insurance companies have the ability and/or

willingness to provide policies that would be suitable to replace the Insurance Policies.

9.    <u>Analysis of options</u>.  The Debtors have evaluated their options and

selected the Insurers' proposal as the best option.  Among other terms, the Insurers'

proposal for insurance coverage for the period January 1, 2006 through September 30,

2006 requires that the Debtors pay a premium of approximately $1.98 million and post

approximately $9.31 million of collateral, in addition to the collateral previously posted

prepetition.

10.    The Debtors have sought the professional advice of their insurance

broker, Aon Risk Services ("Aon"), to provide, among other things, an estimate of the

Debtors' liability under the Agreements, which subsequently can be used to estimate the

value of the Insurers' potential cure claim stemming from the Debtors' assumption of the

Agreements.  As of the date of the Motion, the Debtors submit that there are no defaults

under the Agreements.  The calculations provided by Aon are based on a snap-shot of the

data at the time the Motion was filed.  In addition, the estimates contain a high level of

variance.  Nevertheless, Aon's calculations are the best information available to the

Debtors at this time, and the Debtors factored the uncertainty of these estimates into their

analysis and evaluation of the Debtors' options for insurance coverage.

11.    The Insurers currently hold $19.1 million in collateral and security

posted by the Debtors (the "Collateral"), which is comprised of an irrevocable letter of

credit in the amount of approximately $13.7 million (the "Letter of Credit") and cash

collateral of $5,388,967 (the "Cash Collateral").  The Collateral was provided to the

Insurers prior to the Petition Date.  In analyzing the size of the Insurers' potential cure

claim, the Debtors analyzed the likelihood that the cure claim exceeds the Collateral.  In

6

addition, the Debtors took the potential cure amount into account when comparing the

Insurers' bid against the Debtors' other options.

12.    If the Debtors were to continue paying the prepetition workers'

compensation claims, the estimated liability to the Insurers arising from the Agreements

(as described in paragraph 22 of the Motion) would be approximately $16.6 million.  This

estimate falls between the 55 and 60 percent confidence interval.[1]  Aon's estimate is more

conservative than the median liability, which by definition, would be represented by the

50 percent confidence interval.  Because that estimated liability to the Insurers is less

than the value of the Collateral, the Debtors estimate that Insurers' cure claim would be

zero.

13.    Under the Human Capital Obligations Order, however, the Debtors

are not required to continue paying their prepetition workers' compensation liability

claims.  If the Debtors were to stop paying these claims, Aon estimates that the liability

arising from the indemnification provision would increase by $3.3 million, to

approximately $19.8 million.  With $19.1 million of prepetition collateral posted, the

estimated amount of the Insurers' potential cure claim would therefore be approximately

$700,000.

14.    Because this calculation has a high rate of variance, the Debtors

project that their liability under the Agreements ranges from $8.2 million to $22.2 million

if the Debtors were to continue paying workers' compensation claims and from $9.7

million to $27.2 million if they were to stop paying workers' compensation claims.

---

[1]    Confidence interval is a statistical range with a specified probability that a given
parameter lies within that range.  Applied in this context, the confidence interval
provides the probability that the estimated liability to the Insurers is less than or
equal to $X.

Under the worst case scenario projected by these estimates (i.e., the 99 % confidence

interval that liability will not exceed these amounts), the Insurers could draw on all of the

collateral posted and still have a cure claim of approximately $8.1 million, again

assuming that the Debtors were to stop paying prepetition workers' compensation claims.

If the Debtors continue paying workers' compensation claims, the liability to the Insurers

would fall by approximately $5.0 million, and the Debtors' estimated liability to the

Insurers would be approximately $22.2 million, resulting in a 1% chance that the cure

claim would equal or exceed approximately $3.1 million.

15.    The Debtors have attempted to negotiate a waiver of the

requirements of the Amendment, so as to obviate the need for the assumption of the

Agreements.  The Insurers, however, have refused to waive the assumption requirement

in the Amendment.  Therefore, I believe that the relief sought in the Motion is necessary

because the Insurers' proposal, even including the estimated costs associated with

assuming the Agreements, is more attractive than the Debtors' other options.  Without the

relief sought by the Motion, the Insurers stated that they would not be willing to renew

the Insurance Policies.  This failure to renew would severely limit the Debtors' potential

sources of insurance, and without a viable source of alternative insurance, the Debtors

anticipate that their insurance costs would substantially increase following the expiration

of the Insurance Policies.

16.    The Debtors also have considered the possibility of self-insuring

this layer of liability and thus foregoing any replacement insurance policies as of January

1, 2006.  The Debtors have determined, however, that such action would impose too

much risk upon the estates.  The Debtors' failure to secure a renewal of the Insurance

Policies or replacement policies would expose the Debtors' estates to the risk of putting

8

the Debtors in violation of statutory and contractual insurance requirements in certain

states where the Debtors have on-going operations.  Therefore, I believe that renewal of

the Insurance Policies or entry into replacement insurance policies is necessary and in the

Debtors' best interests.

17.    Replacement of cash collateral with new letter of credit.  The

Debtors have also agreed, as a condition of the Insurers' willingness to provide renewals

of the Insurance Policies, that they will seek to replace the Cash Collateral with an

irrevocable letter of credit in the same amount as the Cash Collateral, in form and

substance acceptable to the Insurers, and issued by a financial institution acceptable to the

Insurers (the "New Letter of Credit").  Although the Debtors recognize that this

transaction involves the use of assets of the estate to secure a prepetition claim, the

Debtors believe that the issuance of the New Letter of Credit is in the best interest of the

Debtors and their estates because a draw on a letter of credit is significantly cheaper for

the Debtors than continuing to maintain the Cash Collateral.

18.    Additional requirements under the Amendment.  Furthermore,

pursuant to the Amendment, the Debtors have also agreed, as a condition of the Insurers'

willingness to provide renewals of the Insurance Policies, that they will seek the

following additional relief, and hereby request that the Court: (a) authorize, but not direct,

the Debtors to renew or enter into insurance policies and to execute all related documents

and agreements between the Debtors and the Insurers pursuant to section 363 of the

Bankruptcy Code; (b) authorize, but not direct, the Debtors to agree to future renewals of

the insurance programs and to provide collateral and security pursuant to any such

programs without further order of this Court;[2] (c) authorize the Insurers to draw against

the Collateral, apply the Collateral to the Debtors' obligations under the Agreements, and

take other actions permitted under applicable non-bankruptcy law and in accordance with

the Agreements without further order of this Court (upon prior written notice, not to

exceed five business days, to the Debtors and counsel for the Creditors' Committee, if

and to the extent that prior notice is required by the applicable rules of this Court;

provided that no notice shall be required for draws under letters of credit due to the

expiration or non-renewal thereof); (d) authorize relief from the automatic stay pursuant

to section 362(d) of the Bankruptcy Code, conditioned on the assumption of the

Agreements, for the sole and limited purpose of effectuating the relief described in

subparagraph (c) above; (e) confirm, conditioned upon the assumption of the Agreements,

administrative priority treatment for all payment and reimbursement obligations owing to

the Insurers under the Agreements; (f) confirm, conditioned on the assumption of the

Agreements, that the Insurers' claims with respect to the Agreements will be paid by the

Debtors in the ordinary course of their businesses; and (g) confirm that the Agreements

and an order of this Court approving the Motion will not be altered by any plan of

reorganization confirmed in these chapter 11 cases or by subsequent order of this Court.

       19.    In the ordinary course of business, the Debtors routinely enter into

new insurance policies and post collateral as a condition precedent to binding the Insurers

to the terms of such insurance policies.

---

[2]      The Debtors believe that entering into new insurance programs and posting
collateral as a prerequisite for such programs are ordinary course transactions.
Because this condition, however, was listed in the Amendment, the Debtors have
agreed to seek authorization for such actions.

20.     I believe that the benefits to the Debtors from the relief sought in

the Motion far outweigh any costs associated with the Motion.


s/ William D. Telgen
WILLIAM D. TELGEN

Sworn to before
me this 16th day
of December 2005

s/ *Barbara L. Rybinski*
Notary Public
State of Michigan
County of Macomb
Commission Expires 12/05/11
Acting in County of Oakland

11

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                            :

    In re                     :      Chapter 11
                              :

DELPHI CORPORATION, <u>et al.</u>,    :      Case No. 05-44481 (RDD)
                              :

                Debtors.    :      (Jointly Administered)
                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ORDER UNDER 11 U.S.C. §§ 362, 363, 365, 1107, AND 1108
AUTHORIZING RENEWAL OF INSURANCE COVERAGE
<u>AND CERTAIN RELATED RELIEF</u>

("INSURANCE AGREEMENT ORDER")

Upon the motion, dated December 16, 2005 (the "Motion")[1], of Delphi

Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-

in-possession in the above-captioned cases (collectively, the "Debtors"), for an order (the

"Order") under 11 U.S.C. §§  362, 363, 365, 1107, and 1108  authorizing renewal of

insurance agreements with ACE American Insurance Company and its affiliates

(collectively, the "Insurers") and certain related relief; and upon the Affidavit of William

D. Telgen in Support of the Motion, sworn to December 16, 2005; and upon the record of

the hearing held on the Motion; and after due deliberation thereon, and sufficient cause

appearing therefor,

---

[1]      Capitalized terms not otherwise defined herein shall have the meanings ascribed
to them in the Motion.

IT IS HEREBY FOUND AND DETERMINED THAT:

A.     The Debtors have exercised reasonable business judgment in

seeking authorization to assume the agreements and policies between Delphi and the

Insurers (collectively, the "Agreements") including, but not limited to the following:

(a)     that certain Multi-Line Deductible Program Agreement
effective as of October 1, 2000 by and between Pacific
Employers Insurance Company and Delphi (formerly
known as Delphi Automotive Systems Corporation) and all
amendments and addenda thereto (collectively, the " Multi-
Line Deductible Program Agreement");

(b)     All General Liability Policies issued to Delphi or the other
Debtors by one or more of the Insurers and all renewals,
extensions, and endorsements thereto (collectively, the
"General Liability Policy");

(c)     All Automobile Liability Policies issued to Delphi or the
other Debtors by one or more of the Insurers and all
renewals, extensions, and endorsements thereto (the
"Automobile Liability Policy");

(d)     All Workers' Compensation Policies issued to Delphi or the
other Debtors by one or more of the Insurers and all
renewals, extensions, and endorsements thereto (the
"Workers' Compensation Policy" and, collectively with the
General Liability Policy and the Automobile Liability
Policy, the "Insurance Policies");

(e)     the binder related to the Insurance Policies; and

(f)     the claims administration agreements related to the
Insurance Policies.

B.     The Debtors have also exercised reasonable business judgment in

seeking the additional relief required to enable them to renew their Insurance Policies.

C.     The relief requested in the Motion is in the best interests of the

Debtors, their estates, their creditors, and other parties-in-interest.

D.      The notice given by the Debtors of the Motion and the hearing thereon constitutes due and sufficient notice thereof.

E.      Good and sufficient cause has been shown for the entry of this Order.

THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT:

1.      The Motion is GRANTED.

2.      The Debtors are hereby authorized, but not directed, to assume the Agreements pursuant to section 365(a) of the Bankruptcy Code, effective as of the date hereof.  The assumption of the Agreements shall be evidenced by written notice from the Debtors to the Insurers.

3.      The Debtors are hereby authorized, but not directed, to renew or enter into insurance policies and to execute all related documents and agreements between the Debtors and the Insurers and to perform their obligations in connection therewith pursuant to section 363 of the Bankruptcy Code.

4.      The Debtors are hereby authorized, but not directed, to replace the $5,388,967 of existing cash collateral (the "Cash Collateral") with a new, irrevocable letter of credit in the same amount as the Cash Collateral, in form and substance acceptable to the Insurers, and issued by a financial institution acceptable to the Insurers (the "New Letter of Credit").  Upon the Insurers' receipt of the New Letter of Credit, the Insurers are directed to return the Cash Collateral to the Debtors promptly thereafter by wire transfer to the Debtors pursuant to the Debtors' written instructions.

5.      The Debtors are hereby authorized, but not directed, to agree to future renewals of the insurance programs and to provide collateral and security pursuant to any such programs without further order of this Court.

6.      The Insurers are hereby authorized, conditioned on the Debtors' assumption of the Agreements, to draw against the collateral, apply the collateral to the Debtors' obligations under the Agreements, and take other actions permitted under applicable non-bankruptcy law and in accordance with the Agreements without further order of this Court (upon prior written notice, not to exceed five business days, to the Debtors and counsel for the official committee of unsecured creditors, if and to the extent that prior notice is required by the applicable rules of this Court; provided that no notice shall be required for draws under letters of credit due to the expiration or non-renewal thereof).

7.      Conditioned on the Debtors' assumption of the Agreements, the automatic stay is hereby lifted pursuant to section 362(d) of the Bankruptcy Code solely for the purpose of effectuating the relief described in paragraph 6 hereof.

8.      Conditioned on the Debtors' assumption of the Agreements, all payment and reimbursement obligations owing to the Insurers from the Debtors under the Agreements are hereby accorded administrative priority status pursuant to section 503(b)(1)(A) of the Bankruptcy Code.

9.      Conditioned on the Debtors' assumption of the Agreements, the Debtors are hereby authorized to pay the Insurers' claims with respect to the Agreements in the ordinary course of their businesses.

4

10.     Neither the terms of this Order, nor the Agreements, shall be altered by any plan of reorganization confirmed in these chapter 11 cases or by subsequent order of this Court.

11.     This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

12.     The requirement under Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York for the service and filing of a separate memorandum of law is deemed satisfied by the Motion.

Dated:    New York, New York
          January  __, 2006


_____
UNITED STATES BANKRUPTCY JUDGE

5