TOGUT, SEGAL & SEGAL LLP
Co-Counsel for Delphi Corporation, *et al.*,
Debtors and Debtors in Possession
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut (AT-9759)
Neil Berger (NB-3599)

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK<br>------------------------------------------------------------x<br>In re:<br><br>DELPHI CORPORATION, *et al.*,<br><br>                       Debtors.<br>------------------------------------------------------------x | HEARING DATE: 1/5/06<br>                 AT: 10:00 a.m.<br><br><br>Chapter 11<br>Case No. 05-44481 [RDD]<br><br>Jointly Administered |

# DEBTORS' OBJECTION TO MOTION BY PEPCO ENERGY SERVICES, INC. FOR RELIEF FROM AUTOMATIC STAY TO PROVIDE NOTICE OF DEFAULT AND TERMINATE SALES AGREEMENT WITH THE DEBTORS, OR IN THE ALTERNATIVE, FOR AN ORDER COMPELLING THE DEBTORS TO ASSUME OR REJECT SALES AGREEMENT

**TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:**

        Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"), by their undersigned counsel, as and for their objection to the motion dated November 21, 2005 (the "Motion") of Pepco Energy Services, Inc. ("Pepco") for an Order for relief from the automatic stay to provide notice of default and terminate the

sales agreement between Pepco and the Debtors, or in the alternative, to compel the Debtors' assumption or rejection of the sales agreement, respectfully state:

## PRELIMINARY STATEMENT

1. Pepco filed this Motion on November 21, 2005, a mere six days after it failed to receive Delphi's *prepayment* for electricity for the December 1-December 31, 2005 period. That prepayment was made to Pepco the day after the Motion was filed.[1]

2. Indeed, the Debtors are current on all of their post-petition obligations to Pepco.

3. Pepco nonetheless seeks entry of "an Order whereby if a future payment under the Sales Agreement [as defined below] is untimely pursuant to the terms of the Sales Agreement, the stay shall be automatically lifted without further Order of this Court to allow [Pepco] to send a notice of non-payment and to terminate the Sales Agreement per its terms." (Motion, at 4-5.) In the alternative, Pepco seeks to compel the Debtors to assume or reject their agreement with Pepco.

4. Pepco premises its extraordinary requests for relief upon its purported concern over the risk that the Debtors will fail to timely pay Pepco in the future and that Pepco will, as a result, become liable to the local utility through which it supplies electricity to the Debtors.

5. This risk has not materialized to date and is contrary to the Court's finding in the Utilities Order[2] that "[t]he Debtors' record of timely payment of

---

[1] The brief delay in payment was caused by a change of account number that occurred after the Debtors' bankruptcy filings.

[2] Final Order Under 11 U.S.C. §§ 105, 366, 503, and 507 (I) Prohibiting Utilities From Altering, Refusing, or Discontinuing Services on Account of Prepetition Invoices and (II) Establishing Procedures for Determining Requests for Additional Assurance, dated October 28, 2005 (Docket No. 760).

2

prepetition utility bills [and] demonstrated ability to pay future utility bills . . . constitute adequate assurance of future payment for utility services pursuant to 11 U.S.C. § 366(b)." (Utilities Order ¶ 4.)

6. Moreover, the extraordinary relief sought by Pepco is contrary to the spirit of the Utilities Order, which enjoins utility companies, including Pepco, from "altering, refusing, or discontinuing service to, or discriminating against, the Debtors solely on the basis of the commencement of these chapter 11 cases. . . ." Utilities Order ¶ 3. The relief sought by Pepco is contrary to the Utilities Order in that Pepco seeks to interrupt or discontinue service to the Debtors if the Debtors make a *single* future payment on an untimely basis.

7. Pepco also improperly seeks to compel the Debtors to assume the Sales Agreement so soon after their bankruptcy filings rather than allowing the Debtors to (a) evaluate numerous factors that affect their business opportunities and responsibilities including, without limitation, the New Brunswick, New Jersey manufacturing facility that utilizes the electricity that is the subject of the Sales Agreement and (b) continue performance under the terms of the pre-petition Sales Agreement while they do so.

8. For these reasons and for the reasons discussed below, the Motion should be denied in its entirety.

## STATEMENT OF FACTS

**The Chapter 11 Cases**

9. On October 8, 2005 (the "Filing Date"), Delphi and certain of its affiliates each filed voluntary petitions in this Court for reorganization relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").

10. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. This Court entered Orders directing the joint administration of the Debtors' chapter 11 cases (Docket Nos. 28 and 404).

11. On October 17, 2005, the United States Trustee for the Southern District of New York appointed an official committee of unsecured creditors in these cases, which is represented by Latham & Watkins. No trustee or examiner has been appointed.

12. The Debtors have only recently commenced a restructuring effort that they anticipate will take approximately 18 months to complete. They are parties to tens of thousands of executory contracts and unexpired leases, which collectively involve billions of dollars of liabilities and which will take many months to examine. The Debtors are currently reviewing 11,000 contracts that are expiring in the near term, many of which are necessary to the supply of product to the Debtors' customers. In furtherance of their efforts to stabilize their businesses, the Debtors are negotiating with these suppliers and analyzing the propriety of assuming such contracts.

13. The Court has recently denied motions brought by several creditors for orders fixing deadlines for the Debtors to assume or reject executory contracts. *See*,

4

*e.g.*, Order under 11 U.S.C. § 365(d)(2) Denying Motion of Sensus Precision Die Casting, Inc. for Order Directing Debtors to Determine Within 30 Days Whether to Assume or Reject Executory Contract, dated December 1, 2005 (Docket No. 1378); Order Under 11 U.S.C. § 365(d)(2) Denying Motion of Russell Reynolds Associates, Inc. for Order Fixing Deadline for Debtors to Assume or Reject Executory Contract, dated December 1, 2005 (Docket No. 1379); Order Under 11 U.S.C. § 365(d)(2) Denying Motion of Solectron Manufactura De Mexico, S.A. for Order Fixing Deadline for Debtors to Assume or Reject Executory Contract, dated December 1, 2005 (Docket No. 1380).

14. In denying Solectron's motion just one month ago, the Court observed: "It's very early in the case. The debtor has stated since the start of the case that one of the reasons it is in Chapter 11 is to further rationalize manufacturing facilities and the like and those decisions clearly have not been made yet on how to do that and will take some time to work through and it seems to me that this agreement is bound up in that decision." Transcript of Hearing Held in *In re Delphi*, Adv. Pro. 05-44481, on November 29, 2005, at 66.

**The Debtors' Agreement with Pepco**

15. Pepco is the supplier of electricity to the Debtors' New Brunswick, New Jersey facility (the "Facility"), which employs approximately 425 people and manufactures batteries under a contract manufacturing agreement with automotive supplier Johnson Controls. *See* Affirmation of Donald S. Poole, dated December 29, 2005, annexed hereto as Exhibit A ("Poole Affirmation") ¶ 4, 6.

16. Pepco provides electricity for the Facility pursuant to a Master Electric Sales Agreement, dated July 8, 2003 (including all amendments, the "Sales Agreement").[3] *See* Poole Affirmation ¶ 6.

17. If the Debtors do not have access to energy to run the Facility, either because Pepco is allowed to terminate the Sales Agreement or because they are compelled to prematurely reject the Sales Agreement, they will be unable to manufacture product, which would result in the Debtors not meeting their manufacturing commitments to customers. Under the terms of the Debtors' contracts with their customers, the Debtors are responsible for damages if, by missing a production commitment, they affect a customer's production schedule. The Debtors' customers have informed the Debtors that damages can be as much as $10 million per facility per day. *See* Poole Affirmation ¶ 5.

18. Review of the Debtors' recent bill payment history to Pepco, included as Exhibit 1 to the Poole Affirmation, indicates that all post-petition invoices have been paid and were paid on a prepayment basis so that, by way of example, Pepco's invoice for December 2005 service was prepaid during November 2005. *See* Poole Affirmation ¶ 8.

**Relief Sought By Pepco**

19. In its Motion, Pepco requests that: (a) the automatic stay be modified so that Pepco may terminate the Sales Agreement based upon a failure of the Debtors to make a post-petition payment that was outstanding as of the filing of the

---

[3] As Pepco indicates in the Motion, the terms of the applicable Addendum to Master Electric Sales Agreement, entered into as of August 26, 2005, are "strictly confidential." *See* Poole Affirmation ¶ 6. To the extent that the Court requires submission of the Sales Agreement, the parties will file the Sales Agreement under seal or provide it to the Court for *in camera* review.

6

Motion (that payment was made the day after the Motion was filed); (b) in the event that the Debtors pay the sums owed to Pepco for the post-petition period later than the exact date such payments are due, the automatic stay be modified without further Order of this Court to permit the termination of the Sales Agreement, and (c) that the Debtors be compelled to assume or reject the Sales Agreement.

20.     Pepco cannot assert or provide any basis to conclude that cause exists for the modification of the automatic stay because the Debtors are current on all of their post-petition obligations to Pepco.  Moreover, Pepco has not asserted or provided any basis to conclude that it is entitled to the extraordinary relief of having the automatic stay modified without further Order of this Court in the event of a single future untimely payment.  Finally, Pepco has not asserted or provided any basis to conclude that the Debtors ought to be compelled to assume or reject the Sales Agreement at this very early stage in their bankruptcy proceedings.

## ARGUMENT

### A. Pepco Has Failed to Show Cause to Lift the Automatic Stay Pursuant to Section 362(d)(1)

21.     Pursuant to Bankruptcy Code section 362(d)(1), the Court may grant relief from the automatic stay "for cause."  11 U.S.C. § 362(d)(1).  The Bankruptcy Code does not define the term "cause" and the determination of whether sufficient cause exists to modify the stay is determined on a case by case analysis.  *See In re Balco Equities Ltd., Inc.*, 312 B.R. 734, 748-49 (Bankr. S.D.N.Y. 2004).

22.     The Second Circuit has described the automatic stay as a "crucial provision of bankruptcy law" intended to "prevent[ ] disparate actions against debtors

7

. . . [and] ensur[e] that no creditor receives more than an equitable share of the bankrupt's estate." *Lincoln Savings Bank, FSB v. Suffolk County Treasurer (In re Parr Meadows Racing Assoc., Inc.*, 880 F.2d 1540, 1545 (2d Cir. 1989) (internal citations omitted).

23. Pepco incorrectly asserts that there is cause to modify the automatic stay because the Debtors have violated this Court's Utilities Order. Specifically, Pepco asserts that the Debtors have run afoul of the provision of the Utilities Order, which requires them to "pay on a timely basis in accordance with their prepetition practices all undisputed invoices for postpetition utility services provided by the Utility Companies to the Debtors." Utilities Order ¶ 2.

24. The Debtors have, in fact, complied with the Utilities Order by paying Pepco's post-petition invoices in accordance with their pre-petition practices. The brief delay in payment to Pepco, which led to the filing of the instant Motion, was caused by a change of account number that occurred after the Debtors' bankruptcy filings.

25. Next, Pepco asserts that cause for lifting the automatic stay exists because the risk of the Debtors' future nonpayment exposes Pepco to liability to the local public utility that ultimately delivers power to the Debtors. *See* Motion, at 3-4.

26. This assertion is negated by the Debtors having made all post-petition payments to Pepco and the Court's finding that the "[t]he Debtors' record of timely payment of prepetition utility bills [and] demonstrated ability to pay future utility bills . . . constitute adequate assurance of future payment for utility services pursuant to 11 U.S.C. § 366(b)." Utilities Order ¶ 4.

8

Pg 9 of 16

27. Pepco faces no greater risk today to exercise its contractual remedies than it did prior to the Filing Date. The only difference is the effect of the automatic stay, which in this instance, is functioning precisely as the Bankruptcy Code intends. *See Parr Meadows*, 880 F.2d at 1545.

**B.  The Debtors Should Not Be Compelled to Assume or Reject the Sales Agreement at this Early Stage of Their Bankruptcy Proceedings**

28. The Bankruptcy Code does not require a debtor to decide whether to assume or reject an executory contract until the time of plan confirmation. *See* 11 U.S.C. § 365(d)(2). A non-debtor party to an executory contract may attempt to compel the debtor into assuming or rejecting before plan confirmation upon motion to the Court. *See id*. In considering such a motion, however, Courts must balance the interests of the debtor against those of the non-debtor party. *See, e.g.*, *Matter of Midtown Skating Corp.*, 3 B.R. 194, 198 (Bankr. S.D.N.Y. 1980); *In re Resource Tech. Corp.*, 254 B.R. 215, 227 (Bankr. N.D. Ill. 2000); *In re Dunes Casino Hotel*, 63 B.R. 939, 949 (D.N.J. 1986); *In re GHR Energy Corp.*, 41 B.R. 668, 676 (Bankr. D. Mass 1984).

29. Courts considering such demands by non-debtor parties rarely force a debtor into prematurely assuming or rejecting a contract. The reason for Courts' reluctance to force early assumption or rejection is that the "interests of the creditors collectively and the bankrupt estate as a whole will not yield easily to the convenience or advantage of one creditor out of many." *Public Serv. Co. of New Hampshire v. New Hampshire Elec. Coop, Inc. (In re Public Serv. Co. of New Hampshire)*, 884 F.2d 11, 15 (1st Cir. 1989). Under most circumstances, it is the clear policy of the Bankruptcy Code to provide a debtor with breathing space following the filing of a bankruptcy petition, and continuing until the confirmation of a plan, in which to decide whether to assume

9

or reject an executory contract. *See In re Enron Corp.*, 279 B.R. 695, 702 (Bankr. S.D.N.Y. 2002) (citation omitted).

        30.     Although the breathing space afforded a debtor is not without limits, *Enron*, 279 B.R. at 702, the law requires, in all circumstances, that a debtor be given a "reasonable time" to decide whether to assume or reject. *Philadelphia Co. v. Dipple*, 312 U.S. 168, 174 (1941); *Enron*, 279 B.R. at 702. The determination of what is reasonable is within the Bankruptcy Court's discretion in light of the circumstances of each case. In determining what constitutes a reasonable time, Courts in this Circuit have considered several factors, including: (1) the nature of the interests at stake; (2) the balance of hurt to the litigants; (3) the good to be achieved; (4) the safeguards afforded to the litigants; (5) whether the debtor's bankruptcy case is complex; (6) the debtor's failure or ability to satisfy post-petition obligations; (7) the damage that the non-debtor will suffer beyond the compensation available under the Bankruptcy Code; (8) the importance of the contract to the debtor's business and reorganization; (9) whether the debtor has sufficient time to appraise its financial situation and formulate a plan; (10) whether there is a need for judicial determination as to whether an executory contract exists; (11) whether the period in which the debtor has the exclusive right to file a plan of reorganization has expired; and (12) whether the time afforded in consistent with the rehabilitative purposes of chapter 11. *See, e.g., In re Burger Boys, Inc.*, 94 F.3d 755, 761 (2d Cir. 1996); *Theatre Holding Corp. v. Mauro*, 681 F.2d 102, 106 (2d Cir. 1982); *In re Adelphia Communications Corp.*, 291 B.R. 283, 293 (Bankr. S.D.N.Y. 2003); *In re Enron Corp.*, 279 B.R. at 702-03; *In re Teligent, Inc.*, 268 B.R. 723, 738-39 (Bankr. S.D.N.Y. 2001); *In re Beker Indus. Corp.*, 64 B.R. 890, 896 (Bankr. S.D.N.Y. 1986).

31. All of the factors enumerated above compel denial of Pepco's request to compel assumption or rejection of the Sales Agreement at this early stage of the Debtors' cases.

C. **The Purpose Of Chapter 11 Warrants Denial Of The Motion**

32. Courts have held that a determination of what is a reasonable time within which a debtor should assume or reject an executory contract should be interpreted "with the broad purpose of chapter 11, which is 'to permit successful rehabilitation of debtors.'" *Teligent,* 268 B.R. at 738-39 (quoting *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 527 (1984)); s*ee also Matter of Midtown Skating Corp.*, 3 B.R. at 198. In the analogous context of leases, the Court of Appeals for the Second Circuit has recognized that a Court may delay the decision on whether to assume or reject a lease until confirmation as a matter of course because the debtor's rehabilitation efforts will be clear at confirmation. *See Nostas Assocs. v. Costich (In re Klein Sleep Products, Inc.)*, 78 F.3d 18, 29 (2d Cir. 1996); *see also In re Crystal Apparel, Inc.*, 220 B.R. 816, 834 (Bankr. S.D.N.Y. 1998) ("[t]he assumption of an executory contract early in a Chapter 11 case is particularly disfavored as it is difficult to predict the course the reorganization will take." (citing *Klein Sleep*, 78 F.3d at 29)).

33. The decision whether to assume or reject executory contracts, such as Pepco's, is important to the Debtors' reorganization efforts. The Debtors intend to use the chapter 11 process to achieve competitiveness for Delphi's core U.S. operations by realigning Delphi's global product portfolio and manufacturing footprint to preserve the Debtors' core businesses. This process will have an impact on the executory contracts that the Debtors ultimately decide to assume or reject. Additionally, if the Motion is granted, the Debtors and their estates will be significantly and pointlessly

11

harmed because they will be forced to decide now whether to assume the Sales Agreement. Assumption not only means payment of pre-petition unsecured claims, it also means elevation to administrative expense priority status of all other obligations that may arise under the Sales Agreement. More importantly, an Order granting the Motion would force the Debtors into devoting resources to analyzing this non-expiring contract in a hurried fashion at a time when the Debtors' resources are already stretched as they examine numerous other aspects of their business while attempting to restructure their affairs. Requiring the Debtors to make determinations on assuming or rejecting non-expiring executory contracts at this time is not in keeping with the protections that chapter 11 affords.

### D. Pepco Will Not Suffer Any Harm Beyond Compensation Available Under The Bankruptcy Code.

34. There is no harm that will befall Pepco if the Debtors are allowed to retain their statutory right to wait until plan confirmation to decide whether to assume or reject the Sales Agreement. As demonstrated by the Poole Affirmation, the Debtors are performing all of their post-petition obligations under the Sales Agreement. Moreover, the Debtors have significant resources, including access to a substantial DIP credit facility, which provide adequate assurance to all of their post-petition suppliers and vendors that such suppliers and vendors will be paid their post-petition bills in a timely fashion. *See, e.g.*, Transcript of Oct. 11, 2005 Hearing at p. 107 ("I am now convinced that the facility adequately satisfies the debtors' needs and provides them with sufficient and abundant availability to conduct their bankruptcy case; and, more importantly, to conduct their businesses in the ordinary course."). Granting the Motion will result in countless motions for the same relief by all similarly situated creditors,

which could cost the Debtors hundreds of millions of dollars in cure costs and jeopardize the Debtors' reorganization efforts.

**E.    The Debtors Have Not Had Sufficient Time To
Appraise Their Financial Situation And Formulate A Plan.**

35.    Prior to making critical assumption or rejection decisions, a debtor must be permitted "the leeway needed to appraise its financial situation and the potential value of its assets in terms of the formulation of a plan. . . ." *Theatre Holding*, 681 F.2d at 104; *see also Teligent*, 268 B.R. at 739. As stated above, the Debtors are only three months into a restructuring effort that they anticipate will take approximately 18 months to complete. At this point, however, the Debtors' energies are focused on stabilizing their business and reviewing expiring executory contracts. The Debtors have not had time to make critical decisions regarding the assumption or rejection of their numerous executory contracts. The Debtors need to focus on developing a comprehensive restructuring plan for their business and the several hundred thousand creditors in these cases. They simply cannot and should not be forced into preemptory contract assumption and rejection decisions for non-expiring contracts.

**F.    The Complexity And Size Of The Debtors' Chapter 11 Filings
Warrant A Considerable Period In Which To Evaluate The Consequences
Associated With Assumption Or Rejection Of Executory Contracts**

36.    The complexity and size of these cases also warrants denial of the Motion at this early stage. The complexity of the issues that the Debtors face in stabilizing their businesses and attempting to restructure their affairs is magnified by the size of these cases, currently among the largest pending before any bankruptcy court in the United States. In summary:

(a)    Forty-two affiliated entities sought chapter 11 relief;

13

    (b)    The Debtors employ approximately 50,600 people in the U.S. at approximately 44 manufacturing sites and 13 technical centers. Ninety-six percent of the company's 34,750 hourly employees are represented by approximately 49 different international and local unions under various CBAs. The company's foreign entities employ more than 134,000 people supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide;

    (c)    The Debtors' global 2004 revenues were approximately $28.6 billion, and global assets as of August 31, 2005 were approximately $17.1 billion; and

    (d)    The Debtors supply products to nearly every major global automotive original equipment manufacturer, with 2004 sales to the Debtors' former parent, General Motors Corporation, equaling approximately $15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

    37.    Courts have recognized that complex cases require a more careful and extended consideration by the debtor of whether to assume or reject executory contracts. *See Dallas-Fort Worth Reg'l Airport Bd. v. Braniff Airways, Inc.*, 26 B.R. 628, 636 (N.D. Tex. 1982) ("[i]t would have been quite unreasonable, in this highly complex bankruptcy proceeding, to have required such a decision within two months of the date the petition in bankruptcy was filed.").

    38.    The Sales Agreement affects the Debtors' manufacturing facility in New Brunswick, New Jersey, which employs more than 425 people, and is an important part of the Debtors' manufacturing structure. Consequently, the decision to assume or reject the Sales Agreement is a significant decision that cannot yet be made by the Debtors.

## CONCLUSION

39.     Based on the foregoing, Pepco has failed to establish at this early stage of these cases any basis for relief from the automatic stay or for compelling the Debtors to assume or reject the Sales Agreement, and its Motion should be denied in its entirety.

## Notice

40.     Notice of this Objection has been provided in accordance with the Order under 11 U.S.C. §§ 102(1) and 105 and Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing (i) Omnibus Hearing Dates, (ii) Certain Notice, Case Management, and Administrative Procedures, and (iii) Scheduling an Initial Case Conference in Accordance with Local Bankr. R. 1007-2(e), which was entered by this Court on October 14, 2005 (Docket No. 245).  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

## Memorandum Of Law

41.     Because the legal points and authorities upon which this Objection relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

**WHEREFORE**, the Debtors respectfully request that the Court enter an Order denying the Motion, together with such other and further relief as may be just and proper.

Dated: New York, New York
December 29, 2005

DELPHI CORPORATION, *et al.*
By their attorneys,
TOGUT, SEGAL & SEGAL LLP
By:

/s/ Neil Berger
ALBERT TOGUT (AT-9759)
NEIL BERGER (NB-3599)
Members of the Firm
One Penn Plaza
New York, New York 10119
(212) 594-5000