**Hearing Date: January 4, 2006 at 10:00 a.m.**
**Objection Deadline: January 3, 2006 at 5:00 p.m.**

SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York  10022
Telephone: (212) 848-4000
Facsimile:  (212) 848-7179
Douglas P. Bartner (DB-2301)
William J.F. Roll, III  (WR-8996)
Andrew V. Tenzer  (AT-2263)

Special Counsel for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                                       :
        In re                                          :    Chapter 11
                                                       :
DELPHI CORPORATION, et al.,                            :    Case No. 05-44481 (RDD)
                                                       :
                        Debtors.       :    (Jointly Administered)
                                                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - -  x

DEBTORS' (I) MOTION (A) TO QUASH TRIAL SUBPOENAS ISSUED TO MEMBERS
OF DEBTORS' AUDIT COMMITTEE AND FOR PROTECTIVE ORDER AND (B) FOR
A PROTECTIVE ORDER TO LIMIT THE SCOPE OF THE DEPOSITION OF ROBERT
DELLINGER TO ONLY THOSE MATTERS PERTAINING DIRECTLY TO THE
DEBTORS' APPLICATION FOR ORDER AUTHORIZING EMPLOYMENT AND
RETENTION OF DELOITTE & TOUCHE LLP AND (II) OBJECTION TO LEAD
PLAINTIFFS' MOTION TO COMPEL DEPOSITION TESTIMONY AND THE
PRODUCTION OF DOCUMENTS IN CONNECTION WITH THE DEBTORS'
APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(a), 328(a), AND 1107(b)
AUTHORIZING EMPLOYMENT AND RETENTION OF DELOITTE & TOUCHE LLP
AS INDEPENDENT AUDITORS AND ACCOUNTANTS TO DEBTORS, EFFECTIVE
NUNC PRO TUNC TO OCTOBER 8, 2005 AND OBJECTIONS FILED THERETO

        Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

respectfully (I) move this Court (A) pursuant to Rule 45 of the Federal Rules of Civil Procedure

(the "Federal Rules"), for an order quashing the trial subpoenas served by the Lead Plaintiffs (as

defined below) upon Robert H. Brust, Oscar De Paula Bernardes Neto, John D. Opie, and John

Walker, members of Delphi's Audit Committee (collectively, the "Subpoenas") and for a

protective order related thereto and (B) pursuant to Federal Rules 26(c) and 30(d)(4), for an order

limiting the scope of the deposition of Mr. Robert Dellinger and (II) object to the motion (the

"Motion to Compel") of the Lead Plaintiffs to compel deposition testimony and production of

documents, filed on December 23, 2005.  Federal Rules 26(c), 30(d)(4) and 45 are made

applicable in these bankruptcy proceedings through Rules 7026, 7030 and 9016, respectively, of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  In support of this Motion,

the Debtors respectfully represent as follows:

<u>Preliminary Statement</u>

       1.      On November 23, 2005, the Debtors filed an Application for Order Under

U.S.C. §§ 327(a), 328(a), and 1107(b) Authorizing Employment and Retention of Deloitte &

Touche LLP as Independent Auditors and Accountants to Debtors, Effective *Nunc Pro Tunc* to

October 8, 2005 (the "Application"), which seeks to retain Deloitte & Touche LLP ("Deloitte")

as their independent auditors and accountants *nunc pro tunc* to October 8, 2005.  The official

committee of unsecured creditors appointed in these cases has filed an objection to the

Application that is limited to isolated issues, not to the Application as a whole.  The Debtors

continue to work toward a resolution of these discrete matters.  No other individual creditor,

shareholder, employee or other stakeholder has filed an objection to the Application.  The

Debtors have discussed the Application with the United States trustee and, based on those

discussions and certain additional information the Debtors have provided, believe that the United

States trustee does not oppose the Application.

2.        The only objection to the Application in its entirety has been filed by a

group identifying themselves not as creditors or interest holders of the Debtors' estates but as

"the Court-appointed Lead Plaintiffs" in the consolidated securities class action entitled *In re

Delphi Corp. Securities Litigation,* Master File No. 1:05-CV-2637 (NRB) (S.D.N.Y. 2005) (the

"Securities Litigation").  Lead Plaintiffs' Objection to Debtors' Application for Order Under 11

U.S.C. §§ 327(a), 328(a), and 1107(b) Authorizing Employment and Retention, Nunc Pro Tunc

to October 8, 2005, of Deloitte & Touche LLP as Independent Auditors and Accountants to

Debtors, filed December 2, 2005 (the "Retention Objection"), at 1.  As Lead Plaintiffs, their

Retention Objection and subsequent discovery requests are aimed not at protecting the Debtors'

estates but at using the chapter 11 process to assist them in the Securities Litigation.[1]  While the

discovery requests all purportedly arise in connection with the Application, the entire Retention

Objection is premised on the presumption that the allegations made against the defendants in the

Securities Litigation, including Deloitte, are true.  However, no party has admitted any

wrongdoing or liability in the Securities Litigation.  Discovery in connection with the Securities

Litigation is currently stayed under both section 362 of chapter 11 of title 11 of the United States

Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"), and the Private Securities

Litigation Reform Act, 15 U.S.C. § 77z-1(b) (1995) ("PSLRA").  Unable to obtain discovery in

the Securities Litigation via proper channels, the Lead Plaintiffs filed the Retention Objection

and are seeking a broad range of depositions, documents and trial testimony.  The Lead

---

[1].        On December 12, 2005, the Judicial Panel on Multi District Litigation ordered the Securities Litigation
transferred to the Eastern District of Michigan, where the ERISA cases are pending.  The Judicial Panel
also transferred these cases to the Honorable Gerald E. Rosen of the Eastern District of Michigan.  The
Debtors expect Judge Rosen to hold a status conference soon.

Plaintiffs' discovery requests are obvious attempts to circumvent the stays arising under the

Bankruptcy Code and the PSLRA to obtain information and strategic advantages for the

Securities Litigation. The Court should not countenance such tactics and should deny the Lead

Plaintiffs' efforts to obtain further discovery.

        3.     Nor should the Court sanction the Lead Plaintiffs' accusations that the

Debtors' are stonewalling by refusing to accede to the Lead Plaintiffs' inappropriate discovery

demands. The Debtors' respectfully submit that, in considering the Application, the primary

inquiry is whether Deloitte holds or represents an interest adverse to the estate, and is a

disinterested person, as required by section 327(a) of the Bankruptcy Code. The Debtors have

submitted an affidavit of Deloitte setting forth Deloitte's disinterestedness and, at the request of

the United States trustee, Deloitte intends to file a supplement to such affidavit. The Lead

Plaintiffs, however, are concerned barely, if at all, by the requirements of the Bankruptcy Code.

Instead, the Lead Plaintiffs want extensive information about numerous matters -- the Debtors'

accounting procedures, internal controls, accounting safeguards, 2005 restatement of earnings

and the results of the outside investigations into Deloitte's audits, as well as the conduct of the

Delphi Audit Committee (the "Audit Committee") regarding these matters, Motion to Compel ¶

23 -- that have a substantial relationship only to the allegations underlying the Securities

Litigation. The Lead Plaintiffs could prosecute an objection to the Application even without

having any information regarding these matters, but discovery with a proper scope would not

advantage the Lead Plaintiffs in the Securities Litigation.

        4.     The Court also should quash the Lead Plaintiffs' Subpoenas and deny the

related requests for deposition testimony from members of the Audit Committee. The Debtors

are seeking to retain Deloitte in connection with audit functions and thus made available for

deposition Mr. Dellinger, the Executive Vice President and Chief Financial Officer of Delphi,

the most senior officer of the Debtors with responsibility for the Debtors' audits and auditors.

Mr. Dellinger has sufficient experience in the audit function, and the selection and retaining of

auditors, for large public companies.  Mr. Dellinger knows and meets regularly with the senior

Deloitte personnel that would lead Deloitte's engagement if the Application is approved.  Mr.

Dellinger can -- and, in his deposition, did -- explain why Deloitte's retention is being sought for

the 2005 audit and why it would be difficult, if not impossible, to replace Deloitte for the 2005

audit.  Mr. Dellinger is the appropriate person to testify in support of the Application.

5.    Mr. Dellinger's testimony cannot, however, cover matters subject to the

attorney-client privilege.  The Lead Plaintiffs take an unreasonably narrow view of privilege in

arguing that the Debtors' counsel somehow attempted to "shield" information from the Lead

Plaintiffs.  Motion to Compel ¶ 42.  For example, Lead Plaintiffs' counsel mistakenly believes

that individualized facts discussed in the context of briefings with counsel are not protected.  Mr.

Dellinger cannot be compelled to testify as to privileged matters.

6.    The Lead Plaintiffs also have argued, disingenuously, that the Debtors'

concerns regarding use of information in the Securities Litigation have been addressed by a

confidentiality stipulation.  The Lead Plaintiffs' agreement not to use such information does not

give them *carte blanche* to ask for whatever they want from whomever they want, regardless of

the stays imposed by the PSLRA and the Bankruptcy Code.  More importantly, information

related to the Securities Litigation may have strategic or tactical value to the Lead Plaintiffs even

if it is not specifically utilized in the litigation.  The Lead Plaintiffs should not be permitted to

exploit the Application process to further their own selfish interest in matters that have little or

anything to do with the Application.

7.      Finally, it should be noted that the Lead Plaintiffs' discovery requests have expanded even while some of the purported concerns raised in their Application have been addressed.  In the Retention Objection, the Lead Plaintiffs request the denial of the Application or, alternatively, confirmation that no senior member of Deloitte's postpetition audit team was involved in prepetition audits of the Debtors.  Retention Objection at 2.  Subsequent to the filing of the Application, the Debtors made the business decision to replace Deloitte as their auditors on a going forward basis; thus, the relief sought in the Application is now limited to Deloitte's retention for 2005.  Moreover, as Mr. Dellinger testified in his deposition, a new leadership team was put in place by Deloitte, and the postpetition audit team will be different from the team in place prior to the prepetition restatement of the Debtors' financial statements.  Notwithstanding the narrower scope of the Application, as well as the information provided to the Lead Plaintiffs in Mr. Dellinger's deposition, which should address the Lead Plaintiffs' professed concerns, the Lead Plaintiffs have continued to press for broad discovery that has no legitimate relation to the Application.  All such discovery requests should be denied.

Background

8.      On October 8, 2005, Delphi and certain of its U.S. subsidiaries filed voluntary petitions in this Court for reorganization relief under the Bankruptcy Code.  On October 14, 2005, three additional U.S. subsidiaries of Delphi also filed voluntary petitions in this Court for reorganization relief under the Bankruptcy Code.  The filing of those petitions invoked the automatic stay under section 362(a) of the Bankruptcy Code.  That stay effectively halted, as against the Debtors, the continuance of a series of lawsuits that had been filed against the Debtors and other parties in several different courts around the country, including, in particular, the Securities Litigation.  Furthermore, any discovery in the Securities Litigation has also been stayed pursuant to the express provisions of the PSLRA.  Thus, with respect to the

6

Debtors, *any* action taken in furtherance of the prosecution of the Securities Litigation or in an attempt to obtain discovery from the Debtors in that case is completely barred.

9.      On December 12, 2005, the Judicial Panel on Multidistrict Litigation directed that the Securities Litigation and twenty-three other pending lawsuits be transferred to the Eastern District of Michigan.  *See* Transfer Order, Docket No. 1725, Before the Judicial Panel on Multidistrict Litigation, In re Delphi Corp. Securities, Derivative and "ERISA" Litigation, December 12, 2005 (the "Transfer Order"), attached hereto as Exhibit A.  Thus, the ERISA cases and the Securities Litigation are before the Honorable Gerald E. Rosen of the Eastern District of Michigan.

10.      Prior to entry of the Transfer Order, on November 23, 2005, the Debtors filed the Application.  On December 2, 2005, the Teachers' Retirement System of Oklahoma, the Public Employees' Retirement System of Mississippi, Raiffeisen Kapitalanlage-Gesellschaft m.b.H. and Stichting Pensioenfonds ABP, plaintiffs in the Securities Litigation (collectively, the "Lead Plaintiffs"), filed the Retention Objection to Debtors' Application.  Although the Retention Objection purports to raise issues regarding the competence and disinterestedness of Deloitte, it is clear from a cursory reading of the Retention Objection, as well as recent actions of the Lead Plaintiffs, that the true purpose of the Retention Objection is to gain information for use in the Securities Litigation.

11.      The Debtors' concerns with respect to the motivation for this Retention Objection were heightened some 10 days after the Retention Objection was filed when, in a letter dated December 12, 2005, the Lead Plaintiffs (identifying themselves as such, and not in their capacities as creditors or shareholders in these chapter 11 cases) made known their desire to depose six people they believed to be members of the Audit Committee.

12.     During a meet-and-confer on December 15, 2005, in accordance with the Order Under 11 U.S.C. §§ 102(1) and 105 and Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing (I) Omnibus Hearing Dates, (II) Certain Notice, Case Management, and Administrative Procedures, and (III) Scheduling an Initial Case Conference in Accordance with Local Bankr. R. 1007-2(e), entered by this Court on October 14, 2005, the Debtors' counsel objected to producing the members of the Audit Committee to the Lead Plaintiffs for depositions in connection with the Application.  Nevertheless, in a good faith effort to accommodate any legitimate discovery needs of the Lead Plaintiffs with respect to the Application, the Debtors agreed to the deposition of Mr. Dellinger, who will be submitting an affidavit in support of the Application and who may well be a witness at the hearing on the Application.  But later that same day, the Debtors' concerns as to the purpose of the Retention Objection were realized once again when the Lead Plaintiffs requested by letter literally thousands of documents in connection with that deposition.  *See* December 15, 2005 Letter from James G. Sabella to John Wm Butler, Jr., et al. (the "Sabella Letter"), a copy of which is attached hereto as Exhibit B.  The documents requested spanned several years and encompassed subjects well beyond the proper scope of discovery relating to the Application, and were to be produced, according to the Lead Plaintiffs, in a single business day.

13.     In a letter dated December 19, 2005, the Debtors confirmed their agreement to the deposition of Mr. Dellinger, but did not, because of the obvious overbreadth and undue burden inherent in the request set forth above, provide the requested documents.  *See* December 19, 2005 Letter from Lynette C. Kelly to Stuart M. Grant and James G. Sabella (the "Kelly Letter"), a copy of which is attached hereto as Exhibit C.  During the deposition on December 20, on several occasions, counsel for the Lead Plaintiffs propounded questions to Mr.

8

Dellinger seeking information completely irrelevant to the Application and therefore well outside the legitimate scope of the deposition. *See* Deposition of Robert Dellinger, dated December 20, 2005 (the "Dellinger Dep."), at 42:1-3, 49:12-15, 50:4-11, 50:23-25, 55:7-9, 56:15-16, 68:7-14, 69:21-24, 75:10-16, attached hereto as Exhibit D. Special counsel for the Debtors objected on each of those occasions, and on five instances instructed Mr. Dellinger not to respond to those questions as being beyond the scope of the deposition. *See*, *e.g.*, *id.* at 68:21-22, 69:24-25, 70:8-9, 70:18-19, 75:16-17. Special counsel for the Debtors made clear on several occasions that it would be making this motion for a protective order, as is its right under Bankruptcy Rule 7030, to prevent such discovery from taking place. *Id.* at 49:17-19, 50:13-17, 56:16-19, 68:15-18, 69:24-25, 75:18-19.

14. The Debtors have met and conferred with the Lead Plaintiffs in a good faith attempt to resolve the dispute between the parties as to the scope of the deposition, but those discussions have come to no avail. *See* Affidavit of Lynette C. Kelly, Pursuant To Local Bankruptcy Rule 7007-1(A), In Support Of Debtors' (I) Motion (A) To Quash Trial Subpoenas And (B) For A Protective Order And (II) Objection To Lead Plaintiffs' Motion To Compel (the "Kelly Affidavit") ¶¶ 2-3, attached hereto as Exhibit E. Thus, given the Lead Plaintiffs' refusal to conduct the deposition in good faith and seek only that information relevant to the Application, the Debtors have been forced to seek this Court's intervention to limit the scope of acceptable questions pursuant to Federal Rules 30(d)(4) and 26(c).

15. On December 22, 2005, the Lead Plaintiffs served the four Subpoenas on Robert H. Brust, Oscar De Paula Bernardes Neto (who resides in Brazil), John D. Opie, and John Walker, seeking trial testimony from every member of the Audit Committee, even though two

days earlier the Debtors had deposed Mr. Dellinger.  Of the subpoenaed individuals, all but Mr.

Walker, who recently was hired by Delphi, are defendants in the Securities Litigation.

16.    As a matter of professional courtesy, special counsel to the Debtors

subsequently agreed to accept service of the Subpoenas on behalf of the subpoenaed individuals

on the Audit Committee members, but without waiving any other objections the Debtors or the

subpoenaed individuals may have to the Subpoenas.  Having reserved their rights, the Debtors

seek to quash the Subpoenas.

17.    On December 23, 2005, the Lead Plaintiffs filed the Motion to Compel.

Through this motion, the Lead Plaintiffs once again are seeking to obtain from the Debtors,

among other things, thousands of documents, responses to interrogatories, a second deposition of

Mr. Dellinger or another deponent to provide information regarding various matters and the

deposition of the members of the Audit Committee, all of which only would provide the Lead

Plaintiffs with information that is wholly irrelevant to the Application before this Court or

duplicative to information they already received and should not be compelled.

<u>Relief Requested</u>

18.    By this Motion, the Debtors request entry of (a) an order quashing the

Subpoenas issued to Robert H. Brust, Oscar De Paula Bernardes Neto, John D. Opie, and John

Walker, members of Delphi's Audit Committee and a protective order to prevent the Lead

Plaintiffs from obtaining testimony or information they are otherwise barred from obtaining

related thereto, (b) a protective order requiring that the Lead Plaintiffs forego those deposition

questions posed to Mr. Dellinger as to which Mr. Dellinger has been instructed not to answer on

the basis of their being outside the proper scope of discovery for this matter or, in the alternative,

that the Lead Plaintiffs sufficiently narrow the scope of the deposition questions propounded to

Mr. Dellinger only to those matters directly pertaining to the Application, *i.e.*, the qualifications,

disinterestedness and compensation of Deloitte, as well as the harm and prejudice to the Debtors

of having the Application denied and (c) an order denying the Motion to Compel.[2]

Basis For Relief

A.    <u>Quashing the Subpoenas</u>

19.    Under Rule 45(c)(3) of the Federal Rules, on motion, "the court by which

a subpoena was issued shall quash or modify the subpoena if it . . . requires disclosure of

privileged or *other protected matter* and no exception or waiver applies, or … subjects a person

to undue burden." Fed. R. Civ. P. 45(c)(3)(A)(iii), (iv) (emphasis added).  Pursuant to this rule,

the Subpoenas should be quashed in their entirety because they are cumulative and they subject

the members of the Audit Committee to substantial undue burden in that they seek testimony on

matters clearly outside the scope of the Application and relating to the Securities Litigation, in

direct contravention of the automatic stay provision of the Bankruptcy Code and the general stay

on discovery in that action pursuant to the PSLRA.

20.    Plainly, the Lead Plaintiffs' Retention Objection is nothing more than a

thinly-veiled and improper attempt to obtain information from the Debtors relating to the

Securities Litigation, as revealed during the deposition of Mr. Dellinger on December 20, 2005.

During that deposition, counsel for the Lead Plaintiffs propounded many questions to Mr.

Dellinger seeking information completely irrelevant to the Application and therefore well outside

the legitimate scope of the deposition.[3]  The Debtors objected to those questions, and the Lead

---

[2]    Debtors are required, pursuant to Federal Rules 26(c) and 30(d)(4), to move for a protective order relating
to those portions of Mr. Dellinger's deposition as to which they seek to limit discovery by the Lead
Plaintiffs.  Nonetheless, to the extent that this Court's decision to deny the Lead Plaintiffs' Motion to
Compel would render that order moot, Debtors would be satisfied with such relief.

[3]    *See* Dellinger Dep. (Ex. D) at 67:15-25, 68:1-22, 69:17-25, 70:2-20, 75:8-19, in which, for example, Lead
Plaintiffs sought information regarding internal controls in the years 2002 and 2003 and regarding the
decision not to appoint the previous acting Chief Financial Officer as the permanent Chief Financial

11

Plaintiffs' unwillingness to withdraw those questions in five such instances have forced the

Debtors to seek a protective order related thereto, as described below.

21.    The true purpose behind the Subpoenas is similar to that of certain

discovery requests that were denied in *In re Worldcom, Inc.*, 311 B.R. 151 (Bankr. S.D.N.Y.

2004).  In *Worldcom*, a group of States that, in separate litigation, were challenging the debtors'

tax treatment of certain royalty charges brought a motion to disqualify the estates' accountants

on the grounds that the accountants were involved in formulating the tax strategy the States were

contesting.  The States sought discovery, purportedly in connection with their disqualification

motion.  The debtors' objected to the discovery requests as overbroad and not germane to the

disqualification motion.  The court agreed, ruling that

> the discovery requests made by the States were extremely broad and primarily
> focused on the litigation over the validity of the Royalty Charges rather than on
> the Disqualification Motion.  If such discovery was appropriate at all, it would be
> in the context of any litigation regarding the Royalty Charges and not in a motion
> to disqualify.

*Id.* at 172.  To allow the States to obtain discovery in those circumstances was not appropriate or

warranted because "the discovery requests sought focused on material which would assist in the

underlying tax controversy and it is the Court's overall view that the States brought this motion

as a litigation tactic."  *Id.*  As in *Worldcom*, it is entirely appropriate for the Court to quash the

Subpoenas because the Lead Plaintiffs are seeking information to be used in the Securities

Litigation, not their Retention Objection to the Application.

22.    The Debtors have twice met and conferred with the Lead Plaintiffs in a

good faith attempt to resolve the dispute between the parties as to the issuance of these

---

Officer.  The information Lead Plaintiffs sought has no bearing whatsoever on the proceedings surrounding
the Application.

Subpoenas, but those discussions have not produced a resolution of the dispute. *See* Kelly

Affidavit ¶¶ 2-3, Ex. E.

23.     The Lead Plaintiffs' attempt to obtain testimony and information from all

four members of the Audit Committee is in direct contravention of the automatic stay provisions

of the Bankruptcy Code and the operation of the stay of discovery of the PSLRA.

24.     The Debtors thus seek this Court's intervention to quash the Subpoenas

and issue a protective order to prevent the Lead Plaintiffs' improper attempt to make an end run

around the Bankruptcy Code and the PSLRA to get information and testimony they are otherwise

barred from obtaining.

25.     In addition, the Lead Plaintiffs have subpoenaed every member of the

Audit Committee, the testimony from whom clearly would be cumulative.  Furthermore, one

Audit Committee member, Oscar De Paula Bernardes Neto, resides in Brazil, and it would be

unduly burdensome for him to appear.  Three of the Audit Committee members, not surprisingly,

also are defendants in the Securities Litigation.  In seeking the testimony of five individuals,

including Mr. Dellinger, which the Debtors already have produced for several hours, the true

purpose behind these Subpoenas becomes clear; the Lead Plaintiffs are attempting to obtain

information for the Securities Litigation.

B.      Limiting Scope of Dellinger Deposition

26.     Rule 30(d)(1) of the Federal Rules provides that a "person may instruct a

deponent not to answer … to present a motion under Rule 30(d)(4)." Fed. R. Civ. P. 30(d)(1).

Federal Rule 30(d)(4) permits a party, upon a showing that the deposition is being conducted in

"bad faith or in such a manner as unreasonably to annoy, embarrass, or oppress the deponent," to

seek an order of the court to "limit the scope and manner of the … deposition as provided in

Rule 26(c)." Fed. R. Civ. P. 30(d)(4).  Under Federal Rule 26(c), the Court may "for good cause

13

shown … make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense…."  Fed. R. Civ. P. 26(c).  In fact, Rule 26(c)(4) specifically authorizes a protective order to require that "certain matters not be inquired into, or that the scope of … discovery be limited to certain matters."  Fed. R. Civ. P. 26(c)(4).

27.     The burden of establishing "good cause" rests with the party seeking the protective order.  *In re Akropan Shipping Corp.*, No. 86 Civ. 4873 (JFK), 1990 U.S. Dist. LEXIS 1545 (S.D.N.Y. Feb. 14, 1990).  To satisfy that burden, the Debtors must simply show that there are facts that militate in favor of granting the protective order.  *Am. Booksellers Ass'n v. Houghton Mifflin Co.*, No. 94 Civ. 8566 (JFK), 1995 WL 72376, at *1 (S.D.N.Y. Feb. 22, 1995) (citing *Akropan*, 1990 U.S. Dist. LEXIS 1545).  The Debtors meet that burden.

28.     "[F]requent or persistent inquiry into matters outside the permissible scope of discovery" qualifies as the sort of bad faith discovery practice meriting an order limiting the scope of the deposition.  *W.R. Grace & Co. v. Pullman Inc.*, 74 F.R.D. 80, 84 (W.D. Okla. 1977); *see Hanlin v. Mitchelson*, 623 F. Supp. 452, 454 (S.D.N.Y. 1985) (denying plaintiff's motions to compel a second deposition where transcript revealed a "vexatious, repetitive and haranguing inquisition *beyond the scope of the issues in the case*") (emphasis added), *aff'd in part, rev'd in part on other grounds*, 794 F.2d 834 (2d Cir. 1986); *see also Laurens Mills v. John J. Ryan & Sons, Inc.*, 14 F.R.D. 191, 192 (S.D.N.Y. 1953) (granting plaintiff's motion to compel answers to deposition questions, but noting that defendant had failed to establish that plaintiff's inquiries were "sought in bad faith" or that they were "clearly not relevant").  Indeed, several courts have held that a showing that the discovery sought is irrelevant can satisfy the good cause requirement for issuance of a protective order.  *E.g.*, *Smith v. Dowson*, 158 F.R.D. 138, 140-41 (D. Minn. 1994).

14

29.     Here, the Lead Plaintiffs have engaged in exactly the kind of oppressive and annoying deposition tactics meant to be prevented by Federal Rules 30(d)(4) and 26(c).  The Lead Plaintiffs' vast document requests, s*ee* Sabella Letter, and persistent, improper deposition questions into matters wholly irrelevant to the Application make clear that they have engaged in this deposition not to bolster their Retention Objection to the retention of Deloitte, but rather in a bad faith effort to garner information relating to the Securities Litigation—discovery of which they are explicitly prevented from obtaining due to the stays in effect pursuant to the operation of the Bankruptcy Code and the PSLRA.

30.     As noted above, counsel for the Lead Plaintiffs has propounded numerous questions to Mr. Dellinger that are well outside of the relevant scope of the Lead Plaintiffs' Retention Objection.  *See* Dellinger Dep. (Ex. D).  For example, counsel for the Lead Plaintiffs persisted in his questioning of Mr. Dellinger regarding internal controls in place at Delphi during 2002-2003.  *Id.* at 66:21-23, 67:15-24, 69:9-12, 69:17-20, 70:2-7.  While whatever internal controls were in place at Delphi during that time *might* bear on claims related to those years -- and it is therefore no surprise that such information would be sought out by the Lead Plaintiffs in the Securities Litigation -- they have no bearing whatsoever on Deloitte's ability to be employed and retained as the Debtors' independent auditor now.

31.     Given the total irrelevance of numerous questions asked of Mr. Dellinger in determining the merits of the Application -- questions to which special counsel for the Debtors scrupulously objected -- it is clear that there is good cause to protect the deponent from answering those questions as currently phrased.  Furthermore, if Mr. Dellinger is forced to answer those questions, despite being wholly irrelevant to the Application, the Lead Plaintiffs will have been given the power to circumvent the express protections of section 362(a) of the

Bankruptcy Code, as well as the operation of the PSLRA's general stay of discovery.  If that is

the case, the Debtors suspect that this Court can expect many further fishing expeditions by the

Lead Plaintiffs in order to obtain as much information relating to the Securities Litigation as they

can wring out of the proceedings.

C.      Denying Motion to Compel

          32.      In furthering their Motion to Compel, the Lead Plaintiffs attempt to

portray the Debtors' attempts to protect their rights under the Bankruptcy Code, the PSLRA and

the attorney-client privilege as "obstructionist."  Motion to Compel ¶ 6.  Not only is such an

assertion unfounded and untrue, the Lead Plaintiffs, indeed, are the ones attempting to obstruct

the retention of a professional for limited purposes and compelling the Debtors' estates to expend

numerous resources so they can, without proper authority, further their own ends.

          i.        *The Debtors properly objected to discovery requests.*

          33.       First, the Lead Plaintiffs loosely contend that the discovery requests set

forth in the Sabella Letter are "narrowly tailored" and "go directly to the heart of whether

Debtors properly considered Deloitte's highly suspect pre-petition conduct in applying to retain

the auditors for 2005."  Motion to Compel ¶¶ 25, 28.  It is difficult to determine how, for

example, "[a]ll minutes of meetings of the Audit Committee from January 1, 1999 to date," "[a]ll

documents relating to any inquiry or investigation conducted by the Company into the

transactions that were restated in the Restatement," and "[a]ll documents relied upon by the

Company in reaching the conclusion expressed in the Company's Form 10-K . . . that "Delphi

had not maintained effective internal controls over financial reporting at December 31, 2004"

and "Delphi's disclosure controls and procedures were also ineffective," *see* Sabella Letter ¶¶

3(e), 3(q), 3(c), are narrowly tailored requests or go to the heart of retaining Deloitte for the year

2005 audit.  In any event, such requests are unduly burdensome.  Although the Lead Plaintiffs

point out that Federal Rule 26(b)(1) provides that a party may obtain discovery "regarding any matter, not privileged, which is *relevant* to the subject matter involved in [the] pending action . . . . ," Fed. R. Civ. P. 26(b)(1) (subdiv. notes) (emphasis added); *see* Motion to Compel ¶ 28, the Lead Plaintiffs fail to provide adequate support for the relevance requirement.

34.     Similarly, it is unclear how a request for the identification of Deloitte professional personnel who have worked, and who it is anticipated will work, on the Delphi engagements, *see* Sabella Letter ¶ 2, could be viewed as narrowly tailored.  In respect of such request, the Debtors provided the Lead Plaintiffs with the names of the principals of Deloitte who have worked and will work on the Delphi engagements.  *See* Kelly Letter ¶ 2.  Furthermore, Mr. Dellinger testified in his deposition that there will be a new engagement partner for the year 2005 audit.  Dellinger Dep. (Ex. D) at 63:24-25, 64:1-6.  There is no need for the names of each and every Deloitte professional in connection with the Application, particularly given Mr. Dellinger's testimony.

35.     **[REDACTED PURSUANT TO CONFIDENTIALITY STIPULATION]**

ii.     *The Confidentiality Stipulation does not sufficiently protect the Debtors*

36.     The Lead Plaintiffs next essentially argue that, given the Stipulation and Agreed Protective Order Governing Production and Use of Confidential and Highly Confidential Information in Connection with the Debtors' Application for Order Under 11 U.S.C. §§ 327(a), 328(a), and 1107(b) Authorizing Employment and Retention of Deloitte & Touche LLP as Independent Auditors and Accountants to Debtors, Effective Nunc Pro Tunc to October 8, 2005 and Objections Filed Thereto, and Lead Plaintiff's Objection (the "Confidentiality Stipulation"), attached hereto as Exhibit F, which prevents the Lead Plaintiffs from using any discovery

obtained in connection with the Application from being used in the Securities Litigation, they can violate the discovery stay provisions of the PSLRA.  Specifically, the Lead Plaintiffs argue that the Debtors' concerns regarding the Lead Plaintiffs' attempts to obtain information they otherwise would not be entitled to receive pursuant to the PSLRA have been addressed by the use restrictions contained in the Confidentiality Stipulation.  Motion to Compel ¶¶ 18-19, 31-32. The Lead Plaintiffs ignore, however, that information related to the Securities Litigation has value to the Lead Plaintiffs even if it not specifically utilized in the litigation.  The same law firms listed on the Retention Objection also are lead counsel in the Securities Litigation.  Even if counsel cannot use the information as such, having any such information (if it exists) would allow the Lead Plaintiffs to formulate tactics and strategy in the Securities Litigation if it proceeds.  The Lead Plaintiffs' agreement not to use such information does not give them *carte blanche* to ask for whatever they want from whomever they want.

37.    Furthermore, the Lead Plaintiffs' request is inappropriate both because the Securities Litigation is presently stayed and any such information could be used to assert claims against the Debtors' estates.  Although the Lead Plaintiffs are correct in providing that "the mere fact that Lead Plaintiffs are prosecuting the Securities Litigation does not preclude them, as creditors and parties in interest in this Chapter 11 proceedings, from demanding *relevant* information in connection with their bona fide objection to the Deloitte Application," Motion to Compel ¶ 32 (emphasis added), again, the key here is whether the information they are requesting is "relevant."  The information sought in connection with the Application clearly does not fall within that category.  While the Lead Plaintiffs may never be entitled to the information and depositions they seek, they certainly are not entitled to it as part of a purported Retention Objection to an application to retain accountants.

      iii.    *The depositions of the Audit Committee members are
not relevant to the Application*

    38.    The Lead Plaintiffs, in arguing the need to depose all four members of the

Audit Committee to determine the "competency" and "disinterestedness" of Deloitte, *see* Motion

to Compel ¶ 33, ignore the requirements of the Bankruptcy Code and relevant case law.  Section

327 of the Bankruptcy Code allows a debtor in possession, with the court's approval, to employ

professionals that do not "hold or represent an interest adverse to the estate, and that are

disinterested persons, to represent or assist the trustee in carrying out the debtor's duties."  11

U.S.C. § 327(a).  Section 101(14) of the Bankruptcy Code defines a "disinterested person" as

one that:

      (A) is not a creditor, an equity security holder, or an insider;

      (B) is not and was not an investment banker for any outstanding security of the
      debtor;

      (C) has not been, within three years before the date of the filing of the petition, an
      investment banker for a security of the debtor, or an attorney for such an
      investment banker in connection with the offer, sale, or issuance of a security of
      the debtor;

      (D) is not and was not, within two years before the date of the filing of the
      petition, a director, officer, or employee of the debtor or of an investment banker
      specified in subparagraph (B) or (C) of this paragraph; and

      (E) does not have an interest materially adverse to the interest of the estate or of
      any class of creditors or equity security holders, by reason of any direct or indirect
      relationship to, connection with, or interest in, the debtor or an investment banker
      specified in subparagraph (B) or (C) of this paragraph, or for any other reason.

11 U.S.C. § 101(14).

    39.    Because the Bankruptcy Code does not define the term "interest adverse to

the estate," courts determine the existence of an adverse interest on a case by case basis.  *In re

Caldor, Inc.*, 193 B.R. 165, 170 (Bankr. S.D.N.Y. 1996).  The Second Circuit has held that to

hold or represent an interest adverse to the estate means "(1) to possess or assert any economic

interest that would tend to lessen the value of the bankruptcy estate or that would create either an

actual or potential dispute in which the estate is a rival claimant; or (2) to possess a

predisposition under circumstances that render such a bias against the estate." *In re AroChem

Corp.*, 176 F.3d 610, 623 (2d Cir. 1999); *In re WorldCom, Inc.*, 311 B.R. 151, 163 (Bankr.

S.D.N.Y. 2004). Courts in this district have made clear, however, that "interests are not

considered 'adverse' merely because it is possible to conceive a set of circumstances under

which they might clash." *In re Leslie Fay Cos., Inc.*, 175 B.R. 525, 532 (Bankr. S.D.N.Y. 1994)

(citing *TWI Int'l v. Vanguard Oil & Serv. Co.*, 162 B.R. 672, 675 (S.D.N.Y. 1994)). As the

Second Circuit has consistently stated in the context of motions to disqualify professionals under

section 327, attempts to deprive debtors of the professionals of their choosing must be viewed

with some skepticism because "disqualification has an immediate adverse effect on the client by

separating him from counsel of his choice . . ., disqualification motions are often interposed for

tactical reasons . . ., [a]nd even when made in the best of faith, such motions inevitably cause

delay." *Armstrong v. McAlpin*, 625 F.2d 433, 444 (2d Cir. 1980), *vacated by*, 449 U.S. 1106

(1981). *See also Harker v. Comm'r of Internal Revenue*, 82 F.3d 806, 808 (8th Cir. 1996)

("Because of the potential for abuse by opposing counsel, 'disqualification motions should be

subjected to "particularly strict judicial scrutiny."'") (citing cases).

       40.    Courts have construed the "disinterested person" and the "no interest

adverse to the estate" requirements of section 327(a) of the Bankruptcy Code as a single test.

*WorldCom*, 311 B.R. at 164 (noting that the "interest adverse to the estate" language in section

327(a) overlaps with the "materially adverse interest" standard under the definition of

disinterested person to form a "single test to judge conflicts"); *Caldor*, 193 B.R. at 171

("[b]ecause §§ 101(14) and 327(a) overlap, the two prongs of § 327(a) are satisfied when the

professional to be retained is found to be a 'disinterested person'"); *Leslie Fay*, 175 B.R. at 532

(quoting *In re Martin*, 817 F.2d 175, 180 (1st Cir. 1987) to state that the "'twin requirements of

disinterestedness and lack of adversity telescope into a single hallmark'").  In applying this test,

courts generally look to the totality of the circumstances and exercise their discretion in

determining whether a party is disinterested and does not hold or represent an interest adverse to

the estate.  *See, e.g.*, *Caldor*, 193 B.R. at 172.

   41. Deloitte is a disinterested person as that term applies under each prong of

section 101(14).  First, Deloitte is disinterested pursuant to section 101(14)(A) of the Bankruptcy

Code in that it is neither a creditor, an equity security holder, nor an insider of the Debtors.

Although Deloitte could otherwise assert a prepetition claim against the Debtors, Deloitte has

agreed to waive that claim upon this Court's approval of the Application.  Second, Deloitte is

disinterested pursuant to section 101(14)(B) of the Bankruptcy Code in that it is not an

investment banker for any outstanding security of the debtors.  Third, Deloitte is disinterested

pursuant to section 101(14)(C) of the Bankruptcy Code in that it has not been, within the three

years prior to the petition date, an investment banker for a security of the Debtors, or an attorney

for such an investment banker in connection with the offer, sale or issuance of a security of the

Debtors.  Fourth, Deloitte is disinterested pursuant to section 101(14)(D) of the Bankruptcy Code

in that it is not, and was not within the two years prior to the petition date, a director, officer or

employee of the Debtors or of an investment banker specified in subparagraph (B) or (C).  Fifth,

Deloitte is disinterested under section 101(14)(E) of the Bankruptcy Code in that it does not hold

an interest materially adverse to the interest of the estate or any class of creditors or equity

holders, by reason of any direct or indirect relationship to, connection with, or interest in the

Debtors or an investment banker in subparagraph (B) or (C), or for any other reason.

42.    The Lead Plaintiffs seek to depose the Audit Committee members as the "primary decision-makers regarding matters relating to the retention of outside auditors," *see* Motion to Compel ¶ 33.  In support of their request, the Lead Plaintiffs argue that Mr. Dellinger was "unable to provide critical information," such as information surrounding, and his involvement in, the decision to retain Deloitte.  *Id.* ¶¶ 35-39.  Nowhere in the Bankruptcy Code or the applicable case law is there a requirement that a debtor put forth evidence regarding the decision process to retain a professional.  While the scope of deliberations in retaining Deloitte likely would be a relevant factor in connection with the Securities Litigation, any such testimony would be irrelevant to the Application and, therefore, the Lead Plaintiffs should not be permitted to depose the Audit Committee members.

43.    Moreover, Mr. Dellinger testified as to the reason to retain Deloitte for the year 2005 audit.  Specifically, Mr. Dellinger explained, the "timing on an auditor transition is typically in the first quarter," "[i]t is very difficult, if not impossible, to change audit firms late in the year," and to bring in a new audit firm in December would result in the firm operating under "an extremely compressed time period and probably impossible for them to complete within the time frame required for SCC [sic] reporting."  Dellinger Dep. (Ex. D) at 22:21-25, 23:1-20, 24:17-25, 25:1-7; *see also* 26:7-23.  He further described that an audit firm starts its work in the first quarter and continues through the second, third and fourth, with a large focus on the year-end audit.  *Id.* at 22:21-25, 23:1-2.  In respect of Deloitte specifically, Mr. Dellinger testified that the firm has been working with the Debtors for 10-11 months, "all of that time and effort is part of the 2005 audit."  *Id.* at 26:10-18.

44.    Mr. Dellinger also testified as to the hardship the Debtors would face if forced to secure a new auditor so late in the year.  He stated that "an attempt to do that would

take at least six months . . . [and] would be extremely disruptive." Dellinger Dep. (Ex. D) at

23:9-11. In addition, it would be difficult to clear the independence requirements on any of the

largest firms, and there would be "transition costs, expenses, and complexities." *Id.* at 23:11-17.

Through his testimony, Mr. Dellinger has provided a rational business justification for retaining

Deloitte, which should satisfy the inquiries of any party in interest with reasonable concerns

regarding such retention under the circumstances.

45.    Mr. Dellinger also is the most appropriate individual to testify in

connection with the Application. As Mr. Dellinger testified, a portion of his responsibilities

includes supervising the preparation of and signing-off on the Debtors' financial statements, he

meets regularly with Deloitte regarding disclosure issues and he has had discussions with

Deloitte regarding weaknesses in the internal controls in connection with corrective actions being

implemented. Dellinger Dep. (Ex. D) at 11:21-25, 72:3-10, 73:9-13.

46.    Finally, as described above, deposing every member of the Audit

Committee would be cumulative and unduly burdensome for at least one member. Given that

the only benefit to permitting the Lead Plaintiffs to depose the Audit Committee members would

be to assist them with their Securities Litigation, the depositions should not be permitted.

    iv.    *The Lead Plaintiffs are not entitled to information that is protected by the attorney client privilege*

47. Finally, the Lead Plaintiffs assert that the Debtors' counsel sought to "shield"

information from the Lead Plaintiffs regarding the decision to retain Deloitte by "baselessly

invoking the attorney-client privilege" with respect to certain questions posed to Robert

Dellinger during his deposition. Motion to Compel ¶ 42. This is simply not the case. In the first

place, Federal Rule 30(d)(1), as applied through Bankruptcy Rule 7030, allows counsel to

instruct a client not to answer a question, as the Lead Plaintiffs concede, "when necessary to

preserve a privilege." Fed. R. Civ. P. 30(d)(1). Thus, special counsel for the Debtors'

instructions not to answer some questions in order to preserve the attorney-client privilege

clearly are not "flagrant violations" of that rule, but rather are provided for specifically by that

rule. Motion to Compel ¶ 48. Second, in numerous instances—including several sections of the

deposition transcript to which the Lead Plaintiffs' misleadingly cite as exemplar of the kind of

"shielding" to which they object—Mr. Dellinger was able to provide an answer without

implicating the privilege on the basis of which special counsel for the Debtors had objected.[4]

*See*, *e.g.*, Dellinger Dep. (Ex. D) at 19:13-19; 21:15-21; 28:11-19; 29:2-3, 22-24; 34:13-16; 60:3-

4; 66:18-20. Third, despite the Lead Plaintiffs' argument to the contrary, the few instances in

which Mr. Dellinger did not answer on the basis of the attorney-client privilege were not based

"merely" on the fact that counsel was present during the discussions. *See* Declaration of Robert

Dellinger ("Dellinger Decl."), attached hereto as Exhibit G.

        48. The Second Circuit has held that the attorney-client privilege protects

confidential communications between a lawyer, acting in his capacity as such, and a client,

relating to legal advice being sought from that lawyer. *See In re Grand Jury Subpoena Duces*

*Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1036-37 (2d Cir. 1984). The same court has also

found that although that privilege can be complicated by situations involving in-house counsel,

communications with them relating to legal advice—as opposed to business advice—are still

covered. *See TVT Records v. Island Def Jam Music Group*, 214 F.R.D. 143, 144 (S.D.N.Y.

2003). Mr. Dellinger stated several times during his deposition that his knowledge of the

---

[4]     It should also be noted that the Lead Plaintiffs have apparently taken the liberty of expanding on the
deposition testimony of Mr. Dellinger at paragraph forty-three of their Motion to Compel, adding an extra
sentence and some bold-facing that the Debtors' have not been able to find anywhere in the transcript of the
deposition they possess, nor particularly at 16 (to which page the Lead Plaintiffs cite). Motion to Compel ¶
43 ("**I instruct the witness not to answer** as the question calls for the disclosure of communications
protected by the attorney client [sic] privilege.") (emphasis in original). The Debtors submit that this
language is not a part of the official deposition transcript of Mr. Dellinger.

internal investigation conducted by the Audit Committee prior to the restatement of certain

financial statements is limited solely to his discussions and briefings with counsel.[5]  *See*, *e.g.*,

Dellinger Dep. (Ex. D) at 22:15-16; 46:18-24; 48:2-7; 49:3-5; 51:12-13, 21-23; 54:20-21; 55:19-

23.  Despite the Lead Plaintiffs' insinuation that such "repeated objections" have no merit, the

discussions as to which Mr. Dellinger refused to provide information were engaged in expressly

for the purpose of discussing and formulating an ongoing legal strategy with respect to the

restated financial statements and the investigation into the events leading up to those restated

financials.  Dellinger Decl. (Ex. G) ¶¶ 3-4.  Such discussions were held with members of the

Audit Committee, in-house counsel and, in several instances, also with outside counsel, but not

in the presence of any third parties given the sensitive nature of the discussions.  *Id.* ¶¶ 3, 5.

Accordingly, any testimony related to those discussions would be protected by the attorney-

client privilege.

49. The Lead Plaintiffs' attempt to portray Debtors' objections on the basis of the

attorney-client privilege during the Dellinger Deposition as improper simply cannot withstand

scrutiny, and therefore, the Lead Plaintiffs' Motion to Compel should be denied as it relates to

the attorney-client privileged portions of the testimony of Robert Dellinger.

---

[5]     It has since come to the attention of the Debtors that, on one occasion, Mr. Dellinger was involved in a meeting with counsel and members of the SEC and other attorneys during which certain aspects of the internal investigation were discussed.  Dellinger Decl. (Ex. G) ¶ 3(d).  However, the purpose of that meeting was not to discuss any past practices of Deloitte (and no such discussions were had), but rather to discuss Delphi's ongoing efforts to implement certain corrective measures and introduce new Delphi executives, such as Mr. Dellinger, to the members of the SEC.  *Id.*  All briefings of Mr. Dellinger during which past practices of Deloitte may have been discussed, were conducted with in-house counsel or outside counsel or their agents present expressly for the purpose of providing legal advice.  To the extent that any portion of the discussions held at this meeting relate to any questions posed by the Lead Plaintiffs during Mr. Dellinger's deposition -- and this is not at all clear -- the Debtors submit that such matters fall well outside the proper scope of the deposition, and therefore should be protected from any further discovery pursuant to the arguments made above for a protective order limiting the scope of the deposition.

<u>Waiver Of Memorandum Of Law</u>

50.     Because there are no novel issues of law presented herein and that the legal authority for the relief being sought is set forth herein, the Debtors respectfully request that this Court waive the requirement that the Debtors file a memorandum of law in support of this Motion as provided in Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York.

<u>Conclusion</u>

WHEREFORE, the Debtors respectfully request that this Court enter an order

granting the relief requested herein, and such other and further relief as may be just.

Dated:    New York, New York
          December  29, 2005


                                        _/s/ Douglas P. Bartner_____
                                        Douglas P. Bartner (DB-2301)
                                        William J.F. Roll, III  (WR-8996)
                                        Andrew V. Tenzer  (AT-2263)

                                        SHEARMAN & STERLING LLP
                                        599 Lexington Avenue
                                        New York, New York 10022-6069
                                        Telephone:  (212) 848-4000
                                        Facsimile:  (212) 848-7179

                                        *Special Counsel for Debtors*