**EXHIBIT A**



# FORM 10-Q

## DELPHI CORP − DPHIQ.PK

**Filed: November 09, 2005 (period: September 30, 2005)**

Quarterly report which provides a continuing view of a company's financial position

## ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

**Executive Summary**

We are a global supplier of vehicle electronics, transportation components, integrated systems and modules and other electronic technology. In addition, our technologies are present in communication, computer, consumer electronic, energy and medical applications. We operate in extremely competitive markets. Our customers select us based upon numerous factors, including technology, quality and price. Our efforts to generate new business do not immediately affect our financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle. As a result, business that we win in 2005 will generally not impact our financial results until 2007 or beyond.

Delphi reported an operating loss of $482 million for the year ended December 31, 2004. Included in the operating loss were charges totaling $502 million pre-tax, primarily related to the recoverability of certain of Delphi's U.S. legacy plant and employee cost structure. Delphi's financial condition deteriorated further in the first nine months of 2005, incurring an operating loss of $1.3 billion. Of the $1.3 billion operating loss, $608 million was incurred in the first two quarters with $693 million incurred in the third quarter. Comparatively, in the first nine months of 2004 Delphi reported operating income of $245 million. Of the $245 million of operating income, $353 million was reported in the first two quarters of 2004 with a loss of $108 million incurred in the third quarter.

Delphi believes that three significant issues have largely contributed to the deterioration of Delphi's financial performance: (a) a competitive U.S. vehicle production environment for domestic original equipment manufacturers ("OEMs") resulting in the reduced number of motor vehicles that GM, our largest customer, produces annually in the United States and related pricing pressures, (b) increasing commodity prices, and (c) increasingly U.S. legacy liabilities, wage and benefit levels, and operational restrictions driven by collectively bargained agreements, including restrictions preventing Delphi from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs that restrict the Company's ability to respond to increasingly challenging market conditions.

In light of the current economic climate in the U.S. automotive industry, Delphi is facing considerable challenges due to revenue decreases and related pricing pressures stemming from a substantial slowdown in GM's North American vehicle production. Although Delphi has shown steady growth of its non-GM business, these gains have been overtaken by the decrease of GM sales. As a percent of our net sales, our non-GM sales were approximately 45% for the nine months ended September 30, 2004. Comparatively, for the same nine-month period in 2005, our non-GM sales, including the impact of migration during the period of certain product programs from direct sales to GM to sales to Tier 1 customers, were approximately 52% of net sales. However, our GM sales for the first nine months of 2005 decreased by approximately $2.1 billion, or approximately a 17.4% year-over-year decline.

Increasing commodity prices have also had a material adverse impact on Delphi's financial performance. Delphi continues to work proactively with suppliers and customers to manage these cost pressures, including seeking alternative product designs and material specifications, combining Delphi's purchase requirements with customers and suppliers, and changing suppliers, but despite these efforts, raw material supply has continued to be constrained and commodity cost pressures have continued to intensify as Delphi's supply contracts expire during 2005. We expect to incur $0.4 billion of higher commodity and troubled supplier costs in 2005 than in 2004, of which $0.3 billion is due to higher commodity costs and $0.1 billion is due to higher troubled supplier costs. To the extent that Delphi experiences cost increases, it will seek to pass these cost increases on to its customers, but if it is not successful, its income in future periods will be further adversely affected. To date, due to previously established contractual terms, Delphi's success in passing commodity cost increases on to customers has been limited.

Delphi's ability to effectively respond to these increasing challenges is impaired by its U.S. legacy liabilities and largely fixed labor costs. Specifically, in connection with Delphi's U.S. legacy liabilities and

24

operational restrictions, the majority of Delphi's collective bargaining agreements provide for wages and benefits which are well above market, costly pension plans and retiree health care and other benefits, and burdensome operating restrictions, constraining Delphi's ability to compete effectively with its U.S. peers. In connection with Delphi's spin-off from GM effective January 1, 1999, Delphi was required to assume the terms and conditions of the collective bargaining agreements negotiated by its unions and GM, which resulted in inflexible and uncompetitive costs and liabilities. Consequently, Delphi believes that the average rates at which it currently compensates its hourly workers, including employee and retiree benefits, is nearly three times the average hourly labor rates paid by its U.S. peer companies. Delphi's U.S. hourly pension and other post-employment benefits ("OPEB"), exposed Delphi to approximately $10.4 billion in unfunded liabilities at December 31, 2004, of which approximately $2.6 billion was attributable to unfunded pension obligations and $7.8 billion was attributable to OPEB obligations. Prior to the Chapter 11 Filings (as defined below), Delphi projected that cash outflows for hourly pension contributions and OPEB payments through 2007 would approximate $1.7 billion. Through the chapter 11 process, Delphi is permitted to defer a significant portion of these contributions until it emerges from chapter 11. As such, the projected future cash outflows for hourly pension contributions and OPEB payments through 2007 may be significantly less than $1.7 billion. Additionally, if these obligations are not addressed as part of the chapter 11 process, cash outflows for pension and OPEB would increase dramatically upon emergence as Delphi's U.S. workforce continues to age and the ratio of retirees to active employees increases.

Additionally, due to declining business conditions, an increasing proportion of Delphi's U.S. hourly workforce is, and is expected to continue to be, a fixed cost which is independent of volume and revenue. Under the terms of Delphi's collective bargaining agreements with its U.S. unions, Delphi is generally not permitted to permanently lay off idled workers, and as of September 30, 2005, approximately 2,500 idled hourly workers received nearly full pay and benefits, although performing no work. Coupled with restrictions on Delphi's ability to exit non-strategic, non-profitable operations, the magnitude of the cost of carrying idled, non-productive workers in the event of plant closings or winddowns effectively prevents Delphi from addressing under-performing product portfolio businesses and non-profitable manufacturing operations. Historically, under the terms of the spin-off from GM, this situation was somewhat mitigated because Delphi's UAW employees are permitted to return to GM's employ (known as "flowback") under certain conditions. As a result of GM's lower production volumes, however, the opportunities for Delphi's employees to flowback to GM have been limited and may be further limited in the future. This situation is placing, and will increasingly place, financial burdens on Delphi of a scope and magnitude that, unless addressed, threatens Delphi's long-term viability.

In light of the deterioration in performance due to the factors described above, Delphi determined that it was necessary to address and resolve its U.S. legacy liabilities, product portfolio, operational issues and forward looking revenue requirements. As a result, we intensified our efforts during 2005 to engage our unions, as well as GM, in discussions seeking consensual modifications that would permit us to align our U.S. operations to our strategic portfolio and be competitive with our U.S. peers, and to obtain financial support from GM to implement our restructuring plan. Despite significant efforts to reach a resolution, we determined that these discussions were not likely to lead to the implementation of a plan sufficient to address our issues on a timely basis and that Delphi needed to pursue other alternatives to preserve value for its stakeholders.

Accordingly, in order to transform and preserve the value of the Company, which required resolution of existing legacy issues and the resulting high cost of U.S. operations, on October 8, 2005, Delphi and certain of its United States ("U.S.") subsidiaries (the "Initial Filers") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Court"), and on October 14, 2005, three additional U.S. subsidiaries of Delphi (together with the Initial Filers, collectively, the "Debtors") filed voluntary petitions for relief under the Bankruptcy Code (collectively the Debtors October 8, 2005 and October 14, 2005 filings are referred to herein as the "Chapter 11 Filings"). We will continue to operate our business as "debtors-in-possession" under the jurisdiction of the Court and in accordance with the

applicable provisions of the Bankruptcy Code and orders of the Court. Delphi's non-U.S. subsidiaries were not included in the filings, will continue their business operations without supervision from the U.S. Courts and will not be subject to the chapter 11 requirements of the Bankruptcy Code.

At hearings held in mid October 2005, the Court approved certain of the Debtors' "first day" motions generally designed to stabilize the Debtors operations and covering, among other things, human capital obligations, supplier relations, customer relations, business operations, tax matters, cash management, utilities, case management and retention of professionals. Certain of these motions were approved on an interim basis and were subject to a final hearing before the Court. Included in the authority granted to Delphi was interim approval to use up to $950 million of Delphi's $2 billion senior secured debtor-in-possession ("DIP") financing being provided by a group of lenders led by JPMorgan Chase Bank and Citigroup Global Markets, Inc. (as further described below), and approval of an adequate protection package for Delphi's outstanding $2.5 billion prepetition secured indebtedness under its prepetition Facilities (as defined below). The adequate protection package includes, among other things: (i) an agreement by Delphi to pay accrued interest on the loans under the prepetition facility on a monthly basis, (ii) the right of Delphi to pay this interest based on LIBOR, although any lender may require that interest on its loans be based on the alternative base rate if such lender waives all claims for interest at the default rate and any prepayment penalties that may arise under the prepetition facility and (iii) an agreement by Delphi to replace approximately $90 million of letters of credit outstanding under the prepetition facility with letters of credit to be issued under the DIP Credit Facility. The proceeds of the DIP financing together with cash generated from daily operations and cash on hand will be used to fund post-petition operating expenses, including supplier obligations and employee wages, salaries and benefits. On October 28, 2005, the Court granted, on a final basis, the Debtor's motion for approval of the DIP financing. The Court had also previously approved a motion to authorize, but not direct the Company generally to honor prepetition obligations to customers, including the Company's prepetition warranty programs, and otherwise to continue customer programs in the ordinary course of business. On November 4, 2005, the Court issued final orders approving the remaining first day matters noted above, with the exception of retention of the Company's investment banker, which will be heard on November 29, 2005 following a mandatory 45 day notice period.

On October 12, 2005, the Court entered an interim order granting the Debtors' motion, filed October 8, 2005, to potentially restrict trading in stock of Delphi and indebtedness of the Debtors' by substantial holders thereof. The order's purpose was to ensure that the Debtors did not lose the benefit of their net operating loss carryforwards and certain other tax attributes, which may be used to reduce their future taxable income, and, thus, constitute valuable assets of the Debtors. The Debtors' ability to use the tax attributes could be severely limited if the Company were to undergo an "ownership change" within the meaning of the Internal Revenue Code. Certain trading in Delphi stock could trigger such an "ownership change." In addition, certain trading in indebtedness of the Debtors could prevent certain beneficial rules from being available to the Debtors upon emergence from the Chapter 11 proceeding (which rules, if available, would permit such tax attributes to be available to the Debtors without limitation). Thus, the interim order imposes restrictions on certain trading in Delphi stock and indebtedness of the Debtors.

On October 14, 2005, Delphi entered into a Revolving Credit, Term Loan and Guaranty Agreement (the "DIP Credit Facility") to borrow up to $2.0 billion from a syndicate of lenders to be arranged by J.P. Morgan Securities Inc. and Citigroup Global Markets, Inc., for which JPMorgan Chase Bank, N.A. is the administrative agent and Citicorp USA, Inc., is syndication agent. The DIP Credit Facility consists of a $1,750 million revolving facility and a $250 million term loan facility (collectively, the "DIP Loans"). Borrowings under the DIP Credit Facility are prepayable at Delphi's option without premium or penalty. On October 27, 2005, Delphi entered into the First Amendment to the Revolving Credit, Term Loan and Guaranty Agreement. On October 28, 2005, the Court granted, on a final basis, the Debtors' motion for approval of the DIP financing order. The DIP financing order granted final approval of the DIP Credit Facility, as amended, and final approval of an adequate protection package for the prepetition Facilities (as defined below). Following approval of the final DIP financing order, Delphi has access to $2 billion in DIP financing subject to the terms and conditions set forth in the DIP financing documents, as amended

26

(the "First Amendment"), and $2.5 billion under the prepetition Facilities (as defined below), for a total financing of $4.5 billion. (See Liquidity and Capital Resources for further details on the DIP Credit Facility.)

We intend through the chapter 11 process to address the competitiveness of Delphi's core U.S. operations through the modification or elimination of non-competitive legacy liabilities, high wages and benefits, and burdensome restrictions under current labor agreements, and the realignment of Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses. This will require negotiation with key stakeholders over their respective contributions to the restructuring plan and utilization of the chapter 11 process as necessary to achieve the cost savings and operational effectiveness envisioned in our transformation objectives. We believe that it is necessary for a substantial segment of Delphi's U.S. business operations to be divested, consolidated or wound-down through the chapter 11 process.

Upon the conclusion of this process, we expect to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally. In addition, Delphi will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as a world premier auto supplier. However, we cannot assure you that potential adverse publicity associated with the chapter 11 filing and the resulting uncertainty regarding Delphi's future prospects will not materially hinder Delphi's ongoing business activities and its ability to operate, fund and execute its business plan by impairing relations with existing and potential customers; negatively impacting the ability of Delphi to attract, retain and compensate key executives and associates and to retain employees generally; limiting Delphi's ability to obtain trade credit; and impairing present and future relationships with vendors and service providers.

**Chapter 11 Cases**

Shortly after the filing, the Debtors began notifying all known actual or potential creditors of the Chapter 11 Filings for the purpose of identifying all prepetition claims against the Debtors. The Chapter 11 Filings triggered defaults on substantially all debt obligations of the Debtors. However, under section 362 of the Bankruptcy Code, the filing of a bankruptcy petition automatically stays most actions against a debtor, including most actions to collect prepetition indebtedness or to exercise control over the property of the debtor's estate. Absent an order of the Court, substantially all prepetition liabilities are subject to settlement under a plan of reorganization. On October 17, 2005, the Court held an organizational meeting for unsecured creditors. On the same day, the Court formed a committee of unsecured creditors in the chapter 11 case.

Under the Bankruptcy Code, the Debtors have the exclusive right for 120 days from the date of the filing to file a plan of reorganization and 60 additional days to obtain necessary acceptances. Such periods may be extended by the Court for cause. If the Debtors' exclusivity period lapses, any party in interest may file a plan of reorganization for the Debtors. In addition to being voted on by holders of impaired claims and equity interests, a plan of reorganization must satisfy certain requirements of the Bankruptcy Code and must be approved, or confirmed, by the Court in order to become effective. Under certain circumstances, the Court may confirm a plan even if such plan has not been accepted by all impaired classes of claims and equity interests. A class of claims or equity interests that does not receive or retain any property under the plan on account of such claims or interests is deemed to have voted to reject the plan. The precise requirements and evidentiary showing for confirming a plan notwithstanding its rejection by one or more impaired classes of claims or equity interests depends upon a number of factors, including the status and seniority of the claims or equity interests in the rejecting class, i.e., secured claims or unsecured claims, subordinated or senior claims, preferred or common stock.

Section 365 of the Bankruptcy Code permits the Debtors to assume, assume and assign, or reject certain contracts. Rejection constitutes a court-authorized breach of the contract in question and, subject to certain exceptions, relieves the Debtors of their future obligations under such contract but creates a

deemed prepetition claim for damages caused by such breach or rejection. Parties whose contracts are rejected may file claims against the rejecting Debtor for damages. Generally, the assumption, or assumption and assignment, of an executory contract requires the Debtors to cure all prior defaults under such executory contract and to provide adequate assurance of future performance. In this regard, Delphi expects that liabilities subject to compromise and resolution in the chapter 11 case may arise in the future as a result of damage claims created by the Debtors' rejection of executory contracts. Conversely, Delphi would expect that the assumption of certain executory contracts may convert liabilities shown in future financial statements as subject to compromise to post-petition liabilities. Due to the uncertain nature of many of the potential claims, Delphi is unable to project the magnitude of such claims with any degree of certainty at this time.

The Court will establish a deadline for the filing of proofs of claim under the Bankruptcy Code, requiring the Debtors' creditors to submit claims for liabilities not paid and for damages incurred. There may be differences between the amounts at which any such liabilities are recorded in Delphi's financial statements and the amount claimed by the Debtors' creditors. Significant litigation may be required to resolve any such disputes or discrepancies.

As a result of the filing, realization of assets and liquidation of liabilities are subject to uncertainty. While operating as debtors-in-possession under the protection of chapter 11 of the Bankruptcy Code, and subject to Court approval or otherwise as permitted in the normal course of business, the Debtors may sell or otherwise dispose of assets and liquidate or settle liabilities for amounts other than those reflected in the consolidated financial statements. Further, a plan of reorganization could materially change the amounts and classifications reported in the consolidated historical financial statements, which do not give effect to any adjustments to the carrying value of assets or amounts of liabilities that might be necessary as a consequence of confirmation of a plan of reorganization.

In addition, under the priority scheme established by the Bankruptcy Code, unless creditors agree otherwise, post-petition liabilities and prepetition liabilities must be satisfied in full before shareholders are entitled to receive any distribution or retain any property under a plan of reorganization. The ultimate recovery to creditors and/or shareholders, if any, will not be determined until confirmation of a plan or plans of reorganization. No assurance can be given as to what values, if any, will be ascribed in the chapter 11 cases to each of these constituencies or what types or amounts of distributions, if any, they would receive. A plan of reorganization could result in holders of Delphi's stock receiving no distribution on account of their interests and cancellation of their existing stock. If certain requirements of the Bankruptcy Code are met, a plan of reorganization can be confirmed notwithstanding its rejection by Delphi's equity security holders and notwithstanding the fact that such equity security holders do not receive or retain any property on account of their equity interests under the plan. Accordingly, Delphi urges that the appropriate caution be exercised with respect to existing and future investments in any of these securities as the value and prospects are highly speculative.

Additional information on Delphi's filing under the Bankruptcy Code, including access to Court documents and other general information about the chapter 11 cases, is available online at www.delphidocket.com. However, such materials will be prepared according to requirements of federal bankruptcy law and while they accurately provide then-current information required under federal bankruptcy law, may nonetheless be unconsolidated, unaudited, and may be prepared in a format different from that used in Delphi's consolidated financial statements filed under the securities laws. Moreover, the materials filed with the Court are not prepared for the purpose of providing a basis for an investment decision relating to Delphi's stock or debt or for comparison with other financial information filed with the SEC.

**Other Events**

Delphi is rated by Standard & Poor's, Moody's, and Fitch Ratings. At September 30, 2005 our senior unsecured debt ratings were CCC-/Ca/CCC+, respectively, our preferred stock ratings were CC/C/CCC, respectively, and our senior secured debt ratings were B-/B3/B, respectively.