REDACTED

          **Hearing Dates: January 4, 2006 at 10:00 a.m.**
          **(Debtors' Motion to Quash and For A Protective Order)**
          **January 5, 2006 at 10:00 a.m. (Deloitte Retention Motion and Lead Plaintiffs' Motion to Compel Discovery)**

**LOWENSTEIN SANDLER PC**
Michael S. Etkin, (ME 0570)
Ira M. Levee (IL 9958)
1251 Avenue of the Americas, 18th Floor
New York, New York 10020
(212) 262-6700 (Telephone)
(212) 262-7402 (Facsimile)
     and
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2481 (Facsimile)

*Bankruptcy Counsel to Lead Plaintiffs and the Prospective Class*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| DELPHI CORPORATION, et al., | |
|         Debtors. | Case No. 05-44481 (RDD) |
| | (Jointly Administered) |

**REPLY BRIEF OF LEAD PLAINTIFFS' IN FURTHER SUPPORT OF THEIR MOTION TO COMPEL DEPOSITION TESTIMONY AND THE PRODUCTION OF DOCUMENTS IN CONNECTION WITH THE DEBTORS' APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(a), 328(a), AND 1107(b) AUTHORIZING EMPLOYMENT AND RETENTION OF DELOITTE & TOUCHE LLP AS INDEPENDENT AUDITORS AND ACCOUNTANTS TO DEBTORS, EFFECTIVE NUNC PRO TUNC TO OCTOBER 8, 2005 AND OBJECTIONS FILED THERETO AND OBJECTION TO DEBTORS' (I) MOTION (A) TO QUASH TRIAL SUBPOENAS ISSUED TO MEMBERS OF DEBTORS' AUDIT COMMITTEE AND FOR PROTECTIVE ORDER AND (B) FOR A PROTECTIVE ORDER TO LIMIT THE SCOPE OF THE DEPOSITION OF ROBERT DELLINGER TO ONLY THOSE MATTERS PERTAINING DIRECTLY TO THE DEBTORS' APPLICATION FOR AN ORDER AUTHORIZING EMPLOYEMENT AND RETENTION OF DELOITTE & TOUCHE LLP**

**TO THE HONORABLE ROBERT D. DRAIN**
**UNITED STATES BANKRUPTCY JUDGE**

The Teachers' Retirement System Of Oklahoma, the Public Employees' Retirement System Of Mississippi, Raiffeisen Kapitalanlage-Gesellschaft m.b.H. and Stichting Pensioenfonds ABP (collectively, "Lead Plaintiffs"), the Court-appointed Lead Plaintiffs in the securities class action entitled *In re Delphi Corp. Securities Litigation*, Master File No. 1:05-CV-2637 (NRB)(SDNY), creditors and parties in interest in this Chapter 11 proceeding, hereby reply in support of their Motion To Compel Deposition Testimony And The Production Of Documents In Connection With The Debtors' Application For Order Under 11 U.S.C. §§ 327(a), 328(a), And 1107(b) Authorizing Employment And Retention Of Deloitte & Touche LLP As Independent Auditors And Accountants To Debtors, Effective *Nunc Pro Tunc* To October 8, 2005 And Objections Filed Thereto filed on December 23, 2005 ("Motion to Compel") and hereby object to Debtors' (I) Motion (A) To Quash Trial Subpoenas Issued To Members Of Debtors' Audit Committee And For Protective Order And (B) For A Protective Order To Limit The Scope Of The Deposition Of Robert Dellinger To Only Those Matters Pertaining Directly To The Debtors' Application For Order Authorizing Employment And Retention Of Deloitte & Touche LLP And (II) Objection To Lead Plaintiffs' Motion To Compel Deposition Testimony And The Production Of Documents In Connection With The Debtors' Application For Order Under 11 U.S.C. §§ 327(a), 328(a), And 1107(b) Authorizing Employment And Retention Of Deloitte & Touche LLP As Independent Auditors And Accountants To Debtors, Effective *Nunc Pro Tunc* To October 8, 2005 And Objections Filed Thereto, filed on December 29, 2005 ("Debtors' Motion to

Quash"). In further support of their Motion to Compel and in opposition to Debtors' Motion to Quash, Lead Plaintiffs represent as follows:

## PRELIMINARY STATEMENT

1.　　In its 2004 Form 10-K ("Restatement"), Delphi restated its financial statements for each of the preceding five years, disclosing that it had failed to account for a host of material transactions in accordance with generally accepted accounting principles ("GAAP"), and attributing the Restatement to deficiencies in its internal accounting controls. During the entire period of the Restatement, Deloitte served as Delphi's sole outside auditor. Delphi's admitted accounting failures make clear that Deloitte's audits of Delphi's financial statements, which resulted in unqualified opinions representing that Delphi's accounting was in accordance with GAAP, were wholly deficient. Indeed, Delphi's accounting misconduct is now the focus of investigations by the Securities and Exchange Commission ("SEC"), United States Department of Justice ("DOJ") and Federal Bureau of Investigation ("FBI"), among others.

2.　　With Deloitte's pre-petition failures as a backdrop, Lead Plaintiffs have objected ("Lead Plaintiffs' Objection") to Debtors' retention of Deloitte to perform additional audit work for the Debtors on the grounds that Deloitte is demonstrably incompetent to serve as Debtors' auditor and that Deloitte, as a defendant in the Securities Litigation, and one of several subjects in an SEC investigation, all relating to its auditing of Debtors' financial statements, is not a "disinterested person" as defined by the Bankruptcy Code and relevant case law. Indeed, Deloitte would have a strong economic incentive to conceal any additional errors it might find in Debtors' financial statements for the periods during which Deloitte rendered unqualified audit opinions, to

2

try to minimize Deloitte's exposure in the Securities Litigation and pending government investigations.

3. Lead Plaintiffs have sought tailored discovery designed to unearth facts relevant to their objections to Deloitte's continued retention as the Debtors' auditor. In opposing such discovery, the Debtors' Motion to Quash makes plain that they seek permission to hire Deloitte to audit the 2005 financial statements (1) without <u>any disclosure</u> of what Deloitte did wrong in its prior years' audits; (2) without disclosing the identity of the members of Deloitte's audit team that were responsible for Deloitte's prior errors; and (3) without identifying what procedures are now in place to insure that such mistakes will not influence Deloitte's future performance, or that such mistakes will happen again. In being asked to approve the Debtors' retention of Deloitte for 2005, the Court, and all parties in interest, should not be deprived of these facts, especially when the audit fee paid from the Debtors' estate will be approximately $15-20 million. *See* Transcript of the Deposition of Robert E. Dellinger, annexed as Ex. E to the Motion ("Dellinger Tr."), at 27:12.

## ARGUMENT

### I. DISCOVERY SOUGHT BY LEAD PLAINTIFFS IS HIGHLY RELEVANT TO THEIR OBJECTION

4. Debtors' relevancy (and only substantive) objection is premised on the fallacious notion that simply because information sought by Lead Plaintiffs' discovery requests might be relevant to the Securities Litigation, it should therefore be automatically deemed not relevant to Lead Plaintiffs' Objection. Debtors' argument overlooks the fact that information can be relevant to more than one case or more than one issue. If the information sought by Lead Plaintiffs is relevant to their Objection and

3

the appropriateness of the Debtors' retention of Deloitte, because it bears on Deloitte's competence or its conflict of interest, then the discovery should be permitted regardless of whether the information might also be relevant to the Securities Litigation. *See, e.g., Dove v. Atlantic Capital Corp.,* 963 F.2d 15, 19 (2d Cir. 1992) ("[W]here the discovery sought is relevant to a good faith defense in the federal case, the mere fact that it may be used in other litigation does not mandate a protective order."). Indeed, it is the most basic tenet that "[a] valid discovery request need only encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *In re Priceline.com Inc. Sec. Litig.*, No. 00-CV-01884, 2005 U.S. Dist. LEXIS 33635, * 9-10 (S.D.N.Y. Dec. 8, 2005) (internal quotations omitted).

5.  At least one bankruptcy court in this District has specifically rejected efforts by a party to curtail appropriate discovery in bankruptcy court by invoking the PSLRA stay in related securities litigation. *See In re Recoton*, 307 B.R. 751, 759 (Bankr. S.D.N.Y. 2004). In *Recoton*, the creditors' committee sought discovery relating to the conduct of the debtors' former directors and officers in order to investigate potential claims by the estate against these individuals. 307 B.R. at 755. The former directors and officers sought a protective order on grounds that the discovery could be used in a related securities fraud case where discovery was stayed pursuant to the PSLRA. *Id.* at 757. The court rejected this argument finding that the committee's need for discovery—which was subject to a confidentiality order—was related to potential claims for relief in the bankruptcy action and not premised on the securities laws. *Id.* at 759. According to the court, "it would seriously delay and disrupt the administration of bankruptcy cases if the

4

happenstance of a pending securities action gave the defendants in that suit the ability to impede investigations that the debtor or committee may appropriately conduct." *Id.*

6. Here, similarly, Debtors are using the PSLRA as a shield to prevent any meaningful review of the propriety of retaining Deloitte as their auditor, an inquiry that is specifically contemplated by the Bankruptcy Code. This sort of "delay and disruption" in the name of a pending securities fraud case, is precisely the conduct that the *Recoton* court rejected.

7. The lone case cited in Debtors' Motion to Quash contesting the relevance of information requested by Lead Plaintiffs is *In re Worldcom, Inc.*, 311 B.R. 151 (Bankr. S.D.N.Y. 2004). This case is wholly distinguishable and, indeed, lends support to Lead Plaintiffs' Motion to Compel.

8. In *WorldCom*, on the eve of WorldCom's reorganization plan being approved and WorldCom emerging from bankruptcy, a coalition of States moved to disqualify KPMG from continuing to serve as WorldCom's accountant, auditor, and tax advisor, and disgorge its fees paid to date. *See* 311 B.R. at 155. The disqualification motion was filed almost 16 months after the bankruptcy court had approved the debtors' unopposed application to retain KPMG. *Id.* 155-56. The States sought KPMG's disqualification on grounds that KPMG had counseled the Debtors on the implementation of a tax minimization program, which had resulted in the States being improperly deprived of billions in tax revenues. *Id.* at 165-66. The basis for the States' motion was a report prepared by a court-appointed examiner that concluded that the States had a potential cause of action against WorldCom relating to the improper withholding of taxes, and that, in turn, the debtor had potential claims against KPMG arising out of its

5

tax advice. *Id.* at 159. The examiner's report also concluded, however, that all of these potential claims were subject to equally valid defenses. *Id.* at 159. Following the examiner's report, WorldCom's audit committee had concluded that it would not pursue such claims against KPMG and the company continued the tax minimization program designed by KPMG. *Id.*

9. In rejecting the States' disqualification motion, the court held that the motion was unduly delayed, since KPMG had been approved as auditor and tax consultant more than a year previously, and the facts surrounding the purportedly improper tax minimization plan were known to the States for more than ten months before bringing the motion. *Id.* at 168 (noting "had the States raised the issue at an earlier junction in this case, the court could have taken corrective measures to address the States' concerns, if such were warranted").

10. In addition to finding the States' actions untimely, the court held that the concerns raised in the disqualification motion with respect to KPMG's tax advice were insufficient to warrant disqualification. *Id.* Critical to the court's holding was its finding that there was little support for the States' substantive challenge that the controversy surrounding KPMG's tax advice created an improper adverse interest or an appearance of impropriety: WorldCom was continuing to implement KPMG's tax minimization program; at the inception of the bankruptcy, the court had appointed a Corporate Monitor to monitor WorldCom's corporate governance and it was highly unlikely that the Corporate Monitor could have shirked its fiduciary duties in determining not to assert any claims against KPMG for improper tax advice; the SEC, during its inquiry into WorldCom, had unearthed no evidence reflecting a lack of independence by KPMG as an

6

auditor, or a failure on the part of the Board in deciding not to pursue KPMG relating to its tax advice. *Id.* at 169-171.

11. Thus, the court's decision in rejecting a disqualification motion was based on (1) unconscionable delay in seeking KPMG's disqualification and (2) a wealth of information that was already available to the court that enabled the court to thoroughly consider the States' objections.

12. Here, the concerns expressed by the *WorldCom* court regarding the timeliness of the States' disqualification motion are not present. More importantly, unlike in *WorldCom*, Debtors here seek to conceal information from this Court that that the *WorldCom* court found critical to determine the merits of the States' disqualification motion, *i.e.*, what measures the Company had taken to assess its auditors' independence and the auditors' role in the challenged transactions.

13. Indeed, in attempting to legitimize their wholesale refusal to provide any meaningful information weighing on Lead Plaintiffs' Objection, Debtors' have distorted Lead Plaintiffs' objections and the relevance of the information sought by Lead Plaintiffs. In fact, the sole example cited in Debtors' Motion to Quash, illustrates this point. Debtors argue:

> For example, counsel for the Lead Plaintiffs persisted in his questioning of Mr. Dellinger regarding internal controls in place at Delphi during 2002-2003. While whatever internal controls were in place at Delphi during that time [2002-2003] *might* bear on claims related to those years…they have **no bearing whatsoever** on Deloitte's ability to be employed and retained as the Debtors' independent auditor now.

Debtors' Motion to Quash at ¶30 (emphasis added).

14. First, by cherry-picking a question about internal controls in 2002-2003, Debtors are transparently attempting to pigeon-hole all questions about Deloitte's pre-

7

petition conduct as irrelevant. Clearly, conduct that culminated in a massive accounting restatement cannot be labeled as such.

15. Separately, far from having "no bearing whatsoever on Deloitte's ability to be employed and retained as Debtors' independent auditor now," in appraising Deloitte's competency going forward, it is relevant to know if Deloitte's failures in this regard were the fault of just one or two individual auditors, or rather whether there are deficiencies in Deloitte's procedures that make it likely that such errors could occur again. Because the information sought is relevant to the Objection, any collateral relevance it might also have to the Securities Litigation is beside the point.

16. Tellingly, apart from the above example, Debtors' Motion to Quash avoids any specific rebuttal of why other aspects of Deloitte's recent pre-petition conduct should be deemed irrelevant to Lead Plaintiffs' Objection, such as: (1) the June, 2005 Restatement and the investigation that precipitated the Restatement; (2) the investigations by the SEC, DOJ, and FBI, among others; and (3) Delphi's admission in March, 2005 that it lacked internal controls on Deloitte's watch as gatekeeper. Instead, Debtors simply repeat their conclusory mantra that such information is irrelevant and that Lead Plaintiffs are simply trying to end-run applicable stays in connection with the underlying Securities Litigation.

17. Debtors make similar relevancy objections to Lead Plaintiffs' trial subpoenas served upon the Audit Committee in their Motion to Quash. Indeed, Debtors make the baseless assertion that although "the scope of deliberations in retaining Deloitte likely would be a relevant factor in connection with the Securities Litigation, any such testimony would be irrelevant to the Application." Debtors' Motion to Quash at ¶42.

8

Not only do these deliberations go to the very core of the Deloitte Application, the Audit Committee members are the only ones equipped to testify concerning Delphi's measures to properly insure that Deloitte is truly disinterested. Indeed, it was clear from the Dellinger deposition that he:

- is unable to provide even the most basic information relating to the Application, a document he admittedly did not even read, including why the Debtors sought the retention of Deloitte for 2005 and thereafter (Dellinger Tr. at 16-17);

- **REDACTED PURSUANT TO CONFIDENTIALITY ORDER**

- had less than two-weeks involvement in the decision making process concerning whether or not to retain Deloitte for 2005 (Dellinger Tr. at 34:19-20);

- had no involvement in the pre-petition investigation into the Restatement (Dellinger Tr. at 46: 12-15); and

- could not even recall conversations he had with the Chairman of the Audit Committee concerning his assurance to Deloitte to retain them through 2005 (Dellinger Tr. at 34:25-35:3; 36:3-7).

18. Thus, by serving the trial subpoenas, Lead Plaintiffs simply seek to obtain information directly from the people who: (1) were supposedly overseeing Deloitte's pre-petition auditing; (2) were instrumental in Debtors' decision to retain Deloitte; and (3) purportedly evaluated the competency and disinterestedness of Deloitte.

## II. DEBTORS' ALTERNATIVE BASIS FOR OBJECTING TO LEAD PLAINTIFFS' DISCOVERY REQUESTS LACK MERIT

19. Without any offer of compromise, Debtors object to all of Lead Plaintiffs' discovery requests as "unduly burdensome." Debtors' Motion to Quash at ¶33. Debtors argue that: (1) Lead Plaintiffs served requests for thousands of documents spanning several years to be produced within one business day (Debtors' Motion to Quash at ¶ 12); and (2) to force the Audit Committee to testify, particularly, Oscar De Paula Bernardes

9

Neto who resides in Brazil, would be unduly burdensome and oppressive. Debtors' Motion to Quash at ¶ 25.

20. However, to ensure that Lead Plaintiffs were adequately prepared to advocate their position with respect to the Deloitte Retention Application at the January 5, 2005, hearing, Lead Plaintiffs served document requests upon Debtors on December 15, 2005 – almost two weeks before Debtors filed their Motion to Quash. Yet, rather than reaching out to Lead Plaintiffs' counsel at any point in an effort to effectuate a compromise on the production, Debtors have refused in wholesale fashion to produce even a single document to Lead Plaintiffs.

21. Instead, Debtors simply claim hardship, complaining about even the most basic requests propounded by Lead Plaintiffs, such as merely providing the names of the Deloitte personnel who have worked, or who will work, on the Delphi engagements. Debtors' Motion to Quash at ¶34. Lead Plaintiffs can think of no simpler request, as Deloitte's billing statements surely contain this basic information.

22. Equally dubious is Debtors' proffered rebuttal to Lead Plaintiffs' claim that Debtors have improperly utilized the attorney-client privilege as a shield against testimony. Debtors' Motion to Quash at ¶¶47-49. Indeed, the facts speak for themselves.

23. At the Dellinger deposition, as Debtors' own citations reveal, all privilege objections were made exclusively on the basis that counsel was merely <u>present</u> or were made in generic fashion: "Yeah, my knowledge of the investigation is attorney-client privilege." *See* Dellinger Tr. at 46:23-24, 19:4-12, 22:2-6, 22:15-16, 29:18-30:10; Debtors' Motion to Quash at ¶48. <u>At no time</u> did Dellinger state, as Debtors contend, that "several times during his deposition that his knowledge of the internal investigation

10

conducted by the audit committee prior to the restatement of certain financial statements is limited solely to *discussions and briefings* with counsel." Debtors' Motion to Quash at ¶48 (emphasis added) (citing Dellinger Tr. at 22:15-16; 46:18-24; 48:2-7; 49:3-5; 51:12-13, 21-23; 54:20-21; 55:19-23). Debtors' statement is simply false and proves that the Debtors are, as Lead Plaintiffs claim, improperly hiding behind attorney-client privilege.

24.  Having been exposed for their improper application of the attorney-client privilege, Debtors now try to right the ship with an after-the-fact declaration from Robert Dellinger that is falsely presented as consistent with prior testimony. Debtors' Motion to Quash at ¶48. Free from the specter of cross-examination, Dellinger now claims that during every meeting he attended in which counsel was present, Debtors were seeking legal advice or devising legal strategy. Debtors' Motion to Quash at ¶48; Dellinger Declaration at ¶3. In fact, Dellinger now recalls with precision four meetings during which the Restatement was discussed, including a meeting with the SEC. Dellinger Declaration at ¶3. According to Dellinger, counsel was present for each one of those meetings except for the meeting with the SEC. *Id.* Dellinger further declares that at each and every one of those meetings, counsel "assist[ed] to formulate Delphi's ongoing legal strategy relating to the investigation and underlying issues surrounding Delphi's restatement of certain financial statements, including some resulting litigation." *Id.* at ¶4.

25.  Dellinger's deposition is rife with other examples of Debtors playing fast and loose with assertions of attorney-client privilege. For example, at the deposition, Dellinger initially testified that counsel was present during all conversations about retaining Deloitte for 2005. Dellinger Tr. at 21:22-26, 22:2-6, 22:15-16. However,

11

minutes later, Dellinger described two conversations - one in person with Brock Plumb from Deloitte and one on the phone with Bob Brust, chair of the Audit Committee – when he did discuss retaining Deloitte for 2005.[1]  Dellinger Tr. at 34:25; 35:1-13; 36:3-7; 37: 17-25; 38: 1-8.  Accordingly, in light Debtors' pattern of abusing the attorney-client privilege, the Court should be skeptical of such claims.

26.    Finally, attempting to have their proverbial cake and eat it too, the Debtors attempt to avoid their discovery obligations by claiming that the Confidentiality Stipulation that Debtors drafted and Lead Plaintiffs signed without change fails to provide them adequate protection.  Debtors now contend that it does not sufficiently protect them, stating that "information related to the Securities Litigation has value to the Lead Plaintiffs even if not specifically utilized in the litigation."  Debtors' Motion to Quash at ¶¶36.  Debtors' argument is nonsensical.  Merely because Lead Plaintiffs might uncover information relevant to the Securities Litigation, the use of which is controlled by the Confidentiality Stipulation, is a wholly unfounded basis to deny Lead Plaintiffs access to evidence of paramount importance to the issue presently before the Court – whether the Application should be denied.  *Dove*, 963 F.2d at 19; *In re Priceline.com Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 33635, at * 9-10.  Tellingly, Debtors have cited no

---

[1]     Lead Plaintiffs acknowledge an error in Lead Plaintiffs' citation to and quotation of the official transcript of Robert Dellinger in their Motion to Compel, at ¶ 43. The correct quotation and citation, in which Debtors' counsel instructed Mr. Dellinger not to answer, is as follows:

> I'll object to that question to the extent that it would require the witness to reveal attorney-client communications, from his previous description of the meeting he attended, I believe it was a meeting with counsel. So I would caution the witness not to reveal any such information. And I object to the question and instruct the witness not to answer to the extent that it does**.**

Dellinger Tr. at 19:1-12.

authority to support their claim that the mere potential of a party viewing information relevant to a collateral litigation relieves them of their discovery obligations.

## CONCLUSION

WHEREFORE, Lead Plaintiffs respectfully request that this Court provide the relief requested in Lead Plaintiffs' Motion to Compel and deny Debtors' Motion to Quash.

Dated:  January 3, 2005                                Respectfully submitted,

**LOWENSTEIN SANDLER, PC**

By:  /s/ Michael S. Etkin
Michael S. Etkin, Esq. (ME 0570)
Ira M. Levee, Esq. (IL 9958)
1251 Avenue of the Americas, 18th Floor
New York, New York 10019
(212) 262-6700 (Telephone)
(212) 262-7402 (Facsimile)
                    and
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Bankruptcy Counsel for Lead Plaintiffs and the Prospective Class*

**NIX, PATTERSON & ROACH, L.L.P.**
Jeffrey J. Angelovich, Esq.
Bradley E. Beckworth, Esq.
Susan Whatley, Esq.
205 Linda Drive
Daingerfield, Texas 75638
(903) 645-7333 (Telephone)
(903) 645-4415 (Facsimile)

**BERNSTEIN LITOWITZ BERGER & GROSSMAN, LLP**
John P. Coffey, Esq. (JC 3832)
Hannah E. Greenwald, Esq. (HG 5180)
Mark D. Debrowski, Esq. (MD 3968)
1285 Avenue of the Americas
New York, New York 10019
(212) 554-1400 (Telephone)
(212) 554-1444 (Facsimile)

**GRANT & EISENHOFER, P.A.**
Stuart M. Grant, Esq. (SG 8157)
James J. Sabella, Esq. (JS 5454)
45 Rockefeller Center
650 Fifth Avenue
New York, New York 10111
(212) 755-6501 (Telephone)
(212) 755-6503 (Facsimile)
                and
Geoffrey C. Jarvis, Esq.
Sharan Nirmul, Esq.
Benjamin J. Hinerfeld, Esq.
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
(302) 622-7000 (Telephone)
(302) 622-7100 (Facsimile)

**SCHIFFRIN & BARROWAY, L.L.P.**
Michael K. Yarnoff, Esq.
Sean M. Handler, Esq.
Jodi Murland, Esq.
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7056 (Telephone)
(610) 667-7706 (Facsimile)

*Co-Lead Counsel for Lead Plaintiffs and the Prospective Class*

14