Control Number
CN-00093
Rev 1

*Final 6/24/02*

# Contract Manufacturing Agreement

This Contract Manufacturing Agreement ("Agreement") is made as of June 24, 2002 (the "Effective Date") between Peak Industries, Inc., 4300 Road 18, Longmont, CO 80504 ("Peak") and Niton LLC, 900 Middlesex Turnpike, Building 8, Billerica, MA 01821 ("Buyer").

## AGREEMENT

In consideration of the mutual covenants, promises, and conditions set forth below, the parties, intending to be bound, agree as follows:

1) Supply Obligations. During the Term, (a) Peak shall manufacture the Products, in accordance with the terms and conditions set forth in this Agreement and the Specifications, and (b) Peak shall manufacture all of Buyer's requirements for Products as provided in Section 5(a) except as provided below in Section 5(b).

2) Design and Specifications.

   a) *Specifications*. The "Specifications" shall mean all of the following: (i) the drawings and specifications for the Products prepared by Buyer and attached to this Agreement (which drawings and specifications have been reviewed by Peak and accepted) and all revisions thereof delivered in writing by Buyer to Peak, which revisions will be mutually agreed upon and controlled in the Peak Manufacturing and Quality System (PMQS); (ii) manufacturing procedures and quality plans for the specific assembly in accordance with Section 2(c); and (iii) all prototypes made by Peak and approved by Buyer for production.

   b) *Design Changes*. Peak and Buyer will mutually review and accept changes in Specifications by releasing such changes in the PMQS. Peak reserves the right to re-quote prices in the event of Buyer changes to the Specifications.

   c) *Change Charges*. Buyer agrees to pay Peak a charge for each change made to the specifications. Peak will provide Buyer a standard fee to accommodate minor changes. Major changes or design work will be quoted separately instead the standard fee arrangement.

   d) *Testing and Quality*. Buyer and Peak will establish testing procedures mutually agreed upon by Peak and Buyer. Peak will evaluate and incorporate Buyer test procedures into its PMQS. Buyer and Peak will agree on Non Recurring Engineering fees to compensate appropriate activities. Peak agrees that Buyer's representatives may have access to the area of Peak's facility where Products are

*Final 6/24/02*

being manufactured or stored or where parts and materials are being processed or stored at all times during normal business hours for purposes of quality inspection and verification of manufacturing procedures to Specifications.

3) <u>Tools and Fixtures</u>. Buyer shall be responsible for purchasing all custom tooling and custom fixtures that are required for production of the Products (including any tooling and fixtures required due to a change to the Specifications) and which Peak does not own as of the Effective Date. All such tooling and fixtures shall be held by Peak in trust for Buyer's exclusive use in accordance with manufacturing and testing procedures established for Buyer's products only. Such tooling and fixtures shall be owned by Buyer and identified to Peak's lenders, creditors, shareholders and other third parties as Buyer assets consigned to Peak. Except for normal production maintenance, which will be the responsibility of Peak, Buyer shall be exclusively responsible for the costs to repair or replace such tooling and fixtures. Peak and Buyer shall cooperate to obtain the best available pricing for all such tooling and fixtures. Peak agrees to execute and deliver to Buyer upon request a form UCC-1 or such other documents as Buyer reasonably may request to protect its interest in such assets.

4) <u>Forecasts</u>.

   a) *Generally*. Buyer agrees to provide Peak a six (6) month rolling forecast of Buyer's reasonably anticipated cumulative quantity of the Product for such six-month period. Buyer agrees to update the forecast monthly and provide it to Peak each month. Peak is authorized to purchase materials for the first thirteen weeks of the forecast (the "<u>Rolling 13 Week Forecast</u>") following the Flexibility Model identified in 5 c).

   b) *Long Lead Time Items*. Peak may request from Buyer written authorization to purchase certain long lead time items for Peak inventory, safety-stock and manufacturing requirements ("<u>Special Inventory</u>"). Upon termination or cancellation of this Agreement, Buyer shall purchase from Peak, at Peak's actual cost, any unused Special Inventory not to exceed the amount that has been specifically agreed to in writing by Buyer.

5) <u>Orders, Changes and Cancellation</u>.

   a) *Purchase Order*. Buyer shall issue written purchase order releases (PO releases) for its Product requirements. Peak shall accept and fulfill all such PO releases to the extent that the Product quantity ordered by Buyer for delivery in any one week period does not exceed the delivery forecast for such week in the Rolling 13 Week Forecast provided by Buyer at least thirteen (13) weeks prior to such week; <u>provided, however,</u> that Peak shall make all reasonable efforts

2
:/peakdata/finance/customers/

*Final 6/24/02*

and afford first priority to production for Buyer to accept and fulfill PO releases that exceed such forecasts. Buyer shall provide a required delivery date for each PO release based on a thirty (30) day lead time or as otherwise mutually agreed between Buyer and Peak.

b) *Exclusivity; Inability to Supply.* During the Term Buyer shall not have the Products made by any third party, except as provided in this paragraph and in Section 10. Peak shall provide immediate written notice to Buyer if Peak reasonably anticipates that it may be unable to meet Buyer' requirements specified in the then-current Rolling 13 Week Forecast (or thereafter), and in such event Buyer shall be entitled to have Products made by other third parties, and may thereafter allocate, in Buyer's sole discretion, its Product requirements among Peak and such third parties.

c) *Flexibility Model.* For any accepted purchase order, Buyer may increase the quantity of product or reschedule the quantity of Products and their shipment date as provided in the table below:

| # of days before Shipment Date On Purchase Order | Allowable Quantity Increase | Maximum Reschedule Quantity | Maximum Reschedule Period |
|---|---|---|---|
| 0-30 | 0% | 0% | 0 |
| 31-45 | 20% | 20% | 15 days |
| 46-60 | 25% | 25% | 30 days |
| 61-90 | 50% | 50% | 30 days |

Increases beyond the Allowable Quantity Increase shall be dealt with pursuant to the last sentence in prececding paragraph b) of this Section 5.

d) *Order Changes.* Peak will make commercially reasonable efforts to accommodate changes to Buyer confirmed purchase orders and releases. Peak will move out purchase order dates to accommodate changes, but in no event will the move out exceed the Flexibility Model outlined above without cost to Buyer. All inventory associated with purchase orders moved out greater than 30 days shall incur a carrying charge as defined in e) below.

e) *Carrying Charges.* Buyer agrees to pay Peak carrying cost for any inventory related to purchase orders or scheduled releases delayed greater than 30 days. The average inventory related to the schedule change will be billed once a month at 1% per month. Peak agrees to charge Buyer interest to hold inventory for a time period not to exceed 90 days. If inventory is not planned for shipment within this 90 day time frame, Buyer agrees the order has been cancelled and remedies available to Peak are defined in f) below.

3
:/peakdata/finance/customers/

*Final 6/24/02*

 f) *Order Cancellation.* Buyer may cancel any PO release or any Rolling 13 Week Forecast, provided that in such event, Buyer shall pay Peak for Products and any inventory affected by the cancellation as follows, not to exceed the purchase price for such order: (i) 100% of Peak's price to Buyer for all finished Products in Peak's possession, (ii) 110% of the cost of all inventory in Peak's possession procured for Buyer confirmed purchase orders and not returnable to the vendor or usable for other customers, whether in raw form or work in process, (iii) 110% of the cost of inventory on order and not cancelable, (iv) any vendor cancellation charges incurred with respect to inventory accepted for cancellation or return by the vendor, and (v) actual costs to Peak of labor incurred by Peak related to work in process for Buyer's canceled PO releases. Upon such payment all such inventory and work in progress shall become the sole property of Buyer.

 g) *Part Change Orders.* Buyer agrees to purchase from Peak, at 110% of the actual cost, any inventory purchased by Peak in reliance on Buyer's Rolling 13 Week Forecast, which inventory is rendered obsolete due to a change to the Specifications. Peak shall, however, first use reasonable efforts to return any such inventory, and Buyer agrees to pay for the restocking charges and shipping if applicable.

6) <u>Packaging, Shipping and Delivery</u>. Peak shall ship the Products in accordance with packaging and shipping instructions provided by Buyer. Unless otherwise specified in writing in a particular PO release, all Product deliveries shall be shipped F.O.B. factory to the destination specified by Buyer for delivery.

7) <u>Spares, Fulfillment and Mark Ups</u>. Buyer may require Peak to provide spares to support Products in the field. Buyer agrees to pay Peak a mark up of 20% in addition to the actual costs of the spares. Buyer can choose to have Peak manage the spares requirements by signing a separate agreement for Peak's fulfillment services. Peak's fulfillment services contract is described in Attachment C.

8) <u>Engineering Change Fee</u>. Buyer agrees to pay Peak a Standard Change Fee of $250 to implement changes to the Specifications provided to Peak. Peak reserves the right to separately quote an Additional Change Fee if the changes are substantial and require resources above and beyond what is covered in the Standard Change Fee.

9) <u>Payment</u>.

 a) *Invoice.* Peak will invoice at the time of shipment of Products. Payment is due at Peak on or within thirty (30) calendar days from the invoice date.

4
:/peakdata/finance/customers/

*Final 6/24/02*

    b)    *Pricing*. Peak's invoices shall reflect charges for the Products as specified in Exhibit B. Such charges are exclusive of taxes, shipping and insurance. Charges for taxes, shipping and insurance (to the extent applicable) shall be separately stated on Peak's invoice.

10)    <u>Cost Reductions</u>.

Peak agrees to seek ways to reduce the cost of manufacturing Products by methods such as obtaining alternate sources of materials and improved assembly or test methods. Peak and Buyer agree to a cost review schedule to implement cost reduction initiatives every 6 months. Peak will provide updated pricing for Products to incorporate cost reductions at cost review. Peak will receive 50% of the cost reduction and Buyer will receive 50% of the cost reduction. Peak agrees to provide Buyer with written proposals for non recurring engineering services or tooling to improve the design or the manufacturing process for Products. Peak agrees to update pricing to incorporate new design or implementation of tooling if such services are agreed by Buyer issuing Peak a purchase order for the proposal. Compliance with this cost reduction procedure shall not preclude Buyer from presenting Peak with valid written price quotations from a third party manufacturer pursuant to the immediately following paragraph.

If Buyer has obtained a valid price quotation from a third party manufacturer which is less than the price in effect from Peak for the Products, then the Buyer may present such quotation to Peak in writing, and Peak shall have fourteen (14) days to notify Buyer whether or not it shall match the price quotation. If not, Buyer shall be free to terminate this Agreement pursuant to Section 18(b), remaining obliged to purchase from Peak the quantity of Product specified in the then current Rolling 13 Week Forecast, but being free to purchase additional Product from the third party whose price quotation Peak elected not to match.

11)    <u>Limited Product Warranties</u>.

    a)    *Basic Warranty*. Peak warrants that the Products are and shall be free from defects in workmanship which exist or develop for a period of 90 days from the date of shipment thereof to Buyer or Buyer's designated distributor, whichever occurs first, provided that such defect developed under normal and proper use within the operating parameter described in the Specifications.

    b)    PEAK EXPRESSLY DISCLAIMS ALL IMPLIED WARRANTIES, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE AND MERCHANTABILITY.

*Final 6/24/02*

    c)    *Limitation of Liability*. Buyer's sole and exclusive remedy in the event of a breach of the foregoing warranties shall be repair or, at Peak's sole discretion, replacement or to be responsible for the cost of Buyer's procuring the Product elswewhere if Peak can not promptly repair or replace within 90 days. .

12)    <u>Intellectual Property</u>.

    a)    As between Buyer and Peak, Buyer shall own all right, title and interest in and to Products and the Know-How, Improvements and Patents related thereto. No implied rights or licenses are granted by this Agreement. Buyer shall have the right to apply, in its own name and at its own expense, for patent, copyright or other Intellectual Property rights in such Know-How and Improvements and, if requested, Peak shall cooperate with Buyer in any reasonable manner in obtaining such protection. Peak agrees that all such Know-How and Improvements shall be owned solely by Buyer, even though developed as a result of this Agreement, and regardless of whether conceived, created or developed by Buyer or Peak.

    b)    *License*. During the Term Buyer grants to Peak a non-exclusive, royalty-free right and license under the Patents, Know-How and Improvements to make the Products solely for delivery to Buyer or Buyer's designee.

13)    <u>Confidentiality</u>.

    a)    *General Obligation*. All information provided by one party (the "<u>Disclosing Party</u>") to the other party (the "<u>Recipient</u>") shall be governed by this <u>Section 13</u>.

    b)    *Proprietary Information*. As used in this Agreement, the term "<u>Proprietary Information</u>" shall mean all trade secrets or confidential or proprietary information designated as such in writing by the Disclosing Party, whether by letter or by the use of an appropriate proprietary stamp or legend, prior to or at the time any such trade secret or confidential or proprietary information is disclosed by the Disclosing Party to the Recipient. Notwithstanding the foregoing, information which is orally or visually disclosed to the Recipient by the Disclosing Party, or is disclosed in writing without an appropriate letter, proprietary stamp or legend, shall constitute Proprietary Information if the Disclosing Party, within thirty (30) days after such disclosure, delivers to the Recipient a written document or documents describing such Proprietary

*Final 6/24/02*

    Information and referencing the place and date of such oral, visual or written disclosure and the names of the employees or officers of the Recipient to whom such disclosure was made.

c)     *Disclosure*. The Recipient shall hold in confidence, and shall not disclose to any person outside its organization, any Proprietary Information, regardless of the termination of the Term of this Agreement. The Recipient shall use such Proprietary Information only for the purpose of developing the Product with the Disclosing Party or fulfilling its future contractual requirements with the Disclosing Party and shall not use or exploit such Proprietary Information for any other purpose or for its own benefit or the benefit of another without the prior written consent of the Disclosing Party. The Recipient shall disclose Proprietary Information received by it under this Agreement only to persons within its organization who have a need to know such Proprietary Information in the course of the performance of their duties and who are bound to protect the confidentiality of such Proprietary Information.

d)     *Limitation on Obligations*. The obligations of the Recipient specified in Section 13 above shall not apply, and the Recipient shall have no further obligations, with respect to any Proprietary Information to the extent that such Proprietary Information: (i) is generally known to the public at the time of disclosure or becomes generally known through no wrongful act on the part of the Recipient; (ii) is in the Recipient's possession at the time of disclosure otherwise than as a result of Recipient's breach of any legal obligation; (iii) becomes known to the Recipient through disclosure by sources other than the Disclosing Party having the legal right to disclose such Proprietary Information; (iv) is independently developed by the Recipient without reference to or reliance upon the Proprietary Information; or (v) is required to be disclosed by the Recipient to comply with applicable laws or governmental regulations, <u>provided that</u> the Recipient provides prior written notice of such disclosure to the Disclosing Party and takes reasonable and lawful actions to avoid and/or minimize the extent of such disclosure.

e)     *Ownership of Proprietary Information*. The Recipient agrees that the Disclosing Party is and shall remain the exclusive owner of Proprietary Information and all Intellectual Property rights embodied therein.

f)     *Return of Documents*. The Recipient shall, upon the request of the Disclosing Party, return to the Disclosing Party all drawings, documents and other tangible manifestations of Proprietary Information received by the Recipient pursuant to this Agreement (and all copies and reproductions thereof): provided that the Recipient may keep one archival copy of the same.

*Final 6/24/02*

14) <u>Indemnification.</u>

    a)     *Buyer Indemnification of Peak.* Buyer shall indemnify, defend and hold harmless Peak from and against any Losses arising out of or relating to a claim brought by a third party against Peak only to the extent that such claim and corresponding Losses are based upon allegations that (i) there exists a defect in the design of any Products by Buyer (including a defect in any materials provided to Peak by a third party with respect to which materials Buyer's Specifications required to be purchased from such third party), (ii) would constitute a breach of the terms of this Agreement by Buyer, or (iii) the manufacture, sale or use of any Product, in accordance with the Specifications and operating instructions provided by Buyer, infringes a patent, copyright, trade secret or other proprietary right of a third party.

    b)     *Indemnification Procedure.* A party claiming indemnification under this Section 14 (an "<u>Indemnified Party</u>") shall provide prompt written notice to the other party (the "<u>Indemnifying Party</u>") of any and all notices, claims, demands, pleadings, and other facts or circumstances that may, in the Indemnified Party's reasonable judgment, be likely to result in a claim for indemnification. The Indemnified Party's failure to provide such prompt written notice shall reduce the indemnification obligation of the Indemnifying Party to the extent that such failure resulted in demonstrable prejudice to the Indemnifying Party. The Indemnified Party shall promptly tender defense of any litigation or other formal dispute to the Indemnifying Party, and the Indemnifying Party shall select counsel of its choice, reasonably acceptable to the Indemnified Party for such litigation or dispute. The Indemnified Party shall cooperate completely with the Indemnifying Party, including without limitation providing timely responses to all discovery requests and providing expert and factual witnesses as necessary or desirable. The Indemnifying Party shall have the sole authority to negotiate and settle such claims to the extent of the applicable indemnification obligation.

    c)     *Insurance.* Each party shall maintain products and general liability insurance in an amount not less than **[$2,000,000]** per claim.

15) <u>Disclaimer of Liability.</u> Neither party shall be liable to the other party or to any third parties for any consequential, incidental or punitive damages, including, but not limited to, damage to property, for loss of use, loss of time, or loss of profits or income.

16) <u>Limitation of Liability.</u> Peak's liability for any breach of warranty under Section 11 or for any manufacturing defect and Buyer sole remedy shall be limited to repair or at

*Final 6/24/02*

Peak's discretion replacement of Products or the cost of Buyer's obtaining the Product elsewhere if Peak is unable to repair or replace. .

17) <u>Integration.</u> This Agreement constitutes the complete and exclusive statement of the terms of the agreement between Peak and Buyer and supersedes all prior and contemporaneous agreements and undertakings of Peak and Buyer with respect to the subject matter hereof.

18) <u>Term and Termination</u>.

   a) *Initial Term and Renewal Term.* Unless sooner terminated in accordance with <u>Section 18(b)</u> or <u>18(c)</u>: (i) the initial term of this Agreement shall be two (2) years; and (ii) after such initial term, the term of this Agreement shall automatically renew for successive one year periods unless either party provides written notice to the other party of non-renewal not less than ninety (90) days prior to the end of the then-current renewal term (such initial term and renewal terms collectively referred to herein as the "<u>Term</u>").

   b) *Termination For Convenience.* After the first anniversary date of this Agreement, either Peak or Buyer may terminate the Term of this Agreement without cause by giving the other party not less than thirteen (13) weeks written notice prior to the effective date of such termination. At any time during this Agreement if Peak does not match a valid price quotation from a third party manufacturer which is less than the price in effect from Peak for the Products, then Buyer may also terminate the Term of this Agreement by giving Peak not less than thirteen weeks written notice of such termination.

   c) *Termination For Cause.* The Term of this Agreement shall terminate: (i) automatically, if one of the parties fails to perform any material obligations hereunder, and such material obligations remain uncured thirty (30) days following the date that the other party delivers to the defaulting party written notice describing such performance failures; (unless breach is for non payment for Product in which case the cure is 10 days plus interest at 12% annualized) or (ii) immediately upon notice by either party if the other party shall file for liquidation, bankruptcy, reorganization, compulsory composition, dissolution, or if the other party has entered into liquidation, bankruptcy, reorganization, compulsory composition or dissolution, or if the other party is generally not paying its debts as they become due (unless such debts are the subject of a bona fide dispute).

   d) *Effect of Termination/Survival.* Notwithstanding any expiration or termination

*Final 6/24/02*

of the Term of this Agreement, all such rights of the parties as are naturally intended to continue in force after such expiration or termination (such as, without limitation, warranty and indemnification terms, payment obligations for Product delivered, confidentiality, and dispute resolution mechanism and governing law) shall survive such termination or expiration.

e) *Transition*. Upon expiration or termination of the Term of this Agreement, and for a period of six (6) months thereafter, Peak shall provide reasonable cooperation and assistance (including without limitation knowledge transfer, materials sourcing, transfer of unused materials and unfinished inventory, and removal and shipping of Buyer-owned tooling and fixtures) to transition production of the Products to a third party designated by Buyer. Peak may invoice Buyer for actual charges incurred by Peak in such rendering such transition services.

19) Required Approvals. Each party shall obtain all domestic and foreign governmental licenses, permits and approvals required for such party's performance under this Agreement. Without limiting the generality of the foregoing: (i) Buyer shall be responsible for complying with all applicable foreign and U.S. federal, state and local laws, rules, regulations and orders and for obtaining all applicable U.S. FDA and other governmental agency product and design approvals and applicable foreign agency approval for sale of the Product; and (ii) Peak shall be responsible complying with all U.S. FDA and applicable state and local laws, rules, regulations and orders applicable to the manufacturing processes and procedures.

20) Compliance with Laws. Each party shall comply with all domestic and foreign laws, rules, regulations and orders applicable to such party's performance under this Agreement.

21) Assignment and Delegation. This Agreement cannot be assigned nor is the performance of the duties delegable by either party without the written consent of the other party which shall not be unreasonably withheld; provided, however, that this Agreement may be assigned by either party to a purchaser of substantially all of such party's assets relating to the Products, or to a successor in interest by merger or corporate reorganization.

22) Governing Law. This Contract Manufacturing Agreement shall be construed to be between merchants and shall be governed by the laws of the State of Colorado.

23) Relationship of Parties. The relationship of Buyer and Peak is that of buyer and seller/manufacturer, respectively, of goods. Nothing in this Agreement is intended to, or shall be deemed to, constitute a partnership, joint venture, agency, or a transfer of

*Final 6/24/02*

any intellectual property of either party, and neither party hereto shall be authorized to act in the name of the other or enter into any contract or other agreement which binds the other.

24) Enforceability. If any of the provisions of this Agreement, or portions thereof, are found to be invalid by any court of competent jurisdiction the remainder of this Agreement shall nevertheless remain in full force and effect.

25) Force Majeure. Neither Buyer nor Peak shall be liable for any failure to perform obligations under this Agreement if prevented so by a cause beyond their control and without the fault or negligence of the defaulting party. Without limiting the generality of the foregoing, such causes include acts of God, fires, floods, storms, epidemics, earthquakes, riots, civil disobedience, wars or war operations, or restraint of government.

26) Amendment. This Agreement may not be amended except in a written amendment signed by each of the parties. Additional or different terms contained in purchase orders or order acknowledgments or similar forms shall not be effective unless signed by both parties with reference to this Agreement.

27) Dispute Resolution. Consent to Arbitration and Venue. Peak and Buyer agree that upon the written demand of either party, whether made before or after the institution of any legal proceedings, but prior to the rendering of any judgment in that proceeding, all disputes, claims, and controversies between them (but excluding disputes, claims and controversies in which a third party is a necessary party), arising from this Agreement, including without limitation contract disputes and tort claims, shall be arbitrated in the Denver, Colorado metropolitan area, pursuant to the Commercial Rules of the American Arbitration Association by a panel of three arbitrators. Any arbitration decision shall be final and non-appealable unless the parties mutually agree otherwise in writing before a final decision by the panel of arbitrators. Any arbitration order or award may be enforceable in an appropriate court as provided herein. Each party shall select one arbitrator and those two arbitrators shall select the third arbitrator to form the panel. Each party reserves the right, notwithstanding the foregoing, to seek equitable relief in a court of competent jurisdiction in any appropriate state or federal court. The prevailing party in any arbitration or court proceeding is entitled to be reimbursed for any and all reasonable attorney's fees, expert fees, and costs of suit from the losing party, and all expenses of the arbitration shall be borne by the losing party, in each instance as determined by the arbitrator.

28) Definitions. The following terms, when used herein with initial capital letters, shall have the respective meanings set forth in this Section 28.

*Final 6/24/02*

a) "Disclosing Party" shall have the meaning stated in Section 13.

b) "Effective Date" shall have the meaning stated in the preamble of this Agreement.

c) "Improvements" shall mean all improvements to Buyer Patents or Know-How hereafter created or acquired during the term of this Agreement by Peak or jointly by one or more employees of Buyer and Peak, including without limitation advances, developments, modifications, enhancements, variations, revisions, adaptations, extensions or any element thereof, utilizing or incorporating, or based on, the Know-How or Patents, whether patentable or not.

d) "Intellectual Property" shall mean trade secrets, ideas, inventions, designs, developments, devices, methods or processes (whether patented or patentable and whether or not reduced to practice) and all patents and patent applications related thereto; copyrightable works and mask works (whether or not registered); trademarks, service marks and trade dress; and all registrations and applications for registration related thereto; and all other intellectual or industrial property rights, to the extent in or related to the Products.

e) "Know-How" shall mean the know-how, technical information and confidential technical data, together with all trade secrets, unpatented technical knowledge and inventions, confidential manufacturing procedures and methods, that are related to the Products.

f) "Losses" shall mean any and all damages, liabilities, costs and expenses (including reasonable attorneys' fees and expenses), and amounts paid in settlement.

g) "Patents" shall mean those patents and patent applications that are now or hereafter owned or acquired by Buyer and relate to the Products.

h) "Products" shall mean the [Identified in Schedule A] described in detail in the Specifications.

i) "Proprietary Information" shall have the meaning stated in Section 13(b).

j) "Recipient" shall have the meaning stated in Section 13(a).

k) "Rolling 13 Week Forecast" shall have the meaning stated in Section 4(a).

12
:/peakdata/finance/customers/

*Final 6/24/02*

    l)    "Spares" shall mean the components and spare parts/assemblies required to support Products in the field.

    m)    "Special Inventory" shall have the meaning stated in Section 4(b).

    n)    "Peak Manufacturing and Quality System (PMQS)" shall have the meaning to include the following processes, procedures and quality requirements.

       (1) Manufacturing Procedures: Mutually agreed upon document with procedures for manufacturing Product.
       (2) Quality Plans: Mutually agreed upon document outlining component quality plans and assembly quality plans for Product.
       (3) Document Change Request: Document approved by Peak and Buyer for changes in Specifications.

*Final 6/24/02*

IN WITNESS WHEREOF, the parties hereto have executed this Contract Manufacturing Agreement as of the Effective Date indicated above.

| **Peak Industries, Inc.** | **NITON LLC** |
|---|---|
| By: *[signature]* | By: *[signature]* |
| Title: VICE PRESIDENT- FINANCE | Title: President and a Manger  General Manager |
| Date: June 24, 2002 | Date: 6/27/02 |

Control Number
CN-00094
Rev 1

*Final 6/24/02*

# Exhibit A
## Preliminary Design and Specifications



*Final 6/24/02*

Exhibit B

Pricing

Peak Quote Number 2890 referenced in proposal dated 6/21/02

Control Number
CN-00096
Rev 1

*Final 6/24/02*

## Peak's ePeak Fulfillment Services

This agreement describes the requirements for Peak's Fulfillment Services.

1. *Software Agreement*. Niton LLC agrees to execute a software agreement for use of the ePeak services.

2. *Individual Shipment Fee*. Niton LLC agrees to pay $15.00 per individual shipment for order fulfillment services.

3. *Purchase Order Fulfillment*. Peak will invoice Niton LLC for Products at the time of completion of Products or transfer of Spares for Purchase Orders provided to Peak. Products and Spares will be available in ePeak on the same day as invoices to Abc co.

4. *Fulfillment Order Requirements*. Niton LLC agrees to input orders into ePeak before scheduled shipping date and in no case later than 2:30 p.m. for same day shipping.

5. *ePeak Invoicing*. Peak will invoice at the end of each month for fulfillment services. Invoice will contain the number of shipments times the individual shipment fee. The invoice will be billed net 30 days from date of invoice.

6. *Maximum holding period*. Peak will hold Products in ePeak for a maximum of 60 days. FGI on hand after 60 days will be sent freight collect to Niton LLC.

EXHIBIT C
LONG LEAD-TIME COMPONENTS

The following is a list of Long Lead-time Components as defined by Peak.
The costs listed are unburdened material costs.

Peak Industries, Inc. is authorized to procure items on this list as required to maintain
appropriate inventory per Niton's forecast for the Niton XII and XLt products.

| Peak # | Mfg | Mfg# | Vendor | Qty Per | Price | Leadtime (wks) | Min Qty | EXT PRICE W/MIN | Broker Price |
|---|---|---|---|---|---|---|---|---|---|
| P221067 | JST | 03DA-8M | FUTURE | 2 | 0.092 | 10 | 2000 | $184.00 | 1.10 |
| P170181 | PANASONIC | ECJ-4YB1C106K | TTI | 3 | 0.306 | 11 | 1000 | $306.00 | 3.30 |
| P221085 | MOLEX | 52271-1890 | TTI | 2 | 0.434 | 12 | 1000 | $434.00 | 2.80 |
| P290169 | MAXIM | MAX3221CDBR | AVNET | 1 | 0.81 | 12 | 400 | $324.00 | 0.07 |
| P160333 | PANASONIC | EXB-A10P273J | TTI | 7 | 0.11 | 13 | 8000 | $880.00 | 2.60 |
| P221088 | MOLEX | 52559-1290 | KENT | 2 | 0.62 | 14 | 1000 | $620.00 | 1.50 |
| P221086 | MOLEX | 52610-0890 | KENT | 2 | 0.41 | 14 | 1000 | $410.00 | 1.50 |
| P370018 | C&K | KT11B2SM | FUTURE | 14 | 1.09 | 14 | 3300 | $3,597.00 | 200.00 |
| P221064 | JST | 40FLZ-RSM1-R-TB | FUTURE | 3 | 0.82 | 16 | 2000 | $1,640.00 | 16.00 |
| P221073 | MOLEX | 52559-1690 | TTI | 3 | 0.724 | 16 | 1000 | $724.00 | 3.15 |
| P290174 | HITACHI | HD6417750F167 | NU HO | 1 | 37.20 | 16 | 180 | $6,696.00 | 7.15 |
| P221074 | MOLEX | 52559-0690 | TTI | 1 | 0.346 | 17 | 1000 | $346.00 | 2.10 |
| P160326 | PANASONIC | EXB-V8V273JV | TTI | 3 | 0.028 | 18 | 5000 | $140.00 | 0.25 |
| P170172 | PANASONIC | EEC-A0EL105 | TTI | 2 | 1.61 | 19 | 400 | $644.00 | 3.30 |
| P221068 | JST | 03DD-8M | FUTURE | 1 | 0.10 | 20 | 4000 | $400.00 | 0.46 |

"BROKER PRICING" QTY'S CAN ONLY BE WHAT IS APPLICABLE WHEN REQUESTED.
THERE COULD BE ZERO MINS OR THERE COULD BE FULL QTY MINS.

PEAK INDUSTRIES, INC.
BY: [signature]
TITLE: VP-Finance
DATE: 10/24/02

NITON, LLC.
BY: [signature]
TITLE: Purchasing Manager
DATE: 10/23/02