IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                              :

In re                            :    Chapter 11
                              :

DELPHI CORPORATION, et al.,    :    Case No. 05-44481 (RDD)
                              :

                   Debtors.    :    (Jointly Administered)
                              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### AFFIDAVIT OF SERVICE

      I, Amber M. Cerveny, being duly sworn according to law, depose and say that I am employed by Kurtzman Carson Consultants, LLC, the Court appointed claims and noticing agent for the Debtors in the above-captioned cases.

On January 4, 2005, I caused to be served the document listed below (i) upon the parties attached hereto as Exhibit A via overnight delivery:

      1)  Notice of Proposed Sale of Assets [a copy of which is attached hereto as Exhibit B]

Dated: January 6, 2006

                                /s/ Amber M. Cerveny
                               Amber M. Cerveny

Sworn to and subscribed before
me on January 6, 2006

      /s/ *Evan J. Gershbein*
Notary Public
My Commission Expires:    1/19/07

# **EXHIBIT A**

Delphi Corporation
Special Parties - Overnight Mail

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX |
|---|---|---|---|---|---|---|---|---|
| Davis Polk & Wardwell | Donald Bernstein | 450 Lexington Avenue | | New York | NY | 10017 | 212-450-4092 | 212-450-3092 |
| Latham & Watkins LLP | Robert J. Rosenberg | 885 Third Avenue | | New York | NY | 10022 | 212-906-1370 | 212-751-4864 |
| Simpson Thatcher & Bartlett LLP | Kenneth S. Ziman, Robert H. Trust, William T. Russell, Jr. | 425 Lexington Avenue | | New York | NY | 10017 | 212-455-2000 | 212-455-2502 |
| United States Trustee | Alicia M. Leonard | 33 Whitehall Street | 21st Floor | New York | NY | 10004-2112 | 212-510-0500 | 212-668-2255 does not take service via fax |
| United States Trustee | Deirdre A. Martini | 33 Whitehall Street | Suite 2100 | New York | NY | 10004 | 212-510-0500 | 212-668-2256 |
| Hollingsworth Logistics Group, LLC | | 14225 W Warren | | Dearborn | MI | 48126 | | |
| Adamo Demolition Company | | 300 E Seven Mile Rd | | Detroit | MI | 48203 | | |
| Champion Laboratories, Inc. | | 1039 Rio Drive | | Grand Blanc | MI | 48439 | | |
| Genesee County Register of Deeds | Attn: Real Estate Recording | 1101 Beach Street | Administration Building | Flint | MI | 48502 | 810-257-3060 | 810-768-7965 |
| Genesee County Treasurer's Office | | 1101 Beach Street | | Flint | MI | 48502-1475 | (810) 257-3059 | (810) 257-3885 |
| City of Burton Treasurer's Office | | 4303 S Center Road | | Burton | MI | 48519 | 810-743-1500 ext 253 | (810) 743-5060 |
| City of Flint | Attn Legal Department | 3rd Floor City Hall | 1101 S Saginaw Street | Flint | MI | 48502 | 810-766-7146 | 810-766-8694 |
| City of Flint Treasurer's Office | | 1st Floor City Hall | 1101 S Saginaw St | Flint | MI | 48502 | 810-766-7015 | 810-238-8481 |
| Porret Investments, LLC | Attn: Gary N. Porrett, Sr. | 5510 Clico Road | | Flint | MI | 48504 | | |
| Porret Investments, LLC | Attn: Scott R. Fraim | 2377 S Linden Road, Ste B | | Flint | MI | 48532 | | |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 1

1/6/2006 1:57 PM
Notice Burton, MI SP

# **EXHIBIT B**

**Objection Deadline: January 11, 2006, 4:00 p.m.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                              :
    In re                           :    Chapter 11
                                              :
DELPHI CORPORATION, <u>et al.</u>,            :    Case No. 05-44481 (RDD)
                                              :
                    Debtors.  :    (Jointly Administered)
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

<u>NOTICE OF PROPOSED SALE OF ASSETS</u>

       1.   In accordance with the Order Under 11 U.S.C. § 363 Approving Procedures

To Sell Certain <u>De</u> <u>Minimis</u> Assets Free And Clear of Liens, Claims, And Encumbrances And

To Pay Market Rate Broker Commissions In Connection With Such Sales Without Further Court

Approval (the "<u>De</u> <u>Minimis</u> Asset Sale Order"), Delphi Automotive Systems LLC (the "Debtor")

hereby gives notice of its intention to sell certain assets, as described more fully below (the

"Assets"), to Porrett Investments, LLC (the "Purchaser") for the purchase price of approximately

$3,000,000.

       2.   The Assets to be sold to the Purchaser include without limitation

approximately 54.6 of land, improvements and personal property that is located in the City of

Burton, County of Genesee, State of Michigan, as more particularly described in that certain

Real Property Purchase Agreement made and entered into on January 3, 2006, by and between

Purchaser and Seller, which is attached hereto (the "Purchase and Sale Agreement").  The terms

of the purchase and sale shall be substantially as set forth in the Purchase and Sale Agreement.

       3.   The Purchaser is not an insider of the Debtor as such term is defined in

section 101(31) of the Bankruptcy Code and has no other connections to the Debtor.

4.    The Debtor believes that the purchase price accurately reflects the current market value of the Assets.  The Debtor has determined, in its business judgment, that the Purchase and Sale Agreement provides for fair and appropriate terms and is a favorable price for the Assets.

5.    Pursuant to the <u>De Minimis</u> Assets Sale Order, the Debtor shall consummate the sale of the Assets, free and clear of liens, claims, and encumbrances, and take such actions as are necessary to close the transaction, including but not limited to collection of proceeds of the sale of Assets provided that counsel to the Debtor does not receive a written objection or written request for additional time within five business days from the date following initial receipt of this Notice from a party that receives this Notice.

Dated:  New York, New York
        January 4, 2006

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP

By:  /s/ John Wm. Butler, Jr
    John Wm. Butler, Jr.
    John K. Lyons
    Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

    - and -

By:  /s/ Kayalyn Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, <u>et al.</u>,
    Debtors and Debtors-in-Possession

2

## Purchase and Sale Agreement

**EXECUTION COPY**

## REAL PROPERTY PURCHASE AGREEMENT

THIS REAL PROPERTY PURCHASE AGREEMENT (this "**Agreement**") is being entered into this 3rd day of January, 2006, between DELPHI AUTOMOTIVE SYSTEMS LLC, a Delaware limited liability company, whose principal address is 5725 Delphi Drive, Troy, Michigan 48098-2815 ("**Seller**"), and Porrett Investments, LLC, a Michigan Limited Liability Company, whose principal address is 5510 Clio Road, Flint, Michigan 48504 ("**Purchaser**") based upon the following:

A.     On October 8, 2005, Seller and certain of its U.S. subsidiaries (the "Initial Filers") filed voluntary petitions for reorganization under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), and on October 14, 2005, three additional U.S. subsidiaries of Delphi Corporation (together with the Initial Filers, collectively, the "Debtors") filed voluntary petitions for reorganization under the Bankruptcy Code.   The Debtors continue to operate their business as "debtors-in-possession" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

B.     On October 27, 2005, the Bankruptcy Court entered Order Under 11 U.S.C. § 363 Approving Procedures to Sell Certain De Minimis Assets Free and Clear of Liens, Claims and Encumbrances and To Pay Market Rate Broker Commissions in Connection with Such Sale Without Further Approval (Case No. 05-44481) (the "De Minimis Sale Order").

C.     Seller owns an improved parcel of real property that is located in the City of Burton, County of Genesee, State of Michigan (the "**State**"), and contains approximately

1

54.6 acres (the "**Parcel**"). An outline of the Property (the "**Site Plan**") is attached to this Agreement as Exhibit A.

D.     Purchaser desires to purchase, and Seller desires to sell, the Parcel together with the buildings located on the Parcel (the "**Buildings**") and all equipment and personal property located in the Buildings (the "**Equipment**"; the Property, Buildings and Equipment are collectively referred to the "**Property**") in accordance with the provisions of this Agreement.

E.     In connection with the sale of the Property to Purchaser, Seller and Purchaser desire to establish various agreements regarding post-closing demolition work and agreements regarding the disconnection and separation of utility and other systems serving the Property and property owned by Delphi adjacent to the Property.

NOW, THEREFORE, in consideration of the mutual covenants, promises, and agreements contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged, Seller and Purchaser agree as follows:

1.     Agreement to Purchase and Sell. Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, the Property upon the terms set forth in this Agreement and the De Minimis Sale Order. The Property shall not include the (a) roadway overpass on the Parcel, (b) a portion of the electrical trestles, both of (a) and (b) will be removed as part of the Seller's Post-Closing Work, as described in Paragraph 10, or (c) a 250T Verson Press which will be removed prior to closing.

2.     Purchase Price. The purchase price to be paid by Purchaser to Seller for the Property (the "**Purchase Price**") is Three Million DOLLARS ($3,000,000.00) (U.S. currency). The Purchase Price will be paid in full by Purchaser to Seller at the time of Closing by means of, at Seller's option, a certified or cashier's check made

2

payable to Seller and drawn on a bank which is acceptable to Seller or a federal wire transfer of immediately available funds to an account designated by Seller.

3.    Earnest Money Deposit. Simultaneously with Purchaser's execution and delivery of this Agreement, Purchaser will deliver to the Title Insurer the sum of Twenty-Five Thousand DOLLARS ($25,000.00) as an earnest money deposit under this Agreement (the "**Deposit**"). If the Closing occurs, the Deposit will be applied to the Purchase Price. If this Agreement is terminated pursuant to Paragraph 14 of this Agreement and Purchaser is not at that time in default under this Agreement, then the entire Deposit will be returned to Purchaser. If this Agreement is terminated for any other reason, then the Deposit will be delivered to Seller as consideration for Seller's execution and delivery of this Agreement.

4.    Closing. The closing of the sale of the Property to Purchaser (the "**Closing**") will occur within forty-five (45) days following the fulfillment of the requirements in the De Minimis Sale Order, provided that the Closing shall occur no later than February 15, 2006. Seller's obligation to consummate the transactions contemplated by this Agreement is subject to the fulfillment of the requirements contained in the De Mimimis Sale Order. If this condition is not satisfied, Seller may terminate is Agreement pursuant to Section 14 below. The Closing will occur on a date designated by Purchaser (at least five (5) days before the Closing) and will be accomplished through an escrow closing at the offices of the "Title Insurer" (as defined in Paragraph 5(b) of this Agreement) unless Purchaser and Seller otherwise agree.

5.    Survey and Evidence of Title. (a) Purchaser, at its sole cost and expense, has obtained and delivered to Seller an ALTA survey of the Property (the "**Survey**"). The Survey was prepared by a land surveyor that is licensed by the State and is approved by Seller in Seller's reasonable discretion (the "**Surveyor**") and sets forth (i) the location of the perimeter boundaries of the Parcel by courses and distances;

3

(ii) all existing improvements located on the Parcel; (iii) the location of all easements, reservations, dedications, setbacks of record and alleys and rights-of-ways on the Parcel (setting forth all applicable recording information); (iv) the lines of streets and roads abutting any portion of the Parcel and their width and distance from the nearest intersecting street and road; (v) any encroachments from the Parcel onto any other property or from any other property onto the Parcel; (vi) precise legal description of the Parcel, which corresponds with the boundary lines as shown in the Survey; (vii) the number of acres contained in the Parcel; (viii) the boundaries of those portions of the Parcel, if any, which are situated in a Federal Flood Plain, or certifying that no portion of the Parcel is in a Federal Flood Plain; and (ix) such other information as Seller or Purchaser reasonably request. The Survey must be certified to Seller, Purchaser, and the Title Insurer.

(b)    Seller, at Purchaser's sole cost and expense, has obtained and delivered to Purchaser a commitment for an owner's policy of title insurance (the **"Title Commitment"**) with respect to the Property, in the amount of the Purchase Price, issued by a title insurer that is authorized to do business in the State (the **"Title Insurer"**). The Title Commitment contains the standard exceptions included by the Title Insurer in commitments for owner's policies of title insurance issued in the State; provided that Purchaser shall not be precluded from causing the Title Insurer to remove such exceptions and Seller agrees to reasonably cooperate by delivering a Seller's affidavit with such changes as Seller requires, provided such affidavit will not increase any liability of Seller.

(c)    Purchaser acknowledges that a portion of the parking lot on the Northern boundary of the Property and access to Donegal Street is over land covered by a Lease between General Motors Corporation (as lessee) and Consumers Power Company (as lessor) recorded in Deed Liber 1675, page 416, as amended by Lease Amendment Agreement dated January 11, 1985 (the "Lease"). It is Purchaser's responsibility to either obtain an assignment of the Lease from General

4

Motors Corporation to Purchaser and any necessary consents from Consumers Power Company, or to enter into a new lease with Consumers Power Company. Seller's sole responsibility with respect to the Lease shall be, upon Purchaser's request, to, during the six (6) month period following Closing, use reasonable methods to act as an intermediary between Purchaser and General Motors Corporation to obtain General Motors Corporation's consent to assign the Lease to Purchaser, without incurring any financial obligation to Seller.

6.   Deliveries at the Closing.   At the Closing, (i) Seller will convey to Purchaser title to the Property by a covenant deed in the form attached to this Agreement as Exhibit B (the "**Deed**") as well as a bill of sale for transfer of the Equipment in the form attached to this Agreement as Exhibit C, (ii) Purchaser and Seller will execute a closing statement setting forth the Purchase Price and any prorations or other disbursements and payments, (iii) Purchaser will pay to Seller the Purchase Price in the manner provided in this Agreement, and (iv) Purchaser will pay any fees charged by Title Insurer in connection with the Closing of the transaction. Seller and Purchaser will also execute and deliver any further documents or instruments as are necessary to accomplish the Closing so long as any additional documents to be executed by Seller will not increase any liability of Seller.

7.   Prorations; Costs.   (a) Seller will pay all taxes and assessments with respect to the Property which are due and payable prior to the date of Closing. Current taxes and assessments for the period in which the Closing occurs will be prorated in accordance with prevailing local practice on a per diem basis as of the date of Closing based upon the most recent tax bills. If the Property is assessed as a part of a tract that includes other land, the taxes and assessments will be allocated to the Property and the other land based upon the respective acreage of the Property and the other land (and any improvements on the Property and the other land). No adjustments will be made after Closing.

5

(b) Seller will pay any local or state transfer taxes, revenue or documentary stamps and Purchaser will pay the recording fees for recording the Deed.

(c) Any fees charged by the Title Insurer will be paid by Purchaser at the time of Closing.

8.    Entry onto the Property.  Purchaser executed and delivered to Seller a Right of Access Agreement, dated September 8, 2005, a copy of which is attached to this Agreement as Exhibit D and a confidentiality letter agreement, dated September 8, 2005, a copy of which is attached to this Agreement as Exhibit E (collectively, the "**Protective Agreements**").  A default by Purchaser under either of the Protective Agreements, shall be deemed a default by Purchaser hereunder, and vice versa.    Notwithstanding anything contained herein or in the Protective Agreements to the contrary, all of Purchaser's obligations under the Protective Agreements shall survive any termination of this Agreement and the Closing of the transaction contemplated under this Agreement.

9.    Transition Services.  (a) For a period of up to sixty (60) days after the Closing (the "**Transition Period**"), Seller will provide fire protection, compressed air, natural gas and electric power to the property-line of the Parcel (the "**Services**") at a fee of (a) $3,000 per thirty (30) day period, plus (b) Delphi's cost for natural gas and electrical power serving the Property.  The natural gas and electrical power serving the Property are separately metered.  Provided that Purchaser is using good faith efforts to install separate natural gas and electric power services to the Property ("**Separation Work**"), but its Separation Work is not completed prior to the expiration of the Transition Period, then Purchaser may extend the Transition Period for such period of time as is necessary to complete its Separation Work.  Such extension of the Transition Period shall be no longer

6

than sixty (60) days. The Transition Period may be shortened if Purchaser terminates all the Services pursuant to Paragraph 9(f), below.

(b) Amounts owed for Services must be paid within thirty (30) days of the date of the invoice sent by Seller to Purchaser.

(c) Purchaser shall indemnify, defend, and hold harmless Seller, from, any losses, costs and expenses incurred by Seller in connection with any and all claims, investigations, audits, actions, causes of action and suits arising from or relating to the Services provided pursuant to this Paragraph 9.

(d) The Services shall be provided by Seller "AS-IS, WHERE-IS", and Seller expressly disclaims to the full extent permissible by law all warranties, express or implied, as to the nature or standard of the services may be provided under this paragraph, including any warranty of merchantability or of fitness for particular purpose. Notwithstanding anything to the contrary contained in this Agreement, in no event will Seller be liable for special, consequential, incidental or indirect damages, including but not limited to loss of profits or loss of use.

(e) Purchaser is responsible for all maintenance of the fire protection, compressed air, natural gas and electrical power systems located on the Parcel.

(f) Seller shall be temporarily excused from performing its obligations under this Paragraph for so long as such performance is prevented or delayed by any event of Force Majeure. The term "**Force Majeure**" shall, for purposes of this Agreement, be defined as: (i) any acts of God, natural disasters, or wars, (ii) any strike, lockout or labor dispute at the plant of a party or its suppliers, (iii) any shortage or curtailment of utilities, materials

7

or transportation, (iv) any act or omission of any government authority, or
(v) any other cause beyond the reasonable control of Seller.

(g)     Purchaser may terminate any of the Services at any time upon a minimum
of seven (7) days written notice to Seller. Provided, however, if Purchaser
terminates any Service, Purchaser may not request Seller provide such
Service thereafter.

10.     Seller's Post-Closing Work. (a) Seller shall perform the following work ("**Seller
Post-Closing Work**") at Seller's sole cost and expense:

   (i)     Termination and disconnection of all utilities and other systems
   identified on Exhibit E to this Agreement (the "**Disconnected Systems**")
   at the property line of the Parcel; provided that Seller will not commence
   termination and disconnection of the Disconnected Systems, until the
   expiration of the Transition Period.

   (ii)    Demolition and removal of the portions of utility trestles as
   approximately indicated on the Site Plan.

   (iii)   Demolition and removal of the roadway overpass as approximately
   indicated on the Site Plan. Prior to Closing, Seller will block access to the
   roadway overpass on the Parcel.

(b)     Seller shall complete the Seller Post-Closing Work within six (6) months of
the Closing date (the "**Seller Post-Closing Work Period**"). Provided that Seller
is using good faith efforts to complete the Seller Post-Closing Work, but the
Seller Post-Closing Work is not completed prior to the expiration of the Seller
Post-Closing Work Period, then Seller may extend the Seller Post-Closing Work
Period for such period of time as is reasonably necessary to complete the Seller

8

Post-Closing Work. Such extension of the Seller Post-Closing Work Period shall be no longer than three (3) months.

(c)     Purchaser acknowledges that (i) Seller intends to completely sever Disconnected Systems, (ii) after the severance and separation of the Disconnected Systems, there will be no electricity, compressed air, fire protection serving the Property, and until Purchaser arranges for installation of electricity to the Property, there will also be no heat or sanitary sewer serving the Property, (iii) Purchaser will be solely responsible at Purchaser's sole cost and expense for arranging for installation of utilities and other systems which are a part of the Disconnected Systems, including new lines across the Property, and (iv) Seller will have no responsibility whatsoever with respect to any of the Disconnected Systems.

(d)     After the Closing, Seller will have the right, after forty-eight (48) hours notice to Purchaser, to enter upon such area of the Property as is reasonably necessary for performance of Seller's Post-Closing Work. Seller shall obtain all necessary governmental permits and approvals necessary in connection with the Seller Post-Closing Work. Seller shall indemnify and hold Purchaser harmless from and against any and all damaged property or injury or death to persons, and from and against any and all costs, claims, damages, causes of action, liabilities and expenses of any nature whatsoever (including reasonable attorney fees) arising out of or in connection with the Seller Post-Closing Work on Purchaser's Property.

11.     Purchaser's Post-Closing Work. (a) Promptly following Closing, Purchaser shall request the appropriate utility company relocate the natural gas meter from Seller's property across Center Road from the Property unto the Property ("**Purchaser Post-Closing Work**"). Purchaser shall endeavor to have the appropriate utility company complete the Purchaser Post-Closing Work within sixty (60) days of Closing, but if the Purchaser Post-Closing Work cannot be completed within such time, due to matters beyond Purchaser's reasonable

9

control, then the Purchaser Post-Closing Work shall be completed as soon as possible but in no event later than six (6) months after the Closing date. The Purchaser Post-Closing Work shall be performed at Purchaser's sole cost and expense.

(b)    After forty-eight (48) hours notice to Seller, Purchaser and the appropriate utility company and/or their contractors will have the right to enter upon Seller's Property after the Closing in order to perform the Purchaser Post-Closing Work. Purchaser shall obtain all necessary governmental permits and approvals necessary in connection with the Purchaser Post-Closing Work. Purchaser shall indemnify and hold Seller harmless from and against any and all damage to property or injury or death to persons, and from and against any and all costs, claims, damages, causes of action, liabilities and expenses of any nature whatsoever (including reasonable attorney's fees) arising out of or in connection with Purchaser Post-Closing Work on Seller's Property.

12.    Disclaimer of Warranties. Purchaser acknowledges that other than as set forth in Paragraph 17 of this Agreement, neither Seller nor any agent, employee, attorney, or representative of Seller has made any statements, agreements, promises, assurances, representations, or warranties, whether express, implied, or otherwise, regarding Seller, the condition of the Property, the suitability of the Property for any uses or purposes contemplated by Purchaser, the zoning of the Property, the right to occupy the Property, the environmental condition of the Property, the state of title to the Property or any other matter pertaining to the Property or Seller. Purchaser agrees that (i) at Closing Purchaser will have fully examined and investigated to its full satisfaction the physical nature and condition of the Property and all other matters pertaining to the Property, including, without limitation, the environmental condition of the Property and surrounding properties, (ii) Purchaser has been made aware of and accepts that the Property contains an approximately one-acre area of spark plug debris buried below the ground surface, such area being generally

10

demarked on a figure contained in that certain ASTM Phase II Environmental Assessment regarding the Property Seller provided Purchaser as described in Paragraph 8 above, and approximately depicted on the Site Plan (the "**Spark Plug Disposal Area**"), and that the presence of such buried spark plug debris may affect Purchaser's ability to develop or build on the Parcel, (iii) Purchaser will acquire the Property in an "AS IS" "WHERE IS" "WITH ALL FAULTS" condition, (iv) Seller will not be responsible for making (or contributing in any way to the cost of making) any changes or improvements to the Property, and (v) Purchaser has not relied upon any statement, promise, representation, or warranty that is not expressly set forth in this Agreement which has been made or given directly or indirectly, orally, or in writing, by Seller or any person or entity acting on behalf of Seller or whose acts or statements are attributable to or binding upon Seller. Purchaser waives any right of rescission and all claims for damages by reason of any statement, representation, warranty, assurance, promise, or agreement that is not expressly contained in this Agreement. Except for breach of any terms of this Agreement, Purchaser further releases and discharges Seller from any and all claims or cause of action which Purchaser may now or ever have against Seller which relate to the Property, and Purchaser will indemnify and hold Seller harmless from and against all costs, claims, damages, causes of action, liabilities and expenses of any nature whatsoever (including reasonable attorneys' fees) which arise after the date of Closing in connection with, or out of the condition of, the Property. Purchaser's waivers and indemnification obligations under this Agreement will survive the Closing of the sale of the Property to Purchaser or the termination of this Agreement.

13. Auction. (a) Notwithstanding anything to the contrary contained herein, Purchaser acknowledges that if during the notice period set forth in the De Minimis Sale Order Seller receives an objection to the sale of the Property to Purchaser or Seller receives an offer to purchase the Property, then Seller shall have the right to conduct an auction for the sale of the Property (the "Auction"). Seller may solicit

additional bids for the Property in connection with the Auction. The Auction will be conducted in accordance with bidding procedures as approved by the Bankruptcy Court.

(b)   In addition to the conditions to Closing set forth herein, Purchaser acknowledges and agrees that this Agreement shall be subject to higher and better offers received by the Seller made at or in connection with the Auction. The Purchaser acknowledges and agrees that this Agreement shall remain binding on the Purchaser and irrevocable by the Purchaser until the Seller enters into an agreement to sell the Property to a third party purchaser; provided, however, that nothing in this Section 13(b) shall limit the Purchaser's right to terminate this Agreement pursuant to Section 14 hereof. Purchaser expressly acknowledges and agrees that this Agreement shall be binding on Purchaser and irrevocable by Purchaser in accordance with the preceding sentence effective as of the execution of this Agreement by Purchaser (regardless of whether this Agreement is executed by Seller).

14.   Termination.   (a) This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time, but not later than the Closing Date:

> (i) by mutual consent of Purchaser and Seller;
>
> (ii) by Seller if Seller receives a higher or otherwise better offer for the purchase of the Property prior to the fulfillment of the requirements of the De Mimimis Sale Order;
>
> (iii) by Seller if Purchaser fails to pay the Deposit within one business day of delivery by Seller to Purchaser of this Agreement executed by the Seller;

12

(iv) by Seller if the Closing does not occur on or prior to the Closing date, provided, that Seller will not be entitled to terminate this Agreement (except due to a default hereunder) pursuant to this subsection (iv) if Seller or its affiliates are in breach of this Agreement;

(v) by Purchaser or Seller if the conditions of the De Minimis Sale Order have not been meet on or before January 31, 2005; or

(vi) by Purchaser or Seller, if Seller enters into an agreement to sell the Property to a purchaser other than Purchaser, as of thirty (30) days after the entry of an order by the Bankruptcy Court approving the sale to such other purchaser.

(b) In the event that there is a consummation of the sale of Property to a purchaser other than Purchaser, this Agreement will terminate and the transaction contemplated hereby will be abandoned three (3) business days after the consummation of the sale of the Property to such other purchaser.

(c) In the event of the termination of this Agreement as above provided, except as a result of a default by Purchaser or Seller (except in the case of paragraph (ii), below) and except for any willful breach by any party hereto of such party's representations, warranties or covenants, (i) this Agreement shall immediately become void, (ii) the Deposit shall be returned to Purchaser, and in the case of termination pursuant to Paragraphs 14(a)(ii) and 14(a)(vi), Seller will reimburse Purchaser for Purchaser's documented out-of-pocket due diligence costs incurred up to the date of termination, up to Twenty-Five Thousand Dollars ($25,000), (iii) no party shall have any further liability hereunder, including any liability for damages and (iv) each party shall bear its own expenses which shall also survive the termination of this Agreement.  In the event that a condition precedent to its obligation is not met, nothing contained herein shall be deemed to require any party

13

to terminate this Agreement rather than to waive (without further Bankruptcy Court order or notice to any Person) such condition precedent and proceed with the Closing.

15.   Default.  (a) If Purchaser defaults under the terms of this Agreement, and such default is not remedied within ten (10) days after Seller notifies Purchaser, then Seller may terminate this Agreement, in which event the Deposit will be delivered to Seller as liquidated damages and not as a penalty (it being understood that Seller's actual damages may be extremely difficult to calculate) after which neither party will have any further obligation or liability under this Agreement (except as may be otherwise expressly provided in this Agreement).

(b)  If Seller defaults under the terms of this Agreement, and such default is not remedied within ten (10) days after Purchaser notifies Seller, then Purchaser may, as Purchaser's sole remedy, terminate this Agreement, in which event the Deposit will be delivered to Purchaser and Seller will reimburse Purchaser for Purchaser's documented, reasonable, out-of-pocket due diligence costs incurred up to the date of termination, up to Twenty-Five Thousand Dollars ($25,000.00), and neither party will have any further obligation or liability under this Agreement except as may be otherwise expressly provided in this Agreement. Purchaser will not be entitled to, and waives all right to seek, any other remedy that may be available to Purchaser at law, in equity or otherwise, including, but not limited to, consequential or incidental damages, the filing of any notice of lis pendens, attachment, lien, or encumbrance, or the taking of any action which could impair the ability of Seller to transfer and freely deal with the Property.

16.   Brokers.  Purchaser represents and warrants to Seller that Purchaser has had no dealings with any broker or agent in connection with this transaction other than Seller's broker, Equis Corporation. Purchaser agrees to indemnify and hold Seller

14

harmless from all costs, claims, damages, causes of action, liabilities and expenses of any nature whatsoever (including reasonable attorney's fees) which are suffered or incurred by Seller as a result of the breach by Purchaser of this representation and warranty. Seller agrees to indemnify and hold Purchaser harmless from all costs, fees, commissions, liabilities and expenses arising from or through its Broker, Equis Corporation. The provisions of this paragraph will survive any termination of this Agreement and the Closing of the transaction contemplated under this Agreement.

17. **Seller's Representations and Warranties.** As a material inducement for Purchaser to enter into this Agreement, Seller makes the following representations and warranties to Purchaser which will survive the Closing for a period of one year from the date of Closing. These representations and warranties will be true and correct (i) on the date of this Agreement and (ii) on the date of the Closing as though made at and as of the date of the Closing.

   (a)   Subject to the requirements contained in the De Minimis Sale Order having been fulfilled, Seller has the full power and authority to execute and deliver this Agreement and all other documents or instruments that this Agreement obligates Seller to execute or deliver (collectively, the **"Seller's Documents"**) and to perform and carry out all covenants and obligations arising under this Agreement and Seller's Documents.

   (b)   Seller is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware and subject to any required approval of the Bankruptcy Court, has the requisite power and authority to enter into this Agreement and into Seller's Documents and to carry out the transactions contemplated by this Agreement, subject to applicable bankruptcy, reorganization, insolvency, moratorium and other laws effecting creditor's rights generally from time to time in effect. The

15

person that signs this Agreement on behalf of Seller has, and any person that signs Seller's Documents on behalf of Seller will have, full power and authority to bind Seller.

(c)     Seller has duly authorized (i) the execution and delivery of this Agreement, (ii) the sale and transfer of the Property to Purchaser pursuant to this Agreement, and (iii) the performance of the other covenants and obligations to be performed by Seller under this Agreement.

(d)     The execution, delivery, and performance of this Agreement and Seller's Documents by Seller do not and will not result in any violation of, conflict with, or constitute a default under any provision of Seller's Articles of Organization.

(e)     Subject to the requirements contained in the De Minimis Sale Order having been fulfilled, this Agreement and Seller's Documents do not and will not conflict with or contravene any provision of any present judgment, order, decree, writ, or injunction, or any provision of any currently applicable law or regulation affecting Seller. On the date of the Closing, the conveyance of the Property and the execution, delivery and performance of this Agreement and Seller's Documents by Seller will not result in a breach of, constitute a default under, interfere with, or require consent pursuant to any credit agreement, lease, indenture, mortgage, deed of trust, purchase agreement, guaranty, security agreement, or other instrument to which Seller is presently a party or by which Seller or Seller's assets are bound or affected

17.     Purchaser's Representations and Warranties. As a material inducement for Seller to enter into this Agreement, Purchaser makes the following representations and warranties to Seller which will survive the Closing for a period of one year from the date of Closing. These representations and warranties will be true and correct (i)

16

on the date of this Agreement and (ii) on the date of the Closing as though made at
and as of the date of the Closing.

(a)     Purchaser has the full power and authority to execute and deliver this
        Agreement and all other documents or instruments that this Agreement
        obligates Purchaser to execute or deliver (collectively, the **"Purchaser's
        Documents"**) and to perform and carry out all covenants and obligations
        arising under this Agreement and Purchaser's Documents.

(b)     Purchaser is a limited liability company duly organized, validly existing, and
        in good standing under the laws of the State of Michigan and has the
        requisite power and authority to enter into this Agreement and into
        Purchaser's Documents and to carry out the transactions contemplated by
        this Agreement. The persons signing this Agreement on behalf of Purchaser
        have, and any person that signs Purchaser's Documents on behalf of
        Purchaser will have, full power and authority to bind Purchaser.

(c)     Purchaser has duly authorized (i) the execution and delivery of this
        Agreement and Purchaser's Documents, (ii) the purchase of the Property
        from Seller pursuant to this Agreement, and (iii) the performance of the other
        covenants and obligations to be performed by Purchaser under this
        Agreement.

(d)     The execution, delivery, and performance of this Agreement and
        Purchaser's Documents by Purchaser do not and will not result in any
        violation of, conflict with, or constitute a default under any provision of
        Purchaser's Articles of Organization.

(e)     This Agreement and Purchaser's Documents do not and will not conflict with
        or contravene any provision of any judgment, order, decree, writ, or

17

injunction, or any provision of any currently applicable law or regulation affecting Purchaser. The purchase of the Property and the execution, delivery and performance of this Agreement and Purchaser's Documents by Purchaser will not result in a breach of, constitute a default under, interfere with, or require consent pursuant to any credit agreement, lease, indenture, mortgage, deed of trust, purchase agreement, guaranty, security agreement, or other instrument to which Purchaser is presently a party or by which Purchaser or Purchaser's assets are bound or affected.

18.    Non-Compete. While Purchaser or its assignee is the owner of the Parcel, Purchaser agrees not to manufacture, or permit to be manufactured, oil filters on the Parcel.

19.    Agreement Not to be Recorded. Each party agrees that it will not cause or permit this Agreement or any notice of this Agreement to be recorded.

20.    Notices. All notices or other communications provided for under this Agreement must be in writing and signed on behalf of the party that sends the notice or other communication. Notices and other communications must be personally delivered, sent by certified or registered mail, return receipt requested, or sent by a reputable national overnight delivery service, and will be effective upon the earlier of receipt or refusal or failure to accept receipt if sent to the following addresses:

If to Seller:          Delphi Automotive Systems LLC
                       5825 Delphi Drive
                       MC: 480-410-172
                       Troy, Michigan 48098
                       Attention: Executive Director, Facilities Services Group

18

| With a Copy to: | Delphi Automotive Systems |
| | 5725 Delphi Drive |
| | MC: 483-400-603 |
| | Troy, Michigan 48098 |
| | Attention: Assistant General Counsel |
| | Commercial & Transactional |

If to Purchaser:   Porrett Investments, LLC
5510 Clio Road
Flint, Michigan 48504
Attention: Gary N. Porrett, Sr.

With a Copy to:
2377 S. Linden Road, Suite B
Flint, Michigan 48532
Attention: Scott R. Fraim

Each party will have the right to designate other addresses or addressees for the delivery of notices, by notifying the other party to this Agreement.

21.   Entire Agreement. This Agreement represents the entire understanding between the parties with respect to the subject matter of this Agreement, and all prior agreements and understandings between the parties with respect to the subject matter of this Agreement are merged in this Agreement. The exhibits attached to this Agreement are made a part of and incorporated in this Agreement.

22.   No Oral Amendment or Modification. No amendments, waivers, or modifications of this Agreement will be made or deemed to have been made unless in writing and executed by both Seller and Purchaser.

23.   Assignability.   Neither this Agreement nor the rights of Purchaser under this Agreement may be assigned or transferred, in whole or in part, to any other party without the prior written consent of Seller, which consent may be withheld for any reason or for no reason.

19

24.    Successors and Assigns. Subject to Paragraph 23, this Agreement will be binding
upon and inure to the benefit of the parties to this Agreement and their respective
heirs, representatives, successors, and assigns.

25.    Captions for Convenience. All headings and captions used in this Agreement are
for convenience only and have no meaning in the interpretation or effect of this
Agreement.

26.    Applicable Law. This Agreement will be interpreted and enforced according to the
laws of the State in which the Property is located.

27.    Continuing Jurisdiction. The parties agree that the Bankruptcy Court shall retain
jurisdiction over the enforcement of the obligations and transactions contemplated
hereunder.

28.    No Waivers. Any waiver of a breach of any provision contained in this Agreement
must be in writing. No waiver of any breach will be deemed a waiver of any
preceding or succeeding breach, nor of any other breach of a provision contained in
this Agreement.

29.    Construction. Seller and Purchaser acknowledge that both parties participated
equally in the negotiation of this Agreement and that no court construing this
Agreement will construe it more stringently against one party than against the other,
regardless of which party's counsel drafted this Agreement.

30.    Time of the Essence. Time is of the essence with respect to performance required
under this Agreement.

20

31.  Survival. The covenants and agreements of Seller and Purchaser set forth in this
     Agreement will survive the Closing of the transaction contemplated under this
     Agreement.

32.  Binding Effect.    This document is not an offer by Seller, and under no
     circumstances will this Agreement have any binding effect upon Seller unless and
     until Seller will have executed this Agreement and delivered executed counterpart
     hereof to Purchaser.

33.  Counterparts. This Agreement may be executed in counterparts, each of which
     shall constitute an original although not fully executed, but all of which when taken
     together, shall constitute but one agreement.    Delivery by facsimile of this
     Agreement or an executed counterpart hereof shall be deemed a good and valid
     execution and delivery hereof.

IN WITNESS WHEREOF, Seller and Purchaser have signed this Real Property Purchase
Agreement as of the day and year first above written.

In the presence of:                       DELPHI AUTOMOTIVE SYSTEMS LLC,
                                           a Delaware limited liability company

_____                 By:_____
                                           Print Name:_____
                                           Its:    Authorized Signatory

In the presence of:                       PORRETT INVESTMENTS, LLC,
                                           a Michigan limited liability company

                                           By:_____
                                                Gary N. Porrett, Sr.
                                           Its:    Member

21

## EXHIBIT "A"

### SITE PLAN
[DEPICTION OF THE PROPERTY]



Flint East Site

{

## EXHIBIT "B"

## COVENANT DEED

KNOW ALL MEN BY THESE PRESENTS: That Delphi Automotive Systems LLC, a Delaware limited liability company, whose address is 5725 Delphi Drive, Troy, Michigan 48098, sell, convey, grant and bargain to Porrett Investments, LLC, a Michigan Limited Liability Company, whose address is 5510 Clio Road, Flint, Michigan 48504, the following described premises situated in the City of Burton, County of Genesee and State of Michigan, to-wit:

### SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

together with all and singular the tenements, hereditaments and appurtenances thereunto belonging or in anywise appertaining, for the sum of One and 00/100ths Dollar ($1.00) and other good and valuable consideration.

Grantor, for itself, its successors and assigns, does covenant, grant, bargain and agree to and with Grantee, its successors and assigns, that, subject to the matters set forth below, Grantor has not heretofore done, committed or knowingly suffered to be done, or committed any act, matter, or thing whatsoever, whereby the Property hereby granted, or any part thereof, is, or shall or may be, charged or encumbered in title, estate or otherwise whatsoever. The foregoing grant is subject to the following:

(a)     Building and zoning laws and ordinances for the municipality where the Property is located and any State, County or Federal regulations affecting the Property, its use or occupancy;

(b)     Private, public and utility easements of record or that would be revealed by an accurate survey of the Property or inquiry of the utility companies servicing the Property, roads and highways;

(c)     Covenants, conditions, restrictions, reservations and exceptions of record;

(d)     Such taxes and assessments as may be a lien upon the Property but not due and payable as of the date of this Deed, and taxes and assessments which may be assessed or accrue subsequent to the date of this Deed;

(e)     **[Easements listed on the title Commitment]**; and

(f)     Grantee, its successors, assigns, and tenants will not treat, store, or dispose of any hazardous substance, hazardous waste, or toxic substance, as those terms are defined under any applicable environmental law, including without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. 9601 et seq., as amended, the Resource Conservation and Recovery Act, 42 U.S.C. 6901 et seq., as amended, the Toxic Substances Control Act 15 U.S.C. 2601 et seq., as amended, or any similar state, local or correlative statute, and all regulations and guidance promulgated thereunder (collectively, "**Environmental Laws**") at, on, or within the Property and will maintain generator-only status pursuant to Environmental Laws; provided, however, that Grantee, its successors, assigns, or tenants may (i) accumulate such substances or wastes as allowed under Environmental Laws for off-site treatment, storage, or disposal so long as such substances or wastes are generated on-site, and (ii) use, store, offer for sale, and sell commercial goods on-site which may contain such substances in accordance with Environmental Laws. Grantee, its successors, assigns, and tenants will use and occupy the Property solely for commercial or industrial purposes, and in no event shall the Property be used for any business that involves residential, hotel, child care, adult day care, educational or similar activities; provided, however that if Grantee or a successor or assign of Grantee takes all necessary actions, makes all proper demonstrations and obtains all necessary approvals from all applicable governmental authorities that the environmental conditions at the Property under applicable law permit use of the Property other than for commercial or industrial purposes, and in such case Grantee or such successor or assign of Grantee shall release and discharge Grantor from any and all claims or cause of action which Grantee or such successor or assign of Grantee may now or ever have against Grantor which relate to the Property and Grantee or such successor or assign of Grantee shall

indemnify and holds Grantor harmless from and against all costs, claims, damages, causes of action, liabilities and expenses of any nature whatsoever (including reasonable attorneys' and consultants' fees) in connection with, or out of the condition of, the Property, such other use can be made of the Property. Any contract, agreement, deed, lease, or other instrument transferring title or possession of all or any part of the Property, by sale, lease, or otherwise, to any successor, assignee, or tenant must incorporate the restrictions set forth in this paragraph. The restrictions contained in this paragraph are deemed covenants running with the land and will inure to the benefit of Grantor, or its successors and assigns. The restrictions are not intended to and will not be deemed to create in the Grantor a possibility of reverter, a power of termination, or any other future interest in the Property.

The Grantor further grants to the Grantee the right to make any and all divisions under Section 108 of the Land Division Act, Act No. 288 of the Public Acts of 1967, as amended.

This Property may be located within the vicinity of farmland or a farm operation. Generally accepted agricultural and management practices which may generate noise, dust, odors, and other associated conditions may be used and are protected by the Michigan Right to Farm Act.

Dated this _____ day of _____, 2005.

In the presence of:

DELPHI AUTOMOTIVE SYSTEMS LLC, a Delaware limited liability company

_____

By: _____
Print Name:_____

_____

Its:    Authorized Signatory

STATE OF MICHIGAN          §
                           §
COUNTY OF OAKLAND          §

BEFORE ME, the undersigned authority, on this day personally appeared
_____, an Authorized Signatory of Delphi Automotive Systems LLC, known to me to be the person whose name is subscribed to the foregoing

instrument, and who acknowledged to me that he executed the same as the act and deed of Delphi Automotive Systems LLC and as an Authorized Signatory thereof, and for the purposes and consideration therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE, this the _____ day of _____, 200____.


 

_____
Notary Public in and for the State of Michigan


_____
(Print Name of Notary Public Here)

My commission expires: _____

| County Treasurer's Certificate | City Treasurer's Certificate |
|---|---|
|  |  |

| When Recorded Return To: | Send Subsequent Tax Bills To: | Drafted by:<br>Ciara M. Comerford, Esq.<br>Delphi Automotive Systems |
|---|---|---|
|  | Grantee | Business Address:<br>5725 Delphi Drive<br>MC: 483-400-603<br>Troy, MI 48098 |

Tax Parcel #_____ Recording Fee _____ Revenue Stamps _____ N/A

## EXHIBIT "C"

### BILL OF SALE

This BILL OF SALE dated as of _____, 2005 ("**Bill of Sale**") is executed by **Delphi Automotive Systems LLC**, a Delaware limited liability company ("**Delphi**") in connection with the Real Property Purchase Agreement, dated as of October ____, 2005 ("**Agreement**"), between Delphi and **Porrett Investments LLC**, a Michigan limited liability company ("**Purchaser**"). Capitalized terms used herein without definition shall have the respective meanings set forth in the Agreement.

1. Intending to be legally bound, and for good and valuable consideration, the sufficiency of which is hereby acknowledged, Delphi hereby sells, transfers, assigns, conveys and delivers to Purchaser, all of the Equipment identified in Paragraph B of the Agreement, to have and to hold unto Purchaser, its successors and assigns, to and for its and their use forever.

2. Delphi hereby conveys the Personal Property to Purchaser, free and clear of all liens or encumbrances created by Delphi.

3. This Bill of Sale and the terms and conditions hereof shall be binding upon Delphi and inure to the benefit of and be enforceable by Purchaser and its successors and permitted assigns.

4. This Bill of Sale shall be subject to, interpreted, and governed by the laws of the State of Michigan.

5. Notwithstanding the foregoing, the provisions of this Bill of Sale are subject, in all respects, to the terms and conditions of the Agreement, which shall survive the execution and delivery of this Bill of Sale as provided in the Agreement.

6. In the event of a conflict between the terms and conditions of this Bill of Sale and the terms and conditions of the Agreement, the terms and conditions of the Agreement shall govern, supersede and prevail.

IN WITNESS WHEREOF, Delphi has caused this Bill of Sale to be executed as of the day and year first written above.

DELPHI AUTOMOTIVE SYSTEMS LLC

By: _____

Name: _____

Title: Authorized Signatory

## **EXHIBIT F**

### DISCONNECTED SYSTEMS

1. Compressed air,
2. Fire protection and
3. Electrical power