HEARING DATE: February 9, 2006 at 10:00 a.m.
OBJECTION DEADLINE: February 2, 2006 at 4:00 p.m.

Thomas R. Slome (TS-0957)
Alan E. Marder (AM-0114)
ROSEN SLOME MARDER LLP
333 Earle Ovington Boulevard
Suite 901
Uniondale, New York 11553-3622
(516) 227-1600

    and

Michael J. Pankow
Daniel J. Garfield
Brownstein Hyatt & Farber, P.C.
410 Seventeenth Avenue
Denver, Colorado 80202-4437
(303) 223-1106

*Co-Counsel for Cherokee North Kansas City, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____
                                          )
**In re:**                              ) **Chapter 11**
                                          )
**DELPHI CORPORATION, INC., et al.,**  ) **Case No. 05-44481 (RDD)**
                                          )
                     **Debtors.**   ) **(Jointly Administered)**
                                          )
_____)

**MOTION FOR ORDER UNDER 11 U.S.C. § 365(d)(2) DIRECTING DEBTOR
DELPHI AUTOMOTIVE SYSTEMS, LLC TO DETERMINE WITHIN 150
DAYS WHETHER TO ASSUME OR REJECT ITS NONRESIDENTIAL
REAL PROPERTY LEASE WITH CHEROKEE NORTH KANSAS CITY, LLC**

Creditor Cherokee North Kansas City, LLC ("Cherokee") submits this motion for an order

under 11 U.S.C. § 365(d)(2) and Fed. R. Bankr. Pro. 6006 directing Debtor Delphi Automotive

Systems, LLC (the Debtor-Lessee, and collectively with the other Debtors, the "Debtors") to determine whether to assume or reject its nonresidential real property lease with Cherokee within 150 days of the February 9, 2006 omnibus hearing and states as follows.

**The Parties**

1.  The Debtors in these jointly administered cases under Chapter 11 of the Bankruptcy Code comprise Delphi Corporation and 41 of its domestic subsidiaries and affiliates, including the Debtor-Lessee.

2.  Cherokee is the owner of an industrial and warehouse facility located at 144 West 23rd St., North Kansas City, Missouri (the "Building"). The Building is Cherokee's sole asset, and its sole source of income is rent paid by the Debtor-Lessee and two other tenants of the Building, Gallagher Power Fence, Inc. ("Gallagher") and NL Grease, LLC ("NL Grease"). Cherokee's property is financed through loans from First Southern National Bank (the "Bank"). A significant portion of the loans from the Bank matured on December 31, 2005, which has forced Cherokee to make arrangements with the Bank that have raised the cost of lending. Cherokee also had intended to put the property on the market at about the time that the Debtor-Lessee filed for bankruptcy. These bankruptcy cases forced Cherokee not to list the Building for sale because of the uncertainty associated with the Debtor-Lessee's right to reject the lease. That uncertainty has been heightened by this Court's order of November 30, 2005 (Docket No. 1345), permitting the Debtors until June 7, 2007, to assume or reject executory contracts and nonresidential real property leases. Moreover, the value of the Building has significantly decreased because no potential buyer can now depend on the rental stream from the Debtor-Lessee. Cherokee brings this Motion because the uncertainty associated with the

Debtor-Lessee's right to assume or reject its lease has severely damaged Cherokee with respect to the loans with the Bank and the value of its property.

3.    The Debtor-Lessee operates a manufacturing facility at the Building in which it manufactures and assembles, upon information and belief, automotive parts for General Motors ("GM").

**Relief Requested**

4.    By this Motion, Cherokee seeks an order under 11 U.S.C. § 365(d)(2) directing the Debtor-Lessee to assume or reject its lease with Cherokee within 150 days of the February 9, 2006, omnibus hearing.

**Background**

5.    On October 8, 2005 (the "Petition Date"), 39 of the 42 Debtors, and on October 14, 2005, the remaining Debtors, filed voluntary petitions in this Court for reorganization relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On the Petition Date, this Court entered an order directing the joint administration of the Debtors' Chapter 11 cases (Docket No. 28).

6.    No trustee or examiner has been appointed in these cases. The Office of the United States Trustee has appointed a single Official Committee of Unsecured Creditors for all of the Debtors pursuant to Bankruptcy Code § 1102.

7. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

8. The statutory predicates for relief are Bankruptcy Code §§ 105(a) and 365(d)(2).

**The Cherokee Lease**

9. Cherokee leases space to three tenants at the Building. The Debtor-Lessee leases approximately 125,566 rentable square feet of industrial and warehouse space (the "Premises") at the Building pursuant to a Lease of Industrial or Warehouse Facilities (the "Lease," a copy of which is attached as Exhibit A). When the parties entered into the Lease on July 2, 2002, the Premises consisted of 79,200 rentable square feet, (see Lease at § 1.1A), with an initial term of six years and six months to terminate in May 2009. The Lease also granted the Debtor-Lessee: a) three additional six-month options and one three-year option after the initial term ended; and b) the right to cancel the Lease in November 2005 and November 2006 upon one-year's written notice and payment of certain sums as provided in Lease §§ 1.2H and 3.4 (the "Cancellation Option"). The Debtor-Lessee is responsible for its proportionate share of operating expenses and real estate taxes. Debtor Delphi Corporation guarantees the Debtor-Lessee's obligations under the Lease.

10. On July 9, 2003, Cherokee and the Debtor-Lessee entered into a First Amendment to Lease (the "First Amendment," a copy of which is attached as Exhibit B) and added 6,785 rentable square feet to the Premises. (First Amendment at 1). The term for the additional premises was the same as for the original premises.

11. On March 3, 2005, Cherokee and the Debtor-Lessee entered into a Second Amendment to Lease of Industrial or Warehouse Facilities (the "Second Amendment," a copy of which is attached as Exhibit C), and added an additional 39,581 rentable square feet to the Premises beginning in June 2005. (Second Amendment at § 2(a)). The parties agreed to extend the lease term until October 31, 2011, and changed the Cancellation Option so that the Debtor-Lessee may terminate the Lease on or after May 1, 2010, by giving one year's notice. (Second Amendment at §§ 3 and 8). Monthly rent for the Premises is now $43,327.43 and increases annually by approximately $900 per month. (Second Amendment at § 5). The parties agreed to change the options for the Premises. The Debtor-Lessee now has two five-year options to rent at the prevailing market rate, as defined the Second Amendment. (Second Amendment at § 6).

12. Gallagher and NL Grease lease 36,000 rentable square feet and 66,211 rentable square feet, respectively, at the Building and collectively pay approximately 38% of the gross rent for the Building. Both tenants are current in their obligations with respect to their leases of space in the Building. Gallagher's tenancy ends on May 31, 2013. NL Grease's lease terminates on October 31, 2015. These two tenants occupy 43% of the rentable square feet in the Building. (Declaration of Kenneth Ho (the "Ho Decl.," attached as Exhibit D) at ¶ 5).

**The Debtor-Lessee's Manufacturing Facilities**

13. The Debtor-Lessee manufactures automotive parts for GM. In September 2005, Cherokee's real estate broker, Whitney Kerr, Jr., toured the Debtor-Lessee's facility prior to an anticipated sale listing in October. (Declaration of Whitney Kerr, Jr. (the "Kerr Decl.," attached as Exhibit E) at ¶ 6). The production manager told Mr. Kerr that the facility was the Debtors' top facility

with respect to quality. The manager also told Mr. Kerr that the facility had recently accepted new manufacturing work that it had not previously done. (Id. at ¶ 6). Most of the employees at the facility, Mr. Kerr was told, earned $14 per hour, which is at the lower end of the pay scale for such employees. (Id.).

## The Uncertainty Associated with Assumption or Rejection Has Severely Damaged Cherokee

14. Two issues drive Cherokee's request for relief. First, Cherokee intended to put the Building up sale in October 2005, but was prevented from doing so due to these bankruptcy cases. Cherokee intended to list the Building for sale at a price of approximately $6.5 million. If Cherokee were to attempt to sell the Building now, the asking price would be between only $4 million and $5 million. Until the uncertainty associated with the Debtor-Lessee's right to assume or reject the Lease ends, Cherokee's ability to sell the Building at a reasonable price is severely hampered; indeed, to a large extent, it is unclear at what price Cherokee could sell the Building because one-half of its rental stream might end at any time. To a potential purchaser, the Debtor-Lessee has a month-to-month lease, which is of little value to a landlord. Even if the Debtor-Lessee rejects the Lease, Cherokee would be able to locate a new tenant, and thus ensure it could sell the Building for an amount at or near the asking price of October 2005. Moreover, if Cherokee is forced to wait until June 2007 (or later) for the Debtor-Lessee to assume or reject the Lease, the rental streams associated with Gallagher and NL Grease will also be one year shorter, further decreasing the value of the Building. (Kerr Decl. at ¶ 9). Cherokee does not intend to sell the Building until the uncertainty associated with the Lease is resolved. (Ho Decl. at ¶ 6).

6

15.     With respect to Cherokee's loan from the Bank, Cherokee has three outstanding loans, two of which matured on December 31, 2005: a) approximately $950,000 (maturity date of December 31, 2005); b) approximately $263,000 (maturity date of December 31, 2005); and c) approximately $506,000 (maturity date of February 28, 2008). (Ho Decl. at ¶ 7). Cherokee is in discussions with the Bank concerning an extension of the two matured loans, but the Bank has not yet agreed to an extension, and it is anticipated that any extension will require Cherokee to incur additional costs, but for the Debtor-Lessee's bankruptcy. (Id.; letter dated December 6, 2005, from Tommy Roberts, Regional President of First Southern National Bank, to Daniel J. Garfield, attached as Exhibit F).

### Basis for Relief

**A.     Applicable Authority**

16.     Section 365(d)(2) of the Bankruptcy Code provides that the court may order that a debtor-in-possession assume or reject an executory contract or lease within a specified time. The settled rule is that the debtor-in-possession have a reasonable time to make that determination, with "reasonable" depending on the facts and circumstances of each case. See, e.g., South St. Seaport Ltd. P'ship v. Burger Boys, Inc. (In re Burger Boys, Inc.), 94 F.3d 755, 761 (2d Cir. 1996); Theatre Holding Corp. v. Mauro, 681 F.2d 102, 105 (2d Cir. 1982). A debtor-in-possession should have sufficient breathing space until the confirmation of a plan in which to assume or reject an executory contract, but "the breathing space afforded to the debtor . . . is not without limits." In re Enron Corp., 279 B.R. 695, 702 (Bankr. S.D.N.Y. 2002). "In certain circumstances, the rights of the nondebtor party . . . outweigh the need of the debtor in possession for unlimited flexibility and breathing space." National Labor Relations Bd. v. Bildisco and Bildisco, 465 U.S. 513, 552 (1984).

17.    These circumstances present a compelling case to require that the assumption or rejection decision be made promptly, notwithstanding the relatively early stage of the case. Requiring an early assumption or rejection decision is justified where, as here, the moving party "will need to know whether the [debtor] is planning to assume or reject a contract or lease, in order for the other party to take actions either to perform on its end of the contract or to mitigate its damages." 3 Collier on Bankruptcy ¶ 365.04[2][b] at 365-32 (15th ed. rev. 2005).

18.    In various cases, courts in this district and in the Second Circuit have identified a list of non-exclusive factors for a court to consider in shortening the time for a debtor to assume or reject an executory contract. See In re Burger Boys, Inc., 94 F.3d at 760; In re Adelphia Communications Corp., 291 B.R. 283, 292-93 (Bankr. S.D.N.Y. 2003); In re Teligent, Inc., 268 B.R. 723, 738 (Bankr. S.D.N.Y. 2001); In re Beker Indus. Corp., 64 B.R. 890, 898 (Bankr. S.D.N.Y. 1986). The pertinent factors are discussed below:

### *The Nature of the Interests at Stake*

19.    The Building and the Lease are of critical importance to Cherokee. The Building and the income it generates are Cherokee's sole assets, and the Debtor-Lessee produces almost half of the income associated with the property. Moreover, without some assurance from the Debtor-Lessee as to its intentions with respect to assumption or rejection, the value of the Building is, and will be, dramatically less than it otherwise would be, and Cherokee is now forced to obtain refinancing at a higher-than-expected cost.

20.    On the other hand, the Debtor-Lessee is not dependent on Cherokee or the Premises for its continued operations. It operates dozens of other manufacturing plants around the world. In any

8

event, while the Premises are no doubt important to the Debtor-Lessee, based upon its representations to this Court in various motions, moving its manufacturing facility at the Premises to another facility or remaining at the Building is not a decision that requires 18 months to decide. Moreover, the Debtor-Lessee extended the Lease and expanded the Premises less than one year ago. This is strong evidence that the Lease is valuable and that the Debtor-Lessee intends to assume it; it is extremely unlikely that the Debtor-Lessee intends to reject a Lease for which it recently extended the term and expanded its premises. Moreover, it is clear from Mr. Kerr's discussions with the plant manager that the Debtor-Lessee's manufacturing facility is excellent, is able to attract new business, and has low costs. The Debtor-Lessee expanded the premises and extended the Lease because of its contract with GM, which terminates well past any possible plan confirmation date and is an advantageous contract for the Debtors. (See Kerr Decl. at ¶¶ 5-6).

### *The Balance of Hurt to the Litigants*

21.     Similar to the analysis of the interests at stake, the balance of hurt falls squarely on Cherokee. Ensuring a tenant leases the Premises is crucial to Cherokee's business, and Cherokee has suffered and will continue to suffer significant harm if the Debtor-Lessee does not assume or reject the Lease promptly.

22.     The uncertainty associated with the status of the Lease ensures that the value of the Building will remain unnecessarily diminished until the Debtor-Lessee makes its decision. Without the Debtor-Lessee's assumption of the Lease, Cherokee has no assurance that the Debtor-Lessee will continue to perform under the Lease, and that uncertainty significantly decreases the value of the Building. See In re Beker Indus. Corp., 64 B.R. at 898 (where major investment is jeopardized by

doubt associated with assumption or rejection, court should shorten time to assume or reject executory contract); H. Rep. No. 95-595, 95th Cong., 1st Sess. 348-49 (1977) (purpose of section 365(d)(2) is to prevent parties in contractual relationships with debtor from being left in doubt concerning status vis-à-vis the estate).

23. A prompt assumption or rejection of the Lease will significantly improve the value of the Premises to Cherokee (and any potential buyer). The longer Cherokee must wait for the Debtor-Lessee to assume or reject the Lease, the greater jeopardy Cherokee will find itself in, which will far outweigh any benefit that creditors might gain from the Debtor-Lessee delaying that decision. See In re Beker Indus. Corp., 64 B.R. at 898 ("Such doubt from the risk of rejection, when it concerns an entire enterprise and the jeopardizing of a major investment, can be paralyzing, and far outweighs the benefit to be derived to creditors.").

### *The Good to Be Achieved*

24. As noted above, Cherokee's business depends in large part upon the Debtor-Lessee's assumption or rejection of the Lease. A prompt assumption or rejection of the Lease will ensure that Cherokee is able to sell the Building at a reasonable price and not incur higher costs with respect to its financing.

### *The Uncompensable Damage That Cherokee Will Suffer*

25. Cherokee's lost opportunity costs due to its inability sell the Building because of the uncertainty associated with the Lease are uncompensable, as will be its higher financing costs. This uncertainty has decreased the value of the Building by approximately 25%-40% and Cherokee's ability

to sell the property at any price is uncertain. (See Kerr Decl. at ¶ 8). Cherokee may be unable to claim these amounts from the Debtor-Lessee's estate.

26. Indeed, so long as the Debtor-Lessee does not assume the Lease, the value of the Building will continue to decrease as the expected income stream associated with the Building decreases. If the Debtor-Lessee assumes the Lease in June 2006, the anticipated income stream from the Debtor-Lessee will be approximately 4 years; if the Lease is assumed in June 2007, the anticipated rental stream will be only 3 years. A building with an income stream of 4 years for its largest tenant will sell at a higher price than a building with an income stream of 3 years for that tenant. Moreover, if Cherokee is forced to wait until June 2007 (or later) for the Debtor-Lessee to assume or reject the Lease, the rental streams associated with Gallagher and NL Grease will also be one year shorter, further decreasing the value of the Building. (Kerr Decl. at ¶ 9).

### *The Importance of the Lease to the Debtor-Lessee*

27. Based upon the Debtors' previous representations to this Court in its filings, the decision whether or not to assume or reject the Lease is not a "make or break" decision for the Debtor-Lessee. The manufacturing facility at the Premises is not an overly significant part of the Debtors' business or reorganization. The Debtors have 90 other real property leases, and in light of the size of these cases, requiring the Debtors to assume or reject one lease out of 90 is not unreasonable. In this context, there is no reason to defer a decision on whether to assume or reject the Lease more than eight months after the Petition Date.

11

*Whether the Debtor-Lessee Has Had Sufficient Time to Appraise Its Finances and Its Successful Rehabilitation*

28.   By June 8, 2006, the Debtor-Lessee will have had eight months to determine whether to assume or reject the Lease, a lease for which the Debtor-Lessee is operating an apparently profitable, low-cost manufacturing facility. That is a reasonable period of time to determine whether to assume or reject only one out of approximately 90 real property leases. The Debtors have made it clear that they intend to continue their businesses, but with a stronger balance sheet. The Debtor-Lessee's wage structure is very favorable in comparison with similar facilities. If, however, the facility is not valuable to the Debtor-Lessee, then the quicker it shuts down or moves this facility, and rejects the Lease, the better its finances will be.

29.   The Debtor-Lessee's rehabilitation will not be hindered by compelling assumption or rejection of the Lease by June 8, 2006. To the contrary, early assumption or rejection will bring some cost certainty.

*The Debtor-Lessee's Failure or Ability to Satisfy Post-Petition Obligations*

30.   The Debtor-Lessee is current in its post-petition obligations.

*The Safeguards Afforded the Litigants*

31.   So long as the Debtor-Lessee neither assumes nor rejects the Lease, Cherokee remains at substantial risk. The current state of affairs severely affects Cherokee's ability to sell the Building, whether or not the Debtor-Lessee assumes the Lease, and ensures that Cherokee must pay higher finance costs. If the Debtor-Lessee assumes the lease promptly, Cherokee will be able to sell a fully-

leased Building. If the Debtor-Lessee rejects the Lease promptly, Cherokee can begin to seek a new tenant(s) for the Premises sooner rather than later and then seek to sell the Building.

32.     On the other hand, requiring the Debtor-Lessee to determine whether to assume or reject the Lease by June 8, 2006, would not place it in much jeopardy. While a typical assumed lease would saddle a debtor with a large administrative expense claim, that is mitigated here by the fact that the Lease is related to a successful contract with GM and the Debtor-Lessee has the right to terminate the Lease beginning May 2010 after giving one-year notice.

### *Whether Exclusivity Has Terminated*

33.     This factor should be entitled to little weight. The Debtors' exclusivity rights have not expired, and they have filed a motion to extend exclusivity to file and solicit acceptances of a plan until August 5, 2006, and October 4, 2006, without prejudice to seek further extensions. As noted above, the Lease is far removed from the basic issues that a plan must address. See In re Adelphia Communications Corp., 291 B.R. at 300 ("[T]he [contract] is not so critical to the Debtors' operations that their ability to reorganize (or their exclusive right to file a reorganization plan) will be affected in any significant way by their decision to assume or reject it.").

### **Notice**

34.     Notice of this Motion has been provided in accordance with the Order Under 11 U.S.C. §§ 102(1) and 105 and Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing (I) Omnibus Hearing dates, (II) Certain Notice, Case Management, and Administrative Procedures, and (III) Scheduling an Initial Case Conference in Accordance with Local Bankr. R. 1007-2(e) entered

by this Court on October 14, 2005 (Docket No. 245). In light of the nature of the relief requested, Cherokee submits that no other or further notice is necessary.

## Memorandum of Law

**35.**	Because the legal points and authorities upon which this Motion relies are incorporated herein, Cherokee respectfully requests that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

## Conclusion

WHEREFORE, Cherokee respectfully requests entry of an order, substantially in the form annexed hereto as Exhibit G, directing the Debtor-Lessee to assume or reject the Lease on or before June 8, 2006.

Dated: Uniondale, New York
January 18, 2006

ROSEN SLOME MARDER LLP

By: /s/ Jil Mazer-Marino
Thomas R. Slome (TS-0957)
Jil Mazer-Marino (JM-6470)

333 Earle Ovington Boulevard
Suite 901
Uniondale, New York 11553-3622
(516) 227-1600

and

Michael J. Pankow
Daniel J. Garfield
Brownstein Hyatt & Farber, P.C.
410 Seventeenth Avenue

14

Denver, Colorado 80202-4437
(303) 223-1106

*Co-Counsel for Cherokee North Kansas City, LLC*

*G:\Cherokee North Kansas City, LLC\Lit\MotionAssumeReject.DOC*