# EXHIBIT A

Proposed Final Draft – 07/10/02

## LEASE OF INDUSTRIAL OR WAREHOUSE FACILITIES

THIS LEASE OF INDUSTRIAL OR WAREHOUSE FACILITIES (this "Lease"), is made and entered into as of the 9th day of July, 2002, between CHEROKEE NORTH KANSAS CITY, LLC, a Delaware limited liability company, with its principal address at 5445 DTC Parkway, Suite 900, Englewood, CO 80111 ("Landlord"), and DELPHI AUTOMOTIVE SYSTEMS LLC, a Delaware limited liability company, with its principal address at 5725 Delphi Drive, Troy, Michigan 48098 ("Tenant").

## ARTICLE 1
## BASIC LEASE PROVISIONS

This Article contains basic information regarding several of the principal terms of this Lease.

Section 1.1    Building and Premises Information:

A.    The "Premises" consist of approximately seventy-nine thousand two hundred (79,200) square feet of manufacturing, warehouse, engineering and office space in the "Building" (as defined in Section 1.1.C of this Lease). The Premises is depicted on Exhibit A to this Lease.

B.    The "Land" is depicted on Exhibit A and is described on Exhibit B to this Lease and includes all easements, access rights and other appurtenances which are related to the property which is depicted and described on Exhibit A and Exhibit B.

C.    The building in which the Premises are or will be located (the "Building") contains two hundred fifty-eight thousand (258,000) square feet of floor area and has a street address of 144 West 23rd Street, North Kansas City, Missouri. The Building is depicted on Exhibit C to this Lease.

D.    The "Project" consists of the Building and the Land. Each reference in this Lease to the Project shall be deemed to refer to the "Project, including the Premises" unless a different construction is clearly intended.

Section 1.2    Term:

A.    Initial Term:    The initial term of this Lease (the "Initial Term") will be six (6) years and six (6) months, commencing upon the "Commencement Date" (as defined in Section 1.2.B) and expiring at 12:00 AM on the date which is six (6) years and six (6) months following the Commencement Date (the "Initial Term Expiration Date"), provided that if the Commencement Date is not the first day of a month, the Initial Term Expiration Date shall occur on the last day of the calendar month which is six (6) years and six (6) months following the Commencement Date.

B.    Commencement Date:    The "Commencement Date" shall be the later of (i) November 8, 2002, and (ii) the date on which Landlord delivers to Tenant possession of the Premises with "Landlord's Work" (as defined in Article 6 of this Lease) "Substantially Complete" (as defined in Article 6 of this Lease) and in accordance with the other requirements of this Lease. Notwithstanding the foregoing, if Landlord's Work is not Substantially Complete by November 8, 2002, due to "Tenant Delay" (as defined in Exhibit E to this Lease), then Landlord's Work shall be deemed to be Substantially Complete on the date on which Landlord's Work would have been Substantially Complete in the absence of the Tenant Delay.

6466\71\706254.7

C.    Delivery of Possession Date: November 8, 2002.

D.    Access Date: The date of this Lease.

E.    Option Term(s): Three (3) option terms of six (6) months each (the "Six Month Option Terms") and one (1) option term of three (3) years (the "Three Year Option Term").

F.    Option Term(s) Annual Rent: Annual Rent during each Six Month Option Term (if any) shall be Three and 70/100th Dollars ($3.70) per square foot per annum with annual increases on the first and each subsequent anniversary of the Initial Term Expiration Date of an amount equal to two percent (2%) of the Annual Rent payable in the immediately prior year. Annual Rent during the Three Year Option Term shall be Three and 25/100th Dollars ($3.25) per square foot of floor area within the Premises. In addition, Tenant shall pay "Tenant's Proportionate Share" (as defined in Section 1.7.B of this Lease) of Additional Rent. Tenant hereby acknowledges that during the Option Term(s) there will be no cap on Operating Expenses and Tenant shall pay the full Tenant's Proportionate Share of Operating Expenses and "Real Estate Taxes" (as defined in Section 9.3).

G.    Option Exercise Date: No later than ninety (90) days before the expiration of the Initial Term or the then-current Option Term.

H.    Permitted Cancellation Date: Upon the terms and conditions set forth in Section 3.4, Tenant shall have the right to cancel this Lease on the fourth anniversary and on the fifth anniversary of the Commencement Date (each, a "Permitted Cancellation Date"). If Tenant exercises this cancellation right, then upon the date the cancellation occurs (the "Cancellation Date") Tenant shall be required to reimburse Landlord for (i) the then-remaining unamortized principal balance of the cost of the "Tenant Improvements Allowance" (as defined in Exhibit E), (ii) the then-remaining unamortized leasing commissions and consultant's fees in the original amount of Two Hundred Thirty-Six Thousand Four Hundred Fifty-Four and 55/100ths Dollars ($236,454.55) (Assuming Roll-Up of Environmental Costs, as defined in Exhibit E-6, Two Hundred Forty-Nine Thousand Two Hundred Fifty-Two and 00/100th Dollars ($249,252.00) and (iii) a cancellation fee as set forth below (the "Cancellation Fee," and, together with the amounts payable under clauses (i) and (ii), the "Termination Fee"). For the purposes of determining the then-remaining unamortized principal balance of the cost of the Tenant Improvements Allowance, the Tenant Improvements Allowance shall be deemed to be amortized over a period of six and one-half (6-1/2) years with interest at the rate of ten percent (10%) per annum. Exhibit D to this Lease sets forth the Termination Fee (and each component of the Termination Fee) for each date upon which Tenant's cancellation right may be effective. Tenant shall also give to Landlord at least one (1) year's advance written notice of cancellation and shall pay the Termination Fee upon vacating the Premises. The notice dates and applicable Cancellation Fees for Tenant's cancellation right are as follows:

| CANCELLATION DATE | NOTICE DATE | CANCELLATION FEE | CANCELLATION FEE ASSUMING ROLL-UP OF ENVIRONMENTAL COSTS |
|---|---|---|---|
| On the Fourth Anniversary of the Commencement Date | On or before the Third Anniversary of the Commencement Date | $338,628.08 | $356,957.00 |
| On the Fifth Anniversary of the Commencement Date | On or before the Fourth Anniversary of the Commencement Date | $259,050.48 | $273,072.00 |

I.    Notice of Cancellation Date:  One (1) year prior to the Cancellation Date.

J.    Daily Delay Charge:  Five Hundred Dollars ($500.00) per business day.

Section 1.3    Annual Rent:

| PERIOD | ANNUAL RENT RATE | MONTHLY INSTALLMENTS | ANNUAL RENT RATE ASSUMING ROLL-UP OF SHARED ENVIRONMENTAL COSTS | |
|---|---|---|---|---|
| | | | ANNUAL | MONTHLY |
| From the 1st month of the Initial Term and continuing through the 12th month of the Initial Term | $312,840.00 | $26,070.00 | $329,772.00 | $27,481.00 |
| From the 13th month of the Initial Term and continuing through the 24th month of the Initial Term | $319,096.80 | $26,591.40 | $336,367.00 | $28,030.58 |
| From the 25th month of the Initial Term and continuing through the 36th month of the Initial Term | $325,478.74 | $27,123.23 | $343,096.00 | $28,591.33 |
| From the 37th month of the Initial Term and continuing through the 48th month of the Initial Term | $331,998.31 | $27,665.69 | $349,958.00 | $29,163.16 |
| From the 49th month of the Initial Term and continuing through the 60th month of the Initial Term | $338,628.08 | $28,219.01 | $356,957.00 | $29,746.41 |
| From the 61st month of the Initial Term and continuing through the 72nd month of the Initial Term | $345,400.64 | $28,783.39 | $364,096.00 | $30,341.33 |
| From the 73rd month of the Initial Term and continuing through the 78th month of the Initial Term | $352,308.66 | $29,359.06 | $371,378.00 | $30,948.17 |

Section 1.4    (a)    Broker(s):        EQUIS CORPORATION
                                        COLLIERS TURLEY MARTIN TUCKER

            (b)    Landlord's Consultant:  NELAND INVESTMENT MANAGEMENT, LLC

Section 1.5    Notice Addresses:  All notices to Landlord shall be addressed to:

            Cherokee North Kansas City, LLC
            5445 DTC Parkway, Suite 900
            Englewood, Colorado 80111

Attention: Guy Arnold

All notices to Tenant shall be addressed to:

Delphi Automotive Systems LLC
5825 Delphi Drive
Troy, Michigan  48098
Attention: Executive Director – Facilities Services Group

With a copy to:

Delphi Automotive Systems LLC
5725 Delphi Drive
Troy, Michigan  48098
Attention:  Assistant General Counsel – Commercial and Transactional

Section 1.6    Permitted Use:  Tenant shall have the right to use the Premises for a manufacturing, warehouse, engineering and office facility. Tenant shall conduct its business and control its agents, employees, invitees, contractors and visitors in such manner as not to create any nuisance, or unreasonably interfere with, annoy or disturb any other tenant or Landlord in its operation of the Building.

Section 1.7    Square Footage of the Building and Tenant's Proportionate Share:

A.    Landlord represents and warrants to Tenant that the Building contains approximately two hundred fifty-eight thousand (258,000) square feet of floor area.

B.    "Tenant's Proportionate Share" is 30.7 percent, which is the percentage obtained when the number of square feet of floor area in the Premises is divided by the number of square feet of floor area in the Building, and the resulting quotient is multiplied by one hundred percent (100%).

C.    Tenant shall have the right to confirm the floor area in the Premises and the Building, and, if different than stated in this Lease, Tenant's Annual Rent and Tenant's Proportionate Share shall be appropriately adjusted.

Section 1.8    Separate Metering of Utilities:

| UTILITY | SEPARATE METERING |
|---|---|
| Electric | Yes |
| Gas | No |
| Water | No |

Section 1.9    Current Zoning:  The Project is currently zoned M1-Industrial, which permits manufacturing, warehouse, engineering and office uses as conforming uses.

Section 1.10    Incorporation of Exhibits and Riders:  Each Exhibit and Rider (if any) which is referred to in this Lease is incorporated in and made a part of this Lease.  In the event of any conflict between the body of this Lease and the provisions of the Exhibits, the provisions in the Exhibits shall be deemed to control.  The Exhibits and Riders (if any) to this Lease are as follows:

| Exhibit | Description | Reference Sections |
|---------|-------------|--------------------|
| A | Depiction of the Premises and Land | 1.1.A |
| B | Description of the Land | 1.1.B |
| B-2 | Exclusive Parking Areas | Article 2 |
| C | The Building | 1.1.C |
| D | Termination Fee | 1.2.H |
| E | Landlord's Work | Article 6 |
| F | Tenant's Work | Article 7 |
| G | Environmental Condition | Article 18 |
| H | Recent Prior Uses of the Project | Article 18 |
| I | Mortgages/Encumbrances/Restrictions | Article 18 |
| J | Memorandum of Lease | 31.9 |
| K | Guaranty of Lease | Article 33 |
| L | Right of First Refusal Space | Article 34 |
| M | Expansion Premises | Article 35 |

## ARTICLE 2
## DEMISE OF PREMISES

Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises for the "Term" (as defined in Section 3.3).  In addition to the Premises, Tenant shall have (i) the exclusive right to use one hundred three (103) automobile parking spaces on the south side of the Building, twenty-five (25) automobile parking spaces on the north side of the Building, and six (6) trailer parking spaces on the south side of the Building as depicted on Exhibit B-2 to the Lease (the "Exclusive Parking Areas") and (ii) the non-exclusive right to use, in common with Landlord and any other tenants of the Building, the hallways, corridors, elevators, utility rooms and other common facilities within the Building, including those depicted on Exhibit C to this Lease, and the yards, parking areas, driveways, walkways and other common facilities serving the Project, including those depicted on Exhibit B-2 to this Lease (collectively, the "Common Areas").  Landlord shall not make any material changes in the Common Areas which unreasonably interfere with Tenant's use or enjoyment of the Premises, Exclusive Parking Areas or Common Areas.

## ARTICLE 3
## TERM

Section 3.1    Initial Term:  The Initial Term shall be for the period specified in Section 1.2.A.

Section 3.2    Option Terms:  Provided that Tenant is not in default hereunder beyond applicable notice and cure periods, Tenant shall have the option to extend the Term for any one or more of the Option Terms identified in Section 1.2.E, upon the same terms and conditions as apply to the Initial Term, provided that (i) Landlord shall not have any responsibility to construct any tenant improvements upon the extension of the Term and Tenant shall accept the Premises in their then "AS IS" condition except for Landlord's obligations for maintenance, repairs and replacements under Sections 11.1 and 19.1 and Articles 14 and 15, and Landlord's obligations under Section 20.3 and (ii) Annual Rent during the Option Terms shall be as set forth

in Section 1.2.F. If Tenant does not notify Landlord in writing of Tenant's election to extend the Term on or before the Option Exercise Date set forth in Section 1.2.G, then Tenant's right to further extend the Term shall expire unless Tenant notifies Landlord that Tenant is exercising its right to extend the Term within ten (10) days after Landlord notifies Tenant that Tenant did not exercise this right on or before the Option Exercise Date.

Section 3.3    Term: The "Term" shall consist of the Initial Term and any Option Terms for which Tenant exercises its extension rights.

Section 3.4    Cancellation Option:  Provided Tenant is not in monetary default beyond applicable notice and cure periods under this Lease, Landlord hereby grants to Tenant a right to terminate this Lease effective on each Permitted Cancellation Date on the following terms and conditions:

(a)    Landlord shall have received written notice of Tenant's election to terminate as set forth in Section 1.2.H.

(b)    Tenant shall pay to Landlord in certified funds or by wire transfer to an account designed by Landlord the Termination Fee.

(c)    Tenant shall surrender the Premises no later than midnight on the Cancellation Date in accordance with the terms of the Lease.

(d)    Provided Tenant has performed in accordance with this Section 3.4 and Landlord has received the Termination Fee as set forth above, this Lease shall automatically terminate as of 12:00 a.m. on the Cancellation Date and neither party shall have any further obligation or liability to the other except for (i) the obligation with respect to Operating Expenses and Real Estate Taxes for the period preceding the Cancellation Date, which shall survive termination and shall be paid in accordance with the terms of Section 31 of the Lease; (ii) any indemnification, waivers or releases by either party of the other for claims or liability accruing or arising prior to the Cancellation Date, including but not limited to the provisions of Article 22 of this Lease, which indemnification, waivers or releases shall survive termination; and (iii) any other provision which by its terms survives termination.

(e)    Time is of the essence hereof.

(f)    If Tenant has given proper and timely notice of its election to terminate but is in monetary default beyond applicable notice and cure periods on the Cancellation Date or has failed to pay the Termination Fee, Landlord at its option may without waiving any rights or remedies for such default elect to either (i) declare Tenant's exercise of the Cancellation Option to be postponed until Tenant cures the applicable default (in which case this Lease shall continue in full force and effect until such cure) or (ii) terminate this Lease pursuant to Article 16 and recover all damages (excluding consequential damages) arising from Tenant having defaulted hereunder.  Nothing herein shall be deemed to prohibit Landlord from recovering the Termination Fee, if due but not paid by Tenant, together with interest thereon.

# ARTICLE 4
## RENT

**Section 4.1**     Annual Rent.  Tenant hereby covenants that it shall pay to Landlord as partial consideration for Tenant's use and occupancy of the Premises the Annual Rent to Landlord in equal monthly installments in the amount set forth in Section 1.3.  The monthly installments of Annual Rent shall be due on the Commencement Date and on the first business day of each subsequent calendar month during the Term.  The monthly installments of Annual Rent for partial months at the inception or expiration of the Term shall be prorated.

**Section 4.2**     Additional Rent.  In addition to the Annual Rent for each calendar year (or portion thereof) during the term of this Lease, Tenant shall pay as additional rent (the "Additional Rent") Tenant's Proportionate Share of (i) the Operating Expenses for that calendar year, (ii) the Real Estate Taxes for that calendar year and (iii) other sums due by Tenant to Landlord under this Lease.

**Section 4.3**     Rent Payments.

     (a)     Tenant hereby covenants and agrees to pay the Annual Rent and Additional Rent and all other sums of money as shall become due from and payable by Tenant to Landlord under this Lease inclusive of the Exhibits hereto (collectively, "Rent") in lawful money of the United States at Landlord's address as provided herein (or to such other persons or at such other address(es) as may be designated by Landlord in writing from time to time).

     (b)     Tenant shall pay all Rent at the times and in the manner provided in this Lease, without demand, set-off or counterclaim except as permitted under this Lease.  Landlord and Tenant hereby acknowledge and agree that Tenant's covenants to pay Rent are separate and independent from Landlord's covenant to provide services and other amenities hereunder.

     (c)     In the event any regularly scheduled payment of Rent is not paid when due, then Landlord and Tenant agree that Landlord will incur additional administrative expenses, the amount of which will be difficult, if not impossible to determine.  Accordingly, in addition to the obligation to pay Rent, Tenant shall pay to Landlord a late charge for such late payment which continues for more than five (5) business days, in the additional amount of three percent (3%) of the amount of such late payment of Rent, provided that Landlord shall waive such late fee on the first occasion of any late payment during any year.

     (d)     All Rent shall bear interest from the date that the Rent is past due until paid at a rate (the "Default Rate") equal to the lesser of (i) a floating annual rate equal to four percent (4%) above the Prime Rate reported in the Money Rates column or section of the most recent issue of *The Wall Street Journal* ("Prime Rate"), automatically adjusting with each change in the Prime Rate, and (ii) the maximum non-usurious rate of interest permitted by the applicable laws of the jurisdiction in which the Building is located.

# ARTICLE 5
## POSSESSION OF PREMISES

**Section 5.1**     Delivery of Possession; Condition:  No later than the Delivery of Possession Date, Landlord shall deliver possession of the Premises to Tenant in a tenantable condition, free of any debris and equipment or other personal property of Landlord or any prior occupant, with all "Building Systems" (as defined in Section 11.1(c)) and other improvements in good working order and condition and with Landlord's Work Substantially Complete, provided that the date on which Landlord is obligated to deliver possession of the

Premises to Tenant may be postponed by the number of days of delay in delivery of possession which are solely attributable to "Tenant Delay" (as defined in Exhibit E) or "Force Majeure Events" (as defined in Section 32.7). If possession of the Premises in the condition required under this Lease is not delivered to Tenant within three (3) weeks of the date required under the preceding sentence, Landlord shall pay to Tenant as liquidated damages an amount equal to the product of (x) the Daily Delay Charge set forth in Section 1.2.J and (y) the actual number of days of delay between the date on which Landlord is obligated to deliver possession of the Premises to Tenant pursuant to the preceding sentence and the date on which Landlord delivers possession of the Premises to Tenant in the condition required under this Lease. If Landlord fails to deliver possession of the Premises to Tenant in the condition required under this Lease within three (3) months following the Delivery of Possession Date, Tenant shall have the right, in addition to all other remedies available under this Lease, at law or in equity, to terminate this Lease by notifying Landlord in writing before Landlord delivers possession of the Premises to Tenant in the condition required under this Lease.

Section 5.2    Tenant's Right of Entry:  Subject to all of the terms and conditions of this Lease except for the payment of Annual Rent and Additional Rent, Tenant shall have the right at any time after the Access Date set forth in Section 1.2.D to enter upon the Premises to review the performance of Landlord's Work, confirm measurements and field conditions and perform other activities which will not materially interfere with the performance of Landlord's Work.  Tenant shall not be obligated to pay any Annual Rent, Additional Rent or other charges to Landlord with respect to periods prior to the Commencement Date.

**ARTICLE 6**
**LANDLORD'S WORK**

Landlord shall Substantially Complete the work set forth in Exhibit E no later than the Delivery of Possession Date, provided that the date on which Landlord is obligated to Substantially Complete Landlord's Work may be postponed by the number of days of delay in the Substantial Completion of Landlord's Work which are directly attributable to Tenant Delay or Force Majeure Events. (The work referred to in this Article 6 and Exhibit E constitutes "Landlord's Work.")  Landlord shall perform Landlord's Work in a good and workmanlike manner, in accordance with all laws, ordinances, rules, regulations, orders, restrictions and other requirements of all governmental authorities that have jurisdiction over the Project (collectively, "Legal Requirements") and in accordance with the other requirements of this Lease.  In addition, Landlord shall cooperate with Tenant in scheduling Landlord's Work in a manner that permits Tenant to install Tenant's trade fixtures, equipment, machinery, furnishings and other personal property at such time as will not materially interfere with the performance of Landlord's Work.  The phrases "Substantially Complete" and "Substantial Completion" mean that (i) Landlord's Work has been completed to the extent necessary to permit Tenant to install, set-up and initially operate Tenant's equipment and machinery and perform Tenant's Work without material interference from the completion of Landlord's Work, and (ii) only items of Landlord's Work, the completion of which will not interfere with Tenant's ability to use the Premises for such purposes, remain to be completed.  The phrase "Fully Complete" means that (1) Landlord's Work has been completed to the extent necessary to permit Tenant to fully use and enjoy the Premises and (2) that, prior to December 8, 2002, Landlord and Tenant shall have performed a walk-through of the Premises, with the requested attendance of local building officials accompanying them, and that the building officials shall have issued all applicable governmental approvals or authorizations (the "Applicable Approvals"), as may be issued by such building officials, approving Landlord's Work and permitting the Premises to be used for its intended purposes, to the extent such Applicable Approvals may be available.  If Landlord's Work is not Fully Complete by December 8, 2002, and Tenant's use and enjoyment of the Premises is materially interfered with as a result of the incomplete items of Landlord's Work, then Rent shall abate for each day after December 8, 2002, until Landlord's Work is Fully Complete.

# ARTICLE 7
## TENANT IMPROVEMENTS

Section 7.1     Tenant's Right to Construct Improvements:  Tenant shall have the right to improve, alter, renovate and perform related work in the Premises by painting, decorating, redecorating, and installing partitions, floor coverings, wall coverings, drop ceilings, light fixtures, and by performing the work set forth in Exhibit F (the "Tenant's Work").  Landlord's consent shall be required for any structural alterations to the Premises or any major changes to any Building Systems (collectively, "Major Alterations").  Landlord shall not unreasonably withhold its consent to any Major Alterations which will not materially reduce the value of the Premises.  If (i) Landlord does not notify Tenant, within twenty (20) days after Landlord receives Tenant's request for Landlord's consent, of the specific reasonable grounds upon which Landlord objects to any Major Alterations for which Tenant requests Landlord's consent, (ii) Tenant delivers to Landlord an additional request for consent which is enclosed in an envelope which states, in bold and all capital letters, "RESPONSE REQUIRED IN 10 DAYS," and (iii) Landlord fails to respond to the second request as required hereunder within ten (10) business days after Landlord receives the second request, then Landlord shall be deemed to have consented to the Major Alterations set forth in Tenant's request for consent.  Tenant shall perform all alterations and improvements in a good and workmanlike manner and in accordance with all applicable Legal Requirements.  Unless otherwise agreed in writing by the parties, any improvements, alterations, and renovations to the Premises which are made by Tenant shall remain on the Premises upon the expiration or earlier termination of this Lease.

Section 7.2     Liens:  If, because of any act or omission of Tenant, its employees, agents, or contractors, any mechanics' lien or similar lien shall be filed against Landlord or any portion of the Project, Tenant shall cause the lien to be discharged of record or bonded within thirty (30) days after Tenant receives from Landlord notice of the filing of the lien.  Tenant shall also indemnify and hold harmless Landlord in accordance with Article 22 resulting from any such lien.

# ARTICLE 8
## UTILITIES

Tenant shall pay for all utility services consumed by Tenant upon the Premises.  Landlord shall cause all utility services to be separately metered to the Premises except for any utilities which Section 1.8 states are not separately metered for specific utilities.  To the extent that any utility services supplied to the Premises are not separately metered and are billed directly to Landlord, Tenant shall reimburse Landlord, within thirty (30) days after Landlord's delivery to Tenant of an invoice, for the portion of the cost of the applicable utility service which is attributable solely to Tenant's use.  The portion of the cost of the non-separately metered utility services which is attributable to Tenant's use shall equal the product of (x) a fraction, the numerator of which is the square footage of floor area in the Premises and the denominator of which is the entire square footage of floor area occupied by the users which share the applicable utility service and (y) the total cost for the applicable utility charged by the public utility provider, less any costs attributable to consumption of the applicable utility by any users whose consumption exceeds that of Tenant.  If Landlord and Tenant disagree regarding the portion of any non-separately metered utilities which are attributable to Tenant's use, then, at Tenant's election, Tenant's portion may be determined by sub-metering, by an evaluation of Tenant's consumption performed by a professional consultant that is reasonably acceptable to Landlord or by any other reasonable means selected by Tenant and approved by Landlord in its reasonable discretion.  Landlord and Tenant shall share equally in the cost of any determination of Tenant's portion of the cost of any utilities, unless the initial determination of Landlord or Tenant is determined to be accurate, in which case the costs shall be paid by the party whose initial determination is determined to be inaccurate.  Failure by Landlord to

furnish any utility, electricity, gas, water ("utilities") to any extent, or any cessation thereof, due to failure of any public utility or other provider to furnish service to the Building, or any other cause beyond the reasonable control of Landlord, shall not render Landlord liable in any respect for damages to Tenant, nor result in an abatement of Rent, nor relieve Tenant from fulfillment of any covenant or agreement hereof, except as otherwise set forth in this Lease. Notwithstanding the foregoing, if (i) as a result of the negligence, willful misconduct or breach of this Lease by Landlord or its agents, employees or contractors (or others for which Landlord is responsible), any utility service to the Premises is terminated or substantially reduced such that the Premises or any substantial portion of the Premises is rendered unusable for the conduct of the business operations which were conducted in such portion of the Premises prior to the interruption in utility service, (ii) the interruption in utility service continues for two (2) or more consecutive days and (iii) the Premises or a substantial portion of the Premises is in fact not actively used by Tenant for two (2) or more consecutive days, then Rent shall abate on a per diem basis (with a proportionate abatement in the case only a portion of the Premises is unusable) until the utility service is restored in a manner reasonably consistent with the level of such services provided prior to the event giving rise to the abatement. In no event shall there be any abatement if the interruption in utility service was caused by the negligence, willful misconduct or improper use of the Premises or utility systems by Tenant, its agents, employees, contractors, sublessees, assignees or licensees or, with respect only to any subleased portion of the Premises, if Tenant's sublessees are not entitled to rent abatement from Tenant. Tenant may terminate this Lease should any material interference with Tenant's use of the Premises or common areas occur as a result of utility interruptions which are attributable to Landlord or its agents, employees, contractors or others for which Landlord is responsible for more than thirty (30) consecutive days and Landlord is not diligently performing all work as is necessary to restore utility service.

## ARTICLE 9
## TAXES

Section 9.1    Landlord's Tax Obligations:  Landlord shall pay all Real Estate Taxes and assessments against the Project (or any portion of the Project) when they are due.

Section 9.2    Tenant's Tax Obligations:  Tenant shall pay all taxes and assessments against Tenant's trade fixtures, equipment, machinery and other personal property at the Premises, in addition to Tenant's Proportionate Share of all Real Estate Taxes.

Section 9.3    "Real Estate Taxes" means all general real estate taxes and, except as set forth below, special assessments imposed upon the Project, whether paid directly by Landlord or through an escrow arrangement with a mortgagee, and whether they be by taxing districts or authorities presently taxing or assessing the Project or by others subsequently created or otherwise. Real Estate Taxes shall not include (i) any special assessments which have been imposed (or are proposed or threatened) against the Project on the date of this Lease or which are imposed after the date of this Lease with the consent of Landlord; (ii) any bond financing or similar government sponsored financing for capital improvements or other improvements; (iii) any water or sewer tap-in or connection charges; (iv) any impact, development or similar fees payable to governmental authorities; (v) any increase in real estate taxes which occurs as a result of the sale or transfer of any interest in the Project or in Landlord; and (vi) any increase in real estate taxes which occurs as a result of any new improvements to the Project (other than as contemplated as a part of Landlord's Work). If at any time during the term of this Lease, the present method of taxation or assessment shall be changed so that the whole or any part of the taxes or assessments now levied, assessed or imposed on real estate and the improvements thereof shall be discontinued and as a substitute therefor, or in lieu of an addition thereto, taxes, assessments, levies, impositions or charges shall be levied, assessed and/or imposed wholly or partially as a capital levy or otherwise on the gross rents received from the Project or the gross rents reserved in this Lease or any part thereof, then such substitute or additional taxes, assessments, levies,

impositions or charges, to the extent so levied, assessed or imposed, shall be deemed to be included within Real Estate Taxes to the extent that such substitute or additional tax would be payable if the Project were the only property of Landlord subject to such tax.

Section 9.4    Payment of Tenant's Proportionate Share of Real Estate Taxes:    (a) Tenant shall reimburse Landlord for Tenant's Proportionate Share of all Real Estate Taxes which are attributable to the Term (as determined in accordance with customary practices in the State in which the Project is located) as Additional Rent in monthly installments. At least thirty (30) days before each calendar year, Landlord shall submit to Tenant a reasonable estimate of the Real Estate Taxes for the following calendar year (the "Tax Estimate"). During each month of the calendar year to which the Tax Estimate applies, concurrent with Tenant's payment of monthly installments of Annual Rent (but in no event earlier than thirty (30) days after Tenant receives the Tax Estimate), Tenant shall pay to Landlord one-twelfth (1/12th) of Tenant's Proportionate Share of the estimated Real Estate Taxes for such calendar year. Landlord hereby represents and warrants to Tenant that Real Estate Taxes for the calendar year 2001 were Forty-Eight Thousand Three Hundred Forty-Nine and 74/100$^{ths}$ Dollars ($48,349.74).

(b)    If the total of Tenant's monthly payments of estimated Real Estate Taxes during a calendar year exceeds Tenant's Proportionate Share of the Real Estate Taxes for that year, then, at Landlord's option, either Landlord shall refund such excess to Tenant in full within thirty (30) days after the "Tax Statement" (as defined in Section 9.5) is delivered to Tenant or Tenant may offset the excess against Annual Rent and other charges due from Tenant to Landlord under this Lease, provided that any unapplied or unrefunded excess shall be paid to Tenant promptly upon expiration or sooner termination of this Lease. If the total of Tenant's monthly payments of Tenant's Proportionate Share of estimated Real Estate Taxes is less than Tenant's Proportionate Share of the actual Real Estate Taxes for any year, then Tenant shall pay the difference to Landlord within thirty (30) days after Tenant receives the Tax Statement. This thirty (30) day period shall not commence until Tenant receives a complete Tax Statement.

Section 9.5    Statement of Taxes:    A statement of Real Estate Taxes (the "Tax Statement") with respect to payments made by Tenant during each calendar year during the Term shall be delivered to Tenant by Landlord within sixty (60) days after each calendar year during the Term. Each Tax Statement shall set forth the Real Estate Taxes which are attributable to the calendar year covered by the Tax Statement and set forth the amount due from Tenant and the manner in which it has been calculated. Landlord shall include a copy of the applicable tax bills with each Tax Statement. Landlord shall certify that each Tax Statement is complete and accurate, and that all Real Estate Taxes set forth in the Tax Statement have been paid.

Section 9.6    Proration:    Tenant's obligation for paying Tenant's Proportionate Share of Real Estate Taxes for the calendar years in which the Term of this Lease commences and expires or is terminated shall be prorated on a daily basis and shall be adjusted based on the actual Real Estate Taxes for such calendar year as set forth in the final Tax Statement.

Section 9.7    Refunds.    If Landlord obtains a reduction or refund of any Taxes for which Tenant has paid Tenant's Proportionate Share, then Landlord shall refund Tenant's Proportionate Share of such reduction or refund to Tenant after deducting Tenant's Proportionate Share of the out-of-pocket expenses Landlord incurred in connection with obtaining such reduction or refund, within sixty (60) days after Landlord receives the reduction or refund. Any refund or reduction shall be deemed to include any interest which may have accrued on the refund or reduction.

## ARTICLE 10
## TENANT'S PROPERTY

Tenant shall have the right to install, use, replace, substitute, and remove its trade fixtures, equipment, machinery, furnishings and personal property, including telephone and other communication and information systems equipment and lines, machinery, conveyor systems, modular docks, dock levelers, task lights, office furniture, and rooftop antennae. Subject to normal wear and tear, Tenant shall repair all damage to the Premises which is caused by Tenant's removal of Tenant's property (unless this Lease has been terminated as a result of casualty or condemnation), provided that floor anchors may be left in place, ground flush with floor surface (by Tenant, at Tenant's sole cost and expense), if the remaining holes are patched. Landlord waives any statutory, common law or judicial lien on any of Tenant's property.

## ARTICLE 11
## MAINTENANCE AND REPAIRS BY LANDLORD

Section 11.1    General Requirements:  Landlord shall maintain, repair, and replace:

(a)    the roof and roof membranes, skylights and roof vents, exterior walls, structural components of floors, foundations, structural supports, windows, drains, downspouts, and structural components of the Building;

(b)    the exterior improvements on the Land, including the parking areas, driveways, curbs, sidewalks and other hard-surfaced areas, and landscaping which are a part of or otherwise serve any part of the Project; and

(c)    all mechanical, electrical, plumbing, utility, lighting and other systems which do not exclusively serve the Premises, including the heating, gas, water supply, sanitary and storm sewer, storm water drainage, septic and sprinkler systems, and the electrical and other utility supply lines (collectively, the "Building Systems").

Landlord's obligations under this Section 11.1 exclude all items expressly set forth in Article 12 as Tenant's responsibility, any "Tenant Improvements" (as defined in Exhibit E) and any repairs which are required due to Tenant's use of the Premises or Building Systems other than for ordinary manufacturing or industrial purposes.

Landlord warrants that the heating, mechanical and electrical systems (and all components of such systems) serving the Premises shall be in good operating order, condition and repair on the Commencement Date and during the following one (1) year period. Notwithstanding anything to the contrary contained in this Lease, Landlord's obligations under the preceding sentence shall be performed at Landlord's sole cost and expense.

Section 11.2    Standard of Maintenance:  Landlord shall perform its maintenance, repair and replacement obligations in accordance with all Legal Requirements and in a manner which assures that the portions of the Project which are Landlord's responsibility remain in a good and fully functional condition at all times during the Term. In the event the Landlord fails to make any repairs or replacements which it is required to make hereunder within a reasonable time specified in a written notice by Tenant, then in that event the Tenant may make such repairs or replacements and deduct the reasonable cost and expense thereof, plus a charge of fifteen percent (15%), from the rent reserved hereunder or require that Landlord pay such amount to Tenant. Tenant shall deliver to Landlord any back-up documentation Landlord reasonably requires to establish the cost of repairs performed by Tenant pursuant to this Section 11.2. If by reason of emergency, repairs or replacements become necessary which by the terms hereof are the responsibility of Landlord, Tenant may

make such repairs or replacements which in the reasonable opinion of Tenant are necessary for the preservation of the Premises or of Tenant's property, and Landlord shall at the option of Tenant either reimburse Tenant or Tenant may deduct the cost and expense thereof from the rent reserved hereunder. Provided, however, that in such event Tenant agrees to make reasonable effort to inform Landlord before proceeding with such repairs or replacements.

Section 11.3    Common Areas:  Landlord shall maintain the Common Areas and any parking areas, driveways, sidewalks and landscaped areas which are included within or exclusively serve the Premises in a neat and clean condition, free and clear of any debris, snow, ice or water. Landlord shall cause all Common Areas to be well lighted and otherwise operated in a manner which is consistent with a first-class industrial development.

## ARTICLE 12
## MAINTENANCE AND REPAIRS BY TENANT

During the Term, Tenant shall at its sole cost and expense maintain those portions of the Premises, which are not Landlord's responsibility under Article 11, in good condition and repair, subject to ordinary wear and tear. Tenant shall not commit or allow to be committed by Tenant's agents or employees any waste or damage to any portion of the Premises or the Building. If Tenant fails to make required repairs or replacements to the Premises which are Tenant's responsibility within a reasonable period of time following written notice from Landlord, Landlord may, at its option, make such repairs or replacements and Tenant shall repay the reasonable cost thereof, plus a charge of fifteen percent (15%), to Landlord within thirty (30) days of Landlord's demand and Tenant's receipt of any back-up documentation reasonably requested by Tenant. Unless Landlord fails to commence the required repairs within thirty (30) days after receipt of written notice (or such shorter period as may be appropriate in an emergency), or Landlord fails to thereafter diligently pursue completion of the required repairs, Tenant shall not undertake the repair or replacement of any damage or injury to the structural components of the Building or the Building Systems caused by Tenant, its agents, contractors, employees, invitees or visitors, but shall reimburse Landlord for all costs and expenses incurred in effecting any such repair or replacement, plus a charge of fifteen percent (15%). Unless otherwise set forth in this Lease, Landlord shall not be required to make any improvements or repairs of any kind or character to the Premises during the term of this Lease. Landlord shall assign to Tenant or enforce for the benefit of Tenant all warranties Landlord has which cover any components of the Premises which Tenant is responsible for maintaining, if any.

## ARTICLE 13
## INSURANCE

Section 13.1    Tenant's Obligations:  During the Term, Tenant shall maintain Comprehensive General Liability Insurance, including Blanket Contractual Liability coverage, with limits of at least Five Million Dollars ($5,000,000) Combined Single Limit for Personal Injury and Property Damage; Comprehensive Automobile Liability Insurance covering all owned, non-owned and hired vehicles with limits of not less than One Million Dollars ($1,000,000) Combined Single Limit for Personal Injury and Property Damage; Statutory Workers Compensation and Employers Liability. Tenant shall deliver to Landlord certificates evidencing the required insurance. The required insurance policies shall provide for no cancellation or material alteration without thirty (30) days prior written notice to Landlord.

Section 13.2    Landlord's Obligations:  During the Term, Landlord shall maintain All Risk Property Insurance for the Project upon a full replacement cost basis, with no co-insurance requirement; Comprehensive General Liability Insurance, including Blanket Contractual Liability coverage, with limits of

at least Two Million Dollars ($2,000,000) Combined Single Limit for Personal Injury and Property Damage; Comprehensive Automobile Liability Insurance covering all owned, non-owned and hired vehicles with limits of not less than One Million Dollars ($1,000,000) Combined Single Limit for Personal Injury and Property Damage; and Statutory Workers Compensation and Employers Liability. Upon Tenant's request, Landlord shall deliver to Tenant certificates evidencing the required insurance. The required insurance policies shall provide for no cancellation or material alteration without thirty (30) days prior written notice to Tenant. During the Term, Landlord shall also require each of the other tenants of the Project to obtain and maintain Comprehensive General Liability Insurance, including Blanket Contractual Liability coverage, with limits of not less than One Million Dollars ($1,000,000) Combined Single Limit for Personal Injury and Property Damage.

Section 13.3    Waiver of Subrogation: Anything in this Lease to the contrary notwithstanding, Landlord and Tenant each, on behalf of themselves and their respective heirs, successors, legal representatives, assigns and insurers, hereby (i) waives any and all rights of recovery, claims, actions or causes of action against the other and their respective officers, directors, partners, shareholders, agents, servants and employees for any property loss or damage that may occur to the Premises or other portion of the Project, or any improvements thereto, or any personal property of such party therein, by reason of fire, the elements, or any other cause which is required to be insured against under the terms of the insurance policies referred to in this Article regardless of cause or origin, including negligence of the other party hereto or its respective officers, directors, partners, shareholders, agents, servants, employees, guests, licensees or invitees, and (ii) covenants that no insurer under any property insurance maintained by Landlord or Tenant shall hold any right of subrogation against such other party.  If the respective insurer of Landlord and Tenant does not permit such a waiver without an appropriate endorsement to such party's insurance policy, then Landlord and Tenant each shall notify its insurer of the waiver set forth herein and to secure from such insurer an appropriate endorsement to its respective insurance policy with respect to such waiver.

## ARTICLE 14
## CASUALTY

Section 14.1    Repair and Restoration:  If the Premises, or any portion of the Project which serves the Premises, is damaged or destroyed and Tenant does not terminate this Lease pursuant to Section 14.2, Landlord shall promptly repair the damage or destruction and restore the Premises and remainder of the Project to substantially the condition that existed immediately before the damage or destruction.  If Tenant occupies any portion of the Premises during the repair and restoration, Landlord shall repair and restore the Premises and remainder of the Project in a manner which does not materially interfere with Tenant's use of the Premises.  Tenant's obligation to pay Annual Rent and other amounts payable by Tenant under this Lease shall abate from the date of the damage or destruction until the completion of all repairs and restoration, in proportion to the extent that the use and occupancy of the Premises by Tenant is materially interfered with, as determined by Landlord and Tenant, in good faith.

Section 14.2    Tenant's Rights of Termination:  Tenant may terminate this Lease if:

(a)    more than sixty percent (60%) of the Premises is damaged or destroyed;

(b)    the conduct of Tenant's business is materially interfered with as a result of any damage or destruction to the Premises or any other portion of the Project, and Landlord and Tenant reasonably anticipate that repair and restoration will not be completed within one hundred eighty (180) days after the damage or destruction;

(c)    if any repair or restoration of the Premises or any portion of the Project which serves the Premises is not actually completed to the extent necessary to permit Tenant to conduct its business operations without material interference within one hundred eighty (180) days after the damage or destruction; or

(d)    a significant casualty which materially affects Tenant's ability to conduct business operations at the Premises occurs during the last six (6) months of the Term.

Any notice of termination pursuant to this Section 14.2 must be given by Tenant to Landlord in writing within ninety (90) days after Tenant's right to terminate becomes effective. Upon delivery of any notice of termination pursuant to this Section 14.2, this Lease shall terminate as of the date of the damage or destruction unless otherwise provided in the notice, and Tenant shall be relieved of any liabilities or obligations except for those that specifically survive termination.

**ARTICLE 15**
**EMINENT DOMAIN**

Section 15.1    Repair and Restoration:  Landlord shall notify Tenant within ten (10) business days after Landlord becomes aware that any portion of the Project will be taken or is threatened to be taken under the power of eminent domain or will be conveyed or is proposed to be conveyed in lieu of a taking (each, a "Taking").  If Tenant does not terminate this Lease pursuant to Section 15.2, Landlord shall promptly restore the remaining portion of the Project to as near the condition as existed before the taking as is practicable.  If Tenant occupies any portion of the Premises during the repair and restoration, Landlord shall repair and restore the Premises and remainder of the Project in a manner which does not materially interfere with Tenant's use of the Premises.  Tenant's obligation to pay Annual Rent and other amounts payable by Tenant under this Lease shall abate from the date on which possession of any portion of the Project is taken by the public or quasi-public body in proportion to the extent that the use and occupancy of the Premises by Tenant is materially interfered with, as determined by Tenant in good faith.

Section 15.2    Tenant's Rights of Termination:  Tenant may terminate this Lease if:

(a)    any portion of the Premises is the subject of a Taking and such Taking materially interferes with Tenant's use of or business operations in the Premises; or

(b)    any portion of the Project is the subject of a Taking and such Taking materially interferes with Tenant's use of or access to the Premises.

Any notice of termination pursuant to this Section 15.2 must be given within sixty (60) days after the date on which Tenant receives notice of the Taking in sufficient detail to permit Tenant to assess the impact of the Taking.  If Tenant delivers a notice of termination pursuant to this Section 15.2, this Lease shall terminate on the date on which possession is given to the Taking authority or its designee unless otherwise provided in the notice from Tenant, and Tenant shall be relieved of any liabilities or obligations except for those that specifically survive termination.

Section 15.3    Automatic Termination:  If the entire Premises is the subject of a Taking, this Lease shall automatically terminate on the date the Taking authority or its designee receives possession of the Premises.

Section 15.4    Condemnation Award:  Landlord reserves all rights to damages and awards paid because of any Taking of the Premises or the Project.  Tenant assigns to Landlord any right Tenant may have to the damages or award.  Further, Tenant shall not make claims against Landlord or the condemning

authority for damages. Notwithstanding the above, Tenant may pursue a separate claim against the condemning authority for (i) the then-unamortized portion of the cost of any improvements made to the Premises at Tenant's expense, (ii) depreciation to, and cost of removal of, Tenant's stock and trade fixtures, (iii) moving expenses, (iv) loss of business and (v) any other award if such other award would not reduce the award payable to Landlord.

## ARTICLE 16
## DEFAULT; REMEDIES

Section 16.1    Tenant's Default:    The occurrence of any one or more of the following events shall constitute an "Event of Default" under this Lease:

(a)    Tenant shall fail to pay any sum of Rent when due, and such failure shall continue for five (5) business days after Tenant receives notice that the unpaid amount is past due;

(b)    Tenant shall fail to execute and acknowledge or otherwise respond in good faith and in writing within thirty (30) days after submission to Tenant of a request for confirmation of the subordination of this Lease pursuant to Section 26, confirmation of the subordination of a mortgage or deed of trust lien to this Lease pursuant to Section 26 or an estoppel certificate pursuant to Section 26;

(c)    if Tenant fails to perform any other obligation under this Lease within thirty (30) days after Tenant receives notice describing the failure, provided that if Tenant is unable to complete the cure within thirty (30) days due to events beyond the reasonable control of Tenant, the thirty (30) day period will be extended for an additional reasonable period if Tenant commences diligent efforts to cure within thirty (30) days after Tenant receives notice from Landlord and continues to exercise diligent efforts to cure the breach;

(d)    The interest of Tenant under this Lease shall be levied on under execution or other legal process; any petition shall be filed by or against Tenant to declare Tenant a bankrupt or to delay, reduce or modify Tenant's debts or obligations, or to reorganize or modify Tenant's capital structure; Tenant is declared insolvent according to law; any general assignment of Tenant's property shall be made for the benefit of creditors; or a receiver or trustee is appointed for Tenant or its property and such levy, execution, legal process, petition, declaration, assignment or appointment is not removed, vacated or stayed within ninety (90) days from the date of its creation, service or filing;

(e)    Tenant, if a corporation, shall cease to exist as a corporation in good standing in the state of its incorporation, or Tenant, if a partnership or other entity, shall be dissolved or otherwise liquidated, except in connection with, or following, an assignment in accordance with Section 23 of this Lease; or

(f)    Tenant shall breach the provisions of Section 23 of this Lease and such failure is not cured within ten (10) business days following Tenant's receipt of written notice from Landlord.

Section 16.2    Landlord's Remedies:    During the continuance of any Event of Default, at Landlord's option, Landlord may (without further notice or grace) exercise any one or more of the following remedies, in addition to all other rights and remedies provided at law or in equity:

(a)    Terminate this Lease and immediately repossess the Premises by forcible entry and detainer suit or otherwise in accordance with legal process, and be entitled to recover forthwith as damages a sum of money equal to the total of (i) the cost of recovering the Premises (including reasonable legal fees

and costs of suit), (ii) the unpaid Rent earned at the time of termination, plus interest thereon at the Default Rate, (iii) the balance of the Rent for the remainder of the term of this Lease, less the fair market rental value of the Premises for said period, taking into account the period of time during which the Premises is likely to remain vacant until a new tenant commences payment of rental and the reasonably anticipated out-of-pocket expenses to be incurred by Landlord to relet the Premises (such as the cost of preparation of the Premises, leasing commissions and reasonable legal fees associated with occupancy by a new tenant), and (iv) any other sum of money and damages owed by Tenant to Landlord under the terms of this Lease. The provisions of this paragraph shall survive the expiration or termination of this Lease. For the purpose of calculating Landlord's damages under clause (iii) of this paragraph, Tenant covenants and agrees that:

        (i)    it shall be assumed that the Additional Rent for the calendar year in which this Lease is terminated would be equal to the Additional Rent for the last full calendar year prior to termination, increased at a rate equal to the average rate of increase (if any) of Operating Expenses for the three (3) full calendar years preceding the calendar year of termination (the "Escalation Rate"), and that the Additional Rent for each year thereafter for the remainder of the term would be equal to the Additional Rent for the preceding calendar year (calculated in the same manner as for the year of termination), increased at the Escalation Rate; and

        (ii)    Landlord may rely upon the average of the determinations of the fair market rental value of the Premises for the remainder of the term of this Lease made independently and in writing by three (3) reputable real estate brokers active in the leasing of space comparable to the Premises in Kansas City, MO office market and selected by Landlord in good faith, and Tenant shall have the right to dispute the value so calculated.

        (b)    Terminate Tenant's right of possession (but not this Lease) and immediately repossess the Premises by forcible entry and detainer suit or otherwise, in accordance with applicable law, without thereby releasing Tenant from any liability hereunder and without terminating this Lease, and shall be entitled to recover forthwith as damages a sum of money equal to the total of (i) the cost of recovering the Premises (including reasonable legal fees and costs of suit), (ii) the unpaid Rent earned at the time of termination, plus interest thereon at the Default Rate, and (iii) any other sum of money and damages then owed by Tenant to Landlord under the terms of this Lease. In addition, Tenant shall remain liable for the payment of all Rent as same become due under the terms of this Lease. After regaining possession of the Premises under this Section 16.2(b), Landlord shall use commercially reasonable efforts to relet the Premises on such terms and conditions as Landlord in its sole, good faith judgment deems acceptable, and if the Premises are so relet, Tenant shall receive credit against the sums otherwise payable to Landlord hereunder only for the amount of the "Net Reletting Income" (as defined below). For the purpose of such reletting Landlord shall be authorized but not obligated to decorate or to make any repairs, changes, alterations or additions in or to Premises as may be reasonably necessary or desirable. Landlord reserves the right, to be exercised in good faith and in a commercially reasonable manner, however (x) to lease any other space available in the Building prior to offering the Premises for lease, (y) to refuse to lease the Premises to any potential tenant that does not meet Landlord's standards and criteria for leasing other comparable space in the Building (including, without limitation, rental rates), and (z) to reconfigure the Premises and lease only portions thereof or lease all or part of the Premises in combination with other space. Any payments due Landlord under this Section 16.2(b) shall be made upon demand therefor from time to time, and Tenant agrees that Landlord may file suit to recover any sums falling due under the terms of this Section 16.2(b) from time to time. No delivery to or recovery by Landlord of any portion due Landlord hereunder shall be any defense in any action to recover any amount not theretofore paid or reduced to judgment in favor of Landlord, nor shall any reletting be construed as an election on the part of Landlord to terminate this Lease unless a written notice of such intention be given to Tenant by Landlord. Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect to terminate this Lease as a result of the breach of this Lease that gave rise to such reletting. As used above, the term "Net Reletting Income"

means the amount of all rentals actually received by Landlord in respect of a reletting of the Premises during the term of this Lease, less all of the costs and expenses incurred by Landlord in good faith in connection with such reletting, including, without limitation, leasing commissions, demolition of existing improvements and installation of new improvements and/or the allowances provided therefor, and legal fees.

        (c)     If this Lease or Tenant's right of possession of the Premises is terminated, Landlord shall have no obligation to provide Tenant a key to re-enter the Premises, but Landlord will, during Landlord's regular business hours, at Landlord's convenience and upon written request by Tenant, escort Tenant or its authorized personnel to the Premises to retrieve personal belongings of Tenant's employees and any property of Tenant.

        (d)     If Landlord terminates this Lease or Tenant's right to possession (without terminating the Lease), Landlord shall use objectively reasonable efforts to mitigate Landlord's damages by re-letting the Premises following Tenant's vacancy thereof, but in doing so, Tenant agrees that Landlord shall not be required to (i) give preference to re-letting the Premises prior to leasing other space that Landlord has available, i.e., any prospective tenant's space requirements will dictate Landlord's leasing activities, (ii) expend any sums to so re-let or (iii) re-let at rental rates less than fair market value. Except for a breach of Landlord's obligations under the preceding sentence, Landlord shall not be liable for, nor shall Tenant's obligations hereunder be diminished because of, Landlord's failure to relet the Premises or collect any rentals due in respect of such reletting. In any proceedings to enforce this Lease, Landlord shall be rebuttably presumed to have used commercially reasonable efforts to relet the Premises or otherwise mitigate Landlord's damages, and Tenant shall bear the burden of proof to establish otherwise.

        (e)     If Tenant shall fail to pay any sum of money, other than monthly installments of Annual Rent and Additional Rent, required to be paid by it hereunder or shall fail to cure any default within any applicable cure, grace or notice period contained herein, then Landlord may, but shall in no event be obligated to, make any such payment or perform any such act on Tenant's account, and such cure by Landlord shall not be deemed a waiver by Landlord of any of its other remedies or a release of Tenant from any obligations hereunder. All sums so paid by Landlord in good faith and all costs incurred by Landlord in good faith in taking such action shall be deemed Rent hereunder and shall be paid to Landlord within thirty (30) days of demand and Tenant's receipt of any back-up information reasonably requested by Tenant, and Landlord shall have (in addition to all other rights and remedies of Landlord) the same rights and remedies in the event of the non-payment thereof by Tenant as in the case of default by Tenant in the payment of Rent hereunder.

        (f)     Failure of Landlord to declare any default immediately upon occurrence thereof, or delay in taking any action in connection therewith, shall not waive such default, but Landlord shall have the right to declare any uncured default at any time and take such action as might be lawful or authorized hereunder, either in law or in equity. No payment by Tenant or receipt by Landlord of a lesser amount than a full installment of Rent due under this Lease shall be deemed to be other than on account of the earliest Rent due, nor shall any endorsement or statement on any check or payment or any documentation accompanying any check or payment as rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Rent or pursue any other remedy provided in this Lease, at law, or in equity.

Section 16.3    Landlord Default and Tenant's Remedies: If Landlord fails to perform any obligation under this Lease within thirty (30) days after Landlord receives written notice from Tenant (provided that (i) if Landlord is unable to complete the cure within thirty (30) days due to events beyond the control of Landlord, then the thirty (30) day period will be extended for an additional reasonable period if Landlord commences diligent efforts to cure within thirty (30) days after Landlord receives written notice from Tenant and continues to exercise diligent efforts to cure the breach and (ii) notice from Tenant shall not be

Pg 20 of 37

required in an emergency); then Tenant (in addition to all other rights and remedies to which Tenant may be entitled under this Lease or at law or in equity) may perform the obligation of Landlord, at Landlord's sole cost and expense. Landlord shall reimburse Tenant for the costs incurred by Tenant for performing Landlord's obligations within thirty (30) days after Tenant delivers to Landlord an invoice evidencing the costs incurred by Tenant, or Tenant may offset the costs and expenses against any Annual Rent or other amounts payable by Tenant under this Lease.

## ARTICLE 17
## INTENTIONALLY DELETED

## ARTICLE 18
## REPRESENTATIONS, WARRANTIES AND COVENANTS

Landlord represents, warrants and covenants to Tenant as follows:

(a)    the Project (including the Premises) complies with all Legal Requirements.

(b)    the Project does not contain any "Hazardous Materials" (as defined in Section 20.1(a)), except as disclosed on Exhibit G;

(c)    the Project does not contain any underground or aboveground fuel storage tanks or related piping, venting, or dispensing systems (collectively, "Fuel Tanks") except for those which are the property of other tenants of the Building;

(d)    the past uses of the Project during Landlord's ownership of the Project, and to the knowledge of Guy Arnold, Landlord's Vice President, with respect to periods prior to Landlord's ownership, are as disclosed in Exhibit H-2 and there has not been any storage, treatment, recycling, or disposal of waste on the Project, except for storage of trash in containers in compliance with applicable federal, state, and local laws, ordinances, and other governmental requirements;

(e)    Landlord is the fee simple owner of the Premises with full authority to execute, deliver, and perform this Lease;

(f)    no mortgage or deed of trust or other lien or restriction encumbers the Premises, except as set forth in Exhibit I, and the encumbrances set forth on Exhibit I will not interfere with Tenant's use of the Premises for industrial or warehouse purposes or increase any of Tenant's obligations under this Lease;

(g)    the Premises are currently zoned as set forth in Section 1.9;

(h)    there is no action pending or, to the best of Landlord's actual knowledge, threatened by any government agency claiming that the Premises violates any Legal Requirements or to restrict the use of the Premises;

(i)    there is no pending or threatened Taking with respect to the Project;

(j)    there are no actions, suits, petitions, notices or proceedings pending, given or, to the best of Landlord's actual knowledge, threatened by any person or government agency before any court, government agency or instrumentality, administrative or otherwise, which if given, commenced, or

concluded could have a material adverse effect upon the Project or the conduct of business at the Premises by Tenant;

(k)    there are no pending or threatened assessments, special or otherwise, on or with respect to the Project imposed by any taxing authority; and

(l)    no third party has any right, title, or interest adverse to Tenant's right, title, and interest in or to the Premises, except as set forth in Exhibit I.

Tenant represents and warrants as follows: If Tenant is a corporation, partnership or other entity, Tenant warrants and represents that (i) Tenant is a duly organized and existing legal entity in the State of Delaware, and is authorized to do business in and in good standing with the jurisdiction where the Building is located, (ii) Tenant has full right and authority to execute, deliver and perform this Lease and all consents or approvals required of its managers, members, board of directors or partners for the execution, delivery and performance of this Lease have been obtained, (iii) the person executing this Lease on behalf of Tenant is authorized to do so and (iv) upon request by Landlord, such person shall deliver to Landlord satisfactory evidence of his/her authority to so execute this Lease on behalf of Tenant.

## ARTICLE 19
## COMPLIANCE WITH LEGAL REQUIREMENTS

Section 19.1    Compliance by Landlord:    Notwithstanding any other provision of this Lease, if any improvements, alterations, or renovations to any portion of the Project is required by any Legal Requirement, then Landlord shall promptly perform the required improvements, alterations, or renovations, provided that Landlord shall not be responsible for any alterations or improvements to the Premises that are required under Legal Requirements (i) solely as a result of the use and occupancy of the Premises by Tenant for the conduct of its particular business operations (as opposed to industrial or warehouse use in general) or (ii) solely as a result of any alterations or improvements Tenant makes to the Premises.

Section 19.2    Compliance by Tenant:    Tenant shall comply with all Legal Requirements that apply to Tenant's particular business operations at the Premises or to any alterations or improvements Tenant makes to the Premises.    To the extent Landlord or any mortgagee of the Premises is not materially and adversely affected, no alleged violation by Tenant of any Legal Requirement shall be deemed to constitute a Tenant Default if Tenant contests, in good faith, the validity of the applicable Legal Requirement, or the existence of the alleged violation.    If required by any law, ordinance, or requirement in effect at the time, Landlord shall join in any proceedings initiated by Tenant pursuant to this Section 19.2 or permit the same to be brought in its name, as applicable, provided that Tenant shall pay all costs and expenses in connection therewith, including reasonable costs and expenses incurred by Landlord.

## ARTICLE 20
## ENVIRONMENTAL MATTERS

Section 20.1    Hazardous Materials and Environmental Laws:    The defined terms set forth in the Lease are hereby incorporated by this reference.    As used herein, the following terms shall have the following meanings:

(a)    Hazardous Materials.    (i) Any substance included within the definitions of hazardous substances," "hazardous waste," "hazardous materials", "toxic substances," "pollutant," "contaminant" "hazardous chemicals", or "solid waste" in an Environmental Law (defined below);

(ii) petroleum, including crude oil or any fraction thereof, (iii) polychlorinated biphenyls (PCB's); (iv) asbestos and asbestos containing materials (whether friable or non-friable) lead-based paint, and radon; and (v) urea formaldehyde.

(b)    Environmental Laws. Environmental Laws mean any federal, state or local law, rule, regulation, ordinance, approval and any judicial or administrative interpretations thereof relative to the environment, public health, occupational health and safety or to any Hazardous Material, and shall include, but not be limited to, any one or more of the following statutes, any amendments thereto and any regulations promulgated thereunder, and any other applicable federal, state and local laws concerning pollution, protection of the environment or the use, storage, discharge or disposal of materials including but not limited to the: Comprehensive Environmental Response Compensation and Liability Act of 1980 (CERCLA), as amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA), 42 U.S.C. 9601 *et seq.*; Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 (RCRA), 42 U.S.C. 6901 *et seq.*; Federal Water Pollution Control Act, 33 U.S.C. 1251 *et seq.*; Toxic Substances Control Act, 15 U.S.C. 2601 *et seq.*; Clean Air Act, 42 U.S.C 7501 *et seq.*

Section 20.2    Tenant Responsibility for Hazardous Materials: Tenant will indemnify, defend and hold harmless Landlord from and against any and all claims, damages, fines, judgments, penalties, costs, expenses, liabilities or losses relating to (a) any release of a Hazardous Material at the Project by Tenant or its agents, employees, representatives, contractors, suppliers, customers, subtenants, concessionaires, licensees or invitees at any time Tenant occupied the Premises and (b) any violation at the Project by Tenant or its representatives, contractors, suppliers, customers, subtenants, concessionaires, licensees or invitees of any Environmental Law including, without limitation, a decrease in value of the Premises or the Project, damages caused by loss or restriction of rentable or usable space, settlement of claims, reasonable attorneys' fees, consultant fees, and expert fees incurred by or asserted against Landlord arising as a result thereof whether during or after the term of this Lease. This indemnification includes, without limitation, any and all costs incurred because of any investigation or remediation related to (a) and (b) above that are (1) conducted by or on behalf of any federal, state, or local agency or political subdivision or (2) otherwise undertaken by Landlord as a result of any release of Hazardous Materials by Tenant or its agents, employees, representatives, contractors, suppliers, customers, subtenants, concessionaires, licensees or invitees during the Term. Without limitation of the foregoing, if a release of Hazardous Material on or from the Project occurs as a result of the acts of Tenant or its agents, employees, representatives, contractors, suppliers, customers, subtenants, concessionaires, licensees or invitees, Tenant will promptly take all actions required by law, simultaneously notify Landlord, and provide Landlord copies of all communications to authorities and of all nonprivileged information relevant to the release, its investigation and its remediation. All investigative and remedial actions directly attributable to the release of Hazardous Materials by Tenant, its agents, employees, representatives, contractors, suppliers, customers, subtenants, concessionaires, licensees or invitees at the Project during the Term will be at Tenant's sole cost. Tenant may take immediate response actions to limit and/or clean-up spills occurring during the Term. Tenant has the right to conduct a baseline environmental investigation when entering possession and upon the expiration or sooner termination of the Term and to conduct periodic worker health and safety testing. Tenant and Landlord agree to allow the other to split any environmental samples taken at the Premises.

Section 20.3    Landlord's Responsibility for Hazardous Materials: Landlord shall indemnify, defend and hold harmless Tenant from and against any and all claims, damages, fines, judgments, penalties, costs, expenses, liabilities or losses relating to (a) any pre-existing environmental condition of the Project, (b) any pre-existing violations of Environmental Laws at or affecting the Project and (c) any release of a Hazardous Material by Landlord, its agents, employees, representatives, contractors, suppliers, customers, tenants, concessionaires, licensees or invitees, including, without limitation, damages caused by loss or

restriction of use of any portion of the Premises, settlement of claims, reasonable attorneys' fees, consultants' fees, and expert fees.

Section 20.4    Responsibility for Lead.    Prior to the Commencement Date, Landlord shall clean the Premises for lead dust and residue, beginning at the upper areas and proceeding down to the floor space, to lower surface lead levels. This cleaning shall also include the air filtration and circulation system. Landlord shall be responsible for undertaking all activity with regard to lead set forth in the Scope of Work for Lead attached as Exhibit E-6. Landlord shall also be responsible for, and shall pay all costs associated with (apart from air monitoring as set forth below), any necessary investigation and remediation of lead in the event of: a) an OSHA citation related to airborne lead levels or other order requiring investigation or remediation from local, state or federal environmental authority, or b) air monitoring results exceeding 75% of the OSHA standard of 30 micrograms per cubic meter averaged over an 8-hour period, as set forth in 29 CFR sec. 1910.1025(b) definition of "Action Level." After Tenant takes possession, Tenant shall be responsible for, and shall pay all costs associated with, air monitoring of the Premises. If required by law, Tenant shall establish and pay the cost for any lead exposure testing, including, but not limited to, any such testing for any worker, agent, or contractor on the Premises, and shall be responsible for, and shall pay any and all costs associated with, any exposure to lead on the Premises, including all liability resulting therefrom.

## ARTICLE 21
## LANDLORD'S RIGHT OF ENTRY

Following reasonable notice to Tenant, Landlord may enter upon the Premises with Tenant's representatives (it being understood and agreed that Landlord shall not have keys to the Premises) at reasonable times to perform maintenance and repairs, inspect the Premises, offer the Premises for lease during the period which commences nine (9) months before the expiration of the Term or offer the Project for sale. In case of an emergency, Landlord may enter without notice. Landlord shall not unreasonably or materially interfere with the use of the Premises by Tenant when Landlord exercises its rights under this Article 21. Landlord acknowledges that Tenant may conduct operations in all or a portion of the Premises which are of a highly confidential and sensitive nature. Accordingly, Landlord agrees that Tenant shall have the right to impose conditions upon any entry and related activities of Landlord as Tenant determines to be necessary or appropriate to maintain the confidentiality of Tenant's activities, including requiring that the representatives of Landlord, and its agents, employees and contractors, be accompanied at all times by representatives of Tenant, and establishing particular secured areas into which Landlord and its agents, employees and contractors shall have no right of entry until the activities and operations being conducted in such secured areas can be moved to another area or screened from view, except in case of an emergency.

## ARTICLE 22
## INDEMNIFICATION

(a)    To the maximum extent permitted by law, except for the breach of this Lease by Landlord or the negligence or willful misconduct of "Landlord's Indemnitees" (as defined below), Landlord's Indemnitees shall not be liable for, and Tenant waives all claims for, loss or damage to Tenant's business or injury or damage to person or property sustained by Tenant, or any person claiming by, through or under Tenant, resulting from: (i) any equipment or appurtenances being or becoming out of repair; (ii) wind or weather; (iii) any defect in or failure to operate any sprinkler, HVAC equipment, wiring, fiberoptic or other cabling, gas, water or steam pipe, stair, railing or walk; (iv) interference, interruption, failure or other fault with respect to any utilities or communications, (v) broken glass; (vi) the backing up of any sewer pipe or

downspout; (vii) the escape of gas, steam or water; (viii) water, snow or ice being upon or about the Building or coming into the Premises; (ix) the falling of any fixture, plaster, tile, stucco or other material; or (x) any act, omission or negligence of other tenants, licensees or any other Persons including occupants of the Building, occupants of adjoining or contiguous buildings, owners of adjacent or contiguous property, or the public.

(b)    Tenant shall indemnify, defend and hold Landlord and its lessors, shareholders, members, trustees, agents, employees, property manager and mortgagee(s) (collectively, "Landlord's Indemnitees") harmless from and against all liabilities, obligations, damages, judgments, penalties, claims, costs, charges and expenses, including reasonable architects' and reasonable attorneys' fees, which may be imposed upon, incurred by, or asserted against any of Landlord's Indemnitees to the extent arising, directly or indirectly, out of or in connection with (i) Tenant's breach of its obligations under this Lease, (ii) the negligence of Tenant, its agents, contractors, and employees, (iii) the negligence of Tenant's invitees while within the Premises, (iv) acts or occurrences that take place within the Premises, and (v) any violations of laws, rules and regulations applicable to the Premises, including, without limitation, the provisions of the Americans with Disabilities Act, which result from Tenant's Work. If any action or proceeding is brought against any of Landlord's Indemnitees by reason of any of the foregoing, Tenant shall reimburse Landlord for the reasonable cost of defending such action or proceeding or, upon Landlord's request and at Tenant's sole cost and expense, defend such action and proceeding by counsel reasonably approved by Landlord. If Landlord elects to defend itself at Tenant's cost as provided in the previous sentence, Tenant shall have the right to approve any settlement or compromise which would cause Tenant to incur any liability, such approval not to be unreasonably withheld or delayed. In furtherance of the foregoing, but not in limitation thereof, Tenant shall not be obligated to indemnify Landlord's Indemnitees against liabilities, obligations, losses, damages, judgments, penalties, claims, costs, charges or expenses arising out of (i) a claim for which Tenant is expressly released from liability under this Lease and any Exhibit hereto including this Section or (ii) Landlord's and/or Landlord's Indemnitees' negligence or wrongful misconduct.

(c)    Landlord shall indemnify, defend and hold Tenant and its shareholders, members, trustees, agents and employees (collectively, "Tenant's Indemnitees") harmless from and against all liabilities, obligations, damages, judgments, penalties, claims, charges and expenses, including reasonable architects' and reasonable attorneys' fees, which may be imposed upon, incurred by, or asserted against any of Tenant's Indemnitees arising, directly or indirectly, out of or in connection with (i) Landlord's breach of its obligations under this Lease and (ii) the willful misconduct or negligence of Landlord, its agents, contractors, and employees . If any action or proceeding is brought against any of Tenant's Indemnitees by reason of any of the foregoing, Landlord shall reimburse Tenant for the reasonable cost of defending such action or proceeding or, upon Tenant's request and at Landlord's sole cost and expense, defend such action and proceeding by counsel reasonably approved by Tenant. If Tenant elects to defend itself at Landlord's cost as provided in the previous sentence, Landlord shall have the right to approve any settlement or compromise which would cause Landlord to incur any liability, such approval not to be unreasonably withheld or delayed. In furtherance of the foregoing, but not in limitation thereof, Landlord shall not be obligated to indemnify Tenant's Indemnitees against loss, liability, damage, cost or expense arising out of (i) a claim for which Landlord is expressly released from liability under this Lease and any Exhibit hereto including this Section or (ii) Tenant's and/or Tenant's Indemnitees' negligence or wrongful misconduct.

## ARTICLE 23
## TRANSFERS

Section 23.1    Landlord's Consent to Assignment: Except as provided in Section 23.2, Tenant shall not assign or sublet the entire Premises or permit the entire Premises to be used or occupied by unrelated third

parties, or mortgage or otherwise encumber its leasehold estate under this Lease without obtaining Landlord's prior written consent, which consent shall not be unreasonably withheld or delayed and shall be deemed to have been granted if (i) Landlord does not notify Tenant of Landlord's specific reasonable basis for any denial of consent within twenty (20) days after Landlord receives Tenant's request for the consent, (ii) Tenant delivers to Landlord an additional request for consent which is enclosed in an envelope which states, in bold and all capital letters, "RESPONSE REQUIRED IN 10 DAYS," and (iii) Landlord fails to respond to the second request as required hereunder within ten (10) business days after Landlord receives the second request, then Landlord shall be deemed to have consented to the assignment or subletting which is described in Tenant's request for consent. It shall not be deemed unreasonable for Landlord to deny its consent to an assignment or sublease if (i) the assignee or sublessee intends to use the Premises for a purpose other than the Permitted Use or (ii) the assignee or sublessee does not have a net worth which is adequate to fulfill its obligations under the proposed sublease or assignment. Tenant will cause any proposed sublessee or assignee for which Landlord's consent is required hereunder to provide Landlord with written financial statements prepared by a licensed accountant or other evidence of financial ability which is reasonably acceptable to Landlord.

Section 23.2    Permitted Assignments:  Tenant shall have the right, without the consent of Landlord, to assign this Lease to any affiliate of Tenant, which shall mean an entity which controls, is controlled or is in common control with Tenant or in which Tenant has a direct or indirect equity interest, or to any entity which acquires the business that is conducted at the Premises.

Section 23.3    No Release of Tenant:  No assignment of this Lease or subletting of all or any portion of the Premises shall relieve Tenant of any of Tenant's obligations under this Lease.

Section 23.4    Notice of Transfer by Landlord:  If Landlord transfers, assigns, or otherwise conveys all or any portion of its interest in and to the Project, Landlord shall notify Tenant of the name and address of the transferee at least ten (10) days prior to the date of the transfer.  Tenant shall have no obligation to any transferee until Tenant receives notice from Landlord which identifies the transferee and evidence that the transferee has assumed Landlord's obligations arising under this Lease.

### ARTICLE 24
### HOLDING OVER

If Tenant continues in occupancy of the Premises after expiration or termination of this Lease without the written consent of Landlord, Tenant shall pay as Rent for the holdover period one hundred fifty percent (150%) of the Annual Rent payable immediately prior to the expiration or termination, plus one hundred percent (100%) of the Additional Rent (in each case pro rated on a daily basis). No holding over by Tenant after the term of this Lease without the written consent of Landlord shall be construed to extend the term hereof. Any holding over without the prior written consent of Landlord shall constitute such holdover a tenancy at sufferance relationship between Landlord and Tenant unless Landlord has specifically stated in writing in such consent that a tenancy at will is intended. The provisions of this paragraph shall survive the expiration or termination of this Lease.

### ARTICLE 25
### QUIET ENJOYMENT

Landlord covenants that Tenant shall have the peaceful and quiet possession and enjoyment of the Premises during the Term without hindrance by Landlord or any other party.

## ARTICLE 26
### SUBORDINATION AND ATTORNMENT; ESTOPPEL CERTIFICATES

Section 26.1    Subordination:

(a)    Tenant covenants and agrees with Landlord that this Lease is subject and subordinate to any mortgage, deed of trust, ground lease and/or security agreement which may now or hereafter encumber the Project or any interest of Landlord therein, and to any advances made on the security thereof and to any and all increases, renewals, modifications, consolidations, replacements and extensions thereof, provided that any such subordination shall be conditioned upon Tenant's receipt of a non-disturbance agreement which is reasonably acceptable to Tenant and the mortgagee, deed of trust beneficiary, ground lessor or security interest holder (any such party being herein referred to as "Interest Holder"). In confirmation of such subordination, however, at Landlord's written request, Tenant shall execute any appropriate certificate or instrument that Landlord may reasonably request within thirty (30) days after being requested by Landlord to do so. In the event of the enforcement by the Interest Holder under any such ground lease, mortgage, deed of trust or security agreement (such documents being referred to herein as "Mortgage Documents") of the remedies provided for by law or by such Mortgage Documents, Tenant, upon the Interest Holder succeeding to the interest of Landlord as a result of such enforcement, will attorn to and automatically become the tenant of such Interest Holder or successor in interest without any change in the terms or other provisions of this Lease; provided, however, that such Interest Holder or successor in interest shall not be bound by (i) any payment of Rent for more than one month in advance except prepayments in the nature of security for the performance by Tenant of its obligations under this Lease, or (ii) any amendment or modification of this Lease made after the commencement of the enforcement by Interest Holder and made without the written consent of such Interest Holder or such successor in interest. Upon request by such Interest Holder or successor in interest, whether before or after the enforcement of its remedies, Tenant shall execute and deliver an instrument or instruments confirming and evidencing the attornment herein set forth.

(b)    Landlord agrees to obtain from any subsequent Interest Holder a non-disturbance agreement with Tenant, in a form reasonably satisfactory to Tenant and the Interest Holder stating that Tenant's right to the continued use and possession of the Premises shall be under the same terms and conditions as set forth in this Lease provided that at such time no Event of Default shall have occurred and be continuing.

(c)    Notwithstanding anything to the contrary set forth in Section 26(a) above, but subject to any non-disturbance agreement which has been executed by the Interest Holder and Tenant, any Interest Holder may at any time subordinate its lien to this Lease in whole or in part, without any need to obtain Tenant's consent, and without regard to their respective dates of execution, delivery or recordation. In confirmation of such subordination, however, Tenant shall execute any appropriate certificate or instrument that Landlord or the Interest Holder may request within ten (10) days after being requested to do so.

Section 26.2    Estoppel Certificates: Each party agrees to execute estoppel certificates (within 30 days of receipt thereof) containing the substance of the following statements (together with other reasonable terms), modified as may be necessary to reflect the then-current state of facts: (i) that the copy of the Lease attached to the certificate is true and complete and there are no amendments, modifications, or alterations of the Lease, except as stated; (ii) the date on which Tenant accepted possession of the Premises; (iii) that Tenant now occupies the Premises; (iv) the date on which Tenant began paying monthly installments of Annual Rent under the Lease; (v) that no installment of Annual Rent has been paid more than one month in advance; (vi) that the Lease is in full force and effect; and (vii) to the actual knowledge of the certifying party, there are no defenses or offsets to enforcement of the Lease by the other party, and the other party is not in default under the Lease.

## ARTICLE 27
## SURRENDER OF PREMISES

Upon the expiration of the Term, Tenant shall deliver up and surrender the Premises to Landlord in good condition (provided that in no event shall Tenant be obligated to deliver the Premises to Landlord in a better condition than exists on the date of this Lease) and broom clean, subject to (a) Tenant's permitted improvements, alterations, and renovations to the Premises, including Tenant's Work; (b) normal wear and tear (provided that floor anchors may be left in place, ground flush with floor surface, if the remaining holes are patched); (c) damage by fire, explosion, or other insurable casualty; and (d) repairs and restoration for which Tenant is not responsible under this Lease.

## ARTICLE 28
## BROKERS

Landlord and Tenant each warrant and represent that it has not dealt with any real estate broker, finder, or agent in connection with this Lease other than the brokers and consultant identified in Section 1.4, whose commissions shall be paid by Landlord.

## ARTICLE 29
## NOTICES

No notice, approval, consent or other communication authorized or required by this Lease shall be effective unless it is in writing and sent postage prepaid by United States registered or certified mail, return receipt requested, or by recognized overnight delivery service, and addressed to the other party at the addresses set forth in Section 1.5, or such other address as the addressee may designate by notice given from time to time in accordance with this Article 29. Notices shall be effective upon receipt or refusal or failure to accept receipt.

## ARTICLE 30
## SIGNS

Tenant shall have the non-exclusive right erect and display signs on the Premises and on such other areas of the Project as Landlord approves in Landlord's reasonable discretion. Tenant's signage shall comply with all Legal Requirements. Landlord agrees that Tenant shall be permitted to place signage at each entrance to the Premises and at the gate to the Project.

## ARTICLE 31
## TENANT'S PROPORTIONATE SHARE OF OPERATING EXPENSES

Section 31.1     Definition of "Operating Expenses": Subject to the exclusions set forth below, "Operating Expenses" means all reasonable expenses, assessments, costs and disbursements of every kind and nature, computed on an accrual basis, incurred by Landlord in connection with the operation, maintenance and repair of the Project, including the following:

(i)      all supplies, tools, equipment and materials used in the operation and maintenance of the Project;

(ii)     the cost of water, sewer, gas and electricity (excluding costs of electricity for individual occupants within the Project);

(iii)    cost of all maintenance and service agreements for the Project and the equipment therein, including but not limited to security service, snow and ice removal, and landscaping maintenance;

(v)      cost of repairs and general maintenance for the Project (excluding repairs and general maintenance costs that are paid by proceeds of insurance or would be payable under an All-Risk Property Insurance policy in the amount of one hundred percent (100%) of the replacement cost of the Project or by Tenant or other third parties);

(vi)     amortization over the useful life of the applicable item (to the extent expressly permitted under clause (s) below and the last sentence of this Section 31.1) of the cost of installation of capital investment items that are hereafter installed for the purpose of reducing Operating Expenses, or which may be required by any Legal Requirements hereafter enacted;

(vii)    the cost of all insurance relating to the Project which is required under this Lease; and

(viii)   all other costs or expenses incurred by Landlord for the operation, maintenance and repair of the Project.

The following expenses shall be excluded from Operating Expenses: (a) expenses for replacements, repairs or other work occasioned by fire, windstorm, or other insurable casualty, or by the act or omission of other tenants in the building or necessitated by eminent domain; (b) wages, salaries, or other compensation paid to any employee above the grade of building manager; (c) any expense for which Landlord receives or is entitled to receive reimbursement from a tenant or another third party, including but not limited to indemnity, a warranty or an insurance policy; (d) penalties or interest for late payment; (e) costs of any environmental remediation, cleanup, removal, or disposal costs, including such costs for Hazardous Materials incurred as a result of Landlord's breach of any representation or warranties contained in this Lease; (f) any expense which under generally accepted accounting principles would be considered a capital expenditure (excluding amortization to the extent permitted under clause (s) below and the last sentence of this Section 31.1); (g) earthquake, coastal windstorm or flood insurance; (h) deductibles under insurance policies or self-insurance costs; (i) charges payable by Tenant under other provisions of this Lease or Exhibits; (j) the cost of leasing equipment or other items which if purchased would constitute a capital expense; (k) markup or profit above the rate for electricity, water, and gas charged to Landlord by the utility company providing service to the Project; (l) costs resulting from the negligence of Landlord, its agents, employees, contractors or representatives or due to Landlord's breach of this Lease; (m) accounting or auditing fees; (n) expenses incurred in leasing space in the Building (including, but not limited to, fees, commissions, advertising and promotion, salaries and expenses of the leasing staff, tenant allowances and/or tenant inducement costs, and legal fees and expenses respecting leasing activities), or expenses in preparing space for tenant occupancy or for painting or decorating any occupant's space or any vacant space; (o) legal expenses incurred in enforcing the terms of any lease and any costs and expenses arising out of Landlord's breach of any lease; (p) any depreciation or amortization on the Project (except as expressly permitted under clause (s) below); (q) legal, accounting or other professional fees for preparation of Landlord's business documents and tax returns; (r) costs of compliance with Legal Requirements which have been imposed prior to the date of this Lease and costs of repairs to components of the Project which are not in good order and condition on the date of this Lease; (s)

expenses which are capital in nature in accordance with generally accepted accounting principals except to the extent incurred (X) as a result of new Legal Requirements which are imposed after the date of this Lease or (Y) in order to achieve a saving in Operating Expenses (in which event the capital expense may be included in Operating Expenses in each calendar year only to the extent of the savings achieved in each calendar year); (t) costs of services which are provided to other occupants of the Project but not to Tenant or, to the extent any such services are not customarily provided to industrial tenants, if Tenant does not request such services; (u) maintenance, repairs and replacements which pertain to the roof or structural elements of the Building; and (v) costs arising in connection with any breach of Landlord's warranty that all heating, mechanical and electrical systems (and components thereof) shall be in good operating order, condition and repair on the Commencement Date and shall remain in good order and condition for one (1) year following the Commencement Date.

In determining Tenant's Proportionate Share of the cost of any repairs or replacements which constitute capital expenses in accordance with generally accepted accounting principals and are permitted to be included in Operating Expenses, (i) the cost of the repair or replacement shall be amortized over the useful life of the repair or replacement and (ii) only the annual amount necessary to amortize the cost of the repair or replacement over its useful life shall be charged to Tenant during each year.

Section 31.2    Reimbursement of Tenant's Proportionate Share of Operating Expenses:    Tenant shall reimburse Landlord for Tenant's Proportionate Share of all Operating Expenses incurred by Landlord, as Additional Rent. Tenant's obligation for payment of Tenant's Proportionate Share of Operating Expenses will not exceed $0.15 per square foot of floor area per year during the Initial Term; provided, however, snow removal service and all utilities consumed in the Premises (electrical, gas and water) shall be billed separately to Tenant under Article 8 and shall not be included in the $0.15 per square foot per year cap.

Section 31.3    Method of Payment:

(a)    At least thirty (30) days before each calendar year during the Term, Landlord shall submit to Tenant a reasonable estimate of the Operating Expenses for the following calendar year, broken down by category (the "Estimate"). During each month of the calendar year to which the Estimate applies, concurrent with Tenant's payment of monthly installments of Annual Rent (but in no event earlier than thirty (30) days after Tenant receives the Estimate), Tenant shall pay to Landlord one-twelfth (1/12th) of the estimated Operating Expenses for such calendar year.

(b)    If the total of Tenant's monthly payments during a calendar year exceeds Tenant's Proportionate Share of the actual Operating Expenses for that year, then, at Landlord's option, Landlord shall refund such excess to Tenant in full within thirty (30) days after the "Expense Statement" (as defined in Section 31.4) is delivered to Tenant or Tenant may offset the excess against Annual Rent and other charges due from Tenant to Landlord under this Lease, provided that any unapplied or unrefunded excess shall be paid to Tenant promptly upon expiration or sooner termination of this Lease. If the total of Tenant's monthly payments of Tenant's Proportionate Share of estimated Operating Expenses is less than Tenant's Proportionate Share of the actual Operating Expenses for any year, then Tenant shall pay the difference to Landlord within thirty (30) days after Tenant receives the Expense Statement. This thirty (30) day period shall not commence until Tenant receives a complete Expense Statement.

Section 31.4    Statement of Expenses:    A statement of Expenses (the "Expense Statement") shall be delivered to Tenant by Landlord within ninety (90) days after each calendar year during the Term. Each Expense Statement shall itemize the Operating Expenses which are attributable to the calendar year covered by the Expense Statement and set forth the amount due from Tenant and the manner in which it has been calculated. Landlord shall certify that each Expense Statement is complete and accurate, and that all Operating Expenses set forth in the Expense Statement have been paid.

Section 31.5    Right to Audit:  Upon Tenant's request and during business hours, Tenant, either using its own personnel or a consultant or licensed accountant which does not charge a contingency fee, shall have the right to examine and audit Landlord's books and records covering the Operating Expenses listed in the Expense Statement and covering Real Estate Taxes.  Tenant shall not exercise this right more than one (1) time during any calendar year.  If Tenant's audit determines that the Operating Expenses vary from the amounts set forth in the Expense Statement by more than two percent (2%), Landlord shall reimburse Tenant for the reasonable cost of the audit.  Within twenty (20) days following Tenant's request, Landlord shall supply Tenant with copies of back-up documentation, bills and invoices detailing particular Operating Expenses.

Section 31.7    Proration:  Operating Expenses for the calendar years in which the Term of this Lease commences and expires or is terminated shall be prorated on a daily basis and shall be adjusted based on the actual Operating Expenses for such calendar year.

## ARTICLE 32
## MISCELLANEOUS

Section 32.1    Entire Agreement; Amendments:  This Lease contains the entire agreement between the parties.  No promise, representation, warranty, covenant, agreement, or understanding that is not specifically set forth in this Lease shall be binding upon or inure to the benefit of either party.  This Lease may not be amended, altered, modified, or supplemented in any manner except by an instrument in writing duly executed by the party against which enforcement is sought.

Section 32.2    Governing Law:  This Lease shall be construed and enforced in accordance with the laws of the state in which the Project is located.

Section 32.3    Landlord's Liability:

    (a)    If Landlord sells or conveys the Premises after Landlord's Work is Substantially Complete, all liabilities and obligations on the part of Landlord that accrue under this Lease after the sale or conveyance shall terminate, and all such liabilities and obligations shall be binding upon the new owner; provided such new owner assumes in writing all of Landlord's obligations under this Lease.

    (b)    If Landlord fails to perform any covenant, term or condition of this Lease upon Landlord's part to be performed after Landlord's Work is Substantially Complete, and Tenant recovers a money judgment against Landlord, the judgment shall be satisfied only against the right, title and interest of Landlord in the Project and out of rents or other income from the Project receivable by Landlord or out of the consideration received by Landlord from the sale or other disposition of all or any part of Landlord's right, title and interest in the Project, and neither Landlord nor any of the members or partners of Landlord shall be personally liable for any deficiency.

Section 32.4    Authority:  If Landlord or Tenant is a corporation, trust, or general or limited partnership, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on behalf of such entity.

Section 32.5    Binding Effect:  The provisions of this Lease shall be binding upon and shall inure to the benefit of the parties and their respective heirs, executors, administrators, personal and legal representatives, successors, and assigns.

Section 32.6    Approval/Consent:   Whenever Landlord's approval is required under this Lease, such approval shall not be unreasonably withheld (except as expressly permitted under this Lease) or delayed. If Tenant requests Landlord's approval or consent and Landlord fails to respond in writing within seven (7) business days following delivery of Tenant's written request, then Tenant's request shall be deemed approved.

Section 32.7    Force Majeure:   In the event that Landlord or Tenant are delayed, hindered in or prevented from the performance of any act required hereunder by reason of strikes, lock-outs, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, the act, failure to act or default of the other party, war or other reason beyond their control (collectively, "Force Majeure Events"), then performance of such act shall be excused for the period of the delay attributable to the Force Majeure Event and the period for the performance of any such act shall be extended for a period equivalent to the period of delay attributable to the Force Majeure Event.   Force Majeure Events shall not (a) delay Tenant's obligations to pay Annual Rent and other charges under this Lease or (b) extend the dates on which Tenant may exercise its rights under Section 5.1.

Section 32.8    No Waiver:   The failure of Landlord or Tenant to insist upon strict performance of any of the terms, conditions, covenants, and obligations contained in this Lease shall not waive any rights or remedies for any subsequent breach or default in the terms, conditions, covenants, and obligations contained in this Lease, provided that Landlord shall not assert against Tenant any claims arising under this Lease unless Landlord notifies Tenant of the claim within sixty (60) days after Landlord becomes aware of the facts or circumstances which give rise to the claim and, in any event, within six (6) months following the expiration of the Term or earlier termination of this Lease.

Section 32.9    Recording:   If Landlord or Tenant requests, the parties shall execute and acknowledge a short form of lease in the form attached as Exhibit J for recording purposes, which short form of lease shall be recorded at the expense of the party requesting the same, which party shall pay any documentary transfer tax or other special tax or assessment associated with or triggered by such recording.

Section 32.10    Rules of Construction:

   (a) Section headings in this Lease are intended for convenience and reference purposes only and shall not be used to construe or interpret this Lease.

   (b) When the word "including" is used in this Lease, it means "including, but not limited to" unless it is clearly intended to mean "including only."

   (c) Whenever this Lease states that Landlord or Tenant shall perform any act, the act shall be performed at the sole cost and expense of the party which is obligated to perform, unless this Lease expressly provides to the contrary.

   (d) The fact that this Lease has been prepared by the attorney for either Landlord or Tenant shall not be used to construe or interpret this Lease for or against either party; the parties intend that the provisions of this Lease shall be given their fair meaning and no court shall construe this Lease more stringently against one party than against the other.

Section 32.11    Severability:   If any provision of this Lease shall be determined by any court to be invalid, illegal, or unenforceable to any extent, then the remainder of this Lease shall not be affected, and this Lease shall be construed as if the invalid, illegal, or unenforceable provision had never been contained in this Lease.

Section 32.12    Transmittal:  Submission of this Lease for examination, even though executed by Landlord or Tenant, shall not bind the other party in any manner, and no lease or other obligation on the part of either party shall arise until this Lease has been executed by Landlord and Tenant and fully executed copies of this Lease have been delivered to Landlord and Tenant.

Section 32.13    Counterparts:  This Lease may be executed in two (2) or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument; provided that the parties shall immediately, following such counterpart execution, circulate not less than two (2) original execution copies, which originals, upon execution by both parties, shall be substituted for and serve as the final original executed form of Lease.  Delivery by facsimile of this Lease or an executed counterpart hereof shall be deemed a good and valid execution and delivery hereof.

**ARTICLE 33**
**GUARANTY OF LEASE**

As an inducement to Landlord to execute this Lease and as a condition to such execution by Landlord, Delphi Corporation ("Guarantor") shall execute and deliver to Landlord a guarantee of the payment and performance of all liabilities, obligations and duties imposed upon Tenant by the terms of this Lease in the form of Exhibit K attached hereto and made a part hereof for all purposes.

**ARTICLE 34**
**RIGHT OF FIRST REFUSAL**

Landlord hereby grants to Tenant a right of first refusal ("Right of First Refusal") to lease approximately forty-two thousand eight hundred thirty-one (42,831) square feet of space in the Premises, as shown on Exhibit L attached hereto (the "Right of First Refusal Space"), subject to and in accordance with the following provisions:

(a)    Prior to Landlord executing any lease for the Right of First Refusal Space, Landlord shall deliver to Tenant a written notice identifying a proposed lease or letter of intent which Landlord is willing to accept, subject to this Right of First Refusal.  In addition, upon Tenant's request, Landlord shall notify Tenant whether the Right of First Refusal Space is available for leasing.  Any notice from Landlord pursuant to either of the preceding two (2) sentences shall constitute an "Offer Notice."  The Offer Notice shall set forth the date that a proposed lease with a third party is to commence or, if the Offer Notice is given in response to a request by Tenant and is not based upon a proposed lease or a letter of intent with a third party, the date on which Landlord would be willing to allow Tenant to commence leasing the Right of First Refusal Space.  The date the proposed lease with a third party would commence or, if the Offer Notice is given in response to a request by Tenant and is not based upon a proposed lease or a letter of intent with a third party, the date on which Landlord would be willing to allow Tenant to commence leasing of the Right of First Refusal Space shall constitute the "Refusal Space Commencement Date."  In no event shall the Refusal Space Commencement Date be less than thirty (30) or more than ninety (90) days following the date of the Offer Notice.  Tenant agrees to use reasonable efforts, consistent with Tenant's customary practices to keep its own information confidential, to keep confidential the information contained in any letter of intent between Landlord and a third party, provided that Tenant may reveal such information to Tenant's brokers and other advisors.

(b)    Tenant shall have six (6) business days from receipt of the Offer Notice to either accept or reject the Offer Notice.  If Tenant rejects the Offer Notice or if Landlord has not received the written acceptance or rejection of the Offer Notice from Tenant by 5:00 p.m. on the sixth (6th) business

day as set forth herein, time being of the essence, then (except as hereinafter set forth) Landlord shall have no further obligation or liability to Tenant pertaining to the Right of First Refusal Space and Landlord may enter into a lease with the tenant identified in the Offer Notice, provided that if Landlord does not enter into a lease of the Right of First Refusal Space with the prospective tenant identified in the Offer Notice within six (6) months of the Offer Notice and Landlord is not actively negotiating with the same prospective tenant in accordance with the Offer Notice, Tenant's Right of First Refusal shall be reinstated.

(c)    If the Offer Notice is accepted by Tenant in accordance herewith, this Lease shall be amended effective as of Refusal Space Commencement Date to include the Right of First Refusal Space on the same terms and conditions as this Lease except (i) the Annual Rent shall be Three and 25/100th Dollars ($3.25) per square foot and shall increase each annual anniversary of the Refusal Space Commencement Date to an amount equal to one hundred two percent (102%) of the Annual Rent per square foot payable immediately prior to that anniversary date. In addition to the adjusted Annual Rent, Tenant's Proportionate Share shall be amended to incorporate the Right of First Refusal Space, Real Estate Taxes and Operating Expenses shall be equitably prorated for such calendar year for Tenant's Proportionate Share, as amended, and Tenant shall be obligated to pay the full Tenant's Proportionate Share of Operating Expenses and Real Estate Taxes with respect to the Right of First Refusal Space.

(d)    Tenant shall accept the Right of First Refusal Space in its "AS IS" condition subject to (i) Landlord's warranty set forth in Section 11.1 of this Lease and (ii) Landlord's obligation, prior to the Refusal Space Commencement Date, to construct a demising wall and install or repair all mechanical, heating, ventilating and air conditioning, and electrical systems to good working order and condition. Landlord shall not be obligated to provide a construction allowance with respect to the Right of First Refusal Space.

(e)    This Right of Refusal shall not be applicable unless there are at least twelve (12) months remaining on the Lease.

(f)    This Right of First Refusal may not be exercised at any time Tenant is in default beyond applicable notice and cure periods and shall be deemed void and of no further force and effect if Tenant assigns this Lease or sublets the Premises other than in accordance with Section 23.2 of this Lease.

## ARTICLE 35
## RIGHT OF FIRST OFFER

Provided Tenant is not in default hereunder beyond applicable notice and cure periods, Tenant shall have a right of first offer (the "Right of First Offer") on the space as depicted on the attached Exhibit M (the "Expansion Premises"). Landlord agrees, prior to the leasing of the Expansion Premises (or any portion thereof), to notify Tenant in writing (the "ROFO Notice") that Tenant shall have the right to lease such Expansion Premises, which notice shall set forth the annual rent and the anticipated commencement date (which shall not be less than thirty (30) days following the date Tenant receives the ROFO Notice) for the proposed leasing of the Expansion Premises. Tenant shall have six (6) business days from receipt of the ROFO Notice to notify Landlord in writing that it is exercising this Right of First Offer as to the Expansion Premises (or applicable portion thereof). If Tenant fails to so notify Landlord or Tenant elects not to exercise this Right of First Offer as to such Expansion Premises (or applicable portion thereof), then this right as to the Expansion Premises (or applicable portion thereof) shall become null and void, and Tenant shall have no further rights to the Expansion Premises (or applicable portion thereof), provided that if Landlord does not, within six (6) months of the date of the ROFO Notice, enter into a lease with respect to the Expansion Space

(or applicable portion thereof) on terms which are not materially more favorable to the tenant than are set forth in the ROFO Notice and Landlord is not actively negotiating with the same prospective tenant, then the Right of First Offer shall be reinstated. If Tenant elects to exercise its Right of First Offer as to the Expansion Premises (or applicable portion thereof), Tenant shall lease the Expansion Premises (or applicable portion thereof) on the same terms and conditions as this Lease except:

(a)    The Annual Rent for the Expansion Premises (or applicable portion thereof) shall be as set forth in the ROFO Notice;

(b)    The term shall commence as of the commencement date set forth in the ROFO Notice (the "Expansion Premises Commencement Date"), and shall be coterminous with this Lease;

(c)    In addition to the adjusted Annual Rent, Tenant's Proportionate Share shall be amended to incorporate the Expansion Premises, Real Estate Taxes and Operating Expenses shall be equitably prorated for such calendar year for Tenant's Proportionate Share, as amended, and Tenant shall be obligated to pay the full Tenant's Proportionate Share of Operating Expenses and Real Estate Taxes with respect to the Expansion Premises.

(d)    Tenant shall accept the Expansion Premises in its "AS IS" condition subject to (i) Landlord's warranty set forth in Section 11.1 of this Lease and (ii) Landlord's obligation, prior to the Expansion Premises Commencement Date, to construct a demising wall and install or repair all mechanical, heating, ventilating and air conditioning, and electrical systems to good working order and condition. Landlord shall not be obligated to provide a construction allowance with respect to the Expansion Premises.

(e)    This Right of First Offer shall be subject to any existing tenancies in the Expansion Premises.

(f)    Tenant acknowledges that Landlord may offer the Expansion Premises to Tenant at any time.

IN WITNESS WHEREOF, Landlord and Tenant have entered into this Lease of Industrial or Warehouse Facilities as of the date set forth in the Preamble to this Lease of Industrial or Warehouse Facilities.

In the presence of:

CHEROKEE NORTH KANSAS CITY, LLC,
a Delaware limited liability company

By: _____
Name: Guy M. Arnold
Its:    Vice President

In the presence of:

DELPHI AUTOMOTIVE SYSTEMS LLC,
a Delaware limited liability company

By:    Delphi Corporation,
       a Delaware corporation

Its:   Managing Member

       By: _____

       Its:    Authorized Signatory

STATE OF _Colorado_    )
                       ) ss.
COUNTY OF _Arapahoe_   )

The foregoing instrument was acknowledged before me this _11th_ day of _July_, 2002, by _Guy Arnold_, the _Vice President_, of CHEROKEE NORTH KANSAS CITY, LLC, a Delaware limited liability company a on behalf of said limited liability company.

_Amy J Brady_, Notary Public
_Arapahoe_ County, _CO_
My commission expires: _March 29, 2006_

AMY J BRADY
Notary Public
State of Colorado

IN WITNESS WHEREOF, Landlord and Tenant have entered into this Lease of Industrial or Warehouse Facilities as of the date set forth in the Preamble to this Lease of Industrial or Warehouse Facilities.

In the presence of:

_____

_____

CHEROKEE NORTH KANSAS CITY, LLC,
a Delaware limited liability company

BY_____

                                      President

ATTEST_____

                                      Secretary

In the presence of:

DELPHI AUTOMOTIVE SYSTEMS LLC,
a Delaware limited liability company

By:    Delphi Corporation,
       a Delaware corporation

Its:   Managing Member

By:

Its:   Authorized Signatory

STATE OF _____ )
                    ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 2002, by _____, the _____, of CHEROKEE NORTH KANSAS CITY, LLC, a Delaware limited liability company a on behalf of said limited liability company.

_____, Notary Public

_____ County, _____

My commission expires:_____

STATE OF _MICHIGAN_ )
_MACOMB_ ) ss.
COUNTY OF _ACTING IN OAKLAND_ )

The foregoing instrument was acknowledged before me this _9TH_ day of _JULY_,
2002, by _MILTON R. SCHEFFLER_ the Authorized Signatory of Delphi Corporation, a
Delaware corporation, which is the Managing Member of Delphi Automotive Systems LLC, a Delaware
limited liability company, on behalf of it.

_Erica L. Shipp_
Notary Public
_MACOMB_ County, _MI_
My commission expires: _6-4-2006_

ERICA L. SHIPP
Notary Public, Macomb County, MI
My Commission Expires Jun. 4, 2006