# EXHIBIT C

## SECOND AMENDMENT
## TO LEASE OF INDUSTRIAL OR WAREHOUSE FACILITIES

THIS SECOND AMENDMENT TO LEASE (this "*Second Amendment*") is entered into this 3rd day of March, 2005 (the "*Second Amendment Date*"), by and between CHEROKEE NORTH KANSAS CITY, LLC, a Delaware limited liability company ("*Landlord*") and DELPHI AUTOMOTIVE SYSTEMS, LLC, a Delaware limited liability company ("*Tenant*").

### RECITALS:

A.  WHEREAS, Landlord, as lessor, and Tenant, as lessee, entered into that certain Lease of Industrial or Warehouse Facilities dated July 9, 2002, as amended pursuant to that certain First Amendment to Lease of Industrial or Warehouse Facilities dated July 9, 2003 ("*First Amendment*") (as amended, the "*Lease*"), relating to the leasing of certain premises consisting of approximately 85,985 rentable square feet of manufacturing, warehouse, engineering and office space (the "*Current Premises*") as shown on Exhibit "A" situated in that certain building located at 144 West 23rd Street, North Kansas City, Missouri (the "*Building*").

B.  WHEREAS, Landlord and Tenant desire (i) to expand the Current Premises to include the Second Expansion Premises (as defined below) as shown on Exhibit "B", (ii) to extend the term of the Lease as to the New Premises (as defined below) and (ii) to provide other amendments of the Lease, all subject and pursuant to the terms and conditions set forth below.

C.  WHEREAS, a portion of the Building was demolished and the square feet of floor area in the Building is now 240,000.

NOW, THEREFORE, for good and valuable consideration the receipt and adequacy of which are hereby acknowledged, Landlord and Tenant agree as follows:

### AGREEMENT:

1.  Definitions. All defined terms in the Lease are incorporated herein by reference.

2.  Lease of Expansion Premises; New Premises.

    (a)  Expansion Premises. As of the Second Expansion Premises Commencement Date, Landlord shall lease to Tenant, and Tenant shall lease from Landlord, those certain premises consisting of approximately 39,581 rentable square feet of space in the Building and being more particularly depicted on Exhibit "A" attached hereto and incorporated herein (the "*Second Expansion Premises*," and, together with the Current Premises, referred to herein collectively as the "*New Premises*") and from and after the Second Expansion Commencement Date, all references in the Lease to the Premises shall be deemed to refer to the New Premises. Except as provided for in Section 4 herein, and the Work Letter Agreement which is attached hereto as Exhibit "C" (the "*Work Letter*"), Tenant acknowledges and agrees that Landlord shall deliver the Expansion Premises to Tenant in "AS-IS" condition, without any express or implied representations or warranties of any kind. Except for Landlord's Expansion Premises Work (as defined in the Work Letter), Landlord shall not have any obligation under this

1

646671\886695.11
3/3/05 4:01 PM

Amendment to construct or install any improvements or alterations or to pay for any such construction or installation in the Second Expansion Premises.

  (b) <u>New Premises</u>.  The New Premises consists of approximately 125,566 rentable square feet of space in the Building and is more particularly depicted on <u>Exhibit "B"</u> attached hereto.

 3. <u>Lease Term</u>.  The term of the Lease for the Second Expansion Premises shall commence on May 1, 2005 (the "*Extension Date*"), and shall terminate on October 31, 2011 (the "*Expiration Date*"), unless sooner terminated pursuant to the Lease.  Upon the Extension Date, the term of the Lease with respect to the Current Premises shall be extended through the Expiration Date, with the effect that the term with respect to the Current Premises and the Second Expansion Premises (the New Premises) shall be coterminous.  Said seventy-eight (78) month term is hereinafter referred to as the "*New Premises Term*."

 4. <u>Landlord's Expansion Premises Work</u>.

  (a) Tenant hereby agrees that it shall take the Second Expansion Premises in its "as is where is" condition, subject to Landlord's obligation to cause Landlord's Expansion Premises Work to be completed in accordance with the Work Letter.  Other than for Landlord's obligations as set forth in this Paragraph 4 and the Work Letter, Landlord shall have no obligation for the completion of the Second Expansion Premises.

  (b) No later than June 15, 2005 (the "Delivery Date"), Landlord shall deliver possession of the Second Expansion Premises to Tenant in a tenantable condition, with Landlord's Expansion Premises Work substantially complete, provided that the date on which Landlord is obligated to deliver possession of the Second Expansion Premises to Tenant shall be postponed by the number of days of delay in delivery of possession which are attributable to (i) "Tenant Delay" (as defined in the Work Letter) or (ii) "Force Majeure Events" (as defined in Section 32.7 of the Original Lease).  If possession of the Second Expansion Premises in the condition required under this Second Amendment is not delivered to Tenant by the Delivery Date as the same may be postponed under the preceding sentence, and there are no delays as described in items (i) to (iii) in the foregoing sentence, Tenant shall receive a day for day abatement of Rent for each day possession is not delivered by the Delivery Date.

  (c) Subject to all of the terms and conditions of the Lease except for the payment of Annual Rent, Tenant shall have the right at any time after April 15, 2005 to enter upon the Second Expansion Premises to review the performance of Landlord's Expansion Premises Work, confirm measurements and field conditions, and perform other activities which will not interfere in any manner with the performance of Landlord's Expansion Premises Work, including set up of machines in a portion of the Second Expansion Premises not to exceed 15,000 square feet; provided Tenant hereby agrees to pay all Operating Expenses and other items of Additional Rent associated with its use of the portion of the Second Expansion Premises.  Tenant shall not be obligated to pay any Annual Rent to Landlord for the Second Expansion Premises with respect to periods prior to the Extension Date.

6466\71\88695.11
3/1/05 4:01 PM

5.  **Rent and Other Terms.**

(a) <u>Base Rent for the New Premises</u>. Tenant shall pay monthly base rent ("*Base Rent*") for the New Premises, accruing on and after the Extension Date and monthly thereafter, as base rent for the New Premises Term, as follows:

| Period of the New Premises Term | Monthly Installment of Base Rent | Annual Rate |
|---|---|---|
| 05/01/05 – 10/31/05 | $42,491.72 | $509,900.66 |
| 11/01/05 – 10/31/06 | $43,327.43 | $519,929.10 |
| 11/01/06 – 10/31/07 | $44,207.53 | $530,490.39 |
| 11/01/07 – 10/31/08 | $45,066.33 | $540,795.91 |
| 11/01/08 – 10/31/09 | $45,970.02 | $551,640.28 |
| 11/01/09 – 10/31/10 | $46,885.84 | $562,630.12 |
| 11/01/10 – 10/31/11 | $47,814.04 | $573,768.53 |

(b) <u>Tenant's Proportionate Share of Operating Expenses</u>. Tenant shall, during the New Premises Term, pay Tenant's Proportionate Share of Operating Expenses with respect to the New Premises, which, from and after the Extension Date shall be equal to fifty-two percent (52%) (as adjusted from time to time in accordance with the Lease). From the beginning of the Extension Date through May 31, 2009, Tenant's obligation for payment of Tenant's Proportionate Share of Operating Expenses for the Current Premises shall not exceed $0.15 per square foot of floor area. From June 1, 2009 until the expiration of the New Premises Term, there shall be no cap on Tenant's Proportionate Share of Operating Expenses for the Current Premises With respect to the Second Expansion Premises, Tenant hereby agrees that there shall be no cap on Tenant's Proportionate Share of Operating Expenses at any time during the New Premises Term and Tenant shall pay its pro-rata share of Operating Expenses for the Second Expansion Premises.

(c) <u>Tenant's Proportionate Share of Real Estate Taxes</u>. Tenant shall, during the New Premises Term, pay Tenant's Proportionate Share (which is 52% as set forth above) of Real Estate Taxes.

6.  **Renewal Option.** Sections 1.2E., F. and G., and Section 3.2 of the Lease are deleted in their entirety and replaced with the following Renewal Option. Provided Tenant is not in default under the terms of the Lease beyond applicable notice and cure periods, at the commencement of the Renewal Period (as hereinafter defined), Tenant shall have the option to renew the Lease (the "*Renewal Option*") for two (2) additional periods of five (5) years each (the "*Renewal Period*") subject to the following terms and conditions:

(a) Tenant shall not have the right to assign the Renewal Option to any sublessee of the New Premises; provided however an assignee of Tenant may exercise the Renewal Option provided that (i) there exists no default under the Lease beyond applicable notice and cure periods and (ii) Tenant remains primarily liable for the obligations under the Lease.

3

(b)    Tenant may give Landlord a non-binding written notice of its interest in renewing the terms of the Lease on or after fifteen (15) months, but no later than fourteen (14) months before the expiration of the New Premises Term and if such notice is provided Landlord, on or before thirty (30) days after Landlord's receipt thereof, Landlord shall provide Tenant its estimation of the then current Prevailing Market Rate (as hereinafter defined).

(c)    Tenant shall have given Landlord written notice of its exercise of the Renewal Option on or before twelve (12) months before the expiration of the New Premises Term, or the expiration of the then-current Renewal Period. The Renewal Option shall be applicable only to the entire New Premises, and not any portion thereof.

(d)    The terms and conditions of the Lease shall remain in full force and effect during any Renewal Period except that the term "*Base Rent*" shall be modified to mean the rent charged at the then-current Prevailing Market Rate (as hereinafter defined).

(e)    "*Prevailing Market Rate*" shall mean the then prevailing market rate for rent for leases in similar quality buildings in the market for space comparable to the New Premises taking into account such factors offered to third party tenants for comparable space as the average operating expenses, the value of the tenant improvements already in place in the New Premises at the commencement of the Renewal Period, rent concessions, tenant improvement allowances, lease commissions saved or incurred, and moving allowances. Landlord shall advise Tenant in writing of its proposed Prevailing Market Rate, on a rentable square foot basis as of the beginning of the Renewal Period. Within ten (10) days of receipt of Landlord's notice and determination, Tenant shall advise Landlord, in writing, whether or not Tenant accepts or rejects the Prevailing Market Rate proposed by Landlord. If Tenant accepts such rate in writing, then the Base Rent rate during the Renewal Period shall be said rate. If Tenant rejects in writing the Prevailing Market Rate proposed by Landlord, Tenant shall have the option to specify in such notice its selection of a real estate appraiser, who shall act on Tenant's behalf in determining the Prevailing Market Rate or elect to allow the then-current Term of the Lease to expire on the then-applicable expiration date. Within thirty (30) days after Landlord's receipt of Tenant's selection of a real estate appraiser, Landlord, by written notice to Tenant shall designate a real estate appraiser, who shall act on Landlord's behalf in the determination of the Prevailing Market Rate. Within fifteen (15) days of the selection of Landlord's appraiser, the two (2) appraisers shall render a joint written determination of the Prevailing Market Rate. If the two appraisers are unable to agree upon a joint written determination within said fifteen (15)-day period, the two appraisers shall select a third appraiser meeting the qualifications stated above. Each of the parties shall bear one-half (1/2) of the cost of the appointment of the third appraiser and of the third appraiser's fee. If the three (3) appraisers are unable to agree upon the Prevailing Market Rate within the fifteen (15) days following the appointment of the third appraiser, then each appraiser shall separately determine the Prevailing Market Rate, they shall average the two (2) closest figures, and within three (3) days after the expiration of such fifteen (15)-day period, the appointed third appraiser shall notify Landlord and Tenant of such averaged determination of the Prevailing Market Rate, which averaged determination shall be binding upon both Landlord and Tenant; provided that Tenant shall have the right to rescind its exercise of the applicable Renewal Option by providing Landlord with written notice thereof within five (5) business days if the rent as so determined is greater than the amount initially determined by Tenant to be the Prevailing Market Rate. In the event that one of the three appraisal Prevailing Market Rates is

4

equidistant between the highest and the lowest, then notwithstanding the foregoing sentence, there shall be no averaging, and the equidistant Prevailing Market Rate shall be the final arbitrated rate. In the event that the appraisal process has not been completed prior to the commencement of the Renewal Period, then upon commencement of the Renewal Period, and until the appraisal process is completed (the "*Interim Period*"), Tenant shall pay Landlord Base Rent equal to the Rent for the immediately preceding Lease year, until the increase in the Base Rent is determined by such process as provided herein; provided, however, that such payments made during the Interim Period shall be subject to adjustment based upon the results of such process. If, as a result of such appraisal process, it is determined that Tenant has underpaid Base Rent during the Interim Period, then such underpaid Base Rent shall be due from Tenant to Landlord within fifteen (15) days after expiration of the Interim Period. If, as a result of such appraisal process, it is determined that Tenant has overpaid Base Rent during the Interim Period, then such overpaid Base Rent shall be credited to Tenant's next payment(s) of Base Rent falling due under the Lease. All appraisers selected in accordance with this subparagraph shall have at least ten (10) years prior experience in the applicable metropolitan commercial leasing market, and shall be members of the American Institute of Real Estate Appraisers or similar professional organization. If either Landlord or Tenant fails or refuses to select an appraiser, the other appraiser shall alone determine the Prevailing Market Rate. Landlord and Tenant agree that they shall be bound by the determination of Prevailing Market Rate pursuant to this subparagraph for the Renewal Period. Landlord shall bear the fee and expenses of its appraiser and Tenant shall bear the fee and expenses of its appraiser.

(f)     Within thirty (30) days after the establishment of the Prevailing Market Rate, Landlord and Tenant agree to enter into an amendment to the Lease to evidence the exercise of the Renewal Option.

7.     **The Premises; The Term**. From and after the Extension Date, the Lease is amended such that (i) all references in the Lease to the "Premises" shall be deemed to refer to the New Premises and (ii) all references in the Lease to the "Term" shall be deemed to refer to the New Premises Term.

8.     **Tenant Cancellation Right**. Section 1.2 H and Section 3.4 of the Lease are deleted in their entirety and replaced with the following Cancellation Right. Provided Tenant is not in default beyond applicable notice and cure periods, Tenant shall have an option to cancel the Lease (the "*Cancellation Option*") on or after May 1, 2010 (the "*Cancellation Date*"), by providing Landlord with three hundred and sixty five (365) days prior written notice before the Cancellation Date (the "*Cancellation Notice*").

(a)     Termination Fee. If Tenant exercises its Cancellation Option, then upon the Cancellation Date Tenant shall pay Landlord, in immediately available funds, the (a) unamortized portion of the Improvement Allowance (as defined in the attached Work Letter) actually expended by Landlord, plus (b) the unamortized portion of the leasing commissions paid to the Brokers (as defined in Section 8 below), in connection with this Second Amendment (the "*Termination Fee*"). For the purposes of the determination of the unamortized portion of the Improvement Allowance and the unamortized portion of leasing commissions paid to the Brokers, the amortizations will be on a straight-line basis over the New Premises Term, with

5

interest at the rate of 10% per annum, and will be calculated as of the Cancellation Date. If the Cancellation Date is May 1, 2010, the Termination Fee shall be $133,750.00.

(b) <u>Landlord's Rejection Rights</u>. If Tenant has given proper and timely notice of its election to terminate but is in monetary default beyond applicable notice and cure periods on the Cancellation Date, or has failed to pay the Termination Fee, Landlord, at its sole option, may without waiving any rights or remedies for such default, elect to either: (i) declare Tenant's exercise of the Cancellation Option postponed until Tenant cures the applicable default (in which case the Lease shall continue in full force and effect until such cure); or (ii) terminate the Lease and recover all damages (excluding consequential damages) arising from Tenant's default hereunder. Nothing herein shall be deemed to prohibit Landlord from recovering the Termination Fee, if due but not paid by Tenant, together with interest at ten (10%) per annum thereon.

(c) <u>Time of Cancellation</u>. Provided that Tenant has performed in accordance with this Section, the Lease shall automatically terminate as of 12:00 a.m. on the Cancellation Date and neither party shall have any further obligation or liability to the other except for: (i) the obligation with respect to Operating Expenses and Real Estate Taxes for the period preceding the Cancellation Date, which shall survive termination and shall be paid in accordance with the terms of the Lease; (ii) any indemnification, waivers or releases by either party of the other for claims or liability accruing or arising prior to the Cancellation Date, which such indemnification, waivers or releases shall survive termination of the Lease; and (iii) any other provision which by its terms survives termination of the Lease.

(d) <u>Surrender of New Premises</u>. Tenant shall surrender the New Premises no later than 12:00 a.m. on the Cancellation Date in accordance with the terms of the Lease.

9. <u>Brokerage</u>. Landlord and Tenant represent and warrant to each other that Landlord has dealt only with Colliers Turley Martin Tucker and Tenant has dealt only with Equis, as their exclusive agents (collectively, the "*Brokers*") in connection with the negotiation of this Second Amendment. Landlord shall make payment of the brokerage fee due to the Brokers at the commencement of the New Premises Term in accordance with a separate agreement with the Brokers. Landlord and Tenant hereby agree to indemnify and hold each other and their respective officers, directors, members, managers, partners, affiliates, employees, agents and representatives (collectively, the "*Indemnitees*") harmless of and from any and all damages, losses, costs or expenses (including, without limitation, all attorneys' fees and disbursements) by reason of any claim of or liability to any other broker or other person claiming through the indemnifying party and arising out of or in connection with the negotiation, execution and delivery of this Second Amendment.

10. <u>General Provisions</u>.

(a) <u>Full force and effect</u>. Except as amended by this Second Amendment, the Lease, as modified herein, remains in full force and effect and is hereby ratified by Landlord and Tenant. In the event of any conflict between the Lease and this Second Amendment, the terms and conditions of this Second Amendment shall control.

6

(b)  <u>Capitalized terms</u>.  Capitalized terms not defined herein shall have the same meaning as set forth in the Lease.

(c)  <u>Successors and assigns</u>.  This Second Amendment shall be binding upon and inure to the benefit of the parties hereto and their heirs, personal representatives, successors and assigns.

(d)  <u>Entire agreement</u>.  This Second Amendment contains the entire agreement of Landlord and Tenant with respect to the subject matter hereof, and may not be amended or modified except by an instrument executed in writing by Landlord and Tenant.

(e)  <u>Power and authority</u>.  Except as provided herein, Tenant has not assigned or transferred any interest in the Lease and has full power and authority to execute this Second Amendment.

(f)  <u>Counterparts</u>.  This Second Amendment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(g)  <u>Facsimile signatures</u>.  This Second Amendment may be executed by facsimile signatures which shall be binding as originals on the parties hereto.

(h)  <u>Attorneys' fees</u>.  In the event of litigation arising out of or in connection with this Second Amendment, the prevailing party shall be awarded reasonable attorneys' fees, costs and expenses.

(i)  <u>Governing Law</u>.  This Second Amendment shall be governed by and construed in accordance with the laws of the State of Missouri.

[Signature Page Follows]

IN WITNESS WHEREOF, Landlord and Tenant have caused this Second Amendment to be executed as of the Second Amendment Date.

**LANDLORD:**

CHEROKEE NORTH KANSAS CITY, LLC
a Delaware limited liability company

By: _/s/ Gary Arnold_
Printed Name: Gary Arnold
Its: Vice President

**TENANT:**

DELPHI AUTOMOTIVE SYSTEMS LLC,
a Delaware limited liability company

By: _/s/ John A. Jeffus_
Printed Name: John A. Jeffus
Its: Authorized Signatory

[ACKNOWLEDGEMENT AND AGREEMENT OF GUARANTOR FOLLOWS]

Execution Recommended
Equita Corporation
By:
By:

**SIGNATURE PAGE**

## ACKNOWLEDGEMENT AND AGREEMENT OF GUARANTOR

In order to induce Landlord to enter into this Second Amendment, and without limiting the generality of any provision of the Guaranty dated July 9, 2002 (the "*Guaranty*"), executed with the Lease by Delphi Corporation, a Delaware corporation (the "*Guarantor*"), the Guarantor confirms and agrees that the Guaranty extends to and includes the guaranty, unconditionally and without limitation, of performance by Tenant of its obligations under the Lease, as amended by this Second Amendment, with the same force and effect as if the amended obligations had been set forth originally in the Lease.

**GUARANTOR:**

DELPHI CORPORATION, a Delaware corporation

By: /s/ J.A. Jaffurs
Printed Name: John A. Jaffurs
Its: Executive Director of Delphi Facilities Services Group

GUARANTORS' SIGNATURE PAGE

# EXHIBIT "A"

## THE CURRENT PREMISES

[attached]

EXHIBIT "A" – PAGE – 1

6466\71\888695.11
3/1/05 4:01 PM



## EXHIBIT "B"

## THE SECOND EXPANSION

[attached]

6466071\688695.11
3/1/05 4:01 PM



# EXHIBIT "C"

## WORK LETTER AGREEMENT
(Allowance)

This Work Letter Agreement (this "Work Letter") is attached to and a part of that certain Second Amendment to Lease dated March 3, 2005 (the "Second Amendment"), by and between CHEROKEE NORTH KANSAS CITY, LLC, a Delaware limited liability company, as Landlord, and DELPHI AUTOMOTIVE SYSTEMS LLC, a Delaware limited liability company, as Tenant. Landlord and Tenant are parties to that certain Lease of Industrial or Warehouse Facilities dated July 9, 2002, as amended pursuant to that certain First Amendment to Lease of Industrial or Warehouse Facilities dated July 9, 2003 (as amended, the "Lease"), relating to the leasing of the premises situated in that certain building located at 144 West 23rd Street, North Kansas City, Missouri (the "Property").

1. **Defined Terms.** Capitalized terms used in this Work Letter shall have the same meanings set forth in the Lease, as amended by the Second Amendment, except as otherwise specified herein and except for terms capitalized in the ordinary course of punctuation. For purposes of this Work Letter the following capitalized terms have the following meanings:

    1.1 "Design Documents" means the layout plans and specifications for the real property improvements to be constructed by Landlord in the Expansion Premises which are the final product of the preliminary space planning, and which shall comply with all Laws (as defined below) as applicable and as interpreted at the time of construction of the Expansion Premises Improvements (defined below), including all building codes;

    1.2 "Construction Drawings" means the final architectural plans and specifications, and engineering plans and specifications for the real property improvements to be constructed by Landlord in the Expansion Premises in sufficient detail to be submitted for governmental approvals and building permits and to serve as the detailed construction drawings and specifications for the contractor, and which shall comply with all Law as applicable and as interpreted at the time of construction of the Expansion Premises Improvements, including all building codes;

    1.3 "Landlord's Expansion Premises Work" means the work referred to in Paragraph 4 of the Second Amendment and this Work Letter;

    1.4 "Law" or "Laws" means all laws, ordinances, rules, regulations, other requirements, orders, rulings or decisions adopted or made by any governmental body, agency, department or judicial authority having jurisdiction over the Property, the Expansion Premises or Tenant's activities at the Expansion Premises and any covenants, conditions or restrictions of record which affect the Property; and

    1.5 "Expansion Premises Improvements" means all real property improvements to be constructed by Landlord as shown on the Construction Drawings, as they may be modified as provided herein.

EXHIBIT "C" – PAGE – 1

646607/1888695.11
3/1/05 4:01 PM

2. <u>Design Matters</u>.

2.1. Tenant, through its architects and/or space planners ("<u>Tenant's Architect</u>"), shall prepare the Design Documents and the Construction Drawings, as they may be modified as provided herein, in accordance with the design specified by Tenant and reasonably approved by Landlord.

2.2. Tenant shall be responsible for the suitability for the Tenant's needs and business of the design and function of all Expansion Premises Improvements. Tenant, at its own expense, shall devote such time and provide such instructions as may be necessary to enable Landlord to approve the Design Documents and Construction Drawings.

3. <u>Construction; Improvement Allowance; Tenant Improvement Costs</u>.

3.1. <u>Construction; Improvement Allowance</u>.

(a) Landlord, through its contractor, shall complete the construction of the Expansion Premises Improvements in a good and workmanlike manner in accordance with all Laws, the Second Amendment and the Work Letter. In addition, after April 15, 2005, Landlord shall reasonably cooperate with Tenant in scheduling Landlord's Expansion Premises Work in a manner that permits Tenant to install Tenant's trade fixtures, equipment, machinery, furnishings and other personal property at such time as will not interfere with the performance of Landlord's Expansion Premises Work; provided, however, any related delay shall be a Tenant Delay.

(b) Landlord shall pay towards the costs of the Expansion Premises Improvements a maximum of Three Hundred Thousand and No/100 Dollars ( the "<u>Improvement Allowance</u>"). Tenant hereby agrees that all other costs approved by Tenant shall be paid by Tenant as set forth in <u>Section 4</u>. All costs on the Bid Cost Statement once approved by Tenant shall be deemed authorized by Tenant. Documentation of any additional costs that arise in the construction of the Expansion Premises Improvements not shown on the Bid Cost Statement shall be provided to Tenant for Tenant's approval. Tenant shall have five (5) days to provide Landlord with its approval or disapproval of such costs and if Tenant fails to respond within five (5) days all costs shall be deemed to be approved and authorized by Tenant.

3.2. <u>Limitations of Landlord's Obligations</u>. When the Expansion Premises Improvements are substantially complete, Landlord shall have no further obligation to construct improvements or construct modifications to or changes in the Expansion Premises Improvements, except to complete the punchlist of Landlord's Expansion Premises Work remaining to be completed or correct any part thereof not in compliance with the Construction Drawings and any approved modifications thereof, as provided in the Lease.

4. <u>Costs of Expansion Premises Improvements in Excess of Improvement Allowance</u>. Within ten (10) days after Tenant's receipt of documentation that satisfies <u>Section 5E</u> below, Tenant shall reimburse Landlord for all costs of the Expansion Premises Improvements authorized by Tenant over the Improvement Allowance. Tenant hereby acknowledges and agrees that it shall be solely responsible for all such costs above the Improvement Allowance ("<u>Excess Costs</u>"). If Tenant fails to pay to Landlord the Excess Costs, such failure shall (i) be deemed a default under the Lease after the expiration of applicable notice and cure periods;

EXHIBIT "C" – PAGE – 2

646617\858695.11
5/1/05 4:01 PM

(ii) interest shall accrue at the rate of 18% per annum; and (iii) Landlord shall cease construction of Landlord's Expansion Premises Work.

5. <u>Selection of Subcontractors and Establishment of Cost of Expansion Improvements</u>.

   A. <u>Selection of Subcontractors</u>. Landlord shall cause Pinnacle Contracting, Inc. ("<u>Landlord's Contractor</u>") to invite a minimum of three (3) qualified contractors and materialmen, at least two (2) of which shall be reasonably selected by Tenant (at Tenant's option) to bid on each of the categories (e.g., mechanical, electrical, fabrication, painting, carpentry, etc.) of the Expansion Premises Improvements, provided that each contractor shall be (i) licensed in the State of Missouri and the City of Kansas City; and (ii) bonded and insured by an insurance agency rated A- or better. No contracts or subcontracts for the Expansion Premises Improvements shall be awarded without the prior written approval of Tenant, which shall not be unreasonably withheld, conditioned or delayed. If Tenant fails to respond to Landlord's request for approval of a bid within the greater of (x) five (5) business days or (y) the number of days specified in Landlord's request for approval after Tenant receives a copy of the bid and all supporting documentation reasonably required by Tenant, then any delay which results from Tenant's failure to respond shall constitute a Tenant Delay.

   B. <u>Cost Records</u>. Landlord shall cause Landlord's Contractor to have an open book approach for all costs related to each component of the Expansion Premises Improvements, including material costs and installation costs. Tenant shall have the right to review Landlord's Contractor's books and records regarding Landlord's Expansion Premises Work.

   C. <u>Statement of Proposed Cost</u>. Tenant shall advise Landlord in writing as to the proposed costs of constructing the applicable components of the Expansion Premises Improvements as set forth in the applicable bids and Tenant shall prepare a bid cost statement for review and approval by Landlord (the "<u>Bid Cost Statement</u>"). The Bid Cost Statement shall include (a) all items of work to be done, (b) the contractor or subcontractor to perform each item of work or the materialmen to supply materials, (c) the estimated cost to complete each item (except in the case of variable cost subcontracts, for which a statement of the variable costs will be provided to Landlord), (d) the total estimated cost (with allowances in the case of variable costs), and (e) all bids (and any other information) establishing such costs.

   D. <u>Approval of Costs</u>. Tenant shall approve the Bid Cost Statement prior to Landlord's commencement of Landlord's Expansion Premises Work. Tenant may modify any of the Expansion Premises Improvements or designate which bid should be accepted prior to Landlord's approval of the Bid Cost Statement. If Tenant elects to modify the Expansion Premises Improvements, then any resulting delay in Substantial Completion shall constitute a Tenant Delay.

   E. <u>Evidence of Costs</u>. The cost to complete the Expansion Premises Improvements shall be established by Waivers of Liens and a Sworn Statement itemizing the work done, the contractor or subcontractor performing each item of work, the cost to complete each item, and the total cost, certified by Landlord's Contractor and the Architect (if any), and supported by evidence that the Expansion Premises Improvements have been paid for in full. Upon Tenant's written request and at reasonable times during normal business hours at Landlord's office, Tenant

Exhibit "C" – Page – 3

shall have the right to examine and audit Landlord's and Landlord's Contractor's books and records with respect to the cost to complete the Expansion Premises Improvements, in order to substantiate the information contained in the Sworn Statement and Waivers of Liens.

6.    Change Orders.  Tenant shall have the right to require (i) that Landlord construct improvements at the Expansion Premises in addition to or different than those required under the Construction Drawings (provided that Landlord approves the additional or different improvements, which approval shall not be unreasonably withheld or delayed and shall be deemed granted if Landlord does not notify Tenant of the specific reasonable grounds upon which Landlord is denying or conditioning its approval, within five (5) business days of Tenant's request) and (ii) changes to the Expansion Premises Improvements, by issuing a change order ("Change Order") to Landlord.  Any delay resulting from a Change Order shall constitute a Tenant Delay.  Tenant shall have the right to require that Change Orders be competitively bid, and to approve the final bids before Change Orders are implemented.  Landlord agrees to cause Landlord's Contractor to promptly bid any Change Orders which Tenant requests be bid, with at least three (3) bidders selected in accordance with Paragraph 5.A, if Tenant requires.  The costs of Change Orders shall be determined based on one of the following methods as selected by Tenant:  (a) a lump sum properly itemized and supported by sufficient substantiating data to permit evaluation, (b) unit prices stated in the contract documents or subsequently agreed upon, or (c) such other manner as is agreed upon by the parties and a mutually acceptable fixed or percentage fee.  The costs of Change Orders shall be determined by Landlord.  Landlord's Contractor's fee on Change Orders shall be no more than ten percent (10%) of the net increase in cost of the Expansion Premises Improvements due to the Change Order.  No Change Order shall be implemented unless and until Tenant approves, in writing, the cost of the Change Order.  The net increase in cost of constructing the Expansion Premises Improvements which results from any Change Order that is approved by Tenant shall constitute an Excess Cost.

7.    Inspections By Tenant; Progress.  Until completion of the construction of the Expansion Premises Improvements, Tenant shall have the right to inspect or have a consultant retained and paid for solely by Tenant inspect and observe the performance of all components of Landlord's Expansion Premises Work during normal business hours (or such other hours as Landlord's Expansion Premises Work is being performed) but only to the extent same does not interfere with Landlord's Expansion Premises Work.  Any delay in substantial completion which results from Tenant's exercise of its rights under this Section 7 shall be deemed a Tenant Delay.  Tenant's observation of construction and approval of plans and other matters shall not waive or limit any of Landlord's obligations to complete Landlord's Expansion Premises Work in accordance with the requirements of this Work Letter, the Second Amendment and the Lease.

8.    Warranties.  Landlord shall cause Tenant to be a third party beneficiary of Landlord's agreements with Landlord's Contractor and materialmen, to the extent such agreements permit Tenant to be a third party beneficiary thereof, and Landlord shall assign to Tenant, to the extent assignable, or otherwise permit Tenant to have the benefit of, all warranties by Landlord's Contractor and its subcontractors, as well as all manufacturers' warranties with respect to materials that are incorporated into the Expansion Premises Improvements.

9.    Tenant Delay.  The term "Tenant Delay" means any delay in the completion of the Landlord's Expansion Premises Work caused by (a) any of the causes specifically identified as

EXHIBIT "C" – PAGE – 4

646671\888695.11
3/1/05 4:01 PM

Tenant Delay elsewhere in this Exhibit; (b) Tenant's failure to act or provide the responses described in this Exhibit within the time specified; (c) the nonavailability or excess procurement time for materials or equipment that are not required under the Scope of Work; (d) delay in making payment to Landlord of any Excess Cost; (e) any delay in Landlord's completion of the Expansion Premises Improvements through any negligence, gross negligence, or willful misconduct of Tenant, its employees, agents, contractors or representatives, or (f) any other delay caused by Tenant, its employees, agents, contractors or representatives.

10. <u>Construction Representatives</u>. Landlord and Tenant shall each designate a representative who shall be responsible for coordinating requirements, consents, approvals, disapprovals and other communications regarding the matters addressed by this Exhibit. Landlord's and Tenant's initial construction representatives are as follows:

| **LANDLORD** | **TENANT** |
|---|---|
| _____ | _____ |
| TITLE | TITLE |
| _____ | _____ |
| TITLE | TITLE |
| _____ | _____ |
| TITLE | TITLE |
| _____ | _____ |
| TITLE | TITLE |

EXHIBIT "C" – PAGE – 5

IN WITNESS WHEREOF, Landlord and Tenant have caused this Work Letter to be executed as of the date of the Second Amendment.

**LANDLORD:**

CHEROKEE NORTH KANSAS CITY, LLC
a Delaware limited liability company

By: _____
Printed Name: Guy Arnold
Its: Vice President


**TENANT:**

DELPHI AUTOMOTIVE SYSTEMS LLC,
a Delaware limited liability company

By: _____
Printed Name: John Jeffurs
Its: Authorized Signator

*Execution Recommended
Equis Corporation
By:*