HEARING DATE & TIME: FEBRUARY 9, 2006 @ 10:00 A.M.
OBJECTION DEADLINE: FEBRUARY 2, 2006 @ 5:00 P.M.

Thomas R. Slome (TS-0957)
Jil Mazer-Marino (JM-6470)
ROSEN SLOME MARDER LLP
333 Earle Ovington Boulevard
Ninth Floor
Uniondale, New York 11553-3622
(516) 227-1600

and

Russell R. Johnson III
2258 Wheatlands Drive
Manakin-Sabot, Virginia  23103
(804) 749-8861

*Co-Counsel for Southern California Edison Company*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| | ) |
| **In re:** | ) **Chapter 11** |
| | ) |
| **DELPHI CORPORATION, INC., <u>et al.</u>,** | ) **Case No. 05-44481 (RDD)** |
| | ) |
| **Debtors.** | ) **(Jointly Administered)** |
| | ) |
| | ) |

**MOTION AND MEMORANDUM OF LAW OF SOUTHERN CALIFORNIA EDISON
COMPANY TO:  (A) VACATE, AND/OR RECONSIDER, AND/OR MODIFY, FINAL
ORDER UNDER 11 U.S.C. §§ 105, 366, 503, AND 507 (I) PROHIBITING UTILITIES
FROM ALTERING, REFUSING, OR DISCONTINUING SERVICES ON ACCOUNT OF
PREPETITION INVOICES AND (II) ESTABLISHING PROCEDURES FOR
DETERMINING REQUESTS FOR ADDITIONAL ASSURANCE; AND (B) SEEK
<u>ADEQUATE ASSURANCE OF FUTURE PAYMENT</u>**

Southern California Edison Company ("SCE"), by counsel, hereby moves this Court

pursuant to Federal Rule of Bankruptcy Procedure 9024, to (A) vacate and/or reconsider, and/or

modify the *Final Order*, entered by this Court on October 28, 2005, *Granting Motion of Debtors*

*for Interim and Final Orders Under 11 U.S.C. §§ 105, 366, 503, and 507 (I) Prohibiting Utilities*

*From Altering, Refusing, or Discontinuing Services on Account of Prepetition Invoices and (II)*

*Establishing Procedures For Determining Requests For Additional Assurance* (the "Final Utility

Order"), and (B) to determine adequate assurance of payment to SCE Utilities pursuant to 11

U.S.C. Section 366(b).  In support of its Motion, SCE sets forth the following:

## Jurisdiction and Venue

1.      This Court has jurisdiction over this Motion under 28 U.S.C. § 1334(b).

2.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).

3.      Venue of this Motion is proper in this district pursuant to 28 U.S.C. § 1409.

## Procedural Facts

4.      On October 8, 2005 (the "Petition Date"), the Debtors each filed a voluntary

petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code")

with this Court.  The Debtors continue to manage their properties and operate their businesses as

debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  These cases

are being jointly administered.

5.      Also on the Petition Date, the Debtors filed the *Motion of Debtors for Interim and*

*Final Orders Under 11 U.S.C. §§ 105, 366, 503, and 507 (I) Prohibiting Utilities From Altering,*

*Refusing, or Discontinuing Services on Account of Prepetition Invoices and (II) Establishing*

*Procedures For Determining Requests For Additional Assurance* (the "Utility Motion") (Docket

No. 41).

6.      According to an *Affidavit of Service* (Docket No. 78), on the Petition Date, the

Debtors allegedly sent the Utility Motion to SCE "via Overnight Mail and facsimile, where

applicable," to the following post office box address:

2

Southern California Edison
P.O. Box 600
Rosemead, CA  91771

It is unclear from that *Affidavit of Service* as to what form of "overnight mail" the Debtors

supposedly used to provide delivery to a United States post office box.  However, neither

Federal Express nor United Parcel Service provide overnight services to a United States post

office box.

7.    The post office box address used by the Debtors to allegedly send the Utility

Motion to SCE is used by SCE customers to send in payments and that post office box receives

over 10,000 payments a day.

8.    Because the Utility Motion was supposedly sent by overnight mail to SCE to a

post office box, which is not proper service pursuant to Rules 7004 and 9014(b) of the

Bankruptcy Code, SCE had no opportunity to respond to the Utility Motion, despite the fact that

SCE was a known entity that provided continuous prepetition utility service to the Debtors and

has continued to provide continuous utility service to the Debtors post-petition.

9.    In the Utility Motion, the Debtors requested the entry of a Final Utility Order that

granted, among other things, the following:

> 3.    Absent any further order of this Court, each of the utility companies that
> provides natural gas, water, electric, telephone, fuel, sewer, cable,
> telecommunications, internet, paging, cellular phone, and other similar
> services to the Debtors (the "Utility Companies"), whether under direct
> relationship with the Debtors or through the Debtors' landlords or other third
> parties, including but not limited to the list of Utility Companies contained in
> Exhibit 1 hereto, enjoined from (a) altering, refusing, or discontinuing service
> to, or discriminating against, the Debtors solely on the basis of the
> commencement of these chapter 11 cases or on account of any unpaid invoice
> for service provided prior to October 8, 2005 or (b) requiring the payment of a
> deposit or other security in connection with such Utility Company's continued
> provision of utility services, including, but not limited to, the furnishing of

3

gas, heat, electricity, water, sewer, cable, telephone, telecommunications, internet, paging, cell phone, or any other service of like kind.

4.   The Debtors' record of timely payment of prepetition utility bills, demonstrated ability to pay future utility bills, and, with respect to those Utility Companies that provide natural gas to the Debtors through GM accounts, such Utility Companies' agreements with GM, constitute adequate assurance of future payment for utility services pursuant to 11 U.S.C. § 366(b).

\* \* \*

7.   In the event the Debtors believe that a timely Request for additional assurance made by any of the Utility Companies is unreasonable and no consensual resolution of the Request is reached, the Debtors shall file a motion for determination of adequate assurance of payment with respect to such Request (the "Determination Motion") within 45 days of receiving such Request and set such Motion for hearing (the "Determination Hearing").

8.   If a Determination Hearing is scheduled in accordance with the immediately preceding paragraph, the Utility Companies shall be deemed to have adequate assurance of payment until an order of this Court is entered in connection with such Determination Hearing.

Final Utility Order, at pp. 3-4.

10.    On October 13, 2005, the Court entered the *Interim Order Under 11 U.S.C. §§ 105, 366, 503, and 507 Prohibiting Utilities From Altering, Refusing, or Discontinuing Services on Account of Prepetition Invoices* (the "Interim Utility Order") (Docket No. 234).

11.    The Interim Utility Order in part provided that the Debtors must serve, by first-class mail, postage prepaid, within five business days of the entry of the Interim Utility Order, a copy  of the Interim Utility Order and the *Notice of Motion and Entry of Interim Order Under 11 U.S.C. §§ 105, 366, 503, and 507 Prohibiting Utilities From Altering, Refusing, or Discontinuing Services on Account of Prepetition Invoices* (the "Notice of Utility Motion"). Interim Utility Order at ¶ 5.

4

12.     Pursuant to the Notice of Utility Motion, the deadline for submitting any

objections to the Utility Motion was October 24, 2005.  The Notice of Utility Motion further

provided that a hearing for the Utility Motion would be held on October 27, 2005 at 10:00 a.m.

13.     According to an *Affidavit of Service* (Docket No. 613), on October 14, 2005, the

Debtors allegedly sent the Interim Utility Order to SCE by first-class mail to the same SCE post

office payment box used by the Debtors to supposedly send the Utility Motion to SCE by

overnight delivery.

14.     Because the Interim Utility Order was supposedly sent by first-class mail to SCE

to a post office box, which is not proper service pursuant to Rules 7004 and 9014(b) of the

Bankruptcy Code, SCE had no notice of the Interim Utility Order.

15.     On October 27, 2005, the Court entered the *Final Order Under 11 U.S.C. §§ 105,

366, 503, and 507 (I) Prohibiting Utilities From Altering, Refusing, or Discontinuing Services

on Account of Prepetition Invoices and (II) Establishing Procedures For Determining Requests

For Additional Assurance* (the "Final Utility Order") (Docket No. 760).

16.     According to an *Affidavit of Service* (Docket No. 811), on October 28, 2005, the

Debtors allegedly sent the Final Utility Order Motion to SCE by overnight delivery to the same

SCE post office payment box used by the Debtors to supposedly send the Utility Motion and

Interim Utility Order to SCE.

17.     Because the Final Utility Order was supposedly sent by overnight delivery to

SCE to a post office box, which is not proper service pursuant to Rules 7004 and 9014(b) of the

Bankruptcy Code, SCE had no notice of the Final Utility Order.

18.     The Final Utility Order provided:

C.    AT&T, Entergy Mississipi, Inc., SBC Communications Inc., American Electric Power, Dominion East Ohio, New York State Electric and Gas Corporation, Niagara Mohawk Power Corporation, Public Services Electric and Gas Company, and Rochester Gas & Electric Corporation (collectively, the "Objecting Utilities") have filed objections (collectively, the "Objections") to the Motion.

\* \* \*

1.    Except with respect to the Objecting Utilities, the Motion is GRANTED on a final basis as provided herein.

2.    The Debtors shall pay on a timely basis in accordance with their prepetition practices all undisputed invoices for postpetition utility services provided by the Utility Companies to the Debtors.

3.    Absent any further order of this Court, each of the utility companies that provides natural gas, water, electric, telephone, fuel, sewer, cable, telecommunications, internet, paging, cellular phone, and other similar services to the Debtors, (the "Utility Companies"), whether under direct relationship with the Debtors or through the Debtors' landlords or other third parties, including but not limited to the list of Utility Companies contained in Exhibit 1 hereto, enjoined from (a) altering, refusing, or discontinuing service to, or discriminating against, the Debtors solely on the basis of the commencement of these chapter 11 cases or on account of any unpaid invoice for service provided prior to October 8, 2005 or (b) requiring the payment of a deposit or other security in connection with such Utility Company's continued provision of utility services, including, but not limited to, the furnishing of gas, heat, electricity, water, sewer, cable, telephone, telecommunications, internet, paging, cell phone, or any other service of like kind.

4.    The Debtors' record of timely payment of prepetition utility bills, demonstrated ability to pay future utility bills, and, with respect to those Utility Companies that provide natural gas to the Debtors through GM accounts, such Utility Companies' agreements with, GM, constitute adequate assurance of future payment for utility services pursuant to 11 U.S.C. § 366(b).

5.    The Debtors shall serve a copy of the Motion and this Final Order on each Utility Company set forth on Exhibit 1 hereto by overnight mail within five business days of the entry of this Final Order.

6.    This Final Order is without prejudice to the rights of any of the Utility

6

Companies to make a request for adequate assurance from the Debtors (a "Request") in the form of deposits or other security based on materially changed circumstances from the date hereof. Any such Request must be in writing and set forth the location for which the utility services are provided, a payment history for the most recent six months, and a description of any prior material payment delinquency or irregularity. Any Request received by the Debtors after the Request Deadline or which otherwise fails to comply with this Final Order (including failure to specify prior material delinquent or irregular payment) shall be deemed untimely and invalid, and any Utility Company making such a Request shall be deemed to have adequate assurance under 11 U.S.C. § 366.

7. In the event the Debtors believe that a timely Request for additional assurance made by any of the Utility Companies is unreasonable and no consensual resolution of the Request is reached, the Debtors shall file a motion for determination of adequate assurance of payment with respect to such Request (the "Determination Motion") within 45 days of receiving such Request and set such Motion for hearing (the "Determination Hearing"). Consistent with the Court's Case Management Order, any of the Utility Companies may seek an earlier Determination Hearing.

8. If a Determination Hearing is scheduled in accordance with the immediately preceding paragraph, the Utility Company shall be deemed to have adequate assurance of payment until an order of this Court is entered in connection with a Determination Hearing.

19. On November 16, 2005, a financial analyst with SCE contacted the Debtors regarding past-due payments by the Debtors for utility services. At that time, SCE learned for the first time that the Debtors had filed for bankruptcy protection.

20. By letter dated November 16, 2005, SCE requested that the Debtors provide SCE with adequate assurance of future payment in the form of either (1) a cash deposit of $226,910 equal to twice the Debtors' monthly energy consumption, or (2) a Surety Bond or Letter of Credit in the amount of $226,910.

21. Through letter agreements dated November 21, 2005, the Debtors agreed to

provide one-month deposits to certain Objecting Utilities, namely, American Electric Power,

New York State Electric and Gas Corporation , Niagara Mohawk Power Corporation, Public

Service Electric and Gas Company and Rochester Gas & Electric Corporation ("RG&E")

(collectively, the "Objecting Utilities").  The undersigned counsel for SCE also represents the

foregoing Objecting Utilities in these jointly administered bankruptcy proceedings.

22.     As a result of the settlements that the Objecting Utilities reached with the

Debtors, on December 31, 2005, the Objecting Utilities filed a *Notice of Withdrawal of*

*Objection of Certain Utility Companies to Motion For Interim and Final Orders Under 11*

*U.S.C. §§ 105, 366, 503, and 507 (I) Prohibiting Utilities From Altering, Refusing, or*

*Discontinuing Services on Account of Prepetition Invoices and (II) Establishing Procedures For*

*Determining Requests For Additional Assurance.*  The docket for this bankruptcy matter reflects

that other utilities that filed objections to the Utility Motion, subsequently withdrew such

objections, presumably based upon settlements that were similar to the settlements reached

between the Objecting Utilities and the Debtors.

23.     On or about December 7, 2005, Debtors' counsel, in response to SCE's

November 16, 2005 letter, informed SCE that an order had been entered that precluded SCE

from seeking post-petition security from the Debtors.

24.     By letter dated December 30, 2005, SCE's counsel, before filing this Motion to

Vacate, made a settlement offer regarding SCE's request for adequate assurance. In the

foregoing letter, SCE's counsel informed Debtors' counsel that SCE disagreed with the Debtors'

position that SCE was precluded from seeking adequate assurance of payment because SCE was

not properly served with the applicable pleadings.

8

25.     Despite the fact that Debtors' counsel was alerted to its failure to properly serve SCE with the applicable pleadings, Debtors' counsel, by letter dated January 6, 2006, rejected the adequate assurance request set forth in the December 30, 2005 letter from SCE's counsel.  In the foregoing letter, Debtors' counsel asserted that pursuant to the Final Utility Order all of SCE's adequate assurance requests were untimely, and that such adequate assurance requests otherwise did not comply with the terms of the Final Utility Order because such requests did not "include a payment history for the most recent six months and a description of any prior material payment delinquency or irregularity."  (hereinafter the "January 6, 2006 Letter," attached hereto as Exhibit "A").  In response to the notification from SCE's counsel that SCE was improperly served with the 366 pleadings, Debtors counsel merely responded that the Interim and Final Utility Orders were sent to SCE "at the address in the Debtors' books and records which they have always used to correspond with [SCE]."

26.     In support of the Debtors' position that SCE's adequate assurance requests are untimely pursuant to the express terms of the Final Utility Order, Debtors' counsel incorrectly states in the January 6, 2006 Letter that paragraph 6 of the Final Utility Order provides that requests for adequate assurance must be received by the Debtors within 25 days of the date of service.  However, paragraph 6 does not contain a 25 day deadline for a utility to make an adequate assurance request.

27.     Furthermore, paragraph 5 of the Final Utility Order expressly provides that "[t]he Debtors shall serve a copy of the Motion and this Final Order on each Utility Company set forth on Exhibit 1 hereto by overnight mail within five business days of the entry of this Final Order."  However, according to both the January 6, 2006 Letter and the *Affidavit of Service* (Docket No.

9

811), the Debtors only allegedly sent the Final Utility Order to SCE – but did not send the Utility

Motion as well -- within five business days of entry of the Final Utility Order.  Accordingly, the

Debtors have clearly violated the express service requirements contained in the Final Utility

Order by failing to serve SCE with a copy of the Utility Motion within five business days of

entry of the Final Utility Order.

### Facts Concerning the Debtors and Other Pleadings Filed in the Case Supporting SCE's Request For Adequate Assurance of Payment

28.    As a result of the poor financial state of the United States automotive industry,

Delphi is the latest among a number of automotive suppliers that have recently filed for

bankruptcy protection (See also Meridian Automotive, Tower Automotive, Intermet, Eagle

Picher, Universal Automotive, Citation Corp, Oxford Automotive (twice)).

29.    Delphi contends that it is the largest manufacturing and technology company ever

to seek chapter 11 relief.  Additionally, Delphi contends that it ranks as the fifth largest public

company business reorganization in terms of revenues, and the thirteenth largest public company

business reorganization in terms of assets.  *Affidavit of Robert S. Miller, jr. Under Local Rule

1007-2 and in Support of Chapter 11 Petitions and Various First Day Applications and Motions

at ¶ 5 (hereinafter "Miller Aff. at ¶ __").*

30.    News reports indicate that Delphi is expected to cut jobs and wages and close

many of its 31 U.S. plants.  Additionally, General Motors Corporation ("GM"), Delphi's largest

customer and former parent company, has stated that it may have to assume up to $11 billion in

retirement benefits for Delphi's union-represented employees.  Fox News.com, *Delphi

Bankruptcy Could Change Auto Industry,* http://www.foxnews.com/story/0,2933,171747,00.html

31.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of

10

GM.  Prior to January 1, 1999, GM conducted Delphi's business through various divisions and subsidiaries.  Utility Motion at ¶ 8.

32.    Delphi claims that although GM is still Delphi's single largest customer, more than half of Delphi's revenue is generated from non-GM sources.  Utility Motion at ¶ 8.  GM, however, still accounts for 49% of Delphi's sales.  Delphi's sales to GM were down by approximately $1.6 billion for the first six months of 2005, an 18.9% decline.

33.    Delphi sales to GM in 2004 equaled approximately $15.4 billion, with sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.  Miller Aff. at ¶ 6.

34.    Delphi admits that although it generated more than $2 billion in net income in the first two years following its separation from GM, Delphi has suffered losses every year thereafter, with the exception of 2002.  In calendar year 2004, Delphi reported a net operating loss of $482 million on $28.6 billion in net sales.  Additionally, Delphi admits that its financial condition had deteriorated further in the first six months of 2005, with net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.  Reported net losses in calendar year 2004 were $4.8 billion.  Utility Motion at ¶ 10.

35.    Upon information and belief, the Debtors have the following Global EBITDAR targets for the first 9 months of 2006:

    A.    January 2006 – ($125,000,000);
    B.    February 2006 – ($100,000,000);
    C.    March 2006 – ($75,000,000);
    D.    April 2006 – ($50,000,000);

       E.      May and June 2006 – ($25,000,000);

       F.      July 2006 – ($50,000,000);

       G.     August 2006 – ($25,000,000); and

       H.     September 2006 - $50,000,000.

36.     The Debtors' chapter 11 petitions listed consolidated global assets and liabilities, as of August 31, 2005, of approximately $17.1 billion and $22.2 billion, respectively.  Delphi had $3.9 billion in outstanding debt as of June 30, 2005, of which $3.4 billion was long-term debt.  Miller Aff. at ¶ 13.

37.     The Debtors contend that three significant issues have largely contributed to the deterioration of their financial performance:  (a) an increasingly unstable U.S. legacy liabilities and operational restrictions driven by collective bargaining agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs; (b) a competitive U.S. vehicle production environment for domestic OEM's resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures; and (c) increasing commodity prices.  Utility Motion at ¶ 11.

### Delphi's U.S. Legacy Liabilities and Operational Restrictions

38.     With respect to Delphi's U.S. legacy liabilities and operational restrictions, the Debtors' assert that their collective bargaining agreements provide for wages and benefits which are well above market, costly pension plans and retiree health care and other benefits, and burdensome operating restrictions, constrain the Debtors' ability to compete with their U.S. peers.  In connection with its spin-off from GM, Delphi was required to assume the terms and conditions of the collective bargaining agreements negotiated by its unions with GM.  Miller Aff. at ¶ 16.

12

39.    Delphi asserts that it is the only U.S. auto supplier with an OEM assembly pattern labor agreement, resulting in unsustainable, inflexible and uncompetitive costs and liabilities. Consequently, the Debtors compensate their hourly workers an average of approximately $64 per hour, including benefits and legacy liabilities, which is nearly three times more than the hourly labor rates of its U.S. peer companies.  Miller Aff. at ¶ 16.

40.    Delphi's domestic hourly pension and other post-employment benefits, including without limitation retiree health care and life insurance (collectively, "OPEB"), exposed the Debtors to $10.4 billion in unfunded liabilities at the end of calendar year 2004.  During the first six months of 2005, the Debtors' cash outflow associated with its hourly benison and OPEB obligations was approximately $485 million and $70 million, respectively.  The Debtors project that cash outflows for hourly pension contributions and OPEB payments through 2007 will be approximately $1.7 billion and will increase geometrically thereafter if not addressed now as a result of the projected retirement of Delphi's U.S. workforce in the years to come.  Miller Aff. at ¶ 17.

41.    Due to declining business conditions, Delphi asserts that an increasing proportion of its U.S. hourly workforce is, and is expected to continue to be, in a paid but non-productive status, i.e., fixed costs which are independent of volume and revenue.  Under the terms of Delphi's collective bargaining agreements with its U.S. unions, Delphi is generally not permitted to permanently lay off idled workers, and in recent months, the number of idled hourly workers that receive nearly full pay and benefits has been as high as 4,000, although performing no work. Coupled with restrictions on the Debtors' ability to exit non-strategic, non-profitable operations, the magnitude of the cost of carrying idled, non-productive workers in the event of plant closings

13

or wind-downs effectively prevents the Debtors from addressing poor product portfolio businesses and non-profitable manufacturing operations.  Miller Aff. at ¶ 18.

42.    Although the Debtors' U.S. hourly workforce was reduced by 15% over the 15-month period ended December 31, 2004, as of June 30, 2005, approximately 12% of Delphi's U.S. hourly workforce was in a non-productive status.  In 2004, this cost Delphi more than $170 million, including wages and benefits.  Miller Aff. at ¶ 18.

### The U.S. Vehicle Production Environment For Domestic OEMs

43.    The Debtors assert that they are facing considerable challenges due to revenue decreases and related pricing pressures stemming from a substantial slowdown in GM's North America vehicle production.  GM currently comprises approximately 49% of Delphi's sales, and GM sales for the first six months of 2005 were down approximately $1.6 billon, an 18% year-over-year decline, thereby adversely affecting Delphi's financial performance.  Miller Aff. at ¶ 19.

### Increasing Commodity Prices

44.    During the first six months of 2005, the Debtors incurred substantial commodity cost increases, most notably for steel and petroleum-based resin products.  Although the Debtors intend to pass cost increases to its customers, the Debtors claim that if they are not successful, their income in future periods will be further adversely affected.  Miller Aff. at ¶ 20. Presumably, the Debtors' energy costs will also be increasing due to the effects from this year's hurricanes on energy prices.

45.    Based upon pre-filing discussions with their Unions and GM that were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely

basis, the Debtors decided to commence these chapter 11 cases.  Utility Motion at ¶ 12.

### Post-Petition Financing

46.    On the Petition Date, the Debtors filed the *Motion For Order Under 11 U.S.C. §§ 105, 361, 362, 363, 364(c), 364(d), and 364(e) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) Authorizing Debtors to Obtain Secured Postpetition Financing on Superpriority Secured and Priming Basis, (II) Authorizing Use of Cash Collateral, (III) Granting Adequate Protection to Prepetition Secured Lenders, (IV) Granting Interim Relief, and (V) Scheduling a Final Hearing Under Fed. R. Bankr. P. 4001(b) and (c)* (the "DIP Financing Motion").

47.    Through the DIP Financing Motion, the Debtors sought a final order allowing Delphi to obtain postpetition financing up to $2 billion, consisting of a $1.75 billion revolving credit facility, and a $250 million term loan facility.  The Debtors also sought, on a preliminary basis, the authority to borrow up to $950 million.  DIP Financing Motion at p. 2.

48.    On October 12, 2005, the Court entered the *Interim Order Under 11 U.S.C. §§ 105, 361, 362, 363, 364(c), 364(d), and 364(e) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) Authorizing Debtors to Obtain Secured Postpetition Financing, (II) To Utilize Cash Collateral, (III) Granting Adequate Protection to Prepetition Secured Lenders, and (IV) Scheduling a Final Hearing Under Fed. R. Bankr. P. 4001(b) and (c)* (the "Interim DIP Financing Order").

49.    Pursuant to the Interim DIP Financing Order, the Debtors were authorized to borrow up to $950 million.  Interim DIP Financing Order at ¶ 5(a).

50.    On October 28, 2005, the Court entered the *Final Order Under 11 U.S.C. §§ 105, 361, 362, 363, 364(c), 364(d), and 364(e) and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) Authorizing Debtors to Obtain Secured Postpetition Financing, (II) To Utilize Cash Collateral*

15

*and (III) Granting Adequate Protection to Prepetition Secured Parties* (the "Final DIP Financing

Order").

51.     Although the Debtors' counsel asserts in the Utility Motion that none of the

utilities need post-petition deposits or other security, that argument is weakened by that the fact

that the Final DIP Financing Order provides a carve-out from superpriority claim status up to

$35 million for the fees of professionals.  Final DIP Financing Order at ¶ 6(b).

### Facts Concerning SCE

52.     SCE provided the Debtors with pre-petition utility service and it continues to

provide the Debtors with post-petition utility service.

53.     Under SCE's state mandated billing cycles, the Debtors receive approximately

one month of utility service before SCE issues a bill for such service.  Once a bill is issued, the

Debtors have 19 days to pay the applicable bill.  If the Debtors fail to timely pay the bill, a past

due notice is issued and a late fee is subsequently imposed on the account.  If the Debtors fail to

pay the bill after the issuance of the past due notice, SCE issues a notice that informs the Debtors

that they must cure the arrearage within 17 to 20 days or their service will be disconnected.

Accordingly, under SCE's billing cycles the Debtors could receive at least 2 months of unpaid

service before their service could be terminated for a post-petition payment default.

54.     SCE's estimated pre-petition losses and two-month post-petition deposit request

is currently as follows:

| Utility | No. of Accounts | Est. Pre-Petition Debt | Deposit Request |
|---|---|---|---|
| SCE | 1 | $183,033.05 | $226,910 |

### Debtors' Proposed Adequate Assurance of Payment Procedures

16

55.     Section 366(b) of the Bankruptcy Code provides:

> Such utility may alter, refuse, or discontinue service if neither the
> trustee nor the debtor, within 20 days after the date of the order
> for relief, furnishes adequate assurance of payment, in the form of
> a deposit or other security, for service after such date.  On request
> of a party in interest and after notice and a hearing, the court may
> order reasonable modification of the amount of the deposit or
> other security necessary to provide adequate assurance of
> payment.

56.     As set forth above, § 366 of the Bankruptcy Code establishes a procedure

whereby a debtor is to provide a utility with "adequate assurance of payment, in the form of a

deposit or other security" within the first 20 days of the bankruptcy proceeding.  If the debtor

fails to provide the utility with adequate assurance of payment that the utility believes is

reasonable, the utility is entitled to alter, refuse or discontinue service to the debtor.  If, however,

either party is not satisfied with the amount of the deposit or other security that is proposed as

adequate assurance of payment, they can move the Bankruptcy Court, upon notice and a hearing,

to modify the amount.

57.     Under the Debtors' proposal, which completely reverses the procedure

established by the clear language of § 366, the Debtors have obtained a 45-day period of time in

which they have to respond to a demand for adequate assurances.  As such, instead of having to

respond to demands for adequate assurance within 20 days of the Petition Date, *i.e.*, October 28,

2005, the Debtors obtained a 45 day period in which to respond to an adequate assurance

demand, and then the Debtors' only obligations in response thereto is to determine if the utilities'

requests were reasonable and to then file a motion for determination of additional adequate

assurance of payment and notice such motion for hearing.  Furthermore, based upon the January

6, 2006 Letter from Debtors' counsel to SCE's counsel, the Debtors incorrectly believe that

17

paragraph 6 of the Final Utility Order provides that requests for adequate assurance must be

received by the Debtors within 25 days of the date of service.  However, paragraph 6 does not

contain a 25 day deadline for a utility to make an adequate assurance request.  Regardless of

what the Final Utility Order provides, it is null and void as to SCE because the Debtors never

properly served SCE with the Utility Motion, Interim Utility Order, or Final Utility Order in

accordance with Bankruptcy Rules 7004 and 9014.

58.    In light of the Debtors' admitted severe financial and liquidity problems, the

uncertainty as to whether the Debtors will even be able to successfully reorganize, and the

exposure presented by the Utilities' state law billing cycles, any further delay in reaching an

initial determination of what the Debtors should provide as adequate assurance of payment is

highly prejudicial to SCE.  Therefore, SCE respectfully requests that the Court immediately

determine what adequate assurances of payment pursuant to § 366(b) of the Bankruptcy Code

should be provided to SCE.

**I.    THE COURT SHOULD VACATE THE FINAL UTILITY ORDER AS TO SCE
BECAUSE THE DEBTORS DID NOT PROPERLY SERVE EITHER THE
UTILITY MOTION OR THE INTERIM AND FINAL UTILITY ORDERS UPON
SCE.**

Bankruptcy Rules 7004 and 9014 require that service of a motion upon a corporation be

made by mail to the attention of an officer, a managing or general agent or to any other agent

authorized by appointment or by law.  Specifically, Rule 4(b)(3) of the Federal Rules of

Bankruptcy Procedure, made applicable by Bankruptcy Rule 7004, provides for service of

process by mail on a corporation as follows:

> Upon a domestic or foreign corporation or upon a partnership or
> other unincorporated association, by mailing a copy of the summons
> and complaint to the attention of an officer, managing or general

> agent, or to any other agent authorized by appointment or by law to
> receive service of process and, if the agent is on authorized to
> receive service and the statute so requires, by also
> mailing a copy to the defendant.

Courts have held that the notice requirements set forth in Fed. R. Civ. P. 4(b)(3) are to be strictly adhered to and that service of process must be addressed to a specific officer, managing or general agent. *See In re Golden Books Family Entertainment, Inc.*, 269 B.R. 300, 305 (D. Del. 2001) (holding that notices addressed to the "Asst. Controller" were deficient because "they failed to address any of the copies of the notice to a person of authority or to a person authorized to accept service"); *see also In re Schoon*, 153 B.R. 48 (Bankr. N.D. Cal. 1993) (holding that notices addressed to "Attn: President" did not constitute valid service upon an officer and "makes a joke of the requirement that an officer be served."); *Addison v. Gibson Equipment Co., Inc. (In re Pittman Mechanical Contractors, Inc.)*, 180 B.R. 453 (Bankr.E.D.Va.1995) (holding that because "nationwide service of process by first class mail was a rare privilege," notice addressed to "President or Corporate Officer" was improper because no individual was named).

Adequate and timely notice of the filing of a suit is an essential element of our judicial system. As held by the Supreme Court and reiterated by Judge McKelvie in *Golden Books*, "due process of law in any proceeding which is to be accorded finality [requires] notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and to afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). Rule 4(b)(3) serves to assure that a corporate defendant is placed on actual notice of a suit filed against it and strict compliance with this notice requirement in turn serves to protect its due process rights as well as assure that bankruptcy matters proceed expeditiously. *Pittman Mechanical*, 180 B.R. at 457

19

The Affidavits of Service regarding service of Section 366 pleadings upon SCE do not reference or otherwise reflect service upon "an officer, managing or general agent, or to any other agent authorized by appointment or by law to receive service of process" on behalf of SCE.  In fact, the Affidavits of Service provide that the Debtors served SCE with the Utility Motion, and Interim and Final Utility Orders via a post office box address used by SCE customers to send payments, which receives over 10,000 payments a day.  Accordingly, it is undisputed that the Debtors failed to properly serve SCE, a corporation, with the Utility Motion, Interim Utility Order, or Final Utility Order in accordance with Bankruptcy Rules 7004 and 9014.  As a result of the Debtors failure to properly serve SCE, SCE, which had the Debtors account listed as Hughes Aircraft, did not learn of the bankruptcy until they contacted the Debtors about unpaid invoices and were informed that the Hughes Aircraft account was part of the Delphi bankruptcy.  Furthermore, SCE did not learn of the Utility Motion, Interim and Final Utility Orders until Debtors' counsel provided them to SCE in response to SCE's request for adequate assurance that was sent out once SCE learned that its Hughes Aircraft account was part of the bankruptcy.

Not only did the Debtors deprive SCE of their due process rights by failing to properly serve SCE with the Utility Motion, the Interim Order and the Final Utility Order, they continued this deprivation by refusing to consider SCE's request for adequate assurance of payment made on November 16, 2005 (39 days from the Petition Date).  Although Section 366 of the Bankruptcy Code has no deadline to make requests for adequate assurance of payment,[1] the Debtors elected to extend their deprivation of SCE's rights by electing to ignore SCE's

---

[1] Interestingly, the only deadline in Section 366 is the 20-day deadline that the Debtors have to provide utilities, such

November 16, 2005 request for adequate assurance of payment based on the provisions of the

Final Utility Order.  Moreover, even after SCE retained counsel and brought the Debtors' due

process violation to their attention and made an offer in accordance with settlements that the

Debtors reached with other utilities, the Debtors continued to hide behind the provisions of the

Final Utility Order instead of agreeing to bring this matter before the Court.

It is even more troubling to consider that all of the foregoing due process violations could

have been avoided if the Debtors, with a minimal amount of effort, made a phone call or

conducted a web search to obtain the name and address of an officer or registered agent for SCE

by contacting the California Secretary of State.  SCE was unquestionably and wrongfully denied

any opportunity to contest the relief sought in the Utility Motion and to seek adequate assurance

pursuant to the terms of the Interim and Final Utility Orders.  Therefore, the Court should vacate

the Final Utility Order as to SCE and permit it to be heard on the issues raised in the Utility

Motion and this Motion.  Furthermore, at a minimum, the Court should hear SCE on the issues of

adequate assurance of payment because Section 366(b) permits SCE to move for a determination

of adequate assurance at any time during the case.

---

as SCE, with adequate assurance of payment.  The Debtors were able to avoid this deadline as to SCE through the
entry of the Interim and Final Orders that were entered without notice to SCE.

II.     **THE COURT SHOULD ORDER THE DEBTORS TO PAY THE DEPOSIT
REQUESTED HEREIN AS ADEQUATE ASSURANCE OF PAYMENT
PURSUANT TO SECTION 366 OF THE BANKRUPTCY CODE.**

A determination of adequate assurance is within the court's discretion, and is made on a

case-by-case basis.  In re Utica Floor Maintenance, Inc., 25 B.R. 1010, 1016 (Bankr. N.D.N.Y.

1982); In re Cunha, 1 B.R. 330, 332-33 (Bankr. E.D. Va. 1979).  SCE acknowledges that the

Second Circuit Court of Appeals' decision in Virginia Electric And Power Company v. Caldor,

Inc., 117 F.3d 646 (2d Cir. 1997) is controlling authority, even though it was statutorily

overruled by amendments to the Bankruptcy Code that took effect on October 17, 2005 and the

legal basis for the decision is in question.  Despite the foregoing, the Court in Caldor, merely

held that a court is afforded reasonable discretion in determining what constitutes adequate

assurance of payment in each case and that, in certain exceptional cases, adequate assurance of

payment may not require anything more than the protections already afforded the utilities under

the Bankruptcy Code.  This case, however, does not present the "exceptional" set of

circumstances that was presented in Caldor.  To the contrary, under the totality of circumstances

test that Caldor establishes, it is clear that the Court should impose some form of adequate

assurance of payment -- in this case to require the Debtors to pay the deposit requested herein to

protect SCE from an unreasonable risk of nonpayment of post-petition invoices.

SCE believes that adequate assurance of payment for post-petition utility services to the

Debtors for the following reasons:

a.          Delphi admits that it will have significant negative EBITDAR until at
least the end of August 2006;

b.          Delphi is faced with significant organized labor issues that threaten the

very existence of Delphi as a going concern in the future;

c.       Delphi admits that it has been suffering losses since 2003;

d.       Delphi admits that its financial condition had deteriorated further in the first six months of 2005, with net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.  Reported net losses in calendar year 2004 were $4.8 billion;

e.       Although the Debtors' U.S. hourly workforce was reduced by 15% over the 15-month period ended December 31, 2004, as of June 30, 2005, approximately 12% of Delphi's U.S. hourly workforce was in a non-productive status.  In 2004, this cost Delphi more than $170 million, including wages and benefits;

f.       The Debtors assert that they are facing considerable challenges due to revenue decreases and related pricing pressures stemming from a substantial slowdown in GM's North America vehicle production.  GM currently comprises approximately 49% of Delphi's sales, and GM sales for the first six months of 2005 were down approximately $1.6 billion, an 18% year-over-year decline, thereby adversely affecting Delphi's financial performance; and

g.       During the first six months of 2005, the Debtors incurred substantial commodity cost increases, most notably for steel and petroleum-based resin products.  Although the Debtors intend to pass cost increases to its customers, the Debtors claim that if they are not successful, their income in future periods will be further adversely affected. Moreover, the Debtors will also be facing increasing energy prices this fall and winter.

Accordingly, unless SCE is granted the deposit it is requesting herein, SCE will be subjected to

an unreasonable risk of nonpayment from the Debtors for post-petition services that SCE

provides on an arrearage basis.  Alternatively, SCE requests that it be granted some form of

advance payments to reduce the exposure presented by its state mandated billing procedures.

Additionally, it is also clear that Debtors' counsel is concerned about the Debtors' ability

to pay their bills and those of other professionals employed in connection with these bankruptcy

23

cases, as they are seeking to obtain a super-priority carve-out for their and other professionals' post-petition fees in the amount of up to $35 million.

Moreover, Section 366 of the Bankruptcy Code was enacted to balance a debtor's need for utility services from a provider that holds a monopoly on such services, with the need of the utility to ensure for itself and its rate payers that it receives payment for providing these essential services.  See In re Hanratty, 907 F.2d 1418, 1424 (3d Cir. 1990).  The balance is struck, with respect to a debtor, by not allowing the utility to require the debtor to pay prepetition invoices or exorbitant deposits[2] in exchange for providing a debtor with an essential service.  In consideration for negating the utility's bargaining power, Section 366 provides that utilities are to receive "adequate assurance of payment, in the form of a deposit or other security" from the debtor for having to assume the risk of providing the debtor with post-petition service.

The deposit or other security "should bear a reasonable relationship to expected or anticipated utility consumption by a debtor."  In re Coastal Dry Dock & Repair Corp., 62 B.R. 879, 883 (Bankr. E.D.N.Y. 1986).  In making such a determination, it is appropriate for the Court to consider "the length of time necessary for the utility to effect termination once one billing cycle is missed."  In re Begley, 760 F.2d 46, 49 (3d Cir. 1985).   Based on the Debtors' anticipated utility consumption, the minimum period of time the Debtors could receive service from SCE before termination of service for non-payment of bills is approximately two (2) months.  Accordingly, the two-month security deposit requested by SCE is reasonable.   See In re Stagecoach, 1 B.R. 732, 735-36 (Bankr. M.D. Fla. 1979) (two month deposit is appropriate

---

[2]SCE is a state-regulated entity that can only request a deposit or other security that is permitted by its Tariffs.  Accordingly, the deposit request made by SCE cannot and do not exceed the amount of security it is permitted to request under its tariffs.

where the debtor could receive 60 days of service before termination of services because of the utilities' billing cycle.); see also In the Matter of Robmac, Inc., 8 B.R. 1, 3-4 (Bankr. N.D. Ga. 1979).

WHEREFORE, SCE respectfully requests that this Court enter an order:

(I)    Vacating the Utility Order in its entirety as to SCE and allowing it to have a prompt hearing before this Court on adequate assurance of payment;

(II)    Award SCE the post-petition adequate assurances of payment it has requested from the Debtors herein; and

(III)    Award such other and further relief as the Court deems just and appropriate for the Debtors' initial and continued violations of SCE's due process rights.

Dated: January 20, 2006
       Uniondale, New York

ROSEN SLOME MARDER LLP

By: /s/ Jil Mazer-Marino
        Thomas R. Slome (TS-0957)
        Jil Mazer-Marino (JM-6470)

333 Earle Ovington Boulevard
Ninth Floor
Uniondale, New York 11553-3622
(516) 227-1600

and

Russell R. Johnson III
2258 Wheatlands Drive
Manakin-Sabot, Virginia  23103
(804) 749-8861

*Co-Counsel for Southern California Edison Company*

G:\Johnson\Southern CA Edison\Delphi\Lit\Motion to Vacate-SCE-v2.doc