HEARING DATE & TIME: FEBRUARY 9, 2006 @ 10:00 A.M.
OBJECTION DEADLINE: FEBRUARY 6, 2006 @ 5:00 P.M.

Seyfarth Shaw LLP
World Trade Center East
Two Seaport Lane, Suite 300
Boston, MA 02110
(617) 946-4800
William J. Hanlon, Esq. (WH 8128)

*Attorneys for LBQ Foundry S.A. de C.V.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>DELPHI CORPORATION<br><br>Debtors. | Chapter 11<br>Case No. 05-44481 (RDD) |

**MOTION FOR ORDER UNDER 11 U.S.C. § 365(d)(2)
DIRECTING THE DEBTORS TO DETERMINE WITHIN 20 DAYS
WHETHER TO ASSUME OR REJECT THEIR EXECUTORY
CONTRACTS WITH LBQ FOUNDRY S.A. DE C.V.**

TO: THE HONORABLE ROBERT D. DRAIN

LBQ Foundry S.A. de C.V. ("LBQ") hereby moves for an order under 11 U.S.C. § 365(d)(2) and Fed. R. Bankr. P. 6006 directing Delphi Corporation to determine whether to assume or reject its executory contracts with LBQ within 20 days. In support of this Motion, LBQ respectfully represents as follows:

**Introduction**

1. LBQ is a Mexican subsidiary of Le Belier, a French corporation. Neither LBQ nor Le Belier have U.S. operations.

2. LBQ is a sole source supplier of brake components to Delphi Energy & Chassis Systems ("DESC")[1] pursuant to several long-term purchase orders denominated

---

[1] Upon information and belief, DESC is a division of Delphi Corporation.

BO1 15750824.3 / 38968-000002

"Requirements Contract," (the "LBQ Requirements Contracts"). As of the petition date, invoices in the aggregate amount of approximately $1,409,044.73 remain unpaid.

3.   As a direct result of DESC's defaults, LBQ faces a severe liquidity crisis which threatens its ability to continue to supply brake components to DESC. If LBQ is to be able to fulfill DESC's purchase orders, DESC must assume and cure its agreements with LBQ. If DESC does not wish to continue doing business with LBQ, in order to avoid catastrophic damage to the Debtors and to LBQ, LBQ must take immediate, and appropriate steps to deal with its own creditors and to attempt to assure a smooth transition of DESC to a new supplier.

### Relief Requested

4.   LBQ seeks an order under 11 U.S.C. § 365(d)(2) directing the Debtors to determine whether to assume or reject the LBQ Requirements Contracts within 20 days.

### Filings and Jurisdiction

5.   On October 8, 2005 (the "Petition Date"), Delphi Corporation and 39 of the 42 of its domestic subsidiaries and affiliates (collectively, "Delphi" or the "Debtors") filed voluntary petitions, and on October 14, 2005, the remaining Debtors, filed voluntary petitions in this Court for reorganization relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Also on the Petition Date, this Court entered an order directing the joint administration of the Debtors' Chapter 11 cases (Docket No. 28).

2

6.  No trustee or examiner has been appointed in the Debtors' cases. The Office of the United States Trustee has appointed a single Official Committee of Unsecured Creditors for all the Debtors pursuant to 11 U.S.C. § 1102.

7.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409, This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

8.  The statutory predicates for the relief requested herein are sections 105(a) and 365(d)(2) of the Bankruptcy Code.

## The LBQ Contracts

9.  LBQ supplies Delphi with aluminum brake components under the LBQ Requirements Contracts, summarized as follows:

### Le Belier/Delphi Requirements Contracts

| Exhibit | Program | P.O. Number | Issue Date | End Date | Part Number(s) |
|---|---|---|---|---|---|
| A | GMX001 | 550025911 | 05/08/03 | 09/30/09 | 18077920 |
| B | GMT800 | 550004915 | 11/01/01 | 06/01/06 | 18045894 |
| C | GMT800 mod | 550075014 | 06/06/05 | 12/31/07 | 18084773 |
| D | GMT355 | 550005887 | 11/01/01 | 12/31/07 | 18042476 |
| E | GMT 900 | 550025909 | 05/07/03 | 06/30/11 | 18077597 |

See, *Affidavit of Victor Ortega Giles*, paragraph 7, hereinafter, ("Ortega Affidavit").

10. All but one of the LBQ Requirements Contracts states that "This Requirement Contract is for 100% unless otherwise specified.[2] Each LBQ Requirements Contract calls for delivery to Delphi's Needmore, OH facility. Each LBQ Requirements Contract specifies an initial price for each product, and certain adjustments in the prices of such products to become effective on certain specified dates. Ortega Affidavit, ¶8.

---

[2] Purchase order 55002909 specifies a quota of 25%.

3

BO1 15750824.3 / 38968-000002

11. Copies of the LBQ Requirements Contracts are attached hereto as <u>Exhibits A – E</u>. The LBQ Requirements Contracts are periodically updated by way of purchase order. Ortega Affidavit, ¶9.

12. DESC is in default under the LBQ Requirements Contracts, having failed to make full payment for components sold and delivered to Delphi prior to the Petition Date. The total balance due for LBQ's pre-petition performance under the LBQ Requirements Contracts (exclusive of the actual pecuniary loss caused by DESC's default) is not less than $1,409,044.73. This balance includes the price of components delivered under the LBQ Requirements Contracts between May, 2005 and October 8, 2005. Ortega Affidavit, ¶10.

13. The LBQ Requirements Contracts are each and all "executory contracts" within the purview of section 365 of the Bankruptcy Code, 11 U.S.C. § 365. Each LBQ Requirements Contract has the essential characteristic of an executory contract: <u>i.e.</u>, "performance remains due to some extent on both sides." H.R. Rep. No. 95 — 595, at 347 (1977); S. Rep. No. 95 -989, at 58 (1978), quoted in <u>In re The Penn Traffic Company</u>, 2005 2276879 at *2 (S.D.N.Y. Sept. 16, 2005). Specifically, LBQ has an unperformed obligation to sell goods to DESC, and DESC has an unperformed obligation to pay for them.

### Consequences of Default

14. DESC's default under the LBQ Requirements Contracts has resulted in a severe and ongoing liquidity crisis for LBQ which threatens LBQ's ability to perform under the LBQ Requirements Contracts. LBQ's own creditors are unwilling to extend the credit necessary to LBQ's continued performance unless the LBQ Requirements

4

Contracts are cured and assumed. If DESC is unwilling to assume the LBQ Requirements Contracts, LBQ must take immediate steps to advise DESC in obtaining a replacement supplier.

15.   To produce the products under the LBQ Requirements Contracts, LBQ has made a capital investment of just under $1,800,000, which has been depreciated to a current value of $1,000,000 in specially designed machinery with a limited life span and limited adaptability for new purposes. Assuming that new purposes could be found, LBQ estimates a start-up time of approximately one year until production begins. Even taking into account depreciation on this investment, LBQ does not make a profit fulfilling the LBQ Requirements Contracts. Ortega Affidavit, ¶12. Notwithstanding this state of affairs, LBQ is prepared perform the LBQ Requirements Contracts, but cannot do so without the Debtor's commitment.

16.   DESC's payment default alone has caused an extraordinary cash flow problem which threatens LBQ's viability. Specifically, LBQ cannot replace the $1,409,040 of cash due from DESC with vendor or bank financing. Approximately two-thirds of the cost to produce parts for DESC is attributable to materials. No supplier will extend credit to LBQ for the length of this reorganization. Ortega Affidavit, ¶13. Unless the interruption in LBQ's cash flow is corrected, LBQ will not have sufficient funds to pay for materials, may be cut off by its own suppliers and may be unable to perform under the LBQ Requirements Contracts.

17.   In addition to the cash flow crisis caused by DESC's default, DESC's failure to assume the LBQ Requirements Contracts has made it impossible for LBQ to obtain working capital financing. Even if DESC were to cure its payment default today,

BO1 15750824.3 / 38968-000002

LBQ must obtain working capital funding in the approximate amount of $1.8 million dollars in order to keep manufacturing products. This facility has proven impossible to obtain while Delphi retains the right to reject the LBQ Requirements Contracts. LBQ's annual sales to DESC for 2004 were approximately $9,900,000. DESC purchased approximately one-third of LBQ's output in 2004. No lender is willing to loan to LBQ as long as DESC retains the right to reject the LBQ Requirements Contracts, raising the possibility that LBQ cannot perform under the LBQ Requirements Contracts. Ortega Affidavit, ¶14.

18. Notwithstanding the severe consequences of DESC's default, LBQ has continued to supply proprietary products to Delphi Mexico at the rate of approximately $40,428 per month. Ortega Affidavit, ¶15. LBQ is not subject to the automatic stay in Mexico, yet it has refrained from exercising its remedies in Mexico. Id.

## Basis for Relief

19. The Bankruptcy Code generally permits debtors to determine whether to assume or reject executory contracts at any time before confirmation of a plan of reorganization. However, pursuant to 11 U.S.C. 365(d)(2), a party to an executory contract may request an order compelling a debtor to determine whether to assume or reject the contract within a specified period of time. Section 365(d)(2) provides in pertinent part as follows:

> In a case under Chapter 9, 11 12, or 13 of this title, the trustee may assume or reject an executory contract ... of the debtor at any time before the confirmation of a plan *but the court, on request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract ...*

11 U.S.C. § 365(d)(2) (emphasis added).

20.     Congress intended bankruptcy courts to grant such relief so as to "prevent parties in contractual or lease relationships with the debtor from being left in doubt concerning their status vis-a-vis the estate." In re Univ. Medical Or., 973 F.2d 1065, 1079 (3d Cir. 1992); see also In re Beker Indus. Corp., 64 B.R. 890, 898 (Bankr. S.D.N.Y. 1986); House Report No. 95- 595, 95th Cong., 1st Sess. at 348-49 (1977); Senate Report No. 95-989, 95th Cong., 2nd Seas. at 59 (1978). Indeed, the United States Supreme Court has recognized that "in certain circumstances, the rights of the nondebtor party ... outweigh the need of the debtor in possession for unlimited flexibility and breathing space." NLRB v. Bildisco & Bildisco, 465 U.S. 513, 552 (1984).

21.     Thus, as noted by a bankruptcy court in this district in In re Enron Corp., 279 B.R. 695, 702 (Bankr. S.D.N.Y. 2002), "the breathing space afforded to the debtor for the assumption or rejection of executory contracts is not without limits." Rather, the bankruptcy court should determine, within its broad discretion, what constitutes a reasonable time for a debtor to decide whether to assume or reject a contract, based on the particular facts of each case. In re Burger Boys, 94 F.3d 755, 760 (2d Cir. 1996); Theatre Holding corp. v. Mauro, 681 F.2d 102, 105 (2d Cir. 1982) ("What constitutes a reasonable time is left to the bankruptcy court's discretion in the light of the circumstances of each case"); In re Adelphia Communications Corp., 291 B.R. 283, 292 (Bankr. S.D.N.Y. 2003); In re Diligent, Inc., 268 B.R. 723, 738 (Bankr. S.D.N.Y. 2001) (reasonable time is determined by the bankruptcy court on a case-by-case basis); Beker; 64 B.R. at 898.

22.     Among the factors courts have considered in applying their discretion are:

(1)     the importance of the contracts to the debtors' business and reorganization;

7

(2) the debtors' failure or ability to satisfy post-petition obligations;

(3) the nature of the interests at stake;

(4) the balance of hurt to the litigants, and the good to be achieved;

(5) whether the debtors have had sufficient time to appraise their financial situation and the potential value of their assets in formulating a plan;

(6) the safeguards afforded the litigants;

(7) the damage the non-debtor will suffer beyond the compensations available under the Bankruptcy Code;

(8) the importance of the contracts to the debtors' business and reorganization;

(9) whether there is a need for judicial determination as to whether an executory contract exists;

(10) whether exclusivity has been terminated;

(11) whether the action to be taken is so in derogation of Congress' scheme that the court may be said to be arbitrary; and

(12) The purpose of Chapter 11, which is to permit successful rehabilitation of debtors.

See In re Burger Boys, Inc. 94 F.3d at 760; Theatre Holding Corp. 681 F at 105-06; Adelphia, 291 B.R. at 293 (ordering debtors to assume or reject executory contract within three months); Beker, 64 B.R. at 896 (ordering debtor to assume or reject executory contracts); In re Charrington Worldwide Enters., Inc., 98 B.R. 65, 70 (Bankr, M.D. Fla. 1989) (directing debtor to file motion within seven days to assume executory contract), *affd*, 110 B.R. 973 (M.D. Fla, 1990); In re Teligent, 268 B.R. at 738-39.

23. Obviously, these factors overlap in many cases, Equally obviously, the weight to be accorded to each factor will depend on the particular circumstances of each

8

case. Adelphia, 291 B.R. at 293, 295-300. In this case, almost all of these factors clearly weigh in favor of directing a prompt decision to assume or reject the LBQ Requirements Contracts.

A. **Application of the Foregoing Factors to the LBQ Requirements Contracts**

24. *The importance of the contracts to the Debtors' business and reorganization.*

This factor weighs in favor of requiring prompt assumption or rejection of the LBQ Requirements Contracts. Delphi has made it abundantly clear that the failure of an essential supplier to deliver threatens its entire production line. LBQ is an "essential supplier" to Delphi because the products that DESC buys from LBQ are critical components of Delphi's own products, and cannot readily be obtained elsewhere. The viability of essential suppliers is critical for Delphi's operations, and for the operations of a multitude of vendors and employees. Delphi is empowered to insure the continuation of an uninterrupted supply of parts by curing defaults and providing LBQ the assurances that LBQ's creditors require.

25. *The Debtor's failure or ability to satisfy post-petition obligations.*

This factor also weighs in favor of requiring prompt assumption or rejection of the LBQ Requirements Contracts. DESC will continue to need brake parts. Delphi has the means to purchase brake parts. Indeed, Delphi's ability to operate continuously is critical to continuing to satisfy post-petition obligations. Because the LBQ Requirements Contracts are "requirement contracts," Delphi controls its own consumption and post-petition obligations.

9

26. *The nature of the interest at stake.*

This factor also weighs in favor of requiring prompt assumption or rejection of the LBQ Requirements Contracts. DESC has a substantial interest in insuring LBQ's continuing performance under the LBQ Requirements Contracts. The LBQ Requirements Contracts are also important to LBQ because LBQ will not be able to secure working capital financing without the contracts assumed or, alternatively, an exit strategy in place.

27. *The balance of hurt to the litigants, and the good to be achieved.*

This factor also weighs in favor of requiring prompt assumption or rejection of the LBQ Requirements Contracts. As noted, the outstanding balance of DESC's pre-petition payment obligations represents a critical cash flow item to LBQ. LBQ's ability to obtain financing hinges on Delphi's decision to assume or reject. On the other hand, curing its contractual defaults would not impose severe burden on Delphi. Delphi has already set aside $90 million to pay the pre-petition claims of "Essential Suppliers" and another $45 million to pay "Foreign Creditors". Replacing LBQ will require a new vendor to make a significant capital investment, and will necessarily increase the cost of goods to Delphi. The "overall good to be achieved" is the stabilization of the supply chain, so that LBQ can continue manufacturing the products DESC needs and Delphi can concentrate on the root of causes of its financial distress and achieve a successful reorganization.

28. *Whether the Debtors have had sufficient time to appraise their financial situation and the potential value of their assets in formulating a plan.*

Delphi's manufacturing needs are well sorted. Continual production is essential to Delphi's reorganization. Delphi is very good at analyzing and monitoring its

10

supply chain. Delphi's relationships with its suppliers in general and with LBQ in particular are not the source of its economic woes. As Delphi has acknowledged, its financial stress stems from other causes, including legacy liabilities, onerous collective bargaining agreements, the competitive United States vehicle production environment for domestic OEMs, and rising commodity prices. The determination as to whether or not the LBQ Contracts are advantageous to the Debtors is a simple matter, which the Debtors should have no difficulty in undertaking. If, contrary to LBQ's belief, the Contracts are disadvantageous to Delphi, then the quicker they are shed the better.

29.   *The safeguards afforded to the litigants.*

This factor also weighs in favor of requiring a prompt decision to assume or reject the Contracts. So long as the Contracts are neither assumed nor rejected, LBQ remains at substantial risk, as does Delphi's supply chain.

This risk extends beyond the question of what, if anything, LBQ will ever recover on its pre-petition claims. The current uncertain state of affairs severely hampers LBQ's ability to obtain working capital financing. Without new financing, LBQ's entire production facility is at risk. While accepting payment pursuant to a "Foreign Creditor" program may solve the immediate cash flow issue, it does not resolve crisis of confidence that prevents LBQ from obtaining third party financing. The cash consequence to DESC of paying LBQ under the Foreign Creditor program versus assumption is the same. Moreover, because the LBQ Requirements Contracts are "requirements" contracts, under which Delphi's purchase obligations are pegged to its own needs, there is little risk associated with the contracts. Finally, Delphi's "General Terms and Conditions" that are incorporated in all its contracts contain a "Termination for Convenience" provision,

11

which provides Delphi with the ability to exit from any disadvantageous contract at a modest cost.

30. *The damage the non-debtor will suffer beyond the compensation available under the Bankruptcy Code.*

This factor overlaps with several other factors previously discussed. It weighs in favor of a prompt decision to assume or reject the Contracts. For the reasons stated above, the "compensations available under the Bankruptcy Code" are woefully inadequate to protect LBQ against the significant damage it will suffer if no prompt decision is made to assume or reject the LBQ Requirements Contracts.

31. *Whether there is a need for judicial determination as to whether an executory contract exists.*

This factor also weighs in favor of a prompt decision to assume or the LBQ Requirements Contracts. There is clearly no need for such a determination, and thus no reason to defer the decision to assume or reject.

32. *Whether exclusivity has been terminated.*

This factor is entitled to little weight in the circumstances of this case. Of course, the Debtors' "exclusivity" rights under 11 U.S.C. § 1121 have not expired or been terminated, and, as noted above, a plan is many months if not years away. However, as also noted above, the LBQ Requirements Contracts are far removed from the basic issues that any plan must address. See Adelphia, 291 B.R. at 300 ("the subject contract is not so critical to the Debtors' operations that their ability to reorganize (or their exclusive right to file a reorganization plan) will be affected in any significant way by their decision to assume or reject it").

12

33. *Whether the action to be taken is so in derogation of Congress' scheme that the Court may be said to be arbitrary.*

This factor weighs in favor of requiring a prompt decision to assume or reject chain, because good cause – the preservation of Delphi's supply chain and LBQ's business – exists, and in light of the factors discussed in this Motion, could not possibly be "so in derogation of Congress' scheme that the court may be said to be arbitrary." See Adelphia, 291 B.R. at 296, n29.

34. *The purpose of Chapter 11.*

For the reasons elaborated above, LBQ respectfully suggests that the purpose of Chapter 11, i.e., the successful rehabilitation of Debtors, will be advanced by the setting of an early deadline for the assumption or rejection of the LBQ Requirements Contracts. Stabilizing and bringing some certainty to the relationship between LBQ and DESC will work to the advantage of all parties.

## Conclusion

35. For the foregoing reasons, the Court should enter an Order directing the Debtors to assume or reject each of the LBQ Requirements Contracts within a period of twenty (20) days from the entry of the Order.

## Notice

36. Notice of this Motion has been provided in accordance with the Order Under 11 U.S.C. §§ 102(1) and 105 and Fed.R.Bankr, P. 2002(m), 9006, 9007, and 9014 Establishing (I) Omnibus Hearing Dates, (II) Certain Notice, Case Management, and Administrative Procedures, and (ill) Scheduling An Initial Case Conference in Accordance with Local Bankr. R, 1007-2(e) entered by this Court on October 14, 2005

BO1 15750824.3 / 38968-000002

(Docket No. 245). In light of the nature of the relief requested, LBQ submits that no other or further notice is necessary.

## Memorandum of Law

37.  Because the legal points and authorities upon which this Motion relies are incorporated herein, LBQ respectfully requests that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

LBQ FOUNDRY S.A. DE C.V.

By its attorneys,

/s/ William J. Hanlon
William J. Hanlon (WH 8128)
SEYFARTH SHAW LLP
World Trade Center East
Two Seaport Lane, Suite 300
Boston, MA  02210
Telephone:    617-946-4800
Telecopier:    617-946-4801
whanlon@seyfarth.com

DATED: January 27, 2006

BO1 15750824.3 / 38968-000002