SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                  :
   In re                                       :       Chapter 11
                                                  :
DELPHI CORPORATION, et al.,       :       Case No. 05-44481 (RDD)
                                                 :
                  Debtors.    :       (Jointly Administered)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C §§ 105(a) AND 363(b) AUTHORIZING
DEBTORS TO PAY CERTAIN FINANCIAL ADVISOR FEES AND
EXPENSES INCURRED BY THE UNITED AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF AMERICA AND THE INTERNATIONAL
UNION OF ELECTRONIC, ELECTRICAL, SALARIED, MACHINE AND
<u>FURNITURE WORKERS-COMMUNICATIONS WORKERS OF AMERICA</u>

("UAW AND IUE-CWA FINANCIAL ADVISOR PAYMENT MOTION")

1

Delphi Corporation and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases, hereby submit this motion (the "Motion") for an order under 11 U.S.C. §§ 105(a) and 363(b) authorizing the Debtors (as defined below) to pay certain financial advisor fees and expenses incurred by the United Automobile, Aerospace And Agricultural Implement Workers Of America ("UAW") in connection with the UAW's retention of Lazard Frères & Co. LLC ("Lazard") and Milliman, Inc. ("Milliman"), and incurred by the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communications Workers of America (the "IUE-CWA") in connection with the IUE-CWA's retention of Chanin Capital Partners L.L.C. ("Chanin"). The UAW and IUE-CWA are referred to herein collectively as the "Unions," and Lazard, Milliman, and Chanin are referred to herein collectively as the "Financial Advisors." In support of this Motion, the Debtors respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8, 2005 (the "Initial Filing Date"), Delphi and certain of its U.S. subsidiaries (the "Initial Filers") filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). On October 14, 2005, three additional U.S. subsidiaries of Delphi (together with the Initial Filers, collectively, the "Debtors") also sought reorganization relief. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. This Court entered orders directing the joint administration of the Debtors' chapter 11 cases (Docket Nos. 28 and 404).

2

2. On October 17, 2005, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "Creditors' Committee"). No trustee or examiner has been appointed in the Debtors' cases.

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4. The statutory predicates for the relief requested herein are sections 105(a) and 363(b) of the Bankruptcy Code.

B. Current Business Operations Of The Debtors

5. Delphi Corporation, together with its subsidiaries and affiliates (collectively, "Delphi" or the "Company") is a leading global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company's technologies and products are present in more than 75 million vehicles on the road worldwide. The Company supplies products to nearly every major global automotive original equipment manufacturer, with 2004 sales to its former parent, General Motors Corporation ("General Motors" or "GM"), equaling approximately $15.4 billion, and sales exceeding $850 million to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group.

6. Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM. Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi in accordance with the terms of a Master Separation Agreement between Delphi and GM (the "Separation"). In connection with the Separation, Delphi accelerated its evolution from a North American-based, captive automotive

supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, more than half of Delphi's current revenue is generated from non-GM sources.

C.  Delphi's Employees And Collective Bargaining Agreements

7. As of the Initial Filing Date, Delphi employed more than 180,000 employees worldwide. Approximately 50,600 of these employees work in the United States at 44 manufacturing sites, 13 technical centers, and Delphi's Troy, Michigan worldwide headquarters. Approximately 34,750 of the U.S. employees as of the Initial Filing Date were hourly employees, and the other 15,850 were salaried and management employees, almost half of whom were engineers engaged in designing and manufacturing Delphi products.

8. Approximately 95% of the Debtors' hourly employees who work at different facilities on different product lines in the United States are represented by two principal unions – the UAW, which represents approximately 70% of Delphi's hourly workforce, and the IUE-CWA, which represents approximately 25% of the hourly workforce. Delphi has collective bargaining agreements with each of the Unions as well as local agreements at each Delphi facility covering primarily local issues with affiliated local unions. Delphi also has collective bargaining agreements covering smaller groups of U.S. hourly employees with four other unions – the United Steelworkers of America, Local 87 (the "USWA"), the International Association of Machinists and Aerospace Workers (the "IAM"), the International Brotherhood of Electrical Workers (the "IBEW"), and the International Union of Operating Engineers (the "IUOE").

9. In conjunction with the Separation, Delphi assumed the terms of existing GM collective bargaining agreements applicable to Delphi operations and committed to "mirror," or duplicate, the 2003 GM-UAW agreement resulting from the next round of industry bargaining by GM, Ford, and Chrysler (collectively, the "Big Three"). At the time of the Separation, the

4

general economic conditions and outlook for the U.S. auto industry were very different from those of today and certain assumptions were made about the ability of Delphi to gradually reduce its labor and legacy costs to more competitive rates typical of peer auto-parts manufacturers and suppliers.  In particular, it was assumed that the Company would continue to receive significant amounts of business from GM while developing other supply relationships and business opportunities.  Furthermore, it was assumed that the Company would be able to negotiate lower rates with its U.S. unions for newly-hired employees who would in time replace the higher-wage portions of the Company's workforce as they retired or returned to work for GM pursuant to "flow-back" agreements entered into at the time of the Separation.[1]  For a number of reasons, including a precipitous decline in the North American market share of GM, which in turn limited the number of high-wage employees who could flow-back to GM, these reductions never materialized.  Consequently, Delphi's labor costs under its current labor agreements remain largely based upon the pattern set by the Big Three.

D.    Events Leading To Chapter 11 Filing

10.    In the first two years following the Separation, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales.  Reflective of a downturn in the marketplace, Delphi's financial condition deteriorated further in the first six months of 2005, with net operating losses of $608 million for the first six months of calendar year 2005 on six-

---

[1]    During the 1999 negotiations of the Separation, GM, Delphi, and the UAW entered into a tripartite "Flow-back Agreement."  Under this agreement, GM agreed to permit UAW-represented Delphi employees with prior GM seniority to return to GM positions as openings became available.

5

month net sales of $13.9 billion -- approximately $1 billion less than the same time period a year earlier.[2]

11.   The Debtors believe that the Company's financial performance has deteriorated because of: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements that originated in the Separation, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations and requiring Delphi to maintain wage, benefit, and staffing levels higher than those provided or maintained by Delphi's competitors, all of which have the effect of creating uncompetitive fixed labor costs, (b) an extremely competitive U.S. vehicle production environment for domestic auto manufacturers that resulted in a reduction in the number of motor vehicles that GM produces annually in the United States and caused related pricing pressures, and (c) increasing commodity prices with respect to, among others, oil, steel, and other raw materials necessary for Delphi's manufacturing processes.

12.   In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, operational issues, product portfolio, and forward-looking revenue requirements.  Because discussions with its unions and GM were not progressing sufficiently, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

13.   Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive

---

[2]   Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

6

legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing base to preserve the Company's core businesses. This will require extensive negotiations with the Unions and other key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness. The Debtors believe that a substantial segment of Delphi's U.S. business operations must be divested, consolidated, or wound-down during these cases.

        14.       Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations. In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers and continue the strategic growth of its operations in order to maintain its prominence as the world's premier auto supplier.

<u>Relief Requested</u>

        15.       By this Motion, the Debtors seek entry of an order under sections 105(a) and 363(b) of the Bankruptcy Code authorizing the Debtors to pay: (a) $175,000 per month to Lazard for financial advisory services rendered to the UAW, plus an additional amount for expenses incurred in connection therewith, (b) $175,000 per month to Chanin for financial advisory services rendered to the IUE-CWA, plus an additional amount for expenses incurred in connection therewith, and (c) up to $100,000 per month to Milliman for actuarial services rendered to the UAW, plus an additional amount for expenses incurred in connection therewith (the foregoing payments to all of the Financial Advisors are referred to herein collectively as the "Advisor Fees"). The Unions have specifically requested that the Debtors pay the Advisor Fees

7

in order to further the full participation of the Unions in important and necessary discussions regarding these chapter 11 cases, as described below.

16.     Among other things, Lazard and Chanin will independently review and analyze the business, operations, financial condition, and prospects of the Company and projections related thereto; advise and attend meetings of the UAW and the IUE-CWA and their respective officers and advisors, as well as meetings with the Unions and the Company; and review and provide analysis to the Unions of the financial aspects of any proposed modifications to the Debtors' existing obligations under their respective collective bargaining agreements with the Unions.  The UAW has further requested the financial services of Milliman to assist the UAW with a full range of actuarial services related to the Delphi employee benefit programs, including the defined benefit pension plan, covering UAW-represented Delphi employees. Milliman's services will include, among other things, an analysis of the current plans; performing expense and liability analyses regarding the plans; actuarial and financial evaluation of proposals and scenarios regarding the plans; and consultation regarding pension and other benefits matters in connection with the restructuring and its overall effect on UAW-represented Delphi employees.

17.     As a condition to bringing this Motion, the Unions and the Debtors have agreed that the Debtors will not be obligated to pay the Advisor Fees unless any order granting this Motion provides that:  (a) the Advisor Fees paid by the Debtors will be applied against, and be considered part of, any distribution in respect of any resolution of any claims the Unions may have (without diminishing any claims employees may have) against the Debtors in these chapter 11 cases, whether by settlement agreement or judgment of this Court, (b) the Debtors will maintain a unilateral right to terminate the commitment to pay the Advisor Fees at any time upon

30 days' notice to the Unions, (c) the Debtors will not be party to any engagement agreement between the Unions and their Financial Advisors and will not assume or be subject to any obligations or liabilities arising as a result of such engagement except with respect to the payment of fees and expenses as set forth in this Motion, (d) subject to the monthly caps and terms provided herein, each Financial Advisor may seek, in its first request for compensation and reimbursement of expenses pursuant to the order granting this Motion, compensation for work performed and reimbursement for expenses incurred during the period beginning on the date of the Financial Advisor's retention (which, in the case of Lazard, is November 1, 2005; in the case of Chanin, is November 21, 2005; and, in the case of Milliman, is November 22, 2005) and ending on the date of the request, (e) prior to the payment of any Advisor Fees, each Financial Advisor will be required to submit to the Debtors and the Creditors' Committee statements specifying the services performed and the disbursement and expenses incurred and will provide such supporting documentation for each statement as the Debtors or the Creditors' Committee shall reasonably require, and (f) in the event that either the Debtors or the Creditors' Committee have an objection to any of the compensation or reimbursement sought in a particular statement, the Debtors shall withhold payment of that portion of the fee statement to which the objection is directed until such time as the objection is resolved or so ordered by the Court.  In addition, prior to the entry of any order granting this Motion, the Creditors' Committee and the Unions must agree upon circumstances under which the Creditors' Committee may terminate the commitment to pay the Advisor Fees.

Basis For Relief

18.    Delphi and the unions representing its U.S. hourly employees have adhered to a practice of "pattern bargaining" that began at GM several decades ago.  Under this

9

practice, Delphi negotiates first with the UAW. Once Delphi and the UAW reach a national agreement, the IUE-CWA and the USWA, followed by the IAM, the IBEW, and the IUOE, historically have adopted the basic terms negotiated by the UAW, with variations based on each respective union's specific circumstances, such as the particular Delphi product lines and facility locations of the union's respective membership. At the same time, the Company also negotiates any "local issues" with the designated local unions.

19. The Delphi-UAW national labor agreement and the Delphi-IUE-CWA national labor agreement adopted at the time of the Separation were renegotiated in 2003 and extended for a four-year term through 2007. As noted above, these labor agreements are applicable to approximately 95% of Delphi's U.S. hourly work force. In April 2004, the Company finalized a seven-year supplement to the UAW national labor agreement (the "UAW-Supplement"). The UAW-Supplement sets new wage and benefit levels for future hires. In light of the current automotive production environment in the United States, specifically at GM's North American production facilities, the Company does not currently anticipate hiring any meaningful number of U.S. hourly employees under the terms of the UAW-Supplement for the foreseeable future.

20. At this time, the Company generally continues to operate under its current labor agreements inherited from the Big Three following the Separation. To survive, Delphi believes it must substantially modify the restrictive terms and costs imposed by these agreements. Accordingly, in October and November 2005, Delphi provided the Unions with comprehensive proposals of significant modifications to existing labor agreements which the Debtors had determined to be necessary to allow them to achieve their restructuring plans.

Complex and detailed supporting information has been provided to the Unions relating to these proposals, including competitor analyses and financial models.

21.     Following the making of these proposals, GM became involved in the negotiations between the UAW and Delphi, leading Delphi in December to withdraw its November proposals, which had been based solely on Delphi's financial constraints. To facilitate these discussions, Delphi also elected to postpone the filing with the Court of motions under sections 1113 and 1114 of the Bankruptcy Code until at least February 17, 2006. In the event that GM's participation in these negotiations does not lead to a satisfactory resolution, Delphi has reserved the right to return to its earlier proposals.

22.     In furtherance of these on-going discussions, and in the face of the substantial complexities involved, the need for expedition, and the enormous scope of activities that have been and must continue to be pursued and negotiated in the coming weeks, the Unions have requested that Delphi pay for the Financial Advisors to assist the Unions in the myriad of issues expected to arise in connection with the due diligence analysis and restructuring discussions with the Debtors and GM.

23.     The Unions have indicated to the Debtors that the Financial Advisors will provide services tailored to the particular needs and concerns of each of the Unions in these negotiations. The UAW and the IUE-CWA represent some 95% of the Debtors' U.S. hourly employees working at different facilities on different product lines, which in turn are in varying economic straits which may be affected in different ways by the restructuring - issues that are different from other stakeholders in these chapter 11 cases. As a result, the labor negotiations will raise unique issues and potentially conflicting priorities for each of the Unions and their memberships. Accordingly, the Unions have requested the independent assistance of Lazard,

Chanin, and Milliman in reviewing, analyzing, and advising them with respect to the financial data supplied to them and the specific proposals affecting their respective memberships.

24.     In light of the foregoing considerations, particularly the importance of the full participation of the Unions in these negotiations and the belief that the Financial Advisors' assistance to the Unions would be in the best interests of the Debtors, their estates, their creditors, and other parties-in-interest, Delphi has agreed to seek authority to pay the Advisor Fees consistent with the terms of this Motion.

Applicable Authority

25.     Section 105(a) of the Bankruptcy Code provides, in relevant part, that "the court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  In turn, section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  To approve a request for the use of property of the estate outside the ordinary course of business, a court must find that the proposed course of action is supported by sound business reasons.  See Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); In re Ionosphere Clubs, Inc., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); Bartel v. Bar Harbor Airways, Inc., 196 B.R. 268, 273 (S.D.N.Y. 1996); In re General Bearing Corp., 136 B.R. 361, 366 (Bankr. S.D.N.Y. 1992); In re Au Natural Restaurant, Inc., 63 B.R. 575, 580 (Bankr. S.D.N.Y. 1986).

26.     Strong business justification exists for the relief requested herein.  The Debtors believe that their employment-related costs and restrictive labor agreements are a key cause of their inability to maintain competitive or sustainable operations in the United States.

12

Based on the extent of the liabilities to employees through collective bargaining agreements, the Debtors must obtain significant participation from the Unions in their restructuring efforts in order to achieve economic viability and successfully emerge from chapter 11 protection.

27.  As noted above, the Debtors have provided and will continue to provide the Unions with detailed information about their labor proposals and financial condition. In light of the extensive nature of the due diligence the Unions have undertaken and will have to continue to undertake, the Debtors believe it is in the best interest of all parties to reimburse the Unions' Advisor Fees in connection with these chapter 11 cases. The Debtors hope that the relief sought herein will foster good faith negotiations that will allow the Debtors to achieve a successful financial and operational restructuring and provide meaningful employment opportunities for the Debtors' employees. Moreover, the Unions and the Debtors have agreed that as a pre-condition to the payment of the Advisor Fees, any amounts paid in Advisor Fees will be applied against and considered part of any distribution in respect of any resolution of any claims the Unions may have (without diminishing any claims employees may have) against the Debtors in these chapter 11 cases.

28.  Payment of financial advisors' fees in circumstances such as these has been approved and authorized in other chapter 11 cases. See In re Bethlehem Steel Corp., Case No. 01-15288 through 01-15302 and 01-15308 through 01-15315 (Bankr. S.D.N.Y. Jan. 7, 2002), aff'd, 2003 WL 21738964 (S.D.N.Y. July 28, 2003) (affirming bankruptcy court decision authorizing debtors to reimburse union's expenses and fees for financial due diligence analysis related to chapter 11 negotiations); In re Republic Technologies Int'l, LLC, Case No. 01-51117 through 01-51120 (Bankr. N.D. Ohio Dec. 4, 2001) (authorizing debtors to pay union's professional fees and expenses incurred in union's chapter 11 negotiations with debtors); In re

Pittsburgh-Canfield Corp., Case No. 00-43394 through 00-43402 (Bankr. N.D. Ohio Oct. 22, 2001) (same); In re LTV Steel Co., Inc., Case No. 00-43866 (Bankr. N.D. Ohio Mar. 21, 2001) (same); see also In re Trans World Airlines, Inc., 1993 WL 559245 (D. Del. June 22, 1993) (affirming bankruptcy court decision authorizing employer reimbursement of $1 million of union's advisors fees pursuant to agreement with unions providing for wage concessions and waiver of certain legal claims against employer in exchange for compromises and agreements from employer, including agreement to pay reasonable fees and expenses incurred by union in connection with agreement).[3]

29.    In the interest of the Court's consideration of potential issues raised by this Motion, the Debtors note that Section 302(a) of the Labor Management Relations Act (LMRA), 29 U.S.C. § 186 ("Section 302"), limits the circumstances in which an employer and union may exchange money or other things of value.  An employer subject to the LMRA is generally prohibited under Section 302(a) from making payments or providing things of value to a union or its officials unless such payments fall within one of the nine statutory exceptions under Section 302(c) of the LMRA, which includes, among other things, payments in settlement of disputes.  Section 302(b) prohibits a union or its officials from requesting, demanding, receiving, or accepting (or agreeing to receive or accept) any payment, loan, or delivery of any money or other thing of value prohibited by Section 302(a). Any person who "willfully" violates Section 302 by paying or receiving an amount or thing of value in excess of $1,000 is guilty of a felony that subjects the violator to a fine of up to $15,000 and 5 years in prison.  See  29 U.S.C. § 186(d)(2); see also U.S. v. Georgopoulos, 149 F.3d 169, 171 (2d Cir. 1998) (noting that Second Circuit Court of Appeals "along with the majority of other Circuits to have considered the issue,

---

[3]  Copies of the unreported bankruptcy court opinions are attached hereto as Exhibit A.

have consistently held that, in the context of Section [302], 'willfully' requires only a finding of general intent").

30.  The Second Circuit has noted that the "fundamental purpose" of Section 302 "is to prevent employers from paying union officials bribes," and that the legislative history of Section 302 indicates that in enacting Section 302, Congress' "'sole purpose' was to insure the integrity of union welfare funds as trust funds for the benefit of employees, and to ensure that payments by employers to the unions would not 'denigrate into bribes.'"  See BASF Wyandotte Corp. v. Local 227, International Chemical Workers Union, 791 F.2d 1046, 1050 (2d Cir. 1986) (citing 93 Cong. Rec. 4804 (sic (4678)) (1947); see also NLRB v. Wyandotte Corp., 798 F.2d 849, 855 (5th Cir. 1986) (noting that "[s]ubsequent amendments to [Section] 302 have reaffirmed the purpose of [Section] 302 as the limited one of 'prevent[ing] bribery, extortion, shakedowns and other corrupt practices'") (citing H.R. Rep. No 286, 91st Cong., 1st Sess. 1-2, reprinted in 1969 U.S.C.C.A.N. at 1159-60).

31.  The Debtors believe that the limitations of Section 302 should not preclude the Court from granting this Motion because the Advisor Fees are not being paid for the direct benefit of the Union or for some unlawful purpose, but, as explained above, for the substantial benefit of the Debtors, their estates, their creditors, and other parties-in-interest.  In any event, the Debtors note that to the extent the payment of the Advisor Fees even arguably implicates the prohibitions of Section 302, the granting of this Motion on the terms proposed should fall within the exception provided under Section 302(c)(2) of the LMRA.  Specifically, Section 302(c)(2) specifies that the "payment or delivery of any money or other things of value" is permitted "in compromise, adjustment, settlement, or release of any claim, complaint, grievance, or dispute in the absence of fraud or duress." 29 U.S.C. § 186(c)(2).  As noted above,

15

the Union and the Debtors have agreed that, as a condition to the filing of this Motion, the Debtors would not be obligated to pay any Advisor Fees of the Union unless any order granting this Motion provides that any Advisor Fees paid by the Debtors will be applied against and considered part of any distribution in respect of any resolution of any claims the Union may have (without diminishing any claims employees may have) against the Debtors in these chapter 11 cases, whether by settlement agreement or judgment of this Court.

       32.    For the forgoing reasons, the Debtors submit that the Motion is consistent with applicable law and the exercise of sound business judgment and in the best interests of the Debtors, their estates, their creditors, and other parties-in-interest.

<u>Notice</u>

       33.    Notice of this Motion has been provided in accordance with the Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing (I) Omnibus Hearing Dates, (II) Certain Notice, Case Management, And Administrative Procedures, And (III) Scheduling An Initial Case Conference In Accordance With Local Bankr. R. 1007-2(e) entered by this Court on October 14, 2005 (Docket No. 245).  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

<u>Memorandum Of Law</u>

       34.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

16

WHEREFORE the Debtors respectfully request that the Court enter an order (a) authorizing the Debtors to pay the Advisor Fees consistent with the terms of this Motion, (b) providing that any Advisor Fees paid by the Debtors will be applied against and considered part of any distribution in respect of any resolution of any claims the Unions may have in these chapter 11 cases, whether by settlement agreement or judgment of this Court, and (c) granting the Debtors such other and further relief as is just.

Dated:  New York, New York
         January 30, 2006

      SKADDEN, ARPS, SLATE, MEAGHER &
        FLOM LLP


      By: /s/ John Wm. Butler, Jr.
        John Wm. Butler, Jr.
        John K. Lyons
        Ron E. Meisler
      333 West Wacker Drive, Suite 2100
      Chicago, Illinois  60606
      (312) 407-0700

       - and -

      By: /s/ Kayalyn A. Marafioti
        Kayalyn A. Marafioti (KM 9632)
        Thomas J. Matz (TM 5986)
      Four Times Square
      New York, New York 10036
      (212) 735-3000

      Attorneys for Delphi Corporation, et al.,
        Debtors and Debtors-in-Possession

The undersigned, on behalf of the Unions, joins in the relief sought in the Motion.

Dated:  New York, New York
       January 30, 2006

                COHEN, WEISS AND SIMON LLP

                By:  /s/ Babette Ceccotti_____
                    Babette Ceccotti (BC 2690)
                330 West 42nd Street
                New York, New York 10036
                Telephone: (212) 563-4100
                Fax: (212) 695-5436

                Attorneys for the United Automobile,
                    Aerospace And Agricultural Implement
                    Workers Of America

                KENNEDY, JENNICK & MURRAY, P.C.

                By:  /s/ Thomas Kennedy_____
                    Thomas Kennedy (TK 0993)
                113 University Place
                7th Floor
                New York, New York 10003
                Telephone: (212) 239-4999
                Fax: (212) 239-1311

                Attorneys for the International Union of
                    Electronic, Electrical, Salaried, Machine
                    and Furniture Workers-Communications
                    Workers of America