Robert N. Michaelson, Esq. (RM 5925)  
Kirkpatrick & Lockhart Nicholson Graham LLP  
599 Lexington Avenue  
New York, NY 10022-6030  
Tel. (212) 536-3900  
Facsimile (212) 536-3901  

– and –

John C. Hutchins, Esq. (BBO #246060)  
Kirkpatrick & Lockhart Nicholson Graham LLP  
75 State Street  
Boston, MA 02109  
Telephone: (617) 261-3100  
Facsimile: (617) 261-3175  
*Attorneys for Applera Corporation*

Hearing Date:    March 9, 2006  
Hearing Time:    10:00 a.m.  
Objection Deadline: March 6, 2006

UNITED STATES BANKRUPTCY COURT  
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re**<br><br>**DELPHI CORPORATION, <u>et</u> <u>al</u>.**<br><br>Debtors. | **Chapter 11 Case No.**<br>**05-44481 (RDD)**<br>**(Jointly Administered)** |

**MOTION FOR AN ORDER GRANTING APPLERA CORPORATION  
(I) AUTHORIZATION TO RECOUP AMOUNTS OWED TO IT BY  
DELPHI MEDICAL SYSTEMS TEXAS CORPORATION AGAINST AMOUNTS  
OWED TO DELPHI MEDICAL SYSTEMS TEXAS CORPORATION BY  
APPLERA CORPORATION, AND/OR (II) RELIEF FROM THE AUTOMATIC STAY  
PURSUANT TO SECTION 362 (d) OF THE BANKRUPTCY CODE TO EXERCISE  
RIGHTS OF SETOFF PRESERVED BY SECTION 553 OF THE BANKRUPTCY CODE  
WITH RESPECT TO PREPETITION AMOUNTS OWING BETWEEN  
<u>APPLERA CORPORATION AND DELPHI MEDICAL SYSTEMS TEXAS CORPORATION</u>**

TO THE HONORABLE ROBERT D. DRAIN  
UNITED STATES BANKRUPTCY JUDGE:

   Applera Corporation ("Applera"), acting by and through its Applied Biosystem group, by the undersigned counsel, respectfully moves that this Court enter an order (i) authorizing Applera to recoup pre-petition amounts owed by Applera to Delphi Medical Systems Texas Corporation (the "Debtor" or "DMSTC") against pre-petition and post-petition amounts owed by Applera to

DMSTC, payment of which has been demanded by DMSTC, (ii) granting Applera relief from the automatic stay pursuant to section 362(d) of the Bankruptcy Code to allow Applera to set off prepetition amounts owing between Applera and DMSTC, and (iii) such other and further relief as the Court may deem appropriate.

In support of this motion Applera respectfully represents:

### Jurisdiction

1. This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Factual Background

2. On October 8, 2005 (the "Commencement Date") each of Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates including DMSTC (collectively with Delphi, the "Debtors"), commenced a case under chapter 11 of the Bankruptcy Code. As set forth in an order of this Court dated October 8, 2005, the Debtors' chapter 11 cases are being jointly administered pursuant to Bankruptcy Rule 1015, and pending as Case No. 05-44481 (RDD).

3. No trustee or examiner has been appointed in these Chapter 11 cases.

4. An Official Committee of Unsecured Creditors was appointed on or about October 17, 2005.

5. On October 28, 2005, the Court entered a Final Order Under 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e), and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors to Obtain Post-Petition Financing, (II) to Utilize Cash Collateral and (III) Granting Adequate Protection to Pre-Petition Secured Parties (the "Final DIP Financing Order") (Docket No. 797).

6. The Final DIP Financing Order provides, in relevant part:

> 18. *Setoff, Replacement Liens and Junior Adequate Protection Liens.* To the extent that a customer or supplier of the Debtors that has an allowable setoff claim under section 506 or 553 of the Bankruptcy Code in respect of its payables owed to any Debtor as of the Petition Date ("Pre-Petition Payables") or a valid right of recoupment that arose prior to the Petition Date (such setoff claim

- 2 -

> or right of recoupment, "Setoff"), such customer or supplier (a "Setoff Claimant") is hereby provided with certain rights and adequate protection as described below.
>
> (a) <u>Exercise of Setoff</u>. (1) . . . Any exercise of any right of Setoff other than in accordance with this Order is subject to section 362 of the Bankruptcy Code. Nothing in this Order shall prevent any holder of a right of Setoff from seeking relief from automatic stay with respect to such Setoff, or prevent the Debtors or any party in interest from objecting or being heard with respect to any such request . . .
>
> (2) Any Setoff Claimant seeking to exercise a Setoff Right against payables during any month (whether against Pre-Petition Payables or Post-Petition Payables) shall submit to the Debtors and the Creditors' Committee) . . . a written request . . . Notwithstanding any award in any such arbitration, in no event shall the Setoff Claimant be permitted to exercise its Setoff Rights against any payables other than Pre-Petition Payables except as set forth in this paragraph 18.[1]

7.     The Final DIP Financing Order is ambiguous and may be interpreted to require holders of recoupment defenses to seek relief from the automatic stay and/or the DIP Financing Order, along with holders of setoff rights, prior to exercising such defenses and rights.

8.     The quoted provisions of the Final DIP Financing Order were not included in the proposed Final DIP Financing Order until Delphi filed Debtors' Omnibus Reply to Objections to DIP Financing Order the day before the final hearing on the DIP Financing Motion. As signed by the Court, the Final DIP Financing Order may be construed to prohibit Applera and other holders of both recoupment and setoff rights from recouping or setting off without first obtaining relief from the automatic stay or complying with the Final DIP Financing Order's provisions for obtaining permission to recoup or set off. Because the Final DIP Financing Motion was a contested matter under Federal Rule 9014 and directly affected Applera's rights, Applera believes due process required more notice to holders of recoupment defenses and setoff rights of the proposed restrictions on their rights and defenses than was actually provided. While reserving its right to contest on the above and other grounds the enforceability and applicability

---

[1] Other portions of Paragraph 18 provide that if a creditor pays its Pre-Petition Payable in full, it will be allowed a replacement setoff right against Post-Petition Payables up to the amount of the pre-Petition Payable it has paid. This substitution mechanism would be of no benefit to Applera. There is no other provision in paragraph 18 that allows for set off or recoupment against Post-Petition Payables.

- 3 -

of the Final DIP Financing Order with respect to Applera's rights of recoupment, out of an excess of caution (and for the reasons set forth in paragraph 21 below, including the prudence of requesting relief from the automatic stay to exercise rights of setoff), Applera is filing this Motion.

## Applera's Transaction and Relationship with DMSTC

9. On June 6, 2005, Applera and DMSTC completed a transaction involving a manufacturing facility which until that date had been used and operated by Applera for the manufacture of highly sophisticated analytical and testing devices, such as DNA and peptide synthesizers, DNA and protein sequencers, and mass spectrometers (the "Products"). Applera had concluded that the manufacturing facility, located in the vicinity of Houston, Texas (the "Houston Facility"), was not efficient because there was excess capacity in the Facility, and that it probably should be sold.

10. On the other hand, because of the technical complexities of the manufacturing processes used in producing Applera's Products, the highly specialized equipment required, the long lead times involved in the procurement of certain parts and components, and the high degree of training and expertise required of the employees at the Houston Facility, Applera needed to find a buyer for the Houston Facility which would commit to a long term contract to continue manufacturing Applera's Products at the Houston Facility using mostly the same employees, equipment and facilities.

11. Applera recognized that to assure continuity of supply of its Products in a timely fashion, there would need to be a transition period for the purchaser of the Houston Facility to train new managers, to put in place its own accounting, inventory and financial systems with appropriate computer software, to establish its own sources of supply, to complete work-in-process at the Houston Facility and to consume Applera's existing inventory of raw materials, parts and components. Since the Houston Facility was leased by Applera from a third party, it would also be necessary to assign the leasehold and obtain consent of the landlord to that assignment.

12. Applera successfully negotiated a transaction with Delphi Medical Systems Corporation which would meet its objectives with respect to the Houston Facility (the "Transaction"). On information and belief, the Transaction also satisfied Delphi's objectives of

acquiring a plant and associated employees that not only had sufficient capacity to meet Delphi's pressing need for additional manufacturing capacity for certain other products, but also would provide an assured source of revenues from Applera's three-year minimum commitment to purchase Products manufactured in the Houston Facility. The Transaction concluded on June 6, 2005 and involved several closely integrated elements, including (1) a sale to DMSTC, a subsidiary of Delphi Medical Systems Corporation, of the equipment and other manufacturing assets of the Houston Facility, the work in process ("WIP") and a short term supply of inventory materials, (2) an agreement under which DMSTC would continue to manufacture Applera's Products in the Houston Facility and Applera committed to purchase specified minimum volumes of the Products, (3) an arrangement for the transfer of the remaining raw materials, parts and components (collectively, "Inventory") to DMSTC on an as-needed basis, and (4) a transition agreement for use by DMSTC of Applera's inventory processing, accounting, purchasing and other systems to make sure that there would be no material interruption in the manufacture of Applera's Products while DMSTC established its management team, set up its own accounting, manufacturing, inventory and financial systems for manufacturing the Products, obtained sources for the timely supply of Inventory, and learned how to operate the Houston Facility effectively. As part of the Transaction, the parties executed 4 documents: (1) a Bill of Sale, Inventory, WIP and Assumption Agreement (the "Inventory/WIP Agreement"), (2) a Contract Manufacturing Agreement ("Manufacturing Agreement"), (3) a Transition Agreement ("Transition Agreement"), and (4) a lease assignment. True and complete copies of these documents are attached as Appendices A through D, respectively.[2]

13. The Manufacturing Agreement deals primarily with the manufacture of Products by DMSTC and their sale and delivery to Applera. However, Section 2.8 of that Agreement also requires DMSTC to purchase Inventory on hand on the date of the Agreement as needed for the manufacture or supply of Products. The Manufacturing Agreement is very explicit in describing the credit that Applera may take for WIP used by DMSTC in production of Products pursuant to

---

[2] To induce Applera to execute and perform its obligations under all four of the listed documents, Delphi executed and delivered a guaranty of performance by DMSTC of all of its obligations and the landlord delivered a consent to the lease. At the closing all of the documents were placed in escrow under an agreement which required that DMSTC receive a wire transfer of funds before a specified deadline before any of the documents could be released and that all the documents had to be released at once.

- 5 -

the Manufacturing Agreement, indicating that the parties intended these obligations be recouped. Paragraph 3.2 of Exhibit 1 to the Manufacturing Agreement states that:

> Delphi will pay for the aggregate value of … WIP by issuance of, and Delphi hereby issues to [Applera], a credit in the amount of the value of the aforesaid WIP as at June 6, 2005 (the "WIP Credit") . . . [Applera] will pay the purchase price for each finished Product that was WIP as of June 6, 2005 by crediting and applying the value of the WIP of such Product as of June 6, 2005 against the WIP Credit, and paying the balance in cash . . . When Delphi issues an invoice for any Product that was WIP as of June 6, 2005, it shall on its invoice apply and credit the appropriate WIP value against the WIP Credit and indicate the amount of cash due, and, if feasible, show the remaining balance of the WIP Credit.[3]

The law of the State of California is specified as the governing law for the Manufacturing Agreement.

14. The Inventory/WIP Agreement transferred title to the equipment and other manufacturing assets to DMSTC and provides that DMSTC is to hold the Inventory at the Houston facility for use in manufacturing Products under the Manufacturing Agreement. The Inventory/WIP Agreement also provides that as Inventory is used by DMSTC to manufacture Products pursuant to the Manufacturing Agreement, Applera, at its option,

> may take an immediate credit for the value and purchase price of [the inventory that was on hand at the Houston Facility as of June 6, 2005] to be applied at [Applera's] discretion to the purchase of Products, or [Applera] may invoice [DMSTC] for such inventory on a weekly or monthly basis and [DMSTC] shall pay any such invoice within thirty (30) days from the invoice date . . . The value and purchase price for the WIP shall be paid by the issuance by Delphi of a credit in such amount against purchases of Products, as more fully set forth in Section 3.2 of Exhibit 1 of the Manufacturing Agreement.

The Inventory/WIP Agreement contains several other cross-references to the Manufacturing Agreement, incorporates the terms defined in the Manufacturing Agreement, and ties performance to obligations under both the Manufacturing Agreement and the Transition

---

[3] Because of the complexities of keeping track of WIP used on a transaction-by-transaction basis and to accommodate DMSTC's cash flow needs, Applera, starting in July 2005, did not insist on the credits for WIP appearing in DMSTC's invoices but instead, at DMSTC's request, invoiced DMSTC for all the WIP but included generous extended payment terms.

- 6 -

Agreement. It also provides that DMSTC will pay or reimburse Applera "for any inventory to be used for the manufacture of products that is not on hand [on the] date [of the Agreement] but that is delivered to the Houston Facility until ordering is transferred [DMSTC] under the Transition Agreement . . . ." Applera's agreement to purchase and resell to DMSTC at cost inventory and components having long lead times for delivery has been essential to DMSTC's ability to be able to perform under the Manufacturing Agreement. Applera is still purchasing certain Inventory for DMSTC.

15.    The Transition Agreement was crucial to the feasibility of the Transaction. It provided for two transition periods. During an Employee Transition Period of thirty days, Applera continued to employ all the employees at the Houston Facility, and DMSTC agreed to reimburse Applera for the employment costs. For a sixty-day period (the "IT Transition Period") Applera also provided administrative services for the employees at the plant and services for the information processing and the purchasing, manufacturing and inventory processing systems. The Employee Transition Period was necessary to permit the employees to have access to the computer software systems of Applera necessary to manufacture the Products. One of the recitals at the beginning of the Transition Agreement explains the purpose of the Transaction as follows:

> Applera is assigning the lease to the [Houston Facility] and selling to Delphi the machinery, furniture, equipment, fixtures, tooling, inventory and other personal property (the 'Transaction") located at such facility *so that Delphi can commence manufacturing and supplying certain products to Applera.*

(emphasis added). The purpose of the transition periods was to enable and facilitate accomplishing this goal and to assure an uninterrupted supply of Products to Applera. Without the transition period services DMSTC would not have been able to manufacture any Products. The law of the State of California is also stipulated as the governing law in the Transition Agreement.

16.    Applera and DMSTC continue to do business under the documents executed in connection with the Transaction.

- 7 -

**Pre-Petition and Post-Petition Claims and Obligations of Applera and DMSTC**

17.     As of October 8, 2005 DMSTC owed Applera $7,535,343 on account of Inventory and WIP in the Houston Facility sold to DMSTC and for services rendered under the Transition Agreement. On that date Applera owed DMSTC $3,854,335 on account of Products manufactured and delivered by DMSTC under the Manufacturing Agreement. As of December 31, 2005 DMSTC was indebted to Applera for an additional $574,526 on account of Inventory and WIP purchased from Applera and used between October 8, 2005 and December 31, 2005. On that same date Applera was indebted to DMSTC for Products manufactured and delivered pursuant to the Manufacturing Agreement between October 8, 2005 and December 31, 2005 in an additional amount of $4,593,241. The balances owing between the parties is summarized in the following table.

|  | Pre-Petition | Post-Petition | TOTAL |
| --- | --- | --- | --- |
| **DMSTC Obligations to Applera** | $ 7,535,343.00 | $ 574,526.00 | $8,109,870.00 |
| **Applera Obligations to DMSTC** | $ 3,854,335.00 | $4,593,241.00 | $8,447,576.00 |
| **NET APPLERA OBLIGATIONS** | $(3,681,008.00) | $4,018,715.00 | $ 337,706.00 |

A statement providing more detailed information with respect to the pre-petition and post-petition accounts receivable and accounts payable owing between Applera and DMSTC is attached as Appendix E. Applera has recently received from DMSTC a report as to its records with respect to the pre-petition account receivable and account payable balances, which appear to be within a net amount of about $116,000 of Applera's figures. The discrepancies may be explained in part by some credits which Applera has agreed to on the accounts receivable owed by DMSTC and some pricing and receipt issues which have not been finally resolved. DMSTC demanded payment of the accounts payable owed by Applera by a letter from Dana Fidler delivered to William Gibbs, Senior Director, Business Operations of Applera, on January 10, 2006, a copy of which is attached as Appendix F.

18.     If, pursuant to § 365 (a) of the Bankruptcy Code, DMSTC rejects the Manufacturing Agreement or Inventory/WIP Agreement as an executory contract, Applera will also have pre-petition rejection damage claims against DMSTC pursuant to § 502 (g) of the Bankruptcy Code ("Rejection Damage Claims").

- 8 -

### **Applera's Recoupment Rights**

19. Applera believes it is entitled to recoup all amounts it presently owes to DMSTC under the Manufacturing Agreement, both pre-petition payables and post-petition payables, against the pre-petition and post-petition accounts receivable owed to it by DMSTC for Inventory and WIP purchased and for services rendered under the Transition Agreement, first, because of the express contractual rights of recoupment set forth in the Inventory/WIP Agreement and Manufacturing Agreement as recited in paragraphs 13 and 14 above, second because California law recognizes the doctrine of recoupment as an equitable remedy available to parties in that state, and third, because bankruptcy courts have long recognized recoupment as an equitable remedy applicable in a bankruptcy context.

20. To the extent Applera has rights of recoupment, the assertion and exercise of such rights is not subject to the automatic stay. As explained in the Memorandum of Law submitted in support of this Motion and incorporated herein by reference (the "Memorandum of Law"), this is because recoupment is viewed as a defense to payment and a means for determining the amount owed to the debtor, rather than a claim against the debtor. Accordingly, the obligation subject to recoupment is not the property of the debtor, and therefore recoupment is not subject to the automatic stay. Applera has not, however, exercised either any rights of recoupment or rights of setoff with respect to the amounts it owes to DMSTC, and there has been no violation of the automatic stay.

21. As noted in the description of the Final DIP Financing Order in paragraphs 7 and 8 above, there is some question as to whether the provisions of paragraph 18 of the DIP Financing Order are meant to bar any exercise of rights of recoupment without further order of the Court. In addition, because the determination of whether recoupment exists can be fact specific, it is generally regarded as prudent to seek court approval of recoupment in advance in order to avoid subsequent attack by the debtor claiming that the exercise of a right of recoupment violates the automatic stay. Because Applera wants to recoup post-petition payables (as well as pre-petition payables) against pre-petition receivables, the Setoff Procedure outlined in the DIP Financing Order will not afford the full recoupment relief to which Applera is entitled. As illustrated by the table in paragraph 17 above, if Applera is allowed only to set off only pre-petition obligations, it will still have a deficiency claim against DMSTC of $3,681,008, but a

- 9 -

recoupment not limited to pre-petition obligations will allow it to be made whole. Therefore, out of an abundance of caution and in order to protect its rights, and without waiving its objections to the applicability or enforceability of the Final DIP Financing Order with respect to Applera, Applera is filing this motion seeking authorization from this Court to exercise its rights of recoupment as described below and, if such authorization is denied, relief from the automatic stay to be permitted to exercise its rights of setoff.

22. Pending a decision on this Motion, Applera has placed an administrative freeze on the accounts payable to DMSTC. It is entitled to freeze payment of those accounts payable pursuant to § 542 (b) of the Bankruptcy Code and *Citizens Bank v. Strumpf,* 516 U.S. 16 (1995). Applera has informed Delphi of that action. See letter from William Gibbs to Dana Fidler dated January 18, 2006 attached as Appendix G.

### Applera's Contractual Rights of Recoupment

23. As noted in the descriptions of the Manufacturing Agreement and the Inventory/WIP Agreement in paragraphs 13 and 14 above, Applera has express contractual rights of recoupment under the terms of those documents with respect to amounts owed by DMSTC for work in progress and other Inventory.

### Applera's Common Law Rights of Recoupment

24. As discussed in more detail in the Memorandum of Law submitted in support of this Motion, recoupment is an equitable remedy that has long been recognized and utilized in the bankruptcy context. *In re Eyke,* 246 B.R. 550, 557 (Bankr. W.D. Mich. 2000). Recoupment allows a defendant to defend against a claim by a plaintiff by asserting a countervailing claim that arose out of the same transaction. *See Beeche Sys. Corp. v. D.A. Elia Constr. Corp. (In re Beeche Sys. Corp.)*, 164 B.R. 12, 18 (Bankr. N.D.N.Y. 1994). However, the right of recoupment is not expressly provided for in the Bankruptcy Code, so that in the bankruptcy context, courts resort to applicable non-bankruptcy law when discussing the right of recoupment. *E.g., id.*

25. In determining whether the equitable right of recoupment exists, bankruptcy courts apply non-bankruptcy law. *E.g., id.* As explained in the Memorandum of Law, bankruptcy courts will apply a contractual choice of law clause in determining which state's recoupment law applies. *See Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138, 146 n.3 (2d

Cir. 2002).[4]  Pursuant to the choice of law provisions in the Manufacturing Agreement and the Transition Agreement, California law should be applied to determine Applera's recoupment rights.[5]

26.     Under California law, recoupment is a defense to payment where the obligation of the defending party to pay is offset by an obligation owing to the defending party arising out of the same transaction. *See Stern v. Sunset Road Oil Co.*, 190 P. 651, 653 (Cal. Ct. App. 1920). A right of recoupment is exercisable if the obligations at issue are not "divisible." *See id.* at 654. Where it appears that the obligations of the transaction would not have been entered into except upon the clear understanding that the full object of the transaction will be performed, the transaction is not divisible and a party may exercise a right of recoupment arising out of that transaction. *See id.*

## Recoupment as Applied in the Second Circuit

27.     After examining applicable state law to determine if the right of recoupment exists, courts in the Second Circuit then have turned to bankruptcy law to interpret whether a particular creditor may exercise that right in bankruptcy. *See, e.g., Malinowski v. N.Y. State Dep't of Labor (In re Malinowski),* 156 F.3d 131, 133 (2d Cir. 1998).[6] Recoupment is allowed where the debts in questions arise out of the same transaction, which has generally been construed in the Second Circuit to require that the debts in question arise out of a single integrated transaction such that it would be inequitable for the debtor to enjoy the benefits of the

---

[4] Although the court in *Westinghouse Credit Corp.* found that the transactions at issue did not constitute a single integrated transaction and did not allow recoupment, *Westinghouse* is distinguishable from this case. In *Westinghouse*, the court found the contract to involve separate transactions because the language of the contract and the distinctly different remedies provided upon breach of different obligations indicated that the parties intended the business be transacted as discrete and independent units. 278 F.3d at 147-148. In this case, as discussed more fully in Paragraph 29 below, language in the documents executed as part of the Transaction makes clear that the parties intended that the Transaction be conducted as a single integrated transaction.

[5] In the event the court determines that the choice of law clauses are not controlling, Texas law should be applied because the relevant actions in this case occurred in Texas. *See In re Woldcom, Inc.,* 304 B.R. 611, 619 (Bankr. S.D.N.Y. 2004). If Texas law is applied, it does not change Applera's right to recoupment, however, because Texas law recognizes that when debts arise out of the same transaction, they give rise to a right of recoupment. *Id.*

[6] Although the court in *Malinowski* found that the obligations at issue were not part of a single integrated transaction and did not allow recoupment, *Malinowski* is distinguishable from this case because there the obligations arose under two separate claims for unemployment benefits based on different episodes of unemployment, and involved "different sets of facts, each complete in itself." 156 F.3d at 134. Here, there is no such disconnect between the obligations Applera seeks to recoup.

transaction without also meeting its obligations. *See Westinghouse Credit Corp.,* 278 F.3d at 147.

28.     The fact that the obligations at issue arise under different contracts does not bar a finding that the contracts are part of a single integrated transaction. *See In re Denby Stores, Inc.,* 86 B.R. at 783 n.18 (Bankr. S.D.N.Y.) (indicating in dictum that although the obligations at issue could not be recouped, it is possible that obligations arising under various documents executed appurtenant to a sale transaction may constitute a single integrated transaction). As explained in the Memorandum of Law, courts in many jurisdictions have found that obligations arising under different contracts can be part of a single integrated transaction where, for example, the purpose of the documents was to facilitate the purpose of the overall transaction. *E.g., In re Eyke*, 246 B.R. at 558.

### The Obligations Owing Between Applera and DMSTC Arise Out of a Single Integrated Transaction

29.     As explained in the Declaration of William F. Gibbs, Senior Director, Business Operations of Applera and formerly the Plant Manager of the Houston Facility, attached as Appendix G (the "Gibbs Affidavit"), the overriding purpose of the Transaction was to further an arrangement under which DMSTC would manufacture Products under the Manufacturing Agreement for Applera on a timely and uninterrupted basis. The recital in the Transition Agreement quoted in paragraph 15 above explicitly states the purpose of the Transaction and expresses the parties' intent that the documents be considered parts of a single integrated transaction. As explained in the Gibbs Affidavit, all of the agreements were structured to enable and facilitate the purpose of the Transaction and are mutually dependent upon and supportive of each other. They are too interconnected to be realistically separated, such that if one of them did not exist, the others could not be performed, would not make sense and would not have been executed. The Manufacturing Agreement not only deals with the manufacture and sale of Products by DMSTC and Applera's commitment to purchase those Products, but also requires DMSTC to purchase Inventory from Applera. DMSTC required the goods and services provided by Applera under the other agreements to fulfill its obligations under the Manufacturing Agreement. Without the right to purchase the Inventory and WIP under the Inventory/WIP Agreement, Applera's agreement to purchase and resell Inventory to DMSTC at cost, and the services Applera provided during the Transition Period, DMSTC would not have been able to

manufacture the Products delivered under the Manufacturing Agreement which gave rise to the accounts payable owing to DMSTC. Put another way, there would be no accounts payable owing to DMSTC if there were no accounts receivable owing to Applera. That the Transaction constitutes single integrated transaction is further evidenced by the explicit recoupment provisions contained in the Manufacturing Agreement and Inventory/WIP Agreement.

### The Equities Favor Allowing Applera to Recoup the Debts Owed to it by Delphi

30.    It would be inequitable to allow DMSTC to enjoy the benefits of the Manufacturing Agreement without also requiring it to meet its obligations arising under the various other agreements it executed in connection with the assets it acquired as part of the Transaction and which were essential for DMSTC to be able to enjoy the benefits of the Manufacturing Agreement. Applera sold the Houston Facility to DMSTC so that DMSTC could manufacture Products for it in that Facility using the Inventory and WIP already located there. Applera has made extensive arrangements and concessions to accommodate DMSTC's difficulties in taking over the operation of the Houston Facility, including making arrangements for Inventory with suppliers who didn't want to deal with DMSTC, granting extended payment terms for the WIP, and placing firm purchase order commitments for a period greater than the thirteen weeks required by the Manufacturing Agreement. To deny recoupment would allow DMSTC to receive a windfall profit from the sale of that Inventory back to Applera in the form of finished Products. The components of the Transaction are so inextricably combined that it would be unjust to try to sever one part of the Transaction from the others. Thus, the equities favor allowing Applera to recoup the obligations owed to it by DMSTC.

### Relief from Stay to Exercise Rights of Setoff

31.    Applera firmly believes it has a right of recoupment. However, in the event the Court does not authorize Applera to exercise rights of recoupment to the full extent requested above, Applera moves for relief from the automatic stay pursuant to § 362(d) of the Bankruptcy Code to allow it to set off the prepetition accounts receivable owed to it by DMSTC against the pre-petition accounts payable it owes to DMSTC. As noted above, if it should be finally determined that recoupment is not warranted but relief from the stay is granted and Applera exercises sits setoff rights, it will have a pre-petition deficiency claim of almost $3,700,000.

32. As set forth more fully in the Memorandum of Law incorporated herein by reference, § 553 of the Bankruptcy Code does not provide creditors with an independent right of setoff but simply preserves for the benefit of a creditor any right of setoff that the creditor had under applicable non-bankruptcy law. *Shirline v. Helman Elect. Corp., (In re Westchester Structures, Inc.),* 181 B.R. 730, 738-39 (Bankr. S.D.N.Y. 1995).

33. Applera has both contractual rights of setoff and common law rights of set off. The provisions in the Manufacturing Agreement and Inventory/WIP Agreement quoted in paragraphs 13 and 14 above, if they are not construed as creating contractual rights of recoupment (as Applera believes they do), certainly grant contractual rights of setoff.

34. The Manufacturing Agreement and the Transaction Agreement both stipulate the law of California as the governing law. The Inventory/WIP Agreement contains cross references to both these agreements. Accordingly, Applera's common law rights of setoff should be determined in accordance with the law of California.

35. As more fully explained in the Memorandum of Law, Applera has established that it has the right under California law to set off the pre-petition account payable owed to DMSTC against the pre-petition account receivable owed by DMSTC. Applera has shown that such pre-petition payables and receivables are both "mutual" and "pre-petition" as required by § 553, and that the credits and debits in question are between Applera and DMSTC, each standing in the same capacity, that is, the mutual claims are owed directly and beneficially, and not in a fiduciary capacity. *See In re Westchester Structures, Inc*., 181 B.R. at 738-739 (Bankr. S.D.N.Y. 1995).

36. Section 506(a) of the Bankruptcy Code provides, in pertinent part:

> "An allowed claim of a creditor…that is subject to setoff under section 553 of this title, is a secured claim…to the extent of the amount subject to setoff…and is an unsecured claim to the extent…the amount so subject to setoff is less than the amount of such allowed claim."

11 U.S.C. § 506(a). Accordingly, Applera's claims against DMSTC is secured to the extent of its right of setoff. *Bank of New York v. Treco (In re Treco),* 240 F. 3d 148 (2d Cir. 2001).

37. The automatic stay in effect under Section 362 of the Bankruptcy Code expressly prohibits the following:

> "The setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor…"

11 U.S.C. § 362(a)(7).  As a result, prior to effectuating a setoff, a creditor must obtain relief from the automatic stay or must otherwise obtain an order allowing the setoff. *See In re Acad. Answering Services, Inc.* 90 B.R. 294, 295 (Bankr. N.D. Ohio 1988).

38. Paragraph (d) of § 362 of the Bankruptcy Code provides that upon request of a party in interest and after notice and a hearing, the Court is empowered to grant relief from the automatic stay in order to permit exercise of a setoff either for "cause" or, with respect to the stay of an act against property, if (A) the debtor does not have an equity in such property, and (B) such property is not necessary to an effective reorganization.

39. The Second Circuit has stated that setoff should be allowed absent compelling circumstances and that "set off should be enforced unless the court finds after due reflection that allowance would not be consistent with the provisions and purposes of the Bankruptcy Act as a whole." *Bohack Corp. v. Borden, Inc. (In re of Bohack Corp.),* 599 F.2d 1160, 1165 (2d Cir. 1979).  Therefore, as explained in the Memorandum of Law, absent compelling circumstances, once a party establishes a right to set off, such party also demonstrates "cause" for lifting the automatic stay.  Applera has established that it has a right of setoff, and accordingly, "cause" exists for granting the relief from the stay sought by Applera.  Alternatively, because of Applera's right of setoff and its security interest, DMSTC has no equity in the accounts payable Applera owes to DMSTC, and for the same reason, they can not be necessary for an effective reorganization of DMSTC.

40. Contemporaneously herewith Applera has filed the Memorandum of Law, pursuant to Rule 9013-1 (b) of the Local Bankruptcy Rules for the Southern District of New York in support of this Motion.  The Memorandum of Law is incorporated herein by reference.

41. Notice of this Motion has been provided pursuant to this Court's Order dated October 14, 2005, establishing notice of procedures in these Chapter 11 Cases.  Applera submits that no other or further notice need be provided.

42. No previous motion for the relief sought here and has been made to this or any other court.

43.     Applera reserves its rights to assert and exercise in the ordinary course of business and without further order of this Court rights of recoupment and/or rights of set off with respect to post-petition receivables and payables not affected by any order granted herein.

44.     Applera also reserves all rights and causes of action with respect to the unsatisfied portion of its claims against DMSTC including without limitation the right to file proofs of claim.

**WHEREFORE,** Applera respectfully requests that the Court enter an Order (i) authorizing Applera to recoup prepetition and post-petition accounts payable which it owes to DMSTC under the Manufacturing Agreement against the accounts receivable owed by Applera to DMSTC, (ii) to the extent the Court does not authorize recoupment, granting relief from the automatic stay pursuant to Section 362 (d) of the Bankruptcy Code to set off prepetition amounts owing between Applera and DMSTC, and (iii) such other and further relief as the Court deems just and appropriate.

Respectfully submitted,

Dated: February 1, 2006
New York, New York

KIRKPATRICK & LOCKHART
NICHOLSON GRAHAM LLP
*Attorneys for Applera Corporation*
599 Lexington Avenue
New York, New York 10022
Telephone (212) 536-3900

By: _____/s/_____
Robert N. Michaelson (RM-5925)