## CONTRACT MANUFACTURING AGREEMENT

THIS CONTRACT MANUFACTURING AGREEMENT ("**Agreement**") is dated as of June 6, 2005 (the "**Effective Date**"), and is by and between APPLERA CORPORATION, a Delaware corporation, acting by and through its Applied Biosystems Group ("**Customer**"), and DELPHI MEDICAL SYSTEMS TEXAS CORPORATION, a Delaware corporation ("**Delphi**") (collectively the "**Parties**," and each individually a "**Party**"), based upon the following recitals.

A.      Customer has designed the instruments and other products described on **Exhibit 1** to this Agreement (collectively, the "Products") and currently manufactures such products at Customer's leased facility in Houston, Texas located at 13215 N. Promenade Blvd., Stafford, TX 77477 (the "Houston Facility"), the lease for which is being assigned and transferred to Delphi concurrently with the execution and delivery of this Agreement.

B.      Customer and Delphi desire that Delphi manufacture the Products described on **Exhibit 1** and that Delphi sell the Products exclusively to Customer and Customer purchase the Products from Delphi, on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE,** in consideration of the mutual promises contained in this Agreement, the Parties agree as follows:

## ARTICLE 1.  DEFINITIONS

As used in this Agreement, the following words, when capitalized, have the meanings set forth below:

1.1      "**Aggregate Purchase Value Shortfall**" has the meaning set forth in Section 3.1(b).

1.2      "**Affiliate{ XE "Affiliate"}**" means any business or other entity which is directly or indirectly controlling, controlled by or under common control with the specified entity, and control means direct or indirect ownership or actual control of at least fifty percent (50%) of the voting shares or other equity interest having power to elect directors or persons performing a similar function.

1.3      "**Beginning Forecast{ XE "Beginning Forecast"}**" has the meaning set forth in Section 2.3(a).

1.4      "**Confidential Information{ XE "Confidential Information"}**" means any and all information which a Party treats as confidential, whether the information is in oral, written, graphic or electronic form; provided that (a) if the information is in writing or other tangible form, it is clearly marked as "proprietary" or "confidential" when disclosed to the Receiving Party by the Disclosing Party or (b) if the information is not in tangible form, it (i) is identified as "proprietary" or "confidential" when disclosed by the Disclosing Party and (ii) is identified in



reasonable detail in a writing which is marked "proprietary" or "confidential" and is delivered to the Receiving Party within thirty (30) days after the date of disclosure by the Disclosing Party to the Receiving Party. Notwithstanding the foregoing, subject to the immediately following sentence, Customer Confidential Information includes, whether or not marked or identified as confidential, (A) the identity of customers of Customer, (B) pricing and other terms of this Agreement, (C) all Specifications, designs, plans, schematics, component and parts lists and other technical information relating to the Products and (D) comments and complaints regarding the Products. Confidential Information excludes any information, data or material which (a) the Disclosing Party expressly agrees in writing is free of any non-disclosure obligations; (b) is independently developed by the Receiving Party or its Affiliates without reference to the Confidential Information of the Disclosing Party (as evidenced by documentation in the Receiving Party's possession); (c) is lawfully received by the Receiving Party or its Affiliates, free of any non-disclosure obligations, from a third Party having the right to so furnish the applicable Confidential Information; or (d) is or becomes generally available to the public without any breach of this Agreement or unauthorized disclosure of Confidential Information by the Receiving Party or any of its Affiliates.

1.5 **"Customer{ XE "Customer"}"** has the meaning set forth in the Preamble to this Agreement.

1.6 **"Defective Products{ XE "Defective Products"}"** has the meaning set forth in Section 10.2.

1.7 **"Delphi{ XE "Delphi"}"** has the meaning set forth in the Preamble to this Agreement.

1.8 **"Disclosing Party{ XE "Disclosing Party"}"** has the meaning set forth in Section 18.2.

1.9 "Firm Order Commitment" has the meaning set forth in Section 2.2.2.

1.10 **"Force Majeure{ XE "Force Majeure"}"** has the meaning set forth in Section 15.1.

1.11 **"Infringing Unit{ XE "Infringing Unit"}"** has the meaning set forth in Section 8.5.

1.12 **"Intellectual Property{ XE "Intellectual Property"}"** means all intellectual property rights worldwide arising under statutory or common law, whether or not perfected, including, without limitation, all (1) patents, patent applications and patent rights; (2) divisions, continuations, continuations-in-part, renewals, reissues, re-examinations, continuing prosecutions, and extensions of the foregoing existing at a time in question, or thereafter filed, issued or acquired; (3)



rights associated with works of authorship including copyrights, copyright applications, copyright registrations, and derivative works; (4) Confidential Information and other proprietary technical or business information that is not generally available to the public; and (5) any right analogous to those specifically set forth in this definition and any other rights relating to intellectual property (other than trademark, trade dress, or service mark rights).

1.13   "**Losses**{ XE "Losses"}" has the meaning set forth in Section 11.1.

1.14   "**Non-Income Taxes**{ XE "Non-Income Taxes"}" has the meaning set forth in Section 5.5.

1.15   "**Party**" and "**Parties**{ XE "Party" and "Parties"}" each have the meaning set forth in the Preamble to this Agreement.

1.16   "**Production Year**{ XE "Production"}" means, for the first Production Year, the twelve (12) month period beginning on the Start of Production, and for all subsequent Production Years during the term of this Agreement, the twelve (12) month period beginning on the anniversary of the Start of Production.

1.17   "**Products**{ XE "Products"}" means the products identified in **Exhibit 1**, and (ii) Service Parts (as defined in Section 13.1), including without limitation refurbished Products.

1.18   "**Receiving Party**{ XE "Receiving Party"}" has the meaning set forth in Section 18.2.

1.19   "**Rolling Forecast**{ XE "Rolling Forecast"}" has the meaning set forth in Section 2.2.2.

1.20   "**Service Parts**{ XE "Service Parts"}" has the meaning set forth in Article 13.

1.21   "**Shortfall Invoice**{ XE "Shortfall Invoice"}" has the meaning set forth in Section 3.1(c).

1.22   "**Specifications**{ XE "Specifications"}" means the specifications for the Products as identified on **Exhibit 2** to this Agreement.

1.23   "**Start of Production**{ XE "Start of Production"}" means the Effective Date, which is the date of the closing of the transaction between Delphi and Customer in which, among other actions, the lease of the Houston Facility is assigned and assumed by Delphi and the closing of the sale of certain manufacturing equipment and other assets of the Houston Facility is consummated. 1.24   "**Term**" means the original three year term of the Agreement set forth in Section 17.1, and any extended term of this Agreement implemented pursuant to Section 17.1 or by Agreement of the Parties.

1.25    **"Third Party"** means any person or entity except Delphi or Customer and their respective Affiliates.

## ARTICLE 2.  PURCHASE AND SUPPLY, FORECASTS AND PURCHASE ORDERS

2.1.    **Purchase and Supply**.

During the Term, Customer agrees to exclusively purchase from Delphi, and Delphi agrees to exclusively supply to Customer, one hundred percent (100%) of Customer's requirements for the Products, excluding off the shelf replacement parts that are generally available commercially, all in accordance with the terms of this Agreement.  For the avoidance of doubt, Customer may order off the shelf replacement parts that are generally available commercially from Delphi pursuant to this Agreement, but is not required to order from Delphi 100% or any other percent or amount of such replacement parts.  Delphi shall not sell Products or components thereof to any person or entity other than Customer or persons designated by Customer in writing, provided that the foregoing shall not preclude Delphi from selling to Third Parties individual Service Parts that are generally available commercially and are not proprietary to Customer.

2.2.    **Forecasts; Purchase Orders**.

2.2.1    **Beginning Forecast**.  **Exhibit 3** sets forth Customer's estimated purchase volumes for each type of Product on a monthly basis for the one (1) year period commencing upon the Start of Production (the **"Beginning Forecast{ XE "Beginning Forecast"}"**).  The aggregate purchase volume for each type of Product set forth in the Beginning Forecast for the first thirteen (13) weeks of the Beginning Forecast, stated in monthly volumes, shall constitute a firm commitment, for which Customer agrees to issue purchase orders as set forth in Section 2.2.3 below, which is not subject to revision by subsequent Rolling Forecasts.  The remainder of the Beginning Forecast is for planning purposes only and is not binding on either Party.

2.2.2    **Rolling 12-Month Forecast**.  On approximately the first day of each month after the Start of Production, Customer shall deliver to Delphi a rolling twelve (12) month non-binding estimated forecast of purchases of each type Product on a monthly basis (each, a **"Rolling Forecast{ XE "Rolling Forecast"}"**).  It is Customer's intent, but it is not a requirement, to update the Rolling Forecast on a weekly basis.  The purchase volume set forth in each Rolling Forecast for the initial thirteen (13) week period of each Rolling Forecast, stated in monthly volumes (each, a **"Firm Order Commitment"**), shall constitute a firm commitment for which Customer agrees to issue purchase orders as set forth in Section 2.2.3 below and which is not subject to reduction or increase by subsequent Rolling Forecasts (provided that Customer may order Products in addition to those set forth in a Firm Order Commitment as provided in Sections 2.4 and

6.3).  If Customer does not provide an updated Rolling Forecast within ten (10) days after the beginning of any month, then Delphi shall use the most recent forecast provided by Customer as the then-applicable Rolling Forecast, including for the purposes of determining the then applicable thirteen (13) week Firm Order Commitment.  Customer shall use reasonable efforts to provide Delphi with reasonable advance notice of any special forecasts, or any unique demand increases or decreases for the Products.  The remainder (beyond the first thirteen (13) weeks) of any Rolling Forecast is for planning purposes only and is not be binding on either Party.

2.2.3   **Submittal of Purchase Orders; Delivery Dates.**  Customer shall submit purchase orders to Delphi for the volume of Products set forth in the applicable Firm Order Commitment, and Delphi shall accept purchase orders from Customer submitted in accordance with this Agreement.  Purchase orders may be issued by mail, facsimile or (upon mutual agreement of the Parties) electronic data interchange.  Customer may order Products subject to each Firm Order Commitment for delivery any time during the month in which delivery of the Products was committed or within ten (10) days after the end of such month, provided that, as set forth in Section 6.3, Delphi shall not be required to deliver any such Product sooner than fifteen (15) calendar days after delivery of Customer's purchase order to Delphi, except, with respect to Service Parts, as set forth in Section 2.2.4, and except that during the last ten (10) calendar days of any month, Customer may designate a delivery date on a purchase order for Products subject to a Firm Order Commitment for such month that is no sooner than five (5) days from the date of the purchase order, or a shipment date that is no sooner then two (2) days from the date of the purchase order.  Delphi shall fill all purchase orders for committed volumes by no later than the delivery dates set forth in Customer's orders, subject to the preceding sentence.  Any such Product delivered within ten (10) after the end of a month, if identified by Customer as counting toward the prior month commitment, shall still be counted as designated for delivery during the previous month's committed forecast notwithstanding that delivery has been deferred and notwithstanding that Delphi may not invoice for the Product until the Product has been shipped.

2.2.4   **Special Order Process for Service Parts.**

2.2.4.1 General Description.   Service Parts (but not Products that are completed instruments) shall be ordered under Customer's JIT ("just in time") program, except to the extent Customer otherwise instructs Delphi in writing. Customer's JIT Program is a just-in-time system of purchasing.  Under the JIT Program, Delphi must supply JIT Inventory to Customer on a frequent basis as instructed via the JIT Report. Time is of the essence in the JIT Program.

5

Delphi ships the product via Customer's designated carrier, FOB Supplier's location, using a carrier account number as provided to Delphi by Customer.

2.2.4.2 <u>JIT Inventory</u>.  The items of JIT Inventory to be supplied under this Agreement are parts and components of Products that are instruments.

2.2.4.3 <u>JIT Ordering</u>.  Customer issues the JIT Report (a sample of which is found in <u>Exhibit 2.2.4.3</u> hereto) on the first business day of each week on Customer's Vendor Self Service ("VSS") web site at <u>https://vss.appliedbiosystems.com/</u>. Each JIT Report, which Delphi must promptly access, states the amount of JIT Inventory required by Customer.  In the event that VSS is inaccessible, Delphi must contact Customer without delay to obtain the JIT Report by other means.  The JIT Report, under "PAST DUE QTY," states the amount of JIT Inventory that Delphi must ship to Customer for delivery no later than the next day.  In addition, Delphi must ship to Customer any PAC Inventory requirements shown in the column entitled "WK1 QTY" for delivery to Customer by the end of the then current business week.

2.2.4.4 <u>Limitation of Liability for Inventory</u>.  Inventory requirements are based on Customer's actual demand and Delphi has been engaged by Customer to provide Inventory in volumes strictly regulated to conform to Customer's actual demand.  Delphi accepts the responsibility to manage Inventory so as to have a sufficient amount available to meet Customer's immediate JIT Report and Safety Stock requirements set forth in Section 2.2.4.5, while acting at all times consistent with the goal of eliminating excess Inventory upon termination of this Agreement.  Notwithstanding the forecast components of the JIT Reports and any steps taken by Delphi in response to any Customer forecasts, Delphi agrees that Customer's entire liability to Delphi for Inventory, Safety Stock and Inventory-related expenditures shall, at any given time, not exceed the value of the sum of the first thirteen (13) weeks worth of forecasted requirements as provided by the most recently issued JIT Report (the "Thirteen Week Commitment").  Any expenditures, including without limitation commitments to third parties, made by Delphi that obligate Delphi beyond the Thirteen Week Commitment shall be at Delphi's sole risk and expense unless otherwise agreed in writing by a duly authorized representative of each Party.  The Thirteen Week Commitment shall not apply in case of and upon termination by Customer under Section 2.2.4.6 below, in which case Customer shall at termination have no further liability for



Inventory, Safety Stock, and Inventory-related expenditures beyond payment for Inventory actually consumed by Customer as of the effective date of termination for cause.

2.2.4.5 <u>Safety Stock</u>.  Delphi shall at all times maintain a Safety-Stock of Inventory in an amount that is equal to the sum of the first twelve (12) weeks of requirements shown within the most recent JIT Report, divided by twelve (12).   This Safety-Stock is to be and remain separate and distinct from Inventory held at Customer facilities and shall be stored by Delphi.

2.2.4.6 <u>JIT Program Representation</u>.  Customer represents that the JIT terms set forth above in this Section 2.2.4 are the same in all material respects as the JIT terms that are in effect with Delphi's Colorado Affiliate with respect to parts that are supplied to Customer by such affiliate, which terms were the terms that Customer entered into with Peak Industries, a company that Delphi acquired. In the event that the foregoing representation is incorrect, Customer will modify the terms of this Section 2.2.4 to make them consistent with the terms applicable to such purchases from Delphi's Colorado Affiliate, except to the extent Delphi otherwise agrees.

2.3     [Intentionally Left Blank.]

2.4     **Non-standard Orders**.  Delphi shall use commercially reasonable efforts to fill any purchase orders in excess of those that Delphi is required to fill pursuant to Sections 2.2.3 or 2.2.4 at the time requested by Customer, provided that Delphi shall not be deemed in breach of this Agreement if despite reasonable efforts it does not fill any such excess purchase orders earlier than ninety (90) days after the date of its receipt of the order.  Notwithstanding the foregoing, as more fully set forth in Section 6.3, if Delphi may incur additional costs to fill any such excess purchase orders in accordance with this Section 2.4, Delphi shall provide a written estimate of the additional costs to Customer, and Delphi shall have no obligation to fulfill the applicable purchase order unless the Parties mutually agree in writing upon the amount of the additional costs which shall be paid to Delphi.

2.5     **Conflicting Terms Void; Modifications**.  All purchase orders issued and sales of Products implemented under this Agreement shall be deemed to incorporate and be governed exclusively by the terms and conditions of this Agreement, unless otherwise agreed in a writing signed by both of the Parties by an officer of the rank of Vice President or higher, or an employee specifically designated in writing as by an officer of the rank of Vice President or higher as authorized to amend the terms of this Agreement.  Any terms contained in any quotation, purchase order, confirmation, invoice or other document which are different from, or in addition to, the terms of this Agreement shall be deemed void and of no effect, unless

7



otherwise agreed in a writing signed by both of the Parties as set forth above in this Section 2.5. Performance by Delphi under a purchase order which incorporates terms which are in addition to, or different than, those set forth in this Agreement shall not constitute acceptance of such different or additional terms, and receipt or acceptance by Customer of Products under a quotation or other document that incorporates terms which are in addition to, or different than, those set forth in this Agreement shall not constitute acceptance of such different or additional terms.

2.6 **Compliance with Law.** Delphi shall, at its own cost and expense, comply with all applicable laws and regulations in connection with its performance hereunder, and shall secure and maintain any and all licenses, permits, and other authorizations which may be required in connection with its performance under this Agreement.

2.7 **Ordering of Lasers from Laser Export Company, Ltd.** Delphi will use reasonable efforts to work out and agree to an arrangement with MDS, Inc. for the ordering of lasers from Laser Export Company, Ltd. through MDS, Inc. and pumps from Varian.

2.8 **Use of Excess Inventory.** Delphi agrees to purchase from Customer, at Customer's book value, and use, or if already purchased, Delphi agrees to use, Houston Facility inventory on hand as of the date of this Agreement when such inventory is needed to manufacture or supply Products to Customer under this Agreement before Delphi purchases and uses any like kind of inventory from any Third Party. Delphi agrees to be responsible for maintaining any such inventory in good order and repair, and shall be responsible for any damage or loss of such inventory. Any such inventory which is lost or damaged shall be deemed purchased and used by Delphi, if not already purchased, or used if already purchased but not yet paid for.

## ARTICLE 3. PRICES AND PAYMENTS

3.1 **Product Pricing.**

(a) **Sale Terms.** Delphi shall sell the Products to Customer at the prices which are listed in **Exhibit 1** to this Agreement. The prices for the Products listed on **Exhibit 1** as of the Effective Date are based on the Specifications; changes in the Product specifications may result in mutually-agreeable changes to Product prices. Delphi shall have no obligation to implement any changes to a Product unless Delphi and Customer agree upon changes to the Product price, or that the Product price need not change.

(b) **Shortfall Payments.** To the extent that the aggregate purchase value (i.e., applicable Product pricing multiplied by actual order volumes, including

without limitation, for the avoidance of doubt, for software products, Service Parts and refurbished Products) of Customer orders for delivery of Products in any Production Year are less than the minimum aggregate purchase value of Products for such Production Year set forth in **Exhibit 1** under the caption "Minimum Aggregate Purchase Value of Products" (an "<u>Aggregate Purchase Value Shortfall</u>") with respect to the Production Year in question, Customer shall pay to Delphi a shortfall payment equal to fifteen percent (15%) of the Aggregate Purchase Value Shortfall, provided, however, that Customer shall not be required to pay any such shortfall payment to the extent that such Aggregate Purchase Value Shortfall is caused by Delphi's breach of this Agreement or a Force Majeure event. In addition, Customer shall not be required to pay any such shortfall payment with respect to any Production Year during which (i) Delphi fails to deliver more than ten (10) shipments (each shipment being the aggregate of one or more Products that have been loaded for delivery on one vehicle, plane or ship) within thirty (30) days of the date such shipments were otherwise required to be delivered under this Agreement or (ii) any other material breach by Delphi of this Agreement that is not curable or which, if is capable of being cured, is not cured within fifteen (15) days after the end of the informal dispute resolution process set forth in Section 17.2.

(c)     <u>Shortfall Invoice</u>. Following the end of each Production Year in which a payment under Section 3.1(b) is due, Delphi shall deliver to Customer an invoice (with reasonable supporting documentation) setting forth payments due to Delphi pursuant to Section 3.1(b) of this Agreement (the **"Shortfall Invoice{ XE "Shortfall Invoice"}"**). Within thirty (30) days after Customer receives the Shortfall Invoice and reasonable supporting documentation, Customer shall pay all amounts due under Section 3.1(b). If Customer disputes any amount which Delphi claims to be due under the Shortfall Notice, Customer may object in writing to any amount which Customer reasonably believes exceeds the actual amount owed to Delphi. For a period not to exceed thirty (30) days after Delphi receives Customer's objection notice, the Parties shall exchange relevant information and diligently attempt in good faith to determine the appropriate amount due under Section 3.1(b). Within ten (10) business days after the conclusion of the negotiating period, Customer shall pay the agreed-upon balance of the Shortfall Invoice. Any amount which then remains in dispute shall be resolved in accordance with Section 17.2 of this Agreement.

## ARTICLE 4.  POST CLOSING ACCESS TO SPECIFICATIONS

4.1     At any time during the term of this Agreement and for a period of one (1) year thereafter, Delphi shall afford Customer reasonable access to the Specifications as in effect on the Effective Date and as they may be modified from time to time after the Closing, together with any Confidential Information of Customer



obtained by Delphi or under Delphi's control. At any time during the term of this Agreement and for a period of one (1) year thereafter, Delphi also shall afford Customer reasonable access to such technical, process, manufacturing method and other information, including without limitation sources of supplies of raw materials and costs thereof, relating to the manufacture and supply of Products as Customer may reasonable request from time to time, excluding any such information that is proprietary or confidential information of Delphi that is materially different than any technical, process, manufacturing method or other such information that was in effect or practiced by Customer at the Houston Facility immediately prior to the Start of Production.

4.2   At Customer's expense, Delphi agrees to make and deliver to Customer one or more electronic or paper copies of any or all the foregoing documents from time to time at Customer's request.

4.3   If requested by Customer within one (1) year after the termination of this Agreement, for any reason except the material breach of this Agreement by Customer, or within one (1) year after the sale by Customer of any product line or business that includes any Product to any Third Party, Delphi will make reasonable efforts to instruct Customer or persons or entities designated by Customer in the means and methods of manufacturing and supplying Products or any of them to assist Customer or such designee or designees in learning how to effectively manufacture Products or any of them, and will respond to Customer's or such designees reasonable questions to such end. Customer agrees to reimburse Delphi any reasonable out of pocket costs of giving such instructions or responding to such requests, and to compensate Delphi for time spent in giving such instructions or responding to such requests on an hourly basis at Delphi's then prevailing commercial rates for such services or, if no such rates are then in existence, at reasonable hourly rates. Any such instruction will be given at times and places reasonably acceptable to Delphi. Delphi shall not be required to unreasonably interfere with its business to furnish such instructions or respond to such questions.

## ARTICLE 5. PAYMENT

5.1   **Wire Transfer**. Payment for Products shall be made by Customer by means of a bank wire transfer of immediately available funds in U.S. Dollars to the Delphi account number provided to Customer by Delphi.

5.2   **Payment Terms**. Customer shall make all payments for amounts due within 30 days after the date of Delphi's invoice. Delphi may only deliver an invoice for a Product after the Product has been shipped to Customer or Customer's designee.

5.3   **Late Payment**. All amounts not paid when due shall bear interest from the due date at the rate of three quarters of one percent (0.75%) per month from the due date until paid. Delphi's right to receive interest on late payments will not limit



or waive any of Delphi's other rights and remedies with respect to any failure by Customer to make a payment when due.

5.4    **Tax Liability**.  Customer is liable for Non-Income Taxes (as defined below) applicable to goods and services sold to Customer by Delphi.  Delphi shall invoice and Customer shall pay the Non-Income Taxes that Customer is liable for unless Customer has provided Delphi with a valid certificate evidencing Customer's exemption from payment of or liability for such Non-Income Taxes.  Invoices shall separately state applicable Non-Income Taxes as required by law.  "**Non-Income Taxes**{ XE "Non-Income Taxes"}" means any federal, state and local sales, use, excise, utility, consumption, value-added and other similar types of transaction based taxes assessed on the provision of goods and services.  For the avoidance of doubt, Non-Income Taxes excludes real and personal (including inventory) property taxes, and taxes based on income to Delphi.

## ARTICLE 6.  DELIVERY

6.1    **Delivery Terms**.  All Products shall be sold FOB Delphi's manufacturing facility in Houston, Texas, unless agreed otherwise in writing by the Parties. Title and risk of loss shall pass to Customer upon loading on the carrier at Delphi's manufacturing facility.  Delphi shall use carriers designated by Customer if requested by Customer, and shall use reasonable forms and procedures requested by Customer.  Delphi will deliver Products to the locations set forth in Customer's purchase orders, or as otherwise directed by Customer in writing.   Without limiting the foregoing, Delphi will "drop ship" Products directly to Customer's customers if requested by Customer, provided that Customer pays all reasonable freight charges incurred in accordance with this Agreement.

6.2    **Packaging**.  Delphi at its expense shall pack and mark the Products, and pack, mark and label shipments, in accordance with the Specifications and in accordance with applicable law and the carrier's requirements.

6.3    **Lead Times; Expedited Delivery**.  Except as may be otherwise agreed in any particular case in writing, all Customer purchase orders shall specify a date of delivery of the Products.  Although Customer may order Products with less than three (3) months lead time (based on the date that a Product first appears on a Firm Order Commitment), in no event shall Delphi be required to ship any Product sooner than seventy (70) days following the date such Product first appears on a Firm Order Commitment, except as set forth in Section 2.2.4 with respect to Service Parts.  In the case of any other order for which Customer requests delivery of Products with less than three (3) months lead time, Delphi shall determine whether the expedited production or shipping can be completed, and advise Customer as to the earliest practicable delivery date and advise Customer in writing of any excess costs that Delphi in good faith expects to incur in filling any such non-standard order.  All such extra costs identified in writing by Delphi to Customer prior to Customer instructing Delphi in writing to proceed

with the expedited order, if any, of fulfilling expedited delivery time orders under this Section 6.3 shall be paid by Customer to Delphi within thirty (30) days after Customer receives an invoice for such costs. Customer shall not be liable to Delphi for any such extra costs unless it instructs Delphi in writing to deliver the non-standard order after Delphi has advised Customer in writing of such costs. Although Delphi shall be under no obligation to deliver Products earlier than required by this Section 6.3, if Delphi agrees to fill a purchase order on an expedited basis, delivery of the Product on the delivery date agreed to by Delphi and Customer shall be required under this Agreement.

6.4   **Late Delivery**.  Time is of the essence with respect to all Product shipments. Delphi shall report delays in shipment immediately to Customers.  If Delphi fails to make delivery of a Product within thirty (30) days after the delivery date required by this Agreement or any other delivery date mutually agreed to in writing, or if on account of late delivery by Delphi Customer's customer cancels its order with Customer, then Customer may cancel the purchase order for such Products that has not been delivered by the specified delivery date by notifying Delphi in writing, and, without limitation of any other right or remedy Customer may have, deduct the aggregate purchase value (i.e., purchase price times volume) of such portion of the purchase order not delivered from the aggregate purchase value described in Section 3.1(b) with respect to the Production Year in which the delivery date specified by Customer falls.

## ARTICLE 7.  INCORRECT QUANTITIES OR TYPE

7.1   **Discrepancy**.  If Customer discovers any discrepancy between (i) the quantity or type of Products ordered by Customer and that received by Customer or (ii) the quantity or type of Products invoiced by Delphi and that received by Customer, Customer shall notify Delphi of the discrepancy as promptly as reasonably feasible.

7.2   **Shortage**.  If the discrepancy is a shortage, Delphi shall, at Customer's option, (i) adjust the invoice, (ii) make a cash refund to adjust for the shortage, or (iii) as quickly as commercially and reasonably practicable, supply the number of units in the applicable shortage to Customer.  Delphi shall be entitled to any insurance proceeds paid to Customer in respect of a shortage for which Delphi replaces units or compensates Customer, provided that the foregoing shall not be deemed to require Customer to carry any particular insurance or make an insurance claim.

7.3   **Overage**.  If there is an overage in any shipment, Customer shall, promptly after learning of the overage, inform Delphi whether Customer will either (i) keep the excess quantity and pay the amount invoiced or the amount to be invoiced if the invoice did not reflect the excess, or (ii) dispose of the excess Products in accordance with Delphi's instructions, in which case all reasonable costs and expenses incurred by Customer in complying with Delphi's instructions shall be promptly reimbursed by Delphi.



7.4    **Non-Conformity.** If the discrepancy is non-conformity as to type, Customer shall, at Delphi's election, return the non-conforming Products to Delphi at Delphi's expense and Delphi shall, upon at Customer's discretion, (i) supply Customer with the conforming Products at its own expense, (ii) refund the purchase price and reasonable expenses for returned non-conforming Products, or (iii) settle such discrepancy in such other manner as agreed upon between Customer and Delphi, all without limitation of any other right or remedy Customer may have. If Customer and Delphi agree to exercise option (i) above, Delphi shall use commercially reasonable efforts to supply conforming Products as soon as reasonably possible and Delphi shall advise Customer of the earliest practicable delivery date.

7.5    **Substantiation of Claims.** For purposes of verifying and substantiating any claim(s) or compensation made by Customer under Article 7 of this Agreement, Customer shall provide to Delphi reasonable access during normal business hours to Customer's premises and such then available information as Delphi reasonably requests, subject to reasonable confidentiality, security and safety procedures imposed by Customer.

## ARTICLE 8.  PRODUCT DEVELOPMENT AND INTELLECTUAL PROPERTY

8.1    **Development by Customer.** Customer and Delphi acknowledge and agree that the Products, as identified on Exhibit 1 to this Agreement, and the Specifications for the Products, as identified on Exhibit 2 to this Agreement, have been developed by Customer prior to the date of this Agreement and that Delphi has no responsibility for historical development of the Products or the Specifications.

8.2    **Independent Ownership of Intellectual Property.** Each Party is and remains the owner of its Intellectual Property, and, except as specifically set forth in Article 8 of this Agreement, no license or other rights, either express or implied, are granted or are to be construed as being granted by either one Party to the other Party, whether express, implied, or by estoppel, to any Intellectual Property, or to trademark, trade dress, or service mark rights, owned, used, licensed to, or otherwise controlled by, a Party, except solely as expressly set forth in this Agreement.

8.3    **License for Production.** Customer grants Delphi a non-exclusive, perpetual, royalty-free, worldwide license to use the Specifications and Customer's other Intellectual Property required for the manufacture, distribution and sale of the Products to the extent and only to the extent required by Delphi to manufacture and deliver Products to Customer under this Agreement. No rights to Intellectual Property, trademark, trade dress, or service mark rights, the Products or their use is granted by Customer to Delphi under this Agreement, except the right to manufacture as set forth in the preceding sentence.



8.4    **Infringement Claims**

8.4.1    **Intellectual Property Indemnity by Customer.**  Subject to the restrictions set forth in this Section 8.4.1, provided Delphi complies with its covenants and obligations set forth in this Section 8.4.1, and provided the Product meets the Specifications applicable to it and that the infringement claims does not arise on account manufacturing means and methods not used by Customer in the manufacture of the Product immediately prior to the date of this Agreement, Customer, at its own expense, agrees to defend Delphi, and indemnify and hold harmless Delphi from and against any infringement damages awarded, in any suit or legal proceeding that may be brought by a Third Party against Delphi, Delphi Affiliates, or their respective officers, directors, employees and agents ("Delphi Indemnitees") to the extent arising from (i) the infringement of Intellectual Property rights of any Third Party on account of (a) the manufacture or sale to Customer of Products by Delphi, provided that Delphi gives Customer prompt written notice of any written claim or threat received by Delphi subject to Customer's indemnity set forth in this Section 8.4.1; and provided further that the failure to deliver prompt written notice to Customer within a reasonable time after the commencement of any such action, if materially prejudicial to its ability to defend such action, will relieve Customer of any obligation to the Indemnitee under this Section 8.4.1, but the failure to give such notice shall not relieve the Customer of any obligation to the Indemnitees under this Section 8.4.1unless the delay is materially prejudicial to its ability to defend such action.  Customer will have the sole right to control and conduct the defense and/or settlement of such indemnified claim, suit or legal proceeding either in the name of Customer or Delphi or both; and Delphi, at Customer's request, and at Customer's expense with respect to reasonable out of pocket expenses paid to Third Parties incurred by Delphi, will provide relevant information and reasonable cooperation.  A Delphi Indemnitee will have the right to retain its own counsel, with the fees and expenses to be paid by Customer if representation of such Indemnitee by the counsel retained by Customer would be inappropriate due to actual or potential differing interests between the Indemnitee and any other Party represented by such counsel in such proceeding.  Upon any judgment of infringement, or prior thereto in Customer's sole discretion, Customer will use commercially reasonable efforts to either procure for Delphi the right to continue to use the Product, replace the Product claimed to infringe with other suitable non-infringing Product, or modify said Product so that it becomes non-infringing.  The foregoing indemnity fully defines Customer's obligations for infringement of the intellectual property rights of others; and the remedies provided above in this Section 8.4.1 are the sole and exclusive remedies of Delphi for patent or other intellectual property infringement.  Notwithstanding anything contained in

14



this Section 8.4.1 to the contrary, Customer's obligations set forth in this Section 8.4.1will not apply to:

(a)  an infringement claim to the extent resulting from additions or changes in or to the Product made solely by Delphi or any Third Party under Delphi's control or from use in combination with other equipment or products not contemplated herein;

(b)  an infringement claim that is settled without the consent of Customer; or

(c)  an infringement claim to the extent resulting from compliance by Customer with modifications furnished, required or requested by Delphi.

8.4.2  **Intellectual Property Indemnity by Delphi.**  Subject to the restrictions set forth in this Section 8.4.2, provided Customer complies with its covenants and obligations set forth in this Section 8.4.1, Delphi, at its own expense, agrees to defend Customer, and indemnify and hold harmless Customer from and against any infringement damages awarded, in any suit or legal proceeding that may be brought by a Third Party against Customer, Customer Affiliates, or their respective officers, directors, employees and agents ("Customer Indemnitees") to the extent arising from the infringement of Intellectual Property rights of any Third Party on account of the manufacture or sale of Products using designs not furnished or expressly approved in writing by Customer or methods not furnished or used by Customer immediately prior to the date of this Agreement, provided that Customer gives Delphi prompt written notice of any written claim or threat received by Customer subject to Delphi's indemnity set forth in this Section 8.4.1; and provided further that the failure to deliver prompt written notice to Delphi within a reasonable time after the commencement of any such action, if materially prejudicial to its ability to defend such action, will relieve Delphi of any obligation to the Indemnitee under this Section 8.4.1, but the failure to give such notice shall not relieve Delphi of any obligation to the Indemnitees under this Section 8.4.1 unless the delay is materially prejudicial to its ability to defend such action. Delphi will have the sole right to control and conduct the defense and/or settlement of such indemnified claims, suit or legal proceeding either in the name of Customer or Customer or both; and Customer, at Delphi's request. and at Delphi's expense with respect to reasonable out of pocket expenses paid to Third Parties incurred by Customer, will provide relevant information and reasonable cooperation.  A Customer Indemnitee will have the right to retain its own counsel, with the fees and expenses to be paid by Delphi if representation of such Indemnitee by the counsel retained by Delphi would be inappropriate due to actual or potential differing interests between the Indemnitee and any other Party represented by such counsel in such proceeding.  Upon any judgment of infringement, or prior



thereto in Delphi's sole discretion, Delphi will use commercially reasonable efforts to procure for Customer the right to continue to use the Product, or, with Customer's consent, which will not be unreasonably withheld, (a) replace the Product claimed to infringe with other suitable non-infringing Product or (b) modify said Product so that it becomes non-infringing. The foregoing indemnity fully defines Delphi's obligations for infringement of the intellectual property rights of others; and the remedies provided above in this Section 8.4.1 are the sole and exclusive remedies of Customer for patent or other intellectual property infringement. Notwithstanding anything contained in this Section 8.4.1 to the contrary, Customer's obligations set forth in this Section 8.4.1 will not apply to:

(a)     an infringement claim to the extent resulting from additions or changes in or to the Product made solely by Customer or any Third Party under Customer's control or from use in combination with other equipment or products not contemplated herein;

(b)     an infringement claim that is settled without the consent of Delphi; or

(c)     an infringement claim to the extent resulting from compliance by Delphi with modifications furnished, required, approved or requested by Customer.

8.5     **Right to Use; Re-Design**. If Customer or any final, non-appealable judgment of a court of competent jurisdiction determines that any Product or individual component of any Product (each, an "**Infringing Unit**"{ XE "Infringing Unit"}) infringes on any patents, trademarks, copyrights, industrial design rights, or other proprietary rights, or by misuse or misappropriation of trade secrets, then, in addition to the obligations set forth in Section 8.4, Customer shall, at its expense, use commercially reasonable efforts to either:  (i) secure the rights to manufacture, sell and use the allegedly Infringing Unit; (ii) replace or modify the Infringing Unit with a non-infringing product without material degradation in performance, features, functions or quality, or with a mutually agreeable amount of degradation in performance, features, functions or quality; or (iii) if, in the sole judgment and discretion of Customer, none of the foregoing alternatives is reasonably available, Customer shall notify Delphi to discontinue manufacturing the Infringing Unit, but only to the extent necessary to avoid the infringement, and in the case of this clause (iii) Customer shall not be liable for any indemnification beyond Delphi's inventory of Infringing Units and work in process on hand at the time of such notification, provided that no such discontinuance shall reduce the Minimum Aggregate Purchase Value of Product set forth on Exhibit 1 with respect to any period, and Customer shall reimburse Delphi for any material and labor costs incurred by Delphi that cannot be mitigated for inventory or WIP committed to the manufacture of such Infringing Unit..



8.6 **Customer Trademarks**. Delphi acknowledges that all trademarks, trade names and trade dress of Customer ("Customer Trademarks") that may be affixed to the Product and/or Product literature are the property of Customer, and Delphi will not claim or obtain any rights in the Customer Trademarks. Delphi will take no action that will in any way impair Customer's right, title and interest in and to the Customer Trademarks, and except as expressly set forth in this Agreement, will not use for its own benefit or for the benefit of any Party other than Customer, the Customer Trademarks or any confusingly similar trademarks, trade names or trade dress during or after the term of this Agreement.

## ARTICLE 9.    VIOLATIONS, COMPLAINTS AND NOTIFICATION; PRODUCTION RECORDS

9.1 **Notification of Violations**.

(a) Each Party shall notify the other Party immediately in writing if a Party becomes aware of any defect or condition which renders the Product in violation of the Food, Drug and Cosmetic Act or any other applicable law or of any action by a regulatory agency making any such claim.

(b) Customer shall be responsible for notifying the appropriate federal, state and local governmental authorities of any complaints it receives and any adverse events or other occurrences of which it has knowledge regarding the Products which are required to be so reported.

(c) Delphi shall provide Customer with any information Delphi receives regarding customer complaints or any such other occurrences with respect to Products. To the extent required by law, Customer will provide Delphi with information Customer receives regarding customer complaints of comments with respect to Products. Customer shall be responsible for evaluating all complaints it receives from Delphi with respect to Products and Customer shall determine what response, if any, to make. Customer shall be responsible for evaluating and responding to all other complaints it receives, and for notifying Delphi of Customer's response. Delphi shall evaluate and respond to Customer with respect to complaints it receives from Customer or Third Party, and use reasonable efforts to work with Customer to resolve any such complaints or comments.

9.2 **Inspections by Customer**. Solely for the purpose of allowing Customer to verify Delphi's adherence to quality assurance and regulatory compliance standards and Delphi's compliance with Delphi's obligations and covenants under this Agreement, upon reasonable advance notice and during normal business hours, Delphi shall provide Customer access to enter and inspect those facilities where Products are manufactured, and Delphi's books and records relating to Products, subject to reasonable confidentiality, security and safety procedures imposed by Delphi.

17



9.3   **Production Records**.  Without limiting the generality of Section 9.2, upon request, Delphi shall provide Customer with the following records for the Products: (i) if the Products are not manufactured directly by Delphi, the name and address of the actual manufacturer of the Products and the location(s) where the Products are manufactured and (ii) quality control specifications to include testing methods, sampling procedures, and acceptance levels.

## ARTICLE 10.  WARRANTY

10.1  **Conformity with Specifications**.  Delphi hereby represents and warrants that (i) it will convey good and merchantable title to Products delivered to Customer or Customer's designee, free and clear of all liens and encumbrances, and (ii) all Products delivered to Customer or its designee shall conform to the Specifications and shall be free from defects in material and workmanship, and shall be made from and comprised of the same raw materials and components, and shall be in all material respects at least of the same quality, as Products manufactured by Customer immediately prior to the date of this Agreement, subject to changes and substitutions approved by Customer in accordance with Article 14, and shall be manufactured using at least the same standard of care and quality as Products were manufactured by Customer immediately prior to the Effective Date.  The warranty set forth in subsection (ii) of this Section 10.1 does not cover (a) defects or deficiencies in the Specifications or (b) defects caused by misuse, neglect, accident, improper maintenance, improper installation, improper repair, or operation with incompatible solvents or samples in the system.

**NO OTHER WARRANTIES, EXPRESS OR IMPLIED, ARE MADE BY DELPHI WITH RESPECT TO THE PRODUCTS, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.**

10.2  **Defective Products**.  As used in this Agreement, the term **"Defective Products{ XE "Defective Products"}"** means any Product which fails to meet the warranty contained in Section 10.1 within the warranty period described in Section 10.4.

10.3  **Warranty Obligations**.  Except as set forth in Article 11 of this Agreement, Delphi's sole obligation, and Customer's exclusive remedy, for Defective Products is for Delphi, at Delphi's option, to either repair or replace Defective Products or refund an amount equal to one hundred five percent (105%) of Customer's purchase price for the applicable Defective Products.  However, notwithstanding the foregoing, (i) if Customer has made an election with its customer to repair, replace or refund the purchase price of a Product, Delphi shall be bound by Customer's election, and (ii) if Customer has replaced a part or component with a new part or component that Customer has purchased from Delphi, and the replaced part is a Defective Product, Delphi shall give Customer a credit of one hundred and five percent (105%) the amount paid by Customer for

18



the replacement part or component. The Parties will reasonably cooperate with each other to administer the warranty process, for the return of parts and components subject to warranty claims if required by Delphi and this Agreement, and for the issuing of credits.

10.4    **Warranty Period**. The warranty period for Products shall be twelve (12) months from the later of the date of delivery of the Product by Customer to Customer's end use customer or the date of installation of the Product at the end use customer's location, but in no event later than eighteen (18) months from the date of the delivery of the Product by Delphi to Customer or Customer's designee.

10.5    **Product Returns**. At Delphi's election, Customer shall either (i) return to a location designated by Delphi, at Delphi's cost, any allegedly Defective Products or components for which claims are made, with a written explanation of the claimed failures, for Delphi's inspection, or (ii) make the allegedly Defective Products or component available at Customer's premises for inspection by Delphi or its designated representative. If the allegedly Defective Products or components are ultimately determined to satisfy Delphi's warranty under Section 10.1 and otherwise to conform to the requirements of this Agreement, they shall be returned to, or retained by, Customer, and Customer shall bear the cost of any freight and duty in both directions. Delphi shall have thirty (30) days from the earlier of the date of delivery to Delphi of a return Product or component, or the date the Product is made available for inspection by Delphi, to inspect returned Products or components thereof to determine whether the Product is conforming and notify Customer in writing if Delphi believes that the Product or component was non-conforming. If Delphi fails to notify Customer within said thirty (30) day period that a Product is conforming, the Product shall be deemed to be a Defective Product.

10.6    **Extraordinary Defect Conditions**. In the event that due to Delphi's delivery of Defective Products: (a) any government authority issues a request, directive or order that any Product be recalled; (b) a court of competent jurisdiction orders such a recall; (c) Customer reasonably determines that a Product should be recalled because there are a significantly increased number of warranty claims as compared to the number or warranty claims experienced by Customer with respect to the Product prior to the Start of Production or (d) because of any other significant risk to health or safety posed by Product which fails to meet the warranty contained in Section 10.1 (for the avoidance of doubt, whether such failure is during or after the Warranty Period) (collectively, "Extraordinary Defect Condition"), then each Party will take reasonable and appropriate corrective actions consistent with its quality procedures and with the intent and purposes of this Agreement. Each Party will promptly notify the other Party in writing, of any order, request or directive of a court or other governmental authority to recall or withdraw a Product in any jurisdiction. Notwithstanding Section 10.3 but subject to the Cap and other limitations set forth in Article 12 below, Delphi will be responsible and liable for the costs (including, but not limited to, costs of



notification and all costs of shipment of any recalled Products) of implementing any recall or withdrawal of any Product on account of a Extraordinary Defect Condition, and for the cost of any replacement Products or refunds required to be given to any end user customer of the Product on account of a Extraordinary Defect Condition, without limitation of any other right or remedy Customer may have.

## ARTICLE 11.  GENERAL INDEMNIFICATION AND INSURANCE

11.1   **Indemnification by Delphi**.   Except to the extent caused by Customer's negligence, willful misconduct or breach of this Agreement, and except to the extent covered and subject to Customer's indemnity of Delphi set forth in Sections 8.4.1 and 11.2, Delphi shall defend, indemnify and hold Customer, its agents, officers, directors, employees, successors and assigns, harmless from and against any and all claims, damages, demands, causes of action, fines, penalties, costs, liabilities, losses or expenses of any kind or nature whatsoever, including, without limitation, reasonable attorneys' fees, litigation expenses and disbursements (collectively, "Losses") asserted by a Third Party arising out of (i) Delphi's breach of any material representation, warranty or covenant set forth in this Agreement, (ii) the negligence or willful misconduct of Delphi, or (iii) Delphi's supply of Products that fail to meet the Specifications, and (iv) the failure of Products (a) to be free from defects in material and workmanship or (b) to be made from and comprised of the same raw materials and components, or to be in all material respects at least of the same quality, as Products manufactured by Customer immediately prior to the date of this Agreement, subject to changes and substitutions approved by Customer in accordance with Article 14, or (c) to be manufactured using at least the same standard of care and quality as Products were manufactured by Customer immediately prior to the Effective Date including, without limitation, in all cases (i), (ii), (iii) and (iv) above, Losses arising from any actual or alleged death or injury to any person or damage to or destruction of any tangible property resulting or claimed to result wholly or in part from any actual or alleged Defective Product. In addition, except to the extent caused by Customer's negligence, willful misconduct or breach of this Agreement, and except to the extent covered and subject to Customer's indemnity of Delphi set forth in Section 8.4.1, Delphi shall indemnify and hold Customer, its agents, officers, directors, employees, successors and assigns, harmless from and against any and all Losses arising from death or injury to person or damage or destruction or property caused by (A) the failure of Products (x) to be free from defects in material and workmanship or (y) to be made from and comprised of the same raw materials and components, or to be in all material respects at least of the same quality, as Products manufactured by Customer immediately prior to the date of this Agreement, subject to changes and substitutions approved by Customer in accordance with Article 14, or (c) to be manufactured using at least the same standard of care and quality as Products were manufactured by Customer immediately prior to the Effective Date.



11.2 **Indemnification by Customer**. Except to the extent covered by and subject to Delphi's indemnity of Customer set forth in Sections 8.4.2 and 11.1, Customer shall defend, indemnify and hold Delphi harmless from and against any and all Losses asserted by a Third Party to the extent arising out of (a) Customer's negligence, willful misconduct or breach of any material representation, warranty or covenant set forth in this Agreement, (b) any actual or alleged defects in Product designs furnished or expressly approved in writing by Customer, (c) the actual or alleged failure of any Product that meets the Specifications and the other requirements of this Agreement and that are manufactured and delivered by Delphi in accordance with this Agreement to comply with applicable legal requirements (other than as a result of manufacturing defects); (d) any actual or alleged misstatement, omission or inadequacy in the packaging, labeling, marketing materials, warnings or instructions relating to the Products (unless made or included by Delphi without Customer's express written instructions or consent); or (e) testing, storage, handling, release, export, import or shipment of the Product by or on behalf of Customer.

11.3 **Defense of Claims**. With respect to any claim that is subject to indemnification under Sections 11.1 or 11.2, Delphi and Customer shall immediately discuss the claim and shall attempt to determine if the claim is covered by an indemnity of a Party under Section 11.1 or 11.2. If a claim is covered by Delphi's indemnity set forth in Section 11.1 Delphi shall defend, indemnify and hold Customer harmless from and against the claim and all related Losses. If a claim is covered by Customer's indemnity set forth in Section 11.2, Customer shall defend, indemnify and hold Delphi harmless from and against the claim and all related Losses. If a claim contains allegations for which each Party is obligated to indemnify the other pursuant to Sections 11.1 and 11.2, then Delphi and Customer shall use good faith, reasonable efforts enter into a joint defense arrangement that is reasonable based on all of the facts and circumstances and Delphi and Customer agree to discuss allocation of any verdict or settlement with respect to claims and attempt to determine the allocation of responsibility in accordance with the procedure set forth in Sections 16.2 and 17.2 of this Agreement. Customer and Delphi agree to communicate and cooperate with each other and, if necessary, any appropriate insurance carrier, in the defense of the claim. Delphi and Customer will make reasonably available to each other the services of knowledgeable personnel and information necessary to defend the claim, at the expense of the Party requesting the support.

11.4 **Notice of Claims**. If any claim is made or threatened against Delphi or its Affiliates or Customer or its Affiliates based on death of or injury to any person, or damage to any property, which is allegedly caused by a Product, regardless of whether the claim is based upon strict liability, negligence, warranty, or any other theory of recovery, or with respect to which one Party will claim indemnity from the other Party, each Party will provide to the other Party prompt notice of the claim and copies of all documents it receives from the Third Party claimant which assert the claim or related to the claim, provided that the failure to deliver prompt

21



written notice to within a reasonable time after the commencement of any such action, if materially prejudicial to its ability to defend such action, will relieve an indemnifying Party of any obligation to the Indemnitee under Section 8.4.1 or 8.4.2, as the case may be, but the failure to give such notice shall not relieve an indemnifying Party of any obligation to the other Party Indemnitees under Section 8.4.1 or 8.4.2, as the case may be, unless the delay is materially prejudicial to the indemnifying Party's ability to defend such action. An Indemnitee will have the right to retain its own counsel, with the fees and expenses to be paid by the indemnifying Party of if representation of such Indemnitee by the counsel retained by the indemnifying Party would be inappropriate due to actual or potential differing interests between the Indemnitee and any other Party represented by such counsel in such proceeding.

11.5    **Indemnification Procedures**.    Provided that the indemnifying Party has acknowledged its indemnification obligations with respect to a particular claim, (i) the indemnified Party under this Agreement shall not enter into any settlement or concession with regard to that indemnified claim without prior approval of the indemnifying Party and (ii) the indemnifying Party shall have full control of the defense of that indemnified claim, with the reasonable cooperation of the indemnified Party. If the indemnifying Party does not confirm that it will assume control of the defense of any claim for which the indemnified Party seeks indemnification (and provide reasonable assurance regarding its fulfillment of this obligation), the indemnified Party shall have the right to take appropriate legal action and the indemnifying Party shall promptly reimburse the indemnified Party for all reasonable costs and expenses of defending the applicable claim upon presentation of reasonable supporting documentation.

11.6    **Required Insurance Coverage**.    Each Party (or an Affiliate of a Party on behalf of that Party) shall obtain and maintain consistent with the provisions of this Agreement, at its sole expense, the following types of insurance coverages, to remain in force during the term of this Agreement, with minimum limits as set forth below:

(a)    Commercial General Liability covering liability arising from premises, operations, independent contractors, products-completed operations, personal and advertising injury, and blanket contractual liability - US$ 10,000,000 each occurrence.

(b)    Workers Compensation - statutory limits for all states of operation (U.S. only).

(c)    Employers Liability – US$1,000,000 each employee for bodily injury by accident and - US$1,000,000 each employee for bodily injury by disease.

11.7    **Policy Requirements**.    All policies of insurance maintained by each Party in accordance with this Agreement shall be written as primary policies; not



contributing with or in excess of coverage that the other Party may carry. If a Party's liability policies do not contain the standard separation of insureds provision, or a substantially similar clause, they shall be endorsed to provide cross-liability coverage. Each Party shall cause its insurer to waive the insurer's right of subrogation under its policies. Each Party shall be an additional insured under the other Party's insurance policies that are required under this Agreement (except Worker's Compensation and Employer's Liability), and at the other Party's request, each Party shall provide the other Party with a certificate of insurance evidencing compliance with the limits, insurance requirements and waiver of subrogation set forth above. Such certificate shall be in a form reasonably acceptable to, and underwritten by an insurance company reasonably satisfactory to, the other Party and with an A.M. Best Company rating of A- or above. Such certificates shall contain a statement that the insurance coverage shall not be materially changed or cancelled without at least thirty (30) days prior written notice to the other Party. Neither Party represents that coverage and limits set forth in this Agreement will necessarily be adequate to protect the other Party. The purchase of appropriate insurance coverage by each Party or the furnishing of a certificate of insurance shall not release either Party from its obligations or liabilities under this Agreement.

## ARTICLE 12.  LIMITATION OF LIABILITY

12.1   **No Recovery of Certain Damages**. EXCEPT WITH RESPECT TO BREACH OF A PARTY'S OBLIGATIONS SET FORTH IN ARTICLE 18, IN NO EVENT, WHETHER AS A RESULT OF BREACH OF CONTRACT OR WARRANTY, ALLEGED NEGLIGENCE OR OTHERWISE, SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR SPECIAL OR CONSEQUENTIAL DAMAGES OF THE OTHER, INCLUDING BUT NOT LIMITED TO LOSS OF REVENUE OR PROFITS, LOSS OF USE OF PRODUCTS OR OTHER EQUIPMENT, OR DOWNTIME COSTS. NOTHING CONTAINED IN THIS SECTION 12.1 IS INTENDED TO LIMIT THE PARTIES' INDEMNIFICATION OBLIGATIONS ARISING OUT OF THIRD PARTY CLAIMS.

12.2   **Liability Cap Under Section 10.6**. Delphi's maximum aggregate liability under this Agreement for costs under Section 10.6 of implementing any sign circumstance of recall or withdrawal of any Product on account of a Extraordinary Defect Condition, and for the cost of any replacement Products or refunds required to be given to any end user customer of the Product on account of such Extraordinary Defect Condition, shall in no event exceed Five Million Dollars ($5,000,000) (the "Cap{ XE "Cap"}").

12.1   **Available Remedies**. Except as limited pursuant to Article 10 and this Article 12, or otherwise expressly limited by other provisions of this Agreement, in the event of any breach or termination of this Agreement, either Party shall be entitled to pursue all remedies available at law or in equity.



## ARTICLE 13. SUPPLY OF SERVICE PARTS; REFURBISHMENT

During the Term, Delphi shall supply Customer with refurbished Products and with components and parts for use by Customer or its designees as service parts ("**Service Parts**{ XE "Service Parts"}") in addition to normal original equipment sales in accordance with this Agreement. During the Term, the prices for Service Parts are specified in **Exhibit 1**. In addition, Delphi shall, notwithstanding any the expiration or termination of this Agreement, supply Customer with refurbished Products and Service Products after the Term through May 31, 2011 unless this Agreement is terminated by Delphi due to a material default by Customer. Pricing for the labor component of refurbished Products and Service Parts supplied after the Term will be subject to annual price increase of up to five percent (5%), at Delphi's discretion.. Delphi shall clearly label any Service Parts or other Products that are refurbished Products as "refurbished" or otherwise identify them in such manner as provides reasonable notice that the applicable Service Parts are not new Products. Service Parts will be supplied as promptly as feasible after being ordered by Customer. In addition to any other obligation related to Service Parts set forth in this Agreement, in the event that Customer furnishes Delphi with a binding order for its estimated Service Part needs for the upcoming year or calendar quarter, Delphi will maintain in inventory a supply of parts at least equal to the number estimated by Customer during the next upcoming calendar quarter.

## ARTICLE 14. PRODUCT CHANGES

If either Party desires to make changes to the Products, it shall submit a written request to the other Party. Within a reasonable period, the Party that received the request shall notify the other Party of its acceptance or rejection of the proposal. As part of the Product change evaluation process, Delphi shall provide Customer with its charges for the change, a proposed implementation date and the impact of such change to the Product unit price. Notwithstanding the foregoing, Delphi may substitute raw materials and/or components that are of at least as high a quality as those used by Customer immediately prior to the date of this Agreement with Customer's written consent, which will not be unreasonably withheld.

## ARTICLE 15. FORCE MAJEURE

15.1   **Force Majeure Defined**.   Each Party shall be temporarily excused from performing its obligations under this Agreement (other than the payment of money) for so long as such performance is prevented or delayed by any event of Force Majeure.   The term "**Force Majeure**{ XE "Force Majeure"}" shall, for purposes of this Agreement, be defined as: (i) any acts of God, terrorism, natural disasters, or wars, (ii) any strike, lockout or labor dispute, (iii) any shortage or curtailment of utilities, materials or transportation that was not caused by the failure of Delphi to act reasonable and exercise due diligence, (iv) any act or omission of any government authority, or (v) any other cause beyond the reasonable control of a Party.

15.2   **Notice and Mitigation**.   A Party affected by an event of Force Majeure shall promptly notify the other Party and shall use commercially reasonable efforts to



overcome and mitigate such event of Force Majeure. Without limiting the foregoing, if Delphi is unable to supply any Products due to Force Majeure, Customer shall be free to purchase such Products from other suppliers as long as Delphi remains unable to do so. If the event that the failure continues for more than sixty (60) days, Customer may terminate this Agreement with respect to the Product or Products effected upon written notice to Delphi.

## ARTICLE 16.  GOVERNING LAW; ARBITRATION

16.1    **Governing Law**.  This Agreement shall be governed by and construed according to the laws of the State of California as such laws are applied to contracts between residents of the State of California to be performed entirely within such state. Venue for all disputes or actions arising from this Agreement, whether at law or in equity, shall be the state and federal courts located in the counties of Santa Clara or San Mateo, California.

16.2    **Informal Settlement Procedures**.  The Parties shall attempt to settle any and all claims, disputes, controversies or differences arising between the Parties which arise out of or in relation to or in connection with this Agreement by good faith negotiations between the Parties pursuant to Section 17.2.

## ARTICLE 17.  TERM AND TERMINATION

17.1    **Term of Agreement**.  This Agreement shall become effective on the Effective Date and shall remain in effect until three (3) years after the Start of Production. Customer shall have the right to extend the term of this Agreement for up to three one year terms upon written notice given to Delphi at least one hundred and twenty (120) days prior to the end of the then term of this Agreement. Any such extension shall be on the same terms and conditions as set forth herein, except that Delphi may increase the price per Product by an amount not to exceed fifteen percent (15%) of the prior period's fixed prices (as well as the labor component of any Service Part or refurbished Product) for the first extended one (1) year term, and by an amount not to exceed five percent (5%) of the prior year's fixed prices for each subsequent annual one year extended term. If Customer delivers any such notice to extension to Delphi, within thirty (30) days after Customer's delivery of such notice, Delphi shall advise Customer in writing of any new prices for Products, within the allowable increases set forth above. Customer shall have the right to rescind its notice of extension by giving Delphi written notice of such rescission within fifteen (15) days after Delphi's delivery of such pricing notice to Customer. If Customer so rescinds such notice, the term of this Agreement shall not extend and shall terminate at the end of the then term of this Agreement. If Delphi fails to deliver its notice of pricing within the thirty (30) day period set forth above, Delphi's pricing for the upcoming extended one year term shall be deemed to be the pricing in effect during the term of this Agreement in which Customer gave the subject notice of extension. If the term of this Agreement is extended as set forth above, for purposes of Article 3, Customer shall be deemed



to have agreed to an aggregate purchase value commitment during the extended one year term equal to the annual purchase commitment during the last six month period of the original term (namely, three million, four hundred and eight seven, nine hundred and six dollars ($3,487,906))

17.2    **Notice of Default; Informal Discussions.**  Except for matters set forth in Section 17.4 which are not subject to this Section 17.2, following any dispute under this Agreement, including any event of default which, upon notice or the passage of time, may constitute grounds for terminating this Agreement, either Party may notify the other Party that it requests that the Parties attempt to resolve the dispute or determine the remedy for the event of default pursuant to informal dispute resolution.  The notice of informal dispute resolution must provide reasonable details describing the nature of the dispute or default.  Within ten (10) days after either Party receives a notice requesting informal dispute resolution, authorized representatives of both Parties shall meet (in person or by telephone) and confer to (i) exchange information pertaining to the dispute or event of default and (ii) attempt in good faith to agree upon a resolution to the dispute or a remedy for the event of default, as applicable.  If the informal dispute resolution procedures fail to resolve the dispute or achieve an agreement on the remedy for the event of default within twenty (20) days after the receipt of the notice requesting informal dispute resolution, then either Party may pursue any other remedy available to it under law or equity. Notwithstanding the foregoing, each Party has the right at any time to seek and obtain from the appropriate court provisional or equitable remedies such as attachment, preliminary injunction, replevin, etc., to avoid irreparable harm, maintain the status quo or preserve the subject matter of the arbitration.

17.3    **Termination for Breach; Extended Force Majeure**.  In the event of breach by either Party of any material provision of this Agreement, the other Party shall have the right to terminate this Agreement if the breach is capable of being cured if the breach is not cured within fifteen (15) days after the end of the informal dispute resolution process set forth in Section 17.2. If a Force Majeure event preventing Delphi's performance continues for more than sixty (60) days, Customer shall have the right to terminate the Agreement on not less than five (5) days written notice to Delphi.  Delphi shall notify Customer promptly if any Force Majeure event will prevent performance for more than sixty (60) days. Customer will have the right to terminate this Agreement on not less than five (5) written notice to Delphi in the event that Force Majeure will prevent Delphi's full performance under this Agreement for more than sixty (60) days.

17.4    **Immediate Termination**.

(a)    Either Party may terminate this Agreement immediately in the event the other Party: (a) becomes insolvent, or (b) enters bankruptcy, receivership, liquidation, composition of creditors, dissolution or similar proceeding.



(b)    Delphi may terminate this Agreement if Customer fails to make payment to Delphi of any amounts owing under this Agreement that are not in dispute within thirty (30) days after the due date if Customer does not cure that default within ten (10) days after Customer receives written notice from Delphi of such default.

17.5    **Termination for Inventory Failures.**  Customer may immediately terminate this Agreement WITHOUT LIABILITY under Sections 2.2.4.4 and 2.2.4.5 if the Inventory or any item therein continues to exhibit defects (excluding design defects with respect to the design of Products furnished or agreed to by Customer) causing serious disruption of use and/or repeated period of downtime, notwithstanding Delphi's remedial or maintenance efforts, over a continuous period of three (3) months or more.

17.6    **No Prejudice.**  The provisions of this Article are without prejudice to any other rights or remedies either Party may have by reason of the default of the other Party.

17.7    **Continuing Refurbishment Obligation**.  As set forth in Article 13, if this Agreement terminates prior to May 31, 2011, Delphi shall have a continuing obligation to supply refurbished Instruments, as more fully set forth in Article 13.

## ARTICLE 18.  CONFIDENTIALITY

18.1    **Scope of Use**.  Each Party agrees that it shall not use or disclose any of another Party's Confidential Information, except as authorized herein.  All Confidential Information of a Party shall remain such Party's property during and after the term of this Agreement.

18.2    **Non-Disclosure.**  Each Party (the **"Receiving Party{ XE "Receiving Party"}"**) shall protect all Confidential Information it receives from the other Party (the **"Disclosing Party{ XE "Disclosing Party"}"**) against disclosure to third parties in the same manner as it would protect its own similar confidential information against disclosure to others for a period from the Effective Date until two (2) years following termination of this Agreement, except with respect to Confidential Information which is a trade secret under the law of the State of California, in which case the obligations of non use and confidentiality shall continue until the trade secrets lose their status as such due to no fault of the Receiving Party. Notwithstanding the above, during such period, each Party may make any disclosure of any of the Disclosing Party's Confidential Information to (i) its Affiliates, (ii) its and its Affiliates' employees, agents, and consultants who have a need to know the Confidential Information and (iii) any others to whom such disclosure is expressly authorized under this Agreement and is necessary to the Receiving Party's fulfillment of its obligations under this Agreement, provided in all cases above the entity or person receiving such information is bound by obligations or non use and confidential at least as favorable to the Disclosing



Party as those set forth in this Agreement. Notwithstanding anything contained in this Agreement to the contrary, a Receiving Party may disclose Confidential Information of the Disclosing Party to the extent required to comply with governmental regulations and other applicable laws or to respond to subpoena or other compulsory legal process, provided in all cases that the Receiving Party takes reasonable and lawful actions to avoid or minimize the extent of such disclosure and notifies the Disclosing Party in writing as far in advance of the date of disclosure as is reasonably feasible so that the Disclosing Party may take steps to seek to prevent or limit disclosure.

## ARTICLE 19.  GENERAL PROVISIONS

19.1    **No Inducement**. The Parties represent to each other and each agrees that, neither it nor any person acting on its behalf has, in contravention of any applicable law, given or offered to give or shall give or offer to give any sum of money or other material consideration to any person, directly or indirectly, as an inducement to obtain business under this Agreement or to influence the granting of licenses or other governmental permissions to enter into this Agreement or perform obligations hereunder.

19.2    **Government Approvals; Regulatory Requirements**.

(a)      As between Customer and Delphi, Customer shall be responsible for obtaining and maintaining all licenses, approvals and other authorizations applicable to the development, testing, marketing, sale or use of the Products, and all products incorporating any Products, in all jurisdictions where the Products, and any products incorporating the Products, are at any time marketed or sold, including, without limitation, with respect to the United States, if required, an effective 510(k) premarketing notification or premarket approval by the U.S. Food and Drug Administration for intended uses, unless subject to an approved Investigational Device Exemption under 21 C.F.R. Part 812.

(b)      As between Customer and Delphi, Customer shall be responsible for providing adequate warnings and instructions for use of the Products and all products incorporating the Products (including proper specifications for labeling and packaging), and release of the Products, and all products incorporating the Products, provided in all cases that the Products meet the Specifications and otherwise comply with this Agreement.

(c)      Customer acknowledges that the Houston Facility is not and has not been registered with the United States Federal Food and Drug Administration, and agrees that this Agreement imposes no obligation on Delphi to so register the Houston Facility. Customer represents that to the best of its knowledge the Houston Facility is not required to be registered with the United States Federal Food and Drug Administration in order to

28



manufacture Products and that Customer has not received any notice, claim, correspondence or legal opinion to the contrary.

19.3 **No Agency**. This Agreement does not constitute either Party the agent or legal representative of the other Party. Neither Party is authorized to create any obligation on behalf of the other Party.

19.4 **Assignment**. Delphi shall not assign or subcontract its rights or obligations under this Agreement, in whole or in part, or any interest therein, without prior written consent of Customer, which may be withheld for any reason or no reason, provided however, that Delphi, upon not less than sixty (60) days prior written notice to Customer, may assign this agreement to an Affiliate or to the purchaser of all or substantially all of its assets that comprise the business line that includes the Products without such prior consent if the assignee is not a Customer Competitor or an Affiliate of a Customer Competitor. Subject to the terms of this Section 19.4, this Agreement shall be binding upon and inure to the benefit of the successors in interest of Delphi and Customer. In all case, the assigning party shall remain primarily liable for all its representations, warranties, obligations and covenants set forth herein notwithstanding any such assignment. Nothing herein shall preclude Delphi from using third party supplies who are not Customer Competitors for parts or labor, provided that the foregoing shall not be deemed to relieve Delphi from its obligations of non-use and confidentiality with respect to Confidential Information of Customer. Customer shall not assign its rights or obligations under this Agreement, in whole or in part, or any interest therein, without prior written consent of Customer, which may be withheld for any reason or no reason, provided however, that in the event that Customer sells all or substantially all of its assets that comprise the business of a product line that includes one or more Products, Customer without obtaining Delphi's consent may assign to the purchaser of such line of business all of Customer's rights to purchase Products within such line, and upon Delphi's receipt of an assumption agreement from such purchaser in form reasonably satisfactory to Delphi with respect to such Products, Delphi shall be deemed to have agreed to sell such Products to such purchaser at the price and pursuant to the terms and conditions of this Agreement, including granting such purchaser the same rights to extent the term of this Agreement as are granted to Customer under this Agreement. Any Purchases of Products made by the purchaser of such product line shall count toward, and be applied to and credited against, Customer's minimum aggregate purchase value of Products set forth on **Exhibit 1**. As used in this Section 19.4, the term "Customer Competitor" means any person or entity that conducts research or development activities with respect to, or develops, licenses or sells, or maintains or performs consulting or other services with respect to, any product or service that is directly competitive with any Customer product or service, as determined by Customer in its reasonable discretion.

19.5 **No Implied Waiver**. The failure of either Party at any time to require performance by the other Party of any provision of this Agreement shall in no way



affect the full right to require such performance at any later time.  The waiver by
either Party of a breach of any provision of this Agreement shall not constitute a
waiver of the provision itself.  The failure of either Party to exercise its rights
provided under this Agreement shall not constitute a waiver of such right.

19.6     **Notices**.   Any notice under this Agreement shall be in writing (letter or facsimile)
and shall be effective upon receipt or refusal or failure to accept receipt by the
addressee at its address indicated below.

(a)     Notice sent to Delphi shall be addressed as follows:

> **Delphi Medical Systems Texas Corporation**
> 5725 Delphi Drive
> Troy, Michigan 48098
> Attention:  President
> Facsimile:  (248) 813-2599

With copies to:

> **Delphi Corporation**
> Assistant General Counsel – Commercial and Transactional
> 5725 Delphi Drive
> Troy, Michigan 48098
> Facsimile:  (248) 813-2491

(b)     Notice sent to Customer shall be addressed as follows:

> **Applied Biosystems**
> 850 Lincoln Centre Drive
> Foster City, CA 94404
> Facsimile: 650-638-6677
> Attn.: Global Procurement – Ann Wagoner

With copies to:

> **Applied Biosystems**
> 850 Lincoln Centre Drive
> Foster City, CA 94404
> Facsimile: 650-638-6677
> Attn.: Legal Department

(c)     The Parties by notice given in accordance with this Section may designate
other addresses to which notices shall be sent.

19.7     **Amendments**.   This Agreement supersedes all previous agreements, oral or
written, between Customer and Delphi with respect to the subject matter of this



Agreement.  No amendment or modification to this Agreement shall be binding upon either Party unless it is in writing and is signed by both Parties.

19.8   **Headings**.  The Article, Section, and/or Paragraph headings in this Agreement are used for convenience of reference only and shall not be deemed a part of this Agreement for any purpose.

19.9   **Severability**.  If any provision of this Agreement shall be held to be invalid, illegal, or unenforceable under any statute, regulation, ordinance, executive order, or other rule of law, that provision shall be deemed severed to the extent necessary to comply with such statute, regulation, ordinance, order, or rule, and the Parties shall negotiate in good faith to arrive at an alternative replacement provision approximating the Parties' original business objective.  The remaining provisions of this Agreement shall remain in effect.

19.10   **Entire Agreement**.  This Agreement contains all the representations and agreements between the Parties hereto and there are no other agreements or understandings, oral or in writing, regarding the matters covered by this Agreement.  No terms submitted by either Party which are in addition to or inconsistent with those set forth in this Agreement shall apply to this Agreement unless agreed to in a writing signed by both Parties.  The Exhibits attached to this Agreement are made a part of and incorporated in this Agreement.

19.11   **Counterparts**.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Delivery by facsimile of this Agreement or an executed counterpart shall be deemed a good and valid execution and delivery of this Agreement.

19.12   **No Minimum Order Requirement**.  Nothing in this Agreement shall be deemed to require Customer to order any particular Products or any minimum number of Products.  The foregoing shall not be deemed to relieve Customer of its obligation to make any shortfall payments due under Section 3.1(b).

19.13   **Guarantee of Delphi Corporation**.  Delphi shall cause Delphi Corporation, Delphi's parent corporation, to execute and deliver to Customer the Guarantee of Delphi Medical Systems Corporation set forth below on or before June 30, 2005. If such signed guarantee not delivered to Customer on or before June 30, 2005, Customer shall have the right to terminate this Agreement upon written notice to Delphi and to rescind the transactions associated with this Agreement, including without limitation the Bill of Sale transferring certain assets to Delphi, the assignment of the lease of the Houston Facility, and to terminate the Transition Agreement and other agreements of even date herewith or entered into in connection therewith.



IN WITNESS WHEREOF, Customer and Delphi have caused this Contract Manufacturing Agreement to be executed by their duly authorized representatives as of the day and year first above written.

APPLERA CORPORATION
Acting through its Applied Biosystems Group

By _Catherine M Burzik_
Title _President Applied Biosystems Group_

DELPHI MEDICAL SYSTEMS TEXAS
CORPORATION

By _____
Title _Managing Director_

x:\Delphi\ContractMann(Supply)\AprHouston5-1,d5,lm-36278
5-5-05. 1:40PMf

Approved for Signature
by _____
date ___eller___
Applied Biosystems Group
Legal Department

32

**EXHIBIT 1**

**Products, Pricing, Minimum Lead Times
and Minimum Aggregate Purchase Value of Products**

1.     Products and Pricing.  Firm unit pricing regardless of unit demand fluctuation over the term of the Agreement.

Finished product, parts and components for the instruments listed in the table immediately below:

| 4700 | Voyager DE-STR | Voyager DE-PRO | 310 | Pro 49x-01 | 8200 | 3400 | 433 | Procise 49xclc-01 | 3900 | Spares, Software, Refurbs |
|---|---|---|---|---|---|---|---|---|---|---|
| $ 164,900.00 | $ 90,550.00 | $ 69,950.00 | $ 21,800.00 | $ 44,345.00 | $ 53,252.00 | $ 20,950.00 | $ 21,550.00 | $ 46,372.00 | $25,500.00 | $60 an hour and 10% markup on materials |

Parts and components, including manufacture of components, for the following instruments: BioCad, Vision, Integral, Cytofluor, Voyager DE and Mariner instruments.  Price for such parts and components are cost of materials plus ten percent (10%) of such cost, plus labor at sixty dollars ($60) per hour.

Software for various Customer instrument lines, including but not limited to the instruments listed above in this Exhibit 1, and other Customer software products, as identified by Customer to Delphi from time to time.  Price for sofware products is cost of materials plus ten percent (10%) of such cost, plus labor at sixty dollars ($60) per hour.

See Sections 3, 4 and 5 of this Exhibit 1 for prices for Products that are finished goods, and WIP, existing as of the Effective Date, for the price of Parts, and for the price of refurbished Products.

2.     Minimum Aggregate Purchase Value of Products

| Minimum Annual $$ Commitments | (Any mix of product) |
|---|---|
| CY 2005 | $  9,000,000.00 |
| CY2006 | $ 12,755,287.00 |
| CY2007 | $  8,757,617.00 |
| CY2008 | $  3,487,096.00 |
| Total | $ 34,000,000.00 |

Note:  1. CY 2005 is the period commencing June 6, 2005 and ending December 31, 2005.
       2. CY 2008 is the period commencing January 1, 2008 and ending June 30, 2008.
       3. Minimum aggregate purchase value of Products includes the 3900 and 3700 instrument product lines along with all value of all parts, components and refurbishments, including without limitation for the 3900 instrument product line and Service Parts for

33



the and 3700 instrument. "Value" means the amount payable by Customer for Products under this Agreement

3.     <u>Prices for finished goods and WIP in inventory as of the Start of Production</u>.

3.1     <u>Finished Goods</u>. Notwithstanding the pricing set forth above, the price for a Product that is a finished good on hand at the Start of Production shall be zero (provided that the foregoing shall not be deemed to relieved Customer from its obligation to pay costs of shipment, e-fill, taxes and other costs required to be paid by Customer under this Agreement).

3.2     <u>Credit for WIP</u>. Delphi has agreed to purchase and has purchased the work in progress (generally known as "WIP", which includes the value of materials and labor) of Products as of June 6, 2005. For information purposes only, Customer notes that the value of WIP as of May 27, 2005, the close date of Customer's most recent fiscal quarter, was valued at $1,721,020.97. Customer hereby represents and warrants that the value of WIP as of June 6, 2005 will be determined by Customer in accordance with Customer's normal manufacturing practices, which are in accordance with generally accepted accounting principles (GAAP). On or before June 30, 2005, Customer will provide Delphi with a detailed report by production work order which will denote the assembly being produced, value of materials issued, and labor, as of June 6, 2005, so that Delphi can calculate, for each finished Product, the value of WIP of such Product as of June 6, 2005. Delphi will pay for the aggregate value of such WIP by issuance of, and Delphi hereby issues to Customer, a credit in the amount of the value of the aforesaid WIP as at June 6, 2005 (the "WIP Credit"). Customer will pay the purchase price for each finished Product that was WIP as of June 6, 2005 by crediting and applying the value of the WIP of such Product as of June 6, 2005 against the WIP Credit, and paying the balance in cash. For example, if the value of WIP as of June 6, 2005 with respect to a Product was $110,000, and the purchase price of the Product was $150,000, Customer would pay for the Product by crediting and applying $110,000 against the WIP Credit (thereby reducing the balance of the WIP Credit by $110,000), and paying the balance of the purchase price due (namely, $40,000) in cash. When Delphi issues an invoice for any Product that was WIP as of June 6, 2005, it shall on its invoice apply and credit the appropriate WIP value against the WIP Credit and indicate the amount of cash due, and, if feasible, show the then remaining balance of the WIP Credit.

4.     <u>Price for Refurbished Products, Software and Service Parts</u>

The price for each refurbished Product, software and Service Parts shall be the materials costs of the Product plus ten percent (10%) of such costs plus the cost of labor billed at sixty dollars ($60) per hour, or such other price as the Parties may agree upon in writing.



## EXHIBIT 2

### Product Specifications

The Product Specifications are those set forth in, or referenced by, the documents identified below as in effect on the Start of Production, or, if a test is specified, the specification with respect to which the test is performed.

5/26/2005      **Houston Manufacturing – Instrument Specifications**

| Instrument / PN | Instrument Desc. | Doucument # | Rev | Description |
|---|---|---|---|---|
| **Voyager DE STR** | | | | |
| V800580 | VOYAGER-DE STR | W-510 | E | WI,Final Test Voyager STR |
| | | V900011 | U | FORM, FINAL TEST RECORD, STR |
| **Voyager DE Pro** | | | | |
| V800630 | VOYAGER DE PRO BIOSPEC WORKSTATION | W-507 | F | WI,TEST,FINAL DE-PRO |
| | | V900058 | U | FORM FINAL TEST RECORD DE PRO |
| **4700** | | | | |
| 4319989 | INSTRUMENT, PROTEOMICS ANALYZER, 4700 | 4334426 | A | WI, TEST, FINAL, 4700 |
| | | 4334427 | D | FORM, FINAL TEST RECORD, 4700 |
| | | 4334426 | A | SHTs 23-35: INSRUMENT SETTINGS & SPECS |
| | | | | |
| **3400** | | | | |
| 4334670 | ASSY,MAINFRAME 3400 | 4337227 | B | PROC,DRY & FLOW TEST 3400 |
| | | 4337228 | A | PROC,BURN IN 3400 |
| | | 4337226 | B | DATA SHEET,DRY & FLOW TEST 3400 |
| **8200** | | | | |
| 4335439 | ASSY,8200 FMAT | 4339529 | D | PROC,MFG TEST 8200 |
| | | 4339532 | E | CHKLST,MFG TEST 8200 |
| **433A** | | | | |
| 433A-00 | PEPTIDE SYNTHESIZER 433A | 902556 | N | PROC,MFG TEST 433A |
| | | 903010 | U | CHECKLIST,MFG 433A |
| **310** | | | | |
| 310-3 | GENETIC ANALYZER ABI PRISM 310 | 903846 | S | WI, FUNCTIONAL TEST, 310 |
| | | 903846 | S | SHEETS 22-28 for TEST SPECIFICATIONS |
| **491** | | | | |
| 491-0 | ASSY,SEQ PROCISE 1 CART | 903242 | L | PROC,DRY TST 490 |
| | | 903308 | L | DATA SHEET,DRY TEST 490 |
| **494cLC** | | | | |
| 494CLC-0 | PROTEIN SEQ,4 CRTG PROCISE cLC | 904762 | F | PROC,DRY TEST 49XcLC |
| | | 904761 | E | DATA SHEET,DRY TEST 491cLC |
| **140C** | | | | |
| 140C-00 | PUMP,2x10cc 650uL DM | 903359 | L | PROC,MFG/CLEAN/TST/CAL 140C |
| | | 903360 | J | PROC,MFG CHECKLIST 140C |
| **140D** | | | | |



| 140D-0 | PUMP,2x2 .5cc 125uL D/M cLC | 903797 | E | PROC,MFG/CLEAN/TST/CAL 140D |
| | | 903799 | G | PROC,MFG CHECKLIST 140D |

## EXHIBIT 3

### Beginning Forecast

Note: Only the first eleven columns, through and including the column entitled "FY06 Total" are part of this Exhibit 3. The other columns are intended to be deleted.

### FY'06 Demand Forecast - Houston

**06/01/05**

| Instruments | WIP Completions | | | FY 06 Demand | | | | | | | Qu |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | June | | | Aug | Sept | Q1 | Q2 | Q3 | Q4 | FY06 Total | P |
| 4700 (TOF/TOF) | 5 | 6 | 0 | 3 | 2 | 11 | 3 | 2 | 0 | 16 | $1( |
| Voyager DE PRO | 3 | 5 | 0 | 2 | 0 | 7 | 4 | 6 | 9 | 26 | $6 |
| Voyager DE STR | 4 | 3 | 0 | 2 | 0 | 5 | 3 | 5 | 5 | 18 | $9 |
| Procise 49X System | 5 | 0 | 2 | 2 | 3 | 7 | 7 | 7 | 8 | 29 | $4 |
| Procise 49X cLC System | 1 | 0 | 0 | 1 | 1 | 2 | 1 | 2 | 1 | 6 | $4 |
| 433 | 4 | 0 | 3 | 4 | 2 | 9 | 4 | 0 | 0 | 13 | $: |
| 310 | 15 | 0 | 11 | 11 | 8 | 30 | 25 | 30 | 25 | 110 | $: |
| 3400 | 7 | 0 | 4 | 4 | 3 | 11 | 8 | 13 | 13 | 45 | $: |
| 8200 | 1 | 4 | 0 | 2 | 0 | 6 | 5 | 8 | 8 | 27 | $! |
| 3900 (Colorado Ops.) | 8 | 0 | 0 | 4 | 0 | 4 | 3 | 2 | 3 | 12 | $: |
| **Totals** | 53 | 18 | 20 | 35 | 19 | 92 | 63 | 75 | 72 | 302 | |

| | Next 12 months | Per Quarter |
|---|---|---|
| **Spares Forecast** | $8,271,850 | $2,067,962 |
| **Software Forecast** | $1,200,000 | $300,000 |

37



**EXHIBIT 2.2.4.3**

**JIT Report Sample**

Supplier:   VENDOR1        Plant:   US21        Buyer:   B45

| PART NUMBER | DESCRIPTION | RELV | PRICE | LEAD TIME | ON HAND | PAST DUE | WK1 QTY | WK2 QTY | WK3 QTY | WK4 QTY | WK5 QTY | WK6 QTY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1234 | Widget | A | $200 | 0 | 25 | 3 | 5 | 5 | 6 | 3 | 9 | 9 |
| 2345 | Assembly | A | $400 | 0 | 5 | 0 | 4 | 3 | 4 | 4 | 3 | 2 |
| 3456 | Part | A | $600 | 0 | 59 | 22 | 14 | 15 | 15 | 19 | 22 | 13 |