UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re )<br>)<br>DELPHI CORPORATION, et al., )<br>)<br>Debtors. )<br>) | Chapter 11 Case No.<br><br>05-44481 (RDD)<br><br>(Jointly Administered) |

DECLARATION OF WILLIAM F. GIBBS

I, William F. Gibbs, declare under penalty of perjury that the following is true and correct:

1. I am the Senior Director of Business Operations of the Applied Biosystems group of Applera Corporation ("Applera"). I was also the Plant Manager of a manufacturing facility formerly operated by Applera in a suburb of Houston, Texas (the "Houston Facility") from January 22, 1998 until June 6, 2005 when Applera sold the Houston Facility to Delphi Medical Systems Texas Corporation ("DMSTC"), a subsidiary of Delphi Medical Systems Corporation ("Delphi Medical"). DMSTC filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the Court on October 8, 2005.

2. I am making this affidavit to support the Motion of Applera for an order granting Applera authorization to recoup amounts owed to it by DMSTC against amounts owed to DMSTC by Applera, and/or from relief from the automatic stay pursuant to §362(d) of the Bankruptcy Code to exercise rights of setoff.

3.  The Houston Facility was operated by Applera to manufacture highly sophisticated analytical and testing devices, such as DNA and peptide synthesizers, DNA and protein sequencers, and mass spectrometers (the "Products"). As part of my duties as Plant Manager of the Houston Facility, I was responsible for efficient and profitable production at the Facility. Applera employed at the Plant a considerable number of employees who had been highly trained and acquired great expertise in the production of the Products. However, because of excess capacity at the Houston Facility, it was determined that the operation of the Facility was less profitable than it should be and that either additional uses would have to be found for the excess manufacturing capacity of the Facility, or the Facility should be sold to someone who could use the excess capacity.

4.  Applera made a business decision to look for a buyer for the Houston Facility which would commit to a long-term contract to continue manufacturing the Products at the Houston Facility using the same employees, equipment and facilities. In structuring the terms of the sale, one of Applera's fundamental objectives was to assure continuity of supply of the Products, so that Applera could meet its delivery commitments to its customers. Applera recognized that there would need to be a transition period for a purchaser of the Facility to train new managers, to put in place its own purchasing, manufacturing and inventory processing systems (with the appropriate computer software), to arrange its own sources of supply, to complete the work in process ("WIP") at the Houston Facility, and to have access to Applera's existing inventory of raw materials, parts and components (collectively, "Inventory"). In addition, since the Facility was leased by Applera from a third party, it would be necessary to assign the leasehold and obtain consent of the landlord to that assignment.

5. I was assigned primary responsibility for locating such a purchaser and negotiating the transaction. I successfully negotiated a transaction with Delphi Medical to achieve these objectives (the "Transaction"). The Transaction closed on June 6, 2005.

6. The Transaction involves several closely integrated elements. First, Applera sold to DMSTC equipment and other manufacturing assets at the Houston Facility, the WIP and a short term supply of the Inventory on hand at the Facility. We also negotiated an arrangement for the transfer of the remaining Inventory to DMSTC on an as-needed basis, and a transition agreement to help make sure that there would be no interruption of manufacturing operations or adverse effect on the quality of the Products being produced by DMSTC. There was also an agreement under which DMSTC would manufacture Products in the Houston Facility for sale to Applera and Applera committed to purchasing specified minimum quantities of the Products for a term of at least three years. The transition arrangements we negotiated allowed for an orderly transfer of responsibility for the skilled work force at the Facility while permitting DMSTC access through those employees to the software programs of Applera essential to the ordering and manufacturing processes. The transition periods were also intended to provide time for DMSTC to set up its own management team, to arrange its own sources of supply and to put in place the necessary purchasing, manufacturing and inventory processing systems (with appropriate computer software tested and operational) to assure continuity and timely delivery of the Products.

7. Because both parties desired to conclude the Transaction as quickly as possible, responsibility for preparing the documents was divided, with the result that several agreements were prepared, but all were regarded as essential.

- 3 -

8.   The overriding purpose of the Transaction from Applera's point of view was to assure a seamless transition of the manufacturing operation for the Products from Applera to DMSTC while allowing Applera to divest itself of a plant that was too large for its needs. I understood that the Houston Facility was attractive to DMSTC first because it needed the excess capacity the Houston Facility would provide for manufacturing its own products and second, because it would give DMSTC an assured source of revenues from Applera's three-year commitment to purchase Products under the Manufacturing Agreement.

9.   All of the documents involved were drafted to enable and facilitate these objectives and are mutually dependent upon and supportive of each other. Without Applera's commitment to continue to buy Inventory items for DMSTC until DMSTC could take over ordering, DMSTC would not have been able to perform as required by the Manufacturing Agreement. Without the Manufacturing Agreement, Applera would not have sold the manufacturing assets, Inventory and WIP, and without the equipment, WIP and Inventory, which Applera agreed to sell, DMSTC would not have been able to meet its obligations under the Manufacturing Agreement. Without access to Applera's inventory, accounting and other software while Applera kept the employees on its payroll during the Employee Transition Period and Applera's services during the IT Transition Period, DMSTC would not have been able to function. Thus I would not have entered into any of the agreements unless the others were also made.

10.  The interdependence of the different parts of the transaction is evidenced by the escrow arrangement agreed to in connection with the Closing of the Transaction, which required receipt by Applera of a wire transfer of a specified sum from DMSTC as a condition to

- 4 -

the release of any of the operative documents and that all the operative documents be released from escrow at the same time. A copy of a letter evidencing the terms of the escrow arrangement is attached as Annex 1. The Guaranty by Delphi Corporation of the obligations of DMSTC, a copy of which is attached as Annex 2, also shows the interdependence by the statement that the Guaranty is made to induce Applera to enter into the Manufacturing Agreement, the Bill of Sale, Inventory, WIP and Assumption Agreement, the Transition Agreement and the lease assignment, and to perform its obligations under those agreements.

11. Applera has made many concessions and accommodations in order to facilitate a seamless transition of the manufacturing operations to DMSTC and help solve the challenges and problems faced by DMSTC in taking over the operation of the Houston Facility.

12. It would not have made any sense for Applera either to sell the Inventory, WIP and Plant assets and assign the lease to the Houston Facility, or to enter into the Transition Agreement, which mandated that DMSTC would hire employees of Applera, without entering into the Manufacturing Agreement for the production of the Products. Entering into any one of these agreements without the Manufacturing Agreement would have prevented Applera from producing the Products necessary to meet its commitments to its customers. If Delphi had not agreed to all of them, it would have been unable to perform under the Manufacturing Agreement. Thus the agreements are so closely interconnected that they cannot realistically be separated.

13. Accordingly, in my view all of the parts were essential and comprise parts of a single integrated transaction.

I declare under the penalties of perjury that the foregoing is true and correct.

_____
William F. Gibbs

- 6 -

# ANNEX 1

June 6, 2005

Christophe Sevrain
Delphi Medical Systems Texas Corporation
5725 Delphi Drive
Troy, Michigan 48098

This will confirm our agreement regarding the escrow of certain signed documents signed by Applera Corporation ("AB") and Delphi Medical Systems Texas Corporation ("Delphi"), and related documents, that have been delivered to you and Bill Gibbs today in connection with sale and assignment to Delphi of certain assets of AB' Houston, Texas manufacturing facility. Delphi has agreed to delivery $250,000 by wire transfer to AB no later than the close of business on June 7, 2005.

The documents subject to this letter agreement are the following documents, all dated 6/6/05 (the "Documents"):

1. Manufacturing Agreement
2. Transition Agreement
3. Assignment of Lease
4. Bill of Sale, Inventory, WIP and Assumption Agreement
5. Landlord's Consent
6. Guarantee of Delphi Corporation

You and Bill each agree that you will hold the Documents in escrow and release the Documents from escrow and deliver them to Delphi and AB, respectively, only after AB, acting through Bill Gibbs or Sam Hunt, has notified Delphi in writing that AB has received by wire transfer in its account shown below the sum of $250,000, which notice AB shall give promptly upon receipt of such wire transfer (the "Release Condition"). You and Bill are each authorized to deliver the Documents to Delphi and AB, respectively, upon fulfillment of the Release Condition.

Bank Account Information

Bank of America
345 Montgomery Street
San Francisco, CA 94104

ABA Number 1210-00358
For the account of: Applera Corporation
Account Number 14990-02360
Reference: (Delphi – Houston Transaction)

Christophe Sevrain
June 6, 2005
Page 2

In the event that the aforesaid funds are not received by AB as set forth above by June 8, 2005, if instructed by AB, you and Bill will destroy the Documents, unless Delphi and AB otherwise agrees in writing.

A facsimile copy of an executed signature page to this letter agreement or any document to be executed and delivered pursuant hereto shall have the same force and effect as an original thereof.

Would you kindly confirm your agreement to the foregoing by signing and returning the enclosed copy of this letter, whereupon you and Bill will be deemed to have agreed to the foregoing.

Sincerely yours,

_____
Name: William Gibbs
Title: Senior Director

Confirmed and Agreed


_____
Christophe Sevrain

im.87014

# ANNEX 2

## GUARANTEE BY DELPHI CORPORATION

Delphi Corporation, a Delaware Corporation (hereinafter "Guarantor"), for good and valuable consideration, the receipt of which is hereby acknowledged, and in order to induce Applera Corporation ("Applera") to enter into (i) the Contract Manufacturing Agreement, (ii) the Bill of Sale, Inventory, WIP and Assumption Agreement, and (iii) the Transition Agreement, all dated June 6, 2005 and all by and between Delphi Medical Systems Texas Corporation and Applera Corporation, acting through its Applied Biosystems Group (collectively, the "Agreements") and others agreements to be entered into in connection with the assignment of Applera's lease dated April 22, 1999, as amended (the "Houston Lease"), with Bailard & Kaiser Feeport I, Limited Partnership of the Houston Facility (as defined in the Contract Manufacturing Agreement referenced above) (collectively, the "Assignment"), and to consummate and perform its covenants and obligations set forth in the Agreements and the Assignment, does hereby guarantee, absolutely and unconditionally, to Applera the full, complete and timely performance of each of the representations, warranties, obligations and covenants of Delphi Medical Systems Texas Corporation ("Obligor") under the Agreements and as tenant-assignee of the Houston Lease under the Assignment, including without limitation, the payment of any and all moneys which may be due to Buyer by Obligor pursuant to the Agreements. The forgoing Guarantee shall be binding upon Guarantor and its successors and assigns. Guarantor hereby represents that the person executing this Guarantee on its behalf is duly authorized to execute same, that Guarantor is duly authorized to execute same and that this Guarantee constitutes the binding obligation of Guarantor, enforceable against it in accordance with its terms.

This is a guarantee of payment and performance, and Guarantor hereby waives all rights Guarantor may have, if any, to require that any action be brought against Obligor or any other person or to require that resort be first made against Obligor.

This Guaranty is primary, absolute, and unconditional and shall not be released, discharged, mitigated, impaired, or affected by any modifications of the Agreements accepted in writing by Obligor or by any waiver or by failure of Applera to enforce any of the terms, covenants, and conditions or by any extension of time or indulgence extended by Applera to Obligor except to the extent of such modification, waiver, or extension. Guarantor hereby waives presentment, demand, protest and notice of default, nonpayment and protest and all demands, notices and suretyship defenses generally.

Applera may proceed directly against Guarantor under this Guaranty without being required to proceed against Obligor under the Agreements or to exhaust any other rights or remedies it may have against Obligor. Applera may pursue Applera's remedies under this Guaranty concurrently with or independently of any such action or proceeding against Obligor under the Agreements or under the assignment of the Houston Lease to Obligor.

Guarantor's liability under this Guaranty shall not be deemed to be waived, released, discharged, mitigated, impaired, or affected by reason of the release or the discharge of Obligor under the Agreements in any bankruptcy, reorganization, or insolvency proceedings. Guarantor shall remain bound notwithstanding that Obligor may be relieved of any obligations under the Agreements or the Houston Lease by operation of law or otherwise.

This Guaranty may not be orally changed or terminated.

Guarantor hereby represents and warrants that Obligor is a direct or indirect wholly owned subsidiary of Guarantor.

This Guaranty shall inure to the benefit of Applera and its successors and permitted assigns under the Agreements and shall be binding upon Guarantor and Guarantor's successors and assigns.

Except as set forth in this Guaranty to the contrary, the word "Obligor" as used in this Guaranty shall be deemed to and shall include any assignee to whom the Agreements or the Houston Lease shall have been assigned in accordance and in compliance with the provisions thereof, and with the documents between Applera and Obligor under which the House Lease was assigned to Obligor.

All notices, requests, demands or other communications given or made to Guarantor with respect to the foregoing guarantee shall be in writing in the English language and shall be deemed to have been duly given when delivered personally, by mail, by courier, by facsimile, telegram, telex or similar means of communication (in all instances other than delivery by mail with confirmation by mail to be provided by the party giving notice) to Guarantor, to the following address:

> **Delphi Corporation**
> Assistant General Counsel – Commercial and Transactional
> 5725 Delphi Drive
> Troy, Michigan 48098
> Facsimile: (248) 813-2491

Guarantor may change the above address by notice to Buyer in the manner specified above.

DELPHI CORPORATION

By: _____
Its Duly Authorized Officer
Title: Vice Chairman
Date Signed:

2