**Hearing Date: February 9, 2006**
                               **Hearing Time: 10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

      - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | : | |
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | | |

        DEBTORS' OBJECTION TO MOTION FOR ORDER UNDER 11 U.S.C. § 365(d)(2)
        DIRECTING DEBTOR DELPHI AUTOMOTIVE SYSTEMS, LLC TO DETERMINE
       WITHIN 150 DAYS WHETHER TO ASSUME OR REJECT ITS NONRESIDENTIAL
         <u>REAL PROPERTY LEASE WITH CHEROKEE NORTH KANSAS CITY, LLC</u>

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this objection (the "Objection") to the Motion for Order Under 11 U.S.C. § 365(d)(2) Directing Debtor Delphi Automotive Systems, LLC to Determine Within 150 Days Whether to Assume or Reject Its Nonresidential Real Property Lease with Cherokee North Kansas City, LLC (the "Motion"). In support of this Objection, the Debtors respectfully represent as follows:[1]

## Preliminary Statement

1.  The Motion should be denied. Cherokee North Kansas City, LLC ("Cherokee") failed to show that "cause" exists for a shortening of the deadline as set forth in the Motion and Cherokee is estopped from seeking the relief requested in the Motion because Cherokee failed to raise these issues in a timely manner. On or about November 9, 2005, the Debtors filed with the Court, and served upon Cherokee, their motion seeking to extend to June 7, 2007 the deadline for the Debtors to assume or reject all leases of nonresidential real property under Section 365(d)(4) of the Bankruptcy Code (the "365(d)(4) Motion"). Among the leases affected by the 365(d)(4) Motion was the Lease of Industrial or Warehouse Facilities between the Debtors and Cherokee (the "Lease"). Notice was proper as evidenced by the certificate of service, the relevant portion of which is attached hereto as Exhibit A. Cherokee did not object to the 365(d)(4) Motion and on November 29, 2005, the Court entered an order granting the 365(d)(4) Motion (the "365(d)(4) Order"), a copy of which is attached hereto as Exhibit B.

---

[1]  Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

2

2.     Cherokee's Motion fails to show that "cause" exists for a shortening of the June 7, 2007 deadline approved by the 365(d)(4) Order (the "365(d)(4) Deadline").  The burden rests with Cherokee to show that sufficient cause exists to shorten the 365(d)(4) Deadline and Cherokee has failed to satisfy its burden.  In the Motion, Cherokee recites several factors to support its position.  None of those factors, however, individually or collectively, rises to a level sufficient to show cause to justify a shortening of the 365(d)(4) Deadline.  Distilled to its essence, the Motion asserts that the 365(d)(4) Deadline should be shortened because the property subject to the Lease may be worth less and the cost of financing may be greater on account of the fact that the Debtors sought bankruptcy protection –a challenge faced by all landlords that have tenants in bankruptcy.  These assertions, which lack sufficient evidentiary support, clearly fall short of the required showing of cause necessary to justify shortening of the 365(d)(4) Deadline.

3.     Moreover, Cherokee is estopped from requesting such relief because its Motion is premised entirely on facts that were known or knowable at the time the 365(d)(4) Motion was filed and served upon Cherokee.  Even though Cherokee had the opportunity and failed to object to the 365(d)(4) Motion, it nonetheless now asks this Court to ignore the 365(d)(4) Order –entered less than two months ago– and compel the Debtors to assume or reject the Lease.

4.     For the foregoing reasons and as set forth in more detail below, the Motion should be denied.

Argument

A.     <u>Cherokee Has Failed To Show "Cause" Sufficient To Justify Shortening The 365(d)(4) Deadline.</u>

5.     At the November 29, 2005 omnibus hearing the Debtors made a sufficient showing of cause, as required by section 365(d)(4) of the Bankruptcy Code, and the Court granted the 365(d)(4) Motion and entered the 365(d)(4) Order.  Paragraph 4(b) of the 365(d)(4)

Order provides that "entry of this Order shall be without prejudice to . . . (b) the right of any party to any Real Property Lease to seek from this Court a shortening of the [June 7, 2007] deadline with respect to any or all of its Real Property Leases for cause shown."  Pursuant to this Court's order and as similarly provided under § 365(d)(4) of the Bankruptcy Code, the burden now rests with Cherokee to demonstrate cause for shortening of the 365(d)(4) Deadline.

      6.      The term "cause" as used in section 365(d)(4) is not defined in the Bankruptcy Code.  In order to meet its burden to show cause, however, Cherokee must satisfy the factors enumerated by the United States Court of Appeals for the Second Circuit in South Street Seaport L.P. v. Burger Boys, Inc., 94 F.3d 755 (2d Cir. 1996).  The Burger Boys court held that the following factors should be weighed in determining this issue:

    (a)    whether the debtor was paying for the use of the property;

    (b)    whether the debtor's continued occupation could damage the lessor beyond the compensation available under the Bankruptcy Code;

    (c)    whether the lease is the debtor's primary asset; and

    (d)    whether the debtor has had sufficient time to formulate a plan of reorganization.

Id. at 761.  The Burger Boys court proceeded to enumerate additional factors that may merit consideration by a court, including the complexity of the case and the number of leases that the debtor must evaluate.  Id.  See also 130 Cong. Rec. S8891, 58,894-95 (daily ed. June 29, 1984) ("cause" includes large number of leases) (statement of Sen. Hatch), reprinted in 1984 U.S.C.C.A.N. 590, 597; In re Unit Portions of Del., Inc., 53 B.R. 83, 85 (Bankr. E.D.N.Y. 1985).

      7.      Similarly, Courts considering demands for early assumption or rejection by non-debtor parties rarely force a debtor into prematurely making a decision.  The reason for courts' reluctance to force early assumption or rejection is that the "interests of the creditors collectively and the bankrupt estate as a whole will not yield easily to the convenience or

4

advantage of one creditor."  See Public Svc. Co. of New Hampshire v. New Hampshire Elec. Coop., Inc. (In re Public Svc. Co. of New Hampshire ), 884 F.2d 11, 14-15 (1st Cir. 1989); see also In re Midtown Skating Corp., 3 B.R. 194, 198 (Bankr. S.D.N.Y. 1980) (denying motion to compel assumption of lease and stating that "debtor should not be expected to jump too soon into this complex matter"); see also; Hiser v. Blue Cross of Greater Philadelphia (In re St. Mary Hosp.), 89 B.R. 503, 513-14 (Bankr. E.D.Pa. 1988) ("the interests of the Debtor here in denying a precipitous assumption or rejection appear to us much greater than the interests of HHS in forcing a prompt resolution").  Accordingly, under most circumstances, it is the clear policy of the Bankruptcy Code to provide the debtor with breathing space following the filing of a bankruptcy petition in which to decide whether to assume or reject an unexpired lease of nonresidential real property.  In re Midtown Skating Corp., 3 B.R. at 198; see also In re Enron Corp., 279 B.R. 695, 702 (Bankr. S.D.N.Y. 2002) (citation omitted).

8. Cherokee, in its Motion, had the burden to show that cause exists to shorten the 365(d)(4) Deadline by satisfying the factors set forth by the Burger Boys court.  A brief review of the factors will clearly indicate that Cherokee has failed in its burden to show cause.

(i) The Debtors Are Continuing To Pay For The Use Of The Property.

9. As acknowledged by Cherokee in its Motion, the Debtors are current in all of their postpetition obligations under the Lease.  Moreover, the Debtors have significant resources, including access to a substantial DIP credit facility, which provide adequate assurance to all of their landlords that they will be paid their postpetition bills in a timely fashion.

5

      (ii)    <u>Cherokee Will Not Suffer Any Harm Beyond Compensation Available Under The Bankruptcy Code Because Of The Debtors Continued Occupation.</u>

      10.    There is no harm beyond compensation available under the Bankruptcy Code that will befall Cherokee if the 365(d)(4) Deadline is not shortened. As stated above, the Debtors are performing all of their postpetition obligations under the Lease and will continue to do so. According to Cherokee, however, this is not enough. In the Motion, Cherokee asserts that if the 365(d)(4) Deadline is not shortened it will face uncompensable damages in the form of decreased value of the property and higher financing costs. This argument is without merit. Cherokee's entire argument is premised on its assertion that the property would be worth more and financing terms would cost less if the Debtors are forced to make a premature assumption or rejection decision. Cherokee assumes that uncertainty would be eliminated, resulting in an increased property value and decreased costs of financing, regardless of whether the Debtors assume or reject the Lease. Uncertainty will surely result if the Lease is rejected. At the least, Cherokee would be forced to find a new tenant and would be faced with the loss of rental income, which according to Cherokee makes up approximately half of the income associated with the property. With this substantial uncertainty in the event of rejection, it is hard to believe that property value would increase 25%-40% and better financing terms would be immediately available. Indeed, Cherokee has provided limited evidence to support this assertion. The harm, if any, that Cherokee faces does not rise to a level sufficient to justify shortening the 365(d)(4) Deadline.

      (iii)    <u>The Lease Is Among The Debtors Primary Assets.</u>

      11.    In the Motion, Cherokee claims that "[b]ased upon the Debtors' previous representations to this Court in its filings, the decision whether or not to assume or reject the Lease is not a 'make or break' decision for the Debtor-Lessee." Motion ¶ 27. This statement is

6

disingenuous and fails to cite any pleading or hearing at which such assertions were made by the Debtors.

12.  Contrary to Cherokee's unsupported assertions, most of the Debtors' leases are fundamental to their reorganization efforts.  As part of the Debtors' restructuring efforts, the Debtors are in the process of evaluating all owned and leased real estate, including the Lease.  In considering their options with respect to the real property leases, the Debtors are evaluating a variety of factors to determine whether it is appropriate to assume, assume and assign, or reject a particular real property lease, including, without limitation, the realignment of Delphi's global product portfolio and manufacturing footprint to preserve Delphi's core businesses.

13.  This evaluation will allow the Debtors to determine those leases that will remain a part of Delphi's core operations.  As determinations are made that certain leases will not be part of Delphi's ongoing operations, the Debtors will then evaluate whether such leases should be assumed and assigned or rejected.  Until the Debtors complete this evaluation, shortening the 365(d)(4) Deadline could force the Debtors, prematurely, to assume substantial, long-term liabilities under the Lease or forfeit value on account of a marketable or otherwise necessary lease.  Indeed, in the instant case, the Debtors manufacture certain automotive parts for GM at the Lease facility.  The Debtors have not yet determined if the production of these parts will remain part of the Debtors' global product portfolio.  Accordingly, if the Debtors prematurely assume the Lease and later stop producing these parts, the estates may be burdened with long term liabilities unnecessary to the Debtors' reorganization or may be faced with substantial administrative expenses if the Lease is later rejected after assumption.  On the other hand, if the Debtors determine to keep this business, premature rejection of the Lease could result in the inability of the Debtors to produce these parts for GM which could then result in substantial

7

damages and the loss of continued business. Accordingly, the Debtors should not be forced to assume or reject the Lease until many of these issues are resolved.

    (iv)    <u>The Debtors Have Not Had Sufficient Time To Formulate A Plan Of Reorganization.</u>

    14.    Prior to making critical assumption or rejection decisions, a debtor must be permitted "the leeway needed to appraise its financial situation and the potential value of its assets in terms of the formulation of a plan." <u>Theatre Holding Corp. v. Mauro</u>, 681 F.2d at 102, 104 (2d Cir. 1982); <u>see</u> <u>also</u> <u>In re Teligent, Inc.</u>, 268 B.R. 723, 739 (Bankr. S.D.N.Y. 2001). As stated above, the Debtors are merely four months into a restructuring effort that they anticipate will take approximately 18 months to complete. At this point, however, the Debtors' energies are focused on stabilizing their businesses. The Debtors have not had time to make critical decisions regarding the assumption or rejection of their leases. The Debtors need to focus on developing a comprehensive restructuring plan for their businesses and the tens of thousands of creditors in these cases.

    15.    In the Motion, Cherokee attempts to impose its own judgment upon the Debtors regarding the Lease. Cherokee claims that the Debtors' operation at the Lease facility "is excellent, is able to attract new business, and has low costs." Motion ¶ 13, 20. These conclusions were apparently based on a conversation with the Debtors' plant manager at the Lease facility and not with management responsible for making strategic decisions in connection with the Debtors' restructuring efforts. Cherokee's conclusions are simply an attempt to substitute its own judgment in place of the Debtors' and such conclusions are not logical in light of the fact that the Debtors have not made final determinations regarding the realignment of Delphi's global product portfolio and manufacturing footprint. These arguments should be given no weight.

16.     Further, every creditor in these cases that is a party to an unexpired lease or executory contract could make an argument similar to Cherokee's, that its financial situation would be better if the Debtors were forced to make certain decisions now.  Forcing the Debtors to assume or reject a lease on this basis, however, would simply benefit Cherokee to the potential detriment of all other creditors.  The Debtors cannot, and should not, be forced into preemptory lease assumption and rejection decisions at this time.

(v)     <u>The Complexity And Size Of The Debtors' Chapter 11 Filings Warrant A Considerable Period In Which To Evaluate The Consequences Associated With Assumption Or Rejection Of All Leases.</u>

17.     The complexity and size of these cases also warrant denial of the Motion at this early stage.  The complexity of the issues that the Debtors face in stabilizing their businesses and attempting to restructure their affairs is magnified by the size of these cases, currently among the largest pending before any bankruptcy court in the United States.  In summary:

(a)     Delphi and 41 affiliated entities sought chapter 11 relief.

(b)     As of the commencement of these chapter 11 cases, the Debtors employed approximately 180,000 employees worldwide.  The Debtors' 50,600 U.S. employees work in approximately 44 manufacturing sites, 13 technical centers, and Delphi's Troy, Michigan worldwide headquarters.  The company's foreign entities employed more than 134,000 people supporting 120 manufacturing sites and 20 technical centers in nearly 40 countries around the globe.

(c)     The Debtors' global 2004 revenues were approximately $28.6 billion, and global assets as of August 31, 2005 were approximately $17.1 billion.

(d)     The Debtors supply products to nearly every major global automotive original equipment manufacturer, with 2004 sales to the Debtors' former parent, General Motors Corporation, equaling approximately $15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

9

18. Courts have recognized that complex cases require a more careful and extended consideration by the debtor of whether to assume or reject leases. See In re Burger Boys, Inc., 94 F.3d at 761.

B. Cherokee Should Be Estopped From Seeking The Relief Requested In The Motion.

19. The doctrine of collateral estoppel or issue preclusion bars the re-litigation of issues decided by final order. Gibraltar Industries, Inc. v. Douds (In re Douds), 327 B.R. 122, 124 (Bankr. W.D.N.Y. 2005); see also Atkins v. Fiberglass Representatives (In re Atkins), 134 B.R. 936, 938 (9th Cir.1992) ("Principles of res judicata and collateral estoppel" preclude litigants from challenging merits of bankruptcy court order that he failed to appeal within 10 days of entry). Moreover, after an order has become final, parties are precluded from litigating all issues that were or could have been addressed in the context of the proceeding resulting in the final order. Jacobson v. Fireman's Fund Ins. Co., 111 F.3d 261, 268 (2d Cir. 1997) (holding that after time to appeal had expired court's determinations became final and "precluded any further litigation of all issues that were or could have been addressed within the context of that arbitration proceeding").

20. As stated above, on or around November 9, 2005, the Debtors filed the 365(d)(4) Motion with the Court and served it upon Cherokee. Cherokee did not object to the 365(d)(4) Motion. At the November 29, 2005 hearing, the Court heard the 365(d)(4) Motion, and again Cherokee made no objection. On November 29, 2005, the Court entered the 365(d)(4) Order with respect to the Lease and roughly 90 other unexpired leases, extending to June 7, 2007 the deadline for the Debtors to assume or reject such leases, including Cherokee's Lease.

21. Cherokee had the opportunity between November 9, 2005 and November 29, 2005 to object to the 365(d)(4) Motion and had from November 29, 2005 to December 9,

10

2005 to appeal the 365(d)(4) Order and raise the arguments that it now raises. Cherokee chose not to do so. All the arguments made in the Motion are premised entirely on facts that were known or knowable at the time the 365(d)(4) Motion was filed and served upon Cherokee. Cherokee should not be awarded a "second bite at the apple" now to assert arguments that existed at the time Cherokee chose not to object to the 365(d)(4) Motion. See Jacobson, 111 F.3d at 268. Cherokee should be estopped from attempting to circumvent the 365(d)(4) Order at this time and the Motion should be denied.

## Conclusion

22.     Cherokee has failed to show that cause exists for a shortening of the 365(d)(4) Deadline. Additionally, Cherokee is estopped from seeking the relief requested in the Motion because Cherokee failed to raise those issues in a timely manner. The Debtors should be afforded the time between now and the 365(d)(4) Deadline to determine whether to assume or reject their non-expiring executory contracts. The Motion should therefore be denied.

## Notice

23.     Notice of this Objection has been provided in accordance with the Order under 11 U.S.C. §§ 102(1) and 105 and Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing (i) Omnibus Hearing Dates, (ii) Certain Notice, Case Management, and Administrative Procedures, and (iii) Scheduling an Initial Case Conference in Accordance with Local Bankr. R. 1007-2(e), which was entered by this Court on October 14, 2005 (Docket No. 245). In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

11

Memorandum Of Law

24.     Because the legal points and authorities upon which this Objection relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

WHEREFORE, the Debtors respectfully request that the court enter an order (a) denying the Motion and (b) granting the Debtors such other and further relief as is just.

Dated: New York, New York
       February 2, 2006

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By: /s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr. (JB 4711)
    John K. Lyons (JL 4951)
    Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

- and -

By: /s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York  10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
Debtors and Debtors-in-Possession

12