UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

In re:

DELPHI CORPORATION, et al.                    Case Nos. 05-44481 (RDD)
                                              Jointly Administered

            Debtors.
-----------------------------------------------------------x

## DECLARATION OF MARK SHAW

I, Mark Shaw, pursuant to 28 U.S.C. § 1746, furnish this declaration in support of the objection filed by the United Steelworkers to the Debtors' motion for authorization to implement a Key Employee Compensation Program ("KECP").

1.  I am employed by the USW as a Bargaining Coordinator in its District 1, which covers the State of Ohio. I have been an employee of the USW since October 1996 when I was appointed to the USW International Staff. I was assigned to the position of Bargaining Coordinator in 2002. The USW has approximately 70,000 members serviced by District 1. As a Bargaining Coordinator, in addition to my other responsibilities, District Director David McCall has assigned me to assist him in engaging in collective bargaining with some of the largest employers in the District.

2.  I am generally familiar with the identity of the current and past large employers within District 1. Among the largest employers in District 1 are Mittal Steel USA, Republic Engineered Products ("REP"), AK Steel – Mansfield, Wheeling-Pittsburgh Steel Corporation, Timken, WCI Steel, and Ormet Aluminum. In addition, LTV Steel Corporation and Republic Technologies International ("RTI"), which are no longer in operation, also had bargaining units in District 1.

1

3.  The USW is the bargaining agent of between 900 to 1,000 bargaining unit employees of the Debtors' facilities located at Dayton and Vandalia, Ohio. I am generally familiar with the collective bargaining proposals that the Debtors made in 2005 to the USW and other labor organizations. I am also aware that the Debtors have filed to obtain approval of the KECP and have proposed revisions to the KECP motion.

4.  In connection with the amendments to the Bankruptcy Code that were enacted in 2004, the USW suggested that Congress place limits on the authority of bankruptcy courts to approve executive compensation programs such as the KECP here. Indeed, on February 10, 2005, District Director McCall testified before the Senate Judiciary Committee on behalf of the USW. Attached as Exhibit 1 is a copy of McCall's prepared remarks in which he (on behalf of the USW) urged that Congress place restrictions upon or even eliminate the authority to implement key employee retention programs similar to the KECP.

5.  Through the years, numerous employers within District 1 have been in bankruptcy. Included among these employers were several of the companies named above, including, LTV, RTI, REP, Wheeling-Pittsburgh, Ormet, and WCI.[1] Each of the employers, with the exception of Wheeling-Pittsburgh, sought and obtained approval to implement a key employee retention program ("KERP") of some sort.

6.  It has been my experience (and the USW's experience generally) that the presence of a key employee retention program, when coupled with a management that

---

[1] See In re LTV Steel Company, Inc., et al., Case 00-43866 (Bankr. N.D. Ohio); In re Republic Technologies International, LLC, et al., Case 01-51117 (Bankr. N.D. Ohio); In re Pittsburgh Canfield Corporation, Inc. (Wheeling-Pittsburgh Steel) et al., Case 00-43394 (Bankr. N.D. Ohio); In re Ormet Corporation et al., Case 04-40993 (Bankr. S.D. Ohio); In re WCI Steel, Inc. et al., Case 03-44662 (Bankr. N.D. Ohio).

2

aggressively seeks reductions in the wages and benefits of active employees and retirees and antagonizes its workforce and unions, creates a significant risk for the ultimate reorganization of a company.

7.     In the LTV Steel case, in early 2001, at a time when it was losing approximately $1 to 2 million per day in operations, the company obtained approval from the bankruptcy court in its Chapter 11 case for a KERP that included significant retention, severance, and other payments to its top executives and others in management totaling several million dollars. During this period, I was a staff representative servicing LTV bargaining units in Cleveland, Ohio and was a part of the USW's bargaining committee. At the same time, LTV Steel demanded that the USW agree to significant wage, benefit and work rule concessions and to deep cuts in retiree insurance benefits. LTV threatened to file, and ultimately, did file for relief pursuant to Sections 1113 and 1114 of the Bankruptcy Code. The deep concessions sought from workers and retirees, when juxtaposed against the KERP available to LTV's management, caused great anger among LTV's workers and the USW's bargaining committees and was a significant source of consternation in bargaining. Eventually, the unsecured creditors' committee in LTV's bankruptcy negotiated a modified labor agreement with the USW when it became apparent for numerous reasons that management could not conclude an agreement. In December 2001, LTV permanently shut its steel making operations and the assets were acquired by another party. The KERP in LTV contributed greatly to an atmosphere of bitterness that made a constructive dialogue impossible. In addition, the existence of a key employee retention program in the Ormet Aluminum matter, a case where the debtor likewise sought and obtained relief pursuant to Sections 1113 and 1114 of the

3

Bankruptcy Code, added to an already acrimonious bargaining relationship. On November 22, 2004, the USW-represented employees employed at Ormet's Hannibal, Ohio plants commenced a strike that continues through today. Since late 2004 I have been one of the lead day-to-day bargainers with Ormet.

8. In contrast to LTV, I am informed that Wheeling-Pittsburgh Steel, which was in bankruptcy from late 2000 through 2003, never sought approval for any sort of a KERP. The USW was able to negotiate consensual modifications to its labor, benefits and pension agreements and the parties were able to maintain a constructive bargaining relationship. Our bargaining relationship was never complicated by the existence of any KERP that would have distracted workers and the negotiating committees.

9. The USW members employed by Delphi (as well as the bargaining unit employees represented by other labor organizations at other facilities) are angry that the Debtors have asked this Court to approve the KECP, particularly in light of the deep concessions that Delphi has sought, and may continue to seek in its collective bargaining agreements and retiree benefit programs. Just as similar programs have done in other cases, the KECP will damage morale and will be a major impediment to collective bargaining with Delphi. I also believe that the KECP, if approved, would imperil the ratification of any tentative agreement that may be concluded with Delphi as the bargaining unit employees would, quite naturally, expect their sacrifices to be made in an environment of shared sacrifice.

10. I am aware that Delphi has withdrawn its initial collective bargaining proposals. I also am aware that Delphi has decided only to proceed on January 27, 2006 with that portion of the KECP that involves the Annual Incentive Program ("AIP") and to

4

defer until July 2006 the consideration of the remaining parts of the KECP. It is my understanding that the general provisions of the AIP were recently disclosed (though not with much detail), and that Delphi still intends to pay millions of dollars to eligible executives. The approval of even the AIP aspect of the KECP is still likely to damage bargaining unit employee morale as before as Delphi has announced that it expects to make another bargaining proposal at some point in the future. Because significant concessions still may be sought, the approval of the AIP, and the future approval of the remaining parts of the KECP, will still cause anger among the bargaining unit employees and will still imperil reorganization.

\* \* \* \* \* \* \* \*

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2nd day of February, 2006

_____
Mark Shaw

5

Mr. Chairman and distinguished Senators, I am David McCall and I'm representing the United Steelworkers of America. I welcome this opportunity to comment on S. 256, and in addition, I have submitted written testimony that I believe, although still brief in content, it will allow for more detail than time will permit today.

I am a member of our Union's International Executive Board and the USWA District Director for the state of Ohio, a state that has lost over 200,000 jobs in the last five years. A State where our Union and the workers and retirees we represent have experienced bankruptcies at such companies as LTV Steel, Ormet Aluminum, Warren Consolidated Industries, Republic Engineered Products, and Wheeling-Pittsburgh Steel, among the largest. Beyond Ohio, our Union of over one million active and retired Steelworkers, has experienced bankruptcies at Bethlehem Steel, National Steel, Kaiser Aluminum, and many other companies. Given the importance of bankruptcy law to the lives of workers and retirees, you can be sure that our International President, Leo Gerard, would have been here today but for his being out of the country. On his and my behalf and that of our Union, we thank you for holding this hearing and considering the perspectives we offer.

By itself, bankruptcy law cannot solve the many problems facing the American worker and pensioner today. It can't roll back a flood of imports that may undermine a plant or industry, and it cannot directly challenge the transfer of manufacturing jobs to other countries. Nor can it necessarily close the widening gap between rich and not-so-rich in our country, or greatly solve the problems in our health care and pension systems. When these other forces do drive companies under, however, our bankruptcy law should treat workers and retirees as fairly and humanely as possible.

Most of the bill now before this Committee addresses consumer bankruptcies of course. Over the life of this bill and its predecessors, our Union and the rest of the AFL-CIO have viewed S. 256 generally as rendering wholesale changes in the consumer bankruptcy system that would shift the rules decidedly in favor of creditors and to the detriment of individuals. While we believe the bill would make it far more difficult for individuals and families to make fresh starts, and we believe that it would do so because of perceived abuses.

Let me offer you four points based on the experience of our Union with manufacturing companies in bankruptcy. And much of this experience came well after S. 256 was first conceived and drafted.

First, it would be hard to say what has been worst about the recent wave of bankruptcies in manufacturing

- the loss of tens of thousands of jobs and the impact on the workers and their families

- the extreme economic shock to the affected communities

- the loss of hard-earned and promised benefits.

- But surely one of the most tragic injuries is when retirees, their spouses and the surviving spouses lose, through bankruptcy, their health insurance, just at the time in life when they need it most. These are citizens who spent a lifetime working in hard and dangerous jobs to earn what was supposed to be lifetime employer-paid retiree insurance, only to lose it all as a result of bankruptcy.

If the bankruptcy law is to be seen as legitimate and credible, it must be as humane and fair as possible on this subject.

Therefore, when a bankrupt company sells its assets to a buyer, the buyer should fund or support at least a portion of the previous health coverage.

I know Senators Leahy and Durbin and Rockefeller each have developed ideas that would dedicate a greater share of the bankruptcy estate to the needs of retirees who lost health coverage in the bankruptcy. In this regard, our Union has been able to bargain with some buyers for even better treatment than those proposals would allow, but the basic point is that the bankruptcy laws should set a floor of protection below which no retiree can fall.

Second, is the subject of pensions. Even with the comprehensive federal pension law of the PBGC, bankruptcies, leave behind to many victims.

The shock and nightmare of workers and retirees losing a substantial amount of a pension benefit because of the termination of the plans in bankruptcy is a tragedy I have witnessed all to many times.

Third, the bill before you proposes to raise the priority for wages from 90 days before filing up to a maximum of $4,925 to a new rule that would give priority to those items earned in the 180 days prior to filing up to a maximum of $10,000.

This is progress, but it is not a complete solution. For example, courts in most areas of the country view severance pay as being earned over a long time (often an entire working career) so even a rule prioritizing 180 days worth of accrual brings very little severance pay into the priority category. In short, there were two problems with the wage priority provision, both the amount and the accrual period.

Fourth, a section of this bill which does not appear until page 495 of a 501 page document, is entitled, "Preventing Corporate Bankruptcy Abuse." I believe a more comprehensive approach to the problem of corporate abuses could be addressed by eliminating or restricting "key employee retention plans" or "KERPs." These "golden parachutes" are payable to the executives of a reorganizing company and rewarding them handsomely often after they have cut workers' pay, reduced or eliminated retiree benefits, shuttered plants, and sold them off. A second area of concern is the perennial problem of enormous sums of money going to bankruptcy professionals. Congress should look to a reasonable way of regulating these excesses.

Finally, let me conclude by making clear that our Union commits to working with this Committee and any of its members in your attempts to craft amendments that will help the bankruptcy courts take greater and fairer account of the interests of the workers, retirees and the communities they live in. Thank you.