Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
    In re                            :        Chapter 11
:
DELPHI CORPORATION, et al.,       :        Case No. 05-44481 (RDD)
:
                      Debtors.  :        (Jointly Administered)
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(e) AND 1107(b) AND FED. R.
BANKR. P. 2014 AUTHORIZING EMPLOYMENT AND RETENTION OF
<u>BAKER & DANIELS LLP AS PATENT COUNSEL TO DEBTORS</u>

("BAKER & DANIELS LLP RETENTION APPLICATION")

       Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this application (the "Application") for an order under 11 U.S.C. §§ 327(e) and 1107(b) and Fed. R. Bankr. P. 2014 authorizing the employment and retention of Baker & Daniels LLP ("Baker & Daniels") as patent counsel to the Debtors, <u>nunc</u> <u>pro</u> <u>tunc</u> to October 8, 2005.  In support of this Application, the Debtors submit the Affidavit of Kevin R. Erdman, sworn to February 6, 2006 (the "Erdman Affidavit").  In further support of this Application, the Debtors respectfully represent as follows:

Background

A.   The Chapter 11 Filings

1.   On October 8, 2005, Delphi and certain of its U.S. subsidiaries filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1130, as amended (the "Bankruptcy Code").  On October 14, 2005, three additional U.S. subsidiaries of Delphi filed voluntary petitions in this Court for reorganization relief under the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(b) and 1108 of the Bankruptcy Code.  This Court entered orders directing the joint administration of the Debtor's chapter 11 cases (Dockets Nos. 28 and 404).

2.   On October 17, 2005, the Office of the Unites States Trustee appointed an official committee of unsecured creditors.  No trustee or examiner has been appointed in the Debtors' cases.

3.   This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.   The statutory predicates for the relief requested herein are sections 327(e), and 1107(b) of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.   Current Business Operations Of The Debtors

5.   With more than 180,000 employees worldwide, global 2004 revenues of approximately $28.6 billion and global assets as of August 31, 2005 of approximately $17.1

2

billion,[1] Delphi ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations without supervision from the Bankruptcy Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy Code.

6. Over the past century, the operations which are now owned by Delphi have developed leading global technology innovations with significant engineering resources and technical competencies in a variety of disciplines. Today, the Company is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company's technologies and products are present in more than 75 million vehicles on the road worldwide. The Company supplies products to nearly every major global automotive original equipment manufacturer with 2004 sales to its former parent, General Motors Corporation, equaling approximately $15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

7. As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world. In the U.S., the Debtors employ approximately 50,600 people. Those employees work in approximately 44 manufacturing sites and 13 technical centers across the country and in Delphi's worldwide headquarters and customer center located in Troy, Michigan. Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and local

---

[1] The aggregated financial data used in this Application generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

3

unions.  Outside the United States, the Company's foreign entities employ more than 134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

        8.     Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

        9.     Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle.  When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base.  The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base.  The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C.      Events Leading To The Chapter 11 Filing

10.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales. Reflective of a downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005. The Company experienced net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[2]

11.    The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward looking revenue requirements. Having concluded that pre-filing discussions with its Unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence

---

[2]    Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

5

these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

13.    Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses.  This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned in the Company's transformation plan.  The Debtors believe that a substantial segment of Delphi's U.S. business operations must be divested, consolidated, or wound-down through the chapter 11 process.

14.    Upon the conclusion of this process, the Debtors expect to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

## Relief Requested

15.    By this Application, the Debtors request entry of an order authorizing the Debtors to employ and retain Baker & Daniels to an ongoing professional relationship between the Debtors and Baker & Daniels.

Basis For Relief

16.  The Debtors submit that Baker & Daniels proposed retention meets all the prerequisites for retention of special counsel under section 327(e) of the Bankruptcy Code, which permits a debtor-in-possession, with court approval, to employ counsel that has represented the Debtors prior to the commencement of their chapter 11 cases, for a "specified special purpose" if such employment is in the best interest of the Debtors.  Because Baker & Daniels is the proposed patent counsel to the Debtors, but not the proposed bankruptcy counsel in these chapter 11 cases, section 327(e) does not require that Baker & Daniels and its attorneys be "disinterested persons" as defined in section 101(14) of the Bankruptcy Code.  Rather, section 327(e) instead requires that Baker & Daniels not represent or hold any interest adverse to the estates or the Debtors with respect to the matter on which Baker & Daniels is to be employed.  As discussed below, the employment of Baker & Daniels as patent counsel is in the best interests of the Debtors.

The Debtors' Employment Of Baker & Daniels LLP
Is In The Best Interests Of The Estates

17.  Baker & Daniels will serve as patent counsel to the Debtors during these chapter 11 cases.  Baker & Daniels has performed similar work for the Debtors in the past and is therefore familiar with the Debtors' businesses and operations.  In particular, Baker & Daniels is especially attuned to the unique technological issues that arise in the Debtors' industry.

18.  Baker & Daniels is well qualified to assist the Debtors in the manner described in the Application.  Baker & Daniels has about thirty registered patent attorneys qualified for this engagement.  Most importantly for present purposes, several members of Baker & Daniels have extensive experience in the Debtors' technologies and patent matters.  Accordingly, the Debtors believe that Baker & Daniels is well qualified to serve as patent counsel in these chapter 11 cases in an efficient and effective manner.

7

19. The Debtors believe that the employment of Baker & Daniels will enhance and will not duplicate the employment of Skadden, Arps, Slate, Meagher, & Flom LLP ("Skadden"), the Debtors' general bankruptcy counsel, Shearman & Sterling LLP ("Shearman"), the Debtors' special counsel, Togut, Segal & Segal LLP ("Togut"), the Debtors' conflicts counsel, or any of the other professionals retained by the Debtors to perform specific tasks that are unrelated to the work to be performed by Baker & Daniels as Patent counsel to the Debtors. The Debtors understand that Baker & Daniels LLP will work with the other professionals retained by the Debtors to avoid any such duplication.

## Services To Be Rendered

20. Pursuant to mutually understood ordinary course of business terms, the Debtors wish to engage Baker & Daniels to provide services to the Debtors in connection with patent matters. The Debtors anticipate that such services will include the following:

   (a) Preparation and filing of patent applications focusing on, among others, the following areas of technical expertise: satellite radio transmission and reception technologies, automotive telecommunications systems, automotive safety systems, automotive circuit components, circuit board design and processing, and automotive entertainment systems;
   (b) Preparation and filing of responses to actions received from the U.S. and foreign patent offices related to, among others, the above-listed areas of technical expertise;
   (c) Preparation and filing of appeals with the United States Patent Office related to, among others, the above-listed areas of technical expertise;
   (d) Conduct searches related to, among others, the above-listed areas of technical expertise;
   (e) Providing patent opinions related to, among others, the above-listed areas of technical expertise;
   (f) Miscellaneous intellectual property advice and counsel related to copyrights, trademarks and know-how and contractual matters involving intellectual property.

21. Baker & Daniels has indicated its desire and willingness to represent the Debtors as set forth herein and to render the necessary professional services as patent counsel to the Debtors.

8

22. The Debtors may request that Baker & Daniels undertake specific matters beyond the scope of the responsibilities set forth above. Should Baker & Daniels agree in its discretion to undertake any such matter, the Debtors shall seek further order of this Court.

Disinterestedness Of Professionals

23. The Erdman Affidavit filed in support of this Application contains information available to date on Baker & Daniels' connections with other parties-in-interest, as required by Bankruptcy Rule 2014(a). To the best of the Debtors' knowledge, and based on the information in the attached Erdman Affidavit, Baker & Daniels, its partners, counsel, and associates do not hold or represent any interest adverse to the Debtors, their creditors, any other party-in-interest in these chapter 11 cases, their respective attorneys and investment advisors, the U.S. Trustee, or any person employed therein, with respect to the matters on which Baker & Daniels is to be employed.

24. Baker & Daniels has disclosed to the Debtors that Baker & Daniels has in the past represented, currently represents, and will likely in the future represent certain of the Debtors' creditors and other parties-in-interest in matters unrelated to the Debtors or their chapter 11 cases. Baker & Daniels does not believe that the foregoing raises any actual or potential conflict of interest of Baker & Daniels relating to the representation of the Debtors as their patent counsel in these chapter 11 cases, but such relationships are disclosed out of an abundance of caution. The Debtors understand that, in order to vitiate any actual or potential conflicts of interest, Baker & Daniels will not assist the Debtors in connection with their analysis, negotiations, and litigation, if any, with parties with whom Baker & Daniels has existing client relationships, and that Skadden (or other counsel if Skadden has a conflict), instead, will handle these tasks.

Professional Compensation

25.    Baker & Daniels intends to apply to this Court for compensation and reimbursement of expenses in accordance with section 330(a) of the Bankruptcy Code, the Bankruptcy Rules, applicable guidelines established by the U.S. Trustee, and orders of this Court. Baker & Daniels acknowledges that all compensation will be subject to this Court's review and approval, after notice and a hearing.

26.    Under the applicable provisions of the Bankruptcy Code, and subject to the approval of this Court, the Debtors propose to pay Baker & Daniels its standard rates and charges for patent prosecution matters.

27.    No arrangement is proposed between the Debtors and Baker & Daniels for compensation to be paid in these chapter 11 cases other than as set forth above and in the Erdman Affidavit.

28.    At the Debtors' request, Baker & Daniels has continued to assist the Debtors in connection with their Patent issues since October 8, 2005 and hence the Debtors request Baker & Daniels' retention to be effective <u>nunc</u> <u>pro</u> <u>tunc</u> to October 8, 2005.

Conclusion

29.    For the foregoing reasons, the Debtors submit that the employment of Baker & Daniels as the Debtors' patent counsel on the terms set forth herein is in the best interests of the estates.

Notice

30.    Notice of this Application has been provided in accordance with the Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing (I) Omnibus Hearing Dates, (II) Certain Notice, Case Management, And Administrative Procedures, And (III) Scheduling An Initial Case Conference In Accordance

With Local Bankr. R. 1007-2(e) entered by this Court on October 14, 2005 (Docket No. 245).  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

### Memorandum Of Law

31.    Because the legal points and authorities upon which this Application relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order (a) authorizing the Debtors to employ and retain Baker & Daniels LLP as their Patent counsel to perform the services set forth herein and (b) granting the Debtors such other and further relief as is just.

Dated:   New York, New York
         February 7, 2006

                                        DELPHI CORPORATION, on behalf of itself and
                                        certain of its subsidiaries and affiliates, as Debtors and
                                        Debtors-in-possession

                                        By:   _/s/ David M. Sherbin_____
                                              Name: David M. Sherbin
                                              Title:  Vice President, General Counsel, and
                                                      Chief Compliance Officer