SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
David E. Springer (DS 9331)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York, 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :
        In re                               :       Chapter 11
                                            :
DELPHI CORPORATION, et al.,                 :       Case No. 05-44481 (RDD)
                                            :
                        Debtors.            :       (Jointly Administered)
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEBTORS' OMNIBUS RESPONSE TO OBJECTIONS TO THEIR MOTION
FOR ORDER UNDER 11 U.S.C. §§ 105 AND 363 AUTHORIZING THE
DEBTORS TO IMPLEMENT A KEY EMPLOYEE COMPENSATION PROGRAM

Delphi Corporation and certain of its subsidiaries and affiliates, debtors, and debtors-in-possession in the above-captioned cases (collectively, "Delphi," the "Company," or the "Debtors"), respectfully submit this omnibus response (the "Response") to the objections filed to their Motion For Order Under §§ 105 And 363 Authorizing the Debtors To Implement A Key Employee Compensation Program (the "KECP Motion").

Preliminary Statement

Since the filing of the KECP Motion on October 8, 2005, as part of the commencement of their chapter 11 cases, the Debtors have exhaustively negotiated with the Official Committee of Unsecured Creditors (the "Creditors' Committee," the "Committee," or "UCC") and considered the views of the objectors concerning the motion.  At the Creditors' Committee's request, the Debtors have agreed to postpone until the July 27, 2006, omnibus hearing, those parts of the KECP Motion relating to annual incentive payments for periods after June 30, 2006, emergence cash awards, and equity participation in the reorganized entity.  Accordingly, the only part of the KECP before the Court at the February 10, 2006, hearing is a revised, performance-based annual incentive program (the "Revised Annual Incentive Plan" or "Revised AIP") for the six-month period ending June 30, 2006.[1]

---

[1]    As a result of the Debtors' discussions with the Creditors' Committee, the Debtors agreed to forego a planned AIP program for the fourth quarter of 2005, which was to have covered the first three months of the Debtors' chapter 11 cases.  This decision was based on the fact that, as a result of the Debtors agreement to adjourn the KECP Motion from its original hearing date in November 2005 to the first quarter of 2006, the fourth quarter 2005 performance quarter was fully performed prior to the agreement between the Debtors and the Creditors' Committee regarding the form and substance of the revised AIP program.  Accordingly, the Revised AIP incentive program presently before the Court has been reduced to an aggregate payment pool, at target performance, of approximately $20.6 million, not more than $5.7 million of which may be paid to the most senior-level (Delphi Strategy Board, or "DSB") executives.  This result, standing

*(cont'd)*

For its part, the Creditors' Committee has agreed to the "form and substance" of the Debtors' proposal, and it has objected only to the Debtors' decision to proceed with implementation of the Revised AIP now, before labor negotiations have been "successfully concluded."[2] The Debtors respectfully submit that this and the few other objections to the Revised AIP now remaining should be overruled.  At the outset, the evidence is unchallenged that the Revised AIP now before the Court is, in all material respects, of a kind with Delphi's prepetition programs and the annual incentive programs of the Debtors' industry peers and other Fortune 1000 companies.  Thus the Revised AIP now before the Court qualifies as an "ordinary course" transaction within the meaning of section 363(c) of the Code.  Accordingly, the Court need now do no more than declare as much, which would allow the Debtors to proceed to implement the Revised AIP.[3]

Even were the Court to consider the Revised AIP a transaction "other than in the ordinary course of business," within the meaning of section 363(b)(1) of the Code, the objections raised against it are unavailing.  Neither the Creditors' Committee nor the other objectors have quarreled with or submitted evidence challenging the process by which the Debtors came to approve the Revised AIP.  They also have not questioned that the Debtors have established a

---

*(cont'd from previous page)*

    alone, represents an approximate one-third reduction in the planned expenditures for the AIP program for the first performance period.

[2]    The Creditors' Committee should not be able to bootstrap its own request to adjourn consideration of the AIP-portion of the KECP from the November 28, 2005, omnibus hearing to the February 10, 2006, hearing (while the deadline for the filing of section 1113/1114 motions was deferred from December 20, 2005, to at least February 17, 2006), into a justification for further delay, especially given that the Debtors not only agreed to defer the balance of the KECP until the July 27, 2006, omnibus hearing but also to resolve every concern the Committee raised regarding the form or substance of the Revised AIP.

[3]    Delphi has already implemented ordinary course incentive programs for executives in non-Debtor affiliates and subsidiaries, as well as for its non-executive salaried workforce.

valid purpose for their proposed use of estate property, nor have they come forward with evidence to rebut the Debtors' showing that the decision to proceed now with the Revised AIP was made on an informed basis, in good faith, and in an honest belief that doing so is in the best interests of the estate.  Accordingly, on this record, there is no basis to question the Debtors' business judgment, much less for the Court to override that judgment and come to a different business judgment in discharging its function as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . . debtor-in-possession," as mandated by the Court of Appeals in <u>Orion Pictures Corp. v. Showtime Pictures Corp. (In re Orion Pictures Corp.)</u>, 4 F.3d 1095 (2d Cir. 1993).

There is also no legitimate record basis on which to label the Revised AIP unfair or unreasonable.  To the contrary, the Creditors' Committee specifically disclaims any objection to the substance of the Revised AIP, which it acknowledges has resulted from the Debtors' "good faith in-depth discussions" with the Committee "regarding the conceptual form and substance of a proper performance-based incentive plan."  (UCC Obj. at 2.)  In reaching that conclusion, the Committee benefited from the advice of one of the leading experts in the field of executive compensation, Pearl Meyer of Steven Hall & Partners, the Committee's professional advisor. The other objectors should be taken to concur in the Committee's and Mrs. Meyer's judgments in this respect, for they have not produced <u>any</u> evidence challenging the merits of the plan.

The objections, then, boil down to two principal categories: the unions' contention (which the Creditors' Committee has recently elected to echo) that the Revised AIP should not be approved before the Debtors' negotiations with its labor unions have been "successfully concluded," and the Securities Class Action Lead Plaintiffs' objection that the Court should not

approve a plan that purportedly allows estate property to be paid to those who may have engaged in the accounting irregularities that are the subject of their class-action lawsuit.

With regard to the first objection, the evidence shows that Delphi's senior management, the Delphi Board of Directors' Compensation and Executive Development Committee (the "Compensation Committee"), and the full Board of Directors all carefully considered the costs and benefits to the estates in deciding to proceed with the Revised AIP now.  And while the Debtors acknowledge that proceeding with the Revised AIP now <u>may</u> make negotiations with the unions harder than they would have been had the Debtors capitulated and agreed to arbitrarily deprive their executive workforce of basic market-based compensation, it is speculative, to say the least, whether approval of the limited Revised AIP now would, in fact, "endanger critical negotiations with the Debtors' unions," as the Creditors' Committee suggests.  (UCC Obj. ¶ 7.)[4] Even were that the case, the Debtors cannot—and the Court should not—countenance efforts by some stakeholders in these chapter 11 cases to hold hostage one population in the Debtors' human capital workforce (<u>i.e.</u>, its salaried executives) to force a resolution acceptable to those same stakeholders of legacy obligations and uncompetitive labor contracts affecting another population of the Debtors' human capital workforce (<u>i.e.</u>, its unionized hourly workers).  This is especially true when the only element of the KECP actually before the Court is an ordinary course incentive program based on specific corporate, divisional, and personal performance

---

[4]     This argument is belied by the reality that the Debtors' labor contracts and legacy costs associated with its hourly unionized workforce can only be modified by agreement or by this Court's determination that the Debtors qualify for relief under sections 1113 and 1114 of the Code.  Neither of these approaches to resolution of one of the Debtors' reorganization hurdles carries with it either a legal or equitable justification for this Court to intervene and withhold market-based compensation from the Debtors' 466 executives covered by the Revised AIP.

targets, the form and substance of which has been negotiated with and approved by the Creditors' Committee.

In all events, the Debtors' management and its Board assessed these concerns and took them into account in deciding to proceed. They evaluated these concerns in the context of facts they know about the history, status, and prospects of the Debtors' ongoing negotiations with the unions and General Motors Corporation and in light of a host of other considerations, including an assessment of the probable damage to the Debtors' estates they believe would flow from further delay in setting for their executive corps reasonable, incentive-based compensation—an integral and non-severable element of the Debtors' basic compensation package offered their executives. The Debtors' management and the Board also weighed in the balance the fact that their 466 domestic executives provide critical global leadership to an enterprise that spans six continents, that employs more than 185,000 people, and that had global revenues in 2004 of nearly $27 billion. That their decisions resulted from a conservative, thoughtful, and balanced effort to take into consideration the host of considerations that confront the Debtors in these chapter 11 cases finds proof in the fact that these very same decision makers simultaneously took action, as part of the development of the KECP, to eliminate certain prepetition long-term incentive programs and previously approved and disclosed retention programs. In the end, the Debtors' ultimate conclusion to proceed now with the limited Revised AIP is a classic business judgment that falls comfortably within the range of discretion the Code leaves to debtors-in-possession.

The Securities Class Action Lead Plaintiffs' objection is also misplaced. The framers of the KECP and the Board's Compensation Committee took as a premise, in light of the investigation conducted by the Board's Audit Committee into the matters about which these

litigants complain, that any executive remaining at Delphi should be entitled to participate in the

KECP.  Moreover, the Debtors have adopted rigorous prophylactic measures—once again,

supported by the Creditors' Committee—to insure that KECP benefits are not paid to, or retained

by, individuals who engaged in wrongdoing against the Company.

In further support of the Response, the Debtors particularly represent as follows:

I.
STATEMENT OF FACTS

A.    The Creation Of Delphi And Its Legacy Labor Costs

1.    For many years, most of what are now the Debtors' businesses were conducted

through various subsidiaries and divisions of GM.  In the 1990s, however, GM decided to

reorganize and then to divest itself of its automotive components businesses.  Pursuant to that

plan, GM caused Delphi to be separately incorporated as a wholly-owned subsidiary and,

effective January 1, 1999, transferred its various automotive component businesses to Delphi,

and it later distributed the stock of Delphi to GM's existing shareholders, thereby "spinning off"

Delphi as a separate publicly-traded company.  Pursuant to a series of agreements between

Delphi and GM, Delphi assumed the assets and related liabilities of GM's automotive

components businesses, and GM and Delphi allocated various assets, liabilities, and

responsibilities related to those business between them.  (Decl. of Mark R. Weber ("Weber

Decl.") ¶ 4.)[5]

---

[5]    The evidence supporting the Motion is found in the separately-filed declarations of Mark
R. Weber, Delphi's Executive Vice President, Operations, Human Resource Management
& Corporate Affairs; John D. Opie, Delphi's Lead Independent Director; and Nick
Bubnovich, Senior Consultant, Watson Wyatt Worldwide, Delphi's outside executive
compensation consultant; and the Supplemental Declaration of Mark W. Weber.  These
witnesses were examined at deposition on February 2-3, 2006.  The Debtors propose to

*(cont'd)*

2.      The great majority of Delphi's domestic employees traditionally have been and today are represented by unions.  Of the more than 46,000 people whom Delphi employed in the United States as of December 31, 2005, approximately 32,000 (or about 70%) are engaged on an hourly basis.  Over 95% of these employees are represented by 49 different international and local unions.  (Weber Decl. ¶ 5.)

3.      As part of its separation agreements with GM, Delphi was required to assume the terms and conditions of the collective bargaining agreements that GM had negotiated with its unions.  As a consequence, today Delphi is the <u>only</u> domestic auto supplier governed by labor agreements patterned on those between the "Big Three" automotive manufacturers (GM, Ford, and Chrysler) and their unions.  The majority of the Debtors' legacy collective bargaining agreements not only provide for wages that are well above market, but they also require Delphi to provide substantial health and welfare pension benefit plans, retiree health care, and other benefits.  As a result, the Debtors presently compensate their hourly production workers an average of <u>almost $64 per hour,</u> including benefits and legacy liabilities.  This level is nearly three times higher than the hourly labor rates of Delphi's U.S. peer companies.  The result is that Delphi is disadvantaged in its ability to compete with its domestic peers in the automotive parts business on the basis of cost.  (Weber Decl. ¶ 8.)

4.      The collective bargaining agreements also impose a variety of significant operating restrictions on Delphi.  For example, the Company may not permanently lay off idled workers.  The result has been that the number of hourly employees receiving nearly full pay and benefits but who are on non-productive status has been in the several thousands.  The collective

_____

*(cont'd from previous page)*
offer these declarations in support of their direct case at the hearing on February 10, 2006, and to make the declarants available for live cross and redirect examination at that time.

bargaining agreements also limit Delphi's ability to exit non-strategic, unprofitable operations,

thereby forcing the Company to continue incurring fixed labor costs, even in the event of plant

closings or wind-downs. In 2004, Delphi incurred more than $170 million in wages and benefits

costs associated with hourly employees in non-working, unproductive status. With the decline of

business conditions in the overall domestic auto industry, these conditions will only worsen and

the numbers of and costs associated with non-productive hourly workers will only increase.

(Weber Decl. ¶ 9.)

B.    The Responsibilities And Compensation Levels Of Delphi's Executive Workforce

        5.      The responsibilities of the Debtors' executive corps extend beyond the Debtors to

include the entirety of Delphi's global enterprise, both debtor and non-debtor entities, with duties

that in many instances reach across product lines.  The Debtors' 466 domestic executives provide

global leadership to a worldwide enterprise doing business on six continents, that employs more

than 185,000 people, and that had global revenues in 2004 of nearly $27 billion.  (Weber Decl.

¶¶ 6-7.) Delphi's executive workforce not only has management responsibility for the Debtors'

domestic workforce of about 46,000, but it also responsibility for management of the 140,000

Delphi employees (representing about 75% of the total workforce) who are employed outside the

United States.

        6.      In contrast to the benefits enjoyed by the Debtors' hourly employees, total

compensation for the Debtors' executive workforce has remained stagnant or has fallen, in

comparative terms, during the past few years.  (Weber Decl. ¶¶ 11-12; Decl. of Nick Bubnovich

("Bubnovich Decl.") ¶¶ 8-9.)  For example, the DSB is comprised of most of the Company's

officers and many of its senior-most executives.  Under the Company's prepetition compensation

program, the actual total compensation earned by members of the DSB was well under the

market median, falling below the 25th percentile of total compensation when compared to

similarly-situated individuals, both in the industry in general, and Delphi's <u>Fortune</u> 100 corporate

peers.  So, too, with respect to the Company's non-DSB executives:  although Delphi targeted

total compensation for non-DSB executives at market-competitive levels, actual total

compensation for this group fell below the 25th percentile when compared to similarly situated

individuals, both in the industry in general, and Delphi's <u>Fortune</u> 100 corporate peers.

(Bubnovich Decl. ¶¶ 10-11.)

7.    When the petitions in these cases were filed on October 8, 2005, therefore,

Delphi's hourly workers enjoyed actual compensation levels at levels well above their market

peers, while the total compensation of the Company's executive workforce was below

competitive levels.  (Weber Decl. ¶¶ 8, 10-12; Bubnovich Decl. ¶¶ 9-11.)

C.    <u>Development Of The Key Employee Compensation Program</u>

8.    In developing the KECP, the Debtors took into consideration certain well-

established principles relating to employee compensation.  In deciding whether to accept or keep

a job, employees consider the employer's entire "employment proposition," that is, the mix of

tangibles (compensation and benefits) and intangibles (employer's prospects, career path, work

content, work relationships, work/life balance, etc.) offered by the employer, adjusted by the risk

that the employer will not be able to deliver on the proposition.  As an employer faces increased

financial distress, its employment proposition becomes impaired as employees face greater risk

of losing their jobs and general uncertainty about their futures increases.  The deeper in distress

the employer the fewer the tools and choices it has to positively affect the employment

proposition it offers existing and prospective employees.  (Bubnovich Decl. ¶ 13; Decl. of John

D. Opie ("Opie Decl.") ¶¶ 6-8.)  Moreover, when financial distress results in a chapter 11 filing,

employer decisions often become subject to court approval. A court's review of those decisions

thus speaks to the "human capital" of the debtors' estates.

9

9.      Under the Debtors' prepetition compensation program, Delphi incorporated the following individual elements as integrated components of its executive compensation plan: base salary, benchmarked against Delphi's industry peers and other <u>Fortune</u> 100 companies; an annual incentive plan (the "AIP"), under which executive incentive compensation payment opportunities were tied to the achievement of the Company's business plan and financial goals; and a long-term incentive plan (the "LTIP"), a program that provided incentive compensation payment opportunities in the form of cash (the "PAP") or equity (both stock options and restricted stock units), and designed to encourage Delphi management to achieve certain strategic corporate goals that, by their nature, took more than a year to complete.  In addition, members of the Debtors' domestic executive workforce were eligible to receive retention grants under a program enacted in 2005.  (Weber Decl. ¶ 14; Opie Decl. ¶¶ 5(a)-(c); Bubnovich Decl. ¶¶ 12(a)-(c).)

10.      As events progressed toward the filing of these cases, Delphi took steps to protect the enterprise's assets by developing a key employee compensation program that would keep the key executives focused on maximizing the Debtors' financial performance and maintain alignment of their interests with those of the Debtors' stakeholders.  (Bubnovich Decl. ¶¶ 14-20; Opie Decl. ¶¶ 9, 11, 13-14; Weber Decl. ¶ 13.)

11.      In August 2005, Delphi began an evaluation of the Debtors' existing compensation structure and incentive plans in the context of a possible restructuring.  With input from the Company's financial, compensation, and legal advisors, including Watson Wyatt Worldwide ("Watson Wyatt") and the Debtors' counsel, Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden," and, collectively, the "Advisors"), this evaluation was intended as a reassessment of the "employment proposition" that the Company could offer its executive

workforce in light of current U.S. and marketplace economic realities.  Delphi gave

consideration not only to overall costs in financial terms, but also to ensuring that the appropriate

employees were included and that they were assigned appropriate levels of compensation in light

of the Debtors' goals.  Throughout, the Debtors held in mind their duty to manage the estate's

assets in a fiscally responsible manner so as to maximize stakeholder recoveries.  For that reason,

the KECP was not simply a managerial exercise, but the product of careful consideration by the

Compensation Committee and the Advisors.  (Opie Decl. ¶¶ 9-10, 13; Bubnovich Decl. ¶¶ 13-

18.)

> 12.    The KECP takes as a principle that the Company should provide market-

competitive compensation opportunities designed to motivate its executive workforce to perform

for, and not simply remain employed by, the Debtors.  To ensure that the program assists the

Company in achieving its overall business plan, the program incorporates the use of measurable

performance milestones sufficient to properly monitor and control short-term risk.  The costs to

the Debtors of the new plan are estimated at no greater than those previously borne by the

Company in connection with its prior compensation package.  The costs also are comparable to

those approved by courts in the case of chapter 11 companies of similar size.  The Debtors

specifically considered particular incentive programs implemented by other companies in chapter

11, including automotive industry suppliers Federal-Mogul Corp. and Hayes Lemmerz

International, Inc., with the goal of creating an overall incentive program that incorporated the

most effective components of each.  (Bubnovich Decl. ¶¶ 19-20; Opie Decl. ¶¶ 11, 13-14.)[6]

---

[6]    This Court may take judicial notice of the fact that bankruptcy courts in the chapter 11
cases of other auto parts suppliers have authorized key employee retention and incentive
plans.  See, e.g., In re Collins & Aikman Corp., Case No. 05-55927 (SWR) (Bankr. E.D.
Mich. Dec. 16, 2005) (approving KERP containing a retention and "success sharing"

*(cont'd)*

11

13.     When the Debtors filed their petitions in these cases, they cancelled the AIP and the LTIP, with the exception of a vested portion of a PAP award for the 2003-2005 performance period, in an amount of less than $3 million.  The Debtors also cancelled the newly enacted retention awards program.  Accordingly, members of Corporate Management saw their total compensation opportunities decrease precipitously upon the Debtors' entry into chapter 11, going from a total prepetition compensation plan composed of base salary, AIP and LTIP incentive compensation payment opportunities, and retention grants, to a post-petition compensation package consisting solely of base salary.  (Weber Decl. ¶ 14.)

14.     The KECP was intended to replace some, but not all, of the compensation opportunities lost by the Debtors' executive workforce when the Company filed for chapter 11 protection.  As announced by the Debtors on the Petition Date, the KECP contains two basic components:  the Revised AIP; and emergence awards, consisting of cash incentive-compensation payments and a percentage of the equity of the reorganized entity, conditioned upon the Debtors' successful reorganization (the "Emergence Incentive Compensation Plan").  (Weber Decl. ¶ 16; Bubnovich Decl. ¶ 21; Opie Decl. ¶ 15; KECP Mtn., ¶¶ 24-37, Ex. 1, at pp.2, 9-26.)  The KECP Motion does not, however, propose any replacement for the discontinued retention grants; and modifies the terms and reduces the costs of the Debtors' substitute for the LTIP.

_____

*(cont'd from previous page)*

plan); In re Meridian Automotives Systems—Composites Operations, Inc., Case No. 05-11168 (MFW) (Bankr. D. Del. Aug. 30, 2005) (approving KERP and annual incentive program); In re Tower Automotive, Inc., Case No. 05010578 (ALJ) (Bankr. S.D.N.Y. March 30, 2005) (approving KERP and annual incentive plan for certain senior executives); In re Hayes Lemmerz International, Inc., Case No. 01-11490 (MFW) (Bankr. D. Del. May 28, 2002) (approving "Critical Employee Retention Plan"); In re Federal Mogul Global, Inc., Case No. 01-10578 (RJN) (Bankr. D. Del. May 1, 2002) (approving, inter alia, a KERP).

15.     The portion of the KECP now before the Court applies to the Debtors' domestic executive positions, 466 as of January 27, 2006, excluding by voluntary agreement the current Chairman and CEO, Robert S. ("Steve") Miller.  For purposes of the KECP, the executives are divided into "bands" A through K, from lowest to highest levels of responsibility.  The two highest bands include one member each:  the Chairman and Chief Executive Officer, Mr. Miller, is in Band K, and the President and Chief Operating Officer, Rodney O'Neal, is in Band H (there are no Bands I or J for domestic executives).  Band G includes Delphi officers and executive officers:  the Debtors' Vice Chairman, David B. Wohleen, two Executive Vice Presidents, and 19 corporate and divisional Vice Presidents, all of whom are DSB members.  The two domestic Vice Presidents with international assignments are in Band F. Bands A through E include various directors, executive directors, and other, more junior executives. Band A, the entry executive level, has 154 executives including, for example, 16 chief product engineers.  (Weber Decl. ¶ 7; Opie Decl. ¶ 18; Bubnovich Decl. ¶ 38.)

D.     Filing Of The KECP Motion And The Creditors' Committee's Due Diligence

16.     Because of the importance of the Debtors' executive workforce to the reorganization of these Debtors' business, the Debtors decided to file the KECP Motion on October 8, 2005 (the "Petition Date"), with their other First Day motions.  (Opie Decl. ¶ 12.)

17.     A hearing on the KECP Motion was originally scheduled for the November 29, 2005, omnibus hearing, with all objections due no later than November 22, 2005.

18.     On November 11, 2005, the Creditors' Committee delivered to the Debtors a 29-point due diligence request, which the Debtors have fulfilled to the Committee's satisfaction.

19.     On November 14, 2005, and then again on December 13, 2005, January 19, 2006, January 31, 2006, and again on February 3, 2006, the Debtors agreed to adjourn the deadline for the Creditors' Committee to file its objections, if any, to the KECP Motion.  The Debtors and the

13

Creditors' Committee agreed to the adjournment and a rescheduling of the KECP hearing so that

the Committee could continue its due diligence and to allow further negotiations about the plan.

(Weber Decl. ¶ 17; Supplemental Declaration of Mark R. Weber ("Weber Supp'l Decl.") ¶ 2;

Opie Decl. ¶ 16; Bubnovich Decl. ¶ 26.)

20.    At the end of December 2005, and at the Creditors' Committee's request, the

Debtors also agreed to the Creditors' Committee's specific request to adjourn all aspects of the

KECP Motion, other than an annual incentive plan for a period ending on June 30, 2006, to the

July 2006 omnibus hearing, which is currently scheduled for July 27, 2006.  (Weber Supp'l Decl.

¶ 3.)

21.    As a result of these adjournments and extensions of time, the Creditors'

Committee announced on Monday, February 6, 2006, that it has no objection to the "form and

substance" of the Revised AIP, but it does not believe than "any AIP should be approved before

labor negotiations have been successfully concluded." (UCC Obj. at 2.)

E.    The Objections

22.    Parties-in-interest other than the Creditors' Committee were required to file

objections to the KECP Motion, if any, by November 22, 2005.  As of the end of the day

November 22, 2005, the Debtors had received four timely-filed objections: from the Wilmington

Trust Company, in its capacity as Indenture Trustee; the United Steel, Paper and Forestry,

Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union,

AFL-CIO; the International Union, United Automobile, Aerospace and Agricultural Implement

Workers of America; and the Pension Benefit Guaranty Corporation.  The Office of the United

States Trustee also filed a timely objection.

23.    On November 23, 2005, the Debtors received five additional, but untimely,

objections and joinders from the International Brotherhood of Electrical Workers Local Union

14

No. 663 and the International Association of Machinists, AFL-CIO tool and Die Makers Local

Lodge 78, District 10; JPMorgan Chase Bank, N.A., in its capacity as administrative agent for

itself and the secured lenders syndicate; the International Union of Operating Engineers Local

Union Nos. 18, 101, and 832; the International Union of Electronic, Electrical, Salaried, Machine

and Furniture Workers-Communications Workers of America; and the Teachers' Retirement

System of Oklahoma, the Public Employees' Retirement System of Mississippi, Raiffeisen

Kapitalanlage-Gessellschaft m.b.H, and Stichting Pensioenfonds ABP, as Lead Plaintiffs in the

Consolidated Securities Class Actions.  (For the Court's convenience, a chart summarizing the

principal objections raised by the Objectors is attached hereto as Exhibit A.)[7]

F.    Summary of the KECP Provisions now before the Court

24.    As a result of discussions between the Debtors and the Creditors' Committee,

certain provisions of the Revised Annual Incentive Plan have been substantially refined and the

details and operation of other aspects of the Revised AIP clarified. In particular, the following

information has been provided:

---

[7]    The Debtors served discovery on most of the Objectors, and some Objectors served
discovery of their own on the Debtors.  In the end, the Debtors agreed to make available
to all Objectors the information that they supplied to the Creditors' Committee or in
response to whatever discovery was produced in connection with the KECP Motion. In
response to the parties' various pre-hearing discovery requests, the Debtors' produced
over 5,000 pages of documents related to the KECP.  Conversely, the Objectors produced
some documents they believe are responsive to some of the Debtors' requests for
clarification of the nature and scope of the Objections raised by these parties.  The
Debtors also produced the declarations of their supporting witnesses and made them
available for deposition.  Three union objectors also tendered declarations and are
making their witnesses available for deposition before the hearing.  The Debtors have
been informed that neither the Creditors' Committee nor the other objectors intend to
offer any other witnesses at the hearing, and the Creditors' Committee has also
represented to the Debtors counsel that it does not intend to offer evidence of any kind.

a.    the names and employment positions of the Debtors' executives who currently are eligible to participate in the Revised Annual Incentive Plan ("Covered Employees");

b.    evidence <u>making clear</u> that the Audit Committee's investigation of the accounting issues underlying the Debtors' June 30, 2005, restatement of certain prior period financial statements, on the one hand, and the process by which the Compensation Committee formulated the KECP, on the other, were independent;

c.    the Debtors' first-period financial performance targets, both on a consolidated basis and by division;

d.    clarification of the performance metrics by which the Debtors' corporate- and division-level executives may become eligible for annual incentive compensation awards;

e.    refinement and clarification of the process by which each Covered Employee's incentive compensation award, if any, may be adjusted; and

f.    detailed safe harbor or prophylactic measures to make clear that the Company has reserved its right to withhold or recover any performance-based awards from Covered Employees, if any, who failed to act in good faith and in a manner the Company reasonably believes to be in or not opposed to the best interests of the Debtors.  (Weber Decl. ¶¶ 17-19, 22-30; Weber Supp'l Decl. ¶¶ 2-3; <u>see also</u> Opie Decl. ¶¶ 17, 25-26.)

25.    The provisions of the KECP now before the Court have been thoroughly reviewed and approved by Delphi's Compensation Committee.  Moreover, the Board of Directors as a whole received a report on the status of the KECP negotiations on February 1, 2006, and the independent directors met separately and determined, after considering all the facts and circumstances of the case—including the views of various constituencies and the effects of

16

continuing uncertainty on the Debtors' executive corps—that the Debtors should proceed to

hearing on the applicable provisions of the KECP Motion on February 10, 2006.  (Opie Decl.

¶ 28.)

26.    The Revised Annual Incentive Plan now before the Court provides the Debtors'

executives with the opportunity to earn cash incentive payments based on the Debtors'

achievement of certain levels of financial performance between January 1 and June 30, 2006,

using targets and business metrics set by the Company, in consultation with its Advisors, and

with input from the Creditors' Committee and its advisors.  All members of the Debtors'

domestic executive workforce (excluding by his voluntary agreement, the current Chairman and

CEO, Mr. Miller) are eligible to participate in these opportunities.  (Bubnovich Decl. ¶ 27; Opie

Decl. ¶¶ 16-18.)

27.    The Revised Annual Incentive Plan incorporates six-month performance cycles

rather than the year-long periods used prior to the Petition Date, with the performance cycle now

before the Court beginning on January 1, 2006, and ending on June 30, 2006.  In making the

decision to employ shorter cycles, the Debtors recognized the need not only to closely monitor

their ongoing financial progress, but also to ensure that executive performance remains linked to

the evolving demands of these chapter 11 cases.  The use of abbreviated cycles permits the

Debtors to anticipate and track more closely the potential effect of non-recurring or non-

operational events that might otherwise affect the Debtors' ability to achieve their financial

targets.  The shortened periods likewise reflect the Debtors' awareness that the chapter 11

process itself introduces variables that make it more difficult to make long-term forecasts about

the Debtors' financial performance.  As a result of these modifications, the Debtors expect to be

able to set corporate performance targets that are neither unattainably high—and which therefore

17

serve no real function—nor so low that eligibility for incentive compensation payments under the Revised Annual Incentive Plan become automatic.  (Weber Decl. ¶¶ 18, 21; Opie Decl. ¶ 20; Bubnovich Decl. ¶ 36.)

28.    The shorter periods also provide Covered Employees (and thus, the Debtors) with more incentive value than annual periods.  By way of example, if the Debtors fall significantly short of their financial targets for any particular month, that shortfall only will affect the ability to meet the target for the six-month incentive cycle, not the entire year, and thus will affect only one-half of an executive's incentive opportunity for the year.  Under the prepetition plan, one bad month might affect an executive's entire annual incentive-compensation opportunity.  (The Debtors did not, however, implement shorter performance cycles (e.g., three months) because the costs associated with administering the plan on a quarterly or other basis would have outweighed the additional incentive value provided by the shorter periods.)  (Bubnovich Decl. ¶ 37.)

29.    Even if the Debtors achieve their performance targets, however, Covered Employees will not necessarily receive incentive compensation payment under the Revised Annual Incentive Plan.  Instead, each Covered Employee also must maintain an acceptable level of personal achievement to qualify for incentive compensation payments.  The individual performance of each Covered Employee will be evaluated annually by his or her supervisor or, in some cases, by a committee of senior executives.  Any Covered Employee whose performance is deemed to be unacceptable will not be eligible for an incentive payment.  (Weber Decl. ¶¶ 22, 26; Opie Decl. ¶¶ 19, 24; Bubnovich Decl. ¶ 34.)

30.    In connection therewith, an executive's annual incentive compensation payment may be adjusted within a range of 0% to 200% of his or her target award opportunity, based on personal performance.  (For DSB members, the positive adjustment is limited to 150% of the

18

executive's target payment opportunity.)  Nevertheless, the net effect to the Debtors of these

individual adjustments must be zero, i.e., a positive individual achievement adjustment for one

executive must be counterbalanced by negative individual achievement adjustments for one or

more other executives.  Additionally, a DSB-level incentive payment adjustment cannot be

funded by (or fund) an adjustment to a non-DSB-level payment, and vice versa.  (Bubnovich

Decl. ¶ 34; Weber Decl. ¶ 26.)

     31.     The Debtors' original KECP Motion proposed to employ EBITDAR-based

performance targets.  As a result of continuing discussions with the Creditors' Committee, the

Debtors have refined the metric to be used in connection with the Revised Annual Incentive

Plan.  To obviate concern that it would be inappropriate for the Debtors to include in their pre-

emergence earnings calculations for the Revised AIP those gains, if any, obtained as a result of

the Debtors' ongoing negotiations with GM ("G") or the Debtors' labor unions ("U"), the Debtors

have agreed to make explicit their intention to exclude these factors from their calculations.  At

the enterprise level, therefore, the Debtors will use "EBITDAR-UG," that is, "earnings before

interest, taxes, depreciation, amortization, restructuring costs, but excluding earnings, if any,

resulting from contractual negotiations with GM and the Unions," as the metric for calculating

Revised Annual Incentive Plan payment opportunities.  The enterprise-level target has been set at

($80 million) and is derived from the Debtors' business plan—which forecasts positive

EBITDAR for the six-month period—and has been reviewed by Delphi's Board of Directors.

(Opie Decl. ¶¶ 21-22; Bubnovich Decl. ¶¶ 29, 32; Weber Decl. ¶¶ 18, 22.)

     32.     In consultation with the Creditors' Committee, the Debtors also have agreed to

begin measuring corporate performance at the Debtors' divisional level for purposes of the

Revised Annual Incentive Plan.  The Debtors therefore will tie a portion of the incentive

compensation opportunities for division-level executives to the performance of that executive's particular division.  Because the Debtors measure earnings only at the enterprise level, however, the Debtors will substitute an "Operating Income" metric ("OI") for "Earnings" at the division level.  Accordingly, 50% of the incentive payment opportunities for division-level executives will be calculated on the basis of OIBITDAR-UG, and the remaining 50% will be calculated on the basis of EBITDAR-UG.  The earnings targets for each division, also drawn from the Debtors' business plan, are as follows:  Energy and Chassis, ($44.2 million); Steering Division, ($92.8 million); Thermal and Interior, ($79.2 million); Electronics and Safety, $193.0 million; Packard Electric, $83.4 million; Product and Service Solutions, $23.1 million; Automotive Holdings Group, ($583.9 million); and Medical, $0.3 million.  (Weber Decl. ¶ 22, Ex. C; Opie Decl. ¶ 23; Bubnovich Decl. ¶¶ 30, 32, Ex. A.)

33.    The enterprise- and division-level compensation payment opportunities will operate independently:  achievement of the financial target at one level of the entity will fund the incentive payment opportunity for that level only, irrespective of the outcome for another entity level (or levels).  For example, if a division achieves its threshold earnings target but the enterprise does not, Covered Employees in that division would be eligible only for their division-level incentive payment opportunities, and corporate-level Covered Employees would not receive incentive compensation payment.  If a division and the enterprise both achieve their respective targets, Covered Employees in that division would be eligible for both components of their incentive compensation payments, and corporate-level employees become eligible for enterprise-level incentive payments.  If the Debtors achieve their enterprise-level targets, but a division does not achieve its corresponding targets, all Covered Employees will be eligible for their enterprise-level payment opportunities, but Covered Employees in that division will not be

20

eligible for their division-level payments.  (Opie Decl. ¶ 23; Weber Decl. ¶ 24; Bubnovich Decl.

¶ 33.)

34.    The apportionment of incentive compensation payment opportunities by entity

level is summarized below:

| Executive | Portion Attributable to Achieving Corporate Target | Portion Attributable to Achieving Division Target |
|---|---|---|
| Corporate-level executive | 100% | 0% |
| Divisional executives (other than in the Medical Division) | 50% | 50% |
| Medical Division executive[8] | 30% | 70% |

(Weber Decl. ¶ 24.)

35.    By adding division targets to the Revised Annual Incentive Plan, the Debtors have

tightened the connection between individual performances and incentive payments at every level

of the organization.  This ensures that each Covered Employee's incentive compensation

payment opportunities more accurately reflect the performance achievement opportunities

available at his or her level of the entity itself.  (Weber Decl. ¶¶ 23-24; Bubnovich Decl. ¶ 33.)

36.    The potential incentive compensation payments have been reduced

proportionately to reflect the shorter (six months versus annual) performance cycle.  The

thresholds, targets, and ceilings have been adjusted to take into account the views of the

Creditors' Committee and its consultant (and are set forth in charts attached to the Supplemental

Declaration of Mark R. Weber).  As a result of discussions between the Debtors and the

Creditors' Committee and its advisors, the Debtors have agreed that, unless the Debtors achieve

at least 90% of their targets at the enterprise level, payouts will be less than half of the prorated

---

[8]    At present, there are no executives in the Medical Division.  Among the reasons given by
the last executive remaining in the division prior to his recent departure was
dissatisfaction with compensation levels.  (Weber Decl. ¶ 24 n.5.)

annual targets.  At a 95% target attainment level, Covered Employees will be eligible for

potential incentive awards of 75% of targets.  One hundred percent of incentive awards become

available only if and when the Debtors actually achieve 100% of their targets.  (Weber Supp'l

Decl. ¶ 9, Ex. 2.)

37.    The Debtors and their compensation advisors estimate that the cost, at target, for

the first six-month cycle of the Revised AIP for all eligible executive is approximately $20.6

million.  For members of DSB, the cost, at target, is $5.7 million.  The Debtors' estimates assume

that all Covered Employees will remain with the Debtors for the entire performance period, and

that all Covered Employees will meet the personal-performance requirements implemented

under the plan.  The target incentive compensation payment opportunities for Covered

Employees under the Revised Annual Incentive Plan for the period January 1, 2006, through

June 30, 2006, are outlined in the spreadsheet attached as Exhibit B to the Declaration of Nick

Bubnovich.  (Bubnovich Decl. ¶ 35; Weber Decl. ¶ 19.)

G.    The Agreed Safe Harbor and Prophylactic Measures

38.    As a result of negotiations with the Creditors' Committee, the Debtors have also

agreed to impose strong and unprecedented safe harbor and prophylactic measures.  (Weber

Supp'l Decl. ¶ 4, Ex. 1.)  In relevant part, a Covered Employee's incentive compensation award

will be temporarily escrowed, pending a final determination whether those payments should be

forfeited (pursuant to procedures and standards set forth below), if, in connection with conduct or

transactions relating to the Covered Employee's employment or affiliation with the Debtors, any

of the following occurs:

a.    the Debtors assert a claim for relief, under the Code or other applicable

law, against the Covered Employee;

22

       b.      the Creditors' Committee notifies the Debtors that the Committee intends to obtain from the Court authority to file a complaint, under the Code or other applicable law, against that Covered Employee; provided, however, that the escrowed payments shall be released if the Committee does not obtain such authority with 45 days of notice to the Debtors or does not file its complaint within 10 days after obtaining such authority;

       c.      the Covered Employee is indicted or agrees to the filing of a criminal information against him or her;

       d.      the Covered Employee is notified, or the Debtors are notified, that the Covered Employee is a target of a criminal investigation;

       e.      the Covered Employee is sued or is informed, or the Debtors are informed, that he or she will, in the near future, be sued by the United States Securities and Exchange Commission (the "SEC");

       f.      the Covered Employee is given notice by the SEC of his or her right to make a Wells submission; or

       g.      the Covered Employee declines, on grounds of the Fifth Amendment rights against self-incrimination, to answer questions with respect to conduct or transactions relating to his or her employment or affiliations with the Debtors.  (Weber Supp'l Decl. ¶ 4, Ex. 1.)[9]

      39.     A Covered Employee must forfeit any escrowed incentive payment, or repay any incentive award(s) already paid, if it ultimately is determined, with respect to the subject conduct or transactions, that the Covered Employee failed to act in good faith and in a manner the

---

[9]    The Debtors have no present information or belief that such events are reasonably likely to occur. (Weber Supp'l Decl. Ex. 1.)

Company reasonably believes to be in or not opposed to the best interests of the Debtors.

Moreover, the Debtors may offset any clawback claim against a Covered Employee, without

further order of the Bankruptcy Court, against any claim of any kind that the Covered Employee

may have against the Debtors, including but not limited to any claim for indemnification.

(Weber Supp'l Decl. ¶ 4, Ex. 1.)

      40.    Any determination under the immediately preceding paragraph shall be made by

the Board of Directors of Delphi Corporation, after notice to the Creditors' Committee and the

participant and an opportunity to be heard by the participant, pursuant to the procedures set forth

in the Debtors' bylaws, subject to the Creditors' Committee right to object to (based on the

Creditors' Committee's review of the record) and, upon such objection, this Court's de novo

review of the Debtors' determination with respect to any particular individual.  This

determination will be made in no event any later than the effective date of the Debtors' plan of

reorganization, unless, for good cause shown with respect to a particular executive, the Court

extends the period.  (Weber Supp'l Decl. ¶ 4, Ex. 1.)

      41.    Finally, no one has suggested—and the Debtors are unaware of any legitimate

basis to conclude—that any provision of the KECP is intended or will otherwise operate to limit

the Debtors' right under any applicable federal, state, or common law, statute, rule, or regulation,

or any corporate bylaw, policy, custom, or contractual provision, to seek disgorgement or

restitution of, or to utilize any other available legal or equitable remedy to recover payments

made, or withhold payments pending, if it becomes apparent that a Covered Employee

improperly misrepresented the basis for his or her entitlement to a Revised Annual Incentive

Plan performance award or was involved in misconduct.  (Opie Decl. ¶ 27.)

<u>ARGUMENT</u>

II.

IMPLEMENTATION OF THE REVISED ANNUAL INCENTIVE PLAN
IS A TRANSACTION IN THE ORDINARY COURSE THAT
DOES NOT REQUIRE APPROVAL

A.    The Code Authorizes Debtors-in-Possession to Implement Executive Compensation
<u>Programs in the Ordinary Course of their Business, without Notice or a Hearing</u>

42.    Following the filing of a petition for relief under chapter 11 of the Bankruptcy

Code (the "Code"), the debtor is authorized to remain in possession of its assets and to continue

operating its business.  11 U.S.C. §§ 1107-1108.

43.    Section 363 governs the debtor-in-possession's use of estate assets. "The

framework of section 363 [of the Code] is designed to allow a . . . debtor-in-possession . . . the

flexibility to engage in ordinary transactions without unnecessary creditor and bankruptcy court

oversight, while protecting creditors by giving them an opportunity to be heard when

transactions are not ordinary."  <u>In re Roth Am., Inc.</u>, 975 F.2d 949, 952 (3d Cir. 1992).

44.    Within this framework, section 363(c) of the Code provides that, unless otherwise

ordered by the Court, a debtor-in-possession may "enter into transactions . . . in the ordinary

course of business, without notice or a hearing, and may use property of the estate in the ordinary

course of business without notice or a hearing."  11 U.S.C. § 363(c); <u>see also</u> <u>id.</u> §§ 1107, 1203,

1304(b).

45.    The Code "recognizes the commercial facts of life."  <u>Bagus v. Clark</u>, 5 F.3d 455,

457 (10th Cir. 1993).  "[I]f a debtor had to seek court approval to pay for every expense incurred

during the normal course of its affairs, the debtor would be in court more than in business."  <u>Id.</u>

at 457-58.  Accordingly, "the Code likens the management of ordinary course operating affairs

of a debtor to those of any business entity and allows the debtor's management free rein to make

those decisions."  <u>Id.</u> at 458.

25

46.     The Code also "favors the continued operation of a business by a debtor, and a presumption of reasonableness attaches to a debtor's management decisions." In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986).  This presumption arises from the courts' recognition that "the debtor and current management are best suited to orchestrate the debtor's rehabilitation."  Id. at 616 (citing In re La Sherene, Inc., 3 B.R. 169, 174 (Bankr. N.D. Ga. 1980)).

47.     Where the debtor continues the prepetition terms and conditions of executive employment beyond its entry into chapter 11, this presumption of reasonableness also "extends to include the compensation of management insiders."  In re All Seasons Indus., Inc., 121 B.R. 822, 825-26 (N.D. Ind. 1990).

48.     While objectors may attempt to rebut this presumption, it is their burden "to produce evidence, beyond the fact of bankruptcy or financial troubles, which would tend to indicate that the compensation being received by management is not reasonable or is somehow improper."  Id. at 826.

49.     When a question arises as to whether a particular transaction or use of estate property is an ordinary-course transaction, courts have developed and "routinely" employ a two-part test to analyze the disputed transaction or usage.  Roth Am., 975 F.2d at 952; see also Lavigne v. Hirsch (In re Lavigne), 114 F.3d 379, 384-85 (2d Cir. 1997) (same).

50.     The first element of this two-part analysis, commonly referred to as the "vertical test," focuses on the debtor's prepetition business practices, in order to discern any significant postpetition differences in treatment or usage.  As long as the debtor's postpetition practices are consistent with the interested parties' reasonable prepetition expectations, "creditors have no right to notice and a hearing because their objections to such transactions are likely to relate to

26

the bankrupt's Chapter 11 status, not the particular transactions themselves." Johns-Manville, 60

B.R. at 616 (quoting In re James A. Phillips, Inc., 29 B.R. 391, 394 (Bankr. S.D.N.Y. 1983)).

51.     The second element of the two-part "ordinary course" analysis, called the

"horizontal test," evaluates the subject transaction from an industry-wide perspective, to

determine how like businesses treat the transactions or uses in the course of their day-to-day

affairs.  See, e.g., Lavigne, 114 F.3d at 385; Johns-Manville, 60 B.R. at 618.  Where "a

substantial number" of the debtor's peers "routinely" engage in the subject practice, the

transaction or usage "meets the requirements of the horizontal dimension." Id. at 619.

52.     At bottom, the "touchstone of 'ordinariness' is . . . the interested parties'

reasonable expectations of what transactions the debtor in possession is likely to enter in the

course of its business." Lavigne, 114 F.3d at 384-85.  "Where the debtor in possession is merely

exercising the privileges of its chapter 11 status, which include the right to operate the bankrupt

business, there is no general right to notice and hearing concerning particular transactions."

Phillips, 29 B.R. at 394.

B.     The Debtors' Implementation of the Revised AIP is an "Ordinary Course" Transaction

53.     At least since the Debtors' spin-off from GM as an independent entity, the

Company has incorporated an annual incentive compensation plan as an integrated element of its

total executive compensation program.  The prepetition annual incentive plan, adopted in the

ordinary course of Delphi's prepetition business, was designed to motivate covered employees to

achieve the Debtors' corporate goals by providing potential rewards set in reference to a variety

of business metrics, all of which ultimately were tied to increases in net earnings.  (Weber Decl.

¶¶ 16, 20; Opie Decl. ¶ 5(b); Bubnovich Decl. ¶¶ 12(b), 22, 25, 28.)

54.     The Revised Annual Incentive Plan merely represents, in all material respects, an

extension of the Debtors' prepetition annual incentive plan, refined to accommodate the

exigencies and uncertainties of the chapter 11 process.  Nevertheless, it remains structured to

motivate Covered Employees to achieve the Debtors' overall business plan, by maintaining the

link between payment opportunities and the Debtors' achievement of its corporate financial

targets.  (Bubnovich Decl. ¶¶ 19, 29, 37; see also Opie Decl. ¶¶ 18, 20-21.)

55.    Following the Petition Date, and in consultation with the Creditors' Committee,

the Debtors have tuned the Revised Annual Incentive Plan's financial metrics to ensure that

executive performance remains sensitive to the evolving demands of these chapter 11 cases.  For

example, the abbreviated performance measurement cycles represent a recognition of the

difficulties currently facing the Debtors in making accurate long-term financial forecasts, yet

also sharpen the Debtors' ability to set earnings targets that are neither unattainably high nor so

low that eligibility becomes automatic.  Similarly, while the particular financial metrics used

during the pre-confirmation period have been modified, when compared to their prepetition

counterparts, all Revised AIP payment opportunities nevertheless remain linked to increases in

the Debtor's core earnings.  Payment opportunities likewise remain subject to individual

adjustment, based on each employee's specific achievements for that year.  (Weber Decl. ¶ 16;

Weber Supp'l Decl. ¶ 9, Ex. 2; Opie Decl. ¶¶ 5(b), 19-20, 22, 24; Bubnovich Decl. ¶¶ 12(b), 19,

34, 36.)

56.    Based on the Debtors' longstanding executive compensation programs and

practices, therefore, the Revised Annual Incentive Plan does not subject any Objector to post-

petition economic risks of a nature different from those faced by the Objectors at any time during

the prepetition period.

57.    Some Objectors' incorrectly suggestions that the Debtors are now proposing to

take money from their hourly employees (or, similarly, to take money that otherwise would be

used to pay down the Debtors' outstanding pension benefit obligations) to pay their executives

bonuses. However, Covered Employees will only become eligible to receive their performance

awards if the Debtors perform in a manner consistent with the overall interests of the Debtors'

estate. The EBITDAR-UG/OIBITDAR-UG metric that the Debtors intend to use in connection

with calculating payment opportunities under the Revised AIP has been refined to make clear the

Debtors' intention to exclude earnings gains, if any, related to contract modifications between the

Debtors and the Unions. (Weber Decl. ¶ 18; Opie Decl. ¶¶ 13-14, 21-22; Bubnovich Decl. ¶¶ 29,

32.)

       58.     Nor does the Revised Annual Incentive Plan represent an approach to executive

compensation that is unique to the Debtors. To the contrary, the Debtors have introduced

uncontested evidence that in the ordinary course of their businesses, virtually all <u>Fortune</u> 1000

companies (Delphi is a <u>Fortune</u> 100 company), and all publicly-held corporations in the auto

supply industry, incorporate annual or other short-term incentive plans into the compensation

packages they offer their executive workforces. The sound business reason for this universal

practice is the recognition that short-term, achievement-based incentive compensation linked to

specific performance targets and acceptable levels of personal performance do motivate

employees to realize the entity's projected business plan during any particular performance cycle.

(Bubnovich Decl. ¶¶ 23-24, 44; <u>see also</u> Opie Decl. ¶¶ 4, 5(b).)

       59.     Furthermore, the principal financial performance metric utilized by the Debtors in

these chapter 11 cases—EBITDAR, as refined during the course of discussions between the

Debtors and the Creditors' Committee—not only is the metric used most often by chapter 11

debtors, it also is used by non-bankrupt companies engaged in out-of-court restructurings, or that

otherwise find themselves in periods of financial distress. The two specific earnings exclusions

introduced since the Petition Date, and at the request of the Creditors' Committee, merely refine

the Debtors' Petition-Date, widely-recognized, and commonplace obligation to exclude from

their pre-emergence earnings calculations the potential effect of non-recurring or non-operational

events that might otherwise affect the Debtors' ability to achieve their financial targets.

(Bubnovich Decl. ¶¶ 29, 31; Opie Decl. ¶¶ 21-23.)

60.     In sum, the Revised Annual Incentive Plan now before the Court does not offend

any interested party's reasonable prepetition expectations about what transactions the Debtors

likely would enter in the ordinary course of conducting their business.  Quite the opposite:  the

proposed plan is well within the range of competitive practice, and it is consistent not only with

the ordinary course of the Debtors' prepetition business practices, but also with those adopted in

the ordinary course by the Debtors' peers.  (Bubnovich Decl. ¶ 44.)  And because the Debtors

merely are exercising the privileges of their chapter 11 status by implementing the Revised

Annual Incentive Plan in the ordinary course of conducting their postpetition business, the

Debtors need not provide notice and a hearing in order to implement these provisions.

III.

THE REVISED ANNUAL INCENTIVE PLAN ALSO QUALIFIES AS AN INFORMED
BUSINESS JUDGMENT DESERVING THE COURT'S APPROVAL

A.     Section 363(b)(1) Authorizes Courts to Approve a Debtor's Implementation of an
       Executive Compensation Program that Falls Outside the Ordinary Course of its Business

61.     Notwithstanding the broad authority the Code grants a debtor-in-possession to

operate its business without unnecessary oversight of creditors or the courts, section 363(b) of

the Code also permits the debtor-in-possession, after notice and a hearing, to "use, sell, or lease,

other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).

62.     Courts may authorize a debtor to use estate property pursuant to section 363(b)(1)

whenever the debtor, in good faith, has provided a "good business reason" that the proposed

30

usage will ultimately "aid in the reorganization."  In re Lionel Corp., 722 F.2d 1063, 1071 (2d

Cir. 1983). The Code provides the court "considerable discretion" in addressing such a section

363(b) motion, and the Court's factual findings will stand unless clearly erroneous.  In re

Montgomery Ward Holding Corp., 242 B.R. 147, 152-53 (Bankr. D. Del. 1999).

63.    The Second Circuit has held that, while the Bankruptcy Court sits as an "overseer

of the wisdom with which the bankruptcy estate's property is being managed by the . . . debtor-

in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors and

the estate." Orion Pictures Corp., 4 F.3d at 1098-99 .

64.    The Court's consideration of a debtor's section 363(b) motion is a summary

proceeding, intended merely as a means to "efficiently review the . . . debtor's decision[s] . . . in

the course of the swift administration of the bankruptcy estate.  It is not the time or place for

prolonged discovery or a lengthy trial with disputed issues." Orion Pictures, 4 F.3d at 1098-99.

65.    The debtor has the burden of establishing a valid business purpose for the use of

estate property outside the ordinary course of business.  Lionel, 722 F.2d at 1070-71.  Once the

debtor has done so, a presumption arises that the debtor's decision was made on an informed

basis, in good faith, and in an honest belief that the action was in the best interests of the estate.

In re Integrated Res., Inc., 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992).

66.    Thereafter, "[p]arties opposing the proposed exercise of a debtor's business

judgment have the burden of rebutting the presumption of validity." Id.

67.    To satisfy its burden, it is not enough for an objector simply to raise and argue an

objection. Rather, an objector "is required to produce some evidence respecting its objections."

Lionel, 722 F.2d at 1071.

68.     As a rule, the debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74, 81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)).

69.     Whenever a debtor seeks the court's authorization under section 363(b) to use estate property to fund a key employee compensation program, the pertinent questions are whether "the debtor has used proper business judgment in formulating the program" and whether the program is "fair and reasonable." Aerovox, 269 B.R. at 80 (quoting In re Logical Software, 66 B.R. 683, 696 (Bankr. D. Mass. 1986)).

70.     The determination of whether to approve a key employee compensation plan under section 363(b)(1) "turns on the facts and circumstances of each case." Montgomery Ward, 242 B.R. at 154.

71.     Although the debtor's consideration of what other companies have done in comparable circumstances is relevant to whether the debtor exercised an informed business judgment, the debtor need not demonstrate that its proposed program provides "exact parity with other companies" to obtain the Court's approval. In re Pac. Gas & Elec. Co., No. 01-30923 (SFM), 2001 WL 34133840, at *2 (Bankr. N.D. Cal. July 13, 2001).

72.     With regard to an examination of the particulars of a proposed key employee compensation program, the Court should not "view its role as second guessing" the debtor's judgment on questions such as which employees should be eligible for the program or how much any particular employee should receive. Id. Nor should the Court delve into the likelihood that any individual employee may leave unless he or she is promised what the debtor proposes. Id.

32

B.    The Proposed Revised AIP Reflects a Sound Exercise of Business Judgment

73.    The Debtors respectfully submit that the Revised Annual Incentive Plan they propose and now seek to implement reflects a sound exercise of business judgment reasonably calculated to maximize the value of the Debtors' estates.

74.    In recognition of the significant challenges facing the Debtors in connection with their union negotiations, the Debtors critically re-examined all of elements of their total prepetition executive compensation plans, with an eye towards retaining only those components the Debtors reasonably believed would be necessary on a post-petition basis.  As a result, the Debtors elected to cancel all non-vested PAP awards (i.e., those for the 2004-06 and 2005-07 business performance cycles).  Going forward, therefore, the Debtors intend to rely on the Revised AIP, a more conservative, market-based compensation approach, in order to realize the Debtors' short-term business goals.  (Weber Decl. ¶¶ 14, 16; see also Opie Decl. ¶¶ 9, 13-14.)

75.    The Debtors' formulation of the Revised AIP not only resulted from its own experience and the contributions of its Advisors, including Watson Wyatt, a leader in the field of executive compensation, but also from the process of negotiation with the Creditors' Committee and its compensation advisor, Pearl Meyer of Steven Hall & Partners.  What emerged from this process is a Revised AIP that the Creditors' Committee unqualifiedly endorses in its form and substance and that is, in terms of which executives may earn how much and under what conditions, fair and reasonable.

76.    Moreover, the Debtors' decision to implement the Revised AIP now—notwithstanding the protests of their unions and the belated misgivings of the Creditors' Committee—resulted from a balanced consideration by senior management, the Compensation Committee, the independent directors, and ultimately the full Board of Directors of all the pertinent facts and considerations.

33

77.    For their parts, the Objectors have not provided any relevant evidence—much less persuasive evidence—to sustain their burden of proving that the Revised AIP is not fair and reasonable, in its form, substance, or timing.  Accordingly, the Objections to the Motion should be overruled and the Revised AIP as modified, be granted.

IV.
## THE GENERAL OBJECTIONS TO THE REVISED AIP LACK MERIT

A.    The Objection to any Form of KECP at this Time

78.    Several objecting unions have stated or implied that they consider any form of key employee incentive plan inappropriate, regardless of its scope, proposed terms, or components.  They argue that any program of incentive compensation for Delphi executives would be unfair and inequitable, in light of the Debtors' request for wage and benefits reductions from its hourly employees.  These unions would thus deny to the Debtors—a Fortune 100 company—the ability to offer their executive a form of compensation not only common to their competitors, but also to American business, in general.

79.    However, at this critical juncture, the Debtors must ensure that they remain efficient and market-competitive in every aspect of their business.  If Delphi is to be successfully reorganized, its costs—including all segments of its human capital costs—must be made competitive with those of its U.S. peers.  Moreover, if Delphi is to prosper in the future, it must offer competitive employment propositions to its executive workforce, particularly for those with critical management-level responsibilities.  For the Objectors to argue that all parties must "sacrifice equally"—measured solely by changes made after the Petition Date—overlooks the fact the future of the Company depends not only upon motivating existing employees, but also upon attracting and motivating new executive talent.  (Weber Decl. ¶¶ 8-12, 31-37; Bubnovich Decl. ¶¶ 8-11, 23-24, 40-43; see also Opie Decl. ¶¶ 6-8, 10-11, 14, 18.)

34

80.    Other Objectors, including the Creditors' Committee, suggest that the KECP

Motion is ill-timed and that consideration of the Revised Annual Incentive Plan should await

negotiation or litigation of whatever motions the Debtors might file under sections 1113 and

1114 of the Code.  The Debtors suspect that, for some of these Objectors, no time is the right

time for a KECP.  The Debtors filed the KECP Motion with their other First Day Motions—and

before the completion of section 1113 negotiations and litigation—because of the importance of

their executive workforce to the Debtors' survival and successful reorganization.  Moreover, by

filing the Motion early, the Debtors have provided interested parties disclosure of and an

opportunity to comment on the financial incentives they hope to offer the Company's key

executives.  In all events, the Motion has been filed, and the purported effect, if any, of the

Revised Annual Incentive Plan on hourly-employee morale would be no different were the

Motion deferred until after a resolution of the section 1113 negotiations.  (Opie Decl. ¶¶ 12, 28.)

81.    While the Debtors did not, of course, consult with other parties-in-interest before

they filed the KECP Motion, they certainly have provided the Objectors specific information

about how the program was developed and an opportunity to comment on it.  And the Revised

Annual Incentive Plan has in fact evolved, partly as a result of some of their questions and

concerns.  Here, parties-in-interest were never denied critical information or an opportunity to

comment.  To the contrary, the Debtors made affirmative efforts, after the Motion was filed but

before the hearing, not only to elicit the specifics underlying the Objectors' concerns and the

bases for their concerns, but also to address those concerns to the extent reasonably appropriate.

The fact remains, however, that for some Objectors, no executive incentive plan in any form

would ever be acceptable.  For them, no concession, proposal, change, or additional

consultation—in short, nothing short of abandoning incentive compensation for executives at

Delphi altogether—would have made a difference.  (Weber Decl. ¶¶ 17-19; Weber Supp'l Decl.

¶¶ 2-10, Exs. 1-2; see also Opie Decl. ¶¶ 12, 16-17, 21-25.)

82.    In a similar vein, other Objectors argue that given the significant pay and benefit

reductions the Debtors are seeking from their hourly workforce in connection with these

proceedings, approval of the Revised AIP (or any other key employee incentive program) would

destroy any possibility of obtaining meaningful union reductions in connection with the

forthcoming section 1113 negotiations, would lead to a strike, and would thereby doom any hope

for a successful reorganization.  These arguments rest upon speculation and lack the support of

any competent proof.  Moreover, these Objectors fail to recognize that the need for wage and

benefit concessions by the Debtors' hourly workforce, in the face of steadily declining

marketplace conditions, is an issue separate from the need to attract and motivate key

management personnel, who have seen their employment and compensation prospects slip, in

comparative terms, over the last five years.  In the end, these Objectors, in effect, seek to make

executive compensation a component of the negotiations required by section 1113(b), thereby

granting the unions additional bargaining leverage that neither their collective bargaining

agreements nor the law grants them.

83.    Ultimately, the objections to the proposed timing of the Revised AIP rest upon a

difference of opinion about what is best for the Debtors' estates. The Objectors, and particularly

the unions, say that now is simply not the right time for a Revised AIP—a view that also happens

to coincide with their own interests. The Debtors' Board of Directors, however, is charged with

broader fiduciary duties, and it has carefully considered the matter and made a different

judgment.  It met as recently as February 1, 2005, and the independent directors separately and

independently determined, in the exercise of their business judgment, and after considering all

the facts and circumstances of the case—including the views of various constituencies, as well as

the effects of continuing uncertainty on the Debtors' executive corps, and on ongoing

negotiations with the unions and GM—that the Debtors should proceed with the Revised AIP

now.  (Opie Decl. ¶ 28.) The Debtors submit that, on this record, there is simply no basis for

overturning that judgment.

B.      The Objection that no KECP is Needed

84.      Several Objectors suggest that no KECP is needed to motivate the Debtors to

perform in a manner that best serves the Debtors' reorganization goals or to attract new talent.

85.      As an overarching principle, the Revised AIP is <u>not</u> incremental to the Debtors'

basic executive compensation structure; rather, it is an integral and non-severable element of it.

The record, moreover, confirms that the Debtors have a reasonable basis to conclude that the

Revised Annual Incentive Plan is necessary to aid in the Debtors' reorganization.  The executive

attrition rate at the Company increased significantly during the prepetition period and has

accelerated since the Petition Date, on October 8, 2005.  During the twelve-month period

between October 8, 2003, and October 7, 2004, only 13 executives quit.  In the twelve-month

period preceding the Petition Date, however, 21 executives quit, an increase of almost 62%.

Since October 8, 2005, sixteen more executives (including two more this week)—with almost

260 years of service to the Debtors—have either quit or given the Debtors notice that they will

do so in the near future.  If executive departures continue at this rate, the Debtors can expect to

lose more than 45 executives during their first year in chapter 11.  Furthermore, in the first five

weeks of 2006, the Debtors have averaged two quits per week.  These attrition statistics do not

include retirements or separations initiated by the Debtors. As one court cogently observed in

authorizing a KECP over an objection that the debtor had not provided evidence that executive

attrition was widespread, "it is no good shutting the barn door after the horses have left." <u>Pac.</u>

Gas & Elec. Co., 2001 WL 34133840, at *2 n.6.  (Weber Decl. ¶¶ 24 & n.5, 33-35; Bubnovich

Decl. ¶¶ 41-42; Opie Decl. ¶ 8.)

86.    Whenever an executive or manager departs from an industrial enterprise, the

employer loses all of that employee's experience and knowledge, and often on relatively short

notice.  Executive attrition also disrupts the orderly operations of the business, as other personnel

are forced to add the responsibilities of the departed employees to their own.  Replacing departed

executives also requires the employer to incur costs that could otherwise be avoided, such as

signing bonuses, reimbursement of relocation expenses, and executive search fees.  When the

employer is undergoing court-supervised reorganization, the chapter 11 process imposes

additional obligations and stress on all employees.  Those Objectors who argue that the Debtors

would be better off if they lost existing executives apparently have given no thought to how their

approach not only would overburden and demoralize all of the Debtors' employees who remain,

but also saddle the Debtors with the replacement costs associated with executive attrition.

(Weber Decl. ¶¶ 33, 35; Bubnovich Decl. ¶¶ 42-43; Opie Decl. ¶ 8.)

C.    The Objection that the KECP Rewards Management Incompetence or Fraud

87.    Some Objectors claim that the KECP Motion should be denied because the

Revised Annual Incentive Plan would "reward" the very people whose managerial ineptitude put

the Company into bankruptcy or who committed fraud.

88.    These allegations fail at the outset. Notwithstanding specific discovery requests

propounded by the Debtors to ascertain the basis for these allegations, these Objectors have

provided no evidence whatsoever to support their contention that the Debtors were

"mismanaged" or "defrauded" into bankruptcy, a matter on which they have the burden of proof.

89.    To the contrary:  no evidence exists because the allegations have no basis.  The

Debtors' petitions—like those of other industry participants—resulted from the financial crisis

facing the entire domestic automobile industry.  Delphi, in particular, also faced the unique

burden of legacy labor agreements that rendered its hourly labor costs uncompetitive.  These

industry- and company-specific conditions, if anything, underscore the importance of providing

competitive compensation opportunities if the Debtors are to attract and motivate the

management talent needed to surmount the difficult challenges ahead.  The Objectors also forget

that, because Revised Annual Incentive Plan payments turn on future performance, they are not

at all a "reward" to be granted, or withheld, on the basis of past actions.  (Weber. Decl. ¶¶ 8-10,

12, 18-26; Bubnovich Decl. ¶¶ 28-38; Opie Decl. ¶¶ 18-24; infra at ¶¶ 105-06.)

90.    With respect to the similar suggestion that the Revised AIP "rewards" those who

have engaged in securities fraud, the Objectors again have provided no supporting evidence,

notwithstanding specific discovery requests to ascertain the basis, if any, for these allegations.

Indeed, the documents produced in response to the Debtors' requests do not bring these Objectors

within haling distance of support, either for these objections, or the representation, made in open

Court, that the Objectors' document production "shows" a Company-wide conspiracy, willful

ignorance of improper accounting methods, or that "fifteen specific people" identified in the

Objections to the KECP "had either participated in the fraud, knew of it, tolerated it, et cetera."

(Tr. Pr. Jan. 5, 2006, at 173:17-173:19.)  To suggest that these or any other documents produced

in response to the Debtors' Requests somehow "show" that "there was a pervasive culture of

manipulating the books" is fanciful, to say the least.  (Id. at 176:15-176:16.)

91.    The original KECP Motion did not expressly address the effect on a Covered

Employee's eligibility for annual incentive payments if the Debtors were later to determine that

he or she had been involved in misconduct .  Based on the Audit Committee's internal

investigation of matters related to the Debtors' June 30, 2005, restatement of certain prior period

financial statements, however, as well as the employment actions undertaken by the Debtors in connection therewith, the Compensation Committee proceeded under the presumption that any individual who remained employed as a Delphi executive would be eligible to participate in the KECP.  (Opie Decl. ¶ 25; see also Bubnovich Decl. ¶ 18.)

92.    To provide additional protection to property of the Debtors' estates, the Debtors and the Creditors Committee negotiated, and the Debtors have agreed to adopt, rigorous safe harbor and  prophylactic measures.  Compare Weber Supp'l Decl. ¶ 4, Ex. 1, with In re Enron Corp., No. 01-16034 (AJG), 2002 WL 32150521, at *2 (Bankr. S.D.N.Y. May 8, 2002) (providing for disgorgement and plan exclusion but not for escrow of payments), and In re Enron Corp., No. 01-16034 (AJG), 2003 WL 22038716, at *1 (Bankr. S.D.N.Y. Feb. 6, 2003) (providing for suspension and escrow of plan payments pending a final determination of whether the employee engaged in improper conduct).  (Weber Decl. ¶¶ 27-30; Opie Decl. ¶ 26; see also supra ¶¶ 38-40.)

D.    The Objection that the KECP Violates Section 331 of BAPCA

93.    Some Objectors contend that the KECP should be rejected because it contravenes the terms or the spirit of section 331 of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCA"), Pub. L. 109-8 (2005), which amended section 503(c) of the Code ("Amended Section 503(c)").

94.    At the outset, it should be apparent that Amended Section 503(c) does not apply to this case because it became effective on October 17, 2005, after this case was filed.  See BAPCA § 1501.  Nor have the Objectors presented argument or evidence that Congress intended the courts to apply BAPCA on a retroactive basis.

95.    Even if Amended Section 503(c) applied retroactively, the Revised AIP passes muster.  Amended Section 503(c) prohibits allowance or transfers to insiders of the debtor "for

the purpose of inducing such person to remain with the debtor's business," absent specific

findings by the court that certain provisions are satisfied.  (Emphasis added.)[10]

96.    Although Amended Section 503(c) has yet to be construed, the courts' analysis of

analogous language suggest that:  (a) this restriction requires proof that in making the transfer,

the Debtor had a conscious purpose to induce the insider to remain with the debtor's business;

and (b) while such purpose need not have been the debtor's sole purpose, it must have been more

than merely incidental; it must have been one of the debtor's "dominant" purposes—in the sense

that these motivations predominate over other, less powerful motivations for the conduct. Cf.

Mortensen v. United States, 322 U.S. 369, 373-74 (1944) (construing section 2 of the Mann Act);

United States v. Miller, 148 F.3d 207, 211 (2d Cir. 1998) (affirming jury instruction in

prosecution for violation of 18 U.S.C. § 2423(a)).  This interpretation is appropriate because, to

some degree, all compensation, including salaries, incentive compensation, and bonuses of most

kinds, can be said to induce employee "retention."  After all, one typically does not get paid a

salary unless he or she shows up for work, or receive a bonus if he quits before they are paid.

97.    Finally, the suggestion that the Revised Annual Incentive Plan should be rejected

because it is prohibited by the amended Code is based on a mischaracterization of the Revised

Annual Incentive Plan itself.  It is apparent on the face of the KECP that the Revised Annual

Incentive Plan does not does not include a retention or "pay to stay" component, i.e., a provision

that pays the employee simply for agreeing to stay with the debtor, irrespective of how long the

---

[10]    In relevant part, Amended Section 503(c) effectively prohibits "a transfer made to, or an
obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing
such person to remain with the debtor's business, absent a finding by the court based on
evidence in the record that — (A) the transfer or obligation is essential to retention of the
person because the individual has a bona fide job offer from another business at the same
or greater rate of compensation; [and] (B) the services provided by the person are
essential to the survival of the business."  11 U.S.C. § 503(c) (2005).

debtor remains in chapter 11 or how it performs in the reorganization process.  To the contrary: the Revised AIP is intended to replace the prepetition AIP, under which covered executives were eligible for performance awards based on the Company's achievement of net earnings targets at year end.  Such plans simply are not "retention plans" of the sort that prompted Congress to enact Amended Section 503(c).  (Weber Decl. ¶¶ 14, 16; Bubnovich Decl. ¶¶ 7, 17, 28.)  Moreover, assuming, for the sake of argument, that BAPCPA were applicable, the vast majority of the 466 Covered Employees are <u>not</u> "insiders" of the Debtors, as defined in the Code, thus rendering Amended Section 503(c) inapplicable as to them.

98.    Similarly, because Revised AIP payments are expressly linked to "specific performance . . . targets" and "acceptable level[s] of personal performance" (KECP Mtn. ¶¶ 25, 27), it emphatically is <u>not</u> the case that the Revised AIP fails to tie proposed increases to executive job performance.  Nor is it true that Covered Employees are guaranteed a bonus regardless of what, if anything, they do to assure the Debtors' successful emergence from chapter 11.  (Weber Decl. ¶¶ 22-26; Bubnovich Decl. ¶¶ 19, 29-34, 36-37.)

99.    Accordingly, the evidence leaves no doubt that "the purpose" of the Revised Annual Incentive Plan is not to induce the Company's key executives to remain with the Debtors' businesses, but to motivate them to achieve the Debtors' business objectives during the reorganization, and to maximize returns to the Debtors' stakeholders following the reorganized entity's emergence from these chapter 11 proceedings.

V.

THE SPECIFIC OBJECTIONS TO THE REVISED AIP ARE MOOT AND MISTAKEN

100.    In their particularized objections to the Revised Annual Incentive Plan, some Objectors assert that EBITDAR is not an appropriate measure of financial performance.  Others have observed that, since the EBITDAR targets had not yet been announced, their

reasonableness could not be evaluated, that no rewards should be paid if the Company falls short

of its targets, and that compensation should not be "increased" without consideration of the value

created for the benefit of the estate's creditors.

101.    As to the first contention, that the Revised Annual Incentive Plan should not be

authorized because the EBITDAR targets have not yet been set by the Compensation Committee,

and thus the reasonableness of the Debtors' financial targets cannot be determined, this objection,

of course, is now moot.  The Compensation Committee, in consultation with its Advisors (with

additional input from the Creditors' Committee and its advisors), disclosed the Debtors'

enterprise- and division-level financial targets on February 1, 2006.  These targets now are a part

of the total mix of information now before the Court.  (Weber Decl. ¶¶ 18, 22, Ex. C; Bubnovich

Decl. ¶¶ 29-30, 32, Ex. A; see also Weber Supp'l Decl. ¶¶ 5-10, Ex. 2.)

102.    Other Objectors have suggested that the use of EBITDAR targets permits the

Debtors to claim earnings gains—and thus to make payments to Covered Employees—not

properly attributable to the efforts of the Debtors' executive workforce to "grow the Company's

business."  Thus, argue these Objectors, if the Debtors are successful in rejecting collective

bargaining agreements, or if the Debtors can secure contract concessions from GM, the earnings

increases resulting from these reductions in expenses will permit Covered Employees to receive

"bonuses" they have done nothing to earn.

103.    To the extent that a fair reading of the original KECP Motion reasonably

permitted such an inference, this objection, too, now is moot.  The evidence before the Court in

connection with the February 10, 2006, hearing is clear that the Compensation Committee, in

consultation with its Advisors (and with additional input from the Creditors' Committee and its

advisors), has disclaimed any intent to include in their pre-emergence award calculations any

43

gains obtained as a result of the Debtors' ongoing negotiations with GM or the Unions.  At the

enterprise level, therefore, the Debtors will use "EBITDAR-UG," i.e., "earnings before interest,

taxes, depreciation, amortization, restructuring costs, but excluding earnings, if any, resulting

from contractual negotiations with GM and the Unions," to calculate Revised Annual Incentive

Plan opportunities.  Although the Debtors will substitute "operating income" for "earnings" for

division-level executive incentive payments, the principle is the same:  achievement of targets

and payments  will be calculated using "OIBITDAR-UG," i.e., "operating income before interest,

taxes, depreciation, amortization, restructuring costs, but excluding earnings, if any, resulting

from contractual negotiations with GM and the Unions."  (Weber Decl. ¶¶ 18, 22; Bubnovich

Decl. ¶¶ 32-33, Ex. A; see also Weber Supp'l Decl. ¶¶ 5-10, Ex. 2.)

104.    Some Objectors have suggested that the use of EBITDAR-based performance

measures reduces the incentive to restrain restructuring charges or discourages the use of post-

petition credit in a responsible, fiscally prudent fashion.  There are significant business reasons,

however, for the Debtors' executive workforce to work to control interest and restructuring costs,

irrespective of the Revised Annual Incentive Plan.  Any increase in the Debtors' interest or

restructuring costs will be to the detriment of the Debtors' available liquidity, the most critical

metric for chapter 11 debtors.  The Debtors, as fiduciaries of the estates, cannot risk the fiscal

health of the enterprise (and thus the Debtors' estates) by unreasonably increasing interest costs.

It also should be noted that interests costs are controlled by only a handful of the Debtors'

executive workforce with responsibility for corporate finance.  It simply is not appropriate to

44

include these finance-related costs in a metric designed to measure the Debtors' core operating performance.[11]

105.    Some union Objectors have suggested that the Debtors' executive compensation levels have not kept pace with industry standards because of a failure of effort or imagination on the part of management in attempting to achieve the Debtors' financial targets and business goals.  These Objectors correctly recognize the link between declining executive salary levels and the Debtors' inability to achieve its various financial goals.  The conclusion they apparently draw from this link, however—that if management simply tried harder, things would work out— is unsupported by any evidence whatsoever.

106.    Furthermore, as part of its separation agreements with GM, Delphi was required to assume the terms and conditions of the collective bargaining agreements that GM had negotiated with its unions.  The majority of the Debtors' legacy collective bargaining agreements thus provide not only for wages and benefits that are well above market, but they also require Delphi to provide non-competitive pension plans, retiree health care, and other benefits, and impose a variety of significant additional operating restrictions on Delphi.  The result is that Delphi is substantially disadvantaged in its ability to compete in the automotive parts business on the basis of cost, thereby hobbling the Debtors' ability to achieve its overall business plan, and limiting the Company's ability to offer an executive employment proposition that remains competitive with other <u>Fortune</u> 100 companies and the Debtors' industry peers.  (Weber Decl. ¶¶ 8-10.)

---

[11]    It is one of the functions of the equity component of the Emergence Incentive Compensation  Plan—which is available only upon the Debtors' successful emergence from chapter 11, and which currently is not before the Court—to encourage the prudent pre-emergence use of the estate assets, and thereby preserve and enhance the post-emergence value of the estate.

107.    Finally, the suggestion by one or two Objectors that the Revised AIP "increases" executive compensation without regard to delivering value for the benefit of the estates' creditors fails on two fronts.  First, annual, performance-based incentive payments are not an "increase" in executive compensation; they are instead an essential component of the basic compensation package that have been offered to Delphi's executive since before the Company was spun-off from GM. Moreover, the notion that the Revised AIP will not deliver "value for the benefit of the estates' creditors" reveals a failure to recollect or appreciate the views and actions of the Creditors' Committee—the one creditor body charged by law with a fiduciary duty to protect and enhance the interests of all creditors.  Less than a month ago, counsel for the Creditors' Committee made clear on the record what the Committee expected and would support by way of a short-term annual incentive program:

> We are talking here about the debtors' business judgment in proposing a . . . plan for compensation based on performance. . . . .
>
> . . . .
>
> It's a very, very limited program, which is somewhat consistent, as Mr. Butler said, with past programs, except frankly, far more aggressive.  The committee won't approve that which has been on the table before.  It will be far more aggressive in terms of being granularly performance based.
>
> That, Your Honor, is well within the debtors' business discretion, it seems to me.  And will or won't get the committee's support depending on the extent to which it [meets the standard] that I just laid out.

(Tr. Pr. Jan. 13, 2006, at 215:12-217:5.)  In the end, the Committee's endorsement of the "form and substance" of the Revised AIP belies any suggestion that the program that the Debtors have proposed will not deliver value for the benefit of creditors.

46

CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court enter an order, in substantially the form of that attached hereto as Exhibit B, overruling the objections, granting the motion, and granting the Debtors such other and further relief as is just.

Dated:  New York, New York
        February 8, 2006

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP

By:  /s/ John Wm. Butler, Jr.
     John Wm. Butler, Jr. (JB 4711)
     David E. Springer (DS 9331)
     John K. Lyons (JL 4951)
     Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

            - and -

By:   /s/ Kayalyn A. Marafioti
      Kayalyn A. Marafioti (KM 9632)
      Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possessio

47