SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
David E. Springer (DS 9331)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
 Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
         In re                            :    Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :    Case No. 05–44481 (RDD)
                                          :
                         Debtors.         :    (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DECLARATION OF MARK R. WEBER IN SUPPORT OF THE DEBTORS' MOTION FOR
ORDER UNDER 11 U.S.C. §§ 105 AND 363 AUTHORIZING THE DEBTORS TO
IMPLEMENT A KEY EMPLOYEE COMPENSATION PROGRAM

Mark R. Weber declares, as follows:

1.      I am the Executive Vice President, Operations, Human Resource

Management, and Corporate Affairs of Delphi Corporation ("Delphi").  I have held this position

since January 1, 2000.  I am also a member of the Delphi Strategy Board, the company's top

policy-making group.  I have worked in the automotive industry for almost 40 years and for

Delphi for approximately 10 years.  From January 1995 through November 1998, I was Delphi's

Executive Director, Human Resource Management.  From November 1998 until I assumed my

current position, I was Delphi's Vice President, Human Resource Management.

2.      Delphi and certain of its subsidiaries and affiliates are debtors and debtors-

in-possession in these chapter 11 cases (collectively, the "Debtors").  I submit this declaration

and the exhibits attached hereto in support of the Debtors' Motion For Order Under §§ 105 And

363 Authorizing The Debtors To Implement A Key Employee Compensation Program (Docket

No. 213), and any modifications thereto (the "KECP Motion").  I have personal knowledge of the

matters set forth herein and am competent to testify, as follows:

I.
DELPHI'S BUSINESS AND HISTORY

3.      Delphi is a leading global supplier of vehicle electronics, transportation

components, integrated systems and modules, and other electronic technology.  Delphi

technologies are present in vehicles as well as in communication, computer, consumer electronic,

energy, and medical applications.  Delphi has extensive technical expertise in a broad range of

product lines and strong systems-integration capabilities, which enable Delphi to provide

comprehensive, systems-based solutions to vehicle manufacturers.  Delphi has established an

expansive global presence, with a network of manufacturing sites, technical centers, sales offices,

and joint ventures located in every major region of the world.

4.      For many years, the business of what is now Delphi was conducted by many separate automotive-parts operations within General Motors Corporation ("GM").  These operations were generally managed independently from one another within the GM organization. In 1991, GM organized its components businesses into a worldwide Automotive Components Group hoping to improve the competitiveness of these operations and then increase its business by penetrating new markets.  In 1995, the group was renamed Delphi Automotive Systems in order to establish its separate identity in the automotive-parts industry.  In late 1998, Delphi Automotive Systems was incorporated as a subsidiary of GM in Delaware under the name Delphi Automotive Systems Corporation, which is now known as Delphi.  In 1999, GM agreed to transfer to Delphi certain assets used in Delphi's business, and Delphi agreed to assume certain related liabilities.  Later in 1999, GM distributed all of its shares of Delphi common stock to holders of GM common stock, thereby spinning off Delphi as a separate, publicly-traded corporation.  GM retained no ownership interest in Delphi.

II.
THE DEBTORS' WORKFORCE AND COMPENSATION

5.      As of December 31, 2005, the Debtors employed approximately 46,400 workers in the United States.  These employees work in more than 40 manufacturing sites and 13 technical centers across the country and in Delphi's worldwide headquarters and customer center in Troy, Michigan.  Approximately 32,000 of these employees are hourly, and the remaining employees are salaried.  More than 95 percent of the Debtors' domestic hourly employees are represented by unions.  Approximately 466 of the domestic salaried employees are classified as "executives."

6.      The responsibilities of the Debtors' executive corps extend beyond the Debtors to include the entirety of Delphi's global enterprise, both debtor and non-debtor entities,

3

and that in many instances reach across product lines.  The Debtors' executives provide global

leadership to a worldwide enterprise doing business on six continents, that employs more than

185,000 people, and that had global revenues in 2004 of nearly $27 billion.  (Documents

highlighting the scope of the Debtors' global operations are attached hereto as Exhibits A and B.)

       7.     The Debtors' domestic executives are grouped into "bands" depending on

their level of responsibility.  The Debtors inherited this construct from GM, which has

categorized its executives by bands since the 1980s.  Robert S. "Steve" Miller, the Chairman of

the Board and Chief Executive Officer of Delphi and the Debtors' highest-ranking executive,

occupies Band K.  (Mr. Miller is not covered by any portion of the Key Employee Compensation

Program proposed by the Debtors (the "KECP").)  Rodney O'Neal, Delphi's President and Chief

Operating Officer, occupies the next-highest executive band, Band H.  Band G includes Delphi's

Vice Chairman, David B. Wohleen, and 21 Delphi Executive Vice Presidents and Vice

Presidents (including me).  Bands F–A contain the Debtors' remaining executives, with the least

senior-ranking executives falling into Band A.  A summary chart listing the number of domestic

executives within each band as of January 27, 2006, is provided below:

| Executive Band | Number of Executives |
|:---:|:---:|
| K | 1 |
| H | 1 |
| G | 22 |
| F | 2 |
| E | 21 |
| D | 66 |
| C | 88 |
| B | 129 |
| A | 136 |
| Total | 466 |

       8.     As part of its separation agreements with GM, Delphi was required to

assume the terms and conditions of the collective bargaining agreements that GM had negotiated

with its unions.  As a consequence, today Delphi is, to my knowledge, the only domestic auto supplier governed by labor agreements patterned on those between the "Big Three" automotive manufacturers (GM, Ford, and Chrysler) and their unions.  The majority of the Debtors' legacy collective bargaining agreements provide not only for wages and benefits that are well above market, but they also require Delphi to provide non-competitive pension plans, retiree health care, and other benefits.  These additional obligations, though typically provided under labor contracts between unions and vehicle manufacturers, are either not included in labor contracts between unions and parts suppliers or are far less generous in their design.  As a result of its legacy collective bargaining agreements, the Debtors presently compensate their hourly workers an average of almost $64 per hour, which includes benefits and legacy liabilities.  This level is nearly three times higher than the hourly labor rates of Delphi's United States competitors, some of which are unionized.  The result is that Delphi is significantly disadvantaged in its ability to compete in the automotive parts business on the basis of cost.

9.       The collective bargaining agreements also impose a variety of significant operating restrictions on Delphi.  For example, Delphi generally may not permanently lay off idled workers.  The result has been that, in 2005, the number of idled, non-working hourly employees who receive nearly full pay and benefits has been as high as 4,000.  The collective bargaining agreements also limit Delphi's ability to shed non-strategic, unprofitable operations, thereby forcing Delphi to continue incurring fixed labor costs, even in the event of plant closings or wind-downs.  In 2004, Delphi incurred more than $170 million in wages and benefits costs associated with hourly employees in non-working, unproductive status.  Under the Debtors' current labor agreements, the continuing decline of business of the domestic auto companies will increase the costs to the Debtors associated with idled hourly workers.

5

10.    The Debtors' increasingly unsustainable United States hourly wages and benefits, legacy liabilities, and operational restrictions driven largely by its collective bargaining agreements have contributed significantly to the deterioration of the Debtors' financial performance.  Through the reorganization process, the Debtors intend to achieve competitiveness for the Debtors' core United States operations by modifying wage and benefit rates and by modifying or eliminating non-competitive legacy liabilities and burdensome operational restrictions under the current labor agreements.

11.    The Debtors have also been advised that, in contrast to the benefits enjoyed by the Debtors' hourly employees, compensation for the Debtors' executives has been well below the actual compensation received by executives in similar positions at comparable companies.  For example, in 2005, Delphi's compensation consultant, Watson Wyatt Worldwide ("Watson Wyatt"), compared the compensation of Delphi's Strategy Board with the compensation of executives holding similar positions at comparable companies.  Watson Wyatt concluded that Delphi's actual compensation for members of the Strategy Board was below the 25th percentile.  Watson Wyatt completed a similar study in 2005 analyzing the competitiveness of the compensation of Delphi executives who are not members of the Strategy Board, and it concluded that actual compensation for those executives was below the 25th percentile as well.

12.    In sum, when the petitions in these cases were filed, the Debtors' hourly workers enjoyed compensation levels at above-competitive market levels, while that of the Debtors' executives was below competitive levels.[1]

---

[1]    Every year, for example, under the Debtors' collective bargaining agreements with its major unions, the Debtors' traditional employees get either annual base-wage increases or lump-sum payments and quarterly COLA adjustments.

III.
### THE KEY EMPLOYEE COMPENSATION PROGRAM

13.     In my role as Delphi's Executive Vice President, Operations, Human Resource Management, and Corporate Affairs, I worked closely with the compensation consultant to the Compensation and Executive Development Committee of Delphi's Board of Directors (the "Compensation Committee"), Watson Wyatt Worldwide ("Watson Wyatt"), and its counsel, Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), to assist in preparing and reviewing the KECP for presentation to the Compensation Committee.  As such, I am personally familiar with the content and purposes of the KECP, as well as the process by which it was created and approved by the Compensation Committee.

14.     To evaluate the KECP, and the objections that have been filed against it, one must first understand the executive-compensation structure in place before the Debtors sought bankruptcy protection and the changes that were made to that structure when these cases commenced.  Under the Debtors' prepetition compensation program (the "Prepetition Program"), executives earned a base salary and were also eligible for yearly cash bonuses under an annual incentive plan (the "AIP" described in greater detail below), and long-term compensation in the form of cash and equity under three programs collectively known as the long-term incentive plan (the "LTIP").  When the Debtors filed their petitions in these cases, they cancelled the AIP and the LTIP, with the exception of a vested portion of a Performance Achievement Plan in an amount of less than $4 million.  In addition to the AIP and the LTIP, under the Prepetition Program, the Debtors' executives were eligible to receive retention grants under a program enacted in 2005.  This program was also cancelled for the Debtors' domestic executives when the Debtors filed for bankruptcy.  Accordingly, the Debtors' executives saw their compensation

opportunities decrease significantly with the filings of these cases, going from base salary, the

AIP, the LTIP, and retention grants to base salary alone.

15.    The Debtors' most senior executives have agreed voluntarily to waive a

portion of their base salaries.  Mr. Miller, Delphi's Chairman and Chief Executive Officer,

agreed to reduce his salary to $1 per year from $1.5 million per year effective January 1, 2006.

Mr. Miller also agreed to forego participation in the AIP and LTIP.  (When Mr. Miller joined the

Company, effective July 1, 2005, he received a $3 million signing bonus and a contractual

promise of a minimum $1.5 million in annual salary, plus participation in the AIP and LTIP. Mr.

Miller's signing bonus recognized that, after joining Delphi, he would be required to resign from

several boards on which he served and would therefore lose access to that income.)  Mr. O'Neal,

Delphi's President and Chief Operating Officer, agreed to waive 20 percent of his annual salary,

also effective January 1, 2006, and the other senior officers who were employed by Delphi when

Mr. Miller joined the company have similarly agreed to waive 10 percent of their annual salaries.

16.    The KECP is intended to replace some, but not all, of the compensation

opportunities the Debtors' executives lost when the Debtors filed for bankruptcy.  As initially

proposed by the Debtors, the KECP contained two principal features: a revised annual incentive

plan (the "Revised Annual Incentive Plan") and an emergence bonus plan that included a cash

component and an equity component.  The Revised Annual Incentive Plan was a substitute for

the prepetition AIP adopted in the ordinary course of Delphi's business under the Prepetition

Program, but incorporated measures of financial performance and time periods that are more

appropriate for companies in chapter 11.  The emergence bonus plan was designed to replace the

prepetition LTIP, but at a lower cost; the total value of the executives' payment opportunities

under the emergence bonus plan are only 80 percent of the value of their payment opportunities

under the LTIP.  (Assuming an 18-month bankruptcy process, the annualized value of the

emergence bonus drops to approximately 50 percent of the value of the LTIP.)  The KECP does

not propose any replacement for the discontinued retention grants.

17.    Since the Debtors filed the KECP Motion, the Debtors have been

endeavoring to work with the Official Committee of Unsecured Creditors (the "Committee") to

reach a consensual agreement on the final design of the program.  As part of those ongoing

negotiations, in December 2005, the Debtors agreed to the Committee's request to defer until the

July 2006 omnibus hearing all portions of the KECP except the portion of the Revised Annual

Incentive Plan covering a period commencing no earlier than October 8, 2005, and concluding

on June 30, 2006.[2]  Pending that upcoming hearing, the Debtors intend to continue working with

the Committee toward an agreement with respect to the other portions of the KECP raised in the

original KECP Motion, including emergence bonus payments and equity participations in the

reorganized entity.  The only matter before the Court at the February 10, 2006, hearing, however,

is the Revised Annual Incentive Plan, which, in and of itself, is not only an ordinary course

compensation program that has existed at Delphi since its spin-off from GM in 1999 and

commonplace in large public companies, but is also an integral and indispensable element of the

basic value structure of the Debtors' overall compensation program.

18.    The Debtors and their advisors have worked diligently and in good faith to

accommodate the concerns identified by the Committee with respect to the Revised Annual

---

[2]    I want to emphasize here that what remains for the Court's consideration is what the Debtors consider an
ordinary course annual incentive program limited to the Debtors' domestic executives for a six-month
performance period.  Delphi's worldwide executive corps includes approximately 600 executives, but about 125
of those executives are employed by foreign, non-Debtor entities whose payments under the Revised Annual
Incentive Program will be paid by non-Debtor entities and who accordingly are not covered by this portion of
the KECP Motion.  The Debtors also have a Supplemental Income Program for their non-executive salaried
personnel that they maintain in the ordinary course of their business and that is also not covered by the KECP
Motion.

Incentive Plan proposed as part of the KECP.  As a result of these efforts, the Revised Annual

Incentive Plan to be considered at the hearing currently scheduled for February 10, 2006, differs

in several respects from the version contained in the Debtors' initial proposal.  The most notable

changes—all of them made at the request of the Committee—include a shorter initial

performance period (from nine months to six months), a different mixture of performance targets

(which, in addition to a company-wide target, will now also include targets for each division), a

slightly modified method of gauging financial performance (rather than EBITDAR, the Revised

Annual Incentive Plan uses a combination of "EBITDAR-UG" and "OIBITDAR-UG" (terms that

are defined below and eliminate the impact of pending discussions with GM and the Debtors'

domestic labor unions)), and the addition of a prophylactic measure that would prevent

wrongdoers from being rewarded.  The Debtors have withdrawn their request for a Revised

Annual Incentive Plan for the last quarter of 2005 (which covered the first quarter of the Debtors'

chapter 11 cases).

19.    As a result of the modifications made by the Debtors, the estimated cost of

the Revised Annual Incentive Plan now before the Court has decreased substantially from the

estimated cost of the Revised Annual Incentive Plan as presented in the KECP Motion.  If all of

the Debtors' executives receive their target bonus opportunities, the total estimated cost under the

present version of the program will be approximately $20.6 million, down more than 33 percent

from the total estimated cost of $31.0 million under the original version of the program.  If one

limits the calculation to the target bonus opportunities available to Delphi Strategy Board

members, the estimated cost has gone from approximately $8.5 million in the initial version to

approximately $5.7 million in the present version, another drop of about 33 percent.

20.     The Revised Annual Incentive Plan covers the Debtors' domestic executives—just as Delphi's prepetition AIP did.[3]  The prepetition AIP, which was adopted in the ordinary course of Delphi's business every year since Delphi's spin-off from GM in 1999, allowed executives to earn a bonus if Delphi achieved certain levels of annual net income set by Delphi's Compensation Committee.  Executives could earn a portion of their bonuses if Delphi surpassed a threshold level of net income, 100 percent of their bonuses if Delphi achieved the target net income, and up to 200 percent of their target bonus if Delphi achieved or surpassed a maximum level of net income.  Any bonuses paid under the prepetition AIP were subject to adjustments for product-quality metrics that could increase or decrease the amount of the bonuses.

21.     The Revised Annual Incentive Plan adopts this same overall approach, albeit with some differences.  To begin, the portion of the Revised Annual Incentive Plan before the Court is limited to the six-month period beginning on January 1, 2006, and ending June 30, 2006.  The Debtors' decision to use six-month periods, rather than the year-long performance periods under the prepetition AIP, reflects the fact that the chapter 11 process introduces several variables that make it more difficult to forecast financial performance over the long term.  The shorter the period, the more likely it is that the Debtors will be able to set earnings targets that are neither so high that they are unattainable nor so low that the payment of bonuses under the Revised Annual Incentive Plan becomes automatic.

22.     Under the Revised Annual Incentive Plan, an executive will not receive a bonus unless the Debtors achieve certain levels of financial performance <u>and</u> the executive's personal performance is satisfactory, as determined by his or her supervisor or supervisors.

---

[3]     The prepetition AIP also covered foreign executives.

Beginning with financial performance, the Revised Annual Incentive Plan adopts a two-track approach—one based on Delphi's company-wide earnings and the other based on the operating income of each of Delphi's eight divisions.  The company target is based on a measurement EBITDAR-UG, which includes earnings before interest, taxes, depreciation, amortization, and restructuring costs,[4] but excludes earnings resulting from the on-going negotiations with the Debtors' labor unions (the "U") or GM (the "G").  The company target has been set at ($80 million) as part of the Debtors' business plan, which has been reviewed by Delphi's Board of Directors.  The metric used for the divisional targets is OIBITDAR-UG, with the "OI" representing operating income.  The Debtors chose operating income as a substitute for earnings because the Debtors' do not typically calculate earnings on a division-by-division basis.  The earnings targets for each division, also drawn from the Debtors' business plan, are as follows: Energy and Chassis, ($44.2 million); Steering Division, ($92.8 million); Thermal and Interior, ($79.2 million); Electronics and Safety, $193.0 million; Packard Electric, $83.4 million; Delphi Product and Service Solutions, $23.1 million; Automotive Holdings Group, ($583.9 million); and Medical, $0.3 million.  Further information concerning the division targets is contained in Exhibit C to this declaration.

      23.     In contrast to the Revised Annual Incentive Plan in its current form, the Debtors' prepetition AIP and the version of the Revised Annual Incentive Plan presented in the initial KECP Motion provided for performance targets only at the company level.  By adding

---

[4]    I have been advised that the technical accounting definition of "restructuring costs" includes (i) the costs and expenses of restructuring, consolidating or closing of any of the plants, facilities or offices of the Borrower or any of its Subsidiaries, (ii) the costs of severance or other similar payments relating to the termination of employees at such plants, facilities or offices, (iii) machine transfer costs or any similar such costs at such plants, facilities or offices, (iv) costs and expenses in respect of the termination or settlement of executory contracts, (v) other non-cash charges in respect of other pre-petition obligations, and (vi) professional fees and other "Chapter 11 expenses" (or "administrative costs reflecting Chapter 11 expenses") attributable to the Debtors.

division targets, the present version tightens the connection between individual performance and bonus payments by ensuring that an executive in a poor-performing division will not earn a full bonus based on the performance of other divisions.

24.    The corporate and divisional performance targets are independent of one another.  Accordingly, if, for example, an executive's division achieved its threshold earnings target but the company as a whole did not achieve its separate threshold earnings target, the executive would be eligible for the portion of his or her bonus opportunity related to the divisional target.  Similarly, if the executive's division achieved its threshold earnings target and Delphi achieved its company-wide target, the executive would be eligible for both portions of his or her bonus opportunity.  The apportionment of bonus opportunities between the company and division targets is summarized in the chart below:

| Executive | Portion Attributable to Achieving Corporate Target | Portion Attributable to Achieving Division Target |
|---|---|---|
| Corporate-level executive | 100% | 0% |
| Divisional executives (other than in the Medical Division) | 50% | 50% |
| Medical Division executive[5] | 30% | 70% |

Thus, under the first example provided above, an executive in the Medical Division would be eligible to receive 70 percent of his or her bonus opportunity, while in the second he or she would be eligible to receive the full 100 percent.

25.    The annual minimum, target, and maximum bonus opportunities—*i.e.*, the amount of cash an executive is eligible to receive if the threshold, target, and maximum performance targets are met—are essentially the same as those set in connection with the

---

[5]    At present, there are no executives in the Medical Division. The last executive recently quit because he was dissatisfied with his compensation.

prepetition AIP for 2005, though they are reduced proportionately to reflect the shorter

performance period.  An executive is eligible for the minimum bonus opportunity when the

company and/or division achieves 70 percent of the performance target, for the target bonus

opportunity if the company and/or division achieves 100 percent of the performance target, and

for the maximum bonus opportunity when the company and/or division achieves 200 percent or

more of the performance target.  The range of bonus opportunities is outlined in the spreadsheet

attached to this declaration as Exhibit D.

26.    Even if the company or the executive's division achieves its performance

target, the executive will not automatically receive a bonus under the Revised Annual Incentive

Plan.  Receipt of a bonus is further conditioned on the executive's personal performance.  If an

executive's supervisor or supervisors determine that an executive's performance is not

satisfactory or otherwise not meeting expectations, the executive will not receive any bonus.  In

addition, based on personal performance, an executive's bonus may be adjusted down to zero or

up to 200 percent of his or her target bonus opportunity.  For members of the Delphi Strategy

Board, the positive adjustment is limited to 150 percent of the member's target bonus opportunity.

27.    In consultation with the Debtors' counsel, the Debtors have also proposed

strong and—to my knowledge—unprecedented prophylactic measures to alleviate concerns that

KECP benefits not be paid to or retained by executives found to have engaged in activities that

injured the Company and who, accordingly, may be liable to the Company.

28.    The Debtors have also proposed strong and—to my knowledge—

unprecedented prophylactic measures to alleviate concerns that KECP benefits not be paid to or

retained by executives found to have engaged in activities that injured the Company and who,

accordingly, may be liable to the Company.  Specifically, an executive's bonus will be

temporarily escrowed if any of the following occurs in connection with conduct or transactions relating to that executive's employment or affiliation with the Debtors:

- the Debtors assert a claim for relief against the executive;

- the Unsecured Creditors' Committee obtains from the Court authority to file and actually does file a complaint against the executive;

- the executive is indicted or agrees to the filing of a criminal information against him;

- the executive is notified, or the Debtors are notified, that the executive is a target of a criminal investigation;

- the executive is sued or is informed, or the Debtors are informed, that the executive will, in the near future, be sued by the United States Securities and Exchange Commission (the "SEC");

- the executive is given notice of his or her right to make a Wells submission by the SEC; or

- the executive declines to answer questions with respect to conduct or transactions relating to his or her employment or affiliations with the Debtors on grounds of the Fifth Amendment right against self-incrimination.

29.    An executive must forfeit any bonus placed in escrow if it is ultimately determined that, with respect to such conduct or transactions relating to the executive's employment or affiliation with the Debtors, the executive failed to act in good faith and in a manner the employee reasonably believed to be in or not opposed to the best interests of the Debtors and the executive had reasonable cause to believe that his or her conduct was unlawful. In addition, with respect to any executive whose bonus was not placed into escrow, but who nevertheless found to have violated this standard, the executive would be required to repay to the Debtors whatever bonus the executive received.  This standard for requiring the forfeiture or clawback of bonus payments is identical to the current standard for the indemnification of

officers, directors, and employees found in Delphi's bylaws, as promulgated under applicable

Delaware law.

30.     Any determination regarding the forfeiture of amounts in escrow or the

clawback of amounts received will be made by Delphi's Board of Directors, after notice to the

Unsecured Creditors' Committee and the executive and after affording the executive an

opportunity to be heard, pursuant to the procedures set forth in Delphi's bylaws, subject to the

Unsecured Creditors' Committee's right to object to and the Court's review of the Debtors'

exercise of business judgment with respect to any particular determination.  The determination

will be made in no event later than the effective date of the Debtors' plan of reorganization,

unless, for good cause shown with respect to a particular executive, the Court extends the period.

IV.
THE DEBTORS' BUSINESS REASONS FOR THE ANNUAL INCENTIVE PLAN

31.     Without the compensation opportunities outlined in the KECP Motion, the

compensation of the Debtors' executives is not competitive with the industry norm.  Their actual

compensation for 2005 will be substantially less than market, and their actual pay for 2004 was

also substantially less than market.  As the Debtors implement their reorganization plan, it is

imperative that the Debtors provide these key employees with appropriate incentives to

maximize the financial performance of the Debtors' operations.  Providing these incentives is

crucial to the Debtors' ability to navigate through this process and to emerge successfully from

chapter 11.

32.     The commencement of these bankruptcy cases has heightened employee

concern regarding possible job loss, and has increased the responsibilities of the Debtors'

employees, created longer hours, and imposed other burdens as a result of the Debtors' status as

debtors-in-possession.  At a time when the Debtors most need the continued efforts and loyalty

of their executives, the Debtors must take proactive steps to ensure that their compensation

programs are sufficient to maintain loyalty, despite potential opportunities employees have with

competitors or other employers who may be perceived as providing more stable employment

opportunities.

33.     The Debtors' record of executive attrition demonstrates the need for the

KECP, in general, and for the portion of the Revised Annual Incentive Plan that is now before

the Court, in particular.  Executive attrition increased significantly during the pre-petition period

and has accelerated thereafter.  Whenever an executive or manager departs from an industrial

enterprise, the employer loses all of that employee's experience and knowledge, and often on

relatively short notice.  This institutional knowledge, which cannot be readily replaced on the

open market, is necessary to maintain the Debtors' ongoing operations and to assure successful

completion of the restructuring.

34.     During the twelve-month period between October 8, 2003, and October 7,

2004, only 13 executives quit.  In the twelve-month period preceding the petition date, October 8,

2005, however, 21 executives quit, an increase of almost 62 percent.  Since October 8, 2005,

fourteen more executives—with a combined 231 years of service to the Debtors—have either

quit or given the Debtors notice that they will do so in the near future.  If executive quits

continue at this rate, the Debtors can expect to lose more than 40 executives during their first

year in chapter 11.  These attrition statistics do not include retirements or separations initiated by

the Debtors.

35.     Executive attrition also disrupts the orderly operations of the business, as

other personnel are forced to add the responsibilities of the departed employees to their own.

Replacing departed executives also requires the employer to incur costs that could otherwise be

17

avoided, such as signing bonuses, reimbursement of relocation expenses, and executive search

fees.  When the employer is undergoing court-supervised reorganization, the chapter 11 process

imposes additional obligations and stress on all employees.  If left unchecked, a growing loss of

key personnel may overburden and demoralize the key employees who remain, result in further

losses, and deny the employer the services of those employees whose knowledge and service are

critical to the debtor's successful reorganization.

      I declare, under penalty of perjury, that the foregoing statements are true and

correct.

      Executed at New York, New York on February 1, 2006.

_____
Mark R. Weber
Executive Vice President, Operations, Human
Resources Management, and Corporate Affairs

18

# Delphi's Worldwide Operations Locations



Weber Dec. Ex. A.

## Delphi's Global Presence



**U.S. & Canada**
Manufacturing sites: 44
Employment: 47,500
Joint ventures: 7
Technical centers: 13

**Europe & Middle East**
Manufacturing sites: 60
Employment: 51,000
Joint ventures: 8
Technical centers: 10

**Total Delphi**
Manufacturing sites: 164
Employment: 185,000
Joint ventures: 41
Technical centers: 33

**Mexico & South America**
Manufacturing sites: 46
Employment: 76,500
Joint ventures: 9
Technical centers: 4

**Asia Pacific**
Manufacturing sites: 14
Employment: 10,000
Joint ventures: 17
Technical centers: 6

As of September 30, 2005

Weber Decl. Ex. B.

# EXHIBIT C

**OIBITDAR By Division- AIP Target/Max/Min**
**January - June 2006 (Excludes Allied Sales)**

| | E&C | Steering | T&I | E&S | Packard | DPSS | AHG | Medical | Divisional Total | HQ/Other | Grand Total | Fund Size* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revised Sales | $3,176.0 | $1,112.5 | $1,737.2 | $2,787.9 | $2,924.6 | $964.4 | $913.4 | $65.9 | $13,681.9 | $41.0 | $13,722.9 | |
| OIBITDAR Target | ($44.2) | ($92.8) | ($79.2) | $193.0 | $83.4 | $23.1 | ($583.9) | $0.3 | ($500.3) | ($96.0) | ($596.3) | $20.6 |
| OIBITDAR as % of Sales | -1.39% | -8.34% | -4.56% | 6.92% | 2.85% | 2.40% | -63.93% | 0.46% | -3.66% | | | |
| | | | | | | | | | | | | |
| Plus 3.1% | 1.71% | -5.24% | -1.46% | 10.02% | 5.95% | 5.50% | -60.83% | 3.56% | -0.56% | | | |
| OIBITDAR Max | $54.3 | ($58.3) | ($25.3) | $279.4 | $174.1 | $53.0 | ($555.6) | $2.3 | ($76.2) | | | $38.4 |
| Increased OIBITDAR to Target | $98.5 | $34.5 | $53.9 | $86.4 | $90.7 | $29.9 | $28.3 | $2.0 | $424.1 | | | |
| | | | | | | | | | | | | |
| Minus 0.9% | -2.29% | -9.24% | -5.46% | 6.02% | 1.95% | 1.50% | -64.83% | -0.44% | -4.56% | | | |
| OIBITDAR Min | ($72.8) | ($102.8) | ($94.8) | $167.9 | $57.1 | $14.4 | ($592.1) | ($0.3) | ($623.4) | | | $8.3 |
| Reduced OIBITDAR to Target | -$28.6 | -$10.0 | -$15.6 | -$25.1 | -$26.3 | -$8.7 | -$8.2 | -$0.6 | -$123.1 | | | |
| | | | | | | | | | | | | |
| Min to Max Range Span | $127.0 | $44.5 | $69.5 | $111.5 | $117.0 | $38.6 | $36.5 | $2.6 | $547.3 | | | |
| | | | | | | | | | | | | |
| U.S. Executives by Division | 81 | 35 | 43 | 70 | 37 | 21 | 19 | 1 | 307 | 159 | 466 | |
| Target Payout by Division | $3,035.5 | $1,509.0 | $1,729.0 | $2,420.5 | $1,664.0 | $832.0 | $867.0 | $33.5 | $12,090.5 | $8,546.0 | $20,636.5 | |
| | | | | | | | | | | | | |
| Global Mfg. Facilities | 50 | 16 | 29 | 22 | 97 | 8 | 12 | 2 | | | 236 | |

* Incentive Payout budget based upon term sheet payout caps

1/26/2006

# EXHIBIT D

**RANGE OF BONUS OPPORTUNITIES FOR AIP PROGRAM PARTICIPANTS (Jan. 1, 2006, through June 30, 2006).**

| | HC | Avg. Salary | Targets thru 6/30/06 | Individual Performance Ranges (threshold) Min | Mid Point | Max | Individual Performance Ranges (target) Min | Mid Point | Max | Individual Performance Ranges (maximum) Min | Mid Point | Max |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *DSB* | | | | | | | | | | | | |
| Miller | | $1 | *Not Participating* | | | | | | | | | |
| Other DSB | | $514,255 | $256,933 | $0 | $102,773 | $154,160 | $0 | $256,933 | $385,399 | $0 | $385,399 | $385,399 |
| *Sum* | 23 | | **$5,652,522** | * | **$2,261,009** | ** | * | **$5,652,522** | ** | $0 | **$8,478,783** | **$8,478,783** |
| | | | | | | | | | | | | |
| *Band F* | | $427,500 | $122,500 | $0 | $49,000 | $98,000 | $0 | $122,500 | $245,000 | $0 | $245,000 | $245,000 |
| *Sum* | 2 | | **$245,000** | * | **$98,000** | ** | * | **$245,000** | ** | $0 | **$490,000** | **$490,000** |
| | | | | | | | | | | | | |
| Band E | 21 | $292,808 | $85,500 | $0 | $34,200 | $68,400 | $0 | $85,500 | $171,000 | $0 | $171,000 | $171,000 |
| Band D | 65 | $240,799 | $67,500 | $0 | $27,000 | $54,000 | $0 | $67,500 | $135,000 | $0 | $135,000 | $135,000 |
| | | | | | | | | | | | | |
| Band C | 88 | $199,856 | $33,500 | $0 | $13,400 | $26,800 | $0 | $33,500 | $67,000 | $0 | $67,000 | $67,000 |
| Band B | 130 | $165,312 | $23,500 | $0 | $9,400 | $18,800 | $0 | $23,500 | $47,000 | $0 | $47,000 | $47,000 |
| Band A | 138 | $141,300 | $18,500 | $0 | $7,400 | $14,800 | $0 | $18,500 | $37,000 | $0 | $37,000 | $37,000 |
| *Sum* | 442 | | **$14,739,000** | * | **$5,895,600** | ** | * | **$14,739,000** | ** | $0 | **$29,478,000** | **$29,478,000** |
| TOTAL COST | 467 | | **$20,636,522** | * | **$8,254,609** | ** | * | **$20,636,522** | ** | $0 | **$38,446,783** | **$38,446,783** |

| $ Fund Summary | Threshold $M | Target $M | Maximum $M |
|---|---|---|---|
| **Original Proposal** | $12.4 | $31.0 | $62.0 |
| **Revised Proposal** | $8.3 | $20.6 | $38.4 |
| **DSB Original** | $3.4 | $8.5 | $17.0 |
| **DSB Revised** | $2.3 | $5.7 | $8.5 |

\* Individual bonuses may be reduced to as low as zero based on performance.
\*\* While individuals can receive up to 200% of their target bonus (150% for DSB) based on individual performance, the total pool cannot exceed the aggregate midpoint amount.