SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
David E. Springer (DS 9331)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                            :

    In re                        :    Chapter 11
                            :

DELPHI CORPORATION, et al.,    :    Case No. 05-44481 (RDD)
                            :

                 Debtors.    :    (Jointly Administered)
                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DECLARATION OF NICK BUBNOVICH IN SUPPORT OF THE
DEBTORS' MOTION FOR AN ORDER UNDER 11 U.S.C. §§ 105 AND
363 AUTHORIZING THE DEBTORS TO IMPLEMENT A KEY
EMPLOYEE COMPENSATION PROGRAM

Nick Bubnovich declares:

1.      I am a senior consultant at Watson Wyatt Worldwide ("Watson"), which maintains an office at 191 North Wacker Drive, Chicago, Illinois and in other cities.  I submit this declaration in support of the Motion for Order under 11 U.S.C. §§ 105 and 363(b) authorizing the Debtors to Implement a Key Employee Compensation Program (Docket No. 213) (the "Motion") prepared and submitted by Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession (collectively, the "Debtors").  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

2.      Except as otherwise indicated, I have personal knowledge or am otherwise competent to testify as to the matters set forth herein.

3.      Watson is a global consulting firm focused on human capital and financial management.  Watson specializes in four areas: employee benefits, human capital strategies, technology solutions, and insurance and financial services.  Watson combines human capital and financial expertise to deliver business solutions that drive shareholder value.  Watson employees approximately 6,000 associates in 30 countries.  Watson's human capital group of 170 associates helps clients achieve competitive advantage by aligning their workforce with their business strategy, and it assists clients in developing and implementing strategies for attracting, retaining, and motivating their employees.

4.      I have worked in executive compensation consulting for approximately 20 years.  I consult and advise companies on a variety of compensation and benefit issues.  I work with companies on salary administration, design incentive arrangements, annual incentive plans, and long-term incentive plans.  I also assist clients

2

in severance programs, negotiation of employment agreements, and bankruptcy

compensation programs.

5.      I have held the position of senior consultant at Watson since

January 2005.  Before then, I was a partner at Deloitte & Touche for approximately two

and one-half years.  Before joining Deloitte & Touche, I was a partner in the Human

Capital Group at Arthur Andersen.  I have served as the compensation consultant for

numerous large and complex restructurings and have provided services for numerous

large multinational companies in and out of chapter 11 including, without limitation,

Bethlehem Steel Co., Delta Airlines, Inc., Federal Mogul Corp., Fibermark, Inc., Hayes

Lemmerz International, Inc., NRG Energy, Inc., Winn-Dixie, Inc., and W.R. Grace & Co.

6.      I have published a number of articles on executive compensation

issues, the most recent being, "Compensation Apples and Option Pricing Oranges,"

World at Work Journal (December 2005), and have co-authored three of the seven

chapters in the National Center for Employee Ownership's 2003 book, Beyond Stock

Options.  I have also been a featured speaker on executive compensation for the

American Bar Association, ALI-ABA, National Center for Employee Ownership,

Executive Enterprise, Inc., Corporate Counsel Center, American Society of Corporate

Secretaries (Chicago Chapter), Chicago Compensation Association, National Association

of Stock Plan Professionals (Chicago Chapter), and Chicago-Kent College of Law.

## II.    DELPHI'S PREPETITION COMPENSATION PROGRAM

7.      In December 2004, Watson was retained by Delphi to assess the

competitiveness of Delphi's executive compensation positioning and subsequently to

assist Delphi in the design of compensation and incentive programs for its executives (the

"Prepetition Program"). I was not directly involved in the Prepetition Program at the time,

as I did not begin at Watson until January 2005. However, I have been involved in the

development of the Key Employee Compensation Program (the "KECP") from the

beginning, and in the course of developing the KECP, it was important for me to become

familiar with Delphi's Prepetition Program. In that connection, I learned that Delphi's

goal in implementing the Prepetition Program was to keep key employees through 2006,

focus on stabilizing or lowering the annual equity grant run rate, minimize the expense of

the equity program, continue the move away from the use of stock options, and increase

the perceived value of Delphi's equity grants.

8.      In connection with developing the KECP, I learned that

compensation was a factor in the departure of several executive resignations at Delphi

prior to its chapter 11 filing.  I learned that annual salary changes for Delphi executives,

relative to market, were limited and infrequent, and that Delphi's historic stock option

awards had proven to have no value as the vast majority of stock options outstanding at

the time were underwater. I also became aware that, during the years 2001-04, annual

bonus payments had been made to Delphi executives only in 2002, and that the Company

did not expect to pay annual bonus payments to its executive for the 2005 fiscal year.

9.      In the course of developing the KECP, I learned that the attrition

rate of Delphi's executives (normally low and quite stable) had increased in the year

immediately before the chapter 11 filing and that total compensation opportunities for

Delphi's executives had remained competitive during that same period.  Although total

compensation opportunities for Delphi's executives had remained competitive in the

years preceding the chapter 11 filing, actual compensation for these executives had

remained stagnant or fallen in comparative terms, because the Company was not reaching

its annual performance targets.  The result was that, when the petitions in these cases

4

were filed, the Debtors' hourly employees enjoyed actual compensation levels at or

above competitive market levels, while actual compensation of the Debtors' executives

was below competitive levels.

10.    In connection with developing the KECP, I reviewed the

Company's historical compensation of its executives.  Delphi's Strategy Board (the

"DSB"), the Company's top policy-making group, is comprised of most of the

Company's officers and many of its highest ranking executives.  Under the Prepetition

Program, members of the DSB earned total compensation well below that of their market

peers, falling below the 25th percentile of total compensation provided to similarly-

situated individuals in both the general industry and Delphi's peer group.

11.    Similarly, Delphi's non-DSB executives also earned total

compensation below their market peers.  Under the Prepetition Program, Delphi targeted

total compensation for the non-DSB executives at the 50th to 60th percentile.  Actual

compensation for the non-DSB executives, however, fell below the 25th percentile of total

compensation provided to similarly situated individuals in both the general industry and

Delphi's peer group.

12.    As part of the Prepetition Program, Delphi incorporated the

following individual components as integrated elements of the total compensation plan of

Delphi's officers and executives:

(a)    <u>Base Salary</u>:  In setting base salaries, the Company took into

account unique factors particular to an individual officer or executive, such as his or her

specific performance, potential for future advancement, and responsibilities within the

organization.  Members of the DSB earned a base salary at approximately the 75th

percentile of base salaries provided to similarly-situated individuals in both the general

5

industry and Delphi's peer group.  Non-DSB executives earned a base salary at

approximately the 60th percentile of base salaries provided to similarly situated

individuals in both the general industry and Delphi's peer group.

(b)    Annual Incentives:  In the ordinary course of its annual

compensation program for its executives, as part of its Prepetition Program, Delphi

provided annual incentive bonus opportunities to all of its domestic executives (currently,

approximately 466 individuals).  Delphi's Compensation and Executive Development

Committee (the "Compensation Committee") established annual corporate performance

levels based on net earnings (e.g., threshold, target, and ceiling) which levels, if achieved,

permitted all U.S. executives to earn annual bonuses.  The size of the final annual

incentive bonus, if any, was dependent on the actual level of performance that the

Company achieved within the aforementioned range.  Executives would be eligible to

receive 40 percent of their bonus opportunities if Delphi achieved 70 percent of its annual

net earnings target, 100 percent of their bonus opportunities if Delphi hit its annual net

earnings target, and a maximum of 200 percent of their bonus opportunities if Delphi

doubled its annual net earnings target.  Any bonus earned by an executive was subject to

adjustment based on his or her individual performance, with the typical range of

adjustment being between 75 percent and 125 percent of the amount (provisionally)

earned.  In some cases, however, no bonuses were paid, and in others, bonuses were as

high as 200 percent of what was provisionally earned.  The annual incentive targets were

set at the beginning of each fiscal year, and the performance of the Company in one year

did not affect an executive's opportunity to obtain an annual incentive bonus in

subsequent years.  Thus, if the Debtors had not filed for bankruptcy, the Company could

have re-set its annual incentive bonus opportunities for the 2006 fiscal year, and its

executives would have had a reasonable opportunity to achieve bonuses in 2006, even though the annual bonus opportunities were not achieved in 2005.

(c)    <u>Long-Term Incentives</u>:  It is a generally-accepted principle of executive compensation—and one to which Delphi adheres—that the ability to acquire equity in the company encourages high levels of executive performance, while further aligning the long-term interests of management with those of the company's stakeholders. Consequently, Delphi historically provided an equity component (generally in the form of stock options or restricted stock grants) as an element of management's total compensation opportunities.  This component of compensation was offered to both U.S. and foreign executives at Delphi (approximately 600 individuals).  Delphi also offered cash incentive awards to officers and senior management under a program entitled the Performance Achievement Plan ("PAP").  PAP awards were intended to encourage the senior-most members of Delphi's management to achieve certain strategic business goals that, by their nature, took more than one year to complete.  Typically, the Compensation Committee granted PAP awards on an annual basis, but did not pay them unless the Company achieved its strategic business goals over rolling three-year performance cycles. As with the other components of the Prepetition Program, the Compensation Committee set performance targets that, if achieved, permitted eligible members to earn PAP awards; with a threshold performance level below which no bonuses would be awarded; and a performance ceiling above which no additional amounts would be paid.

## III.    <u>DEVELOPMENT OF THE KECP</u>

13.    My experience as a compensation consultant over nearly 20 years has taught me that, in deciding whether to accept or keep a job, employees consider the employer's entire "employment proposition," that is, the mix of tangibles (compensation

and benefits) and intangibles (employer's prospects, career path, work content, work

relationships, work/life balance, etc.) offered by the employer, adjusted by the risk that

the employer will not be able to deliver on the proposition.  As an employer faces

increased financial distress, its employment proposition becomes impaired as employees

face greater risk of losing their jobs and general uncertainty about their future increases.

The deeper in distress an employer becomes, the fewer the tools and choices it has to

positively affect the employment proposition it offers existing and prospective employees.

        14.    As it progressed toward filing these chapter 11 cases, Delphi took

steps to protect estate assets by developing a key employee compensation program that

would keep the key executives focused on maximizing the Debtors' financial

performance and maintaining alignment of their interests with those of the Debtors'

stakeholders.

        15.    On August 26, 2005, Delphi formally retained Watson to assist the

Company in the design and implementation of special restructuring incentive

compensation programs to retain and motivate key employees and executives as well as

provide expert testimony, if necessary.  Delphi sought the advice of Watson to assist

Delphi in its reassessment of the "employment proposition" that it could offer the key

salaried employees in light of current U.S. and marketplace economic realities.

        16.    Pursuant to the terms of the engagement agreement, Watson was to

retained to provide the following services to the Company:

> (a)    Review Delphi's current compensation programs and assess
> the need for new or revised programs for certain key
> employees designated by the Company and, if needed, assist
> in the design of such programs.  Key elements of such
> programs might consist of a new annual incentive program, a
> revised cash retention program, and a severance program;

(b)    Compare the terms, conditions, and cost of any such proposed program to competitive practice;

(c)    Review and determine whether to enhance existing severance programs in light of the changed circumstances;

(d)    Prepare a report summarizing its findings regarding the new programs;

(e)    If requested and if the Company files for Chapter 11 protection, assist in negotiations with creditors' groups to obtain their support for the Company's assumption of any such bonus or other compensation program; and

(f)    If necessary, provide testimony with respect to the Company's compensation programs.

17.    I initially sought to provide Delphi with proposed compensation programs for two different scenarios.  One program was designed based on the underlying premise that Delphi was able to restructure outside of chapter 11.  The second option, the KECP, assumed that the Company filed for chapter 11 protection.  I, along with Delphi, worked on developing both programs and presented both options to the Compensation Committee for its approval.

18.    In developing the KECP, consideration was given not only to overall costs in financial terms, but also to ensuring that the appropriate employees were included and that they were assigned appropriate levels of compensation in light of the Debtors' goals. (In developing the KECP, I assumed that any individual then employed in an "executive" position with the Company would be eligible to participate in the KECP, depending upon how the plan was designed.) I was advised that the Debtors were mindful of their duty to manage the estate's assets in a fiscally responsible manner so as to maximize stakeholder recoveries.  For that reason, the KECP was not simply the product of management, but the result of careful consideration by the Compensation Committee.

9

19.    The KECP takes as a principle that the Company should provide market competitive compensation opportunities designed to motivate key employees to perform for, and not simply remain employed by, the Debtors.  To ensure that the program assists the Company in achieving its overall business plan, the program incorporates the use of measurable performance milestones sufficient to properly monitor and control short-term risk.  The costs to the Debtors of the new program are estimated at no greater than those previously approved by the Company in connection with other prior compensation packages, including the Prepetition Program.

20.    The costs of the KECP also are comparable to those approved by courts in the case of chapter 11 companies of similar size.  The Debtors specifically considered specific incentive programs implemented by other companies in chapter 11, including automotive industry suppliers Federal-Mogul Corp. and Hayes Lemmerz International, Inc., among others, with the goal of creating an overall incentive program that incorporated the most effective components of each.

21.    As initially proposed by the Debtors, the KECP contained two basic components: annual incentive bonuses, based upon achievement of EBITDAR targets measured at the end of defined performance intervals; and emergence awards, consisting of cash bonuses and a percentage of the equity of the reorganized entity, conditioned upon successful reorganization of the Company.[1]

---

[1]    Although severance was discussed in the Motion, it is _not_ part of the relief sought in the KECP Motion, but rather was approved as part of the Human Capital Obligations Order (Docket No. 198), ¶ 1. Severance was discussed in the KECP Motion to provide all interested parties with full disclosure as to the covered employees' full compensation opportunities.

22.     The revised annual incentive plan (the "Revised Annual Incentive Plan") serves as a replacement for the Debtors' prepetition annual incentive bonus program, which was based upon achievement of specific annual earnings targets.  The emergence awards, as initially proposed by the Debtors, are intended to substitute for the Debtors' prepetition long-term incentive program, which was cancelled after the filing of the bankruptcy petitions, except the PAP for the 2003-05 performance cycle.

23.     Based on my experience as a compensation consultant, as well as my knowledge of annual incentive plans, I believe that virtually all *Fortune* 1000 companies (Delphi is *Fortune* 100) have an annual or short-term incentive plan.  Such plans are therefore a standard part of all *Fortune* 1000 executives' compensation package, provided in the ordinary course by their employers.

24.     Moreover, it is my belief than all public companies in Delphi's industry—the auto supply industry—have annual incentive plans.  (In certain cases, a particular company may have an annual incentive plan equivalent.  For example, Collins & Aikman, which is also in Chapter 11, has, in lieu of an annual incentive plan, a retention bonus plan (as well as a special emergence incentive plan.)

25.     In Delphi's particular case, it has had an annual incentive plan for its executives (and salaried employees) for each year since it was spun off by General Motors.  Before then, Delphi's executives were participants in General Motor's annual incentive plan.

26.     Since the Debtors first proposed the KECP, the Debtors have been in discussions and negotiations with the official committee of unsecured creditors (the "Creditors' Committee") toward the goal of reaching agreement on the final design of the program.  In December 2005, I commenced communications with Pearl Meyer, the senior

managing director of Steven Hall & Partners, LLC and the Creditors' Committee's

compensation and employment agreement advisor, with regard to discuss potential

modifications to the KECP. I met with her on January 6 and January 18, 2006, and have

been in periodic communication with her since then.  As part of those discussions to

modify the KECP, I have also considered the concerns of all the parties who objected to

the original form of the KECP. I believe that the revised proposal sufficiently addresses

all of the objectors' legitimate concerns.

27.    At the Creditors' Committee's request, the Debtors initially agreed

to defer consideration until the July 2006 omnibus hearing of all portions of the KECP

*other* than that portion of the Revised Annual Incentive Plan covering a period

commencing no earlier than October 8, 2005, and continuing through June 30, 2006.

More recently—and again at the Creditors' Committee's request—the Debtors have

agreed to eliminate the initial three-month period, from the filing of the petitions on

October 8, 2005, through December 31, 2005, from the Revised Annual Incentive Plan.

Thus, all performance periods under the Revised Annual Incentive Plan will cover six

months, and the only performance cycle the Debtors are proposing is the period from

January 1, 2006, through June 30, 2006.

## IV.    DELPHI'S REVISED ANNUAL INCENTIVE PLAN

28.    In designing the Revised Annual Incentive Plan, I was charged

with creating an annual program to replace the Company's prepetition annual incentive

plan.  Delphi historically has, in the ordinary course of its business, and consistent with

the nation's largest industrial enterprises, provided annual incentive bonus opportunities

to all of its U.S. executives (approximately 466 individuals, as of the date of this

declaration).  Accordingly, I designed the Revised Annual Incentive Plan under the

KECP to include all of the Debtors' U.S. executives, except the Debtors' chief executive

officer, Robert S. ("Steve") Miller, who voluntarily "opted out" of the KECP.

29.    <u>Performance Measures</u>.  The Revised Annual Incentive Plan is

designed to pay bonuses based on the achievement of certain performance targets.  At the

corporate level, the Debtors will measure performance based on EBITDAR-UG.

EBITDAR (earnings before interest, taxes, depreciation, amortization and restructuring

costs) is the measure used most often by chapter 11 debtors, and it also is used frequently

by companies outside of bankruptcy, but otherwise engaged in a restructuring or in

financial distress.  For such companies, EBITDAR provides those companies with the

best measure of core operating earnings.  Additionally, the Debtors have agreed, at the

request of the Creditors' Committee, to deduct from the performance measure any

earnings resulting from changes made to the Debtors agreements with its labor unions

("U") and General Motors Corporation ("G").  The end result, therefore, is the

EBITDAR-UG performance metric, which excludes non-performance-related events.

30.    The Debtors have also agreed to the Creditors' Committee request

to measure performance at the division level of the Debtors.  As described in more detail

below, some executives' bonus opportunities will be based, in part, on how their

respective divisions perform.  Because earnings are not measured at the division level,

the Debtors replaced that part of the performance metric with operating income.  Thus,

the Debtors will measure division-level performance based on OIBITDAR-UG (where

"OI" standing for operating income.)  Otherwise, this metric operates the same as the one

being adopted at the corporate level.

31.    <u>Setting Performance Targets</u>.  In most chapter 11 companies, the

EBITDAR target for purposes of a postpetition compensation plan typically is the

13

EBITDAR target projected by members of a company's finance team for operational

purposes.  After the target EBITDAR is set by a company's finance team, the

compensation committee then usually sets a threshold and ceiling EBITDAR, which will

be used to create minimum and maximum bonus opportunities for the applicable

performance period.

      32.     In these chapter 11 cases, the Debtors provided the Creditors'

Committee, a fiduciary in these cases, the opportunity to comment on the various

performance targets for the period January 1, 2006, through June 30, 2006.  At the

corporate level, the target EBITDAR-UG is derived from the Debtors' business plan, as

approved by the Debtors' Board of Directors.  The corporate level EBITDAR-UG target

for the period ending June 30, 2006, is negative $80 million. (A negative EBITDAR

target, for purposes of an incentive compensation plan, is not unusual, in my experience,

for a company in Chapter 11.) I understand that the Company expects that, in fact, its

EBITDAR will be positive. At the division level, OIBITDAR-UG targets for the six-

month period ended June 30, 2006, have been calculated for each division, based on the

Debtors' business plan (and are attached hereto under Exhibit A).

      33.     <u>Individual Executive Performance Mix</u>.  At the Creditors'

Committee's suggestion, the Debtors have also agreed to provide the Debtors' executives

bonus opportunities specifically tailored to each executive's position with the Debtors.

Executives at the corporate level will have 100 percent of their bonus opportunity based

on the Debtors' ability to achieve their corporate-level target EBITDAR-UG.  For

executives working in a specific division (except the medical division), 50 percent of

their bonus opportunity will be based on the Debtors' ability to achieve their target

EBITDAR-UG, and the remaining 50 percent of their bonus opportunity will be based on

14

their respective division's performance relative to the target OIBITDAR-UG.  With regard to the Debtors' medical division, because the success of this division is not highly correlated to the performance of the rest of the Company, only 30 percent of the bonus opportunity for executives in this division will be based on meeting the corporate-level target EBITDAR-UG, while 70 percent will be based on the medical division's ability to achieve its target OIBITDAR-UG.  The corporate and division targets are independent of one another—achievement of one target results in bonus funding even if the other target is not achieved.  Also, executives who transfer between entities or across divisions within the same entity will have their opportunities prorated based upon the time spent at each entity during the performance period.

34.    Bonus Opportunities.  Although the performance metric for the annual incentive plan has now changed from net earnings (Prepetition Program) to EBITDAR/OIBITDAR (Revised Annual Incentive Plan), the Compensation Committee set minimum, target, and maximum bonus opportunities under the Revised Annual Incentive Plan using the same incentive structure that was adopted for the prepetition annual incentive plan.  Under the Revised Annual Incentive Plan, executives will receive 40 percent of their bonus opportunities if the Debtors achieve 70 percent of their target for the applicable performance period, 100 percent of their bonus opportunities if the Debtors hit their target, and a maximum of 200 percent of their bonus opportunities if the Debtors meet or exceed 200 percent of their target for that performance period.  Any bonus earned by an executive is subject to adjustment based on his or her individual performance.  Executives that are designated as poor performers or otherwise not meeting the expectations, as determined by their supervisors, will receive no bonus.  Executives also may have their bonuses adjusted down by any amount or adjusted up as much as 200

percent of their target opportunities (except members of Delphi's Strategy Board, who are limited to a 150 percent ceiling on their bonus adjustments). The net effect of these adjustments to the Debtors must be zero—additional bonus awarded to one executive must come from the downward adjustment of bonuses to other executives.

35.    Assuming the Debtors hit all their performance targets (corporate and division levels), the Revised Annual Incentive Plan has an estimated *maximum* six-month cost of $38.4 million. (The target cost is $20.6 million.) For members of Delphi's Strategy Board, the *maximum* six-month cost is $8.5 million (and the targeted cost is $5.7 million). These estimates also assume that all executives are employed with the Debtors for the whole performance period, and that all of them meet the personal-performance requirements imposed by the Company. (The range of bonus opportunities for participants in the Revised Annual Incentive Plan for the period January 1, 2006, through June 30, 2006, are outlined in the spreadsheet attached to this declaration as Exhibit B.)

36.    <u>Six-Month Performance Period</u>.  For purposes of the Revised Annual Incentive Plan, the Debtors decided to measure performance over a six-month period, rather than annually. At the request of the Creditors' Committee, the Debtors set the initial period of the Revised Annual Incentive Plan for a period commencing on January 1, 2006, and ending on June 30, 2006, thus eliminating the possibility of any performance-based incentive compensation for the first three months after the petitioners were filed. Participants' bonus opportunities during this initial period will be 50 percent of their annual opportunities under the Prepetition Program. The shortened periods reflect that the chapter 11 process introduces several variables that make it more difficult to forecast financial performance over the long term. The shorter the period, the better the chance that the Compensation Committee will be able to set targets that are neither so

16

high that they are unattainable nor so low that the payment of bonuses under the Revised

Annual Incentive Plan becomes automatic.

37.    The shorter periods also provide the covered executives with more

incentive value than annual periods.  By way of example, if the Debtors experience very

low EBITDAR-UG for one month, that performance only will affect the ability to meet

the target EBITDAR-UG for the six-month incentive period, not the entire year.  Thus,

the one bad month only affects one-half of an executive's annual incentive opportunity.

Under the Prepetition Program, the one bad month may have affected the executive's

entire annual bonus opportunity.  The Debtors did not implement a shorter period (e.g.,

three months) to measure EBITDAR-UG under the Revised Annual Incentive Plan

because the additional incentive from making a shorter period did not outweigh the costs

associated with administering the incentive plan more frequently.

38.    Participation in the Revised Annual Incentive Plan.  Again, every

person who occupies an "executive" position with the Debtors (other than Mr. Miller)

will be eligible for payments under the Revised Annual Incentive Plan. I concur with the

Debtors' judgment in electing to follow its usual prepetition practice of making all those

currently employed in executive positions eligible for participation in the program, rather

than changing its practice based upon a post-petition determination of which executives

are "key."  In fact, I believe that it would not be in the best interests of the Debtors or

their estates to change its prior practice in this respect insofar as the Revised Annual

Incentive Plan is concerned because such a change would hurt the morale and lower the

performance levels of the executives excluded, all to the detriment of the Debtors'

businesses.

39.    <u>Forfeiture/Clawback Procedures</u>.  To address concerns raised by various constituents, the Debtors have also proposed prophylactic measures designed to ensure that KECP benefits not be paid to or retained by executives found to have engaged in activities that injured the Company and who, accordingly, may be liable to the Company. These prophylactic measures include provisions for escrowing or forfeiture of payments made to KECP participants under certain circumstances. The particulars of these provisions are detailed in the Declaration of Mark Weber. In my opinion and experience, these prophylactic measures are without precedent for an annual or short-term incentive plan—by companies in or out of bankruptcy.  Indeed, I am unaware of any such "bad boy" provision in any annual or short-term incentive plan.

40.    <u>Necessity of the Revised Annual Incentive Plan</u>.  In my judgment, the Debtors' record of executive attrition, as well as the need to provide competitive pay opportunities, demonstrates their need to implement the Revised Annual Incentive Plan. Whenever an executive or manager departs from an industrial enterprise, the employer loses all of that employee's experience and knowledge, and often on relatively short notice. This institutional knowledge, which cannot be readily replaced on the open market, is necessary to maintain the Debtors' ongoing operations and to assure successful completion of the restructuring.

41.    The Debtors provided me with data that indicated that executive attrition increased significantly during the prepetition period and has accelerated thereafter.  During the twelve-month period between October 8, 2003, and October 7, 2004, only 13 executives quit. In the twelve-month period preceding the petition date, October 8, 2005, however, 21 executives quit, an increase of almost 62 percent.  Since October 8, 2005, fourteen more executives—with a combined 231 years of service to the

18

Debtors—have either quit or given the Debtors notice that they will do so in the near future. If executive quits continue at this rate, the Debtors can expect to lose more than 40 executives during their first year in chapter 11.  These attrition statistics do not include retirements or separations initiated by the Debtors.

42.     Executive attrition also disrupts the orderly operations of the business, as other personnel are forced to add the responsibilities of the departed employees to their own.  Replacing departed executives also requires the employer to incur costs that could otherwise be avoided, such as signing bonuses, reimbursement of relocation expenses, and executive search fees.  Additionally, when the employer is undergoing court-supervised reorganization, the Chapter 11 process imposes additional obligations and stress on all executives, including longer, or irregular working hours, additional "emergency" situations, and general uncertainty.

43.     Those objectors who argue, without any supporting evidence, that the Debtors would be better off if they lost existing key executive personnel apparently have given no thought to how their approach would overburden and demoralize the key employees who remain and saddle the Debtors with the replacement costs associated with executive attrition.

44.     In my opinion, the Revised Annual Incentive Plan approved by the Compensation Committee is well within the range of competitive practice and consistent with the ordinary course of the Debtors' prepetition business and of the ordinary course of the Debtors' peers.

45.     Based on the foregoing, in my opinion, implementation of the Revised Annual Incentive Plan is in the best interests of the Debtors, their estates, their creditors, and all other parties-in-interest.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on February 1, 2006, in Chicago, Illinois.

Nick Bubnovich

# EXHIBIT A

## OIBITDAR By Division- AIP Target/Max/Min
## January - June 2006 (Excludes Allied Sales)

| | E&C | Steering | T&I | E&S | Packard | DPSS | AHG | Medical | Divisional Total | HQ/Other | Grand Total | Fund Size* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revised Sales | $3,176.0 | $1,112.5 | $1,737.2 | $2,787.9 | $2,924.6 | $964.4 | $913.4 | $65.9 | $13,681.9 | $41.0 | $13,722.9 | |
| OIBITDAR Target | ($44.2) | ($92.8) | ($79.2) | $193.0 | $83.4 | $23.1 | ($583.9) | $0.3 | ($500.3) | ($96.0) | ($596.3) | $20.6 |
| OIBITDAR as % of Sales | -1.39% | -8.34% | -4.56% | 6.92% | 2.85% | 2.40% | -63.93% | 0.46% | -3.66% | | | |
| Plus 3.1% | 1.71% | -5.24% | -1.46% | 10.02% | 5.95% | 5.50% | -60.83% | 3.56% | -0.56% | | | |
| OIBITDAR Max | $54.3 | ($58.3) | ($25.3) | $279.4 | $174.1 | $53.0 | ($555.6) | $2.3 | ($76.2) | | | $38.4 |
| Increased OIBITDAR to Target | $98.5 | $34.5 | $53.9 | $86.4 | $90.7 | $29.9 | $28.3 | $2.0 | $424.1 | | | |
| Minus 0.9% | -2.29% | -9.24% | -5.46% | 6.02% | 1.95% | 1.50% | -64.83% | -0.44% | -4.56% | | | |
| OIBITDAR Min | ($72.8) | ($102.8) | ($94.8) | $167.9 | $57.1 | $14.4 | ($592.1) | ($0.3) | ($623.4) | | | $8.35 |
| Reduced OIBITDAR to Target | -$28.6 | -$10.0 | -$15.6 | -$25.1 | -$26.3 | -$8.7 | -$8.2 | -$0.6 | -$123.1 | | | |
| Min to Max Range Span | $127.0 | $44.5 | $69.5 | $111.5 | $117.0 | $38.6 | $36.5 | $2.6 | $547.3 | | | |
| U.S. Executives by Division | 81 | 35 | 43 | 70 | 37 | 21 | 19 | 1 | 307 | 159 | 466 | |
| Target Payout by Division | $3,035.5 | $1,509.0 | $1,729.0 | $2,420.5 | $1,664.0 | $832.0 | $867.0 | $33.5 | $12,090.5 | $8,546.0 | $20,636.5 | |
| Global Mfg. Facilities | 50 | 16 | 29 | 22 | 97 | 8 | 12 | 2 | 236 | | | |

* Incentive Payout budget based upon term sheet payout caps

# EXHIBIT B

**RANGE OF BONUS OPPORTUNITIES FOR AIP PROGRAM PARTICIPANTS (Jan. 1, 2006, through June 30, 2006).**

| | HC | Avg. Salary | Targets thru 6/30/06 | Individual Performance Ranges (threshold) | | | Individual Performance Ranges (target) | | | Individual Performance Ranges (maximum) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Min | Mid Point | Max | Min | Mid Point | Max | Min | Mid Point | Max |
| *DSB* | | | | | | | | | | | | |
| Miller | | $1 | *Not Participating* | | | | | | | | | |
| Other DSB | | $514,255 | $256,933 | $0 | $102,773 | $154,160 | $0 | $256,933 | $385,399 | $0 | $385,399 | $385,399 |
| *Sum* | 23 | | **$5,652,522** | * | **$2,261,009** | ** | * | **$5,652,522** | ** | $0 | **$8,478,783** | **$8,478,783** |
| | | | | | | | | | | | | |
| *Band F* | | $427,500 | $122,500 | $0 | $49,000 | $98,000 | $0 | $122,500 | $245,000 | $0 | $245,000 | $245,000 |
| *Sum* | 2 | | **$245,000** | * | **$98,000** | ** | * | **$245,000** | ** | $0 | **$490,000** | **$490,000** |
| | | | | | | | | | | | | |
| Band E | 21 | $292,808 | $85,500 | $0 | $34,200 | $68,400 | $0 | $85,500 | $171,000 | $0 | $171,000 | $171,000 |
| Band D | 65 | $240,799 | $67,500 | $0 | $27,000 | $54,000 | $0 | $67,500 | $135,000 | $0 | $135,000 | $135,000 |
| | | | | | | | | | | | | |
| Band C | 88 | $199,856 | $33,500 | $0 | $13,400 | $26,800 | $0 | $33,500 | $67,000 | $0 | $67,000 | $67,000 |
| Band B | 130 | $165,312 | $23,500 | $0 | $9,400 | $18,800 | $0 | $23,500 | $47,000 | $0 | $47,000 | $47,000 |
| Band A | 138 | $141,300 | $18,500 | $0 | $7,400 | $14,800 | $0 | $18,500 | $37,000 | $0 | $37,000 | $37,000 |
| *Sum* | 442 | | **$14,739,000** | * | **$5,895,600** | ** | * | **$14,739,000** | ** | $0 | **$29,478,000** | **$29,478,000** |
| TOTAL COST | 467 | | **$20,636,522** | * | **$8,254,609** | ** | * | **$20,636,522** | ** | $0 | **$38,446,783** | **$38,446,783** |

| $ Fund Summary | Threshold | Target | Maximum |
|---|---|---|---|
| | *$M* | *$M* | *$M* |
| **Original Proposal** | $12.4 | $31.0 | $62.0 |
| **Revised Proposal** | $8.3 | $20.6 | $38.4 |
| **DSB Original** | $3.4 | $8.5 | $17.0 |
| **DSB Revised** | $2.3 | $5.7 | $8.5 |

\* Individual bonuses may be reduced to as low as zero based on performance.
\*\* While individuals can receive up to 200% of their target bonus (150% for DSB) based on individual performance, the total pool cannot exceed the aggregate midpoint amount.