SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
David E. Springer (DS 9331)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York, 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
 Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                :
                                :
     In re                      :    Chapter 11
                                :
DELPHI CORPORATION, et al.,     :    Case No. 05–44481 (RDD)
                                :
                  Debtors.      :    (Jointly Administered)
                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


DECLARATION OF JOHN D. OPIE IN SUPPORT OF THE DEBTORS'
MOTION FOR ORDER UNDER §§ 105 AND 363 AUTHORIZING THE
DEBTORS TO IMPLEMENT A KEY EMPLOYEE COMPENSATION PROGRAM

John D. Opie declares as follows:

1. I make this declaration in support of the Debtors' Motion For Order Under §§ 105 And 363 Authorizing The Debtors To Implement A Key Employee Compensation Program (the "KECP Motion"). Capitalized terms not otherwise defined in this Declaration shall have the meanings ascribed to them in the KECP Motion or the various pleadings referenced herein. I have personal knowledge of the matters stated in this declaration.

## BACKGROUND

2. Since 1999, I have served as an independent director, and since 2002 as Lead Independent Director on the Board of Directors of Delphi Corporation (which, with certain of its subsidiaries and affiliates, the debtors, and the debtors-in-possession in the above-captioned cases, are referred to collectively and variously herein as "Delphi," the "Company," or the "Debtors"). I am an *ex officio* member of the Audit Committee, the Corporate Governance and Public Issues Committee, and the Compensation and Executive Development Committee of Delphi's Board of Directors. Prior to my association with Delphi, I worked for General Electric Company ("GE") for 39 years. During the period from 1961 until I retired from GE in 2000, I held numerous senior management positions, including Vice President of its Lexan and Specialty Plastics Divisions, President of its Lighting Business, and, from 1995-2000, Vice Chairman and a director of GE itself. Since 2003, I also have served as a member of the Board of Directors of Wal-Mart Stores, Inc.

3. Delphi's Compensation and Executive Development Committee (the "Compensation Committee") is responsible for discharging the Board of Directors' responsibilities relating to officer and other executive compensation. In connection therewith, it is the Compensation Committee's duty, in relevant part, to review and approve all of Delphi's executive

1

benefit and incentive compensation plans. For compensation purposes, this includes the duty to review and evaluate corporate goals and the individual executive performance of Delphi's chief executive officer. The Compensation Committee also is responsible for reviewing and evaluating the applicable corporate goals relating to the compensation of the Company's other executive officers, officers, and members of senior management (collectively, "Delphi Executives" or "Corporate Management").

4. In conjunction with outside, independent third-party consultants, the Compensation Committee annually reviews compensation opportunities offered to Corporate Management to ensure that Delphi's executive compensation program not only remains competitive, but also provides appropriate incentives to achieve the Company's financial goals. It is a well-settled element of the Company's compensation philosophy that the interests of Delphi's Executives be aligned with those of the Company's stakeholders. To achieve this goal, the Compensation Committee historically has reviewed management's recommendations with regard to the setting of specific, measurable, short- and long-term performance targets, rewarding Delphi Executives when they achieve those targets, and adjusting a particular executive's compensation opportunities to more accurately reflect specific performance and individual contributions to the Company. (In the case of the Company's CEO, the Compensation Committee sets those targets and makes those adjustments directly.) The Compensation Committee regularly reviews the compensation opportunities offered by comparable corporations in Delphi's industry, as well as those offered by other top *Fortune* companies against which Delphi competes in hiring its executive workforce. In connection therewith, the committee uses an independent, third-party compensation consultant (currently, Watson Wyatt Worldwide ("Watson Wyatt")) to provide such information. By evaluating the total compensation opportunities offered by these various com-

panies, the Compensation Committee establishes compensation benchmarks that it uses to set Delphi's total compensation opportunities.

       5.       Traditionally, Delphi has incorporated the following individual components as integrated elements of its compensation plan for Corporate Management:

       a.       <u>Base Salary</u>:  Delphi endeavors to pay base salaries that are competitive with those paid by the benchmarked companies referenced above.  In setting base salaries, the Company also takes into account unique factors particular to an individual executive, such as his or her specific performance, potential for future advancement, and responsibilities within the organization.

       b.       <u>Annual Incentives</u>:  In the ordinary course of its business before filing for chapter 11 protection, Delphi provided annual incentive bonus opportunities as part of its executive compensation plan.  In connection therewith, the Compensation Committee established annual corporate financial achievement levels that, if reached, permitted Corporate Management to earn incentive bonuses.  Depending upon which were most appropriate in light of the Company's business plan for the year, the Compensation Committee could set these targets in reference to a variety of business metrics used by Delphi's industry peers or other *Fortune* 100 companies, such as: return on assets, return on net assets, asset turnover, return on equity, return on capital, market price appreciation of Delphi's common stock, economic value added, total stockholder return, net income, pre-tax income, earnings per share, operating profit margin, net income margin, sales margin, cash flow, market share, inventory turnover, sales growth, capacity utilization, increase in customer base, environmental health and safety, and quality.  Based upon the recommendations and input of the Company's compensation consultant, the Compensation Committee also established threshold performance levels, below which no annual incentive bonuses would

be awarded; and performance ceilings, above which no additional amounts would be paid. The size of a final annual incentive bonus, if any, was dependent on the actual level of performance that the Company achieved within the aforementioned range, subject to adjustment based on the individual employee's specific achievements for that year.

    c. <u>Long-Term Incentives:</u> Delphi believes that the ability to acquire equity in the Company encourages high levels of executive performance, while further aligning the long-term interests of Corporate Management with those of the Company's stakeholders. Consequently, the Company historically has provided an equity component (generally a mixture of stock options and restricted stock unit grants, depending on a Delphi Executive's level of responsibility) as an element of the Company's long-term incentive opportunities. Delphi also offered cash performance awards to officers and Corporate Management under a program entitled the Performance Achievement Plan (the "PAP"). PAP awards were intended to encourage the senior-most members of Delphi Management to achieve certain strategic business goals which, by their nature, took more than one year to complete. Typically, the Compensation Committee granted PAP awards on an annual basis, but did not pay them unless the Company achieved its strategic business goals over rolling three-year performance cycles (*e.g.*, 2003–2005, 2004–2006, 2005–2007). As with the other elements of the Delphi Management compensation plan, the PAP program incorporated performance thresholds and ceilings between which a range of awards might be earned. Collectively, the PAP and the equity opportunities (the "SO" and "RSU" Components, respectively) are referred to by the Company as the "Long-Term Incentive Plan," or "LTIP."

    6. Based on its collective experience, and in consultation with its various advisors, the Compensation Committee has concluded that in deciding whether to accept a job of-

4

fer, or remain with a current employer, employees or prospective employees typically evaluate the overall "employment proposition" offered by an employer (*e.g.*, total compensation opportunities, benefits, career path, work content, work relationships, work/life balance, and the prospects of the employer itself), balanced against the risk that the employer may not deliver on the proposition. The Compensation Committee also believes that as an employer's economic prospects decline, its employment proposition suffers, in significant part because the employer has fewer tools and choices available to positively affect the employment proposition it can offer.

7.   For example, stock options offered as an element of a long-term incentive program may become valueless — and therefore are not valued — if, for any number of reasons, the company's stock price falls and stays below the strike price of the options. Similarly, restricted stock grants or vested stock awards may become valueless if an employer seeks protection under the Bankruptcy Code, a possibility that is not lost on current or prospective employees of an employer that finds itself in serious economic decline. As an ancillary point, it should be noted that simply increasing the cash component of an executive's total compensation package does not necessarily provide an adequate remedy: first, it places additional burdens on the employer's cash resources at a time when those resources are most scarce. Furthermore, the same macroeconomic forces that drive down an employer's overall business prospects increase the difficulty for any particular executive to achieve the performance goals necessary to obtain any incentive award, whether cash or equity. Finally, an employer's ability to offer long-term career advancement and promotions (and the perceived value of those opportunities, if any) also suffers as the entity's financial condition declines.

8.   The result of all of these factors, over time, is the steady erosion of an executive's total compensation opportunities, as well as the employment proposition that an em-

5

ployer is able to offer. Consequently, executive attrition increases, which imposes additional burdens: the employer loses all of that employee's experience and knowledge, often on relatively short notice; other personnel are forced to assume the departed employees' responsibilities, thereby disrupting the orderly operation of the employer's business; and the employer incurs additional costs (*e.g.*, signing bonuses, relocation expenses, and executive search fees), and incurs them more frequently, than a financially more stable employer.

## PRE-PETITION EVENTS AND THE DECISION TO FORMULATE THE KECP

9. As 2005 progressed, it became increasingly clear to the Board of Directors that if Delphi were to remain a viable enterprise, it might need to restructure its financial commitments, either through consensual modification of labor agreements, lender deferrals, and contractual obligations with GM and others; or by means of an in-court resolution under the Bankruptcy Code. In August 2005, the Board of Directors therefore approved the Company's request to initiate a comprehensive reevaluation of its existing compensation structure and incentive plans for Delphi Management, in light of current U.S. and marketplace economic realities, and specifically taking into account the possibility of an in-court restructuring.

10. With input from the Committee's financial, compensation, and legal advisors, including Watson Wyatt and the Debtors' counsel, Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden Arps" and, collectively, the "Advisors"), the Compensation Committee received a variety of materials and information related to a possible revision of the Company's executive compensation and related human capital plans. This included consideration of a range of estimates, projections, and presentations relating to possible business scenarios, and the potential risks and returns entailed by each. The Compensation Committee compared specific compensation options available (or unavailable) in the event a consensual resolution to the Company's fi-

6

nancial difficulties could not be reached, including the probable effect on Delphi Management's vested, pending, or potential equity awards — they likely would be wiped out — if the Company were to proceed in chapter 11. The Compensation Committee also received information that Delphi's executive workforce attrition rate (normally low and quite stable) had increased over the preceding several years, and that total compensation opportunities for Delphi Management's executive workforce had remained stagnant or had fallen, in comparative terms, during that same period.

11. The Compensation Committee concluded that in the event that Delphi elected to seek relief under chapter 11, payments made under any revised key employee compensation program would have to be tied to specific performance targets and acceptable levels of personal achievement. In this regard, the Compensation Committee considered and discussed comparative data about executive compensation plans offered by Delphi's corporate peers, and requested that its Advisors ensure that appropriate comparisons were being made. The Compensation Committee also directed its Advisors to evaluate programs implemented by other chapter 11 companies, including automotive industry suppliers Federal-Mogul Corp. and Hayes Lemmerz International, Inc., with the goal of proposing a revised program for Delphi that incorporated the most effective components of these various plans. As the Compensation Committee's review progressed, it also approved performance metrics to be used in the event that proceeding under chapter 11 became inevitable.

12. During the course of the Compensation Committee's review, the Board of Directors considered the timing of any recommendation that the Company implement a key employee compensation program ("KECP"), in the event that the Company were to proceed under chapter 11. More specifically, the Board considered whether all parties would be better served

7

by permitting negotiations between the Debtors and their stakeholders to progress before proposing a revised compensation plan, or whether the decision, if any, to offer a revised program should be integrated into the Debtors' First Day filings, on October 8, 2005. The Board of Directors concluded that because of the importance of the Debtors' key employees to the successful reorganization of the enterprise, the announcement should be made sooner, rather than later. The Board of Directors further concluded that the need to attract and motivate key management personnel, who have seen their employment and compensation prospects erode over the last five years, was an issue that could no longer be ignored, particularly in light of the uncertainties facing the Company if it were to proceed in chapter 11. The Board likewise determined, in consultation with the Advisors, that by making the KECP a part of the Debtors' First Day filings, all interested parties would be provided full disclosure of, and an opportunity to comment on, the financial incentives the Debtors hope to offer their key executives.

13. Throughout this process, the Board of Directors and the Compensation Committee remained aware not only of the overall financial cost of any revised compensation plan that might be proposed, but also of the need to ensure that the total compensation opportunities for Delphi Management would be appropriate in light of the Debtors' immediate and long-term challenges. Both the Board and the Compensation Committee thus were mindful of their duty to manage the Company's assets in a fiscally responsible manner, while developing a comprehensive program that would keep Corporate Management focused on maximizing the Debtors' financial performance for the benefit of all creditors and other stakeholders.

14. The Board of Directors and the Compensation Committee believe that the KECP is structured to provide market-competitive compensation opportunities that will motivate Corporate Management to achieve the Debtors' overall business plan, while incorporating meas-

8

urable performance milestones sufficient to monitor short- and long-term risk.  Based on the advice of the Advisors, the Board and the Compensation Committee also believe that the costs to the Debtors of the KECP were likely to be no greater than those previously borne by the Company in connection with its prior executive compensation plan. Accordingly, the KECP for which the Debtors now seek approval has been reviewed and approved by the Compensation Committee, on behalf of the full Board.

### PARTICULARS OF THE KECP PROVISIONS NOW BEFORE THE COURT

15.    The KECP originally proposed on October 8, 2005, by the Debtors as part of their First Day Filings contains two basic components:  annual incentive bonus opportunities offered during the course of the chapter 11 process itself (the "Revised Annual Incentive Plan"), and emergence awards, consisting of cash bonuses and a percentage of the equity of the reorganized entity (the "Emergence Plan").

16.    Since the Debtors filed for chapter 11 protection, they and the Official Committee of Unsecured Creditors (the "Creditors' Committee") have engaged in significant and ongoing discussions about a variety of matters related to the KECP.  As a result, and at the request of the Creditors' Committee, the Debtors have agreed to withdraw from further consideration under the Revised Annual Incentive Plan the initial three-month performance period between October 8 and December 31, 2005.  In addition, the Debtors have agreed to limit the scope of the forthcoming hearing on February 10, 2006, to those provisions of the KECP that pertain only to the annual incentive bonus opportunities for the period commencing no earlier than January 1, 2006, and concluding no later than June 30, 2006.  The Debtors will adjourn for now consideration of all other aspects of the KECP, including those provisions of the Revised Annual

9

Incentive Plan pertaining to any period after June 2006, as well as the cash and equity components available under the Emergence Bonus Plan.

17. Accordingly, the following discussion is limited to the matters relevant to the February 10 hearing, and is based on input from, and consultation between, the Debtors' compensation consultant, Watson Wyatt, and Mrs. Pearl Meyer and her colleagues at Steven Hall & Partners, LLC, the compensation and employment advisor engaged by the Creditors' Committee in connection with these chapter 11 proceedings.[1]

### The Revised Annual Incentive Plan's Bonus Provisions

18. The Compensation Committee believes that short-term, achievement-based cash incentive bonuses, linked to specific performance targets and acceptable levels of personal performance, will motivate Covered Employees to realize the Debtors' projected business plan during the pre-confirmation period. Based on the advice of its Advisors, the Compensation Committee also believes that all members of Corporate Management (excluding by voluntary agreement the current Chairman and CEO, Robert S. Miller) should be eligible to participate in these incentive bonus opportunities.[2] The KECP thus recognizes the efforts of each of these employees to the Debtors' successful emergence from chapter 11.

---

[1] The KECP Motion includes a reference to the severance provisions of the Company's executive compensation plan. These provisions are not, however, an element of the KECP itself, as the Court recognized on October 13, 2005, when it authorized the Debtors to continue its pre-petition severance program. ("Human Capital Obligations Order," at ¶¶ 1–2 (Docket No. 198).) The issue was raised in the KECP merely to provide full disclosure to all interested parties of Covered Employees' total compensation package.

[2] The full Board, and thus the members of the Compensation Committee, were aware of the Audit Committee's internal review commenced in response to the SEC's inquiry into certain accounting matters. The Compensation Committee also was aware that certain individuals' association with the Company was terminated as a result of that review. The Compensation Committee operated under the premise that all presently-employed executives of the Com-

19. Even if the Debtors achieve their performance targets, however, Covered Employees will not necessarily receive incentive bonuses under the Revised Annual Incentive Plan. Instead, Covered Employees also must maintain acceptable levels of personal achievement to qualify for the bonuses. In connection therewith, the individual performance of each Covered Employee will be evaluated annually by his or her supervisor or, in some cases, by a committee of senior executives. Any Covered Employee whose performance is not determined to be acceptable will not be eligible for an incentive payment under the Revised Annual Incentive Plan. In this regard, the collective effect to the Debtors of these individual achievement adjustments also must be zero, *i.e.*, a positive individual achievement adjustment for one executive must be counterbalanced by negative individual achievement adjustments for one or more other executives.

20. Unlike the year-long performance cycles used in the pre-petition annual incentive plan, the Revised Annual Incentive Plan incorporates shorter measurement periods. In making the decision to employ shorter cycles, the Compensation Committee recognized the need not only to closely monitor the Debtors' ongoing financial progress, but also to ensure that executive performance remains linked to the evolving demands of these chapter 11 cases. Moreover, the use of abbreviated cycles permits the Compensation Committee to anticipate or track more closely the potential effect of non-recurring or non-operational events that might otherwise affect the Debtors' ability to achieve the Debtors' financial targets.[3] The shortened periods re-

---

pany would be eligible to participate in the KECP, and thus did not specifically take into consideration the Audit Committee's internal review, the details of its investigation, or the Audit Committee's ultimate determinations.

[3] Thus, for example, if the Debtors' financial performance for a single month is low, only the incentive bonus opportunity for that particular six-month cycle may be affected, instead of the entire year.

11

flect the Compensation Committee's awareness that the chapter 11 process itself introduces variables that make it more difficult to make long-term forecasts about the Debtors' financial performance. Consequently, the Compensation Committee expects to be able to set corporate performance targets that are neither unattainably high nor so low that eligibility for bonus payments under the Revised Annual Incentive Plan become automatic.

21.     Under the KECP originally disclosed in connection with the Debtors' First Day filings, the Compensation Committee (in consultation with its Advisors) decided to employ EBITDAR-based performance targets.[4]  It is the Compensation Committee's understanding not only that EBITDAR provides an appropriate means to measure the enterprise's core earnings during the turbulence and uncertainty of the chapter 11 process, but that it is a common practice for chapter 11 companies to employ this metric. As was the case with the Debtors' pre-petition annual incentive program, the Compensation Committee also is responsible for establishing performance thresholds and ceilings, to create a range in which Revised Annual Incentive Plan bonus opportunities may be earned.

22.     With input from, and as a result of continuing discussions with the Creditors' Committee, the Debtors have refined the EBITDAR metric they intend to use in connection with the Revised Annual Incentive Plan. To obviate concern that it would be inappropriate for earnings, if any, obtained as a result of the Debtors' ongoing negotiations with General Motors Corporation ("GM," or "G") or the Debtors' labor unions (the "Unions, or "U"), to be included for purposes of the Revised Annual Incentive Plan, the Debtors have agreed to make explicit their intention to exclude this factor from their periodic, pre-emergence earnings calculations. At

---

[4]  "EBITDAR" means "earnings before interest, taxes, depreciation, amortization, and restructuring costs."

12

the enterprise level, therefore, the Debtors will use "EBITDAR–UG," that is, "earnings before interest, taxes, depreciation, amortization, restructuring costs, but excluding earnings, if any, resulting from contractual negotiations with GM and the Unions," as the metric for calculating Revised Annual Incentive Plan compensation payments.

23. With input from, and in consultation with the Creditors' Committee, the Debtors also have agreed to begin measuring corporate performance at the Debtors' divisional level. Correspondingly, the Debtors will tie a portion of the Revised Annual Incentive Plan bonus opportunities for division-level executive to the performance of that employee's division. Because the Debtors measure earnings only at the enterprise level, however, the Debtors will substitute an "Operating Income," or "OI" metric, for "Earnings" at the division level. As a result, 50 percent of the incentive bonus opportunities for division-level executives will be calculated on the basis of OIBITDAR–UG, and the remaining 50 percent will be calculated on the basis of EBITDAR–UG.[5] The bonus opportunities attributable to the enterprise- and division-level metrics will operate independently: achievement of one target metric will fund the bonus opportunity for that entity level, even if the other bonus metric for the other entity level is not achieved. OIBITDAR–UG targets will be calculated for each division, based on the Debtors' business plan.

24. As was the case with the Company's pre-petition incentive plan, the Revised Annual Incentive Plan utilizes performance ranges in which a Covered Employee may earn bonuses. As a result of inputs from and negotiation with the Creditors' Committee, the Debtors

---

[5] The exception to this "50–50" split is the Debtors' medical division. Because the medical division's performance is relatively independent from that of the enterprise as a whole, 30 percent of the incentive bonus opportunities for executives in the medical division will be tied to EBITDAR–UG, and the remaining 70 percent will be tied to OIBITDAR–UG.

13

have proposed that Covered Employees will receive 40 percent of their bonus opportunities for this performance cycle if the Debtors achieve 70 percent of the targets outlined above; 100 percent of their bonus opportunities if the Debtors achieve 100 percent of the targets, and a maximum of 200 percent of their bonus opportunities for this cycle if the Debtors achieve 200 percent of their targets.  Of course, any bonus earned by a Covered Employee remains subject to individual performance adjustments based on each Covered Employee's personal achievements for the period.

25.    Finally, the KECP Motion does not expressly address the effect on a Covered Employee's KECP eligibility if the Debtors were to conclude that he or she had been involved in misconduct.  Throughout the process of developing and negotiating the KECP and the Revised Annual Incentive Plan, however—a process totally independent of and separate from that undertaken by the Audit Committee in connection with its internal investigation of matters related to the Company's prior accounting—the Compensation Committee proceeded under the presumption that any Delphi Executive still employed by Delphi and who contributes, post-petition, to the Debtors' achievement of its business plan and meets his or her individual performance targets should be compensated under the KECP.

26.    The Debtors have also proposed rigorous prophylactic measures to alleviate concerns that KECP benefits not be paid to or retained by executives found to have engaged in activities that injured the Company and who, accordingly, may be liable to the Company. In general, these prophylactic measures include provisions for escrowing payments to KECP participants under certain circumstances pending a final determination of whether the payments should be forfeit altogether. The particulars of these provisions, which are explained more fully in the Declaration of Mark Weber, were reviewed and approved by the Compensation Commit-

14

tee, which was satisfied that they provide reasonable assurance that property of the Debtors will be protected.

27.  Finally, it should be noted that no one has suggested—and neither the Board of Directors nor the Compensation Committee is aware of any legitimate basis to conclude—that any provision of the KECP is intended or will otherwise operate to limit the Debtors' right under any applicable federal, state, or common law, statute, rule, or regulation, or any corporate by-law, policy, custom, or contractual provision, to seek disgorgement or restitution of, or to utilize any other available legal or equitable remedy to recover payments made, or withhold payments pending, if it becomes apparent that a Covered Employee improperly misrepresented the basis for his or her entitlement to a Revised Annual Incentive Plan performance bonus or was involved in misconduct.

28.  Throughout these discussions, the Compensation Committee has been kept abreast of the parties' negotiations concerning potential modifications to the KECP and the Revised Annual Incentive Plan.  The Compensation Committee has reviewed and approved these proposals, which the Compensation Committee believes not only meet the legitimate concerns of the Objectors, but are fair, reasonable, appropriate, and in the best interests of the Debtors and their stakeholders.  In fact, today, the Board of Directors as a whole received a report on the status of the KECP negotiations, and the independent directors met separately and determined, after considering all the facts and circumstances of the case—including the views of various constituencies and the effects of continuing uncertainty on the Debtors' executive corps—that the Debtors should proceed to hearing on the Motion on February 10, 2006. The Compensation Committee also met today and reviewed and confirmed its approval of the particulars of the Debtors' proposal.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing statements are true and correct.

Executed on February 1, 2006, in Greenwich, Connecticut.

_____
John D. Opie