UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

————————————————x

In re:

DELPHI CORPORATION, et al.

    Debtors.

————————————————x

    Henry Reichard, declares under penalties of perjury that:

1.    I make this declaration to supplement my earlier affidavit in opposition to Delphi's proposed Key Employee Compensation Plan ("KECP") and, in particular, to address the February 1, 2006 version of the "Revised Annual Incentive Plan" ("RAIP") that is apparently going to be submitted for court approval. I am basing my comments on the RAIP as described in the Declaration of Mark Weber which I've now read.

2.    In my earlier affidavit, I stated that Delphi's proposed executive incentive plan, emergence bonuses and equity awards would make it impossible to achieve and ratify a new collective bargaining agreement that included concessions from the current wages and benefits available to our members. Delphi has put off its request for approval of the emergence bonuses and equity awards but is still insisting on putting into place the RAIP program. The February 1st version of the RAIP remains a huge obstacle to the IUE's ability to negotiate and ratify revisions to the collective bargaining agreement with Delphi as part of the process under Section 1113 of the bankruptcy law.

3.    The February 1st version of the AIP described in the Weber Declaration, provides that Delphi management can, for a six month period covering January 1, 2006 – June 30, 2006, receive bonus payments in amounts ranging from $8.3 million to $38.4 million. This is outlined in Exhibit D of his Declaration.

4. I see in paragraph 22 of the Weber Declaration that the corporate target for Delphi, using "EBITDAR-UG," is an $80 million loss over that six month period. I also see in paragraph 22 of the Weber Declaration that, using "OIBITDAR-UG," targets for the divisions where IUE represented employees work are a loss of $79.2 million in the Thermal and Interior Division, where IUE represented employees at the Gadsden Alabama plant work, a $583.9 million loss at the Automotive Holdings Group, which includes IUE represented facilities in Kettering and Moraine, Ohio, New Brunswick, New Jersey and Ontario, California, and a profit of $83.4 million in the Packard Electric division, which includes the IUE represented plans in Warren Ohio, and Brookhaven and Clinton Mississippi.

5. I see from the chart in paragraph 24 of the Weber Declaration that one half of the bonuses for Division level executives would be paid based on achievements of Corporate targets and one half would be paid based on achievement of Division targets. That chart also lays out that for Corporate level executives, the bonus would be payable based only on achievement of Corporate targets.

6. The February 1, 2006 version of the AIP which is described in Mark Weber's declaration would still present what I have previously referred to as an insurmountable hurdle to our ability to negotiate and ratify revisions to the collective bargaining agreement under the 1113 process. I base this statement on my understanding of the views which the Delphi membership and the Local leadership have consistently told me since the original KECP was proposed. They have consistently told me that an agreement cannot be negotiated and ratified when management is receiving millions of dollars of bonuses while the IUE members are being asked to take dramatic cuts to their wages and benefits.

7. The revised AIP described in Mark Weber's Declaration seems to me to be a smoke screen - it provides for the same bonuses, except it covers a revised time period. The time period originally was for 9 months - - October, 2005 through June 30, 2006, and now the AIP applies to a six month period. However, the amounts paid out are two thirds of the original plan, so there has been no real change in the basis for the bonuses being paid out.

8. While I have not sent around this February 1st version of the AIP to the local leadership and the local membership, I am certain that it would have the same impact on negotiations and ratification as the earlier AIP would. This is because, day for day, it is the same level of bonuses, except for a shorter period of time. Also, while they are not before the court on February 10th, the emergence bonus and the equity part of the KECP are still out there – they have just been put off until July, 2006. Delaying them does not reduce their impact on the collective bargaining process. They're still out there, and our members will still know that when they are asked to vote on a proposed contract.

9. At my deposition in connection with this motion on February 6, 2006, I was asked about a prior bankruptcy proceeding in which an auto parts company named Valeo apparently implemented a KERP for its executives and was still able to reach a negotiated and ratified agreement with the IUE. The situation at Valeo was completely different than the situation at Delphi. At Valeo, the company did not seek and the modified agreement did provide for wage cuts -- it included wage increases. The agreement provided for a very substantial severance package but did not involve any reductions in compensation for remaining employees. The dynamics of ratifying an agreement that calls for any wage freezes or wage reductions is entirely different and will be dramatically effected if at the same time corporate executives are getting increases in their compensation.

10. Apart from the problem of implementing the RAIP just as Delphi is trying to negotiate a new wage and benefit for our members, the RAIP itself is bad business. The plan as announced will provide a substantial bonus for executives who meet only 70% of their performance targets. My members would be pleased to receive extra rewards for attaining only 70% of the employer's performance targets. This provision will only emphasize the unfairness of this arrangement to my members.

11. Finally, I learned today that General Motors Coroporation has decided to move in the opposite direction from Delphi. G.M. is reducing the compensation of its executives and not raising their compensation. It is significant that the largest automobile company in the United

States recognizes that times of financial austerity are not the time for an increase in executive compensation. Attached as Exhibit A is a copy of the G.M. press release issued yesterday that discusses their reduction of executive compensation.

_____    2-7-06
Henry Reichard              Date

# News

FOR RELEASE: 2006-02-07

## GM Announces Additional Actions To Support North American Turnaround

**DETROIT** - General Motors Corp. (NYSE: GM) today announced significant new actions to support its ongoing turnaround plan, particularly in its North American business, to reduce costs and business risks, and to further enhance its financial flexibility.

These actions include the following:

- Revised health-care benefit plan for salaried retirees in the U.S. that is expected to reduce the company's liability by about $4.8 billion and its annual health-care expense by almost $900 million before tax;
- Planned restructuring of the U.S. salaried pension benefit plan;
- 50-percent reduction in the cash dividend paid to stockholders;
- Significant reduction in salary for GM's chairman and senior leadership team;
- 50-percent reduction in compensation for outside board members.

"These are difficult decisions that involve sacrifices by our employees, stockholders, retirees, and the senior leadership team," GM Chairman and Chief Executive Officer Rick Wagoner said. "However, we are confronting a dramatic change in our industry and in the global competitive environment, and that requires us to look for additional ways to reduce financial risk and improve our competitiveness for the long term."

Wagoner said the actions announced today further support the ongoing implementation of GM's North American turnaround plan.

"We are now aggressively implementing a solid plan to turn around the North American business and restore overall profitability as quickly as possible," Wagoner said. "It includes plans to grow our revenue base with great cars and trucks and the right marketing strategies - and I have great confidence that we are moving quickly in the right direction here. We also have a clear plan to address our costs, especially in areas where we are not competitive - our structural costs, and health-care and legacy costs."

GM previously announced plans to reduce its North American structural costs by $6 billion on a running-rate basis by the end of 2006, and further plans to reduce its annual net material costs by $1 billion. GM signed a historic agreement with the UAW in October and announced a capacity reduction plan in November that included ceasing operations at nine assembly, stamping and powertrain facilities. Additionally, an aggressive target was recently announced to reduce global structural costs to 25 percent of automotive revenue by 2010 from the 2005 level of about 34 percent on a global basis.

"Our plan is focused on setting us up to be competitive for years to come, and to achieve strong business results - in revenue, income, and cash flow," Wagoner said. "We need to improve our liquidity and our balance sheet, and to reduce risks to our business and financial viability going forward. And while the steps we've announced previously are big, we said at the time we would be doing more. The next steps are today's announced actions."

**SALARIED RETIREE HEALTH CARE**

General Motors today advised its U.S. salaried employees, who are eligible for retirement health-care coverage, of changes to their retiree health-care benefits.

GM will cap its contributions to salaried retiree health-care at the level of its 2006 expenditures. The cap will take effect beginning Jan. 1, 2007. This affects those employees and retirees who are eligible for the salaried post-retirement health-care benefit, their surviving spouses and their eligible dependents. Salaried employees who were hired after Jan. 1, 1993, are not eligible for retiree health-care benefits, so they are not affected by these changes.

When average costs exceed established limits following 2006, additional plan changes that affect cost-sharing features of program coverage will occur, effective with the start of the next calendar year. Program changes may include, but are not limited to, higher monthly contributions, deductibles, coinsurance, out-of-pocket maximums and prescription drug payments. Plan changes may be implemented in medical, dental, vision, and prescription drug plans.

"This is a difficult but necessary decision, and it was made only after the greatest deliberation," said Wagoner. "A number of other U.S. companies have already taken similar action in the face of these rising costs and increasing global competition. In particular, U.S. health-care costs continue to rise at high rates. When these benefits were conceived decades ago, no one could have foreseen the explosive cost inflation that we have been experiencing in recent years. These costs are simply not sustainable."

The adjustments are projected to reduce GM's retiree health-care (OPEB) liabilities by approximately $4.8 billion and cut GM's annual retiree health-care expense by approximately $900 million on a full-year pre-tax basis. The majority of the OPEB liability reduction and related expense would accrue to GM's North American automotive operations. Cash savings will be limited initially, but GM expects that cash savings from this action will grow to about $200 million within five years, and then continue to increase after that.

### ADDITIONAL SALARIED BENEFIT CHANGES PLANNED

In addition to the health care benefit changes announced today, GM is currently evaluating ways to restructure its U.S. salaried pension benefits.

"We have decided to substantially alter the pension benefits for current U.S. salaried employees so that we can provide a competitive and fair benefit but also reduce the financial risks to GM," Wagoner said. "While we will announce specific details early next month, we intend to freeze accrued benefits in the current plan and implement a new plan for future accruals which could include a defined contribution or cash balance plan."

Wagoner said the pension plan changes would not affect current retirees or surviving spouses who are drawing benefits from the Salaried Retirement Program.

### QUARTERLY DIVIDEND

The GM Board of Directors declared a quarterly cash dividend of $0.25 per share, payable on March 10, 2006 to holders of record as of Feb. 16, 2006. The dividend had been $0.50 per share, per quarter, since the first quarter of 1997.

"While GM believes it has adequate cash to fund its turnaround initiatives, it is essential that we stay focused on enhancing our liquidity and financial flexibility," said Wagoner. The change in the dividend rate would reduce GM's cash outlay by about $565 million on an annualized basis.

### EXECUTIVE AND BOARD COMPENSATION REDUCTIONS

GM senior leadership team will reduce its salaries as follows:

50 percent reduction for Wagoner; 30 percent reduction for vice chairmen John Devine, Bob Lutz and Fritz Henderson; 10 percent reduction for Executive Vice President and General Counsel Thomas Gottschalk.

Additionally, there were no annual or long-term cash incentive awards paid to GM's global executives for the 2005 performance year.

"While our 'pay-for-performance' executive compensation system is already structured to significantly reduce total compensation when our business performance and stock price are underperforming, we all agreed that this is the right step to take at this time," Wagoner said.

The Board of Directors voluntarily reduced board member compensation by 50 percent. Non-employee directors will forgo cash compensation and will retain some of the stock portion of their annual retainer.

General Motors Corp., the world's largest automaker, has been the global industry sales leader for 75 years. Founded in 1908, GM today employs about 327,000 people around the world. With global headquarters in Detroit, GM manufactures its cars and trucks in 33 countries. In 2005, 9.17 million GM cars and trucks were sold globally under the following brands: Buick, Cadillac, Chevrolet, GMC, GM Daewoo, Holden, HUMMER, Opel, Pontiac, Saab, Saturn and Vauxhall. More information on GM can be found at www.gm.com.

*Forward-looking Statements*

*In this press release and in related comments by General Motors' and General Motors Acceptance Corporation's management, the use of the words "expect," "anticipate," "estimate," "forecast," "initiative," "objective," "plan," "goal," "project," "outlook," "priorities," "target," "intend," "evaluate," "pursue," "seek," "may," "would," "could," "should," "believe," "potential," "continue," "designed," "impact," or the negative of any of those words or similar expressions is intended to identify forward-looking statements. All statements in this press release and in related comments, other than statements of historical fact, including without limitation, statements about future events and financial performance, are forward-looking statements that involve certain risks and uncertainties.*

*While these statements represent our current judgment on what the future may hold, and we believe these judgments are reasonable, these statements are not guarantees of any events or financial results, and GM's actual results may differ materially due to numerous important factors that are described in GM's most recent report on SEC Form 10-K, which may be revised or supplemented in subsequent reports on SEC Forms 10-K, 10-Q and 8-K. Such factors include, among others, the following: the ability of GM to realize production efficiencies, to achieve reductions in costs as a result of the turnaround restructuring, to achieve reductions in health care and pension costs and to implement capital expenditures at levels and times planned by management; the amount and rate of employee attrition, the pace of product introductions; market acceptance of the corporation's new products; significant changes in the competitive environment and the effect of competition in the corporation's markets, including on the corporation's pricing policies; our ability to maintain adequate financing sources and an appropriate level of debt; restrictions on GMAC's and Residential Capital Corporation (ResCap)'s ability to pay dividends and prepay subordinated debt obligations to us; changes in the existing, or the adoption of new, laws, regulations, policies or other activities of governments, agencies and similar organizations where such actions may affect the production, licensing, distribution or sale of our products, the cost thereof or applicable tax rates; costs and risks associated with litigation; the final results of investigations by the SEC; changes in our accounting principles, or their application or interpretation, and our ability to make estimates and the assumptions underlying the estimates, which could result in an impact on earnings; changes in relations with unions and employees/retirees and the legal interpretations of the agreements with those unions with regard to employees/retirees; labor strikes or work stoppages at GM or at key suppliers such as Delphi Corp.; additional credit rating downgrades; the impact of a potential sale or other extraordinary transaction involving GMAC on the results of GM's and GMAC's operations and liquidity; other factors impacting financing and insurance operating segments' results of operations and financial condition such as credit ratings, adequate access to the market, changes in the residual value of off-lease vehicles, changes in U.S. government-sponsored mortgage programs or disruptions in the markets in which our mortgage subsidiaries operate, and changes in our contractual servicing rights; shortages of and price increases for fuel; and changes in economic conditions, commodity prices, currency exchange rates or political stability in the markets in which we operate.*

*In addition, GMAC's actual results may differ materially due to numerous important factors that are described in GMAC's most recent report on SEC Form 10-K, which may be revised or supplemented in subsequent reports on SEC Forms 10-K, 10-Q and 8-K. Such factors include, among others, the following: the ability of GM, to complete a transaction with a strategic investor regarding a controlling interest in GMAC while maintaining a significant stake in GMAC, securing separate credit ratings and low cost funding to sustain growth for GMAC and ResCap and maintaining the mutually beneficial relationship between GMAC and GM; significant changes in the competitive environment and the effect of competition in the corporation's markets, including on the corporation's pricing policies; our ability to maintain adequate financing sources; our ability to maintain an appropriate level of debt; the profitability and financial condition of GM, including changes in production or sales of GM vehicles, risks based on GM's contingent benefit guarantees and the possibility of labor strikes or work stoppages at GM or at key suppliers such as Delphi Corp.; funding obligations under GM and its subsidiaries' qualified U.S. defined benefits pension plans; restrictions on ResCap's ability to pay dividends and prepay subordinated debt obligations to us; changes in the residual value of off-lease vehicles; changes in U.S. government-sponsored mortgage programs or disruptions in the markets in which our mortgage subsidiaries operate; changes in our contractual servicing rights; costs and risks associated with litigation; changes in our accounting assumptions that may require or that result from changes in the accounting rules or their application, which could result in an impact on earnings; changes in the credit ratings of GMAC or GM; the threat of natural calamities; changes in economic conditions, currency exchange rates or political stability in the markets in which we operate; and changes in the existing, or the adoption of new, laws, regulations, policies or other activities of governments, agencies and similar organizations.*

*Investors are cautioned not to place undue reliance on forward-looking statements. GM undertakes no obligation to update publicly or otherwise revise any forward-looking statements, whether as a result of new information, future events or other such factors that affect the subject of these statements, except where expressly required by law.*

*Use of the term "loans" describes products associated with direct and indirect lending activities of GMAC's global operations. The specific products include retail installment sales contracts, loans, lines of credit, leases or other financing products. The term "originate" refers to GMAC's purchase, acquisition or direct origination of various "loan" products.*

###

# Kennedy, Jennik & Murray, PC

113 University Place
New York, NY 10003
Ph: 212-358-1500
Fx: 212-358-0207

Thomas M. Kennedy
Susan M. Jennik
Thomas M. Murray

Of Counsel:
Larry Magarik

Elizabeth M. Pilecki (NJ,MA)
Rachel A. Kirtner (OR)
Richard A. Maroko
Omar A. Joseph (MA only)

## *facsimile transmission*

Date: February 8, 2006

To: Hanan B. Kolko, Esq., 239-1311

From: Edward W. Logue

* * * COMMENTS * * *

We're not connected to the Internet right now – problem with our equipment. Meanwhile, here's a fax of the document.

– Ed Logue

Total pages: 9
Hard copy will not follow.

The information contained in this fax message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and as such is privileged and confidential. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us by mail. Thank you.