**Objections Due: February 27, 2006 at 4:00 p.m.**

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
    In re                      :   Chapter 11
                                              :
DELPHI CORPORATION, et al.,   :   Case No. 05-44481 (RDD)
                                              :
               Debtors.   :   (Jointly Administered)
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(a), 328(a), AND
1107(b) AUTHORIZING EMPLOYMENT AND RETENTION OF
KPMG LLP AS TAX AND TRANSACTION SERVICES ADVISORS
<u>TO DEBTORS, EFFECTIVE NUNC PRO TUNC TO OCTOBER 8, 2005</u>

("KPMG RETENTION APPLICATION")

       Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this application (the "Application") for entry of an order under 11 U.S.C.

§§ 327(a), 328(a), and 1107(b) and Fed. R. Bankr. P. 2014 authorizing the employment and

retention of KPMG LLP ("KPMG") as tax and transaction services advisors to the Debtors,

effective <u>nunc</u> <u>pro</u> <u>tunc</u> to October 8, 2005.  In support of this Application, the Debtors submit

the Affidavit of Patrick N. Karpen, sworn to February 9, 2006 (the "Karpen Affidavit").  In

further support of this Application, the Debtors respectfully represent as follows:

<u>Background</u>

A.      <u>The Chapter 11 Filings</u>

1.      On October 8, 2005 (the "Petition Date"), 39 of 42 Debtors, and on October

14, 2005, the remaining Debtors, filed voluntary petitions in this Court for reorganization relief

under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the

"Bankruptcy Code").  The Debtors continue to operate their businesses and manage their

properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.  This Court entered orders directing the joint administration of the Debtors' chapter 11

cases (Docket Nos. 28 and 404).

2.      On October 17, 2005, the Office of the United States Trustee (the "U.S.

Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").

No trustee or examiner has been appointed in the Debtors' cases.

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

4.      The statutory predicates for the relief requested herein are sections 327(a),

328(a), and 1107(b) of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules").

B.      <u>Current Business Operations Of The Debtors</u>

5.      With more than 180,000 employees worldwide, global 2004 revenues of

approximately $28.6 billion, and global assets as of August 31, 2005 of approximately $17.1

billion,[1] Delphi ranks as the fifth largest public company business reorganization in terms of

revenues, and the thirteenth largest public company business reorganization in terms of assets.

Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations

without supervision from the Bankruptcy Court, and will not be subject to the chapter 11

requirements of the U.S. Bankruptcy Code.

      6.    Over the past century, the operations which are now owned by Delphi have

become a leading global technology innovator with significant engineering resources and

technical competencies in a variety of disciplines.  Today, the Company (as defined below) is

arguably the single largest global supplier of vehicle electronics, transportation components,

integrated systems and modules, and other electronic technology.  The Company's technologies

and products are present in more than 75 million vehicles on the road worldwide.  The Company

supplies products to nearly every major global automotive original equipment manufacturer with

2004 sales to its former parent, General Motors Corporation ("GM"), equaling approximately

$15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation,

Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

      7.    As part of its growth strategy, Delphi has established an expansive global

presence with a network of manufacturing sites, technical centers, sales offices, and joint

ventures located in every major region of the world.  In the U.S., the Debtors employ

approximately 50,600 people.  Those employees work in approximately 44 manufacturing sites

and 13 technical centers across the country, and in Delphi's worldwide headquarters and

customer center located in Troy, Michigan.  Approximately 34,750 of these individuals are

hourly employees, 96% of whom are represented by approximately 49 different international and

---

[1]    The aggregated financial data used in this Application generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

local unions.  Outside the United States, the Company's foreign entities employ more than

134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40

countries worldwide.

8.   Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary

of GM.  Prior to January 1, 1999, GM conducted the Company's business through various

divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions

and subsidiaries were transferred to Delphi and its subsidiaries and affiliates (collectively, the

"Company") in accordance with the terms of a Master Separation Agreement between Delphi

and GM.  In connection with these transactions, Delphi accelerated its evolution from a North

American-based, captive automotive supplier to a global supplier of components, integrated

systems, and modules for a wide range of customers and applications.  Although GM is still the

Company's single largest customer, today more than half of Delphi's revenue is generated from

non-GM sources.

9.   Due to the significant planning that goes into each vehicle model, Delphi's

efforts to generate new business do not immediately affect its financial results, because supplier

selection in the auto industry is generally finalized several years prior to the start of production

of the vehicle.  When awarding new business, which is the foundation for the Company's

forward revenue base, customers are increasingly concerned with the financial stability of their

supply base.  The Debtors believe that they will maximize stakeholder value and the Company's

future prospects if they stabilize their businesses and continue to diversify their customer base.

The Debtors also believe that this must be accomplished in advance of the expiration of certain

benefit guarantees between GM and certain of Delphi's unions representing most of its U.S.

hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C.      Events Leading To Chapter 11 Filing

        10.     In the first two years following Delphi's separation from GM, the Company generated more than $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales.  Reflective of a downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005. The Company experienced net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[2]

        11.     The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance:  (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

        12.     In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward looking revenue requirements.  Having concluded that

---

[2]       Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

pre-filing discussions with its unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

13.    Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses.  This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned in the Company's transformation plan.  The Debtors believe that a substantial segment of Delphi's U.S. business operations must be divested, consolidated, or wound-down through the chapter 11 process.

14.    Upon the conclusion of this process, the Debtors expect to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

<u>Relief Requested</u>

15.    By this Application, the Debtors request authorization to employ and retain KPMG as one of their tax and transaction services advisors in these chapter 11 cases, effective

nunc pro tunc to October 8, 2005.  Specifically, the Debtors respectfully request entry of an order

under sections 327(a), 328(a), and 1107(b) of the Bankruptcy Code and Bankruptcy Rule 2014

authorizing KPMG to perform tax advisory and consulting services that will be necessary during

these chapter 11 cases, as described below and in accordance with the terms of the following

engagement letters:

- the engagement letter for international tax process improvement project assistance dated May 24, 2005 and attached hereto as Exhibit A (the "International Project Engagement Letter"), as revised by an engagement letter dated August 31, 2005 and amended on September 12, 2005, attached hereto as Exhibit B (the "Revised International Project Engagement Letter");

- the engagement letter for certain tax consulting services dated March 1, 2005, as amended by letter dated May 23, 2005, attached hereto as Exhibit C (the "Tax Consulting Engagement Letter");

- the engagement letter for international executive services dated October 5, 2004, as amended on November 3, 2004, attached hereto as Exhibit D (the "IES Engagement Letter"); and

- the engagement letter for acquisition and due diligence services dated January 23, 2006 and attached hereto as Exhibit E (the "Master Services Engagement Letter").

The International Project Engagement Letter, the Revised International Project Engagement

Letter, the Tax Consulting Engagement Letter, the IES Engagement Letter, and the Master

Services Engagement Letter hereinafter are referred to collectively as the "Engagement Letters."

Scope Of Services

16.    In accordance with the Engagement Letters, KPMG will provide such tax

advisory and consulting services as KPMG and the Debtors deem appropriate and feasible in

order to advise the Debtors and their subsidiaries and affiliates in the course of these chapter 11

cases, including, but not limited to, the following:

(a)    Tax Advisory and Consulting Services

i.    review of and assistance in the preparation and filing of any tax returns;

ii.   advice and assistance to the Debtors regarding tax planning issues, including but not limited to assistance in estimating net operating loss carryforwards, international taxes, and state and local taxes;

iii.  assistance regarding transaction taxes and state and local sales and use taxes;

iv.   assistance regarding tax matters related to the Debtors' pension plans;

v.    assistance regarding real and personal property tax matters, including but not limited to review of real and personal property tax matters, negotiation of values with appraisal authorities, preparation and presentation of appeals to local taxing jurisdictions, and assistance in litigation of property tax appeals;

vi.   assistance regarding any existing or future Internal Revenue Service ("IRS"), state, and/or local tax examinations;

vii.  advice and assistance on the tax consequences of proposed plans of reorganization, including but not limited to assistance in the preparation of IRS ruling requests regarding the future tax consequences of alternative reorganization structures;

viii. assistance to the Debtors in modifying the Debtors' tools and processes for collecting data from the Debtors' foreign operations in support of the computation of an income tax provision;

ix.   serve as the Debtors' VAT representative in certain foreign jurisdictions; and

x.    other consulting, advice, research, planning, or analysis regarding tax issues as may be requested from time to time.

(b)   International Executive Services Provided To The Debtors And Their Expatriates Assigned To And From The United States, Expatriates Assigned To And From Non-U.S. Countries, Employees Assigned To The Mexican Border, And Trainees/J Visa holders

i.    collect tax data;

ii.   calculate annual hypothetical tax withholdings;

iii.  prepare required home and host country individual income tax returns during, and one year after, assignment;

iv.   prepare requests for extension of time to file tax return(s) where required;

v.   prepare U.S. estimated tax vouchers, if required;

vi.   prepare year-end withholding calculations;

vii.   reconcile tax advance accounts;

viii.   prepare tax equalization calculations;

ix.   conduct pre-departure and/or post-arrival tax consultations, as requested;

x.   determine and arrange for timely payment of local taxes in the host countries, where applicable;

xi.   conduct repatriation tax consultation sessions for expatriates;

xii.   handle routine correspondence with the IRS and foreign tax authorities, including review of tax assessments; and

xiii.   additional services as requested by the Debtors or its counsel to assist the Debtors regarding its expatriate employees.

(c)   <u>Transaction Advisory & Other Services</u>

i.   provide sell-side due diligence services associated with the potential sale of certain businesses or assets of the Debtors;

ii.   provide buy-side due diligence services associated with the potential acquisition of certain businesses or assets by the Debtors;

iii.   provide accounting advice and assistance in conjunction with the preparation of financial information for the Debtors' business operations, as specified by the Debtors; and

iv.   other such functions as requested by the Debtors or its counsel to assist the Debtors in their businesses and reorganization.

17.   The services to be provided by KPMG to the Debtors will not unnecessarily be duplicative of those provided by any other of the Debtors' professionals, and KPMG will coordinate any services performed at the Debtors' request with the Debtors' other professionals,

including financial advisors, accountants, and counsel, as appropriate, to avoid duplication of efforts.

18.    Subject to this Court's approval of this Application, KPMG is willing to serve as one of the Debtors' tax and transaction services advisors and to perform the services described in the Engagement Letters on the terms set forth therein.

## Qualifications Of Professionals

19.    The Debtors have selected KPMG as one of their tax and transaction services advisors because of the firm's diverse experience and extensive knowledge in the fields of accounting and taxation.

20.    The Debtors have employed KPMG as tax and transaction services advisors since 1999.  By virtue of its prior engagements, KPMG has developed a significant amount of institutional knowledge regarding the Debtors' books, records, financial information, and other data maintained by the Debtors.  Such experience and knowledge will be valuable to the Debtors in their efforts to reorganize.  Accordingly, the Debtors wish to retain KPMG to provide assistance during these chapter 11 cases.

21.    The services of KPMG are deemed necessary to enable the Debtors to maximize the value of their estates and to reorganize successfully.  Further, KPMG is well-qualified and able to represent the Debtors in a cost-effective, efficient, and timely manner.

## Disinterestedness Of Professionals

22.    The Karpen Affidavit filed in support of this Application contains information available to date on KPMG's connections with other parties-in-interest, as required by Bankruptcy Rule 2014(a).  Based on the information in the Karpen Affidavit, which is incorporated herein by reference, the Debtors submit that KPMG and the professionals in the

firm are "disinterested persons," as that term is used in section 101(14) of the Bankruptcy Code, and are otherwise eligible to be retained under section 327(a) of the Bankruptcy Code.

Professional Compensation

23.    Subject to this Court's approval and pursuant to the terms and conditions of the Engagement Letters, KPMG's requested compensation for professional services rendered to the Debtors will be based upon the hours actually expended by each assigned staff member at each staff member's hourly billing rate, except as noted below.

24.    In the normal course of business, KPMG revises its hourly rates on October 1st of each year.  Subject to this Court's approval, KPMG requests that the rates listed below be revised to the hourly rates that will be in effect at such time.  The hourly rates for the tax advisory and consulting services to be rendered by KPMG, as set forth in the Tax Consulting Engagement Letter and the International Project Engagement Letter and Revised International Project Engagement Letter, are as follows:

| *Tax Advisory and Consulting Services:* | *Hourly Rates:* |
|---|---|
| Partners | $350 - $425 |
| Senior Managers | $325 - $375 |
| Managers | $300 - $325 |
| Senior Staff | $225 |
| Staff | $175 |

25.    The rates for the international executive services to be rendered by KPMG, as set forth in the IES Engagement Letter, are as follows:

| *International Executive Services:* | *Flat Rates Per Debtors' Employee:* |
|---|---|
| Expatriates assigned to the U.S. | $1,750 |
| Expatriates assigned from the U.S. | $2,700 |
| Expatriates assigned to/from non-U.S. countries | $2,100 |

| | |
|---|---|
| Employees assigned to the Mexican border | $750 |
| Trainees/J Visa Holders | $375 |

|  | ***Additional Hourly Rates (as applicable):*** |
|---|---|
| Partners | $760 |
| Senior Managers | $520 |
| Managers | $405 |
| Senior Staff | $320 |
| Staff | $260 |

26.     KPMG has agreed to charge the Debtors a maximum of 70% of the additional hourly rates set forth above, as described in the IES Engagement Letter.  As further set forth in the IES Engagement Letter, additional fees for monthly payroll assistance, amended returns, and clearance certificates have varying rates.

27.     The range of hourly rates for the transactions services to be rendered by KPMG is as follows:

| ***Transaction Services:*** | ***Hourly Rates:*** |
|---|---|
| Partners | $340 - $925 |
| Directors | $270 - $630 |
| Managers | $220 - $575 |

28.     KPMG also will seek reimbursement of incurred necessary expenses such as travel, photocopying, delivery service, postage, vendor charges, and other out-of-pocket expenses incurred in providing professional services.  KPMG will seek such reimbursements in accordance with guidelines established by the U.S. Trustee.

29.     KPMG intends to apply to this Court for compensation and reimbursement of expenses in accordance with section 330(a) of the Bankruptcy Code, the Bankruptcy Rules,

the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of

New York (the "Local Rules"), guidelines established by the U.S. Trustee, and orders of this

Court.  KPMG acknowledges that all compensation will be subject to this Court's review and

approval after notice and a hearing.  KPMG has agreed to accept as compensation such sums as

may be allowed by this Court.

30.    KPMG has received a retainer in connection with the services to be

performed under the Engagement Letters.  KPMG intends to request that the unapplied residual

retainer, which is estimated to total $79,962.50, be applied to the amount that KPMG seeks in its

first interim fee application.  The proposed order provides that any party-in-interest will have the

right to raise the issue of the application of KPMG's prepetition retainer to postpetition fees and

expenses.  During the 90 days prior to the Petition Date, KPMG received approximately

$3,777,868 in fees and expenses from the Debtors.

31.    The Debtors believe that KPMG's fees are fair and reasonable in light of

industry practice, market rates both in and out of chapter 11 proceedings, KPMG's experience in

reorganizations, and KPMG's importance to these cases.

<u>Sub-Contracting Services to KPMG Member Firms</u>

32.    The KPMG global network encompasses independent professional services

practices conducted by separate legal entities throughout the world.  KPMG International, a

Swiss cooperative, serves as a coordinating entity for a network of member firms operating

under the KPMG name.  KPMG International is a member-based entity with no shareholders and

no permanent capital.  Each of the member firms of KPMG International ("KPMG Member

Firms") is separate and legally distinct.  KPMG is the United States member firm of KPMG

International.

33.    As described in greater detail in the Karpen Affidavit, prior to the Petition

Date, KPMG subcontracted with certain other KPMG Member Firms to provide services under

the Engagement Letters to the Debtors.  At the Debtors' request, KPMG has continued and,

subject to this Court's order, will continue to subcontract with KPMG Member Firms to provide

services set forth in the Engagement Letters.  KPMG will remain fully and solely responsible for

all liabilities and obligations under the Engagement Letters, regardless of whether services to be

performed under the Engagement Letters are undertaken by KPMG (or an affiliate thereof) or

any KPMG Member Firm, and the Debtors will have no recourse, and will bring no claim,

against any KPMG Member Firm other than KPMG, or against any of their subcontractors,

members, shareholders, directors, officers, managers, partners, agents, representatives, or

employees (or any of their respective successors or permitted assigns), or any of their respective

assets, with respect to the services provided pursuant to the Engagement Letters or otherwise

under the Engagement Letters.

34.    The Debtors believe that having KPMG Member Firms assist KPMG in the

provision of services has been, and will continue to be, beneficial to the estate.  Through a

coordinated approach to the provision of professional services, KPMG and the other KPMG

Member Firm(s) providing services under the Engagement Letters (the "Engagement Member

Firms") have provided, and will continue to provide, quality and efficiency to the Debtors.

Furthermore, having KPMG serve as the clearinghouse for invoices submitted by the

Engagement Member Firms will be more convenient to the Debtors by allowing billing to be

centralized through a single invoice that settles budgeting and foreign currency issues.  KPMG

submits that this subcontracting arrangement is far more beneficial to and conservative of estate

resources than would be the case if each KPMG Member Firm were required to seek separate

14

retention by the Debtors.  Although the KPMG Member Firms are not undertaking full-fledged

connections checks under this arrangement, no bankruptcy policies should be offended because

their work has little or no relationship to the administration of these chapter 11 cases.

35.    KPMG will pay such Engagement Member Firms directly for their services,

and will apply to the Court for reimbursement by the Debtors of any such payments made by

KPMG to the Engagement Member Firms.  This Application therefore requests approval of an

exception for the KPMG Member Firms (other than KPMG) providing services to the Debtors

under the Engagement Letters to use category codes to describe the services rendered, rather than

the more detailed descriptions usually required for fee applications.

Nunc Pro Tunc Relief Requested

36.    Pursuant to the Debtors' request and due to exigent circumstances, KPMG

commenced this engagement immediately and with assurances that the Debtors would seek

approval of its employment nunc pro tunc to October 8, 2005.

37.    Based upon the foregoing, the Debtors submit that cause exists to

authorize the retention of KPMG nunc pro tunc to October 8, 2005.

Dispute Resolution Procedures

38.    Pursuant to the Engagement Letters, the Debtors and KPMG have agreed

that any dispute or claim between KPMG and the Debtors arising out of or relating to the

Engagement Letters or any other services provided by or on behalf of KPMG to the Debtors or at

the Debtors' request (including any dispute or claim involving any person or entity for whose

benefit the services in question are or were provided) will be resolved in accordance with the

dispute resolution procedures as set forth in the Engagement Letters (the "Dispute Resolution

15

Procedures").  KPMG has acknowledged in the Karpen Affidavit that, notwithstanding the

Dispute Resolution Procedures, any dispute or claim also may be resolved before this Court.

39.    Pursuant to the Dispute Resolution Procedures, any party may request

mediation of a dispute by a written request to the other party for mediation.  KPMG and the

Debtors may use arbitration for (a) any dispute not resolved by mediation 90 days after the

issuance of a written request for mediation, or (b) any dispute in which a party declares, more

than 30 days after receipt of a written request for mediation, that mediation is an inappropriate

means to resolve such dispute and such party initiates a request for arbitration.  The arbitration

will be conducted before a panel of three arbitrators, which will issue its final award in writing

and have no power to award non-monetary or equitable relief of any sort.  Discovery will be

permitted in connection with the arbitration only to the extent expressly authorized by the

arbitration panel upon a showing of substantial need.  The award reached at the end of arbitration

will be binding on the parties, and confirmation of the arbitration award may be sought in any

court having jurisdiction.

<u>Indemnification</u>

40.    Pursuant to the Tax Consulting Engagement Letter, the International Project

Engagement Letter, the Revised International Project Engagement Letter, and the IES

Engagement Letter, subject to the terms of the proposed order, the Debtors will indemnify,

defend, and hold harmless KPMG, including its directors, officers, employees, agents, and

representatives, from and against any and all claims, demands, actions, damages, liabilities,

costs, and expenses, including reasonable attorney fees and expenses, to the extent arising out of

or resulting from third party claims against KPMG based on any of KPMG's written or verbal

work product prepared pursuant to the Tax Consulting Engagement Letter, the International

Project Engagement Letter, the Revised International Project Engagement Letter, and the IES

Engagement Letter and furnished by KPMG to the Debtors for internal use (collectively, the

"Internal Work Product Claims").  In addition, the Debtors shall indemnify, defend, and hold

harmless KPMG, including its directors, officers, employees, agents, and representatives, from

and against any and all claims, demands, actions, damages, liabilities, costs, and expenses,

including reasonable attorney fees and expenses, to the extent arising out of or resulting from

third party claims against KPMG based on any activities of KPMG in connection with the

performance of services under the Tax Consulting Engagement Letter, the International Project

Engagement Letter, the Revised International Project Engagement Letter, and the IES

Engagement Letter (collectively, the "Non-Work Product Claims"); provided, however, that the

Debtors will have no obligation to indemnify KPMG to the extent that any Non-Work Product

Claims arise out of or result from the negligence, illegal acts, or willful misconduct of KPMG

and/or its directors, officers, employees, agents, or representatives.

   41. Pursuant to the Tax Consulting Engagement Letter, the International Project

Engagement Letter, the Revised International Project Engagement Letter, and the IES

Engagement Letter, subject to the terms of the proposed order, KPMG will indemnify, defend,

and hold harmless the Debtors, including their directors, officers, employees, agents, and

representatives, from any and all claims, demands, actions, damages, liabilities, costs, and

expenses, including reasonable attorney fees and expenses, to the extent arising out of or

resulting from the negligence, illegal acts, or willful misconduct of KPMG and/or its directors,

officers, employees, agents, or representatives in connection with the performance of services

under the Tax Consulting Engagement Letter, the International Project Engagement Letter, the

Revised International Project Engagement Letter, and the IES Engagement Letter; provided,

<u>however</u>, that KPMG will have no obligation to indemnify the Debtors to the extent that any

such claims or damages arise out of or result from Internal Work Product Claims.

42.    Pursuant to the Master Services Engagement Letter, subject to the terms of

the proposed order, the Debtors on the one hand, and KPMG on the other hand, each agrees to

indemnify, hold harmless, and defend the other from and against any and all liabilities for

physical injury to, or illness or death of, any person or persons regardless of status, and damage

to or destruction of any tangible property, that the other party may sustain or incur, to the extent

such liabilities result from the negligence or willful misconduct of the indemnifying party.  Also

pursuant to the Master Services Engagement Letter, subject to the terms of the proposed order,

the Debtors will indemnify, defend, and hold harmless KPMG from and against any and all

liabilities suffered by or asserted against KPMG in connection with a third party claim to the

extent resulting from such party's use or possession of or reliance upon KPMG's advice,

recommendations, information, or work product as a result of the Debtors' use or disclosure of

such advice, recommendations, information, or work product.

43.    The Debtors and KPMG seek, through the proposed order, to modify and

amend the Engagement Letters to the extent that KPMG will not be indemnified for claims

arising out of KPMG's own bad-faith, self-dealing, breach of fiduciary duty (if any), gross

negligence, or willful misconduct.

<u>Limitation On Liability</u>

44.    Pursuant to the Engagement Letters, KPMG's liability will be limited to

(a) $500,000 with respect to services performed under the Tax Consulting Engagement Letter,

(b) three times the professional fees paid under the International Project Engagement Letter and

Revised International Project Engagement Letter with respect to services performed thereunder,

and (c) two times the professional fees paid under the IES Engagement Letter and the Master

Services Engagement Letter with respect to services performed thereunder; provided, however,

that with respect to services provided under the Tax Consulting Engagement Letter, the

International Project Engagement Letter and Revised International Project Engagement Letter,

and the IES Engagement Letter, this limitation shall not apply (i) in the event of any breach

relating to proprietary information of the Debtors, or (ii) if KPMG is found to be grossly

negligent or to have acted willfully or fraudulently.  In no event will KPMG or the Debtors be

liable for consequential, special, indirect, incidental, punitive, or exemplary damages, costs,

expenses, or losses (including loss of profits, data, business, or goodwill), even if advised of the

likelihood of such damages.

45.    The Debtors and KPMG seek, through the proposed order, to modify and

amend the Engagement Letters to the extent that KPMG's limitation of liability will not apply to

claims arising out of KPMG's own bad-faith, self-dealing, breach of fiduciary duty (if any), gross

negligence, or willful misconduct.

<u>Conclusion</u>

46.    For the foregoing reasons, the Debtors submit that the relief requested

herein is in the best interests of the Debtors and their estates and creditors and should be

approved.

<u>Notice</u>

47.    Notice of this Application has been provided in accordance with the Order

Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014

Establishing (I) Omnibus Hearing Dates, (II) Certain Notice, Case Management, And

Administrative Procedures, And (III) Scheduling An Initial Case Conference In Accordance

19

With Local Bankr. R. 1007-2(e) entered by this Court on October 14, 2005 (Docket No. 245).  In

light of the nature of the relief requested, the Debtors submit that no other or further notice is

necessary.

<u>Memorandum Of Law</u>

48.    Because the legal points and authorities upon which this Application relies

are incorporated herein, the Debtors respectfully request that the requirement of the service and

filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order

(a) authorizing the Debtors to employ and retain KPMG as one of their tax and transaction

services advisors pursuant to the terms and conditions set forth in the Engagement Letters, as

modified and amended by the proposed order, effective <u>nunc</u> <u>pro</u> <u>tunc</u> to October 8, 2005, and

(b) granting such other and further relief as is just.

Dated:     New York, New York
           February 14, 2006


                                        DELPHI CORPORATION, on behalf of itself and
                                        certain of its subsidiaries and affiliates, as Debtors
                                        and Debtors-in-possession

                                        By:    /s/ John D. Sheehan
                                               Name: John D. Sheehan
                                               Title: Vice President and Chief Restructuring
                                                   Officer