# EXHIBIT A

## INTERNATIONAL PROJECT ENGAGEMENT LETTER

Oct-12-05    03:52pm    From-KPMG LLP - NDPPS                313 983 0500      T-330   P.002   F-405

**KPMG**

KPMG LLP
Suite 1200
150 West Jefferson
Detroit, MI 48226-4429

Telephone  313 983 0200
Fax        313 983 0008
           313 983 0007
           313 983 0008
Internet   www.us.kpmg.com

May 24, 2005

**PRIVATE**

Jennifer A. Williams
Director, Sarbanes-Oxley Compliance & Income Tax Accounting
Delphi Corporation
World Headquarters & Customer Center
M/C 483.400.141
5725 Delphi Drive
Troy, MI 48098

Re:   International Tax Process Improvement Project Engagement Letter

Dear Jennifer:

We are pleased you have engaged KPMG LLP ("KPMG") to conduct International Tax Process Improvement Project for Delphi Corporation ("Delphi"). This letter confirms the scope and related terms of your engagement of KPMG.

**Engagement Scope and Objectives**

As you have requested the objective of this engagement is to enhance the reliability and efficiency of the international tax reporting process. Based on our conversation with you and our past experience with similar projects, we have prepared a high-level project scope as following:

> Part I: Assessment and Planning
> > A. Tax Data Inventory Review
> > B. Tax Process Gap Analysis & Redesign
> Part II: Tool Configuration & Customization
> > A. Foreign Tax Package Customization
> > B. Foreign Tax Reporting Database Development
> Part III: Redesigned Process Implementation
> > A. Foreign Tax Package Collection Training and Rollout
> > B. Foreign Subsidiary Book / Tax Basis Balance Sheet Compilation
> Part IV: Post-Implementation Assessment

The project components are described in more detail below.

KPMG LLP, a U.S. limited liability partnership, is the U.S.
member firm of KPMG International, a Swiss cooperative.

Oct-12-05    03:52pm    From-KPMG LLP - NDPPS                319 999 0590        T-336    P.003    F-465



Page 2
Jennifer A. Williams
Delphi Corporation
May 24, 2005


**Part I: Assessment and Planning**

The objective of Assessment and Planning phase is to understand the current tax process at
Delphi, conduct a gap analysis on existing data and tools, and to design a work plan for the rest
of the tax improvement project. In this phase, KPMG will:

- Conduct interviews with the appropriate tax and IT resources to:
    – Understand the data, functionalities and processes for the current foreign tax package;
    – Understand at a high-level other tax department processes associated with the current
      foreign tax package;
    – Conduct data inventory of available foreign tax attributes and balance sheet data.
    – Identify and prioritize the gaps in the required tax data for the future foreign tax package;
- Document the anticipated future Foreign Tax Package and Foreign Tax Reporting Database
  organized by major data elements and functionalities.
- Document the anticipated future Tax Reporting Process and implementation plan.

**Part II: Tool Customization and Development**

Based on the results from Assessment and Planning, KPMG will customize and/or develop tools
to be deployed in the redesigned international tax reporting process. In this phase, KPMG will:

- Customize KPMG's own Microsoft Excel-based Foreign Tax Reporting Package ("Tax
  Pack") to meet the data requirements captured in Assessment and Planning.
- Tailor the Tax Pack instructions to meet Delphi-specific requirements.
- Change or create design of a Foreign Tax Reporting Database ("Database") that will:
    – Automatic capture and aggregation of Tax Packs
    – Facilitate generation of summary and exception reports
    – Serve as the data mart for historical book / tax basis balance sheet and other tax attributes
- Coordinate programming the new Tax Database with Delphi IT resources;

**Part III: Redesigned Process Implementation**

Upon completion of customizing and developing the tools, KPMG will assist Delphi in
deploying and using the new tools and processes in collecting foreign tax data. In this phase
KPMG will:

- Serve as a part of Program Management Office (PMO) in the rollout of new tools and
  processes.
- Conduct training of the Delphi's foreign offices on Tax Pack.
- Support the foreign offices to complete the Tax Packs via foreign KPMG network.
- Monitor and review Tax Pack collection

Oct-12-05  03:53pm  From-KPMG LLP - NDPPS              313 983 0600        T-330  P.004/017  F-405
06/01/2005  16:53      248-813-3381              DELPHI TREASURY              PAGE  04/17



*Page 3*
*Jennifer A. Williams*
*Delphi Corporation*
*May 24, 2005*

- Assist Delphi in compiling of Tax Packs into Tax Database.
- Assist Delphi in creating their book/tax basis balance sheet using Tax Database

**Part IV: Post-Implementation Assessment**

Upon completion of the new Tax Reporting Process, KPMG will work with Delphi tax users to conduct a Post-Implementation Assessment which will help identify any problems with redesigned processes and develop a plan for additional enhancement in future years.

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**Engagement Team**

The project will be performed by a multidisciplinary team of KPMG professionals who have extensive experience with tax provision, international tax and tax operations.

**Anthony Alexandrou,** Partner in International Tax, will be responsible for the overall success of the project.
**Brad Brown,** Partner in KPMG's Client Tax Operations Services, will serve as the engagement partner with the focus on assessment and process redesign.
**Andrew Hwang,** Senior Manager in Client Tax Operations Services, will serve as the overall engagement manager responsible for the day-to-day activities of the project, with focus on technology tools.
**Frank Schaefer,** Manager in International Tax, will work with Brad and Andrew, with the focus on tax data inventory and implementation.
**Patrick Karpen,** Tax Service Partner for Delphi, will ensure the continuity of overall tax services for Delphi and appropriate level of resource deployment.
**Ashby Corum,** Senior Manager in Federal Tax, will work with Frank, with the focus on implementation.

**Limitation to Engagement Services**

KPMG's services are intended to assist Delphi in modifying Delphi's tools and processes for collecting data from Delphi's foreign operations in support of the computation of an income tax provision. Delphi management is ultimately responsible for ensuring the necessary financial and tax information are collected from its foreign operations.

KPMG's services do not include assisting directly Delphi's management in establishing and supporting its current and deferred income taxes and financial statement disclosures. KPMG is not assuming responsibility for management analysis or decision-making with respect to the application of any accounting principle to the income tax provision, related financial statement disclosures and balance sheet accounts, such as determining the necessity or amount of a valuation allowance or tax contingency reserve. Delphi is to consult with their independent auditor on the application of accounting principles.



Page 4
Jennifer A. Williams
Delphi Corporation
May 24, 2005

In this engagement, KPMG assumes no responsibility for auditing information provided by Delphi management or Delphi foreign operations. KPMG also assumes no responsibility for expressing an opinion on any part of Delphi's financial statements. Those are the sole responsibility of Delphi's independent auditor.

**Engagement Fees & Terms**

Our professional fees to conduct the Tax Process Improvement Project discussed above are based on a number of factors, including the level and time commitment of professional personnel assigned to the engagement. We will bill for actual hours. The billing rates for various professional levels will not exceed:

| Professional Level | Billing Rate |
|---|---|
| Partner | $425 |
| Senior Manager | $375 |
| Manager | $325 |
| Senior Staff | $225 |
| Staff | $175 |

Based on our current understanding of the scope and the billing rates above, we estimate that our fees for these services will be as follows:

| Project Components | Est. Hours | Partner | Mgr. | Staff | Est. Fee |
|---|---|---|---|---|---|
| I. Assessment and Planning | 112 | 32 | 48 | 32 | $37,000 |
| II. Tool Customization and Development | | | | | |
| A. Customize Tax Package | 140 | 12 | 48 | 80 | $44,000 |
| B. Develop Tax Database | 252 | 12 | 88 | 152 | $67,000 |
| III. Redesigned Process Implementation | | | | | |
| A. Tax Package Training & Rollout | 168 | 16 | 72 | 80 | $51,000 |
| B. Create Book Tax Basis Balance Sheet | 136 | 16 | 44 | 76 | $41,000 |
| IV. Post-Implementation Assessment | 64 | 16 | 24 | 24 | $22,000 |
| Total | 872 | 104 | 324 | 444 | $262,000 |

These fee estimates will be updated after the Assessment and Planning phase, upon finalizing the scope and project plan for the rest of the overall project. We will not proceed with the Part II and III of the project without your expressed agreement on the scope and fee estimates. Should any unforeseen needs arise to provide services outside the scope anticipated above, we will also discuss them with you and obtain your approval before proceeding.



*Page 5*
*Jennifer A. Williams*
*Delphi Corporation*
*May 24, 2005*

In addition to our professional fees, we are reimbursed for approved out-of-pocket expenses such as travel, lodging, meals and administrative support, which will be passed through to Delphi and paid on a net basis.

The attached Terms and Conditions are made a part of this engagement letter. Paragraph 10 pertaining to Limitation of Liability, will be revisited after the fees for Phases II and III are agreed upon.

**Engagement Timing**

We are ready to start the engagement immediately. Upon acceptance of this engagement letter, we will hold a series of meetings at Delphi headquarter with appropriate tax and IT resources. The on-site meetings and investigations are expected to take up to 80 hours. We expect the Assessment and Planning phase will take about 4 to 6 weeks to complete.

We are looking forward to the opportunity to work with Delphi Corporation on this exciting project. If you would like to further discuss the engagement, please call me at 212-872-5891. If you agree with the terms and conditions of this engagement letter and the attached Standard Terms and Conditions, please sign the enclosed copy of this letter to confirm our engagement and return it to the attention of Anthony Alexandrou.

Very truly yours,

KPMG LLP

Anthony G. Alexandrou    (d/r)
Anthony G. Alexandrou
*Partner*

rm

Enclosure

cc:    Brad Brown – KPMG / Los Angeles
       Andrew Hwang – KPMG / New York
       Patrick Karpen – KPMG / Detroit

The above terms and conditions are accepted and affirmed:

Page 6
Jennifer A. Williams
Delphi Corporation
May 24, 2005

ACCEPTED:

Delphi Corporation

_____
Authorized Signature

Executive Director Financial Results
Title

June 1, 2005
Date

Oct-12-05   03:54pm   From-KPMG LLP - NDPPS          313 983 0500      T-380   P.008/017   F-405
06/01/2005   16:53      248-913-3381        DELPHI TREASURY



## EXHIBIT A

## GENERAL TERMS AND CONDITIONS

1.    **Agreement.** It is agreed that KPMG LLP ("Consultant") will provide to Delphi Corporation ("Delphi") the services (the "Services") described in the accompanying engagement letter (the "Engagement Letter") to which this Exhibit A is attached (the Engagement Letter, this Exhibit A and Exhibit B are collectively referred to as this "Agreement"). For purposes of this Agreement, the terms "Consultant" include any affiliates of Consultant identified in the Engagement Letter as performing any of the Services, and the term "Delphi" includes any subsidiaries and affiliates of Delphi for which the Services are performed. This Agreement constitutes the entire and sole agreement between Delphi and Consultant, and merges all prior and contemporaneous communications with respect to the subject matter of this Agreement.

2.    **Independent Contractor.** Consultant will provide the Services as an independent contractor. Nothing contained in this Agreement shall be construed to create an employment or principal-agent relationship or joint venture between Consultant and Delphi, and neither party shall have the right, power or authority to obligate or bind the other in any manner whatsoever.

3.    **Personnel.** All of Consultant's agents, employees, subcontractors and/or independent contractors furnished by Consultant to perform the Services (collectively, "Personnel") are and will remain Consultant's employees and/or independent contractors and, under no circumstances, will any Personnel furnished by Consultant be deemed to be Delphi's employees or agents. Consultant is solely responsible, at Consultant's sole cost and expense, for (i) the fulfillment of all obligations to Personnel and (ii) the compliance by Consultant and Personnel with this Agreement and all laws, regulations, orders and other governmental requirements applicable to performance of the Services.

4.    **Conduct of Consultant's Personnel.** Consultant will assure that all Personnel who are performing Services on behalf of Consultant are competent to perform the Services. Consultant will require all Personnel who are performing any work on Delphi's premises to comply with all of Delphi's regulations and policies. Delphi, in its sole discretion, has the right to: (a) bar any of Personnel from Delphi's premises for failure to observe Delphi's regulations or policies, (b) require that Consultant promptly remove from Delphi's premises any Personnel who violate any of Delphi's regulations or policies, and (c) require that Consultant cease using any Personnel to perform the services who are reasonably unacceptable to Delphi. Delphi will confer with Consultant to discuss Delphi's concerns prior to requiring removal of any Personnel. Consultant will replace any barred or removed Personnel with Personnel reasonably acceptable to Delphi.

5.    **Non-Solicitation of Employees.**

    A.    Delphi agrees that during the term of this Agreement and for a period of one (1) year after the termination of this Agreement, it will not hire or attempt to hire any employees or former employees of Consultant if listed in the engagement letter attached hereto, who have been assigned to or have performed any of the Services contemplated herein.

    B.    Consultant agrees that during the term of this Agreement and for a period of one (1) year after the termination of this Agreement, it will not hire or attempt to hire any employees or former employees of Delphi's Tax staff who have participated in the furtherance of this Agreement.



C.    Notwithstanding the provisions of Sections 5A and 5B, neither party shall be prohibited from employing any employee, former employee or personnel of the other who contacts such party (i) on his or her own initiative or (ii) in response to a general solicitation for employment contained in a newspaper or any other publication.

6.    **Professional Fees.**    Delphi will compensate Consultant for actual Services performed in accordance with the fee schedule set forth in this Agreement (the "Fee Schedule"). Consultant will invoice Delphi no more frequently than monthly. Consultant will submit, with each invoice for payment, a report specifying the actual Services performed and the calculation of the invoiced payment in accordance with the Fee Schedule. Invoices will be due and payable by Delphi within forty-five (45) days of Delphi's receipt of the invoice and corresponding report in the required form.

7.    **Expenses.**    Delphi will reimburse Consultant for all reasonable costs and expenses Consultant incurs in connection with the Services, including, without limitation, all travel expenses, _provided, however,_ that Consultant must obtain prior approval of Delphi for any individual reimbursable expenses in excess of $1,000 or for reimbursable expenses which exceed or are anticipated to exceed an aggregate of $2,500 during any calendar month. Consultant will not charge any markup, overhead, profit or other fees on the reimbursable expenses. Delphi's reimbursement obligations will be governed by the provisions of Exhibit B.

8.    **Taxes.**    Unless otherwise agreed in the Engagement Letter, any applicable taxes imposed on Consultant in connection with the performance of the Services (except for taxes imposed on Consultant's income) will be invoiced to, and paid by, Delphi in addition to fees and expenses.

9.    **Indemnification.**

A.    Delphi shall indemnify, defend and hold harmless Consultant, including its directors, officers, employees, agents and representatives, from and against any and all claims, demands, actions, damages, liabilities, costs and expenses, including reasonable attorney fees and expenses, to the extent arising out of or resulting from third party claims against Consultant based on any of Consultant's written or verbal work product prepared pursuant to this Agreement and furnished by Consultant to Delphi for internal use (such as reports, analyses, projections, advice, recommendations and other data ) (collectively, "Internal Work Product Claims"). In addition, Delphi shall indemnify, defend and hold harmless Consultant, including its directors, officers, employees, agents and representatives, from and against any and all claims, demands, actions, damages, liabilities, costs and expenses, including reasonable attorney fees and expenses (other than Internal Work Product Claims), to the extent arising out of or resulting from third party claims against Consultant based on any activities of Consultant in connection with the performance of Services under this Agreement (collectively, "Non-Work Product Claims"), _provided, however,_ that Delphi will have no obligation to indemnify Consultant to the extent that any Non-Work Product Claims arise out of or result from the negligence, illegal acts or willful misconduct of Consultant and/or its directors, officers, employees, agents or representatives.

B.    Consultant shall indemnify, defend and hold harmless Delphi, including its directors, officers, employees, agents and representatives, from any and all claims, demands, actions, damages, liabilities, costs and expenses, including reasonable attorney fees and expenses, to the extent arising out of or resulting from the negligence, illegal acts or willful misconduct of Consultant and/or its directors, officers, employees, agents or representatives in connection with the performance of Services under this Agreement, _provided, however,_ that Consultant will have no obligation to indemnify Delphi to the extent that any such claims or damages arise out of or result from Internal Work Product Claims.

Oct-12-05   03:55pm   From-KPMG LLP - NDPPS                    313 983 0500          T-330  P.010/017  F-405
05/01/2006   16.05   248-613 5501



KPMG/Delphi Standard Engagement Terms & Conditions
rev. 4 8 2005
page 3 of 10

C.    In each case, the indemnifying party shall also pay to the indemnified party any and all costs and expenses incurred in connection with the enforcement of these indemnification provisions.

D.    The indemnification obligations set forth in this Section 9 and the general terms and conditions of this Agreement shall not apply to any tax or other governmental filings prepared by Consultant. The rights and obligations of the parties with respect to such services shall be governed by a separate agreement.

10.    Limitation of Liability.  Consultant's liability under this Agreement will be limited to three (3) times the professional fees paid; provided however that this limitation shall not apply (i) in the event of any breach of Section 16 below relating to Delphi Proprietary Information or (ii) if Consultant is found to be grossly negligent or to have acted willfully or fraudulently. In no event will Consultant or Delphi be liable for consequential, special, indirect, incidental, punitive or exemplary damages, costs, expenses, or losses (including loss of profits, data, business or goodwill) regardless of whether such liability is based on breach of contract, tort, strict liability, breach of warranties, failure of essential purpose or otherwise, and even if advised of the likelihood of such damages.

11.    Standard of Performance.  Consultant will use its best skills, resources and judgment to perform the Services in an efficient and economical manner and in accordance with the highest professional standards. If any Services are not completed to Delphi's reasonable satisfaction, Consultant will, at no additional cost to Delphi, take reasonable steps to correct any deficiencies. The express warranties in this Paragraph and in this Agreement shall be in lieu of all other warranties, express or implied, including the implied warranty of merchantability and fitness for a particular purpose.

12.    Reliance on Information/Authorities.  Consultant will base its conclusions on the facts and assumptions that Delphi submits and will not independently verify this information. Inaccuracy or incompleteness of the information Delphi provides could have a material effect on Consultant's conclusions. In rendering its advice, Consultant may consider, for example, the applicable provisions of the Internal Revenue Code of 1986, and ERISA as amended, and the relevant state statutes, the regulations thereunder, and judicial and administrative interpretations thereof. These authorities are subject to change, retroactively and/or prospectively, and any such changes could affect the validity of Consultant's advice. Consultant will not update its advice for subsequent changes or modifications to the law and regulations, or to the judicial and administrative interpretations thereof, unless Delphi separately engages Consultant to do so after such changes or modifications.

13.    Legal Counsel.  Delphi should consult with and/or engage legal counsel for the purpose of advising on non-tax legal aspects of matters on which Consultant provides tax advice and drafting any legal documents and/or agreements that may be required in connection therewith. Consultant will provide Delphi's legal counsel with tax-related advice that is deemed necessary by Delphi's legal counsel to draft such documents and/or agreements. To the extent Services of legal counsel or other professional service providers are required, Delphi is responsible for engaging and paying such service providers.

14.    Federal Confidential Communications Privilege.  A confidentiality privilege under Internal Revenue Code Section 7525 may pertain to certain communications between Consultant personnel and Delphi regarding federal tax advice provided pursuant to this engagement. By retaining Consultant, Delphi agrees that Consultant is instructed to claim the privilege on Delphi's behalf, with respect to any applicable communications, up to and until such time as Delphi may waive any such privilege in writing. As disclosure of any such confidential communications to the Internal Revenue Service or other third party may cause any confidentiality privilege to be waived, Delphi should notify Consultant if the Internal



Revenue Service or other third party requests information about any tax advice or tax advice documents provided by Consultant.

Delphi understands that Consultant makes no representation, warranty, or promise, and offers no opinion with respect to the applicability of such confidentiality privilege to any communication. Delphi agrees to indemnify Consultant for any attorney's fees and other costs and expenses incurred by Consultant in defending the confidentiality privilege on Delphi's behalf. Consultant agrees to promptly notify Delphi of any claim for which Consultant seeks indemnification and Delphi shall have the right to conduct the defense or settlement of any such claim at Delphi's sole expense, and Consultant shall cooperate with Delphi. Consultant shall nonetheless have the right to participate in such defense at its own expense and to approve the settlement of any claim hereunder that imposes liability or obligation.

15.    <u>Disclosure and Restriction on Use</u>.  If this engagement relates to a strategy offered by Consultant to Delphi that is designed to reduce or defer federal income tax for a direct or indirect corporate participant, pursuant to Treasury Regulation section 301.6111-2(c), Delphi (and each employee, representative, or other agent of Delphi) is expressly authorized to disclose the structure and tax aspects of the strategy with any and all persons, without limitation of any kind.

Written advice provided by Consultant to Delphi is for the information and use of Delphi only and may not be relied upon by any third party without the express written permission of Consultant.

16.    <u>Non-Disclosure of Delphi Proprietary Information</u>.

A.    "Delphi Proprietary Information" means any information concerning the business and affairs of Delphi, which is not publicly available at the time disclosed to, or learned by, Consultant or any Personnel. Delphi Proprietary Information includes, without limitation, this Agreement and any written or verbal work product prepared pursuant to this Agreement (such as reports, analyses, projections, advice, recommendations and other data); trade secrets; product specifications; data; know-how; formulae; compositions; processes; designs; sketches; photographs; samples; inventions; concepts; ideas; past, current and planned research and development; past, current and planned manufacturing or distribution methods and processes; price lists; marketing and business plans, methods and processes; financial results and information; reports; computer software and programs (including object code and source code); databases; notes; analyses; compilations; studies; and other materials or intangibles. Delphi Proprietary Information also includes any materials or information that contain or are based on any other Delphi Proprietary Information, whether prepared by Delphi, Consultant, Personnel or any other person. Information will be conclusively deemed Delphi Proprietary Information if it is marked "Proprietary" or "Confidential" or with an equivalent legend at the time it is disclosed. Any information transmitted orally will be conclusively deemed Delphi Proprietary Information if Delphi notifies Consultant that it is proprietary within a reasonable time following oral disclosure. The failure, however, to mark information as "Proprietary" or "Confidential" or to notify Consultant that oral information is proprietary will not affect the information's proprietary nature. Delphi Proprietary Information does not include any trade secrets; data; know-how; formulae; compositions; processes; designs; sketches; inventions; concepts; ideas; methodologies, and techniques; models; templates; general purpose consulting and software tools previously created, acquired, owned or developed or independently developed by Consultant in the performance of the Services without reference to Delphi's Proprietary Information.

B.    In connection with Consultant's performance of Services, Delphi may disclose Delphi Proprietary Information to Consultant and Personnel. All Delphi Proprietary Information disclosed, furnished or made available to Consultant and/or Personnel and all Delphi Proprietary Information generated or developed by Consultant and/or Personnel will be treated and maintained as confidential by



Consultant and Personnel, will not be disclosed to any third parties, either in whole or in part, except upon Delphi's prior written authorization, and will be used by Consultant and Personnel only for the purpose of performing the Services in accordance with this Agreement, in all cases using the same degree of care and discretion to avoid disclosure, publication or dissemination of such Delphi Proprietary Information that Consultant uses with respect to its own similar information that it does not wish to disclose, publish or disseminate (but in no event less than a reasonable degree of care and discretion). Before Consultant or Personnel discloses any information that could, under any circumstances, constitute Delphi Proprietary Information, Consultant will obtain Delphi's written consent. Neither Consultant nor Personnel will remove any Delphi Proprietary Information from Delphi's premises unless Delphi authorizes the removal in writing. Consultant will be responsible and liable to Delphi for the violation by any of Personnel of these confidentiality obligations.

C.    The foregoing obligations under this Section 16B of this Exhibit A shall not apply to the extent that any Delphi Proprietary Information (i) is at the time of disclosure, or thereafter becomes, part of the public domain through a source other than Consultant and Personnel, (ii) is subsequently learned by Consultant or Personnel from a third party that has a legal right to make such disclosure and does not impose an obligation of confidentiality on the receiving party, (iii) was known to Consultant or Personnel at the time of disclosure by Delphi, (iv) was generated independently by Consultant or Personnel before disclosure by Delphi, or (v) is required to be disclosed by Consultant or Personnel by law, subpoena or other process.

17.    Assignment and Subcontracting.    Consultant will not assign or subcontract any portion of its responsibilities under this Agreement without Delphi's prior written approval.  To the extent any of the services under the Engagement Letter will be performed in or relate to a jurisdiction outside of the United States, Client acknowledges and agrees that such services may be performed by the member firm of KPMG International practicing in such jurisdiction. Accordingly, Client consents to KPMG's disclosure to a member firm and such member firm's use of information received from Client for the purpose of providing services under the Engagement Letter.

18.    Changes and Delays.

A.    In the event that (i) Delphi requires a change in the scope of the Services, (ii) any change of applicable law or regulation affects the timing or performance of the Services or (iii) any action by Delphi or a third party (other than Personnel) affects the timing or performance of the Services, subject to the mutual agreement of Delphi and Consultant, the fees and/or schedule for performance for the Services will be equitably adjusted by the parties.

B.    To the extent that the Engagement Letter provides that Consultant's performance under this Agreement is contingent upon specific action or cooperation of Delphi, including the supply to Consultant of specific resources, approvals, and information, any delays in Consultant's performance which occur as a result of the failure or untimely performance by Delphi shall be excused to the extent of any such delay or untimely performance by Delphi and Consultant shall not incur any liability to Delphi as a result of any such delay or untimely performance by Delphi.

19.    Term and Termination. This Agreement will terminate when the Services have been completed. In addition, either party may terminate this Agreement in the event of the breach by the other party of this Agreement, which breach is not cured within thirty (30) days after notice by the non-breaching party. Delphi shall pay Consultant for Services performed prior to the effective date of termination as well as expenses incurred prior to the effective date of termination and approved by Delphi in accordance with Section 7 of this Exhibit A.

Oct-12-05    03:57pm    From-KPMG LLP - NDPPS                    313 983 0600          T-330  P.013/017  F-405

20.    Conflict.  In the event of any conflict, ambiguity or inconsistency between this Agreement and any other agreement relating to the Services, including any preprinted terms and conditions on Delphi's purchase orders, the terms and conditions of this Agreement shall govern.

21.    Survival.  The provisions of this Agreement, which give the parties rights beyond termination of this Agreement, will survive any termination of this Agreement.

22.    Severability.  If any portion of this Agreement is held to be void, invalid, or otherwise unenforceable, in whole or part, the remaining portions of this Agreement shall remain in effect.

23.    Amendment.  This Agreement shall not be modified except by a later written agreement signed by both parties.

24.    Alternative Dispute Resolution.

    A.    Any dispute or claim arising out of or relating to the Engagement Letter between the parties, the services provided thereunder, or any other services provided by or on behalf of Consultant or any of its subcontractors or agents to Delphi or at its request (including any dispute or claim involving any person or entity for whose benefit the services in question are or were provided) shall be resolved in accordance with the dispute resolution procedures set forth in Exhibit C attached hereto, which constitute the sole methodologies for the resolution of all such disputes.  By operation of this provision, the parties agree to forego litigation over such disputes in any court of competent jurisdiction.  Mediation, if selected, may take place at a location to be designated by the parties.  Arbitration shall take place in Detroit, Michigan.  Either party may seek to enforce any written agreement reached by the parties during mediation, or to confirm and enforce any final award entered in arbitration, in any court of competent jurisdiction.

    B.    Notwithstanding the agreement to such procedures, either party may seek injunctive relief to enforce its rights with respect to the use or protection of (i) its confidential or proprietary information or material or (ii) its names, trademarks, service marks or logos, solely in the courts of the State of Michigan or in the courts of the United States located in the State of Michigan.  The parties consent to the personal jurisdiction thereof and to sole venue therein only for such purposes.

25.    Miscellaneous.

    A.    For engagements where services will be provided by KPMG through offices located in California, Client acknowledges that certain of KPMG's personnel who may be considered "owners" under the California Accountancy Act and implementing regulations (California Business and Professions Code section 5079(a); 16 Cal. Code Regs. sections 51 and 51.1) and who may provide services in connection with this engagement, may not be licensed as certified public accountants under the laws of any of the various states.

    B.    Where KPMG is reimbursed for expenses, it is KPMG's policy to bill clients the amount incurred at the time the good or service is purchased.  If KPMG subsequently receives a volume rebate or other incentive payment from a vendor relating to such expenses, KPMG does not credit such payment to Client.  Instead, KPMG applies such payments to reduce its overhead costs, which costs are taken into account in determining KPMG's standard billing rates and certain transaction charges that may be charged to clients.

Oct-12-05    03:59pm    From-KPMG LLP - NOPPS                    313 088 0500          T-380   P.014/017   F-405



KPMG/Delphi Standard Engagement Terms & Conditions
rev. 4 8 2005
page 7 of 10

## EXHIBIT B

### Travel and Per Diem Reimbursement

A.    If Personnel are required by Delphi to travel as an incidental requirement in performing services for Delphi, then such travel and per diem expenses, subject to prior written approval of Delphi, will be reimbursable as follows:

1. Air Travel    Economy/Coach class only. Business class is permitted only upon prior written consent by Delphi.

2. Hotel    Consultant will exercise good, sound business judgment and discretion in choosing hotels, such as moderately priced chain hotels or hotels that offer discounted corporate rates. Where extended travel is involved, reduced rates may be available and should be requested.

3. Rental cars    Compact or intermediate class only. The cost of collision damage waiver and personal accident insurance is the responsibility of Consultant.

4. Mileage Allowance    Reimbursement will be at the then current IRS rate (currently $0.405 per mile) for the miles which are in excess of his or her normal commute from home to work and back. When permanently assigned to another location, even if the new location is temporary, Consultant will not be reimbursed for excess miles, additional driving time, etc.

5. Expense Reports    If requested, Consultant will provide receipts for all reimbursable expenses, including meals and other expenditures, in excess of $25.00 or more.

6. Meals    Meals will not be reimbursed for non-overnight trips, except in the case of late return occasioned by travel outside normal working hours. Reimbursement for meals will be the actual and reasonable expenses paid by Consultant.

7. Extended Travel    Consultant should review the home visit policy prior to a trip. Generally, the following provisions apply:

    If the travel expense is less than the living expense in the temporary location, Consultant will be reimbursed for travel to the permanent location every week.

    If the travel expense is more than the living expense in the temporary location, Consultant will be reimbursed for travel to the permanent location every two weeks.

    Excess expenses due to frequent travel or stays will not be reimbursed by Delphi without its prior written approval.

8. Miscellaneous    When Consultant chooses an alternative method of transportation, e.g., to drive instead of fly, reimbursement, including meals and lodging, will not exceed the lesser of the two costs. Documentation to support the lesser cost

Oct-12-05    03:59pm    From-KPMG LLP - NDPPS                            313 968 0500        T-830    P.015/017    F-405
06/01/2005    16:53        248-813-3361                        DELPHI TREASURY                        PAGE    15/17

**KPMG**

KPMG/Delphi Standard Engagement Terms & Conditions
rev. 4 8 2005
page 8 of 10

must be attached to expense report. Travel time must also be limited if on working hours.

The employee, his or her immediate supervisor, and an authorized Delphi representative must sign the expense report form.

Consultant is responsible for travel reservations, hotel/motel accommodations and rental cars. If directed by Delphi, Consultant will make all travel arrangements through Global Experts in Travel (GET), or other designated supplier, using a special account set up for such purposes.

Any cash advance by Consultant to its employee is the responsibility of Consultant.

9. Per Diem    In certain instances, a per diem will be paid to Consultant in accordance with Delphi's standard per diem policy.

B.    All travel and per diem for which Consultant seeks reimbursement will be submitted to Delphi on standard vouchers, with substantiating documentation, and will accompany the monthly invoices.

**KPMG**

KPMG/Delphi Standard Engagement Terms & Conditions
rev. 4 8 2005
page 9 of 10

## EXHIBIT C

### Dispute Resolution Procedures

The following procedures are the sole methodologies to be used to resolve any controversy or claim ("dispute"). If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

### Mediation

Any party may request mediation of a dispute by providing a written Request for Mediation to the other party or parties. The mediator, as well as the time and place of the mediation, shall be selected by agreement of the parties. Absent any other agreement to the contrary, the parties agree to proceed in mediation using the CPR Mediation Procedures (Effective April 1, 1998), with the exception of paragraph 2 which shall not apply to any mediation conducted pursuant to this agreement. As provided in the CPR Mediation Procedures, the mediation shall be conducted as specified by the mediator and as agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with facilitation by the mediator, to reach a consensual resolution of the dispute. The mediation shall be treated as a settlement discussion and shall be confidential. The mediator may not testify for any party in any later proceeding related to the dispute. No recording or transcript shall be made of the mediation proceeding. Each party shall bear its own costs in the mediation. Absent an agreement to the contrary, the fees and expenses of the mediator shall be shared equally by the parties.

### Arbitration

Arbitration shall be used to settle the following disputes: (1) any dispute not resolved by mediation 90 days after the issuance by one of the parties of a written Request for Mediation (or, if the parties have agreed to enter or extend the mediation, for such longer period as the parties may agree) or (2) any dispute in which a party declares, more than 30 days after receipt of a written Request for Mediation, mediation to be inappropriate to resolve that dispute and initiates a Request for Arbitration. Once commenced, the arbitration will be conducted either (1) in accordance with the procedures in this document and the Rules for Non-Administered Arbitration of the CPR Institute for Dispute Resolution ("CPR Arbitration Rules") as in effect on the date of the engagement letter or contract between the parties, or (2) in accordance with other rules and procedures as the parties may designate by mutual agreement. In the event of a conflict, the provisions of this document and the CPR Arbitration Rules will control.

The arbitration will be conducted before a panel of three arbitrators, two of whom may be designated by the parties using either the CPR Panels of Distinguished Neutrals or the Arbitration Rosters maintained by any JAMS Office in the United States. If the parties are unable to agree on the composition of the arbitration panel, the parties shall follow the screened selection process provided in Section B, Rules 5, 6, 7, and 8 of the CPR Arbitration Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or any dispute concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator shall be appointed unless he or she has agreed in writing to abide and be bound by these procedures.

The arbitration panel shall issue its final award in writing. The panel shall have no power to award non-monetary or equitable relief of any sort. Damages that are inconsistent with any applicable agreement

KPMG/Delphi Standard Engagement Terms & Conditions
rev. 4 B 2005
page 10 of 10

between the parties, that are punitive in nature, or that are not measured by the prevailing party's actual damages, shall be unavailable in arbitration or any other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitration panel have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

Discovery shall be permitted in connection with the arbitration only to the extent, if any, expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. The parties and the arbitration panel may disclose the existence, content or results of the arbitration only as provided in the CPR Arbitration Rules. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests.

The award reached as a result of the arbitration will be binding on the parties, and confirmation of the arbitration award may be sought in any court having jurisdiction.

## <u>EXHIBIT B</u>

### REVISED INTERNATIONAL PROJECT ENGAGEMENT LETTER

A. ALEXANDROU (N.YOR
ORIG: Scott Russell
60118089

**KPMG**

KPMG LLP
Suite 1200
150 West Jefferson
Detroit, MI 48226-4429

Telephone  313 983 0200
Fax        313 983 0008
           313 983 0007
           313 983 0008
Internet   www.us.kpmg.com

August 31, 2005

11307756
11307763

S

<u>**PRIVATE**</u>

Ms. Suzanne Kihn
Director, Corporate Accounting
Delphi Corporation
M/C 483.400.141
5725 Delphi Drive
Troy, MI 48098

Re: International Tax Process Improvement Project – Revised

Dear Suzanne:

We appreciate the opportunity to work on the Income Tax Accounting and Reporting Package Project. Based on the initial feasibility phase, KPMG has been able to assist Delphi:

- Review and identify key gaps in the existing reporting package and processes
- Evaluate different approaches for redesigning tax reporting packages and improving tax basis balance sheets for foreign reporting units that are suitable for Delphi
- Finalize the project plan and milestones
- Formulate the evaluation criteria for selection of reporting units
- Create the initial communication presentation to local Delphi units
- Establish a network of non-US KPMG resources from the member firms of KPMG International to assist local Delphi units
- Customize the tax basis balance sheet template

As we stated in the original engagement letter, we wanted to provide the update on the scope of this project based on assessment and planning work we have accomplished so far. The key difference from our initial engagement letter is that we now have a better understanding of the level of assistance KPMG is expected to provide through our network of non-US professionals from the member firms of KPMG International. It is our understanding that the KPMG network will be leveraged potentially for all three phases of the project we have laid out –review (and provide suggestions for improvement) regarding tax basis balance sheets, assistance with Q3 "dry run," and review of Year-end procedures.

**Limitation to Engagement Services**

KPMG's services are intended to assist Delphi in modifying Delphi's tools and processes for collecting data from Delphi's foreign operations in support of the computation of an income tax provision. Delphi management is ultimately responsible for ensuring the necessary financial and tax information are collected from its foreign operations.

KPMG LLP, a U.S. limited liability partnership, is the U.S.
member firm of KPMG International, a Swiss cooperative.



KPMG's services do not include assisting directly Delphi's management in establishing and supporting its current and deferred income taxes and financial statement disclosures. KPMG is not assuming responsibility for management analysis or decision-making with respect to the application of any accounting principle to the income tax provision, related financial statement disclosures and balance sheet accounts, such as determining the necessity or amount of a valuation allowance or tax contingency reserve. Delphi is to consult with their independent auditor on the application of accounting principles.

This engagement does not contemplate the provision or oral advice or the issuance of a written report on the application of accounting principles pursuant to AU section 625 of the AICPA's Professional Standards, Reports on the Application of Accounting Principles. Accordingly, KPMG's services will not be directed toward consultation on the application of accounting principles to Delphi's particular facts and circumstances.

Unless separately engaged to do so, KPMG will not express an opinion on the possible outcome of a tax contingency.

In this engagement, KPMG assumes no responsibility for auditing information provided by Delphi management or Delphi foreign operations. KPMG also assumes no responsibility for expressing an opinion on any part of Delphi's financial statements. Those are the sole responsibility of Delphi's independent auditor. If necessary and appropriate, KPMG will meet with Delphi's independent auditor during the course of the engagement to discuss our services and any preliminary findings.

### Coordination With KPMG International Member Firms

Our services covered by this engagement letter may also necessitate the assistance of a member firm of KPMG International. To the extent that our services under this engagement letter require such assistance, the services will be provided under the direction of KPMG LLP, the U.S. member firm of KPMG International, and will include the participation of other member firms of KPMG International ("KPMG member firms"). KPMG LLP is a separate legal entity from other member firms of KPMG International. Advice relative to tax matters outside the United States will be based on tax advice provided by the KPMG member firm in the particular country and on the relevant tax authorities in that country. In rendering such advice, we may also consider U.S. tax treaties, their technical explanations, and judicial and administrative interpretations thereof.

In certain countries, a KPMG member firm is authorized to provide legal services within its jurisdiction. This engagement letter encompasses only tax services provided by KPMG member firms and does not encompass any legal services a KPMG member firm may be authorized to provide. Should the provision of such services not be proscribed by applicable independence rules and should Sample Corporation choose to retain a KPMG member firm to provide legal services, including drafting of documents, in a particular country, Sample Corporation and the KPMG member firm will enter into a separate fee arrangement and engagement letter for the provision of such legal services.

Oct-12-05    04:00pm    From-KPMG LLP - NDPPS                919 883 0500              T-330    P.004/017    F-408



**Fees**

Based on our current understanding of the scope, we estimate that our hours and fees for these services will be as below:

| Project Components | Est. Hours | Est. Fee (US$) |
|---|---|---|
| **Phase 1** | | |
| A. Assessment and Planning | 72 | 27,988 |
| B. Tax Basis Balance Sheet Review & Assistance | 1061 | 408,760 |
| C. Customize Tax Package | 354 | 132,600 |
| **Phase 2** | | |
| A. Develop Tax Database | 420 | 150,000 |
| B. Tax Package Training & Rollout | 420 | 150,000 |
| C. Q3 Dry Run Assistance | 334 | 128,420 |
| **Phase 3** | | |
| A. Post-Q3 Dry Run Assessment | 64 | 22,000 |
| B. 2005 Year End Provision Review | 334 | 128,420 |
| **Total** | 3059 | 1,148,188 |

The revised estimate is principally based on the level of assistance we have budgeted for the non–U.S., local KPMG professionals for 117 reporting units to provide:

- For phase 1, 18 hours of assistance and review per reporting unit
  (3 partner hours, 12 senior manager hours per reporting unit)
- For phase 2, 5 hours per reporting unit (1 partner hours, 4 senior manager hours)
- For phase 3, 5 hours per reporting unit (1 partner hours, 4 senior manager hours)

The actual hours of assistance provided by local KPMG professionals in various countries may be more or less than budgeted, especially where (a) problems are encountered at a particular reporting unit, or (b) efficiencies are gained where a local Delphi contact may have responsibilities over many reporting units. We will bill for actual hours incurred.

As we complete the Tax Basis Balance Sheet phrase, we will be in a better position to estimate the required hours for the Phase 2 and Phase 3 actions. To the extent different from the above, we will send you a revised estimate.

The billing rates of local KPMG professionals will be same as agreed in the original engagement letter.

The attached Exhibit A, Terms and Conditions, and Exhibit B, Travel and Per Diem Reimbursement policy, are made a part of this engagement letter. You acknowledge and agree that all KPMG member firms and their personnel who provide services covered by this engagement letter shall be bound by, and entitled to the benefits of, the terms of this engagement letter and the attached Standard Terms and Conditions. To the extent Delphi personnel are permitted to travel business class on overseas airline trips, it is hereby agreed that KPMG personnel will be allowed to utilize business class as well. Also, we will be paid on the basis of "MNS-1" status for Delphi invoice



*Page 4 of 16*
*Suzanne Kihn*
*Delphi Corporation*
*August 31, 2005*

payment purposes, effective September 1, 2005, for a period of 60 days, when we will re-evaluate the situation.

**✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦**

If you would like to further discuss the engagement scope, please do not hesitate to call me at 212-872-5891. If you agree with the revised fee estimate, please sign the enclosed copy of this letter to confirm our understanding of the scope and return it to my attention.

Very truly yours,

**KPMG LLP**

Anthony G. Alexandrou
*Partner*

**Enclosures**

**Delphi Corporation**

Authorized Signature

Title

Date



## EXHIBIT A

## GENERAL TERMS AND CONDITIONS

1.    Agreement.  It is agreed that KPMG LLP ("Consultant") will provide to Delphi Corporation ("Delphi") the services (the "Services") described in the accompanying engagement letter (the "Engagement Letter") to which this Exhibit A is attached (the Engagement Letter, this Exhibit A and Exhibit B are collectively referred to as this "Agreement").  For purposes of this Agreement, the terms "Consultant" include any affiliates of Consultant identified in the Engagement Letter as performing any of the Services, and the term "Delphi" includes any subsidiaries and affiliates of Delphi for which the Services are performed.  This Agreement constitutes the entire and sole agreement between Delphi and Consultant, and merges all prior and contemporaneous communications with respect to the subject matter of this Agreement.

2.    Independent Contractor.  Consultant will provide the Services as an independent contractor. Nothing contained in this Agreement shall be construed to create an employment or principal-agent relationship or joint venture between Consultant and Delphi, and neither party shall have the right, power or authority to obligate or bind the other in any manner whatsoever.

3.    Personnel.  All of Consultant's agents, employees, subcontractors and/or independent contractors furnished by Consultant to perform the Services (collectively, "Personnel") are and will remain Consultant's employees and/or independent contractors and, under no circumstances, will any Personnel furnished by Consultant be deemed to be Delphi's employees or agents.  Consultant is solely responsible, at Consultant's sole cost and expense, for (i) the fulfillment of all obligations to Personnel and (ii) the compliance by Consultant and Personnel with this Agreement and all laws, regulations, orders and other governmental requirements applicable to performance of the Services.

4.    Conduct of Consultant's Personnel.  Consultant will assure that all Personnel who are performing Services on behalf of Consultant are competent to perform the Services.  Consultant will require all Personnel who are performing any work on Delphi's premises to comply with all of Delphi's regulations and policies.  Delphi, in its sole discretion, has the right to: (a) bar any of Personnel from Delphi's premises for failure to observe Delphi's regulations or policies, (b) require that Consultant promptly remove from Delphi's premises any Personnel who violate any of Delphi's regulations or policies, and (c) require that Consultant cease using any Personnel to perform the services who are reasonably unacceptable to Delphi.  Delphi will confer with Consultant to discuss Delphi's concerns prior to requiring removal of any Personnel.  Consultant will replace any barred or removed Personnel with Personnel reasonably acceptable to Delphi.



5.    <u>Non-Solicitation of Employees</u>.

A.    Delphi agrees that during the term of this Agreement and for a period of one (1) year after the termination of this Agreement, it will not hire or attempt to hire any employees or former employees of Consultant if listed in the engagement letter attached hereto, who have been assigned to or have performed any of the Services contemplated herein.

B.    Consultant agrees that during the term of this Agreement and for a period of one (1) year after the termination of this Agreement, it will not hire or attempt to hire any employees or former employees of Delphi's Tax staff who have participated in the furtherance of this Agreement.

C.    Notwithstanding the provisions of Sections 5A and 5B, neither party shall be prohibited from employing any employee, former employee or personnel of the other who contacts such party (i) on his or her own initiative or (ii) in response to a general solicitation for employment contained in a newspaper or any other publication.

6.    <u>Professional Fees</u>.  Delphi will compensate Consultant for actual Services performed in accordance with the fee schedule set forth in this Agreement (the "Fee Schedule"). Consultant will invoice Delphi no more frequently than monthly. Consultant will submit, with each invoice for payment, a report specifying the actual Services performed and the calculation of the invoiced payment in accordance with the Fee Schedule. Invoices will be due and payable by Delphi within forty-five (45) days of Delphi's receipt of the invoice and corresponding report in the required form.

7.    <u>Expenses</u>.  Delphi will reimburse Consultant for all reasonable costs and expenses Consultant incurs in connection with the Services, including, without limitation, all travel expenses, <u>provided, however,</u> that Consultant must obtain prior approval of Delphi for any individual reimbursable expenses in excess of $1,000 or for reimbursable expenses which exceed or are anticipated to exceed an aggregate of $2,500 during any calendar month. Consultant will not charge any markup, overhead, profit or other fees on the reimbursable expenses. Delphi's reimbursement obligations will be governed by the provisions of <u>Exhibit B</u>.

8.    <u>Taxes</u>. Unless otherwise agreed in the Engagement Letter, any applicable taxes imposed on Consultant in connection with the performance of the Services (except for taxes imposed on Consultant's income) will be invoiced to, and paid by, Delphi in addition to fees and expenses.

Oct-12-05    04:02pm    From-KPMG LLP - NDPPS                    313 983 0500                T-330    P.008/017    F-408



9..    Indemnification.

A.    Delphi shall indemnify, defend and hold harmless Consultant, including its directors, officers, employees, agents and representatives, from and against any and all claims, demands, actions, damages, liabilities, costs and expenses, including reasonable attorney fees and expenses, to the extent arising out of or resulting from third party claims against Consultant based on any of Consultant's written or verbal work product prepared pursuant to this Agreement and furnished by Consultant to Delphi for internal use (such as reports, analyses, projections, advice, recommendations and other data ) (collectively, "Internal Work Product Claims"). In addition, Delphi shall indemnify, defend and hold harmless Consultant, including its directors, officers, employees, agents and representatives, from and against any and all claims, demands, actions, damages, liabilities, costs and expenses, including reasonable attorney fees and expenses (other than Internal Work Product Claims), to the extent arising out of or resulting from third party claims against Consultant based on any activities of Consultant in connection with the performance of Services under this Agreement (collectively, "Non-Work Product Claims"), provided, however, that Delphi will have no obligation to indemnify Consultant to the extent that any Non-Work Product Claims arise out of or result from the negligence, illegal acts' or willful misconduct of Consultant and/or its directors, officers, employees, agents or representatives.

B.    Consultant shall indemnify, defend and hold harmless Delphi, including its directors, officers, employees, agents and representatives, from any and all claims, demands, actions, damages, liabilities, costs and expenses, including reasonable attorney fees and expenses, to the extent arising out of or resulting from the negligence, illegal acts or willful misconduct of Consultant and/or its directors, officers, employees, agents or representatives in connection with the performance of Services under this Agreement, provided, however, that Consultant will have no obligation to indemnify Delphi to the extent that any such claims or damages arise out of or result from Internal Work Product Claims.

C.    In each case, the indemnifying party shall also pay to the indemnified party any and all costs and expenses incurred in connection with the enforcement of these indemnification provisions.

D.    The indemnification obligations set forth in this Section 9 and the general terms and conditions of this Agreement shall not apply to any tax or other governmental filings prepared by Consultant. The rights and obligations of the parties with respect to such services shall be governed by a separate agreement.

10.    Limitation of Liability.    Consultant's liability under this Agreement will be limited to three (3) times the professional fees paid; provided however that this limitation shall not apply (i) in the event of any breach of Section 16 below relating to Delphi Proprietary Information or (ii) if Consultant is found to be grossly negligent or to have acted willfully or fraudulently. In



no event will Consultant or Delphi be liable for consequential, special, indirect, incidental, punitive or exemplary damages, costs, expenses, or losses (including loss of profits, data, business or goodwill) regardless of whether such liability is based on breach of contract, tort, strict liability, breach of warranties, failure of essential purpose or otherwise, and even if advised of the likelihood of such damages.

11.  Standard of Performance.  Consultant will use its best skills, resources and judgment to perform the Services in an efficient and economical manner and in accordance with the highest professional standards.  If any Services are not completed to Delphi's reasonable satisfaction, Consultant will, at no additional cost to Delphi, take reasonable steps to correct any deficiencies. The express warranties in this Paragraph and in this Agreement shall be in lieu of all other warranties, express or implied, including the implied warranty of merchantability and fitness for a particular purpose.

12.  Reliance on Information/Authorities.  Consultant will base its conclusions on the facts and assumptions that Delphi submits and will not independently verify this information. Inaccuracy or incompleteness of the information Delphi provides could have a material effect on Consultant's conclusions.  In rendering its advice, Consultant may consider, for example, the applicable provisions of the Internal Revenue Code of 1986, and ERISA as amended, and the relevant state statutes, the regulations thereunder, and judicial and administrative interpretations thereof.    These authorities are subject to change, retroactively and/or prospectively, and any such changes could affect the validity of Consultant's advice. Consultant will not update its advice for subsequent changes or modifications to the law and regulations, or to the judicial and administrative interpretations thereof, unless Delphi separately engages Consultant to do so after such changes or modifications.

13.  Legal Counsel.  Delphi should consult with and/or engage legal counsel for the purpose of advising on non-tax legal aspects of matters on which Consultant provides tax advice and drafting any legal documents and/or agreements that may be required in connection therewith. Consultant will provide Delphi's legal counsel with tax-related advice that is deemed necessary by Delphi's legal counsel to draft such documents and/or agreements. To the extent Services of legal counsel or other professional service providers are required, Delphi is responsible for engaging and paying such service providers.

14.  Federal Confidential Communications Privilege.  A confidentiality privilege under Internal Revenue Code Section 7525 may pertain to certain communications between Consultant personnel and Delphi regarding federal tax advice provided pursuant to this engagement. By retaining Consultant, Delphi agrees that Consultant is instructed to claim the privilege on Delphi's behalf, with respect to any applicable communications, up to and until such time as Delphi may waive any such privilege in writing.  As disclosure of any such confidential communications to the Internal Revenue Service or other third party may cause any confidentiality privilege to be waived, Delphi should notify Consultant if the Internal Revenue Service or other third party requests information about any tax advice or tax advice documents provided by Consultant.



Delphi understands that Consultant makes no representation, warranty, or promise, and offers no opinion with respect to the applicability of such confidentiality privilege to any communication. Delphi agrees to indemnify Consultant for any attorney's fees and other costs and expenses incurred by Consultant in defending the confidentiality privilege on Delphi's behalf. Consultant agrees to promptly notify Delphi of any claim for which Consultant seeks indemnification and Delphi shall have the right to conduct the defense or settlement of any such claim at Delphi's sole expense, and Consultant shall cooperate with Delphi. Consultant shall nonetheless have the right to participate in such defense at its own expense and to approve the settlement of any claim hereunder that imposes liability or obligation.

15. <u>Disclosure and Restriction on Use.</u>   If this engagement relates to a strategy offered by Consultant to Delphi that is designed to reduce or defer federal income tax for a direct or indirect corporate participant, pursuant to Treasury Regulation section 301.6111-2(c), Delphi (and each employee, representative, or other agent of Delphi) is expressly authorized to disclose the structure and tax aspects of the strategy with any and all persons, without limitation of any kind.

Written advice provided by Consultant to Delphi is for the information and use of Delphi only and may not be relied upon by any third party without the express written permission of Consultant.

16. <u>Non-Disclosure of Delphi Proprietary Information.</u>
"Delphi Proprietary Information" means any information concerning the business and affairs of Delphi which is not publicly available at the time disclosed to, or learned by, Consultant or any Personnel. Delphi Proprietary Information includes, without limitation, this Agreement and any written or verbal work product prepared pursuant to this Agreement (such as reports, analyses, projections, advice, recommendations and other data); trade secrets; product specifications; data; know-how; formulae; compositions; processes; designs; sketches; photographs; samples; inventions; concepts; ideas; past, current and planned research and development; past, current and planned manufacturing or distribution methods and processes; price lists; marketing and business plans, methods and processes; financial results and information; reports; computer software and programs (including object code and source code); databases; notes; analyses; compilations; studies; and other materials or intangibles. Delphi Proprietary Information also includes any materials or information that contain or are based on any other Delphi Proprietary Information, whether prepared by Delphi, Consultant, Personnel or any other person. Information will be conclusively deemed Delphi Proprietary Information if it is marked "Proprietary" or "Confidential" or with an equivalent legend at the time it is disclosed. Any information transmitted orally will be conclusively deemed Delphi Proprietary Information if Delphi notifies Consultant that it is proprietary within a reasonable time following oral disclosure. The failure, however, to mark information as "Proprietary" or "Confidential" or to notify Consultant that oral information is proprietary will not affect the information's proprietary nature. Delphi Proprietary Information does not include any trade secrets; data; know-how;

Oct-12-05    04:03pm    From-KPMG LLP - NDPPS                313 983 0500            T-330    P.011/017    F-406



formulae; compositions; processes; designs; sketches; inventions; concepts; ideas; methodologies, and techniques; models; templates; general purpose consulting and software tools previously created, acquired, owned or developed or independently developed by Consultant in the performance of the Services without reference to Delphi's Proprietary Information.

A.    In connection with Consultant's performance of Services, Delphi may disclose Delphi Proprietary Information to Consultant and Personnel. All Delphi Proprietary Information disclosed, furnished or made available to Consultant and/or Personnel and all Delphi Proprietary Information generated or developed by Consultant and/or Personnel will be treated and maintained as confidential by Consultant and Personnel, will not be disclosed to any third parties, either in whole or in part, except upon Delphi's prior written authorization, and will be used by Consultant and Personnel only for the purpose of performing the Services in accordance with this Agreement, in all cases using the same degree of care and discretion to avoid disclosure, publication or dissemination of such Delphi Proprietary Information that Consultant uses with respect to its own similar information that it does not wish to disclose, publish or disseminate (but in no event less than a reasonable degree of care and discretion). Before Consultant or Personnel discloses any information that could, under any circumstances, constitute Delphi Proprietary Information, Consultant will obtain Delphi's written consent. Neither Consultant nor Personnel will remove any Delphi Proprietary Information from Delphi's premises unless Delphi authorizes the removal in writing. Consultant will be responsible and liable to Delphi for the violation by any of Personnel of these confidentiality obligations.

B.    The foregoing obligations under this Section 16B of this Exhibit A shall not apply to the extent that any Delphi Proprietary Information (i) is at the time of disclosure, or thereafter becomes, part of the public domain through a source other than Consultant and Personnel, (ii) is subsequently learned by Consultant or Personnel from a third party that has a legal right to make such disclosure and does not impose an obligation of confidentiality on the receiving party, (iii) was known to Consultant or Personnel at the time of disclosure by Delphi, (iv) was generated independently by Consultant or Personnel before disclosure by Delphi, or (v) is required to be disclosed by Consultant or Personnel by law, subpoena or other process.

17.    <u>Assignment and Subcontracting.</u>  Consultant will not assign or subcontract any portion of its responsibilities under this Agreement without Delphi's prior written approval.

18.    <u>Changes and Delays.</u>
A.    In the event that (i) Delphi requires a change in the scope of the Services, (ii) any change of applicable law or regulation affects the timing or performance of the Services or (iii) any action by Delphi or a third party (other than Personnel) affects the timing or performance of the Services, subject to the mutual agreement of Delphi and Consultant, the fees and/or schedule for performance for the Services will be equitably adjusted by the parties.



B.    To the extent that the Engagement Letter provides that Consultant's performance under this Agreement is contingent upon specific action or cooperation of Delphi, including the supply to Consultant of specific resources, approvals, and information, any delays in Consultant's performance which occur as a result of the failure or untimely performance by Delphi shall be excused to the extent of any such delay or untimely performance by Delphi and Consultant shall not incur any liability to Delphi as a result of any such delay or untimely performance by Delphi.

19.    <u>Term and Termination</u>. This Agreement will terminate when the Services have been completed. In addition, either party may terminate this Agreement in the event of the breach by the other party of this Agreement, which breach is not cured within thirty (30) days after notice by the non-breaching party. Delphi shall pay Consultant for Services performed prior to the effective date of termination as well as expenses incurred prior to the effective date of termination and approved by Delphi in accordance with Section 7 of this <u>Exhibit A</u>.

20.    <u>Conflict</u>. In the event of any conflict, ambiguity or inconsistency between this Agreement and any other agreement relating to the Services, including any preprinted terms and conditions on Delphi's purchase orders, the terms and conditions of this Agreement shall govern.

21.    <u>Survival</u>. The provisions of this Agreement which give the parties rights beyond termination of this Agreement will survive any termination of this Agreement.

22.    <u>Severability</u>. If any portion of this Agreement is held to be void, invalid, or otherwise unenforceable, in whole or part, the remaining portions of this Agreement shall remain in effect.

23.    <u>Amendment</u>. This Agreement shall not be modified except by a later written agreement signed by both parties.

24.    <u>Alternative Dispute Resolution</u>.

A.    Any dispute or claim arising out of or relating to the Engagement Letter between the parties, the services provided thereunder, or any other services provided by or on behalf of Consultant or any of its subcontractors or agents to Delphi or at its request (including any dispute or claim involving any person or entity for whose benefit the services in question are or were provided) shall be resolved in accordance with the dispute resolution procedures set forth in Exhibit C attached hereto, which constitute the sole methodologies for the resolution of all such disputes. By operation of this provision, the parties agree to forego litigation over such disputes in any court of competent jurisdiction. Mediation, if selected, may take place at a location to be designated by the parties. Arbitration shall take place in Detroit, Michigan. Either party may seek to enforce any written agreement reached by the parties during mediation, or to confirm and enforce any final award entered in arbitration, in any court of competent jurisdiction.

**KPMG**

B.    Notwithstanding the agreement to such procedures, either party may seek injunctive relief to enforce its rights with respect to the use or protection of (i) its confidential or proprietary information or material or (ii) its names, trademarks, service marks or logos, solely in the courts of the State of Michigan or in the courts of the United States located in the State of Michigan.  The parties consent to the personal jurisdiction thereof and to sole venue therein only for such purposes.

Oct-12-05    04:04pm    From-KPMG LLP ~ NDPPS                    319 883 0500                    T-330    P.014/017    F-406



## EXHIBIT B

### Travel and Per Diem Reimbursement

**A.**    If Personnel are required by Delphi to travel as an incidental requirement in performing services for Delphi, then such travel and per diem expenses, subject to prior written approval of Delphi, will be reimbursable as follows:

| | |
|---|---|
| 1. Air Travel | Economy/Coach class only. Business class is permitted only upon prior written consent by Delphi. |
| 2. Hotel | Consultant will exercise good, sound business judgment and discretion in choosing hotels, such as moderately priced chain hotels or hotels that offer discounted corporate rates. Where extended travel is involved, reduced rates may be available and should be requested. |
| 3. Rental cars | Compact or intermediate class only. The cost of collision damage waiver and personal accident insurance is the responsibility of Consultant. |
| 4. Mileage Allowance | Reimbursement will be at the then current IRS rate (currently $0.325 per mile) for the miles which are in excess of his or her normal commute from home to work and back. When permanently assigned to another location, even if the new location is temporary, Consultant will not be reimbursed for excess miles, additional driving time, etc. |
| 5. Expense Reports | If requested, Consultant will provide receipts for all reimbursable expenses, including meals and other expenditures, in excess of $25.00 or more. |
| 6. Meals | Meals will not be reimbursed for non-overnight trips, except in the case of late return occasioned by travel outside normal working hours. Reimbursement for meals will be the actual and reasonable expenses paid by Consultant. |
| 7. Extended Travel | Consultant should review the home visit policy prior to a trip. Generally, the following provisions apply: |
| | If the travel expense is less than the living expense in the temporary location, Consultant will be reimbursed for travel to the permanent location every week. |
| | If the travel expense is more than the living expense in the temporary location, Consultant will be reimbursed for travel to the permanent |



location every two weeks.

Excess expenses due to frequent travel or stays will not be reimbursed by Delphi without its prior written approval.

8. Miscellaneous

When Consultant chooses an alternative method of transportation, *e.g.*, to drive instead of fly, reimbursement, including meals and lodging, will not exceed the lesser of the two costs. Documentation to support the lesser cost must be attached to expense report. Travel time must also be limited if on working hours.

The employee, his or her immediate supervisor, and an authorized Delphi representative must sign the expense report form.

Consultant is responsible for travel reservations, hotel/motel accommodations and rental cars. If directed by Delphi, Consultant will make all travel arrangements through Total Travel Management, using a special account set up for such purposes.

Any cash advance by Consultant to its employee is the responsibility of Consultant.

9. Per Diem

In certain instances, a per diem will be paid to Consultant in accordance with Delphi's standard per diem policy.

B.    All travel and per diem for which Consultant seeks reimbursement will be submitted to Delphi on standard vouchers, with substantiating documentation, and will accompany the monthly invoices.

Oct-12-05    04:05pm    From-KPMG LLP - NDPPS                313 983 0500                T-930    P.016/017    F-406



## EXHIBIT C

### Dispute Resolution Procedures

The following procedures are the sole methodologies to be used to resolve any controversy or claim ("dispute"). If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

### *Mediation*

Any party may request mediation of a dispute by providing a written Request for Mediation to the other party or parties. The mediator, as well as the time and place of the mediation, shall be selected by agreement of the parties. Absent any other agreement to the contrary, the parties agree to proceed in mediation using the CPR Mediation Procedures (Effective April 1, 1998), with the exception of paragraph 2 which shall not apply to any mediation conducted pursuant to this agreement. As provided in the CPR Mediation Procedures, the mediation shall be conducted as specified by the mediator and as agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with facilitation by the mediator, to reach a consensual resolution of the dispute. The mediation shall be treated as a settlement discussion and shall be confidential. The mediator may not testify for any party in any later proceeding related to the dispute. No recording or transcript shall be made of the mediation proceeding. Each party shall bear its own costs in the mediation. Absent an agreement to the contrary, the fees and expenses of the mediator shall be shared equally by the parties.

### *Arbitration*

Arbitration shall be used to settle the following disputes: (1) any dispute not resolved by mediation 90 days after the issuance by one of the parties of a written Request for Mediation (or, if the parties have agreed to enter or extend the mediation, for such longer period as the parties may agree) or (2) any dispute in which a party declares, more than 30 days after receipt of a written Request for Mediation, mediation to be inappropriate to resolve that dispute and initiates a Request for Arbitration. Once commenced, the arbitration will be conducted either (1) in accordance with the procedures in this document and the Rules for Non-Administered Arbitration of the CPR Institute for Dispute Resolution ("CPR Arbitration Rules") as in effect on the date of the engagement letter or contract between the parties, or (2) in accordance with other rules and procedures as the parties may designate by mutual agreement. In the event of a conflict, the provisions of this document and the CPR Arbitration Rules will control.

The arbitration will be conducted before a panel of three arbitrators, two of whom may be designated by the parties using either the CPR Panels of Distinguished Neutrals or the Arbitration Rosters maintained by any JAMS Office in the United States. If the parties are unable to agree on the composition of the arbitration panel, the parties shall follow the screened selection process provided in Section B, Rules 5, 6, 7, and 8 of the CPR Arbitration Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or any dispute concerning the applicability,



interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator shall be appointed unless he or she has agreed in writing to abide and be bound by these procedures.

The arbitration panel shall issue its final award in writing. The panel shall have no power to award non-monetary or equitable relief of any sort. Damages that are inconsistent with any applicable agreement between the parties, that are punitive in nature, or that are not measured by the prevailing party's actual damages, shall be unavailable in arbitration or any other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitration panel have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

Discovery shall be permitted in connection with the arbitration only to the extent, if any, expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. The parties and the arbitration panel may disclose the existence, content or results of the arbitration only as provided in the CPR Arbitration Rules. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests.

The award reached as a result of the arbitration will be binding on the parties, and confirmation of the arbitration award may be sought in any court having jurisdiction.



| | |
|---|---|
| **KPMG LLP** | Telephone 313 983 0200 |
| Suite 1200 | Fax      313 983 0008 |
| 180 West Jefferson | 313 983 0007 |
| Detroit, MI 48226-4429 | 313 983 0008 |
| | Internet  www.us.kpmg.com |

September 12, 2005

<u>PRIVATE</u>

Ms. Suzanne Kihn
Director, Corporate Accounting
Delphi Corporation
M/C 483.400.141
5725 Delphi Drive
Troy, MI 48098

Dear Suzanne,

This letter shall serve as an addendum to our engagement letter dated August 31, 2005
regarding our International Tax Process Improvement Project – Revised.

## Written Tax Advice

We do not anticipate that the written tax advice provided under this engagement letter
will rise to the level of a Covered Opinion as defined in §10.35 of Circular 230 ("Covered
Opinion"). Therefore, all the written tax advice provided under this engagement letter
will contain the following legend:

> ANY TAX ADVICE IN THIS COMMUNICATION IS NOT INTENDED OR
> WRITTEN BY KPMG TO BE USED, AND CANNOT BE USED, BY A CLIENT
> OR ANY OTHER PERSON OR ENTITY FOR THE PURPOSE OF (i)
> AVOIDING PENALTIES THAT MAY BE IMPOSED ON ANY TAXPAYER OR
> (ii) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER
> PARTY ANY MATTERS ADDRESSED HEREIN.

However, if our services will rise to the level of a Covered Opinion, we will issue a
separate engagement letter.

## Tax Return Standards

KPMG applies enhanced tax return preparation standards in preparing tax returns.
Under these standards, we must determine that the position has a "realistic possibility"
of being sustained on its merits (i.e., approximately a one-in-three or greater likelihood
of success if challenged by the IRS) with respect to any return position that does not
involve a transaction designated by the IRS as a "listed transaction" within the meaning

KPMG LLP, a U.S. limited liability partnership, is the U.S.
member firm of KPMG International, a Swiss cooperative



of Treas. Reg. §1.6011-4, or a transaction with the principal purpose of avoiding or
evading any tax imposed by the Internal Revenue Code (a "principal purpose
transaction"). If a return position relates to a "principal purpose transaction", we must
arrive at a "should" confidence level (i.e., approximately a 70 percent or greater likelihood
of success if challenged by the IRS) with respect to the transaction. We will not render
any advice with respect to a "listed transaction" or any transaction that is substantially
similar to a "listed transaction." In determining whether a return position satisfies the
"realistic possibility" and "should" standards, we will not take into account the
possibility that a tax return will not be audited, that an issue will not be raised on audit,
or that an issue will be settled. We will inform you as soon as possible if, during our
analysis, we determine circumstances exist that prevent us from advising you under
these standards.

## Fees

Our fee for this engagement will be based on the actual time incurred to complete the
project at rates previously negotiated. These rates are less than our standard hourly rates
and, accordingly, are not more than 200% of our standard hourly rates for the individuals
involved in providing the services.

Please sign the enclosed copy of this addendum to confirm our agreement and return it to
us as soon as possible. If you have any questions, please call me.

Very truly yours,

KPMG LLP

*A. G. Alexandrou (px)*

Anthony G. Alexandrou
*Partner*


## ACCEPTED:

Delphi Corporation

*[signature]*
Authorized Signature

*Executive Director, Financial Reporting*
Title

*9/16/05*
Date

## EXHIBIT C

### TAX CONSULTING ENGAGEMENT LETTER



Billing 6006082.

KPMG LLP
Suite 1200
150 West Jefferson
Detroit, MI 48226-4429

Telephone    313 983 0200
Fax             313 983 0006
              313 983 0007
              313 983 0008
Internet     www.us.kpmg.com

5

March 1, 2005

1126615 2

**PRIVATE**
Mr. James P. Whitson
Chief Tax Officer
Delphi Corporation
M/C 480.400.626
5725 Delphi Drive
Troy, MI 48098-2815

Dear Mr. Whitson:

We are pleased you have engaged KPMG LLP ("KPMG") to provide tax consulting services for Delphi Corporation ("Delphi"). This letter confirms the scope and related terms of your engagement of KPMG.

We will provide tax consulting services with respect to such matters that may arise for which you seek our advice and consultation.

This letter does not encompass any services that are the subject of a separate engagement letter between KPMG and Delphi.

Our fees for this engagement will be based on the complexity of the issues and the time required of the individuals who will be performing the services. As a result of our discussions with you, we estimate that our rates for these services are as stated:

| | |
|---|---|
| Partners | $350 |
| Senior Manager | $325 |
| Managers | $300 |
| Senior Staff | $225 |
| Staff | $175 |

Circumstances encountered during the performance of these services that warrant additional time or expense could cause us to be unable to deliver them within the above estimates. We will endeavor to notify you of any such circumstances as they are assessed.

To be of greatest assistance to Delphi, we should be advised **in advance** of proposed transactions. If such matters exceed the scope of this engagement letter, we will issue



Page 2
Mr. Jim Whitson
Delphi Automotive Systems
February 9, 2004

separate engagement letters to confirm the scope and related terms of any additional
engagements.

The attached Exhibit A, Terms and Conditions, Exhibit B, Travel and Per Diem
Reimbursement, and Exhibit C, Dispute Resolution Procedures, are made a part of this
engagement letter.  Please sign the enclosed copy of this engagement letter to confirm our
agreement and return it to us within 30 days.  If you have any questions, please call me.

Very truly yours,

KPMG LLP

Patrick N. Karpen
*Partner*

Enclosure


ACCEPTED:

Delphi Corporation

JAMES P. WHITSON

CHIEF TAX OFFICER
Title

17 APR 2005
Date



## EXHIBIT A

### GENERAL TERMS AND CONDITIONS

1.    **Agreement.**  It is agreed that KPMG LLP ("Consultant") will provide to Delphi Corporation ("Delphi") the services (the "Services") described in the accompanying engagement letter (the "Engagement Letter") to which this **Exhibit A** is attached (the Engagement Letter, this **Exhibit A** and **Exhibit B** are collectively referred to as this "Agreement").  For purposes of this Agreement, the terms "Consultant" include any affiliates of Consultant identified in the Engagement Letter as performing any of the Services, and the term "Delphi" includes any subsidiaries and affiliates of Delphi for which the Services are performed.  This Agreement constitutes the entire and sole agreement between Delphi and Consultant, and merges all prior and contemporaneous communications with respect to the subject matter of this Agreement.

2.    **Independent Contractor.**  Consultant will provide the Services as an independent contractor.  Nothing contained in this Agreement shall be construed to create an employment or principal-agent relationship or joint venture between Consultant and Delphi, and neither party shall have the right, power or authority to obligate or bind the other in any manner whatsoever.

3.    **Personnel.**  All of Consultant's agents, employees, subcontractors and/or independent contractors furnished by Consultant to perform the Services (collectively, "Personnel") are and will remain Consultant's employees and/or independent contractors and, under no circumstances, will any Personnel furnished by Consultant be deemed to be Delphi's employees or agents.  Consultant is solely responsible, at Consultant's sole cost and expense, for (i) the fulfillment of all obligations to Personnel and (ii) the compliance by Consultant and Personnel with this Agreement and all laws, regulations, orders and other governmental requirements applicable to performance of the Services.

4.    **Conduct of Consultant's Personnel.**  Consultant will assure that all Personnel who are performing Services on behalf of Consultant are competent to perform the Services.  Consultant will require all Personnel who are performing any work on Delphi's premises to comply with all of Delphi's regulations and policies.  Delphi, in its sole discretion, has the right to: (a) bar any of Personnel from Delphi's premises for failure to observe Delphi's regulations or policies, (b) require that Consultant promptly remove from Delphi's premises any Personnel who violate any of Delphi's regulations or policies, and (c) require that Consultant cease using any Personnel to perform the services who are reasonably unacceptable to Delphi.  Delphi will confer with Consultant to discuss Delphi's concerns prior to requiring removal of any Personnel.  Consultant will replace any barred or removed Personnel with Personnel reasonably acceptable to Delphi.

1

Oct-12-05    03:36pm    From-KPMG LLP - NDPPS          913 693 0500       T-328   P.005/015   F-403



5.      Non-Solicitation of Employees.

        A.      Delphi agrees that during the term of this Agreement and for a period of one (1) year after the termination of this Agreement, it will not hire or attempt to hire any employees or former employees of Consultant if listed in the engagement letter attached hereto, who have been assigned to or have performed any of the Services contemplated herein.

        B.      Consultant agrees that during the term of this Agreement and for a period of one (1) year after the termination of this Agreement, it will not hire or attempt to hire any employees or former employees of Delphi's Tax staff who have participated in the furtherance of this Agreement.

        C.      Notwithstanding the provisions of Sections 5A and 5B, neither party shall be prohibited from employing any employee, former employee or personnel of the other who contacts such party (i) on his or her own initiative or (ii) in response to a general solicitation for employment contained in a newspaper or any other publication.

6.      Professional Fees.  Delphi will compensate Consultant for actual Services performed in accordance with the fee schedule set forth in this Agreement (the "Fee Schedule").  Consultant will invoice Delphi no more frequently than monthly.  Consultant will submit, with each invoice for payment, a report specifying the actual Services performed and the calculation of the invoiced payment in accordance with the Fee Schedule.  Invoices will be due and payable by Delphi within forty-five (45) days of Delphi's receipt of the invoice and corresponding report in the required form.

7.      Expenses.  Delphi will reimburse Consultant for all reasonable costs and expenses Consultant incurs in connection with the Services, including, without limitation, all travel expenses, provided, however, that Consultant must obtain prior approval of Delphi for any individual reimbursable expenses in excess of $1,000 or for reimbursable expenses which exceed or are anticipated to exceed an aggregate of $2,500 during any calendar month. Consultant will not charge any markup, overhead, profit or other fees on the reimbursable expenses. Delphi's reimbursement obligations will be governed by the provisions of Exhibit B.

8.      Taxes.  Unless otherwise agreed in the Engagement Letter, any applicable taxes imposed on Consultant in connection with the performance of the Services (except for taxes imposed on Consultant's income) will be invoiced to, and paid by, Delphi in addition to fees and expenses.

9.      Indemnification.

        A.      Delphi shall indemnify, defend and hold harmless Consultant, including its directors, officers, employees, agents and representatives, from and against any and all claims,



demands, actions, damages, liabilities, costs and expenses, including reasonable attorney fees
and expenses, to the extent arising out of or resulting from third party claims against Consultant
based on any of Consultant's written or verbal work product prepared pursuant to this
Agreement and furnished by Consultant to Delphi for internal use (such as reports, analyses,
projections, advice, recommendations and other data ) (collectively, "Internal Work Product
Claims"). In addition, Delphi shall indemnify, defend and hold harmless Consultant, including
its directors, officers, employees, agents and representatives, from and against any and all
claims, demands, actions, damages, liabilities, costs and expenses, including reasonable attorney
fees and expenses (other than Internal Work Product Claims), to the extent arising out of or
resulting from third party claims against Consultant based on any activities of Consultant in
connection with the performance of Services under this Agreement (collectively, "Non-Work
Product Claims"), provided, however, that Delphi will have no obligation to indemnify
Consultant to the extent that any Non-Work Product Claims arise out of or result from the
negligence, illegal acts or willful misconduct of Consultant and/or its directors, officers,
employees, agents or representatives.

      B.    Consultant shall indemnify, defend and hold harmless Delphi, including its
directors, officers, employees, agents and representatives, from any and all claims, demands,
actions, damages, liabilities, costs and expenses, including reasonable attorney fees and
expenses, to the extent arising out of or resulting from the negligence, illegal acts or willful
misconduct of Consultant and/or its directors, officers, employees, agents or representatives in
connection with the performance of Services under this Agreement, provided, however, that
Consultant will have no obligation to indemnify Delphi to the extent that any such claims or
damages arise out of or result from Internal Work Product Claims.

      C.    In each case, the indemnifying party shall also pay to the indemnified party any
and all costs and expenses incurred in connection with the enforcement of these indemnification
provisions.

      D.    The indemnification obligations set forth in this Section 9 and the general terms
and conditions of this Agreement shall not apply to any tax or other governmental filings
prepared by Consultant. The rights and obligations of the parties with respect to such services
shall be governed by a separate agreement.

10.    Limitation of Liability.  Consultant's liability under this Agreement will be limited to
twenty (20) times the professional fees paid; provided however that this limitation shall not
apply (i) in the event of any breach of Section 16 below relating to Delphi Proprietary
Information or (ii) if Consultant is found to be grossly negligent or to have acted willfully or
fraudulently. In no event will Consultant or Delphi be liable for consequential, special, indirect,
incidental, punitive or exemplary damages, costs, expenses, or losses (including loss of profits,
data, business or goodwill) regardless of whether such liability is based on breach of contract,



tort, strict liability, breach of warranties, failure of essential purpose or otherwise, and even if advised of the likelihood of such damages.

11.    Standard of Performance. Consultant will use its best skills, resources and judgment to perform the Services in an efficient and economical manner and in accordance with the highest professional standards. If any Services are not completed to Delphi's reasonable satisfaction, Consultant will, at no additional cost to Delphi, take reasonable steps to correct any deficiencies. The express warranties in this Paragraph and in this Agreement shall be in lieu of all other warranties, express or implied, including the implied warranty of merchantability and fitness for a particular purpose.

12.    Reliance on Information/Authorities. Consultant will base its conclusions on the facts and assumptions that Delphi submits and will not independently verify this information. Inaccuracy or incompleteness of the information Delphi provides could have a material effect on Consultant's conclusions. In rendering its advice, Consultant may consider, for example, the applicable provisions of the Internal Revenue Code of 1986, and ERISA as amended, and the relevant state statutes, the regulations thereunder, and judicial and administrative interpretations thereof. These authorities are subject to change, retroactively and/or prospectively, and any such changes could affect the validity of Consultant's advice. Consultant will not update its advice for subsequent changes or modifications to the law and regulations, or to the judicial and administrative interpretations thereof, unless Delphi separately engages Consultant to do so after such changes or modifications.

13.    Legal Counsel. Delphi should consult with and/or engage legal counsel for the purpose of advising on non-tax legal aspects of matters on which Consultant provides tax advice and drafting any legal documents and/or agreements that may be required in connection therewith. Consultant will provide Delphi's legal counsel with tax-related advice that is deemed necessary by Delphi's legal counsel to draft such documents and/or agreements. To the extent Services of legal counsel or other professional service providers are required, Delphi is responsible for engaging and paying such service providers.

14.    Federal Confidential Communications Privilege. A confidentiality privilege under Internal Revenue Code Section 7525 may pertain to certain communications between Consultant personnel and Delphi regarding federal tax advice provided pursuant to this engagement. By retaining Consultant, Delphi agrees that Consultant is instructed to claim the privilege on Delphi's behalf, with respect to any applicable communications, up to and until such time as Delphi may waive any such privilege in writing. As disclosure of any such confidential communications to the Internal Revenue Service or other third party may cause any confidentiality privilege to be waived, Delphi should notify Consultant if the Internal Revenue Service or other third party requests information about any tax advice or tax advice documents provided by Consultant.

4



Delphi understands that Consultant makes no representation, warranty, or promise, and offers no opinion with respect to the applicability of such confidentiality privilege to any communication. Delphi agrees to indemnify Consultant for any attorney's fees and other costs and expenses incurred by Consultant in defending the confidentiality privilege on Delphi's behalf. Consultant agrees to promptly notify Delphi of any claim for which Consultant seeks indemnification and Delphi shall have the right to conduct the defense or settlement of any such claim at Delphi's sole expense, and Consultant shall cooperate with Delphi. Consultant shall nonetheless have the right to participate in such defense at its own expense and to approve the settlement of any claim hereunder that imposes liability or obligation.

15.    Disclosure and Restriction on Use.    If this engagement relates to a strategy offered by Consultant to Delphi that is designed to reduce or defer federal income tax for a direct or indirect corporate participant, pursuant to Treasury Regulation section 301.6111-2(c), Delphi (and each employee, representative, or other agent of Delphi) is expressly authorized to disclose the structure and tax aspects of the strategy with any and all persons, without limitation of any kind.

Written advice provided by Consultant to Delphi is for the information and use of Delphi only and may not be relied upon by any third party without the express written permission of Consultant.

16.    Non-Disclosure of Delphi Proprietary Information.

    A.    "Delphi Proprietary Information" means any information concerning the business and affairs of Delphi, which is not publicly available at the time disclosed to, or learned by, Consultant or any Personnel.  Delphi Proprietary Information includes, without limitation, this Agreement and any written or verbal work product prepared pursuant to this Agreement (such as reports, analyses, projections, advice, recommendations and other data); trade secrets; product specifications; data; know-how; formulae; compositions; processes; designs; sketches; photographs; samples; inventions; concepts; ideas; past, current and planned research and development; past, current and planned manufacturing or distribution methods and processes; price lists; marketing and business plans, methods and processes; financial results and information; reports; computer software and programs (including object code and source code); databases; notes; analyses; compilations; studies; and other materials or intangibles. Delphi Proprietary Information also includes any materials or information that contain or are based on any other Delphi Proprietary Information, whether prepared by Delphi, Consultant, Personnel or any other person.  Information will be conclusively deemed Delphi Proprietary Information if it is marked "Proprietary" or "Confidential" or with an equivalent legend at the time it is disclosed.  Any information transmitted orally will be conclusively deemed Delphi Proprietary Information if Delphi notifies Consultant that it is proprietary within a reasonable time following oral disclosure.  The failure, however, to mark information as "Proprietary" or "Confidential" or to notify Consultant that oral information is proprietary will not affect the

5



information's proprietary nature. Delphi Proprietary Information does not include any trade secrets; data; know-how; formulae; compositions; processes; designs; sketches; inventions; concepts; ideas; methodologies, and techniques; models; templates; general purpose consulting and software tools previously created, acquired, owned or developed or independently developed by Consultant in the performance of the Services without reference to Delphi's Proprietary Information.

B.      In connection with Consultant's performance of Services, Delphi may disclose Delphi Proprietary Information to Consultant and Personnel.    All Delphi Proprietary Information disclosed, furnished or made available to Consultant and/or Personnel and all Delphi Proprietary Information generated or developed by Consultant and/or Personnel will be treated and maintained as confidential by Consultant and Personnel, will not be disclosed to any third parties, either in whole or in part, except upon Delphi's prior written authorization, and will be used by Consultant and Personnel only for the purpose of performing the Services in accordance with this Agreement, in all cases using the same degree of care and discretion to avoid disclosure, publication or dissemination of such Delphi Proprietary Information that Consultant uses with respect to its own similar information that it does not wish to disclose, publish or disseminate (but in no event less than a reasonable degree of care and discretion). Before Consultant or Personnel discloses any information that could, under any circumstances, constitute Delphi Proprietary Information, Consultant will obtain Delphi's written consent. Neither Consultant nor Personnel will remove any Delphi Proprietary Information from Delphi's premises unless Delphi authorizes the removal in writing.    Consultant will be responsible and liable to Delphi for the violation by any of Personnel of these confidentiality obligations.

C.      The foregoing obligations under this Section 16B of this <u>Exhibit A</u> shall not apply to the extent that any Delphi Proprietary Information (i) is at the time of disclosure, or thereafter becomes, part of the public domain through a source other than Consultant and Personnel, (ii) is subsequently learned by Consultant or Personnel from a third party that has a legal right to make such disclosure and does not impose an obligation of confidentiality on the receiving party, (iii) was known to Consultant or Personnel at the time of disclosure by Delphi, (iv) was generated independently by Consultant or Personnel before disclosure by Delphi, or (v) is required to be disclosed by Consultant or Personnel by law, subpoena or other process.

17.    <u>Assignment and Subcontracting</u>.  Consultant will not assign or subcontract any portion of its responsibilities under this Agreement without Delphi's prior written approval.  To the extent any of the services under the Engagement Letter will be performed in or relate to a jurisdiction outside of the United States, Client acknowledges and agrees that such services may be performed by the member firm of KPMG International practicing in such jurisdiction. Accordingly, Client consents to KPMG's disclosure to a member firm and such member firm's use of information received from Client for the purpose of providing services under the Engagement Letter.



18.    <u>Changes and Delays</u>.

A.    In the event that (i) Delphi requires a change in the scope of the Services, (ii) any change of applicable law or regulation affects the timing or performance of the Services or (iii) any action by Delphi or a third party (other than Personnel) affects the timing or performance of the Services, subject to the mutual agreement of Delphi and Consultant, the fees and/or schedule for performance for the Services will be equitably adjusted by the parties.

B.    To the extent that the Engagement Letter provides that Consultant's performance under this Agreement is contingent upon specific action or cooperation of Delphi, including the supply to Consultant of specific resources, approvals, and information, any delays in Consultant's performance which occur as a result of the failure or untimely performance by Delphi shall be excused to the extent of any such delay or untimely performance by Delphi and Consultant shall not incur any liability to Delphi as a result of any such delay or untimely performance by Delphi.

19.    <u>Term and Termination</u>. This Agreement will terminate when the Services have been completed. In addition, either party may terminate this Agreement in the event of the breach by the other party of this Agreement, which breach is not cured within thirty (30) days after notice by the non-breaching party. Delphi shall pay Consultant for Services performed prior to the effective date of termination as well as expenses incurred prior to the effective date of termination and approved by Delphi in accordance with Section 7 of this <u>Exhibit A</u>.

20.    <u>Conflict</u>.    In the event of any conflict, ambiguity or inconsistency between this Agreement and any other agreement relating to the Services, including any preprinted terms and conditions on Delphi's purchase orders, the terms and conditions of this Agreement shall govern.

21.    <u>Survival</u>.    The provisions of this Agreement, which give the parties rights beyond termination of this Agreement, will survive any termination of this Agreement.

22.    <u>Severability</u>.    If any portion of this Agreement is held to be void, invalid, or otherwise unenforceable, in whole or part, the remaining portions of this Agreement shall remain in effect.

23.    <u>Amendment</u>. This Agreement shall not be modified except by a later written agreement signed by both parties.

24.    <u>Alternative Dispute Resolution</u>.

A.    Any dispute or claim arising out of or relating to the Engagement Letter between the parties, the services provided thereunder, or any other services provided by or on

7



behalf of Consultant or any of its subcontractors or agents to Delphi or at its request (including any dispute or claim involving any person or entity for whose benefit the services in question are or were provided) shall be resolved in accordance with the dispute resolution procedures set forth in Exhibit C attached hereto, which constitute the sole methodologies for the resolution of all such disputes. By operation of this provision, the parties agree to forego litigation over such disputes in any court of competent jurisdiction. Mediation, if selected, may take place at a location to be designated by the parties. Arbitration shall take place in Detroit, Michigan. Either party may seek to enforce any written agreement reached by the parties during mediation, or to confirm and enforce any final award entered in arbitration, in any court of competent jurisdiction.

B.    Notwithstanding the agreement to such procedures, either party may seek injunctive relief to enforce its rights with respect to the use or protection of (i) its confidential or proprietary information or material or (ii) its names, trademarks, service marks or logos, solely in the courts of the State of Michigan or in the courts of the United States located in the State of Michigan. The parties consent to the personal jurisdiction thereof and to sole venue therein only for such purposes.

25.    Miscellaneous.

A.    For engagements where services will be provided by KPMG through offices located in California, Client acknowledges that certain of KPMG's personnel who may be considered "owners" under the California Accountancy Act and implementing regulations (California Business and Professions Code section 5079(a); 16 Cal. Code Regs. sections 51 and 51.1) and who may provide services in connection with this engagement, may not be licensed as certified public accountants under the laws of any of the various states.

B.    Where KPMG is reimbursed for expenses, it is KPMG's policy to bill clients the amount incurred at the time the good or service is purchased. If KPMG subsequently receives a volume rebate or other incentive payment from a vendor relating to such expenses, KPMG does not credit such payment to Client. Instead, KPMG applies such payments to reduce its overhead costs, which costs are taken into account in determining KPMG's standard billing rates and certain transaction charges that may be charged to clients.



## EXHIBIT B

### Travel and Per Diem Reimbursement

A.      If Personnel are required by Delphi to travel as an incidental requirement in performing services for Delphi, then such travel and per diem expenses, subject to prior written approval of Delphi, will be reimbursable as follows:

1. Air Travel                Economy/Coach class only. Business class is permitted only upon prior written consent by Delphi.

2. Hotel                     Consultant will exercise good, sound business judgment and discretion in choosing hotels, such as moderately priced chain hotels or hotels that offer discounted corporate rates. Where extended travel is involved, reduced rates may be available and should be requested.

3. Rental cars               Compact or intermediate class only. The cost of collision damage waiver and personal accident insurance is the responsibility of Consultant.

4. Mileage Allowance         Reimbursement will be at the then current IRS rate (currently $0.405 per mile) for the miles which are in excess of his or her normal commute from home to work and back. When permanently assigned to another location, even if the new location is temporary, Consultant will not be reimbursed for excess miles, additional driving time, etc.

5. Expense Reports           If requested, Consultant will provide receipts for all reimbursable expenses, including meals and other expenditures, in excess of $25.00 or more.

6. Meals                     Meals will not be reimbursed for non-overnight trips, except in the case of late return occasioned by travel outside normal working hours. Reimbursement for meals will be the actual and reasonable expenses paid by Consultant.

7. Extended Travel           Consultant should review the home visit policy prior to a trip. Generally, the following provisions apply:

                             If the travel expense is less than the living expense in the temporary location, Consultant will be reimbursed for travel to the permanent location every week.

                             If the travel expense is more than the living expense in the temporary location, Consultant will be reimbursed for travel to the permanent location every two

9

Oct-12-05    03:30pm    From-KPMG LLP - NDPPS                    313 963 0500          T-826    P.013/015    F-403



weeks.

Excess expenses due to frequent travel or stays will not be reimbursed by Delphi without its prior written approval.

8. Miscellaneous

When Consultant chooses an alternative method of transportation, e.g., to drive instead of fly, reimbursement, including meals and lodging, will not exceed the lesser of the two costs. Documentation to support the lesser cost must be attached to expense report. Travel time must also be limited if on working hours.

The employee, his or her immediate supervisor, and an authorized Delphi representative must sign the expense report form.

Consultant is responsible for travel reservations, hotel/motel accommodations and rental cars. If directed by Delphi, Consultant will make all travel arrangements through Global Experts in Travel (GET), or other designated supplier, using a special account set up for such purposes.

Any cash advance by Consultant to its employee is the responsibility of Consultant.

9. Per Diem

In certain instances, a per diem will be paid to Consultant in accordance with Delphi's standard per diem policy.

B.    All travel and per diem for which Consultant seeks reimbursement will be submitted to Delphi on standard vouchers, with substantiating documentation, and will accompany the monthly invoices.

Oct-12-05    03:39pm    From-KPMG LLP - NDPPS                313 883 0500          T-328   P.014/015   F-403



## EXHIBIT C

### Dispute Resolution Procedures

The following procedures are the sole methodologies to be used to resolve any controversy or claim ("dispute"). If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

**Mediation**

Any party may request mediation of a dispute by providing a written Request for Mediation to the other party or parties. The mediator, as well as the time and place of the mediation, shall be selected by agreement of the parties. Absent any other agreement to the contrary, the parties agree to proceed in mediation using the CPR Mediation Procedures (Effective April 1, 1998), with the exception of paragraph 2 which shall not apply to any mediation conducted pursuant to this agreement. As provided in the CPR Mediation Procedures, the mediation shall be conducted as specified by the mediator and as agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with facilitation by the mediator, to reach a consensual resolution of the dispute. The mediation shall be treated as a settlement discussion and shall be confidential. The mediator may not testify for any party in any later proceeding related to the dispute. No recording or transcript shall be made of the mediation proceeding. Each party shall bear its own costs in the mediation. Absent an agreement to the contrary, the fees and expenses of the mediator shall be shared equally by the parties.

**Arbitration**

Arbitration shall be used to settle the following disputes: (1) any dispute not resolved by mediation 90 days after the issuance by one of the parties of a written Request for Mediation (or, if the parties have agreed to enter or extend the mediation, for such longer period as the parties may agree) or (2) any dispute in which a party declares, more than 30 days after receipt of a written Request for Mediation, mediation to be inappropriate to resolve that dispute and initiates a Request for Arbitration. Once commenced, the arbitration will be conducted either (1) in accordance with the procedures in this document and the Rules for Non-Administered Arbitration of the CPR Institute for Dispute Resolution ("CPR Arbitration Rules") as in effect on the date of the engagement letter or contract between the parties, or (2) in accordance with other rules and procedures as the parties may designate by mutual agreement. In the event of a conflict, the provisions of this document and the CPR Arbitration Rules will control.

The arbitration will be conducted before a panel of three arbitrators, two of whom may be designated by the parties using either the CPR Panels of Distinguished Neutrals or the Arbitration Rosters maintained by any JAMS Office in the United States. If the parties are unable to agree on the composition of the arbitration panel, the parties shall follow the screened

Oct-12-05    03:36pm    From-KPMG LLP - NDPPS                319 083 0500                T-328    P.015/015    F-408



selection process provided in Section B, Rules 5, 6, 7, and 8 of the CPR Arbitration Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or any dispute concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator shall be appointed unless he or she has agreed in writing to abide and be bound by these procedures.

The arbitration panel shall issue its final award in writing. The panel shall have no power to award non-monetary or equitable relief of any sort. Damages that are inconsistent with any applicable agreement between the parties, that are punitive in nature, or that are not measured by the prevailing party's actual damages, shall be unavailable in arbitration or any other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitration panel have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

Discovery shall be permitted in connection with the arbitration only to the extent, if any, expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. The parties and the arbitration panel may disclose the existence, content or results of the arbitration only as provided in the CPR Arbitration Rules. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests.

The award reached as a result of the arbitration will be binding on the parties, and confirmation of the arbitration award may be sought in any court having jurisdiction.

12

Oct-12-05    03:51pm    From-KPMG LLP - NDPPS                313 983 0500        T-329   P.002/002   F-404

Billing   6006286
· Delphi
   2005
Per TAX
  File

**KPMG**

KPMG LLP
Suite 1900
150 West Jefferson
Detroit, MI 48226-4429

Telephone  313 983 0200
Fax        313 983 0006
           313 983 0007
Internet   www.us.kpmg.com

May 23, 2005

Mr. James P. Whitson
Chief Tax Officer
Delphi Corporation
M/C 480.400.626
5725 Delphi Drive
Troy, MI 48098-2815

Dear Mr. Whitson:

This document will serve as an addendum to our previous engagement letter for tax consulting services dated March 1, 2005, and signed by you on April 14, 2005 ("Agreement"). The modifications are set forth below:

(1)   The term of the Agreement will last only until December 31, 2005, assuming there are no Services in progress at that time. Paragraph 19 of the Agreement is so modified.

(2)   The Fees for the Services contemplated under the Agreement will not exceed $25,000 for any particular tax matter. In such cases where Fees for a particular tax matter are reasonably expected to exceed $25,000, a separate engagement letter will be negotiated.

(3)   Paragraph 10 regarding Limitation of Liability will be modified such that the first part thereof will read:

      Consultant's liability under this Agreement will be limited to $500,000;

      The remainder of Paragraph 10 will stay as is.

Please sign the enclosed copy of this addendum and return it to us.

If you have any questions, please call.

Very truly yours,

KPMG LLP

Patrick N. Karpen
Partner


ACCEPTED

Delphi Corporation

Authorized Signature
JAMES P. WHITSON
Title CHIEF TAX OFFICER

24 MAY 2005
Date

KPMG LLP, a U.S. limited liability partnership, is the U.S.
member firm of KPMG International, a Swiss cooperative.

MAY 23 '05 17:55                                            PAGE.02
                                                    *** TOTAL PAGE.02 ***

## <u>EXHIBIT D</u>

### IES ENGAGEMENT LETTER



**KPMG LLP**
303 East Wacker Drive
Chicago, IL 60601-5212

Telephone    312 665 1000
Fax    312 665 6000
Internet    www.us.kpmg.com

October 5, 2004

**PRIVATE**

Ms. Sara J. Phillips
Manager, International Services Group
Delphi Corporation
World Headquarters & Customer Center
M/C 480.410.122
5825 Delphi Drive
Troy, MI 48098

Dear Sara:

We are pleased you have engaged KPMG LLP (KPMG) to provide international executive services to Delphi Corporation (Delphi) and its:

- Expatriates Assigned From the US;

- Expatriates Assigned To the US;

- Expatriates Assigned To and From Non-US Countries;

- Employees Assigned to the Mexican Border; and,

- Trainees/J-1 Visa Holders.

This letter confirms the scope and related terms of your engagement of KPMG for the 2005, 2006, and 2007 calendar years. For purposes of this Engagement Letter, the term "KPMG" includes any affiliates of KPMG identified as performing any of the Services, and the term "Delphi" includes any subsidiaries and affiliates of Delphi for which the Services are performed. Standard engagement terms and conditions, which are made part of this engagement letter, between KPMG and Delphi are contained in Exhibits A, B, and C.

**Included Services (the "Services")**

The following is a list of the services that we will provide to all Delphi Expatriates Assigned To or From the US:

- Collect tax data;

- Calculate annual hypothetical tax withholding;

KPMG LLP, a U.S. limited liability partnership, is the U.S.
member firm of KPMG International, a Swiss cooperative.



Chicago Office
Celebrating
years



Page 2
Ms. Sara J. Phillips
Delphi Corporation
October 5, 2004

- Prepare required home and host country individual income tax returns during, and one year after, assignment;

- Prepare requests for extension of time to file tax return(s), where required;

- Prepare US estimated tax vouchers, if required;

- Prepare year end withholding calculation;

- Reconcile tax advance account;

- Prepare tax equalization calculations;

- Conduct pre-departure and or post-arrival tax consultation session, as requested;

- Conduct repatriation tax consultation sessions for expatriates; and,

- Handle routine correspondence with the IRS and foreign tax authorities, including review of tax assessments.

The following is a list of the services that we will provide to all Delphi Expatriates Assigned To and From Non-US countries:

- Collect tax data;

- Calculate annual hypothetical tax withholding;

- Prepare required home and host country individual income tax return(s) during, and one year after, assignment;

- Prepare requests for extension of time to file tax return(s), where required;

- Determine and arrange for timely payment of local taxes in the host countries, where applicable;

- Prepare tax equalization calculation;

- Conduct pre-departure and or post-arrival tax consultation session, as requested;

- Conduct repatriation tax consultation session; and,

- Handle routine correspondence with the IRS and foreign tax authorities including review of tax assessments.

The following is a list of the services that we will provide to all Delphi Employees Assigned to the Mexican Border:

- Collect tax data;

- Prepare US income tax return(s);



Page 3
Ms. Sara J. Phillips
Delphi Corporation
October 5, 2004

- Prepare requests for extension of time to file tax return(s), where required;

- Prepare tax equalization calculation;

- Conduct post-arrival counseling session; and,

- Handle routine correspondence with the IRS and foreign tax authorities including review of tax assessments.

The following is a list of the services that we will provide to all Trainees/J-1 Visa Holders:

- Collect tax data;

- Prepare US income tax return(s);

- Prepare requests for extension of time to file tax return(s), where required;

- Conduct pre-departure and or post-arrival tax consultation session; and,

- Handle routine correspondence with the IRS.

The following is a list of the services that we will provide as part of Global Coordination:

- Hypothetical tax process verification;

- Automation of the centralized hypothetical tax calculation process;

- Tax planning solutions;

- On-going benchmarking of Delphi's current tax equalization policy;

- Dedicated Virtual IHR website;

- Dedicated KPMG/ExpatExtranet website;

- Unlimited access to all KPMG publications;.

- Status reports;

- Client service report; and,

- KPMG International Executive Alert Newsletters.

In addition we will provide tax clearance certificates and visa and immigration services as requested. Please see Exhibit F for details.

<u>Verification of Information</u>

We will provide your employees with organizers designed to assist them in gathering the information needed to prepare their income tax return(s). Your employees should review their information



Page 4
Ms. Sara J. Phillips
Delphi Corporation
October 5, 2004

carefully to ensure that it is complete and accurate. We will not audit or independently verify the data submitted by Delphi or the individual taxpayer. We may, however, ask for clarification, where necessary.

### Tax Return Positions

Where there may be alternative positions available in preparing the individual income tax returns, we will follow policy regarding the tax return positions which have been discussed with you and your tax group. At any time during the term of this Engagement Letter and at your request, we will re-address the tax return positions with you.

### Tax Examinations

All tax returns are subject to examination by taxing authorities. In the event of an examination, an expatriate may be requested to produce documents, records, or other evidence to substantiate the various items of income and deduction shown on the tax returns. If such an examination occurs, we will be pleased to assist or represent your employees upon request. A separate engagement letter will be issued at that time to confirm the scope of the examination engagement.

### Tax Calculations

Where we prepare tax equalization calculations for authorized employees, the calculations will be prepared in accordance with your established policies. All calculations will use a tax equalization template which you have reviewed and approved. We will bring questionable items, or items not addressed in your established policies and which have not been previously addressed, to your attention for your review and approval prior to finalizing the tax equalization calculation. You will instruct your employees to review all calculations provided to them.

Where tax returns or tax equalization calculations for authorized employees are to be provided to Delphi, we will require the consent of those particular employees (and their spouses, where married) to disclose tax return information before so providing the calculations.

### Tax Consulting Services

This engagement letter also covers tax consulting matters that may arise for which you seek our advice and consultation, both written and oral, and which are not the subject of a separate engagement letter.

To be of greatest assistance to Delphi, we should be advised in advance of proposed transactions. If such matters exceed the scope of this engagement letter, we will issue separate engagement letters to confirm the scope and related terms of any additional engagements. Global solutions, such as One



Page 5
Ms. Sara J. Phillips
Delphi Corporation
October 5, 2004

Year Rollover for Expatriates and Global Equity Compensation Strategies will be addressed in
separate engagement letters.

## Delivery of Services

The services will be provided under the direction of KPMG LLP, the US member firm of KPMG
International, and will include the participation of other member firms of KPMG International
(KPMG member firms). KPMG LLP is a separate legal entity from other member firms of KPMG
International. Advice relative to tax matters outside the United States will be based on tax advice
provided by the KPMG member firm in the particular country and on the relevant tax authorities in
that country. In rendering such advice, we may also consider US tax treaties, their technical
explanations, and judicial and administrative interpretations thereof.

In certain countries, a KPMG member firm is authorized to provide legal services within its
jurisdiction. This engagement letter encompasses only tax services provided by KPMG member firms
and does not encompass any legal services a KPMG member firm may be authorized to provide.
Should the provision of such services not be proscribed by applicable independence rules and should
Delphi choose to retain a KPMG member firm to provide legal services, including drafting of
documents, in a particular country, Delphi and the KPMG member firm will enter into a separate fee
arrangement and engagement letter for the provision of such legal services.

## Taxes

For purposes of this Engagement Letter, "Taxes" means any sales taxes, use taxes, excise taxes, value
added taxes or other taxes, however designated, assessed, charged or levied upon the use of the
Services or the professional fees charges therefore; provided, however, Taxes shall not include any
income, gross receipts, privilege or franchise taxes or any other taxes that are based on or measured
by a party's net income.

Delphi and KPMG shall reasonably cooperate with each other to more accurately determine each
party's tax liability and to minimize that tax liability to the extent legally permissible. Each party
shall provide and make available to the other party any applicable certificates, information regarding
out-of-jurisdiction sales of services, and other exemption certificates or information reasonably
requested by the other party. In furtherance thereof, KPMG will use its best efforts to obtain an
exemption for any sales, use, value-added or similar Tax, to the extent available under local law.

The parties agree to utilize reasonable efforts to structure the provision and receipt of the Services, as
the case may be, in such a fashion as to minimize, to the extent legally permissible, any sales, use,
value-added, withholding and similar Taxes payable by Delphi and/or incurred by KPMG. In



Page 6
Ms. Sara J. Phillips
Delphi Corporation
October 5, 2004

furtherance thereof and in relation to the provision of local country Services, KPMG, through its member firms, will directly bill the local Delphi affiliate such that there will be local country billings for all local country Services, to the extent legally permissible. To the extent that local country invoicing is not performed, KPMG will bear the cost of any additional Taxes resulting from a cross border payment. Such local country billings will be made in local currency subject to the same terms hereunder (timing, etc.) in relation to all payments by Delphi. The parties will, from time to time, review and enhance, as necessary, the positions taken with respect to the structure hereunder.

There shall be billed as separate line items on each invoice to Delphi, or a separate invoice for, and Delphi shall pay to KPMG, or reimburse KPMG for the payment of, amounts equal to applicable Taxes, if any, and any audit assessments of Taxes and related interest thereon, unless such assessment is the result of KPMG's collection of Taxes from Delphi and failure to remit such taxes to the applicable taxing authority or other gross negligence by KPMG.

KPMG will price the Services excluding any sales, use, service, value-added or similar Taxes that may be levied on the Services provided hereunder. KPMG will invoice, collect and remit such Taxes in accordance with local law. If Delphi is required by law to make any deduction or withholding from sums payable to KPMG, then Delphi shall promptly report and effect payment thereof to the applicable taxing authorities, and Delphi will pay the net amount, after deduction or withholding to KPMG. Delphi shall also provide KPMG with official Tax receipts or other evidence issued by the applicable taxing authorities sufficient to establish that the Taxes have been paid. Invoices shall separately state applicable Taxes as necessary to assist Delphi in recapturing Taxes, as appropriate. Invoices shall be in the appropriate form as required by local law to permit deduction of payments for income tax purposes.

## Federal Confidential Communications Privilege

Delphi's (i) expatriates assigned from the US, (ii) expatriates assigned to the US, (iii) expatriates assigned to and from Non-US countries, (iv) employees assigned to the Mexican border, and (v) trainees/J-1 Visa holders are intended beneficiaries of this Engagement Letter. Accordingly, Delphi agrees that any confidential communications between KPMG and the above referenced individuals will not be shared with Delphi. However, in the event an above referenced individual disputes the tax computation prepared by KPMG and requests Delphi's review of such computation, KPMG agrees to waive the above privilege if the individual furnishes a waiver of its confidential communications with KPMG.



Page 7
Ms. Sara J. Phillips
Delphi Corporation
October 5, 2004

### Privacy

We are enclosing the KPMG Privacy Notice for your reference in Exhibit G. The notice will be provided to all authorized expatriates.

### Professional Fees

Our fees for this engagement will be based upon the attached fee schedule, Exhibit D, E, and F, inclusive of services performed by other KPMG member firms except to the extent related to legal services. As we have discussed, these fees are based upon the complexity of the issues and the time required of the professionals who will be performing these services. Circumstances encountered during the performance of these services that warrant additional time and/or expense could affect the above estimates. We will endeavor to notify you of any such circumstances as they arise.

We will prepare and forward a progress bill to your attention for half of the total projected agreed fee upon mailing of the organizers. The remainder will be billed upon completion of the tax returns. Payment is required upon receipt of the invoice.

### General Provisions

In the event of any conflict, ambiguity or inconsistency between this Engagement Letter and any other agreement relating to the Services, including any preprinted terms and conditions, the terms and conditions of this Engagement Letter shall govern.

The provisions of this Engagement Letter which give the parties rights beyond termination of this Engagement Letter will survive any termination of this Engagement Letter.

If any portion of this Engagement Letter is held to be void, invalid or otherwise unenforceable, in whole or in part, the remaining portions of this Engagement Letter shall remain in effect. This Engagement Letter shall not be modified except by a later written agreement signed by both parties.

Once again, we appreciate the opportunity to serve you and look forward to working with you. The attached Engagement Terms and Conditions are made a part of this engagement letter.



Page 8
Ms. Sara J. Phillips
Delphi Corporation
October 5, 2004

Please sign the enclosed copy of this letter to confirm our agreement and return it to us.  If you have
any questions, please call me at (312) 665-8485 or Doyoung Yong at (312) 665-5207.

Very truly yours,

KPMG LLP

Ann Marie Goddard
*Partner*
*International Executive Services*

Enclosure

cc:      James P. Whitson, Delphi Corporation
         Doyoung Yong, KPMG LLP

**ACCEPTED:**

Delphi Corporation

Authorized Signature

Title

Date

## EXHIBIT A

### GENERAL TERMS AND CONDITIONS

1.    Agreement.  It is agreed that KPMG LLP ("Consultant") will provide to Delphi Corporation ("Delphi") the services (the "Services") described in the accompanying engagement letter (the "Engagement Letter") to which this Exhibit A is attached (the Engagement Letter, this Exhibit A and Exhibit B are collectively referred to as this "Agreement").  For purposes of this Agreement, the terms "Consultant" include any affiliates of Consultant identified in the Engagement Letter as performing any of the Services, and the term "Delphi" includes any subsidiaries and affiliates of Delphi for which the Services are performed.  This Agreement constitutes the entire and sole agreement between Delphi and Consultant, and merges all prior and contemporaneous communications with respect to the subject matter of this Agreement.

2.    Independent Contractor.  Consultant will provide the Services as an independent contractor. Nothing contained in this Agreement shall be construed to create an employment or principal-agent relationship or joint venture between Consultant and Delphi, and neither party shall have the right, power or authority to obligate or bind the other in any manner whatsoever.

3.    Personnel.  All of Consultant's agents, employees, subcontractors and/or independent contractors furnished by Consultant to perform the Services (collectively, "Personnel") are and will remain Consultant's employees and/or independent contractors and, under no circumstances, will any Personnel furnished by Consultant be deemed to be Delphi's employees or agents.  Consultant is solely responsible, at Consultant's sole cost and expense, for (i) the fulfillment of all obligations to Personnel and (ii) the compliance by Consultant and Personnel with this Agreement and all laws, regulations, orders and other governmental requirements applicable to performance of the Services.

4.    Conduct of Consultant's Personnel.  Consultant will assure that all Personnel who are performing Services on behalf of Consultant are competent to perform the Services.  Consultant will require all Personnel who are performing any work on Delphi's premises to comply with all of Delphi's regulations and policies.  Delphi, in its sole discretion, has the right to: (a) bar any of Personnel from Delphi's premises for failure to observe Delphi's regulations or policies, (b) require that Consultant promptly remove from Delphi's premises any Personnel who violate any of Delphi's regulations or policies, and (c) require that Consultant cease using any Personnel to perform the services who are reasonably unacceptable to Delphi.  Delphi will confer with Consultant to discuss Delphi's concerns prior to requiring removal of any Personnel.  Consultant will replace any barred or removed Personnel with Personnel reasonably acceptable to Delphi.

5.    Non-Solicitation of Employees.

A.    Delphi agrees that during the term of this Agreement and for a period of one (1) year after the termination of this Agreement, it will not hire or attempt to hire any employees or former employees of Consultant if listed in the engagement letter attached hereto, who have been assigned to or have performed any of the Services contemplated herein.

B.    Consultant agrees that during the term of this Agreement and for a period of one (1) year after the termination of this Agreement, it will not hire or attempt to hire any employees or former employees of Delphi's Tax staff who have participated in the furtherance of this Agreement.

C.    Notwithstanding the provisions of Sections 5A and 5B, neither party shall be prohibited from employing any employee, former employee or personnel of the other who contacts such party (i) on his or her own initiative or (ii) in response to a general solicitation for employment contained in a newspaper or any other publication.

6.    .    <u>Professional Fees</u>.  Delphi will compensate Consultant for actual Services performed in accordance with the fee schedule set forth in this Agreement (the "Fee Schedule"). Consultant will invoice Delphi no more frequently than monthly. Consultant will submit, with each invoice for payment, a report specifying the actual Services performed and the calculation of the invoiced payment in accordance with the Fee Schedule.  Invoices will be due and payable by Delphi within forty-five (45) days of Delphi's receipt of the invoice and corresponding report in the required form.

7.    <u>Expenses</u>.  Delphi will reimburse Consultant for all reasonable costs and expenses Consultant incurs in connection with the Services, including, without limitation, all travel expenses, <u>provided, however</u>, that Consultant must obtain prior approval of Delphi for any individual reimbursable expenses in excess of $1,000 or for reimbursable expenses which exceed or are anticipated to exceed an aggregate of $2,500 during any calendar month.  Consultant will not charge any markup, overhead, profit or other fees on the reimbursable expenses.  Delphi's reimbursement obligations will be governed by the provisions of <u>Exhibit B</u>.

8.    <u>Taxes</u>.  Unless otherwise agreed in the Engagement Letter, any applicable taxes imposed on Consultant in connection with the performance of the Services (except for taxes imposed on Consultant's income) will be invoiced to, and paid by, Delphi in addition to fees and expenses.

9.    <u>Indemnification</u>.

A.    Delphi shall indemnify, defend and hold harmless Consultant, including its directors, officers, employees, agents and representatives, from and against any and all claims, demands, actions, damages, liabilities, costs and expenses, including reasonable attorney fees and expenses, to the extent arising out of or resulting from third party claims against Consultant based on any of Consultant's written or verbal work product prepared pursuant to this Agreement and furnished by Consultant to Delphi for internal use (such as reports, analyses, projections, advice, recommendations and other data ) (collectively, "Internal Work Product Claims").  In addition, Delphi shall indemnify, defend and hold harmless Consultant, including its directors, officers, employees, agents and representatives, from and against any and all claims, demands, actions, damages, liabilities, costs and expenses, including reasonable attorney fees and expenses (other than Internal Work Product Claims), to the extent arising out of or resulting from third party claims against Consultant based on any activities of Consultant in connection with the performance of Services under this Agreement (collectively, "Non-Work Product Claims"), <u>provided, however</u>, that Delphi will have no obligation to indemnify Consultant to the extent that any Non-Work Product Claims arise out of or result from the negligence, illegal acts or willful misconduct of Consultant and/or its directors, officers, employees, agents or representatives.

B.    Consultant shall indemnify, defend and hold harmless Delphi, including its directors, officers, employees, agents and representatives, from any and all claims, demands, actions, damages, liabilities, costs and expenses, including reasonable attorney fees and expenses, to the extent arising out of or resulting from the negligence, illegal acts or willful misconduct of Consultant and/or its directors, officers, employees, agents or representatives in connection with the performance of Services under this Agreement, <u>provided, however</u>, that Consultant will have no obligation to indemnify Delphi to the extent that any such claims or damages arise out of or result from Internal Work Product Claims.

C.    In each case, the indemnifying party shall also pay to the indemnified party any and all costs and expenses incurred in connection with the enforcement of these indemnification provisions.

D.    The indemnification obligations set forth in this Section 9 and the general terms and conditions of this Agreement shall not apply to any tax or other governmental filings prepared by Consultant. The rights and obligations of the parties with respect to such services shall be governed by a separate agreement.

10.    Limitation of Liability.    Consultant's liability under this Agreement will be limited to twenty (20) times the professional fees paid; provided however that this limitation shall not apply (i) in the event of any breach of Section 16 below relating to Delphi Proprietary Information or (ii) if Consultant is found to be grossly negligent or to have acted willfully or fraudulently. In no event will Consultant or Delphi be liable for consequential, special, indirect, incidental, punitive or exemplary damages, costs, expenses, or losses (including loss of profits, data, business or goodwill) regardless of whether such liability is based on breach of contract, tort, strict liability, breach of warranties, failure of essential purpose or otherwise, and even if advised of the likelihood of such damages.

11.    Standard of Performance.    Consultant will use its best skills, resources and judgment to perform the Services in an efficient and economical manner and in accordance with the highest professional standards. If any Services are not completed to Delphi's reasonable satisfaction, Consultant will, at no additional cost to Delphi, take reasonable steps to correct any deficiencies. The express warranties in this Paragraph and in this Agreement shall be in lieu of all other warranties, express or implied, including the implied warranty of merchantability and fitness for a particular purpose.

12.    Reliance on Information/Authorities.    Consultant will base its conclusions on the facts and assumptions that Delphi submits and will not independently verify this information. Inaccuracy or incompleteness of the information Delphi provides could have a material effect on Consultant's conclusions. In rendering its advice, Consultant may consider, for example, the applicable provisions of the Internal Revenue Code of 1986, and ERISA as amended, and the relevant state statutes, the regulations thereunder, and judicial and administrative interpretations thereof. These authorities are subject to change, retroactively and/or prospectively, and any such changes could affect the validity of Consultant's advice. Consultant will not update its advice for subsequent changes or modifications to the law and regulations, or to the judicial and administrative interpretations thereof, unless Delphi separately engages Consultant to do so after such changes or modifications.

13.    Legal Counsel.    Delphi should consult with and/or engage legal counsel for the purpose of advising on non-tax legal aspects of matters on which Consultant provides tax advice and drafting any legal documents and/or agreements that may be required in connection therewith. Consultant will provide Delphi's legal counsel with tax-related advice that is deemed necessary by Delphi's legal counsel to draft such documents and/or agreements. To the extent Services of legal counsel or other professional service providers are required, Delphi is responsible for engaging and paying such service providers.

14.    Federal Confidential Communications Privilege.    A confidentiality privilege under Internal Revenue Code Section 7525 may pertain to certain communications between Consultant personnel and Delphi regarding federal tax advice provided pursuant to this engagement. By retaining Consultant, Delphi agrees that Consultant is instructed to claim the privilege on Delphi's behalf, with respect to any applicable communications, up to and until such time as Delphi may waive any such privilege in writing. As disclosure of any such confidential communications to the Internal Revenue Service or other third party may cause any confidentiality privilege to be waived, Delphi should notify Consultant if the Internal

Revenue Service or other third party requests information about any tax advice or tax advice documents provided by Consultant.

Delphi understands that Consultant makes no representation, warranty, or promise, and offers no opinion with respect to the applicability of such confidentiality privilege to any communication. Delphi agrees to indemnify Consultant for any attorney's fees and other costs and expenses incurred by Consultant in defending the confidentiality privilege on Delphi's behalf. Consultant agrees to promptly notify Delphi of any claim for which Consultant seeks indemnification and Delphi shall have the right to conduct the defense or settlement of any such claim at Delphi's sole expense, and Consultant shall cooperate with Delphi. Consultant shall nonetheless have the right to participate in such defense at its own expense and to approve the settlement of any claim hereunder that imposes liability or obligation.

15.    Disclosure and Restriction on Use.    If this engagement relates to a strategy offered by Consultant to Delphi that is designed to reduce or defer federal income tax for a direct or indirect corporate participant, pursuant to Treasury Regulation section 301.6111-2(c), Delphi (and each employee, representative, or other agent of Delphi) is expressly authorized to disclose the structure and tax aspects of the strategy with any and all persons, without limitation of any kind.

Written advice provided by Consultant to Delphi is for the information and use of Delphi only and may not be relied upon by any third party without the express written permission of Consultant.

16.    Non-Disclosure of Delphi Proprietary Information.

A.    "Delphi Proprietary Information" means any information concerning the business and affairs of Delphi, which is not publicly available at the time disclosed to, or learned by, Consultant or any Personnel. Delphi Proprietary Information includes, without limitation, this Agreement and any written or verbal work product prepared pursuant to this Agreement (such as reports, analyses, projections, advice, recommendations and other data); trade secrets; product specifications; data; know-how; formulae; compositions; processes; designs; sketches; photographs; samples; inventions; concepts; ideas; past, current and planned research and development; past, current and planned manufacturing or distribution methods and processes; price lists; marketing and business plans, methods and processes; financial results and information; reports; computer software and programs (including object code and source code); databases; notes; analyses; compilations; studies; and other materials or intangibles. Delphi Proprietary Information also includes any materials or information that contain or are based on any other Delphi Proprietary Information, whether prepared by Delphi, Consultant, Personnel or any other person. Information will be conclusively deemed Delphi Proprietary Information if it is marked "Proprietary" or "Confidential" or with an equivalent legend at the time it is disclosed. Any information transmitted orally will be conclusively deemed Delphi Proprietary Information if Delphi notifies Consultant that it is proprietary within a reasonable time following oral disclosure. The failure, however, to mark information as "Proprietary" or "Confidential" or to notify Consultant that oral information is proprietary will not affect the information's proprietary nature. Delphi Proprietary Information does not include any trade secrets; data; know-how; formulae; compositions; processes; designs; sketches; inventions; concepts; ideas; methodologies, and techniques; models; templates; general purpose consulting and software tools previously created, acquired, owned or developed or independently developed by Consultant in the performance of the Services without reference to Delphi's Proprietary Information.

B.    In connection with Consultant's performance of Services, Delphi may disclose Delphi Proprietary Information to Consultant and Personnel. All Delphi Proprietary Information disclosed, furnished or made available to Consultant and/or Personnel and all Delphi Proprietary Information generated or developed by Consultant and/or Personnel will be treated and maintained as confidential by

Consultant and Personnel, will not be disclosed to any third parties, either in whole or in part, except upon Delphi's prior written authorization, and will be used by Consultant and Personnel only for the purpose of performing the Services in accordance with this Agreement, in all cases using the same degree of care and discretion to avoid disclosure, publication or dissemination of such Delphi Proprietary Information that Consultant uses with respect to its own similar information that it does not wish to disclose, publish or disseminate (but in no event less than a reasonable degree of care and discretion). Before Consultant or Personnel discloses any information that could, under any circumstances, constitute Delphi Proprietary Information, Consultant will obtain Delphi's written consent. Neither Consultant nor Personnel will remove any Delphi Proprietary Information from Delphi's premises unless Delphi authorizes the removal in writing. Consultant will be responsible and liable to Delphi for the violation by any of Personnel of these confidentiality obligations.

C.     The foregoing obligations under this Section 16B of this Exhibit A shall not apply to the extent that any Delphi Proprietary Information (i) is at the time of disclosure, or thereafter becomes, part of the public domain through a source other than Consultant and Personnel, (ii) is subsequently learned by Consultant or Personnel from a third party that has a legal right to make such disclosure and does not impose an obligation of confidentiality on the receiving party, (iii) was known to Consultant or Personnel at the time of disclosure by Delphi, (iv) was generated independently by Consultant or Personnel before disclosure by Delphi, or (v) is required to be disclosed by Consultant or Personnel by law, subpoena or other process.

17.     Assignment and Subcontracting.  Consultant will not assign or subcontract any portion of its responsibilities under this Agreement without Delphi's prior written approval.

18.     Changes and Delays.

A.     In the event that (i) Delphi requires a change in the scope of the Services, (ii) any change of applicable law or regulation affects the timing or performance of the Services or (iii) any action by Delphi or a third party (other than Personnel) affects the timing or performance of the Services, subject to the mutual agreement of Delphi and Consultant, the fees and/or schedule for performance for the Services will be equitably adjusted by the parties.

B.     To the extent that the Engagement Letter provides that Consultant's performance under this Agreement is contingent upon specific action or cooperation of Delphi, including the supply to Consultant of specific resources, approvals, and information, any delays in Consultant's performance which occur as a result of the failure or untimely performance by Delphi shall be excused to the extent of any such delay or untimely performance by Delphi and Consultant shall not incur any liability to Delphi as a result of any such delay or untimely performance by Delphi.

19.     Term and Termination. This Agreement will terminate when the Services have been completed. In addition, either party may terminate this Agreement in the event of the breach by the other party of this Agreement, which breach is not cured within thirty (30) days after notice by the non-breaching party. Delphi shall pay Consultant for Services performed prior to the effective date of termination as well as expenses incurred prior to the effective date of termination and approved by Delphi in accordance with Section 7 of this Exhibit A.

20.     Conflict.  In the event of any conflict, ambiguity or inconsistency between this Agreement and any other agreement relating to the Services, including any preprinted terms and conditions on Delphi's purchase orders, the terms and conditions of this Agreement shall govern.

21.    <u>Survival</u>.  The provisions of this Agreement, which give the parties rights beyond termination of this Agreement, will survive any termination of this Agreement.

22.    <u>Severability</u>.  If any portion of this Agreement is held to be void, invalid, or otherwise unenforceable, in whole or part, the remaining portions of this Agreement shall remain in effect.

23.    <u>Amendment</u>.  This Agreement shall not be modified except by a later written agreement signed by both parties.

24.    <u>Alternative Dispute Resolution</u>.

A.  Any dispute or claim arising out of or relating to the Engagement Letter between the parties, the services provided thereunder, or any other services provided by or on behalf of Consultant or any of its subcontractors or agents to Delphi or at its request (including any dispute or claim involving any person or entity for whose benefit the services in question are or were provided) shall be resolved in accordance with the dispute resolution procedures set forth in Exhibit C attached hereto, which constitute the sole methodologies for the resolution of all such disputes.  By operation of this provision, the parties agree to forego litigation over such disputes in any court of competent jurisdiction.  Mediation, if selected, may take place at a location to be designated by the parties.  Arbitration shall take place in Detroit, Michigan.  Either party may seek to enforce any written agreement reached by the parties during mediation, or to confirm and enforce any final award entered in arbitration, in any court of competent jurisdiction.

(b) Notwithstanding the agreement to such procedures, either party may seek injunctive relief to enforce its rights with respect to the use or protection of (i) its confidential or proprietary information or material or (ii) its names, trademarks, service marks or logos, solely in the courts of the State of Michigan or in the courts of the United States located in the State of Michigan.  The parties consent to the personal jurisdiction thereof and to sole venue therein only for such purposes.

KPMG/Delphi Standard Engagement Terms & Conditions
rev. 9 15 2004
page 7 of 10

## EXHIBIT B

### Travel and Per Diem Reimbursement

A.      If Personnel are required by Delphi to travel as an incidental requirement in performing services for Delphi, then such travel and per diem expenses, subject to prior written approval of Delphi, will be reimbursable as follows::

| | | |
|---|---|---|
| 1. Air Travel | Economy/Coach class only. Business class is permitted only upon prior written consent by Delphi. |
| 2. Hotel | Consultant will exercise good, sound business judgment and discretion in choosing hotels, such as moderately priced chain hotels or hotels that offer discounted corporate rates. Where extended travel is involved, reduced rates may be available and should be requested. |
| 3. Rental cars | Compact or intermediate class only. The cost of collision damage waiver and personal accident insurance is the responsibility of Consultant. |
| 4. Mileage Allowance | Reimbursement will be at the then current IRS rate (currently $0.375 per mile) for the miles which are in excess of his or her normal commute from home to work and back. When permanently assigned to another location, even if the new location is temporary, Consultant will not be reimbursed for excess miles, additional driving time, etc. |
| 5. Expense Reports | If requested, Consultant will provide receipts for all reimbursable expenses, including meals and other expenditures, in excess of $25.00 or more. |
| 6. Meals | Meals will not be reimbursed for non-overnight trips, except in the case of late return occasioned by travel outside normal working hours. Reimbursement for meals will be the actual and reasonable expenses paid by Consultant. |
| 7. Extended Travel | Consultant should review the home visit policy prior to a trip. Generally, the following provisions apply:

If the travel expense is less than the living expense in the temporary location, Consultant will be reimbursed for travel to the permanent location every week.

If the travel expense is more than the living expense in the temporary location, Consultant will be reimbursed for travel to the permanent location every two weeks.

Excess expenses due to frequent travel or stays will not be reimbursed by Delphi without its prior written approval. |
| 8. Miscellaneous | When Consultant chooses an alternative method of transportation, e.g., to drive instead of fly, reimbursement, including meals and lodging, will not exceed the lesser of the two costs. Documentation to support the lesser cost must be attached to expense report. Travel time must also be limited if on working hours.

The employee, his or her immediate supervisor, and an authorized Delphi |

representative must sign the expense report form.

Consultant is responsible for travel reservations, hotel/motel accommodations and rental cars. If directed by Delphi, Consultant will make all travel arrangements through Total Travel Management, using a special account set up for such purposes.

Any cash advance by Consultant to its employee is the responsibility of Consultant.

9.  Per Diem          In certain instances, a per diem will be paid to Consultant in accordance with Delphi's standard per diem policy.

B.      All travel and per diem for which Consultant seeks reimbursement will be submitted to Delphi on standard vouchers, with substantiating documentation, and will accompany the monthly invoices.

**Exhibit C**

**Dispute Resolution Procedures**

The following procedures are the sole methodologies to be used to resolve any controversy or claim ("dispute"). If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

## Mediation

Any party may request mediation of a dispute by providing a written Request for Mediation to the other party or parties. The mediator, as well as the time and place of the mediation, shall be selected by agreement of the parties. Absent any other agreement to the contrary, the parties agree to proceed in mediation using the CPR Mediation Procedures (Effective April 1, 1998), with the exception of paragraph 2 which shall not apply to any mediation conducted pursuant to this agreement. As provided in the CPR Mediation Procedures, the mediation shall be conducted as specified by the mediator and as agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with facilitation by the mediator, to reach a consensual resolution of the dispute. The mediation shall be treated as a settlement discussion and shall be confidential. The mediator may not testify for any party in any later proceeding related to the dispute. No recording or transcript shall be made of the mediation proceeding. Each party shall bear its own costs in the mediation. Absent an agreement to the contrary, the fees and expenses of the mediator shall be shared equally by the parties.

### Arbitration

Arbitration shall be used to settle the following disputes: (1) any dispute not resolved by mediation 90 days after the issuance by one of the parties of a written Request for Mediation (or, if the parties have agreed to enter or extend the mediation, for such longer period as the parties may agree) or (2) any dispute in which a party declares, more than 30 days after receipt of a written Request for Mediation, mediation to be inappropriate to resolve that dispute and initiates a Request for Arbitration. Once commenced, the arbitration will be conducted either (1) in accordance with the procedures in this document and the Rules for Non-Administered Arbitration of the CPR Institute for Dispute Resolution ("CPR Arbitration Rules") as in effect on the date of the engagement letter or contract between the parties, or (2) in accordance with other rules and procedures as the parties may designate by mutual agreement. In the event of a conflict, the provisions of this document and the CPR Arbitration Rules will control.

The arbitration will be conducted before a panel of three arbitrators, two of whom may be designated by the parties using either the CPR Panels of Distinguished Neutrals or the Arbitration Rosters maintained by any JAMS Office in the United States. If the parties are unable to agree on the composition of the arbitration panel, the parties shall follow the screened selection process provided in Section B, Rules 5, 6, 7, and 8 of the CPR Arbitration Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or any dispute concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator shall be appointed unless he or she has agreed in writing to abide and be bound by these procedures.

The arbitration panel shall issue its final award in writing. The panel shall have no power to award non-monetary or equitable relief of any sort. Damages that are inconsistent with any applicable agreement between the parties, that are punitive in nature, or that are not measured by the prevailing party's actual damages, shall be unavailable in arbitration or any other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitration panel have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

Discovery shall be permitted in connection with the arbitration only to the extent, if any, expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. The parties and the arbitration panel may disclose the existence, content or results of the arbitration only as provided in the CPR Arbitration Rules. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests.

The award reached as a result of the arbitration will be binding on the parties, and confirmation of the arbitration award may be sought in any court having jurisdiction.

## EXHIBIT D

### Fee Schedule

As agreed we will undertake the services listed in the attached letter for authorized Delphi employees for the 2004, 2005, and 2006 calendar years based on the following fee schedule per employee:

| | |
|---|---|
| • Expatriates Assigned To the US | $1,750 |
| • Expatriates Assigned From the US | $2,700 |
| • Expatriates Assigned To and From Non-US Countries | $2,100 |
| • Employees Assigned To the Mexican Border | $750 |
| • Trainees/J Visa Holders | $375 |

Fees for monthly payroll assistance, amended returns and tax clearance certificates will be dependent on the country in which the services are performed. See exhibit E for the fees for these services.

Fees for visa and immigration assistance will be dependent on the country in which the services are performed. See exhibit F for visa and immigration assistance fees.

We will bill you one-half of the agreed upon fee for income tax preparation on or before January 15th of each year and the remainder after April 15th of each year for completed returns. A final bill will be presented for all income tax returns prior to November 1st of each year. Invoices will be due and payable by Delphi thirty (30) days after receipt. All fees are exclusive of out of pocket expenses and mandatory value added tax.

All fees are based at 70% or less of our standard billing rates. Invoices for these services and other additional services described above will be made at the completion of each individual project on a monthly basis. Circumstances encountered during the performance of services that warrant additional time and/or expenses could affect the above estimates. We will notify you of any such circumstances as they arise.

Delphi will reimburse KPMG for all reasonable costs and expenses, including, without limitation, all travel expenses, KPMG incurs in connection with the Services, provided, however, that KPMG must obtain prior approval of Delphi for any individual reimbursable expenses in excess of $2,500 or for reimbursable expenses which exceed or are anticipated to exceed an aggregate of $10,000 during any calendar month. KPMG will not charge any markup, overhead, profit or other fees on the reimbursable expenses. Delphi's reimbursement obligations will be governed by the provisions of Exhibit B.

## EXHIBIT E
### KPMG Additional Services and Related Fees

| Country | Amended Returns | Tax Clearance | Tax Withholding |
|---|---|---|---|
| Argentina | $1,100 | N/A | Start-up fee $236 per employee<br>$500 per month (up to 5 employees) / $800 per month (up to 10 employee) |
| Australia | $440 | N/A | Start-up fee $900<br>Monthly fee $450 / Annual fee $1,500 |
| Austria | $825 | N/A | $55 per employee per installment (14 installments/yr)<br>$75 per employee per month (social taxes)<br>$60 per employee per month (handling of payr. mts) |
| Belgium | N/A - no amended returns | N/A | $665 per month |
| Botswana | $135 | $265 | $55 per month |
| Brazil | $300 | $1,650 | Not offered – Would recommend third party provider |
| Canada | $250 | $360 | $275 per month |
| China | $90 per month per employee | $450/Arrival $300/Departure | Part of return fee |
| Czech Rep | $775 | $165 | $165 per month per employee / $225 per year per employee |
| France | $1,225 | $775 | Monthly payslips and quarterly social contributions $150 per person per month<br>Processing of yearly social returns $1,950<br>Start-up fee including registration of company with social bodies $2,900 |
| Germany | $280 | N/A | $195 per month for 4 employees<br>$25 per month for each additional employee |
| Hungary | $900 | $880 | $275 per employee per quarter |
| India | $825 | $880 | $110 per employee per month |
| Indonesia | $385 | $115/Arrival $115/Departure | $225 per month<br>$1,100 per year |
| Italy | $500 | N/A | Start-up fee $1,800<br>Annual fee $2,600 |
| Japan | $700 | $400 | $375 per month (up to 5 employees)<br>$550 per month (up to 10 employees) / $825 per month (up to 20 employees) |
| Korea | $675 | N/A | $10 per month per employee |
| Luxembourg | $450 | N/A | $1,350 per month for 11 expatriates |
| Malaysia | $115 | $385 | $45 per employee per month (minimum of $150 per month) |
| Mexico | $500-$700 | N/A | $200 per employee per month |
| Morocco | $1,325 | $2,200 | $900 per month |
| Poland | $825 | $225 | $30 per employee per month |
| Portugal | $565 | $425 | $50 per employee per month |
| Romania | N/A | N/A | Included in tax return fee |
| Russia | $1,595 | N/A | $1,325 month for up to 10 employees |
| Saudi Arabia | N/A | N/A | $500 per month |
| Singapore | $825 | $1,650 | $65 per employee per month ($400 monthly minimum) |
| Spain | $500 | N/A | $550 per employee per month |
| Sweden | $325 | N/A | Not offered – would recommend third party provider |
| Switzerland | $850 | N/A | $390 per employee per month / $750 start-up per employee |
| Taiwan | $650 | N/A | N/A |
| Thailand | $125 | N/A | $165 per employee per month |
| Turkey | $990 | $1,100 | $900 month for up to 10 employees |
| UK | $550 | Included in Return Fee | $250 per employee per month<br>Start-up cost = total monthly charge + $400 / Annual forms $250 per year |
| United States | $800 | N/A | N/A |

All fees are exclusive of out of pocket expenses and required value added tax.

## EXHIBIT F
### KPMG Additional Services and Related Fees

| Country | Visa and Immigration Assistance |
|---------|--------------------------------|
| Argentina | Visa for the assignee $825 |
| | Visa for the assignee plus his/ her spouse $1,240 |
| | Visa for the assignee plus his/ her immediate family $1,650 |
| Australia | Standard business sponsorship $1,255 |
| | Nomination and visa application (per family) $1,085 |
| Austria | Restricted from offering services |
| Belgium | Preparation of application of work permit $840 |
| Botswana | Renewal of work permit $700 |
| Brazil | Permanent or temporary visa (per immediate family) $560 |
| | Extension of temporary visa (per immediate family) $560 |
| | Identification card $80 |
| | Tax number card $45 |
| Canada | Restricted from offering services (Can recommend local legal firm) |
| China | Apply to the Shanghai Public Security Bureau (3 or less) $1,650 per person |
| | Apply to the Shanghai Public Security Bureau (less than 10 more than 3) $1,325 per person |
| | Apply to the Shanghai Public Security Bureau (10 or more) $1,100 per person |
| Czech Rep | KPMG does not offer visa and immigration services (Can recommend a provider) |
| France | $1,700 per employee |
| | No additional costs for a family application |
| | Services rendered by the Law Offices of Sanassi Okoshken |
| Germany | Work permit $715 |
| | Resident permit $715 |
| Hungary | Work permit $185 |
| | Resident permit $265 |
| India | Visa $770 |
| | Foreign registration $440 |
| Indonesia | Business visa including work permit $550 |
| | Multiple business visa $660 |
| | Single business visa $440 |
| | Social visa $440 |
| | Limited stay visa including work permit and stay permit $2,200 |
| | Limited stay visa including stay permit for each dependent $1,925 |
| Italy | Non - European citizen secondment (request of work permit, entry visa, permit stay) $1,685 |
| | Non - European citizen employment (request of work permit, entry visa, permit stay, employment card, employment letter, formalities with Labour Office, formalities with INAIL) $2,400 |
| | European citizen secondment (request of work permit, entry visa, permit stay) $720 |
| | European citizen employment (request of work permit, entry visa, permit stay, employment card, employment letter, formalities with Labour Office, formalities with INAIL) $960 |
| Japan | Per assignee $2,875 / Per dependent $1,265 |
| Korea | Obtaining visa $1,925 |
| Luxembourg | Assisting with work permit and visa $1,760 |
| Malaysia | Application for employment pass $1,540 per person |
| | Application for dependent pass $275 per person |
| Mexico | Obtaining an FM3 document $1,100 per visitor and $825 per relative |
| | Obtaining each exit and entry permit $275 per person |
| Morocco | Obtaining visa $1,100 |

## EXHIBIT F (cont'd)
### KPMG Additional Services and Related Fees

| | |
|---|---|
| Poland | Obtaining preliminary consent for employment and final work permit $1,100 |
| | Obtaining temporary residence card $1,650 |
| | Obtaining an extension of the working visa or temporary visa $550 |
| Portugal | Obtaining visa $700 |
| Romania | Obtaining temporary residence for taxpayer $240 |
| | Obtaining temporary residence for each dependent $100 |
| Russia | Obtaining visa $1,100 |
| | Obtaining work permit $1,650 |
| Saudi Arabia | Not offered |
| Singapore | The following services are offered by M&C Services |
| | Application for Visa $300 |
| | Application of employment pass $1,200 |
| | Application for renewal of employment pass $490 |
| | Application for dependent's pass $120 |
| | Application for training pass $1,210 |
| | Cancellation of pass $180 |
| Spain | Work and resident permit $2,525 per person |
| Sweden | Obtaining visa $2,010 |
| Switzerland | European work permit $450 |
| | Non-European $4,000 |
| Taiwan | N/A |
| Thailand | Original work permit application $1,045 |
| | Work permit renewal $525 |
| | Extension of visa $550 per person per year |
| | Extension of visa for the expatriate's family members $165 per person per year |
| | Re-entry permit $110 per person per application |
| Turkey | Not Offered |
| UK | Intra company transfer work permit $920 |
| | New hire work permit $1075 |
| | Work permit extensions $690 |
| | Permanent resident applications $535 |
| United States | Restricted from offering services |

All fees are exclusive of out of pocket expenses including required value added tax and amounts due to governmental units for the processing of documents.

**Exhibit G**

# KPMG Privacy Notice

KPMG LLP and KPMG Investment Advisors (collectively, "KPMG"), like most providers of financial services, are now required by law to inform our individual clients of our policies regarding privacy of personal client information. At KPMG, we are committed to providing you with the highest level of professional services. As part of this effort, we have always protected the confidentiality and security of our clients' personal information and will continue to do so.

Confidentiality and Security

We restrict access to information about you to personnel who need to know that information in connection with providing services to you. We maintain physical, electronic, and procedural safeguards in compliance with applicable law to guard your information.

Information We Collect

KPMG collects information about you in connection with your engagement of us to provide you with services. Sources from which we collect information about you include interviews with you, tax return organizers, financial planning organizers, financial history questionnaires, financial statements, statements of portfolio holdings, other forms, and transactions and correspondence between you and us, our affiliates and others. If you are an investment advisory services client, KPMG Investment Advisors also collects information about your investment portfolio and your financial situation, requirements and objectives.

Disclosure of Personal Information

We do not disclose any personal information about our clients or former clients to third parties or affiliates, except as permitted by law. For example, if you are an investment advisory services client, KPMG LLP and KPMG Investment Advisors may share information about you with each other with your authorization. This allows us to provide you with the services you have requested from each of us with greater ease and convenience to you.

If you have any questions regarding this Notice or about our privacy policies and practices, please contact the KPMG partner responsible for your engagement.



303 East Wacker Drive
Chicago, IL 60601-5212

Telephone 312 665 1000
Fax 312 665 6000

November 3, 2004

**PRIVATE**

Ms. Sara J. Phillips
Manager, International Services Group
Delphi Corporation
World Headquarters & Customer Center
M/C 480.410.122
5825 Delphi Drive
Troy, MI  48098

Dear Sara:

KPMG LLP (KPMG) and Delphi Corporation (Delphi) have entered into an engagement letter dated October 5, 2004 under which KPMG will provide international executive services to Delphi and its expatriate employees. Attached to and made part of the October 5, 2004 engagement letter is Exhibit A, KPMG/Delphi Standard Engagement Terms & Conditions (rev. 9/15/2004). KPMG and Delphi agree that, for this engagement only, the first and second lines of paragraph ten (10) are deleted and the following inserted in its place:

"Limitation of Liability- Consultant's liability arising in connection with this engagement, if any, and for each year, will be limited to two (2) times the professional fees paid for each year;"

Please sign the enclosed copy of this letter to confirm our agreement and return it to us. If you have any questions, please call me at (312) 665-8485 or Doyoung Yong at (312) 665-5207.

Very truly yours,

KPMG LLP

*Ann Marie Goddard*

Ann Marie Goddard
*Partner*
*International Executive Services*

Enclosure
cc:    James P. Whitson, Delphi Corporation
       Doyoung Yong, KPMG LLP


KPMG LLP KPMG LLP is a U.S. limited liability partnership, is a member of KPMG International, a Swiss association.

KPMG

Page 2
Ms. Sara J. Phillips
Delphi Corporation
November 3, 2004

ACCEPTED:

Delphi Corporation

*Sara Phillips*
Authorized Signature

*Manager International Svcs*
Title

*4 Nov 2004*
Date

KPMG LLP. KPMG LLP, a U.S. limited liability partnership,
is a member of KPMG International, a Swiss association



C.      In each case, the indemnifying party shall also pay to the indemnified party any and all costs and expenses incurred in connection with the enforcement of these indemnification provisions.

D.      The indemnification obligations set forth in this Section 9 and the general terms and conditions of this Agreement shall not apply to any tax or other governmental filings prepared by Consultant. The rights and obligations of the parties with respect to such services shall be governed by a separate agreement.

10.     <u>Limitation of Liability</u>.  Consultant's liability arising in connection with this engagement, if any, and for each year, will be limited to two (2) times the professional fees paid for each year; provided however that this limitation shall not apply (i) in the event of any breach of Section 16 below relating to Delphi Proprietary Information or (ii) if Consultant is found to be grossly negligent or to have acted willfully or fraudulently. In no event will Consultant or Delphi be liable for consequential, special, indirect, incidental, punitive or exemplary damages, costs, expenses, or losses (including loss of profits, data, business or goodwill) regardless of whether such liability is based on breach of contract, tort, strict liability, breach of warranties, failure of essential purpose or otherwise, and even if advised of the likelihood of such damages.

11.     <u>Standard of Performance</u>.  Consultant will use its best skills, resources and judgment to perform the Services in an efficient and economical manner and in accordance with the highest professional standards.  If any Services are not completed to Delphi's reasonable satisfaction, Consultant will, at no additional cost to Delphi, take reasonable steps to correct any deficiencies. The express warranties in this Paragraph and in this Agreement shall be in lieu of all other warranties, express or implied, including the implied warranty of merchantability and fitness for a particular purpose.

12.     <u>Reliance on Information/Authorities</u>.  Consultant will base its conclusions on the facts and assumptions that Delphi submits and will not independently verify this information. Inaccuracy or incompleteness of the information Delphi provides could have a material effect on Consultant's conclusions. In rendering its advice, Consultant may consider, for example, the applicable provisions of the Internal Revenue Code of 1986, and ERISA as amended, and the relevant state statutes, the regulations thereunder, and judicial and administrative interpretations thereof. These authorities are subject to change, retroactively and/or prospectively, and any such changes could affect the validity of Consultant's advice. Consultant will not update its advice for subsequent changes or modifications to the law and regulations, or to the judicial and administrative interpretations thereof, unless Delphi separately engages Consultant to do so after such changes or modifications.

13.     <u>Legal Counsel</u>.  Delphi should consult with and/or engage legal counsel for the purpose of advising on non-tax legal aspects of matters on which Consultant provides tax advice and drafting any legal documents and/or agreements that may be required in connection therewith. Consultant will provide Delphi's legal counsel with tax-related advice that is deemed necessary by Delphi's legal counsel to draft such documents and/or agreements. To the extent Services of legal counsel or other professional service providers are required, Delphi is responsible for engaging and paying such service providers.

14.     <u>Federal Confidential Communications Privilege</u>.  A confidentiality privilege under Internal Revenue Code Section 7525 may pertain to certain communications between Consultant personnel and Delphi regarding federal tax advice provided pursuant to this engagement.  By retaining Consultant, Delphi agrees that Consultant is instructed to claim the privilege on Delphi's behalf, with respect to any applicable communications, up to and until such time as Delphi may waive any such privilege in writing. As disclosure of any such confidential communications to the Internal Revenue Service or other third party may cause any confidentiality privilege to be waived, Delphi should notify Consultant if the Internal

## EXHIBIT E

### MASTER SERVICES ENGAGEMENT LETTER



KPMG LLP
303 East Wacker Drive
Chicago, IL 60601

Telephone  312 665 1000
Fax          312 665 6008
Internet     www.us.kpmg.com

January 23, 2006

**PRIVATE & CONFIDENTIAL**

Mr. Atul Pasricha
Executive Director Mergers Acquisitions & Planning
Delphi Corporation
5725 Delphi Drive
Troy, MI 48098

Dear Atul:

This master letter confirms the terms by which Delphi Corporation ("Delphi" or "you") will engage KPMG LLP ("KPMG" or "we") from time to time to assist you in performing acquisition due diligence and related services on various target companies, and provide vendor assistance and / or pre-sale due diligence services in respect to proposed divestitures (each, a "Target ") that will be identified at later dates. For purposes of this engagement agreement, the acquisition / pre-sale due diligence and vendor assistance services performed for you with respect to each Target will be considered a separate and independent engagement (each an "Engagement"). This letter shall remain in force for one year unless extended by mutual agreement.

**Objective**

Our objective is to assist you in your assessment of the risks and opportunities of your proposed investment in / divestiture of the target companies within the scope of our engagement. In this regard, we will read information you, your advisors, and the Target provide to us, and make inquiries and obtain additional financial data directed towards those business activities you will identify as important to your investment / divestiture decision.

**Engagement Acceptance Process**

When you request KPMG services under this master letter, whether such services are Phase 1 Activities or also include activities relating to subsequent phases of work, KPMG will perform a conflict check to determine whether KPMG has relationships with or represents another bidder for Target we will prepare for your review and approval an Engagement Confirmation for each Engagement, which will summarize engagement details, such as the following:

- Names of the engagement partner and lead engagement manager
- Target name
- Dates and location(s) where fieldwork is expected to be performed
- Specific services you requested
- Known potential conflicts of interest (see "Other Relationships" below)
- Reporting requirements
- Fee arrangements
- Additional details with respect to the engagement or other information

KPMG LLP, a U.S. limited liability partnership, is the U.S.
member firm of KPMG International, a Swiss cooperative.

KPMG

January 23, 2006
Mr. Atul Pasricha
Delphi Corporation
Page 2

Upon receiving your approval of the Engagement Confirmation, which shall be in writing, including via e-mail, you will have engaged KPMG to perform the services in accordance with the Engagement Confirmation and this master letter, including the TS Standard Terms and Conditions (as defined below), and we will commence work.

Upon conclusion of the Phase 1 Activities, you may elect to retain us to perform additional phases of activities ("Additional Phase Activities"). If you so elect, we will discuss with you the scope of the Additional Phase Activities you deem necessary and appropriate and KPMG will prepare an Engagement Confirmation for Additional Phase Activities for your review and approval. Upon written approval (including via e-mail) of the Engagement Confirmation for Additional Phase Activities, you will have engaged KPMG to perform the Additional Phase Activities in accordance with the Engagement Confirmation for Additional Phase Activities and this master letter, including the TS Standard Terms and Conditions, and we will commence the work. If you desire to retain KPMG immediately to provide a scope of activities different than the defined Phase 1 Activities, you would reflect the modified procedures in the engagement request and KPMG will reflect this in our initial Engagement Confirmation.

**Staffing**

I will have overall responsibility for the conduct of our engagements under this master letter. The staffing for each Engagement, including the engagement partner, lead engagement manager, and professionals from other practices, will be discussed with you during the planning stage of the engagement, confirmed in the Engagement Confirmation and will be subject to your approval. We recognize that these engagements are an integral part of your efforts to evaluate the opportunity to acquire / divest various businesses, and will endeavor to assign service teams to each engagement that possess the requisite transaction and industry experience. All of KPMG's agents, employees, subcontractors and/or independent contractors furnished by KPMG to perform the services (collectively, "Personnel") are and will remain KPMG's employees and/or independent contractors and, under no circumstances, will any Personnel furnished by KPMG be deemed to be Delphi's employees or agents. KPMG is solely responsible, at KPMG's sole cost and expense, for (i) the fulfillment of all obligations to Personnel and (ii) the compliance by KPMG and Personnel with this Agreement and all laws, regulations, orders and other governmental requirements applicable to performance of the services.

KPMG warrants that all Personnel who are performing services on behalf of KPMG are competent to perform the services. KPMG will require all Personnel who are performing any work on Delphi's premises to comply with all of Delphi's regulations and policies. Delphi, in its sole discretion, has the right to: (a) bar any of Personnel from Delphi's premises for failure to observe Delphi's regulations or policies and (b) require that KPMG promptly remove from Delphi's premises any Personnel who violate any of Delphi's regulations or policies.

**Other terms and conditions**

All services performed under this master letter with respect to each Engagement will be subject to the Standard Terms and Conditions for Transaction Services Engagements dated May 7, 2004

KPMG

January 23, 2006
Mr. Atul Pasricha
Delphi Corporation
Page 3

(the "TS Standard Terms and Conditions") attached as Appendix 1 and incorporated by reference herein, except modified as follows:

Paragraph 4(a) – Other Potential Bidders/Other Relationships:  Addition of the following third sentence:

"Notwithstanding anything to the contrary set forth in the attached Standard Terms and Conditions, KPMG agrees that: (i) its personnel performing services for Delphi shall not provide services for any other party with respect to active project which is the subject of the related Engagement for Delphi contemplated by this letter remains in effect, and (ii) at no time shall KPMG allow such other party or KPMG personnel providing services to such other party to have access to Delphi's confidential information or the work product from the Delphi engagement."

Paragraph 13 – Limitation on Damages:  Amendment of the first and second sentences to read as follows:

"Except for your and our respective indemnification obligations as described in these Standard Terms and Conditions, or cases of bad faith or willful misconduct, neither you nor we shall be liable to the other for any actions, damages, claims, liabilities, costs, expenses or losses arising out of the services performed hereunder for a total amount in excess of two times the fees paid or owing to us for services rendered by us under this engagement.  Except with respect to a breach of Paragraph 20 below, in no event shall either you or we be liable for consequential, special, indirect, incidental, punitive or exemplary damages, costs, expenses, or losses (including, without limitation, lost profits and opportunity costs)."

Our standard terms and conditions relating to indemnification are modified and amended to the extent that neither party will be indemnified, and its limitation of liability will not apply, to bad faith, self-dealing or a breach of fiduciary duty (if any), gross negligence or willful misconduct.

Paragraph 27 Alternative Dispute Resolution -

Our standard terms and conditions relating to the Dispute Resolution procedures are modified by providing that any dispute or claim also may be resolved before the United States Bankruptcy Court for the Southern District of New York.

**Other Relationships**

The Engagement Confirmation will indicate whether we have determined that the Target is a KPMG audit client or that KPMG has other professional relationships with the Target and whether KPMG has previously been engaged to serve other potential bidders in the transaction involving Target.  Your acceptance of the Engagement Confirmation indicates your acknowledgement of the disclosed relationships, and your agreement that our engagement with you with respect to that Target will be subject to applicable provisions of Paragraph 4 of the TS Standard Terms and Conditions, except that in all cases we will not assign any of the individuals

KPMG

January 23, 2006
Mr. Atul Pasricha
Delphi Corporation
Page 4

on the engagement team serving you (including technical resources within KPMG that advise
your engagement team) that also participate on an engagement team serving the Target or any
other bidder. We will notify you if, subsequent to your acceptance of the Engagement
Confirmation, our engagement team providing services to you becomes aware of the existence of
other engagements to serve other potential bidders in the transaction involving Target. Please see
Paragraph 4(a) of the TS Standard Terms and Conditions.

If KPMG serves as independent auditors of a Target and you engage us to review the KPMG
audit work papers of Target, such review can be performed only with the prior consent of Target
and its audit engagement team

## Professional Fees

We will present in each Engagement Confirmation our estimate of professional fees for the
Engagement based on the estimated number of hours necessary to complete the procedures you
specify for that Target and the standard hourly rates for the level of experience of the KPMG
personnel who will perform the services. Each engagement confirmation will specify fee
estimates which should not be exceeded without Delphi's approval.

We will on all Engagements hereunder estimate and agree with you a range for the estimated total
amount of hours and fees to be incurred on each engagement, based on the initial scope, and will
obtain advance approval from you before incurring fees above the estimated range. You
acknowledge that factors outside of our control or the failure of our reasonable assumptions
regarding the estimate of total fees may cause the actual fees to complete the agreed-upon scope
to exceed such estimate, in which case we shall not be responsible for continuing to provide
services if you do not approve additional fees.

In addition to our professional fees, you agree to reimburse KPMG for our reasonable out-of-
pocket expenses incurred in connection with each Engagement, such as travel, reproduction,
telephone, postage, typing and printing. It is our practice to render progress billings, and our
invoices are due upon receipt. Neither the amount of our fees nor the payment of our fees and
expenses will depend upon the results of our work, the price you pay for your investment in the
Target, or whether you consummate the investment.

Where KPMG is reimbursed for expenses, it is KPMG's policy to bill clients the amount incurred
at the time the good or service is purchased. If KPMG subsequently receives a volume rebate or
other incentive payment from a vendor relating to such expenses, KPMG does not credit such
payment to Client. Instead, KPMG applies such payments to reduce its overhead costs, which
costs are taken into account in determining KPMG's standard billing rates and certain transaction
charges that may be charged to clients.

## Debriefing

As part of our commitment to quality service, we would welcome the opportunity to receive your
comments at any time on our work and the service that we deliver.



January 23, 2006
Mr. Atul Pasricha
Delphi Corporation
Page 5


**Confirmation**

Please indicate your acceptance of these arrangements by signing both copies of this letter in the
space provided below and returning one signed copy of the letter to me. We look forward to
working with you as you execute your business development program.

Very truly yours,

KPMG LLP

Gary Silberg, Partner
Transaction Services


Accepted By Delphi Corporation:

By: _____    1/23/06
    Atul Pasricha                 Date

Title: Executive Director
       Mergers, Acquisitions & Planning

*KPMG*

## Standard Terms and Conditions for
## Transaction Services Engagements

These Standard Terms and Conditions are an integral part of the accompanying letter from KPMG that identifies the engagement (the "Engagement") to which they relate (the "Engagement Letter" or "Engagement Confirmation" in the case of a Master Engagement Letter, collectively referred to herein as the "Engagement Letter"). In the event of conflict between the Engagement Letter and these Standard Terms and Conditions, the provisions of the Engagement Letter shall prevail.

1.    **Certain Definitions.**

    (a)  **Client.** Client herein refers to the addressee(s) of the Engagement Letter.

    (b)  **DDA.** Due diligence assistance ("DDA") is a service in which KPMG assists a client with a financial, tax, or operational investigation of a target business.

    (c)  **Acquisition DDA Engagement.** DDA provided to a client considering an investment in, or acquisition of, another business or part thereof, or that may accept securities from another business as consideration in a transaction.

    (d)  **Pre-Sale DDA Engagement.** DDA that is provided to a client considering the sale or other disposition of the client itself or a division, subsidiary, or other business component of the client. In a Pre-Sale DDA Engagement, any reporting by KPMG is generally limited to the client, and no reporting is provided to prospective acquirers.

    (e)  **Vendor-Initiated DDA Engagement.** DDA that is provided to a client considering the sale or other disposition of the client itself or a division, subsidiary, or other business component of the client. As distinguished from a Pre-Sale DDA Engagement, in a Vendor-Initiated DDA Engagement the objective of the engagement is to prepare a report that will be provided to prospective acquirers.

    (f)  **Target.** Target herein refers to the entity(ies) or division(s) representing the subject of the procedures described in the Engagement Letter.

    (g)  **Bidder.** Bidder herein refers to a potential acquirer of Target.

    (h)  **Other capitalized terms.** Other capitalized terms in these Standard Terms and Conditions not defined elsewhere herein shall have the meanings given to them in the Engagement Letter.

2.    **Procedures.** The procedures KPMG will perform are limited to those referred to in the Engagement Letter and its exhibits and addenda. The procedures KPMG will perform are limited in nature and extent to those that Client has determined meets its needs and, as such, will not necessarily disclose all significant matters about Target or reveal errors in the underlying information, instances of fraud, or illegal acts, if any. KPMG will provide no assurance and make no representation regarding the sufficiency of the procedures either for the purpose for which KPMG has been engaged or for any other purpose.

In performing KPMG's procedures and reporting its findings, KPMG will rely upon information provided to KPMG by Client's and Target's personnel and advisors, and any publicly available information KPMG uses, and KPMG will not independently verify the accuracy or completeness of such information. KPMG's procedures with respect to Target's financial information will be substantially less in scope than an audit conducted in accordance with U.S. generally accepted auditing standards, and any procedures with respect to Target's internal control over financial reporting will be substantially less in scope than an examination of internal control conducted in accordance with Standards for Attestation Services established by the American Institute of Certified Public Accountants. Consequently, KPMG will express no opinion and will provide no other form of assurance on Target's financial statements or Target's internal control over financial reporting.

3.    **Timing.** Client acknowledges that KPMG's ability to gather the information Client requires and to complete KPMG's work in a timely manner and within KPMG's estimates of fees and expenses depends upon a variety of factors outside KPMG's control, including but not limited to, the availability of information, the degree of cooperation KPMG receives from Client's and Target's personnel and advisors, and the timeliness and completeness of the responses by Client's and Target's personnel and advisors to KPMG's requests for information. KPMG intends to complete KPMG's procedures expeditiously under the circumstances, subject to those factors that are beyond KPMG's control.

4.    **Other Relationships.**

    (a)  In an Acquisition DDA Engagement, KPMG may potentially be engaged by more than one potential bidder in connection with an acquisition of Target. In a Pre-Sale DDA Engagement or a Vendor-Initiated DDA Engagement, KPMG may be engaged by potential bidders in connection with an acquisition of Target. If the KPMG engagement team providing services to Client becomes aware that a separate KPMG team has been engaged by a potential bidder, KPMG will notify Client that KPMG has been so engaged (subject to any confidentiality restrictions) and will take all reasonable steps to prevent the disclosure, without appropriate prior approvals, of information between the KPMG team serving Client and the engagement team serving any other party. Unless Client elects to exercise Client's right to terminate the Engagement, Client agrees that KPMG may represent other parties and Client waives any potential conflict.

    (b)  In an Acquisition DDA Engagement, KPMG may serve as independent auditors of Target, or provide other services to Target. In a Pre-Sale DDA Engagement or a Vendor-Initiated DDA Engagement, KPMG may serve as independent auditors of, or provide other services to, a potential bidder or bidders. In such cases, KPMG will take all reasonable steps to prevent the disclosure, without appropriate prior approvals, of confidential information between the KPMG engagement team serving Client and the KPMG engagement team serving any other party. However, Client hereby acknowledges and agrees that KPMG may be in possession of confidential information concerning Target or a potential bidder that may be relevant to Client and that such information will not be disclosed to Client unless Target or the potential bidder provides written consent to such disclosure in advance.

May 7, 2004

KPMG

## Standard Terms and Conditions for Transaction Services Engagements

If KPMG serves as independent auditors of Target or such potential bidder, KPMG's professional responsibilities may require that KPMG inform the engagement team serving Target or the bidder about information coming to KPMG's attention that affects KPMG's engagement to audit Target's or such bidder's consolidated financial statements. In a Vendor-Initiated DDA Engagement, if information comes to our attention that affects KPMG's engagement to audit such bidder's consolidated financial statements and any such information is not reflected in KPMG's report, KPMG reserves the right to disclose that information to KPMG's audit client.

Client acknowledges that KPMG's relationship with Target or a potential bidder may represent an actual or potential conflict of interest for KPMG in light of the services KPMG has agreed to provide to Client hereunder. Client hereby agrees that KPMG's relationship shall not constitute a conflict of interest for purposes of KPMG's Engagement hereunder and Client expressly waives its right to assert any such conflict against KPMG. Client hereby acknowledges that KPMG's agreement to provide the services hereunder is based upon and subject to the foregoing waiver and, in the event that Client revokes such waiver, KPMG's Engagement hereunder will automatically terminate.

5.  **Projections.** In the event the procedures performed by KPMG relate to prospective information, KPMG will not compile, examine, or apply other procedures to such information in accordance with Statements on Standards for Attestation Engagements issued by the American Institute of Certified Public Accountants and, accordingly, will express no opinion or any other form of assurance or representations concerning the accuracy, completeness or presentation format of the prospective information. There will usually be differences between projected and actual results, because events and circumstances frequently do not occur as expected or predicted, and those differences may be material.

6.  **Reporting.** All oral and written communications by KPMG to Client with respect to the Engagement, including drafts and those communications occurring prior to the execution of the Engagement Letter (collectively, "Reports"), will be subject to the terms and conditions of the Engagement Letter and these Standard Terms and Conditions. KPMG has no obligation to update Reports or to revise information presented to Client to reflect events and transactions occurring subsequent to the date of the final Report KPMG issues to Client. Client agrees to review Reports promptly and to advise KPMG on a timely basis of any additional procedures Client would like KPMG to perform or areas to address.

In an Acquisition DDA Engagement or Pre-Sale DDA Engagement, unless specifically requested by Client, KPMG is not obligated to provide copies of Reports to Target for the purpose of confirming Target's representations concerning the accuracy of the factual information presented in Reports. If Client would like Target to review KPMG's report, KPMG may require Client and Target to indemnify KPMG for any claims arising out of or relating to such release. In a Vendor-Initiated DDA Engagement, KPMG will provide Client and Target copies of Reports and will require Client and Target to confirm the factual accuracy of the Reports.

KPMG's findings will not constitute recommendations to Client as to whether or not Client should proceed with any proposed transaction.

7.  **Limitation on the Use and Distribution of Reports.** Because of the special nature of the Engagement, KPMG's Reports are not suited for any purpose other than to assist the intended recipient in evaluating the potential transaction, and Client agrees Reports will be used for that purpose only. Reports will be provided by KPMG for the intended recipient's information only, and Client agrees that the Reports may not be copied, quoted or referred to, in whole or in part, by Client without KPMG's prior written consent, except in the manner provided for in the Engagement Letter or these Standard Terms and Conditions. Client also agrees that Reports, and any of the information contained therein, will be disclosed only to Client's board of directors, management and other employees, Client's independent audit firm, and to attorneys acting as Client's counsel in the contemplated transaction, provided that each of the foregoing is subject to a binding obligation (through a written agreement or professional obligation) to maintain the confidentiality of the Reports.

In certain instances, Client may request that a copy of a Report be distributed to a third party for informational purposes. KPMG will consider consenting to distribution based on such factors as the identity of the third party and the third party's intended use of the Report. If KPMG agrees to the distribution of the Report to a third party, Client agrees to execute, and agrees to require the third party to execute, an "Agreement to Release Information." If an acceptable "Agreement to Release Information" cannot be obtained, KPMG will consider meeting with the third party to discuss in general terms the procedures outlined in the Engagement Letter. In addition, KPMG will consider performing, under the terms of a separate engagement letter with the third party, additional procedures, if any, that the third party considers appropriate.

8.  **Services.** It is understood and agreed that KPMG's services may include advice and recommendations, but all decisions in connection with the implementation of such advice and recommendations shall be the responsibility of, and made by, Client.

9.  **Payment of Invoices.** Client agrees to pay properly submitted invoices within thirty (30) days of the invoice date, or such other due date as may be indicated in the Engagement Letter. KPMG shall have the right to halt or terminate entirely its services under the Engagement Letter until payment is received on past due invoices. All fees, charges and other amounts payable to KPMG under the Engagement Letter do not include any sales, use, excise, value added or other applicable taxes, tariffs or duties, payment of which shall be Client's sole responsibility, excluding any applicable taxes based on KPMG's net income or taxes arising from the employment or independent contractor relationship between KPMG and its personnel.

10.  **Term.** Unless terminated sooner in accordance with its terms, the Engagement shall terminate upon the completion of KPMG's services under the Engagement Letter. In addition, either party may terminate the Engagement Letter at any time by giving written notice to the other party not less than 30 calendar days before the effective date of termination.

**May 7, 2004**

*KPMG*

**Standard Terms and Conditions for**
**Transaction Services Engagements**

11. **Ownership.**

    (a)    **KPMG Property.** KPMG has created, acquired, owns or otherwise has rights in, and may, in connection with the performance of services under the Engagement Letter, employ, provide, modify, create, acquire or otherwise obtain rights in, various concepts, ideas, methods, methodologies, procedures, processes, know-how, and techniques, models, templates; software, user interfaces and screen designs; general purpose consulting and software tools, utilities and routines; and logic, coherence and methods of operation of systems (collectively, the "KPMG Property"). KPMG retains all ownership rights in the KPMG Property. Client shall acquire no right or interest in such property, except for the license expressly granted in the next paragraph. In addition, KPMG shall be free to provide services of any kind to any other party as KPMG deems appropriate, and may use the KPMG Property to do so. KPMG acknowledges that KPMG Property shall not include any of Client's confidential information or tangible or intangible property, and KPMG shall have no ownership rights in such property.

    (b)    **Ownership of Deliverables.** Except for KPMG Property, and upon full and final payment to KPMG under the Engagement Letter, the tangible items specified as deliverables or work product in the Engagement Letter including any intellectual property rights appurtenant thereto (the "Deliverables") will become the property of Client. If any KPMG Property is contained in any of the Deliverables, KPMG hereby grants Client a royalty-free, paid-up, non-exclusive, perpetual license to use such KPMG Property in connection with Client's use of the Deliverables.

12. **Limitation on Warranties. THIS IS A SERVICES ENGAGEMENT. KPMG WARRANTS THAT IT WILL PERFORM SERVICES UNDER THE ENGAGEMENT LETTER IN GOOD FAITH, WITH QUALIFIED PERSONNEL IN A COMPETENT AND WORKMANLIKE MANNER IN ACCORDANCE WITH APPLICABLE INDUSTRY STANDARDS. KPMG DISCLAIMS ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.**

13. **Limitation on Damages.** Except for each party's indemnification obligations as set forth below, neither Client nor KPMG shall be liable to the other for any actions, damages, claims, liabilities, costs, expenses or losses in any way arising out of or relating to the services performed under the Engagement Letter for an aggregate amount in excess of the fees paid or owing to KPMG for services rendered by KPMG under the Engagement Letter. In no event shall either party be liable for consequential, special, indirect, incidental, punitive or exemplary damages, costs, expenses, or losses (including, without limitation, lost profits and opportunity costs). The provisions of this Paragraph shall apply regardless of the form of action, damage, claim, liability, cost, expense, or loss, whether in contract, statute, tort or otherwise.

14. **Infringement.**

    (a)    KPMG hereby agrees to indemnify, hold harmless and defend Client from and against all claims, liabilities, losses, expenses (including reasonable attorneys' fees), fines, penalties, taxes or damages (collectively "Liabilities") asserted by any third party against Client to the extent such Liabilities result from the infringement by the Deliverables of any third party's patents issued as of the date of the Engagement Letter, trade secrets, trademarks or copyrights. The preceding indemnification provision shall not apply to any infringement arising out of the following:

        (i)    use of the Deliverables other than in accordance with applicable documentation or instructions supplied by KPMG or other than in accordance with Paragraph 15(b);

        (ii)    any alteration, modification or revision of the Deliverables not expressly agreed to in writing by KPMG; or

        (iii)    the combination of the Deliverables with materials not supplied or approved by KPMG.

    (b)    In case any of the Deliverables or any portion thereof is held, or in KPMG's reasonable opinion is likely to be held, in any such suit to constitute infringement, KPMG may, within a reasonable time, at its option, either:

        (i)    secure for Client the right to continue the use of such infringing item; or

        (ii)    replace, at KPMG's sole expense, such item with a substantially equivalent non-infringing item or modify such item so that it becomes non-infringing.

        In the event KPMG is, in its reasonable discretion, unable to perform either of the options described in (i) or (ii) above, Client shall return the Deliverable to KPMG, and KPMG's sole liability shall be to refund to Client the amount paid to KPMG for such item; provided that the foregoing shall not be construed to limit KPMG's indemnification obligation set forth in Paragraph 14(a) above.

    (c)    The provisions of this Paragraph 14 state KPMG's entire liability and Client's sole and exclusive remedy with respect to any infringement or claim of infringement.

15. **Indemnification.**

    (a)    Each party agrees to indemnify, hold harmless and defend the other party from and against any and all Liabilities for physical injury to, or illness or death of, any person or persons regardless of status, and damage to or destruction of any tangible property, which the other party may sustain or incur, to the extent such Liabilities result from the negligence or willful misconduct of the indemnifying party.

**May 7, 2004**

KPMG

**Standard Terms and Conditions for
Transaction Services Engagements**

(b) Except as otherwise required by law, as permitted by the Engagement Letter, or as provided in paragraph 20(e) below with respect to any proposed or completed transaction, Client acknowledges and agrees that any advice, recommendations, information or work product provided to Client by KPMG in connection with this Engagement is for the confidential use of Client, may not be relied upon by any third party, and Client will not disclose or permit access to such advice, recommendations, information or work product to any third party or summarize or refer to such advice, recommendations, information or work product or to KPMG's engagement under the Engagement Letter without, in each case, KPMG's prior written consent. In furtherance of the foregoing, Client will indemnify, defend and hold harmless KPMG from and against any and all Liabilities suffered by or asserted against KPMG in connection with a third party claim to the extent resulting from such party's use or possession of or reliance upon KPMG's advice, recommendations, information or work product as a result of Client's use or disclosure of such advice, recommendations, information or work product.

(c) The party entitled to indemnification (the "Indemnified Party") shall promptly notify the party obligated to provide such indemnification (the "Indemnifying Party") of any claim for which the Indemnified Party seeks indemnification. The Indemnifying Party shall have the right to conduct the defense or settlement of any such claim at the Indemnifying Party's sole expense, and the Indemnified Party shall cooperate with the Indemnifying Party. The party not conducting the defense shall nonetheless have the right to participate in such defense at its own expense. The Indemnified Party shall have the right to approve the settlement of any claim that imposes any liability or obligation other than the payment of money damages.

**16. Cooperation; Use of Information.**

(a) Client agrees to cooperate with KPMG in the performance of the services under the Engagement Letter and shall provide KPMG with timely access to and use of Client's and Target's personnel, facilities, equipment, data and information to the extent necessary for KPMG to perform the services under the Engagement Letter. The Engagement Letter may set forth additional obligations of Client in connection with this Engagement. Client acknowledges that Client's failure to assign Client personnel having skills commensurate with their role with respect to this Engagement could adversely affect KPMG's ability to provide the services under the Engagement Letter.

(b) KPMG will base its conclusions on the facts and assumptions that Client's and Target's personnel and advisors submit and will not independently verify this information. Inaccuracy or incompleteness of the information submitted to KPMG could have a material effect on KPMG's conclusions. In rendering its advice, KPMG may consider, for example, the applicable provisions of the Internal Revenue Code of 1986 and ERISA as amended, and the relevant state and foreign statutes, the regulations thereunder, income tax treaties, and judicial and administrative interpretations thereof. These authorities are subject to change, retroactively and/or prospectively, and any such changes could affect the validity of KPMG's advice. KPMG will not update its advice for subsequent changes or modifications to the law and regulations, or to the judicial and administrative interpretations thereof, unless Client separately engages KPMG to do so in writing after such changes or modifications.

(c) Treasury regulations under IRC section 6011 require taxpayers to disclose to the IRS their participation in reportable transactions. Client agrees to use its best efforts to promptly inform KPMG of any transaction covered by this Engagement that is required to be disclosed as a reportable transaction to the IRS or to any state or other jurisdiction adopting similar or analogous provisions. Treasury regulations under IRC section 6112 provide that KPMG must retain lists of investors in reportable and registerable transactions if we are a material advisor with respect to the transactions, and states or other jurisdictions may adopt similar or analogous provisions. Therefore, if KPMG determines that Client has participated in a reportable or registerable transaction, KPMG may place Client's name and information on a list. This list may later be requested by the IRS or other tax authority and KPMG ultimately may be required to provide it; however, KPMG will advise Client if KPMG provides Client's information to the IRS or other tax authority.

(d) Information relating to advice KPMG provides to Client, including communications between KPMG and Client and material KPMG creates in the course of providing advice, may be privileged and protected from disclosure to the IRS or other governmental authority. Should such an authority seek disclosure from KPMG of written or oral communications relating to such advice, KPMG will discuss with Client opportunities for asserting the privilege. As KPMG is not able to assert the privilege on Client's behalf with respect to any communications for which privilege has been waived, Client agrees to notify KPMG of any such waivers, whether resulting from communications with KPMG or third parties in the same or a related matter. Client also understands that privilege may not be available for communications with an audit client and that KPMG personnel providing audit and non-audit services will discuss matters that may affect the audit to the extent required by applicable professional standards.

**17. Force Majeure.** Neither Client nor KPMG shall be liable for any delays resulting from circumstances or causes beyond its reasonable control, including, without limitation, fire or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order or requirement of any governmental agency or authority.

**18. Limitation on Actions.** No action, regardless of form, arising out of or relating to this Engagement, may be brought by either party more than one year after the cause of action has accrued, except that an action for non-payment may be brought by a party not later than one year following the date of the last payment due to such party under the Engagement Letter.

May 7, 2004

*KPMG*

**Standard Terms and Conditions for**
**Transaction Services Engagements**

19. **Independent Contractor.** It is understood and agreed that each of the parties hereto is an independent contractor and that neither party is or shall be considered an agent, distributor or representative of the other. Neither party shall act or represent itself, directly or by implication, as an agent of the other or in any manner assume or create any obligation on behalf of, or in the name of, the other.

20. **Confidentiality.**

(a) "Confidential Information" means all documents, software, reports, data, records, forms and other materials obtained by one party (the "Receiving Party") from the other party (the "Disclosing Party") in the course of performing the services under the Engagement Letter: (i) that have been marked as confidential; (ii) whose confidential nature has been made known by the Disclosing Party to the Receiving Party; or (iii) that due to their character and nature, a reasonable person under like circumstances would treat as confidential. Notwithstanding the foregoing, Confidential Information does not include information which: (i) is already known to the Receiving Party at the time of disclosure by the Disclosing Party; (ii) is or becomes publicly known through no wrongful act of the Receiving Party; (iii) is independently developed by the Receiving Party without benefit of the Disclosing Party's Confidential Information; (iv) relates to the tax treatment or tax structure of any transaction as further described in Paragraph 20(e) below; (v) KPMG determines is required to be maintained by KPMG under section 6112 of the Internal Revenue Code and the regulations thereunder or similar or analogous provisions of a state or other jurisdiction; or (vi) is received by the Receiving Party from a third party without restriction and without a breach of an obligation of confidentiality.

(b) The Receiving Party will deliver to the Disclosing Party all Confidential Information of the Disclosing Party and all copies thereof when the Disclosing Party requests the same, except for one copy thereof that the Receiving Party may retain for its records. The Receiving Party shall not use or disclose to any person, firm or entity any Confidential Information of the Disclosing Party without the Disclosing Party's express, prior written permission; provided, however, that notwithstanding the foregoing, the Receiving Party may disclose Confidential Information to the extent that it is required to be disclosed pursuant to a statutory or regulatory provision or court order or to fulfill professional obligations and standards.

(c) Each party shall be deemed to have met its nondisclosure obligations under this Paragraph 20 as long as it exercises the same level of care to protect the other's information as it exercises to protect its own confidential information but in no event less than reasonable care, except to the extent that applicable law or professional standards impose a higher requirement.

(d) If the Receiving Party receives a subpoena or other validly issued administrative or judicial demand requiring it to disclose the Disclosing Party's Confidential Information, the Receiving Party shall provide prompt written notice to the Disclosing Party of such demand in order to permit it to seek a protective order. So long as the Receiving Party gives notice as

provided herein, the Receiving Party shall be entitled to comply with such demand to the extent permitted by law, subject to any protective order or the like that may have been entered in the matter.

(e) Notwithstanding anything to the contrary set forth herein, no provision in the Engagement Letter or these Standard Terms and Conditions is or is intended to be construed as a condition of confidentiality within the meaning of Internal Revenue Code sections 6011, 6111, 6112 or the regulations thereunder, or under any similar or analogous provisions of the laws of a state or other jurisdiction. Client (and each employee, representative, or other agent of Client) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of any transaction within the scope of this Engagement that reduces or defers federal tax and all materials of any kind (including opinions and other tax analyses) that are provided to Client relating to such tax treatment and tax structure. If a state or other jurisdiction adopts provisions that are similar or analogous to those in IRC sections 6011, 6111, or 6112 or the regulations thereunder, the authorization to disclose in the preceding sentence also shall apply to any transaction within the scope of this Engagement that is subject to such provisions of that state or other jurisdiction.

21. **Survival.** The provisions of Paragraphs 1, 2, 3, 4, 5, 6, 7, 8, 9, 11, 12, 13, 14, 15, 16, 18, 19, 20, 21, 22, 23, 24, 25(a), and 27 hereof shall survive the expiration or termination of this Engagement.

22. **Assignment.** Neither party may assign, transfer or delegate any of its rights or obligations without the prior written consent of the other party, such consent not to be unreasonably withheld. Notwithstanding the foregoing, to the extent any of the services under the Engagement Letter will be performed in or relate to a jurisdiction outside of the United States, Client acknowledges and agrees that such services, including any applicable tax advice, may be performed by the member firm of KPMG International practicing in such jurisdiction. Accordingly, Client agrees that KPMG may share data and information received from Client with such member firm as may be required to complete this Engagement.

23. **Severability.** In the event that any term or provision of this Agreement shall be held to be invalid, void or unenforceable, then the remainder of this Agreement shall not be affected, and each such term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

24. **Governing Law.** The Engagement Letter and these Standard Terms and Conditions shall be governed by and construed in accordance with the laws of the State of New York, without regard to the conflict of laws provisions thereof.

**May 7, 2004**



### Standard Terms and Conditions for
### Transaction Services Engagements

**25. Miscellaneous.**

(a) Except as otherwise set forth in the Engagement Letter, in accepting this Engagement, Client acknowledges that completion of this Engagement or acceptance of Deliverables resulting from this Engagement will not constitute a basis for Client's assessment or evaluation of internal control over financial reporting and disclosure controls and procedures, or its compliance with its principal officer certification requirements under Section 302 of the Sarbanes-Oxley Act of 2002 (the "Act"). This Engagement shall not be construed to support Client's responsibilities under Section 404 of the Act requiring each annual report filed under Section 13(a) or 15(d) of the Securities Exchange Act of 1934 to contain an internal control report from management.

(b) KPMG may communicate with Client by electronic mail or otherwise transmit documents in electronic form during the course of this Engagement. Client accepts the inherent risks of these forms of communication (including the security risks of interception of or unauthorized access to such communications, the risks of corruption of such communications and the risks of viruses or other harmful devices) and agrees that it may rely only upon a final hardcopy version of a document or other communication that KPMG transmits to Client.

(c) For engagements performed in California or where the services provided by KPMG fall under the jurisdiction of California law, rule or regulation, Client acknowledges that certain of KPMG's personnel that have an ownership interest in the partnership and who may provide services in connection with this Engagement may not be licensed as certified public accountants under the laws of any of the various states.

**26. Entire Agreement.** These terms, and the Engagement Letter including Exhibits, constitute the entire agreement between KPMG and Client with respect to this Engagement and supersede all other oral and written representations, understandings or agreements relating to this Engagement.

**27. Alternative Dispute Resolution.**

(a) Any dispute or claim arising out of or relating to the Engagement Letter, the services provided hereunder, or any other services provided by or on behalf of KPMG or any of its subcontractors or agents to Client or at its request (including any dispute or claim involving any person or entity for whose benefit the services in question are or were provided) shall be resolved in accordance with the dispute resolution procedures set forth in Exhibit A attached hereto, which constitute the sole methodologies for the resolution of all such disputes. By operation of this provision, the parties agree to forego litigation over such disputes in any court of competent jurisdiction. Mediation, if selected, may take place at a location to be designated by the parties. Arbitration shall take place in New York, New York. Either party may seek to enforce any written agreement reached by the parties during mediation, or to confirm and enforce any final award entered in arbitration, in any court of competent jurisdiction.

(b) Notwithstanding the agreement to such procedures, either party may seek injunctive relief to enforce its rights with respect to the use or protection of (i) its confidential or proprietary information or material or (ii) its names, trademarks, service marks or logos, solely in the courts of the State of New York or in the courts of the United States located in the State of New York. The parties consent to the personal jurisdiction thereof and to sole venue therein only for such purposes.

**May 7, 2004**

*kpmg!*

**Standard Terms and Conditions for
Transaction Services Engagements**

### Exhibit A

The following procedures are the sole methodologies to be used to resolve any controversy or claim ("dispute"). If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(i) **Mediation.** Any party may request mediation of a dispute by providing a written Request for Mediation to the other party or parties. The mediator, as well as the time and place of the mediation, shall be selected by agreement of the parties. Absent any other agreement to the contrary, the parties agree to proceed in mediation using the CPR Institute for Dispute Resolution Mediation Procedures (effective April 1, 1998), with the exception of paragraph 2 which shall not apply to any mediation conducted pursuant to this agreement. As provided in the CPR Mediation Procedures, the mediation shall be conducted as specified by the mediator and as agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with facilitation by the mediator, to reach a consensual resolution of the dispute. The mediation shall be treated as a settlement discussion and shall be confidential. The mediator may not testify for any party in any later proceeding related to the dispute. No recording or transcript shall be made of the mediation proceeding. Each party shall bear its own costs in the mediation. Absent an agreement to the contrary, the fees and expenses of the mediator shall be shared equally by the parties.

(ii) **Arbitration.** Arbitration shall be used to settle the following disputes: (1) any dispute not resolved by mediation 90 days after the issuance by one of the parties of a written Request for Mediation (or, if the parties have agreed to enter or extend the mediation, for such longer period as the parties may agree) or (2) any dispute in which a party declares, more than 30 days after receipt of a written Request for Mediation, mediation to be inappropriate to resolve that dispute and initiates a Request for Arbitration. Once commenced, the arbitration will be conducted either (1) in accordance with the procedures in this document and the Rules for Non-Administered Arbitration of the CPR Institute for Dispute Resolution ("CPR Arbitration Rules") as in effect on the date of the Engagement Letter, or (2) in accordance with other rules and procedures as the parties may designate by mutual agreement. In the event of a conflict, the provisions of this document and the CPR Arbitration Rules will control.

The arbitration will be conducted before a panel of three arbitrators, two of whom may be designated by the parties using either the CPR Panels of Distinguished Neutrals or the Arbitration Rosters maintained by any JAMS office in the United States. If the parties are unable to agree on the composition of the arbitration panel, the parties shall follow the screened selection process provided in Section B, Rules 5, 6, 7, and 8 of the CPR Arbitration Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or any dispute concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator shall be appointed unless he or she has agreed in writing to abide and be bound by these procedures.

The arbitration panel shall issue its final award in writing. The panel shall have no power to award non-monetary or equitable relief of any sort. Damages that are inconsistent with any applicable agreement between the parties, that are punitive in nature, or that are not measured by the prevailing party's actual damages, shall be unavailable in arbitration or any other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitration panel have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

Discovery shall be permitted in connection with the arbitration only to the extent, if any, expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. The parties and the arbitration panel may disclose the existence, content or results of the arbitration only as provided in the CPR Arbitration Rules. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests.

The award reached as a result of the arbitration will be binding on the parties, and confirmation of the arbitration award may be sought in any court having jurisdiction.

**May 7, 2004**