Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
    In re                          :     Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :     Case No. 05-44481 (RDD)
                                          :
                       Debtors.       :     (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(e) AND 1107(b) AND FED. R.
BANKR. P. 2014 AUTHORIZING EMPLOYMENT AND RETENTION OF
COVINGTON & BURLING AS FOREIGN TRADE AND SPECIAL
<u>CORPORATE COMMITTEE LEGAL COUNSEL TO DEBTORS</u>

("COVINGTON & BURLING RETENTION APPLICATION")

        Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this application (the "Application") for an order under 11 U.S.C. §§ 327(e) and 1107(b) and Fed. R. Bankr. P. 2014 authorizing the employment and retention of Covington & Burling ("Covington") as foreign trade and special corporate committee legal counsel to the Debtors, <u>nunc</u> <u>pro</u> <u>tunc</u> to October 8, 2005.  In support of this Application, the Debtors submit the Affidavit of Aaron R. Marcu, sworn to February 17, 2006 (the "Marcu Affidavit").  In further support of this Application, the Debtors respectfully represent as follows:

Background

A.  The Chapter 11 Filings

1.  On October 8, 2005 (the "Initial Filing Date"), Delphi and certain of its U.S. subsidiaries (the "Initial Filers") filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1130, as amended (the "Bankruptcy Code").  On October 14, 2005, three additional U.S. subsidiaries of Delphi (together with the Initial Filers, collectively, the "Debtors") also sought reorganization relief. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(b) and 1108 of the Bankruptcy Code.  This Court entered orders directing the joint administration of the Debtor's chapter 11 cases (Dockets Nos. 28 and 404).

2.  On October 17, 2005, the Office of the Unites States Trustee appointed an official committee of unsecured creditors.  No trustee or examiner has been appointed in the Debtors' cases.

3.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.  The statutory predicates for the relief requested herein are sections 327(e), and 1107(b) of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.  Current Business Operations Of The Debtors

5.  As of the Initial Filing Date, Delphi had global 2004 revenues of approximately $28.6 billion, and global assets as of August 31, 2005 of approximately $17.1

2

billion,[1] Delphi ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.

      6.    Delphi has become a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and the Company (as defined below) is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company's technologies and products are present in more than 75 million vehicles on the road worldwide. The Company supplies products to nearly every major global automotive original equipment manufacturer with 2004 sales to its former parent, General Motors Corporation, equaling approximately $15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

      7.    As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world. As of the Initial Filing Date, the Debtors employed approximately 180,000 employees. The Debtors' 50,600 U.S. employees work in approximately 44 manufacturing sites, 13 technical centers, and in Delphi's Troy, Michigan headquarters. Approximately 34,750 of these individuals are hourly employees as of the Initial Filing Date, 96% of these were represented by approximately 49 different international and local unions. Outside the United States, the Company's foreign entities employed more than 134,000

---

[1] The aggregated financial data used in this Application generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

3

people on the Initial Filing Date, supporting 120 manufacturing sites and 20 technical centers in nearly 40 countries around the globe.

8.  Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates (collectively, the "Company") in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

9.  Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle.  When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base.  The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base.  The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

4

C.      Events Leading To The Chapter 11 Filing

10. In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales. Reflective of a downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005, with net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, approximately $1 billion less than the same time period a year earlier.[2]

11. The Debtors believe that the Company's financial performance has deteriorated because of: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12. In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward looking revenue requirements. Because discussions with its Unions and GM were not progressing sufficiently, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

---

[2]     Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

5

13. Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses. This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness. The Debtors believe that a substantial segment of Delphi's U.S. business operations must be divested, consolidated, or wound-down during these cases.

14. Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

## Relief Requested

15. By this Application, the Debtors request entry of an order authorizing the Debtors to employ and retain Covington pursuant to certain engagement letters between Delphi and Covington dated July 9, 1999 and June 8, 2005, attached hereto as Exhibits A and B, respectively (together, the "Engagement Letters").

## Basis For Relief

16. The Debtors submit that Covington's proposed retention meets all the prerequisites for retention of special counsel under section 327(e) of the Bankruptcy Code, which permits a debtor-in-possession, with court approval, to employ counsel that has represented the

6

Debtors prior to the commencement of their chapter 11 cases, for a "specified special purpose" if such employment is in the best interest of the Debtors. Because Covington is the proposed foreign trade and special corporate committee legal counsel to the Debtors, but not the proposed bankruptcy counsel in these chapter 11 cases, section 327(e) does not require that Covington and its attorneys be "disinterested persons" as defined in section 101(14) of the Bankruptcy Code. Rather, section 327(e) instead requires that Covington not represent or hold any interest adverse to the estates or the Debtors with respect to the matter on which Covington is to be employed. As discussed below, the employment of Covington as foreign trade and special corporate committee legal counsel is in the best interests of the Debtors.

### The Debtors' Employment Of Covington Is In The Best Interests Of The Estates

17. Covington will serve as foreign trade and special corporate committee legal counsel to the Debtors during these chapter 11 cases in respect of the matters described in paragraph 20 below. Covington has performed similar work for the Debtors in the past and is therefore familiar with the Debtors' businesses and operations. In particular, Covington is especially attuned to the unique legal issues that arise in the Debtors' industry.

18. Covington is a leading international law firm, with more than 500 lawyers practicing in key business and regulatory centers throughout the world. Covington has extensive experience representing and advising clients in connection with complex litigation, regulatory, and corporate matters. Most important for the purposes of this Application, several members of Covington have extensive experience in the provision of advice regarding foreign trade controls, the representation of corporate boards and subcommittees thereof in connection with internal investigations, the provision of advice regarding indemnification of corporate officers and directors, and corporate and securities law and their interplay with restructuring and bankruptcy

7

law.  Accordingly, the Debtors believe that Covington is well qualified to serve as foreign trade and special committee legal counsel with respect to these issues in these chapter 11 cases in an efficient and effective manner.

19. The Debtors believe that the employment of Covington will enhance and will not duplicate the employment of Skadden, Arps, Slate, Meagher, & Flom LLP ("Skadden"), the Debtors' general bankruptcy counsel, Shearman & Sterling LLP ("Shearman"), the Debtors' special counsel, Togut, Segal & Segal LLP ("Togut"), the Debtors' conflicts counsel, or any of the other professionals retained by the Debtors to perform specific tasks that are unrelated to the work to be performed by Covington as foreign trade and special corporate committee legal counsel to the Debtors.  The Debtors understand that Covington will work with the other professionals retained by the Debtors to avoid any such duplication.

## Services To Be Rendered By Covington

20. As set forth in the Engagement Letters, the Debtors wish to engage Covington to provide services to the Debtors in connection with litigation and foreign trade government contract matters.  The Debtors anticipate that such services will include the following:

    (a)    Advice and assistance on U.S. foreign trade controls, including the scope, applicability, licensing, and compliance requirements under the International Traffic in Arms Regulations, Directorate of Defense Controls, U.S. Department of State;

    (b)    Advice to a Special Committee (the "Special Committee") of the Board of Directors (the "Board") in connection with demands made or that may be made by Delphi shareholders with regard to various accounting issues now under investigation and in litigation;

    (c)    Advice to the Special Committee in connection with the Company's selection of a new external auditor; and

    (d)    Advice to the Company regarding indemnification and advancement of funds to certain officers and directors.

21.  Covington has indicated its desire and willingness to represent the Debtors as set forth herein and to render the necessary professional services as foreign trade and special corporate committee legal counsel to the Debtors.

22.  The Debtors may request that Covington undertake specific matters beyond the scope of the responsibilities set forth above.  Should Covington agree in its discretion to undertake any such matter, the Debtors shall seek further order of this Court.

Disinterestedness Of Professionals

23.  The Marcu Affidavit filed in support of this Application contains information available to date on Covington's connections with other parties-in-interest, as required by Bankruptcy Rule 2014(a).  To the best of the Debtors' knowledge, and based on the information in the attached Marcu Affidavit, which is premised on the conflicts check Covington has completed as of this date, Covington, its partners, counsel, and associates do not hold or represent any interest adverse to the Debtors, their creditors, any other party-in-interest in these chapter 11 cases, their respective attorneys and investment advisors, the U.S. Trustee, or any person employed therein, with respect to the matters on which Covington is to be employed.

24.  Covington has disclosed to the Debtors that it has in all probability in the past represented, currently represents, and will likely in the future represent certain of the Debtors' creditors and other parties-in-interest in matters unrelated to the Debtors or their chapter 11 cases.  A list of the parties-in-interest that are current clients of Covington is attached hereto as Exhibit C.  A list of the parties-in-interest that are not current clients but for whom Covington provided legal services within the last five years is attached hereto as Exhibit D.  None of the parties-in-interest accounted for more than 1% of Covington's gross revenues for its 2005 fiscal year, with the exception of Microsoft (less than 3%), JP Morgan Chase (less than

3%), Goodyear Tire & Rubber Company (less than 2%), SG Cowen (less than 2%), the State of Minnesota (less than 2%) and IBM (less than 2%). Covington does not believe that such representation of parties-in-interest in unrelated matters raises any actual or potential conflict of interest of Covington relating to the representation of the Debtors as their foreign trade and special corporate committee legal counsel in these chapter 11 cases. The Debtors understand that, in order to vitiate any actual or potential conflicts of interest, Covington will not assist the Debtors in connection with their analysis, negotiations, and litigation, if any, with parties with whom Covington has existing client relationships, and that Skadden (or other counsel if Skadden has a conflict), instead, will handle these tasks.

Professional Compensation

25. Covington intends to apply to this Court for compensation and reimbursement of expenses in accordance with section 330(a) of the Bankruptcy Code, the Bankruptcy Rules, applicable guidelines established by the U.S. Trustee, and orders of this Court. Covington acknowledges that all compensation will be subject to this Court's review and approval, after notice and a hearing.

26. On the Petition Date, Covington was owed, and continues to be owed, approximately $263,559.79 for services and charges performed prior to the Petition Date.

27. Under the applicable provisions of the Bankruptcy Code, and subject to the approval of this Court, the Debtors propose to pay Covington its hourly billing rates in effect for the period in which services are performed, and other costs incurred for support services on behalf of Debtors. The current hourly rates of the Covington attorneys who are expected to be principally responsible for rendering services to the Debtors in connection with these chapter 11 cases are as follows: Aaron R. Marcu ($760); Peter D. Trooboff ($580); Adam Siegel ($580); Barbara Hoffman ($550); Peter L. Flanagan ($520); Corrine A. Goldstein ($500); Michael J.

Naft ($410); Kimberly A. Strosnider ($365); and Gina R. Merrill ($270). Other Covington attorneys from time to time may render services to the Debtors in connection with these cases. The current hourly rates for Covington attorneys range from $200 to $760. The current hourly rates for the services of legal assistants range from $165 to $250. Covington customarily adjusts its billing rates on an annual basis, usually as of October 1, and if Covington increases its rates during the pendency of this proceeding, it will seek compensation at the modified rates, subject to the terms of the Engagement Letters. Pursuant to the engagement letter dated June 8, 2005, notwithstanding the firm's increase in rates charged as of October 1, 2005, Covington will not increase its rates with respect to its representation of the Special Committee of the Board until June 8, 2006, other than for the regular progression of associates as they move from one year to the next in terms of seniority.

28. No arrangement is proposed between the Debtors and Covington for compensation to be paid in these chapter 11 cases other than as set forth above, in the Engagement Letters, and in the Marcu Affidavit.

29. At the Debtors' request, Covington has continued to assist the Debtors in connection with their foreign trade and special corporate committee issues since October 8, 2005 and hence the Debtors request Covington's retention to be effective <u>nunc pro tunc</u> to October 8, 2005.

## Conclusion

30. For the foregoing reasons, the Debtors submit that the employment of Covington as the Debtors' foreign trade and special corporate committee legal counsel on the terms set forth herein is in the best interests of the estates.

11

Notice

31.    Notice of this Application has been provided in accordance with the Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing (I) Omnibus Hearing Dates, (II) Certain Notice, Case Management, And Administrative Procedures, And (III) Scheduling An Initial Case Conference In Accordance With Local Bankr. R. 1007-2(e) entered by this Court on October 14, 2005 (Docket No. 245).  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

Memorandum Of Law

32.    Because the legal points and authorities upon which this Application relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order (a) authorizing the Debtors to employ and retain Covington as their foreign trade and special corporate committee legal counsel to perform the services set forth herein, and (b) granting the Debtors such other and further relief as is just.

Dated:   New York, New York
         February 17, 2006

                                DELPHI CORPORATION, on behalf of itself and certain of its subsidiaries and affiliates, as Debtors and Debtors-in-possession

                                By:   /s/ David M. Sherbin_____
                                    Name: David M. Sherbin
                                    Title:  Vice President, General Counsel, and
                                           Chief Compliance Officer