UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X
                                          :
In re:                                    :   Case No. 05-44481
                                          :
   DELPHI CORPORATION, et al,             :
                                          :   One Bowling Green
                                          :   New York, NY
                            Debtors.      :   January 5, 2006
------------------------------------------X

TRANSCRIPT OF OMNIBUS HEARING
BEFORE THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:            JOHN W. BUTLER, JR., ESQ.
                            DAVID E. SPRINGER, ESQ.
                            SKADDEN, ARPS, SLATE,
                            MEAGHER & FLOM, LLP
                            333 West Wacker Drive, Suite 2100
                            Chicago, Illinois  60606

                            KEVIN M. MURPHY, ESQ.
                            SKADDEN, ARPS, SLATE,
                            MEAGHER & FLOM, LLP
                            1440 New York Avenue, N.W.
                            Washington, D.C. 20005

                            THOMAS J. MATZ, ESQ.
                            SKADDEN, ARPS, SLATE,
                            MEAGHER & FLOM, LLP
                            Four Times Square
                            New York, New York 10036

                            NEIL BERGER, ESQ.
                            TOGUT, SEGAL & SEGAL, LLP
                            One Penn Plaza, Suite 335
                            New York, New York 10119


                            (Appearances continued on next page)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Special Counsel to<br>Delphi: | WILLIAM J.F. ROLL, III, ESQ.<br>LYNETTE C. KELLY, ESQ.<br>ANDREW V. TENZER, ESQ.<br>SHEARMAN & STERLING LLP<br>599 Lexington Avenue<br>New York, New York 10022 |
| For DC Capital Partners: | JESSICA L. FAINMAN, ESQ.<br>SCHULTE ROTH & ZABEL LLP<br>919 3rd Avenue<br>New York, New York 10022 |
| For Appaloosa<br>Management, LP: | GERARD H. UZZI, ESQ.<br>WHITE & CASE, LLP<br>200 S Biscayne Blvd, Suite 4900<br>Miami, Florida 33131 |
| For Wilmington Trust<br>Company: | EDWARD M. FOX, ESQ.<br>KIRKPATRICK & LOCKHART NICHOLSON<br>GRAHAM LLP<br>599 Lexington Avenue<br>New York, New York 10022 |
| For the Lead Plaintiffs: | MICHAEL S. ETKIN, ESQ.<br>LOWENSTEIN SANDLER PC<br>65 Livingston Avenue<br>Roseland, New Jersey 07068 |
| For the Creditors<br>Committee: | ROBERT J. ROSENBERG, ESQ.<br>LATHAM & WATKINS, LLP<br>53rd at Third, 885 Third Avenue<br>New York, New  York  10022-4802 |
| For the Lead Plaintiffs: | JAMES J. SABELLA, ESQ.<br>GRANT & EISENHOFER, P.A.<br>Chase Manhattan Centre<br>1201 North Market Street<br>Wilmington, Delaware 19801 |

(Appearances continued on next page)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

Co-Lead Counsel for          JOHN P. COFFEY, ESQ.
  Securities:                BERNSTEIN, LITOWITZ, BERGER
                               AND GROSSMANN, LLP
                             1285 Avenue of the Americas
                             New York, New York 10019


For U.S.                     TRACY HOPE DAVIS, ESQ.
                             U.S. DEPARTMENT OF JUSTICE
                             33 Whitehall Street
                             New York, New York 10004


For the Committee:           HENRY P. BAER, JR.
                             ROBERT J. ROSENBERG, ESQ.
                             Latham & Watkins
                             885 Third Avenue
                             New York, New York 10022


For Pepco Energy Serv.:      CAMERON MACDONALD, ESQ.
                             WHITEFORD, TAYLOR & PRESTON, LLP
                             Seven Saint Paul Street
                             Baltimore, Maryland 21202


For Creditors Comm.          MICHAEL D. WARNER, ESQ.
                             WARNER STEVENS, LLP
                             1700 City Center Tower II
                             301 Commerce Street
                             Fort Worth, Texas 76102


For UMICORE:                 EDWARD C. DOLAN, ESQ.
                             HOGAN & HARTSON, LLP
                             555 Thirteenth Street NW
                             Washington, DC 20004


For UAW:                     BABETTE CECCOTTI, ESQ.
                             COHEN, WEISS & SIMON, LLP
                             330 West 42nd Street
                             New York, New York 10036

(Appearances continued on next page)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK


For ACE American Ins.      MARGERY N. REED, ESQ.
                           JOSEPH LEMKIN, ESQ.
                           DUANE MORRIS
                           30 South 17th Street
                           Philadelphia, PA 19103


For Capital Research:      RICHARD G. MASON, ESQ.
                           WACHTELL, LIPTON, ROSEN & KATZ
                           51 West 52nd Street
                           New York, New York 10019


Court Transcriber:         KATHLEEN PRICE, CET
                           TypeWrite Word Processing Service
                           356 Eltingville Boulevard
                           Staten Island, New York 10312


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

5

1          THE COURT:  Please be seated.  Okay.  Good morning.
2    Delphi Corporation.
3          MR. BUTLER:  Good morning, Your Honor.  Jack Butler,
4    Kevin Murphy, David Springer and Tom Matz here today on behalf
5    of Delphi Corporation for its January omnibus hearing.
6          Your Honor, we have filed a proposed third omnibus
7    hearing agenda.  It has been served in accordance with the case
8    management order and has been posted on Delphidocket.com, and
9    it is the agenda we'd like to use today if that's acceptable to
10   the Court.
11         THE COURT:  That's fine.
12         MR. BUTLER:  Your Honor, the first matter on the
13   agenda under the continued or adjourned matters is the interim
14   -- what's remaining of the interim compensation motion at
15   Docket No. 11.  The remaining item deals with the appointment
16   of a fee committee in these cases.
17         The first fee statements in these cases were
18   submitted at the end of last week.  There is a meet and confer
19   that is planned to occur during the month of January between
20   the creditors committee, the debtor and the U.S. Trustee.  The
21   U.S. Trustee did file an objection to the appointment of a fee
22   committee in these cases arguing that it may not be warranted.
23         We've agreed with the U.S. Trustee to adjourn this
24   matter to the February 9th hearing and try to work out a
25   process for the appointment of a committee between now and

6

1  then.   The debtors believe a committee ought to be appointed in

2  these cases, and absent being able to resolve any issues during

3  the meet and confer, our intention would be to proceed with the

4  motion at the February 9th omnibus hearing.

5          THE COURT:  Okay.  That's fine.  I -- I mean, these

6  are obviously large cases, and as evidenced by the number of

7  people in the courtroom, they attract a lot of lawyers,

8  appropriately, and my experience has been that it is worthwhile

9  to have some specific oversight over fees involving the U.S.

10 Trustee, sophisticated consumers of legal services on a

11 creditors committee and the debtors.

12          And I think the only real issue is the cost of

13 involving a third party in that process and generally, my

14 experience with regard to such third parties is that they

15 provide some benefit because they have their computer programs

16 where they check billing records but that they don't have the

17 type of sophistication necessarily that the other parties do.

18          So maybe there's a way to split the issue along those

19 lines.

20          MR. BUTLER:  Your Honor, the -- two co-fiduciaries

21 and the trustee have I think some constructive conversations

22 about this, and they have agreed to meet to try to resolve

23 this, and I would -- I'm reasonably optimistic that there will

24 be a resolution.

25          THE COURT:  Okay.  Thank you.

1          MR. BUTLER:  Your Honor, the second matter on the

2   agenda, Agenda Item No. 2 is the KECP motion.   This is Docket

3   No. 213.   There had been a previous agreement to adjourn the

4   motion to the January 27th specially set hearing.

5          We have been engaged for the last month or so in a

6   dialogue with the creditors committee who has engaged a

7   separate compensation consultant to review the KECP program and

8   to work with our compensation consultant.   In fact, there's a

9   meeting scheduled between the compensation consultants for

10  tomorrow to continue to work on the structure, scope and other

11  details relating to the program.

12         In the course of those discussions between the

13  creditors committee and the company, we would -- had agreed

14  that the January 27th hearing ought to be very narrowly focused

15  on the annual incentive program for the period end of June 30th

16  of this year, and that the balance of the motion which would

17  involve the annual incentive plans beyond June 30th and the

18  proposed cash equity incentive emergency awards, the debtors

19  are prepared to adjourn that to the July 2006 omnibus hearing,

20  and we've extended the objection deadline for the creditors

21  committee.

22         All the other objection deadlines have passed in this

23  case, but we want to be able to continue to work with the

24  committee and their compensation consultants.   The goal here

25  between the company and the committee is to arrive at a program

8

1 that is mutually acceptable to the two -- to at least the

2 debtors and creditors committee and then hopefully we can

3 resolve the remaining objections that have been filed.

4        THE COURT:  Okay.  Obviously, the motion as

5 originally filed was a lightning rod, and I just want to make

6 sure that you've given notice to the objectants that the only

7 thing that's currently contemplated to go forward at the next

8 hearing is that limited portion of the motion.  So --

9        MR. BUTLER:  We have --

10        THE COURT:  -- they won't show up to argue the whole

11 thing.

12        MR. BUTLER:  Your Honor, we have communicated with

13 each of the objectors.  We also have posted that information on

14 Delphidocket.com generally, and so that information is there.

15        We understand that there -- you know, there are I

16 think ten or so objections that have been filed in connection

17 with the program, and I'll not address the merits of the motion

18 at this point.

19        THE COURT:  No, that's fine.  Okay.  Thank you.

20        MR. BUTLER:  Your Honor, the next set of matters are

21 matters that I think Mr. Berger is going to address.

22        MR. BERGER:  Good morning, Judge.  Neil Burger, Togut

23 Segal for the debtors.

24        We have a number of matters in sequence on the

25 calendar.  Number Three is Specmo Enterprises.  This is a

9

1 demand by Specmo to set off -- they assert that Delphi owes

2 Specmo a little more than half a million dollars and that

3 there's a reciprocal claim of more than $350,000. Debtors have

4 completed the reconciliation of these competing claims. They

5 forwarded it to Specmo's counsel who has forwarded it to his

6 business folks, and we're hopeful that before the next omnibus

7 hearing date, this matter will be settled.

8            So, with Your Honor's consent, this matter should be

9 adjourned to February 9th.

10            THE COURT:  Okay.  That's fine.

11            MR. BERGER:  Thank you, Judge.

12            The next matter is Schmidt Technology.  This is an

13 order to show cause that the debtors sought and had entered by

14 Your Honor, Docket No. 477, and the order to show cause directs

15 Schmidt to show cause why it should not be held to have

16 violated the automatic stay for having demanded and obtained a

17 post-petition payment on account of pre-petition obligations.

18            There is a constant and open dialogue and exchange of

19 information between the parties on this matter, Your Honor.

20 Schmidt is asserting that it is a foreign vendor, foreign

21 creditor under Your Honor's prior order and is seeking that

22 status.

23            We're nearing completion of informal discovery and

24 legal research, and again, we're hopeful that this matter as

25 well will be settled.  If not, we'll report back to Your Honor

10

1  on February 9.

2        THE COURT:  Okay.

3        MR. BERGER:  DBM Technologies, Number 5 on the agenda

4  like Specmo is a setoff demand.  The debtors have completed

5  their reconciliation of the competing claims.  We've sent it

6  off to DBM's counsel in Detroit.  They've shared it with their

7  client.  I would expect in the next week or so this matter will

8  be settled, and as the agenda reflects, we'd like to have this

9  matter adjourned to the February 9 date.

10        THE COURT:  That's fine.

11        MR. BERGER:  JST Manufacturing -- I'm sorry, Entergy,

12  Number 6, Entergy filed a motion for authority to set off or

13  recoup against a six-hundred-thousand-dollar payment that it

14  obtained within ninety days prior to the petition date.

15        The debtors filed a response last week, Docket No.

16  1662.  Entergy has expressed a desire to file a response.

17  There are factual issues in play.  We have agreed that they

18  could file a response.  It would be filed on or before a week

19  from tomorrow.

20        We'll look at that response.  If there are factual

21  issues, there may be some discovery, but in the interim, Your

22  Honor, we'd like to adjourn this to February 9.

23        THE COURT:  Okay.

24        MR. BERGER:  JST Manufacturing is Number 7.  It's an

25  order to show cause, again, seeking -- directing JST to show

11

1   cause why it should not be held to have violated the automatic

2   stay for having received a post-petition payment on account of

3   pre-petition obligations.

4        As I understand it, JST is a small Japanese

5   enterprise and, in the beginning, there may have been some

6   language barrier.  Most recently, JST has asserted that they

7   should be treated as a foreign vendor, and perhaps more

8   significantly, they've asserted a financial inability to

9   respond to this order to show cause by having to disgorge the

10  funds.

11       They had promised me expect within the week documents

12  concerning their corporate structure to go to the issue of

13  whether or not they're a foreign vendor and also some financial

14  information to see whether or not we're chasing something that

15  simply won't happen.

16       THE COURT:  Okay.

17       MR. BERGER:  This matter should be adjourned as we

18  requested in the agenda to the February 9 hearing.

19       THE COURT:  All right.

20       MR. BERGER:  And that's a break for my matters for

21  the moment.

22       THE COURT:  Okay.

23       MR. BUTLER:  Your Honor, Number 8 on the agenda is

24  the Pullman Bank and Trust Company motion.  Pullman alleges the

25  debtors have failed to make certain post-petition payments on

12

1  leases held by the bank, and therefore, the bank moved for

2  various relief under the motion.

3          Your Honor, the debtors have disputed with Pullman

4  that those assertions are accurate.  The debtors believe they

5  have made -- they're in full compliance with the leases, and

6  the parties have agreed to try to reconcile the underlying

7  factual record here and try and sort out any remaining

8  disputes, and therefore, would request that this matter be put

9  off to the February 9th omnibus hearing.

10         THE COURT:  Okay.

11         MR. BUTLER:  Mr. Berger?

12         MR. BERGER:  Next on the calendar, Your Honor --

13  excuse me, Neil Berger for the debtors.

14         Number 9, Furukawa Electric North America.  This is a

15  motion by Furukawa for authority to set off against a payment

16  of approximately $2.3 million that it received on October 4,

17  2005.

18         This motion was filed just before the holidays, Your

19  Honor.  Our client needs a little bit of time and an

20  opportunity to look at the facts, and we requested and Furukawa

21  consented to request Your Honor adjourn this matter to the

22  February 9 date.

23         THE COURT:  Okay.

24         MR. BUTLER:  Your Honor, Matter No. 10 on the agenda

25  is a case management amendment motion filed with Docket No.

13

1    1556 filed by the creditors committee which the committee seeks

2    to amend various aspects of case management in these Chapter 11

3    cases.

4             The United States Trustee, the creditors committee

5    and the debtors have agreed to a meet and confer on this matter

6    to try and sort out what procedural changes, if any, we can all

7    consensually agree to and then recommend to the Court for the

8    Court's consideration.  Otherwise, we'll file responses and the

9    matter would be heard at the February 9th hearing.

10            THE COURT:  Okay.

11            MR. BUTLER:  That's -- that's the status.

12            THE COURT:  All right.  There was a similar

13   modification I guess in the Refco case that I'm pretty

14   comfortable with, and your colleagues in that case were too.

15   So maybe that can be a model.

16            I mean, it wasn't major, but it just streamlined

17   things a bit vis-a-vis the committee.

18            MR. BUTLER:  Thank you, Your Honor.

19            Your Honor, Matter No. 11 on the agenda is a motion

20   filed by Appaloosa Management, LP asking this Court to appoint

21   an equity committee in the Chapter 11 case that's filed in

22   Docket No. 1604.

23            This motion was filed while the United States Trustee

24   had a similar request from Appaloosa under its consideration

25   and had not reached a determination.  The debtors asked

14

1  Appaloosa if they would put this matter off for a few weeks.

2  Appaloosa had sought some extensive discovery and we've got

3  issues relating to the discovery they wanted to put in place.

4       The debtors also believed it was appropriate for the

5  schedules of -- the schedules and the statements to be filed in

6  these cases.  They will be filed in accordance with Your

7  Honor's order by January 22nd, and the 341 meeting in these

8  cases is being conducted by the United States Trustee I believe

9  on February 3rd.

10      Our agreement with the -- with Appaloosa is to ask

11 for a date not earlier than January 30th, 2006 for this matter

12 to be heard.  I'm advised by Appaloosa that they have a

13 scheduling conflict with the February 9th hearing, and they

14 asked for a special setting sometime after January 30th, but as

15 soon thereafter as Your Honor could find time.

16      We're certainly prepared to -- we've talked with

17 chambers, we're prepared to, you know, continue to consult in

18 trying to find a mutually acceptable date if that's acceptable,

19 Your Honor.

20      THE COURT:  Okay.  Sometime in February.

21      MR. BUTLER:  I think Mr. Berger has I think the next

22 set of matters.

23      MR. BERGER:  Judge, Neil Berger for the debtors.

24 Moving into the uncontested and settled matters, Number 12, the

25 Lee Company, this was an order to show cause Your Honor issued

15

1  concerning a fifty-eight-thousand-dollar payment that Lee

2  obtained post-petition on account on pre-petition obligations.

3  Lee is a supplier to the debtor, and this matter has been

4  settled, and I have an order that I'll hand up in just a

5  moment.

6       The significant elements of the settlement is that

7  Lee will continue to ship to the debtor.  The debtor will move

8  separately to assume this agreement.  The $58,000 will be

9  applied toward cure obligations on the assumption.  To the

10  extent that cure obligations don't consume the full $58,000,

11  the balance will be applied solely to the post-petition

12  obligations of the debtor.

13       So the harm has been completely remedied.

14       THE COURT:  Okay.

15       MR. BERGER:  The next matter --

16       THE COURT:  That's -- I'll approve that.

17       MR. BERGER:  I'm sorry.  Thank you, Judge.

18       The next matter, Number 13 is Proto Manufacturing,

19  also an order to show cause, challenged a three-hundred-and-

20  forty-thousand-dollar payment that Proto obtained post-petition

21  on account of pre-petition obligations.  This matter has also

22  been resolved, Your Honor.

23       Proto has agreed that the full amount of the

24  transfers will be credited solely to post-petition obligations

25  and barring anyone here in court today or questions from Your

1   Honor, we'd ask that Your Honor approve that one as well.

2   THE COURT:  I'll approve that.

3   MR. BERGER:  Your Honor, I have orders -- I believe
4   they're --

5   THE COURT:  Why don't you leave them up with
6   chambers.

7   MR. BERGER:  I'll do that, Judge.  Thank you.

8   MR. BUTLER:  Matter No. 14 on the agenda at Docket
9   No. 997 is the debtors' motion authorizing debtors to obtain
10  preferential power rights pursuant to a letter agreement with
11  Niagara Mohawk Power Corporation and to assume that agreement.

12  Your Honor may recall that we adjourned this from a
13  prior hearing in order to give an opportunity for the New York
14  Power Authority Board of Trustees to consider this matter which
15  occurred on December 13th, and on that date, the New York Power
16  Authority Board of Trustees approved the various transactions
17  needed to implement the agreement that's before Your Honor.

18  Simply stated, Your Honor, if the Court approves this
19  transaction and allows us to consummate it, we would be able to
20  obtain valuable low-cost electricity at significantly
21  discounted rates for the duration of the power contracts.

22  That assumption will save according to the debtors'
23  estimate approximately $50,000 a month over the terms of the
24  contracts, and the -- and the term of the contracts range from
25  ten months to as long as seven years from today's date.

17

1        We've reviewed this matter with the creditors
2   committee.  No objections have been filed.  Unless Your Honor
3   wants additional information, we'd ask --
4        THE COURT:  I just -- this is not really an
5   assumption under 365 because the debtors weren't really a party
6   to these contracts, right?  They're basically being substituted
7   in for --
8        MR. BUTLER:  There's going to be an assignment and
9   then we're assuming the contract --
10        THE COURT:  Okay.  All right.  And that's why you're
11   paying the extra money --
12        MR. BUTLER:  Correct, Your Honor.
13        THE COURT:  Okay.  I'll approve it.  It's clearly a
14   good deal.
15        MR. BUTLER:  Thank you, Your Honor.
16        Your Honor, Matter No. 15 on the agenda is the
17   application of the creditors committee for the appointment of
18   Latham and Watkins as counsel on Docket No. 1086.  This has
19   been adjourned to allow the debtors an opportunity to complete
20   their review of the application.
21        We have done so.  The debtors support the retention
22   application and we have no other further comments.
23        THE COURT:  Okay.  I've reviewed it and I will
24   approve the retention.
25        MR. BUTLER:  Your Honor, just taking a clue off your

18

1  conversation with Mr. Berger, do you want us to submit all the

2  orders to chambers after the hearing?

3           THE COURT:  Yes, that's fine.  And on that subject,

4  while I'm normally happy to have proposed orders emailed to

5  chambers, when we have a big omnibus day, it's probably better

6  to just bring them on a disc to chambers, particularly since

7  Ms. Li has been out.  It's just easier to have the disc.

8           MR. BUTLER:  Thank you.  And we have discs with us

9  today, Your Honor.

10          THE COURT:  Okay.  Thanks.

11          MR. BUTLER:  Mr. Berger, I think the next is yours.

12          MR. BERGER:  Neil Berger for the debtors.

13          Your Honor, Number 16 on the calendar is AMR

14 Industries, an order to show cause, Docket No. 1090.  This is

15 another order to show cause that the debtors ask to be entered

16 to challenge a small payment of about $6,600 made to AMR post-

17 petition on account of what was believed to have been all pre-

18 petition obligations.

19          JST -- I'm sorry, AMR asserted that not all of the

20 funds were intended to satisfy pre-petition obligations.  After

21 some informal discovery and some diligence, the debtors and we

22 concluded that this creditor was right.  Only about $2,100 was

23 on account of pre-petition obligations.  The matter has been

24 settled, and we have an order to drop off in chambers pursuant

25 to which the $2,100 will be returned to the debtors on or

19

1  before January 13th.  The balance is to pre-petition

2  obligations.

3        While this is a small amount, it should reflect the

4  debtors' commitment to the continued integrity of the order to

5  show cause process that Your Honor put in place and has been

6  effectively enforced.

7        THE COURT:  Okay.  I'll approve that.

8        MR. BERGER:  Thank you, Judge.

9        Number 17 is Pepco Energy Services.  Pepco filed a

10 motion for relief from the automatic stay.  Pepco and the

11 debtors are parties to a sales agreement, pursuant to which

12 energy utility services provided to the debtors' New Brunswick,

13  New Jersey manufacturing facility where approximately 425

14 people are employed, it's an important component of our

15 manufacturing structure.

16       The relief from stay sought three alternative forms

17 of relief.  The first was relief from the stay to serve a

18 termination notice to terminate the sales agreement and

19 potentially the utility service.  Alternatively, they sought to

20 compel the debtors to assume or reject the agreement.

21       Pepco -- the debtors filed a response and Pepco was -

22 - without prejudice the two branches of their motion seeking

23 relief from the automatic stay and the -- an order compelling

24 the debtors to assume or reject.

25       What was left open, Your Honor, was finding some type

1 of mechanism so that the debtor would be protected.  They have

2 significant property interests in this facility, and also

3 Pepco's desire to be protected apparently under certain

4 regulations that they don't serve a termination notice by a

5 date certain late in the month.  They're required to provide

6 the utility service through the next billing period whether or

7 not the debtors pay.

8        We have the framework of a settlement that we reached

9 yesterday, the significant portions of which I can report to

10 the Court are that Pepco has agreed to email invoices to a

11 dedicated email address so that we can be certain to get

12 invoices to the right person on time.  The debtors retain their

13 contractual period to pay and to cure any defaults.

14        And Pepco would have the opportunity to seek relief

15 from the automatic stay.  The concern was that we didn't want

16 to have a utility provider terminating service without coming

17 before the Court on notice to the appropriate parties.

18        They'd be able to seek entry of an order modifying

19 the stay to serve a termination notice on three business days'

20 notice, and that would have to be emailed or faxed to us, and

21 what that does, Your Honor, is that it gives the debtors an

22 opportunity to come back to the Court in case there's some type

23 of dispute about the default that Pepco is concerned about.

24        So, having said all that, Your Honor, I think we've

25 resolved all the issues in this motion.  We're protecting the

21

1  debtors' interest.  We're ensuring that Pepco gets paid on

2  time.

3          THE COURT:  Okay.  So you're going to submit an

4  agreed order later this month or --

5          MR. BERGER:  Hopefully, within the week, we'll have a

6  stipulation to submit to Your Honor.

7          THE COURT:  Okay.

8          MR. BUTLER:  Your Honor, the other matters on the

9  agenda we'd like to take together, Matters No. 18 and 19 and 20

10 on the agenda.

11         Matters 18 -- Matter 18 is the application of the

12 creditors committee for the retention of Warner Stevens, LLP as

13 conflicts counsel found at Docket No. 1170.

14         Matter 19 is the application of the committee to

15 retain Mesirow Financial Consulting, LLC as financial advisors

16 to the committee and that is at Docket No. 1335.

17         And Matter No. 20 is the application of the committee

18 to retain Steven Hall as compensation consultants.  That's at

19 Docket No. 1399.

20         Taking Matter 20 first, there is an open issue that

21 the committee and the U.S. Trustee are working out relating to

22 an indemnity matter, and we're not prepared to present an order

23 today to Your Honor but the request would be to have this

24 carried to the February 9th omnibus hearing, but the

25 expectation would be that there would be a consent order

22

1  submitted between -- before that time between the U.S. Trustee

2  and the creditors committee --

3          THE COURT:  This is Steven Hall and Partners?

4          MR. BUTLER:  This would be -- yeah, Number 20,

5  correct.

6          THE COURT:  Okay.  All right.  That's fine.

7          MR. BUTLER:  As to Matter 18 and 19, Your Honor,

8  there have been no objections filed.  The debtors have reviewed

9  these papers as well in support the motions of the creditors

10  committee.  There has been an amended order in Matter No. 18 in

11  Warner Stevens to simply make the conflicts counsel retention

12  mirror the same -- the debtors' order appears and so there's an

13  amended order in that respect.

14          THE COURT:  Okay.  All right.  I reviewed these

15  applications including the supplemental affidavit by Mesirow

16  regarding their screening procedures and I'm comfortable that

17  they'll live up to those procedures, that they're

18  disinterested.

19          So I'll approve both of those retentions.

20          MR. BUTLER:  Your Honor, I should also point out just

21  so that there's a record on this.  These applications are nunc

22  pro tunc to the actual retention date for each of the

23  individual firms and the debtors support that.

24          THE COURT:  Right.  And I -- given the review process

25  that they've undergone that nunc pro tunc retention is

23

1  appropriate.

2         MR. BUTLER:  Thank you, Your Honor.

3         Your Honor, Matter No. 21 is a procedural matter.
4  Umicore Autocat Canada Corporation has filed a motion to
5  substitute an exhibit that was attached to their file notice of
6  reformation demand.  They filed the motion in Docket No. 1543.

7         Umicore does not wish to change its substantive
8  material but to submit a redacted version of the exhibit
9  contained in the file and published to the ECF in order to
10 protect the information.

11        We've reviewed the exhibit.  We have no issue with
12 the matter at all, and so we don't oppose the motion and are
13 comfortable with the relief requested.

14        THE COURT:  And it provides for the pulling of the
15 current exhibit?

16        MR. BUTLER:  Yes, Your Honor.

17        THE COURT:  Okay.  All right.  Hearing no opposition,
18 I'll approve that.

19        MR. BUTLER:  Thank you, Your Honor.

20        Your Honor, the next matter before the Court is the
21 debtors' first exclusivity motion seeking an extension of time
22 to file and solicit acceptances and solicit acceptance of the
23 plan of reorganization that's filed at Docket No. 1549.

24        Your Honor, the debtors publicly disclosed at the
25 outset of these cases that our strategic organization timetable

targeted emergence from Chapter 11 sometime in the first half
of 2007, about fourteen to sixteen months beyond the current
period of exclusivity and the debtor has, in fact, had
discussions with the creditors committee about having a lengthy
extension of the exclusivity period to mirror that timetable.

In -- we believed that it was most important in this
first extension even though the Court and I think other parties
should know that we'll be coming back.  We thought it was most
important if we could to have a consensual path and framework
with the creditors committee and with other major stakeholders,
and we have therefore agreed with the committee that the
initial extension should be from February 6th, 2006 to -- and
April 7, 2006 to August 5, 2006 and October 4, 2006,
respectively and without prejudice of our rights to seek
further extension.

So the time for filing a plan would go from February
6th to August 5th, and the solicit would go from April 7th to
October 4th.  These periods would apply to all the debtors
including the debtors that filed a few days later than -- the
three debtors that filed a few days later than the majority
that filed on October 8th.

And we have obtained the concurrence of the dip
lenders and the pre-petition administrative agent as well to
that timetable, and that's what we're here before the Court to
ask today.

25

THE COURT:  Okay.  Does anyone want to address this motion?

All right.  Hearing no one and noting that there are no objections, I'll approve it.  I assume you will be coming back, but I think it's -- it's worthwhile to have to come back, you know, in a case like this.

MR. BUTLER:  Thank you, Your Honor.

Your Honor, the Matter No. 23 is a procedures motion. It is a motion asking for authority to approve procedures for rejecting unexpired real property lease and authorizing the debtors to abandon certain furniture, fixture and equipment.

This lease rejection procedures motion was filed at Docket No. 1551.

As part of the debtors' restructuring efforts, the debtors were undertaking a comprehensive evaluation of the economic value of their unexpired non-residential real property leases and we've indicated to parties of interest in the court from the first day of these cases that one of the debtors' principal goals in filing these Chapter 11 cases was to achieve competitiveness by realigning Delphi's global product portfolio and manufacturing footprint.

And, in doing so, we may need to reject certain leases.  There's only one objection that was filed to this motion.  It was an objection by an entity called Orix Warren. They agreed to -- they objected to certain of the notice

procedures and sought an administrative expense claim in

connection with abandonment matters.

We've resolved those -- that objection and have

agreed that any notice of rejection that relates to the lease

for 455 One Research Parkway in Warren, Ohio would be served in

a specific manner as set forth in the revised order, and we

also agreed that -- to certain other relief with respect to

Orix Warren including how we would deal with certain of the

property and the reservation of rights with respect to

abandonment.

Your Honor, General Electric Capital Corporation also

informally raised concerns about the application of this order

to General Electric's equipment lease, but this procedure are

not intended to address anything other than non-residential

real property leases, and we resolved GE's concern by including

language that made it specific that these -- this -- these

procedures do not apply to General Electric.

We also agreed to the creditors committee request

that Saturdays and Sundays be excluded in determining the ten-

day notice period related to giving notice to the committee,

for example, under the -- the notice provisions, and we agreed

to that, and that language has also been put in the order.

So, without going through all the procedures, Your

Honor, essentially this process allows us to rationalize our

real estate portfolio by giving notices to the -- to the

27

1  directly interested parties and the committee and the U.S.

2  Trustee in going through a process.  If no one has a problem

3  with that, we don't need to keep coming back to court.

4          THE COURT:  Okay.  Who did -- did you serve all the

5  real property lessors --

6          MR. BUTLER:  Yes.

7          THE COURT:  You did.  Okay.  All right.  And, as I

8  read it, it really is a notice procedure, primarily, and then

9  obviously it imposes certain results on those who don't object.

10  If you do object, the issues are to be resolved by me.

11          MR. BUTLER:  That's correct, Your Honor.

12          THE COURT:  Okay.  All right.  Based on that,

13  understanding that again there are no objections, except the

14  ones you resolved,  I'll approve it.

15          MR. BUTLER:  Thank you, Your Honor.

16          Your Honor, the next matter on the agenda is Matter

17  No. 24.  This is our motion seeking authority to assume an

18  executory contract with Pillarhouse USA found at Docket No.

19  1553, and Your Honor, this is directly related to the decision

20  Your Honor made at the last omnibus hearing which set a time to

21  assume or reject, and the net result if Your Honor approves

22  means that in addition to being paid the post-petition

23  equipment installation charge of $3,950, Pillarhouse will also

24  receive the pre-petition equipment costs payment of 73,594.60.

25          THE COURT:  Okay.  All right.  I reviewed the motion,

28

1   and, obviously, Pillarhouse was necessary.  So I'll approve it.

2        MR. BUTLER:  Thank you, Your Honor.

3        Your Honor, Matter No. 25, another procedural motion.

4   This is a motion to extend the time within which the debtors

5   may remove actions, and we're seeking an order extending by an

6   additional ninety days the period during which the debtors may

7   remove actions under 28 U.S.C. 1452 and Bankruptcy Rule 9027.

8        We're asking the Court to enter an order that would

9   authorize us to remove actions pending on the petition date to

10  the later of April 6th, 2006 or thirty days after entry of an

11  order terminating the automatic stay with respect to any

12  particular action that's sought to be removed.

13       The order also provides that this is without

14  prejudice to us seeking further extensions of the period, and

15  Your Honor, we actually planned to seek further extensions of

16  the period.

17       This first extension was for a short period of time

18  that would not prejudice all the parties.  It was done on an

19  expedited notice procedure in that not every party to every

20  piece of litigation received notice of this because as we're

21  preparing the schedules and the statements and so forth, trying

22  to put all that together has been sort of a massive

23  undertaking, and we believe that there was -- there would be no

24  prejudice to having a brief extension by serving the master

25  service list, the 2002 list and otherwise, providing that type

29

1   of notice.

2           We will, at least, when we seek a longer extension in

3   connection with some 200 or more judicial and administrative

4   proceedings currently pending across the United States, we will

5   in connection with a longer extension serve each of the

6   litigation parties as we move forward, but I did want Your

7   Honor to understand that the notice procedure for this

8   particular matter, which is why we've limited the request for

9   the extension to ninety days.

10          THE COURT:  But you did serve the 2002 list?

11          MR. BUTLER:  We did, Your Honor.  Anyone who has

12  sought notice in this case has gotten notice --

13          THE COURT:  Right.  And I didn't see any objections.

14          MR. BUTLER:  There have been no objections filed.

15          THE COURT:  Okay.  I'll approve this in light of the

16  number of litigations that the debtors have to consider.

17          MR. BUTLER:  Thank you, Your Honor.

18          Your Honor, Matter No. 26 on the agenda, again,

19  another procedural motion.  This is a lease renewal motion

20  found at Docket No. 1555, and just as, Your Honor, there may be

21  leases that we don't want to stick with, there also are leases

22  that we may want to renew and continue to move forward in.

23          And without getting into the issue of whether this is

24  ordinary course or not ordinary course, we thought that the

25  better procedure here was to work out a settlement procedure

30

1 with the creditors committee on how we would deal with lease

2 renewals.  The guidelines are set forth in the proposed order.

3  There have been no objections filed by any party, and this

4 will eliminate any doubt about how we'll deal with real

5 property assets of the estate.

6 　　　　　THE COURT:  Okay.  I had one comment here which is

7 that Paragraph 3 which says that for lease obligations of

8 200,000 or less per annum or one million in the aggregate

9 wouldn't apply to leases with insiders and that that would be

10 covered by Paragraph 4.

11 　　　　　MR. BUTLER:  Yeah.  I --

12 　　　　　THE COURT:  I don't know if there are any, but I just

13 -- you know, I'd rather you give notice to the notice parties

14 in Paragraph 4 if you're going to be --

15 　　　　　MR. BUTLER:  Not an issue, Your Honor.

16 　　　　　THE COURT:  Okay.

17 　　　　　MR. BUTLER:  I don't think any of these are insider

18 leases, but I understand the comment.

19 　　　　　THE COURT:  Okay.

20 　　　　　MR. BUTLER:  Is the motion otherwise acceptable?

21 　　　　　THE COURT:  Yes, otherwise, it's granted -- yes, it's

22 granted.

23 　　　　　MR. BUTLER:  Thank you, Your Honor.

24 　　　　　Your Honor, Matter No. 27 is the debtors' insurance

25 renewal motion.  This is a motion authorizing the renewal of

31

1   insurance coverage and certain related relief found at Docket

2   No. 1559.  We are seeking an order among other matters that

3   would authorize but not direct us to renew or enter into new

4   insurance policies with ACE American Insurance Company and

5   affiliates and execute and deliver related documents and

6   agreements.

7           This is a fairly complex motion, Your Honor, but the

8   long and the short of it is that we have a tiered insurance

9   program at Delphi, which provides a significant amount of

10  coverage for general liability, products liability, automotive

11  liability and workers compensation claims, and ACE is the

12  foundation of that tier.  So the excess layers don't operate

13  without having that tier in place, the -- what I'll call the

14  foundation tier involving ACE.

15          ACE has asked us to assume the agreements with them

16  and to assume the obligations with them and particularly as it

17  relates to workman's compensation matters because there's a

18  self-insured aspect of that program.  There's a collateral pool

19  that we provide them that needs to be updated.  They have cash.

20   They'd like a letter of credit for some of those matters.

21          And the way I sort of boil this down is that when you

22  -- if you approve this transaction when the dust clears, we'll

23  provide them with an additional approximately $10 million in

24  additional collateral to protect workman's compensation

25  arrangements primarily as we replace cash funds with letters of

32

1  credit and give them additional letters of credit.

2          And, because of our obligations under the way the

3  insurance policies work, there are actuaries that sort of

4  assume -- you know, estimate what the actual liability will be

5  under these programs and depending upon what degree of

6  conference you want to have and what the ranges are, we

7  understand from the actuaries that have given advice to our

8  insurance agents and to our insurance risk management group

9  that if things did not go well in the risk pool, we might by

10  assuming this policy have as much as three or four, five

11  million dollars of additional exposure on a worst-case basis as

12  -- at least as AON has given advice to the company through its

13  agents.

14          And the long and the short of this from the company's

15  perspective, and I can go through each aspect of this policy,

16  but we have reviewed it with the creditors committee.  No

17  objection has been filed.  It's very important that we keep our

18  general liability, products liability, automotive liability,

19  and workman's comp programs in place, and we need to have the

20  foundation tier in place.

21          ACE had given us a brief nine-day extension to move

22  forward with this policy.  Originally, when the case was filed,

23  ACE had indicated they were not prepared to renew.  We got them

24  to go to the end of December and then again to go into the new

25  year because we wanted to take some time to put this program

33

together, explain it to the committee, go through the due

diligence necessary in connection with this.

ACE cooperated and gave us a short-term extension so

we could bring this matter before the Court today.

THE COURT:  Okay.  So am I right then that although

there may be additional liabilities under the agreement as the

claims are actually processed and dealt with, there's no other

cure liability per se.  It's just there may be additional

liabilities under the agreement?

MR. BUTLER:  That's correct, Your Honor.  What

happens we're adding about -- I'm rounding, but we're adding

about $10 million more collateral to the pool right now.

My understanding is that under a worst-case scenario

that if things didn't work out in terms of pre-petition

periods, that collateral pool could be exhausted and we may

have an exposure also on this record of additional 5 million.

I'm told it's slightly less, and they told me it's worst case,

but that's the estimates that -- and that's all based on

estimates from AON.  I mean, you know, these are all estimates,

Your Honor.  The actual facts can change, but that's the --

that's the anticipation.

So the "cure claim" if you think about it from a cure

claim perspective in a worst-case scenario we're estimating

could be approximately 3.1 million, but that's -- there's a

series of assumptions that go there, and it is nothing more

34

1  than an assessment.  It's not a --

2          THE COURT:  These would be fixed as the contracts

3  play out and as they would normally.

4          MR. BUTLER:  Correct, Your Honor.

5          THE COURT:  Okay.  All right.  Again, I had one small

6  comment on this other than wanting to have you answer that

7  question, which is Paragraph 3 of the order says the debtors

8  are authorized to renew or enter into insurance policies going

9  forward, and I understand that that was something that the

10 insurers wanted in the agreement, and I don't have any problem

11 with that if it's in the ordinary course, and I think it's

12 really a truism anyway, but, you know, if entering into a new

13 policy meant, you know, incurring a large obligation for

14 something that alters this agreement for pre-petition activity

15 or something like that, I'd be uncomfortable.

16         So I think putting it in the ordinary course of their

17 business is appropriate here.

18         MR. BUTLER:  We'll add that, Your Honor.

19         THE COURT:  Okay.  All right.  Other than that

20 change, I approve the motion.

21         MR. BUTLER:  Thank you, Your Honor.

22         THE COURT:  So there's no coverage gap then, right?

23         MR. BUTLER:  No.

24         THE COURT:  The extension goes through the --

25         MR. BUTLER:  Yes.  We'll be able to put this in place

35

1    Your Honor, and meet the requirements that ACE has imposed.

2            THE COURT:  Okay.

3            MR. BUTLER:  Mr. Berger has the next matter, Your

4    Honor.

5            MR. BERGER:  Neil Berger for the debtors, Judge.

6            Number 28 is Constellation Newenergy.  This is an

7    unopposed motion by Constellation Newenergy for relief from the

8    automatic stay to set off against a two-hundred-fifty-thousand-

9    dollar prepayment that it received pre-petition.

10           This is in contract to the Entergy matter that I

11   mentioned earlier, Your Honor.  In that situation, the debtors'

12   understanding is that Entergy obtained a deposit within ninety

13   days prior to the petition date.  Having looked at the

14   Constellation agreement, we have determined and now agree with

15   Constellation, this was a contractually required prepayment.

16   So --

17           THE COURT:  That explosion your hear is just people

18   working on a subway spur.

19           MR. BERGER:  This may not even have been ready or

20   actually ripe for set off.  I suppose they did it for

21   prophylactic reasons.  We have no objection.  We've discussed

22   the matter with counsel for the committee, and we have an

23   agreed-upon order that we'll hand into chambers.

24           THE COURT:  Which -- which basically lets them set

25   off?

1          MR. BERGER:  Correct, Judge.

2          THE COURT:  Okay.  All right.  I'll approve that

3 subject to reviewing the order.

4          MR. BERGER:  Thank you.

5          THE COURT:  Okay.

6          MR. BUTLER:  Your Honor, the next matter on the

7 agenda, Matter No. 29 is a reclamation deadline extension

8 motion that we filed at Docket No. 1616.

9          The relief we're seeking is very limited, Your Honor,

10 and that is we're asking the Court to amend the reclamation

11 procedures order and provide that the time by which the debtors

12 are required to submit statements of reclamation as set forth

13 in Paragraph 2(b)(i) of the amended final order be extended by

14 an additional forty-five days.

15          The other procedures remain unchanged, and

16 importantly, as Your Honor may recall, once we've gone through

17 a reconciliation process and we're prepared to have a view as

18 to 75 percent or more of the reclamation claims that have been

19 filed, we have an obligation to deliver the creditors committee

20 a detailed reclamation report that provides the company's

21 assessment of that, and prior to their allowance of any claims,

22 there's -- there is a process that occurs between the debtors

23 and the committee.

24          All that's unchanged, but as we've gone through to

25 try to make assessments of over a hundred thousand different

1 line items in the claims that have been provided, we found that

2 we just need additional time.

3      So we're asking for an extension of forty-five days

4 to send out the initial statements.  The order provides for a

5 forty-five-day extension.  I'd like to actually put a date

6 certain in, which I would propose to be February 21st, 2006.

7      THE COURT:  Okay.  And I didn't see any objections to

8 this.

9      MR. BUTLER:  There have been no objections filed,

10 Your Honor.

11      THE COURT:  All right.  I will approve it with that

12 date.

13      MR. BUTLER:  Thank you, Your Honor.

14      Your Honor, the next matter, Matter No. 30 is the

15 final hearing on the claims trading motion and my partner, Mr.

16 Springer will present that matter.

17      MR. SPRINGER:  Good morning, Your Honor.  David

18 Springer for the debtors.

19      Your Honor, the next matter on the agenda is the

20 debtors' motion for an order establishing notification and

21 hearing procedures for trading and claims and equity

22 securities.  We refer to this as the "final trading order."

23      Briefly, on October 8th, 2005, the debtors filed a

24 motion to establish notification procedures and to approve

25 restrictions on certain transfers of claims against an equity

38

interest in the debtors in order to preserve the debtors net operating loss carry forwards and certain other valuable tax attributes.

On October 11th, 2005 at the first-day hearings, certain investment banks objected to the motion, and then the next day on October 12th after discussion with the objecting parties, the debtors agreed to revise the order, and the Court entered the order on an interim basis, and we refer to that October 12th order as the interim order.

Notice of the interim order was served upon virtually every creditor and equity holder of the debtors, and it was also published in each of The New York Times and The Wall Street Journal.

Subsequently, two parties, Appaloosa Management, LP and DC Capital Partners, LP filed objections to the interim order and several other parties including the creditors committee lodged informal objections or contacted the debtors to discuss the terms of the order and to voice their concerns or questions.

The debtors engaged in extensive negotiations with all these parties and developed a revised trading order to resolve those objections and comments, and then just before Christmas on October -- on December 23rd, 2005, we served notice of a proposed final order which the debtors believe reflected resolutions of various objections while preserving an

39

1 asset of the debtors, the tax value of which could exceed $1

2 billion.

3        Last week, Wilmington Trust lodged an objection to

4 the proposed final trading order, and over the past few days,

5 we've made additional changes to address Wilmington Trust and

6 others' concern, and we believe that all of the objections and

7 the concerns have now been resolved.

8        THE COURT:  Can I interrupt you.  Who did you serve

9 notice of the proposed final order on?

10        MR. SPRINGER:  It was the -- the master service list

11 --

12        THE COURT:  Okay.  It wasn't just the objectants and

13 the informal objectants.

14        MR. SPRINGER:  No.  No, that's right, Your Honor.

15        THE COURT:  Okay.  All right.

16        MR. SPRINGER:  Accordingly, the debtors believe that

17 all the objections and informal concerns that have been raised

18 with regard to the final trading order have been resolved.  I

19 understand that counsel for Appaloosa Management, DC Capital

20 Partners and Wilmington Trust are all present in the courtroom

21 this morning and can confirm that their concerns have been

22 addressed and that their objections are now withdrawn.

23        Silence being consent, Your Honor?

24        THE COURT:  Well, I see people nodding.  Maybe they

25 want to say something.

40

1          MS. FAINMAN:  Good afternoon, Your Honor.  I'm
2   Jessica Fainman from Schulte, Roth, and Zabel representing DC
3   Capital Partners, and we are withdrawing our objection.

4          THE COURT:  Okay.

5          MR. UZZI:  Good morning, Your Honor.  Gerard Uzzi of
6   White and Case on behalf of Appaloosa.

7          We've already filed a notice of withdrawal of our
8   objection.

9          We did reserve the right to be heard with respect to
10  the final order, and we had entered into separate agreements
11  with the debtors with respect to specific relief for Appaloosa
12  under the interim order.

13          Because of the heavy negotiation of the final order,
14  there's a little bit of ambiguity with respect to our -- our
15  pending agreements over the interim order.

16          The debtors had represented to us that nothing in the
17  final order is meant to supercede the relief that we received
18  under the interim order.  We intend to bring down our
19  agreements under the final order once the final order is
20  entered, and I believe we're pretty close to final resolution
21  on those final orders -- rather, the final agreements --

22          THE COURT:  All right.  Because, you know, Paragraph
23  2 says the final order shall supercede the interim order.  So
24  you're saying that as far as Appaloosa is concerned, the
25  debtors have agreed that that's not applicable?

41

1          MR. UZZI:  Yes.  It's my understanding that the

2    debtors have agreed that our agreements under the interim order

3    will apply to the final order --

4          THE COURT:  Okay.

5          MR. UZZI:  -- and we intend and have shared draft

6    separate agreements to make that happen, and as long as that

7    does happen, then we do not have an objection to the entry of a

8    final order.

9          THE COURT:  All right.  Then the debtors are in

10   agreement with that?

11         MR. SPRINGER:  That's right, Your Honor.

12         THE COURT:  Okay.

13         MR. SPRINGER:  The interim order anticipated separate

14   side agreements.  We gave one to Appaloosa, and we'll be

15   bringing that down.

16         THE COURT:  All right.  Well, I guess -- this sort of

17   went to my question about who did you serve because the final

18   order does say it supercedes the interim order without any

19   reservation.

20         So I guess except as to Appaloosa, the way I read it

21   is that it does supercede it.  Unless you have some other

22   understandings with people that I -- that you ought to set out

23   in the record.

24         MR. BUTLER:  Yeah, I think we need to make -- I do

25   think -- you know, counsel for Appaloosa sort of confused the

42

1  record a little bit.

2          The order is superceded.  The final order supercedes

3  the interim order.

4          THE COURT:  Okay.

5          MR. BUTLER:  The agreement that was made during the

6  interim period was that we would have separate written

7  agreements and waive --

8          THE COURT:  Oh, all right.

9          MR. BUTLER:  -- with certain parties.  We have that -

10  -

11          THE COURT:  All right.  So your agreement still

12  exists, and they're not superceded, just the order itself.

13          MR. BUTLER:  That's correct, Your Honor.

14          THE COURT:  All right.  Okay.

15          MR. UZZI:  But, to be clear, yn, our separate

16  agreement was negotiated in the context of the language of the

17  interim order.  There is some ambiguity with respect to the

18  language in this order.  The agreement is that the final order

19  does -- there's nothing in the final order that otherwise

20  supercedes our prior agreement.

21          THE COURT:  Okay.  That's fine.

22          MR. UZZI:  One other issue, Your Honor, and I'll be

23  very brief.

24          As counsel has represented, Appaloosa also has a

25  pending motion for the request to appoint an equity committee.

43

1  I hope after this hearing to resolve the scheduling issues.

2          Appaloosa in connection with the NOL order that's

3  before the Court right now represented its own interests and

4  continues to represent its own interest.  There's obviously

5  some issues in here that might be of concern to an equity

6  committee if it's appointed.  The order is styled the final

7  order.  We believe that it's appropriate that -- that the order

8  be entered without prejudice to an equity committee in the

9  event one is appointed.

10          THE COURT:  Well, I don't think that -- they can file

11  whatever they want to file, but I think it would have to be

12  under Rule 60(b) and not under -- not under the terms of the

13  order.

14          MR. UZZI:  Fair enough, Your Honor.  I just wanted to

15  raise it for --

16          THE COURT:  I mean, assuming one is appointed.  I'm

17  not saying that one should be or -- that's something for the

18  U.S. Trustee to consider in the first instance.

19          MR. UZZI:  Understood, Your Honor.

20          THE COURT:  Okay.

21          MR. UZZI:  Thank you.

22          THE COURT:  Okay.

23          MR. BROMLEY:  Good morning, Your Honor.  James

24  Bromley of Cleary Gottlieb on behalf of the ten investment

25  banks that objected on the first day and those objections still

44

1 stand.

2        I wanted to just give a little bit of color as to how

3 we got to where we are.  On the first day of this case, there

4 were three pending cases all seeking very similar relief,

5 Northwest, Delta and Delphi.

6        With this -- the entry of this order, I think it's

7 fair to say that all three cases resolved very similarly.

8 We're very pleased with the results.  We'd like to pay a debt

9 to Cliff Gross, the tax partner at Skadden who worked through

10 this over three months to get it done, but we think it's a fair

11 and appropriate resolution of the issues.

12        THE COURT:  Okay.  While you're up here, because you

13 and the gentleman standing next to you probably can explain

14 this best.  I went through this, it's one of the reasons I was

15 a little late for the hearing, and I think I understand what

16 it's generally doing which is similar to the issues you had

17 raised in your objections:  that is, how to enforce this

18 without being unduly burdensome or jumping the gun, if you

19 will.

20        But I don't understand Paragraph 6(b) which is

21 prefaced now by the phrase "in order to permit reliance by the

22 debtors upon Treasury Regulation Section 1.3(a)(2)-(9)(d)(iii)"

23 (sic) and then it says -- the teeth in the order-- any entity

24 found by the Court to have willfully violated the participation

25 restriction shall be required to dispose of newly traded --

45

1  covered claims, but I'm not -- I don't -- my question is what

2  is a "participation restriction."

3       As I read it, it's not disclosing information to the

4  debtor, which didn't seem to make sense to me.

5       MR. SPRINGER:  It's -- a participation restriction is

6  a restriction against the claim owner telling the debtor in

7  connection with the presentation or preparation of a plan we

8  obtain these claims on a specific date.

9       THE COURT:  Okay.

10      MR. SPRINGER:  And that's something that's prohibited

11 by the Treasury Reg --

12      THE COURT:  All right.

13      MR. BUTLER:  1.3(a)(2)-(9) --

14      THE COURT:  So this is -- this is a limitation on the

15 general notice issue where there's -- where there is a form of

16 disclosure then.

17      MR. SPRINGER:  That's right.

18      THE COURT:  And it's to comply with this regulation

19 which I guess is designed to prevent tax code manipulation?

20      MR. SPRINGER:  Exactly, Your Honor.

21      THE COURT:  All right.  Okay.  All right.  But this

22 isn't the trigger for the whole order.  This is just a specific

23 provision dealing with this specific regulation, making sure

24 it's not breached.

25      MR. SPRINGER:  Correct.

46

1        THE COURT:  Okay.  All right.

2        All right.  Mr. Fox?

3        MR. FOX:  Thank you, Your Honor.  Edward Fox with

4  Kirkpatrick and Lockhart, Nicholson, Graham on behalf of

5  Wilmington Trust Company as indentured trustee.

6        Mr. Springer's statement is correct, we have agreed

7  based on the changes in 6(b) as well as Section 12 to withdraw

8  our objection.  Our objection was limited to the Section 6(b)

9  which was added to the final order.  It was not in the original

10 language, and we had concerns about that, too.

11       Ordinarily, trading orders are not something that we

12 generally involve ourselves in, but since this limited --

13 potentially limited people's participation in the process, we

14 had some concerns about it, and -- and, in fact, this language

15 is slightly different than the LSTA form which limits these

16 requirements to the substantial holders, not to everybody,

17 although the debtor is correct that the Treasury Regulations

18 that are referred to here would apply to everybody and not just

19 the substantial holders.

20       What we've agreed to -- what the debtors agreed to do

21 is limit the sell-down provision so that it limits and

22 clarifies the remedy that would be involved if somebody

23 violates the provision, and in addition, they've agreed to file

24 an 8-K with this document attached so that there's hopefully

25 some better notice.  I mean, somebody buying into this case at

47

1 this point or later in the -- in the case would have to wade

2 through several thousand docket entries potentially to find

3 this.  Hopefully, they'll have a better opportunity if they're

4 looking on the SEC filings to see it and realize what the

5 obligations are.

6          THE COURT:  Okay.  So the debtors will be filing an

7 8-K with this attached?

8          MR. SPRINGER:  Yes, Your Honor.

9          THE COURT:  All right.  Very well.  All right.

10          MR. SPRINGER:  There are a few more matters that we'd

11 like to make of record with respect to this motion, Your Honor.

12          The debtors again want to emphasize that it's

13 critically important to prevent Delphi from undergoing an

14 ownership change under Section 382 of the Internal Revenue Code

15 prior to the effective time of a plan of reorganization.

16          Such an ownership change could severely limit the

17 debtors' ability to use their valuable net operating loss carry

18 forwards, credit carry forwards, built-in losses and other tax

19 attributes to offset income during the restructuring process

20 and post-confirmation.

21          For purposes of context, the total tax value of those

22 tax attributes is currently estimated to be well in excess of

23 one billion dollars.  Additionally, if there is an ownership

24 change of Delphi, and if the fair market value of the assets of

25 the debtors is less than their tax basis at the time, then for

48

1  five years following the ownership change, the debtors' ability

2  to deduct losses from asset dispositions or to take certain

3  depreciation or amortization deductions may be substantially

4  limited.

5       We want to be clear, Your Honor, that at this point

6  the debtors believe that Delphi has not undergone a Section 382

7  ownership change.  Accordingly, its tax attributes remain

8  available to offset future taxable income.  This prospect is of

9  great value to the successful reorganization of these estates.

10       The final trading order is designed to preserve the

11 debtors' tax attributes and to take full advantage of the

12 special Section 382 bankruptcy rules.  One of the special rules

13 under 382 is Section 382(1)(5).  We think it's important

14 briefly to explain how this works.

15       Section 382(1)(5) applies if upon confirmation of a

16 Chapter 11 plan of reorganization at least 50 percent of the

17 stock of the reorganized corporation is owned by preexisting

18 stockholders in what are known as "qualified creditors."

19       Qualified creditors fall under three categories,

20 those known colloquially as "old and cold creditors," "ordinary

21 course creditors" and those who will own less than five percent

22 of the stock of the reorganized company or de minimis

23 creditors.

24       If a corporation qualifies under Section 382(1)(5),

25 the general limitation under Section 382 of the Internal

49

Revenue Code on the use of tax attributes does not apply

provided that the corporation does not undergo another Section

382 change of ownership within two years of emerging from

bankruptcy.

Your Honor, the final trading order like the interim

trading order is intended to prevent an ownership change prior

to the emergence of the debtors from bankruptcy and to preserve

the possibility of a Section 382(l)(5) plan.

Your Honor, the record should reflect the differences

between the interim trading order and a proposed final trading

order.  On the equity side, the number of shares used to

determine whether an entity is or would become a substantial

equity holder which is a defined term as used in the order, and

thus, subject to the terms of the final trading order has been

increased from 14 million to 26.5 million shares or about 4.75

percent of the shares of Delphi stock now outstanding as

opposed to two and a half percent under the interim order.

Second, the amount of time that the debtors have to

object to a proposed transaction involving an acquisition or

disposition of stock at the threshold has been reduced from

thirty days as provided in the interim trading order to fifteen

days in the proposed final trading order.

On the debt side, the dollar amount of claims used to

determine whether an equity entity is or would become a

substantial claim holder, also a defined term in the order, and

1  thus subject to terms of a proposed final -- of the proposed

2  final trading order has been increased 90 percent from 100

3  million to $190 million.

4        The interim trading order allow claim holders to

5  freely trade, better warn them of the debtors' intention to

6  formulate a final claims trading order that may require such

7  entities and persons to dispose of claims against the debtors

8  to the extent necessary and proper to protect the debtors' tax

9  attributes under Section 382(l)(5), and that was in Paragraph

10  4(f) of Your Honor's interim order.

11       The debtors worked diligently with interested parties

12  over the past three months to formulate a sell-down procedure

13  that allows trading and claims while still preserving the

14  debtors' ability to propose a plan of reorganization that

15  qualifies under Section 382(l)(5).

16       Your Honor, the debtors believe that with the

17  contributions that we've had by those who have raised

18  objections and other interested parties that the proposed final

19  trading order reflects the state of the art in this area and is

20  in the best interest of the creditors and their estates, and we

21  would respectfully request that the Court enter it.

22       THE COURT:  Okay.  I will approve the final trading

23  order.  I think it does balance the debtor's need and right to

24  preserve its ability to confirm a plan that protects its tax

25  attributes while also enabling as free a market in the trading

of the securities and claims of the debtor as possible.

So, in light of there being no remaining objections and my own review of the order, I'll approve it.

MR. SPRINGER:  Thank you, Your Honor.

THE COURT:  I'm also glad that you're going to post the 8-K, because I think that's critical even though the market for these types of obligations and stock probably shrinks in terms of the players.  It's still very active, and there may be parties who aren't readily aware of the order's terms.  So...

MR. SPRINGER:  And that was Mr. Fox's suggestion.  He made a substantial contribution --

THE COURT:  Okay.  I'm not sure you want to use those words.

(Laughter)

THE COURT:  Just in a colloquial sense.

MR. FOX:  He's a litigator, Your Honor.  He doesn't know what he said.

(Laughter)

MR. BERGER:  Judge, Neil Berger again for the debtors.

Number 31 on the calendar is Behr Industries.  This is a hearing concerning the Court's order to show cause, Docket No. 774 to compel Behr Industries to show cause why it shouldn't be held to have violated the stay for demanding and obtaining a payment in excess of a million dollars post-

52

1  petition on account of pre-petition obligations.

2         Behr has responded, and while the parties continue

3  the negotiations, this one does appear to be headed toward a

4  contested evidentiary hearing.  Just broad strokes, Your Honor,

5  Behr has asserted two primary issues.  One is financial

6  ability, vendor rescue program, and while that's taken us part

7  of the way, it certainly doesn't take us all the way on the

8  dollars here, and Behr also asserts that while it obtained the

9  payment, it wasn't the cause for the demand for the payment.

10         The debtors dispute that factually and we don't

11  believe the documents support that allegation.  Behr has

12  requested some discovery on the fact issues and we have agreed

13  that a sixty-day discovery window would be appropriate.

14         With Your Honor's consent, what we would propose is

15  that this matter, today's hearing be adjourned to the March

16  omnibus hearing to function as though as a final or a pretrial

17  conference date, and that I obtain a separate date from

18  chambers as an evidentiary date on a non-omni day.

19         THE COURT:  That's fine.  For the pretrial

20  conference, it would be helpful if you and Behr came prepared

21  with what I hope would be a joint pretrial order laying out the

22  witnesses, any anticipated evidentiary issues and an estimate

23  of the length of the trial -- standing pretrial order.

24         MR. BERGER:  Yes, Judge.

25         THE COURT:  Okay.

53

1      MR. BERGER:  Thank you.

2      THE COURT:  Thank you.

3      MR. BUTLER:  Your Honor, the next matter on the

4 agenda, Matter No. 32 is a motion filed by the lead plaintiffs

5 from the securities litigation for a limited modification of

6 the automatic stay at Docket No. 1063.  It is the first of

7 three motions on the calendar, the others being matters --

8 Matter No. 33 and then again back towards the end of the agenda

9 at Matter No. 37, three contested motions dealing with the lead

10 plaintiffs' attempt to obtain discovery, and we'll cede the

11 podium to them to present the motion.

12     THE COURT:  Okay.

13     MR. ETKIN:  Good morning, Your Honor.

14     Michael Etkin, Lowenstein Sandler on behalf of the

15 lead plaintiffs as bankruptcy counsel to the lead plaintiffs in

16 the consolidated securities litigation, and I will present the

17 initial matter that's on the agenda for today.

18     Your Honor, I'd like to begin by stating the obvious,

19 that this is a motion for a limited modification of the

20 automatic stay.  It is not a motion seeking to lift the stay so

21 as to proceed against the debtor in connection with the

22 securities litigation.

23     What the motion does seek are documents that have

24 already been assembled, indexed and produced in connection with

25 various demands for documents by the SEC, by the U.S.

54

1 Attorney's Office and the FBI as well as documents produced in

2 connection with the internal investigation commenced by the --

3 by the debtors.

4         And, also, again I believe stating the obvious --

5         THE COURT:  I'm sorry.  I thought you were -- when

6 you say as well as documents produced as part of the internal

7 investigation, I thought you were seeking only documents that

8 had already been produced to third parties.

9         MR. ETKIN:  That's correct, Your Honor.

10         THE COURT:  Okay.  Maybe I just misheard you.

11         MR. ETKIN:  Yeah.  That's correct.

12         THE COURT:  Okay.  You're saying the third party

13 would include the internal audit committee's counsel?

14         MR. ETKIN:  That's correct, Your Honor, all of course

15 subject to --

16         THE COURT:  So you would count them as a third party

17 --

18         MR. ETKIN:  That's correct, Your Honor.

19         THE COURT:  All right.  Okay.

20         MR. ETKIN:  And all, of course, as we've indicated

21 and as has been the case in prior orders entered in this

22 district subject to privilege to the extent that privilege has

23 not been laid.

24         THE COURT:  Okay.

25         MR. ETKIN:  Your Honor, and again, just to make it

55

1  clear to the extent that it isn't, we recognize that this is a

2  two-step process that initially we need to get relief from this

3  Court with respect to the limited modification of the automatic

4  stay, and then we need to proceed to get relief from the

5  district court in connection with the PSLRA stay.  So this --

6  this motion really must be viewed in that context.

7            Your Honor, in the debtors' opposition, I think we've

8  been criticized for relying heavily on previous decisions in

9  Worldcom and Enron which are circumstances that we believe are

10 identical to the circumstances that are raised with respect to

11 this motion, and in relying heavily on previous decisions, we

12 believe that all we've done is do what lawyers are supposed to

13 do, which is rely on precedent coming out of the same district

14 that dealt with not only similar sets of fact, but we believe

15 essentially identical sets of facts.

16           THE COURT:  Were those actually litigated decisions?

17           MR. ETKIN:  Yes, Your Honor.  I was involved.  So,

18 yes, they were litigated.  I was involved in the Worldcom

19 motion and that was litigated, opposed, and Judge Gonzales --

20           THE COURT:  So did the -- the orders that you attach

21 are the result of a decision in a matter that he actually

22 decided between the parties?

23           MR. ETKIN:  That's correct, Your Honor.

24           THE COURT:  Fine.  Okay.

25           MR. ETKIN:  The order in Worldcom was not a

1  stipulated order.

2          THE COURT:   Okay.

3          MR. ETKIN:   That I can tell you from personal

4  experience.

5          THE COURT:   Okay.

6          MR. ETKIN:   Your Honor, even the debtors although

7  they raise issues as to the precedential value of those

8  decisions, they even concede in their papers that this

9  precedent is at the very least highly persuasive, and measuring

10 this case against the situations in Worldcom and Enron all

11 involve the backdrop of massive accounting scandals with

12 enormous losses to the investing public.  All involve the

13 backdrop of pending governmental investigations as well as

14 internal investigations.

15         As the Court well knows, Your Honor, Enron and

16 Worldcom were no less complex Chapter 11 cases than the Delphi

17 case, and the parade of horrors that are speculated by the

18 debtors as well as the standard floodgates argument that's

19 conclusorily (sic) raised by the debtors in their opposition

20 are exactly that:  speculation and conclusory allegations.

21         I think the lesson to be learned is best learned from

22 what happened in Worldcom where that company, the largest

23 Chapter 11 filed managed to successfully reorganize.  Enron as

24 well successfully confirmed its plan, both with no ill effects

25 from the limited stay modification orders entered in both of

57

1  those cases.

2       Your Honor, by making the motion that's before you,

3  we are simply adopting a position and a procedure that has

4  already been expressly approved in this district.  Again,

5  there's backdrop of Federal and civil criminal investigations,

6  acknowledged significant accounting irregularities, years of

7  accounting restatements, a self-imposed internal investigation

8  commenced by the debtors, all strikingly similar to the

9  backdrop of facts and circumstances in Enron and in Worldcom.

10      The debtors in their opposition make this appear as

11  if this was a class action commenced willy-nilly by some

12  corporate gadfly, the kind of class actions that the PSLRA

13  presumably was intended to deal with.

14      Your Honor, as lead plaintiffs in this case appointed

15  by the District Court, we have state pension funds and

16  institutional investors, not individual corporate gadflies who

17  take this matter very seriously on their own behalf and on

18  behalf of the investors that they now represent as lead

19  plaintiffs.

20      Your Honor, the debtors have really offered nothing

21  in their opposition papers to dispute that the documents that

22  we've requested which have already been produced have been set

23  aside, have been culled, have been reviewed, have been indexed,

24  and we specifically in our motion --

25      THE COURT:  Well, don't they say that -- I thought

58

1  they -- I thought they dispute that.

2  MR. ETKIN: I don't see anything specifically in

3  their papers disputing that. What I did read, Your Honor, is

4  that there are statements that there's some -- some amorphous

5  burden that they will at some point in the future attempt to

6  bring before the Court. I didn't see anything specific in

7  their papers. I thought that they reserved the right somewhere

8  in their response to raise these issues or bring these issues

9  before the Court at some later time.

10  I didn't see any indication that these documents have

11  not already been set aside and have not already been produced,

12  and essentially that's why we made the motion. We're not

13  looking for documents that have not already been pulled

14  together, set aside and produced.

15  THE COURT: Well, I -- I guess my question comes down

16  to this. I understand that the orders in Enron and Worldcom,

17  at least two of the three, you know, expressly recognized that

18  lifting the stay in the bankruptcy case still leaves to be

19  decided by the District Court the right of the securities

20  plaintiffs to get access to the documents under the PSLRA, but

21  you know, I'm not familiar with the facts of those cases. I

22  don't know why it was important, for example, for those

23  litigants to get the documents at that time or at least get

24  stay relief at that time.

25  But why not let the District Court decide first

1 whether the PSLRA stay applies or not and then -- I mean,

2 obviously, I would give you relief to the extent you needed it

3 to seek that relief from the District Court, and then -- then I

4 could decide on a record as to, you know, how -- how burdensome

5 if at all under <u>Sonax</u> it is for the debtors to produce this

6 under the 362 <u>Sonax</u> factors as opposed to deciding it somewhat

7 in the abstract, because really I don't know what the District

8 Court is going to do.  I mean, is it prejudicial to you just to

9 -- for me to say for now you're going to go to the District

10 Court and ask the District judge if the -- if the PSLRA should

11 be -- the stay under the PSLRA should be lifted, not the

12 Bankruptcy Code stay, and then I -- then I can decide the

13 latter stay issue and I can do that on an expedited basis?

14          I mean, you're going to have to do that anyway.  So I

15 don't understand why it's flipped the other way around.

16          MR. ETKIN:  Well, Your Honor, we actually don't think

17 that we flipped it.  We think that we've followed the procedure

18 that's been utilized --

19          THE COURT:  Well, I understand.  Just humor me for a

20 minute.  If you have to do it anyway, why should I decide this

21 in the abstract?

22          MR. ETKIN:  Well, Your Honor, I don't believe the

23 Court is deciding this in the abstract --

24          THE COURT:  But do I have to decide it at all?  I

25 mean, why should I -- why should I even spend any time on it if

1 it's -- if it's, you know, possible or even more than possible

2 than the District judge is going to say, well, until the

3 motions to dismiss are decided, -- I'm not going to give them

4 relief from the PSLRA.

5      MR. ETKIN:  The -- first of all, as the Court knows,

6 we're acknowledging that this is a two-step process, and if the

7 Court grants our motion, the debtor certainly does not -- does

8 not have to produce a document until the PSLRA stay is lifted

9 as well, and again, the Court actually alluded to an issue that

10 is one of the issues why we went to the Bankruptcy Court first

11 in both of those cases, which is that we believe that going to

12 the District Court first without stay relief would be a

13 violation of a 362 --

14      THE COURT:  Well, but I could give you relief from

15 the stay to go to the District Court.  That's no problem.  I

16 don't have a problem with that.

17      MR. ETKIN:  No, I understand you're saying that, Your

18 Honor, but in terms of the process that we've utilized here,

19 that's one of the issues that we took into consideration, and

20 we believe that the issue of getting stay relief, this limited

21 stay relief from this Court given the fact that these documents

22 are just sitting there and have already been produced and it

23 requires really no effort, and I understand --

24      THE COURT:  But so that begs the questions.  I mean,

25 if the debtors are going to say it does require effort, then I

61

1  need to balance <u>Sonax</u>, and that requires a hearing and it may

2  be a completely advisory or moot issue.

3       MR. ETKIN:  Well, that -- the debtors had an

4  opportunity to lay out in their opposition, Your Honor, what

5  burdens that they would have to undertake in connection with

6  producing these types of documents.  They chose not to do that,

7  and those really weren't issues in the prior cases and we

8  suspect that they really shouldn't be issues here.  The

9  substantive issue of whether the PSLRA stay should be lifted is

10  obviously a matter for the District Court, and we understand

11  that.

12       We don't -- certainly don't view getting this type of

13  limited stay relief a ministerial matter from this Court by any

14  stretch of the imagination, but given the underlying

15  circumstances, given what we're asking for, given the fact that

16  we've already indicated in our moving papers that we would pay

17  the cost of reproduction, there really is nothing else to do

18  for the debtor other than if the debtor chooses resisting the

19  motion before the District Court in the PSLRA -- in connection

20  with the PSLRA.

21       So we believe that a process by virtue of the prior

22  decisions has been outlined and we're attempting to follow that

23  process.  We believe that process makes sense because

24  ultimately for purposes of the securities litigation, it is the

25  District Court that makes the determination as to whether we

1  should get access on the merits prior to the motions to

2  dismiss.

3          We're simply taking the first step that we believe is

4  a process that's been endorsed in this Court previously.

5          THE COURT:  Okay.

6          MR. ETKIN:  And, certainly, Your Honor, and as

7  evidenced by the orders entered previously in the -- in

8  Enron and Worldcom, privilege issues that are raised can be

9  dealt with.  Those are lawyer-driven issues that can be

10 resolved and certainly, nothing is intended to waive those

11 rights to the extent that they -- that they still exist.

12         Your Honor, the bottom line is that the debtors in

13 their papers really have advanced no argument whatsoever to

14 distinguish this case from the circumstances in Worldcom and

15 Enron.

16         THE COURT:  Well, but the problem is I just don't

17 really what those -- all I have is our orders.  I don't really

18 what those circumstances were.  I don't know if they were under

19 deadlines from Judge Harmon or Judge Cote.  It's just -- I see

20 that there's a -- there was an order granted and it recognized

21 the type of relief you're seeking here, but I just don't know

22 what the exigencies were to do it that way rather than the

23 other way.

24         MR. ETKIN:  Well, in each of those --

25         THE COURT:  I don't know whether there was a hearing

63

1  on the <u>Sonax</u> factors either.

2        MR. ETKIN:  Your Honor, in terms of the <u>Sonax</u>

3  factors, I think in the first instance, the <u>Sonax</u> factors

4  really are -- they are certainly relevant, but more relevant to

5  circumstances where a party is seeking relief from the State

6  and continue with litigation in a court outside of the

7  Bankruptcy Court.

8        We're not seeking that kind of relief.  There have

9  been decisions which we have cited in our papers where limited

10 stay relief --

11       THE COURT:  No, I know.  You're saying basically the

12 debtor doesn't have to do anything.  It just has to move the

13 boxes from one place to another.

14       MR. ETKIN:  That's --

15       THE COURT:  And you'll pay for moving them.

16       MR. ETKIN:  That's -- that's the bottom line, Your

17 Honor.

18       THE COURT:  Right.  Okay.

19       MR. BUTLER:  Your Honor, the Court articulated what

20 our concern is.  We concur that this is a two-step process, but

21 we think the first step is in the District Court, not here.

22 Our understanding of what these -- of what the plaintiffs in

23 <u>Enron</u> and <u>Worldcom</u> did was once they got the stay relief from

24 the Bankruptcy Court, they ran to the District Court and said

25 hey, District Court, give us -- grant us the relief because

64

1  there's no reason why you shouldn't, we already got the

2  Bankruptcy Court approval, and so they used Your Honor's

3  determination as the sword to go into the District Court.

4          A couple of initial comments, Your Honor.  This is

5  not Enron, and this is not Worldcom.  Whatever our pre-petition

6  accounting issues were, they were not the proximate cause and

7  had no relationship to the commencement of these Chapter 11

8  cases.  These Chapter 11 cases were filed as Your Honor knows

9  because of our high legacy costs, because of increasing

10 commodity prices and because of the deterioration of the North

11 American automotive industry.  It had nothing to do with

12 accounting.

13         Now, we had pre-petition accounting issues that we

14 will be addressing, but that is not why we are in Bankruptcy

15 Court.

16         Number two, Your Honor, what plaintiffs are asking

17 for really is an advisory opinion from Your Honor.  They're

18 asking without any evidentiary record here, there's none.

19 They've offered no evidence.  All right.  They basically said

20 it's up to the debtors to prove why we're prejudiced.  Well,

21 Your Honor, they failed to meet their burden, which I believe

22 under Sonax means we don't even have to do anything and --

23         THE COURT:  Well, but they're saying that -- I mean,

24 let me paraphrase it and Mr. Etkin can correct me.  They're

25 saying that it's there, why not let us get started on reading

1  it now rather than six months from now.

2  MR. BUTLER:  Because, Your Honor, that's not what

3  PSLRA allows them to do.  They're asking you to give them here

4  on an advisory basis the ammunition to go to Judge -- to go to

5  Judge Rosen, who by the way, just got these cases within the

6  last thirty days.  Talk about infancy of a litigation.  These

7  were just consolidated.  They're just now in front of the

8  Court.  There's been no major activity, as I understand, in the

9  District Court since that act occurred.

10  This motion was filed thirty-eight days into our

11  bankruptcy and was heard less than ninety days after the

12  commencement of these cases without a scintilla of evidence as

13  to why it's necessary.  They are a year probably or more away

14  from being able to deal with the issues in the District Court,

15  and Your Honor, we don't think it's fair.  We think it's highly

16  prejudicial to the debtors to have them come in here and say to

17  Your Honor without any evidentiary demonstration by us.

18  Disregard _Sonax_ because that doesn't apply to us.

19  Disregard -- just take the _Enron_ opinions and the

20  _Worldcom_ opinions which were very different cases and which, by

21  the way, Your Honor, I don't believe based on our review of the

22  record and some familiarity that I had with those cases, I

23  don't believe that the issue we've raised in our papers was

24  raised in those cases, which is if it's a two-step process, the

25  first step is that the plaintiffs have to go to District Court

66

1 and get relief from the PSLRA because then they're able to come

2 here and demonstrate cause or at least argue they have cause.

3 I'll argue that isn't even cause frankly when we get to that,

4 but they can't demonstrate that.

5      They come before you with no ability to demonstrate

6 any cause.  They tell you -- if they're being straightforward,

7 they tell you that Judge Rosen received these cases within the

8 last thirty days.  There has been no substantive activity in

9 the cases since Judge Rosen received the consolidated cases.

10 There's been no certification.  There has been no -- the

11 schedule set either for filing motions to dismiss.

12      You know, there -- you know, I mean, this is in such

13 a different posture than those cases, Your Honor, and we really

14 believe we have no issue.  If they want to take a shot at --

15 you know, on that record in front of Judge Rosen on getting the

16 PSLRA stay lifted, if they want to be able to do that and you

17 want Your Honor -- we don't have an issue with that.  We'll

18 take that battle on in the District Court, but only if they're

19 able to Judge Rosen to change what Congress had intended should

20 they then be able to come back here, and at that point in time,

21 we ought to have an evidentiary hearing and deal with the

22 Sonax factors.

23      We think Your Honor has it exactly right, and we do

24 think it's prejudicial, and you know, counsel can argue that

25 it's not, but Your Honor, for example, to just give one example

67

1  and, you know, maybe this matters, maybe it doesn't, but the

2  reality is, Your Honor, the accounting issues here while

3  important to plaintiffs are not the primary factors in this

4  case, and as Your Honor knows, we were retained in July of last

5  year to help on the restructuring.

6          Clearly, we need to get up to speed and understand

7  those issues at some point.  That hasn't even occurred in these

8  cases.  We've been a little busy in the first ninety days of

9  these cases doing a few other things like getting financing in

10  place and dealing with claims, trading -- assets and all the

11  issues we've dealt with, with the committee.  We haven't had --

12  and Mr. Rosenberg will tell you, we haven't had even the

13  opportunity to have the initial briefing with the committee on

14  these matters which they've requested and which we've agreed to

15  provide and both Mr. Rosenberg and I need to get a little

16  educated from special counsel about these matters.  Neither of

17  us had that opportunity.

18          This is extremely premature, Your Honor, and we think

19  highly prejudicial, and we think the plaintiffs have got it

20  exactly wrong and the Court has got it right.

21          Go to the District Court, see if you can get relief.

22   If you can get relief from the District Court, then at least

23  you arguably can say you've got cause under Sonax here and then

24  the -- then the debtors are in a position with the creditors

25  committee and the other parties in this case to take on the

68

1  issue of whether or not in the balance of harms and prejudices

2  which is a bankruptcy calculation by this Court whether or not

3  Your Honor ought to then lift the stay or modify the stay in

4  this case.

5         And we'd ask Your Honor to deny the relief being

6  request other than giving them the limited opportunity to go

7  speak to Judge Rosen.

8         THE COURT:  Okay.

9         MR. ROSENBERG:  Good morning, Your Honor.  Robert

10 Rosenberg for the creditors committee.

11        Our silence until now on the various matters of

12 course indicates consent or assent agreement with the debtors'

13 position, and that of course is equally true on this one.

14 However, I believe on this one, the issues are sufficiently

15 significant that we ought to address them on the record.

16        Needless to say, we do agree with the assessment that

17 Mr. Butler just stated.  As he stated, we are struggling to get

18 educated on what the issues are in this case and what should

19 happen to them.

20        As Mr. Butler indicated, this was not the driving

21 factor here in arriving in Bankruptcy Court unlike Enron and

22 Worldcom, and therefore, simply is not at this moment at the

23 very top of the issue list.

24        We strongly agree with Your Honor that the -- the

25 plaintiffs here simply have the procedure backwards because

1   there is no reason to consider the balance of prejudice kinds

2   of issues under Section 362 until and unless the issue is ripe

3   and relevant at the District Court issue -- level, and without

4   an evidentiary hearing here, I daresay that I have a very hard

5   time believing that there are a bunch of boxes sitting in a

6   corner simply waiting for Federal Express pickup and that's all

7   that's involved here.

8          To the extent that documents were previously

9   delivered to a special committee at SEC, a justice department,

10  whatever, that hardly suggests to me that they don't need to be

11  entirely re-reviewed in connection with delivery to a private

12  litigant, re-reviewed for privilege, re-reviewed for

13  confidentiality, issues that may not be quite as relevant in

14  the context of an internal or a governmental investigation.

15         So, unless the debtor tells me otherwise, I don't

16  think this is a situation of saying to Federal Express come

17  pick them up.  Accordingly, I do think that an evidentiary

18  hearing is required on the balance of hurt here and it is

19  absurd to have one in a vacuum in a moot situation where the

20  District Court has not said production is ripe.

21         Thank you.

22         THE COURT:  Do you -- Mr. Rosenberg, do you remember

23  when Enron filed?  I'm just looking at these orders.

24         MR. ROSENBERG:  I certainly do, Your Honor.  December

25  2001.

1          THE COURT:  Okay.  Fine.

2          MR. ETKIN:  Your Honor, obviously, the primary issue

3  that's being raised is really somewhat of an chicken-and-egg

4  proposition with respect to the District Court and this Court.

5          Mr. Butler talks about what Congress intended.  I

6  didn't see anything about the debtors' papers that pointed out

7  some legislative history as to how to resolve that issue.

8          I think the only thing that the Court has to provide

9  some guidance as to how that issue has been resolved is how it

10 has, in fact, been resolved previously in the two cases that

11 have addressed this issue, and I think that raising the

12 question of whether the filing itself was precipitated by the

13 accounting improprieties is not really the issue.

14         The issue is what is the stat of play with respect to

15 those accounting improprieties going into the Chapter 11

16 proceeding, and there, the similarities are striking with

17 respect to restatements for years, admitted accounting

18 improprieties with respect to prior financial statements,

19 multiple government investigations.  There are no distinctions

20 as far as that is concerned.

21         And, in fact, if there weren't those governmental

22 investigations and if there wasn't the previous production of

23 documents to the government with respect to these issues, we

24 wouldn't be making this motion.

25         We're not seeking discovery from day one with respect

1  to our pending securities litigation.  We're seeking access to

2  documents that have already been produced, already have been

3  reviewed, already have been indexed.

4        Now, Mr. Rosenberg talks about the prospect of having

5  to review them again where the circumstances are different.

6  Your Honor, those are red herrings.  Those are roadblocks being

7  thrown up now with respect to dealing with what is -- what is

8  the obvious, and the obvious is that there's -- that there's no

9  desire to impede the debtor from exercising whatever privilege

10  objections that they might have or whatever privilege that they

11  might want to assert.

12        The orders that were previously entered in the prior

13  cases specifically provided for that.  The Worldcom motion was

14  hotly contested by the debtor.  Judge Gonzales issued an

15  opinion --

16        THE COURT:  Well, no, he didn't issue an opinion.

17        MR. ETKIN:  He signed an order.  I apologize.  He

18  signed an order based upon his decision and requested an order

19  to be presented.  That order was signed.  That order provides

20  all of the safeguards that the debtor could possibly want with

21  respect to those documents.

22        This is really an example of an effort to create

23  issues with respect to what has been the prior production of

24  documents that have been reviewed, indexed and are waiting to

25  be -- and are waiting to be copied subject to privilege

72

1    objections which is lawyer-driven not debtor-driven, but a

2    lawyer-driven process, and delivered over to the lead

3    plaintiffs in connection with their obligations and

4    responsibilities to move forward on behalf of the class that

5    they represent with respect to the litigation against non-

6    debtor third parties.

7              We understand what the PSLRA requires.  That's a

8    different showing to be made to a different court.  The debtor

9    does not have to do one thing until the District Court decides

10   that issue, similar to what was decided in the Enron and

11   Worldcom cases.  There's no need for a chicken-and-egg issue.

12   There's no need to reinvent the wheel with respect to how this

13   process has worked previously.  It should work no differently

14   in this case.

15             THE COURT:  Okay.  All right.

16             I have in front of me a motion by the lead plaintiffs

17   in the Delphi Corporation securities litigation for a limited

18   modification of the automatic stay under Section 362 of the

19   Bankruptcy Code to permit them to receive all documents

20   previously provided by Delphi to third parties including, an

21   internal audit committee investigation as well as the SEC and

22   others.

23             The issue as I see it is really pretty limited at

24   this point, which is an issue of timing.  That is because the

25   movants acknowledge that even if I were to lift the automatic

73

1 stay to permit the production of such documents, they could not

2 be produced until the movants also obtained relief from the

3 District Court presiding over the securities litigation under

4 the Private Securities Litigation Reform Act of 1995, the

5 PSLRA, which contains a separate stay driven by different

6 considerations than the automatic stay, which separately

7 currently stays the pendency of discovery in the underlying

8 securities litigation.

9        To me, the first gatekeeper issue is obtaining relief

10 from the stay -- relief from the stay in this court under

11 Section 362 to seek relief from the PSLRA stay.  That's the

12 first gatekeeper issue.

13        In my mind, logically, the next gatekeeper issue is

14 obtaining relief from the District Court under the PSLRA.  The

15 District Court is dealing obviously not only with that statute

16 but with discovery issues generally in consolidated litigation

17 that is clearly at a very early stage, and it seems to me that

18 I cannot reasonably predict what the District Court would do in

19 connection with an application for relief under the PSLRA for

20 production of documents or what sort of timetable the District

21 Court will set for the production of documents.

22        Given that fact, it seems to me that what I'm really

23 being asked here to do to the extent it goes beyond a request

24 for relief from the stay simply to go ask the District Court

25 for relief under the PSLRA, is in essence to decide an issue in

74

a vacuum or to give an opinion that is not at this time ripe to
be given.

To my mind, that would end the issue but for the fact
that apparently at least in two instances, a similar issue was
raised in the Bankruptcy Court in front of Judge Gonzales first
in the Enron case and then second in the Worldcom case.  The
movants have attached orders issued by Judge Gonzales in those
two cases, the first of which I note was issued very early in
the Enron case and does not mention the PSLRA, and it's not
clear to me whether this issue was even considered in
connection with that order.

The second Enron order and the Worldcom order
attached do specifically note that the relief granted to the
securities litigation plaintiffs is still subject to any
determination by the District Court presiding over the
securities litigation, including under the PSLRA, but I cannot
tell much more from those orders, which are just that:  orders;
they don't contain findings of fact, and there's no oral ruling
that would lay out findings of fact and conclusions of law as
to why Judge Gonzales granted that particular relief.

One of the things that's not clear to me is whether
there were any communications directly or indirectly from Judge
Harmon or Judge Cote, the judges presiding over the District
Court litigation referred to in those two orders respectively,
about the timing issues involved or the like.

75

1    So I think that not only as matter of judicial

2 economy, but frankly to avoid deciding an issue that's not

3 ripe, all that I will grant here today is relief from the stay

4 to seek relief from the PSLRA stay in the District Court.

5    If such relief is granted and the facts will be clear

6 as to what -- what discovery if any the District Court

7 authorizes under the PSLRA and then I'll decide whether the

8 automatic stay should in any way restrict that discovery.

9 Frankly, if, in fact, it's simply a matter of picking up boxes

10 and limited review by counsel, it may not be much of an issue.

11    On the other hand, I'm not going to get into the

12 facts at this point because I think it's premature and there

13 may be other considerations that are relevant under the

14 Sonax factors.

15    Moreover, at that time, there may be a more complete

16 discovery plan or a more complete litigation schedule that will

17 help me decide the issue.  So I will grant relief from the

18 automatic stay for the limited purpose of seeking relief from

19 the District Court under the PSLRA.

20    And, Mr. Etkin, I will carry the rest of the motion.

21  You can put it on the docket on short notice.  I don't think

22 that there's a need to have a lengthy delay after the District

23 Court rules.

24    MR. ETKIN:  Thank you, Your Honor.

25    THE COURT:  So I don't know which one of you should

76

1  submit an order to that effect.

2      MR. BUTLER:  Your Honor, we'll draft an order and

3  show it Mr. Etkin on that matter (sic).

4      Your Honor, also just so the record is clear today

5  because I don't want either the debtors or the lead plaintiffs

6  to be in a position to characterizing what occurred here today

7  in front of the District Court along the lines, say, gee, Judge

8  Rosen, you know, go ahead and approve this because it will --

9  you know, Judge Drain is ready to sort of, you know -- you

10 know, open the floodgates here.

11     THE COURT:  I think there are very different issues

12 involved.  I think the PSLRA addresses quite different issues

13 than the automatic stay addresses and I wouldn't presume to

14 give a District judge any sort of direction about how he or she

15 should manage their discovery docket or the PSLRA, and really

16 my ruling is based simply on, first, that deference and then

17 issues of ripeness.

18     MR. BUTLER:  And may the order also include a

19 statement that the rights of the debtor and the creditors

20 committee are fully reserved -- preserved in connection with

21 the --

22     THE COURT:  Yes.  I mean, everyone's -- yes.

23     MR. BUTLER:  I just think --

24     THE COURT:  I think -- normally, I recommend people

25 don't do that because then everyone wants to stand up and

1  reserve their rights, but I guess in this instance, it's

2  appropriate so that there's no confusion with another court,

3  but obviously, the class action plaintiffs' rights are fully

4  preserved, too.

5            MR. BUTLER:  We understand that, Your Honor.

6            THE COURT:  Okay.

7            MR. BUTLER:  Thank you very much, Your Honor.

8            Your Honor, the next matters on the agenda are

9  Matters 33 and 34.  These involve the application of the

10 debtors for the retention of Deloitte and Touche, LLP as

11 independent auditors and accountants to the debtors only with

12 respect to the 2005 fiscal year that has been completed.

13           The debtors have previously announced that they have

14 -- after a request for a proposal request that the debtors have

15 engaged other accountants going forward and will be filing a

16 separate application in connection with the retention of

17 auditors for the 2006 fiscal years --

18           THE COURT:  I think that's on my desk, actually.  I

19 think it's on my desk, isn't it?  Yeah.

20           MR. BUTLER:  Yeah.  So it's -- that we'll be moving

21 forward on that separately, Your Honor.

22           THE COURT:  All right.

23           MR. BUTLER:  Your Honor, the -- Matter No. 33 is lead

24 plaintiffs' motion to compel deposition testimony filed at

25 Docket Number -- I believe it's 1618 and we have filed --

78

1 debtors have filed a motion to quash at Docket No. 1666 and

2 there have been other replies filed.

3          Your Honor, Deloitte and Touche, LLP was one of a

4 handful, I think four or five entities that Skadden disclosed

5 in our retention papers exceeded the one percent threshold in

6 terms of revenues with the firm in connection with the

7 guidelines and discussions of the United States Trustees'

8 office and their protocol.  Without acknowledging that there

9 would be any conflict of interest here, we concluded that we

10 should not handle this particular matter but defer to other

11 counsel.

12          Normally, that would go to Mr. Togut and Mr. Berger,

13 conflicts counsel, but Shearman Sterling who is special

14 corporate counsel in this case had, in fact, been handling the

15 Deloitte retention from the beginning because we recognized

16 this in our pre-petition period and they've handling that, and

17 therefore, they will be handling this matter today.

18          Mr. Roll will be dealing with Matter No. 33 in

19 defending the debtors' interest there.

20          The Matter 34, my understanding the actual

21 application, the only thing that's going to be dealt with today

22 I believe are discovery matters which is Matter 33, and my

23 understanding Matter 34, the actual merits of the retention of

24 Deloitte and Touche I believe has been adjourned to January

25 13th as I understand the schedule.

1          THE COURT:  Right.

2          MR. BUTLER:  So, with that in mind, the only -- as to

3    Matter 33, the lead plaintiffs -- litigation again, I'll cede

4    the podium to lead plaintiffs, and Mr. Roll will defend the

5    debtors' interests.

6          MR. ROLL:  Good afternoon, Your Honor.  William Roll

7    of Shearman and Sterling appearing on behalf of the debtors.

8          As Mr. Butler indicated, Number 33 comprises

9    competing motions by the debtors on one hand and by the lead

10    plaintiffs on the other, the lead plaintiffs in the securities

11    litigation raising essentially the same set of issues, the same

12    three issues said to arise in connection with the debtors'

13    application to -- for authorization to retain Deloitte for the

14    limited purpose of the 2005 audit.

15          At the outset, Your Honor, I would say it is not a

16    stretch to say that if Your Honor grants the lead plaintiffs

17    the relief they're seeking in connection with Number 33, the

18    motions I'm going to talk about, it will in effect moot much of

19    the discussion the Court just had and much of the determination

20    the Court just made with respect to the preceding motion on the

21    lifting of the stay.

22          I say that because what the lead plaintiffs

23    essentially are seeking to do here, that is in connection with

24    the Deloitte application and the discovery issues in connection

25    with the Deloitte application is to get discovery in connection

80

1 with the securities litigation.

2       THE COURT:  Although they signed a confidentiality

3 agreement saying that they won't use it.

4       MR. ROLL:  They did sign a confidentiality agreement,

5 Your Honor.  It is a standard -- I think what most lawyers

6 would consider a standard confidentiality agreement.  It does

7 restrict what they can do in many respects with the information

8 they get, but it does not address the fundamental problem we

9 see here which is they are asking for things as counsel for

10 lead plaintiffs put it earlier when they said this is what

11 they're not doing.  This is, in fact, what they are doing.

12       They're asking for things that go back to day one in

13 connection with the securities litigation, and I think the best

14 illustration of that is to look at the actual document request

15 that they've made.

16       Perhaps I should back up.  The three -- the three

17 issues before the Court raised by the competing motions are the

18 propriety of their request to the debtors for documents about

19 which I'll speak in a moment.

20       There -- having served trial subpoenas or subpoenas

21 for the hearing in connection with the Deloitte application and

22 all the members of the Deloitte audit committee and our motion

23 to quash that and their effort to seek further testimony from

24 Mr. Dellinger, Delphi's CFO who has already testified in a

25 deposition with respect to the issues going -- the proper

1 issues going to the Deloitte application.

2        Mr. Dellinger declined on the basis of the attorney-
3 client privilege to answer a number of questions put to him in
4 that deposition.

5        With respect to my point earlier about they're trying
6 to get at the things that Your Honor just said they should seek
7 relief from the state first to be able to get.  The document
8 request they have made here makes it crystal clear that they're
9 going way beyond what they should be trying to get in
10 connection with the Deloitte application.

11        What they should be trying to get are documents
12 relating to the general competence to complete the work with
13 respect to 2005 and to do the 2005 audit and relating to
14 Deloitte's disinterestedness under the Bankruptcy Code.

15        Instead, what they have sought is just about
16 everything that the debtor has relating to Deloitte or indeed
17 even accounting issues going back as far as 1999.  I don't want
18 to burden the Court with every element of their seven-page
19 single-spaced request, but I do want to point out maybe a half
20 a dozen that make this point very clearly.

21        They have asked, for example, that we produce -- and
22 asked by the way that we produce this in essentially two
23 business days -- all minutes of the meetings of the audit
24 committee.  All minutes of all meetings of the audit committee
25 of Delphi from January 1, 1999 to the present.  All memoranda

1   and reports submitted by Deloitte to the audit committee from

2   that same date from January 1, 1999 to the present.

3       All memoranda and all reports submitted by Deloitte

4   to the company relating to any problems encountered during any

5   of Deloitte's -- any of Deloitte's audits of the company's

6   financial statements again going back to presumably the

7   beginning of time.

8       All memoranda on internal controls, management

9   letters and similar documents submitted by Deloitte to the

10  company or its audit committee again from January 1st, 1999 to

11  date.

12      And the list goes on and on and on and on like that.

13   These clear do not go to the issues that are properly -- or

14  will be properly before the Court on the application to retain

15  Deloitte.

16      THE COURT:  And, just for the record, that

17  application as to retain Deloitte to solely complete the 2005

18  tax audit?

19      MR. ROLL:  To complete the audit of the company's

20  financial statements for 2005 and --

21      THE COURT:  So they're not providing any other

22  services in the bankruptcy case?

23      MR. ROLL:  Not to my knowledge, Your Honor.  So it is

24  limited to that --

25      THE COURT:  And -- and it's a different engagement

83

1  team?

2      MR. ROLL:  It is a different engagement team.  The

3  papers submitted by the debtors in support of the application

4  to retain Deloitte make that clear.  In particular, the

5  affidavit from the Deloitte partner who will be heading the

6  engagement team makes clear that it's a different team.

7      I believe Mr. Dellinger when he testified in his

8  deposition at the lead plaintiff's behest testified to that

9  same point.  So the issue -- that issue has been addressed.

10     THE COURT:  Okay.

11     MR. ROLL:  And the kinds of things that the lead

12 plaintiffs are looking for as illustrated by those requests

13 that I read to the Court simply don't go to that kind of an

14 issue.

15     You know, I'm going to refer to Worldcom, too, but I

16 have the easiest task with respect to the decision there.

17 Whatever that -- that case may have said or whatever the judges

18 -- any judge in that case or any other case may have said with

19 respect to whether lifting the stay was appropriate or not, it

20 is without doubt the case and others like it at least stands

21 for the proposition that if there is a stay in place then you

22 cannot use the bankruptcy process to get discovery in

23 connection with the stayed litigation, and that's precisely

24 what the lead plaintiffs are trying to do here, not just in

25 connection with the document request as indicated, but also

84

1 with respect to their entire discovery effort related to the --

2 to the Deloitte application.

3      That's the first issue, the documents.  The second

4 issue, the second main issue or set of issues relates to the

5 subpoena served on all of the members of the Deloitte audit

6 committee.  First of all, the lead plaintiffs know or at least

7 should know one of the four individuals who were subpoenaed is

8 in Brazil, not here in New York, and it would be to say the

9 least a significant hardship for that gentleman to come here to

10 testify just at their behest in connection with this

11 application on issues as we see it are not necessary to a

12 court's determination of that issue.

13      Secondly, there's another member of the audit

14 committee, Mr. Walker, who the lead plaintiffs know or should

15 know has only recently joined the audit committee and clearly

16 by any objective measure has not been involved in issues

17 relating to the restatement, Deloitte's work in connection with

18 -- with Delphi previously or anything like that.

19      That leaves only two, and even those two are

20 unnecessary because as the debtors have said it and conveyed to

21 the lead plaintiffs from the start, everything they need to get

22 in terms of the debtors' reasoning for wanting to employee

23 Deloitte on the limited basis we're asking to do can be

24 obtained and could have been obtained from Mr. Dellinger, the

25 company's CFO, who we did make available promptly for a

85

1  deposition, and I would add that the lead plaintiffs, they were

2  offered several hours of his time and used only a couple hours

3  of his time.

4       THE COURT:  Is he the only witness that the debtors

5  would call at the hearing?

6       MR. ROLL:  He is -- he's one of two, Your Honor.  We

7  would intend to call Mr. Plumb as well.

8       THE COURT:  From Deloitte.

9       MR. BUTLER:  From Deloitte.  I would note that as to

10 Mr. Plumb, the plaintiffs have made no effort to depose him,

11 and I should also note, and I think this is very telling.  The

12 retention of Deloitte, the retention of any professional is an

13 important matter for any debtor and for the estates, only the

14 lead plaintiffs here have sought discovery of this sort in

15 connection with this application.

16      The creditors committee has not.  The U.S. Trustee

17 has not indicated any need to see anything further.  No other

18 party in interest has come forward and said, yes, we'd like to

19 see a whole bunch of information that we think goes to whether

20 or not Deloitte should be retained for the limited purpose that

21 the debtors are trying to retain it for.

22      Clearly, on a very sort of pragmatic level, that

23 illustrates that the lead plaintiffs are pursuing a very

24 different agenda here from the one that all of the players

25 properly on this stage are pursuing.  They are, in fact,

86

1  pursuing an agenda that's appropriate for their stage, for the

2  securities litigation where they are big players, but they're

3  not big players here, and they shouldn't be seen as that in

4  connection with this -- with this very important matter to the

5  estate.

6        That's the subpoenas to the audit committee.  It's

7  unnecessary.  It's cumulative.  Two of the individuals wouldn't

8  even be appropriate in any event, and on top of that, I would

9  also say that if one reads the transcript of Mr. Dellinger's

10  deposition testimony, it's apparent that the members of the

11  audit committee in all likelihood could -- could only duplicate

12  in effect the factual items that he has testified to already

13  with respect to the importance to the debtors of having -- of

14  having Deloitte retained for the limited purpose of 2005.

15        Finally, on the issues arising from Mr. Dellinger's

16  deposition testimony, it's a slightly different set of issues

17  there.  The problems that the lead plaintiffs have with his

18  testimony don't go to so much whether or not his -- his

19  testimony is appropriate for the Deloitte application versus

20  the securities litigation but rather to our assertion in a

21  number of limited instances that -- that what they are asking

22  for and look what they were asking for him to testify about

23  would have necessarily divulged attorney-client protected

24  information.

25        And to be a little more specific, in a number of

87

instances, it -- Mr. Dellinger had made clear that his

knowledge with respect to certain items derived entirely from

discussions he had and meetings he attended with counsel for

the company and only counsel for the company and others

affiliated directly with the company.

That's a classic situation calling for a proper end

location of the attorney-client privilege.  When the lead

plaintiffs continue to probe on -- on those meetings, the

instruction was given that he not answer and he followed that

instruction.

It's not for me to suggest to the Court what it

should do on this, but I would say that if one -- if anyone

were to read the transcript of Mr. Dellinger's deposition

testimony and it's not that lengthy -- it's only about seventy

pages -- it becomes clear very quickly that what was going on

there was the sort of thing that goes on at just about every

deposition in any litigation in this country every single day.

There are questions that on their face and as amplified by

testimony from the witness would -- would invade the privilege

if there's an instruction not to answer and the witness follows

that instruction.

There was no effort made to impede the lead

plaintiffs' ability to get at Mr. Dellinger's knowledge with

respect to the urgency of getting Deloitte employed or having

them go back to work and having them do the work necessary to

1   complete the 2005 audit.  Indeed, he was fully prepared to talk

2   about that.

3           He was prepared and did talk about what he understood

4   about Deloitte's qualifications generally to do the work --

5           THE COURT:  On the privilege point, the plaintiffs

6   contend that the privilege was asserted on the basis that the

7   lawyer was present as opposed to that the lawyer was giving

8   legal advice or was reasonably expected to be giving legal

9   advice and the like.

10          MR. ROLL:  It is true, Your Honor, that that's what

11  they assert, but it's -- it's not quite right.  The privilege

12  was asserted on the basis that the knowledge gained by Mr.

13  Dellinger on the subjects being inquired about came from a

14  discussion with counsel and counsel's client where there was an

15  exchange of communication relating to the rendition or

16  requesting of legal advice.

17          It's as simple as that.  It's not just that counsel

18  was sitting in the corner and two people at the company or two

19  or more people at the company including Mr. Dellinger were

20  talking in the same room about things that would otherwise not

21  be privileged.

22          THE COURT:  And counsel wasn't just reporting on

23  prior meetings?

24          MR. ROLL:  Not to my knowledge.  My knowledge isn't

25  even what's important here.  Mr. Dellinger's knowledge on this

89

1  is important and, in fact, we have added his elaboration of

2  what happened at those meetings to the record.  We submitted a

3  declaration by Mr. Dellinger following his deposition and

4  following these disputes arising where he went into in more

5  detail who was present at those -- there were four meetings,

6  and what happened and who said what, all going to the point,

7  the general point of his only knowledge relating to these

8  issues being inquired about, these accounting issues being

9  inquired about having come from his having heard that

10  discussion and having been a part of it with counsel.

11          Mr. Dellinger is here today.  So, if there's any

12  further doubt about the circumstances giving rise to the proper

13  end location of the privilege, if there's any doubt remaining

14  after our having submitted Mr. Dellinger's declaration, I'm

15  sure he'd be more than happy to lay that doubt to rest with

16  additional testimony.

17          I don't know what the Court has in mind with respect

18  to that, but he's here and he's more than happy to talk about

19  that.

20          So all of that leads me to say -- and I don't mean to

21  minimize the importance of these kinds of issues, but the

22  attorney-client privilege problems here raised by the two

23  parties, the two sides' motions are garden-variety deposition.

24  They're garden-variety attorney-client privilege assertion-

25  type issues.  Indeed, and I mean no disrespect to the lead

90

1   plaintiffs, but I feel duty-bound to say this as well, if they

2   really had a problem with -- a true problem with the assertion

3   of the privilege, they were duty-bound to inquire a lot more

4   than they did at the deposition about the circumstances in

5   which the conversations occurred.

6           As we all know, it's counsel's duty to make an

7   appropriate record if counsel thinks that the -- that the

8   privilege is being asserted improperly.  Here, the privilege

9   was asserted.  The instruction was given.  The witness followed

10  the instruction.  Counsel made a complaining statement and

11  basically moved on.

12          Even in the face of that, we submitted the Dellinger

13  declaration to try to set the record straight and as -- set it

14  straight as fully as we could about why the privilege was

15  invoked and why we believe it to have been appropriate here.

16          THE COURT:  Okay.

17          MR. ROLL:  Thank you.

18          MR. SABELLA:  Your Honor, Jim Sabella from Grant and

19  Eisenhofer for lead plaintiffs.

20          Let me say at the outset that the issue of the PSLRA

21  stay in this context I believe is a complete red herring.

22  Whether or not any of the discovery we seek here could or could

23  not be relevant to the securities litigation doesn't matter.

24  What matters is, is the discovery sought here relevant to the

25  application that the debtors made to retain Deloitte, and

1  recall, we didn't initiate this proceeding.

2  If they weren't insistent on keeping Deloitte for the

3  2005 audit, we wouldn't be here seeking any of this discovery.

4  So the issue is simply whether the discovery is

5  relevant there.  We can't use the discovery in the securities

6  litigation because we signed the confidentiality order that

7  they drafted and put before us the day of the deposition, and

8  we signed it without changes.  There have been cases in this

9  court and perhaps the best one is a called Recotin (phonetic)

10 which we cite in our reply papers at 307 BR 751 where another

11 judge in this court specifically said if discovery is relevant

12 to something going on here, the fact that there's a securities

13 litigation stay in another proceeding doesn't matter.

14 Is the discovery relevant here?  Our objection to

15 Deloitte is twofold.  One is incompetency and the second is

16 conflict of interest, and let me talk about the competency a

17 little bit.

18 We know that there were major problems with

19 Deloitte's audits of the preceding year's financial statements.

20  How do we know that?  Deloitte gave clean opinions that the

21 accounts were presented in accordance with generally accepted

22 accounting principles.

23 Now the audit committee did an investigation and

24 they've restated all those financial statements and they've

25 said that major transactions were improperly accounted for.

Now, we don't know exactly why Deloitte got it so
wrong.  We don't know whether it was -- at this point, whether
it was the fault of just a couple of bad auditors in which case
perhaps changing the audit team might make a different or
whether or not it was deficient audit procedures, and if it's
the latter, what assurance do we have that Deloitte is going to
get it right this time?  None whatsoever, and that's why we're
probing.  What did Deloitte get wrong?  Why did it happen?
What did the audit committee find out when it -- when it did
its investigation which led to these major restatements?  They
blocked all of that.

Counsel talks about the alleged burden in some of our
document requests, but recall, they didn't take us up on our
offer to try to renegotiate the burden, to try to have a
limitation on what we were seeking.  They gave a blunderbuss
objection, not one piece of paper.

So I think the burden aspects or the overbroad
aspects that counsel was suggesting are not what's going to
carry the day here.  They have taken the position we're
entitled to know nothing about what Deloitte got wrong.  We're
entitled to know nothing about what the audit committee looked
at when it made its restatements.  What did it find out about
Deloitte's procedures?  What assurances did it get Deloitte is
not going to blow it again?

We're not entitled to know anything about that.  They

93

1  won't give us any documents.  They won't give us any testimony.

2        Now, we've also talked about the internal controls

3  aspect of the competence.  Deloitte was required at the time it

4  did its audits to give advice on internal controls and the

5  adequacy of internal controls.  The company has now said there

6  were material weaknesses in internal controls during the years

7  that Deloitte did those deficient audits.

8        So we've asked what did Deloitte tell you about the

9  internal controls?  Did they identify those problems?  If not,

10 why not?  Did the audit committee look into that and find out

11 how did they miss those serious material weaknesses in internal

12 controls.  They won't tell us, won't give us any documents,

13 won't even give us the management letters that Deloitte gave to

14 the company at the time when it purported to report on internal

15 controls.

16       So how does one appraise -- how do you get your arms

17 around whether or not Deloitte is up to the job to do the 2005

18 audit when we have no idea how it happened that they got it so

19 wrong in 2001 and 2002 and 2003.

20       THE COURT:  Hasn't every accounting firm, every large

21 accounting firm gotten it wrong in connection with at least one

22 large company in the last several years?  I mean, can't you

23 take your argument to the extent that, you know, you could

24 discovery of -- in connection with name whatever disaster any

25 accounting firm was involved in, you know.  Merry-go-round, for

1 example, for E&Y.

2      You know, I mean, I'm just trying to figure out how

3 far you could take that.

4      MR. SABELLA:  Well, I wouldn't take it there, Your

5 Honor.

6      THE COURT:  I mean, they couldn't hire Grant

7 Thornton, right, because they've been sued?  They couldn't hire

8 any of them.

9      MR. SABELLA:  But the point is we know that

10 Deloitte's --

11      THE COURT:  If they've had restatements.

12      MR. SABELLA:  -- that the relevant Deloitte

13 procedures dealing with this company in this industry and the

14 kinds of problems that these audits present were insufficient.

15  Okay.  Sure, every accounting firm gets sued, but we know that

16 something very wrong went wrong on these audits, with this

17 company, and doesn't the Court want to know why?  I mean, are

18 you going to just pay them an audit fee for 2005 and say, well,

19 they got it wrong last time but I'm sure they'll get it right

20 this time.

21      I think we're entitled to a little more than that.

22      THE COURT:  Well, maybe, although you might posit to

23 the contrary that they'll be walking on eggshells and doing

24 everything they can to get it right.  You know, so they are

25 absolutely blameless --

95

1          MR. SABELLA:  Well, I don't think so, Your Honor, for

2     the following reason.  They're a defendant in the securities

3     litigation.  To the extent that they really dig here and they

4     find additional weaknesses in internal controls, additional

5     errors in accounts, additional contracts that were improperly

6     accounted for, they're digging their own grave in the

7     securities litigation.  They're not going to want to do that.

8          THE COURT:  That's a different point.  I understand

9     that point.

10         MR. SABELLA:  Right.  That's a conflict of interest

11    point.

12         THE COURT:  I understand that point.

13         MR. SABELLA:  And I think it's a serious one.

14         Now -- so that essentially is our argument on the

15    relevancy of at least some discovery.  If they want to limit

16    the documents, we can try to do that, but I think we're

17    entitled to some discovery on some of these issues, and they've

18    blocked all of it.  If it's relevant, the PSLRA stay has

19    nothing to do with it.

20         Now, counsel talked a little bit about the

21    Worldcom case that he cites in his brief, which I think we've

22    adequately distinguished in our reply brief, and it was a

23    totally different situation.  That was a situation where the

24    people wanting discovery about KPMG, they waited a year after

25    they knew about the disqualification-related issues and it

1  really smelled that all it was, was an effort to get discovery

2  for use in another proceeding, and in that case, the company

3  said, we are so sure KPMG is okay here that we are not going to

4  sue them no matter what comes out.

5          They went -- they went on the record as saying we

6  don't have any claims against KPMG.  Debtor has not done that

7  here with respect to Deloitte.  There's been no waiver of the

8  potential that the debtor is going to sue Deloitte or Deloitte

9  is going to sue the debtor, and as Your Honor knows, in most of

10  these accounting fraud situations, it's ultimately what

11  happened.  They point the finger at each other.  So this is

12  very different from the Worldcom case that counsel relied on.

13          Let me talk briefly about our desire to depose --

14          THE COURT:  What more discovery do you need knowing

15  that there's already a lawsuit against Deloitte and, therefore,

16  potential claims going back and forth by the debtor?  Why do

17  you need more discovery?  Can't you point to a potential

18  conflict right there?

19          MR. SABELLA:  Yes.  I think on the conflict point you

20  don't need a lot more discovery.  I think it's more on the

21  competency issue that you need discovery.

22          THE COURT:  And isn't that the case particularly

23  since E&Y is going to do the 2006 audit so they can certainly

24  see if there are, you know, improper procedures that had been

25  in place, and again Deloitte needs to be pretty concerned that

it get it right in 2005 because another firm is going to be

looking over their shoulder in 2006?

MR. SABELLA:  Well, I don't think that's exactly

right, Your Honor, because I mean, in 2006, Ernst & Young is

going to be the 2006 audit, and it will be -- it will not be

re-auditing 2001 or two or three or four or five --

THE COURT:  No, but it's going to look at what --

MR. SABELLA:  It's going to look at what Deloitte did

--

THE COURT:  As far as, you know, controls and

procedures as concerned that are in the company.

MR. SABELLA:  Yeah, but if Deloitte should come

across some bodies in the closet in the context of this audit,

I think they have more incentive than anyone in the world to

make sure they don't come to light and to make it more

difficult not less difficult for Ernst & Young to find it.

THE COURT:  Okay.

MR. SABELLA:  The additional discovery that we're

seeking in addition to documents as counsel referred to is to

examine a couple of members of the audit committee, and we'd be

happy not to take the fellow in Brazil and not to take the

fellow that just joined.  I mean, you know, we're willing to

negotiate those things.

The reason why we wanted members of the audit

committee and not just Mr. Dellinger is number one, it's the

98

1  audit committee that made the decision to stay with Deloitte

2  for 2005 and it's the audit committee that made the decision to

3  go with Ernst & Young for 2006, and we wanted to know what the

4  audit committee knew, what it considered.

5         Mr. Dellinger didn't know obviously what

6  conversations the audit committee members had among themselves.

7   He obviously didn't know what conversations they had with

8  Deloitte.  Did they probe with Deloitte whether -- what

9  assurances Deloitte could give about the 2005 audit?  He didn't

10  know anything about that.  He never discussed the restatements

11  with Deloitte.  He appeared not to know much about what the

12  audit committee investigation showed and what little he knew,

13  he refused to testify about either on the grounds of scope or

14  on the grounds of privilege.

15         So we'd like to probe the audit committee.  He didn't

16  even know if the audit committee considered the conflict issue

17  that Deloitte would have an incentive not to look back at prior

18  transactions that might have been improperly accounted for.  He

19  didn't even know if the audit committee considered that.

20         So it seems to me that at a minimum we ought to get

21  to Question 1 or 2 of the real decision makers who made the

22  decision.  He's been on the job for a month or two.  The audit

23  -- the process of looking for a new accounting firm which ended

24  up with Ernst & Young being appointed, that process began

25  before Dellinger was hired.  Somebody else made that decision

1  that we'd better be looking for another accounting firm.

2          And it's interesting, when they made their

3  application in this Court to retain Deloitte, the application

4  said they wanted to retain Deloitte for 2005 and thereafter

5  although they had already put in progress the idea of getting a

6  new accounting firm.

7          But, in any event, Dellinger wasn't there at the time

8  they made those decisions.  We asked them for all the documents

9  that related to the decision to switch to Ernst & Young or the

10  decision not to go with Deloitte and the decision to retain

11  Deloitte and they didn't give us any documents on those either.

12          THE COURT:  Okay.

13          MR. SABELLA:  So it seems to me the testimony from a

14  couple of people there is not overly burdensome, and it's

15  clearly, clearly relevant to what we want to do, and the

16  objections that we filed.

17          Lastly, on privilege, counsel suggests that it was

18  much more than a lawyer just sitting in the room, but when you

19  look at the questions that I asked at that deposition, there

20  was no suggestion that what I was getting at in any way related

21  to legal advice.

22          I asked questions such as:  Did any members of the

23  audit committee say let's stick with Deloitte for 2006?

24  Objection; privilege.  There was a lawyer in the room.  Did

25  anybody say let's get rid of Deloitte for 2005?  Objection;

100

1 privilege.

2       THE COURT:  Is that -- I confess, I looked at the

3 transcript very quickly.  It seemed to me that that response

4 was basically because he didn't really know except because what

5 a lawyer told him.  He wasn't there, right?

6       MR. SABELLA:  He was at the audit committee meeting.

7       THE COURT:  HE was?

8       MR. SABELLA:  Oh, yes.  Yes.  What --

9       THE COURT:  All of them?

10       MR. SABELLA:  He was at the two key audit committee

11 meetings, December 6th and December 7th when they made these

12 decisions.

13       THE COURT:  Not -- not the four.

14       MR. SABELLA:  The point about what he knew came from

15 what lawyers told him, that relates to the audit committee

16 investigation, the restatements and the material weaknesses in

17 internal controls.  Basically, he said anything he knew about

18 the investigation is what a lawyer told him, but even there, is

19 that the conveying of legal advice.

20       I asked him who did the audit committee interview in

21 the context of their investigation.  Did they interview

22 Deloitte people.  Who did they interview?  Objection; attorney-

23 client privilege.  He would have learned that from counsel.

24       Well, how is that conveying legal advice when you ask

25 someone who did they interview and my lawyer told me these are