1 the three guys.  I mean, yes, it came from a lawyer, but that's

2 not privileged information, and similarly, if the audit

3 committee concluded Deloitte made these three mistakes,

4 Deloitte's procedures were inadequate in these three respects,

5 even if he heard that from a lawyer or even if he heard that

6 from the audit committee with the lawyer in the room, it's not

7 privileged information.

8          That's not a lawyer giving anybody legal advice.

9 That's a lawyer reporting on a fact.  So those are the problems

10 we had at the deposition, but they basically put up a wall and

11 said, anything he heard from a lawyer or anything he heard at

12 that audit committee meeting, a lawyer was in the room, he

13 can't talk about it, except the subjects that he wanted to talk

14 about because he did, of course, tell us that they decided to

15 go with Ernst & Young.

16          So he was willing to tell us some of the things that

17 went on at the audit committee meeting, but not the rest.

18          THE COURT:  Okay.

19          MR. SABELLA:  So, you know, Your Honor, there's

20 really no way to get through the privilege objections,

21 obviously, other than looking at the transcript and we can't,

22 you know, go over them chapter and verse here, but it just

23 seems to me that counsel ought to be instructed that those kind

24 of blanket privilege objections aren't going to fly.

25          THE COURT:  Okay.

1          MR. SABELLA:  Thank you.

2          THE COURT:  I have one question.  In the relief

3   requested, you say you want the complete responses to the

4   interrogatories contained in lead plaintiffs' discovery

5   request.  I didn't actually see any specific interrogatories.

6          MR. SABELLA:  Those are just really the first two

7   questions which had to do with the composition of the audit

8   team.  You know, they've said now that they're going to replace

9   the audit team, but we essentially asked for everybody who

10  worked on the prior audits and everybody who is going to work

11  on the current audit.  They've replaced the partners and the

12  managers.

13         I don't think they've made clear that they've

14  replaced all the lower-level people from the audit, and that's

15  what we meant by interrogatories.

16         THE COURT:  So they confirmed that -- that's what you

17  were looking for?

18         MR. SABELLA:  That's what we were looking for, yeah.

19         THE COURT:  All right.

20         MR. SABELLA:  Basically the identities of everybody

21  on the audit team.

22         THE COURT:  Well, okay.  All right.

23         MR. ROLL:  Very briefly, Your Honor.  William Roll,

24  Shearman and Sterling again on behalf of the debtors.

25         Just a couple of points.  Counsel mentioned the

1  <u>Recotin</u> case.  It's a very different case.  In that instance,

2  it was the party seeking the discovery that was ultimately

3  allowed by the Bankruptcy Court was the committee.  It was not

4  plaintiffs in the -- in the separate securities litigation and

5  it was not clear that anything flowing to the committee in

6  connection with their discovery request would flow to the

7  plaintiffs in the related securities litigation and be used in

8  connection with that.

9        So it clearly does not apply.  It's a different case.

10 I'm sure they cite it because it's just one instance where the

11 Court allowed the discovery, but it did so on a very, very

12 different basis than what we have here.

13       Secondly --

14       THE COURT:  The general proposition is right.  I

15 mean, even -- even the <u>Worldcom</u> case says if it's -- if it is

16 relevant in a bankruptcy case then it's not superceded by

17 another statute.

18       MR. ROLL:  If it's relevant.  That's a very big "if."

19  And my -- my fundamental proposition, maybe I've been less

20 than stellar in asserting is that they don't even satisfy the

21 "if."  There's -- they don't satisfy the relevance here

22 because of -- or the best evidence of that being the breadth of

23 what they had asked for, the fact that nobody else involved

24 here has asked for anything even remotely close to that, and

25 indeed, they haven't asked for anything like that in connection

104

1 with E&Y.

2     And, as Your Honor pointed out, E&Y is going to be
3 assessed as well in terms of its general competence, and so
4 these same kinds of issues if they were appropriate with
5 respect to Deloitte would be appropriate with respect to E&Y,
6 and they've made no effort to do the same thing there. It's
7 clear, their target is Deloitte because Deloitte is a defendant
8 in the case, period, full stop.

9     It's as simple as that.

10     THE COURT: Now E&Y is going to get a deposition of
11 this, right?

12     (Laughter)

13     MR. ROLL: I'm sure they'll thank me for having
14 mentioned it, but it's a telling point, Your Honor, and I think
15 it's worth all of us noting that.

16     The other thing I want to point out about E&Y is that
17 -- and Your Honor touched on this a little bit in questioning
18 counsel, during 2006 and beyond will necessarily require -- or
19 E&Y in doing that would be required to look at as it does the -
20 - in effect the opening balance for 2006. It will be required
21 to look at the closing balances for 2005.

22     There is no question that from a pure accounting
23 standpoint and auditing standpoint they're going to have to
24 look at work done by Deloitte. So -- in connection with the
25 limited engagement that we're seeking authorization for here.

105

1        So, you know, the issues are not going to go away in
2   the way that counsel seems to suggest they are.
3        And then, finally, Your Honor, with respect to the
4   privilege issue, again, and I don't mean to beat a dead horse
5   or to be repetitive or take more of the Court's time than is
6   necessary here, but the fact is that this particular witness
7   we're talking about, Mr. Dellinger learned what he learned
8   because of meetings and conversations that involved a client
9   and counsel and there's no question, and if you look at the
10  Dellinger declaration in particular and the specific questions
11  that counsel was asking, there's no question that the only way
12  he could answer the questions would be to reveal what he
13  learned in the course of those privileged communications.
14       I mean, the -- I mean, in a conventional setting, I
15  suppose the way to really get to this is to -- is to have the
16  Court engage in some kind of an in-camera inquiry.  We're happy
17  to have the Court do that if the Court wishes to do that, but I
18  think it would take us to the same place, which is that as Mr.
19  Dellinger has already testified in the deposition and in his
20  declaration, he didn't know from any other source with respect
21  to those questions as to which he was instructed not to answer,
22  than a communication back and forth involving counsel and
23  client.
24       Thank you.
25       THE COURT:  All right.

106

1          MR. ROSENBERG:  Your Honor, just very briefly.  First
2  of all, for the record, the committee has filed an objection to
3  the form of the order that's proposed for Deloitte and Touche
4  with respect to a couple of very, very narrow specific points,
5  and that of course is not on the calendar today, but I just
6  wanted to make that clear nor will it be handled by Latham and
7   Watkins.  Rather, it will be handled by conflicts counsel
8  because Deloitte is a client of the firm.
9          You know, the committee looked at this issue very,
10  very carefully, Your Honor, and perhaps we have a somewhat
11  simplistic view of it, but to us, there are only two issues
12  here.  Does the audit have to be done and is there any
13  alternative to even consider to Deloitte and Touche doing that
14  audit.
15          And I don't think there is any dispute as to the
16  answer on either one of those questions.  We looked at it very,
17  very carefully.  We didn't see anything to dispute with respect
18  to either one of those issues, and to the extent that counsel
19  is raising all kinds of other issues, to me, they're quite moot
20  in the context of the answers to those two questions which,
21  again, I haven't heard anyone dispute the answers to.
22          Accordingly, I think that this discovery is
23  irrelevant, unwarranted and inappropriate.  Thank you.
24          THE COURT:  Okay.  All right.  I'm going to take a
25  five-minute break, and then I'll be back about five of one.

107

1

2

3          A F T E R N O O N   S E S S I O N          THE

4   COURT:  Please be seated.  Is there any other

5   party in interestthat has anything to say on these motions?

6                    (No response.)

7          THE COURT:  All right.  I have in front of me

8   competing motions by the lead plaintiffs in the Delphi

9   Corporation securities litigation on the one hand and the

10  debtors on the other hand with respect to the scope of

11  discovery of the debtors in connection with their application

12  to retain Deloitte & Touche, LLP under Sections 327 and 328 of

13  the Bankruptcy Code to complete the 2005 audit of the debtors.

14         The issues, as I said, come down to the parties'

15  different view of the appropriateness of the discovery sought

16  by the class action plaintiffs.  In essence, the debtors

17  contend that the discovery requested is not relevant and

18  consequently burdensome or oppressive.  And in addition to the

19  normal oppressiveness of having to undergo irrelevant

20  discovery, the debtors point out, which appears to me to be a

21  pretty obvious fact, given the absence of any other objection

22  or request for discovery here, other than the limited objection

23  that the committee has made to Deloitte's -- Deloitte's

24  proposed retention order, that there appears to me to be a

25  separate agenda in connection with the discovery sought by the

108

1  securities law plaintiffs, which is to obtain information that

2  would be relevant in their litigation in the district court and

3  elsewhere potentially with respect to potential pre-petition

4  claims against the debtor, discovery which would otherwise be

5  stayed by the automatic stay, and, as I noted earlier, also, at

6  least for now, by other federal law.

7         In determining whether the debtors are right and the

8  request is unduly burdensome and irrelevant, I have to consider

9  the underlying application that the discovery is ostensibly

10  meant to respond to.

11         An application to retain a professional raises

12  essentially two issues.  One is the appropriateness of

13  retaining a professional in the first place.  To some extent,

14  that goes to the professional's competence.  And secondly, to

15  determine if the professional satisfies the disinterestedness

16  requirement of the Bankruptcy Code, which here essentially

17  boils down to whether Deloitte & Touche holds an interest

18  adverse to the estate.

19         Judge Gonzalez, in his opinion in In re: WorldCom,

20  Inc., 311 B.R. 151, Bankruptcy SDNY (2004) goes through the

21  standard in more detail in the context of dealing with a

22  similar, although not directly on point, discovery dispute with

23  regard to the proposed retention of an accountant.

24         In essence, the class action plaintiffs contend that

25  they're entitled to probe whether Deloitte has an adverse

1  interest in that Deloitee is a potential target of a claim by
2  the debtors in connection with the conduct of audits which
3  ultimately were restated over the period of five years.  In
4  addition, they claim that they're entitled to prove Deloitte's
5  competence as accountants and therefore, again, look into
6  whether they conducted the audits improperly, which, by the
7  nature of that inquiry, if conducted as the plaintiffs seek,
8  would clearly in my mind spill over into whether the debtors
9  themselves maintained proper accounting procedures and the like
10 and, therefore, potentially reveal extensive information about
11 the debtors themselves that could lead to additional claims
12 being asserted against them or the refinement of claims that
13 have already been asserted against them in the district court
14 securities litigation.

15          Finally, the plaintiffs claim that the one deposition
16 that occurred in this matter, of the debtors' current CFO, was
17 inadequate for two reasons:  first, that the attorney/client
18 privilege was asserted too broadly; and, second, that the CFO
19 is not a sufficiently knowledgeable witness and that they're
20 entitled to take further discovery of one or two members of the
21 audit committee, particularly given the lack of knowledge by
22 the CFO, Mr. Dellinger, of various steps taken in connection
23 with Deloitte & Touche by the board, including the decision to
24 go out and look for other accountants, which resulted in the
25 debtors' decision to retain Ernst & Young as their auditors for

110

1  the year 2006.

2          I've reviewed the pleadings filed by the parties,

3  including the deposition of the CFO, which I again took a look

4  at during the break, and considered their arguments.  And

5  perhaps not entirely surprisingly, I agree with neither party

6  entirely.

7          I believe that the plaintiffs do have a right to some

8  additional discovery, given the lack of knowledge that Mr.

9  Dellinger expressed about the debtor's decision to replace

10  Deloitte with Ernst & Young.  He came recently onto the scene

11  and the decision to replace Deloitte with Ernst & Young was

12  made, or at least put in motion or was under consideration

13  before he came on the scene.  Based on my reading of his

14  deposition, he was somewhat sketchy about the decision.  I

15  believe, though, that unless another audit committee -- an

16  audit committee member is equally sketchy, that one deposition

17  of an audit committee member should be sufficient to pin down

18  the details of that decision.

19          I agree with the debtors, however, that in light of

20  the issues that I need to consider in respect to the underlying

21  application, the extensive discovery sought by the class action

22  plaintiffs of the debtors' accounting practices and the audits

23  undertaken by Deloitte going back to 1999 is overkill, unduly

24  burdensome, and oppressive.

25          I do not believe that, on the issue of competency,

111

1  those areas of inquiry in this particular context are

2  particularly relevant.  I say that because the debtors have

3  certified and, to the extent that that certification is not

4  under oath, although I believe that counsel's representation is

5  sufficient, it can be made under oath, that the new team of

6  Deloitte personnel conducting the audit for 2005 is different,

7  is a different team; and therefore, the issue of whether the

8  audit will be conducted competently should really focus on that

9  team as opposed to what happened in the past.  It's no secret

10 that the big four accounting firms are enormous organizations

11 with a fair amount of difference between the various parties

12 conducting audits and the fact that Deloitte ultimately

13 required a restatement of its prior audits, in my mind, is much

14 less important as far as the issues I need to consider with

15 regard to the retention application than the competence of the

16 current team.

17         I note, as I said during oral argument, that I can't

18 think of any big-four accounting firm or the other two that are

19 nipping at their heels that has not experienced, to its

20 misfortune, either actual liability for bad work or being sued

21 for it.  To put the debtors through the level of inquiry that

22 the plaintiffs want here, in light of that fact, I think is

23 really unnecessary, particularly, again, given the fact that

24 the information is, as I said, transparently much more useful

25 to the class action plaintiffs in a wholly different context

112

1   for which they'd need stay relief.

2          Similarly, with regard to the conflict of interest

3   issue, I think Mr. Sabella acknowledged that short of actually

4   proving that there were something truly wrong here that would

5   justify a claim by the debtors, there's not much more that

6   discovery could show as far as a potential conflict of interest

7   because the very fact of the restatement suggests that there is

8   some potential conflict of interest here.   I don't believe that

9   the debtors, given the limited context of the relief that they

10  are seeking, which is to retain Deloitte to complete the 2005

11  audit, should be put to the level of discovery that would be

12  required to determine once and for all whether, in fact,

13  Deloitte is liable to the debtors or not.   I don't believe

14  that's necessary for me to consider the application under

15  Sections 328 and 327.

16         As I said before, the WorldCom case decided by Judge

17  Gonzalez in 2004 raised similar issues.   I do not believe that

18  the fact that in that case he believed the plaintiffs had

19  basically laid in the grass for a considerable amount of time

20  before raising their concerns was the dispositive fact in that

21  case, but, rather, Judge Gonzalez's view that, given the issues

22  to be decided by him in connection with the retention

23  application, the irrelevant and burdensome nature of the

24  discovery was overbroad was the main issue.

25         It is true that in that case the debtors had

113

1  stipulated that they did not believe they had a claim against

2  the proposed professional, but that -- and that is clearly not

3  the case here-- but that fact in and of itself is something

4  that I certainly will consider at the time I consider the

5  retention application and I'll weigh that in the balance, along

6  with the point that Mr. Rosenberg made, which is that, I'm sure

7  it will be asserted then as it was asserted today, it's highly

8  unlikely that the debtors can retain anyone to do the 2005

9  audit in any length of time or at the cost that Deloitte could

10  do it.

11         So again, weighing the issues that need to be

12  determined under Section 327 and 328 versus the discovery

13  that's sought here on the issue of conflict of interest, I

14  believe it's, again, oppressive and burdensome.

15         However, as I said, I do believe that it's

16  appropriate to permit the plaintiffs to depose at least one

17  audit committee member on the decision to seek to retain some

18  other firm besides Deloitte, since I believe that that

19  decision-making process is one that I should have the benefit

20  of when I consider an objection to Deloitte's retention for the

21  limited purposes of completing the 2005 audit and I don't

22  believe, based on reading Mr. Dellinger's deposition, that he's

23  sufficiently knowledgeable on that issue.

24         As far as the attorney/client privilege issue goes,

25  it seems to me that the privilege may have been asserted overly

114

broadly in the deposition that has taken place already,

although it's hard for me to know because there was not a great

deal of probing of the basis for the assertion of the

privilege, although there were objections to the assertion of

the privilege.  I also think that, in light of the other issues

raised by the discovery requests, the assertion of the

attorney/client privilege at times, particularly as it pertains

to requests to go into the details of the audit committee's

investigation and the history of Deloitte's lengthy retention

by the debtors pre-petition, may have been simply a place

holder for an objection on burdensomeness grounds.  Again, I'm

reading between the lines there.

          I don't know if that was necessarily the case, but it

seems to me that, given the fact that the audit committee

appears to have been directly involved in the decision to seek

a replacement for Deloitte for 2006 and going forward, the

audit committee member should be deposed first.  To the extent

that there are disputes remaining as to whether the privilege

is being asserted in an overly broad way with regard to that

deposition and they can't be resolved, I'll hear those by

telephonic conference and only if in such a conference I'm

convinced that you need to go back to Mr. Dellinger again will

I require that.

          So in sum, I'll permit a deposition of an audit

committee member on the decision to switch horses to E&Y --

115

1  from Deloitte to a different accountant going forward but to

2  keep Deloitte for 2005.  That deposition should not get into

3  the details of the audit committee's investigation of Deloitte

4  or the details of Deloitte's past history with the debtors and,

5  of course, all rights to object on privilege grounds or

6  otherwise are preserved.  I'll determine, if the parties can't

7  work out disputes over those objections, whether they were

8  well-taken or not, but otherwise I will deny the request for

9  additional discovery and grant the motion for a protective

10 order and a motion to quash the subpoenas.

11        So you can submit an order, Mr. -- but run it by Mr.

12 Sibello first.

13        MR. ROLL:  Will do.  Thank you.

14        MR. BUTLER:  Jack Butler from Skadden again on behalf

15 of the debtors.

16        Continuing with the agenda, the next matter is Matter

17 No. 35.  This is a motion for John C. Cox for relief from the

18 automatic stay at Docket No. 1653.  I'm advised that matter's

19 been withdrawn.

20        The next matter, Your Honor, is Matter No. 36.  This

21 is the Law Debenture Trust Company of New York motion

22 requesting an order to change the membership of the official

23 committee of unsecured creditors found at Docket No. 1607.  The

24 motion has been objected to by the United States Trustee, the

25 debtors, the creditors' committee, and the agent for the pre-

116

1   petition lenders.  I'll cede the podium to counsel for Law

2   Debenture.

3          THE COURT:  Okay.

4          MS. CECCOTTI:  Your Honor, I'm going to preempt

5   counsel just for the process and ask for some guidance on.

6   Babette Ceccotti, Cohen, Weiss & Simon, for the UAW.  Good

7   afternoon.

8          UAW has filed a motion for appointment to the

9   creditors' committee that we have noticed for next month on

10  with this hearing.  We have followed with interest papers that

11  have been filed in connection with Law Debenture, of course,

12  and we believe, particularly after a brief discussion at the

13  break with Ms. Martini and Ms. Davis, that the issues are

14  sufficiently distinct that this matter may be able to proceed

15  without prejudice or any sort of issue preclusion as to our

16  matter.  But I did want to raise the issue and just make sure

17  that the Court is aware of our concern.

18         THE COURT:  Well, I was aware of the application.  I

19  mean, obviously, to the extent I lay out a standard for

20  considering such an application, you'll know what I think the

21  standard is, but you're not a party to the motion in front of

22  me.

23         MS. CECCOTTI:  I'm not a party to the motion in front

24  of you, that's correct.  I believe that there is -- I'll

25  address a very narrow point, Judge, which is that they're -- in

117

1  the case of the UAW, we have received what the U.S. Trustee's

2  office has determined their final determination and we have

3  filed our motion on that basis.  I do not -- I believe there is

4  a distinction with Law Debenture in that their matter may still

5  be under advisement, and that may create, actually, a

6  sufficient legal distinction even --

7          THE COURT:  Is it under advisement?  I thought it was

8  done.  Unless facts change, obviously, which may happen at some

9  point.

10         MS. DAVIS:  Your Honor, first, I'd like to object to

11 this request.  I have to tell you how surprised the U.S.

12 Trustee was --

13         THE COURT:  Which request?  I'm sorry.

14         MS. DAVIS:  The request for the Court to consider any

15 aspect of the UAW's case.

16         THE COURT:  No, I don't think that's what Ms.

17 Ceccotti's doing.  I think she just wants to make sure that

18 she's -- that I agree with her that this is not res judicata or

19 collateral estoppel on her motion.

20         MS. DAVIS:  Moving forward, Your Honor, on the issue

21 of advisement, it's our view that regardless of whether the

22 issue's under advisement or not, and we'll get to more of the

23 substantive aspects when we go over our objection, the request

24 of Law Debenture to serve on the committee would be

25 inappropriate at this time and that the U.S. Trustee has in no

1  way acted contrary to the standard of law articulated in the

2  Barney's case or its progeny that she has abused her discretion

3  or that she has acted in an arbitrary or capricious manner by

4  not making a ruling at this juncture or, if we reach that

5  point, that she's declined the request.

6          THE COURT:  Okay.  All right.  But she hasn't --

7  well, obviously she hasn't appointed Law Debenture.

8          MS. DAVIS:  That's right.  Your Honor, the facts are

9  this.  December 14th the U.S. Trustee sent a letter out to four

10 of the parties who had requested service on the creditors'

11 committee.  Those parties were Tyco, PBGC, the union, and Law

12 Debenture.

13         On the 14th she articulated in that letter that she

14 had declined the request of Tyco, PBGC, and the UAW to serve on

15 the creditors' committee, but that the issue of Law Debenture

16 was still under advisement.  And then subsequently Law

17 Debenture filed their pleadings and we responded accordingly.

18         THE COURT:  Okay.

19         MS. DAVIS:  Thank you.

20         MS. CECCOTTI:  Your Honor, I guess that I'm still not

21 clear on the answer to my question as to whether there would be

22 issue preclusion or not under the circumstances.

23         THE COURT:  I don't think directly but you're going

24 to -- I think, that's all.

25         MS. CECCOTTI:  I'm sorry, Your Honor?

1          THE COURT:  You'll learn how I think, but it won't be

2   directly binding on you.  I mean, you can I guess come back a

3   month from now and convince me I should have said something

4   different.  Maybe you'll say - or maybe the debtor will be

5   trying to convince me, I should have said something different

6   when you apply.

7          MS. CECCOTTI:  Your Honor, with that, I'll cede the

8   podium to the people who are really supposed to be arguing now

9   but I may --

10          (Laughter.)

11          MS. CECCOTTI:  I may reserve the right, depending on

12   how you think, to try to get a way --

13          (Laughter.)

14          MR. ANTOSZYK:  All this action, Your Honor, and I

15   haven't said anything yet.

16          Good afternoon, Your Honor.

17          THE COURT:  But the UAW will be listening closely.

18          MR. ANTOSZYK:  Yes, Your Honor.

19          Pater Antoszyk, counsel to Law Debenture Trust

20   Company of New York, Your Honor.

21          Just as a housekeeping matter, there has been a

22   motion to admit me pro hac vice.  I don't know if the Court has

23   acted on it yet, but it has been filed.

24          THE COURT:  That's fine.  You can proceed.

25          MR. ANTOSZYK:  Your Honor, Law Debenture is the

120

1  successor indentured trustee and property trustee for the

2  eight-and-a-quarter junior subordinated notes due 2003 and the

3  adjustable-rate junior subordinated notes due 2003 issued by

4  Delphi Corporation.

5          The aggregate face amount of the notes is $412

6  million.  We have filed a motion on behalf of Law Debenture

7  Trust Company of New York to change the membership of the

8  official committee and the basis of our motion is that the

9  existing committee and the membership of the existing committee

10 of unsecured creditors does not adequately represent the

11 interests of the subordinated bond holders, and therefore, this

12 Court should order the appointment of Law Debenture to the

13 committee as representative of those interests.

14         The circumstances leading up to this motion, Your

15 Honor, I think are undisputed, but they are as follows:

16         These cases, as this Court well knows, were commenced

17 on October 8th of this past year.  These cases are very large.

18  They're complex cases and the debtors and the U.S. Trustee

19 both note the cases will involve a lot of moving parts.

20         The debtors are and will be engaged in divestiture of

21 assets, wind-down of certain U.S. operations, major

22 negotiations with unions which I understand are going on right

23 now, major negotiations with GM governing claims between the

24 parties, and many other matters.

25         The committee is and will be intimately involved with

1    all of these matters and the outcome of these decisions and

2    many, many others that the committee will consider and make

3    will have a major impact, if not determinative of whether the

4    subordinated note holders will receive a small, large, or any

5    dividend.

6            When the debtors filed their cases, they had four

7    general categories of uniquely-positioned creditors.  They are

8    the trade, the employee -- what I group together as the

9    employee pension/wage claims, the $2 billion of subordinated

10   notes, and the -- I'm sorry, $2 billion of senior notes and the

11   $412 million of the subordinated notes.  It was my claim that

12   there might be additional distinctions in those, but those are

13   sort of the broad categories.

14           The subordinated bond holders are one of the debtors'

15   single largest unsecured creditor constituencies.  That by

16   itself, however, is not what makes the position of the

17   subordinated note holders unique, these would be the other

18   members of the committee.

19           The subordinated note holders are uniquely situated

20   because they have the dubious distinction of purportedly being

21   the last in line just above equity.  They're purportedly

22   contractually subordinated to the senior notes and trade and

23   employee claims pursuant to the terms of the governing

24   indenture.  And they are purportedly structurally subordinated

25   to the claims of all other creditors of the subsidiaries

122

1 because the notes were issued by the corporation.

2       Because of the inherent subordinated position, the

3 subordinated bond holders are interested in maximizing value

4 beyond just these other senior claim holders.  Their interests

5 are distinct in that nature.

6       Following commencement of these cases on October 8th,

7 on or about October 20th the U.S. Trustee held a formation

8 meeting and formed a committee of unsecured creditors, as it is

9 required to do under 1102(a)(1) of the bankruptcy code.  U.S.

10 Trustee appointed the following creditors to the committee:

11 four trade creditors, which are Electronic Data Systems

12 Corporation, General Electric Corporation, Flextronics

13 International Asia Pacific, and Freescale Semiconductor; one

14 employee union benefit representative, which is the IUECWA;

15 Wilimington Trust Company, which is the indenture trustee for

16 the senior notes and statutory trustee for the subordinated

17 note holders.

18       However, as we've noted in our papers, its position

19 as statutory trustee is merely ministerial.  It can only accept

20 service of process.  It doesn't represent the interest of the

21 subordinated note holders and, in fact, they filed a statement

22 in connection with our pleading acknowledging that fact.

23       And finally, Capital Research and Management Company,

24 which I refer to as "Cap Re" (phonetic), an institutional

25 investor.  Cap Re holds, according to submissions that it filed

123

with the Court, $530 million in aggregate debt claims against
the estates, of which 500 million is senior notes and only $30
million are the subordinated notes.   Thus, the subordinated
notes represents less than six percent of the Cap Re's
investments in debtors.

So note, in terms of the makeup of the committee, all
of the committee members, all seven of them, hold or represent
claims that are purportedly senior to the interests of the
subordinated note holders.   The committee doesn't just
proportionally represent such senior claims or any senior
relative to the subordinated -- potentially relative to the
subordinated note holders, it is dominated by it, if not
exclusively representative of such potentially senior claims.
None of the current members of the committee hold interests
that are first and foremost aligned with the subordinated note
holders.

This was immediately evident to Law Debenture and, as
trustee for the bonds, it immediately requested -- immediately
following the formation meeting submitted a request to the U.S.
Trustee to appoint it to the committee.   We've attached our
correspondence to our papers.   We advised the U.S. Trustee time
and again that the entire committee consisted of creditors
holding claims allegedly senior to the interest of the
subordinated bond holders, and therefore, the subordinated bond
holders were not adequately represented by the current members

124

1 of the committee.

2       Now simultaneously, like Law Debenture, other

3 creditors also sought appointment to the committee, namely

4 Tyco, UAW as you just heard, and the PBGC.  In response to Law

5 Debenture's and the other creditors' requests, the U.S. Trustee

6 sought the input of the committee and the debtor.  The

7 committee responded but, frankly, gave the request barely what

8 I would calculate as a very short shrift.  Basically, the

9 committee stated that the committee was functioning fine,

10 represented everybody, and the consequence of functioning fine,

11 it represented the interest of all creditors.

12       Law Debenture concluded that, based upon the rather

13 vague response by the committee for input by the U.S. Trustee,

14 we concluded that they were probably relying upon Capital

15 Research to represent the interest of the subordinated note

16 holders, because we concluded that there were no new holders of

17 subordinated claims.  And based upon that, we advised the U.S.

18 Trustee that we thought that because of their dual position and

19 heavily-weighted position in the senior notes, that Capital

20 Research could not adequately represent and was inherently

21 conflicted in its representation of both the senior note

22 holders and the subordinated note holders.

23       The debtors, on the other hand, took a month to

24 respond to the U.S. Trustee's request for input.  Ultimately

25 the debtors supported the request of the UAW and PBGC, but

125

1   opposed the request of Tyco and Debenture.  The debtors took

2   the view that all of the requesting creditors were adequately

3   represented on the committee, but for its own strategic

4   reasons, nonetheless supported the appointment of UAW and PBGC.

5           With respect to Law Debenture, they stated that

6   Wilmington Trust and Capital Research could adequately

7   represent the interests of the subordinated note holders.  As I

8   indicated, Wilmington Trust could not represent those interests

9   because it didn't have any alignment whatsoever and Capital

10  Research was inherently conflicted.

11          The request of the petitioning creditors were denied

12  by the U.S. Trustee except Law Debenture, which continued under

13  advisement with the U.S. Trustee.  We tried to contact the U.S.

14  Trustee, we tried to get a decision out of it, but a lot of

15  time has gone by since our request was pending, in fact, two

16  months have gone by.  And this Court knows better than myself,

17  a lot has happened in this case.  So on December 21st, not

18  having received any decision and effectively viewing it as a

19  pocket veto of our request, we filed our motion to seek

20  appointment to the committee.  And as I said in our motion, we

21  assert that the committee as a whole is not representative of

22  the subordinated interests and Cap Re in particular cannot

23  adequately represent the interests of the subordinated holders

24  because of its overwhelming holdings in the senior notes.

25          We also filed a supplemental pleading that noted that

126

1 Cap Re also held a substantial equity position in General

2 Motors which, on its face, at the time, was a further, in our

3 view, disqualifying factor.

4          THE COURT:  Can I interrupt you for a second?  When

5 you say Cap Re holds "X" and Cap Re holds "Y," is it really Cap

6 Re or are they different funds?  I know a lot of hedge funds

7 have literally different funds and they make a big deal about

8 the fact that they keep those separate and they have different

9 duties to the investors in those funds.

10         MR. ANTOSZYK:  I would let Capital Research respond.

11 My understanding, it's one entity, but it's hard -- I'd have

12 to go back and look at the statement in particular.

13         THE COURT:  Okay.

14         MR. ANTOSZYK:  However, I would note in their

15 statement they didn't say -- I don't believe that they said

16 they were held by different entities and they didn't say in the

17 statement filed that, as a consequence of holding in different

18 entities, there was this distinction that they could draw

19 between the two, as they did with their equity position.  In

20 their statement they said they had established an informational

21 wall to protect against the conflicts that could arise as a

22 result of their equity position and debt position.

23         THE COURT:  Fine.

24         MR. ANTOSZYK:  So I'm just saying there was no

25 disclosure in that regard.

1          U.S. Trustee has opposed the appointment to the

2    committee and I took the opposition as a denial of our request.

3    It wasn't clear to me whether, with the colloquy that just

4    occurred with the Court, whether it's a denial or not denial,

5    but it sure looks like a denial in their opposition.  They

6    oppose it, as does the committee and the debtors on two basic

7    grounds:

8          One, the committee adequately represents -- the

9    committee as a whole adequately represents the interests of the

10   subordinated bond holders because its members generally owe a

11   fiduciary duty to all creditors.

12         And, two, Capital Research, as holder of subordinated

13   notes, can represent the interests of the subordinated notes,

14   notwithstanding the conflict of interest existing as a result

15   of its simultaneous position to the senior and the sub debt.

16         As I mentioned, in addition, Wilmington Trust filed

17   a statement and Cap Re filed a statement along the lines I just

18   described to you.

19         The first sort of gatekeeper issue which you touched

20   upon before I started speaking is the ability of the Court to

21   review the decisions of the U.S. Trustee and the composition of

22   the committee, and more particularly, the adequacy of

23   representation of the committee.  And I don't think, Your

24   Honor, that there's any serious question that this Court has

25   the power to review the decision of the U.S. Trustee to

128

1 determine the adequacy of representation of creditors on the

2 committee.

3 While Section 1102(a)(1) vests the administrative

4 function of appointing committee members in the U.S. Trustee,

5 this was a change from prior law in 1986 where the court

6 approved the creditors' committee.  In 1986 Section 1102®),

7 which provided courts could change the composition if

8 committee's membership did not adequately represent the claims

9 and interests of creditors was deleted.  This was all done at

10 the time the U.S. Trustee program was put into place.  1102®)

11 was repealed and 105 was enacted at the same time.

12 Consequently, following that there was some question

13 whether, particularly after the repeal of 1102®), the court had

14 the authority to review committee appointment by the U.S.

15 Trustee.  However, law courts have since concluded,

16 particularly courts in this circuit, however, and I don't think

17 that any of the objecting parties would necessarily disagree,

18 the bankruptcy courts have the power to review decisions of the

19 U.S. Trustee regarding the composition of the committees to

20 determine whether there's adequate representation.

21 As stated by Judge Garrity in Barney's cited in our

22 papers, notwithstanding the repeal of 1102®), most courts hold

23 that upon timely application the bankruptcy court can review

24 the  U.S. Trustee's decisions regarding the size and/or

25 composition of an official committee.  This sentiment has been

129

1 echoed by virtually every bankruptcy court in this district

2 including most recently Judge Gonzalez in Enron.

3          In Enron Judge Gonzalez, a former U.S. Trustee

4 himself, stated that it stands to reason that the determination

5 of adequate representation is less a legal determination,

6 concluded that was vested with the court.

7          This view is further supported by the restoration of

8 the explicit provision removed in 1986 of the 2005 bankruptcy

9 amendments the new 1102®) -- (a)(4).  Our understanding, it's

10 not effective for this case, however, it is indicative of

11 congressional intent.  The restoration of this provision is

12 strong evidence of congressional intent not to eliminate the

13 court's authority to review and change committee composition,

14 particularly given the weight of the party favoring its review.

15          Although the cases are pretty uniform, I think, in --

16 with respect to the power of the court to review committee

17 composition, there has been in the past a split of authority

18 undoubtedly with regard to the standard of review.  Some courts

19 review it under abuse of discretion standard, which is what the

20 U.S. Trustee and the committee and the debtor would have this

21 Court adopt.  Other courts have adopted a de novo standard.

22 Some courts have said, well, it depends on what section you

23 look at, whether it's an exercise under 1102(a)(1) or whether

24 it's under 105 determines whether or not it's a de novo or

25 abuse of discretion.

130

1      Our view is that several courts in this jurisdiction
2  have determined that the issue of adequacy of representation --
3  the issue of adequacy of representation is -- from whatever the
4  remedy might be -- is a de novo determination.  That seems to
5  be the weight regarding this circuit.  It was adopted by the
6  Texaco case, the Enron case, and several others that we've
7  cited for you in our brief.
8      It's consistent -- that standard is consistent with
9  the historical rule of the court to be the final arbiter of the
10  adequacy of representation and consistent with congressional
11  intent as previously expressed and as presently expressed under
12  the new code.  However, you know, frankly, whether this Court
13  reviews this under a de novo standard or an abuse-of-discretion
14  standard, we think that the relief requested by us should be
15  awarded by the Court.
16      Moreover, as noted by numerous courts, part and
17  parcel of the power to review is an inherent power to give a
18  remedy.  An inherent power to give a remedy, whether contained
19  in the numbers of 1102(a)(2) or enabled by 105 exists to modify
20  the membership of the committee.  And again, this is reinforced
21  by the newest amendments to the code.
22      So in sum, we believe that this Court has the
23  authority to review de novo, or at least under an abuse-of-
24  discretion standard, the decisions of the U.S. Trustee
25  regarding the composition of the committee and, if necessary,

131

1  to change its membership to insure adequate representation and

2  address inadequacy of representation.

3          Now having said that, turning to the substance of our

4  motion, you know, each of the parties lay out basically the

5  same standard when courts are reviewing whether there's

6  adequate representation on a committee and we point to three

7  factors that have been identified by the courts, including the

8  courts in this circuit:  The ability of the committee to

9  function, the nature of the case, and the desires of other

10 constituents.  Each of those factors militate appointing Law

11 Debenture to the committee.

12         In this case, the committee states in its opposition,

13 and it also stated in prior letters to the U.S. Trustee, that

14 the committee is "well-balanced and functioning extremely

15 well."  U.S. Trustee accepts these statements as justification

16 of her decision not to appoint Law Debenture to the committee

17 and notes in her opposition in support of the fact that the

18 committee is functioning just fine, that the committee is

19 participating in all aspects of the case.  That's in Paragraph

20 29 of her opposition.

21         It's understandable that the committee is now

22 accustomed to its current membership and does not want to alter

23 its voting composition, as stated by the committee in its

24 letter to the U.S. Trustee.  However, the committee's collegial

25 working relationship and participation in this case does not

132

1  satisfy the legal requirement, the legal requirement that the

2  committee adequately represent the diverse interests in this

3  case; that is, a collegial active committee doesn't equate to a

4  functioning committee in a sense of adequate representation.

5       As Judge Gonzalez noted, a proper functioning

6  committee goes beyond that.  And he said the problem is that a

7  committee may function just fine, reach a consensus on all

8  issues, and still not adequately represent a particular group,

9  which is exactly the situation we have here.  To be properly

10  functioning, a committee must provide meaningful voice to all

11  creditor classes, not all creditors, all creditor classes.

12       As often stated by courts, and I quote the court in a

13  most recently reported decision, which is the In re:  Garden

14  Ridge Corporation case, a 2005 case out of Delaware, which is

15  2005 Westlaw 523129:  "As a general rule, adequate

16  representation exists through a single committee so long as" --

17  here's the key -- "the diverse interests of the various

18  creditor groups are represented on and have participated in the

19  committee.  Further, the creditor groups are adequately

20  represented if the interests of each group have a meaningful

21  voice in the committee relative to their posture in the case,"

22  and they cite a series of cases that previously held that.

23       The U.S. Trustee appears to agree with this standard,

24  as set forth in her opposition, however, while agreeing with

25  this standard, the U.S. Trustee then proceeds, in our view, to

133

1   ignore it as it pertained to the subordinated notes.  And

2   here's the crux of it, I think.

3            The U.S. Trustee states in opposition that it decided

4   not to appoint Law Debenture to the committee because there is

5   no qualitative difference, in the U.S. Trustee's view, between

6   the claims of the subordinated note holders and all other

7   claims held by the members of the committee.  Apparently, in

8   the view of the U.S. Trustee, the subordinated bond holders'

9   claims have unique origin or no unique priority which would

10  distinguish their claims from the claims of the employees, the

11  trade, the union, or even the senior note holders, and entitle

12  them to a distinct representative on the committee.

13           Instead, the subordinated note holders, in the U.S.

14  Trustee's view, should rely upon the existing committee

15  membership, whose claims are indistinguishable, as far as she

16  is concerned, from those of the subordinated note holders for

17  representation.

18           I suspect, Your Honor, that many a subordinated --

19           THE COURT:  Well, she doesn't go -- that's not what

20  she says.  She doesn't say they're indistinguishable, she says

21  they're --

22           MR. ANTOSZYK:  She says there's no qualitative

23  difference and I guess you're correct.  I've interpreted that

24  to mean that -- what that means when you say "no qualitative

25  difference" is that there's not distinctive characterization --

134

1 no distinctive characteristics between the subordinated note

2 holders' position and those of all the other members of the

3 committee.  That's how I've interpreted it and if I've

4 misinterpreted, that's fine, but I think that's what I took

5 away from the words "no qualitative difference."

6       I suspect that, as I said, the subordinated holders

7 wish that were the case.

8       THE COURT:  Is there any evidence that the interest

9 of the subordinated note holders are not being considered

10 actively by the committee?  I mean, isn't it your burden to

11 show that, other than just saying that we're different?

12      MR. ANTOSZYK:  Well, no.  No.  That is a -- and

13 here's --

14      THE COURT:  Particularly given Cap Re?

15      MR. ANTOSZYK:  No, and here's the difference.  The

16 committee cites a litany of cases which say if you are alleging

17 a conflict of interest, you have a burden of showing an actual

18 existing conflict of interest which would be debilitating.

19 Those cases were all removal cases.  They were to remove those

20 -- they were removal of creditors from the committee.

21      There's a difference, I think, between removing a

22 creditor from the committee for an actual conflict of interest

23 and having adequate representation, a meaningful voice on the

24 committee.  A creditor that has an actual conflict of interest

25 or is alleged to a conflict of interest and is being removed

135

1  from the committee doesn't raise the issue of representation

2  necessarily of the entire creditor body or a particular

3  creditor constituency.

4         In this case, we're alleging that a particular

5  creditor constituency, the subordinated note holders, are not

6  adequately represented, cannot be adequately represented by Cap

7  Re because of it overwhelming interest in the senior notes.  It

8  is, by definition, debilitating.

9         Under what circumstances -- I guess the way we look

10  at it is, under what circumstances would Cap Re put the

11  interest, its very small, less than six percent of its

12  investment, put those interests ahead of the interests of its

13  senior --

14         THE COURT:  I think those investors would be pretty

15  angry if they did.

16         MR. ANTOSZYK:  Yeah, the investors of the senior

17  notes would be --

18         THE COURT:  No, the Cap Re investors.  Go ahead.

19         MR. ANTOSZYK:  Well, the investors of Cap Re, if they

20  put the interests of this minor investment ahead of its very

21  significant investment, would be legitimately upset, I agree,

22  which bears on our point.  What is Cap Re going to do from a

23  reasonable business person's perspective?  What are they

24  logically going to do?  And logic tells us that they're going

25  to represent -- they're going to advocate, first and foremost,

136

1  the position of their largest, by far, investment position,

2  which is in the senior notes, to the detriment of the

3  subordinated note holders.

4        So let me put it another way.  Nobody would debate

5  the fact that if the entire committee was made up of trade

6  creditors, that that wouldn't adequately representative of the

7  creditor constituency.  And I don't think anyone would debate

8  if the committee was made up of entirely senior note holders

9  that that would be adequately representative of the creditor

10 constituency.

11       We're taking the position that the fact that there is

12 -- it's entirely made up of senior -- potentially senior

13 claims, even in regards to Cap Re, which is overrated in that

14 position, that it's not representative of the interests of the

15 subordinated note holders.  And in fact, there's one case, it

16 was the Value Merchants case which we cite in our brief, which

17 held that a committee -- that held that a U.S. Trustee abused

18 his discretion for failing to appoint an indenture trustee

19 representing subordinated note holders to a committee which

20 consisted solely of trade creditors and finance creditors, I

21 believe, in that case.  So the Court may -- you have to have

22 this major creditor constituency on the committee.  They

23 shouldn't have to -- inherently the court recognized that the

24 mere fiduciary duty of the committee is not sufficient to give

25 a meaningful voice to that creditor constituency.

137

1   As I mentioned, Cap Re's interests are debilitating.

2   Their holdings of the senior --

3   THE COURT:   I got that part.

4   MR. ANTOSZYK:   Okay.   Now notwithstanding Cap Re's

5   debilitating conflict, U.S. Trustee determined, we think,

6   erroneously that subordinated note holders should take solace

7   in the fact that the members, including -- that all members of

8   the committee, including Cap Re, have been advised of their

9   fiduciary duty and that no one stepped forward to indicate that

10  they cannot exercise that fiduciary duty.   And they're

11  apparently relying upon the fact that creditors will step

12  forward and say, we can't sufficiently exercise our fiduciary

13  to represent all creditors in the estate, however, that's not a

14  satisfactory solution.   That's not an answer.   The problem is

15  either we're represented on the committee or we're not

16  represented on the committee as a major, major constituency.

17  Our point, Your Honor, is even if an argument could

18  be made that Cap Re could conceivably manage this conflict,

19  which we don't think it could, this issue goes to the heart of

20  the entire bankruptcy process in this case.   It is the

21  integrity of the committee process.   Adequate representation of

22  the committee is a fundamental notion.   It's designed to

23  balance the delicate representative interests of the various

24  creditor interests and to force the subordinated note holders

25  to rely upon Cap Re, an entity faced with an obvious inherent

138

1   conflict, undermines the entire fairness of the process.

2         This is unlike, by the way, many of the other cases

3   in which creditors or creditor representatives seek either

4   additional committees or additional membership on the

5   committees.  Many of the cases cited in opposition are those

6   cases in which creditors were already represented on the

7   committee.  There were already representatives of the

8   subordinated note holders on the committee and they sought to

9   exercise a degree of leverage in the case, either by having

10  additional representatives on the committee, or a separate

11  committee of just that constituency established.  That's not

12  what we're talking about here.

13        U.S. Trustee and the debtors confuse the issues by

14  advancing arguments that are also red herrings, and I'll just

15  touch upon the other factors briefly.  The debtors and the

16  committee state that Law Debenture simply wants to be on the

17  committee to advance its particular agenda.  U.S. Trustee

18  echoes this concern, stating their opposition that committees

19  are not designed to provide a speaker's forum for a particular

20  creditor group.

21        We agree, we do have a particular agenda, and that is

22  to advance and advocate meaningful interest of the subordinated

23  note holders, which we do not believe is the case on the

24  existing committee.  The committee ominously notes that, in the

25  end of their opposition, that the appointment of Law Debenture

139

1  to the committee could have "unfortunate consequences in the

2  case."

3        Undoubtedly, it will be mildly disruptive.  We're

4  going to have to be brought up to speed.  We're going to have

5  to begin to participate in the committee, but that's the nature

6  of participating in the committee and having a meaningful

7  voice.

8        Law Debenture should have been on the committee from

9  the get-go.  It has, after all, been seeking appointment since

10 day one and we're only a couple of months into the case, so the

11 disruption can't be that dramatic.  Nonetheless, under these

12 circumstances, the forebodiance by the committee should not

13 sway this Court one way or the other.

14       U.S. Trustee also argues that the subordinated note

15 holders are not disenfranchised, based upon the example given

16 by Judge Gonzalez in Enron.  Judge Gonzalez noted that

17 disenfranchisement would occur where a committee is so

18 dominated by one group of creditors that a separate group has

19 virtually no say in a decision-making process.  We agree that

20 domination by one group of another group of creditors on a

21 committee would constitute disenfranchisement.  If that's the

22 case, then it must also be true that the exclusion of one

23 creditor class from the committee also constitutes

24 disenfranchisement.

25       Finally, the U.S. Trustee notes that the subordinated

140

1   note holders, Law Debenture, is not without alternatives.  They

2   could independently file motions, we could participate in the

3   case, but that's no substitute for having the benefit of the

4   committee, partaking in the committee deliberations, have the

5   benefit of the timely information of the committee and the

6   benefit of the committee professionals in the case.  So the

7   subordinated note holders should have the same benefits of

8   every other creditor constituency.  That argument could be used

9   to (indiscernible) any creditor constituency from the case.

10          So, Your Honor, all the factors, when considered, we

11  think in favor of appointing Law Debenture to the committee.

12          THE COURT:  Okay.

13          (Counsel confer.)

14          MS. DAVIS:  Your Honor, Tracy Hope Davis for Deirdre

15  Martini, the U.S. Trustee.

16          Your Honor, I just really want to point out first and

17  foremost that any issue concerning integrity and the

18  appointment of creditors' committees is very troublesome to our

19  office because the U.S. Trustee takes very seriously

20  appointments of creditors' committees.  And as Your Honor is

21  aware, we are integrally involved in every major case that has

22  been filed in this district and the U.S. Trustee has been

23  involved in the appointment of creditors' committees in those

24  cases.  And I would note to Your Honor that there could be no

25  more -- this case could be no more complex than the cases, for

141

1   instance, <u>Enron</u>, which Your Honor is being asked to consider in

2   deciding whether or not to modify the decision of the U.S.

3   Trustee; the <u>Adelphia</u> case, the <u>WorldCom</u> case, and numerous

4   other cases similar to it.  And I'll note that in those cases,

5   requests of this kind for modification of the committee, for

6   appointment of additional committees have been denied.

7            Your Honor, in this instance the U.S. Trustee has

8   filed an opposition to the request of Law Debenture which seeks

9   an order from this Court compelling its inclusion on the

10  creditors' committee and I just want to highlight the salient

11  points of our pleadings.

12           I think the most important point is that this case

13  was filed on October 8th, not October 17th, and therefore, in

14  our view, the Bankruptcy Abuse, Prevention and Consumer

15  Protection Act of 2005 and the Section 1102(a)(4), which would

16  suggest that the Court has the authority to modify compositions

17  of committee is inapplicable here.  For that reason, Your

18  Honor, we would request that Your Honor adhere to Section 1102

19  of the bankruptcy code and as well the cases that have sought

20  to identify and resolve issues concerning composition of

21  creditors' committees.

22           Now taking into consideration Section 1102®) of the

23  bankruptcy code, which, as counsel has articulated, was

24  modified for the purpose of determining that the U.S. Trustee

25  and not the court have the authority to modify creditors'

142

1  committees.  In our view, it just makes clear that composition

2  of the creditors' committee, at least that administrative

3  function, should lie with the U.S. Trustee.

4      Your Honor, in this case on October 20th the U.S.

5  Trustee appointed an official committee of unsecured creditors

6  and I remember when Ms. Martini stepped away from the podium

7  after appointing the committee -- before appointing the

8  committee, she articulated that everyone would walk away

9  equally unhappy here.  She basically said that some people

10  would be happy and others would be unhappy.  Clearly, by virtue

11  of the motion that you're dealing with right now, there are

12  some people who are dissatisfied with the U.S. Trustee's

13  decision.

14      But one thing that can be made clear, Your Honor, is

15  that since the U.S. Trustee appointed this committee, she has

16  been involved on a daily basis, she and her staff, with

17  communicating with, if not creditors, committee counsel, with

18  the debtor, and there is no evidence here that the decision of

19  the U.S. Trustee to compose the committee as it stands was

20  improper, in abuse of discretion or arbitrary and capricious.

21      For that reason, Your Honor, we -- and for the reason

22  articulated in the cases which, in our view, interpret Section

23  1102®) of the bankruptcy code as giving the inherent authority

24  in the U.S. Trustee to carry out the administrative function of

25  appointing a creditors' committee, we think Your Honor should

143

1  decline to invoke your authority under 105 to basically modify

2  her decision.

3          Now if Your Honor is of the view that you should

4  exercise jurisdiction over this matter and should basically

5  reconsider the U.S. Trustee's decision, we think the standard

6  that the Court should entertain would be that that's

7  articulated in the Barney's case, abuse of discretion or

8  whether or not the decision was arbitrary and capricious.

9          A decision on whether the U.S. Trustee has acted

10 arbitrary and capriciously would have to be based on erroneous

11 conclusions of law.  The record in this case, in our view, Your

12 Honor, does not support a finding that the U.S. Trustee's

13 decision was based on an erroneous conclusion of law.  In fact,

14 Your Honor, as counsel has conceded, although we disagree on a

15 couple of aspects of this, the U.S. Trustee did appoint a

16 subordinated note holder to the creditors' committee.  That

17 would be Cap Re.

18         Your Honor, in determining that Cap Re -- strike.

19         Your Honor, when Cap Re had sent a letter to the U.S.

20 Trustee asking the U.S. Trustee to reconsider her decision as

21 to whether or not it should be appointed to the committee, the

22 U.S. Trustee, as is her practice, sent letters to the debtor,

23 to the creditors' committee, and as well that's not what her --

24         THE COURT:  When -- you said "Cap Re."  You mean --

25         MS. DAVIS:  Capital Research Management.

144

1          THE COURT:  You're referring to their letter?

2          MS. DAVIS:  I'm sorry?

3          THE COURT:  I'm sorry.  You're referring to their

4 letter?

5          MS. DAVIS:  No, I'm referring to the letter of Law

6 Debenture.  Excuse me, Your Honor.

7          THE COURT:  Okay.

8          MS. DAVIS:  When the U.S. Trustee received Law

9 Debenture's letter requesting that they be added to the

10 creditors' committee, the U.S. Trustee sent a letter out to the

11 creditors' committee counsel and as well to the debtor and as

12 well, as is her practice, she continued to render thoughts and

13 as well to consider the facts with respect to their request.

14 Clearly when she issued a December 14th letter, that decision

15 had not yet been made, however, Cap Re filed this motion to

16 circumvent the authority --

17          THE COURT:  You mean Law Debenture?

18          MS. DAVIS:  I'm sorry.  I keep saying that.  I

19 apologize, Your Honor.  Law Debenture.

20          THE COURT:  That's okay.

21          MS. DAVIS:  Cap Re's just on my mind, although

22 they'll have a chance to speak in a moment.

23          Your Honor, the most important thing to point out is

24 that nowhere in counsel's papers have they made any allegations

25 that the U.S. Trustee acted haphazardly; that she failed to

145

1  timely address their concerns; that she did not take into

2  consideration factors that were raised both at the time the

3  case was filed, that Cap Re submitted its initial solicitation

4  ballots, or the information that she was supplied to by

5  debtor's counsel.

6       THE COURT:  Let me ask you --

7       MS. DAVIS:  I said Cap Re again.  Pardon me, Law

8  Debenture.  They're on my mind.

9       THE COURT:  That's fine.  I think what this boils

10 down to is Law Debenture's contention that, notwithstanding the

11 administrative function that Wilmington Trust performs, and the

12 fact that Cap Re does hold subordinated debt, neither of those

13 two entities has any real -- any meaningful interest in serving

14 as a voice for the sub-debt.  And one thought that certainly

15 crossed my mind is whether, when the U.S. Trustee was

16 appointing the committee, that possibility was evident.

17      When you look at Wilmington Trust's list of roles,

18 you can certainly form the view that, contrary to the statement

19 they filed recently, they did have some duties to the sub-debt

20 and could serve as a voice for them.  Similarly, Cap Re, when

21 one looks at their holdings, you might initially have taken the

22 view that, you know, they're perfectly able to represent the

23 interest of the sub-debt to the extent the interest of the sub-

24 debt needs to be specifically represented on the committee.

25      And so my question is, did -- is the -- have the

146

1  facts, as they've been developed, legitimately surprised the

2  trustee in the sense that, you know, maybe she didn't

3  appreciate at the time that Wilmington Trust really doesn't

4  have anything to do with the sub-debt, for example?

5       MS. DAVIS:  No, I don't think so, Your Honor.  In

6  fact, it was a very long organizational meeting that the U.S.

7  Trustee had.  We had numerous meetings with debtor's counsel

8  prior to the organizational meeting.  We obtained from the

9  debtor extensive information up to the last moment concerning

10  the breakdown of debt here, concerning the composition of the

11  unsecured creditor body, and the U.S. Trustee took all of that

12  information into consideration in making a decision.  In fact,

13  where there was ever an issue of a conflict or a disagreement,

14  the U.S. Trustee actually asked certain parties to come in.

15  There were frequent runnings back and forth between the debtor,

16  between the actual creditor to insure that the U.S. Trustee was

17  taking into consideration all of the breakdowns in the debt,

18  the unsecured debt in this case.

19       THE COURT:  Okay.

20       MS. DAVIS:  So to answer Your Honor's question.  It

21  only flows from that, Your Honor, regarding whether or not, in

22  the U.S. Trustee's -- any decision of the U.S. Trustee not to

23  appoint Law Debenture to the committee, whether or not she has

24  taken into consideration representation on the committee.

25       THE COURT:  Well, when you decide whether it should

147

1  be Law Debenture or someone else, just when you bore it down,

2  how are the interests specifically of the sub-debt represented

3  on the committee?

4          MS. DAVIS:  In our view, Your Honor, they are

5  represented by Cap Re.  And, Your Honor, in our view, based

6  upon the responses that were filed by Cap Re, as well as the

7  evidence that's before Your Honor that was before the U.S.

8  Trustee, there cannot be a finding that subordinated note

9  holders are not protected or would not be represented by this

10 committee.

11         Your Honor, this case is four months old and in the

12 four months this case has been pending, the creditors'

13 committee has had to deal with many substantive issues in this

14 case and we understand there will be many ahead of us, but one

15 of the most important issues, Your Honor, that is going to be

16 before the creditors' committee at some point would be the

17 formulation of a plan of reorganization.  And I would submit to

18 Your Honor that at this juncture in the case, there have been

19 no issues that have been presented to the creditors' committee

20 for it to have any belief that Cap Re or any of the other

21 members would breach their fiduciary duties or would have a

22 conflict with respect to determining whether or not there would

23 be adequate value returned to the subordinated note holders,

24 the senior note holders, and to the other creditors in this

25 case.

148

1          I think that's very important for Your Honor to

2    consider in determining whether or not there's adequate

3    representation here.  Your Honor, one of the most important

4    issues that goes to adequate representation is whether or not

5    the fiduciary duties of creditors can be satisfied.  And as

6    Your Honor can discern from the pleadings that have been filed,

7    I think in support of the U.S. Trustee's objection or

8    consistent with the U.S. Trustee's objection, there isn't any

9    evidence that any of the creditors that are currently serving

10   on the creditors' committee would breach their fiduciary duty

11   to Law Debenture or any of the other creditors here.  In fact,

12   Cap Re has gone so far as to communicate with the U.S. Trustee

13   to prepare a -- I would say an information wall, so they are

14   very cognizant and aware of their fiduciary duty to all of the

15   creditors in this case.

16          THE COURT:  The information wall is between the stock

17   holding and the debt holding, correct?

18          MS. DAVIS:  Your Honor, I'm just saying that it's

19   evidence of how serious they take their role in the case and I

20   think that's very important to point out.  And that's one of

21   the most crucial points, I think, to raise here.

22          Your Honor, I think it sets a very bad precedent for

23   a party who is not appointed to a creditors' committee to run

24   to court when they don't get the response they want or as

25   quickly as they want from the U.S. Trustee.  I think that, by

149

1   virtue of this motion itself, the estate has incurred extensive

2   expenses, perhaps unnecessary here, and I think that, at a

3   minimum, the U.S. Trustee should be afforded her right to

4   exercise her administrative function.

5            And for those reasons, Your Honor, we request that

6   the Court please decline the -- deny the motion of Law

7   Debenture to serve on the creditors' committee.  Thank you.

8            THE COURT:  Okay.

9            MR. ROSENBERG:  Your Honor, I am not going to address

10  the underlying issue here of whether this Court has power to

11  grant the motion or, if so, pursuant to what standard for two

12  reasons.  Number one, I suspect that the Court has already

13  decided that issue in its own mind and, number two, more

14  importantly, I think that regardless of what that decision is,

15  the result is the same.  Under any one of the three issues, no

16  power, de novo, abuse of discretion, the result is the same,

17  the motion should be denied.

18           I find that -- I find two real ironies in the Law

19  Debenture position that should be pointed out.  Counsel stood

20  up here and articulated at great length as to why, as a

21  subordinated creditor, the position is different, and that I

22  can't help but note that the motion papers very, very carefully

23  preserved the right to take the position that they're not

24  subordinated at all.  Well, are they or aren't they?

25           I would think that given their unique inference to

150

1  the position on the committee that's being articulated here, at

2  least they would have the judgment of saying, yes, we are

3  indeed subordinate, because if they're not, why are we here?

4        Number two, to me it's very ironic that in the guise

5  of an argument of representativeness, what we're really hearing

6  parochialism.  The committee is not representative of the

7  parochial position that we want to articulate.  And, Your

8  Honor, I think that the entire argument goes against the whole

9  thrust of what a committee is supposed to be and what

10 representativeness actually means.

11       Now the position is very short on fact and very long

12 on innuendo.  The position seems to be that the committee is

13 not capable or desirous of exercising its fiduciary duty to all

14 creditors, including subordinated creditors, if there are any,

15 which, of course, the moving party isn't conceding.  There's

16 just no basis in fact for that position and I think it is

17 noteworthy that not once in the many, many important issues

18 that have come up in this case -- I should say not ones that I

19 can think of, just in case I'm corrected -- has Law Debenture

20 filed a pleading that says the position that the committee is

21 taking is wrong or we disagree with it.  That hasn't happened,

22 so where is the evidence that the committee is not properly

23 representing all creditors?

24       Where is the evidence that the committee has ever

25 taken a position that suggests less of maximization of value

151

1  for all creditors in this case, maximization of value of the

2  estate?  And where, finally, is the evidence that Cap Re, with

3  a thirty-million-dollar investment in the subordinated debt,

4  has not fully considered the interests of that debt in the

5  committee deliberations and in the committee decision-making

6  process?  The fact that it has another claim?  Where's the

7  evidence that it has ever pushed the other claim to the

8  detriment of the subordinated claim?

9          And, Your Honor, I'm not even comfortable making that

10  argument because it goes against my first point, which is these

11  are parochial interests and that's not the way a committee is

12  supposed to function anyway.  We're talking about value

13  maximization for everybody and there is no evidence that that

14  hasn't been the case in every single one of the committee's

15  deliberations, in every single one of the committee's decision.

16          But, since it keeps coming up, and since there is so

17  much unfortunate and unfair focus on Cap Re, I'll join the

18  chorus and say where is the evidence that they have ever done

19  anything other than exactly what they should, consistent with

20  their fiduciary duty?  For all of those reasons, Your Honor, I

21  think the motion should be denied.

22          THE COURT:  Okay.  Thank you.

23          MR. BUTLER:  Your Honor, I was going to try and

24  address three or four basic points and sit down.

25          First, I agree with Mr. Rosenberg that no matter what

1 standard you apply, de novo, Section 105 as sort of the <u>Hill</u>

2 standard, or any other standard the U.S. Trustee might suggest,

3 that this application ought to be denied under any of those

4 standards.

5          The debtors happen to believe that the standard

6 that's appropriate here is the sort of Section 105/1102

7 standard when you look at the case law because we do agree with

8 the movants that <u>Hill</u>, <u>Barney's</u>, and <u>Enron</u> are instructive and

9 the case law is instructive here.  It really is sort of an

10 abuse of discretion, arbitrary and capricious, and we would add

11 a third element, interest of justice, those kinds of approaches

12 and considerations for the Court are, in fact, we think

13 reasonable to consider.

14          But when you look at this process, I think you have

15 to look at the process that's occurred here.  First of all, a

16 creditors' committee is not a Noah's ark.  You don't take two

17 of every species, put them on the ark, and close the door and

18 say that's the appropriate creditors' committee.  That's not

19 what congress intended, that's not what the statute says.  It

20 just isn't what's required here.

21          What's required is the U.S. Trustee, at least in the

22 (indiscernible) environment, that the U.S. Trustee exercise a

23 process that's reasonable in order to formulate a decision.

24 And, you know, one of the worst-kept secrets in this case is

25 the fact that the debtors believe that the U.S. Trustee should

153

1  have appointed the UAW and the Pension Benefit Guaranty
2  Corporation to the committee.  Everybody in this courtroom I
3  think knows that.  We were vocal about it at the organizational
4  meeting.  We have been vocal about it throughout the case and
5  we think it's important and we will stand and support the UAW's
6  application next month.

7            Having said that, I think it's useful to look at
8  Exhibit K to the movant's motion, which they included our
9  letter to the trustee, because I'd like you to ponder the fact,
10 Your Honor, that the debtors were so, you know, frankly hell-
11 bent on supporting those two major entities, why is it that we
12 would write a letter that went into painstaking detail
13 expressing the debtor's view that the U.S. Trustee did not
14 abuse her discretion and that she did not act in an arbitrary
15 and capricious manner.  That would seem to fly in the face of
16 one of our goals in the case.

17           The reason for it is that she did not and in these
18 cases you have to stand up and say the right thing.  And the
19 right thing in these cases, in the process, was -- I got to
20 tell you, because I was a participant in it.  It was a
21 painstaking process.  The amount of information that Ms.
22 Martini's office asked and Ms. Davis and Ms. Leonard demanded
23 of us over a ten-day period was exhaustive.  I mean, it was
24 reams of information and they required analyses.  We had many,
25 many telephone conferences where they asked to look at slicing

154

1  up creditors different ways, looking at different entities,

2  looking at different business lines so they could get an

3  appreciation.  They required that the notice go out to many,

4  many more people than would normally be required.  It went out

5  in the hundreds.  They received over 100 questionnaires back

6  from people with information.  They asked us, after they got

7  the questionnaires, dozens of questions and required us to

8  provide additional information to them.  They -- I think anyone

9  who attended the organizational meeting on October 17th at the

10 Marriot Marquis, which was a completely-full ballroom with

11 three or 400 people in it, and a selection process that went on

12 for hours and hours after that, and the kinds of interviews

13 that the U.S. Trustee did of individual creditors, to suggest

14 that the process, even though it did not necessarily address

15 all of the debtor's desires, that the process was arbitrary or

16 capricious or that there was a discretion abuse, there's just

17 not a scintilla of evidence in this record, nor could there be,

18 that that is the case here.

19         And so it's important when someone raises the

20 question of the integrity of the process, regardless of what

21 our parochial interests in the debtors may be because we think

22 the case would be better if the PBGC and the UAW were on the

23 committee, we need to stand up and say to Your Honor even

24 though we believe that, the fact of the matter is to suggest in

25 any paper that the U.S. Trustee abused her discretion is just

155

1    completely inappropriate.

2              The other thing we wanted to indicate here, because I

3    was concerned a little bit about the argument here and the

4    innuendo in the paper, there seems to be a suggestion that the

5    fact that there's a collegial active committee, I think the

6    quote I wrote down was the fact that thee's a collegial active

7    creditors' committee doesn't mean that there's a functioning

8    committee.  I'm prepared to get on the stand and give personal

9    testimony, Your Honor, about just how functioning this

10   committee is.

11             (Laughter.)

12             THE COURT:  I think Mr. Antoszyk's point was that

13   people can function very smoothly among themselves and maybe

14   even function best if they just ignore someone who's not on a

15   committee, but then that committee is not working.  And I

16   guess, going back to your Noah's ark, I was actually using the

17   war movie analogy.  You know, you have a guy from Brooklyn and

18   a guy from Oklahoma and a guy from LA in the unit.

19             Isn't there some of that requirement in the adequacy

20   of representation requirement that you actually have a spread

21   of the various constituencies?

22             MR. BUTLER:  Your Honor, in a general matter, but not

23   to a specific parochial point of view.  For example, Tyco

24   Electronics filed a request and they're quite right.  The kind

25   of trade creditors that they are, there's a whole constituency

156

1 that are like the Tycos of the world, they don't have any of

2 their own on this committee and they do have some different

3 interests in this case.  We have a health business, a medical

4 care business.  One of the amount of information that the

5 trustee required of us was to give them a breakdown of the

6 creditors in the medical devices business because it has

7 nothing to do with automotive and we gave that information.

8          Well, there's no medical supplier who is on the

9 committee right now and they are not even involved in the

10 automotive business and they have very different interests that

11 much of the things that are being decided day-to-day by the

12 debtors and by the creditors' committee in terms of the

13 business component.

14          This is a twenty-eight-billion-dollar business with

15 tens of thousands of creditors and I think, Your Honor, to --

16 and again, I'm not -- a lot has been said about Cap Re and

17 their counsel has been very patient in not getting up and

18 saying anything other than having filed some clarifying

19 statements, but Cap Re is one of the major players in this case

20 because they not only owned these (indiscernible), but they

21 owned a lot of equity and they own -- and they're one of

22 General Motors's largest equity holders and they play in this

23 space in lots of different places and they are very -- someone

24 once said to me that they own fifteen percent of America.  You

25 know, they play in lots of spaces and do lots of things, but

157

1  when they sit on this committee represented by Wachtell, they -

2  - and as co-chair of this committee, we believe that they

3  understand what their fiduciary responsibilities are to all

4  creditors in this estate and they certainly haven't exhibited

5  anything to the debtors ,and we meet with them weekly in terms

6  of conversations, that would suggest that they are in any way

7  not aware of what their fiduciary responsibilities are.

8          So I just -- I raise these two points, Your Honor,

9  only because the -- people come up and say, gee, I think I

10  should be on the committee for X, Y, and Z.  That's fine.

11 Everybody has their perspective.  And we have no particular

12 quarrel with Law Debenture, we need to deal with them in this

13 case and other cases and Delphi needs to deal with Law

14 Debenture and we will deal with them.

15          And oh, by the way, as an indentured trustee, I have

16 no doubt that as they -- in this case, whether they're on the

17 committee or not, they will be knocking on my door at the end

18 of the case seeking our consent to a substantial contribution

19 application for whatever they perceive their contributions to

20 the case to be.  So they'll be as active as they think they

21 need to be in their interests and they will come to us and come

22 to the committee.  Sure as we stand here now, I'm telling you

23 it will happen prior to the plan of reorganization being filed

24 to deal with those issues.  So we have no quarrel specifically

25 with Law Debenture.

158

1          We do have a quarrel with anybody standing up in a

2    case of this complexity and suggesting that there's something

3    wrong with the integrity of the committee process or the

4    integrity of the selection process for the U.S. Trustee or the

5    integrity of the overall administration of these cases because

6    it's easy to say that, but it's damaging to these estates when

7    those assertions are made without any evidence to that effect.

8          And so we're simply saying, Your Honor, based on just

9    like Tyco had its own special interests which the U.S. Trustee

10   chose not to acknowledge at that point in time, we believe that

11   all the interests of creditors are adequately represented.  We

12   would have come up, had we been able to scratch it out, with a

13   slightly different composition of the committee, but we're not

14   the United States Trustee.  For this period, the post-1986,

15   pre-BAPCPA period, congress decided that the United States

16   Trustee got to make these decisions.  And oh, by the way,

17   congress had the opportunity when they passed BAPCPA to make

18   this particular provision retroactive or immediately effective,

19   as they did with some other provisions, and they did not, and

20   so I think we know what congressional intent was with respect

21   to these matters, Your Honor.

22         So we would ask, Your Honor, that the Court, under

23   any standard Your Honor might choose to think is applicable,

24   deny this application.

25         THE COURT:  Okay.

1      MR. MASON:  Does Your Honor want to hear from Cap Re?

2      THE COURT:  Well, is Cap Re like some fund managers

3  that actually manage funds that hold investments in different

4  pots or is it all in one?

5      MR. MASON:  It is in different pots, Your Honor.

6  Standing here today, I don't know if the sub-debt holdings of

7  Cap Re and the senior debt holdings are in different funds --

8      THE COURT:  Or are in the same fund.

9      MR. MASON:  -- but I can tell you that there was one

10 representative on the committee for Cap Re, that's David Daygo

11 (phonetic), who acts on behalf of all of them.

12     THE COURT:  Of all the sub-funds or funds?

13     MR. MASON:  Yes, of all of the sub-funds.  He is, as

14 Mr. Butler had indicated and the U.S. Trustee had indicated, he

15 had walled off for purposes of dealing with Delphi, he's walled

16 off from General Motors -- from Cap Re's interest in General

17 Motor securities.

18         I would just point out one thing.  I don't want to

19 belabor the record and repeat statements of other counsel, but

20 we do take to hear our fiduciary duties.  We are a co-chair of

21 the committee.  We believe that we're fiduciaries for all

22 creditors so I completely agree with Mr. Rosenberg.

23         I would just add that, for purposes of seeing who may

24 reflect the views of different creditors, I would add two

25 things.  Number one, while our overwhelming interest is in the

160

1 senior debt from an economic perspective, we do hold $30

2 million of sub-debt.  It's almost ten percent of the sub-debt

3 class and if there's a reason sort of not to give it up, we're

4 not going to just give that up.  And when the appropriate time

5 comes, we may, frankly, be advocating for significant

6 recoveries for sub-debt holders.

7          And number two, both the senior and the subordinated

8 debt holders are holders at the parent-company level, and so in

9 our capacity as a senior debt holder, we can certainly reflect

10 the views of, to the extent it's appropriate, parent company

11 creditors, which may not be the case for other members of the

12 committee.  That has not happened yet, but it may happen at

13 some point with regard to negotiations.

14          THE COURT:  Okay.  Thank you.

15          MR. FOX:  Just briefly, Your Honor, Edward Fox from

16 Kirkpatrick & Lockhart on behalf of Wilmington Trust Company as

17 indentured trustee.

18          Your Honor, we did, as noted, file a statement

19 because we wanted to clarify, not with respect to any confusion

20 we thought that the U.S. Trustee may have had, but with respect

21 to sort of -- Law Debenture's papers may have muddied the

22 waters a little bit.  Specifically wanted to reserve our rights

23 with respect to anything they raised on the subordination

24 issues and make clear that our only role with respect to the

25 toppers which hold the subordinated debt is as Delaware

161

1  statutory trustee.   Our only role there is under Delaware law,

2  which is basically to be a place for service of process and to

3  tell the world if we move our office in Delaware that we've

4  moved it.

5        You asked the question of Ms. Davis as to whether

6  there was any confusion on the part of the U.S. Trustee with

7  respect to (indiscernible).   We were asked to meet with the

8  U.S. Trustee in the midst of the formation meeting, and while I

9  don't remember all the questions that we were asked, I do not

10  recall there being any confusion on the U.S. Trustee's part or

11  if, in fact, there was, we would have cleared it up as to

12  specifically what our role was and we certainly would not want

13  anybody to be laboring under the misapprehension that we have

14  any fiduciary duties with respect to the subordinated debt

15  because that's not a space we would want to be in.

16        THE COURT:  So your client didn't make its pitch to

17  get appointed to the committee, among other things, because it

18  had this role with the sub-debt?

19        MR. FOX:  No, absolutely not.  We did indicate that,

20  as I recall, on the form that you fill out for the U.S.

21  Trustee's office because we're required to indicate to them any

22  role that one plays in the case and we want them to be fully

23  advised of those roles, but, no, we could not, under the Trust

24  Indenture Act, have fiduciary duty to both the senior debt and

25  the sub-debt and we would not --

162

1        THE COURT:  Except as a creditors' committee member
2   to all creditors?

3        MR. FOX:  Yes, that's right.  That's right.

4        With respect to the issues that have been -- some
5   insinuation, if you will, in the Law Debenture papers about
6   valuation issues and you can read those in two ways.  One is
7   with respect to maximizing actual value and the other is with
8   respect to deciding in a stock-for-debt type plan how that gets
9   divided up.

10        As an indentured trustee, and as Mr. Mason pointed
11   out, the senior bonds as well as the subordinated bonds were at
12   the parent level of Delphi Corporation.  We have every interest
13   in seeing as much value flow to Delphi Corporation as possible
14   to get those bonds paid par-plus-accrued plus all the
15   outstanding fees.  And we certainly wouldn't spike the ball
16   before seeing that happen.  And with bonds trading in the
17   fifties at this point, as I understand it, that will be a great
18   place to be.

19        To the extent that we got to that point, it seems to
20   me that at that point Cap Re would have every incentive to say
21   there's more value here and it all goes to the sub-debt so that
22   they get it all.  They would have no incentive, as is suggested
23   in the Law Debenture papers, to, at that point, say, well,
24   let's just leave it on the table for everybody else to share in
25   as opposed to Cap Re and the sub-debt wanting to take it home.

163

1          The final point I'd simply make, when it comes to

2   putting the committee together, and this really looks forward

3   to the UAW motion which we've been advised is on next month, is

4   that there is, I'm sure when the U.S. Trustee sits down and

5   puts together a committee, a recognition of the various

6   interests which are being put on the committee and when you

7   push in one place, it has an effect in another place.  At this

8   point, we have a committee with four trade, one union, and two

9   bond holder representatives.  To the extent we're dealing with

10  Law Debenture this month and UAW next month, if they're taken

11  seriatim -- and who knows, maybe PBGC will or won't jump into

12  that fray, I don't know -- but if they're taken seriatim,

13  there's always a concern that it pushes a committee that might

14  be balanced in a particular way out of balance or more in one

15  direction than another.  Representing the interests of bond

16  holders and senior debt, we're always interested in seeing more

17  bond holder representation rather than less or seeing that

18  increase rather than decrease, so we keep that in mind as well.

19          THE COURT:  Okay.

20          MR. ANTOSZYK:  Your Honor, I think you aptly stated

21  our point, which was it's not sufficient to have Cap Re as the

22  sole representative of the subordinated note holders.  They are

23  not in a position, in our view, to inherently be able to

24  represent -- adequately represent the interests of the

25  subordinated note holders.

164

1    I just want to address briefly some of the comments

2   with regard to process.  We don't doubt that the U.S. Trustee

3   went through a painstaking process.  We don't doubt that the

4   U.S. Trustee took her role and function very seriously.  We

5   just dispute whether she got it right and, in our view, she

6   didn't, so it's not as if we are impinging upon the integrity

7   of the process necessarily, as opposed to the result.

8       And in that regard, the result is very different than

9   what Mr. Butler indicated may be for other creditors.  There's

10  a big difference, I think, between a creditor, a general

11  unsecured creditor that is of a different industry but is yet

12  still a general -- of the same priority and ones that perhaps

13  occupy different levels, different priorities.  And in that

14  instance, I think there's a defining difference and if you look

15  at some of the cases, courts have -- cases in which there have

16  been subordinated note holders where there has been appointment

17  of separate -- where the issue has been a separate committee or

18  additional members, there's always been representatives of this

19  junior class, representatives that are independent,

20  representatives that can give a meaningful voice, which we

21  don't think exists in this case.

22      So in terms of evidence of a conflict, Your Honor,

23  the evidence, we think, is inherent in the nature of the

24  relationship and we don't think anything further needs to be

25  proven.  And for that reason we think that our motion should be

1  allowed.

2          THE COURT:  Okay.  I have in front of me a motion by

3  Law Debenture Trust Company of New York, the indenture trustee

4  for a substantial issue of subordinated debt at the parent-

5  company level at Delphi to alter the composition of the

6  official creditors' committee so that it is appointed to that

7  committee.

8          The Bankruptcy Code, as applicable in this case,

9  which is the pre-BAPCPA version of the code, authorizes the

10 United States Trustee to appoint an official committee and also

11 authorizes the trustee to appoint or remove members of an

12 official committee.  See In re:  America West Airlines, 142 BR

13 901, 902, Bankruptcy Arizona (1992).  Now, that can continue

14 during the course of a case.  See In re:  Heydar Leasing

15 International Company [Ph.] at 11 BR 460, 461, Bankruptcy SDNY

16 (1981).

17         The official committee's composition also may vary

18 from case to case, that is, Section 1102(b) serves only as a

19 guideline for committee composition thus, although she must be

20 generally cognizant of the various classes of interest at stake

21 in the creditor body -- in the unsecured creditor body, excuse

22 me -- the U.S. Trustee and the Court to the extent the Court

23 supervises the U.S. Trustee's decision, also needs to take into

24 account the particular issues involved in the particular

25 Chapter 11 case, which may significantly differ from case to

166

1  case.  Some cases involve serious business issues.  Some cases

2  involve inter-company issues.  Some cases involve inter-

3  creditor issues at one level or more in the capital structure,

4  and the like.  See In re:  Drexel Burnham Lambert Group, Inc.,

5  118 BF 209 at 212, Bankruptcy SDNY (1990).

6         As the parties have noted, the case law is not

7  particularly clear as to whether and under what circumstances

8  the bankruptcy court may change the composition of a committee

9  or, going further than that, order the appointment of a

10  specific entity to a committee.  As Law Debenture has correctly

11  stated, however, the case law is clear, although the statute is

12  not clear itself, that the Court does have some ability to at

13  least determine that the committee as presently composed does

14  not adequately represent the interest of the unsecured-creditor

15  body.

16         Given the statutory charge to the U.S. Trustee to

17  appoint the committee, I believe that the Barney's line of

18  cases, and that's In re:  Barney's, Inc., 197 BR 431,

19  Bankruptcy SDNY (1996), is probably the right line to follow,

20  as to the standard by which the court should review the issue.

21   That is, at least as to whether a particular member should be

22  appointed to a committee, the trustee's decision should be

23  reviewed on an abuse-of-discretion basis, given the trustee's

24  administrative function in deciding which individual member

25  should serve on a committee.  It may be that there's a broader

167

1  right to disagree with the U.S. Trustee with regard to whether

2  a committee as a whole adequately represents the interests of

3  all the unsecured creditors, but even there, I believe that, as

4  a practical matter, in the interest of justice, the Court

5  should be deferential to the trustee's decision, particularly

6  where it appears, as it does here, that the trustee conducted a

7  thorough and extensive analysis of the creditor body and the

8  nature of the case and selected a committee in light of that

9  analysis.

10         In essence, the movant's point here is that, as a

11  sub-debt holder representative, its voice is necessary on the

12  committee to give adequate representation to a class that must

13  be represented on the committee, and there is support in the

14  case law for that view, for example, see In re: McLain

15  Industries, Inc., 70 BR 852, as well as the Garden Ridge case

16  cited by Mr. Antoszyk in oral argument for the proposition that

17  the issue of adequate representation going into the ability of

18  the committee to function focuses in large part on whether the

19  members selected to serve on the committee represent the

20  creditor constituency, which often breaks down into the

21  different classes of debt asserted against the debtor.  And

22  despite the reservation of rights by Mr. Antoszyk's client,

23  it's clear to me that they're wearing a sub-debt hat until

24  proven otherwise, so I think that sub-debt distinction is a

25  meaningful one here, at least until proven otherwise.

1          The responses to some extent acknowledge that
2    requirement of adequate representation under the law, that is
3    that the committee needs to be diversely representative to
4    properly function, so that it is giving a meaningful voice to
5    all classes.  However, the objectants also appropriately note
6    that there are limitations to that principle.  I believe those
7    limitations apply here for a number of reasons.
8          First, there is a significant sub-debt holder serving
9    on the committee for the, Cap Re, which holds, through one or
10   more of its funds, approximately ten percent of the
11   subordinated debt claims.
12         Second, because both Cap Re and Wilmington Trust,
13   which represents at least a voice on the committee senior debt
14   holders, are both representatives of indebtedness at the
15   parent-company level.  And when considering many, perhaps the
16   majority, of the decisions made by the committee in this
17   particular case, it appears to me that the need to have a voice
18   that the movant here is asserting is, more importantly, one
19   that represents the interests of the parent company in
20   considering all of the difficult business issues that these
21   debtors need to evaluate and consider with the committee's
22   help, rather than inter-creditor issues at the parent level.
23         So I believe that, in light of those two facts and my
24   conclusion that the trustee was not confused into a belief that
25   Wilmington Trust might be speaking for the sub-debt class,

169

1  which I had initially been concerned about when I read the

2  papers, I think that the trustee acted appropriately in forming

3  the committee and that the committee does adequately represent

4  the interests of all the unsecured creditors, including the

5  sub-debt.

6       I say that even though I recognize a tension in the

7  Bankruptcy Code between the fact that all committee members

8  obviously are fiduciaries for all unsecured creditors and not

9  just their particular constituency and the contrary fact that

10 congress did clearly contemplate having individual voices on

11 the committee for different constituencies.  These are not at

12 all necessarily tensions that can't be harmonized and they are

13 harmonized, on a properly-functioning committee and I do not

14 believe that there's sufficient evidence here to show that this

15 committee cannot harmonize those tensions in the interest of

16 all the unsecured creditors, including the sub-debt holders.

17      Just a couple more points.  Notwithstanding the fact

18 that the sub-debt trustee is not a part of the committee, it

19 will have, obviously, a meaningful role in this case; that is,

20 it will not be in the trenches on every issue as the committee

21 is,  nevertheless, it will have, I'm sure, an active role in

22 the case and will, in addition, have access to information from

23 the debtor under 704 as incorporated in 1106 and 1007.  And I

24 believe, notwithstanding that BAPCPA was enacted after this

25 case commenced, it will also have a right to information from

170

1  the committee, and I would be very surprised and, frankly,

2  upset if it comes to the time for negotiation of inter-creditor

3  issues at the parent level and the indenture trustee for the

4  sub-debt is frozen out of negotiations.  That would be, in my

5  mind, completely contrary to how I would view a committee

6  functioning and how I view this committee with its particular

7  professionals would function.  So I believe that Law

8  Debenture's particular issues will be dealt with and that it

9  will have the type of access necessary to deal with those

10  issues.

11          Next to last, I would have some real reservations,

12  even if I were to find that the committee generally did not

13  adequately include a representative of the sub-debt, which of

14  course I did not find, I'd have some real reservations even if

15  I were contrary on that issue in appointing this indenture

16  trustee to the committee because of its apparent view as stated

17  by Mr. Antoszyk in oral argument that Law Debenture would be on

18  the committee solely to represent the interests of the sub-debt

19  holders.  I don't believe that is appropriate for a committee

20  member.  Committee members are certainly entitled and expected

21  to deliver their particular constituency's, if you will, view

22  on issues, but ultimately they have to act in the interests of

23  all unsecured creditors, and so even if I were to say that the

24  U.S. Trustee should expand the committee to include a sub-debt

25  holder in addition to Cap Re, I would have some real

171

1 reservations in directing that the particular movant here be

2 appointed.

3          The last point is -- addresses something that Mr. Fox

4 said, which is that rather than hear this motion and the UAW's

5 motion at the same time, I've heard them or I will hear them

6 seriatim, if I do hear the UAW motion.  Let me be clear.  I'm

7 ruling on this motion in a particular context.  If for some

8 reason the composition of the committee changes, the U.S.

9 Trustee may well decide to change it in more than one way, and

10 I don't think that anyone should look at this ruling as other

11 than a ruling in this particular context, which is responding

12 to the committee as currently constituted and a request to add

13 Law Debenture to that committee.

14          So for those reasons I'll deny the request.  And I

15 guess, Mr. Butler, you should submit an order.

16          MR. BUTLER:  We will, Your Honor.

17          THE COURT:  Okay.  Are people getting faint with

18 hunger?  After lunch or do you want to do this now?

19          (Counsel confer.)

20          MR. COFFEY:  I'll try to be brief, Your Honor, on

21 this matter.

22          THE COURT:  All right.

23          MR. BUTLER:  The last matter, Your Honor, we have two

24 matters on the agenda, Matter 37 and Matter 38.  Matter 38 has

25 been withdrawn.

172

1          THE COURT:  Okay.  That makes it easy-- all right.

2          MR. BUTLER:  So that was the Charles Clark matter

3   relief from automatic stay, Docket No. 1625.  It's been

4   withdrawn.

5          THE COURT:  Can I make a suggestion on the discovery

6   matter with the -- based on, among other things, on Mr.

7   Butler's discussion at the beginning of the agenda about how

8   that matter is still under active discussion with the

9   committee, and then perhaps others, and we're only going

10  forward with one small aspect of it, does it really make sense

11  to deal with this discovery issue now or should we wait until

12  you're further along?  Because you may be trying to take

13  discovery on something that's completely different than what

14  the debtors are actually going to present.

15         MR. COFFEY:  If I may, Your Honor, I think we should

16  deal with it today.  It's like being a little bit pregnant.

17  They're talking about paying some people a little money as

18  opposed to --

19         THE COURT:  So your discovery would be focused on

20  what they're doing next week -- or not next week, next hearing.

21         MR. BUTLER:  On the 27th.

22         THE COURT:  Right.

23         MR. COFFEE:  It really goes to eligibility so if I

24  may.

25         THE COURT:  That's fine.

173

1      MR. COFFEY:  Okay.  Thank you.

2      MR. COFFEY:  Good afternoon, Your Honor.  John Coffey

3  from Bernstein, Litowitz, Berger & Grossmann.  I'm one of the

4  co-lead counsel for the four institutional investors that have

5  been appointed to represent the (indiscernible) class and the

6  securities class action.  My particular client is the

7  Mississippi Public Employees Reliance System.

8      Your Honor, shortly after the debtors filed their key

9  employee compensation plan motion, the lead plaintiffs objected

10  on several grounds.  I won't reiterate all of them now, but

11  among other things, we pointed out that there seemed to be an

12  absence of any consideration of whether intended beneficiaries

13  of the plan might have participate in the accounting

14  improprieties, tolerated it, or knew of it and turned the other

15  way.

16      And in addition to making that general observation,

17  we laid out fifteen specific people by name that our

18  investigation had showed had either participated in the fraud,

19  knew of it, tolerated it, et cetera.

20      THE COURT:  Let me stop.  Mr. Butler, are any of

21  those people covered by what's going to be heard in a couple

22  weeks?

23      MR. BUTLER:  Yes, Your Honor.  They're part of the

24  (indiscernible).  Under Mr. Coffey's theory, every executive at

25  the company played some role in this and we've got a lot to say

174

1  about that when their turn comes around.

2       MR. ROSENBERG:  Your Honor, with due respect, we

3  haven't negotiated what's going to be heard in a couple weeks,

4  if it's ready to be heard in a couple weeks.  I'm not

5  suggesting Mr. Butler was wrong, but I don't know how he can

6  know he's right.

7       THE COURT:  Okay.

8       MR. BUTLER:  I actually am good at that, Your Honor.

9       (Laughter.)

10      MR. COFFEY:  Well, Your Honor, I do note that

11 whatever those negotiations are, Your Honor, we're not privy to

12 those.

13      But shortly after we filed an objection, document

14 requests were served and I'd just like to read from some of the

15 document requests.  All documents -- I'll paraphrase, but all

16 documents concerning whether Delphi executives knowingly

17 participated in a massive accounting fraud or tolerated or

18 ignored the fraud, documents concerning sham transactions,

19 inventory manipulating, book cooking; documents concerning how

20 Delphi senior executives routinely set inventory target levels;

21 how they engaged in purportedly fraudulent conduct or willful

22 disobedience; and then documents about the four people who are

23 specifically identified, the only four, as to how they were

24 involved in the fraudulent practices.  And then with regard to

25 the fifteen people that we identified in our objection, all

175

1  documents concerning their alleged improprieties.

2          Your Honor, here's what's interesting about those

3  document requests.  They were served by the debtors.  They were

4  served by the debtors on December 5th before we ever served any

5  discovery request in this.  That's what is one of the most

6  distinguishable facts between this and what you've heard

7  earlier today.

8          Now after we got these discovery requests, we

9  certainly thought they were relevant and we were glad that they

10 thought it was relevant because we assumed that the discovery

11 requests were not offered to harass, not offered because they

12 thought they were doing an end run around any stay, but because

13 they thought it was relevant to the hearing.  So we promptly

14 said we would agree to produce all non-privileged documents

15 and, Your Honor, we have.  They have -- they essentially asked

16 us to empty our files on this.  They have those documents.

17         After they served us, we served them and I'd like to

18 break our request into two pieces.  One is the mirror image of

19 what they have served on us and which we have responded to

20 them.  The other piece identified missing pieces, for example,

21 who's covered.  They don't say, other than the bands and the

22 four people at the top.  What process, if any, was used to get

23 whether anyone was involved in the fraud?

24         Now I heard Mr. Butler say, and I was quite

25 astonished, that the fraud -- the accounting improprieties had

176

1  nothing to do with the bankruptcy.  Well, I might take the view
2  it had everything to do with the bankruptcy.  The death watch
3  for this company began after they announced the restatement.  I
4  suspect it's probably somewhere in between, but it's certainly
5  not no factor.
6          The restatement in this case, Your Honor, is larger
7  than the restatement in Enron.  You have sixteen of your
8  executives fired or forced out this year.  You have the U.S.
9  Attorney's office investigating.  You have the SEC
10  investigation.  We know because we're talking to them.  They
11  liked our complaint and they've asked for our help and they're
12  getting it.  And you have a serious accounting scandal that
13  could not have been accomplished by the six people they asked
14  to leave.
15          As our papers show, there was a pervasive culture of
16  manipulating the books.  Now they may argue on the 27th that,
17  you know, we really need those people even though they were
18  crooked in the past or they did something bad in the past, but
19  that's not what they're saying.  They're saying we shouldn't
20  even look, that we should just trust them to decide who should
21  get a bonus even though, in our view, there are any number of
22  people who were involved in the accounting improprieties.
23          Now they did decide that they would produce some
24  documents relating to the (indiscernible) but before they would
25  let us look at what they had decided to produce, they insisted

177

1  we sign a confidentiality letter.  We got it, we looked at it,

2  we signed it without the slightest modification.

3        We then were allowed access to a website which had a

4  few documents that essentially showed how they arrived at how

5  much they would pay for the bonuses, but said nothing about

6  whether any vetting had been done whatsoever to insure that you

7  don't approve a plan that puts money in the pockets of people

8  who participated in the accounting improprieties.

9        We then got their formal objections, we had a meet-

10  and-confer that failed.  We couldn't even get them to

11  acknowledge that any documents existed or who was covered,

12  hence this motion.

13        Now the motion essentially -- I'll deal with the

14  first three points of the four points dealt with in our papers.

15        As they have done in papers pertaining to motions

16  addressed earlier today, they said this is never to evade the

17  PSLRA (sic) stay and the bankruptcy stay.

18        If the proposition is it is inappropriate to ask for

19  these types of documents, you cannot square their position with

20  their conduct.  They served discovery on us.  We responded.

21  Then they say, "Wait a minute."

22        THE COURT:  Well, we can get beyond it.

23        I've already said that notwithstanding the federal

24  act, if you're entitled to discovery in a bankruptcy case you

25  can get it.

178

1        MR. COFFEY:  I agree, Your Honor, and in fact we will

2    certainly make the point to Judge Rosen in Michigan that they

3    have in effect already violated the PSLRA because they  now

4    have our files and are taking the position that we can't get

5    their files but that's a separate --

6        THE COURT:  Well, I'm not dealing with that.

7        MR. COFFEY:  I heard you loud and clear on that, Your

8    Honor.

9        THE COURT:  But I guess they have a right to -- they

10   were responding to the allegations you made in your objection,

11   right, to the KEYSIP (sic) motion?

12       MR. COFFEY:  Yes, indeed, Your Honor.

13       THE COURT:  All right.  Okay.

14       MR. COFFEY:  And they have those documents.

15       THE COURT:  All right.

16       MR. COFFEY:  If the position is it's not relevant why

17   were they serving such discovery and we responded, they have

18   our documents, but so the idea that there's a stay that bars us

19   from getting it -- in other words, they think it's unilateral,

20   not mutual -- they are entitled to get documents from us --

21       THE COURT:  All right, we're beyond that.

22       MR. COFFEY:  Very well, Your Honor.

23       With regard to the relevance, we think it's highly

24   relevant.  We think it's highly relevant.

25       Does the Court want to be in the position on the 27th

1  of approving a plan that may put money in any of the pockets of

2  the fifteen people we've identified and the other people who we

3  believe were involved without knowing that the company did

4  something about it?  Did they check it out?

5          This is different.  I was involved in <u>Worldcom</u> and I

6  won't revisit what I think would have helped Your Honor on that

7  particular motion but unlike <u>Worldcom</u>, unlike <u>Health South</u>

8  where I'm involved as well, the companies clean house and then

9  built a foundation to build an honest company going forward.

10 That's not what's happened here.  They cite to you the fact

11 that 25 people left since the beginning of the year. Why do

12 they cite that to you?  They want Your Honor to believe, "We

13 need to get this incentive program in place because we're

14 losing people."  We said, "Well, aren't like six or eight of

15 those people who were fired because of the accounting fraud?"

16 They won't answer that.  Well, isn't that answer relevant if

17 they're telling you the number 25 is important?  Wouldn't it be

18 important to you to know, well, how many of those 25 were

19 fired?

20          So that's what we are trying to get.  They won't give

21 us anything.

22          Now, they also talk about privacy -- very briefly.

23 We signed the confidentiality order they proposed.  During the

24 meet and confer when they said it's not adequate, I said, "Give

25 us one that you think is, we'll consider it."  We've never

180

1    gotten one but now what we've heard for the first time on their

2    opposition papers to the motion to compel -- we didn't hear it

3    during the meet and confer -- is, "Well, we might have some

4    morale problems; certain people getting paid more than others."

5    Your Honor, we can do it for attorneys eyes only, that's

6    routinely done, it's not unusual or we can say, "Give us the

7    names. Who is getting this? Is it John Sheehan?" John

8    Sheehan is a defendant in our case. He was head of accounting

9    during one of the largest accounting frauds of our time. That

10   is not an exaggeration. It is bigger than Enron. He's the

11   head of restructuring. I assume he's going to get a bonus.

12   Has there been any investigation about what he was doing while

13   the books were being cooked under his watch?

14          So we would respectfully submit before the estate

15   starts paying these people, some sort of investigation needs to

16   be done.

17          Now, I want to say a word about my former partner and

18   friend, Bob Rosenberg, on the creditors committee. They

19   haven't raised this objection but, Your Honor, rather than --

20   we are uniquely positioned to raise this. We had been on the

21   case for months. We have investigators, we have been talking

22   to people, we have a case involving these accounting

23   allegations. So my client, for example, Mississippi, says,

24   "What do you mean they're going to pay these people?" We

25   wouldn't be here by the way if they hadn't filed a KEYSIP that

181

1   showed no indication that they took into account what happened

2   before.  If they had done that we wouldn't be here.  But they

3   did do that and that's why we're here.

4           So, Your Honor, we respectfully submit that in order

5   to allow you to evaluate whether the KEYSIP is a sound exercise

6   of business judgment, that you would have to have more facts

7   than this in order to do that and what we've asked for are

8   documents that were considered with regard to any links between

9   the intended beneficiaries and the accounting improprieties,

10  any conclusions there might have been, documents relating to

11  sham sales.  There was a $200 million sham transacted at the

12  end of December 2000 so that Delphi could announce,

13  fraudulently, that they made a revenue number.  Laura Marion

14  [Ph.], who we want to depose, was the head of accounting for

15  financial reporting, she reopened the books -- so we have been

16  told -- allowed that sham transaction to be brought and they

17  made their numbers.  That's been restated by the way.  That's

18  admitted by the company.  Is she going to get a bonus?  We'd

19  like to ask her about it.  We'd like documents as to why the 25

20  executives left and we'd like to depose, as I mentioned, the

21  four people in our papers including Mr. Sheehan, who they admit

22  was involved in developing the KEYSIP.

23          The question on the 27th, Your Honor, will be will

24  the KEYSIP benefit anyone who participated in, tolerated or

25  turned a blind eye to the accounting improprieties.  There is

1  no evidence that they've done anything on that and this motion

2  is brought because they want to keep it that way and, Your

3  Honor, we believe the relief we've requested is the minimum

4  necessary to insure that if the KEYSIP is approved that the

5  Court has been adequately informed of all of the relevant facts

6  and circumstances.

7          Thank you.

8          MR. BUTLER:  Your Honor, this motion represents the

9  trifecta for the day of lead plaintiff's efforts to try to

10 gather information about the original accounting fraud for a

11 separate agenda.  I mean if you actually look at the details --

12 and it's useful to look at the details, we've tried to outline

13 some of them in our response -- what they are trying to do is

14 use what is the only thing before the Court now on the 27th of

15 January which is an annual incentive program for performance

16 from the period that ends June 30, 2006, a position I will tell

17 you I think as constructed is ordinary course.  We're still

18 going to negotiate with the creditors committee but that's all

19 that's before you.  The emergence (sic) program has been put

20 off until July as we continue to negotiate with the

21 compensation consultants and with the committee.

22          Let me just take a step back -- and Mr. Coffey

23 obviously feels otherwise and wants the Court to sort of

24 believe otherwise -- but the debtors do not believe that we

25 have any wrongdoers that should leave Delphi working at Delphi

1 today.  If the board of directors of the company or the

2 executive managers of the company believed that we had

3 wrongdoers that had breached their fiduciary responsibilities

4 to the company and should not be at the company they would not

5 be there and the fact of the matter is the executive management

6 team we have at the company now which is led mostly by new

7 people -- but the reality is we have a new general counsel, we

8 have a new CEO, we have a new CFO, we have a number of other

9 new people that are coming, we have a new director of audit, we

10 have lots of new people at the company -- but the fact of the

11 matter is the people who are at the company, the company

12 believes in and believes that they should be compensated and

13 just to make the point, they're being paid right now, they're

14 being compensated now as we sit here, and to suggest that

15 somehow the fact that we want to provide an ordinary course

16 annual incentive plan -- which is al that's up before you on

17 January 27th -- that somehow that program is going to somehow

18 give the license to go back and get the following kinds of

19 things.  They would like to have every document that exists

20 with respect to financing transactions totaling approximately

21 $441 million reported by the debtors as sales of inventory or

22 direct materials as described in detail in lead plaintiff's

23 consolidated class action complaint at Paragraphs 122 to 54.

24 Example 2, they want all the documents that exist on

25 transactions totaling more than $240 million between the

184

1  debtors and General Motors Corporation as set forth in the

2  complaint -- their class action complaint -- in Sections 155 to

3  168.  They would like to have all of the transactions between

4  the debtors and various service provides including $68 million

5  in transactions with Electronic Data Systems or the debtors'

6  information technology providers as described in the complaint

7  from Paragraph 173 to 184 and they go on and on and on.

8          They've asked for copies of all documents that relate

9  to any former Delphi executive who knowingly participated in

10 Delphi's massive accounting fraud and the list goes on and on.

11 We put it all in our response.  I'm not going to go through

12 it.

13         How are those relevant and how do those relate to

14 whether or not the Court approves an incentive plan for

15 performance through the period ended June 30, 2006?  Your

16 Honor, they're using this as a fishing expedition and as a

17 license --

18         THE COURT:  What is the initial period?  What is the

19 start of that period?

20         MR. BUTLER:  The proposed start of it is October 8th

21 when we filed in 2005 through June 30, 2006.  We're negotiating

22 the exact parameters of that with the creditors committee and

23 we will deal with that issue in our negotiations with them but

24 it is for the post-petition period only.

25         Your Honor, when you actually read their voluminous

185

1   requests, those requests are clearly designed to have an agenda

2   so they can get information to buttress their other case.  It

3   has nothing to do with whether or not we've demonstrated

4   reasonable business judgment in having a program and by the

5   way, it also doesn't prevent them from coming to argue at that

6   hearing without having conducted another investigation that

7   they think they're "uniquely" qualified to conduct for them to

8   argue that somehow there should be some curtailance put into

9   the program to address issues they're concerned about.

10          The debtors start from the proposition, Your Honor,

11   unlike Mr. Coffey, that we do not believe that there are

12   currently wrongdoers at this Chapter 11 debtor operating the

13   company.

14          THE COURT:  Well, but let's play that out.

15          If they come to the hearing and say, "We have the

16   following evidence that we've already discovered through other

17   means that Mr. X and Ms. Y shouldn't get this because they're

18   going to end up owing the debtor more," aren't you going to

19   say, "Well, we disagree with that" and to put on a case to say

20   that, you know, there's no such claim?  Or are you just going

21   to let them say that and you'll say, "Well, Judge, you should

22   just consider that for what it's worth?"  I mean if you're

23   going to put on a case in opposition to them why shouldn't they

24   take discovery on it?

25          MR. BUTLER:  We don't intend to put on a case on

186

1  January 27th about the accounting fraud dating back to --

2          THE COURT:  No, I understand.

3          MR. BUTLER:  Which is what they're asking for

4  discovery on.

5          THE COURT:  But if the plaintiffs say you shouldn't

6  approve this with regard to, you know, Messrs. X, Y and Z

7  because "we have good reason to believe" -- and they say what

8  they know -- "they were involved in an accounting fraud and

9  hurt the company and creditors" -- unless the debtors are not

10  going to respond to that, I don't see why they wouldn't be

11  entitled to discovery as to what your response would be.

12          MR. BUTLER:  But our response, Your Honor, I think --

13  I mean part of it -- and I'm a little concerned that the Court

14  is to a certain extent in some respects buying into their view

15  of what the standard is at a KEYSIP hearing.

16          They're basically saying -- they're taking the

17  position that if anybody in their opinion turned a blind eye --

18          THE COURT:  No, no, no, it's not in their opinion.  I

19  mean they're saying what it is and basically throwing the ball

20  back on the debtor unless the debtor is going to say, "Well, we

21  disagree and we rest," they may win.  So I mean if I were in

22  your shoes I may want to say, "Well, they're wrong.  Mr. X

23  wasn't involved in this at all" and there are other things you

24  can do.  You can say that it ought to be held in escrow or

25  something until these issues are decided but other than putting

187

1  off the issue, I don't see how you can oppose them on the

2  merits of that claim without giving them discovery.

3          MR. BUTLER:  But actually, Your Honor, because I

4  believe that the basic claim is faulty --

5          THE COURT:  You believe that but they differ with

6  you.  They've said they have an issue.

7          MR. BUTLER:  Your Honor, let me try and approach this

8  a different way.

9          Mr. Coffey alleges that someone who is currently at

10 the company did bad things for five years and should never bet

11 paid another dollar from the company.

12         THE COURT:  Right.

13         MR. BUTLER:  Okay.

14         I did not intend on January 27th to put on a case

15 about what happened in 1999, 2000, 2001, 2002 --

16         THE COURT:  In response to what he's saying.

17         MR. BUTLER:  Right.

18         I do intend to say, however, that I don't think he

19 can show under all the KEYSIP case law in this country that

20 those allegations, unproven -- in this country, people are

21 innocent until proven guilty -- that because somebody --

22         THE COURT:  Well, he can go ahead and try to prove it

23 at the hearing.

24         MR. BUTLER:  But that's not the place for the

25 hearing, Your Honor.

1          THE COURT:  Why?  I don't understand that.

2          I'm just going to use -- no, I won't even use a real

3  person -- but you know that there have been numerous CEOs of

4  bankrupt companies who have ended up having either serious

5  liability or going to jail for securities or accounting fraud.

6   There have been others who have been acquitted.  Well, I would

7  find it very hard to approve any sort of bonus plan for an

8  executive who, I felt, was going to jail.  I don't care how

9  valuable he was.  That doesn't seem right to me.

10          MR. BUTLER:  Your Honor, when does the bankruptcy

11 court, a civil equity court, get involved in adjudicating that

12 when there's no indictment out?

13          THE COURT:  Oh, no, I understand that.  I understand

14 that, but it seems to me as a matter of business judgment that

15 you don't give bonuses to people who you're going to be seeking

16 millions, perhaps hundreds of millions of dollars later from.

17          I'm not saying -- this is all a matter of proof and

18 discovery and I don't really particularly want this to become a

19 litigation festival.  I don't think that's particularly

20 appropriate, but I think that the plaintiffs have raised

21 legitimate issues here as to what process the company has gone

22 through to determine whether someone here, even if they worked

23 really hard for the next nine months and make a lot of money

24 for the debtor, might ultimately be -- you know, there's a good

25 chance that they might really be liable here.

189

1          I don't know how I could approve a program where

2     there hasn't been some analysis of that fact.

3               MR. BUTLER:  Of what fact, Your Honor?

4               THE COURT:  Not fact, an analysis of that issue.

5               MR. BUTLER:  We have a bald, unsupported allegation -

6     -

7               THE COURT:  But it's not --

8               MR. BUTLER:  I mean I'm pushing back, Your Honor,

9     because --

10              THE COURT:  Well, I assume you asked them for their

11    discovery to see whether Rule 11 was satisfied.  Right?

12              MR. BUTLER:  Right.

13              THE COURT:  But I assume that they believe they did

14    satisfy Rule 11 and given the restatement and given the

15    investigations that are going on there may be some basis to

16    this.  I don't know whether it involves current employees or

17    not, I don't know whether it involves employees who are getting

18    bonuses or not.  They don't know either, they say.

19              So it just seems to me that contemplating the hearing

20    down the road -- and I appreciate that the issue to be heard

21    later this month is a much narrower issue then had originally

22    been teed up some months ago and maybe it's less of an issue

23    but I still see serious, legitimate concerns being raised that

24    unless the debtor just wants to say, "Well, Judge, we think

25    that's irrelevant" and sit down, in which case I have to decide

1   whether it's relevant or not and, of course, then you'll be

2   hearing all these allegations that I'm sure you're going to

3   stand up and say, "that's not true, that's not true, that's not

4   true," I think you have to draw some line somewhere to give

5   them some access and maybe it is just to a vetting process and

6   to who's covered because they say they have a lot of

7   information already and maybe the issue is moot as to a lot of

8   these people because maybe they're not being covered, the ones

9   that they think are implicated in this.

10          On the other hand, maybe you know enough to say that

11  this has been adequately considered.

12          MR. BUTLER:  Your Honor, what they're attempting to

13  do is to use a hearing to determine an annual incentive plan

14  and even, frankly, an emergence plan.  I can address the

15  emergence plans later.  They're seeking to use that as an

16  opportunity to try to take discovery and then litigate in this

17  Court at a KEYSIP hearing about what happened in 2000.

18          THE COURT:  I understand.

19          Well, I understand that and I am inclined to severely

20  limit the discovery and the extent of the litigation that they

21  want to conduct because to some extent I agree with you it's

22  transparent and it's a sideshow.

23          On the other hand, unlike the other discovery issues

24  addressed today, I think that, fundamentally, they are seeking

25  things here that are relevant because I have a very hard time -

191

1   - given the allegations that they've raised which are serious

2   and I assume that they've satisfied Rule 11 and you'll tell me

3   if they haven't -- that I would have a hard time if a

4   particular employee was implicated in those allegations in

5   awarding a bonus without at least saying you've to got escrow

6   it.

7           MR. BUTLER:  I want to play that out.

8           That has the effect for a Chapter 11 debtor of saying

9   that if people make claims against Chapter 11 debtor's

10  employees and we need to keep a workforce going forward and the

11  debtors believed we've separated the people that were actual

12  wrongdoers --

13          THE COURT:  But then I'm saying you're not letting

14  them take discovery as to your process for separating the

15  wrongdoers and apparently you're not going to tell me that

16  either at the hearing.  I don't see how you can expect me to

17  just take it on faith that that's what's happened.

18          MR. BUTLER:  Your Honor, we did not expect that an

19  incentive plan motion was going to be used by parties in the

20  case or by the Court as, frankly, an approach to try to

21  evaluate what occurred over an historic period.

22          THE COURT:  Well, all right.

23          I will use an example.  All right?

24          I don't think that I would have approved an incentive

25  plan for Mr. Fastow, even if he was still working and making

1  money for Enron and valuable for Enron.  I just wouldn't have

2  done it.

3           Now, I'm not saying that anyone who worked for this

4  company is like Mr. Fastow at all.  But they're raising the

5  issue and I think it's a legitimate issue.

6           MR. BUTLER:  Well, Your Honor, if the question is a

7  narrow question which is what is the process or consideration

8  that the company gave, for example, to make sure that our

9  annual incentive program payments don't go to crooks?

10           THE COURT:  Yes.

11           MR. BUTLER:  That narrow question is a question that

12  we could give discovery on and talk about.  That is not -- if

13  you look at their motion, that's not what their motion was.

14           THE COURT:  No, I understand that but you note that

15  if counsel wasn't -- the list of things that he went through in

16  oral argument -- and usually when people deal with discovery in

17  front of the judge they get down to brass tacks -- was who is

18  covered, which he is willing to do pursuant to an attorneys

19  eyes only so you don't reveal to each employee what each other

20  employee is getting; what process was used to determine if

21  anyone was involved in the alleged fraud and why did the 25

22  leave?  Is there really a mass exodus here or did the 25 leave

23  because, you know, fifteen of them were told to leave and ten

24  of them decided that they'd rather go work for GM or Toyota or

25  something?

1          MR. BUTLER:  Your Honor, we can give discovery on

2    that point.

3          Let's take that point, for example.  I don't know how

4    in the world that particular question has any relevance on

5    whether or not we have an annual incentive program.

6          THE COURT:  Well, I think it has a great deal of

7    relevance.

8          One of the reasons you give people incentive programs

9    is to avoid people leaving.  In fact, that's what's in the new

10   Code which, obviously, is inapplicable here but it's a major

11   factor.

12         If you're having a mass exodus then, you know, one of

13   the things people do is pay people to stay.  If the 25 people

14   or however many people that are going to be asserted at the

15   hearing have already left, if actually a lot of them left

16   because they were fired or basically were told that "you'll be

17   fired unless you leave," that's a different story.  So, you

18   know, I think that's relevant.

19         Again, what's on for January, it's probably less

20   relevant to, because as I understand, January is performance-

21   based, the typical types of targets that investment bankers and

22   employee consultants love because it incentivizes people but I

23   think those demands or those requests are ones that people have

24   to confront.

25         I agree with you that through the back door of an

194

1  annual incentive plan motion, to try the whole securities

2  litigation is just wrong.  It shouldn't be done that way but I

3  need to know what efforts the debtor has made to consider

4  whether there is liability here or, alternatively, how the

5  estate is protected if money is awarded and then it turns out

6  there is liability, which may be a more reasonable approach.

7          MR. BUTLER:  I will simply say on that lateral

8  approach, Your Honor, the debtors already have spent a

9  considerable amount of time sorting through that issue.

10          THE COURT:  Okay.

11          MR. BUTLER:  That issue is one that will be addressed

12  on the 27th.

13          THE COURT:  Okay.

14          MR. BUTLER:  That's a different issue than --

15          THE COURT:  Ultimately, going back to where I

16  started, it ultimately may be an issue of how badly the debtors

17  want to win the motion.  The debtors may decide that "we don't

18  want to put on much of a case in opposition to their objection

19  because we don't think it's necessary" and you may end up being

20  right.  On the other hand, if they make cogent and supported

21  accusations, you know, there may be an issue there unless you

22  have some backup plan like putting the money in escrow.

23          MR. BUTLER:  I do think we'll be able to address the

24  latter issue because we've given a pretty good deal of thought

25  to addressing that just in terms of having prophylactic

195

1  safeguards because, obviously, we're fiduciaries and want to

2  protect the estate too.  We know what we know and we will

3  address those issues.

4           THE COURT:  That's one of the reasons I was wondering

5  whether we should have the hearing on this now because you're

6  dealing with a moving target.

7           I mean I had gone on with this aspect of the hearing

8  thinking that you had pretty much reached agreement with the

9  committee at least on the stuff that's for January.

10          Mr. Rosenberg is shaking his head no, you know,

11  unless -- you know, I'm all for reaching agreement and

12  sometimes you don't reach agreement until the last minute but I

13  doubt you're ever going to agree with the securities law

14  plaintiffs on this so --

15          MR. BUTLER:  Your Honor, it sounds like from what I

16  understand, the guidance you're giving, it sounds like limited

17  discovery on the question about the process or consideration

18  given to make sure bonuses don't go to crooks, using my words

19  for a minute.  That that is the kind of thing that you think is

20  relevant but that the things I summarized in my response and

21  addressed on the record are not.

22          THE COURT:  That's right.

23          MR. BUTLER:  If that's the case then my suggestion

24  would be that we consider adjourning this matter to the 13th.

25  We already have -- if that's possible.  I know you don't like -

196

1  -

2          THE COURT:  Well, what I'd like to --

3          MR. BUTLER:  -- just for a meet and confer so we can

4  try and work it out before.

5          THE COURT:  Yes, I'm not adjourning it just so that

6  we can take it up again on the 13th, I'd like you two and the

7  committee, to the extent it wants to be involved, to meet and

8  confer to see whether you can at least agree upon what I've

9  just outlined.

10         MR. COFFEY:  We will, Your Honor, but just one point

11 of clarification because it's a little dangerous when my

12 adversary summarizes.

13         When you mentioned the things I just specified, that

14 was Part 2 of two pieces.  I said we asked for the mirror image

15 of what they had asked of us --

16         THE COURT:  I know.

17         MR. COFFEY:  -- and then specifics.

18         I think mutuality requires and also --

19         THE COURT:  I disagree with that.

20         I think they were responding as, I think, is

21 legitimate, to allegations that were made in your papers that

22 were pretty serious and I think they have a right to know --

23 among other things, they have a right to know because they have

24 a duty to weed out people that are bad apples.

25         MR. COFFEY:  We're happy to alert them to them, Your

197

1  Honor, if they've had trouble finding out themselves.

2       THE COURT:  Well, let me say another thing.

3       I'm not going to let them present a case against you

4  without letting you have discovery on the merits.

5       MR. COFFEY:  Your Honor, that leads to a couple of

6  points on that.

7       THE COURT:  But that's not saying that we should have

8  the discovery now because Mr. Butler is basically saying he's

9  not going to present that type of case.

10       MR. COFFEY:  Well, you know --

11       THE COURT:  Why don't you meet and confer on that

12  point?

13       MR. COFFEY:  I'll make the point, I don't accept that

14  as an alternative acceptable to us because if we put forth what

15  we have and it's arguably a thin case which they will argue,

16  but full lumination of both sides would make our case stronger.

17   I'm not willing to accept his abdication of putting a case on.

18   I'm not.

19       You know, there were specific transactions identified

20  for them.  It was used affirmatively against them -- look what

21  they're doing.  We were telling them, "Here are the

22  transactions.  What have you done?" and now they want you to

23  say, "We'll show you what the process was."  Your Honor, they

24  didn't even mention the accounting improprieties in their

25  opening papers.  Now, they want you to accept and us to have a

198

1  discovery limited to what they did?  No.  We want to test did

2  they get down there?   Did they ever talk to Laura Marion?  I'd

3  like to have her here at the hearing so that we can test the

4  process.

5              THE COURT:  I don't want to do that at this point.

6              I think I've been pretty clear that if you make

7  facially cogent arguments that are not opposed with facially

8  cogent arguments, then you have a real good shot of winning,

9  and if they're opposed with facially cogent arguments, then you

10  have a right to discovery.

11             MR. COFFEY:  Very well, Your Honor.

12             Thank you.

13             THE COURT:  But let me -- so I think that adjourning

14  it to the 13th is the right course and I'd like you to meet and

15  confer on dealing with the three things that I've discussed and

16  I should also say because it's late in the day and there may be

17  reporters here, at least one of your partners in a different

18  case is very concerned about what reporters hear.

19             I am not saying -- and I want to be really clear

20  about this -- that I believe that any officer or director of

21  these debtors is a crook or a fraud or has done anything

22  fraudulent.  That's clearly not something that is in front of

23  me.  I'm dealing with a request for discovery that would try to

24  establish that fact and so I'm dealing with hypotheticals and

25  responding to that discovery request.

1         So, for example, when I raised the Fastow example,

2   that was a hypothetical and does not suggest that I believe

3   that any of the debtors have done anything like that or that

4   the debtor's officers have or that there is a basis for

5   contending anything other than that they've conducted

6   themselves appropriately in this case, which isn't what I have

7   in front of me.

8         But what I have is a discovery request and I have to

9   consider ultimately the issues that would be raised that the

10  discovery is supposed to be for and it's in that context that

11  I'm raising these hypotheticals.

12        MR. BUTLER:  Thank you, Your Honor.

13        We'll conduct a meet and confer and report back to

14  the Court on the 13th.

15        MR. COFFEY:  Thank you, Your Honor.

16        MR. BUTLER:  Your Honor, that concludes the matters

17  on the January omnibus agenda.

18        THE COURT:  Okay.  Thank you.

19                    *  *  *  *  *

20

21

22

23

24

25

200

```
 1                        *  *  *  *  *

 2        I certify that the foregoing is a transcript from an

 3   electronic sound recording of the proceedings in the above-

 4   entitled matter.

 5

 6

 7                               KATHLEEN PRICE

 8

 9   Dated:   January 6, 2006

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```