**Hearing Date and Time:   March 9, 2006 at 10:00 a.m.**
**Objection Deadline:    March 2, 2006 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

     - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
     Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
          In re                               :     Chapter 11
                                              :
DELPHI CORPORATION, et al.,                   :     Case No. 05-44481 (RDD)
                                              :
                              Debtors.        :     (Jointly Administered)
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. § 363 AND FED. R.
BANKR. P. 6004 AUTHORIZING AND APPROVING SALE OF
DEBTORS' EQUITY INTEREST IN CHINESE JOINT
VENTURE

("MOTION TO SELL CHINESE JOINT VENTURE INTEREST")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order under 11 U.S.C. § 363 And Fed. R. Bankr. P. 6004 Authorizing And Approving Sale Of Debtors' Equity Interest In Chinese Joint Venture. In support of this Motion, the Debtors respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8, 2005 (the "Initial Filing Date"), Delphi and certain of its U.S. subsidiaries (the "Initial Filers") filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").  On October 14, 2005, three additional U.S. subsidiaries of Delphi (together with the Initial Filers, collectively, the "Debtors") also sought reorganization relief.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This Court entered orders directing the joint administration of the Debtors' chapter 11 cases (Dockets Nos. 28 and 404).

2.    On October 17, 2005, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "Creditors' Committee").  No trustee or examiner has been appointed in the Debtors' cases.

3.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.      The statutory predicate for the relief requested herein is section

363 of the Bankruptcy Code and Rule 6004 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules").

B.      Current Business Operations Of The Debtors

5.      Delphi had global 2004 revenues of approximately $28.6 billion,

and global assets as of August 31, 2005 of approximately $17.1 billion.[1]  Delphi ranks as

the fifth largest public company business reorganization in terms of revenues, and the

thirteenth largest public company business reorganization in terms of assets.  Delphi's

non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations

without supervision from the Bankruptcy Court.

6.      Delphi has become a leading global technology innovator with

significant engineering resources and technical competencies in a variety of disciplines,

and the Company (as defined below) is today arguably the single largest global supplier

of vehicle electronics, transportation components, integrated systems and modules, and

other electronic technology.  The Company's technologies and products are present in

more than 75 million vehicles on the road worldwide.  The Company supplies products to

nearly every major global automotive original equipment manufacturer, with 2004 sales

to its former parent, General Motors Corporation ("General Motors" or "GM"), equaling

approximately $15.4 billion, and sales to each of Ford Motor Company, DaimlerChrysler

Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding

$850 million.

---

[1]      The aggregated financial data used in this Motion generally consists of
consolidated information from Delphi and its worldwide subsidiaries and
affiliates.

7.       As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world.  As of the Initial Filing Date, the Debtors employed approximately 180,000 employees worldwide.  The Debtors' 50,600 U.S. employees worked in approximately 44 manufacturing sites, 13 technical centers, and Delphi's Troy, Michigan headquarters.  Approximately 34,750 of the Debtors' U.S. employees were hourly employees as of the Initial Filing Date, and 96% of these were represented by approximately 49 different international and local unions. Outside the United States, the Company's foreign entities employed more than 134,000 people on the Initial Filing Date, supporting 120 manufacturing sites and 20 technical centers in nearly 40 countries around the globe.

8.       Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates (collectively, the "Company") in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

9.    Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle.  When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base.  The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base.  The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C.    Events Leading To Chapter 11 Filing

10.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales.  Reflective of a downturn in the marketplace, Delphi's financial condition deteriorated further in the first six months of 2005, with net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, approximately $1 billion less than the same time period a year earlier.[2]

_____

[2]    Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

11.    The Debtors believe that the Company's financial performance has deteriorated because of: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward looking revenue requirements. Because discussions with its unions and GM were not progressing sufficiently, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

13.    Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses.  This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness.  The Debtors believe that a substantial segment of Delphi's U.S. business operations must be divested, consolidated, or wound-down during these cases.

6

14.     Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

<u>Relief Requested</u>

15.   By this Motion, the Debtors seek entry of an order (the "Sale Order") under 11 U.S.C. § 363 authorizing Delphi Electronics (Holding) LLC ("Delphi Electronics"), a Debtor, to sell its fifty percent equity interest in the joint venture Shanghai Delco Electronics & Instrumentation Company Ltd ("SDE") to its joint venture partner, Shanghai Agriculture, Industry & Commerce Group Changjiang General Corporation ("Changjiang") and Changjiang's senior manager, Mr. Yang Yi (together, the "Purchasers").  The sale of Delphi Electronics' equity interest (the "Transaction") will be pursuant to a transfer agreement (the "Transfer Agreement"), a copy of which, substantially in the form to be executed, is attached hereto as Exhibit A.

<u>Basis For Relief</u>

A.  <u>Background And Marketing Efforts For The Proposed Transaction</u>

16.   SDE produces instrument clusters for automobiles.  Delphi Electronics has de-emphasized its focus on the instrument clusters product line as part of its ongoing product portfolio process.  The Transaction will allow Delphi Electronics to exit the SDE joint venture at a time when it is limiting its investment in cluster

7

technology and competing global automotive component suppliers have entered the Asian region.

       17.   Delphi Electronics marketed the sale of its interest in SDE extensively.  Over the course of three years, Delphi Electronics approached nearly twenty potential buyers for its equity interest in SDE.  Although several prospects expressed early interest to the point of making non-binding offers for Delphi Electronics' equity interest in SDE, all subsequently withdrew their offers after further discussions and/or due diligence.  Delphi Electronics also worked with three Asian-based investment bankers to help identify other potential buyers, including financial buyers.  The regional investment bankers, however, declined the engagement due to their perceptions about the feasibility and profitability and difficulty of finding a buyer.

       18.   Early in 2005 Delphi Electronics began discussing in earnest the sale of its equity interest to its joint venture partner and its senior manager - i.e., the current Purchasers.  Over the course of several months, Delphi Electronics negotiated the economic and legal terms of the Transaction with the Purchasers.  After careful evaluation, and after consulting with their advisors and certain creditor constituencies, the Debtors determined, in their sound business judgment, that the sale of its equity interest in SDE to the Purchasers was the best alternative.

       19.   Accordingly, the Debtors finalized with the Purchasers the terms of the Transaction reflected by the Transfer Agreement.  The Debtors submit that the decision to complete the Transaction represents a proper exercise of the Debtors' business judgment. As described above, the Debtors believe that the marketing efforts to date have resulted in the highest or otherwise best offer in the form of the Transfer Agreement.

Nevertheless, the Debtors will serve a copy of this Motion upon each of the potential buyers and/or their agents who expressed an interest in Delphi Electronics' equity interest in SDE and will evaluate any other bids which the Debtors may receive.

B.  The Structure Of SDE And The Proposed Transaction

20.    Delphi Electronics established the joint venture SDE, a company incorporated in the People's Republic of China, with Changjiang in 1995.  Each of Delphi Electronics and Changjiang currently owns 50 percent of the equity of SDE.

21.    The Transaction proposes a total sale price of $7.5 million (the "Purchase Price") to be paid to Delphi Electronics for its fifty percent equity interest in SDE.  Payment of the Purchase Price is as follows:  (i) fifty percent of the Purchase Price ($3,750,000) will be payable on closing, (ii) forty percent of the Purchase Price ($3,000,000) will be payable within 12 months from closing, and (iii) the final payment of 10 percent of the Purchase Price ($750,000) will be made within 24 months from closing.

22.    Changjiang will acquire forty-five percent of the equity interest in SDE from Delphi Electronics for $6,750,000.  Mr. Yang Yi will acquire five percent of the equity interest in SDE from Delphi Electronics for $750,000.

23.    The parties anticipate that the Transaction will be completed by June 2006.  Upon consummation of the transaction, the Articles of Association of SDE and the joint venture contract between Delphi Electronics and Changjiang will be terminated.

Applicable Authority

24.    The Debtors submit that under section 363 of the Bankruptcy Code
and Bankruptcy Rule 6004, this Court should authorize the Debtors to enter into the
Transaction.

25.    Section 363(b)(1) of the Bankruptcy Code provides, in pertinent part,
that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the
ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although
section 363 of the Bankruptcy Code does not set forth a standard for determining when it
is appropriate for a court to authorize the sale or disposition of a debtor's assets, courts in
the Second Circuit and others, in applying this section, have required that it be based
upon the sound business judgment of the debtor.  See In re Chateaugay Corp., 973 F.2d
141 (2d Cir. 1992) (holding that a judge determining § 363(b) application must find good
business reason to grant such application from evidence presented before him);
Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063,
1071 (2d Cir. 1983) (same); In re Delaware Hudson Ry. Co., 124 B.R. 169, 179 (Bankr.
D. Del. 1991).

26.    Once the debtor articulates a valid business justification, "'[there is a
presumption that in making a business decision the directors of a corporation acted on an
informed basis, in good faith and in the honest belief that the action taken was in the best
interests of the company.'"  In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y.
1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)); see also In re
RCN Corp., June 22, 2004 Hr'g Tr. ¶¶ 51:3–12 (approving exit financing commitments
pursuant to 363(b) of Bankruptcy Code).  Once a valid business judgment is made, the
business judgment rule shields a debtor's management from judicial second-guessing.  In

re Farmland Indus., Inc., 294 B.R. at 913 (quoting In re Johns-Manville Corp., 60 B.R.

612, 615-16 (Bankr. S.D.N.Y. 1986)) ("'[T]he Code favors the continued operation of a

business by a debtor and a presumption of reasonableness attaches to a debtor's

management decisions.'").  Once the Debtors articulate a valid business justification,

"[t]he business judgment rule 'is a presumption that in making a business decision the

directors of a corporation acted on an informed basis, in good faith and in the honest

belief that the action was in the best interests of the company.'"  In re Integrated Res., Inc.,

147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872

(Del. 1985)).

       27.   Here, the Debtors submit that the Transaction is warranted under

section 363 of the Bankruptcy Code.  The Transaction contemplates the "sale" of estate

assets and reflects a valid exercise of the Debtors' business judgment in light of the

benefits that will accrue to the Debtors as a result of the Transaction.  See In re Baldwin

United Corp., 43 B.R. 888, 890 n.1 (Bankr. S.D. Ohio 1984) (agreeing that the 363

standard should govern).

       28.   In light of the tangible, important benefits expected to accrue to the

Debtors by consummating the Transaction, this Court should grant the relief requested in

this Motion.  Delphi Electronics is de-emphasizing its focus on the instrument clusters

product line and the Transaction will allow the Debtors to exit the SDE joint venture at an

advantageous sale price.  Consummating the Transaction represents a valid exercise of

the Debtors' business judgment and is in the best interests of the estates.

Notice

29.    Notice of this Motion has been provided in accordance with the

Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007,

And 9014 Establishing (I) Omnibus Hearing Dates, (II) Certain Notice, Case

Management, And Administrative Procedures, And (III) Scheduling An Initial Case

Conference In Accordance With Local Bankr. R. 1007-2(e), which was entered by this

Court on October 14, 2005 (Docket No. 245).  In light of the nature of the relief requested,

the Debtors submit that no other or further notice is necessary.


Memorandum Of Law

30.    Because the legal points and authorities upon which this Motion

relies are incorporated herein, the Debtors respectfully request that the requirement of the

service and filing of a separate memorandum of law under Local Rule 9013-1(b) be

deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order (a)

authorizing the Debtors to transfer sell it fifty percent equity interest in SDE to the

Purchasers and (b) granting the Debtors such other and further relief as is just.

Dated: New York, New York
　　　　February 17, 2006

　　　　　　　　　　　　　SKADDEN, ARPS, SLATE, MEAGHER
　　　　　　　　　　　　　　& FLOM LLP

　　　　　　　　　　　　By: /s/ John Wm. Butler, Jr.
　　　　　　　　　　　　　　John Wm. Butler, Jr. (JB 4711)
　　　　　　　　　　　　　　John K. Lyons (JL 4951)
　　　　　　　　　　　　　　Ron E. Meisler (RM 3026)
　　　　　　　　　　　　333 West Wacker Drive, Suite 2100
　　　　　　　　　　　　Chicago, Illinois  60606
　　　　　　　　　　　　(312) 407-0700

　　　　　　　　　　　　　　　　- and -

　　　　　　　　　　　　By: /s/ Kayalyn A. Marafioti
　　　　　　　　　　　　　　Kayalyn A. Marafioti (KM 9632)
　　　　　　　　　　　　　　Thomas J. Matz (TM 5986)
　　　　　　　　　　　　Four Times Square
　　　　　　　　　　　　New York, New York 10036
　　　　　　　　　　　　(212) 735-3000

　　　　　　　　　　　　Attorneys for Delphi Corporation, et al.,
　　　　　　　　　　　　　　Debtors and Debtors-in-Possession

13

**EXHIBIT A**

**TRANSFER AGREEMENT**

# CONTRACT CONCERNING THE TRANSFER OF EQUITY INTEREST

**IN SHANGHAI DELCO ELECTRONICS & INSTRUMENTATION COMPANY LTD**

**between**

**SHANGHAI AGRICULTURE, INDUSTRY & COMMERCE GROUP CHANGJIANG GENERAL CO., LTD.**

**and**

**Yang Yi**

**and**

**DELPHI ELECTRONICS HOLDING LLC.,**

**and**

**SHANGHAI DELCO ELECTRONICS & INSTRUMENTATION COMPANY LTD**

**____, 2006**

**Shanghai, China**

# Contents

Page

ARTICLE 1      GENERAL PROVISIONS ......................................................................... 1

ARTICLE 2      TRANSFER OF REGISTERED CAPITAL .............................................. 3

ARTICLE 3      FAIR CONSIDERATION......................................................................... 5

ARTICLE 4      LIQUIDATION AND DISSOLUTION ...................................................... 6

ARTICLE 5      REPRESENTATIONS, WARRANTIES AND COVENANTS ................................ 7

ARTICLE 6      TERMINATION OF OTHER REGISTRATION AND CERTIFICATES................ 8

ARTICLE 7       RELEASES ............................................................................................ 9

ARTICLE 8      DELPHI TECHNOLOGY LICENSE AND SERVICE SUPPORT........................... 9

ARTICLE 9      BREACH OF CONTRACT ...................................................................... 9

ARTICLES 10    CONFIDENTIALITY............................................................................... 10

ARTICLE 11     MISCELLANEOUS PROVISIONS ........................................................ 11

Appendix I     Equity Interest to be Transferred to Purchaser.......................................... 15

Appendix II    Termination Agreement to the Joint Venture Contract and Articles of Association  16

Appendix III   Deliverables at Closing .......................................................................... 17

- i -

## Contract Concerning the Transfer of Equity Interest
## in Shanghai Delco Electronics & Instrumentation Company, Ltd.

THIS CONTRACT is made this _____ day of_____, 2006 in Shanghai, People's Republic of China ("PRC"), by and between

(1)    **SHANGHAI AGRICULTURE, INDUSTRY & COMMERCE GROUP CHANGJIANG GENERAL CO., LTD.,** a company limited by shares registered with the Administration for Industry and Commerce, China (Business License No. _____), organized and existing under the laws of the PRC, and with its legal address at _____, China ("Changjiang General");

(2)    **YANG YI**, a PRC citizen with the domicile at _____ and ID card No. of _____(" Yang Yi ");

Changjiang General and Yang Yi being collectively referred to in this Contract as "Purchaser".

(3)    **DELPHI ELECTRONICS HOLDING LLC.** (formerly known as Delco Electronics International, Inc. whose name has been legally changed to Delphi Electronics (Holding) LLC effective on September 23, 2002.), a corporation organized and existing under the laws of the State of Delaware, United States of America ("USA"), with its registered address at The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801 USA ("Seller or Delphi");

(4)    **SHANGHAI DELCO ELECTRONICS & INSTRUMENTATION COMPANY LTD**, a Sino-foreign equity joint venture organized and existing as an enterprise legal person under the laws of the PRC (the "Company");

Purchaser (including Changjiang General and Yang Yi) , Seller and the Company are referred to collectively as the "Parties", and each individually as a "Party".

## ARTICLE 1    GENERAL PROVISIONS

1.1    Preliminary Statements

1.1.1    Changjiang General and Delphi are parties to a joint venture contract dated December 15, 1995 (as amended by Amendment No.1 to the Joint Venture Contract dated July 28, 2000) (the "Joint Venture Contract") and parties to a set of Articles of Association dated December 15, 1995 (as amended by Amendment No.1 to Articles of Association of the Company dated July 28, 2000) (the "Articles of Association") for the establishment of the Company. In accordance with the Joint Venture Contract and the Articles of Association, each of Changjiang General and Delphi owns fifty percent (50%) of the total equity interests of the Company.

1.1.2    On September 23, 2002, Seller changed its company name from "Delco Electronics

1

International, Inc." to "Delphi Electronics (Holding) LLC".

1.1.3    Seller intends to transfer, and Purchaser intends to purchase, Seller's entire fifty percent (50%) equity interest in the Company, which represents the paid-in registered capital in the amount of Renminbi Sixty One Million Two Hundred and Twelve Thousand Five Hundred Yuan (RMB 61,212,500) contributed by Seller pursuant to the Joint Venture Contract (the "<u>Equity Interest Transfer</u>") according to the terms and conditions in this Contract and the applicable laws.   The Parties intend that Seller's said fifty percent (50%) equity interest shall be sold to and acquired by Changjiang General and Yang Yi in the respective portions detailed in Appendix I attached hereto ("<u>Allocated Proportions</u>"). Among which, Changjiang General will purchase 45% equity interest of the Company and Yang Yi will purchase 5% equity interest of the Company.

1.1.4    The Equity Interest Transfer was unanimously approved by the board of directors of the Company (the "<u>Board of Directors</u>") on the board meeting held on _____, 2006 and is subject to approval by Shanghai Foreign Investment Commission (the "<u>Approval Authority</u>").

1.1.5    Upon the consummation of the Equity Interest Transfer, Purchaser shall collectively own one hundred percent (100%) of the equity interest in the registered capital of the Company and the Company shall cease to exist as a Chinese-Foreign joint venture, and shall submit an application to the competent Administration Authority of Industry and Commerce (the "<u>SAIC</u>") for conversion of the Company from a foreign-invested enterprise to a domestically-owned enterprise (the "<u>Converted Co.</u>").

1.1.6    Changjiang General and Delphi have agreed to terminate the Joint Venture Contract and the Articles of Association and other documents further mentioned herein below to reflect the transactions contemplated hereby.

1.2    <u>Definitions</u>

All terms used in this Contract, but not otherwise defined herein, shall have the meanings ascribed to them in the Joint Venture Contract.

1.3    <u>Headings</u>

The headings in this Contract are inserted for convenience only and shall not affect the construction of this Contract.

1.4    <u>Authority of Changjiang</u>

Yang Yi hereby confirms and agrees that Changjiang General shall have full authority to act on his behalf in respect of any and all matters whatsoever relating to this Contract and the transactions contemplated hereby; that Yang Yi shall be unconditionally bound by all agreements, consents, waivers, compromises, decisions, notices and/or communications, made and/or conveyed by Changjiang General to Seller, concerning any and all matters whatsoever relating to this Contract and the transactions contemplated hereby; and that Seller shall be entitled to accept and rely on all such agreements, consents, waivers, compromises, decisions, notices and/or communications as having been duly made or

2

conveyed on behalf of Changjiang General and Yang Yi.

## ARTICLE 2    TRANSFER OF REGISTERED CAPITAL

2.1    <u>Equity Interest Transfer</u>

Subject to the terms and conditions of this Contract, the Parties hereby agree that on the Closing Date (as defined in Section 2.3.1 below), Seller shall sell, transfer and assign to Purchaser, and Purchaser shall (as between them, in the Allocated Proportions) purchase from Seller, Seller's entire equity interest in the registered capital of the Company together with all rights, liabilities and obligations incidental thereto, which constitutes fifty percent (50%) of the registered capital of the Company (the "<u>Transferred Equity Interest</u>"), but excluding any dividends of the Company in the financial year of 2005.

<u>2.2</u>    2005 Dividends

The Parties recognize that if the Company has any operational income in the calendar year 2005 based on the 2005 audited accounts of the Company, the Parties shall take all reasonable actions to cause the Company adopt a board resolution to declare and make such dividend payment to the Parties according to its equity interest held by the respective party in the Company before the Closing Date (defined hereinafter).

2.3    <u>Closing</u>

2.3.1    Subject to the terms and conditions of this Contract, completion of the sale and purchase of the Transferred Equity Interest contemplated by this Contract (the "<u>Closing</u>") shall take place before 4 p.m. on the 30th working day after the date (the "<u>Approval Date</u>") on which this Contract is approved by the Approval Authority and an approval letter on the transfer of the Transferred Equity Interest for the Company reflecting the Equity Interest Transfer under this Contract (the "<u>Approval Letter</u>") is issued or such other date as the Parties may agree in writing (the "<u>Closing Date</u>"), at the offices of the Company.

2.3.2    The Closing shall be subject to and conditional upon the following (unless waived in writing by the affected Party):

(i)    <u>Representations and Warranties</u>: The respective representations and warranties of the Parties shall be true and correct in all material respects as of the Closing Date.

(ii)    <u>No Proceeding or Litigation</u>: No claim, action, suit, inquiry, proceeding or investigation shall have been commenced or threatened by or before any governmental authority or non-governmental authority against any Party, seeking to restrain the transactions contemplated by this Contract which, in the reasonable, good faith determination of Seller, is likely to render it impossible or unlawful to consummate such transactions.

(iii)    <u>Board Approval</u>: The Board of Directors shall have unanimously adopted resolutions approving the Equity Interest Transfer and other transactions contemplated hereby, including but not limited to, this Contract, the

3

Termination Agreement to the Joint Venture Contract the Articles of Association, and change of legal representative of the Company.

(iv)   <u>Registration of Change of Legal Representative with SAIC</u>: The Company shall register with SAIC immediately after but not later than five (5) days after the adoption of the board resolution for the change of legal representative of the Company. Before such registration, Changjiang General shall provide to the Company an appointment letter for the new legal representative to be appointed by Changjiang General and other necessary documents.

(v)   <u>State-owned Assets Approval</u>: Shanghai Municipal Agriculture, Industry and Commerce (Group) General Corporation has performed the necessary approval procedures on behalf of State-owned Assets Supervision and Administration Commission of Shanghai Municipal Government on the purchase of 45% equity interest of the Company by Changjiang, including the approval or filing procedures on the assets evaluation result in relation to the Transferred Equity Interest.

(vi)   <u>Certificate of Property Rights Transaction</u>: Shanghai United Assets and Equity Exchange has issued the Certificate of Property Rights Transaction on the purchase of 45% equity interest of the Company by Changjiang.

(vii)   <u>Government Approval</u>: This Contract and any other documentations related to the transactions contemplated by this Contract, including without limitation, the board resolutions, the application letter, the Termination Agreement to the Joint Venture Contract and Articles of Association as attached hereto as Appendix II (collectively refereed to as the "<u>Transaction Documents</u>") shall have been approved by the Approval Authority, in such form and substance as are acceptable to the Parties, which shall not substantially vary the terms and conditions of the Transaction Documents or impose any additional terms and conditions.

(viii)   <u>State Administration of Foreign Exchange Approval</u>: Purchaser shall obtain from the State Administration of Foreign Exchange as may be necessary all such approvals as may be required under the laws and regulations of the PRC for the conversation of the Purchase Price and the payment thereof to Seller as specified in Section 3.2 herein.

(ix)   <u>Bank Guarantee</u>: Before the Closing Date, Seller shall have received an irrevocable bank guarantee Letter (the "Bank Guarantee") from a bank acceptable to Seller, which shall indicate that in the event of failure by Changjiang General and/or Yang Yi to pay any amount due  according to Section 3.2.1 (b) and/or (c), the bank shall pay such amount together with any interest thereon unconditionally upon the first demand made by Seller to the bank. The Bank Guarantee will be put in place to guarantee the payment by Changjiang General and Yang Yi consistent with the payment schedule shown in Section 3.2.1 (b) and (c). Any expenses arising from the issuance of the Bank Guarantee shall be solely borne by Purchaser.

4

    (x)    <u>Authorizations of Parties</u>: Each Party shall have delivered to the other Parties copies of authorizations and/or duly adopted resolutions approving the execution and delivery of this Contract, and the performance by such Party of its obligations under this Contract.

    (xi)    <u>Bankruptcy Court Order</u>: the bankruptcy court administering Delphi Corporation's bankruptcy case (the "Bankruptcy Court") has entered an order approving the Equity Interest Transfer and other transactions contemplated hereby to the Purchaser.

2.3.3    At the Closing, Purchaser shall deliver or cause to be delivered to Seller the deliverables specified in Part I of Appendix III hereto, and Seller shall deliver or cause to be delivered to Purchaser the deliverables specified in Part II of Appendix III hereto.

2.4    <u>Assumption of Rights & Obligations</u>

2.4.1    Upon the transfer of the Transferred Equity Interest by Seller to Purchaser on the Closing Date, Purchaser shall collectively own one hundred percent (100%) of the equity interest in the registered capital of the Converted Co. and be entirely responsible for the operations of the Converted Co., and shall assume all obligations in relation thereto.

2.4.2    Upon the transfer of the Transferred Equity Interest by Seller to Purchaser on the Closing Date, Purchaser shall assume in full all rights, obligations and liabilities arising from or in connection with the Transferred Equity Interest and for all obligations and liabilities in connection with the Converted Co. and/or its business and activities and shall ensure that Seller will be released from any claims, obligations, liabilities or legal proceedings arising from or in connection with the Transferred Equity Interest or the Company, regardless whether arising before or after the Closing Date and any such claims, obligations and liabilities or legal proceedings shall not affect the Purchase Price as agreed by the Parties in Section 3.1 hereof.

2.4.3    As between Seller and Purchaser, notwithstanding any other provision in this Contract, Changjiang General and Yang Yi shall be jointly and severally liable to Seller in respect of each and every obligation and liability of Purchaser (or either of them) under this Contract, including the obligation to pay the Purchase Price under Article 3. As between Changjiang General and Yang, all rights and liabilities of Purchaser under this Contract shall be assumed and performed by them in the Allocated Proportions.

## ARTICLE 3      FAIR CONSIDERATION

The Parties acknowledge and agree that the Purchase Price constitutes fair and equitable consideration for the Equity Interest Transfer.

3.1    Purchase Price

The Purchase Price for the sale and transfer by Seller to Purchaser of the Transferred Equity Interest shall be USD7,500,000 (In Words: seven million five hundred thousand United States Dollars);

3.2    Payment of the Purchase Price

3.2.1    The Purchase Price of USD 7,500,000 (In Words: seven million five hundred thousand United States Dollars) shall be paid and remitted in US Dollars by Changjiang General and Yang Yi in the Allocated Proportions, to Seller's offshore account specified by Seller in the following three installments:

(a)    50% of the Purchase Price, USD3,750,000 (In Words: Three Million Seven Hundred and Fifty Thousand United States Dollars), payable on the Closing Date. Among which, Changjiang General shall pay USD3,375,000 (In Words: Three Million Three Hundred and Seventy-five Thousand United States Dollars) and Yang Yi shall  pay USD375,000 (In Words: Three Hundred and Seventy-five Thousand United States Dollars);

(b)    40% of the Purchase Price, USD3,000,000 (In Words: Three Million United States Dollars), payable within twelve (12) months from the Closing Date. Among which, Changjiang General shall pay USD2,700,000 (In Words: Two Million Seven Hundred Thousand United States Dollars) and Yang Yi shall pay USD300,000 (In Words: Three Hundred Thousand United States Dollars);

(c)    10% of the Purchase Price, USD750,000 (In Words: Seven Hundred and Fifty Thousand United States Dollars), payable within twenty-four (24) months from the Closing Date. Among which, Changjiang General shall pay USD675,000 (In Words: Six Hundred and Seventy-five Thousand United States Dollars) and Yang Yi shall  pay USD75,000 (In Words: Seventy-five Thousand United States Dollars).

3.2.2    Purchaser shall pay interest to Seller upon any and all amounts of payments that are at any time unpaid to Seller at the prime rate prevailing at the J.P. Morgan Chase & Co. of New York compounded annually in effect in New York City, U. S. A. from the date when such payments are due and payable as provided herein to the date of payment.

3.3    Bank Charges

All bank charges incurred within China will be paid by Purchaser, and all bank charges incurred outside China will be paid by Seller.

### ARTICLE 4    LIQUIDATION AND DISSOLUTION

The Parties agree to conduct the Equity Interest Transfer in accordance with the terms and conditions of this Contract and that in the event that this Contract is not approved by the Approval Authority six (6) months after the execution of this Contract by the Parties, the Company shall be dissolved and

liquidated in accordance with the Liquidation Rules of the Foreign Investment Enterprises, approved by the State Council on June 15, 1996 and promulgated by the Ministry of Foreign Economic and Trade Cooperation on July 9, 1996 and the relevant Chinese laws and regulations.


### ARTICLE 5        REPRESENTATIONS, WARRANTIES AND COVENANTS

5.1    Seller's Representations and Warranties

Seller hereby represents and warrants to Purchaser that, as of the date hereof and as of the Closing Date:

(a)    The Equity Interest is and will be free from any charges, pledges, encumbrances and any third party rights of any kind whatsoever.

(b)    There are no lawsuits, arbitration, legal, administrative or other proceedings or governmental investigations pending or, to the best knowledge of Seller, threatened against it with respect to the subject matter of this Contract or that could affect in any way Seller's ability to enter into or perform this Contract.

5.2    Purchaser's Representations and Warranties

Changjiang General and Yang Yi hereby jointly and severally represents and warrants to Seller, and undertakes, that, as of the date hereof and as of the Closing Date:

(a)    Prior to the Closing Date contemplated by this Contract, Purchaser shall assure and cause the management staff of the Company appointed by Purchaser not to obstruct Seller and the management staff of the Company appointed by Seller to manage and monitor the bank account of the Company, including but not limited to the cash flow of the Company in the bank accounts of the Company, and other management and personnel issues of the Company as deemed necessary by Seller.

(b)    It has obtained and will maintain in effect all governmental approvals required to execute and perform each of its obligations and the Company's obligations under this Contract.

(c)    It shall not claim any items from Seller related to the Company, and warrant that Purchaser shall be fully responsible for the operation and performance of the Company post-closing, and of the Converted Co..

(d)    That the execution by Purchaser of this Contract and the performance of their respective obligations thereunder will not result in a breach of any contract or commitment or any government or court order, judgment or decree entered into by or otherwise binding upon Purchaser.

5.3    Notifications to Suppliers and Customers

Promptly and not later than thirty (30) days after the Closing Date, Purchaser shall cause the Company to issue to each of the Company's suppliers and customers written notification, in form and substance acceptable to Purchaser and Seller, of the change or impending change

7

of status for the Company to Converted Co. and the termination of the joint venture between Changjiang General and Seller.

5.4    Further Assurances

Each of the Parties agrees to expeditiously execute such documents and perform such further acts as may be reasonably required or desirable to carry out or to perform the provisions and purposes of this Contract.

## ARTICLE 6    TERMINATION OF OTHER REGISTRATION AND CERTIFICATES

6.1    Cancellation of the Approval Certificate

Purchaser shall cause the Company to surrender its Approval Certificate immediately after but not later than five (5) days after obtaining the Approval Authority's Approval Letter for the Equity Interest Transfer contemplated herein.

6.2    Cancellation of the Investment Certificates

On the Closing Date, the investment certificate previously issued to Seller by the Company shall be canceled, and Purchaser shall collectively own One Hundred percent (100%) of the equity interest in the registered capital of the Converted Co. pursuant to its articles of association, which 100% equity interest shall be lawfully held by Changjiang General at 95% and Yang Yi at 5%.

6.3    Seals of the Company

The Seals of the Company shall be surrendered to the SAIC for the purpose of cancellation of Company's registration, and new Seals of Converted Co. shall be obtained by the Converted Co. separately.

6.4    Termination of Joint Venture Contract and Articles of Association

(a)    Changjiang, Delphi and the Company hereby agree that the Joint Venture Contract and the Articles of Association of the Company shall terminate and cease to have further effect as of the Closing Date.

(b)    Without prejudice to the generality of the foregoing, Changjiang General and/or the Company shall execute such termination contracts or other like documents as Delphi may request in respect of the termination.

6.5    Other Delphi Related Documents

With regard to all contracts and other legal documents, other than the Technology License Contract as set forth in Article 8 hereof, entered into by Delphi and/or Delphi's Affiliates with the Company (the "Delphi Related Documents"), Purchaser, Seller and the Company hereby agree that:

(a) Secondment Contract between the Company and Delphi dated February 2, 1996 will be amended according to the Amendment to Secondment Contract which will be signed otherwise; and

(b) Technology License Contract between the Company and Delphi Technologies Inc. dated March 16, 2004 (for Compass) will remain valid until the expiration thereof on March 15, 2014.

Affiliate of a Party to this Contract shall mean a company directly or indirectly controlling, controlled by, or under common control with the Party. A company is controlled by ownership of more than fifty percent (50%) of the stock entitled to vote for directors or persons performing a function similar to that of directors.

## ARTICLE 7     RELEASES

After the Joint Venture Contract or the Articles of Association is terminated respectively, each of the Parties hereto (including the Company) shall release each of the other parties hereto and their Affiliates from all further obligations under the Joint Venture Contract and the Articles of Association, and from any and all claims, losses, liabilities, damages, deficiencies, judgments, assessments, fines, settlements, costs or expenses (including interest, penalties and fees, expenses and disbursements of attorneys, experts, personnel and consultants incurred by any Party in any action or proceeding among the Parties or between any Party and any third party, or otherwise) based upon, arising out of, in relation to or otherwise in respect of the Joint Venture Contract or the Articles of Association.

## ARTICLE 8     DELPHI TECHNOLOGY LICENSE AND SERVICE SUPPORT

After the expiration of the Technology License Contract between the Company and Delphi dated February 2, 1996, Supplemental Contract No. 1 dated September 15, 1998 and Amendment to Technology License Contract dated February 16, 2004, all of which will expire on June 30, 2006. Delphi agrees to continuously license certain technology to the Company according to the technology license contract for compass until the termination or expiration thereof, and provide technology license and technical support to the Company according to a separate Technology License Contract and Technical Service Agreement which will be executed between Delphi or Delphi's Affiliate and the Company.

## ARTICLE 9     BREACH OF CONTRACT

Except as otherwise provided herein, if a Party (the "Breaching Party") fails to perform any of its obligations under this Contract, then the other Parties (the "Aggrieved Parties") may at its option, in addition to its other rights under Applicable Laws:

(a)     give written notice to the Breaching Party, describing the nature and scope of the breach and demanding that the Breaching Party cure the breach at its cost within the time specified in the notice (being no more than a [thirty (30)] day period); and

(b)     if the Breaching Party fails to cure the breach within such specified period following delivery of such written notice, the Aggrieved Parties may claim direct and foreseeable damages arising from the breach.

9

Notwithstanding the abovementioned, if Purchaser fails to pay the Purchase Price in accordance with Article 3, Seller is entitled to serve notice on Changjiang General requiring Purchaser to take such steps and execute all legal documents and agreements as are necessary to terminate this Contract, rescind the approvals and reinstate the Parties to the positions they were in prior to the date of this Contract, and compensate Seller against any losses, damages, costs, expenses and liabilities arising therefrom.

## ARTICLES 10    CONFIDENTIALITY

10.1    <u>Public Announcement</u>

Subject to Section 10.3, none of the Parties shall make any public announcement concerning this Contract, the Transaction Documents or any other or subsequent documents executed by the Parties in relation to the transfer without the prior written approval (which approval shall not be unreasonably withheld) from the other Parties.

10.2    <u>Confidential Information</u>

Subject to Section 10.1 and 10.3, each Party shall treat as confidential and not disclose or use any information received or obtained as a result of entering into this Contract or any Transaction Document (or any agreement, contract or document entered into pursuant to the foregoing), which relates to:

(a)    the provisions of this Contract, the Transaction Documents, or any such other agreements or contracts or documents entered into pursuant to the foregoing;

(b)    the negotiations relating to this Contract, the Transaction Documents or such other agreements, contracts or documents; or

(c)    the business, financial or other affairs of the other Parties (including future plans and targets).

10.3    <u>Public Information</u>

Sections 10.1 and 10.2 shall not prohibit disclosure or use of any information if and to the extent:

(a)    the disclosure or use is required by applicable law, any regulatory body or the rules and regulations of any stock exchange or for the purpose of obtaining approvals;

(b)    the disclosure or use is required to vest the full benefit of this Contract or any of the Transaction Document in each Party;

(c)    the disclosure or use is required for the purpose of any judicial proceedings arising out of this Contract or any of the Transaction Document or any other agreement, contract or document entered into under this Contract, or the disclosure is reasonably required to be made to a Taxation Authority in connection with the Taxation affairs of the disclosing Party;

(d)     the disclosure is made to professional advisers of either of the Parties provided such professional advisers comply with the provisions of Section 10.2 in respect of such information as if they were a party to this Contract;

(e)     the disclosure or use is otherwise required by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Contract;

(f)     the information becomes publicly available (other than by breach of this Contract);

(g)     the other Parties has given prior written approval to the disclosure or use; or

(h)     the information is independently developed after the Closing Date,

provided that prior to the disclosure or use of any information pursuant to Section 10.3 (a), 10.3 (b), 10.3 (c) (except in the case of disclosure to the Taxation Authority) 10.3 (d) or 10.3 (e), the Party concerned shall promptly notify the other Parties of such requirement with a view to providing the other Parties with a reasonable opportunity to contest such disclosure or use or otherwise to agree the timing and content of such disclosure or use.


## ARTICLE 11     MISCELLANEOUS PROVISIONS

11.1    <u>Waiver</u>

No waiver by any Party of any breach by any other Party of any provision hereof shall be deemed to be a waiver of any subsequent breach of that or any other provision hereof and any forbearance or delay by any Party in exercising any of its rights hereunder shall not be construed as a waiver thereof.

11.2    <u>Entire Agreement</u>

This Contract supersedes all prior agreements made among the Parties with respect to the subject matter hereof and constitutes the entire agreement among the Parties.  It is expressly agreed that no amendments hereof shall be effective unless made in writing and signed by all Parties.

11.3    <u>Language</u>

This Contract is executed in Chinese and English in _____ (__) counterparts in each language.  Both English and Chinese language versions shall be equally valid.  Each Party acknowledges that it has reviewed both language texts of this Contract and that they are the same in all material respects.

11.4    <u>Taxes and Expenses</u>

Except as otherwise expressly provided in this Contract, any and all Taxes, including any stamp duty, fees or expenses, arising due to or from this transaction shall be borne by each Party respectively upon whom the applicable law, regulation or jurisdiction's customs imposes the obligation to pay.  Accordingly, but without limiting the foregoing, any Taxes, fees and expenses incurred by the Company as a result of this transaction, or otherwise, shall be borne by the Company.  Each Party shall pay its own legal expenses.  If one Party has

paid any Taxes, fees or expenses required to be paid by the other Parties, the Party required to pay such Taxes, fees or expenses shall promptly reimburse the other Parties after receipt of notice thereof from such Party and shall furnish the other Parties with original Tax receipts evidencing payment of such Tax and the amount thereof issued by the PRC Taxation Authority.

The Parties agree that each is subject to a Stamp Duty equal to 0.05% of the Total Purchase Price specified in Section 3.1 above, and shall pay their own respective stamp duties as required by law.

For the purposes of this Contract:

"Tax" or "Taxation" means all forms of taxation or purported taxation, whether direct or indirect and whether levied by reference to income, profits, net wealth, asset values, turnover, added value or other reference and statutory, governmental, state, provincial, local governmental or municipal impositions, duties, contributions, levies whenever and wherever imposed (whether imposed by way of a withholding or deduction for or on account of tax or otherwise) and in respect of any Person and all penalties, fines, charges, surcharges, costs and interest relating thereto.

"Taxation Authority" means any governmental authority or any subdivision, agency, commission or authority thereof, or any quasi-governmental or private body having jurisdiction over the assessment, determination, collection or other imposition of Taxes as defined above.

11.5    Governing Law

The formation, validity, interpretation, execution, amendment and termination of this Contract shall be governed by the published laws of China.

11.6    Settlement of Disputes-Arbitration

(a)    Any dispute arising from, out of or in connection with this Contract shall be settled through friendly consultations between the Parties. Such consultations shall begin immediately after one Party has delivered to the other Parties a written request for such consultation. If within ninety (90) days following the date on which such notice is given, the dispute cannot be settled through consultations, the dispute shall, upon the request of any Party with notice to the other Parties, be submitted to arbitration in Zurich, Switzerland under the auspices of the ICC Court of Arbitration (the "ICC").

(b)    There shall be three (3) arbitrators. Purchaser shall select one (1) arbitrator and Seller shall select one (1) arbitrator, and both arbitrators shall be selected within thirty (30) days after giving or receiving the demand for arbitration. Such arbitrators shall be freely selected, and the Parties shall not be limited in their selection to any prescribed list. The chairman of the ICC shall select the third arbitrator. If a Party does not appoint an arbitrator who has consented to participate within thirty (30) days after the selection of the first arbitrator, the relevant appointment shall be made by the chairman of the ICC.

(c)     The arbitration proceedings shall be conducted in English.  The arbitration tribunal shall apply the ICC Rules of Conciliation and Arbitration in effect on the date of the signing of this Contract.  However, if such rules are in conflict with the provisions of this Article, including the provisions concerning the appointment of arbitrators, the provisions of this Article shall prevail.

(d)     Each Party shall cooperate with the other Parties in making full disclosure of and providing complete access to all information and documents requested by the other Parties in connection with such proceedings, subject only to any confidentiality obligations binding on such Party.

(e)     The arbitral award shall be final and binding upon all Parties, not subject to any appeal, and shall deal with the question of costs of arbitration and all matters related thereto.

(f)     Judgment upon the award rendered by the arbitration may be entered into any court having jurisdiction, or application may be made to such court for a judicial recognition of the award or any order of enforcement thereof.

11.7    Continued Implementation of Contract

During the period when a dispute is being resolved, the Parties shall in all other respects continue their implementation of this Contract.

**IN WITNESS WHEREOF**, this Contract is signed in Shanghai, PRC by the authorized representatives of the Parties on the date first written above.

**SHANGHAI AGRICULTURE, INDUSTRY & COMMERCE GROUP CHANGJIANG GENERAL CO., LTD.**

By:_____
Name:
Title:
Nationality:

**Yang Yi**

By:_____
Name: Yang Yi
Nationality:

**DELPHIELECTRONICS HOLDING LLC.**

By: _____
Name:
Title:
Nationality:

**SHANGHAI DELCO ELECTRONICS & INSTRUMENTATION COMPANY LTD**

By: _____
Name:
Title:
Nationality:

**Appendix I**

**Equity Interest to be Transferred to Purchaser**

| Names of Purchaser | Equity Interest to Be Transferred from Seller | Purchaser Price |
|---|---|---|
| Changjiang | 45% of Company's total equity interest | USD 6,750,000 |
| Yang Yi | 5% of Company's total equity interest | USD 750,000 |

**Appendix II**
**Termination Agreement to the Joint Venture Contract and Articles of Association**

**Appendix III**
**Deliverables at Closing**

**Part I**    **Closing Deliverables by Purchaser**

(i)    Payment Receipt issued by the bank to evidence the payment by Purchaser (including Changjiang General and Yang Yi) of 50% of the Purchase Price under Section 3.2.1 (a) hereof.

(ii)   Copy of the new Business License of the Company reflecting the change of legal representative with SAIC.

(iii)  Copies of authorizations and/or duly adopted resolution approving the execution and delivery of this Contract and the performance of its obligations under this Contract.

**Part II**   **Closing Deliverables by Seller**

(i)    Written resignations of the directors on the Board of Directors appointed by Seller, namely, [                          ].(ii) Copies of authorizations and/or duly adopted resolution approving the execution and delivery of this Contract and the performance of its obligations under this Contract.