**Hearing Date: March 9, 2006 at 10:00 a.m.**
                                          **Objection Deadline: March 2, 2006 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, <u>et al.</u>,
 Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                  :
      In re                                :         Chapter 11
                                                  :
DELPHI CORPORATION, <u>et al.</u>,      :         Case No. 05–44481 (RDD)
                                                   :
                          Debtors.     :         (Jointly Administered)
                                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION UNDER 11 U.S.C. §§ 363, 1107, AND 1108 AUTHORIZING DELPHI
AUTOMOTIVE SYSTEMS LLC TO MAKE EQUITY INVESTMENTS IN DELPHI
FURUKAWA WIRING SYSTEMS LLC AND APPROVING PROCEDURES TO MAKE
<u>ADDITIONAL CONTRIBUTIONS WITHOUT FURTHER COURT APPROVAL</u>

("JOINT VENTURE FUNDING MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion under 11 U.S.C. §§ 363, 1107, and 1108 authorizing Delphi Automotive Systems LLC ("DAS LLC") to make equity investments in Delphi Furukawa Wiring Systems LLC ("DFWS") and approving procedures through which DAS LLC may make additional capital contributions without further court approval (the "Motion"). In further support of this Motion, the Debtors respectfully represent as follows:

Background

A.   The Chapter 11 Filings

1.   On October 8, 2005 (the "Initial Filing Date"), Delphi and certain of its U.S. subsidiaries (the "Initial Filers") filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). On October 14, 2005, three additional U.S. subsidiaries of Delphi including DFWS (together with the Initial Filers, collectively, the "Debtors"), also sought reorganization relief. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. This Court entered orders directing the joint administration of the Debtors' chapter 11 cases (Dockets Nos. 28 and 404).

2.   On October 17, 2005, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "Creditors' Committee"). No trustee or examiner has been appointed in the Debtors' cases.

    3.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

    4.  The statutory predicates for the relief requested herein are sections 363, 1107, and 1108 of the Bankruptcy Code.

B.  <u>Current Business Operations Of The Debtors</u>

    5.  Delphi had global 2004 revenues of approximately $28.6 billion, and global assets as of August 31, 2005 of approximately $17.1 billion,[1]  Delphi ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.

    6.  Delphi has become a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and the Company (as defined below) is today arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company's technologies and products are present in more than 75 million vehicles on the road worldwide.  The Company supplies products to nearly every major global automotive original equipment manufacturer, with 2004 sales to its former parent, General Motors Corporation ("General Motors" or "GM"), equaling approximately $15.4 billion, and sales to

---

[1]  The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

3

each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

        7.      As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world. As of the Initial Filing Date, the Debtors employed approximately 180,000 employees worldwide. The Debtors' 50,600 U.S. employees worked in approximately 44 manufacturing sites, 13 technical centers, and Delphi's Troy, Michigan headquarters. Approximately 34,750 of the Debtors' U.S. employees were hourly employees as of the Initial Filing Date, and 96% of these were represented by approximately 49 different international and local unions. Outside the United States, the Company's foreign entities employed more than 134,000 people on the Initial Filing Date, supporting 120 manufacturing sites and 20 technical centers in nearly 40 countries around the globe.

        8.      Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM. Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates (collectively, the "Company") in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

4

9. Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle. When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base. The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base. The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C. Events Leading To Chapter 11 Filing

10. In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales. Reflective of a downturn in the marketplace, Delphi's financial condition deteriorated further in the first six months of 2005, with net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, approximately $1 billion less than the same time period a year earlier.[2]

---

[2] Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

5

11. The Debtors believe that the Company's financial performance has deteriorated because of: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12. In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward looking revenue requirements. Because discussions with its unions and GM were not progressing sufficiently, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

13. Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses. This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness. The Debtors believe that a substantial segment of Delphi's U.S. business operations must be divested, consolidated, or wound-down during these cases.

14. Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

### Relief Requested

15. By this motion, the Debtors seek an order authorizing, but not directing, DAS LLC to make outstanding, current, and future equity investments in the joint venture DFWS and approving notice procedures by which DAS LLC may contribute additional capital to DFWS without further court approval.

### Basis For Relief

16. DFWS, a Delaware limited liability company, is a joint venture that DAS LLC, a wholly-owned subsidiary of Delphi, and Furukawa Electric North America APD, Inc. ("Furukawa")[3] formed in late 2004. DAS LLC owns 80% of DFWS and Furukawa owns the remaining 20%. DFWS was established to design and deliver electrical/electronic distribution systems ("E/EDS") to a major Japanese automobile manufacturer (the "Customer"). Currently, DFWS is in a start-up phase but expects to begin production, sales, and delivery of product this year or next. As noted above, DAS LLC sought chapter 11 relief on October 8, 2005 and DFWS sought chapter 11 relief on October 14, 2005.

---

[3] Furukawa is a wholly owned subsidiary of Furukawa Electric North America, Inc., which is in turn a wholly owned subsidiary of The Furukawa Electric Co., Ltd., a Japanese corporation.

7

17. The creation and maintenance of the joint venture DFWS is part of the Debtors' strategy to diversify their customer base and grow their North American business with the Customer. Although DAS LLC had a small portion of the Customer's E/EDS business prior to the formation of DFWS, DAS LLC and Furukawa entered into a partnership to strengthen their methods and techniques to meet and better support the Customer's expectations regarding design and processes. Furukawa brings key capabilities to the joint venture including a strong engineering relationship with the Customer, valuable insight into the Customer's recognized CAD systems, and experience in the Customer's product and process design methodologies. By teaming these capabilities with DAS LLC's advanced electrical architecture design capabilities, its strengths in complete systems integration and optimization, and its manufacturing and customer support network, the Debtors and Furukawa established a joint venture well-positioned to expand their relationships with the Customer in North America and to become one of the Customer's key North American E/EDS suppliers. To achieve this result, DAS LLC must nurture its joint venture with Furukawa.

18. Since DFWS's formation, DFWS has already been awarded more Customer business than that which was anticipated at the inception of the joint venture and is being invited to submit proposals for future North American programs. To ensure that DFWS continues to have significant future business prospects with the Customer and to preserve a positive relationship with Furukawa, the Debtors must maintain their momentum and continue to give DFWS the resources it needs to operate effectively.

19. In addition to providing the Debtors' access to the Customer's business and facilitating the Debtors' customer diversification commitment, DFWS is predicted to be a

profitable venture, yielding net positive returns for the Debtors over the first ten years of its existence.

          20.     In addition to what has already been contributed, pursuant to the terms of the LLC Agreement, DAS LLC and Furukawa have agreed to make equity injections in the combined aggregate amount of approximately $3.8 million through the year 2007 to provide DFWS with working capital to fund pre-production requirements such as engineering support, prototypes, manufacturing plant preparation, and other support activities.[4] Under the LLC Agreement, DFWS is required to make payments to either DAS LLC or Furukawa for these services. Of the $3.8 million equity infusion, DAS LLC is scheduled to make aggregate contributions of approximately $3.1 million (representing 80% of total capital contributions of $3.8 million) and Furukawa is scheduled to make aggregate contributions of approximately $0.7 million (representing 20% of the total capital contributions of $3.8 million). As of the Petition Date, DAS LLC had contributed $2.3 million and Furukawa had contributed $0.6 million to the venture.[5] The remaining scheduled capital contributions for 2005 through 2007 are as follows:

|  | 2005[6] | 2006 | 2007 | Total |
|---|---|---|---|---|
| DAS LLC | $0.5 | $1.4 | $1.2 | $3.1 |
| Furukawa | $0.1 | $0.3 | $0.3 | $0.7 |

---

[4]     DFWS is currently in start-up mode and DAS LLC and Furukawa are billing DFWS for the engineering and administrative services that DAS LLC and Furukawa are providing. DFWS currently owes DAS LLC approximately $42,000 for prepetition engineering services and $145,500 for postpetition services. DFWS owes Furukawa $68,059.78.

[5]     In the ordinary course of business, DAS LLC provides equipment and tooling used in the manufacture of products for DFWS. The cost of the equipment and tooling is charged back to DFWS.

[6]     Note that amounts are listed in millions and approximated to the nearest hundred thousand. The total aggregate 2005 contributions, including those contributions paid prepetition and those scheduled, but unpaid, postpetition contributions, equals $3.5 million.

| | | | | |
|---|---|---|---|---|
| **Total** | $0.6 | $1.7 | $1.5 | $3.8 |

21. Under the terms of the LLC Agreement, DAS LLC and Furukawa agree that all scheduled capital contributions must be made to, and received by, DFWS no later than the last business day of the first calendar quarter of the year in which the capital contribution is scheduled, unless otherwise agreed by DAS LLC and Furukawa. DAS LLC and Furukawa agreed to make quarterly contributions in 2005. The fourth quarter capital contribution of $600,000 by both parties ($480,000 for DAS LLC and $120,000 for Furukawa) is currently outstanding. Furukawa has indicated it will make its funding contributions for the fourth quarter of 2005 if DAS LLC injects its equity as well. In the interim, DFWS' liquidity is decreasing. Thus, the failure of DAS LLC to make its scheduled capital contributions to the Affiliated Debtor, DFWS, in the first quarter of 2006 may jeopardize the financial wherewithal of the joint venture. Thus, the Debtors hereby seek authority for DAS LLC to make its scheduled capital contributions of $3.1 million.

<u>Proposed Procedures For Making Additional Capital Contributions</u>

22. The Debtors anticipate that DFWS may require capital through equity contributions during the 2006-2007 period in excess of those scheduled amounts described above. In part, this is due to DFWS's success in winning additional business beyond what was anticipated during the formation of the joint venture. In addition, changes in the Customer's production schedule for certain platforms which use DFWS's products have extended DFWS's start-up period and postponed a portion of DFWS's cash receivables for the sale of its product. Accordingly, the Debtors hereby request authority for DAS LLC to make contributions in excess of those scheduled above, in amounts up to $1.5 million, in the aggregate, in the Debtors' sole discretion, without notice or further court approval. Should DAS LLC's aggregate additional

10

capital contributions total more than $1.5 million (the "Additional Capital Contributions"), the Debtors seek approval of the following process (the "Procedures") by which DAS LLC would make Additional Capital Contributions to DFWS:

      (a)    the Debtors would give notice of the proposed Additional Capital Contributions (the "Additional Capital Notice") to (i) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, Suite 2100, New York, New York 10004, Att'n: Alicia M. Leonhard, Esq., (ii) counsel for the Creditors' Committee, Latham & Watkins LLP, 885 Third Avenue, New York, New York, 10022-4802 (Att'n: Robert J. Rosenberg, Esq.), (iii) counsel for the agent under the Debtors' prepetition credit facility, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York, 10017 (Att'n: Marissa Wesley, Esq.), and (iv) counsel for the agent under the Debtors' postpetition credit facility, Davis Polk & Wardell, 450 Lexington Avenue, New York, New York, 10017 (Att'n: Marlane Melican, Esq.) (collectively, the "Notice Parties"). The Additional Capital Notice would be served by facsimile, overnight delivery, or hand delivery and would include the amount of Additional Capital Contributions requested.

      (b)    The Notice Parties would have ten business days following initial receipt of the Additional Capital Notice to object to or request additional time to evaluate the Additional Capital Contributions. If counsel to the Debtors received no written objection or written request for additional time prior to the expiration of such ten business day period, the Debtors would be authorized to make the requested Additional Capital Contributions.

      (c)    If a Notice Party objects to the Additional Capital Notice within ten business days after the Additional Capital Notice is received, the Debtors and such objecting Notice Party would meet and confer in an attempt to negotiate a consensual resolution. Should either party determine that an impasse exists, then the Debtors would move the Bankruptcy Court for authority to make the Additional Capital Contributions upon notice to the objecting party and other parties-in-interest in accordance with the Court's Case Management Order (as defined below) entered on October 14, 2005.

23.    In the exercise of their business judgment, the Debtors believe that the capital contributions to be made by DAS LLC to DFWS, each of which is a Debtor in these cases, is in the best interests of the Debtors' estates because such contributions will maximize value for all stakeholders by promoting the diversification of the Debtors' businesses by growing their relationship with the Customer.  Similarly, the Debtors believe that the Procedures described herein are in the best interests of the Debtors.

11

Applicable Authority

24. Sections 1107(a) and 1108 of the Bankruptcy Code vest debtors-in-possession with authority to continue operating their businesses. The Debtors, operating their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the duties of a chapter 11 debtor-in-possession is the duty "to protect and preserve the estate, including an operating business's going-concern value." Id.

25. Section 1107(a) of the Bankruptcy Code provides that the debtor-in-possession shall have the duties of a trustee in a chapter 11 case with all the rights and powers of a trustee. 11 U.S.C. § 1107. Accordingly, to understand the rights and powers of the debtor-in-possession, section 1107 of the Bankruptcy Code must be read in conjunction with those provisions of chapters 3, 5, and 11 of the Bankruptcy Code which confer certain rights and powers on trustees. 7 Collier, Bankruptcy ¶ 1107.03 (15th rev. ed. 2003). Section 363(c) of the Bankruptcy Code provides in pertinent part: "[T]he [debtor-in-possession] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1).

26. To the extent that the Debtors' decision to make equity investments in DFWS constitutes a transaction outside of the ordinary course of business, section 363(b)(1) of the Bankruptcy Code requires that "there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business." Institutional Creditors of Continental Airlines, Inc. v. Continental Airlines, Inc. (In re Continental Airlines,

Inc.), citing In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983); accord Stephens Indus., Inc. v. McClung (In re McClung), 789 F.2d 386, 390 (6th Cir. 1986); Fulton State Bank v. Schipper (In re Schipper), 109 B.R. 832, 836 (Bankr. N.D. Ill. 1989); In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1988).

27. Sound business reasons exist to justify DAS LLC making its scheduled equity contributions in the joint venture DFWS, an Affiliated Debtor. From the opening days of these cases, the Debtors have expressed its commitment to diversifying its customer base. Affidavit of Robert S. Miller, Jr. Under Local Bankruptcy Rule 1007-2 And In Support Of Chapter 11 Petitions And Various First Day Applications And Motions at 6, In re Delphi Corporation, Case No. 05-44481 (Bankr. S.D.N.Y. October 8, 2005) ("[T]o continue winning business and to maintain a robust forward revenue base, it is particularly important for Delphi to . . . continue to diversify its customer base.") As discussed above, DFWS is essential to the Debtors' efforts to diversify their customer base as it is a key component towards developing a closer relationship with the Customer and winning E/EDS business from the Customer's North American vehicle programs.

28. Over the last several years, the Customer has achieved substantial growth in the United States and has steadily increased its market share both nationally and globally. Accordingly, it has become increasingly important for the Debtors to develop their business relationship with the Customer. DFWS represents the Debtors' best opportunity to maintain and develop its E/EDS sourcing abilities to the Customer.

29. The Debtors seek this Court's authority for DAS LLC to make Additional Capital Contributions pursuant to the Procedures set forth herein to reduce the costs associated with seeking Court approval of each request for Additional Capital Contributions and to reduce

the time required to obtain that approval.  The Procedures will provide the Debtors with both flexibility and a framework for DAS LLC to make Additional Capital Contributions, while still providing for a review by some of the major constituents of these cases.  Without a process for making Additional Capital Contributions, the Debtors and their estates would incur added and unnecessary expenses and delay in seeking further court approval of the exercise of their business judgment.  The Debtors respectfully submit that should DFWS's business grow such that Additional Capital Contributions are required, the ability to make such Additional Capital Contributions would be essential to ensuring that the Debtors are able to fulfill their obligations to DFWS and in turn to the Customer and continue to diversify their businesses.

30. For the foregoing reasons, the Debtors believe that the relief requested herein is in the best interests of the estates and should be granted.

Notice

31. Notice of this Motion has been provided in accordance with the Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing (I) Omnibus Hearing Dates, (II) Certain Notice, Case Management, And Administrative Procedures, And (III) Scheduling An Initial Case Conference In Accordance With Local Bankr. R. 1007-2(e), entered by this Court on October 14, 2005 (Docket No. 245) (the "Case Management Order").  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

Memorandum Of Law

32. Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy

14

Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE, the Debtors respectfully request that the Court enter an order (i) authorizing, but not directing, DAS LLC to make outstanding, current, and future equity investments in the joint venture DFWS, (ii) approving Procedures through which DAS LLC may make Additional Capital Contributions without further court approval, and (iii) granting such other and further relief as is just and proper.

Dated: New York, New York
February 17, 2006

        SKADDEN, ARPS, SLATE, MEAGHER
          & FLOM LLP

        By: /s/ John Wm. Butler, Jr._____
           John Wm. Butler, Jr. (JB 4711)
           John K. Lyons (JL 4951)
           Ron E. Meisler (RM 3026)
        333 West Wacker Drive, Suite 2100
        Chicago, Illinois  60606
        (312) 407-0700

            - and -

        By: /s/ Kayalyn A. Marafioti_____
           Kayalyn A. Marafioti (KM 9632)
           Thomas J. Matz (TM 5986)
        Four Times Square
        New York, New York  10036
        (212) 735-3000

        Attorneys for Delphi Corporation, et al.,
          Debtors and Debtors-in-Possession