SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                          :
    In re                   :    Chapter 11
                          :
DELPHI CORPORATION, et al.,    :    Case No. 05-44481 (RDD)
                          :
             Debtors.    :    (Jointly Administered)
                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. §§ 362, 363, AND 365 AUTHORIZING
DEBTORS TO (I) OBTAIN SIGNIFICANT IMPROVEMENT IN ENERGY COSTS BY
MODIFYING AGREEMENTS WITH LOCKPORT ENERGY ASSOCIATES L.P.
AND NEW YORK STATE ELECTRIC AND GAS CORPORATION, (II) ASSUME
MODIFIED AGREEMENT WITH LOCKPORT ENERGY ASSOCIATES L.P., AND
(III) CONSENT TO RELIEF FROM AUTOMATIC STAY FOR
LIMITED PURPOSE OF ALLOWING LOCKPORT ENERGY
ASSOCIATES L.P. TO RECORD MODIFIED EASEMENTS

("LOCKPORT ENERGY AGREEMENTS MODIFICATION AND ASSUMPTION MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors

and debtors-in-possession in the above-captioned cases (the "Debtors"), hereby submit this motion

(the "Motion") for an order under 11 U.S.C. §§ 362, 363, and 365 Authorizing The Debtors To (i)

Obtain Significant Improvement In Energy Costs By Modifying Agreements With Lockport Energy

Associates L.P. ("Lockport Energy"), the Power Authority of the State of New York ("NYPA"), and

New York State Electric and Gas Corporation ("NYSEG"), (ii) Assume Modified Agreement with

Lockport Energy, and (iii) Consent To Relief From The Automatic Stay For Limited Purpose Of

Allowing Lockport Energy Associates L.P. To Record Modified Easements.  In support of this

Motion, the Debtors submit the declaration of Matthew J. Zarnosky, sworn to February 17, 2006.  In

further support of this Motion, the Debtors respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8, 2005 (the "Initial Filing Date"), Delphi and certain of its U.S.

subsidiaries (the "Initial Filers") filed voluntary petitions in this Court for reorganization relief under

chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the

"Bankruptcy Code").  On October 14, 2005, three additional U.S. subsidiaries of Delphi (together

with the Initial Filers, collectively, the "Debtors") also sought reorganization relief.  The Debtors

continue to operate their businesses and manage their properties as debtors-in-possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code.  This Court entered orders directing the joint

administration of the Debtors' chapter 11 cases (Dockets Nos. 28 and 404).

2.      On October 17, 2005, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "Creditors' Committee").  No trustee or examiner has been appointed in the Debtors' cases.

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.      The statutory predicates for the relief requested herein are sections 362, 363, and 365 of the Bankruptcy Code.

B.      Current Business Operations Of The Debtors

5.      Delphi had global 2004 revenues of approximately $28.6 billion, and global assets as of August 31, 2005 of approximately $17.1 billion.[1]  Delphi ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.

6.      Delphi has become a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and the Company (as defined below) is today arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company's technologies and products are present in more than 75 million vehicles on the road worldwide.  The Company supplies products to nearly every major global automotive original equipment manufacturer, with 2004 sales to its former parent, General Motors Corporation ("General Motors" or "GM"), equaling approximately $15.4 billion, and sales to each of Ford Motor

---

[1]      The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen

Group exceeding $850 million.

       7.      As part of its growth strategy, Delphi has established an expansive global

presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures

located in every major region of the world.  As of the Initial Filing Date, the Debtors employed

approximately 180,000 employees worldwide.  The Debtors' 50,600 U.S. employees worked in

approximately 44 manufacturing sites, 13 technical centers, and Delphi's Troy, Michigan

headquarters.  Approximately 34,750 of the Debtors' U.S. employees were hourly employees as of

the Initial Filing Date, and 96% of these were represented by approximately 49 different

international and local unions.  Outside the United States, the Company's foreign entities employed

more than 134,000 people on the Initial Filing Date, supporting 120 manufacturing sites and 20

technical centers in nearly 40 countries around the globe.

       8.      Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary

of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions

and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and

subsidiaries were transferred to Delphi and its subsidiaries and affiliates (collectively, the

"Company") in accordance with the terms of a Master Separation Agreement between Delphi and

GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-

based, captive automotive supplier to a global supplier of components, integrated systems, and

modules for a wide range of customers and applications.  Although GM is still the Company's single

largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

       9.      Due to the significant planning that goes into each vehicle model, Delphi's

efforts to generate new business do not immediately affect its financial results, because supplier

selection in the auto industry is generally finalized several years prior to the start of production of

the vehicle. When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base. The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base. The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C.    Events Leading To Chapter 11 Filing

10.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales. Reflective of a downturn in the marketplace, Delphi's financial condition deteriorated further in the first six months of 2005, with net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, approximately $1 billion less than the same time period a year earlier.[2]

11.    The Debtors believe that the Company's financial performance has deteriorated because of: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for

---

[2]    Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12.     In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward looking revenue requirements.  Because discussions with its unions and GM were not progressing sufficiently, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

13.     Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses. This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness.  The Debtors believe that a substantial segment of Delphi's U.S. business operations must be divested, consolidated, or wound-down during these cases.

14.     Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

Relief Requested

15.    By this Motion, the Debtors seek entry of an order under 11 U.S.C. §§ 362,

363, and 365 authorizing the Debtors to (i) obtain significant improvement in energy costs by

modifying (a) that certain Settlement Agreement, dated August 14, 1995, by and among General

Motors Corporation ("GM"), NYPA, and NYSEG (the "Settlement Agreement"), (b) that certain

Energy Sales Agreement, dated April 22, 1991, by and between GM and Lockport Energy, as

amended (the "Energy Sales Agreement"), and (c) all amendments, supplements, exhibits,

easements, licenses, waivers, side letters, and ancillary documents related thereto (collectively, the

"Agreements"), (ii) assume the modified Energy Sales Agreement, and (iii) consent to relief from

the automatic stay for the limited purpose of allowing Lockport Energy to record easements existing

under the Energy Sales Agreement and which will continue as modified to exist under the modified

Energy Sales Agreement (the "Easements").  The relief requested herein is subject to the execution

of definitive documentation acceptable to the Debtors.

16.    The Debtors have determined that modification of the Agreements and

assumption of the modified Energy Sales Agreement will allow them to obtain significant

improvement in energy costs relating to the Debtors' Thermal & Interior Systems Facility, located at

200 Upper Mountain Road, Lockport, New York (the "Lockport Facility"). The Debtors believe that

the modification of the Agreements and assumption of the modified Energy Sales Agreement will

benefit the Debtors' estates and creditors.  The Debtors seek to modify the Agreements and assume

the modified Energy Sales Agreement with the consent of NYPA, NYSEG, and Lockport Energy.  A

copy of the Memorandum of Understanding between NYSEG, Delphi, and Lockport Energy, which

describes the principal terms of the modified Settlement Agreement, is attached hereto as Exhibit A.

The current form of the modified Energy Sales Agreement is attached hereto as Exhibit B.  A list of

the Easements is attached hereto as Exhibit C.

7

## Basis For Relief

17.    The Lockport Facility's power needs are supplied under the Agreements. Pursuant to the Service Agreement, dated April 12, 1989, by and among NYPA, NYSEG, and GM (the "Service Agreement"), NYSEG currently acquires from NYPA and provides to Delphi Automotive Systems, LLC, as GM's successor in interest,[3] certain low-priced  hydropower, designated as expansion power ("Expansion Power"), for usage at the Lockport Facility.  A dispute arose among NYPA, NYSEG, and GM regarding the sale and use of Expansion Power under the Service Agreement and the parties entered into the Settlement Agreement to resolve their dispute. The Settlement Agreement superseded and replaced the Service Agreement and designated the manner in which the electricity needs of the Lockport Facility would be supplied, including how the Expansion Power would be allocated between the Lockport Facility and NYSEG.  Under the Energy Sales Agreement, Lockport Energy designed, constructed, and operates a cogeneration system adjacent to the Lockport Facility (the "Cogeneration System") which uses natural gas to generate and provide electricity and steam service for usage at the Lockport Facility.  The Energy Sales Agreement provides that Lockport Energy will provide all of the Lockport Facility's electricity needs other than the Expansion Power that Delphi receives from NYPA through NYSEG under the Settlement Agreement.

18.    Lockport Energy and Delphi have concluded that modification of the Agreements to reflect the termination of supply of electricity from Lockport Energy and the assumption of the modified Energy Sales Agreement will result in significant ongoing cost savings for the Debtors.  The Debtors and Lockport have determined that Lockport should be allowed to

---

[3]        As described above, prior to January 1, 1999, GM operated Delphi's businesses through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Debtors under a Master Separation Agreement between Delphi and GM.  In connection with these transactions, GM assigned to Delphi its rights and obligations under the Agreements.

continue using the Easements.  Under the modified Energy Sales Agreement, Lockport Energy will

continue to use the easements until December 27, 2027.  The Debtors have agreed to consent to

relief from the automatic stay for the limited purpose of allowing Lockport Energy to record the

Easements as modified under the modified Energy Sales Agreement.

19.    The Debtors' acceptance of Lockport Energy's proposal to modify the

Agreements and assume the modified Energy Sales Agreement as provided herein is conditioned

upon Delphi's ability to obtain an additional 10 mega watts of Expansion Power from NYPA.  An

application for that additional Expansion Power is pending before NYPA.  A new contract with

NYPA for the supply of additional 10 mega watts of Expansion Power would secure the availability

of low-cost power to the Lockport Facility for at least three years beyond the term of the Energy

Sales Agreement, and allow for electricity cost savings for the Debtors in the approximate amount of

$14 million during the 2006-2011 period.  In addition, the Energy Sales Agreement is scheduled to

expire on December 27, 2007, whereas the new contract with NYPA would be in force at least until

April 1, 2011.  Accordingly, the Debtors believe that entering into a new contract with NYPA for the

provision of additional 10 mega watts of Expansion Power is beneficial to the Lockport Facility.

Lockport Energy will continue to supply steam to the Lockport Facility at a reduced cost.

20.    At the time of the execution of the Energy Sales Agreement in 1991, Lockport

Energy entered into long-term contracts with third parties for the supply of natural gas for the

operation of the Cogeneration System.  The proposed modifications to the Agreements should

reduce or eliminate Lockport Energy's role as a supplier of electricity to the Lockport Facility,

thereby creating an opportunity for Lockport Energy to sell to third parties some of the gas used for

the operation of the Cogeneration System at a profit which it will share with Delphi.  The current

estimate of Delphi's share of the profit from these sales of the natural gas to third parties is

approximately $6 million (the "Price Estimate").  In addition, Lockport Energy has agreed to pay

9

NYSEG the sum of approximately $3.35 million as compensation for the losses it will incur as a result of the modification of the Settlement Agreement (the "Additional Payment"). The funds for the payments by Lockport Energy to Delphi and NYSEG will be generated by Lockport Energy's sale to third parties of the natural gas currently under contract that otherwise would be used to satisfy Delphi's electricity requirements under the Energy Sales Agreement.  Lockport Energy will sell the natural gas and will pay to Delphi the Price Estimate within 60 days of the latter of (a) the commencement of delivery to the Lockport Facility of the 10 mega watts of Expansion Power by NYPA or (b) entry of a final order of this Court approving the relief requested herein (the "Payment Date").  The Additional Payment will be made within two business days after all of the following occur: (i) entry of a final order approving this Motion, and (ii) commencement of delivery to the Lockport Facility of the 10 mega watts of Expansion Power by NYPA, and (iii) execution of the amended Agreements between the Lockport Energy and Delphi.  Authorizing the Debtors to consummate this transaction on the negotiated terms described herein will allow the Debtors to obtain valuable, low-cost electricity and steam power.  The negotiated terms are favorable to the Debtors and are in the best interests of their estates.

21.    The Debtors estimate that the amount necessary to cure the defaults existing under the Energy Sales Agreement is approximately $521,975.61 (the "Cure Amount"), which is the total amount due for actual steam supplied by Lockport Energy to the Lockport Facility prior to October 8, 2005.  The savings from entering into a new contract with NYPA for the provision of additional 10 mega watts of Expansion Power will exceed the payment of the Cure Amount within 10 months.  The Debtors and Lockport Energy have agreed that the Cure Amount will be offset against the Price Estimate on the Payment Date.  The Debtors believe that even taking into account offset of the Cure Amount, the assumption of the modified Energy Sales Agreement is beneficial to their estates and constitutes substantial savings on energy costs.

10

22.     The Debtors have determined in the exercise of their business judgment that modifying the Agreements to permit Lockport Energy to sell gas for the Debtors' benefit and to permit the Debtors to obtain valuable, low-priced electricity from NYPA for the duration of the new contracts with NYPA will substantially benefit the Lockport Facility by lowering its energy costs. The modification of the Agreements, the assumption of the modified Energy Sales Agreement, and the lifting of the automatic stay to allow Lockport to record the Easements is favorable to the Debtors and is in the best interests of their estates.

<u>Applicable Authority</u>

23.     Section 363(b)(1) provides that the "trustee, after notice and hearing, may use, sell, or lease, other than in the ordinary course of business, property, of the estate." 11 U.S.C. § 363(b)(1). A debtor's decision to enter into a transaction outside of the ordinary course of business is governed by the business judgment standard. 3 Collier, <u>Bankruptcy</u> ¶ 363.01[1][g] (15th rev. ed. 2005); <u>see</u>, <u>e.g.</u>, <u>In re Global Crossing Ltd.</u>, 295 B.R. 726 (Bankr. S.D.N.Y. 2003) (bankruptcy court would approve, as exercise of reasonable business judgment, decision by chapter 11 debtors to enter into amended agreement for sale of assets); <u>Comm. of Equity Sec. Holders v. Lionel Corp.</u> (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983) (transactions pursuant to section 363(b) should be approved when they are supported by management's sound business judgment.); <u>In re Delaware & Hudson Ry. Co.</u>, 124 B.R. 169, 176 (D. Del. 1991) (same); <u>In re Phoenix Steel Corp.</u>, 82 B.R. 334, 336-36 (Bankr. D. Del. 1987) (same); <u>Orion Pictures Corp. v. Showtime Networks, Inc.</u> (In re Orion Pictures Corp.), 4 F.3d 1095, 1098-99 (2d Cir. 1993); <u>Committee of Asbestos-Related Litigants v. Johns-Manville Corp.</u> (In re Johns Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), court will generally not entertain objections to debtor's conduct.").

11

24.    Once the debtor articulates a valid business justification, '[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company.'" In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992); In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a Debtor's management decisions.").   In deciding whether a proper business judgment exists, a judge must find from the evidence presented a good business reason to grant a motion under section 363(b) of the Bankruptcy Code. In re Chateaugay Corp., 973 F.2d 141 (2d Cir.1992); In re Lionel Corp., 722 F.2d at 1071; In re Enron Corp., 2003 WL 1562202 (Bankr. S.D.N.Y. 2003).

25.    Here, the Debtors have satisfied the "business judgment" standard in connection with their decision to modify the Agreements with the consent of NYSEG, Lockport Energy, and NYPA because terminating the supply of electricity from Lockport Energy and entering into a new contract with NYPA for the supply of additional 10 mega watts of Expansion Power will result in substantial savings for the Debtors.

26.    Section 365(a) of the Bankruptcy Code provides that a debtor-in-possession, "subject to the Court's approval, may . . . assume any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).

27.    The standard to be applied by a court in determining whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which is premised upon the debtor's business judgment that assumption would be beneficial to its estate.  See Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098-99 (2d Cir. 1993);  see also In re Child World, Inc., 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992) (debtor may assume or reject unexpired lease under § 365(a) in exercise of its "business judgment"); In re Roman

Crest Fruit, Inc., 35 B.R. 939, 949 (S.D.N.Y. 1983); Control Data Corp. v. Zelman, 602 F.2d 38, 42

(2d Cir.1979); see also In re Crystalin, L.L.C., 293 B.R. 455, 463 (B.A.P. 8th Cir. 2003) (citing In re

Food Barn Stores, Inc., 107 F.3d 558, 566 (B.A.P. 8th Cir. 1997) (assumption of prepetition

agreement approved under business judgment standard).  This standard is satisfied when a debtor

determines that assumption will benefit the estate.  Id.  See also In re Farmland Indus., Inc., 294 B.R.

903, 913 (Bankr. W.D. Mo. 2003) (finding that debtor must show merely that "the action to be taken

will benefit the estate").

      28.     If the debtor's business judgment has been exercised reasonably, a court

should approve the assumption of an executory contact.  See, e.g., NLRB v. Bildisco and Bildisco,

465 U.S. 513, 523 (1984); Group of Inst'l Investors v. Chicago, Milwaukee, St. Paul & Pacific R.R.

Co., 318 U.S. 523 (1943); Cleveland Hotel Protective Comm. v. Nat'l City Bank of Cleveland (In re

Van Sweringen Corp, 155 F.2d 1009, 1013 (6th Cir.), cert. denied, 329 U.S. 766 (1946); In re

Ionosphere Clubs, Inc., 100 B.R. 670, 673 (Bankr. S.D.N.Y 1989); see also In re Orion Pictures

Corp. 4 F.3d at 1098-99; In re RCN Corp., Case No. 04-13638 (RDD) (Bankr. S.D.N.Y. 2004).

Once the debtor has satisfied the business judgment standard by showing that assumption will

benefit the estate, the court "should not interfere 'except upon a finding of bad faith or gross abuse of

[the debtor's] business discretion.'"  Id. at 465 (citing Lubrizol Enters., Inc. v. Richmond Metal

Finishers Inc., 756 F.2d 1043, 1047 (4th Cir. 1985)).

      29.     The business judgment rule shields a debtor's management from judicial

second-guessing.  In re Farmland Indus., Inc., 294 B.R. at 913 (quoting In re Johns-Manville Corp.,

60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986)) ("'[T]he Code favors the continued operation of a

business by a debtor and a presumption of reasonableness attaches to a debtor's management

decisions.'").  Once the Debtors articulate a valid business justification, "[t]he business judgment

rule 'is a presumption that in making a business decision the directors of a corporation acted on an

13

informed basis, in good faith and in the honest belief that the action was in the best interests of the

company.'" In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van

Gorkom, 488 A.2d 858, 872 (Del. 1985)).

        30.     Indeed, when applying the "business judgment" rule, courts show great

deference to the debtor's decision-making.  See In re Crystalin, L.L.C., 293 B.R. at 464 (finding that

the court need not "place itself in the position of the trustee or debtor-in-possession") (omitting

citations).  See also Summit Land Co. v. Allen (In re Summit Land Co.), 13 B.R. 310, 315 (Bankr.

D. Utah 1981) ("Court approval under Section 365(a), if required, except in extraordinary situations,

should be granted as a matter of course.")

        31.     Upon finding that the Debtors have exercised their sound business judgment

in determining that assumption of the modified Energy Sales Agreement on the negotiated terms

described above is in the best interests of their estates, this Court should approve assumption under

section 365(a) of the Bankruptcy Code.  In re Gucci, 193 B.R. 411, 415-17 (S.D.N.Y. 1996)

(affirming bankruptcy court's approval of assumption of executory contract upon determining that

assumption "was in the best interest of the estate"); Blue Cross Blue Shield of Conn. v. Gurski (In re

Gurski), Nos. 94-51202 & 3:95CV1883, 1996 WL 684397, at *2 (D. Conn. Jan. 25, 1996)

(affirming bankruptcy court's determination that executory contracts were beneficial to debtor such

that debtor could assume them under section 365(a)).

        32.     Bankruptcy Code section 365(b)(1), in turn, codifies the requirements for

assuming an unexpired lease or executory contract of a debtor.  That subsection provides:

    (b)(1)  If there has been a default in an executory contract or unexpired lease
          of the debtor, the trustee may not assume such contract or lease
          unless, at the time of assumption of such contract or lease, the trustee-

        (A)    cures, or provides adequate assurance that the trustee will
             promptly cure, such default;

14

     (B)     compensates, or provides adequate assurance that the trustee  will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

     (C)     provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

33.     The Debtors submit that the statutory requirements of section 365(b)(1) of the Bankruptcy Code have been satisfied because there are no monetary defaults existing under the Agreements to be assumed other than payment of the Cure Amount.  Such payment will be made based upon the conditions set forth above and in accordance with Bankruptcy Code section 365(b).

34.     In determining to assume the modified Energy Sales Agreement, the Debtors clearly have satisfied the requisite "business judgment" standard.  Assumption of the modified Energy Sales Agreement will allow the Debtors to take advantage of the low steam prices available to them through the Energy Sales Agreement, which are important to the continued operation of the Lockport Facility and success of the Debtors' businesses and reorganization efforts.

35.     Accordingly, because the Debtors have determined in the exercise of their business judgment that the modifications of the Agreements and assumption of the modified Energy Sales Agreement, conditioned upon Delphi's ability to obtain an additional 10 mega watts of Expansion Power from NYPA, will allow them to obtain substantial savings in energy costs, the Debtors seek authority to modify the Agreements and assume the modified Energy Sales Agreement. The Debtors submit that this Court should approve the Motion and determine that such modification and assumption is in the best interests of the Debtors' estates, their creditors, and other parties-in-interest.

36.    Section 362(d)(1) of the Bankruptcy Code gives this Court the discretion to

modify the automatic stay "for cause."  11 U.S.C. § 362(d)(1).   Section 362(d) of the Bankruptcy

Code provides in pertinent part:

> On request of a party in interest and after notice and a hearing, the court shall
> grant relief from the stay provided under subsection (a) of this section, such as by
> terminating, annulling, modifying, or conditioning such stay –
>
> (1)  for cause, including the lack of adequate protection of an interest in
> property of such party in interest. . .

11 U.S.C. § 362(d)(1).

37.    The Debtors submit that, under the unique circumstances here presented,

"cause" exists to grant relief from the automatic stay pursuant to section 362(d)(1) to allow Lockport

Energy to record the Easements.  Because the term "cause" is not defined in the Bankruptcy Code,

the courts must determine whether this standard has been satisfied.  See In re M.J. & K Co., Inc.,

161 B.R. 586, 590-91 (Bankr. S.D.N.Y. 1993) (cause is viewed as intentionally broad and flexible

concept which must be determined on case-by-case basis).  "Thus, the 'facts of each request will

determine whether relief is appropriate under the circumstances.'"  In re Mazzeo, 167 F.3d 139, 142-

143 (2d Cir. 1999) (citations omitted) (citing In re Sonnax Indus., Inc., 907 F.2d 1280, 1285-86 (2d

Cir. 1990) (articulating twelve factors which may be considered by court in deciding whether to lift

stay for "cause")).[4]

---

[4]    The Sonnax factors include: (1)  whether relief would result in a partial or complete resolution of the issues; (2)
lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves
the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to
hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6)
whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the
interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable
subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by
the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation;
(11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and
the balance of harms.

Mazzeo, 167 F.3d at 143 (citing In re Sonnax Industries, Inc., 907 F.2d 1280, 1285-86 (2d Cir. 1990)).

38.    The <u>Mazzeo</u> Court noted that all of the factors will not necessarily "be relevant in every case."  167 F.3d at 143; <u>see also</u> <u>In re Bogdanovich</u>, 292 F.3d 104, 110 (2d Cir. 2002).  The legislative history of section 362 is in accord with this interpretation in recognizing that "cause" may be established by a single factor."  <u>See</u> H.R. Rep. No. 95-595, 95th Cong., 1st Sess., 343-344 (1977).  Further, this Court has held that in applying the <u>Sonnax</u> factors, courts "need not assign equal weight to each factor.  <u>In re New York Medical Group, P.C.</u>, 265 B.R. 408, 413 (Bankr. S.D.N.Y. 2001) (citing <u>In re Keene Corp.</u>, 171 B.R. 180, 183 (Bankr. S.D.N.Y. 1994)).

39.    The Debtors believe that cause exists under the circumstances to lift the automatic stay to allow Lockport Energy to record the Easements.  The Debtors have undertaken a careful analysis of the <u>Sonnax</u> factors in reaching this conclusion.  Under the circumstances of the this case the Debtors have determined that (a) the modifications of the Agreements and the recording of the Easements will not interfere with the Debtors' reorganization efforts, (b) the estates are not being exposed to any risk, (c) necessary estate resources and manpower will not be distracted from more important estate needs, and (d) the modification of the Agreements and the recording of the Easements will result in an economic benefit to the Debtors' estates and their creditors.  Accordingly, the Debtors believe that lifting of the automatic stay is appropriate for the limited purpose of allowing Lockport Energy to record the modified easements.

<u>Notice</u>

40.    Notice of this Motion has been provided in accordance with the Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing (I) Omnibus Hearing Dates, (II) Certain Notice, Case Management, And Administrative Procedures, And (III) Scheduling An Initial Case Conference In Accordance With Local Bankr. R. 1007-2(e) entered by this Court on October 14, 2005 (Docket No. 245).  Notice has also been provided to the

counterparties to all of the Agreements.  In light of the nature of the relief requested, the Debtors

submit that no other or further notice is necessary.

Memorandum Of Law

41.    Because the legal points and authorities upon which this Motion relies are

incorporated herein, the Debtors respectfully request that the requirement of the service and filing of

a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

WHEREFORE the Debtors respectfully request that this Court enter an order (a) authorizing the Debtors to modify the Agreements, (b) authorizing the Debtors to assume the modified Energy Sales Agreement, (c) consenting to relief from the automatic stay for the limited purpose of allowing Lockport Energy to record the Easements, and (d) granting the Debtors such other and further relief as is just.

Dated: New York, New York
        February 17, 2006

                        SKADDEN, ARPS, SLATE, MEAGHER
                          & FLOM LLP


                        By:/s/ John Wm. Butler, Jr._____
                            John Wm. Butler, Jr. (JB 4711)
                            John K. Lyons (JL 4951)
                            Ron E. Meisler (RM 3026)
                        333 West Wacker Drive, Suite 2100
                        Chicago, Illinois  60606
                        (312) 407-0700

                        - and -


                        By: /s/ Kayalyn A. Marafioti_____
                            Kayalyn A. Marafioti (KM 9632)
                            Thomas J. Matz (TM 5986)
                        Four Times Square
                        New York, New York 10036
                        (212) 735-3000

                        Attorneys for Delphi Corporation, et al.,
                            Debtors and Debtors-in-Possession

Exhibit A
Memorandum Of Understanding



James P. Laurito
President & CEO, RGS Energy Group

February 17, 2006

Mark Rathke
Facilities Service Group
Manager, Plant Engineering, Design
& Utility Operation
Delphi Corporation
Harrison Thermal Systems
World Headquarters
200 Upper Mountain Road
Lockport, NY  14094

Thomas J. Gesicki
Senior Vice President
Foristar
5087 Junction Road,
Lockport NY  14094

Re:   <u>Memorandum of Understanding Relating to Additional Expansion Power</u>

Dear:  Mr. Rathke and Mr. Gesicki

New York State Electric & Gas Corporation ("NYSEG") and the Delphi Corporation ("Delphi") have been engaged in good-faith discussions as to whether certain contractual arrangements may be modified or terminated so as to allow Delphi to receive an additional allocation of 10 MW of New York Power Authority ("NYPA") Expansion Power for consumption at its Lockport, N.Y. facility.  A basic requirement that NYSEG has expressed in such discussions is that NYSEG, and its other customers, be held economically neutral (as defined by the enumerated parameters below) in any arrangement that permits Delphi to receive such an additional Expansion Power allocation.  For purposes of establishing the consideration that will be exchanged as the parties commence preparing, executing and performing the definitive agreements to accommodate such an additional allocation, NYSEG, Delphi and Lockport Energy Associates, L.P. ("LEA") agree to the following:

An equal opportunity employer

89 East Avenue | Rochester, NY 14649-0001
tel (585) 724-8077 | fax (585) 724-8285
NYSEG/RG&E | Subsidiaries of RGS Energy Group, Inc.

1. NYSEG shall receive a payment of $3.35 million from LEA on that date which is two (2) business days after all of the following occur: (i) the bankruptcy court approves Delphi's motion to enter into definitive agreements necessary to achieve the incremental allocation and to restructure the Energy Sales Agreement between Delphi and LEA and such approval becomes final and non-appealable, and (ii) the NYPA schedules with the NYISO the additional Expansion Power for delivery to Delphi, and (iii) such definitive agreements between LEA and Delphi are executed. If payment is not made by March 29, 2006, this agreement shall terminate and any arrangements that may have been made so as to allow Delphi to receive an additional allocation of 10 MW of NYPA Expansion Power for consumption at its Lockport, N.Y. facility, including Amendment No. 6 to the Power Purchase Agreement between NYSEG and LEA, shall be terminated.

2. If, on April 1, 2006, the additional expansion power does not actually commence flowing, NYSEG shall repay LEALP the $3.35 million within two business days of April 1, 2006, with 10% interest per annum, payable from the date NYSEG receives payment. If, on April 1, 2006, the additional expansion power does not actually flow, this agreement and any arrangements that may have been made so as to allow Delphi to receive an additional allocation of 10 MW of NYPA Expansion Power for consumption at its Lockport, N.Y. facility, including Amendment No. 6 to the Power Purchase Agreement between NYSEG and LEA, shall be terminated.

3. Delphi agrees to take delivery service for such an additional allocation of Expansion Power under NYSEG's S.C. 7-4 Transmission – ERO tariff and the NYISO OATT, which incorporates the S.C. 7-4 Transmission – ERO tariff, and further agrees to pay for, or reimburse NYSEG for, all charges applied under those tariffs, provided, however that Delphi hereby reserves its right to petition the Public Service Commission for an exemption from non-bypassable wires, system benefits and renewable performance standard charges that otherwise apply under said tariffs to the delivery of said Expansion Power allocation to Delphi, and NYSEG hereby agrees not to oppose such petition. With respect to an exemption from non-bypassable wires charges, the petition shall be specific to Delphi's unique circumstances. In addition, NYSEG and Delphi will work together, and the parties will take any necessary actions, which actions may include regulatory filings with the Public Service Commission ("PSC") requesting PSC approval to utilize a flex rate contract or economic development funds to reduce Delphi's cost of doing business in New York State to retain jobs.

4. LEA agrees that the restructuring of the Energy Sales Agreement between Delphi and LEA shall not require NYSEG to purchase additional capacity or energy under the existing power purchase agreement between NYSEG and LEA except to the extent the parties shall otherwise agree in writing.

The terms set forth above shall be binding on the parties only for the purpose of establishing the consideration that will be exchanged and embodied in any definitive agreements NYSEG, Delphi and LEA intend to execute to permit Delphi to receive the additional allocation of Expansion Power.

NYSEG, Delphi and LEA agree to use reasonable commercial efforts to prepare, execute and perform definitive agreements that will permit Delphi to obtain such an additional allocation of Expansion Power pursuant to the terms described herein. Please indicate by your signature below on behalf of Delphi and LEA that Delphi and LEA agree with NYSEG to the terms set forth herein. The parties agree that this letter agreement may be executed in counterparts.

Very truly yours,

James P. Laurito
President and Chief Executive
Officer

AGREED TO AND ACCEPTED:

Delphi Corporation

By:

Name: D. Marshall Andrews

Title: Business Line Executive

AGREED TO AND ACCEPTED:

Lockport Energy Associates, L.P.

By: _____

Name:

Title:

3

The terms set forth above shall be binding on the parties only for the purpose of establishing the consideration that will be exchanged and embodied in any definitive agreements NYSEG, Delphi and LEA intend to execute to permit Delphi to receive the additional allocation of Expansion Power.

NYSEG, Delphi and LEA agree to use reasonable commercial efforts to prepare, execute and perform definitive agreements that will permit Delphi to obtain such an additional allocation of Expansion Power pursuant to the terms described herein. Please indicate by your signature below on behalf of Delphi and LEA that Delphi and LEA agree with NYSEG to the terms set forth herein. The parties agree that this letter agreement may be executed in counterparts.

Very truly yours,

James P. Laurito
President and Chief Executive
Officer

AGREED TO AND ACCEPTED:

Delphi Corporation

By: _____
　　Name:
　　Title:

AGREED TO AND ACCEPTED.

Lockport Energy Associates, L.P.

By: _____
Name: Thomas J. Gosicki
Title: Senior Vice President

3

Exhibit B
Modified Energy Sales Agreement

CONFIDENTIAL DRAFT

## TABLE OF CONTENTS

**Page**

ARTICLE I

      **Definitions** .......................................... 9

ARTICLE II

      **Representation and Warranties** ....................... 16

ARTICLE III

ARTICLE IV

      **Operation and Maintenance of the System** ............. 21

ARTICLE V

      **Interconnection Facilities and Access** ............... 22

ARTICLE VI

      **Coordination Committee** ............................. 23

ARTICLE VII

      **Alterations to the System** .......................... 24

ARTICLE VIII

CONFIDENTIAL DRAFT

Permits and Licenses ................................. 24


**ARTICLE IX**

Metering Devices, Inspections and Adjustments ........ 25


**ARTICLE X**


**ARTICLE XI**

Sale of Steam ....................................... 28


**ARTICLE XII**

Insurance ........................................... 36


**ARTICLE XIII**

Term ................................................ 38


**ARTICLE XIV**


**ARTICLE XV**


**ARTICLE XVI**

Billing and Payment ................................. 39


**ARTICLE XVII**

Other Agreements .................................... 42

CONFIDENTIAL DRAFT

**ARTICLE XIV**

       **Unconditional, First Option to Purchase** . . . . . . . . . . . . . 42

**ARTICLE XIX**

**ARTICLE XX**

       **Sale or Transfer of any Ownership Interest** . . . . . . . . . . 45

**ARTICLE XXI**

       **Force Majeure** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

**ARTICLE XXII**

       **Indemnification** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

**ARTICLE XXIII**

       **Events Constituting Breach** . . . . . . . . . . . . . . . . . . . . . . 51

**ARTICLE XXIV**

       **Remedies Upon Breach** . . . . . . . . . . . . . . . . . . . . . . . . . 53

**ARTICLE XXV**

       **Excluded Damages** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

**ARTICLE XXVI**

       **Environmental Matters** . . . . . . . . . . . . . . . . . . . . . . . . . . 57

CONFIDENTIAL DRAFT

**ARTICLE XXVII**

       **Notices** ........................................... 63

**ARTICLE XXVIII**

**ARTICLE XXIX**

       **Non-Waiver** ....................................... 64

**ARTICLE XXX**

       **Assignment** ....................................... 65

**ARTICLE XXXI**

       **Article Headings** ................................. 65

**ARTICLE XXXII**

       **Governing Law/Forum** .............................. 66

**ARTICLE XXXII**

       **Entire Agreement** ................................. 66

**ARTICLE  XXXIV**

       **Arbitration** ...................................... 67

**ARTICLE XXXV**

       **Counterparts** ..................................... 67

CONFIDENTIAL DRAFT

**ARTICLE XXXV**

    **Complementary Agreements** ............................. 67

**ARTICLE XXXVI**

    **Approval** ........................................... 68

ARTICLE XXIV

Remedies Upon Breach ........................................ 59

ARTICLE XXV

Excluded Damages ........................................... 61

ARTICLE XXVI

Environmental Matters ...................................... 62

ARTICLE XXVII

Notices .................................................... 67

ARTICLE XXVIII
Reserved ................................................... 68

ARTICLE XXIX

Non-Waiver ................................................. 74

ARTICLE XXX

Assignment ................................................. 74

ARTICLE XXXI

Article Headings ........................................... 75

ARTICLE XXXII

Governing Law/Forum ........................................ 75

ARTICLE XXXIII

CONFIDENTIAL DRAFT

Entire Agreement .............................................. 75

ARTICLE XXXIV

Arbitration ................................................... 76

ARTICLE XXXV

Counterparts .................................................. 76

ARTICLE XXXVI

Complementary Agreements ...................................... 76

## AMENDED AND RESTATED ENERGY SALES AGREEMENT

THIS AMENDED AND RESTATED ENERGY SALES AGREEMENT (the "Amended and Restated Energy Sales Agreement") made this ____ day of _____, as amended and in effect from time to time, between Lockport Energy Associates, L.P. ("LEALP"), a Delaware limited partnership, having its principal place of business at 5087 Junction Road, Lockport, New York 12094, and Delphi Automotive Systems, LLC, a Delaware limited liability company, on behalf of its Thermal and Interior Division ("Delphi") facility located at 200 Upper Mountain Road, Lockport, New York, for the operation and maintenance of a cogeneration facility (the "System", which is more particularly described in Exhibits "B", "C" and "C-1" attached hereto) on property owned by LEALP in Lockport, New York, ("Project Site", which is more particularly described in Exhibit "A", attached hereto) and for the sale of steam from the System to Delphi.

## WITNESSETH:

CONFIDENTIAL DRAFT


WHEREAS, on April 22, 1991, LEALP and General Motors Corporation, on behalf of its Harrison Division ("GM"), entered into an Energy Sales Agreement (the "Original Energy Sales Agreement") pursuant to which GM agreed to purchase designated amounts of electricity and steam from the System;

WHEREAS, on February 22, 1993, LEALP AND GM executed Amendment No. 1 to the Energy Sales Agreement (as so amended, the "Energy Sales Agreement");

WHEREAS, on January 1, 1999, GM assigned its rights and obligations under the Energy Sales Agreement to Delphi and Delphi agreed to assume such rights and obligations;

WHEREAS, as of the Effective Date, LEALP and Delphi desire to terminate LEALP's electricity sales to Delphi and restructure the terms and provisions pursuant to which LEALP supplies steam to Delphi;

WHEREAS, as of the Effective Date, LEALP wishes to generate and provide steam service for Delphi's facilities at 200 Upper Mountain Road, Lockport, New York in accordance with the terms and conditions set forth in this Amended and Restated Energy Sales Agreement and to continue to generate electricity for sale to others;

WHEREAS, as of the Effective Date, LEALP desires to sell the steam produced by the System and Delphi desires to purchase the steam for use at the Project Site;

- 7 -

CONFIDENTIAL DRAFT

WHEREAS, on October 8, 2005, Delphi filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code before the United States Bankruptcy Court, Southern District of New York (the "Bankruptcy Case");

WHEREAS, LEALP and Delphi desire to effectuate a written amendment and restatement of the Energy Sales Agreement, in accordance with Section 33.01 thereof;

WHEREAS, this Amended and Restated Energy Sales Agreement is intended to replace the Energy Sales Agreement and the Exhibits thereto in their entirety, except as provided herein ("Surviving Exhibits");

WHEREAS, the Surviving Exhibits and the New Exhibits, as defined herein, shall be incorporated and included in this Amended and Restated Energy Sales Agreement as if fully set forth in full herein;

WHEREAS, LEALP and Delphi, by this Amended and Restated Energy Sales Agreement, desire to establish the terms, conditions and obligations pursuant to which they can accomplish the above desires and needs;

NOW, THEREFORE, in consideration of the premises and the agreements contained in this Amended and Restated Energy Sales Agreement, and for good and valuable consideration as identified in the Termination Agreement attached hereto as Exhibit AA, the receipt and sufficiency of which is mutually acknowledged, LEALP and Delphi agree that the Surviving Exhibits and the New Exhibits

- 8 -

CONFIDENTIAL DRAFT

are incorporated herein as if set forth in full and further agree as follows.


**ARTICLE I - <u>Definitions</u>**

As used herein, the following terms shall have the meaning indicated below:

"Additional QF Steam" shall mean steam in excess of 500,000,000 pounds per calendar year which LEALP requires Delphi to take at no charge.

"<u>Agreements and Amendments</u>" shall mean (i) this Amended and Restated Energy Sales Agreement; (ii) the Termination Agreement, dated ___, 2006; (iii) Amendment No. 2 to the Main Transmission Line Easement, dated ____, 2006; (iv) Amendment No. 2 to the Overhead Piping and Wiring Licensing Agreement, dated ____, 2006; (v) Amendment No. 2 to the Oil Storage Tank Licensing Agreement, dated ____, 2006; (vi) Amendment No. 1 to the Natural Gas Pipeline Easement, dated ____, 2006; (vii) Amendment No. 1 to the Ingress and Egress Easement, dated ____, 2006; (viii) Amendment No. 1 to the Fuel Truck Ingress and Egress Licensing Agreement, dated ____, 2006; (ix) Amendment No. 1 to the Rail Car Ingress and Egress Licensing Agreement, dated ____, 2006; (x) and the Storm Water Drainage Culverts Easement, dated ____, 2006.

CONFIDENTIAL DRAFT

"Backup Boiler Agreement" shall mean the agreement between LEALP and GM dated January 11, 1996, which addresses GM's maintenance and operation of its existing steam boilers at LEALP's cost and on its behalf as a potential source of back-up steam, which is attached to the Energy Sales Agreement as Exhibit "S".

"Bankruptcy Court" shall mean the United States Bankruptcy Court, Southern District of New York.

"Bankruptcy Order" shall mean an order of the Bankruptcy Court in a form reasonably satisfactory to LEALP authorizing and approving the Agreements and Amendments.

"Credit Agreement" shall mean the credit agreement or other financing agreement(s) for the financing of construction and long-term operation of the System (which financing agreement(s) may include, but is not limited to, bond financing and/or lease financing) between LEALP and the Lender and the other financial parties, as amended and in effect from time to time.

"Easements" shall mean the agreements attached to the Energy Sales Agreement as Exhibits "G", "H" and "I" and the Storm Water Drainage Culverts Easement, attached hereto as Exhibit "BB", as amended and in effect from time to time.

"Effective Date" shall mean the day upon whichthe latter of i. an additional 10 MW block of Expansion Power from the New York Power Authority is approved by the Authority and scheduled for delivery to Delphi's Lockport plant and delivery of that power actually commences and ii. the Agreements and

- 10 -

CONFIDENTIAL DRAFT

Amendments are approved by the Bankruptcy Court  in a form reasonably satisfactory to LEALP and the Bankruptcy Order becomes final and non-appealable

"Fair Market Value" for the System and the Project Site shall mean the fair market value of the System and the Project Site that would be obtained in an arms'-length transaction between an informed and willing buyer and an informed and willing seller, under no compulsion, respectively, to buy or sell.  The Fair Market Value determination shall take into account among other things (1) that the System and the Project Site are subject to a right of first refusal;  (2) the value of the following five contracts :  (a) the Turnkey Construction Contract dated October 9, 1990 between Chas. T. Main of New York, Inc. and LEALP; (b) the Operating and Maintenance Agreement or a successor agreement; (c) the Power Purchase Agreement and the related wheeling agreement(s), or successor agreements; (d) this Agreement; and (e) the gas supply and gas transportation agreements for the System; (3) any environmental degradation to the Project Site that is the responsibility of LEALP and (4) the extent to which the System is pledged as collateral for debt.  The fair market value will be agreed upon by LEALP and Delphi or, in the absence of such agreement, determined by an Independent Appraisal.  The Independent Appraisal shall take into account, among other things, items (1) - (4) enumerated in this paragraph

"Fuel Truck Ingress and Egress Licensing Agreement"

- 11 -

CONFIDENTIAL DRAFT

shall mean the agreement attached as Exhibit "X" to the Energy Sales Agreement, as amended and in effect from time to time.

"Hazardous Matter" shall mean hazardous wastes, hazardous substances, or toxic substances as those terms are defined under RCRA, 42 U.S.C. 6901 et seq., CERCLA, 42 U.S.C. 9601 et seq., and TSCA, 15 U.S.C. 2601 et seq.

"Delphi Certificate" shall mean the certificate of Delphi in the form of Exhibit "CC" hereto.

"Independent Appraisal" shall mean an appraisal performed in accordance with the following requirements: LEALP and Delphi each shall select a qualified Member of Appraisal Institute in good standing with the American Institute of Real Estate Appraisers ("AIREA") with experience in the valuation of electric generation facilities to perform an appraisal based on the parties' definition of Fair Market Value, as set forth herein, at their own cost. If the higher of the two appraisals is less than 10% above the lower appraisal, the two appraisals shall be averaged and such average shall constitute the Fair Market Value. If the higher of the two appraisals is 10% or more above the lower appraisal, the two appraisers shall nominate a third similarly qualified member of AIREA, provided that, if either party fails to appoint an appraiser within 15 days after a written request to do so by the other party, or if the two appraisers fail to agree upon a third appraiser, then either party may apply to the American Arbitration Association to make such appointment. Once appointed, the third appraiser shall perform an independent

- 12 -

CONFIDENTIAL DRAFT

appraisal, based on the definition of Fair Market Value set forth herein, which appraisal shall be averaged with the two prior appraisals to constitute the Fair Market Value.  Unless the parties agree otherwise, any third independent appraisal shall be made within 60 days of such appointment and the expenses attendant thereto shall be shared equally by LEALP and Delphi.

"Ingress and Egress Easement" shall mean the agreement attached as Exhibit "I" to the Energy Sales Agreement, as amended and in effect from time to time.

"Lender" shall mean any entity or entities providing debt, equity, lease and/or bond financing for the long term operation of the System, and their successors and assigns.

"LEALP Certificate" shall mean the certificate of LEALP in the form of Exhibit "DD" hereto.

"License To Operate and Maintain Certain Harrison Equipment" shall mean the agreement attached as Exhibit "T" to the Energy Sales Agreement, as amended and in effect from time to time.

"Licensing Agreements" shall mean the agreements attached as Exhibits "E", "F", "J" and "T", "X" and "Y" to the Energy Sales Agreement, as amended and in effect from time to time.

"Main Transmission Line Easement" shall mean the agreement attached as Exhibit "G" to the Energy Sales Agreement, as amended and in effect from time to time.

"Natural Gas Pipeline Easement" shall mean the agreement

- 13 -

CONFIDENTIAL DRAFT

attached as Exhibit "H" to the Energy Sales Agreement, as amended and in effect from time to time.

"Net Steam Energy Supplied" shall mean Steam energy delivered less energy in condensate returned, as determined pursuant to Section 11.09.

"New Exhibits" shall mean the following exhibits to this Amended and Restated Energy Sales Agreement, as amended from time to time: Exhibits "AA" [Termination Agreement], "BB" Storm Water Drainage Culverts Easement], "CC" [Delphi Certificate], "DD" [LEALP Certificate].

"NYSEG" shall mean New York State Electric and Gas Corporation.

"Oil Tank Storage Licensing Agreement" shall mean the agreement attached as Exhibit "F" to the Energy Sales Agreement, as amended and in effect from time to time.

"Operating and Maintenance Agreement" shall mean the agreement effective as of October 9, 1990 and amended and restated as of April 25, 1991 between LEALP and North American Energy Services Company attached as Exhibit "M" to the Energy Sales Agreement, as amended and in effect from time to time.

"Overhead Piping and Wiring Licensing Agreement" shall mean the agreement attached as Exhibit "E" to the Energy Sales Agreement, as amended and in effect from time to time.

"Plans and Specifications" shall mean Exhibit "B" to the Energy Sales Agreement as modified by Exhibit "C" and Exhibit "C-

- 14 -

CONFIDENTIAL DRAFT

1" to the Energy Sales Agreement provided, however, that where the Plans and Specifications are modified by specific provisions of this Amended and Restated Energy Sales Agreement, the provisions of this Amended and Restated Energy Sales Agreement shall control. The sizes and quantities contained within subsections titled "Descriptions of Buildings" and "Definition of Interconnection" set forth in Exhibit "C" shall not be construed to be maximum standards.

"Power Purchase Agreement" shall mean the Power Purchase Agreement (including any mortgage and/or collateral documents delivered in connection therewith) between Empire Energy Niagara Limited Partnership ("Empire") and NYSEG dated March 26, 1990 which agreement was assigned by Empire to LEALP on February 25, 1991, as amended and in effect from time to time.

"Project Site Agreement of Sale" shall mean the agreement dated April 22, 1991 between the parties whereby the Project Site was conveyed by GM to LEALP, attached as Exhibit "D" to the Energy Sales Agreement.

"Rail Car Ingress and Egress Licensing Agreement" shall mean the agreement attached as Exhibit "Y" to the Energy Sales Agreement, as amended and in effect from time to time.

"Security Documents" shall mean the mortgage and security agreement and other collateral documents from LEALP to the Lender to secure the loan under the Credit Agreement, as such

- 15 -

CONFIDENTIAL DRAFT

mortgage and security agreement and collateral documents may be in effect from time to time.

"Steam Minimum" shall mean 500,000,000 pounds of steam per calendar year.

"Storm Water Drainage Culverts Easement" shall mean the agreement attached as Exhibit "BB" hereto , as amended and in effect from time to time.

"Surviving Exhibits" shall mean the following exhibits to the Energy Sales Agreement, as amended from time to time: Exhibits "A", "B", "C", "C-1", "D", "E", "F", "G", "H", "I", "J", "M", "P", "R", "S", "T", "U", "V", "W", "X", and "Y".

## ARTICLE II - Representation and Warranties

2.01    LEALP makes the following representations, covenants and warranties which shall survive the execution and delivery of this Amended and Restated Energy Sales Agreement:

(a)    LEALP is a limited partnership duly organized and existing in good standing under the laws of the State of Delaware, and LEALP has the power to own its property and to carry on its business as it is now being conducted. Throughout the term of this Amended and Restated Energy Sales Agreement, LEALP will provide Delphi with certified copies of all documents that could affect LEALP's ability to perform its obligations hereunder, including documents pertaining to its organization, membership, governance and operation.

- 16 -

CONFIDENTIAL DRAFT

(b)   There is no action, suit, investigation or proceeding pending or, to the knowledge of LEALP, threatened against LEALP, its general partner, or any of their respective properties, which might result in a material adverse change in the business, operations, results of operations, prospects or condition (financial or otherwise) of LEALP or its general partner, or which could be reasonably expected to materially adversely affect the System or the transactions contemplated by this Amended and Restated Energy Sales Agreement.

(c)   LEALP has all requisite partnership power and authority to execute, deliver and perform its obligations under this Amended and Restated Energy Sales Agreement, and the execution, delivery and performance by it of this Amended and Restated Energy Sales Agreement have been duly authorized by all necessary actions on its part, and this Amended and Restated Energy Sales Agreement has been duly executed and delivered by LEALP.

(d)   LEALP is not a party to any contract or agreement or subject to any partnership restriction which materially and adversely affects its business, operations, property or assets, prospects or condition (financial or otherwise). The execution, delivery and performance of this Amended and Restated Energy Sales Agreement will not result in the violation of or be in conflict with or constitute a default under its partnership agreement or any term or provision of any mortgage, lease, license, agreement

- 17 -

CONFIDENTIAL DRAFT

or other instrument, or any judgment, decree, governmental order, statute, rule or regulation, by which LEALP is bound or to which all or a substantial part of its assets are subject, or result in the creation or imposition of, or the obligation to create or impose, any mortgage, lien, charge or encumbrance of any nature whatsoever upon any of the assets of LEALP (except those created or imposed by the Security Documents or the subordinated mortgage referenced in the Power Purchase Agreement) pursuant to the terms of any mortgage, indenture, agreement or instrument to which LEALP is a party or by which all or a substantial part of its assets are bound.   No approval by, authorization of, or filing with any Federal, state or other governmental commission, agency or authority is necessary in connection with the execution and delivery by LEALP of this Amended and Restated Energy Sales Agreement.

(e)   The System has been certified as a qualifying cogeneration facility, as such term is defined in Section 201 of the Public Utility Regulatory Policies Act of 1978 ("PURPA") and in the regulations promulgated thereunder, including, without limitation, 18 C.F.R. § 292.203, 18 C.F.R. § 292.205 and § 292.206, as amended (a "Qualifying Facility and shall remain a Qualifying Facility through the Initial Term.

(f)   During the period that the Amended and Restated Energy Sales Agreement is in effect, LEALP shall be allowed to

- 18 -

CONFIDENTIAL DRAFT

sell steam from the System to entities other than Delphi or its permitted successors and assigns as long as such sales do not interfere with LEALP's obligations hereunder.

2.02    Subject to and only upon the Bankruptcy Court's final and non-appealable order approving this Amended and Restated Energy Sales Agreement, in a form reasonably satisfactory to LEALP, Delphi makes the following representations, covenants and warranties which shall survive the execution and delivery of this Amended and Restated Energy Sales Agreement:

(a)    Delphi is a limited liability company duly organized and existing in good standing under the laws of the State of Delaware, and Delphi has the power to own its property and to carry on its business as it is now being conducted.

(b)    There is no action, suit, investigation or proceeding pending or, to the knowledge of Delphi, threatened against Delphi, which could materially adversely affect the System or the transactions contemplated by this Amended and Restated Energy Sales Agreement, or which involves the possibility of materially adversely affecting the ability of Delphi to comply with this Amended and Restated Energy Sales Agreement.

(c)    Delphi has all requisite power and authority to execute, deliver and perform its obligations under this Amended and Restated Energy Sales Agreement, and the execution, delivery and performance by it of this Amended and Restated Energy Sales Agreement, have been duly authorized by all necessary action on

- 19 -

CONFIDENTIAL DRAFT

its part, and this Amended and Restated Energy Sales Agreement has been duly executed and delivered by Delphi.

(d)   The execution, delivery and performance of this Amended and Restated Energy Sales Agreement will not result in the violation of or be in conflict with or constitute a default under any term or provision of any mortgage, lease, agreement or other instrument, or any judgment, decree, governmental order, statute, rule or regulation, by which Delphi is bound or to which all or a substantial part of its assets are subject, or result in the creation or imposition of, or the obligation to create or impose, any mortgage, lien, charge or encumbrance of any nature whatsoever upon any of the assets of Delphi pursuant to the terms of any mortgage, indenture, agreement or instrument to which Delphi is a party or by which all or a substantial part of its assets are bound.   No approval by, authorization of, or filing with any Federal, state or other governmental commission, agency or authority is necessary in connection with the execution and delivery by Delphi of this Amended and Restated Energy Sales Agreement or the Licenses.

**ARTICLE III - Reserved**

CONFIDENTIAL DRAFT
## ARTICLE IV - <u>Operation and Maintenance of the System</u>

4.01   LEALP shall be responsible for the operation and maintenance of the System and shall operate and maintain the System at its own expense in accordance with the Plans and Specifications. The System at all times shall be operated in a manner that will enable it to meet the steam demands set forth in Article XI.   With the exception of emergency situations, LEALP shall schedule normal maintenance and all capital improvements for the steam supply system for the months of May - September of each year.

4.02   Delphi shall be a third party beneficiary of the Operating and Maintenance Agreement.   Delphi shall have the right at all reasonable times at Delphi's expense and risk to review the operation and maintenance of the System and the records related thereto, to ensure that the System is being operated in accordance with the terms hereof and of the Operating and Maintenance Agreement, <u>provided</u>, however, that neither Delphi's right of review, nor any other provision contained herein, shall be read to infer that Delphi is in any way responsible for the operation or maintenance of the System.   In this regard, the covenants, undertakings and other provisions of the Operating and Maintenance Agreement are incorporated herein by reference, to the extent applicable to LEALP's obligations to Delphi, as if set forth herein.

- 21 -

CONFIDENTIAL DRAFT

4.03   LEALP shall maintain the monitoring station, as it exists as of the Effective Date of this Amended and Restated Energy Sales Agreement, for the System.

## ARTICLE V - <u>Interconnection Facilities and Access</u>

5.01   Subject to Delphi's review rights set forth in Sections 5.02 and 5.03, LEALP shall be responsible for maintaining, at its cost and expense, all the transmission facilities and equipment necessary for the interconnections between the System and Delphi's existing facilities.   The maintenance of all interconnection facilities shall be performed in accordance with the terms and conditions of the Licensing Agreements and Easements.

5.02   Designated Delphi employees, or their appointees, shall have the right, upon reasonable notice, to review any documents related to the maintenance of the interconnections referenced in §5.01, <u>provided</u>, however, that neither Delphi's right to approve or review such documents, nor anything else contained herein, shall be read to infer that Delphi is in any way responsible for the design, installation or maintenance of such interconnection facilities.

5.03   LEALP, its agents, subcontractors, or others under its control shall respond in writing to any comments by Delphi, or its appointees, during the review process established pursuant to §5.02.   Thereafter the parties will negotiate in good faith to

- 22 -

CONFIDENTIAL DRAFT

resolve any comments submitted by Delphi. Unresolved disputes shall be referred to the Coordination Committee established pursuant to §6.01.

## ARTICLE VI - <u>Coordination Committee</u>

6.01   In addition to maintaining routine operations and communications, LEALP and Delphi shall establish a Coordination Committee consisting of management representatives of LEALP and Delphi. The Committee shall meet as required for the following purposes:

1.   Review and resolve disputes arising under Sections 4.02, 5.02, and 5.03.

2.   Provide projections of upcoming operating schedules for maintenance and shutdown of LEALP and Delphi equipment. LEALP and Delphi agree to use their best efforts to promptly resolve any disputes that may arise under Sections 4.02, 5.02, or 5.03 of this Amended and Restated Energy Sales Agreement. In the event the Coordination Committee shall not resolve any such disputes, the decision of LEALP shall be conclusive as to the aforesaid three subsections only, and no others.

6.02   The Coordination Committee shall be comprised of three representatives from Delphi and three representatives from LEALP, which representatives shall be appointed, and are subject to change, by the party that they represent.

- 23 -

CONFIDENTIAL DRAFT

**ARTICLE VII - <u>Alterations to the System</u>**

7.01   So long as the replacement or alteration shall not have an adverse effect on the ability of LEALP to perform its obligations hereunder, LEALP shall have the right to replace or upgrade any component of the System or add components to the System.   Prior notice of any proposed replacement or alteration (not including routine maintenance or in the case of an emergency) of equipment used for the production or delivery of steam shall be given to Delphi.   Replacements, upgradings or additions of such components shall belong to and become the property of LEALP and shall become a part of the System subject to the terms of this Amended and Restated Energy Sales Agreement.

**ARTICLE VIII - <u>Permits and Licenses</u>**

- 24 -

CONFIDENTIAL DRAFT

8.01   LEALP shall, at its own cost and expense, maintain throughout the term of this Amended and Restated Energy Sales Agreement all permits, licenses and approvals from all applicable governmental authorities, or other entities, necessary for the commercial operation of the System.   These permits may include, but are not limited to, state, federal, local and municipal environmental permits and licenses, state siting and operating permits, and local and municipal building code and zoning variances where required.   Delphi shall cooperate with LEALP in maintaining such permits, licenses and approvals but: (i) shall not interfere with LEALP's maintenance of such permits, licenses and approvals; and (ii) shall have no financial responsibility with respect to such maintenance.   LEALP shall at all times operate the System in a manner consistent with such permits, licenses and approvals.   Copies of all such permits, licenses, approvals, and variances shall be provided to Delphi by LEALP promptly after receipt by LEALP.

**ARTICLE IX - <u>Metering Devices, Inspections and Adjustments</u>**

9.01   <u>Metering Devices</u> - LEALP shall provide, own and maintain, at its own expense, all necessary meters and associated equipment to be utilized in measuring the steam energy output of the System and steam condensate return to the System, which measurements will form the basis of the calculation of the monies owed by Delphi to LEALP pursuant to this Amended and Restated Energy Sales Agreement.

- 25 -

CONFIDENTIAL DRAFT

9.02   <u>Check Meters</u> - Delphi shall have the option to install, at its own expense, check meters and associated equipment to verify all meter readings.

9.03   <u>Access, Inspections and Testing</u> - The metering devices shall be sealed and such seals shall be broken only by LEALP and only when a metering device is to be inspected, tested, adjusted, or repaired.  Delphi shall receive reasonable prior notice of any testing, inspecting or adjustment of metering devices and shall have the right to be present at such events.

9.04   <u>Adjustment for Inaccuracies</u> - Periodic tests of such metering equipment will be made by LEALP at least once each year at no cost to Delphi and additional tests will be made at any reasonable time upon request therefore by Delphi.  If, as a result of such tests, the metering equipment is found to be defective or inaccurate, it promptly will be restored to a condition of accuracy or replaced by LEALP.  If a test of the metering equipment is made at the request of Delphi with the result that said metering equipment is found to be registering correctly or within plus or minus one percent (1.0%) of 100% for steam, Delphi agrees to bear the expense of such test; provided that if such test shows an error greater than plus or minus one percent (1%) of 100% for steam, then LEALP will bear all costs of such test.  All meters shall be adjusted by LEALP as close as practical to 100% at the time of installation and testing.

- 26 -

CONFIDENTIAL DRAFT

If any of the metering equipment tests provided for herein disclose that the error for such equipment exceeds plus or minus one percent (1%) of 100% for steam, then one-half (50%) of the measured quantities resulting from the readings of such metering equipment taken during the billing periods since the last test on such equipment was made will be adjusted, in full, either upward or downward from the amount of the error to one hundred percent.  Any correction in billing resulting from such adjustment in meter records shall be made in the next monthly bill rendered by LEALP after the inaccuracy is discovered, and such correction when made shall constitute a complete and final settlement of any claim arising between the parties hereto out of such inaccuracy of the metering equipment.

Should any metering equipment installed by LEALP fail to register the condensate or steam delivered during any period of time, the amount of condensate or steam delivered during such period will be estimated by agreement of the parties based on the amounts previously delivered during similar periods under substantially similar conditions, unless meter readings are available from Delphi's installed meter equipment, in which case Delphi's meter readings will be used.  Delphi shall have its meters inspected and tested annually.

**ARTICLE X - <u>Sale of Electricity</u>**

- 27 -

CONFIDENTIAL DRAFT

10.01   Upon the Effective Date, all electricity sales from LEALP to Delphi shall terminate. Any and all provisions of the Energy Sales Agreement that are necessary for final metering and billing of LEALP's electricity sales to Delphi shall survive for purposes of final metering and billing of electricity sales.

**ARTICLE XI - <u>Sale of Steam</u>**

11.01   LEALP agrees to supply and deliver one hundred percent (100%) of Delphi's requirements for steam from the System up to 160,000 lbs/hour, commencing on the Effective Date and continuing uninterrupted through the Initial Term of this Amended and Restated Energy Sales Agreement, as defined in Article XIII. Through the Initial Term only, for steam equal to or less than 160,000 lbs/hour, up to a limit of 500,000,000 lbs of steam per calendar year, Delphi agrees to accept and pay for such actual steam deliveries pursuant to the terms set forth in §11.04. For the Initial Term only, for steam in excess of 160,000, lbs/hour, or in excess of 500,000,000 lbs of steam per calendar year ("Excess Steam Capacity"), Delphi shall have the option to purchase such steam from LEALP for a price equal to LEALP's cost of supplying that steam or to secure such steam from an alternate source.

- 28 -

CONFIDENTIAL DRAFT

a.    LEALP's  cost  of  supplying  Excess  Steam Capacity  during  the  Initial  Term  shall  be  determined  in  the following  manner:  Excess  Steam  Capacity  will  be  considered  to  be supplied  by  the  auxiliary  boiler  defined  in §2.01  of  Exhibit  "B". Auxiliary  boiler  steam  costs  will  be  determined  by  using  the  as delivered  cost  of  fuel  supplied  and  a  boiler  efficiency  of  82% ("Initial  Term  Supplemental  Steam  Price").

11.02    In  order  to  assure  maximum  reliability  of  supply to  Delphi  during  the  Initial  Term,  the  steam  supply  facilities  of the  System  shall  be  maintained  by  LEALP  in  accordance  with  the Plans  and  Specifications.    LEALP's  obligation  to  supply  steam  in accordance  with  the  provisions  set  forth  herein  shall  not  be excused  by  a  labor  dispute  or  a  labor  or  material  shortage  that might  otherwise  qualify  as  a  Force  Majeure  event  under  Article  XXI hereof  unless  the  LEALP  labor  dispute  or  labor  or  material shortage  is  the  result  of  (1)  events,  other  than  extreme  hot  or cold  weather  or  snow,  beyond  the  reasonable  control  or contemplation  of  LEALP,  or  (2)  a  labor  dispute  or  labor  shortage affecting  Delphi  which  results  in  an  inability  of  LEALP,  its employees  or  operators  to  operate  the  System.

a.    The  delivery  point  for  the  steam  will  be  in Delphi's  Building  No.  16  at  the  block  valve  entering  the  24  inch main  steam  header.    Steam  delivered  will  be  at  145-155  psig  with less  than  20°F  super  heat.    LEALP  shall  be  responsible  for  the maintenance  of  all  steam  supply  lines  up  to  and  at  the  delivery

- 29 -

CONFIDENTIAL DRAFT

point.   Maintenance of steam supply lines inside the existing
Delphi boiler house shall be controlled by Exhibit "T".   Steam
supply lines beyond the delivery point shall be the responsibility
of Delphi.

11.03  Through the Initial Term, Delphi agrees that
it will consume yearly, in a manner consistent with the
requirements of PURPA, the minimum pounds (the "Steam Minimum") of
steam necessary to allow the System to maintain its Qualifying
Facility ("QF") status at the Federal Energy Regulatory Commission
("FERC"), provided, however, that such Steam Minimum does not
exceed 500,000,000 pounds of steam per calendar year.   In  the
event that LEALP should require Delphi to take Additional QF Steam
to maintain LEALP's QF status at FERC, Delphi shall take the
Additional QF Steam at no charge, provided, that Delphi shall have
no obligation to take any Additional QF Steam unless LEALP
provides reasonable notice to Delphi, which shall not be less than
60 days, and, provided further, that the extent of Additional QF
Steam that Delphi may be obligated to take shall reflect Delphi's
historical usage patterns and the extent of additional QF Steam
requirements.  Delphi's obligation to consume the Steam Minimum
and Additional QF Steam shall not be excused by a labor dispute or
a labor or material shortage that might otherwise qualify as a
Force Majeure event under Article XXI.  Subject to LEALP's ability
to deliver steam, Delphi is obligated to take and pay for the
Steam Minimum and take the Additional QF Steam during each

- 30 -

CONFIDENTIAL DRAFT

calendar year or for a partial year, a pro rata portion thereof, throughout the Initial Term.

11.04   The price for Net Steam Energy Supplied by LEALP to Delphi during the Initial Term up to 500,000,000 lbs per calendar year shall be equal to $3.00 per MMBtu.

11.05   During any Additional Term, Delphi shall take or pay for a minimum of 50,000,000 lbs of steam per calendar year. For each calendar year during any Additional Term, LEALP shall provide or be available to provide a minimum of 90% of Delphi's annual steam requirements up to a maximum of 160,000 lbs/hr and 500,000,000 lbs per year at a price equal to the as delivered cost of fuel supplied and a boiler efficiency of 82% plus a mark-up for water, chemicals and other incidentals of $1.50 per million pounds escalating at 3% annually beginning one year from the Effective Date (the "Supplemental Steam Price").  During short term periods when LEALP is unavailable to deliver steam, Delphi may operate its backup boilers pursuant to the Backup Boiler Agreement, Exhibit S.  During periods that Delphi's backup boilers are operated as a short-term substitute for Steam from LEALP, LEALP shall compensate Delphi for all costs associated with running the back-up boilers, including the cost of labor, fuel, water and other reasonable costs, less the Supplemental Steam Price.

- 31 -

CONFIDENTIAL DRAFT

a.    Notwithstanding any other term herein, if during any Additional Term, LEALP is producing electricity from its steam turbine, the price of Steam charged to Delphi during such periods shall be equal to the Initial Term Supplemental Steam Price.

11.06    During the Initial Term onlyin the event that LEALP's supply of steam from the System to Delphi is interrupted for any reason other than Delphi's acts or omissions or a Force Majeure event, which, for purposes herein, shall not include a labor dispute or a labor or material shortage by LEALP unless the labor dispute or labor or material shortage is the result of (1) events, other than extreme hot or cold weather or snow, beyond the reasonable control or contemplation of LEALP, or (2) a labor dispute or labor shortage against or affecting Delphi which results in the inability of LEALP, its employees or operators to operate the System, LEALP is obligated to secure and deliver an alternative, reliable source of steam to Delphi within 72 hours of the interruption.  In the event that LEALP fails in its obligation to deliver alternative, reliable steam hereunder and as a result thereof Delphi is forced to purchase steam from another entity or produce steam itself, for days 4 through 7 of the interruption LEALP shall pay Delphi liquidated damages of $100,000 per day and for days 8 through 30 of the interruption LEALP shall pay Delphi $200,000 per day as liquidated damages.

- 32 -

CONFIDENTIAL DRAFT

a. In addition, during the initial term onlyLEALP shall reimburse Delphi for all reasonable costs or charges directly associated with all replacement steam supplies commencing with the first hour of the first day that Delphi secures such replacement steam supplies including, but not limited to, boiler delivery and installation costs, rental and fuel costs, labor costs, dismantling costs, start-up, and/or other charges related to Delphi's alternate supply steam equipment during the period of interruption, less what such steam supplies would otherwise have cost Delphi pursuant to this Amended and Restated Energy Sales Agreement, _provided_, however, that Delphi shall use its best efforts to secure the least cost supplies of back-up steam recognizing its need to minimize its down time.

b. During each Additional Term, LEALP shall reimburse Delphi for all reasonable costs or charges directly associated with all replacement steam supplies commencing with the first hour of the thirty first day that Delphi secures such replacement steam supplies including, but not limited to, boiler delivery and installation costs, rental and fuel costs, labor costs, dismantling costs, start-up, and/or other charges related to Delphi's alternate supply steam equipment during the period of interruption, less what such steam supplies would otherwise have cost Delphi pursuant to this Amended and Restated Energy Sales Agreement, _provided_, however, that Delphi shall use its best

- 33 -

CONFIDENTIAL DRAFT

efforts to secure the least cost supplies of back-up steam recognizing its need to minimize its down time.

11.07   LEALP shall obtain Delphi's written approval (which approval shall not be unreasonably withheld and shall be addressed promptly by Delphi) for any and all chemical treatment or additives to inhibit corrosion added to the steam produced by LEALP prior to LEALP's making such additions or treatments. Prior to making such chemical additions or treatments, LEALP shall provide the specifications for the additions or treatments to Delphi for review and concurrence.

11.08  Delphi will return the condensate water from the steam production of LEALP to LEALP without adding any Hazardous Matter, as defined herein.  LEALP is responsible for monitoring the quality and quantity of the condensate water returned.  In the event that LEALP finds the condensate water returned to be contaminated, it is responsible for directing the contaminated condensate water to a receptor designated by Delphi.  Title to usable condensate shall pass to LEALP at the delivery point, which shall be the 18,000 gallon condensate storage tank in Delphi Building 16.  LEALP shall retain responsibility for operation and maintenance for all components required for the movement of condensate from the Delivery Point to the System, including the 18,000 gallon condensate storage tank.  Delphi shall receive a credit for all such condensate returned to the condensate delivery point, less contaminated condensate that is diverted to a receptor

- 34 -

CONFIDENTIAL DRAFT

designated by Delphi, based on BTU value, calculated and determined in accordance with the following calculation:

Calculation of Credit For
<u>Condensate Water Return Credits</u>

BTUS - Total weighted Btu value of steam, in million Btu

BTUC - Total weighted Btu value of returned condensate, in million Btu

Calculated as follows:

$$BTUS = \sum_{i=1}^{n} (PS_i \times HS_i)$$

$$BTUC = \sum_{i=1}^{n} (PC_i \times HS_i)$$

Where:

$PS_i$, $HS_i$ =Average hourly steam flow in pounds and corresponding steam enthalpy in Btu per pound during each operating hour.

$PC_i$, $HC_i$ =Average hourly return condensate flow in pounds and corresponding condensate enthalpy during each operating hour.

n        =A sum of weighted Btu values of steam, condensate and water for all operating hours during the billing

$$\sum_{i=1}$$        period.

n        =Total number of hours during each billing period.

Flows    =Determined from meter readings

Net Steam    = BTUS - BTUC
Energy Supplied

– 35 –

CONFIDENTIAL DRAFT

Condensate
Enthalpy = Saturation enthalpy from ASME steam table at the conden-
sate delivered temperature.

Steam
Enthalpy = Saturation enthalpy from ASME steam table at the deliv-
ery pressure.

## ARTICLE XII - <u>Insurance</u>

12.01   LEALP shall obtain and maintain, or cause to be obtained and maintained, at its own expense, the following insurance coverages in full force and effect to cover all activities contemplated herein throughout the term of this Amended and Restated Energy Sales Agreement, unless otherwise specified for a longer coverage period:

(1) Comprehensive general liability insurance, including products, completed operations and contractual liability coverage in limits of not less than $20 million per occurrence combined single limit for personal injury and property damage.

(2) Statutory workers' compensation insurance and employers' liability insurance in limits required by New York State.

(3) Pollution Legal Liability insurance, including coverage for both sudden and accidental and non-sudden occurrences with limits of the greater of $5 million per occurrence combined single limit for personal injury and property damage with $8 million annual aggregate, or such limits as may be required according to applicable governing regulations, <u>provided</u>, however,

- 36 -

CONFIDENTIAL DRAFT

that LEALP shall not be required to renew the Pollution Legal Liability insurance if it can demonstrate each year thereafter, to Delphi's sole satisfaction, that such insurance is no longer available at commercially reasonable rates.

(4)    Comprehensive automobile liability insurance covering all owned and non-owned and hired vehicles in limits of not less than $1 million per occurrence combined single limit for personal injury and property damage, including all statutory coverages for all states of operation.

(5)   "All-risk" property insurance insuring all real and personal property at full replacement cost value.    LEALP and Delphi shall cause their insurers to waive any right of subrogation.    LEALP and Delphi shall assume responsibility for their own deductible amounts and losses in excess of policy limits for an insured loss.

(6)   Professional errors and omissions liability coverage in limits of not less than $3 million per occurrence for bodily injury and property damage resulting from LEALP's design and construction of the System.

The coverages obtained by LEALP pursuant to this Article shall be with reputable insurance companies and subject to the review and approval of Delphi, which approval shall not be unreasonably withheld.    LEALP shall cause each insurance policy to name Delphi as a certificate holder and require that the insurer provide Delphi with notice of any changes or lapses in LEALP's

- 37 -

CONFIDENTIAL DRAFT

insurance coverage.   Each year LEALP shall provide Delphi with certificates of insurance:  (a) evidencing Delphi as an additional insured for all of the above mentioned coverages, except workers compensation.   The purchase of appropriate insurance coverage by LEALP or the furnishing of the certificate(s) of insurance shall not release LEALP from its respective obligations or liabilities under this agreement.


**ARTICLE XIII - <u>Term</u>**

13.01   The Initial Term of this Amended and Restated Energy Sales Agreement shall commence as of the Effective Date and shall terminate on December 27, 2007, unless the Amended and Restated Energy Sales Agreement is terminated earlier pursuant to the terms contained herein.  Delphi shall use its best efforts to file as soon as reasonably practicable after execution of all the Agreements and Amendments all necessary motions and supporting documentation (including without limitation the Agreements and Amendments) with the Bankruptcy Court as may be required to obtain the Bankruptcy Order and Delphi shall use its best efforts to diligently prosecute the same.  All such applications and supporting documentation, including without limitation the proposed form of the Bankruptcy Order, shall be subject to the prior review and approval of LEALP before being filed, not to be unreasonably withheld, conditioned, or delayed. In the event that the Bankruptcy Order has not been entered by the Bankruptcy Court

- 38 -

CONFIDENTIAL DRAFT

and has not become a final non-appealable order  on or before
_____, 2006, either party shall have the right to terminate this
Amended and Restated Energy Sales Agreement without any liability
to the other whatsoever and in which case the original Energy
Sales Agreement shall continue in effect.

13.02    Upon  expiration  of  the  Initial  Term,  this
Amended  and  Restated  Energy  Sales  Agreement  shall  continue  in
force  for  up  to  an  additional  ten  terms  of  two  years  each
("Additional  Terms"),  up  to  a  maximum  of  twenty  (20)  years
("Additional  Term")  unless  Delphi  provides  LEALP  with  written
notice  of  its  intention  to  terminate  this  Amended  and  Restated
Energy  Sales  Agreement  no  later  than  six  months  prior  to  the  end
of  the  Initial  Term  or  the  then  effective  Additional  Term.

**ARTICLE XIV - Reserved**

**ARTICLE XV - Reserved**

**ARTICLE XVI - <u>Billing and Payment</u>**

16.01    Each  month  during  the  term  of  this  Amended  and
Restated  Energy  Sales  Agreement,  Delphi  shall  submit  to  LEALP  a
statement  of  any  steam  standby  or  backup  charges  for  which  LEALP
is  responsible  pursuant  to  Section  11.06  hereof  including,  where
applicable,  copies  of  bills  tendered  to  Delphi  by  third-parties.

- 39 -

CONFIDENTIAL DRAFT

16.02    LEALP will read the metering devices at 8:00 a.m., the first day of each calendar month, and will thereafter prepare and send to Delphi an invoice for the Net Steam Energy Supplied to Delphi by LEALP during such calendar month, at prices determined in accordance with Article XI.    Delphi's employees or agents shall have the right to be present when the metering devices are read.    Invoices will be sent to Delphi by the fifteenth (15th) day of the month following the month in which the readings were taken.    The billing period shall commence at 8:00 A.M. the first day of each month.

16.03    Other than portions of an invoice that are in dispute, Delphi shall pay the amount due to LEALP no later than thirty (30) days after receipt of the monthly invoice from LEALP.    Any payment not so made will bear interest, from the date on which payment was required, at a rate equal to JP Morgan Chase's prime rate, plus one percent (1%), provided, however, that amounts under dispute will not be subject to interest if it is determined, by the agreement of the parties or by the decision of an independent court or arbitration panel, that the amounts were not due and payable to LEALP.

16.04    (a)    LEALP shall pay to Delphi the following schedule of payments, which the parties agree represents Delphi's share of the tax benefits obtained through the participation of the Town of Lockport Industrial Development Agency ("IDA") in the financing of the System:

- 40 -

CONFIDENTIAL DRAFT

| | |
|---|---|
| 2006 | 420,393 |
| 2007 | 459,538 |

The payments to Delphi for shared savings shall be paid only if LEALP is making Payments in Lieu of Taxes ("PILOT") to the IDA during the applicable period set forth on the foregoing chart. Further, if the PILOT in any given year above is different than $725,000 then Delphi's shared savings payment for that year shall be adjusted (upward or downward) by adding fifty percent (50%) of the difference of $725,000 less the actual PILOT payment. In no event shall Delphi be obligated to make payments to LEALP if the above calculation results in a value for Delphi's shared savings of less than zero.

(c) Payment to Delphi for the amounts due for any calendar year shall be achieved by crediting the full amount due to Delphi against the first bill from LEALP in the immediately succeeding calendar year (i.e., the payment due for 2006 shall be credited against the first bill in 2007; the payment due for 2007 shall be credited against the first bill in 2008) provided, however that if the credit taken on any monthly bill would reduce such monthly bill to less than zero, the remaining credit shall apply to each succeeding monthly bill. In the event that such crediting period exceeds six months, payment of the remaining credit for the prior year shall be immediately payable to Delphi in cash. The payment due for the last year in which this Amended

- 41 -

CONFIDENTIAL DRAFT

and Restated Energy Sales Agreement is in effect shall be credited against the last bill to be paid by Delphi.  In the event that the credit for the last year of this Amended and Restated Energy Sales Agreement exceeds the last bill to Delphi, any remaining balance shall be immediately paid to Delphi in cash.


**ARTICLE XVII - <u>Other Agreements</u>**

17.01   LEALP agrees to execute and deliver the LEALP Certificate to Delphi in form and substance reasonably satisfactory to Delphi.

17.02   Delphi agrees to execute and deliver the Delphi Certificate and to LEALP in form and substance reasonably satisfactory to LEALP.


**XVIII - <u>Unconditional, First Option to Purchase</u>**

18.01   In the event that LEALP shall desire to sell or transfer all or any significant part of the System and/or Project Site during the term of this Agreement pursuant to Article XX hereof, Delphi shall have the unconditional and first option to purchase the System and Project Site, subject to LEALP's obligations under the Power Purchase Agreement.  If LEALP receives a bona fide offer to purchase the System and/or Project Site, it shall provide written notice of such offer to Delphi.  Delphi shall have ninety (90) days from receipt of such written notice from LEALP to elect in writing to purchase the System and/or

- 42 -

CONFIDENTIAL DRAFT

Project Site on the same terms and conditions as such bona fide offer.  If Delphi fails to provide LEALP such written election within the ninety (90) day period, Delphi shall be deemed to have elected not to exercise its right to purchase the System and/or Project Site.  Delphi's first option to purchase shall not be activated by transfers of limited partnership interests in LEALP to entities that meet the test outlined in §20.01 or otherwise are approved by Delphi.  If Delphi shall have so elected to purchase the System and/or Project Site, LEALP shall transfer the System and/or Project Site to Delphi pursuant to a deed and bill of sale, in form and substance satisfactory to Delphi, free and clear of all liens and encumbrances other than those arising under the Security Documents and the Power Purchase Agreement in exchange for payment by Delphi to LEALP of the purchase price in funds consisting of lawful currency of the United States of America, net of any funds owed to the Lender under the Security Documents or to NYSEG under the Power Purchase Agreement.  Any sales taxes on such purchase shall be paid by Delphi and all real estate taxes, school taxes and water and sewer rents shall be apportioned between LEALP and Delphi as of the date of the delivery of the deed on the basis of each party's respective period of ownership as it relates to said taxes.

CONFIDENTIAL DRAFT

## ARTICLE XIX - Assignment of Contracts Upon Purchase or Assumption of Control by Delphi

19.01    In the event that, pursuant to the provisions of Articles, XVIII or XXIV Delphi exercises its right to purchase the System and/or Project Site or assumes control of the System and/or Project Site through the operation of other provisions of this Agreement, or otherwise:

(a)    Subject to the Security Documents and the Power Purchase Agreement, LEALP shall assign to Delphi all the contracts requested by Delphi that relate to the operation and maintenance of the System, including, but not limited to, the Power Purchase Agreement, or a power sales agreement with another utility, and the gas supply and transportation contracts provided, however, that Delphi's right to request assignment of certain contracts shall not be read as an obligation by Delphi to assume all or any of those contracts except that, should Delphi exercise its right to purchase the System and/or Project Site, it shall assume only those gas supply and gas transportation contracts entered into by LEALP which are included herein, collectively, as Exhibit "U", in accordance with the terms and conditions contained therein.

(b)    Subject to the Security Documents and the Power Purchase Agreement, LEALP shall promptly transfer title to the Project Site and the System to Delphi; and

- 44 -

CONFIDENTIAL DRAFT

(c)   Subject to the Security Documents and the Power Purchase Agreement, LEALP shall convey its interest in the gas pipeline that interconnects the System and the Tennessee Gas Pipeline Company interstate pipeline located on Delphi's property for its Fair Market Value, as defined herein.

**ARTICLE XX - Sale or Transfer of any Ownership Interest in the System or Project Site to Others**

20.01   Any actual sale, transfer or conveyance of any ownership interest in the System or Project Site during the Initial Term or any Additional Term of this Amended and Restated Energy Sales Agreement, including any transfers or sales of the limited partnership interests in LEALP, whether partial or whole, by LEALP to any entity other than Delphi must be approved in advance by Delphi in writing, which approval shall not be unreasonably withheld, <u>provided</u>, however, that Delphi's prior right of approval shall not apply to any disposition pursuant to the exercise of remedies by the Lender or NYSEG pursuant to the Power Purchase Agreement or to the transfers of limited partnership interests to any entity that agrees to be bound by the terms of the LEALP Partnership Agreement and falls into one of the following three categories:

    (i)any entity that is a partner in LEALP (or any affiliate of such entity) on the date hereof; or

    (ii)any entity that has one or more class or series of securities listed or trades on a

- 45 -

CONFIDENTIAL DRAFT

national or international securities exchange or in the over-the-counter market (or any affiliate of such entity); or

(iii) any entity that would be deemed to be an "accredited investor" as defined in any of sections (a)(1), (a)(4), or (a)(8) of Rule 501 promulgated under the Securities Act of 1933, as in effect on the date hereof (or any affiliate of such entity), _provided_, that this clause shall not include "business development companies" as defined in Rule 501(a)(1) and that under Rule 501(a)(8), "accredited investors" shall include only those entities otherwise permitted herein.

Any approved transfer or sale of the System to any buyer must include a transfer or sale of the Project Site, and vice versa. LEALP shall provide written notice to Delphi of its intent to sell to an entity other than Delphi not less than 90 days prior to its intended date of transfer of title except (1) in the case of transfers of limited partnership interests, or (2) in the case of any disposition pursuant to the exercise of remedies by Lender or NYSEG under the Power Purchase Agreement, in which cases 30 days prior written notice shall be deemed sufficient.

20.02  Any actual or attempted sale, transfer or convey-ance of any ownership interest in the System or Project Site by LEALP subsequent to the termination of this Amended and Restated Energy Sales Agreement to an entity other than Delphi shall be null and void unless the purchaser is approved in advance by Delphi in writing and Delphi shall decide to approve the assignment of the license agreement that would allow the purchaser to enter upon its grounds, _provided_, however, that Delphi's prior

CONFIDENTIAL DRAFT

right of approval in this regard shall not apply to any disposition pursuant to the exercise of remedies by the Lender or NYSEG pursuant to the Power Purchase Agreement.

20.03 Any actual or attempted substitution of parties to the Operation and Maintenance Agreement or a successor agreement approved by Delphi, (other than a substitution pursuant to the exercise of remedies by Lender) during the Initial Term or any Additional Term of this Amended and Restated Energy Sales Agreement, must be approved in advance by Delphi, which approval shall not be unreasonably withheld.

CONFIDENTIAL DRAFT

**ARTICLE XXI - <u>Force Majeure</u>**

21.01  If either party shall be unable to carry out any of its obligations under this Amended and Restated Energy Sales Agreement (other than the payment of money for goods or services actually rendered prior to the Force Majeure event) due to events reasonably beyond its control, and which, with the exercise of due care, it could not reasonably have been expected to avoid, including, without limitation, acts of God, governmental or judicial authority, war, blockage, insurrection, riot, labor dispute, labor or material shortage, fire, explosion, flood, nuclear emergency, epidemic, landslide, lightning, earthquake or similar cataclysmic occurrence, but specifically excluding the effects of extreme cold or hot weather or snow, this Amended and Restated Energy Sales Agreement shall remain in effect but the affected party's obligations shall be suspended for a period equal to the disabling circumstances, provided that:

(a) The non-performing party gives the other party prompt written Notice describing the particulars of the Force Majeure, including but not limited to the nature of the occurrence and its expected duration, and continues to furnish timely regular reports with respect thereto during the period of Force Majeure;

(b) The suspension of performance is of no greater scope and of no longer duration than is required by the Force Majeure;

(c) No obligations of either party that arose before the Force Majeure causing the suspension of performance shall be excused as a result of the Force Majeure;

- 48 -

CONFIDENTIAL DRAFT

(d) The non-performing party uses its best efforts to remedy its inability to perform; and

(e) The force majeure event described above is not otherwise specifically addressed by other provisions of this Amended and Restated Energy Sales Agreement.

21.02   For the avoidance of doubt and notwithstanding the foregoing in Section 21.01, the term "Force Majeure" does not include, with respect to Delphi, the occurrence of the Bankruptcy Case or any direct consequence of the initiation or conduct of the Bankruptcy Case, including without limitation any inability to adopt a bankrupcty plan or otherwise emerge from the Bankruptcy Case or any conversion of the Bankruptcy Case to a case Under chapter 7 of the United States Bankruptcy Code.

## ARTICLE XXII - <u>Indemnification</u>

22.01   LEALP assumes sole and entire responsibility for any loss of life or injuries that may be sustained to its employees, agents, subcontractors, members of the public and Delphi employees in connection with the  operation and maintenance of the System and the delivery of steam to the delivery point with Delphi other than for loss of life or injuries which result solely and exclusively from the fault or negligence of Delphi.  LEALP shall indemnify and save harmless Delphi for any and all liability for personal injuries, property damage, loss of life, expenses, claims, demands, or losses resulting from, or in any way connected with the operation or maintenance of the System and the delivery of steam to the delivery point with Delphi or the receipt of steam

- 49 -

CONFIDENTIAL DRAFT

condensate from Delphi, including any costs, expenses and attorneys' fees which may be incurred by Delphi incident to any such liability; _provided_, however, that LEALP shall not be required to indemnify and hold Delphi harmless from any claims, demands, losses, damages, expenses and other liabilities due solely and exclusively to the fault or negligence of Delphi.

22.02   Delphi shall indemnify and save harmless LEALP for any and all liability for personal injuries, property damage, loss of life, expenses, claims, demands, or losses resulting from, or in any way connected with Delphi's use of the steam after LEALP has delivered such steam to the delivery point set forth in Section 11.02(a) in a safe and proper manner, including any costs, expenses and attorneys' fees which may be incurred by LEALP incident to any such liability; _provided_, however, that Delphi shall not be required to indemnify and hold LEALP harmless from any claims, demands, losses, damages, expenses and other liabilities due solely and exclusively to the fault or negligence of LEALP.

22.03   LEALP and Delphi shall indemnify and hold the other harmless from any claims of LEALP's and Delphi's creditors to any right, title or interest in the other's property and possessions or resulting from any encumbrances, liens or claims placed on the other's property and possessions except as provided for herein.  The duties to indemnify provided herein shall survive the expiration or early termination of this Amended and Restated

- 50 -

CONFIDENTIAL DRAFT

Energy Sales Agreement with respect to any claims based on facts or conditions occurring prior to expiration or early termination hereof.

**ARTICLE XXIII - <u>Events Constituting Breach</u>**

23.01    The occurrence of any of the following shall constitute an "Event Constituting Breach" by Delphi hereunder:

(1)    any payment hereunder is not made when due and remains unpaid for twenty (20) days after written notice from LEALP; <u>provided</u>, however, that this provision shall not apply when Delphi's nonpayment is the result of a good-faith dispute as to a bill from LEALP and is limited to the amount in dispute; or

(2)    Delphi fails to perform any of its material duties or obligations contemplated by this Amended and Restated Energy Sales Agreement and such failure continues and is not cured within thirty (30) days after written notice thereof received from LEALP, except if such cure cannot reasonably be accomplished within such thirty (30) day period there shall be no Event Constituting Breach so long as Delphi has commenced a cure within such thirty (30) day period and diligently pursues such cure to completion.

23.02    The occurrence of any of the following shall constitute an "Event Constituting Breach" by LEALP hereunder;

(1)    any material representation or warranty furnished by LEALP in this Amended and Restated Energy Sales Agreement is discovered to have been false or misleading in any material

- 51 -

CONFIDENTIAL DRAFT

respect when made and such representation or warranty continues to be false or misleading for a period of 30 days after written notice to that effect is provided by Delphi and is material at the time that an Event Constituting Breach is declared;

(2)  LEALP fails to perform any of its material duties or obligations contemplated by this Amended and Restated Energy Sales Agreement and such failure continues and is not cured within thirty (30) days after written notice thereof received from Delphi, except if such cure cannot reasonably be accomplished within such thirty (30) day period there shall be no Event Constituting Breach so long as LEALP has commenced a cure within such thirty (30) day period and diligently pursues such cure to completion.

(3)  a petition in bankruptcy is filed by or against LEALP and is not dismissed within ninety (90) days; or LEALP becomes insolvent within the meaning of any state or federal bankruptcy or insolvency law; or a receiver for all or any part of LEALP's businesses shall be appointed by any state or federal court and such appointment of a receiver is not vacated within ninety (90) days of being made.

(4)  a breach of any material provision in the Licensing Agreements or Easements and such breach continues and is not cured within thirty (30) days after written notice thereof from Delphi;

(5)  LEALP fails, after the Effective Date: (a) to provide steam from any source for a period of 30 consecutive days

- 52 -

CONFIDENTIAL DRAFT

or any 30 days within any 45 day period, or (b) to provide steam from the System for a period of 90 consecutive days or any 90 days within a 120 day period and such failure is not due to a breach by Delphi or a Force Majeure event, which, for purposes herein, shall not include a labor dispute or a labor or material shortage by LEALP unless the labor dispute or labor or material shortage is the result of (1) events, other than extreme hot or cold weather or snow, beyond the reasonable control or contemplation of LEALP, or (2) a labor dispute or labor shortage against or affecting Delphi which results in the inability of LEALP, its employees or operators to operate the System.    23.03    During the Initial Term only, to the extent that Delphi is required to supply written notice of an Event of Default to LEALP under §23.02, it also shall send a copy of that notice to NYSEG via U.S. Mail, regular delivery, at its corporate headquarters, 4500 Vestal Parkway East, Binghamton, New York 13903.

**ARTICLE XXIV - <u>Remedies Upon Breach</u>**

24.01    Upon the occurrence of an Event Constituting Breach by Delphi as defined herein, LEALP may exercise any and all rights or remedies available to it at law or at equity or initiate other appropriate proceedings including bringing an action for recovery of amounts due and unpaid <u>provided</u>, however, that LEALP shall not suspend steam service to Delphi from the System because of any breach unless (1) Delphi has requested such suspension, or

- 53 -

CONFIDENTIAL DRAFT

(2) the Event Constituting Breach is as defined in §23.01(1).  In addition, any approvals or rights provided to Delphi shall be suspended until such time the Event Constituting Breach is cured.

24.02    Except for an Event Constituting Breach as described in §23.02(5) during any Additional Term, the exclusive remedy for which is provided in §24.03, upon the occurrence of an Event Constituting Breach by LEALP as defined herein, Delphi may elect one or more of the following remedies, which shall not be deemed to be exclusive:

(1)    terminate this Amended and Restated Energy Sales Agreement by delivery to LEALP of a written Notice of Termination, receipt of which by LEALP shall suspend the rights and obligations of LEALP and Delphi.    After the Notice of Termination is received by LEALP, Delphi shall have the unilateral option to purchase the System and Project Site from LEALP for the lesser of Fair Market Value, as defined herein, or $180,000,000 by paying the lesser amount to LEALP net of any funds owed to the Lender under the Security Documents or to NYSEG under the Power Purchase Agreement .  This Agreement shall terminate after closing.  This Article does not create an obligation on the part of Delphi to purchase the System and Project Site upon the occurrence of an Event Constituting Breach by LEALP;

(2)    suspend purchases of steam from LEALP and return of steam condensate to LEALP and obtain such steam and/or condensate return services from other sources.  In the event that Delphi

CONFIDENTIAL DRAFT

elects this remedy, LEALP shall reimburse Delphi for all charges of any sort paid by Delphi for such alternate supplies, including, but not limited to, any minimum charges, demand charges, wheeling charges, startup costs, dismantling costs, rental costs, fuel costs, labor costs, and equipment rental costs, less the amount that Delphi would have had to pay LEALP for the same steam pursuant to this Amended and Restated Energy Sales Agreement provided, however, that Delphi shall use its best efforts to secure least cost steam alternatives recognizing its need to minimize its down time. Reimbursement to Delphi pursuant to this provision shall be by direct cash payments at the end of each month of suspension hereunder. Late payments shall include interest calculated at the then-existing prime rate at JP Morgan Chase Bank, plus 1%. The suspension period invoked hereunder by Delphi will be terminated when the Event Constituting Breach is remedied;

(3)    exercise any and all rights or remedies available to it at law or equity or initiate other appropriate proceedings to enforce the terms and provisions of this Amended and Restated Energy Sales Agreement and its rights hereunder.

24.03    Upon the occurrence of an Event Constituting Breach by LEALP as described in §23.02(5) during any Additional Term, this Amended and Restated Energy Sales Agreement shall terminate and Delphi's exclusive remedy shall be to either (i) purchase the auxiliary boiler from LEALP for $1.00 which Delphi

- 55 -

CONFIDENTIAL DRAFT

may continue to operate at its present site with all necessary ingress and egress rights or move to another locations at Delpho's cost, or (ii) purchase the System and Project Site from LEALP for Fair Market Value, or (iii) require LEALP, at LEALP's and Delphi's mutual option, (a) to either provide Delphi a package boiler capable of supplying 160,000 lbs/hr satisfying the quality standards of the Plans and Specifications installed at LEALP's site or delivered to Delphi's site to be connected and installed at Delphi's cost or (b) pay Delphi $500,000.

**ARTICLE XXV - <u>Excluded Damages</u>**

25.01    Notwithstanding any other provision contained herein, neither Delphi, LEALP nor any of their respective successors and assigns shall be liable in any action at law or in equity, whether based on contract or arising as a result of an Event Constituting Breach, tort (including negligence), strict liability or otherwise, to any other party hereto or to any other person, including affiliates and subsidiaries of any other party hereto, for damages for loss of profits or revenues (including, without limitation, loss of profits or revenues contemplated under the Power Purchase Agreement or successor power sales agreements entered into by LEALP with entities other than Delphi, its successors or assigns), loss of use or loss of business opportunity (including, without limitation, lost production time at Delphi facilities relying on Delphi products or damages

- 56 -

CONFIDENTIAL DRAFT

resulting from LEALP's loss of qualifying facility status).
Neither Delphi, LEALP nor any of their respective successors and
assigns shall be liable hereunder for punitive damages as a result
of an Event Constituting Breach or otherwise.

**ARTICLE XXVI - <u>Environmental Matters</u>**

26.01   Delphi represents and warrants that, as of April
22, 1991, to the best of its knowledge, there were no existing
violations of any applicable federal, state, or local
environmental laws, regulations, or ordinances at the Project
Site, including those governing Hazardous Matters.

26.02   LEALP represents and warrants that, to the best
of its knowledge, there are no pending, threatened, ongoing, or
unresolved administrative or enforcement investigations,
compliance orders, claims, demands, actions, or other litigation
brought by governmental authorities or other third parties
alleging violations of any federal, state, or local environmental
laws, regulations, or ordinances at the Project Site.

26.03   LEALP represents and warrants that it shall
comply with all federal, state, and local laws, regulations, and
ordinances in connection with any operations conducted at or use
of the Project Site, including those governing Hazardous Matters.

26.04   LEALP acknowledges and agrees that LEALP, its
successors, assigns, or tenants shall not treat, store, or dispose
of any Hazardous Matter on or below the Project Site and shall

CONFIDENTIAL DRAFT

maintain generator-only status; provided, however, that LEALP, its successors, assigns, or tenants may accumulate such Hazardous Matters as allowed under applicable laws and regulations for off-site treatment, storage, or disposal so long as such Hazardous Matters are generated on-site and may store commercial products purchased for use on-site which may contain such Hazardous Matters

26.05    The parties agree that any contract or deed for transfer of possession in whole or part of the Project Site through sale, lease, or otherwise to any successor, assign, or tenant shall incorporate the obligations set forth above in Sections 26.03 and 26.04 and that these obligations shall bind and inure to the benefit of any successor, assign, or tenant.

26.06    (a)    Delphi shall indemnify and hold LEALP harmless from and against any and all liabilities, damages, penalties, orders, complaints, or fines (including without limitation, reasonable costs of investigation, reasonable costs associated with remediation, responses, removal or corrective actions, or financial assurances, and reasonable attorneys' fees, but in no event shall such terms include consequential damages such as, by way of example and not limitation, loss of use, loss of profits or loss of business opportunity) (any or all of which are hereinafter referred to as "Claims") arising from, out of, or by reason of:  (a) any release of a Hazardous Matter that occurred prior to October 17, 1990 which constituted a violation of an applicable federal, state, or local environmental law, regulation

- 58 -

CONFIDENTIAL DRAFT

or ordinance in effect as of October 17, 1990, or (b) off-site treatment, storage, or disposal, or cleanup or remediation associated therewith, of hazardous substances which originated from the Project Site prior to October 17, 1990.

(b)   LEALP shall indemnify and hold Delphi harmless from and against any Claims which Delphi may be subjected to as a result of (a) any release of a Hazardous Matter which constitutes a violation of any applicable federal, state, or local environmental law, regulation, or ordinance that occurs at the Project Site on or after October 17, 1990 (except if caused by Delphi or its agents, contractors or employees on or after October 17, 1990), or (b) off-site treatment, storage, or disposal, or cleanup or remediation associated therewith, or hazardous substances which originated from the Project Site on or after October 17, 1990.

(c)   The right of indemnification set forth in §26.06(a) and (b) shall be subject to the following terms and conditions:

(1)   For purposes of this section the term "release" shall mean any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment of a reportable quantity as defined under CERCLA of a hazardous substance or hazardous waste or that amount of a hazardous substance or hazardous waste which results in cleanup, removal, or remediation liability being imposed in an

CONFIDENTIAL DRAFT

action brought by a local, state, or federal agency which action could have been brought under statutes in existence at Closing.

(2)   A party, shall upon discovery or notice of any release of a Hazardous Matter which may give rise to a claim under this §26.06 by either party, promptly verbally notify the other party.  Such verbal notice shall be promptly followed by written confirmation, but in no event later than ten (10) days from the date of discovery or notice.

(3)   A party, upon discovering or first learning of any such release shall, if required by law, properly notify the appropriate state or federal agency and shall simultaneously, or as soon as possible after notifying the appropriate government agency, inform the other party that it has notified such agency.

(4)   (i)   In the event of dispute regarding the origin of or responsibility for any release of a Hazardous Matter, the parties shall use their best efforts to resolve such dispute.  If the parties are unable to agree upon the origin of the release, then the parties shall hire a mutually agreeable independent environmental consultant to resolve the dispute either by determining the origin and time of the release or by apportioning responsibility between the parties.  The consultant's decision shall be binding upon the parties.  The costs incurred in hiring the consultant in this resolution process shall be shared equally by the parties.  The parties acknowledge and agree that the contract under which the consultant may be hired shall clearly

CONFIDENTIAL DRAFT

state that the consultant is being hired only to resolve the dispute related to the source of the release of a Hazardous Matter, and in no event will be retained by either party to conduct any resulting remediation or cleanup of the release.

(ii) Following identification of the origin of any such release, the party responsible or determined to be responsible by the consultant for such release shall remediate or undertake cleanup as required under specifically applicable environmental laws, regulations, or ordinances and shall satisfy any reporting obligations.

(5) The parties mutually agree to provide each other with copies of any data, results, or reports and any correspondence with any local, state, or federal agencies regarding any such release.

(6) Neither party shall be obligated to indemnify the other for damages otherwise governed by this §26.06: (i) to the extent that a claim for indemnification results from the failure to notify the other party as provided in Paragraph (C)(2) hereof, or (ii) if, except as provided in Paragraph (C)(8) hereof, the party seeking indemnification has negotiated and/or agreed to remediate or settle a claim for which indemnification may be sought without the prior written approval of the other party.

(7) In the event any release of a Hazardous Matter results in a formal claim for indemnification hereunder, and provided all of the obligations of the party to be indemnified

- 61 -

CONFIDENTIAL DRAFT

(the "Indemnified Party") have been fulfilled as set forth above, the other party (the "Indemnifying Party") shall, upon prompt written notice of any such claim, undertake the defense thereof by representatives reasonably acceptable to the Indemnified Party.

(8)   If the Indemnifying Party, within a reasonable time after notice of any such claim for indemnification, fails to defend such claim, the Indemnified Party shall have the right to undertake the defense, compromise, or settlement of such claim on behalf of and for the account and risk of the Indemnifying Party, which may include but is not limited to expenses (including attorney fees) and liabilities of the Indemnified Party as well as any money damages or other money payments resulting from the defense, compromise, or settlement of such claim; provided, however, the Indemnifying Party shall have the right, upon advance written notice, to assume the defense of such claim prior to settlement, compromise, or final resolution thereof, but such assumption shall not relieve the Indemnifying Party of any costs incurred by the Indemnified Party up to the date of such assumption.

(9)   LEALP agrees that any contract for transfer of possession in whole or part of the Project Site through sale, lease, or otherwise shall incorporate the obligations set forth above in this §26.06.

(10)   The parties agree that the indemnification obligations set forth in this §26.06 survive the expiration or

- 62 -

CONFIDENTIAL DRAFT

termination of this Amended and Restated Energy Sales Agreement but shall bind and inure only to the benefit of the respective initial successor or initial assign of the parties or the Lender in the exercise of its remedies.

**ARTICLE XXVII - <u>Notices</u>**

27.01   Except as otherwise specifically provided for in this Amended and Restated Energy Sales Agreement, all Notices or other communications required or permitted hereunder will be in writing and deemed given if delivered personally, or if deposited in the U.S. mail, certified mail, postage prepaid, or delivered to a nationally recognized express mail service, charges prepaid, receipt obtained, and in any case addressed as follows:

**<u>Delphi Automotive Systems, LLC</u>**

One of the following three       Lockport Energy Associates, L.P.
   officials:                    One North Lexington, Ave
                                 White Plains, New York

                                 Attn:  President

with a copy to:

Manager of Plant and
Environmental Engineering
Harrison Division
Building 6
200 Upper Mountain Road
Lockport, NY 14094


<u>and</u>

_____    **Lockport Energy Associates, L.P.**

                                 Attn: Thomas J. Gesicki
                                 Senior Vice President

- 63 -

CONFIDENTIAL DRAFT

or to such other person or address as the addressee may have specified in a Notice duly given as provided herein.

**ARTICLE XXVIII - No Joint Venture**

28.01 It is expressly agreed and understood that this Amended and Restated Energy Sales Agreement shall not be deemed or construed so as to create a joint venture or partnership between LEALP and Delphi.

**ARTICLE XXIX - <u>Non-Waiver</u>**

29.01 No provision of this Amended and Restated Energy Sales Agreement shall be considered waived by either party unless such waiver is given in writing. The failure of either party to insist on strict performance of any of the provisions of this Amended and Restated Energy Sales Agreement shall not be construed as a waiver of any such provision or the relinquishment of any rights hereunder in the future, but the same shall continue and remain in full force and effect.

CONFIDENTIAL DRAFT

**ARTICLE XXX  - <u>Assignment</u>**


30.01   LEALP may not transfer, assign or in any way convey all or any part of its rights and obligations herein to any party without prior written approval of Delphi, which approval shall not be unreasonably withheld, <u>provided</u>, however, that LEALP may transfer its rights hereunder to the Lender, NYSEG and their respective successors and assigns.  Delphi may not transfer, in whole or in part, its rights and obligations hereunder to any successor or transferee of the Delphi Lockport facility without prior written approval of LEALP,.  Any such transfer by Delphi during the Initial Term shall also include assumption by the transferee of Delphi's obligation to take and pay for the Steam Minimum.

**ARTICLE XXXI - <u>Article Headings</u>**


31.01   The headings used in this Amended and Restated Energy Sales Agreement are for convenience only and shall not affect the construction of any terms of this Amended and Restated Energy Sales Agreement.

CONFIDENTIAL DRAFT

**ARTICLE XXXII - <u>Governing Law/Forum</u>**


32.01   This Amended and Restated Energy Sales Agreement will be governed by and construed in accordance with the laws of the State of New York.   Any judicial action instituted as a result of a breach of this Amended and Restated Energy Sales Agreement shall be instituted in a state or federal court located in the State of New York.

**ARTICLE XXXIII - <u>Entire Agreement</u>**


33.01   This Amended and Restated Energy Sales Agreement, including the Exhibits and the New Exhibits, and made a part hereof, shall completely and fully supersede all other prior understandings or agreements, both written and oral, relating to the subject matter hereof.   This Amended and Restated Energy Sales Agreement, including the Surviving Exhibits and the New Exhibits attached hereto and made a part hereof shall constitute the entire Amended and Restated Energy Sales Agreement between the parties, and no amendment or modification shall be effective except in a writing signed by duly authorized representatives of both parties.

- 66 -

CONFIDENTIAL DRAFT

**ARTICLE    XXXIV   -  Arbitration**

34.01    In   the   event   of   a   dispute   arising   under   this agreement,  upon  the  written  consent  of  both  parties  the  dispute may   be   resolved   through   arbitration.      In   such   event   the arbitration  shall  be  conducted  in  accordance  with  the  rules  of  the American  Arbitration  Association  and  shall  be  held  at  a  mutually agreed  upon  site  in  New  York  State.

**ARTICLE XXXV  -  Counterparts**

35.01    This  Amended  and  Restated  Energy  Sales  Agreement may  be  executed  in  several  counterparts,  each  of  which  shall  be considered  an  original  and  all  of  which  shall  constitute  but  one and  the  same  instrument.

**ARTICLE XXXVI -  Complementary Agreements**

36.01    This  Amended  and  Restated  Energy  Sales  Agreement is  to  be  read  and  interpreted  in  a  manner  that  will  complement  the terms  and  conditions  contained  in  the  Licensing  Agreements  and  the Easements  between  the  parties.  However,  to  the  extent  that  the terms  of  those  exhibits  are  deemed  to  be  inconsistent  with  those contained  herein,  despite  every  effort  to  reconcile  same,  the terms  of  this  Amended  and  Restated  Energy  Sales  Agreement  shall control.

- 67 -

CONFIDENTIAL DRAFT
**[require  notarized  certificate  of  authority  from  officers  of
Parties]**

IN  WITNESS  WHEREOF,  LEALP  and  DELPHI  have  caused  this
Amended  and  Restated  Energy  Sales  Agreement  to  be  executed  by
their  proper,  duly  authorized  officers  and  their  respective  seals
to  be  hereunto  affixed  and  attested  as  of  the  first  date  above
written.

LOCKPORT ENERGY ASSOCIATES, L.P.

By:  FCI Lockport GP, Inc.
its General Partner

Attest:                              By:  _____

By:  _____      Name: _____

Name: _____      Title: _____

Title: _____      Date: _____


DELPHI Automotive Systems, LLC, THERMAL AND INTERIOR DIVISION

Attest:                              By:  _____

By:  _____      Name: _____

Name: _____      Title: _____

Title: _____      Date: _____

- 68 -

Exhibit AA
to
Energy Sales Agreement

**Exhibit AA**

**Payments to Delphi**

Capitalized terms used in this Exhibit AA and not defined herein shall have the meanings ascribed to them in the Amended and Restated Energy Sales Agreement.

In consideration for terminating electricity sales during the Initial Term, LEALP shall pay to NYSEG, as directed by Delphi an amount equal to $3,350,000 (the "Electricity Termination Payment,"), payable on the Effective Date. In addition, in consideration for terminating the Option Agreement (Exhibit Q), LEALP shall pay to Delphi (the "Option Termination Payment,") as defined below, payable within sixty days of the Effective Date and in no event later than June 30, 2006.

Option Termination Payment = (80% x Net Gas Savings) – $3.35 million

Net Gas Savings = HR x DED x (ANG x $D_w$ + GDI x $D_p$) – ECP x DED x ($D_w$ + $D_p$)

Where:

HR    =    9.1 MMBtus/Mwhr, the average net plant heat rate.

DED  =    409.836 Mwhrs, the avoided daily electricity delivery.

ANG =    The average forward price of natural gas, expressed in $/MMBtu, for delivery at "Henry Hub" as published by the New York Mercantile Exchange at the close of business on the Determination Date for those days included in the definition of $D_w$.

GDI  =    The lower of:  (a) the price of natural gas, expressed in $/MMBtu, for the Determination Date as published in the Gas Daily Index for delivery at "Henry Hub"at the close of business on the Determination Date; or (b) the average forward price of natural gas, expressed in $/MMBtu, as published in the Gas Daily Index at the close of business on Determination Date for the last three days included in the definition of $D_p$.

$D_w$    =    Number of days remaining in the Initial Term excluding those days during the calendar month which includes the Effective Date.

$D_p$    =    Number of days in the calendar month that includes the Effective Date from the Effective Date through the end of the month, such days to exclude the Effective Date, but include the last day of the month.

ECP =    $30 per Mwhr, the avoided electricity contract price.

Determination Date =   The date that LEALP sells the excess gas to a third party.  In the event that LEALP does not sell gas forward with a third party by the fifteenth business date following the Effective Date, the Determination Date shall be the fifteenth business day following the Effective Date.

Exhibit C
List Of Agreements, Amendments,
Easements and Licenses Subject To Modification

(i) Termination Agreement between Delphi, NYSEG and NYPA, dated ___, 2006;

(ii) Amendment No. 2 to the Main Transmission Line Easement, dated ____, 2006;

(iii) Amendment No. 2 to the Overhead Piping and Wiring Licensing Agreement, dated ____, 2006;

(iv) Amendment No. 2 to the Oil Storage Tank Licensing Agreement, dated ____, 2006;

(v) Amendment No. 1 to the Natural Gas Pipeline Easement, dated ____, 2006;

(vi) Amendment No. 1 to the Ingress and Egress Easement, dated ____, 2006;

(vii) Amendment No. 1 to the Fuel Truck Ingress and Egress Licensing Agreement, dated ____, 2006;

(viii) Amendment No. 1 to the Rail Car Ingress and Egress Licensing Agreement, dated ____, 2006;

(ix) Storm Water Drainage Culverts Easement, dated ____, 2006;

(x) Overhead Piping and Wiring Licensing Agreement, dated April 22, 1991;

(xi) Amendment No. 1 to the Overhead Piping and Wiring Licensing Agreement, dated February 22, 1993;
(xii) Main Transmission Line Easement, dated April 22, 1991;

(xiii) Amendment No. 1 to Main Transmission Line Easement, dated February 22, 1993;

(xiv) Fuel Truck Ingress and Egress Licensing Agreement;

(xv) Oil Storage Tank Licensing Agreement, dated April 22, 1991;

(xvi) Amendment No. 1 to the Oil Storage Tank Licensing Agreement, dated February 22, 1993;

(xvii) Rail Car Ingress and Egress Licensing Agreement, dated February 22, 1993;

(xviii) License to Operate and Maintain Certain Harrison Equipment, dated April 22, 1991;

(xix) Natural Gas Pipeline Easement, dated April 22, 1991;

(xx) Backup Boiler Agreement, dated January 11, 1991;

(xxi) Amendment No. 1 to Ingress Egress Easement, dated _____, 2006;

(xxii) Ingress Egress Easement, dated April 22, 1991.