Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                            :
    In re                                   :   Chapter 11
DELPHI CORPORATION, et al.,                 :   Case No. 05-44481 (RDD)
                        Debtors.            :   (Jointly Administered)
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(e) AND 1107(b)
AND FED. R. BANKR. P. 2014 AUTHORIZING EMPLOYMENT
AND RETENTION OF DICKINSON WRIGHT PLLC
<u>AS INTELLECTUAL PROPERTY COUNSEL  TO DEBTORS</u>

("DICKINSON WRIGHT RETENTION APPLICATION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this application (the "Application") for an order under 11 U.S.C. §§ 327(e) and 1107(b) And Fed. R. Bankr. P. 2014 authorizing the employment and retention of Dickinson Wright PLLC ("DW") as intellectual property counsel and as litigation and corporate and commercial counsel to the Debtors, <u>nunc</u> <u>pro</u> <u>tunc</u> to January 13, 2006.  In support of this Application, the Debtors submit the Affidavit of William H. Honaker, sworn to February 21, 2006 (the "Honaker Affidavit").  In further support of this Application, the Debtors respectfully represent as follows:

1

Background

A.     The Chapter 11 Filings

1. On October 8, 2005 (the "Initial Filing Date"), Delphi and certain of its U.S. subsidiaries (the "Initial Filers") filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1130, as amended (the "Bankruptcy Code").  On October 14, 2005, three additional U.S. subsidiaries of Delphi (together with the Initial Filers, collectively, the "Debtors") also sought reorganization relief. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(b) and 1108 of the Bankruptcy Code.  This Court entered orders directing the joint administration of the Debtor's chapter 11 cases (Dockets Nos. 28 and 404).

2. On October 17, 2005, the Office of the Unites States Trustee appointed an official committee of unsecured creditors.  No trustee or examiner has been appointed in the Debtors' cases.

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4. The statutory predicates for the relief requested herein are sections 327(e) and 1107(b) of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.     Current Business Operations Of The Debtors

5. As of the Initial Filing Date, Delphi had global 2004 revenues of approximately $28.6 billion, and global assets as of August 31, 2005 of approximately $17.1

2

billion,[1] Delphi ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.

6.   Delphi has become a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and the Company (as defined below) is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company's technologies and products are present in more than 75 million vehicles on the road worldwide.  The Company supplies products to nearly every major global automotive original equipment manufacturer with 2004 sales to its former parent, General Motors Corporation, equaling approximately $15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

7.   As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world.  As of the Initial Filing Date, the Debtors employed approximately 180,000 employees.  The Debtors' 50,600 U.S. employees work in approximately 44 manufacturing sites, 13 technical centers, and in Delphi's Troy, Michigan headquarters.  Approximately 34,750 of these individuals are hourly employees as of the Initial Filing Date, 96% of these were represented by approximately 49 different international and local unions.  Outside the United States, the Company's foreign entities employed more than 134,000

---

[1]   The aggregated financial data used in this Application generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

3

people on the Initial Filing Date, supporting 120 manufacturing sites and 20 technical centers in nearly 40 countries around the globe.

8.  Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates (collectively, the "Company") in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

9.  Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle.  When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base.  The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base.  The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

4

C.      Events Leading To The Chapter 11 Filing

10.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales. Reflective of a downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005, with net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, approximately $1 billion less than the same time period a year earlier.[2]

11.    The Debtors believe that the Company's financial performance has deteriorated because of: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward looking revenue requirements. Because discussions with its Unions and GM were not progressing sufficiently, the Company commenced these

---

[2]    Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

5

05-44481-rdd    Doc 2456    Filed 02/21/06    Entered 02/21/06 14:46:27    Main Document
Pg 6 of 13


chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

13.    Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses.  This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness.  The Debtors believe that a substantial segment of Delphi's U.S. business operations must be divested, consolidated, or wound-down during these cases.

14.    Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

## Relief Requested

15.    By this Application, the Debtors request entry of an order authorizing the Debtors to employ and retain DW as intellectual property counsel and as a litigation and corporate and commercial counsel pursuant to an ongoing professional relationship between the Debtors and DW.

## Basis For Relief

16.     The Debtors submit that DW's proposed retention meets all the prerequisites for retention of special counsel under section 327(e) of the Bankruptcy Code, which permits a debtor-in-possession, with court approval, to employ counsel that has represented the Debtors prior to the commencement of their chapter 11 cases, for a "specified special purpose" if such employment is in the best interest of the Debtors.  DW is a proposed intellectual property counsel to the Debtors, but not the proposed bankruptcy counsel in these chapter 11 cases. Section 327(e) of the Bankruptcy Code does not require that DW and its attorneys be "disinterested persons" as defined in section 101(14) of the Bankruptcy Code.  Rather, section 327(e) instead requires that DW not represent or hold any interest adverse to the estates or the Debtors with respect to the matters on which DW is to be employed.  As discussed below, the employment of DW as special intellectual property counsel and a special corporate and commercial transactional counsel is in the best interests of the Debtors.

<center>The Debtors' Employment Of DW
Is In The Best Interests Of The Estates</center>

17.     Prior to the commencement of these cases, DW represented the Debtors in certain litigation matters and provided legal services to the Debtors' in-house counsel with respect to certain corporate and commercial transactional matters.  After the commencement of these chapter 11 cases, DW continued to provide corporate and commercial transactional legal services to the Debtors, and was authorized by this Court to do so pursuant to the Order Under 11 U.S.C. §§ 327, 330, And 331 Authorizing Retention Of Professionals Utilized By Debtors In Ordinary Course Of Business ("Ordinary Course Professionals Order," Docket no. 883).  DW complied with the Ordinary Course Professionals Order and filed the Affidavit of James A. Plemmons in accordance with the Ordinary Course Professionals Order (docket no. 1461).

18. It is now proposed that DW will also serve as an intellectual property counsel to the Debtors during these chapter 11 cases. Certain attorneys previously affiliated with Howard & Howard Attorneys, P.C. (which has been appointed as an intellectual property counsel to the Debtors) recently joined DW and began providing intellectual property services to the Debtors on January 13, 2006. They have been primarily responsible for performing intellectual property work for the Debtors focusing on climate control systems, heat exchange systems, compressors, evaporators, heating and air conditioning systems, steering systems, chassis, brakes, half shafts and ball joints, fuel injectors, hydraulic steering pumps, electrical systems, and plasma spray systems prior to their joining DW, and are therefore familiar with the Debtors' businesses and operations. It is proposed that they will continue to perform this work for the Debtors at DW.[3] In particular, they are especially attuned to the unique intellectual property issues in the aforementioned technical areas that arise in the Debtors' industry and that have faced the Debtors.

19. DW has an extensive intellectual property practice serving many clients in the automotive industry. Accordingly, the Debtors believe that DW is well qualified to serve as an intellectual property counsel in these chapter 11 cases in an efficient and effective manner.

20. The Debtors believe that the employment of DW will enhance and will not duplicate the employment of Skadden, Arps, Slate, Meagher, & Flom LLP ("Skadden"), the Debtors' general bankruptcy counsel, Shearman & Sterling LLP ("Shearman"), the Debtors' special counsel, Togut, Segal & Segal LLP ("Togut"), the Debtors' conflicts counsel, or the employment of any other professionals retained by the Debtors to perform specific tasks that are

---

[3] Howard & Howard P.C., the firm the DW attorneys were previously affiliated with, continues to provide the Debtors intellectual property legal services focusing on heat exchanger technology, diesel fuel systems, and interior systems (including dashboards).

8

unrelated to the work to be performed by DW as intellectual property counsel and as a corporate and commercial transactional counsel to the Debtors. The Debtors understand that DW will work with the other professionals retained by the Debtors, as necessary, to avoid any such duplication.

### Services To Be Rendered By DW

21. In addition to the services being rendered by the DW to the Debtors as specified in Affidavit of James A. Plemmons (docket no. 1461), the Debtors now wish to engage DW to provide services to the Debtors in connection with intellectual property and certain other matters. The Debtors anticipate that such services will include the following:

   (a) Patent Preparation: review of invention disclosures, preparation of patentability opinions, and preparation and filing of patent applications with U. S. Patent and Trademark Office, focusing on, among others, the following areas of technical expertise: climate control systems, heat exchange systems, compressors, evaporators, heating and air conditioning systems, steering systems, chassis, brakes, half shafts and ball joints, fuel injectors, hydraulic steering pumps, electrical systems, and plasma spray systems.

   (b) Patent Preparation: Review of correspondence from U.S. Patent and Trademark Office and preparation of amendments to patent applications to secure the patent, focusing on the above areas of technical expertise.

   (c) Non-Infringement & Clearance Opinions: Review of potential products and inventions, conduct searches for relevant patents and publications, review and analyze uncovered patents and publications, and preparation of opinions, focusing on the above areas of technical expertise.

   (d) Miscellaneous intellectual property advice and counsel related to copyrights, trademarks and know-how and contractual matters involving intellectual property, focusing on the above areas of technical expertise.

   (e) If requested to do so by the Debtors, DW would also assist the Debtors with discrete ordinary course litigation and corporate and commercial transactional matters.

22. DW has indicated its desire and willingness to represent the Debtors as set forth herein and to render the necessary professional services in the above capacities to the Debtors.

23.    The Debtors may request that DW undertake specific matters beyond the scope of the responsibilities set forth above. Should DW agree in its discretion to undertake any such matter, the Debtors shall seek further order of this Court.

### Disinterestedness Of Professionals

24.    The Honaker Affidavit filed in support of this Application contains information available to date on DW's connections with other parties-in-interest, as required by Bankruptcy Rule 2014(a). To the best of the Debtors' knowledge, and based on the information in the Honaker Affidavit, DW, its members, and associates do not hold or represent any interest adverse to the Debtors, their creditors, any other party-in-interest in these chapter 11 cases, their respective attorneys and investment advisors, the U.S. Trustee, or any person employed therein, with respect to the matters on which DW is to be employed.

25.    DW has disclosed to the Debtors that DW has in the past represented, currently represents, and will likely in the future represent certain of the Debtors' creditors and other parties-in-interest in matters unrelated to the Debtors' chapter 11 cases. DW does not believe that the foregoing raises any actual or potential conflict of interest of DW relating to the representation of the Debtors as intellectual property counsel in these chapter 11 cases, but such relationships are disclosed out of an abundance of caution. The Debtors understand that, in order to vitiate any actual or potential conflicts of interest, DW will not assist the Debtors in connection with their analysis, negotiations, and litigation, if any, with parties with whom DW has existing client relationships, and that Skadden (or other counsel if Skadden has a conflict), instead, will handle these tasks.

### Professional Compensation

26.     DW intends to apply to this Court for compensation and reimbursement of expenses in accordance with section 330(a) of the Bankruptcy Code, the Bankruptcy Rules, applicable guidelines established by the U.S. Trustee, and orders of this Court.  DW acknowledges that all compensation will be subject to this Court's review and approval after notice and a hearing.

27.     In the 90 day period prior to the Petition Date, the Debtors have made payments to DW aggregating approximately $126,708.

28.     Under the applicable provisions of the Bankruptcy Code, and subject to the approval of this Court, the Debtors propose to pay DW as set forth in the Honaker Affidavit.

29.     No arrangement is proposed between the Debtors and DW for compensation to be paid in these chapter 11 cases other than as set forth above and in the Honaker Affidavit.

30.     At the Debtors' request, DW has begun to assist the Debtors in connection with their intellectual property issues since January 13, 2006, and hence the Debtors request that DW's retention be effective <u>nunc pro tunc</u> to January 13, 2006.

11

Conclusion

31.     For the foregoing reasons, the Debtors submit that the employment of DW as the Debtors' special intellectual property counsel on the terms set forth herein is in the best interests of the estates.

Notice

32.     Notice of this Application has been provided in accordance with the Order Under 11 U.S.C. § § 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing (I) Omnibus Hearing Dates, (II) Certain Notice, Case Management, And Administrative Procedures, And (III) Scheduling An Initial Case Conference In Accordance With Local Bankr. R. 1007-2(e) entered by this Court on October 14, 2005 (Docket No. 245). In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

Memorandum Of Law

33.     Because the legal points and authorities upon which this Application relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order (a) authorizing the Debtors to employ and retain DW as intellectual property counsel to perform the services set forth herein and (b) granting the Debtors such other and further relief as is just.

Dated: New York, New York
       February 21, 2006

                                                 DELPHI CORPORATION, on behalf of itself and certain of its subsidiaries and affiliates, as Debtors and Debtors-in-possession

                                                 By:  /s/ David M. Sherbin
                                                      Name: David M. Sherbin

                                                       Title: Vice President, General Counsel,
                                                          and Chief Compliance Officer