SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
David E. Springer (DS 9331)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                          :
            In re                         :    Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :    Case No. 05-44481 (RDD)
                                          :
                    Debtors.              :    (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

DEBTORS' OBJECTION TO THE MOTION OF APPALOOSA MANAGEMENT L.P.
PURSUANT TO 11 U.S.C. § 1102(A)(2) FOR ORDER DIRECTING UNITED STATES
TRUSTEE TO APPOINT EQUITY COMMITTEE

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and

debtors-in-possession (collectively, the "Debtors"), hereby submit this objection (the "Objection")

to the Motion Of Appaloosa Management L.P. Pursuant To 11 U.S.C. § 1102(A)(2) For An

Order Directing The United States Trustee To Appoint An Equity Committee In These Chapter

11 Cases (the "Motion") (Docket No. 1604), and the supporting declaration of John D. Sheehan,

executed March 1, 2006 ("Sheehan Decl."), and respectfully represent as follows:

<u>Preliminary Statement</u>

1.       Appaloosa Management L.P. ("Appaloosa") is a sophisticated financial

institution that acquired all of its equity stake in Delphi at distressed prices in the few days after

the Debtors filed their chapter 11 cases. (Appaloosa's Objections and Responses to Debtors' First

Interrogatories and Documents Requests to Appaloosa Management L.P. ("Appaloosa's

Discovery Responses" (a copy of which is attached hereto as Exhibit A)), Resp. to Interrog. No.

10.)

2.       On November 7, 2005, Appaloosa submitted a written request (the "Letter

Request") to the United States Trustee (the "U.S. Trustee") seeking the appointment an official

equity committee.  (Sheehan Decl. Ex. 1.)  Shortly thereafter, the U.S. Trustee asked the Debtors

for their position on Appaloosa's request.  The Debtors and their advisors discussed the Letter

Request with their Board of Directors on December 7, 2005, and with the Official Committee of

Unsecured Creditors (the "Creditors' Committee") on December 9, 2005.  (Sheehan Decl. ¶¶ 3-4.)

As a result of those discussions, and after careful consideration, the Debtors determined that the

formation of an equity committee in these cases was unwarranted at this time, and they so

informed the U.S. Trustee and Appaloosa's counsel  by letter dated December 19, 2005.  (<u>Id.</u> ¶ 4

& Ex. 2.)

3.       Apparently unwilling to await the U.S. Trustee's decision on Appaloosa's

Letter Request, on December 22, 2005, Appaloosa filed the Motion to compel the U.S. Trustee to

appoint an equity committee.  On December 30, 2005, the U.S. Trustee filed a response to the

Motion (Docket No. 1682), which noted that the Motion was premature—given that the Debtors

had not then even filed their schedules and statements—and that Appaloosa had also failed to

present any evidence that an equity committee is necessary to adequately represent equity

security holders' interests.  (U.S. Trustee Response  ¶¶ 16, 23-26.)

      4.      The Debtors propounded interrogatories and document requests to

Appaloosa requiring it to identify and produce the evidence it has—if any—in support of its

motion.  Appaloosa responded to those discovery requests on February 21, 2006.  (Appaloosa's

Discovery Responses.)[1]

      5.      In a prior ruling on a motion for appointment of an equity committee, this

Court has held that "[t]he threshold consideration . . . is whether there is sufficient equity in the

estate to justify the cost and expense of a separate committee. . . . I note that . . . the movants"—

not the Debtors—"have the burden of proof, and it is their burden to put on evidence establishing,

among other things, whether there is real equity value here."  (In re Loral Space & Comm'ns,

Ltd., No. 03–41710 (RDD), Transcript of Dec. 2, 2003 Hearing ("Loral Hearing Tr."), at 129:4-

16 (a copy of which is attached hereto as Exhibit B).)

      6.      So far, the only evidence that Appaloosa has identified—but which it has

refused to produce—is a reference to a "preliminary recovery analysis" by Ronald Goldstein of

Appaloosa, which Appaloosa says was "conducted . . . during the three months before Delphi

filed for bankruptcy."  (Appaloosa's Discovery Responses, Resp. to Interrog. Nos. 3 & 4

(emphasis added).)  Appaloosa says that this "preliminary analysis" somehow "demonstrated"

[sic] that "under certain [unidentified] circumstances Delphi has substantial equity value, based

---

[1]    Appaloosa's "responsive" document production consists mainly of Delphi's own publicly-filed documents, two
Forms 8–K filed by GM on October 8, 2005, disclosing an agreement entered between GM and Delphi
Corporation on December 22, 1999, and a scattering of analyst reports apparently issued during the period
between March 31, 2004 and March 9, 2005.

in part on Appaloosa's [undisclosed] proprietary forecasts of EBITDA and the [undisclosed] restructuring of certain [unidentified] employee benefit-related obligations." (Id.) This "analysis," however, is irrelevant to the question of whether, as circumstances exist <u>today</u>, there "is" sufficient equity in the estate to justify the costs of an equity committee.  At most, it shows that, sometime during the three months before Delphi filed for bankruptcy, a single individual at Appaloosa—based upon a purported technique for forecasting EBITDA unique to Appaloosa and some personal views about how Debtors' employee-benefit obligations might be restructured—may then have thought that, in the event of a bankruptcy, Delphi's equity holders might ultimately recover something.

7.     Although the Debtors have no obligation to prove a negative—namely, that common equity holders will <u>not</u> receive a meaningful recovery—that fact is hardly subject to reasonable dispute.  The Debtors' schedules and statements, as amended (Docket Nos. 1854 and 1999) and the Debtors' monthly operating report for January 2005, filed on February 28, 2006 (Docket No. 2569), which reflect a shareholder deficit of approximately negative $6.4 billion, as well as the recent trading prices of Delphi's public securities all evidence the fact that equity stands no realistic chance of any recovery.  (Sheehan Decl. ¶¶ 5-7 & Ex. 3.)

8.     Appaloosa also cannot prove that whatever equity value that may exist in the estates is sufficient to justify the costs of an equity committee.  In fact, Appaloosa acknowledges that it has given no thought to the question of costs, for its Discovery Responses admit that "at the present time, Appaloosa has not conducted an analysis concerning the cost of appointing an equity committee."  (Appaloosa's Discovery Responses, Resp. to Interrog. No. 5.)

9.     Appaloosa also cannot prove that an equity committee is necessary to adequately represent the interests of equity holders.  Appaloosa has identified no evidence to

4

overcome the presumption that Delphi's Board of Directors (10 of the 12 of whom are

independent (Sheehan Decl. ¶ 8)) and the Creditors' Committee already adequately protect the

interests of all stakeholders in discharging their duties to maximize the enterprise value of the

Debtors.

10.    In its Discovery Responses, Appaloosa also effectively concedes that it

does not even need an equity committee to protect its interests.  Appaloosa admits that "is able to

retain counsel to represent its interests in the Debtors' chapter 11 cases" (Appaloosa Discovery

Responses, Resp. to Interrog. No. 8), and it acknowledges that it has communicated with four

other large institutional holders of the Debtors' equity securities about the formation of a formal

or informal equity committee. (Id., Resp. to Interrog. No. 9.)

11.    Because Appaloosa cannot meet its burden on the threshold question of

whether there is sufficient equity in the estates to justify the costs of an equity committee, much

less to prove that the appointment of an equity committee is necessary to adequately represent

the interests of equity holders, its Motion should be denied.

<u>Argument</u>

A.    <u>The Legal Standard For Appointing An Equity Committee</u>

12.    Section 1102(a)(2) of the Bankruptcy Code provides that:

On request of a party in interest, the court may order the appointment of
additional committees of … equity security holders if necessary to assure
adequate representation of … equity security holders.  The United State trustee
shall appoint any such committee.

11 U.S.C. § 1102(a)(2).  Because the statute provides that the court "<u>may</u>" appoint an equity

committee "<u>if necessary</u>," this Court has considerable discretion in deciding on whether to create

a statutory committee of equity holders.  Id. (emphasis added); see also In re Johns-Manville

Corp., 68 B.R. 155, 160 (S.D.N.Y. 1986) ("Congress' desire to protect shareholders in

reorganization proceedings was not strong enough, however, to mandate the creation of equity committees.").

13.    Those who seek the appointment of an equity committee bear the burden of proof in demonstrating to the Court that it should exercise its discretionary authority to require one.  In re Williams Commc'ns Group, Inc., 281 B.R. 216, 219 (Bankr. S.D.N.Y. 2002) (Lifland, B.J.).  In determining whether the proponents of an equity committee have satisfied their heavy burden, courts in this District often take guidance from Judge Lifland's decision in In re Williams Communications, in which he concluded:

> The appointment of official equity committees should be the rare exception.  Such committees should not be appointed unless equity holders establish that (i) there is a substantial likelihood that they will receive a meaningful distribution in the case under a strict application of the absolute priority rule, and (ii) they are unable to represent their interests in the bankruptcy case without an official committee.  The second factor is critical because, in most cases, even those equity holders who do expect a distribution in the case can adequately represent their interest without an official committee and can seek compensation if they make a substantial contribution in the case.

Id. at p. 222.[2]

14.    In In re Loral Space & Communications Ltd., Case No. 03-41710 (Bankr. S.D.N.Y. Dec. 2, 2003) (Drain, B.J.), this Court surveyed the decisions in this District and similarly ruled that he who seeks appointment of an equity committee must overcome "a rather high threshold" and that "the appointment of an equity committee is the exception rather than the rule."  (Loral Hearing Tr. at 127, 130.)  This Court also identified "the threshold" question—and one on which the movant has the burden of proof—as whether "there is sufficient equity in the estate to justify the cost and expense of a separate committee."  (Id. at 128.)  In Loral, this Court

---

[2]    In determining whether a debtor appears to be hopelessly insolvent, the Williams court further noted that no formal valuation is required.  Instead, according to Williams, courts should reach "a practical conclusion, based on a confluence of factors," including, among others, an insolvent balance sheet, verified schedules of assets and liabilities showing an equity deficiency, and the trading value of public bonds.  Williams, 281 B.R. at 221.

considered, with respect to that threshold question, "both the book value of the debtors, from

their [publicly] filed SEC reporting, as well as the agreed upon range of trading prices" of

securities.  (Id. at 131.)  While acknowledging that such measures of value are not perfect, this

Court held that when "either method [leads] to such a substantial negative equity [ranging from

negative $230 million to negative $620 million], I think it is clear to me that the debtors are

insolvent as far as the common shareholders are concerned."  (Id. at 132.)  Based on that

evidence, this Court concluded that "the gap is simply too large to justify the expense and

disruption that an official committee of common shareholders would pose, given that the only

trade off . . . would be di minimis recovery at this point by shareholders."  (Id. at 132-33.)

B.    The Debtors Are Hopelessly Insolvent And Equity Holders
      Cannot Expect A Meaningful Recovery

        15.    Although the Debtors wish it were otherwise, Appaloosa cannot

demonstrate—and the Debtors cannot construct—a scenario in which the Debtors can be deemed

solvent.  This is largely because the claims associated with the Debtors' non-competitive U.S.

legacy liabilities and burdensome U.S. labor agreements are generally direct claims against the

U.S. parent holding company and are superior in priority to the interests of that entity's common

shareholders.

        16.    That the Debtors are hopelessly insolvent is illustrated by the recently

filed schedules and statements and the January monthly operating report.   In particular, the

January monthly operating report lists $13.8 billion in assets and $20.2 billion in liabilities, of

which $17.5 billion are liabilities subject to compromise, resulting in a shareholder deficit of

negative $6.4 billion.  Included in the stockholder deficit analysis is the Debtors' interests in its

non-Debtor subsidiaries.

17.    The capital markets also consider Delphi Corporation hopelessly insolvent. As of February 21, 2006, all four tranches of Delphi Corporation's publicly-traded debt securities were trading at an implied recovery of between 53.0% and 55.8% of face value, Delphi Corporation's publicly-traded trust preferred securities were trading at an implied recovery of 24.0% of face value, and Delphi Corporation's common stock was trading at the close of business at $0.33. (Sheehan Decl. Ex. 3.)

18.    Appaloosa has neither identified nor produced any evidence that equity stands a chance of a meaningful recovery. Instead, Appaloosa's Discovery Responses and its Motion point to matters occurring <u>before</u> the Debtors filed their petitions. But the price at which Delphi common stock traded <u>prior to</u> the bankruptcy filings and the fact that the Company declared a dividend in June 2005 are no evidence that, as things stand now, equity holders are likely to receive a meaningful recovery under a plan of reorganization. For Appaloosa, it is as if the collapse of the out-of-court consensual negotiations among Delphi, its unions, and General Motors and the Debtors' consequent bankruptcy filings had never occurred. Simply put, Appaloosa cannot dispute but that the Debtors are hopelessly insolvent <u>today</u>.

C.    <u>The Equity Holders' Interests Are Adequately Represented</u>

19.    Even when recovery by equity holders <u>is</u> likely—a situation not present here—no equity committee should be appointed unless the proponent of one proves that its rights would not otherwise be adequately represented. For example, in <u>In re Kasper A.S.L., Ltd.</u>, Case No. 02-10497 (Bankr. S.D.N.Y.) (Gropper, B.J.), Judge Gropper held that even when recovery by equity holders was possible, the fact that the equity holders' interests were already adequately represented was enough, under the circumstances, to deny the appointment of an equity committee:

> In the cases at bar . . . the debtors' prospects have improved to the point that there
> may be value for equity. . . . . The real question is whether in these cases at this
> time, when it is not clear whether there will be any value for equity and, if so,
> what it will be, but there is a possibility, is a separate committee necessary to
> assure the equity holders adequate representation? The answer, in light of the
> facts of this matter, is clearly "no."

(Transcript of July 15, 2003 Hearing, a copy of which is attached hereto as Exhibit C, at 70-71.)

The court's holding was based upon the safeguards in place ensuring that the interests of the

equity holders would be adequately represented, including, inter alia, the debtors' "responsibility

to equity holders" to maximize value of the estate.  (Id. at 71-79.)

    20.    At the outset, here the Debtors and Delphi's twelve-member board of

directors (ten of whom are independent, including two new directors elected recently), can be

expected adequately to represent the interests of equity holders because they are charged with the

fiduciary duty of maximizing the value of the estate for the benefit of all stakeholders.  See In re

Penick Pharm., Inc., 227 B.R. 229, 232-33 (Bankr. S.D.N.Y. 1998) (Lifland, B.J.) (finding that

managers and employees of debtor-in-possession had same duties as chapter 11 trustee, i.e., to

maximize value of estate and ensure that monies that flowed through estate were used for benefit

of unsecured creditors and other interested parties).  (Loral Haring Tr. at 132 ("There's no

meaningful evidence . . . that management is somehow laying down on its job in . . . obtaining

the most value possible for the debtors."); Kasper Hearing Tr. at 72-73, 76-77 (discussing duty of

debtors to equity holders).)

    21.    So, too, the Creditors' Committee's actions can be counted on to benefit

equity holders' interests, for the Committee also has a duty to maximize the total value of the

estate for the benefit of all stakeholders.  Williams, 281 B.R. at 221 ("A higher valuation is in

both the Creditors' Committee and the shareholders interest."); see also In re Leap Wireless Int'l

Inc., 295 B.R. 135, 139-40 (Bankr. S.D. Cal. 2003) ("The economic interests of the bondholders

and the shareholders appear to be the same—that is, to find the highest realistic value for the

company. And it is the fiduciary duty of the [Creditors' Committee] to do so.").

22.    Appaloosa also has nothing to rebut the presumption that the interests of

equity holders are already adequately represented through the Debtors' Board of Directors and

the Creditors' Committee.  Although Appaloosa's Motion insinuates—apparently upon the basis

of selective newspaper clippings—that General Motors will run roughshod over other

stakeholders' interests, it has offered no admissible evidence to support these claims.  GM has

taken strong exception to Appaloosa's charges.  (Response of General Motors Corp. to the

Motion of Appaloosa Management L.P. Pursuant to 11 U.S.C. § 1102(a) for an Order Directing

the United States Trustee to Appoint an Equity Committee in these Chapter 11 Cases (Docket No.

1712).)  In fact, GM now says that the protection of its own interests requires it to be seated on

the Creditors' Committee.  (Motion for Order Directing Appointment of General Motors Corp. to

the Statutory Creditors' Committee (Docket No. 2443).)  Notwithstanding its innuendoes,

Appaloosa can never prove that "management is hopelessly conflicted or somehow otherwise not

properly conducting their fiduciary duties."  (Loral Hearing Tr. at 134; see also GM Resp., dated

Jan. 2, 2006.)

23.    As a highly sophisticated financial institution which elected to purchase its

equity position in Delphi after the Debtors sought reorganization relief, which has the

wherewithal to retain sophisticated professionals to represent it in these cases, and which knows

how to communicate with other significant equity holders on matters of common interest,

Appaloosa hardly needs an equity committee to look after its interests.  Here, just as in Williams,

"those equity holders who do expect a distribution in a case can adequately represent their own

interests without an official committee and can seek contribution if they make a substantial

contribution to the case." 281 B.R. at 223.   What Appaloosa cannot prove, as it must, is that the interests of equity holders will not be adequately represented "without the formation of an official committee." Id.

D.      The Costs Of An Official Equity Committee Are Substantial And Unwarranted

24.      Appaloosa states that the costs of an official equity committee are not a significant factor because of the size of the Debtors' cases and because the fees of the equity committee's professionals are subject to the scrutiny of the parties and judicial review.  (Motion. ¶¶ 43-45.)  This narrow view may account for Appaloosa's failure to analyze the costs of appointing an equity committee.  In any event, Appaloosa's argument ignores the fact that the costs attendant to an official equity committee include not only professional fees, but also additional administrative burdens imposed on the Debtors and the costs of delay.  (Loral Hearing Tr. at 136 ("The cost and harm to the estate, which is both direct in terms of dollars [paid to an equity committee's professionals], as well as indirect in terms of dollars spent by other parties and potential delay outweigh the rather negligible benefits of additional representation, given my conclusion that the preferred holders have their own resources and their own reasons for protecting their interests actively in the case.").)

25.      Finally, were an equity committee to be appointed here—especially one that includes Appaloosa—it can be expected that such a committee will do whatever it can to achieve a recovery (even in the form of a "gift") for otherwise out-of-the-money equity.  That exercise will itself delay the process and increase the costs of administering these estates.

Memorandum Of Law

26.      Because the legal points and authorities upon which this Objection relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

11

<u>Conclusion</u>

WHEREFORE, the Debtors respectfully request that this Court enter an order (a) denying

Appaloosa's Motion and (b) granting the Debtors such other and further relief as is just.

Dated: New York, New York
        March 2, 2006

                              SKADDEN, ARPS, SLATE, MEAGHER
                                  & FLOM LLP


                              By:   /s/ David E. Springer
                                    John Wm. Butler, Jr. (JB 4711)
                                    David E. Springer (DS 9331)
                                    John K. Lyons (JL 4951)
                                    Ron E. Meisler (RM 3026)
                              333 West Wacker Drive, Suite 2100
                              Chicago, Illinois  60606
                              (312) 407-0700


                                        - and -


                              By:   /s/ Kayalyn A. Marafioti
                                    Kayalyn A. Marafioti (KM 9632)
                                    Thomas J. Matz (TM 5986)
                              Four Times Square
                              New York, New York 10036
                              (212) 735-3000


                              Attorneys for Delphi Corporation, <u>et al.</u>,
                                  Debtors and Debtors-in-Possession

**Exhibit A**

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
(212) 819-8200
Gerard Uzzi (GU-2297)

Wachovia Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
(305) 371-2700
Thomas E Lauria (Admitted *Pro Hac Vice*)
John K. Cunningham (JC-4661)
Linda M. Leali

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| Delphi Corporation, et al. | ) | Case No. 05-44481 |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |

### APPALOOSA'S OBJECTIONS AND RESPONSES TO DEBTORS' FIRST SET OF INTERROGATORIES AND DOCUMENT REQUESTS TO APPALOOSA MANAGEMENT L.P.

Pursuant to Rules 26, 33, 34 and 36 of the Federal Rules of Civil Procedure, made applicable by Rules 7026, 7033, 7034 and 7036 of the Federal Rules of Bankruptcy Procedure, Appaloosa Management L.P. ("Appaloosa"), collectively with and through certain of its affiliates, hereby serves these objections and responses to the Debtors' First Set of Interrogatories and Document Requests to Appaloosa Management L.P. served by Delphi Corporation ("Delphi") and its affiliated debtors and debtors in possession (collectively, with Delphi, the "Debtors").

### GENERAL OBJECTIONS

1.      Nothing herein shall be construed as an admission by Appaloosa regarding the competence, admissibility, and/or relevance of any document, or as an admission of the truth or accuracy of any characterization or document of any kind sought by the Debtors'

Discovery. Appaloosa reserves the right to challenge the competency, relevance, materiality, and admissibility of any documents Appaloosa identifies or produces in response to any request at trial of this or any other action, or at any subsequent proceeding, of this or of any other action.

2.    Appaloosa object to the Definitions and Instructions in the Discovery Requests on the ground, and to the extent, that they attempt to impose upon Appaloosa obligations and requirements beyond the scope of the applicable federal procedural rules, including Federal Rule of Civil Procedure 33.

3.    Appaloosa objects to the Interrogatories and the Definitions and Instructions in the Discovery Requests on the ground, and to the extent, that such requests seek materials that are privileged and protected from production under the attorney/client privilege, the work-product rule, or any other privilege or immunity from discovery.

4.    Appaloosa objects to the Discovery Requests to the extent they seek discovery of information outside of Appaloosa's possession, custody or control.

## RESPONSES AND SPECIFIC
## OBJECTIONS TO INTERROGATORIES

INTERROGATORY NO.1:

Identify every person you intend to call to testify at the hearing on the Motion and describe the subject matters about which they will testify.

RESPONSE:

Without waiving the foregoing general objections, Appaloosa has not yet determined what witnesses, if any, it will call to testify at the hearing on the Motion. Appaloosa intends to produce a list of testifying witnesses to the Debtors no later than five business days prior to the hearing, or when the Debtors produce a list of their testifying witnesses, whichever is later.

INTERROGATORY NO. 2:

Identify all documents you intend to offer in evidence or otherwise use at the hearing on the Motion.

RESPONSE:

Without waiving the foregoing general objection, Appaloosa has not yet determined
which documents it will offer in evidence or otherwise use at the hearing on the Motion.
Appaloosa intends to produce a list of those documents to the Debtors no later than five
business days prior to the hearing, or when the Debtors produce a list of documents it will
offer in evidence or otherwise use at the hearing on the Motion, whichever is later.

INTERROGATORY NO. 3:

Identify every analysis you have done concerning the solvency of Delphi Corporation,

including the dates it was commenced and completed, the person(s) who performed it, the

conclusions it reached, and the bases for those conclusions.

RESPONSE:

Without waiving the foregoing general objections, a preliminary recovery analysis
was prepared by Ronald Goldstein of Appaloosa. Mr. Goldstein conducted that analysis
during the three months before Delphi filed for bankruptcy. The analysis demonstrated that
under certain circumstances Delphi has substantial equity value, based in part on Appaloosa's
proprietary forecasts of EBITDA and the restructuring of certain employee benefit-related
obligations.

INTERROGATORY NO. 4:

Identify every analysis you have done concerning the reorganization value of Delphi

Corporation, including the dates it was commenced and completed, the person(s) who

performed it, the conclusions it reached, and the bases for those conclusions.

RESPONSE:

Without waiving the foregoing general objections, a preliminary recovery analysis
was prepared by Ronald Goldstein of Appaloosa. Mr. Goldstein conducted that analysis
during the three months before Delphi filed for bankruptcy. The analysis demonstrated that
under certain circumstances Delphi has substantial equity value, based in part on Appaloosa's
proprietary forecasts of EBITDA and the restructuring of certain employee benefit-related
obligations.

INTERROGATORY NO. 5:

Identify every analysis you have done concerning the cost of appointing an equity

committee, including the dates it was commenced and completed, the person(s) who

performed it, the conclusions it reached, and the bases for those conclusions.

RESPONSE:

Without waiving the foregoing general objections, at the present time, Appaloosa has not conducted an analysis concerning the cost of appointing an equity committee.

INTERROGATORY NO. 6:

Identify every equity-holder of the Debtor with whom you have communicated concerning the formation of either a formal or informal equity committee.

RESPONSE:

Without waiving the foregoing general objections, Appaloosa has communicated with the following equity holders concerning the formation of either a formal or informal equity committee:

Steve Lampe, Lampe, Conway & Co.

Joseph Thornton, Pardus Capital Management

Chris Wilson, Stonehill Capital Management LLC

DC Capital, LLC, through Schulte Roth & Zabel

INTERROGATORY No. 7:

Do you contend that there is a substantial likelihood that equity holders of Delphi Corporation will receive a meaningful distribution in these cases, taken into account a strict application of the absolute priority rule? If so, provide the complete basis for your contention, including the identity of documents concerning your contention and the identity of persons with knowledge of the facts concerning your contention.

RESPONSE:

Without waiving the foregoing general objections, yes. Please see the Motion and the exhibits thereto, and the responses to Interrogatory Numbers 1 and 2.

INTERROGATORY No. 8:

Do you contend that Appaloosa is unable to represent its interests in these bankruptcy cases, either individually or through an informal committee of equity holders? If so, provide the complete basis for your contention, including the identity of documents concerning your contention.

RESPONSE:

Without waiving the foregoing general objections, while Appaloosa is able to retain counsel to represent its interests in the Debtors' chapter 11 cases, as set forth in the Motion, any suggestion that individual equity holders acting on their own, without the imprimatur of official committee status, can otherwise participate meaningfully without disadvantage in any chapter 11 case of significant magnitude, no less one of this size and complexity, so obviously ignores the practical realities of bankruptcy practice as to be facially disingenuous. Absent official representation, equity holders will be effectively shut out of the process, through a practical lack of access to management and other necessary resources from the Debtors and/or through simple attrition, as evidenced by the fact that, as part of the "meet and confer" held on January 27, 2006, the Debtors indicated an unwillingness to share information that is necessary to protect shareholder interests.

INTERROGATORY No. 9:

Provide a summary (including the costs thereof and receipts therefrom) of trading or

other acquisitions or dispositions, for the period January 1, 2004 through the present, in

securities of the Debtor.

RESPONSE:

In addition to the foregoing general objections, Appaloosa objects to providing a summary (including the costs thereof and receipts therefrom) of trading or other acquisitions or dispositions, for the period January 1, 2004 through the present, in securities of the Debtor as such information is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence.

INTERROGATORY No. 10:

Provide a complete history of your trading or other acquisitions or dispositions in

equity securities of the Debtors.

RESPONSE:

In addition to the foregoing general objections, Appaloosa stipulates that it purchased equity securities of the Debtors subsequent to the commencement of the Debtors' chapter 11 cases. The purchases were reported on the Form SC 13G filed with the Securities & Exchange Commission by Appaloosa on October 11, 2005. There have been no trades by Appaloosa in equity shares of the Debtors since the filing of the October 11, 2005 Form SC 13G.

INTERROGATORY No. 11:

Provide a complete history, for the period January 1, 2004, through the present, in

your trading or other acquisitions or dispositions in claims against the Debtors.

RESPONSE:

In addition to the foregoing general objections, Appaloosa objects to providing a
complete history, for the period January 1, 2004, through the present, in its trading or other
acquisitions or dispositions in claims against the Debtors as such information is not relevant
and is not reasonably calculated to lead to the discovery of admissible evidence.

## RESPONSES AND SPECIFIC
## OBJECTIONS TO DOCUMENT REQUESTS

DOCUMENT REQUEST NO. 1:

All documents identified in response to the foregoing interrogatories.

RESPONSE:

Without waiving the foregoing general objections and pursuant to the "meet and
confer" held on January 27, 2006, any documents responsive to Request No. 1 will be
produced for inspection and copying.

DOCUMENT REQUEST NO. 2:

A copy of the direct testimony, declaration, or affidavit, including all exhibits, of each

witness identified in response to the foregoing interrogatories.

RESPONSE:

Without waiving the foregoing general objections, Appaloosa did not identify any
witnesses in the foregoing interrogatories because it has not yet determined what witnesses, if
any, it will call to testify at the hearing on the Motion.  Appaloosa will produce a copy of the
direct testimony, declaration, or affidavit, including all exhibits, of each witness subsequently
identified to the Debtors no later than five business days prior to the hearing on the Motion,
or when the Debtors produce a copy of the direct testimony, declaration, or affidavit,
including all exhibits, of each of their witnesses, whichever is later.

DOCUMENT REQUEST NO. 3:

All documents substantiating the contentions you make in or that otherwise support

your Motion.

RESPONSE:

Without waiving the foregoing general objections and pursuant to the "meet and
confer" held on January 27, 2006, any documents responsive to Request No. 3 will be
produced for inspection and copying.

DOCUMENT REQUEST NO. 4:

Copies of your communications with other equity holders of the Debtors concerning

the Debtors.

RESPONSE:

Without waiving the foregoing general objections and pursuant to the "meet and confer" held on January 27, 2006, any documents responsive to Request No. 4 will be produced for inspection and copying.

DOCUMENT REQUEST NO. 5:

Copies of your communications with other debt holders of the Debtors concerning the

Debtors.

RESPONSE:

In addition to the foregoing general objections, Appaloosa objects to providing copies of its communications with other debt holders of the Debtors concerning the Debtors as such information is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence.

DOCUMENT REQUEST NO. 6:

Copies of your communications with other holders of claims against the Debtors

concerning the Debtors.

RESPONSE:

Without waiving the foregoing general objections, Appaloosa objects to providing copies of its communications with other holders of claims against the Debtors concerning the Debtors as such information is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence.

DOCUMENT REQUEST NO. 7:

Documents substantiating your contention that you are not able to protect your own

interests in these cases.

RESPONSE:

Without waiving the foregoing general objections and pursuant to the "meet and confer" held on January 27, 2006, any documents responsive to Request No. 7 will be produced for inspection and copying.

DOCUMENT REQUEST NO. 8:

All documents substantiating your contention that the Debtors do not appear to be

hopelessly insolvent.

RESPONSE:

Without waiving the foregoing general objections and pursuant to the "meet and confer" held on January 27, 2006, any documents responsive to Request No. 8 will be produced for inspection and copying.

DOCUMENT REQUEST NO. 9

All documents upon which any of your expert witnesses intend to rely.

RESPONSE:

Without waiving the foregoing general objections, at the present time, Appaloosa has not yet determined the documents upon which its experts intend to rely. Appaloosa intends to produce a list of these documents to the Debtors no later than five business days prior to the hearing, or when the Debtors produce a list of the documents upon which their experts intend to rely, whichever is later.

DOCUMENT REQUEST NO. 10:

All documents you considered in purchasing or selling equity securities of Delphi

Corporation during 2005.

RESPONSE:

Without waiving the foregoing general objections and pursuant to the "meet and confer" held on January 27, 2006, any documents responsive to Request No. 10 will be produced for inspection and copying.

DOCUMENT REQUEST NO. 11:

All documents you considered in purchasing or selling debt securities of Delphi

Corporation during 2005.

RESPONSE:

Without waiving the foregoing general objections and pursuant to the "meet and confer" held on January 27, 2006, any documents responsive to Request No. 11 will be produced for inspection and copying.

DOCUMENT REQUEST NO. 12:

All documents you considered in purchasing or selling claims against the Debtors.

RESPONSE:

Without waiving the foregoing general objections and pursuant to the "meet and confer" held on January 27, 2006, any documents responsive to Request No. 12 will be produced for inspection and copying.

Dated: February 21, 2006

WHITE & CASE LLP
Gerard Uzzi (GU-2297)
1155 Avenue of the Americas
New York, New York 10036-2787
(212) 819-8200

Thomas E Lauria (Admitted *Pro Hac Vice)*
John K. Cunningham (JC-4661)
Wachovia Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
(305) 371-2700

By:  /s/  Linda M. Leilia
        Linda M. Leali

COUNSEL TO APPALOOSA
MANAGEMENT L.P.

## CERTIFICATE OF SERVICE

I certify that on this 21 day of February, 2006, the foregoing APPALOOSA'S OBJECTIONS AND RESPONSES TO DEBTORS' FIRST SET OF INTERROGATORIES AND DOCUMENT REQUESTS TO APPALOOSA MANAGEMENT L.P. was sent by email and by overnight mail to the counsel for the Debtors.

By:  /s/ Aileen Venes
Aileen Venes

**Exhibit B**

1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    - - - - - - - - - - - - - - - - -x

5    In the Matter of

6        LORAL SPACE & COMMUNICATIONS        03-41710 (RDD)

         LTD., et al.,                       03-41709 to

7                                            03-41728

                    Debtors.

8    - - - - - - - - - - - - - - - -x

9                            December 2, 2003

                             10:15 a.m.

10

11                           United States Custom House

                             One Bowling Green

                             New York, New York 10004

12

13        HEARING pursuant to matters listed on

14   agenda.

15

16   B E F O R E:

17               HON. ROBERT D. DRAIN,

18                    U.S. Bankruptcy Judge.

19

20

21

22

23

24

25



**2**

APPEARANCES:

WEIL GOTSHAL & MANGES LLP
   Attorneys for the Debtors
   767 Fifth Avenue
   New York, New York 10153
BY:  RICHARD ROTHMAN, ESQ.
   LORI R. FIFE, ESQ.
   SHAI Y. WAISMAN, ESQ.

AKIN GUMP STRAUSS HAUER & FELD LLP
   Attorneys for the Official
   Committee of Unsecured Creditors
   590 Madison Avenue
   New York, New York 10022

BY:  DAVID H. BOTTER, ESQ.
   ABID QURESHI, ESQ.
   KERRY G. THOMPSON, ESQ.

SONNENSCHEIN, NATH & ROSENTHAL, ESQS.
   Attorneys for Aspen Advisors, LLC
   1221 Avenue of the Americas
   New York, New York 10020

BY:  PETER D. WOLFSON, ESQ.
   JOHN A. BICKS, ESQ.

DAVIS, POLK & WARDWELL, ESQS.
   Attorneys for The Bank of America
   450 Lexington Avenue
   New York, New York 10017
BY:  MARSHALL SCOTT HUEBNER, ESQ.

**3**

APPEARANCES - continued

SCHIFF HARDIN & WAITE
   Attorneys for Shareholders of
   Loral space and Communications. LTD
   6600 Sears Tower
   Chicago, Illinois 60606

BY:  MICHAEL YETNIKOFF, ESQ.

KELLY DRYE & WARREN LLP
   Attorneys for HSBC Bank USA
   as Trustee
   101 Park Avenue
   New York, New York 10178

BY:  MARK R. SOMERSTEIN, ESQ.

CAROLYN S. SCHWARTZ
UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
   33 Whitehall Street
   New York, New York 10004

BY:  LAUREN LANDSBAUM, ESQ.,
   of Counsel

**4**

1    LORAL SPACE & COMMUNICATIONS LTD.
2    PROCEEDINGS:
3         Please be seated.  Have the
4    parties all given their appearances?
5         MR. WOLFSON:  Peter Wolfson and John
6    Bicks from Sonnenschein Nath and Rosenthal for the
7    preferred shareholders.
8         MR. YETNIKOFF:  Michael Yetnikoff
9    with Schiff Hardin and Waite for certain common
10   shareholders of Loral Space and Communications,
11   LTD.
12        THE COURT:  If you've already given
13   your appearances to the court reporter, that's
14   fine.
15        I don't know which one of you wants
16   to go first.
17        MR. YETNIKOFF:  Good morning, your
18   Honor.  Michael Yetnikoff of Schiff Hardin and
19   Waite on behalf of certain common shareholders of
20   Loral Space and Communications Limited.
21        As the court recalls, I was here in
22   September pursuing a motion to appoint an official
23   equity security holders committee of Loral.  At
24   that time the motion was denied without prejudice
25   by the court; and the court left the door open, as

**5**

1    LORAL SPACE & COMMUNICATIONS LTD.
2    it were, in the event that the circumstances
3    changed in a particular way, that is with regard to
4    the Intelsat auction and the circumstances
5    surrounding that.
6         In fact, circumstances have changed
7    in a way that perhaps none of the parties foresaw
8    at that time.  What changed is that this company
9    seems to have experienced a very unusual and
10   significant turn around in the course of this
11   Chapter 11.  Back in September, the company was in
12   some danger of ceasing to do business, at least
13   with respect to the SS/L business.  That situation
14   has turned around rather dramatically.  In
15   September there was a pending potential for a sale
16   of certain satellite of Intelsat, but by no means
17   of certainty that sale now looks likely to close
18   and for a price that is in 3 hundred million
19   dollars in excess of the book value of assets being
20   sold.
21        Moreover, since September, analyst's
22   opinions have been promulgated to the effect that
23   the entire industries is experiencing a turn
24   around.  Therefore this appears to be the
25   relatively unusual case of a company turning around

**6**

LORAL SPACE & COMMUNICATIONS LTD.
almost 180 degrees during the course of a Chapter
11 bankruptcy due to changes in business
circumstances. And we submit that those changes
justify, that means they require appointment of an
official shareholders' committee to represent the
interests of common shareholders.
    The Intelsat sale, which is the
cornerstone of the company strategy, is expected to
close. That sale will pay down all of the
companies' secured debt. The book value of the
assets sold, approximately 805 million dollars, as
set forth in Loral's last form 10-Q. The value
that the company has placed on the sale, 1.1
billion dollars, a 3 hundred million dollar premium
over the book value of the assets. To the extent
that book value is relevant, and to the extent that
there was a book value solvency gap as posited by
the creditors' committee, that 3 hundred million
difference closes that gap to zero; and the 1.1
billion dollar value that the debtor has ascribed
to the sale, as I said is in excess -- as I said,
does not include the value of additional satellite
orders that Intelsat and affiliates have placed.
    There is another significant benefit

**7**

LORAL SPACE & COMMUNICATIONS LTD.
from the sale that removes the secured debt thereby
giving this company significantly more options to
with respect to exit financing and capital
structure upon emergence; that is a major and
perhaps underrated benefit. It is now a whole lot
easier for the company to emerge with a plan that
has a reasonably leveraged capital structure, and
that's a tremendous benefit in my view.
    Another important fact of the
satellite sale is it appears to not only leave
Loral with a high margin high growth markets
outside of North America, as has been set forth in
testimony before this court, but in addition with
orbital slots that the company could use to place
other satellites which it builds to serve the north
American market as well, so there is a very
reasonable scenario where this company could be
completely reconstituted within a reasonable period
of time to its former self with the difference of
having paid out off all its secured debt.
    Although book value, which is not
determinative of solvency, there are a couple of
arguments to be made, first of all with respect to
the 3 hundred million dollars closure of the

**8**

LORAL SPACE & COMMUNICATIONS LTD.
solvencies gap. Second, the company, on November
26th, filed a schedule of assets and liabilities.
And a simple reading of that schedule filed on
November 26th shows that for the parent company,
Loral Space and Communications Limited, assets of
2.6 billion dollars and liabilities at 1.5 billion
dollars, that is simple transcribed from the
finding that was made on the 26th of November. So,
we've had analysis that I realize of course that
there are consolidation issues with respect to
that, but even on a very cursory analysis of the
book value numbers, there appears to be no solvency
gap, certainly the company is not hopelessly
insolvent, and in fact appears to be quite solvent.
    The second change of circumstances
since September, is Loral's receipt for new
satellite orders with options for a 5th satellite
order. That will keep the SS/L business afloat,
demonstrates that the SS/L business is an excellent
business; Loral is one of the very very few
suppliers of the state of the art satellites. Even
in light of its financial difficulties, the markets
have shown that they have enormous respect for the
SS/L business and have placed significant orders,

**9**

LORAL SPACE & COMMUNICATIONS LTD.
and one will only expect that situation to improve
as the expected turn around in the satellite
industry begins to gather steam, Loral is very well
positioned to take advantage of that.
    The third change of circumstance is
the recognition, as indicated in the public press
reports, that this industry is, in fact, turning
around. There is an expectation, for example, for
additional demand for high definition television
which would require additional satellites. And as
I said, there are not very many competitors that
Loral has as a viable vibrant business. And is
simply a company that is not only on the verge, but
in fact has begin its turn around.
    The other circumstances surrounding
this case, with one exception, haven't changed, and
they all favor appointment of an official
shareholders committee. Loral's common stock is
still widely held, still actively traded. This is
still a large and complex case, and Loral's common
shareholders interests are still not adequately
represented. Management has a fiduciary duty to
all constituencies in this case, it has to engage
in a juggling act between its creditors and its

10

LORAL SPACE & COMMUNICATIONS LTD.
1
2 shareholders, and also management has certain
3 economic interests that are personal to the
4 management members, non of which are congruent with
5 the common shareholders interest. Moreover the
6 shareholders cannot represent themselves. The
7 individual shareholders are small, widely
8 scattered, they don't have the funds to represent
9 themselves, and moreover, they don't have the
10 standing to represent themselves. And I think
11 that's demonstrated by the fact that I, on behalf
12 of the shareholders, requested under
13 confidentiality agreement, to view certain
14 projections that the company had apparently made,
15 perhaps not final objections, I really don't know
16 what status they are in. The company declined to
17 provide that information. I submit that had an
18 official shareholders committee been appointed,
19 that information would certainly have been shared
20 with an official shareholders committee, it was not
21 shared with the individual shareholders. I'm
22 simply pointing out the fact that individual
23 shareholders don't have the status, don't have the
24 ability to gain information, or to use it for that
25 matter, in the same way as an official committee.

11

LORAL SPACE & COMMUNICATIONS LTD.
1
2 There simply is no substitute for official
3 committee representation.
4         Finally, the one other surrounding
5 circumstance that has changed is the fact that the
6 company has announced that it does intend to
7 present reasonably viable projections, circulate
8 those to the creditors' committee, and begin the
9 plan of reorganization or negotiating process
10 within the next few weeks. And in order for
11 shareholders to be fairly represented, this is the
12 time to do it. The appointment process will no
13 doubt take a few weeks, and by the time a committee
14 is appointed, if the companies timetable is
15 correct, the plan negotiations will be starting.
16 So effectively, this is, while not quite the last
17 minute, really the last best chance for
18 shareholders to obtain a seat at the table.
19         In summary, this is an unusual case,
20 an unusual case where the facts on the ground of
21 business realities appear to have changed where the
22 company is not hopelessly is insolvent as a matter
23 of book value, and not hopelessly insolvent as a
24 matter of its business case; a case where it does
25 appear that there may well be significant value for

12

LORAL SPACE & COMMUNICATIONS LTD.
1
2 the common shareholders at the end of the day. And
3 I would submit that the probability is significant
4 enough to warrant the appointment of an official
5 shareholders committee in this case, and to give
6 the shareholders the chance to participate in this
7 turn around to the extent economically justifies.
8         THE COURT: Let me ask you. The
9 shareholders that you represent, are they still the
10 shareholders that were listed on the schedule
11 attached to your original motion?
12         MR. YETNIKOFF: That is correct.
13         THE COURT: And they constitute,
14 what, about --
15         MR. YETNIKOFF: We have something in
16 the order of 2 million shares.
17         THE COURT: And that's what percent
18 of the total?
19         MR. YETNIKOFF: Something around
20 five percent.
21         THE COURT: And what is your factual
22 basis for saying that the stock is very widely
23 held?
24         MR. YETNIKOFF: I have seen trading
25 volumes on the publically available bulletin boards

13

LORAL SPACE & COMMUNICATIONS LTD.
1
2 that track that. I don't believe there's any
3 contest about the fact that the company -- I
4 believe that neither the company nor the U.S.
5 Trustee nor the creditors committee has disputed
6 that this common stock is widely held. There is an
7 active message board for stockholders. So based on
8 the fact that that assertion has not been
9 controverted and the fact that the stock continues
10 to trade as publically reported on the internet, I
11 conclude that the stock does continue to be widely
12 held.
13         THE COURT: What is your reaction to
14 the point raised by Aspen Advisors that if a
15 committee is appointed it should be weighted in
16 favor of preferred shareholders and/or that there
17 should be two committees?
18         MR. YETNIKOFF: My response is
19 first, that we would have no objection to two
20 committees.
21         THE COURT: Well, let's assume that
22 there's one committee.
23         MR. YETNIKOFF: Assuming that
24 there's one committee, my view is as follows: The
25 common shareholders committee has an interest

14

LORAL SPACE & COMMUNICATIONS LTD.

1 LORAL SPACE & COMMUNICATIONS LTD.
2 completely aligned with the preferred shareholders
3 in making sure that the preferred shareholders are
4 paid in full their legal entitlements, because the
5 common shareholders don't get a penny until the
6 preferred shareholders are paid whatever they are
7 in entitled to. So the common shareholders have a
8 complete total incentive to pay the preferred
9 shareholders every penny that they are entitled to.
10 On the other hand, the preferred shareholders have
11 an incentive to get themselves paid but have no
12 incentive to have the valuing move down to common.
13 So while the common shareholders can, I believe,
14 fairly and completely protect the interests
15 preferred shareholders, the preferred shareholders
16 do not have the same incentive to protect the
17 interest of common; moreover, I'm not sure whether
18 or not the preferred stock is either widely held or
19 actively traded, and that is another reason not to
20 weight the committee towards appointment towards
21 preferred shareholders. And finally, if the
22 business does turn around and this turn around is
23 real, it's not just a matter of a value split of
24 one hundred million dollars or so or 2 hundred
25 million dollars worth of preferred. If the company

16

1 LORAL SPACE & COMMUNICATIONS LTD.
2 preferred shareholders, you represent Aspen
3 Advisors?
4          MR. WOLFSON: That's correct. We
5 represent Aspen Advisors and there are, I believe,
6 a few others that have hooked up with Aspen
7 Advisors through our office -- I shouldn't say they
8 hooked up with Aspen Advisors, but we are
9 representing a number of preferred shareholders who
10 in the aggregate hold 23 percent of the outstanding
11 shares. There are approximately 4 and a half
12 million shares outstanding having a liquidation
13 preference with accrued and unpaid interest of
14 approximately 237 million dollars. The 23 percent
15 that we own represents that portion of 237 million,
16 and I believe mathematically there is about 185
17 million dollars worth that is scattered among the
18 public. These two series of preferred shares were
19 also publically trading, do publically trade, still
20 publically trade. We have been unable to -- other
21 than the handful that we have found that have the
22 more significant pieces, the balance of it, as far
23 as we are able to ascertain, is widely scattered
24 and held. We do not have the exact count, but no
25 other larger shareholders appear, there are no five

15

1 LORAL SPACE & COMMUNICATIONS LTD.
2 turns around, it will be a radical turn around.
3 The satellite, the FSS business is an extremely
4 high margin business. And my belief is in fact if
5 the value split is not going to be that close, it
6. will either be of the business -- if this turn
7 around isn't real and there is nothing left for
8 preferred or common, or that it will go entirely
9 through the preferred to the common. So I guess
10 the summary of that point is that I don't think
11 it's going to be a real close case, I believe it's
12 going one way or the other, but that's just my
13 belief.
14          THE COURT: Okay. Thank you.
15          MR. WOLFSON: Good morning, your
16 Honor. Peter Wolfson for the preferred
17 shareholders. Your Honor, this is my first
18 appearance in this matter, and I would just like to
19 briefly note a couple of points going down to the
20 legal standards. I will try not to duplicate that
21 which Mr. Yetnikoff has discussed.
22          We represent the preferred
23 shareholders --
24          THE COURT: Can you I interrupt you
25 for a second? When you say you represent the

17

1 LORAL SPACE & COMMUNICATIONS LTD.
2 percent shareholders that appear on public record.
3 And again, as Mr. Yetnikoff indicated, nobody has
4 disputed our contention that in fact it is
5 publically held, widely scattered, and in fact, I
6 think prior to -- if I'm not mistaken, prior to the
7 filing of this petition, these securities were all
8 listed on the New York Stock Exchange until they
9 were dealers.
10          THE COURT: Okay.
11          MR. WOLFSON: As noted in the
12 Johns-Manville case, although some shareholders may
13 have resources to protect their own interests,
14 unlike a committee, they don't have any fiduciary
15 duties to the other shareholders, they don't really
16 have adequate resources, they certainly don't have
17 adequate stature to properly and fully represent
18 the interest of shareholders in a case of this
19 nature.
20          Where Section 1109, as everybody
21 points out, gives individual shareholders and
22 creditors the right to be heard, it does not give
23 them the right to negotiate plans, it does not give
24 them any of the other statutory rights, nor the
25 obligations, nor fiduciary responsibilities that an

18

LORAL SPACE & COMMUNICATIONS LTD.
1
2 official committee gives them.
3        The debtor does have conflicting
4 duties and obligations and loyalties to both
5 creditors, employees, management, shareholders.
6 And again, as noted in Johns-Manville citing the
7 legislative history, the rationale in this sort of
8 a situation for appointing an equity committee is
9 due what Congress perceives as a natural tendency
10 of the debtor to pass by large creditors at the
11 expense of equity holders.
12        We've heard some comments earlier
13 and in the earlier transcript with respect to the
14 joint provisional liquidators, but those are
15 fiduciaries, such as the trustee representing the
16 estate, has sustained infirmities in the ability to
17 represent just shareholders that a debtor has. And
18 I would note that we have scanned the record
19 numerous times and we have not yet seen that the
20 joint liquidators who others would assert have the
21 ability to represent shareholders, we don't even
22 think that they have entered an appearance in this
23 case; if they have, we missed it. But most
24 importantly, I think it is fairly clear at this
25 point, that the debtors are not hopelessly

19

LORAL SPACE & COMMUNICATIONS LTD.
1
2 insolvent, certainly in relationship to the
3 preferred shareholders. I'm not going to address
4 the solvency relative to the common, I'm going to
5 leave that to Mr. Yetnikoff, but I would like to
6 focus the court's attention on whether or not the
7 preferred shareholders are in the money or
8 hopelessly insolvent and out of the money.
9        And what I would like to do is first
10 refer to the most current financial projection, the
11 financial numbers that are obtained in the
12 September 30th, 2003 form 10-Q that the debtor just
13 recently filed, and just walk the court through a
14 couple of pages of that SEC document to pointedly
15 point out that the company, even on a book basis,
16 is not hopelessly insolvent.
17        And if I might just hand the
18 court... I have put yellow tabs on a couple of
19 pages that I'm going to refer to, if I may
20 approach, your Honor?
21        THE COURT: Sure.
22        MR. WOLFSON: We pulled this off of
23 the SEC web site, and I would ask the court first
24 to take a look at the financial information in part
25 one. It shows up in the upper right-hand corner, I

20

LORAL SPACE & COMMUNICATIONS LTD.
1
2 believe the page numbers are page 4 of 112, that is
3 the condensed consolidated balance sheets.
4        THE COURT: Right.
5        MR. WOLFSON: And if your Honor
6 would look at that first, one thing to note is that
7 good will was written off this balance sheet in
8 December of 2002, so you do not see a line here for
9 good will, and I'll point that out in a moment from
10 another exhibit. You have a much more clean
11 balance sheet than you normally would have as a
12 consequence of that.
13        In looking at the balance sheet, we
14 need to then make a couple of adjustments. And you
15 can make a couple of adjustments very easily, and
16 this company is clearly going to be based on a book
17 solvency issue, solvent from the standpoint of the
18 preferred shareholders.
19        If I might, I guess just for the
20 sake of the record, if we could mark that Q as
21 preferred shareholders Exhibit 1. And I would like
22 to mark as Exhibit 2, just a demonstrative aid.
23        MR. ROTHMAN: Your Honor, we're
24 going to object to this. We haven't had any notice
25 of this. He's not here testifying as an expert --

21

LORAL SPACE & COMMUNICATIONS LTD.
1
2        THE COURT: Well, let me interrupt
3 you. You're objecting to the second, this sheet,
4 not the 10-Q?
5        MR. ROTHMAN: I'm objecting to the
6 extent they are trying to put in evidence through
7 the argument of a lawyer for one thing, and for
8 another, we would have liked to have notice that
9 they were going to do this kind of thing so that we
10 could have prepared.
11        MR. WOLFSON: Well, your Honor I --
12        MR. ROTHMAN: I mean, we'll listen
13 to what he says, but I also have doubts as to
14 whether he is even competent.
15        MR. WOLFSON: Your Honor, these are
16 the debtors' documents. These are SEC publically
17 filed documents.
18        THE COURT: When you referred to
19 these --
20        MR. WOLFSON: Well --
21        THE COURT: -- obviously the
22 September 30 10-Q is -- this other document that
23 you just handed up to me, what is this that?
24        MR. WOLFSON: I'm going to show you
25 these this comes straight out of the 10-Q. These

22

1          LORAL SPACE & COMMUNICATIONS LTD.
2   are just numbers right out of the 10-Q just as a
3   demonstrative aid.  If you don't want to look at
4   it --
5          THE COURT:  So you are not seeking
6   to introduce these, you are seeking it to walk
7   through them?
8          MR. WOLFSON:  I will ultimately seek
9   to introduce the 10-Q, I don't need to introduce
10  this separate documents that I've marked as Exhibit
11  2.
12         THE COURT:  Well, until he tries to
13  offer his expert testimony or somebody's expert
14  time, I'll aware of your objection, but I'm happy
15  to have him walk through the debtors' 10-Q.
16         MR. WOLFSON:  Your Honor, if you
17  start off, then, on, again, page four of the
18  Exhibit 1, the September 30th 10-Q, you see that
19  they show total assets of 2.454 billion
20  approximately, and then further down on that page,
21  they show a number of 2.901 billion liabilities
22  subject to compromise.  And on page five, it shows
23  a negative shareholders deficit of 705 million 829.
24         I'm not quite sure that the 300
25  million dollar number that Mr. Yetnikoff was

23

1          LORAL SPACE & COMMUNICATIONS LTD.
2   referring to earlier I think was an earlier Q;
3   however, let's just now see some adjustments that
4   need to be made to that to show that in fact, even
5   based on book value, the preferreds are in the
6   money.
7          If you start off by taking a look,
8   as Mr. Yetnikoff indicated, there is a sale of
9   the -- to Intelsat of a billion -- it's actually a
10  billion 75 million as I understand the proceeds.
11  The sale was a billion 25, plus the additional 50
12  million, so a billion 75 million.  And if you take
13  a look at page 46 of this document, which is, I
14  think, one of the last tabs that I put on your
15  Honor's copy -- I'm sorry, on the upper right-hand
16  corner, it's page 72 of 112; it's actually page 46
17  of the document itself.
18         In the third paragraph down, "the
19  debtor states on October 20th the sellers held a
20  bankruptcy court ordered auction," and continues,
21  "the purchase price was increased from one billion
22  to one billion 25 million."  And then continuing
23  after the parenthetical it says that the buyers are
24  agreeing to pay an additional 50 million dollars at
25  the closing, which is how you get to a billion 75

24

1          LORAL SPACE & COMMUNICATIONS LTD.
2   million.
3          The last sentence of that paragraph
4   shows that the net book value of the satellites to
5   be sold was approximately 805 million, and the
6   other net assets sold of this group was
7   approximately 9 million, so you have a 814 million
8   dollars of net assets being carried on the balance
9   sheet as an assets that have been sold for a
10  billion 75 million.  The difference between the
11  billion 75 million and the 814 million, is actually
12  a 261 million dollar gain on assets.
13         The second --
14         MR. BOTTER:  Your Honor, I don't
15  want to interrupt Mr. Wolfson's testimony, but I
16  think the parenthetical is fairly important; first
17  of all the deal has not yet closed, and there are
18  certain purchase price adjustments which could be,
19  in the context of this discussion, quite material.
20  So I think that --
21         THE COURT:  Well, you can raise that
22  point later.
23         MR. BOTTER:  Okay.
24         MR. WOLFSON:  And we checked with
25  the debtors counsel last night, your Honor, who

25

1          LORAL SPACE & COMMUNICATIONS LTD.
2   said that this more likely than not, they are very
3   optimistic this is closing either this month or
4   next; they know of no reason why it won't.
5          The next adjustment -- and that's
6   the first adjustment that we show on what I marked
7   as Exhibit 2, just to have it on a piece of paper
8   and keep track of it.  The next adjustment that we
9   point out to your Honor is, if you take a look at
10  what shows up at -- well, again, looking at page 4
11  of 112, we show the liability sub compromise; you
12  start off with a number of 2.9 billion dollars.  We
13  then turn to look how that number was calculated,
14  and if your Honor would turn to page 31 of 112,
15  that is footnote 11 to the Q, you'll see that they
16  have a list at the top on the notes adding up to
17  the 2.901394 which matches liabilities subject to
18  compromise noted earlier.  The first number is debt
19  obligations of 2.36 billion, approximately; that
20  number is ascertained by looking at the earlier
21  footnote, footnote 10, that shows up at page 28 of
22  112.  And if your Honor would look at page 28,
23  footnote 10, you'll see that included within the
24  2.236 starting off debt obligations, the second
25  line item is accrued interest being deferred gain

26

1          LORAL SPACE & COMMUNICATIONS LTD.
2    on debt exchanges, that of 214 million 446
3    thousand; 446 thousand. That, your Honor, was when
4    the debtor engaged in its debt exchange, they just
5    had some, from a tax reason, this was just a
6    deferred gain on that debt to the exchange, this
7    was not debt to be paid --
8          MR. HUEBNER: Your Honor. I'm
9    sorry, I think it's now time to consider this
10   objection again. This is pure testimony about what
11   is just a highly technical financial document.
12   He's testifying plain and simple --
13         MR. WOLFSON: I'm just reading.
14         MR. HUEBNER: -- on what -- no, you
15   are not reading.
16         MR. WOLFSON: I'm reading right out
17   of the document.
18         MR. HUEBNER: Sir, would it be okay
19   if I could finish my statement and then you could
20   just help things if you need to. I would
21   appreciate finishing.
22         Your Honor, he's characterizing
23   certain line items in very specific financial ways
24   and then arguing that they should be simply be
25   deducted from a 10-Q. That is not a reading from a

28

1          LORAL SPACE & COMMUNICATIONS LTD.
2    made on my demonstrative of Exhibit 2.
3          MR. ROTHMAN: Your Honor, we do
4    renew the objection, he's not an expert.
5          THE COURT: All right. I will just
6    note that Mr. Wolfson has identified a number that
7    he thinks should be deleted based on the note
8    itself, and I'll read the note --
9          MR. ROTHMAN: Is he is lawyer.
10         THE COURT: -- I'll read the note
11   and make up my own mind whether it's clear enough
12   or not. It might be worth while to ask whether it
13   appears on the schedules.
14         MR. WOLFSON: Finally, your Honor,
15   if you turn back to footnote 11, what the debtor
16   has now done, one of the changes that they made in
17   how they report numbers is that they have included
18   the obligations to the preferred stock as debt
19   obligations, therefore it gets built into the 2.9
20   billion dollar number. And if you look at the last
21   two items, you see the 187 million for six percent,
22   series C, and the 36 some odd million for the 6
23   percent series D. And if you take a look about
24   midway on that note 11, it shows accrued interest
25   and preferred dividends of 40 million 432. The

27

1          LORAL SPACE & COMMUNICATIONS LTD.
2    10-Q. If they wanted to bring a financial witness
3    to testify as to factual matter why certain line
4    items should come out of the asset or liability,
5    they should have done so. I think an additional
6    representation that he was merely reading from the
7    10-Q, walking us through, is in fact is turning out
8    to be more inaccurate as the moments pass.
9          MR. WOLFSON: Your Honor, it says
10   accrued interest, parenthetical, deferred gain on
11   debt exchanges, close parenthetical, and you can
12   search the schedules until the cows come home, you
13   will never find this 214 million listed anywhere by
14   the debtor as a debt that would have to be paid on
15   confirmation. So you take the two publically filed
16   documents together and it's very clear. And, you
17   know, if the committee -- the committee had put in
18   numerous papers identifying what the capital
19   structure is of this case. They've always
20   identified their debt. There is nothing that has
21   ever indicated that this is debt that is
22   represented by their committee that would have to
23   be paid, and in fact it just simply is not, and
24   they know it. So that needs to come off of the
25   2.236, and that was one of the adjustments that we

29

1          LORAL SPACE & COMMUNICATIONS LTD.
2    actual interest is that's owed is approximately 17
3    million dollars. And when you add the interest to
4    the approximately 220 million dollars of principal
5    due on the preferred stock or the liquidation
6    preference on the preferred stock, the total
7    outstanding as of the petition date on the
8    preferred stock is approximately 237 million
9    dollars. So we back out that 237 million dollars
10   from the reported shareholder deficit of 705
11   million. And when you back out just those three
12   items, you end up with a positive book equity
13   available for the preferred shareholders of
14   approximately 6.6 million dollars.
15         The point of that exercise is to
16   demonstrate that based upon the debtors own
17   publically filed information, even based on book
18   value of assets which we understand is not
19   absolutely dispositive of the issue, but even based
20   on its own book value, the company from the
21   preferred standpoint is solvent for preferred
22   shareholders. You do have another 230 billion
23   dollars to go through to get to the common equity,
24   but the preferred are already in the money on that
25   basis. And I would contrast that situation -- keep

30

LORAL SPACE & COMMUNICATIONS LTD.
1
2  in mind that the debtor has never taken the
3  position that the company was hopelessly insolvent.
4  The creditors' committee and the U.S. Trustee have,
5  but they have done that on only two basis, basis
6  number one is book balance sheet. They said look
7  at the book balance sheet. The company has 3
8  hundred million dollars of a negative net worth.
9  They were using the older numbers too, it would
10  actually be a little higher based on these newer
11  numbers. They say maybe there are some off balance
12  sheet items, which may be true, but I would also
13  point out that there were probably off balance
14  sheet assets. The company for example, has totally
15  written off, as we understand from the financials,
16  any interest in Global Star, which may actually
17  have some value.
18        So ignoring off balance sheet --
19        MR. ROTHMAN: Your Honor, the same
20  objection. It's getting worse --
21        MR. WOLFSON: This is public
22  information.
23        MR. ROTHMAN: -- this person is now
24  an expert on Global Star and the implications of
25  that; it's absurd.

31

LORAL SPACE & COMMUNICATIONS LTD.
1
2        MR. WOLFSON: Well, your Honor, the
3  creditors' committee has, and numerous other
4  parties in interest, have very sophisticated, very
5  high paid financial advisers, and not one of them
6  has given you an affidavit that this company is
7  hopelessly insolvent, and I find that very telling;
8  the debtor has not said that they are hopelessly
9  insolvent, and we're pointing out now that this was
10  their argument, the creditor committees' argument
11  was look at the book balance sheet, the book
12  balance sheet show that they are insolvent. It's
13  not the case.
14        The other argument that they make is
15  that the public debt market is indicative of this
16  company being insolvent, and they are saying that
17  that is something we should learn something from.
18  And I would like to address that point. I would
19  like to hand to the court -- first, the committee
20  has acknowledged that since the filing of this
21  petition, the bonds have traded up. I don't think
22  there's any dispute based on publically available
23  information, that the Loral Orion 10 percent senior
24  notes are presently trading somewhere around 75
25  cents, and the Loral 9 and a half percent senior

32

LORAL SPACE & COMMUNICATIONS LTD.
1
2  notes are trading at around 40 cents. And indeed
3  if I may hand to the court just a chart, and this
4  is just pulled out of Bloomberg. If I might. This
5  just tracks, if I might mark this as Exhibit 3, it
6  just tracks historical bond prices.
7        MR. ROTHMAN: Your Honor, we object
8  and don't think it should be used for any purpose.
9        THE COURT: Well, does the -- the
10  committee has given the bond prices as well, and I
11  think everyone basically agrees on a range. Right?
12        MR. WOLFSON: I think that they do,
13  but their financial advisors are in court today.
14  They can testify if these numbers are wrong.
15        MR. BOTTER: Your Honor, the bond
16  prices are what they are. We agree that as of
17  yesterday, they were 75 cents on the Orion bonds
18  and 42 cents on the LTD bonds. We think that shows
19  insolvency.
20        THE COURT: Okay.
21        MR. WOLFSON: What I think it shows,
22  though, your Honor --
23        THE COURT: Is there anything with
24  this that you are trying to show beyond that?
25        MR. WOLFSON: Well, in connection

33

LORAL SPACE & COMMUNICATIONS LTD.
1
2  with -- yes. Now you have just the lawyer, he
3  wants to show you what he thinks it means.
4        THE COURT: He's agreeing with you.
5        MR. WOLFSON: Well, that's good. He
6  agrees with the numbers, but then he says he thinks
7  that that means that it's insolvent and that's
8  indicative of an insolvency position.
9        But if I can hand one other exhibit
10  to the court -- the final exhibit that I would just
11  like to point out, and also just purely extracted
12  from publically filed SEC information, is income
13  statement and balance sheet information straight
14  out of the companies SEC documents going back as
15  far as 1999. And if Your, Honor were to look at
16  the historical bond chart that I handed out, as of
17  December of '01, if you were to take a look at the
18  December '01 historical balance sheet which shows
19  up on page 2 of that last handout; at that time the
20  company was reporting, in 12/01, a shareholder
21  positive equity of a billion 3, and the bonds were
22  trading very close to where they are trading today.
23  And for the debtor or the creditors' committee to
24  argue that the bonds, where they are trading today
25  are indicative of an insolvent company, doesn't

34

1    LORAL SPACE & COMMUNICATIONS LTD.
2    synchronize with the facts of how the bonds have
3    traded in relationship to the book balance sheets
4    of this case in the past.
5        MR. ROTHMAN: Your Honor.
6        MR. WOLFSON: And that's the only
7    point I wish to make on that.
8        MR. ROTHMAN: Your Honor, I'll
9    reiterate the objection. This is getting more
10   tenuating with each document.
11       THE COURT: Well, if your point is
12   that they have always traded at a discount over the
13   last several years, the last two years.
14       MR. WOLFSON: Either that they've
15   always traded at a discount and/or that there's --
16   you can't take a look at where the bond prices are
17   today and say ah ha, the company is insolvent as a
18   consequence of that; the bonds are trading the same
19   as they did two or three years ago when the company
20   was reporting a book value of a billion 3. It was
21   no more insolvent then --
22       THE COURT: Well, that's a different
23   point. It does get into the area of expert
24   testimony.
25       MR. WOLFSON: I'm just asking the

35

1    LORAL SPACE & COMMUNICATIONS LTD.
2    court to look at it factually. I'm not making any
3    particular opinion about it, it's just a fact. The
4    fact is here's where the bonds are trading based on
5    publically financial information, and here's what
6    the balance sheets of the company were showing, and
7    your Honor can draw your own conclusion as to what
8    that means.
9        MR. BOTTER: Your Honor, can I ask a
10   question as to these exhibits? Obviously there's
11   been a lot of work put into them, and I just want
12   to ask if Mr. Wolfson's firm has done all the work
13   by itself or whether it has been assisted by a
14   financial adviser. And I think it's relevant,
15   because if it's been assisted by a financial
16   advisor, than maybe that financial adviser ought to
17   sit on the stand and inform the court that they are
18   representatives of them, and not a financial
19   advisory firm that's involved in this case, and in
20   fact, they are in the courtroom right now, and if
21   they have been involved in working with Mr.
22   Wolfson's firm in preparation of this, I would
23   think it will be appropriate, if Mr. Wolfson is
24   attempting to testify about these exhibits, that we
25   could examine the people that prepared them.

36

1    LORAL SPACE & COMMUNICATIONS LTD.
2        THE COURT: Well, first of all, what
3    is the identification exhibits tracking historical
4    bond prices from December '01 to November '03? Was
5    that prepared by your firm or with the assistance
6    of financial types?
7        MR. WOLFSON: May I for a second?
8        (Discussion off the Record.)
9        MR. WOLFSON: Your Honor, this was
10   prepared by the assistance of Channon and Company,
11   and as was what we've marked as Exhibit 4. I'm
12   perfectly delighted to have --
13       THE COURT: Which one was that?
14       MR. WOLFSON: Exhibit 3 I marked as
15   the historical bond price. Exhibit 4 was the
16   historical income statement going back to 1998.
17   Exhibit 2 was the demonstrative aid book value for
18   preferreds, and Exhibit 1 was the 10-Q.
19       THE COURT: Are you seeking to have
20   any of these introduced into evidence?
21       MR. WOLFSON: Well I would, I guess,
22   I would like, if there's no dispute, to introduce
23   all of them into evidence.
24       THE COURT: Well, there's clearly a
25   dispute.

37

1    LORAL SPACE & COMMUNICATIONS LTD.
2        MR. WOLFSON: Then I will call
3    Channon just to testify as to where these numbers
4    come from.
5        THE COURT: No. If they are to be
6    -- they can't testify as an expert without having
7    been previously identified.
8        MR. WOLFSON: Your Honor, again, I'm
9    not looking for any expert testimony. All these
10   numbers are absolute extracts from the debtors
11   financial statements, with the exception of the
12   chart where there's no dispute, that this
13   accurately reflects simply trading values --
14       THE COURT: Well, I don't know if
15   that's --
16       MR. BOTTER: We have no idea, your
17   Honor.
18       MR. HUEBNER: Your Honor --
19       THE COURT: -- that is in dispute, I
20   think.
21       MR. WOLFSON: Right. Your Honor,
22   that's why I would have Channon testify. But this
23   is not expert testimony, this is just factual.
24   Where did you get these numbers from and how did
25   they get onto this piece of paper. I'm not asking

**38**

LORAL SPACE & COMMUNICATIONS LTD.

1    for any opinions, I'm not asking for anything,
2    other than just if we need to have a source.
3         If the debtor is going to dispute,
4    for example, starting with Exhibit Number 4, the if
5    the debtor is going to dispute that these are an
6    accurate excerpt or regurgitation of what's in
7    their 10-Ks, then I can just put some on to testify
8    and say I got the numbers from the 10-K. They are
9    accurate, here they are. And if the debtor
10   ultimately believes any of these numbers are
11   wrong -- and I also have the 10-Ks with me from
12   2002 and 2001 which I can introduce into evidence.
13        THE COURT: That would probably
14   obviate that issue.
15        MR. WOLFSON: Okay. Well, then let
16   me --
17        THE COURT: Rather than dealing with
18   a summary.
19        MR. WOLFSON: I can do that.
20        MR. HUEBNER: Your Honor --
21        THE COURT: Then I'll hear the
22   response on Exhibit 3.
23        MR. HUEBNER: Your Honor, I think I
24   would note as a matter of process, that perhaps,
25

**40**

LORAL SPACE & COMMUNICATIONS LTD.

1    parties, of the fact that facts were being
2    introduced into evidence, which is normally is
3    accompanied by affidavits and witnesses. Mr.
4    Wolfson was very sort of interested in the fact
5    that there were not financial participant
6    affidavits in this case. It is his evidentiary
7    verdict on his motion to make a factual record.
8    The question of fact is best poised to him. Where
9    is his financial witness with the advanced notice
10   and the opportunity to depose. This is not a
11   Cracker Jack hearing; this is a multi billion
12   dollar case in which we have the right to process.
13        MR. BOTTER: Your Honor, I would
14   just add that I believe the debtors about three
15   days ago asked Mr. Bicks, who is Mr. Wolfson's
16   colleague, whether in fact, they would have a
17   witness at this hearing. He said no. Obviously
18   Mr. Wolfson is appearing as his own witness. But I
19   think that if they had been honest to the process
20   here, I think they would have identified that in
21   fact they were working with Channon, and they would
22   have made Channon available for us to examine them
23   on these exhibits that they are trying to get in
24   through Mr. Wolfson's testimony.
25

**39**

LORAL SPACE & COMMUNICATIONS LTD.

1    you know, people are not aware that bankruptcy
2    courts sort of function like regular federal
3    courts. There was no exhibit list, there was no
4    witness list; what we just found out, pursuant to
5    the court's questioning, is that there is a shadow
6    financial advisor that actually prepared what is,
7    in essence, a small expert report that Mr. Wolfson
8    is reading from.
9         The only note of surprise here, I
10   think it's about as dramatic as one can get, well,
11   actually, the financial advisors who prepared all
12   these documents is in the court, and I'm happy to
13   call them to the stand. I think that next time, if
14   Mr. Wolfson would give the primary parties the
15   courtesy of notice of his exhibits, factual and
16   otherwise, we could have a proper hearing. I think
17   for us to now sit here and compare the 2001 10-Ks,
18   and like there are other documents that he doesn't
19   even have enough copies of for the primary parties
20   in this case, to see if the excerpts of the exhibit
21   is even accurate, is simply grossly unfair. If
22   this was to be an evidentiary hearing, one might
23   have expected the courtesy to, and in fact the
24   obligation to advise the court as well as the
25

**41**

LORAL SPACE & COMMUNICATIONS LTD.

1         MR. WOLFSON: Your Honor, we are not
2    seeking to --
3         THE COURT: Just a second.
4         MR. ROTHMAN: Your Honor, maybe this
5    will help. What I was going to suggest is why
6    don't we just have him put in the 10-Ks if he
7    wants, without the exhibits. I would like to hear
8    the rest of what he has to say because I don't
9    think any of it makes a difference anyway.
10        THE COURT: Again, you are not
11   seeking to introduce any valuation or expert
12   testimony, you are just trying to corroborate the
13   source that are for this document, Exhibit 3?.
14        MR. WOLFSON: That is what I'm --
15        THE COURT: Is that what you are
16   trying to do?
17        MR. WOLFSON: I'm just trying to
18   corroborate -- the 10-Ks corroborate Exhibit 4.
19        THE COURT: Well, the 10-Ks.
20        MR. WOLFSON: The 10-Ks --
21        THE COURT: The debtor is not
22   disputing that those are admissible, and they
23   couldn't. So I think those could be admitted.
24        MR. BOTTER: In terms of the
25

historical bond prices, your Honor, there's nothing in the 10-Ks --

THE COURT: I understand. So I think the remaining issue is whether we could have someone --

MR. HUEBNER: Your Honor, on the bond prices, to make it easy, I don't think there's a big dispute about the bond prices. I think that we all sort of brought different sheets that say the same thing; we all understand the that the Orion bonds are currently at 75. We all understand that the parent bonds are at 39 or 40 or 41. So unless the chart showing the trend up, which we can probably all agree as a general matter, that the announcement of the Intelsat sale and these orders has resulted in something of a trend upward, and in fact the trend recently shows that the prices have recently gone back down, but I'm not sure he needs the chart because I'm not sure that we fundamentally disagree that the bonds on the chart have gone like this (indicating).

THE COURT: I think his only point on the chart is that the bonds did not start trading at a discount county with the petitioner





date, that in fact they were trading at a discount at least as of December 2001. Now this isn't, as Judge Lifland said, anything more than helpful information in the first place. So I don't know whether that's a big point for the objectants to these motion to dispute or whether it's something that they can also agree to, whether the discount was five percent or 10 percent or 15 percent, that there was a period before the petition date where the bonds were trading at a discount.

MR. HUEBNER: Your Honor, again, just to make life procedurally simple for people, at least the agent, I think, has no objection to him sort of testifying as to the proposition that the market understood that even before the actual petition date, that these bonds might not be paid in full, and that there was some discount. Obviously we can't verify right now the 12/21/01 trading price. But if the proposition is just that the market got the fact that there was financial distress and the telecom bumper was exploding, which preceding the petition date, I'm not sure we have to have a factual argument, obviously people understand that.





THE COURT: Okay. So why don't we introduce then the -- is it three 10-Qs?

MR. WOLFSON: It's three 10-Qs bound together in one binder, the 2000, 2001 and 2002 10-K, and then I would like to mark that then perhaps as Exhibit 5.

THE COURT: You are seeking to introduce that, right?

MR. WOLFSON: Correct.

THE COURT: Why don't we introduce that as Exhibit 2. The other exhibit which is being introduced into evidence is the 2003 10 K.

MR. WOLFSON: Very well.

THE COURT: So that's the --

MR. WOLFSON: So Exhibit 2 is the 2003 10-Q?

THE COURT: Right. And Exhibit 2 is what you just handed me --

MR. WOLFSON: The three 10-Ks.

THE COURT: -- is the three 10-Ks. Okay.

MR. WOLFSON: In looking then, your Honor, at whether or not the company -- in looking at the requirement, or one of the tests for





determining whether or not it's appropriate to appoint an equity committee, is obviously one of the key tests is that the debtor is not hopelessly insolvent. And again I'm focusing on the preferred shareholders. And the point of this exercise was to take a look at the arguments that were being made. And again the debtor not focused the only parties that are asserting that the company is hopelessly insolvent is the creditors committee and the U.S. Trustee and both of them for that proposition relied solely on two things, one is the debtor it's publically reported book values and secondly the trading prices of the bonds. And I think that we've demonstrated that like go at the adjustments that need to be made to the debtors book values given the increased value from the sale, the attribution of liability on a gain, which it doesn't belong on that sort of an analysis for this purpose, and the just moving I the liability for the preferred stock out of the 705 million back above the line. That demonstrates then on a book basis the company has value 6 million dollars plus in value on a book basis for the preferred holders.

You might also -- the court may also

46

LORAL SPACE & COMMUNICATIONS LTD.

1  take note that just as the assets that were being
2  carried at book value turned out to be less than
3  their fair market value requiring an adjustment of
4  a fairly significant number from eight hundred
5  million to a billion 1 problem about a 30 percent
6  adjustment the other assets being carried on the
7  books may also be that much understated a further
8  indicia of their not being not focused --
9      THE COURT:  Or they may be
10 overstated.
11     MR. WOLFSON:  Excuse me.
12     THE COURT:  Or they may be
13 overstated.
14     MR. WOLFSON:  Well, okay.  But so
15 far the only test that we have of that is this
16 first group of assets that was sold were apparently
17 sold for a higher amount, and we then have a public
18 statement and the statement made to this court in
19 response to the EchoStar offer to buy all of the
20 assets for the billion 8 something, that that was
21 woefully inadequate.  We take all that together and
22 this case does not look anything like the Williams
23 case it does not look anything like those cases
24 where equity case committees are business Williams

47

LORAL SPACE & COMMUNICATIONS LTD.

1  bonds were trading 10 cents on the dollar the
2  equity committee did not say you do not appear
3  hopelessly insolvent there was a mere possibility
4  that if they commenced all sorts if lawsuits and
5  all sorts of subordination that may be at the end
6  of the day we would be able to squeeze out some
7  value and Judge Lifland said even if you equitably
8  subordinate all of their claims, they are still
9  senior to you equity holders and you might increase
10 the bonds from 10 cents to 20 cents you still have
11 a long way to go.
12     We are not coming to this court and
13 say the way we get value ask by being -- commence
14 go address I have litigation.  We are suggesting on
15 based on values buying ascribed on publically filed
16 information in the fact that the debtor is not
17 taking the position that this is hopelessly
18 insolvent that based upon the courts experience in
19 this case, that it's those financial attributes
20 which demonstrate that they are not hopelessly
21 insolvent.  We don't have to get into litigation to
22 go anywhere.  The next element having gone through
23 the first four is the timing of the request; and
24 that clearly is -- this clearly is an appropriate

48

LORAL SPACE & COMMUNICATIONS LTD.

1  time.  The debtor, as we understand it, has --
2  anticipates issuing a business plan in two to three
3  weeks.  It then intends to discuss that, go over
4  that and begin plan negotiations premised upon
5  that.
6      Now is the time for an equity
7  committee have to very quickly perform whatever due
8  diligence they need to do get up to speed and
9  prepared to participate in those discussions
10 understand the business plan participate in the
11 negotiations for a plan.  That will avoid any sort
12 of delays as Judge Lifland noted if you wait too
13 long you are hands cuffed and you are not going to
14 be able to negotiate it all becomes a fate accomply
15 and I point out absent the appointing of an equity
16 committee, the committee a creditors' committee, if
17 they hold true to this form they are going to come
18 to the court and suggest to you at confirmation or
19 perhaps prior -- couldn't do it prior thereto, they
20 are going to suggest prior thereto that equity gets
21 wiped out and you've got 250 million dollars, of
22 237 million dollars of preferred equity value, and
23 then you've got 44 thousand dollar shares of
24 outstanding of common equity.  And if this court

49

LORAL SPACE & COMMUNICATIONS LTD.

1  gets in what is clearly at least a close case, if
2  not a clear case where we are already in the money,
3  it's at least a closed case.  Before the court has
4  to react to and opine on wiping out a group of
5  equity holders both preferred and common, it would
6  seem to me that having the bin met of the adversary
7  process to really contest that would probably be
8  extraordinarily helpful to the court and the
9  parties to coming to any sort of conclusion.
10     I would also note your Honor that --
11 and as your Honor is I think aware from experience,
12 we have done this before.  We have represented my
13 firm has represented and I in my earlier firms have
14 represented equity committees before they make a
15 vast difference from the in the outcome of a case.
16 In Western Union we represent billions and billions
17 of dollars negative net worth.  Well as here, the
18 industry turned, and things turned around, and low
19 and behold the creditors were paid in full with
20 interest and equity preserved their position in
21 this case.  Similarly in Hexcel, a case that we
22 represented an equity committee, also a New York
23 stock exchange company, pending out in San
24 Francisco, it was before Judge Chichofski.  There

50

LORAL SPACE & COMMUNICATIONS LTD.
1
2   too, the creditors took the position that it was
3   hopelessly insolvent that we should not be given a
4   committee much less lawyer been paid important for
5   it lawyer for the committee. There too, by having
6   an equity committee early enough we actually went
7   out created a competitive environment we engaged
8   financial advisors we had the assistance we did a
9   rights offering, sponsored in part by some of the
10  equity holders and paid in full plus interest and
11  preserved eighty percent of the company for
12  existing creditors. You cannot do that. You
13  cannot fully and accurately and promptly represent
14  equity holders if you do not have an official
15  committee because nobody about will pay any
16  attention to you the court will listen to us under
17  1109(b) but if we need to go out and effectively
18  negotiate with the debtor similar alternatives and
19  full ability to maximize value to the estate
20  including to the shareholders as a matter of
21  practical reality you can't do it without the
22  statute afforded to you by having an official
23  committee. The down side of the committee and
24  there's only one down side to having a committee in
25  a case where it's close and the creditors'

51

LORAL SPACE & COMMUNICATIONS LTD.
1
2   committee is already tell telling you get ready for
3   a cram down and wipe out the only downside is a
4   little bit of cost.
5           In absolute terms, it's a fair
6   amount of the -- this is not an inexpensive case.
7   We represent 237 million dollars worth of preferred
8   shareholders in a liquidation preference. This is
9   a classic billions of dollars of assets and
10  liabilities. It is going to professional fees in
11  an absolute term are substantial. I'm not going to
12  deny that. But in relative terms it's nominal.
13  It's nominal in terms of the investment we are
14  trying to protect it's nominal in comparison to the
15  amounts being spent by the debtors creditors'
16  committee and the amounts being charged by the
17  estate by the secured creditors one once the
18  secured creditor are paid off in a few weeks the
19  only thing between us and being crammed down is
20  really the creditors' committee.
21          The creditors' committee is now
22  going to be controlling the if shots. They will
23  negotiate with the debtor. They will put pressure
24  on the debtor to wipe us out. The debtor will
25  possibly fight for a little bit of a warrant, an

52

LORAL SPACE & COMMUNICATIONS LTD.
1
2   out of money warrant, and that's it. That's a
3   typical case. And I think the experience dictates
4   that when you are this close and you have a
5   preferred shareholder committee we will get a fair
6   greater return without being litigious, unless
7   necessary. You know, they can laugh all they want
8   but we learned a long time ago and I don't get more
9   business in these cases by just being the classic
10  terrorist. Those days are over the days of just
11  coming in and objecting don't get you anywhere you
12  need to have an exostrategy. We are able to do
13  that; we did it professionally we do it
14  economically and economically and it works and gets
15  value for the entire estate.
16          So we think, your Honor, in looking
17  at the standards here and we recognize what the
18  cases and such as Williams and others state. This
19  case squarely falls in there an equity a committee
20  certainly a committee ought to be appointed the key
21  issue it's not insolvent I think that's been
22  demonstrated and I think the cost issue is really
23  normal to the interests that need to be protected
24  here.
25          My final point is in response to

53

LORAL SPACE & COMMUNICATIONS LTD.
1
2   your Honor's inquiry to Mr. Yetnikoff. We believe
3   what would be most appropriate here would be to
4   have a separate equity holders committee, whether
5   you appoint a common committee or not. If your
6   Honor is only prepared to direct the appoint of a
7   single committee and that single committee be a
8   joint committee then we do believe, given they are
9   that we are still 237 million dollar preference
10  ahead of the common, that it should be on the basis
11  that the majority of that committee be represented
12  by preferred shareholders.
13          We are not prepared to leave our
14  fate to the hands of common who have a lot more
15  fighting to do to get into the money than we do. I
16  think it's a very different dynamic when you are
17  representing the way out way of common than the
18  preferred shareholders and not fair to have a
19  committee stacked with common and rely on them to
20  get us paid.
21          THE COURT: What's your response to
22  the point which I expect someone will make that if
23  the cost really is nominal, given the amount at
24  stake, that the new preferred shareholders who you
25  represent would have roughly 25 percent of 237

54

LORAL SPACE & COMMUNICATIONS LTD.
1
2  million at stake, could pay for it themselves?
3      MR. WOLFSON: I was very careful to
4  say it's nominal to relative terms, it's not
5  necessarily nominal in absolute terms, it's many
6  hundreds of thousands if not millions of dollars to
7  represent a committee of this nature. There's no
8  disputing this if I was to suggest to the court
9  otherwise you wouldn't believe me. And for
10  individual preferred shareholders to who risk a
11  batter with the committee who is telling them you
12  are out of the money you are getting wiped out for
13  them to spend out of their own pocket a million
14  dollars or so is a lot of money and not likely to
15  happen.
16      On the other hand, it is normal
17  relative to the says of this case the
18  administrative expenses of this case and all the
19  professional fees being paid out. The other
20  problem in individuals again even more so than the
21  than the money, the one thing that I have learned
22  over the years of doing this is having the official
23  stage which you are makes a deference, that is why
24  these people don't want us to have the committee
25  they are not fighting or objecting to us because

55

LORAL SPACE & COMMUNICATIONS LTD.
1
2  it's going to cost us a million dollars in fees
3  that's not what it is about in a billion dollar
4  case they don't want to let us have standing in
5  this case because it gives the empowerment to do
6  what needs to be done. For us to go out in and
7  negotiate meaningfully in a represent all the
8  preferred shareholders and being able to look at
9  alternatives, you just need that official status.
10  It's hard to quantity exclusive period how
11  important that is; but it is truly very important.
12      THE COURT: At the hearing on
13  exclusivity, the debtor, and I think you looked
14  into this also, the debtor said they hoped to have
15  the business plan as revised out to the parties in
16  the next few weeks and get down to plan negotiation
17  in the first quarter preferably January or
18  February.
19      MR. WOLFSON: Correct, correct.
20      THE COURT: If a committee were
21  ordered by me and certainly it would be appoint the
22  and get organized over the next couple of weeks,
23  when would the professionals for the committee in
24  your view be ready to participate meaningful in
25  negotiations.

56

LORAL SPACE & COMMUNICATIONS LTD.
1
2      MR. WOLFSON: On I think on that
3  time table I think we should be able to. If a
4  committee is able to be appointed mid December and
5  he can select counsel mid December and start
6  negotiations mid-January end of January we would be
7  able to do that.
8      THE COURT: Has Channon done due
9  diligence?
10      MR. WOLFSON: Your Honor I don't
11  know that Channon -- I don't know if the commit
12  exclusive period is going to select Channon. Not
13  withstanding the colloquy here has at our request
14  only done extracting information of from public
15  document because they have spreadsheets. But my
16  representation to the court would be this committee
17  if we were representing the committee we are not
18  going to seek a delay if we can get appointed and
19  going forward promptly. We've handeled cases far
20  larger in less time than this. But we think if we
21  get up and running now by the time the business
22  plan could you please out in the next couple of
23  weeks, have meetings understand the business plan,
24  we will be up and running without much problem.
25      And hopefully you know both the

57

LORAL SPACE & COMMUNICATIONS LTD.
1
2  debtor and the creditors committee, to the extent
3  they can share information and help smooth the path
4  and help an equity committee get up to speed, that
5  too would be productive and help matters.
6      THE COURT: So Channon has not
7  represented Aspen to date?
8      MR. WOLFSON: Correct.
9      THE COURT: Okay. Thank you.
10      MR. BOTTER: Your Honor, although I
11  think both the debtors and credit first committee
12  would both like to respond, I notice Mr. Christ who
13  is in the court and may make sense to take off
14  positive.
15      THE COURT: I agree. Mr. Christ if
16  you can come up.
17      MR. CHRIST: Thank you.
18      I representing the stockholders
19  protective committee, to correct debtor and
20  creditors' responses. I don't know we were heard
21  the first time because I don't think I filed it in
22  the right time, but the judge allowed us to speak.
23  So I guess this is the first time formally heard.
24  We represent a little over one percent of the
25  public shareholders. I had a conversation with Mr.

Herash who holds 10 percent, and he's told me I don't represent him, so I don't represent him. But I will say it's my belief that by inferences -- it goes without saying that we represent all the shareholders. And given the alternative of being extinguished, or the greater likelihood without representation, I can't imagine anyone, even the single shareholder from anyone, who wouldn't be represented here as a matter interest, even if they are unable to come physically here.

I came into town yesterday, I had a funeral actually yesterday. My aunt passed away in Brooklyn. She has had a row-house there since 1950, and we had to bury her, bring my mother up, it set her back. She was an immigrant that survived the Christian Holocaust, that predated the Jewish Holocaust by some 20 years.

They came over here. They were -- she was the last one in that group, in the mid up upper 80s, and they came over here for freedom. And freedom is vested in personal property. And unfortunately it left me with a car in Manhattan. And to be honest with you, I'm ambivalent, given the choice of finding my car or prevailing at this





hearing, I'm not sure which way I would go.

THE COURT: Well, to save you some time, you should assume I've read your papers, so you don't need to go over that ground.

MR. CHRIST: I would like to thank Mr. Wolfson for his incitefulness of pulling things together a lot of things, and Mr. Yetnikoff and I were pointing at, and the third quarter Q was a little disturbing to me in other senses because the loss was twice what everyone expected. And I'm a bit still caught up with the point we're being convinced that the debtor is acting in my best interest, although the debtors response stated it less than no less than three times and the creditors stated once I think the creditors referred to Mr. Zahler's affidavit in which he stated he had a million and a half shares and I guess I keep going back to the potential conflicts and the shareholder wouldn't be an asset in this product process, is a million and a half shares is a lot of money by the executive committee and Loral, but it totals maybe 30 cents a share, roughly a half million dollars or less. And when the same committee, and I'm not sure it's exactly





is paying themselves five million, they can recoup that on a monthly basis.

So theoretically if we are just looking at dollars and cents you could say we will do I want to get the shares to go up or do I want to get paid a few more months there would be a conflict there it makes me a little uncomfortable and that's in addition in a to the other thing I've already cited all that could be released if I think if we are allowed some visibility including to see the sealed documents that were put into the court, because when you considered this consider miss this Q you just want to gag yourself when you see the results of the quarter, and you just wonder if they are concocting a plan that presumably has projected earnings and all these good things, why the shareholders can't have visibility to that.

Well -- and I was reading Barons on the way up here and Warren Buffet invested in a bankrupt company, apparently Sidel, and because it was a lack of projections, the judge -- it was apparently a Delaware bankruptcy, as of December 2nd, has allowed the stockholders and their attorney to put forth a plan in that proceeding,





and that's in this week's Barons, and that plan is scheduled to have been put forth tomorrow in Delaware in that proceeding. And it was over apparently the point that they were going to be able to use projections projected to help justify the value.

I imagine in the moment you'll hear from the debtors and the trustee hold the company is not hopelessly but at least still insolvent, and I flipped on this and I looked at the same Q a lot of times, and I keep going back and forth on this, and I have to -- I have to admit that I almost have been swayed the other way, I almost think that there may not be adequate equity. But I do know to have ownership involved in a process like this can't hurt it. And I called Tokyo a couple of times on my own, it won't go on in perpetuity of my own, but I talked to Sony Corp. and tried to get them over here. And I haven't seen anybody over here try to get some live people with substantial equity or half a billion or a billion dollars, and I think those kinds of efforts can only help whatever the end conclusion of this is.

So for those reasons and, I hope

62

LORAL SPACE & COMMUNICATIONS LTD.
1
2  Judge, I know it's a rare thing, but I hope it's a
3  go you go along with it give us an equity plan.
4         THE COURT:  Okay thank you.
5         I'm going to take a five minute
6  break.
7         (Recess taken.)
8         THE COURT:  Please be seated.
9         MR. ROTHMAN:  Good afternoon your
10 Honor, Richard Rothman from while got and man for
11 the debtors.  I said a little earlier that I didn't
12 think the opinions being voiced by Mr. Wolfson
13 would make a difference, and I'll tell you why.
14 What's most striking to me having listened to the
15 presentations both what you heard and what you
16 didn't hear; firstly all, there was no reference to
17 what the statute actually says.  Section 1102 --
18 1102(a)(2) provides that the court may provide the
19 appoint of additional committees if he is necessary
20 to ensure adequate representation of equity go and
21 present.
22        As Judge Gropper stressed in the
23 Kasper decision last year the operative word is
24 necessary to assure adequate representation which
25 is necessary which applies a reject the strict

63

LORAL SPACE & COMMUNICATIONS LTD.
1
2  standard.  He then went to on to say that the
3  second operative word in the statute or term is
4  adequate representation.  He made clear as have the
5  other courts that have looked at this issue that
6  the burden to prove is on the moving parties to
7  establish that a separate committee is required to
8  provide adequate representation, page 69.
9         We have no burden to prove here.
10 This is a fact intensive inquiry in which the
11 moving parties had the burden to show that a
12 separate committee with all of the costs and
13 burdens that they bring along was necessary that it
14 was required to assure adequate representation.
15 They have put in no proof there's been a complete
16 failure of proof on this motion.  So when Mr.
17 Wolfson to stand up and say he was dumbstruck by
18 the fact that we didn't put in an affidavit, is
19 somewhat bazaar.  They didn't put in any cognizable
20 evidence other than evidence which shows on its
21 face that the company is insolvent:  Kasper, in
22 which the court refused to appoint a committee is
23 consistent with the prior case law.  And what that
24 case law reflects is that where we are necessary,
25 committees serve a purpose.  But they also impose

64

LORAL SPACE & COMMUNICATIONS LTD.
1
2  significant cost.  Monetary costs as well as
3  burdens and impediment on the smooth operation of a
4  bankrupt estate which is already difficult,
5  particularly in a complex business such as this.
6  That is why the law makes clear that equity
7  committees are an exception a rare exception.
8  Indeed if you listen to Mr. Wolfson even where it
9  looks like everybody is way out of the money that
10 you neither need an equity committee in every case,
11 but that isn't the law it's clearly not the law.
12        Now, Mr. Wolfson said that the cost
13 is nominal, in a relative sense, cost here would
14 not be nominal in any sense, if you look at what
15 the costs have been to date in a Chapter 11
16 proceeding which has been laden with litigation,
17 and I'll come back to that later, you will see that
18 the cost of adding a committee would be very
19 substantial by any measure, not only because they
20 would be involved in the various litigated motions
21 and proceedings, but because each time they were to
22 instigate something you would have an expediential
23 inquiry as well as all the other parties who were
24 being paid for by the debtors would have could
25 become involves as well.

65

LORAL SPACE & COMMUNICATIONS LTD.
1
2         Now in their brief, the preferred
3  shareholders cited to the Williams case when they
4  purport to do tell the court what the standard was.
5  And what they said and what the Williams case said
6  is different from what you've heard today.  What
7  they said and what Williams said is that a
8  committee should be appointed if the movants can
9  show two things; one is that there is a
10 "substantial likelihood that equity will receive a
11 mink full distribution" not whether the debtors are
12 merely hopelessly insolvent.  If you were to ledge
13 to the parties who spoke today, you would think
14 that as soon as you find the that debtors are not
15 hopelessly insolvent, Bingo, we appoint a committee
16 but that's not what the law cited in their own
17 brief says.  The issue is whether or not they have
18 carried their burden, their burden of proving that
19 there's a substantial likelihood of a mining full
20 recovery by equity.  They haven't been put in one
21 iota of proof in order to carry that burden, nor
22 could they.
23        The second requirement is to show
24 consistent with the statute that their interests
25 are not adequately represented and that they are

**66**

LORAL SPACE & COMMUNICATIONS LTD.
1
2   unable to represent their interest in the
3   bankruptcy without an official committee. Here,
4   they haven't shown either branch. They haven't
5   shown that there is a substantial likelihood of
6   mining full recovery and they currently certainly
7   haven't shown that their interests aren't
8   adequately protected and that the management of
9   this company is not fulfilling its duty to equity
10  in order to look out for those interests. In fact,
11  we heard nothing about management in this case, all
12  we heard because was an advertisement for a law
13  firm which has apparently done this before and
14  tries to go around and get equity committee
15  representation.
16          There is no group whatsoever that
17  the interest of these shareholders in this case are
18  not adequately represented. In fact, I would
19  submit to you that if you look at their papers and
20  listen to what they have said, they have in fact
21  proved the opposite. They have proved and all
22  their papers show is their interests have been and
23  continue to be adequately protected. Why do I say
24  that? They were here once before in September, and
25  they claimed then that a committee was necessary to

**67**

LORAL SPACE & COMMUNICATIONS LTD.
1
2   represent their interests and then they filed a
3   renewed motion and now we're here we a supplemental
4   motion. So what is the proof that a committee
5   should be appointed. Well, the main element of
6   proof what from what I can tell, is that brought of
7   the actions taken by the management of this
8   company, including the Intelsat sale and including
9   its success in obtaining orders and keeping this
10  company intact and keeping employees on board at an
11  extremely difficult time so that SS/L could hang in
12  there and be in a position to move forward and fill
13  the orders that because those actions of
14  management.
15          This company is better off than it
16  was three or four months ago and that the
17  management of this company who is taken it from a
18  position where it was on the bring of death to the
19  point where they now say and with some merit, we're
20  doing a lot better and the prospects for this
21  company are much better. But all that they have
22  shown is that the management of this company has
23  done an excellent job in a way which has furthered
24  the interests of equity. And put equity in a
25  position where there just may be some recovery.

**68**

LORAL SPACE & COMMUNICATIONS LTD.
1
2          Now, as to the question of whether
3   or not there is a substantial likelihood of refer
4   recovery, I didn't hear anybody say that. I heard
5   Mr. Yetnikoff said if the company turns around
6   which would be a radical thing, then they would be
7   in the money, we heard Mr. Wolfson talk about the
8   book value, and incidentally, we were objecting to
9   what we thought was testimony, and one of the
10  things -- one of the reasons is whether a lawyer
11  walks in and purports to take one number from page
12  nine 23 and move it to page 23 and start adding and
13  subtracting, who knows what's going on. But for
14  example, he opined that the book gained on the sale
15  of Intelsat assets I'm looking at one of his
16  handouts is 261 million dollars. From what we can
17  tell, he didn't factor in the expenses of the sale
18  nor did he factor in the insurance proceeds. So,
19  you know, without even looking, and again, we're
20  not in a position here and I don't think we need to
21  put on evidence here today, because as I've said
22  before it's not our burden, but that's just based
23  on two minutes of looking; what it shows is that
24  the unless but forward by a lawyer is effective
25  worthless and shouldn't be considered at all. All

**69**

LORAL SPACE & COMMUNICATIONS LTD.
1
2   we know it is clear that even if you take his
3   opinion, it's wrong on its face number one. And
4   even if you were to credit it completely, what it
5   could you please out to on the bottom line is to
6   say there would be a six million dollar positive
7   number in terms of book value, at the same time
8   that everybody acknowledged that book value is a
9   good reflection of actual value and that wouldn't
10  show anything approaching a substantial likelihood
11  of a meaningful recovery on the kind of investment
12  we are talking about here.
13          So on a first prong of the standard
14  that they have put forward to this court, there has
15  clearly be a failure to prove a substantial
16  likelihood for a meaningful recovery.
17          THE COURT: Let me stop you there.
18  Are the new orders that were described at the
19  hearing on the sale on to Intelsat, are those
20  reflected in the September 10-Q, the value of those
21  new orders.
22          MR. ROTHMAN: I don't know your
23  Honor. One second.
24          MR. BOTTER: Your Honor, I believe
25  that they were entered into as of September 30th.

70

LORAL SPACE & COMMUNICATIONS LTD.

1          THE COURT: I didn't think so I just
2  wanted to make sure.
3          MR. ROTHMAN: Your Honor, I don't
4  think that anybody is disputing that this company
5  is doing better. Indeed we are proud of it. We
6  think, as I've said, that what they have shown
7  which is true, that the management of this company
8  has done an outstanding job an extraordinarily
9  difficult market operating in a bankruptcy. Now,
10  do we think that there's some hope of recovery for
11  equity? Absolutely, and that is the goal of this
12  management do we hope it's true are they working
13  for that? Are they working tire Leslie for that?
14  Absolutely. But were anybody is it here and say or
15  stand here and say that there is a substantial
16  likelihood at this point in time of a means full
17  Referee? No. That was their burden and they
18  haven't shown it. Moving to the second prong of
19  this test.
20          THE COURT: I'm sorry, before you do
21  that --
22          MR. ROTHMAN: Sure.
23          THE COURT: -- do the schedules
24  reflect the roughly 214 million dollar liability

71

LORAL SPACE & COMMUNICATIONS LTD.

1  that Mr. Wolfson said should be ignored?
2          MR. ROTHMAN: I don't know your
3  Honor. Again if we had some notice we would have
4  had notice to all these questions. We just don't
5  know. Let me move to the second wrong prong,
6  because I believe that that should dispose of this
7  in any event. Even if they had presented
8  cognizable proof of a substantial likelihood of a
9  meaningful recovery they failed to prove that the
10  appointment of an of another committee is likely.
11          There is no proof that the
12  management of this company has not fulfilled its
13  duty to respect and seek to further the interests
14  of equity here. They have not pointed to a single
15  thing that was done over the course of the past six
16  months or at any time which was contrary to the
17  interests of equity they haven't put on a witness,
18  they haven't put in a document, they have done
19  nothing and again they have proved the opposite.
20  They stood her and said we have a much better
21  chance of recovering since you denied our motion
22  than we did before.
23          THE COURT: What about their point
24  that management, just as it has duties to

72

LORAL SPACE & COMMUNICATIONS LTD.

1  everybody, is not -- without criticizing
2  management, it's not well situated to negotiate a
3  plan on their behalf.
4          MR. ROTHMAN: I wanted to take that
5  up specifically, because when you cut through it
6  all that's really their only argument. From what I
7  can tell, that is their argument because under the
8  law you have what is called a duty to both
9  shareholders and to creditors. You cannot
10  adequately represent us -- well, that argument is
11  wrong in several respects.
12          First of all it's wrong on the law
13  and it doesn't make a lot of sense. If the law
14  didn't contemplate that a debtor could fulfill its
15  duty, a duty to both shareholders and creditors, it
16  wouldn't impose it. That wouldn't be the law. It
17  would say that that's an oxymoron. You can't serve
18  two masters, and that's not what the law says. It
19  says that the debtor has an obligation to the
20  various constituencies of the debtors, including
21  the creditors and the shareholders. And this is a
22  perfect case where the debtors have religiously
23  abided by and fulfilled that duty.
24          Their argument was made and

73

LORAL SPACE & COMMUNICATIONS LTD.

1  rejected, I should also add, in the Edison case.
2  It was a decision, I'll give you the site your
3  Honor by Chief Judge Robinson in Delaware 1996 WL
4  Westlaw 53 4853, 1996. And it was precisely the
5  argument that was made here which Judge Robinson
6  rejected. I'll read you a little bit. Chief Judge
7  Robinson said as follows: "The appellants argue
8  that an equity committee is needed because there
9  are 'inherent' conflicts of loyalty which render
10  inside shareholders 'legally incapable' of
11  representing the interests of public shareholders"
12  and I'll omit the cite. "Appellants point to the
13  fact that in a bankruptcy context, the directors
14  owe a fiduciary duty not only to shareholders but
15  also to creditors. Based on this assertion,
16  appellants argue that the 'debtors management in
17  this case or any other bankruptcy case as a matter
18  of law cannot exclusively advocate for the interest
19  of the shareholders, particularly as against
20  creditors.' Next paragraph. While appellants may
21  be correct in their observation that management
22  cannot exclusively advocate interest exclusively
23  advocate for the interest of the shareholders, the
24  statutory focus at Section 1102(a)(2) is not

**74**

LORAL SPACE & COMMUNICATIONS LTD.
1 
2 whether shareholders are exclusively represented,
3 but whether there are 'adequately represented.'
4 Until Congress recognizes that an inherent conflict
5 of interest exist between management and public
6 shareholders in a bankruptcy context that warrant
7 the mandatory appointment of an equity committee,
8 the statutory test remains adequate of
9 representation to be determined on the facts of
10 each case."
11        So that's the law. And if it were
12 to the contrary, again you would have an equity
13 committee in most cases, but it's not the law. The
14 appointment of an equity committee is a rare
15 exception which is to be ordered in the discretion
16 of the court when the facts of a given case it is
17 clear that the appoint of a committee is necessary
18 as required to adequately protect the interests of
19 equity. And so we turn back to the facts of this
20 case and the evidence that has been presented by
21 these movants in order to discharge their burden.
22 And the answer is zero. No evidence.
23        Now, when I say no evidence, I mean
24 they have identified no act taken by the debtor,
25 they pointed to know interest in any evidence

**75**

LORAL SPACE & COMMUNICATIONS LTD.
1 
2 recognizable way to show that management is not
3 protecting or looking out their interests, and
4 indeed as I've said, the evidence shows to the
5 contrary, the evidence shows that they have
6 effectively proved that management has advanced
7 their interests. And in fact your Honor, you have
8 seen Mr. Schwartz. You've heard him testify and
9 you have seen and you have heard Mr. Zahler
10 testify.
11        These people, are working with as
12 much skill as anybody has in this industry to turn
13 this company around. Their goal is not to simply
14 pay off creditors and throw all of the equity down
15 the tubes, including I might add their hone. Their
16 goal is to fulfill their duty to creditors and to
17 the equity holders and there has not been one iota
18 of proof that that's not exactly what they have
19 done and on that basis alone this motion should be
20 concerned.
21        Now, I would also assert your Honor,
22 that the appoint of an equity committee here will
23 in all likelihood serve only to harm these estates,
24 not only by creating a significant drain on the
25 assets of the estates, and as I said before, that's

**76**

LORAL SPACE & COMMUNICATIONS LTD.
1 
2 not just the money that they spend it's the money
3 that they are going do cause others to have to
4 spend with whatever activities they engage in. And
5 we've seen that they are not shy. And in order to
6 get a sense as to why this motion is misguided, I
7 would suggest that we look back at the last few
8 months and look at what's happened since you denied
9 the motion the first time. As I said before, they
10 claimed in September that an equity committee was
11 necessary in order to protect their interest. Well
12 what has happened since then? First of all, we had
13 the Intelsat sale. What would they have added to
14 that process other than --
15        THE COURT: All right. That's in
16 the past. Let me ask you this question. Do you
17 think it's practical to say that a committee can be
18 appointed with the sole responsibility of
19 participating in plan negotiations, not reviewing
20 actions out of the ordinary course, not doing any
21 of the other listed items that a committee may
22 under 1103 of the Code do, but simply participating
23 in plan negotiations.
24        MR. ROTHMAN: In other words they
25 would have no role except and until plan

**77**

LORAL SPACE & COMMUNICATIONS LTD.
1 
2 negotiations?
3        THE COURT: They would obviously
4 will have to get up to speed and there would be
5 some cost in that but I'm assuming it that it will
6 be simply to insult takes with your investment
7 advisers and your investment advisors to do their
8 own analysis enable them to do an analyses of a
9 plan that would be proposed by the debtors.
10        MR. ROTHMAN: Your Honor could I
11 defer answering that to for a few minutes, I would
12 like to consult before I do that. I think it's a
13 significant question.
14        THE COURT: Okay.
15        MR. ROTHMAN: Okay. The --
16        THE COURT: Any way I understand, I
17 understand Your, Honor point about the cost and the
18 focus on what might have happened if a committee
19 had been appointed up to date.
20        MR. ROTHMAN: Not just the cost.
21        THE COURT: Well, the delay the
22 confusion.
23        MR. ROTHMAN: This is an extremely
24 complicated business. It's complicated and
25 difficult from a committee standpoint it's

78

LORAL SPACE & COMMUNICATIONS LTD.
1
2   complicated from a regular standpoint the for
3   example, for instance if you who look at what
4   happened in the APT situation. And by the way, if
5   you want to get a sense of the costs; in the
6   Intelsat litigation, the cost of the bank from what
7   I understand were about eight hundred thousand
8   dollars of cost to the committee, and I'm not
9   saying this in a critical way, I'm just saying this
10  is what life is like when the these types of
11  situations occur, and here they have occurred more
12  than once. The cost of the committee was something
13  in the order after of a million dollars.
14       So for the equity holders to say oh
15  well maybe we are talking about several hundred
16  thousand dollars a million dollars. It's nonsense
17  we are talking about millions of dollars and we are
18  talking about the an ad added cost that would flow
19  therefrom.
20       But going to the ATP situation what
21  you've seen is there and see elsewhere is
22  navigating through this regulatory environment in
23  the context of a bankruptcy is difficult enough.
24  So to add another cook in the kitchen to will make
25  I that much more difficult, and beginning, what

79

LORAL SPACE & COMMUNICATIONS LTD.
1
2   they haven't proven other than the advertisement
3   for Sonnenschein is they have anything substantial
4   to add. And I the reason I say to look back is
5   relevant is we haven't seen anything to date that
6   they would have done or added that was different we
7   haven't seen anything to date that has been done
8   that hurt their interests.
9       Now, the Kasper case which I
10  referred to earlier decided in July of this year, I
11  think is instructive. Because there as here, the
12  debtors started out as hopelessly insolvent and the
13  situation improved. And a motion was made to
14  appoint an equity committee just as here, in fact I
15  think someone saying firms may have been involved.
16  But there was no evidence there just as here that
17  the debtors had ignored their duty to the equity
18  holders.
19       And similarly, there are as here,
20  the debtors -- the equity holders had failed to
21  show, particularly the referred, that they needed a
22  committee. And the judge pointed out that they
23  were vocal and they could object to the plan when
24  they were -- when the plan was proposed they could
25  vote against it they could object to it, and as we

80

LORAL SPACE & COMMUNICATIONS LTD.
1
2   all know, under the Code Section 503(b), to the
3   extent that they want to participate and they can
4   show that they have added substantial value, they
5   can obtain compensation.
6       One other thing, your Honor, and in
7   is that I think the schedule that's been talked
8   about for the plan negotiations is not quite as
9   represented or asserted by the movants counsel. I
10  understand that it's a little bit further down the
11  line. Ms. Fife can talk about that. But, let's go
12  now to the bottom line. They have completely
13  failed to show that they have been hurt in any
14  respect or that their interests haven't been
15  attended to in any way by the denial of the last
16  motion for by anything that's going on today. I
17  don't mean that only lawyers arguments I mean
18  evidence. There's a complete failure of proof on
19  this motion.
20       Second, they couldn't point to any
21  action that the management of this company has
22  taken that was not a reasonable exercise of the
23  judgment of this company, judgment of the
24  management that under mind their interest in any
25  way. In fact, they put in living color that the

81

LORAL SPACE & COMMUNICATIONS LTD.
1
2   management has furthered their interest. We would
3   submit that there should be no equity committee at
4   all, unless and until they can make a showing not
5   only that there's a substantial likelihood of a
6   meaningful recovery by equity that but that the
7   management is not acting in the interest of equity
8   consistent with their fiduciary duty and that they
9   have something substantial to do that. They have
10  not done that.
11       THE COURT: What about Mr.
12  Yetnikoff, Mr. Yetnikoff's point, and Mr. Wolfson
13  echoes it? The debtor and its professionals are
14  just not going to talk to them and won't negotiate
15  anything.
16       MR. ROTHMAN: What I would say to
17  you to that is we will talk to them we will provide
18  information in fact Ms. Fife had a dialogue with
19  one of the movants counsel and I will say to you
20  today that is something that we will do, and I
21  think that is all they need.
22       MS. FIFE: Your Honor, if I may. I
23  have a discussion with the attorneys for the
24  preferred stockholders last night and agreed that
25  subject to an appropriate confidentiality agreement

## 82

LORAL SPACE & COMMUNICATIONS LTD.

1  we would provide them with the business plan and in
2  addition we would make management available to them
3  to address any of their issues and concerns.
4      And in light of that I think the
5  answer to your earlier question is it's not
6  necessary to appoint a committee in order to have
7  the preferred participate in the negotiations of
8  the of a plan of reorganization. Because we are
9  perfectly willing to do that with them individually
10  and give them the information that's necessary in
11  order to enable them to that. And if they do in
12  fact create value and need the substantiation of
13  503(b), they would be awarded compensation from the
14  estate.
15      THE COURT: Okay.
16      MR. ROTHMAN: I have nothing
17  further.
18      MR. BOTTER: Good afternoon your
19  Honor. David Botter, of Akin Gump Strauss Hauer
20  and Feld on behalf of the official creditors'
21  committee.
22      Your Honor, I was going to take a
23  walk through some of the changed circumstances from
24  two months ago to, today but I think we all know

## 83

LORAL SPACE & COMMUNICATIONS LTD.

1  what they are; the IntelSat sale happened, or an
2  order approving the sale has been entered. The
3  terms of increased value we are only talking about
4  25 million dollars of increased value from the
5  auction of those assets. We also talked about or
6  have heard a lot about the SS/L new contracts. And
7  the committee has said on more than one occasion
8  that those are good things, that those are happy
9  events for these estates, but they're contracts,
10  and they are contracts for the debtors to provide
11  services. And we've heard about 25 million dollars
12  times 3 with respect to the DIRECTV and PanAmSat
13  contracts, but those are deposits, your Honor.
14  They are just deposits. And we've heard that the
15  contracts are commercially profitable contracts for
16  the debtors. But that doesn't add hundreds of
17  millions of dollars of value to the SS/L estate,
18  they are just contracts for the debtors to produce
19  something and there will be a profit margin
20  associated with the debtors producing new
21  satellites, but again, it's not hundreds of
22  millions of dollars.
23      I think, your Honor, what we should
24  do today is focus on the facts that are in the

## 84

LORAL SPACE & COMMUNICATIONS LTD.

1  record before this court today. There are
2  publically filed documents. There are Ks and Qs
3  that are going to be in the evidentiary record
4  today. And if you look at those Ks and Qs, you
5  will see that the debtors aren't solvent based upon
6  those Ks and Qs.
7      And Mr. Wolfson, as we all probably
8  like to think, has fairly good financial savvy.
9  And as bankruptcy practitioner, I think, by hanging
10  around all the banking firms, we all get to know a
11  little bit about how to read a balance sheet and
12  the ins and outs. But Mr. Wolfson can't testify as
13  to facts today; he can only -- we can only take a
14  look at the evidence that's properly in the record
15  today. And if you look at the September Q, you see
16  that these debtors are insolvent by a factor of 7
17  hundred million dollars.
18      Now it's true that Mr. Wolfson
19  pointed out some issues on the liability side of
20  the balance sheet, but your Honor I think stated
21  before that there may be some things on the asset
22  side of the balance sheet overstated too. If you
23  look at the asset side of the balance sheet, we
24  have 1.8 billion dollars of PP&E. We all know,

## 85

LORAL SPACE & COMMUNICATIONS LTD.

1  we've all seen assets of PP&E type assets being
2  substantially overstated on balance sheet.
3      So while I can look at this balance
4  sheet and point out some issues as well, at the end
5  of the day I'm not going to testify, and your Honor
6  can't consider what I'm saying as part of the
7  evidentiary record. All your Honor really should
8  be considering is that on the assets side of that
9  balance sheet, which is on page 4 of 112, as Mr.
10  Wolfson pointed out, you have 2.45 billion dollars
11  of assets. On the liability side of the balance
12  sheet, you have over 3 billion dollars of
13  liabilities. To me that's insolvent. And that's
14  the evidence that's in the record today.
15      And in fact, your Honor, that
16  evidence was in the record in September when we
17  considered the very same issue.
18      THE COURT: That does include the
19  preferred -- you agree with that.
20      MR. BOTTER: Your Honor, if it's
21  appropriate to deduct it out you get down to 2.9
22  billion dollars of liabilities, so you are talking
23  about five hundred million dollars of insolvency
24  and it's still substantial.

86

LORAL SPACE & COMMUNICATIONS LTD.
1
2      THE COURT: I'm sorry. Ultimately
3  this isn't that important, but don't you get down
4  to 2.6 something, doesn't it go down to from 2.9
5  you take away 225 million and you get down to 2.6.
6      MR. BOTTER: Your Honor, I thought
7  that the number I had total liability was 3.56
8  billion -- I'm sorry your Honor, that's right that
9  includes if you go to 2.9 you get to 2.6 still
10  almost 2 hundred million dollars out of the money.
11      THE COURT: Okay.
12      MR. BOTTER: Your Honor even if you
13  were to form an Intelsat sale and the assets, Mr.
14  Yetnikoff says that the assets are 3 hundred
15  million dollars off the book you are still out of
16  the money. What is also in the record and I think
17  your Honor we all agree that bond price are what
18  they are and I think we all agree that the bond
19  prices were 75 cents either yesterday or today, on
20  the Orion bonds and 42 cents on the LTD bonds. If
21  you add up those numbers, your Honor, you're
22  talking about a total solvency gap of 321 million
23  dollars. And I don't believe, that if you add up
24  those numbers and take them into account post
25  petition interests that would be required on 1.7

87

LORAL SPACE & COMMUNICATIONS LTD.
1
2  billion dollars of claims that come before the
3  preferred and certainly come before the common.
4      Those are the facts that are in the
5  record today. Mr. Wolfson, and Mr. Yetnikoff had
6  have argued that the creditors committee is the
7  only thing that stands in their way. And I
8  think -- well, the creditors' committee is 7
9  members but we do represent 1.7 billion dollars of
10  debt.
11      But I think that there is another
12  person that stands in their way of the creditors
13  committee cramming down a plan that's inappropriate
14  over the objection of equity, and I think that's
15  your Honor. If we were to come in and we were --
16  had a wonderful situation and that wonderful
17  situation said that 1.7 billion dollars 6 unsecured
18  claims were being paid in full with appropriate
19  post petition interests and there was not one penny
20  above those amounts which would probably be almost
21  2 billion dollars in interest, therefore common is
22  entitled to nothing, I think your Honor would
23  require that we satisfy -- we and the debtors
24  satisfy our evidentiary burden of cramming down
25  such a plan over the objections of equity. And

88

LORAL SPACE & COMMUNICATIONS LTD.
1
2  part of that evidentiary burden would be to
3  demonstrate that in fact the value only justified
4  the distributions to the creditors and nothing for
5  the equity. And we would have to satisfy that
6  burden, just like today the movants are supposed to
7  satisfy their burden of proving the Williams
8  standard for Williams potential for meaningful
9  distribution of cases.
10      And even if you consider and take
11  what it's worth, Mr. Wolfson said about the balance
12  sheet and I don't think it's fair to do that but
13  even if you take what it's worth is 6 million
14  dollars of excess value, I would think that
15  Sonnenschein and Channon, or whomever they were to
16  engage, could run through a big portion of the 6
17  million dollars fairly quickly. And it strikes me
18  in a case of billions of dollars of claims that 6
19  million dollars, or whatever that came out to after
20  you satisfy their professional fees, constitutes of
21  meaningful distribution. But again, that 6 million
22  dollars of potential recovery that's not the
23  evidence before your Honor today, it's not just not
24  there.
25      At the end of the day, I think your

89

LORAL SPACE & COMMUNICATIONS LTD.
1
2  Honor will be the ultimate arbiter of whether or
3  not the committee of the unsecured creditors'
4  estates can cram down a plan upon equity that is
5  not fair and equitable. And I think that your
6  Honor will take very seriously the valuation
7  testimony, the appropriate valuation testimony that
8  you'll hear at that point in time, and your Honor
9  will be the ultimate protection for the evil deeds
10  that the creditors' committee may do here.
11      I think that there's one other point
12  I would like to make. Your Honor asked Mr. Rothman
13  as to whether or not it would be practical or
14  impractical to for an equity committee to be
15  appointed with limited role of just plan
16  negotiations. Your Honor, I have been with this
17  case since July 24th, probably too many hours every
18  single day, and I think it's fair to say that every
19  single matter that that has occurred in these cases
20  has or could effect, ultimately, plan negotiations.
21  Let's just take for an example, we have a hearing
22  on before your Honor on Thursday, I believe, with
23  respect to a settlement of APT.
24      The APT settlement involves
25  transponder space on T-18 satellite that is to be

90

LORAL SPACE & COMMUNICATIONS LTD.
1
2 launched in April. There is a question as to which
3 debtor entity is going to own this transponder
4 space. So if you were, for example, an Orion
5 creditor and ultimately you think that you should
6 own this transponder space, that's going to
7 ultimately affect the value of the Orion estate
8 when we talk about plan negotiation.
9         Similarly, if you are an SS/L
10 creditor and you're getting the benefits
11 potentially of this settlement, that also will
12 affect the SS/L estate down the road. So I don't
13 think it's going to be practical for us to separate
14 a committee out to just deal with plan
15 negotiations, because everything in this case
16 affects plan negotiations. And I also think, your
17 Honor, with the evidence before you, the committee
18 should not be burdened, or the unsecured creditors
19 should not be burdened with paying substantial fees
20 of attorneys and investment bankers for equity
21 which is based upon all of the evidence before you
22 today, it's completely out of the ordinary. And I
23 think, your Honor, the motion should be denied.
24         THE COURT: Okay.
25         MR. HUEBNER: Good morning, your

91

LORAL SPACE & COMMUNICATIONS LTD.
1
2 Honor. I'm Marshall Huebner the firm of Davis Polk
3 and Wardwell on behalf of Bank of America as agent.
4         Your Honor I think it's very
5 important at the as outset to separate out the
6 preferred and the common. I think they are
7 represented by different parties and they line up
8 differently economically and I think each of their
9 different motions need to be denied in for
10 different reasons. And your Honor I would like to
11 first talk start with the common in fact their own
12 evidence the undisputed evidence shows a different
13 financial situation.
14         Your Honor, looking at the values of
15 the publically traded securities introduced by the
16 movants, the common stock in this case is at a
17 minimum 623 million dollars out of the many money
18 based on the current marketplaces praise prices.
19 623 million dollars. That assumes no post petition
20 interest which could in and of itself be hundreds
21 of millions of dollars. To be clear, so that the
22 numbers are in front of everybody, the parent bonds
23 are trading at 39 and a half, there are 350 million
24 dollars of those bonds; the debtor can sit on those
25 bonds. The Orion bonds of which there is 7 hundred

92

LORAL SPACE & COMMUNICATIONS LTD.
1
2 million dollars are trading at 75 cents. So you
3 take 25 percent which is missing, and you add those
4 two numbers and you add -- that's 386 million which
5 we'll talk about in a minute when we will talk
6 about the preferred. So at a minimum before you
7 get to any equity of any kind, there is a 386
8 million dollar deficit based on current market
9 values of what people are actually paying based on
10 the value of the of this recovery. When you add
11 in, as Mr. Wolfson testified, the 237 million
12 dollars of liquidation preferred 386 plus 237 is
13 220 million dollars.
14         So in terms of the common your
15 Honor, I think there is really no legitimate
16 argument, even at facially legitimate argument that
17 the common is anywhere near in the money, 623
18 million dollars is many multiples of most
19 bankruptcy cases, and I think that's where the
20 market is.
21         Now let's talk about book value for
22 a minute, because the own two pieces of evidence we
23 argument that are we have before us at all are the
24 bond trading braces when which we all sort of
25 agreed Dow Jones, Roiters interactive printout; we

93

LORAL SPACE & COMMUNICATIONS LTD.
1
2 although know those are ascertainable and agreed
3 and the 10-Q that was handed up is the 10-Q. So
4 what Mr. Wolfson told us based on his numbers is
5 that the book value for preferred is 6 million
6 dollars. Now it's, of course, curious after
7 encouraging the court to take various deductions of
8 his choosing if the to a number that just barely
9 showed the preferred in the money. But let's take
10 that just for a moment pay it as take it at not as
11 a coincidence but truth and also at the moment take
12 it at as evidence and not an appropriate surprise
13 legal speculation. So what though shows 6 million
14 and subtract 237 million and even based on York in
15 the worlds most Pollyannish optimistic world, the
16 common is still several hundred million dollars out
17 of the money. Now your Honor actually ruled, you
18 know you sort of issued an opinion on this stuff.
19 You went on at the last hearing on this issue and
20 your Honor in fact noted for the benefit of all
21 parties and this is a page 65 of the transcript,
22 book days basis in which normally shows a greater
23 value than the Chapter 11 cases. So
24 unsurprisingly, your Honor is exactly where your
25 Honor knows that these cases are, which is the book

value deficit of 231 million dollars common, the real world deficit, based on what sophisticated players watching these actually put real money on the line for says they are 623 million dollars out of the loan money. So I think the estimate isn't even a facially legitimate argument they deserve a reason that's just a couple of reasons.

And just to highlight a couple very quickly your Honor the second thing that your Honor pointed out as people on this other table have indicated and in fact it's your Honor's view the 7 million dollars of legal fees and financial advisors fees, is really not -- that's not the way I you waive burden; that potentially the even more important burden is the burden on the process of having multiple people, and now I'll add a little bit to it, who don't have a real economic stake or a legitimate economic stake in the enterprise to being at the table. And so, your Honor, you know specifically that the indirect cost and burdens, which could be much more important than the direct cost and burdens, have to be weighed.

The third thing your Honor that you ruled is it's rare such a motion is granted and

that's that the movants have a Plaintiff's transcript error an a heavy error to give the committee that's at page 63. So you gave everybody fair warning and as the cases say in this district it's extraordinary, it's heavy burden fact rarely granted. So what facts what evidence did the equity proponents the common equity proponents bring to this court. Well, your Honor we didn't actually get up and have testifies with them because we they didn't testify as lawyers they didn't have testimony at all. Not a piece of evidence, not an exhibit introduced not an affidavit, not a witness. You told them plain and simple, it's rare, it's extraordinary, you have a very heavy evidentiary burden. All that's happened is that the Intelsat auction, which we don't -- frankly ended very quickly after EchoStar turned and left, gartered 25 million in addition. And Mr. Botter pointed out, and I'll advocate for the other side the court should take judicial notice of the fact that there are a couple of large dollar amount deposits made on new contracts. Not an asset there's an offsetting liability for those contracts. Who even knows if they are profitable

nobody has brought any evidence to say yes or no on these massive new contracts there's an 89 percent profit margin and 3 hundred million dollars of new value, there's nothing.

So the common equity, and we'll certainly move on in a moment, presents zero evidence, zero.zero zero evidence; didn't even try, in support of an extraordinary motion where it's their burden, that is rarely granted that you ruled on a month ago and told them what they would need to show. I won't cite the rest of the transcripts, I'm sure it was entered and I'm sure the court remembers it, but you actually talked about the kind of show stopping change in direction at the auction that would be necessary to have them come back and seek relief. None of that happened, the auction ended almost exactly as it had started, albeit a very small incremental addition to the purchase price. So that's a comment, because they are not the same, and I think they deserve the respect, I think, of being addressed separately.

Now there's the preferred. Let leave aside, just for a moment, because I think it's a pure question of law that's alleged in Mr.

Royter's testimony and attached in the exhibits as to whether the lack of evidence or the hidden expert problem presented to us by Mr. Wolfson's presentation isn't appropriate at all. Let's just look at what he said. What he said is look your Honor almost two years ago the market knew that this company was on the way down and was having serious financial difficulties. Almost two years ago, believe me, your Honor, here's my surprise exhibit, the bonds were trading below par, but the book value was still high. That's right. That proves as you already ruled, that book value is not a reliable indicator of value because it's an artificial thing that takes purchase price times depreciation and often has little relevance to real world values, that's why market values matter, because they show what a sophisticate informed the marketplace actually think this is actually worth. So unsurprisingly, what the chart actually proves is that the company's fortune is deteriorated, the market price of securities went down because the people acknowledged reality, and as good things have happened, market prices went up as there were dramatic exciting new development, market prices

98

LORAL SPACE & COMMUNICATIONS LTD.

1    LORAL SPACE & COMMUNICATIONS LTD.
2    went back up. That's exactly the point, market
3    value matters a lot because in the capitalist world
4    that we leave in, the market is presumed to be a
5    fairly accurate indicator. So when the Intelsat
6    sale was announced, the market prices of the bonds
7    went up. I should know, your honor, because what
8    the chart also shows, which is confirmed by
9    Roiters, is that in the last month and a half the
10   mark value of the securities has gone down by 78
11   million dollars. The prices that peaked in the
12   excitement immediately in the aftermath of the
13   Intelsat sale have gone down by 70 million dollars.
14   So it should not for one minute be thought -- he
15   wanted to focus you one part of this chart, but as
16   you said, you don't need a history lesson, you're
17   here to talk about the current situation in the
18   future, the market is actually getting a little bit
19   less optimistic about the fortunes of this company.
20   78 million dollars worth less optimistic since
21   October 20th.
22       Your Honor, let's take a minute and
23   actually look at his illustrious exhibit, because
24   while non of us is prepared for, I think it's very
25   important to give you an indication of the slight

99

1    LORAL SPACE & COMMUNICATIONS LTD.
2    of hand Mr. Wolfson engaged in in an attempt to
3    demonstrate the preferred, which --
4        MR. WOLFSON: Your Honor, I'm going
5    to object to the continued innuendos and
6    inappropriate statements; slight of hand,
7    advertising slant here.
8        THE COURT: I'm just taking it as
9    rhetoric.
10       MR. ROTHMAN: Let me point out the
11   gross inaccuracies in Mr. Wolfson's exhibit so it's
12   clear, if one fairly looked at his numbers, they
13   would in fact look like. Let's start with this
14   first one, which again, none of us had any time to
15   prepare for.
16       Mr. Wolfson represented to this
17   court that the sale of Intelsat assets is 261
18   million dollars, and therefore that should simply
19   be deducted and that yields the book value. Of
20   course what he does he is he assumes lots of things
21   which are inappropriate, and if he had put on a
22   witness, the witness would have got the skewered.
23   One, he assumes no purchase price adjustment, and I
24   think the debtors told you that they are currently
25   striking a purchase price adjustment in the 40 to

100

1    LORAL SPACE & COMMUNICATIONS LTD.
2    50 million dollar range. Poof, 6.617 million
3    dollars is now negative 40 million.
4        Two, he assumes no closing costs of
5    any kind. He took the gross number of the wire
6    transfer by Intelsat and is simply deducting that
7    from the debtors' balance sheet assuming no cost.
8    In fact, the debtors' have projected the sale to be
9    in 10s of millions of dollars. Poof, negative 44
10   million dollars is probably now negative 84
11   million. Three, he took the value of the lease, he
12   added an asset to the balance sheet without putting
13   in any corresponding liability. Like the satellite
14   purchase contract, this isn't a lottery ticket that
15   the debtors' found, this is a contractual
16   relationship that they are entering into that is
17   going to cost them a lot of money to perform.
18       So what seems like a 261 million
19   deduct, is in fact probably more like a very small
20   deduct. And what it clearly proves, even assuming
21   everything else he says, is that even on a book
22   value basis which is much higher, as he proved to
23   us and this court already ruled, an actual basis
24   the preferred are probably in the 10s, and probably
25   still hundreds of millions of dollars still out of

101

1    LORAL SPACE & COMMUNICATIONS LTD.
2    the money. And that's without giving them the
3    benefit of the doubt entirely, because I'm not
4    sophisticated enough to know what he's talking
5    about when he said, and, your Honor deduct 237
6    million, and your Honor deduct another 214 million,
7    and if you do all those things and sort of hold it
8    sideways and look at it through a prism, I'm in the
9    money.
10       My apologies for the rhetoric, but I
11   think it's sort of important to note when somebody
12   sort of tells you, as Mr. Botter said, take column
13   nine on page 63 and deduct it from page 72 and move
14   it over and multiply it by page 41, there is
15   something a lot more sophisticated going on, and
16   the one that I do know about, which is the Intelsat
17   sale, the number is nothing remotely likely
18   representing to be, for reasons I think without
19   even putting a financial advisor on the stand, is
20   fairly obvious.
21       THE COURT: How much is the bank
22   debt again?
23       MR. HUEBNER: It's about 59.8
24   million -- well, it might be 73.5 million, it
25   depends on whose amortization you're using.

**102**

LORAL SPACE & COMMUNICATIONS LTD.

1
2  THE COURT: Thank you.
3  MR. HUEBNER: So, now let's talk
4  about the other prong of the law, because there is
5  sort of two requirements as I think we all agree,
6  and we are all citing the same cases to your Honor,
7  since I think the common is over 6 hundred million
8  dollars and I don't think there's that much to
9  focus on, the preferreds, you know, may be closer 2
10  hundred million out, maybe they are 250 million
11  out, maybe they 300 million out, maybe they are
12  180, I don't know. I'm certainly not going to
13  testify as their financial advisor. But there are
14  two prongs for this extraordinary relief. One of
15  them is substantial equity of a meaningful
16  distribution which we already talked about, and
17  that's a factual question that they bear a heavy
18  burden on and need to put on evidence.
19  But the second prong, your Honor, is
20  whether they are unable to represent their
21  interests without an official committee. And here
22  it's important to note that the preferred holders
23  are totally different than the common holders.
24  This isn't a law firm in a class action type way,
25  of trying to find a bunch of individuals to sew

**103**

LORAL SPACE & COMMUNICATIONS LTD.

1
2  together to come in and get an assignment of
3  something, this is three totally sophisticated
4  financial players who own at a minimum 54.5 million
5  dollars of liquidation preference of preferred
6,  stock.
7  These are not people who are unable
8  to represent their interests without an official
9  committee, this isn't the great defuse individual
10  holders, these people paid hundreds, or a minimum
11  of ten, but probably hundreds of millions of
12  dollars for these securities. They are a small
13  group of very sophisticated people familiar with
14  these issues. They find their own counsel, the
15  counsel finds financial advisers. These are the
16  exact example of people who don't deserve an
17  official committee. Why does a group of three
18  sophisticated preferred holders who are probably
19  out of the money deserve an official committee with
20  all the extraordinary costs and burdens and
21  invasions on the estate, any more than EchoStar
22  deserves an official committee or trade creditors
23  deserves an official committee.
24  I just think if you took look at the
25  second prong, which also has to be satisfied, I

**104**

LORAL SPACE & COMMUNICATIONS LTD.

1
2  think it's fair to say that this small cadres of
3  high roller preferred holders, are "unable to
4  represent their interests without a committee
5  representing them." They own 23 percent of it,
6  that's a pretty slug.
7  I think it's also important to note,
8  as was true the last time around, that the United
9  States trustee, which is an official arm of the
10  government, which is responsible for providing
11  independent, thoughtful guidance in decision making
12  of these issues, again noted that in light of the
13  changed circumstances, they have carefully reviewed
14  the request and all the of the available evidence
15  and don't feel that the relief is appropriate. And
16  certainly, your Honor, I think the case law has
17  long since been clear, your Honor is not bound by
18  the decisions made by the U.S. Trustee. But I
19  think it's important to note that they don't have
20  any of their own money on the line in this case,
21  and they are not shy in this district or in any
22  other district in supporting committees where they
23  think it's appropriately. But they looked at it
24  independently, and they think it is not
25  appropriate.

**105**

LORAL SPACE & COMMUNICATIONS LTD.

1
2  Finally, your Honor, you asked a
3  question of somebody, and I'll take the political
4  eve of trying to answer it, whether the debtors
5  have incentive for getting equity back from the
6  money and are likely to do it on their own. From
7  my perspective, and I may have slightly misphrased
8  your question, but that's not going to happen
9  without an official committee.
10  THE COURT: No, that wasn't it. I
11  think the debtors have every incentive to maximize
12  the value of the estate. I think they have been
13  doing that. My question I think was answered by
14  Mr. Rothman, which is when you get to the plan
15  negotiations, how bonds the board and management
16  adequately represent the shareholders in plan
17  negotiations.
18  MR. HUEBNER: Your Honor, just for a
19  minute, I have two answers. One is the law, which
20  is, among other things, there's an important
21  decision that was before Justice Cody in re
22  Ferrerra, which again makes clear that the duty of
23  the boards in a development sovereignty, and you
24  heard a lot about this, as I'm sure you remember,
25  at the sale hearing, is to maximize the value of

106

LORAL SPACE & COMMUNICATIONS LTD.

1 the enterprise. Even the very notion of a split
2 duty is an inaccurate statement of the law of
3 fiduciary duties in its own insolvency. What the
4 debtors have done here is perfectly clear, which is
5 to create as much value as possible. And obviously
6 mathematically, the minute that expands, it should
7 ask what is available and it goes to equity.
8         The second reason, your Honor, I
9 think the debtors have every incentive to create
10 value is, as I think we also noted in the last few
11 weeks, although I think the problem is the dynamics
12 have changed recently, these have been fairly
13 litigious cases with a fair amount of
14 unpleasantness. And my guess is that the debtors
15 the management have lots of reasons to insure the
16 dollar is maximized including ensuring that the
17 appropriate value gets added and ensuring that the
18 creditors' committee maintains their creditor
19 status or paid off by the equity status.
20        So at the end of the day, your
21 Honor, I think for slightly different reasons,
22 neither request is appropriate, when you look at
23 the common, they are so many hundreds of millions
24 of dollars out of the money, once you put the

107

LORAL SPACE & COMMUNICATIONS LTD.

1 preferred in front of them, it's actually
2 unprecedented to say that they have any reasonable
3 likelihood of a substantial recovery. No evidence,
4 even Mr. Wolfson's evidence, suggests that they
5 were within the three hundred million dollars of
6 striking range, even in the newest proceed state of
7 affairs.
8         As the preferred committee, again, I
9 think in their own presentation, if you were to
10 admit any of it into evidence, other than the 10-Qs
11 that show the debtor is insolvent, absent Mr.
12 Wolfson's modifications, show that they are also
13 sever hundred million dollars out of the money, but
14 as importantly, since their argument is 237 million
15 dollars stronger than the issuance of substantial
16 likelihood, is the second prong, which is they
17 needed to show that they are unable to represent
18 their interest without an official committee. And
19 I think that given the debtors' representation that
20 they have told them that if they sign a
21 confidentiality agreement, that they will be
22 provided with the information, given their
23 incentive to get the preferreds back into the money
24 and given the extreme sophistication of the clients

108

LORAL SPACE & COMMUNICATIONS LTD.

1 that Mr. Wolfson and his firm represent, I think
2 this is the textbook cases of where the committee
3 is not required.
4         MS. LANDSBAUM: Good afternoon, your
5 Honor. Lauren Landsbaum of the U.S. Trustee's
6 office. I'm not going to repeat the law or the
7 facts that you've already heard, I'm just going to
8 tell you the U.S. Trustee has fully and fairly
9 considered the requests and both requests. As far
10 as preferred shareholders go, we received the
11 joinder without any notification; usually the
12 process is that you write the U.S. Trustee a letter
13 requesting a committee, and then you give the U.S.
14 Trustee time to responds and give them time file a
15 motion or stipulation that the preferred share
16 holders have filed a joinder, and then about a
17 month later, a couple weeks ago I did receive a
18 letter formally requesting the appointment of a
19 preferred shareholders committee.
20        The U.S. Trustee has not responded
21 yet but I was told, I get almost phone calls from
22 the preferred shareholders counsel indicating that
23 they would have filed their own motion had they had
24 time. And I find it disingenuous when I come to

109

LORAL SPACE & COMMUNICATIONS LTD.

1 this hearing today, and obviously they have had
2 time to assemble a lot evidence and hired experts
3 to then present evidence to the court. The
4 evidence that the U.S. Trustee did fully and fairly
5 consider shows that as of today the debtor is
6 insolvent, and that there would be no return to
7 equity and the up kick in business is not going to
8 provide any return to equity. And based on the
9 fact the U.S. Trustee believes the debtor is
10 insolvent, and the fact that their shareholders,
11 particularly the preferred shareholders, are
12 ability to adequately represent themselves, the
13 U.S. Trustee does not believe that an appoint of an
14 equity committee is appropriate at this time. That
15 does not mean that the U.S. trustee will not
16 reconsider this upon new evidence that is
17 presented, but as the case is now and the evidence
18 is before your Honor, the U.S. Trustee believes the
19 appoint of an equity committee is not appropriate
20 at this time.
21        THE COURT: Okay.
22        MR. SOMERSTEIN: Good afternoon,
23 your Honor. Mark Somerstein of Kelly Drye and
24 Warren for HSBC Bank, USA indentured Trustee. Your

110

LORAL SPACE & COMMUNICATIONS LTD.

1    LORAL SPACE & COMMUNICATIONS LTD.
2  Honor, my client is the indentured trustee, and
3  I'll note for the record that we join in the
4  objections of the official committee of unsecured
5  creditors. I don't think I need to belabor the
6  record, but just to note my understanding of the
7  case is really, in constituency with my client who
8  represents what appears to be the equity here, and
9  it's unfortunate but that seems to be the case.
10        MR. WOLFSON: May I just briefly
11  respond?
12        THE COURT: Yes, briefly.
13        MR. WOLFSON: Your Honor, just a
14  couple of points. First let me speak, counsel for
15  the debtor kept referring to Kasper as the case in
16  point. And I think Kasper is a case in point. In
17  Kasper, we did see the appointment of an equity
18  committee, the judge with the objections of the
19  debts and the creditors' committee in that case
20  denied it and then a few weeks later or a month or
21  so later the U.S. trustee appointed a committee
22  took six weeks to designate the members of that
23  committee and the equity committee actually got
24  appointed probably about weeks at most prior to the
25  hearing on disclosure statement, so late in the

112

LORAL SPACE & COMMUNICATIONS LTD.

1    LORAL SPACE & COMMUNICATIONS LTD.
2        I did consult with Channon last
3  night, not as an expert witness, but just simply
4  using their tools to consolidate information that I
5  know that financial advisers can readily do and
6  they can extract information from the SEC. They
7  are not presenting testimony with respect to the
8  values; what they are showing you is right out of
9  the debtors' Qs and their Ks, what -- and factually
10  what is going on in this case.
11        Congress did not say that in order
12  to appoint an equity committee we have to show that
13  management is bad, whether they are doing something
14  inappropriate. We are glad this management is
15  turning around business-wise. The fact that
16  they are doing it and improving things does not
17  mean that you do not get a committee. The case law
18  suggests that are you or are you not hopelessly
19  insolvent that is the primary issues. And I don't
20  think based on this record anyone can conclude that
21  this entity is hopelessly insolvent. Now can
22  management adequately represent the committee in or
23  the equity holders in plan negotiations. Judge
24  you've seen an awful lot of cases on both sides of
25  the bench, and I think you understand the

111

LORAL SPACE & COMMUNICATIONS LTD.

1    LORAL SPACE & COMMUNICATIONS LTD.
2  game that you couldn't really do anything
3  meaningful. If there's going to be an equity
4  committee appointed, it needs to be done at a
5  timely manner not at the very last minute.
6  Circumstances do change but our committee -- this
7  is our first appearance requesting a committee, we
8  were not here at the original filing by the equity
9  committee; this is the first request by the
10  preferreds for a committee, and I think that the
11  lessons that one learns historically do demonstrate
12  Kasper is a case in point where unfortunately and
13  to save a couple of bucks I think they lost an
14  awful lot of value for the preferred. I was
15  confused also by the debtors comments by parties
16  standing up saying there may be some recovery but
17  at the same time immediately thereafter stating we
18  have not demonstrated any likelihood ever
19  substantial distribution individual shareholders
20  are not capable and not usually, it's not
21  economically viable for them to go out, hire
22  financial advisers, spend hundreds of thousand of
23  dollars trying to do a financial advisory analyses
24  just to request the appointment of a committee.
25  It's just not done.

113

LORAL SPACE & COMMUNICATIONS LTD.

1    LORAL SPACE & COMMUNICATIONS LTD.
2  realities. In this case if you take a look at
3  their own 10-K and 10-Qs, they have reported no
4  less than seven class actions filed by shareholders
5  against the board members. These are the board
6  members that are going to represent the --
7        THE COURT: Wasn't that Mr.
8  Huebner's point? If they didn't have the normal
9  incentive, they would have in incentive too?
10        MR. WOLFSON: No, your Honor. I
11  think their incentive is going to be, and you will
12  see this, is for an utter release for all the board
13  members right in the plan. They are going to seek
14  an extension of the 524(e) rule, and I guarantee
15  you that officers and board members of this were
16  are going to seek a complete and utter release at
17  the same time the plan an all but going on wipe out
18  the equity holders if the creditors get their way
19  maybe have a token amount their warrants and come
20  before you they are got not going to be able to
21  adequately and properly and fully property the
22  committee and equity holders. The management, we
23  are talking about management, management is
24  interested, and they have conflicts, Judge, they
25  cannot look solely and represent our interests

114

1         LORAL SPACE & COMMUNICATIONS LTD.
2   while at the same time being expected to disregard
3   their own.  They are interested management in
4   interested in their jobs going forward they are
5   interested in equity in the reorganized equity and
6   I think on that basis we are they are going to be
7   seeking primary equity.
8         MR. ROTHMAN:  Your Honor I object
9   again he doesn't didn't put on any evidence about
10  management of this company that was that would
11  support any of this.  All this is speculation by a
12  lawyer; it has nothing to do with the case.
13        MR. WOLFSON:  Judge, the problem and
14  what counsel is suggesting, is a boot strapping
15  possibility catch 22 argument.  He doesn't want to
16  seek to argue what common sense and experience can
17  demonstrate, we should wait to see what's in the
18  plan when it's way to late to seek the appointment
19  of an equity committee.  I don't know what plan
20  they are going to propose, I admit that, but I
21  think historically we can listen to their comments.
22  He stands up and tells you there is no likelihood
23  of substantial recovery for equity holders.  What
24  does that mean?  And at the same time he tells you,
25  well, were working real hard --

115

1         LORAL SPACE & COMMUNICATIONS LTD.
2         MR. ROTHMAN:  Excuse me.  That's not
3   what I said.  What I said quoted from their brief
4   at page five which says the test is whether there
5   is a substantial likelihood that equity will
6   receive a meaningful distribution.  That's what I
7   said; that's what the law is.
8         MR. WOLFSON:  And he said there is
9   no substantial likelihood, that we haven't
10  demonstrated it.  He's not coming in here, this
11  debtor.  I would have a little more comfort if the
12  debtor was coming in here and saying, hey we think
13  there is going to be a substantial likelihood of
14  some success and some distribution to equity
15  holders.  How come they are not saying that?  They
16  are not saying it's hopelessly insolvent, they are
17  not saying that and yet at the same time they are
18  saying we expect there will be, his quote, was
19  there may be some recovery.  Well if there's going
20  to be some recovery for preferred shareholders, and
21  since nobody has argued, other than the creditors'
22  committee, and the banks are going to be getting
23  paid in full and are gone in a couple of weeks, I
24  don't really understand why they have a dog left in
25  this fight.

116

1         LORAL SPACE & COMMUNICATIONS LTD.
2         MR. BOTTER:  Did he call me a dog?
3         MR. WOLFSON:  While you have a dog
4   left in this fight.
5         Judge, we know how these large cases
6   go; unless management is able to stand up here and
7   advocate there's value and they are not seeking
8   releases and be able to demonstrate the ability to
9   represent bond holders this is why in a large case
10  such as this with vast amount of shareholders out
11  there this is the precise nature of the case in the
12  real world that calls for a committee.
13  Furthermore, it's interesting that counsel for the
14  banks says look at the Martin value pay no
15  attention to the book values that's all we have to
16  go with right now since we don't have anybody
17  that's opining on enterprise values going forward;
18  you can't do that until you see the business plan.
19  It would be a folly, there's no basis upon which
20  you can do this at this point.  But for counsel for
21  the bank to get up and say I'm playing with mirrors
22  here; you want to talk about inappropriate, that's
23  inappropriate.
24        The language of a 10-Q and 10-K
25  should be in English.  It should be understandable

117

1         LORAL SPACE & COMMUNICATIONS LTD.
2   to an investor, and yes even to a bankruptcy
3   lawyer; this one is pretty clear.  It says we sold
4   the value of the assets for a billion 25 million.
5   It says a contract is being assumed by the
6   purchaser for an additional 50 million dollars,
7   it's assumed, it's gone; it's off the balance
8   sheet.  If there's a 10 15 percent adjustment that
9   need to be made to these numbers, well, that
10  belongs in the 10-Q.  If they are not making those
11  adjustments, and there's 40 or 50 million dollars
12  of adjustments and 30 million dollars of expenses,
13  that should be have been in the 10-Q for us normal
14  people to understand.
15        THE COURT:  Doesn't it alert people
16  there may well be an adjustment?
17        MR. HUEBNER:  In the parenthetical.
18        MR. WOLFSON:  And it may be, but not
19  15 20 percent that they are suggesting.  And even
20  if that's the case, and I'm no not here to prove to
21  you beyond a doubt that this company is solvent,
22  that's not the standard.  The standard is, is this
23  things -- when you look at the cases, you look at
24  Williams any of the cases in which is equity
25  committee is being bend denied in those situations,

**118**

LORAL SPACE & COMMUNICATIONS LTD.
1. there is hopeless insolvency. There are billions
2. of dollars of gaps in a public company between
3. creditors, bond holders and equity. You look at
4. any of the cases which that happens, its always
5. enormous; it's never this type. It's bonds trading
6. at five cents, at 10 cents on the dollar; not 75
7. cents or 42 cents. When it trades at 75 cents, as
8. your Honor is probably aware, for the most part
9. these are people buying the bonds in the secondary
10. market; they are expecting 30 percent annual rates
11. of return; it's never going to go above 75 percent,
12. because it's just time is money. People are
13. expecting this bond to pay in full. And that's
14. what we are they are going to pay in order to get
15. the 30 percent return, so this is reflecting
16. payments in full, or pretty close to it, and the
17. market is not always right. Why is the market?
18. The market is right? If the market the right, then
19. let's believer the preferred shareholders and
20. common stock holders who are still putting some
21. value on this today. They are no less intelligent
22. than bond traders. Hard to explain how to that
23. could be. So were if we are going to follow the
24. market precisely my point is the market is not

**119**

LORAL SPACE & COMMUNICATIONS LTD.
1. necessarily a great indicia, my point is that for
2. whatever reason, at a time in when this company was
3. reporting book values of a billion 3, as contrasted
4. to today where they are they are reporting,
5. erroneously we believe, a 705 million in book value
6. negative number, with a 2 billion spread, the bonds
7. are at or about the same prices. So what can you
8. gain from that? Is that indication that the market
9. knows what they are talking about? I don't think
10. so.
11.          THE COURT: Is there evidence on the
12. record of what the stock and preferred is trading
13. at?
14.          MR. WOLFSON: I don't believe -- I
15. don't know that that's in the current 10-Ks or Qs
16. your Honor but --
17.          THE COURT: It wouldn't be.
18.          MR. WOLFSON: But my understanding
19. is that -- and there are probably people in the
20. courtroom who know that answer, it's the common
21. information. The common stock was trading about 30
22. cents a share.
23.          MR. CHRIST: 33.
24.          MR. WOLFSON: 33 cents a share. And

**120**

LORAL SPACE & COMMUNICATIONS LTD.
1. I believe that the preferred is trading at about a
2. buck a share, but I'm not a hundred percent sure
3. about that.
4.          So your Honor what with the debtors
5. admission that there may be some recovery with the
6. fact of the matter that the board here and the
7. management operating the company well, but when it
8. comes down to plan negotiations, they are going to
9. so have done conflicts. They are going to want the
10. jobs; they want their releases; they want their
11. incentive bonuses; they want their primary equity
12. as an incentive to go forward. Creditors typically
13. will give them that at the same time they are
14. wiping out the equity holders.
15.          My last comment, your Honor, is in
16. response to the question with respect to the
17. ability to limit the role of a committee. I don't
18. recall seeing specific cases on that in the past
19. although my recollection is that you pretty much
20. either appoint a committee or you don't appoint a
21. committee. But we certainly have indicate to do
22. courts before and we would certainly represent to
23. this court that we would not duplicate things.
24. There are numerous. I agreed with Mr. Botter.

**121**

LORAL SPACE & COMMUNICATIONS LTD.
1. There are some things that go on in a case there
2. impact plan and the exo strategies and an equity
3. committee ought to be involved in those. But there
4. are numerous other day-to-day matters that we defer
5. to the creditors' committee where you do have a
6. common interest, things such as motions to lift the
7. automatic stay, issues with respect to the sale of
8. normal assets that are not plan threatening. All
9. of those sorts of things you take look at just make
10. sure it's not a big issue you defer typically to
11. the debtor, even when there's a creditors'
12. committee. We are not looking to duplicate issues,
13. and we do act responsibly. And realize that at the
14. end of the day, we are subject to the court's
15. ruling with respect to the fee application, and if
16. we do something inappropriate and duplicative and
17. unnecessary, it will be dealt with accordingly, and
18. we look to avoid that sort of adverse fee hearing.
19.          So, your Honor, we would request,
20. just to conclude -- we believe that this is the
21. appropriate case for a committee. We think we can
22. add value to the case. My primary client, Aspen
23. Advisors and we have two other that have joined in
24. on this motion; they do hold in the aggregate of 23

122

LORAL SPACE & COMMUNICATIONS LTD.
1
2  percent, they are financial institutions. But on
3  the other hand, they are not necessarily in a
4  position to fully fund an appropriate
5  representation of all of the preferred equity
6  holders. And absent there being a preferred equity
7  committee or an equity committee that they are on,
8  there's no commitment on their part to act in a
9  fiduciary responsibility, and there's no guarantee
10  they are going to stick around to the end of the
11  case. That is one of the primary benefits of an
12  equity committee in that it has fiduciary duties to
13  all, and it will see the case to the end. If
14  there's not a committee and an individual
15  shareholder decides to sell its position for
16  whatever gain it can make, it may just do that. So
17  I think it may be the aid to the court to have the
18  benefit of a committee to test what will
19  undoubtedly be the financial advisers coming to you
20  and telling you what the prospective future value
21  of this company hypothetically may be.
22            THE COURT: Okay.
23            MS. LANDSBAUM: Your Honor, I have
24  two brief comments.
25            THE COURT: All right, very briefly.

124

LORAL SPACE & COMMUNICATIONS LTD.
1
2  for Mr. Yetnikoff, that we are able to do it.
3            Also Mr. Rothman's point that we
4  take you on good faith that they are acting in our
5  interests. If that's the case, on Mr. Wolfson's
6  analysis, we can add some value to these four brand
7  new contracts that have just come up. And the last
8  point Mr. Wolfson said, I think we would be value
9  added to the process. I talked to Sony in Tokyo
10  twice, and I don't see anybody bringing in parties
11  that might have substantial equity in interest. I
12  know they are advertised, but I guess it's the
13  difference between a realtor putting a multiple
14  listing and going out and aggressively marketing
15  it. And we certainly have incentive, and we are
16  not conflicted, frankly, to find somebody to
17  replace those insiders and sell that premium too.
18            THE COURT: Okay.
19            MR. CHRIST: Thank you, very much.
20            THE COURT: I unfortunately have to
21  eat something, so I'm going to come back about
22  2:35.
23            Maybe Mr. Wolfson and Mr. Huebner
24  can go to lunch together and work out their
25  metaphors.

123

LORAL SPACE & COMMUNICATIONS LTD.
1
2            MS. LANDSBAUM: Your Honor, just
3  quickly. With respect to the release issue, Mr.
4  Wolfson indicated in the real world the directors
5  will get the broad releases. I think all of us
6  know the U.S. Trustee does not allow those releases
7  and will not allow them in this case. And second,
8  with regard to Kasper Mr. Wolfson was right. An
9  equity committee was appointed and the U.S. Trustee
10  did agree; and it is just an example that the U.S.
11  Trustee can be swayed if circumstances change and
12  an equity committee is deemed appropriate. And in
13  Kasper, circumstances did change subsequent to the
14  hearing on the motion, such that an equity
15  committee was appropriate. But it is not analogous
16  to this situation.
17            THE COURT: Okay.
18            MR. CHRIST: Your Honor, may I be
19  heard brief.
20            THE COURT: Really brief, like a
21  minute.
22            MR. CHRIST: Well, I just wanted to
23  say, speaking for us, we are not going to be able
24  to continue beyond today, assuming I find my car in
25  Manhattan and get out of here, and I can't speak

125

LORAL SPACE & COMMUNICATIONS LTD.
1
2            (Whereupon, a recess was taken for
3  the purpose of luncheon.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

126

1      LORAL SPACE & COMMUNICATIONS LTD.
2         A F T E R N O O N   S E S S I O N
3         THE COURT: Please be seated. 1
4   have in front of me a motion, literally a renewed
5   motion by a group of common shareholders who hold
6   approximately 5 percent of the common stock of
7   Loral. That motion has been joined in by another
8   group of common shareholders who profess to own
9   approximately 1 percent of the common stock, and
10  has also be joined in by a group of preferred
11  shareholders who own approximately 23 percent of
12  the outstanding preferred shares. The motion
13  seeks, again, the appointment of an official
14  committee of equity security holders. 1 say again
15  because I denied a motion by the same group on
16  September 19th of this year.
17        The group of preferred shareholders
18  had not formally sought the appointment of an
19  official preferred shareholders committee from the
20  U.S. Trustee, but we have all been entreated their
21  request as -- at least a request for an official
22  committee of equity security holders that is to be
23  dominated by preferred shareholders, although at
24  times they have also sought in the common
25  shareholders said they would support an appointment

127

1      LORAL SPACE & COMMUNICATIONS LTD.
2   of two separate committees, one for preferred
3   shareholders and one for common shareholders.
4         I think, as has been pointed out in
5   oral arguments, these requests need to be looked at
6   separately because they raise different issues, and
7   that's what I'll do. But in sum, I'm going to deny
8   each of the requests for the appointment of a
9   committee for the following reasons: First, as is
10  well established, the court reviews the U.S.
11  Trustee's decision whether to appoint a committee
12  or not to appoint a committee on a de novo basis,
13  although I obviously note that when, as here,
14  the U.S. Trustee has done a thorough analysis of
15  the request in the first instance. I then turn to
16  the statute which states in Section 1102(a), that
17  the court may appoint an additional official
18  committee of equity holders, if necessary, to
19  assure adequate representation of that group.
20        As Judge Gropper pointed out in his
21  opinion in the Kasper bankruptcy of this year, this
22  statute, by focusing both on whether the
23  appointment is necessary to assure adequate
24  representation, sets a rather high threshold for
25  the movant. Recognizing that threshold, the courts

128

1      LORAL SPACE & COMMUNICATIONS LTD.
2   have also found as set forth in the Johns-Manville
3   case at 68(BR)155 Southern District of New York
4   1986, and other cases, that the determination by
5   the bankruptcy court is based on the facts and
6   circumstances of a particular case in the exercise
7   of the court's discretion.
8         The courts, since there is no
9   specific definition in the statute of adequate
10  representation for purposes of 1102 entails, have
11  applied a number of factors, some of which are met
12  here, but the most important ones are not. Courts
13  consider, among other things, the number of
14  shareholders, the complexity of the case, and the
15  timing of the request, and ultimately whether the
16  cost of forming an official committee outweighs the
17  concern for adequate representation.
18        Perhaps more pointedly, Colliers and
19  the more recent cases have highlighted two key ways
20  of looking at the issues. As Colliers says, the
21  threshold situation is whether there is sufficient
22  equity in the estate to justify the cost and
23  expense of a separate committee. And Colliers also
24  says at Section 1102.03, the key consideration is
25  whether formation of an equity committee is more

129

1      LORAL SPACE & COMMUNICATIONS LTD.
2   likely to accelerate or to impede the
3   reorganization process.
4         The threshold consideration, that is
5   whether there is sufficient equity in the estate to
6   justify the cost and expense of a separate
7   committee is something we've spent considerable
8   time on this morning and this afternoon, although
9   it ultimately there's not an enormous amount of
10  evidence in the record that goes to the value of
11  the debtors and the value of the equity. I note
12  that as set forth by Judge Cram in the Manville
13  case, the movants have the burden of proof, and it
14  is their burden to put on evidence establishing,
15  among other things, whether there is real equity
16  value here. And as Judge Lifland pointed out in
17  the Williams Communications case, this didn't mean
18  that the court should conduct a full valuation of
19  the debtor, but rather should determine whether it
20  appears reasonable that there is a substantial
21  likelihood in Judge Lifland's words, of a
22  meaningful distribution under the absolute priority
23  rule, to equity holders.
24        And again, as pointed out by Judge
25  Lifland, citing to the Emens Industry case, this is

130

1    LORAL SPACE & COMMUNICATIONS LTD.
2    because creditors and debtors should not bear the
3    cost of negotiating what is, in essence, a gift to
4    shareholders who are out of the money; whereas they
5    should bear the costs, at least the debtors should
6    bear the cost of shareholders negotiating a
7    meaningful distribution.
8        Ultimately, as pointed out by
9    numerous cases, the appointment of an equity
10   committee is the exception rather than the rule.
11   But again, as I said earlier, some of the factors
12   suggesting that a committee should be appointed
13   here are present, and therefore this requires some
14   more attention than may have been suggested by some
15   of the objectants.
16       First of all, there is no dispute
17   that the common stock of Loral is very widely held
18   by a number of shareholders who individually
19   probably do not have the resources to pursue
20   actively their rights in this Chapter 11 case. On
21   the other hand, it appears to me that the preferred
22   stock is held by a smaller group, and in
23   particular, the group of moving preferred
24   shareholders here has a sizable stake in the
25   company and is a relatively small group of three

131

1    LORAL SPACE & COMMUNICATIONS LTD.
2    shareholders, holding approximately 23 percent,
3    which, if one looks at the liquidation preference
4    and accrued interest in respect of that preference,
5    is a meaningful amount of money, over 50 million
6    dollars. The timing of the appointment of a
7    committee wouldn't be appropriate at this point, in
8    that the debtors, having through their own
9    auspicious in large part, stabilized their business
10   and taken some key decisions in the case, are now
11   focusing on a Chapter 11 plan preceded by a
12   business plan, so that in fact, if it were
13   appropriate, one could, at this point, have a
14   committee that would be focusing on negotiation of
15   a Chapter 11 plan.
16       However, based on my review of the
17   presentation on valuation, I find that as far as
18   the common shareholders are concerned, that
19   negotiation would be largely academic. Based on
20   both the book value of the debtors, from their
21   publically filed SEC reporting, as well as the
22   agreed upon range of trading prices, which were the
23   only evidence of value offered by the movants, the
24   common shareholders are substantially under water
25   from anywhere between 230 million dollars on a high

132

1    LORAL SPACE & COMMUNICATIONS LTD.
2    end, to 620 or more on a low end, 620 million or
3    more on a low end. As I noted at the hearing in
4    September, both book valuations and trading
5    valuations, that is security trading valuations
6    have their weak elements. And it's been my
7    experience that book valuation in a company like
8    this is has often been overstated, whereas we all
9    recognize that the trading valuations are far from
10   accurate. However, when either method leaves to
11   such a substantial negative equity, I think it is
12   clear to me that the debtors are insolvent as far
13   as the common shareholders are concerned.
14       Colliers states that it is clear
15   that a committee should not be appointed if the
16   debtor is hopelessly insolvent, and it is clear
17   that it should be appointed if the debtor is
18   clearly solvent, obviously leaving a middle ground
19   there for courts to deal with in their discretion.
20       I find here that the gap is simply
21   too large to justify the expense and disruption
22   that an official committee of common shareholders
23   would pose, given that the only trade off, I think,
24   based on what's before me, the evidence before me,
25   would be is di minimis recovery at this point, by

133

1    LORAL SPACE & COMMUNICATIONS LTD.
2    shareholders.
3        It's important to note that the only
4    serious request for a committee here is based on
5    the need to negotiate a plan. There's no
6    meaningful evidence, or even contention, that
7    management is somehow laying down on its job in
8    running the company properly and obtaining the most
9    value possible for the debtors. In fact, the
10   reason for the renewal of the motion in its
11   prosecution today, is just the contrary, that the
12   company, its management has done an excellent job
13   in increasing value. So, I'm really focusing on
14   the one function of a committee, which is
15   negotiating a plan. And again, based on today's
16   record, I believe that those negotiations at this
17   point would result in only a di minimis recovery
18   for common shareholders; perhaps not in Judge
19   Lifland's words "a gift," although, perhaps close
20   to that.
21       I find that management is quite
22   capable of negotiating that type of recovery for
23   the shareholders, and I expect motivated to do so.
24   I also find that the -- if I haven't made it clear
25   already, the concerns that were raised in passing

134

LORAL SPACE & COMMUNICATIONS LTD.

1 by some of the shareholders, that management is
2 hopelessly conflicted or somehow otherwise not
3 properly conducting their fiduciary duties, has not
4 been established. Far from it. I then look at,
5 separately, at the request by the preferred
6 shareholders for either a separate committee or a
7 committee which they were dominant. The valuation
8 issues with regard to the preferred shareholders
9 are much more close. Although there were proved
10 issues, I cannot say that the debtors are
11 hopelessly insolvent when it comes to the preferred
12 shareholders. In fact, it is possible that the
13 preferred shareholders will have a meaningful
14 return in this case, and not just a gift. On the
15 other hand, it is possible that they are out of the
16 money; and ultimately as I said before, they have
17 the burden of proof upon the issues with respect to
18 the appointment of an official committee.
19          However, whether or not a group of
20 shareholders is in or out of the money is only one
21 of the factors, albeit an important one, to be
22 considered when a committee is sought to be
23 appointed. One goes back on the statute which says
24 that a committee may be appointed, if necessary, to

135

LORAL SPACE & COMMUNICATIONS LTD.

1 ensure adequate representation of the equity
2 interest holders. And here it appears clear to me
3 that with regard to the preferred holders, such
4 appointment is far from necessary, in fact is not
5 necessary at all. The preferred shareholders again
6 before me, are a small group, institutional holders
7 represented by a capable law firm. And they have,
8 as I pointed out, a substantial recovery to fight
9 for, and therefore a true incentive to pay a law
10 firm and an expert witness to protect their
11 interests.
12          I note also that the debtors'
13 counsel has represented to the court and confirmed
14 a conversation in which counsel represented to the
15 counsel for the preferred shareholders here, that
16 the debtors will negotiate with the preferred
17 shareholders in a meaningful way, which includes
18 providing, subject to confidentiality constraints,
19 a copy of the debtors' business plan, and other
20 meaningful information that could ensure that those
21 negotiations proceed in good faith. Therefore, the
22 statute put simply does not contemplate the
23 appointment of a committee of preferred
24 shareholders or a committee dominant by preferred

136

LORAL SPACE & COMMUNICATIONS LTD.

1 shareholders in these circumstances. The cost and
2 harm to the estate, which is both direct in terms
3 of dollars, as well as indirect in terms of dollars
4 spent by other parties and potential delay outweigh
5 the rather negligible benefits of additional
6 representation, given my conclusion that the
7 preferred holders have their own resources and
8 their own reasons for protecting their interests
9 actively in the case.
10          With regard to my question early on
11 in this hearing as to whether one could limit the
12 role of a committee to negotiating a plan, I
13 appreciate Mr. Wolfson's candor, as well as Mr.
14 Botter's remarks that in this case there are too
15 many issues that arise that could be used as a
16 means to affect the outcome of a plan. And my
17 reading of Mr. Wolfson's answer is that his clients
18 would prefer to maintain their flexibility with
19 respect to those issues rather than coming in and
20 literally sitting down and negotiating a
21 distribution at the end of the case and have them
22 come up to speed in the meantime. But ultimately,
23 given my conclusion that the preferred shareholders
24 are capable of representing themselves, that

137

LORAL SPACE & COMMUNICATIONS LTD.

1 colloquy was somewhat academic.
2          So, I'm denying the motions. I find
3 that the facts have not changed so dramatically
4 from the September 19th ruling to justify the
5 appointment of a committee of common shareholders,
6 and find that the preferred shareholders do not
7 need a committee to ensure adequate representation,
8 given the quality of their professionals and the
9 amount that they have at stake in the case.
10          Ms. Fife, if you want to settle an
11 order on three days notice then.
12          MS. FIFE:  Yes, that would be fine,
13 your Honor.

138

```
 1
 2
 3        C E R T I F I C A T E
 4   STATE OF NEW YORK    )
                          )  ss.:
 5   COUNTY OF WESTCHESTER )
 6          I, Denise Nowak, a Shorthand
 7   Reporter and Notary Public within and for
 8   the State of New York, do hereby certify:
 9          That I reported the proceedings in
10   the within entitled matter, and that the
11   within transcript is a true record of such
12   proceedings.
13          I further certify that I am not
14   related, by blood or marriage, to any of
15   the parties in this matter and that I am
16   in no way interested in the outcome of
17   this matter.
18          IN WITNESS WHEREOF, I have
19   hereunto set my hand this _____ day of
20   _____, 2003.
21
22        _____
             DENISE NOWAK
23
24
25
```

BENJAMIN REPORTING  (212)374-1138   DOYLE REPORTING  (212)867-8220
A VERITEXT COMPANY

**Exhibit C**

# ORIGINAL

1

2

3

4   UNITED STATES BANKRUPTCY COURT
    SOUTHERN DISTRICT OF NEW YORK

5   - - - - - - - - - - - - - - - - - - - - - - - - - -x

6       In the Matter                    Case No.:
                                         02-10497
        of
7
    KASPER A.S.L., LTD., et al,
8

9                    Debtors.

10  - - - - - - - - - - - - - - - - - - - - - - - - x

11                      July 15, 2003

12                  United States Custom House
                    One Bowling Green
13                  New York, New York    10004

14  motion by Triage shareholders for an order
15  directing the appointment of an official
    committee of equity security holders; motion by
16  debtors for authorization to amend employment
    agreements of Gregg I. Marks, Joseph B. Parsons,
17  and Lee S. Sporn; motion by debtors for an order
    extending the time to assume or reject unexpired
18  leases of nonresidential real property; objection
    by Taubman Auburn Hills Associates Limited
19  (calendar continued on next page)

20

21  B E F O R E :

22      THE HONORABLE ALLAN L. GROPPER, ESQ.,
            United States Bankruptcy Judge
23

24

25

212-867-8220        Doyle Reporting, Inc.      Doylerpt1@aol.com

1

2      Calendar continued:

3      Partnership to the debtors' motion to extend time
       to assume or reject leases; joinder by Gryphon
4      Master Fund, L.P., to the motion of Triage
       shareholders for an order directing the
5      appointment of an official committee of equity
       security holders; objection of CPG Partners,
6      L.P., to motion of debtors for an order extending
       the time to assume or reject unexpired leases of
7      nonresidential real property; debtors' objection
       and response to motion of certain shareholders
8      for order directing the appointment of an
       official committee of equity security holders;
9      joinder of Lonestar Capital Management and
       affiliates for an order directing appointment of
10     official committee of equity security holders;
       objection by official committee of unsecured
11     creditors to the motion of Triage shareholders
       and Gryphon Master Fund, L.P., for order
12     directing the appointment of an official
       committee of equity security holders; objection
13     by the United States Trustee to motion of Triage
       shareholders for the appointment of an official
14     committee of equity security holders.

15

16

17

18

19

20

21

22

23

24

25

3

```
 1
 2    A P P E A R A N C E S:
 3    WEIL, GOTSHAL & MANGES, LLP
      Attorneys for Debtors
 4           767 Fifth Avenue
      New York, New York    10153-0119
 5
      BY:   ALAN B. MILLER, ESQ.
 6                  -and-
      HANS S. HWANG, ESQ.
 7
 8    SONNENSCHEIN NATH & ROSENTHAL, LLP
      Attorneys for Triage
 9           1221 Avenue of the Americas
      New York, New York    10020
10
      BY:   CAROLE NEVILLE, ESQ.
11                  -and-
      D. FARRINGTON YATES, ESQ.
12
13    ANDERSON KILL & OLICK, P.C.
      Attorneys for Creditors' Committee
14           1251 Avenue of the Americas
      New York, New York    10020
15
      BY:   MARK SILVERSCHOTZ, ESQ.
16                  -and-
      ANDREA J. PINCUS, ESQ.
17
18    COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
      Attorneys for Gryphon Master Fund
19           25 Main Street
      Hackensack, New Jersey    07601
20
      BY:   STUART KOMROWER, ESQ.
21
22    PORZIO BROMBERG & NEWMAN, P.C.
      Attorneys for CPG Partners, L.P.
23           100 Southgate Parkway
      Morristown, New Jersey    07962-1997
24
      BY:   BRETT S. MOORE, ESQ.
25
```

212-867-8220        Doyle Reporting, Inc.        Doylerpt1@aol.co

```
1
2    A P P E A R A N C E S:   (continued)
3        UNITED STATES DEPARTMENT OF JUSTICE
         SOUTHERN DISTRICT OF NEW YORK
4        OFFICE OF THE UNITED STATES TRUSTEE
         Attorneys for United States Trustee
5              33 Whitehall Street, 21st Floor
               New York, New York    10004
6
         BY:   RICHARD MORRISSEY, ESQ.
7
8        MILBANK, TWEED, HADLEY & McCLOY, LLP
         Attorneys for Lonestar Capital
9              1 Chase Manhattan Plaza
               New York, New York    10005-1413
10
         BY:   CRAIG P. DRUEHL, ESQ.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

212-867-8220            **Doyle Reporting, Inc.**        Doylerpt1@aol.com

Proceedings

1

2        With these people with their aggressive,

3    energetic support.  You have had it up to

4    now, without their getting everything.  You

5    will have it in the future.  But I think we

6    should recognize they are the ones

7    responsible in part -- in significant part

8    for getting us where we are.  We want them

9    here to get us home.

10           JUDGE GROPPER:  Thank you.  I will take

11   a five-minute recess and give you my

12   rulings.

13           (Whereupon, a recess was taken.)

14           JUDGE GROPPER:  Please be seated.

15           Here are my decisions on both motions.

16   With regard to the motion by Triage

17   Management, LLC, and several of its

18   affiliates to appoint an equity committee, I

19   note the following:

20           The Triage affiliates collectively hold

21   approximately 6 percent of the debtors'

22   equity.  Joinders in the motion have been

23   filed by Lonestar Partners, which owns

24   approximately 9.9 percent of the equity of

25   the debtors by Gryphon Master Fund, LP,

1           Proceedings

2    which owns approximately 6 percent, and by

3    JANA Partners, which also claims to be an

4    equity owner.  All of the foregoing entities

5    asked the United States Trustee to appoint

6    an equity committee in letters sent at

7    various dates last May.  The appointment of

8    a separate committee was opposed before the

9    U.S. Trustee by the debtors and by the

10   Official Committee of Unsecured Creditors,

11   and they similarly oppose such an

12   appointment on this motion.

13        By letter dated June 11, 2003, the U.S.

14   Trustee denied the request for the

15   appointment of an equity committee.

16   Although the Court gives due consideration

17   to the action of the trustee, it reviews the

18   action of the U.S. Trustee de novo.  See, In

19   re Williams Communications Group, Inc., 281

20   B.R. 216 (Bankr. S.D.N.Y. 2002.); In re

21   Enron Corp., 279 B.R. 671, 684 (Bankr.

22   S.D.N.Y. 2002); In re McLean Industries,

23   Inc., 70 B.R. 852, 856-57 (Bankr. S.D.N.Y

24   1987); In re Texaco, Inc., 79 B.R. 560, 566

25   (Bankr. S.B.N.Y. 1987); H.R. Rep. 99-764,

```
 1                    Proceedings
 2     99th Cong., 2nd Sess. at 18 (1986).
 3          We start with the words of the
 4     statute.   Section 1102(a)(2) of the
 5     Bankruptcy Code provides in relevant part
 6     that, quote, "the Court may order
 7     appointment of additional committees of
 8     creditors or of equity holders if necessary
 9     to assure adequate representation of
10     creditors or of equity holders," close
11     quote.   The first question thus is whether
12     an additional separate committee is, quote,
13     "necessary," close quote, to assure
14     adequate representation.   The operative word
15     is "necessary," which implies a fairly
16     restrictive standard, and certainly a
17     standard which is higher than if the statute
18     called for the appointment of a committee
19     if, quote, "useful," close quote.   The
20     second operative term is, quote, "adequate
21     representation," close quote, which directs
22     the Court to consider the nature of the
23     unrepresented or under represented group,
24     the role of the group in the Chapter 11
25     case, and the functions that a committee
```

<center>Proceedings</center>

1
2 would presumably carry out.  The burden is

3 on the moving party to establish that a

4 separate committee is required to provide

5 adequate representation.  In re

6 Johns-Manville Corp. 68 B.R. 155, 158

7 (S.D.N.Y. 1986); accord Enron Corp., 279

8 B.R. at 685.

9  The determination is fact intensive

10 with many courts focusing on the following

11 three issues in connection with a motion for

12 an equity committee:  (i) the number of

13 shareholders; (ii) the complexity of the

14 case, and (iii) whether the cost of the

15 additional committee significantly outweighs

16 the concern for adequate representation.  In

17 re Johns-Manville Corp., 68 B.R. at 159;

18 In re Wang, 149 B.R. at 2; In re Williams

19 281 B.R. at 220.

20  Other factors that have been considered

21 by the courts are:  (i) the timing of the

22 motion relative to the status of the case,

23 In re Kalvar Microfilm, Inc., 195 B.R. 599,

24 600 (Bankr. D.Del. 1996); (ii) potential to

25 recover expenses pursuant to Section 503(b),

Proceedings

1

2     In re Hills Stores, 137 B.R. 4, 8 (Bankr.

3     S.B.N.Y. 1992); (iii) motivation of the

4     movants, In re Orfa Corp. of Philadelphia,

5     121 B.R. 294, 295, (Bankr. E.D.Pa. 1990);

6     and (iv) the tasks an additional committee

7     is to perform, McLean Industries 70 B.R. at

8     860.

9         This case presents the following fact

10    pattern that does not appear to have been

11    considered in a reported case.  At the

12    outset, it appeared that these debtors were

13.   hopelessly insolvent.  It has been held in

14    many cases that an equity committee is not,

15    quote, "necessary to ensure adequate

16    representation," close quote, where the

17    debtors appear to be hopelessly insolvent.

18    See, e.g., In re Emons Industries, 50 B.R.

19    692, 694 (Bankr. S.D.N.Y. 1985); In re

20    Williams Communications, 281 B.R. at 220.

21        In cases at bar, however, the debtors'

22    prospects have improved to the point that

23    there may be value for equity.  The debtors

24    and the creditors' committee argue that it

25    is not at all certain that there will be any

1          Proceedings

2      equity, and this argument is joined in by

3      the U.S. Trustee.   Both argue that this

4      militate against an appointment of a

5      committee.   The real question is whether in

6      these cases at this time, when it is not

7      clear whether there will be any value for

8      equity and, if so, what it will be, but

9      there is a possibility, is a separate

10     committee necessary to assure the equity

11     holders adequate representation?

12         The answer, in light of the facts of

13     this matter, is clearly "no."   The best way

14     to find out what an enterprise is worth is

15     to sell it, preferably as a going concern.

16     As the Supreme Court said in Bank of America

17     v. 203 LaSalle Street Partnership, 526 U.S.

18     434, 457 (1999), quote, "the best way to

19     determine value is exposure to a market,"

20     close quote.

21         The debtors have already put in place

22     sales procedures that the Court has found

23     appropriate to obtain the highest and best

24     offer for the debtors.   If there is more

25     value for the equity than the initial bid

Proceedings

1
2      obtained from Kellwood Company, the sales
3      procedure should smoke it out.   There is not
4      the slightest indication that the sales
5      procedures are not fair or that the Kellwood
6      so-called stalking horse bid is not a fair
7      arm's length offer, untainted by an insider
8      dealer.   Testimony at the hearing of June
9      27, 2003, has contradicted Triage's early
10     claims that the sale process improperly
11     enriches management and therefore improperly
12     incentivizes management to seek a sale,
13     rather than a stand-alone plan.
14          Nevertheless, it is recognized that the
15     equity holders may have a concern that the
16     creditors' committee and the debtors stop
17     negotiating with Kellwood when they covered
18     the debt, or came close to covering it, and
19     ignored the fact that equity might be the
20     holder of the residual interest and was also
21     entitled to have its interests or possible
22     interests taken into account.   In this case
23     there is no indication that the debtors did,
24     in fact, ignore their duties to the holders
25     of the residual interest.   Moreover, the

Proceedings

1
2   presence on the committee of two large
3   creditors who were also large shareholders
4   provides an indication, albeit slight, that
5   the interests of equity were not ignored.
6   But the real protection is that the debtors
7   put themselves up for sale pursuant to fair
8   procedures that are designed to obtain the
9   highest value.  If the Triage group or any
10  other equity holders are convinced that
11  there is more value in the equity, the
12  equity can bid for it.  See, In re Central
13  Ice Cream Corp., 836 F.2d 1068, 1072, Fn. 3,
14  (7th Cir. 1987).  The equity does not need a
15  committee to renegotiate sales procedures
16  and possibly put the current sale and the
17  interests of the debt and equity at more
18  risk than is necessary.  The Kellwood offer
19  expires on November 30, 2003, and the
20  debtors do not have a limitless period of
21  time to effect a plan, especially in a
22  business which, as we have seen in this
23  case, can go down and can go up, and it
24  certainly can change.  This implicates a
25  factor frequently used by the Courts in

74

1          Proceedings

2    considering a motion for an equity

3    committee, whether it simply comes too late

4    in the Chapter 11 process.  See, generally

5    In re Public Serv. Co. of New Hampshire, 89

6    B.R. 1014, 1018 (Bankr. D.N.H. 1988).

7          There is a second mechanism that

8    protects the equity's interests here.  The

9    sale to Kellwood or another purchaser is not

10   final until the debtors duly confirm a plan

11   in accordance with all the requirements of

12   Chapter 11.  The equity will thus have ample

13   opportunity to show, if they wish to so

14   argue, that the debtors have not acted in

15   good faith or that a stand-alone plan is

16   required under the Code.  There is no reason

17   to believe that a committee would be

18   necessary to participate in a contested

19   confirmation hearing, if any.  First, if

20   Triage and its allies wish to contest

21   confirmation, they obviously have the

22   resources to do so.  Moving shareholders of

23   large, sophisticated institutions with the

24   ability to represent themselves well and be

25   heard is evidence by this motion and by

Proceedings

1

2    prior proceedings in these very cases.   With

3    regard to SEC concerns, the Court is' willing

4    to consider any reasonable protection that

5    is within its power to· allow the movants the

6    ability to protect their legitimate

7    interests in connection with these Chapter

8    11 cases.   However, they have not

9    demonstrated that these securities laws

10   prohibit them from taking such steps or

11   justify a committee under the facts of this

12   case or, indeed, that the establishment of a

13   committee provides any automatic immunity.

14   It may, but informal committees are very

15   common under Chapter 11.   They are

16   indirectly recognized by the bankruptcy

17   rules, and the Court certainly will hear

18   from the formal committee, if the committee

19   wishes to be heard in that guise.

20       It is also noteworthy that a majority

21   of the equity appears to be held by holders

22   who have not objected and appears satisfied

23   with the present status.   To create an

24   equity committee from a minority would also

25   be a possible complication and could be

Proceedings

1
2   self-defeating.  A committee would give a
3   movant some additional leverage, but, as I
4   said, if the group wishes to contest
5   confirmation, the court will give it the
6   same attention that it would give any
7   similarly situated group.
8       Creation of a committee would, of
9   course, provide the movants with a clearer
10  path for the recovery of their costs than if
11  they sought such costs under the substantial
12  contribution test of 11 U.S.C. Section
13  503(b).  If any informal committee of equity
14  holders or the equity holder movants
15  themselves make a, quote, "substantial
16  contribution," end quote, they have a right
17  to recovery of expenses under Section 503(b)
18  of the Bankruptcy Code.  In these cases
19  where it is not certain that there will be
20  value for equity, and in light of the other
21  protections for equity, it would not be
22  appropriate to risk imposing these costs on
23  the creditor body at this stage of the
24  case.
25      Finally, the debtors have made it clear

77

1          Proceedings

2      that they recognize their responsibility to

3      equity holders.   They have met and

4      negotiated with representatives of movants

5      and state that they are willing to do so.

6      To form a committee at this late date would,

7      however, imply that the debtors might also

8      have to negotiate the plan, as negotiation

9      of a plan is one of the principal

10     responsibilities of a committee.   This might

11     well propel these cases a giant step

12     backwards and endanger the progress that is

13     ironically for genesis of this motion.

14     Where procedures are in place to protect

15     equity and there is no indication that their

16     interests have been ignored and where they

17     are well represented already, a separate

18     committee is not quote, "necessary to assure

19     their adequate representation," end quote.

20     The motion is denied.   The debtors shall

21     settle an order on three days' notice.

22          With respect to the motion to approve

23     changes to the compensation plans of three

24     members of management, the debtors have

25     shown three factors that support the motions

Proceedings

1

2    as appropriate under the structures of the

3    Bankruptcy Code.  First, these are changes

4    for the benefit of the officers who have

5    concededly done a superb job.  This is not

6    always the case in incentive plans that come

7    before Bankruptcy Court.  Second, these

8    officers could have negotiated these changes

9    earlier.  If this is so, their best efforts

10   are sill needed, and there is no cause for

11   the debtors to be forced to treat them

12   inequitably, because they tended to the

13   needs of the company without negotiating

14   their own benefits at as earliest a stage as

15   possible.  Third, and most important, there

16   has been a showing that these officers would

17   be entitled to more benefits under other

18   scenarios and that the amendments are

19   reasonable and fair to the debtors in terms

20   of rationalizing the treatment of these

21   officers in the event of any sale.  It is

22   clear that they are giving up some very

23   valuable expectancies and rights, and there

24   is no evidence that the costs of their

25   rights as amended is disproportionate to the

79

Proceedings

1
2     amounts that are being given up and to the
3     benefits from the continued services from
4     these officers.   The motion has been
5     reviewed by the creditors' committee, which
6     has no objection, and which the Court will
7     assume believes as it says that the costs of
8     the plan are coming out of the pockets of
9     the creditors rather than the shareholders.
10    In any event, whether the cost is, in fact,
11    a cost of the creditors or the shareholders,
12    under the Bankruptcy Code the debtors have
13    made a sufficient showing that the
14    amendments are reasonable and the motion
15    will be approved.   The debtors are also
16    requested to settle an order on three days'
17    notice.   Thank you very much.
18         MR. MILLER:   The order I settle will
19    have the revised form of the employment
20    agreements to broaden beyond Kellwood, as I
21    indicated earlier.   I will service a
22    blackline copy so that the Triage
23    shareholders will see the changes.
24         JUDGE GROPPER:   Very good.   Thank you.
25

```
 1                    C E R T I F I C A T E

 2

 3     STATE OF NEW YORK    )
                            : SS:
 4     COUNTY OF NEW YORK   )

 5

 6              I, DEBORAH HUNTSMAN, a Shorthand

 7     Reporter and Notary Public within and for the

 8     State of New York, do hereby certify:

 9              That the within is a true and accurate

10     transcript of the proceedings taken on the 15th

11     day of July, 2003.

12              I further certify that I am not

13     related by blood or marriage to any of the

14     parties and that I am not interested in the

15     outcome of this matter.

16              IN WITNESS WHEREOF, I have hereunto

17     set my hand this 18th day of July, 2003.

18                        Deborah Huntsman

19                        DEBORAH HUNTSMAN

20

21

22

23

24

25
```