**LATHAM & WATKINS LLP**
885 Third Avenue
New York, New York 10022-4802
Telephone: (212) 906-1200
Robert J. Rosenberg (RR-9585)
Mitchell A. Seider (*admitted pro hac vice*)
Mark A. Broude (MB-1902)
Email: robert.rosenberg@lw.com
        mitchell.seider@lw.com
        mark.broude@lw.com

Attorneys for the Official Committee of Unsecured Creditors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DELPHI CORPORATION, et al., | ) | Case No. 05-44481 (RDD) |
| | ) | |
| Debtors. | ) | |
| | ) | Jointly Administered |
| | ) | |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO MOTION OF APPALOOSA MANAGEMENT L.P. PURSUANT TO
11 U.S.C. § 1102(a)(2) FOR AN ORDER DIRECTING THE UNITED STATES TRUSTEE
TO APPOINT AN EQUITY COMMITTEE IN THESE CHAPTER 11 CASES**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the

chapter 11 cases of Delphi Corporation and certain of its affiliates (collectively, the "Debtors"),

by and through its counsel, hereby submits this objection ("Objection") to the Motion of

Appaloosa Management L.P. ("Appaloosa") Pursuant to 11 U.S.C. § 1102(a)(2) for an Order

Directing the United States Trustee to Appoint an Equity Committee in these Chapter 11 Cases

(the "Motion").[1]  In support of this Objection, the Committee respectfully states as follows:

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Motion.

## RELEVANT BACKGROUND FACTS

1.      On October 8, 2005 (the "Petition Date"), thirty-nine of the Debtors filed with this Court voluntary petitions for relief under chapter 11 of Title 11 of the United States Code (as amended, the "Bankruptcy Code"). On October 14, 2005, three additional Debtors filed voluntary petitions.

2.      On or about October 10, 2005, _after_ the commencement of these cases, Appaloosa acquired approximately 9.3% of Delphi Corporation's issued and outstanding equity shares.

3.      The Committee was appointed in these cases by the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") on October 17, 2005.[2]

4.      On November 7, 2005, Appaloosa sent to the U.S. Trustee a letter (the "Appaloosa UST Letter," a copy of which is attached hereto as Exhibit A) requesting that the U.S. Trustee appoint an official committee of equity security holders in these cases.

5.      On November 28, 2005, Appaloosa sent to the board of directors (the "Board of Directors") of Delphi Corporation an additional letter (the "Board Letter," a copy of which is attached hereto as Exhibit B) requesting that the Board of Directors support the demands set forth in the Appaloosa UST Letter.

6.      On December 12, 2005, the Committee sent to the U.S. Trustee a letter (the "Committee's Letter," a copy of which is attached hereto as Exhibit C) in response to the Appaloosa UST Letter. The Committee's Letter indicated the Committee's opposition to the appointment of an official equity committee in these cases.

---

[2]  The following members were originally appointed to the Committee: (a) Capital Research and Management Company; (b) Electronic Data Systems Corp.; (c) Flextronics International Asia-Pacific, Ltd.; (d) Freescale Semiconductor, Inc.; (e) General Electric Company; (f) IUE-CWA and (g) Wilmington Trust Company, as Indenture Trustee. Flextronics International Asia-Pacific, Ltd., has since resigned from the Committee, while the Pension Benefit Guaranty Corporation and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW") have been added as _ex officio_ members of the Committee.

2

7.     On December 19, 2005, the Debtors sent to the U.S. Trustee a letter in response to the Appaloosa UST Letter (the "Debtors' Letter," a copy of which is attached hereto as Exhibit D). The Debtors' Letter made clear that, like the Committee, the Debtors are opposed to the appointment of an official equity committee in these cases.

8.     On the evening of December 22, 2005 (prior to the U.S. Trustee's responding to the Appaloosa UST Letter), Appaloosa filed its Motion.

9.     To date, the U.S. Trustee, the agent for the Debtors' prepetition lenders (the "Prepetition Agent," on behalf of itself and the prepetition lenders) and General Motors ("GM") have filed papers in response to Appaloosa's Motion, with the U.S. Trustee and the Prepetition Agent objecting to the relief sought in the Motion. The Committee understands that the Debtors will also be filing an objection to the Motion.

10.     A hearing on the Motion is currently scheduled for March 9, 2006.

## OBJECTION

11.     As set forth below and in the Committee's Letter to the U.S. Trustee, the Motion should be denied because (i) the interests of equity holders are adequately represented, (ii) Appaloosa is highly sophisticated and capable of representing its own interests without burdening the Debtors' estates with the substantial additional administrative costs that would be incurred were an equity committee to be appointed, and (iii) Appaloosa has not satisfied its burden to show that the Debtors are solvent and that value is likely to exist for distribution to equity holders such as Appaloosa at the conclusion of these cases.

### A.     Official Equity Committees Are Rarely Appointed

12.     Section 1102(a)(1) of the Bankruptcy Code provides that the United States Trustee may appoint an equity committee when it deems such an appointment to be appropriate.

NY\1098128.7

"The permissive language ('may') of the statute indicates that the [U.S. Trustee's] authority to appoint such a committee is discretionary." In re Williams Communications Group, Inc., 281 B.R. 216, 219 (Bankr. S.D.N.Y. 2002).

13.    In the event that the U.S. Trustee determines in its discretion not to appoint an official equity committee, section 1102(a)(2) of the Bankruptcy Code allows (in pertinent part) that:

> "On request of a party in interest, the court may order the appointment of additional committees of . . . equity security holders if necessary to assure the adequate representation of . . . equity security holders. The United States Trustee shall appoint any such committee."[3]

14.    In chapter 11 cases that have been filed in this and other districts, the U.S. Trustee has only rarely appointed official equity committees. In fact, it is rare that the appointment of an official equity committee is even sought because of the well-recognized presumption that "[t]he appointment of official equity committees should be the rare exception." Williams, 281 B.R. at 223; Collier on Bankruptcy, 15th Ed. ¶ 1102.03[2] (stating that "appointment of committees of equity security holders is the exception rather than the rule in chapter 11 cases").

15.    As described above, Congress in drafting the Bankruptcy Code did not require the appointment of official equity committees. "Congress' desire to protect shareholders in reorganization proceedings was not strong enough . . . to mandate the creation of equity committees." In re Johns-Manville Corp., 68 B.R. 155, 160 (S.D.N.Y. 1986). Importantly,

---

[3] Despite the logical and efficient sequence of events set forth in sections 1102(a)(1) and (2) of the Bankruptcy Code, Appaloosa prematurely filed its Motion with this Court while awaiting a response to the Appaloosa UST Letter that could have rendered the Motion moot. Motion at 11. Appaloosa acknowledged at the time it filed the Motion that this Court has the power under section 1102(a)(2) of the Bankruptcy Code to consider "appointing an official committee of equity security holders in the event that the United States Trustee does not appoint such a committee." Motion, at 12 (emphasis added). The Committee believes that the potential inefficiencies caused by Appaloosa's premature Motion foreshadow the inefficiencies and waste that will occur if an official equity committee is appointed in these cases.

4

Congress recognized that appointing an equity committee would not always be appropriate. As the Court in Johns-Manville noted, "[w]hile Section 1102(b) states that a court *may* appoint an equity committee, Section 1102(a) *requires* the court to appoint an official committee to represent unsecured creditors. Thus, when Congress intended to mandate the appointment of a committee, it made its intention clear." Id. at 157, 159 (emphasis in original).

16.    For the reasons stated herein, these cases do not present circumstances compelling an exception to this general rule. Appointment of an official equity committee in these cases is unnecessary and would be overly burdensome and costly to the Debtors' estates.

B.    The Interests of Existing Equity Holders Will be Adequately Represented

17.    The legal standard for appointment of an official equity committee is that it must be "necessary to assure adequate representation . . .of equity security holders." 11 U.S.C. § 1102(a)(2). The Bankruptcy Code does not define "adequate representation," thereby leaving it within the discretion of bankruptcy courts to examine the facts of each case and determine if an additional committee is warranted. In re Beker Indus. Corp., 55 B.R. 945, 948 (Bankr. S.D.N.Y. 1985); Johns-Manville, 68 B.R. at 159. In general, equity committees "should not be appointed unless equity holders establish that "they are unable to represent their interests . . . without an official committee." Williams, 281 B.R. at 223. "It is instructive to note that the statutory focus of section 1102(a)(2) is not whether the shareholders are 'exclusively' represented, but whether they are 'adequately' represented." Williams, 281 B.R. at 223; accord Polak v. Edison Bros. Stores (In re Edison Bros. Stores, Inc.), 1996 WL 534853, *4 (D. Del. Sept. 17, 1996).

18.    Invariably, courts first look to the debtor's officers and directors to exercise their fiduciary duties on behalf of all stakeholders, including shareholders. In the Debtors' Letter, the Debtors affirm that "Delphi's Board of Directors (10 of the 12 of which are independent directors) will adequately represent all stakeholders in their role to maximize the enterprise value

5

of the Debtors." Debtors' Letter at 2.  Moreover, Appaloosa acknowledged in the Appaloosa

UST Letter that "Delphi's directors and managers have a fiduciary responsibility to look after

shareholders' interests," but goes on to argue that "conflicting concerns often arise which make it

difficult for such directors and management to follow the best course for non-insider public

shareholders." Appaloosa UST Letter at 3; see also Motion at 14 (". . . Delphi's directors and

managers have a fiduciary responsibility to look after shareholder's interests . . ..").  Appaloosa's

argument (and haphazard speculation with respect to GM's role and other issues in these cases)[4]

attempt to muddy the waters and divert this Court's attention from the primary legal question at

hand: whether equity holders such as Appaloosa will be adequately represented in these cases.

As one District Court has noted in response to arguments similar to those made by Appaloosa in

the Appaloosa UST Letter and Motion:

> [While it may be correct that in an insolvency context]
> management cannot exclusively advocate for the interests of
> shareholders, the statutory focus of § 1102(a)(2) is not whether
> shareholders are "exclusively" represented, but whether they are
> "adequately" represented.  Until Congress recognizes that inherent
> conflicts of interest exist between management and public
> shareholders in the bankruptcy context that warrant the mandatory
> appointment of an equity committee, the statutory test remains
> "adequacy of representation" to be determined on the facts of each
> case. [citation omitted].  [Parties requesting the appointment of a
> committee] have the initial burden of developing a factual record
> to demonstrate the need for adequate representation.

Edison 1996 WL 534853 at *4 (D. Del. September 17, 1996)(denying request on appeal for the

appointment of an official equity committee)(internal citations omitted).

19.    In addition to the protections provided by the Debtors' Board of Directors and

management, the interests of equity holders are also being indirectly furthered by the efforts of

---

[4] In its response to the Motion (the "GM Response"), GM specifically refutes the "rumor and innuendo" contained
in the Motion with respect to GM.  GM Response at 4.

6

the Committee. Appaloosa admits in its Motion and Appaloosa UST Letter that "unsecured creditors and shareholders possess a general identity of interest in seeing that the unsecured creditors are paid because of the 'absolute priority' rule's mandate that junior interests retain nothing unless senior debt is paid in full." Motion at 14; see also Appaloosa UST Letter at 2. Nevertheless, Appaloosa questions the alignment of unsecured creditors' and equity holders' interests because the Committee "has neither a duty nor an incentive in these cases to choose strategic alternatives to maximize value for equity." Motion at 14; Appaloosa UST Letter at 2

20.    Appaloosa misses the point. While it is true that the Committee has no duty to represent equity holders' interests in these cases, such interests are still consistent with those of the Committee. Both unsecured creditors and equity holders will benefit from maximizing the value of the Debtors' estates. Williams, 281 B.R. at 222; In re Leap Wireless Int'l, Inc., 295 B.R. 135, 139-40 (Bankr. S.D. Ca. 2003)(finding that the economic interests of bondholders and shareholders appear to be the same, to find the highest realistic value for the company). Courts have recognized such an alignment of interests in similar situations and deemed it relevant in determining whether equity holders' interests are adequately represented. Williams, 281 B.R. at 222; In re Baldwin-United Corp., 45 B.R. 375, 376 (Bankr. S.D. Ohio 1983). Here, as the Court in Williams found, "the Creditors' Committee has sufficiently aligned or parallel interests with the Shareholders to preclude the need for an additional committee." Williams, 281 B.R. at 223.

21.    Finally, equity holders themselves are not voiceless in these cases. Any party in interest has standing to be heard pursuant to 11 U.S.C. § 1109(b). In addition to being able to participate in these cases individually (as Appaloosa has done), equity security holders could assert a collective voice through an unofficial committee, and seek reimbursement of their costs and attorneys fees under 11 U.S.C. §§ 503(b)(3) and (4) if their actions result in a substantial

NY\1098128.7

contribution to these cases. <u>Williams</u>, 281 B.R. at 224.[5]  However, the right to be heard is not

synonymous with the right to charge the Debtors' estates for the cost of professionals. <u>In re Hills</u>

<u>Stores Co.</u>, 137 B.R. 4, 7 (Bankr. S.D.N.Y. 1992).  In the event that Appaloosa determines that

either Debtors' management or the Committee has overlooked an opportunity to preserve value

in these cases that could provide a recovery for the Debtors' equity holders, Appaloosa certainly

has the knowledge and resources to raise any such issues during the course of these cases:

- Appaloosa is a sophisticated hedge fund which reportedly maintains over $5 billion in assets under management.

- Appaloosa has in the past been involved in complex chapter 11 proceedings.

- Appaloosa has already retained experienced counsel to represent its interests in these cases.

- Appaloosa is currently the holder of approximately 9.3% of the Debtors' total issued and outstanding equity shares.

22.     These cases have been widely publicized.  The Debtors have issued numerous

press releases describing material developments, and virtually daily articles are published

regarding the Debtors' reorganization efforts.  Despite the foregoing publicity, the Committee is

not aware of any party but Appaloosa requesting the formation of an official equity committee.

Notably, Appaloosa acquired its interests in the Debtors on or about October 10, 2005, <u>after</u> the

commencement of these cases.  In short, Appaloosa voluntarily sought to involve itself in the

Debtors' chapter 11 process, and is more than capable of doing so without official committee

status.[6]  Appaloosa should not now be allowed to burden the Debtors' estates and unsecured

---

[5]  By its Motion, Appaloosa in effect is seeking to avoid the procedures intended by Congress in its drafting of sections 503(b)(3) and (4) of the Bankruptcy Code, instead seeking guaranteed payment of its fees and expenses regardless of whether Appaloosa contributes any value in these cases.

[6]  Appaloosa states repeatedly in its Motion that it cannot effectively be involved in these cases without official committee status.  This argument is implausible and flawed given Appaloosa's level of sophistication and employment of experienced counsel, its decision to purchase a significant equity stake in Delphi Corporation after the Petition Date, and its ability to seek discovery (as Appaloosa has done in connection with the Motion) and file

creditors with the potentially huge additional costs associated with an official equity committee, all in an effort to further its junior interests and shift the burden of paying its own professionals.

23.     The facts in these cases satisfy the test of "adequacy of representation," and Appaloosa's request for the appointment of an equity committee should be denied. Equity holders have been, and will continue to be, adequately represented in these cases. Appaloosa's request should be viewed for what it is: an attempt by Appaloosa to advance its parochial interests at great expense to the Debtors' estates and unsecured creditors.

C.     Appaloosa has Failed to Show that the Debtors are Solvent

24.     Appaloosa appears to base its Motion primarily upon its unsupported assertion that the Debtors are not "hopelessly insolvent." However, Appaloosa has failed to provide any meaningful evidence that the Debtors' estates are solvent. Despite speculation and innuendo in the Motion, Appaloosa has failed to meet its burden of proof with respect to this critical solvency issue. Appaloosa's failure compels denial of its request for the appointment of an official equity committee. See Williams, 281 B.R. at 220 ("the debtor's solvency is a major factor when considering the cost of appointing an equity committee").[7]

25.     Various courts have recognized that "[w]hen a debtor appears to be hopelessly insolvent, an equity committee is not generally warranted . . . . As a result of the absolute priority rule, equity holders of a hopelessly insolvent debtor will receive no distribution. As such, the shareholders have no economic interest left to protect . . . ." Williams, 281 B.R. at 220; see also In re Emons, Indus., 50 B.R. 692, 694 (Bankr. S.D.N.Y. 1985) ("no equity committee should be appointed when it appears that a debtor is hopelessly insolvent"). Moreover, a debtor need not

---

pleadings (such as the Motion) as a party in interest in these cases. Clearly, Appaloosa has and will continue to involve itself in these cases. The only question is whether Appaloosa should be able to pursue its own interests at the expense of the Debtors' estates.

[7]  Indeed, it appears that the Motion may in fact be nothing more than an effort to create a pretext for massive and unnecessary discovery, which in fact Appaloosa served on the Debtors on the business day before Christmas.

NY\1098128.7

be hopelessly insolvent in order for courts to deny the appointment of an equity committee. The correct inquiry is whether the debtor "appears to be hopelessly insolvent." Williams, 281 B.R. at 221 (emphasis added). The Court in Williams made clear that equity holders bear the burden of proof with respect to solvency: "[Official equity] committees should not be appointed unless equity holders establish that (i) there is a substantial likelihood that they will receive a meaningful distribution in the case under a strict application of the absolute priority rule, and (ii) they are unable to represent their interests in the bankruptcy case without an official committee." Id at 223; see also In re Leap Wireless Int'l, Inc., 295 B.R. 135, 140 (Bankr. S.D. Ca. 2003) ("[s]hareholders committees should be appointed when equity holders establish there is a substantial likelihood that they will receive a meaningful distribution in the case and that the existing committee(s) do not adequately represent their interests").

26.    Appaloosa has acknowledged that "According to the Debtors' petitions and the Miller Affidavit,[8] the Debtors and their non-debtor subsidiaries and affiliates collectively possess $17.1 billion in total assets and $22.1 billion in total liabilities." Appaloosa UST Letter at 5; see also Miller Affidavit at 7. Moreover, the Debtors' amended Schedules and Statements filed on February 1, 2006, reflect that on a consolidated basis, the Debtors have assets totaling approximately $16.4 billion and liabilities totaling approximately $24.8 billion. Finally, the Debtors' December 2005 Monthly Operating Report filed on January 31, 2006, reported Debtor assets totaling approximately $13.8 billion, and liabilities totaling approximately $20.1 billion.[9]

---

[8] The Affidavit of Robert S. Miller, Jr. Under Local Bankruptcy Rule 1007-2 and in Support of Chapter 11 Petitions and Various First Day Applications and Motions filed in these cases is referred to in the Appaloosa UST Letter and this Objection as the "Miller Affidavit."

[9] The Committee has not yet completed its analysis of the figures set forth in this paragraph, and reserves all rights with respect thereto.

NY\1098128.7

Indeed, the Debtors' Letter concluded that the Debtors are hopelessly insolvent, and that there

will be no meaningful distribution available for common shareholders in these cases.

    27.    All senior liabilities of the Debtors must be satisfied in full before equity holders

of Delphi Corporation can receive any distributions.  While Appaloosa speculates in its Motion

and Appaloosa UST Letter that value may exist for equity holders in these cases, it provides no

tangible evidence supporting this bald assertion and ignores evidence to the contrary filed by the

Debtors to date.[10]  Appaloosa also ignores the possibility of huge claims being asserted by

Debtors' labor unions, the Pension Benefit Guaranty Corporation or GM.[11]

    28.    Appaloosa's position that Delphi Corporation's payment of a $0.015 dividend to

equity holders in June 2005 is evidence of the Debtors' solvency is also inadequate to warrant

the appointment of an official equity committee for several reasons.  See Motion at 17-18;

Appaloosa UST Letter at 3.  The Debtors' financial condition  9 months ago is irrelevant.  As set

forth above, documents filed by the Debtors since the commencement of these cases reflect the

Debtors' assertion that they are insolvent on a consolidated basis by at least $5 billion.[12]  While

the dividend referenced by Appaloosa was apparently made by Delphi Corporation in June 2005,

Delphi Corporation's Board of Directors announced the elimination of such quarterly dividends

---

[10] Even in the event that certain of the Delphi Corporation's subsidiaries are solvent (leaving equity value to flow to Delphi Corporation), public debt issued by Delphi Corporation and totaling approximately $2.43 billion, together with all other senior debt obligations, must be paid in full, with interest, before equity holders of Delphi Corporation could receive any recovery in these cases.

[11] The Committee takes no position at this time with respect to any claims asserted, or to be asserted, by any party in these cases.

[12] Notably, the Miller Affidavit also indicates that "In the first two years following the Spin-Off [of the Debtors by General Motors Corporation in 1999], the Company generated more than $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales.  Indeed, the [Debtors] experienced net operating losses of $608 million for the first six months of calendar year 2005 on six month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same period in calendar year 2004." Miller Affidavit at 11.

in September 2005.  Finally, the June 2005 dividend may have been made in violation of

Delaware or other law.[13]

29.    Appaloosa cannot satisfy its burden to show that the Debtors are solvent simply

by saying as much.  Appaloosa has failed to identify and present evidentiary proof of solvency.

For this reason, Appaloosa's request should be denied, and the Debtors' estates should be spared

the significant costs that would result from the appointment of an official equity committee.

> D.    The Appointment of an Official Equity Committee Will Result in
> Significant Costs to the Estates

30.    Undoubtedly, significant additional costs would result from the appointment of an

official equity committee because the equity committee would certainly seek to retain lawyers

and financial advisors.  In re Saxon Indus., Inc., 39 B.R. 945, 947 (Bankr. S.D.N.Y. 1984)

(recognizing that the appointment of a committee raises cost concerns because it is "closely

followed by applications to retain attorneys and accountants.").  Appaloosa states in its Motion

that "[in] a case of this magnitude, where consolidated assets exceed $17 billion and net sales are

over $26 billion, the benefits of [equity] committee representation far outweigh any relatively

modest costs to the Debtors' estates." Motion at 25 (emphasis added).  Despite the implication in

the Motion that because a case is large, a sophisticated equity holder like Appaloosa should be

entitled to feed at the Debtors' trough in the guise of representing equity holders at large, the

mere size of a chapter 11 case is not the appropriate consideration; this Court must weigh

"adequacy of representation" against the potential financial costs to the Debtors' estates

associated with the appointment of an official equity committee.  Appaloosa's alarming

argument that the size of the Debtors' estates renders the cost of an official equity committee

irrelevant leads to the clearly absurd conclusion that monitoring costs in large chapter 11 cases is

---

[13]  Indeed, the Committee intends to investigate the propriety of this dividend during the course of these cases.

12

unimportant because the size of such cases means that those costs are "relatively modest" as compared to overall assets.  Furthermore, in addition to the financial costs of an official equity committee, there are also intangible "costs," such as the delay and disruption of the reorganization process that results from the appointment of an official equity committee. <u>Johns-Manville</u>, 68 B.R. at 160.  These intangible costs should also carefully be considered by this Court on the facts in these cases.  There is simply no reason for the Debtors' estates to be burdened with the potentially huge additional economic and administrative costs that would result if such a committee is appointed.  <u>See</u> <u>Williams</u>, 281 B.R. at 220.

**WHEREFORE,** the Committee respectfully requests that this Court (a) deny the Motion, and (b) grant the Committee such other relief as is just and proper.

Dated:  March 2, 2006
       New York, New York

**LATHAM & WATKINS LLP**

By: <u>/s/ Robert J. Rosenberg</u>
    Robert J. Rosenberg (RR-9585)
    Mitchell A. Seider
    Mark A. Broude (MB-1902)
    885 Third Avenue, Suite 1000
    New York, New York 10022
    Telephone:  (212) 906-1200

Attorneys for the Official Committee
of Unsecured Creditors

NY\1098128.7

**EXHIBIT A**

**WHITE & CASE**

White & Case LLP                    Tel + 1 305 371 2700
Wachovia Financial Center, Suite 4900    Fax + 1 305 358 5744/5766
200 South Biscayne Boulevard         www.whitecase.com
Miami, Florida 33131-2352

Direct Dial + 305-995-5282    tlauria@whitecase.com

November 7, 2005

SENT VIA FACSIMILE TRANSMISSION

Alicia M. Leonhard, Esq.
Tracy H. Davis, Esq.
Office of the United States Trustee
for the Southern District of New York
33 Whitehall Street, 21st Floor
New York, New York 10004

Re:    In re Delphi Corporation, et al., 05-44481(RDD)
       (Jointly Administered)

Attorneys Leonhard and Davis:

We represent Appaloosa Management L.P. ("Appaloosa"), which, collectively with certain of its
affiliates, is one of Delphi Corporation's ("Delphi") largest shareholders, owning approximately
9.3% of Delphi's issued and outstanding shares.

For the reasons set forth below, Appaloosa believes that the appointment of an official
committee is required to provide adequate and appropriate representation of the interests of all
shareholders of Delphi and to ensure that they receive the value to which they are entitled under
the chapter 11 process. Accordingly, we hereby request the appointment of an official
committee of equity security holders (an "Equity Committee") in the chapter 11 cases of Delphi
and its affiliated debtors and debtors in possession (collectively, the "Debtors").

According to the Affidavit of Robert S. Miller Jr. under Local Bankruptcy Rule 1007-2 and in
support of Chapter 11 Petitions and Various First Day Applications and Motions dated October
8, 2005 (the "Miller Affidavit"), the Debtors estimated that there were 331,202 shareholders as
of August 26, 2005. According to the Miller Affidavit, the Company has 1.35 billion shares of

ALMATY   ANKARA   BANGKOK   BEIJING   BERLIN   BRATISLAVA   BRUSSELS   BUDAPEST   DRESDEN   DÜSSELDORF   FRANKFURT   HAMBURG   HELSINKI
HO CHI MINH CITY   HONG KONG   ISTANBUL   JOHANNESBURG   LONDON   LOS ANGELES   MEXICO CITY   MIAMI   MILAN   MOSCOW   MUMBAI   NEW YORK   PALO ALTO
PARIS   PRAGUE   RIYADH   ROME   SAN FRANCISCO   SÃO PAULO   SHANGHAI   SINGAPORE   STOCKHOLM   TOKYO   WARSAW   WASHINGTON, DC

MIAMI 612795 [512795_8.DOC] (2K)

11/29/2005 TUE  6:09  FAX 305 374 1465 WHITE & CASE                                                      ☑006/011

Alicia M. Leonhard, Esq.
Tracy H. Davis, Esq.

**WHITE & CASE**

November 7, 2005

authorized common stock and of this amount 561,781,590 shares were outstanding as of August 26, 2005.

**The Relevant Criteria for Establishing**
**an Equity Committee are Satisfied Here**

We believe all of the criteria for the appointment of an Equity Committee under 11 U.S.C. § 1102(a)(1) are present in this matter:

      (a)     the interests of shareholders are not otherwise adequately represented;

      (b)     Delphi is not hopelessly insolvent, such that Appaloosa appears to have a real economic interest at stake;

      (c)     the case is large and complex;

      (d)     the stock is widely held and actively traded; and

      (e)     the timing of the request is appropriate.

See generally In re Williams Comm'ns Group, Inc., 281 B.R. 216 (Bankr. S.D.N.Y. 2002); In re Johns-Manville Corp., 68 B.R. 155 (S.D.N.Y. 1986); In re Kalvar Microfilm, 195 B.R. 599 (Bankr. D. Del. 1996); In re Wang Labs., Inc., 149 B.R. 1 (Bankr. D. Mass. 1992) (appointing equity committee over objections of United States Trustee and official committee of unsecured creditors even while debtor had negative book equity of several hundred million dollars); In re Beker Indus. Corp., 55 B.R. 945 (Bankr. S.D.N.Y. 1985) (equity committee appointed); In re Evans Prods. Co., 58 B.R. 572 (S.D. Fla. 1985); In re Emons Indus., Inc., 50 B.R. 692 (Bankr. S.D.N.Y. 1985); In re Exide Technologies, Case No. 02-11125 (Bankr. D. Del. 2002) (appointing equity committee over objections of debtor and official committee of unsecured creditors).

*Equity Will Not is Adequately*
*Represented without an Official Committee.*

Although the unsecured creditors and shareholders possess a general identity of interest in seeing that the unsecured creditors are paid because of the "absolute priority" rule's mandate that junior interests retain nothing unless senior debt is paid in full, see 11 U.S.C. § 1129(b)(2)(B), such interests are not always aligned and often diverge. Furthermore, the official committee of unsecured creditors (the "Creditors' Committee") has neither a duty nor incentive in these cases to choose strategic alternatives that maximize value for equity. In fact, these Debtors are organized with substantial non-debtor affiliates under a complex corporate structure. From a review of publicly available information, it appears that substantial unencumbered assets or assets with substantial residual value exist within legal entities with relatively little debt,

                  o

2

Alicia M. Leonhard, Esq.
Tracy H. Davis, Esq.

**WHITE & CASE**

November 7, 2005

particularly with respect to the company's foreign and emerging new operations. In contrast, the major liabilities contributing to the deterioration of the company's recent financial performance, namely, unsustainable U.S. employee related legacy obligations, are in respect of operations isolated within certain U.S. Debtor subsidiaries, which have no claims against or rights of distribution from other valuable Delphi businesses. While we recognize that these Debtors have substantial obligations that need to be addressed in the context of these bankruptcy cases, there remains substantial value within Delphi's capital structure outside of and unrelated to the Debtors' legacy obligations. Thus, due to the complex legal structure, not only is the total amount of liabilities within the Delphi enterprise an important fact to ascertain, but where such liabilities appropriately reside within the capital structure must be thoroughly explored as well. Simply, ensuring that creditors are satisfied only from the estates against which they have legal entitlements is paramount to protecting the rights of equity shareholders – a function that may be performed only by a body charged with the fiduciary duty to advance the interests of such shareholders. Clearly, the interests represented by the Creditors' Committee conflict with the interests of shareholders on these points.

Further, while Delphi's directors and managers have a fiduciary responsibility to look after shareholders' interests, conflicting concerns often arise which make it difficult for such directors and management to follow the best course for non-insider public shareholders. Accordingly, the shareholders are the only major constituency not independently represented at this time. The shareholders are entitled to an official role in these cases to advance and preserve equity value, equity that a few days before the Delphi filing had a market value in excess of $1.7 billion. Shareholder exclusion without official representation will hamper their ability to effectively participate in the chapter 11 cases and ultimate plan formulation. An Equity Committee should be appointed to enable shareholders to participate fully and actively in these cases.

### Delphi Corporation is not Hopelessly Insolvent

These are not the typical chapter 11 cases where equity should be presumed to be out of the money. In fact, the opposite needs to be presumed here, that is, equity is in the money and therefore entitled to have meaningful participation in these cases. Indeed, the actions of Delphi itself shortly before the commencement of these cases require a presumption that Delphi is solvent. As recently as June 22, 2005, Delphi declared a $0.015 dividend on Delphi $0.01 par value common stock. This dividend was paid on August 2, 2005. Under Delaware law, however, dividends may be declared *and* paid only (i) out of surplus or (ii) in the case where no surplus exists, out of the company's profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year. Del. Cod. Ann. Tit. 8, § 170 (2003). As Delphi has not reported any profits in the current and preceding years, payment of the August 2, 2005 dividend must have been from Delphi's surplus. Surplus is defined as the excess of the net assets (total assets minus total liabilities) of the corporation over its capital, which, if determined to be available, necessarily requires a determination that the corporation is balance sheet solvent. Id. at § 154. Thus, as of August 2, 2005, just two months prior to Delphi's filing, Delphi's board of directors had determined that it was balance sheet solvent. See also, In re Heilig Meyers

3

MIAMI 612795 [612793_8.DOC] (DX)

Alicia M. Leonhard, Esq.
Tracy H. Davis, Esq.

**WHITE & CASE**

November 7, 2005

Company, 329 B.R. 471 (Bankr. E.D. Va. 2005) (court considered debtor's payment of dividend
as factor in determining solvency of debtor as payment of dividend while insolvent violated
Virginia law).

Perhaps more importantly, Delphi's Chief Executive Officer has stated clearly that the Debtors
commenced their chapter 11 cases simply to avoid a potential filing under the Bankruptcy Act of
2005 that came into effect on October 17, 2005. In particular, he indicated that he did not want
Delphi to be the "guinea pig" under the new, less debtor friendly law. See The Sunday Times
(UK), September 18, 2005, at 65, available at 2005 WLNR 14706425. There were, however, no
reports of any impending liquidity crisis or any other matters compelling a filing. In fact, the
expectation was that Delphi, along with General Motors, would continue to negotiate with their
respective union employees and reach a consensual agreement or agreements outside of chapter
11. Recently, however, there have been reports that General Motors urged Delphi to commence
chapter 11 proceedings to gain a strategic advantage in its negotiations with its own union
employees. See Economist, October 15, 2005, at 65, available at 2005 WLNR 16692334. Thus,
unlike other recent large chapter 11 cases commenced on the eve of the effectiveness of the new
bankruptcy amendments, a chapter 11 filing for Delphi was not inevitable (and it could not have
been inevitable, otherwise Delphi's board of directors could not have declared a dividend just
two months prior). Simply, Delphi is in chapter 11 today and shareholders are disenfranchised
not because Delphi is insolvent or unable to pay its obligations as they come due; Delphi is in
chapter 11 solely because it made a calculated determination, perhaps at the urging of its self
proclaimed largest creditor, that the current legal construct offered certain benefits that would
otherwise soon be unavailable.

Moreover, the value of Delphi's current equity will depend in large part on the resolution of
material issues currently being addressed by the Debtors without meaningful participation from
shareholders, including:

(a)   the total amount of actual employee related liabilities and where such
      liabilities reside in the capital structure;

(b)   the manner in which employee related liabilities are restructured,
      including pursuant to sections 1113 & 1114 of the Bankruptcy Code;

(c)   the amount, enforceability, treatment and appropriate characterization of
      any claims asserted by General Motors, including claims, if any, asserted
      pursuant to the Indemnification Agreement, dated December 22, 1999,
      between Delphi and General Motors;

(d)   the extent to which Delphi may mitigate or avoid the accrual of any
      enforceable claims to General Motors under the Indemnification
      Agreement; and

4

Alicia M. Leonhard, Esq.
~~Tracy H. Davis, Esq.~~                                                         WHITE & CASE

November 7, 2005

> (e)    whether intercompany claims exist in favor of Delphi Corporation for,
> among other things, the advancement of substantial funds raised in the
> capital markets for the purpose of addressing certain Debtor legacy
> obligations.

For instance, under the Indemnification Agreement, if enforceable, Delphi must indemnify
General Motors for any liabilities it incurs under those certain Benefit Guarantees issued by
General Motors to certain of the Debtors' employees. Once accrued, the Benefit Guarantees
require General Motors to continue to pay employee obligations notwithstanding the expiration
of the Debtors' own underlying responsibility to pay such obligations. General Motors may
assert, although Appaloosa would contest such interpretation, that the Indemnification
Agreement requires Delphi to reimburse General Motors for all obligations incurred, even if the
Debtors have been relieved of the underlying obligations owing directly to the employees. If not
otherwise triggered, however, the Benefit Guarantees and Delphi's obligations, if any, under the
Indemnification Agreement, terminate in 2007. Accordingly, before taking any actions that may
trigger accrual of obligations owing under the Indemnification Agreement, Delphi must explore
all alternatives with consideration given to the consequences any actions may have on
shareholder value. Delphi has already begun the process of restructuring its employee
obligations. Although Appaloosa does not dispute that such obligations need to be restructured,
disturbingly, there is no evidence in the public record that Delphi has given any consideration to
how the manner in which it does so affects shareholder value.

These factors combined make it clear that Delphi is far from hopelessly insolvent, and
shareholders have a real economic interest at stake in these cases.

*These Cases are Large and Complex.*

According to the Debtors' petitions and the Miller Affidavit, the Debtors and their non-debtor
subsidiaries and affiliates collectively possess $17.1 billion in total assets and $22.1 billion in
total liabilities. $10.4 billion of the stated liabilities are actuarial estimates of future employee
obligations, which obligations are subject to substantial reduction. In addition, as set forth in the
Miller Affidavit, the Debtors are arguably the single largest global supplier of vehicle
electronics, transportation components, integrated systems and modules, and other electronic
technology. The Debtors' technologies are present in more than 75 million vehicles on the road
worldwide. The Debtors and their affiliates employ more than 180,000 employees worldwide,
with global 2004 revenues of approximately $28.6 billion and global assets as of August 31,
2005 of approximately $17.1 billion. By their own admission, the Debtors' bankruptcy ranks as
the fifth largest public company chapter 11 in terms of revenues, the thirteenth largest public
company business reorganization in terms of assets, and represents the second largest bankruptcy
filing in 2005. The vast size and complexity of these cases is therefore not in question.

5

Alicia M. Leonhard, Esq.
Tracy H. Davis, Esq.

WHITE & CASE

November 7, 2005

### *The Stock is Widely Held and Actively Traded.*

As of August 26, 2005, Delphi had more than 561,781,590 million shares of common stock outstanding and 331,202 shareholders. As of the close of business on November 4, 2005, over 4.5 million shares of Delphi were traded, closing at approximately $0.39 per share with a market capitalization of nearly $217 million. The average daily trading volume over the past three months was nearly 22 million shares. On October 4, 2005, just a few days before the bankruptcy filing, Delphi's market capitalization was approximately $1.7 billion.

While the depth and breadth of ownership of Delphi equity securities does not guarantee necessarily that Delphi shareholders are entitled to a distribution under a restructuring plan, the active trading in the stock, its market capitalization, and the large number of holders and potential beneficial holders does heavily weigh in favor of the appointment of an Equity Committee.

### *This Request Comes on a Timely Basis.*

The Debtors only commenced these cases on October 8, 2005. Accordingly Appaloosa's request is timely. More importantly, as shareholder value may likely depend upon the manner in which the Debtors restructure their employee related obligations, as noted above, time is of the essence.

Appaloosa is mindful of concerns regarding the additional expense associated with the formation of an Equity Committee, but "[c]ost alone cannot, and should not, deprive . . . security holders of representation." In re McLean Indus., Inc., 70 B.R. 852, 860 (Bankr. S.D.N.Y. 1987). The Bankruptcy Code contains adequate means for controlling costs. See 11 U.S.C. § 330(a)(1). In a case of this magnitude where assets exceed $17 billion and net sales are over $26 billion, the benefits of committee representation of shareholders' interests far outweigh any additional costs to the Debtors' estates.

In sum, the Debtors have commenced one of the largest bankruptcies in American history. In the span of a few days prior to the Delphi filing, more than $1.5 billion of the market value of Delphi equity evaporated. The filing, on the verge of the Bankruptcy Reform Act of 2005, will affect, at a minimum, hundreds of thousands of beneficial holders of equity. Because of the sheer size of the bankruptcy, it has sent shockwaves throughout the automotive industry and unionized labor. One analyst has compared the Delphi bankruptcy to the former Chrysler Corp.'s brush with bankruptcy in the early 1980s -- only bigger. "I see this as a bigger event than if Chrysler had filed," said Glenn Reynolds, an analyst with the New York research firm CreditSights. "This affects the 800-pound gorilla -- GM. It's probably the biggest event in the auto industry in 25 years."

Accordingly, Appaloosa believes it would be grossly unjust to permit the Debtors to engage in the process of developing a business plan, including negotiations in respect of its employee related obligations, and formulating an exit strategy without any meaningful input from

6

MIAMI 612795 [812795_8.DOC] (2X)

11/29/2005 TUE  6:12  FAX 305 374 1465 WHITE & CASE                                   011/011

Alicia M. Leonhard, Esq.
Tracy H. Davis, Esq.                                            **WHITE & CASE**

November 7, 2005

shareholders who clearly have a large and valuable stake in the Debtors' enterprise. For the
foregoing reasons, we respectfully request that you appoint an Equity Committee at your earliest
possible opportunity.[1]

Very truly yours,

Thomas E Laurie

cc:    Ronald Goldstein
       David Tepper
       John Wm. Butler
       Robert J. Rosenberg

---

[1]    Nothing contained herein shall constitute an admission or a waiver of any rights or remedies by Appaloosa,
all such rights and remedies being expressly reserved.

7

MIAMI 612795 [612795_8.DOC] (2K)

**EXHIBIT B**



*Appaloosa*
**MANAGEMENT L.P.**

26 Main Street, 1st Floor  Chatham, New Jersey 07928

(973) 701-7000
Fax (973) 701-7055

November 28, 2005

Board of Directors
Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098-2815

Re: Appointment of an Official Committee of Equity Security Holders

Dear Board Members:

As you know, Appaloosa Management L.P. ("Appaloosa"), collectively with certain of
its affiliates, are among Delphi Corporation's (the "Company") largest shareholders,
owning approximately 9.3% of the issued and outstanding shares of the Company.
Appaloosa, through its counsel, has recently delivered a letter to the U.S. Trustee
overseeing the Company's chapter 11 cases seeking the appointment of an official
committee of equity security holders (an "Equity Committee"). A copy of such letter is
attached hereto for your convenience. We understand that the Company's Board of
Directors (the "Board") is considering such request.

In chapter 11 cases such as the Company's, appointment of an equity committee eases the
inherent conflicts that confront a board when it attempts to serve the interests of all
constituencies and promotes the perception that the inevitable struggles between creditors
and shareholders will be fought on a level playing field. As you know, when a company
operates under chapter 11 protection, a board's fiduciary duties extend to creditors as
well as shareholders. As such, a board will often find itself in the difficult position of
attempting to serve the conflicting interests of creditors and shareholders. Under such
circumstances, the appointment of an equity committee promotes a fair process for these
conflicts to be resolved by ensuring that both sides, not just the creditors, have
representation with appropriate access to information and the resources to ensure that
their voice is heard and their interests are protected. Importantly, the appointment of an
equity committee also frees a board to play the role of "honest broker" between
competing constituencies, rather than being exposed to allegations that the board is not
fulfilling its duties to one constituency because its interests are aligned with the other.

Appaloosa encourages the Board to extend its support for the appointment of an Equity
Committee. For the reasons set forth in the letter to the U.S. Trustee, Appaloosa believes

MIAMI 621162 (2K)

that the Company has substantial equity value.  Appaloosa believes that the appointment of an Equity Committee at this time will benefit the Company by ensuring that the interests of shareholders are adequately represented, which will send an important message to shareholders, employees, retirees, and the business community at large that the Company is dedicated to ensuring the highest integrity throughout the restructuring process and relieve the Board from undue pressure that might be imposed in the absence of an Equity Committee by constituents with diverging interests from shareholders. Appaloosa believes that the net effect of this increased public confidence in the restructuring process will be the preservation of the maximum possible shareholder value and ultimately a more successful emergence from chapter 11 protection.  We look forward to having the opportunity to work constructively with the Company and the Board to achieve these goals.  In the event that the U.S. Trustee denies the request, Appaloosa is prepared to seek appropriate relief from the Bankruptcy Court.

Should you have any questions or comments, or would like to discuss the appointment of an Equity Committee in further detail, please do not hesitate to contact me at (973) 701-7000.

Very truly yours,

Appaloosa Management L.P.

David Tepper
President

cc:    Thomas E. Lauria, White & Case LLP
        Gerard Uzzi, White & Case LLP

MIAMI 621162 (2K)

**EXHIBIT C**

# LATHAM&WATKINS<sup>LLP</sup>

53rd at Third
885 Third Avenue
New York, New York 10022-4834
Tel: (212) 906-1200 Fax: (212) 751-4864
www.lw.com

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Boston | New York |
| Brussels | Northern Virginia |
| Chicago | Orange County |
| Frankfurt | Paris |
| Hamburg | San Diego |
| Hong Kong | San Francisco |
| London | Shanghai |
| Los Angeles | Silicon Valley |
| Milan | Singapore |
| Moscow | Tokyo |
| New Jersey | Washington, D.C. |

December 12, 2005

**Via Facsimile & Federal Express**

Deirdre A. Martini, Esq.
Alicia M. Leonard, Esq.
Tracy H. Davis, Esq.
United States Trustee
33 Whitehall Street, Suite 2100
New York, NY 10004

Re:     In re Delphi Corporation, et al., Case No. 05-44481 (RDD):
         Opposition of Official Committee of Unsecured Creditors to request of
         Appaloosa Management L.P. for Appointment of Official Committee of
         Equity Security Holders.

Dear Ms. Martini, Ms. Leonard and Ms. Davis:

        The Official Committee of Unsecured Creditors (the "Committee") appointed in the
chapter 11 cases (the "Cases") of Delphi Corporation ("Delphi") and its debtor affiliates
(collectively with Delphi, the "Debtors") opposes the request made by letter (the "Letter") of
Appaloosa Management L.P. ("Appaloosa") for the appointment of an official committee of
equity interest holders.  As set forth below, Appaloosa's request should be denied in these Cases
because (i) the interests of equity holders will be adequately represented, (ii) Appaloosa is highly
sophisticated and capable of representing its own interests without burdening the Debtors' estates
with the substantial additional administrative costs that would be incurred were an equity
committee to be appointed, and (iii) Appaloosa has not satisfied its burden to show that the
Debtors are solvent and that value is likely to exist for distribution to equity holders such as
Appaloosa at the conclusion of these Cases.  Accordingly, the Committee respectfully requests
that the Office of the United States Trustee deny Appaloosa's request that an equity committee
be appointed.

<u>Official Equity Committees are Rarely Appointed</u>

        Section 1102(a)(1) of the Bankruptcy Code provides that the United States Trustee may
appoint an equity committee when it deems such an appointment to be appropriate.  "The
permissive language ('may') of the statute indicates that the [United States Trustee's] authority to
appoint such a committee is discretionary."  In re Williams Communications Group, Inc., 281
B.R. 216, 219 (Bankr. S.D.N.Y. 2002).  In chapter 11 cases that have been filed in this and other
districts, the Office of the United States Trustee has only rarely appointed official equity
committees.  In fact, it is rare that the appointment of an official equity committee is even sought

December 12, 2005

Page 2

LATHAM&WATKINS LLP

because of the well-recognized assumption that "[t]he appointment of official equity committees should be the rare exception." Id. at 223; Collier on Bankruptcy, 15th Ed. ¶ 1102.03[2] (stating that "appointment of committees of equity security holders is the exception rather than the rule in chapter 11 cases"). As discussed below, these Cases do not present circumstances compelling an exception to the general rule.

## Congress did not Mandate the Appointment of Official Equity Committees

"Congress' desire to protect shareholders in reorganization proceedings was not strong enough . . . to mandate the creation of equity committees." In re Johns-Manville Corporation, 68 B.R. 155, 160 (S.D.N.Y. 1986). Importantly, Congress recognized that appointing an equity committee would not always be appropriate: as the Court in Johns-Manville noted, "[w]hile Section 1102(b) states that a court *may* appoint an equity committee, Section 1102(a) *requires* the court to appoint an official committee to represent unsecured creditors. Thus, when Congress intended to mandate the appointment of a committee, it made its intention clear." Id. at 157, 159 (emphasis in original). These Cases clearly show why no such mandate was issued in the case of equity committees: because, as discussed below, appointment of an official equity committee is unnecessary and would be overly burdensome and costly to the Debtors' estates.

## The Interests of Existing Equity Holders Will be Adequately Represented

The legal standard for appointment of an official equity committee is that it must be "necessary to assure adequate representation . . .of equity security holders." 11 U.S.C. § 1102(a)(2). The Bankruptcy Code does not define "adequate representation," thereby leaving it within the discretion of bankruptcy courts to examine the facts of each case and determine if an additional committee is warranted. In re Beker Industries Corp., 55 B.R. 945, 948 (Bankr. S.D.N.Y. 1985); Johns-Manville, 68 B.R. at 159. In general, equity committees "should not be appointed unless equity holders establish that "they are unable to represent their interests . . . without an official committee." Williams, 281 B.R. at 223. "It is instructive to note that the statutory focus of section 1102(a)(2) is not whether the shareholders are 'exclusively' represented, but whether they are 'adequately' represented." Williams, 281 B.R. at 223; accord Polak v. Edison Bros. Stores (In re Edison Bros. Stores, Inc.), 1996 WL 534853, *4 (D. Del. Sept. 17, 1996).

Invariably, courts first look to the debtor's officers and directors to exercise their fiduciary duties on behalf of all stakeholders, including shareholders. Appaloosa acknowledges in its Letter that "Delphi's directors and managers have a fiduciary responsibility to look after shareholders' interests," going on to argue that "conflicting concerns often arise which make it difficult for such directors and management to follow the best course for non-insider public shareholders." Letter at 3. However, as one district court has noted in response to an argument similar to that made by Appaloosa in its Letter:

> [While it may be correct that in an insolvency context]
> management cannot exclusively advocate for the interests of
> shareholders, the statutory focus of § 1102(a)(2) is not whether
> shareholders are "exclusively" represented, but whether they are

NY\1086791.3

December 12, 2005

Page 3

LATHAM&WATKINS**LLP**

> "adequately" represented.  Until Congress recognizes that inherent
> conflicts of interest exist between management and public
> shareholders in the bankruptcy context that warrant the mandatory
> appointment of an equity committee, the statutory test remains
> "adequacy of representation" to be determined on the facts of each
> case.  [citation omitted].  [Parties requesting the appointment of a
> committee] have the initial burden of developing a factual record
> to demonstrate the need for adequate representation.  [citation
> omitted].

Edison 1996 WL 534853 at *4 (D. Del. 1996)(denying request on appeal for the appointment of
an official equity committee).

The facts in these Cases satisfy the test of "adequacy of representation," and Appaloosa's
request for the appointment of an equity committee should be denied because equity holders
have been, and will continue to be, adequately represented in these Cases.  Appaloosa's request
should be viewed for what it is: an attempt by Appaloosa to advance its parochial interests at
great expense to the Debtors' estates.

Appaloosa admits in its Letter that "unsecured creditors and shareholders possess a
general identity of interest in seeing that the unsecured creditors are paid because of the 'absolute
priority' rule mandates that junior interests retain nothing unless senior debt is paid in full."
Letter at 2.  Nevertheless, Appaloosa then questions the alignment of unsecured creditors' and
equity holders' interests because the Committee "has neither a duty nor an incentive in these
cases to maximize value for equity."

Appaloosa misses the point.  While it is true that the Committee has no duty to represent
equity holders' interests in these Cases, such interests are not inconsistent with the Committee's
interest in maximizing the value of the Debtors' estates.  Moreover, equity holders have been,
and will continue to be, adequately represented and protected by (i) Debtors' management
(which has a fiduciary obligation to safeguard such interests), and (ii) the equity holders
themselves (including Appaloosa).

As noted above, courts first look to the debtor's officers and directors to exercise their
fiduciary duties on behalf of all stakeholders, including shareholders.  Regardless of whether the
Debtors' management alone provides adequate representation of the interests of equity holders,
such interests are also being indirectly furthered by the efforts of the Committee.  Both
unsecured Creditors and equity benefit from maximizing the value of the Debtors' estates.
Williams, 281 B.R. at 222; In re Leap Wireless International, Inc., 295 B.R. 135, 139-40 (Bankr.
S.D. Ca. 2003)(finding that the economic interests of bondholders and shareholders appear to be
the same, to find the highest realistic value for the company).  Courts have recognized such an
alignment of interests in similar situations and deemed it relevant in determining whether equity
holders' interests are adequately represented.  Williams, 281 B.R. at 222; In re Baldwin-United
Corp., 45 B.R. 375, 376 (Bankr. S.D. Ohio 1983).  Here, as the Court in Williams found, "the
Creditors' Committee has sufficiently aligned or parallel interests with the Shareholders to
preclude the need for an additional committee." Williams, 281 B.R. at 223.

NY\1086791.3

December 12, 2005

Page 4

LATHAM&WATKINS LLP

Equity holders themselves are not voiceless in these Cases. Any party in interest has standing to be heard pursuant to 11 U.S.C. § 1109(b). Indeed, equity security holders could assert a collective voice through an unofficial committee, and seek reimbursement of their costs and attorneys fees under 11 U.S.C. § 503(b)(3) if their actions result in a substantial contribution to these Cases. Williams, 281 B.R. at 224. However, the right to be heard is not synonymous with the right to charge the Debtors' estates for the cost of professionals. In re Hills Stores Co., 137 B.R. 4, 7 (Bankr. S.D.N.Y. 1992). In the event that Appaloosa determines that the Debtors' Management has overlooked an opportunity to preserve value in these Cases that could provide a recovery for the Debtors' equity holders, Appaloosa certainly has the knowledge and resources to raise any such issues during the course of these cases:

- Appaloosa is a sophisticated investor, and has in the past been involved in complex chapter 11 proceedings.

- Appaloosa has already retained experienced counsel to represent its interests in these Cases.

- Appaloosa is currently the holder of approximately 9.3% of the Debtors' total issued and outstanding equity shares.

These Cases have been widely publicized. The Debtors have issued numerous press releases describing material developments, and various articles have been published regarding the Debtors' reorganization efforts. Despite the foregoing publicity, the Committee is not aware of any party but Appaloosa requesting the formation of an official equity committee. Notably, Appaloosa acquired its interests in the Debtors on or about October 10, 2005, after the commencement of these Cases. In short, Appaloosa voluntarily sought to involve itself in the Debtors' chapter 11 process. Appaloosa should not be allowed to burden the estates and unsecured creditors with the potentially huge additional costs associated with an official equity committee, all in an effort to further its junior interests and shift the burden of paying its own professionals.

<u>Appaloosa has Failed to Show that the Debtors' are Solvent</u>

In addition to the foregoing factors, Appaloosa has failed to provide any meaningful evidence that the Debtors' estates are solvent. Despite speculation and innuendo in its Letter, Appaloosa has failed to meet its burden of proof with respect to this critical issue. Its failure compels denial of its request for the appointment of an official equity committee. See Williams, 281 B.R. at 220 ("the debtor's solvency is a major factor when considering the cost of appointing an equity committee.").

Various courts have recognized that "[w]hen a debtor appears to be hopelessly insolvent, an equity committee is not generally warranted . . . . As a result of the absolute priority rule, equity holders of a hopelessly insolvent debtor will receive no distribution. As such, the shareholders have no economic interest left to protect . . . ." Williams, 281 B.R. at 220; see also In re Emons, Indus., 50 B.R. 692, 694 (Bankr. S.D.N.Y. 1985) ("no equity committee should be appointed when it appears that a debtor is hopelessly insolvent"). Moreover, a debtor need not

December 12, 2005

Page 5

LATHAM&WATKINS LLP

be hopelessly insolvent in order for courts to deny the appointment of an equity committee. The correct inquiry is whether the debtor "appears to be hopelessly insolvent." Williams, 281 B.R. at 221 (emphasis added). The Court in Williams made clear that equity holders bear the burden of proof with respect to solvency: "[Official equity] committees should not be appointed unless equity holders establish that (i) there is a substantial likelihood that they will receive a meaningful distribution in the case under a strict application of the absolute priority rule, and (ii) they are unable to represent their interests in the bankruptcy case without an official committee." Id at 223; see also In re Leap Wireless International, Inc., 295 B.R. 135, 140 (Bankr. S.D. Ca. 2003) ("[s]hareholders committees should be appointed when equity holders establish there is a substantial likelihood that they will receive a meaningful distribution in the case and that the existing committee(s) do not adequately represent their interests").

In its Letter, Appaloosa acknowledges that "According to the Debtors' petitions and the [Affidavit of Robert S. Miller, Jr. Under Local Bankruptcy Rule 1007-2 and in Support of Chapter 11 Petitions and Various First Day Applications and Motions (the "Miller Affidavit")], the Debtors and their non-debtor subsidiaries and affiliates collectively possess $17.1 billion in total assets and $22.1 billion in total liabilities." Letter at 5. See also Miller Affidavit at 7. While the Committee has not conducted a valuation of the Debtors, all current indications from the Debtors are that on a consolidated balance sheet basis, the Debtors' liabilities exceed their assets by approximately $5 billion. All senior liabilities must be satisfied in full before equity holders of Delphi Corporation can receive any distributions. While Appaloosa speculates in its Letter that value exists for equity holders in these Cases because "substantial unencumbered assets or assets with substantial residual value exist within legal entities with relatively little debt," it provides no evidence supporting this bald assertion.

Furthermore, Appaloosa's position that Delphi's payment of a $0.015 dividend to equity holders in June 2005 is evidence of the Debtors' solvency is inadequate to warrant the appointment of an official equity committee for several reasons. See Letter at 3. The Debtors' financial condition over 5 months ago is irrelevant here. The Debtors have stated that as recently as August 31, 2005, they were insolvent on a consolidated basis by approximately $5 billion. While the dividend referenced in Appaloosa's Letter was apparently made by Delphi in June 2005, Delphi Corporation's Board of Directors announced the elimination of such quarterly dividends in September 2005. Finally, the June 2005 dividend may have been made in violation of Delaware or other law.[1]

---

[1] The Miller Affidavit also indicates that "In the first two years following the Spin-Off [of the Debtors by General Motors Corporation in 1999], the Company generated more than $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales. Indeed, the [Debtors] experienced net operating losses of $608 million for the first six months of calendar year 2005 on six month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same period in calendar year 2004." Miller Affidavit at 11. The Debtors' poor financial performance, and the costs incurred in preparing for and commencing these Cases, further calls into question the allegations of solvency made by Appaloosa.

NY\1086791.3

December 12, 2005

Page 6

**LATHAM&WATKINS**LLP

Appaloosa cannot satisfy its burden to show that the Debtors' are solvent simply by saying as much. Appaloosa has failed to identify and present evidentiary proof of solvency. For this reason, Appaloosa's request should be denied, and the Debtors' estates should be spared the significant costs that would result from the appointment of an official equity committee.

<u>The Appointment of an Official Equity Committee Will Result in Significant Costs to the Estates</u>

Undoubtedly, significant additional costs would result from the appointment of an official equity committee because the equity committee would certainly seek to retain lawyers and financial advisors. <u>In re Saxon Indus., Inc.</u>, 39 B.R. 945, 947 (Bankr. S.D.N.Y. 1984) (recognizing that the appointment of a committee raises cost concerns because it is "closely followed by applications to retain attorneys and accountants."). In addition to the financial costs of an official equity committee, there are also intangible "costs," such as the delay and disruption of the reorganization process that results from the appointment of an official equity committee. <u>Johns-Manville</u>, 68 B.R. at 160. These intangible costs should carefully be considered by your Office on the facts in these Cases. Although the expense factor alone should not prohibit the appointment of an official equity committee, when coupled with the facts set forth above, there is no reason for the Debtors' estates to be burdened with the potentially huge additional administrative costs that would result if such a committee is appointed. <u>See</u> <u>Williams</u>, 281 B.R. at 220.

Accordingly, we respectfully request that your Office deny Appaloosa's request for the appointment of an official equity committee.

Very truly yours,

Robert J. Rosenberg
of LATHAM & WATKINS LLP

cc:    Thomas E. Lauria, Esq. (via facsimile)
John Wm. Butler, Esq. (via facsimile)
Members of the Official Committee of Unsecured Creditors (via electronic mail)

NY\1086791.3

**EXHIBIT D**

Exhibit 99(a)

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

### 333 WEST WACKER DRIVE
### CHICAGO, ILLINOIS 60606-1285

(312) 407-0700
Fax: (312) 407-0411
http://www.skadden.com

DIRECT DIAL
(312) 407-0730
DIRECT FAX
(312) 407-8501
EMAIL ADDRESS
jbutler@skadden.com

FIRM/AFFILIATE
OFFICES
———
BOSTON
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO

December 19, 2005

Alicia M. Leonhard, Esq.
Trial Attorney
U.S. Department of Justice
Office of the United States Trustee
Region 2/Southern District of New York
33 Whitehall Street, Suite 2100
New York, New York 10004

> Re: Request for Formation of Statutory Equity Committee
> in *In re Delphi Corporation, et al.*, Lead Case
> No. 05-44481 (RDD) (Jointly Administered)

Dear Alicia:

We are writing on behalf of Delphi Corporation and its affiliated debtors and debtors-in-possession (the "Debtors") to respond to a letter dated November 7, 2005, from White & Case LLP, submitted on behalf of its client, Appaloosa Management L.P. ("Appaloosa"), requesting that the United States Trustee for Region 2 (the "UST") exercise her discretionary authority under Section 1102(a)(1) of the Bankruptcy Code to form an official statutory committee of equityholders in the Debtor's chapter 11 cases. We have reviewed the November 7 letter with the Board of Directors and executive management of the Debtors, as well as with the Debtors' Official Committee of Unsecured Creditors (the "Creditors'

Alicia M. Leonhard, Esq.
December 19, 2005
Page 2

Committee"), and we appreciate the opportunity to share with you the Debtors' position regarding Appaloosa's request to form a statutory equity committee.[1]

In summary, the Debtors request that the UST determine that it is premature to appoint an equity committee at this time and defer further consideration of the request at least until the Debtors file their statements of financial affairs and schedules of assets and liabilities in January, 2006 and the UST has completed her conduct of the formal meeting of creditors required by Section 341 of the Bankruptcy Code (which is presently scheduled to take place in February, 2006). Should your office determine that a binding decision is required to be made at this early point in the Debtors' chapter 11 cases — even before the Debtors' first monthly operating report is filed later this month — the Debtors respectfully request that the UST decline to exercise her statutory prerogative to form an equity committee.

As is discussed in greater detail below, official equity committees are rarely appointed in chapter 11 cases, Delphi's Board of Directors (10 of the 12 of which are independent directors) will adequately represent all stakeholders in their role to maximize the enterprise value of the Debtors, and it is highly unlikely that common equityholders will receive any value in the chapter 11 cases on account of the equity securities of Delphi Corporation, the parent holding company, which interests the Debtors believe are "hopelessly insolvent." This observation is in stark contrast with the value of Delphi's non-U.S. subsidiaries, which are not chapter 11 debtors, are continuing their business operations in the ordinary course of business without supervision from the Bankruptcy Court, and are not subject to the chapter 11 requirements of the U.S. Bankruptcy Code. Notwithstanding the inherent value that the Debtors believe is associated with Delphi's global business operations outside of the United States, the Debtors do not believe that such value can overcome the direct and indirect claims against the parent holding company on account of the non-competitive legacy liabilities and burdensome restrictions under current U.S. labor agreements as well as the realignment of Delphi's global product portfolio and manufacturing footprint that must be achieved to preserve the Debtors' core businesses.

### Background

On October 8, 2005, Delphi Corporation and certain of its U.S. subsidiaries filed chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). We refer you to the Affidavit of Robert S. Miller, Jr. filed in support of the First Day Motions in the Debtors' chapter 11 cases (Docket No. 7) for general background regarding the

---

[1]    A copy of this response will be filed on Form 8-K with the Securities and Exchange Commission.

Alicia M. Leonhard, Esq.
December 19, 2005
Page 3

Debtors' prepetition affairs and events leading up to the commencement of the chapter 11 cases. Also on October 8, 2005, the Debtors issued a press release reporting on the commencement of the chapter 11 cases which included the following cautionary paragraph:

> "Delphi also noted that the execution of its transformation plan through the chapter 11 process may give rise to the incurrence of additional prepetition claims as collective bargaining agreements, executory contracts, retiree health benefits and pension plans, and other liabilities of the company are addressed and resolved to maximize stakeholder value going forward. There is no assurance as to what values, if any, will be ascribed in the chapter 11 cases as to the value of Delphi's existing common stock and/or any other equity securities. Accordingly, the company urges that the appropriate caution be exercised with respect to existing and future investments in any of these securities as the value and prospects are highly speculative."[2]

On or about November 7, 2005, without prior substantive discussion with the Debtors, White & Case LLP delivered to the undersigned a copy of the November 7 letter to the UST. On November 28, 2005, White & Case LLP delivered to the undersigned a letter of even date from Appaloosa addressed to the Debtors' Board of Directors. (See Exhibit 1.) The November 7 and November 28 letters were discussed with the Board of Directors and the subject of a potential equity committee was discussed with the Creditors' Committee at meetings in Troy, Michigan on December 7 and December 9, respectively. On December 13, the Debtors were informed by the Creditors' Committee that the Creditors' Committee had voted to oppose the formation of an equity committee and had submitted its December 12 letter to your office.[**]

---

[2]  Additional cautionary language has been included in the safe harbor statement used in the company's subsequent restructuring-related press releases cautioning current stakeholders and potential investors that "[n]o assurance can be given as to what values, if any, will be ascribed in the bankruptcy proceedings to each of these constituencies [the Company's various prepetition liabilities, common stock and/or other equity securities]. Accordingly, the Company urges that the appropriate caution be exercised with respect to existing and future investments in any of these liabilities and/or securities."

[**]  While not agreeing with every statement in the Creditors' Committee submission, the Debtors concur with the Creditors' Committee conclusion that the appointment of an equity committee is not warranted in the Debtors' chapter 11 cases.

exv99wxay                                                               Page 5 of 21

Alicia M. Leonhard, Esq.
December 19, 2005
Page 4

### Request for Formation of Equity Committee

As summarized above, the Debtors respectfully request that you determine not to exercise your statutory prerogative to appoint an equity committee at this time. At best, appointment of an equity committee would be premature and, at worst, futile and an unnecessary burden to the Debtors' estates and its reorganization prospects.

Among the factors that are examined by the United States Trustee when considering the appointment of a statutory equity committee are whether the Company's shares are widely held and publicly traded; the size and complexity of the chapter 11 cases; the delay and additional cost that would result if an equity committee were appointed; the likelihood of whether the debtor is insolvent; the timing of the request relative to the status of the chapter 11 cases; and whether the interests are otherwise adequately represented. In re Kalvar Microfilm, Inc., 195 B.R. 599, 600 (Bankr. D. Del. 1996).

The Debtors believe that the reported decision of Judge Lifland in the Bankruptcy Court rendered on July 24, 2002 in In re Williams Communs. Group, Inc., 281 B.R. 216 (Bankr. S.D.N.Y. 2002) provides helpful guidance to the UST in this District. Among many of the salient conclusions reached by Judge Lifland that have applicability to the request here is Judge Lifland's penultimate conclusion:

> "The appointment of official equity committees should be the rare exception. Such committees should not be appointed unless equity holders establish that (i) there is a substantial likelihood that they will receive a meaningful distribution in the case under a strict application of the absolute priority rule, and (ii) they are unable to represent their interests in the bankruptcy case without an official committee. The second factor is critical because, in most cases, even those equity holders who do expect a distribution in the case can adequately represent their interest without an official committee and can seek compensation if they make a substantial contribution in the case." (Id., at p. 222).

While the Debtors would fervently wish otherwise, Appaloosa has not demonstrated — and the Debtors cannot construct — a scenario in which these factors can be satisfied. This is largely because the claims associated with the Debtors' non-competitive U.S. legacy liabilities and burdensome U.S. labor agreements are direct claims against the U.S. parent holding company and are superior in priority to the interests of that entity's common shareholders.

Alicia M. Leonhard, Esq.
December 19, 2005
Page 5

 The conclusion that there is no meaningful distribution available for the common shareholders of the U.S. parent holding company is also shared by the capital markets. As shown in the attached capitalization summary, all four tranches of Delphi Corporation's publicly traded debt securities were trading as of December 16, 2005 at an implied recovery of between 49.8% and 51.0% of face value and Delphi Corporation's publicly traded trust preferred securities were trading at an implied recovery of 23.0% of face value. (See Exhibit 2.) Applying the absolute priority rule, there can be no recovery for interests when claims are not satisfied at full value. The capitalization summary also reflects that the balance sheet account for shareholders' equity as of September 30, 2005 reflected a deficit of $5.314 billion and that the common stock was trading on December 16, 2006 at $0.35, which the Debtors believe reflects a combination of option value and market inefficiencies.

 Accordingly, based on all of the relevant information available to the Debtors, the Debtors believe that if the Bankruptcy Court were required to make a determination today, there is a substantial likelihood that the Bankruptcy Court would determine that the Debtors are not solvent and meet the "appearance of hopeless insolvency" standard developed in applicable case law. The Debtors further believe that the Bankruptcy Court would therefore also conclude that any plan of reorganization capable of confirmation in accordance with the statutory priority rules of the Bankruptcy Code would result in holders of Delphi's common stock receiving no distribution on account of their interests and cancellation of their interests.[3] With respect to the issue of adequate representation, the Debtors believe that the Board of Directors, which is presently composed of twelve members (ten of which are independent directors including two new directors elected to the Board earlier this month), adequately represents its stakeholders in its fiduciary mission in the chapter 11 cases to maximize business enterprise value for all of the Debtors' stakeholders.

---

[3] The safe harbor and risk factors language in the Company's Form 8-K filed in connection with this response and future restructuring related press releases will include the following language: "As described in the Company's public statements in response to the request submitted to the United States Trustee for the appointment of a statutory equity committee, holders of Delphi's common stock and other equity interests (such as options) should assume that they will not receive value as part of a plan of reorganization. In addition, under certain conditions specified in the Bankruptcy Code, a plan of reorganization may be confirmed notwithstanding its rejection by an impaired class of creditors or equity holders and notwithstanding the fact that equity holders do not receive or retain property on account of their equity interests under the plan. In light of the foregoing and as stated in its October 8, 2005 press release announcing the filing of its chapter 11 reorganization cases, the Company considers the value of the common stock to be highly speculative and cautions equity holders that the stock may ultimately be determined to have no value. Accordingly, the Company urges that appropriate caution be exercised with respect to existing and future investments in Delphi's common stock or other equity interests or any claims relating to prepetition liabilities."

Alicia M. Leonhard, Esq.
December 19, 2005
Page 6

    Moreover, <u>Williams</u> requires that, as a prerequisite to the formation of a statutory equity committee, equity holders must first establish that "they are unable to represent their interests in the bankruptcy case without an official committee. . . . [this] factor is critical because, in most cases, even those equity holders who do expect a distribution in the case can adequately represent their interest without an official committee and can seek compensation if they make a substantial contribution in the case." (<u>Id.</u>, at p. 222). This is particularly true here where Appaloosa is a highly sophisticated entity that has only recently invested in the Company at levels requiring public disclosure and has retained highly sophisticated professionals to represent it in the Debtors' chapter 11 cases.

    While the Debtors believe that the above two issues should be dispositive of the request pending before the United States Trustee, the Debtors also believe that the request does not satisfy many of the other factors traditionally relied upon by United States Trustees and the Bankruptcy Courts that have been called upon to review such requests. For example, the Debtors are very concerned about the additional costs and burdens that will be placed on the Debtors' estates by the appointment of a statutory equity committee. Similarly, the Debtors reserve their rights in all respects with respect to various statements and suggestions in the November 7 and November 28 letters from or on behalf of Appaloosa. The determination of the Debtors not to specifically address each and every statement in the November 7 and November 28 letters is not an admission against interest or an agreement with such statements, at least some of which the Debtors believe are materially inaccurate.

    In closing, on behalf of the Debtors, we want to again express our appreciation for your willingness to consider input from the Debtors with respect to this request for appointment of an additional statutory committee in the Debtors' chapter 11 cases as well as for your patience while the Debtors considered this matter both internally as a matter of prudent corporate governance and with the Creditors' Committee. Should you have any questions regarding these matters or would like further information from the Debtors, we would be happy to make ourselves available at your convenience.

                                        Sincerely yours,

                                        /s/ John Wm. Butler, Jr.

                                        John Wm. Butler, Jr.

Attachments

Alicia M. Leonhard, Esq.
December 19, 2005
Page 7

cc:   Mr. Robert S. Miller
      David M. Sherbin, Esq.
      Thomas E. Lauria, Esq.
      Robert J. Rosenberg, Esq.