IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                          :
      In re                               :    Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :    Case No. 05-44481 (RDD)
                                          :
                          Debtors.        :    (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
```

<u>AFFIDAVIT OF SERVICE</u>

I, Evan Gershbein, being duly sworn according to law, depose and say that I am employed by Kurtzman Carson Consultants, LLC, the Court appointed claims and noticing agent for the Debtors in the above-captioned cases.

On March 2, 2006, I caused to be served the documents listed below (i) upon the parties listed on <u>Exhibit A</u> hereto via overnight delivery, (ii) upon the parties listed on <u>Exhibit B</u> hereto via electronic notification, and (iii) upon the parties listed on <u>Exhibit C</u> hereto via postage pre-paid U.S. mail:

1) Debtor's Objection to the Motion of Appaloosa Management L.P. Pursuant to 11 U.S.C. Section 1102(A)(2) for Order Directing United States Trustee to Appoint Equity Committee (Docket No. 2629) [a copy of which is attached hereto as Exhibit D]

2) Declaration of John D. Sheehan in Support of Debtors' Objection to Motion of Appaloosa Management L.P. Pursuant to 11 U.S.C. Section 1102(a)(2) for Order Directing United States Trustee to Appoint Equity Committee (Docket No. 2630) [a copy of which is attached hereto as Exhibit E]

3) Debtors' Statement in Response to Motion Directing Appointment of General Motors Corporation to Statutory Creditors' Committee (Docket No. 2642) [a copy of which is attached hereto as Exhibit F]

Dated: March 3, 2006

      _/s/ Evan Gershbein_____
      Evan Gershbein

Subscribed and sworn to (or affirmed) before me on this 3rd day of March, 2006, by Evan Gershbein, personally known to me or proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature : ___/s/ Sarah Elizabeth Frankel_____

Commission Expires: ___12/23/08____

# EXHIBIT A

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Brown Rudnick Berlack Israels LLP | Robert J. Stark | Seven Times Square | | New York | NY | 10036 | 212-209-4800 | 212-2094801 | rstark@brownrudnick.com | Indenture Trustee |
| Capital Research and Management Company | Michelle Robson | 11100 Santa Monica Blvd | 15th Floor | Los Angeles | CA | 90025 | 310-996-6140 | 310-996-6091 | mlfr@capgroup.com | Creditor Committee Member |
| Cohen Weiss & Simon | Bruce Simon | 330 W. 42nd Street | | New York | NY | 10036 | 212-356-0231 | 212-695-5436 | b.simon@cwsny.com | |
| Curtis, Mallet-Prevost, Colt & mosle LLP | Steven J. Reisman | 101 Park Avenue | | New York | NY | 10178-0061 | 2126966000 | 2126971559 | sreisman@cm-p.com | Counsel for Flextronics International USA, Inc. |
| Davis Polk & Wardwell | Donald Bernstein | 450 Lexington Avenue | | New York | NY | 10017 | 212-450-4092 | 212-450-3092 | donald.bernstein@dpw.com | Postpetition Administrative Agent |
| Delphi Corporation | Sean Corcoran, Karen Craft | 5725 Delphi Drive | | Troy | MI | 48098 | 248-813-2000 | 248-813-2670 | sean.p.corcoran@delphi.com, karen.j.craft@delphi.com | Debtors |
| Electronic Data Systems Corp. | Michael Nefkens | 5505 Corporate Drive MSIA | | Troy | MI | 48098 | 248-696-1729 | 248-696-1739 | mike.nefkens@eds.com | Creditor Committee Member |
| Flextronics International | Carrie L. Schiff | 6328 Monarch Park Place | | Niwot | CO | 80503 | 303-652-4853 | 303-652-4716 | cshiff@flextronics.com | Counsel for Flextronics International |
| Freescale Semiconductor, Inc. | Richard Lee Chambers, III | 6501 William Cannon Drive West | MD: OE16 | Austin | TX | 78735 | 512-895-6357 | 512-895-3090 | trey.chambers@freescale.com | Creditor Committee Member |
| FTI Consulting, Inc. | Randall S. Eisenberg | 3 Times Square | 11th Floor | New York | NY | 10036 | 212-2471010 | 212-841-9350 | randall.eisenberg@fticonsulting.com | Financial Advisors to Debtors |
| General Electric Company | Valerie Venable | 9930 Kincey Avenue | | Huntersville | NC | 28078 | 704-992-5075 | 866-585-2386 | | Creditor Committee Member |
| Groom Law Group | Lonie A. Hassel | 1701 Pennsylvania Avenue, NW | | Washington | DC | 20006 | 202-857-0620 | 202-659-4503 | lhassel@groom.com | Counsel for Employee Benefits |
| Hodgson Russ LLP | Stephen H. Gross | 152 West 57th Street | 35th Floor | New York | NY | 10019 | 212-751-4300 | 212-751-0928 | sgross@hodgsonruss.com | Counsel for Hexcel Corporation |
| Honigman Miller Schwartz and Cohn LLP | Frank L. Gorman, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | fgorman@honigman.com | Counsel to General Motors Corporation |
| Honigman Miller Schwartz and Cohn LLP | Robert B. Weiss, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | rweiss@honigman.com | Counsel to General Motors Corporation |
| Internal Revenue Service | Attn: Insolvency Department, Mario Valerio | 290 Broadway | 5th Floor | New York | NY | 10007 | 212-298-2015 | 212-298-2016 | | IRS |
| Internal Revenue Service | Attn: Insolvency Department | 477 Michigan Ave | Mail Stop 15 | Detroit | MI | 48226 | 313-628-3648 | 313-628-3602 | | Michigan IRS |
| IUE-CWA | Henry Reichard | 2360 W. Dorothy Lane | Suite 201 | Dayton | OH | 45439 | 937-294-7813 | 937-294-9164 | hreichardiuecwa@aol.com | Creditor Committee Member |
| Jefferies & Company, Inc. | William Q. Derrough | 520 Madison Avenue | 12th Floor | New York | NY | 10022 | 212-284-2521 | 212-284-2470 | bderrough@jefferies.com | UCC Professional |
| JPMorgan Chase Bank, N.A. | Thomas F. Maher, Richard Duker, Gianni Russello | 270 Park Avenue | | New York | NY | 10017 | 212-270-0426 | 212-270-0430 | thomas.fmaher@chase.com, richard.duker@jpmorgan.com, gianni.russello@jpmorgan.com | Postpetition Administrative Agent |
| JPMorgan Chase Bank, N.A. | Vilma Francis | 270 Park Avenue | | New York | NY | 10017 | 212-270-5484 | 212-270-4016 | vilma.francis@jpmorgan.com | Prepetition Administrative Agent |
| Kramer Levin Naftalis & Frankel LLP | Gordon Z. Novod | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | gnovod@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kramer Levin Naftalis & Frankel LLP | Thomas Moers Mayer | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | tmayer@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kurtzman Carson Consultants | James Le | 12910 Culver Blvd. | Suite I | Los Angeles | CA | 90066 | 310-751-1511 | 310-751-1561 | jle@kccllc.com | Noticing and Claims Agent: |
| Latham & Watkins LLP | Robert J. Rosenberg | 885 Third Avenue | | New York | NY | 10022 | 212-906-1370 | 212-751-4864 | robert.rosenberg@lw.com | UCC Professional |
| Law Debenture Trust of New York | Patrick J. Healy | 767 Third Ave. | 31st Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | patrick.healy@lawdeb.com | Indenture Trustee |
| Law Debenture Trust of New York | Daniel R. Fisher | 767 Third Ave. | 31st Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | daniel.fisher@lawdeb.com | Indenture Trustee |
| McDermott Will & Emery LLP | David D. Cleary | 227 West Monroe Street | | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | dcleary@mwe.com | Counsel for Recticel North America, Inc. |
| McDermott Will & Emery LLP | Mohsin N. Khambati | 227 West Monroe Street | | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | mkhambati@mwe.com | Counsel for Recticel North America, Inc. |
| McTigue Law Firm | J. Brian McTigue | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | bmctigue@mctiguelaw.com | Counsel for Movant Retirees and Proposed Counsel for The Official Committee of Retirees |
| McTigue Law Firm | Cornish F. Hitchcock | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | conh@mctiguelaw.com | Counsel for Movant Retirees and Proposed Counsel for The Official Committee of Retirees |
| Mesirow Financial | Melissa Knolls | 321 N. Clark St. | 13th Floor | Chicago | IL | 60601 | 800-453-0600 | 312-644-8927 | mknoll@mesirowfinancial.com | UCC Professional |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 2

3/2/2006 6:14 PM
MSL lists fedex and email

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Morrison Cohen LLP | Joseph T. Moldovan, Esq. | 909 Third Avenue | | New York | NY | 10022 | 2127358603 | 9175223103 | jmoldovan@morrisoncohen.com | Counsel for Blue Cross and Blue Shield of Michigan |
| Northeast Regional Office | Mark Schonfeld, Regional Director | 3 World Financial Center | Room 4300 | New York | NY | 10281 | 212-336-1100 | 212-336-1323 | newyork@sec.gov | Securities and Exchange Commission |
| Office of New York State | Attorney General Eliot Spitzer | 120 Broadway | | New York City | NY | 10271 | 212-416-8000 | 212-416-6075 | | New York Attorney General's Office |
| O'Melveny & Meyer LLP | Robert Siegel | 400 South Hope Street | | Los Angeles | CA | 90071 | 213-430-6000 | 213-430-6407 | rsiegel@omm.com | Special Labor Counsel |
| O'Melveny & Meyer LLP | Tom A. Jerman, Rachel Janger | 1625 Eye Street, NW | | Washington | DC | 20006 | 202-383-5300 | 202-383-5414 | tjerman@omm.com | Special Labor Counsel |
| Pension Benefit Guaranty Corporation | Jeffrey Cohen | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005 | 202-326-4020 | 202-326-4112 | garrick.sandra@pbgc.gov efile@pbgc.gov | Counsel for Pension Benefit Guaranty Corporation |
| Pension Benefit Guaranty Corporation | Ralph L. Landy | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005-4026 | 2023264020 | 2023264112 | landy.ralph@pbgc.gov | Chief Counsel for the Pension Benefit Guaranty Corporation |
| Phillips Nizer LLP | Sandra A. Riemer | 666 Fifth Avenue | | New York | NY | 10103 | 212-841-0589 | 212-262-5152 | sriemer@phillipsnizer.com | Counsel for Freescale Semiconductor, Inc., f/k/a Motorola Semiconductor Systems |
| Rothchild Inc. | David L. Resnick | 1251 Avenue of the Americas | | New York | NY | 10020 | 212-403-3500 | 212-403-5454 | david.resnick@us.rothschild.com | Financial Advisor |
| Seyfarth Shaw LLP | Robert W. Dremluk | 1270 Avenue of the Americas | Suite 2500 | New York | NY | 10020-1801 | 2122185500 | 2122185526 | rdremluk@seyfarth.com | Counsel for Murata Electronics North |
| Shearman & Sterling LLP | Douglas Bartner, Jill Frizzley | 599 Lexington Avenue | | New York | NY | 10022 | 212-8484000 | 212-848-7179 | dbartner@shearman.com jfrizzley@shearman.com | Local Counsel to the Debtors |
| Simpson Thatcher & Bartlett LLP | Kenneth S. Ziman, Robert H. Trust, William T. Russell, Jr. | 425 Lexington Avenue | | New York | NY | 10017 | 212-455-2000 | 212-455-2502 | kziman@stblaw.com rtrust@stblaw.com wrussell@stblaw.com | Prepetition Administrative Agent |
| Skadden, Arps, Slate, Meagher & Flom LLP | John Wm. Butler, John K. Lyons, Ron E. Meisler | 333 W. Wacker Dr. | Suite 2100 | Chicago | IL | 60606 | 312-407-0700 | 312-407-0411 | jbutler@skadden.com jlyonsch@skadden.com rmeisler@skadden.com | Counsel to the Debtor |
| Skadden, Arps, Slate, Meagher & Flom LLP | Kayalyn A. Marafioti, Thomas J. Matz | 4 Times Square | P.O. Box 300 | New York | NY | 10036 | 212-735-3000 | 212-735-2000 | kmarafio@skadden.com tmatz@skadden.com | Counsel to the Debtor |
| Spencer Fane Britt & Browne LLP | Daniel D. Doyle | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | ddoyle@spencerfane.com | Counsel for Movant Retirees and Proposed Counsel for The Official Committee of Retirees |
| Spencer Fane Britt & Browne LLP | Nicholas Franke | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | nfranke@spencerfane.com | Counsel for Movant Retirees and Proposed Counsel for The Official Committee of Retirees |
| Stevens & Lee, P.C. | Chester B. Salomon, Constantine D. Pourakis | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | 2123198500 | 2123198505 | cp@stevenslee.com cs@stevenslee.com | Counsel for Wamco, Inc. |
| Togut, Segal & Segal LLP | Albert Togut | One Penn Plaza | Suite 3335 | New York | NY | 10119 | 212-594-5000 | 212-967-4258 | altogut@teamtogut.com | Conflicts Counsel to the Debtors |
| United States Trustee | Alicia M. Leonard | 33 Whitehall Street | 21st Floor | New York | NY | 10004-2112 | 212-510-0500 | 212-668-2255 does not take service via fax | | United States Trustee |
| United States Trustee | Deirdre A. Martini | 33 Whitehall Street | Suite 2100 | New York | NY | 10004 | 212-510-0500 | | deirdre.martini@usdoj.gov | United States Trustee |
| Warner Stevens, L.L.P. | Michael D. Warner | 1700 City Center Tower II | 301 Commerce Street | Fort Worth | TX | 76102 | 817-810-5250 | 817-810-5255 | | Proposed Conflicts Counsel for the Official Committee of Unsecured Creditors |
| Weil, Gotshal & Manges LLP | Jeffrey L. Tanenbaum, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | jeffrey.tanenbaum@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Martin J. Bienenstock, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | martin.bienenstock@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Michael P. Kessler, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | michael.kessler@weil.com | Counsel to General Motors Corporation |
| Wilmington Trust Company | Steven M. Cimalore | Rodney Square North | 1100 North Market Street | Wilmington | DE | 19890 | 302-636-6058 | 302-636-4143 | scimalore@wilmingtontrust.com | Creditor Committee Member/Indenture Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 2

3/2/2006 6:14 PM
MSL lists fedex and email

# EXHIBIT B

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Brown Rudnick Berlack Israels LLP | Robert J. Stark | Seven Times Square | | New York | NY | 10036 | 212-209-4800 | 212-2094801 | rstark@brownrudnick.com | Indenture Trustee |
| Capital Research and Management Company | Michelle Robson | 11100 Santa Monica Blvd | 15th Floor | Los Angeles | CA | 90025 | 310-996-6140 | 310-996-6091 | mlfr@capgroup.com | Creditor Committee Member |
| Curtis, Mallet-Prevost, Colt & mosle LLP | Steven J. Reisman | 101 Park Avenue | | New York | NY | 10178-0061 | 2126966000 | 2126971559 | sreisman@cm-p.com | Counsel for Flextronics International Use, Inc. |
| Davis Polk & Wardwell | Donald Bernstein | 450 Lexington Avenue | | New York | NY | 10017 | 212-450-4092 | 212-450-3092 | donald.bernstein@dpw.com | Postpetition Administrative Agent |
| Delphi Corporation | Sean Corcoran, Karen Craft | 5725 Delphi Drive | | Troy | MI | 48098 | 248-813-2000 | 248-813-2670 | sean.p.corcoran@delphi.com karen.j.craft@delphi.com | Debtors |
| Electronic Data Systems Corp. | Michael Nefkens | 5505 Corporate Drive MSIA | | Troy | MI | 48098 | 248-696-1729 | 248-696-1739 | mike.nefkens@eds.com | Creditor Committee Member |
| Freescale Semiconductor, Inc. | Richard Lee Chambers, III | 6501 William Cannon Drive West | MD: OE16 | Austin | TX | 78735 | 512-895-6357 | 512-895-3090 | trey.chambers@freescale.com | Creditor Committee Member |
| FTI Consulting, Inc. | Randall S. Eisenberg | 3 Times Square | 11th Floor | New York | NY | 10036 | 212-2471010 | 212-841-9350 | randall.eisenberg@fticonsulting.com | Financial Advisors to Debtors |
| Groom Law Group | Lonie A. Hassel | 1701 Pennsylvania Avenue, NW | | Washington | DC | 20006 | 202-857-0620 | 202-659-4503 | lhassel@groom.com | Counsel for Employee Benefits |
| Hodgson Russ LLP | Stephen H. Gross | 152 West 57th Street | 35th Floor | New York | NY | 10019 | 212-751-4300 | 212-751-0928 | sgross@hodgsonruss.com | Counsel for Hexcel Corporation |
| Honigman Miller Schwartz and Cohn LLP | Frank L. Gorman, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | fgorman@honigman.com | Counsel to General Motors Corporation |
| Honigman Miller Schwartz and Cohn LLP | Robert B. Weiss, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | rweiss@honigman.com | Counsel to General Motors Corporation |
| IUE-CWA | Henry Reichard | 2360 W. Dorothy Lane | Suite 201 | Dayton | OH | 45439 | 937-294-7813 | 937-294-9164 | hreichardiuecwa@aol.com | Creditor Committee Member |
| Jefferies & Company, Inc, | William Q. Derrough | 520 Madison Avenue | 12th Floor | New York | NY | 10022 | 212-284-2521 | 212-284-2470 | bderrough@jefferies.com | UCC Professional |
| JPMorgan Chase Bank, N.A. | Richard Duker, Gianni Russello | 270 Park Avenue | | New York | NY | 10017 | 212-270-0426 | 212-270-0430 | richard.duker@jpmorgan.com gianni.russello@jpmorgan.com | Postpetition Administrative Agent |
| JPMorgan Chase Bank, N.A. | Vilma Francis | 270 Park Avenue | | New York | NY | 10017 | 212-270-5484 | 212-270-4016 | vilma.francis@jpmorgan.com | Prepetition Administrative Agent |
| Kramer Levin Naftalis & Frankel LLP | Gordon Z. Novod | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | gnovod@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kramer Levin Naftalis & Frankel LLP | Thomas Moers Mayer | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | tmayer@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kurtzman Carson Consultants | James Le | 12910 Culver Blvd. | Suite I | Los Angeles | CA | 90066 | 310-751-1511 | 310-751-1561 | jle@kccllc.com | Noticing and Claims Agent; |
| Latham & Watkins LLP | Robert J. Rosenberg | 885 Third Avenue | | New York | NY | 10022 | 212-906-1370 | 212-751-4864 | robert.rosenberg@lw.com | UCC Professional |
| Law Debenture Trust of New York | Daniel R. Fisher | 767 Third Ave. | 31st Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | daniel.fisher@lawdeb.com | Indenture Trustee |
| Law Debenture Trust of New York | Patrick J. Healy | 767 Third Ave. | 31st Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | patrick.healy@lawdeb.com | Indenture Trustee |
| McDermott Will & Emery LLP | David D. Cleary | 227 West Monroe Street | | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | dcleary@mwe.com | Counsel for Recticel North America, Inc. |
| McDermott Will & Emery LLP | Mohsin N. Khambati | 227 West Monroe Street | | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | mkhambati@mwe.com | Counsel for Recticel North America, Inc. |
| McTigue Law Firm | J. Brian McTigue | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | bmctigue@mctiguelaw.com | Counsel for Movant Retirees and Proposed Counsel for The Official Committee of Retirees |
| McTigue Law Firm | Cornish F. Hitchcock | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | conh@mctiguelaw.com | Counsel for Movant Retirees and Proposed Counsel for The Official Committee of Retirees |
| Mesirow Financial | Melissa Knolls | 321 N. Clark St. | 13th Floor | Chicago | IL | 60601 | 800-453-0600 | 312-644-8927 | mknoll@mesirowfinancial.com | UCC Professional |
| Morrison Cohen LLP | Joseph T. Moldovan, Esq. | 909 Third Avenue | | New York | NY | 10022 | 2127358603 | 9175223103 | jmoldovan@morrisoncohen.com | Counsel for Blue Cross and Blue Shield of Michigan |
| Northeast Regional Office | Mark Schonfeld, Regional Director | 3 World Financial Center | Room 4300 | New York | NY | 10281 | 212-336-1100 | 212-336-1323 | newyork@sec.gov | Securities and Exchange Commission |
| O'Melveny & Meyer LLP | Robert Siegel | 400 South Hope Street | | Los Angeles | CA | 90071 | 213-430-6000 | 213-430-6407 | rsiegel@omm.com | Special Labor Counsel |
| O'Melveny & Meyer LLP | Tom A. Jerman, Rachel Janger | 1625 Eye Street, NW | | Washington | DC | 20006 | 202-383-5300 | 202-383-5414 | tjerman@omm.com | Special Labor Counsel |
| Pension Benefit Guaranty Corporation | Jeffrey Cohen | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005 | 202-326-4020 | 202-326-4112 | garrick.sandra@pbgc.gov efile@pbgc.gov | Counsel for Pension Benefit Guaranty Corporation |
| Pension Benefit Guaranty Corporation | Ralph L. Landy | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005-4026 | 2023264020 | 2023264112 | landy.ralph@pbgc.gov | Chief Counsel for the Pension Benefit Guaranty Corporation |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 2

3/2/2006 6:14 PM
MSL lists fedex and email

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Phillips Nizer LLP | Sandra A. Riemer | 666 Fifth Avenue | | New York | NY | 10103 | 212-841-0589 | 212-262-5152 | sriemer@phillipsnizer.com | Counsel for Freescale Semiconductor, Inc., f/k/a Motorola Semiconductor Systems |
| Rothchild Inc. | David L. Resnick | 1251 Avenue of the Americas | | New York | NY | 10020 | 212-403-3500 | 212-403-5454 | david.resnick@us.rothschild.com | Financial Advisor |
| Seyfarth Shaw LLP | Robert W. Dremluk | 1270 Avenue of the Americas | Suite 2500 | New York | NY | 10020-1801 | 2122185500 | 2122185526 | rdremluk@seyfarth.com | Counsel for Murata Electronics North |
| Shearman & Sterling LLP | Douglas Bartner, Jill Frizzley | 599 Lexington Avenue | | New York | NY | 10022 | 212-8484000 | 212-848-7179 | dbartner@shearman.com jfrizzley@shearman.com | Local Counsel to the Debtors |
| Simpson Thatcher & Bartlett LLP | Kenneth S. Ziman, Robert H. Trust, William T. Russell, Jr. | 425 Lexington Avenue | | New York | NY | 10017 | 212-455-2000 | 212-455-2502 | kziman@stblaw.com rtrust@stblaw.com wrussell@stblaw.com | Prepetition Administrative Agent |
| Skadden, Arps, Slate, Meagher & Flom LLP | John Wm. Butler, John K. Lyons, Ron E. Meisler | 333 W. Wacker Dr. | Suite 2100 | Chicago | IL | 60606 | 312-407-0700 | 312-407-0411 | jbutler@skadden.com jlyonsch@skadden.com rmeisler@skadden.com | Counsel to the Debtor |
| Skadden, Arps, Slate, Meagher & Flom LLP | Kayalyn A. Marafioti, Thomas J. Matz | 4 Times Square | P.O. Box 300 | New York | NY | 10036 | 212-735-3000 | 212-735-2000 | kmarafio@skadden.com tmatz@skadden.com | Counsel to the Debtor |
| Spencer Fane Britt & Browne LLP | Daniel D. Doyle | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | ddoyle@spencerfane.com | Counsel for Movant Retirees and Proposed Counsel for The Official Committee of Retirees |
| Spencer Fane Britt & Browne LLP | Nicholas Franke | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | nfranke@spencerfane.com | Counsel for Movant Retirees and Proposed Counsel for The Official Committee of Retirees |
| Stevens & Lee, P.C. | Chester B. Salomon, Constantine D. Pourakis | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | 2123198500 | 2123198505 | cp@stevenslee.com cs@stevenslee.com | Counsel for Wamco, Inc. |
| Togut, Segal & Segal LLP | Albert Togut | One Penn Plaza | Suite 3335 | New York | NY | 10119 | 212-594-5000 | 212-967-4258 | altogut@teamtogut.com | Conflicts Counsel to the Debtors |
| Weil, Gotshal & Manges LLP | Martin J. Bienenstock, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | martin.bienenstock@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Michael P. Kessler, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | michael.kessler@weil.com | Counsel to General Motors Corporation |
| Wilmington Trust Company | Steven M. Cimalore | Rodney Square North | 1100 North Market Street | Wilmington | DE | 19890 | 302-636-6058 | 302-636-4143 | scimalore@wilmingtontrust.com | Creditor Committee Member/Indenture Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 2

3/2/2006 6:14 PM
MSL lists fedex and email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Airgas, Inc. | David Boyle | 259 Radnor-Chester Road, Suite 100 | P.O. Box 6675 | Radnor | PA | 19087-8675 | | 610-230-3064 | 310-687-1052 | david.boyle@airgas.com | Counsel for Airgas, Inc. |
| Ajamie LLP | Wallace A. Showman | 1350 Avenue of the Americas | 29th Floor | New York | NY | 10019 | | 212-246-6820 | 212-581-8958 | wshowman@ajamie.com | Counsel for SANLUIS Rassini International, Inc.; Rassini, S.A. de C.V. |
| Ajamie LLP | Thomas A. Ajamie | 711 Louisiana | Suite 2150 | Houston | TX | 77002 | | 713-860-1600 | 713-860-1699 | tajamie@ajamie.com | Counsel for SANLUIS Rassini International, Inc.; Rassini, S.A. de C.V. |
| Akebono Corporation (North America) | Alan Swiech | 34385 Twelve Mile Road | | Farmington Hills | MI | 48331 | | 248-489-7406 | 866-609-0888 | aswiech@akebono-usa.com | Vice President of Administration for Akebono Corporation |
| Akin Gump Strauss Hauer & Feld, LLP | Peter J. Gurfein | 2029 Century Park East | | Los Angeles | CA | 90067 | | 310-552-6696 | 310-229-1001 | pgurfein@akingump.com | Counsel for Wamco, Inc. |
| Allen Matkins Leck Gamble & Mallory LLP | Michael S. Greger | 1900 Main Street | Fifth Floor | Irvine | CA | 92614-7321 | | 949-553-1313 | 949-553-8354 | mgreger@allenmatkins.com | Counsel for Kilroy Realty, L.P. |
| Ambrake Corporation | Ronald L. Jones | 300 Ring Road | | Elizabethtown | KY | 42701 | | 270-765-0208 | 270-234-2395 | rjones@ambrake.com | Representative for Ambrake Corporation |
| American Axle & Manufacturing, Inc. | Steven R. Keyes | One Dauch Drive, Mail Code 6E-2-42 | | Detroit | MI | 48243 | | 313-758-4868 | | steven.keyes@aam.com | Representative for American Axle & Manufacturing, Inc. |
| Andrews Kurth LLP | Monica S. Blacker | 1717 Main Street | Suite 3700 | Dallas | TX | 75201 | | 214-659-4400 | 214-659-4401 | mblacker@andrewskurth.com | Counsel for ITW Mortgage Investments IV, Inc. |
| Andrews Kurth LLP | Gogi Malik | 1717 Main Street | Suite 3700 | Dallas | TX | 75201 | | 214-659-4400 | 214-659-4401 | gogimalik@andrewskurth.com | Counsel for ITW Mortgage Investments IV, Inc. |
| Angelo, Gordon & Co. | Leigh Walzer | 245 Park Avenue | 26th Floor | New York | NY | 10167 | | 212-692-8251 | 212-867-6395 | lwalzer@angelogordon.com | |
| Anglin, Flewelling, Rasmussen, Campbell & Trytten, LLP | Mark T. Flewelling | 199 South Los Robles Avenue | Suite 600 | Pasadena | CA | 91101-2459 | | 626-535-1900 | 626-577-7764 | mtf@afrct.com | Counsel for Stanley Electric Sales of America, Inc. |
| APS Clearing, Inc. | Andy Leinhoff | 1301 S. Capital of Texas Highway | Suite B-220 | Austin | TX | 78746 | | 512-314-4416 | 512-314-4462 | aleinoff@ampn.com | Counsel for APS Clearing, Inc. |
| APS Clearing, Inc. | Matthew Hamilton | 1301 S. Capital of Texas Highway | Suite B-220 | Austin | TX | 78746 | | 512-314-4416 | 512-314-4462 | mhamilton@ampn.com | Counsel for APS Clearing, Inc. |
| Arent Fox PLLC | Mitchell D. Cohen | 1675 Broadway | | New York | NY | 10019 | | 212-484-3900 | 212-484-3990 | Cohen.Mitchell@arentfox.com | Counsel for Pullman Bank and Trust Company |
| Arent Fox PLLC | Robert M. Hirsh | 1675 Broadway | | New York | NY | 10019 | | 212-484-3900 | 212-484-3990 | Hirsh.Robert@arentfox.com | Counsel for Pullman Bank and Trust Company |
| Arnall Golden Gregory LLP | Darryl S. Laddin | 171 17th Street NW | Suite 2100 | Atlanta | GA | 30363-1031 | | 404-873-8120 | 404-873-8121 | dladdin@agg.com | Counsel to Daishinku (America) Corp. d/b/a KDS America ("Daishinku"), SBC Telecommunications, Inc. (SBC) |
| Arnold & Porter LLP | Joel M. Gross | 555 Twelfth Street, N.W. | | Washington | D.C. | 20004-1206 | | 202-942-5000 | 202-942-5999 | joel_gross@aporter.com | Counsel for CSX Transportation, Inc. |
| ATS Automation Tooling Systems Inc. | Carl Galloway | 250 Royal Oak Road | | Cambridge | Ontario | N3H 4R6 | Canada | 519-653-4483 | 519-650-6520 | cgalloway@atsautomation.com | Company |
| Barack, Ferrazzano, Kirschbaum Perlman, & Nagelberg LLP | William J. Barrett | 333 West Wacker Drive | Suite 2700 | Chicago | IL | 60606 | | 312-629-5170 | 312-984-3150 | william.barrett@bfkpn.com | Counsel for Motion Industries, Inc. |
| Barack, Ferrazzano, Kirschbaum Perlman, & Nagelberg LLP | Kimberly J. Robinson | 333 West Wacker Drive | Suite 2700 | Chicago | IL | 60606 | | 312-629-5170 | 312-984-3150 | kim.robinson@bfkpn.com | Counsel for Motion Industries, Inc. |
| Barnes & Thornburg LLP | John T. Gregg | 300 Ottawa Avenue, NW | Suite 500 | Grand Rapids | MI | 49503 | | 616-742-3930 | 626-742-3999 | john.gregg@btlaw.com | Counsel to Priority Health |
| Barnes & Thornburg LLP | Michael K. McCrory Wendy D. Brewer | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | wendy.brewer@btlaw.com michael.mccrory@btlaw.com | Counsel for Gibbs Die Casting Corporation |
| Barnes & Thornburg LLP | Patrick E. Mears | 300 Ottawa Avenue, NW | Suite 500 | Grand Rapids | MI | 49503 | | 616-742-3936 | 616-742-3999 | pmears@btlaw.com | Counsel to Armada Rubber Manufacturing Company, Bank of America Leasing & Leasing & Capital, LLC, & AutoCam Corporation |
| Barnes & Thornburg LLP | Alan K. Mills | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | alan.mills@btlaw.com | Counsel for Mays Chemical Company |
| Bernstein Litowitz Berger & Grossman | John P. Coffey | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1409 | 2125541444 | sean@blbglaw.com | Counsel for Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Bernstein Litowitz Berger & Grossman | Hannah E. Greenwald | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1411 | 2125541444 | hannah@blbglaw.com | Counsel for Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bernstein Litowitz Berger & Grossman | Eileen McNerney | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1485 | 212-554-1444 | eileen@blbglaw.com | Counsel for Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Berry Moorman P.C. | James P. Murphy | 535 Griswold | Suite 1900 | Detroit | MI | 48226 | | 313-496-1200 | 313-496-1300 | murph@berrymoorman.com | Counsel for Kamax L.P.; Optrex America, Inc. |
| Bialson, Bergen & Schwab | Kenneth T. Law, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | klaw@bbslaw.com | Counsel to UPS Supply Chain Solutions, Inc. |
| Bialson, Bergen & Schwab | Lawrence M. Schwab, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | lschwab@bbslaw.com | Counsel to UPS Supply Chain Solutions, Inc.; Solectron Corporation; Solectron De Mexico SA de CV; Solectron Invotronics; Coherent, Inc.; Veritas Software Corporation |
| Bialson, Bergen & Schwab | Patrick M. Costello, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | pcostello@bbslaw.com | Solectron Corporation; Solectron de Mexico SA de CV; Solectron Invotronics and Coherent, Inc. |
| Bialson, Bergen & Schwab | Thomas M. Gaa | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | tgaa@bbslaw.com | Counsel to Veritas Software Corporation |
| Blank Rome LLP | Bonnie Glantz Fatell | Chase Manhattan Centre | 1201 Market Street, Suite 800 | Wilmington | DE | 19801 | | 302-425-6423 | 302-428-5110 | fatell@blankrome.com | Counsel for Special Devices, Inc. |
| Blank Rome LLP | Marc E. Richards | The Chrysler Building | 405 Lexington Avenue | New York | NY | 10174 | | 212-885-5000 | 212-885-5002 | mrichards@blankrome.com | Counsel for DENSO International America, Inc. |
| Bodman LLP | Ralph E. McDowell | 100 Renaissance Center | 34th Floor | Detroit | MI | 48243 | | 313-393-7592 | 313-393-7579 | rmcdowell@bodmanllp.com | Counsel for Freudenberg-NOK; General Partnership; Freudenberg-NOK, Inc.; Flextech, Inc.; Vibracoustic de Mexico, S.A. de C.V.; Lear Corporation; American Axle & Manufacturing, Inc. |
| Bolhouse, Vander Hulst, Risko & Baar P.C. | David S. Lefere | 3996 Chicago Drive SW | | Grandville | MI | 49418 | | 616-531-7711 | 616-531-7757 | davidl@bolhouselaw.com | Counsel for Eclipse Tool and Die, Inc. |
| Bond, Schoeneck & King, PLLC | Stephen A. Donato | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | 315-218-8100 | sdonato@bsk.com | Counsel for Marquardt GmbH and Marquardt Switches, Inc.; Tessy Plastics Corp; Diemolding Corporation |
| Bond, Schoeneck & King, PLLC | Camille W. Hill | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | 315-218-8100 | chill@bsk.com | Counsel for Marquardt GmbH and Marquardt Switches, Inc.; Tessy Plastics Corp. |
| Bond, Schoeneck & King, PLLC | Charles J. Sullivan | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | 315-218-8100 | csullivan@bsk.com | Counsel for Diemolding Corporation |
| Bose McKinney & Evans LLP | Jeannette Eisan Hinshaw | 135 N. Pennslyvania Street | Suite 2700 | Indianapolis | IN | 46204 | | 317-684-5296 | 317-684-5173 | jhinshaw@boselaw.com | Counsel for Decatur Plastics Products, Inc. and Eikenberry & Associates, Inc.; Lorentson Manufacturing, Company, Inc.; Lorentson Tooling, Inc.; L & S Tools, Inc.; Hewitt Tool & Die, Inc. |
| Boult, Cummings, Conners & Berry, PLC | Roger G. Jones | 1600 Division Street, Suite 700 | PO Box 34005 | Nashville | TN | 37203 | | 615-252-2307 | 615-252-6307 | rjones@bccb.com | Counsel for Calsonic Kansei North America, Inc.; Calsonic Harrison Co., Ltd. |
| Boult, Cummings, Conners & Berry, PLC | Austin L. McMullen | 1600 Division Street, Suite 700 | PO Box 34005 | Nashville | TN | 37203 | | 615-252-2307 | 615-252-6307 | amcmullen@bccb.com | Counsel for Calsonic Kansei North America, Inc.; Calsonic Harrison Co., Ltd. |
| Brown & Connery, LLP | Donald K. Ludman | 6 North Broad Street | | Woodbury | NJ | 08096 | | 856-812-8900 | 856-853-9933 | dludman@brownconnery.com | Counsel for SAP America, Inc. |
| Buchalter Nemer, A Profesional Corporation | Shawn M. Christianson | 333 Market Street | 25th Floor | San Francisco | CA | 94105-2126 | | 415-227-0900 | 415-227-0770 | schristianson@buchalter.com | Counsel for Oracle USA, Inc.; Oracle Credit Corporation |
| Burr & Forman LLP | Michael Leo Hall | 420 North Twentieth Street | Suite 3100 | Birmingham | AL | 35203 | | (205) 458-5367 | (205) 244-5651 | mhall@burr.com | Counsel to Mercedes-Benz U.S. International, Inc |
| Cage Williams & Abelman, P.C. | Steven E. Abelman | 1433 Seventeenth Street | | Denver | CO | 80202 | | 303-295-0202 | | sabelman@cagewilliams.com | Counsel for United Power, Inc. |
| Cahill Gordon & Reindel LLP | Jonathan Greenberg | 80 Pine Street | | New York | NY | 10005 | | 212-701-3000 | 732-205-6777 | jonathan.greenberg@engelhard.com | Counsel to Engelhard Corporation |
| Cahill Gordon & Reindel LLP | Robert Usadi | 80 Pine Street | | New York | NY | 10005 | | 212-701-3000 | 212-269-5420 | rusadi@cahill.com | Counsel to Engelhard Corporation |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 17

3/2/2006 6:23 PM
2002 lists

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Calinoff & Katz, LLp | Dorothy H. Marinis-Riggio | 140 East 45th Street | 17th Floor | New York | NY | 10017 | | 212-826-8800 | 212-644-5123 | driggio@candklaw.com | Counsel for Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Carson Fischer, P.L.C. | Robert A. Weisberg | 300 East Maple Road | Third Floor | Birmingham | MI | 48009-6317 | | 248-644-4840 | 248-644-1832 | rweisberg@carsonfischer.com | Counsel for Cascade Die Casting Group, Inc. |
| Carter Ledyard & Milburn LLP | Aaron R. Cahn | 2 Wall Street | | New York | NY | 10005 | | 212-732-3200 | 212-732-3232 | cahn@clm.com | Counsel for STMicroelectronics, Inc. |
| Clark Hill PLC | Seth A. Drucker | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8300 | 313-965-8252 | sdrucker@clarkhill.com | Counsel for BorgWarner Turbo Systems Inc.; Metaldyne Company, LLC |
| Clark Hill PLC | Joel D. Applebaum | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8300 | 313-965-8252 | japplebaum@clarkhill.com | Counsel for BorgWarner Turbo Systems Inc.; Metaldyne Company, LLC |
| Clark Hill PLLC | Robert D. Gordon | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8572 | 313-965-8252 | rgordon@clarkhill.com | Counsel for ATS Automation Tooling Systems Inc. |
| Cleary Gottlieb Steen & Hamilton LLP | Deborah M. Buell | One Liberty Plaza | | New York | NY | 10006 | | 212-225-2000 | 212-225-3999 | maofiling@cgsh.com | Counsel for Arneses Electricos Automotrices, S.A.de C.V.; Cordaflex, S.A. de C.V. |
| Cleary, Gottlieb, Steen & Hamilton LLP | James L. Bromley | One Liberty Plaza | | New York | NY | 10006 | | 212-225-2000 | 212-225-3999 | maofiling@cgsh.com | Counsel for Bear, Stearns, Co. Inc.; Citigroup, Inc.; Credit Suisse First Boston; Deutsche Bank Securities, Inc.; Goldman Sachs Group, Inc.; JP Morgan Chase & Co.; Lehman Brothers, Inc.; Merrill Lynch & Co.; Morgan Stanley & Co., Inc.; UBS Securities, LLC |
| Cohen & Grigsby, P.C. | Thomas D. Maxson | 11 Stanwix Street | 15th Floor | Pittsburgh | PA | 15222-1319 | | 412-297-4706 | 412-209-1837 | tmaxson@cohenlaw.com | Counsel for Nova Chemicals, Inc. |
| Cohen, Weiss & Simon LLP | Joseph J. Vitale | 330 West 42nd Street | | New York | NY | 10036 | | 212-356-0238 | 646-473-8238 | jvitale@cwsny.com | Counsel for International Union, United Automobile, Aerospace and Agriculture Implement Works of America (UAW) |
| Cohn Birnbaum & Shea P.C. | Scott D. Rosen, Esq. | 100 Pearl Street, 12th Floor | | Hartford | CT | 06103 | | 860-493-2200 | 860-727-0361 | srosen@cb-shea.com | Counsel to Floyd Manufacturing Co., Inc. |
| Colbert & Winstead, P.C. | Amy Wood Malone | 1812 Broadway | | Nashville | TN | 37203 | | 615-321-0555 | 615-321-9555 | amalone@colwinlaw.com | Counsel for Averitt Express, Inc. |
| Conlin, McKenney & Philbrick, P.C. | Bruce N. Elliott | 350 South Main Street | Suite 400 | Ann Arbor | MI | 48104 | | 734-971-9000 | 734-971-9001 | Elliott@cmplaw.com | Counsel to Brazeway, Inc. |
| Connolly Bove Lodge & Hutz LLP | Jeffrey C. Wisler, Esq. | 1007 N. Orange Street | P.O. Box 2207 | Wilmington | DE | 19899 | | 302-658-9141 | 302-658-0380 | jwisler@cblh.com | Counsel to ORIX Warren, LLC |
| Contrarian Capital Management, L.L.C. | Mark Lee, Janice Stanton, Bill Raine, Seth Lax | 411 West Putnam Avenue | Suite 225 | Greenwich | CT | 06830 | | 203-862-8200 / (230) 862-8231 | 203-629-1977 / (203) 629-1977 | mlee@contrariancapital.com jstanton@contrariancapital.com wraine@contrariancapital.com solax@contrariancapital.com | Counsel to Contrarian Capital Management, L.L.C. |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Ronald S. Pretekin | 33 West First Street | Suite 600 | Dayton | OH | 45402 | | 937-223-8177 | 937-223-6705 | Pretekin@coollaw.com | Counsel for Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Company |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Steven M. Wachstein | 33 West First Street | Suite 600 | Dayton | OH | 45402 | | 937-223-8177 | 937-223-6705 | wachstein@coollaw.com | Counsel for Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Company |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Sylvie J. Derrien | 33 West First Street | Suite 600 | Dayton | OH | 45402 | | 937-223-8177 | 937-223-6705 | derrien@coollaw.com | Counsel for Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Company |
| Cornell University | Nancy H. Pagliaro | Office of University Counsel | 300 CCC Building, Garden Avenue | Ithaca | NY | 14853-2601 | | 607-255-5124 | 607-254-3556 | nhp4@cornell.edu | Paralegal/Counsel for Cornell University |
| Curtin & Heefner, LLP | Robert  Szwajkos | 250 N. Pennsylvania Avenue | | Morrisville | PA | 19067 | | 215-736-2521 | 215-736-3647 | rsz@curtinheefner.com | Counsel for SPS Technologies, LLC; NSS Technologies, Inc.; SPS Technologies Waterford Company; Greer Stop Nut, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 3 of 17

3/2/2006 6:23 PM
2002 lists

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Curtin & Heefner, LLP | Daniel P. Mazo | 250 N. Pennsylvania Avenue | | Morrisville | PA | 19067 | | 215-736-2521 | 215-736-3647 | dpm@curtinheefner.com | Counsel for SPS Technologies, LLC; NSS Technologies, Inc.; SPS Technologies Waterford Company; Greer Stop Nut, Inc. |
| Curtis, Mallet-Prevost, Colt & Mosle LLP | Andrew M. Thau | 101 Park Avenue | | New York | NY | 10178-0061 | | 212-696-8898 | 917-368-8898 | athau@cm-p.com | Counsel for Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Curtis, Mallet-Prevost, Colt & Mosle LLP | Steven J. Reisman | 101 Park Avenue | | New York | NY | 10178-0061 | | 212-696-6065 | 212-697-1559 | sreisman@cm-p.com | Counsel for Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Curtis, Mallet-Prevost, Colt & Mosle LLP | David S. Karp | 101 Park Avenue | | New York | NY | 10178-0061 | | 212-696-6065 | 212-697-1559 | dkarp@cm-p.com | Counsel for Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co. |
| DaimlerChrysler Corporation | Kim Kolb | CIMS 485-13-32 | 1000 Chrysler Drive | Auburn Hills | MI | 48326-2766 | | 248-576-5741 | | krk4@daimlerchrysler.com | Counsel for DaimlerChrysler Corporation; DaimlerChrysler Motors Company, LLC; DaimlerChrysler Canada, Inc. |
| Damon & Morey LLP | William F. Savino | 1000 Cathedral Place | 298 Main Street | Buffalo | NY | 14202-4096 | | 716-856-5500 | 716-856-5510 | wsavino@damonmorey.com | Counsel for Relco, Inc.; The Durham Companies, Inc. |
| Daniels & Kaplan, P.C. | Jay Selanders | 2405 Grand Boulevard | Suite 900 | Kansas City | MO | 64108-2519 | | 816-221-3086 | 816-221-3006 | selanders@danielsandkaplan.com | Counsel for DaimlerChrysler Corporation; DaimlerChrysler Motors Company, LLC; DaimlerChrysler Canada, Inc. |
| Denso International America, Inc. | Carol Sowa | 24777 Denso Drive | | Southfield | MI | 48086 | | 248-372-8531 | 248-350-7772 | carol_sowa@denso-diam.com | Counsel to Denso International America, Inc. |
| Deputy Attorney General | Amina Maddox | R.J. Hughes Justice Complex | P.O. Box 106 | Trenton | NJ | 08625 | | 609-984-0183 | 609-292-6266 | amina.maddox@dol.lps.state.nj.us | Deputy Attorney General - State of New Jersey |
| DiConza Law, P.C. | Gerard DiConza, Esq. | 630 Third Avenue, 7th Floor | | New York | NY | 10017 | | 212-682-4940 | 212-682-4942 | gdiconza@dlawpc.com | Counsel to Tyz-All Plastics, Inc.; Furukawa Electric North America APD |
| Dinsmore & Shohl LLP | John Persiani | 1900 Chemed Center | 255 East Fifth Street | Cincinnati | OH | 45202 | | 513-977-8200 | 513-977-8141 | john.persiani@dinslaw.com | Counsel for The Procter & Gamble Company |
| DLA Piper Rudnick Gray Cary US LLP | Richard M. Kremen Maria Ellena Chavez-Ruark | The Marbury Building | 6225 Smith Avenue | Baltimore | Maryland | 21209-3600 | | 410-580-3000 | 410-580-3001 | richard.kremen@dlapiper.com | Counsel for Constellation NewEnergy, Inc. & Constellation NewEnergy - Gas Division, LLC |
| Drinker Biddle & Reath LLP | Andrew C. Kassner | 18th and Cherry Streets | | Philadelphia | PA | 19103 | | 215-988-2700 | 215-988-2757 | andrew.kassner@dbr.com | Counsel to Penske Truck Leasing Co., L.P. |
| Drinker Biddle & Reath LLP | David B. Aaronson | 18th and Cherry Streets | | Philadelphia | PA | 19103 | | 215-988-2700 | 215-988-2757 | david.aaronson@dbr.com | Counsel to Penske Truck Leasing Co., L.P. and Quaker Chemical Corporation |
| Duane Morris LLP | Margery N. Reed, Esq. | 30 South 17th Street | | Philadelphia | PA | 19103-4196 | | 215-979-1000 | 215-979-1020 | dmdelphi@duanemorris.com | Counsel to ACE American Insurance Company |
| Duane Morris LLP | Wendy M. Simkulak, Esq. | 30 South 17th Street | | Philadelphia | PA | 19103-4196 | | 215-979-1000 | 215-979-1020 | wmsimkulak@duanemorris.com | Counsel to ACE American Insurance Company |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Duane Morris LLP | Joseph H. Lemkin | 744 Broad Street | Suite 1200 | Newark | NJ | 07102 | | 973-424-2000 | 973-424-2001 | jhlemkin@duanemorris.com | Counsel for NDK America, Inc./NDK Crystal, Inc.; Foster Electric USA, Inc.; JST Corporation; Nichicon (America) Corporation; Taiho Corporation of America; American Aikoku Alpha, Inc.; Sagami America, Ltd.; SL America, Inc./SL Tennessee, LLC; Hosiden America Corporation and Samtech Corporation |
| Electronic Data Systems Corporation | Ayala Hassell | 5400 Legacy Dr. | Mail Stop H3-3A-05 | Plano | TX | 75024 | | 212-715-9100 | 212-715-8000 | ayala.hassell@eds.com | Representative for Electronic Data Systems Corporation |
| Erman, Teicher, Miller, Zucker & Freedman, P.C. | David H. Freedman | 400 Galleria Officentre | Ste. 444 | Southfield | MI | 48034 | | 248-827-4100 | 248-827-4106 | dfreedman@ermanteicher.com | Counsel for Doshi Prettl International, LLC |
| Ettelman & Hochheiser, P.C. | Gary Ettelman | c/o Premium Cadillac | 77 Main Street | New Rochelle | NY | 10801 | | 516-227-6300 | 516-227-6307 | gettelman@e-hlaw.com | Counsel for Jon Ballin |
| Fagel Haber LLC | Gary E. Green | 55 East Monroe | 40th Floor | Chicago | IL | 60603 | | 312-346-7500 | 312-580-2201 | ggreen@fagelhaber.com | Counsel for Aluminum International, Inc. |
| Fagel Haber LLC | Lauren Newman | 55 East Monroe | 40th Floor | Chicago | IL | 60603 | | 312-346-7500 | 312-580-2201 | lnewman@fagelhaber.com | Counsel for Aluminum International, Inc. |
| Finkel Goldstein Rosenbloom & Nash LLP | Ted J. Donovan | 26 Broadway | Suite 711 | New York | NY | 10004 | | 212-344-2929 | 212-422-6836 | tdonovan@finkgold.com | Counsel for Pillarhouse (U.S.A.) Inc. |
| Foley & Lardner LLP | Jill L. Murch | 321 North Clark Street | Suite 2800 | Chicago | IL | 60610-4764 | | 312-832-4500 | 312-832-4700 | jmurch@foley.com | Counsel for Kuss Corporation |
| Fox Rothschild LLP | Fred Stevens | 13 East 37th Street | Suite 800 | New York | NY | 10016 | | 212-682-7575 | 212-682-4218 | fstevens@foxrothschild.com | Counsel to M&G Plastic Products, Inc. |
| Fox Rothschild LLP | Michael J. Viscount, Jr. | 1301 Atlantic Avenue | Suite 400 | Atlantic City | NJ | 08401-7212 | | 609-348-4515 | 609-348-6834 | mviscount@foxrothschild.com | Counsel to M&G Plastic Products, Inc. |
| Frederick T. Rikkers | | 419 Venture Court | P.O. Box 930555 | Verona | WI | 53593 | | 608-848-6350 | 608-848-6357 | ftrikkers@rikkerslaw.com | Counsel for Southwest Metal Finishing, Inc. |
| Gazes LLC | Eric Wainer | 32 Avenue of the Americas | Suite 1800 | New York | NY | 10013 | | 212-765-9000 | 212-765-9675 | office@gazesllc.com | Counsel to Setech, Inc. |
| Gazes LLC | Ian J. Gazes | 32 Avenue of the Americas | | New York | NY | 10013 | | 212-765-9000 | 212-765-9675 | ian@gazesllc.com | Counsel to Setech, Inc. |
| Genovese Joblove & Battista, P.A. | Craig P. Rieders, Esq. | 100 S.E. 2nd Street | Suite 4400 | Miami | FL | 33131 | | 305-349-2300 | 305-349-2310 | crieders@gjb-law.com | Counsel for Ryder Integrated Logistics, Inc. |
| Gibbons, Del Deo, Dolan, Griffinger & Vecchione | David N. Crapo | One Riverfront Plaza | | Newark | NJ | 07102-5497 | | 973-596-4523 | 973-639-6244 | dcrapo@gibbonslaw.com | Counsel for Epcos, Inc. |
| Goodwin Procter LLP | Allan S. Brilliant | 599 Lexington Avenue | | New York | NY | 10022 | | 212-813-8800 | 212-355-3333 | abrilliant@goodwinproctor.com | Counsel for UGS Corp. |
| Goodwin Procter LLP | Craig P. Druehl | 599 Lexington Avenue | | New York | NY | 10022 | | 212-813-8800 | 212-355-3333 | cdruehl@goodwinproctor.com | Counsel for UGS Corp. |
| Gorlick, Kravitz & Listhaus, P.C. | Barbara S. Mehlsack | 17 State Street | 4th Floor | New York | NY | 10004 | | 212-269-2500 | 212-269-2540 | bmehlsack@gkllaw.com | Counsel for International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10; International Union of Operating Engineers Local Union Nos. 18, 101 and 832 |
| Goulston & Storrs, P.C. | Peter D. Bilowz | 400 Atlantic Avenue | | Boston | MA | 02110-333 | | 617-482-1776 | 617-574-4112 | pbilowz@goulstonstorrs.com | Counsel to Thermotech Company |
| Grant & Eisenhofer P.A. | Jay W. Eisenhofer | 45 Rockefeller Center | 650 Fifth Avenue | New York | NY | 10111 | | 212-755-6501 | 212-755-6503 | jeisenhofer@gelaw.com | Counsel for Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Grant & Eisenhofer P.A. | Geoffrey C. Jarvis | 1201 North Market Street | Suite 2100 | Wilmington | DE | 19801 | | 302-622-7000 | 302-622-7100 | gjarvis@ggelaw.com | Counsel for Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Grant & Eisenhofer P.A. | Sharan Nirmul | 1201 North Market Street | Suite 2100 | Wilmington | DE | 19801 | | 302-622-7000 | 302-622-7100 | snirmul@gelaw.com | Counsel for Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Gratz, Miller & Brueggeman, S.C. | Jill M. Hartley | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | 414-271-6308 | jh@previant.com | Counsel for International Brotherood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| Gratz, Miller & Brueggeman, S.C. | Matthew R. Robbins | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | 414-271-6308 | mrr@previant.com | Counsel for International Brotherood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| Gratz, Miller & Brueggeman, S.C. | Timothy C. Hall | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | 414-271-6308 | tch@previant.com | Counsel for International Brotherood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| Graydon Head & Ritchey LLP | J. Michael Debbler, Susan M. Argo | 1900 Fifth Third Center | 511 Walnut Street | Cincinnati | OH | 45202 | | 513-621-6464 | 513-651-3836 | mdebbeler@graydon.com | Counsel for Grote Industries; Batesville Tool & Die; PIA Group; Reliable Castings |
| Greensfelder, Hemker & Gale, P.C. | Cherie Macdonald J. Patrick Bradley | 10 S. Broadway | Suite 200 | St. Louis | MO | 63102 | | 314-241-9090 | 314-241-8624 | ckm@greensfelder.com jpb@greensfelder.com | Counsel for ARC Automotive, Inc. |
| Guaranty Bank | Herb Reiner | 8333 Douglas Avenue | | Dallas | TX | 75225 | | 214-360-2702 | 214-360-1940 | herb.reiner@guarantygroup.com | Counsel for American Finance Group, Inc. d/b/a Guaranty Capital Corporation |
| Halperin Battaglia Raicht, LLP | Alan D. Halperin Christopher J.Battaglia | 555 Madison Avenue | 9th Floor | New York | NY | 10022 | | 212-765-9100 | 212-765-0964 | cbattaglia@halperinlaw.net ahalperin@halperinlaw.net | Counsel to Pacific Gas Turbine Center, LLC and Chromalloy Gas Turbine Corporation |
| Harris D. Leinwand | Harris D. Leinwand | 350 Fifth Avenue | Suite 2418 | New York | NY | 10118 | | 212-725-7338 | 212-244-6219 | hleinwand@aol.com | Counsel for Baker Hughes Incorporated; Baker Petrolite Corporation |
| Herrick, Feinstein LLP | Paul Rubin | 2 Park Avenue | | New York | NY | 10016 | | 212-592-1448 | 212-545-3360 | prubin@herrick.com | Counsel for Canon U.S.A., Inc. and Schmidt Technology GmbH |
| Hewlett-Packard Company | Anne Marie Kennelly | 3000 Hanover St., M/S 1050 | | Palo Alto | CA | 94304 | | 650-857-6902 | 650-852-8617 | anne.kennelly@hp.com | Counsel to Hewlett-Packard Company |
| Hewlett-Packard Company | Kenneth F. Higman | 2125 E. Katella Avenue | Suite 400 | Anaheim | CA | 92806 | | 714-940-7120 | 740-940-7539 | ken.higman@hp.com | Counsel to Hewlett-Packard Company |
| Hewlett-Packard Company | Sharon Petrosino | 420 Mountain Avenue | | Murray Hill | NJ | 07974 | | 908-898-4760 | 908-898-4133 | sharon.petrosino@hp.com | Counsel for Hewlett-Packard Financial Services Company |
| Hewlett-Packard Company | Glen Dumont | 420 Mountain Avenue | | Murray Hill | NJ | 07974 | | 908-898-4750 | 908-898-4137 | glen.dumont@hp.com | Counsel for Hewlett-Packard Financial Services Company |
| Hiscock & Barclay, LLP | J. Eric Charlton | 300 South Salina Street | PO Box 4878 | Syracuse | NY | 13221-4878 | | 315-425-2716 | 315-425-8576 | echarlton@hiscockbarclay.com | Counsel for GW Plastics, Inc. |
| Hodgson Russ LLP | Cheryl R. Storie | One M&T Plaza | Suite 2000 | Buffalo | NY | 14203 | | 716-848-1275 | 716-849-0349 | cstorie@hodgsonruss.com | Counsel for Hexcel Corporation |
| Hodgson Russ LLP | Stephen H. Gross, Esq. | Carnegie Hall Tower | 152 West 57th Street, 35th Street | New York | NY | 10019 | | 212-751-4300 | 212-751-0928 | sgross@hodgsonruss.com | Counsel to Hexcel Corporation |
| Hogan & Hartson L.L.P. | Scott A. Golden | 875 Third Avenue | | New York | NY | 10022 | | 212-918-3000 | 212-918-3100 | sagolden@hhlaw.com | Counsel for XM Satellite Radio Inc. |
| Hogan & Hartson L.L.P. | Edward C. Dolan | Columbia Square | 555 Thirteenth Street, N.W. | Washington | D.C. | 20004-1109 | | 202-637-5677 | 202-637-5910 | ecdolan@hhlaw.com | Counsel for Umicore Autocat Canada Corp. |
| Hogan & Hartson L.L.P. | Audrey Moog | Columbia Square | 555 Thirteenth Street, N.W. | Washington | D.C. | 20004-1109 | | 202-637-5677 | 202-637-5910 | amoog@hhlaw.com | Counsel for Umicore Autocat Canada Corp. |
| Holme Roberts & Owen, LLP | Elizabeth K. Flaagan | 1700 Lincoln | Suite 4100 | Denver | CO | 80203 | | 303-861-7000 | 303-866-0200 | elizabeth.flaagan@hro.com | Counsel for CoorsTek, Inc.; Corus, L.P. |
| Honigman, Miller, Schwartz and Cohn, LLP | Robert B. Weiss, Frank L. Gorman | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | | 313-465-7000 | 313-465-8000 | rweiss@honigman.com fgorman@honigman.com | Counsel for General Motors Corporation |
| Honigman, Miller, Schwartz and Cohn, LLP | Donald T. Baty, Jr. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226 | | 313-465-7314 | 313-465-7315 | dbaty@honigman.com | Counsel for Fujitsu Ten Corporation of America |
| Honigman, Miller, Schwartz and Cohn, LLP | E. Todd Sable | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226 | | 313-465-7548 | 313-465-7549 | tsable@honigman.com | Counsel for Valeo Climate Control Corp.; Valeo Electrical Systems, Inc. - Motors and Actuators Division;Valeo Electrical Systems, Inc. - Wipers Division; Valeo Switches & Detection System, Inc. |

In re Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 6 of 17

3/2/2006 6:23 PM
2002 lists

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Hunter & Schank Co. LPA | Thomas J. Schank | One Canton Square | 1700 Canton Avenue | Toledo | OH | 43624 | | 419-255-4300 | 419-255-9121 | tomschank@hunterschank.com | Counsel for ZF Group North America Operations, Inc. |
| Hunter & Schank Co. LPA | John J. Hunter | One Canton Square | 1700 Canton Avenue | Toledo | OH | 43624 | | 419-255-4300 | 419-255-9121 | jrhunter@hunterschank.com | Counsel for ZF Group North America Operations, Inc. |
| Hunton & Wiliams LLP | Michael P. Massad, Jr. | Energy Plaza, 30th Floor | 1601 Bryan Street | Dallas | TX | 75201 | | 214-979-3000 | 214-880-0011 | mmassad@hunton.com | Counsel for RF Monolithics, Inc. |
| Hunton & Wiliams LLP | Steven T. Holmes | Energy Plaza, 30th Floor | 1601 Bryan Street | Dallas | TX | 75201 | | 214-979-3000 | 214-880-0011 | sholmes@hunton.com | Counsel for RF Monolithics, Inc. |
| Hurwitz & Fine P.C. | Ann E. Evanko | 1300 Liberty Building | | Buffalo | NY | 14202 | | 716-849-8900 | 716-855-0874 | aee@hurwitzfine.com | Counsel for Jiffy-Tite Co., Inc. |
| Ice Miller | Ben T. Caughey | One American Square | Box 82001 | Indianapolis | IN | 46282-0200 | | 317-236-2100 | 317-236-2219 | Ben.Caughey@icemiller.com | Counsel for Sumco, Inc. |
| Infineon Technologies North America Corporation | Greg Bibbes | 1730 North First Street | M/S 11305 | San Jose | CA | 95112 | | 408-501-6442 | 408-501-2488 | greg.bibbes@infineon.com | General Counsel & Vice President for Infineon Technologies North America Corporation |
| Infineon Technologies North America Corporation | Jeff Gillespie | 2529 Commerce Drive | Suite H | Kokomo | IN | 46902 | | 765-454-2146 | 765-456-3836 | jeffery.gillispie@infineon.com | Global Account Manager for Infineon Technologies North America |
| International Union of Operating Engineers | Richard Griffin | 1125-17th Avenue, N.W. | | Washington | DC | 20036 | | 202-429-9100 | 202-778-2641 | rgriffin@iuoe.org | Counsel for International Brotherhood of Electrical Workers Local Union Nos. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10; International Union of Operating Engineers Local Union Nos. 18, 101 and 832 |
| Jaffe, Raitt, Heuer & Weiss, P.C. | Paige E. Barr | 27777 Franklin Road | Suite 2500 | Southfield | MI | 48034 | | 248-351-3000 | 248-351-3082 | pbarr@jaffelaw.com | Counsel for Trizer Corporation |
| Jenner & Block LLP | Ronald R. Peterson | One IBM Plaza | | Chicago | IL | 60611 | | 312-222-9350 | 312-840-7381 | rpeterson@jenner.com | Counsel for SPX Corporation (Contech Division), Alcan Rolled Products-Ravenswood, LLC and Tenneco Inc. |
| Jones Day | Scott J. Friedman | 222 East 41st Street | | New York | NY | 10017 | | 212-326-3939 | 212-755-7306 | sjfriedman@jonesday.com | Counsel for WL. Ross & Co., LLC |
| Katten Muchin Rosenman LLP | John P. Sieger, Esq. | 525 West Monroe Street | | Chicago | IL | 60661 | | 312-902-5200 | 312-577-4733 | john.sieger@kattenlaw.com | Counsel to TDK Corporation America and MEMC Electronic Materials, Inc. |
| Kegler, Brown, Hill & Ritter Co., LPA | Kenneth R. Cookson | 65 East State Street | Suite 1800 | Columbus | OH | 43215 | | 614-426-5400 | 614-464-2634 | kcookson@keglerbrown.com | Counsel for Solution Recovery Services |
| Keller Rohrback L.L.P. | Lynn Lincoln Sarko Cari Campen Laufenberg Erin M. Rily | 1201 Third Avenue | Suite 3200 | Seattle | WA | 98101 | | 206-623-1900 | 206-623-3384 | lsarko@kellerrohrback.com claufenberg@kellerrohrback.com erley@kellerrohrback.com | Counsel for Neal Folck, Greg Bartell, Donald McEvoy, Irene Polito, and Thomas Kessler, on behalf of themselves and a class of persons similarly situated, and on behalf of the Delphi Savings-Stock Purchase Program for Salaried Employees in the United States and the Delphi Personal Savings Plan for Hourly-Rate Employees in the United States |
| Keller Rohrback P.L.C. | Gary A. Gotto | National Bank Plaza | 3101 North Central Avenue, Suite 900 | Phoenix | AZ | 85012 | | 602-248-0088 | 602-248-2822 | ggotto@kellerrohrback.com | Counsel for Neal Folck, Greg Bartell, Donald McEvoy, Irene Polito, and Thomas Kessler, on behalf of themselves and a class of persons similarly situated, and on behalf of the Delphi Savings-Stock Purchase Program for Salaried Employees in the United States and the Delphi Personal Savings Plan for Hourly-Rate Employees in the United States |
| Kelley Drye & Warren, LLP | Mark I. Bane | 101 Park Avenue | | New York | NY | 10178 | | 212-808-7800 | 212-808-7897 | mbane@kelleydrye.com | Counsel for the Pension Benefit Guaranty Corporation |
| Kelley Drye & Warren, LLP | Mark. R. Somerstein | 101 Park Avenue | | New York | NY | 10178 | | 212-808-7800 | 212-808-7897 | msomerstein@kelleydrye.com | Counsel for the Pension Benefit Guaranty Corporation |
| Kennedy, Jennick & Murray | Thomas Kennedy | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | 212-358-0207 | tkennedy@kjmlabor.com | Counsel for The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Kennedy, Jennick & Murray | Susan M. Jennik | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | 212-358-0207 | sjennik@kjmlabor.com | Counsel for The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Kennedy, Jennick & Murray | Larry Magarik | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | 212-358-0207 | lmagarik@kjmlabor.com | Counsel for The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| King & Spalding, LLP | George B. South, III | 1185 Avenue of the Americas | | New York | NY | 10036 | | 212-556-2100 | 212-556-2222 | gsouth@kslaw.com | Counsel for Martinrea International, Inc. |
| King & Spalding, LLP | Alexandra B. Feldman | 1185 Avenue of the Americas | | New York | NY | 10036 | | 212-556-2100 | 212-556-2222 | afeldman@kslaw.com | Counsel for Martinrea International, Inc. |
| Kirkland & Ellis LLP | Geoffrey A. Richards | 200 East Randolph Drive | | Chicago | IL | 60601 | | 312-861-2000 | 312-861-2200 | grichards@kirkland.com | Counsel for Lunt Mannufacturing Company |
| Kirkpatrick & Lockhart Nicholson Graham LLP | Edward M. Fox | 599 Lexington Avenue | | New York | NY | 10022 | | 212-536-4812 | 212-536-3901 | efox@klng.com | Counsel to Wilmington Trust Company, as Indenture trustee |
| Krugliak, Wilkins, Griffiths & Dougherty CO., L.P.A. | Sam O. Simmerman | 4775 Munson Street N.W. | P.O. Box 36963 | Canton | OH | 44735-6963 | | 330-497-0700 | 330-497-4020 | sosimmerman@kwgd.com | Counsel to for Millwood, Inc. |
| Kutchin & Rufo, P.C. | Edward D. Kutchin | 155 Federal Street | 17th Floor | Boston | MA | 02110-1727 | | 617-542-3000 | 617-542-3001 | ekutchin@kutchinrufo.com | Counsel for Parlex Corporation |
| Kutchin & Rufo, P.C. | Kerry R. Northrup | 155 Federal Street | 17th Floor | Boston | MA | 02110-1727 | | 617-542-3000 | 617-542-3001 | knorthup@kutchinrufo.com | Counsel for Parlex Corporation |
| Lambert. Leser, Isackson, Cook & Guinta, P.C. | Susan M. Cook | 309 Davidson Building | PO Box 835 | Bay City | MI | 48707-0835 | | 989-893-3518 | | smcook@lambertleser.com | Counsel for Linamar Corporation |
| Latham & Watkins | Mitchell A. Seider | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | mitchell.seider@lw.com | UCC Professional |
| Latham & Watkins | Mark A. Broude | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1384 | 212-751-4864 | mark.broude@lw.com | UCC Professional |
| Latham & Watkins | Robert Rosenberg | 885 Third Avenue | Suite 1000 | New York | NY | 10022-4834 | | 212-906-1370 | 212-751-4864 | robert.rosenberg@lw.com | UCC Professional |
| Latham & Watkins | Henry P. Baer, Jr. | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | henry.baer@lw.com | UCC Professional |
| Latham & Watkins | John W. Weiss | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | john.weiss@lw.com | UCC Professional |
| Latham & Watkins | Michael J. Riela | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | michael.riela@lw.com | UCC Professional |
| Latham & Watkins | Erika Ruiz | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | erika.ruiz@lw.com | UCC Professional |
| Lewis and Roca LLP | Rob Charles, Esq. | One South Church Street | Suite 700 | Tucson | AZ | 85701 | | 520-629-4427 | 520-879-4705 | rcharles@lrlaw.com | Counsel to Freescale Semiconductor, Inc. f/k/a Motorola Semiconductor Systems (U.S.A.) Inc. |
| Lewis and Roca LLP | Susan M. Freeman, Esq. | 40 North Central Avenue | Suite 1900 | Phoenix | AZ | 85004-4429 | | 602-262-5756 | 602-734-3824 | sfreeman@lrlaw.com | Counsel to Freescale Semiconductor, Inc. f/k/a Motorola Semiconductor Systems (U.S.A.) Inc. |
| Linear Technology Corporation | John England, Esq. | 1630 McCarthy Blvd. | | Milpitas | CA | 95035-7417 | | 408-432-1900 | 408-434-0507 | jengland@linear.com | Counsel to Linear Technology Corporation |
| Linebarger Goggan Blair & Sampson, LLP | Diane W. Sanders | 1949 South IH 35 (78741) | P.O. Box 17428 | Austin | TX | 78760-7428 | | 512-447-6675 | 512-443-5114 | austin.bankruptcy@publicans.com | Counsel to Cameron County, Brownsville ISD |
| Linebarger Goggan Blair & Sampson, LLP | Elizabeth Weller | 2323 Bryan Street | Suite 1600 | Dallas | TX | 75201 | | 214-880-0089 | 4692215002 | dallas.bankruptcy@publicans.com | Counsel for Dallas County and Tarrant County |
| Linebarger Goggan Blair & Sampson, LLP | John P. Dillman | P.O. Box 3064 | | Houston | TX | 77253-3064 | | 713-844-3478 | 713-844-3503 | houston_bankruptcy@publicans.com | Counsel in Charge for Taxing Authorities |
| Loeb & Loeb LLP | William M. Hawkins | 345 Park Avenue | | New York | NY | 10154 | | 212-407-4000 | 212-407-4990 | whawkins@loeb.com | Counsel for Industrial Ceramics Corporation |
| Loeb & Loeb LLP | P. Gregory Schwed | 345 Park Avenue | | New York | NY | 10154-0037 | | 212-407-4000 | | gschwed@loeb.com | Counsel for Creditor The Interpublic Group of Companies, Inc. and Proposed Auditor Deloitte & Touche, LLP |
| Lord, Bissel & Brook | Timothy S. McFadden | 115 South LaSalle Street | | Chicago | IL | 60603 | | 312-443-0370 | 312-896-6394 | tmcfadden@lordbissell.com | Counsel for Methode Electronics, Inc. |
| Lord, Bissel & Brook | Timothy W. Brink | 115 South LaSalle Street | | Chicago | IL | 60603 | | 312-443-1832 | 312-443-896-6432 | tbrink@lordbissell.com | Counsel for Sedgwick Claims Management Services, Inc. |
| Lord, Bissel & Brook LLP | Kevin J. Walsh | 885 Third Avenue | 26th Floor | New York | NY | 10022-4802 | | 212-947-8304 212-947-8340 | 212-947-1202 | kwalsh@lordbissell.com | Counsel to Sedgwick Claims Management Services, Inc. and Methode Electronics, Inc. |
| Lowenstein Sandler PC | Michael S. Etkin | 1251 Avenue of the Americas | 18th Floor | New York | NY | 10020 | | 212-262-6700 | 212-262-7402 | metkin@lowenstein.com | Counsel for Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfonds ABP |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 8 of 17

3/2/2006 6:23 PM
2002 lists

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Lowenstein Sandler PC | Ira M. Levee | 1251 Avenue of the Americas | 18th Floor | New York | NY | 10020 | | 212-262-6700 | 212-262-7402 | ilevee@lowenstein.com | Counsel for Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Lowenstein Sandler PC | Kenneth A. Rosen | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | 973-597-2400 | krosen@lowenstein.com | Counsel for Cerberus Capital Management, L.P. |
| Lowenstein Sandler PC | Scott Cargill | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | 973-597-2400 | scargill@lowenstein.com | Counsel for Cerberus Capital Management, L.P.; AT&T Corporation |
| Lowenstein Sandler PC | Vincent A. D'Agostino | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | 973-597-2400 | vdagostino@lowenstein.com | Counsel for AT&T Corporation |
| Lowenstein Sandler PC | Bruce S. Nathan | 1251 Avenue of the Americas | | New York | NY | 10020 | | 212-262-6700 | 212-262-7402 | bnathan@lowenstein.com | Counsel for Daewoo International (America) Corp. |
| Lyden, Liebenthal & Chappell, Ltd. | Erik G. Chappell | 5565 Airport Highway | Suite 101 | Toledo | OH | 43615 | | 419-867-8900 | 419-867-8909 | ego@lydenlaw.com | Counsel for Metro Fibres, Inc. |
| MacDonald, Illig, Jones & Britton LLP | Richard J. Parks | 100 State Street | Suite 700 | Erie | PA | 16507-1459 | | 814-870-7754 | 814-454-4647 | rparks@mijb.com | Counsel for Ideal Tool Company, Inc. |
| Madison Capital Management | Joe Landen | 6143 South Willow Drive | Suite 200 | Greenwood Village | CO | 80111 | | 303-957-4254 | 303-957-2098 | jlanden@madisoncap.com | Representative for Madison Capital Management |
| Margulies & Levinson, LLP | Jeffrey M. Levinson, Esq. Leah M. Caplan, Esq. | 30100 Chagrin Boulevard | Suite 250 | Pepper Pike | OH | 44124 | | 216-514-4935 | 216-514-4936 | jml@ml-legal.com lmc@ml-legal.com | Counsel for Venture Plastics |
| Masuda Funai Eifert & Mitchell, Ltd. | Gary D. Santella | 203 North LaSalle Street | Suite 2500 | Chicago | IL | 60601-1262 | | 312-245-7500 | 312-245-7467 | gsantella@masudafunai.com | Counsel for NDK America, Inc./NDK Crystal, Inc.; Foster Electric USA, Inc.; JST Corporation; Nichicon (America) Corporation; Taiho Corporation of America; American Aikoku Alpha, Inc.; Sagami America, Ltd.; SL America, Inc./SL Tennessee, LLC; Hosiden America Corporation and Samtech Corporation |
| Mayer, Brown, Rowe & Maw LLP | Raniero D'Aversa, Jr. | 1675 Broadway | | New York | NY | 10019 | | 212-262-1910 | 212-506-2500 | rdaversa@mayerbrown.com | Counsel for Bank of America, N.A. |
| Mayer, Brown, Rowe & Maw LLP | Jeffrey G. Tougas | 1675 Broadway | | New York | NY | 10019 | | 212-262-1910 | 212-506-2500 | jgtougas@mayerbrownrowe.com | Counsel for Bank of America, N.A. |
| McCarter & English, LLP | David J. Adler, Jr. Esq. | 245 Park Avenue, 27th Floor | | New York | NY | 10167 | | 212-609-6800 | 212-609-6921 | dadler@mccarter.com | Counsel to Ward Products, LLC |
| McCarthy Tetrault LLP | John J. Salmas Lorne P. Salzman | 66 Wellington Street West | Suite 4700 | Toronto | Ontario | M5K 1E6 | | 416-362-1812 | 416-868-0673 | jsalmas@mccarthy.ca lsalzman@mccarthy.ca | Counsel for Themselves (McCarthy Tetrault LLP) |
| McDermott Will & Emery LLP | James M. Sullivan | 50 Rockefeller Plaza | | New York | NY | 10020 | | 212-547-5400 | 212-547-5444 | jmsullivan@mwe.com | Counsel to Linear Technology Corporation, National Semiconductor Corporation; Timken Corporation |
| McDermott Will & Emery LLP | Stephen B. Selbst | 50 Rockefeller Plaza | | New York | NY | 10020 | | 212-547-5400 | 212-547-5444 | sselbst@mwe.com | Counsel for National Semiconductor Corporation |
| McDonald Hopkins Co., LPA | Jean R. Robertson, Esq. | 600 Superior Avenue, East | Suite 2100 | Cleveland | OH | 44114 | | 216-348-5400 | 216-348-5474 | jrobertson@mcdonaldhopkins.com | Counsel to Brush Engineered materials |
| McDonald Hopkins Co., LPA | Scott N. Opincar, Esq. | 600 Superior Avenue, E. | Suite 2100 | Cleveland | OH | 44114 | | 216-348-5400 | 216-348-5474 | sopincar@mcdonaldhopkins.com | Counsel to Republic Engineered Products, Inc. |
| McDonald Hopkins Co., LPA | Shawn M. Riley, Esq. | 600 Superior Avenue, E. | Suite 2100 | Cleveland | OH | 44114 | | 216-348-5400 | 216-348-5474 | sriley@mcdonaldhopkins.com | Counsel to Republic Engineered Products, Inc. |
| McElroy, Deutsch, Mulvaney & Carpenter, LLP | Jeffrey Bernstein, Esq. | Three Gateway Center | 100 Mulberry Street | Newark | NJ | 07102-4079 | | 973-622-7711 | 973-622-5314 | jbernstein@mdmc-law.com | Counsel to New Jersey Self-Insurers Guaranty Association |
| McGuirewoods LLP | Elizabeth L. Gunn | One James Center | 901 East Cary Street | Richmond | VA | 23219-4030 | | 804-775-1178 | 804-698-2186 | egunn@mcguirewoods.com | Counsel for Siemens Logistics Assembly Systems, Inc. |
| Meyer, Suozzi, English & Klein, P.C. | Lowell Peterson, Esq. | 1350 Broadway | Suite 501 | New York | NY | 10018 | | 212-239-4999 | 212-239-1311 | lpeterson@msek.com | Counsel to United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union (USW), AFL-CIO |
| Meyer, Suozzi, English & Klein, P.C. | Hanan Kolko | 1350 Broadway | Suite 501 | New York | NY | 10018 | | 212-239-4999 | 212-239-1311 | hkolko@msek.com | Counsel for The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Meyers, Rodbell & Rosenbaum, P.A. | Robert H. Rosenbaum | Berkshire Building | 6801 Kenilworth Avenue, Suite 400 | Riverdale Park | MD | 20737-1385 | | 301-699-5800 | | rrosenbaum@mrrlaw.net | Counsel for Prince George County, Maryland |

In re Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 9 of 17

3/2/2006 6:23 PM
2002 lists

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-----|-------|------------------|
| Meyers, Rodbel & Rosenbaum, P.A. | M. Evan Meyers | Berkshire Building | 6801 Kenilworth Avenue, Suite 400 | Riverdale Park | MD | 20737-1385 | | 301-699-5800 | | emeyers@mrrlaw.net | Counsel for Prince George County, Maryland |
| Miami-Dade County, FL | April Burch | 140 West Flagler Street | Suite 1403 | Miami | FL | 33130 | | 305-375-5314 | 305-375-1142 | aburch@miamidade.gov | Paralegal Collection Specialist for Miami-Dade County |
| Michael Cox | | Cadillac Place | 3030 W. Grand Blvd., Suite 10-200 | Detroit | MI | 48202 | | 313-456-0140 | | miag@michigan.gov | Attorney General for State of Michigan, Department of Treasury |
| Michigan Department of Labor and Economic Growth, Worker's Compensation Agency | Dennis J. Raternink | PO Box 30736 | | Lansing | MI | 48909-7717 | | 517-373-1820 | 517-373-2129 | raterinkd@michigan.gov | Assistant Attorney General for Worker's Compensation Agency |
| Michigan Department of Labor and Economic Growth, Worker's Compensation Agency | Michael Cox | PO Box 30736 | | Lansing | MI | 48909-7717 | | 517-373-1820 | 517-373-2129 | miag@michigan.gov | Attorney General for Worker's Compensation Agency |
| Miles & Stockbridge, P.C. | Thomas D. Renda | 10 Light Street | | Baltimore | MD | 21202 | | 410-385-3418 | 410-385-3700 | trenda@milesstockbridge.com | Counsel for Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Miles & Stockbridge, P.C. | Kerry Hopkins | 10 Light Street | | Baltimore | MD | 21202 | | 410-385-3418 | 410-385-3700 | khopkins@milesstockbridge.com | Counsel for Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Miller Johnson | Thomas P. Sarb Robert D. Wolford | 250 Monroe Avenue, N.W. | Suite 800, PO Box 306 | Grand Rapids | MI | 49501-0306 | | 616-831-1748 616-831-1726 | 616-988-1748 616-988-1726 | sarbt@millerjohnson.com wolfordr@millerjohnson.com | Counsel to Pridgeon & Clay, Inc. |
| Miller, Canfield, Paddock and Stone, P.L.C. | Timothy A. Fusco | 150 W. Jefferson Avenue | Suite 2500 | Detroit | MI | 48226 | | 313-496-8435 | 313-496-8453 | fusco@millercanfield.com | Counsel for Niles USA Inc.; Techcentral, LLC; The Bartech Group, Inc.; Fischer Automotive Systems |
| Miller, Canfield, Paddock and Stone, P.L.C. | Jonathan S. Green | 150 W. Jefferson Avenue | Suite 2500 | Detroit | MI | 48226 | | 313-496-8452 | 313-496-7997 | greenj@millercanfield.com | Counsel for Wells Operating Partnership, LP |
| Mintz, Levin, Cohn, Ferris Glovsky and Pepco, P.C. | Paul J. Ricotta | One Financial Center | | Boston | MA | 02111 | | 617-542-6000 | 617-542-2241 | pjricotta@mintz.com | Counsel for Hitachi Automotive Products (USA), Inc. and Conceria Pasubio |
| Mintz, Levin, Cohn, Ferris Glovsky and Pepco, P.C. | Stephanie K. Hoos | The Chrysler Center | 666 Third Avenue | New York | NY | 10017 | | 212-935-3000 | 212-983-3115 | skhoos@mintz.com | Counsel for Hitachi Automotive Products (USA), Inc. and Conceria Pasubio |
| Molex Connector Corp | Jeff Ott | 2222 Wellington Ct. | | Lisle | IL | 60532 | | 630-527-4254 | 630-512-8610 | Jeff.Ott@molex.com | Counsel for Molex Connector Corp |
| Montgomery, McCracken, Walker & Rhoads, LLP | Laurie A. Krepto | 123 South Broad Street | | Philadelphia | PA | 19109 | | 215-772-1500 | 215-772-7620 | lkrepto@mmwr.com | Counsel for AMEC Earth & Environmental, Inc. |
| Morgan, Lewis & Bockius LLP | Richard W. Esterkin, Esq. | 300 South Grand Avenue | | Los Angeles | CA | 90017 | | 213-612-1163 | 213-612-2501 | resterkin@morganlewis.com | Counsel to Sumitomo Corporation |
| Morgan, Lewis & Bockius LLP | Andrew D. Gottfried | 101 Park Avenue | | New York | NY | 10178-0060 | | 212-309-6000 | 212-309-6001 | agottfried@morganlewis.com | Counsel for ITT Industries, Inc.; Hitachi Chemical (Singapore), Ltd. |
| Morgan, Lewis & Bockius LLP | Menachem O. Zelmanovitz | 101 Park Avenue | | New York | NY | 10178 | | 212-309-6000 | 212-309-6001 | mzelmanovitz@morganlewis.com | Counsel for Hitachi Chemical (Singapore) Pte, Ltd. |
| Moritt Hock Hamroff & Horowitz LLP | Leslie Ann Berkoff | 400 Garden City Plaza | | Garden City | NY | 11530 | | 516-873-2000 | | lberkoff@moritthock.com | Counsel for Standard Microsystems Corporation and its direct and indirect subsidiaries Oasis SiliconSystems AG and SMSC NA Automotive, LLC (successor-in-interst to Oasis Silicon Systems, Inc.) |

In re: Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 10 of 17

3/2/2006 6:23 PM
2002 lists

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Morris, Nichols, Arsht and Tunnell | Robert J. Dehney | PO Box 1347 | | Wilmington | DE | 19899-1347 | | 302-658-9200 | 302-658-3989 | rdehney@mnat.com | Counsel for Chicago Miniature Optoelectronnic Technologies, Inc. |
| Morris, Nichols, Arsht and Tunnell | Michael G. Busenkell | PO Box 1347 | | Wilmington | DE | 19899-1347 | | 302-658-9200 | 302-658-3989 | mbusenkell@mnat.com | Counsel for Chicago Miniature Optoelectronic Technologies, Inc. |
| Morrison Cohen LLP | Joseph T. Moldovan Michael R. Dal Lago | 909 Third Avenue | | New York | NY | 10022 | | 212-735-8603 212-735-8757 | 917-522-3103 917-522-3157 | jmoldovan@morrisoncohen.com mdallago@morrisoncohen.com | Counsel to Blue Cross and Blue Shield of Michigan |
| Munsch Hardt Kopf & Harr, P.C. | Raymond J. Urbanik, Esq., Joseph J. Wielebinski, Esq. and Davor Rukavina, Esq. | 3800 Lincoln Plaza | 500 North Akard Street | Dallas | TX | 75201-6659 | | 214-855-7590 214-855-7561 214-855-7587 | 214-855-7584 | rurbanik@munsch.com jwielebinski@munsch.com drukavina@munsch.com | Counsel for Texas Instruments Incorporated |
| Nantz, Litowich, Smith, Girard & Hamilton, P.C. | Sandra S. Hamilton | 2025 East Beltline, S.E. | Suite 600 | Grand Rapids | MI | 49546 | | 616-977-0077 | 616-977-0529 | sandy@nlsg.com | Counsel for Lankfer Diversified Industries, Inc. |
| Nathan, Neuman & Nathan, P.C. | Kenneth A. Nathan | 29100 Northwestern Highway | Suite 260 | Southfield | MI | 48034 | | 248-351-0099 | 248-351-0487 | Knathan@nathanneuman.com | Counsel for 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. and Etkin Real Properties |
| Nathan, Neuman & Nathan, P.C. | Susanna C. Brennan | 29100 Northwestern Highway | Suite 260 | Southfield | MI | 48034 | | 248-351-0099 | 248-351-0487 | sbrennan@nathanneuman.com | Counsel for 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. and Etkin Real Properties |
| National City Commercial Capital | Lisa M. Moore | 995 Dalton Avenue | | Cincinnati | OH | 45203 | | 513-455-2390 | 866-298-4481 | lisa.moore@nationalcity.com | Vice President and Senior Counsel for National City Commercial Capital |
| Nelson Mullins Riley & Scarborough | George B. Cauthen | 1320 Main Street, 17th Floor | PO Box 11070 | Columbia | SC | 29201 | | 803-7255-9425 | 803-256-7500 | george.cauthen@nelsonmullins.com | Counsel for Datwyler Rubber & Plastics, Inc.; Datwyler, Inc.; Datwyler i/o devices (Americas), Inc.; Rothrist Tube (USA), Inc. |
| Nix, Patterson & Roach, L.L.P. | Bradley E. Beckworth | 205 Linda Drive | | Daingerfield | TX | 75638 | | 903-645-7333 | 903-645-4415 | bbeckworth@nixlawfirm.com | Counsel for Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Nix, Patterson & Roach, L.L.P. | Jeffrey J. Angelovich | 205 Linda Drive | | Daingerfield | TX | 75638 | | 903-645-7333 | 903-645-4415 | jangelovich@nixlawfirm.com | Counsel for Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Nix, Patterson & Roach, L.L.P. | Susan Whatley | 205 Linda Drive | | Daingerfield | TX | 75638 | | 903-645-7333 | 903-645-4415 | susanwhatley@nixlawfirm.com | Counsel for Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Noma Company and General Chemical Performance Products LLC | James Imbriaco | 90 East Halsey Road | | Parsippanny | NJ | 07054 | | 973-884-6952 | 973-515-3244 | jimbriaco@gentek-global.com | |
| Norris, McLaughlin & Marcus | Elizabeth L. Abdelmasieh, Esq | 721 Route 202-206 | P.O. Box 1018 | Somerville | NJ | 08876 | | 908-722-0700 | 908-722-0755 | eabdelmasieh@nmmlaw.com | Counsel for Rotor Clip Company, Inc. |
| North Point | David G. Heiman | 901 Lakeside Avenue | | Cleveland | OH | 44114 | | 216-586-3939 | 216-579-0212 | dgheiman@jonesday.com | Counsel for WL. Ross & Co., LLC |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 11 of 17

3/2/2006 6:23 PM
2002 lists

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| North Point | Michelle M. Harner | 901 Lakeside Avenue | | Cleveland | OH | 44114 | | 216-586-3939 | 216-579-0212 | mmharner@jonesday.com | Counsel for WL. Ross & Co., LLC |
| Office of the Chapter 13 Trustee | Camille Hope | P.O. Box 954 | | Macon | GA | 31202 | | 478-742-8706 | 478-746-4488 | cahope@chapter13macon.com | Office of the Chapter 13 Trustee |
| Office of the Texas Attorney General | Jay W. Hurst | P.O. Box 12548 | | Austin | TX | 78711-2548 | | 512-475-4861 | 512-482-8341 | jay.hurst@oag.state.tx.us | Counsel for The Texas Comptroller of Public Accounts |
| Orbotech, Inc. | Michael M. Zizza, Legal Manager | 44 Manning Road | | Billerica | MA | 01821 | | 978-901-5025 | 978-667-9969 | michaelz@orbotech.com | Company |
| Orrick, Herrington & Sutcliffe LLP | Alyssa Englund, Esq. | 666 Fifth Avenue | | New York | NY | 10103 | | 212-506-5187 | 212-506-5151 | aenglund@orrick.com | Counsel to America President Lines, Ltd. And APL Co. Pte Ltd |
| Orrick, Herrington & Sutcliffe LLP | Frederick D. Holden, Jr., Esq. | 405 Howard Street | | San Francisco | CA | 94105 | | 415-773-5700 | 415-773-5759 | fholden@orrick.com | Counsel to America President Lines, Ltd. And APL Co. Pte Ltd |
| Orrick, Herrington & Sutcliffe LLP | Richard H. Wyron | The Washington Harbour | 3050 K Street, N.W. | Washington | DC | 20007 | | 202-339-8400 | 202-339-8500 | rwyron@orrick.com | Counsel for Westwood Associates, Inc. |
| Orrick, Herrington & Sutcliffe LLP | Jonathan P. Guy | The Washington Harbour | 3050 K Street, N.W. | Washington | DC | 20007 | | 202-339-8400 | 202-339-8500 | jguy@orrick.com | Counsel for Westwood Associates, Inc. |
| Orrick, Herrington & Sutcliffe LLP | Matthew W. Cheney | The Washington Harbour | 3050 K Street, N.W. | Washington | DC | 20007 | | 202-339-8400 | 202-339-8500 | mcheney@orrick.com | Counsel for Westwood Associates, Inc. |
| Otterbourg, Steindler, Houston & Rosen, P.C. | Scott L. Hazan | 230 Park Avenue | | New York | NY | 10169 | | 212-661-9100 | 212-682-6104 | shazan@oshr.com | Counsel for Sharp Electronics Corporation |
| Otterbourg, Steindler, Houston & Rosen, P.C. | Melissa A. Hager | 230 Park Avenue | | New York | NY | 10169 | | 212-661-9100 | 212-682-6104 | mhager@oshr.com | Counsel for Sharp Electronics Corporation |
| Paul, Weiss, Rifkind, Wharton & Garrison | Stephen J. Shimshak | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3133 | 212-373-2136 | sshimshak@paulweiss.com | Counsel for Ambrake Corporation |
| Paul, Weiss, Rifkind, Wharton & Garrison | Curtis J. Weidler | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3157 | 212-373-2053 | cweidler@paulweiss.com | Counsel for Ambrake Corporation; Akebono Corporation |
| Paul, Weiss, Rifkind, Wharton & Garrison | Douglas R. Davis | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | 212-757-3990 | ddavis@paulweiss.com | Counsel for Noma Company and General Chemical Performance Products LLC |
| Paul, Weiss, Rifkind, Wharton & Garrison | Elizabeth R. McColm | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | 212-757-3990 | emccolm@paulweiss.com | Counsel for Noma Company and General Chemical Performance Products LLC |
| Peggy Housner | | Cadillac Place | 3030 W. Grand Blvd., Suite 10-200 | Detroit | MI | 48202 | | 313-456-0140 | | housnerp@michigan.gov | Assistant Attorney General for State of Michigan, Department of Treasury |
| Pension Benefit Guaranty Corporation | Ralph L. Landy | 1200 K. Street, N.W. | | Washington | DC | 20005-4026 | | 202-326-4020 | 202-326-4112 | landy.ralph@pbgc.gov | Counsel to Pension Benefit Guaranty Corporation |
| Pepe & Hazard LLP | Charles J. Filardi, Jr., Esq. | 30 Jelliff Lane | | Southport | CT | 06890 | | 203-319-4042 | 203-319-4034 | cfilardi@pepehazard.com | Federal Express Corporation |
| Pepper, Hamilton LLP | Francis J. Lawall | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | 215-981-4750 | lawallf@pepperlaw.com | Counsel for Capro, Ltd, Teleflex Automotive Manufacturing Corporation and Teleflex Incorporated d/b/a Teleflex Morse (Capro) |
| Pepper, Hamilton LLP | Anne Marie Aaronson | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | 215-981-4750 | aaronsona@pepperlaw.com | Counsel for Capro, Ltd, Teleflex Automotive Manufacturing Corporation and Teleflex Incorporated d/b/a Teleflex Morse (Capro) |
| Pepper, Hamilton LLP | Linda J. Casey | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | 215-981-4750 | caseyl@pepperlaw.com | Counsel for SKF USA, Inc. |
| Pepper, Hamilton LLP | Henry Jaffe | 1313 Market Street | PO Box 1709 | Wilmington | DE | 19899-1709 | | 302-777-6500 | 302-421-8390 | jaffeh@pepperlaw.com | Counsel for SKF USA, Inc. |
| Phillips Nizer LLP | Sandra A. Riemer, Esq. | 666 Fifth Avenue | | New York | NY | 10103 | | 212-841-0589 | 212-262-5152 | sriemer@phillipsnizer.com | Counsel to Freescale Semiconductor, Inc. f/k/a Motorola Semiconductor Systems (U.S.A.) |
| Pierce Atwood LLP | Jacob A. Manheimer | One Monument Square | | Portland | ME | 04101 | | 207-791-1100 | 207-791-1350 | jmanheimer@pierceatwood.com | Counsel for FCI Canada, Inc.; FCI Electronics Mexido, S. de R.L. de C.V.; FCI USA, Inc.; FCI Brasil, Ltda; FCI Automotive Deutschland Gmbh; FCI Italia S. p.A. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 12 of 17

3/2/2006 6:23 PM
2002 lists

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-----|-------|------------------|
| Pierce Atwood LLP | Keith J. Cunningham | One Monument Square | | Portland | ME | 04101 | | 207-791-1100 | 207-791-1350 | kcunningham@pierceatwood.com | Counsel for FCI Canada, Inc.; FCI Electronics Mexido, S. de R.L. de C.V.; FCI USA, Inc.; FCI Brasil, Ltda; FCI Automotive Deutschland Gmbh; FCI Italia S.p.A. |
| Pillsbury Winthrop Shaw Pittman LLP | Mark D. Houle | 650 Town Center Drive | 7th Floor | Costa Mesa | CA | 92626-7122 | | 714-436-6800 | 714-436-2800 | mark.houle@pillsburylaw.com | Counsel for Clarion Corporation of America |
| Pillsbury Winthrop Shaw Pittman LLP | Karen B. Dine | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | karen.dine@pillsburylaw.com | Counsel for Clarion Corporation of America |
| Pillsbury Winthrop Shaw Pittman LLP | Richard L. Epling | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | richard.epling@pillsburylaw.com | Counsel for MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Pillsbury Winthrop Shaw Pittman LLP | Robin L. Spear | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | robin.spear@pillsburylaw.com | Counsel for MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Pillsbury Winthrop Shaw Pittman LLP | Margot P. Erlich | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | margot.erlich@pillsburylaw.com | Counsel for MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Pitney Hardin LLP | Ronald S. Beacher | 7 Times Square | | New York | NY | 10036 | | 212-297-5800 | 212-682-3485 | rbeacher@pitneyhardin.com | Counsel for IBJTC Business Credit Corporation |
| Pitney Hardin LLP | Richard M. Meth | P.O. Box 1945 | | Morristown | NJ | 07962-1945 | | 973-966-6300 | 973-966-1015 | rmeth@pitneyhardin.com | Counsel for Marshall E. Campbell Company |
| Porzio, Bromberg & Newman, P.C. | Brett S. Moore, Esq. | 100 Southgate Parkway | P.O. Box 1997 | Morristown | NJ | 07960 | | 973-538-4006 | 973-538-5146 | bsmoore@pbnlaw.com | Counsel to Neuman Aluminum Automotive, Inc. and Neuman Aluminum Impact Extrusion, Inc. |
| Porzio, Bromberg & Newman, P.C. | John S. Mairo, Esq. | 100 Southgate Parkway | P.O. Box 1997 | Morristown | NJ | 07960 | | 973-538-4006 | 973-538-5146 | jsmairo@pbnlaw.com | |
| Pryor & Mandelup, LLP | A. Scott Mandelup, Kenneth A. Reynolds | 675 Old Country Road | | Westbury | NY | 11590 | | 516-997-0999 | 516-333-7333 | asm@pryormandelup.com kar@pryormandelup.com | Counsel for National Molding Corporation; Security Plastics Division/NMC LLC |
| QAD, Inc. | Jason Pickering, Esq. | 10,000 Midlantic Drive | | Mt. Laurel | NJ | 08054 | | 856-840-2489 | 856-840-2740 | jkp@qad.com | Counsel to QAD, Inc. |
| Quadrangle Debt Recovery Advisors LLC | Andrew Herenstein | 375 Park Avenue, 14th Floor | | New York | NY | 10152 | | 212-418-1742 | 866-741-2505 | andrew.herenstein@quadranglegroup.com | Counsel to Quadrangle Debt Recovery Advisors LLC |
| Quadrangle Group LLC | Patrick Bartels | 375 Park Avenue, 14th Floor | | New York | NY | 10152 | | 212-418-1748 | 866-552-2052 | patrick.bartels@quadranglegroup.com | Counsel to Quadrangle Group LLC |
| Quarles & Brady Streich Lang LLP | John A. Harris | Renaissance One | Two North Central Avenue | Phoenix | AZ | 85004-2391 | | 602-229-5200 | 602-229-5690 | jharris@quarles.com | Counsel for Semiconductor Components Industries, Inc. |
| Quarles & Brady Streich Lang LLP | Scott R. Goldberg | Renaissance One | Two North Central Avenue | Phoenix | AZ | 85004-2391 | | 602-229-5200 | 602-229-5690 | sgoldber@quarles.com | Counsel for Semiconductor Components Industries, Inc. |
| Quarles & Brady Streich Lang LLP | Kasey C. Nye | One South Church Street | | Tucson | AZ | 85701 | | 520-770-8717 | 520-770-2203 | knye@quarles.com | Counsel for Offshore International, Inc.; Maquilas Teta Kawi, S.A. de C.V.; On Semiconductor Corporation |
| Reed Smith | Elena Lazarou | 599 Lexington Avenue | 29th Street | New York | NY | 10022 | | 212-521-5400 | 212-521-5450 | elazarou@reedsmith.com | Counsel for General Electric Capital Corporation, Stategic Asset Financal |
| Republic Engineered Products, Inc. | Joseph Lapinsky | 3770 Embassy Parkway | | Akron | OH | 44333 | | 330-670-3004 | 330-670-3020 | jlapinsky@republicengineered.com | Counsel to Republic Engineered Products, Inc. |
| Riddell Williams P.S. | Joseph E. Shickich, Jr. | 1001 4th Ave. | Suite 4500 | Seattle | WA | 98154-1195 | | 206-624-3600 | 206-389-1708 | jshickich@riddellwilliams.com | Counsel for Microsoft Corporation; Microsoft Licensing, GP |
| Riemer & Braunstein LLP | Mark S. Scott | Three Center Plaza | | Boston | MA | 02108 | | 617-523-9000 | 617-880-3456 | mscott@riemerlaw.com | Counsel for ICX Corporation |
| Riverside Claims LLC | Holly Rogers | 2109 Broadway | Suite 206 | New York | NY | 10023 | | 212-501-0990 | 212-501-7088 | holly@regencap.com | Riverside Claims LLC |
| Robinson, McFadden & Moore, P.C. | Annemarie B. Mathews | P.O. Box 944 | | Columbia | SC | 29202 | | 803-779-8900 | 803-771-9411 | amathews@robinsonlaw.com | Counsel for Blue Cross Blue Shield of South Carolina |
| Ropers, Majeski, Kohn & Bentley | Christopher Norgaard | 515 South Flower Street | Suite 1100 | Los Angeles | CA | 90071 | | 213-312-2000 | 213-312-2001 | cnorgaard@ropers.com | Counsel for Brembo S.p.A; Bibielle S.p.A.; AP Racing |
| Ropes & Gray LLP | Gregory O. Kaden | One International Place | | Boston | MA | 02110-2624 | | 617-951-7000 | 617-951-7050 | gregory.kaden@ropesgray.com | Attorneys for D-J, Inc. |
| Ropes & Gray LLP | Marc E. Hirschfield | 45 Rockefeller Plaza | | New York | NY | 10111-0087 | | 212-841-5700 | 212-841-5725 | marc.hirschfield@ropesgray.com | Attorneys for D-J, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 13 of 17

3/2/2006 6:23 PM
2002 lists

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Rosen Slome Marder LLp | Thomas R. Slome | 333 Earle Ovington Boulevard | Suite 901 | Uniondale | NY | 11533 | | 516-227-1600 | | tslome@rsmllp.com | Counsel for JAE Electronics, Inc. |
| Russell Reynolds Associates, Inc. | Charles E. Boulbol, P.C. | 26 Broadway, 17th Floor | | New York | NY | 10004 | | 212-825-9457 | 212-825-9414 | rtrack@msn.com | Counsel for Russell Reynolds Associates, Inc. |
| Sachnoff & Weaver, Ltd | Charles S. Schulman, Arlene N. Gelman | 10 South Wacker Drive | 40th Floor | Chicago | IL | 60606 | | 312-207-1000 | 312-207-6400 | cschulman@sachnoff.com agelman@sachnoff.com | Counsel for Infineon Technologies North America Corporation |
| Satterlee Stephens Burke & Burke LLP | Christopher P. Belmonte | 230 Park Avenue | | New York | NY | 10169 | | 212-818-9200 | 212-818-9606 | cbelmonte@ssbb.com | Counsel to Moody's Investors Service |
| Satterlee Stephens Burke & Burke LLP | Pamela A. Bosswick | 230 Park Avenue | | New York | NY | 10169 | | 212-818-9200 | 212-818-9606 | pbosswick@ssbb.com | Counsel to Moody's Investors Service |
| Schafer and Weiner PLLC | Howard Borin | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | hborin@schaferandweiner.com | Counsel for Dott Industries, Inc. |
| Schafer and Weiner PLLC | Max Newman | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | mnewman@schaferandweiner.com | Counsel for Dott Industries, Inc. |
| Schafer and Weiner PLLC | Ryan Heilman | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | rheilman@schaferandweiner.com | Counsel for Dott Industries, Inc. |
| Schafer and Weiner PLLC | Daniel Weiner | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | dweiner@schaferandweiner.com | Counsel for Dott Industries, Inc. |
| Schiff Hardin LLP | William I. Kohn | 6600 Sears Tower | | Chicago | IL | 60606 | | 312-258-5500 | 312-258-5600 | wkohn@schiffhardin.com | Counsel for Means Industries |
| Schiff Hardin LLP | Michael Yetnikoff | 623 Fifth Avenue | 28th Floor | New York | NY | 10022 | | 212-753-5000 | 212-753-5044 | myetnikoff@schiffhardin.com | Counsel for Means Industries |
| Schiffrin & Barroway, LLP | Michael Yarnoff | 280 King of Prussia Road | | Radnor | PA | 19087 | | 610-667-7056 | 610-667-7706 | myarnoff@sbclasslaw.com | Counsel for Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.h and Stichting Pensioenfords ABP |
| Schiffrin & Barroway, LLP | Sean M. Handler | 280 King of Prussia Road | | Radnor | PA | 19087 | | 610-667-7706 | 610-667-7056 | shandler@sbclasslaw.com | Counsel for Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Schulte Roth & Sabel LLP | Michael L. Cook | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2000 | 212-595-5955 | michael.cook@srz.com | Counsel for Panasonic Automotive Systems Company of America; D.C. Capital Partners, L.P. |
| Schulte Roth & Sabel LLP | James T. Bentley | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2273 | 212-593-5955 | james.bentley@srz.com | Counsel for Panasonic Autommotive Systems Company of America |
| Schulte Roth & Zabel LLP | Carol Weiner Levy | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2000 | 212-595-5955 | carol.weiner.levy@srz.com | Counsel for D.C. Capital Partners, L.P. |
| Seyfarth Shaw LLP | Paul M. Baisier, Esq. | 1545 Peachtree Street, N.E. | Suite 700 | Atlanta | GA | 30309-2401 | | 404-885-1500 | 404-892-7056 | pbaisier@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Seyfarth Shaw LLP | Robert W. Dremluk, Esq. | 1270 Avenue of the Americas | Suite 2500 | New York | NY | 10020-1801 | | 212-218-5500 | 212-218-5526 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Seyfarth Shaw LLP | William J. Hanlon | World Trade Center East | Two Seaport Lane, Suite 300 | Boston | MA | 02210 | | 617-946-4800 | 617-946-4801 | whanlon@seyfarth.com | Counsel for le Belier/LBQ Foundry S.A. de C.V. |
| Sheehan Phinney Bass + Green Professional Association | Steven E. Boyce | 1000 Elm Street | P.O. Box 3701 | Manchester | NH | 03105-2347 | | 603-627-8278 | 603-641-2347 | sboyce@sheehan.com | Counsel for Source Electronics, Inc. |
| Sheldon S. Toll PLLC | Sheldon S. Toll | 2000 Town Center | Suite 2550 | Southfield | MI | 48075 | | 248-358-2460 | 248-358-2740 | lawtoll@comcast.net | Counsel for Milwaukee Investment Company |
| Sher, Garner, Cahill, Richter, Klein & Hilbert, LLC | Robert P. Thibeaux | 5353 Essen Lane | Suite 650 | Baton Rouge | LA | 70809 | | 225-757-2185 | 225-757-7674 | rthibeaux@shergarner.com | Counsel for Gulf Coast Bank & Trust Company |
| Sher, Garner, Cahill, Richter, Klein & Hilbert, LLC | Robert P. Thibeaux | 909 Poydras Street | 28th Floor | New Orleans | LA | 70112-1033 | | 504-299-2100 | 504-299-2300 | rthibeaux@shergarner.com | Counsel for Gulf Coast Bank & Trust Company |
| Shipman & Goodwin LLP | Jennifer L. Adamy | One Constitution Plaza | | Hartford | CT | 06103-1919 | | 860-251-5811 | 860-251-5218 | bankruptcy@goodwin.com | Counsel to Fortune Plastics Company of Illinois, Inc.; Universal Metal Hose Co. |
| Sills, Cummis Epstein & Gross, P.C. | Andrew H. Sherman | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-643-7000 | 212-643-6500 | asherman@sillscummis.com | Counsel for Hewlett-Packard Financial Services Company |
| Sills, Cummis Epstein & Gross, P.C. | Jack M. Zackin | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-643-7000 | 212-643-6500 | jzackin@sillscummis.com | Counsel for Hewlett-Packard Financial Services Company |
| Silver Point Capital, L.P. | Chaim J. Fortgang | Two Greenwich Plaza | 1st Floor | Greenwich | CT | 06830 | | 203-542-4216 | 203-542-4100 | cfortgang@silverpointcapital.com | Counsel for Silver Point Capital, L.P. |
| Simpson Thacher & Bartlett LLP | Kenneth S. Ziman, Esq. | 425 Lexington Avenue | | New York | NY | 10017 | | 212-455-2000 | 212-455-2502 | cfox@stblaw.com | Counsel to JPMorgan Chase Bank, N.A. |
| Simpson Thacher & Bartlett LLP | William T. Russell, Jr., Esq. | 425 Lexington Avenue | | New York | NY | 10017 | | 212-455-2000 | 212-455-2502 | cfox@stblaw.com | Counsel to JPMorgan Chase Bank, N.A. |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Smith, Gambrell & Russell, LLP | Barbara Ellis-Monro | 1230 Peachtree Street, N.E. | Suite 3100 | Atlanta | GA | 30309 | | 404-815-3500 | 404-815-3509 | bellis-monro@sgrlaw.com | Counsel for Southwire Company |
| Smith, Katzenstein & Furlow LLP | Kathleen M. Miller | 800 Delaware Avenue, 7th Floor | P.O. Box 410 | Wilmington | DE | 19899 | | 302-652-8400 | 3026528405 | kmiller@skfdelaware.com | Counsel for Airgas, Inc. |
| Sonnenschein Nath & Rosenthal LLP | D. Farrington Yates | 1221 Avenue of the Americas | 24th Floor | New York | NY | 10020 | | 212-768-6700 | 212-768-6800 | fyates@sonnenschein.com | Counsel for Molex, Inc. and INA USA, Inc. |
| Sonnenschein Nath & Rosenthal LLP | Jo Christine Reed | 1221 Avenue of the Americas | 24th Floor | New York | NY | 10020 | | 212-768-6700 | 212-768-6800 | jcreed@sonnenschein.com | Counsel for Molex, Inc. and INA USA, Inc. |
| Sonnenschein Nath & Rosenthal LLP | Robert E. Richards | 8000 Sears Tower | 233 South Wacker Drive | Chicago | IL | 60606 | | 312-876-8000 | 312-876-7934 | richards@sonnenschein.com | Counsel for Molex, Inc. and INA USA, Inc. |
| Sony Electronics Inc. | Lloyd B. Sarakin - Chief Counsel, Finance and Credit | 1 Sony Drive | MD #1 E-4 | Park Ridge | NJ | 07656 | | 201-930-7483 | | lloyd.sarakin@am.sony.com | Counsel to Sony Electronics, Inc. |
| Sotiroff & Abramczyk, P.C. | Robert M. Goldi | 30400 Telegraph Road | Suite 444 | Bingham Farms | MI | 48025 | | 248-642-6000 | 248-642-9001 | rgoldi@sotablaw.com | Counsel for Michigan Heritage Bank; MHB Leasing, Inc. |
| Squire, Sanders & Dempsey L.L.P. | Penn Ayers Butler | 600 Hansen Way | | Palo Alto | CA | 94304 | | 650-856-6500 | 650-843-8777 | pabutler@ssd.com | Counsel for Furukawa Electric Co., Ltd. And Furukawa Electric North America, APD Inc. |
| Squire, Sanders & Dempsey L.L.P. | Eric Marcks | One Maritime Plaza | Suite 300 | San Francisco | CA | 94111-3492 | | | 415-393-9887 | emarcks@ssd.com | Counsel for Furukawa Electric Co., Ltd. And Furukawa Electric North America, APD Inc. |
| Steel Technologies, Inc. | John M. Baumann | 15415 Shelbyville Road | | Louisville | KY | 40245 | | 502-245-0322 | 502-245-0542 | jmbaumann@steeltechnologies.com | Counsel for Steel Technologies, Inc. |
| Stein, Rudser, Cohen & Magid LLP | Robert F. Kidd | 825 Washington Street | Suite 200 | Oakland | CA | 94607 | | 510-287-2365 | 510-987-8333 | rkidd@srcm-law.com | Counsel for Excel Global Logistics, Inc. |
| Steinberg Shapiro & Clark | Mark H. Shapiro | 24901 Northwestern Highway | Suite 611 | Southfield | MI | 48075 | | 248-352-4700 | 248-352-4488 | shapiro@steinbergshapiro.com | Counsel for Bing Metals Group, Inc.; Central Transport International, Inc.; Crown Enerprises, Inc.; Economy Transport, Inc.; Logistics Insight Corp (LINC); Universal Am-Can, Ltd.; Universal Truckload Services, Inc. |
| Sterns & Weinroth, P.C. | Jeffrey S. Posta | 50 West State Street, Suite 1400 | PO Box 1298 | Trenton | NJ | 08607-1298 | | 609-3922100 | 609-392-7956 | jposta@sternslaw.com | Counsel for Doosan Infracore America Corp. |
| Stevens & Lee, P.C. | Chester B. Salomon, Esq. Constantine D. Pourakis, Esq. | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | | 212-319-8500 | 212-319-8505 | cs@stevenslee.com cp@stevenslee.com | Counsel to Tonolli Canada Ltd.; V.J. Technologies, Inc. and V.J. ElectroniX, Inc. |
| Stinson Morrison Hecker LLP | Mark A. Shaiken | 1201 Walnut Street | | Kansas City | MO | 64106 | | 816-842-8600 | 816-691-3495 | mshaiken@stinsonmoheck.com | Counsel to Thyssenkrupp Waupaca, Inc. and Thyssenkrupp Stahl Company |
| Stites & Harbison PLLC | Madison L.Cashman | 424 Church Street | Suite 1800 | Nashville | TN | 37219 | | 615-244-5200 | 615-782-2371 | robert.goodrich@stites.com | Counsel to Setech, Inc. |
| Stites & Harbison PLLC | Robert C. Goodrich, Jr. | 424 Church Street | Suite 1800 | Nashville | TN | 37219 | | 615-244-5200 | 615-782-2371 | madison.cashman@stites.com | Counsel to Setech, Inc. |
| Stites & Harbison, PLLC | W. Robinson Beard, Esq. | 400 West Market Street | | Louisville | KY | 40202 | | 502-681-0448 | 502-779-8274 | wbeard@stites.com | Counsel to WAKO Electronics (USA), Inc. and Ambrake Corporation |
| Stroock & Stroock & Lavan, LLP | Kristopher M. Hansen | 180 Maiden Lane | | New York | NY | 10038 | | 212-806-5400 | 212-806-6006 | khansen@stroock.com | Counsel for 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates LP c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. and Etkin Real Properties |
| Stroock & Stroock & Lavan, LLP | Joseph G. Minias | 180 Maiden Lane | | New York | NY | 10038 | | 212-806-5400 | 212-806-6006 | jminias@stroock.com | Counsel for 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. and Etkin Real Properties |
| Swidler Berlin LLP | Robert N. Steinwurtzel | The Washington Harbour | 3000 K Street, N.W. Suite 300 | Washington | DC | 20007 | | 202-424-7500 | 202-424-7645 | rnsteinwurtzel@swidlaw.com | Attorneys for Sanders Lead Co., Inc. |
| Taft, Stettinius & Hollister LLP | Richard L .Ferrell | 425 Walnut Street | Suite 1800 | Cincinnati | OH | 45202-3957 | | 513-381-2838 | | ferrell@taftlaw.com | Counsel for Wren Industries, Inc. |

In re: Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 15 of 17

3/2/2006 6:23 PM
2002 lists

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Tennessee Department of Revenue | Marvin E. Clements, Jr. | c/o TN Attorney General's Office, Bankruptcy Division | PO Box 20207 | Nashville | TN | 37202-0207 | | 615-532-2504 | 615-741-3334 | marvin.clements@state.tn.us | Tennesse Department of Revenue |
| Thacher Proffitt & Wood LLP | Jonathan D. Forstot | Two World Financial Center | | New York | NY | 10281 | | 212-912-7679 | 212-912-7751 | jforstot@tpw.com | Counsel for TT Electronics, Plc |
| Thacher Proffitt & Wood LLP | Louis A. Curcio | Two World Financial Center | | New York | NY | 10281 | | 212-912-7607 | 212-912-7751 | lcurcio@tpw.com | Counsel for TT Electronics, Plc |
| The Furukawa Electric Co., Ltd. | Mr. Tetsuhiro Niizeki | 6-1 Marunouchi | 2-Chrome, Chiyoda-ku | Tokyo | Japan | 100-8322 | | | 81-3-3286-3919 | | Legal Department of The Furukawa Electric Co., Ltd. |
| The Timpken Corporation BIC - 08 | Robert Morris | 1835 Dueber Ave. SW | PO Box 6927 | Canton | OH | 44706 | | | | niizeki.tetsuhiro@furukawa.co.jp  robert.morris@timken.com | Representative for Timken Corporation |
| Thelen Reid & Priest LLP | David A. Lowenthal | 875 Third Avenue | | New York | NY | 10022 | | 212-603-2000 | 212-603-2001 | dlowenthal@thelenreid.com | Counsel for American Finance Group, Inc. d/b/a Guaranty Capital Corporation |
| Thelen Reid & Priest LLP | Daniel A. Lowenthal | 875 Third Avenue | | New York | NY | 10022 | | 212-603-2000 | 212-603-2001 | dlowenthal@thelenreid.com | Counsel for Oki Semiconductor Company |
| Thompson & Knight | Rhett G. Cambell | 333 Clay Street | Suite 3300 | Houston | TX | 77002 | | 713-654-1871 | 713-654-1871 | rhett.campbell@tklaw.com | Counsel for STMicroelectronics, Inc. |
| Thompson & Knight LLP | John S. Brannon | 1700 Pacific Avenue | Suite 300 | Dallas | TX | 75201 | | 214-969-1505 | 214-969-1609 | john.brannon@tklaw.com | Counsel for Victory Packaging |
| Thurman & Phillips, P.C. | Ed Phillips, Jr. | 8000 IH 10 West | Suite 1000 | San Antonio | TX | 78230 | | 210-341-2020 | 210-344-6460 | ephillips@thurman-phillips.com | Counsel for Royberg, Inc. d/b/a Precision Mold & Tool and d/b/a Precision Mold and Tool Group |
| Todd & Levi, LLP | Jill Levi, Esq. | 444 Madison Avenue | Suite 1202 | New York | NY | 10022 | | 212-308-7400 | | jlevi@toddlevi.com | Counsel to Bank of Lincolnwood |
| Togut, Segal & Segal LLP | Albert Togut, Esq. | One Penn Plaza | Suite 3335 | New York | NY | 10119 | | 212-594-5000 | 212-967-4258 | bmcdonough@teamtogut.com | Conflicts counsel to Debtors |
| Tyler, Cooper & Alcorn, LLP | W. Joe Wilson | City Place | 35th Floor | Hartford | CT | 06103-3488 | | 860-725-6200 | 860-278-3802 | jwilson@tylercooper.com | Counsel for Barnes Group, Inc. |
| Underberg & Kessler, LLP | Helen Zamboni | 300 Bausch & Lomb Place | | Rochester | NY | 14604 | | 585-258-2800 | 585-258-2821 | hzamboni@underbergkessler.com | Counsel for McAlpin Industries, Inc. |
| Union Pacific Railroad Company | Mary Ann Kilgore | 1400 Douglas Street | MC 1580 | Omaha | NE | 68179 | | 402-544-4195 | 402-501-0127 | mkilgore@UP.com | Counsel for Union Pacific Railroad Company |
| United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union (USW), AFL-CIO | David Jury, Esq. | Five Gateway Center | Suite 807 | Pittsburgh | PA | 15222 | | 412-562-2549 | 412-562-2429 | djury@steelworkers-usw.org | Counsel to United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union (USW), AFL-CIO |
| Varnum, Riddering, Schmidt & Howlett LLp | Michael S. McElwee | Bridgewater Place | P.O. Box 353 | Grand Rapids | MI | 49501-0352 | | 616-336-6827 | 616-336-7000 | msmcelwee@varnumlaw.com | Counsel for Furukawa Electric North America APD |
| Vorys, Sater, Seymour and Pease LLP | Robert J. Sidman, Esq. | 52 East Gay Street | P.O. Box 1008 | Columbus | OH | 43216-1008 | | 614-464-6422 | 614-719-8676 | rjsidman@vssp.com | |
| Vorys, Sater, Seymour and Pease LLP | Tiffany Strelow Cobb | 52 East Gay Street | | Columbus | OH | 43215 | | 614-464-8322 | 614-719-4663 | tscobb@vssp.com | Counsel for America Online, Inc. and its Subsidiaries and Affiliates |
| Wachtell, Lipton, Rosen & Katz | Richard G. Mason | 51 West 52nd Street | | New York | NY | 10019-6150 | | 212-403-1000 | 212-403-2000 | RGMason@wlrk.com | Counsel for Capital Research and Management Company |
| Wachtell, Lipton, Rosen & Katz | Emil A. Kleinhaus | 51 West 52nd Street | | New York | NY | 10019-6150 | | 212-403-1000 | 212-403-2000 | EAKleinhaus@wlrk.com | Counsel for Capital Research and Management Company |
| Waller Lansden Dortch & Davis, PLLC | David E. Lemke, Esq. | 511 Union Street | Suite 2700 | Nashville | TN | 37219 | | 615-244-6380 | 615-244-6804 | david.lemke@wallerlaw.com | Counsel to Nissan North America, Inc. |
| Waller Lansden Dortch & Davis, PLLC | Robert J. Welhoelter, Esq. | 511 Union Street | Suite 2700 | Nashville | TN | 37219 | | 615-244-6380 | 615-244-6804 | robert.welhoelter@wallerlaw.com | Counsel to Nissan North America, Inc. |
| Warner Norcross & Judd LLP | Gordon J. Toering | 900 Fifth Third Center | 111 Lyon Street, N.W. | Grand Rapids | MI | 49503 | | 616-752-2185 | 616-222-2185 | gtoering@wnj.com | Counsel for Robert Bosch Corporation |
| Warner Norcross & Judd LLP | Michael G. Cruse | 2000 Town Center | Suite 2700 | Southfield | MI | 48075 | | 248-784-5131 | 248-603-9631 | mcruse@wnj.com | Counsel to Compuware Corporation |
| Warner Norcross & Judd LLP | Stephen B. Grow | 900 Fifth Third Center | 111 Lyon Street, N.W. | Grand Rapids | MI | 49503 | | 616-752-2158 | | growsb@wnj.com | Counsel for Behr Industries Corp. |
| Warner Stevens, L.L.P. | Michael D. Warner | 301 Commerce Street | Suite 1700 | Fort Worth | TX | 76102 | | 817-810-5250 | 817-810-5255 | bankruptcy@warnerstevens.com | Counsel for Electronic Data Systems Corp. and EDS Information Services, L.L.P. |
| Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP | Lei Lei Wang Ekvall | 650 Town Center Drive | Suite 950 | Costa Mesa | CA | 92626 | | 714-966-1000 | 714-966-1002 | lekvall@wgllp.com | Counsel for Toshiba America Electronic Components, Inc. |
| Weinstein, Eisen & Weiss LLP | Aram Ordubegian | 1925 Century Park East | #1150 | Los Angeles | CA | 90067 | | 310-203-9393 | 310-203-8110 | aordubegian@weineisen.com | Counsel for Orbotech, Inc. |
| Weltman, Weinberg & Reis Co., L.P.A. | Geoffrey J. Peters | 175 South Third Street | Suite 900 | Columbus | OH | 43215 | | 614-857-4326 | 614-222-2193 | gpeters@weltman.com | Counsel to Seven Seventeen Credit Union |
| White & Case LLP | John K. Cunningham | 1155 Avenue of the Americas | | New York | NY | 10036-2787 | | 212-819-8200 | | jcunningham@whitecase.com | Counsel for Appaloosa Management, LP |
| White & Case LLP | Margarita Mesones-Mori | Wachovia Financial Center | 200 South Biscayne Blvd., Suite 4900 | Miami | FL | 33131 | | 305-371-2700 | 305-358-5744 | mmesonesmori@whitecase.com | Counsel for Appaloosa Management, LP |
| Whyte, Hirschboeck Dudek S.C. | Bruce G. Arnold | 555 East Wells Street | Suite 1900 | Milwaukee | WI | 53202-4894 | | 414-273-2100 | 414-223-5000 | barnold@whdlaw.com | Counsel for Schunk Graphite Technology |
| Winstead Sechrest & Minick P.C. | Berry D. Spears | 401 Congress Avenue | Suite 2100 | Austin | TX | 78701 | | 512-370-2800 | 512-370-2850 | bspears@winstead.com | Counsel for National Instruments Corporation |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Winstead Sechrest & Minick P.C. | R. Michael Farquhar | 5400 Renaissance Tower | 1201 Elm Street | Dallas | TX | 75270 | | 214-745-5400 | 214-745-5390 | mfarquhar@winstead.com | Counsel for National Instruments Corporation |
| Winthrop Couchot Professional Corporation | Marc. J. Winthrop | 660 Newport Center Drive | 4th Floor | Newport Beach | CA | 92660 | | 949-720-4100 | 949-720-4111 | mwinthrop@winthropcouchot.com | Counsel for Metal Surfaces, Inc. |
| Winthrop Couchot Professional Corporation | Sean A. O'Keefe | 660 Newport Center Drive | 4th Floor | Newport Beach | CA | 92660 | | 949-720-4100 | 949-720-4111 | sokeefe@winthropcouchot.com | Counsel for Metal Surfaces, Inc. |
| WL Ross & Co., LLC | Oscar Iglesias | 600 Lexington Avenue | 19th Floor | New York | NY | 10022 | | 212-826-1100 | 212-317-4893 | oiglesias@wlross.com | Counsel for WL. Ross & Co., LLC |
| Womble Carlyle Sandridge & Rice, PLLC | Lillian H. Pinto | 300 North Greene Street | Suite 1900 | Greensboro | NC | 27402 | | 336-574-8058 | 336-574-4528 | lpinto@wcsr.com | Counsel for Armacell |
| Zeichner Ellman & Krause LLP | Stuart Krause | 575 Lexington Avenue | | New York | NY | 10022 | | 212-223-0400 | 212-753-0396 | skrause@zeklaw.com | Counsel for Toyota Tsusho America, Inc. |
| Zeichner Ellman & Krause LLP | Peter Janovsky | 575 Lexington Avenue | | New York | NY | 10022 | | 212-223-0400 | 212-753-0396 | pjanovsky@zeklaw.com | Counsel for Toyota Tsusho America, Inc. |

# EXHIBIT C

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|-------|-----|-------|------------------|
| Lord, Bissel & Brook LLP | Rocco N. Covino | 885 Third Avenue | 26th Floor | New York | NY | 10022-4802 | 212-947-8304 212-947-8340 | 212-947-1202 | rcovino@lordbissell.com | Counsel to Sedgwick Claims Management Services, Inc. and Methode Electronics, Inc. |
| Professional Technologies Services | John V. Gorman | P.O. Box #304 | | Frankenmuth | MI | 48734 | 989-385-3230 | 989-754-7690 | | Corporate Secretary for Professional Technologies Services |
| Terra Law LLP | David B. Draper | 60 S. Market Street | Suite 200 | San Jose | CA | 95113 | 408-299-1200 | 408-998-4895 | ddraper@terra-law.com | Counsel for Maxim Integrated Products, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 1

3/2/2006 6:23 PM
2002 lists

# EXHIBIT D

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
David E. Springer (DS 9331)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                          :
        In re                             :    Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :    Case No. 05-44481 (RDD)
                                          :
                      Debtors.            :    (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

DEBTORS' OBJECTION TO THE MOTION OF APPALOOSA MANAGEMENT L.P.
PURSUANT TO 11 U.S.C. § 1102(A)(2) FOR ORDER DIRECTING UNITED STATES
TRUSTEE TO APPOINT EQUITY COMMITTEE

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and

debtors-in-possession (collectively, the "Debtors"), hereby submit this objection (the "Objection")

to the Motion Of Appaloosa Management L.P. Pursuant To 11 U.S.C. § 1102(A)(2) For An

Order Directing The United States Trustee To Appoint An Equity Committee In These Chapter

11 Cases (the "Motion") (Docket No. 1604), and the supporting declaration of John D. Sheehan,

executed March 1, 2006 ("Sheehan Decl."), and respectfully represent as follows:

<div align="center">Preliminary Statement</div>

1.      Appaloosa Management L.P. ("Appaloosa") is a sophisticated financial

institution that acquired all of its equity stake in Delphi at distressed prices in the few days after

the Debtors filed their chapter 11 cases. (Appaloosa's Objections and Responses to Debtors' First

Interrogatories and Documents Requests to Appaloosa Management L.P. ("Appaloosa's

Discovery Responses" (a copy of which is attached hereto as Exhibit A)), Resp. to Interrog. No.

10.)

2.      On November 7, 2005, Appaloosa submitted a written request (the "Letter

Request") to the United States Trustee (the "U.S. Trustee") seeking the appointment an official

equity committee.  (Sheehan Decl. Ex. 1.)  Shortly thereafter, the U.S. Trustee asked the Debtors

for their position on Appaloosa's request.  The Debtors and their advisors discussed the Letter

Request with their Board of Directors on December 7, 2005, and with the Official Committee of

Unsecured Creditors (the "Creditors' Committee") on December 9, 2005.  (Sheehan Decl. ¶¶ 3-4.)

As a result of those discussions, and after careful consideration, the Debtors determined that the

formation of an equity committee in these cases was unwarranted at this time, and they so

informed the U.S. Trustee and Appaloosa's counsel  by letter dated December 19, 2005.  (Id. ¶ 4

& Ex. 2.)

3.      Apparently unwilling to await the U.S. Trustee's decision on Appaloosa's

Letter Request, on December 22, 2005, Appaloosa filed the Motion to compel the U.S. Trustee to

appoint an equity committee.  On December 30, 2005, the U.S. Trustee filed a response to the

<div align="center">2</div>

Motion (Docket No. 1682), which noted that the Motion was premature—given that the Debtors

had not then even filed their schedules and statements—and that Appaloosa had also failed to

present any evidence that an equity committee is necessary to adequately represent equity

security holders' interests.  (U.S. Trustee Response  ¶¶ 16, 23-26.)

      4.      The Debtors propounded interrogatories and document requests to

Appaloosa requiring it to identify and produce the evidence it has—if any—in support of its

motion.  Appaloosa responded to those discovery requests on February 21, 2006.  (Appaloosa's

Discovery Responses.)[1]

      5.      In a prior ruling on a motion for appointment of an equity committee, this

Court has held that "[t]he threshold consideration . . . is whether there is sufficient equity in the

estate to justify the cost and expense of a separate committee. . . . I note that . . . the movants"—

not the Debtors—"have the burden of proof, and it is their burden to put on evidence establishing,

among other things, whether there is real equity value here."  (In re Loral Space & Comm'ns,

Ltd., No. 03–41710 (RDD), Transcript of Dec. 2, 2003 Hearing ("Loral Hearing Tr."), at 129:4-

16 (a copy of which is attached hereto as Exhibit B).)

      6.      So far, the only evidence that Appaloosa has identified—but which it has

refused to produce—is a reference to a "preliminary recovery analysis" by Ronald Goldstein of

Appaloosa, which Appaloosa says was "conducted . . . during the three months before Delphi

filed for bankruptcy."  (Appaloosa's Discovery Responses, Resp. to Interrog. Nos. 3 & 4

(emphasis added).)  Appaloosa says that this "preliminary analysis" somehow "demonstrated"

[sic] that "under certain [unidentified] circumstances Delphi has substantial equity value, based

---

[1]    Appaloosa's "responsive" document production consists mainly of Delphi's own publicly-filed documents, two Forms 8–K filed by GM on October 8, 2005, disclosing an agreement entered between GM and Delphi Corporation on December 22, 1999, and a scattering of analyst reports apparently issued during the period between March 31, 2004 and March 9, 2005.

in part on Appaloosa's [undisclosed] proprietary forecasts of EBITDA and the [undisclosed] restructuring of certain [unidentified] employee benefit-related obligations." (Id.) This "analysis," however, is irrelevant to the question of whether, as circumstances exist today, there "is" sufficient equity in the estate to justify the costs of an equity committee. At most, it shows that, sometime during the three months before Delphi filed for bankruptcy, a single individual at Appaloosa—based upon a purported technique for forecasting EBITDA unique to Appaloosa and some personal views about how Debtors' employee-benefit obligations might be restructured—may then have thought that, in the event of a bankruptcy, Delphi's equity holders might ultimately recover something.

7.    Although the Debtors have no obligation to prove a negative—namely, that common equity holders will not receive a meaningful recovery—that fact is hardly subject to reasonable dispute. The Debtors' schedules and statements, as amended (Docket Nos. 1854 and 1999) and the Debtors' monthly operating report for January 2005, filed on February 28, 2006 (Docket No. 2569), which reflect a shareholder deficit of approximately negative $6.4 billion, as well as the recent trading prices of Delphi's public securities all evidence the fact that equity stands no realistic chance of any recovery. (Sheehan Decl. ¶¶ 5-7 & Ex. 3.)

8.    Appaloosa also cannot prove that whatever equity value that may exist in the estates is sufficient to justify the costs of an equity committee. In fact, Appaloosa acknowledges that it has given no thought to the question of costs, for its Discovery Responses admit that "at the present time, Appaloosa has not conducted an analysis concerning the cost of appointing an equity committee." (Appaloosa's Discovery Responses, Resp. to Interrog. No. 5.)

9.    Appaloosa also cannot prove that an equity committee is necessary to adequately represent the interests of equity holders. Appaloosa has identified no evidence to

4

overcome the presumption that Delphi's Board of Directors (10 of the 12 of whom are

independent (Sheehan Decl. ¶ 8)) and the Creditors' Committee already adequately protect the

interests of all stakeholders in discharging their duties to maximize the enterprise value of the

Debtors.

10.    In its Discovery Responses, Appaloosa also effectively concedes that it

does not even need an equity committee to protect its interests.  Appaloosa admits that "is able to

retain counsel to represent its interests in the Debtors' chapter 11 cases" (Appaloosa Discovery

Responses, Resp. to Interrog. No. 8), and it acknowledges that it has communicated with four

other large institutional holders of the Debtors' equity securities about the formation of a formal

or informal equity committee. (Id., Resp. to Interrog. No. 9.)

11.    Because Appaloosa cannot meet its burden on the threshold question of

whether there is sufficient equity in the estates to justify the costs of an equity committee, much

less to prove that the appointment of an equity committee is necessary to adequately represent

the interests of equity holders, its Motion should be denied.

<u>Argument</u>

A.    <u>The Legal Standard For Appointing An Equity Committee</u>

12.    Section 1102(a)(2) of the Bankruptcy Code provides that:

On request of a party in interest, the court may order the appointment of
additional committees of … equity security holders if necessary to assure
adequate representation of … equity security holders.  The United State trustee
shall appoint any such committee.

11 U.S.C. § 1102(a)(2).  Because the statute provides that the court "<u>may</u>" appoint an equity

committee "<u>if necessary</u>," this Court has considerable discretion in deciding on whether to create

a statutory committee of equity holders.  Id. (emphasis added); <u>see also</u> <u>In re Johns-Manville</u>

<u>Corp.</u>, 68 B.R. 155, 160 (S.D.N.Y. 1986) ("Congress' desire to protect shareholders in

5

reorganization proceedings was not strong enough, however, to mandate the creation of equity

committees.").

13.     Those who seek the appointment of an equity committee bear the burden

of proof in demonstrating to the Court that it should exercise its discretionary authority to require

one.  In re Williams Commc'ns Group, Inc., 281 B.R. 216, 219 (Bankr. S.D.N.Y. 2002) (Lifland,

B.J.).  In determining whether the proponents of an equity committee have satisfied their heavy

burden, courts in this District often take guidance from Judge Lifland's decision in In re Williams

Communications, in which he concluded:

> The appointment of official equity committees should be the rare exception.  Such
> committees should not be appointed unless equity holders establish that (i) there is
> a substantial likelihood that they will receive a meaningful distribution in the case
> under a strict application of the absolute priority rule, and (ii) they are unable to
> represent their interests in the bankruptcy case without an official committee.  The
> second factor is critical because, in most cases, even those equity holders who do
> expect a distribution in the case can adequately represent their interest without an
> official committee and can seek compensation if they make a substantial
> contribution in the case.

Id. at p. 222.[2]

14.     In In re Loral Space & Communications Ltd., Case No. 03-41710 (Bankr.

S.D.N.Y. Dec. 2, 2003) (Drain, B.J.), this Court surveyed the decisions in this District and

similarly ruled that he who seeks appointment of an equity committee must overcome "a rather

high threshold" and that "the appointment of an equity committee is the exception rather than the

rule."  (Loral Hearing Tr. at 127, 130.)  This Court also identified "the threshold" question—and

one on which the movant has the burden of proof—as whether "there is sufficient equity in the

estate to justify the cost and expense of a separate committee."  (Id. at 128.)  In Loral, this Court

---

[2]    In determining whether a debtor appears to be hopelessly insolvent, the Williams court further noted that no
formal valuation is required.  Instead, according to Williams, courts should reach "a practical conclusion, based
on a confluence of factors," including, among others, an insolvent balance sheet, verified schedules of assets
and liabilities showing an equity deficiency, and the trading value of public bonds.  Williams, 281 B.R. at 221.

considered, with respect to that threshold question, "both the book value of the debtors, from

their [publicly] filed SEC reporting, as well as the agreed upon range of trading prices" of

securities.  (Id. at 131.)  While acknowledging that such measures of value are not perfect, this

Court held that when "either method [leads] to such a substantial negative equity [ranging from

negative $230 million to negative $620 million], I think it is clear to me that the debtors are

insolvent as far as the common shareholders are concerned."  (Id. at 132.)  Based on that

evidence, this Court concluded that "the gap is simply too large to justify the expense and

disruption that an official committee of common shareholders would pose, given that the only

trade off . . . would be di minimis recovery at this point by shareholders."  (Id. at 132-33.)

B.    The Debtors Are Hopelessly Insolvent And Equity Holders
      Cannot Expect A Meaningful Recovery

15.    Although the Debtors wish it were otherwise, Appaloosa cannot

demonstrate—and the Debtors cannot construct—a scenario in which the Debtors can be deemed

solvent.  This is largely because the claims associated with the Debtors' non-competitive U.S.

legacy liabilities and burdensome U.S. labor agreements are generally direct claims against the

U.S. parent holding company and are superior in priority to the interests of that entity's common

shareholders.

16.    That the Debtors are hopelessly insolvent is illustrated by the recently

filed schedules and statements and the January monthly operating report.   In particular, the

January monthly operating report lists $13.8 billion in assets and $20.2 billion in liabilities, of

which $17.5 billion are liabilities subject to compromise, resulting in a shareholder deficit of

negative $6.4 billion.  Included in the stockholder deficit analysis is the Debtors' interests in its

non-Debtor subsidiaries.

17.    The capital markets also consider Delphi Corporation hopelessly insolvent. As of February 21, 2006, all four tranches of Delphi Corporation's publicly-traded debt securities were trading at an implied recovery of between 53.0% and 55.8% of face value, Delphi Corporation's publicly-traded trust preferred securities were trading at an implied recovery of 24.0% of face value, and Delphi Corporation's common stock was trading at the close of business at $0.33.  (Sheehan Decl. Ex. 3.)

18.    Appaloosa has neither identified nor produced any evidence that equity stands a chance of a meaningful recovery.  Instead, Appaloosa's Discovery Responses and its Motion point to matters occurring before the Debtors filed their petitions.  But the price at which Delphi common stock traded prior to the bankruptcy filings and the fact that the Company declared a dividend in June 2005 are no evidence that, as things stand now, equity holders are likely to receive a meaningful recovery under a plan of reorganization.  For Appaloosa, it is as if the collapse of the out-of-court consensual negotiations among Delphi, its unions, and General Motors and the Debtors' consequent bankruptcy filings had never occurred.  Simply put, Appaloosa cannot dispute but that the Debtors are hopelessly insolvent today.

C.    The Equity Holders' Interests Are Adequately Represented

19.    Even when recovery by equity holders is likely—a situation not present here—no equity committee should be appointed unless the proponent of one proves that its rights would not otherwise be adequately represented.  For example, in In re Kasper A.S.L., Ltd., Case No. 02-10497 (Bankr. S.D.N.Y.) (Gropper, B.J.), Judge Gropper held that even when recovery by equity holders was possible, the fact that the equity holders' interests were already adequately represented was enough, under the circumstances, to deny the appointment of an equity committee:

8

> In the cases at bar . . . the debtors' prospects have improved to the point that there may be value for equity. . . . . The real question is whether in these cases at this time, when it is not clear whether there will be any value for equity and, if so, what it will be, but there is a possibility, is a separate committee necessary to assure the equity holders adequate representation? The answer, in light of the facts of this matter, is clearly "no."

(Transcript of July 15, 2003 Hearing, a copy of which is attached hereto as Exhibit C, at 70-71.) The court's holding was based upon the safeguards in place ensuring that the interests of the equity holders would be adequately represented, including, inter alia, the debtors' "responsibility to equity holders" to maximize value of the estate.  (Id. at 71-79.)

20.    At the outset, here the Debtors and Delphi's twelve-member board of directors (ten of whom are independent, including two new directors elected recently), can be expected adequately to represent the interests of equity holders because they are charged with the fiduciary duty of maximizing the value of the estate for the benefit of all stakeholders.  See In re Penick Pharm., Inc., 227 B.R. 229, 232-33 (Bankr. S.D.N.Y. 1998) (Lifland, B.J.) (finding that managers and employees of debtor-in-possession had same duties as chapter 11 trustee, i.e., to maximize value of estate and ensure that monies that flowed through estate were used for benefit of unsecured creditors and other interested parties).  (Loral Haring Tr. at 132 ("There's no meaningful evidence . . . that management is somehow laying down on its job in . . . obtaining the most value possible for the debtors."); Kasper Hearing Tr. at 72-73, 76-77 (discussing duty of debtors to equity holders).)

21.    So, too, the Creditors' Committee's actions can be counted on to benefit equity holders' interests, for the Committee also has a duty to maximize the total value of the estate for the benefit of all stakeholders.  Williams, 281 B.R. at 221 ("A higher valuation is in both the Creditors' Committee and the shareholders interest."); see also In re Leap Wireless Int'l Inc., 295 B.R. 135, 139-40 (Bankr. S.D. Cal. 2003) ("The economic interests of the bondholders

9

and the shareholders appear to be the same—that is, to find the highest realistic value for the company. And it is the fiduciary duty of the [Creditors' Committee] to do so.").

22.     Appaloosa also has nothing to rebut the presumption that the interests of equity holders are already adequately represented through the Debtors' Board of Directors and the Creditors' Committee.  Although Appaloosa's Motion insinuates—apparently upon the basis of selective newspaper clippings—that General Motors will run roughshod over other stakeholders' interests, it has offered no admissible evidence to support these claims.  GM has taken strong exception to Appaloosa's charges.  (Response of General Motors Corp. to the Motion of Appaloosa Management L.P. Pursuant to 11 U.S.C. § 1102(a) for an Order Directing the United States Trustee to Appoint an Equity Committee in these Chapter 11 Cases (Docket No. 1712).)  In fact, GM now says that the protection of its own interests requires it to be seated on the Creditors' Committee.  (Motion for Order Directing Appointment of General Motors Corp. to the Statutory Creditors' Committee (Docket No. 2443).)  Notwithstanding its innuendoes, Appaloosa can never prove that "management is hopelessly conflicted or somehow otherwise not properly conducting their fiduciary duties."  (Loral Hearing Tr. at 134; see also GM Resp., dated Jan. 2, 2006.)

23.     As a highly sophisticated financial institution which elected to purchase its equity position in Delphi after the Debtors sought reorganization relief, which has the wherewithal to retain sophisticated professionals to represent it in these cases, and which knows how to communicate with other significant equity holders on matters of common interest, Appaloosa hardly needs an equity committee to look after its interests.  Here, just as in Williams, "those equity holders who do expect a distribution in a case can adequately represent their own interests without an official committee and can seek contribution if they make a substantial

10

contribution to the case."  281 B.R. at 223.   What Appaloosa cannot prove, as it must, is that the interests of equity holders will not be adequately represented "without the formation of an official committee."  Id.

D.    The Costs Of An Official Equity Committee Are Substantial And Unwarranted

24.    Appaloosa states that the costs of an official equity committee are not a significant factor because of the size of the Debtors' cases and because the fees of the equity committee's professionals are subject to the scrutiny of the parties and judicial review.  (Motion. ¶¶ 43-45.)  This narrow view may account for Appaloosa's failure to analyze the costs of appointing an equity committee.  In any event, Appaloosa's argument ignores the fact that the costs attendant to an official equity committee include not only professional fees, but also additional administrative burdens imposed on the Debtors and the costs of delay.  (Loral Hearing Tr. at 136 ("The cost and harm to the estate, which is both direct in terms of dollars [paid to an equity committee's professionals], as well as indirect in terms of dollars spent by other parties and potential delay outweigh the rather negligible benefits of additional representation, given my conclusion that the preferred holders have their own resources and their own reasons for protecting their interests actively in the case.").)

25.    Finally, were an equity committee to be appointed here—especially one that includes Appaloosa—it can be expected that such a committee will do whatever it can to achieve a recovery (even in the form of a "gift") for otherwise out-of-the-money equity.  That exercise will itself delay the process and increase the costs of administering these estates.

Memorandum Of Law

26.    Because the legal points and authorities upon which this Objection relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

11

<u>Conclusion</u>

WHEREFORE, the Debtors respectfully request that this Court enter an order (a) denying

Appaloosa's Motion and (b) granting the Debtors such other and further relief as is just.

Dated: New York, New York
          March 2, 2006

                              SKADDEN, ARPS, SLATE, MEAGHER
                                   & FLOM LLP


                              By:   /s/ David E. Springer
                                    John Wm. Butler, Jr. (JB 4711)
                                    David E. Springer (DS 9331)
                                    John K. Lyons (JL 4951)
                                    Ron E. Meisler (RM 3026)
                              333 West Wacker Drive, Suite 2100
                              Chicago, Illinois  60606
                              (312) 407-0700


                                         - and -


                              By:   /s/ Kayalyn A. Marafioti
                                    Kayalyn A. Marafioti (KM 9632)
                                    Thomas J. Matz (TM 5986)
                              Four Times Square
                              New York, New York 10036
                              (212) 735-3000


                              Attorneys for Delphi Corporation, <u>et al.</u>,
                                   Debtors and Debtors-in-Possession

12

**Exhibit A**

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
(212) 819-8200
Gerard Uzzi (GU-2297)

Wachovia Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
(305) 371-2700
Thomas E Lauria (Admitted *Pro Hac Vice*)
John K. Cunningham (JC-4661)
Linda M. Leali

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| Delphi Corporation, et al. | ) | Case No. 05-44481 |
|  | ) | Jointly Administered |
| Debtors. | ) |  |
|  | ) |  |

**APPALOOSA'S OBJECTIONS AND RESPONSES TO**
**DEBTORS' FIRST SET OF INTERROGATORIES AND**
**DOCUMENT REQUESTS TO APPALOOSA MANAGEMENT L.P.**

Pursuant to Rules 26, 33, 34 and 36 of the Federal Rules of Civil Procedure, made

applicable by Rules 7026, 7033, 7034 and 7036 of the Federal Rules of Bankruptcy

Procedure, Appaloosa Management L.P. ("Appaloosa"), collectively with and through certain

of its affiliates, hereby serves these objections and responses to the Debtors' First Set of

Interrogatories and Document Requests to Appaloosa Management L.P. served by Delphi

Corporation ("Delphi") and its affiliated debtors and debtors in possession (collectively, with

Delphi, the "Debtors").

**GENERAL OBJECTIONS**

1.      Nothing herein shall be construed as an admission by Appaloosa regarding the

competence, admissibility, and/or relevance of any document, or as an admission of the truth

or accuracy of any characterization or document of any kind sought by the Debtors'

Discovery. Appaloosa reserves the right to challenge the competency, relevance, materiality, and admissibility of any documents Appaloosa identifies or produces in response to any request at trial of this or any other action, or at any subsequent proceeding, of this or of any other action.

2.    Appaloosa object to the Definitions and Instructions in the Discovery Requests on the ground, and to the extent, that they attempt to impose upon Appaloosa obligations and requirements beyond the scope of the applicable federal procedural rules, including Federal Rule of Civil Procedure 33.

3.    Appaloosa objects to the Interrogatories and the Definitions and Instructions in the Discovery Requests on the ground, and to the extent, that such requests seek materials that are privileged and protected from production under the attorney/client privilege, the work-product rule, or any other privilege or immunity from discovery.

4.    Appaloosa objects to the Discovery Requests to the extent they seek discovery of information outside of Appaloosa's possession, custody or control.

## RESPONSES AND SPECIFIC
## OBJECTIONS TO INTERROGATORIES

### INTERROGATORY NO.1:

Identify every person you intend to call to testify at the hearing on the Motion and describe the subject matters about which they will testify.

### RESPONSE:

Without waiving the foregoing general objections, Appaloosa has not yet determined what witnesses, if any, it will call to testify at the hearing on the Motion. Appaloosa intends to produce a list of testifying witnesses to the Debtors no later than five business days prior to the hearing, or when the Debtors produce a list of their testifying witnesses, whichever is later.

### INTERROGATORY NO. 2:

Identify all documents you intend to offer in evidence or otherwise use at the hearing on the Motion.

RESPONSE:

Without waiving the foregoing general objection, Appaloosa has not yet determined which documents it will offer in evidence or otherwise use at the hearing on the Motion. Appaloosa intends to produce a list of those documents to the Debtors no later than five business days prior to the hearing, or when the Debtors produce a list of documents it will offer in evidence or otherwise use at the hearing on the Motion, whichever is later.

INTERROGATORY NO. 3:

Identify every analysis you have done concerning the solvency of Delphi Corporation,

including the dates it was commenced and completed, the person(s) who performed it, the

conclusions it reached, and the bases for those conclusions.

RESPONSE:

Without waiving the foregoing general objections, a preliminary recovery analysis was prepared by Ronald Goldstein of Appaloosa. Mr. Goldstein conducted that analysis during the three months before Delphi filed for bankruptcy. The analysis demonstrated that under certain circumstances Delphi has substantial equity value, based in part on Appaloosa's proprietary forecasts of EBITDA and the restructuring of certain employee benefit-related obligations.

INTERROGATORY NO. 4:

Identify every analysis you have done concerning the reorganization value of Delphi

Corporation, including the dates it was commenced and completed, the person(s) who

performed it, the conclusions it reached, and the bases for those conclusions.

RESPONSE:

Without waiving the foregoing general objections, a preliminary recovery analysis was prepared by Ronald Goldstein of Appaloosa. Mr. Goldstein conducted that analysis during the three months before Delphi filed for bankruptcy. The analysis demonstrated that under certain circumstances Delphi has substantial equity value, based in part on Appaloosa's proprietary forecasts of EBITDA and the restructuring of certain employee benefit-related obligations.

INTERROGATORY NO. 5:

Identify every analysis you have done concerning the cost of appointing an equity

committee, including the dates it was commenced and completed, the person(s) who

performed it, the conclusions it reached, and the bases for those conclusions.

RESPONSE:

Without waiving the foregoing general objections, at the present time, Appaloosa has not conducted an analysis concerning the cost of appointing an equity committee.

INTERROGATORY NO. 6:

Identify every equity-holder of the Debtor with whom you have communicated concerning the formation of either a formal or informal equity committee.

RESPONSE:

Without waiving the foregoing general objections, Appaloosa has communicated with the following equity holders concerning the formation of either a formal or informal equity committee:

Steve Lampe, Lampe, Conway & Co.

Joseph Thornton, Pardus Capital Management

Chris Wilson, Stonehill Capital Management LLC

DC Capital, LLC, through Schulte Roth & Zabel

INTERROGATORY No. 7:

Do you contend that there is a substantial likelihood that equity holders of Delphi Corporation will receive a meaningful distribution in these cases, taken into account a strict application of the absolute priority rule? If so, provide the complete basis for your contention, including the identity of documents concerning your contention and the identity of persons with knowledge of the facts concerning your contention.

RESPONSE:

Without waiving the foregoing general objections, yes. Please see the Motion and the exhibits thereto, and the responses to Interrogatory Numbers 1 and 2.

INTERROGATORY No. 8:

Do you contend that Appaloosa is unable to represent its interests in these bankruptcy cases, either individually or through an informal committee of equity holders? If so, provide the complete basis for your contention, including the identity of documents concerning your contention.

RESPONSE:

Without waiving the foregoing general objections, while Appaloosa is able to retain counsel to represent its interests in the Debtors' chapter 11 cases, as set forth in the Motion, any suggestion that individual equity holders acting on their own, without the imprimatur of official committee status, can otherwise participate meaningfully without disadvantage in any chapter 11 case of significant magnitude, no less one of this size and complexity, so obviously ignores the practical realities of bankruptcy practice as to be facially disingenuous. Absent official representation, equity holders will be effectively shut out of the process, through a practical lack of access to management and other necessary resources from the Debtors and/or through simple attrition, as evidenced by the fact that, as part of the "meet and confer" held on January 27, 2006, the Debtors indicated an unwillingness to share information that is necessary to protect shareholder interests.

INTERROGATORY No. 9:

Provide a summary (including the costs thereof and receipts therefrom) of trading or

other acquisitions or dispositions, for the period January 1, 2004 through the present, in

securities of the Debtor.

RESPONSE:

In addition to the foregoing general objections, Appaloosa objects to providing a summary (including the costs thereof and receipts therefrom) of trading or other acquisitions or dispositions, for the period January 1, 2004 through the present, in securities of the Debtor as such information is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence.

INTERROGATORY No. 10:

Provide a complete history of your trading or other acquisitions or dispositions in

equity securities of the Debtors.

RESPONSE:

In addition to the foregoing general objections, Appaloosa stipulates that it purchased equity securities of the Debtors subsequent to the commencement of the Debtors' chapter 11 cases. The purchases were reported on the Form SC 13G filed with the Securities & Exchange Commission by Appaloosa on October 11, 2005. There have been no trades by Appaloosa in equity shares of the Debtors since the filing of the October 11, 2005 Form SC 13G.

INTERROGATORY No. 11:

Provide a complete history, for the period January 1, 2004, through the present, in

your trading or other acquisitions or dispositions in claims against the Debtors.

RESPONSE:

In addition to the foregoing general objections, Appaloosa objects to providing a complete history, for the period January 1, 2004, through the present, in its trading or other acquisitions or dispositions in claims against the Debtors as such information is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence.

## RESPONSES AND SPECIFIC
## OBJECTIONS TO DOCUMENT REQUESTS

DOCUMENT REQUEST NO. 1:

All documents identified in response to the foregoing interrogatories.

RESPONSE:

Without waiving the foregoing general objections and pursuant to the "meet and confer" held on January 27, 2006, any documents responsive to Request No. 1 will be produced for inspection and copying.

DOCUMENT REQUEST NO. 2:

A copy of the direct testimony, declaration, or affidavit, including all exhibits, of each

witness identified in response to the foregoing interrogatories.

RESPONSE:

Without waiving the foregoing general objections, Appaloosa did not identify any witnesses in the foregoing interrogatories because it has not yet determined what witnesses, if any, it will call to testify at the hearing on the Motion. Appaloosa will produce a copy of the direct testimony, declaration, or affidavit, including all exhibits, of each witness subsequently identified to the Debtors no later than five business days prior to the hearing on the Motion, or when the Debtors produce a copy of the direct testimony, declaration, or affidavit, including all exhibits, of each of their witnesses, whichever is later.

DOCUMENT REQUEST NO. 3:

All documents substantiating the contentions you make in or that otherwise support

your Motion.

RESPONSE:

Without waiving the foregoing general objections and pursuant to the "meet and confer" held on January 27, 2006, any documents responsive to Request No. 3 will be produced for inspection and copying.

DOCUMENT REQUEST NO. 4:

Copies of your communications with other equity holders of the Debtors concerning

the Debtors.

MIAMI 632654
(2K)

RESPONSE:

Without waiving the foregoing general objections and pursuant to the "meet and confer" held on January 27, 2006, any documents responsive to Request No. 4 will be produced for inspection and copying.

DOCUMENT REQUEST NO. 5:

Copies of your communications with other debt holders of the Debtors concerning the

Debtors.

RESPONSE:

In addition to the foregoing general objections, Appaloosa objects to providing copies of its communications with other debt holders of the Debtors concerning the Debtors as such information is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence.

DOCUMENT REQUEST NO. 6:

Copies of your communications with other holders of claims against the Debtors

concerning the Debtors.

RESPONSE:

Without waiving the foregoing general objections, Appaloosa objects to providing copies of its communications with other holders of claims against the Debtors concerning the Debtors as such information is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence.

DOCUMENT REQUEST NO. 7:

Documents substantiating your contention that you are not able to protect your own

interests in these cases.

RESPONSE:

Without waiving the foregoing general objections and pursuant to the "meet and confer" held on January 27, 2006, any documents responsive to Request No. 7 will be produced for inspection and copying.

DOCUMENT REQUEST NO. 8:

All documents substantiating your contention that the Debtors do not appear to be

hopelessly insolvent.

RESPONSE:

Without waiving the foregoing general objections and pursuant to the "meet and confer" held on January 27, 2006, any documents responsive to Request No. 8 will be produced for inspection and copying.

DOCUMENT REQUEST NO. 9

All documents upon which any of your expert witnesses intend to rely.

RESPONSE:

Without waiving the foregoing general objections, at the present time, Appaloosa has not yet determined the documents upon which its experts intend to rely. Appaloosa intends to produce a list of these documents to the Debtors no later than five business days prior to the hearing, or when the Debtors produce a list of the documents upon which their experts intend to rely, whichever is later.

DOCUMENT REQUEST NO. 10:

All documents you considered in purchasing or selling equity securities of Delphi

Corporation during 2005.

RESPONSE:

Without waiving the foregoing general objections and pursuant to the "meet and confer" held on January 27, 2006, any documents responsive to Request No. 10 will be produced for inspection and copying.

DOCUMENT REQUEST NO. 11:

All documents you considered in purchasing or selling debt securities of Delphi

Corporation during 2005.

RESPONSE:

Without waiving the foregoing general objections and pursuant to the "meet and confer" held on January 27, 2006, any documents responsive to Request No. 11 will be produced for inspection and copying.

DOCUMENT REQUEST NO. 12:

All documents you considered in purchasing or selling claims against the Debtors.

RESPONSE:

Without waiving the foregoing general objections and pursuant to the "meet and confer" held on January 27, 2006, any documents responsive to Request No. 12 will be produced for inspection and copying.

Dated: February 21, 2006

WHITE & CASE LLP
Gerard Uzzi (GU-2297)
1155 Avenue of the Americas
New York, New York 10036-2787
(212) 819-8200

Thomas E Lauria (Admitted *Pro Hac Vice)*
John K. Cunningham (JC-4661)
Wachovia Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
(305) 371-2700

By:  /s/  Linda M. Leilia
      Linda M. Leali


COUNSEL TO APPALOOSA
MANAGEMENT L.P.

## CERTIFICATE OF SERVICE

I certify that on this 21 day of February, 2006, the foregoing APPALOOSA'S OBJECTIONS AND RESPONSES TO DEBTORS' FIRST SET OF INTERROGATORIES AND DOCUMENT REQUESTS TO APPALOOSA MANAGEMENT L.P. was sent by email and by overnight mail to the counsel for the Debtors.

By: /s/ Aileen Venes
Aileen Venes

**Exhibit B**

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -x

In the Matter of

    LORAL SPACE & COMMUNICATIONS      03-41710 (RDD)

    LTD., et al.,                  03-41709 to

                                   03-41728

              Debtors.

- - - - - - - - - - - - - - - -x

                  December 2, 2003

                  10:15 a.m.

                  United States Custom House

                  One Bowling Green

                  New York, New York 10004

    HEARING pursuant to matters listed on
agenda.

B E F O R E :

          HON. ROBERT D. DRAIN,

               U.S. Bankruptcy Judge.



**2**

APPEARANCES:

WEIL GOTSHAL & MANGES LLP
    Attorneys for the Debtors
    767 Fifth Avenue
    New York, New York 10153
BY:  RICHARD ROTHMAN, ESQ.
     LORI R. FIFE, ESQ.
     SHAI Y. WAISMAN, ESQ.

AKIN GUMP STRAUSS HAUER & FELD LLP
    Attorneys for the Official
    Committee of Unsecured Creditors
    590 Madison Avenue
    New York, New York 10022

BY:  DAVID H. BOTTER, ESQ.
     ABID QURESHI, ESQ.
     KERRY G. THOMPSON, ESQ.

SONNENSCHEIN, NATH & ROSENTHAL, ESQS.
    Attorneys for Aspen Advisors, LLC
    1221 Avenue of the Americas
    New York, New York 10020

BY:  PETER D. WOLFSON, ESQ.
     JOHN A. BICKS, ESQ.

DAVIS, POLK & WARDWELL, ESQS.
    Attorneys for The Bank of America
    450 Lexington Avenue
    New York, New York 10017
BY:  MARSHALL SCOTT HUEBNER, ESQ.

**3**

APPEARANCES - continued

SCHIFF HARDIN & WAITE
    Attorneys for Shareholders of
    Loral space and Communications, LTD
    6600 Sears Tower
    Chicago, Illinois 60606

BY:  MICHAEL YETNIKOFF, ESQ.

KELLY DRYE & WARREN LLP
    Attorneys for HSBC Bank USA
    as Trustee
    101 Park Avenue
    New York, New York 10178

BY:  MARK R. SOMERSTEIN, ESQ.

CAROLYN S. SCHWARTZ
UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
    33 Whitehall Street
    New York, New York 10004

BY:  LAUREN LANDSBAUM, ESQ.,
     of Counsel

**4**

1    LORAL SPACE & COMMUNICATIONS LTD.
2    PROCEEDINGS:
3         Please be seated.  Have the
4    parties all given their appearances?
5         MR. WOLFSON:  Peter Wolfson and John
6    Bicks from Sonnenschein Nath and Rosenthal for the
7    preferred shareholders.
8         MR. YETNIKOFF:  Michael Yetnikoff
9    with Schiff Hardin and Waite for certain common
10   shareholders of Loral Space and Communications,
11   LTD.
12        THE COURT:  If you've already given
13   your appearances to the court reporter, that's
14   fine.
15        I don't know which one of you wants
16   to go first.
17        MR. YETNIKOFF:  Good morning, your
18   Honor.  Michael Yetnikoff of Schiff Hardin and
19   Waite on behalf of certain common shareholders of
20   Loral Space and Communications Limited.
21        As the court recalls, I was here in
22   September pursuing a motion to appoint an official
23   equity security holders committee of Loral.  At
24   that time the motion was denied without prejudice
25   by the court; and the court left the door open, as

**5**

1    LORAL SPACE & COMMUNICATIONS LTD.
2    it were, in the event that the circumstances
3    changed in a particular way, that is with regard to
4    the Intelsat auction and the circumstances
5    surrounding that.
6         In fact, circumstances have changed
7    in a way that perhaps none of the parties foresaw
8    at that time.  What changed is that this company
9    seems to have experienced a very unusual and
10   significant turn around in the course of this
11   Chapter 11.  Back in September, the company was in
12   some danger of ceasing to do business, at least
13   with respect to the SS/L business.  That situation
14   has turned around rather dramatically.  In
15   September there was a pending potential for a sale
16   of certain satellite of Intelsat, but by no means
17   of certainty that sale now looks likely to close
18   and for a price that is in 3 hundred million
19   dollars in excess of the book value of assets being
20   sold.
21        Moreover, since September, analyst's
22   opinions have been promulgated to the effect that
23   the entire industries is experiencing a turn
24   around.  Therefore this appears to be the
25   relatively unusual case of a company turning around

**6**

LORAL SPACE & COMMUNICATIONS LTD.

1  almost 180 degrees during the course of a Chapter
2  11 bankruptcy due to changes in business
3  circumstances. And we submit that those changes
4  justify, that means they require appointment of an
5  official shareholders' committee to represent the
6  interests of common shareholders.
7
8          The Intelsat sale, which is the
9  cornerstone of the company strategy, is expected to
10  close. That sale will pay down all of the
11  companies' secured debt. The book value of the
12  assets sold, approximately 805 million dollars, as
13  set forth in Loral's last form 10-Q. The value
14  that the company has placed on the sale, 1.1
15  billion dollars, a 3 hundred million dollar premium
16  over the book value of the assets. To the extent
17  that book value is relevant, and to the extent that
18  there was a book value solvency gap as posited by
19  the creditors' committee, that 3 hundred million
20  difference closes that gap to zero; and the 1.1
21  billion dollar value that the debtor has ascribed
22  to the sale, as I said is in excess -- as I said,
23  does not include the value of additional satellite
24  orders that Intelsat and affiliates have placed.
25          There is another significant benefit

**7**

LORAL SPACE & COMMUNICATIONS LTD.

1  from the sale that removes the secured debt thereby
2  giving this company significantly more options to
3  with respect to exit financing and capital
4  structure upon emergence; that is a major and
5  perhaps underrated benefit. It is now a whole lot
6  easier for the company to emerge with a plan that
7  has a reasonably leveraged capital structure, and
8  that's a tremendous benefit in my view.
9
10          Another important fact of the
11  satellite sale is it appears to not only leave
12  Loral with a high margin high growth markets
13  outside of North America, as has been set forth in
14  testimony before this court, but in addition with
15  orbital slots that the company could use to place
16  other satellites which it builds to serve the north
17  American market as well, so there is a very
18  reasonable scenario where this company could be
19  completely reconstituted within a reasonable period
20  of time to its former self with the difference of
21  having paid out off all its secured debt.
22          Although book value, which is not
23  determinative of solvency, there are a couple of
24  arguments to be made, first of all with respect to
25  the 3 hundred million dollars closure of the

**8**

LORAL SPACE & COMMUNICATIONS LTD.

1  solvencies gap. Second, the company, on November
2  26th, filed a schedule of assets and liabilities.
3  And a simple reading of that schedule filed on
4  November 26th shows that for the parent company,
5  Loral Space and Communications Limited, assets of
6  2.6 billion dollars and liabilities at 1.5 billion
7  dollars, that is simple transcribed from the
8  finding that was made on the 26th of November. So,
9  we've had analysis that I realize of course that
10  there are consolidation issues with respect to
11  that, but even on a very cursory analysis of the
12  book value numbers, there appears to be no solvency
13  gap, certainly the company is not hopelessly
14  insolvent, and in fact appears to be quite solvent.
15
16          The second change of circumstances
17  since September, is Loral's receipt for new
18  satellite orders with options for a 5th satellite
19  order. That will keep the SS/L business afloat,
20  demonstrates that the SS/L business is an excellent
21  business; Loral is one of the very very few
22  suppliers of the state of the art satellites. Even
23  in light of its financial difficulties, the markets
24  have shown that they have enormous respect for the
25  SS/L business and have placed significant orders,

**9**

LORAL SPACE & COMMUNICATIONS LTD.

1  and one will only expect that situation to improve
2  as the expected turn around in the satellite
3  industry begins to gather steam, Loral is very well
4  positioned to take advantage of that.
5
6          The third change of circumstance is
7  the recognition, as indicated in the public press
8  reports, that this industry is, in fact, turning
9  around. There is an expectation, for example, for
10  additional demand for high definition television
11  which would require additional satellites. And as
12  I said, there are not very many competitors that
13  Loral has as a viable vibrant business. And is
14  simply a company that is not only on the verge, but
15  in fact has begin its turn around.
16          The other circumstances surrounding
17  this case, with one exception, haven't changed, and
18  they all favor appointment of an official
19  shareholders committee. Loral's common stock is
20  still widely held, still actively traded. This is
21  still a large and complex case, and Loral's common
22  shareholders interests are still not adequately
23  represented. Management has a fiduciary duty to
24  all constituencies in this case, it has to engage
25  in a juggling act between its creditors and its

10

LORAL SPACE & COMMUNICATIONS LTD.
1
2 shareholders, and also management has certain
3 economic interests that are personal to the
4 management members, non of which are congruent with
5 the common shareholders interest. Moreover the
6 shareholders cannot represent themselves. The
7 individual shareholders are small, widely
8 scattered, they don't have the funds to represent
9 themselves, and moreover, they don't have the
10 standing to represent themselves. And I think
11 that's demonstrated by the fact that I, on behalf
12 of the shareholders, requested under
13 confidentiality agreement, to view certain
14 projections that the company had apparently made,
15 perhaps not final objections, I really don't know
16 what status they are in. The company declined to
17 provide that information. I submit that had an
18 official shareholders committee been appointed,
19 that information would certainly have been shared
20 with an official shareholders committee, it was not
21 shared with the individual shareholders. I'm
22 simply pointing out the fact that individual
23 shareholders don't have the status, don't have the
24 ability to gain information, or to use it for that
25 matter, in the same way as an official committee.

11

LORAL SPACE & COMMUNICATIONS LTD.
1
2 There simply is no substitute for official
3 committee representation.
4       Finally, the one other surrounding
5 circumstance that has changed is the fact that the
6 company has announced that it does intend to
7 present reasonably viable projections, circulate
8 those to the creditors' committee, and begin the
9 plan of reorganization or negotiating process
10 within the next few weeks. And in order for
11 shareholders to be fairly represented, this is the
12 time to do it. The appointment process will no
13 doubt take a few weeks, and by the time a committee
14 is appointed, if the companies timetable is
15 correct, the plan negotiations will be starting.
16 So effectively, this is, while not quite the last
17 minute, really the last best chance for
18 shareholders to obtain a seat at the table.
19       In summary, this is an unusual case,
20 an unusual case where the facts on the ground of
21 business realities appear to have changed where the
22 company is not hopelessly is insolvent as a matter
23 of book value, and not hopelessly insolvent as a
24 matter of its business case; a case where it does
25 appear that there may well be significant value for

12

LORAL SPACE & COMMUNICATIONS LTD.
1
2 the common shareholders at the end of the day. And
3 I would submit that the probability is significant
4 enough to warrant the appointment of an official
5 shareholders committee in this case, and to give
6 the shareholders the chance to participate in this
7 turn around to the extent economically justifies.
8       THE COURT: Let me ask you. The
9 shareholders that you represent, are they still the
10 shareholders that were listed on the schedule
11 attached to your original motion?
12       MR. YETNIKOFF: That is correct.
13       THE COURT: And they constitute,
14 what, about --
15       MR. YETNIKOFF: We have something in
16 the order of 2 million shares.
17       THE COURT: And that's what percent
18 of the total?
19       MR. YETNIKOFF: Something around
20 five percent.
21       THE COURT: And what is your factual
22 basis for saying that the stock is very widely
23 held?
24       MR. YETNIKOFF: I have seen trading
25 volumes on the publically available bulletin boards

13

LORAL SPACE & COMMUNICATIONS LTD.
1
2 that track that. I don't believe there's any
3 contest about the fact that the company -- I
4 believe that neither the company nor the U.S.
5 Trustee nor the creditors committee has disputed
6 that this common stock is widely held. There is an
7 active message board for stockholders. So based on
8 the fact that that assertion has not been
9 controverted and the fact that the stock continues
10 to trade as publically reported on the internet, I
11 conclude that the stock does continue to be widely
12 held.
13       THE COURT: What is your reaction to
14 the point raised by Aspen Advisors that if a
15 committee is appointed it should be weighted in
16 favor of preferred shareholders and/or that there
17 should be two committees?
18       MR. YETNIKOFF: My response is
19 first, that we would have no objection to two
20 committees.
21       THE COURT: Well, let's assume that
22 there's one committee.
23       MR. YETNIKOFF: Assuming that
24 there's one committee, my view is as follows: The
25 common shareholders committee has an interest

14

LORAL SPACE & COMMUNICATIONS LTD.

1 completely aligned with the preferred shareholders
2 in making sure that the preferred shareholders are
3 paid in full their legal entitlements, because the
4 common shareholders don't get a penny until the
5 preferred shareholders are paid whatever they are
6 in entitled to. So the common shareholders have a
7 complete total incentive to pay the preferred
8 shareholders every penny that they are entitled to.
9 On the other hand, the preferred shareholders have
10 an incentive to get themselves paid but have no
11 incentive to have the valuing move down to common.
12 So while the common shareholders can, I believe,
13 fairly and completely protect the interests
14 preferred shareholders, the preferred shareholders
15 do not have the same incentive to protect the
16 interest of common; moreover, I'm not sure whether
17 or not the preferred stock is either widely held or
18 actively traded, and that is another reason not to
19 weight the committee towards appointment towards
20 preferred shareholders. And finally, if the
21 business does turn around and this turn around is
22 real, it's not just a matter of a value split of
23 one hundred million dollars or so or 2 hundred
24 million dollars worth of preferred. If the company

16

LORAL SPACE & COMMUNICATIONS LTD.

1 preferred shareholders, you represent Aspen
2 Advisors?
3     MR. WOLFSON: That's correct. We
4 represent Aspen Advisors and there are, I believe,
5 a few others that have hooked up with Aspen
6 Advisors through our office -- I shouldn't say they
7 hooked up with Aspen Advisors, but we are
8 representing a number of preferred shareholders who
9 in the aggregate hold 23 percent of the outstanding
10 shares. There are approximately 4 and a half
11 million shares outstanding having a liquidation
12 preference with accrued and unpaid interest of
13 approximately 237 million dollars. The 23 percent
14 that we own represents that portion of 237 million,
15 and I believe mathematically there is about 185
16 million dollars worth that is scattered among the
17 public. These two series of preferred shares were
18 also publically trading, do publically trade, still
19 publically trade. We have been unable to -- other
20 than the handful that we have found that have the
21 more significant pieces, the balance of it, as far
22 as we are able to ascertain, is widely scattered
23 and held. We do not have the exact count, but no
24 other larger shareholders appear, there are no five

15

LORAL SPACE & COMMUNICATIONS LTD.

1 turns around, it will be a radical turn around.
2 The satellite, the FSS business is an extremely
3 high margin business. And my belief is in fact if
4 the value split is not going to be that close, it
5 will either be of the business -- if this turn
6 around isn't real and there is nothing left for
7 preferred or common, or that it will go entirely
8 through the preferred to the common. So I guess
9 the summary of that point is that I don't think
10 it's going to be a real close case, I believe it's
11 going one way or the other, but that's just my
12 belief.
13     THE COURT: Okay. Thank you.
14     MR. WOLFSON: Good morning, your
15 Honor. Peter Wolfson for the preferred
16 shareholders. Your Honor, this is my first
17 appearance in this matter, and I would just like to
18 briefly note a couple of points going down to the
19 legal standards. I will try not to duplicate that
20 which Mr. Yetnikoff has discussed.
21     We represent the preferred
22 shareholders --
23     THE COURT: Can you I interrupt you
24 for a second? When you say you represent the

17

LORAL SPACE & COMMUNICATIONS LTD.

1 percent shareholders that appear on public record.
2 And again, as Mr. Yetnikoff indicated, nobody has
3 disputed our contention that in fact it is
4 publically held, widely scattered, and in fact, I
5 think prior to -- if I'm not mistaken, prior to the
6 filing of this petition, these securities were all
7 listed on the New York Stock Exchange until they
8 were dealers.
9     THE COURT: Okay.
10     MR. WOLFSON: As noted in the
11 Johns-Manville case, although some shareholders may
12 have resources to protect their own interests,
13 unlike a committee, they don't have any fiduciary
14 duties to the other shareholders, they don't really
15 have adequate resources, they certainly don't have
16 adequate stature to properly and fully represent
17 the interest of shareholders in a case of this
18 nature.
19     Where Section 1109, as everybody
20 points out, gives individual shareholders and
21 creditors the right to be heard, it does not give
22 them the right to negotiate plans, it does not give
23 them any of the other statutory rights, nor the
24 obligations, nor fiduciary responsibilities that an

**18**

LORAL SPACE & COMMUNICATIONS LTD.
2 official committee gives them.
3        The debtor does have conflicting
4 duties and obligations and loyalties to both
5 creditors, employees, management, shareholders.
6 And again, as noted in Johns-Manville citing the
7 legislative history, the rationale in this sort of
8 a situation for appointing an equity committee is
9 due what Congress perceives as a natural tendency
10 of the debtor to pass by large creditors at the
11 expense of equity holders.
12        We've heard some comments earlier
13 and in the earlier transcript with respect to the
14 joint provisional liquidators, but those are
15 fiduciaries, such as the trustee representing the
16 estate, has sustained infirmities in the ability to
17 represent just shareholders that a debtor has. And
18 I would note that we have scanned the record
19 numerous times and we have not yet seen that the
20 joint liquidators who others would assert have the
21 ability to represent shareholders, we don't even
22 think that they have entered an appearance in this
23 case; if they have, we missed it. But most
24 importantly, I think it is fairly clear at this
25 point, that the debtors are not hopelessly

**19**

LORAL SPACE & COMMUNICATIONS LTD.
2 insolvent, certainly in relationship to the
3 preferred shareholders. I'm not going to address
4 the solvency relative to the common, I'm going to
5 leave that to Mr. Yetnikoff, but I would like to
6 focus the court's attention on whether or not the
7 preferred shareholders are in the money or
8 hopelessly insolvent and out of the money.
9        And what I would like to do is first
10 refer to the most current financial projection, the
11 financial numbers that are obtained in the
12 September 30th, 2003 form 10-Q that the debtor just
13 recently filed, and just walk the court through a
14 couple of pages of that SEC document to pointedly
15 point out that the company, even on a book basis,
16 is not hopelessly insolvent.
17        And if I might just hand the
18 court... I have put yellow tabs on a couple of
19 pages that I'm going to refer to, if I may
20 approach, your Honor?
21        THE COURT: Sure.
22        MR. WOLFSON: We pulled this off of
23 the SEC web site, and I would ask the court first
24 to take a look at the financial information in part
25 one. It shows up in the upper right-hand corner, I

**20**

LORAL SPACE & COMMUNICATIONS LTD.
2 believe the page numbers are page 4 of 112, that is
3 the condensed consolidated balance sheets.
4        THE COURT: Right.
5        MR. WOLFSON: And if your Honor
6 would look at that first, one thing to note is that
7 good will was written off this balance sheet in
8 December of 2002, so you do not see a line here for
9 good will, and I'll point that out in a moment from
10 another exhibit. You have a much more clean
11 balance sheet than you normally would have as a
12 consequence of that.
13        In looking at the balance sheet, we
14 need to then make a couple of adjustments. And you
15 can make a couple of adjustments very easily, and
16 this company is clearly going to be based on a book
17 solvency issue, solvent from the standpoint of the
18 preferred shareholders.
19        If I might, I guess just for the
20 sake of the record, we could mark that Q as
21 preferred shareholders Exhibit 1. And I would like
22 to mark as Exhibit 2, just a demonstrative aid.
23        MR. ROTHMAN: Your Honor, we're
24 going to object to this. We haven't had any notice
25 of this. He's not here testifying as an expert --

**21**

LORAL SPACE & COMMUNICATIONS LTD.
2        THE COURT: Well, let me interrupt
3 you. You're objecting to the second, this sheet,
4 not the 10-Q?
5        MR. ROTHMAN: I'm objecting to the
6 extent they are trying to put in evidence through
7 the argument of a lawyer for one thing, and for
8 another, we would have liked to have notice that
9 they were going to do this kind of thing so that we
10 could have prepared.
11        MR. WOLFSON: Well, your Honor I --
12        MR. ROTHMAN: I mean, we'll listen
13 to what he says, but I also have doubts as to
14 whether he is even competent.
15        MR. WOLFSON: Your Honor, these are
16 the debtors' documents. These are SEC publically
17 filed documents.
18        THE COURT: When you referred to
19 these --
20        MR. WOLFSON: Well --
21        THE COURT: -- obviously the
22 September 30 10-Q is -- this other document that
23 you just handed up to me, what is this that?
24        MR. WOLFSON: I'm going to show you
25 these this comes straight out of the 10-Q. These

22

```
 1          LORAL SPACE & COMMUNICATIONS LTD.
 2  are just numbers right out of the 10-Q just as a
 3  demonstrative aid.  If you don't want to look at
 4  it --
 5          THE COURT:  So you are not seeking
 6  to introduce these, you are seeking it to walk
 7  through them?
 8          MR. WOLFSON:  I will ultimately seek
 9  to introduce the 10-Q, I don't need to introduce
10  this separate documents that I've marked as Exhibit
11  2.
12          THE COURT:  Well, until he tries to
13  offer his expert testimony or somebody's later
14  time, I'll aware of your objection, but I'm happy
15  to have him walk through the debtors' 10-Q.
16          MR. WOLFSON:  Your Honor, if you
17  start off, then, on, again, page four of the
18  Exhibit 1, the September 30th 10-Q, you see that
19  they show total assets of 2.454 billion
20  approximately, and then further down on that page,
21  they show a number of 2.901 billion liabilities
22  subject to compromise.  And on page five, it shows
23  a negative shareholders deficit of 705 million 829.
24          I'm not quite sure that the 300
25  million dollar number that Mr. Yetnikoff was
```

23

```
 1          LORAL SPACE & COMMUNICATIONS LTD.
 2  referring to earlier I think was an earlier Q;
 3  however, let's just now see some adjustments that
 4  need to be made to that to show that in fact, even
 5  based on book value, the preferreds are in the
 6  money.
 7          If you start off by taking a look,
 8  as Mr. Yetnikoff indicated, there is a sale of
 9  the -- to Intelsat of a billion -- it's actually a
10  billion 75 million as I understand the proceeds.
11  The sale was a billion 25, plus the additional 50
12  million, so a billion 75 million.  And if you take
13  a look at page 46 of this document, which is, I
14  think, one of the last tabs that I put on your
15  Honor's copy -- I'm sorry, on the upper right-hand
16  corner, it's page 72 of 112; it's actually page 46
17  of the document itself.
18          In the third paragraph down, "the
19  debtor states on October 20th the sellers held a
20  bankruptcy court ordered auction," and continues,
21  "the purchase price was increased from one billion
22  to one billion 25 million."  And then continuing
23  after the parenthetical it says that the buyers are
24  agreeing to pay an additional 50 million dollars at
25  the closing, which is how you get to a billion 75
```

24

```
 1          LORAL SPACE & COMMUNICATIONS LTD.
 2  million.
 3          The last sentence of that paragraph
 4  shows that the net book value of the satellites to
 5  be sold was approximately 805 million, and the
 6  other net assets sold of this group was
 7  approximately 9 million, so you have a 814 million
 8  dollars of net assets being carried on the balance
 9  sheet as an assets that have been sold for a
10  billion 75 million.  The difference between the
11  billion 75 million and the 814 million, is actually
12  a 261 million dollar gain on assets.
13          The second --
14          MR. BOTTER:  Your Honor, I don't
15  want to interrupt Mr. Wolfson's testimony, but I
16  think the parenthetical is fairly important; first
17  of all the deal has not yet closed, and there are
18  certain purchase price adjustments which could be,
19  in the context of this discussion, quite material.
20  So I think that --
21          THE COURT:  Well, you can raise that
22  point later.
23          MR. BOTTER:  Okay.
24          MR. WOLFSON:  And we checked with
25  the debtors counsel last night, your Honor, who
```

25

```
 1          LORAL SPACE & COMMUNICATIONS LTD.
 2  said that this more likely than not, they are very
 3  optimistic this is closing either this month or
 4  next; they know of no reason why it won't.
 5          The next adjustment -- and that's
 6  the first adjustment that we show on what I marked
 7  as Exhibit 2, just to have it on a piece of paper
 8  and keep track of it.  The next adjustment that we
 9  point out to your Honor is, if you take a look at
10  what shows up at -- well, again, looking at page 4
11  of 112, we show the liability sub compromise; you
12  start off with a number of 2.9 billion dollars.  We
13  then turn to look how that number was calculated,
14  and if your Honor would turn to page 31 of 112,
15  that is footnote 11 to the Q, you'll see that they
16  have a list at the top on the notes adding up to
17  the 2.901394 which matches liabilities subject to
18  compromise noted earlier.  The first number is debt
19  obligations of 2.36 billion, approximately; that
20  number is ascertained by looking at the earlier
21  footnote, footnote 10, that shows up at page 28 of
22  112.  And if your Honor would look at page 28,
23  footnote 10, you'll see that included within the
24  2.236 starting off debt obligations, the second
25  line item is accrued interest being deferred gain
```

26

LORAL SPACE & COMMUNICATIONS LTD.
1   LORAL SPACE & COMMUNICATIONS LTD.
2   on debt exchanges, that of 214 million 446
3   thousand; 446 thousand. That, your Honor, was when
4   the debtor engaged in its debt exchange, they just
5   had some, from a tax reason, this was just a
6   deferred gain on that debt to the exchange, this
7   was not debt to be paid --
8       MR. HUEBNER: Your Honor. I'm
9   sorry, I think it's now time to consider this
10  objection again. This is pure testimony about what
11  is just a highly technical financial document.
12  He's testifying plain and simple --
13      MR. WOLFSON: I'm just reading.
14      MR. HUEBNER: -- on what -- no, you
15  are not reading.
16      MR. WOLFSON: I'm reading right out
17  of the document.
18      MR. HUEBNER: Sir, would it be okay
19  if I could finish my statement and then you could
20  just help things if you need to. I would
21  appreciate finishing.
22      Your Honor, he's characterizing
23  certain line items in very specific financial ways
24  and then arguing that they should be simply be
25  deducted from a 10-Q. That is not a reading from a

27

1   LORAL SPACE & COMMUNICATIONS LTD.
2   10-Q. If they wanted to bring a financial witness
3   to testify as to factual matter why certain line
4   items should come out of the asset or liability,
5   they should have done so. I think an additional
6   representation that he was merely reading from the
7   10-Q, walking us through, is in fact is turning out
8   to be more inaccurate as the moments pass.
9       MR. WOLFSON: Your Honor, it says
10  accrued interest, parenthetical, deferred gain on
11  debt exchanges, close parenthetical, and you can
12  search the schedules until the cows come home, you
13  will never find this 214 million listed anywhere by
14  the debtor as a debt that would have to be paid on
15  confirmation. So you take the two publically filed
16  documents together and it's very clear. And, you
17  know, if the committee -- the committee had put in
18  numerous papers identifying what the capital
19  structure is of this case. They've always
20  identified their debt. There is nothing that has
21  ever indicated that this is debt that is
22  represented by their committee that would have to
23  be paid, and in fact it just simply is not, and
24  they know it. So that needs to come off of the
25  2.236, and that was one of the adjustments that we

28

1   LORAL SPACE & COMMUNICATIONS LTD.
2   made on my demonstrative of Exhibit 2.
3       MR. ROTHMAN: Your Honor, we do
4   renew the objection, he's not an expert.
5       THE COURT: All right. I will just
6   note that Mr. Wolfson has identified a number that
7   he thinks should be deleted based on the note
8   itself, and I'll read the note --
9       MR. ROTHMAN: Is he is lawyer.
10      THE COURT: -- I'll read the note
11  and make up my own mind whether it's clear enough
12  or not. It might be worth while to ask whether it
13  appears on the schedules.
14      MR. WOLFSON: Finally, your Honor,
15  if you turn back to footnote 11, what the debtor
16  has now done, one of the changes that they made in
17  how they report numbers is that they have included
18  the obligations to the preferred stock as debt
19  obligations, therefore it gets built into the 2.9
20  billion dollar number. And if you look at the last
21  two items, you see the 187 million for six percent,
22  series C, and the 36 some odd million for the 6
23  percent series D. And if you take a look about
24  midway on that note 11, it shows accrued interest
25  and preferred dividends of 40 million 432. The

29

1   LORAL SPACE & COMMUNICATIONS LTD.
2   actual interest is that's owed is approximately 17
3   million dollars. And when you add the interest to
4   the approximately 220 million dollars of principal
5   due on the preferred stock or the liquidation
6   preference on the preferred stock, the total
7   outstanding as of the petition date on the
8   preferred stock is approximately 237 million
9   dollars. So we back out that 237 million dollars
10  from the reported shareholder deficit of 705
11  million. And when you back out just those three
12  items, you end up with a positive book equity
13  available for the preferred shareholders of
14  approximately 6.6 million dollars.
15      The point of that exercise is to
16  demonstrate that based upon the debtors own
17  publically filed information, even based on book
18  value of assets which we understand is not
19  absolutely dispositive of the issue, but even based
20  on its own book value, the company from the
21  preferred standpoint is solvent for preferred
22  shareholders. You do have another 230 billion
23  dollars to go through to get to the common equity,
24  but the preferred are already in the money on that
25  basis. And I would contrast that situation -- keep

30

LORAL SPACE & COMMUNICATIONS LTD.

1   in mind that the debtor has never taken the
2   position that the company was hopelessly insolvent.
3   The creditors' committee and the U.S. Trustee have,
4   but they have done that on only two basis, basis
5   number one is book balance sheet. They said look
6   at the book balance sheet. The company has 3
7   hundred million dollars of a negative net worth.
8   They were using the older numbers too, it would
9   actually be a little higher based on these newer
10  numbers. They say there was some off balance
11  sheet items, which may be true, but I would also
12  point out that there were probably off balance
13  sheet assets. The company for example, has totally
14  written off, as we understand from the financials,
15  any interest in Global Star, which may actually
16  have some value.
17        So ignoring off balance sheet --
18        MR. ROTHMAN: Your Honor, the same
19  objection. It's getting worse --
20        MR. WOLFSON: This is public
21  information.
22        MR. ROTHMAN: -- this person is now
23  an expert on Global Star and the implications of
24  that; it's absurd.

31

LORAL SPACE & COMMUNICATIONS LTD.

1        MR. WOLFSON: Well, your Honor, the
2   creditors' committee has, and numerous other
3   parties in interest, have very sophisticated, very
4   high paid financial advisers, and not one of them
5   has given you an affidavit that this company is
6   hopelessly insolvent, and I find that very telling;
7   the debtor has not said that they are hopelessly
8   insolvent, and we're pointing out now that this was
9   their argument, the creditor committees' argument
10  was look at the book balance sheet, the book
11  balance sheet show that they are insolvent. It's
12  not the case.
13        The other argument that they make is
14  that the public debt market is indicative of this
15  company being insolvent, and they are saying that
16  that is something we should learn something from.
17  And I would like to address that point. I would
18  like to hand to the court -- first, the committee
19  has acknowledged that since the filing of this
20  petition, the bonds have traded up. I don't think
21  there's any dispute based on publically available
22  information, that the Loral Orion 10 percent senior
23  notes are presently trading somewhere around 75
24  cents, and the Loral 9 and a half percent senior

32

LORAL SPACE & COMMUNICATIONS LTD.

1   notes are trading at around 40 cents. And indeed
2   if I may hand to the court just a chart, and this
3   is just pulled out of Bloomberg. If I might. This
4   just tracks, if I might mark this as Exhibit 3, it
5   just tracks historical bond prices.
6        MR. ROTHMAN: Your Honor, we object
7   and don't think it should be used for any purpose.
8        THE COURT: Well, does the -- the
9   committee has given the bond prices as well, and I
10  think everyone basically agrees on a range. Right?
11        MR. WOLFSON: I think that they do,
12  but their financial advisors are in court today.
13  They can testify if these numbers are wrong.
14        MR. BOTTER: Your Honor, the bond
15  prices are what they are. We agree that as of
16  yesterday, they were 75 cents on the Orion bonds
17  and 42 cents on the LTD bonds. We think that shows
18  insolvency.
19        THE COURT: Okay.
20        MR. WOLFSON: What I think it shows,
21  though, your Honor --
22        THE COURT: Is there anything with
23  this that you are trying to show beyond that?
24        MR. WOLFSON: Well, in connection

33

LORAL SPACE & COMMUNICATIONS LTD.

1   with -- yes. Now you have just the lawyer, he
2   wants to show you what he thinks it means.
3        THE COURT: He's agreeing with you.
4        MR. WOLFSON: Well, that's good. He
5   agrees with the numbers, but then he says he thinks
6   that that means that it's insolvent and that that's
7   indicative of an insolvency position.
8        But if I can hand one other exhibit
9   to the court -- the final exhibit that I would just
10  like to point out, and also just purely extracted
11  from publically filed SEC information, is income
12  statement and balance sheet information straight
13  out of the companies SEC documents going back as
14  far as 1999. And if Your Honor were to look at
15  the historical bond chart that I handed out, as of
16  December of '01, if you were to take a look at the
17  December '01 historical balance sheet which shows
18  up on page 2 of that last handout; at that time the
19  company was reporting, in 12/01, a shareholder
20  positive equity of a billion 3, and the bonds were
21  trading very close to where they are trading today.
22  And for the debtor or the creditors' committee to
23  argue that the bonds, where they are trading today
24  are indicative of an insolvent company, doesn't

**34**

LORAL SPACE & COMMUNICATIONS LTD.
1    LORAL SPACE & COMMUNICATIONS LTD.
2  synchronize with the facts of how the bonds have
3  traded in relationship to the book balance sheets
4  of this case in the past.
5        MR. ROTHMAN: Your Honor.
6        MR. WOLFSON: And that's the only
7  point I wish to make on that.
8        MR. ROTHMAN: Your Honor, I'll
9  reiterate the objection. This is getting more
10  tenuating with each document.
11       THE COURT: Well, if your point is
12  that they have always traded at a discount over the
13  last several years, the last two years.
14       MR. WOLFSON: Either that they've
15  always traded at a discount and/or that there's --
16  you can't take a look at where the bond prices are
17  today and say ah ha, the company is insolvent as a
18  consequence of that; the bonds are trading the same
19  as they did two or three years ago when the company
20  was reporting a book value of a billion 3. It was
21  no more insolvent then --
22       THE COURT: Well, that's a different
23  point. It does get into the area of expert
24  testimony.
25       MR. WOLFSON: I'm just asking the

**35**

1    LORAL SPACE & COMMUNICATIONS LTD.
2  court to look at it factually. I'm not making any
3  particular opinion about it, it's just a fact. The
4  fact is here's where the bonds are trading based on
5  publically financial information, and here's what
6  the balance sheets of the company were showing, and
7  your Honor can draw your own conclusion as to what
8  that means.
9        MR. BOTTER: Your Honor, can I ask a
10  question as to these exhibits? Obviously there's
11  been a lot of work put into them, and I just want
12  to ask if Mr. Wolfson's firm has done all the work
13  by itself or whether it has been assisted by a
14  financial adviser. And I think it's relevant,
15  because if it's been assisted by a financial
16  advisor, than maybe that financial adviser ought to
17  sit on the stand and inform the court that they are
18  representatives of them, and not a financial
19  advisory firm that's involved in this case, and in
20  fact, they are in the courtroom right now, and if
21  they have been involved in working with Mr.
22  Wolfson's firm in preparation of this, I would
23  think it will be appropriate, if Mr. Wolfson is
24  attempting to testify about these exhibits, that we
25  could examine the people that prepared them.

**36**

1    LORAL SPACE & COMMUNICATIONS LTD.
2        THE COURT: Well, first of all, what
3  is the identification exhibits tracking historical
4  bond prices from December '01 to November '03? Was
5  that prepared by your firm or with the assistance
6  of financial types?
7        MR. WOLFSON: May I for a second?
8        (Discussion off the Record.)
9        MR. WOLFSON: Your Honor, this was
10  prepared by the assistance of Channon and Company,
11  and as was what we've marked as Exhibit 4. I'm
12  perfectly delighted to have --
13       THE COURT: Which one was that?
14       MR. WOLFSON: Exhibit 3 I marked as
15  the historical bond price. Exhibit 4 was the
16  historical income statement going back to 1998.
17  Exhibit 2 was the demonstrative aid book value for
18  preferreds, and Exhibit 1 was the 10-Q.
19       THE COURT: Are you seeking to have
20  any of these introduced into evidence?
21       MR. WOLFSON: Well I would, I guess,
22  I would like, if there's no dispute, to introduce
23  all of them into evidence.
24       THE COURT: Well, there's clearly a
25  dispute.

**37**

1    LORAL SPACE & COMMUNICATIONS LTD.
2        MR. WOLFSON: Then I will call
3  Channon just to testify as to where these numbers
4  come from.
5        THE COURT: No. If they are to be
6  -- they can't testify as an expert without having
7  been previously identified.
8        MR. WOLFSON: Your Honor, again, I'm
9  not looking for any expert testimony. All these
10  numbers are absolute extracts from the debtors
11  financial statements, with the exception of the
12  chart where there's no dispute, that this
13  accurately reflects simply trading values --
14       THE COURT: Well, I don't know if
15  that's --
16       MR. BOTTER: We have no idea, your
17  Honor.
18       MR. HUEBNER: Your Honor --
19       THE COURT: -- that is in dispute, I
20  think.
21       MR. WOLFSON: Right. Your Honor,
22  that's why I would have Channon testify. But this
23  is not expert testimony, this is just factual.
24  Where did you get these numbers from and how did
25  they get onto this piece of paper. I'm not asking

38

LORAL SPACE & COMMUNICATIONS LTD.
1
2  for any opinions, I'm not asking for anything,
3  other than just if we need to have a source.
4       If the debtor is going to dispute,
5  for example, starting with Exhibit Number 4, the if
6  the debtor is going to dispute that these are an
7  accurate excerpt or regurgitation of what's in
8  their 10-Ks, then I can just put some on to testify
9  and say I got the numbers from the 10-K. They are
10  accurate, here they are. And if the debtor
11  ultimately believes any of these numbers are
12  wrong -- and I also have the 10-Ks with me from
13  2002 and 2001 which I can introduce into evidence.
14       THE COURT: That would probably
15  obviate that issue.
16       MR. WOLFSON: Okay. Well, then let
17  me --
18       THE COURT: Rather than dealing with
19  a summary.
20       MR. WOLFSON: I can do that.
21       MR. HUEBNER: Your Honor --
22       THE COURT: Then I'll hear the
23  response on Exhibit 3.
24       MR. HUEBNER: Your Honor, I think I
25  would note as a matter of process, that perhaps,

39

LORAL SPACE & COMMUNICATIONS LTD.
1
2  you know, people are not aware that bankruptcy
3  courts sort of function like regular federal
4  courts. There was no exhibit list, there was no
5  witness list; what we just found out, pursuant to
6  the court's questioning, is that there is a shadow
7  financial advisor that actually prepared what is,
8  in essence, a small expert report that Mr. Wolfson
9  is reading from.
10       The only note of surprise here, I
11  think it's about as dramatic as one can get, well,
12  actually, the financial advisors who prepared all
13  these documents is in the court, and I'm happy to
14  call them to the stand. I think that next time, if
15  Mr. Wolfson would give the primary parties the
16  courtesy of notice of his exhibits, factual and
17  otherwise, we could have a proper hearing. I think
18  for us to now sit here and compare the 2001 10-Ks,
19  and like there are other documents that he doesn't
20  even have enough copies of for the primary parties
21  in this case, to see if the excerpts of the exhibit
22  is even accurate, is simply grossly unfair. If
23  this was to be an evidentiary hearing, one might
24  have expected the courtesy to, and in fact the
25  obligation to advise the court as well as the

40

LORAL SPACE & COMMUNICATIONS LTD.
1
2  parties, of the fact that facts were being
3  introduced into evidence, which is normally is
4  accompanied by affidavits and witnesses. Mr.
5  Wolfson was very sort of interested in the fact
6  that there were not financial participant
7  affidavits in this case. It is his evidentiary
8  verdict on his motion to make a factual record.
9  The question of fact is best poised to him. Where
10  is his financial witness with the advanced notice
11  and the opportunity to depose. This is not a
12  Cracker Jack hearing; this is a multi billion
13  dollar case in which we have the right to process.
14       MR. BOTTER: Your Honor, I would
15  just add that I believe the debtors about three
16  days ago asked Mr. Bicks, who is Mr. Wolfson's
17  colleague, whether in fact, they would have a
18  witness at this hearing. He said no. Obviously
19  Mr. Wolfson is appearing as his own witness. But I
20  think that if they had been honest to the process
21  here, I think they would have identified that in
22  fact they were working with Channon, and they would
23  have made Channon available for us to examine them
24  on these exhibits that they are trying to get in
25  through Mr. Wolfson's testimony.

41

LORAL SPACE & COMMUNICATIONS LTD.
1
2       MR. WOLFSON: Your Honor, we are not
3  seeking to --
4       THE COURT: Just a second.
5       MR. ROTHMAN: Your Honor, maybe this
6  will help. What I was going to suggest is why
7  don't we just have him put in the 10-Ks if he
8  wants, without the exhibits. I would like to hear
9  the rest of what he has to say because I don't
10  think any of it makes a difference anyway.
11       THE COURT: Again, you are not
12  seeking to introduce any valuation or expert
13  testimony, you are just trying to corroborate the
14  source that are for this document, Exhibit 3?.
15       MR. WOLFSON: That is what I'm --
16       THE COURT: Is that what you are
17  trying to do?
18       MR. WOLFSON: I'm just trying to
19  corroborate -- the 10-Ks corroborate Exhibit 4.
20       THE COURT: Well, the 10-Ks.
21       MR. WOLFSON: The 10-Ks --
22       THE COURT: The debtor is not
23  disputing that those are admissible, and they
24  couldn't. So I think those could be admitted.
25       MR. BOTTER: In terms of the

42

LORAL SPACE & COMMUNICATIONS LTD.
1
2  historical bond prices, your Honor, there's nothing
3  in the 10-Ks --
4          THE COURT: I understand. So I
5  think the remaining issue is whether we could have
6  someone --
7          MR. HUEBNER: Your Honor, on the
8  bond prices, to make it easy, I don't think there's
9  a big dispute about the bond prices. I think that
10 we all sort of brought different sheets that say
11 the same thing; we all understand the that the
12 Orion bonds are currently at 75. We all understand
13 that the parent bonds are at 39 or 40 or 41. So
14 unless the chart showing the trend up, which we can
15 probably all agree as a general matter, that the
16 announcement of the Intelsat sale and these orders
17 has resulted in something of a trend upward, and in
18 fact the trend recently shows that the prices have
19 recently gone back down, but I'm not sure he needs
20 the chart because I'm not sure that we
21 fundamentally disagree that the bonds on the chart
22 have gone like this (indicating).
23         THE COURT: I think his only point
24 on the chart is that the bonds did not start
25 trading at a discount county with the petitioner

43

LORAL SPACE & COMMUNICATIONS LTD.
1
2  date, that in fact they were trading at a discount
3  at least as of December 2001. Now this isn't, as
4  Judge Lifland said, anything more than helpful
5  information in the first place. So I don't know
6  whether that's a big point for the objectants to
7  these motion to dispute or whether it's something
8  that they can also agree to, whether the discount
9  was five percent or 10 percent or 15 percent, that
10 there was a period before the petition date where
11 the bonds were trading at a discount.
12         MR. HUEBNER: Your Honor, again,
13 just to make life procedurally simple for people,
14 at least the agent, I think, has no objection to
15 him sort of testifying as to the proposition that
16 the market understood that even before the actual
17 petition date, that these bonds might not be paid
18 in full, and that there was some discount.
19 Obviously we can't verify right now the 12/21/01
20 trading price. But if the proposition is just that
21 the market got the fact that there was financial
22 distress and the telecom bumper was exploding,
23 which preceding the petition date, I'm not sure we
24 have to have a factual argument, obviously people
25 understand that.

44

LORAL SPACE & COMMUNICATIONS LTD.
1
2          THE COURT: Okay. So why don't we
3  introduce then the -- is it three 10-Qs?
4          MR. WOLFSON: It's three 10-Qs bound
5  together in one binder, the 2000, 2001 and 2002
6  10-K, and then I would like to mark that then
7  perhaps as Exhibit 5.
8          THE COURT: You are seeking to
9  introduce that, right?
10         MR. WOLFSON: Correct.
11         THE COURT: Why don't we introduce
12 that as Exhibit 2. The other exhibit which is
13 being introduced into evidence is the 2003 10 K.
14         MR. WOLFSON: Very well.
15         THE COURT: So that's the --
16         MR. WOLFSON: So Exhibit 2 is the
17 2003 10-Q?
18         THE COURT: Right. And Exhibit 2 is
19 what you just handed me --
20         MR. WOLFSON: The three 10-Ks.
21         THE COURT: -- is the three 10-Ks.
22 Okay.
23         MR. WOLFSON: In looking then, your
24 Honor, at whether or not the company -- in looking
25 at the requirement, or one of the tests for

45

LORAL SPACE & COMMUNICATIONS LTD.
1
2  determining whether or not it's appropriate to
3  appoint an equity committee, is obviously one of
4  the key tests is that the debtor is not hopelessly
5  insolvent. And again I'm focusing on the
6  preferred shareholders. And the point of this
7  exercise was to take a look at the arguments that
8  were being made. And again the debtor not focused
9  the only parties that are asserting that the
10 company is hopelessly insolvent is the creditors
11 committee and the U.S. Trustee and both of them for
12 that proposition relied solely on two things, one
13 is the debtor it's publically reported book values
14 and secondly the trading prices of the bonds. And
15 I think that we've demonstrated that like go at the
16 adjustments that need to be made to the debtors
17 book values given the increased value from the
18 sale, the attribution of liability on a gain, which
19 it doesn't belong on that sort of an analysis for
20 this purpose, and the just moving I the liability
21 for the preferred stock out of the 705 million back
22 above the line. That demonstrates then on a book
23 basis the company has value 6 million dollars plus
24 in value on a book basis for the preferred holders.
25         You might also -- the court may also

take note that just as the assets that were being carried at book value turned out to be less than their fair market value requiring an adjustment of a fairly significant number from eight hundred million to a billion 1 problem about a 30 percent adjustment the other assets being carried on the books may also be that much understated a further indicia of their not being not focused --

THE COURT: Or they may be overstated.

MR. WOLFSON: Excuse me.

THE COURT: Or they may be overstated.

MR. WOLFSON: Well, okay. But so far the only test that they we have of that is this first group of assets that was sold were apparently sold for a higher amount, and we then have a public statement and the statement made to this court in response to the EchoStar offer to buy all of the assets for the billion 8 something, that that was woefully inadequate. We take all that together and this case does not look anything like the Williams case it does not look anything like those cases where equity case committees are business Williams





bonds were trading 10 cents on the dollar the equity committee did not say you do not appear hopelessly insolvent there was a mere possibility that if they commenced all sorts if lawsuits and all sorts of subordination that may be at the end of the day we would be able to squeeze out some value and Judge Lifland said even if you equitably subordinate all of their claims, they are still senior to you equity holders and you might increase the bonds from 10 cents to 20 cents you still have a long way to go.

We are not coming to this court and say the way we get value ask by being -- commence go address I have litigation. We are suggesting on based on values buying ascribed on publically filed information in the fact that the debtor is not taking the position that this is hopelessly insolvent that based upon the courts experience in this case, that it's those financial attributes which demonstrate that they are not hopelessly insolvent. We don't have to get into litigation to go anywhere. The next element having gone through the first four is the timing of the request; and that clearly is -- this clearly is an appropriate





time. The debtor, as we understand it, has -- anticipates issuing a business plan in two to three weeks. It then intends to discuss that, go over that and begin plan negotiations premised upon that.

Now is the time for an equity committee have to very quickly perform whatever due diligence they need to do get up to speed and prepared to participate in those discussions understand the business plan participate in the negotiations for a plan. That will avoid any sort of delays as Judge Lifland noted if you wait too long you are hands cuffed and you are not going to be able to negotiate it all becomes a fate acomply and I point out absent the appointing of an equity committee, the committee a creditors' committee, if they hold true to this form they are going to come to the court and suggest to you at confirmation or perhaps prior -- couldn't do it prior thereto, they are going to suggest prior thereto that equity gets wiped out and you've got 250 million dollars, of 237 million dollars of preferred equity value, and then you've got 44 thousand dollar shares of outstanding of common equity. And if this court





gets in what is clearly at least a close case, if not a clear case where we are already in the money, it's at least a closed case. Before the court has to react to and opine on wiping out a group of equity holders both preferred and common, it would seem to me that having the bin met of the adversary process to really contest that would probably be extraordinarily helpful to the court and the parties to coming to any sort of conclusion.

I would also note your Honor that -- and as your Honor is I think aware from experience, we have done this before. We have represented my firm has represented and I in my earlier firms have represented equity committees before they make a vast difference from the in the outcome of a case. In Western Union we represent billions and billions of dollars negative net worth. Well as here, the industry turned, and things turned around, and low and behold the creditors were paid in full with interest and equity preserved their position in this case. Similarly in Hexcel, a case that we represented an equity committee, also a New York stock exchange company, pending out in San Francisco, it was before Judge Chichofski. There

50

LORAL SPACE & COMMUNICATIONS LTD.

1
2 too, the creditors took the position that it was
3 hopelessly insolvent that we should not be given a
4 committee much less lawyer been paid important for
5 it lawyer for the committee. There too, by having
6 an equity committee early enough we actually went
7 out created a competitive environment we engaged
8 financial advisors we had the assistance we did a
9 rights offering, sponsored in part by some of the
10 equity holders and paid in full plus interest and
11 preserved eighty percent of the company for
12 existing creditors. You cannot do that. You
13 cannot fully and accurately and promptly represent
14 equity holders if you do not have an official
15 committee because nobody about will pay any
16 attention to you the court will listen to us under
17 1109(b) but if we need to go out and effectively
18 negotiate with the debtor similar alternatives and
19 full ability to maximize value to the estate
20 including to the shareholders as a matter of
21 practical reality you can't do it without the
22 statute afforded to you by having an official
23 committee. The down side of the committee and
24 there's only one down side to having a committee in
25 a case where it's close and the creditors'

51

LORAL SPACE & COMMUNICATIONS LTD.

1
2 committee is already tell telling you get ready for
3 a cram down and wipe out the only downside is a
4 little bit of cost.
5     In absolute terms, it's a fair
6 amount of the -- this is not an inexpensive case.
7 We represent 237 million dollars worth of preferred
8 shareholders in a liquidation preference. This is
9 a classic billions of dollars of assets and
10 liabilities. It is going to professional fees in
11 an absolute term are substantial. I'm not going to
12 deny that. But in relative terms it's nominal.
13 It's nominal in terms of the investment we are
14 trying to protect it's nominal in comparison to the
15 amounts being spent by the debtors creditors'
16 committee and the amounts being charged by the
17 estate by the secured creditors one once the
18 secured creditor are paid off in a few weeks the
19 only thing between us and being crammed down is
20 really the creditors' committee.
21     The creditors' committee is now
22 going to be controlling the if shots. They will
23 negotiate with the debtor. They will put pressure
24 on the debtor to wipe us out. The debtor will
25 possibly fight for a little bit of a warrant, an

52

LORAL SPACE & COMMUNICATIONS LTD.

1
2 out of money warrant, and that's it. That's a
3 typical case. And I think the experience dictates
4 that when you are this close and you have a
5 preferred shareholder committee we will get a fair
6 greater return without being litigious, unless
7 necessary. You know, they can laugh all they want
8 but we learned a long time ago and I don't get more
9 business in these cases by just being the classic
10 terrorist. Those days are over the days of just
11 coming in and objecting don't get you anywhere you
12 need to have an exostrategy. We are able to do
13 that; we did it professionally we do it
14 economically and economically and it works and gets
15 value for the entire estate.
16     So we think, your Honor, in looking
17 at the standards here and we recognize what the
18 cases and such as Williams and others state. This
19 case squarely falls in there an equity a committee
20 certainly a committee ought to be appointed the key
21 issue it's not insolvent I think that's been
22 demonstrated and I think the cost issue is really
23 normal to the interests that need to be protected
24 here.
25     My final point is in response to

53

LORAL SPACE & COMMUNICATIONS LTD.

1
2 your Honor's inquiry to Mr. Yetnikoff. We believe
3 what would be most appropriate here would be to
4 have a separate equity holders committee, whether
5 you appoint a common committee or not. If your
6 Honor is only prepared to direct the appoint of a
7 single committee and that single committee be a
8 joint committee then we do believe, given they are
9 that we are still 237 million dollar preference
10 ahead of the common, that it should be on the basis
11 that the majority of that committee be represented
12 by preferred shareholders.
13     We are not prepared to leave our
14 fate to the hands of common who have a lot more
15 fighting to do to get into the money than we do. I
16 think it's a very different dynamic when you are
17 representing the way out way of common than the
18 preferred shareholders and not fair to have a
19 committee stacked with common and rely on them to
20 get us paid.
21     THE COURT: What's your response to
22 the point which I expect someone will make that if
23 the cost really is nominal, given the amount at
24 stake, that the new preferred shareholders who you
25 represent would have roughly 25 percent of 237

54

LORAL SPACE & COMMUNICATIONS LTD.

1. LORAL SPACE & COMMUNICATIONS LTD.
2. million at stake, could pay for it themselves?
3. MR. WOLFSON: I was very careful to
4. say it's nominal to relative terms, it's not
5. necessarily nominal in absolute terms, it's many
6. hundreds of thousands if not millions of dollars to
7. represent a committee of this nature. There's no
8. disputing this if I was to suggest to the court
9. otherwise you wouldn't believe me. And for
10. individual preferred shareholders to who risk a
11. batter with the committee who is telling them you
12. are out of the money you are getting wiped out for
13. them to spend out of their own pocket a million
14. dollars or so is a lot of money and not likely to
15. happen.
16. On the other hand, it is normal
17. relative to the says of this case the
18. administrative expenses of this case and all the
19. professional fees being paid out. The other
20. problem in individuals again even more so than the
21. than the money, the one thing that I have learned
22. over the years of doing this is having the official
23. stage which you are makes a deference, that is why
24. these people don't want us to have the committee
25. they are not fighting or objecting to us because

55

1. LORAL SPACE & COMMUNICATIONS LTD.
2. it's going to cost us a million dollars in fees
3. that's not what it is about in a billion dollar
4. case they don't want to let us have standing in
5. this case because it gives the empowerment to do
6. what needs to be done. For us to go out in and
7. negotiate meaningfully in a represent all the
8. preferred shareholders and being able to look at
9. alternatives, you just need that official status.
10. It's hard to quantity exclusive period how
11. important that is; but it is truly very important.
12. THE COURT: At the hearing on
13. exclusivity, the debtor, and I think you looked
14. into this also, the debtor said they hoped to have
15. the business plan as revised out to the parties in
16. the next few weeks and get down to plan negotiation
17. in the first quarter preferably January or
18. February.
19. MR. WOLFSON: Correct, correct.
20. THE COURT: If a committee were
21. ordered by me and certainly it would be appoint the
22. and get organized over the next couple of weeks,
23. when would the professionals for the committee in
24. your view be ready to participate meaningful in
25. negotiations.

56

1. LORAL SPACE & COMMUNICATIONS LTD.
2. MR. WOLFSON: On I think on that
3. time table I think we should be able to. If a
4. committee is able to be appointed mid December and
5. he can select counsel mid December and start
6. negotiations mid-January end of January we would be
7. able to do that.
8. THE COURT: Has Channon done due
9. diligence?
10. MR. WOLFSON: Your Honor I don't
11. know that Channon -- I don't know if the commit
12. exclusive period is going to select Channon. Not
13. withstanding the colloquy here has at our request
14. only done extracting information of from public
15. document because they have spreadsheets. But my
16. representation to the court would be this committee
17. if we were representing the committee we are not
18. going to seek a delay if we can get appointed and
19. going forward promptly. We've handeled cases far
20. larger in less time than this. But we think if we
21. get up and running now by the time the business
22. plan could you please out in the next couple of
23. weeks, have meetings understand the business plan,
24. we will be up and running without much problem.
25. And hopefully you know both the

57

1. LORAL SPACE & COMMUNICATIONS LTD.
2. debtor and the creditors committee, to the extent
3. they can share information and help smooth the path
4. and help an equity committee get up to speed, that
5. too would be productive and help matters.
6. THE COURT: So Channon has not
7. represented Aspen to date?
8. MR. WOLFSON: Correct.
9. THE COURT: Okay. Thank you.
10. MR. BOTTER: Your Honor, although I
11. think both the debtors and credit first committee
12. would both like to respond, I notice Mr. Christ who
13. is in the court and may make sense to take off
14. positive.
15. THE COURT: I agree. Mr. Christ if
16. you can come up.
17. MR. CHRIST: Thank you.
18. I representing the stockholders
19. protective committee, to correct debtor and
20. creditors' responses. I don't know we were heard
21. the first time because I don't think I filed it in
22. the right time, but the judge allowed us to speak.
23. So I guess this is the first time formally heard.
24. We represent a little over one percent of the
25. public shareholders. I had a conversation with Mr.

58

```
 1        LORAL SPACE & COMMUNICATIONS LTD.
 2   Herash who holds 10 percent, and he's told me I
 3   don't represent him, so I don't represent him. But
 4   I will say it's my belief that by inferences -- it
 5   goes without saying that we represent all the
 6   shareholders. And given the alternative of being
 7   extinguished, or the greater likelihood without
 8   representation, I can't imagine anyone, even the
 9   single shareholder from anyone, who wouldn't be
10   represented here as a matter interest, even if they
11   are unable to come physically here.
12            I came into town yesterday, I had a
13   funeral actually yesterday. My aunt passed away in
14   Brooklyn. She has had a row-house there since
15   1950, and we had to bury her, bring my mother up,
16   it set her back. She was an immigrant that
17   survived the Christian Holocaust, that predated the
18   Jewish Holocaust by some 20 years.
19            They came over here. They were --
20   she was the last one in that group, in the mid up
21   upper 80s, and they came over here for freedom.
22   And freedom is vested in personal property. And
23   unfortunately it left me with a car in Manhattan.
24   And to be honest with you, I'm ambivalent, given
25   the choice of finding my car or prevailing at this
```

59

```
 1        LORAL SPACE & COMMUNICATIONS LTD.
 2   hearing, I'm not sure which way I would go.
 3            THE COURT: Well, to save you some
 4   time, you should assume I've read your papers, so
 5   you don't need to go over that ground.
 6            MR. CHRIST: I would like to thank
 7   Mr. Wolfson for his incitefulness of pulling things
 8   together a lot of things, and Mr. Yetnikoff and I
 9   were pointing at, and the third quarter Q was a
10   little disturbing to me in other senses because the
11   loss was twice what everyone expected. And I'm a
12   bit still caught up with the point we're being
13   convinced that the debtor is acting in my best
14   interest, although the debtors response stated it
15   less than no less than three times and the
16   creditors stated once I think the creditors
17   referred to Mr. Zahler's affidavit in which he
18   stated he had a million and a half shares and I
19   guess I keep going back to the potential conflicts
20   and the shareholder wouldn't be an asset in this
21   product process, is a million and a half shares is
22   a lot of money by the executive committee and
23   Loral, but it totals maybe 30 cents a share,
24   roughly a half million dollars or less. And when
25   the same committee, and I'm not sure it's exactly
```

60

```
 1        LORAL SPACE & COMMUNICATIONS LTD.
 2   is paying themselves five million, they can recoup
 3   that on a monthly basis.
 4            So theoretically if we are just
 5   looking at dollars and cents you could say we will
 6   do I want to get the shares to go up or do I want
 7   to get paid a few more months there would be a
 8   conflict there it makes me a little uncomfortable
 9   and that's in addition in a to the other thing I've
10   already cited all that could be released if I think
11   if we are allowed some visibility including to see
12   the sealed documents that were put into the court,
13   because when you considered this consider miss this
14   Q you just want to gag yourself when you see the
15   results of the quarter, and you just wonder if they
16   are concocting a plan that presumably has projected
17   earnings and all these good things, why the
18   shareholders can't have visibility to that.
19            Well -- and I was reading Barons on
20   the way up here and Warren Buffet invested in a
21   bankrupt company, apparently Sidel, and because it
22   was a lack of projections, the judge -- it was
23   apparently a Delaware bankruptcy, as of December
24   2nd, has allowed the stockholders and their
25   attorney to put forth a plan in that proceeding.
```

61

```
 1        LORAL SPACE & COMMUNICATIONS LTD.
 2   and that's in this week's Barons, and that plan is
 3   scheduled to have been put forth tomorrow in
 4   Delaware in that proceeding. And it was over
 5   apparently the point that they were going to be
 6   able to use projections projected to help justify
 7   the value.
 8            I imagine in the moment you'll hear
 9   from the debtors and the trustee hold the company
10   is not hopelessly but at least still insolvent, and
11   I flipped on this and I looked at the same Q a lot
12   of times, and I keep going back and forth on this,
13   and I have to -- I have to admit that I almost have
14   been swayed the other way, I almost think that
15   there may not be adequate equity. But I do know to
16   have ownership involved in a process like this
17   can't hurt it. And I called Tokyo a couple of
18   times on my own, it won't go on in perpetuity of my
19   own, but I talked to Sony Corp. and tried to get
20   them over here. And I haven't seen anybody over
21   here try to get some live people with substantial
22   equity or half a billion or a billion dollars, and
23   I think those kinds of efforts can only help
24   whatever the end conclusion of this is.
25            So for those reasons and, I hope
```

62

LORAL SPACE & COMMUNICATIONS LTD.

1
2 Judge, I know it's a rare thing, but I hope it's a
3 go you go along with it give us an equity plan.
4        THE COURT:  Okay thank you.
5        I'm going to take a five minute
6 break.
7        (Recess taken.)
8        THE COURT:  Please be seated.
9        MR. ROTHMAN:  Good afternoon your
10 Honor, Richard Rothman from while got and man for
11 the debtors.  I said a little earlier that I didn't
12 think the opinions being voiced by Mr. Wolfson
13 would make a difference, and I'll tell you why.
14 What's most striking to me having listened to the
15 presentations both what you heard and what you
16 didn't hear; firstly all, there was no reference to
17 what the statute actually says.  Section 1102 --
18 1102(a)(2) provides that the court may provide the
19 appoint of additional committees if he is necessary
20 to ensure adequate representation of equity go and
21 present.
22        As Judge Gropper stressed in the
23 Kasper decision last year the operative word is
24 necessary to assure adequate representation which
25 is necessary which applies a reject the strict

63

LORAL SPACE & COMMUNICATIONS LTD.

1
2 standard.  He then went to on to say that the
3 second operative word in the statute or term is
4 adequate representation.  He made clear as have the
5 other courts that have looked at this issue that
6 the burden to prove is on the moving parties to
7 establish that a separate committee is required to
8 provide adequate representation, page 69.
9        We have no burden to prove here.
10 This is a fact intensive inquiry in which the
11 moving parties had the burden to show that a
12 separate committee with all of the costs and
13 burdens that they bring along was necessary that it
14 was required to assure adequate representation.
15 They have put in no proof there's been a complete
16 failure of proof on this motion.  So when Mr.
17 Wolfson to stand up and say he was dumbstruck by
18 the fact that we didn't put in an affidavit, is
19 somewhat bazaar.  They didn't put in any cognizable
20 evidence other than evidence which shows on its
21 face that the company is insolvent:  Kasper, in
22 which the court refused to appoint a committee is
23 consistent with the prior case law.  And what that
24 case law reflects is that where we are necessary,
25 committees serve a purpose.  But they also impose

64

LORAL SPACE & COMMUNICATIONS LTD.

1
2 significant cost.  Monetary costs as well as
3 burdens and impediment on the smooth operation of a
4 bankrupt estate which is already difficult,
5 particularly in a complex business such as this.
6 That is why the law makes clear that equity
7 committees are an exception a rare exception.
8 Indeed if you listen to Mr. Wolfson even where it
9 looks like everybody is way out of the money that
10 you neither need an equity committee in every case,
11 but that isn't the law it's clearly not the law.
12        Now, Mr. Wolfson said that the cost
13 is nominal, in a relative sense, cost here would
14 not be nominal in any sense, if you look at what
15 the costs have been to date in a Chapter 11
16 proceeding which has been laden with litigation,
17 and I'll come back to that later, you will see that
18 the cost of adding a committee would be very
19 substantial by any measure, not only because they
20 would be involved in the various litigated motions
21 and proceedings, but because each time they were to
22 instigate something you would have an expediential
23 inquiry as well as all the other parties who were
24 being paid for by the debtors would have could
25 become involves as well.

65

LORAL SPACE & COMMUNICATIONS LTD.

1
2        Now in their brief, the preferred
3 shareholders cited to the Williams case when they
4 purport to do tell the court what the standard was.
5 And what they said and what the Williams case said
6 is different from what you've heard today.  What
7 they said and what Williams said is that a
8 committee should be appointed if the movants can
9 show two things; one is that there is a
10 "substantial likelihood that equity will receive a
11 mink full distribution" not whether the debtors are
12 merely hopelessly insolvent.  If you were to ledge
13 to the parties who spoke today, you would think
14 that as soon as you find the that debtors are not
15 hopelessly insolvent, Bingo, we appoint a committee
16 but that's not what the law cited in their own
17 brief says.  The issue is whether or not they have
18 carried their burden, their burden of proving that
19 there's a substantial likelihood of a mining full
20 recovery by equity.  They haven't been put in one
21 iota of proof in order to carry that burden, nor
22 could they.
23        The second requirement is to show
24 consistent with the statute that their interests
25 are not adequately represented and that they are

66

LORAL SPACE & COMMUNICATIONS LTD.

1   LORAL SPACE & COMMUNICATIONS LTD.
2   unable to represent their interest in the
3   bankruptcy without an official committee. Here,
4   they haven't shown either branch. They haven't
5   shown that there is a substantial likelihood of
6   mining full recovery and they currently certainly
7   haven't shown that their interests aren't
8   adequately protected and that the management of
9   this company is not fulfilling its duty to equity
10  in order to look out for those interests. In fact,
11  we heard nothing about management in this case, all
12  we heard because was an advertisement for a law
13  firm which has apparently done this before and
14  tries to go around and get equity committee
15  representation.
16          There is no group whatsoever that
17  the interest of these shareholders in this case are
18  not adequately represented. In fact, I would
19  submit to you that if you look at their papers and
20  listen to what they have said, they have in fact
21  proved the opposite. They have proved and all
22  their papers show is their interests have been and
23  continue to be adequately protected. Why do I say
24  that? They were here once before in September, and
25  they claimed then that a committee was necessary to

68

1   LORAL SPACE & COMMUNICATIONS LTD.
2          Now, as to the question of whether
3   or not there is a substantial likelihood of refer
4   recovery, I didn't hear anybody say that. I heard
5   Mr. Yetnikoff said if the company turns around
6   which would be a radical thing, then they would be
7   in the money, we heard Mr. Wolfson talk about the
8   book value, and incidentally, we were objecting to
9   what we thought was testimony, and one of the
10  things -- one of the reasons is whether a lawyer
11  walks in and purports to take one number from page
12  nine 23 and move it to page 23 and start adding and
13  subtracting, who knows what's going on. But for
14  example, he opined that the book gained on the sale
15  of Intelsat assets I'm looking at one of his
16  handouts is 261 million dollars. From what we can
17  tell, he didn't factor in the expenses of the sale
18  nor did he factor in the insurance proceeds. So,
19  you know, without even looking, and again, we're
20  not in a position here and I don't think we need to
21  put on evidence here today, because as I've said
22  before it's not our burden, but that's just based
23  on two minutes of looking; what it shows is that
24  the unless but forward by a lawyer is effective
25  worthless and shouldn't be considered at all. All

67

1   LORAL SPACE & COMMUNICATIONS LTD.
2   represent their interests and then they filed a
3   renewed motion and now we're here we a supplemental
4   motion. So what is the proof that a committee
5   should be appointed. Well, the main element of
6   proof what from what I can tell, is that brought of
7   the actions taken by the management of this
8   company, including the Intelsat sale and including
9   its success in obtaining orders and keeping this
10  company intact and keeping employees on board at an
11  extremely difficult time so that SS/L could hang in
12  there and be in a position to move forward and fill
13  the orders that because those actions of
14  management.
15          This company is better off than it
16  was three or four months ago and that the
17  management of this company who is taken it from a
18  position where it was on the bring of death to the
19  point where they now say and with some merit, we're
20  doing a lot better and the prospects for this
21  company are much better. But all that they have
22  shown is that the management of this company has
23  done an excellent job in a way which has furthered
24  the interests of equity. And put equity in a
25  position where there just may be some recovery.

69

1   LORAL SPACE & COMMUNICATIONS LTD.
2   we know it is clear that even if you take his
3   opinion, it's wrong on its face number one. And
4   even if you were to credit it completely, what it
5   could you please out to on the bottom line is to
6   say there would be a six million dollar positive
7   number in terms of book value, at the same time
8   that everybody acknowledged that book value is a
9   good reflection of actual value and that wouldn't
10  show anything approaching a substantial likelihood
11  of a meaningful recovery on the kind of investment
12  we are talking about here.
13          So on a first prong of the standard
14  that they have put forward to this court, there has
15  clearly be a failure to prove a substantial
16  likelihood for a meaningful recovery.
17          THE COURT: Let me stop you there.
18  Are the new orders that were described at the
19  hearing on the sale on to Intelsat, are those
20  reflected in the September 10-Q, the value of those
21  new orders.
22          MR. ROTHMAN: I don't know your
23  Honor. One second.
24          MR. BOTTER: Your Honor, I believe
25  that they were entered into as of September 30th.

70

LORAL SPACE & COMMUNICATIONS LTD.

1       THE COURT: I didn't think so I just
2 wanted to make sure.
3       MR. ROTHMAN: Your Honor, I don't
4 think that anybody is disputing that this company
5 is doing better. Indeed we are proud of it. We
6 think, as I've said, that what they have shown
7 which is true, that the management of this company
8 has done an outstanding job an extraordinarily
9 difficult market operating in a bankruptcy. Now,
10 do we think that there's some hope of recovery for
11 equity? Absolutely, and that is the goal of this
12 management do we hope it's true are they working
13 for that? Are they working tire Leslie for that?
14 Absolutely. But were anybody is it here and say or
15 stand here and say that there is a substantial
16 likelihood at this point in time of a means full
17 Referee? No. That was their burden and they
18 haven't shown it. Moving to the second prong of
19 this test.
20       THE COURT: I'm sorry, before you do
21 that --
22       MR. ROTHMAN: Sure.
23       THE COURT: -- do the schedules
24 reflect the roughly 214 million dollar liability

71

LORAL SPACE & COMMUNICATIONS LTD.

1 that Mr. Wolfson said should be ignored?
2       MR. ROTHMAN: I don't know your
3 Honor. Again if we had some notice we would have
4 had notice to all these questions. We just don't
5 know. Let me move to the second wrong prong,
6 because I believe that that should dispose of this
7 in any event. Even if they had presented
8 cognizable proof of a substantial likelihood of a
9 meaningful recovery they failed to prove that the
10 appointment of an of another committee is likely.
11       There is no proof that the
12 management of this company has not fulfilled its
13 duty to respect and seek to further the interests
14 of equity here. They have not pointed to a single
15 thing that was done over the course of the past six
16 months or at any time which was contrary to the
17 interests of equity they haven't put on a witness,
18 they haven't put in a document, they have done
19 nothing and again they have proved the opposite.
20 They stood her and said we have a much better
21 chance of recovering since you denied our motion
22 than we did before.
23       THE COURT: What about their point
24 that management, just as it has duties to

72

LORAL SPACE & COMMUNICATIONS LTD.

1 everybody, is not -- without criticizing
2 management, it's not well situated to negotiate a
3 plan on their behalf.
4       MR. ROTHMAN: I wanted to take that
5 up specifically, because when you cut through it
6 all that's really their only argument. From what I
7 can tell, that is their argument because under the
8 law you have what is called a duty to both
9 shareholders and to creditors. You cannot
10 adequately represent us -- well, that argument is
11 wrong in several respects.
12       First of all it's wrong on the law
13 and it doesn't make a lot of sense. If the law
14 didn't contemplate that a debtor could fulfill its
15 duty, a duty to both shareholders and creditors, it
16 wouldn't impose it. That wouldn't be the law. It
17 would say that that's an oxymoron. You can't serve
18 two masters, and that's not what the law says. It
19 says that the debtor has an obligation to the
20 various constituencies of the debtors, including
21 the creditors and the shareholders. And this is a
22 perfect case where the debtors have religiously
23 abided by and fulfilled that duty.
24       Their argument was made and

73

LORAL SPACE & COMMUNICATIONS LTD.

1 rejected, I should also add, in the Edison case.
2 It was a decision, I'll give you the site your
3 Honor by Chief Judge Robinson in Delaware 1996 WL
4 Westlaw 53 4853, 1996. And it was precisely the
5 argument that was made here which Judge Robinson
6 rejected. I'll read you a little bit. Chief Judge
7 Robinson said as follows: "The appellants argue
8 that an equity committee is needed because there
9 are 'inherent' conflicts of loyalty which render
10 inside shareholders 'legally incapable' of
11 representing the interests of public shareholders"
12 and I'll omit the cite. "Appellants point to the
13 fact that in a bankruptcy context, the directors
14 owe a fiduciary duty not only to shareholders but
15 also to creditors. Based on this assertion,
16 appellants argue that the 'debtors management in
17 this case or any other bankruptcy case as a matter
18 of law cannot exclusively advocate for the interest
19 of the shareholders, particularly as against
20 creditors.' Next paragraph. While appellants may
21 be correct in their observation that management
22 cannot exclusively advocate interest exclusively
23 advocate for the interest of the shareholders, the
24 statutory focus at Section 1102(a)(2) is not

74

LORAL SPACE & COMMUNICATIONS LTD.

2  whether shareholders are exclusively represented,
3  but whether there are 'adequately represented.'
4  Until Congress recognizes that an inherent conflict
5  of interest exist between management and public
6  shareholders in a bankruptcy context that warrant
7  the mandatory appointment of an equity committee,
8  the statutory test remains adequate of
9  representation to be determined on the facts of
10 each case."
11     So that's the law. And if it were
12 to the contrary, again you would have an equity
13 committee in most cases, but it's not the law. The
14 appointment of an equity committee is a rare
15 exception which is to be ordered in the discretion
16 of the court when the facts of a given case it is
17 clear that the appoint of a committee is necessary
18 as required to adequately protect the interests of
19 equity. And so we turn back to the facts of this
20 case and the evidence that has been presented by
21 these movants in order to discharge their burden.
22 And the answer is zero. No evidence.
23     Now, when I say no evidence, I mean
24 they have identified no act taken by the debtor,
25 they pointed to know interest in any evidence

75

LORAL SPACE & COMMUNICATIONS LTD.

2  recognizable way to show that management is not
3  protecting or looking out their interests, and
4  indeed as I've said, the evidence shows to the
5  contrary, the evidence shows that they have
6  effectively proved that management has advanced
7  their interests. And in fact your Honor, you have
8  seen Mr. Schwartz. You've heard him testify and
9  you have seen and you have heard Mr. Zahler
10 testify.
11     These people, are working with as
12 much skill as anybody has in this industry to turn
13 this company around. Their goal is not to simply
14 pay off creditors and throw all of the equity down
15 the tubes, including I might add their hone. Their
16 goal is to fulfill their duty to creditors and to
17 the equity holders and there has not been one iota
18 of proof that that's not exactly what they have
19 done and on that basis alone this motion should be
20 concerned.
21     Now, I would also assert your Honor,
22 that the appoint of an equity committee here will
23 in all likelihood serve only to harm these estates,
24 not only by creating a significant drain on the
25 assets of the estates, and as I said before, that's

76

LORAL SPACE & COMMUNICATIONS LTD.

2  not just the money that they spend it's the money
3  that they are going do cause others to have to
4  spend with whatever activities they engage in. And
5  we've seen that they are not shy. And in order to
6  get a sense as to why this motion is misguided, I
7  would suggest that we look back at the last few
8  months and look at what's happened since you denied
9  the motion the first time. As I said before, they
10 claimed in September that an equity committee was
11 necessary in order to protect their interest. Well
12 what has happened since then? First of all, we had
13 the Intelsat sale. What would they have added to
14 that process other than --
15     THE COURT: All right. That's in
16 the past. Let me ask you this question. Do you
17 think it's practical to say that a committee can be
18 appointed with the sole responsibility of
19 participating in plan negotiations, not reviewing
20 actions out of the ordinary course, not doing any
21 of the other listed items that a committee may
22 under 1103 of the Code do, but simply participating
23 in plan negotiations.
24     MR. ROTHMAN: In other words they
25 would have no role except and until plan

77

LORAL SPACE & COMMUNICATIONS LTD.

2  negotiations?
3     THE COURT: They would obviously
4  will have to get up to speed and there would be
5  some cost in that but I'm assuming it that it will
6  be simply to insult takes with your investment
7  advisers and your investment advisors to do their
8  own analysis enable them to do an analyses of a
9  plan that would be proposed by the debtors.
10     MR. ROTHMAN: Your Honor could I
11 defer answering that to for a few minutes, I would
12 like to consult before I do that. I think it's a
13 significant question.
14     THE COURT: Okay.
15     MR. ROTHMAN: Okay. The --
16     THE COURT: Any way I understand, I
17 understand Your, Honor point about the cost and the
18 focus on what might have happened if a committee
19 had been appointed up to date.
20     MR. ROTHMAN: Not just the cost.
21     THE COURT: Well, the delay the
22 confusion.
23     MR. ROTHMAN: This is an extremely
24 complicated business. It's complicated and
25 difficult from a committee standpoint it's

78

LORAL SPACE & COMMUNICATIONS LTD.

1    complicated from a regular standpoint the for
2    example, for instance if you who look at what
3    happened in the APT situation. And by the way, if
4    you want to get a sense of the costs; in the
5    Intelsat litigation, the cost of the bank from what
6    I understand were about eight hundred thousand
7    dollars of cost to the committee, and I'm not
8    saying this in a critical way, I'm just saying this
9    is what life is like when the these types of
10   situations occur, and here they have occurred more
11   than once. The cost of the committee was something
12   in the order after of a million dollars.
13        So for the equity holders to say oh
14   well maybe we are talking about several hundred
15   thousand dollars a million dollars. It's nonsense
16   we are talking about millions of dollars and we are
17   talking about the an ad added cost that would flow
18   therefrom.
19        But going to the ATP situation what
20   you've seen is there and see elsewhere is
21   navigating through this regulatory environment in
22   the context of a bankruptcy is difficult enough.
23   So to add another cook in the kitchen to will make
24   I that much more difficult, and beginning, what

80

LORAL SPACE & COMMUNICATIONS LTD.

1    all know, under the Code Section 503(b), to the
2    extent that they want to participate and they can
3    show that they have added substantial value, they
4    can obtain compensation.
5        One other thing, your Honor, and in
6    is that I think the schedule that's been talked
7    about for the plan negotiations is not quite as
8    represented or asserted by the movants counsel. I
9    understand that it's a little bit further down the
10   line. Ms. Fife can talk about that. But, let's go
11   now to the bottom line. They have completely
12   failed to show that they have been hurt in any
13   respect or that their interests haven't been
14   attended to in any way by the denial of the last
15   motion for by anything that's going on today. I
16   don't mean that only lawyers arguments I mean
17   evidence. There's a complete failure of proof on
18   this motion.
19        Second, they couldn't point to any
20   action that the management of this company has
21   taken that was not a reasonable exercise of the
22   judgment of this company, judgment of the
23   management that under mind their interest in any
24   way. In fact, they put in living color that the

79

LORAL SPACE & COMMUNICATIONS LTD.

1    they haven't proven other than the advertisement
2    for Sonnenschein is they have anything substantial
3    to add. And I the reason I say to look back is
4    relevant is we haven't seen anything to date that
5    they would have done or added that was different we
6    haven't seen anything to date that has been done
7    that hurt their interests.
8        Now, the Kasper case which I
9    referred to earlier decided in July of this year, I
10   think is instructive. Because there as here, the
11   debtors started out as hopelessly insolvent and the
12   situation improved. And a motion was made to
13   appoint an equity committee just as here, in fact I
14   think someone saying firms may have been involved.
15   But there was no evidence there just as here that
16   the debtors had ignored their duty to the equity
17   holders.
18        And similarly, there are as here,
19   the debtors -- the equity holders had failed to
20   show, particularly the referred, that they needed a
21   committee. And the judge pointed out that they
22   were vocal and they could object to the plan when
23   they were -- when the plan was proposed they could
24   vote against it they could object to it, and as we

81

LORAL SPACE & COMMUNICATIONS LTD.

1    management has furthered their interest. We would
2    submit that there should be no equity committee at
3    all, unless and until they can make a showing not
4    only that there's a substantial likelihood of a
5    meaningful recovery by equity that but that the
6    management is not acting in the interest of equity
7    consistent with their fiduciary duty and that they
8    have something substantial to do that. They have
9    not done that.
10       THE COURT: What about Mr.
11   Yetnikoff, Mr. Yetnikoff's point, and Mr. Wolfson
12   echoes it? The debtor and its professionals are
13   just not going to talk to them and won't negotiate
14   anything.
15       MR. ROTHMAN: What I would say to
16   you to that is we will talk to them we will provide
17   information in fact Ms. Fife had a dialogue with
18   one of the movants counsel and I will say to you
19   today that is something that we will do, and I
20   think that is all they need.
21       MS. FIFE: Your Honor, if I may. I
22   have a discussion with the attorneys for the
23   preferred stockholders last night and agreed that
24   subject to an appropriate confidentiality agreement

**82**

LORAL SPACE & COMMUNICATIONS LTD.

1  LORAL SPACE & COMMUNICATIONS LTD.
2  we would provide them with the business plan and in
3  addition we would make management available to them
4  to address any of their issues and concerns.
5      And in light of that I think the
6  answer to your earlier question is it's not
7  necessary to appoint a committee in order to have
8  the preferred participate in the negotiations of
9  the of a plan of reorganization. Because we are
10 perfectly willing to do that with them individually
11 and give them the information that's necessary in
12 order to enable them to that. And if they do in
13 fact create value and need the substantiation of
14 503(b), they would be awarded compensation from the
15 estate.
16     THE COURT: Okay.
17     MR. ROTHMAN: I have nothing
18 further.
19     MR. BOTTER: Good afternoon your
20 Honor. David Botter, of Akin Gump Strauss Hauer
21 and Feld on behalf of the official creditors'
22 committee.
23     Your Honor, I was going to take a
24 walk through some of the changed circumstances from
25 two months ago to, today but I think we all know

**83**

LORAL SPACE & COMMUNICATIONS LTD.

1  LORAL SPACE & COMMUNICATIONS LTD.
2  what they are; the IntelSat sale happened, or an
3  order approving the sale has been entered. The
4  terms of increased value we are only talking about
5  25 million dollars of increased value from the
6  auction of those assets. We also talked about or
7  have heard a lot about the SS/L new contracts. And
8  the committee has said on more than one occasion
9  that those are good things, that those are happy
10 events for these estates, but they're contracts,
11 and they are contracts for the debtors to provide
12 services. And we've heard about 25 million dollars
13 times 3 with respect to the DIRECTV and PanAmSat
14 contracts, but those are deposits, your Honor.
15 They are just deposits. And we've heard that the
16 contracts are commercially profitable contracts for
17 the debtors. But that doesn't add hundreds of
18 millions of dollars of value to the SS/L estate,
19 they are just contracts for the debtors to produce
20 something and there will be a profit margin
21 associated with the debtors producing new
22 satellites, but again, it's not hundreds of
23 millions of dollars.
24     I think, your Honor, what we should
25 do today is focus on the facts that are in the

**84**

LORAL SPACE & COMMUNICATIONS LTD.

1  LORAL SPACE & COMMUNICATIONS LTD.
2  record before this court today. There are
3  publically filed documents. There are Ks and Qs
4  that are going to be in the evidentiary record
5  today. And if you look at those Ks and Qs, you
6  will see that the debtors aren't solvent based upon
7  those Ks and Qs.
8      And Mr. Wolfson, as we all probably
9  like to think, has fairly good financial savvy.
10 And as bankruptcy practitioner, I think, by hanging
11 around all the banking firms, we all get to know a
12 little bit about how to read a balance sheet and
13 the ins and outs. But Mr. Wolfson can't testify as
14 to facts today; he can only -- we can only take a
15 look at the evidence that's properly in the record
16 today. And if you look at the September Q, you see
17 that these debtors are insolvent by a factor of 7
18 hundred million dollars.
19     Now it's true that Mr. Wolfson
20 pointed out some issues on the liability side of
21 the balance sheet, but your Honor I think stated
22 before that there may be some things on the asset
23 side of the balance sheet overstated too. If you
24 look at the asset side of the balance sheet, we
25 have 1.8 billion dollars of PP&E. We all know,

**85**

LORAL SPACE & COMMUNICATIONS LTD.

1  LORAL SPACE & COMMUNICATIONS LTD.
2  we've all seen assets of PP&E type assets being
3  substantially overstated on balance sheet.
4      So while I can look at this balance
5  sheet and point out some issues as well, at the end
6  of the day I'm not going to testify, and your Honor
7  can't consider what I'm saying as part of the
8  evidentiary record. All your Honor really should
9  be considering is that on the assets side of that
10 balance sheet, which is on page 4 of 112, as Mr.
11 Wolfson pointed out, you have 2.45 billion dollars
12 of assets. On the liability side of the balance
13 sheet, you have over 3 billion dollars of
14 liabilities. To me that's insolvent. And that's
15 the evidence that's in the record today.
16     And in fact, your Honor, that
17 evidence was in the record in September when we
18 considered the very same issue.
19     THE COURT: That does include the
20 preferred -- you agree with that.
21     MR. BOTTER: Your Honor, if it's
22 appropriate to deduct it out you get down to 2.9
23 billion dollars of liabilities, so you are talking
24 about five hundred million dollars of insolvency
25 and it's still substantial.

86

LORAL SPACE & COMMUNICATIONS LTD.

1
2  THE COURT: I'm sorry. Ultimately
3  this isn't that important, but don't you get down
4  to 2.6 something, doesn't it go down to from 2.9
5  you take away 225 million and you get down to 2.6.
6  MR. BOTTER: Your Honor, I thought
7  that the number I had total liability was 3.56
8  billion -- I'm sorry your Honor, that's right that
9  includes if you go to 2.9 you get to 2.6 still
10  almost 2 hundred million dollars out of the money.
11  THE COURT: Okay.
12  MR. BOTTER: Your Honor even if you
13  were to form an Intelsat sale and the assets, Mr.
14  Yetnikoff says that the assets are 3 hundred
15  million dollars off the book you are still out of
16  the money. What is also in the record and I think
17  your Honor we all agree that bond price are what
18  they are and I think we all agree that the bond
19  prices were 75 cents either yesterday or today, on
20  the Orion bonds and 42 cents on the LTD bonds. If
21  you add up those numbers, your Honor, you're
22  talking about a total solvency gap of 321 million
23  dollars. And I don't believe, that if you add up
24  those numbers and take them into account post
25  petition interests that would be required on 1.7

87

LORAL SPACE & COMMUNICATIONS LTD.

1
2  billion dollars of claims that come before the
3  preferred and certainly come before the common.
4  Those are the facts that are in the
5  record today. Mr. Wolfson, and Mr. Yetnikoff had
6  have argued that the creditors committee is the
7  only thing that stands in their way. And I
8  think -- well, the creditors' committee is 7
9  members but we do represent 1.7 billion dollars of
10  debt.
11  But I think that there is another
12  person that stands in their way of the creditors
13  committee cramming down a plan that's inappropriate
14  over the objection of equity, and I think that's
15  your Honor. If we were to come in and we were --
16  had a wonderful situation and that wonderful
17  situation said that 1.7 billion dollars 6 unsecured
18  claims were being paid in full with appropriate
19  post petition interests and there was not one penny
20  above those amounts which would probably be almost
21  2 billion dollars in interest, therefore common is
22  entitled to nothing, I think your Honor would
23  require that we satisfy -- we and the debtors
24  satisfy our evidentiary burden of cramming down
25  such a plan over the objections of equity. And

88

LORAL SPACE & COMMUNICATIONS LTD.

1
2  part of that evidentiary burden would be to
3  demonstrate that in fact the value only justified
4  the distributions to the creditors and nothing for
5  the equity. And we would have to satisfy that
6  burden, just like today the movants are supposed to
7  satisfy their burden of proving the Williams
8  standard for meaningful potential for meaningful
9  distribution of cases.
10  And even if you consider and take
11  what it's worth, Mr. Wolfson said about the balance
12  sheet and I don't think it's fair to do that but
13  even if you take what it's worth is 6 million
14  dollars of excess value, I would think that
15  Sonnenschein and Channon, or whomever they were to
16  engage, could run through a big portion of the 6
17  million dollars fairly quickly. And it strikes me
18  in a case of billions of dollars of claims that 6
19  million dollars, or whatever that came out to after
20  you satisfy their professional fees, constitutes of
21  meaningful distribution. But again, that 6 million
22  dollars of potential recovery that's not the
23  evidence before your Honor today, it's not just not
24  there.
25  At the end of the day, I think your

89

LORAL SPACE & COMMUNICATIONS LTD.

1
2  Honor will be the ultimate arbiter of whether or
3  not the committee of the unsecured creditors'
4  estates can cram down a plan upon equity that is
5  not fair and equitable. And I think that your
6  Honor will take very seriously the valuation
7  testimony, the appropriate valuation testimony that
8  you'll hear at that point in time, and your Honor
9  will be the ultimate protection for the evil deeds
10  that the creditors' committee may do here.
11  I think that there's one other point
12  I would like to make. Your Honor asked Mr. Rothman
13  as to whether or not it would be practical or
14  impractical to for an equity committee to be
15  appointed with limited role of just plan
16  negotiations. Your Honor, I have been with this
17  case since July 24th, probably too many hours every
18  single day, and I think it's fair to say that every
19  single matter that that has occurred in these cases
20  has or could effect, ultimately, plan negotiations.
21  Let's just take for an example, we have a hearing
22  on before your Honor on Thursday, I believe, with
23  respect to a settlement of APT.
24  The APT settlement involves
25  transponder space on T-18 satellite that is to be

90

LORAL SPACE & COMMUNICATIONS LTD.

1    LORAL SPACE & COMMUNICATIONS LTD.
2 launched in April. There is a question as to which
3 debtor entity is going to own this transponder
4 space. So if you were, for example, an Orion
5 creditor and ultimately you think that you should
6 own this transponder space, that's going to
7 ultimately affect the value of the Orion estate
8 when we talk about plan negotiation.
9      Similarly, if you are an SS/L
10 creditor and you're getting the benefits
11 potentially of this settlement, that also will
12 affect the SS/L estate down the road. So I don't
13 think it's going to be practical for us to separate
14 a committee out to just deal with plan
15 negotiations, because everything in this case
16 affects plan negotiations. And I also think, your
17 Honor, with the evidence before you, the committee
18 should not be burdened, or the unsecured creditors
19 should not be burdened with paying substantial fees
20 of attorneys and investment bankers for equity
21 which is based upon all of the evidence before you
22 today, it's completely out of the ordinary. And I
23 think, your Honor, the motion should be denied.
24    THE COURT: Okay.
25    MR. HUEBNER: Good morning, your

91

1    LORAL SPACE & COMMUNICATIONS LTD.
2 Honor. I'm Marshall Huebner the firm of Davis Polk
3 and Wardwell on behalf of Bank of America as agent.
4    Your Honor I think it's very
5 important at the as outset to separate out the
6 preferred and the common. I think they are
7 represented by different parties and they line up
8 differently economically and I think each of their
9 different motions need to be denied in for
10 different reasons. And your Honor I would like to
11 first talk start with the common in fact their own
12 evidence the undisputed evidence shows a different
13 financial situation.
14    Your Honor, looking at the values of
15 the publically traded securities introduced by the
16 movants, the common stock in this case is at a
17 minimum 623 million dollars out of the many money
18 based on the current marketplaces praise prices.
19 623 million dollars. That assumes no post petition
20 interest which could in and of itself be hundreds
21 of millions of dollars. To be clear, so that the
22 numbers are in front of everybody, the parent bonds
23 are trading at 39 and a half, there are 350 million
24 dollars of those bonds; the debtor can sit on those
25 bonds. The Orion bonds of which there is 7 hundred

92

1    LORAL SPACE & COMMUNICATIONS LTD.
2 million dollars are trading at 75 cents. So you
3 take 25 percent which is missing, and you add those
4 two numbers and you add -- that's 386 million which
5 we'll talk about in a minute when we will talk
6 about the preferred. So at a minimum before you
7 get to any equity of any kind, there is a 386
8 million dollar deficit based on current market
9 values of what people are actually paying based on
10 the value of the of this recovery. When you add
11 in, as Mr. Wolfson testified, the 237 million
12 dollars of liquidation preferred 386 plus 237 is
13 220 million dollars.
14    So in terms of the common your
15 Honor, I think there is really no legitimate
16 argument, even at facially legitimate argument that
17 the common is anywhere near in the money, 623
18 million dollars as many multiples of most
19 bankruptcy cases, and I think that's where the
20 market is.
21    Now let's talk about book value for
22 a minute, because the own two pieces of evidence we
23 argument that are we have before us at all are the
24 bond trading braces when which we all sort of
25 agreed Dow Jones, Roiters interactive printout; we

93

1    LORAL SPACE & COMMUNICATIONS LTD.
2 although know those are ascertainable and agreed
3 and the 10-Q that was handed up is the 10-Q. So
4 what Mr. Wolfson told us based on his numbers is
5 that the book value for preferred is 6 million
6 dollars. Now it's, of course, curious after
7 encouraging the court to take various deductions of
8 his choosing if the to a number that just barely
9 showed the preferred in the money. But let's take
10 that just for a moment pay it as take it at not as
11 a coincidence but truth and also at the moment take
12 it at as evidence and not an appropriate surprise
13 legal speculation. So what though shows 6 million
14 and subtract 237 million and even based on York in
15 the worlds most Pollyannish optimistic world, the
16 common is still several hundred million dollars out
17 of the money. Now your Honor actually ruled, you
18 know you sort of issued an opinion on this stuff.
19 You went on at the last hearing on this issue and
20 your Honor in fact noted for the benefit of all
21 parties and this is a page 65 of the transcript,
22 book days basis in which normally shows a greater
23 value than the Chapter 11 cases. So
24 unsurprisingly, your Honor is exactly where your
25 Honor knows that these cases are, which is the book

value deficit of 231 million dollars common, the real world deficit, based on what sophisticated players watching these actually put real money on the line for says they are 623 million dollars out of the loan money. So I think the estimate isn't even a facially legitimate argument they deserve a reason that's just a couple of reasons.

And just to highlight a couple very quickly your Honor the second thing that your Honor pointed out as people on this other table have indicated and in fact it's your Honor's view the 7 million dollars of legal fees and financial advisors fees, is really not -- that's not the way I you waive burden; that potentially the even more important burden is the burden on the process of having multiple people, and now I'll add a little bit to it, who don't have a real economic stake or a legitimate economic stake in the enterprise to being at the table. And so, your Honor, you know specifically that the indirect cost and burdens, which could be much more important than the direct cost and burdens, have to be weighed.

The third thing your Honor that you ruled is it's rare such a motion is granted and

that's that the movants have a Plaintiff's transcript error an a heavy error to give the committee that's at page 63. So you gave everybody fair warning and as the cases say in this district it's extraordinary, it's heavy burden fact rarely granted. So what facts what evidence did the equity proponents the common equity proponents bring to this court. Well, your Honor we didn't actually get up and have testifies with them because we they didn't testify as lawyers they didn't have testimony at all. Not a piece of evidence, not an exhibit introduced not an affidavit, not a witness. You told them plain and simple, it's rare, it's extraordinary, you have a very heavy evidentiary burden. All that's happened is that the Intelsat auction, which we don't -- frankly ended very quickly after EchoStar turned and left, gartered 25 million in addition. And Mr. Botter pointed out, and I'll advocate for the other side the court should take judicial notice of the fact that there are a couple of large dollar amount deposits made on new contracts. Not an asset there's an offsetting liability for those contracts. Who even knows if they are profitable

nobody has brought any evidence to say yes or no on these massive new contracts there's an 89 percent profit margin and 3 hundred million dollars of new value, there's nothing.

So the common equity, and we'll certainly move on in a moment, presents zero evidence, zero.zero zero evidence; didn't even try, in support of an extraordinary motion where it's their burden, that is rarely granted that you ruled on a month ago and told them what they would need to show. I won't cite the rest of the transcripts, I'm sure it was entered and I'm sure the court remembers it, but you actually talked about the kind of show stopping change in direction at the auction that would be necessary to have them come back and seek relief. None of that happened, the auction ended almost exactly as it had started, albeit a very small incremental addition to the purchase price. So that's a comment, because they are not the same, and I think they deserve the respect, I think, of being addressed separately.

Now there's the preferred. Let leave aside, just for a moment, because I think it's a pure question of law that's alleged in Mr.

Royter's testimony and attached in the exhibits as to whether the lack of evidence or the hidden expert problem presented to us by Mr. Wolfson's presentation isn't appropriate at all. Let's just look at what he said. What he said is look your Honor almost two years ago the market knew that this company was on the way down and was having serious financial difficulties. Almost two years ago, believe me, your Honor, here's my surprise exhibit, the bonds were trading below par, but the book value was still high. That's right. That proves as you already ruled, that book value is not a reliable indicator of value because it's an artificial thing that takes purchase price times depreciation and often has little relevance to real world values, that's why market values matter, because they show what a sophisticate informed the marketplace actually think this is actually worth. So unsurprisingly, what the chart actually proves is that the company's fortune is deteriorated, the market price of securities went down because the people acknowledged reality, and as good things have happened, market prices went up as there were dramatic exciting new development, market prices

98

LORAL SPACE & COMMUNICATIONS LTD.

1
2 went back up. That's exactly the point, market
3 value matters a lot because in the capitalist world
4 that we leave in, the market is presumed to be a
5 fairly accurate indicator. So when the Intelsat
6 sale was announced, the market prices of the bonds
7 went up. I should know, your honor, because what
8 the chart also shows, which is confirmed by
9 Roiters, is that in the last month and a half the
10 mark value of the securities has gone down by 78
11 million dollars. The prices that peaked in the
12 excitement immediately in the aftermath of the
13 Intelsat sale have gone down by 70 million dollars.
14 So it should not for one minute be thought -- he
15 wanted to focus you one part of this chart, but as
16 you said, you don't need a history lesson, you're
17 here to talk about the current situation in the
18 future, the market is actually getting a little bit
19 less optimistic about the fortunes of this company.
20 78 million dollars worth less optimistic since
21 October 20th.
22          Your Honor, let's take a minute and
23 actually look at his illustrious exhibit, because
24 while non of us is prepared for, I think it's very
25 important to give you an indication of the slight

99

LORAL SPACE & COMMUNICATIONS LTD.

1
2 of hand Mr. Wolfson engaged in in an attempt to
3 demonstrate the preferred, which --
4          MR. WOLFSON: Your Honor, I'm going
5 to object to the continued innuendos and
6 inappropriate statements; slight of hand,
7 advertising law firm.
8          THE COURT: I'm just taking it as
9 rhetoric.
10          MR. ROTHMAN: Let me point out the
11 gross inaccuracies in Mr. Wolfson's exhibit so it's
12 clear, if one fairly looked at his numbers, they
13 would in fact look like. Let's start with this
14 first one, which again, none of us had any time to
15 prepare for.
16          Mr. Wolfson represented to this
17 court that the sale of Intelsat assets is 261
18 million dollars, and therefore that should simply
19 be deducted and that yields the book value. Of
20 course what he does he is he assumes lots of things
21 which are inappropriate, and if he had put on a
22 witness, the witness would have got the skewered.
23 One, he assumes no purchase price adjustment, and I
24 think the debtors told you that they are currently
25 striking a purchase price adjustment in the 40 to

100

LORAL SPACE & COMMUNICATIONS LTD.

1
2 50 million dollar range. Poof, 6.617 million
3 dollars is now negative 40 million.
4          Two, he assumes no closing costs of
5 any kind. He took the gross number of the wire
6 transfer by Intelsat and is simply deducting that
7 from the debtors' balance sheet assuming no cost.
8 In fact, the debtors' have projected the sale to be
9 in 10s of millions of dollars. Poof, negative 44
10 million dollars is probably now negative 84
11 million. Three, he took the value of the lease, he
12 added an asset to the balance sheet without putting
13 in any corresponding liability. Like the satellite
14 purchase contract, this isn't a lottery ticket that
15 the debtors' found, this is a contractual
16 relationship that they are entering into that is
17 going to cost them a lot of money to perform.
18          So what seems like a 261 million
19 deduct, is in fact probably more like a very small
20 deduct. And what it clearly proves, even assuming
21 everything else he says, is that even on a book
22 value basis which is much higher, as he proved to
23 us and this court already ruled, an actual basis
24 the preferred are probably in the 10s, and probably
25 still hundreds of millions of dollars still out of

101

LORAL SPACE & COMMUNICATIONS LTD.

1
2 the money. And that's without giving them the
3 benefit of the doubt entirely, because I'm not
4 sophisticated enough to know what he's talking
5 about when he said, and, your Honor deduct 237
6 million, and your Honor deduct another 214 million,
7 and if you do all those things and sort of hold it
8 sideways and look at it through a prism, I'm in the
9 money.
10          My apologies for the rhetoric, but I
11 think it's sort of important to note when somebody
12 sort of tells you, as Mr. Botter said, take column
13 nine on page 63 and deduct it from page 72 and move
14 it over and multiply it by page 41, there is
15 something a lot more sophisticated going on, and
16 the one that I do know about, which is the Intelsat
17 sale, the number is nothing remotely likely
18 representing to be, for reasons I think without
19 even putting a financial advisor on the stand, is
20 fairly obvious.
21          THE COURT: How much is the bank
22 debt again?
23          MR. HUEBNER: It's about 59.8
24 million -- well, it might be 73.5 million, it
25 depends on whose amortization you're using.

102

LORAL SPACE & COMMUNICATIONS LTD.

1       LORAL SPACE & COMMUNICATIONS LTD.
2       THE COURT: Thank you.
3       MR. HUEBNER: So, now let's talk
4 about the other prong of the law, because there is
5 sort of two requirements as I think we all agree,
6 and we are all citing the same cases to your Honor,
7 since I think the common is over 6 hundred million
8 dollars and I don't think there's that much to
9 focus on, the preferreds, you know, may be closer 2
10 hundred million out, maybe they are 250 million
11 out, maybe they 300 million out, maybe they are
12 180, I don't know. I'm certainly not going to
13 testify as their financial advisor. But there are
14 two prongs for this extraordinary relief. One of
15 them is substantial equity of a meaningful
16 distribution which we already talked about, and
17 that's a factual question that they bear a heavy
18 burden on and need to put on evidence.
19       But the second prong, your Honor, is
20 whether they are unable to represent their
21 interests without an official committee. And here
22 it's important to note that the preferred holders
23 are totally different than the common holders.
24 This isn't a law firm in a class action type way,
25 of trying to find a bunch of individuals to sew

103

LORAL SPACE & COMMUNICATIONS LTD.

1       LORAL SPACE & COMMUNICATIONS LTD.
2 together to come in and get an assignment of
3 something, this is three totally sophisticated
4 financial players who own at a minimum 54.5 million
5 dollars of liquidation preference of preferred
6, stock.
7       These are not people who are unable
8 to represent their interests without an official
9 committee, this isn't the great defuse individual
10 holders, these people paid hundreds, or a minimum
11 of ten, but probably hundreds of millions of
12 dollars for these securities. They are a small
13 group of very sophisticated people familiar with
14 these issues. They find their own counsel, the
15 counsel finds financial advisers. These are the
16 exact example of people who don't deserve an
17 official committee. Why does a group of three
18 sophisticated preferred holders who are probably
19 out of the money deserve an official committee with
20 all the extraordinary costs and burdens and
21 invasions on the estate, any more than EchoStar
22 deserves an official committee or trade creditors
23 deserves an official committee.
24       I just think if you took look at the
25 second prong, which also has to be satisfied, I

104

LORAL SPACE & COMMUNICATIONS LTD.

1       LORAL SPACE & COMMUNICATIONS LTD.
2 think it's fair to say that this small cadres of
3 high roller preferred holders, are "unable to
4 represent their interests without a committee
5 representing them." They own 23 percent of it,
6 that's a pretty slug.
7       I think it's also important to note,
8 as was true the last time around, that the United
9 States trustee, which is an official arm of the
10 government, which is responsible for providing
11 independent, thoughtful guidance in decision making
12 of these issues, again noted that in light of the
13 changed circumstances, they have carefully reviewed
14 the request and all the of the available evidence
15 and don't feel that the relief is appropriate. And
16 certainly, your Honor, I think the case law has
17 long since been clear, your Honor is not bound by
18 the decisions made by the U.S. Trustee. But I
19 think it's important to note that they don't have
20 any of their own money on the line in this case,
21 and they are not shy in this district or in any
22 other district in supporting committees where they
23 think it's appropriately. But they looked at it
24 independently, and they think it is not
25 appropriate.

105

LORAL SPACE & COMMUNICATIONS LTD.

1       LORAL SPACE & COMMUNICATIONS LTD.
2       Finally, your Honor, you asked a
3 question of somebody, and I'll take the political
4 eve of trying to answer it, whether the debtors
5 have incentive for getting equity back from the
6 money and are likely to do it on their own. From
7 my perspective, and I may have slightly misphrased
8 your question, but that's not going to happen
9 without an official committee.
10       THE COURT: No, that wasn't it. I
11 think the debtors have every incentive to maximize
12 the value of the estate. I think they have been
13 doing that. My question I think was answered by
14 Mr. Rothman, which is when you get to the plan
15 negotiations, how bonds the board and management
16 adequately represent the shareholders in plan
17 negotiations.
18       MR. HUEBNER: Your Honor, just for a
19 minute, I have two answers. One is the law, which
20 is, among other things, there's an important
21 decision that was before Justice Cody in re
22 Ferrerra, which again makes clear that the duty of
23 the boards in a development sovereignty, and you
24 heard a lot about this, as I'm sure you remember,
25 at the sale hearing, is to maximize the value of

106

LORAL SPACE & COMMUNICATIONS LTD.

1  the enterprise. Even the very notion of a split
2  duty is an inaccurate statement of the law of
3  fiduciary duties in its own insolvency. What the
4  debtors have done here is perfectly clear, which is
5  to create as much value as possible. And obviously
6  mathematically, the minute that expands, it should
7  ask what is available and it goes to equity.
8      The second reason, your Honor, I
9  think the debtors have every incentive to create
10 value is, as I think we also noted in the last few
11 weeks, although I think the problem is the dynamics
12 have changed recently, these have been fairly
13 litigious cases with a fair amount of
14 unpleasantness. And my guess is that the debtors
15 the management have lots of reasons to insure the
16 dollar is maximized including ensuring that the
17 appropriate value gets added and ensuring that the
18 creditors' committee maintains their creditor
19 status or paid off by the equity status.
20     So at the end of the day, your
21 Honor, I think for slightly different reasons,
22 neither request is appropriate, when you look at
23 the common, they are so many hundreds of millions
24 of dollars out of the money, once you put the

107

LORAL SPACE & COMMUNICATIONS LTD.

1  preferred in front of them, it's actually
2  unprecedented to say that they have any reasonable
3  likelihood of a substantial recovery. No evidence,
4  even Mr. Wolfson's evidence, suggests that they
5  were within the three hundred million dollars of
6  striking range, even in the newest proceed state of
7  affairs.
8      As the preferred committee, again, I
9  think in their own presentation, if you were to
10 admit any of it into evidence, other than the 10-Qs
11 that show the debtor is insolvent, absent Mr.
12 Wolfson's modifications, show that they are also
13 sever hundred million dollars out of the money, but
14 as importantly, since their argument is 237 million
15 dollars stronger than the issuance of substantial
16 likelihood, is the second prong, which is they
17 needed to show that they are unable to represent
18 their interest without an official committee. And
19 I think that given the debtors' representation that
20 they have told them that if they sign a
21 confidentiality agreement, that they will be
22 provided with the information, given their
23 incentive to get the preferreds back into the money
24 and given the extreme sophistication of the clients

108

LORAL SPACE & COMMUNICATIONS LTD.

1  that Mr. Wolfson and his firm represent, I think
2  this is the textbook cases of where the committee
3  is not required.
4      MS. LANDSBAUM: Good afternoon, your
5  Honor. Lauren Landsbaum of the U.S. Trustee's
6  office. I'm not going to repeat the law or the
7  facts that you've already heard, I'm just going to
8  tell you the U.S. Trustee has fully and fairly
9  considered the requests and both requests. As far
10 as preferred shareholders go, we received the
11 joinder without any notification; usually the
12 process is that you write the U.S. Trustee a letter
13 requesting a committee, and then you give the U.S.
14 Trustee time to responds and give them time file a
15 motion or stipulation that the preferred share
16 holders have filed a joinder, and then about a
17 month later, a couple weeks ago I did receive a
18 letter formally requesting the appointment of a
19 preferred shareholders committee.
20     The U.S. Trustee has not responded
21 yet but I was told, I get almost phone calls from
22 the preferred shareholders counsel indicating that
23 they would have filed their own motion had they had
24 time. And I find it disingenuous when I come to

109

LORAL SPACE & COMMUNICATIONS LTD.

1  this hearing today, and obviously they have had
2  time to assemble a lot evidence and hired experts
3  to then present evidence to the court. The
4  evidence that the U.S. Trustee did fully and fairly
5  consider shows that as of today the debtor is
6  insolvent, and that there would be no return to
7  equity and the up kick in business is not going to
8  provide any return to equity. And based on the
9  fact the U.S. Trustee believes the debtor is
10 insolvent, and the fact that their shareholders,
11 particularly the preferred shareholders, are
12 ability to adequately represent themselves, the
13 U.S. Trustee does not believe that an appoint of an
14 equity committee is appropriate at this time. That
15 does not mean that the U.S. trustee will not
16 reconsider this upon new evidence that is
17 presented, but as the case is now and the evidence
18 is before your Honor, the U.S. Trustee believes the
19 appoint of an equity committee is not appropriate
20 at this time.
21     THE COURT: Okay.
22     MR. SOMERSTEIN: Good afternoon,
23 your Honor. Mark Somerstein of Kelly Drye and
24 Warren for HSBC Bank, USA indentured Trustee. Your

110

LORAL SPACE & COMMUNICATIONS LTD.

1    LORAL SPACE & COMMUNICATIONS LTD.
2    Honor, my client is the indentured trustee, and
3    I'll note for the record that we join in the
4    objections of the official committee of unsecured
5    creditors. I don't think I need to belabor the
6    record, but just to note my understanding of the
7    case is really, in constituency with my client who
8    represents what appears to be the equity here, and
9    it's unfortunate but that seems to be the case.
10        MR. WOLFSON: May I just briefly
11    respond?
12        THE COURT: Yes, briefly.
13        MR. WOLFSON: Your Honor, just a
14    couple of points. First let me speak, counsel for
15    the debtor kept referring to Kasper as the case in
16    point. And I think Kasper is a case in point. In
17    Kasper, we did see the appointment of an equity
18    committee, the judge with the objections of the
19    debts and the creditors' committee in that case
20    denied it and then a few weeks later or a month or
21    so later the U.S. trustee appointed a committee
22    took six weeks to designate the members of that
23    committee and the equity committee actually got
24    appointed probably about weeks at most prior to the
25    hearing on disclosure statement, so late in the

111

LORAL SPACE & COMMUNICATIONS LTD.

1    LORAL SPACE & COMMUNICATIONS LTD.
2    game that you couldn't really do anything
3    meaningful. If there's going to be an equity
4    committee appointed, it needs to be done at a
5    timely manner not at the very last minute.
6    Circumstances do change but our committee -- this
7    is our first appearance requesting a committee, we
8    were not here at the original filing by the equity
9    committee; this is the first request by the
10    preferreds for a committee, and I think that the
11    lessons that one learns historically do demonstrate
12    Kasper is a case in point where unfortunately and
13    to save a couple of bucks I think they lost an
14    awful lot of value for the preferred. I was
15    confused also by the debtors comments by parties
16    standing up saying there may be some recovery but
17    at the same time immediately thereafter stating we
18    have not demonstrated any likelihood ever
19    substantial distribution individual shareholders
20    are not capable and not usually, it's not
21    economically viable for them to go out, hire
22    financial advisers, spend hundreds of thousand of
23    dollars trying to do a financial advisory analyses
24    just to request the appointment of a committee.
25    It's just not done.

112

LORAL SPACE & COMMUNICATIONS LTD.

1    LORAL SPACE & COMMUNICATIONS LTD.
2        I did consult with Channon last
3    night, not as an expert witness, but just simply
4    using their tools to consolidate information that I
5    know that financial advisers can readily do and
6    they can extract information from the SEC. They
7    are not presenting testimony with respect to the
8    values; what they are showing you is right out of
9    the debtors' Qs and their Ks, what -- and factually
10    what is going on in this case.
11        Congress did not say that in order
12    to appoint an equity committee we have to show that
13    management is bad, whether they are doing something
14    inappropriate. We are glad this management is
15    turning things around business-wise. The fact that
16    they are doing it and improving things does not
17    mean that you do not get a committee. The case law
18    suggests that are you or are you not hopelessly
19    insolvent that is the primary issues. And I don't
20    think based on this record anyone can conclude that
21    this entity is hopelessly insolvent. Now can
22    management adequately represent the committee in or
23    the equity holders in plan negotiations. Judge
24    you've seen an awful lot of cases on both sides of
25    the bench, and I think you understand the

113

LORAL SPACE & COMMUNICATIONS LTD.

1    LORAL SPACE & COMMUNICATIONS LTD.
2    realities. In this case if you take a look at
3    their own 10-K and 10-Qs, they have reported no
4    less than seven class actions filed by shareholders
5    against the board members. These are the board
6    members that are going to represent the --
7        THE COURT: Wasn't that Mr.
8    Huebner's point? If they didn't have the normal
9    incentive, they would have in incentive too?
10        MR. WOLFSON: No, your Honor. I
11    think their incentive is going to be, and you will
12    see this, is for an utter release for all the board
13    members right in the plan. They are going to seek
14    an extension of the 524(e) rule, and I guarantee
15    you that officers and board members of this were
16    are going to seek a complete and utter release at
17    the same time the plan an all but going on wipe out
18    the equity holders if the creditors get their way
19    maybe have a token amount their warrants and come
20    before you they are got not going to be able to
21    adequately and properly and fully property the
22    committee and equity holders. The management, we
23    are talking about management, management is
24    interested, and they have conflicts, Judge, they
25    cannot look solely and represent our interests

114

LORAL SPACE & COMMUNICATIONS LTD.
1    LORAL SPACE & COMMUNICATIONS LTD.
2    while at the same time being expected to disregard
3    their own. They are interested management in
4    interested in their jobs going forward they are
5    interested in equity in the reorganized equity and
6    I think on that basis we are they are going to be
7    seeking primary equity.
8        MR. ROTHMAN: Your Honor I object
9    again he doesn't didn't put on any evidence about
10   management of this company that was that would
11   support any of this. All this is speculation by a
12   lawyer; it has nothing to do with the case.
13       MR. WOLFSON: Judge, the problem and
14   what counsel is suggesting, is a boot strapping
15   possibility catch 22 argument. He doesn't want to
16   seek to argue what common sense and experience can
17   demonstrate, we should wait to see what's in the
18   plan when it's way to late to seek the appointment
19   of an equity committee. I don't know what plan
20   they are going to propose, I admit that, but I
21   think historically we can listen to their comments.
22   He stands up and tells you there is no likelihood
23   of substantial recovery for equity holders. What
24   does that mean? And at the same time he tells you,
25   well, were working real hard --

115

LORAL SPACE & COMMUNICATIONS LTD.
1    LORAL SPACE & COMMUNICATIONS LTD.
2        MR. ROTHMAN: Excuse me. That's not
3    what I said. What I said quoted from their brief
4    at page five which says the test is whether there
5    is a substantial likelihood that equity will
6    receive a meaningful distribution. That's what I
7    said; that's what the law is.
8        MR. WOLFSON: And he said there is
9    no substantial likelihood, that we haven't
10   demonstrated it. He's not coming in here, this
11   debtor. I would have a little more comfort if the
12   debtor was coming in here and saying, hey we think
13   there is going to be a substantial likelihood of
14   some success and some distribution to equity
15   holders. How come they are not saying that? They
16   are not saying it's hopelessly insolvent, they are
17   not saying that and yet at the same time they are
18   saying we expect there will be, his quote, was
19   there may be some recovery. Well if there's going
20   to be some recovery for preferred shareholders, and
21   since nobody has argued, other than the creditors'
22   committee, and the banks are going to be getting
23   paid in full and are gone in a couple of weeks, I
24   don't really understand why they have a dog left in
25   this fight.

116

LORAL SPACE & COMMUNICATIONS LTD.
1    LORAL SPACE & COMMUNICATIONS LTD.
2        MR. BOTTER: Did he call me a dog?
3        MR. WOLFSON: While you have a dog
4    left in this fight.
5        Judge, we know how these large cases
6    go; unless management is able to stand up here and
7    advocate there's value and they are not seeking
8    releases and be able to demonstrate the ability to
9    represent bond holders is why in a large case
10   such as this with vast amount of shareholders out
11   there this is the precise nature of the case in the
12   real world that calls for a committee.
13   Furthermore, it's interesting that counsel for the
14   banks says look at the Martin value pay no
15   attention to the book values that's all we have to
16   go with right now since we don't have anybody
17   that's opining on enterprise values going forward;
18   you can't do that until you see the business plan.
19   It would be a folly, there's no basis upon which
20   you can do this at this point. But for counsel for
21   the bank to get up and say I'm playing with mirrors
22   here; you want to talk about inappropriate, that's
23   inappropriate.
24       The language of a 10-Q and 10-K
25   should be in English. It should be understandable

117

LORAL SPACE & COMMUNICATIONS LTD.
1    LORAL SPACE & COMMUNICATIONS LTD.
2    to an investor, and yes even to a bankruptcy
3    lawyer; this one is pretty clear. It says we sold
4    the value of the assets for a billion 25 million.
5    It says a contract is being assumed by the
6    purchaser for an additional 50 million dollars,
7    it's assumed, it's gone; it's off the balance
8    sheet. If there's a 10 15 percent adjustment that
9    need to be made to these numbers, well, that
10   belongs in the 10-Q. If they are not making those
11   adjustments, and there's 40 or 50 million dollars
12   of adjustments and 30 million dollars of expenses,
13   that should be have been in the 10-Q for us normal
14   people to understand.
15       THE COURT: Doesn't it alert people
16   there may well be an adjustment?
17       MR. HUEBNER: In the parenthetical.
18       MR. WOLFSON: And it may be, but not
19   15 20 percent that they are suggesting. And even
20   if that's the case, and I'm no not here to prove to
21   you beyond a doubt that this company is solvent,
22   that's not the standard. The standard is, is this
23   things -- when you look at the cases, you look at
24   Williams any of the cases in which is equity
25   committee is being bend denied in those situations,

118

LORAL SPACE & COMMUNICATIONS LTD.

1    LORAL SPACE & COMMUNICATIONS LTD.
2  there is hopeless insolvency. There are billions
3  of dollars of gaps in a public company between
4  creditors, bond holders and equity. You look at
5  any of the cases which that happens, its always
6  enormous; it's never this type. It's bonds trading
7  at five cents, at 10 cents on the dollar; not 75
8  cents or 42 cents. When it trades at 75 cents, as
9  your Honor is probably aware, for the most part
10  these are people buying the bonds in the secondary
11  market; they are expecting 30 percent annual rates
12  of return; it's never going to go above 75 percent,
13  because it's just time is money. People are
14  expecting this bond to pay in full. And that's
15  what we are they are going to pay in order to get
16  the 30 percent return, so this is reflecting
17  payments in full, or pretty close to it, and the
18  market is not always right. Why is the market?
19  The market is right? If the market the right, then
20  let's believer the preferred shareholders and
21  common stock holders who are still putting some
22  value on this today. They are no less intelligent
23  than bond traders. Hard to explain how to that
24  could be. So were if we are going to follow the
25  market precisely my point is the market is not

119

1    LORAL SPACE & COMMUNICATIONS LTD.
2  necessarily a great indicia. my point is that for
3  whatever reason, at a time in when this company was
4  reporting book values of a billion 3, as contrasted
5  to today where they are they are reporting,
6.  erroneously we believe, a 705 million in book value
7  negative number, with a 2 billion spread, the bonds
8  are at or about the same prices. So what can you
9  gain from that? Is that indication that the market
10  knows what they are talking about? 1 don't think
11  so.
12    THE COURT: Is there evidence on the
13  record of what the stock and preferred is trading
14  at?
15    MR. WOLFSON: 1 don't believe -- 1
16  don't know that that's in the current 10-Ks or Qs
17  your Honor but --
18    THE COURT: It wouldn't be.
19    MR. WOLFSON: But my understanding
20  is that -- and there are probably people in the
21  courtroom who know that answer, it's the common
22  information. The common stock was trading about 30
23  cents a share.
24    MR. CHRIST: 33.
25    MR. WOLFSON: 33 cents a share. And

120

1    LORAL SPACE & COMMUNICATIONS LTD.
2  1 believe that the preferred is trading at about a
3  buck a share, but I'm not a hundred percent sure
4  about that.
5    So your Honor what with the debtors
6  admission that there may be some recovery with the
7  fact of the matter that the board here and the
8  management operating the company well, but when it
9  comes down to plan negotiations, they are going to.
10  so have done conflicts. They are going to want the
11  jobs; they want their releases; they want their
12  incentive bonuses; they want their primary equity
13  as an incentive to go forward. Creditors typically
14  will give them that at the same time they are
15  wiping out the equity holders.
16    My last comment, your Honor, is in
17  response to the question with respect to the
18  ability to limit the role of a committee. 1 don't
19  recall seeing specific cases on that in the past
20  although my recollection is that you pretty much
21  either appoint a committee or you don't appoint a
22  committee. But we certainly have indicate to do
23  courts before and we would certainly represent to
24  this court that we would not duplicate things.
25  There are numerous. 1 agreed with Mr. Botter.

121

1    LORAL SPACE & COMMUNICATIONS LTD.
2  There are some things that go on in a case there
3  impact plan and the exo strategies and an equity
4  committee ought to be involved in those. But there
5  are numerous other day-to-day matters that we defer
6  to the creditors' committee where you do have a
7  common interest, things such as motions to lift the
8  automatic stay, issues with respect to the sale of
9  normal assets that are not plan threatening. All
10  of those sorts of things you take look at just make
11  sure it's not a big issue you defer typically to
12  the debtor, even when there's a creditors'
13  committee. We are not looking to duplicate issues,
14  and we do act responsibly. And realize that at the
15  end of the day, we are subject to the court's
16  ruling with respect to the fee application, and if
17  we do something inappropriate and duplicative and
18  unnecessary, it will be dealt with accordingly, and
19  we look to avoid that sort of adverse fee hearing.
20    So, your Honor, we would request,
21  just to conclude -- we believe that this is the
22  appropriate case for a committee. We think we can
23  add value to the case. My primary client, Aspen
24  Advisors and we have two other that have joined in
25  on this motion; they do hold in the aggregate of 23

122

LORAL SPACE & COMMUNICATIONS LTD.
1
2    percent, they are financial institutions. But on
3    the other hand, they are not necessarily in a
4    position to fully fund an appropriate
5    representation of all of the preferred equity
6    holders. And absent there being a preferred equity
7    committee or an equity committee that they are on,
8    there's no commitment on their part to act in a
9    fiduciary responsibility, and there's no guarantee
10   they are going to stick around to the end of the
11   case. That is one of the primary benefits of an
12   equity committee in that it has fiduciary duties to
13   all, and it will see the case to the end. If
14   there's not a committee and an individual
15   shareholder decides to sell its position for
16   whatever gain it can make, it may just do that. So
17   I think it may be the aid to the court to have the
18   benefit of a committee to test what will
19   undoubtedly be the financial advisers coming to you
20   and telling you what the prospective future value
21   of this company hypothetically may be.
22        THE COURT: Okay.
23        MS. LANDSBAUM: Your Honor, I have
24   two brief comments.
25        THE COURT: All right, very briefly.

123

LORAL SPACE & COMMUNICATIONS LTD.
1
2        MS. LANDSBAUM: Your Honor, just
3    quickly. With respect to the release issue, Mr.
4    Wolfson indicated in the real world the directors
5    will get the broad releases. I think all of us
6    know the U.S. Trustee does not allow those releases
7    and will not allow them in this case. And second,
8    with regard to Kasper Mr. Wolfson was right. An
9    equity committee was appointed and the U.S. Trustee
10   did agree; and it is just an example that the U.S.
11   Trustee can be swayed if circumstances change and
12   an equity committee is deemed appropriate. And in
13   Kasper, circumstances did change subsequent to the
14   hearing on the motion, such that an equity
15   committee was appropriate. But it is not analogous
16   to this situation.
17        THE COURT: Okay.
18        MR. CHRIST: Your Honor, may I be
19   heard brief.
20        THE COURT: Really brief, like a
21   minute.
22        MR. CHRIST: Well, I just wanted to
23   say, speaking for us, we are not going to be able
24   to continue beyond today, assuming I find my car in
25   Manhattan and get out of here, and I can't speak

124

LORAL SPACE & COMMUNICATIONS LTD.
1
2    for Mr. Yetnikoff, that we are able to do it.
3        Also Mr. Rothman's point that we
4    take you on good faith that they are acting in our
5    interests. If that's the case, on Mr. Wolfson's
6    analysis, we can add some value to these four brand
7    new contracts that have just come up. And the last
8    point Mr. Wolfson said, I think we would be value
9    added to the process. I talked to Sony in Tokyo
10   twice, and I don't see anybody bringing in parties
11   that might have substantial equity in interest. I
12   know they are advertised, but I guess it's the
13   difference between a realtor putting a multiple
14   listing and going out and aggressively marketing
15   it. And we certainly have incentive, and we are
16   not conflicted, frankly, to find somebody to
17   replace those insiders and sell that premium too.
18        THE COURT: Okay.
19        MR. CHRIST: Thank you, very much.
20        THE COURT: I unfortunately have to
21   eat something, so I'm going to come back about
22   2:35.
23        Maybe Mr. Wolfson and Mr. Huebner
24   can go to lunch together and work out their
25   metaphors.

125

LORAL SPACE & COMMUNICATIONS LTD.
1
2        (Whereupon, a recess was taken for
3    the purpose of luncheon.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

126

LORAL SPACE & COMMUNICATIONS LTD.

1  LORAL SPACE & COMMUNICATIONS LTD.
2  A F T E R N O O N   S E S S I O N
3  THE COURT: Please be seated. I
4  have in front of me a motion, literally a renewed
5  motion by a group of common shareholders who hold
6  approximately 5 percent of the common stock of
7  Loral. That motion has been joined in by another
8  group of common shareholders who profess to own
9  approximately 1 percent of the common stock, and
10  has also be joined in by a group of preferred
11  shareholders who own approximately 23 percent of
12  the outstanding preferred shares. The motion
13  seeks, again, the appointment of an official
14  committee of equity security holders. I say again
15  because I denied a motion by the same group on
16  September 19th of this year.
17      The group of preferred shareholders
18  had not formally sought the appointment of an
19  official preferred shareholders committee from the
20  U.S. Trustee, but we have all been entreated their
21  request as -- at least a request for an official
22  committee of equity security holders that is to be
23  dominated by preferred shareholders, although at
24  times they have also sought in the common
25  shareholders said they would support an appointment

127

1  LORAL SPACE & COMMUNICATIONS LTD.
2  of two separate committees, one for preferred
3  shareholders and one for common shareholders.
4      I think, as has been pointed out in
5  oral arguments, these requests need to be looked at
6  separately because they raise different issues, and
7  that's what I'll do. But in sum, I'm going to deny
8  each of the requests for the appointment of a
9  committee for the following reasons: First, as is
10  well established, the court reviews the U.S.
11  Trustee's decision whether to appoint a committee
12  or not to appoint a committee on a de novo basis,
13  although I obviously note that when, as here,
14  the U.S. Trustee has done a thorough analysis of
15  the request in the first instance. I then turn to
16  the statute which states in Section 1102(a), that
17  the court may appoint an additional official
18  committee of equity holders, if necessary, to
19  assure adequate representation of that group.
20      As Judge Gropper pointed out in his
21  opinion in the Kasper bankruptcy of this year, this
22  statute, by focusing both on whether the
23  appointment is necessary to assure adequate
24  representation, sets a rather high threshold for
25  the movant. Recognizing that threshold, the courts

128

1  LORAL SPACE & COMMUNICATIONS LTD.
2  have also found as set forth in the Johns-Manville
3  case at 68(BR)155 Southern District of New York
4  1986, and other cases, that the determination by
5  the bankruptcy court is based on the facts and
6  circumstances of a particular case in the exercise
7  of the court's discretion.
8      The courts, since there is no
9  specific definition in the statute of adequate
10  representation for purposes of 1102 entails, have
11  applied a number of factors, some of which are met
12  here, but the most important ones are not. Courts
13  consider, among other things, the number of
14  shareholders, the complexity of the case, and the
15  timing of the request, and ultimately whether the
16  cost of forming an official committee outweighs the
17  concern for adequate representation.
18      Perhaps more pointedly, Colliers and
19  the more recent cases have highlighted two key ways
20  of looking at the issues. As Colliers says, the
21  threshold situation is whether there is sufficient
22  equity in the estate to justify the cost and
23  expense of a separate committee. And Colliers also
24  says at Section 1102.03, the key consideration is
25  whether formation of an equity committee is more

129

1  LORAL SPACE & COMMUNICATIONS LTD.
2  likely to accelerate or to impede the
3  reorganization process.
4      The threshold consideration, that is
5  whether there is sufficient equity in the estate to
6  justify the cost and expense of a separate
7  committee is something we've spent considerable
8  time on this morning and this afternoon, although
9  it ultimately there's not an enormous amount of
10  evidence in the record that goes to the value of
11  the debtors and the value of the equity. I note
12  that as set forth by Judge Cram in the Manville
13  case, the movants have the burden of proof, and it
14  is their burden to put on evidence establishing,
15  among other things, whether there is real equity
16  value here. And as Judge Lifland pointed out in
17  the Williams Communications case, this didn't mean
18  that the court should conduct a full valuation of
19  the debtor, but rather should determine whether it
20  appears reasonable that there is a substantial
21  likelihood in Judge Lifland's words, of a
22  meaningful distribution under the absolute priority
23  rule, to equity holders.
24      And again, as pointed out by Judge
25  Lifland, citing to the Emens Industry case, this is

130

1       LORAL SPACE & COMMUNICATIONS LTD.
2   because creditors and debtors should not bear the
3   cost of negotiating what is, in essence, a gift to
4   shareholders who are out of the money; whereas they
5   should bear the costs, at least the debtors should
6   bear the cost of shareholders negotiating a
7   meaningful distribution.
8           Ultimately, as pointed out by
9   numerous cases, the appointment of an equity
10  committee is the exception rather than the rule.
11  But again, as I said earlier, some of the factors
12  suggesting that a committee should be appointed
13  here are present, and therefore this requires some
14  more attention than may have been suggested by some
15  of the objectants.
16          First of all, there is no dispute
17  that the common stock of Loral is very widely held
18  by a number of shareholders who individually
19  probably do not have the resources to pursue
20  actively their rights in this Chapter 11 case. On
21  the other hand, it appears to me that the preferred
22  stock is held by a smaller group, and in
23  particular, the group of moving preferred
24  shareholders here has a sizable stake in the
25  company and is a relatively small group of three

131

1       LORAL SPACE & COMMUNICATIONS LTD.
2   shareholders, holding approximately 23 percent,
3   which, if one looks at the liquidation preference
4   and accrued interest in respect of that preference,
5   is a meaningful amount of money, over 50 million
6   dollars. The timing of the appointment of a
7   committee wouldn't be appropriate at this point, in
8   that the debtors, having through their own
9   auspicious in large part, stabilized their business
10  and taken some key decisions in the case, are now
11  focusing on a Chapter 11 plan preceded by a
12  business plan, so that in fact, if it were
13  appropriate, one could, at this point, have a
14  committee that would be focusing on negotiation of
15  a Chapter 11 plan.
16          However, based on my review of the
17  presentation on valuation, I find that as far as
18  the common shareholders are concerned, that
19  negotiation would be largely academic. Based on
20  both the book value of the debtors, from their
21  publically filed SEC reporting, as well as the
22  agreed upon range of trading prices, which were the
23  only evidence of value offered by the movants, the
24  common shareholders are substantially under water
25  from anywhere between 230 million dollars on a high

132

1       LORAL SPACE & COMMUNICATIONS LTD.
2   end, to 620 or more on a low end, 620 million or
3   more on a low end. As I noted at the hearing in
4   September, both book valuations and trading
5   valuations, that is security trading valuations
6   have their weak elements. And it's been my
7   experience that book valuation in a company like
8   this is has often been overstated, whereas we all
9   recognize that the trading valuations are far from
10  accurate. However, when either method leaves to
11  such a substantial negative equity, I think it is
12  clear to me that the debtors are insolvent as far
13  as the common shareholders are concerned.
14          Colliers states that it is clear
15  that a committee should not be appointed if the
16  debtor is hopelessly insolvent, and it is clear
17  that it should be appointed if the debtor is
18  clearly solvent, obviously leaving a middle ground
19  there for courts to deal with in their discretion.
20          I find here that the gap is simply
21  too large to justify the expense and disruption
22  that an official committee of common shareholders
23  would pose, given that the only trade off, I think,
24  based on what's before me, the evidence before me,
25  would be is di minimis recovery at this point, by

133

1       LORAL SPACE & COMMUNICATIONS LTD.
2   shareholders.
3           It's important to note that the only
4   serious request for a committee here is based on
5   the need to negotiate a plan. There's no
6   meaningful evidence, or even contention, that
7   management is somehow laying down on its job in
8   running the company properly and obtaining the most
9   value possible for the debtors. In fact, the
10  reason for the renewal of the motion in its
11  prosecution today, is just the contrary, that the
12  company, its management has done an excellent job
13  in increasing value. So, I'm really focusing on
14  the one function of a committee, which is
15  negotiating a plan. And again, based on today's
16  record, I believe that those negotiations at this
17  point would result in only a di minimis recovery
18  for common shareholders; perhaps not in Judge
19  Lifland's words "a gift," although, perhaps close
20  to that.
21          I find that management is quite
22  capable of negotiating that type of recovery for
23  the shareholders, and I expect motivated to do so.
24  I also find that the -- if I haven't made it clear
25  already, the concerns that were raised in passing

134

LORAL SPACE & COMMUNICATIONS LTD.

1. LORAL SPACE & COMMUNICATIONS LTD.
2. by some of the shareholders, that management is
3. hopelessly conflicted or somehow otherwise not
4. properly conducting their fiduciary duties, has not
5. been established. Far from it. I then look at,
6. separately, at the request by the preferred
7. shareholders for either a separate committee or a
8. committee which they were dominant. The valuation
9. issues with regard to the preferred shareholders
10. are much more close. Although there were proved
11. issues, I cannot say that the debtors are
12. hopelessly insolvent when it comes to the preferred
13. shareholders. In fact, it is possible that the
14. preferred shareholders will have a meaningful
15. return in this case, and not just a gift. On the
16. other hand, it is possible that they are out of the
17. money; and ultimately as I said before, they have
18. the burden of proof upon the issues with respect to
19. the appointment of an official committee.
20. However, whether or not a group of
21. shareholders is in or out of the money is only one
22. of the factors, albeit an important one, to be
23. considered when a committee is sought to be
24. appointed. One goes back on the statute which says
25. that a committee may be appointed, if necessary, to

135

1. LORAL SPACE & COMMUNICATIONS LTD.
2. ensure adequate representation of the equity
3. interest holders. And here it appears clear to me
4. that with regard to the preferred holders, such
5. appointment is far from necessary, in fact is not
6. necessary at all. The preferred shareholders again
7. before me, are a small group, institutional holders
8. represented by a capable law firm. And they have,
9. as I pointed out, a substantial recovery to fight
10. for, and therefore a true incentive to pay a law
11. firm and an expert witness to protect their
12. interests.
13. I note also that the debtors'
14. counsel has represented to the court and confirmed
15. a conversation in which counsel represented to the
16. counsel for the preferred shareholders here, that
17. the debtors will negotiate with the preferred
18. shareholders in a meaningful way, which includes
19. providing, subject to confidentiality constraints,
20. a copy of the debtors' business plan, and other
21. meaningful information that could ensure that those
22. negotiations proceed in good faith. Therefore, the
23. statute put simply does not contemplate the
24. appointment of a committee of preferred
25. shareholders or a committee dominant by preferred

136

1. LORAL SPACE & COMMUNICATIONS LTD.
2. shareholders in these circumstances. The cost and
3. harm to the estate, which is both direct in terms
4. of dollars, as well as indirect in terms of dollars
5. spent by other parties and potential delay outweigh
6. the rather negligible benefits of additional
7. representation, given my conclusion that the
8. preferred holders have their own resources and
9. their own reasons for protecting their interests
10. actively in the case.
11. With regard to my question early on
12. in this hearing as to whether one could limit the
13. role of a committee to negotiating a plan, I
14. appreciate Mr. Wolfson's candor, as well as Mr.
15. Botter's remarks that in this case there are too
16. many issues that arise that could be used as a
17. means to affect the outcome of a plan. And my
18. reading of Mr. Wolfson's answer is that his clients
19. would prefer to maintain their flexibility with
20. respect to those issues rather than coming in and
21. literally sitting down and negotiating a
22. distribution at the end of the case and have them
23. come up to speed in the meantime. But ultimately,
24. given my conclusion that the preferred shareholders
25. are capable of representing themselves, that

137

1. LORAL SPACE & COMMUNICATIONS LTD.
2. colloquy was somewhat academic.
3. So, I'm denying the motions. I find
4. that the facts have not changed so dramatically
5. from the September 19th ruling to justify the
6. appointment of a committee of common shareholders,
7. and find that the preferred shareholders do not
8. need a committee to ensure adequate representation,
9. given the quality of their professionals and the
10. amount that they have at stake in the case.
11. Ms. Fife, if you want to settle an
12. order on three days notice then.
13. MS. FIFE: Yes, that would be fine,
14. your Honor.
15.
16.
17.
18.
19.
20.
21.
22.
23.
24.
25.

138

```
 1
 2
 3              C E R T I F I C A T E
 4    STATE OF NEW YORK    }
                       ss.:
 5    COUNTY OF WESTCHESTER )
 6          I, Denise Nowak, a Shorthand
 7    Reporter and Notary Public within and for
 8    the State of New York, do hereby certify:
 9          That I reported the proceedings in
10    the within entitled matter, and that the
11    within transcript is a true record of such
12    proceedings.
13          I further certify that I am not
14    related, by blood or marriage, to any of
15    the parties in this matter and that I am
16    in no way interested in the outcome of
17    this matter.
18          IN WITNESS WHEREOF, I have
19    hereunto set my hand this _____ day of
20    _____, 2003.
21
22
          _____
            DENISE NOWAK
23
24
25
```

**Exhibit C**

ORIGINAL

1

2

3

4   UNITED STATES BANKRUPTCY COURT
    SOUTHERN DISTRICT OF NEW YORK
5   - - - - - - - - - - - - - - - - - - - - - - - - - - -x
6       In the Matter                    Case No.:
                                         02-10497
7           of

    KASPER A.S.L., LTD., et al,
8

9                           Debtors.

10  - - - - - - - - - - - - - - - - - - - - - - - -x

11                       July 15, 2003

12                  United States Custom House
                    One Bowling Green
13                  New York, New York    10004

14  motion by Triage shareholders for an order
15  directing the appointment of an official
    committee of equity security holders; motion by
16  debtors for authorization to amend employment
    agreements of Gregg I. Marks, Joseph B. Parsons,
17  and Lee S. Sporn; motion by debtors for an order
    extending the time to assume or reject unexpired
18  leases of nonresidential real property; objection
    by Taubman Auburn Hills Associates Limited
19  (calendar continued on next page)

20

21  B E F O R E :

22      THE HONORABLE ALLAN L. GROPPER, ESQ.,
            United States Bankruptcy Judge
23

24

25

212-867-8220        Doyle Reporting, Inc.      Doylerpt1@aol.com

1

2    Calendar continued:

3    Partnership to the debtors' motion to extend time
     to assume or reject leases; joinder by Gryphon
4    Master Fund, L.P., to the motion of Triage
     shareholders for an order directing the
5    appointment of an official committee of equity
     security holders; objection of CPG Partners,
6    L.P., to motion of debtors for an order extending
     the time to assume or reject unexpired leases of
7    nonresidential real property; debtors' objection
     and response to motion of certain shareholders
8    for order directing the appointment of an
     official committee of equity security holders;
9    joinder of Lonestar Capital Management and
     affiliates for an order directing appointment of
10   official committee of equity security holders;
     objection by official committee of unsecured
11   creditors to the motion of Triage shareholders
     and Gryphon Master Fund, L.P., for order
12   directing the appointment of an official
     committee of equity security holders; objection
13   by the United States Trustee to motion of Triage
     shareholders for the appointment of an official
14   committee of equity security holders.

15

16

17

18

19

20

21

22

23

24

25

1

2      A P P E A R A N C E S :

3      WEIL, GOTSHAL & MANGES, LLP
       Attorneys for Debtors
4              767 Fifth Avenue
               New York, New York    10153-0119
5
       BY:    ALAN B. MILLER, ESQ.
6                     -and-
              HANS S. HWANG, ESQ.
7

8      SONNENSCHEIN NATH & ROSENTHAL, LLP
       Attorneys for Triage
9              1221 Avenue of the Americas
               New York, New York    10020
10
       BY:    CAROLE NEVILLE, ESQ.
11                    -and-
              D. FARRINGTON YATES, ESQ.
12

13     ANDERSON KILL & OLICK, P.C.
       Attorneys for Creditors' Committee
14             1251 Avenue of the Americas
               New York, New York    10020
15
       BY:    MARK SILVERSCHOTZ, ESQ.
16                    -and-
              ANDREA J. PINCUS, ESQ.
17

18     COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
       Attorneys for Gryphon Master Fund
19             25 Main Street
               Hackensack, New Jersey    07601
20
       BY:    STUART KOMROWER, ESQ.
21

22     PORZIO BROMBERG & NEWMAN, P.C.
       Attorneys for CPG Partners, L.P.
23             100 Southgate Parkway
               Morristown, New Jersey    07962-1997
24
       BY:    BRETT S. MOORE, ESQ.
25

212-867-8220        Doyle Reporting, Inc.        Doylerpt1@aol.co

4

1

2      A P P E A R A N C E S:    (continued)

3          UNITED STATES DEPARTMENT OF JUSTICE
           SOUTHERN DISTRICT OF NEW YORK
4          OFFICE OF THE UNITED STATES TRUSTEE
           Attorneys for United States Trustee
5                  33 Whitehall Street, 21st Floor
                   New York, New York    10004

6          BY:  RICHARD MORRISSEY, ESQ.

7

8          MILBANK, TWEED, HADLEY & McCLOY, LLP
           Attorneys for Lonestar Capital
9                  1 Chase Manhattan Plaza
                   New York, New York    10005-1413

10         BY:  CRAIG P. DRUEHL, ESQ.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           Proceedings

2       With these people with their aggressive,

3   energetic support.  You have had it up to

4   now, without their getting everything.  You

5   will have it in the future.  But I think we

6   should recognize they are the ones

7   responsible in part -- in significant part

8   for getting us where we are.  We want them

9   here to get us home.

10          JUDGE GROPPER:  Thank you.  I will take

11  a five-minute recess and give you my

12  rulings.

13          (Whereupon, a recess was taken.)

14          JUDGE GROPPER:  Please be seated.

15          Here are my decisions on both motions.

16  With regard to the motion by Triage

17  Management, LLC, and several of its

18  affiliates to appoint an equity committee, I

19  note the following:

20          The Triage affiliates collectively hold

21  approximately 6 percent of the debtors'

22  equity.  Joinders in the motion have been

23  filed by Lonestar Partners, which owns

24  approximately 9.9 percent of the equity of

25  the debtors by Gryphon Master Fund, LP,

1          Proceedings

2     which owns approximately 6 percent, and by

3     JANA Partners, which also claims to be an

4     equity owner.  All of the foregoing entities

5     asked the United States Trustee to appoint

6     an equity committee in letters sent at

7     various dates last May.  The appointment of

8     a separate committee was opposed before the

9     U.S. Trustee by the debtors and by the

10    Official Committee of Unsecured Creditors,

11    and they similarly oppose such an

12    appointment on this motion.

13         By letter dated June 11, 2003, the U.S.

14    Trustee denied the request for the

15    appointment of an equity committee.

16    Although the Court gives due consideration

17    to the action of the trustee, it reviews the

18    action of the U.S. Trustee de novo.  See, In

19    re Williams Communications Group, Inc., 281

20    B.R. 216 (Bankr. S.D.N.Y. 2002.); In re

21    Enron Corp., 279 B.R. 671, 684 (Bankr.

22    S.D.N.Y. 2002); In re McLean Industries,

23    Inc., 70 B.R. 852, 856-57 (Bankr. S.D.N.Y

24    1987); In re Texaco, Inc., 79 B.R. 560, 566

25    (Bankr. S.B.N.Y. 1987); H.R. Rep. 99-764,

68

1               Proceedings

2      99th Cong., 2nd Sess. at 18 (1986).

3          We start with the words of the

4      statute.  Section 1102(a)(2) of the

5      Bankruptcy Code provides in relevant part

6      that, quote, "the Court may order

7      appointment of additional committees of

8      creditors or of equity holders if necessary

9      to assure adequate representation of

10     creditors or of equity holders," close

11     quote.  The first question thus is whether

12     an additional separate committee is, quote,

13     "necessary," close quote, to assure

14     adequate representation.  The operative word

15     is "necessary," which implies a fairly

16     restrictive standard, and certainly a

17     standard which is higher than if the statute

18     called for the appointment of a committee

19     if, quote, "useful," close quote.  The

20     second operative term is, quote, "adequate

21     representation," close quote, which directs

22     the Court to consider the nature of the

23     unrepresented or under represented group,

24     the role of the group in the Chapter 11

25     case, and the functions that a committee

1                           Proceedings

2        would presumably carry out.  The burden is

3        on the moving party to establish that a

4        separate committee is required to provide

5        adequate representation.  In re

6        Johns-Manville Corp. 68 B.R. 155, 158

7        (S.D.N.Y. 1986); accord Enron Corp., 279

8        B.R. at 685.

9            The determination is fact intensive

10       with many courts focusing on the following

11       three issues in connection with a motion for

12       an equity committee:  (i) the number of

13       shareholders; (ii) the complexity of the

14       case, and (iii) whether the cost of the

15       additional committee significantly outweighs

16       the concern for adequate representation.  In

17       re Johns-Manville Corp., 68 B.R. at 159;

18       In re Wang, 149 B.R. at 2; In re Williams

19       281 B.R. at 220.

20           Other factors that have been considered

21       by the courts are:  (i) the timing of the

22       motion relative to the status of the case,

23       In re Kalvar Microfilm, Inc., 195 B.R. 599,

24       600 (Bankr. D.Del. 1996); (ii) potential to

25       recover expenses pursuant to Section 503(b),

70

Proceedings

1

2      In re Hills Stores, 137 B.R. 4, 8 (Bankr.

3      S.B.N.Y. 1992); (iii) motivation of the

4      movants, In re Orfa Corp. of Philadelphia,

5      121 B.R. 294, 295, (Bankr. E.D.Pa. 1990);

6      and (iv) the tasks an additional committee

7      is to perform, McLean Industries 70 B.R. at

8      860.

9           This case presents the following fact

10     pattern that does not appear to have been

11     considered in a reported case.  At the

12     outset, it appeared that these debtors were

13     hopelessly insolvent.  It has been held in

14     many cases that an equity committee is not,

15     quote, "necessary to ensure adequate

16     representation," close quote, where the

17     debtors appear to be hopelessly insolvent.

18     See, e.g., In re Emons Industries, 50 B.R.

19     692, 694 (Bankr. S.D.N.Y. 1985); In re

20     Williams Communications, 281 B.R. at 220.

21          In cases at bar, however, the debtors'

22     prospects have improved to the point that

23     there may be value for equity.  The debtors

24     and the creditors' committee argue that it

25     is not at all certain that there will be any

1                           Proceedings

2       equity, and this argument is joined in by

3       the U.S. Trustee.  Both argue that this

4       militate against an appointment of a

5       committee.  The real question is whether in

6       these cases at this time, when it is not

7       clear whether there will be any value for

8       equity and, if so, what it will be, but

9       there is a possibility, is a separate

10      committee necessary to assure the equity

11      holders adequate representation?

12          The answer, in light of the facts of

13      this matter, is clearly "no."  The best way

14      to find out what an enterprise is worth is

15      to sell it, preferably as a going concern.

16      As the Supreme Court said in Bank of America

17      v. 203 LaSalle Street Partnership, 526 U.S.

18      434, 457 (1999), quote, "the best way to

19      determine value is exposure to a market,"

20      close quote.

21          The debtors have already put in place

22      sales procedures that the Court has found

23      appropriate to obtain the highest and best

24      offer for the debtors.  If there is more

25      value for the equity than the initial bid

Proceedings

1

2  obtained from Kellwood Company, the sales

3  procedure should smoke it out.  There is not

4  the slightest indication that the sales

5  procedures are not fair or that the Kellwood

6  so-called stalking horse bid is not a fair

7  arm's length offer, untainted by an insider

8  dealer.  Testimony at the hearing of June

9  27, 2003, has contradicted Triage's early

10 claims that the sale process improperly

11 enriches management and therefore improperly

12 incentivizes management to seek a sale,

13 rather than a stand-alone plan.

14      Nevertheless, it is recognized that the

15 equity holders may have a concern that the

16 creditors' committee and the debtors stop

17 negotiating with Kellwood when they covered

18 the debt, or came close to covering it, and

19 ignored the fact that equity might be the

20 holder of the residual interest and was also

21 entitled to have its interests or possible

22 interests taken into account.  In this case

23 there is no indication that the debtors did,

24 in fact, ignore their duties to the holders

25 of the residual interest.  Moreover, the

| | Proceedings |
|---|---|
| 1 | |
| 2 | presence on the committee of two large |
| 3 | creditors who were also large shareholders |
| 4 | provides an indication, albeit slight, that |
| 5 | the interests of equity were not ignored. |
| 6 | But the real protection is that the debtors |
| 7 | put themselves up for sale pursuant to fair |
| 8 | procedures that are designed to obtain the |
| 9 | highest value.  If the Triage group or any |
| 10 | other equity holders are convinced that |
| 11 | there is more value in the equity, the |
| 12 | equity can bid for it.  See, In re Central |
| 13 | Ice Cream Corp., 836 F.2d 1068, 1072, Fn. 3, |
| 14 | (7th Cir. 1987).  The equity does not need a |
| 15 | committee to renegotiate sales procedures |
| 16 | and possibly put the current sale and the |
| 17 | interests of the debt and equity at more |
| 18 | risk than is necessary.  The Kellwood offer |
| 19 | expires on November 30, 2003, and the |
| 20 | debtors do not have a limitless period of |
| 21 | time to effect a plan, especially in a |
| 22 | business which, as we have seen in this |
| 23 | case, can go down and can go up, and it |
| 24 | certainly can change.  This implicates a |
| 25 | factor frequently used by the Courts in |

|   | Proceedings |
|---|---|
| 1 | |
| 2 | considering a motion for an equity |
| 3 | committee, whether it simply comes too late |
| 4 | in the Chapter 11 process.  See, generally |
| 5 | In re Public Serv. Co. of New Hampshire, 89 |
| 6 | B.R. 1014, 1018 (Bankr. D.N.H. 1988). |
| 7 | There is a second mechanism that |
| 8 | protects the equity's interests here.  The |
| 9 | sale to Kellwood or another purchaser is not |
| 10 | final until the debtors duly confirm a plan |
| 11 | in accordance with all the requirements of |
| 12 | Chapter 11.  The equity will thus have ample |
| 13 | opportunity to show, if they wish to so |
| 14 | argue, that the debtors have not acted in |
| 15 | good faith or that a stand-alone plan is |
| 16 | required under the Code.  There is no reason |
| 17 | to believe that a committee would be |
| 18 | necessary to participate in a contested |
| 19 | confirmation hearing, if any.  First, if |
| 20 | Triage and its allies wish to contest |
| 21 | confirmation, they obviously have the |
| 22 | resources to do so.  Moving shareholders of |
| 23 | large, sophisticated institutions with the |
| 24 | ability to represent themselves well and be |
| 25 | heard is evidence by this motion and by |

75

1                           Proceedings

2       prior proceedings in these very cases.  With

3       regard to SEC concerns, the Court is' willing

4       to consider any reasonable protection that

5       is within its power to allow the movants the

6       ability to protect their legitimate

7       interests in connection with these Chapter

8       11 cases.  However, they have not

9       demonstrated that these securities laws

10      prohibit them from taking such steps or

11      justify a committee under the facts of this

12      case or, indeed, that the establishment of a

13      committee provides any automatic immunity.

14      It may, but informal committees are very

15      common under Chapter 11.  They are

16      indirectly recognized by the bankruptcy

17      rules, and the Court certainly will hear

18      from the formal committee, if the committee

19      wishes to be heard in that guise.

20          It is also noteworthy that a majority

21      of the equity appears to be held by holders

22      who have not objected and appears satisfied

23      with the present status.  To create an

24      equity committee from a minority would also

25      be a possible complication and could be

1           Proceedings

2       self-defeating.  A committee would give a

3       movant some additional leverage, but, as I

4       said, if the group wishes to contest

5       confirmation, the court will give it the

6       same attention that it would give any

7       similarly situated group.

8           Creation of a committee would, of

9       course, provide the movants with a clearer

10      path for the recovery of their costs than if

11      they sought such costs under the substantial

12      contribution test of 11 U.S.C. Section

13      503(b).  If any informal committee of equity

14      holders or the equity holder movants

15      themselves make a, quote, "substantial

16      contribution," end quote, they have a right

17      to recovery of expenses under Section 503(b)

18      of the Bankruptcy Code.  In these cases

19      where it is not certain that there will be

20      value for equity, and in light of the other

21      protections for equity, it would not be

22      appropriate to risk imposing these costs on

23      the creditor body at this stage of the

24      case.

25          Finally, the debtors have made it clear

Proceedings

1
2   that they recognize their responsibility to
3   equity holders.  They have met and
4   negotiated with representatives of movants
5   and state that they are willing to do so.
6   To form a committee at this late date would,
7   however, imply that the debtors might also
8   have to negotiate the plan, as negotiation
9   of a plan is one of the principal
10  responsibilities of a committee.  This might
11  well propel these cases a giant step
12  backwards and endanger the progress that is
13  ironically for genesis of this motion.
14  Where procedures are in place to protect
15  equity and there is no indication that their
16  interests have been ignored and where they
17  are well represented already, a separate
18  committee is not quote, "necessary to assure
19  their adequate representation," end quote.
20  The motion is denied.  The debtors shall
21  settle an order on three days' notice.
22      With respect to the motion to approve
23  changes to the compensation plans of three
24  members of management, the debtors have
25  shown three factors that support the motions

|   |   |
|---|---|
| 1 | Proceedings |
| 2 | as appropriate under the structures of the |
| 3 | Bankruptcy Code.  First, these are changes |
| 4 | for the benefit of the officers who have |
| 5 | concededly done a superb job.  This is not |
| 6 | always the case in incentive plans that come |
| 7 | before Bankruptcy Court.  Second, these |
| 8 | officers could have negotiated these changes |
| 9 | earlier.  If this is so, their best efforts |
| 10 | are sill needed, and there is no cause for |
| 11 | the debtors to be forced to treat them |
| 12 | inequitably, because they tended to the |
| 13 | needs of the company without negotiating |
| 14 | their own benefits at as earliest a stage as |
| 15 | possible.  Third, and most important, there |
| 16 | has been a showing that these officers would |
| 17 | be entitled to more benefits under other |
| 18 | scenarios and that the amendments are |
| 19 | reasonable and fair to the debtors in terms |
| 20 | of rationalizing the treatment of these |
| 21 | officers in the event of any sale.  It is |
| 22 | clear that they are giving up some very |
| 23 | valuable expectancies and rights, and there |
| 24 | is no evidence that the costs of their |
| 25 | rights as amended is disproportionate to the |

1                           Proceedings
2        amounts that are being given up and to the
3        benefits from the continued services from
4        these officers.   The motion has been
5        reviewed by the creditors' committee, which
6        has no objection, and which the Court will
7        assume believes as it says that the costs of
8        the plan are coming out of the pockets of
9        the creditors rather than the shareholders.
10       In any event, whether the cost is, in fact,
11       a cost of the creditors or the shareholders,
12       under the Bankruptcy Code the debtors have
13       made a sufficient showing that the
14       amendments are reasonable and the motion
15       will be approved.   The debtors are also
16       requested to settle an order on three days'
17       notice.   Thank you very much.
18            MR. MILLER:   The order I settle will
19       have the revised form of the employment
20       agreements to broaden beyond Kellwood, as I
21       indicated earlier.   I will service a
22       blackline copy so that the Triage
23       shareholders will see the changes.
24            JUDGE GROPPER:   Very good.   Thank you.
25

80

1

2                     C E R T I F I C A T E

3     STATE OF NEW YORK    )
                           : SS:
4     COUNTY OF NEW YORK   )

5

6             I, DEBORAH HUNTSMAN, a Shorthand

7     Reporter and Notary Public within and for the

8     State of New York, do hereby certify:

9             That the within is a true and accurate

10    transcript of the proceedings taken on the 15th

11    day of July, 2003.

12            I further certify that I am not

13    related by blood or marriage to any of the

14    parties and that I am not interested in the

15    outcome of this matter.

16            IN WITNESS WHEREOF, I have hereunto

17    set my hand this 18th day of July, 2003.

18                       _Deborah Huntsman_

19                       DEBORAH HUNTSMAN

20

21

22

23

24

25

# EXHIBIT E

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
David E. Springer (DS 9331)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)


        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York, 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)


Attorneys for Delphi Corporation, et al.,
 Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
                                              :
        In re                                 :      Chapter 11
                                              :
DELPHI CORPORATION, et al.,                   :      Case No. 05–44481 (RDD)
                                              :
                        Debtors.              :      (Jointly Administered)
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DECLARATION OF JOHN D. SHEEHAN IN SUPPORT OF DEBTORS'
OBJECTION TO MOTION OF APPALOOSA MANAGEMENT L.P.
PURSUANT TO 11 U.S.C. § 1102(a)(2) FOR ORDER DIRECTING
UNITED STATES TRUSTEE TO APPOINT EQUITY COMMITTEE

John D. Sheehan declares as follows:

1.        I make this declaration in support of the Debtors' Objection To Motion Of Appaloosa Management L.P. Pursuant To 11 U.S.C. § 1102(a)(2) For Order Directing United States Trustee To Appoint Equity Committee (the Debtors' "Objection" and Appaloosa's "Equity Committee Motion," respectively).  Capitalized terms not otherwise defined in this declaration shall have the meanings ascribed to them in the Objection or the various pleadings referenced herein.  I have personal knowledge of the matters stated in this declaration.

2.        I am the Vice President of Corporate Restructuring, Chief Accounting Officer, and Controller for Delphi Corporation (which, with certain of its subsidiaries and affiliates, the debtors, and the debtors-in-possession in the above-captioned cases, are referred to collectively and variously herein as "Delphi" or the "Debtors").  I joined Delphi in July 2002 as Chief Accounting Officer and Controller.  On March 4, 2005, I also assumed the position of acting Chief Financial Officer, a position that I held until October 8, 2005, when I was appointed Chief Restructuring Officer.  Consequently, I am familiar with, and personally was involved in, the events and circumstances giving rise to the Debtors' decision to seek chapter 11 protection on October 8, 2005 (the "Petition Date").  Since the Petition Date, I have been involved at some level in virtually all of the significant decisions made by the Debtors in connection with these chapter 11 cases.

3.        On or about November 7, 2005, Appaloosa submitted to the United States Trustee (the "Trustee") a letter seeking the appointment of an official equity committee (the "Letter Request").  A copy of the Letter Request, which Appaloosa forwarded inter alia to counsel for the Debtors, and to counsel for the Official Committee of Unsecured Creditors (the "Creditors' Committee"), is attached to this declaration as Exhibit 1.

1

4.      Shortly after the Trustee received Appaloosa's Letter Request, the Trustee asked the Debtors for their position regarding Appaloosa's Request.  On December 7, 2005, the Debtors and their advisors, including their legal and final advisors (Rothschild & Co.), discussed the Letter Request with the Debtors' Board of Directors, and on December 8, 2005, the Debtors discussed the Letter Request with the Creditors' Committee and its advisors.  As a result of those discussions, and after careful consideration, the Debtors determined that the formation of an equity committee in these chapter 11 cases was unwarranted at that time, and they so informed the Trustee.  A copy of the Debtors' December 19, 2005, letter response to the Trustee's request was attached to Appaloosa's Equity Committee Motion, as Exhibit A, and is attached hereto as Exhibit 2.

5.      Attached as Exhibit 3 to this declaration are charts showing the historical trading price, current through February 21, 2006, of certain Delphi bonds and stock and Delphi's market capitalization.  The first chart, captioned "Recent Debt Pricing," comes from information supplied by the commercial information supplier known as "LoanX," which is a commercial information provider of market quotations, tabulations, lists, directories, and other published compilations, generally used and relied upon by the public or by persons in the business of buying or selling corporate debt securities.[1]  The second chart, captioned "Recent Stock Pricing and Market Capitalization," comes from CapitalIQ, which is a division of Standard and Poor's, a commercial

---

[1]    According to its website (www.bondmarkets.com), LoanX is an industry-sponsored platform that provides secondary market liquidity and transparency services to dealers and asset managers in the syndicated loan market. The company currently provides brokerage services to the dealer community, posting the inside markets and facilitating trade activity on as many as 50 different issues at any time. LoanX launched an Internet-enabled mark-to-market service in May 2002. This new service marries dealer marks and known facility details, and integrates this market data with analytical tools and real-time credit market news from multiple vendors.

information provider of market quotations, tabulations, lists, directories, and other published compilations, generally used and relied upon by the public or by persons in the business of buying or selling corporate equity securities.

6.      According to information supplied by LoanX, as of February 21, 2006, all four tranches of Delphi Corporation's publicly-traded debt securities were trading at an implied recovery of between 53.0% and 55.8% of face value.  Also as of February 21, 2006, Delphi's publicly-traded trust preferred securities were trading at an implied recovery of 24.0% of face value.  According to information supplied by CapitalIQ, as of the close of the business day on February 23, 2006, Delphi's common stock was trading at $0.33.

7.      The Debtors' schedules and statements, as amended (Docket Nos. 1854 and 1999), the Debtors' monthly operating report for January 2005, filed on February 28, 2006 (Docket No. 2569), and the recent trading prices of Delphi's public securities described in the paragraphs 4 &5 and Exhibit 3 hereto, all evidence the fact that equity is deep under water.

8.      Delphi Corporation's Board of Directors has twelve members, 10 of whom are independent, and two of those ten were elected to the Board within the past month.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing statements are true and correct.

Executed on March 1, 2006, in New York, New York.


/s/ John D. Sheehan
                    John D. Sheehan

3

**Exhibit A**

**WHITE & CASE**

White & Case LLP
Wachovia Financial Center, Suite 4900
200 South Biscayne Boulevard
Miami, Florida 33131-2352

Tel  + 1 305 371 2700
Fax + 1 305 358 5744/5766
www.whitecase.com

Direct Dial + 305-995-5282      tlauria@whitecase.com

November 7, 2005

<u>SENT VIA FACSIMILE TRANSMISSION</u>

Alicia M. Leonhard, Esq.
Tracy H. Davis, Esq.
Office of the United States Trustee
for the Southern District of New York
33 Whitehall Street, 21st Floor
New York, New York 10004

Re:   In re Delphi Corporation, et al., 05-44481(RDD)
        (Jointly Administered)

Attorneys Leonhard and Davis:

We represent Appaloosa Management L.P. ("Appaloosa"), which, collectively with certain of its affiliates, is one of Delphi Corporation's ("Delphi") largest shareholders, owning approximately 9.3% of Delphi's issued and outstanding shares.

For the reasons set forth below, Appaloosa believes that the appointment of an official committee is required to provide adequate and appropriate representation of the interests of all shareholders of Delphi and to ensure that they receive the value to which they are entitled under the chapter 11 process. Accordingly, we hereby request the appointment of an official committee of equity security holders (an "Equity Committee") in the chapter 11 cases of Delphi and its affiliated debtors and debtors in possession (collectively, the "Debtors").

According to the Affidavit of Robert S. Miller Jr. under Local Bankruptcy Rule 1007-2 and in support of Chapter 11 Petitions and Various First Day Applications and Motions dated October 8, 2005 (the "Miller Affidavit"), the Debtors estimated that there were 331,202 shareholders as of August 26, 2005. According to the Miller Affidavit, the Company has 1.35 billion shares of

ALMATY   ANKARA   BANGKOK   BEIJING   BERLIN   BRATISLAVA   BRUSSELS   BUDAPEST   DRESDEN   DÜSSELDORF   FRANKFURT   HAMBURG   HELSINKI
HO CHI MINH CITY   HONG KONG   ISTANBUL   JOHANNESBURG   LONDON   LOS ANGELES   MEXICO CITY   MIAMI   MILAN   MOSCOW   MUMBAI   NEW YORK   PALO ALTO
PARIS   PRAGUE   RIYADH   ROME   SAN FRANCISCO   SÃO PAULO   SHANGHAI   SINGAPORE   STOCKHOLM   TOKYO   WARSAW   WASHINGTON, DC

MIAMI 612795 [612792_2.DOC] (2K)

Alicia M. Leonhard, Esq.
Tracy H. Davis, Esq.

November 7, 2005

authorized common stock and of this amount 561,781,590 shares were outstanding as of August 26, 2005.

**The Relevant Criteria for Establishing
an Equity Committee are Satisfied Here**

We believe all of the criteria for the appointment of an Equity Committee under 11 U.S.C. § 1102(a)(1) are present in this matter:

(a)    the interests of shareholders are not otherwise adequately represented;

(b)    Delphi is not hopelessly insolvent, such that Appaloosa appears to have a real economic interest at stake;

(c)    the case is large and complex;

(d)    the stock is widely held and actively traded; and

(e)    the timing of the request is appropriate.

See generally In re Williams Commc'ns Group, Inc., 281 B.R. 216 (Bankr. S.D.N.Y. 2002); In re Johns-Manville Corp., 68 B.R. 155 (S.D.N.Y. 1986); In re Kalvar Microfilm, 195 B.R. 599 (Bankr. D. Del. 1996); In re Wang Labs., Inc., 149 B.R. 1 (Bankr. D. Mass. 1992) (appointing equity committee over objections of United States Trustee and official committee of unsecured creditors even while debtor had negative book equity of several hundred million dollars); In re Beker Indus. Corp., 55 B.R. 945 (Bankr. S.D.N.Y. 1985) (equity committee appointed); In re Evans Prods. Co., 58 B.R. 572 (S.D. Fla. 1985); In re Emons Indus., Inc., 50 B.R. 692 (Bankr. S.D.N.Y. 1985); In re Exide Technologies, Case No. 02-11125 (Bankr. D. Del. 2002) (appointing equity committee over objections of debtor and official committee of unsecured creditors).

**Equity Will Not is Adequately
Represented without an Official Committee.**

Although the unsecured creditors and shareholders possess a general identity of interest in seeing that the unsecured creditors are paid because of the "absolute priority" rule's mandate that junior interests retain nothing unless senior debt is paid in full, see 11 U.S.C. § 1129(b)(2)(B), such interests are not always aligned and often diverge.  Furthermore, the official committee of unsecured creditors (the "Creditors' Committee") has neither a duty nor incentive in these cases to choose strategic alternatives that maximize value for equity.  In fact, these Debtors are organized with substantial non-debtor affiliates under a complex corporate structure.  From a review of publicly available information, it appears that substantial unencumbered assets or assets with substantial residual value exist within legal entities with relatively little debt,

2

Alicia M. Leonhard, Esq.
Tracy H. Davis, Esq.

WHITE & CASE

November 7, 2005

particularly with respect to the company's foreign and emerging new operations. In contrast, the major liabilities contributing to the deterioration of the company's recent financial performance, namely, unsustainable U.S. employee related legacy obligations, are in respect of operations isolated within certain U.S. Debtor subsidiaries, which have no claims against or rights of distribution from other valuable Delphi businesses. While we recognize that these Debtors have substantial obligations that need to be addressed in the context of these bankruptcy cases, there remains substantial value within Delphi's capital structure outside of and unrelated to the Debtors' legacy obligations. Thus, due to the complex legal structure, not only is the total amount of liabilities within the Delphi enterprise an important fact to ascertain, but where such liabilities appropriately reside within the capital structure must be thoroughly explored as well. Simply, ensuring that creditors are satisfied only from the estates against which they have legal entitlements is paramount to protecting the rights of equity shareholders -- a function that may be performed only by a body charged with the fiduciary duty to advance the interests of such shareholders. Clearly, the interests represented by the Creditors' Committee conflict with the interests of shareholders on these points.

Further, while Delphi's directors and managers have a fiduciary responsibility to look after shareholders' interests, conflicting concerns often arise which make it difficult for such directors and management to follow the best course for non-insider public shareholders. Accordingly, the shareholders are the only major constituency not independently represented at this time. The shareholders are entitled to an official role in these cases to advance and preserve equity value, equity that a few days before the Delphi filing had a market value in excess of $1.7 billion. Shareholder exclusion without official representation will hamper their ability to effectively participate in the chapter 11 cases and ultimate plan formulation. An Equity Committee should be appointed to enable shareholders to participate fully and actively in these cases.

### *Delphi Corporation is not Hopelessly Insolvent*

These are not the typical chapter 11 cases where equity should be presumed to be out of the money. In fact, the opposite needs to be presumed here, that is, equity is in the money and therefore entitled to have meaningful participation in these cases. Indeed, the actions of Delphi itself shortly before the commencement of these cases require a presumption that Delphi is solvent. As recently as June 22, 2005, Delphi declared a $0.015 dividend on Delphi $0.01 par value common stock. This dividend was paid on August 2, 2005. Under Delaware law, however, dividends may be declared *and* paid only (i) out of surplus or (ii) in the case where no surplus exists, out of the company's profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year. Del. Cod. Ann. Tit. 8, § 170 (2003). As Delphi has not reported any profits in the current and preceding years, payment of the August 2, 2005 dividend must have been from Delphi's surplus. Surplus is defined as the excess of the net assets (total assets minus total liabilities) of the corporation over its capital, which, if determined to be available, necessarily requires a determination that the corporation is balance sheet solvent. Id. at § 154. Thus, as of August 2, 2005, just two months prior to Delphi's filing, Delphi's board of directors had determined that it was balance sheet solvent. See also, In re Heilig Meyers

3

MIAMI 617791 [617791_5.DOC] (2X)

Alicia M. Leonhard, Esq.
Tracy H. Davis, Esq.

November 7, 2005

Company, 329 B.R. 471 (Bankr. E.D. Va. 2005) (court considered debtor's payment of dividend as factor in determining solvency of debtor as payment of dividend while insolvent violated Virginia law).

Perhaps more importantly, Delphi's Chief Executive Officer has stated clearly that the Debtors commenced their chapter 11 cases simply to avoid a potential filing under the Bankruptcy Act of 2005 that came into effect on October 17, 2005. In particular, he indicated that he did not want Delphi to be the "guinea pig" under the new, less debtor friendly law. See The Sunday Times (UK), September 18, 2005, at 65, available at 2005 WLNR 14706425. There were, however, no reports of any impending liquidity crisis or any other matters compelling a filing. In fact, the expectation was that Delphi, along with General Motors, would continue to negotiate with their respective union employees and reach a consensual agreement or agreements outside of chapter 11. Recently, however, there have been reports that General Motors urged Delphi to commence chapter 11 proceedings to gain a strategic advantage in its negotiations with its own union employees. See Economist, October 15, 2005, at 65, available at 2005 WLNR 16692334. Thus, unlike other recent large chapter 11 cases commenced on the eve of the effectiveness of the new bankruptcy amendments, a chapter 11 filing for Delphi was not inevitable (and it could not have been inevitable, otherwise Delphi's board of directors could not have declared a dividend just two months prior). Simply, Delphi is in chapter 11 today and shareholders are disenfranchised not because Delphi is insolvent or unable to pay its obligations as they come due; Delphi is in chapter 11 solely because it made a calculated determination, perhaps at the urging of its self proclaimed largest creditor, that the current legal construct offered certain benefits that would otherwise soon be unavailable.

Moreover, the value of Delphi's current equity will depend in large part on the resolution of material issues currently being addressed by the Debtors without meaningful participation from shareholders, including:

(a)    the total amount of actual employee related liabilities and where such liabilities reside in the capital structure;

(b)    the manner in which employee related liabilities are restructured, including pursuant to sections 1113 & 1114 of the Bankruptcy Code;

(c)    the amount, enforceability, treatment and appropriate characterization of any claims asserted by General Motors, including claims, if any, asserted pursuant to the Indemnification Agreement, dated December 22, 1999, between Delphi and General Motors;

(d)    the extent to which Delphi may mitigate or avoid the accrual of any enforceable claims to General Motors under the Indemnification Agreement; and

4

      (e)    whether intercompany claims exist in favor of Delphi Corporation for, among other things, the advancement of substantial funds raised in the capital markets for the purpose of addressing certain Debtor legacy obligations.

For instance, under the Indemnification Agreement, if enforceable, Delphi must indemnify General Motors for any liabilities it incurs under those certain Benefit Guarantees issued by General Motors to certain of the Debtors' employees. Once accrued, the Benefit Guarantees require General Motors to continue to pay employee obligations notwithstanding the expiration of the Debtors' own underlying responsibility to pay such obligations. General Motors may assert, although Appaloosa would contest such interpretation, that the Indemnification Agreement requires Delphi to reimburse General Motors for all obligations incurred, even if the Debtors have been relieved of the underlying obligations owing directly to the employees. If not otherwise triggered, however, the Benefit Guarantees and Delphi's obligations, if any, under the Indemnification Agreement, terminate in 2007. Accordingly, before taking any actions that may trigger accrual of obligations owing under the Indemnification Agreement, Delphi must explore all alternatives with consideration any given to the consequences any actions may have on shareholder value. Delphi has already begun the process of restructuring its employee obligations. Although Appaloosa does not dispute that such obligations need to be restructured, disturbingly, there is no evidence in the public record that Delphi has given any consideration to how the manner in which it does so affects shareholder value.

These factors combined make it clear that Delphi is far from hopelessly insolvent, and shareholders have a real economic interest at stake in these cases.

### *These Cases are Large and Complex.*

According to the Debtors' petitions and the Miller Affidavit, the Debtors and their non-debtor subsidiaries and affiliates collectively possess $17.1 billion in total assets and $22.1 billion in total liabilities. $10.4 billion of the stated liabilities are actuarial estimates of future employee obligations, which obligations are subject to substantial reduction. In addition, as set forth in the Miller Affidavit, the Debtors are arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Debtors' technologies are present in more than 75 million vehicles on the road worldwide. The Debtors and their affiliates employ more than 180,000 employees worldwide, with global 2004 revenues of approximately $28.6 billion and global assets as of August 31, 2005 of approximately $17.1 billion. By their own admission, the Debtors' bankruptcy ranks as the fifth largest public company chapter 11 in terms of revenues, the thirteenth largest public company business reorganization in terms of assets, and represents the second largest bankruptcy filing in 2005. The vast size and complexity of these cases is therefore not in question.

5

Alicia M. Leonhard, Esq.

Tracy H. Davis, Esq.

WHITE & CASE

November 7, 2005

### The Stock is Widely Held and Actively Traded.

As of August 26, 2005, Delphi had more than 561,781,590 million shares of common stock outstanding and 331,202 shareholders. As of the close of business on November 4, 2005, over 4.5 million shares of Delphi were traded, closing at approximately $0.39 per share with a market capitalization of nearly $217 million. The average daily trading volume over the past three months was nearly 22 million shares. On October 4, 2005, just a few days before the bankruptcy filing, Delphi's market capitalization was approximately $1.7 billion.

While the depth and breadth of ownership of Delphi equity securities does not guarantee necessarily that Delphi shareholders are entitled to a distribution under a restructuring plan; the active trading in the stock, its market capitalization, and the large number of holders and potential beneficial holders does heavily weigh in favor of the appointment of an Equity Committee.

### This Request Comes on a Timely Basis.

The Debtors only commenced these cases on October 8, 2005. Accordingly Appaloosa's request is timely. More importantly, as shareholder value may likely depend upon the manner in which the Debtors restructure their employee related obligations, as noted above, time is of the essence.

Appaloosa is mindful of concerns regarding the additional expense associated with the formation of an Equity Committee, but "[c]ost alone cannot, and should not, deprive . . . security holders of representation." In re McLean Indus., Inc., 70 B.R. 852, 860 (Bankr. S.D.N.Y. 1987). The Bankruptcy Code contains adequate means for controlling costs. See 11 U.S.C. § 330(a)(1). In a case of this magnitude where assets exceed $17 billion and net sales are over $26 billion, the benefits of committee representation of shareholders' interests far outweigh any additional costs to the Debtors' estates.

In sum, the Debtors have commenced one of the largest bankruptcies in American history. In the span of a few days prior to the Delphi filing, more than $1.5 billion of the market value of Delphi equity evaporated. The filing, on the verge of the Bankruptcy Reform Act of 2005, will affect, at a minimum, hundreds of thousands of beneficial holders of equity. Because of the sheer size of the bankruptcy, it has sent shockwaves throughout the automotive industry and unionized labor. One analyst has compared the Delphi bankruptcy to the former Chrysler Corp.'s brush with bankruptcy in the early 1980s — only bigger. "I see this as a bigger event than if Chrysler had filed," said Glenn Reynolds, an analyst with the New York research firm CreditSights. "This affects the 800-pound gorilla — GM. It's probably the biggest event in the auto industry in 25 years."

Accordingly, Appaloosa believes it would be grossly unjust to permit the Debtors to engage in the process of developing a business plan, including negotiations in respect of its employee related obligations, and formulating an exit strategy without any meaningful input from

6

Alicia M. Leonhard, Esq.
Tracy H. Davis, Esq.

WHITE & CASE

November 7, 2005

shareholders who clearly have a large and valuable stake in the Debtors' enterprise.  For the foregoing reasons, we respectfully request that you appoint an Equity Committee at your earliest possible opportunity.[1]

Very truly yours,

Thomas E Lauria

cc:     Ronald Goldstein
        David Tepper
        John Wm. Butler
        Robert J. Rosenberg

---

[1]     Nothing contained herein shall constitute an admission or a waiver of any rights or remedies by Appaloosa, all such rights and remedies being expressly reserved.

                                    7

MIAMI 677765 [H2795_5.DOC] [2K]

**Exhibit B**

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

333 WEST WACKER DRIVE
CHICAGO, ILLINOIS 60606-1285
—
(312) 407-0700
FAX: (312) 407-0411
http://www.skadden.com

AFFILIATE OFFICES
BOSTON
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

DIRECT DIAL
(312) 407-0730
DIRECT FAX
(312) 407-8501
EMAIL ADDRESS
JBUTLER@SKADDEN.COM

December 19, 2005

Alicia M. Leonhard, Esq.
Trial Attorney
U.S. Department of Justice
Office of the United States Trustee
Region 2/Southern District of New York
33 Whitehall Street, Suite 2100
New York, New York 10004

Re:    Request for Formation of Statutory Equity Commit-
tee in *In re Delphi Corporation, et al.,* Lead Case
No. 05-44481 (RDD) (Jointly Administered)

Dear Alicia:

We are writing on behalf of Delphi Corporation and its affiliated
debtors and debtors-in-possession (the "Debtors") to respond to a letter dated
November 7, 2005, from White & Case LLP, submitted on behalf of its client,
Appaloosa Management L.P. ("Appaloosa"), requesting that the United States
Trustee for Region 2 (the "UST") exercise her discretionary authority under
Section 1102(a)(1) of the Bankruptcy Code to form an official statutory com-
mittee of equityholders in the Debtor's chapter 11 cases. We have reviewed the
November 7 letter with the Board of Directors and executive management of the
Debtors, as well as with the Debtors' Official Committee of Unsecured Credi-
tors (the "Creditors' Committee"), and we appreciate the opportunity to share
with you the Debtors' position regarding Appaloosa's request to form a statutory
equity committee.*

---

* A copy of this response will be filed on Form 8-K with the Securities and Exchange Commis-
sion.

Alicia M. Leonhard, Esq.
December 19, 2005
Page 2

In summary, the Debtors request that the UST determine that it is premature to appoint an equity committee at this time and defer further consideration of the request at least until the Debtors file their statements of financial affairs and schedules of assets and liabilities in January, 2006 and the UST has completed her conduct of the formal meeting of creditors required by Section 341 of the Bankruptcy Code (which is presently scheduled to take place in February, 2006). Should your office determine that a binding decision is required to be made at this early point in the Debtors' chapter 11 cases – even before the Debtors' first monthly operating report is filed later this month – the Debtors respectfully request that the UST decline to exercise her statutory prerogative to form an equity committee.

As is discussed in greater detail below, official equity committees are rarely appointed in chapter 11 cases, Delphi's Board of Directors (10 of the 12 of which are independent directors) will adequately represent all stakeholders in their role to maximize the enterprise value of the Debtors, and it is highly unlikely that common equityholders will receive any value in the chapter 11 cases on account of the equity securities of Delphi Corporation, the parent holding company, which interests the Debtors believe are "hopelessly insolvent." This observation is in stark contrast with the value of Delphi's non-U.S. subsidiaries, which are not chapter 11 debtors, are continuing their business operations in the ordinary course of business without supervision from the Bankruptcy Court, and are not subject to the chapter 11 requirements of the U.S. Bankruptcy Code. Notwithstanding the inherent value that the Debtors believe is associated with Delphi's global business operations outside of the United States, the Debtors do not believe that such value can overcome the direct and indirect claims against the parent holding company on account of the non-competitive legacy liabilities and burdensome restrictions under current U.S. labor agreements as well as the realignment of Delphi's global product portfolio and manufacturing footprint that must be achieved to preserve the Debtors' core businesses.

## Background

On October 8, 2005, Delphi Corporation and certain of its U.S. subsidiaries filed chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). We refer you to the Affidavit of Robert S. Miller, Jr. filed in support of the First Day Motions in the

Alicia M. Leonhard, Esq.
December 19, 2005
Page 3

Debtors' chapter 11 cases (Docket No. 7) for general background regarding the Debtors' prepetition affairs and events leading up to the commencement of the chapter 11 cases. Also on October 8, 2005, the Debtors issued a press release reporting on the commencement of the chapter 11 cases which included the following cautionary paragraph:

> "Delphi also noted that the execution of its transformation plan through the chapter 11 process may give rise to the incurrence of additional prepetition claims as collective bargaining agreements, executory contracts, retiree health benefits and pension plans, and other liabilities of the company are addressed and resolved to maximize stakeholder value going forward. There is no assurance as to what values, if any, will be ascribed in the chapter 11 cases as to the value of Delphi's existing common stock and/or any other equity securities. Accordingly, the company urges that the appropriate caution be exercised with respect to existing and future investments in any of these securities as the value and prospects are highly speculative."[*]

On or about November 7, 2005, without prior substantive discussion with the Debtors, White & Case LLP delivered to the undersigned a copy of the November 7 letter to the UST. On November 28, 2005, White & Case LLP delivered to the undersigned a letter of even date from Appaloosa addressed to the Debtors' Board of Directors. (See Exhibit 1.) The November 7 and November 28 letters were discussed with the Board of Directors and the subject of a potential equity committee was discussed with the Creditors' Committee at meetings in Troy, Michigan on December 7 and December 9, respectively. On December 13, the Debtors were informed by the Creditors'

---

[*] Additional cautionary language has been included in the safe harbor statement used in the company's subsequent restructuring-related press releases cautioning current stakeholders and potential investors that "[n]o assurance can be given as to what values, if any, will be ascribed in the bankruptcy proceedings to each of these constituencies [the Company's various prepetition liabilities, common stock and/or other equity securities]. Accordingly, the Company urges that the appropriate caution be exercised with respect to existing and future investments in any of these liabilities and/or securities."

Alicia M. Leonhard, Esq.
December 19, 2005
Page 4

Committee that the Creditors' Committee had voted to oppose the formation of
an equity committee and had submitted its December 12 letter to your office.[*]

### Request for Formation of Equity Committee

As summarized above, the Debtors respectfully request that you
determine not to exercise your statutory prerogative to appoint an equity
committee at this time. At best, appointment of an equity committee would be
premature and, at worst, futile and an unnecessary burden to the Debtors' estates
and its reorganization prospects.

Among the factors that are examined by the United States Trustee
when considering the appointment of a statutory equity committee are whether
the Company's shares are widely held and publicly traded; the size and
complexity of the chapter 11 cases; the delay and additional cost that would
result if an equity committee were appointed; the likelihood of whether the
debtor is insolvent; the timing of the request relative to the status of the chapter
11 cases; and whether the interests are otherwise adequately represented. In re
Kalvar Microfilm, Inc., 195 B.R. 599, 600 (Bankr. D. Del. 1996).

The Debtors believe that the reported decision of Judge Lifland in
the Bankruptcy Court rendered on July 24, 2002 in In re Williams Communs.
Group, Inc., 281 B.R. 216 (Bankr. S.D.N.Y. 2002) provides helpful guidance to
the UST in this District. Among many of the salient conclusions reached by
Judge Lifland that have applicability to the request here is Judge Lifland's
penultimate conclusion:

> "The appointment of official equity committees should be the rare
> exception. Such committees should not be appointed unless
> equity holders establish that (i) there is a substantial likelihood
> that they will receive a meaningful distribution in the case under a
> strict application of the absolute priority rule, and (ii) they are
> unable to represent their interests in the bankruptcy case without
> an official committee. The second factor is critical because, in

---

[*] While not agreeing with every statement in the Creditors' Committee submission, the Debtors
concur with the Creditors' Committee conclusion that the appointment of an equity committee
is not warranted in the Debtors' chapter 11 cases.

Alicia M. Leonhard, Esq.
December 19, 2005
Page 5

> most cases, even those equity holders who do expect a
> distribution in the case can adequately represent their interest
> without an official committee and can seek compensation if they
> make a substantial contribution in the case." (Id., at p. 222).

While the Debtors would fervently wish otherwise, Appaloosa has not
demonstrated – and the Debtors cannot construct – a scenario in which these
factors can be satisfied. This is largely because the claims associated with the
Debtors' non-competitive U.S. legacy liabilities and burdensome U.S. labor
agreements are direct claims against the U.S. parent holding company and are
superior in priority to the interests of that entity's common shareholders.

The conclusion that there is no meaningful distribution available
for the common shareholders of the U.S. parent holding company is also shared
by the capital markets. As shown in the attached capitalization summary, all
four tranches of Delphi Corporation's publicly traded debt securities were
trading as of December 16, 2005 at an implied recovery of between 49.8% and
51.0% of face value and Delphi Corporation's publicly traded trust preferred
securities were trading at an implied recovery of 23.0% of face value. (See
Exhibit 2.) Applying the absolute priority rule, there can be no recovery for
interests when claims are not satisfied at full value. The capitalization summary
also reflects that the balance sheet account for shareholders' equity as of
September 30, 2005 reflected a deficit of $5.314 billion and that the common
stock was trading on December 16, 2006 at $0.35, which the Debtors believe
reflects a combination of option value and market inefficiencies.

Accordingly, based on all of the relevant information available to
the Debtors, the Debtors believe that if the Bankruptcy Court were required to
make a determination today, there is a substantial likelihood that the
Bankruptcy Court would determine that the Debtors are not solvent and meet
the "appearance of hopeless insolvency" standard developed in applicable case
law. The Debtors further believe that the Bankruptcy Court would therefore
also conclude that any plan of reorganization capable of confirmation in
accordance with the statutory priority rules of the Bankruptcy Code would result
in holders of Delphi's common stock receiving no distribution on account of

Alicia M. Leonhard, Esq.
December 19, 2005
Page 6

their interests and cancellation of their interests.* With respect to the issue of
adequate representation, the Debtors believe that the Board of Directors, which
is presently composed of twelve members (ten of which are independent
directors including two new directors elected to the Board earlier this month),
adequately represents its stakeholders in its fiduciary mission in the chapter 11
cases to maximize business enterprise value for all of the Debtors' stakeholders.

 Moreover, <u>Williams</u> requires that, as a prerequisite to the
formation of a statutory equity committee, equity holders must first establish
that "they are unable to represent their interests in the bankruptcy case without
an official committee. . . .[this] factor is critical because, in most cases, even
those equity holders who do expect a distribution in the case can adequately
represent their interest without an official committee and can seek
compensation if they make a substantial contribution in the case." (<u>Id.</u>, at p.
222). This is particularly true here where Appaloosa is a highly sophisticated
entity that has only recently invested in the Company at levels requiring public
disclosure and has retained highly sophisticated professionals to represent it in
the Debtors' chapter 11 cases.

 While the Debtors believe that the above two issues should be
dispositive of the request pending before the United States Trustee, the Debtors
also believe that the request does not satisfy many of the other factors
traditionally relied upon by United States Trustees and the Bankruptcy Courts
that have been called upon to review such requests. For example, the Debtors

---

\* The safe harbor and risk factors language in the Company's Form 8-K filed in connection with
this response and future restructuring related press releases will include the following lan-
guage: "As described in the Company's public statements in response to the request submitted
to the United States Trustee for the appointment of a statutory equity committee, holders of
Delphi's common stock and other equity interests (such as options) should assume that they
will not receive value as part of a plan of reorganization. In addition, under certain conditions
specified in the Bankruptcy Code, a plan of reorganization may be confirmed notwithstanding
its rejection by an impaired class of creditors or equity holders and notwithstanding the fact
that equity holders do not receive or retain property on account of their equity interests under
the plan. In light of the foregoing and as stated in its October 8, 2005 press release announcing
the filing of its chapter 11 reorganization cases, the Company considers the value of the
common stock to be highly speculative and cautions equity holders that the stock may
ultimately be determined to have no value. Accordingly, the Company urges that appropriate
caution be exercised with respect to existing and future investments in Delphi's common stock
or other equity interests or any claims relating to prepetition liabilities."

Alicia M. Leonhard, Esq.
December 19, 2005
Page 7

are very concerned about the additional costs and burdens that will be placed on the Debtors' estates by the appointment of a statutory equity committee. Similarly, the Debtors reserve their rights in all respects with respect to various statements and suggestions in the November 7 and November 28 letters from or on behalf of Appaloosa. The determination of the Debtors not to specifically address each and every statement in the November 7 and November 28 letters is not an admission against interest or an agreement with such statements, at least some of which the Debtors believe are materially inaccurate.

In closing, on behalf of the Debtors, we want to again express our appreciation for your willingness to consider input from the Debtors with respect to this request for appointment of an additional statutory committee in the Debtors' chapter 11 cases as well as for your patience while the Debtors considered this matter both internally as a matter of prudent corporate governance and with the Creditors' Committee. Should you have any questions regarding these matters or would like further information from the Debtors, we would be happy to make ourselves available at your convenience.

Sincerely yours,

John Wm. Butler, Jr.

Attachments

cc:    Mr. Robert S. Miller
       David M. Sherbin, Esq.
       Thomas E. Lauria, Esq.
       Robert J. Rosenberg, Esq.

**Exhibit C**

243775

# Delphi Corporation

## Recent debt pricing

**One year historical pricing**



Source **LoanX** 2/21/06

243775

# Delphi Corporation

## *Recent stock pricing and market capitalization*

**One year stock price**



**One year market capitalization ($ in millions)**



Source **CapitalIQ** 2/21/06

# EXHIBIT F

**Hearing Date: March 9, 2006**
**Hearing Time: 10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

　　　- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
　　Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
　　　　　　　　　　　　　　　　　　　:
　　　　In re　　　　　　　　　　　　:　　Chapter 11
　　　　　　　　　　　　　　　　　　　:
DELPHI CORPORATION, et al.,　　　　:　　Case No. 05-44481 (RDD)
　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:　　(Jointly Administered)
　　　　　　　　　　　　　Debtors.　　:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEBTORS' STATEMENT IN RESPONSE TO MOTION DIRECTING
APPOINTMENT OF GENERAL MOTORS CORPORATION TO
STATUTORY CREDITORS' COMMITTEE

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this statement (the "Statement") in response to the Motion For Order Directing Appointment Of General Motors Corporation to Statutory Creditors' Committee (the "Motion") filed on February 17, 2006 by General Motors Corporation ("GM").  The Debtors respectfully represent as follows:

1.          When these cases were initially filed, Delphi did not support General Motors' request for appointment to the Creditors' Committee because of GM's relationship to Delphi as its former parent and largest customer, the legacy contractual agreements between the two companies, and the unique role that GM was expected to play in the resolution of Delphi's legacy obligations in its North American operations.  After their chapter 11 filings, the Debtors have engaged in extensive and ongoing discussions with GM about labor and supplier issues and other matters of common concern, and although no final agreements have been reached, progress has been made.[1]  Delphi also has not participated in, and neither supported nor opposed, GM's subsequent informal efforts to be added to the Creditors' Committee.  Accordingly, the Debtors take no position on the merits of the Motion, which raises disagreements with the United States Trustee and primarily intercreditor issues with other stakeholders that are more appropriately addressed by the United States Trustee and the Creditors' Committee.

---

[1]     For example, in October 2005, GM estimated that its contingent liability relating to benefit guarantees for certain Delphi employees ranged from zero to $12 billion.  In a January 26, 2006 press release, GM revised its estimate and now acknowledges that the liability will range from $3.6 billion to $12 billion.

2.        However, while the Debtors are neutral with respect to the relief

sought in the Motion, the Debtors affirmatively dispute many of the assertions, statements,

and characterizations contained in the Motion including the subject matter highlighted

below.  In that regard, the Debtors fully reserve all of their rights with respect to all such

factual and legal assertions, substantially all of which are superfluous and irrelevant to the

relief sought in the Motion.  Moreover, the Debtors request that any Order entered in

connection with the Motion specifically recognize the Debtors' reservation of rights and

refrain from making any findings of fact or conclusions of law with respect to such

assertions.

3.        As a threshold matter, the Debtors disagree with GM's suggestion

that the process that the U.S. Trustee employed in selecting the members of the Committee

was arbitrary and capricious or that she otherwise "abused" her discretion.  The Debtors

also reserve all their rights with respect to all of GM's Prepetition Claims (as that term is

defined in the Motion) and should not be viewed as agreeing with GM's statements about

them.

4.        In addition, GM makes a number of superfluous and irrelevant

statements  regarding its supply arrangements and contractual agreements with the

Debtors.  See, e.g., Motion ¶ 6.  Because none of these statements is particularly relevant

to the merits of the Motion, the Debtors will not address GM's assertions here. [2]  Finally,

although this Statement in response to the Motion is not the occasion to brief the merits of

whatever motions to reject executory contracts or leases with GM that circumstances may

---

[2]      As discussed in paragraph 2 of this Statement, the Debtors specifically reserve their rights with regard to
all issues relating to GM including their contractual relations with GM.

3

require the Debtors to file, GM's assertion, in a footnote, that Delphi will never be entitled

to reject <u>any</u> GM contracts, including purchase orders between GM and Delphi (<u>see</u>

Motion ¶ 11 n. 3), is plainly wrong.[3]


Dated: New York, New York
　　　 March 2, 2006

　　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　SKADDEN, ARPS, SLATE, MEAGHER
　　　　　　　　　　　　　　　　　 & FLOM LLP

　　　　　　　　　　　　　　　　By: <u>/s/  John Wm. Butler, Jr.　　　　</u>
　　　　　　　　　　　　　　　　　　 John Wm. Butler, Jr. (JB 4711)
　　　　　　　　　　　　　　　　　　 John K. Lyons (JL 4951)
　　　　　　　　　　　　　　　　　　 Ron E. Meisler (RM 3026)
　　　　　　　　　　　　　　　　333 West Wacker Drive, Suite 2100
　　　　　　　　　　　　　　　　Chicago, Illinois  60606
　　　　　　　　　　　　　　　　(312) 407-0700

　　　　　　　　　　　　　　　　 - and -

　　　　　　　　　　　　　　　　By: <u>/s/  Kayalyn A. Marafioti　　　　</u>
　　　　　　　　　　　　　　　　　　 Kayalyn A. Marafioti (KM 9632)
　　　　　　　　　　　　　　　　　　 Thomas J. Matz (TM 5986)
　　　　　　　　　　　　　　　　Four Times Square
　　　　　　　　　　　　　　　　New York, New York 10036
　　　　　　　　　　　　　　　　(212) 735-3000

　　　　　　　　　　　　　　　　Attorneys for Delphi Corporation, <u>et al.</u>,
　　　　　　　　　　　　　　　　　　 Debtors and Debtors-in-Possession

---

[3]　　Section 365(a) authorizes the Debtors to review their inventory of executory contracts and decide "which ones would be beneficial to adhere to and which ones would be beneficial to reject."  <u>Orion Pictures Corp. v. Showtime Networks, Inc.</u> (In re Orion Pictures Corp.), 4 F.3d 1095, 1098 (2d Cir. 1993).  The Debtors intend to exercise that authority and to make an informed business judgment about rejecting executory contracts, be they with GM or anyone else.  <u>See</u>  <u>In re The Penn Traffic Co.</u>, 322 B.R. 63, 68 (Bankr. S.D.N.Y. 2005) ("It is well established that the decision whether to assume or reject an executory contract under Section 365(a) is a matter of business judgment to be exercised in the best interests of the debtor in possession and its creditors.").  The Debtors' agnosticism about GM's present Motion should not be taken to presage their future beliefs about rejecting GM contracts or about the terms and conditions they will require in GM contracts succeeding those that have expired or that are rejected.