```
                    UNITED STATES BANKRUPTCY COURT
                    SOUTHERN DISTRICT OF NEW YORK


--------------------------------------X
                                      :
In re:                                :   Case No. 05-44481
                                      :
    DELPHI CORPORATION, et al,        :
                                      :   One Bowling Green
                                      :   New York, NY
                        Debtors.      :   January 5, 2006
--------------------------------------X


               TRANSCRIPT OF OMNIBUS HEARING
          BEFORE THE HONORABLE ROBERT D. DRAIN
              UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:


For the Debtors:          JOHN W. BUTLER, JR., ESQ.
                          DAVID E. SPRINGER, ESQ.
                          SKADDEN, ARPS, SLATE,
                          MEAGHER & FLOM, LLP
                          333 West Wacker Drive, Suite 2100
                          Chicago, Illinois  60606

                          KAYALYN A. MARAFIOTI, ESQ.
                          SKADDEN, ARPS, SLATE,
                          MEAGHER & FLOM, LLP
                          Four Times Square
                          New York, New York 10024

                          THOMAS J. MATZ, ESQ.
                          SKADDEN, ARPS, SLATE,
                          MEAGHER & FLOM, LLP
                          Four Times Square
                          New York, New York 10036

                          NEIL BERGER, ESQ.
                          TOGUT, SEGAL & SEGAL, LLP
                          One Penn Plaza, Suite 335
                          New York, New York 10119
```

(Appearances continued on next page)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

Special Counsel to
  Delphi:
WILLIAM J.F. ROLL, III, ESQ.
LYNETTE C. KELLY, ESQ.
ANDREW V. TENZER, ESQ.
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022


For DC Capital Partners:
JESSICA L. FAINMAN, ESQ.
SCHULTE ROTH & ZABEL LLP
919 3rd Avenue
New York, New York 10022


For Appaloosa
Management, LP:
GERARD H. UZZI, ESQ.
WHITE & CASE, LLP
200 S Biscayne Blvd, Suite 4900
Miami, Florida 33131


For Wilmington Trust
Company:
EDWARD M. FOX, ESQ.
KIRKPATRICK & LOCKHART NICHOLSON
GRAHAM LLP
599 Lexington Avenue
New York, New York 10022


For the Lead Plaintiffs:
MICHAEL S. ETKIN, ESQ.
LOWENSTEIN SANDLER PC
65 Livingston Avenue
Roseland, New Jersey 07068


For the Creditors
Committee:
ROBERT J. ROSENBERG, ESQ.
LATHAM & WATKINS, LLP
53rd at Third, 885 Third Avenue
New York, New  York  10022-4802


For the Lead Plaintiffs:
JAMES J. SABELLA, ESQ.
GRANT & EISENHOFER, P.A.
Chase Manhattan Centre
1201 North Market Street
Wilmington, Delaware 19801


(Appearances continued on next page)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Co-Lead Counsel for Securities: | JOHN P. COFFEY, ESQ.<br>BERNSTEIN, LITOWITZ, BERGER<br>AND GROSSMANN, LLP<br>1285 Avenue of the Americas<br>New York, New York 10019 |
| For U.S. | TRACY HOPE DAVIS, ESQ.<br>U.S. DEPARTMENT OF JUSTICE<br>33 Whitehall Street<br>New York, New York 10004 |
| For the Committee: | HENRY P. BAER, JR.<br>ROBERT J. ROSENBERG, ESQ.<br>Latham & Watkins<br>885 Third Avenue<br>New York, New York 10022 |
| For Pepco Energy Serv.: | CAMERON MACDONALD, ESQ.<br>WHITEFORD, TAYLOR & PRESTON, LLP<br>Seven Saint Paul Street<br>Baltimore, Maryland 21202 |
| For Creditors Comm. | MICHAEL D. WARNER, ESQ.<br>WARNER STEVENS, LLP<br>1700 City Center Tower II<br>301 Commerce Street<br>Fort Worth, Texas 76102 |
| For UMICORE: | EDWARD C. DOLAN, ESQ.<br>HOGAN & HARTSON, LLP<br>555 Thirteenth Street NW<br>Washington, DC 20004 |
| For UAW: | BABETTE CECCOTTI, ESQ.<br>COHEN, WEISS & SIMON, LLP<br>330 West 42nd Street<br>New York, New York 10036 |

(Appearances continued on next page)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK


For ACE American Ins.        MARGERY N. REED, ESQ.
                             JOSEPH LEMKIN, ESQ.
                             DUANE MORRIS
                             30 South 17th Street
                             Philadelphia, PA 19103


For Capital Research:        RICHARD G. MASON, ESQ.
                             WACHTELL, LIPTON, ROSEN & KATZ
                             51 West 52nd Street
                             New York, New York 10019


Court Transcriber:           KATHLEEN PRICE, CET
                             TypeWrite Word Processing Service
                             356 Eltingville Boulevard
                             Staten Island, New York 10312


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

5

1          THE COURT:  Please be seated.  Okay.  Good morning.

2    Delphi Corporation.

3          MR. BUTLER:  Good morning, Your Honor.  Jack Butler,

4    Kevin Murphy, David Springer and Tom Matz here today on behalf

5    of Delphi Corporation for its January omnibus hearing.

6          Your Honor, we have filed a proposed third omnibus

7    hearing agenda.  It has been served in accordance with the case

8    management order and has been posted on Delphidocket.com, and

9    it is the agenda we'd like to use today if that's acceptable to

10   the Court.

11         THE COURT:  That's fine.

12         MR. BUTLER:  Your Honor, the first matter on the

13   agenda under the continued or adjourned matters is the interim

14   -- what's remaining of the interim compensation motion at

15   Docket No. 11.  The remaining item deals with the appointment

16   of a fee committee in these cases.

17         The first fee statements in these cases were

18   submitted at the end of last week.  There is a meet and confer

19   that is planned to occur during the month of January between

20   the creditors committee, the debtor and the U.S. Trustee.  The

21   U.S. Trustee did file an objection to the appointment of a fee

22   committee in these cases arguing that it may not be warranted.

23         We've agreed with the U.S. Trustee to adjourn this

24   matter to the February 9th hearing and try to work out a

25   process for the appointment of a committee between now and

26   then.  The debtors believe a committee ought to be appointed in

6

these cases, and absent being able to resolve any issues during

the meet and confer, our intention would be to proceed with the

motion at the February 9th omnibus hearing.

THE COURT:  Okay.  That's fine.  I -- I mean, these

are obviously large cases, and as evidenced by the number of

people in the courtroom, they attract a lot of lawyers,

appropriately, and my experience has been that it is worthwhile

to have some specific oversight over fees involving the U.S.

Trustee, sophisticated consumers of legal services on a

creditors committee and the debtors.

And I think the only real issue is the cost of

involving a third party in that process and generally, my

experience with regard to such third parties is that they

provide some benefit because they have their computer programs

where they check billing records but that they don't have the

type of sophistication necessarily that the other parties do.

So maybe there's a way to split the issue along those

lines.

MR. BUTLER:  Your Honor, the -- two co-fiduciaries

and the trustee have I think some constructive conversations

about this, and they have agreed to meet to try to resolve

this, and I would -- I'm reasonably optimistic that there will

be a resolution.

THE COURT:  Okay.  Thank you.

MR. BUTLER:  Your Honor, the second matter on the

agenda, Agenda Item No. 2 is the KECP motion.  This is Docket

7

No. 213.   There had been a previous agreement to adjourn the

motion to the January 27th specially set hearing.

         We have been engaged for the last month or so in a

dialogue with the creditors committee who has engaged a

separate compensation consultant to review the KECP program and

to work with our compensation consultant.  In fact, there's a

meeting scheduled between the compensation consultants for

tomorrow to continue to work on the structure, scope and other

details relating to the program.

         In the course of those discussions between the

creditors committee and the company, we would -- had agreed

that the January 27th hearing ought to be very narrowly focused

on the annual incentive program for the period end of June 30th

of this year, and that the balance of the motion which would

involve the annual incentive plans beyond June 30th and the

proposed cash equity incentive emergency awards, the debtors

are prepared to adjourn that to the July 2006 omnibus hearing,

and we've extended the objection deadline for the creditors

committee.

         All the other objection deadlines have passed in this

case, but we want to be able to continue to work with the

committee and their compensation consultants.  The goal here

between the company and the committee is to arrive at a program

that is mutually acceptable to the two -- to at least the

debtors and creditors committee and then hopefully we can

resolve the remaining objections that have been filed.

8

1        THE COURT:  Okay.  Obviously, the motion as

2  originally filed was a lightning rod, and I just want to make

3  sure that you've given notice to the objectants that the only

4  thing that's currently contemplated to go forward at the next

5  hearing is that limited portion of the motion.  So --

6        MR. BUTLER:  We have --

7        THE COURT:  -- ~~continue~~ they won=t show up to argue

8  the whole thing.

9        MR. BUTLER:  Your Honor, we have communicated with

10 each of the objectors.  We also have posted that information on

11 Delphidocket.com generally, and so that information is there.

12       We understand that there -- you know, there are I

13 think ten or so objections that have been filed in connection

14 with the program, and I'll not address the merits of the motion

15 at this point.

16       THE COURT:  No, that's fine.  Okay.  Thank you.

17       MR. BUTLER:  Your Honor, the next set of matters are

18 matters that I think Mr. Berger is going to address.

19       MR. BERGER:  Good morning, Judge.  Neil Burger, Togut

20 Segal for the debtors.

21       We have a number of matters in sequence on the

22 calendar.  Number Three is Specmo Enterprises.  This is a

23 demand by Specmo to set off -- they assert that Delphi owes

24 Specmo a little more than half a million dollars and that

25 there's a reciprocal claim of more than $350,000.  Debtors have

26 completed the reconciliation of these competing claims.  They

9

forwarded it to Specmo's counsel who has forwarded it to his

business folks, and we're hopeful that before the next omnibus

hearing date, this matter will be settled.

So, with Your Honor's consent, this matter should be

adjourned to February 9th.

THE COURT:  Okay.  That's fine.

MR. BERGER:  Thank you, Judge.

The next matter is Schmidt Technology.  This is an

order to show cause that the debtors sought and had entered by

Your Honor, Docket No. 477, and the order to show cause directs

Schmidt to show cause why it should not be held to have

violated the automatic stay for having demanded and obtained a

post-petition payment on account of pre-petition obligations.

There is a constant and open dialogue and exchange of

information between the parties on this matter, Your Honor.

Schmidt is asserting that it is a foreign vendor, foreign

creditor under Your Honor's prior order and is seeking that

status.

We're nearing completion of informal discovery and

legal research, and again, we're hopeful that this matter as

well will be settled.  If not, we'll report back to Your Honor

on February 9.

THE COURT:  Okay.

MR. BERGER:  DBM Technologies, Number 5 on the agenda

like Specmo is a setoff demand.  The debtors have completed

their reconciliation of the competing claims.  We've sent it

10

off to DBM's counsel in Detroit.  They've shared it with their

client.  I would expect in the next week or so this matter will

be settled, and as the agenda reflects, we'd like to have this

matter adjourned to the February 9 date.

THE COURT:  That's fine.

MR. BERGER:  JST Manufacturing -- I'm sorry, Entergy,

Number 6, Entergy filed a motion for authority to set off or

recoup against a six-hundred-thousand-dollar payment that it

obtained within ninety days prior to the petition date.

The debtors filed a response last week, Docket No.

1662.  Entergy has expressed a desire to file a response.

There are factual issues in play.  We have agreed that they

could file a response.  It would be filed on or before a week

from tomorrow.

We'll look at that response.  If there are factual

issues, there may be some discovery, but in the interim, Your

Honor, we'd like to adjourn this to February 9.

THE COURT:  Okay.

MR. BERGER:  JST Manufacturing is Number 7.  It's an

order to show cause, again, seeking -- directing JST to show

cause why it should not be held to have violated the automatic

stay for having received a post-petition payment on account of

pre-petition obligations.

As I understand it, JST is a small Japanese

enterprise and, in the beginning, there may have been some

language barrier.  Most recently, JST has asserted that they

11

should be treated as a foreign vendor, and perhaps more

significantly, they've asserted a financial inability to

respond to this order to show cause by having to disgorge the

funds.

        They had promised me expect within the week documents

concerning their corporate structure to go to the issue of

whether or not they're a foreign vendor and also some financial

information to see whether or not we're chasing something that

simply won't happen.

        THE COURT:  Okay.

        MR. BERGER:  This matter should be adjourned as we

requested in the agenda to the February 9 hearing.

        THE COURT:  All right.

        MR. BERGER:  And that's a break for my matters for

the moment.

        THE COURT:  Okay.

        MR. BUTLER:  Your Honor, Number 8 on the agenda is

the Pullman Bank and Trust Company motion.  Pullman alleges the

debtors have failed to make certain post-petition payments on

leases held by the bank, and therefore, the bank moved for

various relief under the motion.

        Your Honor, the debtors have disputed with Pullman

that those assertions are accurate.  The debtors believe they

have made -- they're in full compliance with the leases, and

the parties have agreed to try to reconcile the underlying

factual record here and try and sort out any remaining

12

1    disputes, and therefore, would request that this matter be put

2    off to the February 9th omnibus hearing.

3              THE COURT:  Okay.

4              MR. BUTLER:  Mr. Berger?

5              MR. BERGER:  Next on the calendar, Your Honor --

6    excuse me, Neil Berger for the debtors.

7              Number 9, Furukawa Electric North America.  This is a

8    motion by Furukawa for authority to set off against a payment

9    of approximately $2.3 million that it received on October 4,

10   2005.

11             This motion was filed just before the holidays, Your

12   Honor.  Our client needs a little bit of time and an

13   opportunity to look at the facts, and we requested and Furukawa

14   consented to request Your Honor adjourn this matter to the

15   February 9 date.

16             THE COURT:  Okay.

17             MR. BUTLER:  Your Honor, Matter No. 10 on the agenda

18   is a case management amendment motion filed with Docket No.

19   1556 filed by the creditors committee which the committee seeks

20   to amend various aspects of case management in these Chapter 11

21   cases.

22             The United States Trustee, the creditors committee

23   and the debtors have agreed to a meet and confer on this matter

24   to try and sort out what procedural changes, if any, we can all

25   consensually agree to and then recommend to the Court for the

26   Court's consideration.  Otherwise, we'll file responses and the

13

1  matter would be heard at the February 9th hearing.

2          THE COURT:  Okay.

3          MR. BUTLER:  That's -- that's the status.

4          THE COURT:  All right.  There was a similar

5  modification I guess in the Refco case that I'm pretty

6  comfortable with, and your colleagues in that case were too.

7  So maybe that can be a model.

8          I mean, it wasn't major, but it just streamlined

9  things a bit vis-a-vis the committee.

10         MR. BUTLER:  Thank you, Your Honor.

11         Your Honor, Matter No. 11 on the agenda is a motion

12 filed by Appaloosa Management, LP asking this Court to appoint

13 an equity committee in the Chapter 11 case that's filed in

14 Docket No. 1604.

15         This motion was filed while the United States Trustee

16 had a similar request from Appaloosa under its consideration

17 and had not reached a determination.  The debtors asked

18 Appaloosa if they would put this matter off for a few weeks.

19 Appaloosa had sought some extensive discovery and we've got

20 issues relating to the discovery they wanted to put in place.

21         The debtors also believed it was appropriate for the

22 schedules of -- the schedules and the statements to be filed in

23 these cases.  They will be filed in accordance with Your

24 Honor's order by January 22nd, and the 341 meeting in these

25 cases is being conducted by the United States Trustee I believe

26 on February 3rd.

14

Our agreement with the -- with Appaloosa is to ask
for a date not earlier than January 30th, 2006 for this matter
to be heard.  I'm advised by Appaloosa that they have a
scheduling conflict with the February 9th hearing, and they
asked for a special setting sometime after January 30th, but as
soon thereafter as Your Honor could find time.

We're certainly prepared to -- we've talked with
chambers, we're prepared to, you know, continue to consult in
trying to find a mutually acceptable date if that's acceptable,
Your Honor.

THE COURT:  Okay.  Sometime in February.

MR. BUTLER:  I think Mr. Berger has I think the next
set of matters.

MR. BERGER:  Judge, Neil Berger for the debtors.
Moving into the uncontested and settled matters, Number 12, the
Lee Company, this was an order to show cause Your Honor issued
concerning a fifty-eight-thousand-dollar payment that Lee
obtained post-petition on account on pre-petition obligations.
 Lee is a supplier to the debtor, and this matter has been
settled, and I have an order that I'll hand up in just a
moment.

The significant elements of the settlement is that
Lee will continue to ship to the debtor.  The debtor will move
separately to assume this agreement.  The $58,000 will be
applied toward cure obligations on the assumption.  To the
extent that cure obligations don't consume the full $58,000,

15

1   the balance will be applied solely to the post-petition

2   obligations of the debtor.

3               So the harm has been completely remedied.

4               THE COURT:  Okay.

5               MR. BERGER:  The next matter --

6               THE COURT:  That's -- I'll approve that.

7               MR. BERGER:  I'm sorry.  Thank you, Judge.

8               The next matter, Number 13 is Proto Manufacturing,

9   also an order to show cause, challenged a three-hundred-and-

10  forty-thousand-dollar payment that Proto obtained post-petition

11  on account of pre-petition obligations.  This matter has also

12  been resolved, Your Honor.

13              Proto has agreed that the full amount of the

14  transfers will be credited solely to post-petition obligations

15  and barring anyone here in court today or questions from Your

16  Honor, we'd ask that Your Honor approve that one as well.

17              THE COURT:  I'll approve that.

18              MR. BERGER:  Your Honor, I have orders -- I believe

19  they're --

20              THE COURT:  Why don't you leave them up with

21  chambers.

22              MR. BERGER:  I'll do that, Judge.  Thank you.

23              MR. BUTLER:  Matter No. 14 on the agenda at Docket

24  No. 997 is the debtors' motion authorizing debtors to obtain

25  preferential power rights pursuant to a letter agreement with

26  Niagara Mohawk Power Corporation and to assume that agreement.

16

Your Honor may recall that we adjourned this from a prior hearing in order to give an opportunity for the New York Power Authority Board of Trustees to consider this matter which occurred on December 13th, and on that date, the New York Power Authority Board of Trustees approved the various transactions needed to implement the agreement that's before Your Honor.

Simply stated, Your Honor, if the Court approves this transaction and allows us to consummate it, we would be able to obtain valuable low-cost electricity at significantly discounted rates for the duration of the power contracts.

That assumption will save according to the debtors' estimate approximately $50,000 a month over the terms of the contracts, and the -- and the term of the contracts range from ten months to as long as seven years from today's date.

We've reviewed this matter with the creditors committee.  No objections have been filed.  Unless Your Honor wants additional information, we'd ask --

THE COURT:  I just -- this is not really an assumption ~~of the~~ under 365 because the debtors weren't really a party to these contracts, right?  They're basically being substituted in for --

MR. BUTLER:  There's going to be an assignment and then we're assuming the contract --

THE COURT:  Okay.  All right.  And that's why you're paying the extra money --

MR. BUTLER:  Correct, Your Honor.

17

1          THE COURT:  Okay.  I'll approve it.  It's clearly a

2  good deal.

3          MR. BUTLER:  Thank you, Your Honor.

4          Your Honor, Matter No. 15 on the agenda is the

5  application of the creditors committee for the appointment of

6  Latham and Watkins as counsel on Docket No. 1086.  This has

7  been adjourned to allow the debtors an opportunity to complete

8  their review of the application.

9          We have done so.  The debtors support the retention

10 application and we have no other further comments.

11         THE COURT:  Okay.  I've reviewed it and I will

12 approve the retention.

13         MR. BUTLER:  Your Honor, just taking a clue off your

14 conversation with Mr. Berger, do you want us to submit all the

15 orders to chambers after the hearing?

16         THE COURT:  Yes, that's fine.  And on ~~the~~ that

17 subject, ~~where~~ while I'm normally happy to have proposed orders

18 ~~proposed order~~ emailed to chambers, ~~but~~ when we have a big

19 omnibus day, it's probably better to just bring them on a disc

20 to chambers, particularly since Ms. ~~Lee~~ Li has been out. ~~, and i~~

21 It's just easier to have the disc.

22         MR. BUTLER:  Thank you.  And we have discs with us

23 today, Your Honor.

24         THE COURT:  Okay.  Thanks.

25         MR. BUTLER:  Mr. Berger, I think the next is yours.

26         MR. BERGER:  Neil Berger for the debtors.

18

Your Honor, Number 16 on the calendar is AMR
Industries, an order to show cause, Docket No. 1090.  This is
another order to show cause that the debtors ask to be entered
to challenge a small payment of about $6,600 made to AMR post-
petition on account of what was believed to have been all pre-
petition obligations.

JST -- I'm sorry, AMR asserted that not all of the
funds were intended to satisfy pre-petition obligations.  After
some informal discovery and some diligence, the debtors and we
concluded that this creditor was right.  Only about $2,100 was
on account of pre-petition obligations.  The matter has been
settled, and we have an order to drop off in chambers pursuant
to which the $2,100 will be returned to the debtors on or
before January 13th.  The balance is to pre-petition
obligations.

While this is a small amount, it should reflect the
debtors' commitment to the continued integrity of the order to
show cause process that Your Honor put in place and has been
effectively enforced.

THE COURT:  Okay.  I'll approve that.

MR. BERGER:  Thank you, Judge.

Number 17 is Pepco Energy Services.  Pepco filed a
motion for relief from the automatic stay.  Pepco and the
debtors are parties to a sales agreement, pursuant to which
energy utility services provided to the debtors' New Brunswick,
New Jersey manufacturing facility where approximately 425

19

1  people are employed, it's an important component of our

2  manufacturing structure.

3          The relief from stay sought three alternative forms

4  of relief.  The first was relief from the stay to serve a

5  termination notice to terminate the sales agreement and

6  potentially the utility service.  Alternatively, they sought to

7  compel the debtors to assume or reject the agreement.

8          Pepco -- the debtors filed a response and Pepco was -

9  - without prejudice the two branches of their motion seeking

10  relief from the automatic stay and the -- an order compelling

11  the debtors to assume or reject.

12          What was left open, Your Honor, was finding some type

13  of mechanism so that the debtor would be protected.  They have

14  significant property interests in this facility, and also

15  Pepco's desire to be protected apparently under certain

16  regulations that they don't serve a termination notice by a

17  date certain late in the month.  They're required to provide

18  the utility service through the next billing period whether or

19  not the debtors pay.

20          We have the framework of a settlement that we reached

21  yesterday, the significant portions of which I can report to

22  the Court are that Pepco has agreed to email invoices to a

23  dedicated email address so that we can be certain to get

24  invoices to the right person on time.  The debtors retain their

25  contractual period to pay and to cure any defaults.

26          And Pepco would have the opportunity to seek relief

20

from the automatic stay.  The concern was that we didn't want
to have a utility provider terminating service without coming
before the Court on notice to the appropriate parties.

They'd be able to seek entry of an order modifying
the stay to serve a termination notice on three business days'
notice, and that would have to be emailed or faxed to us, and
what that does, Your Honor, is that it gives the debtors an
opportunity to come back to the Court in case there's some type
of dispute about the default that Pepco is concerned about.

So, having said all that, Your Honor, I think we've
resolved all the issues in this motion.  We're protecting the
debtors' interest.  We're ensuring that Pepco gets paid on
time.

THE COURT:  Okay.  So you're going to submit an
agreed order later this month or --

MR. BERGER:  Hopefully, within the week, we'll have a
stipulation to submit to Your Honor.

THE COURT:  Okay.

MR. BUTLER:  Your Honor, the other matters on the
agenda we'd like to take together, Matters No. 18 and 19 and 20
on the agenda.

Matters 18 -- Matter 18 is the application of the
creditors committee for the retention of Warner Stevens, LLP as
conflicts counsel found at Docket No. 1170.

Matter 19 is the application of the committee to
retain Mesirow Financial Consulting, LLC as financial advisors

21

1  to the committee and that is at Docket No. 1335.

2          And Matter No. 20 is the application of the committee

3  to retain Steven Hall as compensation consultants.  That's at

4  Docket No. 1399.

5          Taking Matter 20 first, there is an open issue that

6  the committee and the U.S. Trustee are working out relating to

7  an indemnity matter, and we're not prepared to present an order

8  today to Your Honor but the request would be to have this

9  carried to the February 9th omnibus hearing, but the

10 expectation would be that there would be a consent order

11 submitted between -- before that time between the U.S. Trustee

12 and the creditors committee --

13         THE COURT:  This is Steven Hall and Partners?

14         MR. BUTLER:  This would be -- yeah, Number 20,

15 correct.

16         THE COURT:  Okay.  All right.  That's fine.

17         MR. BUTLER:  As to Matter 18 and 19, Your Honor,

18 there have been no objections filed.  The debtors have reviewed

19 these papers as well in support the motions of the creditors

20 committee.  There has been an amended order in Matter No. 18 in

21 Warner Stevens to simply make the conflicts counsel retention

22 mirror the same -- the debtors' order appears and so there's an

23 amended order in that respect.

24         THE COURT:  Okay.  All right.  I reviewed these

25 applications including the supplemental affidavit by Mesirow

26 regarding their screening procedures and I'm comfortable that

22

they'll live up to those procedures, that they're

disinterested.

So I'll approve both of those retentions.

MR. BUTLER:  Your Honor, I should also point out just

so that there's a record on this.  These applications are nunc

pro tunc to the actual retention date for each of the

individual firms and the debtors support that.

THE COURT:  Right.  And I -- given the review process

that they've undergone that nunc pro tunc retention is

appropriate.

MR. BUTLER:  Thank you, Your Honor.

Your Honor, Matter No. 21 is a procedural matter.

Umicore Autocat Canada Corporation has filed a motion to

substitute an exhibit that was attached to their file notice of

reformation demand.  They filed the motion in Docket No. 1543.

Umicore does not wish to change its substantive

material but to submit a redacted version of the exhibit

contained in the file and published to the ECF in order to

protect the information.

We've reviewed the exhibit.  We have no issue with

the matter at all, and so we don't oppose the motion and are

comfortable with the relief requested.

THE COURT:  And it provides for the pulling of the

current exhibit?

MR. BUTLER:  Yes, Your Honor.

THE COURT:  Okay.  All right.  Hearing no opposition,

23

1   I'll approve that.

2            MR. BUTLER:   Thank you, Your Honor.

3            Your Honor, the next matter before the Court is the

4   debtors' first exclusivity motion seeking an extension of time

5   to file and solicit acceptances and solicit acceptance of the

6   plan of reorganization that's filed at Docket No. 1549.

7            Your Honor, the debtors publicly disclosed at the

8   outset of these cases that our strategic organization timetable

9   targeted emergence from Chapter 11 sometime in the first half

10  of 2007, about fourteen to sixteen months beyond the current

11  period of exclusivity and the debtor has, in fact, had

12  discussions with the creditors committee about having a lengthy

13  extension of the exclusivity period to mirror that timetable.

14           In -- we believed that it was most important in this

15  first extension even though the Court and I think other parties

16  should know that we'll be coming back.  We thought it was most

17  important if we could to have a consensual path and framework

18  with the creditors committee and with other major stakeholders,

19  and we have therefore agreed with the committee that the

20  initial extension should be from February 6th, 2006 to -- and

21  April 7, 2006 to August 5, 2006 and October 4, 2006,

22  respectively and without prejudice of our rights to seek

23  further extension.

24           So the time for filing a plan would go from February

25  6th to August 5th, and the solicit would go from April 7th to

26  October 4th.  These periods would apply to all the debtors

24

including the debtors that filed a few days later than -- the

three debtors that filed a few days later than the majority

that filed on October 8th.

          And we have obtained the concurrence of the dip

lenders and the pre-petition administrative agent as well to

that timetable, and that's what we're here before the Court to

ask today.

          THE COURT:  Okay.  Does anyone want to address this

motion?

          All right.  Hearing no one and noting that there are

no objections, I'll approve it.  I assume you will be coming

back, but I think it's -- it's worthwhile to have to come back,

you know, in a case like this.

          MR. BUTLER:  Thank you, Your Honor.

          Your Honor, the Matter No. 23 is a procedures motion.

 It is a motion asking for authority to approve procedures for

rejecting unexpired real property lease and authorizing the

debtors to abandon certain furniture, fixture and equipment.

          This lease rejection procedures motion was filed at

Docket No. 1551.

          As part of the debtors' restructuring efforts, the

debtors were undertaking a comprehensive evaluation of the

economic value of their unexpired non-residential real property

leases and we've indicated to parties of interest in the court

from the first day of these cases that one of the debtors'

principal goals in filing these Chapter 11 cases was to achieve

25

competitiveness by realigning Delphi's global product portfolio

and manufacturing footprint.

And, in doing so, we may need to reject certain

leases.  There's only one objection that was filed to this

motion.  It was an objection by an entity called Orix Warren.

They agreed to -- they objected to certain of the notice

procedures and sought an administrative expense claim in

connection with abandonment matters.

We've resolved those -- that objection and have

agreed that any notice of rejection that relates to the lease

for 455 One Research Parkway in Warren, Ohio would be served in

a specific manner as set forth in the revised order, and we

also agreed that -- to certain other relief with respect to

Orix Warren including how we would deal with certain of the

property and the reservation of rights with respect to

abandonment.

Your Honor, General Electric Capital Corporation also

informally raised concerns about the application of this order

to General Electric's equipment lease, but this procedure are

not intended to address anything other than non-residential

real property leases, and we resolved GE's concern by including

language that made it specific that these -- this -- these

procedures do not apply to General Electric.

We also agreed to the creditors committee request

that Saturdays and Sundays be excluded in determining the ten-

day notice period related to giving notice to the committee,

26

for example, under the -- the notice provisions, and we agreed

to that, and that language has also been put in the order.

So, without going through all the procedures, Your

Honor, essentially this process allows us to rationalize our

real estate portfolio by giving notices to the -- to the

directly interested parties and the committee and the U.S.

Trustee in going through a process.  If no one has a problem

with that, we don't need to keep coming back to court.

THE COURT:  Okay.  Who did -- did you serve all the

real property lessors --

MR. BUTLER:  Yes.

THE COURT:  You did.  Okay.  All right.  And, as I

read it, it really is a notice procedure, primarily, and then

obviously it imposes certain results on those who don't object.

 If you do object, the issues are to be resolved by me.

MR. BUTLER:  That's correct, Your Honor.

THE COURT:  Okay.  All right.  Based on that,

understanding that again there being are no objections, I'll

accept except the ones you resolved.  ,  I'll approve it.

MR. BUTLER:  Thank you, Your Honor.

Your Honor, the next matter on the agenda is Matter

No. 24.  This is our motion seeking authority to assume an

executory contract with Pillarhouse USA found at Docket No.

1553, and Your Honor, this is directly related to the decision

Your Honor made at the last omnibus hearing which set a time to

assume or reject, and the net result if Your Honor approves

27

means that in addition to being paid the post-petition

equipment installation charge of $3,950, Pillarhouse will also

receive the pre-petition equipment costs payment of 73,594.60.

THE COURT:  Okay.  All right.  I reviewed the motion,

and, obviously, ~~they~~ Pillarhouse was~~were~~ necessary.  So I'll

approve it.

MR. BUTLER:  Thank you, Your Honor.

Your Honor, Matter No. 25, another procedural motion.

This is a motion to extend the time within which the debtors

may remove actions, and we're seeking an order extending by an

additional ninety days the period during which the debtors may

remove actions under 28 U.S.C. 1452 and Bankruptcy Rule 9027.

We're asking the Court to enter an order that would

authorize us to remove actions pending on the petition date to

the later of April 6th, 2006 or thirty days after entry of an

order terminating the automatic stay with respect to any

particular action that's sought to be removed.

The order also provides that this is without

prejudice to us seeking further extensions of the period, and

Your Honor, we actually planned to seek further extensions of

the period.

This first extension was for a short period of time

that would not prejudice all the parties.  It was done on an

expedited notice procedure in that not every party to every

piece of litigation received notice of this because as we're

preparing the schedules and the statements and so forth, trying

28

to put all that together has been sort of a massive
undertaking, and we believe that there was -- there would be no
prejudice to having a brief extension by serving the master
service list, the 2002 list and otherwise, providing that type
of notice.

We will, at least, when we seek a longer extension in
connection with some 200 or more judicial and administrative
proceedings currently pending across the United States, we will
in connection with a longer extension serve each of the
litigation parties as we move forward, but I did want Your
Honor to understand that the notice procedure for this
particular matter, which is why we've limited the request for
the extension to ninety days.

THE COURT:  But you did serve the 2002 list?

MR. BUTLER:  We did, Your Honor.  Anyone who has
sought notice in this case has gotten notice --

THE COURT:  Right.  And I didn't see any objections.

MR. BUTLER:  There have been no objections filed.

THE COURT:  Okay.  I'll approve this in light of the
number of litigations that the debtors have to consider.

MR. BUTLER:  Thank you, Your Honor.

Your Honor, Matter No. 26 on the agenda, again,
another procedural motion.  This is a lease renewal motion
found at Docket No. 1555, and just as, Your Honor, there may be
leases that we don't want to stick with, there also are leases
that we may want to renew and continue to move forward in.

29

1    And without getting into the issue of whether this is

2  ordinary course or not ordinary course, we thought that the

3  better procedure here was to work out a settlement procedure

4  with the creditors committee on how we would deal with lease

5  renewals.  The guidelines are set forth in the proposed order.

6   There have been no objections filed by any party, and this

7  will eliminate any doubt about how we'll deal with real

8  property assets of the estate.

9    THE COURT:  Okay.  I had one comment here which is

10  that Paragraph 3 which says that for lease obligations of

11  200,000 or less per annum or one million in the aggregate

12  wouldn't apply to leases with insiders and that that would be

13  covered by Paragraph 4.

14    MR. BUTLER:  Yeah.  I --

15    THE COURT:  I don't know if there are any, but I just

16  -- you know, I'd rather you give notice to the notice parties

17  in Paragraph 4 if you're going to be --

18    MR. BUTLER:  Not an issue, Your Honor.

19    THE COURT:  Okay.

20    MR. BUTLER:  I don't think any of these are insider

21  leases, but I understand the comment.

22    THE COURT:  Okay.

23    MR. BUTLER:  Is the motion otherwise acceptable?

24    THE COURT:  Yes, otherwise, it's granted -- yes, it's

25  granted.

26    MR. BUTLER:  Thank you, Your Honor.

30

Your Honor, Matter No. 27 is the debtors' insurance renewal motion.  This is a motion authorizing the renewal of insurance coverage and certain related relief found at Docket No. 1559.  We are seeking an order among other matters that would authorize but not direct us to renew or enter into new insurance policies with ACE American Insurance Company and affiliates and execute and deliver related documents and agreements.

This is a fairly complex motion, Your Honor, but the long and the short of it is that we have a tiered insurance program at Delphi, which provides a significant amount of coverage for general liability, products liability, automotive liability and workers compensation claims, and ACE is the foundation of that tier.  So the excess layers don't operate without having that tier in place, the -- what I'll call the foundation tier involving ACE.

ACE has asked us to assume the agreements with them and to assume the obligations with them and particularly as it relates to workman's compensation matters because there's a self-insured aspect of that program.  There's a collateral pool that we provide them that needs to be updated.  They have cash.  They'd like a letter of credit for some of those matters.

And the way I sort of boil this down is that when you -- if you approve this transaction when the dust clears, we'll provide them with an additional approximately $10 million in additional collateral to protect workman's compensation

31

arrangements primarily as we replace cash funds with letters of

credit and give them additional letters of credit.

And, because of our obligations under the way the

insurance policies work, there are actuaries that sort of

assume -- you know, estimate what the actual liability will be

under these programs and depending upon what degree of

conference you want to have and what the ranges are, we

understand from the actuaries that have given advice to our

insurance agents and to our insurance risk management group

that if things did not go well in the risk pool, we might by

assuming this policy have as much as three or four, five

million dollars of additional exposure on a worst-case basis as

-- at least as AON has given advice to the company through its

agents.

And the long and the short of this from the company's

perspective, and I can go through each aspect of this policy,

but we have reviewed it with the creditors committee.  No

objection has been filed.  It's very important that we keep our

general liability, products liability, automotive liability,

and workman's comp programs in place, and we need to have the

foundation tier in place.

ACE had given us a brief nine-day extension to move

forward with this policy.  Originally, when the case was filed,

ACE had indicated they were not prepared to renew.  We got them

to go to the end of December and then again to go into the new

year because we wanted to take some time to put this program

32

together, explain it to the committee, go through the due

diligence necessary in connection with this.

ACE cooperated and gave us a short-term extension so

we could bring this matter before the Court today.

THE COURT:  Okay.  So am I right then that although

there may be additional liabilities under the agreement as the

claims are actually processed and dealt with, there's no other

cure liability per se.  It's just there may be additional

liabilities under the agreement?

MR. BUTLER:  That's correct, Your Honor.  What

happens we're adding about -- I'm rounding, but we're adding

about $10 million more collateral to the pool right now.

My understanding is that under a worst-case scenario

that if things didn't work out in terms of pre-petition

periods, that collateral pool could be exhausted and we may

have an exposure also on this record of additional 5 million.

I'm told it's slightly less, and they told me it's worst case,

but that's the estimates that -- and that's all based on

estimates from AON.  I mean, you know, these are all estimates,

Your Honor.  The actual facts can change, but that's the --

that's the anticipation.

So the "cure claim" if you think about it from a cure

claim perspective in a worst-case scenario we're estimating

could be approximately 3.1 million, but that's -- there's a

series of assumptions that go there, and it is nothing more

than an assessment.  It's not a --

33

THE COURT:  ~~There~~ These would be fixed as the

contracts play out and as they would normally.

MR. BUTLER:  Correct, Your Honor.

THE COURT:  Okay.  All right.  Again, I had one small

comment on this other than wanting to have you answer that

question, which is Paragraph 3 of the order says the debtors

are authorized to renew or enter into insurance policies going

forward, and I understand that that was something that the

insurers wanted in the agreement, and I don't have any problem

with that if it's in the ordinary course, and I think it's

really a truism anyway, but, you know, if entering into a new

policy meant, you know, incurring a large obligation for

something that alters this agreement for pre-petition activity

or something like that, I'd be uncomfortable.

So I think putting it in the ordinary course of their

business is appropriate here.

MR. BUTLER:  We'll add that, Your Honor.

THE COURT:  Okay.  All right.  Other than that

change, I approve the motion.

MR. BUTLER:  Thank you, Your Honor.

THE COURT:  So there's no coverage gap then, right?

MR. BUTLER:  No.

THE COURT:  The extension goes through the --

MR. BUTLER:  Yes.  We'll be able to put this in place

Your Honor, and meet the requirements that ACE has imposed.

THE COURT:  Okay.

34

1        MR. BUTLER:  Mr. Berger has the next matter, Your

2   Honor.

3        MR. BERGER:  Neil Berger for the debtors, Judge.

4        Number 28 is Constellation Newenergy.  This is an

5   unopposed motion by Constellation Newenergy for relief from the

6   automatic stay to set off against a two-hundred-fifty-thousand-

7   dollar prepayment that it received pre-petition.

8        This is in contract to the Entergy matter that I

9   mentioned earlier, Your Honor.  In that situation, the debtors'

10  understanding is that Entergy obtained a deposit within ninety

11  days prior to the petition date.  Having looked at the

12  Constellation agreement, we have determined and now agree with

13  Constellation, this was a contractually required prepayment.

14  So --

15       THE COURT:  That~~'s~~ explosion your hear is just people

16  working on a subway spur.

17       MR. BERGER:  This may not even have been ready or

18  actually ripe for set off.  I suppose they did it for

19  prophylactic reasons.  We have no objection.  We've discussed

20  the matter with counsel for the committee, and we have an

21  agreed-upon order that we'll hand into chambers.

22       THE COURT:  Which -- which basically lets them set

23  off?

24       MR. BERGER:  Correct, Judge.

25       THE COURT:  Okay.  All right.  I'll approve that

26  subject to reviewing the order.

35

1          MR. BERGER:  Thank you.

2          THE COURT:  Okay.

3          MR. BUTLER:  Your Honor, the next matter on the

4 agenda, Matter No. 29 is a reclamation deadline extension

5 motion that we filed at Docket No. 1616.

6          The relief we're seeking is very limited, Your Honor,

7 and that is we're asking the Court to amend the reclamation

8 procedures order and provide that the time by which the debtors

9 are required to submit statements of reclamation as set forth

10 in Paragraph 2(b)(i) of the amended final order be extended by

11 an additional forty-five days.

12          The other procedures remain unchanged, and

13 importantly, as Your Honor may recall, once we've gone through

14 a reconciliation process and we're prepared to have a view as

15 to 75 percent or more of the reclamation claims that have been

16 filed, we have an obligation to deliver the creditors committee

17 a detailed reclamation report that provides the company's

18 assessment of that, and prior to their allowance of any claims,

19 there's -- there is a process that occurs between the debtors

20 and the committee.

21          All that's unchanged, but as we've gone through to

22 try to make assessments of over a hundred thousand different

23 line items in the claims that have been provided, we found that

24 we just need additional time.

25          So we're asking for an extension of forty-five days

26 to send out the initial statements.  The order provides for a

36

forty-five-day extension.  I'd like to actually put a date

certain in, which I would propose to be February 21st, 2006.

          THE COURT:  Okay.  And I didn't see any objections to

this.

          MR. BUTLER:  There have been no objections filed,

Your Honor.

          THE COURT:  All right.  I will approve it with that

date.

          MR. BUTLER:  Thank you, Your Honor.

          Your Honor, the next matter, Matter No. 30 is the

final hearing on the claims trading motion and my partner, Mr.

Springer will present that matter.

          MR. SPRINGER:  Good morning, Your Honor.  David

Springer for the debtors.

          Your Honor, the next matter on the agenda is the

debtors' motion for an order establishing notification and

hearing procedures for trading and claims and equity

securities.  We refer to this as the "final trading order."

          Briefly, on October 8th, 2005, the debtors filed a

motion to establish notification procedures and to approve

restrictions on certain transfers of claims against an equity

interest in the debtors in order to preserve the debtors net

operating loss carry forwards and certain other valuable tax

attributes.

          On October 11th, 2005 at the first-day hearings,

certain investment banks objected to the motion, and then the

37

next day on October 12th after discussion with the objecting

parties, the debtors agreed to revise the order, and the Court

entered the order on an interim basis, and we refer to that

October 12th order as the interim order.

Notice of the interim order was served upon virtually

every creditor and equity holder of the debtors, and it was

also published in each of <u>The New York Times</u> and <u>The Wall</u>

<u>Street Journal</u>.

Subsequently, two parties, Appaloosa Management, LP

and DC Capital Partners, LP filed objections to the interim

order and several other parties including the creditors

committee lodged informal objections or contacted the debtors

to discuss the terms of the order and to voice their concerns

or questions.

The debtors engaged in extensive negotiations with

all these parties and developed a revised trading order to

resolve those objections and comments, and then just before

Christmas on October -- on December 23rd, 2005, we served

notice of a proposed final order which the debtors believe

reflected resolutions of various objections while preserving an

asset of the debtors, the tax value of which could exceed $1

billion.

Last week, Wilmington Trust lodged an objection to

the proposed final trading order, and over the past few days,

we've made additional changes to address Wilmington Trust and

others' concern, and we believe that all of the objections and

38

1  the concerns have now been resolved.

2          THE COURT:  Can I interrupt you.  Who did you serve

3  notice of the proposed final order on?

4          MR. SPRINGER:  It was the -- the master service list

5  --

6          THE COURT:  Okay.  It wasn't just the objectants and

7  the informal objectants.

8          MR. SPRINGER:  No.  No, that's right, Your Honor.

9          THE COURT:  Okay.  All right.

10          MR. SPRINGER:  Accordingly, the debtors believe that

11  all the objections and informal concerns that have been raised

12  with regard to the final trading order have been resolved.  I

13  understand that counsel for Appaloosa Management, DC Capital

14  Partners and Wilmington Trust are all present in the courtroom

15  this morning and can confirm that their concerns have been

16  addressed and that their objections are now withdrawn.

17          Silence being consent, Your Honor?

18          THE COURT:  Well, I see people nodding.  Maybe they

19  want to say something.

20          MS. FAINMAN:  Good afternoon, Your Honor.  I'm

21  Jessica Fainman from Schulte, Roth, and Zabel representing DC

22  Capital Partners, and we are withdrawing our objection.

23          THE COURT:  Okay.

24          MR. UZZI:  Good morning, Your Honor.  Gerard Uzzi of

25  White and Case on behalf of Appaloosa.

26          We've already filed a notice of withdrawal of our

39

1 objection.

2        We did reserve the right to be heard with respect to

3 the final order, and we had entered into separate agreements

4 with the debtors with respect to specific relief for Appaloosa

5 under the interim order.

6        Because of the heavy negotiation of the final order,

7 there's a little bit of ambiguity with respect to our -- our

8 pending agreements over the interim order.

9        The debtors had represented to us that nothing in the

10 final order is meant to supercede the relief that we received

11 under the interim order.  We intend to bring down our

12 agreements under the final order once the final order is

13 entered, and I believe we're pretty close to final resolution

14 on those final orders -- rather, the final agreements --

15        THE COURT:  All right.  Because, you know, Paragraph

16 2 says the final order shall supercede the interim order.  So

17 you're saying that as far as Appaloosa is concerned, the

18 debtors have agreed that that's not applicable?

19        MR. UZZI:  Yes.  It's my understanding that the

20 debtors have agreed that our agreements under the interim order

21 will apply to the final order --

22        THE COURT:  Okay.

23        MR. UZZI:  -- and we intend and have shared draft

24 separate agreements to make that happen, and as long as that

25 does happen, then we do not have an objection to the entry of a

26 final order.

40

1          THE COURT:  All right.  Then the debtors are in

2 agreement with that?

3          MR. SPRINGER:  That's right, Your Honor.

4          THE COURT:  Okay.

5          MR. SPRINGER:  The interim order anticipated separate

6 side agreements.  We gave one to Appaloosa, and we'll be

7 bringing that down.

8          THE COURT:  All right.  Well, I guess -- this sort of

9 went to my question about who did you serve because the final

10 order does say it supercedes the interim order without any

11 reservation.

12         So I guess except as to Appaloosa, the way I read it

13 is that it does supercede it.  Unless you have some other

14 understandings with people that I -- that you ought to set out

15 in the record.

16         MR. BUTLER:  Yeah, I think we need to make -- I do

17 think -- you know, counsel for Appaloosa sort of confused the

18 record a little bit.

19         The order is superceded.  The final order supercedes

20 the interim order.

21         THE COURT:  Okay.

22         MR. BUTLER:  The agreement that was made during the

23 interim period was that we would have separate written

24 agreements and waive --

25         THE COURT:  Oh, all right.

26         MR. BUTLER:  -- with certain parties.  We have that -

41

1    -

2              THE COURT:  All right.  So your agreement still

3    exists, and they're not superceded, just the order itself.

4              MR. BUTLER:  That's correct, Your Honor.

5              THE COURT:  All right.  Okay.

6              MR. UZZI:  But, to be clear, yn, our separate

7    agreement was negotiated in the context of the language of the

8    interim order.  There is some ambiguity with respect to the

9    language in this order.  The agreement is that the final order

10   does -- there's nothing in the final order that otherwise

11   supercedes our prior agreement.

12             THE COURT:  Okay.  That's fine.

13             MR. UZZI:  One other issue, Your Honor, and I'll be

14   very brief.

15             As counsel has represented, Appaloosa also has a

16   pending motion for the request to appoint an equity committee.

17    I hope after this hearing to resolve the scheduling issues.

18             Appaloosa in connection with the NOL order that's

19   before the Court right now represented its own interests and

20   continues to represent its own interest.  There's obviously

21   some issues in here that might be of concern to an equity

22   committee if it's appointed.  The order is styled the final

23   order.  We believe that it's appropriate that -- that the order

24   be entered without prejudice to an equity committee in the

25   event one is appointed.

26             THE COURT:  Well, I don't think that -- they can file

42

1  whatever they want to file, but I think it would have to be

2  under Rule 60(b) and not under -- not under the terms of the

3  order.

4        MR. UZZI:  Fair enough, Your Honor.  I just wanted to

5  raise it for --

6        THE COURT:  I mean, assuming one is appointed.  I'm

7  not saying that one should be or -- that's something for the

8  U.S. Trustee to consider in the first instance.

9        MR. UZZI:  Understood, Your Honor.

10        THE COURT:  Okay.

11        MR. UZZI:  Thank you.

12        THE COURT:  Okay.

13        MR. BROMLEY:  Good morning, Your Honor.  James

14  Bromley of Cleary Gottlieb on behalf of the ten investment

15  banks that objected on the first day and those objections still

16  stand.

17        I wanted to just give a little bit of color as to how

18  we got to where we are.  On the first day of this case, there

19  were three pending cases all seeking very similar relief,

20  <u>Northwest</u>, <u>Delta</u> and <u>Delphi</u>.

21        With this -- the entry of this order, I think it's

22  fair to say that all three cases resolved very similarly.

23  We're very pleased with the results.  We'd like to pay a debt

24  to Cliff Gross, the tax partner at Skadden who worked through

25  this over three months to get it done, but we think it's a fair

26  and appropriate resolution of the issues.

43

THE COURT:  Okay.  While you're up here, because you
and the gentleman standing next to you probably can explain
this best.  I went through this, it's one of the reasons I was
a little late for the hearing, and I think I understand what
it's generally doing which is similar to the issues you had
raised in your objections: that is, how to enforce this
without being unduly burdensome or jumping the gun, if you
will.

But I don't understand Paragraph 6(b) which is
prefaced now by the phrase "in order to permit reliance by the
debtors upon Treasury Regulation Section 1.3(a)(2)-(9)(d)(iii)"
(sic) and then it says -- the teeth in the order-- any entity
found by the Court to have willfully violated the participation
restriction shall be required to dispose of newly traded --
covered claims, but I'm not -- I don't -- my question is what
is a Aparticipation restriction.@

As I read it, it's not disclosing information to the
debtor, which didn't seem to make sense to me.

MR. SPRINGER:  It's -- a participation restriction is
a restriction against the claim owner telling the debtor in
connection with the presentation or preparation of a plan we
obtain these claims on a specific date.

THE COURT:  Okay.

MR. SPRINGER:  And that's something that's prohibited
by the Treasury Reg --

THE COURT:  All right.

44

MR. BUTLER:  1.3(a)(2)-(9) --

THE COURT:  So this is -- this is a limitation on the general notice issue where there's -- where there is a form of disclosure then.

MR. SPRINGER:  That's right.

THE COURT:  And it's to comply with this regulation which I guess is designed to prevent tax code manipulation?

MR. SPRINGER:  Exactly, Your Honor.

THE COURT:  All right.  Okay.  All right.  But this isn't the trigger for the whole order.  This is just a specific provision dealing with this specific regulation, making sure it's not breached.

MR. SPRINGER:  Correct.

THE COURT:  Okay.  All right.

All right.  Mr. Fox?

MR. FOX:  Thank you, Your Honor.  Edward Fox with Kirkpatrick and Lockhart, Nicholson, Graham on behalf of Wilmington Trust Company as indentured trustee.

Mr. Springer's statement is correct, we have agreed based on the changes in 6(b) as well as Section 12 to withdraw our objection.  Our objection was limited to the Section 6(b) which was added to the final order.  It was not in the original language, and we had concerns about that, too.

Ordinarily, trading orders are not something that we generally involve ourselves in, but since this limited -- potentially limited people's participation in the process, we

45

had some concerns about it, and -- and, in fact, this language

is slightly different than the LSTA form which limits these

requirements to the substantial holders, not to everybody,

although the debtor is correct that the Treasury Regulations

that are referred to here would apply to everybody and not just

the substantial holders.

What we've agreed to -- what the debtors agreed to do

is limit the sell-down provision so that it limits and

clarifies the remedy that would be involved if somebody

violates the provision, and in addition, they've agreed to file

an ~~AK~~ 8-K with this document attached so that there's hopefully

some better notice.  I mean, somebody buying into this case at

this point or later in the -- in the case would have to wade

through several thousand docket entries potentially to find

this.  Hopefully, they'll have a better opportunity if they're

looking on the SEC filings to see it and realize what the

obligations are.

THE COURT:  Okay.  So the debtors will be filing an

~~AK~~ 8-K with this attached?

MR. SPRINGER:  Yes, Your Honor.

THE COURT:  All right.  Very well.  All right.

MR. SPRINGER:  There are a few more matters that we'd

like to make of record with respect to this motion, Your Honor.

The debtors again want to emphasize that it's

critically important to prevent Delphi from undergoing an

ownership change under Section 382 of the Internal Revenue Code

46

prior to the effective time of a plan of reorganization.

Such an ownership change could severely limit the debtors' ability to use their valuable net operating loss carry forwards, credit carry forwards, built-in losses and other tax attributes to offset income during the restructuring process and post-confirmation.

For purposes of context, the total tax value of those tax attributes is currently estimated to be well in excess of one billion dollars.  Additionally, if there is an ownership change of Delphi, and if the fair market value of the assets of the debtors is less than their tax basis at the time, then for five years following the ownership change, the debtors' ability to deduct losses from asset dispositions or to take certain depreciation or amortization deductions may be substantially limited.

We want to be clear, Your Honor, that at this point the debtors believe that Delphi has not undergone a Section 382 ownership change.  Accordingly, its tax attributes remain available to offset future taxable income.  This prospect is of great value to the successful reorganization of these estates.

The final trading order is designed to preserve the debtors' tax attributes and to take full advantage of the special Section 382 bankruptcy rules.  One of the special rules under 382 is Section 382(l)(5).  We think it's important briefly to explain how this works.

Section 382(l)(5) applies if upon confirmation of a

47

Chapter 11 plan of reorganization at least 50 percent of the

stock of the reorganized corporation is owned by preexisting

stockholders in what are known as "qualified creditors."

Qualified creditors fall under three categories,

those known colloquially as "old and cold creditors," "ordinary

course creditors" and those who will own less than five percent

of the stock of the reorganized company or de minimis

creditors.

If a corporation qualifies under Section 382(l)(5),

the general limitation under Section 382 of the Internal

Revenue Code on the use of tax attributes does not apply

provided that the corporation does not undergo another Section

382 change of ownership within two years of emerging from

bankruptcy.

Your Honor, the final trading order like the interim

trading order is intended to prevent an ownership change prior

to the emergence of the debtors from bankruptcy and to preserve

the possibility of a Section 382(l)(5) plan.

Your Honor, the record should reflect the differences

between the interim trading order and a proposed final trading

order.  On the equity side, the number of shares used to

determine whether an entity is or would become a substantial

equity holder which is a defined term as used in the order, and

thus, subject to the terms of the final trading order has been

increased from 14 million to 26.5 million shares or about 4.75

percent of the shares of Delphi stock now outstanding as

48

opposed to two and a half percent under the interim order.

Second, the amount of time that the debtors have to object to a proposed transaction involving an acquisition or disposition of stock at the threshold has been reduced from thirty days as provided in the interim trading order to fifteen days in the proposed final trading order.

On the debt side, the dollar amount of claims used to determine whether an equity entity is or would become a substantial claim holder, also a defined term in the order, and thus subject to terms of a proposed final -- of the proposed final trading order has been increased 90 percent from 100 million to $190 million.

The interim trading order allow claim holders to freely trade, better warn them of the debtors' intention to formulate a final claims trading order that may require such entities and persons to dispose of claims against the debtors to the extent necessary and proper to protect the debtors' tax attributes under Section 382(l)(5), and that was in Paragraph 4(f) of Your Honor's interim order.

The debtors worked diligently with interested parties over the past three months to formulate a sell-down procedure that allows trading and claims while still preserving the debtors' ability to propose a plan of reorganization that qualifies under Section 382(l)(5).

Your Honor, the debtors believe that with the contributions that we've had by those who have raised

49

objections and other interested parties that the proposed final

trading order reflects the state of the art in this area and is

in the best interest of the creditors and their estates, and we

would respectfully request that the Court enter it.

THE COURT:  Okay.  I will approve the final trading

order.  I think it does balance the ~~debtors'~~ debtor=s need and

right to preserve its ability to confirm a plan that protects

its tax attributes while also enabling as free a market ~~and~~ in

the trading of the securities and claims of the debtor as

possible.

So, in light of ~~their~~ there being no remaining

objections and my own review of the order, I'll approve it.

MR. SPRINGER:  Thank you, Your Honor.

THE COURT:  I'm also glad that you're going to post

the ~~AK~~ 8-K, because I think that's critical even though the

market for these types of obligations and stock probably

shrinks in terms of the players.  It's still very active, and

there may be parties who aren't readily aware of the order=s

terms.  So...

MR. SPRINGER:  And that was Mr. Fox's suggestion.  He

made a substantial contribution --

THE COURT:  Okay.  I'm not sure you want to use those

words.

(Laughter)

THE COURT:  Just in a colloquial sense.

MR. FOX:  He's a litigator, Your Honor.  He doesn't

50

1    know what he said.

2                              (Laughter)

3          MR. BERGER:  Judge, Neil Berger again for the

4    debtors.

5          Number 31 on the calendar is Behr Industries.  This

6    is a hearing concerning the Court's order to show cause, Docket

7    No. 774 to compel Behr Industries to show cause why it

8    shouldn't be held to have violated the stay for demanding and

9    obtaining a payment in excess of a million dollars post-

10   petition on account of pre-petition obligations.

11         Behr has responded, and while the parties continue

12   the negotiations, this one does appear to be headed toward a

13   contested evidentiary hearing.  Just broad strokes, Your Honor,

14   Behr has asserted two primary issues.  One is financial

15   ability, vendor rescue program, and while that's taken us part

16   of the way, it certainly doesn't take us all the way on the

17   dollars here, and Behr also asserts that while it obtained the

18   payment, it wasn't the cause for the demand for the payment.

19         The debtors dispute that factually and we don't

20   believe the documents support that allegation.  Behr has

21   requested some discovery on the fact issues and we have agreed

22   that a sixty-day discovery window would be appropriate.

23         With Your Honor's consent, what we would propose is

24   that this matter, today's hearing be adjourned to the March

25   omnibus hearing to function as though as a final or a pretrial

26   conference date, and that I obtain a separate date from

51

1   chambers as an evidentiary date on a non-omni day.

2           THE COURT:  That's fine.  For the pretrial

3   conference, it would be helpful if you and Behr came prepared

4   with what I hope would be a joint pretrial order laying out the

5   witnesses, any anticipated evidentiary issues and an estimate

6   of the length of the trial -- standing pretrial order.

7           MR. BERGER:  Yes, Judge.

8           THE COURT:  Okay.

9           MR. BERGER:  Thank you.

10          THE COURT:  Thank you.

11          MR. BUTLER:  Your Honor, the next matter on the

12  agenda, Matter No. 32 is a motion filed by the lead plaintiffs

13  from the securities litigation for a limited modification of

14  the automatic stay at Docket No. 1063.  It is the first of

15  three motions on the calendar, the others being matters --

16  Matter No. 33 and then again back towards the end of the agenda

17  at Matter No. 37, three contested motions dealing with the lead

18  plaintiffs' attempt to obtain discovery, and we'll cede the

19  podium to them to present the motion.

20          THE COURT:  Okay.

21          MR. ETKIN:  Good morning, Your Honor.

22          Michael Etkin, Lowenstein Sandler on behalf of the

23  lead plaintiffs as bankruptcy counsel to the lead plaintiffs in

24  the consolidated securities litigation, and I will present the

25  initial matter that's on the agenda for today.

26          Your Honor, I'd like to begin by stating the obvious,

52

1   that this is a motion for a limited modification of the

2   automatic stay.  It is not a motion seeking to lift the stay so

3   as to proceed against the debtor in connection with the

4   securities litigation.

5          What the motion does seek are documents that have

6   already been assembled, indexed and produced in connection with

7   various demands for documents by the SEC, by the U.S.

8   Attorney's Office and the FBI as well as documents produced in

9   connection with the internal investigation commenced by the --

10  by the debtors.

11         And, also, again I believe stating the obvious --

12         THE COURT:  I'm sorry.  I thought you were -- when

13  you say as well as documents produced as part of the internal

14  investigation, I thought you were seeking only documents that

15  had already been produced to third parties.

16         MR. ETKIN:  That's correct, Your Honor.

17         THE COURT:  Okay.  Maybe I just misheard you.

18         MR. ETKIN:  Yeah.  That's correct.

19         THE COURT:  Okay.  You're saying the third party

20  would include the internal board audit committee's counsel?

21         MR. ETKIN:  That's correct, Your Honor, all of course

22  subject to --

23         THE COURT:  So you would count them as a third party

24  --

25         MR. ETKIN:  That's correct, Your Honor.

26         THE COURT:  All right.  Okay.

53

1          MR. ETKIN:  And all, of course, as we've indicated

2     and as has been the case in prior orders entered in this

3     district subject to privilege to the extent that privilege has

4     not been laid.

5          THE COURT:  Okay.

6          MR. ETKIN:  Your Honor, and again, just to make it

7     clear to the extent that it isn't, we recognize that this is a

8     two-step process that initially we need to get relief from this

9     Court with respect to the limited modification of the automatic

10    stay, and then we need to proceed to get relief from the

11    district court in connection with the PSLRA stay.  So this --

12    this motion really must be viewed in that context.

13          Your Honor, in the debtors' opposition, I think we've

14    been criticized for relying heavily on previous decisions in

15    Worldcom and Enron which are circumstances that we believe are

16    identical to the circumstances that are raised with respect to

17    this motion, and in relying heavily on previous decisions, we

18    believe that all we've done is do what lawyers are supposed to

19    do, which is rely on precedent coming out of the same district

20    that dealt with not only similar sets of fact, but we believe

21    essentially identical sets of facts.

22          THE COURT:  Were those actually litigated decisions?

23          MR. ETKIN:  Yes, Your Honor.  I was involved.  So,

24    yes, they were litigated.  I was involved in the Worldcom

25    motion and that was litigated, opposed, and Judge Gonzales --

26          THE COURT:  So did the -- the orders that you attach

54

are the result of a decision in a matter that he actually

decided between the parties?

        MR. ETKIN:  That's correct, Your Honor.

        THE COURT:  Fine.  Okay.

        MR. ETKIN:  The order in Worldcom was not a

stipulated order.

        THE COURT:  Okay.

        MR. ETKIN:  That I can tell you from personal

experience.

        THE COURT:  Okay.

        MR. ETKIN:  Your Honor, even the debtors although

they raise issues as to the precedential value of those

decisions, they even concede in their papers that this

precedent is at the very least highly persuasive, and measuring

this case against the situations in Worldcom and Enron all

involve the backdrop of massive accounting scandals with

enormous losses to the investing public.  All involve the

backdrop of pending governmental investigations as well as

internal investigations.

        As the Court well knows, Your Honor, Enron and

Worldcom were no less complex Chapter 11 cases than the Delphi

case, and the parade of horrors that are speculated by the

debtors as well as the standard floodgates argument that's

conclusorily (sic) raised by the debtors in their opposition

are exactly that:  speculation and conclusory allegations.

        I think the lesson to be learned is best learned from

55

what happened in _Worldcom_ where that company, the largest

Chapter 11 filed managed to successfully reorganize.  _Enron_ as

well successfully confirmed its plan, both with no ill effects

from the limited stay modification orders entered in both of

those cases.

          Your Honor, by making the motion that's before you,

we are simply adopting a position and a procedure that has

already been expressly approved in this district.  Again,

there's backdrop of Federal and civil criminal investigations,

acknowledged significant accounting irregularities, years of

accounting restatements, a self-imposed internal investigation

commenced by the debtors, all strikingly similar to the

backdrop of facts and circumstances in _Enron_ and in _Worldcom_.

          The debtors in their opposition make this appear as

if this was a class action commenced willy-nilly by some

corporate gadfly, the kind of class actions that the PSLRA

presumably was intended to deal with.

          Your Honor, as lead plaintiffs in this case appointed

by the District Court, we have state pension funds and

institutional investors, not individual corporate gadflies who

take this matter very seriously on their own behalf and on

behalf of the investors that they now represent as lead

plaintiffs.

          Your Honor, the debtors have really offered nothing

in their opposition papers to dispute that the documents that

we've requested which have already been produced have been set

56

aside, have been culled, have been reviewed, have been indexed, and we specifically in our motion --

THE COURT:  Well, don't they say that -- I thought they -- I thought they dispute that.

MR. ETKIN:  I don't see anything specifically in their papers disputing that.  What I did read, Your Honor, is that there are statements that there's some -- some amorphous burden that they will at some point in the future attempt to bring before the Court.  I didn't see anything specific in their papers.  I thought that they reserved the right somewhere in their response to raise these issues or bring these issues before the Court at some later time.

I didn't see any indication that these documents have not already been set aside and have not already been produced, and essentially that's why we made the motion.  We're not looking for documents that have not already been pulled together, set aside and produced.

THE COURT:  Well, I -- I guess my question comes down to this.  I understand that the orders in Enron and Worldcom, at least two of the three, you know, expressly recognized that lifting the stay in the bankruptcy case still leaves to be decided by the District Court the right of the securities plaintiffs to get access to the documents under the PSLRA, but you know, I'm not familiar with the facts of those cases.  I don't know why it was important, for example, for those litigants to get the documents at that time or at least get

57

stay relief at that time.

        But why not let the District Court decide first
whether the PSLRA stay applies or not and then -- I mean,
obviously, I would give you relief to the extent you needed it
to seek that relief from the District Court, and then -- then I
could decide on a record as to, you know, how -- how burdensome
if at all under <u>Sonax</u> it is for the debtors to produce this
under the 362 <u>Sonax</u> factors as opposed to deciding it somewhat
in the abstract, because really I don't know what the District
Court is going to do.  I mean, is it prejudicial to you just to
-- for me to say for now you're going to go to the District
Court and ask the District judge if the -- if the PSLRA should
be -- ~~you know, have the effect of a~~the stay ~~here~~ under the
PSLRA should be lifted, not the Bankruptcy Code stay, and then
I -- then I can decide the latter stay issue and I can do that
on an expedited basis.?

        I mean, you're going to have to do that anyway.  So I
don't understand why it's flipped the other way around.

        MR. ETKIN:  Well, Your Honor, we actually don't think
that we flipped it.  We think that we've followed the procedure
that's been utilized --

        THE COURT:  Well, I understand.  Just humor me for a
minute.  If you have to do it anyway, why should I decide this
in the abstract?

        MR. ETKIN:  Well, Your Honor, I don't believe the
Court is deciding this in the abstract --

58

THE COURT:  But do I have to decide it at all.——?  I
mean, why should I -- why should I even spend any time on it if
it's -- if it's, you know, possible or even more than possible
than the District judge is going to say, well, until the
motions to dismiss are decided, they--- I'm not going to give
them relief from the PSLRA.

MR. ETKIN:  The -- first of all, as the Court knows,
we're acknowledging that this is a two-step process, and if the
Court grants our motion, the debtor certainly does not -- does
not have to produce a document until the PSLRA stay is lifted
as well, and again, the Court actually alluded to an issue that
is one of the issues why we went to the Bankruptcy Court first
in both of those cases, which is that we believe that going to
the District Court first without stay relief would be a
violation of a 362 --

THE COURT:  Well, but I could give you relief from
the stay to go to the District Court.  That's no problem.  I
don't have a problem with that.

MR. ETKIN:  No, I understand you're saying that, Your
Honor, but in terms of the process that we've utilized here,
that's one of the issues that we took into consideration, and
we believe that the issue of getting stay relief, this limited
stay relief from this Court given the fact that these documents
are just sitting there and have already been produced and it
requires really no effort, and I understand --

THE COURT:  But so that begs the questions.  I mean,

59

if the debtors are going to say it does require effort, then I
need to balance _Sonax_, and that requires a hearing and it may
be a completely advisory or moot issue.

MR. ETKIN:  Well, that -- the debtors had an
opportunity to lay out in their opposition, Your Honor, what
burdens that they would have to undertake in connection with
producing these types of documents.  They chose not to do that,
and those really weren't issues in the prior cases and we
suspect that they really shouldn't be issues here.  The
substantive issue of whether the PSLRA stay should be lifted is
obviously a matter for the District Court, and we understand
that.

We don't -- certainly don't view getting this type of
limited stay relief a ministerial matter from this Court by any
stretch of the imagination, but given the underlying
circumstances, given what we're asking for, given the fact that
we've already indicated in our moving papers that we would pay
the cost of reproduction, there really is nothing else to do
for the debtor other than if the debtor chooses resisting the
motion before the District Court in the PSLRA -- in connection
with the PSLRA.

So we believe that a process by virtue of the prior
decisions has been outlined and we're attempting to follow that
process.  We believe that process makes sense because
ultimately for purposes of the securities litigation, it is the
District Court that makes the determination as to whether we

60

should get access on the merits prior to the motions to

dismiss.

We're simply taking the first step that we believe is

a process that's been endorsed in this Court previously.

THE COURT:  Okay.

MR. ETKIN:  And, certainly, Your Honor, and as

evidenced by the orders entered previously in the -- in

Enron and Worldcom, privilege issues that are raised can be

dealt with.  Those are lawyer-driven issues that can be

resolved and certainly, nothing is intended to waive those

rights to the extent that they -- that they still exist.

Your Honor, the bottom line is that the debtors in

their papers really have advanced no argument whatsoever to

distinguish this case from the circumstances in Worldcom and

Enron.

THE COURT:  Well, but the problem is I just don't

really what those -- all I have is our orders.  I don't really

what those circumstances were.  I don't know if they were under

deadlines from Judge Harmon or Judge Cote.  It's just -- I see

that there's a -- there was an order granted and it recognized

the type of relief you're seeking here, but I just don't know

what the exigencies were to do it that way rather than the

other way.

MR. ETKIN:  Well, in each of those --

THE COURT:  I don't know whether there was a hearing

on the Sonax factors either.

61

MR. ETKIN:  Your Honor, in terms of the _Sonax_

factors, I think in the first instance, the _Sonax_ factors

really are -- they are certainly relevant, but more relevant to

circumstances where a party is seeking relief from the State

and continue with litigation in a court outside of the

Bankruptcy Court.

We're not seeking that kind of relief.  There have

been decisions which we have cited in our papers where limited

stay relief --

THE COURT:  No, I know.  You're saying basically the

debtor doesn't have to do anything.  It just has to move the

boxes from one place to another.

MR. ETKIN:  That's --

THE COURT:  And you'll pay for moving them.

MR. ETKIN:  That's -- that's the bottom line, Your

Honor.

THE COURT:  Right.  Okay.

MR. BUTLER:  Your Honor, the Court articulated what

our concern is.  We concur that this is a two-step process, but

we think the first step is in the District Court, not here.

Our understanding of what these -- of what the plaintiffs in

_Enron_ and _Worldcom_ did was once they got the stay relief from

the Bankruptcy Court, they ran to the District Court and said

hey, District Court, give us -- grant us the relief because

there's no reason why you shouldn't, we already got the

Bankruptcy Court approval, and so they used Your Honor's

62

determination as the sword to go into the District Court.

A couple of initial comments, Your Honor.  This is
not Enron, and this is not Worldcom.  Whatever our pre-petition
accounting issues were, they were not the proximate cause and
had no relationship to the commencement of these Chapter 11
cases.  These Chapter 11 cases were filed as Your Honor knows
because of our high legacy costs, because of increasing
commodity prices and because of the deterioration of the North
American automotive industry.  It had nothing to do with
accounting.

Now, we had pre-petition accounting issues that we
will be addressing, but that is not why we are in Bankruptcy
Court.

Number two, Your Honor, what plaintiffs are asking
for really is an advisory opinion from Your Honor.  They're
asking without any evidentiary record here, there's none.
They've offered no evidence.  All right.  They basically said
it's up to the debtors to prove why we're prejudiced.  Well,
Your Honor, they failed to meet their burden, which I believe
under Sonax means we don't even have to do anything and --

THE COURT:  Well, but they're saying that -- I mean,
let me paraphrase it and Mr. Etkin can correct me.  They're
saying that it's there, why not let us get started on reading
it now rather than six months from now.

MR. BUTLER:  Because, Your Honor, that's not what
PSLRA allows them to do.  They're asking you to give them here

63

on an advisory basis the ammunition to go to Judge -- to go to

Judge Rosen, who by the way, just got these cases within the

last thirty days.  Talk about infancy of a litigation.  These

were just consolidated.  They're just now in front of the

Court.  There's been no major activity, as I understand, in the

District Court since that act occurred.

This motion was filed thirty-eight days into our

bankruptcy and was heard less than ninety days after the

commencement of these cases without a scintilla of evidence as

to why it's necessary.  They are a year probably or more away

from being able to deal with the issues in the District Court,

and Your Honor, we don't think it's fair.  We think it's highly

prejudicial to the debtors to have them come in here and say to

Your Honor without any evidentiary demonstration by us.

Disregard <u>Sonax</u> because that doesn't apply to us.

Disregard -- just take the <u>Enron</u> opinions and the

<u>Worldcom</u> opinions which were very different cases and which, by

the way, Your Honor, I don't believe based on our review of the

record and some familiarity that I had with those cases, I

don't believe that the issue we've raised in our papers was

raised in those cases, which is if it's a two-step process, the

first step is that the plaintiffs have to go to District Court

and get relief from the PSLRA because then they're able to come

here and demonstrate cause or at least argue they have cause.

I'll argue that isn't even cause frankly when we get to that,

but they can't demonstrate that.

64

1          They come before you with no ability to demonstrate

2    any cause.  They tell you -- if they're being straightforward,

3    they tell you that Judge Rosen received these cases within the

4    last thirty days.  There has been no substantive activity in

5    the cases since Judge Rosen received the consolidated cases.

6    There's been no certification.  There has been no -- the

7    schedule set either for filing motions to dismiss.

8          You know, there -- you know, I mean, this is in such

9    a different posture than those cases, Your Honor, and we really

10   believe we have no issue.  If they want to take a shot at --

11   you know, on that record in front of Judge Rosen on getting the

12   PSLRA stay lifted, if they want to be able to do that and you

13   want Your Honor -- we don't have an issue with that.  We'll

14   take that battle on in the District Court, but only if they're

15   able to Judge Rosen to change what Congress had intended should

16   they then be able to come back here, and at that point in time,

17   we ought to have an evidentiary hearing and deal with the

18   <u>Sonax</u> factors.

19         We think Your Honor has it exactly right, and we do

20   think it's prejudicial, and you know, counsel can argue that

21   it's not, but Your Honor, for example, to just give one example

22   and, you know, maybe this matters, maybe it doesn't, but the

23   reality is, Your Honor, the accounting issues here while

24   important to plaintiffs are not the primary factors in this

25   case, and as Your Honor knows, we were retained in July of last

26   year to help on the restructuring.

65

Clearly, we need to get up to speed and understand
those issues at some point.  That hasn't even occurred in these
cases.  We've been a little busy in the first ninety days of
these cases doing a few other things like getting financing in
place and dealing with claims, trading -- assets and all the
issues we've dealt with, with the committee.  We haven't had --
and Mr. Rosenberg will tell you, we haven't had even the
opportunity to have the initial briefing with the committee on
these matters which they've requested and which we've agreed to
provide and both Mr. Rosenberg and I need to get a little
educated from special counsel about these matters.  Neither of
us had that opportunity.

This is extremely premature, Your Honor, and we think
highly prejudicial, and we think the plaintiffs have got it
exactly wrong and the Court has got it right.

Go to the District Court, see if you can get relief.
If you can get relief from the District Court, then at least
you arguably can say you've got cause under Sonax here and then
the -- then the debtors are in a position with the creditors
committee and the other parties in this case to take on the
issue of whether or not in the balance of harms and prejudices
which is a bankruptcy calculation by this Court whether or not
Your Honor ought to then lift the stay or modify the stay in
this case.

And we'd ask Your Honor to deny the relief being
request other than giving them the limited opportunity to go

66

1  speak to Judge Rosen.

2           THE COURT:  Okay.

3           MR. ROSENBERG:  Good morning, Your Honor.  Robert

4  Rosenberg for the creditors committee.

5           Our silence until now on the various matters of

6  course indicates consent or assent agreement with the debtors'

7  position, and that of course is equally true on this one.

8  However, I believe on this one, the issues are sufficiently

9  significant that we ought to address them on the record.

10          Needless to say, we do agree with the assessment that

11 Mr. Butler just stated.  As he stated, we are struggling to get

12 educated on what the issues are in this case and what should

13 happen to them.

14          As Mr. Butler indicated, this was not the driving

15 factor here in arriving in Bankruptcy Court unlike Enron and

16 Worldcom, and therefore, simply is not at this moment at the

17 very top of the issue list.

18          We strongly agree with Your Honor that the -- the

19 plaintiffs here simply have the procedure backwards because

20 there is no reason to consider the balance of prejudice kinds

21 of issues under Section 362 until and unless the issue is ripe

22 and relevant at the District Court issue -- level, and without

23 an evidentiary hearing here, I daresay that I have a very hard

24 time believing that there are a bunch of boxes sitting in a

25 corner simply waiting for Federal Express pickup and that's all

26 that's involved here.

67

1      To the extent that documents were previously

2 delivered to a special committee at SEC, a justice department,

3 whatever, that hardly suggests to me that they don't need to be

4 entirely re-reviewed in connection with delivery to a private

5 litigant, re-reviewed for privilege, re-reviewed for

6 confidentiality, issues that may not be quite as relevant in

7 the context of an internal or a governmental investigation.

8      So, unless the debtor tells me otherwise, I don't

9 think this is a situation of saying to Federal Express come

10 pick them up.  Accordingly, I do think that an evidentiary

11 hearing is required on the balance of hurt here and it is

12 absurd to have one in a vacuum in a moot situation where the

13 District Court has not said production is ripe.

14      Thank you.

15      THE COURT:  Do you -- Mr. Rosenberg, do you remember

16 when Enron filed?  I'm just looking at these orders.

17      MR. ROSENBERG:  I certainly do, Your Honor.  December

18 2001.

19      THE COURT:  Okay.  Fine.

20      MR. ETKIN:  Your Honor, obviously, the primary issue

21 that's being raised is really somewhat of an chicken-and-egg

22 proposition with respect to the District Court and this Court.

23      Mr. Butler talks about what Congress intended.  I

24 didn't see anything about the debtors' papers that pointed out

25 some legislative history as to how to resolve that issue.

26      I think the only thing that the Court has to provide

68

some guidance as to how that issue has been resolved is how it

has, in fact, been resolved previously in the two cases that

have addressed this issue, and I think that raising the

question of whether the filing itself was precipitated by the

accounting improprieties is not really the issue.

The issue is what is the stat of play with respect to

those accounting improprieties going into the Chapter 11

proceeding, and there, the similarities are striking with

respect to restatements for years, admitted accounting

improprieties with respect to prior financial statements,

multiple government investigations.  There are no distinctions

as far as that is concerned.

And, in fact, if there weren't those governmental

investigations and if there wasn't the previous production of

documents to the government with respect to these issues, we

wouldn't be making this motion.

We're not seeking discovery from day one with respect

to our pending securities litigation.  We're seeking access to

documents that have already been produced, already have been

reviewed, already have been indexed.

Now, Mr. Rosenberg talks about the prospect of having

to review them again where the circumstances are different.

Your Honor, those are red herrings.  Those are roadblocks being

thrown up now with respect to dealing with what is -- what is

the obvious, and the obvious is that there's -- that there's no

desire to impede the debtor from exercising whatever privilege

69

objections that they might have or whatever privilege that they

might want to assert.

    The orders that were previously entered in the prior

cases specifically provided for that.  The Worldcom motion was

hotly contested by the debtor.  Judge Gonzales issued an

opinion --

        THE COURT:  Well, no, he didn't issue an opinion.

        MR. ETKIN:  He signed an order.  I apologize.  He

signed an order based upon his decision and requested an order

to be presented.  That order was signed.  That order provides

all of the safeguards that the debtor could possibly want with

respect to those documents.

    This is really an example of an effort to create

issues with respect to what has been the prior production of

documents that have been reviewed, indexed and are waiting to

be -- and are waiting to be copied subject to privilege

objections which is lawyer-driven not debtor-driven, but a

lawyer-driven process, and delivered over to the lead

plaintiffs in connection with their obligations and

responsibilities to move forward on behalf of the class that

they represent with respect to the litigation against non-

debtor third parties.

    We understand what the PSLRA requires.  That's a

different showing to be made to a different court.  The debtor

does not have to do one thing until the District Court decides

that issue, similar to what was decided in the Enron and

70

1  Worldcom cases.  There's no need for a chicken-and-egg issue.

2  There's no need to reinvent the wheel with respect to how this

3  process has worked previously.  It should work no differently

4  in this case.

5          THE COURT:  Okay.  All right.

6          I have in front of me a motion by the lead plaintiffs

7  in the Delphi Corporation securities litigation for a limited

8  modification of the automatic stay under Section 362 of the

9  Bankruptcy Code to permit them to receive all documents

10  previously provided by Delphi to third parties including, an

11  internal audit committee investigation as well as the SEC and

12  others.

13          The issue as I see it is really pretty limited at

14  this point, which is an issue of timing.  That is because the

15  movants acknowledge that even if I were to lift the automatic

16  stay to permit the production of such documents, they could not

17  be produced until the movants also obtained relief from the

18  District Court presiding over the securities litigation.

19  Under the Private Securities Litigation Reform Act

20  of 1995, the PSLRA, which contains a separate stay driven by

21  different considerations than the automatic stay, that which

22  separately currently stays the pendency of discovery in the

23  underlying securities litigation.

24          To me, the first gatekeeper issue is obtaining relief

25  from the stay to obtain -- relief from the stay in this court

26  under Section 362 to seek relief from the PSLRA stay.  That's

71

the first gatekeeper issue.

In my mind, logically, the next gatekeeper issue is obtaining relief from the District Court under the PSLRA.  The District Court is dealing obviously not only with that statute but with discovery issues generally in consolidated litigation that is clearly at a very early stage, and it seems to me that I cannot reasonably predict what the District Court would do in connection with an application for relief under the PSLRA for production of documents or what sort of time-table the District Court will set for the production of documents.

Given that fact, it seems to me that what I'm really being asked here to do to the extent it goes beyond a request for relief from the stay simply to go ask the District Court for relief under the PSLRA, is in essence to decide an issue in a vacuum or to give an opinion that is not at this time ripe to be given.

To my mind, that would end the issue but for the fact that apparently at least in two instances, a similar issue was raised in the Bankruptcy Court in front of Judge Gonzales first in the Enron case and then second in the Worldcom case.  The movants have attached orders issued by Judge Gonzales in those two cases, the first of which I note was issued very early in the case in the Enron case and does not mention the PSLRA, and it's not clear to me whether this issue was even considered in connection with that order.

The second Enron order and the Worldcom order

72

attached do specifically note that the relief granted to the

securities litigation plaintiffs is still subject to any

determination by the District Court presiding over the

securities litigation, including under the PSLRA, but I cannot

tell much more from those orders, which are just that. :

orders; tThey don't contain findings of fact, and there's no

oral ruling that would lay out findings of fact and conclusions

of law as to why Judge Gonzales granted that particular relief.

One of the things that's not clear to me is whether

there were any communications directly or indirectly from Judge

Harmon or Judge Cote, the judges presiding over the District

Court litigation referred to in those two orders respectively.

—, about tThe timing issues involved or the like.

So I think that not only an issueas matter of

judicial economy, but frankly to avoid deciding an issue that's

not ripe, all that I will grant here today is relief from the

stay to seek relief from the PSLRA stay in the District Court.

If such relief is granted before the hearing whereand

the facts will be clear as to what -- what discovery if any the

District Court authorizes under the PSLRA and then I'll decide

whether the automatic stay should in any way restrict that

discovery.  Frankly, if, in fact, it's simply a matter of

picking up boxes and limited review by counsel, it may not be

much of an issue.

On the other hand, I'm not going to get into the

facts at this point because I think it's premature and there

73

1  may be other considerations that are relevant under the

2  Sonax factors.

3          Moreover, at that time, there may be a more complete

4  discovery plan or a more complete litigation schedule that will

5  help me decide the issue.  So I will grant relief from the

6  automatic stay for the limited purpose of seeking relief from

7  the District Court under the PSLRA.

8          And, Mr. Etkin, I will carry the rest of the motion.

9  You can put it on the docket on short notice.  I don't think

10 that there's a need to have a lengthy delay after the District

11 Court rules.

12         MR. ETKIN:  Thank you, Your Honor.

13         THE COURT:  So I don't know which one of you should

14 submit an order to that effect.

15         MR. BUTLER:  Your Honor, we'll draft an order and

16 show it Mr. Etkin on that matter (sic).

17         Your Honor, also just so the record is clear today

18 because I don't want either the debtors or the lead plaintiffs

19 to be in a position to characterizing what occurred here today

20 in front of the District Court along the lines, say, gee, Judge

21 Rosen, you know, go ahead and approve this because it will --

22 you know, Judge Drain is ready to sort of, you know -- you

23 know, open the floodgates here.

24         THE COURT:  I think there are very different issues

25 involved.  I think the PSLRA addresses quite different issues

26 than the automatic stay addresses and I wouldn't presume to

74

give a District judge any sort of direction about how he or she

should manage their discovery docket or the PSLRA, and really

my ruling is based simply on, first, that deference and then

issues of ripeness.

MR. BUTLER:  And may the order also include a

statement that the rights of the debtor and the creditors

committee are fully reserved -- preserved in connection with

the --

THE COURT:  Yes.  I mean, everyone's -- yes.

MR. BUTLER:  I just think --

THE COURT:  I think -- normally, I recommend people

don't do that because then everyone wants to stand up and

reserve their rights, but I guess in this instance, it's

appropriate so that there's no confusion with another court,

but obviously, the class action plaintiffs' rights are fully

preserved, too.

MR. BUTLER:  We understand that, Your Honor.

THE COURT:  Okay.

MR. BUTLER:  Thank you very much, Your Honor.

Your Honor, the next matters on the agenda are

Matters 33 and 34.  These involve the application of the

debtors for the retention of Deloitte and Touche, LLP as

independent auditors and accountants to the debtors only with

respect to the 2005 fiscal year that has been completed.

The debtors have previously announced that they have

-- after a request for a proposal request that the debtors have

75

engaged other accountants going forward and will be filing a

separate application in connection with the retention of

auditors for the 2006 fiscal years --

THE COURT:  I think that's on my desk, actually.  I

think it's on my desk, isn't it?  Yeah.

MR. BUTLER:  Yeah.  So it's -- that we'll be moving

forward on that separately, Your Honor.

THE COURT:  All right.

MR. BUTLER:  Your Honor, the -- Matter No. 33 is lead

plaintiffs' motion to compel deposition testimony filed at

Docket Number -- I believe it's 1618 and we have filed --

debtors have filed a motion to quash at Docket No. 1666 and

there have been other replies filed.

Your Honor, Deloitte and Touche, LLP was one of a

handful, I think four or five entities that Skadden disclosed

in our retention papers exceeded the one percent threshold in

terms of revenues with the firm in connection with the

guidelines and discussions of the United States Trustees'

office and their protocol.  Without acknowledging that there

would be any conflict of interest here, we concluded that we

should not handle this particular matter but defer to other

counsel.

Normally, that would go to Mr. Togut and Mr. Berger,

conflicts counsel, but Shearman Sterling who is special

corporate counsel in this case had, in fact, been handling the

Deloitte retention from the beginning because we recognized

76

this in our pre-petition period and they've handling that, and

therefore, they will be handling this matter today.

Mr. Roll will be dealing with Matter No. 33 in

defending the debtors' interest there.

The Matter 34, my understanding the actual

application, the only thing that's going to be dealt with today

I believe are discovery matters which is Matter 33, and my

understanding Matter 34, the actual merits of the retention of

Deloitte and Touche I believe has been adjourned to January

13th as I understand the schedule.

THE COURT:  Right.

MR. BUTLER:  So, with that in mind, the only -- as to

Matter 33, the lead plaintiffs -- litigation again, I'll cede

the podium to lead plaintiffs, and Mr. Roll will defend the

debtors' interests.

MR. ROLL:  Good afternoon, Your Honor.  William Roll

of Shearman and Sterling appearing on behalf of the debtors.

As Mr. Butler indicated, Number 33 comprises

competing motions by the debtors on one hand and by the lead

plaintiffs on the other, the lead plaintiffs in the securities

litigation raising essentially the same set of issues, the same

three issues said to arise in connection with the debtors'

application to -- for authorization to retain Deloitte for the

limited purpose of the 2005 audit.

At the outset, Your Honor, I would say it is not a

stretch to say that if Your Honor grants the lead plaintiffs

77

1    the relief they're seeking in connection with Number 33, the

2    motions I'm going to talk about, it will in effect moot much of

3    the discussion the Court just had and much of the determination

4    the Court just made with respect to the preceding motion on the

5    lifting of the stay.

6            I say that because what the lead plaintiffs

7    essentially are seeking to do here, that is in connection with

8    the Deloitte application and the discovery issues in connection

9    with the Deloitte application is to get discovery in connection

10   with the securities litigation.

11           THE COURT:  Although they signed a confidentiality

12   agreement saying that they won't use it.

13           MR. ROLL:  They did sign a confidentiality agreement,

14   Your Honor.  It is a standard -- I think what most lawyers

15   would consider a standard confidentiality agreement.  It does

16   restrict what they can do in many respects with the information

17   they get, but it does not address the fundamental problem we

18   see here which is they are asking for things as counsel for

19   lead plaintiffs put it earlier when they said this is what

20   they're not doing.  This is, in fact, what they are doing.

21           They're asking for things that go back to day one in

22   connection with the securities litigation, and I think the best

23   illustration of that is to look at the actual document request

24   that they've made.

25           Perhaps I should back up.  The three -- the three

26   issues before the Court raised by the competing motions are the

78

1  propriety of their request to the debtors for documents about

2  which I'll speak in a moment.

3          There -- having served trial subpoenas or subpoenas

4  for the hearing in connection with the Deloitte application and

5  all the members of the Deloitte audit committee and our motion

6  to quash that and their effort to seek further testimony from

7  Mr. Dellinger, Delphi's CFO who has already testified in a

8  deposition with respect to the issues going -- the proper

9  issues going to the Deloitte application.

10         Mr. Dellinger declined on the basis of the attorney-

11 client privilege to answer a number of questions put to him in

12 that deposition.

13         With respect to my point earlier about they're trying

14 to get at the things that Your Honor just said they should seek

15 relief from the state first to be able to get.  The document

16 request they have made here makes it crystal clear that they're

17 going way beyond what they should be trying to get in

18 connection with the Deloitte application.

19         What they should be trying to get are documents

20 relating to the general competence to complete the work with

21 respect to 2005 and to do the 2005 audit and relating to

22 Deloitte's disinterestedness under the Bankruptcy Code.

23         Instead, what they have sought is just about

24 everything that the debtor has relating to Deloitte or indeed

25 even accounting issues going back as far as 1999.  I don't want

26 to burden the Court with every element of their seven-page

79

single-spaced request, but I do want to point out maybe a half

a dozen that make this point very clearly.

They have asked, for example, that we produce -- and

asked by the way that we produce this in essentially two

business days -- all minutes of the meetings of the audit

committee.  All minutes of all meetings of the audit committee

of Delphi from January 1, 1999 to the present.  All memoranda

and reports submitted by Deloitte to the audit committee from

that same date from January 1, 1999 to the present.

All memoranda and all reports submitted by Deloitte

to the company relating to any problems encountered during any

of Deloitte's -- any of Deloitte's audits of the company's

financial statements again going back to presumably the

beginning of time.

All memoranda on internal controls, management

letters and similar documents submitted by Deloitte to the

company or its audit committee again from January 1st, 1999 to

date.

And the list goes on and on and on and on like that.

These clear do not go to the issues that are properly -- or

will be properly before the Court on the application to retain

Deloitte.

THE COURT:  And, just for the record, that

application as to retain Deloitte to solely complete the 2005

tax audit?

MR. ROLL:  To complete the audit of the company's

80

1   financial statements for 2005 and --

2          THE COURT:  So they're not providing any other

3   services in the bankruptcy case?

4          MR. ROLL:  Not to my knowledge, Your Honor.  So it is

5   limited to that --

6          THE COURT:  And -- and it's a different engagement

7   team?

8          MR. ROLL:  It is a different engagement team.  The

9   papers submitted by the debtors in support of the application

10  to retain Deloitte make that clear.  In particular, the

11  affidavit from the Deloitte partner who will be heading the

12  engagement team makes clear that it's a different team.

13         I believe Mr. Dellinger when he testified in his

14  deposition at the lead plaintiff's behest testified to that

15  same point.  So the issue -- that issue has been addressed.

16         THE COURT:  Okay.

17         MR. ROLL:  And the kinds of things that the lead

18  plaintiffs are looking for as illustrated by those requests

19  that I read to the Court simply don't go to that kind of an

20  issue.

21         You know, I'm going to refer to Worldcom, too, but I

22  have the easiest task with respect to the decision there.

23  Whatever that -- that case may have said or whatever the judges

24  -- any judge in that case or any other case may have said with

25  respect to whether lifting the stay was appropriate or not, it

26  is without doubt the case and others like it at least stands

81

for the proposition that if there is a stay in place then you

cannot use the bankruptcy process to get discovery in

connection with the stayed litigation, and that's precisely

what the lead plaintiffs are trying to do here, not just in

connection with the document request as indicated, but also

with respect to their entire discovery effort related to the --

to the Deloitte application.

That's the first issue, the documents.  The second

issue, the second main issue or set of issues relates to the

subpoena served on all of the members of the Deloitte audit

committee.  First of all, the lead plaintiffs know or at least

should know one of the four individuals who were subpoenaed is

in Brazil, not here in New York, and it would be to say the

least a significant hardship for that gentleman to come here to

testify just at their behest in connection with this

application on issues as we see it are not necessary to a

court's determination of that issue.

Secondly, there's another member of the audit

committee, Mr. Walker, who the lead plaintiffs know or should

know has only recently joined the audit committee and clearly

by any objective measure has not been involved in issues

relating to the restatement, Deloitte's work in connection with

-- with Delphi previously or anything like that.

That leaves only two, and even those two are

unnecessary because as the debtors have said it and conveyed to

the lead plaintiffs from the start, everything they need to get

82

in terms of the debtors' reasoning for wanting to employee

Deloitte on the limited basis we're asking to do can be

obtained and could have been obtained from Mr. Dellinger, the

company's CFO, who we did make available promptly for a

deposition, and I would add that the lead plaintiffs, they were

offered several hours of his time and used only a couple hours

of his time.

THE COURT:  Is he the only witness that the debtors

would call at the hearing?

MR. ROLL:  He is -- he's one of two, Your Honor.  We

would intend to call Mr. Plumb as well.

THE COURT:  From Deloitte.

MR. BUTLER:  From Deloitte.  I would note that as to

Mr. Plumb, the plaintiffs have made no effort to depose him,

and I should also note, and I think this is very telling.  The

retention of Deloitte, the retention of any professional is an

important matter for any debtor and for the estates, only the

lead plaintiffs here have sought discovery of this sort in

connection with this application.

The creditors committee has not.  The U.S. Trustee

has not indicated any need to see anything further.  No other

party in interest has come forward and said, yes, we'd like to

see a whole bunch of information that we think goes to whether

or not Deloitte should be retained for the limited purpose that

the debtors are trying to retain it for.

Clearly, on a very sort of pragmatic level, that

83

illustrates that the lead plaintiffs are pursuing a very

different agenda here from the one that all of the players

properly on this stage are pursuing.  They are, in fact,

pursuing an agenda that's appropriate for their stage, for the

securities litigation where they are big players, but they're

not big players here, and they shouldn't be seen as that in

connection with this -- with this very important matter to the

estate.

            That's the subpoenas to the audit committee.  It's

unnecessary.  It's cumulative.  Two of the individuals wouldn't

even be appropriate in any event, and on top of that, I would

also say that if one reads the transcript of Mr. Dellinger's

deposition testimony, it's apparent that the members of the

audit committee in all likelihood could -- could only duplicate

in effect the factual items that he has testified to already

with respect to the importance to the debtors of having -- of

having Deloitte retained for the limited purpose of 2005.

            Finally, on the issues arising from Mr. Dellinger's

deposition testimony, it's a slightly different set of issues

there.  The problems that the lead plaintiffs have with his

testimony don't go to so much whether or not his -- his

testimony is appropriate for the Deloitte application versus

the securities litigation but rather to our assertion in a

number of limited instances that -- that what they are asking

for and look what they were asking for him to testify about

would have necessarily divulged attorney-client protected

84

information.

And to be a little more specific, in a number of instances, it -- Mr. Dellinger had made clear that his knowledge with respect to certain items derived entirely from discussions he had and meetings he attended with counsel for the company and only counsel for the company and others affiliated directly with the company.

That's a classic situation calling for a proper end location of the attorney-client privilege.  When the lead plaintiffs continue to probe on -- on those meetings, the instruction was given that he not answer and he followed that instruction.

It's not for me to suggest to the Court what it should do on this, but I would say that if one -- if anyone were to read the transcript of Mr. Dellinger's deposition testimony and it's not that lengthy -- it's only about seventy pages -- it becomes clear very quickly that what was going on there was the sort of thing that goes on at just about every deposition in any litigation in this country every single day. There are questions that on their face and as amplified by testimony from the witness would -- would invade the privilege if there's an instruction not to answer and the witness follows that instruction.

There was no effort made to impede the lead plaintiffs' ability to get at Mr. Dellinger's knowledge with respect to the urgency of getting Deloitte employed or having

85

them go back to work and having them do the work necessary to

complete the 2005 audit.  Indeed, he was fully prepared to talk

about that.

He was prepared and did talk about what he understood

about Deloitte's qualifications generally to do the work --

THE COURT:  On the privilege point, the plaintiffs

contend that the privilege was asserted on the basis that the

lawyer was present as opposed to that the lawyer was giving

legal advice or was reasonably expected to be giving legal

advice and the like.

MR. ROLL:  It is true, Your Honor, that that's what

they assert, but it's -- it's not quite right.  The privilege

was asserted on the basis that the knowledge gained by Mr.

Dellinger on the subjects being inquired about came from a

discussion with counsel and counsel's client where there was an

exchange of communication relating to the rendition or

requesting of legal advice.

It's as simple as that.  It's not just that counsel

was sitting in the corner and two people at the company or two

or more people at the company including Mr. Dellinger were

talking in the same room about things that would otherwise not

be privileged.

THE COURT:  And counsel wasn't just reporting on

prior meetings?

MR. ROLL:  Not to my knowledge.  My knowledge isn't

even what's important here.  Mr. Dellinger's knowledge on this

86

is important and, in fact, we have added his elaboration of

what happened at those meetings to the record.  We submitted a

declaration by Mr. Dellinger following his deposition and

following these disputes arising where he went into in more

detail who was present at those -- there were four meetings,

and what happened and who said what, all going to the point,

the general point of his only knowledge relating to these

issues being inquired about, these accounting issues being

inquired about having come from his having heard that

discussion and having been a part of it with counsel.

        Mr. Dellinger is here today.  So, if there's any

further doubt about the circumstances giving rise to the proper

end location of the privilege, if there's any doubt remaining

after our having submitted Mr. Dellinger's declaration, I'm

sure he'd be more than happy to lay that doubt to rest with

additional testimony.

        I don't know what the Court has in mind with respect

to that, but he's here and he's more than happy to talk about

that.

        So all of that leads me to say -- and I don't mean to

minimize the importance of these kinds of issues, but the

attorney-client privilege problems here raised by the two

parties, the two sides' motions are garden-variety deposition.

 They're garden-variety attorney-client privilege assertion-

type issues.  Indeed, and I mean no disrespect to the lead

plaintiffs, but I feel duty-bound to say this as well, if they

87

really had a problem with -- a true problem with the assertion

of the privilege, they were duty-bound to inquire a lot more

than they did at the deposition about the circumstances in

which the conversations occurred.

As we all know, it's counsel's duty to make an

appropriate record if counsel thinks that the -- that the

privilege is being asserted improperly.  Here, the privilege

was asserted.  The instruction was given.  The witness followed

the instruction.  Counsel made a complaining statement and

basically moved on.

Even in the face of that, we submitted the Dellinger

declaration to try to set the record straight and as -- set it

straight as fully as we could about why the privilege was

invoked and why we believe it to have been appropriate here.

THE COURT:  Okay.

MR. ROLL:  Thank you.

MR. SABELLA:  Your Honor, Jim Sabella from Grant and

Eisenhofer for lead plaintiffs.

Let me say at the outset that the issue of the PSLRA

stay in this context I believe is a complete red herring.

Whether or not any of the discovery we seek here could or could

not be relevant to the securities litigation doesn't matter.

What matters is, is the discovery sought here relevant to the

application that the debtors made to retain Deloitte, and

recall, we didn't initiate this proceeding.

If they weren't insistent on keeping Deloitte for the

88

1   2005 audit, we wouldn't be here seeking any of this discovery.

2           So the issue is simply whether the discovery is

3   relevant there.  We can't use the discovery in the securities

4   litigation because we signed the confidentiality order that

5   they drafted and put before us the day of the deposition, and

6   we signed it without changes.  There have been cases in this

7   court and perhaps the best one is a called <u>Recotin</u> (phonetic)

8   which we cite in our reply papers at 307 BR 751 where another

9   judge in this court specifically said if discovery is relevant

10  to something going on here, the fact that there's a securities

11  litigation stay in another proceeding doesn't matter.

12          Is the discovery relevant here?  Our objection to

13  Deloitte is twofold.  One is incompetency and the second is

14  conflict of interest, and let me talk about the competency a

15  little bit.

16          We know that there were major problems with

17  Deloitte's audits of the preceding year's financial statements.

18   How do we know that?  Deloitte gave clean opinions that the

19  accounts were presented in accordance with generally accepted

20  accounting principles.

21          Now the audit committee did an investigation and

22  they've restated all those financial statements and they've

23  said that major transactions were improperly accounted for.

24          Now, we don't know exactly why Deloitte got it so

25  wrong.  We don't know whether it was -- at this point, whether

26  it was the fault of just a couple of bad auditors in which case

89

1  perhaps changing the audit team might make a different or

2  whether or not it was deficient audit procedures, and if it's

3  the latter, what assurance do we have that Deloitte is going to

4  get it right this time?  None whatsoever, and that's why we're

5  probing.  What did Deloitte get wrong?  Why did it happen?

6  What did the audit committee find out when it -- when it did

7  its investigation which led to these major restatements?  They

8  blocked all of that.

9       Counsel talks about the alleged burden in some of our

10 document requests, but recall, they didn't take us up on our

11 offer to try to renegotiate the burden, to try to have a

12 limitation on what we were seeking.  They gave a blunderbuss

13 objection, not one piece of paper.

14      So I think the burden aspects or the overbroad

15 aspects that counsel was suggesting are not what's going to

16 carry the day here.  They have taken the position we're

17 entitled to know nothing about what Deloitte got wrong.  We're

18 entitled to know nothing about what the audit committee looked

19 at when it made its restatements.  What did it find out about

20 Deloitte's procedures?  What assurances did it get Deloitte is

21 not going to blow it again?

22      We're not entitled to know anything about that.  They

23 won't give us any documents.  They won't give us any testimony.

24      Now, we've also talked about the internal controls

25 aspect of the competence.  Deloitte was required at the time it

26 did its audits to give advice on internal controls and the

90

adequacy of internal controls.  The company has now said there
were material weaknesses in internal controls during the years
that Deloitte did those deficient audits.

So we've asked what did Deloitte tell you about the
internal controls?  Did they identify those problems?  If not,
why not?  Did the audit committee look into that and find out
how did they miss those serious material weaknesses in internal
controls.  They won't tell us, won't give us any documents,
won't even give us the management letters that Deloitte gave to
the company at the time when it purported to report on internal
controls.

So how does one appraise -- how do you get your arms
around whether or not Deloitte is up to the job to do the 2005
audit when we have no idea how it happened that they got it so
wrong in 2001 and 2002 and 2003.

THE COURT:  ~~Doesn't~~ Hasn=t every accounting firm,
every large accounting firm gotten it wrong in connection with
~~a~~ at least one large company in the last several years?  I
mean, can't you take your argument to the extent that, you
know, you could discovery of -- in connection with name
whatever disaster any accounting firm was~~they were~~ involved in,
you know.  Merry ~~-go- ~~round, for example, for E&Y.

You know, I mean, I'm just trying to figure out how
far you could take that.

MR. SABELLA:  Well, I wouldn't take it there, Your
Honor.

91

        THE COURT:  I mean, they couldn't hire Grant
Thornton, right, because they've been sued?  They couldn't hire
any of them.

        MR. SABELLA:  But the point is we know that
Deloitte's --

        THE COURT:  If they've had restatements.

        MR. SABELLA:  -- that the relevant Deloitte
procedures dealing with this company in this industry and the
kinds of problems that these audits present were insufficient.
 Okay.  Sure, every accounting firm gets sued, but we know that
something very wrong went wrong on these audits, with this
company, and doesn't the Court want to know why?  I mean, are
you going to just pay them an audit fee for 2005 and say, well,
they got it wrong last time but I'm sure they'll get it right
this time.

        I think we're entitled to a little more than that.

        THE COURT:  Well, maybe, although you might—— posit
to the contrary that they'll be walking on eggshells and doing
everything they can to get it right.  You know, so they are
absolutely blameless --

        MR. SABELLA:  Well, I don't think so, Your Honor, for
the following reason.  They're a defendant in the securities
litigation.  To the extent that they really dig here and they
find additional weaknesses in internal controls, additional
errors in accounts, additional contracts that were improperly
accounted for, they're digging their own grave in the

92

securities litigation.  They're not going to want to do that.

THE COURT:  That's a different point.  I understand that point.

MR. SABELLA:  Right.  That's a conflict of interest point.

THE COURT:  I understand that point.

MR. SABELLA:  And I think it's a serious one.

Now -- so that essentially is our argument on the relevancy of at least some discovery.  If they want to limit the documents, we can try to do that, but I think we're entitled to some discovery on some of these issues, and they've blocked all of it.  If it's relevant, the PSLRA stay has nothing to do with it.

Now, counsel talked a little bit about the Worldcom case that he cites in his brief, which I think we've adequately distinguished in our reply brief, and it was a totally different situation.  That was a situation where the people wanting discovery about KPMG, they waited a year after they knew about the disqualification-related issues and it really smelled that all it was, was an effort to get discovery for use in another proceeding, and in that case, the company said, we are so sure KPMG is okay here that we are not going to sue them no matter what comes out.

They went -- they went on the record as saying we don't have any claims against KPMG.  Debtor has not done that here with respect to Deloitte.  There's been no waiver of the

93

potential that the debtor is going to sue Deloitte or Deloitte

is going to sue the debtor, and as Your Honor knows, in most of

these accounting fraud situations, it's ultimately what

happened.  They point the finger at each other.  So this is

very different from the Worldcom case that counsel relied on.

Let me talk briefly about our desire to depose --

THE COURT:  What more discovery do you need knowing

that there's already a lawsuit against Deloitte and, therefore,

potential claims going back and forth by the debtor?  Why do

you need more discovery?  Can't you point to a potential

conflict right there?

MR. SABELLA:  Yes.  I think on the conflict point you

don't need a lot more discovery.  I think it's more on the

competency issue that you need discovery.

THE COURT:  And isn't that the case particularly

since E&Y is going to do the 2006 audit so they can certainly

see if there are, you know, improper procedures that had been

in place, and again Deloitte needs to be pretty concerned that

it get it right in 2005 because another firm is going to be

looking over their shoulder in 2006?

MR. SABELLA:  Well, I don't think that's exactly

right, Your Honor, because I mean, in 2006, Ernst & Young is

going to be the 2006 audit, and it will be -- it will not be

re-auditing 2001 or two or three or four or five --

THE COURT:  No, but it's going to look at what --

MR. SABELLA:  It's going to look at what Deloitte did

94

1  --

2          THE COURT:  As far as, you know, controls and

3  procedures ~~are~~ as concerned that are in the company.

4          MR. SABELLA:  Yeah, but if Deloitte should come

5  across some bodies in the closet in the context of this audit,

6  I think they have more incentive than anyone in the world to

7  make sure they don't come to light and to make it more

8  difficult not less difficult for Ernst & Young to find it.

9          THE COURT:  Okay.

10          MR. SABELLA:  The additional discovery that we're

11  seeking in addition to documents as counsel referred to is to

12  examine a couple of members of the audit committee, and we'd be

13  happy not to take the fellow in Brazil and not to take the

14  fellow that just joined.  I mean, you know, we're willing to

15  negotiate those things.

16          The reason why we wanted members of the audit

17  committee and not just Mr. Dellinger is number one, it's the

18  audit committee that made the decision to stay with Deloitte

19  for 2005 and it's the audit committee that made the decision to

20  go with Ernst & Young for 2006, and we wanted to know what the

21  audit committee knew, what it considered.

22          Mr. Dellinger didn't know obviously what

23  conversations the audit committee members had among themselves.

24   He obviously didn't know what conversations they had with

25  Deloitte.  Did they probe with Deloitte whether -- what

26  assurances Deloitte could give about the 2005 audit?  He didn't

95

know anything about that.  He never discussed the restatements

with Deloitte.  He appeared not to know much about what the

audit committee investigation showed and what little he knew,

he refused to testify about either on the grounds of scope or

on the grounds of privilege.

        So we'd like to probe the audit committee.  He didn't

even know if the audit committee considered the conflict issue

that Deloitte would have an incentive not to look back at prior

transactions that might have been improperly accounted for.  He

didn't even know if the audit committee considered that.

        So it seems to me that at a minimum we ought to get

to Question 1 or 2 of the real decision makers who made the

decision.  He's been on the job for a month or two.  The audit

-- the process of looking for a new accounting firm which ended

up with Ernst & Young being appointed, that process began

before Dellinger was hired.  Somebody else made that decision

that we'd better be looking for another accounting firm.

        And it's interesting, when they made their

application in this Court to retain Deloitte, the application

said they wanted to retain Deloitte for 2005 and thereafter

although they had already put in progress the idea of getting a

new accounting firm.

        But, in any event, Dellinger wasn't there at the time

they made those decisions.  We asked them for all the documents

that related to the decision to switch to Ernst & Young or the

decision not to go with Deloitte and the decision to retain

96

Deloitte and they didn't give us any documents on those either.

THE COURT:  Okay.

MR. SABELLA:  So it seems to me the testimony from a couple of people there is not overly burdensome, and it's clearly, clearly relevant to what we want to do, and the objections that we filed.

Lastly, on privilege, counsel suggests that it was much more than a lawyer just sitting in the room, but when you look at the questions that I asked at that deposition, there was no suggestion that what I was getting at in any way related to legal advice.

I asked questions such as:  Did any members of the audit committee say let's stick with Deloitte for 2006?  Objection; privilege.  There was a lawyer in the room.  Did anybody say let's get rid of Deloitte for 2005?  Objection; privilege.

THE COURT:  Is that -- I confess, I looked at the transcript very quickly.  It seemed to me that that response was basically because he didn't really know except because what a lawyer told him.  He wasn't there, right?

MR. SABELLA:  He was at the audit committee meeting.

THE COURT:  HE was?

MR. SABELLA:  Oh, yes.  Yes.  What --

THE COURT:  All of them?

MR. SABELLA:  He was at the two key audit committee meetings, December 6th and December 7th when they made these

97

1  decisions.

2          THE COURT:  Not -- not the four.

3          MR. SABELLA:  The point about what he knew came from

4  what lawyers told him, that relates to the audit committee

5  investigation, the restatements and the material weaknesses in

6  internal controls.  Basically, he said anything he knew about

7  the investigation is what a lawyer told him, but even there, is

8  that the conveying of legal advice.

9          I asked him who did the audit committee interview in

10  the context of their investigation.  Did they interview

11  Deloitte people.  Who did they interview?  Objection; attorney-

12  client privilege.  He would have learned that from counsel.

13          Well, how is that conveying legal advice when you ask

14  someone who did they interview and my lawyer told me these are

15  the three guys.  I mean, yes, it came from a lawyer, but that's

16  not privileged information, and similarly, if the audit

17  committee concluded Deloitte made these three mistakes,

18  Deloitte's procedures were inadequate in these three respects,

19  even if he heard that from a lawyer or even if he heard that

20  from the audit committee with the lawyer in the room, it's not

21  privileged information.

22          That's not a lawyer giving anybody legal advice.

23  That's a lawyer reporting on a fact.  So those are the problems

24  we had at the deposition, but they basically put up a wall and

25  said, anything he heard from a lawyer or anything he heard at

26  that audit committee meeting, a lawyer was in the room, he

98

can't talk about it, except the subjects that he wanted to talk

about because he did, of course, tell us that they decided to

go with Ernst & Young.

          So he was willing to tell us some of the things that

went on at the audit committee meeting, but not the rest.

          THE COURT:  Okay.

          MR. SABELLA:  So, you know, Your Honor, there's

really no way to get through the privilege objections,

obviously, other than looking at the transcript and we can't,

you know, go over them chapter and verse here, but it just

seems to me that counsel ought to be instructed that those kind

of blanket privilege objections aren't going to fly.

          THE COURT:  Okay.

          MR. SABELLA:  Thank you.

          THE COURT:  I have one question.  In the relief

requested, you say you want the complete responses to the

interrogatories contained in lead plaintiffs' discovery

request.  I didn't actually see any specific interrogatories.

          MR. SABELLA:  Those are just really the first two

questions which had to do with the composition of the audit

team.  You know, they've said now that they're going to replace

the audit team, but we essentially asked for everybody who

worked on the prior audits and everybody who is going to work

on the current audit.  They've replaced the partners and the

managers.

          I don't think they've made clear that they've

99

1    replaced all the lower-level people from the audit, and that's

2    what we meant by interrogatories.

3           THE COURT:  So they confirmed that -- that's what you

4    were looking for?

5           MR. SABELLA:  That's what we were looking for, yeah.

6           THE COURT:  All right.

7           MR. SABELLA:  Basically the identities of everybody

8    on the audit team.

9           THE COURT:  Well, okay.  All right.

10          MR. ROLL:  Very briefly, Your Honor.  William Roll,

11   Shearman and Sterling again on behalf of the debtors.

12          Just a couple of points.  Counsel mentioned the

13   Recotin case.  It's a very different case.  In that instance,

14   it was the party seeking the discovery that was ultimately

15   allowed by the Bankruptcy Court was the committee.  It was not

16   plaintiffs in the -- in the separate securities litigation and

17   it was not clear that anything flowing to the committee in

18   connection with their discovery request would flow to the

19   plaintiffs in the related securities litigation and be used in

20   connection with that.

21          So it clearly does not apply.  It's a different case.

22   I'm sure they cite it because it's just one instance where the

23   Court allowed the discovery, but it did so on a very, very

24   different basis than what we have here.

25          Secondly --

26          THE COURT:  The general proposition is right.  I

100

mean, even -- even the Worldcom case says if it's -- if it is

relevant in a bankruptcy case then it's not superceded by

another statute.

          MR. ROLL:  If it's relevant.  That's a very big "if."

And my -- my fundamental proposition, maybe I've been less

than stellar in asserting is that they don't even satisfy the

"if."  There's -- they don't satisfy the relevance here

because of -- or the best evidence of that being the breadth of

what they had asked for, the fact that nobody else involved

here has asked for anything even remotely close to that, and

indeed, they haven't asked for anything like that in connection

with E&Y.

          And, as Your Honor pointed out, E&Y is going to be

assessed as well in terms of its general competence, and so

these same kinds of issues if they were appropriate with

respect to Deloitte would be appropriate with respect to E&Y,

and they've made no effort to do the same thing there.  It's

clear, their target is Deloitte because Deloitte is a defendant

in the case, period, full stop.

          It's as simple as that.

          THE COURT:  Now E&Y is going to get a deposition of

this, right?

                         (Laughter)

          MR. ROLL:  I'm sure they'll thank me for having

mentioned it, but it's a telling point, Your Honor, and I think

it's worth all of us noting that.

101

1      The other thing I want to point out about E&Y is that
2  -- and Your Honor touched on this a little bit in questioning
3  counsel, during 2006 and beyond will necessarily require -- or
4  E&Y in doing that would be required to look at as it does the -
5  - in effect the opening balance for 2006.  It will be required
6  to look at the closing balances for 2005.
7      There is no question that from a pure accounting
8  standpoint and auditing standpoint they're going to have to
9  look at work done by Deloitte.  So -- in connection with the
10 limited engagement that we're seeking authorization for here.
11     So, you know, the issues are not going to go away in
12 the way that counsel seems to suggest they are.
13     And then, finally, Your Honor, with respect to the
14 privilege issue, again, and I don't mean to beat a dead horse
15 or to be repetitive or take more of the Court's time than is
16 necessary here, but the fact is that this particular witness
17 we're talking about, Mr. Dellinger learned what he learned
18 because of meetings and conversations that involved a client
19 and counsel and there's no question, and if you look at the
20 Dellinger declaration in particular and the specific questions
21 that counsel was asking, there's no question that the only way
22 he could answer the questions would be to reveal what he
23 learned in the course of those privileged communications.
24     I mean, the -- I mean, in a conventional setting, I
25 suppose the way to really get to this is to -- is to have the
26 Court engage in some kind of an in-camera inquiry.  We're happy

102

1   to have the Court do that if the Court wishes to do that, but I

2   think it would take us to the same place, which is that as Mr.

3   Dellinger has already testified in the deposition and in his

4   declaration, he didn't know from any other source with respect

5   to those questions as to which he was instructed not to answer,

6   than a communication back and forth involving counsel and

7   client.

8          Thank you.

9          THE COURT:  All right.

10         MR. ROSENBERG:  Your Honor, just very briefly.  First

11  of all, for the record, the committee has filed an objection to

12  the form of the order that's proposed for Deloitte and Touche

13  with respect to a couple of very, very narrow specific points,

14  and that of course is not on the calendar today, but I just

15  wanted to make that clear nor will it be handled by Latham and

16  Watkins.  Rather, it will be handled by conflicts counsel

17  because Deloitte is a client of the firm.

18         You know, the committee looked at this issue very,

19  very carefully, Your Honor, and perhaps we have a somewhat

20  simplistic view of it, but to us, there are only two issues

21  here.  Does the audit have to be done and is there any

22  alternative to even consider to Deloitte and Touche doing that

23  audit.

24         And I don't think there is any dispute as to the

25  answer on either one of those questions.  We looked at it very,

26  very carefully.  We didn't see anything to dispute with respect

103

1  to either one of those issues, and to the extent that counsel

2  is raising all kinds of other issues, to me, they're quite moot

3  in the context of the answers to those two questions which,

4  again, I haven't heard anyone dispute the answers to.

5              Accordingly, I think that this discovery is

6  irrelevant, unwarranted and inappropriate.  Thank you.

7              THE COURT:  Okay.  All right.  I'm going to take a

8  five-minute break, and then I'll be back about five of one.

9

10

11                          A F T E R N O O N   S E S S I O

12  N                          THE COURT:  Please be

13  seated.  ~~If there's~~ Is there any other

14  party in interest ~~have~~ that has anything to say on these

15  motions?

16              (No response.)

17              THE COURT:  All right.  I have in front of me

18  competing motions by the lead plaintiffs in the Delphi

19  Corporation securities litigation on the one hand and the

20  debtors on the other hand with respect to the scope of

21  discovery of the debtors in connection with their application

22  to retain Deloitte & Touche, LLP under Sections 327 and 328 of

23  the ~~bankruptcy~~ Bankruptcy ~~code~~ Code to complete the 2005 audit

24  of the debtors.

25              The issues, as I said, come down to the parties'

26  different view of the appropriateness of the discovery sought

104

by the class action plaintiffs.  In essence, the debtors

contend that the discovery requested is not relevant and

consequently burdensome or oppressive.  And in addition to the

normal oppressiveness of having to undergo irrelevant

discovery, the debtors point out, which appears to me to be a

~~pure~~ pretty obvious fact, given the absence of any other

objection or request for discovery here, other than the limited

objection that the committee has made to Deloitte's -- ~~reasons~~

~~of~~ Deloitte's proposed retention order, that there appears to

me to be a separate agenda in connection with the discovery

sought by~~of~~ the securities ~~by~~ law plaintiffs, which is to

obtain information that would be relevant in their litigation

in the district court and elsewhere potentially with respect to

potential pre-petition claims against the debtor, discovery

which would otherwise be stayed by the automatic stay, and, as

I noted earlier, also, at least for now, by other federal law.

In determining whether the debtors are right and the

request is unduly burdensome and irrelevant, I have to consider

the underlying application that the discovery is ostensibly

~~went~~ meant to respond to.

An application to retain a professional raises

essentially two issues.  One is the appropriateness of

retaining a professional in the first place.  To some extent,

that goes to the professional's competence.  And secondly, to

~~order~~ determine if the professional satisfies the

disinterestedness requirement of the ~~bankruptcy~~ Bankruptcy

105

~~code~~Code, which here essentially boils down to whether Deloitte

& Touche holds an interest adverse to the estate.

Judge Gonzalez, in his opinion in <u>In re: WorldCom,</u>

<u>Inc.</u>, ~~33~~ 311 ~~D~~B.R. 151, Bankruptcy SDNY (2004) goes through the

standard in more detail in the context of dealing with a

similar, although not directly on point, ~~discovered~~ discovery

dispute with regard to the proposed retention of an accountant.

In essence, the class action plaintiffs contend that

they're entitled to probe whether Deloitte has an adverse

interest in that ~~it~~ Deloitee is a potential target of a claim

by the debtors in connection with the conduct of audits which

ultimately were restated over the period of five years.  In

addition, they claim that they're entitled to prove Deloitte's

competence as accountants and therefore, again, look into

whether they conducted the audits improperly, which, by the

nature of that inquiry, if conducted as the plaintiffs seek,

would clearly in my mind spill over into whether the debtors

themselves maintained proper accounting procedures and the like

and, therefore, potentially reveal extensive information about

the debtors themselves that could lead to additional claims

being asserted against them or the refinement of claims that

have already been asserted against them in the district court

securities litigation.

Finally, the plaintiffs claim that the one deposition

that occurred in this matter, of the debtors' current CFO, was

inadequate for two reasons:  first, that the attorney/client

106

privilege was asserted too broadly; and, second, that the CFO

is not a sufficiently knowledgeable witness and that they're

entitled to take further discovery of one or two members of the

audit committee., And particularly given the lack of knowledge

by the CFO, Mr. Dellinger, of various steps taken in connection

with Deloitte & Touche by the board, including the decision to

go out and look for other accountants, which resulted in the

debtors' decision to retain Ernst & Young as their auditors for

the year 2006.

I've reviewed the pleadings filed by the parties,

including the deposition of the CFO, which I again took a look

at during the break, and considered their arguments.  And

perhaps not entirely surprisingly, I agree with neither party

entirely.

I believe that the plaintiffs do have a right to some

additional discovery, given the lack of knowledge that Mr.

Dellinger expressed about the debtor's decision to replace

Deloitte with Ernst & Young.  He came recently onto the scene

and the decision to replace Deloitte with Ernst & Young was

made, or at least put in motion or was under consideration

before he came on the scene.  Based on my reading of his

deposition, he was somewhat sketchy about the decision.  I

believe, though, that unless another audit committee -- an

audit committee member is equally sketchy, that one deposition

of an audit committee member should be sufficient to pin down

the details of that decision.

107

1    I agree with the debtors, however, that in light of
2 the issues that I need to consider in respect to the underlying
3 application, the extensive discovery sought by the class action
4 plaintiffs of the debtors' accounting practices and the audits
5 undertaken by Deloitte going back to 1999 is overkill, _unduly_
6 burdensome, and oppressive.

7    I do not believe that, on the issue of competency,
8 those areas of inquiry in this particular context are
9 particularly relevant.  I say that because the debtors have
10 certified and, to the extent that that certification is not
11 under oath, although I believe that counsel's representation is
12 sufficient, it can be made under oath, that the new team of
13 Deloitte personnel conducting the audit for 2005 is different,
14 is a different team; and therefore, the issue of whether the
15 audit will be conducted competently should really ~~be~~
16 ~~focusing~~focus on that team as opposed to what happened in the
17 past.  It's no secret that the big four accounting firms are
18 enormous organizations with a fair amount of difference between
19 the various parties conducting audits and the fact that
20 Deloitte ultimately required a restatement of its prior audits,
21 in my mind, is much less important as far as the issues I need
22 to consider with regard to the retention application than the
23 competence of the current team.

24    I note, as I said during oral argument, that I can't
25 think of any big-four accounting firm or the other two that are
26 nipping at their heels that has not experienced, to its

108

misfortune, either actual liability for bad work or being sued
for it.  To put the debtors through the level of inquiry that
the plaintiffs want here, in light of that fact, I think is
~~fully~~ really unnecessary, particularly, again, given the fact
that the information is, as I said, transparently much more
useful to the class action plaintiffs in a wholly different
context for which they=d need stay relief.

Similarly, with regard to the conflict of interest
issue, I think Mr. Sabella acknowledged that short of actually
proving that there were something truly wrong here that would
justify a claim by the debtors, there's not much more that
discovery could show as far as a potential conflict of interest
because the very fact of the restatement suggests that there is
some potential conflict of interest here.  I don't believe that
the debtors, given the limited context of the relief that they
are seeking, which is to retain Deloitte to complete the 2005
audit, should be put to the level of discovery that would be
required to determine once and for all whether, in fact,
Deloitte is liable to the debtors or not.  I don't believe
that's necessary for me to consider the application under
Sections 328 and 327.

As I said before, the WorldCom case decided by Judge
Gonzalez in 2004 raised similar issues.  I do not believe that
the fact that in that case he believed the plaintiffs had
basically laid in the grass for a considerable amount of time
before raising their concerns was the dispositive fact in that

109

case, but, rather, Judge Gonzalez's view that, given the issues

to be decided by him in connection with the retention

application, the irrelevant and burdensome nature of the

discovery was overbroad was the main issue.

It is true that in that case, the debtors had

stipulated that they did not believe they had a claim against

the proposed professional, but that -- and that is clearly not

the case here, -- but that fact in and of itself is something

that I certainly will consider at the time I consider the

retention application and I'll weigh that in the balance, along

with the point that Mr. Rosenberg made, which is that, I'm sure

it will be asserted then as it was asserted today, it's highly

unlikely that the debtors can retain anyone to do the 2005

audit in any length of time or at the cost that Deloitte could

do it.

So again, weighing the issues that need to be

determined under Section 327 and 328 versus the discovery

that's sought here on the issue of conflict of interest, I

believe it's, again, oppressive and burdensome.

However, as I said, I do believe that it's

appropriate to permit the plaintiffs to depose at least one

audit committee member on the decision to seek to retain some

other firm besides Deloitte, since I believe that that

decision-making process is one that I should have the benefit

of when I consider an objection to Deloitte's retention for the

limited purposes of completing the 2005 audit and I don't

110

believe, based on reading Mr. Dellinger's deposition, that he's

sufficiently knowledgeable on that issue.

As far as the attorney/client privilege issue goes,

it seems to me that the privilege may have been asserted overly

broadly in the deposition that has taken place already,

although it's hard for me to know because there was not a great

deal of probing of the basis for the assertion of the

privilege, although there were objections to the assertion of

the privilege.  I also think that, in light of the other issues

raised by the discovery requests, the assertion of the

attorney/client privilege at times, particularly as it pertains

to requests to go into the details of the audit committee's

investigation and the history of Deloitte's lengthy retention

by the debtors pre-petition, may have been simply a place

holder for an objection on burdensomeness grounds.  Again, I'm

reading between the lines there.

I don't know if that was necessarily the case, but it

seems to me that, given the fact that the audit committee

appears to have been directly involved in the decision to seek

a replacement for Deloitte for 2006 and going forward, the

audit committee member should be deposed first.  To the extent

that there are disputes remaining as to whether the privilege

is being asserted in an overly broad way with regard to that

deposition and they can't be resolved, I'll hear those by

telephonic conference and only if in such a conference I'm

convinced that you need to go back to Mr. Dellinger again will

111

1   I require that.

2       So in sum, I'll permit a deposition of an audit

3   committee member on the decision to switch horses ~~for~~ to E&Y --

4   from Deloitte to a different accountant going forward but to

5   keep Deloitte for 2005.  That deposition should not get into

6   the details of the audit committee's investigation of Deloitte

7   or the details of Deloitte's past history with the debtors and,

8   of course, all rights to object on privilege grounds or

9   otherwise are preserved.  I'll determine, if the parties can't

10  work out disputes over those objections, whether they were

11  well-taken or not, but otherwise I will deny the request for

12  additional discovery and grant the motion for a protective

13  order and a motion to quash the subpoenas.

14      So you can submit an order, Mr. -- but run it by Mr.

15  Sibello first.

16      ~~COUNSEL~~ MR. ROLL:  Will do.  Thank you.

17      MR. BUTLER:  Jack Butler from Skadden again on behalf

18  of the debtors.

19      Continuing with the agenda, the next matter is Matter

20  No. 35.  This is a motion for John C. Cox for relief from the

21  automatic stay at Docket No. 1653.  I'm advised that matter's

22  been withdrawn.

23      The next matter, Your Honor, is Matter No. 36.  This

24  is the Law Debenture Trust Company of New York motion

25  requesting an order to change the membership of the official

26  committee of unsecured creditors found at Docket No. 1607.  The

112

1  motion has been objected to by the United States Trustee, the

2  debtors, the creditors' committee, and the agent for the pre-

3  petition lenders.  I'll cede the podium to counsel for Law

4  Debenture.

5          THE COURT:  Okay.

6          MS. CECCOTTI:  Your Honor, I'm going to preempt

7  counsel just for the process and ask for some guidance on.

8  Babette Ceccotti, Cohen, Weiss & Simon, for the UAW.  Good

9  afternoon.

10         UAW has filed a motion for appointment to the

11 creditors' committee that we have noticed for next month on

12 with this hearing.  We have followed with interest papers that

13 have been filed in connection with Law Debenture, of course,

14 and we believe, particularly after a brief discussion at the

15 break with Ms. Martini and Ms. Davis, that the issues are

16 sufficiently distinct that this matter may be able to proceed

17 without prejudice or any sort of issue preclusion as to our

18 matter.  But I did want to raise the issue and just make sure

19 that the Court is aware of our concern.

20         THE COURT:  Well, I was aware of the application.  I

21 mean, obviously, to the extent I lay out a standard for

22 considering such an application, you'll know what I think the

23 standard is, but you're not a party to the motion in front of

24 me.

25         MS. CECCOTTI:  I'm not a party to the motion in front

26 of you, that's correct.  I believe that there is -- I'll

113

address a very narrow point, Judge, which is that they're -- in

the case of the UAW, we have received what the U.S. Trustee's

office has determined their final determination and we have

filed our motion on that basis.  I do not -- I believe there is

a distinction with Law Debenture in that their matter may still

be under advisement, and that may create, actually, a

sufficient legal distinction even --

        THE COURT:  Is it under advisement?  I thought it was

done.  Unless facts change, obviously, which may happen at some

point.

        MS. DAVIS:  Your Honor, first, I'd like to object to

this request.  I have to tell you how surprised the U.S.

Trustee was --

        THE COURT:  Which request?  I'm sorry.

        MS. DAVIS:  The request for the Court to consider any

aspect of the UAW's case.

        THE COURT:  No, I don't think that's what Ms.

Ceccotti's doing.  I think she just wants to make sure that

she's -- that I agree with her that this is not res judicata or

collateral estoppel on her motion.

        MS. DAVIS:  Moving forward, Your Honor, on the issue

of advisement, it's our view that regardless of whether the

issue's under advisement or not, and we'll get to more of the

substantive aspects when we go over our objection, the request

of Law Debenture to serve on the committee would be

inappropriate at this time and that the U.S. Trustee has in no

114

way acted contrary to the standard of law articulated in the

Barney's case or its progeny that she has abused her discretion

or that she has acted in an arbitrary or capricious manner by

not making a ruling at this juncture or, if we reach that

point, that she's declined the request.

          THE COURT:  Okay.  All right.  But she hasn't --

well, obviously she hasn't appointed Law Debenture.

          MS. DAVIS:  That's right.  Your Honor, the facts are

this.  December 14th the U.S. Trustee sent a letter out to four

of the parties who had requested service on the creditors'

committee.  Those parties were Tyco, PBGC, the union, and Law

Debenture.

          On the 14th she articulated in that letter that she

had declined the request of Tyco, PBGC, and the UAW to serve on

the creditors' committee, but that the issue of Law Debenture

was still under advisement.  And then subsequently Law

Debenture filed their pleadings and we responded accordingly.

          THE COURT:  Okay.

          MS. DAVIS:  Thank you.

          MS. CECCOTTI:  Your Honor, I guess that I'm still not

clear on the answer to my question as to whether there would be

issue preclusion or not under the circumstances.

          THE COURT:  I don't think directly but you're going

to -- I think, that's all.

          MS. CECCOTTI:  I'm sorry, Your Honor?

          THE COURT:  ~~That's really~~ You=ll learn how I think,

115

but it won't be directly binding on you.  I mean, you can I

guess come back a month from now and convince me I should have

said something different.  Maybe you'll say —B or maybe the

debtor will be trying to convince me, I should have said

something different when you apply.

         MS. CECCOTTI:  Your Honor, with that, I'll cede the

podium to the people who are really supposed to be arguing now

but I may --

         (Laughter.)

         MS. CECCOTTI:  I may reserve the right, depending on

how you think, to try to get a way --

         (Laughter.)

         MR. ANTOSZYK:  All this action, Your Honor, and I

haven't said anything yet.

         Good afternoon, Your Honor.

         THE COURT:  But the UAW will be listening closely.

         MR. ANTOSZYK:  Yes, Your Honor.

         Pater Antoszyk, counsel to Law Debenture Trust

Company of New York, Your Honor.

         Just as a housekeeping matter, there has been a

motion to admit me pro hac vice.  I don't know if the Court has

acted on it yet, but it has been filed.

         THE COURT:  That's fine.  You can proceed.

         MR. ANTOSZYK:  Your Honor, Law Debenture is the

successor indentured trustee and property trustee for the

eight-and-a-quarter junior subordinated notes due 2003 and the

116

1  adjustable-rate junior subordinated notes due 2003 issued by

2  Delphi Corporation.

3        The aggregate face amount of the notes is $412

4  million.  We have filed a motion on behalf of Law Debenture

5  Trust Company of New York to change the membership of the

6  official committee and the basis of our motion is that the

7  existing committee and the membership of the existing committee

8  of unsecured creditors does not adequately represent the

9  interests of the subordinated bond holders, and therefore, this

10  Court should order the appointment of Law Debenture to the

11  committee as representative of those interests.

12        The circumstances leading up to this motion, Your

13  Honor, I think are undisputed, but they are as follows:

14        These cases, as this Court well knows, were commenced

15  on October 8th of this past year.  These cases are very large.

16   They're complex cases and the debtors and the U.S. Trustee

17  both note the cases will involve a lot of moving parts.

18        The debtors are and will be engaged in divestiture of

19  assets, wind-down of certain U.S. operations, major

20  negotiations with unions which I understand are going on right

21  now, major negotiations with GM governing claims between the

22  parties, and many other matters.

23        The committee is and will be intimately involved with

24  all of these matters and the outcome of these decisions and

25  many, many others that the committee will consider and make

26  will have a major impact, if not determinative of whether the

117

subordinated note holders will receive a small, large, or any
dividend.

        When the debtors filed their cases, they had four
general categories of uniquely-positioned creditors.  They are
the trade, the employee -- what I group together as the
employee pension/wage claims, the $2 billion of subordinated
notes, and the -- I'm sorry, $2 billion of senior notes and the
$412 million of the subordinated notes.  It was my claim that
there might be additional distinctions in those, but those are
sort of the broad categories.

        The subordinated bond holders are one of the debtors'
single largest unsecured creditor constituencies.  That by
itself, however, is not what makes the position of the
subordinated note holders unique, these would be the other
members of the committee.

        The subordinated note holders are uniquely situated
because they have the dubious distinction of purportedly being
the last in line just above equity.  They're purportedly
contractually subordinated to the senior notes and trade and
employee claims pursuant to the terms of the governing
indenture.  And they are purportedly structurally subordinated
to the claims of all other creditors of the subsidiaries
because the notes were issued by the corporation.

        Because of the inherent subordinated position, the
subordinated bond holders are interested in maximizing value
beyond just these other senior claim holders.  Their interests

118

are distinct in that nature.

Following commencement of these cases on October 8th, on or about October 20th the U.S. Trustee held a formation meeting and formed a committee of unsecured creditors, as it is required to do under 1102(a)(1) of the bankruptcy code.  U.S. Trustee appointed the following creditors to the committee: four trade creditors, which are Electronic Data Systems Corporation, General Electric Corporation, Flextronics International Asia Pacific, and Freescale Semiconductor; one employee union benefit representative, which is the IUECWA; Wilimington Trust Company, which is the indenture trustee for the senior notes and statutory trustee for the subordinated note holders.

However, as we've noted in our papers, its position as statutory trustee is merely ministerial.  It can only accept service of process.  It doesn't represent the interest of the subordinated note holders and, in fact, they filed a statement in connection with our pleading acknowledging that fact.

And finally, Capital Research and Management Company, which I refer to as "Cap Re" (phonetic), an institutional investor.  Cap Re holds, according to submissions that it filed with the Court, $530 million in aggregate debt claims against the estates, of which 500 million is senior notes and only $30 million are the subordinated notes.  Thus, the subordinated notes represents less than six percent of the Cap Re's investments in debtors.

119

So note, in terms of the makeup of the committee, all of the committee members, all seven of them, hold or represent claims that are purportedly senior to the interests of the subordinated note holders.  The committee doesn't just proportionally represent such senior claims or any senior relative to the subordinated -- potentially relative to the subordinated note holders, it is dominated by it, if not exclusively representative of such potentially senior claims. None of the current members of the committee hold interests that are first and foremost aligned with the subordinated note holders.

This was immediately evident to Law Debenture and, as trustee for the bonds, it immediately requested -- immediately following the formation meeting submitted a request to the U.S. Trustee to appoint it to the committee.  We've attached our correspondence to our papers.  We advised the U.S. Trustee time and again that the entire committee consisted of creditors holding claims allegedly senior to the interest of the subordinated bond holders, and therefore, the subordinated bond holders were not adequately represented by the current members of the committee.

Now simultaneously, like Law Debenture, other creditors also sought appointment to the committee, namely Tyco, UAW as you just heard, and the PBGC.  In response to Law Debenture's and the other creditors' requests, the U.S. Trustee sought the input of the committee and the debtor.  The

120

committee responded but, frankly, gave the request barely what
I would calculate as a very short shrift.  Basically, the
committee stated that the committee was functioning fine,
represented everybody, and the consequence of functioning fine,
it represented the interest of all creditors.

Law Debenture concluded that, based upon the rather
vague response by the committee for input by the U.S. Trustee,
we concluded that they were probably relying upon Capital
Research to represent the interest of the subordinated note
holders, because we concluded that there were no new holders of
subordinated claims.  And based upon that, we advised the U.S.
Trustee that we thought that because of their dual position and
heavily-weighted position in the senior notes, that Capital
Research could not adequately represent and was inherently
conflicted in its representation of both the senior note
holders and the subordinated note holders.

The debtors, on the other hand, took a month to
respond to the U.S. Trustee's request for input.  Ultimately
the debtors supported the request of the UAW and PBGC, but
opposed the request of Tyco and Debenture.  The debtors took
the view that all of the requesting creditors were adequately
represented on the committee, but for its own strategic
reasons, nonetheless supported the appointment of UAW and PBGC.

With respect to Law Debenture, they stated that
Wilmington Trust and Capital Research could adequately
represent the interests of the subordinated note holders.  As I

121

indicated, Wilmington Trust could not represent those interests

because it didn't have any alignment whatsoever and Capital

Research was inherently conflicted.

        The request of the petitioning creditors were denied

by the U.S. Trustee except Law Debenture, which continued under

advisement with the U.S. Trustee.  We tried to contact the U.S.

Trustee, we tried to get a decision out of it, but a lot of

time has gone by since our request was pending, in fact, two

months have gone by.  And this Court knows better than myself,

a lot has happened in this case.  So on December 21st, not

having received any decision and effectively viewing it as a

pocket veto of our request, we filed our motion to seek

appointment to the committee.  And as I said in our motion, we

assert that the committee as a whole is not representative of

the subordinated interests and Cap Re in particular cannot

adequately represent the interests of the subordinated holders

because of its overwhelming holdings in the senior notes.

        We also filed a supplemental pleading that noted that

Cap Re also held a substantial equity position in General

Motors which, on its face, at the time, was a further, in our

view, disqualifying factor.

        THE COURT:  Can I interrupt you for a second?  When

you say Cap Re holds "X" and Cap Re holds "Y," is it really Cap

Re or are they different funds?  I know a lot of hedge funds

have literally different funds and they make a big deal about

the fact that they keep those separate and they have different

122

1   duties to the investors in those funds.

2          MR. ANTOSZYK:  I would let Capital Research respond.

3    My understanding, it's one entity, but it's hard -- I'd have

4   to go back and look at the statement in particular.

5          THE COURT:  Okay.

6          MR. ANTOSZYK:  However, I would note in their

7   statement they didn't say -- I don't believe that they said

8   they were held by different entities and they didn't say in the

9   statement filed that, as a consequence of holding in different

10  entities, there was this distinction that they could draw

11  between the two, as they did with their equity position.  In

12  their statement they said they had established an informational

13  wall to protect against the conflicts that could arise as a

14  result of their equity position and debt position.

15         THE COURT:  Fine.

16         MR. ANTOSZYK:  So I'm just saying there was no

17  disclosure in that regard.

18         U.S. Trustee has opposed the appointment to the

19  committee and I took the opposition as a denial of our request.

20   It wasn't clear to me whether, with the colloquy that just

21  occurred with the Court, whether it's a denial or not denial,

22  but it sure looks like a denial in their opposition.  They

23  oppose it, as does the committee and the debtors on two basic

24  grounds:

25         One, the committee adequately represents -- the

26  committee as a whole adequately represents the interests of the

123

subordinated bond holders because its members generally owe a

fiduciary duty to all creditors.

        And, two, Capital Research, as holder of subordinated

notes, can represent the interests of the subordinated notes,

notwithstanding the conflict of interest existing as a result

of its simultaneous position to the senior and the sub debt.

        As I mentioned, in addition, Wilmington Trust filed

a statement and Cap Re filed a statement along the lines I just

described to you.

        The first sort of gatekeeper issue which you touched

upon before I started speaking is the ability of the Court to

review the decisions of the U.S. Trustee and the composition of

the committee, and more particularly, the adequacy of

representation of the committee.  And I don't think, Your

Honor, that there's any serious question that this Court has

the power to review the decision of the U.S. Trustee to

determine the adequacy of representation of creditors on the

committee.

        While Section 1102(a)(1) vests the administrative

function of appointing committee members in the U.S. Trustee,

this was a change from prior law in 1986 where the court

approved the creditors' committee.  In 1986 Section 11028),

which provided courts could change the composition if

committee's membership did not adequately represent the claims

and interests of creditors was deleted.  This was all done at

the time the U.S. Trustee program was put into place.  11028)

124

was repealed and 105 was enacted at the same time.

Consequently, following that there was some question whether, particularly after the repeal of 11028), the court had the authority to review committee appointment by the U.S. Trustee.  However, law courts have since concluded, particularly courts in this circuit, however, and I don't think that any of the objecting parties would necessarily disagree, the bankruptcy courts have the power to review decisions of the U.S. Trustee regarding the composition of the committees to determine whether there's adequate representation.

As stated by Judge Garrity in Barney's cited in our papers, notwithstanding the repeal of 11028), most courts hold that upon timely application the bankruptcy court can review the  U.S. Trustee's decisions regarding the size and/or composition of an official committee.  This sentiment has been echoed by virtually every bankruptcy court in this district including most recently Judge Gonzalez in Enron.

In Enron Judge Gonzalez, a former U.S. Trustee himself, stated that it stands to reason that the determination of adequate representation is less a legal determination, concluded that was vested with the court.

This view is further supported by the restoration of the explicit provision removed in 1986 of the 2005 bankruptcy amendments the new 11028) -- (a)(4).  Our understanding, it's not effective for this case, however, it is indicative of congressional intent.  The restoration of this provision is

125

strong evidence of congressional intent not to eliminate the

court's authority to review and change committee composition,

particularly given the weight of the party favoring its review.

Although the cases are pretty uniform, I think, in --

with respect to the power of the court to review committee

composition, there has been in the past a split of authority

undoubtedly with regard to the standard of review.  Some courts

review it under abuse of discretion standard, which is what the

U.S. Trustee and the committee and the debtor would have this

Court adopt.  Other courts have adopted a de novo standard.

Some courts have said, well, it depends on what section you

look at, whether it's an exercise under 1102(a)(1) or whether

it's under 105 determines whether or not it's a de novo or

abuse of discretion.

Our view is that several courts in this jurisdiction

have determined that the issue of adequacy of representation --

the issue of adequacy of representation is -- from whatever the

remedy might be -- is a de novo determination.  That seems to

be the weight regarding this circuit.  It was adopted by the

Texaco case, the Enron case, and several others that we've

cited for you in our brief.

It's consistent -- that standard is consistent with

the historical rule of the court to be the final arbiter of the

adequacy of representation and consistent with congressional

intent as previously expressed and as presently expressed under

the new code.  However, you know, frankly, whether this Court

126

reviews this under a de novo standard or an abuse-of-discretion standard, we think that the relief requested by us should be awarded by the Court.

Moreover, as noted by numerous courts, part and parcel of the power to review is an inherent power to give a remedy. An inherent power to give a remedy, whether contained in the numbers of 1102(a)(2) or enabled by 105 exists to modify the membership of the committee. And again, this is reinforced by the newest amendments to the code.

So in sum, we believe that this Court has the authority to review de novo, or at least under an abuse-of-discretion standard, the decisions of the U.S. Trustee regarding the composition of the committee and, if necessary, to change its membership to insure adequate representation and address inadequacy of representation.

Now having said that, turning to the substance of our motion, you know, each of the parties lay out basically the same standard when courts are reviewing whether there's adequate representation on a committee and we point to three factors that have been identified by the courts, including the courts in this circuit: The ability of the committee to function, the nature of the case, and the desires of other constituents. Each of those factors militate appointing Law Debenture to the committee.

In this case, the committee states in its opposition, and it also stated in prior letters to the U.S. Trustee, that

127

the committee is "well-balanced and functioning extremely

well."  U.S. Trustee accepts these statements as justification

of her decision not to appoint Law Debenture to the committee

and notes in her opposition in support of the fact that the

committee is functioning just fine, that the committee is

participating in all aspects of the case.  That's in Paragraph

29 of her opposition.

It's understandable that the committee is now

accustomed to its current membership and does not want to alter

its voting composition, as stated by the committee in its

letter to the U.S. Trustee.  However, the committee's collegial

working relationship and participation in this case does not

satisfy the legal requirement, the legal requirement that the

committee adequately represent the diverse interests in this

case; that is, a collegial active committee doesn't equate to a

functioning committee in a sense of adequate representation.

As Judge Gonzalez noted, a proper functioning

committee goes beyond that.  And he said the problem is that a

committee may function just fine, reach a consensus on all

issues, and still not adequately represent a particular group,

which is exactly the situation we have here.  To be properly

functioning, a committee must provide meaningful voice to all

creditor classes, not all creditors, all creditor classes.

As often stated by courts, and I quote the court in a

most recently reported decision, which is the In re:  Garden

Ridge Corporation case, a 2005 case out of Delaware, which is

128

2005 Westlaw 523129:  "As a general rule, adequate

representation exists through a single committee so long as" --

here's the key -- "the diverse interests of the various

creditor groups are represented on and have participated in the

committee.  Further, the creditor groups are adequately

represented if the interests of each group have a meaningful

voice in the committee relative to their posture in the case,"

and they cite a series of cases that previously held that.

          The U.S. Trustee appears to agree with this standard,

as set forth in her opposition, however, while agreeing with

this standard, the U.S. Trustee then proceeds, in our view, to

ignore it as it pertained to the subordinated notes.  And

here's the crux of it, I think.

          The U.S. Trustee states in opposition that it decided

not to appoint Law Debenture to the committee because there is

no qualitative difference, in the U.S. Trustee's view, between

the claims of the subordinated note holders and all other

claims held by the members of the committee.  Apparently, in

the view of the U.S. Trustee, the subordinated bond holders'

claims have unique origin or no unique priority which would

distinguish their claims from the claims of the employees, the

trade, the union, or even the senior note holders, and entitle

them to a distinct representative on the committee.

          Instead, the subordinated note holders, in the U.S.

Trustee's view, should rely upon the existing committee

membership, whose claims are indistinguishable, as far as she

129

is concerned, from those of the subordinated note holders for
representation.

I suspect, Your Honor, that many a subordinated --

THE COURT:  Well, she doesn't go -- that's not what
she says.  She doesn't say they're indistinguishable, she says
they're --

MR. ANTOSZYK:  She says there's no qualitative
difference and I guess you're correct.  I've interpreted that
to mean that -- what that means when you say "no qualitative
difference" is that there's not distinctive characterization --
no distinctive characteristics between the subordinated note
holders' position and those of all the other members of the
committee.  That's how I've interpreted it and if I've
misinterpreted, that's fine, but I think that's what I took
away from the words "no qualitative difference."

I suspect that, as I said, the subordinated holders
wish that were the case.

THE COURT:  Is there any evidence that the interest
of the subordinated note holders are not being considered
actively by the committee?  I mean, isn't it your burden to
show that, other than just saying that we're different?

MR. ANTOSZYK:  Well, no.  No.  That is a -- and
here's --

THE COURT:  Particularly given Cap Re?

MR. ANTOSZYK:  No, and here's the difference.  The
committee cites a litany of cases which say if you are alleging

130

a conflict of interest, you have a burden of showing an actual existing conflict of interest which would be debilitating. Those cases were all removal cases.  They were to remove those -- they were removal of creditors from the committee.

There's a difference, I think, between removing a creditor from the committee for an actual conflict of interest and having adequate representation, a meaningful voice on the committee.  A creditor that has an actual conflict of interest or is alleged to a conflict of interest and is being removed from the committee doesn't raise the issue of representation necessarily of the entire creditor body or a particular creditor constituency.

In this case, we're alleging that a particular creditor constituency, the subordinated note holders, are not adequately represented, cannot be adequately represented by Cap Re because of it overwhelming interest in the senior notes.  It is, by definition, debilitating.

Under what circumstances -- I guess the way we look at it is, under what circumstances would Cap Re put the interest, its very small, less than six percent of its investment, put those interests ahead of the interests of its senior --

THE COURT:  I think those investors would be pretty angry if they did.

MR. ANTOSZYK:  Yeah, the investors of the senior notes would be --

131

1          THE COURT:  No, the Cap Re investors.  Go ahead.

2          MR. ANTOSZYK:  Well, the investors of Cap Re, if they

3   put the interests of this minor investment ahead of its very

4   significant investment, would be legitimately upset, I agree,

5   which bears on our point.  What is Cap Re going to do from a

6   reasonable business person's perspective?  What are they

7   logically going to do?  And logic tells us that they're going

8   to represent -- they're going to advocate, first and foremost,

9   the position of their largest, by far, investment position,

10  which is in the senior notes, to the detriment of the

11  subordinated note holders.

12         So let me put it another way.  Nobody would debate

13  the fact that if the entire committee was made up of trade

14  creditors, that that wouldn't adequately representative of the

15  creditor constituency.  And I don't think anyone would debate

16  if the committee was made up of entirely senior note holders

17  that that would be adequately representative of the creditor

18  constituency.

19         We're taking the position that the fact that there is

20  -- it's entirely made up of senior -- potentially senior

21  claims, even in regards to Cap Re, which is overrated in that

22  position, that it's not representative of the interests of the

23  subordinated note holders.  And in fact, there's one case, it

24  was the Value Merchants case which we cite in our brief, which

25  held that a committee -- that held that a U.S. Trustee abused

26  his discretion for failing to appoint an indenture trustee

132

representing subordinated note holders to a committee which

consisted solely of trade creditors and finance creditors, I

believe, in that case.  So the Court may -- you have to have

this major creditor constituency on the committee.  They

shouldn't have to -- inherently the court recognized that the

mere fiduciary duty of the committee is not sufficient to give

a meaningful voice to that creditor constituency.

As I mentioned, Cap Re's interests are debilitating.

Their holdings of the senior --

THE COURT:  I got that part.

MR. ANTOSZYK:  Okay.  Now notwithstanding Cap Re's

debilitating conflict, U.S. Trustee determined, we think,

erroneously that subordinated note holders should take solace

in the fact that the members, including -- that all members of

the committee, including Cap Re, have been advised of their

fiduciary duty and that no one stepped forward to indicate that

they cannot exercise that fiduciary duty.  And they're

apparently relying upon the fact that creditors will step

forward and say, we can't sufficiently exercise our fiduciary

to represent all creditors in the estate, however, that's not a

satisfactory solution.  That's not an answer.  The problem is

either we're represented on the committee or we're not

represented on the committee as a major, major constituency.

Our point, Your Honor, is even if an argument could

be made that Cap Re could conceivably manage this conflict,

which we don't think it could, this issue goes to the heart of

133

the entire bankruptcy process in this case.  It is the

integrity of the committee process.  Adequate representation of

the committee is a fundamental notion.  It's designed to

balance the delicate representative interests of the various

creditor interests and to force the subordinated note holders

to rely upon Cap Re, an entity faced with an obvious inherent

conflict, undermines the entire fairness of the process.

This is unlike, by the way, many of the other cases

in which creditors or creditor representatives seek either

additional committees or additional membership on the

committees.  Many of the cases cited in opposition are those

cases in which creditors were already represented on the

committee.  There were already representatives of the

subordinated note holders on the committee and they sought to

exercise a degree of leverage in the case, either by having

additional representatives on the committee, or a separate

committee of just that constituency established.  That's not

what we're talking about here.

U.S. Trustee and the debtors confuse the issues by

advancing arguments that are also red herrings, and I'll just

touch upon the other factors briefly.  The debtors and the

committee state that Law Debenture simply wants to be on the

committee to advance its particular agenda.  U.S. Trustee

echoes this concern, stating their opposition that committees

are not designed to provide a speaker's forum for a particular

creditor group.

134

We agree, we do have a particular agenda, and that is to advance and advocate meaningful interest of the subordinated note holders, which we do not believe is the case on the existing committee.  The committee ominously notes that, in the end of their opposition, that the appointment of Law Debenture to the committee could have "unfortunate consequences in the case."

Undoubtedly, it will be mildly disruptive.  We're going to have to be brought up to speed.  We're going to have to begin to participate in the committee, but that's the nature of participating in the committee and having a meaningful voice.

Law Debenture should have been on the committee from the get-go.  It has, after all, been seeking appointment since day one and we're only a couple of months into the case, so the disruption can't be that dramatic.  Nonetheless, under these circumstances, the forebodiance by the committee should not sway this Court one way or the other.

U.S. Trustee also argues that the subordinated note holders are not disenfranchised, based upon the example given by Judge Gonzalez in _Enron_.  Judge Gonzalez noted that disenfranchisement would occur where a committee is so dominated by one group of creditors that a separate group has virtually no say in a decision-making process.  We agree that domination by one group of another group of creditors on a committee would constitute disenfranchisement.  If that's the

135

case, then it must also be true that the exclusion of one

creditor class from the committee also constitutes

disenfranchisement.

Finally, the U.S. Trustee notes that the subordinated

note holders, Law Debenture, is not without alternatives.  They

could independently file motions, we could participate in the

case, but that's no substitute for having the benefit of the

committee, partaking in the committee deliberations, have the

benefit of the timely information of the committee and the

benefit of the committee professionals in the case.  So the

subordinated note holders should have the same benefits of

every other creditor constituency.  That argument could be used

to (indiscernible) any creditor constituency from the case.

So, Your Honor, all the factors, when considered, we

think in favor of appointing Law Debenture to the committee.

THE COURT:  Okay.

(Counsel confer.)

MS. DAVIS:  Your Honor, Tracy Hope Davis for Deirdre

Martini, the U.S. Trustee.

Your Honor, I just really want to point out first and

foremost that any issue concerning integrity and the

appointment of creditors' committees is very troublesome to our

office because the U.S. Trustee takes very seriously

appointments of creditors' committees.  And as Your Honor is

aware, we are integrally involved in every major case that has

been filed in this district and the U.S. Trustee has been

136

involved in the appointment of creditors' committees in those

cases.  And I would note to Your Honor that there could be no

more -- this case could be no more complex than the cases, for

instance, <u>Enron</u>, which Your Honor is being asked to consider in

deciding whether or not to modify the decision of the U.S.

Trustee; the <u>Adelphia</u> case, the <u>WorldCom</u> case, and numerous

other cases similar to it.  And I'll note that in those cases,

requests of this kind for modification of the committee, for

appointment of additional committees have been denied.

Your Honor, in this instance the U.S. Trustee has

filed an opposition to the request of Law Debenture which seeks

an order from this Court compelling its inclusion on the

creditors' committee and I just want to highlight the salient

points of our pleadings.

I think the most important point is that this case

was filed on October 8th, not October 17th, and therefore, in

our view, the Bankruptcy Abuse, Prevention and Consumer

Protection Act of 2005 and the Section 1102(a)(4), which would

suggest that the Court has the authority to modify compositions

of committee is inapplicable here.  For that reason, Your

Honor, we would request that Your Honor adhere to Section 1102

of the bankruptcy code and as well the cases that have sought

to identify and resolve issues concerning composition of

creditors' committees.

Now taking into consideration Section 11028) of the

bankruptcy code, which, as counsel has articulated, was

137

modified for the purpose of determining that the U.S. Trustee

and not the court have the authority to modify creditors'

committees.  In our view, it just makes clear that composition

of the creditors' committee, at least that administrative

function, should lie with the U.S. Trustee.

Your Honor, in this case on October 20th the U.S.

Trustee appointed an official committee of unsecured creditors

and I remember when Ms. Martini stepped away from the podium

after appointing the committee -- before appointing the

committee, she articulated that everyone would walk away

equally unhappy here.  She basically said that some people

would be happy and others would be unhappy.  Clearly, by virtue

of the motion that you're dealing with right now, there are

some people who are dissatisfied with the U.S. Trustee's

decision.

But one thing that can be made clear, Your Honor, is

that since the U.S. Trustee appointed this committee, she has

been involved on a daily basis, she and her staff, with

communicating with, if not creditors, committee counsel, with

the debtor, and there is no evidence here that the decision of

the U.S. Trustee to compose the committee as it stands was

improper, in abuse of discretion or arbitrary and capricious.

For that reason, Your Honor, we -- and for the reason

articulated in the cases which, in our view, interpret Section

11028) of the bankruptcy code as giving the inherent authority

in the U.S. Trustee to carry out the administrative function of

138

appointing a creditors' committee, we think Your Honor should

decline to invoke your authority under 105 to basically modify

her decision.

Now if Your Honor is of the view that you should

exercise jurisdiction over this matter and should basically

reconsider the U.S. Trustee's decision, we think the standard

that the Court should entertain would be that that's

articulated in the <u>Barney's</u> case, abuse of discretion or

whether or not the decision was arbitrary and capricious.

A decision on whether the U.S. Trustee has acted

arbitrary and capriciously would have to be based on erroneous

conclusions of law.  The record in this case, in our view, Your

Honor, does not support a finding that the U.S. Trustee's

decision was based on an erroneous conclusion of law.  In fact,

Your Honor, as counsel has conceded, although we disagree on a

couple of aspects of this, the U.S. Trustee did appoint a

subordinated note holder to the creditors' committee.  That

would be Cap Re.

Your Honor, in determining that Cap Re -- strike.

Your Honor, when Cap Re had sent a letter to the U.S.

Trustee asking the U.S. Trustee to reconsider her decision as

to whether or not it should be appointed to the committee, the

U.S. Trustee, as is her practice, sent letters to the debtor,

to the creditors' committee, and as well that's not what her --

THE COURT:  When -- you said "Cap Re."  You mean --

MS. DAVIS:  Capital Research Management.

139

1          THE COURT:  You're referring to their letter?

2          MS. DAVIS:  I'm sorry?

3          THE COURT:  I'm sorry.  You're referring to their

4    letter?

5          MS. DAVIS:  No, I'm referring to the letter of Law

6    Debenture.  Excuse me, Your Honor.

7          THE COURT:  Okay.

8          MS. DAVIS:  When the U.S. Trustee received Law

9    Debenture's letter requesting that they be added to the

10   creditors' committee, the U.S. Trustee sent a letter out to the

11   creditors' committee counsel and as well to the debtor and as

12   well, as is her practice, she continued to render thoughts and

13   as well to consider the facts with respect to their request.

14   Clearly when she issued a December 14th letter, that decision

15   had not yet been made, however, Cap Re filed this motion to

16   circumvent the authority --

17         THE COURT:  You mean Law Debenture?

18         MS. DAVIS:  I'm sorry.  I keep saying that.  I

19   apologize, Your Honor.  Law Debenture.

20         THE COURT:  That's okay.

21         MS. DAVIS:  Cap Re's just on my mind, although

22   they'll have a chance to speak in a moment.

23         Your Honor, the most important thing to point out is

24   that nowhere in counsel's papers have they made any allegations

25   that the U.S. Trustee acted haphazardly; that she failed to

26   timely address their concerns; that she did not take into

140

consideration factors that were raised both at the time the

case was filed, that Cap Re submitted its initial solicitation

ballots, or the information that she was supplied to by

debtor's counsel.

THE COURT:  Let me ask you --

MS. DAVIS:  I said Cap Re again.  Pardon me, Law

Debenture.  They're on my mind.

THE COURT:  That's fine.  I think what this boils

down to is Law Debenture's contention that, notwithstanding the

administrative function that Wilmington Trust performs, and the

fact that Cap Re does hold subordinated debt, neither of those

two entities has any real -- any meaningful interest in serving

as a voice for the sub-debt.  And one thought that certainly

crossed my mind is whether, when the U.S. Trustee was

appointing the committee, that possibility was evident.

When you look at Wilmington Trust's list of roles,

you can certainly form the view that, contrary to the statement

they filed recently, they did have some duties to the sub-debt

and could serve as a voice for them.  Similarly, Cap Re, when

one looks at their holdings, you might initially have taken the

view that, you know, they're perfectly able to represent the

interest of the sub-debt to the extent the interest of the sub-

debt needs to be specifically represented on the committee.

And so my question is, did -- is the -- have the

facts, as they've been developed, legitimately surprised the

trustee in the sense that, you know, maybe she didn't

141

appreciate at the time that Wilmington Trust really doesn't

have anything to do with the sub-debt, for example?

　　　　　MS. DAVIS:  No, I don't think so, Your Honor.  In

fact, it was a very long organizational meeting that the U.S.

Trustee had.  We had numerous meetings with debtor's counsel

prior to the organizational meeting.  We obtained from the

debtor extensive information up to the last moment concerning

the breakdown of debt here, concerning the composition of the

unsecured creditor body, and the U.S. Trustee took all of that

information into consideration in making a decision.  In fact,

where there was ever an issue of a conflict or a disagreement,

the U.S. Trustee actually asked certain parties to come in.

There were frequent runnings back and forth between the debtor,

between the actual creditor to insure that the U.S. Trustee was

taking into consideration all of the breakdowns in the debt,

the unsecured debt in this case.

　　　　　THE COURT:  Okay.

　　　　　MS. DAVIS:  So to answer Your Honor's question.  It

only flows from that, Your Honor, regarding whether or not, in

the U.S. Trustee's -- any decision of the U.S. Trustee not to

appoint Law Debenture to the committee, whether or not she has

taken into consideration representation on the committee.

　　　　　THE COURT:  Well, when you decide whether it should

be Law Debenture or someone else, just when you bore it down,

how are the interests specifically of the sub-debt represented

on the committee?

142

1          MS. DAVIS:  In our view, Your Honor, they are

2  represented by Cap Re.  And, Your Honor, in our view, based

3  upon the responses that were filed by Cap Re, as well as the

4  evidence that's before Your Honor that was before the U.S.

5  Trustee, there cannot be a finding that subordinated note

6  holders are not protected or would not be represented by this

7  committee.

8          Your Honor, this case is four months old and in the

9  four months this case has been pending, the creditors'

10  committee has had to deal with many substantive issues in this

11  case and we understand there will be many ahead of us, but one

12  of the most important issues, Your Honor, that is going to be

13  before the creditors' committee at some point would be the

14  formulation of a plan of reorganization.  And I would submit to

15  Your Honor that at this juncture in the case, there have been

16  no issues that have been presented to the creditors' committee

17  for it to have any belief that Cap Re or any of the other

18  members would breach their fiduciary duties or would have a

19  conflict with respect to determining whether or not there would

20  be adequate value returned to the subordinated note holders,

21  the senior note holders, and to the other creditors in this

22  case.

23          I think that's very important for Your Honor to

24  consider in determining whether or not there's adequate

25  representation here.  Your Honor, one of the most important

26  issues that goes to adequate representation is whether or not

143

the fiduciary duties of creditors can be satisfied.  And as
Your Honor can discern from the pleadings that have been filed,
I think in support of the U.S. Trustee's objection or
consistent with the U.S. Trustee's objection, there isn't any
evidence that any of the creditors that are currently serving
on the creditors' committee would breach their fiduciary duty
to Law Debenture or any of the other creditors here.  In fact,
Cap Re has gone so far as to communicate with the U.S. Trustee
to prepare a -- I would say an information wall, so they are
very cognizant and aware of their fiduciary duty to all of the
creditors in this case.

THE COURT:  The information wall is between the stock
holding and the debt holding, correct?

MS. DAVIS:  Your Honor, I'm just saying that it's
evidence of how serious they take their role in the case and I
think that's very important to point out.  And that's one of
the most crucial points, I think, to raise here.

Your Honor, I think it sets a very bad precedent for
a party who is not appointed to a creditors' committee to run
to court when they don't get the response they want or as
quickly as they want from the U.S. Trustee.  I think that, by
virtue of this motion itself, the estate has incurred extensive
expenses, perhaps unnecessary here, and I think that, at a
minimum, the U.S. Trustee should be afforded her right to
exercise her administrative function.

And for those reasons, Your Honor, we request that

144

the Court please decline the -- deny the motion of Law

Debenture to serve on the creditors' committee.  Thank you.

THE COURT:  Okay.

MR. ROSENBERG:  Your Honor, I am not going to address

the underlying issue here of whether this Court has power to

grant the motion or, if so, pursuant to what standard for two

reasons.  Number one, I suspect that the Court has already

decided that issue in its own mind and, number two, more

importantly, I think that regardless of what that decision is,

the result is the same.  Under any one of the three issues, no

power, de novo, abuse of discretion, the result is the same,

the motion should be denied.

I find that -- I find two real ironies in the Law

Debenture position that should be pointed out.  Counsel stood

up here and articulated at great length as to why, as a

subordinated creditor, the position is different, and that I

can't help but note that the motion papers very, very carefully

preserved the right to take the position that they're not

subordinated at all.  Well, are they or aren't they?

I would think that given their unique inference to

the position on the committee that's being articulated here, at

least they would have the judgment of saying, yes, we are

indeed subordinate, because if they're not, why are we here?

Number two, to me it's very ironic that in the guise

of an argument of representativeness, what we're really hearing

parochialism.  The committee is not representative of the

145

parochial position that we want to articulate.  And, Your

Honor, I think that the entire argument goes against the whole

thrust of what a committee is supposed to be and what

representativeness actually means.

Now the position is very short on fact and very long

on innuendo.  The position seems to be that the committee is

not capable or desirous of exercising its fiduciary duty to all

creditors, including subordinated creditors, if there are any,

which, of course, the moving party isn't conceding.  There's

just no basis in fact for that position and I think it is

noteworthy that not once in the many, many important issues

that have come up in this case -- I should say not ones that I

can think of, just in case I'm corrected -- has Law Debenture

filed a pleading that says the position that the committee is

taking is wrong or we disagree with it.  That hasn't happened,

so where is the evidence that the committee is not properly

representing all creditors?

Where is the evidence that the committee has ever

taken a position that suggests less of maximization of value

for all creditors in this case, maximization of value of the

estate?  And where, finally, is the evidence that Cap Re, with

a thirty-million-dollar investment in the subordinated debt,

has not fully considered the interests of that debt in the

committee deliberations and in the committee decision-making

process?  The fact that it has another claim?  Where's the

evidence that it has ever pushed the other claim to the

146

detriment of the subordinated claim?

And, Your Honor, I'm not even comfortable making that argument because it goes against my first point, which is these are parochial interests and that's not the way a committee is supposed to function anyway.  We're talking about value maximization for everybody and there is no evidence that that hasn't been the case in every single one of the committee's deliberations, in every single one of the committee's decision.

But, since it keeps coming up, and since there is so much unfortunate and unfair focus on Cap Re, I'll join the chorus and say where is the evidence that they have ever done anything other than exactly what they should, consistent with their fiduciary duty?  For all of those reasons, Your Honor, I think the motion should be denied.

THE COURT:  Okay.  Thank you.

MR. BUTLER:  Your Honor, I was going to try and address three or four basic points and sit down.

First, I agree with Mr. Rosenberg that no matter what standard you apply, de novo, Section 105 as sort of the <u>Hill</u> standard, or any other standard the U.S. Trustee might suggest, that this application ought to be denied under any of those standards.

The debtors happen to believe that the standard that's appropriate here is the sort of Section 105/1102 standard when you look at the case law because we do agree with the movants that <u>Hill</u>, <u>Barney's</u>, and <u>Enron</u> are instructive and

147

the case law is instructive here.  It really is sort of an

abuse of discretion, arbitrary and capricious, and we would add

a third element, interest of justice, those kinds of approaches

and considerations for the Court are, in fact, we think

reasonable to consider.

          But when you look at this process, I think you have

to look at the process that's occurred here.  First of all, a

creditors' committee is not a Noah's ark.  You don't take two

of every species, put them on the ark, and close the door and

say that's the appropriate creditors' committee.  That's not

what congress intended, that's not what the statute says.  It

just isn't what's required here.

          What's required is the U.S. Trustee, at least in the

(indiscernible) environment, that the U.S. Trustee exercise a

process that's reasonable in order to formulate a decision.

And, you know, one of the worst-kept secrets in this case is

the fact that the debtors believe that the U.S. Trustee should

have appointed the UAW and the Pension Benefit Guaranty

Corporation to the committee.  Everybody in this courtroom I

think knows that.  We were vocal about it at the organizational

meeting.  We have been vocal about it throughout the case and

we think it's important and we will stand and support the UAW's

application next month.

          Having said that, I think it's useful to look at

Exhibit K to the movant's motion, which they included our

letter to the trustee, because I'd like you to ponder the fact,

148

Your Honor, that the debtors were so, you know, frankly hell-

bent on supporting those two major entities, why is it that we

would write a letter that went into painstaking detail

expressing the debtor's view that the U.S. Trustee did not

abuse her discretion and that she did not act in an arbitrary

and capricious manner.  That would seem to fly in the face of

one of our goals in the case.

          The reason for it is that she did not and in these

cases you have to stand up and say the right thing.  And the

right thing in these cases, in the process, was -- I got to

tell you, because I was a participant in it.  It was a

painstaking process.  The amount of information that Ms.

Martini's office asked and Ms. Davis and Ms. Leonard demanded

of us over a ten-day period was exhaustive.  I mean, it was

reams of information and they required analyses.  We had many,

many telephone conferences where they asked to look at slicing

up creditors different ways, looking at different entities,

looking at different business lines so they could get an

appreciation.  They required that the notice go out to many,

many more people than would normally be required.  It went out

in the hundreds.  They received over 100 questionnaires back

from people with information.  They asked us, after they got

the questionnaires, dozens of questions and required us to

provide additional information to them.  They -- I think anyone

who attended the organizational meeting on October 17th at the

Marriot Marquis, which was a completely-full ballroom with

149

three or 400 people in it, and a selection process that went on

for hours and hours after that, and the kinds of interviews

that the U.S. Trustee did of individual creditors, to suggest

that the process, even though it did not necessarily address

all of the debtor's desires, that the process was arbitrary or

capricious or that there was a discretion abuse, there's just

not a scintilla of evidence in this record, nor could there be,

that that is the case here.

        And so it's important when someone raises the

question of the integrity of the process, regardless of what

our parochial interests in the debtors may be because we think

the case would be better if the PBGC and the UAW were on the

committee, we need to stand up and say to Your Honor even

though we believe that, the fact of the matter is to suggest in

any paper that the U.S. Trustee abused her discretion is just

completely inappropriate.

        The other thing we wanted to indicate here, because I

was concerned a little bit about the argument here and the

innuendo in the paper, there seems to be a suggestion that the

fact that there's a collegial active committee, I think the

quote I wrote down was the fact that thee's a collegial active

creditors' committee doesn't mean that there's a functioning

committee.  I'm prepared to get on the stand and give personal

testimony, Your Honor, about just how functioning this

committee is.

        (Laughter.)

150

THE COURT:  I think Mr. Antoszyk's point was that
people can ~~either~~ function very smoothly among themselves and
maybe even function ~~less~~ best if they just ignore someone who's
not on a committee, but then that ~~the~~ committee is not working.
And I guess, going back to your Noah's ark, I was actually
using the war movie analogy.  You know, you have a guy from
Brooklyn and a guy from Oklahoma and a guy from LA in the unit.

Isn't there some of that requirement in the adequacy
of representation requirement that you actually have a spread
of the various constituencies?

MR. BUTLER:  Your Honor, in a general matter, but not
to a specific parochial point of view.  For example, Tyco
Electronics filed a request and they're quite right.  The kind
of trade creditors that they are, there's a whole constituency
that are like the Tycos of the world, they don't have any of
their own on this committee and they do have some different
interests in this case.  We have a health business, a medical
care business.  One of the amount of information that the
trustee required of us was to give them a breakdown of the
creditors in the medical devices business because it has
nothing to do with automotive and we gave that information.

Well, there's no medical supplier who is on the
committee right now and they are not even involved in the
automotive business and they have very different interests that
much of the things that are being decided day-to-day by the
debtors and by the creditors' committee in terms of the

151

1  business component.

2          This is a twenty-eight-billion-dollar business with

3  tens of thousands of creditors and I think, Your Honor, to --

4  and again, I'm not -- a lot has been said about Cap Re and

5  their counsel has been very patient in not getting up and

6  saying anything other than having filed some clarifying

7  statements, but Cap Re is one of the major players in this case

8  because they not only owned these (indiscernible), but they

9  owned a lot of equity and they own -- and they're one of

10  General Motors's largest equity holders and they play in this

11  space in lots of different places and they are very -- someone

12  once said to me that they own fifteen percent of America.  You

13  know, they play in lots of spaces and do lots of things, but

14  when they sit on this committee represented by Wachtell, they -

15  - and as co-chair of this committee, we believe that they

16  understand what their fiduciary responsibilities are to all

17  creditors in this estate and they certainly haven't exhibited

18  anything to the debtors ,and we meet with them weekly in terms

19  of conversations, that would suggest that they are in any way

20  not aware of what their fiduciary responsibilities are.

21          So I just -- I raise these two points, Your Honor,

22  only because the -- people come up and say, gee, I think I

23  should be on the committee for X, Y, and Z.  That's fine.

24  Everybody has their perspective.  And we have no particular

25  quarrel with Law Debenture, we need to deal with them in this

26  case and other cases and Delphi needs to deal with Law

152

1  Debenture and we will deal with them.

2        And oh, by the way, as an indentured trustee, I have

3  no doubt that as they -- in this case, whether they're on the

4  committee or not, they will be knocking on my door at the end

5  of the case seeking our consent to a substantial contribution

6  application for whatever they perceive their contributions to

7  the case to be.  So they'll be as active as they think they

8  need to be in their interests and they will come to us and come

9  to the committee.  Sure as we stand here now, I'm telling you

10  it will happen prior to the plan of reorganization being filed

11  to deal with those issues.  So we have no quarrel specifically

12  with Law Debenture.

13        We do have a quarrel with anybody standing up in a

14  case of this complexity and suggesting that there's something

15  wrong with the integrity of the committee process or the

16  integrity of the selection process for the U.S. Trustee or the

17  integrity of the overall administration of these cases because

18  it's easy to say that, but it's damaging to these estates when

19  those assertions are made without any evidence to that effect.

20        And so we're simply saying, Your Honor, based on just

21  like Tyco had its own special interests which the U.S. Trustee

22  chose not to acknowledge at that point in time, we believe that

23  all the interests of creditors are adequately represented.  We

24  would have come up, had we been able to scratch it out, with a

25  slightly different composition of the committee, but we're not

26  the United States Trustee.  For this period, the post-1986,

153

1  pre-BAPCPA period, congress decided that the United States

2  Trustee got to make these decisions.  And oh, by the way,

3  congress had the opportunity when they passed BAPCPA to make

4  this particular provision retroactive or immediately effective,

5  as they did with some other provisions, and they did not, and

6  so I think we know what congressional intent was with respect

7  to these matters, Your Honor.

8          So we would ask, Your Honor, that the Court, under

9  any standard Your Honor might choose to think is applicable,

10  deny this application.

11          THE COURT:  Okay.

12          MR. MASON:  Does Your Honor want to hear from Cap Re?

13          THE COURT:  Well, is Cap Re like some fund managers

14  that actually manage funds that hold investments in different

15  pots or is it all in one?

16          MR. MASON:  It is in different pots, Your Honor.

17  Standing here today, I don't know if the sub-debt holdings of

18  Cap Re and the senior debt holdings are in different funds --

19          THE COURT:  Or a~Are in the same fund.

20          MR. MASON:  -- but I can tell you that there was one

21  representative on the committee for Cap Re, that's David Daygo

22  (phonetic), who acts on behalf of all of them.

23          THE COURT:  Of all the sub-funds or funds?

24          MR. MASON:  Yes, of all of the sub-funds.  He is, as

25  Mr. Butler had indicated and the U.S. Trustee had indicated, he

26  had walled off for purposes of dealing with Delphi, he's walled

154

1  off from General Motors -- from Cap Re's interest in General

2  Motor securities.

3            I would just point out one thing.  I don't want to

4  belabor the record and repeat statements of other counsel, but

5  we do take to hear our fiduciary duties.  We are a co-chair of

6  the committee.  We believe that we're fiduciaries for all

7  creditors so I completely agree with Mr. Rosenberg.

8            I would just add that, for purposes of seeing who may

9  reflect the views of different creditors, I would add two

10 things.  Number one, while our overwhelming interest is in the

11 senior debt from an economic perspective, we do hold $30

12 million of sub-debt.  It's almost ten percent of the sub-debt

13 class and if there's a reason sort of not to give it up, we're

14 not going to just give that up.  And when the appropriate time

15 comes, we may, frankly, be advocating for significant

16 recoveries for sub-debt holders.

17           And number two, both the senior and the subordinated

18 debt holders are holders at the parent-company level, and so in

19 our capacity as a senior debt holder, we can certainly reflect

20 the views of, to the extent it's appropriate, parent company

21 creditors, which may not be the case for other members of the

22 committee.  That has not happened yet, but it may happen at

23 some point with regard to negotiations.

24           THE COURT:  Okay.  Thank you.

25           MR. FOX:  Just briefly, Your Honor, Edward Fox from

26 Kirkpatrick & Lockhart on behalf of Wilmington Trust Company as

155

indentured trustee.

Your Honor, we did, as noted, file a statement because we wanted to clarify, not with respect to any confusion we thought that the U.S. Trustee may have had, but with respect to sort of -- Law Debenture's papers may have muddied the waters a little bit. Specifically wanted to reserve our rights with respect to anything they raised on the subordination issues and make clear that our only role with respect to the toppers which hold the subordinated debt is as Delaware statutory trustee. Our only role there is under Delaware law, which is basically to be a place for service of process and to tell the world if we move our office in Delaware that we've moved it.

You asked the question of Ms. Davis as to whether there was any confusion on the part of the U.S. Trustee with respect to (indiscernible). We were asked to meet with the U.S. Trustee in the midst of the formation meeting, and while I don't remember all the questions that we were asked, I do not recall there being any confusion on the U.S. Trustee's part or if, in fact, there was, we would have cleared it up as to specifically what our role was and we certainly would not want anybody to be laboring under the misapprehension that we have any fiduciary duties with respect to the subordinated debt because that's not a space we would want to be in.

THE COURT: So your client didn't make its pitch to get appointed to the committee, among other things, because it

156

had this role with the sub-debt?

MR. FOX:  No, absolutely not.  We did indicate that, as I recall, on the form that you fill out for the U.S. Trustee's office because we're required to indicate to them any role that one plays in the case and we want them to be fully advised of those roles, but, no, we could not, under the Trust Indenture Act, have fiduciary duty to both the senior debt and the sub-debt and we would not --

THE COURT:  Except as a creditors' committee member to all creditors?

MR. FOX:  Yes, that's right.  That's right.

With respect to the issues that have been -- some insinuation, if you will, in the Law Debenture papers about valuation issues and you can read those in two ways.  One is with respect to maximizing actual value and the other is with respect to deciding in a stock-for-debt type plan how that gets divided up.

As an indentured trustee, and as Mr. Mason pointed out, the senior bonds as well as the subordinated bonds were at the parent level of Delphi Corporation.  We have every interest in seeing as much value flow to Delphi Corporation as possible to get those bonds paid par-plus-accrued plus all the outstanding fees.  And we certainly wouldn't spike the ball before seeing that happen.  And with bonds trading in the fifties at this point, as I understand it, that will be a great place to be.

157

To the extent that we got to that point, it seems to me that at that point Cap Re would have every incentive to say there's more value here and it all goes to the sub-debt so that they get it all.  They would have no incentive, as is suggested in the Law Debenture papers, to, at that point, say, well, let's just leave it on the table for everybody else to share in as opposed to Cap Re and the sub-debt wanting to take it home.

The final point I'd simply make, when it comes to putting the committee together, and this really looks forward to the UAW motion which we've been advised is on next month, is that there is, I'm sure when the U.S. Trustee sits down and puts together a committee, a recognition of the various interests which are being put on the committee and when you push in one place, it has an effect in another place.  At this point, we have a committee with four trade, one union, and two bond holder representatives.  To the extent we're dealing with Law Debenture this month and UAW next month, if they're taken seriatim -- and who knows, maybe PBGC will or won't jump into that fray, I don't know -- but if they're taken seriatim, there's always a concern that it pushes a committee that might be balanced in a particular way out of balance or more in one direction than another.  Representing the interests of bond holders and senior debt, we're always interested in seeing more bond holder representation rather than less or seeing that increase rather than decrease, so we keep that in mind as well.

THE COURT:  Okay.

158

MR. ANTOSZYK:  Your Honor, I think you aptly stated
our point, which was it's not sufficient to have Cap Re as the
sole representative of the subordinated note holders.  They are
not in a position, in our view, to inherently be able to
represent -- adequately represent the interests of the
subordinated note holders.

I just want to address briefly some of the comments
with regard to process.  We don't doubt that the U.S. Trustee
went through a painstaking process.  We don't doubt that the
U.S. Trustee took her role and function very seriously.  We
just dispute whether she got it right and, in our view, she
didn't, so it's not as if we are impinging upon the integrity
of the process necessarily, as opposed to the result.

And in that regard, the result is very different than
what Mr. Butler indicated may be for other creditors.  There's
a big difference, I think, between a creditor, a general
unsecured creditor that is of a different industry but is yet
still a general -- of the same priority and ones that perhaps
occupy different levels, different priorities.  And in that
instance, I think there's a defining difference and if you look
at some of the cases, courts have -- cases in which there have
been subordinated note holders where there has been appointment
of separate -- where the issue has been a separate committee or
additional members, there's always been representatives of this
junior class, representatives that are independent,
representatives that can give a meaningful voice, which we

159

1  don't think exists in this case.

2          So in terms of evidence of a conflict, Your Honor,

3  the evidence, we think, is inherent in the nature of the

4  relationship and we don't think anything further needs to be

5  proven.  And for that reason we think that our motion should be

6  allowed.

7          THE COURT:  Okay.  I have in front of me a motion by

8  Law Debenture Trust Company of New York, the indentured trustee

9  for a substantial issue of subordinated debt at the

10  ~~joint~~parent-company level at Delphi to alter the composition of

11  the official creditors' committee so that it is appointed to

12  that committee.

13          The ~~bankruptcy~~ Bankruptcy ~~code~~Code, as applicable in

14  this case, which is the pre-BAPCPA version of the code,

15  authorizes the United States Trustee to appoint an official

16  committee and also authorizes the trustee to appoint or remove

17  members of an official committee.  See In re:  America West

18  Airlines, 142 BR 901, 902, Bankruptcy Arizona (1992).  Now,

19  that can continue during the course of a case.  See In re:

20  Heydar Leasing International Company [Ph.] at 11 BR 460, 461,

21  Bankruptcy SDNY (1981).

22          The official committee's composition also may vary

23  from case to case, that is, Section 1102(b) serves only as a

24  guideline for committee composition ~~which~~thus, although she

25  must be generally cognizant of the various classes of interest

26  at stake in the ~~committee~~ creditor body -- in the unsecured

160

creditor body, excuse me -- the U.S. Trustee and the Court to

the extent the Court supervises the U.S. Trustee's decision,

also needs to take into account the particular issues involved

in the particular Chapter 11 case, which may significantly

differ from case to case.  Some cases involve serious business

issues.  Some cases involve inter-company issues.  Some cases

involve inter-creditor issues at one level or more in the

capital structure, and the like.  See In re:  Drexel Burnham

Lambert Group, Inc., 118 BF 209 at 212, Bankruptcy SDNY (1990).

As the parties have noted, the case law is not

particularly clear as to whether and under what circumstances

the bankruptcy Court court may change the composition of a

committee or, going further than that, order the appointment of

an additional specific member entity to a committee.  As the

movant here Law Debenture has as correctly stated, however, the

case law is clear, although the statute is not clear itself,

that the Court does have some ability to at least determine

that the committee as presently composed does not adequately

represent the interest of the unsecured-creditor body.

Given the statutory charge to the U.S. Trustee to

appoint the committee, I believe that the Barney's line of

cases, and that's In re:  Barney's, Inc., 197 BR 431,

Bankruptcy SDNY (1996), is probably the right line to follow,

as to the standard by which the court should review the issue.

in that the court's review of the issue,  That is, at least as

to whether a particular member should be appointed to a

161

committee, the trustee=s decision should be reviewed on an
abuse-of-discretion basis, ~~again,~~ given the trustee's
administrative function in deciding which individual member
should serve on a committee~~,~~. ~~it~~ It may be that there's a
broader right to disagree with the U.S. Trustee with regard to
whether a committee as a whole adequately represents the
interests of all the unsecured creditors~~.  B,~~ but even there, I
believe that, as a practical matter, in the interest of
justice, the Court should be deferential to the trustee's
decision, particularly where it appears, as it does here, that
the trustee ~~committed~~ conducted a thorough and extensive
analysis of the creditor body and the nature of the case and
selected a committee in light of that analysis.

In essence, the movant's point here is that, as a
sub-debt holder representative, its voice is necessary on the
committee to give adequate representation to a class that must
be represented on the committee, and there is support in the
case law for that view, for example, see In re:  McLain
Industries, Inc., 70 BR 852, as well as the Garden Ridge case
cited by Mr. Antoszyk in oral argument for the proposition that
the issue of adequate representation going into the ability of
the committee to function focuses in large part on whether the
members selected to serve on the committee represent the
creditor constituency, which often breaks down into the
different classes of debt asserted against the debtor.  And
despite the reservation of rights by Mr. Antoszyk's client,

162

it's clear to me that they're wearing a sub-debt hat until

proven otherwise, so I think that ~~that~~ sub-debt distinction is

a meaningful one here, at least until proven otherwise.

The responses to some extent acknowledge that

requirement of adequate representation under the law, that is

that the committee needs to be diversely representative to

properly function, so that it is giving a meaningful voice to

all classes.  However, the objectants also appropriately note

that there are limitations to that principle.  I believe those

limitations apply here for a number of reasons.

First, there is a significant sub-debt holder serving

on the committee for the, Cap Re, which holds, through one or

more of its funds, approximately ten percent of the

subordinated debt claims.

Second, because both Cap Re and Wilmington Trust,

which represents at least a voice on the committee senior debt

holders, are both representatives of indebtedness at the

parent-company level.  And when considering many, ~~if not~~ perhaps

the majority, of the decisions made by the committee in this

particular case, it appears to me that the need to have a voice

that the movant here is asserting is, more importantly, one

that represents ~~the current committee~~ the interests of the

parent company in considering all of the difficult business

issues that these debtors need to evaluate and consider with

the committee's help, rather than inter-creditor issues at the

~~current~~ parent level.

163

1    So I believe that, in light of those two facts and my

2  conclusion that the trustee was not confused in~~to~~ a belief that

3  Wilmington Trust~~, in some other reason,~~ might be speaking for

4  the sub-debt class, which I had initially been concerned about

5  when I read the papers, I think that the trustee acted

6  appropriately in forming the committee and that the committee

7  does adequately represent the interests of all the unsecured

8  creditors, including the sub-debt.

9    I say that even though I recognize a tension in the

10  ~~bankruptcy~~ Bankruptcy ~~code~~ Code between the fact that all

11  committee members obviously are fiduciaries for all unsecured

12  creditors and not just their particular constituency and the

13  contrary fact that congress did clearly contemplate having

14  individual voices on the committee for different

15  constituencies.  ~~They're~~ These are not at all necessarily

16  tensions that can't be harmonized and they are harmonized, on a

17  properly-functioning committee and I do not believe that

18  there's sufficient evidence here to show that this committee

19  cannot harmonize those tensions in the interest of all the

20  unsecured creditors, including the sub-debt holders.

21    Just a couple more points.  ~~When I was~~

22  ~~(indiscernible)~~Notwithstanding the fact that the sub-debt

23  trustee is not a part of the committee, it will have,

24  obviously, a meaningful role in this case; that is, it will not

25  be in the trenches on every issue as the committee is~~.~~,

26  ~~Nevertheless~~nevertheless, it will have, I'm sure, an active

164

1  role in the case and will, in addition, have access to

2  information from the debtor under 704~~7~~ as incorporated in 1106

3  and 1007.  And I believe, notwithstanding that BAPCPA was

4  enacted after this case commenced, it will also have a right to

5  information from the committee, and I would be very surprised

6  and, frankly, upset if it ~~came~~ comes to the time for

7  negotiation of inter-creditor issues at the parent level ~~that~~

8  and the indentured trustee for the sub-debt ~~would be~~is frozen

9  out of negotiations.  That would be, in my mind, completely

10 contrary to how I would view a committee functioning and how I

11 view this committee with its particular professionals would

12 function.  So I believe that ~~its~~ Law Debenture=s particular

13 issues will be dealt with and that it will have the type of

14 access necessary to deal with those issues.

15      Next to last, I would have some real reservations,

16 even if I were to find that the committee generally ~~does~~ did

17 not adequately include a representative of the sub-debt, which

18 of course I ~~don't~~ did not find, I'd have some real reservations

19 even if I were contrary on that issue in appointing this

20 indentured trustee to the committee because of ~~the~~ its apparent

21 view as stated by Mr. Antoszyk in oral argument that Law

22 Debenture would be on the committee solely to represent the

23 interest=s of the sub-debt holders.  I don't believe that is

24 appropriate for a committee member.  Committee members are

25 certainly entitled and expected to ~~give~~ deliver their

26 particular constituency=s, if you will, view on ~~that~~issues, but

165

ultimately they have to act in the interests of all unsecured

creditors, and so even if I were to say that the U.S. Trustee

should expand the committee to include a sub-debt holder in

addition to Cap Re, I would have some real reservations in

directing that the particular movant here be appointed.

The last point is -- addresses something that Mr. Fox

said, which is that rather than hear this motion and the UAW's

motion at the same time, I've heard them or I will hear them

seriatim, if I do hear the UAW motion.  Let me be clear.  I'm

ruling on this motion in a particular context.  If for some

reason the composition of the committee changes, the U.S.

Trustee may well decide to change it in more than one way, and

I don't think that anyone should look at this ruling as other

than a ruling in this particular context, which is responding

to the committee as currently constituted and a request to add

the Law Debenture trustee to that committee.

So for those reasons I'll deny the request.  And I

guess, Mr. Butler, you should submit an order.

MR. BUTLER:  We will, Your Honor.

THE COURT:  Okay.  Are people getting faint with

hunger?  After lunch or do you want to do this now?

(Counsel confer.)

MR. COFFEY:  I'll try to be brief, Your Honor, on

this matter.

THE COURT:  All right.

MR. BUTLER:  The last matter, Your Honor, we have two

166

matters on the agenda, Matter 37 and Matter 38.  Matter 38 has

been withdrawn.

THE COURT:  Okay.  That makes ~~it~~ it easy-- all right.

MR. BUTLER:  So that was the Charles Clark matter

relief from automatic stay, Docket No. 1625.  It's been

withdrawn.

THE COURT:  Can I make a suggestion on the discovery

matter with the -- based on, among other things, on Mr.

Butler's discussion at the beginning of the agenda about how

that matter is still under active discussion with the

committee, and then perhaps others, and we're only going

forward with one small aspect of it, does it really make sense

to deal with this discovery issue now or should we wait until

you're further along?  Because you may be trying to take

discovery on something that's completely different than what

the debtors are actually going to present.

MR. ~~BUTLER~~COFFEY:  If I may, Your Honor, I think we

should deal with it today.  It's like being a little bit

pregnant.  They're talking about paying some people a little

money as opposed to --

THE COURT:  So your discovery would be focused on

what they're doing next week -- or not next week, next hearing.

MR. BUTLER:  On the 27th.

THE COURT:  Right.

MR. ~~BUTLER~~COFFEE:  It really goes to eligibility so

if I may.

167

THE COURT:  That's fine.

MR. ~~BUTLER~~COFFEY:  Okay.  Thank you.

MR. COFFEY:  Good afternoon, Your Honor.  John Coffey from Bernstein, Litowitz, Berger & Grossmann.  I'm one of the co-lead counsel for the four institutional investors that have been appointed to represent the (indiscernible) class and the securities class action.  My particular client is the Mississippi Public Employees Reliance System.

Your Honor, shortly after the debtors filed their key employee compensation plan motion, the lead plaintiffs objected on several grounds.  I won't reiterate all of them now, but among other things, we pointed out that there seemed to be an absence of any consideration of whether intended beneficiaries of the plan might have participate in the accounting improprieties, tolerated it, or knew of it and turned the other way.

And in addition to making that general observation, we laid out fifteen specific people by name that our investigation had showed had either participated in the fraud, knew of it, tolerated it, et cetera.

THE COURT:  Let me stop.  Mr. Butler, are any of those people covered by what's going to be heard in a couple weeks?

MR. BUTLER:  Yes, Your Honor.  They're part of the (indiscernible).  Under Mr. Coffey's theory, every executive at the company played some role in this and we've got a lot to say

168

1   about that when their turn comes around.

2        MR. ROSENBERG:  Your Honor, with due respect, we

3   haven't negotiated what's going to be heard in a couple weeks,

4   if it's ready to be heard in a couple weeks.  I'm not

5   suggesting Mr. Butler was wrong, but I don't know how he can

6   know he's right.

7        THE COURT:  Okay.

8        MR. BUTLER:  I actually am good at that, Your Honor.

9        (Laughter.)

10        MR. COFFEY:  Well, Your Honor, I do note that

11   whatever those negotiations are, Your Honor, we're not privy to

12   those.

13        But shortly after we filed an objection, document

14   requests were served and I'd just like to read from some of the

15   document requests.  All documents -- I'll paraphrase, but all

16   documents concerning whether Delphi executives knowingly

17   participated in a massive accounting fraud or tolerated or

18   ignored the fraud, documents concerning sham transactions,

19   inventory manipulating, book cooking; documents concerning how

20   Delphi senior executives routinely set inventory target levels;

21   how they engaged in purportedly fraudulent conduct or willful

22   disobedience; and then documents about the four people who are

23   specifically identified, the only four, as to how they were

24   involved in the fraudulent practices.  And then with regard to

25   the fifteen people that we identified in our objection, all

26   documents concerning their alleged improprieties.

169

1        Your Honor, here's what's interesting about those
2   document requests.  They were served by the debtors.  They were
3   served by the debtors on December 5th before we ever served any
4   discovery request in this.  That's what is one of the most
5   distinguishable facts between this and what you've heard
6   earlier today.
7        Now after we got these discovery requests, we
8   certainly thought they were relevant and we were glad that they
9   thought it was relevant because we assumed that the discovery
10  requests were not offered to harass, not offered because they
11  thought they were doing an end run around any stay, but because
12  they thought it was relevant to the hearing.  So we promptly
13  said we would agree to produce all non-privileged documents
14  and, Your Honor, we have.  They have -- they essentially asked
15  us to empty our files on this.  They have those documents.
16       After they served us, we served them and I'd like to
17  break our request into two pieces.  One is the mirror image of
18  what they have served on us and which we have responded to
19  them.  The other piece identified missing pieces, for example,
20  who's covered.  They don't say, other than the bands and the
21  four people at the top.  What process, if any, was used to get
22  whether anyone was involved in the fraud?
23       Now I heard Mr. Butler say, and I was quite
24  astonished, that the fraud -- the accounting improprieties had
25  nothing to do with the bankruptcy.  Well, I might take the view
26  it had everything to do with the bankruptcy.  The death watch

170

for this company began after they announced the restatement.  I

suspect it's probably somewhere in between, but it's certainly

not no factor.

        The restatement in this case, Your Honor, is larger

than the restatement in Enron.  You have sixteen of your

executives fired or forced out this year.  You have the U.S.

Attorney's office investigating.  You have the SEC

investigation.  We know because we're talking to them.  They

liked our complaint and they've asked for our help and they're

getting it.  And you have a serious accounting scandal that

could not have been accomplished by the six people they asked

to leave.

        As our papers show, there was a pervasive culture of

manipulating the books.  Now they may argue on the 27th that,

you know, we really need those people even though they were

crooked in the past or they did something bad in the past, but

that's not what they're saying.  They're saying we shouldn't

even look, that we should just trust them to decide who should

get a bonus even though, in our view, there are any number of

people who were involved in the accounting improprieties.

        Now they did decide that they would produce some

documents relating to the (indiscernible) but before they would

let us look at what they had decided to produce, they insisted

we sign a confidentiality letter.  We got it, we looked at it,

we signed it without the slightest modification.

        We then were allowed access to a website which had a

171

few documents that essentially showed how they arrived at how

much they would pay for the bonuses, but said nothing about

whether any vetting had been done whatsoever to insure that you

don't approve a plan that puts money in the pockets of people

who participated in the accounting improprieties.

        We then got their formal objections, we had a meet-

and-confer that failed.  We couldn't even get them to

acknowledge that any documents existed or who was covered,

hence this motion.

        Now the motion essentially -- I'll deal with the

first three points of the four points dealt with in our papers.

        As they have done in papers pertaining to motions

addressed earlier today, they said this is never to evade the

PSLRA (sic) stay and the bankruptcy stay.

        If the proposition is it is inappropriate to ask for

these types of documents, you cannot square their position with

their conduct.  They served discovery on us.  We responded.

Then they say, "Wait a minute."

        THE COURT:  Well, we can get beyond it.

        I've already said that notwithstanding the federal

act, if you're entitled to discovery in a bankruptcy case you

can get it.

        MR. COFFEY:  I agree, Your Honor, and in fact we will

certainly make the point to Judge Rosen in Michigan that they

have in effect already violated the PSLRA because they  now

have our files and are taking the position that we can't get

172

1  their files but that's a separate --

2       THE COURT:  Well, I'm not dealing with that.

3       MR. COFFEY:  I heard you loud and clear on that, Your

4  Honor.

5       THE COURT:  But I guess they have a right to -- they

6  were responding to the allegations you made in your objection,

7  right, to the KEYSIP (sic) motion?

8       MR. COFFEY:  Yes, indeed, Your Honor.

9       THE COURT:  All right.  Okay.

10       MR. COFFEY:  And they have those documents.

11       THE COURT:  All right.

12       MR. COFFEY:  If the position is it's not relevant why

13  were they serving such discovery and we responded, they have

14  our documents, but so the idea that there's a stay that bars us

15  from getting it -- in other words, they think it's unilateral,

16  not mutual -- they are entitled to get documents from us --

17       THE COURT:  All right, we're beyond that.

18       MR. COFFEY:  Very well, Your Honor.

19       With regard to the relevance, we think it's highly

20  relevant.  We think it's highly relevant.

21       Does the Court want to be in the position on the 27th

22  of approving a plan that may put money in any of the pockets of

23  the fifteen people we've identified and the other people who we

24  believe were involved without knowing that the company did

25  something about it?  Did they check it out?

26       This is different.  I was involved in Worldcom and I

173

won't revisit what I think would have helped Your Honor on that

particular motion but unlike <u>Worldcom</u>, unlike <u>Health South</u>

where I'm involved as well, the companies clean house and then

built a foundation to build an honest company going forward.

That's not what's happened here.  They cite to you the fact

that 25 people left since the beginning of the year. Why do

they cite that to you?  They want Your Honor to believe, "We

need to get this incentive program in place because we're

losing people."  We said, "Well, aren't like six or eight of

those people who were fired because of the accounting fraud?"

They won't answer that.  Well, isn't that answer relevant if

they're telling you the number 25 is important?  Wouldn't it be

important to you to know, well, how many of those 25 were

fired?

          So that's what we are trying to get.  They won't give

us anything.

          Now, they also talk about privacy -- very briefly.

We signed the confidentiality order they proposed.  During the

meet and confer when they said it's not adequate, I said, "Give

us one that you think is, we'll consider it."  We've never

gotten one but now what we've heard for the first time on their

opposition papers to the motion to compel -- we didn't hear it

during the meet and confer -- is, "Well, we might have some

morale problems; certain people getting paid more than others."

 Your Honor, we can do it for attorneys eyes only, that's

routinely done, it's not unusual or we can say, "Give us the

174

names.  Who is getting this?  Is it John Sheehan?"  John

Sheehan is a defendant in our case.  He was head of accounting

during one of the largest accounting frauds of our time.  That

is not an exaggeration.  It is bigger than <u>Enron</u>.  He's the

head of restructuring.  I assume he's going to get a bonus.

Has there been any investigation about what he was doing while

the books were being cooked under his watch?

           So we would respectfully submit before the estate

starts paying these people, some sort of investigation needs to

be done.

           Now, I want to say a word about my former partner and

friend, Bob Rosenberg, on the creditors committee.  They

haven't raised this objection but, Your Honor, rather than --

we are uniquely positioned to raise this.  We had been on the

case for months.  We have investigators, we have been talking

to people, we have a case involving these accounting

allegations.  So my client, for example, Mississippi, says,

"What do you mean they're going to pay these people?"  We

wouldn't be here by the way if they hadn't filed a KEYSIP that

showed no indication that they took into account what happened

before.  If they had done that we wouldn't be here.  But they

did do that and that's why we're here.

           So, Your Honor, we respectfully submit that in order

to allow you to evaluate whether the KEYSIP is a sound exercise

of business judgment, that you would have to have more facts

than this in order to do that and what we've asked for are

175

documents that were considered with regard to any links between

the intended beneficiaries and the accounting improprieties,

any conclusions there might have been, documents relating to

sham sales.  There was a $200 million sham transacted at the

end of December 2000 so that Delphi could announce,

fraudulently, that they made a revenue number.  Laura Marion

[Ph.], who we want to depose, was the head of accounting for

financial reporting, she reopened the books -- so we have been

told -- allowed that sham transaction to be brought and they

made their numbers.  That's been restated by the way.  That's

admitted by the company.  Is she going to get a bonus?  We'd

like to ask her about it.  We'd like documents as to why the 25

executives left and we'd like to depose, as I mentioned, the

four people in our papers including Mr. Sheehan, who they admit

was involved in developing the KEYSIP.

          The question on the 27th, Your Honor, will be will

the KEYSIP benefit anyone who participated in, tolerated or

turned a blind eye to the accounting improprieties.  There is

no evidence that they've done anything on that and this motion

is brought because they want to keep it that way and, Your

Honor, we believe the relief we've requested is the minimum

necessary to insure that if the KEYSIP is approved that the

Court has been adequately informed of all of the relevant facts

and circumstances.

          Thank you.

          MR. BUTLER:  Your Honor, this motion represents the

176

trifecta for the day of lead plaintiff's efforts to try to
gather information about the original accounting fraud for a
separate agenda.  I mean if you actually look at the details --
and it's useful to look at the details, we've tried to outline
some of them in our response -- what they are trying to do is
use what is the only thing before the Court now on the 27th of
January which is an annual incentive program for performance
from the period that ends June 30, 2006, a position I will tell
you I think as constructed is ordinary course.  We're still
going to negotiate with the creditors committee but that's all
that's before you.  The emergence (sic) program has been put
off until July as we continue to negotiate with the
compensation consultants and with the committee.

         Let me just take a step back -- and Mr. Coffey
obviously feels otherwise and wants the Court to sort of
believe otherwise -- but the debtors do not believe that we
have any wrongdoers that should leave Delphi working at Delphi
today.  If the board of directors of the company or the
executive managers of the company believed that we had
wrongdoers that had breached their fiduciary responsibilities
to the company and should not be at the company they would not
be there and the fact of the matter is the executive management
team we have at the company now which is led mostly by new
people -- but the reality is we have a new general counsel, we
have a new CEO, we have a new CFO, we have a number of other
new people that are coming, we have a new director of audit, we

177

have lots of new people at the company -- but the fact of the

matter is the people who are at the company, the company

believes in and believes that they should be compensated and

just to make the point, they're being paid right now, they're

being compensated now as we sit here, and to suggest that

somehow the fact that we want to provide an ordinary course

annual incentive plan -- which is al that's up before you on

January 27th -- that somehow that program is going to somehow

give the license to go back and get the following kinds of

things.  They would like to have every document that exists

with respect to financing transactions totaling approximately

$441 million reported by the debtors as sales of inventory or

direct materials as described in detail in lead plaintiff's

consolidated class action complaint at Paragraphs 122 to 54.

Example 2, they want all the documents that exist on

transactions totaling more than $240 million between the

debtors and General Motors Corporation as set forth in the

complaint -- their class action complaint -- in Sections 155 to

168.  They would like to have all of the transactions between

the debtors and various service provides including $68 million

in transactions with Electronic Data Systems or the debtors'

information technology providers as described in the complaint

from Paragraph 173 to 184 and they go on and on and on.

They've asked for copies of all documents that relate

to any former Delphi executive who knowingly participated in

Delphi's massive accounting fraud and the list goes on and on.

178

1    We put it all in our response.  I'm not going to go through

2    it.

3            How are those relevant and how do those relate to

4    whether or not the Court approves an incentive plan for

5    performance through the period ended June 30, 2006?  Your

6    Honor, they're using this as a fishing expedition and as a

7    license --

8            THE COURT:  What is the initial period?  What is the

9    start of that period?

10            MR. BUTLER:  The proposed start of it is October 8th

11   when we filed in 2005 through June 30, 2006.  We're negotiating

12   the exact parameters of that with the creditors committee and

13   we will deal with that issue in our negotiations with them but

14   it is for the post-petition period only.

15            Your Honor, when you actually read their voluminous

16   requests, those requests are clearly designed to have an agenda

17   so they can get information to buttress their other case.  It

18   has nothing to do with whether or not we've demonstrated

19   reasonable business judgment in having a program and by the

20   way, it also doesn't prevent them from coming to argue at that

21   hearing without having conducted another investigation that

22   they think they're "uniquely" qualified to conduct for them to

23   argue that somehow there should be some curtailance put into

24   the program to address issues they're concerned about.

25            The debtors start from the proposition, Your Honor,

26   unlike Mr. Coffey, that we do not believe that there are

179

currently wrongdoers at this Chapter 11 debtor operating the

company.

THE COURT:  Well, but let's play that out.

If they come to the hearing and say, "We have the

following evidence that we've already discovered through other

means that Mr. X and Ms. Y shouldn't get this because they're

going to end up owing the debtor more," aren't you going to

say, "Well, we disagree with that@ and ~~they~~ to put on a case

to say that, you know, there's no such claim?~~"~~  Or are you just

going to let them say that and you'll say, "Well, Judge, you

should just consider that for what it's worth?"  I mean if

you're going to put on a case in opposition to them why

shouldn't they take discovery on it?

MR. BUTLER:  We don't intend to put on a case on

January 27th about the accounting fraud dating back to --

THE COURT:  No, I understand.

MR. BUTLER:  Which is what they're asking for

discovery on.

THE COURT:  But if the plaintiffs say you shouldn't

approve this with regard to, you know, Messrs. X, Y and Z

because "we have good reason to believe" -- and they say what

they know -- "they were involved in an accounting fraud and

hurt the company and creditors" -- unless the debtors are not

going to respond to that, I don't see why they wouldn't be

entitled to discovery as to what your response would be.

MR. BUTLER:  But our response, Your Honor, I think --

180

I mean part of it -- and I'm a little concerned that the Court

is to a certain extent in some respects buying into their view

of what the standard is at a KEYSIP hearing.

They're basically saying -- they're taking the

position that if anybody in their opinion turned a blind eye --

THE COURT:  No, no, no, it's not in their opinion.  I

mean they're saying what it is and basically throwing the ball

back on the debtor unless the debtor is going to say, "Well, we

disagree and we rest," they may win.  So I mean if I were in

your shoes I may want to say, "Well, they're wrong.  Mr. X

wasn't involved in this at all" and there are other things you

can do.  You can say that it ought to be held in escrow or

something until these issues are decided but other than putting

off the issue, I don't see how you can oppose them on the

merits of that claim without giving them discovery.

MR. BUTLER:  But actually, Your Honor, because I

believe that the basic claim is faulty --

THE COURT:  You believe that but they differ with

you.  They=ve said they have the an issue (sic).

MR. BUTLER:  Your Honor, let me try and approach this

a different way.

Mr. Coffey alleges that someone who is currently at

the company did bad things for five years and should never bet

paid another dollar from the company.

THE COURT:  Right.

MR. BUTLER:  Okay.

181

I did not intend on January 27th to put on a case
about what happened in 1999, 2000, 2001, 2002 --

THE COURT:  In response to what he's saying.

MR. BUTLER:  Right.

I do intend to say, however, that I don't think he
can show under all the KEYSIP case law in this country that
those allegations, unproven -- in this country, people are
innocent until proven guilty -- that because somebody --

THE COURT:  Well, he can go ahead and try to prove it
at the hearing.

MR. BUTLER:  But that's not the place for the
hearing, Your Honor.

THE COURT:  Why?  I don't understand that.

I'm just going to use -- no, I won't even use a real
person -- but you know that there have been numerous CEOs of
bankrupt companies who have ended up having either serious
liability or ~~being in~~going to jail for securities or accounting
fraud.  There have been others who have been acquitted.  Well,
I would find it very hard to approve any sort of bonus plan for
an executive who, I felt, was going to jail.  I don't care how
valuable he was.  That doesn't seem right to me.

MR. BUTLER:  Your Honor, when does the bankruptcy
court, a civil equity court, get involved in adjudicating that
when there's no indictment out?

THE COURT:  Oh, no, I understand that.  I understand
that, but it seems to me as a matter of business judgment that

182

you don't give bonuses to people who you're going to be seeking

millions, perhaps hundreds of millions of dollars later from.

I'm not saying -- this is all a matter of proof and

discovery and I don't really particularly want this to become a

litigation festival.  I don't think that's particularly

appropriate, but I think that the plaintiffs have raised

legitimate issues here as to what process the company has gone

through to determine whether ~~(a)~~ someone here, even if they

worked really hard for the next nine months and make a lot of

money for the debtor, might ultimately be -- you know, there's

a good chance that they might really be liable here.

I don't know how I could approve a program where

there hasn't been some analysis of that fact.

MR. BUTLER:  Of what fact, Your Honor?

THE COURT:  Not fact, an analysis of that issue.

MR. BUTLER:  We have a bald, unsupported allegation -

-

THE COURT:  But it's not --

MR. BUTLER:  I mean I'm pushing back, Your Honor,

because --

THE COURT:  Well, I assume you asked them for their

discovery to see whether ~~their~~ Rule 11 was satisfied.  Right?

MR. BUTLER:  Right.

THE COURT:  But I assume that they believe they did

satisfy Rule 11 and given the restatement and given the

investigations that are going on there may be some basis to

183

this.  I don't know whether it involves current employees or

not, I don't know whether it involves employees who are getting

bonuses or not.  They don't know either, they say.

So it just seems to me that contemplating the hearing

down the road -- and I appreciate that the issue to be heard

later this month is a much narrower issue then had originally

been teed up some months ago and maybe it's less of an issue

but I still see serious, legitimate concerns being raised that

unless the debtor just wants to say, "Well, Judge, we think

that's irrelevant" and sit down, in which case I have to decide

whether it's relevant or not and, of course, then you'll be

hearing all these allegations that I'm sure you're going to

stand up and say, "that's not true, that's not true, that's not

true," I think you have to draw some line somewhere to give

them some access and maybe it is just to a vetting process and

to ~~whose~~ who=s covered because they say they have a lot of

information already and maybe the issue is moot as to a lot of

these people because maybe they're not being covered, the ones

that they think are implicated in this.

On the other hand, maybe you know enough to say that

this has been adequately considered.

MR. BUTLER:  Your Honor, what they're attempting to

do is to use a hearing to determine an annual incentive plan

and even, frankly, an emergence plan.  I can address the

emergence plans later.  They're seeking to use that as an

opportunity to try to take discovery and then litigate in this

184

Court at a KEYSIP hearing about what happened in 2000.

THE COURT:  I understand.

Well, I understand that and I am inclined to severely
limit the discovery and the extent of the litigation that they
want to conduct because to some extent I agree with you it's
transparent and it's a sideshow.

On the other hand, unlike the other discovery issues
addressed today, I think that, fundamentally, they are seeking
things here that are relevant because I have a very hard time -
- given the allegations that they've raised which are serious
and I assume that they've satisfied Rule 11 and you'll tell me
if they haven't -- that I would have a hard time if a
particular employee was implicated in those allegations in
awarding a bonus without at least saying you've to got escrow
it.

MR. BUTLER:  I want to play that out.

That has the effect for a Chapter 11 debtor of saying
that if people make claims against Chapter 11 debtor's
employees and we need to keep a workforce going forward and the
debtors believed we've separated the people that were actual
wrongdoers --

THE COURT:  But then I'm saying you're not letting
them take discovery as to your process for separating the
wrongdoers and apparently you're not going to tell me that
either at the hearing.  I don't see how you can expect me to
just take it on faith that that's what's happened.

185

1        MR. BUTLER:  Your Honor, we did not expect that an

2  incentive plan motion was going to be used by parties in the

3  case or by the Court as, frankly, an approach to try to

4  evaluate what occurred over an historic period.

5        THE COURT:  Well, all right.

6        I will use an example.  All right?

7        I don't think that I would have approved an incentive

8  plan for Mr. Fastow, even if he was still working and making

9  money for Enron and valuable for Enron.  I just wouldn't have

10  done it.

11        Now, I'm not saying that anyone who worked for this

12  company is like Mr. Fastow at all.  But they're raising the

13  issue and I think it's a legitimate issue.

14        MR. BUTLER:  Well, Your Honor, if the question is a

15  narrow question which is what is the process or consideration

16  that the company gave, for example, to make sure that our

17  annual incentive program payments don't go to crooks?

18        THE COURT:  Yes.

19        MR. BUTLER:  That narrow question is a question that

20  we could give discovery on and talk about.  That is not -- if

21  you look at their motion, that's not what their motion was.

22        THE COURT:  No, I understand that but you note that

23  if counsel wasn't -- the list of things that he went through in

24  oral argument -- and usually when people deal with discovery in

25  front of the judge they get down to brass ~~tax~~ tacks -- was who

26  is covered, which he is willing to do pursuant to an attorneys

186

eyes only so you don't reveal to each employee what each other

employee is getting; what process was used to determine if

anyone was involved in the alleged fraud and why did the 25

leave?  Is there really a mass exodus here or did the 25 leave

because, you know, fifteen of them were told to leave and ten

of them decided that they'd rather go work for GM or Toyota or

something?

          MR. BUTLER:  Your Honor, we can give discovery on

that point.

          Let's take that point, for example.  I don't know how

in the world that particular question has any relevance on

whether or not we have an annual incentive program.

          THE COURT:  Well, I think it has a great deal of

relevance.

          One of the reasons you give people incentive programs

is to avoid people leaving.  In fact, that's what's in the new

Code which, obviously, is inapplicable here but it's a major

factor.

          If you're having a mass exodus then, you know, one of

the things people do is pay people to stay.  If the 25 people

or however many people that are going to be asserted at the

hearing have already left, if actually a lot of them left

because they were fired or basically were told that "you'll be

fired unless you leave," that's a different story.  So, you

know, I think that's relevant.

          Again, what's on for January, it's probably less

187

relevant to, because as I understand, January is performance-
based, the typical types of targets that investment bankers and
employee consultants love because it incentivizes people but I
think those demands or those requests are ones that people have
to confront.

I agree with you that through the back door of an
annual incentive plan motion, to try the whole securities
litigation is just wrong.  It shouldn't be done that way but I
need to know what efforts the debtor has made to consider
whether there is liability here or, alternatively, how the
estate is protected if money is awarded and then it turns out
there is liability, which may be a more reasonable approach.

MR. BUTLER:  I will simply say on that lateral
approach, Your Honor, the debtors already have spent a
considerable amount of time sorting through that issue.

THE COURT:  Okay.

MR. BUTLER:  That issue is one that will be addressed
on the 27th.

THE COURT:  Okay.

MR. BUTLER:  That's a different issue than --

THE COURT:  Ultimately, going back to where I
started, it ultimately may be an issue of how badly the debtors
want to win the motion.  The debtors may decide that "we don't
want to put on much of a case in opposition to their objection
because we don't think it's necessary" and you may end up being
right.  On the other hand, if they make cogent and supported

188

accusations, you know, there may be an issue there unless you

have some backup plan like putting the money in escrow.

MR. BUTLER:  I do think we'll be able to address the

latter issue because we've given a pretty good deal of thought

to addressing that just in terms of having prophylactic

safeguards because, obviously, we're fiduciaries and want to

protect the estate too.  We know what we know and we will

address those issues.

THE COURT:  That's one of the reasons I was wondering

whether we should have the hearing on this now because you're

dealing with a moving target.

I mean I had gone on ~~in~~ with this aspect of the

hearing thinking that you had pretty much reached agreement

with the committee at least on the stuff that's for January.

Mr. Rosenberg is shaking his head ~~so~~no, you know,

unless -- you know, I'm all for reaching agreement and

sometimes you don't reach agreement until the last minute but I

doubt you're ever going to agree with the securities law

plaintiffs on this so --

MR. BUTLER:  Your Honor, it sounds like from what I

understand, the guidance you're giving, it sounds like limited

discovery on the question about the process or consideration

given to make sure bonuses don't go to crooks, using my words

for a minute.  That that is the kind of thing that you think is

relevant but that the things I summarized in my response and

addressed on the record are not.

189

1        THE COURT:  That's right.

2        MR. BUTLER:  If that's the case then my suggestion

3   would be that we consider adjourning this matter to the 13th.

4   We already have -- if that's possible.  I know you don't like -

5   -

6        THE COURT:  Well, what I'd like to --

7        MR. BUTLER:  -- just for a meet and confer so we can

8   try and work it out before.

9        THE COURT:  Yes, I'm not adjourning it just so that

10  we can take it up again on the 13th, I'd like you two and the

11  committee, to the extent it wants to be involved, to meet and

12  confer to see whether you can at least agree upon what I've

13  just outlined.

14       MR. COFFEY:  We will, Your Honor, but just one point

15  of clarification because it's a little dangerous when my

16  adversary summarizes.

17       When you mentioned the things I just specified, that

18  was Part 2 of two pieces.  I said we asked for the mirror image

19  of what they had asked of us --

20       THE COURT:  I know.

21       MR. COFFEY:  -- and then specifics.

22       I think mutuality requires and also --

23       THE COURT:  I disagree with that.

24       I think they were responding as, I think, is

25  legitimate, to allegations that were made in your papers that

26  were pretty serious and I think they have a right to know --

190

among other things, they have a right to know because they have

a duty to weed out people that are bad apples.

MR. COFFEY:  We're happy to alert them to them, Your

Honor, if they've had trouble finding out themselves.

THE COURT:  Well, let me say another thing.

I'm not going to let them present a case against you

without letting you have discovery on the merits.

MR. COFFEY:  Your Honor, that leads to a couple of

points on that.

THE COURT:  But that's not saying that we should have

the discovery now because Mr. Butler is basically saying he's

not going to present that type of case.

MR. COFFEY:  Well, you know --

THE COURT:  Why don't you meet and confer on that

point?

MR. COFFEY:  I'll make the point, I don't accept that

as an alternative acceptable to us because if we put forth what

we have and it's arguably a thin case which they will argue,

but full lumination of both sides would make our case stronger.

I'm not willing to accept his abdication of putting a case on.

I'm not.

You know, there were specific transactions identified

for them.  It was used affirmatively against them -- look what

they're doing.  We were telling them, "Here are the

transactions.  What have you done?" and now they want you to

say, "We'll show you what the process was."  Your Honor, they

191

didn't even mention the accounting improprieties in their

opening papers.  Now, they want you to accept and us to have a

discovery limited to what they did?  No.  We want to test did

they get down there?   Did they ever talk to Laura Marion?  I'd

like to have her here at the hearing so that we can test the

process.

            THE COURT:  I don't want to do that at this point.

            I think I've been pretty clear that if you make

facially cogent arguments that are not opposed with facially

cogent arguments, then you have a real good shot of winning,

and if they're opposed with facially cogent arguments, then you

have a right to discovery.

            MR. COFFEY:  Very well, Your Honor.

            Thank you.

            THE COURT:  But let me -- so I think that adjourning

it to the 13th is the right course and I'd like you to meet and

confer on dealing with the three things that I've discussed and

I should also say because it's late in the day and there may be

reporters here, at least one of your partners in a different

case is very concerned about what reporters hear.

            I am not saying -- and I want to be really clear

about this -- that I believe that any officer or director of

these debtors is a crook or a fraud or has done anything

fraudulent.  That's clearly not something that is in front of

me.  I'm dealing with a request for discovery that would try to

establish that fact and so I'm dealing with hypotheticals and

responding to that discovery request.

So, for example, when I raised the Fastow example,
that was a hypothetical and does not suggest that I believe
that any of the debtors have done anything like that or that
the debtor's officers have or~~and~~ that there is a basis for
contending anything other ~~then~~ than that they've conducted
themselves appropriately in this case, which isn=t what I have
in front of me.

But what I have is a discovery request and I have to
consider ultimately the issues that would be raised that the
discovery is supposed to be for and it's in that context that
I'm raising these hypotheticals.

MR. BUTLER:  Thank you, Your Honor.

We'll conduct a meet and confer and report back to
the Court on the 13th.

MR. COFFEY:  Thank you, Your Honor.

MR. BUTLER:  Your Honor, that concludes the matters
on the January omnibus agenda.

THE COURT:  Okay.  Thank you.

* * * * *

193

1
2
3
4
5
6
7
8
9
10
11

194

\* \* \* \* \*

1

2    I certify that the foregoing is a transcript from an

3  electronic sound recording of the proceedings in the above-

4  entitled matter.

5

6

7                  KATHLEEN PRICE

8

9  Dated:  January 6, 2006

10

11

12

13

14

15

16

17

18

19

20

21

22

23