Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                  :
   In re                      :     Chapter 11
                  :
DELPHI CORPORATION, et al.,      :     Case No. 05-44481 (RDD)
                  :
             Debtors.   :     (Jointly Administered)
                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(a), 328(a), AND 1107(b) AND FED. R. BANKR. P. 2014 AUTHORIZING EMPLOYMENT AND RETENTION OF ERNST & YOUNG LLP AS INDEPENDENT AUDITORS, ACCOUNTANTS, AND TAX ADVISORS TO DEBTORS, EFFECTIVE NUNC PRO TUNC TO JANUARY 1, 2006

("ERNST & YOUNG RETENTION APPLICATION")

        Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this application (the "Application") for an order under 11 U.S.C. §§ 327(a), 328(a),

and 1107(b) and Fed. R. Bankr. P. 2014 authorizing the employment and retention of Ernst &

Young LLP ("E&Y") as independent auditors, accountants, and tax advisors to the Debtors,

effective nunc pro tunc to January 1, 2006.  In support of this Application, the Debtors submit

the Declaration of Kevin F. Asher, executed on March 17, 2006 (the "Asher Declaration").  In

further support of this Application, the Debtors respectfully represent as follows:

<u>Background</u>

A.     <u>The Chapter 11 Filings</u>

1.     On October 8, 2005 (the "Initial Filing Date"), Delphi and certain of its U.S. subsidiaries (the "Initial Filers") filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").  On October 14, 2005, three additional U.S. subsidiaries of Delphi (together with the Initial Filers, collectively, the "Debtors") also sought reorganization relief. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This Court entered orders directing the joint administration of the Debtors' chapter 11 cases (Dockets Nos. 28 and 404).

2.     On October 17, 2005, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "Creditors' Committee").  No trustee or examiner has been appointed in the Debtors' cases.

3.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.     The statutory predicates for the relief requested herein are sections 327(a), 328(a), and 1107(b) of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.       Current Business Operations Of The Debtors

5.       Delphi had global 2004 revenues of approximately $28.6 billion, and

global assets as of August 31, 2005 of approximately $17.1 billion.[1]  Delphi ranks as the fifth

largest public company business reorganization in terms of revenues, and the thirteenth largest

public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are

not chapter 11 debtors and continue their business operations without supervision from the

Bankruptcy Court.

6.       Delphi has become a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and the Company

(as defined below) is today arguably the single largest global supplier of vehicle electronics,

transportation components, integrated systems and modules, and other electronic technology.

The Company's technologies and products are present in more than 75 million vehicles on the

road worldwide.  The Company supplies products to nearly every major global automotive

original equipment manufacturer, with 2004 sales to its former parent, General Motors

Corporation ("General Motors" or "GM"), equaling approximately $15.4 billion, and sales to

each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company,

Ltd., and Volkswagen Group exceeding $850 million.

7.       As part of its growth strategy, Delphi has established an expansive global

presence with a network of manufacturing sites, technical centers, sales offices, and joint

ventures located in every major region of the world.  As of the Initial Filing Date, the Debtors

employed approximately 180,000 employees worldwide.  The Debtors' 50,600 U.S. employees

---

[1]     The aggregated financial data used in this Application generally consists of consolidated information from
Delphi and its worldwide subsidiaries and affiliates.

worked in approximately 44 manufacturing sites, 13 technical centers, and Delphi's Troy, Michigan headquarters.  As of the Initial Filing Date, the Debtors employed approximately 34,750 hourly employees in the United States, 96% of whom are union-represented.  Approximately 34,750 of the Debtors' U.S. employees were hourly employees as of the Initial Filing Date, and 96% of these were represented by approximately 49 different international and local unions.  Outside the United States, the Company's foreign entities employed more than 134,000 people on the Initial Filing Date, supporting 120 manufacturing sites and 20 technical centers in nearly 40 countries around the globe.

8.      Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates (collectively, the "Company") in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

9.      Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle.  When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their

supply base.  The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base. The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C.      Events Leading To Chapter 11 Filing

10.      In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales.  Reflective of a downturn in the marketplace, Delphi's financial condition deteriorated further in the first six months of 2005, with net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, approximately $1 billion less than the same time period a year earlier.[2]

11.      The Debtors believe that the Company's financial performance has deteriorated because of: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for

---

[2]      Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12.     In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward looking revenue requirements. Because discussions with its unions and GM were not progressing sufficiently, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

13.     Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses. This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness. The Debtors believe that a substantial segment of Delphi's U.S. business operations must be divested, consolidated, or wound-down during these cases.

14.     Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

<u>Relief Requested</u>

15.    By this Application, the Debtors request authorization to employ and retain

E&Y as their independent auditors and to provide accounting, tax, and other audit-related

services consistent with the rules and regulations of the Securities and Exchange Commission

and the Public Company Accounting Oversight Board (the "Applicable Rules and Regulations")

in these chapter 11 cases, effective <u>nunc</u> <u>pro</u> <u>tunc</u> to January 1, 2006.  Specifically, the Debtors

respectfully request entry of an order under sections 327(a), 328(a), and 1107(b) of the

Bankruptcy Code and Bankruptcy Rule 2014 authorizing E&Y to perform (a) independent

auditing and accounting services in accordance with the terms set forth in the letter agreement

attached hereto as <u>Exhibit 1</u> (the "Audit Engagement Letter") and (b) tax advisory services in

accordance with the terms set forth in the letter agreement attached hereto as <u>Exhibit 2</u> (the

"Master Tax Advisory Agreement," and together with the Audit Engagement Letter, the

"Engagement Letters").

16.    On November 28, 2005, the Debtors filed an Application For Order Under

11 U.S.C. §§ 327(a), 328(a), and 1107(b) Authorizing Employment And Retention Of Ernst &

Young LLP As Sarbanes-Oxley, Valuation, And Tax Services Providers to Debtors, Effective

<u>Nunc</u> <u>Pro</u> <u>Tunc</u> To October 8, 2005 (the "Initial Application").  The Initial Application sought

the Court's authorization of the Debtors' employment of E&Y in accordance with the terms of

four engagement letters (the "Prior Engagement Letters").  The Initial Application was supported

by the Affidavit of Randall J. Miller, sworn to November 28, 2005 (the "Miller Affidavit").  On

January 5, 2006 the Court entered an order approving the Initial Application (Docket No. 1743).

17.    E&Y completed all of the services under the Prior Engagement Letters on

or before December 16, 2005.  On December 29, 2005, E&Y provided to the Debtors formal

7

notice of termination of the Prior Engagement Letters.  All of the services provided under the Prior Engagement Letters involved the review of, advice with respect to, and assistance in assessing and testing the internal controls over financial reporting and tax services as applied to transactions and events during 2005.  E&Y has not been involved and will not be involved in providing any such services during 2006 and will only provide services during 2006 that are consistent with maintaining its independence as required and in accordance with the Applicable Rules and Regulations, including the prohibition on E&Y reviewing E&Y's own work under the Prior Engagement Letters.

Scope Of Services

18.     As set forth in further detail in the Engagement Letters and in the Asher Declaration, subject to approval of this Court, E&Y has agreed to provide the following services:

A.     <u>Services Under The Audit Engagement Letter</u>:

(i)     Perform an audit (the "Integrated Audit") of the Company's consolidated financial statements and its internal control over financial reporting, including auditing and reporting on the consolidated financial statements of the Debtors for the year ending December 31, 2006; audit and report on management's assessment of the effectiveness of internal control over financial reporting and on the effectiveness of internal control over financial reporting as of December 31, 2006; and review the Debtor's unaudited interim financial information before the Debtors file their Form 10-Q (collectively, the "Audit Services"); and

(ii)     as and when requested by the Debtors from time to time, provide accounting advisory and research services in connection with various accounting matters, including consultations required for significant proposed or executed transactions; continuing education support; assistance with and review of registration statements, comfort letters, and consents; information technology internal controls; and services related to mergers, acquisitions, and divestitures, which such services may include carve-out audits of one or more business units and which may, with Delphi's consent, be provided by one of the Ernst & Young Global

Limited entities;[3] E&Y (or any EYGL Member Firms) may perform additional audit procedures with respect to any financial statements of a non-consolidated affiliate of Delphi which are required to be filed with Delphi's annual report on Form 10-K pursuant to Article 3-09 of Regulation S-X of the Securities and Exchange Act of 1934, as amended; provide services to audit the accounts, disclosures, and transactions associated with the Debtors' operating under chapter 11 of the Bankruptcy Code (collectively, the "Additional Accounting Advisory Services").

B.    Services Under The Master Tax Advisory Agreement:

19.    In addition to the services described in the Audit Engagement Letter, E&Y will provide tax services to the Debtors.  The Debtors will, from time to time, identify tax services which they desire to be performed by E&Y.  E&Y will authorize the performance of such services on a project-by-project basis.  The description of the first two projects is attached to the Master Tax Advisory Agreement as Project Addendum I (Other Tax Advisory Services) and Project Addendum II (Bankruptcy Tax Services).  E&Y will not provide any tax service to the Debtors until those services have been approved by the Company's audit committee.

1.    Bankruptcy Tax Services.

(a)    Advise and assist the Debtors on the federal, state, and local income tax consequences of proposed plans of reorganization, including, if necessary, assistance in the preparation of IRS ruling requests regarding the tax consequences of alternative reorganization structures;

(b)    prepare "Section 382 calculations" and apply the appropriate federal, state, and local tax law to historic information regarding changes in ownership of the Delphi's stock to calculate whether any of the shifts in stock ownership may have caused an ownership change that will restrict the use

---

[3]    The Ernst & Young global network encompasses independent professional services practices conducted by separate legal entities throughout the world.  All of these practice entities join the Ernst & Young network by becoming members (each, an "EYGL Member Firm") of Ernst & Young Global Limited (EYGL), a company incorporated under the laws of England and Wales and limited by guarantee, with no shareholders and no capital.  EYGL is the principal governance entity of the Ernst & Young network.  Each EYGL Member Firm is a separate legal entity that is separately owned and managed.  Through their membership in EYGL, the EYGL member firms undertake to operate certain of their professional practices in accordance with agreed standards and the guidance of EYGL.  In addition, EYGL member firms share access to certain intellectual property and centrally licensed materials, including the Ernst & Young name.  E&Y and Ernst & Young (Canada) are members of EYGL.

of tax attributes (such as net operating loss, capital loss, credit carry forwards, and build in losses) and the amount of any such limitation;

(c)    through analysis of the information contained in historic tax returns and other relevant records of the Company and application of relevant consolidated tax return rules, prepare calculations and apply the appropriate federal, state, and local tax law to determine the tax asset and stock basis and deferred inter-company transactions and other consolidated return issues for each legal entity in the Company's U.S. tax group, and identify major deferred inter-company transactions, excess loss accounts, etc.;

(d)    prepare calculations and apply the appropriate federal, state, and local tax law to determine the amount of tax attribute reduction related to debt cancellation income;

(e)    provide analysis of the federal, state, and local tax treatment governing the timing of deductions of plant shut down, severance, and other costs incurred as the Company rationalizes its operations, including tax return disclosure, and presentation;

(f)    provide analysis of the federal, state, and local tax treatment of the costs and fees incurred by the Debtors in connection with the bankruptcy cases, including tax return disclosure and presentation;

(g)    provide analysis of the federal, state, and local tax treatment of interest and financing costs related to debt subject to the automatic stay, and new debt incurred as the Debtors emerge from bankruptcy, including tax return disclosure and presentation;

(h)    provide analysis of the federal, state, and local tax consequences of restructuring and rationalization of inter-company accounts;

(i)    provide analysis of the federal, state, and local tax consequences of proposed dispositions of assets during bankruptcy, including tax return disclosure and presentation;

(j)    provide analysis of the federal, state, and local tax consequences of restructuring the U.S. or worldwide corporate groups during bankruptcy, including tax return disclosure and presentation;

(k)    provide analysis of the federal, state, and local tax consequences of potential bad debt and worthless stock deductions, including tax return disclosure and presentation; and

      (l)     providing analysis of the federal, state, and local tax consequences of employee benefit plans (services (a) through (l) collectively, the Bankruptcy Tax  Services").

2.    <u>Other Tax Advisory Services</u>.

      (a)     Provide the Company tax advice and assistance concerning issues as requested by the Company's tax department, such as assistance with tax issues, assistance with transactional issues, or assistance in connection with the Company's dealings with tax authorities (collectively, "Other Tax Advisory Services").

C.    <u>Audit Committee Pre-Approval And Maintenance Of Independence</u>:

20.    All services to be provided by E&Y to the Company which are not specifically contemplated by the Engagement Letters and attached Addendums, must be pre-approved by Delphi's Audit Committee pursuant to the Audit Committee's pre-approval process, policies, and procedures and no services may be provided which adversely impact E&Y's ability to satisfy the independence standards of the Applicable Rules and Regulations.  E&Y is required to communicate annually with the Audit Committee on independence matters as required by such independence standards.

21.    E&Y will provide the Audit Services and Additional Accounting Advisory Services under the Audit Engagement Letter to Delphi and its U.S. subsidiaries and affiliates which are Debtors in these chapter 11 cases (the "U.S. Debtors").

22.    Delphi's foreign subsidiaries and affiliates which are debtors in these chapter 11 cases (the "Foreign Debtors") may seek to retain and employ the local EYGL Member Firms from the respective countries where such Foreign Debtors are located to perform certain services, which services may include, without limitation, statutory audit services.  Those services will be provided under engagement letters which are separate and distinct from the Audit Engagement Letter.  The Foreign Debtors will seek such retention pursuant to either (a) sections

327, 328, and 1107 of the Bankruptcy Code or (b) under a subcontracting arrangement pursuant

to the following language, which is substantially similar to that provided for in the Initial

Application:

> E&Y may subcontract a portion of its responsibilities under this Agreement without Company's prior written approval to any affiliate of E&Y, any other member of the global E&Y network or any of their respective affiliates (collectively, the "E&Y Entities," and any of them, an "E&Y Entity"); provided, however, that E&Y shall be and shall remain fully and solely responsible for all of the liabilities and obligations of E&Y under this Agreement, whether or not performed, in whole or part, by E&Y, or any subcontractor or personnel of any E&Y Entity. The Company shall have no recourse, and shall bring no claim, against any E&Y Entity other than E&Y, or against any subcontractors, members, shareholder, directors, officers, managers, partners, agents, representatives or employees of any E&Y Entity (or any of their respective successors or permitted assigns) or any of their respective assets, with respect to the Services or otherwise under this Agreement.

23.    If E&Y subcontracts to an EYGL Member Firm, E&Y will supplement the

Asher Declaration to set forth the nature of the services to be provided under the subcontracting

arrangement.

24.    The services to be provided by E&Y to the Debtors will not be

unnecessarily duplicative of those provided by any other of the Debtors' professionals, and E&Y

will coordinate any services performed at the Debtors' request with the Debtors' other

professionals, including financial advisors and counsel, as appropriate, to avoid duplication of

effort, consistent with the auditor independence requirements of the Applicable Rules and

Regulations.

25.    Subject to this Court's approval of the Application, E&Y is willing to serve

as the Debtors' independent auditors, accountants, and tax advisors and to perform the services

described in the Engagement Letters on the terms set forth therein.

Qualifications Of Professionals

26.     The Debtors are familiar with the professional standing and reputation of E&Y.  The Debtors understand that E&Y is well-experienced in providing independent auditors and accountants in restructurings and reorganizations, and that E&Y is well-respected for services it has rendered in large, complex chapter 11 cases on behalf of debtors and creditors throughout the United States.

27.     As set forth in the Asher Declaration, E&Y's depth and breadth of experience with Tier 1 automotive suppliers offers numerous benefits to the Debtors.

28.     The services of E&Y are deemed necessary to enable the Debtors to maximize the value of their estates and to reorganize successfully.  The Debtors submit that E&Y is well-qualified and able to represent the Debtors in a cost-effective, efficient, and timely manner.

Disinterestedness Of Professionals

29.     The Miller Affidavit and the Asher Declaration contain information available to date on E&Y's connections with other parties-in-interest, as required by Bankruptcy Rule 2014(a).  Based on the information in the Miller Affidavit and the Asher Declaration, which are incorporated herein by reference, the Debtors submit that E&Y and the professionals in the firm are "disinterested persons," as that term is used in section 101(14) of the Bankruptcy Code, and are otherwise eligible to be retained under section 327(a) of the Bankruptcy Code.

30.     E&Y's engagement period for the Audit Services and the Additional Audit Advisory Services begins on January 1, 2006.  As such, with respect to the Audit Services or Additional Audit Advisory Services, E&Y will not be auditing transactions or controls that were performed pursuant to the Prior Engagement Letters.  Both E&Y and the Debtors have

13

performed comprehensive independence reviews prior to the commencement of the Audit

Services.  E&Y's independence review was consistent with the Applicable Rules and

Regulations, including Independence Standard Board No. 1.

Professional Compensation

31.    Subject to this Court's approval and pursuant to the terms and conditions of

the Engagement Letters, the Debtors have agreed to E&Y's professional compensation as

follows:

A.    Services Rendered Under The Audit Engagement Letter

1.    Audit Services.

28.    E&Y's fixed domestic fee for the Audit Services (the "Domestic Fixed

Fee") will be $7,500,000, plus expenses.  Expenses include reasonable and customary out-of-

pocket expenses such as travel, meals, accommodations, and other expenses specifically related

to E&Y's engagement.  The Debtors and E&Y have agreed that E&Y may submit invoices for

the Audit Services in accordance with the following schedule:

| Date | Amount[4] |
|------|-----------|
| March 2006 | $ 3,000,000 |
| August 2006 | $ 3,000,000 |
| January 2007 | $ 1,500,000 |

29.    The Domestic Fixed Fee is based upon, among other things, E&Y's

preliminary review of the Debtors' records and the representations Debtors' personnel have made

---

[4]    This amount does not reflect expenses.

to E&Y, the Debtors' documentation of internal control over financial reporting, the procedures the Debtors' perform to support management's assessment of the effectiveness of internal control over financial reporting, and the results of E&Y's audit procedures.  The Domestic Fixed Fee is additionally based upon the Debtors' personnel providing a reasonable level of assistance during the Integrated Audit.  Should E&Y's assumptions with respect to these matters be incorrect or should it require additional commitments by E&Y beyond those upon which the Domestic Fixed Fee is based, E&Y will bill for this time at the rates and in the manner set forth below with respect to the Additional Accounting Advisory Services.

      2.    <u>Additional Accounting Advisory Services</u>.

      30.    Fees for the Additional Accounting Advisory Services will be based on E&Y's hourly rates for such services, plus reasonable expenses.  Expenses include reasonable and customary out-of-pocket expenses such as travel, meals, accommodations, and other expenses specifically related to E&Y's engagement.  E&Y's current hourly rates for the Additional Accounting Advisory Services are as follows:

| Level | Hourly Rate |
|---|---|
| Partner | $ 525 – 750 |
| Senior Manager | $ 400 – 625 |
| Manager | $ 300 – 470 |
| Senior | $ 220 – 375 |
| Staff | $125 – 200 |
| Client Service Associate | $75 – 125 |

B.    Services Rendered Under The Master Tax Advisory Agreement

31.    Fees for the Bankruptcy Tax Services and Other Tax Advisory Services will be based on E&Y's hourly rates for such services, plus reasonable expenses as described in Attachment D to the Master Tax Advisory Agreement.  E&Y's current hourly rates for the Bankruptcy Tax Services and Other Tax Advisory Services are currently as follows:

| Level | Hourly Rate |
|---|---|
| Partner/Principal/Executive Director | $ 650 - $750 |
| Senior Manager | $ 550 – 650 |
| Manager | $ 500 – 600 |
| Senior | $ 400 – 500 |
| Staff | $ 200 - 300 |

32.    E&Y's hourly rates are revised periodically in the ordinary course of E&Y's business.  E&Y's hourly rates for the Additional Accounting Advisory Services will be adjusted on January 1st annually, beginning January 1, 2007.  E&Y's hourly rates for the Bankruptcy Tax Services and Other Tax Advisory Services will be adjusted on July 1st, annually, beginning July 1, 2007.  E&Y will advise the Debtors, the Office of the United States Trustee, the Creditors' Committee, and any other party as directed by this Court of its new rates once they are established if a rate change is effective during the course of this engagement.

33.    E&Y will request reimbursement of E&Y's actual expenses related to the services provided under the Engagement Letters as well as fees for any time E&Y may spend in considering or responding to discovery requests or participating as a witness in any legal regulatory, or other proceeding before this Court or the United States District Court for the

16

Southern District of New York (the "District Court") and any relevant administrative orders as a result of E&Y's performance of services under the Engagement Letters, including any time or reasonable expenses of outside counsel retained by E&Y in respect of any of the foregoing.[5]

34.    E&Y intends to invoice the Debtors on a monthly basis for Additional Accounting Advisory Services, Bankruptcy Tax Services, and Other Tax Advisory Services.

35.    E&Y will apply to this Court for compensation and reimbursement of expenses in accordance with section 330(a) of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"), the guidelines established by the Office of the United States Trustee, the Order Under 11 U.S.C. § 331 Establishing Procedures For Interim Compensation And Reimbursement Of Expenses Of Professionals, and any other applicable orders of this Court. E&Y acknowledges that all compensation will be subject to this Court's review and approval after notice and a hearing.

36.    The Debtors believe that E&Y's fees are fair and reasonable in light of industry practice, market rates both inside and outside of chapter 11 cases, E&Y's experience in reorganizations, and E&Y's importance to these cases.

<u>Dispute Resolution</u>

37.    Pursuant to the Engagement Letters, the Debtors and E&Y have agreed that any controversy or claim with respect to, in connection with, arising out of, or in any way related to the Engagement Letters or the services provided thereunder (including any such matter

---

[5]    E&Y acknowledges that in the event it seeks reimbursement for outside counsel pursuant to this paragraph, such attorney's time records and invoices have to be included in E&Y's own fee applications. Additionally, such attorney's time records and invoices will be subject to the Office of the United States Trustee's guidelines for compensation and reimbursement of expenses and approval of this Court under the standards of sections 330 and 331 of the Bankruptcy Code and without regard to whether such attorneys' services satisfy section 330(a)(3)(C) of the Bankruptcy Code.

involving a parent, subsidiary, affiliate, successor-in-interest, or agent of the Debtors or E&Y) will be brought in this Court, or in the District Court if such District Court withdraws the reference, and the Debtors and E&Y, and any and all successors and assigns thereof, consent to the jurisdiction and venue of such court as the sole and exclusive forum (unless such court does not have jurisdiction and venue of such claims or controversies) for the resolution of such claims, causes of action, or lawsuits.  The Debtors and E&Y, and any and all successors and assigns thereof, have also agreed to waive trial by jury in any controversy or claim.  If this Court, or the District Court upon withdrawal of the reference, does not have or retain jurisdiction over the foregoing claims or controversies, the Debtors and E&Y, and any and all successors and assigns thereof, have agreed to submit first to non-binding mediation and, if mediation is not successful, then to binding arbitration in Detroit, Michigan.

38.    The Audit Engagement Letter provides further that notwithstanding the dispute resolution procedures described above, the Debtors or E&Y may seek injunctive relief to enforce its rights with respect to the use or protection of (a) its confidential or proprietary information or material, (b) its names, trademarks, service marks, or logos, and (c) the enforcement of the notice provisions set forth in the Audit Engagement Letter.

Termination

39.    Under the Engagement Letters the Debtors or E&Y may terminate the engagements thereunder at any time, provided, however, that under the Audit Engagement Letter the terminating party will notify the other and will provide this Court, the Office of the United States Trustee, the Creditors' Committee and any other party as directed by this Court  with three business days' notice of termination.  In any event E&Y's engagement will terminate upon the earlier of the completion of the services to be rendered by E&Y under the Engagement Letters or

the effective date of the Debtors' confirmed plan of reorganization, or liquidation of the Debtors' assets under chapter 11 or 7 of the Bankruptcy Code, or otherwise.  The  provisions of the Audit Engagement Letter relating to fees and expenses and alternative dispute resolution and the provisions of the Master Tax Advisory Agreement relating to indemnification, limitation of liability, fees and expenses, and alternative dispute resolution will remain operative and in full force and effect regardless of any termination or expiration of such engagement and will survive completion of the Debtors' bankruptcy

## Conclusion

40.    For the foregoing reasons, the Debtors submit that the relief requested herein is in the best interests of the Debtors and their estates and creditors and should be approved.

## Notice

41.    Notice of this Application has been provided in accordance with the Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing (I) Omnibus Hearing Dates, (II) Certain Notice, Case Management, And Administrative Procedures, And (III) Scheduling An Initial Case Conference In Accordance With Local Bankr. R. 1007-2(e) entered by this Court on October 14, 2005 (Docket No. 245).  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

## Memorandum Of Law

42.    Because the legal points and authorities upon which this Application relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order (a) authorizing the Debtors to employ and retain E&Y as independent auditors, accountants, and tax advisors pursuant to the terms and conditions set forth in the Engagement Letters, effective <u>nunc pro tunc</u> to January 1, 2006, and (b) granting such other and further relief as is just.

Dated:        New York, New York
              March 17, 2006

                              DELPHI CORPORATION, on behalf of itself and
                              certain of its subsidiaries and affiliates, as Debtors
                              and Debtors-in-Possession

                              By:   /s/ John D. Sheehan
                                    Name: John D. Sheehan
                                    Title: Vice President and Chief Restructuring
                                           Officer

**Exhibit 1**

**ΞIJ ERNST & YOUNG**

■ Ernst & Young LLP          ■ Phone: (248) 457-3800
Global Automotive Center       www.ey.com
Suite 1200
101 West Big Beaver Road
Troy, Michigan 48084

January 5, 2006

Mr. Robert H. Brust, Chairman
The Audit Committee of Delphi Corporation
5725 Delphi Drive
Troy, MI 48098

Mr. Robert J. Dellinger, Executive Vice President, Chief Financial Officer
Delphi Corporation
5725 Delphi Drive
Troy, MI 48098

Dear Messrs. Brust and Dellinger:

This letter agreement (the "Agreement") sets forth the terms and conditions of the engagement of
Ernst & Young LLP ("Ernst & Young" or "E&Y") by Delphi Corporation and its affiliates (the
"Company," "Delphi" or "Debtor") to perform audit services and, on request of the Company, to
provide related accounting advisory and research services subsequent to the Company's filing of
a Chapter 11 petition in the United States Bankruptcy Court for the Southern District of New
York (the "Bankruptcy Court").

We have agreed to provide such services, contingent upon the Bankruptcy Court approving our
retention in accordance with the terms and conditions which are set forth in this Agreement.

1. This will confirm the engagement of Ernst & Young by Delphi Corporation as approved by
   the Audit Committee to perform an audit of the Company's consolidated financial statements
   and its internal control over financial reporting (referred to hereinafter as the "integrated
   audit"). As part of the integrated audit, we will audit and report on the consolidated financial
   statements of the Company for the year ending December 31, 2006 (the "audit of the
   financial statements"). We also will audit and report on management's assessment of the
   effectiveness of internal control over financial reporting and on the effectiveness of internal
   control over financial reporting as of December 31, 2006 (the "audit of internal control"). In
   addition, we will review the Company's unaudited interim financial information before the
   Company files its Form 10-Q. All of the services described in this paragraph may hereafter be
   referred to as either "Audit Service" or "Audit Services."

2. In addition, as and when requested by the Company from time to time during the term hereof,
   we will   provide accounting advisory and research services in connection with various
   accounting matters, including consultations required for significant proposed or executed
   transactions; continuing education support; assistance with and review of registration
   statements, comfort letters and consents; information technology internal controls; and
   services related to mergers, acquisitions, and divestitures, which such services may include

January 5, 2006

carve-out audits of one or more business units and which may, with Delphi's consent, be provided by one of our Ernst & Young Global Limited member firms. Additionally, as and when requested by the Company, we may (or with Delphi's consent one of our Ernst & Young Global Limited member firms may) perform additional audit procedures with respect to any financial statements of a consolidated or non-consolidated affiliate of Delphi which are required to be filed with Delphi's annual report on Form 10-K pursuant to Article 3-09 of Regulation S-X of the Securities and Exchange Act of 1934, as amended, or otherwise. We will also provide services to audit the accounts, transactions and disclosures associated with the Company operating under Chapter 11 of the Bankruptcy Code. All of the services described in this paragraph may hereafter be referred to as "Additional Accounting Advisory Services."

## Audit Services-Integrated Audit Responsibilities and Limitations

3. The objective of our audit of the consolidated financial statements is to express an opinion on whether the consolidated financial statements are presented fairly, in all material respects, in conformity with U.S. generally accepted accounting principles. The objectives of our audit of internal control are to express an opinion on (1) whether management's assessment of the effectiveness of internal control over financial reporting is fairly stated, in all material respects, based on suitable control criteria, and (2) the effectiveness of internal control over financial reporting. Should conditions not now anticipated preclude us from completing either our audit of the financial statements or our audit of internal control and issuing our reports thereon, we will advise the Audit Committee and management promptly and take such action as we deem appropriate.

4. We will conduct our integrated audit in accordance with the standards of the Public Company Accounting Oversight Board ("the PCAOB"). Those standards require that we obtain reasonable, rather than absolute, assurance that the consolidated financial statements are free of material misstatement, whether caused by error or fraud, and that the Company maintained, in all material respects, effective internal control over financial reporting as of the date specified in management's assessment. As the Company is aware, there are inherent limitations in the audit process, including, for example, selective testing and the possibility that collusion or forgery may preclude the detection of material error, fraud, and illegal acts. Accordingly, there is some risk that a material misstatement of the financial statements or a material weakness in internal control over financial reporting would remain undetected. Also, an audit of the financial statements is not designed to detect error or fraud that is immaterial to the consolidated financial statements. Similarly, an audit of internal control is not designed to detect deficiencies in internal control over financial reporting that, individually or in combination, are less severe than a material weakness.

5. We will consider the Company's internal control over financial reporting in determining the nature, timing, and extent of our audit procedures for the purpose of expressing our opinion on: (1) the consolidated financial statements; (2) management's assessment of the effectiveness of internal controls over financial reporting, and; (3) the effectiveness of internal

January 5, 2006

controls over financial reporting. Our report on item (2) above relates to whether management's assessment process, including documentation, provides a reasonable basis for its assessment. Our report on item (3) above relates to the effectiveness of the entity's internal controls over financial reporting taken as a whole, and not to the effectiveness of each individual internal control component.

6. In accordance with the standards of the PCAOB, we will communicate certain matters related to the conduct and results of the audit to the Audit Committee. Such matters include, when applicable, disagreements with management, whether or not resolved; serious difficulties encountered in performing the audit; our level of responsibility under PCAOB auditing standards for the financial statements, for internal control, and for other information in documents containing the audited financial statements; unadjusted audit differences that were determined by management to be immaterial, both individually and in the aggregate, to the financial statements as a whole; changes in the Company's significant accounting policies and methods for accounting for significant unusual transactions or for controversial or emerging areas; our judgments about the quality of the Company's accounting principles; our basis for conclusions as to sensitive accounting estimates; management's consultations, if any, with other accountants; and major issues discussed with management prior to our retention.

7. In accordance with the rules of the Securities and Exchange Commission (SEC) implementing the requirements of Section 204 of the Sarbanes-Oxley Act of 2002, we will communicate to the Audit Committee all critical accounting policies and practices used by the Company, and all alternative treatments within generally accepted accounting principles for policies and practices related to material items that have been discussed with management, including ramifications of the use of such alternative disclosures and treatments along with the treatment preferred by us. We also will advise the Audit Committee of other material written communications between management and us.

8. We will obtain pre-approval to be confirmed in writing from the Audit Committee for any services we are to provide to the Company pursuant to the Audit Committee's pre-approval process, policies, and procedures. We also will communicate annually with the Audit Committee on independence matters as required by the independence standards of the PCAOB. We will promptly inform the Chair of the Audit Committee and management if the Audit Services are selected for inspection by the PCAOB and also will promptly communicate any information of which we become aware as a result of such inspection that has a material effect on the financial statements previously reported on by us or that could result in a significant modification to an audit report previously issued by us. Upon your request, we will promptly provide the Audit Committee and the Company with a copy of any publicly available inspection reports on E&Y issued by the PCAOB, but we will not provide any confidential inspection reports issued by the PCAOB to E&Y, the confidentiality of which is provided for in the Sarbanes-Oxley Act of 2002 and the PCAOB's inspection rules.

January 5, 2006

9.  If we determine that there is evidence that fraud or possible illegal acts may have occurred, we
    will promptly bring such matters to the attention of an appropriate level of management and
    confirm such evidence to the General Counsel in writing within five business days. If we
    become aware of fraud involving senior management or fraud (whether by senior management
    or other employees) that causes a material misstatement of the consolidated financial
    statements, we will promptly report this matter directly to the Audit Committee and confirm
    such representation to the Chair of the Audit Committee in writing. We will determine that the
    Audit Committee is adequately informed of possible illegal acts that come to our attention
    unless they are clearly inconsequential. In addition, we will promptly inform the Audit
    Committee and appropriate members of management of significant audit adjustments noted
    during our audit procedures and confirm such representations in writing to the Chair of the
    Audit Committee and the General Counsel within five business days.

10. We will communicate in writing to management and the Audit Committee all significant
    deficiencies and material weaknesses in internal control over financial reporting that we
    identify during the course of our integrated audit. The identification of a material weakness
    may cause us to express an adverse opinion on the effectiveness of the Company's internal
    control over financial reporting. We also will communicate to management in writing all
    internal control deficiencies (that is, those deficiencies in internal control over financial
    reporting that are of a lesser magnitude than significant deficiencies) identified during the
    integrated audit and not previously communicated by us or by others. We also will promptly
    communicate in writing to the Board of Directors the existence of any significant deficiency or
    material -weakness- as- a -result· -of- ineffeetive -oversight -by -the -Audit · Committee -of -the
    Company's external financial reporting and internal control over financial reporting.

### *Audit Services-Reviews of Unaudited Interim Financial Information*

11. Our review of the Company's unaudited interim financial information will be performed in
    accordance with relevant PCAOB auditing standards.

12. A review of interim financial information consists principally of performing analytical
    procedures and making inquiries of management responsible for financial and accounting
    matters. It involves a review of the condensed consolidated financial information included in
    the filing on Form 10-Q and does not include any earlier earnings releases or other such
    communications. A review is substantially less in scope than an audit conducted in accordance
    with the standards of the PCAOB, the objective of which is the expression of an opinion
    regarding the financial statements taken as a whole. Accordingly, we will not express an
    opinion on the interim financial information.

13. A review includes obtaining sufficient knowledge of the entity's business and its internal
    control as it relates to the preparation of both annual and interim financial information to:
    identify the types of potential material misstatements in the interim financial information and
    consider the likelihood of their occurrence; and select the inquiries and analytical procedures

January 5, 2006

that will provide us with a basis for communicating whether we are aware of any material modifications that should be made to the interim financial information for it to conform with generally accepted accounting principles.

14. A review is not designed to provide assurance on internal control or to identify reportable conditions. However, we will communicate to the Audit Committee any significant deficiencies noted during our review procedures.

15. If, during our review procedures, we determine that there is evidence that fraud or possible illegal acts may have occurred, we will promptly bring such matters to the attention of the appropriate level of management and confirm such representations in writing within five business days. If we become aware of fraud involving senior management or fraud (whether caused by senior management or other employees) that causes a material misstatement of the interim financial information, we will promptly report this matter directly to the Audit Committee and confirm such representation to the Chair of the Audit Committee in writing within five business days. We will determine that the Audit Committee is adequately informed of possible illegal acts that come to our attention unless they are clearly inconsequential. We also will inform the Audit Committee and appropriate members of management of significant unadjusted differences noted during our review procedures.

## Audit Services-Management's Responsibilities and Representations

16. The consolidated financial statements, unaudited interim financial information, and management's assessment of the effectiveness of internal control over financial reporting are the responsibility of the Company's management. Management is responsible for establishing and maintaining effective internal control over financial reporting, for properly recording transactions in the accounting records, for safeguarding assets, and for the overall fair presentation of the consolidated financial statements and unaudited interim financial information. Management of the Company also is responsible for identifying and ensuring that the Company complies with the laws and regulations applicable to its activities.

17. Management is responsible for adjusting the consolidated financial statements and unaudited interim financial information to correct material misstatements and for affirming to us in its representation letter that the effects of any unadjusted differences accumulated by us during the applicable Audit Service and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the consolidated financial statements and unaudited interim financial information taken as a whole.

18. Management is responsible for apprising us of all allegations involving financial improprieties received by management or the Audit Committee (regardless of the source or form and including, without limitation, allegations by "whistle-blowers"), and providing us full access to these allegations and any results of internal investigations of them, on a timely basis, subject to the limitations set forth below regarding the Company's right to limit information based on

January 5, 2006

claims of attorney/client privilege, work product doctrine, or otherwise. Allegations of financial improprieties include allegations of manipulation of financial results by management or employees, misappropriation of assets by management or employees, intentional circumvention of internal controls, inappropriate influence on related party transactions by related parties, intentionally misleading the auditors, or other allegations of illegal acts or fraud that could result in a misstatement of the financial statements or otherwise affect the financial reporting of the Company. If the Company limits the information otherwise available to us under this paragraph (based on the Company's claims of attorney/client privilege, work product doctrine, or otherwise), the Company will promptly inform us of the fact that certain information is being withheld from us. Any such withholding of information could be considered a restriction on the scope of our Audit Services and may prevent us from opining on the Company's financial statements or internal control over financial reporting; alter the form of report we may issue on such financial statements or internal control over financial reporting; prevent us from consenting to the inclusion of previously issued auditor's reports in future Company filings; or otherwise affect our ability to continue as the Company's independent registered public accounting firm. The Company and we will disclose any such withholding of information to the Audit Committee and we and the Company will work together in good faith to consider appropriate procedures to safeguard the Company's attorney/client privilege or work product doctrine while at the same time providing us with sufficient access to factual information we require to complete our Audit Services and thus avoid to the extent possible a change or restriction on the scope of our Audit Services or us being prevented from delivering the related opinions.

19. Management is responsible for evaluating the effectiveness of the Company's internal control over financial reporting using suitable control criteria and for supporting its assessment with sufficient evidence, including documentation. Management also is responsible for presenting a written assessment of the effectiveness of the Company's internal control over financial reporting as of the end of the Company's most recent fiscal year. In connection with its assessment of internal control over financial reporting, management will affirm to us in its representation letter that it has: (1) disclosed to us all significant deficiencies in the design or operation of internal control over financial reporting, and (2) identified those that it believes to be material weaknesses.

20. As required by PCAOB auditing standards, we will make specific inquiries of management about the representations contained in the consolidated financial statements and unaudited interim financial information and management's assessment of the effectiveness of internal control over financial reporting. Those standards also require that, at the conclusion of the applicable Audit Service, we obtain representation letters from certain members of management about these matters. The responses to those inquiries, the written representations, and the results of our procedures comprise the evidential matter we will rely upon in completing the applicable Audit Service. Management is responsible for providing us with all financial records and related information and making available to us all internal control documentation and records necessary to complete our Audit Services on a timely basis.

January 5, 2006

Management's failure to do so may cause us to delay our report, as applicable, modify our
procedures, or even terminate our engagement.

21. Management agrees to cause all of the Company's foreign subsidiaries and affiliates included
in the Company's consolidated financial statements ("Companies Entities"), to provide any
authorization, to the fullest extent permissible under applicable law, necessary to permit
compliance with requests by the SEC or the PCAOB for production of documents or
information in a foreign public accounting firm's, associated person's or E&Y's possession,
custody or control that was obtained in the conduct of audit services by such firm or person.
In addition, the Company hereby waives, to the fullest extent permissible under applicable law,
the rights provided under any laws, regulations, professional standards, or other provisions
that might restrict the ability of any foreign public accounting firm, any associated person, or
E&Y, to comply with requests by the SEC or the PCAOB for production of documents or
information in such foreign public accounting firm's, associated person's or E&Y's
possession, custody or control that was obtained in the conduct of audit services by such
foreign firm or person, and consents, to the fullest extent permissible under applicable law, to
action taken in furtherance of the foregoing by any foreign public accounting firm, associated
person or E&Y. Notwithstanding the foregoing, (i) management is not obligated to cause the
Company or any of the Company Entities to obtain any authorization or consent from
individuals under applicable data protection laws and nothing contained herein or in any such
agreement shall be construed as a waiver by the Company or any of the Company Entities of
any right to assert a claim of attorney/client privilege, or auditor/client privilege, provided that
~~the right to assert auditor/client privilege is preserved solely to preserve any related claim of~~
attorney/client privilege, and (ii) E&Y agrees that the notice and review provisions of
paragraph 18 shall apply to any request, subpoena or order delivered to E&Y, any public
accounting firm or associated person.

The parties hereto recognize that E&Y and/or any foreign public accounting firm and any
associated person may obtain documents and copies of documents and other information
during the conduct of audit services for the Company and any Company Entity that contain
legally privileged, business confidential, trade secret, other confidential, proprietary and
competitively sensitive information, or the Company or Company Entity's books and records.
In the event that a request, subpoena or order is delivered to E&Y, any foreign public
accounting firm or associated person by the SEC, the PCAOB, the United States or any
foreign government, a non-government third party seeking access to or copies of documents
or any other information of a Company Entity that may be in the possession of E&Y, any
foreign public accounting firm or associated person, whether for the purpose of a review by
the PCAOB or any other requesting party, or in connection with an informal or formal
investigation of a Company Entity, E&Y, to the fullest extent permitted by the applicable
regulatory or professional body or under applicable law, shall:

    (i)     promptly provide both Delphi's Vice President, General Counsel and its Chief
            Accounting Officer, Controller with written notice of such request, subpoena or

January 5, 2006

order, together with a copy thereof by facsimile and Federal Express (or similar overnight courier) as follows:

Delphi Vice President,                Delphi Chief Accounting Officer,
General Counsel                          Controller
5725 Delphi Drive                        5725 Delphi Drive
M/C 483-400-603                          M/C 483-400-626
Troy, MI 48098                           Troy, MI 48098
Facsimile: 248-813-2491                  Facsimile: 248-813-2590

(ii)    promptly, after receiving such request, subpoena or order, and (subject to clause (iv) below) prior to responding to any such request, subpoena or order by means of the production of any non-public documents in the possession of E&Y or such foreign public accounting firm or associated person, either prepared by a Company Entity or which were obtained by E&Y or such foreign public accounting firm or associated person from any Company Entity (in each case a "Delphi Document"), provide the Company the opportunity to read all Delphi Documents within the scope of such request;

(iii)   subject to clause (iv) below, prior to responding to any such request, subpoena or order by means of the production of any non-public Delphi Documents, (A) provide reasonable cooperation to the Company in connection with any efforts the Company may wish to make in presenting to the SEC, the PCAOB, any relevant court, or other government agency, attorney or other authority, any reasonable objection they may have to the granting of access to or production of any such documents and information, and (B) provide reasonable cooperation to the Company in connection with the Company's efforts to seek any reasonable protective order, delay in production (including reasonable efforts by E&Y to pursue any extension of time requested by the Company for compliance with any government request based on the applicable circumstances) or other reasonable agreement requested by them in relation to such documents and information so as to permit the Company to avoid any loss of privilege or confidentiality with respect to the content of any such documents, and to comply with any confidentiality obligations it may have to third parties prior to granting access to or delivery of such documents or information, and (C) not produce or grant third party access to such documents until the Company, based on applicable circumstances, has had an opportunity to seek assurances regarding the confidentiality of such information sought by the SEC, the PCAOB, or other relevant court, government agency, attorney or other authority; and

(iv)    nothing in this Agreement shall require E&Y or any foreign public accounting firm or associated person to violate any legal or regulatory requirement.

January 5, 2006

22. Kevin Asher will be the Coordinating Partner and Steve Sheckell and Jeff Henning will be the Engagement Partners, responsible for the provision of our accounting and auditing services. Mike Hatzfeld, Jamie Simpson, and Aaron Krabill, Senior Managers, will work closely with management in performing all required accounting and audit services.       If one or more of these individuals ceases to provide services pursuant to this agreement, Ernst & Young will so advise the Company and, if that professional is replaced, provide the Company with the name of that professional's replacement. Other staff, not identified herein, may be utilized as required to conduct our work in most efficient manner. Key personnel would be replaced by like skills and competency where appropriate.       Delphi has the right to approve the replacement of any key partner or senior manager, not to be unreasonably withheld.

23. We will perform the Audit Services described herein for each of the Company's subsequent fiscal years based on the terms and conditions set forth in this agreement until either the Audit Committee or E&Y terminates the agreement. Changes in the scope of our Audit Services and estimated fees for such services in subsequent fiscal years will be communicated in supplemental letters.

### Fees and Billings

#### Fees and Billings for Audit Services

24. We estimate that our U.S. fee for Audit Services will be $7,500,000, plus expenses.

We will submit our invoices following the below schedule, and payment of them will be made in accordance with the Interim Compensation Order (as defined below).

| March 2006 | $3,000,000 |
| August 2006 | 3,000,000 |
| January 2007 | 1,500,000 |

25. All payments made pursuant to paragraphs 24, 25, 26, 27 and 28 must be made in conformity with the orders from the Bankruptcy Court including the order under 11 U.S.C Section 331 establishing procedures for interim compensation and reimbursement of expenses of professionals (the "Interim Compensation Order") (Docket No. 869). E&Y will timely file the appropriate interim and final applications for allowance of compensation and reimbursement of expenses pursuant to the Interim Compensation Order. In addition, the Company shall reimburse us for direct expenses incurred in connection with the performance of the Audit Services, subject to the provisions of paragraph 27 and the Interim Compensation Order. Direct expenses include reasonable and customary out-of-pocket expenses such as travel, meals, accommodations and other expenses specifically related to this engagement. E&Y may receive rebates in connection with certain purchases, which are used to reduce overhead charges that E&Y would otherwise pass on to its clients. Our estimated fees and schedule of performance are based upon, among other things, our preliminary review of the Company's records and the representations Company personnel have made to us, the Company's documentation of internal control over financial reporting, the procedures the Company

January 5, 2006

performs to support management's assessment of the effectiveness of internal control over financial reporting, and the results of our audit procedures. Our fee estimate does not include any fees associated with Additional Accounting Advisory Services. (See paragraphs 26 through 28 below). Our fee and schedule of performance also are dependent upon the Company's personnel providing a reasonable level of assistance during our integrated audit. Should our assumptions with respect to these matters be incorrect or should the documentation of internal control, results of our procedures, condition of the records, degree of cooperation, extent of procedures performed by the Company to support management's assessment, extent of remediation testing related to ineffective internal controls or other matters beyond our reasonable control require additional commitments by us beyond those upon which our estimated fees are based, we will bill for this time at the rates and in the manner set forth below with respect to the Additional Accounting Advisory Services.

## *Fees and Billings for Additional Accounting Advisory Services*

26. Fees for the Additional Accounting Advisory Services will be billed as follows:

    a. Projects will be billed at hourly rates as scheduled in the attached document in Exhibit A.

    b. The rate in Exhibit A will be adjusted on January 1st, annually, beginning January 1, 2007, based on our revised standard rates.

    c. We will submit monthly invoices and detailed billing schedules by individual and topic at hourly rates as scheduled in the attached document.

    d. In addition, the Company shall reimburse us for direct expenses incurred in connection with the performance of the Additional Accounting Advisory Services. Direct expenses include reasonable and customary out-of-pocket expenses such as travel, meals, accommodations and other expenses specifically related to this engagement. E&Y may receive rebates in connection with certain purchases, which are used to reduce overhead charges that E&Y would otherwise pass on to its clients.

27. We will request payment of our fees for Audit Services and Additional Accounting Advisory Services in accordance with local bankruptcy rules for the Southern District of New York, orders from the Bankruptcy Court including the Interim Compensation Order (Docket No. 869), and any relevant administrative orders. In addition, we will request reimbursement of our actual expenses related to this engagement, as well as fees for any time (including any time or reasonable expenses of outside legal counsel), subject to prior approval by the Company, which approval shall not unreasonably be withheld, we may incur in considering or responding to discovery requests or participating as a witness in any legal regulatory, or other proceeding before the Southern District of New York and any relevant administrative orders as a result of our performance of these services. Delphi's Billing Procedures for outside counsel (Exhibit B) shall control the expenses for which Delphi will be responsible.

January 5, 2006

28. In the event we are requested or authorized by the Company or are required by government regulation, subpoena, or other legal process (but otherwise than in conjunction with the PCAOB annual evaluation of our audits) to produce our documents or our personnel as witnesses with respect to our engagements for the Company, the Company will, so long as we are not a party to the proceeding in which the information is sought, reimburse us for our reasonable professional expenses, as well as the fees and expenses of our outside counsel, incurred in responding to such requests as set forth in paragraph 27, above.

### Other Matters

29. The Company shall not, during the term of the Agreement and for 12 months following its termination for any reason, solicit for employment, or hire, any E&Y personnel involved in the performance of the Audit Services, except as otherwise agreed in writing by E&Y; provided that the Company shall not breach its obligation hereunder by generally advertising available positions or hiring E&Y personnel who either respond to such advertisements or come to the Company on their own initiative without direct or indirect encouragement from the Company.

30. In addition, the Company shall not, without the prior written consent of E&Y, solicit for employment or for a position on its Board of Directors, or hire, any current or former partner or professional employee of E&Y, any affiliate thereof, or any other member of the global Ernst & Young network or any of their respective affiliates, if such partner or professional employee has been involved in the performance of any audit, review, or attest service for or relating to the Company at any time since the date of filing of the Company's most recent periodic annual report with the SEC (or, if the Company has not previously filed such a report, since the beginning of the most recent fiscal year to be covered by the Company's first such report) or in the 12 months preceding that date.

31. By your signature below, you confirm that the Company, through its Board of Directors, has authorized the Audit Committee to enter into this agreement with us on the Company's behalf and that you have been expressly authorized by the Audit Committee to execute this agreement.

32. Any controversy or claim with respect to, in connection with arising out of, or in any way related to this Agreement or the Services provided hereunder (including any such matter involving any parent, subsidiary, affiliate, successor in interest or agent of the Company or of E & Y) shall be brought in the Bankruptcy Court, or the District Court if such District Court withdraws the reference and the parties to this Agreement, and any and all successors and assigns thereof, consent to the jurisdiction and venue of such court as the sole exclusive forum (unless such court does not have jurisdiction and venue of such claims or controversies) for the resolution of such claims, causes of action or lawsuits. The parties to this Agreement, and any and all successors and assigns thereof, hereby waive trial by jury, such waiver being informed and freely made. If the Bankruptcy Court, or the District Court upon withdrawal of the reference does not have or retain jurisdiction over the foregoing claims or controversies,

January 5, 2006

the parties to this Agreement and any and all successors and assigns thereof, agree to submit first to non-binding mediation; and, if mediation is not successful, then to binding arbitration in Detroit, Michigan, in accordance with the dispute resolution procedures set forth in Exhibit C to this Agreement. Judgment on any arbitration award may be entered in any court having proper jurisdiction. The foregoing is binding upon the Company, E & Y and any all successors and assigns thereof. Notwithstanding the agreement to such procedures, either party may seek injunctive relief to enforce its rights with respect to the use or protection of (i) its confidential or proprietary information or material, (ii) its names, trademarks, service marks or logos and (iii) the enforcement of the notice provisions set forth in this Agreement.

33. The benefits of this Agreement shall inure to the respective successors and assigns of the parties hereto and the obligations and liabilities assumed in this Agreement by the parties hereto shall be binding upon their respective successors and assigns.

34. As set forth herein, the Company has requested that Ernst & Young provide audit and accounting services, the scope of which is set forth in the Agreement. The Company recognizes and acknowledges that by performing the services set forth in the Agreement, Ernst & Young is not acting in any Company management capacity and that the Company has not asked Ernst & Young to make, nor has Ernst & Young agreed to make, any business decisions on behalf of the Company. All decisions about the business or operations of the Company remain the sole responsibility of the Company's management and its board of directors.

35. If any portion of this agreement is held to be void, invalid, or otherwise unenforceable, in whole or part, the remaining portions of this agreement shall remain in effect. This agreement shall be governed by, and construed in accordance with, the laws of the State of Michigan applicable to agreements made and fully to be performed therein by residents thereof.

36. This Agreement may be terminated at any time by the Company or E&Y, but in any event this Agreement will expire upon the earlier of (i) completion of the Services or (ii) the effective date of the Company's confirmed plan of reorganization, or liquidation of the Company's assets under Chapter 11 or 7 of Title 11 of the United States Code, or otherwise. If either party terminates this Agreement, in addition to notice to the other party, the terminating party shall provide not less than three (3) days' prior written notice to the Bankruptcy Court, the U.S. Trustee's office, the Creditor's Committee and the Fee Review Committee (if any). The provisions of this Agreement relating to fees and expenses and alternative dispute resolution will remain operative and in full force and effect regardless of any termination or expiration of this Agreement and shall survive completion of the Company's bankruptcy whether through a confirmed plan of reorganization, liquidation of the Company's assets under Chapter 11 or 7 of Title 11 of the United States Code, or otherwise. If any portion of this Agreement is held to be void, invalid, or otherwise unenforceable, in whole or in part, the remaining portions of this Agreement shall remain in full force and effect. By agreement to the provision of the Services set forth in the Agreement, E&Y is not providing a guarantee to the Company that E & Y's performance of those services pursuant to the terms and conditions set forth in the Agreement

January 5, 2006

will guarantee the Company's successful reorganization under Chapter 11 of Title 11 of the United States Code.

37. E&Y may subcontract a portion of its responsibilities under this Agreement without Company's prior written approval to any affiliate of E&Y, any other member of the global E&Y network or any of their respective affiliates (collectively, the "E&Y Entities," and any of them, and "E&Y Entity"); provided, however, that E&Y shall be and shall remain fully and solely responsible for all of the liabilities and obligations of E&Y under this Agreement, whether or not performed, in whole or part, by E&Y, or any subcontractor or personnel of any E&Y Entity.  The Company shall have no recourse, and shall bring no claim, against any E&Y Entity other than E&Y, or against any subcontractors, members, shareholder, directors, officers, managers, partners, agents, representatives or employees of any E&Y Entity (or any of their respective successors or permitted assigns,) or any of their respective assets, with respect to the Services or otherwise under this Agreement.

If these arrangements are acceptable, please sign one copy of this agreement and return it to us.

January 5, 2006

We very much appreciate the opportunity to serve as Delphi Corporation's independent registered public accounting firm and would be pleased to furnish any additional information you may request concerning our responsibilities and functions.

Yours very truly,

*Ernst + Young LLP*

AGREED TO AND ACCEPTED BY:
DELPHI CORPORATION

By:

Mr. Robert H. Brust
Chairman, The Audit Committee of Delphi
Corporation

Date:

By:

Mr. Robert J. Dellinger
Executive Vice President, Chief Financial
Officer

Date:

### Dispute Resolution Procedures

The following procedures shall be used to resolve any controversy or claim ("dispute") as provided in this Agreement, other than objections to fee applications relating to the subject retention. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

#### *Mediation*

A dispute shall be submitted to mediation by written notice to the other party or parties. The mediator shall be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by the CPR Institute for Dispute Resolution at the request of a party. Any mediator so designated must be acceptable to all parties.

The mediation shall be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with facilitation by the mediator, to reach an amicable resolution of the dispute.

The mediation shall be treated as a settlement discussion and therefore shall be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings.

Each party shall bear its own costs in the mediation. The fees and expenses of the mediator shall be shared equally by the parties.

#### *Arbitration*

If a dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute shall be settled by arbitration. The arbitration will be conducted in Detroit, Michigan in accordance with the procedures in this document and the Rules for Non-Administered Arbitration of the CPR Institute for Dispute Resolution ("Rules") as in effect on the date of the engagement letter, or such other rules and procedures as the parties may designate by mutual agreement. In the event of a conflict, the provisions of this document will control.

The arbitration will be conducted before a panel of three arbitrators, two of whom are to be designated by the parties from the CPR Panels of Distinguished Neutrals using the screened selection process provided in the Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator shall be appointed unless he or she has agreed in writing to abide and be bound by these procedures.

In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitration panel have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. Discovery shall be

permitted in connection with the arbitration only to the extent, if any, expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

The result of the arbitration will be binding on the parties, and judgment on the arbitration award may be entered in any court having jurisdiction.

# Exhibit A

**Review of Fee Arrangements-AABS**

**Delphi Corporation**

| Level | Rate 2006 |
| --- | --- |
| Client Service Associate | $ 75 - 125 |
| Staff | $ 125 - 200 |
| Senior | $ 220 - 375 |
| Manager | $ 300 - 470 |
| Senior Manager | $ 400 - 625 |
| Partner | $ 525 - 750 |

## INSTRUCTIONS FOR COMPLETING INVOICES

The attached invoice form should be submitted with all original invoices for services rendered in connection with all legal matters involving Delphi Automotive Systems and its U.S. subsidiaries submitted by law firms or consultants and experts providing legal-related services.

Please submit invoices monthly if the "Total Fees & Disbursements" exceed $500.00 per case or matter. Otherwise, submit invoices quarterly or annually. In the case of a flat fee or other special billing arrangement, submit invoices in accordance with that arrangement.

---

**CERTAIN BASIC INFORMATION IS REQUIRED TO PROCESS AN INVOICE. THE INVOICE CANNOT BE PROCESSED WITHOUT THIS INFORMATION:**

**Case Matter Name:** If you do not know the case/matter name, please contact the responsible Delphi Attorney or Legal Assistant.

**Case Matter No.:** If you do not know the case/matter number, please contact the responsible Delphi Attorney or Legal Assistant. Note that only one case/matter may be billed on an invoice.

**Firm Employer Identification Number:** Please include your firm's EIN on the invoice.

**Invoice No.:** Each invoice must be specifically identifiable by means of a unique Invoice Number. In other words, no two invoices should have the same Invoice Number. The Invoice Number should consist of no more than ten characters (numeric and/or alpha). Please do not reuse invoice numbers submitted to Delphi previously.

**Insurance No.:** Please include any insurance number on the invoice (Sedgwick for those matters covered by Delphi's insurance carrier or ESIS for those matters covered by GM's insurance carrier).

---

**Approval:** All invoices must be signed on behalf of the firm.

## ANALYSIS OF FEES FOR PERSONS PERFORMING SERVICES DURING THIS BILLING PERIOD

**Last Name, First Initial:** List only persons who performed services during the billing period covered by the invoice. Partial hours should be stated as a decimal fraction, i.e., 20 minutes = .33.

**This Bill:** Under the category "This Bill," please do not include any past due amount. Past due amounts should only be included in the "Cumulative Totals."

**Cumulative Totals:** Amounts for "This Bill" should be included in "Cumulative Totals." (The amounts shown under "This Bill" and "Cumulative Totals" should be the same on each line on the first billing for each case/matter using the new invoice format.)

## GENERALLY

Delphi will reimburse a firm for reasonable and actual out-of-pocket payments made to third-party vendors (i.e., Delphi will not pay for markups or surcharges added by the firm) for the following items:

- Air freight/express mail deliveries
- Bond fees and premiums
- Coach-class air fare (lowest available rate/class)
- Computerized Delphi database research
- Computerized legal research (e.g., Lexis, Westlaw)
- Court reporter fees
- Expert witness fees
- Filing fees
- Inside photocopy (up to 10 cents per page)
- Local business transportation (e.g., taxi fares)
- Long distance telephone charges (for voice, fax or data)
- Outside messenger services
- Outside photocopy, binding, and printing services
- Postage
- Travel (airfare, hotel, rental car)

Delphi will not pay for:

- Books/subscriptions
- Charges related to overall case management
- Creating, updating or organizing litigation or case files
- Distribution of documents, pleadings, correspondence and materials internally or to client
- Entertainment items (movies, books, alcohol, etc.)
- Fax communications (except long distance telephone charges)
- Hourly fees while traveling
- Inside photocopy (more than 10 cents per page)
- Internal case docketing activities
- Internal firm information technology charges
- LEXIS/NEXIS/Westlaw charges beyond the expenses actually incurred by the firm
- Local meals
- Local personal transportation (taxi/limousine to/from home)
- Local telephone charges
- Membership fees
- Office supplies
- Overtime charges
- Room service or excessive meal expenses
- Secretarial/clerical charges
- Storage charges
- Time spent copying documents or materials
- Transportation expenses or time spent traveling between firm offices
- Word processing

January 5, 2006

We very much appreciate the opportunity to serve as Delphi Corporation's independent registered public accounting firm and would be pleased to furnish any additional information you may request concerning our responsibilities and functions.

Yours very truly,

*Ernst + Young LLP*

AGREED TO AND ACCEPTED BY:
DELPHI CORPORATION

By: _____

Mr. Robert H. Brust
Chairman, The Audit Committee of Delphi
Corporation

Date: _____

By: _____

Mr. Robert J. Dellinger
Executive Vice President, Chief Financial
Officer

Date: _____

January 5, 2006

We very much appreciate the opportunity to serve as Delphi Corporation's independent registered public accounting firm and would be pleased to furnish any additional information you may request concerning our responsibilities and functions.

Yours very truly,

*Ernst + Young LLP*

AGREED TO AND ACCEPTED BY:
DELPHI CORPORATION

By:

Mr. Robert H. Brust
Chairman, The Audit Committee of Delphi
Corporation

Date:

By:

Mr. Robert J. Dellinger
Executive Vice President, Chief Financial
Officer

Date:

**Exhibit 2**

**ᴣᵢᵢ ERNST & YOUNG**

■ Ernst & Young LLP
Suite 1700
500 Woodward Avenue
Detroit, Michigan 48226-5195

■ Phone: (313) 628-7100
www.ey.com

March 16, 2006

Mr. James P. Whitson
Chief Tax Officer
Delphi Corporation
5725 Delphi Drive, MC 483.400.626
Troy, MI 48098-2815

**Master Tax Advisory Agreement**
**Between Delphi Corporation and Ernst & Young LLP**

Dear Jim:

This letter and accompanying Attachments A through D constitute a Master Tax Advisory
Agreement ("Agreement") between Delphi Corporation and its affiliates ("Company") and Ernst
& Young LLP ("E&Y") for the provision of tax consulting services subsequent to the Company
filing a Chapter 11 petition in October 2005 with the United States Bankruptcy Court for the
Southern District of New York (the "Bankruptcy Court").

We have agreed to provide such services contingent upon the Bankruptcy Court's approval of
our retention in accordance with the terms and conditions which are set forth in this Agreement.

**SCOPE OF SERVICES**

The Company shall, from time to time, identify tax services which the Company desires to be
performed by E&Y and will authorize the performance of such services on a project-by-project
basis (the "Services."). All such Services will be governed by all of the terms and conditions of
this Agreement, in the absence of any written agreement to the contrary, and will be described in
a separate Project Addendum for each project, the terms of which shall be agreed to by the
Company and E&Y and the cost of which shall be consistent with the rates provided on
Attachment A hereto. Each Project Addendum shall incorporate by reference, and shall be
deemed a part of, this Agreement. Project Addenda Nos. 1 and 2 are attached hereto and made
part hereof.

Except with respect to the rates set forth on Attachment A hereto, in the event of any
inconsistency between this Agreement and any Project Addendum, the terms of the Project
Addendum shall control.

A Member Practice of Ernst & Young Global

March 16, 2006
Page 2

Mr. James P. Whitson
Delphi Corporation

## FEES AND EXPENSES

Fees for tax consulting will be billed based on hours spent at agreed upon discounted hourly billing rates that will be updated annually on July 1. Current discounted hourly billing rates are included as Attachment A. The rates in Attachment A may be adjusted annually on July 1st, beginning July 1, 2007, based on our revised standard rates, upon the written approval of Delphi, or a written extension of this engagement letter.     In addition, the Company shall reimburse E&Y for direct expenses incurred in connection with the performance of the Services, in accordance with Attachment B, section 7, and Attachment D. E&Y may receive rebates in connection with certain purchases, which are used to reduce charges that E&Y would otherwise pass on to its clients.

E&Y acknowledges that payment of its fees and expenses hereunder is subject to (i) the jurisdiction and approval of the Bankruptcy Court under Sections 328(a), 330 and 331 of the Bankruptcy Code and any order of the Bankruptcy Court approving the retention of E&Y, (ii) any applicable fee and expense guidelines and/or orders, including the U.S. Trustee Guidelines, and (iii) any requirements governing interim and final fee applications.

We will request payment of our fees in accordance with local bankruptcy rules for the Southern District of New York and any relevant administrative orders.  In addition, we will request reimbursement of our actual expenses related to this Agreement, as well as fees for any time (including any time or reasonable expenses of legal counsel) we may incur in considering or responding to discovery requests or participating as a witness or otherwise in any legal regulatory, or other proceeding as a result of our performance of these Services, so long as we are not a subject of the investigation or proceeding in which the information is sought.

## OTHER MATTERS

None of the work that we will perform under this Agreement will constitute an attest engagement in accordance with generally accepted auditing standards. We assume no responsibility to keep the Company apprised of developments in the tax law relative to this engagement after it has been completed.

Our advice and Services are only applicable to the specific facts and circumstance presented to us.

In addition to members of our tax services team, others involved in serving you, such as senior members of the audit team, may participate in our provision of tax advice so that, among other things, they can provide relevant input into the process and the effects on financial statement treatment of the tax advice we provide may be considered on a timely basis.

March 16, 2006
Page 3

Mr. James P. Whitson
Delphi Corporation

Any controversy or claim with respect to, in connection with, arising out of, or in any way related to this Agreement or the Services provided hereunder (including any such matter involving any parent, subsidiary, affiliate, successor in interest or agent of the Company or of E&Y) shall be brought in the Bankruptcy Court or the District Court, if such District Court withdraws the reference, and the parties to this Agreement, and any and all successors and assigns thereof, consent to the jurisdiction and venue of such court as the sole exclusive forum (unless such court does not have jurisdiction and venue of such claims or controversies) for the resolution of such claims, causes of action or lawsuits. The parties to this Agreement, and any and all successors and assigns thereof, hereby waive trial by jury, such waiver being informed and freely made. If the Bankruptcy Court, or the District Court upon withdrawal of the reference, does not have or retain jurisdiction over the foregoing claims or controversies, the parties to this Agreement and any and all successors and assigns thereof, agree to submit first to nonbinding mediation; and, if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures set forth in Attachment C to this Agreement. Judgment on any arbitration award may be entered in any court having proper jurisdiction. Notwithstanding the agreement to such procedures, either party may seek injunctive relief to enforce its rights with respect to the use or protection of (i) its confidential or proprietary information or material, (ii) its names, trademarks, service marks or logos and (iii) the enforcement of the notice provisions set forth in this Agreement. The foregoing is binding upon the Company, E&Y and any all successors and assigns thereof.

## MISCELLANEOUS

The benefits of this Agreement shall inure to the respective successors and assigns of the parties hereto and the obligations and liabilities assumed in this Agreement by the parties hereto shall be binding upon their respective successors and assigns.

It is understood and agreed that E&Y will not agree to perform any tax advisory services that, in the sole opinion of E&Y, might impair its independence as auditors of the Company. The Company recognizes and acknowledges that by performing the Services set forth in the Agreement, E&Y is not acting in any Company management capacity and that the Company has not asked E&Y to make, nor has E&Y agreed to make, any business decisions on behalf of the Company. E&Y will not perform management functions or make management decisions on behalf of the Company. E&Y may provide advice and recommendations to assist management of the Company in performing its functions and making decisions, but all decisions about the business or operations of the Company remain the sole responsibility of the Company's management and its board of directors. The Company agrees to (a) make all management decisions and perform all management functions, including determining account codings and approving all proposed journal entries; (b) assign a competent employee to oversee the tax Services and evaluate the adequacy and results of the Services; (c) accept responsibility for the results of the Services; and (d) establish and maintain internal controls over the related Company processes. E&Y, in its sole professional judgment, reserves the right to refuse to do any procedures or take any action that could be construed as making management decisions or performing management functions, including determining accounting codings and approving journal entries.

**≡ll ERNST & YOUNG**                                ■ Ernst & Young LLP

                                                                    March 16, 2006
Mr. James P. Whitson                                                      Page 4
Delphi Corporation

By agreement to the provision of the Services set forth in the Agreement, E&Y is not providing a
guarantee to the Company that E&Y's performance of those Services pursuant to the terms and
conditions set forth in the Agreement will guarantee the Company's successful reorganization
under Chapter 11 of Title 11 of the United States Code.

No amendment, modification, waiver or discharge of this Agreement shall be valid unless in
writing and signed by an authorized representative of the party against whom such amendment,
modification, waiver or discharge is sought to be enforced. Except as expressly provided herein,
this Agreement does not modify the terms or provisions of any engagement letter or agreement
for other professional services executed prior to the date noted below.

If these arrangements are acceptable, please sign one copy of this Agreement and return it to Dan
Kelley.

If the Company has any questions concerning this Agreement, please call Dan Kelley, who will
be coordinating E&Y's tax services for the Company, at (313) 628-8929.

We very much appreciate the opportunity to perform tax services for the Company.

                                        Very truly yours,

                                        Ernst + Young LLP

**I hereby accept and agree to the Agreement stated above on behalf of Delphi Corporation.**

By: _____          _16 March 2006_
    James P. Whitson, Chief Tax Officer          Date

Attachments

March 16, 2006

Attachment A

Schedule of Hourly Rates for Tax Consulting Services  .

US Tax Consulting Rates

|                                       | Hourly Rates |
|---------------------------------------|--------------|
| Partner/Principal/Executive Director  | $650 - $750  |
| Sr. Manager                           | $550 – $650  |
| Manager                               | $500 – $600  |
| Senior                                | $400 – $500  |
| Staff                                 | $200 – $300  |

March 16, 2006

### Attachment B
### Revised Delphi/EY Previously Agreed to Terms and Conditions on file with Delphi General Auditor

GENERAL TERMS AND CONDITIONS

1.  Agreement.

It is agreed that Ernst & Young LLP ("E&Y") will provide the Services described in the accompanying letter to which this Exhibit B is attached (the letter, this Exhibit B and Exhibits A, C and D are collectively referred to as "the Master Tax Advisory Agreement" or this "Agreement"). For purposes of this Agreement, the terms "E&Y" include any affiliates of E&Y identified in the Agreement as performing any of the Services, and the term "Delphi" includes any subsidiaries and affiliates of Delphi for which the Services are performed.

2.  Conduct of E&Y Personnel.

E&Y will take all reasonable steps to assure that all of its partners, principals, directors, officers, employees, agents, subcontractors and/or independent contractors who are performing Services on behalf of E&Y (collectively, "E&Y Personnel") are competent to perform the Services. E&Y will require all E&Y Personnel who are performing any work on Delphi's premises to comply with all of Delphi's regulations and policies that have been provided to E&Y in writing. Delphi, in its sole discretion, has the right to: (a) bar any of E&Y Personnel from Delphi's premises for failure to observe Delphi's regulations or policies, (b) require that E&Y promptly remove from Delphi's premises any of E&Y Personnel who violate any of Delphi's regulations or policies, and (c) require that E&Y cease using any of E&Y Personnel to perform the Services who are reasonably unacceptable to Delphi. Delphi will confer with E&Y to discuss Delphi's concerns prior to requiring removal of any E&Y Personnel. E&Y will replace any barred or removed E&Y Personnel with E&Y Personnel reasonably acceptable to Delphi.

3.  Non-Solicitation of Personnel.

The Company shall not, during the term of this Agreement and for 12 months following its termination for any reason, solicit for employment, or hire, any E&Y personnel involved in the performance of the Services, except as otherwise agreed in writing by E&Y; provided that the Company shall not breach its obligation hereunder by generally advertising available positions or hiring E&Y personnel who either respond to such advertisements or come to the Company on their own initiative without direct or indirect encouragement from the Company. In addition, without the prior written consent of E&Y, the Company will not solicit for a position on its Board of Directors, nor hire, any current or former partner or professional employee of E&Y or any other E&Y Entity, if such solicitation, hiring or employment may impair the independence of E&Y under the Sarbanes-Oxley Act or under any other law, regulation, rule, listing requirement or professional standard governing the independence of accountants. Without limiting the foregoing, the Company agrees not to solicit, hire or employ, without the prior

March 16, 2006

written consent of E&Y, any current or former partner or professional employee of E&Y or any E&Y Entity: (a) in a financial reporting oversight role, if such partner or professional employee has been involved in the performance of more than ten (10) hours of (or, in the case of the lead and concurring partner, any) audit, review, or attest service for or relating to the Company since the date of filing of the Company's most recent periodic annual report with the SEC or during the one year period preceding that date; or (b) in an accounting role, unless such partner or professional employee does not influence E&Y's operations or financial policies and has no capital balances or other financial arrangements with E&Y; or (c) if such partner or employee has not been retired from E&Y in the 36 months preceding the date of this agreement and that person will become a member of the board of directors. In order to effectuate this provision, the Company agrees to give E&Y written notice prior to soliciting or hiring any such person in order to allow E&Y to assess and advise the Company whether, in E&Y's judgment, such solicitation or hiring may impair E&Y's independence under the Act or under any other law, regulation, rule, listing requirement or professional standard governing the independence of accountants. The Company shall not hire any such person in the event E&Y has advised the Company, within 30 days of receiving such notice, of its determination that independence may be impaired

4.    E&Y Personnel.

E&Y Personnel furnished by E&Y to perform the Services are and will remain E&Y's employees and/or independent contractors and, under no circumstances, will any E&Y Personnel furnished by E&Y be deemed to be Delphi's employees or agents. E&Y is solely responsible, at E&Y's sole cost and expense, for (a) the fulfillment of all obligations to E&Y Personnel and (b) the compliance by E&Y and E&Y Personnel with all laws, regulations, orders and other governmental requirements applicable to performance of the Services.

5.    Professional Fees.

Subject to Bankruptcy Court approval, Delphi will compensate E&Y for actual Services performed as set forth in the Agreement.

6.    Expenses.

Subject to Bankruptcy Court approval, Delphi will reimburse E&Y for all reasonable costs and expenses E&Y incurs in connection with the Services as set forth in the Agreement; provided, however, that E&Y must obtain prior approval of Delphi for any individual reimbursable expenses in excess of $2,500 or for reimbursable expenses which exceed or are anticipated to exceed an aggregate of $10,000 during any calendar month. E&Y will not charge any markup, overhead, profit or other fees on the reimbursable expenses. The provisions of Exhibit D will govern Delphi's reimbursement obligations.

7.    Taxes.

Unless otherwise agreed by the parties, any applicable taxes imposed on E&Y in connection with the performance of the Services (except for withholding taxes and taxes imposed on income) will be invoiced to, and paid by, Delphi in addition to fees and expenses.

March 16, 2006

8.   Standard of Performance.

E&Y will exercise due professional care and competence in the performance of the Services, and all of the Services will be performed in accordance with applicable professional standards.

EXCEPT AS STATED ABOVE, E&Y MAKES NO WARRANTIES OF ANY KIND OR NATURE, WHETHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, OR WARRANTIES OF ANY PRODUCTS OR SERVICES PROVIDED BY A THIRD PARTY VENDOR.

9.   Federal Confidential Communications Privilege.

A confidentiality privilege under Internal Revenue Code Section 7525 may pertain to certain communications between E&Y personnel and Delphi regarding federal tax advice provided pursuant to this engagement. By retaining E&Y, Delphi agrees that E&Y is instructed to claim the privilege on Delphi's behalf, with respect to any applicable communications, up to and until such time as Delphi may waive any such privilege in writing. As disclosure of any such confidential communications to the Internal Revenue Service or other third party may cause any confidentiality privilege to be waived, each party shall notify the other party if the Internal Revenue Service or other third party requests information about any tax advice or tax advice documents provided by E&Y.

Delphi understands that E&Y makes no representation, warranty, or promise, and offers no opinion with respect to the applicability of such confidentiality privilege to any communication. Delphi agrees to indemnify E&Y for any attorney's fees and other costs and expenses incurred by E&Y in defending the confidentiality privilege on Delphi's behalf. E&Y agrees to promptly notify Delphi of any claim for which E&Y seeks indemnification and Delphi shall have the right to conduct the defense or settlement of any such claim at Delphi's sole expense, and E&Y shall cooperate with Delphi. E&Y shall nonetheless have the right to participate in such defense at its own expense and to approve the settlement of any claim hereunder that imposes liability or obligation.

10.   Non-Disclosure of Proprietary Information.

"Delphi Proprietary Information" means any information concerning the business and affairs of Delphi which is not publicly available at the time disclosed to or learned by E&Y or any of E&Y Personnel and which is identified by Delphi as "Confidential" and/or "Proprietary" or which is known, or under all of the facts and circumstances should reasonably have been known, by E&Y to be considered by Delphi as confidential and/or proprietary. Delphi Proprietary Information includes, without limitation, this Agreement, trade secrets, product specifications, data, know-how, formulas, compositions, processes, designs, sketches, photographs, samples, inventions, concepts, ideas, information, past, current and planned research and development, past, current and planned manufacturing or distribution methods and processes, price lists, business plans, reports, computer software and programs (including object code and source code), databases, notes, analyses, compilations, studies and other materials or intangibles. Delphi Proprietary

March 16, 2006

Information also includes any materials or information that contain or are based on any other
Delphi Proprietary Information, whether prepared by E&Y, Delphi, E&Y Personnel or any other
person.

In connection with E&Y's performance of Services, Delphi may disclose Delphi Proprietary
Information to E&Y. All Delphi Proprietary Information disclosed, furnished or made available
to E&Y or to E&Y Personnel and all Delphi Proprietary Information generated or developed by
E&Y or E&Y Personnel will be treated as confidential by E&Y and E&Y Personnel, and E&Y
and E&Y Personnel will use reasonable efforts to avoid and prevent disclosure of Delphi
Proprietary Information to third parties, either in whole or in part, except upon Delphi's prior
written authorization. E&Y will be responsible and liable to Delphi for the violation by any of
E&Y Personnel of these confidentiality obligations.

E&Y retains the right to use its knowledge, experience, and know-how, including processes,
ideas, concepts and techniques developed in the course of performing the Services. If, during the
course of performing the Services, E&Y discloses to Delphi any proprietary algorithms,
formulae, tools, techniques, methods, processes, computer software or programs of E&Y ("E&Y
Proprietary Information"), Delphi agrees to treat such E&Y Proprietary Information as
confidential and use reasonable efforts to avoid and prevent disclosure of such E&Y Proprietary
Information to third parties, provided that (a) E&Y informs Delphi of the proprietary nature of
such E&Y Proprietary Information in advance of any such disclosure, (b) E&Y marks all
documents or other physical media containing E&Y Proprietary Information as "Confidential" or
"Proprietary", (c) E&Y discloses such information only to those personnel of Delphi which have
a reasonable need to know such E&Y Proprietary Information and (d) does not include such
E&Y Proprietary Information (as opposed to the results generated by use or application of the
E&Y Proprietary Information) in any work product delivered to Delphi under this Agreement.

If this engagement relates to a strategy offered by E&Y to Delphi that is designed to reduce or
defer federal income tax for a direct or indirect corporate participant, pursuant to Treasury
Regulation section 301.6111-2(c), Delphi (and each employee, representative, or other agent of
Delphi) is expressly authorized to disclose the structure and tax aspects of the strategy with any
and all persons, without limitation of any kind. The advice and Services provided hereunder are
solely for management's purposes or for submission to taxing authorities, and are to be used for
no other purpose. However, the Company may share our work product with other interested
parties related to the bankruptcy process. Regardless, because our advice is solely for the benefit
of the Company, it is not to be relied upon by any other person.

Written advice provided by E&Y to Delphi is for the information and use of Delphi only and
may not be relied upon by any third party without the express written permission of E&Y.

The foregoing obligations under this Section 10 shall not apply to the extent that any information
(i) is at the time of disclosure, or thereafter becomes, part of the public domain through a source
other than the receiving party, (ii) is subsequently learned by the receiving party from a third
party that has a legal right to make such disclosure and does not impose an obligation of
confidentiality on the receiving party, (iii) was known to the receiving party at the time of
disclosure by the disclosing party, (iv) was generated independently by the receiving party before

March 16, 2006

disclosure by the disclosing party, or (v) is required to be disclosed by the receiving party by law, regulation, subpoena or other process, or applicable professional regulations.

11.    Subcontracting.

E&Y may subcontract a portion of its responsibilities under this Agreement without Company's prior written approval to any affiliate of E&Y, any other member of the global E&Y network or any of their respective affiliates (collectively, the "E&Y Entities," and any of them, and "E&Y Entity"); provided, however, that E&Y shall be and shall remain fully and solely responsible for all of the liabilities and obligations of E&Y under this Agreement, whether or not performed, in whole or part, by E&Y, or any subcontractor or personnel of any E&Y Entity. The Company shall have no recourse, and shall bring no claim, against any E&Y Entity other than E&Y, or against any subcontractors, members, shareholder, directors, officers, managers, partners, agents, representatives or employees of any E&Y Entity (or any of their respective successors or permitted assigns,) or any of their respective assets, with respect to the Services or otherwise under this Agreement.

12.    Changes and Delays.

In the event that (i) Delphi requires a change in the scope of the Services, (ii) any change of applicable law or regulation affects the timing or performance of the Services or (iii) any action by Delphi or a third party (other than E&Y Personnel) affects the timing or performance of the Services, the fees and/or schedule for performance for the Services will be equitably adjusted by the parties subject to receipt of all necessary Bankruptcy Court approvals and notification to the U.S. Trustee's office and any committee designated to review fee applications (the "Fee Review Committee").If either party is unable to perform its obligations in accordance with this Agreement as a result of an event or occurrence beyond the reasonable control of the affected party and without the affected party's fault or negligence, then any delay or failure to perform under this Agreement that results from such event or occurrence will be excused for so long as such event or occurrence continues, provided, however, that the affected party gives written notice of such delay (including the anticipated duration of the delay) to the other party as soon as possible after the event or occurrence (but in no event more than three (3) days thereafter). Such events and occurrences may include, by way of example and not limitation, natural disasters, fires, floods, windstorms, severe weather, explosions, riots, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), equipment breakdowns and power failures. If the affected party fails to provide adequate assurances that any delay will not exceed thirty (30) days or if any delay lasts more than thirty (30) days, the other party may terminate this Agreement without further liability.

To the extent this Agreement provides that E&Y's performance under this Agreement is contingent upon specific action or cooperation of Delphi, including the supply to E&Y of specific resources, approvals, and information, any delays in E&Y's performance which occur as a result of the failure or untimely performance by Delphi shall be excused to the extent of any such delay or untimely performance by Delphi and E&Y shall not incur any liability to Delphi as a result of any such delay or untimely performance by Delphi. If any such delay or untimely performance by Delphi lasts for thirty (30) days or more, E&Y shall be entitled to terminate this

March 16, 2006

Agreement by giving written notice to Delphi, such termination to be effective on the date indicated in said notice.

13.    Term and Termination.

This Agreement may be terminated at any time by the Company or E&Y, but in any event this Agreement will expire upon the earlier of (a) the completion of the Services or (b) the effective date of the Company's confirmed plan of reorganization, or liquidation of the Company's assets under Chapter 11 or 7 of Title 11 of the United States Code, or otherwise. If either party terminates this Agreement, in addition to notice to the other party, the terminating party shall provide not less than three (3) days' prior written notice to the Bankruptcy Court, the U.S. Trustee's office, the Creditor's Committee and the Fee Review Committee (if any). The provisions of this Agreement relating to indemnification, limitation of liability, fees and expenses and alternative dispute resolution will remain operative and in full force and effect regardless of any termination or expiration of this Agreement and shall survive completion of the Company's bankruptcy whether through a confirmed plan of reorganization, liquidation of the Company's assets under Chapter 11 or 7 of Title 11 of the United States Code, or otherwise.

14.    Conflict.

In the event of any conflict, ambiguity or inconsistency between this Agreement and any other agreement relating to the Services, including any preprinted terms and conditions on Delphi's purchase orders, the terms and conditions of this Agreement shall govern.

15.    Survival.

The provisions of this Agreement which give the parties rights beyond termination of this Agreement will survive any termination of this Agreement.

16.    Severability.

If any portion of this Agreement is held to be void, invalid, or otherwise unenforceable, in whole or part, the remaining portions of this Agreement shall remain in effect.

March 16, 2006

## Attachment C

### Dispute Resolution Procedures

#### *Mediation*

A party shall submit a dispute to mediation by written notice to the other party or parties. The mediator shall be selected by the parties. If the parties cannot agree on a mediator, the CPR Institute for Dispute Resolution ("CPR") shall designate a mediator at the request of a party. Any mediator must be acceptable to all parties.

The mediator shall conduct the mediation as he/she determines, with the agreement of the parties. The parties shall discuss their differences in good faith and attempt, with the mediator's assistance, to reach an amicable resolution of the dispute. The mediation shall be treated as a settlement discussion and shall therefore be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. The mediation proceedings shall not be recorded or transcribed.

Each party shall bear its own costs in the mediation. The parties shall share equally the fees and expenses of the mediator.

If the parties have not resolved a dispute within 90 days after written notice beginning mediation (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute shall be settled by arbitration. In addition, if a party initiates litigation, arbitration, or other binding dispute resolution process without initiating mediation, or before the mediation process has terminated, an opposing party may deem the meditation requirement to have been waived and may proceed with arbitration.

#### *Arbitration*

The arbitration will be conducted in accordance with the procedures in this document and the CPR Rules for Non-Administered Arbitration ("Rules") as in effect on the date of the Agreement, or such other rules and procedures as the parties may agree. In the event of a conflict, the provisions of this document will control.

The arbitration will be conducted before a panel of three arbitrators, to be selected in accordance with the screened selection process provided in the Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of any of these procedures, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator may be appointed unless he or she has agreed in writing to these procedures.

The arbitration panel shall have no power to award non-monetary or equitable relief of any sort. Damages that are inconsistent with any applicable agreement, that are punitive in nature, or that are not measured by the prevailing party's actual damages, shall be unavailable in arbitration or

March 16, 2006

any other forum. The parties expressly waive the right to such damages, and the arbitrators shall have no power to award them unless the foregoing waiver is invalid or unenforceable. The arbitration panel shall have no power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

Discovery shall be permitted in connection with the arbitration only to the extent, if any, expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. The parties and the arbitration panel may disclose the existence, content or results of the arbitration only in accordance with the Rules or applicable professional standards. Before making any such disclosure, a party shall give written notice to all other parties and shall afford them a reasonable opportunity to protect their interests, except to the extent such disclosure is necessary to comply with applicable law, regulatory requirements or professional standards.

The result of the arbitration shall be binding on the parties, and judgment on the arbitration award may be entered in any court having jurisdiction.

March 16, 2006

## Attachment D

### Travel and Per Diem Reimbursement

A.   If E&Y Personnel are required by Delphi to travel as an incidental requirement in performing services for Delphi, then such travel and per diem expenses, subject to prior written approval of Delphi, and subject to any guidelines established by the Bankruptcy Court or the U.S. Trustee, will be reimbursable as follows:

1. Air Travel - Economy/Coach class only for U.S. travel. Business class is permitted for international travel.

2. Hotel - E&Y will exercise good, sound business judgment and discretion in choosing hotels, such as a moderately priced chain hotels or hotels that offer discounted corporate rates. Where extended travel is involved, reduced rates may be available and should be requested.

3. Rental cars - Compact or intermediate class only. The cost of collision damage waiver and personal accident insurance is the responsibility of E&Y.

4. Mileage Allowance - Reimbursement will be at the then current IRS rate (currently $0.445 per mile) for the miles which are in excess of his or her normal commute from home to work and back. When permanently assigned to another location, even if the new location is temporary, E&Y will not be reimbursed for excess miles, additional driving time, etc.

5. Expense Reports - Customarily available receipts must be attached to expense reports E&Y submits. Detailed receipts, other than restaurant tabs, are required for all meals and other expenditures of $25.00 or more.

6. Meals - Meals will not be reimbursed for non-overnight trips, except in the case of late return occasioned by travel outside normal working hours. Reimbursement for meals will be the actual and reasonable expenses paid by E&Y.

7. Extended Travel - E&Y should review the home visit policy prior to a trip. Generally, the following provisions apply:

   • If the travel expense is less than the living expense in the temporary location, E&Y will be reimbursed for travel to the permanent location every week.

   • If the travel expense is more than the living expense in the temporary location, E&Y will be reimbursed for travel to the permanent location every two weeks.

   • Excess expenses due to frequent travel or stays will not be reimbursed by Delphi without its prior written approval.

8. Miscellaneous - When E&Y chooses an alternative method of transportation, e.g., to drive instead of fly, reimbursement, including meals and lodging, will not exceed the lesser of the two costs. Documentation to support the lesser cost must be attached to expense report. Travel time must also be limited if on working hours.

March 16, 2006

The employee, his or her immediate supervisor, and an authorized Delphi representative must sign the expense report form.

E&Y is responsible for travel reservations, hotel/motel accommodations and rental cars. If directed by Delphi, E&Y will make all travel arrangements through Global Experts in Travel, using a special account set up for such purposes.

Any cash advance by E&Y to its employee is the responsibility of E&Y.

9. Per Diem. - In certain instances, a per diem will be paid to E&Y in accordance with Delphi's standard per diem policy.

B. All travel and per diem for which E&Y seeks reimbursement will be submitted to Delphi on standard vouchers, with substantiating documentation, and will accompany the monthly invoices.

March 16, 2006

## PROJECT ADDENDUM 1
## OTHER TAX ADVISORY SERVICES

This Project Addendum ("Addendum") to the Master Tax Services Agreement ("Agreement") dated March 16, 2006 between Ernst & Young LLP ("E&Y") and Delphi Corporation and its affiliates ("Company" or "Delphi"), incorporates and is deemed to be a part of the Agreement. Accordingly, unless expressly stated to the contrary herein, all of the terms and conditions contained in the Agreement govern this Addendum.

This Addendum confirms our engagement to provide to the Company tax advice and assistance concerning issues as requested by the Company's tax department when such projects are not covered by a separate project addendum and do not involve any significant tax planning or projects ("tax advisory services") as mutually determined by the Company and E&Y.

## I.    SCOPE OF SERVICES

Providing assistance to the Company's tax department for tax projects when such projects are not covered in a separate addendum to the Agreement, such as assistance with tax issues, assistance with transactional issues, or assisting the Company in connection with its dealings with tax authorities (the "Services").

Specific tasks that may be involved in connection with the Services include participation in meetings and telephone calls with Company personnel, participating in meetings and telephone calls with taxing authorities and other third parties, review of transactional documentation, research of technical issues, and the preparation of technical memoranda, letters, emails, and other written documentation.

This Addendum is intended for use to respond to basic tax questions and assignments that are expected, at the beginning of the project, to involve total professional time not to exceed $20,000 in professional fees. It is intended that projects that exceed this threshold will be covered in separate Addenda.

## II.    OUT-OF-SCOPE SERVICES

Any activities not described as Services will be considered outside the scope of this Addendum ("Out-of-Scope Services") and are the responsibility of the Company to perform on a timely basis unless otherwise agreed by the parties in writing.

March 16, 2006

## III.    TEAM PROVIDING SERVICES

Dan Kelley will be the Tax Services Coordinator for the Company. Cathy Tosto, Jim Beckman, and Jeff Michalak will be the Engagement Partners responsible for the provision of our tax services. If one or more of these individuals ceases to provide tax services to the Company pursuant to the Agreement, E&Y will so advise the Company and, if that professional is replaced, provide the Company with the name of that professional's replacement. Other E&Y Entities, not identified herein may be utilized as required to conduct our work in the most efficient manner possible.

## IV.    FEES AND BILLINGS

1. Fees for projects related to tax advisory services contemplated under this project addendum will be billed under the terms of the Master Tax Advisory Agreement.

2. In general, the following guidelines will be used for any tax advisory services contemplated under this project addendum:

   a. Projects will be billed at hourly rates as scheduled in Attachment A of the Master Tax Advisory Agreement dated March 16, 2006.

If these arrangements are acceptable, please sign one copy of this Agreement and return it to Dan Kelley.

If the Company has any questions concerning this Agreement, please call Dan Kelley, who will be coordinating E&Y's tax services for the Company, at (313) 628-8929.

We very much appreciate the opportunity to perform tax services for the Company.

Very truly yours,

Ernst + Young LLP

I hereby accept and agree to the Agreement stated above on behalf of Delphi Corporation.

By: _____                    16 March 2006
James P. Whitson, Chief Tax Officer                    Date

March 16, 2006

### PROJECT ADDENDUM 2
### BANKRUPTCY TAX SERVICES

This Project Addendum ("Addendum") to the Master Tax Services Agreement ("Agreement") dated March 16, 2006 between Ernst & Young LLP ("E&Y") and Delphi Corporation and its affiliates ("Company" or "Delphi"), incorporates and is deemed to be a part of the Agreement. Accordingly, unless expressly stated to the contrary herein, all of the terms and conditions contained in the Agreement govern this Addendum.

This Addendum confirms our engagement to provide to the Company bankruptcy tax services as requested by the Company's tax department.

### I.  SCOPE OF SERVICES

Ernst & Young will perform mutually agreed Bankruptcy Tax Services on an as-requested basis by Delphi. For purposes of this Addendum, the term "Bankruptcy Tax Services" will include the following:

- Advise and assist on the federal, state and local income tax consequences of proposed plans of reorganization, including, if necessary, assisting in the preparation of IRS ruling requests regarding the tax consequences of alternative reorganization structures.

- Prepare calculations ("Section 382 Calculations") and apply the appropriate federal, state and local tax law to historic information regarding changes in ownership of Delphi's stock to calculate whether any of the shifts in stock ownership may have caused an ownership change what will restrict the use of tax attributes (such as net operating loss, capital loss, credit carry forwards, and build in losses) and the amount of any such limitation.

- Through analysis of the information contained in historic tax returns and other relevant client records and application of relevant consolidated tax return rules, prepare calculations and apply the appropriate federal, state and local tax law to determine the tax asset and stock basis and deferred inter-company transactions and other consolidated return issues for each legal entity in the client's U.S. tax group. Identify major deferred inter-company transaction, excess loss accounts, etc.

- Prepare calculations and apply the appropriate federal, state and local tax law to determine the amount of tax attribute reduction related to debt cancellation income.

- Analysis of the federal, state and local tax treatment governing the timing of deductions of plant shut down, severance and other costs incurred as the client rationalizes its operations including tax return disclosure and presentation.

- Analysis of the federal, state and local tax treatment of the costs and fees incurred by the client in connection with the bankruptcy proceedings, including tax return disclosure and presentation.

March 16, 2006

- Analysis of the federal, state and local tax treatment of interest and financing costs related to debt subject to the automatic stay, and new debt incurred as the client emerges from bankruptcy including tax return disclosure and presentation.

- Analysis of the federal, state and local tax consequences of restructuring and rationalization of inter-company accounts.

- Analysis of the federal, state and local tax consequences of proposed dispositions of assets during bankruptcy including tax return disclosure and presentation.

- Analysis of the federal, state and local tax consequences of restructuring the U.S. or worldwide corporate groups during bankruptcy including tax return disclosure and presentation.

- Analysis of the federal, state and local tax consequences of potential bad debt and worthless stock deductions including tax return disclosure and presentation.

- Analysis of the federal, state and local tax consequences of employee benefit plans.

## II.   OUT-OF-SCOPE SERVICES

Any activities not described as Bankruptcy Tax Services, as indicated above under Scope of Services, will be considered outside the scope of this Addendum ("Out-of-Scope Services") and are the responsibility of the Company to perform on a timely basis unless otherwise agreed by the parties in writing.

## III.   TEAM PROVIDING SERVICES

Dan Kelley will be the Tax Services Coordinator for the Company. Jacob Blank and Howard Tucker will be the Engagement Partners responsible for the provision of our tax services. If one or more of these individuals ceases to provide tax services to the Company pursuant to the Agreement, E&Y will so advise the Company and, if that professional is replaced, provide the Company with the name of that professional's replacement. Other E&Y Entities not identified herein may be utilized as required to conduct our work in the most efficient manner possible.

March 16, 2006

## IV.    FEES AND BILLINGS

1. Fees for projects related to tax advisory services contemplated under this project addendum will be billed under the terms of the Agreement .

2. In general, the following guidelines will be used for any tax advisory services contemplated under this Addendum:

   a. Projects will be billed at hourly rates as scheduled in Attachment A of the Master Tax Advisory Agreement dated March 16, 2006.

If these arrangements are acceptable, please sign one copy of this Agreement and return it to Dan Kelley.

If the Company has any questions concerning this Agreement, please call Dan Kelley, who will be coordinating E&Y's tax services for the Company, at (313) 628-8929.

We very much appreciate the opportunity to perform tax services for the Company.

Very truly yours,

*Ernst + Young LLP*

I hereby accept and agree to the Agreement stated above on behalf of Delphi Corporation.

By: _____                         *16 March 2006*
      James P. Whitson, Chief Tax Officer                  Date