**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

Hearing Date and Time: March 21, 2006 @ 10:00 a.m.

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
(212) 819-8200
Gerard Uzzi (GU-2297)

Wachovia Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
(305) 371-2700
Thomas E Lauria (Admitted *Pro Hac Vice*)
Frank L. Eaton (FE-1522)
Linda M. Leali

ATTORNEYS FOR APPALOOSA
MANAGEMENT L.P.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| Delphi Corporation, <u>et al.</u>, | ) | Case No. 05-44481 |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |

**APPALOOSA MANAGEMENT L.P.'S MEMORANDUM OF LAW IN REPLY TO
OBJECTIONS TO ITS MOTION PURSUANT TO 11 U.S.C. § 1102(a)(2) FOR AN
ORDER DIRECTING THE UNITED STATES TRUSTEE TO APPOINT AN EQUITY
COMMITTEE IN THESE CHAPTER 11 CASES**

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. iii

PRELIMINARY STATEMENT ......................................................................................... 1

FACTS ............................................................................................................................... 7

    A.    Debtors' Financial Condition................................................................ 8

    B.    Delphi's Dividend Declaration and Payment ...................................... 9

    C.    Delphi's Cancellation of Shareholder Meetings ................................ 9

    D.    Decision to File Bankruptcy .............................................................. 10

    E.    Proposed Rejection of CBAs and Retiree Benefits............................ 12

    F.    The Debtors' Prepetition Severance Plan and Key Employee
        Compensation Plan ............................................................................ 13

    G.    Board's Consideration of Appaloosa's Request for Equity Committee ................ 14

    H.    Responses and Objections................................................................... 17

    I.    The Debtors Are Not "Hopelessly Insolvent" ...................................... 19

    J.    The Debtors Valuation of Their Pension and OPEB Funding Obligations
        Is Misleading and Inconsistent with Their Public Disclosures.............................. 29

REPLY .............................................................................................................................. 33

    I.    Adequate Representation of Equity Security
        Holders Under Section 1102(a)(2)...................................................... 33

    II.    The Court's Standard of Review of the U.S. Trustee's Refusal to Appoint an
        Equity Committee is De Novo ............................................................ 35

    III.    There is no Credible Basis to Assert that Delphi is "Hopelessly Insolvent" ......... 36

        A.    Appaloosa Need Only Demonstrate that Delphi is not "Hopelessly
            Insolvent"..................................................................................... 36

        B.    Debtors' Filings had Nothing to do with Insolvency and were Triggered
            by Amendments to the Bankruptcy Code .................................... 45

        C.    Factors Relied upon by Objecting Parties that Debtors are Insolvent are
            Faulty and not Dispositive ........................................................... 46

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

|  | D. | The Appropriate Standard in Determining Solvency is Enterprise Value | 52 |
|---|---|---|---|
|  | E. | Delphi's Solvency Analysis is Wholly Inadequate | 54 |
| IV. |  | The Debtors' Shareholders Are Not Adequately Represented in these Cases | 59 |
|  | A. | The Debtors and the Board Have Not and Will Not Adequately Represent the Interests of the Shareholders | 59 |
|  | B. | The Creditors' Committee Has Not and Cannot Be Expected to Adequately Represent the Interests of Shareholders | 62 |
|  | C. | Additional Factors Warrant Appointment of an Equity Committee | 63 |
|  |  | i. Appointment Of An Equity Committee Is Not Rare In Large And Complex Cases | 63 |
|  |  | ii. Sections 1109(b) And 503(b) Of The Bankruptcy Code Do Not Provide Shareholders With Adequate Representation | 65 |
|  |  | iii. An Equity Committee Must Be Appointed Because These Cases Are Large And Complex | 69 |
|  |  | iv. Appaloosa's Request For Appointment Of An Equity Committee Is Timely | 71 |
| V. |  | Concerns for Adequate Representation Outweigh the De Minimis Costs Associated with an Equity Committee | 72 |
| CONCLUSION |  |  | 75 |

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

## TABLE OF AUTHORITIES

### FEDERAL CASES

Albero v. Johns-Manville Corp. (In re Johns-Manville Corp.),
   68 B.R. 155 (S.D.N.Y. 1986) ............................................................................... 32-33, 42, 64

In re Babcock & Wilcox Co.,
   274 B.R. 230 (Bankr. E.D. La. 2002) ............................................................................. 46-47

In re Beker Indus. Corp.,
   55 B.R. 945 (Bankr. S.D.N.Y. 1985) ................................................................................ 33, 72

Blum v. Stenson,
   465 U.S. 886 (1984) ....................................................................................................................... 33

In re Braniff Airways, Inc.,
   700 B.R. 935 (5th Cir. 1983) ................................................................................................... 71-72

In re Bush Indus., Inc.,
   315 B.R. 292 (Bankr. W.D.N.Y. 2004) ................................................................................. 47-48

In re Cellular Info. Sys., Inc.,
   171 B.R. 926 (Bankr. S.D.N.Y. 1994) ....................................................................................... 47

In re Centennial Textiles, Inc.,
   220 B.R. 165 (Bankr. S.D.N.Y. 1998) ................................................................................... 46-47

In re Dow Corning Corp.,
   194 B.R. 121 (Bankr. E.D. Mich. 1996),
   rev'd on other grounds, 212 B.R. 258 (E.D. Mich. 1997) ...................................................... 67

In re Emons Indus., Inc.,
   50 B.R. 692 (Bankr. S.D.N.Y. 1985) ......................................................................................... 37

In re Enron Corp.,
   279 B.R. 671 (Bankr. S.D.N.Y. 2002) ............................................................................. *passim*

In re Evans Prods. Co.,
   58 B.R. 572 (Bankr. S.D. Fla. 1985) ......................................................................................... 62

In re Exide Techs.,
   303 B.R. 48 (Bankr. D. Del. 2003) ....................................................................... 47, 49, 66-67

In re Exide Techs. v. State of Wis. Inv. Bd.
   No. 02-1572-SLR, 02-11125-KJC, 02-1610-SLR,
   2002 WL 3233200 (D. Del. Dec. 23, 2002) ............................................................................. 34

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

Freier v. Westinghouse Elec. Corp.,
    303 F.3d 176 (2d Cir. 2002)......................................................................33

In re Kalvar Microfilm, Inc.,
    195 B.R. 599 (Bankr. D. Del. 1996) ........................................................34

In re Kaypro,
    218 F.3d 1070 (9th Cir. 2000) ..................................................................46

In re McLean Indus., Inc.,
    70 B.R. 852 (Bankr. S.D.N.Y. 1987).................................................35, 73

In re Mirant Corp.,
    334 B.R. 800 (Bankr. N.D. Tex. 2005)............................................. *passim*

In re National Gypsum Co.,
    219 F.3d 478 (5th Cir. 2000) ....................................................................38

In re N.Y., New Haven & Hartford R.R. Co.,
    4 B.R. 758 (D. Conn. 1980) .....................................................................49

In re Penn. Cent. Transp. Co.,
    596 F.2d 1102 (3d Cir. 1979)....................................................................49

In re Pullman Constr. Indus. Inc.,
    107 B.R. 909 (Bankr. N.D. Ill. 1989) ......................................................47

In re Saxon Indus., Inc.,
    29 B.R. 320 (Bankr. S.D.N.Y. 1983).......................................................62

In re Sierra Steel, Inc.,
    96 B.R. 275 (B.A.P. 9th Cir. 1989)......................................................46-47

In re Texaco Inc.,
    79 B.R. 560 (Bankr. S.D.N.Y. 1987).......................................................35

In re Wang Labs., Inc.,
    149 B.R. 1 (Bankr. D. Mass. 1992) ...........................................34, 38, 47

In re Williams Commc'ns Group, Inc.,
    281 B.R. 216 (Bankr. S.D.N.Y. 2002) ........................................... *passim*

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

## DOCKETED CASES

In re Adelphia Commc'ns Corp.,
    No. 02-41729 (REG) (Bankr. S.D.N.Y. June 25, 2002) ........................................................63

In re Amresco, Inc.,
    No. 01-35327 (RCM) (Bankr. N.D. Tex. Sep. 24, 2001) ........................................................37

In re Carmike Cinemas, Inc.,
    No. 00-03302 (Bankr. D. Del. Jan. 3, 2002) ..............................................................................51

In re Conseco, Inc.,
    No. 02-49672 (Bankr. N.D. Ill. Sep. 9, 2003) .....................................................................50-51

In re Enron Corp.,
    No. 01-16034 (Bankr. S.D.N.Y. July 15, 2004) ... ...................................................................50

In re KCS Energy, Inc.,
    No. 00-00028 (Bankr. D. Del. Jan. 30, 2001) ...........................................................................51

In re Kmart Corp.,
    No. 02-02474 (SPS) (Bankr. N.D. Ill. Jan. 22, 2002) .........................................................39, 63

In re Loral Space & Commc'ns, Ltd.,
    No. 03-41710 (RDD) (Bankr. S.D.N.Y. 2003) ..............................................................*passim*

In re Mirant Corp.,
    No. 03-46590 (DML) (Bankr. N.D. Tex. July 14, 2003) ................................................*passim*

In re Texaco, Inc.,
    No. 87-20142 (ASH) ...................................................................................................................63

In re UAL Corp.,
    No. 02-48191 (Bankr. N.D. Ill., confirmed on Jan. 20, 2006) ..................................................50

In re WorldCom, Inc.,
    No. 02-13533 (Bankr. S.D.N.Y., confirmed on Oct. 31, 2003) ................................................50

## STATUTES

11 U.S.C. § 101(32) .............................................................................................................................34

11 U.S.C. § 107(b) ................................................................................................................................1

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

11 U.S.C. § 328 ..................................................................................................................72

11 U.S.C. § 330 ..................................................................................................................72

11 U.S.C, § 503(b) ........................................................................................................ 65-68

11 U.S.C. § 1102(a) ...................................................................................................... *passim*

11 U.S.C. § 1109(b) ...................................................................................................... 65-68

11 U.S.C. § 1129(b) ............................................................................................................48

26 U.S.C. § 412 ............................................................................................................. 59-60

29 U.S.C. § 1082 ........................................................................................................... 59-60

26 U.S.C. § 1083 ........................................................................................................... 59-60

S. Rep. No. 989, 95th Cong., 2d Sess. (1978) ...................................................... *passim*

Del. Code Ann. tit. 8, § 170 ..............................................................................................44

Del. Code Ann. tit. 8, § 174 ..............................................................................................45

Del. Code Ann. tit. 8, § 211 ................................................................................................9

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

TO:    THE HONORABLE ROBERT D. DRAIN,
       UNITED STATES BANKRUPTCY JUDGE:

Appaloosa Management L.P. ("Appaloosa"), collectively with and through certain

of its affiliates, one of Delphi Corporation's ("Delphi") largest shareholders, beneficially owning

approximately 9.3% of Delphi's issued and outstanding shares, by and through its undersigned

counsel, hereby submits this memorandum of law in reply (the "Reply")[1] to the objections and

responses (collectively, the "Objections") filed by (i) Delphi and its affiliated debtors and debtors

in possession (the "Debtors"), (ii) the United States Trustee for the Southern District of New

York (the "U.S. Trustee"), (iii) the Official Committee of Unsecured Creditors (the "Creditors'

Committee"), (iv) JPMorgan Chase Bank, N.A. (the "Prepetition Agent"), and (v) General

Motors Corporation ("GM" and, together with the Debtors, the U.S. Trustee, the Creditors'

Committee, and the Prepetition Agent, the "Objecting Parties") to Appaloosa's motion (the

"Motion")[2] for entry of an order pursuant to section 1102(a)(2) of title 11 of the United States

Code, 11 U.S.C. §§ 101, et seq., (as amended, the "Bankruptcy Code") directing the U.S. Trustee

to appoint an official committee of equity security holders to serve in the above-captioned jointly

administered chapter 11 cases (the "Cases"). In support of the Reply, Appaloosa respectfully

represents as follows:

## PRELIMINARY STATEMENT

Dateline (Troy, Michigan) – August 2, 2005. Finding that Delphi has surplus

capital, management pays a dividend as previously declared by its board of directors (the

---

[1]    On the date hereof, Appaloosa has filed its Motion for an Order Pursuant to 11 U.S.C. § 107(b) and Fed. R. Bankr. P. 9018 to File under Seal its Memorandum of Law in Reply to Objections to its Motion Pursuant to 11 U.S.C. § 1102(a)(2) for an Order Directing the United States Trustee to Appoint an Equity Committee in these Chapter 11 Cases and Exhibits Thereto, requesting that the Reply be filed under seal. Appaloosa intends to file a redacted version of the Reply.

[2]    Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

"Board") on June 22, 2005. Delphi's common stock closes trading at $5.33 per share. Based on

the fact that there are about 560 million shares outstanding, the equity owned by Delphi's more

than 300,000 shareholders is worth $2.99 billion.

Dateline (Troy, Michigan) – December 7, 2005. Finding that Delphi is "grossly

insolvent," the Board determines to oppose the motion of one of its largest shareholders,

Appaloosa, for an order directing the appointment of an equity committee. Delphi's common

stock closes trading at $0.32 per share, indicating a total common equity value of $181.45

million.

Dateline (New York, New York) – March 21, 2006. What happened? Surely it

must be something material and disastrous. In a four-month period, over $2.8 billion of equity

value was vaporized and, if management is to be believed, Delphi went from having surplus

capital to being grossly insolvent. Did Delphi and its subsidiaries (collectively, the "Company")

suffer an unexpected multi-billion dollar judgment? Did the unions go on strike? Did a key

plant or facility suffer some disaster, thereby crippling the business? Did a key customer

terminate a valuable long-term contract? Did some event (or series of events) occur in the

automotive industry that materially changed Delphi's prospects? Did Delphi report

unexpectedly bad financial results? Did Delphi uncover massive fraud in its accounting

function? Did the stock market crash?

A review of Delphi's public filings and news reports during this four-month

period reveals that the answers to each of these questions is "no." In fact, the only readily

identifiable material adverse event during this period occurred on October 8, 2005: Delphi and

38 of its subsidiaries filed chapter 11 petitions. Why?

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

Did Delphi experience a liquidity crisis that could only be relieved by bankruptcy? Were creditors or contract parties threatening to exercise remedies requiring the protection of the automatic stay to prevent potentially irreparable damage to the business? Had Delphi negotiated an important transaction with a third party that required bankruptcy relief to consummate?

Again, the answer to each of these questions is "no." In fact, one plausible explanation for the October 8 bankruptcy filing is that it was made to avoid the application of the amendments to the Bankruptcy Code, which became effective on October 17, 2006. Among other things, the amendments outlawed the type of key employee retention plan the Debtors sought to have approved in their "first day" filings. Notably, the Debtors' proposed retention plan reserves for issuance to management 10% of the Company's shares at emergence. This feature could be construed as demonstrating the Board's disregard for the interests of shareholders by purporting to dilute them without having any idea of what the results of the reorganization will be and without creating any incentives for management other than to get the case completed. It also creates difficult conflicts of interest for management by placing them in competition with the old shareholders for the limited value that will be available for distribution under a plan.

The foregoing indisputable facts and circumstances, standing alone, expose the dubiousness of Delphi's argument that it is "hopelessly insolvent." It is simply not credible that Delphi could go from having a sufficient surplus to pay a dividend to being so grossly insolvent that shareholder interests should not be separately represented in these large and complex cases -- in a four-month period without the occurrence of any material, adverse event, except for the self-serving filing for chapter 11 protection on October 8. ▮▮▮▮▮▮▮▮▮▮

3

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

Indeed, these facts and circumstances also demonstrate that the interests of

Delphi's shareholders are not being vigilantly protected. By declaring itself to be grossly

insolvent, Delphi has effectively said that the shareholders have no legitimate interest to protect -

- without having done the work needed to support such a conclusion, and without properly

plumbing the impact alternative reorganization structures could have on overall value. Gross

insolvency, however, is convenient to management and the Board at multiple levels: it makes

plan negotiations easier by eliminating one constituency from the process; and it eliminates a

competitor to the 10% stake in the reorganized Company the Board wishes to reserve for

management. Not only has the Board undermined shareholders interests in the chapter 11 cases

and condoned the creation of conflicts that make it unlikely that management can represent them,

4

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

but it has prevented shareholders from exercising their ordinary governance rights by failing to

hold a shareholder meeting since May 2004, even though applicable Delaware law requires a

meeting at least once every 13 months. As such, it seems likely that, absent the appointment of

an equity committee, shareholder interests will not be adequately represented in these cases.

     Against this vast nothingness, Appaloosa and its experts have labored under

difficult (if not impossible) circumstances to generate a credible view that substantial value will

be available for Delphi's shareholders when Delphi emerges from chapter 11. As more fully

explained below, Appaloosa believes that under a proper value maximizing reorganization, after

providing for the payment in full of all funded debt, non-contingent trade obligations and the

reasonable price associated with reducing the Debtors' labor costs, the remaining distributable

value ███████████████████████████████ The difficulties

of this task should be weighted by the Court in its consideration of the Motion:

> (A)    first, it required trying to foresee what Delphi's business plan will look like at some point in the future (probably a year from now, but maybe longer);
>
> (B)    second, the result depended heavily on attempting to predict the resolution of business issues that are inherently unpredictable, such as (i) the terms on which the Debtors' labor obligations will be renegotiated with their unions, (ii) how Delphi will treat its pension obligations (it was assumed that pension costs will be brought into line with the market by freezing Delphi's pension plans and establishing a defined contribution plan); and (iii) the structure of the reorganized Company (the continued operation of the unprofitable AHG segment was assumed, even though ████████████████████████ ████████████████████████████████ );
>
> (C)    third, it required attempting to predict the future of the global automotive industry, including the success or failure of the restructuring efforts of Delphi's former parent and current largest customer, GM;
>
> (D)    fourth, it required the assessment of the outcome of disputed issues between Delphi and GM involving billions of dollars that, at this point, one must assume will be resolved by litigation; and

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

    (E)    finally, it required that the analysis be performed with access to only limited information obtained through formal discovery and with no access to management outside of a few hours of deposition.

Review of the reports and testimony of Appaloosa's experts in light of the foregoing factors should lead to the conclusion that Appaloosa has met its burden on this critical issue.

    As far as timing is concerned, although a plan is probably a long way off, many of the critical issues and components are under active review now (such as discussions regarding the renegotiation of the Debtors' collective bargaining agreements ("CBAs")), will require significant advance diligence to properly address (such as the formulation of a business plan), or will be the subject of potentially lengthy and complex litigation (such as resolving and liquidating the obligations and claims of GM with respect to Delphi's labor-related costs). As such, now is the time for the formation of an equity committee if shareholder interests are to be represented. Ultimately, the fight/negotiation over how the surplus value of Delphi's estate will be divided is between the unions, GM and old equity. At present only old equity is unrepresented.

    The notion that Appaloosa should bear the burden of representing the interests of all shareholders (with the opportunity to get reimbursed under section 503(b) of the Bankruptcy Code for making a substantial contribution to the case) is preposterous. First of all, Appaloosa is not a fiduciary, which is what the shareholders need. Second, it is clear that without official committee status (and the rights conferred by section 1102 of the Bankruptcy Code), no individual shareholder relying solely on the rules of discovery will be able to get timely access to the level and type of information needed to fully and fairly represent the interests of all shareholders in the resolution of the complex issues presented by this case.

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

The arguments about additional cost should be disregarded. Given the size of these Cases and the issues at stake, the additional expenses associated with the activities of a responsible equity committee will be little more than a rounding error (if that) in overall value and constituency recoveries. Moreover, the expenses of an equity committee's advisors are subject to the review and oversight of the Court and must otherwise meet the statutory criteria for payment from the estate.

Based on the foregoing, it is clear that the Court should order the appointment of an equity committee.

## FACTS

On October 8, 2005 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Court"), thereby commencing these Cases. The Debtors continue to operate their businesses as debtors and debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

The Debtors are among the largest global suppliers of vehicle electronics, transportation components, and integrated systems and modules in the world. Their Cases represent the largest chapter 11 filing by a manufacturing company in American history and, consequently, involve complex issues that will affect, among others, the 49 unions that currently represent approximately 33,360 of the Debtors' 184,700 global employees; the 134,000 international employees who work for Delphi and its affiliates worldwide; the 15,950 salaried employees who work for Delphi; and the hundreds of thousands of beneficial shareholders of Delphi common stock. See Affidavit of Robert S. Miller, Jr. under Local Bankruptcy Rule 1007-2 (the "Miller Aff.") [D.I. 3] ¶¶ 11, 51.

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

A.    **Debtors' Financial Condition**

> For the nine months ending September 30, 2005, the Company reported total assets of $17.21 billion and total liabilities of $22.36 billion. Delphi Corp., Quarterly Report (3rd Quarter Form 10-Q) (Nov. 9, 2005), attached as Exhibit "L" to the Motion. During that same period, the Company reported a net loss of $1.53 billion stemming from operating revenues of approximately $20.17 billion and operating expenses of $21.47 billion resulting in a net loss of $1.53 billion. Id.

> On a collective basis, the Debtors' Schedules of Assets & Liabilities, which were filed with the Court on January 20, 2006 and amended on February 1, 2006 (the "SOAL," and collectively with each Debtor's SOAL, the "Consolidated SOAL"), reported the Debtors' total assets of $16.38 billion and total liabilities of $24.82 billion. See Section 341 Meeting of Creditors Presentation, pp. 57-58 attached as Exhibit "A" to the Appendix to Appaloosa Management L.P.'s Memorandum of Law in Reply to Objections to its Motion ("App."). The single largest liability reported on the Consolidated SOAL is post employment health and life benefits ("OPEB"), which total $9.585 billion. See Delphi Corp. SOAL, Schedule F, attached as Exhibit "B" to the App. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮ Thus, assuming the proper deduction of these unvested OPEBs from total liabilities, the Consolidated SOAL would reflect that the Debtors had a book value of at least $1.145 billion as of the Petition Date.

---

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Notably, "[a] 30(b)(6) witness testifies as a representative of the entity, his answers bind the entity and he is responsible for providing all the relevant information known or reasonably available to the entity." Sabre v. First Dominion Capital, LLC, No. 01CIV2145BSJHBP, 2001 WL 1590544, *1 (S.D.N.Y. 2001).

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

As of January 31, 2006, the Debtors reported total assets of $13.81 billion and total liabilities of $20.18 billion. See January 2006 Monthly Operating Report at p.5, attached as Exhibit "E" to the App. Of this amount, $7.39 billion is listed as OPEB obligations, and $3.33 billion is listed as pension obligations. Id. at 11. After properly deducting the OPEB obligations, it is clear that the Debtors had a book value of at least $1.02 billion as late as January 31, 2006.

**B.      Delphi's Dividend Declaration and Payment**

As recently as June 22, 2005, Delphi declared a $0.015 dividend on Delphi $0.01 par value common stock, which was paid on August 2, 2005. As Delphi has not reported any profits in the current and preceding years, payment of the August 2, 2005 dividend was made from Delphi's surplus, which is defined under Delaware law as the excess of the net assets (total assets minus total liabilities) of the corporation over its capital. Del. Code Ann. tit. 8, § 211(c) (2003).

**C.      Delphi's Cancellation of Shareholder Meetings**

9

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

The Board has breached its fiduciary duty by failing to hold a single shareholders'

meeting over the last twenty-two months. Specifically, Delphi's last shareholders' meeting was

held on May 6, 2004. See Delphi Corp., Quarterly Report (2nd Quarter Form 10-Q) (July 16,

2004), 27, attached as Exhibit "H" to the App.; Del. Code Ann. tit. 8 § 211(c)(2003) (where a

corporation has failed to hold an annual meeting for 13 months, the Delaware Chancery Court

"may summarily order a meeting to be held upon the application of any stockholder or director").

Delphi originally scheduled the 2005 annual meeting for October 12, 2005, and the meeting was

rescheduled for December 7, 2005. See Delphi Corp., Quarterly Report (2nd Quarter, Form 10-

Q), 38 (Aug. 8, 2005), attached as Exhibit "I" to the App. However, according to Delphi's 10-Q

for the period ending September 30, 2005, Delphi cancelled its Annual Meeting of Shareholders

for 2005 as a result of the commencement of the Debtors' bankruptcy cases which were filed on

October 8, 2005. See Delphi Corp., Quarterly Report (3rd Quarter Form 10-Q), 54 (Nov. 9,

2005), attached as Exhibit "J" to the App.

**D.    Decision to File Bankruptcy**

In their first-day pleadings, the Debtors contend that three significant issues

largely contributed to the deterioration of their financial performance: (a) increasingly

unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained

agreements, including restrictions preventing the Debtors from exiting non-strategic, non-

profitable operations, all of which have the effect of creating largely fixed labor costs; (b)

competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced

number of motor vehicles that GM produces annually in the United States and related pricing

pressures; and (c) increasing commodity prices. Miller Aff. at ¶ 14. However, the Debtors have

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

conveniently omitted one of the single biggest factors in their decision to file – the changes in the

Bankruptcy Code effective October 17, 2005.



Based upon a review of Delphi's publicly filed Current Reports (Form 8-K)

between August 2, 2005 and October 8, 2005, no looming liquidity crisis existed to help explain

the Debtors' decision to file bankruptcy on the Petition Date.[4] On August 5, 2005, Delphi

announced that it had borrowed $1.5 billion under its $1.8 billion credit facility. Delphi also

announced that it had the authority to make a voluntary repayment of a portion of outstanding

borrowings under its $1.8 billion revolving credit facility by September 30, 2005 to remain in

compliance with the facility's consolidated leverage covenant. On September 30, 2005, Delphi

announced that it did not make a voluntary repayment so it could continue to maintain additional

liquidity while it worked on its transformation strategy. Delphi also stated it was exploring

potential waivers or amendments to the facility. See Press Release, Delphi Corp. (Sept. 30,

2005, attached as Exhibit "L" to the App. In addition, in the days and weeks prior to the Petition

Date, the Debtors reported that $1 billion was on hand outside of the United States, which Delphi

did not plan to repatriate to fund U.S. operations. See Press Release, Delphi Corp. (Oct. 8,

---

[4]    UAW President Ron Gettelfinger recently declared that Delphi's bankruptcy is "mechanical" and
"unneeded," and that Delphi filed for bankruptcy solely because it was not succeeding in its efforts to win labor
concessions from the unions. See Justin Hyde, UAW Head: Delphi Chap. 11 Unneeded, Detroit Free Press, Feb. 6,
2006, available at 2006 WLNR 2044780, attached as Exhibit "K" to the App.

11

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

2005), attached as Exhibit "M" to the App. Accordingly, the only logical presumption is that

Delphi did not need to repatriate its offshore cash accounts because Delphi <u>was not</u> experiencing

a cash shortage.

**E.    Proposed Rejection of CBAs and Retiree Benefits**

The Debtors are under a Court-imposed deadline pursuant to which, in the event

that the Debtors and the affected unions are unable to reach an agreement on the terms of any

modifications to the CBAs or OPEB obligations for union represented retirees, the Debtors will

file a motion to reject such CBAs and eliminate such OPEB obligations no later than March 31,

2006. According to recent news reports, although the Debtors' CBAs expire by October 2007,[5]

Delphi believes that it is nearing a tri-partite deal with the International Union, United

Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") and GM,

Delphi's former parent, regarding modifications to certain of the Debtors' CBAs that would

impact the Debtors' labor costs.[6] The significance of the Debtors' decision with respect to their

legacy labor obligations cannot be overstated. Any major actions by the Debtors with respect to

restructuring their legacy employee obligations could trigger accrual of indemnification

obligations arising from the Indemnification Agreement[7] with respect to the Benefit Guarantees

to the detriment of creditors and shareholders.

---

[5]    The UAW and United Steel Workers of America ("USW") CBAs expire in September 2007, while the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers – Communications Workers of America ("IUE-CWA") CBA expires in October 2007.

[6]    See Jeffrey McCracken, <u>Delphi, GM Near Cost-Cutting Pact with UAW – Deal Could Ease Threat of Strike at Parts Maker, Become Industrial Model,</u> Wall. St. J., Mar. 9, 2006, at A3, attached as Exhibit "N" to the App.

[7]    Prior to January 1, 1999, Delphi was a wholly owned subsidiary of GM. Effective January 1, 1999, the assets and liabilities of the Company were spun-off in accordance with the terms of a Master Separation Agreement between GM and Delphi (the "Spin-Off"). After the Spin-Off, GM entered into separate agreements (the "Benefit Guarantees") with the UAW, IUE-CWA and the USW pursuant to which GM guaranteed certain pension benefits and post-retirement health care and life insurance benefits to certain of its former GM U.S. hourly employees who

12

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

F.    **The Debtors' Prepetition Severance Plan and Key Employee Compensation Plan**

Beginning on October 4, 2005, in the days prior to the Petition Date, the Debtors

entered into a number of agreements which rewarded 21 key executives ("Key Executives") with

an enhanced severance package and modified severance benefits for other executives ("Mid-

Level Executives"). Delphi Corp., Current Report (Form 8-K) (Oct. 7, 2005), without

accompanying Exhibits, attached as Exhibit "O" to the App. Under the pre-petition severance

plan ("Severance Plan"), Key Executives would be entitled to a severance benefit of 18 months'

salary and a target bonus.[8] See Motion for an Order under §§ 105 and 365 Authorizing the

Debtors to implement a Key Employee Compensation Program ("KECP Motion"), Exhibit 1, p.

31 [D.I. 13]. Mid-Level Executives would be entitled to a severance benefit of 12 months base

pay. Id. In contrast, according to the Debtors' comparative analysis, out of the universe of

"industrial manufacturing" companies surveyed, the maximum severance benefits for

comparable Mid-Level Executives is 26 weeks — one half the severance benefits Delphi's Mid-

Level Executives would enjoy. Id. at 34.

In addition to the Severance Plan, on the Petition Date, the Debtors filed the

KECP Motion seeking authority to reward all U.S. executives, approximately 486 employees

(collectively, the "Delphi Executives"), with an annual incentivization plan and emergence

bonus plan. The proposed KECP's annual incentivization plan is intended to provide Delphi

Executives with bonuses every six months based upon undisclosed performance standards. Id. at

---

transferred to Delphi as part of the Spin-Off. Copies of the Benefit Guarantees are annexed as Exhibit "C" to the
Motion. Delphi subsequently agreed to indemnify GM for any amounts that GM was obligated to pay to employees
under its benefit guarantee who were covered by the UAW collective bargaining agreement (the "Indemnification
Agreement"). A copy of the Indemnification Agreement is annexed as Exhibit "D" to the Motion.

[8]    The Severance Plan clearly smacks of excessiveness in light of the Debtors' reportedly low attrition rate.
The Debtors report that since January 1, 2005, the Debtors have lost 25 executives out of the Debtors' more than
500 executives. KECP Motion ¶ 17.

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

2. The expected six month cost of the plan is $21.5 million. Id. at 10. The proposed KECP's

emergence bonus plan has two components: (i) a cash component and (ii) a post-emergence

equity component, which is predicated on existing shareholders being wiped out. Id. at 2. The

cash under the emergence bonus plan becomes payable to Delphi Executives upon either the

effective date of a plan of reorganization or a sale of all or substantially all of the Debtors' assets.

Id. Cash payments vary from 30% to 250% of a participant's salary based on the level of such

participant's responsibility. Id. The projected cost of the cash component is approximately $88

million. Id. at 12. Pursuant to the equity component, the Debtors intend to set aside an

astounding 10% of the equity in the reorganized Debtors. Id.[9]

In light of the numerous objections to the proposed KECP, the Debtors agreed to

postpone the approval of those parts of the KECP relating to the annual incentivization

payments, emergence cash awards, and equity participation in the reorganized entity until

July 27, 2006. In the interim, the Debtors sought approval of a revised incentivization program

("Revised AIP"), which, at target, would have rewarded executives with approximately $20.6

million during the period between January 1, 2006 through June 20, 2006. On February 17,

2006, this Court approved the Final Revised AIP, which sets specific earnings targets at the

corporate and divisional level (excluding earnings resulting from the Debtors' on-going

negotiations with their labor unions or GM) before compensation payments are made.

**G.        Board's Consideration of Appaloosa's Request for Equity Committee**

By letter dated November 7, 2005, from Thomas E Lauria, Esq. of White & Case

LLP ("W&C"), as Counsel to Appaloosa, to Alicia M. Leonhard, Esq. & Tracy H. Davis, Esq.,

Office of the U.S. Trustee (the "Request Letter"), Appaloosa formally requested that the U.S.

---

[9]        The lavishness of the KECP provisions is a striking reminder that the Debtors have failed to act reasonably
in these Cases and without due regard for those to whom it owes fiduciary duties – Delphi equity holders.

14

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

Trustee appoint an official committee of equity security holders in these Cases pursuant to

section 1102(a)(1) of the Bankruptcy Code.  A copy of the Request Letter is attached as Exhibit

"G" to the Motion.

Later, on November 28, 2005, by letter from Appaloosa to the Board, Appaloosa

encouraged the Board to extend its support for the appointment of an equity committee (the

"November 28th Letter").  A copy of the November 28th Letter is attached as Exhibit "P" to the

App.

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**



**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

Because the U.S. Trustee had failed to formally respond to the November 7th Request Letter, on December 22, 2005, Appaloosa filed the Motion [D.I. 1604] to avoid any further prejudice to the interests of Delphi's equity holders that would otherwise ensue from a continued delay in forming an equity committee.

As a result of the news articles discussing the Debtors' potential agreement with the UAW and GM, by letter dated March 12, 2006 (the "March 12th Letter") from Thomas E Lauria, counsel to Appaloosa, to John W. Butler, Jr., Esq. of Skadden, Arps, Slate, Meagher & Flom LLP, attached as Exhibit "S" to the App., Appaloosa requested a meeting with the Debtors to discuss the status of their negotiations with the UAW and GM regarding potential modifications to certain of the Debtors' CBAs that would restructure the Debtors' labor costs. Appaloosa expressed its concern that the Debtors, in the interests of serving their management and employees to the detriment of shareholders, may hastily enter into improvident modifications of the CBA with the UAW, resulting in expenses to the estates which substantially exceed the cost of performing under the current CBA through its current expiry in late 2007. In the March 12th Letter, Appaloosa stated that shareholders deserve a seat at the negotiation table to ensure that the Debtors do not squander away enterprise value for the sake of preserving the employment of its executives. To date, Appaloosa has yet to receive a formal response or invitation to participate in these critical negotiations.

**H.    Responses and Objections**

Appaloosa has received a number of responses and objections to the Motion as outlined below. On December 30, 2005, the U.S. Trustee filed its response to the Motion (the "U.S. Trustee Response") [D.I. 1682], arguing that appointment of an equity committee would be premature because insolvency had not been conclusively established. U.S. Trustee Response

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

¶¶ 13-14. Indeed, the U.S. Trustee highlighted two factors that contradict the Debtors' belief that
it is "hopelessly insolvent," including Delphi's payment of a dividend to shareholders
approximately 2 months prior to the Petition Date and certain representations by the Debtors
contained within the Miller Aff. Id. at ¶ 14. According to the U.S. Trustee, these factors suggest
that "insolvency was not an integral factor precipitating its October 8, 2005 filing." Id.

On March 2, 2006, the U.S. Trustee filed its amended response and objection to
the Motion (the "U.S. Trustee Objection") [D.I. 2636]. The U.S. Trustee objected to the Motion
because: (i) based upon the Consolidated SOAL and Delphi's public filings with the SEC, the
Debtors appeared to be insolvent at this time; and (ii) Appaloosa had failed to demonstrate that
the appointment of an equity committee is necessary to adequately represent equity security
holders' interests.

On January 2, 2006, the Prepetition Agent, on behalf of itself and a syndicate of
approximately 250 senior secured lenders, filed its objection to the Motion (the "Prepetition
Agent Objection") [D.I. 1693], asserting that appointment of an equity committee is
inappropriate because: (i) the existing equity holders are adequately represented; (ii) the Debtors
appear hopelessly insolvent as of the Petition Date; and (iii) the cost and delay would be
burdensome.

On January 3, 2006, GM filed its response to the Motion (the "GM Response")
[D.I. 1712]. GM neither opposes nor supports the relief requested in the Motion, but rather
attempts to refute the assertion that GM is exerting undue influence over the Debtors.

On March 2, 2006, the Debtors filed their objection to the Motion (the "Debtors'
Objection") [D.I. 2629]. The Debtors argue that an equity committee should not be appointed
because: (i) the Debtors are hopelessly insolvent and equity holders cannot expect a meaningful

18

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

recovery; (ii) equity holders' interests are adequately represented; and (iii) the costs of an official

equity committee are substantial and unwarranted.

Also on March 2, 2006, the Creditors' Committee filed its objection to the Motion

(the "Creditors' Committee Objection") [D.I. 2634]. The Creditors' Committee contends that an

equity committee should not be appointed because: (i) official equity committees are rarely

appointed; (ii) the interests of existing equity holders will be adequately represented; (iii)

Appaloosa has failed to show that the Debtors are solvent; and (iv) the appointment of an official

equity committee will result in significant costs to the estates.

I.      **The Debtors Are Not "Hopelessly Insolvent"**

Based upon Appaloosa's expert reports and supplemental declarations, the

Debtors are not "hopelessly insolvent."

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**



**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**



**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**



**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**



**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**



**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**



**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**



**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**



**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**



**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**



**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**



**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**



**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**



**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

[REDACTED]

**REPLY**

I.   **Adequate Representation of Equity
     Security Holders Under Section 1102(a)(2)**

Recognizing the vulnerability of public investors in chapter 11 bankruptcy cases,

Congress specifically provided for the appointment of official equity committees to represent

shareholders in section 1102(a)(2) of the Bankruptcy Code, which provides that "[o]n request of

a party in interest, the court may order the appointment of additional committees . . . of equity

security holders if necessary to assure adequate representation of . . . equity security holders." 11

U.S.C. § 1102(a)(2).  As noted in Albero v. Johns-Manville Corp.(In re Johns-Manville), section

1102(a)(2) of the Bankruptcy Code is premised upon a Congressional intent "to counteract the

natural tendency of a debtor in distress to pacify large creditors, with whom the debtor would

expect to do business, at the expense of small and scattered public investors." 68 B.R. 155, 160

(S.D.N.Y. 1986) (quoting S. Rep. No. 989, 95th Cong., 2d Sess. at 10 (1978), as reprinted in

1978 U.S.C.C.A.N. 5787, 5796) (emphasis added).[14]  The Senate Report states in pertinent part

that:

---

[14]   Given that the Bankruptcy Code does not define "adequate representation," it is appropriate to consider the
legislative history with respect to section 1102(a)(2) of the Bankruptcy Code. See, e.g., Blum v. Stenson, 465 U.S.

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

> The Committee believes that it should be emphasized that investor protection is most critical when the company in which the public invested is in financial difficulties and is forced to seek relief under the bankruptcy laws.   A fair and equitable reorganization, as provided in the bill, is literally the last clear chance to conserve for them values that corporate financial stress or insolvency have placed in jeopardy.   As public investors are likely to be junior or subordinated creditors or debtholders, it is essential for them to have legislative assurance that their interests will be protected. Such assurance should not be left to a plan negotiated by a debtor in distress and senior or institutional debtors who will have their own best interest to look after.

S. Rep. No. 95-989 at 10 (1978), as reprinted in 1978 U.S.C.C.A.N. 5787, 5796; see also Johns-Manville, 68 B.R. at 160.  In noting that "[a] bankruptcy court's discretion should also be guided by the official committee's envisioned role in the reorganization," the Johns-Manville court again looked to legislative history with respect to the role of equity committees:

> [E]quity security holders' committees . . . will be the primary negotiating bodies for the formulation of the plan of reorganization.  They will also provide supervision of the debtor in possession and of the trustee, and will protect their constituents' interests.

Id. (quoting H. Rep. No. 95-595, 95th Cong., 1st Sess. at 401 (1977), as reprinted in 1978 U.S.C.C.A.N. 5963, 6357).

Although the Bankruptcy Code itself affords no litmus test for determining "adequate representation," courts have generally applied a set of factors in analyzing the adequacy of a committee's representation, including (i) the ability of the committee to function; (ii) the nature of the case; and (iii) the standing and desires of the various constituencies.  See In

---

886, 896 (1984) ("Where, as here, resolution of a question of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statutory language is unclear."); Freier v. Westinghouse Elec. Corp., 303 F.3d 176, 197 (2d Cir. 2002).  No party contests this point and, in fact, the Creditors' Committee recognizes the lack of a statutory definition: "The Bankruptcy Code does not define 'adequate representation,' thereby leaving it within the discretion of bankruptcy courts to examine the facts of each case and determine if an additional committee is warranted."  Creditors' Committee Objection ¶ 17.

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

re Enron Corp., 279 B.R. 671, 685 (Bankr. S.D.N.Y. 2002). The analysis of what constitutes

"adequate representation" is determined on a case-by-case basis. Id. Courts also consider a

variety of additional factors, including:

> (i)    whether the interests of shareholders are otherwise already
>        adequately represented;
> (ii)   whether the debtor appears to be hopelessly insolvent;
> (iii)  the complexity of the case;
> (iv)   whether the stock is widely held and actively traded;
> (v)    the timing of the request; and
> (vi)   whether the cost of the additional committee significantly
>        outweighs the concerns for adequate representation.

See, e.g., In re Williams Commc'ns Group, Inc., 281 B.R. 216 (Bankr. S.D.N.Y. 2002); Johns-

Manville, 68 B.R. at 155; In re Beker Indus. Corp., 55 B.R. 945 (Bankr. S.D.N.Y. 1985) (equity

committee appointed); see also Exide Techs. v. Wis. Inv. Bd., No. 02-1572-SLR, 02-11125-KJC,

02-1610-SLR, 2002 WL 32332000, at *2 (D. Del. Dec. 23, 2002) (appointing equity committee

over objections of debtor and official committee of unsecured creditors); In re Kalvar Microfilm,

Inc., 195 B.R. 599 (Bankr. D. Del. 1996); In re Wang Labs., Inc., 149 B.R. 1 (Bankr. D. Mass.

1992) (appointing equity committee over objections of U.S. Trustee and official committee of

unsecured creditors even while debtor had negative book equity of several hundred million

dollars). Although each of these factors heavily favors the appointment of an official committee

of equity security holders in these Cases, the U.S. Trustee has failed to do so.

**II.     The Court's Standard of Review of the U.S. Trustee's
         Refusal to Appoint an Equity Committee is De Novo**

       The U.S. Trustee's failure to appoint an official committee of equity security

holders to represent the interests of Delphi shareholders is reviewable de novo by this Court. See

In re Loral Space & Commc'ns, Ltd., Case No. 03-41710 (RDD), December 2, 2003, Hr'g Tr. at

127 (Bankr. S.D.N.Y. 2003) (hereinafter "Loral December Tr.") ("[A]s is well established, the

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

court reviews the U.S. Trustee's decision whether to appoint a committee on a de novo basis. . . ."), attached as Exhibit "Y" to the App.; Enron, 279 B.R. at 683-84; Williams, 281 B.R. at 219-20 (citing In re McLean Indus., Inc., 70 B.R. 852, 857-58 (Bankr. S.D.N.Y. 1987); In re Texaco Inc., 79 B.R. 560, 566 (Bankr. S.D.N.Y. 1987)).

Indeed, bankruptcy courts have an obligation to exercise independent judgment under section 1102(a)(2) of the Bankruptcy Code when considering whether an official committee should be appointed. See Enron, 279 B.R. at 684 (the court "must necessarily conduct an independent review of whether there is adequate representation by an existing committee by the mandate of 11 U.S.C. § 1102 (a)(2)"); McLean, 70 B.R. at 856 ("Noteworthy is the absence of any indication from the statutory language that the Court's ability to determine the issue of adequate representation is fettered by any constraint other than the requirement that the appointment of one or more additional committees is necessary to achieve the designed goal [of assuring adequate representation].").

**III.    There is no Credible Basis to Assert that Delphi is
"Hopelessly Insolvent"**

    **A.    Appaloosa Need Only Demonstrate that
Delphi is not "Hopelessly Insolvent"**

Despite the adage that a court should "judge and not prejudge," that is exactly what is being asked of a bankruptcy court when it is required to determine whether an equity committee must be appointed to adequately represent the interests of shareholders, particularly in the early stages of a chapter 11 case. A request to appoint an equity committee effectively asks a bankruptcy court to prejudge issues that will not be ultimately decided until the end of the case, i.e., at confirmation, but the outcome of which may well be materially impacted at the beginning and during the middle of the case. This is obviously a difficult and touchy exercise as instead of

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

asking the court to determine the value of a company today, it requires the court to make a

preliminary assessment of the range of reasonable values at emergence and the potential for

recovery in the future. Indeed, current valuations provide little guidance, given that one of the

purposes of chapter 11 is to improve operations of a company and restructure obligations

towards a successful emergence – the outcome of which will be determinative of recoveries to

shareholders. Thus, this Court is asked to look into its crystal ball to try to predict the future of

the Cases, even their ultimate outcome, in considering whether or not the over 300,000

shareholders of Delphi are entitled to an official committee to protect their interests.

   Despite the need to predict the likely future of the Debtors, the Court does not

have to engage in a full scale solvency analysis. Rather, the proper time and place to establish

conclusively whether the Debtors are insolvent is at confirmation and not at the beginning of the

case where there is uncertainty surrounding the Debtors' performance and financial information.

Williams, 281 B.R. at 221-22 ("Valuation is a proper issue for confirmation, and no

determination [on a motion to appoint an equity committee] is binding on a subsequent

determination."); see also Loral December Tr. at 129 (relying on Williams, this Court indicated

that in determining whether the appointment of an equity committee is appropriate that the court

is not required to conduct a full valuation); see also, Neil B. Glassman et al., Equity Committees:

A Consequence of the "Zone of Insolvency", 24 AM. BANKR. INST. J. 28, 52 (2006).

   Indeed, the legal standard most frequently applied by courts in determining

whether appointment of an official committee of shareholders focuses not on whether the

Debtors *are* hopelessly insolvent, but rather on whether the Debtors *appear* to be hopelessly

insolvent. See Williams, 281 B.R. at 221 (quoting In re Emons Indus., Inc., 50 B.R. 692, 694

(Bankr. S.D.N.Y. 1985)) ("Nowhere in the Emons decision, or other courts recognizing that

37

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

decision, does it mandate a finding by the court that the debtor *is* hopelessly insolvent. Instead, the language is whether the debtor 'appears to be hopelessly insolvent.''). In fact, courts have appointed an equity committee even where the debtor *appeared* to be insolvent. See generally, In re Amresco, Inc., Case No. 01-35327 (RCM), Hr'g Tr. (Bankr. N.D. Tex. Sep. 24, 2001) (the court appointed a committee even though it was abundantly clear that the debtor appeared insolvent to ensure legitimacy with the bankruptcy process and to explore the rapid dissipation of the debtor's equity values in the weeks and months prior to the chapter 11 filing, as well as explore the disconnect between the debtors' positive "book value," and apparent negative market value), attached as Exhibit "Z" to the App. Were it otherwise, shareholders would be required to fund a valuation report from questionable information to which they have limited access, and the court would be required to rely on this incomplete valuation prior to exercising its discretion to appoint an official equity committee. See Glassman, supra. Such a fire drill would serve little purpose other than creating "stab in the dark" valuations.

Here, having only limited access to information through discovery and no access to management outside of a few hours of depositions, Appaloosa's task in coming forward with a case on solvency has been made more difficult. For these reasons, bankruptcy courts have given shareholders the benefit of the doubt on the issue of solvency when requesting the appointment of an equity committee under section 1102 of the Bankruptcy Code. For example, the court in Wang concluded that it could not on the basis of the record determine that the debtor was hopelessly insolvent where the various parties presented evidence both in support of and against the solvency of the debtors. Wang, 149 B.R. at 3. In particular, (i) the trustee pointed to the debtor's postpetition financial disclosures which showed negative equity; (ii) the petitioning shareholder argued that his shares had value as they were trading actively on the American Stock

38

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

Exchange at a value greater than zero at the time when an equity committee was sought; and (iii)

the creditors committee directed the court's attention to the debtor's publicly traded debt

securities which were selling at a deep discount postpetition. Id. The court concluded, however,

that because the debtor remained in operation, it was not "hopelessly insolvent." Id. ("In any

event, the debtor remains in operation at present, albeit at a loss, and is not *hopelessly* insolvent .

. . ." (footnote omitted)).

Likewise, in the instant Cases, this Court should give Appaloosa the benefit of the

doubt on the issue of solvency, particularly given the complexity of valuing a public company.

Even in chapter 11 cases where a valuation is performed during the plan confirmation process,

significant room for error exists which can harm shareholders and other junior creditors. For

example, in the case of In re National Gypsum Co., the debtors submitted a reorganization plan

to the bankruptcy court based on a valuation of their business at $350 million. See In re National

Gypsum Co., 219 F.3d 478, 480 (5th Cir. 2000) (commercial creditors would own "New-NGC"

worth approximately $350 million). The company's junior bondholders, unhappy with the low

valuation, proposed a competing plan of reorganization based on a valuation of $750 million.

See Soma Biswas, The Creditor's Cudgel, The Deal.com, Oct. 15, 2004, attached as Exhibit

"AA" to the App. Before confirmation Judge Felsenthal rejected arguments by junior

bondholders that National Gypsum was underestimating its value throughout the case, saying

there was no evidence to back up the claim. See Melody Petersen, Going For Broke, N.Y.

Times, May 2, 1999, 31, available at 1999 WL 3084013, attached as Exhibit "BB" to the App.

The bankruptcy court ultimately approved the debtors' reorganization plan based on a valuation

of $350 million, pursuant to which senior creditors received a substantial portion of stock in the

reorganized company. Id. Notably, after plan confirmation in April 1993, the price of the

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

reorganized company' soared from $12.50 per share to more than $24 per share within six

months, following announcements of significant cost cutting at the company giving some senior

creditors returns in excess of 300% of their initial investment when the company was eventually

sold for $54 per share in 1995. Id.

Another example of the difficulties inherent in valuing a public company in

bankruptcy is the Kmart chapter 11 case. See In re Kmart Corp., Case No. 02-02474 (SPS)

(Bankr. N.D. Ill. Jan. 22, 2002). In Kmart's liquidation analysis, the estimated proceeds range

for Kmart's real estate assets was between $550 million to $800 million. See Disclosure

Statement with Respect to First Amended Joint Chapter 11 Plan of Reorganization of Kmart

Corporation and its Affiliated Debtors and Debtors-in-Possession, ("Kmart Disclosure

Statement"), Appendix B-13. However, within 2 years of its initial public offering in April

2003, Kmart collected at least $1.4 billion by selling just 117 of its 1,500 stores. See Biswas,

supra. Moreover, the equity value of the reorganized debtors was estimated to range between

approximately $753 million to $1.503 billion. See Kmart Disclosure Statement, App. D-1. In

contrast, based upon the 89 million issued and outstanding shares under the Kmart of

Reorganization, Kmart's equity value was $3.9 billion approximately one year after its

emergence from bankruptcy and as of March 15, 2006, these same shares are valued at

approximately $11.5 billion. http://powerdata.surguard.com/lexisnexis (April 30, 2004 and

March 15, 2006).

Finally, most recently illustrating the uncertainty of valuing a public company in

chapter 11 is the Mirant chapter 11 case, where certain holders of general unsecured claims

totaling approximately $6.3 billion, including interest, received approximately 90.62% of the

300,000,000 issued and outstanding common stock. See Second Amended Disclosure Statement

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

Relating to the Debtors' Second Amended Joint Chapter 11 Plan of Reorganization dated
September 30, 2005, at 160; In re Mirant Corp., Case No. 03-46590 (DML) (Bankr. N.D. Tex.
July 14, 2003). As of March 13, 2006, a little more than two months after the effective date of
the Mirant plan of reorganization, the value attributable to these shares was $6.9 billion,
representing a premium of approximately 9.3%. See http://powerdata.surgard.com/lexisnexis
(March 13, 2006). Attached as Exhibit "CC" to the App. is the Mirant historical stock price on
March 13, 2006. While Mirant shareholders ultimately received a recovery of 3.75% equity in
new common stock, new warrants, and a pro rata share of 50% of litigation distributions, such
recovery was a direct result of the equity committee's hard fought efforts during the chapter 11
cases culminating in a twenty-seven day valuation trial which ultimately resulted in a consensual
chapter 11 plan amongst Mirant's key constituencies, including shareholders. See Mirant
Disclosure Statement at 74-75.

As noted above, this "prejudged" valuation of the debtor is an extremely difficult
exercise under the best of circumstances. Here, this exercise is even further complicated.
Notwithstanding the early stages of these Cases, the Court is now required to foresee the
composition of the Debtors' business plan at some distant date in the future, perhaps a year from
now or even longer. The Court is also required to prematurely predict the resolution of a variety
of business issues facing the Debtors, all of which are inherently unpredictable, such as (i) the
potential outcome of the renegotiation of the Debtors' union obligations, including the
continuation, termination or freezing of their pension plans or instead the implementation of a
defined contribution plan; and (ii) the possible structure of the reorganized Debtors, including the
potential elimination of the Automotive Holdings Group ("AHG") segment. Further
complicating the valuation of the Debtors' enterprise is the requirement that the Court predict the

41

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

uncertain future of the global automotive industry, which may be significantly impacted by the success or failure of the restructuring efforts of GM – Delphi's former parent and currently its largest customer. Finally, the Court must assess the outcome of the significant, disputed issues between the Debtors and GM involving billions of dollars, which most likely will be resolved through litigation. Accordingly, given the overwhelming uncertainties associated with valuing a public company in chapter 11, such as the Debtors, Appaloosa should be given the benefit of the doubt.

Relying on the holding in <u>Williams</u>, however, the Debtors and Creditors' Committee argue that Appaloosa must prove to the Court that there is a "substantial likelihood that [shareholders] will receive a meaningful distribution in the case under a strict application of the absolute priority rule." Debtors' Objection ¶ 13 (quoting <u>Williams</u>, 281 B.R. at 223); Creditors' Committee Objection ¶ 25 (same). As explained above, this "substantial likelihood" factor is a departure from established case law, which clearly holds that Appaloosa need only establish that Delphi does not appear "hopelessly insolvent."

Further, the "substantial likelihood" of a meaningful distribution factor is at odds with the Congressional intent behind the enactment of section 1102(a) of the Bankruptcy Code, which was to "'counteract the natural tendency of a debtor in distress to pacify large creditors, with whom the debtor would expect to do business, at the expense of small and scattered public investors.'" <u>Johns-Manville</u>, 68 B.R. at 160 (quoting S. Rep. No. 989, at 10 (1978), <u>as reprinted in</u> 1978 U.S.C.C.A.N. 5787, 5796). Requiring the Delphi shareholders to incur the costs of proving that the Debtors are solvent does nothing to protect the small shareholders. The need for protection through the appointment of an equity committee is paramount, given that (i) Delphi has capitulated to the parochial interests of GM and the unions by publicly stating that the

42

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

Debtors are insolvent, and (ii) as evidenced by the KECP Motion, management is hopelessly

conflicted.

Additionally, the "substantial likelihood" factor set forth by the Williams court is

unnecessarily broad given that there was not even a colorable argument that the debtors in that

case were solvent. In Williams, the debtors' expert determined that the debtors' enterprise was

valued between $1.225 billion and $1.575 billion. Williams, No. 02-11957 (BRL), July 24,

2002, Hr'g Tr. at 17:13-17 (hereinafter, the "Williams Hearing Tr."), attached as Exhibit "DD"

to the App. Moreover, the debtors in Williams had approximately $2.5 billion in funded debt

outstanding, $2.3 billion in claims owed to the parent company, and approximately $725 million

in funded debt owed to secured lenders on account of guarantee claims as well as additional

funded debts of approximately $250 million. Williams Hearing Tr. at 15:20-16:15. Even

assuming, arguendo, that it was possible for an equity committee to eliminate the $2.3 billion in

claims owed to the parent company, the debtors' funded debt was still more than $1.5 billion

greater than the debtors' most optimistic enterprise value. Without doubt, the debtors in

Williams were hopelessly insolvent. Consequently, in light of Congressional intent to protect

shareholders interests, the higher implied standard of a "substantial likelihood" of receiving a

meaningful distribution should be limited to the facts in Williams.[15] However, even adapting the

---

[15]    The facts of Williams are even further distinguishable from the instant case; that case involved a pre-bankruptcy agreement with the debtors' banks, which permitted the holding company to complete a financial restructuring without the entanglement of the operating business which was reorganizing under chapter 11. Williams Hearing Tr. at 26:5-9, attached as Exhibit "DD." Within 30 days of its chapter 11 filing, a joint plan of reorganization and related disclosure statement had already been filed with the bankruptcy court. At the time of the motion to appoint an equity committee, the debtors were already rapidly approaching a deadline under this pre-bankruptcy agreement which would allow the debtors' banks the freedom to exercise their remedies at the operating company level. Id. at 26:9-13, supra. Had the bank-imposed deadline been missed, the case would have taken on increased complexity and cost. Id. at 26:13-23. In contrast, these Cases are only in their infant stages at five months old and there is no potentially hazardous deadline quickly approaching.

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

<u>Williams</u> dicta, Appaloosa believes that there is a substantial likelihood that the Debtors

ultimately will be found solvent and shareholders will receive a meaningful distribution.

The Debtors' reliance on this Court's decision in <u>Loral</u> in support of their

objection is also misplaced. Debtors' Objection ¶ 14. In the <u>Loral</u> case, this Court twice rejected

the shareholders' request for the appointment of an equity committee. Initially, the Court

rejected the appointment of an equity committee because the main reason for the filing of the

motion to appoint such committee was the pending auction of a substantial percentage of the

debtors' assets; the Court denied the motion because it could not determine how an equity

committee would add any value to the auction procedures it had previously approved as fair and

value-maximizing. <u>See</u> <u>Loral</u>, No. 03-41710 (RDD), September 19, 2003, Hr'g Tr. at 67:23-25,

68:8-10 attached as Exhibit "EE" to the App. This Court further concluded that the appointment

of an equity committee, absent a determination of the existence of "real equity," would have

jeopardized the asset sale, and severely reduced the debtors' enterprise value.[16] <u>See</u> <u>Loral</u>

December Tr. at 129:15, <u>supra</u>. The facts in <u>Loral</u> are strikingly different from the facts of these

Cases, since there is no impending or rapidly approaching "drop-dead" date that threatens to

reduce the Debtors' enterprise value if an equity committee is appointed.

Upon the petitioning shareholders' second request, this Court denied the

appointment of an equity committee because (i) the sole evidence relied upon by the movants,

the debtors' "book value" derived from SEC filings along with a range of trading prices, clearly

pointed to the debtors' insolvency, <u>id.</u> at 131:16-132:3; and (ii) there was no claim that

management was not already adequately representing shareholder interests. <u>Id.</u> at 133:5-9, In

---

[16]      An equity committee was ultimately appointed by the U.S. Trustee on March 29, 2005, after the Court
concluded that the Debtors failed to honor their agreement to provide equity with confidential material pertinent to
the development of their business plan and plan of reorganization. <u>See</u> Appointment of Committee of Equity
Security Holders, <u>Loral</u>, No. 03-41710 (RDD) [D.I. 1814].

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

sharp contrast, Appaloosa has and will present significant evidence, including expert reports and

expert testimony, demonstrating that the Debtors' enterprise value significantly exceeds its

funded and trade debt, resulting in significant value to shareholders.

> **B.** **Debtors' Filings had Nothing to do with Insolvency and**
> **were Triggered by Amendments to the Bankruptcy Code**

Based upon the discovery produced by the Debtors, it is clear that the

commencement of these Cases was not predicated upon any immediate or looming liquidity

crisis. See, e.g., October 8, 2006 through November 30, 2006 Monthly Operating Report (listing

cash and cash equivalents at $956 million), attached as Exhibit "FF" to the App.  To date, the

Debtors have failed to produce any analyses or evidence demonstrating that the Debtors'

enterprise was insolvent either at the time of filing or even at the time that Delphi declared that it

was hopelessly insolvent.  The Debtors' claims of hopeless insolvency are severely undermined

by their payment of a $0.015 dividend on Delphi $0.01 par value common stock on August 2,

2005 – shortly before the commencement of these Cases.  As set forth in the Motion, Delaware

law allows dividends to be declared *and* paid only (i) out of surplus, or, in the case where no

surplus exists, (ii) out of the company's profits for the fiscal year in which the dividend is

declared and/or the preceding fiscal year.  Del. Code Ann. tit. 8, § 170 (2005).  As Delphi had

not reported any profits in 2005 or 2004, payment of the August 2, 2005 dividend must have

been from Delphi's surplus.[17]  Thus, as of August 2, 2005, just two months prior to Delphi's

filing, the Board determined that the value of Delphi's assets exceeded its liabilities.  Any

---

[17]      At the time the dividend was declared, Delphi's consolidated financials, as reported in the company's
filings with the SEC, stated that the company had total assets of $16.5 billion, total liabilities of $20.9 billion, and a
stockholders' deficit of $4.6 billion. See Delphi Corp., (2nd Quarter Form 10-Q) (Aug. 8, 2005), 4.  The company
also reported a net loss of $741 million for the first six months of 2005.  The company's consolidated financials for
the year ending December 31, 2004, stated that the company had total assets of $16.6 billion, total liabilities of
$19.9 billion, and a stockholders' deficit of $3.5 billion.  See Delphi Corp. (Form 10-K) (June 30, 2005), 58-59.
The company also reported a net loss of $4.8 billion for 2004.

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

inference that the Board did not carefully consider whether Delphi was solvent is belied by the

fact that Delaware law provides for personal liability to the board members who vote for a

dividend that is ultimately determined to be unlawful. See Del. Code Ann. tit. 8, § 174 (2005).

Further, a review of the Debtors' public filings between the payment of the August dividend and

commencement of these Cases does not demonstrate any drastic changes in the Debtors'

financial conditions.

### C.    Factors Relied upon by Objecting Parties that Debtors are Insolvent are Faulty and not Dispositive

The Debtors, U.S. Trustee and Prepetition Agent argue that the Debtors are or

appear to be hopelessly insolvent. In support of their objection, the Debtors simplistically rely

on their schedules and statement of financial affairs, as well as their January monthly operating

report "which reflect a shareholder deficit of approximately negative $6.4 billion." Debtors'

Objection ¶ 7; see also █████████████████████████

████████████████████████████████

████████████████████████████████████

████████ rely on the recent trading prices of Delphi's public securities as evidence that equity

"stands no realistic chance of any recovery." Id.; see also █████████████

███████████████████████████████████

████████████████████████████ In concluding that the Debtors are

arguably insolvent, the U.S. Trustee relies on the Debtors' schedules, each of the Debtors'

monthly operating reports and the Debtors' various SEC filings including, specifically the

Debtors' September 30, 2005, Third Quarter Form 10-Q filed with the SEC on November 9,

2005. U.S. Trustee Objection ¶¶ 14-16. Similarly, in concluding that the Debtors are insolvent,

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

the Prepetition Agent relies on the Debtors' September 30, 2005 balance sheet from Delphi's

third quarter 10-Q.  Prepetition Agent Objection ¶ 15.  The Creditors' Committee skirts around

the issue of the Debtors' insolvency by never concluding that the Debtors are hopelessly

insolvent; but rather that "documents filed by the Debtors since the commencement of these

cases reflect the Debtors' assertion that they are insolvent on a consolidated basis by at least $5

billion."  Creditors' Committee Objection ¶ 28.

Each of the Objecting Parties' conclusions is based at least in part on the faulty

and overly simplistic premise that the valuation of a going concern enterprise in bankruptcy is

based solely upon the "book value" of its assets.  Even assuming that the Debtors' "book value"

is accurately prepared in accordance with GAAP, such valuation is simply not an appropriate

tool for predicting the insolvency of a debtor or the potential economic recoveries of its

stakeholders.  See In re Kaypro, 218 F.3d 1070, 1076 (9th Cir. 2000) ("There is no generally

accepted accounting principle for analyzing the insolvency of a company.").  A surplus or deficit

based on GAAP book value relates, if at all, only coincidentally to distributable value in a

bankruptcy case.  As stated by this Court,

> The market value of assets may be greater or less than their book
> value.  Generally accepted accounting principles ("GAAP") do not
> control a court's decision.  In spite of their propriety according to
> GAAP, a court may modify balance sheet entries (i.e.,
> increase/decrease the value of an asset or reduce/elevate the
> amount of the liability) in order to more accurately reflect the
> financial condition of the Debtor.

In re Centennial Textiles, Inc., 220 B.R. 165, 174-75 (Bankr. S.D.N.Y. 1998) (citations omitted);

see also In re Babcock & Wilcox Co., 274 B.R. 230, 260 (Bankr. E.D. La. 2002) ("Requiring

application of GAAP would make accountants and the board which promulgate GAAP the

arbiters of insolvency questions.  Clearly the Code provides that judges should make such

47

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

decisions . . . . Thus although GAAP are relevant, they are not controlling in insolvency

determinations.") (citing In re Sierra Steel, Inc., 96 B.R. 275, 278 (B.A.P. 9th Cir. 1989)).

To the contrary, the determination of solvency in the circumstances of considering whether to

appoint an equity committee is a "practical conclusion, based on a confluence of factors."

Williams, 281 B.R. at 221. "[It] is not a simple matter of statutory construction where the Court

can rest with citation to the balance sheet test of 11 U.S.C. § 101(32)." Wang, 149 B.R. at 3.

Moreover, where a debtor is reorganizing and will continue to build the value of its assets, the

fair market value of these assets must also account for future earnings potential.

        Accordingly, the appropriate valuation of the Debtors' assets should be grounded

on a comparable methodology or discounted cash flow methodology - not simply based upon

their balance sheet. See In re Mirant Corp., 334 B.R. 800, 816 (Bankr. N.D. Tex. 2005) ("The

court has found in numerous opinions support for valuation of a chapter 11 debtor through the

use of the DCF Method and the Comparable Method . . . . The court finds these methods of

valuation the most likely to ensure that Mirant Group is valued based on the worth of its future

ability to produce income.") (citing In re Bush Indus., Inc., 315 B.R. 292, 299-02 (Bankr.

W.D.N.Y. 2004); In re Exide Techs., 303 B.R. 48, 65 (Bankr. D. Del. 2003); In re Cellular Info.

Sys., Inc., 171 B.R. 926, 930 (Bankr. S.D.N.Y. 1994); In re Pullman Constr. Indus. Inc., 107

B.R. 909 (Bankr. N.D. Ill. 1989)); see also Loral December Tr. 131:16-132:3, supra, (petitioning

shareholders relied solely on 'back of the envelope accounting' as they produced no evidence

other than the debtors' book value derived from SEC filings along with a range of trading

prices). In Bush, the bankruptcy court also found that, for the court to conduct an appropriate

valuation of a debtor in the context of a cram down under section 1129(b) of the Bankruptcy

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

Code, the debtor must demonstrate its present value as a reorganized entity, based upon the

debtor's earning capacity.  315 B.R. at 299.

In short, the foregoing authority clearly provides that, in determining whether the

Debtors are hopelessly insolvent, a balance sheet test is simply insufficient for estimating the fair

value of their assets.  Rather, because the Debtors are reorganizing and will continue to obtain

value from their assets, the fair market value of these assets must account for future ability to

produce income.

Even if one relies solely on "book value," the Debtors are solvent (and are

certainly not 'hopelessly insolvent').  ███████████████████████████████████

███████████████████████████.  Moreover, the Debtors' various CBAs will expire by

their own terms in the fall of 2007.  ███████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████.  In their most recent quarterly report filed with the SEC for

September 30, 2005, the Debtors report total assets of $17.210 billion and total liabilities of

$22.363 billion.  After deducting the unvested OPEBs, Delphi and its affiliates have a positive

"book value" that totals $1.614 billion.  Accordingly, even under the "book value" standards

advocated by the U.S. Trustee, the Debtors are "book value" solvent.

The Debtors and the Prepetition Agent rely on trading value of the Debtors'

publicly traded bonds as support for their position that the Debtors are insolvent.  Prepetition

Agent Objection ¶ 14; Debtors' Objection ¶ 17; ████████████████  Trading value of a

debtors' publicly traded securities is hardly an accepted measure of valuation.  The Debtors

argue that because the Debtors' public bonds were trading at an implied recovery of between

53.0% and 55.8% of face value and Delphi's publicly traded preferred trust securities were

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

trading at an implied recovery of 24% of face value this is an indicator that the Debtors are

insolvent.  Debtors' Objection ¶ 17.  However, as this Court noted in the Loral decision, trading

valuations are far from accurate.  See Loral December Tr. 132:8-10, supra.  Indeed, in the initial

stages of a bankruptcy case, trading prices in public bonds for companies in bankruptcy often

bear little or no relationship to stakeholders' ultimate recoveries.  In most large bankruptcies, the

debtors' publicly traded debt instruments will trade at a discount to its face value due to the

stigma of bankruptcy itself.  As noted by the court in In re Mirant Corp., "[i]t is not appropriate

to value securities of a reorganized debtor based on what the market would pay since the 'taint'

of bankruptcy will cause the market to undervalue the securities and future earning capacity of

the Debtor."  334 B.R. 800, 822 n.71 (Bankr. N.D. Tex. 2005) (quoting In re Exide Techs., 303

B.R. 48, 66 (Bankr. D. Del. 2003)); In re New York, New Haven & Hartford R.R. Co., 4 B.R.

758, 792 (D. Conn. 1980) ("The stigma of bankruptcy alone is a factor that will seriously depress

the market value of a company's securities."); see also In re Penn Cent. Transp. Co., 596 F.2d

1102, 1115 (3d Cir. 1979) (recognizing that, in some instances, "evidence of market value should

be ignored because the market can be expected irrationally to undervalue the securities of a once-

distressed company emerging from a lengthy reorganization").  Not only is the market likely to

irrationally undervalue distressed securities due to the "taint" of bankruptcy, it will also likely

fail to adequately account for the benefits inherent in the chapter 11 process.  See Mirant, 334

B.R. at 834 ("the market does not fully accord Mirant Group the value enhancement achieved in

the course of these cases").  Until a chapter 11 plan is developed and the terms of emergence

become clear, trading prices are frequently volatile and unreliable.  The Mirant case is illustrative

of the inefficiency of the markets in the debt trading arena.  In In re Mirant Corp., Case No. 03-

46590 (DML) (Bankr. N.D. Tex. 2003), filed July 14, 2003, Mirant Corp.'s public bonds traded

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

at an implied recovery of 52.0% of face value on September 30, 2003. See Company Synopsis

Report, BankruptcyData.com, http://www.bankruptcydata.com (last visited March 9, 2006).

However, within months prior to the plan confirmation in Mirant (the "Mirant Plan"), these

bonds were trading at face value and under the Mirant Plan, equity holders ultimately received

3.75% equity in new common stock, new warrants, and a pro rata share of 50% of litigation

distributions. Id. Attached as Exhibit "GG" to the App. is a chart illustrating the market

inefficiencies in the Mirant public bond trading prices during the pendency of Mirant's chapter

11 case.

      The Mirant situation is not unique. See, e.g., UAL Corp., Case No. 02-48191

(Bankr. N.D. Ill., confirmed Jan. 20, 2006) (bond trading prices were 11.5% of face value on the

petition date, decreased to as low as 3.75% three months into bankruptcy, and gradually

increased after much volatility to 22.5% at confirmation); Enron Corp., Case No. 01-16034

(Bankr. S.D.N.Y., confirmed July 15, 2004) (bond trading prices decreased from approximately

60% to 21% of face value in the week preceding the petition date, decreased to as low as

10% almost eight months into bankruptcy, and then gradually increased over two years of slight

volatility to 27% at confirmation); WorldCom, Inc., Case No. 02-13533 (Bankr. S.D.N.Y.,

confirmed Oct. 31, 2003) (bond trading prices were approximately 13% of face value on the

petition date, decreased to as low as 9.5% a month later, then gradually increased through great

volatility over more than a year's time to 36.75% at confirmation); Conseco, Inc., Case No. 02-

49672 (Bankr. N.D. Ill., confirmed Sep. 9, 2003) (bond trading prices were 12% to 32% of face

value on the petition date, and gradually increased to 48%-97% at confirmation); Carmike

Cinemas, Inc., Case No. 00-03302 (Bankr. D. Del., confirmed Jan. 3, 2002) (common

stockholders received pro-rata share of the new common stock and subsidiary holders retained

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

equity interests under confirmed plan, even though debt traded at a discount early in

bankruptcy: bond trading prices decreased from 43.5% to 20.5% of face value in the week

preceding the petition date, decreased slightly more and then gradually increased with slight

volatility to 104.25% at confirmation); KCS Energy, Inc., Case No. 00-00028 (Bankr. D. Del.,

confirmed Jan. 30, 2001) (common stockholders retained equity interests under confirmed plan,

even though debt traded at a discount early in bankruptcy; bond trading prices were 32% to 34%

of face value on the petition date, decreased slightly more and then gradually increased with

slight volatility to 97.5% at confirmation). Attached as Exhibit "HH" to the App. are charts

illustrating the market inefficiencies in the public bond trading prices during the pendency of

these chapter 11 cases.

       The obvious conclusion is that postpetition debt trading values are not an accurate

measure of future recoveries. See Mirant 334 B.R. at 833 (noting that there are too many risks

warranting a discount in the market price of traded debt for the court to rely upon

preconfirmation debt prices as a credible test of value). Accordingly, this Court should give very

little weight, if any, to the present trading price of the Debtors' publicly traded debt securities in

relation to the Debtors' solvency or the likelihood that Delphi shareholders will receive a

substantial recovery.

    **D.**    **The Appropriate Standard in
Determining Solvency is Enterprise Value**

       Enterprise value is a measure of the value of a corporation based on its future

ability to produce income. See In re Mirant Corp., 334 B.R. 800, 816 (Bankr. N.D. Tex. 2005).

As set forth above, in contrast to the arguments made by the various Objecting Parties, the Court

does not assess the enterprise value of a business based upon a mere review of the balance sheet.

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

Rather, the Court must consider the Debtors' future projected income stream. While in many cases the largest components of debt are largely undisputed, funded obligations such as bank loans, bond debt and trade debt, in these Cases, the largest components of debt (at least according to the Debtors) are retiree and employee benefits -- debts that are subject to dispute and various interpretations (including how they should be charged against enterprise value). Furthermore, the Court must make certain assumptions as to certain outcome-determinative matters that plague the Debtors, including how labor contracts may ultimately be restructured and the impacts of such restructuring. Depending upon the resolution of these issues, the Debtors could be <u>wildly</u> solvent.

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**



**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**



**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**



**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**



**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**



**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

IV.    **The Debtors' Shareholders Are Not**
**Adequately Represented in these Cases**

A.    **The Debtors and the Board Have Not and Will Not**
**Adequately Represent the Interests of the Shareholders**

In their oppositions to the Motion, certain of the Objecting Parties argue that

interests of shareholders are adequately represented by the Debtors and their Board because they

have a fiduciary duty to maximize the value of the Debtors' estate for the benefit of all

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

stakeholders.  See Debtors' Objection ¶ 20; Creditors' Committee Objection ¶ 18; Prepetition

Agent Objection ¶ 10.  Appaloosa does not dispute that the Debtors have a fiduciary duty to

maximize value for all stakeholders.  The mere existence of this fiduciary duty, however, does

not logically lead to a finding of adequate representation for shareholders.  Rather, the Debtors

actually must be acting in furtherance of that duty and truly be representing and protecting the

interests of the Delphi shareholders.

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

[REDACTED]

In dereliction of their duty to shareholders, the Board has, among other things, (i) cancelled shareholder meetings; (ii) [REDACTED] ; (iii) double-counted liabilities, thereby erroneously inflating liabilities; and (iv) filed its chapter 11 petitions without any looming liquidity crisis in order to protect and maximize the rights of the Debtors relating to key employee retention plans and exclusivity rights. Clearly, the interests of shareholders are simply being ignored by the Debtors.

The apparent self-serving predicate for filing bankruptcy is also evidenced by the KECP Motion, which the Debtors filed on the Petition Date. The mere filing of the KECP Motion makes the Debtors' management hopelessly conflicted. The KECP, which assumes the cancellation of some portion of old equity, coupled with the Debtors' apparent unwillingness to even consider alternative analyses regarding its claim of hopeless insolvency, clearly demonstrate that Delphi's Board and management are more concerned with protecting their own interests than those of the Debtors' shareholders.

As the Debtors have already resigned themselves to the position that there is no shareholder interest to protect, it is unquestioned that the Debtors have not and will not adequately represent the interests of shareholders in these Cases and, thus, the appointment of an official equity committee is essential.

61

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

B.     **The Creditors' Committee Has Not and Cannot Be Expected to
Adequately Represent the Interests of Shareholders**

Despite Congress' clear instruction that neither debtors nor creditors can

adequately represent the interests of public shareholders in large and complex cases, certain of

the Objecting Parties allege that the Creditors' Committee will adequately represent the

shareholders' interests in these Cases. See Debtors' Objection ¶ 21; Creditors' Committee

Objection ¶ 20; Prepetition Agent Objection ¶ 21.[18]

Although unsecured creditors and shareholders may possess a general identity of

interest on account of the absolute priority rule's mandate that junior interests retain nothing

unless senior debt is paid in full, such interests are not always aligned and often diverge.

See, e.g., In re Saxon Indus., Inc., 29 B.R. 320, 321 (Bankr. S.D.N.Y. 1983) (unsecured creditors

committees and equity committees "are separate and distinct entities with the members of the

unsecured creditors and equity creditors class possessing variant priorities and interests with

respect to their relationship with the debtor"); In re Evans Prods. Co., 58 B.R. 572, 575 (Bankr.

S.D. Fla. 1985) ("The interests of creditors and shareholders are likely to conflict over the course

of a Chapter 11 proceeding").

Furthermore, despite the Debtors' assertions to the contrary, the Creditors'

Committee has neither a duty nor incentive in these Cases to choose strategic alternatives that

maximize value for equity. The Creditors' Committee only has a fiduciary duty to maximize the

value of the Debtors' estates to produce the greatest recovery for unsecured creditors, and

unsecured creditors have a limited upside to their interests – they may only hope to receive a

---

[18]     In presenting their position, the Debtors even go so far as to contend that the Creditors' Committee owes a
fiduciary duty to shareholders, but such a notion can be easily disregarded given that the Creditors' Committee
freely admits that it owes no duty to maximize value for shareholders. See Debtors' Objection ¶ 20; Creditors'
Committee Objection ¶ 20.

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

distribution up to the aggregate value of their claims. Thus, no matter how well a debtor could perform over the course of the restructuring process, the Creditors' Committee need only maximize value up to the point that its constituency receives a meaningful distribution. Shareholders may still be left out of any distribution, however, even if a creditors' committee has completely satisfied its duty to its unsecured creditors. Accordingly, it is facially disingenuous to argue that the Creditors' Committee, owing fiduciary duties only to creditors, can adequately represent the interests of the Delphi shareholders simply because unsecured creditors might share *some* interests in line with equity holders.

Finally, the divergence of interests between the Creditors' Committee and the Delphi shareholders is underscored by the fact that the Creditors' Committee has failed to challenge the Debtors' irresponsible claims of hopeless insolvency. As such, the Creditors' Committee has resigned itself to the position that shareholders have no interest in these Cases. Again, it defies logic to argue that the Creditors' Committee, a party who refuses to recognize that the Delphi shareholders even have interests worth protecting, can or will adequately represent the interests of such shareholders. For this reason, the appointment of an equity committee is essential to assure the adequate protection of the Delphi shareholders.

**C.    Additional Factors Warrant Appointment of an Equity Committee**

   i.    Appointment Of An Equity Committee
         Is Not Rare In Large And Complex Cases

The Debtors and the Creditors' Committee contend that the appointment of an equity committee is rare. See Debtors' Objection ¶ 13; Creditors' Committee Objection ¶ 14. However, the Debtors and the Creditors' Committee ignore the fact that, in large and complex bankruptcy cases, such as these Cases, the appointment of an equity committee is quite common. In four of the ten largest chapter 11 cases in U.S. history (other than primarily financial

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

companies), official equity committees were appointed.[19]  Additionally, since 2000, at least 30

equity committees have been appointed in various jurisdictions.[20]  While the appointment of an

equity committee may not be common in the average "mom and pop" grocery store chapter 11

case, the empirical data simply refutes the supposed rarity of official equity committees,

particularly in cases of this size.

> The Creditors' Committee further argues that "Congress' desire to protect

shareholders in reorganization proceedings was not strong enough . . . to mandate the creation of

equity committees."  Creditors' Committee Objection ¶ 15 (quoting Johns-Manville, 68 B.R. at

160).  While it is true that Congress decided not to require the appointment of equity committees,

legislative history illuminates Congressional reasoning that the appointment of an equity

committee need to be seriously considered in cases involving public companies:

> Statistical information provided by the SEC . . . indicates that the
> overwhelming majority of reorganization cases would not involve
> public companies . . . .  But the few exceptions -- the public
> companies -- are of vast importance.  As the SEC noted . . . public
> companies . . . represented only between one-half and one percent
> of the business reorganization cases in Chapters X and XI in the
> years 1975-77.    But these cases,  though  few  in  number,

---

[19]    A committee of equity security holders was appointed in In re Texaco, Inc., Case No. 87-20142 (ASH) (Bankr. S.D.N.Y. Apr. 12, 1987), In re Adelphia Commc'ns Corp., Case No. 02-41729 (REG) (Bankr. S.D.N.Y. June 25, 2002), In re Mirant Corp., Case No. 03-46590 (DML) (Bankr. N.D. Tex. July 14, 2003), and In re Kmart Corp., Case No. 02-02474 (SPS) (Bankr. N.D. Ill. Jan. 22, 2002).

[20]    Equity committees have been appointed in the following additional cases: USG Corp., (01-2094 D. Del.); Loral Space & Commc'ns Ltd., (03-41710 S.D.N.Y); THCR/LP Corp. (Trump Hotels & Casinos), (04-46898 D. N.J.); Interstate Bakeries Corp., (04-45814 W.D. Mo.); Intermet Corp.,(04-67597 E.D. Mich.); Bush Indus., Inc., (04-12295 W.D.N.Y); Footstar, Inc., (04-22350 S.D.N.Y.); Gadzooks, Inc., (04-31486 N.D. Texas); Seitel, Inc., (03-12227 D. Del.); Impath Inc., (03-16113 S.D.N.Y.); Solutia Inc., (03-17949 S.D.N.Y.); Peregrine Sys., Inc.,(02-12740 D. Del.); Cone Mills Corp.,(03-12944 D. Del.); Exide Techs., (02- 11125 D. Del.); MSCP Holdings, Inc., (02-10253 D. Del.); Pathmark Stores, Inc., (00-2963 D. Del.); Fed.-Mogul Global, Inc., (01-10578. D. Del.); W.R. Grace & Co., (01-01139 D. Del.); Quintus Corp., (01-501 D. Del.); Imperial Distrib., (01- 00140 D. Del.); AMRESCO, INC., (01-35327 N.D. Texas); The Finova Group Inc., (01-00697 D. Del.); Comdisco Inc., (01-24795 N.D. Ill.); Heilig-Meyers Co., (00-34533 E.D. Va.); Coram Healthcare Corp., (00-03299 D. Del.); Stone & Webster, Inc., (00-2142, D. Del.); and LTV Steel Co., Inc., (00-43866 N.D. Ohio).

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

> represented over 90 percent in total assets and liabilities of all cases with a substantial public investor interest. It is only for such public companies that the Bill reenacts the few basic safeguards of Chapter X.
>
> As public investors are likely to be junior or subordinated creditors or stockholders, it is essential for them to have legislative assurance that their interests will be protected. Such assurance should not be left to a plan negotiated by a debtor in distress and senior or institutional creditors who will have their own best interest to look after.

S. Rep. No. 95-989 at 10 (1978) (emphasis added), as reprinted in 1978 U.S.C.C.A.N. 5787, 5796. In short, Congress recognized that equity committees are not necessary in most reorganization cases (i.e., where the reorganizing debtors do not have public investors); but in the few exceptions (i.e., where the interests of a substantial number of public shareholders are implicated), Congress clearly expressed its belief that protection and adequate representation of these interests is essential and fundamental to the chapter 11 process.

      ii.      Sections 1109(b) And 503(b) Of The Bankruptcy Code Do Not Provide Shareholders With Adequate Representation

Surprisingly, certain Objecting Parties argue that, because Appaloosa has standing to be heard on various issues pursuant to section 1109(b) of the Bankruptcy Code, the appointment of an equity committee is unnecessary. See Creditors' Committee Objection ¶ 21; U.S. Trustee Objection ¶ 30; Prepetition Agent Objection ¶ 23. These parties suggest that Appaloosa and other existing equity holders form an ad hoc committee and then, depending upon the outcome of these Cases, seek award of their expenses under section 503(b) of the Bankruptcy Code. See Creditors' Committee Objection ¶ 21; U.S. Trustee Objection ¶ 31; Prepetition Agent Objection ¶ 23. The notion that Appaloosa, whether alone or in conjunction with some "ad-hoc" committee, should bear the burden of representing the interests of all shareholders (with the

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

opportunity to seek reimbursement under section 503(b) for making a substantial contribution to these Cases) is preposterous.

First, Appaloosa is not a fiduciary, which is what shareholders need. Second, it is abundantly clear based simply on the discovery disputes involved in litigating this Motion that without official committee status (and the rights conferred by section 1102), no individual shareholder relying on the rules of discovery will be able to obtain timely access to the level and type of information needed to fully and fairly represent the interests of all shareholders in the resolution of the complex issues presented by these Cases.

Further, if equity holders could be considered adequately represented simply because section 1109(b) provides them standing to be heard and section 503(b) provides them with the ability to request reimbursement for expenses, under what circumstances would an equity committee ever be appointed? Such an interpretation of sections 1109(b) and 503(b) would render meaningless section 1102(b) of the Bankruptcy Code, which clearly authorizes a court to appoint an equity committee where "necessary to assure adequate representation." 11 U.S.C. § 1102(a)(2).

The answer, of course, is that the rights afforded under section 1109(b) and 503(b) do not, standing alone, constitute adequate representation. As the court discussed in the seminal case of Beker,

> Certain benchmarks have thus been developed [to determine if additional committees are warranted]. Collier notes:
>
> > [I]n a large case, in which there are significant groups of creditors or equity security holders with conflicting claims which are likely to be affected by the plan of reorganization, the court should authorize the appointment of additional committees. . . .

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

> Here it is clear that the holders of Debentures and stock need to be
> represented by separate official committees. Most importantly, the
> public debt here is widely held. While a significant portion,
> particularly of the public debt, may be held for their own account
> by institutions having the financial interest and means to represent
> themselves, the presence of at least 400 holders of small amounts
> indicates the need for their representation through an official
> committee having the fiduciary responsibility of acting on their
> behalf. The same is true of the shareholders. The position that
> some members of the class may have resources sufficient to protect
> their interests is of little significance, in our judgment, at least
> where the security is widely held. They do not have the fiduciary
> duty to represent their fellow security holders.

Beker, 55 B.R. at 948-49 (quoting 5 COLLIER ON BANKRUPTCY ¶ 1102.2 at 1102-18 (15th ed.

1984)) (citations omitted; emphasis added); see also Exide Techs., 2002 WL 32332000 at *2

(district court noted that "although appellee is a substantial equity holder capable of representing

itself in the bankruptcy proceeding, the bankruptcy court concluded that the Chapter 11 process

would benefit from having an official committee of equity holders"). Section 1109 of the

Bankruptcy Code gives individual shareholders the right to be heard, but it does not give

shareholders the right to negotiate plans, nor any of the other statutory rights, obligations, and

fiduciary responsibilities that come with official committee status.

   Any suggestion that individual equity holders acting on their own, without the

imprimatur of official committee status, can otherwise participate meaningfully without

disadvantage in any bankruptcy case of significant magnitude – no less one of this size and

complexity – so obviously ignores the practical realities of chapter 11 practice as to be facially

disingenuous. Absent official representation, equity holders will be effectively shut out of the

process, through a practical lack of access to management and other necessary resources from

the Debtors and/or through simple attrition. See, e.g., In re Dow Corning Corp., 194 B.R. 121,

146 (Bankr. E.D. Mich. 1996) ("[T]en months into the case and after repeated assurances by the

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

Debtor that it would consult with the official committees and the unofficial groups such as the

physicians, all parties agree that the physicians have never yet been a party to discussions.

Although their legal positions are defended in court, the behind-the-scenes work which is so

essential to a successful chapter 11 case is stymied by the physicians' lack of official committee

status." (emphasis added)), rev'd on other grounds, 212 B.R. 258 (E.D. Mich. 1997).  Along

these lines, the Debtors are currently negotiating with the UAW and GM on restructuring its

CBA with the UAW without any consultation with shareholders.  Thus, at the very least, if there

is any doubt, this Court should err on the side of caution and not permit others to gain strategic

advantage to improve their positions or advance agendas through the de facto exclusion of equity

security holders that will result from a denial of this Motion.

Finally, the Creditors' Committee baldly states that "[b]y its Motion, Appaloosa

in effect is seeking to avoid the procedures intended by Congress in its drafting of sections

503(b)(3) and (4) of the Bankruptcy Code, instead seeking guaranteed payment of its fees and

expenses regardless of whether Appaloosa contributes any value in these cases."  Creditors'

Committee Objection, p. 5.  Aside from baselessly insulting the integrity of Appaloosa by

suggesting that Appaloosa's primary concern is having its fees paid, the Creditors' Committee

confuses the role of Appaloosa, as significant shareholder, with the role of Appaloosa as movant

seeking the appointment of an equity committee.  Appaloosa cannot be expected to form an ad

hoc equity committee with the hope that the expenses it incurs in doing so will ultimately be

reimbursed.  This would improperly force Appaloosa to bear the costs of representing all of the

over 300,000 equity holders' interests (to whom it owes no fiduciary duties) with money from its

own pockets and with no assurance of ever being reimbursed for its efforts.

In short, the rights provided under sections 1109(b) and 503(b) of the Bankruptcy

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

Code are simply insufficient to assure that the interests of equity holders are adequately

represented in these Cases.

      iii.     An Equity Committee Must Be Appointed Because
                These Cases Are Large And Complex

      The U.S. Trustee questions whether the Debtors' Cases are sufficiently complex

to justify appointment of an equity committee. U.S. Trustee Objection ¶ 28. This is remarkable

given that the Debtors themselves have acknowledged that these Cases are large and complex.

See Debtors' Objection to Motion of Law Debenture Trust Company of New York Requesting

Change in Membership of Official Committee of Unsecured Creditors, dated December 30, 2005

¶ 18 (neither the Debtors nor the Creditors' Committee have disputed the complexity of the

case); see Global Notes and Statement of Limitations, Methodology and Disclaimer Regarding

Debtors' Schedules and Statements, Note 6(k) ("[t]he businesses of the Debtors are complex");

see also Miller Aff. ¶ 39. Likewise, the Prepetition Agent has acknowledged that these Cases are

large and complex. Prepetition Agent Objection ¶ 22. Indeed, the Debtors' bankruptcy ranks as

the fifth largest public company chapter 11 in terms of revenues, the 13th largest public company

business reorganization in terms of assets, and the third largest bankruptcy filing in 2005.

      Further, the range of issues that will need to be resolved prior to confirmation

support a determination that these Cases are complex. The Debtors, together with substantial,

non-Debtor affiliates, are organized under a complex corporate structure. The publicly available

information indicates that substantial unencumbered assets (or assets with substantial residual

value) exist within legal entities with relatively little debt, particularly with respect to the

Debtors' foreign and emerging new operations. In contrast, the major liabilities cited by the

Debtors as the cause of the deterioration of their recent financial performance – namely,

69

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

unsustainable U.S. employee-related legacy obligations – are in respect of operations isolated
within certain U.S. Debtor subsidiaries.  These U.S. Debtors have no claims against or rights of
distribution from other valuable Delphi businesses.  Accordingly, at the present time,  it is
unclear at what level within the Debtors' capital structure the Debtors' liabilities should be
appropriately scheduled to ensure that creditors are only satisfied from the estates against which
they have legal entitlement.  Thus, due to this complex legal structure, not only is the total
amount of liabilities within the Delphi enterprise an important complicating factor to ascertain,
but where such liabilities appropriately reside within the capital structure must be thoroughly
explored as well.

      Finally, the manner in which Delphi ultimately deals with its substantial
employee-related obligations is another complex issue that is far from straightforward.  Concerns
regarding the proper treatment of employee-related obligations date back more than seven years
to the date Delphi was spun-off from GM.  At that time, a significant number of transactions and
agreements were executed which allowed the Debtors ultimately to emerge as a stand alone
entity.  These transactions and agreements raise an array of critical questions regarding the
validity, enforceability and treatment of GM's claims, if any, against the Debtors and what
claims, if any, the Debtors intend to assert against GM.[21]  Accordingly, the "weight of the
evidence" clearly supports the finding that these Cases are complex.  See Wang, 149 B.R. at 3
(finding the case complex after a review of the docket and the large amount of documents
generated in the case).

---

[21]     Section 6(h) of the Global Notes indicates that in addition to the claims against GM set forth in Schedule B
for Delphi Corp. and Delphi Automotive Systems, LLC, the Debtors reserve all of their rights to assert claims
against GM or any of its subsidiaries and affiliates.  See Global Notes and Statement of Limitations, Methodology
and Disclaimer Regarding Debtors' Schedules and Statements, Note 6(h).

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

          iv.     Appaloosa's Request For Appointment Of An
                  Equity Committee Is Timely

The U.S. Trustee argues that since the Cases have been pending for only five months, it is too early to appoint an equity committee. U.S. Trustee Objection ¶ 29. The Creditors' Committee also contends that because the Motion was filed prematurely by Appaloosa, it foreshadows that inefficiencies will result from the creation of a committee. Creditors' Committee Objection, 3. As mentioned above, many of the critical issues and components of any plan of reorganization are either under active review and negotiation, will require significant advance diligence to properly address, or may be the subject of potentially lengthy and complex litigation. The Court has already established critical deadlines relating to the rejection of CBAs and termination of retiree benefits that could have a material impact on equity holders, depending on how these obligations are restructured. Delphi's shareholders are in immediate need of a single voice and fiduciary to represent their interests, a role that has not and cannot be filled by the Debtors or the Creditors' Committee. If shareholder interests are to be adequately represented, it is best to act early in the case to seek such an appointment.

Given that the Debtors, the UAW, and GM have been actively negotiating revised terms to the Debtors' CBAs without any consideration as to how such revisions will impact equity holders, the critical time for an equity committee in these Cases is now. Putting aside the manifest process concerns of negotiating critical contracts without shareholder participation, under the circumstances, Appaloosa believes that it would be inappropriate for the Debtors, without equity holders explicit participation, to (a) enter into long-term CBAs or to resolve the disputes between GM and the Debtors regarding its liability for (and claims against the Debtors with respect to) employee and retiree obligations, without the protections of a chapter 11 plan

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

process or (b) link the terms of an amended CBA to settlement with GM.  Appaloosa is concerned that without equity participation, the Debtors will not vigorously negotiate the optimal outcome due to perceived constraints.

Indeed, if the Debtors were to enter into amended long-term CBAs which exceed the cost of performing under such CBAs through their current expiry, such a plan would constitute an unlawful sub rosa plan.  See In re Braniff Airways, Inc., 700 B.R. 935, 940 (5th Cir. 1983) ("The debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of [a] plan sub rosa...."). Further, given that the Debtors are clearly not "hopelessly insolvent," any business plan, and ultimate plan of reorganization, developed in these Cases will be a lengthy process requiring substantial input from the Debtors' stakeholders, including shareholders.  Simply stated, the Motion for appointment of an equity committee is ripe and timely.

**V.    Concerns for Adequate Representation Outweigh the**
**De Minimis Costs Associated with an Equity Committee**

Ironically, the Debtors allege that Appaloosa failed "to analyze the costs of appointing an equity committee." Debtors' Objection ¶ 24.  Indeed, a cost/benefit analysis would dictate that an equity committee should be appointed.   In a case of this magnitude, where consolidated assets exceed $17 billion and net sales are over $26 billion, the costs associated with appointment of an equity committee are truly de minimis, whereas the benefit of providing a single voice to over 300,000 shareholders is substantial.

The Debtors' assertion that Appaloosa failed to analyze the costs of appointing an equity committee is particularly outrageous, considering that the Debtors' management had no problem rewarding themselves with unusually generous benefits immediately prior to the

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

Petition Date, and then through their proposed KECP allocate 10% of post-emergence equity to the Debtors' management. See KECP Motion [D.I. 213]. Importantly though, the Debtors fail to recognize that it is their burden, not Appaloosa's, to prove that the costs of appointing an equity committee significantly outweigh the shareholders' interest in adequate representation. See Motion ¶ 43 (citing Beker, 55 B.R. at 949; 4 Norton Bankr. L. & Prac. § 78:5 (2d ed. 2005) ("Should the moving party be successful in showing that an additional committee is required, the burden then shifts to the opponent to demonstrate that the cost of such an additional committee notably outweighs the interest in adequate representation.").

Here, certain of the Objecting Parties, including the Debtors, merely allege a number of tangible and intangible costs that they believe will be incurred if an equity committee is appointed, including "administrative burdens" (Debtors' Objection ¶ 24), the expenses associated with the retention of various professionals (U.S. Trustee Objection ¶ 29), and the "delay and disruption of the reorganization process" (Creditors' Committee Objection ¶ 30). These alleged costs are simply too vague or insufficient to satisfy the Objecting Parties' burden to prove that the costs of an equity committee significantly outweigh shareholders' need for adequate representation.

If general assertions of administrative costs, costs associated with the retention of professionals, and other intangible costs such as delay and disruption were sufficient to outweigh valid concerns regarding adequate representation, it is difficult to imagine a situation in which an equity committee could ever be appointed. To be sure, "[c]ost alone cannot, and should not, deprive . . . security holders of representation." McLean, 70 B.R. at 860; see also Enron, 279 B.R. at 694 ("Added cost alone does not justify the denial of appointment of an additional committee where it is warranted."). As set forth in the Motion, the Bankruptcy Code contains

73

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

adequate means for controlling costs.  See Motion at ¶ 45 (citing 11 U.S.C. §§ 328 & 330(a)).

Thus, if necessary, the Court is adequately equipped to address any concerns about costs,

including those raised by the Objecting Parties.  Simply, Appaloosa has no reason to believe, nor

is any given by the Objecting Parties, as to why these costs are any different or any greater than

they would be for any other chapter 11 proceeding.

   Accordingly, the Objecting Parties have failed to meet their burden of establishing

that the costs of an official equity committee would significantly outweigh equity's interest in

adequate representation.

**REDACTED VERSION (UNREDACTED VERSION TO BE FILED UNDER SEAL)**

## CONCLUSION

For the foregoing reasons and those set forth in the Motion, Appaloosa

respectfully requests entry of an order pursuant to section 1102(a)(2) of the Bankruptcy Code

directing the U.S. Trustee to appoint an official committee of equity security holders to serve in

the Debtors' Cases.

Dated: March 20, 2006
      Miami, Florida

                    WHITE & CASE LLP
                    Gerard Uzzi (GU-2297)
                    1155 Avenue of the Americas
                    New York, New York 10036-2787
                    (212) 819-8200

                    Thomas E Lauria (Admitted *Pro Hac Vice)*
                    Linda M. Leali
                    Wachovia Financial Center
                    200 South Biscayne Boulevard
                    Miami, Florida 33131
                    (305) 371-2700

                    By: /s Frank L. Eaton
                    Frank L. Eaton (FE-1522)

                    ATTORNEYS FOR APPALOOSA
                    MANAGEMENT L.P.