EXHIBIT "Z"

```
             IN THE UNITED STATES BANKRUPTCY COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
                        DALLAS DIVISION

IN RE:                       )
                             )      BK. NO: 01-35327-SAF-11
AMRESCO, INC.                )
                             )
        D E B T O R          )
```

* * * * * * * * * * * * * * *

TRANSCRIPT OF PROCEEDINGS

* * * * * * * * * * * * * * *

(Court's Ruling)

COPY

BE IT REMEMBERED, that on the 7th day of September, 2001, before the HONORABLE STEVEN FELSENTHAL, United States Bankruptcy Judge at Dallas, Texas, the above styled and numbered cause came on for hearing, and the following constitutes the transcript of such proceedings as hereinafter set forth.

NATIONAL COURT REPORTERS 214-651-8393

```
 1                    * * * * * * * * * *
 2              THE COURT:  Okay.  This will be the
 3   Court's bench ruling on the motion of Financial
 4   Acquisition Partners, L.P., for the Court to order
 5   the appointment of an equity securities holders
 6   committee.  The Prescott Group joined in that motion
 7   The SEC supports the motion.  At the hearing on
 8   September 5, one other shareholder appeared to
 9   support the motion.  The debtors and the committee o
10   unsecured creditors oppose the motion.
11              The Court held an evidentiary hearing
12   on the motion on September 5, 2001, and continued it
13   to completion today.  The determination of a motion
14   under Section 1102 for the appointment of an equity
15   security holders committee is a core matter over
16   which this Court has jurisdiction to enter a final
17   order.
18              The Court, on contested matters, is
19   required to make findings of facts and conclusions o
20   law.  The parties should understand that this
21   statement from the bench constitutes the Court's
22   findings and conclusions, but because it's a bench
23   ruling, the Court reserves the opportunity to edit o
24   amend or supplement these findings for purposes of
25   clarity and completeness.
```

NATIONAL COURT REPORTERS 212-651-0399

3

1           Financial Acquisition Partners, L.P.,
2  which is known as FALP, had requested that the U.S.
3  Trustee appoint a committee of equity security
4  holders.  The United States Trustee had declined to
5  do so, and the U.S. Trustee has taken no position on
6  this motion, basically deferring to the discretion of
7  the Court.
8           Under Section 1102 of the Bankruptcy
9  Code, request of a party in interest, the Court may
10 order the appointment of a committee of equity
11 security holders if necessary to assure the adequate
12 representation of the equity security holders.  Under
13 the statute, the Court must determine if a committee
14 is necessary to assure adequate representation of
15 equity security holders, and if so, the Court must
16 further determine whether to exercise its discretion
17 to order the appointment of a committee.
18           The Wang case discusses this at Section
19 149 B.R., page 1 and page 2.  The Code does not
20 define adequate representation.  Adequate
21 representation must be determined by the facts of the
22 particular case.  To make that determination, and
23 then to exercise its discretion, the Court should
24 consider the following factors:  One, the number of
25 shareholders; two, the complexity of the case; three,

1   whether the cost of the committee would significantly
2   outweigh the concerns for adequate representation;
3   four, the solvency of the debtor; five, the ability
4   or the appearance of the management shareholders to
5   represent the non-management shareholders; six, the
6   integrity of the bankruptcy process; seven, the
7   Congressional intent to protect public shareholders
8   by providing for a negotiating body for shareholders
9   for the formulation of a plan; and eight, the impact
10  on the reorganization process.
11          These guidelines and factors have been
12  enunciated in a series of cases that include the Wang
13  case, the Beker Industries Case at 55 B.R. 945, the
14  Edison Brothers case out of Delaware which apparently
15  is available only on Westlaw and Lexis, and the
16  Imperial Distributing case, another Delaware case
17  which apparently has not been published.  The
18  memorandum order was filed May 15th, 2001.  And also
19  Colliers discusses some of these factors.
20          Amresco had publicly traded common
21  shares of stock, about 2.6 million shares.  At the
22  time of the bankruptcy petition, there were about
23  2,500 holders of record, and actually that number may
24  date from March 31, 2001, but there are approximately
25  2,500 holders of record.  There were about 12,000

1  beneficial owners. I believe the officers and
2  directors held about 5 percent of the stock, and the
3  trading of the stock was indeed delisted in July.
4       The case has been designated as a
5  complex Chapter 11 case for purposes of the
6  procedures adopted by this Court. But neither the
7  debt structure nor the equity structure is especially
8  or unusually complicated. It is a large case, but
9  it's not a mega-case. However, the debtor does
10 conduct its business through a multi-level subsidiary
11 structure with two non-debtor subsidiaries operating
12 at a profit; and, therefore, the Court considers the
13 case complex because of the size of the assets and
14 the amount of the debt that had been publicly traded,
15 the public trading of the stock and the structure of
16 the business, but not because of the structure of the
17 debt or the equity alone.
18      The management shareholders may
19 generally perform their fiduciary duties, but they
20 cannot adequately represent the interests of
21 nonmanagement shareholders. With the filing of the
22 petition, the debtors filed a motion to sell its
23 assets and those of its subsidiaries to NCS. The
24 sale proposal holds a prospect of employment for
25 management that may be more lucrative than any

1  returns that they may receive on the stock. While
2  they may legitimately believe and they may ultimately
3  establish in the case that the sale will be in the
4  best interest of the estate, they cannot advocate a
5  plan on behalf of the shareholders.
6  　　　　　　　Mr. Brown, the debtor's CEO,
7  Mr. Robbins, the debtor's financial advisor, and
8  Mr. Cleveland, the creditors' committee's financial
9  advisor, all testified that the debtor was insolvent
10 on the petition date. Adjusting book values as of
11 June 30, 2001, for market factors and a fair market
12 value basis, the testimony was that the debtor is
13 insolvent by a range of between $97 million and $250
14 million. At the NCS sale proposal values,
15 Mr. Cleveland is projecting a return to unsecured
16 creditors of somewhere between 34 to 41 cents on the
17 dollar which would leave no prospect for a
18 shareholder recovery unless the debtor's assets could
19 be sold for an additional approximately $200 million.
20 But all three of those witnesses recognized and hoped
21 that the NCS offer was a floor, and that the sale
22 process would generate more than is currently on the
23 table.
24 　　　　　　　PALP did not present contradictory
25 evidence, but instead contended that it would be

1  premature to adjudicate asset value and thereby
2  affect the sales of assets or the negotiation,
3  formulation, and confirmation of a plan. For
4  purposes of this motion, the evidence reflects the
5  debtor is insolvent, and the Court notes
6  parenthetically, that under the Bankruptcy Code, the
7  Court is often called on to value a debtor and its
8  assets for particular purposes during the course of a
9  bankruptcy case. So the determination for this
10 motion is not binding on a subsequent determination.
11         The finding of insolvency for this
12 motion, though, does lead the Court into the
13 integrity of the process argument that FALP has
14 advanced and that the Delaware court discussed in the
15 Imperial Distributing case. And actually we have
16 discussed in argument whether this Court recognized
17 it in the Southmark case the March 31, 2001, 10-Q
18 publicly reported an equity value of $154 million.
19         During a proxy contest initiated by
20 FALP in the spring of 2001, Amresco issued a public
21 press release on May 14th, 2001, confirming that
22 value while recognizing the volatility and the timing
23 of securitizations and working with its financial
24 advisors to maximize shareholder value. On July 2,
25 2001, Amresco filed its petition for relief under

1 Chapter 11 of the Bankruptcy Code. The petition
2 reported equity value. Not until the filing of its
3 schedules and statement of financial affairs did
4 Amresco publicly state its insolvency.
5    Thus as a matter of public disclosure
6 in the months prior to the bankruptcy petition and
7 continuing until the filings of the schedules after
8 the bankruptcy, Amresco publicly reported shareholder
9 value. The stock supposedly traded for some value,
10 albeit rather small, it was still trading for value,
11 even though the bonds during the 12 months prior to
12 bankruptcy were only trading at a 40 to 60 percent
13 range.
14    Amresco contends, however, that the
15 public filings including the 10-Q and the bankruptcy
16 petition reported book values. And all the witnesses
17 agreed that book value did not necessarily equate to
18 market value. Depending on the circumstances, they
19 testified the book value may be more or less than
20 market value. Mr. Brown, Mr. Robbins and
21 Mr. Cleveland testified that indeed the market value
22 for Amresco is less than the book value. They also
23 testified to developments of Amresco's business that
24 required write downs of the book value on June 30th,
25 and actually testified as to continuing developments

9

1   that may increase liabilities. The Court has no
2   evidence that from March 31, 2001, until the filing
3   of the schedules, that Amresco ever publicly
4   disclosed or reported that its book values were
5   greater than its market value, or that business
6   events were actually occurring that would require
7   write downs of book values in the next quarterly
8   statement. Amresco did not state in its public
9   disclosures that the public should not rely on its
10  book values because they did not accurately reflect
11  but rather inflated Amresco's market value.
12              On May 8, 2001, in the proxy materials,
13  Amresco did publicly identify the risks that without
14  a warehouse line that the stock value would be lost.
15  But, at the same time, it reported that they had a
16  strategic plan that would avoid that situation, and
17  indeed, they did have a strategic plan at that time.
18  Thus Amresco provided no meaningful warning to its
19  investors of the write downs or the unreliability of
20  the book values in the days immediately proceeding
21  the bankruptcy case.
22              Whether this was proper or not, Amresco
23  concedes that it filed no disclosure of its material
24  business matters with the SEC and issued no press
25  release until it filed the schedules. There was also

1  testimony that Amresco did not disclose or suggest
2  that it would have to make a bankruptcy filing. The
3  Court does not consider the FBR report as a report of
4  Amresco. So even though it discussed risks, it was
5  not Amresco making public statements of those risks.
6       Consequently, and based on this record,
7  the public markets knew only that Amresco reported
8  shareholder value from March 31, 2001, until after
9  the bankruptcy petition, but now Amresco reports that
10 it's insolvent. The Court agrees with FALP that the
11 integrity of the bankruptcy process dictates that
12 shareholders receive an explanation of what happened
13 and determine whether they have value to be realized,
14 any causes of action to pursue or any plans or
15 strategies to negotiate.
16      The appearances of a fair bankruptcy
17 process is compounded by: One, the immediate motion
18 to sell the assets; two, the 5 to $6 million loans
19 made to management on the eve of bankruptcy; and,
20 three, the prospect of employment for management with
21 the proposed sale to NCS.
22      FALP is not willing and may not be able
23 to represent the other shareholders in this case. No
24 other shareholder has stepped forward to carry that
25 representation. The Code contemplates that a

11

1  statutory committee may be the only effective means
2  of representing shareholders. The creditors'
3  committee is analyzing some of these issues,
4  including the loans and the prospective employment
5  and the employee benefits, and is analyzing, as is
6  the debtor, a stand alone plan and other options to a
7  sale at auction of the assets of the debtor. But the
8  committee's financial advisors have concluded that
9  equity is completely out of the money, so obviously,
10 the committee will not be adequately representing the
11 equity holders.
12             The appointment of an equity committee
13 will increase the costs of the administration of the
14 bankruptcy case. The committee must investigate the
15 pre-petition public valuation of the debtor and
16 endeavor to determine the actual value of the debtor
17 at the present time, and has to try to determine what
18 its recovery prospects are, if there's value they can
19 bring to the estate, or any cause of action, if any,
20 that they should claim as theirs. The appointment of
21 an equity committee will increase the difficulty for
22 other parties in interest to pursue their objections
23 in the case. But assuming that the debtor is indeed
24 insolvent and that its pre-petition public
25 disclosures were proper, and even assuming a return

1   to unsecured creditors in the 34 to 41 percent range,
2   a bankruptcy case is about more than the return to
3   creditors and the reorganization or sale of the
4   debtor.  The bankruptcy case is also about the fair
5   and equitable adjustment or elimination of claims and
6   equity.
7               The debtor and the unsecured creditors
8   committee contend that equity is out of the money
9   even though Amresco had reported value until it filed
10  its schedules.  They argue that there's nothing for
11  equity to represent.  But under the facts and
12  circumstances of this case, acceptance of that
13  position as a legitimate result of a bankruptcy
14  process compels that equity have a formal statutory
15  voice in assessing the correctness and
16  appropriateness of that result.  The integrity of the
17  process dictates that the estate spend reasonable
18  costs for equity to formally have a negotiating voice
19  if this case could result in the elimination of
20  hundreds of thousands of dollars in equity
21  investments in the debtor even with the pre-petition
22  disclosure of value.  The process must not only be
23  fair, it must seem fair.  And to meet that standard
24  under the facts and circumstances of this case, the
25  estate must incur some reasonable administrative

13

1 expenses.
2         As I stated during the closing
3 arguments, I did try to go back to where this Court
4 had presided over or had cases with equity committees
5 to determine if there was any precedent that I should
6 draw on.  I mentioned the Southmark case.  Obviously,
7 Southmark was a case of a completely different
8 magnitude, but there's a similarity in this respect.
9 Several months prior to the bankruptcy petition
10 Southmark publicly reported that it had considerable
11 value for the shareholders.  On the eve of its
12 petition, it took a $1 billion write down, and that
13 write down eliminated all value for equity.  The
14 Court recognized that equity needed to have a
15 committee, even though it came at a significant cost
16 to the estate, to adequately represent equity under
17 those circumstances.
18         We discussed in closing arguments the
19 NeoStar case, and I went back to look at the motion
20 that was filed for the appointment of an equity
21 committee in NeoStar.  The motion reports that in the
22 months proceeding the bankrutpcy petition, NeoStar
23 reported equity value while post-petition the company
24 incurred substantial administrative debt.  As the
25 U.S. Trustee pointed out, the company barely cleared

1   its administrative expenses and paid its secured
2   creditor. There had been an ad hoc group of
3   shareholders and they had moved for the appointment
4   of an equity committee. Before the Court could
5   consider the motion, the U.S. Trustee had appointed
6   the committee. As Mr. McElreath reported today, that
7   had more to do with the functioning of the creditors'
8   committee at the time than with the position of
9   equity. But, nevertheless, the result in the
10  immediate time after the appointment of a committee
11  was that there was a formal structured committee to
12  try to determine what happened to the public report
13  of value in the weeks and months immediately
14  proceeding the bankruptcy, and it turned out, indeed,
15  there wasn't value, that the debtor's post-petition
16  position was correct, and the committee lasted a
17  short time. And as quickly as I could determine
18  during the recess, I think they were out of existence
19  in about six weeks. But they at least satisfied
20  themselves as to the legitimacy of the process before
21  the Court.
22              In those cases in this court ranging
23  from the largest and most complex of cases to a case
24  more akin in size to this case the debtors had
25  reported with pre-petition public disclosure, value

15

1  for shareholders that appeared to have vanished with
2  the filing of the bankruptcy petition. This Court
3  assured that the shareholders had adequate
4  representation to determine the validity of that
5  insolvency, and hence the legitimacy of the
6  bankruptcy process that eliminated a return on their
7  investments.
8        Having addressed the factors, the Court
9  summarizes them as follows: For the purposes of this
10 motion, the debtor is insolvent, and the cost of an
11 equity committee will be significant. But of greater
12 weight on balance are the following factors: Number
13 of shareholders, the size of the case and the
14 structure of the business of the debtor, the
15 limitation of management shareholders to represent
16 non-management shareholders, the pre-petition public
17 disclosures and lack of disclosure, the apparent
18 disappearance of shareholder value, the pre-petition
19 management benefits, and the resulting integrity of
20 the process. Those cumulatively compel the Court to
21 conclude the shareholders need a committee to
22 adequately represent them to assure the integrity and
23 fairness of the process, and the legitimacy of the
24 outcome of the case, which may include a validation
25 that there is no return for equity. The Court

1   exercises discretion to impose the administrative
2   costs of the estate of an equity committee.  The
3   Court, therefore, grants the motion without prejudice
4   to a motion to disband the committee after they have
5   had a reasonable time to assess the merits of the
6   case.
7           And there we are.  Mr. Mojdehi, if you
8   would please prepare an order to that effect.  I will
9   note in passing I didn't address the examiner
10  suggestion because after the suggestion had been
11  made, no one actually asked the Court to go that
12  route.  And the Court having determined that from a
13  shareholder advocacy point of view, there has to be
14  an analysis of what happen to the apparent value of
15  the company, and take that and advocate on behalf of
16  the shareholders, I didn't explore the examiner
17  suggestion in greater detail.
18          Mr. Mojdehi, if you would please
19  prepare an order based on the bench ruling.  I would
20  ask the U.S. Trustee's office to act on this as soon
21  as possible because the Court has no inclination to
22  delay the process before the Court.  Once the process
23  has been established, we need to see how it plays
24  out.
25          MR. MOJDEHI:  Thank you very much, Your

05-44481-rdd   Doc 2914-27   Filed 03/22/06   Entered 03/22/06 12:20:09   Exhibit Z
Pg 18 of 19

17

1   Honor. I again thank you for allowing us to
2   participate by phone. We will submit the order to
3   Your Honor.
4              THE COURT: Okay. Thank you. And
5   thank you all for being available so we can get that
6   accomplished today.
7              MR. HALE: Judge Felsenthal?
8              THE COURT: Yeah.
9              MR. HALE: Would if be all right with
10  you -- this is Cooter Hale -- if we simply get a
11  transcript of your ruling and have that filed with
12  the clerk's office as we circulate that as opposed to
13  putting that in the form of an order?
14             THE COURT: Yeah. I think all the
15  order -- that's fine. All the order needs to do is
16  say, Based on the bench ruling, the motion is
17  granted.
18             MR. HALE: Thank you --
19             THE COURT: Okay. Thank you.
20             (End of Court's ruling)
21
22
23
24
25

NATIONAL COURT REPORTERS 214-651-8393

18

# CERTIFICATE

I, DIANE M. DENNIS, Acting Official Court Reporter in and for the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, certify that during the hearing of the above-entitled and numbered cause, I reported in shorthand the proceedings hereinafter set forth, and that the foregoing pages contain a full, true and correct transcript of said proceedings.

GIVEN UNDER MY HAND AND SEAL OF OFFICE on this the 24th day of September, 2001.

*Diane M. Dennis, CSR, RPR*
DIANE M. DENNIS
Certified Shorthand Reporter #434
Acting Official Court Reporter
United States Bankruptcy Court
Northern District of Texas
Dallas Division

NATIONAL COURT REPORTERS 214-651-8393