EXHIBIT "AA"



[BACK TO ARTICLE]

## The creditor's cudgel
by Soma Biswas
Posted 01:44 PM EST, Oct-15-2004   Updated 01:19 PM EST, Oct-20-2004



Valuation fights have long been the bane of bankruptcy proceedings. But some bankruptcy professionals have lately come to believe that there are fewer of them these days as more companies are sold out of Chapter 11 before such battles can develop. Case in point: **Adelphia Communications Corp.** The cabler was sure to be the subject of a brutal valuation fight had it attempted to reorganize. Instead, its bondholders were emphatic that, with **Comcast Corp.** and **Time Warner Inc.** jointly bidding for the company, Adelphia could readily fetch $20 billion. Bondholders prevailed. Adelphia will be auctioned off.

Despite cases like Adelphia, valuation fights have not disappeared, and, when they do occur, they may be nastier than ever. The valuation process has continued to be a favorite cudgel of creditors eager to grab a larger share of assets. They can erupt in bankruptcies large and small, with some of the toughest scraps over relatively small amounts.

Consider the case of Minorplanet Systems USA Inc., in which shareholders argued that the bankrupt company was worth $36.1 million. Unsecured creditors volleyed back that its value was only $31.6 million, which would have given them most of the reorganized company's shares. In the end, a Dallas judge agreed with the unsecureds, who got 75% of the company when it exited Chapter 11 on July 2. It's now called **Remote Dynamics Inc.**

Generally, stakes in valuation fights appear higher and valuation gaps wider than in the past. Unsecured creditors of Harnischfeger Industries Inc. argued that the mining equipment maker was worth $1.6 billion, while the equity committee thought it should be valued north of $2.2 billion. Judge Peter Walsh of the U.S. Bankruptcy Court for the District of Delaware sided with the unsecureds, who received all the shares of the company. Lucky for them. Harnischfeger exited Chapter 11 on July 15, 2001, and began trading again as **Joy Global Inc.** for $16.25. Its stock has since more than doubled.

Some bankruptcy professionals believe these fights are pointless. Farukh Farooqi, a **Jefferies & Co.** analyst who follows the stocks of companies after they exit Chapter 11, says earnings projections and estimated valuations are often skewed because of horse-trading between creditor groups. "I've never really paid much attention to plan valuation," he says.

Valid or not, valuations often become he-said, she-said debates with real consequences. But thanks to a ruling by a Delaware judge nearly a year ago in the valuation fight over **Exide Technologies Inc.**, the rules of engagement have significantly changed. "The Exide decision clearly has made all parties in Chapter 11 much more careful in preparing their valuations," says an attorney not involved in the case, Rick Cieri, the head of the bankruptcy practice at **Gibson, Dunn & Crutcher LLP.**

Exide, a maker of batteries for everything from cars to cell phones, emerged from bankruptcy on May 5. But in November 2003, Delaware Visiting Judge Kevin Carey rejected the company's valuation and ruled in favor of a higher one proposed by Exide's unsecured creditors. What made his ruling so important was that it represented a defeat for the use of subjective or market judgments in sizing up a company's worth and a victory for harder, more

quantitative analysis.

For seven days in late October and early November 2003, Exide's financial adviser, Arthur Newman of Blackstone Group LP, went toe-to-toe with the unsecureds' hired gun, Jefferies' William Derrough, in Carey's courtroom on the valuation issue. Newman valued Lawrenceville, N.J.-based Exide at $950 million to $1.05 billion. Derrough put it at $1.48 billion to $1.7 billion.

Citing a "private equity process," Newman said Exide should be valued at 7.2 times earnings before income, taxes, depreciation, amortization and rent. To arrive at that number, he said he took the average trading multiple for three comparable companies - **C&D Technologies Inc., Delphi Corp.** and **Johnson Controls Inc.** - then made some adjustments. C&D, for example, had an inflated stock value because of the August 2003 blackout and its status as a pure-play battery maker; Delphi and Johnson made other kinds of auto parts as well.

As a result, Newman said the stock market would never reward Exide with a multiple of 7.2. A multiple of 5 or 6 times Ebitdar would be more like it, he noted, since Exide, with 37% of its revenue coming from its industrial business, wasn't a pure play.

During cross-examination, it was also disclosed that Blackstone had actually gotten a bid of $250 million to $300 million from C&D for Exide's industrial battery business in March 2003. In fact, Blackstone said seven private equity firms offered between $700 million and $950 million in two rounds of bidding for all of Exide.

Derrough argued that Newman's private equity process was distorted and tended to yield a lower price.

Still, from the start it appeared certain that Newman and Derrough's valuations would be drastically different, since they didn't even use the same Ebitdar figures. Newman took one for the 12 months ended June 30, 2003, while Derrough's was projected Ebitdar for a 12-month period ending Dec. 31, 2003.

Then Derrough trotted out a valuation expert, Edith Hotchkiss, a professor of finance at Boston College, and the battle was joined. She argued that Newman's use of a 7.2 multiple wasn't unreasonable at all, even though Derrough had come up with 7.7 by doing his analysis on transactions of peer-group companies.

Where Newman erred, she said, was knocking the multiple down to 5 or 6. In a study she did on 63 companies coming out of bankruptcy, valuations done with projections in disclosure statements were just as likely to undervalue the bankruptcy survivors as overvalue them. In fact, she said, plans that give most of the company's equity to senior creditors and management tend to undervalue such Chapter 11 departees.

And while Hotchkiss noted that the private equity process Newman used wasn't an "accepted methodology" for valuation, more damning was her research that showed that when auctions of Chapter 11 companies are held and private equity firms participate, their resulting worth is actually a "significant discount" to what a former bankrupt company's stock eventually trades for.

Nor did the dispute end there. Newman and Derrough used sharply different costs of capital when calculating discounted cash flows. Derrough's plugged in 10.5% to 11.5%; Newman's used 15% to 17%. And their costs of equity were far apart, with Newman working with 20% to 30% and Derrough using 13.6% to 14.6%.

In the end, Carey surprised many when he found Newman's use of a higher return on equity and his reliance on the private equity process to be subjective. "Hotchkiss noted that, in this case, the input information chosen by the experts was not significantly different," he wrote in his opinion. "What caused the variance was that Newman made a subjective determination to reduce further the multiples determined from the input information."

Carey sided with Derrough's methodology because both the U.S. Supreme Court and the 3rd Circuit Court of Appeals have ruled that a reorganized company's value should be based on its future earnings capacity.

"The stated purpose of Newman's numerous adjustments to the valuation methodologies were to bring value calculations in line with the current market value," Carey wrote. "This is not appropriate when seeking to value securities of a reorganized debtor since the 'taint' of bankruptcy will cause the market to undervalue the securities and the future earnings capacity of the debtor."

In the end, Exide compromised with unsecured creditors, giving them 10% of the equity in Exide, plus warrants for up to 28%.

Newman and others who do valuation analysis in the same manner may feel some redemption, however, since at a recent $15.63 per share, Exide has a market capitalization of $376 million and $600 million or so in debt, which give the company a total enterprise value of $976 million - the low end of Blackstone's range.

Indeed, many believe that valuing bankrupt companies is definitely more art than science. "With troubled companies, you shouldn't use traditional Wall Street valuation methods," says Edwin Ordway Jr., head of **Capstone Corporate Recovery LLC**, a restructuring firm. "It's a broken company. You can't infer that it should have the same multiples as its peer group."

Jeffrey Manning, senior managing director and head of investment banking at **FTI Consulting Inc.**, says he definitely chops down valuations of companies coming out of bankruptcy because he believes it's appropriate. "As a practitioner of bankruptcy, I acknowledge that you take higher discounts on valuation than you would with the peer group that's not in bankruptcy," he says.

Some bankruptcy pros argue that Carey's decision simply provides ammo for creditors' committees seeking to score a few extra million bucks. "The methodology endorsed by the ruling will result in higher valuations than the market would normally give to distressed companies," notes Durc Savini of **Miller Buckfire Lewis Ying & Co. LLC**. "This opinion puts more arrows in the quivers of creditors' advisers."

He says Walsh, the judge in the Harnischfeger case, came to a very different conclusion than Carey in Polaroid Corp.'s bankruptcy case in 2002. Walsh asserted an "appropriately shopped" sale transaction should always be considered a better measure of enterprise value than any theoretical analysis.

Savini, Polaroid's financial adviser, conducted an auction for the company that resulted in a sale to One Equity Partners LLC, the private equity arm of Bank One Corp., for $455 million, including $200 million of assumed debt.

Polaroid's unsecured creditors' committee, represented by Fred Hodara of **Akin, Gump, Strauss, Hauer & Feld LLP**, made the case that One Equity was getting a bargain, and that the unsecured creditors could generate greater value if they received most of the shares and the company reorganized.

"I have never accepted the proposition that the court should be guided by valuation when a sale transaction, and in many of cases, including this one, an appropriately shopped sale transaction, is the alternative," Walsh said in his ruling in favor of the sale to Bank One.

 What may have influenced creditors in their attempt to wield valuation as a big stick is the asbestos-related Chapter 11 case of **National Gypsum Co.**, the Charlotte, N.C.-based maker of wallboard. 

In January 1992, management valued the company at $350 million, or $14 per share, while the company's unsecured creditors' committee put a $750 million, or $30 per share, tag on it. The company's reorganization plan gave senior bondholders most of the shares in the company, while its junior bondholders and asbestos creditors got little.

By July 1993, National Gypsum exited bankruptcy, and its stock soon traded as high as $36 per share, giving it a market cap of $720 million, or just $30 million less than what junior bondholders and asbestos creditors assessed it for.

Even more curious about the case is that exactly 186 days after National Gypsum emerged, it unveiled a plan to cut $30 million in expenses. That move added approximately $350 million in enterprise value to the company, based on a discounted cash flow analysis. Under the federal bankruptcy code, creditors have 180 days after a company's exit to ask the court to revoke a plan if there's fraud.

Undeterred, the junior bondholders filed a lawsuit in 1997 against the company, **Goldman, Sachs & Co., Trust Co. of the West, Fidelity Management**, and Donaldson, Lufkin & Jenrette, accusing management and senior bondholders of fraud by withholding information.

In support of their suit, a private detective found a cost-cutting plan in the trash outside the home of Harry Leonhardt, a consultant for the company, the day before he was to be deposed by lawyers for the junior bondholders.

In the end, the lawsuits didn't get anywhere. Many of the parties settled for small amounts.

Perhaps the most glaring example of how far off valuations in reorganization plans can be from reality is the **Kmart Corp.** case. Kmart's reorganization plan pegged its enterprise value at $753 million to $1.5 billion.

The company's market capitalization is now almost at $8 billion.

Almost no one thinks Kmart is a healthy, growing retailer with a very bright future. Instead, they believe that Eddie Lampert, the hedge fund manager who took control in bankruptcy, is shrewdly selling its real estate and cutting its inventory.

In fact, in Kmart's liquidation analysis, an exercise all companies have to go through to prove that they deserve to come out of Chapter 11 reorganized rather than liquidated, the retailer's real estate was valued at only $300 million to $600 million.

Yet since August, Kmart has raked in $1.4 billion by selling 117 stores to **Sears, Roebuck and Co.** and **Home Depot Inc.** While some observers think those were many of Kmart's best locations, it nonetheless represents a small fraction of the retailer's 1,500 stores.

One academic, Harlan Platt, a professor of business at Northeastern University in Boston, says his study of 52 companies and their post-Chapter 11 projections in disclosure statements proves there is no bias on the part of management.

Platt's study concludes that the projections were pretty far off compared to what the companies ended up trading for after the exit. "The errors are very large," he says. "Larger than what you find with investment analysts."

Hardly a revelation. Value, after all, is in the eye of the beholder and is thus, to a degree, subjective. And whether it's Hotchkiss' study, or Platt's, or real-life experiences, everyone seems to come to the same place - disclosure statement projections aren't very reliable. Which is why the valuation fights will undoubtedly continue.