EXHIBIT "BB"

5/2/99 N.Y. Times 31
1999 WLNR 3084013

New York Times (NY)
Copyright (c) 1999 The New York Times. All rights reserved.

May 2, 1999

Section: 3

Going For Broke

MELODY PETERSEN

Small investors, asbestos-exposed workers and property owners who spent millions to rid buildings of asbestos are challenging National Gypsum Co's 1993 bankruptcy reorganization; hold National Gypsum and three main holders of company's senior debt, Fidelity Management and Research, Goldman, Sachs & Co and Trust Co of West, had secret cost-cutting plan, devised by consultant Harry Leonhardt, and improperly failed to tell court that company hired Booz-Allen & Hamilton consulting firm to flesh out plan; investment firms largely gained control of company and have made big profits, while other creditors got only fraction of their claims; time-line; graph; table; photos (L)

DIANNE LAWE, a private investigator, arrived early enough on an overcast morning last November to beat the garbage truck to Harry Leonhardt's home in a tranquil neighborhood north of Houston.

When she lifted the lid of the dark green trash can at the foot of Mr. Leonhardt's driveway, Ms. Lawe found just what the lawyers who had hired her said she might: a trove of financial documents, many of them emblazoned with the corporate name of the National Gypsum Company.

Mr. Leonhardt, a consultant and former building industry executive who had advised National Gypsum as it went through a messy bankruptcy in the early 1990's, had been ordered in a subpoena to turn over any papers he had relating to the company. The lawyers say they sent Ms. Lawe to check Mr. Leonhardt's trash the day before his scheduled deposition because they thought he might be tempted to throw away whatever documents he had; he later explained that he did not even realize he still had the papers and simply was cleaning boxes out of his closets.

Like many other companies that make construction materials, National Gypsum filed for bankruptcy to help rid itself of thousands of injury claims that were pouring in from people who had become ill -- or feared they would -- after inhaling asbestos in the manufacturers' products.

What distinguished National Gypsum's case was the outcome.

For three prominent investment firms that held most of the company's senior debt -- Fidelity Management and Research; Goldman, Sachs & Company and the Trust Company of the West, an investment firm based in Los Angeles -- gypsum turned to gold when National Gypsum went on to flourish after it emerged from bankruptcy in 1993, largely in their control. The firms doubled or even quadrupled their initial investments, making upwards of $240 million in profits.

But thousands of others had claims against National Gypsum -- asbestos-exposed workers, school districts, hospitals and universities that spent millions ripping asbestos from their ceilings and walls, investors who bought National Gypsum bonds for their retirement accounts. At best, they were left with mere fractions of what they were owed. Those creditors have been unhappy with the company almost from the day the trouble started. But now their lawyers -- the people who hired Ms. Lawe -- say they finally have proof that the resolution of the bankruptcy case was a miscarriage of justice.

The lawyers say documents they have uncovered suggest that before the bankruptcy was settled, the company and the investment firms had a secret cost-cutting plan, devised by Mr. Leonhardt, that had the potential to add millions to the company's value -- and eventually did. Though bankruptcy court judges are supposed to approve all advisers and professional fees, the court was never told that National Gypsum had hired Booz-Allen & Hamilton, the consulting firm, to flesh out the plan.

To the contrary: The company and the investment firms' experts said on the witness stand that National Gypsum's expenses had already been cut to the bone. Documents that might have painted a different story -- like those in Mr. Leonhardt's trash -- are only now making their way to the courthouse, as part of a long-running lawsuit now heading to a Texas appeals court.

The defendants in that suit -- including the three investment firms, former executives of National Gypsum, and Donaldson, Lufkin & Jenrette, the company's financial adviser during the bankruptcy (but not Mr. Leonhardt, whose behind-the-scenes role was not initially known to the plaintiffs) -- all say there was no secret plan and no misconduct of any sort.

"It's a fantasy piece," said Bryant C. Boren Jr., a Dallas lawyer who has kept busy representing the company's former officers and directors in much of the litigation that has trailed the bankruptcy. What the creditors' lawyers call Mr. Leonhardt's secret plan, Mr. Boren added, was nothing more than his sales pitch for a role in restructuring National Gypsum.

The investment firms, meanwhile, say their gains were their rightful reward for making the risky choice to take stock in National Gypsum in exchange for their bankruptcy claims. It was an unforeseen upturn in the economy and the housing market -- not some back-room conspiracy -- that led those shares to triple soon after the company emerged from bankruptcy, they say.

"It is clear that the rise in National Gypsum's stock price subsequent to the reorganization was principally due to an upturn in the U.S. housing market generally and in gypsum prices in particular," said Scott Beyerl, a spokesman for Fidelity.

And in any event, the defendants add, the dispute has already been aired in court and resolved in their favor.

Undisputed, though, is the meager amount that National Gypsum's bankruptcy left for a long parade of creditors.

"I think I've been had," said Alfred B. Earnest, a retired human-resources manager from Houston, who invested $1,800 of his retirement money in the company's junior bonds in 1986. After years of waiting, Mr. Earnest was paid $592.65 in 1995.

Anxieties are high, too, for asbestos-exposed workers counting on payments from a trust fund established during the bankruptcy proceedings. Already, 300,000 claims have been filed, even though the first signs of lung disease often do not emerge until 30 years after the exposure. National Gypsum's fund, which has received a total of $518 million to pay claims, may run out of money as soon as 2002, according to W. Dee Hilton, its managing trustee.

"Because of the alleged fraud committed during the bankruptcy process, the trust did not get the money that it would have," Mr. Hilton said.

The three investment firms, however, received the entire value of their bonds -- and, in the end, much, much more. Lawyers for the asbestos trust, Mr. Earnest and the others who held the company's junior bonds estimate that Fidelity; Goldman, Sachs; the Trust Company of the West, and a few other senior creditors walked away with securities that, in total, were eventually worth as much as $800 million for bankruptcy claims that had a face value of only about $300 million.

Indeed, because the bankruptcy had driven down the value of National Gypsum bonds, the stakes actually cost the three investment firms only about $120 million to acquire.

Goldman, which put up $31.8 million, acknowledges that it more than doubled its money. (Those profits are atop the investment banking fees it made for advising National Gypsum to take on debt in the mid-1980's.) Trust Company of the West says it quadrupled its initial investment of $40 million or so. Fidelity has not divulged details but lawyers for the other creditors believe that it at least doubled a $30 million investment.

A Judge's Concern For Facts Not Known

The Federal judge who spent three years shepherding National Gypsum through bankruptcy has second thoughts about those results.

In a written opinion a year ago -- in which he was in the awkward position of arguing that his own judgment ought to be re-examined -- Judge Steven A. Felsenthal said he was concerned that the "very integrity" of the bankruptcy process might have been harmed by the possible concealment of work-force cuts intended to save $30 million a year.

Though he was "keenly sensitive" to the protection of jobs during the bankruptcy process, Judge Felsenthal wrote, "substantial work-force reductions were not presented to the court" when he was asked to confirm National Gypsum's reorganization plan.

During the bankruptcy, Judge Felsenthal had rejected arguments that the company was underestimating its value, saying there was no evidence to back up that claim. Had he known that the company would be announcing layoffs in October 1993, just three months after it emerged from his court, the case would have ended differently, Judge Felsenthal said in his January 1998 opinion.

The value of the company would have been greater, and "unpaid asbestos claimants and unpaid bondholders would have benefited," he wrote.

But Judge Felsenthal's ruling came on a narrow issue about the payment of certain legal fees. The fraud case is being argued in Texas state court, and there the disgruntled creditors' charges have been rejected. On March 1, David C. Godbey, a Texas district court judge, decided without much explanation to leave the outcome of the bankruptcy case essentially intact.

That is the decision that the asbestos trust fund and creditors who owned the junior bonds plan to appeal. They say the district court gave short shrift to evidence they discovered, largely over the last year, of a conspiracy to conceal the company's true financial value during the bankruptcy court proceedings.

"They walked away with $500 million of value that belonged to other people," said James R. Moriarty, a Houston lawyer who represents the junior bondholders. "These people have committed an outrageous fraud."

The defendants, however, argue that letting bankruptcies be reopened because events didn't turn out as some of the parties expected would destroy the system. "The consequences of permitting that second trial would indeed be devastating to the principle of finality of judgments," the lawyers wrote in their motion asking Judge Godbey to dismiss the case.

How Some Creditors Got Less of the Pie

It wasn't until late 1997 that the lawyers for the creditors began to piece together what they now contend took place behind the scenes of the bankruptcy case.

At a hearing before Judge Felsenthal, a lawyer for the company's former executives said the work-force reductions were not management's idea, but had come from consultants at Booz-Allen. That was the first that the plaintiffs' lawyers had heard of Booz-Allen's involvement. But with that lead, the lawyers subpoenaed Booz-Allen and obtained many key documents, including a plan prepared by Mr. Leonhardt.

When Mr. Leonhardt was confronted last fall with the discovery of the documents in his trash -- including spreadsheets that showed his estimates of the company's worth -- he said it was all an innocent mistake. He had no idea he had any relevant documents, he told the junior creditors' lawyers at his deposition; he was simply cleaning his closets, and the spreadsheets and other papers, which he did not even know he had, must have been in boxes he was tossing.

But the lawyers say they believe there are many more documents that the defendants should have turned over long ago.

"They've put up every conceivable obstacle to try to keep us from getting at the truth," Mr. Moriarty said. "Every single defendant has said they don't have the documents. It's all part of their plan."

Mr. Boren said in response, "It shouldn't surprise anybody that people who claim there's a conspiracy but can't find evidence of that then say there's a conspiracy to hide the evidence."

This is not the first time, however, that National Gypsum has been accused of being slow to produce crucial documents in a court proceeding. In June 1990, when the asbestos lawsuits hit a crescendo, the company lost a case filed by 52 Texas school districts that had bought its building products and wanted to be reimbursed for the cost of removing them.

In explaining his ruling, the Texas district court judge who decided the case said he was dismayed by evidence that National Gypsum had concealed or not produced documents that the schools had subpoenaed while preparing their case. Later, just before a subsequent trial was to begin, to decide how much money the Texas schools should get, the company filed for protection from its creditors under Chapter 11 of the Federal bankruptcy code, stopping that trial and hundreds of similar lawsuits dead in their tracks.

By filing for bankruptcy, National Gypsum transferred the injury claims from the trial courts, where juries don't generally consider whether a company can afford to pay any damages they might award, to Federal bankruptcy court, where the priority is settling a company's debts so it can continue its operations.

At the end of the bankruptcy, a trust fund was set up to pay the asbestos claims. The company has contributed $138 million to the fund, while insurance companies have so far agreed to pay $380 million. But that money will not cover claims expected to reach $2.3 billion.

With the fund running out of money, asbestos-exposed workers who are not yet ill wonder what will be left for them.

"The doctors tell me sooner or later it's coming around," said Leroy Gilley, a retired boilermaker in Chickasaw, Ala., who spent four decades insulating boilers and has buried friends who died from lung disease. The trust fund should have money "until all the people are gone," he said.

The trust fund also was responsible for reimbursing property owners that had claims against the company. Because money is tight, that group has received less than half of the cost of their repairs. The biggest claimant, New York City's schools, sought about $44 million and have received $20 million, Mr. Hilton said.

A Profit Opportunity Not Widely Shared

Mr. Leonhardt has not been named as a defendant in any of the litigation, but his work is at the heart of what the angry creditors are calling fraud in the National Gypsum bankruptcy.

A consultant with more than 40 years of experience in the building and gypsum industries, he prepared an analysis -- never disclosed to Judge Felsenthal -- that concluded that National Gypsum was paying $40 million a year too much for costs associated with selling its products and operating its administrative offices.

The report by Mr. Leonhardt is significant because, while he was preparing it in 1992, the company's executives and other consultants hired by the investment firms were testifying in court that those costs could not be reduced and would instead rise with inflation by about 3 percent a year.

Days after Judge Felsenthal, relying on the testimony, approved National Gypsum's reorganization plan in April 1993, a series of private meetings about implementing a cost-cutting program began, according to documents obtained by the creditors' lawyers.

Attending the meetings were Mr. Leonhardt; Peter C. Browning, chief executive of National Gypsum, and two men whom Trust Company of the West hoped to place on National Gypsum's board: Richard Masson, a managing director of Trust Company of the West, and Vincent J. Naimoli, now an owner of baseball's Tampa Bay Devil Rays, who was then chief executive of Anchor Industries International.

According to an April 16, 1993, memo written by Mr. Browning, it was agreed on April 1 that National Gypsum would hire Booz-Allen to help determine which specific costs could be cut and which workers could be let go. On April 6, Mr. Browning wrote a memo informing employees of the company's decision to bring in the consultants.

Handwritten notes taken during the April meetings by John E. McGrath, a Booz-Allen consultant, indicate that one of the participants said the company could save as much as $40 million, or 50 percent of its selling, general and administrative costs. "30% to 50% SG&A can go!" he scribbled. His notes also say that there was an opportunity to increase the value of the company by $200 million to $600 million.

It was at this juncture, the junior creditors contend, that National Gypsum and the investment firms made a clear choice to hide their plans from the bankruptcy court. The accusers point to another passage in Mr. Browning's April 16 memo, in which he says that Booz-Allen's work needed to be delayed.

"Since it is felt by counsel that the project would require court approval at this stage," the memo says, "we have decided to postpone the initial phase" until either the company emerged from bankruptcy "or whenever we have reached a point where obtaining court approval would be more appropriate."

In a deposition, Mr. Browning testified that it was appropriate for the men -- all of whom expected to be directors of the new National Gypsum that would emerge from bankruptcy -- to begin talking about future plans for the company. But actually spending the money to hire Booz-Allen was a matter for the new company, which would not exist until July, he said.

Indeed, National Gypsum formally emerged from bankruptcy that July 1, without ever having informed the court of its dealings with Booz-Allen. The first announcement of the restructuring was made on Oct. 5, 1993, when the company announced that it was laying off 12 percent of its work force to save $30 million a year.

The news came just a month after a key legal deadline; the creditors had until Sept. 6 to ask Judge Felsenthal to revoke the company's reorganization plan if they suspected fraud.

Playing out the opportunity that the executives had envisioned, National Gypsum's cost-reduction plans delighted the stock market. In the week after the layoffs were announced, the stock rose 20 percent; by February 1994, the company's shares had hit $40 -- more than three times the $12.50 price at which they had been valued, at the urging of the company and investment funds, by the bankruptcy court. Gypsum prices were booming during the period, as well.

Lawyers for the disgruntled creditors estimate that the three investment firms would have turned their $295 million bankruptcy claim into $790 million if they held their stock until October 1995, when National Gypsum was acquired for $54 a share, or about $1.2 billion, by Delcor Inc., a private investment company led by National Gypsum's former chairman.

Not all the firms held the stock that long. The Justice Department required Goldman, Sachs to sell its 20 percent stake in November 1993 after Federal antitrust officials learned that Goldman's Water Street Fund also owned 43 percent of the USG

Corporation, National Gypsum's largest competitor. Goldman made a profit of about $70 million on the deal, according to a deposition by Barry S. Volpert, who managed the National Gypsum investment for the Water Street Fund.

Lawyers for Goldman, Sachs said that because the firm sold its shares so quickly after National Gypsum emerged from bankruptcy, it could not have reaped any benefit even if there were a secret plan. They also said Goldman had intentionally taken no role in creating new business plans for National Gypsum because it knew it would have to sell its investment quickly.

Trust Company of the West held its stock longer; according to evidence obtained by the junior creditors' lawyers, the firm sold its stock and bonds, which had cost $40 million, piecemeal from 1993 to 1995 for $180 million.

Those numbers sting for people who haven't shared in the good fortune.

"The big money guys took care of themselves," said Jackie Fields, who owns a Phillips 66 distributorship in McAllen, Tex., and bought some of the company's money-losing junior bonds, "and left everybody else in the cold."

Photos (Photographs by Robert Mihovil (Earnest) and Glenn Andrews for The New York Times (Gilley); Don Hogan Charles/The New York Times (asbestos))

Charts: "After Chapter 11"
Lawsuits over asbestos exposure drove National Gypsum, like many other makers of building products, to seek shelter in bankruptcy court from its huge obligations. Now, six years after the company reorganized, its creditors continue to battle over the outcome of the case.

THE DISCONTENTED

Small investors like Alfred B. Earnest, a Houston retiree, got pennies on the dollar for their National Gypsum bonds.

HIS INITIAL INVESTMENT: $1,800*
RECEIVED: $592.65
*Had expected to receive $4,000 after 20 years

Asbestos-exposed workers like Leroy Gilley of Chickasaw, Ala., worry that no money will be left in a National Gypsum trust fund if they develop lung disease.

ANTICIPATED CLAIMS AGAINST TRUST FUND: $2.3 BILLION
PROCEEDS OF TRUST FUND: $518 MILLION

Property owners that spent millions to rid buildings of asbestos were reimbursed for less than half their costs. The biggest claim is from New York City's schools.

NEW YORK SCHOOLS' CLAIM: $44 MILLION
SO FAR: $20 MILLION

THE BIG INVESTORS

Fidelity Management and Research, Trust Company of the West and Goldman, Sachs traded their National Gypsum debt for stock that gave them control when the company emerged from bankruptcy -- and then soared in value.

INITIAL INVESTMENT: $101 MILLION
ESTIMATED PROFIT: $240 MILLION

THE ACCUSATIONS

Lawyers for the trust fund and junior creditors contend that National Gypsum executives and the investment firms kept a cost-cutting plan secret until after the bankruptcy, so they could reap its rewards. At a deposition, lawyers confronted Harry J. Leonhardt, an industry consultant, with documents found in his trash can. The investors and executives say that there was no secret plan and that the company's recovery reflected an economic upturn. (pg. 1)

"A Building Products Bankruptcy"
National Gypsum's future has fallen and revived along with the market for its gypsum products. Here are some key points in the company's bankruptcy and its aftermath.

April 1986 -- National Gypsum's executives take the company private in a leveraged buyout with advice from Goldman, Sachs. The transaction increases the company's debt by hundreds of millions of dollars.

Oct. 29, 1990 -- National Gypsum files for bankruptcy protection as the price of gypsum falls and the company is buried in injury claims from people who have inhaled the asbestos fibers in its building products.

Late 1990 to 1992 -- Fidelity, Trust Company of the West and Goldman buy the company's senior debt at cheap prices and become the company's most powerful creditors.

Spring 1992 -- The three big investment firms decide to break away from the other creditors, hire their own lawyer and work toward getting the court to approve a reorganization plan that benefits their interests.

Fall 1992 -- A bankruptcy committee representing all creditors except the three investment firms says it believes that the company is intentionally understating its value in documents filed with the bankruptcy court.

December 1992 -- Harry J. Leonhardt, a consultant, completes a written plan that says National Gypsum is spending $40 million too much on selling and administrative costs. He gives copies to Trust Company of the West and Fidelity.

1993

March 9 -- Bankruptcy Judge Steven A. Felsenthal approves the reorganization plan presented by the company and the three investment firms.

April 1 -- The company's chief executive, Mr. Leonhardt and two representives of Trust Company of the West agree to hire Booz-Allen & Hamilton to implement a cost reduction plan.

April 14 -- Booz-Allen consultants prepare a letter stating they plan to begin work on April 19.

April 16 -- In a letter, Mr. Browning says that the company's lawyer believes the Booz-Allen project would need court approval and that the work therefore will be delayed.

July 1 -- National Gypsum emerges from bankruptcy protection.

Oct. 5 -- The company announces that it is cutting its workforce to save $30 million a year. Within a week, the stock rises 20 percent.

1995 -- Creditors file a lawsuit against the company's former executives charging that National Gypsum and its financial advisers hid the cost-cutting plan from the bankruptcy court. The investment firms later are added as defendants.

Jan. 21, 1998 -- In a written opinion, Judge Felsenthal says that the company's value would have been greater -- and that smaller creditors would have received more money -- had he known about the job cuts before National Gypsum left his court.

March 1, 1999 -- David C. Godbey, a Texas District Court judge, rules that the outcome of the bankruptcy case should essentially remain intact. Lawyers for the creditors and asbestos victims say that they will appeal.

(Sources: Court documents; Bureau of Labor Statistics)(pg. 12)

"Turning Gypsum to Gold"
Three big firms that invested heavily in National Gypsum debt scored big gains when the company's stock soared after its bankruptcy. All figures are in millions of dollars.

INITIAL INVESTMENT
Trust Company of the West -- $40
Goldman, Sachs -- $31
Fidelity Management and Research -- $30

BANKRUPTCY CLAIM
Trust Company of the West -- $120
Goldman, Sachs -- $86
Fidelity Management and Research -- $46.5

PROCEEDS FROM STOCK SALE
Trust Company of the West -- $180
Goldman, Sachs -- $101
Fidelity Management and Research -- $60*

PROFITS:
Trust Company of the West -- $140
Goldman, Sachs -- 70
Fidelity Management and Research -- 30*

*Fidelity's proceeds and profits are estimates made by lawyers for the junior creditors. They say Fidelity at least doubled its investment.

(Sources: Documents from investment firms; depositions of firms' executives)(pg. 12)

---- INDEX REFERENCES ----

COMPANY: NATIONAL GYPSUM; GOLDMAN SACHS GROUP INC (THE); BOOZ ALLEN AND HAMILTON INC; USG CORP; AXA SA; NATIONAL GYPSUM CO

NEWS SUBJECT: (Corporate Financial Data (1XO59); Legal (1LE33); Financially Distressed Companies (1FI85); Major Corporations (1MA93); Investment Banking (1IN86))

INDUSTRY: (Housing (1HO38); Investment Management (1IN34); Business Services (1BU80); Building Materials (1BU25); Non-Metallic Minerals (1MI05); Financial Services (1FI37); Accounting, Consulting & Legal Services (1AC73); Internal Medicine (1IN54); Consulting Services (1CO47); Construction (1CO11); Management Consulting (1MA79); Insurance Liability (1IN26); Lead Paint & Asbestos (1LE49); Insurance Industry Legal Issues (1IN64); Healthcare (1HE06); Insurance (1IN97); Healthcare Practice Specialties (1HE49); Real Estate (1RE57); Respiratory & Pulmonary (1RE29))

REGION: (North America (1NO39); Texas (1TE14); New York (1NE72); Americas (1AM92); USA (1US73))

Language: EN

OTHER INDEXING: (Petersen, Melody; Leonhardt, Harry) (ALLEN; ANCHOR INDUSTRIES INTL; BOOZ; BOOZ ALLEN; BOOZ ALLEN HAMILTON; DELCOR INC; DONALDSON LUFKIN JENRETTE; FIDELITY; GOLDMAN; GOLDMAN SACHS CO; GYPSUM; JUSTICE DEPARTMENT; NATIONAL GYPSUM;

NATIONAL GYPSUM CO; RESEARCH; SACHS; SOURCES: COURT; TRUST; TRUST CO; USG CORP) (Alfred B. Earnest; Barry S. Volpert; Boren; Browning; Bryant C. Boren Jr.; David C. Godbey; Earnest; Felsenthal; Gilley; Glenn Andrews; Godbey; Handwritten; Harry J. Leonhardt; Harry Leonhardt; Hilton; Hogan Charles; Jackie Fields; James R. Moriarty; John E. McGrath; Lawe; Leonhardt; Leroy Gilley; Moriarty; Peter C. Browning; Playing; Richard Masson; Robert Mihovil; Scott Beyerl; Steven A. Felsenthal; Undisputed; Vincent J. Naimoli; W. Dee Hilton) (Asbestos; Suits and Litigation; Bankruptcies; Asbestos)

COMPANY TERMS: NATIONAL GYPSUM CO; FIDELITY MANAGEMENT AND RESEARCH; GOLDMAN SACHS AND CO; TRUST CO OF WEST; BOOZ ALLEN AND HAMILTON

EDITION: Late Edition - Final

Word Count: 5043
5/2/99 NYT 31
END OF DOCUMENT
More Like This | More Like Selected Text
(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

© 2006 by The New York Times Company.                NewsRoom

5/2/99 NYT 31 0