1              UNITED STATES BANKRUPTCY COURT
                SOUTHERN DISTRICT OF NEW YORK

2

3                                    .
     IN RE:                          .    Case No. 05-44481

4                                    .
     DELPHI CORPORATION, et al,      .    New York, New York

5                                    .    Tuesday, March 21, 2006
                           Debtors.  .    10:02 a.m.

6    . . . . . . . . . . . . . . . .

7

          TRANSCRIPT OF SECTION 1102(a)(2) EVIDENTIARY HEARING

8              BEFORE THE HONORABLE ROBERT D. DRAIN
                UNITED STATES BANKRUPTCY JUDGE

9

     APPEARANCES:

10

     For the Debtors:              John Wm. Butler, Jr., Esq.

11                                 David E. Springer, Esq.
                                   SKADDEN, ARPS, SLATE, MEAGHER

12                                  & FLOM, LLP
                                   333 West Wacker Drive, Suite 2100

13                                 Chicago, Illinois 60606

14                                 Kayalyn A. Marafioti, Esq.
                                   SKADDEN, ARPS, SLATE, MEAGHER

15                                  & FLOM, LLP
                                   Four Times Square

16                                 New York, New York 10036

17   (Appearances continued)

18   Audio Operator:              Electronically Recorded
                                  by Greg White, ECRO

19

     Transcription Company:       Rand Transcript Service, Inc.

20                                311 Cheyenne Road
                                  Lafayette, New Jersey  07848

21                                (973) 383-6977

22

23   Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.

24

25

```
 1    A P P E A R A N C E S:   (Continued)

 2    For Appaloosa
      Management, LP:                  Thomas E. Lauria, Esq.
 3                                      Rudolph F. Aragon, Esq.
                                        Frank L. Eaton, Esq.
 4                                      WHITE & CASE, LLP
                                        Wachovia Financial Center
 5                                      200 South Biscayne Boulevard
                                        Suite 4900
 6                                      Miami, Florida 33131

 7                                      Glenn M. Kurtz, Esq.
                                        Douglas P. Baumstein, Esq.
 8                                      WHITE & CASE, LLP
                                        1155 Avenue of the Americas
 9                                      New York, New York 10036

10
      For the U.S. Trustee:            Alicia M. Leonhard, Esq.
11                                      U.S. DEPARTMENT OF JUSTICE
                                        Office of the U.S. Trustee
12                                      33 Whitehall Street, Suite 2100
                                        New York, New York 10004
13

14    For the Official Committee
      of Unsecured Creditors:          Robert J. Rosenberg, Esq.
15                                      John W. Weiss, Esq.
                                        LATHAM & WATKINS, LLP
16                                      53rd at Third, 885 Third Avenue
                                        New York, New York 10022
17

18    For JPMorgan, et al:             Kenneth S. Ziman, Esq.
                                        Robert Trust, Esq.
19                                      SIMPSON, THACHER & BARTLETT, LLP
                                        425 Lexington Avenue
20                                      New York, New York 10017

21

22

23

24

25
```

3

1                              I N D E X

2                                                     Page
     PRETRIAL CONFERENCE                                 4
3        Motion to Quash Subpoena (Re:  Mr. Tepper)      5
             Court Decision                             13
4
     OPENING STATEMENTS
5        By Mr. Lauria                                  16
         By Mr. Butler                                  36
6        By Mr. Rosenberg                               46
         By Ms. Leonhard                                48
7

8                        DIRECT   CROSS   REDIRECT   RECROSS

9    WITNESSES FOR APPALOOSA MANAGEMENT, LP
     ADAM REESE
10       By Mr. Springer          51
         By Mr. Baumstein                  57
11
     MARK HYMAN
12       By Mr. Springer          61
         By Mr. Kurtz                      87
13
     STEPHEN GREENE
14       By Mr. Springer         114                139
         By Mr. Kurtz                     133,146
15
     WITNESSES FOR THE DEBTORS
16   JOHN B. SHEEHAN
         By Mr. Aragon           150                218
17       By Mr. Butler                    194,231

18   EXHIBITS:                                Marked   Received

19   Debtors' Exhibit 34   (Not identified.)              15

20   Debtors' Exhibit 74   Daily Deal article.            15

21   Debtors' Exhibit 193  (Not identified.)              15

22
     Appaloosa Exhibit 6  Reese Declaration.              50
23
     Appaloosa Exhibit 10 Reese Supplemental Declaration. 50
24

25   All Exhibits Stipulated and Received in Evidence.    61

Pretrial Conference                           4

1    (Proceedings commence at 10:02 a.m.)

2         THE COURT:  Please be seated.

3         Okay.  <u>Delphi Corporation</u>.

4         MR. BUTLER:  Your Honor, good morning.  Jack Butler

5    from Skadden, Arps, Slate, Meagher & Flom, on behalf of --

6    along with my partners David Springer and Kayalyn Marafioti,

7    on behalf of the debtors for this specially set hearing.

8         Your Honor, the sole matter on today's agenda is the

9    motion by Appaloosa Management, LP, pursuant to Section 1102

10   of the Bankruptcy Code, for an order directing the United

11   States Trustee to appoint an equity committee in the Chapter

12   11 cases.  It's at Docket No. 1604.

13        There have been oppositions filed by the United

14   States Trustee at Docket Nos. 1682 and 2636; by the pre-

15   petition lenders at Docket No. 1693; by the debtors at Docket

16   No. 2629; by the Creditors' Committee at Docket No. 2634; and

17   a statement in response by General Motors Corporation was

18   filed at Docket No. 1712.

19        Your Honor, there are three motions that have been

20   filed overnight in connection with this matter by Appaloosa

21   in addition to the main motion.  They have filed motions to

22   exclude some or all of testimony of both of the debtors'

23   experts, Mr. Resnick and Mr. Williams, and they have filed a

24   motion to quash a trial subpoena that was properly served on

25   the principal of Appaloosa Mr. David Tepper, and we'd like to

1   have those matters dealt with at this time.

2           THE COURT:  Okay.

3           MR. LAURIA:  Your Honor, if I may be heard.

4           THE COURT:  Yes.

5           MR. LAURIA:  Good morning, Your Honor.  Tom Lauria

6   with White & Case; we represent Appaloosa Management.  I'm

7   here with my colleagues Glenn Kurtz, Rudy Aragon, and Doug

8   Baumstein.  We're going to alternatively be dealing with

9   argument and witnesses today.

10          As to the three motions, we have no problem with

11  dealing with the motion to quash up front, but the other two

12  motions are really in the nature of objections to the

13  admissibility of evidence that has been prepared for offer

14  into the record by the debtors.  And we think it probably is

15  more appropriate to deal with those matters in context when

16  they come up during the course of the presentation.  So we

17  would agree to the motion to quash being addressed up front,

18  but the other two ...

19          THE COURT:  Okay.  That's fine.  Let's deal with the

20  Tepper one.

21          MR. KURTZ:  Good morning, Your Honor.  Glenn Kurtz

22  from White & Case.

23          Your Honor, we filed a motion for a protective

24  order.  There's really two grounds here.

25          First, we've agreed to a fairly comprehensive

Motion                                                         6

1    pretrial stipulation, which has been so ordered, that

2    provided the procedures that we would operate pursuant to, in

3    connection with this motion for an equity committee.  We have

4    specifically provided that each party would provide

5    affirmative declarations and expert reports, in lieu of

6    direct testimony, and that those parties would be produced

7    for deposition and then for cross-examination in court.

8    There is no provision for additional witnesses or for the

9    adducement of any evidence that does not involve an

10   affirmative proffer by one of the parties.

11         Secondly, and perhaps more importantly, is Mr.

12   Tepper has absolutely no information that is relevant to

13   today's proceedings; in fact, we think this was served

14   strictly for purposes of harassment, and probably solely in

15   response to a letter that Mr. Tepper sent to Mr. Butler for

16   provision to the board of directors.  I don't think it was

17   attached to the papers, Your Honor; and, if I may, I will

18   hand you a copy.

19         THE COURT:  Okay.

20         MR. KURTZ:  The March 15 letter addresses certain

21   serious concerns that equity-holders have with respect to the

22   way that the debtors are proceeding in this case and makes

23   certain demands for a shareholders meeting and certain other

24   issues that are relevant to the governance of the debtor, but

25   have absolutely nothing to do with any issue that's been

Motion                                                          7

1    raised in connection with this motion.

2            Certainly there is nothing in that letter, which is,

3    by the way, precisely why the debtors have subpoenaed Mr.

4    Tepper.  They've told us they subpoenaed him in connection

5    with this letter.  There's nothing in this letter that is in

6    any way relevant to any piece of evidence that the debtors

7    would seek to put on that would be admissible in connection

8    with these proceedings.  If anything, they would look to

9    rebut the kinds of showings that Mr. Tepper would make.

10      But Mr. Tepper is not going to be a witness in this case.

11   He hasn't provided a declaration, he hasn't sat for

12   deposition, he's not on a witness list.

13           So, to the extent that the debtors think that

14   there's anything relevant about these matters, they can be

15   addressed at a later time in a relevant proceeding, and we'll

16   talk about it then.  But it certainly has nothing to do with

17   what is already going to be a fairly condensed proceeding to

18   get through what we have to get through today, with what's

19   going to be five expert witnesses and one fact witness.

20           THE COURT:  Do you have any objection to the

21   introduction of the Daily Deal article, which does link the

22   letter to this hearing --

23           MR. KURTZ:  Your Honor, I --

24           THE COURT:  -- you know, that's referred to in the

25   debtors' objection.

1        MR. KURTZ:  Yeah.  I have not read the <u>Daily Deal</u>

2    article, so I can't comment on that.  I can tell you that we

3    will be putting on evidence of what the enterprise valuation

4    is for the company and what the --

5        THE COURT:  That really didn't respond to my

6    question.

7        MR. KURTZ:  Yeah.  I haven't read it, so I'm not in

8    a position to stipulate to the admission of something I

9    haven't reviewed yet.

10        THE COURT:  Okay.

11        MR. KURTZ:  Thank you, Your Honor.

12        MR. BUTLER:  Your Honor, first of all, the <u>Daily</u>

13    <u>Deal</u> article is Exhibit 74 to the trial exhibits for today's

14    hearing, and Appaloosa has agreed to the admission of all the

15    exhibits, subject to motions, their pretrial motions.

16        THE COURT:  Okay.

17        MR. BUTLER:  So it has been reviewed by someone on

18    the Appaloosa legal side.

19        THE COURT:  Okay.

20        MR. BUTLER:  Your Honor, the reason that we -- Mr.

21    Tepper made himself relevant to this proceeding is by

22    Appaloosa's conduct and his conduct that occurred on March

23    15th and 16th, long after the pretrial order was entered

24    here.

25        Mr. Tepper -- and the letter that counsel says

1   wasn't served included, Your Honor -- in fact, was attached

2   to our response to the motion to -- or the response to the

3   motion to strike.  It's also Exhibit 194 of the trial

4   exhibits for today.  And the 13(d) filed by Appaloosa on

5   March 16th is trial exhibit 195.

6           Your Honor, the reason that Mr. Tepper became

7   relevant is because, when things were going badly in this

8   hearing, the day after their expert report had been totally

9   discredited by a responsive report from Mr. Resnick because

10  they had made a 1.2-billion-dollar mistake in their

11  calculations, the day after that happened, for the very first

12  time -- and this will come across in examination with Mr.

13  Tepper -- for the very first time, Mr. Tepper raised a whole

14  host of breach of duty claims with respect to the debtors-in-

15  possession; including, on Page 2 of their letter, alleging

16  that it is a breach of fiduciary duty for the debtors to be

17  opposing this motion in the court today.  The same day he did

18  this, Mr. Tepper held extensive media interviews and told the

19  media that, if we would agree with their motion, this would

20  go away.

21          This was a litigation tactic.  It was, in the

22  debtors' view, reprehensible.  And the fact is Mr. Tepper, if

23  cross-examined by us as a hostile witness here will let this

24  Court know, I believe -- the Court can draw important

25  inferences about the motives behind this motion, which are

1   relevant to Your Honor's considerations under both <u>Williams</u>

2   and <u>LaRalle</u> (phonetic), as to why Appaloosa brought this

3   motion and what their conduct has been.

4           And the fact of the matter is that they've had no

5   communications in this case whatsoever with the debtors; with

6   our Chief Restructuring Officer, with our Chief Executive

7   Officer, with the president of our company during the Chapter

8   11 case.  They didn't have any communications with us when

9   they bought their stock two days after the Chapter 11 was

10  filed.  They didn't have any communications before they wrote

11  the letter to the United States Trustee.

12          They didn't raise any of these allegations that

13  miraculously appeared this week in their letter to the U.S.

14  Trustee.  They didn't raise any of these allegations that

15  miraculously appeared in their motion that was filed before

16  this Court.

17          All right.  All of this came about when the Eureka

18  report was totally discredited.  And, Your Honor, we believe

19  that it is absolutely relevant by the words, Mr. Tepper's

20  words himself.  He's the one who wrote this letter, he's the

21  one who linked the letter to this proceeding.  He's the one

22  who told the media, that was reported in the <u>Daily Deal</u>,

23  that's part of the trial exhibits, that if we would only

24  agree to appointing an equity committee, that all of these

25  issues would go away.

Motion                                                    11

1        And, Your Honor, we believe that the motive of

2   Appaloosa, who was not a pre-petition equity-holder in this

3   case, but who speculated on the stock when it was trading at

4   option value, and has then filed a motion that is done

5   without any interface or raising any of these issues before;

6   we think it's transparent, and we believe it's relevant for

7   the debtors at this hearing to be able to expose Mr. Tepper

8   and Appaloosa for what they have done and what their conduct

9   has been.  And that's the reason we did it.

10       We couldn't possibly have contemplated it by the

11  pretrial order that was entered weeks earlier.  We --

12  obviously, it would be unethical for me to try to consult

13  with Mr. Tepper to prepare his declaration; he's a hostile

14  witness.  There's no way that we would be submitting a

15  declaration on behalf of Mr. Tepper.  And Mr. Tepper's

16  conduct can be not a surprise to Appaloosa, seeing as he is a

17  party principal to the movant.

18       THE COURT:  Okay.

19       MR. KURTZ:  Your Honor, I think that presentation

20  confirms that Mr. Tepper's testimony wouldn't be relevant to

21  the issues that are being raised here today, and it's for the

22  following reasons:

23       There is no issue as to whether or not there's a

24  breach of fiduciary duty claim today.  The issue is whether

25  or not equity has an interest that needs to be protected, and

Motion                                                    12

1   whether it's being adequately protected today.

2          Motive is, in fact, not an element with respect to

3   the appointment of an equity committee, so that's not

4   relevant.  But if it was, the -- we have heard nothing that

5   would undercut the motive of trying to protect the financial

6   interests of equity-holders here.

7          The motive that counsel seems to be suggesting is

8   that, if an equity committee was appointment, which in turn

9   would permit the protection of the equity-holders, that

10  perhaps there wouldn't have to be a shareholders meeting.

11  That has nothing to do with valuation; that is simply another

12  avenue towards protecting equity-holders in a bankruptcy in

13  which the debtor seems absolutely bent on wiping them out.

14         There was some notion here about Eureka's report

15  being flawed and a timing issue.  That is absolutely untrue.

16  That will be demonstrated by evidence, not commentary during

17  a motion to quash.  I'll only respond briefly that, in fact -

18  -

19         THE COURT:  No, you don't need to.  That's fine.

20         MR. KURTZ:  Okay.  I mean, Your Honor, there's

21  simply -- what you're going to hear about is whether equity,

22  one, is --

23         THE COURT:  I think I've heard enough on this

24  motion.

25         MR. KURTZ:  Thank you, Your Honor.

Court Decision                                        13

1        THE COURT:  The matter in front of me is a motion to

2   quash a trial subpoena of the principal of Appaloosa, the

3   movant here for the appointment of an official equity

4   committee.  Appaloosa relies upon two arguments for quashing

5   the subpoena.

6        The first is that the subpoena is precluded by the

7   pretrial order agreed to by the parties and entered by me; in

8   that, according to Appaloosa, the debtor in putting on its

9   direct case is limited to declarations and other written

10  exhibits such as expert reports, and therefore is precluded

11  from calling Mr. Tepper; all of such declarations and expert

12  reports required to have been identified before the letter

13  dated March 15th that prompted the trial subpoena.

14       The second basis for the motion to quash ultimately

15  is that the purpose for calling Mr. Tepper as a witness is

16  irrelevant or largely irrelevant to the motion for

17  appointment of an equity committee; and, consequently, having

18  him testify here would be burdensome on him, as well as on

19  the parties and the Court, for the limited amount of time

20  that we have to hear the motion.

21       The first argument is specious.  Obviously, Mr.

22  Tepper is an adverse or hostile witness who would be cross-

23  examined.  There's no reason to have a -- or way to get a

24  declaration from him, other than, of course, the letter

25  itself and the Daily Deal article that refers to the

Court Decision                                    14

1   substance of the letter.  That is the basis for the linkage

2   in the first place that the debtors want to have on the

3   record.

4           However, with those two documents on the record, I

5   believe that the second basis, given the issues here and my

6   view that additional testimony by Mr. Tepper would be

7   essentially cumulative from the March 15 letter and the <u>Daily</u>

8   <u>Deal</u> article, as well as the other fact that the debtor and

9   the other objectors have already brought out, which is the

10  timing of Appaloosa's purchase and the nature of Appaloosa as

11  a sophisticated hedge fund, I think it would be needlessly

12  burdensome on Mr. Tepper, as well as on the other parties and

13  the Court to have him testify as a hostile witness here.

14          I am, however, very concerned by the letter and its

15  timing and the quotes from the <u>Daily Deal</u> article.  And if I

16  do, at the end of the day, appoint an equity committee, the

17  foregoing facts raise serious concerns in my mind as to

18  whether Mr. Tepper or anyone under his control could, in

19  fact, as a fiduciary, adequately represent the interests of

20  equity-holders.

21          That is an issue for another day; and, of course, in

22  connection with that issue, if it ever arises, the U.S.

23  Trustee will be free to look into motivation and conduct

24  here, and I trust will do a thorough analysis as to the bona

25  fides of anyone wishing to serve on an equity committee, if

Court Decision                                          15

1    one is ordered to be appointed.

2           So I'll grant the motion to quash.

3           We'll reserve the other two evidentiary motions to

4    the appropriate time when the two experts are offered up in

5    respect to their reports and their rebuttal reports.

6           MR. BUTLER:  Your Honor, is it also part of the

7    Court's ruling that the exhibits that we referred to:

8    Exhibit 193, Exhibit 34, and Exhibit 74, are admitted?

9           THE COURT:  Well, that's a premise of my ruling.

10   The documents speak for themselves.  This is a -- obviously

11   not a jury trial, and I can take statements to the press for

12   what their worth, and I'll do so.

13          MR. BUTLER:  Thank you, Your Honor.

14      (Debtors' Exhibit 34 received in evidence.)

15      (Debtors' Exhibit 74 received in evidence.)

16      (Debtors' Exhibit 193 received in evidence.)

17          THE COURT:  Mr. Lauria.

18          MR. LAURIA:  Good morning again, Your Honor.

19          I think what we would like to do by way of

20   proceeding with the motion is to start with brief opening

21   statements, and then turn to the presentation of evidence.

22          THE COURT:  Okay.  Very brief because I've read your

23   papers, even the seventy-five-page reply papers that were

24   submitted yesterday afternoon.  So you can be brief, and Mr.

25   Butler can be, too.

1          **OPENING STATEMENT FOR APPALOOSA MANAGEMENT, LP**

2          MR. LAURIA:  Let me start with a brief apology then;

3    in that, we have put a strong burden on the Court here with

4    the massive filings that occurred late in the day.  I

5    apologize for that.  I hope that the Court will understand

6    that that has largely been driven just by the compressed

7    discovery schedule and the volume of material that we've

8    tried to digest in a very short period of time.

9          THE COURT:  Okay.

10         MR. LAURIA:  Your Honor, if ever there was a case

11   calling for the per se appointment of an equity committee,

12   this is it.  Bona fide equity interests that are entitled to

13   be represented are not being represented and are presently at

14   risk of being obliterated.

15         On August 2, 2005, the company had sufficient

16   surplus to pay a dividend to its 300,000-plus shareholders.

17   During the months of August and September, the company's

18   stock traded consistently between four and six dollars per

19   share, suggesting total common equity value of between two

20   and a quarter billion dollars, and $3.3 billion, based on the

21   fact that there were at all relevant times 560 million shares

22   outstanding.

23         Then, on October 8, 2005, the company makes what it

24   acknowledges was an elective Chapter 11 filing; "elective" in

25   the sense that no event had occurred necessitating the

Opening - Lauria                                    17

1   filing; rather, the filing was made to avoid the unknown

2   effect of the pending amendments to the Bankruptcy Code, and

3   thereby optimized the opportunity to maximize the value for

4   all constituencies.

5           And yet, less than two months later, without citing

6   to any material adverse event, either before or after the

7   filing, the company declared itself to be hopelessly

8   insolvent.  In other words, if management and the board are

9   to be believed, far from maximizing value for the company's

10  shareholders, the elective Chapter 11 filing, instead,

11  destroyed two to $3 billion of equity value.

12          Where did it go?  Not since the Great Houdini has

13  anyone seen such an amazing and unexplained disappearing act.

14  Unconvinced that so much value could disappear so fast

15  without explanation, Appaloosa retained experts to

16  investigate the mystery.  The fact is, just like Houdini,

17  this disappearing act was an illusion.

18          What Appaloosa's experts, whose firm ironically is

19  named "Eureka," found was that substantial distributable

20  value is likely to exist for old equity upon the

21  reorganization of Delphi pursuant to a Chapter 11 plan.

22          In reaching this conclusion, they performed a

23  traditional valuation of Delphi's business to determine a

24  range of enterprise values, and then made a series of

25  deductions to get to a range of anticipated equity values.

1  The enterprise valuation fundamentally involved three basic

2  components:

3          Number one, the establishment of a set of a

4  reasonable base case projections.

5          Number two, the formulation of a view regarding

6  expected savings from a new labor deal to derive expected

7  reorganization EBITDA.

8          And then the application of an appropriate multiple

9  to derive enterprise value.

10          As to the base case, Eureka initially established an

11  EBITDA range of between negative 154 million and positive 200

12  million; the lower end of that range being the actual EBITDA

13  for the year 2005, and the higher end being the annualization

14  of the positive $59 million of EBITDA realized during the

15  company's first four months in Chapter 11.

16          In its final analysis, as set forth in Mr. Hyman's

17  March 17 declaration, Eureka then applied a number of

18  adjustments to the debtors' so-called "steady-state

19  projections" that conformed them to the 2005 numbers and took

20  into account the results of the last four months.  This

21  produces a base case EBITDA of $102 million 2006, and $295

22  million in 2007.

23          Eureka then developed a view regarding what it

24  believed are reasonable savings to be generated from the

25  anticipated transition of Delphi's labor-related costs,

Opening - Lauria                                          19

1   labor-related -- a transition that the debtors themselves

2   have heralded throughout the pendency of these cases.  In the

3   opinion of Eureka, the costs would aggregate approximately

4   $2.5 million per year.

5           Finally, Eureka developed a range of reasonable --

6           THE COURT:  I'm sorry.  Can you say that again?

7           MR. LAURIA:  In the opinion of Eureka, the annual

8   savings from the transition of the debtors' labor-related

9   costs will be approximately $2.5 billion per --

10          THE COURT:  Oh, I think you said "million" at first.

11          MR. LAURIA:  I'm sorry, Your Honor.

12          THE COURT:  Okay.  All right.

13          MR. LAURIA:  Finally, Eureka developed a range of

14  reasonable multipliers of 5.2 to 5.9, based on its review of

15  the results of a number of comparable companies.  This,

16  through the application of simple math, generates a total

17  enterprise value of approximately 12.9 -- I'm sorry, $12.7

18  billion to $16.2 billion.

19          In reviewing these three steps, the debtors' expert

20  Mr. Resnick of Rothschild really only contests and attacks

21  step one:  The establishment of the base case projections.

22  His declaration really does not address the level of savings

23  from a new labor deal, nor does he challenge the range of

24  multiples Eureka has used.

25          Now here's where it gets interesting.  As we all

Opening - Lauria                                          20

1   know, you have to watch equity, not trying to adopt pie-in-

2   the-sky projections that have the effect of materially

3   inflating the company's value.

4          What's interesting and highly unusual here, Your

5   Honor, is that Eureka has adjusted the company's steady-state

6   numbers to bring them in line with current performance.  And

7   it is the company who is relying on stale projections to take

8   the position that the number, the starting point for the

9   analysis is materially lower.

10         Eureka's adjustments for the debtors' base case

11  projection focus on the following material elements:

12         Number one, Eureka held overall revenues flat, as

13  compared to the company, which reduces them by about $500

14  million.  In reviewing the materials provided by the debtors,

15  Eureka concluded that this movement in the debtors' numbers

16  is a function of two things:

17         First, expectations regarding GM's U.S. production

18  and the average value that Delphi derives from each GM unit.

19  The company uses 4.65 million units as the number of units

20  for 2005, and reduces that to 4.35 million units for 2006.

21  In reality, GM's U.S. production totaled 4.85 million units

22  in 2005, and appears to be only slightly off for 2006.  In

23  recognition of this, Eureka dropped the number by about three

24  percent to 4.7 million units.  In addition, to be

25  conservative, Eureka reduced the value of Delphi's

1  participation in those units by ten percent.  These

2  adjustments derive a stable number year to year, in terms of

3  revenue, for Delphi.

4       The second material adjustment was that Eureka held

5  material costs constant at fifty-two percent.  That's the

6  number that was realized in 2005.  Instead, or in comparison,

7  the debtors moved material costs up to 54.7 percent.

8       Now in the course of performing its valuation and

9  adjustment its assessment, Eureka has always felt that, in

10 fact, material costs are presently declining, and are likely

11 to continue to do so at present; however, again in the

12 interest of being conservative, Eureka initially took the

13 position that you could split the difference between fifty-

14 two and 54.7, but ultimately determined that the right thing

15 to do was to just leave the percentage of material costs flat

16 at fifty-two percent, even though Eureka believes, in fact,

17 that you're going to see a decline in the percentage material

18 costs as time continues.

19      Eureka made a number of other miscellaneous

20 adjustments, none of which are as important as the foregoing

21 two, but all of which are designed to bring the debtors'

22 steady-state projection into line with actual 2005

23 performance and the results of the first four months of

24 operation in Chapter 11.

25      In contrast, the company starts its base case

1   numbers with a projected negative EBITDA of $1.5 billion.

2   This compares to 2005, the number was negative 154 million.

3   This compares to the first four months' positive EBITDA of 59

4   million.  In the opinion of Eureka, the debtors' numbers

5   under these circumstances are unreasonable and artificially

6   depress the expected EBITDA of the company.  The debtors have

7   offered no explanation regarding their view that the starting

8   point for valuation should be materially worse.

9           Now as an aside --

10          THE COURT:  Just a minute.  Sorry.

11      (Court and court personnel confer.)

12          THE COURT:  Okay.

13          MR. LAURIA:  Now as an aside, I want to make clear

14  that the numbers I've just described correct for an error in

15  Eureka's second report, which was provided to the debtors on

16  March 10.  A couple of points of background here.

17          Eureka prepared its initial report on March 6th, a

18  Monday.  In that report, Eureka used as a starting point the

19  debtors' 2005 EBITDA, negative $154 million.  The debtors'

20  steady-state projections had been first delivered to the

21  debtors Sunday night, less than twenty-four hours before

22  Eureka's report was do.  And Eureka was simply uncomfortable

23  in that time frame, trying to assemble and digest the steady-

24  state projections and incorporate them into the report.

25          So in its second reports, which came out four days

1   later; it was required to be filed on Friday of that week,

2   Eureka attempted to incorporate the debtors' steady-state

3   numbers and, in doing so, became a victim of coincidence, a

4   very short schedule, and no management access.

5           In developing its revised base case view, Eureka

6   calculated the annualized EBITDA of Delphi, as I previously

7   mentioned, using the four months' actual results in

8   bankruptcy and the 2005 numbers.  Using those -- using the

9   four-month results in bankruptcy produced an expected 2006

10  EBITDA of about $180 million.  Looking at the debtors'

11  numbers; and, again, under a short time frame and without the

12  ability to talk to management about this, Eureka found that

13  you get to the same number by taking the debtors' negative

14  EBITDA and adding the amortization and depreciation back in.

15          Now what they didn't know was that the debtors'

16  number already took into account the depreciation and

17  amortization.  So, in effect, Eureka double-counted the D&A.

18  This resulted in an over-one-billion-dollar error.  This

19  error, however, was corrected in the March 17 supplemental

20  declaration and report presented by Eureka.

21          There, they made the adjustments that I previously

22  described, and is fully set forth in the declaration, and got

23  back to what they believe is an appropriate target range for

24  EBITDA as a starting point, which is in this case $100

25  million, not the one eighty, and not the negative one fifty-

Opening - Lauria                                                  24

1   four.

2            Now back to the valuation.  Having derived a range

3   of enterprise values of 2.7 billion to 16.2 billion, Eureka

4   then calculated the deductions that would be required to --

5            THE COURT:  I'm sorry.  Two point -- it's 12.7,

6   right?

7            MR. LAURIA:  Did I say "two," Your Honor?

8            THE COURT:  Yeah.

9            MR. LAURIA:  Apologies.

10           THE COURT:  Okay.

11           MR. LAURIA:  12.7 billion to 16.2 billion.

12           Eureka then calculated the deductions that would be

13   required to get to equity value.  They included approximately

14   $5 billion of funded debt, approximately $2 billion of trade

15   and other pre-petition obligations that are non-contingent,

16   about $1 billion per year in Chapter 11 of assumed cash burn,

17   $2.6 billion in assumed buy-out costs with respect to a labor

18   deal, and approximately $200 million of miscellaneous other

19   expenses related to the Chapter 11 case; the grand total of

20   the deductions, 11.8 billion.  Eureka then reduced that

21   number by the debtors' cash on hand, which is approximately

22   $2 billion; taking the aggregate deduction to 9.8 billion,

23   which against the enterprise value leaves equity value in a

24   range of 2.9 to $6.5 billion.  So the bottom end of the range

25   approximates the market capitalization of the equity prior to

1    bankruptcy and goes up from there in recognition of the fact

2    that it anticipates a labor transition.

3           Now, to be sure, the debtors criticize Eureka's

4    assumptions regarding buy-out costs, stating that the 2.6-

5    billion-dollar number is too low.  However, the debtors

6    haven't offered an alternative number that, if adopted, would

7    reduce value enough to eliminate the value for old equity.

8           In addition, any potential concern is more than

9    offset by two things:

10          Number one, the debtors' numbers have materially

11   overstated the debtors' pension and OPEB liabilities in 2006

12   and 2007.

13          And number two, neither the debtors, nor Eureka's

14   projections capture the potential value to be created by

15   separating out the debtors' unprofitable AHG business

16   segment.  As Eureka expressed in its supplemental report,

17   that could generate additional value of seven hundred and

18   fifty to $850 million.

19          Against Eureka's analysis and report, in discovery

20   we learned for the first time that the debtors had not

21   prepared a reorganization value of any kind, either in

22   connection with declaring themselves to be grossly insolvent

23   or in connection with the hearing on this motion.  Indeed, in

24   his report, Mr. Resnick attempts to support the debtors'

25   statement of gross insolvency, relying on, one, the debtors'

Opening - Lauria                                        26

1   current consolidated balance sheet; and, two, the current

2   discount in the trading price of the debtors' debt.

3          However, neither of these approaches are recognized

4   as an appropriate technique to determine reorganized

5   enterprise value.  Our concerns regarding the absence of a

6   bona fide valuation by Mr. Resnick will be the basis of our

7   Daubert motion.

8          GAAP balance sheet numbers simply do not reflect

9   number; and, as conceded by Mr. Resnick, is a one-time

10  snapshot as of the date of preparation, not at

11  reorganization.  Trading prices of debt in a distressed

12  company do not accurately predict reorganized value.  This

13  has been recognized by other courts, and I believe by this

14  Court, and the examples of cases where the prediction is

15  materially wrong are numerous.

16         I had personal involvement most recently, Your

17  Honor, in the Mirant Chapter 11 case.  There, the debt at the

18  beginning of the case traded between thirty and forty cents

19  on the dollar.  We recently confirmed a plan of

20  reorganization that paid that same debt par-plus-accrued-

21  interest, and provided a return to equity.

22         So we have a case where there is clearly some

23  evidence of a reasonable likelihood of a recovery to old

24  equity; and, in the balance against that evidence, nothing.

25  Indeed, Mr. Resnick has conceded that he has performed no

Opening - Lauria                                                    27

1   enterprise value or equity valuation of reorganized Delphi,

2   and that he is unable to predict at this time whether there

3   would be value for old equity in a plan.

4         He also concedes that if the contingent issues in

5   this case; in terms of a new labor deal, the restructuring of

6   OPEB and pension obligations, the resolution of disputes

7   regarding GM's responsibility or claims with respect to these

8   matters, are massive, and involve billions of dollars of

9   swings.

10         So based on this record, the Court should find that

11  Appaloosa has met its burden regarding the potential of an

12  equity recovery.

13         Moreover, the Court should bolster its conclusion by

14  drawing an appropriate negative inference from the fact that

15  Delphi has not offered an enterprise valuation, even though

16  it has full access to all required information and data to

17  perform one.  Its choice not to present that evidence can be

18  construed by the Court as evidence that the result was not in

19  its interest in connection with this litigation.

20         The case regarding the adequacy of representation is

21  even more compelling -- and I know you want me to be brief,

22  so I'm going to speed through this, Your Honor.  The purpose

23  of this elective filing was to preserve and maximize value

24  for all constituencies.  And, yet, within two months of the

25  petition, the debtors have thrown their hands up and said,

1    old equity is out of the money, and the prospect of any

2    recovery is so remote that, in effect, there is no legitimate

3    interests to be represented.  In effect, the board is now

4    saying that it is relieved of any duty to otherwise represent

5    equity because equity is not a bona fide interest in this

6    case.

7           THE COURT:  Well, where is that in the record?

8           MR. LAURIA:  Pardon me?

9           THE COURT:  Where is that in the record?

10          MR. LAURIA:  Your Honor, it's my conclusion from the

11   debtors' position stating that, we're grossly insolvent.

12          THE COURT:  All right.

13          MR. LAURIA:  In fact, hopelessly insolvent.

14          THE COURT:  Although that's in the context of a

15   motion for the appointment of an equity committee.

16          MR. LAURIA:  Yes, Your Honor.

17          THE COURT:  Okay.

18          MR. LAURIA:  I think the focal point is that the

19   concept of hopeless insolvency is not a current status

20   analysis, but it's a forward-looking concept.  It's basically

21   saying that it's hopeless, there is no chance, you are

22   hopeless, there is no chance you're going to get a recovery.

23          It is hard to imagine that a board or management

24   that has made that determination at this stage of the case is

25   going to fight our battles to maximize our recovery; in fact,

Opening - Lauria                                                    29

1   it suggests just the opposite to be the case.

2        Making this concern even worse is the fact that the

3   board has taken this position, as evidenced by discovery,

4   without requiring the performance of a proper enterprise

5   valuation of Delphi at reorganization.  Instead, they based

6   their position on the mere review of a GAAP balance sheet,

7   showing that liabilities exceeded assets by billions; the

8   review of the fact that the company's debt is trading at a

9   material discount; and the review of a set of steady-state

10  projections that failed to give effect to a reorganization.

11  This is a totally flawed approach to determining if the

12  company is hopelessly insolvent.

13       The reliance on the balance sheet is particularly

14  troubling.  The balance sheet before the board on December

15  7th was substantially identical to the balance sheet the

16  board had available to it on August 2, when the dividend was

17  paid; both show billions of dollars of negative equity.  And,

18  yet, on August 2nd, when the dividend was paid, the board had

19  to be comfortable looking through form to substance, that

20  there were net assets, as required under Delaware law, and

21  there was still value left when capital was subtracted from

22  those net assets.

23       And, yet, a short four months later, the same

24  balance sheet has become opaque.  And the board can't look

25  through form to substance anymore, and all they see is a

Opening - Lauria                                          30

1  negative number at the bottom of the page, and that leads

2  them to the conclusion that the company is hopelessly

3  insolvent.

4        The steady-state projections are also useless for

5  this function.  They ignore what everyone knows will happen

6  in this case:  There will be a restructuring of Delphi's

7  labor costs.  And they don't attempt to determine the effect

8  and value of that restructuring.

9        They also do not reflect, as I previously mentioned,

10  the company's current performance in Chapter 11, which is

11  positive EBITDA.  This debtor is not on the road to a 1.5-

12  billion-dollar negative EBITDA here.  They're -- so far, in

13  four months, they're at plus 59 million.  In short, the

14  company has declared itself grossly insolvent without doing

15  what we would consider to be the necessary homework to take

16  such a position.

17        No business plan reflecting a reorganization, no

18  assessment of the impact of a revised labor deal, no plumbing

19  of alternative structures to maximize value, no performance

20  of a proper valuation.

21        In addition, Your Honor, the company has engaged in

22  the truly extraordinary strategy of formulating a KERP on day

23  one of this case that actually puts the interests of

24  management in competition with those of the shareholders.

25  The KERP proposed by the debtors at the beginning of the case

1   without negotiation purports to reserve ten percent of the

2   company's reorganized equity for management.  There's no

3   ability to determine at this point if such a reservation is

4   appropriate.  But what it seems to presuppose is that old

5   equity is out of the money.  And so this is a mechanism for

6   aligning the interest of management with the new

7   shareholders.

8        Assuming a more favorable outcome to old equity,

9   what it does is it puts management in competition for the

10  surplus value after the creditors' claims are paid in full.

11  In short, rather than being aligned with the interests of old

12  equity through the proposed KERP, management is positioning

13  itself to be opposed, in conflict with the interests of old

14  equity.

15       Adding insult to injury, the board has deprived the

16  shareholders of their fundamental governance rights by

17  failing to hold a shareholder meeting for over -- I'm sorry -

18  - for nearly two years.  Your Honor, the last shareholder

19  meeting was in May of 2004.  As I'm sure this Court is aware,

20  Delaware law requires a shareholder meeting every thirteen

21  months.

22       The case law in Delaware is clear that all a

23  shareholder has to do is ask, and you're entitled to a

24  meeting.  And the case law is also clear in the Second

25  Circuit that it requires extraordinary circumstances for the

1   bankruptcy process to get involved in defeating corporate

2   governance rights of a debtor in bankruptcy.

3          THE COURT:  Was the March 15th letter the first

4   request by Appaloosa for a shareholders meeting?

5          MR. LAURIA:  I believe it was, Your Honor.

6          THE COURT:  Okay.

7          MR. LAURIA:  As such, there can be no doubt that the

8   interests of equity are currently unrepresented, period.  The

9   company has engaged in a course of conduct that has destroyed

10  shareholder value and seems designed to completely

11  disenfranchise this company's shareholders.  It is a strategy

12  that is explainable by the conflicts of interest that the

13  company has inflicted on itself.

14         The final point, Your Honor, is timing.  This case

15  is sure to be long.  A plan is probably a year to two away.

16  Nevertheless, material activities are underway now that will

17  impact the ultimate result.  Negotiations with the union,

18  according to media reports, are ongoing and active.  Rumors

19  of a deal or the formation of a deal have been surfacing on

20  almost a daily basis.  And, yet, on request, Appaloosa has

21  been told, you don't get any information now because we're in

22  litigation.

23         So Appaloosa, acting as a sole shareholder, doesn't

24  apparently have the right to find out what's going on with

25  these negotiations, that may materially; in fact, will

Opening - Lauria                                      33

1   materially impact recoveries in the case.  An official

2   committee could not be so deprived of that right.  1102 gives

3   the committee the right to sit down and get inside those

4   discussions.

5          In addition, there are activities that are going to

6   have to be performed that will require substantial lead time

7   and proper diligence to address; in particular, the formation

8   of a reorganization business plan.  Mr. Resnick has conceded

9   that such a plan does not exist today, something that's going

10  to have to be done.  And for equity to participate in this

11  case, they're going to have to have a seat at the table in

12  the formation and debate over a business plan.

13         Finally, there are important disputed issues that

14  may well require litigation to resolve; in particular, the

15  relationship between GM and the debtors' labor-related costs.

16  To be able to play a meaningful role in the resolution of

17  those issues, equity-holders are going to have to have an

18  opportunity to participate at the beginning of the case, not

19  at the end.

20         In short, Your Honor, if equity interests are to be

21  protected and represented, they need a vehicle to achieve

22  that now.

23         In sum, Delphi is not hopelessly insolvent.  There

24  is a credible case to support a meaningful recovery for

25  equity.  Equity is not being represented at present, and the

Opening - Lauria                                    34

1    posture of the case supports the appointment of a committee

2    as soon as possible to ensure that representation can be

3    provided in an effective fashion.

4              THE COURT:  Okay.  Let me go back -- I'm sure I'll

5    hear about this a little more later.  But in calculating the

6    deductions from its enterprise value calculation, your expert

7    gave, I think, 2.6 billion of buy-out costs for the labor

8    situation.  Was that a net number?  Did it include in that

9    number a projected claim that GM might have?

10             MR. LAURIA:  Your Honor, the assumption is that GM

11   will not end up with a net claim.

12             THE COURT:  Oh, so this -- in other words, the 2.6

13   billion is a net number?

14             MR. LAURIA:  It is.

15             THE COURT:  Okay.  And when you -- when you went

16   through the functions that an official equity committee would

17   perform, you addressed both the formation of a business plan

18   and the negotiation with the union.  And I think in both of

19   those cases, you mentioned a need to get information.  What

20   additional role would the committee in your mind play,

21   irrespective of both of those two tasks?

22             MR. LAURIA:  I think the committee would anticipate

23   being involved in the investigation and review of the GM

24   relationship, and either the participation in any negotiation

25   toward a settlement, or the direct participation or heavy

1   monitoring of any litigation that is ultimately commenced to

2   get to a resolution of those issues.

3           THE COURT:  Okay.  And you said GM.  But as far as

4   the negotiations and the formation of the business plan,

5   again, it's heavy monitoring as far as the negotiations are

6   concerned?

7           MR. LAURIA:  Well, Your Honor, we -- one of the

8   things that we're concerned about is negotiating a labor

9   contract that is obviously going to lock in material expense

10  without first having a business plan and a reorganization

11  structure and a capital structure.  It seems like it's a

12  little cart-before-the-horse-ish to take on such a big thing

13  without having the rest of the foundation laid.

14          By way of example, Your Honor, the existing labor

15  agreements are principally at the parent level.  It may be

16  important to negotiate to push those obligations under an

17  amended contract down to the asset level, so that the company

18  has the flexibility under a reorganization to separate

19  profitable businesses from unprofitable ones to maximize

20  enterprise value.  And if that is locked in the other way at

21  this point, remember, the existing labor agreement expire

22  principally in September 2007 and October 2007.  After that,

23  there is freedom, as we currently exist, to reallocate the

24  legal liability for the labor costs.

25          THE COURT:  Well --

1          MR. LAURIA:  If we lock in to a new labor agreement

2     that keeps it at the parent, we've given up what may be very

3     important value-optimizing opportunities.

4          THE COURT:  I'm sorry.  I was -- my question was a

5     lot simpler, which is:  Do you envision the chairman or

6     professionals for an equity committee engaging in face-to-

7     face negotiations with the unions?

8          MR. LAURIA:  Your Honor, I think our first interest

9     would be to be in face-to-face discussions with the company

10    and its advisors, and to get a sense of what's going on.  I

11    think that our view would be, in the first instance, those

12    are negotiations to be conducted by the company.  I wouldn't

13    want to say that at some point in time, if concern got to an

14    appropriate level, that we wouldn't want to reserve the

15    opportunity to have an actual seat in the room.  But I think,

16    in the first instance, it would be appropriate to have those

17    discussions led by the company.

18         THE COURT:  Okay.  All right.  Thanks.

19         MR. LAURIA:  Thank you.

20              **OPENING STATEMENT FOR THE DEBTORS**

21         MR. BUTLER:  Your Honor, I'm not going to review

22    what's in our responsive papers, our objections, or other

23    pleadings.  I have hopefully a short and fundamental message

24    to deliver to the Court in connection with this hearing.

25              First, one of the things that's always troubled me,

Opening - Butler                                                    37

1    Your Honor, in contested hearings for equity committee

2    motions is the potential for the general public and the media

3    and others to misunderstand what's being litigated, because

4    it has been portrayed, and Mr. Lauria has tried to portray it

5    as the debtors against their own shareholders, and that's

6    really not what's going on here.

7            The facts are that what is being contested here is

8    an opportunistic motion filed by a very substantial and very

9    sophisticated hedge fund, who made a play in this company

10   after we filed Chapter 11, bought almost ten percent of the

11   company a couple of days after we filed Chapter 11,

12   intentionally has had no communications with the company

13   throughout the entire Chapter 11 case; never spoken to the

14   CEO, never spoken to the President, never spoken to the Chief

15   Restructuring Officer; has then filed a series of demands to

16   the U.S. Trustee -- which, by the way, Your Honor, are what

17   triggered the issues involving the debtors making any kind of

18   public statements about the appearance of hopeless

19   insolvency.

20           Because that was a chain of events that Appaloosa

21   began when, without consultation of the company, they made

22   their demand on the United States Trustee.  Ms. Leonhard then

23   communicated with us and asked us to respond to her about the

24   company's views, specifically asked us to address the issue

25   of the appearance of hopeless insolvency and to respond to

1   the U.S. Trustee about our views.

2        A public company debtor doesn't have the luxury of

3   making that response privately; and so, when we made that

4   response, we filed an 8-K on December 20th, it's Exhibit 28

5   to these proceedings, and it says at Page 4, and I quote:

6        "While the debtors would fervently wish otherwise,

7   Appaloosa has not demonstrated, and the debtors cannot

8   construct a scenario in which these factors" -- referring to

9   the Williams factors -- "can be satisfied.  This is largely

10  because the claims associated with the debtors' non-

11  competitive U.S. legacy liabilities and burdensome U.S. labor

12  agreements are direct claims against the U.S. parent holding

13  company and are superior in priority to the interest of that

14  entity's common shareholders."

15        And then two paragraphs later we said, and I quote:

16        "Accordingly, based on all of the relevant

17  information available to the debtors, the debtors believe

18  that if the Bankruptcy Court were required to make a

19  determination today, there is a substantial likelihood that

20  the Bankruptcy Court would determine that the debtors are not

21  solvent and meet the appearance of hopeless insolvency

22  standard developed in applicable case law.

23        "The debtors further believe that the Bankruptcy

24  Court would, therefore, also conclude that any plan of

25  reorganization capable of confirmation in accordance with

1   statutory priority rules of the Bankruptcy Code would result

2   in the holders of Delphi's common stock receiving no

3   distribution on account of their interests and cancellation

4   of their interests.

5        "With respect to the issue of adequate

6   representation, the debtors believe that the board of

7   directors, which is presently composed of twelve members; ten

8   of which are independent directors, including two new

9   directors elected to the board earlier this month" -- that

10  being December of 2005 -- "adequately represents its

11  stakeholders in its fiduciary mission in the Chapter 11 cases

12  to maximize business enterprise value for all of the debtors'

13  stakeholders."

14       Those statements, Your Honor, those conclusions were

15  reached in response to a direct inquiry of the United States

16  Trustee occasioned by Appaloosa's letter.

17       We're here today, Your Honor, in a contested hearing

18  after the U.S. Trustee declined to appoint a committee and

19  has objected to the formation of a committee, along with the

20  Creditors' Committee and the lenders, to put Appaloosa to its

21  burden to demonstrate by a preponderance of the evidence that

22  the Williams standards are met; that is, that there is a

23  substantial likelihood that the equity-holders will receive a

24  meaningful distribution in this case under a strict

25  application of the absolute priority rule, and that they're

1   unable to represent their interests in the bankruptcy case

2   without an official committee.  That is their burden.

3        And to the extent that Mr. Lauria would try to meet

4   his burden by saying we haven't introduced evidence for him

5   or haven't opposed him, there's nothing in the case law that

6   suggests that that -- that we have obliged to make any

7   response.  This is an affirmative case he has.  Nonetheless,

8   we have put in a rebuttal case.

9        And, Your Honor, there are just a couple of simple

10  points.  And may I move over to the flip charts?

11       THE COURT:  Yes.

12       MR. BUTLER:  These are uncontested facts, Your

13  Honor.  Exhibit 204, Trial Exhibit 204 says that there are

14  twenty-billion-plus in liabilities, $13 million of assets,

15  and a stockholders' deficit of $6.3 billion.  Those are the

16  facts, and they are uncontested.

17       Trial Exhibit 205 drills down into the liabilities

18  that are on the balance sheet as of January 31st, 2006, and

19  makes clear that, of the 20.1 billion of liabilities, only

20  17.4 billion or so are subject to compromise.  The balance of

21  the liabilities are post-petition obligations that have to be

22  dealt with in the administration of this case.  Your Honor,

23  those are the facts, and they are not subject to dispute.

24       Trial Exhibit 206 now breaks down the $17 billion

25  worth of liabilities.  And that chart indicates that, of the

Opening - Butler                                          41

1   17 billion, just as we told Your Honor on the day we filed

2   these cases, the preponderance of those liabilities are

3   liabilities dealing with the human capital of this company:

4   Some $7.4 billion dealing with post-retirement obligations

5   other than pensions, some $3.3 billion dealing with pension

6   obligations, and the balance dealing with the two point --

7   the red line, $2.4 billion in comprehends (sic), Your Honor,

8   the bond debt in this case, and the balance are other

9   obligations in this case.  Your Honor, those are the facts,

10  and they are not subject to dispute.

11         Now what Appaloosa wants the Court to do and what

12  they say needs to be done here is they basically say, Your

13  Honor, never mind the 7.4 billion.  On Page 8 of their

14  response, reply brief, they say, Your Honor, if you ignore

15  the OPEB, we're solvent.  And it's hard to contest that, Your

16  Honor.  If we deal with two-thirds of the pie, we get a

17  different result than if we deal with the whole pie.  Hard to

18  dispute that.  But that's what their argument is, that's what

19  the reply brief says.  Never mind the elephant in the room.

20         The second piece of this, Your Honor, is that

21  Appaloosa doesn't like this analysis, and so they filed a

22  Daubert motion to preclude Mr. Resnick's testimony and

23  presentation of the balance sheet analysis and some

24  additional analysis done by our investment bankers.  They

25  don't like this, so they want you to forget this, put this

Opening - Butler                                    42

1   away.

2        (Counsel confer.)

3        MR. BUTLER:  They want you to ignore this, pay no

4   attention to two-thirds of the pie, Your Honor.

5        They also want you to ignore the next issue, Your

6   Honor, which is at trial exhibit, I believe it's 208.

7        (Counsel confer.)

8        MR. BUTLER:  And that is Trial Exhibit 208 discusses

9   the trading -- the market test, the market trading of the

10  debt securities in this case.  And as Your Honor can see,

11  there's a big bright line across sixty percent.  And

12  throughout the pendency of these cases, starting on October

13  8th and following these cases, but throughout the pendency of

14  these cases, the debt in this case has traded below sixty

15  cents on the dollar.

16       Now is that, or should that be a surprise to

17  Appaloosa, to Mr. Tepper?  No, it shouldn't be, Your Honor,

18  because Trial Exhibits 189 and 190 disclose the fact that in

19  the week that Mr. Tepper made his investment and bought this

20  -- made this option investment in this company at some price

21  below whatever it was -- certainly, all trading is below a

22  dollar, so I presume it was below a dollar -- that he made

23  his option purchase after we filed Chapter 11, Mr. Tepper had

24  in his possession an analytical report from Lehman Brothers

25  in which they say, Exhibit 189 and 190, that the likely

Opening - Butler                                                    43

1   recovery or trade debt for all this debt is forty to seventy

2   cents.  Not a surprise that it's trading this way, just as

3   Lehman Brothers said that it would.  Your Honor, if the

4   results are forty to seventy cents for the unsecured debt,

5   there is no value here for equity.

6          But Appaloosa doesn't like this line of testimony

7   either, and they have filed a Daubert motion to say, let's

8   forget about this white elephant in the room, because this

9   one we can't pay any attention to, either.  So on a market --

10  on a balance sheet basis, on a market sheet basis, doesn't

11  work on a market basis, doesn't work.

12         Now let's go to the crux of their case.  And putting

13  aside the fact that we're supposed to prove their case for

14  them, and so we're supposed to do a reorganization plan right

15  now, they make much in their papers that the debtors are

16  supposed to have done a reorganization plan right now, and

17  have an enterprise valuation, and be ready to emerge from the

18  case.  At the same time, they tell you that it's going to be

19  a couple of years before we can do that.  Same opening

20  statement, same statements.

21         All right.  The fact of the matter is that Mr.

22  Resnick testified to that which was the appropriate and --

23  thing for an advisor to a fiduciary to say and say, we're not

24  ready with that valuation, nor does the case law in a

25  contested equity committee motion require us to be.

1          But let's look at what they put together.  They

2     filed, Your Honor, as they were required to by the pretrial

3     order, their expert's report for Eureka at Exhibit -- Trial

4     Exhibit No. 4, and provided declarations at Trial Exhibit No.

5     3 and 5.  This was their carefully reasoned analysis that

6     they've been working on for months about how there's equity

7     in this case.

8          However, they learned the next day when we were

9     dealing with them that they made one important mistake.  They

10    took the "DA" out of EBITDA.  Earnings before interest,

11    taxes, depreciation, and amortization already has

12    depreciation and amortization not comprehended within the

13    number, but they deducted it anyways.  This has nothing to do

14    with the steady-state projections, this has nothing to do

15    with understanding, you know, what the debtors' models may

16    be.  This has to do with their reduction deduction of

17    something from an accounting principle that made no sense.

18    They made it -- they just blew it by a billion-two.

19         And the result is their expert report, the March

20    10th expert report, the report filed in accordance with the

21    pretrial order, shows that there's a negative equity value of

22    over a billion dollars in this case.  Their numbers, their

23    assumptions, their analyses, corrected only for their

24    mistake, shows that there's negative equity, according to

25    them, of a negative billion-two; their admission against

Opening - Butler                                            45

1   interest.

2           Now what did they do?  Well, you heard Mr. Lauria.

3   They did what anyone would do.  They changed their

4   assumptions.  And so, on March 17th, not in accordance with

5   the pretrial order, after the depositions had been taken,

6   after they had been discredited, they filed a whole new

7   report that basically says, you know what, you're right, that

8   billion-two shouldn't have been there, so let's change

9   materials, let's change manufacturing, let's change

10  engineering, let's cost other costs of goods sold, and, you

11  know, presto, when we're done, no worries about the mistake

12  because our March 17th report gets to a range of $4.4 billion

13  plus of business enterprise value.

14          Your Honor, the debtors' position is that the Court

15  should draw a big line right here, and everything on the

16  right-hand side of this line is incredible and should receive

17  no credence from the Court whatsoever.  Their mistake, their

18  admission against interest.

19          Your Honor, we don't believe that the case is much

20  more than that; those three basic principles:

21          Almost $17 billion of negative equity in the book

22  account.

23          Market trading for a sustained period of time below

24  sixty cents on the dollar for unsecured debt, or in that

25  range for unsecured debt.

Opening - Rosenberg                                    46

1           And even their own attempt to try to establish on

2      some set of theories -- forget all of the numbers back and

3      forth, forget all of the arguments about every single

4      assumption, all of which we have rebutted and dealt with;

5      just basic math.  They constructed a scenario in which you

6      could get to equity based on a mistake.  When they found out

7      they made the mistake, they changed the construction and

8      said, okay, we'll get the equity this way.  That analysis has

9      to fail from an evidentiary perspective.

10          Your Honor, that's our basic views in this case.

11     We'll have more to say in our closing.

12          THE COURT:  Okay.

13       (Court and court personnel confer.)

14        MR. ROSENBERG:  (Not identified for the record.)

15     Your Honor, may I very briefly?

16          THE COURT:  Yeah.  Yes, that's fine.

17        **OPENING STATEMENT FOR THE CREDITORS' COMMITTEE**

18        MR. ROSENBERG:  Your Honor, I will save my

19     substantive statements to add anything at the end of the case

20     that was not already in our pleadings, and not already

21     stated.  For the moment, Your Honor, I simply want to make

22     the statement that Your Honor has heard from me before, which

23     Your Honor actually alluded to earlier when you talked about

24     the summary nature of these proceedings.

25          Today, more than ever before in this case, issues

1    involving the ultimate resolution of this case will be

2    discussed in a summary, non-conclusory fashion:  Valuation,

3    solvency, and claims against the estate; and, in particular,

4    the claims that may end up driving creditors' return to this

5    estate, to the extent that they end up being liquidated and

6    non-contingent.  Those are the claims of GM, the PBGC, and

7    the labor-related claims, either from rejection claims or

8    settlements or OPEB situations.  These are the issues in this

9    case, Your Honor.  These are the issues that will ultimately

10   determine what a plan looks like in this case when ultimately

11   addressed.

12           I ask Your Honor not to address them today, other

13   than in the summary fashion required to determine the issues

14   before you, and not to have them binding or res judicata for

15   further proceedings.

16           THE COURT:  Okay.  Before you sit down, do you think

17   those issues are issues that lawyers primarily address, along

18   with businesspeople?  Do those issues -- assuming, of course,

19   that the debtors have actuaries and investment bankers and

20   consultants and the like, I know you all have some -- you

21   know, you have actuarial advice, but is it -- given that the

22   debtors have those types of professionals, is it mostly

23   lawyer input and client input on the other constituents' side

24   to analyze those issues, do you think?

25           MR. ROSENBERG:  Well, Your Honor, I think it depends

Opening - Leonhard                                              48

1   what issue you're specifically talking about.  To the extent

2   that you're talking about, for example, the scope of an OPEB

3   claim, either under a settlement or under the existing

4   situation, no, that's basically an actuarial exercise.  And,

5   frankly, the function of the committee's actuary is not to

6   recreate the wheel, but to know that the actuarial

7   assumptions that the debtors' actuaries are using are

8   reasonable, correct, et cetera.  So, no, it is, A, not a

9   legal exercise, for the most part; and, B, it is simply an

10  oversight exercise to the extent you describe it.

11          On the other hand, Your Honor, when you talk, for

12  example, about the GM claims that Mr. Lauria mentioned,

13  there, the extent of those claims, I think, is very much a

14  legal exercise in the first instance; followed, of course, by

15  an accounting/financial kind of exercise.  But, of course,

16  it's one where the committee has every conceivable incentive

17  to do the job that Mr. Lauria is suggesting that the equity

18  committee needs to do.

19          THE COURT:  Okay.  Thank you.  All right.

20          **OPENING STATEMENT FOR THE U.S. TRUSTEE**

21          MS. LEONHARD:  Excuse me, Your Honor.  Good morning,

22  Your Honor.  Alicia Leonhard for the United States Trustee.

23          The United States Trustee will preserve her

24  observations until the end; however, I do want to correct the

25  record.  Several parties have stated in briefs and in oral

Colloquy                                    49

1    argument that the United States Trustee refused to appoint an

2    equity committee.  That is not correct.  The U.S. Trustee had

3    not yet made the decision, and it was under advisement at

4    that time.

5            THE COURT:  Okay.

6            MS. LEONHARD:  Thank you.

7            THE COURT:  Before you sit down ...

8            MS. LEONHARD:  Yes.

9            THE COURT:  And maybe others know the answer to this

10   better.  Has the SEC taken any position on this motion?

11           MS. LEONHARD:  The SEC has not -- in conversations

12   has said it opposed it, but has not taken a formal position,

13   though.

14           THE COURT:  Okay.  No formal position.

15           MS. LEONHARD:  That's correct, Your Honor.

16           THE COURT:  Okay.

17           MR. LAURIA:  Your Honor, I apologize for

18   interrupting out of turn, but we did have some conversations

19   preliminarily with the SEC; and, far from opposing it, they

20   said they needed to see if there was a case for value for

21   equity; and, at some point, when that could be presented to

22   them, then they would be in a position to take a position.

23           THE COURT:  Okay.

24           MR. ZIMAN:  Your Honor, Ken Ziman, Simpson, Thacher

25   & Bartlett, on behalf of JPMorgan Chase as pre-petition

Colloquy                                           50

1    agent.  I'll save my remarks for closing, if that's all

2    right.

3              THE COURT:  That's fine.

4              MR. ZIMAN:  Thank you.

5              THE COURT:  Okay.  So you want to proceed with your

6    evidentiary case?

7         (Counsel confer.)

8              MR. KURTZ:  I guess we move to, I guess, introduce

9    the evidence of the declaration and supplemental declaration

10   of Adam Reese in support of --

11        (Counsel confer.)

12             MR. KURTZ:  -- in support of our motion.

13             THE COURT:  And just tell me which exhibits they are

14   in the joint binder?

15             MR. BUTLER:  They are, in the joint binder, I

16   believe they're Exhibits 8 and 10, but I may be working off

17   of our old numbers.  Hold on.  It is ...

18        (Counsel confer.)

19             MR. BUTLER:  Trial Exhibit, Your Honor, 6, and Trial

20   Exhibit No. 10.  6 is the initial, and 10 is the supplement.

21             THE COURT:  Okay.

22        (Appaloosa Exhibit No. 6 received in evidence.)

23        (Appaloosa Exhibit No. 10 received in evidence.)

24             MR. KURTZ:  Mr. Reese.

25             THE COURT:  Okay.

1    (Counsel confer.)

2         THE COURT:  All right.  Does anybody wish to cross-

3    examine Mr. Reese?

4         MR. SPRINGER:  Yes, Your Honor.

5         THE COURT:  All right.  You can come up then.

6         MR. SPRINGER:  Good morning, Your Honor.  May it

7    please the Court, it's David Springer for the debtors.

8         THE COURT:  Okay.  Mr. Reese, would you -- I'll

9    swear him in.  It's okay.

10   **ADAM REESE, WITNESS FOR APPALOOSA MANAGEMENT, LP, SWORN.**

11        THE COURT:  All right.  You can have a seat.

12        Could you spell your last name for the record?

13        THE WITNESS:  R-e-e-s-e.

14        THE COURT:  Okay.  Okay.  You can go ahead, Mr.

15   Springer.

16        MR. SPRINGER:  I will endeavor to be brief.

17                    **CROSS-EXAMINATION**

18   **BY MR. SPRINGER:**

19   Q    Good morning, Mr. Reese.

20        Is it true, sir, that in your report you did two models?

21   A    I did several scenarios for both pension and OPEB.

22   Q    Did you do two basic models?  One was to model benefit

23   plans, so that they were close to the market for industrial

24   companies?

25   A    In my expert report, I presented a valuation of the

Reese - Cross/Springer                    52

1    hourly employee benefits being modeled at the same level as

2    the salaried retiree benefits.

3    Q   And did you also do a model based on the plans being

4    close to the market for industrial companies?

5    A   Not in my latest declaration.

6    Q   Did you do that in your initial declaration?

7    A   (Witness reviews exhibits.)

8        No, I did not; I did not submit that.

9    Q   We asked these questions, and did you make these answers

10   at your deposition, Page 36, Line 14:

11       "Question:  When you say 'modeling such plan changes,'

12   were you given a set of possible plan changes, or did Hay

13   Group come up with those?

14       "Answer:  If I recall, the initial discussion was around

15   two types of benefit plan changes:  One of them would be

16   modeling benefit plans close to market for industrial

17   companies, and the second one was modeling hourly benefit

18   plan changes to those of the salaried plan?

19       "Question:  And whose idea was it to model benefit plan

20   changes to make them close to market; was that Hay's or was

21   that brought to Hay as a suggestion?

22       "Answer:  My recollection, it was brought to Hay as a

23   suggestion.

24       "Question:  Brought to Hay by White & Case?

25       "Answer:  Primarily, the initial conversations with only

Reese - Cross/Springer                                    53

1   White & Case.  White & Case was directing us with all this

2   project."

3       Were you asked those questions, and did you give those

4   answers at your deposition?

5   A   I did.

6   Q   Now in your baseline case, you assume that the company's

7   pension funding obligations would be affected by a change in

8   the law.  Isn't that true?

9   A   That is correct.

10  Q   And your projection assumes that the funding obligations

11  would be changed in a version of a law that was passed by the

12  Senate, right?

13  A   Correct.

14  Q   And that version of the law is different than the one

15  that was passed by the House, right?

16  A   Correct.

17  Q   And the matter is now in committee?

18  A   Correct.

19  Q   And did you know that the administration has raised the

20  possibility of a veto of the bill if the bill that comes out

21  of committee does not meet its satisfaction?

22  A   I have not paid close attention to those comments.

23  Q   And did you read this Sunday's <u>Times</u>?

24  A   No.

25  Q   Would it surprise you to learn that, on March 19th, 2006,

Reese - Cross/Springer                                54

1   there was a front-page article in the <u>Times</u>, in which it was

2   reported, quote:

3        "-- but the White House already warned in November that

4   President Bush might veto any bill that extended too much

5   special pension relief to individual companies and

6   industries."

7        Had you heard that before, sir?

8   A    And I think that refers to the House bill, which has

9   particular different funding arrangements for certain

10  industries.

11  Q    Now the company's steady-state projections, you've seen

12  those, right?

13  A    I have.

14  Q    And they anticipate an obligation to make a 1.9-billion-

15  dollar pension contribution in 2007.  Isn't that true?

16  A    Correct.

17  Q    And you're not aware of what the company's obligations

18  are under ERISA with respect to making pension contributions

19  upon emergence from bankruptcy, are you?

20  A    I'm not aware of any special rules under bankruptcy that

21  would override ERISA's funding requirements.

22  Q    Were you asked this question, and did you give this

23  answer at Page 68 of your deposition:

24       "Question:  Do you know what the company's obligations

25  are under ERISA with regard to making pension contributions

Reese - Cross/Springer                          55

1    upon emergence from bankruptcy?

2        "Answer:  It's not something I've studied."

3        Was that your answer?

4    A    Yes, it was.

5    Q    Now if the company has concluded that, upon emergence

6    from bankruptcy, it will be required under ERISA to make a

7    payment of $1.9 billion, you're not in a position to contest

8    that, are you, sir?

9    A    Not at this stage, not with the information that's been

10   presented to me.

11   Q    Now you have also looked at the declaration of Keith

12   Williams?

13   A    I have.

14   Q    And you've known Keith Williams for many years, have you

15   not?

16   A    I have.

17   Q    And in fact, he was a colleague at yours at Watson Wyatt

18   when you both worked there, right?

19   A    Correct.

20   Q    And you recognize him as a qualified actuary, do you not?

21   A    I do.

22   Q    Now if you take a look at Exhibit 12, Mr. Reese.

23       MR. SPRINGER:  If the Court please, that Mr.

24   Williams's declaration.

25   A    Do you know which binder it's in?

Reese - Redirect/Baumstein                      56

1       (Counsel confer.)

2       (Witness reviews exhibits.)

3            MR. BUTLER:  May we approach, Your Honor, to help

4   him find --

5            THE COURT:  Yes.  What binder is it in?

6            MR. BUTLER:  It should be in the confidential

7   binder, probably would be Binder 4 is my guess.

8            THE WITNESS:  I don't have a 4.

9            THE COURT:  I don't think there is a 4.

10           MR. BUTLER:  Excuse me.  There are three binders,

11  Your Honor, that are public, and two that are confidential.

12           THE COURT:  Okay.

13           MR. SPRINGER:  It would be in the confidential

14  binder, Your Honor.

15           THE COURT:  Okay.  Those are marked 1 and 2, so it's

16  one of those.

17           THE WITNESS:  And which tab?

18           MR. SPRINGER:  It's Exhibit No. 12, sir.

19           THE WITNESS:  Thank you.

20  BY MR. SPRINGER:

21  Q   And if I could direct your -- invite your attention,

22  please, to Paragraph 9 of Mr. Williams's declaration.  Do you

23  have that in front of you?

24  A   I do.

25  Q   And you see there that Mr. Williams summarizes his views

Reese - Redirect/Baumstein                              57

1   on your report.  Do you see that, sir?

2   A   I do.

3   Q   And he says, in his view, there are five areas in which

4   your opinions are too optimistic.  That's what he says,

5   right?

6   A   Five assumptions.

7   Q   Yes, five assumptions that are too optimistic.

8       And as you sit here today, sir, you would agree that, as

9   to all five of those assumptions, reasonable actuaries acting

10  in good faith could have reasonable differences of opinion;

11  you would agree, would you not?

12  A   Correct.

13          MR. SPRINGER:  I have no further questions, Your

14  Honor.

15          THE COURT:  Okay.  Any redirect?

16          MR. BAUMSTEIN:  Just a bit, Your Honor.

17                    **REDIRECT EXAMINATION**

18  **BY MR. BAUMSTEIN:**

19  Q   Mr. Reese, good afternoon.  My name is Doug Baumstein,

20  and we've met, but I'm introducing myself to the Court.

21      In your normal practice, do you consult clients

22  regularly?

23  A   I do.

24  Q   Do you prepare projections of OPEB and pension

25  obligations?

1   A   I do.

2   Q   And in your normal --

3         MR. SPRINGER:  An objection is taken here, Your

4   Honor.  It's beyond the scope of the cross.

5         THE COURT:  Right.  Everyone is accepting he's an

6   expert.

7         MR. BAUMSTEIN:  No, no, I'm sorry.  I'll go on that

8   ...

9   BY MR. BAUMSTEIN:

10  Q   In providing projections, do you -- have you modeled the

11  changes in the new law for your clients?

12  A   Yes, compared to the current law.

13  Q   And is it your belief that that is an appropriate

14  assumption for the normal representation of your clients?

15        MR. SPRINGER:  That's simply a leading question,

16  Your Honor.

17        THE COURT:  That's all right.  He can answer that

18  question.

19  A   Yes.

20  Q   Okay.  You also issued a supplemental declaration in this

21  case.  Is that correct?

22  A   Yes.

23  Q   Your supplemental declaration is, I believe it's Exhibit

24  10 in the joint binder.

25  A   (Witness reviews exhibits.)

Reese - Redirect/Baumstein                          59

1       Joint binder, Volume?

2              THE COURT:  It's in the same volume that you were

3    looking at Williams's in.

4              THE WITNESS:  Thank you, Your Honor.  Okay.

5    BY MR. BAUMSTEIN:

6    Q   Mr. Springer asked you some questions about a 1.9-

7    billion-dollar payment that thought you would be -- that

8    would be believed to paid out of -- upon emergence from

9    bankruptcy.  Is that correct?  Just to set the stage.

10      Have you looked at any of the assumptions underlying what

11   would require that $1.9 billion?

12   A   I have.

13   Q   And have you reached any conclusions concerning the

14   appropriateness of those -- of the underlying assumptions?

15   A   The 1.9-billion-dollar contribution assumed funding as of

16   the end of June 2007, upon emergence from bankruptcy.

17   Q   And what is the significance of choosing an assumption of

18   June 30th, 2007 as a funding date?

19   A   Under ERISA law, contributions contributed within eight

20   and a half months at the end of the plan year can be counted

21   as assets for that plan year.

22   Q   And what is the plan year for Delphi's plans?

23   A   September 30th, so ...

24   Q   And what is the eight-and-a-half-month-contribution bar

25   date?

Reese - Redirect/Baumstein                                                60

1   A     June 15th.

2   Q     So what would the effect be of making contributions on

3   June 15th, 2007, as opposed to June 30th, 2007, as assumed by

4   the debtors in their steady-state scenario?

5   A     Contributions on June 15th would count as assets for the

6   prior -- for the plan year ending 9/30th, 2006.

7   Q     And how would that affect the total obligation, pension

8   obligation, of the debtors upon emergence from bankruptcy?

9   A     It would reduce the required contributions in 2007 by

10  approximately $350 million.

11  Q     And just to be clear, that $350 million, is that a timing

12  issue or is that a -- is that an amount that would not

13  otherwise be needed to be made up at some point?

14  A     It's both, but primarily for 2007, it's a significant

15  reduction in the required contributions.

16          MR. BAUMSTEIN:  Nothing further.

17          THE COURT:  Okay.  All right.  You can step down,

18  sir.

19      (Witness excused.)

20          MR. KURTZ:  Your Honor, Appaloosa calls Mark Hyman.

21          THE COURT:  Okay.  Would you raise your right hand,

22  please.

23    **MARK HYMAN, WITNESS FOR APPALOOSA MANAGEMENT, LP, SWORN.**

24          THE COURT:  And could you also spell your last name

25  for the record.

1          THE WITNESS:  Hyman, H-y-m-a-n.

2          THE COURT:  Okay.

3          MR. KURTZ:  Your Honor, Appaloosa offers into

4  evidence Mr. Hyman's expert report dated March 10th, which

5  has been marked, I believe, as New Exhibit No. 4; Mr. Hyman's

6  declaration of March 10th, which has been marked as New

7  Exhibit No. 5; and Mr. Hyman's supplemental declaration of

8  March 17th, which has been marked as New Exhibit No. 9.

9          THE COURT:  Okay.  Okay.

10         MR. SPRINGER:  All of the exhibits, Your Honor,

11 pursuant to the parties agreement, are in, subject to motions

12 to strike.

13         THE COURT:  That's fine.

14    (All exhibits received in evidence.)

15                    **CROSS-EXAMINATION**

16 **BY MR. SPRINGER:**

17 Q   Now good morning, Mr. Hyman; nice to see you again, sir.

18 A   Nice to see you again, Mr. Springer.

19 Q   This is the first occasion on which you have testified as

20 an expert witness, other than your deposition, right?

21 A   That's correct.

22 Q   And you've never been qualified by a court before to give

23 expert testimony, have you?

24 A   That's correct.

25 Q   Now in connection with your work on the Appaloosa and

Hyman - Cross/Springer                                    62

1    Delphi project, it's true that you looked at research

2    reports.  Isn't that true?

3    A    We looked at many research reports.

4    Q    Analysts' reports issued by various Wall Street firms,

5    you looked at those, right?

6    A    Many Wall Street firms.

7    Q    And you are, in fact, interested for purposes of your

8    analysis to know what research analysts have to say, right?

9    A    We're always interested in hearing different points of

10   view when we prepare an analysis.

11   Q    When you went about doing your report on this matter, did

12   you know that Appaloosa had in its files a research report

13   requested by Appaloosa that was done by Jane Castle, who is

14   the Senior Vice President, Fixed Income, High Yield Distress

15   Debt, and Special Situations of Lehman Brothers; did you know

16   that they had such a report?

17   A    At the time of us preparing our analysis, I was not aware

18   of that report.

19   Q    You were not aware of that --

20   A    Although I am aware of it now.

21   Q    Right.  Because I brought it to your attention at your

22   deposition, right?

23   A    That's correct.

24   Q    And did you know that Ms. Castle had sent her analysis to

25   Mr. Tepper and Mr. Goldstein of Appaloosa on or about October

Hyman - Cross/Springer                                          63

1  12th, 2005; did you know that?

2  A   I didn't know that.

3  Q   You know that now, though, right?

4  A   I don't recall reading the dates on the spreadsheet that

5  you gave me, so I can't answer that.

6  Q   At your deposition, you were shown Exhibit -- what we've

7  marked as Exhibit 189, and asked to examine it, were you not?

8  A   If could you just tell me what -- I saw a lot of

9  exhibits.

10  Q   If you could turn to Exhibit 189, it's in the

11  confidential binder, sir.

12  A   Okay.

13      (Witness reviews exhibits.)

14  Q   Do you have that in front of you, sir?

15  A   I'm looking for it.

16          THE COURT:  It's Volume 2 of the confidential --

17          THE WITNESS:  Okay.

18      (Witness reviews exhibits.)

19  BY MR. SPRINGER:

20  Q   And if you'd turn to the --

21  A   I have it.

22  Q   Okay.  And you recall seeing this document at your

23  deposition?

24  A   (Witness reviews exhibit.)

25  Q   And the spreadsheet is the last --

Hyman - Cross/Springer                                      64

1   A    Oh.

2   Q    -- the last page of the exhibit, sir.

3   A    Okay.

4        (Witness reviews exhibit.)

5        Okay.  I do recall seeing this.

6   Q    And if you look at Page 2 of the exhibit, it's got the

7   Bates number 3463 at the lower right-hand corner.  Do you

8   have that in front of you, sir?

9   A    (Witness reviews exhibit.)

10  Q    To Page 2 of the exhibit, sir.

11  A    Page 2?

12  Q    2, yes.  That would be the second page in.

13  A    Yes.

14  Q    Do you see that it's got "3463" at the bottom?

15  A    (Witness reviews exhibit.)

16  Q    Right-hand corner.

17  A    Yes, I see --

18  Q    Okay.

19  A    -- 3464 and 3463.

20  Q    And do you see the -- do you see the email from Ms.

21  Castle to Mr. Tepper and Mr. Goldstein; do you see that

22  there?

23  A    Yes.

24  Q    Now did you know that after -- strike that.

25       At your deposition you were shown the exhibit, including

Hyman - Cross/Springer                        65

1    the spreadsheet, but the copy that we had was very hard to

2    read, right?

3    A    That's correct.

4         MR. KURTZ:  Your Honor, I'm just going to --

5    BY MR. SPRINGER:

6    Q    Did you know --

7         MR. KURTZ:  One second, Mr. Springer.  Sorry.

8         I'm going to object to this, Your Honor.  This is

9    rank hearsay.  This witness did not rely on the document in

10   connection with his report, so it's not admissible under any

11   exception.  This seems to be some effort to import Lehman

12   into these proceedings.  Lehman is not here.  We don't know

13   what went into this analysis.  If Lehman was here, they would

14   have had to give us a declaration or deposition or something.

15   But they can't back-door some third-party alleged valuation,

16   which we don't know if it took five minutes or fifteen

17   minutes or what was looked at, through an expert who hasn't

18   reviewed it or considered on it or relied on it in connection

19   with his analysis or conclusions.

20        MR. BUTLER:  Your Honor, if I can respond that part

21   of what we wanted to talk to Mr. Tepper about was the receipt

22   of this.  If they don't want Mr. Tepper here under the motion

23   to quash, then they've got to live with what Mr. Tepper got,

24   in terms of the document and --

25        THE COURT:  Well, are you offering it for the truth

                      Hyman - Cross/Springer                    66

1   of the report or is the basis --

2           MR. SPRINGER:  Well, it's already in evidence,

3   they've agreed to it, in that respect, Your Honor.

4           THE COURT:  All right.  Okay.

5           MR. SPRINGER:  And the witness has testified that he

6   would be -- he did look at analysts' reports --

7           THE COURT:  All right.

8           MR. SPRINGER:  -- in connection with his work.

9           THE COURT:  Well, I'll let you ask him questions as

10  a basis for critiquing his own report based on it.  I don't

11  particularly want this to take over the testimony.

12          MR. SPRINGER:  Absolutely not, Your Honor.  I'll

13  endeavor to move through it quickly.

14          THE COURT:  Okay.

15  BY MR. SPRINGER:

16  Q   Did you know that after your deposition we issued a

17  subpoena to Lehman Brothers for production of clearer copies?

18  A   Okay.

19  Q   Did you know that?

20  A   I didn't know that.

21  Q   Take a look at Exhibit 190, which is the response from

22  Lehman Brothers to us, to the subpoena, and the cover letter

23  from Ms. Castle.  Do you see where she writes in the first

24  paragraph with respect to the analysis she sent to Mr. Tepper

25  and Mr. Goldstein, quote --

Hyman - Cross/Springer                                    67

1           MR. SPRINGER:  Excuse me, Counsel.

2   BY MR. SPRINGER:

3   Q   "The hard copy version that was produced by Appaloosa

4   differs from my saved version, most likely due to changes

5   that I saved electronically after sending the analysis to

6   them.  Though the hard copy version is difficult to believe"

7   -- "to read, I believe it estimates that Delphi claims will

8   receive significantly less than par recovery, about forty to

9   seventy cents at the end of a two-year Chapter 11 case.

10  Refer to recovery (FV on claim).  In my electronic copy I

11  submit for your review, we estimate recoveries at forty-eight

12  to sixty-eight centers."

13      Do you see that, sir?

14          MR. KURTZ:  Hold on.  Your Honor, objection.  It's

15  rank hearsay.  Counsel cannot come in here with letters from

16  outside firms --

17          THE COURT:  I'm sorry.  I thought these were

18  stipulated to be admitted.

19      (Counsel confer.)

20          MR. KURTZ:  Not for the truth of the matter

21  asserted.  For a cleaner copy of the document.  There was a

22  complaint --

23          MR. SPRINGER:  Your Honor, may I read the e-mail --

24          MR. KURTZ:  There was a -- hold on.

25          MR. SPRINGER:  -- exchange we had last night from --

1          MR. KURTZ:  Mr. Springer, let me finish.

2          There was a point during the course of the

3    deposition that the spreadsheets were not legible and could

4    not be read; and, for that purpose, we are permitting it in,

5    although we all have the right to strike any documents with

6    respect to expert testimony, that's set forth in our

7    correspondence.  And this is purported expert testimony and

8    rank hearsay.

9          MR. SPRINGER:  Your Honor, may I read into the

10   record our email exchange memorializing our agreement?

11         THE COURT:  Okay.

12         MR. SPRINGER:  A 6:28 p.m. email from Mr.

13   Shivakumar, who's a member of the Bar of this Court, to Ms.

14   Kirshner, who is of White & Case.  Dan writes:

15         "This will confirm the understanding reached during

16   our 6 p.m. meeting conference call that Appaloosa and the

17   debtors will not object to the admissibility to any of the

18   exhibits in the joint exhibit binder, other than Appaloosa's

19   objection to Mr. Resnick's qualification to provide expert

20   testimony and to the portions of exhibits that constitute Mr.

21   Resnick's opinion testimony.  The debtors will oppose

22   Appaloosa's purported Daubert motion."

23         Two minutes later, Ms. Kirshner, on behalf of

24   Appaloosa, writes:

25         "Dan, we confirm your understanding.  Allison."

Hyman - Cross/Springer                                      69

1          MR. KURTZ:  Your Honor, for some reason, Mr.

2   Springer has left out the one-minute-late email which is as

3   follows:

4          "Dan, please also be advised that we are also filing

5   a motion to strike the expert report and direct testimony of

6   Keith Williams.  My apologies for not bringing this up on our

7   call.  As soon as our motion is ready to file, we will email

8   you a copy."

9          Which was responded to as follows:

10         "Let me also clarify our position.  All of

11  Appaloosa's expert reports and declarations will be taken

12  subject to any motion to strike that the debtors will make

13  after the cross-examination of the witnesses."

14         So all experts are open --

15         THE COURT:  All right.  Overruled.

16         MR. SPRINGER:  Now --

17         THE COURT:  Based on the plain language that you

18  quoted, nothing pertains to this.  Obviously, it's an

19  analyst's research report, and I'll take it for what it's

20  worth, but there's no basis for excluding it.

21         MR. KURTZ:  Your Honor, I just object to it being

22  admitted for the truth of the matter asserted.  It's

23  authenticated --

24         THE COURT:  I'm sorry.  There are consequences from

25  lawyers entering into agreements as to admissibility.  You

Hyman - Cross/Springer                              70

1  can't reargue those things.

2          MR. KURTZ:  It was an authentication agreement, Your

3  Honor, but your ruling is what it is.

4          THE COURT:  No, it wasn't.  That's not how I read

5  that -- I understood that stipulation to be.

6          So you can continue.

7          MR. SPRINGER:  Thank you, Your Honor.

8  BY MR. SPRINGER:

9  Q   Now you were also shown at your deposition a Bernstein

10  call report of June 7th, 2005, which is Exhibit No. 82, were

11  you not?

12  A   I believe that's correct.

13  Q   And Exhibit 82 actually appeared on the list of analysts'

14  reports that you and Appaloosa specifically considered.

15  Isn't that true?

16  A   Well, as I mentioned earlier, Counsel, we looked at a lot

17  of research reports, and I believe that was one of the

18  reports on our list.

19  Q   And the Bernstein report does an estimate of -- an equity

20  recovery of zero, does it not?

21  A   Well, I don't have that report in front of me, but if

22  you'd like to give me a chance, I'll find it in my file of

23  exhibits.  Did you say it's 182?

24  A   No, it's Number 82, plain 82.  Sorry.

25  A   I'm sorry.

                    Hyman - Cross/Springer                    71

1      (Witness reviews exhibits.)

2      (Counsel confer.)

3          THE COURT:  It's in Volume 2 of the non-confidential

4  binder.

5          THE WITNESS:  Okay.  Volume 2 of the non-

6  confidential.  All right.

7          THE COURT:  Right.  The one that doesn't -- the one

8  that doesn't say "confidential."

9      (Witness reviews exhibits.)

10         THE WITNESS:  Okay.

11  BY MR. SPRINGER:

12  Q   And if you turn to Page 5 of the Bernstein report of June

13  7th, 2005, do you see there that Bernstein estimates equity

14  recovery at zero?

15  A   I do, but I also see on that same table --

16  Q   Yeah, that's -- the question, sir, is:  Do you see that

17  they estimate an equity recovery of zero?

18  A   Well, the answer is --

19         MR. KURTZ:  Your Honor, can the witness be -- it's

20  an expert witness.  Can he be permitted to answer the

21  question without being cut off by counsel?

22         THE COURT:  I'm sure you'll bring it out on

23  redirect.

24  A   Well, the answer is it's zero, but there's a GM claim --

25         MR. SPRINGER:  Your Honor, may the witness be

Hyman - Cross/Springer                                72

1   directed kindly just answer my question?

2          THE COURT:  It will go -- your counsel will bring

3   this out --

4          THE WITNESS:  Okay.

5          THE COURT:  -- when he takes you on redirect.

6   BY MR. SPRINGER:

7   Q   And on Page 8, if you could turn to that, sir.

8   A   (Witness reviews exhibit.)

9   Q   Do you see where it says, Exhibit 8, "Impact of DPH

10  filing on key stakeholders;" do you see that?

11  A   Yes, I do.

12  Q   And the entry under "equity" is "no recovery," right?

13  A   I see that.

14  Q   And you were -- turn to the next exhibit, 83.  That's a

15  Morgan Stanley report dated September 30th, 2005.  Isn't that

16  true?

17  A   That is true.

18  Q   And this was one that, again, was on the list of

19  documents that you specifically considered.  Isn't that

20  right?

21  A   Yes, it was.

22  Q   And on Page 1, it says, quote, at the first paragraph:

23     "The main purpose of this report is to provide a

24  framework to arrive at recovery values, should Delphi file

25  for Chapter 11."

1       Do you see that?

2   A   Yes.

3   Q   And then down at the third paragraph it says:

4       "We believe the bank debt is covered.  In our base case,

5   the unsecured bonds are worth forty-five to fifty cents on an

6   FV" -- future value -- "basis, and thirty to thirty-five

7   cents on a PV" -- or present value -- "basis."

8       Right?  See that?

9   A   That's what it says in the third paragraph down.

10  Q   Now Morgan Stanley's view that the unsecured bonds are

11  worth forty-five to fifty cents, that's inconsistent with the

12  opinions and conclusions that you're offering in this case.

13  Isn't that right?

14  A   Well, I haven't offered an opinion on the valuation of

15  the bonds.

16  Q   You have no opinion one way or another of what the bonds

17  are worth?

18  A   I guess --

19          MR. KURTZ:  One second.  Objection, Your Honor.

20  It's outside the scope of the expert report.

21          THE COURT:  All right.

22          MR. KURTZ:  We have not proffered any opinion or

23  analysis with respect to the bonds.

24          THE COURT:  That's fair.  He's not offering an

25  opinion on the bonds.

1   BY MR. SPRINGER:

2   Q   Do you see any connection at all, sir, between what the

3   bonds might recover and what equity might recover; do you see

4   any connection there?

5   A   I guess there's a connection.

6   Q   Yeah.  And the connection is that, unless the bonds

7   recover a hundred cents on the dollar and accumulated

8   interest, equity gets nothing, right?

9   A   Well --

10  Q   Isn't that true, sir?

11  A   I'm not a bankruptcy expert, Counsel.

12          MR. KURTZ:  And it's outside the scope of the

13  report, sir.  What a reorganization plan looks like in a

14  restructuring is outside the scope of the report.

15          THE COURT:  Okay.  Sustained.

16  BY MR. SPRINGER:

17  Q   Now let's take a look at Exhibit 84, that's another

18  Morgan Stanley report dated October 9th, 2005.  And that,

19  again, was an exhibit that you specifically looked at, right?

20  A   You brought it up in my deposition.  It may have been in

21  our list of exhibits, but I don't remember exactly looking at

22  it.

23  Q   Okay.  And do you see on the first page under "Investment

24  Negatives," quote:

25      "Delphi has filed for Chapter 11 bankruptcy protection.

Hyman - Cross/Springer                               75

1    There is a high likelihood that the equity will be

2    worthless."

3         Do you see that?

4    A    Is that in the third paragraph?

5    Q    Yes, sir.

6    A    Yes.

7    Q    And do you know that Mr. Tepper and Appaloosa bought

8    their entire equity position in Delphi after the company

9    filed for bankruptcy; did you know that?

10   A    Well, I know that now.  I wasn't aware of it then.

11   Q    And if we turn to Page 85 -- excuse me, Exhibit 85.

12   That's a Zachs Equity research report of February 7th, 2006.

13   Do you see that?

14   A    Yes.

15   Q    And you're familiar with Zachs, right?

16   A    I am familiar with Zachs.

17   Q    Are you aware of any other equity reports done on Delphi

18   after it filed for bankruptcy, other than the Zachs report

19   and the Morgan Stanley report that we just looked at?

20   A    I'm not familiar with other reports, but that doesn't

21   mean there aren't other reports --

22   Q    Now --

23   A    -- I'm just not familiar with them.

24   Q    Do you see in the Zachs report where it says on the

25   second column under "Outlook":

Hyman - Cross/Springer                    76

1        "Delphi's filing for bankruptcy to restructure its U.S.

2   operations will result in little value for equity-holders."

3        Do you see that?

4   A    Is that on the front page?

5   Q    Yeah, it's on the front page in the right column, sir.

6   A    Yes.

7   Q    Okay.  And this is February 7th.  That was three days

8   before you and your colleagues at Eureka began work on your

9   project for Appaloosa, right?

10  A    I believe that's about right.

11  Q    Now let's -- I want you to focus now on what transpired

12  at your deposition on Tuesday, March 14th.  Do you have that

13  in mind, sir?

14  A    I do.

15  Q    And you knew that when we came in for the deposition that

16  morning, that your colleague Mr. Greene had given a

17  deposition the day before, right?

18  A    I did.

19  Q    And after Mr. Greene had completed his deposition, he

20  called you and sent you emails about things that had happened

21  at the deposition, right?

22  A    We spoke on a number of occasions, and he sent an email

23  to White & Case, and a copy of that email was printed for me.

24  Q    Right.

25       And at your deposition, I asked you -- I asked counsel to

1  produce the email, right?

2  A    Well, it was a long deposition, but I seem to remember

3  some back-and-forth on that topic.

4  Q    And you would not -- I mean, we can take a look at the

5  deposition if you want, at Page 17 and 18, where I asked

6  counsel to produce it, and I was told that Appaloosa would

7  take it under advisement.

8            MR. KURTZ:  Your Honor, relevance, this witness.

9            MR. SPRINGER:  Not at all, Your Honor.

10           MR. KURTZ:  And it was produced.

11           MR. SPRINGER:  It was produced on March 17th, at

12  6:45 p.m., after their supplemental expert declaration, two

13  days -- three days after I asked for it, and after the

14  depositions of their expert witnesses, so that I was denied

15  the opportunity to question them about it.

16           MR. KURTZ:  Your --

17           MR. SPRINGER:  And so, Your Honor, when you -- when

18  Your Honor assesses the credibility of their belated March

19  17th submission, the Court ought to be able to take that into

20  account.

21           MR. KURTZ:  Your Honor, I'll also note that I've

22  been requesting certain documents that undermine the debtors'

23  position for five days, which I got at 12:30 a.m. last night.

24  So I wish I got them on the 17th.

25           THE COURT:  Okay.  All right.  So -- well, I don't

Hyman - Cross/Springer                                    78

1   know if there is a remaining objection, but to the extent

2   there is one, I'll overrule it.

3   BY MR. SPRINGER:

4   Q    Now after Mr. Greene's deposition on March 13th, he

5   called you up and he told you in substance, we might have

6   missed an issue, we might have missed something to do with

7   depreciation and amortization, right?

8   A    That was the substance of the conversations.

9   Q    And you discussed the question of whether or not

10  depreciation and amortization should be added back in,

11  properly added back in for purposes of your analysis, right?

12  A    We actually discussed that, and I brought up a bunch of

13  assumptions, a bunch of the assumptions:  Materials,

14  manufacturing, engineering, jobs TLO, other costs of goods

15  sold, SG&A; we discussed all of those.

16  Q    Well, did you --

17  A    And we also discussed our March 6th report.

18  Q    Did you -- did you discuss whether or not this matter of

19  the D&A calculation or use of D&A was a mistake?

20  A    Yes, we did.

21  Q    And did you acknowledge that it was a mistake?

22  A    After a number of hours of discussions and analysis, I

23  acknowledged that it was a mistake.

24       MR. SPRINGER:  Okay.  Your Honor, if the Court

25  please, I'd just like to read briefly from the deposition of

1    -- that was taken of Mr. Hyman on March 14th.  Page 19 --

2              MR. KURTZ:  Your Honor, unless there is some

3    question pending which he's going to try to impeach, it's

4    improper to read a deposition into the record during the

5    course of this cross-examination or otherwise.

6              THE COURT:  I --

7              MR. SPRINGER:  It --

8              THE COURT:  Yeah.  Well, what do you --

9              MR. SPRINGER:  May I be heard, Your Honor?

10             THE COURT:  Yes.  What are you trying to achieve

11   with this?

12             MR. SPRINGER:  It's a statement made by a

13   representative of a party-deponent, an adverse witness.

14   These are admissions that were made during the course of the

15   deposition, and I think these are things that Your Honor

16   ought to be entitled to consider when assessing the

17   credibility --

18             THE COURT:  Well, but you should ask him the

19   question first, before you impeach his testimony with his

20   deposition.

21   BY MR. SPRINGER:

22   Q    Did I ask you at your deposition --

23             MR. KURTZ:  Can we have a page reference, please?

24             MR. SPRINGER:  Page 19.

25   BY MR. SPRINGER:

Hyman - Cross/Springer                                    80

1   Q    Did you refuse to acknowledge at your deposition that you

2   had made a mistake?

3   A    Did I refuse to acknowledge that?

4   Q    Yes.

5   A    No, I don't believe I refused to acknowledge that.  I

6   pointed out that there were a number of issues --

7   Q    Were you asked these questions --

8   A    -- that we needed to consider.

9   Q    Were you asked these questions, and did you make these

10  answers?  Page 19 to 20, starting at Line 21:

11      "Question:  Did you recognize, as you sit here today,

12  that on Page 55 of Exhibit No. 1" --

13      Which is now our Exhibit No. 4.

14      "-- which is your expert report, that you made a

15  mistake?"

16      And Mr. Kurtz:

17      "Objection.  Assumes facts not in evidence.

18      "Answer:  As I said earlier, I think that conclusions and

19  terms of unrestructured EBITDA would be broadly the same, but

20  I think that the matter in which we presented it, and the

21  items that we put in different boxes underneath the sales

22  lines would probably be different.

23      "Question:  Because you made a mistake, right?

24      "Mr. Kurtz:  Objection.  Mischaracterizes testimony,

25  assumes facts not in evidence.

Hyman - Cross/Springer                                    81

1       "Do you have anything to add to your question?" your

2    counsel said.

3       And then you said:

4       "I don't have anything to add."

5       Were you asked those questions, and did you make those

6    answers at your deposition, sir?

7    A   Well, I don't have a copy of my deposition in front of

8    me, but I do remember in my deposition at various points in

9    time trying to point out to you the background to that; and

10   that, in our original report, we had used last year's

11   negative EBITDAR of 154 million --

12          MR. SPRINGER:  Your Honor, the witness was asked

13   whether he was asked the questions and made the answers.  I

14   object and move to strike.

15          MR. KURTZ:  Your Honor, counsel should have put his

16   transcript in front of him if he wanted to confirm his

17   reading.  But let's move it along.  I confirm the reading.

18          THE COURT:  Okay.  Very well.

19   BY MR. SPRINGER:

20   Q   Now insofar as the way you and Mr. Greene divided your

21   efforts on this matter, you essentially were charged with

22   responsibility for doing the enterprise valuation, right?

23   A   That's correct.

24   Q   And then Mr. Greene was responsible for speaking to

25   deductions, including the treatment of OPEB and pension

Hyman - Cross/Springer                                    82

1   benefits.

2   A    That's correct.  I was responsible for enterprise value,

3   with the exception of pensions and OPEB, which Mr. Greene

4   focused; he spent most of his time dealing with Hay on those

5   issues.

6   Q    Now after the deposition on March 13th, Mr. Greene sent

7   you some calculations, and he changed some of the assumptions

8   relating to the calculation of enterprise value, did he not?

9   A    I don't have it in front of me, but I vaguely remember

10  the change -- the changes that he made.

11  Q    Right.  So he made changes up here in this area relating

12  to the calculation of enterprise valuation, correct?

13  A    As I recall, he made changes to materials and it might

14  have been other costs of goods sold.

15  Q    But this area up here was your enterprise valuation, and

16  Mr. Greene, your colleague, was coming in and he was

17  lateraling in (sic) changes to that area after his deposition

18  and before yours.

19  A    The background to Mr. Greene sending the email was that I

20  -- when we spoke on the telephone; it was actually on a cell

21  phone, I believe, at the time, I really couldn't hear, the

22  reception was terrible.  And I said, well, just send an email

23  to White & Case, and I'll take a look at the email, and

24  that's what he did.

25  Q    And that email and the communications you had thereafter,

Hyman - Cross/Springer                                    83

1   that resulted in your supplemental declaration and Exhibit

2   No. 1 that I've attached here.  Isn't that right?

3   A   No, that email didn't result in all my changes, no.  And

4   in fact --

5   Q   It resulted in --

6   A   In fact, in that email, he made some assumptions that I

7   didn't use.

8   Q   Now between the -- strike that.

9       Between the March 10th report and the March 17th report,

10  did you run a calculation that showed the effect solely of

11  correcting your 1.2-billion-dollar mistake on D&A; did you

12  run such a calculation?

13  A   Well, I didn't need to run a calculation, Counsel.  I

14  mean, it was pretty obvious the impact of that.

15      And I would say one other thing; that had that occurred

16  and had I picked that up, I would have rejected those

17  projections and gone back to where we were on March 6th.

18  Q   Well, you were happy enough with your March 10th report

19  to submit it and to make it the subject of your sworn

20  declaration, were you not?

21  A   We --

22  Q   Were you --

23  A   That's correct.

24  Q   Okay.  Then you didn't do a recalculation based on the

25  correction of your 1.2-billion-dollar mistake because it was

Hyman - Cross/Springer                                        84

1   obvious, wasn't it, that if you had done so, it would show

2   that equity would be $1.2 billion out of the money?

3   A    No, that isn't -- that isn't at all what I was thinking.

4       What I was thinking at the time was, what's really

5   relevant here and something that I've been thinking about and

6   making pretty clear in both of our reports from the very

7   first time I me looked at this company, the most important

8   thing is what did they do last year, and what are they doing

9   now.  And a bunch of projections, which frankly we couldn't

10  understand the assumptions behind half of those projections,

11  and without an opportunity to talk to management, in my

12  judgment, as a guy who's been in the business for twenty

13  years or more, if you can't figure out the assumptions behind

14  radical change, the smart approach is to look at what the

15  company is doing today.  And that was the basis of our March

16  6th report, and that was the only reason, the absolutely only

17  reason why I accepted the calculations that we put in the

18  March 10th report.

19  Q    Now were you unhappy with the March 10th report?

20  A    Was I unhappy with it?

21  Q    Yeah.  Were you unhappy with it?

22  A    I had some reservations about the assumptions in the

23  projections.

24  Q    And nowhere in your March 10th report or in your

25  declaration did you express those reservations.

Hyman - Cross/Springer                        85

1   A    I actually did.  I insisted on leaving in the discussion

2   about historical EBITDA being -- 2005 EBITDA being negative

3   154 million.

4       I insisted on leaving the appendix, which talked about

5   run rates, EBITDA in the last four months ending January.

6       And I also insisted on leaving in the language on

7   materials, where we said specifically in materials:  We don't

8   believe material costs are going to rise in 2007 versus 2005.

9       But in actual fact, just to set the record straight on

10  this, we put 53.4 percent for materials in that March 10th

11  report, and the only reason we did it, the only reason we did

12  it was because in '05, the company had fifty-two percent,

13  they had projected 54.7 percent; it made no sense.  We chose

14  the middle ground to minimize areas of dispute.

15  Q    After the 1.244 billion error was detected, isn't it true

16  that you had changed your assumption regarding materials?

17  Yes or no.

18  A    That's true.

19  Q    Isn't it true that you changed your assumption regarding

20  manufacturing?  Yes or no.  Yes or no.

21  A    That is true.

22  Q    Isn't it true that you changed your assumption regarding

23  engineering?  Yes or no.

24  Q    Isn't it true that you changed your assumption regarding

25  other costs of goods sold?

Hyman - Cross/Springer                                86

1   A    That --

2   Q    Yes or no.

3   A    Yeah.  That's true, but I think if you look --

4   Q    Isn't it true -- sir.

5        MR. KURTZ:  Your Honor, can counsel stop cutting off

6   the witness.  It's an expert witness, we're here trying to

7   find facts.

8        THE COURT:  Well, he asked him a yes-or-no question.

9   You can bring it out of why -- you can bring it out -- I'm

10  sure you will bring out why he made these changes?

11  BY MR. SPRINGER:

12  Q    Isn't it true that you changed your assumption regarding

13  SG&A?  Yes or no.

14  A    Yes, we did.

15  Q    And -- and --

16  A    Partially -- partially --

17       MR. SPRINGER:  Your Honor, may the witness be

18  directed to answer the question --

19       THE COURT:  Again, your counsel will bring --

20  A    Yes, we did.

21       THE COURT:  -- will walk you through this, I'm sure.

22  BY MR. SPRINGER:

23  Q    And then you corrected your 1.244-billion-dollar mistake

24  on D&A, right?

25  A    That's correct.

Hyman - Redirect/Kurtz                          87

1    Q    And the net of all those changes was a net change to

2    adjusted EBITDA of $86 million, right?

3    A    Are you -- from our March 10th -- our March 17th report,

4    is that what you're saying?

5    Q    Yes, sir.

6    A    Yeah, I think that's right.

7             MR. SPRINGER:  I have no further questions, Your

8    Honor.

9             THE COURT:  Okay.

10            MR. KURTZ:  Redirect?

11            THE COURT:  Redirect.

12                      **REDIRECT EXAMINATION**

13   **BY MR. KURTZ:**

14   Q    Mr. Hyman, can you explain to the Court the mistake that

15   you made in your March 10th report, and why you revised your

16   report and submitted a supplemental declaration thereafter?

17   A    The mistake we made was we missed the fact that

18   depreciation was not included in cost of goods sold.  I guess

19   that's the best way to describe it.  We -- and that's -- we

20   picked that up, and we then went through a detailed analysis

21   of all the expense items that we had assumed in our original

22   report.

23      Our original report, as I've explained on a number of

24   occasions, was simply an attempt, simply an attempt to use

25   the company's assumptions as best we could, as best we could,

Hyman - Redirect/Kurtz                                    88

1   with a few obvious changes:  To revenues, where we just

2   couldn't figure out where their revenue projections were

3   coming from, and still can't figure it out.

4        And we made -- we made as few changes as we could to the

5   company's assumptions, and that's what we put in our report.

6   And then in my declaration we went through kind of a detailed

7   analysis of all the items in the income statement to correct

8   the record.

9        But I want to say, you know, I think this is in many ways

10  a sideshow.  Because what matters here and what's relevant is

11  what the company is actually doing today.  And I haven't

12  heard anything from anybody to tell me that the company -- to

13  refute the notion --

14            MR. SPRINGER:  Your Honor, I really have to object.

15       This is just a volunteered statement and a speech at

16  this point.  Can we proceed by question and answer?

17            THE COURT:  Well, I want to follow-up on this,

18  though.  Do the changes you made for October 17th, do they --

19  were they based on what the company is doing today or some

20  other notion?

21            THE WITNESS:  Your Honor, we tried to -- I'm happy

22  to take you through them if you like, if you think it's a

23  good use of everyone's time, but we tried our best, based on

24  the assumptions that they -- based on the steady-state report

25  that they gave us, to make assumptions that were fairly close

Hyman - Redirect/Kurtz                              89

1   to our -- what we viewed to -- that were reasonable in the

2   light of what we saw as current reality.  That's what we

3   tried to do --

4           THE COURT:  Well, let me just --

5           THE WITNESS:  -- in our adjusted report.

6           THE COURT:  So was the answer to my question yes?

7           THE WITNESS:  Yes.

8           THE COURT:  All right.  And then, I want to make

9   sure I understood your answer to the earlier question.  I

10  think what you said is you had thought that depreciation,

11  when you first look at the company's numbers, when you were

12  coming up with your March 10th report, was included in cost

13  of goods sold and you acknowledge now that it wasn't, but

14  does the shift reflect some backing out of a depreciation

15  number that would have been included in cost of goods sold,

16  between the March 10th and March 17th reports?

17          THE WITNESS:  Well, I think we've included

18  depreciation correctly this time, I believe.

19          THE COURT:  No, but if it had been included in cost

20  of goods sold instead, would you -- I mean, would it have

21  been a one-for-one change or is there some other change that

22  also took place?

23          THE WITNESS:  No.  I believe if it had been

24  included, we would have come to the same conclusion and a

25  background to the conclusion, which I think is important.

Hyman - Redirect/Kurtz                    90

1            THE COURT:  I'm sorry.  Is cost -- I can't --

2    because I'm a little bit farsighted.  Is cost of goods sold

3    increased by a billion two?  That's really, ultimately, my

4    question, I guess.

5            THE WITNESS:  Yeah.  It's hard for -- I can't read

6    it either, to tell you the truth.

7            THE COURT:  Well, is it?  I mean, it's your report.

8    You have it in front of you.

9            THE WITNESS:  I mean, no.  But I'm just doing it

10   from memory, via the --

11           MR. SPRINGER:  If the Court please, it's Exhibit 210

12   in evidence.

13           THE COURT:  All right.  Well, why don't you take a

14   look at that?  I just want to see if there is a one-to-one

15   correspondence there or if we're not --

16           THE WITNESS:  All right.  That's much better.

17           THE COURT:  Okay.  So again, how much have -- well,

18   if you move depreciation -- I guess my question is this.  You

19   had a cost-of-goods-sold number in your March 10th report,

20   right?

21           THE WITNESS:  That's correct.

22           THE COURT:  And I took from your answer that you

23   thought that the depreciation was in that number, as opposed

24   to a separate line entry.

25           THE WITNESS:  That's correct.

Hyman - Redirect/Kurtz                          91

1           THE COURT:  Okay.  So if you take out the

2   depreciation, do you reduce the cost of goods sold by a

3   billion two from that March report?

4           THE WITNESS:  We would have, had we taken

5   depreciation out, cost of goods sold would have been, I

6   guess, in our minds, reduced by the amount of depreciation.

7           THE COURT:  Okay.  Now how does that --

8           THE WITNESS:  And we would have resulted in a

9   positive EBITDA of 1.5 billion, approximately --

10          THE COURT:  Okay.

11          THE WITNESS:  -- which --

12          THE COURT:  Let me -- all right.  And then how does

13  that relate to the cost of goods sold that you have in the

14  March 17th?

15          THE WITNESS:  Well, our March 17th report, cost of

16  goods sold is approximately 26.6 billion, supplemental --

17  26.6 billion cost of goods sold and the March 10th report,

18  just for comparative purposes, was 26.4 billion.

19          THE COURT:  So you didn't pull out a billion two

20  from it?

21          THE WITNESS:  Well, what we did is we included

22  depreciation and then we made -- as we made changes to

23  assumptions of materials, manufacturing, engineering, out of

24  cost of goods sold, to reflect current reality as best we

25  could see it.

05-44481-rdd   Doc 2942   Filed 03/22/06   Entered 03/23/06 14:57:15   Main Document
                    Pg 92 of 236
Hyman - Redirect/Kurtz                                    92

1        THE COURT:  I'm sorry.  Wasn't the earlier number

2   reflective of current reality, too, since it -- you were

3   assuming the depreciation was in it?

4        THE WITNESS:  Well, what we did for the March 10th

5   report, just so you understand, I mean, we didn't do

6   projections in our March 6th report.  We did it in our March

7   10th report with very little time.  We didn't go into the

8   company's assumptions in their steady-state scenario in a lot

9   of detail.  We couldn't do it.  We couldn't have a

10  conversation with management.  We couldn't -- diligence,

11  yeah.

12       So what we did is we said look, and that's what I

13  said to my team.  I said, look, let's make some obvious

14  changes because they're clearly off -- you know, off the

15  reservation on a few points.  We made some changes.  And then

16  if the number -- if we run the numbers, let's see where they

17  come out.  We ran the numbers and they came out to be the run

18  rate and what I had explained to them, what I had said is

19  look, as long as the numbers come out to be somewhere between

20  negative 154 million, which is what they did last year, and

21  the run rate of 200 million, I'm comfortable.  If it comes to

22  a billion five positive, which would hugely help our case, I

23  would have rejected it.  I would have absolutely rejected

24  those projections because I don't have any basis to believe

25  that the company is doing any different to what it's

Hyman - Redirect/Kurtz                                     93

1   currently -- is going to do any different over the next year

2   versus what it's doing today.

3           THE COURT:  Okay.

4           THE WITNESS:  I have no --

5           THE COURT:  All right.  You can go ahead.

6   BY MR. KURTZ:

7   Q   Let me just go through this just a little bit.  Sitting

8   here today, based on your expertise and your analysis, what

9   is your best judgment of what an historical EBITDA would be

10  for 2006, without pre-structure savings?

11  A   Well, you know, we put an amended schedule together to

12  correct the record, as we point out and it comes to

13  approximately a hundred billion.

14          THE COURT:  Well, can I -- you said you didn't have

15  a whole lot of information when you did the March 10th report

16  from the company.  What additional information did you have

17  to do the March 17th report?

18          THE WITNESS:  Just more time, Your Honor.

19          THE COURT:  No, but what additional information?

20  From where?

21          THE WITNESS:  I think what we were able to do -- we

22  got a lot of information in different pieces and I think we

23  were able to put them together.  I think we have the same

24  information, but we were able to put it together in a fashion

25  that was a little easier for us to understand, to connect

1  page numbers, that kind of stuff.

2  BY MR. KURTZ:

3  Q   I think the Court is asking, when did you get the steady-

4  state projections?  What date?

5  A   I believe it was on a Sunday and our report was due on

6  Monday.

7  Q   At what time?

8  A   I don't remember exactly when.

9  Q   Was it noon?

10      THE COURT:  I'm sorry.  What was the additional

11  information that gave you the confidence to change the cost

12  numbers for materials, manufacturing, et cetera?

13      THE WITNESS:  Well, additional information -- I

14  mean, I didn't actually --

15      THE COURT:  Maybe I'm using the wrong phrase,

16  additional.  It was in what the company had given you.  You

17  just had more time to look at it.  Is that it?

18      THE WITNESS:  Your Honor, we had volumes, of stuff,

19  yeah.

20      THE COURT:  I appreciate you were working quickly.

21  I'm just trying to figure out, was it in what the company had

22  given you --

23      THE WITNESS:  Yes.

24      THE COURT:  Or did you get it from somewhere else?

25      THE WITNESS:  Yes.  We were able to look at the

Hyman - Redirect/Kurtz                                    95

1   company's accounts and make some assumptions, derive

2   financial information going back a few years.

3          THE COURT:  As to cost of goods sold and --

4          THE WITNESS:  As to materials, manufacturing,

5   engineering, jobs TLO, other costs of goods sold and

6   depreciation and amortization.  Some of those numbers,

7   frankly, we were comfortable with.  Others, we were forced to

8   make some judgements because they don't actually give you a

9   breakdown of materials and manufacturing historically.  They

10  didn't give it to us.  So what we did --

11         THE COURT:  So -- go ahead.  I was going to say,

12  what were the judgments based on?

13         THE WITNESS:  I'm sorry?

14         THE COURT:  So what were the judgments based on?

15         THE WITNESS:  Well, I looked at manufacturing and

16  made some assumptions about manufacturing costs over time,

17  that they were pretty fixed and I think a lot of labor is in

18  manufacturing.  I looked at their projections and if you add

19  manufacturing and jobs TLO, the number was pretty consistent

20  and then I looked at that number historically and was able to

21  derive -- we knew what the number of materials in

22  manufacturing was.  We just didn't know the components and we

23  were able to back into what we thought was a materials number

24  and that's an estimate.  We don't know exactly what it was

25  because the company hasn't shared it with us and I haven't

Hyman - Redirect/Kurtz                                    96

1   been able to discuss it with them.

2         But we looked at material costs.  That's a good

3   example and good judgment a few years ago, material costs

4   were forty-nine percent of sales and they've risen in the

5   last two years to fifty-two percent of sales and in that

6   period, commodity prices have risen dramatically, almost to

7   unprecedented levels and material costs went from forty-nine

8   to fifty-two percent.  In fact, steel, which is a big part of

9   what they -- of their commodity -- the commodities that they

10  use and they say it in their reports, the price of steel has

11  come down and I just couldn't see a basis.  I couldn't see a

12  basis for their projection on materials.  And that's why I

13  insisted on putting that paragraph in both of our reports.

14         THE COURT:  Okay.

15         THE WITNESS:  And just so we understand

16  mathematically, you know, this is a twenty-seven-billion-

17  dollar company and to just -- we're talking about materials.

18  That's fifty-two percent of sales.  I mean, that's a big

19  assumption.  A little bit of a change in that item would have

20  a huge impact one way or the other and so, I looked at it and

21  I couldn't get comfortable with it.  Without a discussion

22  with management, I just couldn't get comfortable.  I picked

23  the middle ground.  In retrospect, it was in error, but I did

24  it for the only reason, you know, when we ran the numbers,

25  trying to compromise on the company's assumptions, we came up

Hyman - Redirect/Kurtz                               97

1    to the run rate and so, we accepted it without -- and we were

2    under some time pressure, but that's no excuse.  We accepted

3    it without actually going into all the assumptions in a lot

4    of detail.

5            Because fundamentally, our conclusions were

6    unchanged and our basis, the basis for our projection, the

7    basis of our projections for this business is what did it do

8    last year and what's it doing over the last four months?  And

9    that's been the foundation of our analysis in both of our

10   reports.

11           THE COURT:  Okay.

12   BY MR. KURTZ:

13   Q   Let me just cover a couple of areas.  In your opinion,

14   what is the best indication of what EBITDA would be in 2006,

15   unrestructured?

16   A   I think the best indication is the current run rate.  You

17   know, historical financial -- historical performance or the

18   current run rate.  I think that is the best indication.

19   Q   And what is the 2005 EBITDA historical information?

20   A   It's negative 154 million.

21   Q   And what is the run rate, based on the prior four months

22   of operations?

23   A   Approximately 200 million positive.

24   Q   In light of the run rates being $200 million positive,

25   why did you assume, in your March 10th report, a starting

Hyman - Redirect/Kurtz                                            98

1   point of negative one fifty-four?

2   A   For all the reasons that I've discussed in the last half

3   hour.  I just couldn't get comfortable with the company's

4   assumptions.  I looked at them and I just couldn't get

5   comfortable with them.

6   Q   But why did you not go with the run rate, as opposed to

7   the historical minus 154 million EBITDA for 2005?

8   A   I think I was trying to be conservative.  We've been

9   trying to be conservative on -- that was what we were trying

10  to do on our March 10th report.  We were trying to be

11  conservative.

12  Q   Okay.  Now, during his opening statement, Mr. Butler said

13  these March 10th numbers were your numbers.  They weren't the

14  debtors' numbers.  They were your numbers.  Is he correct?

15  A   Well, some of them are my -- no, no.  He's not correct.

16  The revenues are our revenue projections.  He's correct when

17  it comes to the revenues, but he's not correct about all the

18  specific items.  As I mentioned in my deposition and in my

19  report, we did make some changes.

20  Q   And you believe you can adequately and properly and

21  confidently calculate a baseline EBITDA off of the steady-

22  state projections?

23  A   Well, you know, I can't say that I'm comfortable with the

24  steady-state assumptions as the company as presented them.

25  No,  I'm not comfortable with them.  We've made some changes

Hyman - Redirect/Kurtz                                    99

1   that we think are reasonable, but without a discussion with

2   management, we think they're reasonable.

3       I should say that, you know, the revenue numbers, I

4   think, were particularly disturbing, you know, from our

5   perspective.  They were really hard for us to get our heads

6   around.

7   Q   Can you disclose what the debtors' revenue projections

8   were for GM?

9   A   Well --

10          MR. SPRINGER:  I think we're beyond the scope now,

11  Your Honor.

12          MR. KURTZ:  Your Honor, this is part of the very

13  chart.  I was told that I'd get that and we explained this

14  because it's been represented, Your Honor, that these are

15  Appaloosa's numbers and that's the debtors' numbers.  That's

16  not right.  I want to show what's going in.  You're being

17  asked to accept that these numbers -- this line because a

18  valuation, you were told, break the line here and this is

19  what governs.  And I believe Your Honor should understand

20  that the kinds of assumptions that are going into the

21  debtors' numbers, which Eureka has used for purposes of

22  presentation, but are completely inconsistent with run rates.

23          And the same is true of revenues.  This witness will

24  be able to testify very quickly about them.

25          MR. BUTLER:  Your Honor, may I respond?

Hyman - Redirect/Kurtz                    100

1        MR. KURTZ:  How many counsel per witness are we

2   entitled to have here?

3        MR. BUTLER:  You just spoke about my opening,

4   Counsel.

5        MR. KURTZ:  That's okay.

6        MR. BUTLER:  May I respond?  May I respond, Your

7   Honor?

8        THE COURT:  You can go ahead.

9        MR. BUTLER:  What I said, Your Honor, here was the

10  March 10th report, these numbers are the numbers that appear

11  in Exhibit 4.  They're Eureka's numbers, Exhibit 4.  That

12  goes to the facts.  These numbers are the numbers in Eureka's

13  Exhibit 89.  Did they change their March 17th?  This -- these

14  -- there's no column.  This is the very same number, except

15  adjusting for Mr. Hyman's mistake, which he's acknowledged.

16  That's Eureka's report there and Eureka's report there.

17        THE COURT:  Well, but he -- but --

18        MR. BUTLER:  Now he's trying to move away from that.

19        THE COURT:  Counsel is just asking him whether, in

20  adopting those numbers, he was being conservative, I guess,

21  is ultimately what you're asking.

22        MR. BUTLER:  I have no problem with that, Your

23  Honor.  I just want the characterization that these were the

24  numbers in the Eureka report.

25        MR. KURTZ:  And whether the projections -- whether

Hyman - Redirect/Kurtz                                    101

1   the debtor has proven accurate projections and we'll be able

2   to then -- well, I'll ask the question, Your Honor, and we'll

3   just see that they are moving beyond what --

4            THE COURT:  Well, ask the question.

5   BY MR. KURTZ:

6   Q   Mr. Hyman, what were the debtors' projections for 2005 GM

7   sales?

8   A   I don't have that exact number in front of me, but it was

9   based on, if there's a schedule I can look at it, but it was

10  based on the -- they had assumed GM projection in '05 of 4.65

11  million vehicles.

12           MR. SPRINGER:  Your Honor, I think -- all right.  If

13  we're going to be talking about contents of confidential

14  documents, I'm not sure this particular one was especially

15  important, but perhaps we could do it in a way that didn't

16  reveal the company confidences.

17           THE COURT:  Well, there's probably a way for you to

18  ask the question, so we don't have to empty the courtroom and

19  just talk about percentages where you would disagree with a

20  percentage.

21  BY MR. KURTZ:

22  Q   Was the debtor -- was Delphi accurate in its 2005

23  projections of GM production?

24  A   Delphi was inaccurate in its estimate of GM production in

25  2005 by approximately, and I don't have actually -- I don't

Hyman - Redirect/Kurtz                            102

1   have my declaration in front of me, but I think it was five

2   or six percent.

3   Q   And has Delphi made a projection of GM production for

4   2006?

5   A   Yes.

6   Q   And how does that projection compare with 2005 actual

7   production?

8   A   Well, that projection, as I recall, went down almost ten

9   percent on a 2005 number that was already down below reality

10  five percent, so the net effect would have been a reduction

11  of somewhere between fifteen and twenty percent.

12  Q   Are you aware of any circumstances which would support

13  such a dramatic projection decrease for GM production?

14  A   No.

15  Q   Have you reviewed GM's disclosures with respect to its

16  production?

17  A   Yes.  What I did was -- and this is a number that,

18  frankly, we didn't diligence as hard as we probably should

19  have initially, just because of time, but I've been around

20  for a long time and I know that GM published their production

21  numbers, so I go into the GM web site and I looked at their

22  production schedules, which they publish every few months,

23  every month, and their '05 number was 4.856 million vehicles

24  in North American.  And then I looked at the Delphi number,

25  which was -- this is for '05.  I looked at the Delphi number

Hyman - Redirect/Kurtz                                    103

1    and it was low, a lot lower.  And then I looked at GM's

2    production for the first quarter of '06, which GM,

3    interestingly, only a few days ago, actually reaffirmed its

4    forecast for the first quarter of '06, which was 1.25 million

5    vehicles for the first quarter and also gave a forecast for

6    the second quarter of 1.2 million vehicles.

7        And if you extrapolate from that GM's position on what

8    it's doing in North America today and you look at Delphi's

9    forecast on what it thinks GM is going to do in '06, GM would

10   need to fall by approximately twenty percent.  GM production

11   would need to fall by approximately twenty percent in the

12   second half of '06 versus the second half of '05.

13       And in my mind, that's an extraordinary number and there

14   isn't anything -- there are no facts that I'm aware of that

15   would justify that kind of fall.

16   Q   Has Delphi offered any facts that would justify that kind

17   of fall?

18   A   No.

19   Q   How about on the EBITDA?  What did you say that last

20   fourth months' EBITDA was for Delphi?

21   A   59 million.

22   Q   Positive?

23   A   Positive.

24   Q   And Delphi has projected a 1.5-billion loss?

25   A   That's correct.

Hyman - Redirect/Kurtz                                104

1   Q   Has Delphi or any of its advisors or representatives give

2   you any basis or any explanation for how EBITDA could fall

3   from a positive fifty-nine to minus 1.5 billion in the next

4   eight months?

5   A   Other than pointing out our mistake on depreciation, no.

6   Q   Are you aware of any circumstances which would support an

7   assumption that Delphi is going to fall from 59 million

8   positive to 1.5 billion negative in the next eight months?

9   A   I'm not aware of anything out there to support that.

10  Q   Do you believe that Delphi's projections of an EBITDA

11  loss of 1.5 billion are reasonable?

12  A   No.

13  Q   And do you know when they were prepared?

14  A   I'm speculating, but I believe, because they said eight

15  plus four, eight being actual and four being projected, that

16  they were prepared either in -- probably in September of last

17  year, which would make them almost six months old.

18  Q   And in your experience, would six-month-old projections

19  be dated?

20  A   I think -- yes.  Yes.

21  Q   You were asked some questions about the Lehman report.

22  Do you know how much time went into that report?

23  A   From my perspective?  Is that your question?

24  Q   Yeah.  Do you know how much time someone spent at Lehman

25  Brothers preparing that research report?

Hyman - Redirect/Kurtz                              105

1   A   I really don't know.

2   Q   Do you have any -- does the Lehman Brothers report impact

3   in any way your work, your conclusion or your analysis?

4   A   I never read the -- I never went through that report when

5   I prepared the analysis.

6   Q   You were shown a number of other research reports during

7   your cross-examination.  Do you recall that?

8   A   Yes.

9   Q   Does anything that you were pointed to in those other

10  research reports impact your analysis and conclusions in this

11  case?

12  A   No.  We do our own analysis.  We're always interested in

13  people's points of view, but we did our own analysis and came

14  to our own conclusions.

15  Q   Nonetheless, was there information or observation set

16  forth in those other research reports which support your

17  analysis and/or conclusions?

18  A   Well, there were -- we actually referred specifically in

19  our report to one research article which adopted a similar

20  methodology to our methodology, too, and actually came out

21  with the same operating margin percentages as we had with our

22  methodology, too.  And so, I did reference that report and

23  that was a Bernstein report dated June, I believe.

24  Q   Okay.  But you were shown some research reports here and

25  I believe you wanted to point out some material that you

Hyman - Redirect/Kurtz                                106

1   believe supported your conclusions, but you were not

2   permitted to do so during the course of cross-examination.

3   I'm going to offer you the opportunity now to show us what,

4   in those research reports, supports you conclusions and

5   analysis.

6   A    Okay.

7   Q    You were shown first Exhibit 82.

8   A    Okay.  The Bernstein core report dated June 7th, 2005.

9   And what I was just going to point out was that the target

10  price on that report was four dollars a share.

11  Q    For equity?

12  A    For equity.

13  Q    Okay.  Is there anything you want to point out in the

14  other reports?

15  A    Well, there may have been.  I don't -- you would need to

16  kind of direct me to those reports and I could tell you an

17  answer.

18  Q    Well, they were consecutive, I believe, through eighty-

19  five.

20  A    Yeah.  I think there was a Morgan Stanley report, I

21  believe, that had an analysis where I noticed that they had -

22  - they had different -- they had, I guess, different claims,

23  but my partner will talk about that, but they assumed a

24  multiple of five and a half times EBITDA in their estimate of

25  enterprise value, which is in line with our analysis.

Hyman - Redirect/Kurtz                                    107

1   Q    Two other question areas.  I want to go back to sales for

2   a moment.  Have you reviewed research analyst projections of

3   what Delphi's GM sales will be in 2006?

4   A    I have.

5   Q    And what did you review?

6   A    We've looked at a few research analysts.  There isn't

7   actually that many that focus specifically on North American

8   production, but the range is from plus two percent to minus

9   three percent.

10  Q    And what did you assume, for purposes of your

11  projections?

12  A    Minus three percent.

13  Q    And why did you assume minus three percent when the

14  actual sales have been rising and there was an analyst report

15  that suggested they would rise?

16  A    I assumed minus three percent to be conservative,

17  although the actual dollar numbers for GM, I should just

18  point out, GM revenues were at -- we assumed GM revenues

19  would decline by ten percent in our projections.

20  Q    And the final question I want to ask you is, you

21  testified that the debtor had assumed a substantial increase

22  in material costs, which you didn't think was supported.  Can

23  you tell us what work you did to study material that might be

24  relevant to Delphi's business plan and the conclusions you

25  were able to reach?

Hyman - Redirect/Kurtz                                    108

1   A   Well, you know, I've done some work in the steel

2   industry, so I was familiar with steel prices, so I knew that

3   steel prices had come off their highs and that they were

4   actually -- I mean, we're not projecting steel prices to come

5   down dramatically, but they're certainly nowhere near their

6   highs of the last twelve months and so, we looked at a couple

7   of research reports, just to verify that my observation on

8   steel was accurate and we also looked at some projections of

9   the natural gas price, which is a key driver of the resin

10  business.  Resin prices are impacted by natural gas.  Natural

11  gas prices have gone up dramatically in the last few years.

12  They were pretty high last year and the kind of question is,

13  how do you see resins over the next year or so?  And we see

14  them as flat to maybe down a little bit.

15  Q   And I guess, as my last area, if you had correctly

16  identified the depreciation and amortization issue on March

17  10th and produced for yourself a negative EBITDA of one

18  million, what would you have done in your analysis and in

19  your conclusion?

20  A   I would have rejected those projections and in all

21  likelihood, gone back to -- I would have gone back to either

22  the historical numbers that the company used -- had done in

23  '05, which is negative 154 million.  That's probably what I

24  would have done.

25  Q   And why would you have rejected the debtor's projections

Hyman - Redirect/Kurtz                                    109

1    for production of a billion-dollar EBITDA loss?

2    A    Because I'm not -- I couldn't get comfortable with their

3    assumptions.  It's as simple as that.

4    Q    And if you had performed the March 17th report

5    adjustments with respect to materials and manufacturing and

6    the like and had continued to double count D&A and produce an

7    EBITDA of a billion dollars, what would you have done?

8    A    I would have rejected those projections because, as I've

9    stated, I think what really matters here, what's important is

10   that what did the company do in '05 and what's it been doing

11   over the last four months?

12   Q    And in your expert opinion, based on your considerable

13   experience, is it appropriate to use projections are a

14   reality check, the way you're describing, to look at the

15   conclusions and see how it comes out?

16   A    I think the absence of clear, easy-to-understanding

17   explanations for change, you absolutely should look at

18   current performance and historical performance before you

19   jump to conclusions about any future projections.

20   Q    And in the absence of some valid explanation that would

21   cause a change from current performance and historical

22   performance, is it appropriate or reasonable to adopt

23   assumptions that we have losses that were multiples of

24   performance and historical performance with actual

25   performance and insurable performance (sic)?

1          MR. SPRINGER:  Can I just object, Your Honor?

2   That's a speech that's leading.

3          MR. KURTZ:  I'll rephrase it because it was

4   obviously imprecise.

5   BY MR. KURTZ:

6   Q   But in your expert opinion, is absence a reasonable and

7   credible explanation?  Is it appropriate to adopt projections

8   which reflect performance that is completely out of line with

9   historical performance?

10         MR. SPRINGER:  I have to object to the leading.

11         MR. KURTZ:  He's an expert witness, Your Honor.

12         MR. SPRINGER:  So that means he shouldn't be led.

13         MR. KURTZ:  But, I mean, I've given him a

14  hypothetical that I asked him to answer.

15         THE COURT:  You don't need to ask the question.

16  You've already made your point about the projections.

17         MR. KURTZ:  No further questions.

18         THE COURT:  But I have a question.  What is your

19  projection for 2006 income?

20         THE WITNESS:  EBITDA?

21         THE COURT:  Yeah.

22         THE WITNESS:  It's positive a hundred million.

23         THE COURT:  And that's based on what?

24         THE WITNESS:  We redid the income statement.  We

25  went through every item.  We redid the income statement as

Hyman - Redirect/Kurtz                                    111

1    best we could, made some changes to assumptions, to reflect

2    current reality as best we could.  We thought they were

3    reasonable.  It came out to be positive a hundred mil and to

4    correct the record, really, that's why we included that in

5    the report.

6              THE COURT:  And I'm sorry.  Maybe this leads to my

7    confusion.  Was one of those assumptions analyzing the first

8    quarter?

9              THE WITNESS:  No, they -- we've always, in all of

10   our presentations, whenever we put our projections together,

11   we said look, look at run rate.  Look at what the company has

12   done historically.  This is important.  You know, it's doing

13   negative one fifty.  It's currently doing positive 200.

14             THE COURT:  Wait.  Let me stop you on that.

15             THE WITNESS:  Yeah.

16             THE COURT:  How do you get to the positive two

17   hundred?

18             THE WITNESS:  What we did was we looked at -- we got

19   the company's financial reports that have been, I guess,

20   provided to the Court, the debtor and the non-debtor

21   financial reports for the last four months, since filing.

22             THE COURT:  Right.

23             THE WITNESS:  And then we looked at the debtor

24   income statements and we derived an operating income number

25   from the debtor income statement.

Hyman - Redirect/Kurtz                                    112

1          THE COURT:  For the first quarter?

2          THE WITNESS:  For each month, actually.

3          THE COURT:  For the first quarter?

4          THE WITNESS:  Well, for the last four months.

5          THE COURT:  All right.

6          THE WITNESS:  It's actually for October.

7          THE COURT:  For the last four months.  What was that

8  number?

9          THE WITNESS:  The EBITDA you're talking about?

10          THE COURT:  Right.  I thought I heard it was --

11          THE WITNESS:  The total EBITDA is 59 million.

12          THE COURT:  59 million?

13          THE WITNESS:  Yeah.

14          THE COURT:  So how do you get 200 million from that,

15  by annualizing it?

16          THE WITNESS:  I said it was actually -- it's not

17  actually four months.  It's a little less than four months.

18  It's from October -- I can't remember the exact date, but I

19  just divided it by .315 to reflect the number of days in the

20  period and you get approximately 200 mil.  I think it's like

21  one eighty-nine or it might be two hundred and ten, the

22  actual number.  I can't recall.  But it's approximately 200

23  million.

24          THE COURT:  Okay.  Okay.

25          MR. SPRINGER:  No further questions.

1        MR. KURTZ:  No redirect, Your Honor.

2        THE COURT:  All right.  You can step down, sir.

3     (Witness excused.)

4        THE COURT:  Your Honor, before we proceed, does the

5  Court have a view as to whether the Court wants to take any

6  kind of a lunch recess today or --

7        THE COURT:  The Court definitely has a view, which

8  is we should do that now.

9     (Laughter.)

10       THE COURT:  And let me just get a sense.  How many

11  more witnesses do you have?

12       MR. BUTLER:  Your Honor, we have one more witness.

13       THE COURT:  Okay.  And you have two or one?

14       MR. KURTZ:  We have three.  Mr. Resnick, and turn in

15  declarations for Mr. Resnick, Mr. Sheehan and Mr. Williams.

16       THE COURT:  All right.  Okay.  I'll be back at 1:30

17  sharp.

18       MR. BUTLER:  Thank you.

19     (Luncheon recess taken at 12:35 p.m.)

20                       AFTERNOON SESSION

21     (Proceedings resume at 1:32 p.m.)

22       THE COURT:  Okay.  We're back on the record in

23  Delphi.

24       Mr. Springer, are you going to call your next

25  witness?

Greene - Cross/Springer                                    114

1          MR. SPRINGER:  Thank you, Your Honor.  Appaloosa

2   calls Stephen Greene.

3          THE COURT:  Okay.

4   **STEPHEN GREENE, WITNESS FOR APPALOOSA MANAGEMENT, LP, SWORN.**

5          THE COURT:  Now just for the record, would you spell

6   your name?

7          THE WITNESS:  G-r, double E, e-n-e.

8          THE COURT:  Okay.

9          THE WITNESS:  Do you want the first one, too, Your

10  Honor?

11         THE COURT:  It's with a V?

12         THE WITNESS:  With a p-h.

13         THE COURT:  P-h.  Okay.

14         THE WITNESS:  That's why I offered.

15         THE COURT:  Okay.  All right.

16         MR. SPRINGER:  Thank you, Your Honor.

17                      **CROSS-EXAMINATION**

18  **BY MR. SPRINGER:**

19  Q   Good afternoon, Mr. Greene.  Nice to see you again, sir.

20  A   Nice to see you, too, Mr. Springer.

21  Q   Is it true, sir, that the first work that Eureka actually

22  performed on this matter was on or after February 10th of

23  2006?

24  A   That is true.

25  Q   And whatever basis Appaloosa had for filing the motion

Greene - Cross/Springer                                    115

1   back on December 22nd of 2005, that wasn't based on any work

2   that Eureka had done?

3   A    That is true.

4   Q    And your first contact with regard to the matter was on

5   or about February 1st, 2006, when you were having a phone

6   call with Mr. Tepper and Mr. Goldstein of Appaloosa?

7   A    I believe I -- I think I estimated it was ten days or so

8   before we were actually retained.  At least that's what I

9   recall saying in my deposition.

10  Q    And you were talking to them about another matter at that

11  point?

12  A    Yes.  Actually, as I think I said, I called them.  I

13  can't actually remember what the particular reason was for

14  the call, but they raised with me, for the first time, the

15  discussion of Delphi.

16  Q    And you had worked previously or your firm had done some

17  work previously for Appaloosa.  Isn't that true?

18  A    That is true.

19  Q    And you've done a few matters that on which you would

20  earn, oh, somewhere in the neighborhood of three-quarters-of-

21  a-million dollars in fees?

22  A    I think I said it was no more than that, if I recall

23  correctly what I said, but I think that's right, yes.

24  Q    And in your conversation with Mr. Greene and Mr. Tepper,

25  they said in substance that they needed an expert to help

Greene - Cross/Springer                                116

1   suggest whether there was actually a likelihood or a

2   significant likelihood of recovery in the Delphi case by

3   equity?  In substance, that's what they said?

4   A   To tell you the truth, Mr. Springer, I don't remember

5   exactly the words, but my best recollection is that they said

6   that they were -- had a motion out or were certain pursuing -

7   - I don't remember if they actually said they had a motion

8   out, but they said that they were pursuing the notion of

9   forming an equity committee in Delphi and that they had come

10  to the conclusion that they needed some expert help and they

11  asked if we were potentially interested in working on it and

12  we really didn't have any more substantive discussion at that

13  time, as I can recall, about what the actual expert testimony

14  would be about.  They just said you'll hear from our lawyers

15  at White and Case and we left it at that.

16  Q   Well, at Page 45 of your deposition, you testified,

17  quote, at Line 6, with respect to this conversation, quote:

18      "So what came up in that conversation?

19      "Was that -- it was either Mr. Goldstein or Mr. Tepper

20  said that Appaloosa felt, at this point, that they needed an

21  expert to help suggest whether there was actually a

22  likelihood or significant likelihood of recovery here by

23  equity and was this something that they felt we would want to

24  take a look at."

25      You testified to that effect?

Greene - Cross/Springer                                117

1    A   Yes.  You know, and actually, Mr. Springer, you're right.

2    That probably is more accurate testimony, now that you remind

3    me.   That's probably more accurate.

4    Q   And you actually knew before that conversation that

5    Appaloosa had acquired a position, an equity position in

6    Delphi, right?

7    A   That is true.

8    Q   And you actually knew that, before that conversation,

9    that they were looking to form an equity committee, true?

10   A   I think I was aware of that, yes.

11   Q   Now, isn't it true that in your discussions that you've

12   had with Appaloosa, that there have been general discussions

13   about whether or not Eureka would be asked to serve as a

14   financial advisor to an equity committee if, in fact, the

15   Court appointed one?  That subject has come up?

16   A   Yes, the subject came up.

17   Q   And Appaloosa suggested that there might be an

18   opportunity for Eureka to represent the equity committee.

19   Isn't that true?

20   A   I think that that came up in discussion and I think

21   that's how I testified in my deposition?

22   Q   And you know, from your own experience, that fees to a

23   financial advisor in those circumstances would run

24   approximately a hundred to $200,000 a month by way of

25   retainer, right?

Greene - Cross/Springer                                        118

1   A    I think I testified as such in my deposition.

2   Q    And you heard Mr. Lauria mention in his opening statement

3   that he anticipates the case could go on for another two

4   years, so that would amount to somewhere, you know, between

5   two point -- well, help me with the math.  Two years of --

6   twenty-four months of 100,000 or $200,000 a month.  That's

7   what, 2.4 million to 4.8 million?

8   A    I'll trust your math, Mr. Springer.

9   Q    Okay.  I don't have an MBA.

10  A    That's all right.

11  Q    Now, you actually, before you prepared your expert

12  report, you read Appaloosa's motion.  Isn't that true?

13  A    The motion that they filed seeking appointment of an

14  equity committee?  Yes, I did.

15  Q    And you also read the objection that was filed by the

16  debtors, right?

17  A    This is before we actually issued our report?

18  Q    Right.

19  A    I just want to be clear on the timing.  Yes.  Yes.

20  Q    And I'd ask the Court to notice and I would represent to

21  you, sir, that the objection makes reference to the

22  importance of balance sheet and trading prices of the bonds.

23  Do you recall that, sir?

24  A    I do.

25  Q    And now you actually considered or Eureka considered the

Greene - Cross/Springer                                    119

1  financial statements contained in Delphi's latest 10Q and in

2  its monthly operating reports, for purposes of its work, did

3  you not?

4  A   I think we stated that they were documents that we looked

5  at, yes.

6  Q   And neither you, nor Mr. Hyman is a CPA.  Isn't that the

7  case?

8  A   Yes.  I would say that's absolutely the case.

9  Q   And neither of you is qualified to speak to the question

10 of whether those financial statements comply with generally

11 accepted accounting principles, are you?

12 A   That's absolutely true.

13 Q   In fact, you take those financial statements and -- as

14 compliant with generally accepted accounting principles for

15 purposes of your work, do you not?

16 A   Yes, we do.

17 Q   And you're -- isn't it true, sir, that no where in your

18 report or your declarations -- your declaration, let's say,

19 before March 10th, do you make any statement about what

20 inferences or conclusions about the likelihood of equity

21 receiving a recovery can be drawn from a reading of the

22 debtors' financial statements.  Isn't that true?

23 A   I'm sorry.  It was a bit of a long question.  Would you

24 mind regiving it?

25 Q   You're right.  You're right.  Isn't it true that in your

Greene - Cross/Springer                              120

1   report and in your declarations, you don't make any

2   statements at all about what inferences or conclusions can be

3   drawn from the debtors' financial statements.  Isn't that

4   right?

5   A   And when you say reporting declaration, I presume you're

6   excluding our supplemental declaration of the 17th.

7   Q   Well, let's start with that.

8   A   I'm sorry.  Maybe you could then rephrase the question.

9   Q   Well, you recall, when I took your deposition on March

10  13th, right?

11  A   Yes.

12  Q   Do you recall that?

13  A   I do.  That's about the right date.

14  Q   Yes.  And you told me at your deposition that your

15  declarations and your report set forth all of the opinions

16  and conclusions that you intended to give in the case.  Do

17  you recall that?

18  A   I recall a question along those lines.  I'd have to refer

19  specifically to the question you asked and specifically to

20  how I answered it to be absolutely sure, but I certainly

21  remember that you raised that topic.

22  Q   All right.  At Page 57 of the deposition -- excuse me,

23  Page 55 of the deposition, we asked these questions and did

24  you make these answers?

25      "Question:  Now, between Debtors' Exhibit No. 1 --"

Greene - Cross/Springer                                    121

1    At the deposition, which was your report.

2    "-- and Debtors' Exhibit No. 3, does that fully set forth

3  your opinions and conclusions in this matter?

4    "Answer:  I believe it does.

5    "Question:  Yours and Eureka's?

6    "Answer:  Well, mine."

7    And then there was an interruption.

8    "Just for the record, the reports here, correct me if I'm

9  wrong, but there were experts here, myself and Mr. Hyman.

10  Eureka is not an expert.  I don't think it can be, but I'm

11  not a lawyer, so I can't draw that conclusion."

12    And then I asked you:

13    "Okay."

14    And then you said, quote:

15    "But if I can answer with respect to my opinions, my

16  opinions are reflected in the two documents that you stated."

17    Was that your testimony at that time, sir?

18  A    Yes, it -- I think it was.

19  Q    Right.

20  A    I trust you that that's what it says.

21  Q    Right.  And at that point in time, you had not been asked

22  to and you didn't have any opinions at all about what

23  inferences or conclusions could be drawn from the debtors'

24  financial statements in respect to whether or not equity

25  stood any chance of participating, right?

Greene - Cross/Springer                          122

1    A    I think the operant words are, you know, I hadn't been

2    asked and I hadn't formulated.  Yes.  I think that's a fair

3    characterization.

4    Q    And you understand that one of the things that courts do

5    consider in determining whether equity stands a meaningful

6    chance of recovery is what the financial statements say,

7    right?

8    A    I think it's one of the things that people would look at

9    reasonably, yes.

10   Q    And in your initial report and declaration that you have,

11   you were not asked to look into that and you weren't prepared

12   to testify about that, right?

13   A    Yeah.  I think that -- I think I just answered it exactly

14   that way.

15   Q    Now, you know, in fact, that there is a market in

16   Delphi's debt securities, do you not?

17   A    Yes, there's a market.

18   Q    And Eureka's report does not address the prices at which

19   debt securities have been trading since the bankruptcy

20   petition, does it?

21   A    Again, when you're saying report, you mean our March --

22   you're talking about our March 10th report?

23   Q    Yeah.  I'm talking about Debtors' Exhibit No. -- excuse

24   me, Hearing Exhibit No. 4, which you understood was to set

25   forth all of your opinions and conclusions in this matter.

Greene - Cross/Springer                                123

1  A    Okay.  Now I know what you're referring to.  Could you

2  ask the question again, Mr. Springer?

3  Q    Yeah.  It's true, isn't it, that your report does not

4  address the prices at which debt securities have been trading

5  since the bankruptcy petition.  Isn't that true?

6  A    That is true.

7  Q    And you were not asked to and you were not prepared to

8  address, nor offer any opinions or conclusions, regarding

9  what inferences could be drawn from the trading history of

10  the debtors' debt, were you?

11  A    At the time of the deposition, that's true.

12  Q    Now, you understand what an efficient market is, do you

13  not, sir?

14  A    I do and I think you asked me about it in the deposition.

15  Q    And you -- and in your report and in your declaration,

16  you didn't give any testimony or any -- make any remarks

17  about whether or not the trading in Delphi's debt was in an

18  efficient market, did you?

19  A    No, I don't believe we did.

20  Q    Would you agree, sir, that securities prices, in an

21  efficient market, reflect the true underlying value of the

22  asset?

23  A    I don't know that I'd say that they reflect the true

24  underlying value of the assets, but what they reflect is the

25  best information available about the true underlying value of

Greene - Cross/Springer                                    124

1    the asset.

2    Q    Now, you recognize Brealey and Myers, Principles of

3    Corporate Finance, as a recognized authority, do you not?

4    A    Yes, I think you took me through a number of recognized

5    authorities in the deposition.  Brealey and Myers was one of

6    them.

7    Q    And at Page 1007, Your Honor, in the chapter about --

8    it's the conclusion.  What we do and do not know about

9    finance and Brealey and Myers go on and said, what we do

10   know, the seven most important ideas in finance and Idea No.

11   3 is efficient capital markets, which is what we've been

12   talking about.  It says:

13       "The third fundamental idea is that security prices

14   accurately reflect available information and respond rapidly

15   to new information as soon as it becomes available.  This

16   efficient market theory comes in three flavors, corresponding

17   to different definitions of available information.  The weak

18   form, or random walk theory, says that prices reflect all the

19   available -- all the information in past price.  The semi-

20   strong form says that prices reflect all publicly available

21   information and the strong form holds that prices reflect all

22   acquirable information.  Don't misunderstand the efficient

23   market idea.  It doesn't say that there are no taxes or

24   costs.  It doesn't say that there aren't some clever people

25   and some stupid ones.  It merely implies that competition in

Greene - Cross/Springer                              125

1    capital markets is very tough.  There are no money machines

2    and security prices reflect the true underlying values of

3    assets."

4        That's what Professors Brealey and Myers say, right?

5    A   Again, I'm trusting you that you're reading it

6    accurately.

7    Q   And in your report, you were not asked to consider and

8    you didn't disclose anything in connection with the market

9    for unsecured claims against the debtor, did you?

10   A   No, we didn't.

11   Q   And you haven't made any opinions or conclusions on the

12   basis of what information could be derived from the market

13   for unsecured claims, have you?

14   A   Well, I think the question was posed to me in my

15   deposition as to where we were at that point in time, on the

16   13th or whatever, with respect to that.  I think that I

17   certainly stand by what I said on the 13th.

18   Q   Right.  Well, didn't you understand that your expert

19   report was intended to ensure that you disclose all the

20   opinions and conclusions you had in the case?

21   A   Yes.  All the opinions and conclusions on matters we were

22   asked to have opinions or conclusions about.

23   Q   Right.  And before then, you hadn't been asked about what

24   you could derive from the balance sheet of the debtors or

25   about the market information, had you?

Greene - Cross/Springer                                    126

1   A    That's true.

2   Q    Now, it's true that your report makes no mention of

3   whether the board of directors can adequately represent the

4   interests of equity holders.  Isn't that true?

5   A    Yes.  Again, you're talking about the same exhibit that

6   we're all talking about, our March 10th report.  That's true.

7   Q    Right.  And you were not asked to and you're not prepared

8   to offer any opinions or conclusions as to whether the board

9   can adequately represent the interests of equity holders, are

10  you?

11  A    Again, I think the most honest answer I can give is we

12  haven't been asked at this point and we haven't formulated a

13  point of view on that.

14  Q    And similarly -- similarly -- it's kind of a hard word

15  sometimes, similarly -- I still didn't get it right, but you

16  haven't been --

17  A    You had that same problem in the deposition.

18  Q    I know.  I'm going to come up with another word.  To like

19  effect --

20       (Laughter.)

21  Q    -- to like effect, you haven't been asked to look into

22  what the costs of an equity committee would be, have you?

23  A    That's correct.  We have not.

24  Q    And -- now, you recognize the discounted cash flow method

25  as a standard method for valuing a business, do you not?

Greene - Cross/Springer                                127

1   A    I do.

2   Q    And in your report and declarations, you do not do a

3   discounted cash flow analysis, do you?

4   A    That's true.

5   Q    Now, as I understand it, as between you and Mr. Hyman,

6   you're speaking to the bottom-line conclusion about whether

7   equity stands a meaningful chance of participating, right?

8   A    That's true.

9   Q    And it was Mr. Hyman's task to address the issue of

10  enterprise valuation and you're concerned with deductions

11  from enterprise value.  Is that right?

12  A    That's true, except for the fact, as I think I clarified

13  for you in my deposition, that I got the, you know, happy or

14  unhappy task to try to understand the full implications, at

15  least as much as we could understand them, of the OPEB and

16  pension accounting and liabilities and how those would flow

17  through, so some of that had an impact on enterprise value.

18  Some of that had an impact on deducts, so that particular

19  aspect of the analysis fell to me, but with the exception of

20  that one piece of the analysis, what you stated is correct.

21  Q    Is it fair to say, sir, that it's important to take into

22  consideration claims against the debtors' estates when

23  determining whether equity will have a meaningful opportunity

24  to participate?

25  A    I think that's a fair statement.

Greene - Cross/Springer                                    128

1  Q   In fact, insofar as you understand, claims have to be

2  paid or compromised before equity can participate, right?

3  A   That's true.  That's certainly the premise under which we

4  were operating and I think we said that in our report.

5  Q   Now, here on -- you're familiar -- you've looked at our

6  chart Exhibit 210?

7  A   It's hard not to look at it.

8  Q   Well, now isn't it true, sir, that here, on adjustments

9  to EBITDA, you don't recognize any claims that would result,

10  for example, from the jobs bank termination, do you?

11  A   I'm sorry.  Could you ask the question again?

12  Q   Yeah.  For purposes of your report, you don't recognize

13  any claims against the debtors' estates that might result

14  from termination of the jobs banks under the debtors'

15  collective bargaining agreements, do you?

16  A   Well, is the question a -- let me try to answer your

17  question as best I can.  We don't recognize claims in the

18  sense of claims, I suppose, if you're talking about damage

19  claims, you know, pursuant to a union contract.  What we do

20  do is attempt to account economically for the cost required

21  to modify the labor agreements on a go-forward basis by our

22  estimate of buy-out cost, so the way I think we

23  conceptualized it is that that's a surrogate, at least in

24  part, for the claims that would otherwise arise, but

25  obviously, you know, they're -- it's being constructed in a

Greene - Cross/Springer                              129

1  slightly different way.

2  Q    Okay.  I have a specific question though, sir.

3  A    Okay.  I'm sorry.

4  Q    For purposes of your enterprise valuation, you do not

5  consider any possible claims that might arise from

6  termination of the jobs bank, do you?

7  A    For purposes of our enterprise valuation?

8  Q    Right.

9  A    Again, it was Mr. Hyman's analysis, but my best

10  understanding is no, there's nothing considered there.

11  That's true.

12  Q    Nor do you recognize any claims that might result from

13  reduction of wages to tier two levels, do you?

14  A    I think it's the same answer, yes.

15  Q    And the same answer would be true with regard to non-

16  pension benefits reduced to tier two, net benefit pension

17  benefits reductions or OPEB reductions, your answers would be

18  the same?

19  A    Yes, I think they would be.

20  Q    Now if you turn to Page 41 of your report, sir.

21  A    Would you mind, Mr. Springer, pointing me to --

22  Q    Yeah.

23  A    I'm sorry.  To which binder?

24  Q    It's Exhibit 4 in the confidential binders, sir.

25  A    The one that says highly confidential on it?

Greene - Cross/Springer                          130

1    Q   Right.  That must be the one.

2    A   That must be the one.  There are some confidential and a

3    highly confidential there.  Exhibit 4 you said?

4    Q   Right.

5    A   Okay.  I'm there now.

6    Q   And you see the entry, "Employee Buy-outs."

7    A   I'm sorry.  Is there a page number?

8    Q   Yeah.  Page 41 of Exhibit 4, sir.

9    A   Oh, I'm sorry.  Give me a moment.  Page 41, Exhibit 4.

10   You said employee buy-outs.  Okay.

11   Q   Right.

12   A   I think I made that line out.

13   Q   Deductions from enterprise value.  I'd like to invite

14   your attention to the line that says, "Employee Buy-outs."

15   A   Yes.  I see the line item.

16   Q   Now, buy-out costs, as indicated there, are the only

17   quantitative way in which your analysis factored in potential

18   union claims against the debtors.  Isn't that true?

19   A   It is the way in which we captured what we thought would

20   be all the costs associated with reforming or restructuring

21   the labor arrangements in the U.S., yes.

22   Q   That's the only way?

23   A   Yes.  I think that's what I just said.  That's certainly

24   what I intended to say.

25   Q   And similarly, any potential claim by General Motors

Greene - Cross/Springer                    131

1   under its indemnity agreement is, to like effect, factored

2   into buy-out costs.  Isn't that true?

3   A   Yes.  I mean, as I think you're aware, Mr. Springer, the

4   presumption behind buy-out costs is that there's a consensual

5   way to be able to restructure the labor arrangements and so

6   that's why it's done the way it's done.

7   Q   Now, for purposes of your analysis, you assumed, did you

8   not, that labor would agree to a buy-out package for U.S.

9   hourly employees at $100,000 per active, high-cost employee,

10  right?

11  A   I believe that's our stated assumption, yes.

12  Q   Now, and you based that assumption, in part, upon the

13  Ford/Visteon proposal?

14  A   I don't know that it's the Ford/Visteon proposal.  I

15  think we based it, in part, upon a current proposal that Ford

16  has out, which I think we cite a specific news release or set

17  of news releases or press reports from early February of this

18  year, relating to an offer that Ford was making.  I don't

19  know that that offer was specifically -- I don't recall that

20  it was specifically in the context of Visteon.  I remember it

21  was certainly a Ford offer.

22  Q   Do you want to take a look at your -- any of your report

23  and see if you can refresh your recollection on that?  I

24  think it's in the page thirties.

25  A   Actually, I think it's in the pages behind here.

Greene - Cross/Springer                           132

1   Q    Okay.

2   A    It would be on Page --

3   Q    Forty-two.

4   A    Forty-two actually, yes.  And I think what it says is, in

5   conjunction with its plan to close fourteen plants by 2012,

6   Ford, on February 7th, 2006, offered five options to affected

7   employees, including a one-hundred-thousand-dollar buy-out to

8   all employees who agree to give up all benefits except their

9   pensions.

10  Q    Now, you don't -- your report does not include any

11  information on how many, if any, Ford employees have agreed

12  to that proposal, does it?

13  A    That's true.

14  Q    And for purposes of your work, yours and Mr. Hyman's, you

15  haven't given consideration at all what effect a strike might

16  have on the value of the debtors' businesses, have you?

17  A    I haven't given it consideration at all.  I can't say the

18  thought hasn't crossed our mind, but if you're asking the

19  question, have we quantified it in some explicit way, the

20  answer is no.

21          MR. SPRINGER:  I have nothing further, Your Honor.

22          THE COURT:  Okay.  Redirect?

23          MR. KURTZ:  Yes, Your Honor.

24                    **REDIRECT EXAMINATION**

25  **BY MR. KURTZ:**

Greene - Redirect/Kurtz                                    133

1   Q   Mr. Greene, you were asked some questions about your

2   relationship with Appaloosa.  Some prospect of being retained

3   by an equity committee, if one is formed.  Does any of that

4   have anything to do with either your analysis or the

5   conclusions that you reached in your reports and in your

6   declarations?

7   A   No.  Excuse me.  No.

8   Q   You were asked some questions about why, in the first

9   instance, you did not analyze either the balance sheet or

10  post-filing trading in your expert report.  Can you explain

11  why it is you didn't conduct that kind of analysis in trying

12  to determine the total enterprise value and the equity value

13  of Delphi?

14  A   Well, I think there were two primary reasons.  Probably

15  the first reason is we weren't asked to, but I think the

16  second, you know, and probably equally compelling reason was

17  we didn't think it was particularly -- it particularly led to

18  any sort of conclusive determination, according to any

19  valuation methodology that we would recognize as being

20  appropriate for determining, you know, enterprise value for

21  the restructured company, you know, and ultimately equity

22  value.

23  Q   In your opinion, is a balance sheet review of -- strike

24  that.  In your opinion, would an unrestructured balance sheet

25  be an accepted methodology for valuing a going concern?

Greene - Redirect/Kurtz                                    134

1   A    No, it wouldn't be an accepted methodology for evaluating

2   a going concern.

3   Q    Can you explain why it is that such an analysis is not

4   reliable?

5   A    Well, you're valuing a going concern, you know, the

6   premise is that a going concern has income-generating

7   capability and any entity that has income generating

8   capability should be valued according to, certainly virtually

9   all valuation experts that I've ever been aware of, should be

10  valued primarily on the basis of methodologies that measure

11  income and put either multiples or, as we talked about with

12  the discounted cash flow, you know, discount cash flows at

13  discount rates, but in any case, you're talking about incomes

14  and cash flows as the basis for determining value, as opposed

15  to a balance sheet, which is, you know, if it's relevant at

16  all, is relevant only in the context of liquidation and even

17  then, there are some significant adjustments which need to be

18  made to the balance sheet if you're doing a so-called

19  adjusted balance sheet approach, in order to be able to make

20  that a valuation methodology that's worth considering.

21  Q    In your supplemental declaration, did you quote from the

22  leading treatise of Pratt, the reasons that a balance sheet

23  test is not a valuation technique and cannot result in a

24  total enterprise value?

25  A    Yeah.  It's something -- I think I quoted the particular

Greene - Redirect/Kurtz                                        135

1   sections from Shannon's Book, which talk about the fact that

2   insofar as you're talking about some sort of a balance sheet

3   test, it's really only appropriate in liquidation and I think

4   he also, and maybe in one of the footnotes, also cited -- we

5   also cite an area -- I also cite an area of his treatise

6   where, you know, he talks about the fact that, you know, even

7   when you're looking at the balance sheet, you have to take

8   into consideration, you know, intangible assets and the like

9   that may not be, you know, fully comprehended on the balance

10  sheet, which is another way of kind of articulating the same

11  thing I'm trying to talk about with respect to this adjusted

12  balance sheet approach.

13  Q   Mr. Springer also asked you whether you had conducted

14  evaluation based on the Delphi bond post-filing trading.   In

15  your experience and expertise, is that an accepted

16  methodology for valuing the company?

17          MR. SPRINGER:  I object to the form of the question,

18  Your Honor.   That wasn't a question I asked him.

19          THE COURT:  Well, ignore the first clause of the

20  question.  Is an accepted method of valuing a company to look

21  at its trading prices?

22          THE WITNESS:  In my experience, Your Honor, the

23  answer is no.

24  BY MR. KURTZ:

25  Q   Can you explain your experience in that respect?

Greene - Redirect/Kurtz                                    136

1   A   Well, I think one of the issues about looking at post-

2   filing, you know, distress, quote/unquote "debt prices" is

3   that they're very subject to fluctuation, depending upon the

4   level and quality of information that's out there.  I think

5   particularly in a situation like this, where there isn't

6   really a lot of information as to the exact nature and, you

7   know, and quantified amount of what ultimate savings will be

8   achieved through a restructuring in the U.S., maybe not even

9   a hundred percent clarity about what the direction of that

10  restructuring will be, you know, the assumptions that get

11  made, you know, may or may not be by investors who are buying

12  and selling, you know, fixed-income claims, you know, may or

13  may not be reflective of anything that, you know, that deals

14  -- that's reflective of ultimate recovery.

15       And so, because the information is not necessarily of

16  particularly high quality, you know, it's not particularly

17  indicative of what ultimate recovery, you know, might look

18  like.  So it's not a particularly good approach, you know,

19  unless it's the only thing you have, you know, to even get a

20  starting point on value.

21  Q   You have been able to identify cases in which equity, in

22  fact, received a recovery in bankruptcy?

23  A   In cases in which equity has received a recovery in

24  bankruptcy?  Yes.

25  Q   About how many?

Greene - Redirect/Kurtz                                        137

1    A    Well, I think in my supplemental declaration, you know, I

2    reference, I think, something on the order or magnitude of

3    twenty companies that I was aware of where equity had

4    received, you know, a recovery, you know, despite the fact

5    that it was -- that equity was trading in a range that we

6    would sort of call a bankruptcy trading range for equity of a

7    dollar or so or less.  If that's what you're referring to, I

8    think that was my conclusion.

9    Q    Last question.  You were directed to, I think, what's

10   been marked as Plaintiff's Exhibit 201 and I'd like to see if

11   you can pull a copy and confirm that's in fact, there's a

12   second page to the exhibit.  One just simply hasn't been

13   blown up.

14   A    I'm sorry.  What are you talking about?

15   Q    I will hand you my copy for now.  Can you confirm that

16   you've seen, that Plaintiff's Exhibit 201, in fact, has a

17   Page 2?

18   A    I'm looking at this.  I presume that what's up there,

19   I've got the same problem Mr. Hyman does.  I can't

20   necessarily read it from that length.  I presume that is

21   dealing with 2006 and this is dealing with 2007.  Is that the

22   distinction?

23   Q    Correct.

24   A    Okay.

25   Q    If you look at 2007 and you look under the line March

Greene - Redirect/Kurtz                                    138

1  10th report, corrected for D&A error, only.  Can you confirm

2  whether Delphi is showing equity value for the shareholders?

3  A   I'm sorry.  I'm not sure exactly where you want me to

4  look.

5  Q   I want you to look at the value-to-equity holders, using

6  Eureka's methodology one, but under the heading March 10th

7  report correct for D&A error only, which is Delphi's

8  calculations, not Eureka's calculations, but can you just

9  confirm whether or not, under those circumstances, that

10 Delphi shows a recovery equity hold?

11 A   You're asking me to look at the line items that say --

12 I'm still not sure I'm following you.

13 Q   The bottom line, value to equity holders?

14 A   Value to equity holders.

15 Q   Corresponding right here.  Corresponding to the very

16 bottom of the exhibit.

17 A   Right.  Oh, you're talking about at 5.2 multiple and at

18 5.9 multiple?

19 Q   Correct.

20 A   Okay.

21 Q   Are there scenarios there where Delphi shows that, in

22 fact, equity is in the money and will receive a recovery,

23 even utilizing their effort to change your report?

24 A   Well, at the 5.9 multiple, it is a positive number.

25        MR. KURTZ:  No further questions.

1        THE COURT:  Okay.  Any further cross?

2        MR. SPRINGER:  Just very briefly, Your Honor.

3                    **RECROSS-EXAMINATION**

4    **BY MR. SPRINGER:**

5    Q    You were asked some questions about whether balance

6    sheet -- taking a look at the balance sheet was useful for

7    doing a valuation or looking at market evidence was useful

8    for doing a valuation.  Do you remember those questions?

9    A    I'm sorry.  The questions that were just --

10   Q    Yes.

11   A    -- you know, asked of me?  Yes, I remember those

12   questions.

13   Q    Now you know, as a matter of fact, though, because you

14   read that looking at the balance sheet is relevant for

15   purposes of considering a motion to appoint and equity

16   committee.  You know that, right?

17   A    To tell you the truth, Mr. Springer, I'm not sure I'm in

18   a -- I'm not a lawyer.  I'm not in a position to make a

19   conclusion about what's relevant for legal purposes.

20   Q    Well, you read the motion and the objection and you could

21   see right there that there were quotations made of the

22   Court's rulings relating to the use of balance sheet and

23   market evidence, right?

24        MR. KURTZ:  Your Honor, the witness is proffered as

25   an investment banker, a financial expert who can tell you

Greene - Recross/Springer                    140

1   whether a balance sheet is relative to enterprise value, but

2   not as to the legal standards that may or may not govern the

3   equity committee motion.

4          THE COURT:  Sustained.

5   BY MR. SPRINGER:

6   Q   Now, with respect to efficient markets, one of the things

7   that's looked at is whether there is active trading in the

8   security in question, right?

9   A   Well, I think it's one of the elements that would, you

10  know, let you believe one way or another.  I suppose it's

11  helpful in coming to a conclusion one way or another about

12  whether it might be an efficient market or not, yes.

13  Q   And you know, as a matter of fact, that there is active

14  trading in Delphi debt securities.  You know that?

15  A   Well, I largely know it from what Mr. Resnick has said in

16  his report.

17  Q   But do you dispute that?

18  A   No, I don't dispute it.  I'm just trying to say that, you

19  know, I haven't gone out there independently and tried to

20  look at the trading volume.  I'm not questioning what Mr.

21  Resnick says.  I'm just saying, I want to be clear what I

22  have done and what I haven't done personally.

23  Q   Let me put the question to you directly, then, sir.  Do

24  you quarrel with Mr. Resnick at all that the debt securities

25  of Delphi Corporation are in an efficient market?  Do you

Greene - Recross/Springer                    141

1   quarrel with that at all?

2   A   I -- again, I think in your quotation from Brealey and

3   Myers, you differentiated among several forms.  They

4   differentiate among several forms of efficiency.  If the

5   question is, is it strong form efficiency, that they're

6   trading with all available information that is available,

7   perhaps only to the debtor, but not available to others, no,

8   I don't believe the market is efficient, if that's your

9   question.

10  Q   Well, let's -- you know what the semi-strong version of

11  market efficiency is?

12  A   Right.  That it's all publicly available information.

13  Q   Right.  Now, do you quarrel with Mr. Resnick that

14  Delphi's debt securities trade within an efficient market

15  within the meaning of the semi-strong market?

16  A   I don't.  I mean, my only hesitation about this one is,

17  you know, that my understanding of Brealey and Myers, which

18  goes back a ways now because it's been a while since I've

19  been in business school, but I learned all the same things

20  that everybody else learns about financial theory.

21      Most of what Brealey and Myers are focusing on are, you

22  know, publicly traded equity markets and they do make certain

23  assumptions about, you know, whether the information out

24  there is really broadly known, whether it's questioned.

25  There are presumptions there about the quality of the

Greene - Recross/Springer                                      142

1   information, not just the quantity of it.

2   Q   All right.  I've got -- Your Honor, I have a very

3   specific question, okay.

4   A   I'm not trying to be evasive.  I'm just trying to say I

5   think it's not as simple as putting it in a little box.

6   Q   No, I'm not asking you for your interpretation of Brealey

7   and Myers.  I'm asking about --

8   A   Oh, so you're not?  Okay.

9   Q   -- your testimony today.  Do you quarrel at all, yes or

10  no, with Mr. Resnick's view that Delphi's debt trades in an

11  efficient market within the meaning of the semi-strong form

12  of efficient market?  Do you quarrel with that at all?  Yes

13  or no?

14  A   I do have a fundamental problem with the notion, I must

15  admit.  I'm not sure I agree with it.  We could have a long

16  discussion about the nuances of efficient markets theory, but

17  I think, again, efficient market theory, to my best

18  understanding, was not constructed to focus particularly on

19  the debt markets for, you know, for distressed securities

20  and, you know, I'm not sure that we're not talking a little

21  bit about apples and oranges.  I'm not sure whether my

22  opinion on this really matters, but if it does matter, I

23  suppose that's my opinion.

24  Q   Well, do you recognize that one indication of whether a

25  market is efficient is whether or not there are analysts who

Greene - Recross/Springer                                    143

1  are following the securities?

2  A   Yes, but --

3  Q   And do you recognize that there are, in fact, analysts

4  today following Delphi's debt securities?

5  A   I --

6  Q   Yes or no, sir?

7  A   Yes, but I'd like --

8          MR. KURTZ:  Your Honor, not all of these are yes or

9  no questions.  The witness can't be controlled like this or

10  shut down.

11          THE COURT:  Well, I'll overrule this objection.

12  He's being somewhat evasive, so I thin it's helpful to focus

13  the question a little better.

14  BY MR. SPRINGER:

15  Q   So just to sum up, you would agree with me that Delphi's

16  debt is actively traded, right?

17  A   I definitely agree with that.  That's not in question.

18  Q   You would agree with me that there are analysts following

19  Delphi's debt securities, right?

20  A   I agree there are analysts following it.  I'm not

21  agreeing that the information they're putting out is very

22  accurate.

23  Q   Well, you recognize, for example, Lehman Brothers has one

24  of the leading distress desks on Wall Street.  You know that,

25  don't you?

Greene - Recross/Springer                              144

1    A    I do, but I also recognize that most of the people who

2    have put out reports on Delphi have also misinterpreted

3    dramatically how to take into consideration the right side of

4    the balance sheet and that's, to tell you the truth, Your

5    Honor, why I'm hedging on this, because, you know, efficient

6    markets theory implies that somehow or another, the

7    information that's out there is reasonably accurate and the

8    fact of the matter is, if there's a lot of coverage, chances

9    are that misinformation gets filtered to the side and people

10   have a view of the world which is reasonably close to

11   reality.

12       But what I will tell you, just from a very informal look

13   at some of the things that are out there looking at Delphi,

14   most of the people who have looked at Delphi have totally

15   missed the boat with respect to how you look at the treatment

16   of the claims in bankruptcy and in particular, how you treat

17   the OPEB liability and how you treat the pension liability

18   from an enterprise value point of view.  And so, from that

19   point of view, it's hard for me to sort of say that the

20   market is efficient.  So if you want the answer, that's my

21   answer.

22   Q    Okay.  So the folks that -- the analyst report that

23   you've looked at when treating the question of claim, they

24   disagree with you, that there wouldn't be any claims to be

25   recognized, arising out of transformation of the labor

Greene - Recross/Springer                                    145

1  program?

2  A    No.   That's not what I'm saying.   What I'm saying is that

3  when most of these people do -- and I can't quote the Lehman

4  one specifically because it's been a while since I looked at

5  it and I think I only looked at it quickly, if I looked at

6  it, I'm pretty sure I looked at it.

7      When you look at what most of these people have done,

8  what they have done is they have said, here is enterprise

9  value.   Enterprise value is calculated after taking into

10  consideration pension expense and OPEB expense, so pension

11  expense and OPEB expense are already taken into consideration

12  in EBITDA.   They're already factored in as deductions by the

13  time you get to enterprise value.

14     What most of them have then turned around and done is

15  said, okay, now we have enterprise value.   Let's subtract out

16  the OPEB at face value and let's subtract out the pension at

17  face value and a lot of the reasons they're coming up with

18  the answers they're coming up with is simply because they're

19  double counting those liabilities.   That's what I'm trying to

20  tell you.

21     And from that point of view, since that bears no

22  relationship, at least to my understanding, of the way in

23  which the realities of the situation are, it's hard for me to

24  say the market is, quote/unquote, "efficient," if that's the

25  information they're getting.   That's what I'm telling you.

Greene - Redirect/Kurtz                          146

1  Q   Okay.  The last point is, you would agree with me, sir,

2  that there are -- there have been, since Delphi filed for

3  bankruptcy, acquisitions of debt securities by large and

4  sophisticated investors.  You would agree with that?

5  A   Yeah.  I'm sure that's true.

6  Q   And that's another indication of market efficiency, isn't

7  it?

8  A   I mean, it's another indication of active trading and

9  that there are people that are out there.  I don't know that

10  it goes to the question I just stated.

11          MR. SPRINGER:  Okay.  I have nothing further, Your

12  Honor.  Thank you.

13                **FURTHER REDIRECT EXAMINATION**

14  **BY MR. KURTZ:**

15  Q   Mr. Greene, what was the stock of Delphi trading at

16  eleven days before the filing of bankruptcy?

17          MR. SPRINGER:  This is beyond the scope of the

18  recross, Your Honor.

19          MR. KURTZ:  Your Honor, their recross went to the

20  marketplace and the way the marketplace values the security.

21  Which is the efficient marketplace?  What's the impact?  And

22  --

23          THE COURT:  Are you sure you really want to get into

24  this, given his prior answers?

25          MR. KURTZ:  All I'm asking for -- one of my

Greene - Redirect/Kurtz                                        147

1   questions will be --

2       (Laughter.)

3           MR. KURTZ:  -- will be pretty clear.

4           THE COURT:  Okay.  Go ahead.

5   BY MR. KURTZ:

6   Q   What was the Delphi stock trading at a mere eleven days

7   before the filing of this bankruptcy case?

8   A   Somebody want to point me to a page where I can see this?

9   Q   Do you have a recollection generally of what the stock

10  was trading at?

11  A   What I do recollect, because it's in my declaration, is

12  that approximately eighteen trading days before the filing,

13  it was still trading at somewhere above four dollars,

14  somewhere between four and five dollars.  Exactly what

15  happened over the next seven days, you know, I couldn't

16  exactly tell you.

17  Q   And has there been any material change in the company's

18  business or its assets since just prior to filing and now?

19          MR. SPRINGER:  Objection, Your Honor.  This is well

20  beyond the scope.

21          THE WITNESS:  Could you ask that question again?

22  I'm sorry.

23          THE COURT:  Well, why don't you ask it in terms of

24  information instead of change?

25          MR. KURTZ:  Okay.

Greene - Redirect/Kurtz                                    148

1  BY MR. KURTZ:

2  Q    Has there been any information that would suggest that

3  Delphi's core assets or its business or its operations, other

4  than this bankruptcy, have changed in any material fashion

5  since the time that the marketplace was trading the

6  securities in the neighborhood of four or five dollars?

7  A    I think the fundamental change -- I hope I'm being

8  responsive to your question.  I think the fundamental change

9  was the decision to file for Chapter 11, which was

10 continually probably more and more impounded in the price of

11 the stock, you know, from sometime, you know, in say, the

12 middle of September through the date of the -- through the

13 date of the filing.  You can see this just simply by reading

14 analyst reports that came out, you know, near and around the

15 end of September, where people were speculating about the

16 question as to whether Delphi would file or Delphi wouldn't

17 file.

18 Q    In your experience, what impact does a bankruptcy filing

19 have on the way in which a filer's debt securities and equity

20 trades?

21 A    Well, I think the filing of bankruptcy in and of itself

22 creates a higher level of uncertainty as to what happened, so

23 all things being equal, a bankruptcy filing is not

24 necessarily going to be a positive impact, irrespective.

25 Particularly with respect to equity, though, I think it's a

Sheehan - Cross/Aragon                                      149

1   pretty widely-accepted point of view that the common stocks

2   of companies that are in Chapter 11 tend to trade at a dollar

3   a share or less almost irrespective of what the ultimate

4   prospects are for equity, so certainly, from an equity point

5   of view, it's a very bad signal for a filer to give, to say

6   that they're going to be filing Chapter 11.  Effectively,

7   it's a self-fulfilling prophecy that the stock is going to

8   trade sort of in the dollar-a-share-or-less range.

9   Q    And in your experience and expertise and in your opinion,

10  does the filing of a bankruptcy case impact the intrinsic

11  value of the company's assets or operations?

12  A    No, I don't believe it does.

13          MR. KURTZ:  No further questions.

14          THE COURT:  Okay.  You can step down.

15          THE WITNESS:  Okay.

16      (Witness excused.)

17          MR. KURTZ:  Your Honor, Appaloosa rests.

18          THE COURT:  Okay.

19          MR. BUTLER:  Your Honor, we present for cross-

20  examination the chief restructuring officer of the company,

21  Mr. John B. Sheehan.  In connection with his declarations

22  that have been admitted at Docket No. 2630 and Docket -- and

23  Exhibit 11 and Trial Exhibit 15 is his supplemental

24  declaration.

25          THE COURT:  Okay.  Why don't you come up, Mr.

1    Sheehan?

2          **JOHN B. SHEEHAN, WITNESS FOR THE DEBTORS, SWORN.**

3          MR. ARAGON:  May it please the Court, good

4    afternoon, Your Honor.  Rudy Aragon for White and Case,

5    representing Appaloosa.

6                        **CROSS-EXAMINATION**

7    **BY MR. ARAGON:**

8    Q   Good afternoon, Mr. Sheehan.

9    A   Mr. Aragon.

10   Q   Good to see you again.  Now, sir, you joined Delphi in

11   July of 2002 as its chief accounting officer and controller,

12   correct?

13   A   Yes, sir.

14   Q   And on March the 4th, 2005, you assumed the position of

15   chief financial officer of the company, right?

16   A   Yes, sir.

17   Q   And you held that position until October the 8th, 2005,

18   when the company filed for Chapter 11 bankruptcy, right?

19   A   Yes, sir.  I was the acting chief financial officer of

20   the company between March 4th, 2005 and October 8th, 2005.

21   Q   I left out the word acting.  You were acting.  All right,

22   sir.  On October the 8th, 2005, you were appointed as the

23   chief restructuring officer of the debtors, right?

24   A   Yes, sir.

25   Q   And you're familiar with and have been involved with the

Sheehan - Cross/Aragon                                    151

1   events and circumstances which gave rise to the debtors'

2   decision to seek Chapter 11 protection, correct?

3   A    Yes, sir.

4   Q    And since October the 8th, 2005, you've been involved in

5   some level in virtually all of the significant decisions that

6   have been made in connection with this Chapter 11 proceeding.

7   Isn't that right, Mr. Sheehan?

8   A    In varying degrees.

9   Q    I want to take you back to July of 2002, when you joined

10  Delphi as chief accounting officer and controller.  When you

11  joined the company at that time, was it solvent?

12  A    If you would define for me the word solvent.

13  Q    You're a CPA, are you not, sir?

14  A    Yes, sir.

15  Q    You don't understand what the term solvent is?

16  A    I don't believe that solvent is defined in GAAP.

17  Q    Let me ask you this, sir.  When you joined Delphi in July

18  2002, going through the rest of the year, 2002, the company

19  paid dividends to its shareholders, did it not?

20  A    Yes, sir.

21  Q    And in the year 2003, your first full year with the

22  company, the company paid quarterly dividends for that year,

23  correct?

24  A    Yes, sir.

25  Q    And the following year, 2004, the company, as well, paid

1   dividends, did it not?

2   A    Yes, sir.

3   Q    And the company, in the year 2005, for the first quarter,

4   paid a dividend.  Am I correct?

5   A    Yes, sir.

6   Q    Now, the second quarter of 2005, the company paid a

7   dividend then or for that quarter, as well, did it not?

8   A    Yes, sir.

9   Q    And that dividend was voted on by the board of directors

10  at a meeting of the board on June 22nd, 2005, right?

11  A    Yes, sir.

12  Q    You attended that meeting, when the board voted on that

13  dividend.  Correct, sir?

14  A    Yes sir.

15  Q    And Mr. Resnick, who is going to come and testify as an

16  expert and as the investment banker and financial advisor of

17  the company since May the 1st of 2005, he was at that

18  meeting, as well, was he not?

19  A    Yes, sir.

20  Q    And the board voted on that dividend on June the 22nd,

21  2005 and it was actually paid on August the 2nd, 2005, was it

22  not?

23  A    Yes, sir.

24  Q    And that was Delphi's last dividend payment.  Correct,

25  sir?

Sheehan - Cross/Aragon                     153

1   A   Yes, sir.

2   Q   And so, there was a dividend payment made on August the

3   2nd, 2005 to all 561,000 -- 561 million -- strike that.

4   There was a dividend payment made to all of the over 300,000

5   owners of Delphi stock as of August the 2nd, 2005, right?

6   A   A dividend was paid to all of our shareholders, yes.

7   Q   Right.  And it was a dividend of one-and-a-half cents per

8   shareholder -- or per share, right?

9   A   That's what the board agreed on.

10  Q   And at that time, on August the 2nd, 2005, when this

11  dividend was paid, there were over 561 million shares of

12  Delphi common stock issued and outstanding, correct?

13  A   Approximately, yes.

14  Q   Now, Delphi is a Delaware company, is it not, sir?

15  A   Yes, sir.

16  Q   And it's been a Delaware company since you first came on

17  board with the company in July of 2002, right?

18  A   Yes, sir.

19  Q   And the company and the board always attempted to comply

20  with Delaware corporate law, I take it.  Is that correct?

21  A   Yes, sir.

22  Q   Now, under Delaware, you are aware, are you not, Mr.

23  Sheehan, that in order to pay a dividend, a company has to

24  have a surplus or the company has to have profits for the

25  fiscal year in which a dividend was paid or the previous year

Sheehan - Cross/Aragon                                    154

1   to that.  You know that, don't you?

2   A    That is my understanding, yes.

3   Q    Now, Delphi didn't have profits for the fiscal year 2005,

4   did it?

5   A    The year 2005 was in progress at that point in time.

6   Q    There was no profits, though, that year, were there?

7   A    During the period of time up until the board meeting in

8   June of 2005, for that shortened period of a year, interim

9   period, yeah, that's correct.

10  Q    And the company did not have profits for the previous

11  year, 2004, did it?

12  A    No, sir.

13  Q    So to pay a dividend, and therefore, to be in compliance

14  with Delaware law that you understand, the company would have

15  to have had a surplus.  Isn't that true?

16  A    Yes, sir.

17  Q    And you understand, do you not, sir, that to have a

18  surplus, a company has to have an excess of net assets over

19  the capital of the company, right?

20  A    Yes, sir.

21  Q    And net assets are defined as the assets of the company

22  minus the total liabilities, right?

23  A    Yes, sir.

24  Q    And then from that, you deduct the capital, correct, in

25  order to get the surplus?

Sheehan - Cross/Aragon                                        155

1   A   Yes, sir.

2   Q   All right.  In fact, you yourself made that calculation,

3   did you not, prior to that meeting on July or June the 22nd,

4   2005?

5   A   I considered that matter, yes.

6   Q   You made that calculation in your head, didn't you?

7   A   That's what I testified to.  Yes, sir.

8   Q   Right.  And you made that calculation along with a couple

9   of members of the legal staff of Delphi, didn't you?

10  A   The legal staff explained to me the Delaware law with

11  respect to the matter.

12  Q   So the legal staff knew you had to have a surplus and

13  they wanted to make sure that you did that calculation and

14  you did the calculation and bingo, you came up with a

15  positive surplus, correct?

16  A   As it was explained to me that Delaware law considered

17  the definition.

18  Q   Right.  The legal staff and you wanted to make sure you

19  didn't make a dividend payment that was contrary to Delaware

20  law, so that's why they had you do that, right?

21  A   The issue of surplus was considered for a number of

22  reasons and not just the one you're referring to.

23  Q   Now, sir, in order to have a surplus, the company has to

24  have, as we just talked about it, net assets that are over

25  net liability.  Isn't that right?  That would have to be the

Sheehan - Cross/Aragon                                    156

1   case.

2   A    As defined by Delaware law and case law, yes.

3   Q    Right.  And in order to be legal under Delaware law, both

4   when the vote was made on June 22nd of 2005 and when the

5   dividend was paid on August the 2nd, 2005, the company has to

6   have had net assets that were bigger than the net liabilities

7   in order to have a surplus, correct?

8            MR. BUTLER:  Your Honor, that's a legal conclusion,

9   as he testified.  I have no problem with this line of

10  questioning after that point in time, but that's a legal

11  question.

12           THE COURT:  Can you say the question again?

13           MR. ARAGON:  I'm not sure if I could repeat that

14  again.  I was on a roll, sir, so --

15      (Laughter.)

16           MR. ARAGON:  But I'll try it again.

17  BY MR. ARAGON:

18  Q    So when the company voted on the dividend on June 22nd,

19  2005, and when the dividend was actually paid on August the

20  2nd, 2005, the company had to have had a surplus, which means

21  that the company would have had to have net assets that

22  exceeded net liabilities.  Isn't that correct?

23  A    As defined by Delaware law and case law, yes.

24  Q    Okay.  Now, at the time the dividend was paid, August the

25  2nd, 2005, about two months prior to the filing of this

Sheehan - Cross/Aragon                      157

1   bankruptcy, the company had not come to any conclusion about

2   being insolvent, had it?

3   A   No, sir.

4   Q   In fact, you thought you were solvent.  That's why you

5   paid the dividend, right?

6   A   Yes, sir.

7   Q   Okay.  Now, the company, though, on October the 8th,

8   2005, announced to the world that it was insolvent.  Isn't

9   that right?

10  A   No, sir.  We announced that we were filing for a

11  reorganization.

12  Q   There's no question, is there, sir, that by December the

13  7th, 2005, this would be four months after the payment of the

14  dividend on August the 2nd, 2005, the company responded to

15  Appaloosa's motion by stating that it was hopelessly

16  insolvent and it used the words hopelessly insolvent.  Isn't

17  that true?

18  A   In a letter to the U.S. Trustee, in response to her

19  request, we stated those words, yes.

20  Q   And I take it, sir, as the chief restructuring offer of

21  the company, you personally believed that Appaloosa was

22  hopelessly insolvent, even though just four months prior to

23  that --

24          MR. BUTLER:  Delphi.

25          MR. ARAGON:  Delphi.  Excuse me.  We'll start again.

Sheehan - Cross/Aragon                          158

1    BY MR. ARAGON:

2    Q   So I take it that you came to that conclusion about being

3    hopelessly insolvent on December the 7th, 2005, four months

4    after you had come to the conclusion, because you did a

5    calculation in your head, that the company was solvent, I

6    take it that there's some major activities that must have

7    happened during that four-month period of time that took this

8    company from being solvent to hopelessly insolvent.  Were

9    there?

10          MR. BUTLER:  Judge, I'm not sure what the question

11   is there.  There seemed to be like three of them.

12          THE COURT:  Well, why don't you restate it?  Is the

13   question, what, if anything, changed between the dividend and

14   December 7th?

15   BY MR. ARAGON:

16   Q   Yeah.  Sir, exactly.  There was a dividend payment on

17   August the 2nd, 2005.  At the time, you must have concluded

18   the company was solvent, you and your legal staff.  On

19   December the 7th, 2005, you came to the conclusion, along

20   with the company, that the company was hopelessly insolvent.

21   What happened?  Was there some major lawsuit that hit the law

22   firm with a billion-dollar judgment that caused the company

23   to conclude that it was insolvent in that four-month period

24   of time?

25   A   During that period of time, we were unable to find an

Sheehan - Cross/Aragon                                       159

1    agreement with our unions and General Motors with respect to

2    our legacy cost issues that were causing the company to

3    experience significant losses in the United States.

4    Q    So you couldn't find a legacy solution and that's what

5    caused you to come to a conclusion, in that four-month period

6    of time, that you went from being solvent to hopelessly

7    insolvent, sir?  Is that your testimony?

8    A    In the August -- in the early August, the early summer

9    period, there was a significant level of hope, both within

10   the company and in the marketplace with respect to resolving

11   our issues with the unions and General Motors in a consensual

12   fashion.  By late September 2005, it became clear that those

13   issues were not going to be able to be resolved in a

14   consensual manner.

15   Q    It became clear to you that those issues could not be

16   resolved, but as far as the balance sheet of the company, did

17   those issues all of a sudden require that the company

18   disgorge sufficient money from its coffer, such that it would

19   go from being insolvent -- excuse me -- so it would go from

20   being solvent in June of 2005 and then in August of 2005,

21   when a dividend was paid, all the way to being hopelessly

22   insolvent four months later?

23   A    As my understanding of the Delaware law with respect to

24   the question of solvency, it is not measured on a book-value

25   basis.

Sheehan - Cross/Aragon                          160

1   Q    And you believe the company today is hopelessly

2   insolvent.  Do you not, Mr. Sheehan?

3   A    Based upon our steady-state scenarios, I do, sir.

4   Q    We will get to the steady-state scenarios.  Now, you

5   concluded the company is hopelessly insolvent without having

6   conducted any evaluation at all, prepared by anybody, you

7   mean your financial advisor and investment banker, Mr.

8   Resnick, to determine the enterprise value of Delphi.  Isn't

9   that right?

10  A    I testified to you that I had considered external market

11  prices for the company, securities in making my judgment,

12  yes.

13  Q    So you considered external market prices for the

14  securities, but you never did, nor anybody in the company

15  ever did an evaluation of the company on an enterprise-value

16  basis, did you?

17  A    No, sir.

18  Q    And as you sit here today, sir, isn't it true that the

19  company does not have an evaluation of the capital structure

20  of the company when it emerges from bankruptcy, does it?

21  A    No, sir.

22  Q    Now, the company has not given to Appaloosa a definitive

23  business plan, has it?

24  A    The company has provided Appaloosa with the same

25  information that was reviewed with the company's board of

Sheehan - Cross/Aragon                                161

1   directors on December 7th, 2005.

2   Q   I think it's December the 7th, 2005, that's a steady-

3   state scenario, correct?

4   A   Yes, sir.

5   Q   But you heard Mr. Butler when the opening was given today

6   and he said there was no definitive business plan.  You

7   remember that?

8   A   I don't remember those -- that statement exactly.

9   Q   You don't dispute, do you, that there's no definitive

10  business plan for the company?  There's a steady-state

11  scenario that does some projections, but there's no business

12  plan for the company that's a definitive business plan, is

13  there?

14  A   The steady-state scenario does not yield a viable

15  business enterprise.  The company needs to transform itself

16  and to deal with the legacy cost issues that are creating the

17  losses in the United States.  We reviewed with our board of

18  directors on December 7th, 2005 the steady-state scenario and

19  why that wasn't a viable business enterprise and resolved

20  that we needed to reach agreement with our unions and General

21  Motors for the transformation of the company's costs or

22  alternatively, to pursue legal action, to be able to affect

23  such change.

24  Q   I understand that the steady-state scenario shows what

25  the company will do if it keeps on its current path, but

Sheehan - Cross/Aragon                                                 162

1    isn't it true that in trying to restructure and reorganize

2    the company, the company has got to have some plan that it's

3    going to change this steady state in some fashion that will

4    make the company profitable?  Would you agree with me?

5    A    Yes, sir.

6    Q    But you don't have a plan that says that, do you?

7    A    We have a plan that -- to transform the cost -- the labor

8    costs of the company in the United States, to bring them to a

9    competitive level and to return the company's North American

10   operations to profitability and hence, the corporation to

11   profitability.  That plan requires the negotiation and the

12   agreement with our unions and General Motors or

13   alternatively, the pursuit of legal action to be able to

14   impose those changes.

15   Q    So I understand you have a desire to do that.  That's

16   what you have in your mind to do.  But do you have a business

17   plan that has dollars and cents and numbers as to what you

18   project the company is going to be able to do with respect to

19   getting those labor costs and pension plans and contract with

20   general motors in such a condition that the company can be

21   profitable?

22   A    We reviewed with our board of directors the savings that

23   the company would achieve by the implementation of a labor

24   proposed that was presented to our unions on November 15th,

25   2005 and the level of labor savings the company would incur

Sheehan - Cross/Aragon                                    163

1    from those savings and what would be the effective overlaying

2    that on the steady-state scenario.

3    Q   Now, sir, we have not received a copy of that document,

4    have we?

5    A   I'm not sure that's true.

6          MR. ARAGON:  Your Honor, I will just say to the

7    Court that we have not received a copy of that document,

8    which I think underscores one of the problems here, as

9    testified by our experts and as Mr. Lauria pointed out, we

10   don't have those figures.  In fact, we have been thwarted

11   from receiving those figures, for reasons that the debtors

12   can address, but the fact is, it's impossible to look at

13   what's going to happen in the company with numbers that the

14   debtors have without having that information and we do not

15   have it.

16         THE COURT:  But when you saw thwarted, wasn't this

17   the subject of the pre-trial conference that we had, the

18   telephone conference?

19         MR. BUTLER:  Yes, it was, Your Honor, and we

20   produced exactly we agreed to produce in that meet and

21   confer.

22         THE COURT:  Right.  So you're really saying thwarted

23   by me?

24         MR. ARAGON:  It's definitely you, Your Honor.  You

25   have not thwarted us from anything, but we have been thwarted

Sheehan - Cross/Aragon                               164

1   by the debtors from receiving documents.  During the course

2   of discovery, when we've asked questions of witnesses --

3         THE COURT:  I thought what I said is you could run

4   your own scenarios on projections from the labor cost.

5         MR. ARAGON:  We have tried to do that, but they have

6   more current projections.  Obviously, they have --

7         THE COURT:  All right.

8         MR. ARAGON:  -- in November.  But I just point this

9   out, Your Honor.

10        THE COURT:  Okay.

11        MR. ARAGON:  We'll make an argument on that.

12        THE COURT:  Okay.

13        MR. ARAGON:  But I just want to make sure, and I

14   think it's been confirmed, we have not received those

15   projections.

16        THE COURT:  Okay.  As far as I recall, they didn't

17   have an obligation to give them to you, either.

18        MR. BUTLER:  We do not, Your Honor.  We produced the

19   projections that were agreed to at the meet and confer on the

20   bench in the chambers conference, which had to do with what

21   the board saw on December 7th.

22        THE COURT:  I mean, obviously, we didn't have a

23   court reporter for that conference, but that is my memory of

24   it.  Is the debtor trying to use those projections now, in

25   this case?

Sheehan - Cross/Aragon                                    165

1          MR. BUTLER:  We're not using any of the projections,

2   Your Honor, that -- and I'm sure our guy is talking about the

3   connection which is contested here.

4          THE COURT:  Okay.

5   BY MR. ARAGON:

6   Q   Now, sir, you have not done any analysis, have you, what

7   the likely outcomes will be of the claims made in this

8   bankruptcy by the unions, for example, have you, where you've

9   sat down with dollars and cents and said, this is what we

10  think the unions are going do?

11  A   We understand what the value of those legacy liabilities

12  are on an actuarial basis and will be a reasonable starting

13  point for consideration of the claims.

14  Q   Have you come out with some analysis or prediction of the

15  likely outcome of those claims?

16  A   No, sir.

17  Q   And it's true you haven't come out with an analysis for

18  the likely outcome of claims, vis-a-vis General Motors, have

19  you?

20  A   No, sir.

21  Q   And it's true you haven't come up with a likelihood of

22  what the claims will look like at the end of the day with

23  respect to pensions, have you?

24  A   No, sir.

25  Q   And the same question relative to OPEBs.  You have not

Sheehan - Cross/Aragon                                            166

1    come up with predictions as to what the likely outcome will

2    be with respect to OPEBs, have you?

3    A   All of those matters will be dealt with when we have an

4    agreement with our unions and General Motors on how to

5    transform the company.

6    Q   And as all of those matters are resolved and as these

7    things fight their way through the courts, that's going to

8    have an impact at the end of the day of what the company

9    looks like when it's reorganized at some point in time in the

10   future.  Isn't that right?

11   A   That is my understanding.  This is my first time through

12   bankruptcy, and that is my understanding how the process will

13   work.

14   Q   And only when all of that occurs will we know for an

15   absolute certainty whether or not shareholders of this

16   company are going to end up getting a recovery when the

17   company has it's plan confirmed to Chapter 11, right?

18   A   Yes, sir.

19   Q   Now, with respect to the OPEBs, that's a big liability,

20   isn't it?

21   A   Yes, sir.

22   Q   Now those OPEBs are not vested, are they?

23   A   I'd ask for your definition of "vested."

24   Q   Well, sir, I will get it from a document that the company

25   has.  It's Exhibit 52.  It's called, "Employment and Sales

Sheehan - Cross/Aragon                                       167

1   Summary."  And it was from the deposition, Pages 342 -- well,

2   it's Page 342, Lines 5 through 15.

3       "Question:  All right.  If you look at the last page of

4   that document --" this Exhibit 52, "Employment and Sales

5   Summary," Page 3 footnote -- "there is a footnote which is a

6   footnote following items at the top that are entitled,

7   'Vested.'  And that footnote says, and I quote, quote:

8   'Delphi takes the position from a technical legal perspective

9   that retiree healthcare and life insurance benefits do not

10  vest for either hourly or salaried employees.'  Do you agree

11  with that?"

12      And your answer was:

13      "From a technical legal perspective I understand that."

14      Do you recall that answer?

15  A   Yes, I do.

16  Q   Now it's true too, sir, isn't it, that the obligations to

17  pay these OPEBs end on September 15, 2007 when the collective

18  bargaining agreements with Delphi terminate according to

19  their terms?

20          MR. BUTLER:  Objection, Your Honor.  I just want to

21  -- Mr. Aragon chose to read part of the footnote.  I would

22  just like to ask the Court to take judicial notice of the

23  entire footnote on Page 52 -- rather, Exhibit 52, the last

24  paragraph when the Court considers the record because the

25  footnote says other things relating to the issue.

Sheehan - Cross/Aragon                                    168

1          MR. ARAGON:  Well, what the footnote says or not,

2   Judge, he's answered that as far as he thinks or knows,

3   they're not vested.

4          THE COURT:  Well, I'll look at the exhibit

5   separately.  Did you have an objection to the last question?

6          MR. BUTLER:  Just -- I just -- he read a partial

7   footnote and I wanted to make sure the record was clear, Your

8   Honor.  That was it.

9          THE COURT:  So you can go ahead with that question,

10  if you remember it.

11  BY MR. ARAGON:

12  Q   All right, sir.  I'll go on to this other question, or

13  maybe I'll ask it again.

14      Now, sir, the obligations to pay these OPEBs end on

15  September the 15th, 2007 when the collective bargaining

16  agreements terminate according to their own terms, do they

17  not?

18  A   At September 15th, 2007, we will be -- the collective

19  bargaining agreement expires and we will need to renegotiate

20  a new contract with the unions at that time.

21  Q   Okay.  So on September the 15th, 2007, the CBA is going

22  to expire and the OPEB obligations are not going to be owed

23  at that point, correct?

24  A   That's technically true.

25  Q   Okay.  And as we sit here today, those OPEB obligations

Sheehan - Cross/Aragon                                        169

1    are not vested, are they?

2    A    That is technically true.

3    Q    Okay.  Now I'm going to take this chart we've all been

4    really happy with off and I'm going to show you a couple

5    other charts that debtors' counsel used during his opening.

6        The first chart he showed was this one, let's see if I

7    can get the record citation on this one, that is Exhibit 204.

8    And you'll see, sir, this is the consolidated debtors-in-

9    possession balance sheet as of January 31, 2006.  Do you see

10   that?

11   A    Yes, sir.

12   Q    And I think that's from the monthly operating report of

13   the company that was filed with this court, wasn't it?

14   A    I think that's what Mr. Butler represented --

15   Q    Right.  And if you look at this --

16   A    -- to the best of my --

17   Q    -- it has a little over $20 billion of liabilities,

18   right?

19   A    Yes, sir.

20   Q    It's got $13.8 billion of assets.  Do you see that?

21   A    Yes, sir.

22   Q    Another chart Mr. Butler used in his opening was this

23   chart.  This is Exhibit 206.  This chart is called,

24   "Consolidated Debtors-in-Possession Liabilities Subject to

25   Compromise as of January 31, 2006."  Do you recognize that

Sheehan - Cross/Aragon                              170

1   chart?

2   A   Yes, sir.

3   Q   That's also from the monthly operating report filed by

4   the -- with the court, correct?

5   A   Yes, sir.

6   Q   And if you look at this document, you'll see that OPEB

7   payments or obligations are seven billion three hundred and

8   ninety-nine million dollars, correct?

9   A   Yes, sir.

10  Q   Now these are liabilities subject to compromise.  You

11  understand that, right?

12  A   Yes, sir.

13  Q   You understand what that means?

14  A   Yes, sir.

15  Q   Well, we've already just established that these OPEBs are

16  not vested right now and come September the 15th, 2007,

17  they're no longer going to be owed because the collective

18  bargaining agreement is going to expire at that time, right?

19  A   That's a true statement.

20  Q   So if you were to at an appointed time, upon expiration

21  of these OPEB obligations and the fact that they're not

22  vested, if you were to subtract this seven billion three

23  hundred and ninety-nine million dollars, that liability, from

24  the total liabilities of the company, whether or not subject

25  to compromise, do you know what number you'd get, sir?

Sheehan - Cross/Aragon                      171

1   A    I haven't done that math.

2   Q    I did.

3   A    Thank you.

4   Q    I'll tell you what it is.  It's twenty billion one

5   hundred and eighty-four million minus the seven billion three

6   hundred and ninety-nine million, and the total is twelve

7   billion seven hundred and eighty five million dollars of

8   liability.

9        Will you take my word for that?

10  A    Absolutely.

11  Q    That's less than the assets, isn't it?

12  A    On a book value basis, yes.

13  Q    So if you eliminated OPEBs, which are not vested and

14  which expire on September 15, 2007, just simply on a balance

15  sheet test, the liabilities of the company would be less than

16  the assets, wouldn't they?

17  A    Without giving consideration to how the company would run

18  the next day without a workforce, yes.

19  Q    Well, sir, you were talking about balance sheet liability

20  and you were saying to me before this is strictly a number

21  game.  This is numbers, assets, liabilities.  We weren't

22  talking about claims.  We weren't talking about anything

23  before.  And all of a sudden you threw that in.

24       Doesn't that just show that it depends what's going to

25  happen in the future as to what, at the end of the day, this

Sheehan - Cross/Aragon                              172

1  reorganized company is going to look like as far as what it's

2  worth in assets and what liabilities are going to be in the

3  books at that time?

4         MR. BUTLER:  Objection.  Your Honor, Mr. Aragon

5  mischaracterized -- mischaracterizes Mr. Sheehan's testimony.

6  He didn't testify it was a numbers game nor much of the other

7  things that were the predicate of that question.

8         THE COURT:  Well, let me ask it differently.

9         It sounds from your last answer that you ascribe a

10  substantive basis to the OPEB liabilities that go beyond the

11  balance sheet GAAP treatment of them.  I think what counsel

12  is asking you is shouldn't you go beyond -- if you're going

13  to do that, shouldn't you go beyond the GAAP treatment on the

14  other numbers that form the chart there?

15         MR. ARAGON:  Thank you, Your Honor.  That's a better

16  question than I asked.

17         THE COURT:  Ted, do you have a -- I mean, do you

18  have a response to that?

19         THE WITNESS:  As it relates to the --

20         THE COURT:  Well, for example, the assets.

21         THE WITNESS:  The assets.  Certainly, there are

22  assets that the company recognizes have a fair value greater

23  than book value, in particular our non-U.S. operations.

24         THE COURT:  Okay.  I get the sense that you're

25  reasonably comfortable with the OPEB number, not on a GAAP

Sheehan - Cross/Aragon                                    173

1   basis but generally as a liability for reporting purposes,

2   but also for just a working purpose of --

3            THE WITNESS:  Yes, sir.

4            THE COURT:  -- a potential liability.

5            THE WITNESS:  Yes, sir.

6            THE COURT:  Do you have the same comfort with

7   respect to the assets?

8            THE WITNESS:  The assets are valued appropriately

9   under generally accepted accounting principles.

10           THE COURT:  No.  I'm going beyond that and getting a

11  sense as -- in addition to that, do you have the same sort of

12  general confidence in the asset values that you have on the

13  liability side?

14           THE WITNESS:  The values on the balance sheet are

15  not at a lower of cost or market convention under generally

16  accepted accounting principles.  The book value -- the assets

17  are not worth less than thirteen billion eight hundred and

18  thirteen million.  Did that answer your --

19           THE COURT:  Okay.  All right.

20  BY MR. ARAGON:

21  Q   Mr. Sheehan, when was the last shareholders' meeting of

22  Delphi?

23  A   I believe it was in early May 2004.

24  Q   So it's been almost two years since the company has held

25  a shareholders' meeting, right?

Sheehan - Cross/Aragon                           174

1   A    Yes, sir.

2   Q    Isn't it true that the company canceled a shareholders'

3   meeting that was scheduled for October the 12th, 2005 before

4   it announced the filing of its Chapter 11 bankruptcy?

5   A    Yes, sir.

6   Q    And isn't it also the fact that the board has not

7   considered holding a shareholders' meeting to consider the

8   views of equity since the filing of the bankruptcy on October

9   the 8th of last year?

10  A    No, sir.

11  Q    The board has not considered that, correct?

12  A    Your question was has the board considered holding a

13  shareholders' meeting, and my answer was, no, sir, they have

14  not considered holding --

15  Q    It has not.  All right.

16      Now respecting the decision to file for this bankruptcy,

17  it's true, is it not, that one of the factors in the decision

18  to file for Chapter 11 was that the debtors didn't want to be

19  a guinea pig for the changes to the Bankruptcy Code that

20  became effective October the 17th, 2005, just nine days after

21  the actual filing?

22  A    No, sir.

23  Q    That's not one of the factors?

24  A    No, sir.

25  Q    Isn't that one of the factors that Mr. Miller mentioned

Sheehan - Cross/Aragon                          175

1  in September of 2005, that he did not want Delphi to be a

2  guinea pig for the new bankruptcy laws?  Do you recall that

3  quote?

4  A   You read that to me at my deposition.

5  Q   And your answer was you recall that quote.  Isn't that

6  true?

7  A   I said that I generally remembered it, yes.

8  Q   I'm sorry, sir.  I didn't hear you.

9  A   I said I generally remembered it, yes.

10 Q   Now what was it about the changes to the Bankruptcy Code

11 that caused Mr. Miller to be concerned about being the guinea

12 pig under those new laws?

13 A   I don't think in my deposition that I agreed that the

14 changes in the bankruptcy law were a factor that led to

15 Delphi filing for reorganization.  I just agreed that I

16 remembered the quote that you -- or something to that effect

17 that you read

18 Q   Are you aware that one of the changes to the Bankruptcy

19 Code that took effect on October 17th, 2005 limits

20 management's ability to participate in key employee retention

21 and bonus programs?

22 A   I am aware that the law changed with respect to those

23 programs.

24 Q   And you're aware, are you not, sir, that one of the first

25 motions filed by the debtors on the very first day of these

Sheehan - Cross/Aragon                                        176

1   proceedings was to adopt a key employee compensation program,

2   the KECP?

3   A   We had a motion.  We had a motion to adopt such a

4   program, that's true.

5   Q   So I take it that's a "yes" to my question?

6   A   We had a motion, yes.

7   Q   And the proposed KECP that was part of that motion was

8   intended to provide Delphi executives with bonuses every six

9   months based on certain performance standards.  Do you recall

10  that?

11  A   Yes, sir.

12  Q   And the proposed KECP assumed old equity being wiped out

13  and would grant management ten percent of the post-emergence

14  new equity.  Do you recall that also?

15  A   I'm not sure I recall the wiping out part.  I do remember

16  -- I do know that we had -- that we had proposed a ten

17  percent allocation of the new equity for management.

18  Q   So post-emergence from bankruptcy, management would get

19  ten percent.  That was new equity that management would get

20  in those circumstances, correct?

21  A   Yes, sir.

22  Q   And the KECP assumed, did it not, that old equity would

23  not be in the money?

24  A   I'm not familiar with that aspect, sir.

25  Q   But it's true, is it not, that only two months after a

Sheehan - Cross/Aragon                              177

1    dividend was paid, the company's management was already

2    considering giving dividends to management and a ten-percent

3    stake in the company after it emerged from bankruptcy?

4    A    The KECP program that was proposed had a ten-percent

5    allocation of new equity for management.

6    Q    And with that ten-percent allocation in equity for

7    management, you have an incentive, do you not, to get this

8    company restructured?  You personally.

9    A    Yes, I do.

10   Q    And you want to get this company restructured whether or

11   not shareholders receive a penny.  Isn't that true?

12   A    I want to restructure this company for the benefit of all

13   constituencies, including our shareholders.

14   Q    Well, isn't it true it will be much easier to restructure

15   this company and you get your ten-percent equity share if

16   shareholders are completely wiped out?

17   A    I don't think that -- I don't think I can draw that

18   conclusion.

19   Q    Someone else can draw that conclusion, though, can't

20   they?

21   A    I cannot.

22   Q    Now, sir, you contend, I take it, that senior management

23   and the board vigorously represents equity in these

24   proceedings?

25   A    We represent all constituencies in these proceedings.

Sheehan - Cross/Aragon                      178

1    Q    Okay.  Sir, let me ask you this.  When the company was

2    considering filing bankruptcy, it was paying its liabilities

3    as they became due.  Isn't that right?

4    A    Yes, sir.

5    Q    And just eight days prior to bankruptcy, Delphi issued a

6    press release updating its liquidity position, didn't it?

7    A    Yes, sir.

8    Q    And in its press release of September the 30th, 2005,

9    Delphi announced that its anticipated closing third-quarter

10   cash balance was in excess of $1.6 billion, right?

11   A    That's correct.

12   Q    And Delphi also confirmed that it would make its regular

13   monthly payments to suppliers on October the 4th, 2005,

14   didn't it?

15   A    I believe that the press release you're referring to is

16   one where we indicated that we had not repaid -- we had not

17   used our liquidity to repay our bank borrowings and, as a

18   result, we were in default on the terms of our credit

19   agreement.

20   Q    But, basically, Delphi chose not to make payments on

21   those bank obligations, even though it had a cash balance in

22   excess of $1.6 billion which could easily have covered that

23   payment, correct?

24   A    And given all of the circumstances that existed at that

25   time, that was management's decision, yes.

Sheehan - Cross/Aragon                    179

1    Q   And on September the 30th, 2005, Delphi had the ability

2    as well to make a voluntary repayment on a portion of

3    outstanding borrowings it had on its revolving 1.8-billion-

4    dollar credit agreement as well, didn't it?

5    A   It had that choice to do if it so chose.

6    Q   Okay.  So Delphi had no looming liquidity crisis in the

7    days leading up to the bankruptcy filing.  If it had wanted

8    to pay, it could have paid.

9    A   That's not true.

10   Q   Now, sir, Delphi and the unions and General Motors are

11   presently negotiating in a three-way negotiation to modify

12   certain of the debtors' CBAs that would impact labor costs.

13   Isn't that correct?

14   A   Yes, sir.

15   Q   And those negotiations are going on as we speak or in the

16   days surrounding as we speak, are they not?

17   A   In the days surrounding as we speak.

18   Q   And, of course, shareholders are not involved in those

19   negotiations, are they?

20   A   None of our constituencies are involved in those

21   negotiations.

22   Q   And no efforts whatsoever have been made to consult with

23   shareholders about those negotiations.  Isn't that correct?

24   A   We have not reached out to any shareholders, that's

25   correct.

Sheehan - Cross/Aragon                    180

1   Q   And it's true, is it not, sir, that whatever happens in

2   those negotiations is going to have a major impact on

3   shareholders?

4   A   Whatever happens in those negotiations will have a major

5   impact on all of our constituencies, including our

6   shareholders.

7   Q   Now in reaching the conclusion that you did by December

8   the 7th, 2007 that the debtors are hopelessly insolvent, you

9   looked at the company's balance sheet and other financial

10  documents.  Isn't that right?

11  A   Can you just ask your question again please?

12  Q   I said, sir, in reaching the conclusion on December the

13  7th, 2005 that the debtors are hopelessly insolvent, you

14  looked to the company's balance sheet and other financial

15  documents.  Did you not?

16  A   We looked at the company's steady state scenario and

17  other financial information.

18  Q   Okay.  And as an accountant, you'd agree that the balance

19  sheet shows a financial company -- a financial condition of

20  the company based on historical numbers.  They're as of a

21  certain date, correct?

22  A   Yes, sir.

23  Q   And the condition of a company, though, when it merges

24  from reorganization is not shown by the company's balance

25  sheet, is it?

Sheehan - Cross/Aragon                                181

1    A    No, sir.

2    Q    In fact, it's true, is it not, sir, that what a company's

3    balance sheet says today does not relate at all to what the

4    company's financial condition will be a year or eighteen

5    months or two years from now after the company has had an

6    opportunity to try to resolve its labor disputes, to try to

7    negotiate with respect to the OPEBs and the pensions and with

8    GM.  Isn't that correct?

9    A    It does not reflect those matters.

10   Q    Now, sir, in your declaration that you filed in support

11   of the objection here, you gave two reasons for why you

12   thought in your words the company was under -- excuse me, you

13   thought the equity was deep under water.  Do you recall those

14   reasons?

15   A    I believe that I referred to the pension and post-

16   retirement benefit obligations that the company had, as well

17   as the losses it was incurring from the collective bargaining

18   agreements.

19   Q    Well, in your declaration, if you look at the

20   declaration, you cited, and I'll pull it out, I thought two

21   things:  one --

22        THE COURT:  It's Exhibit 11 in the book?

23        MR. ARAGON:  Yeah.  It's Exhibit -- we have 13.  I

24   have 13 on mine.

25        MR. BUTLER:  Exhibit 11.

Sheehan - Cross/Aragon                                          182

1           MR. ARAGON:  Is it 11?  Okay.  Exhibit 11.

2           THE COURT:  And there is a 15 as well.  That's a

3    supplemental?

4           MR. ARAGON:  No wonder I have it.  You're right.

5    I'm sorry, Your Honor.  I have it here somewhere.

6           MR. BUTLER:  It's in the public book, Mr. Sheehan.

7           THE WITNESS:  I beg your pardon?

8           MR. BUTLER:  It's in the public book.

9    BY MR. ARAGON:

10   Q   Okay.  I've got here Trial Exhibit No. 11.  If you look

11   at that, sir --

12   A   Uh-huh.

13   Q   -- you will see that on Paragraph 5 you talk about

14   historical trading prices and then you get to the issue as

15   you go on under Paragraph 6 and 7, you talk about the more

16   recent trading prices of Delphi's public securities, both the

17   debt securities and the equity securities.

18       Do you see that?

19   A   Yes, sir.

20   Q   That was, was it not, the main basis for your filing this

21   declaration in opposition to Appaloosa's motion, that the

22   trading values of Delphi's securities were such that it was

23   inappropriate for Appaloosa to be involved in this matter, or

24   any of the equity to be involved in this matter, because in

25   your view the company was hopelessly insolvent based upon

Sheehan - Cross/Aragon                    183

1   this analysis, correct?

2   A    Yes, sir.

3   Q    Okay.  Can you cite to me a single authority, and you're

4   a CPA, a single authoritative source that states that the

5   company's book value of its assets and liabilities -- well,

6   strike that.

7        Can you cite to me a single authoritative source that

8   trading prices are a measure of what a company's financial

9   situation is going to look like when it emerges from

10  bankruptcy, Mr. Sheehan?

11  A    No, sir.

12  Q    Can you cite to me, sir, a single authority for the

13  proposition that is hinted at in this document that the fact

14  that the company is insolvent on a book basis, that that is a

15  test as to what the financial condition of the company is

16  going to look like when it emerges from reorganization?  A

17  single source?

18  A    No, sir.

19  Q    Now it's true, sir, is it not, that you don't know

20  whether debtors will be hopelessly insolvent when the company

21  emerges from bankruptcy, do you?

22  A    When we look at the legacy liabilities that this company

23  has that need to be dealt with in the course of this

24  reorganization and the claims that will arise therefrom and

25  the extent of transformation required, it's hard to see a

Sheehan - Cross/Aragon                                    184

1   resolution to this matter that would leave the equity holders

2   in a in-the-money situation.

3   Q   Well, let me cite to you, sir, on Pages 70 through 71 of

4   your deposition, and let me pull the deposition transcript

5   out so I can make sure, question on Line 20, Page 70:

6       "So Delphi --"

7   A   Can you just tell me what exhibit we're looking at?

8   Q   This is Exhibit 241 if you want to follow with us.

9   A   What exhibit is it in the book?

10  Q   Well, I can just read this to you and I think my reading

11  will be accurate.  The question I put to you on the day of

12  your deposition, March the 7th, 2006 here in New York on Page

13  70, Line 20 of your transcript was:

14      "Question:  So Delphi has not ruled out the possibility

15  that if you're able to reach agreements with General Motors

16  and the union that at the end of the day shareholders of the

17  company would be in the money, correct?"

18      And then there is:

19      "Mr. Shivakumar:  Would you repeat, Mr. Aragon, please?

20      "Mr. Shivakumar:  Objection to form.

21      "Question:  Continue.  You can answer, sir."

22      And the answer you gave was, and I quote starting on Line

23  7:

24      "The -- Delphi is seeking to maximize the value of the

25  estate for all.  The benefit of all of its constituencies and

Sheehan - Cross/Aragon                                    185

1    seeking to find a resolution to the issues that have caused

2    it to be where it is today where there is any -- where there

3    will be any value for existing shareholders is -- is -- is

4    something that -- that where we sit today, it's not able to

5    be determined."

6        Do you remember that?

7    A    I believe that's a correct statement.

8            MR. BUTLER:  Excuse me, Your Honor.  If he's going

9    to read from the deposition the testimony that Mr. Sheehan

10   gave regarding this question, Mr. Aragon must also fairly

11   read from Pages 132 and 133 of the deposition.

12           THE COURT:  Well, you can ask him about that when

13   you talk to him about redirect.

14           MR. BUTLER:  He's seeking to impeach, Your Honor,

15   with half a loaf.

16           THE COURT:  Well --

17           MR. ARAGON:  Your Honor, this is sixty pages later

18   and I have to go --

19           THE COURT:  Yeah.  It's a lot later, so you can ask

20   him about that at a different time.

21           MR. BUTLER:  All right.  I will, Your Honor.

22   BY MR. ARAGON:

23   Q    Now, sir, I want to turn to --

24           THE COURT:  Before you do that, though, Mr. Sheehan,

25   you said it's hard to see shareholders being in the money

Sheehan - Cross/Aragon                                    186

1    knowing what you know today.  Is that statement based on

2    anything material other than what's set forth in your two

3    declarations?

4              THE WITNESS:  When we look at the level of claim as

5    I understand the bankruptcy process and the level of claims

6    that will arise, because while I don't dispute that the post-

7    retirement benefit obligations that the company has are a

8    contractual obligation that technically expire on September

9    15, 2007, the company needs to have a U.S. workforce that

10   will come to work the next day.  And that workforce needs to

11   find a way to be compensated for the losses that they were --

12   they will incur as a result of moving from the current labor

13   agreement to a competitive labor agreement.

14             That movement will generate claims and it will

15   generate significant claims.  Those claims may be from the

16   union or they may be from General Motors as a result of

17   certain agreements that General Motors has with our unions

18   and agreements that we have with General Motors.

19             And, therefore, while the company may be able to

20   resolve its obligations with respect to OPEB, I think it's

21   reasonable to assume that if there is going to be a workforce

22   at Delphi, that claims will arise thereafter.

23             THE COURT:  Okay.

24   BY MR. ARAGON:

25   Q   Mr. Sheehan, I'd like you to look at Exhibit 46, which is

Sheehan - Cross/Aragon                                              187

1    the 2006 steady state scenario status update that we've been

2    speaking about.

3    A    This is in the confidential one?

4    Q    Yes, sir, it is.

5    A    Okay.

6    Q    Sir, do you recognize this document?

7    A    Yes, I do.

8    Q    What is this?  You've described it a little bit during

9    the course of your testimony, but just to be clear for the

10   record, tell the Court precisely what this is and why it was

11   created.

12   A    This document represents the company's business planning

13   process that it went through during the fourth quarter of

14   2005 and was presented to our board of directors setting

15   forth absent any transformation in our U.S. cost structure

16   what a -- what the results of operations would be during the

17   period 2006 through 2010.

18   Q    So is it fair to say that this is the company's best

19   estimate of where the company is heading over the next few

20   years if it continues to proceed business as usual?  In other

21   words, steady state?

22   A    Yes, sir.

23   Q    And this was presented to the board of directors on

24   December the 7th, 2005.  Am I correct?

25   A    Yes, sir.

Sheehan - Cross/Aragon                        188

1   Q    This steady state scenario assumes no changes in the

2   business, right?

3   A    That's correct, sir.

4   Q    And the assumptions underlying the steady state scenario,

5   such as the assumptions concerning OPEB obligations and

6   pension expenses and all the other assumptions in here were

7   created by the company.  Isn't that correct, sir?

8   A    Yes, sir.

9   Q    And so the basis for all of this is the company's past

10  performance and estimates as well.  Isn't that correct?

11  A    The basis for this information is the company's

12  expectations with respect to its future performance based

13  upon the facts and circumstances as to its business.

14  Q    And this was the expectation of the company as of

15  December the 7th, 2005 when the steady state scenario was

16  presented to the board, right?

17  A    Yes, sir.

18  Q    And this steady state scenario is based on information

19  that dates back as far as August of 2005.  Isn't that

20  correct?

21  A    The company went through a planning process that is a

22  bottoms-up process that starts early in the fourth quarter of

23  2005 and culminated in this presentation to our board of

24  directors on December 7th, 2005.

25  Q    In fact, if you look at the third page of the steady

Sheehan - Cross/Aragon                                         189

1    state scenario where it says, "Income statement," and I'm not

2    going to give any figures lest Mr. Butler get mad at me for

3    revealing anything confidential, if you look at the top of

4    that, the left column, it says what?  Would you read that for

5    the Court, sir?

6    A   It says, "Adjusted eight plus four forecast."

7    Q   Now what does that mean, "Adjusted eight plus four

8    forecast?"

9    A   It represents the eight months of actual plus four months

10   of forecast.

11   Q   And, in fact, that adjusted eight plus four forecast is

12   all over this agreement, is it not?

13   A   Yes, sir.

14   Q   This agreement -- or agreement, this document, this

15   steady state scenario is bottomed on eight months of real

16   performance in 2005 and four months of forecast in 2005,

17   correct?

18   A   That is a correct statement.

19   Q   So the last actual numbers upon which the company bases

20   this steady state scenario would have come from no later than

21   August 31, 2005.  Isn't that correct?

22   A   Because of the fact that we were performing in accordance

23   with the forecast, we didn't see the need to update the

24   numbers.

25   Q   And as we sit here today, Mr. Sheehan, isn't it correct

Sheehan - Cross/Aragon                                    190

1   that the steady state scenario has never been updated?

2   A   The steady state scenario -- this is the steady state

3   scenario that was presented to our board on December 7th,

4   2005.

5   Q   That's not my question, sir.  My question is, since this

6   steady state scenario was presented to the board on December

7   7th, 2005, it has not been updated, has it?

8   A   No, sir.

9   Q   So we and our experts that were trying to deal with this

10  to come up with an analysis of what the company would look

11  like when it emerges from bankruptcy were faced with facts

12  and figures that were no more current than August 31, 2005.

13  Isn't that right?

14  A   No, sir.

15  Q   Didn't you just say that the last date that the facts and

16  figures were derived from was August 31, 2005 at the very

17  latest?

18  A   No, sir.

19  Q   I thought you just said that, sir.

20  A   What I said was that this is eight months of actual, four

21  months of forecast.  We presented this information to our

22  board of directors on December 7th, 2005.  It represents our

23  best estimate as of that point in time as to what our

24  forecasted performance or expected performance in the period

25  2006 through 2010 would be.

Sheehan - Cross/Aragon                                        191

1       We considered up until the moment we presented it to our

2  board of directors if it was reasonable information.  So it

3  doesn't -- the process started in August, but it didn't

4  finish in August.

5  Q    But there are no numbers here that have been updated.

6  When it says, "eight plus four," we're talking about the last

7  known actual performance numbers no later than August 31,

8  2005.  Isn't that right?

9  A    As I said a few moments ago, we considered whether there

10 was any material differences between the eight plus four and

11 our performance up until the board of directors meeting, and

12 didn't see the need to update that information.

13 Q    And you still to this day as we sit here today don't see

14 the need to update the steady state scenario to advise the

15 folks who are concerned about this what the company will look

16 like at some point in the future, more particularly when it

17 emerges from bankruptcy, sir?

18 A    This is the financial best estimate of the steady state

19 scenario at the current time.

20 Q    And that current time is as of December 7 with facts back

21 to August 31 of 2005, right?

22 A    That's your statement.

23 Q    Thank you, sir.

24         THE COURT:  Well, can I follow up on that?  There

25 was testimony earlier by the Appaloosa experts that the

Sheehan - Cross/Aragon                                    192

1  actual EBITDA for the first quarter, although I guess he

2  modified that to say or slightly less than the first quarter,

3  was $59 million positive as compared to a projection for that

4  quarter of a billion five negative.  Well, actually, that

5  would be for the whole year.

6           THE WITNESS:  Yes, sir.

7           THE COURT:  So you take a fourth of that.  Anyway,

8  why wouldn't -- why do you feel that you wouldn't adjust in

9  light of that?

10          THE WITNESS:  There is a couple of factors that need

11 to be considered, Your Honor.  Number one is that the

12 automotive industry is highly seasonal and cyclical.  And, in

13 particular, the third quarter of each year the automotive

14 manufacturers, all the major automotive manufacturers shut

15 down for periods of time to retool.  The company incurs

16 significant losses in those periods of time, so taking just a

17 short period of time that is not representative of what the

18 company's results over an extended period of time would be.

19          Secondly, we have benefitted in recent months from

20 certain of our customers undertaking protection of supply

21 programs to ensure that if there was a labor disruption that

22 they would be in a position to be able to continue to run

23 their businesses.

24          THE COURT:  And those are short term?

25          THE WITNESS:  Yes, sir.  They do have the potential

Sheehan - Redirect/Butler                            193

1    for a whip-saw effect on us in future months when there isn't

2    a labor disruption that -- and those parts aren't -- then

3    they bleed those parts off that our results will suffer as a

4    result.

5           THE COURT:  Am I correct in interpreting what you

6    said as they are modifying this sort of just-in-time approach

7    that is --

8           THE WITNESS:  Yeah.  Without saying it specifically,

9    what I was telling you was that certain of our customers are

10   building banks of inventories to be able to protect against

11   labor disruption at their -- in their factories.

12          THE COURT:  So did you or the financial advisors do

13   testing on the actual results in connection with the board

14   presentation?  Or how did you get comfortable with this, that

15   the forecasts were reasonably accurate?

16          THE WITNESS:  We went through -- the business

17   planning process that we went through, Your Honor, in the

18   fourth quarter of 2005 was exactly the same business planning

19   process that the company has utilized in previous years.

20          We sent out instructions to our operating divisions

21   across the world asking them to prepare forecasts for -- on a

22   bottoms-up basis using the best information available to

23   them.  They submitted that information to us in the early

24   part of the fourth quarter and we then conducted during the

25   late October and November period business reviews with our

1  business units to understand the reasonableness of the

2  information, why the -- why we were seeing the trends we were

3  in our business, why the business was either improving or

4  deteriorating, and we approved those business plans.

5       We then, upon conclusion, prepared the presentation

6  to the board of directors and reviewed it as a senior

7  management team to be comfortable that it was at the date

8  that we presented it to the board our best estimate for the

9  period 2006 through 2010.

10      What Mr. Aragon was pointing out was that the 2005

11 information in the past period represented the eight plus

12 four forecast.  The -- that forecast we also considered the

13 accuracy of it and whether we needed to update that

14 information.

15      Since we were performing largely in the fourth

16 quarter of 2005, we were performing largely in accordance

17 with that forecast, we didn't see the need to change the

18 information when the focus of the discussion was on the

19 forward-looking information, not the backward-looking

20 information.

21      THE COURT:  Okay.  All right.  Thank you.

22                **REDIRECT EXAMINATION**

23 **BY MR. BUTLER:**

24 Q   Mr. Sheehan, for your redirect, let's start with Mr.

25 Aragon's last line of questioning and we'll sort of work

1    through it.

2        If you turn to Page -- to Exhibit 46, which was the

3    document that he examined you on, and I'd like you to make

4    sure that's in front of you, we'll start with -- the document

5    is -- there's only portions of the document here I think.

6    The first document has a page number of -- that I want to

7    refer to as Page No. 12.  Do you see that in the lower right-

8    hand corner?  It's actually I think the second page of the

9    exhibit, but it's Page 12.

10   A    Yes, sir.

11   Q    All right.  In preparing the steady state scenario, the

12   company made certain assumptions about a variety of factors,

13   did it not?

14   A    Yes, sir.

15   Q    Were one of those factors -- assumptions about GM North

16   America volume?

17   A    Yes, sir.

18   Q    Is there any outside information that you obtain in

19   evaluating General Motors North America volume?

20   A    In putting together our business plan, we use a third-

21   party econometric firm by -- which is generally known in the

22   industry as DRI.  It was recently purchased by a company

23   called Global Insights, but everybody continues to refer to

24   it as DRI.

25   Q    And is DRI volume used generally in the industry or just

Sheehan - Redirect/Butler                          196

1   by Delphi?

2   A   It is my understanding that it is used generally in the

3   industry, in the supplier industry, to estimate automotive

4   manufacturers' future production volumes.

5   Q   And in building your business plans, then, do you look to

6   DRI's estimates in making projections about revenue volume?

7   A   We are a subscriber to DRI and they provide that

8   information to us on a quarterly basis and we use that for

9   purposes of doing our future -- our business planning

10  process.

11  Q   In your prior budgets have you used DRI to set your --

12  help set your budget?

13  A   We have used every year since I've been at the company.

14  Q   And has General Motors production come in at, above or

15  below DRI estimates in recent years?

16  A   In the last three years, DRI has generally overstated

17  what GM's future production volumes will be.  GM's market

18  share has been declining and DRI has generally missed -- has

19  missed the GM production volumes by approximately five

20  percent.

21  Q   So if you just took DRI volumes the way DRI established

22  them and put them in your budget, you would end up having a

23  five percent less actual revenue than projected.  Is that

24  correct?

25  A   That is what's happened in the last several years and

Sheehan - Redirect/Butler                    197

1   resulted in the company continuing to miss its budget.

2   Q    That happened to Delphi in fact, didn't it?

3   A    In each of the last three years.

4   Q    And so when you were putting the steady state assumption

5   -- presumptions together, you decided to discount DRI, didn't

6   you?

7   A    Yes, we did.

8   Q    And that's what that presumption in the first bullet

9   point on Page 12 of Exhibit 46 states.  Is that correct?

10  A    Right.  What this is laying out is the rationale for why

11  we used 4.3 million units as the steady state assumption for

12  production volumes for 2006.  And, as we note, it's two

13  percent below what our -- DRI was noting for -- at that time

14  for General Motors.

15  Q    And that contrasts to actual negative units from DRI over

16  the last three years of five percent negative.  Is that

17  right?

18  A    That's correct, sir.

19  Q    Were you in the courtroom when the Eureka experts

20  testified?

21  A    Yes, I was, sir.

22  Q    And did you hear them testify that one of the things they

23  disputed about your steady state numbers was a difference

24  between the GM volume for 2005 that were in your numbers and

25  the numbers that they were able to find on the GM website?

Sheehan - Redirect/Butler                    198

1    A    Yes, I did, sir.

2    Q    And, in fact, there is a difference, isn't there, Mr.

3    Sheehan?

4    A    Yes, there is.

5    Q    Do you have an explanation for that difference?

6    A    I don't believe that the other individuals that testified

7    were -- are aware of how Delphi is calculating its GM North

8    America production volumes.  We -- the numbers we quote

9    exclude production by General Motors NUMMI CAMMI joint

10   venture, which is a joint venture between General Motors and

11   Toyota.  And that accounts for the difference between what

12   they were talking about, approximately 4.8 million units, and

13   the 4.6 that you see in this presentation.

14   Q    In fact, Mr. Sheehan, if I went to the GM website and got

15   North America volume production schedules, I couldn't tell

16   how much of that had Delphi content in it and how much had

17   NUMMI content in it, correct?

18   A    No, sir.

19   Q    From the GM website.

20   A    I don't believe so, sir.

21   Q    All right.  Adjusting for the NUMMI CAMMI differential,

22   Mr. Sheehan, do you believe there's any material difference

23   between the Eureka numbers and your numbers with respect to

24   volume?

25   A    No, sir.

Sheehan - Redirect/Butler                              199

1   Q    Let's continue on Exhibit 46.  The third bullet point

2   down shows a increase, without going on -- with the number in

3   this record here, shows a increase of almost one percent in

4   net material performance, correct?

5   A    That's correct.

6   Q    So in putting together the steady state for 2006, you

7   believe that you should increase material performance a

8   hundred basis points.  Is that your testimony?

9   A    That's correct.

10  Q    Why, Mr. Sheehan?

11  A    I think it's -- I think to make an explanation here I

12  need to explain that the company has historically achieved

13  much better material performance than what we're anticipating

14  to occur and are seeing occur in 2006.  We've actually had

15  material performance more in the four percent range; however,

16  as a result of two factors we are seeing much reduced

17  performance in 2006.

18     Those two factors are, number one, that commodity cost

19  increases during the course of 2006 that the company was

20  insulated from as a result of having fixed price contracts

21  that it had entered into in the latter part of 2005 were

22  required to be renegotiated.  They were annual contracts that

23  expired at the end of '05.  And, as a result, those commodity

24  cost increases which we were insulated from during the course

25  of 2005 are hitting us in 2006.

Sheehan - Redirect/Butler                                    200

1    So that while I recognize that in some commodities such

2  as steel that prices have declined since their highs during

3  the course of '05, they are still higher than they were at

4  the beginning of '05.  And, as a result, we are seeing those

5  costs come across to us.

6    Secondly, the company isn't nearly in the same leverage

7  position that it was prior to filing for reorganization.

8  And, as a result, in order to ensure a source of supply in

9  this period of time when we're negotiating with our customers

10  and General Motors, and it is absolutely critical to us to

11  not lose any of our customers during this period of time, we

12  have had to agree to lower levels of performance than we've

13  otherwise experienced.

14  Q   Let's turn to Page 14 now of Exhibit 46, the page marked

15  14.  This document, and again without going over the specific

16  numbers, this document, if I understand it, Mr. Sheehan,

17  walks a reader from the 2005 budget performance to the 2006

18  budget performance.  Is that correct?

19  A   Yes, sir.  It walks you from the 2005 actual and forecast

20  to the 2006 budget.

21  Q   And, in fact, the loss is projected to be just about

22  twice as much in 2006.  Is that correct?

23  A   Yes, sir.

24  Q   All right.  Walking through from left to right, can you

25  tell the Court why there's a variance in volume mix and

Sheehan - Redirect/Butler                               201

1   design?

2   A    The variance in volume mix and design represents decline

3   in General Motors production volumes offset by increases in

4   General Motors -- excuse me, non-General Motors business as

5   well as mix represents where there's additional content being

6   delivered to the customer that -- versus a previous version

7   of the product for which is eating into the margin.

8   Q    Why the deterioration in price, Mr. Sheehan?  The next

9   column that's analyzed.

10  A    It's a common phenomenon in the automotive industry that

11  prices with customers decline.  We have contractual price

12  decreases that we've negotiated with our customers and we're

13  obliged to honor.  Generally speaking, we have sought to

14  offset those lower prices through performance both in

15  material and manufacturing.  That isn't necessarily the case

16  -- occurring in 2006 as a result of some of the factors I

17  mentioned a few moments ago.

18  Q    There is also deterioration in economics.  Is that

19  correct, Mr. Sheehan?

20  A    The economics represents higher costs that the company is

21  incurring for its labor.  There are salary increases and cost

22  of living increases that the employees receive, active

23  healthcare increases that take place.  So all of those things

24  leave -- are included within the line called, "Economics."

25  Q    Would you please explain the negative variance for U.S.

Sheehan - Redirect/Butler                           202

1   OPEB pension and other?

2   A   The company prepares actuarial evaluations of its pension

3   and post retirement benefit obligations and is required under

4   GAAP to record expense for those legacy liabilities or

5   benefit obligations.

6       In recent years as a result of healthcare inflation and

7   lower interest rates in particular, the company has been

8   experiencing increased, significantly increased, levels of

9   pension and OPEB expense.

10  Q   Can you explain what, "Job/TLO" are?

11  A   Jobs and TLO represents our -- the cost associated with

12  guaranteed employment for our hourly workers who are not on a

13  productive status.  So an employee who doesn't have a

14  position on the factory floor, rather than being able to lay

15  them off, we're required to continue to pay that worker

16  virtually all of its -- of his or her wages that they incur

17  when they're in a productive status.  We account for those

18  costs separately to separate them from the costs of our

19  productive workers.

20  Q   And, Mr. Sheehan, I fear I'm in the next column, but

21  there's a negative variance labeled, "Professional Expenses."

22  What's that?

23  A   That represents mostly Skadden Arps, but some of our

24  other advisors as well.  I apologize.  I couldn't help

25  myself.

Sheehan - Redirect/Butler                                203

1  Q   And then what's "Other," which also has a negative

2  variance?

3  A   "Other" represents costs associated with such things as

4  warranty, scrap costs, excess and obsolete inventory and

5  other charges that the company might incur.

6  Q   Now you testified a minute ago that material costs

7  actually show -- they're positive here, correct?  It's a walk

8  up?

9  A   It's a walk up.  Yes, that's correct.

10 Q   But you testified earlier that the percentage walk-up is

11 about, if I'm right, about 3,100 basis points below where it

12 ought to be, right?

13 A   That's correct.  We have averaged approximately four

14 percent material performance period-over-period and that has

15 helped to -- that has largely been offsetting the price.  We

16 don't see that occurring this year as a result of the factors

17 I mentioned.

18 Q   And, similarly, you would -- the net manufacturing is a

19 positive walk-up as well, is it not?

20 A   Yes, it is.

21 Q   And that -- but that also is not as much as you'd expect

22 it to be, is that correct, in a normal year?

23 A   It's pretty close.  I mean, we -- we're fairly satisfied

24 with our manufacturing performance.  And it might be a point

25 lower, but not more than that.

Sheehan - Redirect/Butler                         204

1   Q   Now let's go to Page 17 of Exhibit 46, which shows the

2   steady state key financials for the five-year period.  And

3   just to make the point, you began to explain to the Court a

4   minute ago, 2006, '7, '8, '9 and '10, those numbers, were

5   they developed based on just a tops-down corporate financial

6   exercise?  Or were they based on having the company build a

7   business plan from the bottoms up?

8            MR. ARAGON:  Objection, Your Honor.  This goes well

9   beyond the scope of the direct.  If they had wanted to

10  explain the steady state, they could have done it in the

11  declaration.  They didn't do that.  Now they're trying to

12  back-door and get an explanation for the steady state which

13  they didn't do in the first instance.

14           The only reason I asked about this was to point out

15  that the numbers were wrong in this, they were dated, they

16  were stale, to make the argument that our numbers for our

17  experts are more current and, therefore, our expert report is

18  a viable more current report.  So I object.

19           MR. BUTLER:  Your Honor, they opened the door on

20  this exhibit and on what it means.  They were trying to

21  attack the credibility of the numbers.  I think we have the

22  ability to explain --

23           THE COURT:  Well, he's already testified that it's a

24  bottoms-up analysis.  So I think you can move off of that

25  one.

1          MR. BUTLER:  Okay.

2   BY MR. BUTLER:

3   Q    And the last -- my last question for this exhibit, did

4   you describe to the board of directors on December 7th at

5   that meeting through this exhibit what it would take to

6   transform the business from a steady state to something else?

7   A    Yes, we did.

8   Q    If you look at Page 31 of Exhibit 46, does this represent

9   the description of what it would take to transform the

10  company from steady state on the left-hand side to a

11  transformed enterprise on the right-hand side?

12  A    This was the process that we implemented to prepare this

13  presentation for the board, yes.

14  Q    And the transformation model, that -- on the right side,

15  that's still in process by the company.  Is that correct?

16  A    The transformation is, obviously, still in a work-in-

17  progress as we don't have agreement with our unions and

18  General Motors.

19  Q    And as to some of the overlays that would transform the

20  business, in fact, the company has provided through this

21  presentation certain information regarding these overlays to

22  Appaloosa, have they not?

23  A    That's why I was surprised with Mr. Aragon's question to

24  me.

25  Q    The answer to my question is?

Sheehan - Redirect/Butler                          206

1   A    I apologize.  Yes.

2   Q    All right.  Now let's run through a couple of other

3   issues.

4        Mr. Aragon talked about various charts and he did some

5   math for you and basically took $7.3 billion in Exhibit 206,

6   put these together just like this, and he subtracted it from

7   the $20 billion on Exhibit 204.  That got him to a number

8   that was less than the assets.  Do you remember that

9   testimony?

10  A    Yes, I do.

11  Q    You agreed with Mr. Aragon's math?

12  A    I did.

13  Q    Correct.  What's missing -- what's taken out of the

14  capital structure in that calculation, Mr. Sheehan?  What's

15  being subtracted?

16  A    The assets from the liabilities.  And the math subtracted

17  the post-retirement benefit obligation.

18  Q    He basically said the Court should pay no attention to

19  the OPEB.  Is that correct?  And only consider the rest of

20  the liabilities.

21  A    That was the inference.

22  Q    Now, Mr. Sheehan, you're the chief accounting officer of

23  the company.  Is that correct?

24  A    I am.

25  Q    On September 15th, 2007, when the collective bargaining

Sheehan - Redirect/Butler                                    207

1   agreement expires, do you have the ability to change the

2   financial statements of the company on that day and say, oh,

3   poof, like Houdini, this -- the $7 billion is gone?

4   A    The accounting for the company at that point in time will

5   reflect what the new labor agreement with the company is.

6   And, as I was explaining to the judge, the company will need

7   a workforce and, therefore, will have a collective bargaining

8   agreement.

9   Q    But let's get the mechanics for a minute.  The collective

10  bargaining agreement expires.

11  A    Yep.

12  Q    It's not the collective bargaining agreement that causes

13  the liability.  Isn't it the plan, Mr. Sheehan?

14  A    It is the plan.  That's correct.

15  Q    Right.  So if the collective bargaining agreement -- and

16  the collective bargaining agreement has a requirement if you

17  maintain the plan, correct?

18  A    That's correct.

19          MR. ARAGON:  Objection, Your Honor.  This is all

20  leading.  This is --

21          THE COURT:  It works better if you don't lead.

22          THE WITNESS:  Sorry.

23  BY MR. BUTLER:

24  Q    Mr. Sheehan, with respect to the -- let me ask it another

25  way.

Sheehan - Redirect/Butler                    208

1        With respect to the collective bargaining agreement, do

2   you know whether it has a requirement about maintenance of

3   the plan?

4   A    It does have a requirement to maintain the plan, yes.

5   Q    Do you have a separate set of plan documents?

6   A    Yes.

7   Q    If the collective bargaining agreement expires, do you

8   still have the plan documents?

9   A    I believe we do.

10  Q    In order to take off the $7 billion, do you have to

11  affirmatively terminate the plan and the plan documents?

12  A    Yes, sir.

13  Q    To do a -- would that be a voluntary termination of a

14  defined benefit plan?

15       I mixed up pension with OPEB.  Excuse me.  That

16  particular termination, that would be a determination -- that

17  would be a -- would that be a termination, then, of the

18  health benefit plan?

19  A    That is my understanding, yes.

20  Q    Okay.  And you've previously testified what you think

21  would happen to the workforce if you did that?

22  A    Yes, I did.

23  Q    Similarly, with -- moving on to the next line of

24  questioning, then, with respect to that, let's move to

25  Exhibit I believe it's 205.

Sheehan - Redirect/Butler                    209

1       Mr. Aragon asked you a series of questions about what

2    happened in connection with events leading up -- between the

3    time the dividend was declared for the second quarter -- that

4    was on what date, do you recall?  In June of 2005?

5    A    June 22nd, I believe it was, 2005.

6    Q    And it was paid when?  In August?  Is that correct?

7    A    I believe it was August 2nd, 2005.

8    Q    Did the company make any other declaration regarding its

9    dividend program during the third quarter of 2005?

10   A    I think the -- not that I recall.  Not that I recall.

11   Q    Did the company, prior to September 30, 2005, issue a

12   press release about a third-quarter dividend?

13   A    I'm sorry.  The company held a stockholders' meeting on

14   September -- excuse me, a board of directors meeting in the

15   first week of September 2005, and issued a release thereafter

16   indicating that it would not pay a dividend for the third

17   quarter or the fourth quarter for 2005.  Sorry.

18   Q    So in September no more dividends.  Is that correct?

19   A    Yes, sir.  Sorry.

20   Q    Did any -- when did the company first announce -- sorry.

21   Strike that.

22       Did the company make any public filings during the first

23   week of August of 2005?

24   A    Yes, it did.

25   Q    Would you look at -- please at Exhibit 18 and Exhibit --

Sheehan - Redirect/Butler                           210

1   I'll get the dates here.  Okay, I'm sorry.  I guess it's

2   Number 19.  It's the -- would you look at Exhibit No. 19,

3   please?

4   A    19?

5   Q    Yes, Exhibit 19.

6   A    Yes, sir.

7   Q    Is that the 10Q that you filed on or about August 8,

8   2005?

9   A    Yes, it is.

10  Q    In that announcement -- in that 10Q, did you make any

11  announcements about the company's go-forward business plans,

12  about what it was seeking to do with General Motors, UAW, or

13  any other information?

14  A    There was -- I believe that in the management discussion

15  and analysis we discussed at some length the situation with

16  respect to our discussions with our unions and General Motors

17  about transforming our U.S. legacy cost structure and labor

18  agreements.

19  Q    And did you comment on what would happen to the company

20  if the company was unsuccessful in that mission?

21  A    I believe we did.  I believe that we indicated for the

22  first time that should we not be successful, that we would

23  potentially seek a Chapter 11 process.  I think it's

24  described on Page 20 of the 10Q where we indicated that we

25  are engaging our other U.S. unions -- sorry, that's just a --

Sheehan - Redirect/Butler                    211

1   with respect to our operations outside -- I apologize.

2       "If we are not successful, we would consider other

3   strategic alternatives for preserving the value of the

4   company, including a reorganization pursuant to the U.S.

5   Bankruptcy Code."

6   Q   Continue with the next sentence, please.

7   A   Sorry.  "In this regard, a modification of the current

8   U.S. Bankruptcy Code is scheduled to become effective October

9   17, 2005, which modifications generally -- which modification

10  is generally expected to reduce the flexibility of companies

11  filing for reorganization on or after such date."

12  Q   So when you testified with Mr. Aragon a few minutes ago,

13  you said that the October 17th date was not a factor in the

14  filing.  Was that your testimony?

15  A   Yes, sir.

16  Q   Could you then explain and reconcile why this statement

17  is in the 10Q?

18  A   I think that we just wanted our constituencies to be

19  aware of the impending change in the Bankruptcy Code.  It was

20  a significant -- it is a significant change and one that we

21  felt our shareholders should be aware of.

22      We didn't establish that that was the rationale for why

23  we might act.  We just wanted individuals to be aware.

24  Q   What was the rationale for filing Chapter 11, Mr.

25  Sheehan?

Sheehan - Redirect/Butler                        212

1  A    The rationale for filing for Chapter 11 was that the

2  company was suffering from a collective bargaining agreement

3  with its U.S. unions, or collective bargaining agreements

4  with its U.S. unions that weren't -- that didn't allow it to

5  react to the changes that had occurred in the industry.

6  General Motors production volumes had declined significantly

7  and we were not able to take any actions to right-size our

8  workforce.

9      Secondly, we were -- are paying our labor -- U.S. labor

10 hourly employees approximately three times the competitive

11 wages of our peers, that our peers are paying.  And, in

12 addition to that, we don't have the ability to close

13 facilities without the agreement of the unions which has been

14 very difficult, if not impossible, to achieve.

15     Secondly, we were suffering from increased commodity cost

16 increases.  And then, lastly, as I talked about with Mr.

17 Aragon, we were not in compliance with the terms of our debt

18 covenants at September 30th.

19 Q    With respect to the -- this announcement was made on

20 Monday the 8th, correct, of August 8th, just to get the

21 calendar right?

22 A    That I believe is correct.

23 Q    Three days earlier, on August 5th, and it's at Exhibit

24 18, did you make another public announcement affecting the

25 capital structure?

Sheehan - Redirect/Butler                    213

1  A    Yes, we did.

2  Q    What was that announcement?

3  A    On Friday, August 5th, we announced that we had drawn

4  down $1.5 billion under our revolving credit facility that

5  the company had available to it.

6  Q    Was that a fairly regular draw for the company, Mr.

7  Sheehan?

8  A    No.  The company had never drawn upon its revolving

9  credit facility since the time that it had separated from

10 General Motors.

11 Q    So this was the first time in seven years the company had

12 drawn on its revolver.  Is that your testimony?

13 A    Yes, sir, to the best of my knowledge.

14 Q    Why did the company draw a billion five down on that

15 date?

16 A    The company drew down the amount as it recognized that it

17 was entering a very significant period where it would be

18 negotiating and discussing with its unions and General Motors

19 to find a consensual resolution to the issues that were

20 causing the losses in the United States, and that it was

21 absolutely imperative that we had available to us liquidity

22 to be able to continue to operate the business.

23     We have commitments, significant commitments, that we've

24 made to all of our customers, including General Motors, but

25 also our non-GM customers, and therefore, we wanted to make

Sheehan - Redirect/Butler                    214

1   sure that we had the liquidity to run the business.

2   Q    So August 5th the billion and five draw-down, August 8th

3   the first warning about the potential for Chapter 11.

4   Exhibit 21, the next public event in terms of a public

5   filing.  You make an announcement on September -- excuse me.

6   Exhibit 20, rather.  You make an announcement on September

7   8th.  What was that announcement?

8   A    The announcement on September 8th was that the company

9   would no longer be -- that it had eliminated its quarterly

10  dividend for the remainder of 2005.

11  Q    Two weeks later you made another public announcement on

12  September 20th.  That's at Exhibit 21.  What was that

13  announcement, Mr. Sheehan?

14  A    Delphi announced that -- well, this was in response to

15  rumors in the marketplace that were indicating that we had

16  drawn down the other $300 million under the revolving credit

17  facility that we hadn't drawn down in early August.  And so

18  we actually confirmed that we had not drawn down that $300

19  million.

20  Q    Why in the world did you feel compelled to issue a public

21  announcement that you hadn't done something?

22  A    I think we felt it was very important that the market --

23  there were a lot of -- Delphi was significantly in the press

24  at that time, and that we felt it was important that accurate

25  financial -- information about the company be disclosed.

Sheehan - Redirect/Butler                                    215

1       In addition to that, I do believe that one of our

2   investor relations directors did indicate to a third party

3   that we had not drawn down the amount.  And so we believed it

4   was required under Regulation FD that we immediately inform

5   the entire market.

6   Q   A week later you made another public announcement.  This

7   one is at Exhibit 22.  What was the announcement you made on

8   September 30th, Mr. Sheehan?

9   A   On that -- on September 30th, we announced that we had

10  not drawn -- excuse me, that we had not repaid any of the

11  amount that we had drawn down on October 5th -- excuse me, on

12  August 5th, excuse me, and as a result that because we had a

13  covenant testing requirement as of September 30th, that we

14  were not in compliance with the terms of our debt covenant

15  and, therefore, in default on the debt.

16  Q   So as of the end of the third quarter you were in default

17  under your --

18  A   Yes, sir.

19  Q   -- credit line.  Is that correct?

20  A   Yes, sir.

21  Q   During the course of this period of time, were you -- was

22  the company negotiating with General Motors and UAW?

23  A   There was ongoing discussions and negotiations with the

24  unions and General Motors during this period of time, yes.

25  Q   Those discussions failed, didn't they, Mr. Sheehan?

Sheehan - Redirect/Butler                          216

1   A   They did not result in any agreement.  Yes.

2   Q   As the chief restructuring officer of the company, do you

3   have any -- and as the then chief financial officer and chief

4   accounting officer of the company, did you have any

5   understanding as to any of the major factors dealing with

6   that failure?

7         MR. ARAGON:  Objection, Your Honor.  It's the

8   leading questions.  They just keep coming on.  I hate to

9   object.

10        THE COURT:  Actually, the one before that was

11  leading.  This one isn't leading.  But you should watch the

12  leading questions.

13        THE WITNESS:  Can you just ask the question again,

14  Mr. Butler?

15  BY MR. BUTLER:

16  Q   What caused the lack of an agreement pre-bankruptcy

17  between the company, GM and the unions?

18  A   The -- well, there were a number of factors, including

19  the fact that we didn't receive any real offer from the

20  unions or General Motors in response to our offers to them.

21  One of the most significant factors that led to the

22  reorganization filing was a position by General Motors that

23  it was not going to be the sole -- sole holder of the costs

24  associated with Delphi's transformation and it believed that

25  other parties, including the unsecured bondholders, would

Sheehan - Redirect/Butler                    217

1  need to be impaired through the process and that could really

2  only be achieved at that point in time through a bankruptcy

3  filing.

4  Q   Mr. Sheehan, one final question.  If you would turn to

5  your deposition transcript, and I'll just read it to you and

6  ask if you -- this deals in connection with testimony you

7  gave in your deposition regarding -- and this is the other

8  half of the question, Your Honor -- dealing with Mr. Aragon's

9  line of questioning on what your testimony was with respect

10  to equity being out of the money.  I'll read you the

11  questions asked and this was, in fact, your answer.

12      Reading from Page 132 and 133 of your deposition.  Mr.

13  Aragon asked you, quote:

14      "In like vein, is it premature to conclude that equity is

15  out of the money?

16      "Answer:  I think that -- I think that if you look at the

17  magnitude of the claims that are going to arise out of this

18  process it would be fair to conclude that it's highly

19  unlikely, given the magnitude of those claims, that the

20  equity of this company which stands behind labor, including

21  the PBGC, the banks and other creditors, there's a lot of

22  folks standing in line ahead of them."

23      Was that your answer?

24  A   Yes, it was.

25          MR. BUTLER:  No further questions, Your Honor.

1          THE COURT:  Okay.  All right.

2                   **RECROSS-EXAMINATION**

3   **BY MR. ARAGON:**

4   Q   Mr. Sheehan, if you could turn your attention again to

5   the steady state scenario, Exhibit 46, in particular the

6   second page that Mr. Butler addressed at the top --

7   A   Could you just refresh my memory on what exhibit number

8   this is?

9   Q   This is Exhibit 46, sir.

10  A   Sorry.  Sorry.  You said that.  Sorry.

11  Q   It's all right.  Okay?

12          If you look at 46, it says, "General Motors North

13  American Volume."  This is based upon an estimate from DRI,

14  correct?

15  A   The -- it is our estimate that started with the DRI

16  volume, that's correct.

17  Q   Right.  Now isn't it the case, though, that real numbers

18  from General Motors indicating what the real performance was

19  from 2006 would be a more accurate indication of General

20  Motors North American volume for this 2006 steady state

21  scenario assumption?

22  A   I think that would be incorrect and I wouldn't agree with

23  that, no.

24  Q   You wouldn't agree with a GM number that has the amount

25  of volume for North America at 4.85 million units versus 4.3

Sheehan - Recross/Aragon                          219

1    estimate of DRI?

2    A    In -- no, I would not.

3    Q    So if our experts relied upon numbers that they purport

4    to come from General Motors, you take the position that an

5    estimate from DRI is better than real numbers from General

6    Motors?

7    A    In the first quarter of -- during the course of -- for

8    preparation of the 2005 business plan, Delphi -- the 2005

9    business plan, so late '04, the company, haircut similar to

10   what it did for the 2006 business plan, haircut DRI volumes.

11   DRI was at 5.1 million units for 2005.

12       We prepared our business plan at 4.85 million units.  And

13   we thought we were conservative.  And our board was

14   appreciative of that.

15   Q    I don't think you're understanding my questions.  We're

16   not communicating.

17   A    I apologize.

18   Q    Sir, if General Motors North America announces to the

19   world that they have actually had a volume of 4.85 million

20   units, isn't that a more accurate indication of what their

21   production is for 2005 than what DRI says in December of 2005

22   as to what the prediction will be for the year, which is 4.3

23   million units?  That's my question.  Very simple.

24   A    I think you're mixing two concepts up, Mr. Aragon.  I'm

25   sorry.

Sheehan - Recross/Aragon                              220

1   Q   All right.  Now you heard the testimony of our expert who

2   said --

3            THE COURT:  I'm sorry.  Why is that?  Why do you say

4   that?

5            THE WITNESS:  Because I believe the 4.8 million

6   units that he's -- I'm not sure what the 4.8 million he's

7   referring to.  If he's referring to actual 2005 production,

8   that has nothing to do with 2006.

9            And if I can explain, Your Honor --

10           THE COURT:  I'm sorry.  Were you referring to 2005

11  or 2006?

12           MR. ARAGON:  I was talking about 2005 numbers,

13  Judge.  That's exactly what we're dealing with here.

14           THE COURT:  Okay.  I wasn't sure the witness

15  understood because I didn't understand the question so I

16  wanted to make sure --

17           MR. ARAGON:  It was 2005.  I'm dealing with 2005,

18  sir.

19           THE COURT:  Okay.

20  BY MR. ARAGON:

21  Q   If you've got real numbers from General Motors for

22  production of General Motors North America for 2005 and you

23  compare it with a DRI estimate for 2005, wouldn't the General

24  Motors North America numbers that are actual numbers be more

25  valid for purposes of analyzing projections and budgets and

Sheehan - Recross/Aragon                                    221

1   the like than something that's a prediction from a company

2   like DRI?

3   A   I don't believe, Mr. Aragon, that you understood the

4   conversation -- the line of questioning that Mr. Butler had

5   with me.

6   Q   It doesn't matter what the line of questioning I have --

7   A   Okay.  Then I disagree with your --

8   Q   Well, can I --

9   A   To answer your question, no.

10         THE COURT:  Are you asking him should he base his

11   prediction for 2006 on GM's actual numbers for 2005?

12         MR. ARAGON:  Yes, Your Honor.  That's exactly

13   correct.  And that's what I'm trying to get at.

14         THE WITNESS:  No.  That would be a very foolish

15   thing for us to do.

16         THE COURT:  And why is that?

17         THE WITNESS:  Because, Your Honor, General Motors

18   production volumes in the United States have been declining

19   in each of the last three years.  Their market share has been

20   declining significantly.  And, quite honestly, and what I was

21   trying to explain a few moments ago, was in the fourth

22   quarter of 2004, General Motors had public production volume

23   numbers for 2005.

24         In the first quarter of 2005, they reduced those

25   production estimates by ten percent.  So if I was to go and

Sheehan - Recross/Aragon                                  222

1   use the 2005 public numbers that GM has, even the numbers it

2   has for 2006, that is public information that may change.

3          And what we believe is that a more appropriate

4   benchmark to use or measuring stick to use is a third-party

5   independent econometric firm, DRI, who estimates those

6   volumes without any prejudice from either Delphi management

7   or, for that matter, GM management, as to what the future

8   number may be.

9          THE COURT:  Okay.

10  BY MR. ARAGON:

11  Q   I'm completely misunderstanding, then.

12         THE COURT:  Well, can I -- was DRI off with regard

13  to 2005?

14         THE WITNESS:  Yes, sir.

15         THE COURT:  Were they off in terms of

16  underestimating or overestimating?

17         THE WITNESS:  They overestimated by five percent.

18  And they've done so in each of the last -- the average over

19  the last three years was five percent over.

20         Nobody really has been predicting how General Motors

21  market share would decline.  And that has been what's led to

22  the company being in the situation it's in.

23         THE COURT:  Okay.

24  BY MR. ARAGON:

25  Q   Isn't it true, sir, that the debtors' estimate for 05 was

1  4.65 and it came out 4.85 million units?

2  A    No, sir.  What Mr. Butler and I were trying to convey to

3  this Court was that the 4.85-million-unit number for 2005 and

4  the 4.65-million-unit number that you see in this

5  presentation, they do reconcile with each other.

6      The difference between the two is the CAMMI NUMMI joint

7  venture of General Motors.  We have no content on those

8  vehicles.  So we exclude those vehicles when talking about

9  production volumes for General Motors.

10  Q    Now you were here when Mr. Hyman testified about steel

11  prices, correct?

12  A    Yes, I was.

13  Q    And you heard him say steel prices have gone down.  You

14  confirmed that.  Isn't that right?

15  A    I confirmed that they are down from their highs during

16  the course of 2005.

17  Q    I'd like you to look, if you would be so kind, sir, at

18  Page 14 that Mr. Butler so carefully walked you up and down

19  through.  And at the top of that page you'll see it says,

20  "2005 Eight Plus Four Forecast for 2006."

21      This is based on real numbers going back to August 31,

22  2005 and then a forecast from August 31, 2005 through 2006.

23  Isn't that right?

24  A    That's correct.

25  Q    Okay.  And real numbers, obviously, if applied to

1   forecast, assuming that the real numbers are different, are

2   going to give you a more accurate picture of what a budget

3   ought to be for that period.  Isn't that right?

4   A   In isolation, that's true.

5   Q   Now I'd like you to look at Page 32 of the steady state

6   scenario that Mr. Butler asked you about and I didn't.

7       He talked about this transformation issue and

8   transformation plan.  He started on Page 31 and then he went

9   to 32.

10  A   I don't think he asked me --

11  Q   Well, I'll ask about 32 since he did talk about

12  transformation.

13          MR. BUTLER:  That wouldn't be responsive to the

14  cross, would it, Your Honor?

15          MR. ARAGON:  Well, he talked about transformation,

16  Your Honor.

17          THE COURT:  Well, if it's in the box of

18  transformation overlays, then I think it is responsive.

19          MR. BUTLER:  I'd love to ask a -- that's fine.

20  BY MR. ARAGON:

21  Q   Okay, sir, on this Page 32 actually, if you look at it,

22  it says, "Labor proposal assumes market base mid '06."

23      This directly follows the page that says, "What will it

24  take to transform?"

25      And on this page you see that one of the major

Sheehan - Recross/Aragon                                    225

1   modifications listed was OPEB to terminate.  You see that,

2   right?

3   A   Yes, I do.

4   Q   And, of course, if you terminate OPEB, no matter how you

5   look at it, at the end of the day when you do the arithmetic

6   we did on these pie charts, assets are going to be higher

7   than liabilities.  Isn't that right?

8   A   Not in the first instance as the company will have a

9   claim from -- as a result of an indemnification agreement

10  that it has with General Motors that would be a liability

11  subject to compromise, I believe.

12  Q   That claim doesn't show on this Page 32, does it?

13  A   No, sir.

14  Q   And this Page 32 shows base wages, major modification of

15  $12.50, right?

16  A   This is the labor proposal that we made to our unions on

17  November 15th and publicly disclosed.

18  Q   And it says, "Less rich healthcare plan" as well, does it

19  not?

20  A   Yes, it does.

21  Q   And it says, "Eliminate jobs bank and competitive

22  operating agreement," right?

23  A   Yes, sir.

24  Q   And it says, "Eliminate no sale, no close provision under

25  the CBA," right?

Sheehan - Recross/Aragon                               226

1    A    Yes, sir.

2    Q    And it talks about freezing the pension plan with DC plan

3    for new hires.  You see that, right?

4    A    Yes, sir.

5    Q    So these were all within the contemplation of the company

6    when they were thinking about what to do to get themselves in

7    a circumstance after they emerge from bankruptcy in a

8    position to be able to go forward on a going-forward basis

9    successfully, right?

10   A    This was our proposal on November 15th.

11   Q    And if all of these things occurred, if you eliminate

12   OPEB, if you do all these things, there's a high likelihood,

13   a very high likelihood, that equity would be in the money.

14   Isn't that right?

15   A    I think -- I can't conclude that, sir.

16         THE COURT:  Well, does this page indicate any of the

17   costs of achieving these results?

18         THE WITNESS:  No, it does not.

19         THE COURT:  Did the company indicate the costs

20   somewhere of achieving those results?

21         THE WITNESS:  We discussed with our board of

22   directors the claims that would come out of the

23   transformation, including the -- whether that be from the

24   unions directly or from the GM --

25         THE COURT:  Is that somewhere else in this

Sheehan - Recross/Aragon                                    227

1    presentation?

2            MR. ARAGON:  It is, Your Honor.  Page 35.  I was

3    just going to take the witness to Page 35.

4            THE COURT:  Okay.

5    BY MR. ARAGON:

6    Q   Now, Mr. Sheehan, Page 35 with respect to labor

7    transformation shows an income impact for those various

8    years, correct?

9    A   That's correct.

10   Q   And I take it that this page indicates numerically what

11   those changes that you've just talked about, numerically how

12   those changes will affect the bottom line of the company,

13   right?

14   A   That's correct.

15   Q   And so if you have, for example, elimination of OPEB,

16   there are tremendous savings along the way from 2006 to 2010

17   that the Court can see, and I won't give the numbers.

18   A   Yes, sir.

19   Q   All right.  And you have tremendous savings with respect

20   to pension savings.  You do have, according to your numbers,

21   a two-billion-dollar hit at 2006, but then savings from that

22   point on to 2010, right?

23   A   Yes, sir.

24   Q   And you have total labor savings of a tremendous number,

25   almost $2 billion in each of the years 2007 through and

Sheehan - Recross/Aragon                                    228

1  including 2010, don't you?

2  A   Yes, sir.

3  Q   And the cash impact also has -- there is also a

4  tremendous cash impact as well, correct?

5  A   Yes, sir.

6  Q   So all of those things that if done properly would result

7  in the company being in a condition that equity would be in

8  the money.  Isn't that true?

9  A   I don't think I can conclude that from this page, sir.

10 Q   But you can't conclude otherwise from this page, can you?

11 A   This page doesn't address that.

12 Q   Now you testified, sir, about the fact that you were in

13 default on a loan.  You weren't on default of the loan.  You

14 just couldn't draw down on the loan anymore, correct?

15 A   No.  I think that -- while I'd have to go back and read

16 the credit agreement, I believe that we were technically in

17 default as a result of not having met the EBITDA calculation.

18 Q   You didn't get a default notice from the bank, did you?

19 A   No.  But we would -- as of that date, we were not in

20 compliance with the terms of the covenant.

21 Q   You were capable of paying that loan because you had

22 drawn down a tremendous amount of money from your revolver,

23 right?

24 A   We --

25 Q   Yes or no?

Sheehan - Recross/Aragon                                      229

1   A   Yes.

2   Q   Last, but not least, on Page 29, I just want to clear up

3   something.

4           THE COURT:  Is this still Exhibit 46?

5           MR. ARAGON:  Yes, sir.  We're still on Exhibit 46.

6   BY MR. ARAGON:

7   Q   We have also the steady state cash flow negative without

8   financing.  And there is OPEB expenses.  Do you see that?

9   A   Yes, sir.

10  Q   And so, with respect to the cash flow vis-a-vis the OPEB

11  expenses, you made certain assumptions for the healthcare

12  trend rates to derive your OPEB expense, correct?

13  A   Yes, sir.

14  Q   Okay.  And those assumptions represented at the time your

15  best estimates of the healthcare rates as of that time,

16  right?

17  A   Uh-huh.  Yes, sir.

18  Q   And the company, however, recently issued a document,

19  SFAS-106 report, correct?

20  A   Yes, sir.

21  Q   In fact, we just got that a few days ago.  You submitted

22  it to us about four or five days ago, right?

23  A   I think it's a little bit more than that.  But that's

24  fine.

25  Q   And in that report, the more recent report, assumes

1   significantly lower healthcare costs than this particular

2   page.  Isn't that right?

3   The FAS-106 calculation is a calculation on liability as of

4   12/31/05, that's correct.

5   Q   And that would result in significant lower potential OPEB

6   expenses than set forth in this document.  Isn't that true?

7   A   For purposes of this business plan, the company assumed

8   that in each successive year of the business plan that it

9   would have to push out by one year the declination of the

10  OPEB healthcare trend rate.  And that is consistent with our

11  actual experience over the last five years and, therefore, we

12  believed it was an appropriate assumption to continue that

13  experience.

14  Q   It was an assumption at the time, but that assumption, of

15  course, would have to change if you were to update this to

16  correct it to reality, right?

17  A   No, sir.

18  Q   Well, if you're doing a budget and you know exactly what

19  the expenses would be for a particular item for the previous

20  year, and that budget ended up being based on old numbers,

21  wouldn't the more current numbers as applied to that budget

22  be more accurate and give you a more accurate budget, Mr.

23  Sheehan?

24  A   I think that the actuarial evaluation that you're

25  referring to provides information with respect to the

Sheehan - Redirect/Butler                              231

1  actuarial liability at 12/31/05 and the expense for 2006, but

2  -- and while I'm not aware of exactly what the difference is,

3  I don't think there is any material difference between that

4  '06 number and what's in the actuarial valuation.

5  Q   Our actuarial witness will be able to tell us that,

6  wouldn't he?

7  A   I believe so.

8  Q   Thank you, sir.

9          MR. ARAGON:  No further questions, Judge.

10         THE COURT:  Okay.

11         MR. BUTLER:  One set of questions, Your Honor, very

12 quickly.

13               **FURTHER REDIRECT EXAMINATION**

14 **BY MR. BUTLER:**

15 Q   Mr. Sheehan, mindful of Mr. Rosenberg's admonitions at

16 the beginning of this trial, I want to be very careful about

17 the words I ask here.

18     In Exhibit 205 what does the blue shaded part of the pie

19 represent?

20 A   The blue shaded pie -- blue shaded part of the pie

21 represents the liabilities subject to compromise as of

22 January 31, 2006.

23 Q   Now just because a claim is in here doesn't mean that

24 you've agreed to it.  Is that correct?

25 A   That's correct.

Sheehan - Redirect/Butler                          232

1   Q    These aren't allowed claims, are they?

2   A    No, sir.

3   Q    So at some point there will be a claims administration

4   process in this case and we'll sort through all of these?

5   A    That's my understanding.

6   Q    Is OPEB -- the OPEB liability comprehended within this

7   blue chart?

8   A    Yes, sir.

9   Q    If you were to terminate OPEB, would the amount of this

10  blue chart change at all?

11          MR. ARAGON:  Objection, Your Honor.  That's leading.

12  He just keeps leading.

13          THE COURT:  I don't think that's leading.  Would it

14  change if you terminated OPEB?

15          MR. ARAGON:  Any question to me that has a "yes" or

16  "no" answer, suggesting the answer to the witness is leading.

17          THE COURT:  Well, it could be "yes" or "no."

18          MR. ARAGON:  But that one was leading and asked for

19  a "yes" or "no."

20          THE COURT:  I'll overrule the objection.

21          THE WITNESS:  Yes.  The answer is is that as a

22  result of an indemnification agreement that we have between

23  Delphi and General Motors, the liability would transform its

24  nature, but we would still have a liability that would be

25  subject to compromise.

Sheehan - Redirect/Butler                           233

1   BY MR. BUTLER:

2   Q   So your testimony is that if OPEB is terminated, this

3   number -- this color doesn't change at all?

4   A   No, it does not.

5   Q   The amount doesn't change?

6   A   No, sir.

7   Q   If you terminated pensions, same answer?

8   A   The same answer, that's correct.  I will -- just to be

9   totally accurate, there will be -- there are some employees -

10  - hourly employees, a small number of hourly employees, that

11  the benefit guarantee -- sorry, the benefit guarantee

12  agreement and the indemnification agreement don't apply to.

13  So the number would shrink slightly, but not materially.

14  Sorry.

15  Q   And with Mr. Rosenberg's admonition, we're not talking

16  about whether it's an allowed claim for today, but the

17  general principle is what you've testified.  Is that correct,

18  Mr. Sheehan?

19  A   Yes, sir.

20          MR. BUTLER:  No further questions.

21          MR. ARAGON:  No further questions, Your Honor.

22          THE COURT:  You can step down.

23      (Witness excused.)

24          THE COURT:  I'm going to take a five-minute break

25  and then be back.

Colloquy                                                              234

1      (Recess taken at 4:16 p.m.)

2      (Proceedings resume at 4:26 p.m.)

3           THE COURT:  Please be seated.  I think my chambers

4  had informed the parties that I have a scheduling commitment

5  that requires me to leave at five today.  I, however, have

6  the afternoon tomorrow free for you all.

7           I don't know how long people anticipate the next

8  witness going.  I don't particularly want to interrupt his

9  testimony, particularly since the cross will come first and I

10 like the witness to give the answers and not think about them

11 overnight.

12          So how much time do you estimate on cross you'll

13 take?

14          MR. ARAGON:  Thank you, Your Honor.  The next

15 witness is Keith Williams and the cross-examination will take

16 longer than a half hour.  So we certainly won't get to the

17 redirect, so to speak.

18          THE COURT:  All right.  Well, he's the last witness,

19 right?

20          MR. BUTLER:  No, Mr. Resnick, Your Honor.

21          THE COURT:  Oh, of course.  I'm sorry.  How long --

22 I can give you from two until, you know, eight tomorrow which

23 would include a ruling.  So it's really two until --

24          MR. ARAGON:  We appreciate that accommodation and

25 Appaloosa will certainly take it.

Colloquy                                                          235

1          THE COURT:  Okay.  So you think we'll be -- based on

2    your estimates, you think we'll be able to finish tomorrow,

3    then?

4          MR. ARAGON:  Absolutely.  Within that time frame,

5    absolutely.

6          THE COURT:  Okay.  Is that -- do the objectors

7    believe that, too?

8          MR. BUTLER:  Yes, Your Honor.

9          THE COURT:  Okay.  And, Mr. Williams, you can be

10   here tomorrow?

11         MR. WILLIAMS:  Yes.

12         THE COURT:  Okay.  All right.  Then I think it makes

13   sense, then, to break for the day.  I rearranged this class

14   because of the Refco hearing last week and some of the

15   students had to miss it and I don't want them to miss two

16   classes.  So that's why I have to do this.

17         MR. ARAGON:  We understand.

18         THE COURT:  Okay.

19         MR. ARAGON:  Thank you, Your Honor.

20         THE COURT:  Okay.  You can leave your boxes here and

21   we'll just resume at two o'clock tomorrow.

22      (Proceedings concluded at 4:28 p.m.)

23                              *****

24

25

1                          CERTIFICATION

2           We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6
     _____                    March 22, 2006
7    Coleen Rand
     Certified Court Transcriptionist/Agency Director
8    Rand Transcript Service, Inc.

9
     _____                    March 22, 2006
10   Jennifer Linnartz
     Certified Court Transcriptionist
11   For Rand Transcript Service, Inc.

12
     _____                    March 22, 2006
13   Cathryn Lynch
     Certified Court Transcriptionist
14   For Rand Transcript Service, Inc.

15

16

17

18

19

20

21

22

23

24

25