## **EXHIBIT A**

## DEFINITIONS

The terms used herein shall have the meanings ascribed to them in the definitions set forth below:

1. "Aftermarket Agreement" means the document entitled "Aftermarket Agreement" executed on or about January 1, 1999, between General Motors Corporation and Delphi Automotive Systems Corporation.

2. "Bankruptcy Proceeding" means the matter proceeding under the caption In re Delphi Corporation, et al., Chapter 11 Case No. 05-44481 currently pending in the United States Bankruptcy Court for the Southern District of New York.

3. "Benefit Guarantee" means the document entitled "Benefit Guarantee" executed on or about September 30, 1999, between General Motors Corporation and the United Automobile, Aerospace and Agricultural Implement Workers of America, or any other guarantees entered into between General Motors Corporation and any Labor Union associated with Delphi.

4. "CBA" or "Collective Bargaining Agreement" means the Agreement between Delphi and the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communications Workers of America, dated as of November 16, 2003, the Agreement between General Motors Corporation and the United Auto Workers Union, dated as of September 18, 2003, and any other national agreement between Delphi and any Labor Union.

5. "Communication" means the transmittal of information in the form of facts, ideas, inquiries, or otherwise.

6. "Component Supply Agreement" means the "Component Supply Agreement" dated on or about January 1, 1999, between General Motors Corporation and Delphi Automotive Systems Corporation.

7. "Concerning" means relating to, referring to, describing, evidencing or constituting.

8. "Delphi" means Delphi Corporation (and any predecessor thereof), any of its subsidiaries (and any predecessors thereof), directors, officers, employees, affiliates, representatives, advisors, agents, attorneys, associates or any other person acting on its behalf.

9. "Document" means all writings, whether an original, a draft, or a copy, however produced or reproduced, and each and every thing from which information can be processed or transcribed, including but not limited to, electronically stored data and including, without limitation, all things meeting the definition of "documents" set forth in Rule 34(a) of the Federal Rules of Civil Procedure (the "Federal Rules"), as incorporated by Rule 7034(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), or meeting the definition of "writings and recordings" set forth in Rule 1001 of the Federal Rules of Evidence. Any draft and any document with any marks such as initials, comments, or notations of any kind is not deemed to be identical to one without such marks and is a separate document within the meaning of this term.

10. "Employee Matters Agreement" means the U.S. Employee Matters Agreement dated as of December 22, 1998 between General Motors Corporation and Delphi Systems Corporation, Attachments I-VIII thereto and any documents referred to in such Attachments.

11. "FASB" means "Financial Accounting Standards Board" and any financial accounting and reporting standards established by same.

12.     "GM" means General Motors Corporation (and any predecessor thereof), any of its subsidiaries (and any predecessors thereof), directors, officers, employees, affiliates, representatives, advisors, agents, attorneys, associates or any other person acting on its behalf.

13.     "Including" means including but not limited to.

14.     "Indemnity Agreement" means the indemnity agreement made and entered into as of December 22, 1999, between Delphi and GM.

15.     "Initial Public Offering and Distribution Agreement" means the agreement made and entered into as of February 1, 1999, between General Motors Corporation and Delphi Automotive Systems Corporation.

16.     "Labor Union" means any labor organization consisting of workers of the same trade that is formed for the purpose of advancing its members' interests in respect to wages, benefits, and working conditions.

17.     "OPEB" means "retiree benefits" as defined in 11 U.S.C. § 1114.

18.     "Person" means any natural person or any business, legal, or governmental entity or association.

19.     "Price-down" means any contractual or non-contractual request or requirement for Delphi to reduce pricing on its products where such pricing was previously agreed upon between Delphi and the customer to which the price reduction would apply.

20.     "Spin-off" means the transaction contemplated by the Master Separation Agreement dated December 22, 1998, among GM, Delphi Automotive Systems Corporation, Delphi Automotive Systems LLC, Delphi Technologies, Inc., and Delphi Automotive Systems (Holding), Inc.

21.     "UAW" means the Labor Union bearing the name United Automobile, Aerospace and Agricultural Implement Workers of America.

## INSTRUCTIONS

1.      Unless otherwise indicated, these requests cover all documents dated or created on or after January 1, 1997, through and including the date of production.

2.      In accordance with Rule 34(a) of the Federal Rules, and Rule 7034(a) of the Bankruptcy Rules, these requests shall be deemed to include any document now or at any time in GM's possession, custody, or control, including but not limited to, any of its respective employees, agents, attorneys, or other persons acting or purporting to act on its behalf.

3.      In accordance with Rule 26(e) of the Federal Rules, each request for the production of documents shall be deemed to be continuing in nature.  If at any time additional, responsive documents come into GM's possession, custody or control, then the responses to these requests shall be promptly supplemented.

4.      In accordance with Rule 34(b) of the Federal Rules and Rule 7034(b) of the Bankruptcy Rules, documents shall be produced in the manner in which they are maintained in the ordinary course of business or shall be organized and labeled to correspond with the categories in this request.

5.      In accordance with Rule 7034-1(c) of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), any document or portion of any document withheld from production based on a claim of privilege shall be identified by (1) the type of document, (2) the general subject matter of the document, (3) the date of the document, and (4) such other information as is sufficient to identify the document including the author of the document, the addressee of the document, and, where not apparent, the relationship of the author

4

and the addressee to each other. The nature of each claim of privilege shall be set forth. Notwithstanding the assertion of any objection, any requested document that contains non-objectionable information responsive to this request should be produced, but that portion of the document for which the objection is asserted may be redacted, provided that the redacted portion is identified and described consistently according to the requirements listed herein.

6. The fact that another party produces a document does not relieve GM of its obligation to produce its copy of the same document, even if the two documents are identical.

7. In accordance with Rule 34(b) of the Federal Rules, Rule 7034(b) of the Bankruptcy Rules, and Rule 7034-1(c) of the Local Rules, objections to any part of these requests shall be stated in full.

8. The terms "all" and "each" shall be construed as "all and each."

9. The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

10. Whenever necessary to bring within the scope of this request documents that might otherwise be construed to be outside its scope:

(a) the use of a verb in any tense shall be construed as the use of that verb in all other tenses; and

(b) the use of a word in its singular form shall be deemed to include within its use the plural form, and vice versa.

11. Each paragraph, subparagraph, clause and word herein should be construed independently and not by reference to any other paragraph, subparagraph, clause or word herein for purposes of limitation.

REQUESTED DOCUMENTS

1.       All documents provided to or created by the board of directors of GM or any sub-committee thereof including, without limitation, any meeting notices, meeting agendas, meeting minutes, resolutions, analyses, correspondence, reports, or presentations, that relate to any of the following: (a) the Spin-off, including any factors considered by the board or its sub-committees during the decision-making process, and any advantages or disadvantages associated with or resulting from the Spin-off; and (b) capitalization of Delphi in connection with the Spin-off.

2.       All documents provided to or created by the board of directors of GM or any sub-committee thereof including, without limitation, any meeting notices, meeting agendas, meeting minutes, resolutions, analyses, correspondence, reports, or presentations, that relate to any SEC investigation of GM's relationships and transactions with Delphi, including but not limited to, accounting by GM and Delphi for any payment by Delphi to GM in connection with any disputes relating to warranty or OPEB claims and any payment or credit given by GM to Delphi.

3.       All documents concerning identification or selection of Delphi management, officers, directors, or executives, whether (a) in anticipation of the Spin-off, or (b) after the Spin-off.

4.       All documents concerning GM's access to or control over any non-public Delphi information after the Spin-off, including any effort taken by GM after the Spin-off to segregate any non-public Delphi information to which GM may have had access or over which GM may have had control in connection with any service provided by GM to Delphi after the Spin-off.

5.       All documents concerning Delphi's financing and capital requirements post Spin-off, including any requirements for access or lack of access to debt, equity, or any other type of financing.

NY\1121948.4

6. All documents concerning GM's consideration of various capital structures for Delphi post Spin-off and any documents related to same, including any solvency opinion regarding Spin-off, Delphi's initial public offering, or Delphi's ability to continue as a going concern, and any opinion as to what was necessary for Delphi to be considered adequately capitalized.

7. All valuations, reports, analyses, budgets, balance sheets, forecasts, and projections regarding the Spin-off or used in connection with GM's consideration of the Spin-off, including any projections concerning Delphi's pension funding obligations and Delphi's OPEB obligations, both as a cash expense or as a FASB reporting item.

8. All documents concerning Delphi's liquidity post Spin-off, including any contract, agreement or understanding related to any financial support of Delphi by GM post Spin-off.

9. The Indemnity Agreement and all documents referring to actual or potential risks, rewards, benefits, or obligations thereunder, including any consideration received by Delphi for the Indemnity Agreement.

10. Any Benefit Guarantee related to obligations of Delphi and all documents referring to actual or potential risks, rewards, benefits, or obligations thereunder, including any consideration for any Benefit Guarantee received by GM.

11. All documents concerning any agreement made or to be made in 2003 pursuant to which wages or benefits reflected in any of Delphi's CBAs were renegotiated or modified in any manner for a four-year period, through 2007.

12. All documents concerning any agreement by Delphi to link benefits offered to any of Delphi's employees to the benefits offered by GM to any of GM's employees, including all

7

agreements pursuant to which "Delphi assumed the terms of existing GM collective bargaining agreements applicable to Delphi operations and committed to 'mirror,' or duplicate, the 2003 GM-UAW agreement resulting from the next round of industry bargaining by GM, Ford, and Chrysler," as stated in the Motion for Order under 11 U.S.C §§ 105(a) and 363(b) Authorizing Debtors to Pay Certain Financial Advisor Fees and Expenses Incurred by the United Automobile, Aerospace and Agricultural Implement Workers of America and the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communications Workers of America, at ¶ 9 (Docket No. 1930).

13. All documents concerning negotiations in which GM and Delphi are involved relating in whole or in part to any Collective Bargaining Agreement or any local agreement related to any Collective Bargaining Agreement.

14. All documents reflecting any modification to any Collective Bargaining Agreement to the extent such modification was made in connection with, or as the result of, the Spin-off.

15. All documents concerning any warranty reserve established at Delphi in connection with the Spin-off and any warranty claim asserted by GM against Delphi after the Spin-off, including but not limited to (a) the setting and capitalization of the warranty reserve; (b) Delphi's warranty liabilities to GM pre and post Spin-off; (c) warranty claims made by GM within twenty-four months post Spin-off; and (d) any dispute, negotiation, mediation, arbitration, litigation, or settlement relating to any of parts (a) through (c), above, including the process pursuant to which any mediator or arbitrator was selected.

16. All documents concerning any requirement or request and the grounds therefor that Delphi contact, consult, inform, or obtain permission from GM regarding any of Delphi's

8

actual or proposed business decisions or operations, including, but not limited to, the following requests or requirements:

a) "In the event of a proposed plant closure or elimination of a product line, Delphi will agree to keep GM timely appraised of its decision process, review all plans with GM, in good faith reasonably consider GM's input and concerns, and in good faith reasonably consider modifying its plans to accommodate GM's timing requirements to resource the business." Component Supply Agreement, at Sec. 10.1(b);

b) "In the event of a proposed divestiture of a business, Delphi will keep GM timely appraised of its decision process and in good faith reasonably consider GM's input and concerns." Component Supply Agreement, at Sec. 10.2(a);

c) "In the event of an extension of production of an existing product…beyond the term of the original program life, GM shall have the right to require Delphi to continue production and sale of that product for a reasonable extension period, at reasonable commercial terms to be negotiated by the parties." Component Supply Agreement, at Sec. 10.1(a);

d) "Delphi shall not, without consulting with GM at least five days in advance (or if such notice is not reasonably possible, such lesser amount of time as is reasonably possible, but in any event not less than 24 hours), take or permit any of its subsidiaries (or other affiliates controlled by it) to take any of the following actions: 1. Other than for fair value, the sale, transfer or other disposition of assets in any single transaction or series of related transactions, including shares of capital stock of any of its subsidiaries, that in the aggregate constitute more than 60% of the consolidated gross assets of Delphi and its direct and indirect subsidiaries; or 2. The entering into of any single transaction or series of related transactions which, if consummated, would cause Delphi's "Consolidated Leverage Ratio" to exceed 3.25:1.00 (as defined and measured in the Delphi Competitive Advance and Revolving Credit Facility with Chase Manhattan Bank as agent, dated as of January 4, 1999 as in effect on the date hereof)." Indemnity Agreement, at (B);

e) "Delphi shall not, without GM's prior written consent (which shall not be unreasonably delayed or withheld) voluntarily liquidate or dissolve Delphi, Delco Electronics Corporation, Delphi Automotive Systems LLC or Delphi Automotive Systems (Holding), Inc. or any of their "significant subsidiaries" (as defined in Regulation S-X (17 CFR 210) or their respective successor entities or cause or permit any of such entities voluntarily to enter into any proceeding relating to its bankruptcy or insolvency (or similar reorganization under statutes for the protection of creditors), in each case only to the extent permitted by law, and subject to the fiduciary obligations of Delphi's board of directors." Indemnity Agreement, at (C);

f) "Delphi shall not, without GM's prior written consent (which shall not be unreasonably delayed or withheld) merge, consolidate or consummate a similar business combination involving Delphi unless (A) Delphi is the surviving entity and

9

the ultimate controlling parent entity of its affiliated group of companies (a "UCPE") or (B) if as a result of such transaction Delphi is not the surviving entity or Delphi (or its successor) is controlled by another UCPE, then, in either case, under this Section C(2)(B): (i) such UCPE (if any) and the successor entity (if other than Delphi) shall expressly assume Delphi's obligations hereunder by an agreement substantially in the form of Exhibit B hereto or otherwise in form reasonably satisfactory to GM, and (ii) immediately after giving effect to such merger, consolidation or other similar business combination, Delphi or the successor entity (if other than Delphi) and the UCPE (if any) shall not be in violation of its obligations under this Agreement." Indemnity Agreement, at (C);

g) "Delphi shall not, without GM's prior written consent (which shall not be unreasonably delayed or withheld) enter into any single transaction or series of related transactions which, if consummated, would cause Delphi's credit rating to be downgraded below B1 from Moody's or B+ from Standard & Poor's (whether or not such a downgrade might constitute Financial Distress under the Benefit Guarantee)." Indemnity Agreement, at (C);

h) "Delphi shall not, without GM's prior written consent (which shall not be unreasonably delayed or withheld) enter into any single transaction or series of related transactions which, if consummated, would cause the independent auditors of Delphi to qualify their opinion regarding Delphi's financial statements as they relate to Delphi's ability to continue to operate as a going concern." Indemnity Agreement, at (C);

i) "Delphi shall not, without GM's prior written consent (which shall not be unreasonably delayed or withheld), permit any of its subsidiaries (or other affiliates controlled by it) to take any actions which would cause Delphi to violate [subparts (f), (g), and (h) listed above, reproduced from] paragraphs (2), (3) or (4) of…Section C [of the Indemnity Agreement]." Indemnity Agreement, at (C); and

j) "Delphi shall consult with, and cooperate in all respects with, GM in connection with the pricing of the Delphi common stock to be offered in the Initial Public Offering and shall, at GM's discretion, promptly take any and all actions necessary or desirable to consummate the Initial Public Offering as contemplated by the IPO Registration Statement and the Underwriting Agreement." Initial Public Offering and Distribution Agreement, at 2.1.

17. All documents concerning GM's agreement to provide the following services to

Delphi post Spin-off:

a) financial services, including, but not limited to, payroll, disbursement, travel expense accounting, invoicing, accounts receivable, and real estate accounting services, as set forth in the Financial Services Supply Agreement dated December 18, 1998, between GM and Delphi Automotive Systems LLC;

10

NY\1121948.4

b)   audit services, as set forth in the Audit Services Supply Agreement dated December 21, 1998, between GM and Delphi Automotive Systems LLC;

c)   legal services, as set forth in the Legal Services Supply Agreement dated December 16, 1998, between GM and Delphi Automotive Systems LLC;

d)   customs services, as set forth in the Customs Consulting Agreement dated December 16, 1998, between GM and Delphi Automotive Systems Corporation;

e)   tax compliance and reporting services as set forth in the Tax Compliance and Planning Services Agreement dated December 16, 1998, between GM and Delphi Automotive Systems Corporation;

f)   technology services as set forth in the GM Staffs Information Technology Services Agreement dated January 1, 1999, between GM and Delphi Automotive Systems LLC; the Information Systems and Services Agreement dated January 1, 1999, between GM and Delphi Automotive Systems LLC; the International Operations Information Technology Services Agreement dated January 1, 1999, between GM and Delphi Automotive Systems (Holding), Inc.; and the NAO Information Technology Services Agreement dated January 1, 1999, between GM and Delphi Automotive Systems LLC;

g)   commercial and executive travel services as set forth in the Commercial Travels Services Supply Agreement dated December 18, 1998, between GM and Delphi Automotive Systems LLC, and the Executive Air Travel Services Supply Agreement dated December 18, 1998, between GM and Delphi Automotive Systems LLC; and

h)   utility-related services as set forth in the Energy Services Agreement dated December 22, 1998, between GM and Delphi Automotive Systems LLC, and the Gas Services Agreement dated on or around December 1998 between GM and Delphi Automotive Systems LLC.

18.   All documents concerning the provision (a) in the Component Supply Agreement that Delphi and GM "honor all existing supply agreements", and (b) in the Aftermarket Agreement that Delphi "honor the terms and conditions of all existing Purchase Orders and other contractual agreements regarding the purchase, supply and distribution of automotive products worldwide."

19.   All documents concerning any Price-down sought or obtained by GM for any Delphi product.

11

NY\1121948.4

20.  All documents concerning any instruction, request, direction, or requirement conveyed by or imposed on Delphi by GM regarding (a) Delphi's choice of suppliers, (b) the terms of any agreements between Delphi and its suppliers, (c) products to be purchased by Delphi from its suppliers, or (d) the amount to be paid by Delphi to its suppliers.

21.  All documents concerning any claims that GM may assert against Delphi in the Bankruptcy Proceeding, including the prepetition claims against Delphi asserted in paragraphs 7 through 13 of GM's Motion for Order Directing Appointment of General Motors Corporation to Statutory Creditors' Committee, dated February 17, 2006:

   a)  "Pursuant to the general terms and conditions incorporated in all Purchase Agreements, Delphi warrants/guarantees the automotive parts and systems it provides to General Motors, and sells such automotive parts and systems to General Motors in accordance with certain pricing mechanisms. As of the Commencement Date, General Motors had asserted prepetition warranty/product recall claims against Delphi aggregating approximately $100 million (the "Asserted Warranty Claims"). General Motors also asserted prepetition overpricing claims against Delphi aggregating approximately $7.5 million (the "Overpricing Claims"). In addition to the Asserted Warranty Claims and Overpricing Claims, General Motors has asserted and will in the ordinary course assert further warranty/product recall claims against Delphi in connection with automotive parts and systems delivered prior to the Commencement Date (the "Additional Warranty Claims" and together with the Asserted Warranty Claims, the "Warranty Claims")." Motion for Order Directing Appointment of General Motors Corporation to Statutory Creditors' Committee, at ¶ 7;

   b)  "Pursuant to the U.S. Employee Matters Agreement, dated as of December 22, 1998, and attachments and supplements thereto between Delphi and General Motors, which was entered into in connection with Delphi's spin-off from General Motors, Delphi is liable to General Motors for certain costs associated with post-employment benefits ("OPEB") for certain employees who worked at Delphi and subsequently returned to and retired from General Motors (the "Flowback Employees"). The total amount of such OPEB obligations, which are currently accrued and Delphi is obligated to pay to General Motors between 2006 and 2014, is approximately $1.228 billion (the "OPEB Flowback Claims"). Delphi is required to make certain annual true-up payments to partially reimburse General Motors for such OPEB Flowback Claims (the "Annual OPEB Flowback Payments"). The next Annual OPEB Flowback Payment in the amount of approximately $64 million is due from Delphi to General Motors on June 10, 2006." Id. at ¶ 8;

12

c) "Pursuant to the Master Separation Agreement, dated as of December 22, 1998, among other things, Delphi and the Debtors, jointly and severally, indemnified General Motors and its affiliates for all losses, claims, damages, liabilities, and actions (i) relating to liabilities assumed by or transferred to Delphi in connection with the spin-off and/or (ii) the conduct of the Debtors' business. In connection with such indemnification, General Motors holds claims against the Debtors, including prepetition contingent claims (the "Indemnification Claims")." Id. at ¶ 9;

d) "In connection with 1999 labor negotiations, General Motors and the United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW") entered into an agreement (the "Benefit Guarantee Agreement") pursuant to which General Motors agreed, subject to various conditions, to be secondarily liable for a portion of certain obligations if, under certain circumstances, Delphi were to reduce the scope and level of pension benefits, retiree health benefits, or retiree life insurance benefits provided to certain of its UAW-represented employees. In connection with the Benefit Guarantee Agreement, Delphi and General Motors entered into an indemnity agreement pursuant to which, among other things, Delphi indemnified General Motors and its affiliates for any losses and liabilities relating to the Benefit Guarantee (the "Indemnity Agreement"). In connection with the Indemnity Agreement, General Motors holds claims against Delphi, including prepetition contingent claims (the "Benefit Guarantee Claims")." Id. at ¶ 10;

e) "General Motors also holds various other liquidated, unliquidated, and/or contingent prepetition claims against the Debtors' estates including, without limitation, unpaid obligations under certain legacy agreements, environmental and asbestos related claims, and product liability claims (the "Other Claims")." Id. at ¶ 12; and

f) "As a result of prepetition shipment of goods from Delphi to GM for which the accounts payable were not yet due as of the Commencement Date, GM also holds setoff rights for a portion of its claims (against the Debtors and their affiliates) against GM's prepetition payable pursuant to sections 506 and 553 of the Bankruptcy Code and applicable non-bankruptcy law (the "Setoff Claims" and together with the Warranty Claims, the Overpricing Claims, the OPEB Flowback Claims, the Indemnification Claims, the Benefit Guarantee Claims, the Rejection Damage Claims, the Other Claims, the Setoff Claims, and any other prepetition claims of General Motors against the Debtors, the "General Motors Prepetition Claims"). As a result of the General Motors Prepetition Claims, General Motors holds the largest claim against the Debtors' estates." Id. at ¶ 13.

22.   All documents concerning any modified steady state model by, about, or for Delphi, including, but not limited to, any documents used to construct such model and any analyses of such model.

23. All documents concerning (i) payments made by Delphi or requested by GM under the Employee Matters Agreement and (ii) any calculations made by or for GM in connection with such payments.