SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

333 West Wacker Drive, Suite 2100

Chicago, Illinois 60606

(312) 407-0700

John Wm. Butler, Jr. (JB 4711)

John K. Lyons (JL 4951)

Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

Four Times Square

New York, New York 10036

(212) 735-3000

Kayalyn A. Marafioti (KM 9632)

Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:

Toll Free:  (800) 718-5305

International:  (248) 813-2698

Delphi Legal Information Website:

http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | |
| : | |
| In re | : | Chapter 11 |
| : | |
| DELPHI CORPORATION, et al., | : | Case No. 05- 44481 (RDD) |
| : | |
| Debtors. | : | (Jointly Administered) |
| : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | |

CERTIFICATE OF SERVICE

PLEASE NOTE that on March 22, 2006, I caused to be served true copies of the

documents listed below (i) upon the parties listed on Exhibit A hereto via overnight delivery:

1) Motion for Order Under 11 U.S.C. § 363(b) Fed. R. Bankr. P. 6004
Approving Debtors' Human Capital Hourly Attrition Programs ("Human
Capital Hourly Attrition Programs Motion"), [Proposed] Order Under 11
U.S.C. § 363(b) and Fed. R. Bankr. P. 6004 Approving Debtors' Human
Capital Hourly Attrition Programs, and UAW-GM-Delphi Special Attrition
Program Agreement (Docket No. 2933)[a copy of which is attached hereto as
Exhibit B]

2) Notice of Motion for Order Under 11 U.S.C. § 363(b) Fed. R. Bankr. P. 6004
Approving Debtors' Human Capital Hourly Attrition Programs (Docket No.
2933)[a copy of which is attached hereto as Exhibit C]

Executed in: Troy, Michigan
On: March 27, 2006

/s/ Ron E. Meisler
Ron E. Meisler

**EXHIBIT A**

2/15/06

## UNION MAILING LIST

| Contact | Company | Address 1 | Address 2 | City | State | Zip | Fax |
|---|---|---|---|---|---|---|---|
| Carl Kolb | IUE-CWA Local 698 | PO Box 86 | | Clinton | MS | 39060 | 601-925-2581 |
| Thomas Charles | IUOE 832S | P.O Box 93310 | | Rochester | NY | 14692 | 405-691-0857 |
| William Humber | IUE-CWA Local 416 | PO Box 7361 | | North Brunswick | NJ | 08902 | 732-246-5121 |
| Zeb Wells | IUE-CWA Local 718 | PO Box 1136 | | Brookhaven | MS | 39602 | 412-562-2429 |

**EXHIBIT B**

**Hearing Date and Time: April 7, 2006 at 10:00 a.m.**
**Objection Deadline: April 4, 2006 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                                              :
        In re                                 :      Chapter 11
                                              :
DELPHI CORPORATION, et al.,                   :      Case No. 05-44481 (RDD)
                                              :
                                              :      (Jointly Administered)
            Debtors.                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

MOTION FOR ORDER UNDER 11 U.S.C. § 363(b) AND FED. R. BANKR. P. 6004
APPROVING DEBTORS' HUMAN CAPITAL HOURLY ATTRITION PROGRAMS

("HUMAN CAPITAL HOURLY ATTRITION PROGRAMS MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order pursuant to 11 U.S.C. § 363(b) and Fed. R. Bankr. P. 6004 approving and authorizing the Debtors to implement human capital attrition programs covering certain of the Debtors' hourly union-represented employees.  In support of this Motion, the Debtors respectfully represent as follows:

<u>Background</u>

A.      <u>The Chapter 11 Filings</u>

1.      On October 8, 2005 (the "Initial Filing Date"), Delphi and certain of its U.S. subsidiaries (the "Initial Filers") filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").  On October 14, 2005, three additional U.S. subsidiaries of Delphi (together with the Initial Filers, collectively, the "Debtors") also sought reorganization relief. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This Court entered orders directing the joint administration of the Debtor's chapter 11 cases (Dockets Nos. 28 and 404).

2.      On October 17, 2005, the Office of the Unites States Trustee appointed an official committee of unsecured creditors.  No trustee or examiner has been appointed in the Debtors' cases.

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

2

4.    The statutory predicates for the relief requested herein are section 363(b) of

the Bankruptcy Code and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules").

B.    Current Business Operations Of The Debtors

5.    As of the Initial Filing Date, Delphi had global 2004 revenues of

approximately $28.6 billion, and global assets as of August 31, 2005 of approximately $17.1

billion.[1] At the time of filing, Delphi ranked as the fifth largest public company business

reorganization in terms of revenues, and the thirteenth largest public company business

reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and

continue their business operations without supervision from the Bankruptcy Court.

6.    Delphi has become a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and the Company

(as defined below) is arguably the single largest global supplier of vehicle electronics,

transportation components, integrated systems and modules, and other electronic technology.

The Company's technologies and products are present in more than 75 million vehicles on the

road worldwide.  The Company supplies products to nearly every major global automotive

original equipment manufacturer with 2004 sales to its former parent, General Motors

Corporation ("GM"), equaling approximately $15.4 billion and sales to each of Ford Motor

Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and

Volkswagen Group exceeding $850 million.

7.    As part of its growth strategy, Delphi has established an expansive global

presence with a network of manufacturing sites, technical centers, sales offices, and joint

---

[1]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi
and its worldwide subsidiaries and affiliates.

3

ventures located in every major region of the world.  As of the Initial Filing Date, the Debtors

employed approximately 180,000 employees.  The Debtors' 50,600 U.S. employees work in

approximately 44 manufacturing sites, 13 technical centers, and in Delphi's Troy, Michigan

headquarters.  As of the Initial Filing Date, the Debtors employed approximately 34,750 hourly

employees in the United States, 96% of whom are union-represented.  Outside the United States,

the Company's foreign entities employed more than 134,000 people on the Initial Filing Date,

supporting 120 manufacturing sites and 20 technical centers in nearly 40 countries around the

globe.

       8.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary

of GM.  Prior to January 1, 1999, GM conducted the Company's business through various

divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions

and subsidiaries were transferred to Delphi and its subsidiaries and affiliates (collectively, the

"Company") in accordance with the terms of a Master Separation Agreement between Delphi

and GM.  In connection with these transactions, Delphi accelerated its evolution from a North

American-based, captive automotive supplier to a global supplier of components, integrated

systems, and modules for a wide range of customers and applications.  Although GM is still the

Company's single largest customer, today more than half of Delphi's revenue is generated from

non-GM sources.

       9.    Due to the significant planning that goes into each vehicle model, Delphi's

efforts to generate new business do not immediately affect its financial results, because supplier

selection in the auto industry is generally finalized several years prior to the start of production

of the vehicle.  When awarding new business, which is the foundation for the Company's

forward revenue base, customers are increasingly concerned with the financial stability of their

4

supply base.  The Debtors believe that they will maximize stakeholder value and the Company's

future prospects if they stabilize their businesses and continue to diversify their customer base.

The Debtors also believe that this must be accomplished in advance of the expiration of certain

benefit guarantees between GM and certain of Delphi's unions representing most of its U.S.

hourly employees which coincides with the expiration of the Company's U.S. collective

bargaining agreements in the fall of 2007.

C.    Events Leading To The Chapter 11 Filing

10.    In the first two years following Delphi's separation from GM, the Company

generated approximately $2 billion in net income.  Every year thereafter, however, with the

exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company

reported a net operating loss of $482 million on $28.6 billion in net sales. [2]  Reflective of a

downturn in the marketplace, Delphi's financial condition deteriorated further in the first six

months of 2005, with net operating losses of $608 million for the first six months of calendar

year 2005 on six-month net sales of $13.9 billion, approximately $1 billion less than the same

time period a year earlier.

11.    The Debtors believe that the Company's financial performance has

deteriorated because of: (a) increasingly unsustainable U.S. legacy liabilities and operational

restrictions driven by collectively bargained agreements, including restrictions preventing the

Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating

largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic

OEMs resulting in the reduced number of motor vehicles that GM produces annually in the

United States and related pricing pressures, and (c) increasing commodity prices.

---

[2]    Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily
related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

12.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward looking revenue requirements.  Because discussions with its major unions and GM were not progressing sufficiently, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

13.    Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome costs and restrictions under current labor agreements and by realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses.  This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness.  The Debtors believe that a substantial segment of Delphi's U.S. business operations must be divested, consolidated, or wound-down during these cases.

14.    Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

### Relief Requested

15.    By this Motion, the Debtors seek entry of an order under section 363 of the Bankruptcy Code and Bankruptcy Rule 6004 approving and authorizing, as more fully set forth

6

below, Delphi to enter into agreements providing for human capital hourly attrition programs

(collectively, the "Hourly Attrition Programs") covering the majority of the Debtors' hourly

union-represented employees (the "Eligible Employees") and the Debtors to implement the

Hourly Attrition Programs.  Delphi reached agreement on the terms of the UAW-GM-Delphi

Special Attrition Program (the "UAW Special Attrition Program") through negotiations among

Delphi, GM, and the United Automobile, Aerospace and Agricultural Implement Workers of

America (the "UAW").  By this Motion, the Debtors request authority to enter into the agreement

by and among Delphi, GM, and the UAW governing the UAW Special Attrition Program (the

"UAW Special Attrition Program Agreement").[3]  Under the program, certain eligible UAW-

represented employees (the "UAW-Represented Employees") can retire with financial incentives

through early retirement or through a pre-retirement program.  The program also provides that

GM will create 5,000 job openings or "flowbacks" for Delphi UAW-Represented Employees.

      16.    The Debtors also intend to offer Hourly Attrition Programs to certain of

Delphi's other union-represented employee groups and anticipate that those respective unions

will agree to such Hourly Attrition Programs.  By this Motion, therefore, the Debtors also request

authority, but not direction, to enter into agreements providing for reasonably comparable (as to

the Debtors' obligations) Hourly Attrition Programs for certain of Delphi's other union-

represented employees and to implement such Hourly Attrition Programs.  As described below,

implementation of the Hourly Attrition Programs will comprise the first cornerstone in the

Debtors' restructuring of their U.S. operations.

---

[3]    A copy of the UAW Special Attrition Program Agreement is appended to the Proposed Order which is attached
hereto as Exhibit A.  The attrition programs contained in the agreement are the product of negotiations between
the Debtors, the UAW and GM.  While the Debtors understand that the UAW, and possibly GM, will be filing a
statement in support of Court approval of the UAW Special Attrition Program in the near future, neither the
UAW nor GM are parties to this Motion.

7

17.    The UAW Special Attrition Program Agreement provides that the Proposed Order shall include express approval of certain specific provisions in the Agreement including paragraphs 3.b.iv.3, 7.b, 7.c and 7.d thereof.  Among those provisions, of utmost importance to the Debtors is that paragraphs 7.c and 7.d[4] specifically provide that the Agreement is <u>without prejudice</u> to any interested party, including the Debtors and the Official Committee of Unsecured Creditors (the "Creditors' Committee"), in all other aspects of the Debtors' chapter 11 cases, including, by illustration, the Debtors' and GM's respective positions in all commercial discussions and claims matters between them, all collective bargaining matters involving the parties, in any potential proceedings under Sections 1113 and/or 1114 of the Bankruptcy Code with respect to the UAW, under Section 365 of the Bankruptcy Code with respect to GM's contracts with the Debtors, in any pension termination proceeding under the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and/or the Bankruptcy Code, and all claims administration and allowance matters.  Delphi would not have agreed to undertake the obligations provided in the Agreement without this specific acknowledgement and therefore seeks this Court's specific approval of this term of the Agreement.  Indeed, if this Court harbors any belief or concern that the Debtors' ability to proceed with any necessary or desirable motions in the Bankruptcy Court with respect to the Debtors' rights under Section 4041 of ERISA, or the Debtors' rights under Section(s) 1113 and/or 1114 of the Bankruptcy Code would be impaired in any way by the approval and implementation of the UAW Special Attrition Program Agreement, then the relief requested in this Motion should not be approved.

---

[4]    The Debtors' discussion of the importance of paragraph 7.c and 7.d should not denigrate in any way the importance of other integrated and non-severable provisions in the Agreement.  For example, paragraph 7.e of the Agreement provides that nothing contained in the Agreement will constitute the assumption of any agreement <u>or</u> be deemed to create an administrative or priority claim with respect to GM <u>or</u> deemed to convert a prepetition claim into a postpetition claim or an administrative expense with respect to any party.  The paragraph 7.e claims protection provisions are of fundamental importance to the Creditors' Committee as well as to the Debtors.

8

18.    The Debtors have scheduled this Motion for hearing at the April 7, 2006 regularly-scheduled omnibus hearing in these cases (the "April Hearing") in compliance with the provisions of the Supplemental Order Under 11 U.S.C. §§ 102(1) and 105 and Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing Omnibus Hearing Dates and Certain Notice, Case Management, and Administrative Procedures (the "Supplemental Case Management Order"), entered March 20, 2006.  Pursuant to the terms of the Supplemental Case Management Order, the Debtors have consulted closely over the last several weeks with counsel to the Creditors' Committee regarding the relief sought in this Motion as well as the timing of its filing.  The Debtors have been informed that the Creditors' Committee does not object to this Motion being heard at the April Hearing in accordance with paragraph 11(a) of the Supplemental Case Management Order.  Because this Motion is being filed on less than 20 days' notice, parties-in-interest will have until April 4, 2006 to file an objection.

Basis For Relief

A.    The Debtors' Uncompetitive Cost Structure

19.    Approximately 98% of the Debtors' hourly employees, working at numerous facilities on different product lines in the United States, are represented by three principal unions: the UAW, which represents approximately 70% of Delphi's represented hourly workforce, the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communications Workers of America, which represents approximately 25% of the represented hourly workforce, and the United Steelworkers of America, which represents approximately three percent of the represented hourly employees.  Delphi has collectively-bargained national agreements with each of these unions as well as local agreements with affiliated local unions at each facility covering primarily local issues.  Delphi also has collective bargaining agreements covering smaller groups of U.S. hourly employees with three other unions

9

– the International Association of Machinists and Aerospace Workers; the International

Brotherhood of Electrical Workers; and the International Union of Operating Engineers.

20.    In conjunction with the Debtors' spin-off from GM (the "Separation"),

Delphi assumed the terms of existing GM collective bargaining agreements applicable to the

Debtors' operations.[5]  The Debtors subsequently committed to substantially "mirror" the 2003

GM-UAW agreement resulting from the next round of industry bargaining by GM, Ford, and

Chrysler (collectively, the "Big Three").  Consequently, Delphi's labor costs under its current

labor agreements remain largely based upon the pattern set by the major unions and the Big

Three, in particular the UAW and GM, which generate more than triple the labor costs of its

peers.  Furthermore, in 1999, the general economic conditions and outlook for the U.S. auto

industry were very different from those today.  In particular, it was expected that the Debtors

would continue to generate substantially similar amounts of revenue from GM while developing

other supply relationships and business opportunities.  For a number of reasons, including a

precipitous decline in the North American market share of GM, which in turn limited the number

of employees who could flowback to GM, the Debtors' anticipated workforce reductions never

fully materialized.

21.    The labor agreements are unsustainable.  Specifically, to stem the Debtors'

operating losses from their U.S. operations and achieve the Debtors' transformation, Delphi's

existing labor agreements must be modified in three principal respects.  First, Delphi must

obtain hourly wage and benefit cost levels that are competitive with other U.S. auto parts

suppliers.  Currently, Delphi's total hourly labor costs, including legacy retirement liabilities, for

---

[5]    During the 1999 negotiations, GM, Delphi, and the UAW also entered into a tripartite "Flow-Back Agreement."
Under this agreement, GM agreed to permit UAW-represented Delphi employees with prior GM seniority to
return to GM positions as openings became available.

10

its traditional production and skilled trades employees are approximately three times the labor

costs of a typical U.S. auto parts supplier.  Second, Delphi must address those provisions that

limit Delphi's ability to respond to market forces by selling or closing unnecessary or

unprofitable operations, or by laying off excess employees.  Delphi must also address its

substantial liabilities for retirement benefits for hourly employees and its costly retiree health

care plans.

22.    The Debtors believe that implementation of the voluntary Hourly Attrition

Programs is a critical first step in enabling Delphi to transform its workforce from legacy wages

and benefits to a competitive labor cost structure.  The Debtors therefore believe that

implementation of the Hourly Attrition Programs will accelerate necessary attrition and reduce

the uncertainties and concerns over the impact of potential rejection of labor agreements and

modification of retiree benefits.  As a result, implementation of the Hourly Attrition Programs

should create a more favorable environment for reaching consensual resolution of remaining

labor issues.[6]

B.    The Hourly Attrition Programs

23.    In light of the Debtors' need to address the labor issues confronting the

Debtors and make meaningful progress toward an overall restructuring of the Debtors' U.S.

operations and a plan of reorganization, the Debtors have been discussing with their major

unions and GM the terms of a comprehensive resolution of the Debtors' uncompetitive labor

agreements.  Although discussions may lead to a consensual resolution of these issues, the

Debtors cannot continue to suffer significant operating losses from their U.S. operations.  The

---

[6]    Although Delphi is intent upon achieving a comprehensive consensual agreement with its unions and GM, absent such agreement, and notwithstanding approval of the Hourly Attrition Programs, Delphi will proceed under sections 1113 and 1114 of the Bankruptcy Code seeking this Court's authorization to reject Delphi's collective bargaining agreements and modify hourly post-retirement healthcare coverage and life insurance benefits.

11

Hourly Attrition Programs are a significant step to enable realignment of the Debtors' global product portfolio and manufacturing footprint, as well as reduction of the Debtors' traditional-rate hourly U.S. workforce to levels needed to run its realigned U.S. operations.

24.    As noted above, the terms of the Hourly Attrition Programs for all Eligible Employees as they relate to the Debtors' obligations thereunder are anticipated to be reasonably similar to the terms of the UAW Special Attrition Program.  Among the significant terms of the UAW Special Attrition Program are the following:[7]

(a)    Employees who are eligible to retire under the normal or early voluntary provisions of the Delphi Hourly-Rate Employees Pension Plan (the "HRP") would be eligible for a one-time, lump-sum incentive payment in the amount of $35,000 in exchange for their agreement to retire.  The application period, timing of the number of retirements, release dates, and number of sign-up dates would be determined by Delphi and the UAW, and may vary in accordance with operational needs.  This incentive payment would be made by GM and would be retroactive to cover eligible employees who have retired since October 1, 2005.

(b)    Employees age 50 with ten or more years of credited service who are eligible to retire under the MSR (i.e., mutually satisfactory retirement) provisions of the HRP could do so.

(c)    Employees with at least 27 and less than 30 years of credited service (regardless of age) would be eligible for special voluntary placement in a pre-retirement program under the following terms:

(i)    Employees electing to accept placement in the pre-retirement program would have to be eligible no later than July 1, 2006;

(ii)    Employees would retire without additional incentives (i.e., such employees would not be eligible to receive the $35,000 incentive payment described in paragraph (a) above) when they first accrue 30 years of credited service under the provisions of the HRP; and

---

[7]    The terms contained herein are provided solely as a summary and are qualified in all respects by the terms of the UAW Special Attrition Program Agreement.  To the extent that this summary differs in any way from the terms of the UAW Special Attrition Program Agreement, the provisions of the UAW Special Attrition Program Agreement will control.  Additionally, the UAW Special Attrition Program would be implemented consistent with the parties' past attrition programs, including release of claims by the employee participants.

12

(iii)    Employees would receive gross monthly wages while in the program of:

1.    29 years credited service: $2,900

2.    28 years credited service: $2,850

3.    27 years credited service: $2,800

Wages would be weekly on an hourly basis (2,080 hours per year) and would remain at that rate until 30 years of credited service is accrued.

(iv)    Within ten business days after the first date on which any employees are eligible to receive wage payments in accordance with paragraph 3.b.iii of the UAW Special Attrition Program Agreement, Delphi would establish a segregated payment account (the "Segregated Account") in the amount of $75 million (the "Ceiling Amount").[8]    The funds in the Segregated Account would be available to reimburse Delphi for the payment of weekly wage payments (which will be paid through Delphi's normal payroll process) under paragraph 3.b.iii. or for direct wage payments to employees entitled to receive such payments, as described in paragraph 3.b.

1.    Delphi would not draw funds from the Segregated Account until a date (the "Permitted Draw Down Date"), which would be the later of the Final Election Date or the Adequate Funding Date (each as defined below).  Prior to the Permitted Draw Down Date, payments to satisfy the obligations to employee participants pursuant to paragraph 3.b will be drawn from Delphi's available cash.

2.    If, on the Permitted Draw Down Date, the Anticipated Liability (as defined below) is less than the Ceiling Amount, Delphi would be permitted to draw such funds out of the Segregated Account so that the balance remaining in the Segregated Account is equal to the Anticipated Liability.

a.    The "Final Election Date" would be the first of the month following the last day on which employees at any UAW-Delphi facility can make an election to participate in the pre-retirement program described in paragraph 3.b., or sooner if determined by the UAW-Delphi National Parties.

---

[8]    Prior to implementation of the relief requested in the Motion, the Debtors will confirm with the Agent for the Debtors' postpetition debtor-in-possession financing facilities that the transaction structure proposed in the Agreement is either compliant with the facilities or otherwise acceptable to the DIP lenders.

b.      The "Adequate Funding Date" would be the date on which the Ceiling Amount is greater than or equal to the Anticipated Liability.

c.      The "Anticipated Liability" would be an amount, calculated after the Final Election Date, sufficient to pay all of the remaining liabilities under paragraph 3.b.iii. for all employees who have elected to participate in such program for the full remaining duration of such program.  The Anticipated Liability would be calculated based on the number of eligible employees, the remaining duration of the wage payments, and the applicable pay rates.

3.      The funds in the Segregated Account would be available to satisfy the obligations of paragraph 3.b and for no other purpose.  The order approving the UAW Special Attrition Program Agreement would be required to specifically provide that under no circumstances (including but not limited to conversion of Delphi's chapter 11 cases to chapter 7 proceedings) would the assets in the Segregated Account be available to satisfy the claims of any party other than the employees.  The UAW Special Attrition Program Agreement is, in its entirety, contingent on entry of an order which, to the satisfaction of the UAW and Delphi National Parties provides the protections described in paragraph 3.b.iv.3 of the UAW Special Attrition Program Agreement.

(d)      Employees electing option (a), (b), or (c) as described above[9] would be eligible either to retire as employees of Delphi or to flowback to GM and retire ("check the box").[10]  Upon such an employee's flowback to GM, GM would become obligated for non-pension post-retirement employee benefit (i.e., health care coverage and life insurance benefits) ("OPEB") obligations.

(e)      GM would commit to allowing 5,000 Delphi UAW-Represented Employees to flowback to GM, with a target date for reaching that level of no later than September 1, 2007.  Upon an employee's flowback to GM, GM would become obligated for all OPEB obligations to such employee.  Flowbacks under "check the box" retirements would not reduce GM's 5,000 flowback commitment.

---

[9]   Any employee electing placement into the pre-retirement program would be considered a Delphi employee until he or she retires.

[10]   Any employee electing to "check the box" and retire from GM would be considered a flowback to GM effective as of the date of retirement for purposes of all GM, UAW, and Delphi agreements governing flowbacks, including the UAW Special Attrition Program Agreement.

14

(f)    Employees who were hired at Delphi after October 18, 1999 who were on-roll on the Initial Filing Date would be given two opportunities to fill openings at GM after all GM employees or Delphi flowback applications have been exhausted.

25.    During negotiations over the terms of the UAW Special Attrition Program Agreement, the UAW expressed concern regarding the funding of Delphi's obligations under the pre-retirement program provisions of the Agreement, should certain subsequent events occur.  In resolving these issues, as described above, Delphi has agreed to establish a segregated account for payment of such obligations in the amount of $75 million.  The parties have agreed, and the Debtors request that any order approving the Agreement provide that no other party would have a claim on the Segregated Account.  Providing this accommodation to the UAW assuaged the UAW's concerns by incorporating an account dedicated to the payment of wages to the UAW-Represented Employees under the pre-retirement program.

26.    Importantly, the Debtors' obligations under the UAW Special Attrition Program are subject to certain conditions precedent and acknowledgements, which will ensure that the Debtors maintain needed flexibility to effectuate their transformation plan, while sharing the costs arising on account of implementation of the UAW Special Attrition Program. Specifically, the following are conditions precedent to the Debtors' obligations and acknowledgements under the UAW Special Attrition Program:

(a)    The UAW Special Attrition Program obligations are subject to the approval of this Court.

(b)    Any obligations assumed by GM with respect to OPEB under paragraph 4 of the UAW Special Attrition Program Agreement or with respect to active health care and life insurance under paragraph 7.d of the UAW Special Attrition Program Agreement would be conclusively deemed to be comprehended by, included within, and would constitute a prepetition, general unsecured claim assertable by GM against the estate of Delphi under the U.S. Employee Matters Agreement (including, without limitation, related flowback agreements and the UAW-GM-Delphi Memorandum of Understanding – Benefit Plan Treatment and the UAW-GM-Delphi Flowback Agreements contained in the 1999 and 2003 GM-UAW and Delphi-UAW Contract Settlement Agreements), Delphi's Agreement dated December 22, 1999 to indemnify GM

15

for its liability under the Benefit Guarantee as if all conditions for the triggering of GM's claim shall have occurred, and Delphi's general indemnity of GM under the Master Separation Agreement.  The presumed triggering of GM's claim against Delphi described above would be only for purposes of the UAW Special Attrition Program Agreement and would not trigger any contractual claims against either Delphi or GM beyond their respective obligations under the UAW Special Attrition Program Agreement.

(c)      The UAW Special Attrition Program Agreement would not be subject to abrogation, modification, or rejection without the mutual consent of the UAW, GM, and Delphi (with the exception of bilateral agreements of the UAW and GM that do not affect Delphi, such as obligations under paragraphs 1 and 5a.-d., f., and g. of the Agreement), and the order obtained in this Court by Delphi approving the UAW Special Attrition Program Agreement would so provide.  The parties would further agree (and the order would also provide) that the UAW Special Attrition Program Agreement is without prejudice to any interested party (including the parties to the UAW Special Attrition Program Agreement and the Creditors' Committee) in all other aspects of the Debtors' chapter 11 cases, including, by illustration, Delphi's and GM's respective positions in all commercial discussions and claims matters between them, all collective bargaining matters involving the parties, in any potential proceedings under sections 1113 and/or 1114 of the Bankruptcy Code with respect to the UAW and under section 365 of the Bankruptcy Code with respect to GM's contracts with Delphi, in any pension termination proceeding under ERISA and/or the Bankruptcy Code, and all claims administration and allowance matters.

(d)      Nothing in the UAW Special Attrition Program Agreement would limit or otherwise modify (i) Delphi's rights under Section 4041 of ERISA or (ii) Delphi's rights under sections 1113 and/or 1114 of the Bankruptcy Code with regard to any obligations which pre-existed the UAW Special Attrition Program Agreement (including pre-existing obligations referenced within the UAW Special Attrition Program Agreement), such as (by way of illustration only) the obligation to maintain the hourly pension plan or provide retirees or active employees (including employees/retirees participating in the attrition programs contained in the UAW Special Attrition Program Agreement) with levels of healthcare or other benefits as specified in pre-existing labor agreements.  Under no circumstances would Delphi freeze its pension plan in a manner that prevents employees in the pre-retirement program described in paragraph 3.b of the UAW Special Attrition Program Agreement from receiving ongoing credited service sufficient to reach 30 years of credited service.  Delphi would provide the same healthcare and life insurance coverage to employees participating in paragraph 3.b of the UAW Special Attrition Program Agreement that it provides to its other active UAW employees; provided, however, that if Delphi reduces or eliminates such coverage provided to its active UAW employees, GM would subsidize such coverage provided to employees participating in paragraph 3.b of the UAW Special Attrition Program Agreement up to the level provided to GM-UAW active employees.  Except as otherwise expressly provided therein, nothing in the UAW Special Attrition Program Agreement would limit, expand, or otherwise modify the rights or obligations of any party under the Benefit Guarantee between GM and the UAW.

16

(e)    Nothing contained in the UAW Special Attrition Program Agreement would constitute an assumption of any agreement described therein, including, without limitation, any collective bargaining agreement between the UAW and Delphi or any commercial agreement between GM and the Debtors, nor would anything therein be deemed to create an administrative or priority claim with respect to GM or convert a prepetition claim into a postpetition claim or an administrative expense with respect to any party.

(f)    The parties to the UAW Special Attrition Program Agreement would agree that any UAW Employee participating in the UAW Special Attrition Program who elects to flowback to GM for purposes of retirement would be eligible to retire in accordance with Sections 3.a.6 and 3.b.6 of the UAW-GM-Delphi Memorandum of Understanding Benefit Plan Treatment.

27.    These conditions precedent and acknowledgements are crucial elements of the UAW Special Attrition Program Agreement and Delphi would not have agreed to undertake its obligations under the UAW Special Attrition Program without the protections provided by these provisions.  Of particular importance, the Debtors insisted upon the addition of paragraphs 7.c and 7.d of the UAW Special Attrition Program Agreement (described above) providing that entry into the Agreement be without prejudice to the Debtors and all other interested parties' rights in all other aspects of these cases, including in any potential proceedings under sections 1113 and 1114 of the Bankruptcy Code or in any pension termination proceeding under ERISA and/or the Bankruptcy Code.

28.    As noted previously, approval of the Hourly Attrition Programs is only the first step in the Debtors' resolution of their labor issues and, absent a consensual agreement with its unions and adequate financial or commercial support from GM, will not eliminate the need for Delphi to proceed on its previously-announced path with respect to sections 1113 and 1114 of the Bankruptcy Code.  The above-cited provisions of the UAW Special Attrition Program Agreement make clear that the Debtors retain the ability to proceed as they deem appropriate in resolving their remaining labor issues and the provisions are therefore critical to the parties' overall agreement to the terms of the UAW Special Attrition Program Agreement.  Therefore,

17

the Debtors respectfully request that the Court include provisions in any order approving this

Motion expressly approving the provisions of paragraphs 7.c and 7.d of the UAW Special

Attrition Program Agreement.  Moreover, as emphasized at the outset of this Motion, if this

Court harbors any belief or concern that the Debtors' ability to proceed with any necessary or

desirable motions in the Bankruptcy Court with respect to the Debtors' rights under Section 4041

of ERISA, or the Debtors' rights under Section(s) 1113 and/or 1114 of the Bankruptcy Code

would be impaired in any way by the approval and implementation of the UAW Special Attrition

Program Agreement, then the relief requested in this Motion should not be approved.

   29. The Debtors expect that as many as approximately 17,000 employees would

be eligible to participate in the Hourly Attrition Programs, with an additional 5,000 employees

having the opportunity to flowback to GM.  While the Debtors cannot predict how many of the

17,000 employees will elect to participate, each individual event of attrition will result in positive

cash flow such that the Debtors believe that the Hourly Attrition Programs will be cash flow

positive beginning in 2006 and would generate positive cash flow each year thereafter.  The

potential cash cost of the lump-sum payments to all Eligible Employees electing to retire under

the normal or voluntary provisions of the HRP would be borne by GM.  Although the Debtors

will be obligated to make certain payments to those Eligible Employees electing to participate in

the pre-retirement program, implementation of the Hourly Attrition Programs is anticipated to

generate positive cash flow in 2006 as a result of the reductions in the Debtors' workforce and

cost savings from utilizing lower-rate employees.  Between 2006 and 2010, the Debtors expect to

generate substantial cost savings associated with the reduction in headcount provided by the

Hourly Attrition Programs and, in those instances in which replacements might be needed, as a

result of replacing Eligible Employees with other lower-cost temporary and nontraditional rate employees.

30.    It is important to note that GM will likely assert claims against the Debtors related to obligations assumed and/or undertaken by GM as part of the UAW Special Attrition Program.  The UAW Special Attrition Program Agreement expressly provides, however, that nothing therein would be deemed to create an administrative or priority claim with respect to GM or to convert a prepetition claim into a postpetition claim or an administrative expense with respect to any party to the Agreement.  Further, entry into the UAW Special Attrition Program Agreement does not prejudice the rights of any interested party (including the Debtors and the Creditors' Committee) with respect to, among other things, the administration, reconciliation, and ultimate allowance, if ever, of such assertable claims.  With certain exceptions, the Debtors believe that any claims that would be asserted by GM under the UAW Special Attrition Program Agreement would relate to claims that GM would have otherwise asserted against Delphi under certain other agreements between GM and Delphi even absent entry into the UAW Special Attrition Program Agreement.

31.    While the Debtors have described above certain cash-flow positive aspects of the Hourly Attrition Programs, the Debtors also acknowledge that the Debtors' minimum pension funding obligations would increase as a result of the Hourly Attrition Programs. Moreover, depending upon the number and mix of employees who elect to participate in the Hourly Attrition Programs, the Pension Benefit Guaranty Corporation's claim for unfunded benefit liabilities in the event of a potential termination of the HRP could also increase.

32.    Nevertheless, the Debtors believe that the Hourly Attrition Programs constitute an important first step in implementing their transformation plan.  In total, the Debtors

19

believe that implementing the Hourly Attrition Programs, and the sharing of the costs of the

Hourly Attrition Programs between the Debtors and GM, will likely improve the Debtors' net

cash flow in 2006 and each year thereafter in comparison to the status quo.  The Debtors intend

to continue seeking a resolution of their remaining labor issues, preferably through a consensual

agreement but, if necessary, through litigated proceedings under federal law including sections

1113 and 1114 of the Bankruptcy Code.  The Debtors believe that this Court's approval of the

Hourly Attrition Programs is clearly in the best interests of the Debtors, their estates and all

parties-in-interest.

<u>Applicable Authority</u>

33.    Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use

property of the estate "other than in the ordinary course of business" after notice and a hearing.

11 U.S.C. § 363(b)(1).  Uses of estate property outside the ordinary course of business may be

authorized if the debtor demonstrates a sound business justification for it.  <u>See</u> <u>In re Lionel</u>

<u>Corp.</u>, 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good

business reason exists to grant debtor's application under section 363(b)); <u>In re Delaware Hudson</u>

<u>Ry. Co.</u>, 124 B.R. 169, 179 (Bankr. D. Del. 1991).  Once the debtor articulates a valid business

justification, "[t]he business judgment rule 'is a presumption that in making a business decision

the directors of a corporation acted on an informed basis, in good faith and in the honest belief

that the action was in the best interests of the company.'" <u>In re Integrated Resources, Inc.</u>, 147

B.R. 650, 656 (S.D.N.Y. 1992).

34.    The Debtors' decreased production volumes, largely as a result of the

competitive U.S. vehicle production environment for domestic OEMs, have left the Debtors

significantly overstaffed and Delphi's restrictive labor agreements do not provide the Debtors

20

with the flexibility to react accordingly.  Moreover, the Debtors anticipate further reductions in

domestic OEM production volumes between now and 2010 which will further exacerbate the

Debtors' overstaffing if Delphi's labor agreements remain unchanged.  Specifically, under

Delphi's uncompetitive labor agreements, except for a small minority of newer employees who

are not covered by the job security protections of the agreements, Delphi cannot lay off

employees except for temporary periods during which the employees are entitled to supplemental

unemployment benefits.  Following temporary layoff, excess employees are placed in a "JOBS

Bank" where they receive full pay and benefits.  Thus, even when lower-than-expected volumes

leave Delphi with more employees than needed to run its operations, Delphi must nonetheless

pay those employees.  Employees in a JOBS Bank or on temporary layoff cost Delphi an

estimated $346 million in 2005.

        35.    In addition, Delphi's high wages and benefits have helped perpetuate this

overstaffing.  When compared to other automotive parts suppliers – both union and non-union –

whose total labor costs average approximately $22 per hour, Delphi has a total hourly labor cost

that is approximately three times that of its peers.  Understandably, employers such as Delphi

which pay high compensation premiums tend to have lower voluntary employee attrition rates

and, thus, the Debtors' current labor overcapacity situation is unlikely to be resolved through

normal attrition.  Therefore, the Debtors have determined that it is in the best interests of the

Debtors, their creditors, and their estates to implement the Hourly Attrition Programs to address

the Debtors' excess workforce and facilitate the Debtors' necessary restructuring of their U.S.

operational footprint.

        36.    As described above, the Hourly Attrition Programs will provide significant

benefits to the Debtors and their estates.  First, the Hourly Attrition Programs could facilitate the

reduction of the hourly workforce from among the approximately 17,000 Eligible Employees

plus shift up to an additional 5,000 employees to GM pursuant to GM's flowback commitment.

The Debtors expect to realize substantial cost savings associated with the reduction in headcount

provided by the Hourly Attrition Programs and as a result of replacing Eligible Employees with

lower-cost temporary and nontraditional rate employees, as needed.  In addition, pursuant to the

terms of the UAW Special Attrition Program Agreement, GM will share a significant portion of

the costs associated with the Hourly Attrition Programs, including the assumption of Delphi's

outstanding OPEB obligations related to Delphi employees who "check the box" under the

Hourly Attrition Programs.  As noted above, however, GM will likely assert claims against

Delphi's estate related to obligations assumed by GM as part of the UAW Special Attrition

Program and the Debtors' underfunded pension liabilities will increase as a result of

implementation of the Hourly Attrition Programs.  Nevertheless, in sum, the Debtors estimate

that the Debtors will achieve net positive cash flow in 2006 and thereafter as a result of the

Hourly Attrition Programs.

        37.    The Debtors will also realize significant operational benefits as a result of

implementation of the Hourly Attrition Programs.  Approval of the Hourly Attrition Programs

should help address the concerns of  many of the Debtors' hourly employees relating to their

personal options in the event of potential rejection of labor agreements and modification of

retiree benefits.  The Hourly Attrition Programs should therefore contribute to a more stable

environment for a consensual resolution of the Debtors' remaining labor issues.  By doing so,

implementation of the Hourly Attrition Programs should also ameliorate concerns expressed by

many of the Debtors' customers and suppliers regarding an unstable labor and production

environment, thus improving the opportunities for the Debtors to win new forward revenue

22

commitments from the Debtors' customers and maintain (and improve) trade relationships (and trade terms) with the Debtors' suppliers.  While the Debtors' implementation of the Hourly Attrition Programs represents only one element in the Debtors' overall effort to address the Debtors' current uncompetitive U.S. cost structure, it would allow the Debtors to make continued progress toward the Debtors' restructuring.  Therefore, the Debtors respectfully request that this Court authorize the Debtors to implement the Hourly Attrition Programs.

Notice Of Motion

38.    Notice of this Motion has been provided in accordance with the Supplemental Case Management Order.  In addition, the Debtors have complied with the Supplemental Case Management Order with respect to the filing of this Motion and the need for expedited relief.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

Memorandum Of Law

39.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

23

WHEREFORE the Debtors respectfully request that the Court (a) enter the Proposed

Order approving the Hourly Attrition Programs, (b) authorize Delphi to enter into the UAW

Special Attrition Program Agreement and to implement the UAW Special Attrition Program, (c)

expressly approve the provisions of paragraphs 3.b.iv.3, 7.b, 7.c and 7.d of the UAW Special

Attrition Program Agreement, (d) authorize, but not direct, the Debtors to enter into agreements

providing for reasonably comparable (as to the Debtors' obligations) Hourly Attrition Programs

for Delphi's other union-represented employees and to implement such Hourly Attrition

Programs, and (e) grant the Debtors such other and further relief as is just.

Dated:  New York, New York
        March 22, 2006

                          SKADDEN, ARPS, SLATE, MEAGHER
                            & FLOM LLP

                          By: /s/ John Wm. Butler, Jr.
                              John Wm. Butler, Jr. (JB 4711)
                              John K. Lyons (JL 4951)
                              Ron E. Meisler (RM 3026)
                          333 West Wacker Drive, Suite 2100
                          Chicago, Illinois  60606
                          (312) 407-0700

                                   - and -

                          By: /s/ Kayalyn A. Marafioti
                              Kayalyn A. Marafioti (KM 9632)
                              Thomas J. Matz (TM 5986)
                          Four Times Square
                          New York, New York 10036
                          (212) 735-3000

                          Attorneys for Delphi Corporation, et al.,
                            Debtors and Debtors-in-Possession

24

**<u>Exhibit A</u>**

**Proposed Special Attrition Programs Approval Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                            :
       In re                      :     Chapter 11
                            :
 DELPHI CORPORATION, et al.,    :     Case No. 05-44481 (RDD)
                            :
             Debtors.     :     (Jointly Administered)
                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ORDER UNDER 11 U.S.C. § 363(b) AND FED. R. BANKR. P. 6004
APPROVING DEBTORS' HUMAN CAPITAL HOURLY ATTRITION PROGRAMS

("HUMAN CAPITAL HOURLY ATTRITION PROGRAMS ORDER")

          Upon the motion, dated March 22, 2006 (the "Motion"), of Delphi Corporation

("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the

above-captioned cases (collectively, the "Debtors"), for an order (the "Order") under 11 U.S.C. §

363(b) and Rules 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")

(a) approving and authorizing the Debtors to enter into agreements providing for the human

capital hourly attrition programs (collectively, the "Hourly Attrition Programs") covering the

majority of the Debtors' hourly union-represented employees, (b) authorizing the Debtors to

implement the Hourly Attrition Programs, (c) authorizing and approving the UAW Special

Attrition Program Agreement (as defined in ordering paragraph 2 below), and (d) approving the

provisions set forth in paragraphs 3.b.iv.3, 7.b, 7.c and 7.d of the UAW Special Attrition

Program Agreement (provided, however that such express approval thereof shall not be deemed

to limit in any way this Court's approval of any other provisions of the UAW Special Attrition

Program Agreement); and this Court having determined that the relief requested in the Motion is

in the best interests of the Debtors, their estates, their creditors, and other parties-in-interest; and

it appearing that proper and adequate notice of the Motion has been given and that no other or

further notice is necessary; and after due deliberation thereon; and good and sufficient cause

appearing therefor, it is hereby

ORDERED, ADJUDGED, AND DECREED THAT:

1.    The Motion is GRANTED and the Hourly Attrition Programs are hereby

APPROVED.

2.    The Debtors are hereby authorized to enter into the agreement by and

among  Delphi Corporation, General Motors Corporation ("GM"), and the United Automobile,

Aerospace and Agricultural Implement Workers of America (the "UAW") attached hereto as

Exhibit 1 (the "UAW Special Attrition Program Agreement") and to implement the terms of such

UAW Special Attrition Program Agreement.

3.    The Debtors are hereby authorized, but not directed, to enter into

agreements providing for reasonably comparable (as to the Debtors' obligations) Hourly Attrition

Programs for the Debtors' non-UAW, union-represented employees (the "Hourly Attrition

Program Agreements") and to implement such Hourly Attrition Programs provided for by the

terms of the Hourly Attrition Program Agreements, which shall be on terms reasonably similar to

the UAW Special Attrition Program Agreement.

4.    Except for bilateral agreements of a union and GM to which the Debtors

are not a party, each of the signatories to the agreements memorializing the Hourly Attrition

Programs, including, without limitation, the UAW Special Attrition Program Agreement (each

such party, a "Signatory," and collectively, the "Signatories") is directed to take all actions

necessary or appropriate to effectuate the terms of this Order and the terms of its respective

Hourly Attrition Program (including, without limitation, the UAW Special Attrition Program

2

Agreement), including, without limitation, any and all actions necessary or appropriate to its

implementation of and performance under such program.

       5.     With respect to payment by the Debtors of gross monthly wages to those

employees that participate in the voluntary pre-retirement program as provided by paragraph 3.b

of the UAW Special Attrition Program Agreement, Delphi shall establish a segregated bank

account (the "Segregated Account") that shall be funded in the amount of $75 million.  The

funds in the Segregated Account shall be available to satisfy the obligations of paragraph 3.b of

the UAW Special Attrition Program Agreement and for no other purpose.  Under no

circumstances (including but not limited to conversion of Delphi's Chapter 11 cases to Chapter 7

proceedings) shall the assets in the Segregated Account be available to satisfy the claims of any

party other than the employees except as otherwise specifically provided in the UAW Special

Attrition Program Agreement.

       6.     The Debtors are authorized, but not directed, to establish a similar account

with substantially similar rights and protections for each Hourly Attrition Program entered into

with the Debtors' non-UAW, union-represented employees.

       7.     The UAW Special Attrition Program Agreement (and the other Hourly

Attrition Programs Agreements, to the extent so provided therein) shall not be subject to

abrogation, modification or rejection without the mutual consent of the applicable Signatories

thereto (with the exception of Delphi's consent solely in connection with the bilateral agreements

of the UAW (or such other union, as applicable) and GM (such as paragraphs 1 and 5a.-d, f, and

g obligations) that do not affect the Debtors).  The UAW Special Attrition Program Agreement,

the other Hourly Attrition Programs Agreements and this Court's approval of such agreements

are each without prejudice to any interested party (including the Signatories and the Official

3

Committee of Unsecured Creditors) in all other aspects of the Debtors' chapter 11 cases, including by illustration, the Debtors' and GM's respective positions in all commercial discussions and claims matters between them, all collective bargaining matters involving the parties, in any potential proceedings under Sections 1113 and/or 1114 of the Bankruptcy Code with respect to the UAW (or such other union, as applicable), under Section 365 of the Bankruptcy Code with respect to GM's contracts with the Debtors, in any pension termination proceeding under the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and/or the Bankruptcy Code, and all claims administration and allowance matters.

8.      Nothing in the UAW Special Attrition Program Agreement, the other Hourly Attrition Program Agreements, or this Court's approval of such agreements shall limit or otherwise modify (a) the Debtors' rights under Section 4041 of ERISA, or (b) the Debtors' rights under Section(s) 1113 and/or 1114 of the Bankruptcy Code with regard to any obligations which pre-existed the UAW Special Attrition Program Agreement or the other Hourly Attrition Programs Agreements (including pre-existing obligations referenced within such agreements), such as (by way of illustration only) the obligation to maintain the hourly pension plan or provide retirees or active employees (including employees/retirees participating in the attrition programs contained in the UAW Special Attrition Program Agreement or the other Hourly Attrition Program Agreements, as applicable) with levels of healthcare or other benefits as specified in pre-existing labor agreements.  Under no circumstances shall the Debtors freeze any pension plan covering UAW-represented employees in a manner that prevents such employees in the pre-retirement program described in paragraph 3.b. of the UAW Special Attrition Program Agreement from receiving on-going credited service sufficient to reach 30 years of credited service.  The Debtors shall provide the same healthcare and life insurance coverage to employees

4

participating in paragraph 3.b. of the UAW Special Attrition Program Agreement that it provides

to its other active UAW employees; provided, however, that if the Debtors reduce or eliminate

such coverage provided to their active UAW employees, GM shall subsidize such coverage

provided to employees participating in such paragraph 3.b up to the level provided to GM-UAW

active employees.

9.      Any obligations assumed by GM under the UAW Special Attrition

Program Agreement with respect to OPEB under paragraph 4. thereof or active health care and

life insurance under Paragraph 7.d. thereof shall be conclusively deemed to be comprehended by,

included within, and shall constitute a prepetition, general unsecured claim assertable by GM

against the estate of Delphi Corporation under the U.S. Employee Matters Agreement (including

without limitation, related flowback agreements and the UAW-GM-Delphi Memorandum of

Understanding – Benefit Plan Treatment and the UAW-GM-Delphi Flowback Agreements

contained in the 1999 and 2003 GM-UAW and Delphi-UAW Contract Settlement Agreements),

Delphi's Agreement dated December 22, 1999 to indemnify GM for its liability under the

Benefit Guarantee as if all conditions for the triggering of GM's claim shall have occurred, and

Delphi's general indemnity of GM under the Master Separation Agreement.  GM has agreed to

assume and pay OPEB payments to Delphi employees who "check the box" and/or flow back to

GM for purposes of retirement, and to pay the amounts due under paragraph 3.a.i. of the UAW

Special Attrition Program Agreement.  The presumed triggering of GM's claim against Delphi

Corporation described above is only for purposes of the UAW Special Attrition Program

Agreement and does not trigger any contractual claims against either Delphi or GM beyond their

respective obligations under the UAW Special Attrition Program Agreement.

10.    Nothing contained in the UAW Special Attrition Program Agreement, any other Hourly Attrition Program Agreements or this Court's approval of such agreements shall constitute an assumption of any agreement described therein, including, without limitation (a) any collective bargaining agreement between the UAW (or any other union, as applicable) and the Debtors, or (b) any commercial agreement between GM and the Debtors, nor shall anything in the UAW Special Attrition Program Agreement, in any other Hourly Attrition Program Agreement, or in this Court's approval of such agreements be deemed to create an administrative or priority claim with respect to GM or convert a prepetition claim into a postpetition claim or an administrative expense with respect to any party.

11.    Notwithstanding any provision in the Bankruptcy Code or Bankruptcy Rules to the contrary, the Debtors are not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order, and the Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

12.    This Court shall retain jurisdiction to hear and determine all matters, arising from the implementation and performance of this Order and the Hourly Attrition Programs and over each of the Signatories in connection therewith; provided, however, that the Court's jurisdiction shall not extend to bilateral agreements of the UAW (or such other union, as applicable) and GM (such as paragraphs 1 and 5a.-d, f, and g obligations of the UAW Special Attrition Program Agreement).

13.     The requirement under Rule 9013-1(b) of the Local Bankruptcy Rules for

the United States Bankruptcy Court for the Southern District of New York for the service and

filing of a separate memorandum of law is deemed satisfied by the Motion.

Dated: New York, New York
       April ___, 2006


_____
UNITED STATES BANKRUPTCY JUDGE

## **Exhibit 1**

**The UAW Special Attrition Program Agreement**

## UAW-GM-DELPHI
## SPECIAL ATTRITION PROGRAM

Due to the extraordinary circumstances in the domestic auto industry and the Delphi bankruptcy, the parties agree to the following special one-time program:

1. GM and the UAW agree on a Special Attrition Program at GM:
   a. $35,000 for normal or early voluntary retirements retroactive to October 1, 2005.
   b. 50 & 10 Mutually Satisfactory Retirement (MSR).
   c. Any employee with at least 27 and less than 30 years of credited service regardless of age will be eligible for special voluntary placement in a pre-retirement program under the following terms:
      i. Employees electing this pre-retirement program must be eligible no later than July 1, 2006.
      ii. Employees will retire without additional incentives when they first accrue 30 years of credited service under the provisions of the General Motors Hourly-Rate Employees Pension Plan.
      iii. The gross monthly wages while in the program will be:
         1. 29 years credited service    $2,900
         2. 28 years credited service    $2,850
         3. 27 years credited service    $2,800
         Wages will be paid weekly on an hourly basis (2,080 hours per year) and will remain at that rate until 30 years of credited service is accrued.
   d. Due to their unique situations, Oklahoma City, Linden, Muncie, Lansing Craft Centre and Baltimore plants will have the following additional option:
      i. Employees with 26 years of credited service will be eligible for the pre-retirement program.
      ii. The monthly wages while in the program for those who sign up with 26 years credited service will be $2,750 paid weekly on an hourly basis and will remain at that rate until 30 years of credited service is accrued.
   e. Buy out of $140,000 (10 or more years seniority) or $70,000 (less than 10 years seniority) to sever all ties with GM and Delphi except any vested pension benefits.
   f. This program will be offered on a nation-wide basis immediately. The application period, timing of the retirements and release dates will be determined by the joint UAW-GM National Parties.

2. GM and the UAW agree on the following items related to flowbacks from Delphi:
   a. GM commits to 5,000 Delphi flowbacks. The target date for reaching this level is September 1, 2007. This date may be extended by mutual agreement of the UAW-GM National Parties through December 31, 2007. To further extend the target date will require the agreement of the UAW, GM, and Delphi. The order of placement will continue to be governed by Appendix A and the Flowback Agreement.
   b. Employees who flowed from GM to Delphi will have the same flowback rights as other Delphi employees covered by the Flowback Agreement.

    c. Any Delphi employee with flowback rights who turned down an area hire offer will be given one more area hire offer to return to GM.

    d. The employees who were hired at Delphi after October 18, 1999, who were on-roll at the time the Delphi bankruptcy was declared (October 8, 2005) will be given two opportunities to fill openings at GM after all GM employee or Delphi flowback applications have been exhausted. One will be within a reasonable distance from their plant (either in the area hire or a location to be determined jointly by GM and the UAW) and one will be anywhere in the country.

3. Delphi and the UAW agree on the following Special Attrition Program for Delphi employees:

    a. An attrition program will be run for Delphi employees as follows:

        i. $35,000 for normal or early voluntary retirements retroactive to October 1, 2005.

        ii. 50 & 10 Mutually Satisfactory Retirement (MSR).

    b. Any employee with at least 27 and less than 30 years of credited service regardless of age will be eligible for special voluntary placement in a pre-retirement program under the following terms:

        i. Employees electing this pre-retirement program must be eligible no later than July 1, 2006.

        ii. Employees will retire without additional incentives when they first accrue 30 years of credited service under the provisions of the Delphi Hourly-Rate Employees Pension Plan.

        iii. The gross monthly wages while in the program will be:

            1. 29 years credited service    $2,900
            2. 28 years credited service    $2,850
            3. 27 years credited service    $2,800

        Wages will be paid weekly on an hourly basis (2,080 hours per year) and will remain at that rate until 30 years of credited service is accrued.

        iv. Within ten (10) business days after the first date on which any employees are eligible to receive wage payments in accordance with Paragraph 3.b.iii. above, Delphi will establish a segregated payment account (the "Account") in the amount of $75 million (the "Ceiling Amount"). The funds in the Account will be available to reimburse Delphi for the payment of weekly wage payments (which will be paid through Delphi's normal payroll process) under Paragraph 3.b.iii. above or for direct wage payments to employees entitled to receive such payments, as described in this Paragraph.

            1. Delphi shall not draw funds from the Account for purposes of this Paragraph until a date (the "Permitted Draw Down Date"), which shall be the later of the Final Election Date or the Adequate Funding Date (see definitions below). Prior to the Permitted Draw Down Date, payments to satisfy the obligations to employee participants pursuant to this Paragraph will be drawn from Delphi's available cash.

2. If, on the Permitted Draw Down Date, the Anticipated Liability is less than the Ceiling Amount, Delphi shall be permitted to draw such funds out of the Account so that the balance remaining in the Account is equal to the Anticipated Liability.

> The Final Election Date shall be the first of the month following the last day on which employees at any UAW-Delphi facility can make an election to participate in the pre-retirement program described in Paragraph 3.b., or sooner if determined by the UAW-Delphi National Parties.

> The Adequate Funding Date shall be the date on which the Ceiling Amount is greater than or equal to the Anticipated Liability.

> The Anticipated Liability shall be an amount, calculated after the Final Election Date, sufficient to pay all of the remaining liabilities under Paragraph 3.b.iii. for all employees who have elected to participate in such program for the full remaining duration of such program. The Anticipated Liability shall be calculated based on the number of eligible employees, the remaining duration of the wage payments, and the applicable pay rates.

3. The funds in the Account shall be available to satisfy the obligations of this Paragraph and for no other purpose. The Bankruptcy Court order approving this Agreement shall specifically provide that under no circumstances (including but not limited to conversion of Delphi's Chapter 11 cases to Chapter 7 proceedings) shall the assets in the Account be available to satisfy the claims of any party other than the employees. This Agreement is, in its entirety, contingent on entry of an order which, to the satisfaction of the UAW and Delphi National Parties provides the protections described in this Paragraph.

c. This program will be offered on a nation-wide basis immediately. The application period, timing of retirements, release dates, and number of sign-up dates will be determined jointly by Delphi and the UAW. These dates may vary by location.

4. GM, the UAW and Delphi agree that any employee electing to retire under option 3.a.i. or 3.a.ii., or electing to retire under 3.b. above will be permitted to either retire from Delphi or flowback to GM for purposes of retirement ("check the box"). Any employee choosing GM under this provision will be considered a flowback to GM effective the day of retirement for purposes of the U.S. Employee Matters Agreement and all GM, UAW and Delphi agreements governing flowbacks, including this Agreement.

a. Any employee choosing option 3.b. above will be considered a Delphi employee until they retire.

      b.  Flowbacks under "check the box" retirements will not reduce the 5,000 commitment in 2.a.

5.  GM and the UAW agree to the following:
    a.  Oklahoma City will be given closed plant treatment for purposes of placement under Appendix A.
    b.  Lordstown will be included in the area hire for Pittsburgh as of June 1, 2007. Any move greater than 50 miles will be eligible for relocation.
    c.  Employees at Spring Hill who have made application for transfer to Bowling Green as of a mutually agreed-upon date will be given on a one-time basis the same preference as volunteers from plants with closed plant treatment.
    d.  After the Special Attrition Program has been run, or no later than December 31, 2006, GM and the UAW agree to discuss:
        i.  Options to address remaining surplus people at specific locations. These options may include expanding the area hire and other options covered in the National Agreement.
        ii.  All areas in which the parties can work together to close GM's competitive gap with the foreign competition and reduce GM's structural cost.
    e.  Following the implementation of this program, if there are still employees at Delphi who wish to leave Delphi (including those who want to flowback to GM), the UAW, GM, and Delphi agree to implement a mutually acceptable resolution to this matter.
    f.  GM will use temporary employees as needed to bridge any difficulties arising from the implementation of the Special Attrition Program subject to the approval of the UAW-GM National Parties.
    g.  During the course of this nationwide Special Attrition Program certain obligations from Appendix K will be "frozen." This means:
        i.  No additional obligations from attrition.
        ii.  No one for two hires from Delphi flowbacks.
       iii.  No credit against obligations from Delphi flowbacks.

6.  Delphi and the UAW agree to the following:
    a.  Delphi will use temporary employees as needed to bridge any difficulties arising from the implementation of the Special Attrition Program subject to the approval of the UAW-Delphi National Parties.
    b.  Delphi and the UAW may agree to use separated employees as contract personnel on a case by case basis as needed to bridge any difficulties arising from the implementation of the Special Attrition Program.
    c.  During the course of the Special Attrition Program, the eligibility of GM employees to flow to Delphi will be suspended and no additional hiring obligations due to attrition or flowbacks from Delphi to GM will accrue.

7.  The parties acknowledge the following matters regarding the Special Attrition Program:
    a.  Delphi's participation in this Agreement is subject to the approval of the U.S. Bankruptcy Court; which approval Delphi will seek promptly at the April 7, 2006 omnibus hearing should this Agreement be finalized in time for Delphi to file a

motion by March 22, 2006 or as otherwise permitted by the Case Management Order in Delphi's Chapter 11 cases. In the event such participation is not allowed by the Bankruptcy Court, GM and the UAW will have no obligations hereunder.

b. For the avoidance of doubt, any obligations assumed by GM under this Agreement with respect to OPEB under Paragraph 4. above or active health care and life insurance under 7.d. below shall be conclusively deemed to be comprehended by, included within, and shall constitute a prepetition, general unsecured claim assertable by GM against the estate of Delphi Corporation under the U.S. Employee Matters Agreement (including without limitation, related flowback agreements and the UAW-GM-Delphi Memorandum of Understanding – Benefit Plan Treatment and the UAW-GM-Delphi Flowback Agreements contained in the 1999 and 2003 GM-UAW and Delphi-UAW Contract Settlement Agreements), Delphi's Agreement dated December 22, 1999 to indemnify GM for its liability under the Benefit Guarantee as if all conditions for the triggering of GM's claim shall have occurred, and Delphi's general indemnity of GM under the Master Separation Agreement. GM agrees to assume and pay OPEB payments to Delphi employees who "check the box" and/or flow back to GM for purposes of retirement, and to pay the amounts due under Paragraph 3.a.i. above. The presumed triggering of GM's claim against Delphi Corporation described above is only for purposes of this Agreement and does not trigger any contractual claims against either Delphi or GM beyond their respective obligations under this Agreement.

c. This Agreement shall not be subject to abrogation, modification or rejection without the mutual consent of the UAW, GM and Delphi (with the exception of bilateral agreements of the UAW and GM that do not affect Delphi such as Paragraphs 1 and 5a.-d., f., and g. obligations, which may be modified by the UAW-GM National Parties), and the order obtained in the Bankruptcy Court by Delphi approving this Agreement shall so provide. The parties further agree (and the Bankruptcy Court order shall also provide) that this Agreement is without prejudice to any interested party (including the parties to this Agreement and the Official Committee of Unsecured Creditors) in all other aspects of Delphi's Chapter 11 cases, including by illustration, Delphi's and GM's respective positions in all commercial discussions and claims matters between them, all collective bargaining matters involving the parties, in any potential proceedings under Sections 1113 and/or 1114 of the Bankruptcy Code with respect to the UAW and under Section 365 of the Bankruptcy Code with respect to GM's contracts with Delphi, in any pension termination proceeding under ERISA and/or the Bankruptcy Code, and all claims administration and allowance matters.

d. Nothing in this Agreement shall limit or otherwise modify (a) Delphi's rights under Section 4041 of ERISA, or (b) Delphi's rights under Section 1113 and/or 1114 of the Bankruptcy Code with regard to any obligations which pre-existed this Agreement (including pre-existing obligations referenced within this Agreement), such as (by way of illustration only) the obligation to maintain the hourly pension plan or provide retirees or active employees (including employees/retirees participating in the attrition programs contained in this Agreement) with levels of healthcare or other benefits as specified in pre-existing labor agreements. Under no circumstances shall Delphi freeze its pension plan in

a manner that prevents employees in the pre-retirement program described in Paragraph 3.b. above from receiving on-going credited service sufficient to reach 30 years of credited service. Delphi shall provide the same healthcare and life insurance coverage to employees participating in Paragraph 3.b. above that it provides to its other active UAW employees; provided, however, that if Delphi reduces or eliminates such coverage provided to its active UAW employees, GM shall subsidize such coverage provided to employees participating in Paragraph 3.b. above up to the level provided to GM-UAW active employees. Except as otherwise expressly provided herein, nothing in this Agreement shall limit, expand or otherwise modify the rights or obligations of any party under the Benefit Guarantee between GM and the UAW.

e. Nothing contained herein shall constitute an assumption of any agreement described herein, including, without limitation any collective bargaining agreement between the UAW and Delphi or any commercial agreement between GM and Delphi, nor shall anything herein be deemed to create an administrative or priority claim with respect to GM or convert a prepetition claim into a postpetition claim or an administrative expense with respect to any party.

f. For the avoidance of doubt, any employee participating in the Special Attrition Program for Delphi Employees under 3. above, who elects to flowback to GM for purposes of retirement ("check the box"), will be eligible to retire in accordance with Sections 3.a.6. and 3.b.6. of the UAW-GM-Delphi Memorandum of Understanding Benefit Plan Treatment (MOU). For illustrative purposes, as provided in the MOU, such Delphi employees will be eligible for pro-rata pension benefits as defined in the MOU, including but not limited to eligibility for all basic benefits and supplements. For example, such employees checking the box who have 100% of his/her credited service in the Delphi Plan will receive 100% of their pension benefit from the Delphi Plan. Similarly, any employee retiring from GM under 1.b. with credited service under the Delphi Plan shall be considered eligible to retire under the Delphi Plan with eligibility for pro-rata pension benefits.

General Motors Corporation    Delphi Corporation    International Union, UAW

General Motors Corporation    Delphi Corporation    International Union, UAW

General Motors Corporation    Delphi Corporation    International Union, UAW

Date: 3/22/06

**EXHIBIT C**

**Hearing Date and Time: April 7, 2006 at 10:00 a.m.**
**Objection Deadline: April 4, 2006 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

     - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
        In re                                 :    Chapter 11
                                              :
DELPHI CORPORATION, et al.,                   :    Case No. 05-44481 (RDD)
                                              :
                        Debtors.              :    (Jointly Administered)
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NOTICE OF MOTION FOR ORDER UNDER 11 U.S.C. § 363(b) AND FED. R. BANKR. P.
6004 APPROVING DEBTORS' HUMAN CAPITAL HOURLY ATTRITION PROGRAMS

PLEASE TAKE NOTICE that on March 22, 2006, Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), filed a Motion For Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Approving Debtors' Human Capital Hourly Attrition Programs (the "Motion").

PLEASE TAKE FURTHER NOTICE that a hearing to consider approval of the Motion will be held on April 7, 2006, at 10:00 a.m. (Prevailing Eastern Time) (the "Hearing") before the Honorable Robert D. Drain, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 610, New York, New York 10004.

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion must (a) be in writing, (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and the Supplemental Order Under 11 U.S.C. §§ 102(1) and 105 and Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing Omnibus Hearing Dates and Certain Notice, Case Management, and Administrative Procedures (the "Supplemental Case Management Order") (Docket No. 2883), (c) be filed with the Bankruptcy Court in accordance with General Order M-242 (as amended) – registered users of the Bankruptcy Court's case filing system must file electronically, and all other parties-in-interest must file on a 3.5 inch disk (preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format), (d) be submitted in hard-copy form directly to the chambers of the Honorable Robert D. Drain, United States Bankruptcy Judge, and (e) be served upon (i) Delphi Corporation, 5725 Delphi Drive, Troy, Michigan 48098 (Att'n: General Counsel), (ii) counsel to the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Suite 2100, Chicago, Illinois 60606 (Att'n: John Wm. Butler, Jr.), (iii) counsel for

2

the agent under the Debtors' prepetition credit facility, Simpson Thacher & Bartlett LLP, 425

Lexington Avenue, New York, New York 10017 (Att'n: Kenneth S. Ziman), (iv) counsel for the

agent under the postpetition credit facility, Davis Polk & Wardwell, 450 Lexington Avenue, New

York, New York 10017 (Att'n:  Marlane Melican), (v) counsel for the Official Committee of

Unsecured Creditors, Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022

(Att'n: Robert J. Rosenberg and Mark A. Broude), and (vi) the Office of the United States

Trustee for the Southern District of New York, 33 Whitehall Street, Suite 2100, New York, New

York 10004 (Att'n:  Alicia M. Leonhard), in each case so as to be **received** no later than **4:00

p.m. (Prevailing Eastern Time) on April 4, 2006** (the "Objection Deadline").

3

PLEASE TAKE FURTHER NOTICE that only those objections made as set forth herein and in accordance with the Supplemental Case Management Order will be considered by the Bankruptcy Court at the Hearing.  If no objections to the Motion are timely filed and served in accordance with the procedures set forth herein and in the Supplemental Case Management Order, the Bankruptcy Court may enter an order granting the Motion without further notice.

Dated:  New York, New York
        March 22, 2006

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:/s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr. (JB 4711)
    John K. Lyons  (JL 4951)
    Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

    - and -

By: /s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

4