*Hearing Date/Time: June 15, 2006 at 10:00 a.m.*
*Objection Deadline: June 8, 2006 at 4:00 p.m.*

Michael P. Richman (MR-2224)
MAYER, BROWN, ROWE & MAW LLP
1675 Broadway
New York, New York 10019
Phone: (212) 506-2500
Facsimile: (212) 262-1910

*Counsel for Ernst & Young LLP*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------ x
                               :
    In re                    :    Chapter 11
                               :
DELPHI CORPORATION, et al.,    :    Case No. 05-44481 (RDD)
                               :
                        Debtors.  :    (Jointly Administered)
                               :
------------------------------ x

# FIRST AND FINAL APPLICATION OF ERNST & YOUNG LLP, AS SARBANES-OXLEY, VALUATION, AND TAX SERVICES PROVIDERS FOR THE DEBTORS, FOR ALLOWANCE AND PAYMENT OF COMPENSATION FOR PROFESSIONAL SERVICES AND REIMBURSEMENT OF ACTUAL AND NECESSARY EXPENSES

| | |
|---|---|
| Name of Applicant: | Ernst & Young LLP |
| Authorized to Provide Professional Services to: | Delphi Corporation, and certain of its subsidiaries and affiliates, as debtors and debtors-in-possession |
| Date of Retention Order: | January 5, 2006, *nunc pro tunc* to October 8, 2005 |
| Period for Which Compensation and Reimbursement is Sought: | October 8, 2005 through January 31, 2006 |
| Amount of Compensation Sought as Actual, Reasonable and Necessary: | $3,140,215 |
| Amount of Expense Reimbursement Sought as Actual, Reasonable and Necessary: | $152,464 |
| Less: Aggregate Amounts Paid to Date: | ($2,664,635) |
| Amount of Compensation Requested for Payment: | $628,044 |

17361218

Voluntary Reductions:

| | |
|---|---:|
| Monthly Fee Statements: | $8,000 |
| Fee Applications: | $0 |
| Total Voluntary Reductions: | $8,000 |

This is a(n) __ Interim _X_ Final Application

Prior Applications Filed:

| Date Filed | Period Covered | Fees | Expenses | Status |
|---|---|---|---|---|
| N/A | N/A | N/A | N/A | N/A |

Ernst & Young LLP (the "Applicant" or "E&Y"), former Sarbanes-Oxley, valuation and tax services providers to Delphi Corporation, and certain of its subsidiaries and affiliates, as debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), respectfully represents:

### INTRODUCTION

1. This is the Applicant's first and final application (the "Application") for allowance and payment of compensation for professional services and reimbursement of expenses pursuant to sections 330 and 331 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Local Rule 2016-1 of the Local Rules of the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"), the Court's General Orders M-104 and M-151 (the "General Orders"), the United States Trustees Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses filed under 11 U.S.C. §330 adopted on January 30, 1996 (the "UST Guidelines") and the Order under 11 U.S.C. § 331 Establishing Procedures for Interim Compensation and Reimbursement of Professionals, entered November 4, 2005 (the "Interim Compensation Order," and collectively, the "Applicable Guidelines and Orders").

2. This Application requests compensation for Sarbanes-Oxley, valuation and tax services (the "Services") rendered by the Applicant on behalf of the Debtors during the period October 8, 2005 through January 31, 2006 (the "Compensation Period") and reimbursement of actual and necessary expenses incurred by (or first billed by outside vendors to) the Applicant during the Compensation Period in connection with the rendering of such services. This Application complies with the Bankruptcy Code, the Bankruptcy Rules, the UST Guidelines and

17361218                                    3

the Local Rules, as stated in the certification dated March 29, 2006, attached hereto as <u>Exhibit A</u>, made on behalf of the Applicant by Randall J. Miller (the "<u>Certification</u>").

3.  This Application seeks the final approval and allowance of compensation in the amount of **$3,140,215** representing the fees for Applicant's actual time charges for **19,146.5 hours** of professional services rendered during the Compensation Period, <u>plus</u> reimbursement of actual and necessary expenses incurred in the amount of **$152,464**, for a total of **$3,292,679**, all as more fully set forth below. This Application also requests this Court authorize and direct the Debtors to pay E&Y the fees held back from payment (20% of the total fees billed) in the amount of **$628,044**. Applicant submits that allowance and payment of these amounts are fully warranted given the actual and necessary services rendered to the Debtors by the Applicant as described in this Application.

<u>JURISDICTION</u>

4.  This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

<u>BACKGROUND</u>

5.  On October 8, 2005 (the "<u>Petition Date</u>"), Delphi Corporation and certain of its U.S. subsidiaries filed voluntary petitions in this Court for reorganization relief under chapter 11 of the Bankruptcy Code. On October 14, 2005, three additional U.S. subsidiaries of Delphi Corporation also sought reorganization relief. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. This Court entered orders directing the joint administration of the Debtors' chapter 11 cases.

6. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee"). No trustee or examiner has been appointed in the Debtors' cases. No committee has been appointed for the purpose of reviewing fees and expenses in these cases (a "Fee Committee").

On November 4, 2005, this Court entered the Interim Compensation Order, which authorizes the monthly payment of eighty percent (80%) of fees and one hundred percent (100%) of expenses to retained professionals upon submission of timely monthly statements to, and provided no formal objections were filed by, the Debtors and their counsel, the U.S. Trustee, counsel for the Creditors' Committee, counsel for the agent under the Debtors' prepetition credit facility, counsel for the agent under the Debtors' postpetition credit facility, and the members of any Fee Committee (collectively, the "Notice Parties"). The Interim Compensation Order also requires the submission of periodic interim fee applications and a final fee application for approval and allowance of compensation and reimbursement of expenses, upon which any formal objections not resolved consensually will be presented to the Court.

### RETENTION OF ERNST & YOUNG LLP AND MONTHLY FEE STATEMENTS

7. Prior to and through the Petition Date, the Debtors required the provision of Sarbanes-Oxley, valuation and tax services. Following the Petition Date, Debtors retained Applicant based on Applicant's professional standing and reputation, experience in providing Sarbanes-Oxley, valuation, and tax services in restructurings and reorganizations, experience in rendering services in large, complex chapter 11 cases on behalf of debtors and creditors, and significant experience and institutional knowledge regarding the Debtors' businesses, operations, finances, and systems based on Applicant's pre-petition provision of Sarbanes-Oxley, valuation and tax services to the Debtors.

8. At the Debtors' request, on the Petition Date, the professionals of E&Y and certain other Ernst & Young Global Limited ("EYGL") member firms (the "EYGL Member Firms") subcontracted pursuant to the Engagement Letters (as defined below) commenced the provision of the Services for the Debtors.

9. On November 28, 2005, the Debtors filed the Application for Order Under 11 U.S.C. §§ 327(a), 328(a), and 1107(b) Authorizing Employment and Retention of Ernst & Young LLP as Sarbanes-Oxley, Valuation and Tax Services Providers to Debtors, Effective *Nunc Pro Tunc* to October 8, 2005 (the "Initial Application"). The Initial Application sought the Court's authorization of the Debtors' employment of the Applicant to perform the Services in accordance with the terms of four engagement letters attached as exhibits to the Initial Application (the "Engagement Letters"). The Engagement Letters set forth, among other matters, the scope of the Services (a summary of which is attached hereto as Exhibit B), the terms of compensation for fees and expenses, and terms for subcontracting certain Services to the EYGL Member Firms.

10. E&Y and the EYGL Member Firms completed all of the Services under the Engagement Letters on or before December 16, 2005. On December 29, 2005, Applicant provided formal notice of termination of the Engagement Letters to the Debtors.

11. On January 5, 2006, the Court entered an order approving the Initial Application on a final basis, *nunc pro tunc* to the Petition Date (the "Retention Order").

12. On or about January 24, 2006, Applicant sent copies of three monthly fee statements for (i) October 8, 2005 through October 31, 2005 requesting $727,351 in fees and $37,644 in expenses (the "October Fee Statement"), (ii) November 1 through December 2, 2005 requesting $1,902,468 in fees and $105,938 in expenses (the "November Fee Statement"), and

(iii) December 3 through December 16, 2005 requesting $510,396 in fees and $8,882 in expenses (the "December Fee Statement," and collectively, the "Monthly Fee Statements") to the Notice Parties.

13.     No party has filed an objection to Applicant's Monthly Fee Statements, and neither Applicant nor counsel for Applicant have received any objections to the Monthly Fee Statements.

14.     The amounts invoiced under the November Fee Statement included a voluntary reduction of $8,000 in fees for professional services which had been previously negotiated with the Debtors reflecting 61.0 hours of additional time spent at the Debtors' Kokomo, Indiana site under the BRS 404 SOX Project (as defined below).

15.     On or about February 22, 2006, Debtors paid Applicant $2,247,437, representing eighty percent (80%) of the fees for professional services and one hundred percent (100%) of the expenses invoiced under the October Fee Statement and November Fee Statement. On or about March 22, 2006, Debtors paid Applicant $417,198, representing eighty percent (80%) of the fees for professional services and one hundred percent (100%) of the expenses invoiced under the December Fee Statement. The total amount that Debtors have paid Applicant to date under the Monthly Fee Statements is $2,664,635.

16.     On March 17, 2006, the Debtors filed the Application for Order under 11 U.S.C. §§ 327(a), 328(a), and 1107(b) and Fed. R. Bankr. P. 2014 Authorizing Employment and Retention of Ernst & Young LLP as Independent Auditors, Accountants, and Tax Advisors to Debtors, Effective *Nunc Pro Tunc* To January 1, 2006 (the "2006 Application"). The 2006 Application sought the Court's authorization of the Debtors' employment of the Applicant to perform certain auditing, accounting and tax advisory services (the "2006 Services") in

accordance with the terms of two engagement letters attached as exhibits to the 2006 Application (the "2006 Engagement Letters"), setting forth, among other matters, the scope of Applicant's services and terms of compensation for fees and expenses.

17. For all parties in interest except the Creditors' Committee, the deadline for objecting to the 2006 Application passed on March 27, 2006 at 2:00 p.m. The Debtors have granted the Creditors' Committee extensions to file objections to the 2006 Application until March 30, 2006 at 2:00 p.m. As of the date of this filing, no objections have been filed to the 2006 Application.

18. Since, as of the date of this filing, approval of Applicant's proposed retention under the 2006 Application is still pending, Applicant has not issued any monthly fee statements for the 2006 Services (auditing, accounting and tax advisory services) rendered on and after January 1, 2006. Applicant reserves the right to seek allowance and/or payment for any 2006 Services rendered during the Compensation Period under future fee statements, interim applications and final applications in accordance with the Applicable Guidelines and Orders.

19. No agreement or understanding exists between Applicant and any other person for the sharing of compensation received from services rendered or in connection with Debtors' chapter 11 cases, nor shall Applicant share or agree to share the compensation paid or allowed from Debtors' estates for such services with any other person.

### SUMMARY OF SERVICES RENDERED BY ERNST & YOUNG LLP DURING THE COMPENSATION PERIOD

20. During the Compensation Period, Applicant provided the Services under a number of different discrete projects. The Services fall under the general project categories of (I) Sarbanes-Oxley-related services (the "SOX Services"), (II) valuation services (the "Valuation Services"), which were provided by E&Y's Transaction & Advisory Services practice group

17361218                                    8

("TAS") (III) tax services (the "Tax Services"), which were also provided by TAS, and (IV) services related to the retention of Applicant ("Retention Services" or "Contingency Planning"). Moreover, with respect to (I) the SOX Services, Applicant provided services which correspond to further subcategories, including (A) services provided by E&Y's Business Risk Services practice group ("BRS") related to (1) the functional testing of internal controls related to Section 404 of the Sarbanes-Oxley Act ("SOX"), and the loaning of staff ("SOX 404"), and (2) assistance with the Delphi Corporate Accounting Policies ("Policies & Procedures"), and (B) services provided by E&Y's Technology & Security Risk Services practice group ("TSRS") related to (1) the remediation of segregation of duties ("Segregation of Duties"), (2) assisting the Debtors with implementation of the Certus Sarbanes-Oxley tool ("Proof of Concept") and (3) assisting Delphi IT regarding compliance with SOX Section 404 ("IT SOX 404").

21.     The attached Exhibit C sets forth, separated by project, the names, titles, hourly rates, the number of hours billed and total fees of or by all partners, principals, managers and auditors of Applicant who rendered services to the Debtors during the Compensation Period. The hourly rates comply with the terms of the Engagement Letters and Retention Order, reflect the normal hourly rates for professional services charged by each partner, principal, manager and auditors of Applicant for this type of work, and are consistent with rates typically charged by other comparable firms for this type of work.

22.     Attached hereto as Exhibit D is a schedule specifying the categories of expenses for which the Applicant is seeking reimbursement and the total amount for each such expense category.

23.     The paragraphs below summarize and describe the services performed by E&Y and the subcontracted EYGL Member Firms on behalf of the Debtors during the Compensation

17361218                                              9

Period. The summary is intended, however, only to highlight the general services performed by E&Y and the subcontracted EYGL Member Firms on behalf of the Debtors, and not to set forth each and every item of professional service which Applicant performed. The professionals of E&Y and the subcontracted EYGL Member Firms have maintained contemporaneous time records which indicate the time that each auditor has spent working on a particular matter and the nature of the work performed.[1] Copies of these time records are annexed to this Application as Exhibit E.

**(I)(A)(1) – BRS: SOX 404 Project**

24.    The services provided under the SOX 404 project primarily consisted of providing the Debtors with the testing of internal controls at approximately 75 of the Debtors' locations. E&Y and the subcontracted EYGL Member Firms assisted Debtors' management in a loan staff capacity with reviewing documentation regarding the design effectiveness, and testing the operating effectiveness, of the Debtors' key controls as identified by Debtors' management. E&Y and the subcontracted EYGL Member Firms also assisted the Debtors with prioritizing the findings from such testing, and made recommendations to assist Debtors' management in prioritizing any retesting efforts.

25.    In connection with the foregoing services, E&Y's and the subcontracted EYGL Member Firms' professionals expended a total of 16,495.2 hours during the Compensation Period for which E&Y seeks allowance of compensation for professional services of $2,543,555 and expenses of $145,293.

---

[1] However, the Retention Order provides, "With the exception of E&Y, the Ernst & Young Global Limited member firms providing services under the Engagement Letters shall be permitted to use category codes to describe the time spent on services rendered, rather than the more detailed descriptions usually required for fee applications." E&Y reserves the right to substitute the time entries for the EYGL Member Firms set forth in Exhibit E with category codes pursuant to the Retention Order.

17361218                                                    10

**(I)(A)(2) – BRS: Policies & Procedures**

26.     Under the Policies & Procedures project, E&Y assisted Debtors' management with the development of the organization, format, and content update of the Delphi Corporate Accounting Policies ("DCAP").  E&Y's process was to participate in discussions with Delphi management as to clarity on GAAP in their existing policy.  Overall, the sole responsibility of the interpretation and application of U.S. Generally Accepted Accounting Principles ("GAAP") to Debtors' transactions and financial reporting was the responsibility of the Debtors.  At no time did E&Y provide accounting advice to specific transactions or anticipated future transactions to Delphi.  In addition, E&Y provided generic examples of U.S. GAAP for the application of certain policies relevant to an automotive supplier.  The deliverables provided by E&Y were the recommendations in connection with the development of the organization, format, and content update of the DCAP.

27.     In connection with the foregoing services, E&Y's professionals expended a total of 310.8 hours during the Compensation Period for which E&Y seeks allowance of compensation for professional services of $59,301 (no expenses were incurred).

**(I)(B)(1) – TSRS: Segregation of Duties**

28.     Under the Segregation of Duties project, E&Y assisted with the design and implementation of processes and controls related to user access within various applications of the Debtors, primarily SAP.  This project spanned across all divisions within the Debtors, and included all of the Debtors' international operations.  The project was broken into six primary workstreams which included, Access Review Design, Conflict Review Design, Access Administration Design, Role Analysis, SOX Integration and Tool Development.  The Access Review design phase resulted in a master sensitive transaction list, policies regarding the timing

and extent of the reviews, roles and responsibilities, and detailed procedures for performing the reviews. E&Y also led the training effort around this activity, and assisted management in the administration of the reviews. The Conflict Review phase also included the generation of policies regarding the timing and extent of the reviews, roles and responsibilities, and detailed procedures for performing the reviews, as well as training and administration assistance. Specific to this phase was the creation of Delphi-specific Segregation of Duties ("SOD") rules, SOD compensating controls, and data programs that performed the SOD analysis according to the Debtors' rules. The Access Administration phase was focused on enhancing the existing process for adding users to the system to include a conflict prevention attribute. This phase produced detailed desk procedures, updates to source documentation, and logic requirements for the "SOD What-If Tool". This phase also included end-user training. The Role Analysis phase examined the existing Delphi SAP security structure (through various data analysis techniques and tools) and provided recommendations for improving the structure toward increasing efficiencies and addressing the critical logical access control components (*e.g.*, appropriate sensitive access and appropriate segregation of duties). In addition to providing recommendations, E&Y assisted in some of the role clean-up, specifically, addressing inherent segregation of duties conflicts within roles. The SOX integration phase defined SOD control objectives and activities and integrated them into the SOX templates for assessment / validation. The templates were distributed as part of the SOX program and were validated accordingly. This phase also produced SOD test procedures that were used by the SOX testers in evaluation of the newly designed controls. The Tool Development phase focused on building an application for enabling all of the new logical access processes that were designed (see descriptions above). A web-based tool was built for the Debtors that administered all of the reviews (globally) and

17361218                                    12

executed the conflict analysis logic. It also produced the reports that were used as part of the SOX testing. The combination of these phases resulted in a fully integrated/automated process for performing logical access control operation (increasing control effectiveness and adding efficiencies to the processes). In addition to providing the Debtors with a sustainable process for managing risk associated with logical access, E&Y also helped clean-up existing issues, including a reduction in SAP SOD conflicts from approximately 88,000 to 20,000 globally. All 20,000 remaining conflicts were addressed with compensating transaction-level controls.

29.    In connection with the foregoing services, E&Y's professionals expended a total of 1,586.3 hours during the Compensation Period for which E&Y seeks allowance of compensation for professional services of $345,699 and expenses of $108.

**(1)(B)(2) – TSRS: Proof of Concept**

30.    The Proof of Concept project involved consultation with the Debtors and representatives from Certus regarding the configuration options and deployment methodology for the Certus Sarbanes-Oxley 404 software. This involvement included attendance at meetings with both Delphi and Certus representatives, development of global roll-out plans, application testing to validate functionality requirements, and preparation of executive level reporting for upper level Delphi IT management. Throughout this project, E&Y worked to establish a plan for deploying the Certus software to meet the Debtors' existing specific needs pertaining to their yearly SOX procedures and certifications. The most significant challenge E&Y encountered during this project was testing the ability of Delphi's global user base to utilize the Certus application when hosted in the Delphi IT infrastructure. Through a series of detailed discussions with Certus representatives and Delphi IT, E&Y was able to identify appropriate solutions allowing the majority of the global user base to access and utilize the application without issues.

17361218                                              13

31. In connection with the foregoing services, E&Y's professionals expended a total of 18.7 hours during the Compensation Period for which E&Y seeks allowance of compensation for professional services of $4,021 (no expenses were incurred).

**(1)(B)(3) – TSRS: IT SOX 404**

32. Under the IT SOX 404 project, E&Y's and the subcontracted EYGL Member Firms' primary role was to assist Debtors' management in a loan staff capacity in reviewing documentation regarding the design effectiveness and also to test the operating effectiveness of the key controls of Delphi as identified by management. This project involved consultation with Delphi representatives regarding SOX assessment and testing approach, assistance with the global coordination and execution of SOX assessments and testing, and the resolution of control deficiencies identified by either E&Y, Debtors, or Deloitte & Touche ("Deloitte") testing teams throughout the year. The scope included thirteen IT locations covering 25 significant applications and eight different countries. This involvement included attendance at meetings with both the Debtors and Deloitte representatives, development of global testing plans and training materials, execution of testing plans, review of global work papers for quality, reporting of control deficiencies, remediation and retesting of control deficiencies, and roll-forward procedures. Throughout this project, E&Y's and the subcontracted EYGL Member Firms' most significant accomplishment was the successful coordination of assessments and testing of IT controls across the Debtors' complex global IT organization.

33. In connection with the foregoing services, E&Y's and the subcontracted EYGL Member Firms' professionals expended a total of 310.2 hours during the Compensation Period for which E&Y seeks allowance of compensation for professional services of $77,694 and expenses of $7,063.

17361218                                14

**(II) – TAS: Valuation Services**

34. Under the Valuation Services (also referred to as "VAL/SFAS 142 Step II Analysis" in the Monthly Fee Statements) project, E&Y executed valuations of the fixed assets of one of the Debtors' reporting units for Step Two of the Statement of Financial Accounting Standard 142 ("<u>SFAS 142</u>").  E&Y also reviewed the discounted cash flow analysis for this reporting unit as a part of Step One of SFAS 142.  Over the Compensation Period, E&Y's services under this project consisted of conference calls with the Debtors and its auditor, reviewing, inputting, and analyzing data, and performing valuations of the fixed assets.

35. In connection with the foregoing services, E&Y's professionals expended a total of 101.9 hours during the Compensation Period for which E&Y seeks allowance of compensation for professional services of $31,253 (no expenses were incurred).

**(III) – TAS: Tax Services**

36. The Tax Services (also referred to as "Section 382 Analysis" in the Monthly Fee Statements) project involved performing an analysis to determine whether the Debtors had undergone an ownership change, as defined by section 382 of the Internal Revenue Code (section 382 limits the amount of taxable income that a corporation may offset with net operating loss and credit carry-forwards if the corporation has undergone an ownership change), during the period January 1, 1999 through December 31, 2005.  The services which E&Y provided under this project included 1) gathering data from spreadsheets and sources prepared by the Debtors, from public information available from the Securities and Exchange Commission's Edgar website, and through discussions with the Debtors; 2) applying section 382 and the regulations of the U.S. Treasury issued thereunder to perform calculations to determine the percentage point increases in ownership among five percent shareholders during every testing period from January

17361218                                                   15

1, 1999 through December 31, 2005; 3) drafting a report to document E&Y's analysis and conclusions; and 4) discussing the results of the analysis with the Debtors. The results of E&Y's analysis support that Debtors have not undergone an ownership change under section 382.

37.    In connection with the foregoing services, E&Y's professionals expended a total of 87.3 hours during the Compensation Period for which E&Y seeks allowance of compensation for professional services of $51,130 (no expenses were incurred).

**(IV) – Retention Services (a/k/a Contingency Planning)**

38.    The Retention Services project consisted of work relating to the organization and execution of the required bankruptcy retention process. The majority of the time under this project was focused on conducting a thorough "Connection Check," in which E&Y created a team to search certain databases of E&Y to determine whether E&Y has provided in the recent past or is currently providing services to the parties-in-interest on a list supplied by Debtors' counsel. All parties-in-interest were investigated and an ultimate master spreadsheet was created for inclusion within E&Y's affidavit supporting the Initial Application which summarized the results of the investigation. The remaining time in this project was spent on the following: discussions with internal and external legal counsel regarding filing requirements under the Applicable Guidelines and Orders, preparing and reviewing documents required for inclusion within the retention affidavit (including revisions to all pre-petition engagement letters), and filing the completed retention affidavit in accordance with the Applicable Guidelines and Orders. E&Y is not seeking reimbursement for the time spent by E&Y's in-house counsel nor fees paid by E&Y to its external bankruptcy counsel in connection with its retention in these chapter 11 cases.

39. In connection with the foregoing services, E&Y's professionals expended a total of 175.1 hours during the Compensation Period for which E&Y seeks allowance of compensation for professional services of $24,562 (no expenses were incurred).

40. Every effort has been made to reduce fees by assigning work to professionals with lower hourly rates whenever possible. Upon information and belief, the services provided by Applicant were not duplicative in any manner with the services performed by other professionals retained by the Debtors.

41. All services rendered by the Professionals for the Debtors during the Compensation Period were performed in connection with the representation of Debtors in this chapter 11 case.

## THE REQUESTED COMPENSATION SHOULD BE ALLOWED

42. Section 330 of the Bankruptcy Code provides that a court may award a professional employed under section 327 of the Bankruptcy Code "reasonable compensation for actual necessary services rendered . . . and reimbursement for actual, necessary expenses." 11 U.S.C. § 330(a)(1). Section 330(a)(3) further provides that in determining the amount of reasonable compensation to be awarded,

> [T]he court shall consider the nature and extent, and the value of such services, taking into account all relevant factors, including –
>
> (A) the time spent on such services;
>
> (B) the rates charged for such services;
>
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> (D) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title; and

       (E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

43.    In light of the foregoing, Applicant respectfully submits that the Services for which compensation is sought were necessary and beneficial to the estate and that the compensation sought is reasonable in light of the nature, extent and value of such services.

### NOTICE AND PRIOR APPLICATIONS

44.    Pursuant to paragraph 7 of the Interim Compensation Order, a complete copy of this Application with exhibits has been provided to the Notice Parties. Pursuant to paragraph 8 of the Interim Compensation Order, notice of the filing (including of all exhibits) of and the hearing on the Application has been provided by email (or First Class U.S. Mail if no email address is available) to all parties (other than the Notice Parties) who have filed a notice of appearance, based on the "2002 Entities List" available on the Debtors' "virtual docket" website (http://www.delphidocket.com). Upon request, E&Y shall provide a copy of the Application, with all exhibits, to any party-in-interest who cannot access this Application on the Court's website or the Debtors' "virtual docket" website. In light of the nature of the relief requested herein, Applicant submits that no other or further notice need be provided.

45.    No prior application for the relief sought herein has been made to this or any other Court.

## CONCLUSION

WHEREFORE, Ernst & Young LLP respectfully requests that this Court enter an order (i) approving and allowing on a final basis compensation of fees for professional services rendered for the Debtors during the Compensation Period in the amount of $3,140,215, and reimbursement for actual and necessary expenses incurred during the Compensation Period in the amount of $152,464; (ii) authorizing and directing the Debtors to pay E&Y the total fees held back from payment in the amount of $628,044; and (iii) granting such other and further relief as this Court deems just and equitable under the circumstances.

Dated: New York, New York
       March 29, 2006

By:    /s/ Michael P. Richman
      Michael P. Richman (MR-2224)
      MAYER, BROWN, ROWE & MAW LLP
      1675 Broadway
      New York, New York 10019
      Phone: (212) 506-2500
      Facsimile: (212) 262-1910

*Counsel for Ernst & Young LLP*