**Hearing Date and Time: May 12, 2006 at 10:00 a.m.**
**Objection Deadline: May 5, 2006 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
David E. Springer (DS 9331)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                      :
    In re                             :        Chapter 11
                                      :
DELPHI CORPORATION et al.,      :        Case No. 05-44481 (RDD)
                                      :
                     Debtors.    :        (Jointly Administered)
                                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DECLARATION OF RANDALL S. EISENBERG IN
SUPPORT OF DEBTORS' MOTION FOR ORDER UNDER
11 U.S.C. § 365 AND FED. R. BANKR. P. 6006
AUTHORIZING REJECTION OF CERTAIN EXECUTORY
CONTRACTS WITH GENERAL MOTORS CORPORATION

I, RANDALL S. EISENBERG, DECLARE:

    1.    I am a Senior Managing Director at FTI Consulting, Inc. ("FTI"), which maintains an office at Three Times Square, New York, New York 10036 and in other cities. I submit this declaration in support of the motion of Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession (collectively, the "Debtors"), For An Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing The Rejection Of Certain Executory Contracts With General Motors Corporation ("GM"), dated March 31, 2006 (hereinafter the "Motion"). Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

    2.    Except as otherwise indicated, I have personal knowledge of the information contained herein either directly or through professionals at FTI working under my direction, and am competent to testify as to the matters set forth herein. I am authorized to submit this declaration.

    3.    I have held the position of Senior Managing Director of FTI since 2002. Prior to that time, I was a Partner in PricewaterhouseCoopers LLP's Business Recovery Services ("BRS") practice. The BRS practice was sold to FTI and I joined FTI upon the completion of the transaction. I have served as the engagement leader for numerous large and complex restructurings representing numerous multinational companies in and out of chapter 11 including, without limitation, US Airways, Inc., Kmart Corporation, Planet Hollywood International, Inc., Interpool, Inc., and RSL Communications, Ltd. In connection with these or other engagements I have been involved with, I have served both as an advisor to senior management and the board of directors, and have also served in interim senior management positions.

4. I am a Certified Turnaround Professional, a past Chairman of the Turnaround Management Association, and the current President of the Association for Certified Turnaround Professionals. I have previously served as an Adjunct Professor at the John E. Anderson School of Management at the University of California Los Angeles and the University of Southern California School of Accounting, where I taught cost accounting in their graduate school programs. I am also a certified public accountant licensed in the states of New York and California.

5. FTI was retained by Delphi, on or about August 1, 2005, to provide restructuring and financial advisory services in connection with preparing for a possible chapter 11 filing. FTI's assistance to Delphi included, but was not limited to, preparing "first day" motions, obtaining debtor-in-possession financing, managing vendor issues, and advising on numerous strategic matters associated with the potential filing. Postpetition, FTI has continued to serve as restructuring and financial advisor to the Debtors during the pendency of these chapter 11 cases, advising on a myriad of strategic, operational, and financial issues central to the Debtors' reorganization.

6. FTI has assisted the Debtors in analyzing and understanding the reasons for their declining and unsustainable performance. As part of this analysis, FTI has been involved in the evaluation of steps to address the key factors causing the decline in the Debtors' financial performance — factors that must be rectified to effectuate a turnaround.

7. A key factor causing the Debtors' underperformance is the structure of their contractual arrangements with GM, which require the Debtors to supply products to GM at a loss. FTI has developed extensive knowledge of certain of the

3

Debtors' unprofitable contracts. FTI assisted the Debtors in analyzing the Debtors' businesses and operations, and identifying unprofitable contracts that should be rejected — a large-scale and time-intensive process that is ongoing. The analysis was conceived as a multi-phase process. In connection with the first phase of this contract-review process, FTI assisted the Debtors in completing detailed profitability analyses of all of the executory contracts at four plants (Saginaw, Needmore, Sandusky, and Home Avenue). The second phase considered the profitability of customer supply arrangements at the plant level for 69 of the Debtors' sites. As explained herein, these profitability analyses support the Debtors' business judgment that rejecting the GM contracts at issue in the Motion is in the best interests of the Debtors' estates and integral to a successful turnaround of the Debtors' businesses. I believe that continuing to produce products pursuant to the terms of these contracts, which contain burdensome price as well as non-price terms, will be catastrophic for the Debtors and prevent a successful reorganization.

I.  The Debtors Must Take Immediate Steps To
    <u>Remedy Their Deteriorating Financial Condition</u>

8. In calendar year 2004, Delphi reported a net operating loss of $482 million on $28.6 billion in net sales. In 2005, Delphi had a preliminary, unaudited net operating loss of $2.5 billion on revenues of $26.9 billion. This translates into a year-over-year sales decline of $1.7 billion and additional loss of $2.0 billion.[1] The losses are mainly attributable to Delphi's U.S. operations, which declined financially from 2004 to

---

[1] With the exception of 2004 consolidated financial information, all financial data referenced herein is unaudited financial information derived from the books and records of Delphi. Certain financial information has not been subject to procedures typically applied to financial information presented in accordance with generally accepted accounting principles in the United States and upon the application of such procedures, the financial information could be subject to changes, and these changes could be material.

4

2005. In calendar year 2004, Delphi's U.S. manufacturing sites, collectively, had an operating loss of $1.6 billion on revenues of $12.5 billion. In 2005, Delphi's U.S. manufacturing sites had an operating loss of $2.2 billion on revenues of $11.5 billion. See Declaration of John D. Sheehan, executed March 31, 2006, in support of the Debtors' Motion For Authority To Reject Collective Bargaining Agreements Under 11 U.S.C. § 1113(c) And Modify Retiree Welfare Benefits 11 U.S.C. § 1114(g), Ex. C.

9. Delphi's estimate of revenues and expenses, assuming that (a) Delphi's current labor agreements continued in effect, (b) Delphi retained all of its existing contracts at the volumes Delphi anticipates based on GM's deteriorating financial condition and market share, and (c) pricing pressures and material costs continue on their present trend lines, indicates that Delphi would experience operating losses approximating $8.1 billion over the next five years, through 2010.

10. Direct sales to GM constituted more than 63% of Delphi's North American sales revenue in 2005. Delphi's North American operations — which are more profitable as a whole than the subset constituting the Debtors' U.S. operations — had estimated operating losses of $1.7 billion in 2005 (excluding impairment charges) and are expected to experience an even greater loss in 2006. Efforts to achieve a consensual solution or receive sufficient interim financial support to mitigate the escalating losses under GM loss contracts have so far been unsuccessful. Thus, the Debtors have no alternative: absent a consensual agreement with GM that provides sufficient financial support, the Debtors cannot achieve a successful reorganization and emerge as a viable business enterprise without restructuring unprofitable supply relationships with GM in

their U.S. operations. Therefore, the Debtors must take immediate steps to free themselves from the terms of loss-generating, burdensome executory contracts.

11.     To be a viable business enterprise and to position themselves for emergence from chapter 11, the Debtors must utilize the reorganization process to restructure their contractual relationships with GM so as to be profitable. The Debtors must address their deteriorating financial condition through the rejection and repricing of their burdensome GM contracts. Performing under the unprofitable pricing terms of the Debtors' customer contracts with GM is draining value from the Debtors' estates while subsidizing GM's financial performance. Unless such losses are stanched, the Debtors could face liquidation.

II.     The Debtors' GM Executory
        Contracts Contain Onerous Terms

12.     Delphi is the largest parts supplier to GM. The Debtors currently supply parts to GM under tens of thousands of separate contracts. The contracts at issue in the Motion (the "GM Loss Contracts") are generally requirements contracts that take the form of purchase orders ("POs"). The Debtors' shipment of component parts to GM is triggered by GM's issuance of releases or specified delivery schedules under the POs. The POs establish product specifications and price terms for a specified time period, but generally do not establish specific supply quantities. The GM Loss Contracts contain or incorporate by reference standard GM terms and conditions.

13.     The Debtors have studied the profitability of their supply arrangements with GM and have identified 21 U.S. manufacturing sites that generated estimated operating losses in 2005 of $1.5 billion and projected losses in 2006 of $2.1 billion as a result of the current pricing structure of GM customer supply arrangements

(the "GM Loss Plants"). Aside from onerous price terms, the purchase orders that govern the supply of parts to GM at the 21 GM Loss Plants also contain or incorporate non-price terms that further render them burdensome.

14. The GM Loss Contracts generally do not permit the Debtors to adjust prices equitably during the contract term in light of changing commodity or supply costs. The costs of the Debtors' raw materials — in particular oil, metals, and resins — have more than doubled since 1998. GM has required annual price-downs from Delphi during this same period. While GM typically reserves the right to cancel any purchase order at any time, the Debtors are obligated under the GM Loss Contracts to supply parts to GM at a set price for the entire duration of the contract period. These customer supply contracts typically range from one to three years but some contract terms exceed five years.

15. If granted the relief requested in the Motion, the Debtors will have the opportunity not only to readjust pricing, but also to further protect the value of their estates by negotiating non-price terms that more equitably allocate risks between the Debtors and GM. For example, the Debtors would have the opportunity to seek contractual protections with respect to potential material cost increases, lower demand, or other factors that may increase the Debtors' cost of production during the contract period. Currently, the GM Loss Contracts offer little or no protection against adverse changes in circumstances and are burdensome for this additional reason.

III. The Role Of The Motion
    In The Restructuring Process

16. FTI, along with other advisors, is assisting the Debtors in taking significant strides to address the two central issues that, if addressed satisfactorily, will

enable the Debtors to reorganize successfully: (a) onerous fixed labor and legacy costs inherited from GM and (b) unprofitable contractual relationships with GM. Contemporaneously with the filing of the Motion, the Debtors are filing a motion to reject their collective bargaining agreements under section 1113 of the Bankruptcy Code, and to modify hourly retiree benefits under section 1114 of the Bankruptcy Code (the "Section 1113 Motion"). The relief requested in the Section 1113 Motion will not only lower labor costs, but also free the Debtors to wind down or sell unprofitable businesses consistent with their restructuring plans.

17. The Motion, in turn, represents the Debtors' initial effort to rid their estates of burdensome GM supply contracts. The relief requested in the Motion, together with the relief requested in the contemporaneously filed Section 1113 Motion, will serve as a foundation for the Debtors' successful reorganization.

IV.    The Debtors Established A Systematic Approach
       To Identifying Loss Contracts That Merit Rejection

18. After filing these chapter 11 cases, and consistent with the core purpose of section 365(a) of the Bankruptcy Code, the Debtors' management initiated a comprehensive review of the profitability of the Debtors' customer-related executory contracts. In light of the vast number of executory contracts, the Debtors determined that the review should proceed in stages.

19. In the first phase of this review ("Phase One"), a methodology was developed to analyze profitability on a part-by-part and contract basis based on several metrics, including but not limited to contribution margin, factory profit, and operating income. Phase One of the loss contract analysis focused on four manufacturing sites located in Dayton, Ohio ("Needmore" and "Home Avenue"), Sandusky, Ohio

8

("Sandusky"), and Saginaw, Michigan ("Saginaw"). Parts intended for GM vehicles account for the majority of the sales revenue in each of these four plants. None of these plants has produced positive operating income since 2004.

20. The business rationale for commencing the loss contract analysis with these four plants was as follows: the Debtors chose to begin with unprofitable plants within Delphi's Automotive Holdings Group ("AHG") sector. Beginning in 2002, and well before these chapter 11 cases commenced, Delphi purposefully grouped under the AHG umbrella those unprofitable operations that they believed needed to be fixed, sold, or closed. Most of the products manufactured by AHG are commodity products that can be manufactured less expensively by other suppliers within the U.S. or in other countries with lower labor costs. Within AHG, the Needmore and Home Avenue plants are particularly unprofitable. Needmore and Home Avenue were selected for Phase One of the Debtors' loss contract analysis for this reason.

21. In light of the level of intercompany sales, which involve sub-component parts moving from one plant to another for further production prior to shipment of a completed component part to a customer, the Debtors determined that Phase One of the loss contract analysis should also include parts produced at the Saginaw and Sandusky manufacturing sites.

22. The financial health of these plants is deteriorating. The following chart outlines the financial performance of these plants:

9

| Plant | 2004 Revenue ($ millions) | 2004 OI ($ millions) | 2005 Revenue ($ millions) | 2005 OI ($ millions) |
|---|---|---|---|---|
| Needmore | $422.0 | ($118.8) | $350.8 | ($144.5) |
| Home Avenue | $237.2 | ($19.4) | $216.1 | ($48.3) [2] |
| Saginaw | $1,281.6 | ($5.6) | $1,041.9 | ($65.8) |
| Sandusky | $376.7 | ($5.7) | $360.8 | ($34.4) |
| Total | $2,317.5 | ($149.5) | $1,969.6 | ($293.0) |

23.   The four plants generated estimated operating losses (before asset impairment charges) of $293 million in 2005.  These plants are expected to generate greater operating losses (before asset impairment charges) in 2006, primarily as a result of increased operating costs and reduced demand from GM, unless the Debtors' various restructuring actions are implemented or consensual resolutions are achieved.

V.   The Results Of The Debtors'
     Phase One Loss Contract Analysis

24.   From November 2005 through February 2006, the Debtors, assisted by FTI, completed Phase One of the loss contract analysis.  This involved the profitability analysis of 3,157 parts manufactured at the four plants.  The analysis confirmed that the majority of the parts (2,353) was manufactured pursuant to direct supply contracts with GM.

25.   The Debtors used a systematic approach to determining costs to assess part-level profitability for the 3,157 parts produced by the four plants.  Using November 2005 year-to-date data, the Debtors identified direct and indirect manufacturing costs related to each part (such as standard costs related to material,

---

[2]   Excludes asset impairment charges.  Home Avenue losses are expected to increase significantly in 2006 due to lower GM demand.

10

freight, direct labor, and manufacturing overhead) and assigned such costs to their respective part based on each product's bill of materials. Variances to standard costs were allocated to each part number based upon either pro-rata standard costs (material variance) or pro-rata direct labor hours (labor and manufacturing overhead). Other indirect costs (such as engineering, other cost of goods sold, and selling, general, and administrative expense) were primarily allocated to each part using a combination of time and effort studies (for allocations to product portfolio within plant) and sales activity (for allocations to parts within the plant's product portfolio). Treatment of human capital-related expenses such as Jobs Bank and retiree OPEB were allocated to the product lines and plants that incurred the obligation. The Debtors also made reasonable adjustments to account for inter-plant activity, essentially eliminating any inter-plant markups so that the total Delphi production cost (without markup) is attributed to the plant that actually supplies GM. For example, Saginaw obtains several sub-component parts from Needmore and Sandusky necessary for completing parts it supplies to GM under GM supply contracts. Saginaw's costs for manufacturing the parts were adjusted to (a) add costs from Needmore and/or Sandusky representing the relevant sub-component's share of those plants' costs and (b) eliminate any inter-plant profit reflected within Saginaw's cost for the sub-components.

26. After a thorough analysis of various options, the Company determined that operating income is an appropriate and reasonable metric for assessing profitability in the context of identifying executory contracts for rejection. Operating income is the metric Delphi's management usually employs in assessing the viability of current and potential businesses. A business must generate sufficient income to cover all

11

direct and indirect costs incurred at its plants as well as allocated division and corporate costs, plus a reasonable profit margin.

27. On a customer/part level basis, the profitability analysis identified 1,395 parts supplied to GM by these four plants that resulted in negative operating income. These 1,395 parts relate to 515 executory supply contracts with GM. These 1,395 parts also represent more than 80% of the sales revenue from GM at these four plants. Through the Motion, the Debtors seek, among other things, to reject the 515 unprofitable executory contracts identified during the Phase One review. Together, the 1,395 parts relating to the 515 GM Loss Contracts accounted for approximately $120 million in operating losses in 2005.

28. Phase One of the loss contract analysis thus confirmed that each of the 515 GM Loss Contracts identified generates negative operating income. Because the Phase One loss contract analysis is based on 2005 historical data, it likely underestimates the anticipated losses related to these contracts in 2006.

VI. The Debtors' Phase Two
    <u>Loss Contract Analysis</u>

29. The results of the Phase One analysis confirmed several facts that shaped the manner in which the Debtors implemented the next phase of their analysis of loss-generating contracts. First, the Phase One analysis confirmed that the majority of the parts (1,395 of 2,353) produced for direct sale to GM at the four plants generated operating losses and that the vast majority of the plants' overall losses stemmed from producing parts for GM vehicles. Second, whereas 1,395 of 2,353 GM parts generated approximately $120 million of negative operating income in 2005 on approximately $796 million of revenue, the remaining 958 parts generated only approximately $12 million of

12

operating income on approximately $140 million of revenue. All told, the GM contracts at these four plants (including both the unprofitable and profitable contracts) generated approximately $108 million in operating losses in 2005, based upon 11-month annualized information and before any asset impairment charges. This result indicated that the added value of performing a resource-intensive, part-by-part analysis was negligible, in light of the fact that (a) direct sales to GM comprise over 63% of North American revenues, (b) the level of losses flowing from the Debtors' U.S. plants is untenable, and (c) stemming the drain on the value of the Debtors' estates that these plants create is a necessity. Finally, the Debtors recognized that a part-by-part profitability analysis would be extraordinarily time-consuming and yet would only confirm the continuing and wide-spread losses generated by the Debtors' contracts with GM. For all of these reasons, the Debtors pursued plant-wide profitability analyses in the second phase of the loss contract analysis ("Phase Two").

30. During Phase Two, the Debtors, assisted by FTI, gathered financial data from each U.S. manufacturing site, including break-downs of expenses that supported plant-wide operating profit/loss estimates as well as revenue generated by customer for each Debtor plant. Finance Directors from each of the Debtors' divisions provided both preliminary 2005 data as well as projected data regarding 2006. Consistent with Phase One, the Debtors continued to evaluate operations through the metric of operating income ("OI"). FTI assisted the Debtors in analyzing the data to isolate the subset of plants that (a) generates more than half of plant revenue by supplying parts intended for GM vehicles to either GM or GM's Tier suppliers and (b) generates negative operating income. The Debtors and their financial advisors determined that this analysis

13

is an effective means to identify GM-focused plants that are draining the value of the

Debtors' estates.  The following table summarizes the data gathered regarding the 21 GM

Loss Plants covered in Phase Two:

**Table: GM Loss Plant Summary ($ millions)**

| | Plants/Sites | Division | Number of GM Contracts | % Sales to GM and Tier to GM* | 2005 Actual Sales | 2005 Actual OI** | 2006 Budget Sales | 2006 Budget OI |
|---|---|---|---|---|---|---|---|---|
| | $ in millions | | | | | | | |
| 1 | Saginaw[1] | Steering | 978 | 79.6% | $ 1,529 | $ (169) | $ 1,469 | $ (296) |
| 2 | Saginaw | E&C | 282 | 85.8% | 1,042 | (66) | 908 | (96) |
| 3 | Lockport | T&I | 161 | 94.3% | 953 | (127) | 820 | (195) |
| 4 | Kokomo | E&S | 1,091 | 84.0% | 848 | (51) | 670 | (26) |
| 5 | Rochester | E&C | 197 | 83.9% | 679 | (85) | 621 | (88) |
| 6 | Milwaukee | E&C | 19 | 85.5% | 549 | (6) | 444 | (34) |
| 7 | Flint East | AHG | 286 | 92.9% | 446 | (194) | 321 | (254) |
| 8 | Athens | AHG | 226 | 74.9% | 426 | (135) | 428 | (251) |
| 9 | Milwaukee | E&S | 308 | 78.7% | 418 | (4) | 360 | (25) |
| 10 | Needmore | AHG | 162 | 58.0% | 351 | (145) | 307 | (200) |
| 11 | Kettering | AHG | 388 | 83.6% | 276 | (89) | 250 | (122) |
| 12 | Columbus | T&I | 180 | 89.5% | 251 | (43) | 225 | (56) |
| 13 | Moraine | AHG | 27 | 77.0% | 235 | (116) | 198 | (118) |
| 14 | Control Heads[2] | T&I | 154 | 57.8% | 217 | (11) | 178 | (11) |
| 15 | Home Avenue | AHG | 314 | 59.5% | 216 | (48) | 151 | (71) |
| 16 | Flint Clusters | AHG | 192 | 70.0% | 199 | (75) | 206 | (88) |
| 17 | Grand Rapids | E&C | 46 | 81.7% | 177 | (21) | 173 | (24) |
| 18 | Direct Ship Thermal | T&I | 293 | 77.4% | 173 | (12) | 163 | (14) |
| 19 | Adrian | T&I | 57 | 89.8% | 153 | (5) | 151 | (32) |
| 20 | Anderson Ignition | AHG | 57 | 76.9% | 124 | (43) | 95 | (69) |
| 21 | Wichita Falls | E&C | 44 | 76.1% | 70 | (29) | 77 | (25) |
| | Total | | 5,462 | 81.8% | $ 9,332 | $ (1,472) | $ 8,216 | $ (2,096) |

* Note - Calculation includes intercompany sales.

**Note - 2005 OI excludes asset impairment charges.

Note 1 - Saginaw (Steering) excludes approximately $41 million of divisional support costs that were allocated to other Steering regions for management reporting purposes.

Note 2 - 2006 Control Heads reflects debtor and non-debtor information, as the budget information is compiled from a total entity perspective.

31. In 2005, the GM Loss Plants generated an operating loss of $1.5 billion on sales revenue of $9.3 billion. In 2006, the GM Loss Plants are currently budgeted to generate an operating loss of $2.1 billion on sales revenue of $8.2 billion.

32. On a financial basis, the results of Phase Two of the Debtors' loss contract analysis confirm what was determined at a more detailed level in Phase One. Specifically, the terms of the GM Loss Contracts at issue in the Motion are burdensome to the Debtors' estates because they generate operating losses which continue to drain value from the Debtors' estates. On the other hand, rejecting the GM Loss Contracts will provide the Debtors the opportunity to enter into new contracts at price levels that return a reasonable profit. Should Delphi succeed in resolving its labor-related cost issues, it would expect to reduce GM pricing from the adjusted levels so as to recoup a reasonable profit in an equitable manner. Rejecting the contracts will also enable the Debtors to negotiate non-price terms that will further support the Debtors' ability to reorganize successfully.

33. In light of current financial trends, and without an agreement with GM to provide substantial financial support, the Debtors cannot undergo a successful reorganization and emerge as a viable business enterprise unless they begin a process of repricing unprofitable supply contracts with GM at levels that generate an appropriate level of profitability. Relief on the Motion is a first step in that process.

34. Based on the foregoing, in my opinion, the Motion is in the best interests of the Debtors, their estates, their creditors, and other stakeholders.

16

I declare, under penalty of perjury, and pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on March 31, 2005.

/s/ Randall S. Eisenberg
RANDALL S. EISENBERG