**Hearing Date and Time: May 9, 2006 at 10:00 a.m.**
**Objection Deadline: April 21, 2006 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300
Robert A. Siegel (RS 0922)
Tom A. Jerman
Rachel S. Janger
Jessica Kastin (JK 2288)

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

GROOM LAW GROUP, CHTD
1701 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 857-0620
Lonie A. Hassel

Attorneys for Delphi Corporation, et al.,
   Debtor and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                   :
     In re              :     Chapter 11
                   :
DELPHI CORPORATION, et al.,    :     Case No. 05-44481 (RDD)
                   :
           Debtors.    :     (Jointly Administered)
                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. § 1113(c) AUTHORIZING REJECTION OF
COLLECTIVE BARGAINING AGREEMENTS AND UNDER 11 U.S.C. § 1114(g)
AUTHORIZING MODIFICATION OF RETIREE WELFARE BENEFITS

("SECTION 1113 AND 1114 MOTION")

1.      Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for relief under sections 1113 and 1114 of the Bankruptcy Code (as defined below).

2.      At the outset, Delphi wishes to emphasize that while this Motion is a necessary procedural step to enable action that may become necessary at some point in the future, Delphi is singularly focused on reaching a consensual resolution with all of its unions before any Court hearing is necessary.  Only if the parties cannot reach a consensual resolution by May 9, 2006 will Delphi proceed to hearing on this Motion.

3.      If a hearing becomes necessary, the Debtors will seek an order (a) authorizing the Debtors to reject, pursuant to 11 U.S.C. § 1113(c), their collective bargaining agreements with the United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communications Workers of America ("IUE-CWA"), the United Steelworkers of America ("USW"), the International Association of Machinists and Aerospace Workers ("IAM"), the International Brotherhood of Electrical Workers ("IBEW"), and the International Union of Operating Engineers ("IUOE"), and their local affiliates (collectively, the "Unions"),[1] upon ten calendar days' notice to the Court and the Unions; and (b) modifying, pursuant to section 1114(g) of the Bankruptcy Code, the Debtors' obligations to provide medical and life insurance benefits for hourly retirees, whether arising under their collective bargaining

---

[1]      Delphi has national agreements with the UAW, IUE-CWA, and USW which set the principal economic terms and conditions of employment for Delphi employees in the facilities comprising the national collective bargaining units represented by those unions (the "National Agreements") and local agreements, typically with UAW, IUE-CWA, and USW-affiliated local unions, that govern local issues at each plant (the "Local Agreements"). The IAM, IBEW, and IUOE have plant-specific agreements governing certain maintenance employees at five Delphi facilities (the "IAM, IBEW, and IUOE Local Agreements").

2

agreements or otherwise, effective October 1, 2006. For those retirees who are eligible for

retiree medical and life insurance under a retirement benefit guarantee negotiated between

General Motors Corporation ("GM") and the UAW, IUE-CWA, and USW in 1999 (the "GM

Benefit Guarantee"), the Debtors seek to eliminate Delphi's obligations entirely. For those

retirees and future eligible retirees who do not have the benefit of the GM Benefit Guarantee, the

Debtors seek to substitute individual retirement medical accounts in lieu of Delphi's existing

obligations.

4.    Even if Delphi obtains the order requested in this Motion, however,

Delphi will not immediately impose all of the relief sought. Instead, Delphi intends to continue

working with its Unions to be competitive in the global marketplace, and hopes that the parties

can resolve all of their issues consensually.

5.    In support of this Motion, the Debtors concurrently submit a memorandum

of law, a proposed order, the Declarations of Kevin M. Butler, Steven Gebbia, Darrell Kidd,

Bernard J. Quick, John D. Sheehan, and Mark R. Weber, and the Expert Declarations and

Reports of Michael L. Wachter and Keith Williams. In further support of this Motion, the

Debtors respectfully represent as follows:

<u>Introduction</u>

6.    Delphi is one of the world's largest suppliers of vehicle electronics and

transportation components, with global revenues of $26.9 billion in 2005. Formerly a division of

GM, Delphi became a wholly-owned GM subsidiary on January 1, 1999, and, as of May 28,

1999, had been spun off by GM to a combination of GM shareholders and new investors, making

Delphi an independent entity (the "Spin-Off").

7.    Delphi currently has approximately 33,100 production and skilled trade

employees in the United States, virtually all of whom are represented by one of the Unions and

3

are subject to the collective bargaining agreements at issue in this Motion.  Delphi inherited these

agreements from GM in connection with the Spin-Off.  Although Delphi initially anticipated that

it would be able to negotiate these labor agreements independently of GM, to resolve the UAW's

objections to the Spin-Off, GM and Delphi ultimately agreed with the UAW that Delphi would

honor the GM-UAW National Agreement negotiated in 1999.  In the course of finalizing the

1999 Delphi-UAW National Agreement, Delphi further agreed to duplicate, or "mirror," the GM-

UAW National Agreement negotiated in 2003.  For its entire history, therefore, Delphi has been

governed largely by the terms of the UAW-GM automotive pattern labor agreement.

   8. Delphi was profitable immediately following the Spin-Off, earning

approximately $2 billion on a consolidated basis in its first two years as an independent

company.  Delphi's international operations remain profitable to this day.  Delphi's U.S.

operations, however, have become increasingly unsustainable.  As a result of losses in the U.S.,

Delphi has not earned a net profit since 2003, suffering net losses of $4.8 billion in 2004

(including special items) and $2.8 billion in 2005.  Without modifications to its labor agreements

or to its retirement obligations, according to Delphi's most recent financial projections, Delphi

would suffer operating losses ranging from approximately $6.1 billion to $8.1 billion, and net

losses ranging from approximately $11 billion to $13 billion, over the next five years.

   9. The mounting losses in Delphi's U.S. operations are attributable to three

principal factors:  (a) the labor agreements have caused an enormous increase in Delphi's labor

and benefit costs, including the legacy retirement liabilities arising under those agreements, and

have limited Delphi's ability to respond to economic changes by selling or closing facilities, or

by laying off excess employees, (b) competitive conditions in the U.S. automotive market have

greatly reduced GM's sales and profitability since 1999, resulting in reduced business and greater

pricing pressure for Delphi, and (c) commodity costs have risen rapidly in recent years, and

Delphi has been unable to pass along those costs to its automaker customers.

     10.    To stem these losses and achieve a successful reorganization, Delphi has

adopted a restructuring plan with five key elements:

- Modifying its labor agreements to create a competitive arena in which to conduct business going forward.

- Concluding negotiations with GM to finalize GM's financial support for the legacy costs Delphi currently carries and to ascertain GM's business commitment to Delphi going forward.

- Streamlining its product portfolio to capitalize on Delphi's world class technology and market strengths, and making the necessary manufacturing alignment with this new focus.

- Transforming its salaried workforce to ensure that Delphi's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint.

- Devising a workable solution to its pension funding obligations by reducing its contributions to manageable levels.

     11.    This Motion is intended to address Delphi's labor costs, its ability to

streamline its product portfolio, and its legacy retirement liabilities. For Delphi to achieve a

successful reorganization, the Delphi labor agreements must be modified in three principal

ways.[2] First, Delphi must reduce its wage and benefit costs to levels competitive with other U.S.

auto parts suppliers. Delphi's current labor cost for its "traditional" employees is estimated to be

approximately $78.63 per hour per employee – nearly three-and-a-half times higher than the

---

[2]        The Debtors are also filing contemporaneously herewith their GM Loss Contract Rejection Motion No. 1, which represents the Debtors' first effort to rationalize their loss-generating contractual relationships with GM. The GM Loss Contract Rejection Motion No. 1 seeks the Court's authority to reject burdensome executory contracts relating to 21 U.S. plants pursuant to which the Debtors are supplying GM parts at a significant loss. Together with this Motion, the GM Loss Contracts Motion No. 1 will position the Debtors to restructure their businesses successfully in the best interests of all parties in interest.

typical parts supplier and more than 80 percent higher than Delphi's own labor costs at the time

of the Spin-Off in 1999.

12.    Second, Delphi must eliminate those provisions in the labor agreements that

preclude Delphi from streamlining its product portfolio, and making the necessary manufacturing

alignment.  Under the labor agreements that have continued to bind Delphi since the Spin-Off in

1999, Delphi is generally prohibited from selling or closing its existing plants.  As a result,

Delphi has been largely unable to divest unprofitable or non-core operations or to close facilities

that it no longer needs given its level of business.  The labor agreements also prohibit Delphi

from laying off excess or redundant employees, except for temporary periods during which

Delphi must provide Supplemental Unemployment Benefits that provide 95 percent of their pre-

layoff take-home wages.  As a result, during 2005 Delphi had as many as 4,000 employees on

temporary layoff or in a "JOBS Bank" where they received full wages and benefits but

performed no work.

13.    Third, Delphi must reduce its legacy liabilities for pension and other retiree

benefits.  Under the labor agreements, Delphi must provide (a) a defined benefit pension plan

that allows Delphi employees to retire, regardless of age, after 30 years of employment, (b)

retiree health care, including dependent coverage, with minimal cost to the individual, and (c)

retiree life insurance benefits.  The unfunded liability created by these programs has more than

doubled since the 1999 Spin-Off, reaching $10.7 billion for hourly employees alone at the end of

2005.  To reduce these liabilities to manageable levels, Delphi has proposed to freeze the Delphi

Hourly-Rate Employees Pension Plan (the "HRP"), and to eliminate other post-employment

benefits ("OPEB") entirely for those employees who are protected under the GM Benefit

Guarantee.  For employees not protected under the GM Benefit Guarantee, Delphi proposes to

provide a replacement defined contribution retirement program and individual retirement

medical accounts to pay some portion of their health care costs during retirement.

14.    Delphi must achieve these imperatives to become a viable business, and has

offered the Unions two alternative paths to reach the necessary labor cost reductions.  The first

potential path was outlined in Section 1113 and 1114 proposals (as defined below) delivered to

the Unions by Delphi in October 2005, and amended November 2005 (the "Competitive

Benchmark Proposals").  Under those proposals, Delphi would immediately implement the wage

rates, benefits, and other terms needed to create the competitive labor cost structure that Delphi

needs to survive.  The Unions have flatly rejected this approach, however, essentially refusing to

even discuss the proposals or provide any counter-proposals.  The second set of proposals, which

were formalized by Delphi and provided to the Unions on March 24 and 25, 2006 (the "GM

Consensual Proposals"), would provide a gradual reduction in wages for existing Delphi

employees, provide buyouts for employees who elect to leave Delphi, and provide buydowns for

employees who continue at Delphi under the lower wage scale, contingent upon GM's

commitment to pay the incremental cost created by these terms.  Delphi and its three largest

unions and GM have had exploratory discussions over these concepts since January, 2006, but

have been unable to reach agreement on the terms of both the modifications to the Delphi labor

agreements and GM's financial support.

15.    The special attrition program, which was recently negotiated by Delphi,

GM, and the UAW (the "UAW Special Attrition Program"), provides that GM will fund a

$35,000 retirement incentive for each UAW-represented hourly employee who is eligible for

regular or early retirement, that Delphi will create a pre-retirement program for employees within

three years of retirement, and that Delphi will offer a special early retirement option to

employees who are at least 50 years of age with ten years of service. Delphi has filed a motion

with the Court seeking to approve similar programs that Delphi hopes to negotiate with its other

Unions (collectively, the "Hourly Attrition Programs"). These programs do not eliminate the

need to modify Delphi's labor agreements. While those programs would substantially reduce the

effect of the proposed modifications on Delphi's hourly workforce, they have no effect on the

terms of the existing labor agreements. These programs would allow almost 18,000 Delphi

employees to retire, and provide flow-back opportunities to positions at GM for at least 5,000

additional Delphi employees by September 2007. When coupled with the possibility of buyouts

and buydowns as set forth in Delphi's GM Consensual Proposals, Delphi anticipates that

virtually all of Delphi's existing high-wage employees will have an opportunity for the "soft

landing" that the Unions and Delphi have sought.

<u>Background</u>

A.     <u>The Chapter 11 Filings</u>

16.     On October 8, 2005 (the "Initial Filing Date"), Delphi and certain of its

U.S. subsidiaries filed voluntary petitions in this Court for reorganization relief under chapter 11

of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy

Code"). On October 14, 2005, three additional U.S. subsidiaries of Delphi filed voluntary

petitions in this Court for reorganization relief under the Bankruptcy Code. The Debtors

continue to operate their businesses and manage their properties as debtors-in-possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. This Court entered orders

directing the joint administration of the Debtors' chapter 11 cases.

17.     Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue

their business operations without supervision from the Bankruptcy Court, and will not be subject

to the chapter 11 requirements of the Bankruptcy Code.

8

18.    On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors.

19.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

20.    The statutory predicates for the relief sought herein are 11 U.S.C. §§ 1113 and 1114 (hereinafter "Section 1113" and "Section 1114," respectively).

B.    Delphi's Current Business Operations

21.    Delphi and its subsidiaries operate in 34 countries, with some 184,000 employees, 163 manufacturing sites, 39 joint ventures, and 32 technical centers.  Within the United States, Delphi has approximately 47,400 employees at 41 manufacturing sites (including idled and non-union facilities) in 15 states, 13 technical centers, and its world headquarters in Troy, Michigan.  Approximately 33,100 of these employees are production and skilled employees, represented primarily by the UAW, IUE-CWA, and USW, at Delphi's manufacturing sites.

22.    Delphi designs and manufactures products for every major automaker in the world.  Delphi's products comprise one of the widest ranges of auto parts manufactured by any independent parts supplier, ranging from complex electronic systems to simple commodity components.  In 2005, Delphi's former parent, GM, accounted for approximately $12.8 billion of Delphi's revenue, while Delphi's other customers accounted for approximately $14.1 billion in revenues.  Delphi's non-GM revenue consisted of sales to other OEMs, including Ford Motor Corporation, Chrysler Corporation, Renault/Nissan Motor Company, Volkswagen Group, and Toyota Motor Corporation; sales of service replacement auto parts through the independent "aftermarket"; sales of consumer products such as non-automotive heating and cooling systems,

9

mobile video, satellite radio, and other audio entertainment systems; medical products; and aerospace products.

C.    The Delphi Spin-Off And The Mirror Agreement

23.    For most of its history, GM manufactured a large proportion of the parts used in the vehicles it produced.  In 1991, GM combined its parts manufacturing facilities into a single entity, originally known as the Automotive Components Group and eventually renamed Delphi Automotive Systems.  On January 1, 1999, GM transferred the assets (including plants, equipment, and tools), liabilities, manufacturing sites, and most of the employees assigned to Delphi Automotive Systems to the newly-created Delphi Automotive Systems Corporation, a wholly-owned subsidiary of GM.  GM and Delphi also entered into a Master Separation Agreement, which governed the separation of the two entities, and a Supply Agreement which, subject to certain exceptions, obliged GM to honor the then-existing supply contracts between GM and Delphi and to renew those contracts upon their expiration so long as Delphi could meet GM's cost, quality, and technology requirements.

24.    In early 1999, Delphi publicly announced that it anticipated that it would be able to negotiate with the Unions independently of GM, and thereby "increase competitiveness over time as a result of improving [Delphi's] labor relations and establishing more flexible local work rules and practices."  While Delphi was still majority owned and controlled by GM, however, in order to resolve the UAW's objections to the Spin-Off, Delphi and GM representatives informed the UAW that Delphi would honor the "pattern" agreement negotiated between GM and the UAW in September 1999.

25.    In the course of finalizing the 1999-2003 agreement, following trilateral and bilateral discussions among GM, Delphi, and the UAW, the UAW insisted on Delphi's further commitment that Delphi would also "mirror" the next agreement between GM and the UAW,

10

scheduled to be negotiated in 2003.  The UAW, in turn, committed to consider mutually

agreeable exceptions to the 2003 GM-UAW agreement "to assure the continued success of

Delphi as an on-going business."  Based on this commitment, Delphi agreed to "mirror," or

duplicate, the terms of the 2003 GM-UAW National Agreement (the "Mirror Agreement").

Because Delphi's National Agreements with the IUE-CWA, USW, IAM, IBEW, and IUOE are

patterned after the Delphi-UAW agreement, those agreements also largely mirror the GM-UAW

Agreements.

D.    The Causes Of Delphi's Financial Distress

          26.    Delphi believed in 1999 that it could succeed as an independent parts

supplier, despite the high cost of the labor agreements, by retaining all of its existing GM

business and by greatly expanding its revenue from other automakers worldwide.  As described

in more detail below, Delphi's current financial distress arises from the following three factors

that were not predicted:  (a) the labor agreements, which have caused an enormous increase in

Delphi's labor and benefit costs, including the legacy retirement liabilities arising under those

agreements, and have limited Delphi's ability to respond to economic changes by selling or

closing facilities, or by laying off excess employees, (b) competitive conditions in the U.S.

automotive market, which have greatly reduced GM's sales and profitability, resulting in reduced

business and greater pricing pressure for Delphi, and (c) rapidly rising commodity costs which

Delphi is unable to pass along to its automaker customers.

          27.    Cost Increases And Operational Restrictions Under The GM Agreements.

Although Delphi was aware in 1999 that the Mirror Agreement limited its ability to reduce its

labor costs, Delphi could not have foreseen the full effect of the 1999 and 2003 GM-UAW

agreements on its labor costs and operational flexibility.

- The average hourly wage for a traditional employee under the GM-UAW agreements, including both production and skilled trades, was approximately $21.65 per hour, including cost of living adjustments, in 1999. By 2005, the average hourly wage was $27.83, an approximate 29 percent increase.

- The total labor cost for a traditional employee was approximately $43.47 per hour in 1999. In 2005, it was approximately $78.63 per hour – an 81 percent increase. Delphi cannot reorganize unless it brings its wages and benefits to competitive levels.

- The 1999 GM-UAW agreement imposed a critical new restriction that had not previously existed under GM's labor agreements – a prohibition on selling existing facilities. As a result, Delphi's flexibility to accomplish its objective to "fix, sell, or close" unprofitable or non-core Delphi operations was substantially eliminated.

28.    During the same 1999-2005 period, Delphi's legacy retirement liabilities have more than doubled. At the time of the Spin-Off, Delphi's estimated liability for unfunded pension and OPEB obligations for hourly employees was $1.7 billion and $3.7 billion, respectively. As of the end of 2005, those liabilities had increased to $2.3 billion in unfunded hourly pension obligations and $8.4 billion in unfunded hourly health care and life insurance OPEB obligations.

29.    <u>Delphi's Loss Of GM Revenue And Pricing Pressure</u>. At the time of the Spin-Off, Delphi was primarily a captive supplier servicing GM's assembly plants world-wide. One of Delphi's most important business objectives in the Spin-Off was to become a global supplier to OEMs world-wide. To achieve this transition, Delphi needed to maintain its existing GM business in the U.S., expand its revenue from other OEMs within the U.S., and expand its international presence, supplying both GM's foreign operations and other OEMs world-wide.

30.    Delphi has largely succeeded in the latter two goals by more than doubling its non-GM revenue from $6.9 billion in 1999 to approximately $14.1 billion in 2005, and by increasing its international revenue from $11.1 billion in 2000 to approximately $15.3 billion in 2005. Delphi was not successful, however, in maintaining its existing GM business. Rather,

12

Delphi's total revenue from GM fell from $22.3 billion in 1999 to $12.8 billion in 2005, and

Delphi's revenue from GM's North American operations – revenue that is critical to supporting

Delphi's U.S. operations – fell approximately 42 percent from approximately $18.3 billion in

1999 to approximately $10.6 billion in 2005.

31.    The reduction in GM revenue is attributable largely to a consistent decline

in GM's own sales and profitability within the U.S.  GM's share of U.S. light vehicles sales,

which was 29.4 percent in 1999, declined to approximately 26.2 percent in 2005.  GM's

consolidated income, in turn, has fallen from a profit of more than $6.0 billion in 1999 to a net

loss of $10.6 billion in 2005.

32.    The decline in GM's market share, revenue, and income since 1999 has

undermined Delphi's business plan in several different ways:

- GM's loss of market share has resulted in a direct reduction in volume under Delphi's existing supply agreements with GM.

- GM has increased its use of suppliers other than Delphi, particularly lower cost, foreign suppliers.  The "Delphi content" – that is, the dollar value of Delphi parts in a typical GM vehicle – has fallen from $3,196 in 1999 to $2,325 in 2005, a decrease of 27 percent.  At the same time, the level of "foreign content" in a typical GM vehicle has increased from 12.4 percent in 1999 to 20.1 percent in 2005.

- In light of its financial condition, GM has aggressively pursued price-downs – that is, year over year price reductions – under its existing supply agreements. Between 1999 and 2005, the average price-down under Delphi's supply agreements with GM was 2.1 percent – 50 percent higher than the average price-down Delphi was forced to provide to other automakers.

- Because Delphi cannot eliminate unnecessary facilities or employees, the reduction in GM revenue has forced Delphi to assume capital investments, labor, and other fixed costs incurred by Delphi to service its GM business.

33.    <u>Delphi's Increased Commodity Costs</u>.  As a result of increasing global

demand, the price for the most common materials used to manufacture auto parts –  metals and

oil-based products – have increased substantially since the Spin-Off, adding an additional $700

13

million to Delphi's costs since 2003.  Under Delphi's supply agreements, it generally must absorb

these increases even as its customers seek ever larger price-downs on Delphi's parts.

E.    Delphi's Financial Performance And Projections

34.    Delphi's most recent financial projections indicate that without

modifications to its labor agreements, Delphi would suffer operating losses of between

approximately $6.1 billion and $8.1 billion over the next five years, depending on the number of

employees who retire under the Hourly Attrition Programs.  Moreover, these projected losses

stem almost entirely from Delphi's U.S. operations.  Under the "Steady State Scenario" – that is,

Delphi's financial projections assuming no change in its labor agreements and retirement

obligations – even with the deterioration in revenue and costs that Delphi has assumed for 2006-

2010, Delphi's projections show that Delphi's international operations will be profitable during

that period, earning approximately $3.4 billion in operating income over the five-year period.

35.    Given this scenario, Delphi can survive only if it reduces its wage and

benefit costs to competitive levels, obtains the flexibility to respond to changed market

conditions by selling or closing unprofitable facilities, and eliminates or significantly reduces its

legacy benefit costs.

Relief Requested

36.    By this Motion, Delphi seeks an order (a) authorizing the Debtors to reject

their collective bargaining agreements with each of their Unions, upon ten calendar days' notice

to the Court and the Unions and (b) modifying the Debtors' obligations to provide medical and

life insurance benefits for hourly retirees, whether arising under their collective bargaining

agreements or otherwise, effective October 1, 2006.  Both steps are vital and necessary

components of Delphi's reorganization plans.

Basis For Relief

37.    To carry out its restructuring plans, Delphi must implement labor cost-reductions with each of its Unions and modify Delphi's hourly retiree medical and life insurance benefits.[3] Although Delphi has diligently pursued consensual agreements with its major unions, unfortunately these efforts have thus far been unsuccessful.  Delphi has complied with all the conditions for granting relief under Section 1113 and Section 1114.

38.    Section 1113(c) of the Bankruptcy Code provides the exclusive means for Delphi to reject a collective bargaining agreement.  Section 1113(c) specifically provides:

> The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that – (1) a trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1); (2) the authorized representative of the employees has refused to accept such proposal without good cause; and (3) the balance of the equities clearly favors rejection of such agreement.

11 U.S.C. § 1113(c).

39.    Section 1113(b)(1) of the Bankruptcy Code provides that the debtor shall

> (A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and (B) provide . . . the representative of the employees with such relevant information as is necessary to evaluate the proposal.

40.    Similarly, Section 1114(g) of the Bankruptcy Code, which provides the exclusive means for a debtor to eliminate retiree medical and life insurance benefits, provides that:

---

[3]    11 U.S.C. § 1114(a) defines "retiree benefits" to mean payments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under title 11.

> The court shall enter an order providing for modification in the payment of retiree benefits if the court finds that – (1) a trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (f); (2) the authorized representative of the retirees has refused to accept such proposal without good cause; and (3) such modification is necessary to permit the reorganization of the debtor and assures that all creditors are treated fairly and equitably, and is clearly favored by the balance of equities[.]

11 U.S.C. § 1114(g).

41.     Section 1114(f) of the Bankruptcy Code contains essentially the same provision as Section 1113(b)(1).  In addition, section 1114(f)(2) of the Bankruptcy Code requires that the trustee "meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications."  Accordingly, compliance with the provisions of Section 1113 equates with compliance with the provisions of Section 1114.

42.     When the debtor demonstrates compliance with the provisions of Section 1113, the court is authorized to approve rejection of collective bargaining agreements.  New York Typographical Union No. 6 v. Royal Composing Room, Inc., 848 F.2d 345, 347 (2d Cir. 1988), cert. denied, 489 U.S. 1078 (1989) (debtor satisfied burden of showing that proposal it submitted to union for modifying collective bargaining agreement was necessary and equitable, so that when union for two months delayed in responding to and ultimately rejected proposal, debtor could reject agreement); Truck Drivers Local 807 v. Carey Transp., Inc., 816 F.2d 82, 92 (2d Cir. 1987) (rejection of CBA allowed when debtor follows procedures set forth in Section 1113(b) and makes three substantive showings as required by statute).  The same Section 1113 authorities are applicable to support Delphi's motion to modify retiree benefits under Section 1114.  See In re Horsehead Indus., 300 B.R. 573, 583 (Bankr. S.D.N.Y. 2003) ("[c]ompliance with § 1114 is substantively and procedurally the same as compliance with § 1113") (quoting In re Ionosphere Clubs, Inc., 134 B.R. 515, 519-20 (Bankr. S.D.N.Y. 1991); In re Family Snacks,

16

257 B.R. 884, 892 (B.A.P. 8th Cir. 2001) (applying same standard to both Section 1113(c) and

Section 1114(g) requests).

43.     As set forth in greater detail below and in the Memorandum Of Law,

Delphi has complied with every element of Sections 1113 and 1114.  Thus, the Debtors request

an order (a) authorizing the Debtors to reject their collective bargaining agreements with each of

their Unions, upon 10 calendar days' notice to the Court and the Unions and (b) modifying the

Debtors' obligation to provide medical and life insurance benefits for hourly retirees, whether

arising under their collective bargaining agreements or otherwise, effective October 1, 2006.

A.      <u>After Filing The Petitions, Delphi Submitted Proposals To Its Unions For
        Modifications To The Collective Bargaining Agreements</u>

44.     In an effort to reach a consensual resolution, Delphi offered two distinct

alternative paths to its Unions under Sections 1113 and 1114.  Delphi first served the Unions

with Section 1113 and 1114 proposals on October 20 and 21, 2005, but those proposals were

soon superseded by the Competitive Benchmark Proposals, served on November 15-17, 2005,

which increased the proposed base hourly wages.  The Unions flatly rejected these proposals and

failed to provide any counter-offers.

45.     In the Competitive Benchmark Proposals, Delphi sought, among other

things, to (a) modify base hourly wage rates to include separate starting and base wages

competitive with the average wages in the industry, (b) eliminate cost of living allowances, (c)

reduce overtime and shift premiums, (d) reduce the number of paid holidays to ten days, (e)

reduce vacation eligibility, (f) modify Profit Sharing Plan provisions, (g) modify health care

provisions, including implementing employee cost-sharing, (h) modify life and disability

provisions, (i) eliminate restrictions on Delphi's ability to close or partially or wholly sell, spin-

off, split-off, consolidate, or otherwise dispose of in any form any plant, asset, or business unit,

(j) eliminate Protected Employee status provisions, including the JOBS Bank, (k) eliminate

supplemental unemployment benefits, (l) eliminate all hiring requirements, (m) eliminate

provisions of the agreements restricting Delphi's right to have sole discretion to determine the

number of employees required at each facility, the work to be assigned to each employee, and to

lay off or release employees who are unnecessary to the operation, (n) give Delphi sole

discretion to hire permanent or temporary employees, (o) eliminate restrictive provisions related

to outsourcing, (p) eliminate the Guaranteed Income Stream benefit program, (q) close the

Income Security Plan to new participants and eliminate future Delphi contributions to individual

accounts under that plan, (r) freeze the HRP, and (s) eliminate hourly retiree health care and life

insurance.

46.    In transmitting its Competitive Benchmark Proposals, Delphi informed the

Unions that the proposals were based on the assumption that Delphi would not receive any

financial support from GM to implement a restructuring of its labor costs.  Delphi made this

assumption because it had attempted to obtain GM's commitment to provide such support prior

to filing its chapter 11 petitions but had been unsuccessful.  Delphi informed the Unions that if

GM were able to provide such support, Delphi would modify its proposals accordingly.

47.    On March 24 and 25, 2006, Delphi provided the Unions with the GM

Consensual Proposals, an alternative set of proposals which were based on concepts that had

been explored with GM and Delphi's three largest unions since January 2006.  The GM

Consensual Proposals provide for an average base wage of $22 per hour for current employees

(compared to $12.50 in the Competitive Benchmark Proposals) until September 3, 2007.  At that

point, wages would be reduced to an average base wage of $16.50 per hour for existing

employees who would also receive a $50,000 buydown to help ease the transition.  In addition,

the proposals provide for a modified dental plan, a defined contribution pension plan, retiree medical accounts, and, for certain affected employees, benefits comparable to Supplemental Unemployment Benefits for the transformation period. These wage and benefits structures, however, were expressly proposed to be contingent upon a commitment by GM to provide Delphi with financial support sufficient to fund the difference between the cost of these programs and the cost of Delphi's Competitive Benchmark Proposals.

    B.    <u>The Proposals Were Based On The Most Complete And Reliable Information Available</u>

    48.    The Competitive Benchmark Proposals and the GM Consensual Proposals provided by Delphi to the Unions were based on Delphi's most recent financial projections and other information relevant to the proposals.

    C.    <u>Delphi Provided Relevant Information Necessary For The Unions To Evaluate The Proposals</u>

    49.    With each proposal, Delphi provided the Unions and their financial advisors with the business plans, models, and financial and operating data underlying the proposals. Delphi has also responded to hundreds of information requests by the Unions and their financial advisors, placing volumes of additional information and documents in a "virtual data room" accessible by representatives of any of Delphi's Unions for the last thirteen weeks. The virtual data room includes information Delphi has provided to the Unions in response to their information requests, which is then made available in the virtual data room to all Unions, regardless of which Union made the information request. All responses to information requests were also provided, and will continue to be provided, to the requesting Union or financial advisor outside the virtual data room by mail, facsimile, or e-mail.

D.    The Proposals Are Necessary To Permit Delphi's Successful Reorganization

50.    In light of Delphi's financial situation, the cost savings that would result
from the modifications set forth in the Section 1113 and Section 1114 proposals are necessary
for a successful reorganization.  As set forth in greater detail in the Memorandum Of Law,
Delphi's financial projections indicate that there is no single "solution" that would return Delphi
to profitability.  Rather, Delphi can survive only if it reduces its wage and benefit costs to
competitive levels, obtains the flexibility to respond to changed market conditions by laying off
unneeded employees and selling or closing unprofitable facilities, and eliminates or substantially
reduces its legacy benefit costs.

E.    The Proposals Treat All Parties Fairly And Equitably And The Balance Of
Equities Clearly Favors Rejection

51.    These labor cost savings are necessary even in light of all other cost cutting
efforts undertaken by Delphi.

- Delphi's pubic shareholders, whose stock from the years 2001 to 2004 had
market value ranging between approximately $3.6 billion and $9.8 billion,
will likely lose their entire investment.

- GM, Delphi's largest customer, has indicated that it may assume as much as
$12 billion in liabilities under its GM Benefit Guarantee.

- The holders of Delphi's $2 billion in senior unsecured securities currently are
projected by the market to receive between one-quarter and one-half of the
face value of their securities under a restructuring plan.

- The holders of Delphi's $412 million in subordinated notes are structurally
subordinate to the claims of trade creditors, and are only one step above
equityholders based on the absolute priority rule.  In light of the Debtors'
insolvency, the holders of the subordinated notes can reasonably expect to
receive, at best, only a minimal percentage of the face value of these notes
under a restructuring plan.

- Suppliers whose contracts have been assumed by the Debtors have generally
accepted significantly less than the face amount of their outstanding
prepetition payables as cure of all existing prepetition defaults under the

20

assumed contracts and waived their right to assert administrative claims for cure of the additional prepetition obligations.

- Because of the magnitude of the Debtors' scheduled liabilities, unsecured creditors holding nonpriority claims will likely receive less than 100 cents on the dollar.

52.     Salaried and management employees, whose compensation and benefits are at or below competitive levels, also will be comparably affected by the elimination of an estimated 5,250 individuals from the salaried and management workforce in the U.S.  There is no JOBS Bank or other job security for these employees.  There are no GM Benefit Guarantees protecting their pension benefits or OPEB.  Thus, the sought-after level of labor cost reductions is necessary for the Union-represented employees and retirees to shoulder their fair share of the burden of the restructuring.

F.     <u>Delphi Sought To Meet At Reasonable Times With The Unions And Confer With The Unions In Good Faith But The Unions Refused To Accept Delphi's Proposals Without Good Cause</u>

53.     Despite the fact that the labor cost reductions are necessary for Delphi to complete a successful reorganization, and fairness and equity demand that all of Delphi's represented employees participate in the financial sacrifices necessary for the long-term success of Delphi, the Unions have refused to accept the Section 1113 and Section 1114 proposals without good cause.  In fact, although Delphi sought to negotiate with the Unions upon delivery to them of the Section 1113 and 1114 proposals, and regularly reiterated that request, the only response they have made to the Competitive Benchmark Proposals was, in the case of the UAW, to reject the proposals outright and to indicate that a strike would be likely should Delphi implement those proposed modifications to its labor agreements, or, in the case of the IUE-CWA, to state that it might provide a counter-proposal that has never materialized.

21

54.    Delphi, GM, and the three largest unions began to explore the concepts contained in the GM Consensual Proposals in January, 2006. Except for the UAW Special Attrition Program, however, the parties have been unable to reach agreement on either modifications to the Delphi labor agreements or GM financial support.

55.    Accordingly, Delphi has been forced to file this Motion authorizing the Debtors to (a) reject the collective bargaining agreements of the Unions and (b) modify hourly retiree medical and life insurance benefits of existing retirees whose initial benefits were provided under a collective bargaining agreement or otherwise.

<u>Notice</u>

56.    Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures entered by this Court on March 17, 2006 (Docket No. 2883). Notice has also been provided to the counterparties to all of the labor agreements subject to this Motion. In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

WHEREFORE, the Debtors respectfully request that the Court enter an order (a) granting this Motion, (b) authorizing the Debtors to reject, pursuant to Section 1113(c) of the Bankruptcy Code their collective bargaining agreements with the Unions, upon ten calendar days' notice to the Court and the Unions, (c) modifying, pursuant to Section 1114(g) of the Bankruptcy Code, the Debtors' obligations to provide medical and life insurance benefits for hourly retirees, whether arising under their collective bargaining agreements or otherwise, effective October 1, 2006, and (d) granting the Debtors such other and further relief as is just.

Dated:  New York, New York
        March 31, 2006

                          SKADDEN, ARPS, SLATE, MEAGHER &
                          FLOM LLP

                          By:/s/ John Wm. Butler, Jr.
                              John Wm. Butler, Jr. (JB 4711)
                              John K. Lyons (JL 4951)
                              Ron E. Meisler (RM 3026)
                          333 West Wacker Drive, Suite 2100
                          Chicago, Illinois  60606
                          (312) 407-0700


                          By:/s/ Kayalyn A. Marafioti
                              Kayalyn A. Marafioti (KM 9632)
                              Thomas J. Matz (TM 5986)
                          Four Times Square
                          New York, New York 10036
                          (212) 735-3000

                          O'MELVENY & MYERS LLP

                          By:/s/ Tom A. Jerman
                              Robert A. Siegel (RS 0922)
                              Tom A. Jerman (pro hac vice application
                                  pending)
                              Rachel S. Janger
                              Jessica Kastin (JK 2288)
                          1625 Eye Street, NW
                          Washington, DC  20006
                          (202) 383-5300

23

GROOM LAW GROUP, CHARTERED

By: /s/ Lonie A. Hassel
    Lonie A. Hassel (pro hac vice application
       pending)
1701 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 857-0620

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession