Hearing Date and Time: May 9, 2006 at 10:00 a.m.
Objection Deadline: April 21, 2006 at 4:00 p.m.

SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300
Robert A. Siegel (RS 0922)
Tom A. Jerman
Rachel S. Janger
Jessica Kastin (JK 2288)

GROOM LAW GROUP, CHTD
1701 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 857-0620
Lonie A. Hassel

Attorneys for Delphi Corporation, et al.,
    Debtor and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                        :
        In re                                           :        Chapter 11
                                                        :
DELPHI CORPORATION, et al.,                             :        Case No. 05-44481 (RDD)
                                                        :
                                Debtors.                :        (Jointly Administered)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ORDER
UNDER 11 U.S.C. § 1113(c) AUTHORIZING REJECTION OF COLLECTIVE
BARGAINING AGREEMENTS AND UNDER 11 U.S.C. § 1114(g)
AUTHORIZING MODIFICATION OF RETIREE WELFARE BENEFITS

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ..................................................................................... 6

    I.    Overview Of Delphi's Business Following Its Spin-Off From GM .................... 6

        A.    Delphi's Operations ................................................................... 6

        B.    The Delphi Spin-Off And The Mirror Agreement .................................... 7

        C.    Delphi's Historical Financial Performance ........................................ 9

    II.    The Causes Of Delphi's Current Financial Condition ............................... 11

        A.    Delphi Has Been Burdened By Non-Competitive Labor
            Agreements That Hinder Delphi's Operational And Competitive
            Performance ...................................................................... 11

        B.    Reduced GM Sales And Profitability Have Resulted In Lower
            Levels Of GM Business And Greater Pricing Pressure For Delphi
            Than Anticipated At The Time Of The Spin-Off ................................... 17

    III.    Delphi Cannot Restructure Without Modifications To Its Labor
        Agreements ............................................................................ 24

        A.    Without Labor Modifications, Delphi Would Suffer Unsustainable
            Losses Over The Next Five-years ................................................. 24

        B.    Without A Substantial Reduction In Its Hourly Labor Costs,
            Delphi's U.S. Operations Cannot Compete For New Business ............... 26

        C.    Delphi Must Eliminate Those Provisions Of The Labor
            Agreements That Prohibit It From Responding To Market Forces ......... 30

        D.    Delphi Must Eliminate Or Substantially Reduce Its Legacy
            Retirement Liabilities ............................................................ 31

    IV.    Delphi Has Complied With The Requirements Of Sections 1113 And 1114 ...... 32

        A.    Delphi Has Proposed Two Alternatives For Modification Of Its
            Labor Agreements – One With, And One Without, GM Financial
            Support ........................................................................... 32

        B.    The Proposed Modifications To Delphi's Labor Agreements In The
            Competitive Benchmark Proposals .............................................. 35

        C.    The Proposed Modifications To Delphi's Labor Agreements In The
            GM Consensual Proposals ....................................................... 43

ARGUMENT ................................................................................................ 46

    I.    The Court Should Authorize Delphi Under Section 1113(c) Of The
        Bankruptcy Code To Reject All Of Its Existing Collective Bargaining
        Agreements ............................................................................ 46

A.    Section 1113(c) Authorizes The Court To Approve An Application To Reject A Collective Bargaining Agreement When The Debtor Has Complied With The Procedural Requirements of Section 1113(b), The Union Has Failed To Accept Debtor's Proposal "Without Good Cause," And The Balance Of Equities Clearly Favors Rejection ..................................................................................... 46

B.    After Filing the Petitions, Delphi Provided the Unions With Proposals For Modifications To The Labor Agreements Based On The Most Complete And Reliable Information Available And Provided All Relevant Information To The Unions ................................ 49

C.    The Proposed Modifications Are Necessary To Permit Delphi To Reorganize ............................................................................. 56

D.    The Proposals Treat All Parties Fairly And Equitably ........................... 60

E.    Delphi Has Made Itself Available For Meetings, And Has Acted In Good Faith To Reach Mutually Satisfactory Modifications................... 70

F.    The Unions Have Failed To Accept The Proposals Without Good Cause...................................................................................... 71

G.    The Balance Of The Equities Clearly Favors Rejection......................... 73

II.    The Court Should Modify Delphi's Obligations To Provide Hourly Retiree Welfare Benefits By Eliminating That Obligation For Hourly Retirees ............. 78

A.    Delphi Has Satisfied The Procedural Requirements Of Section 1114(f)...................................................................................... 79

B.    The Authorized Representatives Have Failed To Accept The Proposals Without Good Cause ........................................................... 81

C.    The Balance Of The Equities Clearly Favors Modifications To Retiree Benefits...................................................................... 81

CONCLUSION ...................................................................................... 83

In re American Provision Co.,
 44 B.R. 907 (Bankr. D. Minn. 1984) ........................................................................... 47, 48, 52

In re Amherst Sparkle Mkt.,
 75 B.R. 847 (Bankr. N.D. Ohio. 1987) ............................................................................... 51

In re Appletree Mkts., Inc.,
 155 B.R. 431 (S.D. Tex. 1993) ............................................................................... 52, 58, 61

In re Blue Diamond Coal Co.,
 131 B.R. 633 (Bankr. E.D. Tenn. 1991) ................................................................. 57, 70, 76, 80

In re Blue Diamond Coal Co.,
 147 B.R. 720 (Bankr. E.D. Tenn. 1992) ............................................................................. 60

In re Carey Transp., Inc.,
 50 B.R. 203 (Bankr. S.D.N.Y. 1985) ....................................................................... 47, 56, 61

In re Century Brass Prods.,
 795 F.2d 265 (2d Cir. 1986) .................................................................................. 50, 56, 60

In re Continental Airlines Corp.,
 901 F.2d 1259 (5th Cir. 1990) ................................................................................... 76, 77

Baldridge v. Continental Airlines Holdings, Inc. (In re Continental Airlines Inc.),
 257 B.R. 658 (D. Del. 2000) ........................................................................................ 77

In re Electrical Contracting Serv. Co.,
 305 B.R. 22 (Bankr. D. Colo. 2003) ................................................................................. 71

In re Horsehead Indus., Inc.,
 300 B.R. 573 (S.D.N.Y. 2003) ................................................................... 72, 76, 77, 78

In re Ionosphere Clubs, Inc.,
 134 B.R. 515 (Bankr. S.D.N.Y. 1991) ............................................................................. 79

In re Kentucky Truck Sales,
 52 B.R. 797 (Bankr. W.D. Ky. 1985) ............................................................................... 61

In re Maxwell Newspapers, Inc.,
 146 B.R. 920 (Bankr. S.D.N.Y. 1992) ............................................................................. 57

In re Maxwell Newspapers, Inc.,
 981 F.2d 85 (2d Cir. 1992) ................................................................................. 57, 72, 73

In re Maxwell Newspapers, Inc.,
 149 B.R. 334 (S.D.N.Y. 1992) ..................................................................................... 57

In re Mile Hi Metal Systems, Inc.,
    899 F.2d 887 (10th Cir. 1990) ........................................................ 48, 72

In re Ormet Corp.,
    316 B.R. 665 (Bankr. S.D. Ohio 2004) .............................................. 59, 72

In re Ormet Corp.,
    324 B.R. 655 (Bankr. S.D. Ohio 2005) .................................................. 79

In re Rayman, Martin & Fader, Inc.,
    170 B.R. 286 (D. Md. 1994) ................................................................ 76

In re Royal Composing Room, Inc.,
    62 B.R. 403 (Bankr. S.D.N.Y. 1986) .................................. 47, 50, 52, 71

In re Sol-Sieff Produce Co.,
    82 B.R. 787 (Bankr. W.D. Pa. 1988) ...................................................... 71

In re Texas Sheet Metals,
    90 B.R. at 260 (Bankr. S.D. Tex. 1988) .............................. 48, 52, 60, 72

In re US Airways Group, Inc.,
    No. 04-13879 (Bankr. E.D. Va. Jan. 6, 2005) ........................................ 59

In re Valley Steel Prods. Co.,
    142 B.R. 337 (Bankr. E.D. Mo. 1992) .................................................... 52

In re Walway Co.,
    69 B.R. 967 (Bankr. E.D. Mich. 1987) ............................................ 61, 80

In re Wheeling-Pittsburgh Steel Corp.,
    50 B.R. 969 (Bankr. W.D. Pa. 1985) ...................................................... 48

New York Typographical Union No. 6 v. Royal Composing Room, Inc.,
    848 F.2d 345 (2d Cir. 1988) ......................................................... passim

NLRB v. Bildisco & Bildisco,
    465 U.S. 513 (1984) ............................................................................ 74

Southern Labor Union, Local 188 v. Blue Diamond Coal Co.,
    160 B.R. 574 (E.D. Tenn. 1993) .......................................................... 76

Truck Drivers Local 807 v. Carey Transp., Inc.,
    816 F.2d 82 (2d Cir. 1987) .......................................................... passim

United Food & Commercial Workers Union, Local 211 v. Family Snacks, Inc.
    (In re Family Snacks)
    257 B.R. 884 (B.A.P. 8th Cir. 2001) .............................................. 48, 79

## STATUTES AND OTHER AUTHORITIES

11 U.S.C. § 365(b)(1) ........................................................................................ 64

11 U.S.C. § 502(b)(7) ........................................................................................ 82

11 U.S.C. § 1113 ........................................................................................ passim

11 U.S.C. § 1114 ........................................................................................ passim

130 Cong. Rec. H7495 (daily ed. June 29, 1984) .......................................... 71

130 Cong. Rec. S8888 (daily ed. June 29, 1984) ........................................... 71

7 Collier, Bankruptcy, ¶ 1113.06[1] (15th rev. ed. 2005) ...................... 52, 56

<u>Preliminary Statement</u>

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), submit this memorandum of law (the "Memorandum Of Law") in support of the motion (the "Motion") seeking an order under 11 U.S.C. § 1113(c) ("Section 1113") authorizing rejection of the Debtors' collective bargaining agreements.  The Debtors also seek an order under 11 U.S.C. § 1114(g) ("Section 1114") modifying the Debtors' obligations to provide health and life insurance benefits for hourly retirees, whether arising under their collective bargaining agreements or otherwise, effective October 1, 2006.

At the outset, Delphi wishes to emphasize that while the Motion is a necessary procedural step to enable action that may become necessary at some point in the future, Delphi is singularly focused on reaching a consensual resolution with all of its unions before any Court hearing is necessary.  If the parties cannot reach a consensual resolution, and a hearing becomes necessary, Delphi will seek an order authorizing the Debtors to reject, upon ten calendar days' notice, their existing agreements with the United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communications Workers of America ("IUE-CWA"), the United Steelworkers of America ("USW"), the International Association of Machinists and Aerospace Workers ("IAM"), the International Brotherhood of Electrical Workers ("IBEW"), the International Union of Operating Engineers ("IUOE"), and their local affiliates (collectively, the "Unions").

Delphi inherited these agreements from General Motors Corporation ("GM") when GM created Delphi as an independent company on January 1, 1999.  To help resolve the UAW's opposition to GM's plan to spin off Delphi as a publicly held corporation (the "Spin-Off"),

Delphi agreed to accept the GM-UAW pattern national collective bargaining agreement negotiated in 1999, and to duplicate, or "mirror," the GM-UAW pattern national agreement to be negotiated in 2003 (and effective through September 2007). Under the practice of pattern bargaining at Delphi, the terms of the UAW agreements were extended to Delphi's other unions as well. As a result, for its entire history Delphi has been governed largely by the terms of the GM-UAW pattern labor agreements – arguably among the most costly and restrictive industrial agreements in the United States.

Delphi believed in 1999 that it could succeed as an independent parts supplier, despite the high cost of the GM labor agreements, by retaining its existing GM business, making significant gains in productivity, and by rapidly expanding its revenue from other automakers worldwide. Delphi was profitable immediately following the Spin-Off, earning approximately $2.0 billion on a consolidated basis in its first two years as an independent company, and Delphi's international operations remain profitable to this day. Delphi's U.S. operations, however, have become increasingly unsustainable. As a result of losses in the U.S., Delphi has not earned a net profit since 2003, suffering net losses of $4.8 billion in 2004 (including special items) and $2.8 billion in 2005. Without modifications to its labor agreements, according to Delphi's most recent financial projections, Delphi would suffer operating losses of between $6.0 billion and $8.0 billion, and net losses of between $11 billion and $13 billion, over the next five-years.

The mounting losses in Delphi's U.S. operations are attributable to three principal factors: (a) the GM labor agreements have caused an enormous increase in Delphi's labor and benefit costs since 1999, including the legacy retirement liabilities arising under those agreements, and have limited Delphi's ability to respond to economic changes in the U.S. automobile industry by selling or closing unprofitable or non-core facilities and laying off excess employees, (b) the

increasingly competitive environment facing U.S. automakers over the last five-years has

substantially reduced GM's market share and profitability, resulting in dramatically reduced

revenue and greater pricing pressure for Delphi, and (c) rapidly rising commodity prices have

significantly increased Delphi's manufacturing costs, because Delphi has been unable to pass

along those increased costs to its automaker customers.

To stem these losses and achieve a successful reorganization, Delphi has adopted a

restructuring plan with five key elements:

- Modifying its labor agreements to create a competitive arena in which to conduct business going forward.

- Concluding negotiations with GM to finalize GM's financial support for the legacy costs Delphi currently carries and to ascertain GM's business commitment to Delphi going forward.

- Streamlining its product portfolio to capitalize on Delphi's world class technology and market strengths, and making the necessary manufacturing alignment with this new focus.

- Transforming its salaried workforce to ensure that Delphi's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint.

- Devising a workable solution to its pension funding obligations by reducing its contributions to manageable levels.

To accomplish these goals, Delphi's existing labor agreements must be modified in three

principal respects.  First, Delphi must reduce its hourly wage and benefit costs to levels that are

competitive with other U.S. auto parts suppliers.  Currently, Delphi's total hourly labor cost,

including legacy retirement liabilities, for its traditional production and skilled trades employees[1]

---

[1]      The term "traditional" employee, as used in this Memorandum Of Law, excludes employees hired under agreements governing new-hire employees that Delphi has negotiated with the UAW, IUE-CWA, and USW.  Under these agreements, new-hire employees hired after certain dates receive lower wages and benefits than traditional employees for a period of time.  Because Delphi had been shrinking its workforce since 1999 rather than hiring, however, there are now fewer than 3,000 Delphi employees governed by these agreements.  See Declaration of Kevin M. Butler ("Butler Dec.") ¶ 35.

3

is $78.63 per hour. This cost is nearly three and a half times the labor costs of a typical U.S. auto

parts supplier, and more than 80 percent higher than Delphi's own labor costs in 1999. Second,

Delphi must eliminate those provisions that limit Delphi's ability to respond to market forces by

streamlining its product portfolio, selling or closing non-core operations, and laying off excess

employees. Finally, Delphi must reduce its $10.7 billion unfunded liability for hourly employee

retirement benefits. These benefits include a defined benefit pension plan that allows Delphi

employees to retire after 30 years of employment, regardless of age, and retiree health care

without any monthly contributions by the retirees.

In an effort to reach a consensual resolution with the Unions pursuant to Sections 1113

and 1114, Delphi has pursued two different approaches. In late 2005, Delphi provided its Unions

with proposals outlining the modifications necessary to bring Delphi's wages and benefits costs

in line with its competitors, allowing it to restructure without any financial support from its

former parent, GM (the "Competitive Benchmark Proposals"). The Unions flatly rejected these

proposals, essentially without discussion, and have failed to offer even a single counter-proposal.

In March 2006, therefore, Delphi provided the Unions with alternative Section 1113 and 1114

proposals that incorporated much more favorable terms, contingent upon GM's willingness to

provide financial support sufficient to fund the incremental cost of those terms (the "GM

Consensual Proposals"). The concepts encompassed in the GM Consensual Proposals, which

have been explored with the three largest unions and GM since January 2006, include an average

base wage of $22 per hour for current employees (compared to $12.50 in the Competitive

Benchmark Proposals) until September 3, 2007. At that point, wages would be reduced to an

average base wage of $16.50 per hour for existing employees who would also receive a $50,000

4

buydown to help ease the transition.  In addition to other improved terms for existing employees,
those employees who elect to leave Delphi would be offered a buyout of up to $140,000.

These benefits would supplement the retirement incentives and GM flow-back
opportunities recently negotiated in the UAW Special Attrition Program (defined below).  Under
this program, which is currently pending the Court's approval, GM and Delphi would provide
monetary incentives and early retirement programs for almost 13,000 of Delphi's 23,300 UAW-
represented employees and flow-back opportunities to positions at GM for at least 5,000 more
UAW-represented employees by September 2007.  GM, Delphi, and the UAW also committed to
implement a mutually acceptable resolution to the matter of remaining Delphi employees who
wish to leave Delphi (including those who want to flow back to GM).  Negotiation of reasonably
comparable programs is contemplated for Delphi's other Unions as well.  Accordingly, virtually
all of Delphi's existing high-wage employees will have an opportunity for the "soft landing" that
the Unions and Delphi have sought.  Thus far, none of the Unions has accepted the GM
Consensual Proposals or provided any counter-proposal.

Under these circumstances, Delphi must now initiate the process for rejection of its
collective bargaining agreements.  During this process, and even if the Court authorizes rejection,
Delphi will still pursue a consensual resolution with its Unions, and a commitment of financial
support from GM, before implementing the proposed terms.

Statement Of Facts

I.    Overview Of Delphi's Business Following Its Spin-Off From GM

    A.    Delphi's Operations

Delphi is one of the world's largest suppliers of vehicle electronics and transportation

components, with global revenue of $28.6 billion in 2004 and $26.9 billion in 2005.[2]  Delphi and

its subsidiaries operate in 34 countries, with some 184,000 employees, 163 manufacturing sites,

39 joint ventures, and 32 technical centers.  Delphi's international operations are conducted

through foreign subsidiaries and affiliates in Mexico, South America, Europe, the Middle East,

Asia, and Australia.  See Sheehan Dec. ¶¶ 7, 24.

Within the United States, Delphi has approximately 47,400 employees at approximately

41 manufacturing sites (including idled and non-Union facilities) in 15 states, 13 technical

centers, and its world headquarters in Troy, Michigan.  Approximately 33,100 of these are

production and skilled employees, represented primarily by the UAW, IUE-CWA, and USW, at

Delphi's manufacturing sites.[3]  The remainder are primarily salaried and management employees,

including engineers engaged in designing and manufacturing Delphi's products, management

employees at Delphi's U.S. manufacturing sites, and employees who perform Delphi's sales,

general, and administration ("SG&A") functions.  See Sheehan Dec. ¶ 7; Butler Dec. ¶ 11.

Delphi designs and manufactures products for every major original equipment

manufacturer – also known as "OEMs," "assemblers," or "automakers" – in the world.  As

described more fully in the Sheehan Declaration, Delphi is organized into three business sectors:

---

[2]        In June 2005, Delphi restated its financial results for 1999 through the second quarter of 2004; the financial
data described in this Memorandum Of Law reflects the restated results.  See Delphi Corporation 10-K, filed June
30, 2005.  The 2005 financial data cited in this Memorandum Of Law are Delphi's preliminary results, which are
subject to audit and adjustment in the ordinary course.  Audited results will be announced later this year.  See
Declaration of John D. Sheehan ("Sheehan Dec.") ¶ 4.

(a) Electrical, Electronics, and Safety, (b) Dynamics, Propulsion, Thermal, and Interior, and (c)
Automotive Holdings Group.  Delphi's products represent one of the widest ranges of auto parts
manufactured by any independent parts supplier, ranging from complex electronic systems to
simple commodity components.  See Sheehan Dec. ¶¶ 8, 12-22.

B.    The Delphi Spin-Off And The Mirror Agreement

For most of its history, GM itself manufactured a large proportion of the parts used in its
vehicles.  During the 1990s, GM combined these operations into a single parts division, Delphi
Automotive Systems, that produced parts for GM and, to a lesser extent, other automakers.  On
January 1, 1999, GM transferred the assets and liabilities of this division (including equipment,
plants, and tools, manufacturing sites, and most of the employees) to the newly-created Delphi
Automotive Systems Corporation, a wholly-owned subsidiary of GM, and entered into a Master
Separation Agreement making Delphi an independent business.  See Declaration of Mark R.
Weber ("Weber Dec.") ¶¶ 4-5.  On May 28, 1999, through an initial public offering to new
investors and a spin-off of Delphi's remaining stock to GM shareholders, Delphi became a
publicly-traded corporation independent of GM.  See Weber Dec. ¶ 6.

Delphi's Intent To Negotiate Separately.  GM and Delphi recognized at the time of the
Spin-Off that the GM labor agreements were too costly for an independent parts supplier and
limited the flexibility that Delphi needed to improve its operational performance.  One of the
assumptions of the Spin-Off articulated by GM and Delphi was that following the separation,
Delphi would be able to negotiate independently of GM and, "over time, be able to negotiate
local work rules and practices and other terms more consistent with those generally prevailing in
the automotive parts industry."  See Weber Dec. ¶ 15 and Ex. A at 28.

---

[3]    For purposes of consistency, all of the employment figures in this Memorandum Of Law will be based on
Delphi's employee census data as of October 31, 2005.  These figures include all employees who were active or on

While Delphi was still majority owned and controlled by GM, Delphi and GM representatives informed the UAW that, in an effort to help resolve the UAW's concerns over the Spin-Off, Delphi would honor the "pattern" agreement negotiated between GM and the UAW in September 1999. In the course of finalizing the 1999-2003 National Agreement, following discussions among GM, Delphi, and the UAW, the UAW insisted on Delphi's further commitment that Delphi would also "mirror" the next agreement between GM and the UAW, scheduled to be negotiated in 2003. The UAW asserted that without such commitment there was a risk that the agreement would not be ratified but acknowledged that the terms of the 2003 agreement might be untenable for Delphi. The UAW therefore committed to consider mutually agreeable exceptions to the 2003 GM-UAW National Agreement "to assure the continued success of Delphi as an on-going business," and, based on this commitment, Delphi agreed to "mirror," or duplicate, the terms of the 2003 GM-UAW National Agreement (the "Mirror Agreement").[4]  See Weber Dec. ¶¶ 15-17 and Ex. B. Pursuant to Delphi's practice of pattern bargaining, the terms of the Mirror Agreement were extended to Delphi's other unions. As a result, Delphi's labor costs and operational restrictions have been dictated almost entirely by the labor agreement between GM and the UAW. See Butler Dec. ¶¶ 8-9, 14-15.

---

temporary layoff, indefinite layoff, or long-term leaves of absence. See Butler Dec. ¶ 10.

[4]    Delphi's labor agreements with the IUE-CWA, USW, IAM, and IUOE are patterned largely after the Delphi-UAW National Agreement. Once Delphi and the UAW finalize a National Agreement, Delphi then negotiates with the IUE-CWA and the USW, followed by the IAM, the IBEW, and the IUOE, each of which historically demands and adopts the basic pattern terms set by the UAW, with variations based on each Union's specific circumstances. Concurrent with national negotiations, local Delphi management negotiates any "local issues" with the designated local Unions. The result of this process is that the UAW, IUE-CWA, and USW have very similar National Agreements, but the Unions' Local Agreements can differ based on union affiliation and local circumstances. See Butler Dec. ¶ 9. Therefore, the practical effect of the Mirror Agreement is that the provisions of Delphi's other labor agreements applicable to traditional employees generally mirror the 1999 and 2003 GM-UAW Agreements. See Butler Dec. ¶ 15.

C.    Delphi's Historical Financial Performance

In the first two years following the 1999 Spin-Off of Delphi from GM, Delphi performed reasonably well financially, earning net income of $1.0 billion in 1999 and $817 million in 2000. In 2001, however, as the entire industry suffered the after-effects of the terrorist attacks of September 11, Delphi's financial performance began to deteriorate steadily.  While Delphi's international operations remain profitable to this day, as a result of steadily increasing losses in the U.S., Delphi has not had a net profit on a consolidated basis since 2003.  In 2004, Delphi lost $4.8 billion, including special items, and in 2005, according to Delphi's preliminary, unaudited results, Delphi had a net loss of $2.8 billion.  See Sheehan Dec. ¶ 24.

Table 1 shows Delphi's consolidated sales and net income or losses since the Spin-Off.



Table 1 – Delphi's Consolidated Sales and Net Income/(Loss), 1999-2005

Delphi's losses stem in large part from its U.S. operations – the only operations subject to the collective bargaining agreements at issue in the Motion.[5]  As Table 2 illustrates, Delphi's

---

[5]    None of Delphi's foreign subsidiaries is a debtor in these chapter 11 cases and Delphi does not plan to commence any reorganization, bankruptcy, or insolvency cases outside the United States.  See Sheehan Dec. ¶ 25.

revenue from its U.S. operations has steadily decreased since 1999, while revenue from Delphi's

international operations has steadily increased.  U.S. manufacturing sites, collectively, had

operating losses of $700 million in 2003, $1.6 billion in 2004, and a projected $2.2 billion in

2005, while its non-US facilities had operating income of $800 million in 2003, $1.1 billion in

2004, and a projected $700 million in 2005.  See Sheehan Dec. ¶¶ 25-26.

**Table 2 - U.S. and International Sales and Operating Income/(Loss)
[1] 2000-2005**



[1] Based on management studies performed periodically to assess U.S. and Non-U.S. profitability.
Non-U.S. results include Mexico Maquiladora profitability.
[2] Based on August 2005 Forecast.  Primary difference with actual is $473 million of international
impairments and $479 million of U.S. impairments recorded in Q4 2005.

When reviewed as a percentage of revenue, the difference between Delphi's foreign and

U.S. operations is even more extreme.  As reflected in Table 3, Delphi's projected operating

income of $700 million from its non-U.S. operations in 2005 represented a profit of 4.6 percent

on $15.3 billion in revenue, whereas Delphi's projected operating loss of $2.2 billion in the U.S.

represented a 19.1 percent loss on $11.5 billion in U.S. revenue.  See Sheehan Dec. ¶ 29.

**Table 3 - Delphi Operating Income As A Percentage of Sales,
International vs. U.S., 2000-2005**



*Comprehends all Non-US locations including Mexico Maquiladora locations

## II.    The Causes Of Delphi's Current Financial Condition

The continued deterioration in Delphi's U.S. operations arises from three factors.  First, the GM labor agreements have caused an enormous increase in Delphi's labor and benefit costs and in its legacy retirement liabilities arising under those agreements, and have limited Delphi's ability to respond to reduced revenue by selling or closing facilities and laying off excess employees.  Second, competitive conditions in the U.S. automotive market have greatly reduced GM's sales and profitability, resulting in reduced business and greater pricing pressure for Delphi.  Finally, there has been a large increase in commodity prices in recent years, creating millions of dollars in additional costs that Delphi cannot pass on to its customers.  Each of these factors is discussed in more detail below.

### A.    Delphi Has Been Burdened By Non-Competitive Labor Agreements That Hinder Delphi's Operational And Competitive Performance

#### 1.    Delphi's Labor And Benefit Costs Have Increased Significantly Since 1999

While Delphi was aware in 1999 that the Mirror Agreement limited its ability to reduce its labor costs, it could not have foreseen the full effect of that agreement six years later.  In 1999,

the average hourly wage for traditional employees under the GM-UAW agreements, including both production and skilled trades, was $20.96 plus a cost of living adjustment ("COLA") of 69 cents per hour, for a total of $21.65 per hour.  The blended "all-in" labor cost in 1999 for a Delphi-UAW employee – that is, the cost of base wages, overtime, premiums, vacation, holidays, wage-related costs such as social security, health care and pension, as well as hourly post-employment health care and life insurance benefits ("OPEB") and other benefits – was approximately $43.47 per hour.  See Butler Dec. ¶ 38.

Six years later, however, as the result of cost of living adjustments and base wage increases negotiated in 1999 and 2003, the comparable average blended base hourly rate for a traditional employee under the Delphi agreements, including both production and skilled trades, had risen to $26.90 per hour.  With an average cost of living adjustment in 2005 of $0.93 per hour, the total hourly wage increase has been nearly 29 percent in six years.  In fact, by year-end of 2005, the COLA has risen dramatically higher to $1.61 per hour.  Overall, the all-in labor cost for a traditional Delphi employee, including benefits, fixed costs, and retirement obligations, increased from approximately $43.47 per hour to approximately $78.63 per hour – an 81 percent increase in six years.  See Butler Dec. ¶ 38.

Delphi's liabilities for legacy retirement benefits have increased even more than its labor costs as a whole.  GM and Delphi recognized in 1999 that Delphi might be unable to meet its future capital requirements because of $5.4 billion in liability for OPEB and underfunded hourly pension plan obligations.  At the time, Delphi's estimated liability was $3.4 billion for hourly retiree health care, $0.3 billion for hourly retiree life insurance, and $1.7 billion in unfunded liability under its hourly pension plan.  See Weber Dec. ¶ 13; Declaration of Keith Williams ("Williams Dec.") ¶¶ 9, 21; Sheehan Dec. ¶ 55.  In the February 2, 1999 Form S-1/A

Registration Statement filed by GM and Delphi with the United States Securities and Exchange Commission (the "1999 S-1"), Delphi stated that this level of unfunded liability could adversely affect its liquidity or its ability to fund capital expenditures.  See Weber Dec. ¶ 6 and Ex. A.

In the six years since the Spin-Off, Delphi's unfunded legacy retirement obligations for its hourly and salaried retirees have more than doubled to an estimated $13.6 billion, of which $10.7 billion (excluding overseas liabilities) is attributable to hourly retirees.  Williams Dec. ¶¶ 9, 21.  Delphi's revenue from its U.S. operations, on the other hand, has fallen by 47 percent, from $18.1 billion in 2000 to $11.5 billion in 2005, and its hourly workforce in the U.S. has been reduced by almost 50 percent.  See Sheehan Dec. ¶¶ 26-27 and Ex. C.  As of December 31, 2005, Delphi's estimate of its unfunded liability for its OPEB obligations was $9.6 billion,[6] and its unfunded pension plan liability had increased to $4.1 billion – $2.3 billion under the Delphi Hourly-Rate Employees Pension Plan ("HRP"), $1.5 billion under the Delphi Retirement Program for Salaried Employees ("SRP"), and $0.3 billion under the Supplemental Executive Retirement Plan ("SERP").[7]  See Williams Dec. ¶¶ 21, 22.

2.    <u>Delphi Labor Agreements Prevent It From Responding Adequately To Market Forces</u>

Delphi's labor agreements contain significant prohibitions on Delphi's operations that prevent it from responding to market forces by exercising normal management discretion to sell

---

[6]  As discussed below, these liabilities have since grown to $8.4 billion in hourly retiree health and life OPEB liability and $2.3 billion in unfunded hourly pension liability.  See Williams Dec. ¶¶ 9, 21; Sheehan Dec. ¶ 55.

[7]  The increase in Delphi's hourly health OPEB liability since 1999 is attributable to several factors.  First, the health care trend rate of for hourly health care costs increased over and above assumptions during the period beginning with the Spin-Off in 1999 through 2005, increasing liabilities by 40 percent.  Second, the discount rate used to measure hourly retiree health liabilities under FAS 106 decreased from 6.75 percent as of January 1, 1999 to 5.5 percent  as of December 31, 2005, increasing liabilities by 42 percent.  Finally, the current claims rate per hourly retiree is greater than the expected claims rate based on 1999 assumptions, increasing liabilities by 18 percent .  See Williams Dec. ¶ 23.  There are several reasons for the increase in hourly retiree health APBO since 1999.  First, benefits under the pension plans have increased by approximately 30 percent  since 1999.  Second, cumulative investment gains since the pension plans' inception have been less than expected.  And third, the discount rate used

13

or close unprofitable or non-core operations and determining the number of employees it needs.

Indeed, one of the principal reasons for Delphi's current financial situation is that it could not

respond to dramatically reduced GM volumes, leaving it with unnecessary and unprofitable

facilities, and employees being paid full wages and benefits even though no work may be

available.

          a)        <u>Delphi's Inability To "Fix, Sell, Or Close" Its Non-Core Operations</u>

While the existing GM-UAW agreement in 1999 prohibited the closure of facilities

without union consent, the 1999 GM-UAW agreement imposed a critical new restriction on

selling facilities.  In the 1999 negotiations between GM and the UAW, the UAW sought to

amend Document 13, a plant closing moratorium provision contained in the GM-UAW

agreement, to prohibit GM from selling, spinning off, consolidating, or otherwise divesting

existing operations "constituting a bargaining unit."  As a result of Delphi's agreement to honor

the 1999 UAW-GM agreement, Delphi became bound by the 1999 modification to Document 13.

Pursuant to Delphi's practice of pattern bargaining, similar provisions also became part of the

IUE-CWA national agreements, thus prohibiting Delphi from selling the operations that it hoped

at the time of the Spin-Off to divest.[8]  <u>See</u> Butler Dec. ¶ 22 and Ex. C; Kidd Dec. ¶  37;

Declaration of Bernard J. Quick ("Quick Dec.") ¶ 40.

As a result, Delphi's flexibility to accomplish its objective to "fix, sell, or close"

unprofitable and non-core Delphi operations was substantially eliminated within months

following the Spin-Off.  While a handful of Delphi operations have been consolidated or

---

to measure the pension plans' liabilities for FAS 87 purposes decreased from 6.75 percent as of January 1, 1999 to
5.5 percent as of December 31, 2005.  The lower the discount rate, the higher the liability.  <u>See</u> Williams Dec. ¶ 11.

[8]      Under the UAW national agreement, however, Delphi agreed in April 2004 during negotiations for a
supplemental new-hire agreement, to extend the prohibitions under Document 13 to 2011 for UAW-represented sites.
Under the IUE-CWA and USW national agreements, the provisions equivalent to UAW Document 13 will expire in
September 2007.  <u>See</u> Butler Dec. ¶ 23; Declaration of Darrell Kidd ("Kidd Dec.") ¶ 37.

gradually wound down since 1999, Delphi has largely been unable to sell or close its

unprofitable or non-core operations, or reduce its capacity as its GM volumes have fallen.  And,

as described more fully below, when certain operations were consolidated or wound down,

Delphi incurred high costs for the affected employees, who were either carried in a JOBS Bank

or incentivized to retire early.  See Butler Dec. ¶ 24.

> b)    Delphi Has Been Unable To Transition Its Workforce Effectively
>        And Thereby Lower Its Labor Costs

At the time of the Spin-Off, Delphi had agreements in place with both the IUE-CWA and

USW that provided for starting wages and benefits for certain new-hire employees below those

under the basic IUE-CWA and USW agreements.  The IUE-CWA agreements, however,

provided that some of the newly-hired employees would transition to the higher cost traditional

wages and benefits over a period of time.  See Butler Dec. ¶ 31; Quick Dec. ¶¶ 21-28.

In light of its deteriorating financial condition, Delphi informed the UAW during the

2003 negotiations that it could not honor the Mirror Agreement without relief in the form of

commercial support from GM, increased flow-back of higher-cost traditional employees to GM,

and lower wage and benefit levels, at least for new-hire employees.  See Butler Dec. ¶ 30.  In

particular, Delphi sought to extend the IUE-CWA and USW competitive hire agreements, but

eliminate the "grow-in," or transition, feature, and to negotiate a similar agreement with the

UAW.  See Butler Dec. ¶ 32.

Delphi was partially successful in these efforts.  As part of the 2003 agreement, the UAW

committed to negotiate a supplemental agreement that would provide for a reduced wage and

benefit structure for new-hire employees, and the parties ultimately reached such an agreement in

April 2004.  That agreement, Delphi noted, while substantially below the traditional wage and

benefit rates – it had a starting wage of $14 per hour and a top wage of $18.50 per hour

depending on position – was not a truly competitive wage and benefit structure.  Delphi was also

able to extend the IUE-CWA and USW competitive hire agreements, which had starting wages

as low as $7.77 per hour, and was largely able to eliminate the "grow-in" provisions for future

new-hires.  Employees hired before 2003, however, continued to transition into the traditional

wage and benefit structure.  See Butler Dec. ¶ 34.

GM's loss of market share since 1999, however, has limited the opportunities for Delphi

to transition to a lower-paid workforce.  At the time of the Spin-Off, GM, Delphi, and the UAW

entered into a Flow-Back Agreement under which former GM employees employed by Delphi

would have the right to return to open positions at GM.  Between September 1999 and

September 2003, approximately 4,500 Delphi employees flowed back to GM.  During

negotiations over the 2003-2007 agreement, GM made a "good faith effort" commitment to make

2,500 flow-back offers of employment to Delphi employees by the end of 2004.  Between the

2003 agreement and the end of 2005 – a year longer than GM anticipated – 2,465 Delphi

employees flowed back to GM.  One of the purposes of encouraging employees to flow back to

GM was that Delphi hoped it would eventually be able to backfill positions with new-hire

employees at lower wage and benefit rates under the supplemental agreements discussed below.

See Butler Dec. ¶¶ 19-20.

The loss of GM volume left Delphi overstaffed as well.  At the time of the Spin-Off,

Delphi employed approximately 63,000 hourly employees in the U.S.  By 2005, Delphi's

operations required less than half that number.  Because GM was unable to accommodate all of

the excess Delphi employees, and because the GM labor agreements prohibited Delphi from

permanently laying off excess employees, Delphi was forced to implement a series of expensive

retirement incentive programs between 1999 and 2004 to reduce its headcount.  Even with these

efforts, at times during 2005 there were as many as 4,000 employees on temporary layoff or in a

JOBS Bank.  See Butler Dec. ¶ 40.

As a result of these circumstances, Delphi has been unable to take advantage of the

supplemental new-hire terms and conditions to avoid the high labor costs that were associated

with the Mirror Agreement.  Currently, of Delphi's 33,100 hourly workforce employees, the

supplemental new-hire agreements cover only approximately 579 UAW-represented Delphi

employees, approximately 1,910 IUE-CWA-represented employees, and 496 USW-represented

Delphi employees who have not transitioned to the traditional, high-cost wage and benefit levels.

See Butler Dec. ¶ 35; Kidd Dec. ¶ 29; Quick Dec. ¶ 28.

     B.     <u>Reduced GM Sales And Profitability Have Resulted In Lower Levels Of GM
              Business And Greater Pricing Pressure For Delphi Than Anticipated At The Time
              Of The Spin-Off</u>

At the time of the initial public offering in February 1999, GM and Delphi filed the 1999

S-1, outlining a number of business objectives, assumptions, and risks underlying the Spin-Off.

See Weber Dec. ¶ 9 and Ex. A.  The most important was that GM and Delphi expected that

Delphi would expand its total sales and earnings by (a) retaining its existing GM revenue "well

into the next decade" through the Supply Agreement executed with GM at the time of the Spin-

Off and (b) substantially increasing its revenue from other automobile manufacturers that had

been reluctant to do business with a GM subsidiary.  See Weber Dec. ¶ 11.  As explained below,

that did not happen.

     1.     <u>The Decline In GM's Business And Market Share Since 1999</u>

Delphi was primarily a captive supplier servicing GM's assembly plants at the time of the

Spin-Off.  To achieve the transition to a successful independent auto parts supplier, Delphi

needed to maintain its existing GM business in the U.S., expand its revenue from other OEMs

within the U.S., and expand its international presence, supplying both GM's foreign operations

and other OEMs world-wide.  <u>See</u> Weber Dec. ¶¶ 8, 10.  Delphi has largely succeeded in the

latter two goals, by more than doubling its non-GM revenue from $6.9 billion in 1999 to $14.1

billion in 2005, and by increasing its international revenue from $11.1 billion in 2000 to

approximately $15.3 billion in 2005.  <u>See</u> Sheehan Dec. ¶ 33.  Table 4 illustrates the migration of

Delphi's business from GM and GM's U.S. operations to a global supplier of OEMs worldwide.

<u>See</u>  Sheehan Dec. ¶ 11 and Ex. A.

### Table 4 - Customer Revenue Comparison



*Excluding GMSPO which is included in GMNA

Delphi was not successful, however, in maintaining its existing GM business.  Rather, as

illustrated in Table 5, Delphi's GM world-wide revenue fell from $22.3 billion in 1999 to $12.8

billion in 2005, a decrease of approximately 42 percent, and its GM North American revenue –

key to maintaining Delphi's U.S. operations – fell from approximately $18.3 billion in 1999 to

approximately $10.6 billion in 2005, also a decrease of approximately 42 percent.  <u>See</u> Sheehan

Dec. ¶ 33 and Ex. E.

**Table 5 - Delphi's Consolidated GM and Non-GM Revenues, 1999-2005**



Notes:
GM revenue represents direct sales from Delphi to GM
Numbers may differ due to rounding

The reduction in GM revenue is attributable in part to a consistent decline in GM's own sales within the U.S.  Although GM's share of U.S. light vehicle sales had slowly declined over several decades, in the late 1990s it still maintained its market-leading role.  In 1999, the first year of the Delphi Spin-Off, GM reported total net revenue of approximately $176.6 billion, with a net profit of $6.0 billion, and its North American operations earned a net income of approximately $4.9 billion on revenues of $111.9 billion.  Its share of the U.S. light vehicle market was 29.4 percent, with sales of nearly 5 million automobiles and light trucks.  See Sheehan Dec. ¶ 34.

By 2005, the situation had changed markedly.  GM's share of the U.S. light vehicle market had fallen to 26.2 percent and its sales had dropped to 4.5 million vehicles, a volume decline of 10 percent.  GM's North American automotive operations, which produced the vast

majority of Delphi's GM revenues, lost $7.6 billion in 2005 – roughly $1,574 for every GM vehicle sold in North America.[9]  Tables 6 and 7 illustrate the decline in GM's market share and profitability over this period.  See Sheehan Dec. ¶ 35 and Exs. F, G.

**Table 6 - GM U.S. Market Share and Sales Volume, 1999-2005**



**Table 7 - GM Consolidated Net Income / (Loss) - 1995-2005 [1]**



[1] Data for 1995-1999 is based on GM 10-K filings. Data for 2000 is based on GM 2004 10-KA filing and data for 2001-2005 is based on GM 2005 10-K filing.

---

[9]    Note that GM figures for 1995-1999 reflect amounts obtained from GM's prior Form 10-K filings with the SEC.  The 2000-2005 figures reflect amounts obtained from GM's 2004 Form 10KA and 2005 Form 10-K filings with the SEC.  See Sheehan Dec. ¶ 35.

2.    The Effect Of GM's Revenue Decline On Delphi's Business

The decline in GM's market share, revenue, and income since 1999 has undermined Delphi's business plan in four different ways:  (a) loss of volume and thus revenue under Delphi's existing supply agreements with GM, (b) lower returns on the capital investments and other fixed costs incurred by Delphi under those agreements, (c) a reduction in new business from GM as GM has increased its use of lower cost, foreign suppliers, and (d) lower prices paid by GM under both existing and new supply agreements.

Reductions In Volume And Revenue For Booked Business.  The decline in GM's sales between 1999 and 2004 caused a direct reduction in the number of parts GM purchased from Delphi, and, consequently, a direct reduction in Delphi's revenue. [10]  See Sheehan Dec. ¶ 37.  The reduction in Delphi's revenue has been greater than the absolute decline in vehicles sold by GM, however, because the revenue per vehicle can vary substantially based on the type of vehicle – a measurement known as the vehicle "mix."  For example, the most profitable GM vehicles from Delphi's perspective are large sport utility vehicles ("SUVs").  In 2005, the Delphi "content per vehicle" for large SUVs – the dollar value of Delphi-produced parts in each GM vehicle – was $3,003 per vehicle whereas the Delphi content per vehicle for automobiles was only $2,168.  As the result of significant recent increases in oil prices, GM's sales of large SUVs in the U.S. declined by 25 percent between 2003 and 2005, from 645,000 to 481,000 vehicles, exacerbating the overall decline in Delphi's GM revenues.  See Sheehan Dec. ¶ 38.

---

[10]    The typical supply agreements between an OEM and its suppliers are "requirements" contracts.  These agreements set the duration of the agreement (generally three to five-years, depending on the vehicle) and the price of the part (including, typically, a provision for annual price reductions) but do not guarantee the supplier a particular volume of business.  Automakers order the parts as needed based on their own production, and a reduction in the number of vehicles sold by the OEM will directly reduce the number of parts purchased.  See Sheehan Dec. ¶ 37.

Inability To Recover Capital And Other Fixed Costs.  The harm to Delphi's operating results is much greater than the loss of revenue alone.  When Delphi – or any other supplier – negotiates the price for which it will supply a particular part, it typically bases that price, among other factors, on the duration and anticipated volume under the supply agreement.  Producing a new part can require a substantial initial investment by the supplier in engineering, equipment, tools, and training, and the supplier assumes that it will recover that cost over the life of the agreement.  For example, about 85 percent of Delphi's total capital expenditures are incurred in the launch of new products.  If volumes fall short of those anticipated, the supplier will be unable to recover its full investment in the product.  See Sheehan Dec. ¶ 39.

For Delphi, the cost of an automaker's failure to meet volume estimates is compounded by the fact that labor is, in effect, a fixed cost under the GM labor agreements assumed by Delphi.  Under the GM labor agreements, Delphi cannot lay off employees except for temporary periods in which the employees are entitled to Supplemental Unemployment Benefits and, following temporary layoff, excess employees are placed in a "JOBS Bank" where they receive full pay and benefits.  Thus, if lower-than-expected volumes leave Delphi with more employees than needed to run its operations, Delphi must nonetheless pay those employees.  As a result of the decline in GM volumes, at certain points during 2005 Delphi had as many as 4,000 employees on temporary layoff or in a JOBS Bank.  See Butler Dec. ¶ 40.

GM's Use Of Lower Cost Suppliers.  Falling prices for new automobiles has resulted, in turn, in declining prices that the OEMs will pay independent parts suppliers, such as Delphi, for auto components.  In many cases, the OEMs have turned to foreign suppliers which, as a result of lower labor costs abroad, can undercut the U.S.-based suppliers on price.  As GM's profits have declined, GM has escalated its efforts to de-source from Delphi by purchasing parts from

22

lower-cost providers, and, in particular, from foreign suppliers in countries with substantially

lower wages than the U.S.  See Sheehan Dec. ¶ 36.

The net effect of GM's use of other suppliers is reflected in the measurement of Delphi's

content per GM vehicle.  In 1999, the Delphi content in the average GM vehicle was $3,196.  By

2005, that figure had fallen to $2,325, a 27 percent reduction over a six-year period.  Table 8

illustrates this decrease.  See Sheehan Dec. ¶ 41.

**Table 8 - Delphi's Content Per GM Vehicle, 1999-2005**



Pricing Pressure Under Existing GM Agreements.  The Big Three have recently adopted

the practice of demanding year-over-year parts price reductions under long-term supply contracts.

Although annual price-downs are a standard industry practice, GM has been aggressive in

seeking such price-downs, demanding larger than normal price-downs on new contracts, or

conditioning new business on Delphi's willingness to provide greater than required price-downs

under its existing supply contracts.  GM has also been aggressive in pursuing model-to-model

23

price reductions.  For example, GM demanded that new part models be sold at the same price as

older models of the same part, allowing GM to receive more content for the same price.  See

Sheehan Dec. ¶ 42.  At the time of the Spin-Off, according to Delphi's S-1, Delphi estimated that

its total price-downs over the foreseeable future would average 1.6 percent of sales.  See Weber

Dec. ¶ 14.  Since 1999, Delphi's actual price-downs under its GM supply agreements has

averaged 2.1 percent per year.  By way of comparison, the average price-down required by

Delphi's other OEM customers was only 1.4 percent per year during the same period.  Thus,

since the Spin-Off Delphi has been required to reduce its year-over-year prices on GM business

by 50 percent more than the price reductions required by its other OEM customers.  See Sheehan

Dec. ¶ 43.

III.    Delphi Cannot Restructure Without Modifications To Its Labor Agreements

      A.    Without Labor Modifications, Delphi Would Suffer Unsustainable Losses Over
            The Next Five-years

In formulating its restructuring business plan, Delphi began by developing a "Steady

State Scenario" – that is Delphi's best estimate of costs and revenue in each division based on (a)

the assumption that Delphi's existing labor agreements continued in effect, (b) the assumption

that Delphi retained all of its existing lines of business, and (c) Delphi's best estimate of business

volumes, pricing, and material costs based on existing economic trends.  See Sheehan Dec. ¶ 44.

In creating the Steady State Scenario, Delphi conducted an in-depth evaluation of each of

its businesses, taking into account revenue and cost forecasts in light of changed economic

conditions, including the chapter 11 filings.  As explained in the Sheehan Declaration, Delphi

concluded that most of the economic trends leading to Delphi's current financial crisis – GM's

loss of market share, reduced GM revenues, pressure for price-downs, higher material costs, and

the like – will continue for the foreseeable future.  See Sheehan Dec. ¶ 45.

24

Under the Steady State Scenario, which was created before negotiation of the recent Special Attrition Program with the UAW (the "UAW Special Attrition Program") described in detail below, Delphi projects an operating loss of $8.1 billion, and a net loss of $12.9 billion, over the five-year period from 2006 to 2010. As with its historical financial results, these losses are in large part attributable to Delphi's U.S. operations. Even with the deterioration in revenue and costs that Delphi has assumed for 2006-2010, Delphi's international operations will be profitable during the period, earning approximately $3.4 billion in operating income over the five-year period. Delphi's North American operations, on the other hand, would lose $11.5 billion in operating income during the same period. See Sheehan Dec. ¶¶ 44, 49-50 (reflecting Delphi's revenue and operating income losses under the Steady State Scenario for 2006 through 2010). As noted above, Delphi's North American operations perform better than its U.S. operations alone.

While the UAW Special Attrition Program, and the reasonably comparable programs contemplated for Delphi's other Unions (the "Hourly Attrition Programs"), would "improve" Delphi's financial projections in the sense of reducing the projected losses, they in no way produce a viable enterprise. The precise effect of these programs will depend on how many employees elect the retirement and flow-back options. Even under the best case scenario – that is, that 100 percent of Delphi's retirement-eligible employees actually retire – Delphi would still lose approximately $6.1 billion over the next five-years. See Sheehan Dec. ¶ 51. Thus, the Hourly Attrition Programs do not alleviate the need for the modifications that Delphi seeks in its labor agreements.

B.    <u>Without A Substantial Reduction In Its Hourly Labor Costs, Delphi's U.S.
Operations Cannot Compete For New Business</u>

In light of the financial projections discussed above, Delphi does not anticipate that its

Unions will contend that Delphi can survive without modifications to its labor agreements.  The

all-in labor cost for a traditional Delphi employee, including benefits, fixed costs, and retirement

obligations, is approximately $78.63 in 2005 for traditional hourly employees.  <u>See</u> Butler Dec.

¶ 38.  No one could seriously contend that Delphi can become financially viable while burdened

with such high labor costs.  Instead, Delphi anticipates that the Unions will challenge the need

for the specific modifications set forth in Delphi's Section 1113 and 1114 proposals.

Under Delphi's Competitive Benchmark Proposals, Delphi targeted a wage and benefit

package that does not exceed $22 per hour for production employees, with a base wage

averaging $12.50 per hour.  As explained below, that target was based on an extensive analysis

of labor costs for other auto parts suppliers, and represents a competitive wage and benefit

structure compared to similar companies and similar workers economy-wide.  Because the

Competitive Benchmark Proposals represent a competitive wage and benefit structure, the GM

Consensual Proposals – which reduce Delphi's existing wages to $22 per hour until September 3,

2007, and then to $16.50 per hour at that point, and provide a $50,000 buydown for employees

who continue working under that wage – are, by definition, above a competitive wage and

benefit package.

<u>Supplier-Based Competitor Analysis</u>.  In constructing the Competitive Benchmark

Proposals, Delphi sought to produce a wage and benefit package equivalent to the wages and

benefits prevailing at other U.S.-based automotive parts suppliers.  Such a package, Delphi

believes, would allow Delphi to bid for future work in the U.S. on a competitive basis while still

providing Delphi's employees with competitive wages and benefits.

26

The details of Delphi's analysis are set forth in the Butler Declaration.  This analysis

included an evaluation of internal wage and benefits data, the all-in labor rates provided by GM

and Delphi's own suppliers, Bureau of Labor Statistics data, and a study by the Center for

Automotive Research.  The following charts illustrate the comparative wage and benefit costs of

Delphi's competitors and demonstrate that to remain competitive, Delphi must obtain a wage and

benefit package that does not exceed $22 for production employees.  See Butler Dec. ¶¶ 81-85

and Exs. J, K.



* Reflects weighted average of available data-mature suppliers (2005 economics)



Competitor benefit costs are estimated based on relative comparisons to Delphi's existing plans and demographics. Competitor demographics and financial policies can have a substantial impact on the competitor cost structure, both higher and lower.

Economy-Wide Labor Costs Analysis. Delphi's current wage rates are also well above market when compared to similarly-skilled workers economy-wide. Delphi's traditional skilled employees currently earn a base wage and COLA that is approximately 46 percent more than their peers, while Delphi's traditional production employees earn approximately 104 percent more than their similarly-skilled peers economy-wide.

Similarly, Delphi's hourly employees currently receive non-wage benefits that are significantly more costly to their employer than those of their economy-wide peers. Traditional skilled workers at Delphi receive non-wage benefits approximately three times greater than those of similarly-skilled workers economy-wide on a cost per hour worked basis, while Delphi's traditional production workers' benefits are four times higher. See Report of Michael L. Wachter ("Wachter Report") ¶ 5.

Delphi's Compensation Premium.  When compared to other automotive parts suppliers –

both union and non-union – whose total labor costs, as described above, are approximately $22

per hour, Delphi currently provides its traditional hourly employees with a total compensation

premium of approximately 150 to 230 percent.  See Wachter Report ¶ 7.  Understandably,

employers such as Delphi which pay high compensation premiums tend to have lower voluntary

employee attrition rates.  Between 2002 and 2004, Delphi's employees voluntarily terminated

their employment at a rate of less than one percent, rising to a mere 1.7 percent in 2005.  By

comparison, the economy-wide average "quit rate" is 19 to 21 percent, while the manufacturing

sector "quit rate" is 15 percent.  See Wachter Report ¶ 6.

Delphi's Proposals.  After establishing its labor cost goal through the internal bench-

marking exercise described above, Delphi constructed the Competitive Benchmark Proposals to

produce a labor cost, excluding certain fixed and legacy costs, of approximately $22 per hour for

production employees.  Based on an economy-wide analysis, Delphi's skilled employees would

receive total compensation of $32.35 on a pro forma basis, averaging $35.34 over the life of the

labor contract, while comparable workers economy-wide receive $32.80.  Thus, on a pro forma

basis, Delphi would still be providing a level of total compensation within one percent of total

compensation expected economy-wide and a compensation premium of approximately 10.8

percent over the life of the labor contract.  Delphi's production employees would, under the

Competitive Benchmark Proposals, receive total compensation averaging $20.79 per hour on a

pro forma basis, and $23.90 per hour on average over the lifetime of the labor contract, while

comparable workers economy-wide receive $21.33 per hour.  Thus, on a pro forma basis,

production wages would be within three percent of expected economy-wide levels for production

workers.  Over the five-year period of the contract, the Competitive Benchmark Proposals would

still be providing a compensation premium of approximately 12.0 percent to its production

employees.  <u>See</u> Wachter Report ¶¶ 30-31; Butler Dec. ¶ 97.

      C.    <u>Delphi Must Eliminate Those Provisions Of The Labor Agreements That Prohibit
It From Responding To Market Forces</u>

Delphi's labor agreements (a) restrict its ability to exit non-strategic, unprofitable

operations by prohibiting sales, spin-offs, or closures, (b) restrict its ability to lay off employees,

(c) would require Delphi to continue paying thousands of employees not to work in the case of a

manufacturing site closure, and (d) would also require that any purchaser of an ongoing Delphi

business be bound by the applicable labor agreement that covers the workers employed by that

operation.  Simply put, Delphi cannot restructure if these restrictions remain in place.  <u>See</u> Butler

Dec. ¶¶ 21-25.

Management discretion to sell or close facilities, and determine employment levels, is

fundamental to any successful reorganization.  No business can compete successfully if it does

not have discretion to respond to market forces.  As a result of the manner in which Delphi was

created, Delphi's product portfolio includes certain products that are outside the scope of Delphi's

strategic vision.  Rather, certain products that are not part of Delphi's core portfolio were

transferred by GM to Delphi at the time of its Spin-Off.  One of the key elements of Delphi's

restructuring plan is to streamline its product portfolio and focus on those core businesses where

it can leverage its significant, market-leading technical and engineering strength to develop new

products.  To do so, Delphi must eliminate restrictions on its ability to sell or close its non-core

or unprofitable businesses.  <u>See</u> Sheehan Dec. ¶¶ 62, 67.

Moreover, a large number of Delphi's U.S. manufacturing sites are extremely

unprofitable, and cannot be made profitable even with revised labor terms.  Delphi's loss of GM

business in the U.S. has left Delphi with costly excess capacity that it simply does not need and

products that are subject to extreme price pressure.  As a result, almost three-quarters of Delphi's

U.S. plants with collective bargaining agreements subject to the Motion had negative margins of

10 percent or more in 2005, and almost half had negative margins of between 20 and over 80

percent.  Returning Delphi to profitability clearly requires that it have the ability to exit

unprofitable facilities.  <u>See</u> Sheehan Dec. ¶ 30.

     D.     <u>Delphi Must Eliminate Or Substantially Reduce Its Legacy Retirement Liabilities</u>

     After formulating the Competitive Benchmark Proposals, Delphi created financial

projections based on implementation of those proposals.  This forecast, known as the

Competitive Benchmark Scenario, substantially improves Delphi's operating profits over the

five-year period from 2006 through 2010, but it still does not produce a business plan that is

viable without further cost reductions.  <u>See</u> Sheehan Dec. ¶¶ 59, 64 and Ex. M.  While the

Competitive Benchmark Scenario projects positive operating income in 2008, the cash flow

forecasts associated with that scenario do not provide Delphi with sufficient cash to make its

required pension contributions in 2007-2008.  Thus, even under Delphi's Competitive

Benchmark Proposals, without either financial support from GM or a method to amortize the

pension funding requirements over a longer period of time, Delphi cannot afford to fund the HRP.

<u>See</u> Sheehan Dec. ¶¶ 63-64 and Ex. N.

     If additional benefit accruals under the HRP were "frozen" effective October 1, 2006, as

set forth in the Competitive Benchmark Proposals, Delphi would face a minimum funding

obligation upon emergence from bankruptcy of $1.5 billion in calendar year 2007, $0.4 billion

for calendar year 2008, and $0.2 billion for calendar year 2009.  <u>See</u> Williams Dec. ¶ 12.

Making these payments, according to Delphi's cash flow projections, would exceed all of the

cash and available credit that Delphi anticipates having at the time.  <u>See</u> Sheehan Dec. ¶ 63 and

Ex. N.

**Table 10 - Cash Flow Projections (Cumulative Loss),
2006-2010, Competitive Benchmark Scenario**



Even under the Competitive Benchmark Scenario, Delphi needs to identify a "pension solution" – that is, a source of additional funding or a method to decrease its minimum contributions – to maintain the HRP.  See Sheehan Dec. ¶ 65.

IV.    Delphi Has Complied With The Requirements Of Sections 1113 And 1114

    A.    Delphi Has Proposed Two Alternatives For Modification Of Its Labor
        Agreements – One With, And One Without, GM Financial Support

In an effort to reach a consensual resolution, Delphi has made two distinct sets of proposals to its Unions under Sections 1113 and 1114.  The Competitive Benchmark Proposals were delivered to the Unions on October 20 and 21, 2005, and were amended on November 15-17, 2005, to increase the proposed base hourly wages.  See Butler Dec. ¶¶ 46-55 and Exs. E-F. The content of the Competitive Benchmark Proposals is described below.

In transmitting the Competitive Benchmark Proposals, Delphi informed the Unions that they were based on the assumption that Delphi would not receive any financial support from GM

to implement a restructuring of its labor costs.  Delphi made this assumption because it had

attempted to obtain GM's commitment to provide such support prior to seeking reorganization

relief, but had been unsuccessful.  If GM were able to provide such support, Delphi informed the

Unions, Delphi would modify its proposals accordingly.  <u>See</u> Butler Dec. ¶ 50.

In a series of public statements, the Unions categorically rejected both Delphi's October

proposals and its Competitive Benchmark Proposals.  The UAW stated that it would not respond

to Delphi's proposals, and that a strike would be likely if Delphi sought to implement those

proposed modifications.  The IUE-CWA informed Delphi that the IUE-CWA intended to

provide Delphi with a counter-offer, but Delphi has not received any such offer.  None of the

Unions accepted the proposals or made a counter-proposal.[11]  <u>See</u> Butler Dec. ¶ 54.

In December 2005, GM agreed to provide Delphi with interim financial support and

indicated that it might be willing to provide additional financial support to facilitate an

agreement between Delphi and the Unions.  In light of this development, and in an effort to

jump-start negotiations, on December 19, 2005, Delphi conditionally withdrew the Competitive

Benchmark Proposals.  In doing so, however, Delphi made it clear that if the parties were unable

to reach an agreement involving GM support, Delphi would have to reinstate the Competitive

Benchmark Proposals, and seek to reject the collective bargaining agreements based on such

proposals.  <u>See</u> Butler Dec. ¶ 55.

Since December 2005, Delphi, GM, and the UAW have engaged in a series of

exploratory discussions in an attempt to reach a tripartite agreement on potential modifications to

the Delphi labor agreements, and the GM financial support necessary to pay for such an

agreement.  As a result of these discussions, Delphi, GM, and the UAW reached agreement on a

---

[11]      Delphi's other Unions followed the UAW's lead and did not seek to negotiate after receiving Delphi's
Competitive Benchmark Proposals.  <u>See</u> Butler Dec. ¶ 54.

UAW Special Attrition Program, described in the Butler Declaration, providing retirement

incentives for a large number of Delphi employees.  See Butler Dec. ¶¶ 41-45.  On March 22,

2006, Delphi filed with the Court a motion seeking approval and authorization to implement the

UAW Special Attrition Program, and to enter into similar programs with the other Unions.

Nonetheless, the parties have been unable to reach agreement on either modifications to the

existing collective bargaining agreements or GM financial support for such an agreement.  See

Butler Dec. ¶¶ 56-61.

In January, 2006, Delphi began exploring with the Unions and GM the concept of a

gradual reduction in wages for existing employees, a combination of buyouts and buydowns for

those employees, and other modifications that Delphi might be able to implement if GM were to

provide financial support to pay the incremental cost of the proposal relative to Delphi's

Competitive Benchmark Proposal.  On March 24 and 25, 2006 in light of a March 31, 2006,

deadline for filing its Motion under Section 1113 and 1114, Delphi served the Unions with the

GM Consensual Proposals, the definitive written proposals pursuant to Sections 1113 and 1114

of the modifications that Delphi had proposed informally in January 2006.  See Butler Dec.

¶¶ 56-61.  The specific terms of the GM Consensual Proposals are discussed below.

In the GM Consensual Proposals, Delphi has made its willingness to provide the higher

wages, buyouts, buydowns, and other improved terms contingent upon GM's commitment to pay

the incremental cost of those terms to Delphi.  See Butler Dec. ¶¶ 46-47.  Because the cost of the

additional terms would be borne by GM, the financial effect of the GM Consensual Proposals for

Delphi is the same as the Competitive Benchmark Scenario.  For purposes of illustrating the

complete cost of the proposals, and thus to illustrate the financial support required from GM to

implement the proposals, Delphi developed financial projections known as the GM Consensual

Scenario.  In the GM Consensual Scenario, Delphi also has modeled a method under which it could afford to maintain the hourly employee pension plan, the HRP, by spreading the contributions over a six-ear period.  See Sheehan Dec. ¶ 81.

     B.    <u>The Proposed Modifications To Delphi's Labor Agreements In The Competitive Benchmark Proposals</u>

The following is a summary of the principal modifications Delphi outlined in the Competitive Benchmark Proposals to (a) wages and benefits, (b) job security, (c) retirement, and (d) other non-competitive provisions.[12]  These proposed modifications, taken as a whole, are designed to allow Delphi to achieve a competitive labor rate enabling Delphi to compete for new business.

<u>Wage Rates</u>.  In the Competitive Benchmark Proposals, Delphi seeks to address the wage structure that was imposed by Delphi's adoption of the GM labor agreements and which, all-in, is at least two times greater than Delphi's competitors.  Under these proposals, Delphi would implement a uniform wage scale to bring wages in line with U.S. auto supply industry norms. Delphi increased its base wage proposals to achieve an average base wage of $12.50 per hour for production employees (compared to the $10.00 proposed in October) and a base wage of $21.50 for skilled trades (compared to the $19.00 proposed in October).  <u>See</u> Butler Dec. ¶ 52.  Delphi also proposes to eliminate COLA payments for all employees.  <u>See</u> Butler Dec. ¶ 65.[13]

---

[12]    Delphi's Section 1113 and 1114 proposals are lengthy documents that address the numerous and complex provisions in each of the 39 collective bargaining agreements subject to the Motion.  <u>See</u> Butler Dec. ¶ 62.  In this Memorandum Of Law, therefore, Delphi will address only the highlights of those proposals.  The current terms of these agreements, and the proposed modifications thereto – and the terms of the supplemental agreements covering new-hire employees – are set forth in greater detail in the Butler, Kidd, and Quick Declarations and the Declaration of Steven Gebbia ("Gebbia Dec.").  These declarations detail the changes sought by Delphi and the rationale behind these requests.

[13]    In the event that Delphi's U.S. operations exceed Delphi's current financial forecasts, the Section 1113 proposals provide that the hourly employees benefit from that success in the form of employee profit sharing.  The proposals therefore include a provision retaining the current Profit Sharing Plan while limiting any future calculation of profit sharing amounts to U.S. Operations, as defined in those plans, and excluding the effects of adjustments from restructuring.  <u>See</u> Gebbia Dec. ¶ 51.

Overtime And Shift Premiums.  The average Delphi employee worked approximately

250 hours of overtime in 2005, increasing average annual earnings by approximately $12,000,

with an annual cost to Delphi of over $325 million.  Currently, an estimated 28 percent of

Delphi's employees receive a five percent afternoon shift premium and an estimated 14 percent

receive a 10 percent night shift premium.  These shift premiums increase the average traditional

Delphi employee's all-in labor costs by $1.13 per hour, at an annual cost to Delphi of $65 million.

See Kidd Dec. ¶¶ 25-26.

Delphi proposes to modify these non-competitive overtime and shift premium provisions

by paying all overtime at time-and-a-half only.  Overtime would be payable only after working

40 hours in a pay period, which 40 hours would include other contractual paid time such as

vacation and holidays.  In addition, the amount and nature of overtime worked would be

determined at Delphi's sole discretion, and voluntary overtime provisions would be eliminated.

Shift premiums also would be reduced to five percent of the applicable base hourly rate.  See

Butler Dec. ¶ 67.

Health Care, Dental, Vision, And Prescription Drug Coverage.  Delphi's traditional

employees are entitled to health care, dental care, vision care, and prescription drug coverage, for

employees and their eligible dependents, without monthly employee contribution.  The estimated

cost to Delphi of providing these coverages to hourly active employees during 2005 was $11,273

per active hourly employee, totaling approximately $32 million per month, or $384 million per

year.  See Gebbia Dec. ¶ 5.

Delphi seeks to provide an industry-standard employee cost-sharing program with

monthly employee contributions and increased out-of-pocket maximums, co-payments, and

deductibles.  Delphi also proposes to eliminate any dental and vision coverage from the plans,

and would cap the length of continuation of company-paid health care coverage at seven months following the month the employee was last in active service.  <u>See</u> Gebbia Dec. ¶¶ 5, 9-10; Butler Dec. ¶ 53 Ex. G.

<u>Job Security</u>.  Delphi seeks the elimination of agreement provisions that inhibit its ability to close, or partially or wholly sell, spin-off, split-off, consolidate, or otherwise dispose in any form any manufacturing site, asset, or business unit.  In the event Delphi sells a facility, Delphi would use its best efforts to obtain the purchaser's agreement to hire existing Delphi employees.  Any collective bargaining agreement provisions that would require a purchaser of Delphi's facilities to assume the existing collective bargaining agreements, however, would be eliminated. <u>See</u> Butler Dec. ¶ 70.

<u>Secured Employment Levels/Staffing Requirements</u>.  Under the terms of Delphi's agreements with the UAW, Delphi is obligated to maintain a minimum level of employment – known as a Secured Employment Level ("SEL") – at each facility.  If employment levels fall below the applicable SEL, Delphi is obligated to hire a certain number of employees to replace employees who quit or retire based on a formula in the agreement.  <u>See</u> Kidd Dec. ¶ 31.  Delphi also has hiring obligations in the event that Delphi employees flow back to GM or Delphi outsources work.  For flow-backs, Delphi generally must hire a new employee to replace the employee returning to GM.  When outsourcing, Delphi must not only retain the employees affected by the outsourcing, but must also hire new employees equivalent to the number of jobs attributable to the outsourced work.  This requirement is purely punitive.  For example, if Delphi

outsources the work of ten employees, Delphi must retain the ten employees whose work was

outsourced and hire ten new employees who are clearly redundant.  See Butler Dec. ¶ 72.[14]

Delphi's labor agreements contain a number of additional restrictions on "subcontracting"

and "outsourcing" – terms that have specific, and different, meanings under the agreements – that

significantly restrict Delphi's ability to have work performed in the most cost-efficient manner.

The effect of these restrictions is best expressed in terms of Delphi's ratio of "direct" employees,

those who actually produce Delphi's products, to "indirect" employees, those who perform

support or maintenance functions that could be performed by a third party at much lower cost.

See Kidd Dec. ¶¶ 39-43; Quick Dec. ¶¶ 43-44.  While Delphi currently employs 69 "indirect"

employees for every 100 "direct" employees, Delphi's competitors employ fewer than half the

number of indirect employees per direct employee.  If Delphi could achieve the same ratio of

indirect to direct employees, it would be able to reduce its headcount by approximately 4,700

employees.  See Kidd Dec. ¶ 39.

Delphi proposes to eliminate all restrictions on its rights to determine appropriate

numbers of employees and to hire or lay off employees, including indirect and temporary

employees, as necessary to any operation.  Delphi also proposes to remove restrictions on its

ability to outsource and subcontract work.  By realigning its product portfolio and limiting

Delphi's headcount to those who are needed to run its operations, Delphi expects to reduce its

headcount by approximately 27,000 U.S. hourly employees through retirements, flow-backs to

GM, and layoffs, by the end of 2010.  See Butler Dec. ¶ 72.

Protected Status/JOBS Bank.  Under the Delphi-UAW agreements, in general, Delphi is

prohibited from laying off traditional employees unless the layoff is directly attributable to a

---

[14]        Acknowledging Delphi's financial constraints, the UAW, to its credit, has not sought to enforce these hiring
requirements, which, as of December 31, 2005, would have required Delphi to hire 8,605 new, unneeded employees.

reduced volume of work from Delphi's customers.  Even then, Delphi may only layoff SEL-eligible employees for a maximum of 48 weeks.[15]  If the employee is not recalled by the end of the 48-week period, Delphi must recall the employee and place the employee into the "JOBS Bank."  See Kidd Dec. ¶¶ 34-36.[16]

Employees in the JOBS Bank receive full pay and benefits and must report to "work" for eight hours each day at a facility designated by Delphi.  Employees may remain in this status until they are either required to return to normal active assignments due to a change in business conditions, used to replace future attrition, or retire.  With Union concurrence, JOBS Bank employees may be assigned by Delphi and the Union to "non-traditional" work assignments (i.e., work not belonging to the bargaining unit), or to training assignments.  When no such assignments are available, those employees report to a designated JOBS Bank location where they commonly read, play cards, or watch television during work hours.  Delphi has sometimes been forced to rent a facility in order to house some employees in the JOBS Bank.  See Kidd Dec. ¶ 35.

In recent years, at any given time, Delphi has had approximately 4,000 UAW, IUE-CWA, and USW-represented employees in a JOBS Bank or on temporary layoff (i.e., "Protected Status").  Employees in a JOBS Bank or on temporary layoff cost Delphi an estimated $346 million in 2005.  See Butler Dec. ¶ 40.

---

Nonetheless, Delphi remains subject to these requirements, and the Unions could seek to enforce them at any point.

[15]        While Delphi is generally allowed to lay off based on volume declines attributable to market-related conditions, the agreement also allows layoffs for acts of God, sale of part of the company's business as an ongoing business, model changeover or plant rearrangement, and layoffs of individual employees who have been recalled from layoff or reassigned to fill a temporary opening.  See Kidd Dec. ¶¶ 34-36.

[16]        Under the IUE-CWA-Delphi agreements, there is a similar program but it is limited to employees with more than five-years of seniority.  Under the USW-Delphi agreements, the program is limited to employees who have six or more years of seniority.  Delphi may only layoff those employees based on a reduction in customer volumes, and the layoff is limited to 90 weeks for IUE-CWA-represented employees, or 74 weeks for USW-represented employees.  After 90 or 74 weeks, respectively, the employee is then placed in the JOBS Bank where he or she enjoys the same benefits as those under the UAW agreement.  See Quick Dec. ¶¶ 38-40.

Delphi's Section 1113 proposals would eliminate Protected Status and the JOBS Bank, giving Delphi the right to permanently lay off excess employees. Delphi expects that the elimination of these programs will result in a reduction of 6,057 hourly employee positions, including an estimated 4,247 employees expected to be in a JOBS Bank or on Protected Status and an additional 1,810 employees who would otherwise have entered the JOBS Bank or Protected Status if these provisions continued unchanged. <u>See</u> Butler Dec. ¶ 71.

<u>Supplemental Unemployment Benefits</u>. While on temporary layoff under the provisions described above, both UAW- and IUE-CWA-represented traditional eligible employees are entitled to supplemental payments under Delphi's Supplemental Unemployment Benefit ("SUB") program, under which they receive (a) a supplement to their state unemployment benefits so that the two payments equal nearly 95 percent of their weekly after-tax pay and (b) continued health care and life insurance benefits. Once state unemployment benefits end, Delphi is solely responsible for payment of the full combined amount of the benefit. In December 2005, 2,956 UAW- and IUE-CWA-represented Delphi employees received a SUB benefit. <u>See</u> Gebbia Dec. ¶ 33. Delphi proposes to eliminate SUB benefits. Employees who would be laid off would be eligible for state unemployment compensation benefits without subsidy or supplement from Delphi. <u>See</u> Gebbia Dec. ¶ 54.

<u>Pension Benefits</u>. Delphi's pension plan for hourly employees provides a basic monthly benefit that, for a 30-year employee, can currently range up to $1,518 per month. In addition, under the "30 and out" supplement, available to all employees with 30 years of credited service regardless of age, the retiree receives the difference between the basic monthly benefit and $2,950 from the date of retirement until the retiree is eligible for 80 percent of his or her unreduced Social Security benefit. Like base wages, pension benefits have increased

substantially since the Spin-Off.  The 1999 and 2003 agreements, collectively, provided a 29.1 percent increase in the basic benefit, and a 31.6 percent increase in the "30 and out" supplement (including a 10.6 percent increase in the 2003 agreement).  See Gebbia Dec. ¶¶ 23-24.

Delphi proposes freezing the existing HRP, including the Individual Retirement Plan benefit, effective October 1, 2006.[17]  Delphi also proposes that new-hire employees would participate in a defined contribution plan to which Delphi would contribute three percent of each employee's base wages up to 40 hours per week.  Delphi reserves the right, however, to seek termination of the HRP at a later date if necessary to achieve a viable restructuring plan.  See Gebbia Dec. ¶ 48.

On November 9, 2005, GM announced in its Form 10-Q that it is "probable" that it has incurred a liability under the GM Benefit Guarantee, and, in a March 16, 2006 announcement of updated preliminary results, estimated its pre-tax liability at $5.5 billion to $12 billion.  Moreover, GM indicated that it had reached an agreement with the UAW as to the scope and details of coverage under the GM Benefit Guarantee, and that GM agreed that former GM employees who became Delphi employees have the potential to earn up to seven years of credited service for purposes of eligibility for certain pension benefits under the GM Benefit Guarantee.  See Butler Dec. ¶¶ 26-29.

The GM Benefit Guarantee should provide hourly Delphi employees with protections if the proposed freeze of the HRP is approved.  If at any time before October 2007, Delphi freezes the HRP due to financial distress, GM will pay any differential between the pension benefits Delphi or the PBGC provides to eligible Delphi retirees and the level of benefits provided to GM

---

[17]     Under the UAW Special Attrition Program Delphi agreed not to freeze the HRP in a manner that prevents certain participants with at least 27 years of service from earning additional credited service to become eligible for a 30-year benefit, Delphi will honor that agreement.

retirees, and will guarantee to active Covered Employees "up to 7 years of credited [pension]

service at the level and scope in effect at Delphi . . . ." See Butler Dec. ¶ 27.

OPEB.  Under Delphi's labor agreements, Delphi is obligated to provide retirees with

OPEB consisting of (a) health care, for themselves and their dependents, at the same scope and

level as active employees, and (b) fully-paid life and accident insurance identical to that provided

to active employees until the retiree reaches age 65.[18]  Delphi also provides a retiree's surviving

spouse with the same health care benefits until death, remarriage, or age 65, depending on

eligibility.

Pursuant to Section 1113 for active hourly employees, and pursuant to Section 1114 for

hourly retirees, Delphi proposes to eliminate any obligation on the part of Delphi to provide

health care and employer-paid life insurance coverage during retirement.[19]  Under Delphi's

proposals, active hourly employees would also no longer receive Basic Life Insurance, Survivor

Income Benefit Insurance, and Extra Accident Insurance during retirement from Delphi,

although hourly retirees may be eligible for the GM Benefit Guarantee and would have the

option of continuing any employee-paid coverages for which they were enrolled at the point of

retirement.  Delphi would implement its elimination of these OPEB benefits effective July 1,

2006.  See Gebbia Dec. ¶ 45.

Joint Fund Accrual And Training Costs And Legal Services Program.  Under Delphi's

UAW agreements, Delphi incurs a liability for funding a number of jointly-administered training

and education programs, including, among others, up to $8,400 in tuition assistance for laid-off

---

[18]    Following age 65, basic life insurance amounts are reduced by a small percentage each month until they reach an ultimate amount payable based on the retiree's credited service.  See Gebbia Dec. ¶ 19.

[19]    Although Delphi believes that it has preserved the right to modify such benefits unilaterally for hourly retirees, any exercise of this right – particularly with regard to Union-represented retirees – would undoubtedly produce protracted litigation, and Delphi therefore, out of an abundance of caution, seeks to modify the OPEB benefits for hourly retirees only under Section 1114.

and active employees and their dependents, and retirees; in-plant adult education centers for

employees, spouses, and retirees; and scholarships and a homework hotline for employees'

children.  Under Delphi's UAW and IUE-CWA labor agreements, Delphi must fund Legal

Services Plans that provide certain legal services to eligible union-represented retirees and

employees, including their spouses, surviving spouses, domestic partners, and certain children.

See Gebbia Dec. ¶¶ 45-46; Kidd Dec. ¶¶ 44-46; Quick Dec. ¶¶ 45-46.  Delphi proposes to

modify the Joint Fund Accrual Training Program, by giving Delphi discretion to determine the

level of participation in the programs, services, and related activities formerly funded by these

provisions.  Any costs incurred would be Delphi's responsibility.  See Butler Dec. ¶ 74.  It also

proposes to eliminate the Legal Services Plans.  See Gebbia Dec. ¶ 43.[20]

     C.     <u>The Proposed Modifications To Delphi's Labor Agreements In The GM
         Consensual Proposals</u>

     As summarized below, the GM Consensual Proposals modify several provisions of the

Competitive Benchmark Proposals.  The majority of these modifications are contingent upon a

---

[20]     Delphi proposed a series of other changes:  (i) Delphi seeks to cap vacation at four weeks per year for the most senior hourly employees, resulting in a reduction of two and a half days of vacation each year for the average employee (see Butler Dec. ¶ 68); (ii) when combined with vacation entitlement, the average traditional Delphi employee receives between 40 and 45 paid days off each year out of a total of 260 annual work days; Delphi proposes reducing the number of paid holidays from a maximum of 20 to 10 each year (see Butler Dec. ¶ 69); (iii) Delphi seeks to modify its life and accident insurance programs from a range of $40,500 to $82,000 depending on position, to an industry-competitive level of $30,000 (see Gebbia Dec. ¶ 44); (iv) Delphi proposes to reduce Sickness and Accident Benefits ("S&A") and Extended Disability Benefits ("EDB") for current recipients proportionate to the proposed wage rates, and to limit S&A to a maximum of 26 weeks of disability for future recipients, and to make available, on an employee self-pay basis, EDB for a maximum of 36 months of disability after exhaustion of S&A  (see Gebbia Dec. ¶ 52); (iv) Delphi proposes to eliminate the Guaranteed Income Stream benefit, which, although dormant now, would entail significant costs to Delphi should the SUB program be eliminated, and Delphi also seeks to close the existing Income Security Plan to new participants and eliminate future employer contributions to the Plan (see Gebbia Dec. ¶¶ 55-56) (v) Delphi proposes to meet and confer with the Unions to discuss the use of contract service personnel (see Butler Dec. ¶ 73); (vi) Delphi proposes to eliminate provisions under which Delphi is obligated to pay certain Michigan retirees full Total and Permanent Disability retirement benefits until age 65 while such retirees are also receiving full workers' compensation benefits, the cost of which is currently $19 million per year (see Gebbia Dec. ¶ 49); and (vii) Delphi proposes to modify the union representation provisions of the National Agreements, and related Local Agreement provisions, by reducing the number of union representatives (whose compensation Delphi pays) to a lower ratio of representatives to employees, and by reducing the amount of overtime assigned to union representatives for the purpose of representation (see Butler Dec. ¶ 75).

level of GM financial support sufficient to fund these higher cost provisions.  With minor

exceptions, Delphi's Competitive Benchmark Proposals are incorporated into the GM

Consensual Proposals with the modifications outlined below.  Unless noted specifically below,

each modification to the Competitive Benchmark Proposals is contingent upon GM financial

support sufficient to fund the proposal.

Performance Bonus.  Delphi proposes that eligible employees receive a performance

bonus equal to three percent of the employee's qualified earnings in 2008 and 2009.  See Butler

Dec. ¶ 64.

Increases To Proposed Wage Scales.  The GM Consensual Proposals increase Delphi's

proposed wage scales.  Traditional production employees would receive an average base wage of

$22.00 per hour effective July 3, 2006 (compared to the $12.50 proposed in November, and

$10.00 proposed in October) and a base wage of $28.00 for skilled trades employees (compared

to the $21.50 proposed in November and $19.00 proposed in October).  Traditional employees in

plants that Delphi does not intend to wind down by December 31, 2007 would be subject to a

further reduction on September 3, 2007 to an average base wage of $16.50 per hour for

production employees and $24.00 per hour for skilled employees.  If GM fails to provide

financial support sufficient to allow Delphi to implement this wage proposal, such that Delphi is

financially neutral on a cash basis to the Competitive Benchmark Scenario, then Delphi's wage

proposal will revert back to the Competitive Benchmark Proposals.  See Butler Dec. ¶ 52.

Buydowns.  Delphi offers a $50,000 buydown on September 3, 2007, to those employees

moving to the reduced wage scale.  See Butler Dec. ¶ 66.

Buyouts.  Delphi proposes a payment of $140,000 for employees with 10 or more years

of seniority who are no longer required and have no prospect of recall in the foreseeable future.

The payment for traditional employees with fewer than 10 years of seniority would be $70,000.
See Gebbia Dec. ¶ 53.

Dental Coverage.  While the Competitive Benchmark Proposals included elimination of
the dental plan, the GM Consensual Proposals include a dental plan with monthly employee
contributions of $5.00 to $15.00 depending on the number of an employee's dependents.  See
Gebbia Dec. ¶ 41.

Personal Savings Plan.  Delphi proposes to modify the Personal Savings Plan by
implementing a new provision applicable to all employees hired on or after the effective date of
the modifications to the collective bargaining agreements and to all employees who are covered
by the HRP but are not eligible to retire under provisions of the HRP within seven years of the
date that the HRP is frozen.  Delphi also proposes that new-hire employees be eligible for a
defined contribution plan, with Delphi contributing 7.5 percent of each employee's base wages
up to 40 hours per week in the UAW-represented plants, and an amount to be negotiated locally
in IUE-CWA and USW plants.  Delphi reserves the right, however, to seek termination of the
HRP at a later date if necessary to achieve a viable restructuring plan.  See Gebbia Dec. ¶ 50.

Retiree Medical Account.  Delphi proposes to establish a new Retiree Medical Account
for all employees not eligible to retire under the HRP within seven years after the date on which
it is frozen, with a beginning balance based on their years of credited service as of the month
prior to the freezing of the HRP, and to continue the existing Retiree Medical Account for
employees hired under the UAW-Delphi Supplemental Agreement.  See Gebbia Dec. ¶ 47.

Shortened Duration.  Delphi proposes to shorten the duration of any agreement entered
into as a result of the GM Consensual Proposals.  While the Competitive Benchmark Proposals

contained a January 1, 2012 expiration date, the GM Consensual Proposals contain a May 1,

2010 expiration date.  <u>See</u> Butler Dec. ¶ 60.

<u>Argument</u>

I.    <u>The Court Should Authorize Delphi Under Section 1113(c) Of The Bankruptcy Code To
      Reject All Of Its Existing Collective Bargaining Agreements</u>

    A.    <u>Section 1113(c) Authorizes The Court To Approve An Application To Reject A
      Collective Bargaining Agreement When The Debtor Has Complied With The
      Procedural Requirements Of Section 1113(b), The Union Has Failed To Accept
      Debtor's Proposal "Without Good Cause," And The Balance Of Equities Clearly
      Favors Rejection</u>

Section 1113(c) of the Bankruptcy Code provides that:

> The court shall approve an application for rejection of a collective bargaining
> agreement only if the court finds that –
>
> (1) a trustee has, prior to the hearing, made a proposal that fulfills the
> requirements of [Section 1113] (b)(1);
> (2) the authorized representative of the employees has refused to accept such
> proposal without good cause; and
> (3) the balance of the equities clearly favors rejection of such agreement.

11 U.S.C. § 1113(c).

Section 1113(b) of the Bankruptcy Code sets forth procedural requirements that a debtor

must meet in order to reject a collective bargaining agreement.  Under Section 1113(b)(1), after

filing a petition under chapter 11, the debtor must make a proposal to its union(s) for such

modifications to the existing collective bargaining agreement as are "necessary to permit the

reorganization of the debtor."  11 U.S.C. § 1113(b)(1)(A).  This proposal must be "based on the

most complete and reliable information available at the time of such proposal," <u>id.</u>, and the

employer must provide the union "with such relevant information as is necessary to evaluate the

proposal."  11 U.S.C. § 1113(b)(1)(B).  The proposal must also ensure "that all creditors, the

debtor and all of the affected parties are treated fairly and equitably[.]"  11 U.S.C. §

1113(b)(1)(A).

Under Section 1113(b)(2), the debtor is obligated, between making the proposal to the union and the hearing on the application to reject, to meet "at reasonable times . . . to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement." 11 U.S.C. § 1113(b)(2).

Courts in the Southern District of New York have used a seven-factor checklist to analyze the sufficiency of requests under Section 1113(c): (a) the debtor made a proposal to modify the collective bargaining agreement based on the most complete and reliable information available at the time of the proposal and provided all relevant information to the union, (b) the proposed modifications were necessary to permit reorganization of the debtor, (c) the proposed modifications assured that all creditors, the debtor, and all other affected parties were treated fairly and equitably, (d) the debtor met at reasonable times with the authorized representative between the time of the proposal and the time of the hearing on the proposal, (e) the debtor conferred with the union in good faith at these meetings in an attempt to reach mutually satisfactory modifications, (f) the union refused to accept the debtor's proposal without good cause, and (g) the balance of equities clearly favors rejection of the agreement. In re Carey Transp., Inc., 50 B.R. 203, 207-12 (Bankr. S.D.N.Y. 1985) ("Carey Transp. I"), aff'd sub nom. Truck Drivers Local 807 v. Carey Transp., 816 F.2d 82 (2d Cir. 1987) ("Carey Transp. II") (consolidating into seven factors the nine factors originally set forth in In re Am. Provision Co., 44 B.R. 907 (Bankr. D. Minn. 1984)).[21]

---

[21]     Although the Second Circuit has neither expressly accepted nor rejected the Southern District's seven-factor test, the Second Circuit focuses primarily on whether the statutory standards of Section 1113 have been met. See, e.g., In re Royal Composing Room, Inc., 62 B.R. 403, 406 (Bankr. S.D.N.Y. 1986) ("This court eschews the talismanic nine-step analysis of Bankruptcy Code § 1113. . . ."), aff'd on other grounds, 78 B.R. 671 (S.D.N.Y. 1987), aff'd, 848 F.2d 345 (2d Cir. 1988), cert. denied, New York Typographical Union No. 6 v. Royal Composing Room, Inc. (In re Royal Composing Room, Inc.), 489 U.S. 1078 (1989). Because the seven factors derive from the language of the statute and are based on the statutory standards themselves, evidence that the seven factors have been satisfied supports a finding that the statutory standards have been met. See, e.g., Carey Transp. I, 50 B.R. at

A debtor must establish by a preponderance of the evidence that it has satisfied each of these elements.  See United Food & Commercial Workers Union, Local 211 v. Family Snacks, Inc. (In re Family Snacks), 257 B.R. 884, 892 (B.A.P. 8th Cir. 2001).  After a debtor establishes compliance with each element, however, the burden shifts to the authorized representative in three instances.  See In re Texas Sheet Metals, Inc., 90 B.R. 260, 263-64 (Bankr. S.D. Tex. 1988); see also In re Wheeling-Pittsburgh Steel Corp., 50 B.R. 969, 975 (Bankr. W.D. Pa. 1985).  First, after a debtor identifies the information it gave to the union, the union must then produce evidence that it was not given the "relevant" information it needed to evaluate the proposal. Texas Sheet Metals, Inc., 90 B.R. at 263; Am. Provision Co., 44 B.R. at 909-10.  Second, when a debtor demonstrates that it met with the union, it falls to the union to produce evidence that the debtor did not confer in good faith.  Texas Sheet Metals, Inc., 90 B.R. at 263-64; Am. Provision Co., 44 B.R. at 910.  Finally, when the debtor produces prima facie evidence that the union lacked good cause to reject the proposal, the union must demonstrate that it did have good cause. See Carey Transp. II, 816 F.2d at 92; In re Mile Hi Metal Sys., Inc., 899 F.2d 887, 892 (10th Cir. 1990) (the union has an "obligation . . . to explain its reasons for opposing the proposal").

When the debtor demonstrates compliance with the provisions of Section 1113, the court is authorized to approve rejection of collective bargaining agreements.  In re Royal Composing Room, 848 F.2d at 347 (debtor satisfied burden of showing that proposal it submitted to union for modifying collective bargaining agreement was necessary and equitable, so that when union for two months delayed in responding to and ultimately rejected proposal, debtor could reject agreement); Carey Transp. II, 816 F.2d at 92 (rejection of CBA allowed when debtor follows the

---

207 (stating that the court would "be guided by the plain meaning of the statutory language;" relying on the seven - factor analysis).

procedures set forth in Section 1113(b) and makes the three substantive showings as required by
the statute).

In this case, as demonstrated below, Delphi has satisfied the requirements of Section
1113, and the Court should authorize rejection of all of Delphi's existing collective bargaining
agreements with the Unions.

B.    After Filing The Petitions, Delphi Provided The Unions With Proposals For
       Modifications To The Labor Agreements Based On The Most Complete And
       Reliable Information Available And Provided All Relevant Information To The
       Unions

1.    Delphi Provided The Unions With Postpetition Proposals

Section 1113(b)(1) provides that after filing its petition for relief under chapter 11 the
debtor must make a proposal to its union for such modifications to the existing collective
bargaining agreement as are "necessary to permit the reorganization of debtor."  In the present
case, after filing the chapter 11 petitions on October 8, 2005, Delphi delivered to each of its
Unions written proposals pursuant to section § 1113 for modifications to Delphi's existing
agreements.  See Butler Dec. ¶¶ 48, 52, 58.  Delphi served all of its Unions with modified
proposals, the Competitive Benchmark Proposals, in November 2005.[22]  See Butler Dec. ¶¶ 52-
53.  In the Competitive Benchmark Proposals, which were substantially similar for all of the
Unions, Delphi proposed a number of specific changes to the existing agreements that it believed
were necessary to reorganize.  On December 16, 2005, Delphi removed the Competitive

---

[22]    The proposals also seek modifications to retiree welfare benefits, pursuant to Section 1114 of the
Bankruptcy Code, for Delphi's existing hourly retirees, surviving spouses, and dependents (collectively, the
"Retirees").  Under 11 U.S.C. § 1114, any proposals must be provided to the "authorized representative" of the
Retirees.  "Authorized representative" is defined as the authorized representative designated for persons receiving
any retiree benefits covered by a collective bargaining agreement or persons receiving retiree benefits not covered
by such an agreement.  11 U.S.C. § 1114(b)(1).  Each of the Unions has elected to serve as the authorized
representative of its respective Retirees.  Delphi's request for relief under Section 1114 is discussed in Part II, below.

Benchmark Proposals from the table to facilitate discussions for consensual agreements with GM and the Unions.

In light of tripartite discussions among Delphi, GM, and the UAW after Delphi removed the Competitive Benchmark Proposals from the table and the parties' agreement to the UAW Special Attrition Program, Delphi revised the Competitive Benchmark Proposals to reflect the concepts that had been explored with the UAW and GM since January 2006 and provided the Unions with the GM Consensual Proposals on March 24 and 25, 2006, consistent with Delphi's commitment to incorporate soft-landings into its proposals if GM financial support became available. No particular period of time need elapse between delivery of a proposal to the union and the filing of a motion for rejection. See In re Royal Composing Room, 62 B.R. at 409 (one day between proposal and filing of application); In re Century Brass Prods., Inc., 55 B.R. 712, 716 (Bankr. D. Conn. 1985) (four days between proposal and filing of application), rev'd and remanded on other grounds, 795 F.2d 265 (2d Cir. 1986), cert. denied, 479 U.S. 949 (1986). Given this record, there is no question that Delphi has satisfied the first procedural requirement under Section 1113(b)(1).

2.    The Proposals Were Based On The Most Complete And Reliable Information Available

Section 1113(b)(1) provides that a proposal must be "based on the most complete and reliable information available at the time of such proposal." As explained in the Butler and Sheehan Declarations, the October proposals were based on the most complete and reliable information available to Delphi at that time, including Delphi's most recent revenue and cost projections. See Butler Dec. ¶ 77; Sheehan Dec. ¶¶ 44-53, 65-89 . On November 15-17, 2005, as Delphi revised and refined its business plan and forecasts, Delphi served is Unions with revised proposals based upon more recent financial forecasts. See Butler Dec. ¶ 52. Delphi also

provided the Unions with updated financial information in December 2005.  In March 2006,

following GM's agreement to the UAW Special Attrition Plan, Delphi continued to revise its

forecasts in light of the Hourly Attrition Programs, and Delphi provided the Unions with the GM

Consensual Proposals premised on financial support from GM.   In all cases, at the time that the

proposals were served, or, when necessary, at the time the projections became available, the

basic financial projections underlying the proposals were provided to the Unions, and, in some

cases, their attorneys and financial advisors.  See Butler Dec. ¶ 80.

Delphi's reliance on its most recent business plan and financial forecasts satisfies its

obligation to base the proposal on the most complete and reliable information available.  In re

Amherst Sparkle Mkt., 75 B.R. 847, 850-51 (Bankr. N.D. Ohio 1987) (proposal met standard

when debtor relied on profit and loss reports, balance sheets for prior fiscal year, cash

disbursement data, general ledger and payroll registers, and projections of performance).  In

applying the rule that the proposal must be based on the most complete and reliable information

available, courts have recognized that Section 1113 proposals must generally be made at an early

stage in chapter 11 cases, and that the available information will, of necessity, be tentative or

incomplete.  For example, it is unlikely that a debtor will be able to project with complete

accuracy the outline of its plan of reorganization, the recovery of other creditors or the effect on

other constituencies, or changes that will be made to its business plans in light of the chapter 11

filings.

Thus, Section 1113 requires only that the proposal be based on the best information then

available.  Any other construction of the statute would make it impossible to obtain Section 1113

relief until the company had completed a plan of reorganization – and the debtor could not do so

without knowing the status of its collective bargaining agreements.  As noted in a leading treatise

on bankruptcy law, "Congress must have intended that the court make its finding based on the best, albeit fragmentary information available at the time of the hearing on rejection."  7 Collier, Bankruptcy at ¶ 1113.6[1][b].

Thus, there is no question that Delphi has satisfied the second procedural requirement under Section 1113(b)(1).

> 3.    Delphi Provided Relevant Information Necessary For The Unions To Evaluate The Proposals

Section 1113(b)(1)(B) requires that the debtor provide the union with relevant information to evaluate a proposal.  The information that must be provided to the union need not have been provided at the same time as the proposal is made if the union has already been supplied with all the financial or other materials relevant to its analysis, or if the debtor provides additional information requested by the union.  In re Appletree Mkts. Inc., 155 B.R. 431, 437-38 (S.D. Tex. 1993) (obligation met when debtor provided union with access to financial books and current financial statements); In re Valley Steel Prods. Co., 142 B.R. 337 (Bankr. E.D. Mo. 1992) (debtor offered yearly operating statements and monthly bankruptcy operating report); In re Royal Composing Room, 62 B.R. at 412-13 (a single sheet of paper which listed the union costs was "reliable and relevant information and complete enough to form a basis for reasoned consideration of [the debtor's] proposal"); 7 Collier, Bankruptcy at ¶ 1113.06[4].  Once the debtor has provided the information necessary to evaluate its proposals, the burden shifts to the union to identify specific information that was not provided and to explain its relevance.  In re Texas Sheet Metals, 90 B.R. at 263; In re Am. Provision Co., 44 B.R. at 909-10.

> a)    Information Provided With Proposals

At the time Delphi delivered its initial Section 1113 and 1114 proposals in October 2005, Delphi provided the UAW, the IUE-CWA, and the USW with a formal presentation in which it

explained Delphi's financial condition, the need for modifications, and the treatment of other

constituencies.  Delphi provided the IAM, IBEW, and the IUOE with the same information and

met with each of these unions in late October 2005.  See Butler Dec. ¶¶ 48-49.  Delphi also

provided to each Union:

- Delphi's most recent Steady State and Competitive Benchmark financial
  Scenarios/business plan (i.e., future projections), which Delphi informed the Unions
  were in the process of being revised.

- A summary of the changes in financial projections since prior projections were
  developed.

- Delphi's assessment of the impact of the proposed labor contract modifications, which
  Delphi noted was based on the existing size of the work force and did not take into
  account or seek to value sale, closure, or consolidation of product lines for facilities.
  Delphi explained that as the size of the work-force decreases, the "value" of the
  modifications will likewise change.

- An electronic copy of the financial model used for these calculations.

- Historical financials on a generally accepted accounting principals ("GAAP") basis.

See Butler Dec. ¶ 55.

On November 15-17, 2005, in connection with its Competitive Benchmark Proposals,

Delphi provided the Unions with:

- An illustration of Delphi's labor costs per hour, showing the breakdown of wages,
  wage-related expenses, and benefits in achieving the targeted labor cost contained in
  the proposals.

- Documents demonstrating how the targeted labor costs compared to Delphi's
  benchmark comparators.

On December 12, 2005, Delphi supplemented this information with the following

additional information:

- Information regarding the Steady State financial projections developed by Delphi in
  early December 2005.

- A summary of the changes in financial projections under the new projections/business
  plan and prior business plan/projections.

- Delphi's updated impact of the proposed modifications based on (a) changes in Delphi's November Proposals, and (b) changes in Delphi's Steady State and Competitive Benchmark Scenario.

See Butler Dec. ¶¶ 77-80.

On January 13, 2006, Delphi provided the Unions with updated financial information, including, among other items, preliminary Ssteady state financial data, cash flows, and Delphi's preliminary 2006-2010 Steady State financial projections.  See Butler Dec. ¶ 79.

On March 28, 2006, Delphi provided the Unions with a financial analysis of the GM Consensual Proposals and other information relevant to its consideration of these proposals. Delphi also expects to provide the Unions and other stakeholders with an updated forecast of 2006 performance in mid-April based on Delphi's actual performance for the first two months of 2006 and estimated performance for the balance of 2006 and through 2010.  The Unions also are represented on the Creditors' Committee and receive certain information in that regard.  See Butler Dec. ¶ 77.

b)      Responses To Union Information Requests

In addition to the information provided with each of the proposals, Delphi has responded to hundreds of information requests from the various Unions, many of which were detailed requests for "due diligence."  Delphi's financial advisors also have met with the UAW's and the IUE-CWA's financial advisors to explain and clarify the information provided.  See Kidd Dec. ¶¶ 50-52.

c)      Creation Of The Virtual Data Room

To further allow the Unions to easily access information in response to their numerous information requests, Delphi, in conjunction with FTI Consulting, Inc., established a virtual data room.  On December 20, 2005, Delphi notified the Unions via e-mail messages that it was in the process of establishing a "website for the purpose of sharing data and other information

requested during the course of Delphi's Chapter 11 proceedings." Delphi included a "data access request form" with each of the e-mail notifications and informed the Unions that when their representatives completed and returned the form, they would be issued a user login and password to access the data room. Delphi has granted all requests for access to the data room received from any of the Unions and/or their advisors. All of the information in the data room can be found by any of these persons using the identification and password provided to them. See Kidd Dec. ¶ 57.

The data room "went live" on January 3, 2006, after which time anyone with a login identification and password has been able to access the data, which includes information Delphi has provided to the Unions in response to their previous information requests and which has been continually updated with information responsive to new Union information requests. Although Delphi has the ability to restrict access to information in the data room to specific Unions, it has chosen to make its responses to one Union's information requests available to all of the Unions and their financial advisors. This broad access has proven beneficial to the Unions. For example, the advisors to the IUE-CWA have formulated additional information requests based on data posted in response to other Unions' requests. Delphi regularly updates the data room in response to union requests. All responses to information requests are also provided to the requesting Union or financial advisor outside the virtual data room through, for example, mail, facsimile, or e-mail, or in some cases, personal delivery. To date, Delphi has responded on a continuous basis to the Unions' information requests and all of that information can be found by anyone with an identification and password in the virtual data room. See Kidd Dec. ¶¶ 55, 57.

Because Delphi has provided all relevant information necessary to evaluate the Section 1113 proposals, Delphi submits that this prong of the Section 1113(c) test has been satisfied.

C.    The Proposed Modifications Are Necessary To Permit Delphi To Reorganize

Section 1113(b)(1) provides that the proposed modifications must be "necessary to permit the reorganization of the debtor."  The determination of whether a proposal is necessary to the employer's reorganization is made on a case-by-case basis, with consideration of the employer's business and industry patterns.  Carey Transp. I, 50 B.R. at 209.  Under Second Circuit case law, the debtor need not prove that absent the specific modifications set forth in the proposal the debtor would be forced to liquidate.  Rather, the proposed modifications are considered "necessary" if they increase the likelihood of a successful reorganization.  In re Royal Composing Room, 848 F.2d at 350 ("[a] debtor's proposal need not be limited to the bare bones relief that will keep it going"); Carey Transp. II, 816 F.2d at 82; see also 7 Collier, Bankruptcy, at ¶ 1113.06[2][b] ("Congress did not codify a standard that modifications should be authorized only where it clearly appears that unless the agreement is rejected, the debtor will collapse. . . . [D]ebtor should not have to show that absent modification, liquidation would occur").

Likewise, there is no restriction under Section 1113 on the nature of the modifications that a debtor may propose.  While Section 1113 specifically identifies modifications to "employees' benefits and protections," the courts have held that this phrase encompasses any subject matter that "vitally affects the level of benefits and wages available to employees" if modifications to the agreement are necessary for a successful reorganization.  In re Century Brass Prods., 795 F.2d at 274 (retiree welfare benefits proper subject of proposal because failure to reduce benefits could cause employer to fail); In re Royal Composing Room, 848 F.2d at 350 (elimination of priority system in laying off junior workers first found to be necessary to give debtor maximum flexibility to adapt in a changing business environment).

56

In this case, Delphi does not anticipate that the Unions will dispute that modifications to the existing agreements are necessary for Delphi to reorganize and that the alternative to reorganization is eventual liquidation.

- Under the Steady State Scenario, without labor modifications, Delphi would lose between $6 billion and $8 billion in operating income, and between $11 billion and $13 billion in net income, over the next five-years.  <u>See</u> Sheehan Dec. ¶ 50.

- Delphi's traditional labor agreements produce a 2005 average labor cost of approximately $78.63 per hour – more than three times as high as its U.S.-based competitors.  Delphi cannot reorganize unless it brings its wages and benefits to competitive levels.  <u>See</u> Butler Dec. ¶ 38.

- Delphi's labor agreements require it to maintain specified employment levels even when it has no work for those employees, resulting at times in thousands of employees being paid not to work.  Plainly, Delphi cannot return to profitability with such restrictive provisions.  <u>See</u> Kidd Dec. ¶ 31.

- Delphi's labor agreements prohibit it from selling, closing, or consolidating manufacturing sites.  An absolutely key element of any successful restructuring must be the sale or wind-down of unprofitable or non-strategic product lines.  <u>See</u> Butler Dec. ¶¶ 21-25.

- In the six years since the Spin-Off, Delphi's liability for OPEB and underfunded pension liabilities has nearly doubled from $5.4 billion in 1999 to $10.7 billion at the end of 2005.  <u>See</u> Williams Dec. ¶ 7.  Delphi will be unable to emerge from bankruptcy as long as these liabilities remain in place.  <u>See</u> Sheehan Dec. ¶ 84.

In analogous circumstances, the federal courts have had no reluctance to conclude that a debtors' proposed modifications were "necessary" for reorganization.  <u>E.g.</u>, <u>In re Royal Composing Room</u>, 848 F.2d at 350 (when debtor forced to employ more workers than it needed or could afford because of agreement's priority system which required certain layoff order, held, elimination of such system necessary to give debtor maximum flexibility to adapt in changing business environment); <u>In re Maxwell Newspapers, Inc.</u>, 146 B.R. 920, 931 (Bankr. S.D.N.Y. 1992) (holding that removal of the collective bargaining agreement's lifetime job guarantees is necessary to allow debtor to operate viably in the future), <u>aff'd in part and rev'd in part</u>, 149 B.R. 334 (S.D.N.Y.), <u>aff'd in part and rev'd in part</u>, 981 F.2d 85 (2d Cir. 1992); <u>In re Blue Diamond</u>

Coal Co., 131 B.R. 633, 644 (Bankr. E.D. Tenn. 1991) ("Blue Diamond I") (elimination of subcontracting restrictions necessary for debtor to successfully reorganize).

Given the patent and indisputable need for major modifications to Delphi's labor agreements, Delphi anticipates that its Unions will concede the need for some relief, but argue that (a) some of the specific terms and conditions proposed by Delphi are not necessary for reorganization, (b) Delphi's proposals giving management discretion to sell or close manufacturing sites and to determine employment levels are not necessary to reorganize, and (c) Delphi's proposals place an unfair burden on Delphi's hourly employees. As explained below, these arguments are without merit.

First, as a factual matter, Delphi's proposed modifications are necessary for a successful reorganization. As described in the Statement Of Facts and in the supporting Declarations, the wage and benefit proposals are those which are necessary to produce an all-in labor cost that will allow Delphi to compete on a level playing field. Although it is possible to rearrange the various components of total labor costs – and Delphi has indicated to its Unions a willingness to do so – the Unions cannot legitimately dispute that Delphi needs a competitive wage and benefit package to survive. Likewise, management discretion to sell or close facilities, and determine employment levels, is fundamental to any successful reorganization. No business can compete successfully if management does not have discretion to respond to market forces. Indeed, one of the principal reasons for Delphi's current financial situation is that it could not respond to changes in GM volume. See Sheehan Dec. ¶ 68.

Second, courts have consistently held in Section 1113 cases that an employer's proposals must be viewed as a package, and that a union cannot attack the individual elements of that package if the proposal, taken as a whole, is necessary for reorganization. In re Appletree Mkts.,

155 B.R. at 441.  So long as the total quantum of savings is necessary, a union cannot prevent

rejection by attacking a specific element.  In re Royal Composing Room, 848 F.2d at 349; see

also In re US Airways Group, Inc., Case No. 04-139, Trans of Record at 26 (Bankr. E.D. Va. Jan.

6, 2005) (proposal for cost savings target that was not necessarily tied to specific line items in

proposal "provided for necessary modification that were necessary to permit the reorganization

of the debtor") (a copy of the court's oral decision is attached hereto as Appendix A).  The

transcript is referred to hereafter as "US Airways Tr.".

Third, to be "necessary," the proposed modifications do not need to comprise the bare

minimum needed to survive.  Rather, the debtor need only show that "its proposal is made in

good faith, and that it contains necessary, but not absolutely minimal, changes that will enable

the debtor to complete the reorganization successfully."  Carey Transp. II, 816 F.2d at 90.

Delphi's package proposal was designed to enable Delphi to compete successfully with

independent auto suppliers.  Delphi's total package is necessary for its long-term survival as a

restructured competitive entity.

Fourth, Delphi fully recognizes that its proposals, even if financially supported by GM,

will substantially disrupt the lives and expectations of its employees.  In the recent restructuring

of US Airways, Bankruptcy Judge Steven Mitchell of the Eastern District of Virginia eloquently

described this dilemma.  "[I]f the test were purely subjective, I would be hard-pressed to find that

the IAM refused to accept the proposal without good cause.  They were being asked, after all,

essentially, to cut their own throats. . .."  US Airways Tr. at 27; In re Ormet Corp., 316 B.R. 665,

670 (Bankr. S.D. Ohio 2004) ("Court regrets that the hourly employees . . . giv[ing] up certain

provisions that are important to their economic security[,] [s]ome of the gains they have made in

prior collective bargaining agreements . . . are no longer sustainable in the economic climate

currently existing within the aluminum manufacturing industry").  Because of this factor, Delphi

has taken every step it can conceive of to avoid the substantial hardship an immediate transition

to market wages and benefits would have on its employees.  Delphi intends to continue to work

with GM and its Unions in an effort to obtain the financial support needed to enable

implementation of these competitive labor terms in a manner that causes the least harm to its

employees.

Finally, while the Unions will likely argue that there are other areas in which Delphi

could cut costs or increase revenue, no one can credibly dispute that the fundamental problem

with Delphi's U.S. operations is its extraordinary hourly labor costs, the restrictions on

management's flexibility to respond to market forces, and the legacy retirement costs under its

existing labor agreements.  When labor costs make up the bulk of a debtor's obligations, courts

have found that a reduction in labor costs is necessary because cutting costs in areas besides

labor would be insufficient to permit the reorganization.  E.g., In re Texas Sheet Metals, 90 B.R.

at 266; In re Blue Diamond Coal Co., 131 B.R. at 644-45.

D.    The Proposals Treat All Parties Fairly And Equitably

Section 1113(b)(1) provides that a proposal must also ensure "that all creditors, the

debtor and all of the affected parties are treated fairly and equitably."  The purpose of this

requirement "is to spread the burdens of saving the company to every constituency while

ensuring that all sacrifice to a similar degree."  In re Century Brass Prods., 795 F.2d at 273.

There is, however, no formula under Section 1113 – nor could there be – for determining

equivalent sacrifice.  Each constituency may suffer in a different manner, some through the total

loss of equity, some through substantial reductions in their prepetition claims, and some through

job loss or reduction in pay and benefits going forward.  Because a motion for rejection of a

collective bargaining agreement is frequently made long before a plan of reorganization is

proposed, the debtor cannot at the time of the hearing on rejection be expected to guarantee the ultimate treatment of all constituents.  See Carey Transp. I, 50 B.R. at 210; In re Kentucky Truck Sales, Inc., 52 B.R. 797, 802 (Bankr. W.D. Ky. 1985).  "This requirement of equivalent sacrifice does not mean that the debtor must formally propose his plan of reorganization prior to seeking rejection of the collective bargaining agreement."  Id.  Instead, courts look to the changes proposed, as well as concessions already made and likely to be made by creditors, stockholders or owners of the debtor, and other non-union employees.  Id.

Even when the constituencies are similarly situated – as are, for example, the debtors' organized and unorganized employees – the requirement of "fair and equitable" treatment does not require identical treatment.  Instead, the courts look at such factors as whether the employees have already suffered a reduction in pay or benefits prepetition and the impact on the debtors' operations.  E.g., In re Appletree Mkts., 155 B.R. at 439 (proposal was fair and equitable even when not requiring reductions in compensation for management, where union salaries were above competitive wage levels while management salaries were at or below prevailing wage levels, management had made other sacrifices in benefits and job cuts, and company could not reduce management salaries while retaining valued employees); Carey Transp. II, 816 F.2d at 90-91 (proposal was fair and equitable when the managerial and non-union staff took prepetition reductions and only union employees were receiving above-industry standard pay and benefits); US Airways Tr. at 24 (even if management employees had been asked to take a smaller wage cut than union employees, the total dollar amount was not disproportionate to that being sought from Unions); In re Walway Co., 69 B.R. 967, 974 (Bankr. E.D. Mich. 1987) ("[e]quity . . . under § 1113 means fairness under the circumstances, not a comparative dollar-for-dollar concession").

1.    The Effect On Non-Employee Stakeholders

There are many significant parties and classes of creditors which will be bearing their

share of the Debtors' cost-cutting measures.

Equity Holders.  Delphi's equity holders will bear their share of the Debtors' restructuring

burden.  During the years 2001-2004, the market value of Delphi's stock ranged from

approximately $3.6 to $9.8 billion.  At the close of business on October 7, 2005, Delphi's

common stock was trading at $1.12 and the stock's market value was approximately $629.2

million.[23]  Moreover, as of September 30, 2005, Delphi's stockholders' deficit was approximately

negative $5.3 billion.  See Sheehan Dec. ¶ 93.  In response to a request to the Office of the

United States Trustee (the "U.S. Trustee") by Appaloosa Management, L.P. for the appointment

of an equity committee in these chapter 11 cases, the Debtors stated in a December 19, 2005

letter to the U.S. Trustee that it is "highly unlikely" that common equity holders will receive any

value in the chapter 11 cases because the Debtors believe that Delphi is "hopelessly insolvent."

Additionally, as of December 16, 2005, all four tranches of Delphi's publicly traded debt

securities were trading at an implied recovery of between 49.8 percent and 51.0 percent of face

value and Delphi's publicly traded trust preferred securities were trading at an implied recovery

of 23.0 percent of face value.  Applying the absolute priority rule, it is extremely unlikely that

the equity holders will recover any portion of their claims against Delphi.  See Sheehan Dec.

¶ 94.

GM.  GM, Delphi's former parent and largest customer, will also equitably share in

enabling a successful reorganization.  The Debtors are filing their GM Loss Contract Rejection

Motion No. 1 concurrently with the Motion.  Through the GM Loss Contract Rejection Motion

---

[23]    This value assumes no change in the shares outstanding from September 30, 2005, to October 7, 2005.  See
Sheehan Dec.  ¶ 92.

No. 1, the Debtors are seeking the Court's authority to reject burdensome executory contracts pursuant to which the Debtors are supplying GM parts at a significant loss.  Relief on that motion will permit the Debtors to renegotiate reasonable prices that will permit the Debtors to reorganize successfully.  Moreover, in its January 26, 2006 Form 8-K, and in a March 16, 2006 announcement of updated preliminary results, GM stated that the GM Benefit Guarantee could be triggered as a result of reductions in Delphi's hourly OPEB or pension liabilities in bankruptcy, resulting in a financial impact on GM of an estimated $5.5 billion to $12 billion pre-tax.  See Butler Dec. ¶ 29.

Bondholders.  Delphi has approximately $2 billion, plus unpaid interest, in senior unsecured securities outstanding as of the Petition Date.  Because of the substantial liabilities faced by the Debtors, in all likelihood, the holders of these securities will receive only a percentage of their face value under a restructuring plan.  See Sheehan Dec. ¶ 97.  Delphi also issued subordinated notes with an aggregate principal amount of approximately $412 million, making the beneficiaries of the Subordinated Notes represent, as a class, one of the seven largest unsecured claims against the Debtors.  See Sheehan Dec. ¶ 97.  Because the Debtors are hopelessly insolvent, the holders of the Subordinated Notes will receive, at best, only a minimal percentage of their face value under a restructuring plan.  As stated above, the market's interpretation of the publicly-disclosed information about Delphi is that the holders of Delphi's debt securities will receive between one-quarter and one-half of their face value under a restructuring plan.  See Sheehan Dec. ¶ 97.

Suppliers.  The Debtors' outstanding payables as of the Petition Date to their thousands of suppliers exceeded $1.0 billion.  The Debtors' inability to make payments on account of those obligations has exacerbated the difficult financial situation faced by many of those suppliers who,

like the Debtors, are dependent upon the domestic automotive industry and are therefore facing

many of the same business issues as are the Debtors.  As such, many of these suppliers are

among the Debtors' creditors that are least able to bear the burden of the Debtors' restructuring.

<u>See</u> Sheehan Dec. ¶ 99.  Nevertheless, such suppliers have made concessions and continue to

support the Debtors' restructuring goals.  For example, more than 11,000 of the Debtors'

suppliers with contracts that expired by the end of 2005 had no obligation to continue to supply

goods to the Debtors, yet the Debtors were able to reach consensual extensions for more than 99

percent of all expiring contracts for which the Debtors' business plans necessitated an

extension.[24]  <u>See</u> Sheehan Dec. ¶ 99.  Furthermore, certain suppliers whose contracts have been

assumed have generally accepted significantly less than the face amount of their outstanding

prepetition payables as cure of all extant prepetition defaults under the assumed contracts and

waived their right to assert administrative claims for cure of the additional prepetition obligations,

to which they would otherwise be entitled under section 365(b)(1) of the Bankruptcy Code.[25]

     <u>Other Unsecured Creditors</u>.  Due to the magnitude of the scheduled liabilities of the

Debtors, nonpriority claims will likely receive less than 100 cents on the dollar.  Members of the

unsecured creditors group include, among others, the Debtors' non-supplier trade creditors, upon

whom the Debtors continue to rely in order to produce their goods and service their customers.

Moreover, these groups have continued to provide goods and services to the Debtors during the

postpetition period, despite the hardship that the Debtors' filings caused on their own financial

situations.  <u>See</u> Sheehan Dec. ¶ 102.

---

[24]     Motion for an Order Under 11 U.S.C. §§ 363(b) and 365(a) and Fed. R. Bankr. P. 9019 Approving
Procedures to Assume Certain Amended and Restated Sole Source Supplier Agreements.

[25]     Order Under 11 U.S.C. §§ 363(b) and 365(a) and Fed. R. Bankr. P. 9019 Approving Procedures to Assume
Certain Amended and Restated Sole Source Supplier Agreements.

2.    <u>The Effect On Salaried And Management Employees</u>

Based on prior public statements, Delphi anticipates that the Unions will argue that Delphi's Union-represented employees are bearing a disproportionate share of the burden relative to salaried, and particularly management, employees.  As demonstrated below, this is not the case.

<u>Sacrifices Already Made By Salaried And Management Employees</u>.  In considering potential modifications to employee wages and benefits, Delphi has operated under the basic philosophy that the compensation of its entire workforce, including its hourly and salaried employees, should be at "market" levels – neither higher nor lower.  <u>See</u> Weber Dec. ¶ 19.  Thus, in determining whether the modifications sought in the Delphi labor agreements are "fair and equitable" relative to salaried and management employees, it is necessary to examine the base-line under which hourly employees on the one hand, and salaried and management employees on the other hand, entered into the chapter 11 cases.

Following the Spin-Off, several steps were taken to move Delphi's salaried compensation more in line with compensation at other U.S. companies scaled closer to Delphi than GM.  For example, base salaries were targeted at levels more closely approximating employees in companies whose revenue, on average, more closely tracked Delphi's.  Comparator companies were thus changed from those the size of GM to those closer to Delphi, including other automotive component companies.  The design and modifications to the compensation approach resulted from studies and recommendations of independent expert compensation consulting companies.

The chart below demonstrates current differences between Delphi's traditional hourly and salaried and management employees' compensation, job security, and benefits provisions:

|  | Hourly Employees | Salaried & Management Employees |
|---|---|---|
| Wages | • Wages based upon Big Three-UAW wage rates | • Pay structure developed to reflect market for companies with similar revenue |
| COLA | • Yes | • Eliminated in 1984 |
| Overtime | • Time and a half for any hours worked over eight per day, 40 per week<br><br>• Double time for Sundays, Holidays | • Overtime eliminated in 2003 for all exempt employees except first line supervisors |
| Shift Premiums | • Five percent for afternoon shift; ten percent for night shift | • No shift premiums |
| Health Care | • No monthly contributions for traditional employees | • Monthly contributions required since 1993 |
| Sickness & Accident | • Paid at 60 percent of base wage for 52 weeks | • Reduced to 26 weeks for employees hired after 2000 |
| Extended Disability Benefits | • Employees with ten years of service get 55 percent of base wage until retirement | • Self-pay for certain employees hired after 2000 |
| Life Insurance | • Company-paid life insurance equal to 110 percent of the employee's annual base wage | • Reduced employee life insurance for employees hired after 2000 |
| Flow-Back To GM | • Most hourly employees entitled to return to open positions at GM | • No right to return to GM |
| Job Security | • No permanent layoffs permitted | • Delphi can terminate unneeded employees as needed |
| Layoff Benefits | • Employees receive 95 percent of base wage for 48 to 90 weeks | • Layoff benefits eliminated in 2001 |
| Staffing Requirements | • Delphi generally must perform work in-house even if cheaper | • Delphi may outsource functions at will |

|  | Hourly Employees | Salaried & Management Employees |
|---|---|---|
|  | to outsource |  |
| "30 and Out" Pension Benefit | • Employees receive retirement supplement after 30 years, regardless of age<br><br>• Supplement increased by 31.6 percent since 1999 | • "30 and Out" supplement eliminated for salaried and management employees hired after 1988 |
| Retiree Health Care | • Company-paid health care coverage upon retirement | • Retiree health care eliminated entirely for employees hired after 1993<br><br>• Post-65 coverage eliminated for all employees and retirees effective January 2007 |
| Retiree Life Insurance | • Company-paid life insurance coverage upon retirement | • Eliminated entirely for employees hired after 1993 |
| Legal Services | • Employees receive certain free legal services | • No legal services provided |
| Dependent Tuition | • $1500 per year per child | • Eliminated in 2002 |

See Weber Dec ¶ 24; Gebbia Dec. ¶ 60.

Based on these changes, the value of the wage and benefit package for management and salaried employees has decreased by more than 15 percent since the Spin-Off. Taking into account wage and benefit reductions implemented by GM before the Spin-Off, the value of the wage and benefit package for management and salaried employees hired prior to 1988 has fallen 30 percent since then, and the value of the wage and benefit package for employees hired after 1988 has fallen 43 percent when compared to the value of wages and benefits in effect for employees in similar positions prior to that time. See Gebbia Dec. ¶ 59.

67

Further Reductions Already Planned Or Implemented.  In light of the chapter 11 filings, Delphi's salaried and management employees will be subject to further reductions, both in head-count and in their wage and benefit package.

First, approximately 3,650 of Delphi's approximately 14,300 salaried and management employees in the United States will be separated from Delphi as a result of the planned sales or wind-downs of certain of Delphi's U.S. manufacturing sites.  These reductions will affect both salaried and management employees at the manufacturing sites and engineering, corporate, and divisional management that support the manufacturing operations.  See Weber Dec. ¶ 25.

Second, another 1,600 salaried and management positions in the U.S. will be eliminated as part of a project designed to reduce Delphi's SG&A expenses.  This program is intended to reduce costs attributable to salaried and management employees, and the information systems that support those employees, by approximately $450 million per year.  See Weber Dec. ¶ 26; Sheehan Dec. ¶ 60.

Maintaining Market Wages Is Critical To Delphi's Future Success.  In comparing the treatment of hourly employees to salaried and management employees, it is also critical to understand the differences between the two employee groups.  First, Delphi's salaried employees are not protected in their positions by a union agreement that pays above-market wages and benefits, nor are they deterred from switching employers by the prospect of starting at the bottom of a wage scale or a seniority system at a new company.  The salaried employees could more easily leave Delphi tomorrow, and obtain "market" wages and benefits with another employer. In the last six months, more than 470 salaried employees have left Delphi for other career options.  Accordingly, unless Delphi is able to provide market wages and benefits to salaried and management employees, many are and will likely continue to depart.  See Weber Dec. ¶ 29.

Second, some 7,250 employees – more than half of Delphi's salaried and management workforce – are engineers who are engaged in research, product development, and execution. Much of Delphi's market position lies in its technological expertise. For example, Delphi has been rated the number one automotive company in technological strength by ipIQ, an organization specializing in technology analysis, for three years in a row, and generated the third largest number of patents in the U.S. in 2003. Delphi's engineers have extremely valuable institutional knowledge of Delphi's products and processes that cannot easily be replaced by new-hires. Furthermore, there is a well-documented shortage of qualified engineers in the U.S, resulting in the fact that Delphi's engineers are highly sought-after in the job market. Nine OEMs from Germany, Japan, and Korea have invested in engineering facilities in Michigan, and Asian automakers have hired approximately 3,000 engineers in Michigan in the past year alone. The loss of engineering employees to Delphi's competitors would greatly undercut Delphi's ability to remain a profitable enterprise going forward. See Weber Dec. ¶ 30.

Finally, in determining the appropriate level of cost-savings among salaried and management employees, the court must also consider the long-term interests of Delphi itself. Section 1113(b)(1) provides that the proposed modifications must ensure "that all creditors, the debtor and all of the affected parties are treated fairly and equitably." 11 U.S.C. § 1113(b)(1). Requiring a debtor in Delphi's position to treat its salaried and management employees in exactly the same fashion as its hourly employees would severely hamper any efforts to reorganize successfully. Delphi's salaried and management employees are not tied to their positions by a union agreement that pays above-market wages and benefits. Unless Delphi is able to provide "market" wages and benefits to its salaried and management employees, they will find another employer who will do so. See Weber Dec. ¶ 29.

In sum, under Delphi's best analysis of the ultimate treatment of all constituencies, the

Union-represented employees and retirees are not being asked to assume more than their

proportionate share of Delphi's cost-cutting measures. Accordingly, Delphi submits that the

Section 1113 proposals treat all parties fairly, and that Delphi has satisfied this element of

Section 1113(b)(1).

      E.      <u>Delphi Has Made Itself Available For Meetings, And Has Acted In Good Faith To
Reach Mutually Satisfactory Modifications</u>

Section 1113(b)(2) requires that after serving its proposal, the debtor must be available to

meet at reasonable times with the union to discuss the proposal. In its Section 1113 proposals,

Delphi asked to meet with the Unions at any time that was acceptable to that Union, and has

reiterated its availability to do so. Seeing no movement from its Unions, in an attempt to bring

both GM and the Unions to the negotiating table and in light of GM's agreement to provide

limited financial support, Delphi rescinded its Competitive Benchmark Proposals on December

16, 2005, with the caveat that should no consensual resolution be reached, Delphi may be forced

to reinstate its Competitive Benchmark Proposals. After Delphi's revocation of the Competitive

Benchmark Proposals, the UAW did meet with Delphi and GM to establish an agreement on the

UAW Special Attrition Program. Shortly after reaching agreement on the UAW Special

Attrition Program, Delphi served the Unions with the GM Consensual Proposals and remained

available to meet with the Unions at any time, or any place, the Unions desired to discuss its

proposals. No Union has agreed to the Competitive Benchmark Proposals or the GM

Consensual Proposals, nor has any Union provided a counter-proposal. <u>See</u> Butler Dec. ¶ 61.

In determining whether an employer has satisfied the requirement to confer with the

union in good faith, courts look for "conduct indicating an honest purpose to arrive at an

agreement as the result of the bargaining process." <u>In re Blue Diamond Coal Co.</u>, 131 B.R. at

646.  A debtor's continued willingness to meet with the union is itself compelling evidence of

debtor's good faith.  See In re Sol-Sieff Produce Co., 82 B.R. 787, 795 (Bankr. W.D. Pa. 1988).

When a debtor-employer tries to meet but the authorized representative refuses to discuss the

debtor's proposal, the debtor nonetheless satisfies the statute's requirements.  See In re Royal

Composing Room, 62 B.R. at 403 (granting Section 1113(c) relief when debtor tried to meet

with union on several occasions but union stonewalled).  In other words, this good faith

requirement "does not apply exclusively to debtors . . . a good faith negotiation cannot take place

when only one party acts in good faith."  In re Elec. Contracting Serv. Co., 305 B.R. 22, 29

(Bankr. D. Colo. 2003) (internal citation omitted). Delphi's willingness to revoke its Competitive

Benchmark Proposals in an attempt to bring the Unions to the table and its continued willingness

to meet to discuss its GM Consensual Proposals meet the requirements for Section 1113(b)(2) -

any argument to the contrary would be disingenuous at best.

F.    The Unions Have Failed To Accept The Proposals Without Good Cause

To approve rejection of a collective bargaining agreement, the court must be presented

with evidence that the authorized representative refused to accept the proposal without good

cause.  11 U.S.C. § 1113(c).  Although the legislative history provides little guidance, it does

indicate that the term "without good cause" should be narrowly interpreted in a workable manner.

See 130 Cong. Rec. H7495 (daily ed. June 29, 1984) (remarks of Rep. Lungren) ("The phrase

'good cause' is undefined, but the conferees clearly believed that it should be interpreted

narrowly by a reviewing court"); 130 Cong. Rec. S8888 (daily ed. June 29, 1984) (remarks of

Sen. Thurmond) ("the intent is for these provisions to be interpreted in a workable manner").  As

this Court has explained, the "good cause" requirement:

> fosters the goals of good faith negotiations and voluntary modifications.  It
> induces the debtor to propose only those modifications necessary to a successful
> reorganization while protecting the debtor against the union's refusal to accept its

> proposal without a good reason.  Where the union rejects a proposal that is
> necessary, fair and equitable, it must explain the reasons for its opposition.  On
> the other hand, if the union makes counter-proposals that meet its needs while
> preserving the savings required by the debtor, its rejection of the debtor's proposal
> will be with "good cause."

In re Horsehead Indus., Inc., 300 B.R. 573, 587 (Bankr. S.D.N.Y. 2003) (citations omitted).

The burden lies with the Unions as the authorized representatives to articulate in detail

their reasons for declining to accept Delphi's proposals.  See Carey Transp. II, 816 F.2d at 92,

Texas Sheet Metals, 90 B.R. at 263-64.  When, as here, the debtor has produced prima facie

evidence that the union lacked good cause to reject the proposal, the authorized representative

must demonstrate that it did have good cause.  See Carey Transp. II, 816 F.2d at 92; In re Mile

Hi Metal Systems, 899 F.2d at 892 (the union has an "obligation . . . to explain its reasons for

opposing the proposal").

When the union makes demands that the employer cannot meet and offers no alternatives

focusing on the needs of the employer's reorganization, it does not have "good cause" for

rejecting the proposal.  In re Maxwell Newspapers, Inc., 981 F.2d 85, 89-90 (2d Cir. 1992).  A

union that refuses to bargain also lacks good cause to reject a proposal.  In re Mile Hi Metal

Systems, 899 F.2d at 892 (noting that "a union's lack of participation [in the bargaining process]

should be considered when the court decides whether the union had good cause to reject the

proposal, and whether the balance of equities favors rejection of the agreement") (citations

omitted); In re Ormet Corp., 316 B.R. at 670 (union had no good cause when it "rejected the

Debtors' proposals early on, in a manner that at least appeared to discourage meaningful efforts

at negotiations"); In re Horsehead Indus., 300 B.R. at 589 (unilateral refusal to negotiate, leading

to de facto rejection of debtor's opening proposal constituted rejection without good cause).

Here, the Unions have not, and cannot, articulate any good reason for refusing to address

Delphi's reorganization needs.  The only response they have made to the Competitive

72

Benchmark Proposals was, in the case of the UAW, to reject and indicate that a strike would be likely should Delphi implement its proposed modifications to its labor agreements or, in the case of the IUE-CWA, to promise a counter-proposal that never materialized.  Nor have the Unions accepted the GM Consensual Proposals or made counter-proposals.

It is indisputable that Delphi cannot successfully restructure and avoid liquidation without the cost savings contemplated in the Section 1113 proposals.  The Unions have identified no material flaws in Delphi's projections or financial models, and offered no data to Delphi to suggest that the Section 1113 proposals are unnecessary**.**  These undisputed facts are more than sufficient evidence that the Unions' failure to accept the Section 1113 proposals is without good cause.  See In re Maxwell Newspapers, 981 F.2d at 90; Carey Transp. II, 816 F.2d at 92.

G.      The Balance Of The Equities Clearly Favors Rejection

Section 1113(c)(3) requires the Court to find that the balance of the equities clearly favors rejection of the collective bargaining agreements before approving the motion.  The Second Circuit has crafted a six-factor test to determine whether the balance of the equities clearly favors rejection of the agreement:

- The likelihood and consequence of liquidation if rejection is not permitted;

- The likely reduction in the creditors' claims if the bargaining agreement remains in force;

- The likelihood and consequences of a strike if the bargaining agreement is voided;

- The possibility and likely effect of any employee claims for breach of contract if rejection is approved;

- The cost-spreading abilities of the various parties, taking into account the number of employees covered by the bargaining agreement and the manner in which various employees' wages and benefits compare with those of others in the industry; and

- The good or bad faith of the parties in dealing with the employer's financial dilemma.

See Carey Transp. II, 816 F.2d at 92-93.  This balancing must be undertaken in light of the

ultimate goal of chapter 11 – the success of the reorganization.  See id. at 92-93 (quoting NLRB

v. Bildisco & Bildisco, 465 U.S. 513, 527 (1984)).

When the equities at hand are considered in light of the six-factor test articulated by the

Second Circuit in Carey Transportation II, the balance clearly favors rejection of the collective

bargaining agreements and elimination of hourly retiree benefits for the following reasons:

> 1.    In the Absence Of A Significant Reduction In Labor Costs, Delphi Will
>       Be Unable To Reorganize

As explained in the Statement Of Facts, the modifications set forth in Delphi's Section

1113 proposals are necessary to Delphi's successful reorganization.  Delphi has not had positive

net income since 2003, and its performance has declined substantially each year, with a net loss

of $2.8 billion in 2005.  Delphi is currently estimated to lose approximately $8.1 billion in

operating income, or approximately $6.1 billion if 100 percent of eligible employees accept one

of the packages offered through the Hourly Attrition Programs, and approximately $12.9 billion

in net income between 2006-2010, without labor modifications or other changes to its operations.

As discussed further below, were Delphi to liquidate, which it would absent modification

of its labor agreements, the effects would be far-reaching.  Delphi's fate would severely affect

more than just the Union-represented employees and retirees, because all of Delphi's customers,

particularly auto manufacturers worldwide, are dependent upon Delphi for essential components

for their products.  In addition, the sudden loss of Delphi's business in certain of the smaller

communities in which it now operates could have a devastating effect on their economies.

> 2.    If Rejection Is Not Authorized, Delphi's Continuing Operating Losses
>       Likely Will Consume The Cash Available To Satisfy Other Creditors

Current projections show that Delphi would lose a total of approximately $8.1 billion in

operating income and $12.9 billion in net income between 2006 and 2010 without labor

74

modifications or the Hourly Attrition Programs.  Even with the Hourly Attrition Programs,

Delphi is still projected to lose approximately $6.1 billion in operating income, or more.  At this

rate, without relief from the existing collective bargaining agreements, Delphi will rapidly

consume any assets available to satisfy other creditors.

       3.      The Potential Consequences Of A Strike Cannot Control The Outcome Of
              The Motion

Although Delphi does not lightly dismiss the possibility of a strike in response to the

potential rejection of its labor agreements – or, more likely, in response to implementing changes

in the terms of employment – that possibility cannot control the decision on the Motion.  If the

Court denies Delphi's Motion to reject its labor agreements, Delphi would be forced to liquidate.

If the Court grants Delphi's Motion, and its Unions strike, Delphi might well also be forced to

liquidate.  Absent a consensual agreement prior to hearing on the Motion, the best path to

success for Delphi, its Unions, and its employees would be to negotiate a consensual agreement

following rejection.  It is precisely for this reason that Delphi currently plans that in the event of

rejection of the labor agreements, it will not immediately impose new terms and conditions, but

will continue to seek a multi-party consensual agreement involving GM.  Plainly, either Delphi

or GM must obtain and provide substantial economic support to bridge the workforce to the

wage, benefit, and supplemental unemployment benefit reductions contemplated by Delphi's

proposals, particularly given the magnitude of job losses likely as Delphi aligns its global

product portfolio.  Only with a practical, workable solution can the high risk of strikes and the

resulting damage to the estate and the automobile industry be mitigated.

Notwithstanding Delphi's intentions, the case law counsels that the possibility of a strike

should not deter a court from authorizing rejection of a collective bargaining agreement if the

debtors face the very real potential for liquidation absent rejection.  As the court stated in <u>In re</u>

<u>Horsehead Industries</u>:

> A strike is an inherent risk in every § 1113 motion, and in the end, it makes little
> difference if the debtors are forced out of business because of a union strike or the
> continuing obligation to pay union benefits to avoid one.  The Unions may have
> the legal right to strike, but that does not mean that they must exercise that right.
> The union's right to strike carries with it the burden of holding the fate of the rank
> and file in its hands.  Little purpose would be served by a strike if a strike results
> in the termination of operations and the loss of jobs by the strikers.

300 B.R. at 585.

The same analysis applies here.  While there is a possibility of a strike if and when

Delphi imposes unilateral changes to the existing terms of employment, that possibility cannot be

used to deny Delphi the relief that is necessary for its survival.

4.      <u>The Possibility Of Employee Claims For Damages Is Not Superior To The
Outcome That Would Occur If Rejection Is Denied</u>

In considering the possibility of damage claims arising from a potential rejection of the

collective bargaining agreements, there is a clear split of authority on whether such claims would

exist at all.  <u>Compare</u> <u>In re Blue Diamond Coal Co.</u>, 147 B.R. 720, 728-32 (Bankr. E.D. Tenn.

1992) <u>aff'd</u>, <u>Southern Labor Union, Local 188 v. Blue Diamond Coal Co.</u>, 160 B.R. 574 (E.D.

Tenn. 1993) (holding that "the Bankruptcy Code, as presently enacted, does not provide or

recognize a remedy for damages resulting from rejection of a collective bargaining agreement

under § 1113"), <u>with</u> <u>In re Continental Airlines Corp.</u>, 901 F.2d 1259, 1264-65 (5th Cir. 1990)

(holding that employees entitled to damage claims for difference between wages and benefits set

forth in rejected CBA and those paid after rejection of CBA) and <u>In re Rayman, Martin & Fader,</u>

<u>Inc.</u>, 170 B.R. 286 (D. Md. 1994).  If the Court were to conclude that no damage claim was

available, this factor would not be relevant.

76

Moreover, even courts that have acknowledged a damage claim have limited that claim in important respects. For example, in <u>In re Continental Airlines Corp.</u>, 901 F.2d at 1265, the court held that a damage claim was available only to the extent that work would have been available had the agreements not been rejected. If the failure to reject the agreement meant that the debtor would liquidate, there would not be a damage claim under this theory. Other courts have held that under section 502(b)(7) of the Bankruptcy Code, any damage claim would be limited to damages accruing in the one-year period following bankruptcy. <u>E.g.</u>, <u>Baldridge v. Continental Airlines Holdings, Inc.</u> (In re Continental Airlines, Inc.), 257 B.R. 658 (Bankr. D. Del. 2000).

Finally, even if the rejection of a collective bargaining agreement under Section 1113 created a damage claim, that does not militate against rejection of the agreements. If the potential damage claim is considered a prepetition general unsecured claim, or is limited by the one-year restriction on employment claims, the estate is still much better off than if it were forced to abide by the existing labor agreements. <u>See</u> <u>In re Horsehead Indus.</u>, 300 B.R. at 587.

Compared to the outcome in liquidation that may occur without rejection, a successful reorganization in which the employees have general unsecured claims arising from collective bargaining agreement rejection damages is clearly more favorable. Thus, an order authorizing rejection affords the superior benefit to the creditors of the estate.

5.    <u>The Wages And Benefits Provided Under Delphi's Proposals Are Consistent With Wages And Benefits For Comparably-Situated Employees</u>

As detailed in the Statement Of Facts, the Butler Declaration and the Wachter Report, Delphi's Section 1113 proposals simply put its employees on par with similarly situated employees, both in terms of wages and benefits. Based on a finding that the competitive all-in labor rate ranged from $17-22 per hour for Delphi's auto supplier competitors, Delphi's proposed all-in labor rate of less than $22 per hour is reasonable. <u>See</u> Butler Dec. ¶ 96. Moreover,

Delphi's proposed total compensation rate under the proposals is still comparable to the market

labor rate for comparable workers economy-wide.  This factor, therefore, militates in favor of

rejection.

6.    <u>Delphi Has Attempted In Good Faith To Deal With Its Financial Dilemma</u>

Delphi's good faith in attempting to achieve a solution to its huge labor and retiree costs

and operational inflexibility cannot be questioned.  Delphi has undertaken the substantial SG&A

project designed to reduce its SG&A costs by nearly half a billion dollars per year, which,

combined with other cost savings efforts, will result in the elimination of approximately 44

percent of the salaried and management workforce.  Delphi has also attempted in good faith to

negotiate collective bargaining agreement modifications with its Unions, repeatedly conveying

its willingness to negotiate mutually acceptable modifications that produce the necessary level of

labor and retiree cost reductions, and allow Delphi to respond to market forces, and diligently

responding to the Unions' information requests.  This record amply demonstrates Delphi's good

faith approach to dealing with its financial dilemma.

II.    <u>The Court Should Modify Delphi's Obligations To Provide Hourly Retiree Welfare
       Benefits By Eliminating That Obligation For Hourly Retirees</u>

Section 1114 imposes substantially the same requirements as Section 1113, except that

Section 1114 includes a provision for the appointment of a committee of retirees if necessary to

protect the interests of retirees, 11 U.S.C. §§ 1114(c), (d); explicit provisions about the priority

of payments to which retirees are entitled, 11 U.S.C. § 1114(e); and a provision that agreements

reached between an employer and retirees may be revisited during the bankruptcy case, 11 U.S.C.

§ 1114(g).[26]  <u>See</u> <u>In re Horsehead Indus.</u>, 300 B.R. at 583 ("[c]ompliance with § 1114 is

---

[26]    Section 1114(g) of the Bankruptcy Code, which provides the exclusive means for a debtor to eliminate
retiree medical and life insurance benefits, provides that:

substantively and procedurally the same as compliance with § 1113") (quoting <u>In re Ionosphere</u>

<u>Clubs, Inc.</u>, 134 B.R. 515, 519-20 (Bankr. S.D.N.Y. 1991)); <u>In re Family Snacks</u>, 257 B.R. at

892 (applying same standard to both Section 1113(c) and 1114(g) requests).  Thus, the same

authorities are applicable to support Delphi's motion to reject the collective bargaining

agreements under Section 1113 and to reduce retiree benefits under Section 1114.  <u>See</u> <u>Family</u>

<u>Snacks</u>, 257 B.R. at 896-97 (relying on Section 1113 cases in interpreting Section 1114).

When the debtor demonstrates compliance with these provisions of Section 1114, the

court is authorized to approve rejection of collective bargaining agreements, and elimination of

retiree health and life insurance benefits.  <u>See</u> <u>In re Ormet Corp.</u>, 324 B.R. 645 (Bankr. S.D.

Ohio 2005).

A.        <u>Delphi Has Satisfied The Procedural Requirements Of Section 1114(f)</u>

As described above with respect to Section 1113, Delphi has delivered written proposals

pursuant to 11 U.S.C. § 1114 for modification of hourly retiree welfare benefits, and

subsequently provided a new set of proposals in March 2006 upon which the Motion is based.

These proposals were based on the most complete and reliable information available at the time

the proposals were delivered, and Delphi has provided and is continuing to provide to the Unions

all relevant information necessary to evaluate the proposals.

Delphi's proposals to eliminate the retiree health and life insurance benefits are necessary

to Delphi's successful reorganization.  Under the Steady State Scenario, Delphi currently faces

hourly retiree health care cash costs of $1.4 billion through 2010, which could increase

---

The court shall enter an order providing for modification in the payment of retiree benefits if the court
finds that – (1) a trustee has, prior to the hearing, made a proposal that fulfills the requirements of
subsection (f); (2) the authorized representative of the retirees has refused to accept such proposal without
good cause; and (3) such modification is necessary to permit the reorganization of the debtor and assures
that all creditors are treated fairly and equitably, and is clearly favored by the balance of equities[.]

substantially given the disproportionately high number of Delphi employees who will become retirement eligible during that time frame.  See Williams Dec. ¶¶ 7.  Both the UAW and GM acknowledged this potential when they entered into the GM Benefit Guarantee that may provide Union-represented employees with protection if Delphi is unable to provide OPEB to its GM-legacy employees.  Given Delphi's current cash situation, and the worsening revenue picture projected for the coming years, Delphi simply does not have the financial wherewithal to support its ongoing OPEB expenses.  There is no viable means for Delphi to continue supporting its hourly retirees ongoing health care costs if Delphi is to emerge from bankruptcy as a viable entity.

Elimination of hourly OPEB benefits treats all parties fairly and equitably.  Delphi has already eliminated retiree health care and life insurance for salaried and management employees hired after 1993, and eliminated retiree health care for other salaried and management retirees upon reaching Medicare eligibility.  Moreover, salaried and management retirees who receive health care until Medicare eligibility do not have the possible advantage currently held by most hourly retirees in the form of the GM Benefit Guarantees that may, in effect, preserve hourly health care benefits.  In addition, as described in Section I.D. above, all of Delphi's constituencies, from creditors to shareholders, will be making enormous sacrifices as a result of these chapter 11 cases.  All affected parties are assuredly shouldering a proportional share of the debtor's cost-cutting measures.  In re Walway Co., 69 B.R. at 974; In re Blue Diamond Coal Co., 131 B.R. at 645.  Thus, in the same fashion as it complied with Section 1113(b), Delphi has satisfied the procedural requirements under Section 1114(f).

---

11 U.S.C. § 1114(g).  Section 1114(f)(1) contains essentially the same provision as Section 1113(b)(1).  In addition, Section 1114(f)(2) requires that the trustee "meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications."

B.    The Authorized Representatives Have Failed To Accept The Proposals Without
Good Cause

Despite the fact that Delphi's proposed modifications are necessary for its reorganization

and also to treat all constituencies fairly and equitably, the Unions rejected Delphi's proposals

without good cause.  Similar to the Section 1113 negotiation process, the Unions have failed to

articulate any reason why Delphi's proposals are not necessary to Delphi's successful

reorganization.

C.    The Balance Of The Equities Clearly Favors Modifications To Retiree Benefits

Finally, the balance of equities clearly favors modifications to retiree benefits.  As

discussed in Section I above, Delphi clearly meets the six-factor test courts rely upon for

determining whether the balance of the equities favors rejection.

As of the end of 2005, Delphi had OPEB liabilities of approximately $9.6 billion for its

current and future retirees – $8.0 billion attributable to retiree health care for hourly employees,

$0.4 billion attributable to retiree life insurance for hourly employees, $0.9 billion attributable to

retiree health care for salaried employees, and $0.3 billion attributable to life insurance for

salaried employees.  See Williams Dec. ¶ 21; Sheehan Dec. ¶ 56.

First, Delphi's estimated cash cost of providing future OPEB health care benefits for

hourly employees and retirees through 2010 is projected to be $1.4 billion, which could increase

substantially if the number of retirements in the 2006 to 2010 timeframe is greater than expected.

See Williams Dec. ¶ 19.  In addition, the hourly retiree health APBO is estimated to be $8.0

billion as of December 31, 2005.  See Williams Dec. ¶ 21.  In the absence of elimination of these

OPEB costs, and other labor contract modifications, Delphi will be unable to overcome its

ongoing losses and show that it will have positive cash flow upon emergence.  As a result,

Delphi will be unable to attract the exit financing necessary for a successful reorganization.

Second, other creditors will suffer if Delphi is required to maintain its OPEB expenses and liabilities, because Delphi's dollars will be used to fund these expenses and liabilities, rather than repay its creditors.

Third, as explained above, while a strike is a very real possibility, that cannot control the outcome of the Motion.  If required to maintain its OPEB benefits, Delphi will face liquidation; therefore the potential of a strike by active employees who lose their OPEB benefits – and the risk of liquidation that could result – simply cannot serve to deter a decision to eliminate these benefits.

Fourth, unlike Section 1113, Section 1114 does expressly address the availability of a damage claim following modification, by providing that under section 502(b)(7) of the Bankruptcy Code, the one-year limitation on a claim for damages arising from the rejection of an employment contract does not apply to retiree benefits.  11 U.S.C. § 502(b)(7).  Presuming that this provision means that retirees affected by a modification in their benefits are able to assert a claim for damages arising from the modification, those damages are expected to be lessened due to the GM Benefit Guarantee, which is intended to insure those benefits for most Union-represented employees.  Moreover, as explained above, general unsecured claims arising from elimination of retiree benefits will allow for greater value to creditors.  Thus, rejection is more favorable than liquidation.

Finally, Delphi's repeated efforts to obtain consensual agreements with its Unions, as authorized representatives of its employees and retirees, as well as its efforts to reduce other non-labor costs, demonstrate its good faith.

Conclusion

Accordingly, for all of the foregoing reasons, to enable Delphi to reorganize successfully, the Debtors request that the Court (a) grant the Motion, (b) authorize the Debtors to reject, pursuant to Section 1113, their collective bargaining agreements with each of their Unions, upon ten calendar days' notice to the Court and Unions, (c) authorize the Debtors to modify, pursuant to Section 1114, the Debtors' obligations to provide health and life insurance benefits for hourly retirees, whether arising under their collective bargaining agreements or otherwise, effective October 1, 2006, and (d) grant the Debtors such other and further relief as is just.

Dated:  New York, New York
      March 31, 2006

SKADDEN, ARPS, SLATE, MEAGHER &
 FLOM LLP

By: /s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr. (JB 4711)
    John K. Lyons (JL 4951)
    Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

By:/s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

O'MELVENY & MYERS LLP

By:/s/ Tom A. Jerman
    Robert A. Siegel (RS 0922)
    Tom A. Jerman (pro hac vice application
    pending)
    Rachel S. Janger
    Jessica Kastin (JK 2288)
1625 Eye Street, NW
Washington, DC  20006
(202) 383-5300

GROOM LAW GROUP, CHARTERED

By: /s/ Lonie A. Hassel
    Lonie A. Hassel (pro hac vice application
    pending)
1701 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 857-0620

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession