Appendix A

UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

```
- - - - - - - - - - - - - x
IN RE:                     :  Case No. 04-13819
U.S. AIRWAYS GROUP, INC.,  :  Jointly Administered
et al.,                    :
          Debtors.         :  (Chapter 11)
- - - - - - - - - - - - - x
```

Thursday, January 6, 2005

U.S. Bankruptcy Court

Alexandria, Virginia

The above-entitled action came on to be heard before the HONORABLE STEPHEN S. MITCHELL, Judge for the United States Bankruptcy Court for the Eastern District of Virginia, Alexandria Division, beginning at approximately 9:34 a.m.

1   whether it believes each of the plans meets the distress

2   test.

3           THE COURT:  Okay.  Before making my ruling on the

4   remaining issues, I certainly do want to commend the parties

5   for what is, obviously, the hard work that was involved.

6   Usually, last minute agreements means people have stayed up

7   late and worked hard.  And I am appreciative of the efforts

8   of counsel.

9           And with respect to the non-union-represented

10  retirees here today, I am appreciative of the efforts of the

11  Retiree Committee.  Unlike the lawyers, who are being paid

12  for their efforts in this case, they're not being paid.

13  Obviously, their self-interest was a motivating factor there.

14   That's why they were appointed to the Committee in the first

15  place.

16          Even so, I know that all of these negotiations have

17  taken place over a time period in which most people would

18  like to be with their families and enjoying the holidays.  As

19  I say, I am appreciative.

20          Even as to the matters that still remain disputed,

21  I also do want to express my appreciation to counsel for what

22  I thought were well-focused and well-tried presentations.

23  These issues are never easy ones to make, but to the extent

24  that anything can make the Court's job easier, it's when the

25  lawyers do a good job of presenting the evidence on each

14

1    side.  And even though I may have a hard time making a

2    decision, at least I go into the decision-making process

3    knowing that I have all of the relevant information, which is

4    about all that I can ask for under the circumstances.

5            This matter is before the Court on what can only be

6    characterized as a sweeping motion by the debtor in

7    possession airline to reject certain collective bargaining

8    agreements with its unionized work force, to eliminate

9    retiree medical benefits for its retired work force, and to

10   terminate three defined benefit pension plans.

11           Hearings were held on December 2nd, 3rd, 9th, 10th,

12   14th, 16th, and 17th and were continued over until today's

13   date for a ruling, as well as to permit ratification votes by

14   two unions, the Communication Workers of America and the

15   Association of Flight Attendants, that had reached agreements

16   with the debtor during the hearing with respect to modifying

17   their collective bargaining agreements.

18           Those modifications have been ratified by the union

19   members.  Additionally, since the matter was continued over,

20   the committee representing the retirees, as well as the one

21   union which was representing its retirees -- that is, the IAM

22   -- have reached agreement with the debtor on the -- with

23   respect to the motion to eliminate the retiree medical

24   benefits.  And I will not, therefore, be making rulings today

25   with respect to those aspects of this broad motion.

15

1        That leaves for consideration the motion by the

2   debtor-in-possession to reject the collective bargaining

3   agreement -- the three collective bargaining agreements with

4   the bargaining groups represented by the International

5   Association of Machinist and Aerospace Workers, or IAM, as

6   well as the motion to approve a distress termination of three

7   mainline defined benefit pension plans.

8        Under 28 USC Sections 1334 and 157(a) and the

9   general order of reference from the U.S. District Court for

10  the Eastern District of Virginia, dated August 15, 1984, I

11  have subject matter jurisdiction over the remaining issues

12  before me here today.

13       The motion to reject the collective bargaining

14  agreement and the motion to approve the distress termination

15  of the defined benefit pension plans are both core

16  proceedings over which a final judgment or order may be

17  entered by a bankruptcy judge, subject, of course, to the

18  right of an aggrieved party to appeal.

19       By way of background, U.S. Airways, Inc. is the

20  seventh-largest airline in the United States.  Together with

21  its parent holding company and three affiliates, it filed a

22  voluntary Chapter 11 petition in this Court on September 12,

23  2004, and has continued since that date to operate its

24  business as a debtor-in-possession.  A plan of reorganization

25  has not yet been proposed.

16

1   This is the company's second Chapter 11 filing in

2 approximately two years.  The previous Chapter 11 case was

3 filed in August 2002.  During that case the company's

4 unionized employees, including those working -- excuse me --

5 represented by the IAM, agreed to two rounds of concessions.

6   Additionally, the defined benefit pension plan

7 maintained by the company for its pilots was terminated under

8 the -- as a distress termination.  A plan of reorganization

9 was then confirmed in March of 2003.

10   The evidence shows that upon emergence from the

11 first Chapter 11 case U.S. Airways had what appeared to be a

12 sound business plan based on its continued operation as a

13 traditional hub and spoke carrier.  Its financial

14 performance, however, did not meet the -- all of the

15 projections upon which the business was based.

16   For example, passenger revenue per available seat-

17 mile was only 9.3 cents rather than the projected 10.4 cents,

18 while fuel prices were $1.14 per gallon rather than 80.5

19 cents per gallon.  The result was an operating loss from

20 2003, the year of emergence, of $460 million, and a loss for

21 2004 of $700 million.

22   This failure to achieve its financial projections,

23 the company contends, and the evidence supports, resulted in

24 large measure from the then unforeseen effect that the growth

25 of low cost carriers was having on the market.  Such

1   carriers, exemplified by Southwest Airlines, Jet Blue

2   Airlines, and America West Airlines, now have an

3   approximately 31 percent share of the market and a combined

4   market capitalization exceeding that of the legacy carriers,

5   such as American Airlines, United Airlines, Delta Airlines,

6   and U.S. Airways.

7          This competition from low cost carriers who are

8   increasingly able to dictate prices in the marketplace has

9   been exacerbated by a dramatic rise in the last year or so in

10   the cost of jet fuel.

11          After examining its situation, U.S. Airways

12   determined that it could not survive as a traditional or

13   legacy carrier, but would have to transform itself into a low

14   cost carrier.  More specifically, into what has been

15   described as a hybrid low cost carrier on the model of

16   America West.  Hybrid here refers to a mixture of both point

17   to point flying together with some hub and spoke operations.

18          In order to operate under such a model, U.S.

19   Airways, which has one of the higher costs per available

20   passenger mile, or CASM, in the industry, determined that it

21   had to reduce its cost to a level competitive with that of

22   the successful low cost carriers.

23          U.S. Airways' CASM at the time it sought the relief

24   now being requested was approximately 9.9 cents per mile, of

25   which 4.2 cents represented labor costs.

1          Those labor costs are some 35 percent higher than

2     those even at Southwest Airlines, which has the highest labor

3     cost among the low cost carriers.

4          Since America West was the closest to the model of

5     the hybrid carrier that U.S. Airways wanted to become, U.S.

6     Airways has attempted, first through negotiations with its

7     labor groups and then through the present motion to achieve

8     cost reductions that represented a combination of wage scales

9     similar to those of America West combined with productivity

10    rules similar to those at Jet Blue, plus an additional 15

11    percent the company determined was needed to achieve

12    profitability on a going forward basis.

13         Based on this analysis, U.S. Airways calculated a

14    dollar amount of concessions, which has been referred to in

15    the testimony as the ask that it has sought from each of its

16    labor groups.

17         U.S. Airways has reached agreements with the

18    pilots, flight attendants, passenger service agents, and

19    members of the transport workers union, but not with the

20    International Association of Machinists.

21         U.S. Airways is a party to three collective

22    bargaining agreements with groups represented by the IAM.

23    One agreement is with the mechanics and related employees,

24    one with the fleet service employees, and one with the

25    maintenance training specialists.

19

1    The mechanics and related employees and the
2    maintenance training specialists are represented by District
3    Lodge 142 of the IAM, while the fleet service employees are
4    represented by a different district, District 141.
5    Rejection of a collective bargaining agreement in
6    bankruptcy is governed by Section 1113 of the Bankruptcy
7    Code.  Section 1113 was enacted in part to refine and codify
8    and in part to overrule the ruling of the Supreme Court in
9    National Labor Relations Board v. Bildisco & Bildisco, which
10   was at 465 U.S. 513, decided in 1984.
11   The Supreme Court in Bildisco affirmed that a
12   collective bargaining agreement as an executory contract may
13   be rejected by a trustee or by a Chapter 11
14   debtor-in-possession upon a showing that the contract is
15   burdensome to the estate.
16   Because of the special status of collective
17   bargaining agreements, however, and the national labor
18   policies of avoiding labor strife and encouraging collective
19   bargaining, the court held that rejection was held to a
20   higher standard than the simple business judgment standard
21   applied to executory contracts generally.
22   In particular, the court held that national labor
23   policy generally favored allowing employers and unions to
24   reach their own agreements on terms and conditions of
25   employment, free from governmental interference.

1        And before acting on a petition to modify or reject

2    a collective bargaining agreement, the Bankruptcy Court

3    should be persuaded that reasonable efforts to negotiate a

4    voluntary modification have been made and are not likely to

5    produce a prompt and satisfactory solution.  And that a

6    bankruptcy court should step into the process only if the

7    parties' inability to reach an agreement threatens to impede

8    the success of the debtor's reorganization.

9        The court further held, however, that an employer

10    did not commit an unfair labor practice by unilaterally

11    imposing changes in pay and working conditions pending court

12    approval of the rejection.

13        Congress responded to the decision in Bildisco by

14    enacting Section 1113.  Section 1113 allows a trustee or a

15    debtor-in-possession to reject a collective bargaining

16    agreement only if specific requirements are met.  And it

17    prohibits unilateral modification of pay and working

18    conditions prior to Court approval of the rejection --

19    although there is a provision for the court, after noticing a

20    hearing, to provide for interim relief from the agreement.

21        The requirements before a collective bargaining

22    agreement may be rejected are that prior to any hearing on

23    the application to reject the agreement, the trustee or

24    debtor-in-possession must first make a proposal to the

25    authorized representative of the employees covered by the

1    agreement based on the most complete and reliable information

2    available at the time of the proposal, which provides for

3    those necessary modifications in the benefits and protections

4    that are necessary to permit the reorganization of the debtor

5    and assures that all creditors, the debtor, and all of the

6    affected parties are treated fairly and equitably.

7        The debtor-in-possession or trustee must also

8    provide the representative of the employees with such

9    relevant information as is necessary to evaluate the proposal

10   and must meet at reasonable times with the authorized

11   representative to confer in good faith in attempting to reach

12   mutually satisfactory modifications of such agreement.

13       Before the Court can approve the rejection, the

14   Court must find that the trustee or debtor-in-possession has

15   gone through those steps.  And in addition, the Court must

16   find that the authorized representative of the employee has

17   refused to accept the proposal without good cause and that

18   the balance of the equities clearly favors rejection of the

19   agreement.

20       In this case, prior to the filing of this

21   agreement, the company did make a motion for interim relief

22   from the collective bargaining agreement.  And after a

23   hearing, the Court granted a temporary 21 percent pay cut and

24   permission for the company to continue to outsource heavy

25   maintenance on the company's Airbus aircraft.

22

1           With respect to the -- thereafter the evidence

2   shows that the company presented a proposal in early November

3   and prior to the filing of the present motion for the

4   modifications to the three collective bargaining agreements

5   and offered and agreed to meet with the representatives of

6   the union.

7           As I stated earlier, the company had basically

8   determined for each of its labor groups a dollar amount of

9   concessions it sought.  And the specific proposals that it

10  presented for changes in wages and benefits and other factors

11  were accompanied by the company's valuation of each of the

12  components of the proposal.

13          The evidence shows, however, that the company was

14  not insistent upon any particular changes, but was insistent

15  on the total dollar amount of the concessions to be achieved,

16  and the company was willing to negotiate trade-offs or

17  various methods of achieving the ask provided the dollar

18  target was met.

19          In each case, the -- with respect to each of the

20  three agreements and the two bargaining representatives,

21  since there were different districts of the IAM, the company

22  provided, as I say, the proposal.  It provided its cost

23  analysis of the savings to be achieved by each component of

24  the proposal.  And it also provided its current -- then

25  current business plan, which has been referred to as

1    transformation plan 3.0, which has since been superseded by

2    transformation plan 3.1.

3          It also agreed and expressed its willingness to

4    provide additional financial information as requested by the

5    union.  It met promptly with the -- with the union, but no

6    serious negotiations took place in the sense that the union

7    spent a lot of time -- and of course, I am talking about the

8    situation as it existed as of December 17th, the last day of

9    the hearings.

10          I read the newspapers like everybody else.  I

11   understand there have been meetings since then.  But in terms

12   of what's formally before me, while there are a lot of

13   meetings by the union negotiating committee itself, there

14   were very few meetings with the debtor, although the debtor

15   consistently offered to meet at any time with the members of

16   the union's negotiating committee.

17          The union itself never made a formal counter

18   proposal.  At best, it offered what might be fairly

19   characterized, I guess, as trial balloons, particular

20   suggestions that might result in some measure of savings, but

21   no comprehensive proposal that achieved the savings or even

22   anything closely approaching the savings that were being

23   sought by the company.

24          There has been no evidence presented here today

25   that the savings that the debtor was asking for from the

1    labor groups represented by the IAM were unnecessary or were

2    disproportionate to the savings being asked from any of the

3    other different labor groups -- at least any of the other

4    unionized labor groups.

5            There has been an argument made that the group

6    consisting of -- well, call it the management employees, but

7    it includes also just general headquarters people -- and the

8    like were being asked to take a smaller wage cut than the IAM

9    employees were being asked to take.

10           But in terms of the total amount of the dollar

11   concessions being sought, there was no evidence that those

12   were not, in fact, necessary or were disproportionate, as I

13   say, to the dollar amounts being sought from the other labor

14   groups.

15           With respect to the mechanical and related, the ask

16   was on an annualized average basis over the period 2005 to

17   2009, $169 million per year from amendments to the collective

18   bargaining agreement.

19           With respect to the mechanical and related, the

20   wage cuts were, perhaps, not as dramatic being requested as

21   those of the other labor groups, but perhaps of more concern

22   to the union, more than one-half of the savings to the

23   company, some 114 of the $169 million, would come from

24   outsourcing, as well as from complete elimination of one of

25   the categories of employees, the utility men, who are the

25

1   folks who clean the airplanes between flights.

2          The company's proposal would have eliminated all

3   restrictions on the company's ability to outsource.  And

4   while there were representations as to the -- what jobs the

5   company intended still to keep in-house, the proposal did not

6   include those as guarantees.  And the evidence was that if

7   implemented, the company's proposal would result in at least

8   half of the IAM-represented employees losing their jobs.

9          The ask of the fleet service employees was $99

10  million on an annual average basis, while for the maintenance

11  training specialists it was $860,000.

12         The wage cuts for each of the groups varied rather

13  widely.  For mechanics it was only 5.6 percent at top of

14  scale.  And I might add, most of U.S. Airways employees are

15  at top of scale, based on seniority.

16         On the other hand, the stock clerks would have

17  their pay cut 21 percent.  Fleet service employees would be

18  cut 22 percent at the -- I will call the major airports, and

19  35 percent at some other airports.  Maintenance training

20  specialists' pay would be cut 18 percent.

21         So that's, essentially, the background.

22         The question before the Court is, first of all,

23  whether the debtor complied with the procedural requirements

24  under Section 1113.  Clearly, here it made a proposal to the

25  authorized representative of the employees that are covered

1  by the three collective bargaining agreements.  And the

2  evidence is that that proposal was based on the most complete

3  and reliable information available at the time.

4       Second, the question is whether it provided for

5  those necessary modifications to the employee benefits and

6  protections that are necessary to permit the reorganization

7  of the debtor.  Here, of course -- and I have read through

8  each of the term sheets involved -- one could, obviously,

9  quibble with any particular element as to whether that was

10  necessary.  But the company never took the position that each

11  line item was necessary.  The position it took from the

12  outset was that the dollars were necessary, and how those

13  dollars were achieved was open to negotiation.  The company's

14  proposal achieved the cost targets, but it was open to and

15  expressed a willingness to consider other approaches that

16  would achieve the same dollars.

17       So viewing -- not line item by line item, but

18  viewing the aggregate of the proposal, I find that the

19  proposal provided for necessary modifications that were

20  necessary to permit the reorganization of the debtor.

21       And second question is whether it assures that all

22  creditors, the debtor and all of the affected parties, are

23  treated fairly and equitably.  And I am going to come back to

24  that in a moment, because it's really tied up with the test

25  that the Court finally has to make, which is whether the IAM

27

1   refused to accept the proposal without good cause, and

2   second, whether the balance of the equities clearly favors

3   rejection of the agreement.

4        The issue with respect to whether the IAM refused

5   to accept the proposal without good cause is simply this:  Is

6   the test a subjective one or an objective one?  Because if

7   the test were purely subjective, I would be hard-pressed to

8   find that the IAM refused to accept the proposal without good

9   cause.  They were being asked, after all, essentially, to cut

10   their own throats, and in a way that was qualitatively

11   different from that of the other employees' groups, who, by

12   and large, were not losing jobs.  There was probably some job

13   loss in the other labor categories, but the dollar savings

14   were being realized more in terms of pay and benefits.

15        It is simply, in human terms, difficult to expect

16   that people will feel that there is good cause simply out of

17   concern for the larger group for one-half of them to lose

18   their jobs.  But I believe the statute here must be construed

19   as requiring that the good cause be determined on an

20   objective basis rather than a purely subjective basis.

21        And here I would have to say that the refusal of

22   the IAM to accept the proposal, not each individual line item

23   or even the amount of lay-offs, but to accept some proposal

24   or to come up with some proposal of its own that would

25   achieve the costs being sought, was not objectively

```
 1    reasonable.  The union has not shown that the amount of the
 2    ask exceeds what is necessary for the company's survival or
 3    reorganization or that it is disproportionate to the cuts
 4    that other labor groups have been asked to take or the
 5    creditors will likely suffer in this case.
 6              Now, we do not yet have a plan of reorganization.
 7    We have a transformation plan, which is the company's
 8    business plan, but that doesn't tell us how claims are going
 9    to be treated in this case.  But simply looking at the
10    company's cash position and cash balances on a going forward
11    basis and the amount of its debt, it is clear that creditors
12    are going to take a very substantial hit in this case.  And
13    equity is, obviously, not going to come out unscathed.  It
14    may not be entirely terminated, but if equity does survive,
15    it will, obviously, be heavily diluted by whatever happens in
16    this case.
17              And that really kind of leads into whether the
18    balance of the equity clearly favors rejection of the
19    agreement.  And that requires the Court to consider not just
20    the sacrifices or the hardship to the affected labor group
21    here, which are very great.  There is no question about that.
22     But at bottom, it is clear that the debtors' financial
23    situation is so precarious that even with the relief being
24    sought here, there are still grave questions as to whether
25    the company can reorganize and emerge from bankruptcy.
```

29

1    It still has to attract some additional equity in order to do

2    that.   It certainly could not emerge from bankruptcy today.

3         And so from the objective viewpoint, the question

4    simply comes down to this:  Which is worse, that half of the

5    mechanics lose their jobs, or that all of the mechanics lose

6    their jobs?  Because quite clearly, if this company is not

7    able to achieve the savings that it has sought, it is highly

8    likely that the company would have to liquidate and go out of

9    business, and that would mean that all of the mechanics would

10   lose their jobs.

11        And so in the cosmic sense, is it fair to these

12   employees who have worked hard, and I expect loyally, for the

13   company all these years, to have their agreement rejected and

14   these changes unilaterally imposed upon them by the company?

15    No, it's not.  And if life were fairer and if there were

16   money coming available from other sources, it would make this

17   unnecessary.  I would not be in a position of having to grant

18   the company's motion here.

19        But having considered all the circumstances, and

20   although it's a close case, and I have had to wrestle with

21   this quite a bit, I believe the company has met its burden of

22   showing that it has satisfied the requirements for the

23   rejection of the collective bargaining agreement.

24   Accordingly, I am going to grant the motion and allow the

25   company to reject the agreement.

1          I have been advised at the outset of this hearing

2     that there is a proposal, I assume different from anything

3     that I have exactly seen before, which has been sent out or

4     is to be sent out to the union members for a vote.  And I

5     certainly, by making this ruling, do not want to discourage

6     or foreclose the parties from continuing to negotiate in an

7     attempt to reach a consensual resolution.

8          And the reason I say that is very simple.  This

9     company -- its financial situation is not going to be

10    enhanced by labor unrest or labor strife.  And I cannot

11    decree labor peace any more than I can decree profitability.

12     That's the job of management in terms of labor peace

13    negotiation between the parties.  But I think everybody

14    understands what's at stake here.  The question is whether

15    there will be any jobs at all at the end of the day.

16          I certainly hope, even though I have granted this

17    agreement, that the parties still will be able to reach a

18    consensual resolution.

19          Let me next address the termination of the three

20    mainline defined benefit pension plans.  The company here

21    seeks termination of the mainline defined benefit plans it

22    maintains for its flight attendants, mechanics, and a group

23    known as certain employees.

24          And I should mention that the defined benefit plan

25    for mechanics covers only two of the three bargaining groups.

1     That is mechanics and related employees and the maintenance

2     training specialists.  The fleet service workers do not

3     belong to a defined benefit pension plan.  Instead, under the

4     collective bargaining agreement, the company made payments to

5     a national pension plan maintained by -- multi-employer

6     pension plan maintained by the IAM.  And the termination of

7     the contributions to that plan is covered by the rejection of

8     the collective bargaining agreement.

9          The three defined benefit plans I just mentioned

10    are subject to the Employee Retirement Income Security Act of

11    1974, commonly known as ERISA.  Among other things, ERISA

12    establishes funding standards for a defined benefit plan.  It

13    provides for an insurance program under which the Pension

14    Benefit Guaranty Corporation will administer an underfunded

15    pension plan that is terminated.

16         Termination of a pension plan by an employer is

17    governed by 29 USC Section 1341, which addresses both a

18    "standard termination" and a "distress termination."  It is

19    the latter which the debtors seek to accomplish here.

20         In order to effect a distress termination, the plan

21    administrator must give the PBGC and each affected party at

22    least 60 days' written notice of intent to terminate, setting

23    forth the proposed termination date.  Additionally, the

24    termination must not violate the terms and conditions of an

25    existing collective bargaining agreement.

32

1           For a Chapter 11 debtor, the standards for a

2   distress termination require that four conditions be met.

3   First, as of the proposed termination date, the employer has

4   filed or has had filed against it a petition for

5   reorganization under the Bankruptcy Code.  That standard has,

6   obviously, been met in this case.

7           Second, the case has not, as of the proposed

8   termination date, been dismissed.  That standard, too, has

9   been met.

10           Third, the employer has provided the PBGC any

11   request for bankruptcy court approval of the termination.

12   That standard has been met.

13           And the fourth is if the bankruptcy court

14   determines that unless the plan is terminated, the employer

15   will be unable to pay all its debts pursuant to a plan of

16   reorganization and will be unable to continue in business

17   outside the Chapter 11 reorganization process.

18           Basically, the statute requires the debtor to make

19   a showing that it will be unable to pay all of its debts

20   under a plan of reorganization and will be unable to continue

21   in business outside of bankruptcy.

22           The purpose of this portion of the statute is to

23   limit the cases of severe business hardship, the ability of

24   plan sponsors to terminate their pension plans, and thereby

25   shift liability for guaranteed benefits onto other insurance

33

1    premium payers in the PBGC program.

2            The reference in the statute to a plan of

3    reorganization does not permit a distress termination simply

4    because a particular plan requires it.  Rather, the test is

5    whether the debtor can obtain confirmation of any plan of

6    reorganization without termination of the retirement plan.

7            The burden of proof for a distress termination is

8    on the sponsor of the plan.  The PBGC here has not consented

9    to termination -- a distress termination of a plan, but it

10   has also not opposed it and has not presented any evidence to

11   rebut the evidentiary showing made by the debtor here.

12           The evidence shows that over the period from year

13   2005 to 2009, the payments into the pension plan for flight

14   attendants' minimum funding contributions would be $299.3

15   million.  For the company-sponsored plan for the IAM-

16   represented employees, it would be $413.2 million, and for

17   the so-called certain employees' plan it would be $274.5

18   million.

19           Now, the certain employees' plan differs from the

20   other two in that it was frozen many years ago.  And for the

21   next two years, that is -- actually, the year that just

22   started right now, year 2005, and 2006, there are no minimum

23   funding contributions required into that plan.

24           However, starting in the year 2007, and 2008, there

25   are contributions required.  Almost half of the minimum

1  funding contributions for the three plans in question fall

2  within the year 2007 to 2008.

3         The testimony was presented that -- expert

4  testimony by the actuary for the plans that even if the

5  flight attendant and mechanic plans were frozen, as the

6  certain employees' plans are now frozen, there would still be

7  over that same period minimum funding contributions required

8  of some $888 million.  So the freezing of plans would only

9  save approximately $100 million.

10        The testimony further showed that in terms of the

11  company's projected cash balances on a going forward basis,

12  that assuming the company obtained all the other relief that

13  it requested in this motion, that without termination of the

14  defined benefit pension plans, its cash balances would be, at

15  the end of the year, $470 million in year 2005, $361 million

16  in the year 2006, a minus $53 million in the year 2007, a

17  minus $234 million in the year 2008, and a minus $285 million

18  in the year 2009.

19        On the other hand, if the plans were terminated,

20  the cash balances would be far more healthy:  $712 million in

21  the year 2005, $735 million in the year 2006, $639 million in

22  the year 2007, $657 million in the year 2008, and $738

23  million in the year 2009.

24        Although there is no plan of reorganization before

25  the Court this time, as there was in the first Chapter 11

1   case when the Court considered the termination of a pilot's

2   pension plan, there is at least the outline of a business

3   plan, which is -- admittedly, a work in progress, not a final

4   one -- but would, obviously, have to be the basis upon which

5   any reorganization plan was based.

6       And simply looking at the dollars, it is perfectly

7   apparent that the debtor could not propose any viable plan of

8   reorganization without eliminating what can only be fairly

9   described as this financial albatross, the $978 million in

10  minimum funding contributions that would come due during the

11  year 2005 and 2009.

12      A situation in which the debtor not only did not

13  have cash at the end of the year, but was running cash

14  deficits -- huge cash deficits -- simply could not support

15  any conceivable plan of reorganization, nor could the company

16  even conceivably operate -- continue to operate outside of

17  the protection of Chapter 11 if it had to shoulder these

18  minimum funding contributions.

19      Accordingly, I find that the company has met the

20  test for a distress termination of the pension plan, and I

21  will grant the company's motion to approve the termination of

22  the three pension plans.

23      Obviously, with respect to the IAM, the ruling is

24  tied in with the ruling allowing rejection of the collective

25  bargaining agreement, because the collective bargaining

36

1    agreement requires that, and the debtor could not otherwise

2    satisfy the requirement that termination not violate the

3    terms of a collective bargaining agreement.

4         I will prepare and enter orders reflecting my

5    rulings.  I am going to enter separate orders with respect to

6    the rejection and with respect to the distress termination,

7    just because I don't want an appeal on one aspect, arguably,

8    to rob the other of its finality.

9         Okay.  Are there any other matters to be taken care

10   of at this time?

11        MR. LEITCH:  No, Your Honor.  Thank you.

12        THE COURT:  Okay.  Stand adjourned.

13        (Whereupon, at 10:31 a.m., the hearing was

14   adjourned.)

15                    *  *  *  *  *

16

17

18

19

20

21

22

23

24

37

UNITED STATES BANKRUPTCY COURT

REPORTER'S CERTIFICATE

Diversified Reporting Services hereby certifies that:

(A) The foregoing pages represent an accurate and complete transcription of the proceedings before the United States Bankruptcy Court, the Honorable Stephen S. Mitchell, Judge, Presiding, in the matter of USAirways; and these pages constitute the original of the proceedings.


Diversified Reporting Services, Inc.
1101 16th Street, NW
Second Floor
Washington, D.C.   20036


BY: _____
                              Stella Christian


1