**Hearing Date and Time: May 9, 2006 at 10:00 a.m.**
**Objection Deadline: April 21, 2006 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300
Robert A. Siegel (RS 0922)
Tom A. Jerman
Rachel S. Janger
Jessica Kastin (JK 2288)

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

GROOM LAW GROUP, CHTD
1701 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 857-0620
Lonie A. Hassel

Attorneys for Delphi Corporation, et al.,
    Debtor and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                          :
            In re                                         :     Chapter 11
                                                          :
DELPHI CORPORATION, et al.,                               :     Case No. 05-44481 (RDD)
                                                          :
                              Debtors.                    :     (Jointly Administered)
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

DECLARATION OF KEVIN M. BUTLER
IN SUPPORT OF DELPHI'S MOTION FOR AUTHORITY TO REJECT
COLLECTIVE BARGAINING AGREEMENTS UNDER 11 U.S.C. § 1113(c) AND
MODIFY RETIREE WELFARE BENEFITS UNDER 11 U.S.C. § 1114(g)

I, Kevin M. Butler, declare and state as follows:

1.        I am the Vice President, Human Resource Management, of Delphi Corporation

("Delphi"), and am responsible for oversight of Delphi's worldwide human resources.  I am also

a member of the Delphi Strategy Board, Delphi's top policy-making group, and I am the

executive champion for Delphi's Personnel Task Team.  I began my career in the automotive

industry thirty years ago, in the Chevrolet Motor Division of General Motors Corporation

("GM").  I held a series of positions with GM, including production supervisor, plant personnel

manager, senior health-care administrator, senior administrator of classified-employee

compensation, and manager of executive compensation.  In 1989, I was named the director of

human resources for GM's former Hydramatic Division operations in Ypsilanti, Michigan.  In

1991, I became the director of GM Health Care Plans, and in February 1995 I was promoted to

general director of GM's Health Care Initiatives.  I started working for what is now known as

Delphi in 1997, when I became the general director of human resources for Delphi Delco

Electronics Systems.  I have held my current position as Delphi's Vice President, Human

Resource Management, since January 2000.

2.        In my current position with Delphi, I am responsible for oversight of Delphi's

human resources worldwide.  In that capacity, I oversee Delphi's relations and collective

bargaining with each of the Unions representing Delphi's hourly employees.

3.        I submit this declaration in support of Delphi's Motion For Authority to Reject

Collective Bargaining Agreements Under 11 U.S.C. § 1113(c) And Modify Retiree Welfare

Benefits Under 11 U.S.C. § 1114(g) (the "Motion").  Any capitalized terms not expressly defined

2

**Declaration of Kevin M. Butler**

herein are intended to have the meanings ascribed to them in the Motion or accompanying memorandum of law, and references to Delphi herein include the Debtors, as appropriate. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, my opinion, my experience with and knowledge of Delphi's labor relations, or are based upon knowledge obtained from Delphi employees reporting to me in the course of their duties. If I were called upon to testify, I could and would testify to the facts set forth herein.

I.      The Pattern Of Representation And Collective Bargaining At Delphi

        A.      Delphi's Collective Bargaining Agreements

        4.      Delphi has national agreements with the UAW, IUE-CWA, and USW that set the principal economic terms and conditions of employment for Delphi employees in the facilities comprising the national collective bargaining units represented by those unions (the "National Agreements"), and 33 local agreements, governing primarily local issues, with local unions affiliated with the UAW, IUE-CWA, and USW (the "Local Agreements"). Delphi also has five local agreements with the IAM, the IBEW, and IUOE, which collectively represent approximately 124 maintenance employees at five facilities (the "IAM, IBEW, and IUOE Local Agreements").

        5.      Delphi also has sites that have no union representation or have union agreements that are not at issue in this Motion because the cost structure and operation provisions are not an impediment to Delphi's competitive position. These sites are Irvine, California; Mountain View, California; North Kansas City, Missouri; Orion Township, Michigan; Landrum, South Carolina; Spring Hill, Tennessee; and Tulsa, Oklahoma.

3

**Declaration of Kevin M. Butler**

6.     The National Agreements consist of a basic agreement; a series of separately printed and bound supplements that generally address different benefit programs (e.g., pension, supplemental unemployment benefits, and health care); and a number of side-letters, memoranda of understanding, memoranda of agreement, appendices, documents, letters, or minutes, published and unpublished, which supplement (and sometimes modify) the printed agreements and supplements.  All of the National Agreements explicitly provide that they supersede any contrary provision of the Local Agreements, absent agreement of the national parties.

7.     A list of the National and Local Agreements that Delphi seeks to reject in the Motion is attached hereto as Exhibit A.   Excerpts of the UAW, IUE-CWA, and USW National Agreements and the IAM, IBEW, and IUOE Local Agreements are attached as exhibits to the Declarations of Darrell Kidd and Bernard J. Quick filed in support of the Motion.  Copies of the collective bargaining agreements will be made available to parties-in-interest upon request.

B.     Delphi's Practice Of Pattern Bargaining

8.     Delphi and the Unions have adhered to a practice of "pattern bargaining" that began in the auto manufacturing industry many decades ago.  Under this practice, the UAW selects one of the Big Three and negotiates a labor agreement.  The UAW then negotiates agreements with the remaining two of the Big Three auto manufacturers, seeking to obtain the same "pattern" labor agreement.  In the most recent round of national bargaining in 2003, the UAW also sought the same "pattern" agreement with the larger auto suppliers in the industry. The U.S. automakers, including Delphi, have also followed a practice of pattern bargaining with other unions once the UAW agreement has been negotiated: once the automaker finalizes a

4

**Declaration of Kevin M. Butler**

National Agreement with the UAW, it then negotiates similar agreements with any other unions representing its employees.

9.      At Delphi, this practice has resulted in Delphi negotiating an agreement first with the UAW, then with the IUE-CWA and the USW, and then with the IAM, the IBEW, and the IUOE, all of which historically demand and obtain the basic pattern terms set by the UAW, with variations based on each union's specific circumstances.  Concurrent with these national negotiations, local Delphi management negotiates any "local issues" with the designated local Unions affiliated with the UAW, IUE-CWA, and USW.  The result of this process is that the UAW, IUE-CWA, and USW National Agreements are very similar but the terms of the Local Agreements can vary substantially.

II.      <u>Delphi's Employees</u>

10.      The employment figures in this Declaration are based on Delphi's employee census data as of October 31, 2005.  These figures include all employees who were active or on temporary layoff, indefinite layoff, or long-term leaves of absence as of that date.

11.      Delphi has approximately 47,400 employees in the United States, of whom approximately 33,100 are production and skilled employees represented by the Unions at Delphi's manufacturing sites.  Of these employees, 23,317 are represented by the UAW, 8,514 are represented by the IUE-CWA, 889 are represented by the USW, and 124 are represented by the IAM, IBEW, and IUOE.   Delphi also has approximately 14,300 salaried and management employees, including engineers engaged in designing and manufacturing Delphi's products, management employees at Delphi's U.S. manufacturing sites, and employees who perform Delphi's sales, general, and administration functions.

5

**Declaration of Kevin M. Butler**

12.    Delphi is organized into three business sectors: the Electrical, Electronics, and Safety ("ES&S") sector, the Dynamics, Propulsion, Thermal and Interior ("DPT&I") sector, and the Automotive Holdings Group ("AHG") sector.  The following chart shows the number of hourly employees in each sector as of October 31, 2005:

| Sector | Hourly Headcount |
|---|---|
| Electrical, Electronics, and Safety | 8,227 |
| Dynamics, Propulsion, Thermal and Interior | 13,489 |
| Automotive Holdings Group | 11,376 |

13.    The following chart shows the number of hourly employees at each of Delphi's active manufacturing sites at issue in the Motion as of October 31, 2005, and the union or unions that represent those employees.  While not listed below, there are several idled manufacturing facilities that are also subject to this Motion because they employ individuals who are either on leave or in a JOBS Bank.

| Manufacturing Site | October 31, 2005 Hourly Headcount | Union Representation |
|---|---|---|
| Adrian, Michigan | 374 | UAW |
| Anderson, Indiana | 788 | UAW |
| Athens, Alabama | 2,019 | UAW |
| Brookhaven, Mississippi | 501 | IUE-CWA |
| Clinton, Mississippi | 891 | IUE-CWA |
| Columbus, Ohio | 739 | UAW, IUOE |
| Coopersville, Michigan | 565 | UAW |
| Cottondale, Alabama (including Tuscaloosa) | 226 | UAW |
| Fitzgerald, Georgia | 365 | UAW |
| Flint, Michigan (Flint East & Flint West) | 2,784 | UAW |
| Gadsden, Alabama | 203 | IUE-CWA |
| Grand Rapids, Michigan | 523 | UAW |

6

**Declaration of Kevin M. Butler**

| Home Avenue (Dayton), Ohio | 636 | USW |
|---|---|---|
| Kettering, Ohio | 1,422 | IUE-CWA |
| Kokomo, Indiana | 2,294 | UAW |
| Laurel, Mississippi | 72 | UAW |
| Lockport, New York | 2,953 | UAW |
| Milwaukee, Wisconsin (E&C Division) | 479 | UAW, IBEW |
| Milwaukee, Wisconsin (E&S Division) | 705 | UAW, IBEW, IAM |
| Moraine, Ohio | 1,257 | IUE-CWA |
| New Brunswick, New Jersey | 389 | IUE-CWA |
| Needmore (Dayton), Ohio | 1,408 | UAW |
| Rochester, New York | 1,436 | UAW |
| Saginaw, Michigan (E&C Division) | 971 | UAW |
| Saginaw, Michigan (Steering Division) | 3,675 | UAW |
| Sandusky, Ohio | 897 | UAW |
| Vandalia, Ohio | 255 | USW |
| Warren, Ohio | 3,836 | IUE-CWA |
| Wichita Falls, Texas | 193 | UAW |

III.    The Relevant Labor Agreements Arising Out Of Delphi's Spin-Off By GM

14.    Delphi inherited its existing collective bargaining agreements at the time of its spin-off by GM in 1999 (the "Spin-Off").  In this section of my Declaration, I will describe some of the principal agreements executed by GM and Delphi in connection with the Spin-Off.

A.    The Mirror Agreement

15.    Following its formal separation from GM on January 1, 1999, Delphi agreed to honor the collective bargaining agreements negotiated by GM in the first two rounds of national negotiations following the Spin-Off – the 1999 negotiations and the 2003 negotiations – effectively binding Delphi to the GM-UAW labor agreements through 2007 (the "Mirror Agreement").  At the time, my current position was held by Mark R. Weber, and the circumstances and details of these agreements are set forth in the Declaration of Mark R. Weber filed in support of the Motion.  Copies of the Mirror Agreements are attached thereto as Exhibit B.

7

**Declaration of Kevin M. Butler**

B.    The Flow-Back Agreement

16.    During the same time period, GM, Delphi, and the UAW agreed to various

provisions designed to allow virtually all of the former GM employees working at Delphi to

return to GM as openings became available (the "Flow-Back Agreement").  This agreement is set

forth at pages 663-69 of the UAW National Agreement, a copy of which is attached hereto as

Exhibit B.

17.    To incentivize these "flow-backs," GM and Delphi further agreed in 1999 to

provide a $23,500 relocation allowance to Delphi employees who returned to a GM plant that

was outside of the "area hire," generally considered to be more than 50 miles from the Delphi

manufacturing site.  In the 2003 UAW-GM negotiations, the relocation allowance was increased

to its current level of $25,000.  In some specific cases involving plants with large numbers of

excess employees and/or in unique circumstances, Delphi has also provided employees with

additional cash incentives.

18.    Delphi was obligated to reimburse GM for the cost to GM of Other Post-

Employment Benefits ("OPEB") – that is, retiree health care and retiree life insurance – for

employees who flowed back to GM.   The level of reimbursement is a proportion of the total cost

based on the employee's service with Delphi prior to flowing back to GM, and the date that the

employee is actuarially predicted to retire from GM.

19.    Between September 1999 and September 2003, approximately 4,500 Delphi

employees flowed back to GM.  During negotiations over the 2003-2007 agreement, GM made a

"good faith effort" commitment to make 2,500 flow-back offers of employment to Delphi

8

**Declaration of Kevin M. Butler**

employees by the end of 2004.  Between the 2003 agreement and the end of 2005 – a year longer

than GM anticipated – 2,465 Delphi employees flowed back to GM.

20.    One of the purposes of encouraging employees to flow-back to GM was that

Delphi hoped it would eventually be able to backfill positions with new-hire employees at lower

wage and benefit rates under the supplemental agreements discussed further below.

C.    <u>The No-Sale Provisions Of "Document 13"</u>

21.    One of Delphi's business objectives at the time of the Spin-Off was to "fix, sell or

close" a number of unprofitable or non-core operations that were transferred by GM to Delphi.

At the time, the GM-UAW agreement contained a Plant Closing Moratorium Agreement, known

generally as Document 13, that prohibited closure of facilities without union consent but did not

prohibit the sale of a facility as a going concern.

22.    In the 1999 negotiations between GM and the UAW, the UAW sought to amend

Document 13 to prohibit GM from selling, spinning off, consolidating, or otherwise divesting

existing operations "constituting a bargaining unit."  As a result of Delphi's agreement to honor

the 1999 UAW-GM agreement, Delphi became bound by Document 13.  Pursuant to Delphi's

practice of pattern bargaining, similar provisions also became part of the IUE-CWA and USW

National Agreements, thus prohibiting Delphi from selling the operations that it hoped at the

time of the Spin-Off to divest.

23.    Delphi agreed in April 2004, during negotiations over a supplemental new-hire

agreement, to extend until 2011 the prohibitions under Document 13 for UAW-represented sites.

A true and correct copy of Document 13, as amended in the 1999 negotiations and extended in

9

**Declaration of Kevin M. Butler**

the 2003 negotiations, is attached hereto as Exhibit C.  Under the IUE-CWA and USW National

Agreements, similar provisions will expire in September 2007.

24.    Although a handful of Delphi operations have been consolidated or gradually

wound down without union objection since 1999, as a result of Document 13 and similar

provisions Delphi has largely been unable to sell or close its unprofitable or non-core operations

or eliminate its excess capacity as its GM volumes have fallen.  And, when certain operations

were consolidated or wound down, Delphi incurred high costs for the affected employees, who

were either carried in a JOBS Bank or incentivized to retire early.

25.    The restrictions imposed on Delphi's ability to sell or close its non-competitive

operations have left Delphi with a product portfolio that differs from Delphi's strategic vision.

Moreover, a number of Delphi's product lines have become subject to such intense foreign, low-

cost competition, that Delphi could not make a profit in these areas even if labor costs were

reduced to competitive U.S. wages and benefits.

D.    The GM Benefit Guarantee

26.    In response to the UAW, IUE-CWA, and USW's concern about the security of

layoff and retirement benefits at the time of the Spin-Off, GM and the unions entered into certain

benefit guarantees (collectively, the "GM Benefit Guarantee") described below.  The relevant

portions of the GM Benefit Guarantee remain in effect through October 2007 and are attached to

the Declaration of Mark R. Weber as Exhibit C.

27.    Under the GM Benefit Guarantee, if Delphi ceases to do business, terminates, or

freezes its pension plan due to "financial distress," GM agreed to provide virtually all of Delphi's

former GM hourly employees with the difference between pension benefits paid by Delphi

10

(including benefits paid by its subsidiaries, affiliates, or successors, or the Pension Benefit

Guaranty Corporation ("PBGC") in the event of plan termination), and the benefits otherwise

payable under the Delphi pension plan (but not more than the benefits provided by GM to its

own hourly employees and retirees).  Pursuant to Section b of the GM Benefit Guarantee, GM

also agreed to provide Delphi's former GM employees with "up to 7 years of credited [pension]

service at the level and scope in effect at Delphi at such time."

28.    Sections c and d of the GM Benefit Guarantee provide that if, as a result of

"financial distress," Delphi fails or refuses to provide post-retirement health care or life insurance

to retired Delphi employees, or reduces such benefits below the level being provided to GM's

hourly retirees, GM will provide the covered employees with the same scope and level of post-

retirement medical or life insurance benefits provided by GM to its own retirees.

29.    On November 9, 2005, GM announced in its Form 10-Q that it "believes some

losses under the [benefit] guarantees are probable," but reported that it was "not possible to

reasonably estimate the financial impact that the Corporation may eventually sustain, if any, due

to the benefit guarantees."  Subsequently, in a March 28, 2006 Form 10-K, GM estimated its pre-

tax liability at $5.5 billion to $12 billion.  GM also indicated in a January 26, 2006 Form 8-K that

it had reached an agreement with the UAW as to the scope and details of coverage under the

Benefit Guarantee, and that GM agreed that former GM employees who became Delphi

employees have the potential to earn up to seven years of credited service for purposes of

eligibility for certain health-care benefits under the GM Benefit Guarantee.

11

**Declaration of Kevin M. Butler**

E.    Supplemental New-Hire Agreements

30.    While Delphi was obligated under the Mirror Agreement to honor the collective

bargaining agreement arising out of the 2003 negotiations between GM and the UAW, the UAW

committed in 1999 to consider exceptions if required by Delphi's financial condition.  In light of

its deteriorating financial condition, Delphi informed the UAW during 2003 negotiations that it

could not honor the Mirror Agreement without relief in the form of commercial support from

GM, increased flow-back of higher-cost traditional employees to GM, and, in addition, lower

wages and benefit levels, at least for new-hire employees.

31.    At the time of the Spin-Off, Delphi had agreements in place with both the IUE-

CWA and the USW that already provided for starting wages and benefits for certain new-hire

employees below those under the basic IUE-CWA and USW agreements.  These new-hire

agreements are discussed in greater detail in the Declaration of Bernard J. Quick.

32.    The IUE-CWA agreements, however, provided that some of the newly-hired

employees would transition to the high-cost wages and benefits of traditional employees over a

period of time.  In the 2003 negotiations, Delphi sought to extend the IUE-CWA and USW

competitive hire agreements, but eliminate the "grow-in," or transition, feature, and to negotiate a

similar agreement with the UAW.

33.    Delphi was partially successful in these efforts.  As part of the 2003 agreement,

the UAW committed to negotiate a supplemental agreement that would provide for a reduced

wage and benefit structure for new-hire employees, and the parties ultimately reached such an

agreement in April 2004.  That agreement, with a starting wage of $14 per hour and a top wage

of $18.50 per hour depending on position, was substantially below Delphi's traditional wage and

12

**Declaration of Kevin M. Butler**

benefit rates but was above a truly competitive wage and benefit structure. The terms of this

agreement are discussed in greater detail in the Declarations of Darrell Kidd and Steven Gebbia.

34.    Delphi was able to extend the IUE-CWA and USW competitive hire agreements,

which had starting wages as low as $7.77 per hour, and was largely able to eliminate the "grow-

in" provisions for future new-hires. Employees hired before 2003, however, continue to

transition into the traditional wage and benefit structure. The terms of these new-hire

agreements are discussed in greater detail in the Declarations of Bernard J. Quick and Steven

Gebbia.

35.    Currently, out of an hourly workforce of approximately 33,100, Delphi has

approximately 579 employees working under the UAW supplemental agreement, 1,910

employees working under the IUE-CWA supplemental agreements, and 496 employees working

under the USW supplemental agreements who have not transitioned to the traditional, high cost

wage and benefit levels or been laid off.

F.    The Increase In Delphi's Labor Costs Under The 1999 And 2003 GM Agreements

36.    The term "traditional" employee, as used in the Motion, means those UAW-

represented employees hired by GM or Delphi before April 2004, and those IUE-CWA and

USW-represented employees who were not hired under one of the competitive operating

agreements or who have since progressed to the higher wage and benefit provisions. The term

excludes UAW-represented employees hired since April 2004, IUE-CWA and USW-represented

employees hired before September 2003 who have not progressed to the higher wages, and all

IUE-CWA and USW-represented employees hired since September 2003.

13

**Declaration of Kevin M. Butler**

37.     Although Delphi was aware in 1999 that the Mirror Agreement concept limited its ability to reduce its labor costs, it could not have foreseen the full effect of that agreement six years later.  In 1999, the average hourly wage for Delphi traditional employees under the GM-UAW agreements, including both production and skilled trades, was approximately $20.96 plus a cost of living adjustment of 69 cents per hour, for a total of $21.65 per hour.  The blended "all-in" labor cost in 1999 for a Delphi traditional employee under the GM-UAW agreements – that is, the cost of base wages, overtime, premiums, vacation, holidays, wage-related costs such as social security, health care, pension, OPEB, and other benefits – was approximately $43.47 per hour.

38.     Six years later, however, as the result of cost of living adjustments and base wage increases negotiated in 1999 and 2003, the comparable average blended base hourly rate for a traditional employee under the Delphi agreements, including both production and skilled trades, had risen to approximately $26.90 per hour. With an average cost of living adjustment in 2005 of 93 cents per hour, the total hourly wage increase was nearly 29 percent in six years.  By year end 2005, the cost of living adjustment had risen to $1.61.  The all-in labor cost for a traditional Delphi employee, including benefits, fixed costs, and retirement obligations, increased from approximately $43.47 per hour to approximately $78.63 per hour – an 81 percent increase in just six years.

39.     Delphi's cost of benefits for its traditional employees has undergone similar increases.  Those increases are outlined in the Declaration of Steven Gebbia.

40.     In addition to the increased costs for traditional employees, GM's loss of market share since the Spin-Off has limited the opportunities for Delphi to transition to a lower-paid

14

**Declaration of Kevin M. Butler**

workforce.  First, as GM's loss of market share forced GM to reduce the size of its own

workforce, there were fewer opportunities for Delphi employees to flow back to GM.  Second,

the loss of GM volume left Delphi overstaffed as well.  At the time of the Spin-Off, Delphi

employed approximately 63,000 hourly employees.  By 2005, Delphi's operations required less

than half that number.  Because GM was unable to accommodate all of the excess Delphi

employees, and because the GM labor agreements prohibited Delphi from permanently laying

off excess employees, Delphi was forced to implement a series of expensive retirement incentive

programs between 1999 and 2004 to reduce its headcount.  Even with these efforts, at times

during 2005 there were nearly 4,000 employees on temporary layoff or in the JOBS Bank.

IV.   Delphi's Hourly Attrition Programs

41.     On March 22, 2006, Delphi filed with the Court a Human Capital Hourly Attrition

Plan Motion, seeking approval and authorization to implement a tripartite agreement among

Delphi, GM, and the UAW that creates retirement incentives and flow back opportunities for

UAW-represented Delphi employees (the "UAW Special Attrition Program").  The motion also

seeks approval to allow Delphi to enter into similar programs (collectively, the "Hourly Attrition

Programs") with the other unions.  That motion is currently scheduled for hearing on April 7,

2006.

42.     The Hourly Attrition Programs would provide the following three options to

eligible employees:

> a.   Early Voluntary Retirements:  Eligible employees agreeing to normal or voluntary
> retirement would be entitled to a one-time, lump-sum incentive payment in the
> amount of $35,000.  This incentive payment would be made by GM and would be
> retroactive to cover eligible employees who have retired since October 1, 2005.

15

**Declaration of Kevin M. Butler**

    b.   <u>50 & 10 Retirements:</u>  Eligible employees at age 50 and with ten years of credited service would be eligible for mutually satisfactory retirement under the terms of the HRP.

    c.   <u>Pre-Retirement Placements:</u>  Eligible employees with at least 27 and fewer than 30 years of seniority (regardless of age) no later than July 1, 2006, who agree to retire when first eligible under the normal/voluntary "30 and out" provisions of the HRP and forego any additional incentives, would be eligible to elect a pre-retirement program that would provide reduced wages on par with retirement earnings during the period of grow-in to retirement.  The costs of the pre-retirement program would be borne by Delphi.

43.    Under the Hourly Attrition Programs, employees eligible to retire under the HRP, and who elect any of the above programs, would be eligible to choose whether to retire as employees of Delphi or to flow back to GM for purposes of retirement.  Moreover, GM would commit to allowing an additional 5,000 Delphi UAW employees to flow back to GM, with a target date of September 1, 2007 for reaching that level.  GM, Delphi and the UAW also committed to implement a mutually acceptable resolution to the matter of remaining Delphi employees who wish to leave Delphi (including those who want to flowback to GM).  Upon an employee's flow back to GM, GM would become obligated for all OPEB obligations owing to such employee.

44.    Delphi believes that the UAW Special Attrition Program could provide approximately 18,000 of Delphi's 23,000 existing UAW-represented long-term hourly employees – 13,000 receiving early retirement incentives, and 5,000 or more flowing back to GM – with "soft landings."   If extended to other unions, the Hourly Attrition Programs could provide approximately 4,500 additional hourly employees with retirement incentives.

45.    The soft landings will allow these employees to avoid much of the economic hardship that they might otherwise face as a result of Delphi's financial situation.  Delphi also

16

**Declaration of Kevin M. Butler**

hopes that the Hourly Attrition Programs' soft landings will allow Delphi and its Unions to achieve a consensual resolution of Delphi's remaining labor issues discussed in the Motion. Even failing consensual resolution, if this Court approves the Motion and Delphi proceeds with rejection of its labor agreements, assuming comparable GM financial support for programs covering the other unions, the Hourly Attrition Programs will prevent most of Delphi's long-term employees from feeling the full weight of the necessary modifications to Delphi's labor agreements.

V.    Delphi's Proposals Pursuant To Sections 1113 And 1114

46.    On October 13, 2005, pursuant to a motion by Delphi, the Court issued an order requiring that the Unions notify Delphi if they did not wish to represent their respective retirees for purposes of negotiations pursuant to Section 1114 of the Bankruptcy Code.  Delphi received no such notification.  Accordingly, pursuant to the Court's order, the Unions became the "authorized representatives" of their respective retirees pursuant to Section 1114.  Accordingly, Delphi has proposed modifications to the Unions under both Section 1113 and Section 1114.

47.    Since October 2005, Delphi has attempted, without success, to negotiate with the Unions modifications to their collective bargaining agreements and retiree benefits that are necessary for Delphi successfully to restructure.  In these negotiations, Delphi has offered the Unions two alternative paths to reach the necessary labor cost reductions.  The first option, which was outlined in the Section 1113 and 1114 proposals served by Delphi in October and November 2005, would immediately implement the wage rates, benefits, and other terms needed to create the competitive labor cost structure that Delphi needs to survive.  The Unions have flatly rejected this approach, however, refusing even to discuss the October proposals or the

17

**Declaration of Kevin M. Butler**

November proposals (the "Competitive Benchmark Proposals") or provide any counter-

proposals. The third set of proposals, which were formalized by Delphi and provided to the

Unions on March 24 and 25, 2006 (the "GM Consensual Proposals"), would provide a gradual

reduction in wages for existing Delphi employees, and create monetary incentives for employees

who elect to leave Delphi, contingent upon GM's commitment to pay the incremental cost

created by these terms.

       A.    <u>The October 2005 Proposals</u>

     48.    Delphi met with representatives of the UAW, IUE-CWA, and USW, and provided

them with its initial proposals pursuant to Sections 1113 and 1114, on October 20 and 21, 2005.

On the same dates, Delphi served the IAM, IBEW, and IUOE, and all of the Local Unions with

similar proposals. True and correct copies of the October proposals are attached hereto as

Exhibit D.

     49.    The October proposals were accompanied by my cover letter explaining the

proposals, the financial assumptions underlying the proposals, and the need for the modifications

to the collective bargaining agreements, as well as relevant information necessary to evaluate the

proposals. True and correct copies of the cover letters to the October Proposals are attached

hereto as Exhibit E.

     50.    Delphi's October proposals were aimed at (a) creating an hourly labor cost that

would allow Delphi successfully to bid for new work, (b) removing restrictions in its labor

agreements that would impede Delphi's ability to restructure, and (c) eliminating or reducing

Delphi's legacy labor costs. In my cover letter, I explained these purposes. I also informed the

Unions that unlike the parties' prepetition discussions, Delphi's October Proposals assumed that

18

**Declaration of Kevin M. Butler**

Delphi would not receive any financial support from GM to implement a restructuring of its labor costs, and that if GM were able to provide such support Delphi would modify its proposals accordingly.  Delphi made this assumption because it had attempted to obtain GM's commitment to provide such support prior to filing the bankruptcy petition, but had been unsuccessful.

51.    In my cover letters, and in meetings conducted to explain the proposals, I asked the Unions to engage in immediate discussions regarding the proposal, and stated that Delphi was "open to considering all workable options and alternatives that will still provide the Corporation with the durable savings and competitive structure needed to exit Chapter 11 successfully."  None of the Unions accepted my request to engage in discussions, nor did any of the Unions suggest any other options or alternatives to Delphi's proposals.  Rather, the Unions – in particular, the UAW – publicly rejected the proposal.

B.    The November 2005 "Competitive Benchmark" Proposals

52.    Between November 15 and 17, 2005, Delphi served all of its Unions with new proposals that superseded the October proposals.  These are called the "Competitive Benchmark Proposals" because they represented the best terms that Delphi could offer the Unions without financial support from GM.  In these proposals, Delphi (a) increased its base wage proposal to achieve an average base wage of $12.50 per hour for production employees (compared to the $10.00 proposed in October) and a base wage of $21.50 for skilled trades (compared to the $19.00 previously in October) and (b) increased the benefits and reduced employee contributions under its proposed health care plan.  True and correct copies of the Competitive Benchmark Proposals are attached hereto as Exhibit F.

19

**Declaration of Kevin M. Butler**

53.     In a cover letter accompanying the Competitive Benchmark Proposals, I
explained that Delphi modified its October proposals based on its ability to treat certain of its
legacy pension, OPEB, and workers' compensation costs – costs that arose or accrued prepetition
and attributable to former employees – as prepetition liabilities that would be dealt with in the
bankruptcy process.  This change, Delphi believed, would allow it not only to increase its wage
and benefit proposals, but to bid more competitively for future U.S. work.  In my cover letter, I
also informed the Unions that Delphi was prepared to discuss these issues at the Unions' earliest
availability.  True and correct copies of my cover letters to the Competitive Benchmark
Proposals are attached hereto as Exhibit G.

54.     As with the October proposals, in a series of public statements, the Unions
categorically rejected Delphi's Competitive Benchmark Proposal.  The UAW stated that it would
not respond to Delphi's proposal, and that a strike would be likely if Delphi sought to implement
those proposed modifications.  While the IUE-CWA informed Delphi that the IUE-CWA
intended to provide Delphi with a counteroffer, Delphi has not received any such offer.  None of
the Unions came to the bargaining table, nor did any of them provide Delphi with counter-
proposals or proposed strategies to deal with Delphi's financial problems.

55.     On December 19, 2005, after GM agreed to provide Delphi with interim financial
pricing support, Delphi conditionally withdrew the Competitive Benchmark Proposals in an
effort to facilitate discussions with GM and the UAW regarding a consensual resolution to
Delphi's request for contract modifications that would include GM financial support.  In doing
so, Delphi made it clear that if the parties were unable to reach an agreement involving GM,
Delphi would have to reinstate the Competitive Benchmark Proposals.  Delphi provided updated

20

**Declaration of Kevin M. Butler**

Steady State Scenario information to all advisors on January 13, 2006.  The information was

released to the UAW on February 1, 2006 and made available in the Virtual Data Room on

February 5, 2006.

C.    The GM Consensual Proposals

56.    Between December 2005 and March 2006, Delphi met with the UAW and GM to

discuss a potential consensual resolution and contract modifications and GM financial support

that would allow Delphi successfully to restructure.  To facilitate an open exchange of views, the

parties agreed that the substance and nature of the discussions would be exploratory.

57.    As a result of these discussions, on March 22, 2006, the parties reached agreement

on the UAW Special Attrition Program discussed above.  Delphi has since asked the Court for

approval to implement this agreement.

58.    While the UAW Special Attrition Program was a significant step toward

restructuring Delphi's unsustainable labor costs, and may facilitate a consensual resolution, the

parties have been unable to reach agreement on necessary modifications to Delphi's collective

bargaining agreements, with or without GM financial support.  Accordingly, on March 24-25,

2006, Delphi served the Unions with new proposals, the GM Consensual Proposals, pursuant to

Sections 1113 and 1114.  True and correct copies of the GM Consensual Proposals are attached

hereto as Exhibit H.  The cover letters to these proposals are attached hereto as Exhibit I.

59.    The GM Consensual Proposals are based upon the Competitive Benchmark

Proposals which the Unions have had since November 2005.  Most of the modifications set forth

in the GM Consensual Proposals are necessary whether or not Delphi obtains a commitment of

GM financial support.  In several critical areas, however, Delphi's proposals set forth alternative

21

terms that depend on whether Delphi obtains GM financial support sufficient to fund the

incremental cost to Delphi compared to the Competitive Benchmark Proposals.  The contingent

terms include wages for current employees, monetary buy outs for current employees who elect

to leave Delphi, monetary buy downs for current employees who elect to stay with Delphi under

a lower wage and benefit structure, and certain retirement benefits for employees who are not

protected under the GM Benefit Guarantee.

60.     The GM Consensual Proposals also modify the terms of the Competitive

Benchmark Proposal in certain minor respects, including implementation of a performance bonus

equal to 3 percent of the employee's qualified earnings in 2008 and 2009, and a May 1, 2010

expiration date rather than the January 1, 2012 expiration date previously proposed.

61.     As of March 30, 2006, none of the Unions have accepted the proposal, nor have

any provided Delphi with a counter-proposal.

D.      The Proposed Modifications To Delphi's Labor Agreements

62.     Delphi's proposals are lengthy documents that address the numerous and complex

provisions in each of the 39 collective bargaining agreements subject to the Motion.  In this

Declaration, I will address only the highlights of those proposals with regard to wages, work

rules, and job security.  The highlights of the proposed modifications to hourly employee and

retiree benefits are set forth in the Declaration of Steven Gebbia.

63.     Wage Rates.  In its GM Consensual Proposals, Delphi seeks to address a wage

structure that was imposed by Delphi's adoption of the GM labor agreements and, all-in, is at

least two times greater than Delphi's competitors.  Under its Section 1113 proposals, effective

July 3, 2006, Delphi will reduce base wages to an average of $22.00 per hour for all current

22

**Declaration of Kevin M. Butler**

traditional production employees and an average of $28.00 per hour for all current skilled

employees.  For employees in plants that Delphi does not intend to wind down by December 31,

2007, base wage rates will be further reduced to an average of $16.50 per hour for production

employees and $24.00 per hour for skilled employees, effective September 3, 2007.

64.    <u>Performance Bonus</u>.  Delphi proposes to provide eligible hourly employees with a

Performance Bonus equal to three percent of the employee's Qualified Earnings to be paid in

2008 and 2009.

65.    <u>Wage Increases And COLA</u>.  Delphi proposes to eliminate COLA payments for

all employees.

66.    <u>Buy-Downs</u>.  Delphi proposes to offer a $50,000 buy down on September 3, 2007

to those employees moving to the reduced wage scale.

67.    <u>Overtime And Shift Premiums</u>.  Delphi proposes to modify non-competitive

overtime and shift premium provisions by paying all overtime at time and one-half only,

therefore eliminating any provisions for double time pay.  Overtime would be payable only after

working 40 hours in a pay period, which 40 hours would include vacation and holidays.  In

addition, the amount and nature of overtime worked would be determined at Delphi's sole

discretion, and voluntary overtime provisions would be eliminated.  Shift premiums would be

reduced as well, to five percent of the applicable base hourly rate (as compared to as high as ten

percent under the current agreements).

68.    <u>Vacation</u>.  Delphi seeks to cap vacation at four weeks per year for the most senior

hourly employees, resulting in a reduction of two and a half days of vacation each year for the

average employee.

23

**Declaration of Kevin M. Butler**

69.    <u>Holidays</u>.  Delphi proposes reducing the number of paid holidays from a
maximum of 20 to 10 each year, a number that is comparable to the number provided to
similarly-situated employees at many of Delphi's competitors.

70.    <u>Job Security</u>.  Delphi seeks the elimination of National and Local Agreement
provisions that inhibit its ability to close, or partially or wholly sell, spin off, split off,
consolidate or otherwise dispose in any form any manufacturing site, asset, or business unit.  In
the event that Delphi sells a facility, Delphi would use its best efforts to obtain the purchaser's
agreement to hire existing Delphi employees.  However, any collective bargaining agreement
provisions that would require a purchaser of Delphi's facilities to assume the existing collective
bargaining agreements would be eliminated.

71.    <u>JOBS Bank</u>.  Delphi's Section 1113 proposals would eliminate the secured
employment levels and the JOBS Bank, giving Delphi the right to permanently lay off excess
employees.  Delphi expects that the elimination of these programs will result in a reduction of
6,057 hourly employee positions, including an estimated 4,247 employees expected to be in a
JOBS Bank or on Protected Status, and an additional 1,810 employees who would otherwise
have entered the JOBS Bank or Protected Status if things continued unchanged.

72.    <u>Staffing Requirements</u>.  Delphi proposes to eliminate all restrictions on its rights
to determine appropriate numbers of employees and to hire or lay off employees, including
indirect and temporary employees, as necessary to any operation.  Delphi also proposes to
remove restrictions on its ability to outsource and subcontract work.  By realigning its product
portfolio and limiting Delphi's headcount to those who are needed to run its operations, Delphi

24

**Declaration of Kevin M. Butler**

expects to reduce its headcount by approximately 27,000 U.S. hourly employees through

retirements, flow-backs to GM, and layoffs, by the end of 2010..

73.     Temporary Employees And Contract Service Personnel.  If the implementation of

the Hourly Attrition Programs results in an insufficient number of employees to operate a

particular site, Delphi would, with mutual consent of the union, utilize temporary employees or

contract service personnel on a case-by-case basis.  For needs not related to the implementation

of the Hourly Attrition Programs, Delphi proposes to exercise sole discretion as to utilization of

such personnel.

74.     Joint Fund Accrual And Training Costs.  Delphi proposes to modify the Joint

Fund Accrual Training Program by giving Delphi discretion to determine the level of

participation in the programs, services, and related activities formerly funded by these

provisions.  Any costs incurred would be Delphi's responsibility.

75.     Compensation Of Union Representatives.  Delphi proposes to modify the union

representation provisions of the National Agreements, and related Local Agreement provisions,

by reducing the number of union representatives to a lower ratio of representatives to employees.

Delphi also proposed a formula to reduce the amount of overtime assigned to union

representatives for the purpose of representation.

76.     Provisions Subject To GM Financial Support.  Delphi expressly noted in its

Section 1113 and Section 1114 proposals that several aspects of the proposals are contingent on

sufficient financial support from GM as described in more detail below.

25

**Declaration of Kevin M. Butler**

E.    Relevant Information Provided To The Unions

77.    Each of Delphi's proposals were based on the most complete and reliable
information available to Delphi at that time, including Delphi's most recent revenue and cost
projections, and that information was provided to the Unions contemporaneously with the
proposals.  The specific information provided to the Unions with the October 2005 and
Competitive Benchmark Proposals is identified in my cover letters to those proposals attached as
Exhibits E and G to this Declaration.  The information provided with the GM Consensual
Proposals is set forth in letters that I sent to each of the Unions on March 28, 2006.

78.    On December 12, 2005, Delphi provided the Unions with the following:

- Information regarding the Steady State financial projections developed by Delphi in
  early December 2005;

- A summary of the changes in financial projections under the new projections/business
  plan and prior business plan/projections; and

- Delphi's updated impact of the proposed modifications based on (a) changes in
  Delphi's Competitive Benchmark Proposals and (b) changes in Delphi's Steady State
  and labor-related GM Consensual Proposal scenarios.

79.    In addition, on January 13, 2006, Delphi provided the Unions with updated
financial information, including, among other items, preliminary steady-state financial data, cash
flows, and Delphi's preliminary 2006-2010 Steady State financial projections.  The Unions that
are represented on the Creditors' Committee have also received the information presented to that
committee.

80.    Delphi's financial advisors have met several times with the UAW's financial
advisors, and with the IUE-CWA's financial advisors, to explain and clarify the information that
Delphi provided to the Unions in conjunction with Delphi's proposals.

26

**Declaration of Kevin M. Butler**

F.    Delphi's Supplier-Based Competitor Analysis

81.    In light of the financial projections discussed in the Declaration of John D.

Sheehan, Delphi does not anticipate that its Unions will contend that Delphi can survive without

modifications to its labor agreements.

82.    In constructing its wage and benefit proposals ("Competitive Benchmark") Delphi

sought to produce a wage and benefit package equivalent to the wages and benefits prevailing at

other U.S.-based automotive parts suppliers.  Such a package, Delphi believes, would allow

Delphi to bid for new work on a competitive basis while still providing Delphi's employees with

competitive wages and benefits.  To determine the "market" wage and benefit package, Delphi

conducted a detailed analysis of the following data, discussed in more detail below:

- The wages and benefits under certain existing supplemental new-hire agreements between Delphi and the IUE-CWA and USW;

- Estimates by Delphi's operating divisions of the all-in labor rates of their principal competitors;

- The all-in labor rates provided by GM under the Growth and Opportunity ("GO") process for competitors that had underbid Delphi;

- The all-in labor rates provided by Delphi's own suppliers for their own business;

- Bureau of Labor Statistics ("BLS") data showing wages for comparable jobs and for other auto suppliers;

- A study by the Center for Automotive Research showing average, all-in wage rates for union-represented and non-union suppliers;

- The anecdotal experience of Delphi's business teams regarding what Delphi's customers believed Delphi's labor costs should be in order to bid successfully; and

- Information obtained from public and private sources regarding the wages and benefits of Delphi's competitors.

27

**Declaration of Kevin M. Butler**

83.    <u>Wages And Benefits Under Delphi's Supplemental New-Hire Agreements</u>.

Delphi's first data point, certain supplemental agreements between Delphi and the IUE-CWA and

the USW, have starting wages between $7.77 and $8.00 per hour, and which produce an all-in

labor rate under $20 per hour.

84.    <u>All-In Labor Rates Of Delphi's Principal Competitors</u>.  Delphi's second data point

was the all-in labor rate of its actual competitors as determined by its operating divisions.  Delphi

asked each division to identify its principal competitors, and to determine – or make their best

estimate of – the "all-in" labor rates of these competitors.  This process identified the estimated

labor rates of 45 competitors.

85.    Delphi believed that the large number of estimates produced a reasonably reliable

estimate of its competitors' costs.  This study showed that Delphi's competitors, on average, had

an all-in labor cost of $21.60 per hour.  Assuming the cost of wage-related expenses and benefits

was 65 percent of the base wage, this data would indicate an average base wage of $13.09.

86.    <u>All-In Labor Rates Provided By GM Under The Growth And Opportunity</u>

<u>Process</u>.  Third, under the GO process between GM, Delphi, and the UAW, GM agreed to

provide Delphi with a labor premium for certain products to ensure continued levels of UAW-

represented employees in those programs.

87.    As part of this process, GM provided Delphi with sufficient information to

validate the labor premium calculations, which is based on the difference in labor cost between

Delphi and GM's most competitive supplier.  Delphi collected data through the GO process on

13 bids in which a U.S. competitor underbid it.  According to this data, the average labor costs

included in the most competitive supplier bid were slightly more than $23 per hour.  Assuming

28

**Declaration of Kevin M. Butler**

the cost of wage-related expenses and benefits was 65 percent of the base wage, this data would indicate an average base wage of approximately $14 per hour.

88.     While this data plainly demonstrates that Delphi's all-in labor costs are not sustainable, Delphi did not believe that this data was sufficiently representative of the all-in labor costs of a typical competitor for a number of reasons.

89.     The competitive labor costs provided by GM did not identify the economic year. It is highly possible that the labor costs are reflective of the start of production date rather than current year economics.  Removing even one year of economics could eliminate up to $0.70 per hour from the competitor's rates, creating a wage rate of $13.58 per hour and an all-in rate of approximately $22.40 per hour.

90.     Also, Delphi obtained some of the competitive data by challenging the award, and it did so only when the competitive bid appeared out of line.  Therefore, some of the bids included in this analysis are likely subject to an "adverse selection" bias.  Both GM and the competitor had an incentive to show a relatively high labor cost because (i) it would make it harder for Delphi to successfully bid, even with the labor cost premium, and (ii) the smaller the labor cost difference, the lower premium GM was obligated to pay.

91.     Customer Data.  Fourth, customers routinely provide feedback on variance to lowest competitive prices or targets.  Often, this feedback is specific to the various cost structure components such as labor and material.  Based on its knowledge of the competitive landscape, Delphi's business teams used this data to estimate other suppliers' labor costs, and concluded that it could not bid successfully if its all-in labor costs exceeded $22 per hour.

29

**Declaration of Kevin M. Butler**

92.    <u>BLS Data</u>.  Fifth, Delphi examined BLS data showing average hourly wages for

four BLS job categories, machine operators, assemblers, material handlers, and laborers, each

assuming a comparable skill level as a Delphi employee.  This data was compiled without regard

to the industry in which the employee worked, but was limited to the five BLS regions in which

Delphi has facilities.  The simple average of these rates was $11.91 per hour as a base wage and

$19.65 all-in, assuming an estimated wage related and benefit cost structure of 65 percent of base

wages.

93.    Delphi also examined BLS Survey data showing average hourly wages for its 36

most-populated job categories among all auto supply industry employers.  This data – which

included the Big Three and Delphi – showed an average wage rate of $15.37, from which Delphi

estimated an average all-in labor rate of similarly situated employees of $25.36 per hour.  Given

that the base BLS data included high wage OEMs, Delphi also estimated the average labor rates

by excluding the Big Three and Delphi.  Estimating the number of Big Three and Delphi

employees in the total population, and their related total labor costs, this analysis identified an

average wage rate of $12.67, from which Delphi estimated an average all-in labor rate of

similarly situated employees of $20.91 per hour.

94.    <u>CAR Study</u>.  Sixth, Delphi obtained a study from the Center for Automotive

Research on average wages for UAW-represented and non-union suppliers.  The study for

UAW-represented employers showed that the average wage rate was $16.23 (in 2005

economics) for production employees, which equated to $26.78 when applying a benefit rate of

65 percent to wages.  The study for non-union employers showed that the average wage rate was

$11.33 per hour (2005 economics) for production employees, which translated to a total all-in

**Declaration of Kevin M. Butler**

cost of $18.70 after applying a benefit rate of 65 percent to wages.  This study is available to the public at http://www.cargroup.org.

95.    <u>Competitor Analysis</u>.  Finally, Delphi corroborated all of this data by constructing "penny sheets" – Delphi's long-standing method of illustrating its labor costs per hour – for some of its competitors, both unionized and non-unionized.  Based on the collective bargaining agreements in effect for those competitors, and other public or private sources, Delphi estimated selected competitors' costs using the same methodology that Delphi uses to construct its own penny sheets.  This data shows that these competitors' base wages ranged from $9.34 to $14.83 per hour, with a simple average of $12.48 per hour.  The associated all-in labor costs of these competitors ranged from $15.80 to $29.54 with a simple average of $21.08 per hour.

96.    <u>Conclusions</u>.  Based on its competitive analysis, Delphi concluded that a competitive average labor cost for production employees could not exceed $22 per hour.  The charts attached hereto as Exhibits J and K summarize the data examined by Delphi as part of this benchmarking exercise, showing both base wage rates and all-in labor costs.

97.    <u>Delphi's Proposal</u>.  After establishing its labor cost goal through the bench-marking exercise described above, Delphi constructed its proposals to produce a labor cost, excluding legacy retirement costs, of $20.79 per hour for production employees.  Skilled employees would receive total compensation averaging $35.34 over the life of the labor contract, and production employees would receive total compensation averaging $23.90 over the life of the contract.  I have attached hereto as Exhibit L the "penny sheet" which shows the breakdown of wages, wage-related expenses, and benefits in achieving the targeted labor cost.

31

**Declaration of Kevin M. Butler**

98.    Historically, in bidding for new work Delphi has included all of its legacy costs, in determining its average hourly rate.  The logic of this long-standing past practice was that all of these costs were attributable to labor, and the company therefore needed to recover these costs in order to remain profitable.  In connection with the current restructuring, however, Delphi management made an important policy decision in November 2005 to exclude those legacy costs in analyzing its average U.S. hourly labor costs and in direct bidding for new supply contracts.

99.    As explained, as Delphi down-sizes and its number of active employees decreases, the legacy costs become increasingly burdensome, ultimately dictating that Delphi could never achieve competitive labor costs because of its legacy obligations.  Delphi concluded, therefore, it must deal with the legacy costs as part of its restructuring.  The change in practice allows Delphi to consider resultant legacy costs as corporate burden, offer a competitive base wage for its U.S. employees, and win more business.

I declare under penalty of perjury, and pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 31st day of March, 2006

/s/ Kevin M. Butler
KEVIN M. BUTLER

**Declaration of Kevin M. Butler**