**Hearing Date and Time: May 9, 2006 at 10:00 a.m.**
**Objection Deadline: April 21, 2006 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC  20006
(202) 383-5300
Robert A. Siegel (RS 0922)
Tom A. Jerman
Rachel S. Janger
Jessica Kastin (JK 2288)

GROOM LAW GROUP, CHTD
1701 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 857-0620
Lonie A. Hassel

Attorneys for Delphi Corporation, et al.,
    Debtor and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                            :
   In re         :  Chapter 11
                                                            :
DELPHI CORPORATION, et al.,   :  Case No. 05-44481 (RDD)
                                                            :
        Debtors. :  (Jointly Administered)
                                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DECLARATION OF DARRELL KIDD
IN SUPPORT OF DELPHI'S MOTION FOR AUTHORITY TO REJECT
COLLECTIVE BARGAINING AGREEMENTS UNDER 11 U.S.C. § 1113(c) AND
MODIFY RETIREE WELFARE BENEFITS UNDER 11 U.S.C. § 1114(g)

I, Darrell Kidd, declare and state as follows:

1.      I joined Delphi in April of 1998 as a Divisional Director of Labor Relations. Prior to joining Delphi, I was employed by General Motors Corporation ("GM"). I began my employment with GM in August of 1978 and served in a variety of personnel, manufacturing, and labor relation positions. My last position at GM was as Assistant Director of the Corporate Labor Staff in Detroit.

2.      In my current position with Delphi, I have, among other responsibilities, the role of negotiating Delphi's National Agreement with the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"). I also oversee Delphi's Local Agreements with the International Association of Machinists (the "IAM"), the International Brotherhood of Electrical Workers (the "IBEW"), and the International Union of Operating Engineers (the "IUOE"), and the negotiation of Delphi's Local Agreements with the UAW.

3.      I submit this declaration in support of Delphi's Motion For Authority to Reject Collective Bargaining Agreements Under 11 U.S.C. § 1113(c) And Modify Retiree Benefits Under 11 U.S.C. § 1114(g) (the "Motion"). Any capitalized terms not expressly defined herein are intended to have the meanings ascribed to them in the Motion or accompanying memorandum of law, and references to Delphi herein include the Debtors, as appropriate. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, my opinion, my experience with and knowledge of Delphi's industrial relations and collective bargaining agreements, or are based upon knowledge obtained from employees of Delphi reporting to me in the course of their duties. If I were called on to testify, I could and would testify to the facts set forth herein.

2

**Declaration of Darrell Kidd**

I.      Delphi's Agreements With The UAW, IAM, IBEW, And IUOE

        A.      The UAW Agreements

        4.      The UAW is the exclusive representative of production and skilled trades employees at 22 Delphi facilities nationwide.

        5.      On September 18, 2003, Delphi and the UAW entered into a collective bargaining agreement, which will remain in effect until September 14, 2007 (the "UAW National Agreement").  True and correct copies of cited portions of the UAW National Agreement describing the provisions discussed below, are attached hereto as Exhibit A.  Excerpts describing Delphi's benefit plans are attached to the Declaration of Steven Gebbia filed in support of the Motion.

        6.      The UAW has delegated to a number of its local affiliates the right to negotiate over local issues with Delphi at specific sites.  These local affiliates have entered into 22 separate Local Agreements with Delphi.   Because of their volume, Delphi is not filing the Local Agreements with this Motion but will provide copies of the documents upon request.

        7.      The UAW represents some or all of Delphi's hourly employees in the following active manufacturing plants:  Adrian, Michigan (Local No. 2031), Anderson, Indiana (Local No. 662), Athens, Alabama (Local No. 2195), Columbus, Ohio (Local No. 969), Coopersville, Michigan (Local No. 2151), Cottondale, Alabama (Local No. 2083), Fitzgerald, Georgia (Local No. 2188), Flint-East, Michigan (Local No. 651), Grand Rapids, Michigan (Local No. 167), Kokomo, Indiana (Local No. 292), Laurel, Mississippi (Local No. 2190), Lockport, New York (Local No. 686), Milwaukee, Wisconsin (E&C) (Local No. 1866), Milwaukee, Wisconsin (E&S) (Local No. 438), Needmore (Dayton), Ohio (Local No. 696), Rochester, New York (Local No. 1097), Saginaw, Michigan (E&C) (Local No. 699), Saginaw, Michigan (Steering) (Local No.

3

**Declaration of Darrell Kidd**

467), Sandusky, Ohio (Local No. 913), and Wichita Falls, Texas (Local No. 2157).  The UAW

also represents employees at Delphi's idled facility in Olathe, Kansas (Local No. 1021).

      B.      <u>The IAM, IBEW, And IUOE Agreements</u>

      8.      The IAM, IBEW, and IUOE represent a small number of Delphi hourly

employees in largely UAW-dominated plants.  The majority of the terms and conditions of

employment under the IAM, IBEW, and IUOE Agreements are the same as those under the

UAW Agreements.  Major differences among the terms and conditions provided by the UAW

Agreements and the IAM, IBEW, and IUOE Agreements are described below.

      9.      The IAM represents skilled Toolmakers and Machine Repairmen in Delphi's

Milwaukee, Wisconsin Electronics and Safety operation.  Delphi and District 10 of the IAM

entered into a collective bargaining agreement (the "IAM Agreement") on December 22, 2003.

The IAM Agreement is valid through December 7, 2007.  True and correct copies of cited

portions of the IAM Agreement are attached hereto as Exhibit B.

      10.      The IBEW represents approximately 60 Electricians and Electronic Technicians

in Milwaukee, Wisconsin.   Delphi is a party to two agreements with the IBEW.  The Agreement

between Delphi Corporation, Energy and Chassis, Milwaukee Operations and the IBEW (the

"IBEW E&C Agreement") was entered into on March 31, 2004 and expires on December 7,

2007.  A contract Settlement Agreement, resolving certain issues between the parties, was

entered into on March 31, 2004.  An Agreement between Delphi Corporation, Electronics and

Safety, Milwaukee Operations (the "IBEW E&S Agreement") was entered into on March 11,

2004 and expires on December 7, 2007. True and correct copies of cited portions of the IBEW

E&C Agreement are attached hereto as Exhibit C. True and correct copies of cited portions of

the IBEW E&S Agreement are attached hereto as Exhibit D.

4

11.     The IUOE represents approximately 20 Powerhouse Operators in Delphi's Rochester, New York and Columbus, Ohio facilities.  The IUOE also represented employees at Delphi's Olathe, Kansas facility until November 2005, when that facility was closed.  Delphi Thermal and Interior in Columbus, Ohio and IUOE Local 18-S of Columbus, Ohio (the "IUOE Columbus Agreement") entered into an agreement on October 1, 2003 (amended on March 16, 2004), which expires on September 30, 2007.  Delphi Energy and Chassis in Rochester entered into an agreement with the IUOE Local No. 832S (the "IUOE Rochester Agreement") on March 24, 2004, which expires on September 14, 2007.  True and correct copies of cited portions of the IUOE Columbus Agreement are attached hereto as Exhibit E.   True and correct copies of cited portions of the IUOE Rochester Agreement are attached hereto as Exhibit F.

12.     The IBEW E&C and IBEW E&S are collectively referred to as "IBEW" and the IUOE Columbus, and IUOE Rochester are collectively referred to as "IUOE" to the extent each union's two agreements do not differ.  Unless a specific union or unions are mentioned in my description of the provision, each provision is applicable to all six of the above-referenced labor agreements.

II.     The Principal Terms Of The UAW, IAM, IBEW, And IUOE Agreements

    A.     Wages And Benefits

13.     Base Wage Rates.  Under these Delphi agreements, there are no national wage rates.  Rather, the base wage rates are established by local negotiations and cover hundreds of different positions.  These rates are subject to approval by Delphi and the national unions, however, and therefore, tend to be within a few cents of each other for similar positions.

14.     Traditional UAW-represented employees receive base wages as described in the wage scales established in their respective local wage agreements.  Following is a chart

5

**Declaration of Darrell Kidd**

summarizing the wage rates provided in the UAW local agreements.  The chart represents the

total range of wage rates for traditional employees with the seniority to be paid at the full wage

rate for their job classification at each plant as of March 31, 2006.  The chart does not reflect

wage rates of employees hired under the supplemental wage and benefit scale discussed in

paragraph 29 below.

| Plant Location | Wage Rate Range |
|---|---|
| Adrian, MI (Local No. 2031) | $25.45 - $30.52 |
| Anderson, Indiana (Local No. 662) | $25.87 - $31.70 |
| Athens, Alabama (Local No. 2195) | $25.45 - $30.60 |
| Columbus, OH (Local No. 969) | $25.45 - $ 30.86 |
| Coopersville, MI (Local No. 2151) | $25.45 - $31.19 |
| Cottondale, AL (Local No. 2083) | $26.09 – 30.60 |
| Fitzgerald, Georgia (Local No. 2188) | $27.14 - $31.06 |
| Flint-East, Michigan (Local No.  651) | $25.45 - $32.21 |
| Grand Rapids, MI (Local No. 167) | $25.89 - $31.19 |
| Kokomo, IN (Local No. 292) | $25.45 - $31.70 |
| Laurel, MS (Local No. 2190) | $26.09 - $30.95 |
| Lockport, NY (Local No. 686) | $25.45 - $31.70 |
| Milwaukee, WI - E&C (Local No. 1866) | $25.76 - $30.60 |
| Milwaukee, WI - E&S (Local No. 438) | $25.62 - $30.50 |
| Needmore (Dayton), Ohio (Local No. 696) | $25.54 - $31.19 |
| Rochester, NY (Local No. 1097) | $25.45 - $31.70 |
| Saginaw, MI (Local No. 467) | $25.76 - $30.60 |
| Saginaw, MI (Local No. 699) | $25.45 - $31.19 |
| Sandusky, OH (Local No. 913) | $25.57 - $31.19 |
| Wichita Falls, TX (Local No. 2157) | $25.45 - $ 30.60 |

**Declaration of Darrell Kidd**

15.    The base wage rates under the IAM, IBEW E&C, IBEW E&S, IUOE Columbus, and IUOE Rochester are described in Exhibit B at page 106, Exhibit C at paragraph 63, Exhibit D at page 89, Exhibit E at page 34, and Exhibit F at page 44 respectively, and adjusted according to the various wage increases described below.  Following is a summary of the wage rates paid under the IAM, IBEW, and IUOE Agreements as of March 31, 2006.

| Union Agreement | Wage Rates |
|---|---|
| IAM | $30.19 - $30.60 |
| IBEW E&C | $30.50 |
| IBEW E&S | $30.50 |
| IUOE Columbus | $27.86 - $31.03 |
| IUOE Rochester | $23.77 - $30.19 |

16.    Where applicable, apprentices are subject to separate wage schedules.  For example, the IAM and IBEW E&C agreements provide apprentices with wages starting at $25.53 per hour, subject to periodic increases.  The base wages for apprentices are described in Exhibit B at pages 120-121 and Exhibit C at page 100.

17.    <u>Wage Increases</u>.  There are four types of wage increases that traditional UAW, IAM, IBEW, and IUOE employees may receive.

18.    UAW, IBEW E&S and IUOE traditional production employees generally start at 70 percent of the base wage at the time of their hire, and progress at intervals of five percent every 26 weeks, reaching the full base rate after three years of employment.  These provisions are described in Exhibit A at paragraph 98, Exhibit D at page 87, Exhibit E at page 12, and Exhibit F at page 40.  UAW (as provided in local agreements), IAM, and IBEW skilled employees are paid initially at $0.20 below the top rate of the classification in which they are

7

**Declaration of Darrell Kidd**

hired. This provision is stated in Exhibit B at page 105, Exhibit C at paragraph 64(1) and Exhibit

D at page 89. Currently, however, more than 95 percent of Delphi's union-represented

traditional employees are at the top of the scale, receiving the highest base wage available for

their positions.

19.        Second, employees may receive specific increases each year in amounts

negotiated on a national basis. The following chart provides a general summary of the annual

increases, Delphi's union-represented traditional employees have received:

| Date | Increase |
|---|---|
| September 1999 | 3% + $0.85 COLA fold-in to base wages |
| September 2000 | 3% |
| September 2001 | 3% |
| September 2002 | 3% |
| September 2003 | $2 COLA fold-in to base wages |
| September 2004 | None |
| September 2005 | 2% |

20.        The specific yearly wage increases for UAW and IUOE employees in 2005 are

$0.50 - $0.71 and in 2006 are $0.76-$1.09, as outlined in Exhibit A at paragraph 101(a), Exhibit

E at pages 13- 15, and Exhibit F at pages 42-43. IAM employees receive increases of between

$0.59-0.92 in 2005 and 2006 as described in Exhibit B at paragraph 79(a). The wage increases

for IBEW E&C-represented employees is $0.60 - $0.92. This provision is outlined in Exhibit C

at paragraph 64. The scheduled increases for IBEW E&S-represented employees is $0.51 -

$0.92. This provision is explained in Exhibit D at paragraph 67(a).

21.        Employees of all of the unions received a three percent lump sum performance

bonus payment in September 2004. These provisions are described in Exhibit A at paragraph

101(b), Exhibit B at paragraph 79(b), Exhibit C at paragraph 64(2), Exhibit D at paragraph 67(b),

8

**Declaration of Darrell Kidd**

and Exhibit E at page 16.  An additional three percent increase to base wages is currently

scheduled to take effect in September 2006.

22.    Third, Delphi's employees have received quarterly COLA adjustments, over and

above the base wage and negotiated increases discussed above, since 1999.  Under the current

labor agreements, the COLA adjustments are based upon a three-month average of the Consumer

Price Index ("CPI") ending in the month prior to the month in which the adjustment is made (i.e.,

the December 1, 2003 adjustment was based on the August, September, and October CPI

average).  During the 1999 negotiations and again during the 2003 negotiations, Delphi and the

UAW and IUOE agreed to fold all but five cents of the accumulated hourly COLA into

employees' base pay rates, simultaneously reducing the hourly COLA payable by that same

amount.  These provisions are described in Exhibit A at paragraph 101(g), Exhibit E at page 17,

and Exhibit F at page 30.  The IAM and IBEW agreed to fold all but 17 cents into employees'

base pay.  These provisions are described in Exhibit B at paragraph 80(d), Exhibit C at paragraph

65(c), and Exhibit D at paragraph 68(d).

23.    The following table depicts the approximate annual COLA adjustments since

1999:

| Year | COLA Increase |
|------|---------------|
| 1999 | 1.9% |
| 2000 | 3.2% |
| 2001 | 2.2% |
| 2002 | 1.5% |
| 2003 | 2.2% |
| 2004 | 2.4% |
| 2005 | 3.7% |

9

**Declaration of Darrell Kidd**

The specific calculations of COLA are described in Exhibit A at paragraph 101(d)-(l), Exhibit B at paragraph 80, Exhibit C at paragraph 65, Exhibit D at paragraph 68, Exhibit E at pages 15-18, and Exhibit F at pages 29-31.

24.    In the last two rounds of contract negotiations in 1999 and 2003, all of Delphi's traditional employees also received lump-sum "signing bonuses" of $1,350 and $3,000, respectively.  The 2003 signing bonus is described in Exhibit A at page 543, Exhibit B at page 168, Exhibit C at page 140, Exhibit D at page 179, and Exhibit E at page 15.

25.    Overtime.  All of Delphi's traditional hourly employees receive time-and-a-half for all hours worked beyond eight hours per day or 40 hours per week.  They also receive double-time for work performed on Sunday or a company-paid holiday (in addition to eight hours straight time holiday pay for the holiday).  These provisions are described in Exhibit A at paragraphs 81-87, Exhibit B at paragraphs 56-58, Exhibit C at paragraphs 41-43, Exhibit D at paragraphs 44-46, Exhibit E pages 9-10, and Exhibit F at pages 13-14.  The average Delphi employee worked approximately 250 hours of overtime in 2005, increasing average annual earnings by approximately $12,000, with an annual cost to Delphi of over $325 million.

26.    Shift Premiums.  Traditional employees who work an afternoon shift are entitled to a shift premium of five percent of base pay, and employees who work a night shift are entitled to a shift premium of 10 percent of base pay.  These provisions are described in Exhibit A at paragraph 89, Exhibit B at paragraph 58, Exhibit C at paragraph 43, Exhibit D at paragraph 46(d), Exhibit E at page 12, and Exhibit F at page 16.  Currently, an estimated 28 percent of Delphi's employees receive an afternoon shift premium, and an estimated 14 percent receive a night shift premium.  These shift premiums increase the average traditional Delphi employee's all-in labor costs by $1.13 per hour, at an annual cost to Delphi of $65 million.

10

27.    <u>Vacation Benefits</u>.  Traditional employees with less than one year of service receive up to one week of vacation.  Traditional employees receive annual vacation of two weeks for employees with one to three years of service; two-and-a-half weeks for employees with three to five years of service; three weeks for employees with five to 10 years of service; three-and-a-half weeks for employees with 10 to 15 years of service; four weeks for employees with 15 to 20 years of service; and five weeks per year for employees with 20 or more years of service.  These vacation provisions are described in Exhibit A at paragraphs 191-92, Exhibit B at paragraph 70(b), Exhibit C at paragraph 56, Exhibit D at paragraph 59(c)-(d), Exhibit E at pages 20-22, and Exhibit F at pages 19-24.  Because Delphi's workforce is very senior, the average Delphi traditional employee receives four and one-half weeks of vacation annually.

28.    <u>Holidays</u>.  Depending on the calendar, Delphi's traditional employees have received between 16 and 20 Company-paid holidays each year plus an additional four days surrounding Independence Day when the Company shuts down for Independence Week, in addition to their already generous vacation benefits.  For 2005-2006, these holidays include Election Day, Veterans Day, Thanksgiving Day, the day after Thanksgiving, Christmas week (five days off during the week between Christmas and New Year's Day), the day after New Year's Day, Martin Luther King, Jr. Day, Good Friday, the day after Easter, Memorial Day, Independence Day, and Labor Day.  In addition, employees enjoy an "Independence Week Shutdown," four additional paid days off, usually during the week in which Independence Day is celebrated.  The holiday schedules are described in Exhibit A at paragraph 203, Exhibit B at paragraph 72, Exhibit C at paragraph 57, Exhibit D at paragraph 60, Exhibit E at pages 25-27, and Exhibit F at pages 25-27.  The Independence Week Shutdown is described in Exhibit A at paragraph 202(a), Exhibit B at paragraph 71(h)-(l), Exhibit C at paragraph 56(n), Exhibit D at

11

**Declaration of Darrell Kidd**

paragraph 59(n), Exhibit E at page 23, and Exhibit F at page 56.  When combined with vacation entitlement, the average traditional Delphi employee receives between 40 and 45 paid days off each year out of a total of 260 annual work days.

29.    <u>Supplemental New-Hire Agreement</u>.  In April 2004, the UAW and Delphi reached agreement on a supplemental wage and benefit scale for new-hires that was below the traditional wage and benefit rates.  The Supplemental New-Hire Agreement is attached hereto as Exhibit G.  Under this agreement, the UAW new-hire base wage rates start at $14 per hour for production employees with a maximum rate of $18.50 per hour.  Employees begin receiving COLA adjustments of 70% of the full amount given to traditional employees in 2008.  This provision is described in Exhibit G at page 2.  In addition, employees hired under the agreement are subject to other limitations. For instance, they do not benefit from Independence Week.  This provision is described in Exhibit G at page 3.  They also have higher health care co-pays and deductibles than traditional employees, do not benefit from most job security provisions, and have waiting periods before eligibility for certain benefits.  Currently, there are 579 UAW-represented employees working under the UAW Supplemental Agreements.  Benefits for employees subject to the Supplemental New-Hire Agreement are further described in the Declaration of Steven Gebbia.

B.    <u>Job Security Provisions</u>

30.    Delphi's existing labor agreements with the UAW, IBEW, and IUOE contain a variety of job security provisions that constrain Delphi's ability to respond to customer and market forces.

31.    <u>Hiring Requirements/Secured Employment Levels</u>.  Under the terms of Delphi's agreements with the UAW, Delphi is obligated to maintain a minimum level of employment –

12

known as a Secured Employment Level ("SEL") – at each facility.  The SEL at each

manufacturing site was initially set under a formula based on the number of eligible employees

on the effective date of the 1999 agreement, and was reduced by 0.333 percent at the end of each

quarter year of the agreement.  The existing SELs and reduction rate were carried forward in the

2003 agreement.  If employment levels at a manufacturing site are between 90 and 100 percent

of the applicable SEL, Delphi is obligated to hire one new employee for every three who quit or

retire.  If employment levels at a manufacturing site are between 80 and 90 percent of the

applicable SEL, Delphi is obligated to hire one new employee for every two who quit or retire.

If employment levels at a manufacturing site fall below 80 percent of the SEL, Delphi must hire

employees on a one-for-one basis.  These hiring obligations apply even if Delphi has no need for

these additional employees.  These provisions are set forth in Exhibit A from pages 205 to page

213.

     32.     Unlike the UAW, the IAM, IBEW, and IUOE do not have SEL levels.  The IUOE

does impose hiring restrictions, however.  Under the IUOE Rochester Agreement, as hourly job

openings become available, Delphi must consider IUOE represented employees first, in seniority

order, to fill the positions.  This provision is explained in Exhibit F at page 53.

     33.     Delphi also has hiring obligations in the event that Delphi employees represented

by the UAW "flow back" to GM, or Delphi outsources work.  For flow-backs, Delphi generally

must hire a new employee to replace the employee returning to GM.  When outsourcing, Delphi

must not only retain the employees impacted by the outsourcing, but must also hire new

employees equivalent to the number of jobs attributable to the outsourced work.  This

requirement is purely punitive.  For example, if Delphi outsources the work of ten employees,

13

**Declaration of Darrell Kidd**

Delphi must retain the ten employees whose work was outsourced <u>and</u> hire ten new employees that are clearly redundant.  This provision is outlined in Exhibit A at pages 663-68.

34.    <u>Protected Status/JOBS Bank</u>.  The UAW, IBEW, and IUOE labor agreements, in general, prohibit Delphi from laying off traditional employees unless the layoff is directly attributable to a reduced volume of work from Delphi's customers.  Even then, Delphi may only lay off eligible employees for a maximum of 48 weeks.  The agreements also allow layoffs for acts of God, sale of part of the Company's business as an ongoing business, model changeover or plant rearrangement, and layoffs of individual employees who have been recalled from layoff or reassigned to fill a temporary opening.   These provisions are outlined in Exhibit A at pages 205-08, Exhibit C at pages 130-31, Exhibit D at pages 119-21, Exhibit E at pages 40-42, and Exhibit F at page 61.

35.    Under these agreements, if the employee is not recalled by the end of the 48-week period, Delphi must recall the employee and place the employee into the "JOBS Bank." Employees in the JOBS Bank receive full pay and benefits, and must report to "work" for eight hours each day at a facility designated by Delphi.  Employees may remain in this status until they are either required to return to normal active assignments due to a change in business conditions, used to replace future attrition, or retire.  With union concurrence, JOBS Bank employees may be assigned by Delphi and the union to "non-traditional" work assignments (<u>i.e.</u>, work not belonging to the bargaining unit), or to training assignments.  When no such assignments are available, those employees report to a designated JOBS Bank location where they commonly read, play cards, or watch television during work hours.  Delphi has sometimes been forced to rent a facility in order to house some employees in the JOBS Bank.  JOBS Bank is described in Exhibit A at pages 205-29.

**Declaration of Darrell Kidd**

36.    In recent years, at any given time, Delphi has had nearly 4,000 employees (including USW- and IUE-CWA-represented employees) in a JOBS Bank (i.e., Protected Status) or on temporary layoff.  Employees in a JOBS Bank or on temporary layoff cost Delphi an estimated $346 million in 2005.

37.    <u>No Sale Or Closure Provisions</u>.  Delphi's labor agreements with the UAW,  IAM, IBEW E&S and IUOE Columbus prohibit Delphi from closing, partially or wholly selling, spinning-off or splitting-off, consolidating, or otherwise disposing of any manufacturing site, asset, or business unit constituting a bargaining unit.  These provisions are described in Exhibit A at page 373-74, Exhibit B at page 174, Exhibit D at page 182-83, Exhibit E at pages 37-38, and Exhibit G at page 7.  For the UAW and IUOE Columbus, this obligation does not expire until September 2011.  For the IAM and IBEW E&S, this obligation expires, at the earliest, in September 2007.  Even in those cases in which a facility has been wound down, absent union concurrence on a placement and/or attrition plan, Delphi is obligated to retain all of the "protected employees" at that location who do not retire or who are not redeployed to other manufacturing sites.  Currently, Delphi has 5 manufacturing sites with UAW-represented employees that have been closed or "idled," and for which it continues to provide former active employees with full pay and benefits.  The IBEW E&C and IUOE Rochester Agreements do not include these restrictions.

38.    <u>Successorship</u>.  Delphi's labor agreements with UAW, IAM, IBEW E&S, and IUOE Columbus effectively prohibit the sale of a facility without union consent.  Even if Delphi receives union consent to sell a facility, any purchaser of an ongoing Delphi business becomes bound by the labor agreements covering employees at that facility, further constraining Delphi in its ability to make strategic or economically-necessary decisions to close or otherwise

15

**Declaration of Darrell Kidd**

discontinue unprofitable operations.  These provisions are explained in Exhibit A at page 542,

Exhibit B at page 165, Exhibit D at page 172, and Exhibit E at pages 37-38, respectively.  The

IBEW E&C and IUOE Rochester Agreements do not contain these restrictions.

39.    Staffing Requirements.  Delphi's labor agreements with the UAW contain a

number of restrictions on "subcontracting" and "outsourcing" – terms that have specific, and

different, meanings under the agreements – that significantly restrict Delphi's ability to have

work performed in the most cost-efficient manner.  The effect of these restrictions are best

expressed in terms of Delphi's ratio of "direct" employees, those who actually produce Delphi's

products, to "indirect" employees, those who perform support or maintenance functions that

could be performed by a third party at much lower cost.  While Delphi currently employs 69

"indirect" employees for every 100 direct employees, Delphi's competitors employ fewer than

half the number of indirect employees per direct employee.  If Delphi could achieve the same

ratio of indirect to direct employees, it would be able to reduce its headcount by approximately

4,700 employees.

40.    The source of these restrictions is a contractual requirement under the UAW

agreements (as well as IBEW E&S Agreement) that Delphi continue to perform production and

maintenance work normally and historically performed by the bargaining unit at its facilities

with its own employees.  Delphi may subcontract work on a temporary basis to a contractor, but

only if Delphi's skilled employees are "fully utilized."  These provisions are explained fully in

Exhibit A in paragraph 183 and pages 193-97 and Exhibit D at page 140.  The definition of

"fully utilized" is typically established by Local Agreement, but in the most extreme cases,

Delphi is precluded from subcontracting unless its own employees are working 16 hours a day,

seven days a week, which in and of itself triggers overtime pay.  Worse yet, certain

subcontracting disputes are "strikeable" issues, meaning that the union may strike if it believes that Delphi is not complying with contractual obligations.

41.    Similarly, the IAM and IBEW Agreements state that Delphi has a policy of performing maintenance work with its own employees, and that it must give advance notice and conduct discussions with the union when it contemplates subcontracting union work.  These provisions are explained in Exhibit B at pages 151-54, Exhibit C at pages 126-27, and Exhibit D at pages 140-41.  Further, under the IBEW E&C Agreement, if Delphi subcontracts certain work, additional overtime opportunities must be made available to the union members as long as the subcontractors are on premises.  This provision is explained in Exhibit C at pages 160-61.

42.    The effect of these provisions is that Delphi must employ maintenance or skilled trades employees to perform a large variety of functions that no competitive employer would perform in-house – particularly at the wage and benefit levels required under Delphi's agreements.  Some of these functions simply do not require a full-time employee, either because the work is performed only sporadically (e.g., carpentry and painting), or seasonally (e.g., snow removal, mowing grass, and roof repair).  Under these provisions, Delphi is also required to manufacture certain tools in-house that it could purchase "off the shelf" at much lower prices.  If Delphi were able to subcontract these functions, it would incur a much lower hourly rate or lower cost, and would need to pay for the relevant services only when needed.

43.    The restrictions on "outsourcing" generally apply to work that is performed in-house by Delphi's union employees, but which Delphi is contemplating purchasing from another company or manufacturing at another Delphi facility.  Outsourcing is not a strikeable issue under the collective bargaining agreements, but Delphi's labor agreements do prohibit it from outsourcing without justifying, through a lengthy process, that the work can be performed more

17

**Declaration of Darrell Kidd**

efficiently outside a particular facility.  More significantly, some of the agreements impose a

hiring obligation, described above, as a penalty if Delphi outsources work.  These provisions also

apply where Delphi seeks to transfer work to another Delphi facility if it is non-represented or its

employees are represented, but are not in the same national bargaining unit, if Delphi (rather than

the customer) has the authority to determine where the work is performed.  These provisions

apply to the UAW and are generally described in Exhibit A at pages 236-44.

      C.     <u>Other Non-Competitive Provisions</u>

      44.     <u>Joint Fund Accrual And Training Costs</u>.  Under Delphi's agreements with the

UAW, IAM, IBEW, and IUOE, it must provide funding for a number of jointly-administered

training and education programs, which may include, among others, up to $8,400 in tuition

assistance for laid-off and active employees and their dependents and retirees; in-plant adult

education centers for employees, spouses, and retirees; and scholarships and a homework hotline

for employees' children.  Delphi's specific commitments to training programs for each union are

described in Exhibit A at pages 268-89, Exhibit B at pages 71-75, Exhibit C at pages 110-15 and

152-154, Exhibit D at pages 114-18 and 176-77, Exhibit E at pages 35 -38, and Exhibit F at page

47.

      45.     Under the UAW agreements, Delphi accrues a liability of five cents per hour

worked for training initiatives at the national level, ten cents per hour worked for local or

national training initiatives, and four cents per hour worked for health and safety initiatives, for a

total of $0.19 of liability per hour worked per employee.  A penalty provision also requires

Delphi to accept a liability of up to $5 per hour to the training programs for every hour of

overtime worked by all UAW employees on average in excess of two hours per week on a

rolling twelve month basis.  The joint activities program is generally outlined in various

18

memoranda of understanding in Exhibit A at pages 268-84 and are further discussed in side

letters to the Agreement.  The funding for joint activities is specifically described on pages 272-

77; the funding for health and safety initiatives is outlined at pages 661-62.  Delphi participates

in the Joint Fund Accrual program in conjunction with GM, with Delphi actually paying 23

percent of the incurred costs of the UAW joint training programs, even though the liability on its

book – and potential costs – may be much greater.

46.     While Delphi has also committed to funding training for employees represented

by the IAM, IBEW, and IUOE, these unions do not have a specific training fund agreement with

Delphi.  Examples of the training commitment are described in Exhibit B at page 155-57 and

Exhibit D at page 165-66.

47.     <u>Compensation Of Union Representatives</u>.  Under the Delphi labor agreements

with the UAW, Delphi is obligated to permit a substantial number of employees to function as

full-time Union representatives.  Under these provisions, in each manufacturing site, a minimum

of one employee functions full-time as a District Committeeperson for every 250 employees and

up to 12 employees function full-time as Shop and Zone Committeepersons, whose sole purpose

is to represent Delphi's employees.  These provisions are described in Exhibit A at paragraphs 9-

11.  The employees represented by the IAM, IBEW, and IUOE are also guaranteed

representation.  For example, IAM-represented employees have three District Committee

persons.  This provision is described in Exhibit B at paragraph 19(b).  IBEW E&C-represented

employees are entitled to two Committee persons and a Shop Chairman.  This provision is

described in Exhibit C at page 13.  The representation for IBEW E&S employees is described in

Exhibit D at pages 11-13, for IUOE Columbus employees is described in Exhibit E at page 4,

and for IUOE Rochester employees is described in Exhibit F at page 5.

19

**Declaration of Darrell Kidd**

48.     Delphi also must permit numerous other employees, most appointed by the Union, to function as Union representatives who represent employees exclusively on issues such as benefits, health and safety, special skilled trades, joint training, human resource development, joint activities, and the like.  For instance, the UAW-represented Laurel manufacturing site, at one point, had approximately seven percent of the site's 72 employees who were full-time Union representatives.  These provisions are described in Exhibit A at pages 462-66.

49.     Delphi is also required to pay these Union representatives overtime whenever a certain number of employees they represent are working overtime on the representative's scheduled shift.  These provisions are described in Exhibit A at paragraph 21.  The total cost per year to Delphi of payments to Union representatives who perform no, or in the case of some few appointees, very limited, production work was approximately $80 million in 2005.

III.     Responses to Union Information Requests

50.     Since filing for bankruptcy, Delphi has received and responded to more than 300 information requests from the various Unions or their financial advisors – many of which were detailed requests for "due diligence."  As soon as Delphi received an information request from one of the Unions, one of my reports, Charles McWee, Director of Labor Relations, along with other Delphi Industrial Relations and finance personnel, gathered the requested information and provided information responsive to the request as soon as possible.

51.     To ensure that Delphi has responded to all information requests, all Delphi personnel or outside advisors who have any contact with the Unions were required to forward those requests to Chuck.  He has maintained a log of all requests received, the person or persons assigned to respond to the request, and when Delphi responded to the request.  He has also maintained copies of the information or documents provided in response to such requests.

20

**Declaration of Darrell Kidd**

52.    As of March 27, 2006, these records reflected that Delphi has responded, either

directly or through its financial advisors or attorneys, to all information requests received from

the Unions as of that date.  Accordingly, on March 28, 2006, Delphi's Vice President of Human

Resource Management, Kevin M. Butler, sent a letter by e-mail or Federal Express to each

Union that included, among other things, the following statement:

> At this time, we believe that Delphi has provided, directly or through
> information provided in the presentations and meetings or in the litigation
> process, all of the available, relevant information that the [name of the Union] and
> its financial advisors have sought to date regarding the Corporation's proposals,
> financial condition and restructuring plans. If you believe that there are still
> outstanding requests, please let us know the specifics of those requests so that we
> can ensure that you have all of the relevant information need to evaluate our
> proposals.

True and correct copies of these letters are attached hereto as Exhibit H.

53.    On the same day, the IUE-CWA responded to Kevin Butler's letter asserting

incorrectly that Delphi's GM Consensual Proposals differed significantly from the Competitive

Benchmark Proposals and that the IUE-CWA did not have adequate financial forecasts necessary

to evaluate the GM Consensual Proposals.  The IUE-CWA also informed Delphi through its

March 28 letter that it intended to oppose the Motion based on allegations of bad-faith

bargaining and failure to proved adequate information.

54.    Kevin Butler responded to the IUE-CWA by letter dated March 29, 2006.

Through his letter, Kevin Butler recounted the reams of information given to the IUE-CWA and

its financial advisors as well as the numerous meetings and other correspondence that have

occurred between the IUE-CWA and Delphi since before Delphi's October 2005 bankruptcy

filing regarding Delphi's deteriorating financial condition and its need for relief from its

collective bargaining agreements.

21

**Declaration of Darrell Kidd**

IV.     Creation of A Virtual Data Room

55.     To further allow the Unions and their advisors to easily access information in response to their numerous information requests, Delphi, in conjunction with FTI Consulting, established a virtual data room.  The data room went live on January 3, 2006, after which time anyone with an identification and password has been able to access the data, which includes information Delphi has issued to the Unions in response to their previous information requests, and has been continually updated with information responsive to new Union information requests.

56.     On December 20, 2005, Delphi notified the Unions via e-mail messages or facsimile that Delphi was in the process of establishing a "website for the purpose of sharing data and other information requested during the course of Delphi's Chapter 11 proceedings."  Delphi included a "data access request form" with each of the e-mail notifications, and attached a form to facsimile sent to the IUOE in Columbus.  We informed the Unions that when their representatives completed and returned the form, they would be issued a user login and password to access the data room.

57.     Delphi has granted all requests for access to the data room received from any of the Unions and/or their advisors.  All of the information in the data room can be found by any of these persons using the identification and password provided to them. While Delphi has the ability to restrict access to information in the data room to specific Unions, it has chosen to make its responses to one Union's information requests available to all of the Unions and their financial advisors.

22

**Declaration of Darrell Kidd**

58.    I believe this broad access has proven beneficial to the Unions.  For example, the advisors to the IUE-CWA have formulated additional information requests based on data posted in response to other Unions' requests.

59.    All responses to Union information requests are also provided to the requesting Union or financial advisor outside of the virtual data room either, for example, through mail, facsimile, e-mail, or in some cases, personal delivery.

I declare under penalty of perjury, and pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 31st day of March, 2006

/s/ Darrell Kidd_____
DARRELL KIDD

23

**Declaration of Darrell Kidd**