# Exhibit A

# *Supplemental Agreement*

Covering

## HEALTH CARE PROGRAM

Exhibit C

to

AGREEMENT

between

DELPHI CORPORATION

and

UAW

dated

September 18, 2003

Art. II, 2(d)

health care coverages in the geographic area or arrange
with another carrier to do so.

(e)   Core and non-core coverages may be provided
through the Health Maintenance Organization option.
However, the coverages provided through this option
may vary from the coverages described in Appendices
A, B, and D.

**Section 3.   Replacement or Supplementation
of Coverages**

If in its judgment the Corporation considers it advisable
in the interest of the enrollees in any geographic area,
another arrangement may be substituted in such area or
areas for all or part of the coverages referred to in
Section 1 above.

**Section 4.   Selection of Option in the Informed
Choice Plan**

The Corporation will make arrangements to provide an
opportunity for primary enrollees to elect to have core
coverages provided through one of the options available
under the Informed Choice Plan.  Such election also may
include a choice among dental options, where applicable.
The specific choices offered to a primary enrollee will
depend on the availability of approved options in the
enrollee's geographic area and Medicare status of the
primary and secondary enrollees. The options are as
follows:

(a)   *Preferred Provider Organization Option*

This option provides core coverages, as described in
Appendix A, through access to a panel of providers who
have agreed to provide services under the terms of
participation established by the preferred provider
organization such as limits on fees, and controls on
quality and utilization.  In order to receive full benefits
for certain covered services, such services must be
obtained through the organization's panel of providers.

25

Art. II, 4(a)(1)

(1) A preferred provider organization assumes responsibility for conducting utilization reviews, predetermination of services, or other reviews necessary to promote quality of care and control costs. A preferred provider organization may place the panel physician and other providers at financial risk through capitation, withholding of a percentage of fees, or other mechanisms, or if not, will have other means to monitor and control utilization by individual providers on a continuous basis.

(2) A preferred provider organization assumes responsibility for selection and periodic evaluation of hospitals, physicians, pharmacists, laboratories, and other providers to ensure sufficient numbers and types of providers who are geographically distributed to allow adequate access for enrollees.

(3) A preferred provider organization assumes responsibility for providing the scope and level of benefits set forth in Appendix A, monitoring the appropriateness of referrals to non-panel providers, taking affirmative corrective action with respect to providers when necessary, and implementing and maintaining other administrative processes as required by the Corporation.

(4) Payment for covered services provided by non-panel providers, unless the enrollee is referred by a panel provider, will be 80% of the non-panel provider's reasonable and customary charges for the same service or, if less, the actual charges. The reimbursement to providers by the preferred provider organization will be reduced to reflect any waiver or forgiveness by a provider of the remaining 20%.

Under this subsection, the 80% limitation on payment for charges payable to non-panel providers by the preferred provider organization shall not be applicable (i) to an individual enrollee who has incurred

personal expense under this provision of $1,000 for such covered services in a calendar year or (ii) to the covered members of the enrollee's family, if any, after the enrollee and such members have incurred a total of $2,000 in personal expense under this provision for such covered services in the same calendar year.

(5) Preferred provider organizations may seek Corporation approval to establish special contractual relationships with providers not otherwise included under the Program (e.g., freestanding ambulatory surgical centers), when it can be shown that doing so will improve quality of care and enhance cost competitiveness.

(6) Mental health and substance abuse coverage is administered in accordance with the terms and conditions of Appendix B.

### (b) *Health Maintenance Organization Option*

This option provides coverages to enrollees through physicians, hospitals, and other providers who have agreed to provide services under the terms established by the health maintenance organization to limit fees, assure quality, and control utilization.

(1) The types of coverages and the scope and level of coverages provided under this option may vary among health maintenance organizations and may be different than the coverages set forth in Appendices A, B, and D.

(2) Most health maintenance organizations provide health care coverages (including preventive care) that generally are managed for the enrollee by a primary care physician. The primary care physician is responsible for referring the patient to other providers of service. If such referral is not obtained, the enrollee may be responsible for charges incurred.

Art. II, 4(b)(3)

(3) Under this option, if an enrollee receives services from a non-health maintenance organization provider, in a non-emergency situation or without a referral, such services may not be covered.

(4) The Corporation pays a capitated fee to health maintenance organizations for enrollees electing coverage through this option. The fee paid is based upon a comparison of the monthly rates of the health maintenance organization and those of the base option in the rating area. When the health maintenance organization's rates are higher than those of the base option, the enrollee may be required to make a contribution.

(c) *Traditional Option*

This option provides core coverages described in Appendix A with predetermination and review procedures required in order to receive full benefits for certain covered services. These procedures include but are not limited to predetermination (which includes, but is not limited to, prior authorization or assessment for non-emergency inpatient admissions, and second opinions for selected procedures), concurrent utilization review, retrospective utilization review, and focused utilization review. In some instances, special programs (such as foot surgery predetermination or predetermination of specific outpatient procedures) will be developed and implemented, as necessary and practicable, to address specific utilization problems.

(1) Benefits for certain covered services, which require predetermination, when provided without obtaining necessary predetermination approvals will be administered according to Program standards including the provision that such services be payable at 80% of reasonable and customary charges after the first $100 of expense for such services. The reimbursement to providers will be reduced to reflect any waiver or forgiveness by a provider of the $100 or remaining 20%.

28

(2)  Under this subsection, the 80% payment limitation and the requirement that payment be made for the first $100 of covered expenses shall not be applicable (i) to an individual enrollee who has incurred a personal expense of $750 under this provision for such covered services in a calendar year or (ii) to the covered members of the enrollee's family, if any, after the enrollee and such members have incurred a total of $1,500 in personal expense under this provision for such covered services in the same calendar year.

(3)  Primary and secondary enrollees eligible for Medicare and enrolled in the Traditional option may not be subject to the predetermination and review procedures set forth above for those covered services for which Medicare has primary responsibility.

(4)  In selected states, or geographic areas within a state, Traditional Care Networks (TCN) may be implemented. Such networks will apply to Traditional option enrollees residing in the respective states/areas. The scope and level of coverages may vary from those for the Traditional option in non-TCN states/areas and may involve variation in benefits for use of non-TCN providers. When a TCN is implemented, affected enrollees will be provided additional information.

(5)  Mental health and substance abuse benefits are administered in accordance with the terms and conditions of Appendix B.

29

Art. III, 5(d)

Section 4, as of the date certification of disability is presented.

## Section 6.  Continuation of Coverages Upon Retirement or Termination of Employment at Age 65 or Older

**(a)**  The health care coverages an employee has at the time of retirement or termination of employment at age 65 or older (for any reason other than a discharge for cause) with insufficient credited service to entitle the employee to a benefit under Article II of The Delphi Corporation Hourly-Rate Employees Pension Plan shall be continued.

**(b)**  An employee who upon retirement is not enrolled for the coverages as provided in subsection (a) above may enroll for health care coverages to which entitled at the time of or subsequent to retirement. Such coverage shall become effective on the first of the month following receipt of application from such retired employee.

**(c)**  Except as provided in subsection (d), below, the Corporation shall make contributions, in accordance with Program provisions, for health care coverages continued in accordance with subsections (a) and (b) above, for:

**(1)**  a retired employee (including any eligible dependents other than sponsored dependents), provided such retired employee is eligible for benefits under Article II of The Delphi Corporation Hourly-Rate Employees Pension Plan; and

**(2)**  an employee (including any eligible dependents other than sponsored dependents) terminating at age 65 or older (for any reason other than a discharge for cause) with insufficient credited service to be entitled to a benefit under Article II of The Delphi Corporation Hourly-Rate Employees Pension Plan.

38

**(d)** Corporation contributions will not be made for employees hired on or after November 18, 1996 who, at the time of retirement or termination at age 65 or older, have fewer than ten (10) years of credited service under the Corporation's Pension Plans. Such individuals may elect to continue coverage on a self-paid basis.

**Section 7.    Continuation of Coverages Upon Termination of Employment Other Than by Retirement or Death**

**(a)** Except as provided in Article III, Section 4(c) above, health care coverages for an employee who quits or is discharged shall automatically cease as of the last day of the month in which the employee quits or is discharged or, if later, the date seniority is broken.

**(b)** Following termination of employment other than by retirement or death, the former employee shall be entitled to <u>self-paid</u> continuation of coverages provided under applicable Federal laws, <u>and/or may be offered</u> a conversion contract.

**Section 8.    Continuation of Coverages for the Survivors of an Employee, or of a Retired Employee or Certain Former Employee**

**(a)** If an employee dies prior to becoming eligible for health care coverages under Section 2 above, the Corporation shall permit the spouse of such employee to participate in the core coverages, on a self-pay basis, as provided in subsection (b)(1) below.

**(b)** If an employee or retiree dies after coverages are in effect under the Program, coverage for any dependents will cease as of the end of the month in which the employee or retiree dies. Thereafter, a surviving spouse may be eligible to continue coverages as indicated below.

For purposes of this Section 8 and of Article V,

Art. III, 8(b)

"surviving spouse" does not include the spouse of a former employee eligible for a deferred pension under Article VII, Section 2 of The Delphi Hourly-Rate Employees Pension Plan; or a spouse or former spouse receiving, or eligible to receive, a pre-retirement survivor benefit under Article II, Section 11 of the previously referenced Pension Plan.

(1) The Corporation shall make suitable arrangements for the surviving spouse of an employee to participate, on a self-pay basis, in core coverages for the first 24 months following the month in which the employee dies, provided the surviving spouse was married to the deceased employee for at least one full year immediately preceding the date of death.

(2) The Corporation shall make contributions for core coverages continued in accordance with subsection (b)(1) above, for the first twelve months following the month in which the employee dies, provided that, as of the employee's date of death, the surviving spouse's age is at least 45, or the surviving spouse's age, when added to the deceased employee's seniority, totals 55 or more. Thereafter, the surviving spouse may continue core coverages, on a self-pay basis, until the earlier of (a) remarriage, (b) the end of the month in which age 62 is attained, or (c) death.

(3) The Corporation shall make suitable arrangements for a surviving spouse

(i)    of an employee or retired employee (but not the surviving spouse of a former employee eligible for a deferred pension or a surviving spouse or surviving divorced spouse eligible for a pre-retirement survivor benefit under Article II, Section 11 of The Delphi Corporation Hourly-Rate Employees Pension Plan) if such spouse is receiving or is eligible to receive a survivor benefit under Article II of The Delphi Corporation Hourly-Rate Employees Pension Plan,

(ii) of a retired employee if, prior to death, the retired employee was receiving a benefit under Article II of The Delphi Corporation Hourly-Rate Employees Pension Plan,

(iii) of a former employee whose employment was terminated at age 65 or older for any reason other than a discharge for cause with insufficient credited service to be entitled to a benefit under Article II of The Delphi Corporation Hourly-Rate Employees Pension Plan, or

(iv) of an employee who at the time of death was eligible to retire on an early or normal pension under Article II of The Delphi Corporation Hourly-Rate Employees Pension Plan,

to participate in health care coverages; provided, however, that dental coverage shall be available to a surviving spouse age 65 or over only for months that such surviving spouse is enrolled for Medicare Part B coverage.

(4) The Corporation shall make contributions for health care coverages continued in accordance with subsection (b)(3) above only on behalf of a surviving spouse, as provided therein and in subsection (b)(5) below (including for this purpose a surviving spouse who would receive survivor benefits under The Delphi Corporation Hourly-Rate Employees Pension Plan except for receipt of Survivor Income Benefits under the Delphi Corporation Life and Disability Benefits Program), and the eligible dependents of any such spouse; provided, however, that the contributions on behalf of a surviving spouse for the month the surviving spouse becomes age 65 and subsequent months shall be made only for months that the surviving spouse is enrolled for Medicare Part B coverage.

Notwithstanding the above, no Corporation

41

Art. III, 8(b)(4)

contributions, other than contributions related to subsection (b)(5) below, shall be made under this subsection (b)(4) for the surviving spouse and eligible dependents of a deceased employee or retiree hired on or after November 18, 1996, if such employee or retiree had fewer than 10 years of credited service under the Corporation's Pension Plans.

(5) The Corporation shall make suitable arrangements for a surviving spouse of an employee whose loss of life results from accidental bodily injuries caused solely by employment with Delphi Corporation, and results solely from an accident in which the cause and result are unexpected and definite as to time and place, to participate in health care coverages; provided, however, such coverages shall terminate upon the remarriage or death of the surviving spouse. Any Corporation contributions for coverages continued under this subsection (b)(5) shall be as provided in subsection (b)(4) above.

(6) A surviving spouse who is eligible for such coverages provided in subsections (b)(1), (b)(3) and (b)(5) above and who elects such coverages but who is not eligible for Corporation contributions as provided in subsections (b)(2) and (b)(4), must make such election no later than 60 days following the later of the end of the month in which the death of the employee, retired employee, or former employee occurs, or following the date of notice of available options by the Corporation, and shall contribute monthly the entire cost for such coverages for (i) single party, (ii) two party, or (iii) family.

(7) When contributions by surviving spouses are required, they shall be paid in cash directly to the Corporation or its agent on or before the 10th day of the month for which such coverages are to be provided or such other due date as may be established by the Corporation.

42

## Section 9.    Dependent Eligibility Provisions

(a)  *General Provisions* .

(1)  As used in this Section 9, when reference is made to a person (i.e. - person A) being "dependent upon" another person (i.e. - person B), the term shall mean that person B may legally claim an exemption for person A, under Section 151 of the Internal Revenue Code, for Federal income tax purposes.

(2)  The provisions of this Section 9 apply with respect to enrollment of certain dependents as secondary enrollees under primary enrollees who elect "self and spouse," "self and child," or "self and family" enrollment, in accordance with Article III, Section 1(a)(1) of the Program and to enrollment of sponsored dependents under subsection (e) below.  Unless specifically provided otherwise in the Program, such a dependent has no individual or personal right of enrollment, right to select an option within the Informed Choice Plan, or right to continue coverages under the Program.

(3)  The Corporation shall have the right of determining eligibility of a dependent, consistent with the provisions of this Program.

(4)  A primary enrollee claiming initial or continuing eligibility of a dependent shall furnish whatever documentation may be necessary to substantiate the claimed eligibility of a dependent and the social security number of each such dependent for whom a social security number is required to claim an exemption on the primary enrollee's Federal income tax return. Refusal or failure to furnish such documentation when requested to do so, or to furnish the social security number within a reasonable period of time, shall result in denial or withdrawal of eligibility for such dependent.

43

Art. III, 9(a)(5)

(5) Unless otherwise provided, a dependent who loses eligibility in accordance with the provisions of this Program, and who once again meets the requirements for dependent eligibility, may have coverage reinstated. The effective date of coverage in such cases will be the first day of the month following the month in which a valid enrollment form and any necessary supporting documentation is received by the Corporation.

(6) When, as a result of oversight or error, an eligible primary or secondary enrollee entitled to Corporation-paid coverage is not enrolled in a timely manner, coverage may be provided retroactive to the date of eligibility that would have been established if proper processing had occurred. However, in no event will the retroactivity exceed twelve (12) months from the month in which the error or omission is discovered.

This retroactive enrollment provision shall not apply to surviving spouses who are not entitled to Corporation-paid coverage. Such surviving spouses electing to continue coverages on a self-paid basis must make such election as stipulated in Article III, Section 8(b)(6). This retroactive enrollment provision also shall not apply to principally supported children or sponsored dependents, as discussed in subsections (d) and (e) respectively below.

(7) The receipt of a benefit under The Delphi Corporation Hourly-Rate Employees Pension Plan as an "alternate payee" in accordance with the Retirement Equity Act of 1984 shall not serve to entitle such recipient to coverages or continuation of coverages under this Program.

(8) Provisions will be made for the enrollment and administration of coverage for an individual determined to qualify for coverage pursuant to Qualified Medical Child Support Orders (QMCSO) under the provisions of the Omnibus Budget Reconciliation Act of 1993 (OBRA '93).

44

**(b)  *Spouse***

(1)  The spouse of an eligible and enrolled employee or retiree shall be eligible for coverage.  A surviving spouse of an employee or retiree, as defined in Section 8 above, may not have or add a new spouse as a dependent.

(2)  A spouse by common-law marriage shall be eligible for coverage only to the extent such relationship is recognized by the laws of the state in which the employee or retiree is enrolled, and the employee or retiree has met such requirements for documentation of the status as may be necessary by law and required by the Corporation.

(3)  The effective date of coverage for a spouse shall be the later of the effective date of coverage for the employee or retiree, or the date of marriage.  For a common-law spouse, the effective date of coverage shall be the date of receipt by the Corporation of a completed enrollment form and any necessary supporting documentation.

(4)  A spouse's eligibility for coverage shall cease on the earlier of:

(i)  the date the primary enrollee's coverage ceases, except that, in the case of the primary enrollee's death, coverage shall cease on the last day of the month in which the primary enrollee dies, unless the spouse is eligible for coverage as a surviving spouse as set forth in Section 8 of this Article, or

(ii)  the date of the final decree of divorce.

**(c)  *Children***

(1)  Children of a primary enrollee, or of the spouse of an eligible and enrolled employee or retiree, shall be eligible for coverage if, as to each one, the following criteria are met.

45

Art. III, 9(c)(1)(i)

(i)    Relationship.  The child must be the child of the primary enrollee, or of an employee's or retiree's spouse, by birth, or legal adoption, or legal guardianship.

Under the provisions of the Omnibus Budget Reconciliation Act of 1993 (OBRA '93), a child under the age of 18 who is in the process of being adopted by an employee or retiree will be deemed to satisfy the relationship test when the child is placed and takes up residence with the employee or retiree, pursuant to the adoption process.

(ii)    Age.  The child must not have reached the end of the calendar year in which the child becomes age 25, unless such child has been determined to be totally and permanently disabled prior to the end of that year. For the purposes of this subsection, "totally and permanently disabled" means having any medically determinable physical or mental condition which prevents the child from engaging in substantial gainful activity and which can be expected to result in death or be of long-continued or indefinite duration.

Coverage will not be reinstated for a child who first becomes totally and permanently disabled after the end of the calendar year in which age 25 is attained or who was eligible for coverage as a totally and permanently disabled child, recovers, and, after the end of such calendar year, again becomes so disabled.

(iii)    Marital Status.  The child must be unmarried.

(iv)    Residency.  The child must reside with the primary enrollee, as a member of such enrollee's household or, if not a member of the household, such enrollee must be legally responsible for the provision of health care for the child (such as children of certain divorced parents, legal guardianships, children confined in training institutions, or children in school).

46

(v)    Dependency.  The child must be dependent upon the primary enrollee, or upon the spouse of an eligible and enrolled employee or retiree.  This requirement shall be waived with respect to a child (by birth, legal adoption or legal guardianship) of a divorced employee or retiree, if the divorce decree, or order of the court of proper jurisdiction, or amendment of such decree or order, stipulates that such employee or retiree is legally responsible for providing health care coverage for such child.

(2)    An eligible surviving spouse may not enroll a child unless the child was eligible to be enrolled prior to the death of the employee or retiree or, in the case of a child born after the death of the employee or retiree, unless such child is the issue of the surviving spouse's marriage to the deceased employee or retiree, and was conceived prior to such employee's or retiree's death.

(3)    The effective date of coverage for a child shall be the later of the effective date of coverage for the primary enrollee, or in the case of:

(i)    Birth - the date of birth;

(ii)    Legal Adoption - the date the adoption becomes final in accordance with applicable laws (or, for children being adopted and who meet the criteria of OBRA '93, the date the child is placed and resides with the adopting employee or retiree);

(iii)    Legal Guardianship - the date guardianship becomes final in accordance with applicable laws; and

(iv)    Stepchild - the date the child becomes a member of the employee's or retiree's household.

(4)    A child, as defined above, shall cease to be eligible for coverage as of:

47

Art. III, 9(c)(4)(i)

(i)    the date of marriage of such child;

(ii)    the last day of the month in which the child ceases to be dependent upon the primary enrollee, or upon the spouse of an eligible and enrolled employee or retiree, unless the exception in subsection (c)(1)(v) applies;

(iii)    the last day of the month in which the child ceases to meet the residency criteria of subsection (c)(1)(iv) above;

(iv)    the last day of the calendar year in which the child becomes age 25, except in the case of a totally and permanently disabled child (in the event coverage for a totally and permanently disabled child is continued, eligibility for such coverage shall cease as of the last day of the month in which the child ceases to be totally and permanently disabled as defined by this Program); or

(v)    the date the primary enrollee's coverage ceases, except that, in the case of the primary enrollee's death, coverage for such dependent child shall cease on the last day of the month in which the primary enrollee dies, unless such child is eligible for coverage as a dependent child of the surviving spouse of such employee or retiree.

(5)    Notwithstanding any other provisions of the Program, the Program shall provide coverages in accordance with Section 4301 of the Omnibus Budget Reconciliation Act of 1993 (OBRA '93) and Section 609 of ERISA.  The Corporation will maintain reasonable procedures related to the implementation of Qualified Medical Child Support Order and other aspects of the Federal regulations.

(d)  *Principally Supported Children*

(1)  Children residing with and related to a

48

Art. III, 9(d)(1)

primary enrollee by blood or marriage and for whom the primary enrollee provides principal support (as defined by the Internal Revenue Code of the United States) and who were reported as dependents on the primary enrollee's most recent income tax return or who qualify in the current year for dependency tax status, may be enrolled as principally supported children.

(i) A surviving spouse may continue coverages for a principally supported child enrolled by the deceased employee or retiree prior to such employee's or retiree's death, but may not enroll a new principally supported child unless such child was eligible to be enrolled by the deceased employee or retiree as of the date of death.

(ii) The residency waiver based on legal responsibility for the provision of health care, which applies to other children as indicated in subsection (c)(1)(iv), does not apply to principally supported children.

(iii) The other criteria of subsection (c)(1) apply to principally supported children.

(2) The effective date of coverage for a principally supported child shall be the first day of the month following the month in which a valid enrollment form is received by the Corporation.

(3) Eligibility of a principally supported child shall cease as it would for any other child in accordance with subsection (c)(4).

(e) *Sponsored Dependents*

(1) A primary enrollee may obtain core coverages for dependents other than those specified in subsections (b), (c), and (d) above. Such dependents will include persons who are related to the primary enrollee by blood

49

Art. III, 9(e)(1)

or marriage, or if not related, who reside with the primary enrollee as members of the household. Before becoming eligible for coverage, sponsored dependents (other than a child being adopted by the primary enrollee) who are not citizens of the United States must reside in the United States for one (1) full year, and must be legally entitled to remain in the United States indefinitely. Sponsored dependents must be dependent upon the primary enrollee for more than half of their support as defined by the Internal Revenue Code of the United States and must either qualify to be claimed as an exemption by the primary enrollee in the current year or have been claimed as an exemption on the primary enrollee's most recent Federal income tax return. They must be designated as sponsored dependents on a valid enrollment form signed by the primary enrollee. The coverages shall be provided under the Program option elected by the primary enrollee. For the purposes of this subsection, an adopted child shall be considered to be related to a primary enrollee "by blood."

(2)  Coverages provided under this subsection for a sponsored dependent enrolled at the time of an employee's or retiree's death may be continued at the option of the employee's or retiree's surviving spouse while such surviving spouse is enrolled for coverages as provided in Section 8 of this Article. A surviving spouse may not add any new sponsored dependents.

(3)  The primary enrollee shall pay the full cost of coverages under this subsection, and the Corporation shall not contribute toward the cost of health care coverages for any sponsored dependents.

(4)  The effective date of coverages for an eligible sponsored dependent shall be the later of the effective date of coverages for the primary enrollee, or the first day of the month following the month of receipt by the Corporation of a completed enrollment form and any

50

Art. III, 9(e)(4)

supporting documentation as may be required by the Corporation. However, the effective date for a sponsored dependent previously enrolled as such, and whose coverages as a sponsored dependent were discontinued, shall be the first day of the sixth month following receipt of the application for reinstatement.

(5) Coverage for a sponsored dependent shall cease on the earlier of:

(i) the last day of the month in which the person ceases to meet the eligibility criteria set forth in (1) above,

(ii) on the last day of the month preceding the month for which the required contribution was due but not paid, or

(iii) the date the primary enrollee's coverages cease except that in the case of the primary enrollee's death, coverage for such sponsored dependent shall cease on the last day of the month in which the primary enrollee dies, unless the sponsored dependent has coverages continued in accordance with (2) above.

### (f) *Same-Sex Domestic Partners and Their Children*

(1) Effective January 1, 2001, the eligible domestic partner of an employee may be enrolled for coverage. To qualify for enrollment, the employee and domestic partner must:

(i) Be the same sex;

(ii) Have shared a continuous committed relationship for at least six months, intend to do so indefinitely and have no such domestic partner relationship with any other person;

(iii) Reside in the same household;

51

Art. III, 9(f)(1)(iv)

(iv)  Share responsibility for each other's welfare and financial obligations;

(v)  Not be related by blood to a degree of kinship that would prevent marriage from being recognized under law;

(vi)  Be over the age of 18, of legal age and legally competent to enter into a contract;

(vii)  Reside in a state where marriage between two persons of the same sex is not recognized as valid under law; and

(viii) Not be married to any other person.

(2)  If the enrollee resides in a state that has a formal recognition of domestic partner relationships, such recognition is required for enrollment of the domestic partner.

(3)  The employee and the domestic partner will be required to complete an affidavit attesting to meeting the eligibility requirements and provide any additional documentation necessary to support the claimed eligibility.

(4)  An eligible domestic partner's child may be enrolled if the primary enrollee can claim an exemption for the child on his or her federal income tax return and the child meets all of the Program's eligibility provisions pertaining to children.

(5)  Neither a domestic partner nor his or her children are eligible to be enrolled following the primary enrollee's retirement.  However, coverage for an eligible domestic partner, or his or her child, enrolled prior to the primary enrollee's retirement may be continued in retirement.

(6)  If the primary enrollee and his or her domestic

52

Art. III, 9(f)(6)

partner terminate the relationship, an opportunity to continue coverage on a basis comparable to COBRA will be provided.

(7) In the event of the primary enrollee's death, a surviving domestic partner will be provided continuation opportunities comparable to a similarly situated surviving spouse. Under no circumstances will the privileges afforded a domestic partner exceed those of a similarly situated spouse.

### Section 10.  Conversion Privilege

(a) Any former enrollee who is no longer eligible to continue coverages under the Program, may, be offered an opportunity to obtain other available coverage, on a self-paid basis, from the basic carrier with whom enrolled at the time eligibility terminated.

(b) A former enrollee wishing to exercise this privilege shall make application to the carrier within thirty (30) days of termination of eligibility under this Program.

### Section 11.  Consolidated Omnibus Budget Reconciliation Act (COBRA) Continuation

The Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA, or the Act), as amended, provides continuation rights to certain employees or dependents who would ordinarily lose eligibility for coverage under the Program.

If amendments to the Act or the applicable regulations preclude administration in accordance with the following provisions, the Corporation will make any changes necessary to comply with COBRA.

(a) For purposes of COBRA, this Program is

53

Art. III, 11(a)

considered to be a single plan offering "core coverages" (hospital, surgical, medical, prescription drug, hearing aid, mental health and substance abuse) and "non-core coverages" (dental and vision), regardless of the carrier option (Traditional, Preferred Provider Organization, Health Maintenance Organization, alternative dental plan, etc.) chosen by the primary enrollee, or of the entity chosen by the Corporation to administer such coverages on the Corporation's behalf.

   **(b)**   The Corporation is responsible for providing notification, as required under COBRA, to "qualified beneficiaries," as defined therein.  The Corporation may delegate the administrative functions associated with COBRA.

   **(c)**   To the extent the Corporation makes alternative continuation privileges available under Article III of the Program that do not satisfy all the requirements for "COBRA" continuation coverage," enrollees shall have the opportunity to elect either the COBRA continuation coverage or continuation under the Program.  An election of COBRA continuation coverage will terminate the enrollee's eligibility for Program continuation.

   **(d)**   To the extent the Corporation makes alternative continuation privileges available under Article III of the Program that do satisfy all of the requirements for "COBRA continuation coverage," such alternative continuation privileges will be integrated with the COBRA continuation coverage.

   **(e)**   In the event a primary enrollee is entitled to elect between COBRA continuation coverage and alternative continuation provided under the Program, coverage will be continued beyond the point coverage as an active employee or dependent of an active employee ceases as if the primary enrollee elected alternative continuation under the Program.  If the primary enrollee

54

Art. III, 11(e)

subsequently elects COBRA continuation during the election period and pays any required contribution, coverages will be adjusted retroactively to provide the COBRA continuation.

**(f)** Unless advised otherwise by a COBRA "qualified beneficiary," an election of alternative continuation by the primary enrollee shall be presumed to be an election for all other enrollees and/or qualified beneficiaries covered under such primary enrollee's coverage.

## ARTICLE IV

## DEFINITIONS

Unless otherwise indicated, as used in this Program:

**1.** *"active service"* or *"in active service"* - means receiving pay for regular hours of work scheduled by the Corporation, or otherwise scheduled to work but absent due to either,

**(a)** vacation time off authorized in advance,

**(b)** a specified holiday, or

**(c)** bereavement, jury duty, or short-term military leave of absence under circumstances where the absence is authorized in advance and the employee is entitled to receive full or partial compensation from the Corporation for the day(s) of absence.

An employee is not in active service if the employee is absent every scheduled work day during a month, for reasons other than those specified above, whether or not such absence is excused.

An employee is not in active service in any full month in which such employee is not scheduled to work

55

is authorized in advance and the employee is entitled to receive full or partial compensation from the Corporation for the day(s) of absence.

An employee is not in active service if the employee is absent every scheduled work day during a month, for reasons other than those specified above, whether or not such absence is excused.

An employee is not in active service in any full month in which such employee is not scheduled to work due to layoff or any leave of absence (other than short-term military leave referred to in subsection (c) above), regardless of whether the employee may be entitled to some compensation for any day(s) during such month.

**2.** *"Authorized Employee"*- means a Delphi employee whose duties require access to PHI for purposes of administering the Program, including: the Privacy Official/Director, Health Care; Manager, Health Care; Analyst, Health Care; Coordinator, Health Care; Staff Assistant, Health Care; Executive Director, Employee Benefits; Administrative Assistant, Employee Benefits; members of the Delphi Employee Benefit Plans Committee ("EBPC"); personnel specifically designated as an Authorized Employee by the Privacy Official or his delegate (e.g., finance staff personnel, audit staff personnel); and in-house counsel to Employee Benefits.

**3.** *"benefit"* - means a payment made, in accordance with the Program provisions, to an enrollee, or to a provider on behalf of an enrollee.

**4.** *"carrier"* - means any entity by which Program coverages are administered or benefits are paid. The term includes, but is not limited to, the following types of entities:

(a) an insurance company

56

having been rendered to the enrollee. The provider must certify upon the report that the provider is entitled to payment under this Program and that the service was personally rendered or rendered during the provider's presence and under the provider's supervision. An enrollee's request for service is authorization to the provider to make the report.

3. An enrollee seeking payment from a carrier must furnish, or cause the provider to furnish, a report to the carrier in the form prescribed by the carrier. By filing the report the enrollee consents that the carrier may have access to the data disclosed by the records and files of the provider and of the hospital or other facility named in this report.

### D. *Identification Cards*

1. Enrollees shall be furnished identification cards by the carrier(s). Such cards shall contain toll-free telephone numbers for obtaining predetermination information or other required approvals of services.

2. The identification card must be presented when service is requested.

3. An enrollee shall not use an identification card to obtain benefits to which such enrollee is not entitled, nor shall the enrollee permit another person to obtain benefits to which such person is not entitled.

### E. *Medicare*

1. Under current Federal laws, certain enrollees otherwise eligible to enroll for benefits under Medicare, may defer enrollment in Medicare without penalty. If such enrollees are not eligible for coverage under any other employer plan or program and elect to enroll in Medicare, the Program remains the primary source of benefits, with Medicare supplementing Program coverage. For purposes of subsections 2 through 4

79

App. A, II.E.1.

below, Medicare enrollment of such enrollees shall be disregarded.

2.    Enrollees who are eligible to enroll for benefits under Part A of Medicare, whether or not they are enrolled, will have all coverage available under this Program reduced to the extent payment or benefit is available (or would have been available had the eligible enrollee been enrolled for Medicare benefits) under Part A of Medicare.  The hospital coverage under this Program will be reduced during the additional Medicare sixty (60) day lifetime maximum for inpatient hospital benefits, to the extent the benefits are available under Medicare whether or not the member utilizes the lifetime reserve.

3.    Enrollees who are enrolled for benefits under Part B of Medicare will have all coverage available under this Program reduced to the extent that payment or benefit is available under Part B of Medicare.

4.    All benefits furnished under Medicare Part A, or which would have been furnished had the enrollee been enrolled for Medicare Part A benefits, and all benefits furnished under Medicare Part B will be charged against the maximum benefit periods and maximum benefit amounts under this Program. Reduction of coverage under this provision or charging of Medicare benefits against the maximum benefit periods and maximum benefit amounts of this Program will be limited to the benefits provided by Medicare which would have been provided under this Program in the absence of this subsection.

**F.    *Medical Necessity***

1.    All covered services under the Program are subject to a requirement of medical necessity (see App. A, IV.H.).

App. A, II.F.2.

**2.**    The Control Plan will establish criteria, where necessary, to define medical necessity and accepted uniform standards of medical practice for the purposes of determining covered services. The Control Plan shall propose such criteria to the Corporation, and when such criteria are approved, shall communicate them to the local carriers. Local carriers shall communicate the criteria to providers.

**3.**    Local carriers, or others, requesting establishment, revision or withdrawal of such criteria shall submit such requests to the Control Plan for consideration. The Control Plan shall advise the Corporation of all such requests and recommended dispositions.

**G.    _Legal Action By An Enrollee_**

No action by an enrollee for entitlement to benefits under this Program may be brought more than two (2) years after such claim has accrued; provided, however, no other actions may be brought against the Program at all more than six (6) months after such claim has accrued.

**H.    _Changes in the Program_**

**1.**    Any rate of payment by the enrollee and any other terms and conditions of the Program may be changed at any time by the Corporation. Reasonable notice of such changes will be furnished to enrollees and/or affected parties as necessary.

**2.**    From time to time additional coverages may be provided or existing coverages withdrawn by the Corporation. In either event adequate notice shall be given to providers and/or enrollees, as appropriate, by the Corporation and/or the carrier(s).

**3.**    Neither the Control Plan nor a local carrier may make a substantive change to the coverages or

81

(7)   Transportation (one-way or round trip) of an enrollee to a health care facility for the purpose of receiving ESWL services;

(8)   Services which are payable through an existing arrangement for transfer of patients, where no additional charge is usually made, whether or not such services were immediately available; and

(9)   Coverage for ambulance services is subject to the Terms and Conditions of Section II, and the Limitations and Exclusions of Section IV.

### G.   *Prescription Drug Coverage*

#### 1.   *Definitions*

For the purposes of this subsection:

a.   "*brand name drug*" means a drug which is covered by a patent and for which an equivalent version can not be manufactured or marketed (single source) or a drug which is no longer covered by a patent and for which chemically equivalent versions can be manufactured and marketed (multi-source).

b.   "*copayment*" means an amount to be paid by the enrollee for each separate prescription order or refill of a covered drug.

c.   "*covered drug, supplies or diaphragm*" means insulin or any prescription legend drug that is dispensed according to a prescription order provided that:

(1)   the drug is medically necessary for the treatment of an illness or injury, or is a contraceptive medication;

(2)   the cost of the drug is not included or includable in the cost of other services or supplies provided to the enrollee;

121

App. A, III.G.1.c.(3)

(3)  the amount of the prescription charge exceeds the copayment;

(4)  the drug is customarily dispensed according to a prescription order; and

(5)  the drug is not entirely consumed at the time and place of the prescription order.

*"Supplies"* refers to syringes and needles dispensed with <u>self-administered</u> insulin or an antineoplastic agent under the provisions of this subsection.

<u>*"Diaphragm"* refers to a self-administered contraceptive device.</u>

<u>**d.**  *"generic drug"* means a drug that is chemically equivalent to a multi-source brand name drug.</u>

**e.**  *"nonparticipating provider"* means a provider who has not entered into a contract with the carrier.

**f.**  *"participating provider"* means a provider who has entered into a contract with a carrier to provide a covered drug to an enrollee, in accordance with the provisions of this Program and this subsection.  Such contract shall provide for payment to the provider based on prescription charges.  In the case of a preferred provider organization which provides prescription drug coverage under the Program, participating providers are the organization's panel pharmacies.

**g.**  *"pharmacist"* means a person licensed to dispense prescription legend drugs under the laws of the state where such person practices.

**h.**  *"pharmacy"* means a licensed establishment where prescription legend drugs are dispensed by a pharmacist.

122

**i.** *"prescription legend drug"* means any medicinal substance which, under the Federal Food, Drug and Cosmetic Act, is required to <u>be labeled</u> "Caution: Federal law prohibits dispensing without a prescription" <u>or "Rx Only"</u> and includes compounded medications containing at least one prescription legend drug.

**j.** *"prescription charge"* means a dispensing fee <u>plus lesser of the reasonable and customary amount paid by the provider for a covered drug (including insulin and disposable syringes and needles</u>, or such amount as may be negotiated by the carrier with participating providers. The "dispensing fee" is an amount or amounts, including applicable sales tax, predetermined by the carrier to compensate participating providers for dispensing covered drugs.

<u>For</u> covered drugs obtained from a nonparticipating provider or from a provider in an area where the carrier does not provide the coverage, the prescription charge means the reasonable and customary charge as determined by the carrier.

**k.** *"prescription order"* means a written or oral request to a provider by a physician for a single prescription legend drug.

**l.** *"provider"* means a pharmacy or any other organization or person licensed to dispense prescription legend drugs.

**2.** *Reimbursement*

**a.** The copayment amount for each separate prescription order or refill of a covered drug shall not exceed:

**(1)** $5.00 for <u>generic drugs dispensed at retail</u>; or

App. A, III.G.2.a.(2)

(2)    $10.00 for brand name drugs dispensed at retail; or

(3)    $2.00 ($5.00 effective January 1, 2005) for brand name or generic drugs dispensed through mail order.

(4)    The retail copayment for generic and brand name drugs applicable to those enrolled as a retiree, surviving spouse (or a dependent of a retiree or surviving spouse) as of September 18, 2003 will be $5.00.

b.    In addition to the copayment, enrollees may incur additional expense if a brand name drug, other than a drug identified in subsection (4), below is dispensed:

(1)    If the brand name drug is dispensed at the enrollee's request or upon determination that it is not medically necessary to dispense the brand name drug rather than the generic, the enrollee will pay the appropriate generic copayment plus the full difference in cost between the generic drug and the brand name drug;

(2)    If the brand name drug is dispensed at retail and at physician direction, the enrollee will pay the appropriate brand name copayment plus the difference (up to a maximum of $10.00) in Program cost between the generic drug and the brand name drug.

(3)    The carrier will initiate a review of the medical necessity for dispensing the brand name drug rather than the generic if no review has been requested by enrollees or their physicians. If the medical necessity is not established, future dispensing will be subject to (1) above.

(4)    In the case of (3), above, if it is found that dispensing of the brand name drug rather than the generic was medically necessary, amounts in excess of the brand name copayment will be refunded

124

App. A, III.G.2.b.(4)

automatically. The carrier's systems will be adjusted to allow dispensing of the brand name for the duration of the prescription.

(5)    "Narrow Therapeutic Index Drugs" are those for which small variations in the dose could result in changes in drug safety. In order to remain within a safe and effective range, these medications may require frequent patient monitoring to adjust the dose. When such brand name drugs are dispensed, only the brand name copayment will apply.  Drugs currently included in this group are:

> Lanoxin
> Dilantin
> Tegretol
> Cyclosporin
> Depakene
> Mysoline
> Levothyroxine (including Synthroid)

This list may be adjusted from time-to-time as reflected in Program standards.

c.    The copayments specified above are for the days supply referenced in subsection G.3., below. To the extent a particular covered drug, supply or device is pre-packaged in days supply exceeding the specified ones, and cannot be repackaged by the provider, the copayments will be prorated to account for the additional days supply.

d.    Effective January 1, 2004, after the original prescription order and two (2) refills, retail purchases of covered drugs identified in subsection 5.b., below, (and related supplies, if applicable) are subject to an enrollee copayment of 100% of the Program cost.

e.    Except for the amounts indicated above, covered drugs or supplies obtained from a participating provider are covered subject to the Program provisions.

125

App. A, III.G.2.f.

**f.** Upon proof of payment acceptable to the carrier, an enrollee is entitled to reimbursement from the carrier of seventy-five percent (75%) of the reasonable and customary charge <u>for the generic or brand name drug as applicable,</u> as determined by the carrier after deduction of the <u>appropriate</u> copayment, of covered drugs obtained on a non-emergency basis from a nonparticipating provider located within the area in which the carrier provides coverage. <u>The enrollee may incur additional expense if a brand name drug is dispensed at the enrollee's request or when not medically necessary.</u>

**g.** Upon proof of payment acceptable to the carrier, an enrollee is entitled to reimbursement from the carrier of one hundred percent (100%) of the reasonable and customary charge <u>for the generic or brand name drug, as applicable,</u> as determined by the carrier after deduction of the <u>appropriate</u> copayment, of covered drugs obtained from a provider located outside the area in which the carrier provides coverage or from an in-area non-participating provider in the case of an emergency. <u>The enrollee may incur additional expense if a brand name drug is dispensed at the enrollee's request or when not medically necessary.</u>

**3. *Coverage***

**a.** <u>At retail,</u> coverage includes up to a 34-day supply of a covered drug. <u>Certain drugs, such as contraceptives, may be subject to Program Standards clarifying what is included in "up to a 34-day supply".</u>

**b.** <u>At retail,</u> coverage includes a one-month supply of disposable syringes and needles when prescribed <u>and dispensed</u> with a one-month supply of <u>self-administered</u> insulin <u>or</u> a covered <u>self-administered</u> antineoplastic agent.

**c.** <u>At retail, coverage includes two</u>

126

# APPENDIX C

# DENTAL COVERAGE

## I. Enrollment Classifications

Dental coverage for a primary enrollee shall include coverage for secondary enrollees as defined in the Program.

## II. Description of Benefits

Dental benefits will be payable, subject to the conditions herein, if an enrollee incurs a covered dental expense.

## III. Covered Dental Expenses

Covered dental expenses are the usual charges of a dentist which an enrollee is required to pay for services and supplies which are necessary for treatment of a dental condition, but only to the extent that such charges are reasonable and customary charges, as herein defined, for services and supplies customarily employed for treatment of that condition, and only if rendered in accordance with accepted standards of dental practice. Such expenses shall be only those incurred in connection with the following dental services which are performed, except as otherwise provided in Section VII. B., by a licensed dentist and which are received while coverage is in force.

A. The following covered dental expenses shall be paid at 100 percent of the reasonable and customary charge:

1. Routine oral examinations and prophylaxes (scaling and cleaning of teeth), but not more than twice each in any calendar year. Three cleanings per calendar year will be allowed if there is a documented history of periodontal disease. Four cleanings per calendar year will be covered for two full calendar years following periodontal surgery.

177

App. C, III.A.2.

**2.**    Topical application of fluoride provided that such treatment shall be a covered dental expense only for enrollees under 20 years of age, unless a specific dental condition makes such treatment necessary.

**3.**    Space maintainers that replace prematurely lost teeth for children under 19 years of age.

**4.**    Emergency palliative treatment.

**B.**    The following covered dental expenses shall be paid at 90 percent of the reasonable and customary charge:

**1.**    Dental x-rays, including:

**a.**    full mouth x-rays, once in any period of five (5) consecutive calendar years.

**b.**    supplementary bitewing x-rays once in any calendar year, and

**c.**    such other dental x-rays, including but not limited to those specified in a. and b. above, as are required in connection with the diagnosis of a specific condition requiring treatment.

**2.**    Extractions.

**3.**    Oral surgery.

**4.**    Amalgam, silicate, acrylic, synthetic porcelain, composite, and other American Dental Association (ADA)-approved direct restorative materials that meet Program standards and are used to restore diseased or accidentally injured teeth.

**5.**    General anesthetics and intravenous sedation when medically necessary and administered in connection with oral or dental surgery.

**6.**    Treatment of periodontal and other diseases of the gums and tissues of the mouth.

178

App. C, III.B.7.

**7.** Endodontic treatment, including root canal therapy.

**8.** Injection of antibiotic drugs by the attending dentist.

**9.** Repair or recementing of crowns, inlays, onlays, bridgework, or dentures; or relining or rebasing of dentures more than six (6) months after the installation of an initial or replacement denture, but not more than one relining or rebasing in any period of three (3) consecutive calendar years.

**10.** Inlays, onlays, gold fillings, or crown restorations to restore diseased or accidentally injured teeth, but only when the tooth, as a result of extensive caries or fracture, cannot be restored with an amalgam, silicate, acrylic, synthetic porcelain, composite or other American Dental Association (ADA)-approved materials that meet Program standards and are used for direct filling restoration.

**11.** Cosmetic bonding of eight (8) front teeth for children 8 through 19 years of age if required because of severe tetracycline staining, severe fluorosis, hereditary opalescent dentin, or amelogenesis imperfecta, but not more frequently than once in any period of three (3) consecutive calendar years.

**C.** The following covered dental expenses shall be paid at 50 percent of the reasonable and customary charge:

**1.** Initial installation of fixed bridgework (including inlays and crowns as abutments).

**2.** Initial installation of partial or full removable dentures (including precision attachments and any adjustments during the six (6) month period following installation).

179

App. C, III.C.3.

3.    Replacement of an existing partial or full removable denture or fixed bridgework by a new denture or by new bridgework, or the addition of teeth to an existing partial removable denture or to bridgework, but only if satisfactory evidence is presented that:

a.    the replacement or addition of teeth is required to replace one or more teeth extracted after the existing denture or bridgework was installed;

b.    the existing denture or bridgework cannot be made serviceable and, if it was installed under this dental coverage, at least five (5) years have elapsed prior to its replacement; or,

c.    the existing denture is an immediate temporary denture which cannot be made permanent and replacement by a permanent denture takes place within twelve (12) months from the date of initial installation of the immediate temporary denture.

Normally, dentures will be replaced by dentures but if a professionally adequate result can be achieved only with bridgework, such bridgework will be a covered dental expense.

4.    Orthodontic procedures and treatment (including related oral examinations) consisting of surgical therapy, appliance therapy, and functional/myofunctional therapy (when provided by a dentist in conjunction with appliance therapy) for enrollees under 19 years of age, provided, however, that benefits will be paid after attainment of age 19 for continuous treatment which began prior to such age.

## IV. Maximum Benefit For Other Than Accidental Dental Injury

The maximum benefit payable for all covered dental expenses incurred during a calendar year commencing

180

App. C, IV.

January 1 and ending the following December 31 (except for services described in Section III. C.4. above and in Section XI below) shall be $1,600 ($1,700 effective January 1, 2005 for each enrollee.

For covered dental expenses in connection with orthodontics including related oral examinations, described in Section III. C.4. above, the maximum benefit payable shall be $1,800 ($2,000 effective January 1, 2005), during the lifetime of each enrollee, with a maximum of $1,800 applicable to covered dental expenses for services provided prior to January 1, 2005.

## V. Pre-Determination of Benefits

If a course of treatment can reasonably be expected to involve covered dental expenses of $200 or more, a description of the procedures to be performed and an estimate of the dentist's charges must be filed with the carrier prior to the commencement of the course of treatment.

The carrier will notify the enrollee and the dentist of the benefits certified as payable based upon such course of treatment. In determining the amount of benefits payable, consideration will be given to alternate procedures, services, or courses of treatment that may be performed for the dental condition concerned in order to accomplish the desired result. The amount included as certified dental expenses will be the appropriate amount as provided in Sections III. and IV., determined in accordance with the limitations set forth in Section VI.

If a description of the procedures to be performed and an estimate of the dentist's charges are not submitted in advance, the carrier reserves the right to make a determination of benefits payable taking into account alternate procedures, services, or courses of treatment, based on accepted standards of dental practice. To the extent verification of covered dental expenses cannot

181

**E.** *"Nonparticipating provider"* means an ophthalmologist, optometrist, or optician who has not signed an agreement with the carrier covering reimbursement, quality, service standards and other terms and conditions connected with providing covered vision services to enrollees.

**F.** *"Reasonable and customary charge"* means the actual amount charged by an ophthalmologist, optometrist, or optician for a service rendered or materials furnished but only to the extent that the amount is reasonable, taking into consideration the following:

**1.** the usual amount which the individual provider most frequently charges the majority of patients or customers for a similar service rendered or materials furnished;

**2.** the prevailing range of charges made in the same area by providers with similar training and experience for the service rendered or materials furnished;

**3.** unusual circumstances or complications requiring additional time, skill, and experience in connection with the particular service rendered or materials furnished.

As used in this Appendix, "reasonable and customary charge" also refers to scheduled or other contracted amounts of payment used by carriers with participating provider arrangements.

The carrier is responsible for determining the appropriate reasonable and customary charge for a given provider and service or material, and such determination shall be conclusive.

**G.** *"Contact lenses"* means ophthalmic corrective lenses, as prescribed by an ophthalmologist or optometrist, to be fitted directly to the enrollee's eyes.

189

**H.**   *"Lenses"* means ophthalmic corrective lenses, as prescribed by an ophthalmologist or optometrist, to be fitted into a frame.

**I.**   *"Frame"* means a standard eyeglass frame into which two lenses are fitted.

**J.**   *"Covered vision expense"* means the reasonable and customary charges for vision care services and materials, as described in Section IV., when provided by ophthalmologists, optometrists, and opticians for each enrollee.

**K.**   *"Corrective eye surgery"* means a surgical procedure used to alter the cornea or shape/surface of the eye in order to improve visual acuity, correct vision conditions such as myopia, hyperopia, or astigmatism and reduce or eliminate the reliance on eyewear. Such surgeries can include, but are not necessarily limited to, Laser-assisted In-Situ Keratomileusis (LASIK), PhotoRefractive Keratectomy (PRK) and Radial Keratotomy (RK).

## IV.  Benefits

Benefits will be paid for the covered vision expenses described in A., B., and C. below, less any copayment as described in D. below.

### A.   *Vision Examinations:*

**1.**   Refraction, including case history, coordinating measurements, and tests;

**2.**   The prescription of glasses where indicated; and

**3.**   Examination by an ophthalmologist, upon referral by an optometrist, within 60 days of a vision examination by the optometrist.

190

### B. *Lenses and Frames:*

When lenses are prescribed by an ophthalmologist or optometrist, the necessary materials and professional services connected with the ordering, preparation, fitting, and adjusting of:

**1.** Lenses (single vision, bifocals, trifocals, lenticular). If the enrollee selects lenses, the size of which results in an additional charge, only the reasonable and customary charge for normal size lenses of the same material and prescription will be considered a covered vision expense. If the enrollee selects photochromic lenses or lenses with a tint other than Number 1 or Number 2, only the reasonable and customary charge for clear lenses of the same material and prescription will be considered a covered vision expense.

**2.** Contact lenses following cataract surgery, or when visual acuity cannot be corrected to 20/70 in the better eye except by their use, or when medically necessary due to keratoconus, irregular astigmatism or irregular corneal curvature. If contact lenses are prescribed for any other reason, $80 is the maximum amount that will be considered a covered vision expense.

**3.** Frames. If frames are obtained from a participating provider, the enrollee may make a selection from the display shown by the participating provider and there will be no out-of-pocket expense to the enrollee other than as described under "Copayments". If the enrollee obtains frames from a nonparticipating provider, $24 is the maximum amount that will be considered a covered vision expense.

### C. *Corrective Eye Surgery:*

Effective January 1, 2004, corrective eye surgery performed by an ophthalmologist will become a covered

App. D, IV. C.

service. Coverage includes any related pre and post-surgical professional services, facility expense and medically necessary supplies. Coverage is subject to the following provisions:

**1.** An enrollee may not receive benefits for both corrective eye surgery and for frames and/or lenses (including contact lenses) in the same calendar year;

**2.** Upon proof of payment to the corrective eye surgery provider, the carrier will reimburse the primary enrollee for covered expense, up to the lesser of the charges or the maximum benefit of $295.00 in any four (4) year period; and

**3.** An enrollee receiving benefits for corrective eye surgery in any one calendar year will be ineligible for lens (including contact lens) and/or frame benefits for that year and three (3) subsequent years. For example, an enrollee undergoing corrective eye surgery in 2004 would be eligible for lens and/or frame benefits in 2008. Such enrollees will be eligible for benefits for an annual exam, and will have access to the participating provider fee schedule for non-covered services and for lenses and/or frames for which no benefits are payable.

**D.** *Copayments:*

For each enrollee, there is a $7.00 copayment applicable to the covered vision expense for each vision examination and a $10.00 copayment for the combined covered vision expenses for lenses, contact lenses, and frames. The total copayment for each enrollee, during a calendar year, will not exceed $17.00.

## V. Frequency Limitations

For each enrollee, there are the following limitations on the frequency with which charges for certain services and materials will be considered covered vision expenses:

App. D, V.

| | |
|---|---|
| Vision Examination | — Once during a calendar year, except as provided in Section IV.A.3. |
| Lenses and Contact Lenses | — Once during a calendar year, except as provided in Section IV.C. |
| Frames | — Once during two consecutive calendar years, except as provided in Section IV.C. |

The limitations on lenses, contact lenses, and frames apply whether or not they are a replacement of lost, stolen, or broken lenses, contact lenses, or frames.

## VI. Exclusions

**A.** Any lenses which do not require a prescription;

**B.** Medical or surgical treatment of the eye, except as provided in Section IV.C.;

**C.** Drugs or any other medication;

**D.** Procedures determined by the carrier to be special or unusual, such as, but not limited to, orthoptics, vision training, subnormal vision aids, aniseikonic lenses, and tonography;

**E.** Vision examinations or materials furnished for any condition, disease, ailment, or injury arising out of or in the course of employment;

**F.** Vision examinations performed and lenses and frames ordered:

**1.** before the enrollee became covered for this coverage;

**2.** after the termination of the enrollee's coverage;

193

App. D, VI. F.3.

**3.** to the extent that they are obtained without cost to the enrollee.

## VII. Vision Network

**A.** The carrier has established a network of participating providers who agree to accept reimbursement according to a schedule for the covered vision services and materials described in Section IV. A. and B. without enrollee copayments.

**B.** If an enrollee uses a participating provider to obtain covered services, the carrier will reimburse the provider, without enrollee copayment, as specified below:

**1.** the scheduled amount (which shall be payment in full) for eye examinations; normal-size clear, Number 1 or Number 2 tinted lenses; and medically necessary contact lenses (see Section IV. B.1. and 2.);

**2.** the scheduled amount <u>(which shall be payment in full)</u> for eyeglass frames with a retail value <u>of</u> $<u>80</u>.00 <u>or less</u>. If an eyeglass frame with a retail value greater than $<u>80</u>.00 is selected, the enrollee will be responsible for <u>the discounted price (participating providers discount frames with the retail cost in excess of $80.00), less</u> $<u>24</u>.00; and

**3.** the scheduled amount of $65.00 for contact lenses, which do not meet the criteria in Section IV.B.2. The enrollee will be responsible for any amount greater than $<u>80</u>.00.

**C.** If an enrollee resides 25 miles or less from a participating provider but obtains covered services from a non-participating provider (other than an ophthalmologist) the carrier will reimburse the enrollee the scheduled amounts. The enrollee will be responsible for paying the provider, including any remaining

194

balance.  Reimbursement to the enrollee for covered services received from non-participating ophthalmologists will be made at the reasonable and customary amount, less the enrollee copayment (see Section IV. D.).

**D.**  If an enrollee resides more than 25 miles from a participating provider and obtains covered services from a non-participating provider (including an ophthalmologist), the carrier will reimburse the enrollee in accordance with Section IV. above.

<u>Misc. (Traditional Care Network)</u>

# DELPHI CORPORATION

<u>September 18, 2003</u>

<u>International Union, United Automobile
    Aerospace and Agricultural Implement
    Workers of America, UAW
8000 East Jefferson Avenue
Detroit, MI 48214</u>

<u>Attn:</u>  <u>Mr. Richard Shoemaker
    Vice President and Director
    General Motors Department</u>

<u>Dear Mr. Shoemaker:</u>

<u>This is to confirm the understandings reached between the parties during discussions concerning the Traditional option.  Subject to the review and approval of the parties, the Control Plan will assure development, implementation, and overseeing of the Traditional Care Networks as replacements for the Traditional option. The Traditional Care Networks will have the following features:</u>

- <u>The Traditional Care Networks will provide core coverages described in Appendix A, through access to a panel of providers within a defined service area who have agreed to provide services under the terms of participation established by the Traditional Care Network carrier such as limits on fees, and controls on quality and utilization. In most instances, the Traditional Care Network will consist of PPO/Managed Care Networks maintained by the individual carriers. In order to receive full benefits for certain covered services, enrollees must obtain such services through the panel of providers and predetermination and review procedures must be followed per Art. II, 4(c) of the Delphi Health Care Program for Hourly Employees (the Program), including sub-paragraphs (1) through (3).</u>

- <u>The Traditional Care Network carriers assume responsibility for conducting utilization reviews, predetermination of services, or other reviews necessary to promote quality of care and control</u>

<u>Misc. (Traditional Care Network)</u>

costs. The Traditional Care Network carriers may place the panel physician at financial risk through capitation, withholding of a percentage of fees, or other mechanisms, or if not, will have other means to monitor and control utilization by individual providers on a continuous basis.

- Subject to the review and approval of the parties, the Traditional Care Network carriers assume responsibility for selection and periodic evaluation of hospitals, physicians, laboratories, and other providers to ensure sufficient numbers and types of providers who are geographically distributed to allow adequate access for enrollees within a service area as defined by the carrier.

- The Traditional Care Network carriers assume responsibility for providing the scope and level of benefits set forth in Appendix A, monitoring the appropriateness of referrals to non-panel providers, taking affirmative corrective action with respect to providers when necessary, and implementing and maintaining other administrative processes as mutually agreed to by the parties.

- For select geographic locations and/or carriers, payment for covered services provided by non-panel providers, unless the enrollee is referred by a panel provider or resides outside of the carrier's defined service area, will be 90% of the non-panel provider's reasonable and customary charge as determined by the carrier for the same service or, if less, the actual charge. The reimbursement to providers by the Traditional Care Network carrier will be reduced to reflect any waiver or forgiveness by a provider of the remaining 10%. The 90% limitation on payment for charges payable to non-panel providers by the Traditional Care Network carrier shall not be applicable (i) to an individual who has incurred personal expense under this provision of $250.00 for such covered services in a calendar year (with the exception of personal expenses for office visits defined below) or (ii) to the covered members of the enrollee's

286

Misc. (Traditional Care Network)

family, if any, after the enrollee and such members have incurred a total of $500.00 in personal expense under this provision for such covered services in the same calendar year (with the exception of office visits defined below).

- Upon implementation of the Traditional Care Network, select services currently covered under the Preferred Provider Organization Option of the Program will be covered under the Traditional Care Network when services are provided by a panel provider. These services shall be limited:

1. Well baby care as defined under App. A, III.E.3.o.

2. Immunizations and vaccinations as defined under App. A, III.E.3.p, and

3. Screenings as defined under App. A, III.E.3.s

When the above services are provided to Traditional Care Network enrollees living outside of the defined service area by a provider participating with the carrier, the services will be covered as if they had been provided by a panel provider. If a non-panel, non-participating provider is utilized for the above services by an enrollee living outside of the defined service area, the Program will pay the non-participating reasonable and customary rate, and a balance bill to the enrollee may occur.

In addition to the select services identified above, office visits as defined under App. A, III.E.3.n. of the Program will be covered, subject to a coinsurance of 100% when services are provided by a panel provider. Office visits will be covered for a non-panel provider with a referral from a panel provider. Coinsurance amounts related to office visits will not be applied to the out-of-pocket maximum personal expense defined above.

- Under the Traditional Care Network, benefits may be payable in full (up to the carrier's reasonable and customary charge level) for services rendered by non-panel providers if such services are rendered on referral from a panel physician, subject to the conditions below:

287

**Misc. (Traditional Care Network)**

1. The panel provider is responsible for reporting all enrollee referrals for out-of-network services. Referrals to non-panel providers must be communicated to the carrier per the carrier's program guidelines.

2. The carrier is responsible for monitoring referral frequency and patterns, and for ensuring that additional costs are not incurred by the program or the enrollee.

3. Referral does not apply to well baby care, immunizations, or screenings as defined above. These are not covered services if rendered by a non-panel provider unless the enrollee lives outside of the defined service area.

4. A service which would not otherwise be a covered service does not become a covered service by virtue of a referral.

- A procedure will be available for carriers to hold the enrollee harmless, up to the limits of coverage, for: (1) errors of commission or omission over which the enrollee has no control or (2) in instances where participating or non-participating provider charges exceed usual, customary, and reasonable reimbursement rates for covered services. This procedure shall be published in the Administration Manual. The carriers shall require participating providers to hold the enrollee harmless from the provider's errors of commission or omission. If an enrollee receives covered services from a non-network par provider, the provider will accept payment from the carrier as payment in full.

- Mental Health and Substance Abuse coverage will continue to be administered in accordance with the terms and conditions of Appendix B.

288

Misc. (Traditional Care Network)

The Traditional Care Network will be implemented by July 1, 2004. All decisions of the Control Plan are subject to review and approval by the parties prior to implementation of the Traditional Care Networks.

Very truly yours,

DELPHI CORPORATION

Kevin M. Butler
Vice President
Human Resource Management

Accepted and Approved:

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW

By: Richard Shoemaker

289

# Exhibit B

# *Supplemental Agreement*

Covering

## HEALTH CARE PROGRAM

Exhibit C

to

AGREEMENT

between

DELPHI CORPORATION

and

IUE-CWA

dated

November 16, 2003

(Effective December 1, 2003)

agreement as stated above, or fails to perform in accordance with its agreement, the Control Plan, with the approval of the Corporation, shall provide such health care coverages in the geographic area or arrange with another carrier to do so.

(e) Core and non-core coverages may be provided through the Health Maintenance Organization option. However, the coverages provided through this option may vary from the coverages described in Appendices A, B, and D.

## Section 3.   Replacement or Supplementation of Coverages

If in its judgment the Corporation considers it advisable in the interest of the enrollees in any geographic area, another arrangement may be substituted in such area or areas for all or part of the coverages referred to in Section 1 above.

## Section 4.   Selection of Option in the Informed Choice Plan

The Corporation will make arrangements to provide an opportunity for primary enrollees to elect to have core coverages provided through one of the options available under the Informed Choice Plan. Such election also may include a choice among dental options, where applicable. The specific choices offered to a primary enrollee will depend on the availability of approved options in the enrollee's geographic area and Medicare status of the primary and secondary enrollees. The options are as follows:

### (a) *Preferred Provider Organization Option*

This option provides core coverages, as described in Appendix A, through access to a panel of providers who have agreed to provide services under the terms of participation established by the preferred provider

25

organization such as limits on fees, and controls on quality and utilization. In order to receive full benefits for certain covered services, such services must be obtained through the organization's panel of providers.

(1) A preferred provider organization assumes responsibility for conducting utilization reviews, predetermination of services, or other reviews necessary to promote quality of care and control costs. A preferred provider organization may place the panel physician and other providers at financial risk through capitation, withholding of a percentage of fees, or other mechanisms, or if not, will have other means to monitor and control utilization by individual providers on a continuous basis.

(2) A preferred provider organization assumes responsibility for selection and periodic evaluation of hospitals, physicians, pharmacists, laboratories, and other providers to ensure sufficient numbers and types of providers who are geographically distributed to allow adequate access for enrollees.

(3) A preferred provider organization assumes responsibility for providing the scope and level of benefits set forth in Appendix A, monitoring the appropriateness of referrals to non-panel providers, taking affirmative corrective action with respect to providers when necessary, and implementing and maintaining other administrative processes as required by the Corporation.

(4) Payment for covered services provided by non-panel providers, unless the enrollee is referred by a panel provider, will be 80% of the non-panel provider's reasonable and customary charges for the same service or, if less, the actual charges. The reimbursement to providers by the preferred provider organization will be reduced to reflect any waiver or forgiveness by a provider of the remaining 20%.

26

Under this subsection, the 80% limitation on payment for charges payable to non-panel providers by the preferred provider organization shall not be applicable (i) to an individual enrollee who has incurred personal expense under this provision of $1,000 for such covered services in a calendar year or (ii) to the covered members of the enrollee's family, if any, after the enrollee and such members have incurred a total of $2,000 in personal expense under this provision for such covered services in the same calendar year.

(5)  Preferred provider organizations may seek Corporation approval to establish special contractual relationships with providers not otherwise included under the Program (e.g., freestanding ambulatory surgical centers), when it can be shown that doing so will improve quality of care and enhance cost competitiveness.

(6)  Mental health and substance abuse coverage is administered in accordance with the terms and conditions of Appendix B.

## (b)  *Health Maintenance Organization Option*

This option provides coverages to enrollees through physicians, hospitals, and other providers who have agreed to provide services under the terms established by the health maintenance organization to limit fees, assure quality, and control utilization.

(1)  The types of coverages and the scope and level of coverages provided under this option may vary among health maintenance organizations and may be different than the coverages set forth in Appendices A, B, and D.

(2)  Most health maintenance organizations provide health care coverages (including preventive care) that generally are managed for the enrollee by a

primary care physician. The primary care physician is responsible for referring the patient to other providers of service. If such referral is not obtained, the enrollee may be responsible for charges incurred.

(3) Under this option, if an enrollee receives services from a non-health maintenance organization provider, in a non-emergency situation or without a referral, such services may not be covered.

(4) The Corporation pays a capitated fee to health maintenance organizations for enrollees electing coverage through this option. The fee paid is based upon a comparison of the monthly rates of the health maintenance organization and those of the base option in the rating area. When the health maintenance organization's rates are higher than those of the base option, the enrollee may be required to make a contribution.

(c) *Traditional Option*

This option provides core coverages described in Appendix A with predetermination and review procedures required in order to receive full benefits for certain covered services. These procedures include but are not limited to predetermination (which includes, but is not limited to, prior authorization or assessment for non-emergency inpatient admissions, and second opinions for selected procedures), concurrent utilization review, retrospective utilization review, and focused utilization review. In some instances, special programs (such as foot surgery predetermination or predetermination of specific outpatient procedures) will be developed and implemented, as necessary and practicable, to address specific utilization problems.

(1) Benefits for certain covered services, which require predetermination, when provided without obtaining necessary predetermination approvals will be

administered according to Program standards including the provision that such services be payable at 80% of reasonable and customary charges after the first $100 of expense for such services. The reimbursement to providers will be reduced to reflect any waiver or forgiveness by a provider of the $100 or remaining 20%.

(2)   Under this subsection, the 80% payment limitation and the requirement that payment be made for the first $100 of covered expenses shall not be applicable (i) to an individual enrollee who has incurred a personal expense of $750 under this provision for such covered services in a calendar year or (ii) to the covered members of the enrollee's family, if any, after the enrollee and such members have incurred a total of $1,500 in personal expense under this provision for such covered services in the same calendar year.

(3)   Primary and secondary enrollees eligible for Medicare and enrolled in the Traditional option may not be subject to the predetermination and review procedures set forth above for those covered services for which Medicare has primary responsibility.

(4)   In selected states, or geographic areas within a state, Traditional Care Networks (TCN) may be implemented. Such networks will apply to Traditional option enrollees residing in the respective states/areas. The scope and level of coverages may vary from those for the Traditional option in non-TCN states/areas and may involve variation in benefits for use of non-TCN providers. When a TCN is implemented, affected enrollees will be provided additional information.

(5)   Mental health and substance abuse benefits are administered in accordance with the terms and conditions of Appendix B.

(d)  Corporation contributions will not be made for employees hired on or after November 18, 1996 who, at the time of retirement or termination at age 65 or older, have fewer than ten (10) years of credited service under the Corporation's Pension Plans. Such individuals may elect to continue coverage on a self-paid basis.

### Section 7.   Continuation of Coverages Upon Termination of Employment Other Than by Retirement or Death

(a)  Except as provided in Article III, Section 4(c) above, health care coverages for an employee who quits or is discharged shall automatically cease as of the last day of the month in which the employee quits or is discharged or, if later, the date seniority is broken.

(b)  Following termination of employment other than by retirement or death, the former employee shall be entitled to self-paid continuation of coverages provided under applicable Federal laws, and/or may be offered a conversion contract.

### Section 8.   Continuation of Coverages for the Survivors of an Employee, or of a Retired Employee or Certain Former Employee

(a)  If an employee dies prior to becoming eligible for health care coverages under Section 2 above, the Corporation shall permit the spouse of such employee to participate in the core coverages, on a self-pay basis, as provided in subsection (b)(1) below.

(b)  If an employee or retiree dies after coverages are in effect under the Program, coverage for any dependents will cease as of the end of the month in which the employee or retiree dies. Thereafter, a surviving spouse may be eligible to continue coverages as indicated below.

For purposes of this Section 8 and of Article V,

Art. III, 8(b)

"surviving spouse" does not include the spouse of a former employee eligible for a deferred pension under Article VII, Section 2 of The Delphi Hourly-Rate Employees Pension Plan; or a spouse or former spouse receiving, or eligible to receive, a pre-retirement survivor benefit under Article II, Section 11 of the previously referenced Pension Plan.

(1) The Corporation shall make suitable arrangements for the surviving spouse of an employee to participate, on a self-pay basis, in core coverages for the first 24 months following the month in which the employee dies, provided the surviving spouse was married to the deceased employee for at least one full year immediately preceding the date of death.

(2) The Corporation shall make contributions for core coverages continued in accordance with subsection (b)(1) above, for the first twelve months following the month in which the employee dies, provided that, as of the employee's date of death, the surviving spouse's age is at least 45, or the surviving spouse's age, when added to the deceased employee's seniority, totals 55 or more. Thereafter, the surviving spouse may continue core coverages, on a self-pay basis, until the earlier of (a) remarriage, (b) the end of the month in which age 62 is attained, or (c) death.

(3) The Corporation shall make suitable arrangements for a surviving spouse

(i) of an employee or retired employee (but not the surviving spouse of a former employee eligible for a deferred pension or a surviving spouse or surviving divorced spouse eligible for a pre-retirement survivor benefit under Article II, Section 11 of The Delphi Corporation Hourly-Rate Employees Pension Plan) if such spouse is receiving or is eligible to receive a survivor benefit under Article II of The Delphi Corporation Hourly-Rate Employees Pension Plan,

40

(ii)  of a retired employee if, prior to death, the retired employee was receiving a benefit under Article II of The Delphi Corporation Hourly-Rate Employees Pension Plan,

(iii)  of a former employee whose employment was terminated at age 65 or older for any reason other than a discharge for cause with insufficient credited service to be entitled to a benefit under Article II of The Delphi Corporation Hourly-Rate Employees Pension Plan, or

(iv)  of an employee who at the time of death was eligible to retire on an early or normal pension under Article II of The Delphi Corporation Hourly-Rate Employees Pension Plan,

to participate in health care coverages; provided, however, that dental coverage shall be available to a surviving spouse age 65 or over only for months that such surviving spouse is enrolled for Medicare Part B coverage.

(4)  The Corporation shall make contributions for health care coverages continued in accordance with subsection (b)(3) above only on behalf of a surviving spouse, as provided therein and in subsection (b)(5) below (including for this purpose a surviving spouse who would receive survivor benefits under The Delphi Corporation Hourly-Rate Employees Pension Plan except for receipt of Survivor Income Benefits under the Delphi Corporation Life and Disability Benefits Program), and the eligible dependents of any such spouse; provided, however, that the contributions on behalf of a surviving spouse for the month the surviving spouse becomes age 65 and subsequent months shall be made only for months that the surviving spouse is enrolled for Medicare Part B coverage.

Notwithstanding the above, no Corporation

Art. III, 8(b)(4)

contributions, other than contributions related to subsection (b)(5) below, shall be made under this subsection (b)(4) for the surviving spouse and eligible dependents of a deceased employee or retiree hired on or after November 18, 1996, if such employee or retiree had fewer than 10 years of credited service under the Corporation's Pension Plans.

(5) The Corporation shall make suitable arrangements for a surviving spouse of an employee whose loss of life results from accidental bodily injuries caused solely by employment with Delphi Corporation, and results solely from an accident in which the cause and result are unexpected and definite as to time and place, to participate in health care coverages; provided, however, such coverages shall terminate upon the remarriage or death of the surviving spouse. Any Corporation contributions for coverages continued under this subsection (b)(5) shall be as provided in subsection (b)(4) above.

(6) A surviving spouse who is eligible for such coverages provided in subsections (b)(1), (b)(3) and (b)(5) above and who elects such coverages but who is not eligible for Corporation contributions as provided in subsections (b)(2) and (b)(4), must make such election no later than 60 days following the later of the end of the month in which the death of the employee, retired employee, or former employee occurs, or following the date of notice of available options by the Corporation, and shall contribute monthly the entire cost for such coverages for (i) single party, (ii) two party, or (iii) family.

(7) When contributions by surviving spouses are required, they shall be paid in cash directly to the Corporation or its agent on or before the 10th day of the month for which such coverages are to be provided or such other due date as may be established by the Corporation.

42

and shall contribute monthly the entire cost for such coverages for (i) single party, (ii) two party, or (iii) family.

(7)  When contributions by surviving spouses are required, they shall be paid in cash directly to the Corporation or its agent on or before the 10th day of the month for which such coverages are to be provided or such other due date as may be established by the Corporation.

## Section 9.    Dependent Eligibility Provisions

(a)  *General Provisions*

(1)  As used in this Section 9, when reference is made to a person (i.e. - person A) being "dependent upon" another person (i.e. - person B), the term shall mean that person B may legally claim an exemption for person A, under Section 151 of the Internal Revenue Code, for Federal income tax purposes.

(2)  The provisions of this Section 9 apply with respect to enrollment of certain dependents as secondary enrollees under primary enrollees who elect "self and spouse," "self and child," or "self and family" enrollment, in accordance with Article III, Section 1(a)(1) of the Program and to enrollment of sponsored dependents under subsection (e) below.  Unless specifically provided otherwise in the Program, such a dependent has no individual or personal right of enrollment, right to select an option within the Informed Choice Plan, or right to continue coverages under the Program.

(3)  The Corporation shall have the right of determining eligibility of a dependent, consistent with the provisions of this Program.

43

**(4)** A primary enrollee claiming initial or continuing eligibility of a dependent shall furnish whatever documentation may be necessary to substantiate the claimed eligibility of a dependent and the social security number of each such dependent for whom a social security number is required to claim an exemption on the primary enrollee's Federal income tax return. Refusal or failure to furnish such documentation when requested to do so, or to furnish the social security number within a reasonable period of time, shall result in denial or withdrawal of eligibility for such dependent.

**(5)** Unless otherwise provided, a dependent who loses eligibility in accordance with the provisions of this Program, and who once again meets the requirements for dependent eligibility, may have coverage reinstated. The effective date of coverage in such cases will be the first day of the month following the month in which a valid enrollment form and any necessary supporting documentation is received by the Corporation.

**(6)** When, as a result of oversight or error, an eligible primary or secondary enrollee entitled to Corporation-paid coverage is not enrolled in a timely manner, coverage may be provided retroactive to the date of eligibility that would have been established if proper processing had occurred. However, in no event will the retroactivity exceed twelve (12) months from the month in which the error or omission is discovered.

This retroactive enrollment provision shall not apply to surviving spouses who are not entitled to Corporation-paid coverage. Such surviving spouses electing to continue coverages on a self-paid basis must make such election as stipulated in Article III, Section 8(b)(6). This retroactive enrollment provision also shall not apply to principally supported children or sponsored dependents, as discussed in subsections (d) and (e) respectively below.

44

(7) The receipt of a benefit under The Delphi Corporation Hourly-Rate Employees Pension Plan as an "alternate payee" in accordance with the Retirement Equity Act of 1984 shall not serve to entitle such recipient to coverages or continuation of coverages under this Program.

(8) Provisions will be made for the enrollment and administration of coverage for an individual determined to qualify for coverage pursuant to Qualified Medical Child Support Orders (QMCSO) under the provisions of the Omnibus Budget Reconciliation Act of 1993 (OBRA '93).

(b) *Spouse*

(1) The spouse of an eligible and enrolled employee or retiree shall be eligible for coverage. A surviving spouse of an employee or retiree, as defined in Section 8 above, may not have or add a new spouse as a dependent.

(2) A spouse by common-law marriage shall be eligible for coverage only to the extent such relationship is recognized by the laws of the state in which the employee or retiree is enrolled, and the employee or retiree has met such requirements for documentation of the status as may be necessary by law and required by the Corporation.

(3) The effective date of coverage for a spouse shall be the later of the effective date of coverage for the employee or retiree, or the date of marriage. For a common-law spouse, the effective date of coverage shall be the date of receipt by the Corporation of a completed enrollment form and any necessary supporting documentation.

(4) A spouse's eligibility for coverage shall cease on the earlier of:

45

**(i)**   the date the primary enrollee's coverage ceases, except that, in the case of the primary enrollee's death, coverage shall cease on the last day of the month in which the primary enrollee dies, unless the spouse is eligible for coverage as a surviving spouse as set forth in Section 8 of this Article, or

**(ii)**   the date of the final decree of divorce.

**(c)**   *Children*

**(1)**   Children of a primary enrollee, or of the spouse of an eligible and enrolled employee or retiree, shall be eligible for coverage if, as to each one, the following criteria are met.

**(i)**   Relationship.   The child must be the child of the primary enrollee, or of an employee's or retiree's spouse, by birth, or legal adoption, or legal guardianship.

Under the provisions of the Omnibus Budget Reconciliation Act of 1993 (OBRA '93), a child under the age of 18 who is in the process of being adopted by an employee or retiree will be deemed to satisfy the relationship test when the child is placed and takes up residence with the employee or retiree, pursuant to the adoption process.

**(ii)**   Age.   The child must not have reached the end of the calendar year in which the child becomes age 25, unless such child has been determined to be totally and permanently disabled prior to the end of that year. For the purposes of this subsection, "totally and permanently disabled" means having any medically determinable physical or mental condition which prevents the child from engaging in substantial gainful activity and which can be expected to result in death or be of long-continued or indefinite duration.

Coverage will not be reinstated for a child who first becomes totally and permanently disabled after the

end of the calendar year in which age 25 is attained or who was eligible for coverage as a totally and permanently disabled child, recovers, and, after the end of such calendar year, again becomes so disabled.

**(iii)** Marital Status. The child must be unmarried.

**(iv)** Residency. The child must reside with the primary enrollee, as a member of such enrollee's household or, if not a member of the household, such enrollee must be legally responsible for the provision of health care for the child (such as children of certain divorced parents, legal guardianships, children confined in training institutions, or children in school).

**(v)** Dependency. The child must be dependent upon the primary enrollee, or upon the spouse of an eligible and enrolled employee or retiree. This requirement shall be waived with respect to a child (by birth, legal adoption or legal guardianship) of a divorced employee or retiree, if the divorce decree, or order of the court of proper jurisdiction, or amendment of such decree or order, stipulates that such employee or retiree is legally responsible for providing health care coverage for such child.

**(2)** An eligible surviving spouse may not enroll a child unless the child was eligible to be enrolled prior to the death of the employee or retiree or, in the case of a child born after the death of the employee or retiree, unless such child is the issue of the surviving spouse's marriage to the deceased employee or retiree, and was conceived prior to such employee's or retiree's death.

**(3)** The effective date of coverage for a child shall be the later of the effective date of coverage for the primary enrollee, or in the case of:

**(i)** Birth - the date of birth;

47

**(ii)** Legal Adoption - the date the adoption becomes final in accordance with applicable laws (or, for children being adopted and who meet the criteria of OBRA '93, the date the child is placed and resides with the adopting employee or retiree);

**(iii)** Legal Guardianship - the date guardianship becomes final in accordance with applicable laws; and

**(iv)** Stepchild - the date the child becomes a member of the employee's or retiree's household.

**(4)** A child, as defined above, shall cease to be eligible for coverage as of:

**(i)** the date of marriage of such child;

**(ii)** the last day of the month in which the child ceases to be dependent upon the primary enrollee, or upon the spouse of an eligible and enrolled employee or retiree, unless the exception in subsection (c)(1)(v) applies;

**(iii)** the last day of the month in which the child ceases to meet the residency criteria of subsection (c)(1)(iv) above;

**(iv)** the last day of the calendar year in which the child becomes age 25, except in the case of a totally and permanently disabled child (in the event coverage for a totally and permanently disabled child is continued, eligibility for such coverage shall cease as of the last day of the month in which the child ceases to be totally and permanently disabled as defined by this Program); or

**(v)** the date the primary enrollee's coverage ceases, except that, in the case of the primary enrollee's death, coverage for such dependent child shall cease on the last day of the month in which the primary enrollee dies, unless such child is eligible for coverage as a

48

dependent child of the surviving spouse of such employee or retiree.

(5) Notwithstanding any other provisions of the Program, the Program shall provide coverages in accordance with Section 4301 of the Omnibus Budget Reconciliation Act of 1993 (OBRA '93) and Section 609 of ERISA. The Corporation will maintain reasonable procedures related to the implementation of Qualified Medical Child Support Order and other aspects of the Federal regulations.

### (d) *Principally Supported Children*

(1) Children residing with and related to a primary enrollee by blood or marriage and for whom the primary enrollee provides principal support (as defined by the Internal Revenue Code of the United States) and who were reported as dependents on the primary enrollee's most recent income tax return or who qualify in the current year for dependency tax status, may be enrolled as principally supported children.

(i) A surviving spouse may continue coverages for a principally supported child enrolled by the deceased employee or retiree prior to such employee's or retiree's death, but may not enroll a new principally supported child unless such child was eligible to be enrolled by the deceased employee or retiree as of the date of death.

(ii) The residency waiver based on legal responsibility for the provision of health care, which applies to other children as indicated in subsection (c)(1)(iv), does not apply to principally supported children.

(iii) The other criteria of subsection (c)(1) apply to principally supported children.

(2) The effective date of coverage for a

principally supported child shall be the first day of the month following the month in which a valid enrollment form is received by the Corporation.

(3) Eligibility of a principally supported child shall cease as it would for any other child in accordance with subsection (c)(4).

### (e) *Sponsored Dependents*

(1) A primary enrollee may obtain core coverages for dependents other than those specified in subsections (b), (c), and (d) above. Such dependents will include persons who are related to the primary enrollee by blood or marriage, or if not related, who reside with the primary enrollee as members of the household. Before becoming eligible for coverage, sponsored dependents (other than a child being adopted by the primary enrollee) who are not citizens of the United States must reside in the United States for one (1) full year, and must be legally entitled to remain in the United States indefinitely. Sponsored dependents must be dependent upon the primary enrollee for more than half of their support as defined by the Internal Revenue Code of the United States and must either qualify to be claimed as an exemption by the primary enrollee in the current year or have been claimed as an exemption on the primary enrollee's most recent Federal income tax return. They must be designated as sponsored dependents on a valid enrollment form signed by the primary enrollee. The coverages shall be provided under the Program option elected by the primary enrollee. For the purposes of this subsection, an adopted child shall be considered to be related to a primary enrollee "by blood."

(2) Coverages provided under this subsection for a sponsored dependent enrolled at the time of an employee's or retiree's death may be continued at the option of the employee's or retiree's surviving spouse while such surviving spouse is enrolled for coverages as

50

provided in Section 8 of this Article. A surviving spouse may not add any new sponsored dependents.

**(3)** The primary enrollee shall pay the full cost of coverages under this subsection, and the Corporation shall not contribute toward the cost of health care coverages for any sponsored dependents.

**(4)** The effective date of coverages for an eligible sponsored dependent shall be the later of the effective date of coverages for the primary enrollee, or the first day of the month following the month of receipt by the Corporation of a completed enrollment form and any supporting documentation as may be required by the Corporation. However, the effective date for a sponsored dependent previously enrolled as such, and whose coverages as a sponsored dependent were discontinued, shall be the first day of the sixth month following receipt of the application for reinstatement.

**(5)** Coverage for a sponsored dependent shall cease on the earlier of:

**(i)** the last day of the month in which the person ceases to meet the eligibility criteria set forth in (1) above,

**(ii)** on the last day of the month preceding the month for which the required contribution was due but not paid, or

**(iii)** the date the primary enrollee's coverages cease except that in the case of the primary enrollee's death, coverage for such sponsored dependent shall cease on the last day of the month in which the primary enrollee dies, unless the sponsored dependent has coverages continued in accordance with (2) above.

**(f)** *Same-Sex Domestic Partners and Their Children*

**(1)** Effective January 1, 2001, the eligible

51

domestic partner of an employee may be enrolled for coverage. To qualify for enrollment, the employee and domestic partner must:

(i)   Be the same sex;

(ii)   Have shared a continuous committed relationship for at least six months, intend to do so indefinitely and have no such domestic partner relationship with any other person;

(iii)   Reside in the same household;

(iv)   Share responsibility for each other's welfare and financial obligations;

(v)   Not be related by blood to a degree of kinship that would prevent marriage from being recognized under law;

(vi)   Be over the age of 18, of legal age and legally competent to enter into a contract;

(vii)   Reside in a state where marriage between two persons of the same sex is not recognized as valid under law; and

(viii)  Not be married to any other person.

(2)   If the enrollee resides in a state that has a formal recognition of domestic partner relationships, such recognition is required for enrollment of the domestic partner.

(3)   The employee and the domestic partner will be required to complete an affidavit attesting to meeting the eligibility requirements and provide any additional documentation necessary to support the claimed eligibility.

(4)   An eligible domestic partner's child may be enrolled if the primary enrollee can claim an exemption

52

for the child on his or her federal income tax return and the child meets all of the Program's eligibility provisions pertaining to children.

**(5)**  Neither a domestic partner nor his or her children are eligible to be enrolled following the primary enrollee's retirement.  However, coverage for an eligible domestic partner, or his or her child, enrolled prior to the primary enrollee's retirement may be continued in retirement.

**(6)**  If the primary enrollee and his or her domestic partner terminate the relationship, an opportunity to continue coverage on a basis comparable to COBRA will be provided.

**(7)**  In the event of the primary enrollee's death, a surviving domestic partner will be provided continuation opportunities comparable to a similarly situated surviving spouse.  Under no circumstances will the privileges afforded a domestic partner exceed those of a similarly situated spouse.

## Section 10.  Conversion Privilege

**(a)**  Any former enrollee who is no longer eligible to continue coverages under the Program, may, be offered an opportunity to obtain other available coverage, on a self-paid basis, from the basic carrier with whom enrolled at the time eligibility terminated.

**(b)**  A former enrollee wishing to exercise this privilege shall make application to the carrier within thirty (30) days of termination of eligibility under this Program.

## Section 11.  Consolidated Omnibus Budget Reconciliation Act (COBRA) Continuation

The Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA, or the Act), as amended, provides

continuation privileges will be integrated with the COBRA continuation coverage.

**(e)** In the event a primary enrollee is entitled to elect between COBRA continuation coverage and alternative continuation provided under the Program, coverage will be continued beyond the point coverage as an active employee or dependent of an active employee ceases as if the primary enrollee elected alternative continuation under the Program. If the primary enrollee subsequently elects COBRA continuation during the election period and pays any required contribution, coverages will be adjusted retroactively to provide the COBRA continuation.

**(f)** Unless advised otherwise by a COBRA "qualified beneficiary," an election of alternative continuation by the primary enrollee shall be presumed to be an election for all other enrollees and/or qualified beneficiaries covered under such primary enrollee's coverage.

## ARTICLE IV

## DEFINITIONS

Unless otherwise indicated, as used in this Program:

**1.** *"active service"* or *"in active service"* - means receiving pay for regular hours of work scheduled by the Corporation, or otherwise scheduled to work but absent due to either,

**(a)** vacation time off authorized in advance,

**(b)** a specified holiday, or

**(c)** bereavement, jury duty, or short-term military leave of absence under circumstances where the absence

is authorized in advance and the employee is entitled to receive full or partial compensation from the Corporation for the day(s) of absence.

An employee is not in active service if the employee is absent every scheduled work day during a month, for reasons other than those specified above, whether or not such absence is excused.

An employee is not in active service in any full month in which such employee is not scheduled to work due to layoff or any leave of absence (other than short-term military leave referred to in subsection (c) above), regardless of whether the employee may be entitled to some compensation for any day(s) during such month.

**2.** _"Authorized Employee"_- means a Delphi employee whose duties require access to PHI for purposes of administering the Program, including: the Privacy Official/Director, Health Care; Manager, Health Care; Analyst, Health Care; Coordinator, Health Care; Staff Assistant, Health Care; Executive Director, Employee Benefits; Administrative Assistant, Employee Benefits; members of the Delphi Employee Benefit Plans Committee ("EBPC"); personnel specifically designated as an Authorized Employee by the Privacy Official or his delegate (e.g., finance staff personnel, audit staff personnel); and in-house counsel to Employee Benefits.

**3.** _"benefit"_ - means a payment made, in accordance with the Program provisions, to an enrollee, or to a provider on behalf of an enrollee.

**4.** _"carrier"_ - means any entity by which Program coverages are administered or benefits are paid. The term includes, but is not limited to, the following types of entities:

    **(a)** an insurance company

App. A, III. G.1.i.

prescription" or "Rx Only" and includes compounded
medications containing at least one prescription legend
drug.

j.    "prescription charge" means a dispensing
fee plus the lesser of the reasonable and customary
amount paid by the provider for a covered drug
(including insulin and disposable syringes and needles),
or such amount as may be negotiated by the carrier with
participating providers.  The "dispensing fee" is an
amount or amounts, including applicable sales tax,
predetermined by the carrier to compensate participating
providers for dispensing covered drugs.

For covered drugs obtained from a non-
participating provider or from a provider in an area
where the carrier does not provide the coverage, the
prescription charge means the reasonable and customary
charge as determined by the carrier.

k.    "prescription order" means a written or
oral request to a provider by a physician for a single
prescription legend drug.

l.    "provider" means a pharmacy or any other
organization or person licensed to dispense prescription
legend drugs.

2.    Reimbursement

a.    The copayment amount for each separate
prescription order or refill of a covered drug shall not
exceed:

(1)    $5.00 for generic drugs dispensed at
retail; or

(2)    $10.00 for brand name drugs dispensed
at retail; or

(3)    $2.00 ($5.00 effective January 1, 2005)

for <u>brand name or generic drugs</u> dispensed through <u>mail order</u>.

**(4)** The retail copayment for generic and brand name drugs applicable to those enrolled as a retiree, surviving spouse (or a dependent of a retiree or surviving spouse) as of September 18, 2003 will be $5.00.

**b.** In addition to the copayment, enrollees may incur additional expense if a brand name drug, other than a drug identified in subsection (4), below is dispensed:

**(1)** If the brand name drug is dispensed at the enrollee's request or upon determination that it is not medically necessary to dispense the brand name drug rather than the generic, the enrollee will pay the appropriate generic copayment plus the full difference in cost between the generic drug and the brand name drug;

**(2)** If the brand name drug is dispensed at retail and at physician direction, the enrollee will pay the appropriate brand name copayment plus the difference (up to a maximum of $10.00) in Program cost between the generic drug and the brand name drug.

**(3)** The carrier will initiate a review of the medical necessity for dispensing the brand name drug rather than the generic if no review has been requested by enrollees or their physicians. If the medical necessity is not established, future dispensing will be subject to (1) above.

**(4)** In the case of (3), above, if it is found that dispensing of the brand name drug rather than the generic was medically necessary, amounts in excess of the brand name copayment will be refunded automatically. The carrier's systems will be adjusted to allow dispensing of the brand name for the duration of the prescription.

124

**(5)**   "Narrow Therapeutic Index Drugs" are those for which small variations in the dose could result in changes in drug safety. In order to remain within a safe and effective range, these medications may require frequent patient monitoring to adjust the dose. When such brand name drugs are dispensed, only the brand name copayment will apply.  Drugs currently included in this group are:

> Lanoxin
> Dilantin
> Tegretol
> Cyclosporin
> Depakene
> Mysoline
> Levothyroxine (including Synthroid)

This list may be adjusted from time-to-time as reflected in Program standards.

**c.**   The copayments specified above are for the days supply referenced in subsection G.3., below. To the extent a particular covered drug, supply or device is pre-packaged in days supply exceeding the specified ones, and cannot be repackaged by the provider, the copayments will be prorated to account for the additional days supply.

**d.**   Effective January 1, 2004, after the original prescription order and two (2) refills, retail purchases of covered drugs identified in subsection 5.b., below, (and related supplies, if applicable) are subject to an enrollee copayment of 100% of the Program cost.

**e.**   Except for the amounts indicated above, covered drugs or supplies obtained from a participating provider are covered subject to the Program provisions.

**f.**   Upon proof of payment acceptable to the carrier, an enrollee is entitled to reimbursement from the

App. A, III. G.2.f.

carrier of seventy-five percent (75%) of the reasonable and customary charge for the generic or brand name drug as applicable, as determined by the carrier after deduction of the appropriate copayment, of covered drugs obtained on a non-emergency basis from a nonparticipating provider located within the area in which the carrier provides coverage. The enrollee may incur additional expense if a brand name drug is dispensed at the enrollee's request or when not medically necessary.

     **g.** Upon proof of payment acceptable to the carrier, an enrollee is entitled to reimbursement from the carrier of one hundred percent (100%) of the reasonable and customary charge for the generic or brand name drug, as applicable, as determined by the carrier after deduction of the appropriate copayment, of covered drugs obtained from a provider located outside the area in which the carrier provides coverage or from an in-area non-participating provider in the case of an emergency. The enrollee may incur additional expense if a brand name drug is dispensed at the enrollee's request or when not medically necessary.

     **3.** *Coverage*

     **a.** At retail, coverage includes up to a 34-day supply of a covered drug. Certain drugs, such as contraceptives, may be subject to Program standards clarifying what is included in "up to a 34-day supply".

     **b.** At retail, coverage includes a one-month supply of disposable syringes and needles when prescribed and dispensed with a one-month supply of self-administered insulin or a covered self-administered antineoplastic agent.

     **c.** At retail, coverage includes two diaphragms per year. Diaphragms are not available through the mail order pharmacy.

App. A, III. G.3.d.

**d.**   At mail order, coverage includes up to a 90-day supply of covered drugs and supplies, with a corresponding prescription or refill order. Diaphragms are not available through the mail order pharmacy.

### 4.   *Maximum Allowable Cost Programs*

Maximum Allowable Cost or alternative generic substitution programs, are provided by all carriers. All enrollees except those in the Health Maintenance Organization option will be eligible. Unless precluded by law, or responding to a physician direction or enrollee request, Program providers may substitute a generic drug for the equivalent multi-source brand name drug.

### 5.   *Limitations and Exclusions*

**a.**   Coverage under this subsection does not include:

**(1)**   any research or experimental agent including Federal Food and Drug Administration approved drugs which may be prescribed for research or experimental treatments;

**(2)**   any charge for a medication being used for a cosmetic purpose, even if the medication is a prescription legend drug;

**(3)**   any charge for devices (other than diaphragms) or appliances (e.g., orthotics, and other non-medical substances);

**(4)**   any vaccine administered for the prevention of infectious diseases;

**(5)**   antineoplastic agents except those that can be self-administered through subcutaneous or intramuscular injection or in oral dosage form and are not covered under another section of this Appendix;

127

**(6)**   any charge for administration of covered drugs;

**(7)**   any charge for a covered drug in excess of the quantity specified by the physician, or any refill dispensed after one (1) year from the physician's order;

**(8)**   any charge for more than a thirty-four (34) day supply of a covered drug <u>at retail;</u>

**(9)**   any charge for medications furnished on an inpatient or outpatient basis covered under any other subsection of this Appendix or under any subsection of Appendix B; and

**(10)**   any charge for drugs received prior to the effective date of this coverage.

**<u>b.</u>**   <u>The following drugs are covered at retail, at the applicable 34-day copayment, for an original prescription and two (2) refills; thereafter they are covered at mail, at the applicable copayment for up to a 90-day supply, or at retail at 100% copayment for up to a 34-day supply:</u>

<u>Insulin</u>
<u>Acebutolol</u>
<u>Acetazolamide</u>
<u>Acetohexamide</u>
<u>Albuterol</u>
<u>Allopurinol</u>
<u>Amiloride</u>
<u>Amiloride/HCTZ (hydrochlorothiazide)</u>
<u>Amlodipine</u>
<u>Atenolol</u>
<u>Atenolol/Chlorthalidone</u>
<u>Atorvastatin</u>
<u>Benazepril</u>
<u>Bendroflumethiazide</u>
<u>Benzthiazide</u>
<u>Benztropine</u>

128

App. C, IV.

January 1 and ending the following December 31 (except for services described in Section III. C.4. above and in Section XI below) shall be $1,600 ($1,700 effective January 1, 2005) for each enrollee.

For covered dental expenses in connection with orthodontics including related oral examinations, described in Section III. C.4. above, the maximum benefit payable shall be $1,800 ($2,000 effective January 1, 2005), during the lifetime of each enrollee, with a maximum of $1,800 applicable to covered dental expenses for services provided prior to January 1, 2005.

## V. Pre-Determination of Benefits

If a course of treatment can reasonably be expected to involve covered dental expenses of $200 or more, a description of the procedures to be performed and an estimate of the dentist's charges must be filed with the carrier prior to the commencement of the course of treatment.

The carrier will notify the enrollee and the dentist of the benefits certified as payable based upon such course of treatment. In determining the amount of benefits payable, consideration will be given to alternate procedures, services, or courses of treatment that may be performed for the dental condition concerned in order to accomplish the desired result. The amount included as certified dental expenses will be the appropriate amount as provided in Sections III. and IV., determined in accordance with the limitations set forth in Section VI.

If a description of the procedures to be performed and an estimate of the dentist's charges are not submitted in advance, the carrier reserves the right to make a determination of benefits payable taking into account alternate procedures, services, or courses of treatment, based on accepted standards of dental practice. To the extent verification of covered dental expenses cannot

180

reasonably be made by the carrier, the benefits for the course of treatment may be for a lesser amount than would otherwise have been payable.

This pre-determination requirement will not apply to courses of treatment under $200 or to emergency treatment, routine oral examinations, x-rays, prophylaxes, and fluoride treatments.

## VI. Limitations

### A. *Restorative*

#### 1. *Gold, Baked Porcelain Restorations, Crowns and Jackets*

If a tooth can be restored with a material such as amalgam, payment of the applicable percentage of the charge for that procedure will be made toward the charge for another type of restoration selected by the enrollee and the dentist. The balance of the treatment charge remains the responsibility of the enrollee.

#### 2. *Reconstruction*

Payment based on the applicable percentage will be made toward the cost of procedures necessary to eliminate oral disease and to replace missing teeth. Appliances or restorations necessary to increase vertical dimension or restore the occlusion are considered optional and their cost remains the responsibility of the enrollee.

### B. *Prosthodontics*

#### 1. *Partial Dentures*

If a cast chrome or acrylic partial denture will restore the dental arch satisfactorily, payment of the applicable percentage of the cost of such procedure will be made toward a more elaborate or precision appliance that enrollee and dentist may choose to use, and the balance of the cost remains the responsibility of the enrollee.

### 2.   *Complete Dentures*

If, in the provision of complete denture services, the enrollee and dentist decide on personalized restorations or specialized techniques as opposed to standard procedures, payment of the applicable percentage of the cost of the standard denture services will be made toward such treatment and the balance of the cost remains the responsibility of the enrollee.

### 3.   *Replacement of Existing Dentures*

Replacement of an existing denture will be a covered dental expense only if the existing denture is unserviceable and cannot be made serviceable. Payment based on the applicable percentage will be made toward the cost of services which are necessary to render such appliances serviceable. Replacement of prosthodontic appliances will be a covered dental expense only if at least five (5) years have elapsed since the date of the initial installation of that appliance under this dental coverage, except as provided in Section III. C.3. above.

### C.   *Orthodontics*

**1.**   If orthodontic treatment is terminated for any reason before completion, the obligation to pay benefits will cease with payment to the date of termination. If such services are resumed, benefits for the services, to the extent remaining, shall be resumed.

**2.**   The benefit payment for orthodontic services shall be only for months that coverage is in force.

## VII. Exclusions

Covered dental expenses do not include and no benefits are payable for:

**A.**   charges for services for which benefits are provided under other health care coverages;

**B.**   charges for treatment by other than a dentist,

# APPENDIX D

# VISION COVERAGE

## I. Enrollment Classifications

Vision coverage for a primary enrollee shall include coverage for secondary enrollees as defined in the Program.

## II. Description of Benefits

Vision benefits will be payable, subject to the conditions herein, if an enrollee incurs a covered vision expense.

## III. Definitions

As used herein:

**A.** *"Ophthalmologist"* means any licensed doctor of medicine or osteopathy legally qualified to practice medicine, including the diagnosis, treatment, and prescribing of lenses related to conditions of the eye.

**B.** *"Optometrist"* means any person legally licensed to practice optometry as defined by the laws of the state in which the service is rendered.

**C.** *"Optician"* means one who makes or sells eyeglasses prescribed by an ophthalmologist or optometrist to cure or correct defects in the eyes, and grinds the lenses or has them ground according to prescription, fits them into a frame, and adjusts the frame to fit the face.

**D.** *"Participating provider"* means an ophthalmologist, optometrist, or optician who has signed an agreement with the carrier covering reimbursement, quality, service standards and other terms and conditions connected with providing covered vision services to enrollees.

**E.** *"Nonparticipating provider"* means an ophthalmologist, optometrist, or optician who has not signed an agreement with the carrier covering reimbursement, quality, service standards and other terms and conditions connected with providing covered vision services to enrollees.

**F.** *"Reasonable and customary charge"* means the actual amount charged by an ophthalmologist, optometrist, or optician for a service rendered or materials furnished but only to the extent that the amount is reasonable, taking into consideration the following:

**1.** the usual amount which the individual provider most frequently charges the majority of patients or customers for a similar service rendered or materials furnished;

**2.** the prevailing range of charges made in the same area by providers with similar training and experience for the service rendered or materials furnished;

**3.** unusual circumstances or complications requiring additional time, skill, and experience in connection with the particular service rendered or materials furnished.

As used in this Appendix, "reasonable and customary charge" also refers to scheduled or other contracted amounts of payment used by carriers with participating provider arrangements.

The carrier is responsible for determining the appropriate reasonable and customary charge for a given provider and service or material, and such determination shall be conclusive.

**G.** *"Contact lenses"* means ophthalmic corrective lenses, as prescribed by an ophthalmologist or optometrist, to be fitted directly to the enrollee's eyes.

189

**H.** *"Lenses"* means ophthalmic corrective lenses, as prescribed by an ophthalmologist or optometrist, to be fitted into a frame.

**I.** *"Frame"* means a standard eyeglass frame into which two lenses are fitted.

**J.** *"Covered vision expense"* means the reasonable and customary charges for vision care services and materials, as described in Section IV., when provided by ophthalmologists, optometrists, and opticians for each enrollee.

**K.** *"Corrective eye surgery"* means a surgical procedure used to alter the cornea or shape/surface of the eye in order to improve visual acuity, correct vision conditions such as myopia, hyperopia, or astigmatism and reduce or eliminate the reliance on eyewear. Such surgeries can include, but are not necessarily limited to, Laser-assisted In-Situ Keratomileusis (LASIK), PhotoRefractive Keratectomy (PRK) and Radial Keratotomy (RK).

## IV. Benefits

Benefits will be paid for the covered vision expenses described in A., B., and C. below, less any copayment as described in D. below.

**A.** *Vision Examinations:*

**1.** Refraction, including case history, coordinating measurements, and tests;

**2.** The prescription of glasses where indicated; and

**3.** Examination by an ophthalmologist, upon referral by an optometrist, within 60 days of a vision examination by the optometrist.

190

### B.  *Lenses and Frames:*

When lenses are prescribed by an ophthalmologist or optometrist, the necessary materials and professional services connected with the ordering, preparation, fitting, and adjusting of:

**1.**   Lenses (single vision, bifocals, trifocals, lenticular).  If the enrollee selects lenses, the size of which results in an additional charge, only the reasonable and customary charge for normal size lenses of the same material and prescription will be considered a covered vision expense.  If the enrollee selects photochromic lenses or lenses with a tint other than Number 1 or Number 2, only the reasonable and customary charge for clear lenses of the same material and prescription will be considered a covered vision expense.

**2.**   Contact lenses following cataract surgery, or when visual acuity cannot be corrected to 20/70 in the better eye except by their use, or when medically necessary due to keratoconus, irregular astigmatism or irregular corneal curvature.  If contact lenses are prescribed for any other reason, $\underline{\$80}$ is the maximum amount that will be considered a covered vision expense.

**3.**   Frames.  If frames are obtained from a participating provider, the enrollee may make a selection from the display shown by the participating provider and there will be no out-of-pocket expense to the enrollee other than as described under "Copayments".  If the enrollee obtains frames from a nonparticipating provider, $\underline{\$24}$ is the maximum amount that will be considered a covered vision expense.

### C.  *Corrective Eye Surgery:*

Effective January 1, 2004, corrective eye surgery performed by an ophthalmologist will become a covered

App. D, IV. C.

service. Coverage includes any related pre and post-surgical professional services, facility expense and medically necessary supplies. Coverage is subject to the following provisions:

**1.** An enrollee may not receive benefits for both corrective eye surgery and for frames and/or lenses (including contact lenses) in the same calendar year;

**2.** Upon proof of payment to the corrective eye surgery provider, the carrier will reimburse the primary enrollee for covered expense, up to the lesser of the charges or the maximum benefit of $295.00 in any four (4) year period; and

**3.** An enrollee receiving benefits for corrective eye surgery in any one calendar year will be ineligible for lens (including contact lens) and/or frame benefits for that year and three (3) subsequent years. For example, an enrollee undergoing corrective eye surgery in 2004 would be eligible for lens and/or frame benefits in 2008. Such enrollees will be eligible for benefits for an annual exam, and will have access to the participating provider fee schedule for non-covered services and for lenses and/or frames for which no benefits are payable.

## D. *Copayments:*

For each enrollee, there is a $7.00 copayment applicable to the covered vision expense for each vision examination and a $10.00 copayment for the combined covered vision expenses for lenses, contact lenses, and frames. The total copayment for each enrollee, during a calendar year, will not exceed $17.00.

## V. Frequency Limitations

For each enrollee, there are the following limitations on the frequency with which charges for certain services and materials will be considered covered vision expenses:

App. D, V.

| | |
|---|---|
| Vision Examination | — Once during a calendar year, except as provided in Section IV.A.3. |
| Lenses and Contact Lenses | — Once during a calendar year, except as provided in Section IV.C. |
| Frames | — Once during two consecutive calendar years, except as provided in Section IV.C. |

The limitations on lenses, contact lenses, and frames apply whether or not they are a replacement of lost, stolen, or broken lenses, contact lenses, or frames.

## VI. Exclusions

**A.**   Any lenses which do not require a prescription;

**B.**   Medical or surgical treatment of the eye, except as provided in Section IV.C.;

**C.**   Drugs or any other medication;

**D.**   Procedures determined by the carrier to be special or unusual, such as, but not limited to, orthoptics, vision training, subnormal vision aids, aniseikonic lenses, and tonography;

**E.**   Vision examinations or materials furnished for any condition, disease, ailment, or injury arising out of or in the course of employment;

**F.**   Vision examinations performed and lenses and frames ordered:

**1.**   before the enrollee became covered for this coverage;

**2.**   after the termination of the enrollee's coverage;

193

App. D, VI. F.3.

**3.** to the extent that they are obtained without cost to the enrollee.

## VII. Vision Network

**A.** The carrier has established a network of participating providers who agree to accept reimbursement according to a schedule for the covered vision services and materials described in Section IV. A. and B. without enrollee copayments.

**B.** If an enrollee uses a participating provider to obtain covered services, the carrier will reimburse the provider, without enrollee copayment, as specified below:

**1.** the scheduled amount (which shall be payment in full) for eye examinations; normal-size clear, Number 1 or Number 2 tinted lenses; and medically necessary contact lenses (see Section IV. B.1. and 2.);

**2.** the scheduled amount (which shall be payment in full) for eyeglass frames with a retail value of $80.00 or less. If an eyeglass frame with a retail value greater than $80.00 is selected, the enrollee will be responsible for the discounted price (participating providers discount frames with the retail cost in excess of $80.00), less $24.00; and

**3.** the scheduled amount of $65.00 for contact lenses, which do not meet the criteria in Section IV.B.2. The enrollee will be responsible for any amount greater than $80.00.

**C.** If an enrollee resides 25 miles or less from a participating provider but obtains covered services from a non-participating provider (other than an ophthalmologist) the carrier will reimburse the enrollee the scheduled amounts. The enrollee will be responsible for paying the provider, including any remaining

194

balance. Reimbursement to the enrollee for covered services received from non-participating ophthalmologists will be made at the reasonable and customary amount, less the enrollee copayment (see Section IV. D.).

**D.** If an enrollee resides more than 25 miles from a participating provider and obtains covered services from a non-participating provider (including an ophthalmologist), the carrier will reimburse the enrollee in accordance with Section IV. above.

Misc. (Vision Coverage)

# UNDERSTANDINGS WITH RESPECT TO VISION COVERAGE

## 1. Administrative Manual

Policies, procedures and interpretations to be used in administering vision coverage shall be incorporated in an Administrative Manual prepared by the carrier, subject to review and approval by the Corporation and the Union.

## 2. Cost and Quality Controls

The carrier will undertake the following review procedures and mechanisms and report annually to the Corporation-Union Committee:

### (a) *Utilization Review*

Analysis of various reports displaying such data as provider/patient profiles, procedure profiles, utilization profiles and covered vision expense payment summaries to:

(1) evaluate the patterns of utilization, cost trends and quality of care;

(2) establish guidelines and norms with respect to profiles of practice in order to identify providers with either a high or low percentage of prescriptions issued in relation to the number of enrollees examined, with a high percentage of lenses provided under vision coverage that fail the minimum perception criteria for new lenses or other departures from the guidelines; and

(3) establish the percentage of vision benefits that are paid to participating providers.

### (b) *Price Reviews*

Where possible, price reviews or other audit techniques shall be conducted to examine records,

213

# UNDERSTANDINGS WITH RESPECT TO EMPLOYEE CONTRIBUTIONS - HEALTH MAINTENANCE ORGANIZATIONS (HMOS), AND ALTERNATIVE DENTAL AND VISION OPTIONS

In calculating the Corporation's monthly contributions (and any required member contributions) toward the cost of coverage for eligible individuals electing health maintenance organization (such term to include group practice dental and vision organizations) under Article II, Section 4 of the Program, the following method will be used:

1.    At the time of any change in the component premium rates (e.g., single, two-party, family) of either a health maintenance organization or the corresponding accrual rates for local carrier(s), the health maintenance organization's composite premium shall be compared to an adjusted local carrier's composite accrual rate developed by using comparable component rates of the local carrier(s) and the health maintenance organization enrollment mix of Delphi employees who are then members of the health maintenance organization.  For purposes of these calculations, the rates of the local carrier(s) are defined as the greater of the rates for the Traditional option and the Preferred Provider Organization option, based on the adjusted composite rate.  If there are less than 30 Delphi primary enrollees in a health maintenance organization (which includes all new health maintenance organizations), the national enrollment mix of all Delphi primary enrollees in health maintenance organizations will be used in calculating its composite premium rate and comparing its rate to that of the corresponding local carrier(s) so as to produce more reasonable statistical results.  Whenever possible, these calculations will employ separate enrollment

225

Misc. (General)

# UNDERSTANDINGS WITH RESPECT TO HEALTH CARE - GENERAL

This will confirm our understanding with respect to the following matters under the Health Care Program, herein referred to as the Program, incorporated by reference in the Collective Bargaining Agreement:

### 1.   Dental Coverage

In the event arrangements are made pursuant to Appendix C, Section IX, of the Program to offer alternative dental coverage to enrollees of the Corporation, payment by the Corporation for such alternative dental coverage on behalf of enrollees who elect such coverage in lieu of dental coverage under Article II, Section 1(b) of the Program shall be no greater than the amount the Corporation would have contributed for dental coverage under Article II, Section 1(b) of the Program.

### 2.   Vision Coverage

If a health maintenance organization referred to in Article II, Section 4(b) of the Program, decides it is able to provide its own vision coverage, the Corporation and the Union may arrange, by mutual agreement, for enrollees therein to be covered by the health maintenance organization's vision coverage, in lieu of the coverage referred to in Article II, Section 1(b) of the Program.

### 3.   Departicipating Hospitals

The Corporation will request the Control Plan to assure that each participating carrier institutes the following procedure in the event a hospital departicipates.

(a)   A Plan will give adequate notice at the earliest possible date to enrollees of a hospital's departicipation and of the payment arrangements in such a departicipating situation.

230

Misc. (Traditional Care Network)

# DELPHI CORPORATION

November 16, 2003

Mr. James D. Clark
Chairman, IUE-CWA
Automotive Conference Board
IUE-CWA, Industrial Division
of the Communications Workers
of America, AFL-CIO, CLC
2360 West Dorothy Lane, Suite 201
Dayton, Ohio 45439

Dear Mr. Clark:

This is to confirm the understandings reached between the parties during discussions concerning the Traditional option. Subject to the review and approval of the parties, the Control Plan will assure development, implementation, and overseeing of the Traditional Care Networks as replacements for the Traditional option. The Traditional Care Networks will have the following features:

- The Traditional Care Networks will provide core coverages described in Appendix A, through access to a panel of providers within a defined service area who have agreed to provide services under the terms of participation established by the Traditional Care Network carrier such as limits on fees, and controls on quality and utilization. In most instances, the Traditional Care Network will consist of PPO/Managed Care Networks maintained by the individual carriers. In order to receive full benefits for certain covered services, enrollees must obtain such services through the panel of providers and predetermination and review procedures must be followed per Art. II, 4(c) of the Delphi Health Care Program for Hourly Employees (the Program), including sub-paragraphs (1) through (3).

- The Traditional Care Network carriers assume responsibility for conducting utilization reviews, predetermination of services, or other reviews

282

necessary to promote quality of care and control costs. The Traditional Care Network carriers may place the panel physician at financial risk through capitation, withholding of a percentage of fees, or other mechanisms, or if not, will have other means to monitor and control utilization by individual providers on a continuous basis.

- Subject to the review and approval of the parties, the Traditional Care Network carriers assume responsibility for selection and periodic evaluation of hospitals, physicians, laboratories, and other providers to ensure sufficient numbers and types of providers who are geographically distributed to allow adequate access for enrollees within a service area as defined by the carrier.

- The Traditional Care Network carriers assume responsibility for providing the scope and level of benefits set forth in Appendix A, monitoring the appropriateness of referrals to non-panel providers, taking affirmative corrective action with respect to providers when necessary, and implementing and maintaining other administrative processes as mutually agreed to by the parties.

- For select geographic locations and/or carriers, payment for covered services provided by non-panel providers, unless the enrollee is referred by a panel provider or resides outside of the carrier's defined service area, will be 90% of the non-panel provider's reasonable and customary charge as determined by the carrier for the same service or, if less, the actual charge. The reimbursement to providers by the Traditional Care Network carrier will be reduced to reflect any waiver or forgiveness by a provider of the remaining 10%. The 90% limitation on payment for charges payable to non-panel providers by the Traditional Care Network carrier shall not be applicable (i) to an individual who has incurred personal expense under this provision of $250.00 for such covered services in a calendar year (with

283

the exception of personal expenses for office visits defined below) or (ii) to the covered members of the enrollee's family, if any, after the enrollee and such members have incurred a total of $500.00 in personal expense under this provision for such covered services in the same calendar year (with the exception of office visits defined below).

- Upon implementation of the Traditional Care Network, select services currently covered under the Preferred Provider Organization Option of the Program will be covered under the Traditional Care Network when services are provided by a panel provider. These services shall be limited:

    1. Well baby care as defined under App. A, III.E.3.o.

    2. Immunizations and vaccinations as defined under App.A, III.E.3.p., and

    3. Screenings as defined under App. A, III.E.3.s.

When the above services are provided to Traditional Care Network enrollees living outside of the defined service area by a provider participating with the carrier, the services will be covered as if they had been provided by a panel provider. If a non-panel, non-participating provider is utilized for the above services by an enrollee living outside of the defined service area, the Program will pay the non-participating reasonable and customary rate, and a balance bill to the enrollee may occur.

In addition to the select services identified above, office visits as defined under App. A, III.E.3.n. of the Program will be covered, subject to a coinsurance of 100% when services are provided by a panel provider. Office visits will be covered for a non-panel provider with a referral from a panel provider. Coinsurance amounts related to office visits will not be applied to the out-of-pocket maximum personal expense defined above.

Misc. (Traditional Care Network)

- Under the Traditional Care Network, benefits may be payable in full (up to the carrier's reasonable and customary charge level) for services rendered by non-panel providers if such services are rendered on referral from a panel physician, subject to the conditions below:

  1. The panel provider is responsible for reporting all enrollee referrals for out-of-network services. Referrals to non-panel providers must be communicated to the carrier per the carrier's program guidelines.

  2. The carrier is responsible for monitoring referral frequency and patterns, and for ensuring that additional costs are not incurred by the program or the enrollee.

  3. Referral does not apply to well baby care, immunizations, or screenings as defined above.   These are not covered services if rendered by a non-panel provider unless the enrollee lives outside of the defined service area.

  4. A service which would not otherwise be a covered service does not become a covered service by virtue of a referral.

- A procedure will be available for carriers to hold the enrollee harmless, up to the limits of coverage, for: (1) errors of commission or omission over which the enrollee has no control or (2) in instances where participating or non-participating provider charges exceed usual, customary, and reasonable reimbursement rates for covered services.  This procedure shall be published in the Administration Manual.  The carriers shall require participating providers to hold the enrollee harmless from the provider's errors of commission or omission. If an enrollee receives covered services from a non-network par provider, the provider will accept payment from the carrier as payment in full.

285

# Exhibit C

HEALTH CARE PROGRAM

Art. I, 3(b)

(b)   Substitution of Applicable Provisions of the Program for State Plan

The provisions of subsection (a) above to the contrary notwithstanding, the Corporation may, in any state wherein the substitution of a private plan is authorized by the law of such state, modify the provisions of the Program to the extent and in the respects necessary to secure the approval of the appropriate state governing body to substitute the plan provided by the Program in lieu of any plan provided by state law, and upon such modification and approval as a qualified plan, the Corporation may make the plan provided by the Program available to its employees in such state or states with such employee contributions as may be appropriate with respect to any benefits under such modified plan which exceed the benefits provided under the Program.

a                                    8

<u>HEALTH CARE PROGRAM</u>

Art. II, 4

Section 4. <u>Selection of Option in the Informed Choice Plan</u>

The Corporation will make arrangements to provide an opportunity for primary enrollees to elect to have core coverages provided through one of the options available under the Informed Choice Plan. Such election also may include a choice among dental options, where applicable. The specific choices offered to a primary enrollee will depend on the availability of approved options in the enrollee's geographic area~~, an employee's date of hire~~ and Medicare status of the primary and secondary enrollees. The options are as follows:

(a)    Preferred Provider Organization Option

This option provides core coverages, as described in Appendix A, through access to a panel of providers who have agreed to provide services under the terms of participation established by the preferred provider organization such as limits on fees, and controls on quality and utilization. In order to receive full benefits for certain covered services, such services must be obtained through the organization's panel of providers.

b

31

HEALTH CARE PROGRAM

Art. II, 4(a)(1)

    (1)  A preferred provider organization assumes
responsibility for conducting utilization reviews,
predetermination of services, or other reviews
necessary to promote quality of care and control
costs.  A preferred provider organization may place
the panel physician and other providers at financial
risk through capitation, withholding of a percentage
of fees, or other mechanisms, or if not, will have
other means to monitor and control utilization by
individual providers on a continuous basis.

    (2)  A preferred provider organization assumes
responsibility for selection and periodic evaluation
of hospitals, physicians, pharmacists, laboratories,
and other providers to ensure sufficient numbers and
types of providers who are geographically distributed
to allow adequate access for enrollees.

a

HEALTH CARE PROGRAM

Art. II, 4(a)(3)

> (3)  A preferred provider organization assumes
> responsibility for providing the scope and level of
> benefits set forth in Appendix A, monitoring
> the appropriateness of referrals to non-panel
> providers, taking affirmative corrective action with
> respect to providers when necessary, and implementing
> and maintaining other administrative processes as
> required by the Corporation.

> (4)  Payment for covered services provided by non-panel
> providers, unless the enrollee is referred by a panel
> provider, will be 80% of the non-panel provider's
> reasonable and customary charges for the same service
> or, if less, the actual charges. The reimbursement to
> providers by the preferred provider organization will
> be reduced to reflect any waiver or forgiveness by a
> provider of the remaining 20%.

a                                    33

## HEALTH CARE PROGRAM

Art. II, 4(a)(4)

Under this subsection, the 80% limitation on payment
for charges payable to non-panel providers by the
preferred provider organization shall not be
applicable (i) to an individual enrollee who has
incurred personal expense under this provision of
$~~500~~ 1,000 for such covered services in a calendar
year or (ii) to the covered members of the enrollee's
family, if any, after the enrollee and such members
have incurred a total of $~~1,000~~ 2,000 in personal
expense under this provision for such covered
services in the same calendar year.

(5)   Preferred provider organizations may seek Corporation
approval to establish special contractual
relationships with providers not otherwise included
under the Program (e.g., freestanding ambulatory
surgical centers), when it can be shown that doing so
will improve quality of care and enhance cost
competitiveness.

b                                        34

<u>HEALTH CARE PROGRAM</u>

Art. II, 4(a)(6)

    (6)   Mental health and substance abuse coverage is
administered in accordance with the terms and
conditions of Appendix B.

  (b)  Health Maintenance Organization Option
This option provides coverages to enrollees through
physicians, hospitals, and other providers who have
agreed to provide services under the terms established by
the health maintenance organization to limit fees, assure
quality, and control utilization.

    (1)   The types of coverages and the scope and level of
coverages provided under this option may vary among
health maintenance organizations and may be different
than the coverages set forth in Appendices A, B, and
D.

    (2)   Most health maintenance organizations provide health
care coverages (including preventive care) that
generally are managed for the enrollee by a primary
care physician.  The primary care physician is

a                                    35

## HEALTH CARE PROGRAM

Art. II, 4(b)(2)

responsible for referring the patient to other providers of service.  If such referral is not obtained, the enrollee may be responsible for charges incurred.

(3) Under this option, if an enrollee receives services from a non-health maintenance organization provider, in a non-emergency situation or without a referral, such services may not be covered.

(4) The Corporation pays a capitated fee to health maintenance organizations for enrollees electing coverage through this option.  The fee paid is based upon a comparison of the monthly rates of the health maintenance organization and those of the base option in the rating area.  When the health maintenance organization's rates are higher than those of the base option, the enrollee may be required to make a contribution.

a

HEALTH CARE PROGRAM

Art. II, 4(c)

   (c)   Traditional Option

This option provides core coverages described in Appendix A with predetermination and review procedures required in order to receive full benefits for certain covered services.  These procedures include but are not limited to predetermination (which includes, but is not limited to, prior authorization or assessment for non-emergency inpatient admissions, and second opinions for selected procedures), concurrent utilization review, retrospective utilization review, and focused utilization review.  In some instances, special programs (such as foot surgery predetermination or predetermination of specific outpatient procedures) will be developed and implemented, as necessary and practicable, to address specific utilization problems.

a

37

## HEALTH CARE PROGRAM

Art. II, 4(c)(1)

(1)   Benefits for certain covered services, which require
predetermination, when provided without obtaining
necessary predetermination approvals will be
administered according to Program standards including
the provision that such services be payable at 80% of
reasonable and customary charges after the first $100
of expense for such services.  The reimbursement to
providers will be reduced to reflect any waiver or
forgiveness by a provider of the $100 or remaining
20%.

(2)   Under this subsection, the 80% payment limitation and
the requirement that payment be made for the first
$100 of covered expenses shall not be applicable (i)
to an individual enrollee who has incurred a personal
expense of $750 under this provision for such covered
services in a calendar year or (ii) to the

a                          38

<u>HEALTH CARE PROGRAM</u>

Art. II, 4(c)(2)

covered members of the enrollee's family, if any, after the enrollee and such members have incurred a total of $1,500 in personal expense under this provision for such covered services in the same calendar year.

(3)   Primary and secondary enrollees eligible for Medicare and enrolled in the Traditional option may not be subject to the predetermination and review procedures set forth above for those covered services for which Medicare has primary responsibility.

(4)   <u>In selected states, or geographic areas within a state, Traditional Care Networks (TCN) may be implemented. Such networks will apply to Traditional option enrollees residing in the respective states/areas. The scope and level of coverages may vary from those for the Traditional option in non-TCN states/areas and may involve variation in benefits</u>

b                                39                     Plus 39A

<u>HEALTH CARE PROGRAM</u>

Art. II, 4(c)(4)

<u>for use of non-TCN providers. When a TCN is</u>

<u>implemented, affected enrollees will be provided</u>

<u>additional information.</u>

<u>(5)</u>   Mental health and substance abuse benefits are

administered in accordance with the terms and

conditions of Appendix B.

HEALTH CARE PROGRAM

Art. III, 6

Section 6.      Continuation of Coverages
                Upon Retirement or Termination of
                Employment at Age 65 or Older

(a)   The health care coverages an employee has at the time of
      retirement or termination of employment at age 65 or older
      (for any reason other than a discharge for cause) with
      insufficient credited service to entitle the employee to a
      benefit under Article II of The Delphi ~~Automotive~~
      ~~Systems~~Corporation Hourly-Rate Employees Pension Plan
      shall be continued.

(b)   An employee who upon retirement is not enrolled for the
      coverages as provided in subsection (a) above may enroll
      for health care coverages to which entitled at the time of
      or subsequent to retirement.  Such coverage shall become
      effective on the first of the month following receipt of
      application from such retired employee.

(c)   Except as provided in subsection (d), below, the
      Corporation shall make contributions, in accordance with
      Program provisions, for health care coverages continued in
      accordance with subsections (a) and (b) above, for:

a-dc                              59

<u>HEALTH CARE PROGRAM</u>

Art. III, 6(c)(1)

      (1)  a retired employee (including any eligible
dependents other than sponsored dependents),
provided such retired employee is eligible for
benefits under Article II of The Delphi ~~Automotive
Systems~~ Corporation Hourly-Rate Employees Pension
Plan; and

      (2)  an employee (including any eligible dependents
other than sponsored dependents) terminating at age
65 or older (for any reason other than a discharge
for cause) with insufficient credited service to be
entitled to a benefit under Article II of The
Delphi ~~Automotive Systems~~ Corporation Hourly-Rate
Employees Pension Plan.

  (d)  Corporation contributions will not be made for employees
hired on or after November 18, 1996 who, at the time of
retirement or termination at age 65 or older, have fewer
than ten (10) years of credited service under the
Corporation's Pension Plans. Such individuals may elect to
continue coverage on a self-paid basis.

a-dc

60

HEALTH CARE PROGRAM

Art. III, 7

Section 7.        Continuation of Coverages Upon Termination of
                  Employment Other Than by Retirement or Death

    (a)  Except as provided in Article III, Section 4(c) above,

health care coverages for an employee who quits or is

discharged shall automatically cease as of the last day

of the month in which the employee quits or is discharged

or, if later, the date seniority is broken.

    (b)  Following termination of employment other than by

retirement or death, the former employee shall be

entitled to self-paid continuation of coverages provided

under applicable Federal laws, and/or may be offered, or

to a conversion contract under Section 10, below.

Section 8.        Continuation of Coverages for the Survivors
                  of an Employee, or of a Retired Employee
                  or Certain Former Employee

    (a)  If an employee dies prior to becoming eligible for

health care coverages under Section 2 above, the

Corporation shall permit the spouse of such employee to

participate in the core coverages, on a self-pay basis,

as provided in subsection (b)(1) below.

b                                    61

<u>HEALTH CARE PROGRAM</u>

Art. III, 8(b)

(b)   If an employee or retiree dies after coverages are in
effect under the Program, coverage for any dependents
will cease as of the end of the month in which the
employee or retiree dies.   Thereafter, a surviving
spouse may be eligible to continue coverages as
indicated below.

For purposes of this Section 8 and of Article V,
"surviving spouse" does not include the spouse of a
former employee eligible for a deferred pension under
Article VII, Section 2 of The Delphi ~~Automotive~~
~~SystemsCorporation~~ Hourly-Rate Employees Pension Plan;
or a spouse or former spouse receiving, or eligible to
receive, a pre-retirement survivor benefit under Article
II, Section 11 of the previously referenced Pension
Plan.

a-dc                          62

<u>HEALTH CARE PROGRAM</u>

Art. III, 8(b)(1)


    (1)   The Corporation shall make suitable arrangements
for the surviving spouse of an employee to
participate, on a self-pay basis, in core
coverages ~~as long as monthly survivor income~~
~~benefits provided in the Delphi Automotive~~
~~Systems~~Corporation ~~Life and Disability Benefits~~
~~Program for Hourly Employees are payable, or as~~
~~long as the Bridge Survivor Income Benefit~~
~~provided therein is not payable only because the~~
~~survivor is eligible for a Mother's Insurance~~
~~Benefit, or a comparable benefit for a father~~
~~whether or not it is called a Father's Insurance~~
~~Benefit, under the Federal Social Security Act as~~
~~now in effect or as hereafter amended.  However,~~
~~such coverage shall not include prescription drug~~
~~or hearing aid coverage unless applicable to the~~
~~employee at date of death~~<u>for the first 24 months</u>
<u>following the month in which the employee dies,</u>
<u>provided the surviving spouse was married to the</u>
<u>deceased employee for at least one full year</u>
<u>immediately preceding the date of death.</u>

HEALTH CARE PROGRAM

Art. III, 8(b)(2)

(2) The Corporation shall make contributions for core
coverages continued in accordance with subsection
(b)(1) above, for the first twelve months ~~in which
monthly Transition Survivor Income Benefits are
payable to a surviving spouse who also is eligible
for monthly Bridge Survivor Income Benefits provided
under the Delphi Automotive Systems~~Corporation Life
~~and Disability Benefits Program.  This provision
also shall apply to the surviving spouse of an
employee who dies on or after October 26, 1987, but
who is ineligible for Bridge Survivor Income
Benefits solely because of being age sixty (60) or
older as of the employee's date of death.
Thereafter, the surviving spouse shall contribute
the full cost for such coverages~~following the month
in which the employee dies, provided that, as of the
employee's date of death, the surviving spouse's age
is at least 45, or the surviving spouse's age, when
added to the deceased employee's seniority, totals
55 or more.  Thereafter, the surviving spouse may
continue core coverages, on a self-pay basis, until
the earlier of (a) remarriage, (b) the end of the
month in which age 62 is attained, or (c) death.

b-dc                              64

HEALTH CARE PROGRAM

Art. III, 8(b)(3)

(3)   The Corporation shall make suitable arrangements for a surviving spouse

(i)   of an employee or retired employee (but not the surviving spouse of a former employee eligible for a deferred pension or a surviving spouse or surviving divorced spouse eligible for a pre-retirement survivor benefit under Article II, Section 11 of The Delphi ~~Automotive Systems~~Corporation Hourly-Rate Employees Pension Plan) if such spouse is receiving or is eligible to receive a survivor benefit under Article II of The Delphi ~~Automotive Systems~~Corporation Hourly-Rate Employees Pension Plan,

a-dc                                   65

HEALTH CARE PROGRAM

Art. III, 8(b)(3)(ii)

(ii) of a retired employee if, prior to death, the retired employee was receiving a benefit under Article II of The Delphi ~~Automotive Systems~~ Corporation Hourly-Rate Employees Pension Plan,

(iii) of a former employee whose employment was terminated at age 65 or older for any reason other than a discharge for cause with insufficient credited service to be entitled to a benefit under Article II of The Delphi ~~Automotive Systems~~ Corporation Hourly-Rate Employees Pension Plan, or

(iv) of an employee who at the time of death was eligible to retire on an early or normal pension under Article II of The Delphi ~~Automotive Systems~~ Corporation Hourly-Rate Employees Pension Plan,

to participate in health care coverages; provided, however, that dental coverage shall be available

a-dc

66

HEALTH CARE PROGRAM

Art. III, 8(b)(3)(iv)

to a surviving spouse age 65 or over only for months
that such surviving spouse is enrolled for Medicare
Part B coverage.

(4)    The Corporation shall make contributions for health
care coverages continued in accordance with
subsection (b)(3) above only on behalf of a
surviving spouse, as provided therein and in
subsection (b)(5) below (including for this purpose
a surviving spouse who would receive survivor
benefits under The Delphi ~~Automotive~~
~~Systems~~Corporation Hourly-Rate Employees Pension
Plan except for receipt of Survivor Income Benefits
under the Delphi ~~Automotive Systems~~Corporation Life
and Disability Benefits Program), and the eligible
dependents of any such spouse; provided, however,
that the contributions on behalf of a surviving
spouse for the month the surviving spouse becomes
age 65 and subsequent months shall be made only for
months that the surviving spouse is enrolled for
Medicare Part B coverage.

a-dc                              67

HEALTH CARE PROGRAM

Art. III, 8(b)(4)

Notwithstanding the above, no Corporation
contributions, other than contributions related to
subsection (b)(5) below, shall be made under this
subsection (b)(4) for the surviving spouse and
eligible dependents of a deceased employee or retiree
hired on or after November 18, 1996, if such employee
or retiree had fewer than 10 years of credited
service under the Corporation's Pension Plans.

(5)    The Corporation shall make suitable arrangements
for a surviving spouse of an employee whose loss
of life results from accidental bodily injuries
caused solely by employment with
Delphi ~~Automotive Systems~~ Corporation, and results
solely from an accident in which the cause and
result are unexpected and definite as to time and
place, to participate in health care coverages;
provided, however, such

a-dc                        68

HEALTH CARE PROGRAM

Art. III, 8(b)(5)

coverages ~~shall not include prescription drug,~~
~~dental, hearing aid or vision coverages unless~~
~~applicable to the employee at date of death, and~~
shall terminate upon the remarriage or death of the
surviving spouse.  Any Corporation contributions
for coverages continued under this subsection
(b)(5) shall be as provided in subsection (b)(4)
above.

(6)  A surviving spouse who is eligible for such
coverages provided in subsections (b)(1), (b)(3)
and (b)(5) above and who elects such coverages but
who is not eligible for Corporation contributions
as provided in subsections (b)(2) and (b)(4), must
make such election no later than 60 days following
the later of the end of the month in which the
death of the employee, retired employee, or former

b                           69

HEALTH CARE PROGRAM

Art. III, 8(b)(6)

        employee occurs, or following the date of notice of
available options by the Corporation, and shall
contribute monthly the entire cost for such
coverages for (i) single party, (ii) two party, or
(iii) family.

(7)   When contributions by surviving spouses are
required, they shall be paid in cash directly to
the Corporation or its agent on or before the 10th
day of the month for which such coverages are to be
provided or such other due date as may be
established by the Corporation.

a

70

HEALTH CARE PROGRAM

Art. III, 9

Section 9.        Dependent Eligibility Provisions

   (a)  General Provisions

      (1)  As used in this Section 9, when reference is made to a person (i.e. - person A) being "dependent upon" another person (i.e. - person B), the term shall mean that person B may legally claim an exemption for person A, under Section 151 of the Internal Revenue Code, for Federal income tax purposes.

      (2)  The provisions of this Section 9 apply with respect to enrollment of certain dependents as secondary enrollees under primary enrollees who elect "self and spouse," "self and child," or "self and family" enrollment, in accordance with Article III, Section 1(a)(1) of the Program and to enrollment of sponsored dependents under subsection (e) below.  Unless specifically provided otherwise in the Program, such a

a                                    71

HEALTH CARE PROGRAM

Art. III, 9(a)(2)

dependent has no individual or personal right of enrollment, right to select an option within the Informed Choice Plan, or right to continue coverages under the Program.

(3)   The Corporation shall have the right of determining eligibility of a dependent, consistent with the provisions of this Program.

(4)   A primary enrollee claiming initial or continuing eligibility of a dependent shall furnish whatever documentation may be necessary to substantiate the claimed eligibility of a dependent and the social security number of each such dependent for whom a social security number is required to claim an exemption on the primary enrollee's Federal income tax return. Refusal or failure to furnish such documentation when requested to do so, or to furnish the social security number within a reasonable period of time, shall result in denial or withdrawal of eligibility for such dependent.

a                                    72

HEALTH CARE PROGRAM

Art. III, 9(a)(5)

    (5)  Unless otherwise provided, a dependent who loses eligibility in accordance with the provisions of this Program, and who once again meets the requirements for dependent eligibility, may have coverage reinstated. The effective date of coverage in such cases will be the first day of the month following the month in which a valid enrollment form and any necessary supporting documentation is received by the Corporation.

    (6)  When, as a result of oversight or error, an eligible primary or secondary enrollee entitled to Corporation-paid coverage is not enrolled in a timely manner, coverage may be provided retroactive to the date of eligibility that would have been established if proper processing had occurred.  However, in no event will the retroactivity exceed twelve (12) months from the month in which the error or omission is discovered.

a               73

HEALTH CARE PROGRAM

Art. III, 9(a)(6)

This retroactive enrollment provision shall not
apply to surviving spouses who are not entitled to
Corporation-paid coverage.  Such surviving spouses
electing to continue coverages on a self-paid
basis must make such election as stipulated in
Article III, Section 8(b)(6).  This retroactive
enrollment provision also shall not apply to
principally supported children or sponsored
dependents, as discussed in subsections (d) and
(e) respectively below.

(7)  The receipt of a benefit under The Delphi
~~Automotive Systems~~Corporation Hourly-Rate
Employees Pension Plan as an "alternate payee" in
accordance with the Retirement Equity Act of 1984
shall not serve to entitle such recipient to
coverages or continuation of coverages under this
Program.

a-dc                                74

HEALTH CARE PROGRAM

Art. III, 9(a)(8)

(8) Provisions will be made for the enrollment and administration of coverage for an individual determined to qualify for coverage pursuant to Qualified Medical Child Support Orders (QMCSO) under the provisions of the Omnibus Budget Reconciliation Act of 1993 (OBRA '93).

(b)   Spouse

(1)   The spouse of an eligible and enrolled employee or retiree shall be eligible for coverage.  A surviving spouse of an employee or retiree, as defined in Section 8 above, may not have or add a new spouse as a dependent.

a                                        75

HEALTH CARE PROGRAM

Art. III, 9(b)(2)

(2)   A spouse by common-law marriage shall be eligible for
coverage only to the extent such relationship is
recognized by the laws of the state in which the
employee or retiree is enrolled, and the employee or
retiree has met such requirements for documentation
of the status as may be necessary by law and required
by the Corporation.

(3)   The effective date of coverage for a spouse shall be
the later of the effective date of coverage for the
employee or retiree, or the date of marriage.  For a
common-law spouse, the effective date of coverage
shall be the date of receipt by the Corporation of a
completed enrollment form and any necessary
supporting documentation.

(4)   A spouse's eligibility for coverage shall cease on
the earlier of:

a                               76

<u>HEALTH CARE PROGRAM</u>

Art. III, 9(b)(4)(i)

    (i)   the date the primary enrollee's coverage ceases, except that, in the case of the primary enrollee's death, coverage shall cease on the last day of the month in which the primary enrollee dies, unless the spouse is eligible for coverage as a surviving spouse as set forth in Section 8 of this Article, or

    (ii)   the date of the final decree of divorce.

(c)  Children

    (1)  Children of a primary enrollee, or of the spouse of an eligible and enrolled employee or retiree, shall be eligible for coverage if, as to each one, the following criteria are met.

a

HEALTH CARE PROGRAM

Art. III, 9(c)(1)(i)

(i)  Relationship.  The child must be the child of
the primary enrollee, or of an employee's or
retiree's spouse, by birth, or legal adoption,
or legal guardianship.

Under the provisions of the Omnibus Budget
Reconciliation Act of 1993 (OBRA '93), a child
under the age of 18 who is in the process of
being adopted by an employee or retiree will be
deemed to satisfy the relationship test when the
child is placed and takes up residence with the
employee or retiree, pursuant to the adoption
process.

(ii) Age. The child must not have reached the end of
the calendar year in which the child becomes age
25, unless such child has been determined to be
totally and permanently disabled prior to the

a                              78

<u>HEALTH CARE PROGRAM</u>

Art. III, 9(c)(1)(ii)

end of that year. For the purposes of this subsection, "totally and permanently disabled" means having any medically determinable physical or mental condition which prevents the child from engaging in substantial gainful activity and which can be expected to result in death or be of long-continued or indefinite duration.

Coverage will not be reinstated for a child who first becomes totally and permanently disabled after the end of the calendar year in which age 25 is attained or who was eligible for coverage as a totally and permanently disabled child, recovers, and, after the end of such calendar year, again becomes so disabled.

(iii)  Marital Status.  The child must be unmarried.

a                          79

HEALTH CARE PROGRAM

Art. III, 9(c)(1)(iv)

(iv) Residency.  The child must reside with the
primary enrollee, as a member of such enrollee's
household or, if not a member of the household,
such enrollee must be legally responsible for
the provision of health care for the child (such
as children of certain divorced parents, legal
guardianships, children confined in training
institutions, or children in school).

(v) Dependency.  The child must be dependent upon
the primary enrollee, or upon the spouse of an
eligible and enrolled employee or retiree.  This
requirement shall be waived with respect to a
child (by birth, legal adoption or legal
guardianship) of a divorced employee or retiree,
if the divorce decree, or order of the court of

a                                   80

<u>HEALTH CARE PROGRAM</u>

Art. III, 9(c)(1)(v)

proper jurisdiction, or amendment of such decree
or order, stipulates that such employee or
retiree is legally responsible for providing
health care coverage for such child.

(2)  An eligible surviving spouse may not enroll a child
unless the child was eligible to be enrolled prior to
the death of the employee or retiree or, in the case
of a child born after the death of the employee or
retiree, unless such child is the issue of the
surviving spouse's marriage to the deceased employee
or retiree, and was conceived prior to such
employee's or retiree's death.

(3)  The effective date of coverage for a child shall be
the later of the effective date of coverage for the
primary enrollee, or in the case of:

(i)  Birth - the date of birth;

a                                    81

<u>HEALTH CARE PROGRAM</u>

Art. III, 9(c)(3)(ii)

      (ii)  Legal Adoption - the date the adoption becomes final in accordance with applicable laws (or, for children being adopted and who meet the criteria of OBRA '93, the date the child is placed and resides with the adopting employee or retiree);

      (iii)  Legal Guardianship - the date guardianship becomes final in accordance with applicable laws; and

      (iv)  Stepchild - the date the child becomes a member of the employee's or retiree's household.

  (4)  A child, as defined above, shall cease to be eligible for coverage as of:

a

82

## HEALTH CARE PROGRAM

Art. III, 9(c)(4)(i)


(i)   the date of marriage of such child;


(ii)  the last day of the month in which the child ceases to be dependent upon the primary enrollee, or upon the spouse of an eligible and enrolled employee or retiree, unless the exception in subsection (c)(1)(v) applies;


(iii) the last day of the month in which the child ceases to meet the residency criteria of subsection (c)(1)(iv) above;


(iv)  the last day of the calendar year in which the child becomes age 25, except in the case of a totally and permanently disabled child (in the event coverage for a totally and permanently disabled child is continued, eligibility for


a                                  83

HEALTH CARE PROGRAM

Art. III, 9(c)(4)(iv)

such coverage shall cease as of the last day of the month in which the child ceases to be totally and permanently disabled as defined by this Program); or

(v) the date the primary enrollee's coverage ceases, except that, in the case of the primary enrollee's death, coverage for such dependent child shall cease on the last day of the month in which the primary enrollee dies, unless such child is eligible for coverage as a dependent child of the surviving spouse of such employee or retiree.

(5) Notwithstanding any other provisions of the Program, the Program shall provide coverages in accordance with Section 4301 of the Omnibus Budget Reconciliation Act of 1993 (OBRA '93) and Section 609 of ERISA. The

a

84

HEALTH CARE PROGRAM

Art. III, 9(c)(5)

Corporation will maintain reasonable procedures related to the implementation of Qualified Medical Child Support Order and other aspects of the Federal regulations.

(d)   Principally Supported Children

(1)   Children residing with and related to a primary enrollee by blood or marriage and for whom the primary enrollee provides principal support (as defined by the Internal Revenue Code of the United States) and who were reported as dependents on the primary enrollee's most recent income tax return or who qualify in the current year for dependency tax status, may be enrolled as principally supported children.

a

HEALTH CARE PROGRAM

Art. III, 9(d)(1)(i)

    (i)  A surviving spouse may continue coverages for a principally supported child enrolled by the deceased employee or retiree prior to such employee's or retiree's death, but may not enroll a new principally supported child unless such child was eligible to be enrolled by the deceased employee or retiree as of the date of death.

    (ii)  The residency waiver based on legal responsibility for the provision of health care, which applies to other children as indicated in subsection (c)(1)(iv), does not apply to principally supported children.

    (iii)  The other criteria of subsection (c)(1) apply to principally supported children.

a

86

HEALTH CARE PROGRAM

Art. III, 9(d)(2)

    (2)  The effective date of coverage for a principally supported child shall be the first day of the month following the month in which a valid enrollment form is received by the Corporation.

    (3)  Eligibility of a principally supported child shall cease as it would for any other child in accordance with subsection (c)(4).

  (e)  Sponsored Dependents

    (1)  A primary enrollee may obtain core coverages for dependents other than those specified in subsections (b), (c), and (d) above.  Such dependents will include persons who are related to the primary enrollee by blood or marriage, or if not related, who reside with the primary enrollee as members of the household.

a

87

<u>HEALTH CARE PROGRAM</u>

Art. III, 9(e)(1)

       Before becoming eligible for coverage, sponsored
dependents (other than a child being adopted by the
primary enrollee) who are not citizens of the United
States must reside in the United States for one (1)
full year, and must be legally entitled to remain in
the United States indefinitely.  Sponsored dependents
must be dependent upon the primary enrollee for more
than half of their support as defined by the Internal
Revenue Code of the United States and must either
qualify to be claimed as an exemption by the primary
enrollee in the current year or have been claimed as
an exemption on the primary enrollee's most recent
Federal income tax return.  They must be designated as
sponsored dependents on a valid enrollment form signed
by the primary enrollee.  The coverages shall be

a

88

HEALTH CARE PROGRAM

Art. III, 9(e)(1)

provided under the Program option elected by the primary enrollee.  For the purposes of this subsection, an adopted child shall be considered to be related to a primary enrollee "by blood."

(2)   Coverages provided under this subsection for a sponsored dependent enrolled at the time of an employee's or retiree's death may be continued at the option of the employee's or retiree's surviving spouse while such surviving spouse is enrolled for coverages as provided in Section 8 of this Article.  A surviving spouse may not add any new sponsored dependents.

(3)   The primary enrollee shall pay the full cost of coverages under this subsection, and the Corporation shall not contribute toward the cost of health care coverages for any sponsored dependents.

a

89

<u>HEALTH CARE PROGRAM</u>

Art. III, 9(e)(4)

    (4)   The effective date of coverages for an eligible sponsored dependent shall be the later of the effective date of coverages for the primary enrollee, or the first day of the month following the month of receipt by the Corporation of a completed enrollment form and any supporting documentation as may be required by the Corporation.  However, the effective date for a sponsored dependent previously enrolled as such, and whose coverages as a sponsored dependent were discontinued, shall be the first day of the sixth month following receipt of the application for reinstatement.

    (5)   Coverage for a sponsored dependent shall cease on the earlier of:

a

90

HEALTH CARE PROGRAM

Art. III, 9(e)(5)(i)

      (i)  the last day of the month in which the person ceases to meet the eligibility criteria set forth in (1) above,

     (ii) on the last day of the month preceding the month for which the required contribution was due but not paid, or

    (iii) the date the primary enrollee's coverages cease except that in the case of the primary enrollee's death, coverage for such sponsored dependent shall cease on the last day of the month in which the primary enrollee dies, unless the sponsored dependent has coverages continued in accordance with (2) above.

(f)   Same-Sex Domestic Partners and Their Children

  (1)   Effective January 1, 2001, the eligible domestic partner of an employee may be enrolled for coverage. To qualify for enrollment, the employee and domestic partner must:

b-dc

PLUS 91A-C

## HEALTH CARE PROGRAM

### Art. III, 9(f)(1)(i)

    (i)  Be the same sex;

   (ii)  Have shared a continuous committed relationship for at least six months, intend to do so indefinitely and have no such domestic partner relationship with any other person;

  (iii)  Reside in the same household;

  (iv)  Share responsibility for each other's welfare and financial obligations;

   (v)  Not be related by blood to a degree of kinship that would prevent marriage from being recognized under law;

  (vi)  Be over the age of 18, of legal age and legally competent to enter into a contract;

 (vii)  Reside in a state where marriage between two persons of the same sex is not recognized as valid under law; and

(viii)  Not be married to any other person.


(2)  If the enrollee resides in a state that has a formal recognition of domestic partner relationships, such recognition is required for enrollment of the domestic partner.


                                                

HEALTH CARE PROGRAM

Art. III, 9(f)(3)

(3)  The employee and the domestic partner will be
     required to complete an affidavit attesting to
     meeting the eligibility requirements and provide any
     additional documentation necessary to support the
     claimed eligibility.

(4)  An eligible domestic partner's child may be enrolled
     if the primary enrollee can claim an exemption for
     the child on his or her federal income tax return and
     the child meets all of the Program's eligibility
     provisions pertaining to children.

(5)  Neither a domestic partner nor his or her children
     are eligible to be enrolled following the primary
     enrollee's retirement.  However, coverage for an
     eligible domestic partner, or his or her child,
     enrolled prior to the primary enrollee's retirement
     may be continued in retirement.

(6)  If the primary enrollee and his or her domestic
     partner terminate the relationship, an opportunity to
     continue coverage on a basis comparable to COBRA will
     be provided.

a                          91B                    PLUS 91C

<u>HEALTH CARE PROGRAM</u>

<u>Art. III, 9(f)(7)</u>

    <u>(7)</u>  In the event of the primary enrollee's death, a surviving domestic partner will be provided continuation opportunities comparable to a similarly situated surviving spouse.  Under no circumstances will the privileges afforded a domestic partner exceed those of a similarly situated spouse.

a

<u>HEALTH CARE PROGRAM</u>

App. A, III. G.2.

2.   Reimbursement

a.   The copayment amount for each separate prescription order or refill of a covered drug shall not exceed:

(1)   $5<u>.00</u> for ~~enrollees in the Traditional option~~ <u>generic drugs dispensed at retail</u>; or

(2)   $~~3~~<u>10.00</u> for ~~enrollees in the Preferred Provider Organization option~~ <u>brand name drugs dispensed at retail</u>; or

(3)   $2<u>.00</u> ($5.00 effective January 1, 2005) for ~~enrollees who receive prescriptions~~ <u>brand name or generic drugs</u> dispensed through ~~the~~ <u>M</u>mail <u>O</u>order ~~Prescription Drug program~~<u>.</u>

(4)   <u>The retail copayment for generic and brand name drugs applicable to those enrolled as a retiree, surviving spouse (or a dependent of a retiree or surviving spouse) as of _____(A)_____ will be $5.00.</u>

b

<u>HEALTH CARE PROGRAM</u>

App. A, III. G.2.b.

b.    In addition to the copayment, enrollees may incur additional expense if a brand name drug, other than a drug identified in subsection (4), below is dispensed:

(1)    If the brand name drug is dispensed at the enrollee's request or upon determination that it is not medically necessary to dispense the brand name drug rather than the generic, the enrollee will pay the appropriate generic copayment plus the full difference in cost between the generic drug and the brand name drug;

(2)    If the brand name drug is dispensed at retail and at physician direction, the enrollee will pay the appropriate brand name copayment plus the difference (up to a maximum of $10.00) in Program cost between the generic drug and the brand name drug.

a                          242A                    PLUS 242B-D

HEALTH CARE PROGRAM

App. A, III. G.2.b.(3)

(3)    The carrier will initiate a review of the medical necessity for dispensing the brand name drug rather than the generic if no review has been requested by enrollees or their physicians. If the medical necessity is not established, future dispensing will be subject to (1) above.

(4)    In the case of (3), above, if it is found that dispensing of the brand name drug rather than the generic was medically necessary, amounts in excess of the brand name copayment will be refunded automatically. The carrier's systems will be adjusted to allow dispensing of the brand name for the duration of the prescription.

(5)    "Narrow Therapeutic Index Drugs" are those for which small variations in the dose could result in changes in drug safety. In order to remain within a safe and

a                         242B                  PLUS 242C

<u>HEALTH CARE PROGRAM</u>

App. A, III. G.2.b.(5)

<u>effective range, these medications may require</u>

<u>frequent patient monitoring to adjust the dose.</u>

<u>When such brand name drugs are dispensed, only</u>

<u>the brand name copayment will apply.  Drugs</u>

<u>currently included in this group are:</u>

<u>Lanoxin</u>
<u>Dilantin</u>
<u>Tegretol</u>
<u>Cyclosporin</u>
<u>Depakene</u>
<u>Mysoline</u>
<u>Levothyroxine (including Synthroid)</u>

<u>This list may be adjusted from time-to-time as</u>

<u>reflected in Program standards.</u>

c.    <u>The copayments specified above are for the days</u>

<u>supply referenced in subsection G.3., below. To</u>

<u>the extent a particular covered drug, supply or</u>

<u>device is pre-packaged in days supply exceeding</u>

<u>the specified ones, and cannot be repackaged by</u>

<u>the provider, the copayments will be prorated</u>

<u>to account for the additional days supply.</u>

d.    <u>Effective January 1, 2004, after the original</u>

<u>prescription order and two (2) refills, retail</u>

a                                242C                    PLUS 242D


<u>HEALTH CARE PROGRAM</u>

App. A, III. G.2.d.


<u>purchases of covered drugs identified in
subsection 5.b., below, (and related supplies,
if applicable) are subject to an enrollee
copayment of 100% of the Program cost.</u>


~~be~~. Except for the ~~copayment~~ <u>amounts indicated
above</u>, covered drugs or supplies obtained from
a participating provider are covered subject to
the Program provisions.


a                                242D

HEALTH CARE PROGRAM

App. A, III. G.2.e̲f̲.

e̲f̲.    Upon proof of payment acceptable to the
carrier, an enrollee is entitled to
reimbursement from the carrier of seventy-five
percent (75%) of the reasonable and customary
charge for the generic or brand name drug as
applicable, as determined by the carrier after
deduction of the appropriate copayment, of
covered drugs obtained on a non-emergency basis
from a nonparticipating provider located within
the area in which the carrier provides
coverage. The enrollee may incur additional
expense if a brand name drug is dispensed at
the enrollee's request or when not medically
necessary.

d̶g̲.    Upon proof of payment acceptable to the
carrier, an enrollee is entitled to
reimbursement from the carrier of one hundred
percent (100%) of the reasonable and customary

b                                243                              PLUS 243A


<u>HEALTH CARE PROGRAM</u>

App. A, III. G.2.g.


charge <u>for the generic or brand name drug, as</u>
<u>applicable</u>, as determined by the carrier after
deduction of the <u>appropriate</u> copayment, of
covered drugs obtained from a provider located
outside the area in which the carrier provides
coverage or from an in-area non-participating
provider in the case of an emergency. <u>The</u>
<u>enrollee may incur additional expense if a</u>
<u>brand name drug is dispensed at the enrollee's</u>
<u>request or when not medically necessary.</u>

a                                          243A

### HEALTH CARE PROGRAM

App. A, III. G.3.

3.   Coverage

a.   At retail, ~~C~~coverage includes up to a 34-day supply of a covered drug ~~unless otherwise specified in d. below~~. Certain drugs, such as contraceptives, may be subject to Program standards clarifying what is included in "up to a 34-day supply".

b.   At retail, ~~C~~coverage includes a one-month supply of disposable syringes and needles ~~for the injection of insulin~~ when prescribed and dispensed with a one-month supply of self-administered insulin ~~or 100 disposable syringes and needles when prescribed with a three month supply of insulin~~.

~~c.   Coverage includes a supply of disposable syringes and needles consistent with the prescribed supply of~~ or a covered self-administered antineoplastic agent.

b                                      244                              PLUS  244A

                        HEALTH CARE PROGRAM

App. A, III. G.3.c.


        c.   At retail, coverage includes two diaphragms per

            year. Diaphragms are not available through the

            mail order pharmacy.


        d.   At mail order, ~~C~~coverage includes up to a

            90-day supply of covered drugs ~~obtained through~~

            ~~the Mail Order Prescription Drug program~~ and

            supplies, with a corresponding

a                                    244A


<u>HEALTH CARE PROGRAM</u>

App. A, III. G.3.d.

prescription or refill order. <u>Diaphragms are
not available through the mail order pharmacy.</u>
~~When injectable insulin or a covered
antineoplastic agent is obtained through the
Mail Order Prescription Drug program, coverage
includes up to a 90-day supply of disposable
syringes and needles when prescribed with a
90-day supply of insulin or a covered
antineoplastic agent.~~


4.    Maximum Allowable Cost Programs

Maximum Allowable Cost ~~prescription drug programs,~~ or
alternative generic substitution programs, are
provided by all carriers.  All enrollees except those
in the Health Maintenance Organization option will be
eligible. <u>Unless precluded by law, or responding to a
physician direction or enrollee request, Program
providers may substitute a generic drug for the
equivalent multi-source brand name drug.</u>

<u>HEALTH CARE PROGRAM</u>

App. A, III. G.5.

    5.   Limitations and Exclusions

       a.   Coverage under this subsection does not

          include:

a

## 245A
## HEALTH CARE PROGRAM

App. A, III. G.5.a.(1)

(1)    any research or experimental agent including Federal Food and Drug Administration approved drugs which may be prescribed for research or experimental treatments;

(2)    ~~any charge for a contraceptive medication, regardless of intended use, or~~ any charge for a medication being used for a cosmetic purpose, even if the medication is a prescription legend drug;

(3)    any charge for devices (other than diaphragms) or appliances (e.g., orthotics, and other non-medical substances);

(4)    any vaccine administered for the prevention of infectious diseases;

App. C

## HEALTH CARE PROGRAM

## APPENDIX C

## DENTAL COVERAGE

I.   ## Enrollment Classifications

Dental coverage for a primary enrollee shall include coverage for secondary enrollees as defined in the Program.

II.   ## Description of Benefits

Dental benefits will be payable, subject to the conditions herein, if an enrollee incurs a covered dental expense.

III.   ## Covered Dental Expenses

Covered dental expenses are the usual charges of a dentist which an enrollee is required to pay for services and supplies which are necessary for treatment of a dental condition, but only to the extent that such charges are reasonable and customary charges, as herein defined, for services and supplies customarily employed for treatment of that condition, and only if rendered in accordance with accepted standards of dental practice. Such expenses shall be only those incurred in connection with the following dental services which are

a

347

<u>HEALTH CARE PROGRAM</u>

App. C, III.

performed, except as otherwise provided in Section VII. B., by a licensed dentist and which are received while coverage is in force.

A.   The following covered dental expenses shall be paid at 100 percent of the reasonable and customary charge:

1.   Routine oral examinations and prophylaxes (scaling and cleaning of teeth), but not more than twice each in any calendar year.  Three cleanings per calendar year will be allowed if there is a documented history of periodontal disease. Four cleanings per calendar year will be covered for two full calendar years following periodontal surgery.

2. Topical application of fluoride provided that such treatment shall be a covered dental expense only for enrollees under 20 years of age, unless a specific dental condition makes such treatment necessary.

a

348

HEALTH CARE PROGRAM

App. C, III. A.3.

    3.   Space maintainers that replace prematurely lost teeth for children under 19 years of age.

    4.   Emergency palliative treatment.

B.   The following covered dental expenses shall be paid at 90 percent of the reasonable and customary charge:

    1.   Dental x-rays, including:

        a.   full mouth x-rays, once in any period of five (5) consecutive calendar years.

        b.   supplementary bitewing x-rays once in any calendar year, and

a                  349

<u>HEALTH CARE PROGRAM</u>

App. C, III. B.1.c.

        c.    such other dental x-rays, including but not limited to those specified in a. and b. above, as are required in connection with the diagnosis of a specific condition requiring treatment.

   2.   Extractions.

   3.   Oral surgery.

   4.   Amalgam, silicate, acrylic, synthetic porcelain, composite, and other American Dental Association (ADA)-approved direct restorative materials that meet Program standards and are used to restore diseased or accidentally injured teeth.

a

## HEALTH CARE PROGRAM

App. C, III. B.5.

5.  General anesthetics and intravenous sedation when medically necessary and administered in connection with oral or dental surgery.

6.  Treatment of periodontal and other diseases of the gums and tissues of the mouth.

7.  Endodontic treatment, including root canal therapy.

8.  Injection of antibiotic drugs by the attending dentist.

9.  Repair or recementing of crowns, inlays, onlays, bridgework, or dentures; or relining or rebasing of dentures more than six (6) months after the installation of an initial or replacement denture, but not more than one relining or rebasing in any period of three (3) consecutive calendar years.

a

HEALTH CARE PROGRAM

App. C, III. B.10.

10. Inlays, onlays, gold fillings, or crown restorations to restore diseased or accidentally injured teeth, but only when the tooth, as a result of extensive caries or fracture, cannot be restored with an amalgam, silicate, acrylic, synthetic porcelain, composite or other American Dental Association (ADA)-approved materials that meet Program standards and are used for direct filling restoration.

11. Cosmetic bonding of eight (8) front teeth for children 8 through 19 years of age if required because of severe tetracycline staining, severe fluorosis, hereditary opalescent dentin, or amelogenesis imperfecta, but not more frequently than once in any period of three (3) consecutive calendar years.

a

352

<u>HEALTH CARE PROGRAM</u>

App. C, III. C.

C.   The following covered dental expenses shall be paid at 50 percent of the reasonable and customary charge:

1.   Initial installation of fixed bridgework (including inlays and crowns as abutments).

2.   Initial installation of partial or full removable dentures (including precision attachments and any adjustments during the six (6) month period following installation).

3.   Replacement of an existing partial or full removable denture or fixed bridgework by a new denture or by new bridgework, or the addition of teeth to an existing partial removable denture or to bridgework, but only if satisfactory evidence is presented that:

a

353

<u>HEALTH CARE PROGRAM</u>

App. C, III. C.3.a.

a.   the replacement or addition of teeth is required to replace one or more teeth extracted after the existing denture or bridgework was installed;

b.   the existing denture or bridgework cannot be made serviceable and, if it was installed under this dental coverage, at least five (5) years have elapsed prior to its replacement; or,

c.   the existing denture is an immediate temporary denture which cannot be made permanent and replacement by a permanent denture takes place within twelve (12) months from the date of initial installation of the immediate temporary denture.

Normally, dentures will be replaced by dentures but if a professionally adequate result can be achieved only with bridgework, such bridgework will be a covered dental expense.

a                         354

HEALTH CARE PROGRAM

App. C, III. C.4.

4.   Orthodontic procedures and treatment (including
related oral examinations) consisting of surgical
therapy, appliance therapy, and
functional/myofunctional therapy (when provided by a
dentist in conjunction with appliance therapy) for
enrollees under 19 years of age, provided, however,
that benefits will be paid after attainment of age
19 for continuous treatment which began prior to
such age.

IV.  Maximum Benefit For Other Than Accidental Dental Injury

The maximum benefit payable for all covered dental expenses
incurred during a calendar year commencing January 1 and
ending the following December 31 (except for services
described in Section III. C.4. above and in Section XI below)
shall be ~~$1,400~~1,600 (~~$1,500~~1,700 effective January 1, 200~~0~~5
~~and $1,600 effective January 1, 2003~~) for each enrollee.

For covered dental expenses in connection with orthodontics
including related oral examinations, described in Section III.
C.4. above, the maximum benefit payable shall be ~~$1,700~~1,800
(~~$2,000~~ effective January 1, 200~~0~~5 ~~and $1,800 effective January
1, 2003~~), 

b                        355

<u>HEALTH CARE PROGRAM</u>

App. C, IV.

during the lifetime of each enrollee, with a maximum of

$~~1,500~~1,800 applicable to covered dental expenses for services

provided prior to January 1, 200~~0~~5.

V.    <u>Pre-Determination of Benefits</u>

If a course of treatment can reasonably be expected to involve

covered dental expenses of $200 or more, a description of the

procedures to be performed and an estimate of the dentist's

charges must be filed with the carrier prior to the

commencement of the course of treatment.

The carrier will notify the enrollee and the dentist of the

benefits certified as payable based upon such course of

treatment.  In determining the amount of benefits payable,

consideration will be given to alternate procedures, services,

or courses of treatment that may be performed for the dental

b                                    356

HEALTH CARE PROGRAM

App. D, IV.

IV. Benefits

Benefits will be paid for the covered vision expenses
described in A.~~,~~ ~~and~~ B~~., and C.~~ below, less any copayment as
described in ~~C~~D. below.

    A.    Vision Examinations:

        1.    Refraction, including case history, coordinating
measurements, and tests;

        2.    The prescription of glasses where indicated; and

        3.    Examination by an ophthalmologist, upon referral by
an optometrist, within 60 days of a vision
examination by the optometrist.

    B.    Lenses and Frames:

When lenses are prescribed by an ophthalmologist or
optometrist, the necessary materials and professional
services connected with the ordering, preparation,
fitting, and adjusting of:

b

377

<u>HEALTH CARE PROGRAM</u>

App. D, IV. B.1.

1.   Lenses (single vision, bifocals, trifocals, lenticular).  If the enrollee selects lenses, the size of which results in an additional charge, only the reasonable and customary charge for normal size lenses of the same material and prescription will be considered a covered vision expense.  If the enrollee selects photochromic lenses or lenses with a tint other than Number 1 or Number 2, only the reasonable and customary charge for clear lenses of the same material and prescription will be considered a covered vision expense.

2.   Contact lenses following cataract surgery, or when visual acuity cannot be corrected to 20/70 in the better eye except by their use, or when medically necessary due to keratoconus, irregular astigmatism

a                        378

HEALTH CARE PROGRAM

App. D, IV. B.2.

> or irregular corneal curvature.  If contact lenses are prescribed for any other reason, ~~$75~~$80 is the maximum amount that will be considered a covered vision expense.

>> 3.  Frames.  If frames are obtained from a participating provider, the enrollee may make a selection from the display shown by the participating provider and there will be no out-of-pocket expense to the enrollee other than as described under "Copayments".  ~~However, if the selection at the participating provider is not from the display shown, or i~~If the enrollee obtains frames from a nonparticipating provider, $~~15~~24 is the maximum amount that will be considered a covered vision expense ~~until January 1, 2000 and $16 thereafter~~.

> C.  Corrective Eye Surgery:  Effective January 1, 2004, corrective eye surgery performed by an ophthalmologist will become a covered service.  Coverage includes any

b                              379                    PLUS 379A-B

HEALTH CARE PROGRAM

App. D, IV. C.

related pre and post-surgical professional services, facility expense and medically necessary supplies. Coverage is subject to the following provisions:

1.    An enrollee may not receive benefits for both corrective eye surgery and for frames and/or lenses (including contact lenses) in the same calendar year;

2.    Upon proof of payment to the corrective eye surgery provider, the carrier will reimburse the primary enrollee for covered expense, up to the lesser of the charges or the maximum benefit of $295.00 in any four (4) year period; and

3.    An enrollee receiving benefits for corrective eye surgery in any one calendar year will be ineligible for lens (including contact lens) and/or frame benefits for that year and three (3) subsequent years.  For example, an enrollee undergoing

a                    379A                    PLUS 379B

HEALTH CARE PROGRAM

App. D, IV. C.3.

corrective eye surgery in 2004 would be eligible
for lens and/or frame benefits in 2008.  Such
enrollees will be eligible for benefits for an
annual exam, and will have access to the
participating provider fee schedule for non-covered
services and for lenses and/or frames for which no
benefits are payable.

a                                    379B

HEALTH CARE PROGRAM

App. D, IV. ~~C~~D.

    ~~C~~D.  Copayments:

        For each enrollee, there is a $7.00 copayment applicable to the covered vision expense for each vision examination and a $10.00 copayment for the combined covered vision expenses for lenses, contact lenses, and frames.  The total copayment for each enrollee, during a calendar year, will not exceed $17.00.

V.   Frequency Limitations

For each enrollee, there are the following limitations on the frequency with which charges for certain services and materials will be considered covered vision expenses:

| | | |
|---|---|---|
| Vision Examination | - | Once during a calendar year, except as provided in Section IV.A.3. |
| Lenses and Contact Lenses | - | Once during a calendar year, except as provided in Section IV.C. |
| Frames | - | Once during two consecutive calendar years, except as provided in Section IV.C. |

# Exhibit D

EXHIBIT C-1

THE DELPHI ~~AUTOMOTIVE SYSTEMS~~
<u>CORPORATION</u> HEALTH CARE
PROGRAM FOR HOURLY EMPLOYEES

HEALTH CARE PROGRAM

ARTICLE II
HEALTH CARE COVERAGES

Section 1. Establishment of Health Care Coverages
    (a)   Core Coverages
           The Corporation shall continue its arrangements
to make core coverages (hospital, surgical, medical,
prescription drug, and hearing aid coverages as set
forth in Appendix A and mental health and substance
abuse coverages as set forth in Appendix B)
available.  Collectively, the coverages shall be
known as the Informed Choice Plan.

    (b)   Non-Core Coverages
       The Corporation shall continue its arrangements to make
non-core coverages (dental and vision coverages as set
forth in Appendices C and D, respectively, to this
Program) available.

Section 2.  Uniform National Health Care Coverages
    (a)   The Corporation shall provide uniform health care
coverages, nationwide, as described in this Program and
Appendices A, B, C, and D hereto, through arrangements
with appropriate carriers.

    (b)   Core coverages (other than mental health and substance
abuse) for enrollees shall be those provided under a
national system by agreement between the Corporation and
Blue Cross and Blue Shield of Michigan, hereinafter
referred to as the Control Plan, or by agreement with
other carriers.

    (c)   The Control Plan shall have responsibility for assuring
that the core coverages as defined in Appendix A are
provided and administered uniformly for Traditional option
and Preferred Provider Organization option enrollees.

       All carriers agreeing to provide such coverages under the
Program, shall do so in accordance with interpretations
and benefit practices established by the Control Plan.

    (d)   Under the national system each carrier with a written
agreement with the Control Plan will provide uniform core
coverages, as described in Appendix A, in the carrier's
respective geographic area.  If in any geographic area a
carrier fails to enter into the agreement as stated above,

16

or fails to perform in accordance with its agreement, the
Control Plan, with the approval of the Corporation, shall
provide such health care coverages in the geographic area
or arrange with another carrier to do so.

(e)   Core and non-core coverages may be provided through the
Health Maintenance Organization option. However, the
coverages provided through this option may vary from the
coverages described in Appendices A, B, and D.

Section 3.   Replacement or Supplementation
             of Coverages
If in its judgment the Corporation considers it advisable in the
interest of the enrollees in any geographic area, another
arrangement may be substituted in such area or areas for all or
part of the coverages referred to in Section 1 above.

Section 4. Selection of Option in the Informed Choice Plan
The Corporation will make arrangements to provide an opportunity
for primary enrollees to elect to have core coverages provided
through one of the options available under the Informed Choice
Plan. Such election also may include a choice among dental
options, where applicable. The specific choices offered to a
primary enrollee will depend on the availability of approved
options in the enrollee's geographic area, an employee's date of
hire and Medicare status of the primary and secondary enrollees.
The options are as follows:

(a)   Preferred Provider Organization Option
This option provides core coverages, as described in
Appendix A, through access to a panel of providers who
have agreed to provide services under the terms of
participation established by the preferred provider
organization such as limits on fees, and controls on
quality and utilization. In order to receive full benefits
for certain covered services, such services must be
obtained through the organization's panel of providers.

(1)   A preferred provider organization assumes
responsibility for conducting utilization reviews,
predetermination of services, or other reviews
necessary to promote quality of care and control
costs. A preferred provider organization may place
the panel physician and other providers at financial
risk through capitation, withholding of a percentage
of fees, or other mechanisms, or if not, will have
other means to monitor and control utilization by
individual providers on a continuous basis.

(2)   A preferred provider organization assumes
responsibility for selection and periodic evaluation
of hospitals, physicians, pharmacists, laboratories,
and other providers to ensure sufficient numbers and
types of providers who are geographically distributed
to allow adequate access for enrollees.

17

(3)   A preferred provider organization assumes
      responsibility for providing the scope and level of
      benefits set forth in Appendix A, monitoring
      the appropriateness of referrals to non-panel
      providers, taking affirmative corrective action with
      respect to providers when necessary, and implementing
      and maintaining other administrative processes as
      required by the Corporation.

(4)   Payment for covered services provided by non-panel
      providers, unless the enrollee is referred by a panel
      provider, will be 80% of the non-panel provider's
      reasonable and customary charges for the same service
      or, if less, the actual charges. The reimbursement to
      providers by the preferred provider organization will
      be reduced to reflect any waiver or forgiveness by a
      provider of the remaining 20%.

      Under this subsection, the 80% limitation on payment
      for charges payable to non-panel providers by the
      preferred provider organization shall not be
      applicable (i) to an individual enrollee who has
      incurred personal expense under this provision of
      $500 1,000 for such covered services in a calendar
      year or (ii) to the covered members of the enrollee's
      family, if any, after the enrollee and such members
      have incurred a total of $1,000 2,000 in personal
      expense under this provision for such covered
      services in the same calendar year.

(5)   Preferred provider organizations may seek Corporation
      approval to establish special contractual
      relationships with providers not otherwise included
      under the Program (e.g., freestanding ambulatory
      surgical centers), when it can be shown that doing so
      will improve quality of care and enhance cost
      competitiveness.

(6)   Mental health and substance abuse coverage is
      administered in accordance with the terms and
      conditions of Appendix B.

(b)   Health Maintenance Organization Option
      This option provides coverages to enrollees through
      physicians, hospitals, and other providers who have
      agreed to provide services under the terms established by
      the health maintenance organization to limit fees, assure
      quality, and control utilization.

      (1)   The types of coverages and the scope and level of
            coverages provided under this option may vary among
            health maintenance organizations and may be different
            than the coverages set forth in Appendices A, B, and
            D.

18

(2)   Most health maintenance organizations provide health
care coverages (including preventive care) that
generally are managed for the enrollee by a primary
care physician.  The primary care physician is
responsible for referring the patient to other
providers of service.  If such referral is not
obtained, the enrollee may be responsible for charges
incurred.

(3)   Under this option, if an enrollee receives services
from a non-health maintenance organization provider,
in a non-emergency situation or without a referral,
such services may not be covered.

(4)   The Corporation pays a capitated fee to health
maintenance organizations for enrollees electing
coverage through this option.  The fee paid is based
upon a comparison of the monthly rates of the health
maintenance organization and those of the base option
in the rating area.  When the health maintenance
organization's rates are higher than those of the base
option, the enrollee may be required to make a
contribution.

(c)   Traditional Option
This option provides core coverages described in Appendix A
with predetermination and review procedures required in
order to receive full benefits for certain covered
services.  These procedures include but are not limited to
predetermination (which includes, but is not limited to,
prior authorization or assessment for non-emergency
inpatient admissions, and second opinions for selected
procedures), concurrent utilization review, retrospective
utilization review, and focused utilization review.  In some
instances, special programs (such as foot surgery
predetermination or predetermination of specific outpatient
procedures) will be developed and implemented, as necessary
and practicable, to address specific utilization problems.

(1)   Benefits for certain covered services, which require
predetermination, when provided without obtaining
necessary predetermination approvals will be
administered according to Program standards including
the provision that such services be payable at 80% of
reasonable and customary charges after the first $100
of expense for such services.  The reimbursement to
providers will be reduced to reflect any waiver or
forgiveness by a provider of the $100 or remaining
20%.

(2)   Under this subsection, the 80% payment limitation and
the requirement that payment be made for the first
$100 of covered expenses shall not be applicable (i)
to an individual enrollee who has incurred a personal
expense of $750 under this provision for such covered
services in a calendar year or (ii) to the covered

19

members of the enrollee's family, if any, after the
enrollee and such members have incurred a total of
$1,500 in personal expense under this provision for
such covered services in the same calendar year.

(3)     Primary and secondary enrollees eligible for Medicare
        and enrolled in the Traditional option may not be
        subject to the predetermination and review procedures
        set forth above for those covered services for which
        Medicare has primary responsibility.

(4)     In selected states, or geographic areas within a
        state, Traditional Care Networks (TCN) may be
        implemented. Such networks will apply to Traditional
        option enrollees residing in the respective
        states/areas. The scope and level of coverages may
        vary from those for the Traditional option in non-TCN
        states/areas and may involve variation in benefits
        for use of non-TCN providers. When a TCN is
        implemented, affected enrollees will be provided
        additional information.

(5)     Mental health and substance abuse benefits are
        administered in accordance with the terms and
        conditions of Appendix B.

20

above, on the same basis as set forth in Section 4, as of the date certification of disability is presented.

Section 6.        Continuation of Coverages
                  Upon Retirement or Termination of
                  Employment at Age 65 or Older

(a) The health care coverages an employee has at the time of retirement or termination of employment at age 65 or older (for any reason other than a discharge for cause) with insufficient credited service to entitle the employee to a benefit under Article II of The Delphi ~~Automotive Systems~~ Corporation Hourly-Rate Employees Pension Plan shall be continued.

(b) An employee who upon retirement is not enrolled for the coverages as provided in subsection (a) above may enroll for health care coverages to which entitled at the time of or subsequent to retirement. Such coverage shall become effective on the first of the month following receipt of application from such retired employee.

(c) Except as provided in subsection (d), below, the Corporation shall make contributions, in accordance with Program provisions, for health care coverages continued in accordance with subsections (a) and (b) above, for:

(1) a retired employee (including any eligible dependents other than sponsored dependents), provided such retired employee is eligible for benefits under Article II of The Delphi ~~Automotive Systems~~ Corporation Hourly-Rate Employees Pension Plan; and

(2) an employee (including any eligible dependents other than sponsored dependents) terminating at age 65 or older (for any reason other than a discharge for cause) with insufficient credited service to be entitled to a benefit under Article II of The Delphi ~~Automotive Systems~~ Corporation Hourly-Rate Employees Pension Plan.

(d) Corporation contributions will not be made for employees hired on or after November 18, 1996 who, at the time of retirement or termination at age 65 or older, have fewer than ten (10) years of credited service under the Corporation's Pension Plans. Such individuals may elect to continue coverage on a self-paid basis.

Section 7.        Continuation of Coverages Upon Termination of
                  Employment Other Than by Retirement or Death

(a) Except as provided in Article III, Section 4(c) above, health care coverages for an employee who quits or is discharged shall automatically cease as of the last day of the month in which the employee quits or is discharged or, if later, the date seniority is broken.

28

(b)   Following termination of employment other than by
retirement or death, the former employee shall be
entitled to <u>self-paid</u> continuation of coverages provided
under applicable Federal laws, <u>and/or may be offered</u>, ~~or~~
~~to~~ a conversion contract ~~under Section 10, below~~.

Section 8.        Continuation of Coverages for the Survivors
                  of an Employee, or of a Retired Employee
                  <u>or Certain Former Employee</u>

(a)   If an employee dies prior to becoming eligible for
health care coverages under Section 2 above, the
Corporation shall permit the spouse of such employee to
participate in the core coverages, on a self-pay basis,
as provided in subsection (b)(1) below.

(b)   If an employee or retiree dies after coverages are in
effect under the Program, coverage for any dependents
will cease as of the end of the month in which the
employee or retiree dies.  Thereafter, a surviving
spouse may be eligible to continue coverages as
indicated below.

For purposes of this Section 8 and of Article V,
"surviving spouse" does not include the spouse of a
former employee eligible for a deferred pension under
Article VII, Section 2 of The Delphi ~~Automotive~~
~~Systems~~<u>Corporation</u> Hourly-Rate Employees Pension Plan;
or a spouse or former spouse receiving, or eligible to
receive, a pre-retirement survivor benefit under Article
II, Section 11 of the previously referenced Pension
Plan.

(1)   The Corporation shall make suitable arrangements
for the surviving spouse of an employee to
participate, on a self-pay basis, in core
coverages ~~as long as monthly survivor income~~
~~benefits provided in the Delphi Automotive~~
~~Systems~~<u>Corporation</u> ~~Life and Disability Benefits~~
~~Program for Hourly Employees are payable, or as~~
~~long as the Bridge Survivor Income Benefit~~
~~provided therein is not payable only because the~~
~~survivor is eligible for a Mother's Insurance~~
~~Benefit, or a comparable benefit for a father~~
~~whether or not it is called a Father's Insurance~~
~~Benefit, under the Federal Social Security Act as~~
~~now in effect or as hereafter amended.  However,~~
~~such coverage shall not include prescription drug~~
~~or hearing aid coverage unless applicable to the~~
~~employee at date of death~~<u>for the first 24 months</u>
<u>following the month in which the employee dies,</u>
<u>provided the surviving spouse was married to the</u>
<u>deceased employee for at least one full year</u>
<u>immediately preceding the date of death.</u>

(2)   The Corporation shall make contributions for core
coverages continued in accordance with subsection

29

(b) (1) above, for the first twelve months ~~in which monthly Transition Survivor Income Benefits are payable to a surviving spouse who also is eligible for monthly Bridge Survivor Income Benefits provided under the Delphi Automotive Systems~~Corporation Life ~~and Disability Benefits Program.   This provision also shall apply to the surviving spouse of an employee who dies on or after October 26, 1987, but who is ineligible for Bridge Survivor Income Benefits solely because of being age sixty (60) or older as of the employee's date of death.   Thereafter, the surviving spouse shall contribute the full cost for such coverages~~following the month in which the employee dies, provided that, as of the employee's date of death, the surviving spouse's age is at least 45, or the surviving spouse's age, when added to the deceased employee's seniority, totals 55 or more.   Thereafter, the surviving spouse may continue core coverages, on a self-pay basis, until the earlier of (a) remarriage, (b) the end of the month in which age 62 is attained, or (c) death.

(3)   The Corporation shall make suitable arrangements for a surviving spouse

    (i)   of an employee or retired employee (but not the surviving spouse of a former employee eligible for a deferred pension or a surviving spouse or surviving divorced spouse eligible for a pre-retirement survivor benefit under Article II, Section 11 of The Delphi ~~Automotive Systems~~Corporation Hourly-Rate Employees Pension Plan) if such spouse is receiving or is eligible to receive a survivor benefit under Article II of The Delphi ~~Automotive Systems~~Corporation Hourly-Rate Employees Pension Plan,

Art. III, 8(b)(3)(ii)

    (ii)   of a retired employee if, prior to death, the retired employee was receiving a benefit under Article II of The Delphi ~~Automotive Systems~~ Corporation Hourly-Rate Employees Pension Plan,

    (iii)   of a former employee whose employment was terminated at age 65 or older for any reason other than a discharge for cause with insufficient credited service to be entitled to a benefit under Article II of The Delphi ~~Automotive Systems~~Corporation Hourly-Rate Employees Pension Plan, or

    (iv)   of an employee who at the time of death was eligible to retire on an early or normal pension under Article II of The Delphi

~~Automotive Systems~~Corporation Hourly-Rate
Employees Pension Plan,

to participate in health care coverages; provided,
however, that dental coverage shall be available
to a surviving spouse age 65 or over only for
months that such surviving spouse is enrolled for
Medicare Part B coverage.

(4)   The Corporation shall make contributions for health
care coverages continued in accordance with
subsection (b)(3) above only on behalf of a
surviving spouse, as provided therein and in
subsection (b)(5) below (including for this purpose
a surviving spouse who would receive survivor
benefits under The Delphi ~~Automotive
Systems~~Corporation Hourly-Rate Employees Pension
Plan except for receipt of Survivor Income Benefits
under the Delphi ~~Automotive Systems~~Corporation Life
and Disability Benefits Program), and the eligible
dependents of any such spouse; provided, however,
that the contributions on behalf of a surviving
spouse for the month the surviving spouse becomes
age 65 and subsequent months shall be made only for
months that the surviving spouse is enrolled for
Medicare Part B coverage.

Notwithstanding the above, no Corporation
contributions, other than contributions related to
subsection (b)(5) below, shall be made under this
subsection (b)(4) for the surviving spouse and
eligible dependents of a deceased employee or retiree
hired on or after November 18, 1996, if such employee
or retiree had fewer than 10 years of credited
service under the Corporation's Pension Plans.

(5)   The Corporation shall make suitable arrangements
for a surviving spouse of an employee whose loss
of life results from accidental bodily injuries
caused solely by employment with
Delphi ~~Automotive Systems~~ Corporation, and results

solely from an accident in which the cause and result are
unexpected and definite as to time and place, to participate in
health care coverages; provided, however, such coverages ~~shall not
include prescription drug, dental, hearing aid or vision coverages
unless applicable to the employee at date of death, and~~ shall
terminate upon the remarriage or death of the surviving spouse.
Any Corporation contributions for coverages continued under this
subsection (b)(5) shall be as provided in subsection (b)(4) above.

(6)   A surviving spouse who is eligible for such
coverages provided in subsections (b)(1), (b)(3)
and (b)(5) above and who elects such coverages but
who is not eligible for Corporation contributions
as provided in subsections (b)(2) and (b)(4), must

make such election no later than 60 days following
the later of the end of the month in which the
death of the employee, retired employee, or former
employee occurs, or following the date of notice of
available options by the Corporation, and shall
contribute monthly the entire cost for such
coverages for (i) single party, (ii) two party, or
(iii) family.

(7)     When contributions by surviving spouses are
required, they shall be paid in cash directly to
the Corporation or its agent on or before the 10th
day of the month for which such coverages are to be
provided or such other due date as may be
established by the Corporation.

Section 9.     Dependent Eligibility Provisions
    (a)     General Provisions

(1)     As used in this Section 9, when reference is made
to a person (i.e. - person A) being "dependent
upon" another person (i.e. - person B), the term
shall mean that person B may legally claim an
exemption for person A, under Section 151 of the
Internal Revenue Code, for Federal income tax
purposes.

(2)     The provisions of this Section 9 apply with
respect to enrollment of certain dependents as
secondary enrollees under primary enrollees who
elect "self and spouse," "self and child," or
"self and family" enrollment, in accordance with
Article III, Section 1(a)(1) of the Program and
to enrollment of sponsored dependents under
subsection (e) below.  Unless specifically
provided otherwise in the Program, such a
dependent has no individual or personal right of
enrollment, right to select an option within the
Informed Choice Plan, or right to continue
coverages under the Program.

(3)     The Corporation shall have the right of
determining eligibility of a dependent, consistent
with the provisions of this Program.

(4)     A primary enrollee claiming initial or continuing
eligibility of a dependent shall furnish whatever
documentation may be necessary to substantiate the
claimed eligibility of a dependent and the social
security number of each such dependent for whom a
social security number is required to claim an
exemption on the primary enrollee's Federal income
tax return. Refusal or failure to furnish such
documentation when requested to do so, or to furnish
the social security number within a reasonable

period of time, shall result in denial or withdrawal
of eligibility for such dependent.

(5)   Unless otherwise provided, a dependent who loses
eligibility in accordance with the provisions of
this Program, and who once again meets the
requirements for dependent eligibility, may have
coverage reinstated. The effective date of
coverage in such cases will be the first day of
the month following the month in which a valid
enrollment form and any necessary supporting
documentation is received by the Corporation.

(6)   When, as a result of oversight or error, an eligible
primary or secondary enrollee entitled to
Corporation-paid coverage is not enrolled in a timely
manner, coverage may be provided retroactive to the
date of eligibility that would have been established
if proper processing had occurred.  However, in no
event will the retroactivity exceed twelve (12)
months from the month in which the error or omission
is discovered.

This retroactive enrollment provision shall not
apply to surviving spouses who are not entitled to
Corporation-paid coverage.  Such surviving spouses
electing to continue coverages on a self-paid
basis must make such election as stipulated in
Article III, Section 8(b)(6).  This retroactive
enrollment provision also shall not apply to
principally supported children or sponsored
dependents, as discussed in subsections (d) and
(e) respectively below.

(7)   The receipt of a benefit under The Delphi
~~Automotive Systems~~Corporation Hourly-Rate
Employees Pension Plan as an "alternate payee" in
accordance with the Retirement Equity Act of 1984
shall not serve to entitle such recipient to
coverages or continuation of coverages under this
Program.

(8)   Provisions will be made for the enrollment and
administration of coverage for an individual
determined to qualify for coverage pursuant to
Qualified Medical Child Support Orders (QMCSO) under
the provisions of the Omnibus Budget Reconciliation
Act of 1993 (OBRA '93).

(b)   Spouse
(1)   The spouse of an eligible and enrolled employee or
retiree shall be eligible for coverage.  A surviving
spouse of an employee or retiree, as defined in
Section 8 above, may not have or add a new spouse as
a dependent.

33

(2)  A spouse by common-law marriage shall be eligible for coverage only to the extent such relationship is recognized by the laws of the state in which the employee or retiree is enrolled, and the employee or retiree has met such requirements for documentation of the status as may be necessary by law and required by the Corporation.

(3)  The effective date of coverage for a spouse shall be the later of the effective date of coverage for the employee or retiree, or the date of marriage. For a common-law spouse, the effective date of coverage shall be the date of receipt by the Corporation of a completed enrollment form and any necessary supporting documentation.

(4)  A spouse's eligibility for coverage shall cease on the earlier of:

(i)  the date the primary enrollee's coverage ceases, except that, in the case of the primary enrollee's death, coverage shall cease on the last day of the month in which the primary enrollee dies, unless the spouse is eligible for coverage as a surviving spouse as set forth in Section 8 of this Article, or

(ii)  the date of the final decree of divorce.

(c)  Children

(1)  Children of a primary enrollee, or of the spouse of an eligible and enrolled employee or retiree, shall be eligible for coverage if, as to each one, the following criteria are met.

(i)  Relationship. The child must be the child of the primary enrollee, or of an employee's or retiree's spouse, by birth, or legal adoption, or legal guardianship.

Under the provisions of the Omnibus Budget Reconciliation Act of 1993 (OBRA '93), a child under the age of 18 who is in the process of being adopted by an employee or retiree will be deemed to satisfy the relationship test when the child is placed and takes up residence with the employee or retiree, pursuant to the adoption process.

(ii)  Age. The child must not have reached the end of the calendar year in which the child becomes age 25, unless such child has been determined to be totally and permanently disabled prior to the end of that year. For the purposes of this subsection, "totally and permanently disabled"

34

means having any medically determinable physical or mental condition which prevents the child from engaging in substantial gainful activity and which can be expected to result in death or be of long-continued or indefinite duration.

Coverage will not be reinstated for a child who first becomes totally and permanently disabled after the end of the calendar year in which age 25 is attained or who was eligible for coverage as a totally and permanently disabled child, recovers, and, after the end of such calendar year, again becomes so disabled.

(iii)  Marital Status.  The child must be unmarried.

(iv)  Residency.  The child must reside with the primary enrollee, as a member of such enrollee's household or, if not a member of the household, such enrollee must be legally responsible for the provision of health care for the child (such as children of certain divorced parents, legal guardianships, children confined in training institutions, or children in school).

(v)  Dependency.  The child must be dependent upon the primary enrollee, or upon the spouse of an eligible and enrolled employee or retiree.  This requirement shall be waived with respect to a child (by birth, legal adoption or legal guardianship) of a divorced employee or retiree, if the divorce decree, or order of the court of proper jurisdiction, or amendment of such decree or order, stipulates that such employee or retiree is legally responsible for providing health care coverage for such child.

(2)  An eligible surviving spouse may not enroll a child unless the child was eligible to be enrolled prior to the death of the employee or retiree or, in the case of a child born after the death of the employee or retiree, unless such child is the issue of the surviving spouse's marriage to the deceased employee or retiree, and was conceived prior to such employee's or retiree's death.

(3)  The effective date of coverage for a child shall be the later of the effective date of coverage for the primary enrollee, or in the case of:

(i)  Birth - the date of birth;

(ii)  Legal Adoption - the date the adoption becomes final in accordance with applicable laws (or, for children being adopted and who meet the criteria of OBRA '93, the date the child is

35

placed and resides with the adopting employee or retiree);

    (iii) Legal Guardianship - the date guardianship becomes final in accordance with applicable laws; and

    (iv) Stepchild - the date the child becomes a member of the employee's or retiree's household.

(4) A child, as defined above, shall cease to be eligible for coverage as of:

    (i)  the date of marriage of such child;

    (ii)  the last day of the month in which the child ceases to be dependent upon the primary enrollee, or upon the spouse of an eligible and enrolled employee or retiree, unless the exception in subsection (c)(1)(v) applies;

    (iii)  the last day of the month in which the child ceases to meet the residency criteria of subsection (c)(1)(iv) above;

    (iv)  the last day of the calendar year in which the child becomes age 25, except in the case of a totally and permanently disabled child (in the event coverage for a totally and permanently disabled child is continued, eligibility for such coverage shall cease as of the last day of the month in which the child ceases to be totally and permanently disabled as defined by this Program); or

    (v)  the date the primary enrollee's coverage ceases, except that, in the case of the primary enrollee's death, coverage for such dependent child shall cease on the last day of the month in which the primary enrollee dies, unless such child is eligible for coverage as a dependent child of the surviving spouse of such employee or retiree.

(5) Notwithstanding any other provisions of the Program, the Program shall provide coverages in accordance with Section 4301 of the Omnibus Budget Reconciliation Act of 1993 (OBRA '93) and Section 609 of ERISA. The Corporation will maintain reasonable procedures related to the implementation of Qualified Medical Child Support Order and other aspects of the Federal regulations.

(d)    Principally Supported Children

(1) Children residing with and related to a primary
enrollee by blood or marriage and for whom the
primary enrollee provides principal support (as
defined by the Internal Revenue Code of the United
States) and who were reported as dependents on the
primary enrollee's most recent income tax return or
who qualify in the current year for dependency tax
status, may be enrolled as principally supported
children.

    (i) A surviving spouse may continue coverages for a
principally supported child enrolled by the
deceased employee or retiree prior to such
employee's or retiree's death, but may not
enroll a new principally supported child unless
such child was eligible to be enrolled by the
deceased employee or retiree as of the date of
death.

    (ii) The residency waiver based on legal
responsibility for the provision of health care,
which applies to other children as indicated in
subsection (c)(1)(iv), does not apply to
principally supported children.

    (iii) The other criteria of subsection (c)(1) apply
to principally supported children.

(2) The effective date of coverage for a principally
supported child shall be the first day of the month
following the month in which a valid enrollment form
is received by the Corporation.

(3) Eligibility of a principally supported child shall
cease as it would for any other child in accordance
with subsection (c)(4).

(e) Sponsored Dependents

(1) A primary enrollee may obtain core coverages for
dependents other than those specified in subsections
(b), (c), and (d) above.  Such dependents will include
persons who are related to the primary enrollee by
blood or marriage, or if not related, who reside with
the primary enrollee as members of the household.

Before becoming eligible for coverage, sponsored
dependents (other than a child being adopted by the
primary enrollee) who are not citizens of the United
States must reside in the United States for one (1)
full year, and must be legally entitled to remain in
the United States indefinitely.  Sponsored dependents
must be dependent upon the primary enrollee for more
than half of their support as defined by the Internal
Revenue Code of the United States and must either
qualify to be claimed as an exemption by the primary

enrollee in the current year or have been claimed as
an exemption on the primary enrollee's most recent
Federal income tax return.  They must be designated as
sponsored dependents on a valid enrollment form signed
by the primary enrollee.  The coverages shall be
provided under the Program option elected by the
primary enrollee.  For the purposes of this
subsection, an adopted child shall be considered to be
related to a primary enrollee "by blood."

(2)     Coverages provided under this subsection for a
        sponsored dependent enrolled at the time of an
        employee's or retiree's death may be continued at the
        option of the employee's or retiree's surviving spouse
        while such surviving spouse is enrolled for coverages
        as provided in Section 8 of this Article.  A surviving
        spouse may not add any new sponsored dependents.

(3)     The primary enrollee shall pay the full cost of
        coverages under this subsection, and the Corporation
        shall not contribute toward the cost of health care
        coverages for any sponsored dependents.

(4)     The effective date of coverages for an eligible
        sponsored dependent shall be the later of the
        effective date of coverages for the primary enrollee,
        or the first day of the month following the month of
        receipt by the Corporation of a completed enrollment
        form and any supporting documentation as may be
        required by the Corporation.  However, the effective
        date for a sponsored dependent previously enrolled as
        such, and whose coverages as a sponsored dependent
        were discontinued, shall be the first day of the
        sixth month following receipt of the application for
        reinstatement.

(5)     Coverage for a sponsored dependent shall cease on the
        earlier of:

        (i)   the last day of the month in which the  person
              ceases to meet the eligibility  criteria set forth
              in (1) above,

        (ii)  on the last day of the month preceding the month
              for which the required contribution was due but
              not paid, or

        (iii) the date the primary enrollee's coverages cease
              except that in the case of the primary enrollee's
              death, coverage for such sponsored dependent shall
              cease on the last day of the month in which the
              primary enrollee dies, unless the sponsored
              dependent has coverages continued in accordance
              with (2) above.

(f)  Same-Sex Domestic Partners and Their Children

(1)   Effective January 1, 2001, the eligible domestic partner of an employee may be enrolled for coverage. To qualify for enrollment, the employee and domestic partner must:

   (i)   Be the same sex;
   (ii)   Have shared a continuous committed relationship for at least six months, intend to do so indefinitely and have no such domestic partner relationship with any other person;
   (iii)   Reside in the same household;
   (iv)   Share responsibility for each other's welfare and financial obligations;
   (v)   Not be related by blood to a degree of kinship that would prevent marriage from being recognized under law;
   (vi)   Be over the age of 18, of legal age and legally competent to enter into a contract;
   (vii)   Reside in a state where marriage between two persons of the same sex is not recognized as valid under law; and
   (viii)   Not be married to any other person.

(2)   If the enrollee resides in a state that has a formal recognition of domestic partner relationships, such recognition is required for enrollment of the domestic partner.

(3)   The employee and the domestic partner will be required to complete an affidavit attesting to meeting the eligibility requirements and provide any additional documentation necessary to support the claimed eligibility.

(4)   An eligible domestic partner's child may be enrolled if the primary enrollee can claim an exemption for the child on his or her federal income tax return and the child meets all of the Program's eligibility provisions pertaining to children.

(5)   Neither a domestic partner nor his or her children are eligible to be enrolled following the primary enrollee's retirement. However, coverage for an eligible domestic partner, or his or her child, enrolled prior to the primary enrollee's retirement may be continued in retirement.

(6)   If the primary enrollee and his or her domestic partner terminate the relationship, an opportunity to continue coverage on a basis comparable to COBRA will be provided.

(7)   In the event of the primary enrollee's death, a surviving domestic partner will be provided continuation opportunities comparable to a similarly situated surviving spouse. Under no circumstances will the

privileges afforded a domestic partner exceed those
of a similarly situated spouse.

Section 10.   Conversion Privilege

    (a)  Any former enrollee who is no longer eligible to continue
coverages under the Program, ~~shall~~may, be offered an
opportunity to obtain other available coverage, on a
self-paid basis, from the basic carrier with whom enrolled
at the time eligibility terminated.  ~~Such conversion
privilege shall not apply to prescription drug, hearing
aid, vision, or dental coverages.~~

    (b)  A former enrollee wishing to exercise this privilege
shall make application to the carrier within thirty (30)
days of termination of eligibility under this Program.

Section 11.   Consolidated Omnibus Budget Reconciliation Act (COBRA)
Continuation

The Consolidated Omnibus Budget Reconciliation Act of 1985
(COBRA, or the Act), as amended, provides continuation rights to
certain employees or dependents who would ordinarily lose
eligibility for coverage under the Program.

If amendments to the Act or the applicable regulations preclude
administration in accordance with the following provisions, the
Corporation will make any changes necessary to comply with
COBRA.

    (a)  For purposes of COBRA, this Program is considered to be
a single plan offering "core coverages" (hospital,
surgical, medical, prescription drug, hearing aid,
mental health and substance abuse) and "non-core
coverages" (dental and vision), regardless of the
carrier option (Traditional, Preferred Provider
Organization, Health Maintenance Organization,
alternative dental plan, etc.) chosen by the primary
enrollee, or of the entity chosen by the Corporation to
administer such coverages on the Corporation's behalf.

(b)  The Corporation is responsible for providing notification, as
required under COBRA, to "qualified beneficiaries," as defined
therein.  The Corporation may delegate the administrative
functions associated with COBRA.

    (c)  To the extent the Corporation makes alternative
continuation privileges available under Article III of
the Program that do not satisfy all the requirements for
"COBRA" continuation coverage," enrollees shall have
the opportunity to elect either the COBRA continuation
coverage or continuation under the Program.  An
election of COBRA continuation coverage will terminate
the enrollee's eligibility for Program continuation.

    (d)  To the extent the Corporation makes alternative
continuation privileges available under Article III of

40

HEALTH CARE PROGRAM

ARTICLE IV

DEFINITIONS

Unless otherwise indicated, as used in this Program:

1.   "active service" or "in active service" - means receiving pay for regular hours of work scheduled by the Corporation, or otherwise scheduled to work but absent due to either,

   (a)   vacation time off authorized in advance,

   (b)   a specified holiday, or

   (c)   bereavement, jury duty, or short-term military leave of absence under circumstances where the absence is authorized in advance and the employee is entitled to receive full or partial compensation from the Corporation for the day(s) of absence.

   An employee is not in active service if the employee is absent every scheduled work day during a month, for reasons other than those specified above, whether or not such absence is excused.

   ~~An employee is not in active service in any full month in which such employee is not scheduled to work due to layoff or any leave of absence (other than short-term military leave referred to in subsection (c) above), regardless of whether the employee may be entitled to some compensation for any day(s) during such month.~~

2.   "Authorized Employee"- means a Delphi employee whose duties require access to PHI for purposes of administering the ~~Program,~~ including: the Privacy Official/Director, Health Care; Manager, Health Care; Analyst, Health Care; Coordinator, Health Care; Staff Assistant, Health Care; Executive Director, Employee Benefits; Administrative Assistant, Employee Benefits; members of the Delphi Employee Benefit Plans Committee ("EBPC"); personnel specifically designated as an Authorized Employee by the Privacy Official or his delegate (e.g., finance staff personnel, audit staff personnel); and in-house counsel to Employee Benefits.

~~2~~3.   "benefit" - means a payment made, in accordance with the Program provisions, to an enrollee, or to a provider on behalf of an enrollee.

prohibits dispensing without a prescription" <u>or "Rx Only"</u> and includes compounded medications containing at least one prescription legend drug.

~~h~~<u>j</u>.   "prescription charge" means ~~the acquisition cost to the provider for the covered drug (including disposable syringes and needles) plus~~ a dispensing fee <u>plus lesser of the reasonable and customary amount paid by the provider for a covered drug (including insulin and disposable syringes and needles~~)~~. ~~The "acquisition cost" is the actual cost (price) which is paid for a drug by the provider (pharmacy, physician, dentist) or by a company, organization or its affiliates with which the provider may be associated~~, or such amount as may be negotiated by the carrier with participating providers. ~~This cost will include trade discounts but will not include cash discounts.~~ The "dispensing fee" is an amount or amounts, including applicable sales tax, predetermined by the carrier to compensate participating providers for dispensing covered drugs. ~~Exceptions are:~~

~~(1)   injectable insulin — for which the prescription charge means the lower of the reasonable and customary charge as determined by the carrier or the acquisition cost plus the dispensing fee; and~~

~~(2)~~ <u>For</u> covered drugs obtained from a nonparticipating provider or from a provider in an area where the carrier does not provide the coverage<u>,</u> ~~— for which~~ the prescription charge means the reasonable and customary charge as determined by the carrier.

~~i~~<u>k</u>.   "prescription order" means a written or oral request to a provider by a physician for a single prescription legend drug.

~~j~~<u>l</u>.   "provider" means a pharmacy or any other organization or person licensed to dispense prescription legend drugs.

2.   Reimbursement
   a.   The copayment amount for each separate prescription order or refill of a covered drug shall not exceed:

      (1)   $<u>5.00</u> for ~~enrollees in the Traditional option~~ <u>generic drugs dispensed at retail</u>; or

(2)   $~~3~~10.00 for ~~enrollees in the Preferred Provider Organization option~~ brand name drugs dispensed at retail; or

(3)   $2.00 ($5.00 effective January 1, 2005) for ~~enrollees who receive prescriptions~~ brand name or generic drugs dispensed through ~~the~~ ~~M~~mail ~~O~~order ~~Prescription Drug program~~.

(4)   The retail copayment for generic and brand name drugs applicable to those enrolled as a retiree, surviving spouse (or a dependent of a retiree or surviving spouse) as of (A)        will be $5.00.

b.    In addition to the copayment, enrollees may incur additional expense if a brand name drug, other than a drug identified in subsection (4), below is dispensed:

(1)   If the brand name drug is dispensed at the enrollee's request or upon determination that it is not medically necessary to dispense the brand name drug rather than the generic, the enrollee will pay the appropriate generic copayment plus the full difference in cost between the generic drug and the brand name drug;

(2)   If the brand name drug is dispensed at retail and at physician direction, the enrollee will pay the appropriate brand name copayment plus the difference (up to a maximum of $10.00) in Program cost between the generic drug and the brand name drug.

(3)   The carrier will initiate a review of the medical necessity for dispensing the brand name drug rather than the generic if no review has been requested by enrollees or their physicians. If the medical necessity is not established, future dispensing will be subject to (1) above.

(4)   In the case of (3), above, if it is found that dispensing of the brand name drug rather than the generic was medically necessary, amounts in excess of the brand name copayment will be refunded automatically. The carrier's systems will be adjusted to allow dispensing of the brand name for the duration of the prescription.

(5)   "Narrow Therapeutic Index Drugs" are those for which small variations in the dose could result in changes in drug safety. In order to remain within a safe and effective range,

96

these medications may require frequent
patient monitoring to adjust the dose. When
such brand name drugs are dispensed, only
the brand name copayment will apply.  Drugs
currently included in this group are:

      Lanoxin
      Dilantin
      Tegretol
      Cyclosporin
      Depakene
      Mysoline
      Levothyroxine (including Synthroid)

This list may be adjusted from time-to-time as
reflected in Program standards.

c.   The copayments specified above are for the days
supply referenced in subsection G.3., below. To
the extent a particular covered drug, supply or
device is pre-packaged in days supply exceeding
the specified ones, and cannot be repackaged by
the provider, the copayments will be prorated to
account for the additional days supply.

d.   Effective January 1, 2004, after the original
prescription order and two (2) refills, retail
purchases of covered drugs identified in
subsection 5.b., below, (and related supplies, if
applicable) are subject to an enrollee copayment
of 100% of the Program cost.

~~be~~. Except for the ~~copayment~~ amounts indicated above,
covered drugs or supplies obtained from a
participating provider are covered subject to the
Program provisions.

~~e~~f. Upon proof of payment acceptable to the carrier,
an enrollee is entitled to reimbursement from the
carrier of seventy-five percent (75%) of the
reasonable and customary charge for the generic
or brand name drug as applicable, as determined
by the carrier after deduction of the appropriate
copayment, of covered drugs obtained on a non-
emergency basis from a nonparticipating provider
located within the area in which the carrier
provides coverage. The enrollee may incur
additional expense if a brand name drug is
dispensed at the enrollee's request or when not
medically necessary.

~~d~~g. Upon proof of payment acceptable to the carrier,
an enrollee is entitled to reimbursement from the
carrier of one hundred percent (100%) of the
reasonable and customary charge for the generic
or brand name drug, as applicable, as determined
by the carrier after deduction of the appropriate

HEALTH CARE PROGRAM

APPENDIX C
DENTAL COVERAGE

I.    Enrollment Classifications
      Dental coverage for a primary enrollee shall include coverage
      for secondary enrollees as defined in the Program.

II.   Description of Benefits
      Dental benefits will be payable, subject to the conditions
      herein, if an enrollee incurs a covered dental expense.

III.  Covered Dental Expenses
      Covered dental expenses are the usual charges of a dentist which
      an enrollee is required to pay for services and supplies which
      are necessary for treatment of a dental condition, but only to
      the extent that such charges are reasonable and customary
      charges, as herein defined, for services and supplies
      customarily employed for treatment of that condition, and only
      if rendered in accordance with accepted standards of dental
      practice.  Such expenses shall be only those incurred in
      connection with the following dental services which are
      performed, except as otherwise provided in Section VII. B., by a
      licensed dentist and which are received while coverage is in
      force.

      A.    The following covered dental expenses shall be paid at 100
            percent of the reasonable and customary charge:

            1.    Routine oral examinations and prophylaxes (scaling
                  and cleaning of teeth), but not more than twice each
                  in any calendar year.   Three cleanings per calendar
                  year will be allowed if there is a documented history
                  of periodontal disease. Four cleanings per calendar
                  year will be covered for two full calendar years
                  following periodontal surgery.

            2. Topical application of fluoride provided that such
                  treatment shall be a covered dental expense only for
                  enrollees under 20 years of age, unless a specific
                  dental condition makes such treatment necessary.

            3.    Space maintainers that replace prematurely lost teeth
                  for children under 19 years of age.

            4.    Emergency palliative treatment.

      B.    The following covered dental expenses shall be paid at 90
            percent of the reasonable and customary charge:

            1.    Dental x-rays, including:

                  a.    full mouth x-rays, once in any period of five
                        (5) consecutive calendar years.

140

b.  supplementary bitewing x-rays once in any calendar year, and

c.  such other dental x-rays, including but not limited to those specified in a. and b. above, as are required in connection with the diagnosis of a specific condition requiring treatment.

2.  Extractions.

3.  Oral surgery.

4.  Amalgam, silicate, acrylic, synthetic porcelain, composite, and other American Dental Association (ADA)-approved direct restorative materials that meet Program standards and are used to restore diseased or accidentally injured teeth.

5.  General anesthetics and intravenous sedation when medically necessary and administered in connection with oral or dental surgery.

6.  Treatment of periodontal and other diseases of the gums and tissues of the mouth.

7.  Endodontic treatment, including root canal therapy.

8.  Injection of antibiotic drugs by the attending dentist.

9.  Repair or recementing of crowns, inlays, onlays, bridgework, or dentures; or relining or rebasing of dentures more than six (6) months after the installation of an initial or replacement denture, but not more than one relining or rebasing in any period of three (3) consecutive calendar years.

10. Inlays, onlays, gold fillings, or crown restorations to restore diseased or accidentally injured teeth, but only when the tooth, as a result of extensive caries or fracture, cannot be restored with an amalgam, silicate, acrylic, synthetic porcelain, composite or other American Dental Association (ADA)-approved materials that meet Program standards and are used for direct filling restoration.

11. Cosmetic bonding of eight (8) front teeth for children 8 through 19 years of age if required because of severe tetracycline staining, severe fluorosis, hereditary opalescent dentin, or amelogenesis imperfecta, but not more frequently than once in any period of three (3) consecutive calendar years.

C.   The following covered dental expenses shall be paid at 50 percent of the reasonable and customary charge:

1.   Initial installation of fixed bridgework (including inlays and crowns as abutments).

2.   Initial installation of partial or full removable dentures (including precision attachments and any adjustments during the six (6) month period following installation).

3.   Replacement of an existing partial or full removable denture or fixed bridgework by a new denture or by new bridgework, or the addition of teeth to an existing partial removable denture or to bridgework, but only if satisfactory evidence is presented that:

a.   the replacement or addition of teeth is required to replace one or more teeth extracted after the existing denture or bridgework was installed;

b.   the existing denture or bridgework cannot be made serviceable and, if it was installed under this dental coverage, at least five (5) years have elapsed prior to its replacement; or,

c.   the existing denture is an immediate temporary denture which cannot be made permanent and replacement by a permanent denture takes place within twelve (12) months from the date of initial installation of the immediate temporary denture.

Normally, dentures will be replaced by dentures but if a professionally adequate result can be achieved only with bridgework, such bridgework will be a covered dental expense.

4.   Orthodontic procedures and treatment (including related oral examinations) consisting of surgical therapy, appliance therapy, and functional/myofunctional therapy (when provided by a dentist in conjunction with appliance therapy) for enrollees under 19 years of age, provided, however, that benefits will be paid after attainment of age 19 for continuous treatment which began prior to such age.

IV.   <u>Maximum Benefit For Other Than Accidental Dental Injury</u>
The maximum benefit payable for all covered dental expenses incurred during a calendar year commencing January 1 and ending the following December 31 (except for services described in Section III. C.4. above and in Section XI below) shall be $~~1,400~~1,600 ($~~1,500~~1,700 effective January 1, 200~~0~~5 ~~and $1,600 effective January 1, 2003~~) for each enrollee.

> For covered dental expenses in connection with orthodontics including related oral examinations, described in Section III. C.4. above, the maximum benefit payable shall be $~~1,700~~1,800 ($2,000 effective January 1, 20~~05~~ ~~and $1,800 effective January 1, 2003~~), during the lifetime of each enrollee, with a maximum of $~~1,500~~1,800 applicable to covered dental expenses for services provided prior to January 1, 20~~05~~.

V.    Pre-Determination of Benefits
If a course of treatment can reasonably be expected to involve covered dental expenses of $200 or more, a description of the procedures to be performed and an estimate of the dentist's charges must be filed with the carrier prior to the commencement of the course of treatment.

The carrier will notify the enrollee and the dentist of the benefits certified as payable based upon such course of treatment.  In determining the amount of benefits payable, consideration will be given to alternate procedures, services, or courses of treatment that may be performed for the dental condition concerned in order to accomplish the desired result. The amount included as certified dental expenses will be the appropriate amount as provided in Sections III. and IV., determined in accordance with the limitations set forth in Section VI.

If a description of the procedures to be performed and an estimate of the dentist's charges are not submitted in advance, the carrier reserves the right to make a determination of benefits payable taking into account alternate procedures, services, or courses of treatment, based on accepted standards of dental practice.  To the extent verification of covered dental expenses cannot reasonably be made by the carrier, the benefits for the course of treatment may be for a lesser amount than would otherwise have been payable.

This pre-determination requirement will not apply to courses of treatment under $200 or to emergency treatment, routine oral examinations, x-rays, prophylaxes, and fluoride treatments.

VI.    Limitations
    A.    Restorative
        1.    Gold, Baked Porcelain Restorations, Crowns and Jackets
        If a tooth can be restored with a material such as amalgam, payment of the applicable percentage of the charge for that procedure will be made toward the charge for another type of restoration selected by the enrollee and the dentist.  The balance of the treatment charge remains the responsibility of the enrollee.

        2.    Reconstruction
        Payment based on the applicable percentage will be made toward the cost of procedures necessary to

eliminate oral disease and to replace missing teeth.
Appliances or restorations necessary to increase
vertical dimension or restore the occlusion are
considered optional and their cost remains the
responsibility of the enrollee.

B.    Prosthodontics
   1.    Partial Dentures
      If a cast chrome or acrylic partial denture will
      restore the dental arch satisfactorily, payment of the
      applicable percentage of the cost of such procedure
      will be made toward a more elaborate or precision
      appliance that enrollee and dentist may choose to use,
      and the balance of the cost remains the responsibility
      of the enrollee.

   2.    Complete Dentures
      If, in the provision of complete denture services, the
      enrollee and dentist decide on personalized
      restorations or specialized techniques as opposed to
      standard procedures, payment of the applicable
      percentage of the cost of the standard denture
      services will be made toward such treatment and the
      balance of the cost remains the responsibility of the
      enrollee.

   3.    Replacement of Existing Dentures
      Replacement of an existing denture will be a covered
      dental expense only if the existing denture is
      unserviceable and cannot be made serviceable.  Payment
      based on the applicable percentage will be made toward
      the cost of services which are necessary to render
      such appliances serviceable.  Replacement of
      prosthodontic appliances will be a covered dental
      expense only if at least five (5) years have elapsed
      since the date of the initial installation of that
      appliance under this dental coverage, except as
      provided in Section III. C.3. above.

C.    Orthodontics
   1.    If orthodontic treatment is terminated for any reason
      before completion, the obligation to pay benefits
      will cease with payment to the date of termination.
      If such services are resumed, benefits for the
      services, to the extent remaining, shall be resumed.

   2.    The benefit payment for orthodontic services shall be
      only for months that coverage is in force.

VII.  Exclusions
Covered dental expenses do not include and no benefits are
payable for:

A.    charges for services for which benefits are provided under
     other health care coverages;

144

B.    charges for treatment by other than a dentist, except that
      scaling or cleaning of teeth and topical application of
      fluoride may be performed by a licensed dental hygienist if
      the treatment is rendered under the supervision and guidance
      of the dentist;

C.    charges for veneers or similar properties of crowns and
      pontics placed on, or replacing teeth, other than the ten
      upper and lower anterior teeth;

D.    charges for services or supplies that are cosmetic in nature
      (except as provided in Section III.B.11.), including charges
      for personalization or characterization dentures;

E.    charges for prosthetic devices (including bridges),
      crowns, inlays, and onlays, and the fitting thereof which
      were ordered while the enrollee was not covered for dental
      coverage or which were ordered while the enrollee was
      covered for dental coverage but are finally installed or
      delivered to such enrollee more than sixty (60) days after
      termination of coverage;

F.    charges for the replacement of a lost, missing, or stolen
      prosthetic device;

G.    charges for failure to keep a scheduled visit with the
      dentist;

H.    charges for replacement or repair of an orthodontic
      appliance;

I.    charges for services or supplies which are compensable under
      a Workers Compensation or Employer's Liability Law;

J.    charges for services rendered through a medical department,
      clinic, or similar facility provided or maintained by the
      enrollee's employer;

K.    charges for services or supplies for which no charge is made
      that the enrollee is legally obligated to pay or for which
      no charge would be made in the absence of dental coverage;

L.    charges for services or supplies which are not necessary,
      according to accepted standards of dental practice, or which
      are not recommended or approved by the attending dentist;

M.    charges for services or supplies which do not meet accepted
      standards of dental practice, including charges for services
      or supplies which are experimental in nature;

N.    charges for services or supplies received as a result of
      dental disease, defect or injury due to an act of war,
      declared or undeclared;

O.    charges for services or supplies from any governmental
      agency which are obtained by the enrollee without cost by

145

compliance with laws or regulations enacted by any federal, state, municipal, or other governmental body;

P.    charges for any duplicate prosthetic device or any other duplicate appliance;

Q.    charges for any services to the extent for which benefits are payable under any health care program supported in whole or in part by funds of the federal government or any state or political subdivision thereof;

R.    charges for the completion of any insurance forms;

S.    charges for sealants and for oral hygiene and dietary instruction;

T.    charges for a plaque control program;

U.    charges for implantology; or

V.    charges for services or supplies related to periodontal splinting.

VIII. Proof of Loss
The carrier reserves the right at its discretion to accept, or to require verification of, any alleged fact or assertion pertaining to any claim for dental benefits.  As part of the basis for determining benefits payable, the carrier may require x-rays and other appropriate diagnostic and evaluative materials.

IX.   Alternative Dental Plans
The Corporation will make arrangements for eligible enrollees to be afforded the opportunity to enroll for dental coverage under approved and qualified alternative dental plans, instead of the dental coverage hereunder; provided, however, that the Corporation's contributions toward coverage under such alternative dental plans shall not be greater than the amount the Corporation would have contributed for dental coverage hereunder.

X.    Definitions
As used in this Appendix, the terms identified below have the meanings stated.

A.    The term "dentist" means a legally licensed dentist practicing within the scope of such dentist's license.  As used herein, the term "dentist" also includes a legally licensed physician authorized by license to perform the particular dental services such physician has rendered.

B.    The term "reasonable and customary charge" means the actual fee charged by a dentist for a service rendered or supply furnished but only to the extent that the fee is reasonable taking into consideration the following:

1.   the usual fee which the individual dentist most frequently charges the majority of patients for a service rendered or a supply furnished;

2.   the prevailing range of fees (as defined in the Administrative Manual(s)) charged in the same area by dentists of similar training and experience for the service rendered or supply furnished; and,

3.   unusual circumstances or complications requiring additional time, skill, and experience in connection with the particular dental service or procedure.

As used in this Appendix, "reasonable and customary charge" also refers to scheduled or other contracted amounts of payment used by carriers with participating provider arrangements.

The carrier is responsible for determining the appropriate reasonable and customary charge for a given provider and service or material, and such determination shall be conclusive.

C.   The term "area" means a metropolitan area, a county or such greater area as is necessary to obtain a representative cross-section of dentists rendering such services or furnishing such supplies.

D.   The term "course of treatment" means a planned program of one or more services or supplies, whether rendered by one or more dentists, for the treatment of a dental condition diagnosed by the attending dentist as a result of an oral examination.   The course of treatment commences on the date a dentist first renders a service to correct or treat such diagnosed dental condition.

E.   The term "orthodontic treatment" means preventive and corrective treatment of all those dental irregularities which result from the anomalous growth and development of dentition and its related anatomic structures or as a result of accidental injury and which require repositioning (except for preventive treatment) of teeth to establish normal occlusion.

F.   The term "ordered" means, in the case of dentures, that impressions have been taken from which the denture will be prepared; and, in the case of fixed bridgework, restorative crowns, inlays, or onlays, that the teeth which will serve as abutments or support or which are being restored have been fully prepared to receive, and impressions have been taken from which will be prepared the bridgework, crowns, inlays or onlays.

XI.   Accidental Dental Injury
Payments for covered dental services related to the repair of accidental injury to sound natural teeth due to a sudden

unexpected impact from outside the mouth will not count against the annual benefit limit or the lifetime orthodontic limit. Regular copayments will be required for all such services.

APPENDIX D
VISION COVERAGE

I.   Enrollment Classifications
     Vision coverage for a primary enrollee shall include coverage
     for secondary enrollees as defined in the Program.

II.  Description of Benefits
     Vision benefits will be payable, subject to the conditions
     herein, if an enrollee incurs a covered vision expense.

III. Definitions
     As used herein:
     A.   "Ophthalmologist" means any licensed doctor of medicine or
          osteopathy legally qualified to practice medicine,
          including the diagnosis, treatment, and prescribing of
          lenses related to conditions of the eyes.

     B.   "Optometrist" means any person legally licensed to
          practice optometry as defined by the laws of the state in
          which the service is rendered.

     C.   "Optician" means one who makes or sells eyeglasses
          prescribed by an ophthalmologist or optometrist to cure or
          correct defects in the eyes, and grinds the lenses or has
          them ground according to prescription, fits them into a
          frame, and adjusts the frame to fit the face.

     D.   "Participating provider" means an ophthalmologist,
          optometrist, or optician who has signed an agreement with
          the carrier covering reimbursement, quality, service
          standards and other terms and conditions connected with
          providing covered vision services to enrollees.

     E.   "Nonparticipating provider" means an ophthalmologist,
          optometrist, or optician who has not signed an agreement
          with the carrier covering reimbursement, quality, service
          standards and other terms and conditions connected with
          providing covered vision services to enrollees.

     F.   "Reasonable and customary charge" means the actual amount
          charged by an ophthalmologist, optometrist, or optician
          for a service rendered or materials furnished but only to
          the extent that the amount is reasonable, taking into
          consideration the following:

          1.   the usual amount which the individual provider most
               frequently charges the majority of patients or
               customers for a similar service rendered or materials
               furnished;

          2.   the prevailing range of charges made in the same area
               by providers with similar training and experience for
               the service rendered or materials furnished;

149

3. unusual circumstances or complications requiring additional time, skill, and experience in connection with the particular service rendered or materials furnished.

As used in this Appendix, "reasonable and customary charge" also refers to scheduled or other contracted amounts of payment used by carriers with participating provider arrangements.

The carrier is responsible for determining the appropriate reasonable and customary charge for a given provider and service or material, and such determination shall be conclusive.

G. "Contact lenses" means ophthalmic corrective lenses, as prescribed by an ophthalmologist or optometrist, to be fitted directly to the enrollee's eyes.

H. "Lenses" means ophthalmic corrective lenses, as prescribed by an ophthalmologist or optometrist, to be fitted into a frame.

I. "Frame" means a standard eyeglass frame into which two lenses are fitted.

J. "Covered vision expense" means the reasonable and customary charges for vision care services and materials, as described in Section IV., when provided by ophthalmologists, optometrists, and opticians for each enrollee.

K. "Corrective eye surgery" means a surgical procedure used to alter the cornea or shape/surface of the eye in order to improve visual accuity, correct vision conditions such as myopia, hyperopia, or astigmatism and reduce or eliminate the reliance on eyewear. Such surgeries can include, but are not necessarily limited to, Laser- assisted In-Situ Keratomileusis (LASIK), PhotoRefractive Keratectomy (PRK) and Radial Keratotomy (RK).

IV. Benefits
Benefits will be paid for the covered vision expenses described in A., and B., and C. below, less any copayment as described in CD. below.

A. Vision Examinations:
1. Refraction, including case history, coordinating measurements, and tests;

2. The prescription of glasses where indicated; and

3. Examination by an ophthalmologist, upon referral by an optometrist, within 60 days of a vision examination by the optometrist.

B.   Lenses and Frames:
When lenses are prescribed by an ophthalmologist or
optometrist, the necessary materials and professional
services connected with the ordering, preparation,
fitting, and adjusting of:

1.   Lenses (single vision, bifocals, trifocals,
lenticular).  If the enrollee selects lenses, the
size of which results in an additional charge, only
the reasonable and customary charge for normal size
lenses of the same material and prescription will be
considered a covered vision expense.  If the enrollee
selects photochromic lenses or lenses with a tint
other than Number 1 or Number 2, only the reasonable
and customary charge for clear lenses of the same
material and prescription will be considered a
covered vision expense.

2.   Contact lenses following cataract surgery, or when
visual acuity cannot be corrected to 20/70 in the
better eye except by their use, or when medically
necessary due to keratoconus, irregular astigmatism
or irregular corneal curvature.  If contact lenses
are prescribed for any other reason, ~~$75~~$80 is the
maximum amount that will be considered a covered
vision expense.

3.   Frames.  If frames are obtained from a participating
provider, the enrollee may make a selection from the
display shown by the participating provider and there will
be no out-of-pocket expense to the enrollee other than as
described under "Copayments".  ~~However, if the selection
at the participating provider is not from the display
shown, or i~~If the enrollee obtains frames from a
nonparticipating provider, $~~15~~24 is the maximum amount
that will be considered a covered vision expense ~~until
January 1, 2000 and $16 thereafter~~.

C.   Corrective Eye Surgery:  Effective January 1, 2004,
corrective eye surgery performed by an ophthalmologist
will become a covered service.  Coverage includes any
related pre and post-surgical professional services,
facility expense and medically necessary supplies.
Coverage is subject to the following provisions:

1.   An enrollee may not receive benefits for both
corrective eye surgery and for frames and/or lenses
(including contact lenses) in the same calendar year;

2.   Upon proof of payment to the corrective eye surgery
provider, the carrier will reimburse the primary
enrollee for covered expense, up to the lesser of the
charges or the maximum benefit of $295.00 in any four
(4) year period; and

3.          An enrollee receiving benefits for corrective eye
surgery in any one calendar year will be ineligible for
lens (including contact lens) and/or frame benefits for
that year and three (3) subsequent years.  For example, an
enrollee undergoing <u>corrective eye surgery in 2004 would
be eligible for lens and/or frame benefits in 2008.  Such
enrollees will be eligible for benefits for an annual
exam, and will have access to the participating provider
fee schedule for non-covered services and for lenses
and/or frames for which no benefits are payable.</u>

<u>C</u>D.    Copayments:
For each enrollee, there is a $7.00 copayment applicable
to the covered vision expense for each vision examination
and a $10.00 copayment for the combined covered vision
expenses for lenses, contact lenses, and frames.  The
total copayment for each enrollee, during a calendar year,
will not exceed $17.00.


V.    <u>Frequency Limitations</u>
For each enrollee, there are the following limitations on the
frequency with which charges for certain services and materials
will be considered covered vision expenses:

| | | |
|---|---|---|
| Vision Examination | – | Once during a calendar year, except as provided in Section IV.A.3. |
| Lenses and Contact Lenses | – | Once during a calendar year, except as provided in Section IV.C. |
| Frames | – | Once during two consecutive calendar years, except as provided in Section IV.C. |

The limitations on lenses, contact lenses, and frames apply
whether or not they are a replacement of lost, stolen, or broken
lenses, contact lenses, or frames.


VI.    <u>Exclusions</u>
A.    Any lenses which do not require a prescription;

B.    Medical or surgical treatment of the eye, except as
provided in Section IV.C.;

C.    Drugs or any other medication;

D.    Procedures determined by the carrier to be special or
unusual, such as, but not limited to, orthoptics, vision
training, subnormal vision aids, aniseikonic lenses, and
tonography;

E.    Vision examinations or materials furnished for any
condition, disease, ailment, or injury arising out of or
in the course of employment;

F.   Vision examinations performed and lenses and frames
ordered:

1.   before the enrollee became covered for this coverage;

2.   after the termination of the enrollee's coverage;

3.   to the extent that they are obtained without cost to
the enrollee.

VII. <u>Vision Network</u>

A.   The carrier has established a network of participating
providers who agree to accept reimbursement according to a
schedule for the covered vision services and materials
described in Section IV. A. and B. without enrollee
copayments.

B.   If an enrollee uses a participating provider to obtain
covered services, the carrier will reimburse the provider,
without enrollee copayment, as specified below:

1.   the scheduled amount (which shall be payment in full)
for eye examinations; normal-size clear, Number 1 or
Number 2 tinted lenses; ~~eyeglass frames which have a
retail price of $55.00 or less;~~ and  medically
necessary contact lenses (see
Section IV. B.1. and 2.);

2.   the scheduled amount <u>(which shall be payment in full)</u>~~of
$21.00~~ for eyeglass frames with a retail value ~~greater
than~~ <u>of $55</u>80.00 <u>or less</u>.  If an eyeglass frame with a
retail value greater than $55<u>80</u>.00 is selected, the
enrollee will be responsible for ~~any difference between
the discounted price~~ <u>(participating providers discount
frames with the retail cost in excess of $80.00), less
$21</u>24.00 ~~and the discounted amount;~~ and

3.   the scheduled amount of $65.00 for contact lenses, which
do not meet the criteria in Section IV.B.2. The enrollee
will be responsible for any amount greater than $75<u>80</u>.00.

C.   If an enrollee resides 25 miles or less from a
participating provider but obtains covered services from a
non-participating provider (other than an ophthalmologist)
the carrier will reimburse the enrollee the scheduled
amounts.  The enrollee will be responsible
for paying the provider, including any remaining balance.
Reimbursement to the enrollee for covered services
received from non-participating ophthalmologists will be
made at the reasonable and customary amount, less the
enrollee copayment (see Section IV. ~~C~~<u>D</u>.).

D.   If an enrollee resides more than 25 miles from a participating
provider and obtains covered services from a non-
participating provider (including an ophthalmologist), the

carrier will reimburse the enrollee in accordance with
Section IV. above.

<u>New Language</u>

<u>HEALTH CARE PROGRAM</u>

Misc. (Traditional Care Network)

<u>September 18, 2003</u>

[Name of Union]

_____

_____

_____


Attention: _____


Dear _____:

This is to confirm the understandings reached between the parties during discussions concerning the Traditional option.  Subject to the review and approval of the parties, the Control Plan will assure development, implementation, and overseeing of the Traditional Care Networks as replacements for the Traditional option.  The Traditional Care Networks will have the following features:

- The Traditional Care Networks will provide core coverages described in Appendix A, through access to a panel of providers within a defined service area who have agreed to provide services under the terms of participation established by the Traditional Care Network carrier such as limits on fees, and controls on quality and utilization. In most instances, the Traditional Care Network will consist of PPO/Managed Care Networks maintained by the individual carriers. In order to receive full benefits for certain covered services, enrollees must obtain such services through the panel of providers and predetermination and review procedures must be followed per Art. II, 4(c) of the Delphi Health Care Program for Hourly Employees (the Program), including sub-paragraphs (1) through (3).

- The Traditional Care Network carriers assume responsibility for conducting utilization reviews, predetermination of services, or other reviews necessary to promote quality of care and control costs.  The Traditional Care Network carriers may place the panel physician at financial risk through capitation, withholding of a percentage of fees, or other mechanisms, or if not, will have other means to monitor

171

and control utilization by individual providers on a
continuous basis.

- Subject to the review and approval of the parties, the
  Traditional Care Network carriers assume responsibility for
  selection and periodic evaluation of hospitals, physicians,
  laboratories, and other providers to ensure sufficient
  numbers and types of providers who are geographically
  distributed to allow adequate access for enrollees within a
  service area as defined by the carrier.

- The Traditional Care Network carriers assume responsibility
  for providing the scope and level of benefits set forth in
  Appendix A, monitoring the appropriateness of referrals to
  non-panel providers, taking affirmative corrective action
  with respect to providers when necessary, and implementing
  and maintaining other administrative processes as mutually
  agreed to by the parties.

- For select geographic locations and/or carriers, payment for
  covered services provided by non-panel providers, unless the
  enrollee is referred by a panel provider or resides outside
  of the carrier's defined service area, will be 90% of the
  non-panel provider's reasonable and customary charge as
  determined by the carrier for the same service or, if less,
  the actual charge.  The reimbursement to providers by the
  Traditional Care Network carrier will be reduced to reflect
  any waiver or forgiveness by a provider of the remaining 10%.
  The 90% limitation on payment for charges payable to non-
  panel providers by the Traditional Care Network carrier shall
  not be applicable (i) to an individual who has incurred
  personal expense under this provision of $250.00 for such
  covered services in a calendar year (with the exception of
  personal expenses for office visits defined below) or (ii) to
  the covered members of the enrollee's family, if any, after
  the enrollee and such members have incurred a total of
  $500.00 in personal expense under this provision for such
  covered services in the same calendar year (with the
  exception of office visits defined below).

- Upon implementation of the Traditional Care Network, select
  services currently covered under the Preferred Provider
  Organization Option of the Program will be covered under the
  Traditional Care Network when services are provided by a
  panel provider.  These services shall be limited:

  1.   Well baby care as defined under App. A, III,E.3.o.
  2.   Immunizations and vaccinations as defined under App. A,
       III.E.3.p., and
  3.   Screenings as defined under App. A, III.E.3.s

When the above services are provided to Traditional Care Network
enrollees living outside of the defined service area by a provider
participating with the carrier, the services will be covered as if
they had been provided by a panel provider.  If a non-panel, non-

participating provider is utilized for the above services by an
enrollee living outside of the defined service area, the Program
will pay the non-participating reasonable and customary rate, and
a balance bill to the enrollee may occur.

In addition to the select services identified above, office visits
as defined under App. A, III.E.3.n. of the Program will be
covered, subject to a coinsurance of 100% when services are
provided by a panel provider.  Office visits will be covered for a
non-panel provider with a referral from a panel provider.
Coinsurance amounts related to office visits will not be applied
to the out-of-pocket maximum personal expense defined above.

- Under the Traditional Care Network, benefits may be payable
  in full (up to the carrier's reasonable and customary charge
  level) for services rendered by non-panel providers if such
  services are rendered on referral from a panel physician,
  subject to the conditions below:

  1.  The panel provider is responsible for reporting all
      enrollee referrals for out-of-network services.
      Referrals to non-panel providers must be communicated to
      the carrier per the carrier's program guidelines.
  2.  The carrier is responsible for monitoring referral
      frequency and patterns, and for ensuring that additional
      costs are not incurred by the program or the enrollee.
  3.  Referral does not apply to well baby care,
      immunizations, or screenings as defined above.  These
      are not covered services if rendered by a non-panel
      provider unless the enrollee lives outside of the
      defined service area.
  4.  A service which would not otherwise be a covered service
      does not become a covered service by virtue of a
      referral.

- A procedure will be available for carriers to hold the
  enrollee harmless, up to the limits of coverage, for: (1)
  errors of commission or omission over which the enrollee has
  no control or (2) in instances where participating or non-
  participating provider charges exceed usual, customary, and
  reasonable reimbursement rates for covered services.  This
  procedure shall be published in the Administration Manual.
  The carriers shall require participating providers to hold
  the enrollee harmless from the provider's errors of
  commission or omission. If an enrollee receives covered
  services from a non-network par provider, the provider will
  accept payment from the carrier as payment in full.

- Mental Health and Substance Abuse coverage will continue to
  be administered in accordance with the terms and conditions
  of Appendix B.

The Traditional Care Network will be implemented by July 1, 2004.
All decisions of the Control Plan are subject to review and approval

173

by the parties prior to implementation of the Traditional Care
Networks.

                              Very truly yours,

                              DELPHI CORPORATION


                              Kevin M. Butler
                              Vice President
                              Human Resource Management

Accepted and Approved:

[Name of Union]

_____
_____
_____


By:   _____