**Hearing Date and Time: May 9, 2006 at 10:00 a.m.**
**Objection Deadline: April 21, 2006 at 4:00 p.m.**

| | |
|---|---|
| SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP<br>333 West Wacker Drive, Suite 2100<br>Chicago, Illinois 60606<br>(312) 407-0700<br>John Wm. Butler, Jr. (JB 4711)<br>John K. Lyons (JL 4951)<br>Ron E. Meisler (RM 3026) | O'MELVENY & MYERS LLP<br>1625 Eye Street, NW<br>Washington, DC 20006<br>(202) 383-5300<br>Robert A. Siegel (RS 0922)<br>Tom A. Jerman<br>Rachel S. Janger<br>Jessica Kastin (JK 2288) |
| SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP<br>Four Times Square<br>New York, New York 10036<br>(212) 735-3000<br>Kayalyn A. Marafioti (KM 9632)<br>Thomas J. Matz (TM 5986) | GROOM LAW GROUP, CHTD<br>1701 Pennsylvania Avenue, NW<br>Washington, DC 20006<br>(202) 857-0620<br>Lonie A. Hassel |

Attorneys for Delphi Corporation, et al.,
   Debtor and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                         :
        In re                            :    Chapter 11
                                         :
DELPHI CORPORATION, et al.,              :    Case No. 05-44481 (RDD)
                                         :
                        Debtors.         :    (Jointly Administered)
                                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DECLARATION OF MARK R. WEBER
IN SUPPORT OF DELPHI'S MOTION FOR AUTHORITY TO REJECT
COLLECTIVE BARGAINING AGREEMENTS UNDER 11 U.S.C. § 1113(c) AND
MODIFY RETIREE WELFARE BENEFITS UNDER 11 U.S.C. § 1114(g)

I, Mark R. Weber, declare and state as follows:

1. I am the Executive Vice President, Operations, Human Resource Management, and Corporate Affairs of Delphi Corporation ("Delphi"). I have held this position since January 1, 2000. I am also a member of the Delphi Strategy Board, the company's top policy-making group. I have worked in the automotive industry for almost 40 years, and I have worked for Delphi for approximately 10 years. From January 1995 through November 1998, I was Delphi's Executive Director, Human Resource Management. From November 1998 until I assumed my current position, I was Delphi's Vice President, Human Resource Management.

2. In my current position with Delphi, I have, among other responsibilities, responsibility for overseeing Delphi's human resource management and corporate affairs.

3. I submit this Declaration in support of Delphi's Motion For Authority to Reject Collective Bargaining Agreements Under 11 U.S.C. § 1113(c) And Modify Hourly Retiree Benefits Under 11 U.S.C. § 1114(g) (the "Motion"). Any capitalized terms not expressly defined herein are intended to have the meanings ascribed to them in the Motion or accompanying memorandum of law, and references to Delphi herein include the Debtors, as appropriate. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my opinion, my experience with and knowledge of Delphi's organizational structure, or are based upon knowledge obtained from employees of Delphi reporting to me in the course of their duties. If I were called upon to testify, I could and would testify to the facts set forth herein.

I.     GM's Spin-Off Of Delphi In 1999

    A.     The Reasons For GM's Spin-Off Of Delphi

4.     For most of its history, GM manufactured a large proportion of the parts used in its vehicles. In 1991, GM combined its parts manufacturing facilities into a single entity, originally known as the Automotive Components Group and eventually renamed Delphi Automotive Systems. On January 1, 1999, GM transferred the assets, liabilities, manufacturing sites, and most of the employees assigned to Delphi Automotive Systems to the newly-created Delphi Automotive Systems Corporation, a wholly-owned subsidiary of General Motors. GM and Delphi also entered into a Master Separation Agreement, which governed the separation of the two entities, and a Component Supply Agreement, which, subject to certain exceptions, obligated GM to honor the then-existing supply contracts between GM and Delphi and to provide Delphi with a right of last refusal on replacement business for a three-year period, so long as Delphi could meet GM's cost, quality, and technology requirements.

5.     In February 1999, shortly after Delphi's incorporation, while GM held a majority of seats on Delphi's Board of Directors, an initial public offering (IPO) was conducted under which 17.7 percent of Delphi's stock was offered for sale to a combination of new investors and GM shareholders, and Delphi became a publicly-traded corporation. On May 28, 1999, GM distributed Delphi's remaining stock to GM's shareholders, making Delphi completely independent of GM.

6.     Delphi identified several reasons supporting the Spin-Off decision, as stated in its February 2, 1999 Form S-1/A Registration Statement filed with the United States Securities and Exchange Commission ("1999 S-1") in connection with the IPO. First, GM believed that the internal competition by its OEM and component businesses for GM's capital resources was not

3

sustainable. Accordingly, it determined that its capital was best devoted to investing in the automobile manufacturing business, and not the component business in which Delphi was engaged. Supporting excerpts of Delphi's 1999 S-1 are attached hereto as Exhibit A and a full copy is available to the public at http://investor.delphi.com.

7. Second, as stated on page 13 of the 1999 S-1, "One of the principal benefits that [Delphi] expect[ed] to achieve from [its] separation from General Motors [was] increased competitiveness over time as a result of improving [Delphi's] labor relations and establishing more flexible local work rules and practices, which [was] very important to [Delphi's] business because [its] workforce [was] highly unionized."

8. Finally, as explained on page 27 of Delphi's 1999 S-1, GM believed that the Spin-Off would maximize the value of Delphi to GM's shareholders because Delphi would be in a better position to win business from other OEMs if it was independent from GM. While Delphi began pursuing such business in the mid-1990s as a division of GM, it was basically a captive supplier to GM's assembly plants world-wide. GM and Delphi believed that many potential customers were reluctant to do business with another OEM. One of the assumptions in the Spin-Off was that Delphi could eventually more than double its non-GM business if it were independent from GM.

B. The Assumptions And Risks In The Spin-Off

9. At the time of the initial public offering in February 1999, GM and Delphi identified in the 1999 S-1, a prospectus provided to potential investors, a number of business objectives, assumptions, and risks underlying the Spin-Off. These objectives, assumptions, and risks are summarized below and are discussed in greater detail in Delphi's 1999 S-1.

4

**Declaration of Mark R. Weber**

10.     One of Delphi's most important business objectives was to become a global supplier to OEMs world-wide. To achieve this transition, Delphi needed to maintain its existing GM business in the U.S., expand its revenue from other OEMs within the U.S., and expand its international presence, supplying both GM's foreign operations and other OEMs world-wide.

11.     First, GM and Delphi expected that Delphi would expand its total sales and earnings by (a) retaining its existing GM revenue and (b) substantially increasing its revenue from other automobile manufacturers that had been reluctant to do business with a GM subsidiary.

12.     Second, GM and Delphi anticipated that Delphi could improve its operational performance to become competitive with other independent parts suppliers. In establishing this goal, Delphi recognized two imperatives, achievable only over time, to improve its performance: (a) the ability to negotiate its own national and local labor agreements independent of GM to eventually establish and implement more flexible work rules aimed at achieving significant productivity improvements, absent which Delphi would eventually have to address its noncompetitive wages and benefits focusing upon new-hires, and (b) the ability to "fix, sell, or close" unprofitable product lines.

13.     Third, GM and Delphi recognized that Delphi might be unable to meet its future capital requirements because of its liability for hourly post-employment health care and life insurance benefits ("OPEB") and underfunded hourly pension plan obligations. At the time, Delphi's estimated liability for hourly retiree health care was $3.4 billion, and was $0.3 billion for retiree life insurance. The unfunded liability under its hourly pension plans was $1.7 billion.

14.     Finally, GM and Delphi further recognized that Delphi's margins could be adversely affected by unanticipated price reductions demanded by its customers and/or

**Declaration of Mark R. Weber**

unanticipated increases in material costs that could not be passed on to its customers. At the time of the Spin-Off, according to Delphi's S-1, Delphi estimated that its total "price-downs" over the foreseeable future would average only 1.6 percent of sales.

  C.  <u>The Mirror Agreement With The UAW</u>

  15. At the time of the Spin-Off, Delphi was required to assume the labor agreements in effect between GM and each of its unions, including the UAW, IUE-CWA, and USW. GM and Delphi recognized at the time that the GM labor agreements were too costly for an independent parts supplier and limited the flexibility that Delphi needed to improve its operational performance. The UAW agreements were subject to expiration beginning in September 1999, and the IUE-CWA agreements expired in November 1999. The USW agreements in effect at the time of the Spin-Off did not expire until September 2002. As stated on page 28 of Exhibit A, Delphi's 1999 S-1, one of the assumptions of the Spin-Off articulated by GM and Delphi was that following the separation, Delphi would be able to negotiate independently of GM and, "over time, be able to negotiate local work rules and practices and other terms more consistent with those generally prevailing in the automotive parts industry."

  16. Prior to the Spin-Off, there was no distinction between UAW-represented GM and Delphi employees – Delphi employees were GM employees. The UAW publicly opposed the Spin-Off, and after the Spin-Off was announced, pledged to "aggressively work to protect the rights and interest of its members." According to its public statements, the reasons for the opposition included the UAW's concern that the Spin-Off would put the retirement of Delphi employees at risk, result in lower wages or benefits for the new Delphi employees than their counterparts at GM, or result in the closure of unprofitable Delphi facilities.

**Declaration of Mark R. Weber**

17. Prior to the distribution of Delphi's stock to GM shareholders in May 1999, while Delphi was still majority owned and controlled by GM, Delphi and GM representatives informed the UAW that, in an effort to help resolve the UAW's concerns over the Spin-Off, Delphi would honor the "pattern" agreements negotiated between GM and the Big Three in September 1999. In the course of finalizing the 1999-2003 agreement, however, the UAW sought Delphi's further commitment that Delphi would also "mirror" the next agreement between GM and the UAW, scheduled to be negotiated in 2003, asserting that without such commitment there was a risk that the 1999-2003 agreement would not be ratified. Delphi and the UAW acknowledged that the terms of the 2003 Agreement might be untenable for Delphi and the UAW committed to consider mutually agreeable exceptions to the 2003 GM-UAW agreement "to assure the continued success of Delphi as an on-going business." Based on these mutual commitments, Delphi agreed to "mirror," or duplicate, the terms of the 2003 GM-UAW labor agreement (the "Mirror Agreement"). A true and correct copy of the Mirror Agreement is attached hereto as Exhibit B.

D. The GM Benefit Guarantee

18. To further resolve the UAW's opposition to the Spin-Off, GM executed with the UAW (and subsequently with the IUE-CWA and USW) a benefit guarantee agreement designed to ensure that the former GM employees who became employees of Delphi would not suffer a reduction in their layoff and retirement benefits (collectively, the "GM Benefit Guarantee"). Based upon information and belief, true and correct copies of the GM-UAW, the GM-IUE, and the GM-USW Benefit Guarantees are attached hereto as Exhibit C.

II.     Delphi's Salaried And Management Workforce

19.     In my current position, one of my responsibilities has been to consider what modifications Delphi needs to make to the wages and benefits of its employees in order to implement a successful restructuring. In considering this question, Delphi has operated under the basic philosophy that the compensation of its entire workforce, including its hourly and salaried employees, should be at "market" levels – neither higher nor lower.

20.     Thus, in determining whether the modifications sought in the Delphi labor agreements are "fair and equitable" relative to salaried and management employees, it is necessary to examine the base-line under which hourly employees on the one hand, and salaried and management employees on the other hand, entered into the chapter 11 cases. In this Declaration, I will address the compensation of Delphi's salaried and management workforce and the job losses that are likely to occur among that group. The Declaration of Steven Gebbia filed in support of the Motion addresses the benefits applicable to Delphi's salaried and management workforce, and the potential changes to those benefits.

A.      The Compensation Of Delphi's Salaried And Management Employees

21.     Well prior to the Spin-Off, GM began to reduce on a relative basis the total compensation of its salaried and management employees compared to its hourly employees. Among the most significant of these was the elimination in 1984 of cost of living adjustments for salaried and management employees.

22.     Following the Spin-Off in 1999, several steps were taken to move Delphi's salaried compensation more in line with compensation at other U.S. companies scaled closer to Delphi than GM.

23.     For example, base salaries were targeted at levels more closely approximating employees in companies whose revenue, on average, more closely tracked Delphi's. Comparator companies were thus changed from those the size of GM to those closer to Delphi, including other automotive component companies. The design and modifications to the compensation approach resulted from studies and recommendations of independent expert compensation consulting companies.

24.     The chart below highlights the current differences in compensation and job security provisions between Delphi's hourly employees and its salaried and management employees:

|  | <u>Hourly Employees</u> | <u>Salaried & Management Employees</u> |
|---|---|---|
| Wages | • Wages based upon Big Three-UAW wage rates | • Pay structure developed to reflect market for companies with similar revenue |
| COLA | • Yes | • Eliminated in 1984 |
| Overtime | • Time and a half for any hours worked over eight per day, 40 per week<br>• Double time for Sundays, Holidays | • Overtime eliminated in 2003 for all exempt employees except first line supervisors |
| Shift Premiums | • Five percent for afternoon shift; ten percent for night shift | • No shift premiums |
| Flow-Back to GM | • Most hourly employees entitled to return to open positions at GM | • No right to return to GM |
| Job Security | • No permanent layoffs permitted | • Delphi can terminate unneeded employees as needed |
| Staffing Requirements | • Delphi generally must perform work in house even if cheaper to outsource | • Delphi may outsource functions at will |

9

**Declaration of Mark R. Weber**

      **B.**      <u>Jobs Reductions For Salaried And Management Employees</u>

      25.      Delphi's salaried and management employees will suffer a significant number of job reductions as part of Delphi's restructuring.  First, approximately 3,650 of Delphi's approximately 14,300 salaried and management employees in the United States will be separated from Delphi as a result of the planned sales or wind-downs of certain of Delphi's U.S. manufacturing sites.  These reductions will affect both salaried and management employees at the manufacturing sites, and engineering and corporate and divisional management that support the manufacturing operations.

      26.      Another 1,600 salaried and management positions in the U.S. will be eliminated as part of a project designed to reduce Delphi's Sales, General & Administrative expenses. This project was developed by Delphi with an outside management consultant, Booz Allen Hamilton ("Booz Allen"), and will be implemented beginning in 2006.  This program is intended to reduce costs attributable to salaried and management employees, and the information systems that support those employees, by approximately $450 million per year.

      27.      The largest SG&A cost reduction anticipated would arise from implementation of a shared service structure, in which Delphi's headquarters and divisions will redistribute and share a number of services such as information technology support, human resources transactions, accounts receivable, and routine sales reporting, and will outsource several services. In addition, the SG&A Project targets organization redesign, corporate streamlining, and streamlining at the divisional levels.

      28.      As part of the process, every area of Delphi's corporate and divisional operations is reviewing its own services and processes to eliminate or reduce discretionary services and

**Declaration of Mark R. Weber**

unaffordable policies, streamline administrative work, and resource work where savings can be achieved.

29. In comparing the treatment of hourly employees to salaried and management employees, it is also critical to understand the differences between the two employee groups. First, Delphi's salaried employees are not protected in their positions by a union agreement that pays above-market wages and benefits, nor are they deterred from switching employers by the prospect of starting at the bottom of a wage scale or a seniority system at a new company. The salaried employees could more easily leave Delphi tomorrow, and obtain "market" wages and benefits with another employer. In the last six months, more than 470 salaried employees have left Delphi for other career options. Accordingly, unless Delphi is able to provide market wages and benefits to salaried and management, many are and will likely continue to depart.

30. Second, some 7,250 employees – more than half of Delphi's salaried and management workforce – are engineers who are engaged in research, product development, and execution. Much of Delphi's market position depends on its technological expertise. For example, Delphi has been rated the number one automotive company in technological strength by ipIQ, an organization specializing in technology analysis, for three years in a row, and generated the third largest number of patents in the U.S. in 2003. Delphi's engineers have extremely valuable institutional knowledge of Delphi's products and processes that cannot easily be replaced by new-hires. Furthermore, there is a well-documented shortage of qualified engineers in the U.S. Nine OEMs from Germany, Japan, and Korea have invested in engineering facilities in Michigan, and Asian automakers have hired approximately 3,000 engineers in Michigan in the past year alone. The loss of engineering employees to Delphi's competitors would greatly undercut Delphi's ability to remain a profitable enterprise going forward.

**Declaration of Mark R. Weber**

I declare under penalty of perjury, and pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 31st day of March, 2006

                         /s/ Mark R. Weber_____
                         MARK. R. WEBER