# Exhibit A

1

AS FILED WITH THE SECURITIES AND EXCHANGE COMMISSION ON FEBRUARY 2, 1999

REGISTRATION NO. 333-67333

--------------------------------------------------------------------------------
--------------------------------------------------------------------------------

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549
------------------------

AMENDMENT NO. 5

TO

FORM S-1
REGISTRATION STATEMENT
UNDER THE
THE SECURITIES ACT OF 1933
------------------------

DELPHI AUTOMOTIVE SYSTEMS CORPORATION
(EXACT NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)

DELAWARE
(State or other jurisdiction of
incorporation or organization)
3714
(Primary Standard Industrial
Classification Code Number)
38-3430473
(IRS Employer
Identification Number)

5725 Delphi Drive
Troy, Michigan 48098
(248) 813-2000
(Address, including zip code, and telephone number, including
area code, of registrant's principal executive offices)
------------------------

Alan S. Dawes
Chief Financial Officer
and Vice President
5725 Delphi Drive
Troy, Michigan 48098
(248) 813-2000
(Name, address, including zip code, and telephone number,
including area code, of agent for service)
------------------------

Copies to:

| | | | |
|---|---|---|---|
| Jill Sugar Factor | Warren G. Andersen | Logan G. Robinson | Frank Morison |
| Robert S. Osborne, P.C. | General Motors | Delphi Automotive | Sarah Beshar |

their existing contracts from GM to us or to enter into new contracts to replace
these existing contracts. See "Business of Delphi--Customers--Other VMs."

WE MAY BE UNABLE TO INCREASE OUR COMPETITIVENESS IF WE FAIL TO IMPROVE OUR
LABOR RELATIONS AND ESTABLISH MORE FLEXIBLE LOCAL WORK RULES AND PRACTICES
FOLLOWING OUR SEPARATION FROM GENERAL MOTORS

   One of the principal benefits that we expect to achieve from our separation
from General Motors is increased competitiveness over time as a result of
improving our labor relations and establishing more flexible local work rules
and practices, which are very important to our business because our workforce is
highly unionized. However, we cannot assure you as to when or the extent to
which we will be able to achieve these benefits. In this regard, our largest
union, the UAW, which represents about 29% of our unionized employees, has
stated that it is on record as opposing the separation of Delphi from GM and
that, should GM decide to proceed with the transaction, the UAW can and will
aggressively work to protect the rights and interests of its members who would
be impacted by GM's distribution of Delphi common stock to the holders of its
$1 2/3 common stock. Since that time, GM and the UAW have agreed that any of our
employees who are members of the UAW and who retire on or before October 1, 1999
will be treated as GM retirees. GM and Delphi have been working with the UAW and
the other unions representing our employees to address the best interests of
their members regarding these matters. However, we cannot assure you as to the
outcome of these efforts to work with the unions. See "Business of
Delphi--Strategy--Improve Operating Performance--Labor Relations."

WE MAY INCUR MATERIAL COSTS IN CONNECTION WITH OUR SEPARATION FROM GENERAL
MOTORS

   We may incur costs and expenses, potentially including additional taxes and
employee costs, greater than those we have planned for in connection with our
separation from GM. We cannot assure you that these costs will not be material
to our business. See "--Risk Factors Relating to Our Business--Making Payments
of Pensions and Other Postretirement Employee Benefits Could Adversely Affect
Our Liquidity" and "Management's Discussion and Analysis of Financial Condition
and Results of Operations."

WE WILL BE CONTROLLED BY GENERAL MOTORS AS LONG AS IT OWNS A MAJORITY OF
OUR COMMON STOCK AND OUR OTHER STOCKHOLDERS WILL BE UNABLE TO AFFECT THE OUTCOME
OF STOCKHOLDER VOTING DURING SUCH TIME

   After the completion of this offering, GM will own about 82.3% of our
outstanding shares of common stock, or about 80.2% if the U.S. underwriters
exercise their over-allotment option in full. As long as GM owns a majority of
our outstanding common stock, GM will continue to be able to elect our entire
board of directors and to remove any director, with or without cause, and
generally to determine the outcome of all corporate actions requiring
stockholder approval. As a result, GM will be in a position to continue to
control all matters affecting our company, including:

   - the composition of our board of directors and, through it, any
     determination with respect to the direction and policies of our company,
     including the appointment and removal of officers;

- any determinations with respect to mergers or other business combinations involving our company;

- the acquisition or disposition of assets by our company;

- future issuances of common stock or other securities of our company;

- the incurrence of debt by our company;

- amendments, waivers and modifications to our supply agreement with GM and other agreements providing for our separation from GM;

- the payment of dividends on our common stock; and

13

Motors--Our Business May Be Adversely Affected if General Motors Does Not
Complete Its Divestiture of Our Company."

GM has also advised us that it would not complete the Distribution if its
Board of Directors determines that the Distribution is no longer in the best
interests of General Motors and its stockholders. GM has further advised us that
it currently expects that the principal factors that it would consider in making
this determination, as well as the principal factors that it would consider in
making the determination as to the timing, structure and terms of the
Distribution, would be:

- the market price of the Delphi common stock;

- the market price of GM's $1 2/3 common stock;

- satisfaction that the Distribution will be tax-free to GM and its
  stockholders and as to the other tax consequences of the transactions;

- the absence of any court orders or regulations prohibiting or restricting
  the completion of the Distribution; and

- other conditions affecting the businesses of Delphi or GM that make it no
  longer in the best interests of such businesses to be fully separated.

On January 13, 1999, GM received a private letter ruling from the IRS to the
effect that the Distribution would be tax-free to GM and its stockholders for
U.S. federal income tax purposes.

BACKGROUND OF THE SEPARATION. Historically, many large automotive vehicle
manufacturers, which we sometimes refer to as "VMs," have relied on in-house
components divisions to fill their supply needs. Over the past few decades,
however, the automotive industry has moved away from such vertical integration.
Instead, VMs have moved towards sourcing a substantial portion of a vehicle's
parts from independent suppliers and purchasing more fully-engineered,
integrated systems and modules rather than individual components. As a result,
VMs are now requiring their suppliers to perform many of the design, engineering
and assembly functions traditionally executed by VMs. The degree to which VMs
source from independent, outside suppliers varies by VM.

General Motors began reducing its vertical integration several years ago by
adopting a global sourcing program. We believe that this initiative was designed
to leverage GM's purchasing power and reduce its purchasing costs by enhancing
competition for its business among its suppliers on the basis of quality,
service, technology and price. As a result of the completion of the
Distribution, GM would substantially reduce its vertical integration.

BENEFITS OF THE SEPARATION. We believe that we will realize certain
benefits from our complete separation from General Motors. As an independent
company, we expect to be better able to expand our revenue base through sales to
major VM customers other than GM. We also believe that, as a fully independent
company after the completion of the Distribution, we will be better able, over
time, to establish more flexible local work rules and practices through improved
labor relations, thereby increasing our competitiveness. These and other
benefits of the separation are discussed further below.

- Increased Non-GM Sales. We believe that one of the most significant
  limitations on our ability to expand our sales to major VMs other than GM
  is a general reluctance by such VMs to source from a supplier owned by

GM. Other major VMs have shown varying degrees of reluctance to source extensively from a supplier owned by GM since GM, one of their major competitors, may be strengthened by the related profits. In addition, we believe that many major VMs remain reluctant to source from us because they fear that GM might obtain access through us to confidential information regarding their vehicle designs and manufacturing processes. This is particularly important as suppliers are increasingly performing more of the vehicle design and assembly functions traditionally executed by VMs and are thus involved earlier in the design and development stages of vehicles.

27

Notwithstanding our strict confidentiality pledge and procedures to preserve customer confidentiality, which to our knowledge have never been breached, we believe that we will remain at a competitive disadvantage in pursuing sales opportunities with major VMs other than GM while we are owned by GM. We believe that if we are established as a fully independent company, we will, over time, be able to substantially grow our sales to VMs other than GM. See "Risk Factors--Risk Factors Relating to Separating Our Company from General Motors--Our Close Relationship with General Motors Could Limit Our Potential to Do Business with Its Competitors" and "--Risk Factors Relating to Our Business--We May Be Unable to Increase Our Sales to Vehicle Manufacturers Other Than GM-North America."

- Improved Labor Relations. We believe that our complete separation from General Motors will provide us with the opportunity to improve our labor relations and, over time, establish more flexible local work rules and practices. While we have been a part of GM, the national labor agreements negotiated by GM with the unions have applied to our workforce in the United States and Canada. As a fully independent company with control of our own labor relations after the Distribution, we believe that we would have the right to negotiate regarding our own national and local labor agreements directly with the unions representing our employees. Our intent is to base such negotiations on a management-union relationship focused on sharing information, growing non-GM revenues and satisfying the automotive parts supply requirements of multiple VMs around the world. We further anticipate that by having control of our labor relations we will, over time, be able to negotiate local work rules and practices and other terms more consistent with those generally prevailing in the automotive parts industry. We believe that this would enhance our overall operational competitiveness. However, we cannot assure you as to when or the extent to which we will realize these benefits.

GM has informed us that it has satisfactorily completed discussions with the International Union of Electronic, Electrical, Salaried, Machine & Furniture Workers AFL-CIO (the "IUE"), one of the principal unions representing our employees, regarding the effects of the separation on its members. As a result of these discussions, the IUE has recognized that, upon Delphi's separation from GM, Delphi will be an independent company with its own national and local agreements with the IUE. GM has informed us that initial discussions with the United Steel Workers of America (the "USW") regarding the effects of the separation on its members were held on December 8, 1998 and that further discussions will be held with the USW. Similar discussions are expected to occur with the other unions representing our employees, but we cannot assure you as to when they will occur or as to the outcome. In this regard, our largest union, the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"), which represents about 29% of our unionized employees, has stated that it is on record as opposing the separation of Delphi from GM and that, should GM decide to proceed with the transactions, the UAW can and will aggressively work to protect the rights and interests of its members who would be impacted by the Distribution. Since that time, GM and the UAW have agreed that any of our employees who are members of the UAW and who retire on or before October 1, 1999 will be treated as GM retirees. GM and Delphi have been working with the UAW to address its concerns and will continue to do so. We intend to cooperate with GM in working together with the UAW, the IUE, the USW

and the other unions representing our employees to address the best interests of their members regarding these matters. See "Risk Factors-- Risk Factors Relating to Separating Our Company from General Motors--We May Be Unable to Increase Our Competitiveness if We Fail to Improve Our Labor Relations and Establish More Flexible Work Rules and Practices Following Our Separation from General Motors."

- Capital Financing Flexibility. A separation of our company from General Motors would also benefit our company by enhancing our capital planning flexibility. For example, we would be able to use our own stock to facilitate growth through acquisitions. Also, we would no longer have to compete with other sectors of GM for funding from GM. However, we have entered into certain agreements in connection with our separation from GM that contain covenants which restrict our ability to issue stock and incur indebtedness, including in connection with acquisitions. For a description of these covenants, see "Arrangements Between Delphi and General Motors--IPO and Distribution Agreement."

28

# Exhibit B

September 29, 1999

Mr. Richard Shoemaker
Vice President and Director
General Motors Department
International Union, UAW
8000 East Jefferson Avenue
Detroit, Michigan   48214


Dear Mr. Shoemaker:

Re:   Post-2003 Delphi Agreement

This will confirm our understanding that the Agreement next succeeding the
1999-03 UAW-Delphi Automotive Systems National Agreement will mirror
the UAW-GM National Agreement next succeeding the 1999-03 UAW-GM
National Agreement, unless the parties agree to mutually acceptable
modifications.

The agreement set forth in this letter shall not terminate or expire with the
expiration of the 1999-03 UAW-Delphi Agreement.  Instead, this letter
agreement will continue in full force and effect for the duration of the UAW-
GM National Agreement immediately following the 1999-03 UAW-GM
National Agreement, absent agreement to the contrary.

Very truly yours,

Ralph E. Handley
Executive Director, Industrial Relations
Delphi Automotive Systems

## NEW

## EXCERPTS FROM THE MINUTES

During the discussions that led to the 1999 Delphi-
UAW National Agreement, the Corporation advised the
Union of its willingness to mirror the appropriate terms
of the next GM-UAW National Agreement. The UAW,
in turn, advised the Corporation of its willingness to
consider mutually agreeable exceptions, as they have in
the 1999 Delphi-UAW National Agreement, to assure
the continued success of Delphi as an on-going business.

### EXPLANATORY COMMENTS

Self-explanatory

DAS-exmirA01

462

# Exhibit C

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, DC 20549-1004
# FORM 8-K
### CURRENT REPORT
### PURSUANT TO SECTION 13 OR 15(d) OF
### THE SECURITIES EXCHANGE ACT OF 1934
#### Date of Report (Date of earliest event reported) October 8, 2005

# GENERAL MOTORS CORPORATION

(Exact Name of Registrant as Specified in its Charter)

| STATE OF DELAWARE | 1-143 | 38-0572515 |
|---|---|---|
| (State or other jurisdiction of Incorporation or Organization) | (Commission File Number) | (I.R.S. Employer Identification No.) |

| 300 Renaissance Center, Detroit, Michigan | 48265-3000 |
|---|---|
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's telephone number, including area code (313) 556-5000

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17-CFR 240.14a-12)
☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

## TABLE OF CONTENTS

Item 8.01          Other Events

SIGNATURES

INDEX TO EXHIBIT

Exhibit 99.1          Agreement between General Motors Corporation (GM) and Delphi Automotive Systems Corporation (Delphi)
Exhibit 99.2          Benefit Guarantee – UAW (Also Exhibit A to Exhibit 99.1)
Exhibit 99.3          Model Assumption Agreement (Also Exhibit B to Exhibit 99.1)
Exhibit 99.4          Benefit Guarantee – USWA
Exhibit 99.5          Benefit Guarantee – IUE
Agreement between General Motors Corporation and Delphi Automotive Systems Corporation
Benefit Guarantee - UAW (Also Exhibit A to Exhibit 99.1)
Model Assumption Agreement (Also Exhibit B to Exhibit 99.1)
Benefit Guarantee - USWA
Benefit Guarantee - IUE

Exhibit 99.2
EXHIBIT A

## Benefit Guarantee

During these negotiations, the Union concerns about the security of pensions, retiree medical, and certain other benefits described below for UAW-represented former GM employees who are employed by Delphi Automotive Systems Corporation ("Delphi"). In order to address these concerns, GM guarantees the provision of the benefits listed below, to the extent described herein, to those UAW-represented Delphi employees who had unbroken seniority and were employed by GM under the terms of the 1996 GM-UAW National Agreement as of the spin-off of Delphi from GM on May 28, 1999 (the "Covered Employees").

a.   In the event that Delphi or its successor company(ies) has ceased doing business on or before June 1, 2004:

   1.   Covered Employees at Delphi who are laid-off will be entitled to layoff benefits available to laid-off GM employees under the GM-UAW National Agreement and Supplemental Agreements. Further, any such benefits provided by GM shall be secondary to benefits provided by Delphi, any of its subsidiaries or affiliates, or any of their successor company(ies).

b.   In the event that Delphi or its successor company(ies) has ceased doing business, terminated its pension plan covering the Covered Employees, or ceases to provide on-going credited service for the covered Employees under such pension plan due to Financial Distress, on or before the eighth anniversary of the Effective Date of the 1999-2003 GM-UAW National Agreement:

   1.   GM will provide up to 7 years of credited service at the level and scope in effect at Delphi at such time to Covered Employees working at Delphi. Further, any such benefits provided by GM shall be secondary to benefits provided by Delphi, any of its subsidiaries or affiliates or any of their successor company(ies), or the PBGC. However, in no event shall GM provide pension benefits on such credited service at a level and scope that exceeds that being provided to hourly retirees of GM.

c.   In the event that Delphi or its successor company(ies) on or before the eighth anniversary of the Effective Date of the 1999-2003 GM-UAW National Agreement (x) due to Financial Distress fails or refuses to provide post-retirement medical benefits to eligible Covered Employees retired from Delphi, or (y) due to Financial Distress reduces the level of post-retirement medical benefits for eligible Covered Employees retired from Delphi below the level of benefits which, at that time, GM is providing to its UAW-represented retirees:

1

---

   1.   GM shall guarantee such retired Covered Employees post-retirement medical benefits at the level and scope in effect for UAW-represented GM retirees at the time of the event described in c.(x) or c.(y). Further, any such coverage provided by GM shall be secondary to coverages, if any, provided by Delphi, any of its subsidiaries or affiliates, or any of their successor company(ies).

   2.   For purposes of this agreement, the term "post-retirement medical benefits" shall include hospital, surgical and medical benefits, Medicare Part B benefits, prescription drug benefits, dental, vision and hearing benefits, and any other similar benefit for retirees which is now provided, by GM to its UAW-represented retirees.

d.   In the event that Delphi or its successor company(ies) on or before the eighth anniversary of the Effective Date of the 1999-2003 GM-UAW National Agreement (x) due to Financial Distress fails or refuses to provide post-retirement life insurance benefits to eligible Covered Employees retired from Delphi, or (y) due to Financial Distress reduces that level of post-retirement life insurance benefits for eligible Covered Employees retired from Delphi below the level of benefits which, at that time, GM is providing to its UAW-represented retirees:

   1.   GM shall guarantee such retired Covered Employees the level of post-retirement life insurance coverage equal to the amount in effect for UAW-represented GM retirees at the time of the event described in clause d.(x) or d.(y). Further, such life insurance shall be subject to reduction in accordance with provisions of the plan covering UAW-represented GM retirees in effect at such time. In addition, any such coverage provided by GM shall be secondary to coverage provided by Delphi, any of its subsidiaries or affiliates, or any of their successor companies.

e.   In the event that Covered Employees on or before the eighth anniversary of the Effective Date of the 1999-2003 GM-UAW National Agreement receive pension benefits at a level below that called for in any applicable Delphi/UAW agreement or pension plan due to Financial Distress:

   1.   GM shall provide supplemental payments to such retired Covered Employees which, when combined with any pension benefits received (x) from a pension plan sponsored by Delphi, any of its subsidiaries or affiliates or any of their successor company(ies), (y) from the PBGC, and/or (z) from a pension plan sponsored by GM, result in the retired Covered Employees receiving pension benefits equal to those called for in the UAW-Delphi agreement applicable at such time.

2

**General Provisions**

GM's obligations as described in this letter will continue in effect with respect to each of the benefits described above, regardless of the expiration of any collective bargaining agreement, for as long as GM is providing the corresponding benefit to its UAW-represented employees or retirees. This agreement may be modified only by mutual agreement of the parties.

GM's obligations to provide a particular benefit under this letter shall not apply to the extent that Delphi provides a lower scope or level of such benefits to Covered Employees than that provided to UAW-represented hourly active or retired non-Covered Employees. In addition, in no event shall GM be required to provide benefits to Covered Employees at a level and scope that exceeds that being provided to UAW-represented hourly retirees of GM.

As used herein, the term "Financial Distress" means a risk affecting Delphi's continuing financial viability. The UAW cited companies with which they have a bargaining relationship as examples of the type of situation they are concerned about when referencing Financial Distress. The parties also discussed a significant drop in credit rating, reorganization in bankruptcy, and a qualified opinion by Delphi's auditors regarding Delphi's prospects as a going concern and agreed that these types of circumstances are non-exclusive examples of conditions associated with Financial Distress.

In the event that the Financial Distress is eliminated, and Delphi restores the benefits at issue to the level and scope in effect immediately before the reduction that triggered the guarantee, GM shall be relieved of its obligation for so long as Delphi continues to provide the restored level and scope of benefits.

GM's obligations as described in this letter will not be triggered by a short-term failure (i.e., less than 60 days) by Delphi to maintain the benefits and/or coverages described above, provided that Delphi is taking reasonable steps to cure such failure during such time.

3

Exhibit 99.4

### Benefit Guarantee

During these negotiations, the Union raised concerns about the security of pensions, retiree medical, and certain other benefits described below for United Steelworkers of America (USWA) represented former GM employees who are now employed by Delphi Automotive Systems Corporation ("Delphi").

In order to address these concerns, GM guarantees the provision of the benefits listed below, to the extent described herein, to those USWA-represented Delphi employees who had unbroken seniority and were employed by GM under the terms of the 1996 GM-USWA National Agreement as of the spin-off of Delphi from GM on May 28, 1999 (the "Covered Employees"). (However, such guarantees do not apply to those Delphi USWA employees employed under competitive hire agreements unless such employees are at parity for wages and benefits as of May 28, 1999.)

a. In the event that Delphi or its successor company(ies) has ceased doing business on or before June 1, 2004:

    1.   Covered Employees at Delphi who are laid-off will be entitled to layoff benefits available to laid-off GM hourly employees under the GM hourly National Agreement and Supplemental Agreements. Further, any such benefits provided by GM shall be secondary to benefits provided by Delphi, any of its subsidiaries or affiliates, or any of their successor company(ies).

b. In the event that Delphi or its successor company(ies) has ceased doing business, terminated its pension plan covering the Covered Employees and all other union-represented hourly-rate employees in the United States, or ceases to provide on-going credited service for the Covered Employees and all other union-represented hourly-rate employees in the United States under such pension plan due to Financial Distress, on or before October 18, 2007:

    1.   GM will provide up to 7 years of credited service at the level and scope in effect at Delphi at such time to Covered Employees working at Delphi. Further, any such benefits provided by GM shall be secondary to benefits provided by Delphi, any of its subsidiaries or affiliates or any of their successor company(ies), or the PBGC. However, In no event shall GM provide pension benefits on such credited service at a level and scope that exceeds that being provided to hourly retirees of GM.

c. In the event that Delphi or its successor company(ies) on or before October 18, 2007 (x) due to Financial Distress fails or refuses to provide post-retirement medical benefits to eligible Covered Employees and all other union-represented hourly-rate employees in the United States retired from Delphi, or (y) due to Financial Distress reduces the level of post-retirement medical benefits for eligible Covered Employees and all other union-represented hourly-rate employees in the United States retired from Delphi below the level of benefits which, at that time, GM is providing to its hourly retirees:

    1.   GM shall guarantee such retired Covered Employees post-retirement medical benefits at the level and scope in effect for hourly GM retirees at the time of the event described in c.(x) or c.(y). Further, any such coverage provided by GM shall be secondary to coverages, if any, provided by Delphi, any of its subsidiaries or affiliates, or any of their successor company(ies).

    2.   For purposes of this agreement, the term "post-retirement medical benefits" shall include hospital, surgical and medical benefits, Medicare Part B benefits, prescription drug benefits, dental, vision, and hearing benefits, and any other similar benefit for retirees which is now provided, by GM to its hourly retirees.

d. In the event that Delphi or its successor company(ies) on or before October 18, 2007 (x) due to Financial Distress fells or refuses to provide post-retirement life insurance benefits to eligible Covered Employees and all other union-represented hourly-rate employees in the United States retired from Delphi, or (y) due to Financial Distress reduces the level of post-retirement life insurance benefits for eligible Covered Employees and all other union-represented hourly-rate employees in the United States retired from Delphi below the level of benefits which, at that time, GM is providing to its hourly retirees:

    1.   GM shall guarantee such retired Covered Employees the level of post-retirement life insurance coverage equal to the amount in effect for hourly GM retirees at the time of the event described in clause d.(X) or d.(y). Further, such life insurance shall be subject to reduction in accordance with provisions of the plan covering hourly GM retirees in effect at such time. In addition, any such coverage provided by GM shall be secondary to coverage provided by Delphi, any of its subsidiaries or affiliates, or any of their successor companies.

e. In the event that Covered Employees and all other union-represented hourly-rate employees in the United States on or before October 18, 2007 receive pension benefits at a level below that called for in any applicable Delphi/USWA agreement or pension plan due to Financial Distress:

    1.   GM shall provide supplemental payments to such retired Covered Employees which, when combined with any pension benefits received (x) from a pension plan sponsored by Delphi, any of its subsidiaries or affiliates or any of their successor company(ies), (y) from the PBGC, and/or (z) from a pension plan sponsored by GM, result in the retired Covered Employees receiving pension benefits equal to those called for in the Delphi/USWA agreement applicable at such time.

**General Provisions**

GM's obligations as described in this letter will continue in effect with respect to each of the benefits described above, regardless of the expiration of any collective bargaining agreement for as long as GM is providing the corresponding benefit to its hourly employees or retirees. This agreement may be modified only by mutual agreement of the parties.

GM's obligations to provide a particular benefit under this letter shall not apply to the extent that Delphi provides a lower scope or level of such benefits to Covered Employees than that provided to hourly active or retired non-Covered Employees. In addition, in no event shall GM be required to provide benefits to Covered Employees at a level and scope that exceeds that being provided to hourly retirees of GM.

As used herein, the term "Financial Distress" means a risk affecting Delphi's continuing financial viability. The USWA cited companies it is aware of that another union representing GM employees has a bargaining relationship with, as examples of the type of situation they are concerned about when referencing Financial Distress. The parties also discussed a significant drop in the credit rating, reorganization in bankruptcy, and a qualified opinion by Delphi's auditors regarding Delphi's prospects as an on-going concern and agreed that these types of circumstances are nonexclusive examples of conditions associated with Financial Distress.

In the event that the Financial Distress is eliminated, and Delphi restores the benefits at issue to the level and scope in effect immediately before the reduction that triggered the guarantee, GM shall be relieved of its obligation for so long as Delphi continues to provide the restored level and scope of benefits.

GM's obligations as described in this letter will not be triggered by a short-term failure(i.s., less than 60 days) by Delphi to maintain the benefits and/or coverages described above, provided that Delphi is taking reasonable steps to cure such failure during such time.

3

Exhibit 99.5

### Benefit Guarantee

During these negotiations, the Union raised concerns about the security of pensions, retiree medical, and certain other benefits described below for International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers, AFL-CIO (IUE) represented former GM employees who are now employed by Delphi Automotive Systems Corporation ("Delphi"). In order to address these concerns, GM guarantees the provision of the benefits listed below, to the extent described herein, to those IUE-represented Delphi employees who had unbroken seniority and were employed by GM under the terms of the 1996 GM-IUE National Agreement as of the spin-off of Delphi from GM on May 28, 1999 (the "Covered Employees"). (However, such guarantees do not apply to those Delphi IUE employees employed under a competitive wage agreement as of May 28, 1999, i.e., Tier II or Tier III employees.)

a.  In the event that Delphi or its successor company(ies) has ceased doing business on or before June 1, 2004:

    1.  Covered Employees at Delphi who are laid-off will be entitled to layoff benefits available to laid-off GM hourly employees under the GM hourly National Agreement and Supplemental Agreements. Further, any such benefits provided by GM shall be secondary to benefits provided by Delphi, any of its subsidiaries or affiliates, or any of their successor company(ies).

b.  In the event that Delphi or its successor company(ies) has ceased doing business, terminated its pension plan covering the Covered Employees and all other union-represented hourly-rate employees in the United States, or ceases to provide on-going credited service for the Covered Employees and all other union-represented hourly-rate employees in the United States under such pension plan due to Financial Distress, on or before October 18, 2007:

    1.  GM will provide up to 7 years of credited service at the level and scope in effect at Delphi at such time to Covered Employees working at Delphi. Further, any such benefits provided by GM shall be secondary to benefits provided by Delphi, any of its subsidiaries or affiliates or any of their successor company(ies), or the PBGC. However, in no event shall GM provide pension benefits on such credited service at a level and scope that exceeds that being provided to hourly retirees of GM.

---

c.  In the event that Delphi or its successor company(ies) on or before October 18, 2007 (x) due to Financial Distress fails or refuses to provide post-retirement medical benefits to eligible Covered Employees and all other union-represented hourly-rate employees in the United States retired from Delphi, or (y) due to Financial Distress reduces the level of post-retirement medical benefits for eligible Covered Employees and all other union-represented hourly-rate employees in the United States retired from Delphi below the level of benefits which, at that time, GM is providing to its hourly retirees:

    1.  GM shall guarantee such retired Covered Employees post-retirement medical benefits at the level and scope in effect for hourly GM retirees at the time of the event described in c.(x) or c.(y). Further, any such coverage provided by GM shall be secondary to coverages, if any, provided by Delphi, any of its subsidiaries or affiliates, or any of their successor company(ies).

    2.  For purposes of this agreement, the term "post-retirement medical benefits" shall include hospital, surgical and medical benefits, Medicare Part B benefits, prescription drug benefits, dental, vision, and hearing benefits, and any other similar benefit for retirees which is now provided, by GM to its hourly retirees.

d.  In the event that Delphi or its successor company(ies) on or before October 18, 2007 (x) due to Financial Distress fails or refuses to provide post-retirement life insurance benefits to eligible Covered Employees and all other union-represented hourly-rate employees in the United States retired from Delphi, or (y) due to Financial Distress reduces the level of post-retirement life insurance benefits for eligible Covered Employees and all other union-represented hourly-rate employees in the United States retired from Delphi below the level of benefits which, at that time, GM is providing to its hourly retirees:

    1.  GM shall guarantee such retired Covered Employees the level of post-retirement life insurance coverage equal to the amount in effect for hourly GM retirees at the time of the event described in clause d.(x) or d.(y). Further, such life insurance shall be subject to reduction in accordance with provisions of the plan covering hourly GM retirees in effect at such time. In addition, any such coverage provided by. GM shall be secondary to coverage provided by Delphi, any of its subsidiaries or affiliates, or any of their successor companies.

e.  In the event that Covered Employees and all other union-represented hourly-rate employees in the United States on or before October 18, 2007 receive pension benefits at a level below that called for in any applicable Delphi/IUE agreement or pension plan due to Financial Distress:

    1.  GM shall provide supplemental payments to such retired Covered Employees which, when combined with any pension benefits received (x) from a pension plan sponsored by Delphi, any of its subsidiaries or affiliates or any of their successor company(ies), (y) from the PBGC, and/or (z) from a pension plan sponsored by GM, result in the retired Covered Employees receiving pension, benefits equal to those called for in the Delphi/IUE agreement applicable at such time.

3

**General Provision**

GM's obligations as described in this letter will continue in effect with respect to each of the benefits described above, regardless of the expiration of any collective bargaining agreement, for as long as GM is providing the corresponding benefit to its hourly employees or retirees. This agreement may be modified only by mutual agreement of the parties.

GM's obligation to provide a particular benefit under this letter shall not apply to the extent that Delphi provides a lower scope or level of such benefits to Covered Employees than that provided to hourly active or retired non-Covered Employees. In addition, in no event shall GM be required to provide benefits to Covered Employees at a level and scope that exceeds that being provided to hourly retirees of GM.

As used herein, the term "Financial Distress" means a risk affecting Delphi's continuing financial viability. The IUE cited companies it is aware of that another union representing GM employees has a bargaining relationship with, as examples of the type of situation they are concerned about when referencing Financial Distress. The parties also discussed a significant drop in the credit rating, reorganization in bankruptcy, and a qualified opinion by Delphi's auditors regarding Delphi's prospects as an on-going concern and agreed that these types of circumstances are nonexclusive examples of conditions associated with Financial Distress.

In the event that the Financial Distress is eliminated, and Delphi restores the benefits at issue to the level and scope in effect immediately before the reduction that triggered the guarantee, GM shall be relieved of its obligation for so long as Delphi continues to provide the restored level and scope of benefits.

GM's obligation as described in this letter will not be triggered by a short-term failure (i.e., less than 60 days) by Delphi to maintain the benefits and/or coverages described above, provided that Delphi is taking reasonable steps to cure such failure during such time.

4

Created by 10KWizard Technology    www.10KWizard.com