Hearing Date and Time: May 9, 2006 at 10:00 a.m.
Objection Deadline: April 21, 2006 at 4:00 p.m.

| | |
|---|---|
| SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP<br>333 West Wacker Drive, Suite 2100<br>Chicago, Illinois 60606<br>(312) 407-0700<br>John Wm. Butler, Jr. (JB 4711)<br>John K. Lyons (JL 4951)<br>Ron E. Meisler (RM 3026) | O'MELVENY & MYERS LLP<br>1625 Eye Street, NW<br>Washington, DC  20006<br>(202) 383-5300<br>Robert A. Siegel (RS 0922)<br>Tom A. Jerman<br>Rachel Janger<br>Jessica Kastin (JK 2288) |
| SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP<br>Four Times Square<br>New York, New York 10036<br>(212) 735-3000<br>Kayalyn A. Marafioti (KM 9632)<br>Thomas J. Matz (TM 5986) | GROOM LAW GROUP, CHTD<br>1701 Pennsylvania Avenue, NW<br>Washington, DC 20006<br>(202) 857-0620<br>Lonie A. Hassel |

Attorneys for Delphi Corporation, et al.,
   Debtor and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
: 
    In re                                    :     Chapter 11
: 
DELPHI CORPORATION, et al.,     :     Case No. 05-44481 (RDD)
: 
                          Debtors.     :     (Jointly Administered)
: 
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DECLARATION OF KEITH WILLIAMS WITH RESPECT
TO DELPHI'S MOTION FOR AUTHORITY TO REJECT
COLLECTIVE BARGAINING AGREEMENTS UNDER SECTION 1113(c)
AND MODIFY HOURLY RETIREE BENEFITS UNDER SECTION 1114(g)

I, Keith Williams, declare and state as follows.

1.  I am employed by Watson Wyatt Worldwide ("Watson Wyatt") and I am a Fellow of the Society of Actuaries, a Member of the American Academy of Actuaries, a Fellow of the Conference of Consulting Actuaries, and an enrolled actuary under the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  I am the enrolled actuary for the Delphi Hourly-Rate Employees Pension Plan ("HRP") and the Delphi Corporation Retirement Program for Salaried Employees ("SRP" and, with the HRP, the "DB Plans") maintained by Delphi Corporation ("Delphi") for its employees.  As the enrolled actuary, I supervise the annual valuations of the DB Plans, including calculation of plan liabilities for funding purposes.  As the lead actuary for the DB Plans, I supervise the annual valuations of the DB Plans for financial purposes.  I have served as the lead actuary of the DB Plans since they were established in 1999.

2.  In connection with Delphi's employee benefit plans, I also direct and oversee the information developed by Charles Thrower and Cara Jareb, who are the Watson Wyatt valuation actuary and health care actuary, respectively, for the retiree health portion of the Delphi Corporation Health Care Program for Hourly Employees ("Hourly Health Program") and the retiree health portion of the Delphi Corporation Salaried Health Care Program ("Salaried Health Program" and, with the Hourly Health Program, the "Health Programs") maintained by Delphi for its employees and retirees.

3.  Further, I direct Watson Wyatt's development of alternative forecasts and projections concerning Delphi's employee benefit plans for Delphi to consider in its business planning process.

2

**Declaration of Keith Williams**

4.      I submit this Declaration with respect to Delphi's Motion For Authority to Reject Collective Bargaining Agreements Under 11 U.S.C. § 1113(c) And To Modify Hourly Retiree Benefits Under 11 U.S.C. § 1114(g) (the "Motion").  Any capitalized terms not expressly defined herein are intended to have the meanings ascribed them in the Motion, and references to Delphi herein include the Debtors, as appropriate.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my opinion, and my experience, or are based upon knowledge obtained from Watson Wyatt employees reporting to me in the course of their duties.  If I were called upon to testify, I could and would testify to the facts set forth herein.

Delphi's DB Plans

5.      The DB Plans were established when Delphi was spun off from General Motors ("GM") in 1999.  At the time of the Spin-Off, benefits earned under GM pension plans by GM employees who moved to Delphi (and certain assets from the GM pension plans) were transferred from GM pension plans to the DB Plans established and maintained by Delphi.

6.      The HRP provides a basic monthly retirement benefit to all covered hourly employees who meet certain age and service requirements.  The benefit is calculated by multiplying the employee's months of service by a set dollar amount based on the employee's wage rate.  Normal retirement age under the HRP is 65, but the HRP also provides other types of benefits based on retirement age and years of service.  The most significant of these is commonly called "30 and out," meaning that an employee can retire after 30 years of credited service, regardless of age.  This benefit includes a supplement in the amount of the difference between the basic monthly benefit, described above, and a set dollar value, which is paid from the date of

retirement until the retiree is eligible for 80 percent of his or her unreduced Social Security benefit. The employee then becomes entitled to the full basic retirement benefit under the plan, without any actuarial reduction (even though the employee retired early).

7. Exhibit A attached hereto and incorporated herein by reference sets forth different measures of HRP liabilities that Delphi asked Watson Wyatt to calculate. The HRP liabilities are based on certain assumptions specified by Delphi, which are described in Exhibit B attached hereto and incorporated herein by reference.

8. For financial statement purposes, HRP liabilities are measured in accordance with Financial Accounting Standard ("FAS") 87. An "expense" component representing Delphi's additional accrued cost of maintaining the HRP each year is reported on Delphi's profit and loss statements and is determined in accordance with FAS 87. The FAS 87 expense for the HRP was $0.4 billion for 2005. If the HRP were to continue unchanged through 2010, the estimated FAS 87 expense for the HRP would average $0.2 billion per year from 2006 through 2010. Exhibit A, Table 1; Exhibit B at 1.

9. The FAS 87 pension liability, also referred to as the projected benefit obligation ("PBO"), represents the actuarial present value of all benefits earned as of a specified date. When the HRP was established on May 28, 1999, the fair market value of the HRP's assets was $3.8 billion and the FAS 87 PBO of the HRP was valued at $5.5 billion using a discount rate of 6.75%, resulting in unfunded benefit liabilities of $1.7 billion. As of December 31, 2005, the value of the HRP's assets was $6.6 billion and the preliminary estimated FAS 87 PBO was $8.9 billion using a discount rate of 5.5%, resulting in unfunded benefit liabilities of $2.3 billion. Exhibit A, Table 1; Exhibit B at 1.

**Declaration of Keith Williams**

10.     When the SRP was established on January 1, 1999, the fair market value of the SRP's assets was $2.4 billion, which exceeded the SRP's FAS 87 PBO value of $2.3 billion using a discount rate of 6.75%. As of December 31, 2005, the value of the SRP's assets was $3 billion and the preliminary estimate of the FAS 87 PBO was $4.5 billion using a discount rate of 5.5%, resulting in unfunded benefit liabilities of $1.5 billion. Exhibit A, Table 1; Exhibit B at 1.

11.     There are a number of reasons for the increase in unfunded pension obligations since 1999. The three primary reasons are as follows. First, benefits under the DB Plans have increased since 1999. Second, cumulative investment gains since the DB Plans' inception have been less than expected. And third, the discount rate used to measure the DB Plans' liabilities for FAS 87 purposes decreased from 6.75% as of January 1, 1999 to 5.5% as of December 31, 2005. Lower discount rates result in higher liabilities.

12.     For funding purposes, the amount of cash required to be contributed to the HRP is governed by the Internal Revenue Code and ERISA, subject to certain restrictions under bankruptcy law while Delphi is in bankruptcy. The aggregate minimum funding obligations to the HRP, assuming no changes in the HRP, are projected to be approximately $2.2 billion for calendar years 2006 through 2010. The annual contributions are as follows, assuming Delphi emerges from Chapter 11 in July 2007: $0.1 billion during calendar 2006, $1.5 billion during calendar year 2007, $0.4 billion during calendar year 2008, and $0.2 billion during calendar year 2009. Exhibit A, Table 1; Exhibit B at 1.

13.     If future benefit accruals under the HRP were eliminated effective October 1, 2006, that is, if the HRP were "frozen," and the rate of retirements increased as a result of the freeze ("Restructured HRP"), projected minimum required contributions to the HRP for calendar

5

**Declaration of Keith Williams**

years 2006 through 2010, in the aggregate, would be approximately $3.1 billion for calendar years 2006 through 2010.  The annual contributions are as follows, assuming Delphi emerges from Chapter 11 in July 2007:  $0.1 billion during calendar year 2006, $2.2 billion during calendar year 2007, $0.6 billion during calendar year 2008, and $0.2 billion during calendar year 2009.  Exhibit A, Table 4; Exhibit B at 3.

14.     The Internal Revenue Service is permitted to grant up to three "funding waivers" for a pension plan during a 15-year period if certain requirements are met.  A funding waiver permits the plan sponsor to skip an annual contribution and amortize the skipped contribution over the following five years.  If the Restructured HRP received two funding waivers, projected minimum required contributions to the Restructured HRP for calendar years 2006 through 2010 are estimated to be approximately $3.2 billion, with an additional $0.1 billion due during calendar year 2011.  Exhibit A, Table 6; Exhibit B at 3.  A third waiver would not materially change the aggregate amount of contributions, but would delay the contribution obligations by about a year.

15.     Before Delphi's bankruptcy filing, Watson Wyatt prepared a study evaluating Delphi's recent experience in areas such as retirement, withdrawal, disability, and retiree medical coverage election rates as a first step in potentially changing the actuarial assumptions used to value the liabilities of the DB Plans.  After Delphi's bankruptcy filing, it was determined that historical experience related to plan participants' decisions to retire or withdraw under the DB Plans may not be an accurate indicator of future experience.  For that reason, the results of the experience study were not used in the calculation of the 2005 year-end pension liability and projections of future expense, liabilities and contributions.  For business planning purposes, I

6

**Declaration of Keith Williams**

understand that Delphi's management included the impact of the study in their projections of pension expense in the "Steady State Scenario" business plan because the purpose of the Steady State Scenario was to represent Delphi's best estimate of costs and revenue as if no changes in the benefit structure or workforce were to occur. If Delphi had not filed for bankruptcy and sought changes in its labor agreements, the results of the study could reasonably have been used in Delphi's year-end financial results, as well as for projections.

## Delphi's Retiree Health Programs

16. The Health Programs were established when Delphi was spun off from GM in 1999 and mirrored the benefits provided by the GM health plans. The Hourly Health Program provides hourly active employees and retirees and their dependents with fully-paid health care for life.

17. The cost of providing retiree health coverage is measured in different ways for different purposes. Retiree health is included as part of "Other Post-Employment Benefits" or "OPEB" under FAS 106. In addition to retiree health coverage, OPEB includes non-pension retirement benefits, primarily life insurance. Watson Wyatt measures only retiree health, not other components of OPEB, but retiree health accounts for the vast majority of Delphi's OPEB.

18. Exhibit C attached hereto and incorporated herein by reference sets forth different measures of Health Program liabilities that Delphi asked Watson Wyatt to calculate. The Health Program liabilities are based on certain assumptions specified by Delphi, which are described in Exhibit D attached hereto and incorporated herein by reference.

19. The cash cost of providing health care to existing retirees is reflected in Delphi's cash flow statements. In 2000, the first full year after the Spin-Off, the cash cost of providing

7

**Declaration of Keith Williams**

health care to existing hourly retirees was $4 million. The cash cost of providing health care to existing hourly retirees was $140 million in 2005. In addition, pursuant to an agreement with GM, Delphi is required to make "flow-back" payments to GM for retiree health benefits paid to former Delphi employees who "flow-back" to employment with GM. Exhibit D at 1. The net flow-back payment to GM for retiree health in 2005 was $47 million. Future cash flow-back payments for retiree health also are reflected as a payable on Delphi's balance sheet. Assuming the current Hourly Health Program for retirees remained in place, no hourly employees were hired after October 1, 2005, and the assumptions outlined in Exhibit D do not change, the aggregate cash cost of health coverage for Delphi hourly retirees from 2006 through 2010 is projected to be approximately $1.4 billion. Exhibit C, Table 1; Exhibit D at 1. The aggregate cash flow-back payments are $0.5 billion. Exhibit C, Table 1; Exhibit D at 1.

20. For financial statement purposes, OPEB liabilities are measured in accordance with FAS 106. An "expense" component representing Delphi's additional accrued cost of maintaining OPEB benefits each year is reported on Delphi's profit and loss statements and is determined in accordance with FAS 106. The FAS 106 expense for hourly health care in retirement was $0.7 billion for 2005. If the hourly health care in retirement were to continue unchanged through 2010 and the assumptions outlined in Exhibit D do not change, the estimated FAS 106 expense would average $0.8 billion per year from 2006 through 2010. Exhibit C, Table 1; Exhibit D at 1.

21. The FAS 106 OPEB liability, also referred to as the accumulated postretirement benefit obligation ("APBO"), represents the actuarial present value of benefits earned as of a specified date. For hourly active employees and retirees, as of January 1, 1999, the FAS 106

APBO for retiree health benefits, that is, the liability for benefits earned to date, was $3.4 billion. As of year-end 2005, the APBO for retiree health benefits is projected to increase to $8 billion. The payable for net flow-back true-up payments to GM is estimated as of year-end 2005 at $0.9 billion. Exhibit C, Table 1; Exhibit D at 1. The APBO and flowback liabilities are unfunded.

22. For salaried active employees and retirees, as of January 1, 1999, the FAS 106 APBO for retiree health benefits was $0.7 billion. As of year-end 2005, the preliminary estimate of FAS 106 APBO for retiree health benefits was $0.9 billion. Exhibit C, Table 1; Exhibit D at 1.

23. There are several reasons for the increase in hourly retiree health APBO since 1999. The three primary reasons are as follows. First, the health care trend rate of the Hourly Health Program increased over and above assumptions during the period beginning with the Spin-Off in 1999 through 2005, increasing liabilities by 40%. Second, the discount rate used to measure hourly retiree health liabilities under FAS 106 decreased from 6.75% as of January 1, 1999 to 5.5% as of December 31, 2005, increasing liabilities by 42%. Finally, the current claims rate per hourly retiree is greater than the expected claims rate based on 1999 assumptions, increasing liability by 18%.

24. If health care coverage under the Hourly Health Program were eliminated effective October 1, 2006, the rate of retirement increased as a result of restructuring, and Delphi established Retirement Medical Accounts for hourly employees who retire on or after October 1, 2006 with an opening balance set at the 2005 year-end retiree health APBO for that group of employees and future service credited at $1,000 per year, the aggregate cash cost of health coverage for hourly retirees from 2006 through 2010 is projected to be approximately $0.2

9

**Declaration of Keith Williams**

billion for 2006 with no cash outflows for 2007 through 2010. Exhibit C, Table 4; Exhibit D at 3. Based on the same assumptions, the estimated FAS 106 expense would be negative $3.3 billion for 2006, and would average $0.1 billion per year from 2007 through 2010. Exhibit C, Table 4; Exhibit D at 3. The FAS 106 APBO for retiree health benefits would drop from $8 billion in 2006 to $1.2 billion in 2007, $1.3 billion in 2008 and 2009, and $1.4 billion in 2010. Exhibit C, Table 4; Exhibit D at 3.

25. If the Hourly Health Program for retirees were eliminated effective October 1, 2006 and all retirees elected coverage under "COBRA," the aggregate cash cost of health coverage for hourly retirees from 2006 through 2010 is projected to be approximately $0.6 billion, dropping from $0.2 billion for 2006 to $0.1 billion for 2007 through 2009, and $0.1 billion for 2010. Exhibit C, Table 3; Exhibit D at 3. Based on the same assumptions, the estimated FAS 106 expense would be negative $3.2 billion for 2006, and would average $0.1 billion per year from 2007 through 2009, and $0.0 billion in 2010. Exhibit C, Table 3; Exhibit D at 3. The FAS 106 APBO for retiree health benefits would drop from $8 billion in 2006 to $1.2 billion in 2007, $1.1 billion in 2008, $1 billion in 2009, and $0.9 billion in 2010. Exhibit C, Table 3; Exhibit D at 3.

26. For purposes of calculating the retiree health APBO under FAS 106 as of December 31, 2005, Delphi has elected to assume health care trend rates for the retiree portion of the Health Programs of 10% for 2006, 8% for 2007, 6% for 2008, 5.5% for 2009, 5.25% for 2010, and trending down to 5% for years after 2010. Delphi has used the same assumptions for the projections of future FAS 106 APBO, FAS 106 expense, and cash payments shown in Exhibit C. These assumptions are within the range of possible assumptions that are reasonable

10

**Declaration of Keith Williams**

and appropriate for this purpose.  Other assumptions also are reasonable and appropriate for this and other purposes.

27.    For example, for purposes of estimating the retiree health care expense in Delphi's 2006 through 2010 business plan, I understand that Delphi has developed a cautious, forward-looking scenario for business planning purposes based on recent historical experiences.  The Watson Wyatt assumptions are best estimates of the current trend rates based on the standards set forth in FAS 106, and therefore may differ from Delphi's assumptions for business planning purposes.

I declare under penalty of perjury, and pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 31st day of March, 2006

/s/ Keith Williams_____
KEITH WILLIAMS

11

**Declaration of Keith Williams**