**LATHAM & WATKINS LLP**
885 Third Avenue
New York, New York 10022-4802
Telephone: (212) 906-1200
Robert J. Rosenberg (RR-9585)
Mitchell A. Seider (MS-4321)
Mark A. Broude (MB-1902)
Email: robert.rosenberg@lw.com
       mitchell.seider@lw.com
       mark.broude@lw.com

Counsel for The Official Committee of Unsecured Creditors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Delphi Corporation, <u>et al.</u>, | ) | Case No. 05-44481 (RDD) |
| | ) | |
| Debtors. | ) | |
| | ) | Jointly Administered |
| | ) | |

**LIMITED OBJECTION OF THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS TO MOTION FOR ORDER UNDER
11 U.S.C. § 363(b) AND FED. R. BANKR. P. 6004
APPROVING DEBTORS' HUMAN CAPITAL HOURLY ATTRITION PROGRAMS**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 cases of Delphi Corporation ("Delphi") and certain of its affiliates (collectively, the "Debtors"), by and through its undersigned counsel, hereby submits this limited objection (the "Objection") to the Motion (the "Motion") for an Order Approving Debtors' Human Capital Hourly Attrition Programs (the "Program"). In support of this Objection, the Committee respectfully states as follows:

**PRELIMINARY STATEMENT**

1. The Committee supports the Debtors' efforts to provide its hourly employees with a "soft landing" from the impact of the Debtors' decision to reduce the size of their workforce and legacy costs. Moreover, while the Committee believes General Motors Corporation ("GM") should absorb the full cost of the Program as an unfortunate but unavoidable consequence of its spinoff of the Debtors, the Committee does not object to GM maintaining a reasonable right to file a general unsecured prepetition claim for costs it has not otherwise agreed to forego, subject to the rights of any party to object to, seek to subordinate or otherwise challenge such claim. The Motion, however, opens avenues of recovery that are far too broad, given GM's prepetition agreements. Because the collateral consequences of allowing GM to make claims in the manner contemplated in the Program are so significant and the mechanisms for doing so are not sustainable, the Committee objects to the relief in the Motion that is provided to GM.

2. As drafted, the Program would create an outsized, unnecessary and unjustifiable claim for GM against the Debtors pursuant to that certain U.S. Employee Matters Agreement dated December 22, 1998 between GM and Delphi Automotive Systems Corporation (together with attachments and term sheets appended thereto, the "U.S. Employee Matters Agreement"). While described in more detail below, in summary, applying the U.S. Employee Matters Agreement to the Program would give GM the right to demand an immediate lump sum payment from the Debtors that is equal to the present value of each flowback employee's actuarially-calculated future OPEB obligations, thereby shifting various risks from GM to Delphi and undermining the estates' defenses to GM's claims.

3. GM does not need the Court to rewrite the U.S. Employee Matters Agreement and make it applicable to the Program for GM to have redress for its claims, if any, under the

2

NY\1129174.6

Program. GM has existing vehicles under which it may assert claims against the Debtors for the obligations it owns up to in the Program. Those are the indemnity provisions in two prepetition agreements between certain Debtors and GM; the Master Separation Agreement and the Indemnity Agreement (both of which are described herein). The Committee asserts it has availing defenses to such claims.

4. Accordingly, the Committee requests that the Motion be denied unless any order authorizing the Debtors to implement the Program (a) bars GM from asserting claims arising from or related to the Program under the U.S. Employee Matters Agreement and (b) expressly preserves all objections of any party to the source, amount, allowability, or priority of any prepetition claim GM may assert against the Debtors arising from or related to the Program.[1]

**BACKGROUND**

**I.    General Background**

5. On October 8, 2005 (the "Petition Date"), thirty-nine of the Debtors filed with this Court voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On October 14, 2005, the three remaining Debtors similarly filed voluntary petitions.

6. The Committee was appointed nine days after the Petition Date, on October 17, 2005.[2] Shortly thereafter, the Committee selected Latham & Watkins LLP as its counsel,

---

[1] The Debtors have advised the Committee that GM will not receive an administrative expense claim in connection with the Program. Because the Committee believes that GM's unilateral actions have made the Program necessary in the first place, and that GM alone should be responsible for its costs, the Debtors' position on this point is correct. See 11 U.S.C. 503(b).

[2] The following members originally were appointed to the Committee: (a) Capital Research and Management Company; (b) Electronic Data Systems Corp.; (c) Flextronics International Asia-Pacific, Ltd.; (d) Freescale Semiconductor, Inc.; (e) General Electric Company; (f) IUE-CWA and (g) Wilmington Trust Company, as Indenture Trustee. Flextronics International Asia-Pacific, Ltd., has since resigned from the Committee, and Tyco Electronics Corporation has since been appointed to the Committee. The Pension Benefit Guaranty Corporation and the UAW have been added as *ex officio* members of the Committee.

3

Mesirow Financial Consulting LLC as its financial advisor and Jefferies & Company, Inc. as its investment banker.

7.  On March 22, 2006, the Debtors filed the Motion, in which they request that this Court authorize them to implement the Program. The Program represents a trilateral agreement among Delphi, GM and the United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW") to provide for the voluntary retirement of certain UAW-represented GM and Delphi hourly employees and to provide for the "flowback" of up to 5,000 UAW-represented Delphi hourly employees to GM. The Program refers to and implicates numerous prepetition agreements and, potentially, creates and enhances claims under them.

**II.  Description of the Relevant Prepetition Agreements Between GM and the Debtors**

    **A.  The Master Separation Agreement**

8.  GM, Delphi Automotive Systems Corporation (Delphi's predecessor), and certain other Delphi affiliates are parties to that certain Master Separation Agreement, dated December 22, 1998 (the "Master Separation Agreement"). Under the Master Separation Agreement, Delphi and its subsidiaries are purportedly jointly and severally liable for indemnifying GM and its subsidiaries against any claims or losses relating to or arising out of (a) the liabilities transferred to Delphi under the Master Separation Agreement or (b) Delphi's conduct of its business and affairs after January 1, 1999.

    **B.  The U.S. Employee Matters Agreement and the Flowback Agreements**

9.  GM and Delphi Automotive Systems Corporation are parties to the U.S. Employee Matters Agreement. In addition, GM, Delphi and the UAW entered into agreements governing UAW employees' ability to transfer between GM and Delphi (the "Flowback Agreements").

4

10. In general, under the U.S. Employee Matters Agreement, Delphi assumed the liabilities for all employees associated with the Delphi business prior to the spinoff from GM, including OPEB and pension liabilities. The Flowback Agreements provide that UAW hourly employees at the time of Delphi's spinoff from GM are eligible to transfer employment from Delphi to GM and vice versa through December 31, 2006. Under the terms of the U.S. Employee Matters Agreement, at the time of a flowback, the entity receiving the covered employee becomes responsible for providing lifetime healthcare and life insurance benefits to that employee. However, the receiving entity is entitled to accelerated reimbursement for future OPEB liabilities.

11. To determine the amount to which the receiving entity is entitled, actuarial valuations are performed by the receiving entity on each calendar year's group of flowback employees. Upon identification of the preceding year's flowback population, the actuaries establish an estimated pattern for cessation of employment (whether by retirement, death, or quitting) for the group. That cessation of employment schedule remains constant for the respective annual flowback group and will be utilized to determine the timing of payments due to GM for the group of flowbacks in a given year. Settlement is made in the form of cash to the appropriate entity for employees that were actuarially expected to retire in the preceding year. The settlement includes the amount accrued at the time of flowback and grown with interest from the point of flowback to the settlement date for the actuarially estimated number of flowbacks that retire, die or quit during the year.

    **C.**    **The UAW Benefit Guarantee and the Indemnity Agreement**

12. As part of the spinoff, GM and the UAW entered into that certain Benefit Guarantee (the "UAW Benefit Guarantee"), pursuant to which GM agreed to provide pension

5

and OPEB benefits to UAW-represented Delphi employees who had unbroken seniority and were employed by GM under the terms of the 1996 GM-UAW National Agreement as of the spinoff, if certain contingencies arise.

13. Under the UAW Benefit Guarantee, GM is obligated to provide OPEB to covered employees if, on or before the eighth anniversary of the effective date of the 1999 GM-UAW collective bargaining agreement, Delphi either (a) due to Financial Distress, fails or refuses to provide OPEB to eligible Covered Employees retired from Delphi or (b) due to Financial Distress, reduces the level of OPEB for eligible covered employees retired from Delphi below the level of benefits which, at that time, GM is providing to its own UAW-represented retirees. GM guaranteed such retired covered employees' OPEB at the level and scope in effect for UAW-represented GM retirees at the time Delphi fails or refuses to provide such benefits, or reduces the level of such benefits.

14. Moreover, if Delphi (a) ceases doing business, (b) terminates its pension plan covering the covered employees or (c) ceases to provide ongoing credited service for the covered employees under its pension plan, as a result of financial distress on or before the eighth anniversary of the effective date of the 1999 GM-UAW collective bargaining agreement, then GM will provide up to seven years of credited service at the level and scope in effect at Delphi at such time to the covered employees.

15. One year after entering into the Master Separation Agreement, GM and Delphi signed an indemnity agreement, dated December 22, 1999 (the "Indemnity Agreement"), relating to the UAW Benefit Guarantee. Under the Indemnity Agreement, Delphi purportedly must indemnify GM against any losses and liabilities relating to all benefits provided by GM under the

6

UAW Benefit Guarantee, all third party claims or settlements relating to any benefits provided by GM under the UAW Benefit Guarantee and all collection efforts by or on behalf of GM.

## OBJECTION

16. No order approving the Program should allow for GM to assert a claim under the U.S. Employee Matters Agreement. No order approving the Program should in any way limit the right of any party to object to, seek to subordinate or otherwise challenge on any basis, including source, amount, allowability, or priority, any claim of GM. As the Committee has stated in previous filings with this Court, GM's claims against the Debtors are either contingent or unliquidated (and may be disallowed in their entirety), subject to subordination or recharacterization, or otherwise subject to challenge on their merits. Well before parties had a meaningful opportunity to understand the prepetition agreements between GM and Delphi, GM obtained for itself the right to set off claims against the Debtors pursuant to the final DIP financing order that was entered by this Court on October 28, 2006. This setoff right should not be allowed to transform any allowed prepetition general unsecured claim of GM into a secured claim to the extent of the setoff right. Furthermore, the relationship between GM and Delphi may give rise to claims that the Debtors can assert against GM, which could affect the amount and priority of any claims asserted by GM as well as provide the Debtors with a substantial affirmative recovery from GM.

17. The Debtors and Committee have worked cooperatively toward a common understanding of the impact of the Program on the Debtors' estates. The Committee accepts and agrees with the Debtors' position that the Program does not prejudice the right of any interested party (including the Debtors and the Committee) to challenge the allowability, amount or priority of any claims asserted by GM. The Debtors have also clarified for the Committee that GM's

7

claims with respect to OPEB or health care and life insurance for active employees under the Program would not be subject to objection on the basis that the claims were not assertable under the U.S. Employee Matters Agreement. As noted above and explained below, the Motion should be denied to the extent it allows the U.S. Employee Matters Agreement to serve as a vehicle for GM's claim under the Program. Furthermore, the Program is a trilateral agreement and neither GM nor the UAW has stated that the Committee's and Debtors' understanding of the Program's limits is acceptable to them. Accordingly, the Committee believes the Court and all parties in interest should be aware of how GM, for instance, could use the Program to improve its position against the estates' creditors. Parties should bear in mind that the agreements subject to the Program may be subject to avoidance in whole or in part, or subject to rejection by the Debtors. Thus, neither these agreements nor any of their conditions precedent should not be validated prematurely. Under no circumstances should they be rewritten for GM's benefit.

18. Several provisions of the Program may be, and the Committee expects, will be, asserted to create or liquidate allowed claims against the Debtors in favor of GM. For instance, paragraph 7.b. of the Program, provides, in part, that certain obligations assumed by GM under the Program

> shall be conclusively deemed to be comprehended by, included within, and shall constitute a prepetition, general unsecured claim assertable by GM against the estate of Delphi Corporation under the U.S. Employee Matters Agreement (including without limitation, related flowback agreements and the UAW-GM-Delphi Memorandum of Understanding – Benefit Plan Treatment and the UAW-GM-Delphi Flowback Agreements contained in the 1999 and 2003 GM-UAW and Delphi-UAW Contract Settlement Agreements), Delphi's Agreement dated December 22, 1999 to indemnify GM for its liability under the Benefit Guarantee as if all conditions for the triggering of GM's claim shall have occurred, and

8

NY\1129174.6

>   Delphi's general indemnity of GM under the Master Separation Agreement.[3]

## I. Flowbacks and "Check the Box" Retirements

19. Pursuant to paragraph 2 of the Program, GM would commit to accepting 5,000 flowback active UAW employees from Delphi by a target date of September 1, 2007. This target date may be extended, as set forth in the Program. Upon an employee's flowback to GM, GM would become obligated for the OPEB obligations relating to the flowback employees.

20. Paragraph 4 of the Program provides that any Delphi UAW employee electing to retire under the Program may choose either to retire from Delphi or to flow back to GM for purposes of retirement (the so-called "check the box" option). Any employee choosing to flow back to GM for purposes of retirement would be considered a flowback to GM effective as of the day of the employee's retirement for purposes of the U.S. Employee Matters Agreement and all other GM, UAW and Delphi agreements covering flowbacks. Paragraph 7.b. of the Program states that "any obligations assumed by GM under this Agreement with respect to OPEB under Paragraph 4 … shall be conclusively deemed to be comprehended by, included within, and shall constitute a prepetition, general unsecured claim assertable against the estate of Delphi Corporation …"

21. Pursuant to the U.S. Employee Matters Agreement, once it receives a flowback employee from Delphi, GM would administer that employee's future post-employment health care and life insurance benefits. GM's OPEB obligation for each employee would consist of ongoing periodic payments for the employee's lifetime. Under the U.S. Employee Matters

---

[3] Paragraph 7.c. of the Program provides that it "is without prejudice to any interested party (including the parties to this Agreement and the Official Committee of Unsecured Creditors) in all *other* aspects of Delphi's Chapter 11 cases including … all claims administration and allowance matters." (emphasis added). However, because of the presence of the word "other" in that paragraph, it is unclear whether the parties intended for the Debtors or the Committee to retain the right to challenge any GM claims that may arise under the Program.

9

NY\1129174.6

Agreement, the cost of these benefits for each flowback employee's lifetime is calculated using actuarial assumptions, and the present value of that cost is billed and is payable to GM in a lump sum. As such, the Debtors' payment obligation to GM under the U.S. Employee Matters Agreement with respect to OPEB obligations for the 5,000 flowback employees and the "check the box" retirees would be in the billions of dollars.[4] Without the benefit of the relief provided in the Motion, GM would have to demonstrate that the U.S. Employee Matters Agreement is applicable to flowback employees subject to the Program *and* is assertable against Delphi Corporation.

22.  If it were approved as written, the Motion would allow GM to assert claims under the U.S. Employee Matters Agreement against "the estate of Delphi." The Motion defines "Delphi" as Delphi Corporation. Delphi Corporation is not party to the U.S. Employee Matters Agreement. The parties to that agreement are General Motors Corporation and Delphi Automotive Systems Corporation. The Motion states that, among others, the Flowback Agreements are included within the U.S. Employee Matters Agreement. The expiration date of the Flowback Agreements is December 31, 2006. Under the Program, however, GM would receive claims under the U.S. Employee Matters Agreement for flowbacks until no earlier than September 1, 2007.

23.  With respect to whether GM may assert claims arising from or related to the Program under the US Employee Matters Agreement, the Motion requires post petition rewriting of a prepetition agreement to change the identity of the debtor party and extend the expiration date. Furthermore, if Delphi Automotive Systems Corporation (the debtor that is party to the

---

[4] Watson Wyatt is the actuary that calculates GM's claim against the Debtors with respect to the future OPEB obligations for flowbacks. Watson Wyatt also serves as the Debtors' actuary. The Committee believes that GM has used Watson Wyatt to calculate these claims against the Debtors on behalf of GM since the spinoff.

10

NY\1129174.6

U.S. Employee Matters Agreement) rejected the U.S. Employee Matters Agreement or if that agreement were determined to be non-excutory[5], then the bases of GM's claim against any of the Debtors relating to the future OPEB obligations of flowback employees would be the indemnification provisions of the Master Separation Agreement and the Indemnity Agreement. Unlike an indemnity claim under the Master Separation Agreement and the Indemnity Agreement where the right to payment, if any, is not enforceable until the obligation subject to indemnity is actually paid, the U.S. Employee Matters Agreement accelerates and fixes GM's claim. Instead of seeking reimbursement only if and when it actually pays OPEB obligations, GM may assert a claim against the Debtors for the present value of the entire actuarially calculated future cost of OPEB obligations before paying any of those obligations. While the Debtors have not yet sought to reject the U.S. Employee Matters Agreement, they very well may do so (and the Committee believes, should do so to the extent the agreement is executory) in the future.

24.    In addition to accelerating a GM claim, allowing the use of the U.S. Employee Matters Agreement as a source for a GM claim under the Program shifts risks from GM to Delphi. Under the U.S. Employee Matters Agreement, the Debtors' payment obligation to GM for flowback employees' future OPEB obligations would not be reduced even if GM reduces or terminates its obligations to provide OPEB to its own employees before or after the expiration of its current collective bargaining agreement with the UAW in 2007.[6] This is because the actuarial

---

[5] The Committee reserves its rights with respect to the question of whether the US Employee Matters Agreement is executory and otherwise reserves its right to assert any defense or take any other action with respect to any claim of GM or any other party.

[6] Indeed, GM has already reduced the OPEB it will provide in the future to its retired hourly employees who were represented by the UAW. On March 31, 2006, the United States District Court for the Eastern District of Michigan approved a settlement among GM, the UAW and a class representing retired GM hourly employees, pursuant to which GM reduced the level of OPEB it would provide to the members of the class. The settlement agreement

11

assumptions upon which GM calculates its claim against the Debtors under the U.S. Employee Matters Agreement are based on the level of OPEB benefits GM *currently* provides to its own employees, and does not take into account the potential future reduction in the level of benefits GM would provide to its employees. Charging the Debtors in full for flowbacks' future OPEB obligations now, and simply reducing or eliminating OPEB for its own employees and retirees later, is just one way in which GM could realize an enormous windfall to the Debtors' detriment if it receives a claim through the U.S. Employee Matters Agreement under the Program.

25. In addition, under the U.S. Employee Matters Agreement, the Debtors' payment obligation to GM would not be reduced if GM's actual OPEB costs for any particular employee end up being lower than what was calculated. For example, if an employee dies only one year after flowing back to GM, GM would realize a huge windfall because it (a) would have received from the Debtors the present value of the actuarially calculated amount of GM's future OPEB obligations on account of the employee (for example, $200,000 per employee), but (b) would have only paid one year of actual OPEB obligations on account of that employee.

26. The U.S. Employee Matters Agreement also removes the contingency of GM's indemnity claim under the Master Separation Agreement and the Indemnity Agreement (*i.e.*, the actual payment of OPEB obligations over time). Thus, by allowing GM to assert a non-contingent, fully liquidated claim against the Debtors under the U.S. Employee Matters Agreement, the Program could undermine any objection to GM's claim under section 502(e)(1) of the Bankruptcy Code. If GM's rights are not expanded beyond a straightforward indemnity

---

would be effective indefinitely, unless either GM or the UAW decide to terminate the settlement at some time after September 14, 2011. In its motion in support of final approval of the class action settlement, GM repeatedly claimed that OPEB for the UAW employees and retirees were not vested. *See* General Motors Corporation's Motion of Final Approval of Class Action Settlement, at 24-28 (E.D. Mich., Case No. 05-73991 (RHC), Docket No. 1360). Specifically, GM asserted that it had clearly expressed its right to unilaterally modify or terminate retiree benefits altogether.

12

NY\1129174.6

claim, then section 502(e)(1) of the Bankruptcy Code, of course, would be a basis to object to a request from GM for recovery of amounts it might pay in the future.[7]

27. A GM claim in connection with the OPEB obligations for the 5,000 flowback employees and those who choose to retire from GM under their "check the box" option may impair the Debtors' ability to deal with their OPEB liabilities under section 1114 of the Bankruptcy Code. The amount of GM's potential claim as calculated under the U.S. Employee Matters Agreement would dwarf the amount of a claim that would be asserted against the Debtors if they terminated or reduced OPEB under section 1114 of the Bankruptcy Code. A claim under section 1114 of the Bankruptcy Code would ordinarily be equal to the reduction in OPEB only for the remainder of the term of Delphi's collective bargaining agreement with the UAW.[8] On the other hand, under the U.S. Employee Matters Agreement, GM's claim for future OPEB provided to flowback employees and those who decide to retire from GM is not limited to the term of the current collective bargaining agreement between Delphi Corporation and the UAW.

28. Finally, the Program would provide an entirely new claim in favor of GM for the health care and life insurance benefits it provides to *active* employees that flow back to GM.

---

[7] For example, section 502(e)(1)(B) of the Bankruptcy Code provides that the court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor, to the extent that such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of the claim. *See* 11 U.S.C. § 502(e)(1)(B).

[8] The legislative history of section 1114 of the Bankruptcy Code states that claims of retirees under that section should be reduced to present value:

> If the present value of the health insurance benefits of retirees is $100 million at the time the petition is filed and the court orders a modification reducing benefit payments by $25 million, the retirees have an unsecured claim for the full $25 million. If every unsecured claimant receives 50 cents on every dollar, retirees would receive $12.5 million in addition to the continuation of 75 percent of their original health benefit.

S. Rep. No. 119, 100th Cong., 1st Sess. 1, 6 n.2, *reprinted in* 1988 U.S. Code Cong. & Admin. News, 683, 688 n.2.

13

Under the U.S. Employee Matters Agreement, the Indemnity Agreement and the Master Separation Agreement, GM does not have a basis to assert a claim against the Debtors with respect to these obligations. As counsel for the Debtors stated in his April 3, 2006 response to counsel for the Committee, the Debtors understand that GM's claims would not be subject to objection on the basis that the claims were not assertable under these agreements. See Exhibit A. The Court should not approve the Motion unless the U.S. Employee Matters Agreement is removed as a basis for a GM claim arising from or related to the Program.

## II.     The Lump-Sum Payment for Retirement-Eligible Employees

29.     Pursuant to paragraph 3.a.i. of the Program, each Delphi UAW employee who currently is eligible to retire under the Delphi Hourly-Rate Employees Pension Plan would be eligible to receive a lump-sum incentive payment in the amount of $35,000 in exchange for his or her agreement to retire. The incentive payment would be retroactive to cover eligible Delphi UAW employees who have retired since October 1, 2005. GM would make this incentive payment to the eligible employees who accept this proposal. Though nothing in the Program establishes whether GM may assert claims against the Debtors with respect to this part of the Program, the Committee requests that any order approving the Motion specifically provide that the source, amount, allowability, or priority of any claim GM may assert with respect to this part of the Program be subject to challenge on any grounds.

## III.    GM's Benefit Guarantee for Certain Employees

30.     Paragraph 7.d. of the Program provides, in part, that if Delphi reduces or eliminates its healthcare and life insurance coverage to its active UAW employees, then GM would subsidize such coverage to employees participating in paragraph 3.b. of the Program (*i.e.*,

14

employees with at least 27 and less than 30 years of credited service who participate in the pre-retirement program) up to the level provided to GM-UAW active employees.

31.     The reason that this provision is included in the Program at all is unclear. Pursuant to the UAW Benefit Guarantee, GM already guaranteed to provide OPEB to certain UAW employees retired from Delphi, if Delphi reduces or stops providing OPEB to those employees due to financial distress.  If GM truly is not expanding the scope of its obligations under the UAW Benefit Guarantee, then the inclusion of this provision in the Program would be redundant.  However, it is the Debtors' understanding that reductions in health care and life insurance benefits to active Delphi employees that participate in the pre-retirement program set forth paragraph 3.b. are not covered under the UAW Benefit Guarantee.  The Debtors further understand that to protect the health care and life insurance benefits of the employees who participate in paragraph 3.b. of the Program in case the Debtors reduce those benefits, GM would provide the difference between the level of benefits provided by the Debtors and the level of benefits GM provides to its own active employees.

32.     At this time, GM holds only a contingent, unliquidated claim against the Debtors under the Benefit Guarantee and the Indemnity Agreement for OPEB provided to Delphi retirees. There is no reason to grant GM a liquidated allowed claim in connection with benefits it might possibly provide to the Debtors' employees who participate in paragraph 3.b. of the Program. Accordingly, any order approving the Motion should affirmatively state that nothing in such order creates or allows any claim against the Debtors in favor of GM.

**IV.     Eligibility for Pro-Rata Pension Benefits**

33.     Paragraph 7.f. of the Program provides that an employee retiring from GM under paragraph 1.b. with credited service under the Delphi pension plan would be considered eligible

15

to retire under the Delphi plan with eligibility for pro rata pension benefits. The extent of the Debtors' obligations arising from this provision is unclear. For example, if an employee worked at GM for 23 years and then worked at Delphi for 7 years before retiring, the Program does not address whether the Debtors would be liable for 7/30 of the employee's pension, 100% of the employee's pension, or some other amount. It is the Debtors' understanding that the Debtors would be liable for 100% of the pension, even though that employee had only worked for the Debtors for 7 out of 30 years. See Exhibit A. To the extent Delphi's pension plan was underfunded by GM at the time of the spinoff, this creates a windfall for GM by transferring the responsibility for the underfunding in the retiree's pension to Delphi from GM. Thus, the order approving the Motion should provide that any claim of GM with respect to paragraph 7.f. of the Program would not be allowed at this time, and would remain subject to challenge on any ground, including, but not limited to, GM's failure to properly fund the Delphi pension plan at the time of the spinoff.

## V. A "Soft Landing" For Employees Should Not Become A *Sub Rosa* Plan Of Reorganization

34. A debtor may not "short circuit the requirements of a reorganization plan by establishing the terms of the plan *sub rosa*" in connection with a proposed sale or use of assets. *Pension Benefit Guaranty Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983) (refusing to permit a sale of substantially all of the debtors' assets where the terms of that sale "had the practical effect of dictating some of the terms of any future reorganization plan"); *see also Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1227 (5th Cir. 1986). To ensure that the Program is not used as a *sub rosa* plan, any order authorizing the

16

Program should state that neither the treatment of any claims against the Debtors nor the defenses to any such claims under any chapter 11 plan are set by the Program.

**VI.     The Debtors' Request for Authority to
         Enter Into Similar Programs Without Court Order**

35.     By the Motion, the Debtors request blanket authority to enter into other agreements providing for "reasonably comparable (as to the Debtors' obligations)" hourly attrition programs for certain of their other union-represented employees and to implement such programs, presumably without further Court order.  An order granting the Motion should require any such agreements will be subject to the review and right of the Committee to request and have a hearing before any such agreements become effective.

36.     Debtors' counsel has proposed a new provision in the order approving the Program to handle this concern,  Under the Debtors' proposal, the order would provide that the Debtors would give written notice of proposed new hourly attrition program to counsel for the Committee.  The Committee would then have only three business days to review the terms of the proposed program and to object.  If the Committee were not to object within the three business day period, the Debtors would be authorized to enter into the proposed hourly attrition program.

37.     Though the Committee appreciates the Debtors' willingness to add this provision in the proposed order, it believes that three business days simply is not long enough for it to review the terms of the program and arrive at a reasoned conclusion about whether to support or oppose it.  Indeed, given this short time, the Committee likely would have to file an objection to each new proposed program simply to give itself enough time to perform due diligence.  Accordingly, the Committee requests entry of an order providing it at least ten business days to review and object to each new hourly attrition program.  The order should also provide that after such an objection is filed, if the Debtors and the Committee are unable to achieve a consensual

17

resolution, the Debtors may not take any further steps to implement the proposed new program without first obtaining Court approval of entry into such program upon at least five business days' notice prior to a hearing as scheduled by this Court.

NY\1129174.6

**WHEREFORE,** the Committee respectfully requests that this Court deny the Motion unless any order approving the Motion expressly provides that (a) the U.S. Employee Matters Agreement (including its Attachments and Term Sheets) may not be used as a basis for claims by GM arising from or related to the Program, (b) the right of any party to object to, seek to subordinate, or otherwise challenge on any grounds the source, amount, allowability, or priority of GM's claims against the Debtors, including but not limited to those claims arising under the Program, is fully reserved (c) the order does not shield from avoidance or rejection any prepetition agreement and (d) if the Debtors seek to enter into additional agreements under the Program, the Committee be provided at least ten business days to review and object to those agreements, and that if the Debtors and the Committee are unable to achieve a consensual resolution of the Committee's objection, the Debtors may not take any further steps to implement the agreements without first obtaining Court approval upon at least five business days' notice prior to a hearing. The Committee also requests that this Court grant it such other relief as is just and proper.

Dated: April 4, 2006
       New York, New York

                                         **LATHAM & WATKINS LLP**

                                         By: /s/ Robert J. Rosenberg
                                               Robert J. Rosenberg (RR-9585)
                                               Mitchell A. Seider (MS-4321)
                                               Mark A. Broude (MB-1902)
                                               885 Third Avenue, Suite 1000
                                               New York, New York 10022
                                               Telephone: (212) 906-1200

                                         Attorneys for the Official Committee
                                         of Unsecured Creditors