**Hearing Date and Time:  April 7, 2006 at 10:00 a.m.**

WHITE & CASE LLP

1155 Avenue of the Americas

New York, New York 10036-2787

(212) 819-8200

Glenn M. Kurtz (GK-6272)

Gerard Uzzi (GU-2297)

Douglas P. Baumstein (DB-1948)


Wachovia Financial Center

200 South Biscayne Blvd., Suite 4900

Miami, Florida 33131

(305) 371-2700

Thomas E Lauria (Admitted *Pro Hac Vice*)

Frank L. Eaton (FE-1522)

Linda M. Leali


ATTORNEYS FOR APPALOOSA
MANAGEMENT L.P.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| Delphi Corporation, <u>et</u> <u>al.</u> | ) | Case No. 05-44481 |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |

**APPALOOSA MANAGEMENT L.P.'S SUPPLEMENTAL OBJECTION TO MOTION**
**FOR ORDER UNDER 11 U.S.C. § 363(b) AND FED. R. BANKR. P. 6004 APPROVING**
<u>**THE DEBTORS' HUMAN CAPITAL HOURLY ATTRITION PROGRAMS**</u>

TO:    THE HONORABLE JUDGE ROBERT D. DRAIN
       UNITED STATES BANKRUPTCY JUDGE

Appaloosa Management L.P. ("Appaloosa"), collectively with and through certain of its

affiliates, one of Delphi Corporation's ("Delphi") largest shareholders, beneficially owning

approximately 9.3% of Delphi's issued and outstanding shares, by and through its undersigned

counsel, hereby submits this supplemental objection (the "Supplemental Objection") to the

Motion for an Order under 11 U.S.C. § 363(b) and Fed. R. Bankr. P. 6004 Approving the

Debtors' Human Capital Hourly Attrition Programs (the "Motion") of Delphi and its affiliated

debtors (collectively, with Delphi, the "Debtors").  In support of this Supplemental Objection,

Appaloosa respectfully states as follows:

## PRELIMINARY STATEMENT

   1.  Delphi faces a difficult task.  It is so burdened with out-of-market labor

costs that have been imposed by its former parent (and its largest on-going customer), General

Motors Corporation ("GM"), that most of the operations of its U.S. Debtor subsidiaries cannot be

salvaged and must now be wound down or disposed of, and the survival of the remainder of its

U.S. operations turns on the ability to materially reduce and right-price their workforce.

   2.  No one reasonably disputes that a price must be paid to Delphi's

employees in connection with the exit from unprofitable U.S. businesses and the effort to

rehabilitate those U.S. businesses that can be operated profitably.  However, the basic questions

that must be answered are difficult and are already the subject of heated dispute: how much

should be paid, and how should the responsibility for such payment be allocated between

Delphi's stakeholders and those of GM?  The answers to these questions will determine not only

the terms on which Delphi will be reorganized, but also the amount and quality of the recovery

of Delphi's creditors and whether Delphi's shareholders receive anything in these chapter 11

cases, or instead, are wiped-out.  One thing at this juncture is clear: Delphi's stakeholders are

entitled to the protections of the chapter 11 process and those of GM, at the present, are not.

   3.  Against this backdrop, concerns regarding the Motion and the Hourly

Attrition Programs it seeks authority to implement on an expedited basis are both obvious and

serious.  As a threshold matter, given that the Hourly Attrition Programs will impact thousands

of the Debtors' workers, determine the status of substantially all of the Debtors' U.S. assets and

operations, and result in the assertion of hundreds of millions (if not billions) of dollars of claims

by GM, the question must be asked if this is the type of relief that can be granted without the due

process protections of a chapter 11 plan process; certainly, it would appear to be inappropriate to

compromise the rights afforded Delphi's stakeholders by the chapter 11 process for the benefit of

GM's.  At the very least, is this the type of relief that, as the Debtors argue, should be considered

on shortened notice (without any showing of extenuating circumstances) and sheltered from a

more penetrating level of scrutiny by reliance on the Debtors' purported exercise of their

business judgment?

        4.        As importantly, the Motion does not set forth fundamental information

and analysis that would permit the Debtors' stakeholders or the Court to evaluate independently

the propriety and advisability of authorizing the proposed Hourly Attrition Programs.  The

Debtors characterize the Hourly Attrition Programs as "a critical first step" in the anticipated

transformation of their "workforce from legacy wages and benefits to a competitive labor cost

structure" (Motion ¶ 22), but omit any meaningful analysis of the costs and benefits of the

programs under the existing range of realistic outcomes; potential outcomes that currently

include, without limitation, the shutdown of 21 of the Debtors' 29 U.S. plants (as recently

proposed by the Debtors), the rejection of the Debtors' collective bargaining agreements, and

alternatively, a reasonable range of consensual resolutions.  As such, the Debtors have not met

their burden of providing tangible support for any perceived economic or cash flow benefits from

the Hourly Attrition Programs, nor have they quantified the costs (including, without limitation,

potential increases in minimum pension funding obligations and, more importantly, potential

claims of GM that do not appear to be capped at an amount equivalent to the Debtors' present

legal obligations).  Absent an order that GM's claims cannot exceed the amount of Delphi's current enforceable obligations to the employees who participate in the Hourly Attrition Programs, or a meaningful presentation from the Debtors regarding the programs' costs and benefits, there is no ability to determine whether the programs are in the best interest of any of the Debors' estates.

5.    The analysis is made more difficult by the Debtors' apparent determination to wind down a significant portion of its U.S. operations.  If the plants are to be shut down or disposed of by 2008, why incur potential liability for OPEB obligations as though they are vested for life? Moreover, given that the adoption of the Hourly Attrition Programs is not a trigger event under GM's benefit guaranty agreements, why treat it as such and expose the Delphi estate to claims that materially exceed Delphi's existing liability (rather than permitting such prospective burdens to flow directly to the appropriate Debtor subsidiary where the participating employees worked)?

6.    Given these unanswered questions and the materiality and magnitude of the implications of implementing the Hourly Attrition Programs, the Motion should be adjourned or denied pending a more complete development of the landscape against which the programs can be evaluated.

## BACKGROUND

7.    On March 22, 2006, the Debtors filed the Motion, seeking expedited authority to (a) implement a proposed attrition/flowback arrangement covering workers represented by the UAW, and (b) negotiate and implement similar deals covering workers represented by the Debtors' other union.

8.      Promptly after receiving notice of the Motion, Appaloosa requested information from the Debtors regarding the Hourly Attrition Programs.  Such requests were made first informally and then through formal discovery requests, but the Debtors declined to produce discovery in the absence of a filed objection.  Accordingly, on March 30, 2006, Appaloosa filed its preliminary objection to the Motion (the "Preliminary Objection") for the purpose of framing potential concerns regarding the Hourly Attrition Programs and to prompt the Debtors' cooperation with Appaloosa's discovery rights under the Federal Rules of Bankruptcy Procedure.  As set forth in the Preliminary Objection, the Motion leaves unaddressed material and relevant matters that are properly before the Court in determining whether implementation of the Hourly Attrition Programs should be authorized.

9.      On Thursday, March 30, 2006, counsel for Appaloosa "met and conferred" with counsel to the Debtors regarding the scope of discovery and designation of Rule 30(b)(6) deponents.  On Friday, March 31, 2006, Appaloosa executed a Stipulation and Agreed Protective Order (the "Protective Order") substantially in the form of the protective order executed by the parties in connection with Appaloosa's Motion Pursuant to 11 U.S.C. § 1102(a)(2) for an Order Directing the United States Trustee to Appoint an Equity Committee in these Chapter 11 Cases.  Commencing on Monday, April 3, 2006 at approximately 2:30 p.m., the Debtors began producing documents to Appaloosa's counsel.

10.      On March 31, 2006, the Debtors filed with the Court their (i) Motion for Order Under 11 U.S.C. § 1113(c) Authorizing Rejection of Collective Bargaining Agreements and Under 11 U.S.C. § 1114(g) Authorizing Modification of Retiree Welfare Benefits and memorandum of law in support thereof (the "1113/1114 Motion"), and (ii) Motion for Order

Under 11 U.S.C. § 365 and Fed. R. Bankr. P. 6006 Authorizing Rejection of Certain Executory

Contracts with General Motors Corporation (the "GM Rejection Motion").

11.    In the 1113/1114 Motion, the Debtors discuss "Competitive Benchmark

Proposals" that provided for (a) modification of base hourly wage rates to include separate

starting and base wages competitive with average wages in the industry, (b) elimination of cost

of living allowances, (c) reduction of overtime and shift premiums, (d) reduction of the number

of paid holidays to ten days, (e) reduction of vacation eligibility, (f) modification of profit

sharing plans, (g) modifications of health care provisions, (h) modification of life and disability

provisions, (i) elimination of restrictions on Delphi's ability to close, sell, consolidate, or

otherwise dispose of plants, assets and business units, and (j) the elimination of the JOBS Bank

and other commercially unsound programs and requirements.

12.    According to the 1113/1114 Motion, on March 24 and 25, 2006, the

Debtors provided their unions with the "GM Consensual Proposals," which provide for an

average base wage of $22 per hour for current employees (compared to $12.50 in the

Competitive Benchmark Proposals) until September 3, 2007.  Thereafter, wages would be

reduced to an average base wage of $16.50 per hour for existing employees who would also

receive a $50,000 buydown.  In addition, the proposal would provide for a modified dental plan,

a defined contribution pension plan, and a retiree medical plan.

13.    On March 31, 2006, Delphi announced a massive proposed restructuring

of its U.S. operations, including the closing of 21 of its 29 U.S. plants.  See Delphi Corp.,

Current Report (Form 8-K) (March 31, 2006).

## SUPPLEMENTAL OBJECTION

### I.

### BY NOT ANALYZING THE HOURLY ATTRITION PROGRAMS IN LIGHT OF THE BUSINESS OBJECTIVES DEBTORS ARE PURSUING, DEBTORS HAVE FAILED TO EXERCISE THEIR BUSINESS JUDGMENT

14.     To date, the Debtors have only provided the barest of financial and economic analysis regarding how the Hourly Attrition Programs would impact the Debtors and their operations, let alone how the Hourly Attrition Programs fit in to the recently announced plant shut-downs.  Given the massive proposed restructuring and plant shut-downs, coupled with the rejection of over 5,000 GM contracts and various labor transformation proposals, the Debtors should be required to provide this Court and parties in interest with a comprehensive and thorough analysis of how the proposed restructuring, as well as alternative restructuring scenarios, tie in with the Hourly Attrition Programs.  Absent such a showing, the Debtors cannot demonstrate that the Hourly Attrition Programs are in the best interest of all or any of the Debtors' estates or their stakeholders, or that their decision to enter into the Hourly Attrition Programs is protected by the business judgment rule.

15.     The Debtors concede that the Hourly Attrition Programs are but a "first step" as part of a much larger plan to restructure the Debtors' business operations.  (Motion ¶ 28) Nevertheless, the Debtors have not analyzed the effect of the Hourly Attrition Programs in light of reasonable alternative scenarios, including the possible rejection of the collective bargaining agreements, the shutting of plants in 2008 or reasonable scenarios representing potential compromises with the union or other parties in interest.  Attempting to analyze the Hourly Attrition Programs in such a vacuum is virtually impossible without understanding the massive restructuring of the Debtors' U.S. operations announced on March 31, 2006.  In connection with

seeking approval of the Motion, cost/benefit analyses of various reasonable alternative scenarios should be performed by the Debtors.  Such analyses should include:

- The cost/benefit to Delphi under the Hourly Attrition Programs, including (a) the cost of closing the 21 GM Loss Plants identified in the GM Rejection Motion and of rejecting the GM (and other unprofitable) supply contracts, (b) the present value expected from continuing to operate the remaining 8 non-idled North American plants, (c) the cost of the  Hourly Attrition Programs, and (d) the cost of amending and renewing any collective bargaining and other labor agreements (including the expected amount of any claim for indemnification by GM in respect of the Hourly Attrition Programs and any future labor agreements).

- The cost/benefit to Delphi of (a) rejecting GM (and other unprofitable ) supply contracts, (b) running the 29 non-idled unionized plants until the expiration of the current CBAs in 2007 (recognizing that, to ensure an orderly transfer, plants will/should be transferred before the collective bargaining agreements (the "CBAs") expire), and/or (c) transferring control (before the CBAs expire) of those plants to the unions, their members and the pension funds.  The transfer of plants (and a substantial portion of North American assets) gives the unions, their employees, and the pension funds an ownership stake and a right to determine their own fate.

- The cost/benefit to Delphi of (a) rejecting GM (and other unprofitable) supply contracts, (b) running the North American plants until 2007 (but not renewing the labor contracts), and then (or before 2007) (c) closing/selling all unionized plants.

16.    As the Debtors recognize in the Motion, the Hourly Attrition Programs are part of a larger restructuring program that is uncertain at best.  Prior to approving the Hourly Attrition Programs, the Debtors should be required to articulate how the Hourly Attrition Programs fit into these various scenarios.  Given the broad ranging impact of the Hourly Attrition Programs on the Debtors and their stakeholders, it is imperative that the Debtors not be locked in to programs that could later prove to have been improvident and unsound. Accordingly, Appaloosa believes that the Court and parties in interest should have the benefit of this analysis prior to approving the Hourly Attrition Programs.  Absent such demonstration, the Debtors have failed to establish that the Hourly Attrition Programs are in the best interest of all or any of the Debtors' estates or their stakeholders or that their decision to enter into the Hourly

Attrition Programs is protected by the business judgment rule.  Accordingly, the Motion should

be denied.  Alternatively, the hearing should be continued until such time that the Debtors

provide this Court and parties in interest with adequate and sufficient analysis to support

approval of the Motion.

## II.

### BY FAILING TO ANALYZE THE BENEFITS OF THE HOURLY ATTRITION PROGRAMS COMPARED TO THE COSTS ARISING FROM THE CLAIMS GM WOULD LIKELY ASSERT, DEBTORS HAVE FAILED TO DEMONSTRATE THEIR BUSINESS JUDGMENT

**A.     Debtors Have Not Shown that the Cash Flow Benefits to Delphi from the Attritions Program Exceed the Costs in Terms of Incurrence of Additional Claims**

17.     The Debtors have not done a basic cost/benefit analysis of the Hourly

Attrition Programs.  To obtain approval of the proposed UAW Special Attrition Program

Agreement (the "Attrition Agreement"), the Debtors need to establish that there are benefits to

the Hourly Attrition Programs that exceed the costs.  Failing that, even under the business

judgment test, which the Debtors argue should apply, the Debtors should not be entitled to court

approval under section 363 of the Bankruptcy Code.

18.     By implementing the Hourly Attrition Programs set forth in the Attrition

Agreement prior to the expiration of GM's benefit guaranty obligations in October 2007, and

treating the Hourly Attrition Programs as a triggering event under the GM Benefit Guaranty (it is

not a trigger under the Guaranty), Delphi is exposing itself to indemnity claims by GM with

respect to OPEB payments that exceed Delphi's existing contractual obligations.

19.     As to an employee who flows back to GM (either by "checking the box"

or by being among the 5,000 flowbacks) and retires under the $140,000 or the $70,000 option

available at GM, such employee is in effect receiving accelerated payment based on the present

value of OPEB at current levels for the rest of his/her life.  Such calculation necessarily includes paying for OPEB obligations that would not accrue to well past the expiry of the collective bargaining agreement in 2007, at which point Delphi would not be required to pay for OPEB expenses, especially in light of Delphi's stated goal of closing 21 of 29 U.S. plants at that time.  Thus, the claims likely to be incurred as a result of the Hourly Attrition Programs are materially greater than Delphi's legal obligation to pay OPEB (which, as per the Debtors, does not vest until it is paid out) and any reduced amount Delphi would likely commit to pay under an amended collective bargaining agreement as a practical matter.  The Debtors have not attempted to quantify this effect, leaving the constituencies to guess whether purported short-term cash flow benefits (which have not been demonstrated) justify the exposure to billions of dollars of claims.

20.    As to employees who (a) take the early or pre-retirement options at Delphi, or (b) flow-back to GM and do not retire, GM becomes obligated to pay OPEB to such employees at levels equal to the current level provided by GM until GM ceases to provide OPEB.  This OPEB obligation also exceeds Delphi's current legal obligation and an anticipated reduced obligation under a revised collective bargaining agreement.

21.    Thus, by implementing the Hourly Attrition Programs even though the Debtors recently have announced their intention to wind down or dispose of the vast majority of their U.S. operations by January 2008, it appears that the Debtors are incurring unnecessary costs with respect to employees they otherwise intend to terminate (and which could be done without triggering GM's guaranty or indemnity rights if the shut downs started after October 2007).  Approval of the Hourly Attrition Programs should thus be conditioned upon an order that GM's allowable claims may not exceed the Debtors' current legally enforceable obligations to

employees who elect to participate in the Hourly Attrition Programs.  Otherwise, the costs

exceed the benefits, and the Motion should be denied.

### B.    The Hourly Attrition Programs Should Not Create Obligations At the Parent Company Level Without Attendant Benefits

22.     Under the Hourly Attrition Programs, GM's indemnity claims will be

against Delphi even though it has no legal liability with respect to underlying OPEB after

October 2007. After the expiry of the existing CBAs, presumably each Delphi subsidiary would

have primary liability for OPEB as to its employees.  Substantially all of (a) the present value of

OPEB for employees who flow back and retire at GM, and (b) future OPEB for employees who

retire at Delphi or who flow back to GM but do not retire, would not be a liability of Delphi (but

rather a liability of the applicable subsidiary).  This is particularly problematical where the

applicable subsidiary is insolvent.  Under such circumstances, it is hard to understand what

benefit Delphi receives.

23.     Either (a) the Hourly Attrition Programs should not be approved, or (b) the

order approving the deal should specify that GM's claims (to the extent they relate to OPEB that

vests after October 2007) can only be asserted against the subsidiary where the employee was

providing services.

### C.    At Minimum, Approval of The Attrition Programs Must Clearly Preserve All Rights

24.     Pursuant to the Attrition Agreement, the Debtors state that "[f]or the

avoidance of doubt, any obligations assumed by GM under this Agreement . . . shall be

conclusively deemed to be comprehended by, included within, and shall constitute a prepetition,

general unsecured claim assertable by GM against the estate of Delphi Corporation under the

U.S. Employee Matters Agreement … , Delphi's Agreement dated December 22, 1999 to

indemnify GM for its liability under the Benefit Guarantee as if all conditions for the triggering

of GM's claim shall have occurred, and Delphi's general indemnity of GM under the Master

Separation Agreement."  (Attrition Agreement, ¶ 7.b).  This provision, however, which includes

phrases that have no known commercial meaning, such as "conclusively deemed to be

comprehended," creates substantial doubt regarding the nature and treatment of the claims that

GM may be acquiring.

       25.     The Attrition Agreement does not make clear what the status is of any

claims that GM may assert as a consequence of payments it makes under the Agreement (see

Attrition Agreement, ¶ 7.b.); nor does the Attrition Agreement make clear what estate rights are

reserved with respect to GM's claims (see Attrition Agreement, ¶ 7.c).

       26.     If the Court finds that the Attrition Agreement otherwise meets the

requirements for approval, the approval order should provide that (a) nothing in the Attrition

Agreement nor the approval order shall be construed to mean that any claim by GM is "allowed"

for any purpose, and (b) all estate rights and remedies (as asserted by the Debtors or any other

party who acquires standing) vis à vis the GM claims (including, without limitation, objections,

defenses, counterclaims, offsets, rights of subordination and recharacterization, claims to recover

avoidable transfers and rights under 502(d) of the Bankruptcy Code) are preserved for the benefit

of all parties in interest.

       27.     Additionally, the Attrition Agreement does not specify the effect the

possible subsequent assumption of the U.S. Employee Matters Agreement would have on the

prepetitition claim GM is entitled to assert with respect to assumed OPEB and related

employee/retiree payments.  If the Attrition Agreement otherwise meets the requirements for

approval, the approval order should specify that GM's claims are prepetition unsecured claims

that shall be excluded from any cure obligation otherwise required in connection with

assumption of the U.S. Employee Matters Agreement.

### III.

### THE ORDER SHOULD NOT PERMIT DEBTORS UNILATERALLY
### TO ENTER INTO "REASONABLY SIMILAR" ATTRITION PROGRAMS

28.    The Order sought by the Debtors seeks authority for the Debtors to enter

into "reasonably comparable" agreements on terms that are "reasonably similar" to the Attrition

Agreement.  Such open-ended authority is inappropriate.  Each agreement the Debtors enter into

should be analyzed on its own merits in light of the facts and circumstances of the case.

### IV.

### THE HOURLY ATTRITION PROGRAMS MAY BE MORE APPROPRIATELY
### CONSIDERED IN CONJUNCTION WITH A PLAN OF REORGANIZATION

29.    It is indisputable that the implementation of the Hourly Attrition Programs

affects thousands of hourly workers and perhaps all of Delphi's U.S. operations in significant

ways and may result in hundreds of millions or billions of dollars of claims against the Debtors'

estates.  Appaloosa is concerned whether programs of this magnitude are appropriately

considered outside the context of a plan of reorganization. See In re Braniff Airways, Inc., 700

B.R. 935, 940 (5th Cir. 1983) ("The debtor and the Bankruptcy Court should not be able to short

circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing

the terms of [a] plan sub rosa….").

30.    At the very least, the issues raised by the Motion are of a sufficient

magnitude and import to the Debtors and their interest-holders that they should not be considered

on 16 days notice and with limited and expedited discovery.  In such circumstances, the Court

should require not only the sound exercise of the Debtors' business judgment, but consider the

approval of the Hourly Attrition Programs subject to a heightened scrutiny.  See In re Public

<u>Serv. Co. of New Hampshire</u>, 90 B.R. 575, 581 (Bankr. D.N.H. 1988) ("The degree of scrutiny necessarily must be elastic -- becoming more strict and searching the nearer the transaction gets to the heart of the reorganization plan in terms of channeling that process toward any particular option.").

## V.

## APPALOOSA JOINS IN THE OBJECTIONS OF THE CREDITORS COMMITTEE

31.    Appaloosa joins in the Limited Objection of the Official Committee of Unsecured Creditors, to the extent not inconsistent with the issues raised herein.

## <u>CONCLUSION</u>

For the reasons set forth herein and in the Preliminary Objection, Appaloosa respectfully requests that the Motion be denied or, alternatively, that the hearing be continued until such time that the Debtors provide this Court and parties in interest with adequate and sufficient analysis to support approval of the Motion.

Dated:    April 4, 2006
          Miami, Florida

WHITE & CASE LLP
Glenn M. Kurtz (GK-6272)
Gerard Uzzi (GU-2297)
Douglas P. Baumstein (DB-1948)
1155 Avenue of the Americas
New York, New York 10036-2787
(212) 819-8200

Thomas E Lauria (Admitted *Pro Hac Vice)*
Frank L. Eaton (FE-1522)
Linda M. Leali
Wachovia Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
(305) 371-2700

By:   /s/  Frank L. Eaton
          Frank L. Eaton

COUNSEL TO APPALOOSA
MANAGEMENT L.P.