HEARING DATE:  April 7, 2006
TIME:  10:00 a.m.

Thomas R. Slome (TS-0957)
Jil Mazer-Marino (JM-6470)
ROSEN SLOME MARDER LLP
333 Earle Ovington Boulevard
Suite 901=
Uniondale, New York 11553-3622
(516) 227-1600

　　　　and

Michael J. Pankow
Daniel J. Garfield
Brownstein Hyatt & Farber, P.C.
410 Seventeenth Avenue
Denver, Colorado 80202-4437
(303) 223-1106

*Co-Counsel for Cherokee North Kansas City, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

————————————————————————————
　　　　　　　　　　　　　　　　　　　　　　　)
**In re:**　　　　　　　　　　　　　　　　) **Chapter 11**
　　　　　　　　　　　　　　　　　　　　　　　)
**DELPHI CORPORATION, INC., et al.,**　　) **Case No. 05-44481 (RDD)**
　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　**Debtors.**　　) **(Jointly Administered)**
　　　　　　　　　　　　　　　　　　　　　　　)
————————————————————————————)

**REPLY IN SUPPORT OF MOTION FOR ORDER UNDER 11 U.S.C. § 362(d)(2)**
**DIRECTING DEBTOR DELPHI AUTOMOTIVE SYSTEMS, LLC TO DETERMINE**
**WITHIN 150 DAYS WHETHER TO ASSUME OR REJECT ITS NONRESIDENTIAL**
**REAL PROPERTY LEASE WITH CHEROKEE NORTH KANSAS CITY, LLC**

Creditor Cherokee North Kansas City, LLC ("Cherokee") submits this reply in support of its

motion (the "Motion," Docket #1834) for an order under 11 U.S.C. § 365(d)(2) and Fed. R. Bankr.

Pro. 6006 directing the Debtor-Lessee[1] to determine whether to assume or reject its nonresidential real property lease with Cherokee within 150 days[2] of the February 9, 2006, omnibus hearing, and the Debtors' objection thereto (the "Objection," Docket #2035), and states as follows.

### The Debtors Have a Business Plan That Includes Selling Operations at the Building

1.      A primary argument of the Debtors is that they are focused on stabilizing their businesses and implementing their transformation plan and have not had time to decide whether to assume or reject their leases.  (See Objection at ¶¶ 14; Declaration of John D. Sheehan in Support of the Debtors' Objection to Motion for Order Directing Debtor Delphi Automotive Systems, LLC to Determine within 150 Days Whether to Assume or Reject Its Nonresidential Real Property Lease with Cherokee North Kansas City, LLC (the "Sheehan Cherokee Decl.," a copy of which is included in the parties' submission of papers and exhibits for the April 7, 2006, omnibus hearing) at ¶ 8).  Given the significant court filings and announcements made by the Debtors since the Motion was filed, particularly motions to reject certain contracts with General Motors and to reject certain collective bargaining agreements, these assertions, even if true a few months ago, no longer have merit.  The Debtors have a business reorganization plan, even if they have not filed a formal plan of reorganization, and intend to sell, and will be able to sell, their cockpit assembly operations at the Building and other locations by 2008.

2.      As noted in Declaration of John D. Sheehan in Support of Delphi's Motion for Authority to Reject Collective Bargaining Agreements under 11 U.S.C. § 1113(c) and Modify

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.
[2] In the Motion, Cherokee incorrectly calculated June 8, 2006, rather than July 8, 2006, as 150 days from the date of the February 9, 2006, hearing.  Given the passage of time since the Motion was filed and subsequent events in the Debtors' cases, Cherokee requests that the Court set July 8, 2006, as the deadline by which the Debtor-Lessee must assume or reject the Lease.

Retiree Welfare Benefits under 11 U.S.C. § 1114(g) (the "Sheehan 1113 Decl.," Docket #3037), the

Debtors have identified eight core businesses and eight manufacturing locations in the United States

which the reorganized Debtors will operate.  (Sheehan 1113 Decl. at ¶¶ 73-77).  The Debtors' cockpit

businesses, including the Debtor-Lessee's cockpit assembly operations at the Building, will not remain a

part of the reorganized Debtors' business; instead, they will sell or wind-down those operations.  (See

id.; Sheehan Cherokee Decl. at ¶ 6).

     3.     With the Debtors' transformation and reorganization plan in full swing, any impediments

to a prompt decision to assume or reject the Lease are now, at most, minimal.  It is clear from the

Debtors' intentions to first attempt to sell, rather than dissolve, their cockpit businesses that the Debtors

will assume, rather than reject, the Lease.  The manufacture of cockpits for General Motors is a

valuable going concern with positive cash flow, and General Motors will certainly need someone to

continue to manufacture cockpits.  As a result, the Debtors will first seek to sell, rather than wind down,

their cockpit business, and will try to do so until January 2008, well after their anticipated emergence

from Chapter 11 in the first half of 2007.  (See Sheehan Cherokee Decl. at ¶ 6).

     4.     The fact that the Debtors have not yet started any sale process will have little or no

effect on the timing of a decision to assume or reject the Lease.  (See id. at ¶ 6).  If the Debtors

succeed in selling their cockpit business before emergence from Chapter 11, they will assume and assign

the Lease to a buyer.  A buyer would most likely find the operations at the Premises to be cost-effective

as the Debtor-Lessee utilizes contract, not union, employees.  (See Sheehan 1113 Decl. at ¶ 21).  Even

if a buyer determines that it no longer needs to use the Premises to produce cockpits, there will be a

lengthy transition period to a new facility; a buyer will be unable to shut down operations at the Premises

the first day after sale.  Thus, the chances that a buyer would require the Debtor-Lessee to reject the

Lease prior to a pre-confirmation § 363 sale are exceedingly slim.  If, on the other hand, the Debtors

have not yet sold their cockpit business before emergence from bankruptcy, the Debtor-Lessee will

need to assume or reject the Lease before plan confirmation to preserve going-concern value and then

will continue to seek a buyer until 2008.  Either way, the Debtor-Lessee will assume the Lease.

      5.      The Debtors claim that because they will implement their transformation plan on "a

product line by product line basis," they should not be forced to make "premature decisions" as to the

Lease.  (Sheehan Cherokee Decl. at ¶ 8).  This argument is a red herring.  The Debtors will sell their

cockpit business, including operations at the Premises, as a going concern, and the operations at the

Building generate significant revenue.  Even if a buyer decides to wind down operations at the Premises,

it will not want to shut down operations at the Premises immediately after a sale because General

Motors will still need cockpits while the buyer transitions operations elsewhere.  In any event, the

obvious detriment to Cherokee if assumption or rejection is delayed far outweighs any potential

detriment to the Debtor-Lessee.  Even if premature rejection or premature assumption and a subsequent

rejection generates an administrative expense claim of approximately $2,000,000, that amount pales in

comparison to the amounts available to a Debtor-Lessee that generates billions in cash, has access to a

multi-billion dollar credit facility, and whose schedules of assets and liabilities indicate that it is solvent.

### Cherokee and the Bank Have Agreed to Extend the Matured Loans, But for a Significant Cost Uncompensable under the Bankruptcy Code

      6.      At the time the Motion was filed, Cherokee and the Bank were in negotiations to extend

the maturity date of two loans that had matured on December 31, 2005.  (Motion at ¶ 15).  At the end

of January 2006, Cherokee and the Bank entered into a Third Amendment to Construction Loan

Agreement (the "Third Loan Amendment," a copy of which is attached as Exhibit H), which extended

the two matured loans and a related third loan on the Building for two years. (Supplemental Declaration of Kenneth Ho, attached as Exhibit I, at ¶ 2.

7.       Due to the Third Loan Amendment, Cherokee has incurred additional costs, directly attributable to the Debtor-Lessee's bankruptcy, that are not compensable under the Bankruptcy Code: a) Cherokee is required to deposit into a reserve account $20,000 per month, not to exceed $200,000, as additional security until the loans are repaid in full or the Debtor-Lessee assumes the Lease; b) a non-refundable, fully-earned $12,000 amendment fee; (Third Loan Amendment at ¶¶ 3 and 5); and c) Cherokee must continue to pay interest at the prime rate plus 1.25% on outstanding amounts owed to the Bank. Cherokee has also incurred an opportunity cost by not having available to it the funds it would have received if it sold the Building with a non-bankrupt Debtor-Lessee as a tenant. Cherokee's only asset is the Building and income generated from rents paid the Debtor-Lessee and its two other tenants. The loss of use of $20,000 per month, payment of a $12,000 fee, continued interest payments, and lost opportunity costs are substantial costs for which Cherokee can make no claim under the Bankruptcy Code.

**Prompt Assumption or Rejection of the Lease Would Eliminate Uncertainty to Cherokee**

8.       The Debtors belittle Cherokee's argument that not only would prompt assumption of the Lease eliminate uncertainty for Cherokee, so would prompt rejection. (See Objection at ¶ 10). The Debtors ignore the obvious fact that prompt rejection of the Lease would allow Cherokee to begin to look for a new tenant for the Premises in July 2006, rather than June 2007 (or later, if the Debtors are unable to confirm a plan in 2007 and obtain additional extensions under § 362(d)(2)). Even if the Debtor-Lessee rejects the Lease in July 2006 and discontinues lease payments, Cherokee benefits by foregoing an uncertain rental stream for the Premises for a short period of time in exchange for enlisting

a credit-worthy tenant in the long term:

> An extension of time beyond 60 days mentioned in 11 U.S.C. § 365—especially for an indefinite period extending until confirmation of a Chapter 11 plan—may, if allowed to remain in place for a significant period, cause substantial hardship to a landlord who does not know whether or not a lease will remain in effect, and whether or not to seek another tenant for the space.

The Edward J. DeBartolo Corp. v. Child World, Inc. (In re Child World, Inc.), 146 B.R. 89, 90, as modified on r'hrg, 147 B.R. 854 (S.D.N.Y. 1992).

### Complexity Is Not a Sufficient Reason to Delay Assumption or Rejection of the Lease

9.    The Debtors also argue that the sheer complexity of these bankruptcy cases is reason enough to deny the Motion.  (Objection at ¶¶ 17-18; see Sheehan Cherokee Decl. at ¶ 9).  In essence, the Debtors claim that § 365(d)(2) should not apply to them as a matter of law because they are just too big and that landlords should suffer silently while the Debtors put their entire house in order over an 18-month period.  This argument has no legal authority and should be rejected because it is contrary to the particularized determination required under § 365(d)(2).  See South St. Seaport Ltd. P'ship v. Burger Boys, Inc. (In re Burger Boys, Inc.), 94 F.3d 755, 761 (2d Cir. 1996).  The Bankruptcy Code does not grant special favors to large debtors.

### The 365(d)(4) Deadline Extension Order Does Not Estop Cherokee from Seeking Relief

10.    In the final section of their Objection, the Debtors make the preposterous assertion that the doctrine of collateral estoppel is a bar to the relief Cherokee seeks.  The Debtors' argument is directly contrary to the plain language of the 365(d)(4) Deadline Extension Order (Docket #1345) and applicable precedent from this District.

11.    Paragraph 4 of the 365(d)(4) Deadline Extension Order specifically contemplates that, notwithstanding the extension of the lease assumption/rejection deadline to June 8, 2007, a landlord may

seek to shorten the deadline by which a Debtor must assume or reject a lease:

> The entry of this Order shall be without prejudice to (a) the Debtors' right to seek from this Court further extensions of the assumption and rejection deadline with respect to any or all of their Real Property Leases and (b) the right of any party to any Real Property Lease to seek from this Court a shortening of the deadline with respect to any or all of its Real Property Leases for cause shown.

The order, by its terms, does not limit "cause shown" to issues that could have been raised with respect to the Debtors' request to extend the deadline.  Moreover, if collateral estoppel bars the Motion, then collateral estoppel would similarly bar or limit the Debtors' ability to seek further extensions, which could not possibly have been the Debtors' intent in seeking to extend the deadline.

12.    The Debtors also ignore relevant case law from this District.  An order extending the deadline to assume or reject under Bankruptcy Code § 365(d)(4) is not final and thus is not subject to the doctrine of collateral estoppel.  See Escondido Mission Village L.P. v. Best Prods. Co., 137 B.R. 114, 115 (S.D.N.Y. 1992); In re Ames Dep't Stores, Inc., 2002 U.S. Dist. LEXIS 5604 at *3 (S.D.N.Y. March 28, 2002) (granting leave to appeal § 365(d)(4) extension order); see

also <u>In re Child World, Inc.</u>, 146 B.R. at 91-92 (extension under § 365(d)(4) has administrative, rather

than substantive, effect).

Dated:  Uniondale, New York
      April 6, 2006

ROSEN SLOME MARDER LLP

By:    <u>   /s/ Jil Mazer-Marino    </u>
       Thomas R. Slome (TS-0957)
       Jil Mazer-Marino (JM-6470)

333 Earle Ovington Boulevard
Suite 901
Uniondale, New York 11553-3622
(516) 227-1600

      and

Michael J. Pankow
Daniel J. Garfield
Brownstein Hyatt & Farber, P.C.
410 Seventeenth Avenue
Denver, Colorado 80202-4437
(303) 223-1106

*Co-Counsel for Cherokee North Kansas City, LLC*

G:\Cherokee North Kansas City, LLC\Lit\Reply for Motion to Compel Assumption or Rejection_v1.DOC