Martin J. Bienenstock, Esq. (MB 3001)
Michael P. Kessler, Esq. (MK 7134)
Jeffrey L. Tanenbaum, Esq. (JT 9797)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY  10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

– and –

Robert B. Weiss, Esq.
Frank L. Gorman, Esq.
HONIGMAN MILLER SCHWARTZ AND COHN LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI  48226-3506
Telephone: (313) 465-7000
Facsimile: (313) 465-8000

Attorneys for GM Corporation

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | |
| | : | Chapter 11 Case No. |
| | : | |
| **DELPHI CORPORATION, et al.,** | : | 05-44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

---------------------------------------------------------------x

**REPLY OF GENERAL MOTORS CORPORATION TO
OBJECTIONS TO DEBTORS' MOTION FOR ORDER
<u>APPROVING HUMAN CAPITAL HOURLY ATTRITION PROGRAMS</u>**

TO THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE:

        General Motors Corporation ("<u>GM</u>"), as and for its reply to (i) the limited

objection of the statutory committee (the "<u>Committee</u>") of unsecured claimholders

appointed in the chapter 11 cases of Delphi Corporation ("<u>Delphi</u>") and certain of its

affiliates and subsidiaries (collectively, the "Debtors") to the motion of the Debtors for an order under 11 U.S.C. § 363(b) and Fed. R. Bankr. P. 6004 approving the Debtors' human capital hourly attrition programs (the "Motion"), (ii) the supplemental and preliminary objections of Appaloosa Management L.P. ("Appaloosa") to the Motion, (iii) the limited objection of Wilmington Trust Company ("WTC") to the Motion, and (iv) the limited of objection Law Debenture Trust Company of New York (together with the Committee, Appaloosa and WTC, the "Objectors") to the Motion, respectfully represents:[1]

### GM Claims Under the Liability Documents

1.     The Objectors try to portray GM's rights under the UAW Special Attrition Program Agreement as an attempt by GM to create claims for itself where none exists. On the contrary, GM is making valuable new, voluntary contributions under the UAW Special Attrition Program Agreement for the benefit of the Debtors and for which it is entitled to consideration. The general unsecured claims (that remain subject to challenge) that GM will receive for *a portion* of its contributions are a compromise by GM and are substantially less consideration than GM might otherwise be entitled for contributing assets towards Delphi's reorganization.

2.     The Committee and Appaloosa base much of their opposition to the Motion on the argument that GM should not be permitted to assert claims under the U.S. Employee Matters Agreement dated as of December 22, 1998, among GM and Delphi

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

(together with related documents, the "EMA"), the Master Separation Agreement dated as of December 22, 1998, among GM, Delphi and certain of Delphi's affiliates (the "MSA") and/or the Agreement dated as of December 22, 1999, among GM and Delphi (the "Indemnification Agreement" and, together with the EMA and MSA, the "Liability Documents") for contributions and expenditures made by GM in connection with Delphi's implementation of the UAW Special Attrition Program because GM allegedly would not otherwise be able to assert claims under one or all of the Liability Documents for such contributions and expenditures. Such arguments miss the point: GM is making new, voluntary contributions (not required by the Liability Documents or related documents, or by any other agreements) for the benefit of the Debtors for which it is entitled to consideration. GM's right to assert general unsecured claims under any of the Liability Documents is simply the consideration negotiated by GM and Delphi for such contributions.

3. Under the UAW Special Attrition Program Agreement, GM agrees to make several contributions for the benefit of Delphi and its UAW-represented employees. Specifically, GM will (1) pay lump sums of $35,000 to certain employees who participate in the UAW Special Attrition Program (the "Lump Sum Retirement Payments"); (2) allow Delphi employees who agree to retire under the UAW Special Attrition Program to flowback to GM for purposes of retirement (upon any such employee's retirement, GM will assume all OPEB obligations to such retiree); (3) subsidize health care and life insurance coverage provided to certain Delphi employees participating in the UAW Special Attrition Program before such employees actually retire, if Delphi reduces or eliminates its health care and/or life insurance coverage provided to active UAW

3

employees in the interim; and (4) accept 5,000 active flowback employees (which will cause GM to pay such employees' wages and benefits and incur pension and OPEB obligations) (collectively, the "New GM Obligations").  But for the UAW Special Attrition Program Agreement, GM is not required to make any of these contributions.[2]

4.    Because GM is making these new, voluntary contributions, GM initially requested and believes that it would have been legally entitled to claims, in the amount of any such contributions, with administrative priority under section 507(a)(2) of the Bankruptcy Code as an actual and necessary cost and expense incurred by the Debtors to preserve their estates.  After intense negotiations, however, GM agreed to make the following significant concessions to permit Delphi the flexibility it requested in continuing its reorganization:  (1) GM will receive no claim on account of the $35,000 Lump Sum Payments; (2) GM will receive no claims of administrative or priority status; and (3) GM will receive general unsecured claims under the Liability Documents for the OPEB and active employee health and life insurance benefit obligations it assumes under the UAW Special Attrition Program Agreement, subject to the rights of parties in interest

---

[2] The EMA and the benefit guarantee executed on September 30, 1999 by GM and the UAW (the "Benefit Guarantee"), which is the subject of the Indemnification Agreement, obligate GM to assume or guarantee under certain circumstances OPEB and other obligations of Delphi.  But neither of these agreements requires GM to assume the New GM Obligations because (i) the UAW-GM-Delphi Flowback Agreement (which is part of the EMA and is part of both GM's and Delphi's respective existing collective bargaining agreements with the UAW) only requires GM to accept flowbacks under certain circumstances that are not implicated by the UAW Special Attrition Program and (ii) the Benefit Guarantee is only triggered if, among other things, Delphi fails or refuses to provide or reduces (below the level provided by GM to its UAW represented retirees) OPEB provided to the retirees covered by the Benefit Guarantee and Delphi fails or refuses to provide or reduces OPEB to the same extent for its other UAW represented active employees or retirees.

to object to allowance on any grounds other than that the claims did not arise under the terms of the Liability Documents. Accordingly, GM is not seeking to create claims for itself where none exists, but has instead agreed as a concession to the Debtors to accept general unsecured claims under certain prepetition agreements.

5. The Objectors complain about the effect of the allowance of GM's claims under the Liability Documents. These complaints are simply the Objectors' attempts to further reduce the consideration that GM will receive for its contributions under the UAW Special Attrition Program.[3] GM has, however, made all of the concessions that it will make in connection with this program – GM will not agree to accept general unsecured claims, subject to challenge, of a lesser amount than has been negotiated and agreed with Delphi.

**Effect of Expiration of Collective Bargaining Agreement**

6. Appaloosa argues that GM should not receive claims in the full amount of the OPEB obligations that it assumes under the UAW Special Attrition Program because Delphi will allegedly be able to walk away from its OPEB obligations after expiration in 2007 of its collective bargaining agreement with the UAW. This argument reveals Appaloosa's fundamental misunderstanding of the nature of a bankruptcy case of a manufacturing company whose labor is provided primarily by employees represented by

---

[3] For example, (i) Appaloosa argues that GM's claims for providing OPEB to participants in the UAW Special Attrition Program should be capped at the amount of the Debtors' obligations to provide OPEB to such participants under the Debtors' existing collective bargaining agreement with the UAW, and (ii) the Committee argues that GM should only be allowed claims for providing OPEB to participants in the UAW Special Attrition Program when GM actually makes payments to such participants, regardless of the present existence of GM's obligations to make such future payments.

5

labor unions. While Delphi's obligations to provide OPEB may expire in 2007, it is naïve to assume that Delphi will cease providing OPEB to retirees thereafter. Any effort of Delphi to unilaterally cease providing OPEB to such retirees would risk a potentially crippling strike. Even if there were merit to Appaloosa's argument, however, this argument (like the arguments about GM's claims under the Liability Documents) is irrelevant because the extent and treatment of GM's claims permitted by the UAW Special Attrition Program Agreement is simply the reasonable, agreed-upon consideration for GM's contributions to facilitate Delphi's restructuring.

**Claims Against Delphi Instead of Its Subsidiaries**

7. Each of Appaloosa and WTC argue that GM's claims against Delphi for GM's contributions to facilitate the UAW Special Attrition Program should not be allowed because Delphi's operating subsidiaries will be the true beneficiaries of the program. This argument ignores the fact that Delphi is the obligor under the collective bargaining agreement with the UAW. As such, Delphi is liable for the wages and benefits paid to or provided on account of the potential participants in the UAW Special Attrition Program and accordingly benefits from the reduction in force permitted by the program.[4] Additionally, as the parent of its subsidiaries, Delphi is the residual beneficiary of any improvement in their finances. And, finally, GM's claims against

---

[4] Appaloosa implies that only Delphi's subsidiaries would be liable for OPEB for their employees after expiration of the collective bargaining agreement with the UAW. This argument is infirm for the reasons discussed above in connection with Appaloosa's other arguments that Delphi's OPEB liability will cease upon expiration of the CBA.

6

Delphi are simply the reasonable consideration negotiated by Delphi for GM's contributions.

### Preservation of Rights to Object to GM Claims

8. Each of the Objecting Parties expresses concern about the preservation of rights of parties in interest to challenge GM's claims. GM believes that the Motion and UAW Special Attrition Program Agreement are clear, but to resolve any confusion, GM confirms that any claims that it asserts arising from the UAW Special Attrition Program are subject to objection by any party in interest on any grounds other than that the claims were not triggered and do not fall under the terms of the Liability Documents.[5]

### GM Claims for Pension

9. The Committee argues that any claims of GM against Delphi arising under paragraph 7.f of the UAW Special Attrition Program Agreement from pension obligations to Delphi employees who "check the box" to retire from GM should be subject to challenge on any ground. GM does not anticipate having any claims against Delphi on account of such pension obligations because GM's pension plan will not assume any liability on account of such retirees. The Delphi pension plan will remain obligated for pension benefits payable to such retirees; GM is assuming only the OPEB obligations to such retirees. To the extent, however, that GM has any such claims, such

---

[5] For example, the Indemnification Agreement is applicable when GM provides OPEB under the Benefit Guarantee. The UAW Special Attrition Program Agreement will enable GM to make a claim under the Indemnification Agreement for OPEB that it voluntarily provides under the UAW Special Attrition Program Agreement. Parties will be precluded from objecting that GM may not make a claim under the Indemnification Agreement because GM is a volunteer or that GM is not required to provide these agreed OPEB payments under the Benefit Guarantee.

claims will be subject to the same challenges, as described above, to which all other claims arising under the UAW Special Attrition Program Agreement will be subject.

WHEREFORE GM respectfully requests that the Court grant the relief requested in the Motion.

Dated: April 6, 2006
New York, New York

/s/ Michael P. Kessler
Martin J. Bienenstock (MB 3001)
Michael P. Kessler (MK 7134)
Jeffrey L. Tanenbaum (JT 9797)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

- and -

Robert Weiss
Frank Gorman
HONIGMAN MILLER SCHWARTZ
& COHN, LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226-3583
Telephone: (313) 465-7000
Facsimile: (313) 465-8000

Attorneys for GM Corporation

9