**Hearing Date: April 7, 2006**
**Hearing Time:  10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
David E. Springer (DS 9331)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
                                                              :
          In re                                               :          Chapter 11
                                                              :
DELPHI CORPORATION, et al.,                                   :          Case No. 05-44481 (RDD)
                                                              :
                                 Debtors.                     :          (Jointly Administered)
                                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO MOTION FOR
ORDER UNDER 11 U.S.C. § 363(b) AND FED. R. BANKR. P. 6004 APPROVING
DEBTORS' HUMAN CAPITAL HOURLY ATTRITION PROGRAMS

        Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the

"Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively,

the "Debtors"), hereby submit this response (the "Reply") to the three objections timely filed to

the Debtors' Motion For Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Approving

The Debtors' Human Capital Hourly Attrition Programs, dated March 22, 2006 (the "Motion").

Such objections include (a) Appaloosa Management L.P.'s ("Appaloosa") Preliminary Objection

To Motion For Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Approving The

Debtors' Human Capital Hourly Attrition Programs, dated March 30, 2006, (Docket No. 3021),

supplemented by Appaloosa Management L.P.'s Supplemental Objection To Motion For Order

Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Approving the Debtors' Human Capital

Hourly Attrition Programs, dated April 4, 2006, (Docket No. 3098); (b) Limited Objection of the

Official Committee of Unsecured Creditors (the "Creditors' Committee") To Motion For Order

Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Approving The Debtors' Human Capital

Hourly Attrition Programs, dated April 4, 2006, (Docket No. 3092), amended by Amended

Limited Objection of the Official Committee of Unsecured Creditors To Motion For Order

Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Approving The Debtors' Human Capital

Hourly Attrition Programs, dated April 5, 2006, (Docket No. 3108); and (c) Limited Objection of

Wilmington Trust Company, as Indenture Trustee ("WTC" and, collectively with Appaloosa and

the Creditors' Committee, the "Objectors"), To Motion For Order Under 11 U.S.C. § 363(b) And

Fed. R. Bankr. P. 6004 Approving The Debtors' Human Capital Hourly Attrition Programs,

dated April 4, 2006, (Docket No. 3097) (collectively, the "Objections").[1]  In support of this

Reply, the Debtors respectfully represent as follows:[2]

---

[1]    On April 6, 2006, two days after the objection period ended, Law Debenture Trust
Company ("Law Debenture") filed its Limited Objection of Law Debenture Trust
Company of New York, As Indenture Trustee, To Motion For Order Under 11 U.S.C. §
363 (b) And Fed. R. Bankr. P. 6004 Approving Debtors' Human Capital Hourly Attrition

*(cont'd)*

2

<u>Preliminary Statement</u>

1.      Within hours of having reached agreement with GM and the UAW, the

Debtors filed the Motion seeking approval and authorization to implement a tripartite agreement

(the "UAW Special Attrition Program Agreement") by and among Delphi, GM, and the UAW

that creates retirement incentives and programs and certain flowback opportunities for UAW-

represented Delphi employees (the "UAW Special Attrition Program") and to allow Delphi to

enter into similar programs (collectively, the "Hourly Attrition Programs") with certain of its

other unions.  The International Union, United Automobile, Aerospace and Agricultural

Implement Workers of America (the "UAW") and General Motors Corporation ("GM"), parties

to the UAW Special Attrition Program, each filed a statement supporting the relief requested by

the Motion.[3]

2.      Only Appaloosa opposes the UAW Special Attrition Program and the

Hourly Attrition Programs themselves.  The Creditors' Committee and WTC have each filed

narrow, limited objections going to GM claims matters.  The only disagreement that is

unresolved with respect to these objections[4] is whether the Creditors' Committee can convince

---

*(cont'd from previous page)*

    Programs (Docket No. 3130) (the "Law Debenture Objection").  The Law Debenture Objection is, in fact, a joinder in the objections of the Creditors' Committee and WTC and raises no new objections to the relief sought in the Motion.

[2]    Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

[3]    <u>See</u> Response of UAW In Support Of Debtors' Motion For Approval Of UAW Special Attrition Program, dated March 24, 2006 (Docket No. 2958) (the "UAW Supporting Response") and Response of General Motors Corporation In Support Of Debtors' Motion For Order Approving Human Capital Hourly Attrition Programs, dated April 4, 2006 (Docket No. 3090) (the "GM Supporting Response").

[4]    As discussed below, WTC also objects to the Motion on the grounds that this Court should not grant the Debtors prospective authority to enter into agreements providing for

*(cont'd)*

the Court to rewrite a tripartite agreement to reduce the "claims channels" pursuant to which GM

can assert (subject to a full reservation of rights to object by all parties) a prepetition unsecured

claim as to certain postpetition accommodations extended to Delphi by GM.[5]  Appaloosa, on the

other hand, is the sole party in these chapter 11 cases that would have the Court unravel the "soft

landings" that have been painstakingly negotiated by Delphi, GM, and the UAW for Delphi's

UAW-represented hourly labor force.

    3.    As the Debtors will detail below, the actual facts of the Debtors' current

labor situation unquestionably evidence that approval of the Motion is in the best interests of the

Debtors and their estates and the Debtors' determination to enter into the UAW Special Attrition

Program Agreement and the Hourly Attrition Programs constitutes a reasonable exercise of their

business judgment.

Argument

A.    The Hourly Attrition Programs Reflect A Sound Exercise Of Business Judgment

    4.    Bankruptcy Code section 363(b) permits a debtor-in-possession, after

notice and a hearing, to "use, sell, or lease, other than in the ordinary course of business, property

of the estate." 11 U.S.C. § 363(b)(1).  Courts may authorize a debtor to use estate property

pursuant to section 363(b)(1) whenever the debtor, in good faith, has provided a "good business

_____

*(cont'd from previous page)*

    reasonably comparable (as to the Debtors' obligations) Hourly Attrition Programs for the
    Debtors' non-UAW, union-represented employees.

[5]    Further, the Court's role should not be to rewrite the terms of an agreement reached
    between Delphi and third parties.  In re Global Crossing Securities and ERISA Litig., 225
    F.R.D. 436, 455 (S.D.N.Y. 2004) ("Although the Court must make its own independent
    evaluation of the settlement, the Court must also assess the settlement as it stands,
    without modifying its terms. . .and without substituting its 'business judgment for that of
    counsel, absent evidence of fraud or overreaching.'") (citing In re Warner Communication
    Sec. Litig., 798 F.2d 35, 37 (2d Cir. 1986)).

reason" that the proposed usage will ultimately "aid in the reorganization."  In re Lionel Corp.,
722 F.2d 1063, 1071 (2d Cir. 1983).  The Code provides the court "considerable discretion" in
addressing such a section 363(b) motion, and the Court's factual findings will stand unless
clearly erroneous.  In re Montgomery Ward Holding Corp., 242 B.R. 147, 152-53 (Bankr. D.
Del. 1999).

   5. The Second Circuit has held that, while the Bankruptcy Court sits as an
"overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . .
debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors
and the estate."  In re Orion Pictures Corp., 4 F.3d 1095, 1098-99 (2d Cir. 1993).  The Court's
consideration of a debtor's section 363(b) motion is a summary proceeding, intended merely as a
means to "efficiently review the . . . debtor's decision[s] . . . in the course of the swift
administration of the bankruptcy estate.  It is not the time or place for prolonged discovery or a
lengthy trial with disputed issues."  Orion Pictures, 4 F.3d at 1098-99.

   6. The debtor has the burden of establishing a valid business purpose for the
use of estate property outside the ordinary course of business.  Lionel, 722 F.2d at 1070-71.
Once the debtor has done so, a presumption arises that the debtor's decision was made on an
informed basis, in good faith, and in an honest belief that the action was in the best interests of
the estate.  In re Integrated Res., Inc., 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992).  Thereafter,
"[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of
rebutting the presumption of validity."  Id.   To satisfy its burden, it is not enough for an objector
simply to raise and argue an objection. Rather, an objector "is required to produce some evidence
respecting its objections." Lionel, 722 F.2d at 1071.

7.      As a rule, the debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74, 81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)).

8.      Here, the Debtors chose to enter into the UAW Special Attrition Program Agreement and seek authority for the Hourly Attrition Programs after determining that such actions will aid the Debtors in reorganizing their businesses.  As stated in the Motion, Delphi's labor agreements are unsustainable.  To stem the Debtors' operating losses from their U.S. operations and achieve the Debtors' transformation, Delphi's existing labor agreements must be modified (a) by obtaining hourly wage and benefit cost levels which are competitive with other U.S. auto parts suppliers, (b) by addressing those provisions that limit Delphi's ability to respond to market forces by selling or closing unnecessary or unprofitable operations, or by laying off excess employees, and (c) by addressing Delphi's substantial liabilities for retirement benefits for hourly employees and costly retiree health care plans.  The Hourly Attrition Programs are a significant step to enable realignment of Delphi's global product portfolio and manufacturing footprint, as well as reduction of Delphi's non-competitive hourly U.S. workforce to levels needed to operate its realigned U.S. operations.

9.      The value of the Debtors' estates is materially dependent on maintaining customer supply through rigorous shipping compliance at world-class quality levels as well as the ability to win profitable new business (especially non-GM business).  Although Delphi must modify its labor agreements, it cannot operate or maximize enterprise value without the ultimate support of its employees.  Therefore, as stated in Delphi's March 31, 2006 press release, while

6

the Debtors, through their Court filings on March 31, 2006, have taken necessary procedural steps to enable action that may become necessary at some point in the future, Delphi is singularly focused on reaching a consensual resolution with all of its unions and GM before any court hearing is necessary.

10.    Delphi negotiated the terms of and entered into the UAW Special Attrition Program in the spirit of reaching consensual resolution.  The UAW Special Attrition Program Agreement is the product of extensive and complex negotiations among the Debtors, the UAW, and GM.  As acknowledged in both the UAW Supporting Response and the GM Supporting Response, the negotiations over the UAW Special Attrition Program were "complex," "intense and often contentious."  UAW Supporting Response at ¶ 1; GM Supporting Response at ¶ 5.  Nonetheless, when the parties completed their negotiations, they had come to a mutual agreement that Delphi believes is a reasonable agreement with the UAW and GM and one that will benefit its estate and aid in its reorganization.  Furthermore, the UAW and GM are indispensable parties to any voluntary attrition program – Delphi could not successfully implement a stand-alone attrition program.

11.    Moreover, entry into the UAW Special Attrition Program Agreement has had, and will continue to have, a positive effect on the overall negotiations between Delphi, its unions, and GM.  Indeed, in its response to the Motion, the UAW stated that the UAW Special Attrition Program represents "a positive step in the parties' efforts to address challenging issues."  UAW Supporting Response at ¶ 4.  The UAW further stated that "the constructive results

achieved in this agreement demonstrate the value of a consensual resolution of difficult and

complex matters affecting tens of thousands of hourly employees and their families." Id.[6]

12.    Delphi maintains that the Hourly Attrition Programs are beneficial for

Delphi's labor reorganization because they will incentivize attrition and prevent most of Delphi's

long-term employees from feeling the full weight of the necessary modifications to Delphi's

labor agreements.  Delphi believes that the UAW Special Attrition Program could provide as

many as 18,000 of Delphi's 23,000 existing UAW-represented long-term hourly employees

programs with "soft landings" – approximately 13,000 being able to participate in retirement

attrition programs, and 5,000 or more flowing back to GM.  If extended to other unions, the

Hourly Attrition Programs could provide as many as 4,500 additional hourly employees with

retirement programs or incentives.

13.    In light of the Debtors' transformation plan described in Delphi's March

31, 2006, press release, the Hourly Attrition Programs' "soft landings" should ease the sudden

impact upon employees from the economic hardship that they might otherwise face as a result of

Delphi's financial situation and enhance Delphi and its unions' ability to achieve a consensual

resolution of Delphi's remaining labor issues that will be ratifiable by the unions' members.

Even if Delphi must proceed in chapter 11 and obtains Court authority to reject and subsequently

modify its collective bargaining agreements and modify its retiree benefits, to continue its

---

[6]    While the pleadings go on to chastise the Debtors for their 1113/1114 filing as to the
unions and 365 filing as to GM, both filings were also a prudent exercise of the Debtors'
business judgment six months into these chapter 11 cases and where no comprehensive
agreements have yet been reached since discussions began in the second quarter of 2005
– particularly where Delphi has been clear that successfully prosecuting the motions will
not result in immediate imposition of full relief without continued negotiations.

ongoing operations, Delphi must reach a resolution with its unions that the unions' membership will ratify and will keep employees working.

14.    Delphi believes that creating a "soft landing" for excess or high cost employees is critical to facilitating the structure of and subsequent ratification of any modified labor agreement that Delphi ultimately reaches with its unions. Moreover, a voluntary attrition plan such as the UAW Special Attrition Program is superior to other alternatives because it encourages the attrition of senior, higher-rate employees. Finally, the Debtors anticipate that the Hourly Attrition Programs will generate positive cash flow in 2006 resulting from the reductions in the Debtors' workforce and cost savings from utilizing lower-rate employees.

15.    The timing of the UAW Special Attrition Program was critical to the Debtors. GM and the UAW separately were negotiating an attrition program related to GM's hourly employees. If the Debtors did not become involved in the initial discussions regarding potential attrition programs, and instead waited until after GM and the UAW reached their own agreement, then the Debtors could have been severely prejudiced because they may have been anchored to the terms of the GM-UAW attrition program. By taking a proactive approach, the Debtors had greater ability and flexibility to negotiate terms more favorable to the Debtors and more specifically tailored to the needs and interests of their hourly employees.

16.    Delphi could not achieve this "soft landing" without GM's support. Many of Delphi's hourly employees may view the option to retire as a GM retiree as more appealing than retiring as a Delphi retiree. In addition, GM's financial support enables the Debtors to provide their most senior hourly employees appropriate incentives to retire at an accelerated rate. Should the Motion not be approved, the Debtors may not have a future opportunity to achieve these "soft landings." As stated in the GM Supporting Response, the agreement is integrated and

comprehensive – none of the parties to the UAW Special Attrition Program is obligated to another unless the Court approves Delphi's entry into the agreement.  GM Supporting Response at ¶ 5.  Moreover, there is no guarantee that the UAW and GM will be amenable to the same terms as are made in the UAW Special Attrition Program if the approval is deferred or denied. Id.  GM is not obligated to enter a deal with Delphi and will only enter a deal if it receives some benefit under such agreement.

17.     As described in the Motion, GM will likely assert claims against the Debtors related to obligations assumed and/or undertaken by GM as part of the UAW Special Attrition Program.  The UAW Special Attrition Program Agreement expressly provides, however, that nothing therein would be deemed to create an administrative or priority claim with respect to GM or to convert a prepetition claim into a postpetition claim or an administrative expense with respect to any party to the Agreement.  Further, entry into the UAW Special Attrition Program Agreement does not prejudice the rights of any interested party (including the Debtors and the Creditors' Committee) with respect to, among other things, the administration, reconciliation, and ultimate allowance, if ever, of such assertable claims.  With certain exceptions, the Debtors believe that any claims that would be asserted by GM under the UAW Special Attrition Program Agreement would relate to claims that GM would have otherwise asserted against Delphi under certain other agreements between GM and Delphi even absent entry into the UAW Special Attrition Program Agreement.[7]

---

[7]     It is possible that a significant portion of the claims that may be asserted by GM under the UAW Special Attrition Program Agreement would relate to GM's assumption of OPEB obligations for Eligible Employees who elect to flowback to GM.  Although Appaloosa has previously argued that Delphi's OPEB obligations would "go away because the collective bargaining agreements go away in 2007," the Debtors do not consider this argument tenable.  Furthermore, this Court has previously considered such

*(cont'd)*

18.     In sum, the Debtors believe that the Hourly Attrition Programs constitute an important first step in implementing their transformation plan.  Particularly, the Debtors believe that implementing the Hourly Attrition Programs, and the anticipated sharing of the costs of the Hourly Attrition Programs between the Debtors and GM, including GM's commitment to provide significant financial support toward the UAW Special Attrition Plan, will improve the Debtors' net cash flow and reduce the Debtors' projected operating losses in comparison to the status quo over the five-year period from 2006 through 2010.  Even more, the Hourly Attrition Programs are a critical first step to facilitating the Debtors' transformation plan.

B.     The Objectors' Arguments Should be Overruled and the Relief Granted

19.     As noted above, three timely objections were filed to the Motion – objections of Appaloosa Management L.P. ("Appaloosa"), the Official Committee of Unsecured Creditors ("Creditors' Committee), and Wilmington Trust Company ("WTC").  The Debtors, in this section, will respond to discrete issues raised by one or more Objectors.  For convenience, attached hereto as Exhibit A is a chart summarizing the issues raised by each of the Objectors.

1.     Objections Regarding the Debtors' Business Judgment

20.     As noted above, the appropriate standard for review of a debtor's motion to use estate property outside the ordinary course of business is whether the debtor has provided a good business reason that the use of estate property will aid in the debtor's reorganization.[8]

_____

*(cont'd from previous page)*
argument and described it as "almost laughable."  Tr. of March 22, 2006 Evidentiary Hearing, at pp. 177-78.

[8]     Further, the Motion in no way constitutes a sub rosa plan of reorganization and there is no basis for this Court to apply a heightened level of scrutiny, as requested by Appaloosa. The Braniff case cited by Appaloosa addressed a transaction significantly different than the Debtors' proposed implementation of the Hourly Attrition Plans.  Pension Benefit Guaranty Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.), 700 F.2d 935 (5th

*(cont'd)*

Once such a showing is made, an objecting party must overcome the substantial deference

provided to a debtor's exercise of its business judgment by demonstrating that the debtor's

business judgment is so manifestly unreasonable that it could not possibly be based upon sound

business judgment.  The Debtors respectfully assert that the Debtors have clearly met their

burden under section 363(b) with respect to the relief sought in the Motion.

          21.      Nevertheless, Appaloosa argues that, in order to meet their burden under

section 363(b), the Debtors must provide parties-in-interest with substantial, detailed financial

projections addressing various scenarios under which Appaloosa believes the Debtors could

attempt to reorganize their operations.  Appaloosa's argument is, however, contrary to Second

Circuit precedent, which provides that the court's consideration of a motion under section 363 is

intended to be a summary proceeding and is not the place for prolonged discovery.  See Orion

Pictures Corp., 4 F.3d at 1098-99.

          22.      The Debtors did, however, provide Appaloosa with extensive discovery.

On March 30, 2006,[9] Appaloosa served the Debtors with wide-ranging document requests and

---

(cont'd from previous page)

    Cir. 1983).  In a subsequent decision, the Fifth Circuit found the Braniff case to be
    "entirely distinguishable" where a proposed transaction did not dispose of all claims
    against the debtor, did not restrict creditors' rights to vote as they saw fit on a proposed
    reorganization plan and did not dispose of "virtually all" of the debtor's assets.  Official
    Comm. of Unsecured Creditors v. Cajun Elec. Power Cooperative, Inc. (In re Cajun Elec.
    Power Cooperative, Inc.), 119 F.3d 349, 355 (5th Cir. 1997).  Similarly, courts in this
    District have held that an agreement that "does not interfere with any safeguards of
    disclosure and voting rights afforded creditors under the Bankruptcy Code" and is not "an
    evasion of the plan confirmation process" does not constitute a sub rosa plan.  Motorola,
    Inc. v. Off. Comm. of Unsecured Creditors (In re Iridium Operating LLC), Case No. 01
    Civ. 5429 (GBD), 2005 WL 756900 at *8 (S.D.N.Y. Apr. 4, 2005).  As the relief sought
    in the Motion does not implicate any of these issues, it clearly does not constitute a sub
    rosa plan.

[9]    The Debtors did not accept earlier service on March 27, 2006 prior to Appaloosa's filing
    of an objection as this matter was not yet contested.

interrogatories, as well as a notice of Rule 30(b)(6) deposition.  Following the Debtors' receipt of

such requests, the Debtors, Appaloosa and the Creditors' Committee participated in a lengthy

meet and confer during which the parties reached agreement upon more limited discovery which

the Debtors would agree to provide.  In particular, the Debtors, pursuant to an agreed-upon

discovery schedule, produced over 500 pages of documents to Appaloosa and made both John D.

Sheehan, Vice President, Chief Restructuring Officer, Chief Accounting Officer, and Controller

of Delphi, and Kevin M. Butler, Vice President, Human Resource Management, of Delphi,

available for three-hour depositions, which took place on Wednesday, April 5, 2006.  In addition,

the Debtors provided declarations of John D. Sheehan and Kevin M. Butler to each of the

Objectors, as well as GM and the UAW, on Tuesday, April 4, 2006 (to Appaloosa) and

Wednesday, April 5, 2006 (to the remaining Objectors, GM, and the UAW).[10]

   23. There is ample justification for Delphi's determination to enter into the

UAW Special Attrition Program Agreement and for the Debtors' request to be authorized to

implement other Hourly Attrition Programs.  Implementation of the Hourly Attrition Programs

constitutes a significant step to enable realignment of the Debtors' global product portfolio and

manufacturing footprint.  Furthermore, entry into the UAW Special Attrition Program

Agreement, while representing only one element in the Debtors' overall effort to address the

Debtors' current uncompetitive U.S. cost structure, evidences crucial progress in the Debtors'

negotiations of a consensual resolution with two key constituencies – GM and the UAW.[11]  By

---

[10] Each of the declarations contain confidential information and therefore have not been
filed with the Court.

[11] The importance of the UAW Special Attrition Program Agreement to the Debtors' overall
negotiations has also been noted by each of GM and the UAW.  See GM Supporting
Response at ¶ 4 ("GM is prepared to help finance this significant step towards ensuring

*(cont'd)*

providing a substantial number of Delphi's employees with a "soft landing," implementation of the Hourly Attrition Programs directly addresses the concerns of the Debtors' employees, customers, and other key constituent groups, thereby providing distinct operational benefits. Finally, because GM has agreed to shoulder a significant portion of the obligations arising as a result of the UAW Special Attrition Program Agreement, the Debtors' implementation of the Hourly Attrition Programs will generate significant financial benefits, both by way of enhanced cash flow and decreased operating losses over the five-year period from 2006 through 2010 versus the status quo.

        24.    Contrary to Appaloosa's objection, section 363(b) of the Bankruptcy Code does not require the Debtors to provide analysis supporting that the proposed use of estate property is favorable to any other potential alternative use of such property, no matter how remote in likelihood.  Furthermore, Appaloosa's objection is bereft of any evidentiary support for Appaloosa's assertion that entry into the UAW Special Attrition Program Agreement and implementation of the Hourly Attrition Programs is not a valid exercise of the Debtors' business judgment or that such decision is "manifestly unreasonable."  Aerovox, 269 B.R. at 81.  As such, the Debtors respectfully assert that the relief sought in the Motion should be authorized under section 363(b) of the Bankruptcy Code as a valid exercise of the Debtors' business judgment and Appaloosa's objection should be overruled.

---

*(cont'd from previous page)*
        that the Debtors may emerge from chapter 11 as a viable supplier to the automotive
        industry, under the terms set forth in the Agreement"); UAW Supporting Response at ¶ 4
        ("the UAW Special Attrition Program represents a positive step in the parties' efforts to
        address challenging issues").

2.            Objections Related to Potential Claims of GM

25.        The Objectors have raised certain objections to the provisions of the UAW

Special Attrition Program Agreement which relate to potential claims GM may assert with

respect to certain Delphi obligations that GM has agreed to assume pursuant to the terms of the

UAW Special Attrition Program Agreement.  Initially, the Debtors have agreed, in order to

remove any ambiguity with respect to the reconciliation and potential allowance of GM claims

pursuant to this Court's approval of the UAW Special Attrition Program Agreement, to include

the following language in a modified proposed order, a marked copy (against the version filed

with the Motion) of which is attached hereto as Exhibit B:[12]

> For the avoidance of doubt, nothing in the Motion, the UAW Special Attrition
> Program Agreement or any other document shall prejudice the right of any
> interested party (including the Debtors and the Creditors' Committee) to challenge
> the allowability, amount or priority of any claims asserted by GM, except that
> GM's claims, if any, with respect to OPEB under paragraph 4. of the UAW
> Special Attrition Program Agreement or active health care and life insurance
> under Paragraph 7.d. of the UAW Special Attrition Program Agreement shall not
> be subject to objection on the basis that the claims were not assertable under U.S.
> Employee Matters Agreement (including without limitation, related flowback
> agreements and the UAW-GM-Delphi Memorandum of Understanding – Benefit
> Plan Treatment and the UAW-GM-Delphi Flowback Agreements contained in the
> 1999 and 2003 GM-UAW and Delphi-UAW Contract Settlement Agreements),
> Delphi's Agreement dated December 22, 1999 to indemnify GM for its liability
> under the Benefit Guarantee as if all conditions for the triggering of GM's claim
> shall have occurred, and Delphi's general indemnity of GM under the Master
> Separation Agreement.

26.        The UAW Special Attrition Program Agreement is the product of

extensive negotiations among Delphi, GM and the UAW spanning multiple days of round-the-

clock face-to-face meetings. Importantly, the Debtors could not have implemented such an

---

[12]    As WTC objects to the provisions of the UAW Special Attrition Program Agreement
relating to GM's claims solely on the basis that such provisions could be read to grant
GM an allowed claim, the Debtors believe that this proposed clarifying language should
resolve WTC's objection.

attrition program on a stand-alone (i.e., without the cooperation and support of GM and the

UAW) basis, nor do the Debtors have the ability to force non-consensual reductions in workforce

(outside of the section 1113 process).  Therefore, entry into a tripartite agreement with the GM

and the UAW was essential to the Debtors' ability to enact these important plans.

　　　　27.　　　Pursuant to the UAW Special Attrition Program Agreement, GM has

agreed to assume a substantial portion of the costs associated with implementation of the UAW

Special Attrition Program.  Specifically, GM has agreed to pay one-time, lump-sum incentive

payments in the amount of $35,000 to employees who are eligible to retire under the normal or

early voluntary provisions of the Delphi Hourly-Rate Employees Pension Plan (the "HRP") in

exchange for their agreement to retire and grant a release of claims.  Furthermore, GM has

agreed to assume OPEB obligations for employees who flowback to GM, including those

employees who flowback to GM for purposes of retiring ("check the box").  GM has also

committed to subsidize any health care coverage differential for Delphi employees participating

in the Delphi pre-retirement program.  Finally, GM has committed to allowing 5,000 Delphi

UAW-represented employees to flow back to GM.  GM would similarly assume OPEB

obligations for such employees as they flow back to GM and has agreed to expand the scope of

its prior agreement to permit such flowback.  GM's financial commitment to Delphi employees

under the UAW Special Attrition Program Agreement is so substantial that Delphi's entry into an

attrition program for UAW-represented employees would likely not have been feasible without

GM's commitments.[13]

---

[13]　　　GM will likely seek "credit" to recoup these contributions in any comprehensive
settlement but GM's obligations are not conditioned on such a settlement.

16

28.     Delphi's entry into the UAW Special Attrition Program Agreement, as well as its ability to enter into reasonably comparable agreements with its other unions as such agreements are reached, is a critical first step in the Debtors' efforts to realign their global product portfolio and manufacturing footprint, as well as to reduce the Debtors' traditional-rate hourly U.S. workforce to levels needed to run its realigned U.S. operations.  The statements in support of the Motion filed by each of GM and the UAW further acknowledge the importance of this Court's timely approval of Delphi's entry into the UAW Special Attrition Program Agreement to the parties' continuing negotiations regarding the consensual resolution of their numerous remaining issues, without resolution of which the Debtors will be unable to formulate and implement a plan of reorganization in these cases.

29.     Nevertheless, and despite the financial obligations GM has agreed to assume under the UAW Special Attrition Program Agreement, Appaloosa and the Creditors' Committee assail the terms of the UAW Special Attrition Program Agreement on the basis of terms that GM extracted from Delphi as a condition of GM's entry into the agreement.  However, neither acknowledges that GM's financial support of the UAW Special Attrition Program is critical to the overall viability of the Program or that GM was under no obligation to provide such financial support to Delphi.  Rather, each of such Objectors appears to take the untenable position that Delphi should have been able to receive all of the benefits of the UAW Special Attrition Program Agreement without providing GM with any corresponding benefit.  To expect GM to take on what will likely amount to hundreds of millions of dollars in obligations without receiving any benefit whatsoever simply does not acknowledge the respective leverage of the parties or the commercial realities of the Debtors' situation.

30.    Furthermore, the terms provided to GM under the UAW Special Attrition Program Agreement in exchange for its agreement to take on such financial obligations are narrowly-tailored, reasonable, and preserve substantial rights for all parties-in-interest, including Appaloosa and the Creditors' Committee, to later challenge any claims that GM may assert related to the obligations which it has agreed to assume by the terms of the UAW Special Attrition Program Agreement.  The only term that the Debtors have provided to GM with respect to its claims, if any, with respect to OPEB or active health care and life insurance is the agreement that such claims would not be subject to objection on the basis that the claims were not assertable under one of the three GM agreements expressly set forth in paragraph 7.b of the UAW Special Attrition Program Agreement.[14]  Further, GM has agreed to accept a prepetition general unsecured claim on account of such obligations, which claim will be paid (likely at less than 100 cents on the dollar) pursuant to the terms of the plan of reorganization confirmed and consummated in these chapter 11 cases.  GM is further incurring hundreds of millions of dollars in additional immediate obligations – for the $35,000 incentive payments to employees who are eligible to retire under the normal or early voluntary provisions of the HRP – without Delphi's agreement to provide GM with any claim or compensation for incurring such obligations.

31.    Other than the clarifying paragraph provided above, the Debtors respectfully request that this Court overrule the objections to the provisions of the UAW Special

---

[14]    Appaloosa also objects to GM's claim for OPEB obligations being assertable against Delphi, as provided by the terms of the UAW Special Attrition Program Agreement. Delphi is the party to all relevant outstanding agreements relating to such OPEB obligations owing to Eligible Employees and, therefore, claims related thereto are properly assertable against the estate of Delphi Corporation and not against the estates of other of the Debtors.  Contrary to Appaloosa, the Debtors will not speculate as to the terms of any future agreements regarding OPEB, as such agreements will be the product of negotiations between Delphi and its unions.

Attrition Program Agreement relating to GM's claims.  Such objections reflect nothing more than attempts by Appaloosa and the Creditors' Committee to retrade the carefully-crafted and extensively-negotiated terms of the UAW Special Attrition Program Agreement.  Such attempts jeopardize the parties' overall agreement and all of the benefits that will be realized by Delphi and its employees thereunder.  Indeed, GM expressly noted this fact in its statement in support.  See GM Supporting Response at ¶5 ("[The Agreement] is a comprehensive and integrated agreement.  No party has any obligation to any other party unless the entire Agreement is approved as to Delphi.  If the benefits are to be realized, time is of the essence.  There is no assurance that the UAW and GM will be amenable to making the same concessions if approval of the program is deferred or denied.").  Delphi would not be able to achieve more favorable results if the parties were forced to reopen negotiations over the terms of the UAW Special Attrition Program Agreement.

3.      Objections Related to the Debtors' Entry into Hourly Attrition Program Agreements

32.      Each of Appaloosa and WTC object to the Motion based upon the assertion that this Court should not authorize the Debtors to enter into agreements providing for reasonably comparable (as to the Debtors' obligations) Hourly Attrition Programs for the Debtors' non-UAW, union-represented employees (the "Hourly Attrition Program Agreements") absent specific Court approval.[15]

33.      The Debtors dispute that this relief cannot appropriately be granted under section 363(b) of the Bankruptcy Code.  First, this Court has previously granted the Debtors authority to take action prospectively under section 363 of the Bankruptcy Code.  See, e.g.,

---

[15]      The Creditors' Committee raises a similar objection in requesting that the Creditors' Committee be provided with oversight over the Debtors' entry into any Hourly Attrition Programs covering non-UAW represented employees.

Order Under 11 U.S.C. § 363 Approving Procedures to Sell Certain De Minimis Assets Free and

Clear of Liens, Claims, and Encumbrances and to Pay Market Rate Broker Commissions in

Connection with Such Sales without Further Court Approval (Docket No. 766); Order Under 11

U.S.C. §§ 363(b) and 365(a) and Fed. R. Bankr. P. 9019 Order Approving Procedures to Assume

Certain Amended and Restated Sole Source Supplier Agreements (Docket No. 1494); Order

Under 11 U.S.C. §§ 363, 1107, and 1108 Approving Procedures to Enter Into or Renew Real

Property Leases Without Further Court Approval (Docket No. 1777).  Therefore, these

objections are inconsistent with prior orders entered by this Court.  Furthermore, as described

above, the Debtors have provided ample justification for their entry into the Hourly Attrition

Program Agreements under section 363(b) and nothing contained in the objections disputes the

underlying rationales or factual support for the Debtors' exercise of their business judgment.

Therefore, the Debtors respectfully assert that these objections are without merit and should be

overruled.

34.     Further, in response to the request of the Creditors' Committee reflected in

its objection, the Debtors have agreed to include provisions in the modified proposed order to be

submitted to the Court providing the Creditors' Committee with advance notice and an

opportunity to object to the Debtors' entry into any such Hourly Attrition Program Agreements.

The Debtors believe that this grant of additional oversight to the Creditors' Committee should

alleviate any concerns of any other party-in-interest, including Appaloosa and WTC, regarding

the appropriateness of those provisions of the order.  Furthermore, the alternative suggested by

Appaloosa and WTC – ostensibly, that the Debtors be forced to file separate motions with

respect to each separate Hourly Attrition Program Agreement – would be incredibly inefficient

and costly, while providing no concomitant benefit to parties-in-interest.  The proposed order

would limit the Debtors' authority to enter into such Hourly Attrition Program Agreements to only such agreements as are reasonably comparable to the UAW Special Attrition Program Agreement, as they relate to the Debtors' obligations, and would provide the Creditors' Committee with a meaningful oversight role, similar to the role played by the Creditors' Committee with respect to prior orders of this Court granting the Debtors prospective authority, including those referenced above.  Given those protections against any abuse of the Debtors' discretion, Appaloosa and WTC's concerns are unfounded and would constitute a waste of the Debtors' resources.  Therefore, the Debtors respectfully request that these objections be overruled to the extent that they are not resolved by the Debtors' proposed language referenced above.

WHEREFORE the Debtors respectfully request that this Court enter an

order (a) overruling the Objections, (b) granting the Motion, and (c) granting the Debtors such

other and further relief as is just.

Dated: New York, New York
      April 6, 2006

                              SKADDEN, ARPS, SLATE, MEAGHER
                                & FLOM LLP

                         By:  /s/ John Wm. Butler, Jr.
                              John Wm. Butler, Jr. (JB 4711)
                              David E. Springer (DS 9331)
                              John K. Lyons (JL 4951)
                              Ron E. Meisler (RM 3026)
                         333 West Wacker Drive, Suite 2100
                         Chicago, Illinois  60606
                         (312) 407-0700

                         - and -

                         By:  /s/ Kayalyn A. Marafioti
                              Kayalyn A. Marafioti (KM 9632)
                              Thomas J. Matz (TM 5986)
                         Four Times Square
                         New York, New York  10036
                         (212) 735-3000

                         Attorneys for Delphi Corporation, et al.,
                          Debtors and Debtors-in-Possession