Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                          :
    In re                                 :    Chapter 11
                                                          :
DELPHI CORPORATION, et al.,                               :    Case No. 05-44481 (RDD)
                                                          :
                                    Debtors. :    (Jointly Administered)
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SUPPLEMENTAL APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(a), 328(a),
AND 1107(b) AUTHORIZING (I) EMPLOYMENT AND RETENTION OF KPMG LLP AS
ADVISORY AND VALUATION ADVISORS TO DEBTORS, EFFECTIVE NUNC PRO
TUNC TO FEBRUARY 16, 2006, (II) CONTINUED RETENTION OF KPMG LLP AS TAX
ADVISORS TO DEBTORS, EFFECTIVE NUNC PRO TUNC TO JANUARY 1, 2006, AND
(III) ADDITIONAL INTERNATIONAL EXECUTIVE TAX SERVICES TO BE RENDERED
BY KPMG LLP TO DEBTORS EFFECTIVE NUNC PRO TUNC TO JANUARY 18, 2006

("KPMG LLP SUPPLEMENTAL RETENTION APPLICATION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this application (the "Supplemental Application") for entry of an order under 11

U.S.C. §§ 327(a), 328(a), and 1107(b) and Rule 2014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") authorizing (i) the employment and retention of KPMG LLP

as advisory and valuation advisors to the Debtors, effective nunc pro tunc to February 16, 2006,

(ii) the continued retention of KPMG LLP as tax advisors to the Debtors, effective nunc pro tunc

to January 1, 2006, and (iii) additional international executive tax services to be rendered by

KPMG LLP to the Debtors, effective <u>nunc</u> <u>pro</u> <u>tunc</u> to January 18, 2006. In support of this Supplemental Application, the Debtors submit the First Supplemental Affidavit of Gary A. Silberg, sworn to April 20, 2006 (the "First Supplemental Affidavit"), attached hereto as <u>Exhibit A</u>. This Supplemental Application supplements that certain application, dated February 14, 2006, pursuant to sections 327(a), 328(a) and 1107(b) and Rule 2014 of the Federal Rules of Bankruptcy Procedure for authorization to retain KPMG LLP as tax and transaction services advisors to the Debtors, effective <u>nunc</u> <u>pro</u> <u>tunc</u> to October 8, 2005 (Docket No. 2366) (the "Original Application"). In further support of this Supplemental Application, the Debtors respectfully represent as follows:

<u>Background</u>

A.   <u>The Chapter 11 Filings</u>

1.   On October 8, 2005 (the "Petition Date"), 39 of 42 Debtors, and on October 14, 2005, the remaining Debtors, filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. This Court entered orders directing the joint administration of the Debtors' chapter 11 cases (Docket Nos. 28 and 404).

2.   On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee"). No trustee or examiner has been appointed in the Debtors' cases.

3.   This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.  The statutory predicates for the relief requested herein are sections 327(a), 328(a), and 1107(b) of the Bankruptcy Code and Bankruptcy Rule 2014.

B.  Current Business Operations Of The Debtors

5.  With more than 180,000 employees worldwide, global 2004 revenues of approximately $28.6 billion, and global assets as of August 31, 2005 of approximately $17.1 billion,[1] Delphi ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations without supervision from the Bankruptcy Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy Code.

6.  Over the past century, the operations which are now owned by Delphi have become a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines. Today, the Company (as defined below) is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company's technologies and products are present in more than 75 million vehicles on the road worldwide. The Company supplies products to nearly every major global automotive original equipment manufacturer with 2004 sales to its former parent, General Motors Corporation ("GM"), equaling approximately $15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

7.  As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint

---

[1]  The aggregated financial data used in this Supplemental Application generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

ventures located in every major region of the world. In the U.S., the Debtors employ approximately 50,600 people. Those employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in Delphi's worldwide headquarters and customer center located in Troy, Michigan. Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and local unions. Outside the United States, the Company's foreign entities employ more than 134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

8. Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM. Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates (collectively, the "Company") in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

9. Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle. When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their

supply base. The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base. The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C.      Events Leading To Chapter 11 Filing

10.     In the first two years following Delphi's separation from GM, the Company generated more than $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales. Reflective of a downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005. The Company experienced net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[2]

11.     The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of

---

[2]     Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12.   In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward looking revenue requirements.  Having concluded that pre-filing discussions with its unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

13.   Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses.  This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned in the Company's transformation plan.  The Debtors believe that a substantial segment of Delphi's U.S. business operations must be divested, consolidated, or wound-down through the chapter 11 process.

14.   Upon the conclusion of this process, the Debtors expect to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally.

Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

### The Original Application

15. On February 15, 2006, the Debtors filed the Original Application pursuant to the terms of certain engagement letters, by and between the Debtors and KPMG LLP, each as described and defined therein (the "Original Engagement Letters").

16. On March 3, 2006, this Court entered an order approving the Original Application, pursuant to the terms of the Original Engagement Letters, effective nunc pro tunc to October 8, 2005 (Docket No. 2653) (the "Original KPMG Order").

### Relief Requested

17. By this Supplemental Application, the Debtors respectfully request entry of an order under sections 327(a), 328(a), and 1107(b) of the Bankruptcy Code and Bankruptcy Rule 2014, authorizing (i) the employment and retention of KPMG LLP as advisory and valuation advisors to the Debtors, effective nunc pro tunc to February 16, 2006, pursuant to the terms and conditions set forth in that certain engagement letter for advisory and valuation services, dated February 16, 2006, annexed to the First Supplemental Affidavit as Exhibit "A" (the "Advisory and Valuation Engagement Letter"), (ii) the continued retention of KPMG LLP as tax advisors to the Debtors, effective nunc pro tunc to January 1, 2006, pursuant to that certain letter agreement, dated February 21, 2006, annexed to the First Supplemental Affidavit as Exhibit "B" (the "Supplemental Tax Consulting Engagement Letter"), extending the term of that certain tax consulting engagement letter, dated March 1, 2005 and amended by letter agreement, dated May 23, 2005, annexed to the First Supplemental Affidavit as Exhibit "C" (the "Original Tax Consulting Engagement Letter"), and (iii) additional international executive tax services to

be rendered by KPMG LLP to the Debtors effective <u>nunc</u> <u>pro</u> <u>tunc</u> to January 18, 2006, pursuant to that certain letter agreement, dated January 18, 2006, executed on March 8, 2006, annexed to the First Supplemental Affidavit as Exhibit "D" (the "January 18 IES Engagement Letter"), and certain amendments to the pricing provisions of that certain international executive tax services letter agreement, dated October 5, 2004, amended on November 3, 2004, annexed to the First Supplemental Affidavit as Exhibit "E" (the "Original IES Engagement Letter"), as set forth in that certain letter agreement, dated March 20, 2006, annexed to the First Supplemental Affidavit as Exhibit "F" (the "March 20 IES Amendment," and together with the January 18 IES Engagement Letter, the "Supplemental IES Engagement Letters," and together with the Advisory and Valuation Engagement Letter and the Supplemental Tax Consulting Engagement Letter, the "Supplemental Engagement Letters").

<u>Scope Of Services</u>

18.  In accordance with the Advisory and Valuation Engagement Letter, KPMG LLP will provide such advisory and valuation services as KPMG LLP and the Debtors deem appropriate and feasible in order to advise the Debtors and their subsidiaries and affiliates in the course of these chapter 11 cases, including, but not limited to, the following:

   i.  analysis of potential impairment charges in accordance with Statements of Financial Accounting Standards (SFAS) 142 and 144 related to goodwill, intangibles, and long-lived assets; and

   ii. assistance to the Debtors with initial planning for the Fresh Start valuation exercise in connection with the Debtors' future emergence from chapter 11.

19.  In accordance with the Supplemental Tax Consulting Engagement Letter, KPMG LLP will continue to provide tax consulting services to the Debtors on terms and

conditions identical to those set forth in the Original Tax Consulting Engagement Letter, other than the extension of the term of such agreement until December 31, 2006.

20. In accordance with the January 18 IES Engagement Letter, KPMG LLP will provide certain international executive services to the Debtors in addition to those set forth in the Original IES Engagement Letter, including, but not limited to, the following:

> i. prior to assignment services, (a) prepare cost projection including revisions, (b) prepare draft expatriate agreement, and (c) prepare draft pay calc;
>
> ii. at the beginning of assignment services, (a) prepare final expatriate agreement and pay calc and participate in orientation, (b) calculate relocation allowance and mobility premium to be paid in month prior to assignment and provide to payroll, and (c) calculate first year spending account to be paid in first month of assignment and provide to payroll;
>
> iii. calculate annual spending account on assignment anniversary date and provide to payroll; and
>
> iv. calculate relocation allowance less outstanding tax and pro-rata spending account due from employee.

KPMG LLP will provide these additional international executive tax services to the Debtors on the terms and conditions set forth in the January 18 IES Engagement Letter and the Original IES Engagement Letter, as amended by the March 20 IES Amendment.

21. The services to be provided by KPMG LLP to the Debtors will not be unnecessarily duplicative of those provided by any other of the Debtors' professionals, and KPMG LLP will coordinate any services performed at the Debtors' request with the Debtors' other professionals, including financial advisors, accountants, and counsel, as appropriate, to avoid duplication of efforts.

22. Subject to this Court's approval of the Supplemental Application, KPMG LLP is willing to (i) serve as the Debtors' advisory and valuation advisors and to perform the

services described in the Advisory and Valuation Engagement Letter on the terms set forth therein, (ii) continue to provide tax consulting services to the Debtors and to perform the services described in the Original Tax Consulting Engagement Letter and the Supplemental Tax Consulting Engagement Letter on the terms set forth therein, and (iii) provide additional international executive tax services described in the January 18 IES Engagement Letter on the terms set forth therein and the Original IES Engagement Letter, as amended by the March 20 IES Amendment.

### Qualifications of Professionals

23.  The Debtors have selected KPMG LLP as one of their advisory and valuation and tax advisors because of the firm's diverse experience and extensive knowledge in the fields of accounting and taxation.

24.  The Debtors have employed KPMG LLP as financial and tax advisors since 1999. By virtue of its prior engagements, KPMG LLP has developed a significant amount of institutional knowledge regarding the Debtors' books, records, financial information, and other data maintained by the Debtors. Such experience and knowledge will be valuable to the Debtors in their efforts to reorganize. Accordingly, the Debtors wish to retain KPMG LLP to provide assistance during these chapter 11 cases.

25.  The services of KPMG LLP are deemed necessary to enable the Debtors to maximize the value of their estates and to reorganize successfully. Further, KPMG LLP is well-qualified and able to represent the Debtors in a cost-effective, efficient, and timely manner.

### Disinterestedness of Professionals

26.  The Affidavit of Patrick N. Karpen, sworn to February 9, 2006 and filed in support of the Original Application (the "Original Affidavit"), and the First Supplemental

Affidavit filed in support of this Supplemental Application contain information available as of the date hereof with respect to KPMG LLP's connections with other parties-in-interest, as required by Bankruptcy Rule 2014(a). Based on the information set forth in the Original Affidavit and the First Supplemental Affidavit, the Debtors submit that KPMG LLP and the professionals in the firm are "disinterested persons," as that term is used in section 101(14) of the Bankruptcy Code, and are otherwise eligible to be retained under section 327(a) of the Bankruptcy Code.

### Professional Compensation

27. Subject to this Court's approval and pursuant to the terms and conditions of the Supplemental Engagement Letters, KPMG LLP's requested compensation for professional services rendered to the Debtors will be based upon the hours actually expended by each assigned staff member at each staff member's hourly billing rate.

28. The rates included in this Supplemental Application (exclusive of discounts) are KPMG LLP's normal and customary rates for matters of this sort. In the normal course of business, KPMG LLP revises its hourly rates on October 1st of each year. Subject to this Court's approval, KPMG LLP requests that the rates listed below be revised to the hourly rates that will be in effect at such time.

29. KPMG LLP has agreed to apply a voluntary discount of 20% as set forth in the Advisory and Valuation Engagement Letter. The hourly rates for the advisory and valuation services to be rendered by KPMG LLP are as follows:

| Advisory and Valuation Services: | Net Hourly Rate after application of 20% discount: |
|---|---|
| Partner | $620 |
| Director | $600 |
| Manager | $488 |
| Senior | $376 |
| Staff | $312 |

30.     The hourly rates for the tax consulting services to be rendered by KPMG LLP pursuant to the Supplemental Tax Consulting Engagement Letter are identical to those set forth in the Original Tax Consulting Engagement Letter.

31.     The rates for the additional international executive tax services to be rendered by KPMG LLP pursuant to the January 18 IES Engagement Letter are as set forth in the Original IES Engagement Letter, except as modified by the January 18 IES Engagement Letter and as amended by the March 20 IES Amendment.  Specifically, the January 18 IES Engagement Letter modifies the Original IES Engagement Letter and provides that the fees for the compliance services detailed in the Original IES Engagement Letter will be billed at the lesser of (i) the fees set forth in the Original IES Engagement Letter and (ii) the actual time incurred to complete the tax return or task at KPMG LLP's standard hourly rate plus out-of-pocket expenses and the lesser of (i) the fees related to services proivded by KPMG member firms as indicated in the original fee schedule and (ii) the actual time incurred to complete the tax return or task at the KPMG member firm's standard hourly rates.

32.     In addition, the March 20 IES Amendment provides for a certain pricing addendum to Exhibit E of the Original IES Engagement Letter and similarly provides that such services will be billed at the lesser of (i) the fees set forth in the addendum and (ii) the actual

time incurred to complete the services at KPMG LLP's standard hourly rate. The fees set forth in the addendum are as follows:

| Services: | Fees: |
|---|---|
| Prepare amended US income tax returns for employees assigned to the Mexican border | $375 |
| Prepare monthly Mexican non-resident income tax withholding calculation for employees assigned to the Mexican Border | $40 |
| Prepare and compile payments at host information for employees assigned from the US, expatriates assigned to the US, and expatriates assigned to and from non-US countries | $375 |

33.  KPMG LLP also will seek reimbursement of incurred necessary expenses such as travel, photocopying, delivery service, postage, vendor charges, and other out-of-pocket expenses incurred in providing professional services. KPMG LLP will seek such reimbursements in accordance with guidelines established by the U.S. Trustee.

34.  The Debtors believe that KPMG LLP's fees are fair and reasonable in light of industry practice, market rates both in and out of chapter 11 proceedings, KPMG LLP's experience in reorganizations, and KPMG LLP's importance to these cases.

<u>Dispute Resolution Procedures, Indemnification, and Limitation on Liability</u>

35.  The terms of the Advisory and Valuation Engagement Letter are substantially similar to the terms set forth in the Original Engagement Letters with respect to dispute resolution procedures. The indemnification and limitation on liability provisions of the Advisory and Valuation Engagement Letter are substantially similar to the indemnification and limitation on liability provisions set forth in the Master Services Engagement Letter (as defined in the Original Application).

36.    The terms of the Supplemental Tax Consulting Engagement Letter are identical to the terms set forth in the Original Tax Consulting Engagement Letter with respect to dispute resolution procedures, indemnification, and limitation on liability.

37.    The terms of the Supplemental IES Engagement Letters are identical to the terms set forth in the Original IES Engagement Letter with respect to dispute resolution procedures, indemnification, and limitation on liability.

## Conclusion

38.    For the foregoing reasons, the Debtors submit that the relief requested herein is in the best interests of the Debtors and their estates and creditors and should be approved.

## Notice

39.    Notice of this Supplemental Application has been provided in accordance with the Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing (I) Omnibus Hearing Dates, (II) Certain Notice, Case Management, And Administrative Procedures, And (III) Scheduling An Initial Case Conference In Accordance With Local Bankr. R. 1007-2(e) entered by this Court on October 14, 2005 (Docket No. 245). In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

## Memorandum Of Law

40.    Because the legal points and authorities upon which this Supplemental Application relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order authorizing (a) the employment and retention of KPMG LLP as advisory and valuation advisors to the Debtors, consistent with the terms and conditions set forth in the Advisory and Valuation Engagement Letter, effective nunc pro tunc to February 16, 2006, (b) the continued retention of KPMG LLP as one of the tax advisors to the Debtors, consistent with the terms of the Supplemental Tax Consulting Engagement Letter, effective nunc pro tunc to January 1, 2006, (c) additional international executive tax services to be rendered by KPMG LLP to the Debtors consistent with the terms and conditions set forth in the Supplemental IES Engagement Letters, effective nunc pro tunc to January 18, 2006, and (d) granting such other and further relief as is just.

Dated:  New York, New York
        April 20, 2006

>                               DELPHI CORPORATION, on behalf of itself and
>                               certain of its subsidiaries and affiliates, as Debtors
>                               and Debtors-in-possession
>
>                               By:  /s/ John D. Sheehan
>                                    Name: John D. Sheehan
>                                    Title: Vice President and Chief Restructuring
>                                           Officer