

KPMG LLP
303 East Wacker Drive
Chicago, IL  60601

Telephone  312 665 1000
Fax          312 665 6038
Internet     www.us.kpmg.com

February 16, 2006

Mr. John D. Sheehan
Controller, Chief Accounting Officer & Chief Restructuring Officer
Delphi
5725 Delphi Drive
Troy, Michigan  48098-2815

Dear John:

We appreciate the opportunity for KPMG LLP ("KPMG" or "we") to assist Delphi ("Delphi",
the "Company", or "you") related to your gathering evidence to support your analysis of
potential impairment charges in accordance with Statements of Financial Accounting Standards
(SFAS) 142 and 144 related to goodwill, intangibles, and long-lived assets.  In addition, we will
assist you with initial planning for your Fresh Start valuation exercise in connection with your
future emergence from Bankruptcy.  This letter outlines the background, scope, timeline and
professional fees for this project.

## BACKGROUND

In connection with your December 31, 2005 financial statements, Delphi Management conducted
a review for impairment of your long-lived assets and intangible assets, including goodwill, by
applying the provisions of SFAS Nos. 142 and 144.  As a result, Management identified 21 plant
locations (12 in Western Europe, 1 in India, and 8 in North America) which had indicators of
impairment at December 31, 2005 under SFAS 144, for which Management recognized a
preliminary impairment charge at year-end.  In addition, Management identified four reporting
units under SFAS 142 which had indicators of goodwill impairment after applying the provisions
of the SFAS 142 and recognized a preliminary impairment charge at year-end.  An additional
reporting unit may also have goodwill impairment upon further refinement of the internal
estimates utilized.

In making its assessment, Management utilized valuation assumptions, cash flow projections and
other supporting data and performed a calculation to support its conclusions on the existence of
impairments and to measure the amount of the impairment charges preliminarily recognized.  In
conducting its audit, the Company's auditors, Deloitte & Touche LLP, and Management have
requested enhanced evidential support for Management's conclusions and impairment
measurements through additional analysis and evidential support through engagement of an
external valuation consultant.

Given the unique circumstances facing Delphi as a result of its Debtor-in-Possession status and
prospective emergence from Bankruptcy and application of Fresh Start reporting in connection
therewith, the Company desires to consider the scope, design, planning, and evidential support
that can be gathered to meet the current objectives to support the 2005 impairment analysis, and
also to consider the implications on the planning for and design of the process for valuing the
tangible and intangible assets and liabilities of Delphi for Fresh Start purposes.



Mr. John D. Sheehan
Delphi
February 16, 2006
Page 2

## SCOPE

### *SFAS 142*

You have requested that we perform the following:

- Detailed reading of the reporting unit balance sheets prepared by management, including gaining an understanding of the methodologies utilized to allocate shared asset and liabilities to reporting units.

- Preparation of fair value estimates for each reporting unit based upon market participant information.

- To the extent the fair value estimate of the reporting unit is less than the net book value of the reporting unit, complete an allocation of the fair value of the reporting unit to the assets and liabilities of that unit (including any unrecognized intangible assets or unrecorded liabilities such as contracts that are not at market value).

- Issuance of a valuation reporting covering the fair value estimates of each reporting unit as well as the "purchase price allocation" of the fair value to the assets and liabilities of each reporting unit.

- Assistance with completing the formal accounting documentation (memoranda, discussions with external auditors as required, etc.) to support the conclusions reached in accordance with FAS 142.

We anticipate that the scope of our assistance under Step 1 will include the valuation of each of the Reporting Units of Delphi that contain goodwill. Both SFAS 142 and SFAS 144 include a two-step approach to test for and measure impairment. For SFAS 142 the approach is equivalent to a business valuation and, if necessary, a purchase price allocation. The steps are as follows:

**Step 1**    Compare the fair value of a reporting unit to its carrying amount, including goodwill. If the fair value of the reporting unit is greater than its carrying amount, goodwill is not considered impaired.

**Step 2**    If the fair value of the reporting unit is less than its carrying amount, the amount of the impairment loss, if any, must be measured. The amount of the impairment loss, if any, is measured by comparing the implied fair value of goodwill to its carrying amount. If the carrying amount of goodwill exceeds its implied fair value, an impairment loss is recognized equal to that excess.

KPMG

Mr. John D. Sheehan
Delphi
February 16, 2006
Page 3

> The fair value of goodwill is valued in the same manner that goodwill is calculated in a business combination. The entity should allocate the fair value of the reporting unit to *all* of the assets and liabilities of that unit (including any unrecognized intangible assets) as if the reporting unit had been acquired in a business combination and the fair value of the reporting unit was the purchase price. The excess "purchase price" over the amounts assigned to assets and liabilities would be the implied fair value of goodwill. This allocation would be performed only for purposes of testing goodwill for impairment and entities would not record the "step-up" in net assets or any unrecognized intangible assets.

Therefore, if required, our assistance related to any impairment quantification under Step 2 will consist of:

- Valuation of the tangible and intangible assets of each of the required Reporting Units; and

- Calculation of the goodwill impairment.

We have assumed for purposes of this proposal that, as a part of Step 1, Delphi will provide management's allocation of current assets, tangible assets, shared assets and all liabilities to the individual Reporting Units. The assets will include an allocation of the goodwill to each Reporting Unit. In addition, we assume that Delphi will provide separate historical and projected income statements for each Reporting Unit and that the income statements will contain all corporate allocations. We will read this allocation and provide Delphi commentary on any observations resulting from our procedures.

### *SFAS 144*

You have requested that we perform the following:

- Completion of Step 1 (development of undiscounted cash flows and comparison to the net book value of assets) for shared assets including corporate and divisional headquarters, technical centers, sales centers and other assets outside of plant manufacturing locations and Step 2 valuation of such assets, to the extent required by the results of Step 1. The assets included in this evaluation are located around the world, management is currently in the process of developing a listing of the assets included herein.

- Completion of additional Step 2 valuations as required, if indicated throughout the course of the project. Scope of this requirement to be defined as additional information becomes available.

**KPMG**

Mr. John D. Sheehan
Delphi
February 16, 2006
Page 4

- Assistance with completing the formal accounting documentation (memoranda, discussions with external auditors as required, etc.) to support the conclusions reached in accordance with FAS 144.

To achieve this request, KPMG will provide valuation studies to determine the valuation of long-lived assets, amortizing intangible assets, and non-amortizing intangible assets and goodwill for the identified plant locations and reporting units in connection with the Company's application of SFAS 142 and 144 at December 31, 2005. In connection therewith, we will provide you with consultation and advice on the proposed scope of the valuation exercise, sampling approaches that are acceptable when addressing large numbers of assets in a relatively homogenous population, valuation assumptions and methodology, and evidential support underlying assumptions utilized. We will perform such assistance based on our prior experience in providing consultation, valuation, or audit services in connection with other Impairment exercises.

As previously mentioned Delphi has concluded 21 Asset Groups (plant locations) are subject to further testing to determine the amount, if any, of impairment. Those locations include:

Laurel, U.S. (AHG)                Sochaux, France (P)
Home Avenue, U.S. (AHG)          Tarazona, Spain (P)
Anderson, U.S. (AHG)             Neumarkt, Germany (P)
Livorno, Italy (S)               Portugal (P)
Cadiz, Spain (S)                 Flint, U.S. (E&S)
Orion, U.S. (T&I)                Liverpool, UK (E&S)
Gadsden, U.S. (T&I)              Ponte De Sor, Portugal (E&S)
DCC-Douai, France (T&I)          Cadiz, Spain (E&C)
DHC-Douai, France (T&I)          Villeron, France (E&C)
Warren, U.S. (P)                 Noida, India (E&C)
Clinton, U.S. (P)

In addition to these plant locations, it is our understanding that a number of shared assets (e.g., technology centers, sales centers, etc.) likely will be included in the SFAS 144 analysis. The anticipated valuation steps under our SFAS 144 assistance are as follows:

**Step 1**        We will read the recoverability test performed by Delphi on each of the Asset Groups and provide Delphi our observations of the recoverability test for SFAS 144 purposes.

**Step 2**        For those Asset Groups which do not pass the recoverability test of Step 1, we will determine the fair value of the underlying long-lived fixed assets and real property. We will then compare the concluded fair value of the Asset Group with its carrying value to quantify the impairment.

KPMG

Mr. John D. Sheehan
Delphi
February 16, 2006
Page 5


In addition, we will provide you with consultation and advice regarding potential options on approaches to conducting your Fresh Start valuation exercise.  As part of this, we will discuss with you the potential implications of your current valuation exercise, particularly as it relates to the valuation of intangible assets for Step 2 purposes under the application of SFAS 142, on your initially planned approaches to perform the Fresh Start valuations that will be required as part of your emergence from Bankruptcy.  We will perform such assistance based on our prior experience in providing consultation, valuation or audit services in connection with other Bankruptcies and Fresh Start exercises.

We will utilize a combination of our Accounting Advisory and Valuation Services professionals on the engagement, as well as professionals with other complimentary backgrounds from KPMG LLP.  The individuals listed in Appendix D are your engagement team, subject to any changes that you request.

We will meet with Delphi personnel to:

- identify the accounting issues encountered in connection with your application of SFAS 142 and 144,
- read the Company's existing valuations and evidential matter,
- understand the Company's valuation methodologies and assumptions and proposed accounting position and calculations,
- understand the views and requested evidential support expected by the Company's auditors Deloitte & Touche, LLP, and will meet with the Company and its auditors as necessary, and
- discuss and identify potential accounting technical matters that may require additional research of accounting literature, accounting practice, and the experience of selected KPMG personnel for similar transactions to assist the Company in further documenting its proposed positions and supporting rationale.  We will communicate the results of our accounting advisory services in the format you request, which may consist of (i) our comments on your white papers or other documentation drafted by you, (ii) our memorandums or presentations to you, accompanied by summaries based on your accounting records, or (iii) discussions with you.

The objective of our assistance is to provide an independent and supportable basis to measure your impairments of long-lived assets and intangibles, including goodwill, under SFAS 142 and 144. No other use is intended or inferred.  The generally accepted definition of fair value as defined in SFAS 141, which we will follow, is:

> "The amount at which the asset (or liability) could be bought (or incurred) or sold (or settled) in a current transaction between willing parties, that is, other than in a forced or liquidation sale."

(Note: We may be looking at liquidation value for some of the long lived assets)

**KPMG**

Mr. John D. Sheehan
Delphi
February 16, 2006
Page 6

Our study will consider, where appropriate, the three basic approaches to determining an asset's fair value: the income, market and cost approaches. Brief descriptions of each approach are presented below:

The **Income Approach** measures the value of an asset or a business by the present value of its future economic benefits. These benefits can include earnings, cost savings, royalty savings, tax deductions and proceeds from the asset's disposition. When applied to a business, value indications are developed by capitalizing current benefits or discounting prospective cash flows to their present value at a rate of return that incorporates the risk-free rate for the use of funds, the expected rate of inflation and risks associated with that particular investment. The capitalization and discount rates selected are generally based on rates of return available for alternative investments of similar type and quality as of the valuation date.

The **Market Approach** measures the value of an asset or a business through an analysis of recent sales or offerings of comparable assets. When applied to the valuation of a business, consideration is given to the financial condition and operating performance of the company being valued relative to those of publicly traded companies operating in the same or similar lines of business, potentially subject to corresponding economic risks and therefore considered to be reasonable investment alternatives.

The **Cost Approach** measures the value of an asset or a business based on the cost to reconstruct or replace it with another of like utility. When applied to the valuation of a business, value is based on the net aggregate fair value of the entity's underlying assets. This technique entails a recasting of the balance sheet of the enterprise in which the fair values of its assets and liabilities are substituted for their book values.

We may utilize all or a combination of these approaches to derive our conclusions. It should be noted that no one formula or rule of thumb automatically yields a definitive determination of value. Each company and asset valuation involves unique factors. The valuation process involves the objective analysis of data, the application of experienced judgment, and collaboration with management to yield a reasonable conclusion.

We anticipate the scope of our valuation assistance to include, but not be limited to, these general tasks:

- Discuss with management  regarding all assets subject to the impairment analysis, including any other assets not explicitly valued by KPMG and unrecognized intangible assets to be considered in the SFAS 142 analysis;

- Read Delphi's related due diligence reports on recent acquisitions or prior valuation reports related to impaired assets, plants, or reporting units;

KPMG

Mr. John D. Sheehan
Delphi
February 16, 2006
Page 7

- Interview Delphi's operations, accounting/finance and marketing personnel;

- Obtain the fixed asset register and hold discussions with the appropriate personnel;

- Consider the historical attrition rates, statutory or contractual lives, and life cycles; and

- Consider historical results and projected financial budgets, cash flows, etc.

Based on our discussions with you and our preliminary read of the data, we anticipate the scope of our assistance to include:

- WORKPLAN. We will draft a preliminary workplan based on our understanding of your facts and circumstances and the assistance you have requested. You will consider this workplan and approve or suggest revisions before we incur significant additional work.

- REPORTING UNITS will be valued using traditional business valuation methodology (e.g. the market and income approaches).

- REAL AND PERSONAL PROPERTY will be valued using the market approach and a sampling technique intended to balance coverage and cost.

- INTELLECTUAL PROPERTY/PATENTS/TRADE SECRETS/"KNOW HOW". We will evaluate both patented and unpatented technology, as well as design patents and registrations. Consideration of both the cost and income approach will be used to derive value.

- LICENSES AND CERTIFICATIONS will be valued using the cost and income approaches.

- CUSTOMER/DISTRIBUTION BASE. We plan to perform an excess earnings or differential cash flow analysis to determine the value of the distribution base, if any.

- CONTRACTS. We will evaluate existing material customer or supply contracts for any provisions that indicate a material favorable or unfavorable contract compared with current market conditions.

- OTHER INTANGIBLES (e.g., order/production backlog, favorable supply/lease agreements, covenants-not-to-compete) Findings will be discussed with you regarding the presence of other intangibles and their materiality prior to expanding our work plan.

We plan to conduct our valuation engagement such that a summary report with accompanying financial schedules detailing preliminary valuation conclusions will be provided when available. Subsequently we will complete a full report, with accompanying financial schedules, that provides an overview of our valuation process, fair values of the Subject Assets and where appropriate, and a description of valuation methodologies and assumptions utilized.



Mr. John D. Sheehan
Delphi
February 16, 2006
Page 8

*Management's Role and Responsibilities*

Management is responsible for providing the necessary financial and tax information to KPMG. Delphi's management is responsible for establishing and supporting its income statement and balance sheet accounts and financial statement disclosures and maintaining adequate internal controls and procedures necessary to prepare such information. In addition, Delphi will:

a) Provide KPMG, on a timely basis, all information, documentation and materials relating to Delphi's operations necessary for KPMG to perform the services described in this letter;

b) Establish that all information provided to KPMG is materially accurate and complete, and is updated on a timely basis. KPMG will not be held responsible for Delphi information that has not been rendered in accordance with the provisions of paragraphs (a) and (b); and

c) Provide KPMG with reasonable access to all employees and personnel affected by the services described in this letter and cooperate with KPMG in arranging meetings as appropriate.

## OTHER TERMS AND CONDITIONS

All services performed under this master letter with respect to each Engagement will be subject to the Delphi Standard Terms and Conditions for Transaction Services Engagements dated February 16, 2006 (the "Standard Terms and Conditions") attached as Appendix A and incorporated by reference herein.

KPMG will perform their services under the Statements on Standards for Consulting Services issued by the American Institute of Certified Public Accountants. The sufficiency of the procedures is solely the responsibility of the specified users of our advice and/or discussion documents. Consequently, KPMG makes no representation regarding the sufficiency of the procedures either for the purpose for which our advice and/or discussion documents is being prepared or for any other purpose.

To the extent that KPMG provides accounting advisory services to Delphi, we will base our conclusions on the facts and assumptions that Delphi submits; we will not independently verify such information but will inform Delphi's management of any such information that may appear questionable to KPMG. Inaccuracy or incompleteness of the information provided to us could have a material effect on our advice and services provided. In rendering accounting advice, whether written or oral, we will consider the applicable technical literature, laws and regulations. Financial reporting authoritative guidance is subject to change or modification, retroactively or

KPMG

Mr. John D. Sheehan
Delphi
February 16, 2006
Page 9

prospectively, by varying interpretation and by subsequently issued pronouncements, legislation, and regulatory, administrative, or judicial decisions. Any such change or modification could affect the validity of our advice. Following the termination of this engagement, we will not update our advice for subsequent changes or modifications.

In this engagement, KPMG assumes no responsibility for auditing information provided by Delphi or for expressing an opinion on any part of Delphi's financial statements. Those responsibilities belong to Delphi and their independent auditor.

Accounting advice provided by KPMG to Delphi may not be provided to any third party without the express written permission of KPMG. Additionally, Delphi agrees that we have no obligation to update any information provided to you for events and circumstances occurring after termination of this engagement, unless a request is agreed to in writing.

Because of the requirements of Statement of Auditing Standards No. 50 *Reports on the Application of Accounting Principles* (SAS 50) as amended by Statement of Auditing Standards No. 97, *Amendment to SAS 50, 'Reports on the Application of Accounting Principles'* (SAS 97), and KPMG internal policies, on those occasions when we provide such accounting advice to the principal of proposed accounting policies who is not a KPMG audit client, such professional requirements include communicating with the independent auditors' of the Company to discuss such matters as:

- the economic substance of the transactions in scope versus the form of the transaction;

- whether there is a dispute between the Company and the continuing accountants; or

- whether the continuing accountants have reached a conclusion that differs from ours.

If necessary and appropriate, KPMG will meet with Delphi's independent auditor during the course of the engagement to discuss our services and any preliminary findings. If you request oral or written advice on the application of Generally Accepted Accounting Procedures that we consider to be under the requirements of SAS 50, we will conduct our customary engagement procedures for the individual topics requested and, if accepted, we will issue an addendum to this engagement letter defining the scope of such procedures.

KPMG's valuation services in this engagement are intended to be a primarily straightforward application of generally accepted valuation methodologies to Delphi's facts. KPMG is not assuming responsibility for management analysis or decision-making with respect to the Delphi's positions taken on tax returns, the application of any accounting principles, related financial statement disclosures and balance sheet accounts. Delphi is to consult with their independent auditor on the application of accounting principles.

Delphi has the right to share the results of their work, as well as KPMG's final valuation reports, with their auditors (Deloitte & Touche) and legal counsel. If you would like to share our final valuation reports with other parties, we would consider the specific request and, if accepted, we



Mr. John D. Sheehan
Delphi
February 16, 2006
Page 10

would require that such parties execute an approved reader letter prior to your release of the final report. An example of such letter is included at Appendix E.

Except as otherwise set forth in the Engagement Letter, in accepting this engagement, Delphi acknowledges that completion of this engagement or acceptance of Deliverables resulting from this engagement will not constitute a basis for Delphi's assessment or evaluation of internal control over financial reporting and disclosure controls and procedures, or its compliance with its principal officer certification requirements under Section 302 of the Sarbanes-Oxley Act of 2002 (the "Act"). This engagement shall not be construed to support Delphi's responsibilities under Section 404 of the Act requiring each annual report filed under Section 13(a) or 15(d) of the Securities Exchange Act of 1934 to contain an internal control report from management.

All oral and written communications by KPMG to you with respect to the Engagement, including drafts and those communications occurring prior to the execution of the Engagement Letter (collectively, "Reports") will be subject to the terms and conditions of the Engagement Letter and the Delphi Standard Terms and Conditions dated February 16, 2006. We have no obligation to update Reports or to revise information presented to you to reflect events and transactions occurring subsequent to the date of the final Report we issue to you. You agree to review Reports promptly and to advise us on a timely basis of any additional procedures you would like us to perform or areas to address. You authorize us to send Reports electronically for your convenience. However, you may only rely upon the final copy of our report as our work product.

**TIMING**

KPMG is available to begin providing these services beginning the week of February 20, 2006, or sooner once this engagement letter has been executed by you. We will seek proper authorization for service and fee payment from the Bankruptcy Court and/or US Trustee as appropriate. Should we learn that our application for provision of these services or fee reimbursement is not accepted by the Bankruptcy Court or US Trustee, our engagement will terminate immediately upon such notice and we will have no obligation to complete the services engaged herein.

We expect to provide drafts of our preliminary work products by mid-March, absent any delays caused by Delphi or Deloitte & Touche. Delivery of our final work product is contingent on the scope and documentation agreed to between you and your auditors, Deloitte & Touche, as well as the timing of when you provide data requests and the underlying books and records.



Mr. John D. Sheehan
Delphi
February 16, 2006
Page 11

## PROFESSIONAL FEES

We will charge our actual hours incurred using a discount of 20% from our standard hourly rates
by level listed below.

| Level | Standard Rate | 20%Discount | Net Hourly Rate |
|-------|------|-----|-----------------|
| Partner | $ 775 | $ 155 | $ 620 |
| Director | $ 750 | $ 150 | $ 600 |
| Manager | $ 610 | $ 122 | $ 488 |
| Senior | $ 470 | $ 94 | $ 376 |
| Staff | $ 385 | $ 77 | $ 312 |

We have attached as Appendix D a preliminary estimate of resources and potential hours
incurred over the period from Feb 20 to April 15th as an indicative illustration of the potential
size and fees on this engagement. This preliminary illustration will be revised to an on-going
engagement fee projection based on our detailed planning and experience as we conduct the
engagement. KPMG will keep you updated of our progress, and provide you with the hours that
are expected to be incurred on a weekly or bi-weekly basis in advance. We will highlight any
changes in scope and additional fees for your approval prior to incurring such fees. We will
accumulate actual hours incurred extended by our agreed rates, along with out-of-pocket
expenses on a bi-weekly basis, will explain any significant variances from our initial estimates,
and will submit invoices monthly.

In addition to our professional fees, you agree to reimburse KPMG for our approved out-of-
pocket expenses incurred in connection with each engagement. Neither the amount of our fees
nor the payment of our fees and expenses will depend upon the findings of our work. We will
bill expenses that we consider normal and necessary, and will exclude perks such as first class
travel.

## OTHER MATTERS

The report provided under this engagement letter is not intended to be used, nor should be used,
in connection with any tax matter. In the event Client uses this report for or in relation to any tax
matter, the report is not intended or written by KPMG to be used, and cannot be used by a client
or any other person or entity for the purpose of (i) avoiding penalties that may be imposed on any
taxpayer or (ii) promoting, marketing or recommending to any other party any matters addressed
herein.

We do not anticipate providing any tax advice under this engagement letter and therefore
our report will contain the following legend:

> *This report is not intended to be used, nor should be used, in connection with any*
> *tax matter. In the event Client uses this report for or in relation to any tax*



Mr. John D. Sheehan
Delphi
February 16, 2006
Page 12

*matter, the report is not intended or written by KPMG to be used, and cannot be used, by a client or any other person or entity for the purpose of (i) avoiding penalties that may be imposed on any taxpayer or (ii) promoting, marketing or recommending to any other party any matters addressed herein.*

We have attached as Appendix B to this letter the Valuation Limiting Terms and Conditions for your information. We also have attached as Appendix C to this letter, an example representation letter that we would tailor to your specific facts and assumptions and will request that you sign at the end of our engagement.

## DEBRIEFING

As part of our commitment to quality service, we would welcome the opportunity to receive your comments at any time on our work and the service that we deliver.



Mr. John D. Sheehan
Delphi
February 16, 2006
Page 13

**CONFIRMATION**

Please indicate your acceptance of these arrangements by signing both copies of this letter in the space provided below and returning one signed copy of the letter. We look forward to working with you.

If you have any questions, please call Brian Heckler at (312) 665-2693.

Very truly yours,

KPMG LLP

Brian Heckler, *Partner*
Transaction Services

Robert Musur, *Partner*
Valuation Services

Enclosures

cc: R Musur
    G. Silberg
    S. Carlin

**ACCEPTED by Delphi:**

_____            2/22/06,
Signature                          Date

Chief Security Officer
Title
    & Controller.