Hearing Date and Time: May 9, 2006, 10:00 am

Barbara Mehlsack (BM 1390)
GORLICK, KRAVITZ & LISTHAUS, P.C.
17 State Street, 4th Floor
New York, New York 10004
(212) 269-2500
bmehlsack@gkllaw.com

Richard Griffin, General Counsel
INTERNATIONAL UNION OF OPERATING ENGINEERS
1125 17th Street, NW
Washington, DC 20036
(202) 778-2675
rgriffin@iuoe.org

Attorneys for International Union of Operating Engineers
Local Union Nos. 18 and 832

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------
                                              :
           In re                              :    Chapter 11
                                              :
DELPHI CORPORATION, et al.,                   :    Case No.05-44481 (RDD)
                                              :
                             Debtors.         :    (Jointly Administered)
                                              :
-----------------------------------------------------------

**OPPOSITION OF INTERNATIONAL UNION OF OPERATING ENGINEERS LOCALS
18, 832 AND 101 TO DEBTORS' MOTION FOR AUTHORITY TO REJECT
COLLECTIVE BARGAINING AGREEMENTS AND TO MODIFY RETIREE
BENEFITS AND MEMORANDUM OF LAW IN SUPPORT OF OPPOSITION**

## TABLE OF CONTENTS

Page

Table Of Authorities . ........................................................................................... ii

Preliminary Statement............................................................................................ 1

Statement Of Facts .............................................................................................. 8

    A.    Delphi is not entitled to reject its collective bargaining agreements with
        the IUOE Locals as it cannot demonstrate that it has met the procedural
        or the substantive requirements of Section 1113 (b) and (c) ...........................8

    B.    Delphi's failure to address with the IUOE Locals the complex of new
        proposal and current provisions affecting hourly retiree welfare benefits
        means that Delphi has failed to comply with the procedural requirement
        of Section 1114 ...................................................................................... 11

Conclusion ........................................................................................................ 13

## TABLE OF AUTHORITIES

**Cases**                                                                                        **Page**


*Century Brass Products, Inc. v. UAW*, 795 F.2d 265 (2nd Cir.,1986). ............................................. 2

*In re Horsehead Industries, Inc.* 300 B.R. 573 (S.D.N.Y. 2003). ................................. 2, 8, 10, 11

*In re Ionosphere Clubs, Inc.* 134 B.R. 515, 519-20 (S.D.N.Y 1991) ........................................... 15

*NLRB v. Bildisco*, 465 U.S. 513, 79 L.Ed.2d 482, 104 S. Ct. 1188 (1984) .................................... 1

*Truck Drivers Local 807, Int'l Bhd. of Teamsters v. Carey Transp. Inc.* 816 F 2d 82

(2d.Cir.1987)................................................................................................................................. 12




**Statutes**                                                                                     **Page**

11 U.S.C. §1113................................................................................................. 1, 8, 9, 10, 11

11 U.S.C. §1114.................................................................................................... 1, 10, 12

Local Bankruptcy Rule 9013-1(b)…………………………………………………………..…3

# I

## Preliminary Statement

International Union of Operating Engineers ("IUOE") Locals 18 S, 832 S and 101, by their undersigned attorneys, hereby oppose Delphi Corporation's ("Delphi") Motion for Authority to Reject Collective Bargaining Agreements Under 11 U.S.C.§ 1113 (c) and Modify Retiree Welfare Benefits Under 11 U.S.C. § 1114 (g). As will be demonstrated below, when it comes to the three bargaining units, comprising a scant 20 employees represented by the IUOE Locals, Delphi has failed utterly to comply with the procedural and substantive requirements of Sections 1113 and 1114.

Delphi cannot meet its burden to show that it has: a) made a proposal to each of the IUOE Locals that meets the requirements of Section 1113 (b)(1)(A); 2) provided the Locals with the relevant information necessary to evaluate any such proposals; or 3) engaged in good faith negotiations with the Locals to reach a mutually satisfactory resolution. As a result Delphi cannot demonstrate that the IUOE Locals' have "refused to accept" Delphi's post petition proposals without good cause or that the balance of equities favors rejection. Delphi has similarly failed to meet the requirements of Section 1114 (f) to make a proposal to the IUOE Locals that ensures that all affected parties are treated fairly and equitably, provide the relevant information to enable the Locals to evaluate any proposals and engage in good faith negotiations with the Locals.

As the Second Circuit has discussed, quoting Senator Packwood on the Congressional purposes of Section 1113, the aim of Section 1113, in the wake of the Supreme Court's decision in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 79 L.Ed.2d 482, 104 S. Ct. 1188 (1984), was to

"encourage the collective bargaining process as a means of solving a debtor's financial problems insofar as they affect its union employees. *Century Brass Products, Inc. v. UAW*, 795 F.2d 265, 273 (2nd Cir.,1986). Delphi has taken the position that its voluntary attrition plans (or "soft landing" proposals) are critical to the collective bargaining process because they are necessary to structuring any modified labor agreements and achieving a consensual resolution with its unions. (Debtors' Omnibus Reply to Objections to Motion for Order Under 11 U.S.C § 363 (b) Approving Debtors' Human Capital Hourly Attrition Programs, ¶ 14, p.9.) Indeed, it has acknowledged that the hourly attrition programs will generate substantial savings. *Id.* As the Declarations of Business Agent Jim Glather of Local 832 S and Business Agent Charles Scherer of Local 18 S demonstrate, Delphi has never made any such proposals to either Locals nor made itself available to the Locals to discuss such proposals despite promises to the contrary.

Whether Delphi's failure is characterized as a failure to make a proposal that meets the requirements of Section 1113 (b) (1) (A) or to provide relevant information needed to evaluate such proposals as required by Section 1113 (b)(1) (B), or both, Delphi has clearly failed to meet its procedural burden under Section 1113. While Delphi may have made a strategic decision to focus its efforts on negotiating a soft landing for UAW employees (See Debtors' Omnibus Reply at ¶10, p. 7 characterizing negotiations as complex and intense), the price of that strategy is that Delphi has failed to comply with the procedural requirements of §1113 (b). In short, Delphi chose not to negotiate with IUOE Locals 18 S, 832 S and 101. Accordingly, its motion to reject their collective bargaining agreements must be denied. *In re Horsehead Industries, Inc.* 300 B.R. 573, 588 (S.D.N.Y. 2003).

As will be further discussed below, Delphi's failure to address with the IUOE Locals the various means it currently has in place or proposes to put in place to mitigate the effects of the

concession it seeks, including its modifications of retiree benefits, also compels the rejection of its proposals to modify retiree benefits. The IUOE Locals are not in a position to evaluate any such proposals until and unless they have a full understanding of what rights will inure to the benefit of the individuals they represent.

Because the IUOE Locals have incorporated the legal points and authorities upon which their Opposition is based in this document, the Locals respectfully request that the requirement of service and filing of a separate Memorandum of Law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

## II

## Statement of Facts

As Delphi has represented, it has over 33,000 unionized employees and over 14,000 salaried and management employees at sites throughout the country. The vast majority are represented by the UAW. The IUOE Locals represent some 20 employees in the classification of powerhouse operator, a miniscule percentage of Delphi's unionized work force. IUOE Local 18 S represents 13 of those employees at Delphi's plant in Columbus Ohio. (Exhibit A, Declaration of Business Agent Charles Scherer ("Scherer"), ¶ 3, p. 2) IUOE Local 832 S represents six such employees at Delphi's facility in Rochester. (Exhibit B, Declaration of Business Agent Jim Glather ("Glather"), ¶3, p. 2. The IUOE employees at the Rochester and Columbus facilities operate and maintain the boilers and HVAC systems and are skilled employees.

The IUOE has another bargaining unit at Delphi. IUOE Local 101 has historically represented employees at Delphi's wastewater facility in Olathe, Kansas. The facility is now

closed and there remains a single IUOE represented employee there, whose presence on the site is apparently required until clean up is accomplished. The Debtor's submissions in support of its Motion do not include a proposal to Local 101. The only contract modifications included in the Declaration of Kevin Butler in support of the Debtor's Motion are those covering the Rochester and Columbus facilities. Moreover, in response to the cover letter to Delphi's March 25, 2006 proposal addressed to the IUOE General President and included as Exhibit I in the Declaration of Kevin Butler, Local 101 made a demand to Mr. Butler to negotiate the details of the plant closing and its contract. The demand is annexed hereto as Exhibit C. Mr. Butler has never responded to the demand.

As Delphi has recited in the various filings made by it documents, it has made a series of proposals to its various unions, including IUOE Locals 18 S and 832 S, denominated the Competitive Benchmark Proposals and the GM Consensual Proposals (the "Consensual Proposals"), that not only will result in radical reductions in wages and benefits for the affected individuals but will also substantially modify other provisions of the IUOE collective bargaining agreements, including provisions, like a new "no picketing" prohibition, that have nothing to do with Delphi's reorganization needs. [1]

At the same time apparently, the Debtor was in "complex" and "intense" negotiations with the UAW over the Human Capital Attrition Agreement. While Delphi has represented to the Court that it will be proposing comparable programs to its other unions (Motion for Order Approving Human Capital Hourly Attrition Programs "Human Capital Attrition Programs

---

[1] Delphi added a provision to the IUOE No Strike Clause to the Consensual Proposal that was not in the Competitive Benchmark Proposal and that would prohibit employees from picketing. Compare Exhibit F to Butler Declaration, Columbus and Rochester Proposed Modifications Term Sheet Final 111705 and 111805 respectively , No Strike Provisions, at P.12 to Exhibit H, Columbus and Rochester Proposed Modifications, Term Sheet Final 032506, No Strike Provisions, at Page 15.

Motion", ¶ 16.), no such proposals have been made to the IUOE Locals.  IUOE Local 18 S

Business Agent Charles Scherer scheduled a meeting with Delphi labor relations representative

Robert Gerling for the express purpose of Mr. Gerling presenting the program to him but Mr.

Gerling canceled the meeting and advised the Business Agent that he would get back to him as

soon as "the program was cleared by the lawyers" ( Ex. A, Scherer Declaration ¶6.)  Mr. Scherer

has yet to hear from Mr. Gerling or anyone else at Delphi regarding the Hourly Attrition

Programs or "soft landings."    Similarly IUOE Business Agent Jim Glather has not heard from

Delphi about the "soft landings" programs since Mr. Gerling also told him that early retirement

incentives and flow back opportunities would be made available to the IUOE bargaining units.

The last Mr. Glather heard was that the package would be extended "this week." (Exhibit B ¶ 6).

Similarly, Local 101 has heard nothing from Delphi, despite its demand to negotiate.

As both Business Agents have stated in their Declarations the "soft landings" proposals

would be critical to their ability to evaluate and respond to Delphi's requests for wage and

benefit concessions. (Exhibit A, ¶ 9, Exhibit B ¶ 10).   They cannot possibly know the impact of

the wage and benefit concessions on their bargaining unit members or on Delphi without those

proposals in hand.

In Delphi's own view, the "soft landings" proposals are critical elements of their

negotiations with the unions and they have sought to "sell" the contract modifications on the

promise of the "soft landings."    Delphi made the following representations in its Omnibus

Reply to Objections to its Human Capital Attrition Motion:


...(T) he Hourly Attrition Programs 'soft landings' should ease the sudden impact
upon employees from the economic hardship that they might otherwise face as a
result of Delphi's financial situation and enhance Delphi and its unions' ability to

achieve a consensual resolution of Delphi's remaining labor issues that will be ratifiable by the unions' members...

Omnibus Reply ¶13

Delphi believes that creating a "soft landing" for excess or high cost employees is critical to facilitating the structure of and subsequent ratification of any modified labor agreement that Delphi ultimately reaches with its unions.

Omnibus Reply ¶14

Furthermore, Delphi touted the Attrition Programs as likely to generate positive cash flow and

substantial savings:

...Finally, the Debtors anticipate that the Hourly Attrition Programs will generate positive cash flow in 2006 resulting form the reductions in the Debtor's workforce and cost savings from utilizing lower-rate employees.

Omnibus Reply ¶14

...Furthermore entry into the UAW Special Attrition Program Agreement, while representing only one element in the Debtor's overall effort to address the Debtors' current uncompetitive U.S. cost structure, evidences curical progress in the Debtor's negotiations of a consensual resolution with two key constituencies. – GM and the UAW. By providing a substantial number of Delphi's employees with a "soft landing" implementation of the Hourly Attrition Programs directly addresses the concerns of the Debtors' employees, customers, and other key constituent groups, thereby providing distinct operational benefits. Finally because GM has agreed to shoulder a significant portion of the obligations arising as a result of the UAW Special Attrition Program Agreement, the Debtor's implementation of the Hourly Attrition Programs will generate significant financial benefits, both by way of enhanced cash flow and decreased cooperating losses over the five year period form 2006 through 2010 versus the status quo.

Omnibus Reply ¶23

Delphi sought to sell the IUOE on its contract concessions on the promise of the "soft

landings." On March 25, 2006, Delphi transmitted its contract proposals to IUOE General

President Vincent Giblin under cover of the following:

6

With today's proposal, we hope the parties can utilize the momentum created this week as we seek the Bankruptcy Court's approve of Hourly Attrition Programs which might be negotiated with the IUOE and continue to find mutually acceptable solutions to reduce the hardship created by Delphi's financial situation.

Exhibit I to Declaration of Kevin Butler

Delphi dropped the ball and never followed up with any of the IUOE Locals, canceling its meeting with Local 18 S, never responding to Local 101 and never reaching out to Local 832 S.   Effectively the IUOE Locals had no proposal to which they might make a counteroffer.

While Delphi has taken the position that the Hourly Attrition Programs will not obviate the need for contract concessions, as the declarations of Business Agents Glather and Scherer set forth, Delphi never took the opportunity to explain how the cost and operational provisions of the IUOE contracts -- with or without the "soft landings" -- at either the Columbus or Rochester facilities are an impediment to Delphi's competitive position.  (Exhibit A, ¶ 7; Exhibit B ¶ 7)[2]

The IUOE Locals are also the representatives of the IUOE retirees.  Delphi's failure to engage with the IUOE representatives on the issue of retirement incentives and programs has meant that in their capacity as retiree representatives they are without the full package of comprehensive and integrated proposals that are being contemplated by Delphi.  It appears that the UAW Attrition Program will affect the healthcare coverage of employees participating in the Program.  See Human Attrition Programs Approval Motion, ¶ 8.  Moreover, the status of the IUOE Local bargaining units under the GM Benefit Guarantee has not been explicitly addressed, It is the position of Delphi that the elimination of hourly retiree welfare benefits is fair and equitable albeit certain management employees will continue to receive health care benefits until reaching Medicare eligibility, because the management employee do not "have the possible

---

[2] The IUOE Locals also question Delphi's use of data from automotive companies as the basis for comparing the powerhouse engineers wages and benefits.

advantage currently held by most hourly retirees in the form of the GM Benefit Guarantees that may, in effect, preserve hourly health care benefits." (Delphi's Memorandum of Law in Support of Order Authorizing Rejection of Collective Bargaining Agreements, p. 80).    As Delphi has failed to address the issues of the Guarantee, retirement incentives and flow back opportunities with the IUOE Locals, the IUOE representatives are not able to evaluate or respond to the proposals to modify retiree welfare benefits.

## III

### Argument

A.    **Delphi is not entitled to reject its collective bargaining agreements with the IUOE Locals as it cannot demonstrate that it has met the procedural or the substantive requirements of Section 1113 (b) and (c).**

As the Second Circuit has stated, the procedural requirements of Section 1113 of the Bankruptcy Code,  set forth in  Sub-Sections 1113 (b) (1) and (2) are intended to foster the collective bargaining process and not the courts as the means for the debtor to solve its financial problems.  As a result, in order to obtain this Court's approval to reject its labor contracts with the IUOE Locals, Delphi must demonstrate that it: a) made a proposal to the IUOE Locals that is necessary to its reorganization and is fair and equitable to all parties; b) provided the relevant information to the Locals that they need to evaluate the proposal; and c) have met with the Locals at reasonable times to negotiate in good faith to reach a mutually satisfactory resolution. *Century Brass*, 795 F2d at 273. "The necessity requirement places on Delphi the burden of proving that the proposal is made in good faith and contains necessary, but not absolutely minimal, changes that will enable the debtor to complete the reorganization process successfully." *Truck Drivers Local 807, Int'l Bhd. of Teamsters v. Carey Transp. Inc.* 816 F 2d

82,90 (2d. Cir.1987).    The requirement of fair and equitable treatment forces the debtor to

spread the hurt.    The burden of saving the debtor must be borne through sacrifice to a similar

degree by every constituency. *Horsehead Industries, Inc.*  300 B.R. at 584. (Citations omitted)

Moreover, as the decision of this Court *Horsehead Industries, Inc.* makes clear, Delphi

must demonstrate it's compliance with the requirements of Section 1113 with respect to each of

the bargaining units and their representatives on its property, even though the Debtor may be

seeking similar concessions from all of the bargaining units., 300 B.R. at  580, 582, 588.

The facts are unequivocal that the Debtor cannot demonstrate its compliance with the

procedural requirements of Section 1113 vis a vis the IUOE Locals.  As we have seen, by the

Debtor's own lights, the "soft landing" provisions of the Attrition Programs are a necessary

element of their efforts to restructure their labor agreements and reach a consensual resolution

with their unions.  Despite promises to the contrary, and efforts by the IUOE Locals to get

Delphi to the bargaining table, Delphi has failed to discuss either the retirement incentives or the

flow back aspects of the Attrition Programs with the IUOE Locals.    The Debtor canceled its

meeting with Local 18 S, never made good on its promise to Local 832 S to produce the

proposals, and failed to respond to negotiation demands from Local 101.

Furthermore, the Debtor has touted the retirement incentives and flow back provisions of

the Attrition Agreement with the UAW as evidence that its proposals are equitable when

comparing the position of the hourly employees to that of its salaried and management

employees.

As the IUOE Locals have never received the "soft landings" proposals or even had the

opportunity to discuss them with Delphi nor has Delphi discussed with the Locals how their

contracts with or without the soft landings provisions impede Delphi's competitive position,

Delphi cannot demonstrate that it has provided the relevant information that the IUOE Locals need to evaluate either the necessity or the equities of the massive contract concessions sought by Delphi.    Moreover, each of the Locals and their members face very different situations, in one case the plant has closed, in another Delphi projects its closing and in the third, Delphi intends to keep the plant operating.    In each instance therefore, the interplay of retirement incentives, flow back opportunities and the concessions sought will be different.    As Delphi itself has acknowledged, negotiations with the UAW and GM over the Attrition programs were complex and intense and the agreements are comprehensive and integrated.    The mere fact that the IUOE bargaining unit is a shadow of the UAW unit does not mean that negotiations will be any the less intense or complex.

As a result, Delphi cannot demonstrate that it has: a) made a proposal that complies with Section 1113 (b) (1) (A);  b) provided the relevant information needed by the IUOE Locals to evaluate the proposals they have received to date as required by Section 1113(b)(1)(B); or c) met with the IUOE Locals at reasonable times in a good faith effort to negotiate mutually satisfactory changes to their agreements as required by Section 1113 (b) (2).

Hence, Delphi also cannot show that it has complied with the substantive requirements of Section 1113 (c).    It cannot demonstrate that the IUOE Locals rejected a proposal that meets the requirements of Subsection 1113 (b) (1) without good cause or that the balance of the equities clearly favors rejection of their agreements.    The good cause requirement is intertwined with the requirement to negotiate in good faith. *Horsehead Industries*, at 584-585.  Where, as here, the Debtor has not made its complete package or relevant information available to the union representatives, nor made its representatives available to meet with the unions,   the union representatives were clearly not in a position to evaluate the concession proposals and come up

10

with a counter offer, especially as the Debtor itself took the position that it was not seeking a specific dollar value of cost reductions (See letter to Vincent Giblin, October 21, 2005, Exhibit E to Declaration of Kevin Butler).

The second substantive requirement of §1113 (c) involves the balancing of the equities. The Second Circuit has identified at least six permissible equitable considerations: 1) the likelihood and consequences of liquidation if rejection is permitted; 2) the likely reduction in the value of creditors claims if the bargaining agreement remains in force; 3) the likelihood and consequences of a strike if the bargaining agreement is voided; 4) the possibility and likely effect of any employee claims for breach of contract if rejection is approved; 5) the cost spreading abilities of the various parties taking into account the number of employees covered by the bargaining agreement and how various employees wages and benefits compare to those of others in the industry; and 6) the good or bad faith of the parties in dealing with the debtor's financial dilemma. *Carey Transp.*, 816 F.2d at 93.

In view of the failure of the Debtor to present what it itself characterized as proposals necessary to ease the hourly employees financial hardship and critical to achieving ratification of any modified labor agreement and to make its representatives available to the IUOE Locals or respond to their demands to negotiate, it is clear that the balance of the equities weighs heavily against rejections.

As this Court recognize in *Horsehead Industries*, the fact that Delphi's strategy to focus its efforts on the unions representing the bulk of its employees may have made sense, does not excuse it from dealing in good faith or complying with the requirements of Section 1113 (b) when it comes to the IUOE Locals. *Horsehead Industries*, at 588. As are result, it cannot be

said that the IUOE Locals have acted without good cause in not accepting the Consensual

Proposals or that the balance of the equities favors rejecting their agreements.

**B.    Delphi's failure to address with the IUOE Locals the complex of new proposals and current provisions affecting hourly employees' retiree welfare benefits means that Delphi has failed to comply with the procedural requirement of Section 1114.**

The Debtor has proposed to do away with active and retiree post employment

welfare benefits.  The termination of those benefits is governed by Section 1114.  Compliance

with §1114 is in certain respects substantively and procedurally similar to §1113.  *In re*

*Ionosphere Clubs, Inc.*, 134 B.R. 515, 519-20 (S.D.N.Y 1991).  Pursuant to §1114(f), the Debtor

must have made a proposal that is necessary for it to achieve reorganization and is fair and

equitable to all affected parties, have provided relevant information to permit the representatives

to evaluate the proposal, and have met with the representative to negotiate modifications in good

faith.  Under §1114 (g), the Court may not enter an order permitting such modification unless it

finds that the requirements of §1114 (f) have been met, the retiree representatives have rejected

the proposal without good cause, and the proposal is necessary to permit the reorganization of

the debtor, assures fair and equitable treatment of all affected parties and is favored by the

balance of the equities.  Under the present circumstances, Delphi clearly has not complied with

Section 1114 (f) and the Court may not make the findings required by Section 1114(g).

As the Declarations of IUOE Representatives Scherer and Glather set forth, they are in no

position to evaluate the proposed modifications to retiree welfare benefits without having

received the "soft landings" proposals, which will affect individuals post employment benefits.

(Exhibit A, ¶ 9; Exhibit B, ¶10).  Moreover, Delphi has defended the equities of the termination

of hourly employees' benefits by citing to the GM Benefit Guarantee.  Until and unless, Delphi

representatives are prepared to sit down with IUOE Local representatives and discuss the impact of the Guarantee for their members, as well as the early retirement incentives and the flow back provisions, the IUOE Locals cannot evaluate the proposed modifications. Since Delphi has not made its representatives available, has canceled meetings and has failed to respond to a demand to negotiate, it cannot demonstrate that it met with the Locals to negotiate in good faith.

As a result, the Debtor has not complied with § 1114(f) and the Court cannot make the findings required by §1114(g) to permit the modifications to go into effect.

## IV
## Conclusion

Delphi has failed to meet its burden to demonstrate that it has complied with the procedural and substantive requirements of Sections 1113 with respect to its collective bargaining agreements with IUOE Locals 18 S, 832 S and 101 or with the procedural and substantive requirements of Section 1114 with respect to post employment benefits of IUOE active employees or retirees. It is respectfully submitted that the Court must deny in all respects Delphi's motion to reject the IUOE agreements and to modify the post employment benefits of IUOE employees and retirees.

Dated:          New York, NY
                April 20, 2006

                                    GORLICK, KRAVITZ & LISTHAUS, P.C.
                                    17 State Street
                                    New York, NY 10004
                                    (212) 269-2500


                                    By    /s/
                                        Barbara S. Mehlsack (BM 1390)

Richard Griffin, General Counsel
INTERNATIONAL UNION OF
OPERATING ENGINEERS
1125 Seventeenth St. NW
Washington DC 20036
(202) 778-2675


By: _/s/_____
     Richard Griffin

Attorneys for IUOE Locals 18 S, 832 S,
101

# Exhibit A

**To**

**OPPOSITION OF INTERNATIONAL UNION OF
OPERATING ENGINEERS LOCALS 18 AND 832 TO
DEBTORS' MOTION FOR AUTHORITY TO
REJECT COLLECTIVE BARGAINING
AGREEMENTS AND TO MODIFY RETIREE
BENEFITS AND MEMORANDUM OF LAW IN
SUPPORT OF OPPOSITION**

Hearing Date and Time: May 9, 2006, 10:00 am

Barbara Mehlsack (BM 1390)
GORLICK, KRAVITZ & LISTHAUS, P.C.
17 State Street, 4th Floor
New York, New York 10004
(212) 269-2500
bmehlsack@gkllaw.com

Richard Griffin, General Counsel
INTERNATIONAL UNION OF OPERATING ENGINEERS
1125 17th Street, NW
Washington, DC 20036
(202) 778-2675
rgriffin@iuoe.org

Attorneys for International Union of Operating Engineers
Local Union Nos. 18 and 832

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------
                                    :
        In re                       :      Chapter 11
                                    :
DELPHI CORPORATION, et al.,         :      Case No.05-44481 (RDD)
                                    :
                        Debtors.    :      (Jointly Administered)
                                    :
------------------------------------------------------
```

DECLARATION OF CHARLES SCHERER
IN SUPPORT OF IUOE LOCAL UNION NOS. 18 AND 832 OPPOSITION
TO DELPHI'S MOTION FOR AUTHORITY TO REJECT
COLLECTIVE BARGAINING AGREEMENTS

I, Charles Scherer, declare and state as follows:

1. I am currently a Business Agent for International Union of Operating Engineers

("IUOE") Local Union No. 18 ("Local 18"). I have held this position for 25 years. Local 18 has

over 15,000 members and geographical jurisdiction in the State of Ohio, with its headquarters in

Cleveland, Ohio.

2.  In 1995, IUOE Local Union No. 589 merged into Local 18 and became Local 18 S, a

branch of Local 18.  Since the time of the merger, I have represented a number of Local 18 S

bargaining units.  These include three units—Powerhouse (5 employees), Maintenance (50

employees), and Production (240 employees)—at Ralston Foods in Lancaster, Ohio; a 46-

employee unit at Ford Motor Company in Brook Park, Ohio where the employees operate and

maintain the powerhouse and heating, ventilation, and air conditioning ("HVAC") units; two

divisions of the Ohio American Water Company—the Franklin Division (13 employees

operating and maintaining water treatment and waste water treatment facilities) and the Tiffin

Division (13 employees operating water treatment facilities).

3.  Another Local 18 S bargaining unit I represent consists of the powerhouse operators at

the Delphi Thermal and Interior facility in Columbus, Ohio ("Delphi Columbus bargaining unit")

.  This facility produces automobile locking mechanisms.  Local 18 S represents thirteen

employees at this facility.  The thirteen employees work in the facility's powerhouse and operate

and maintain the boilers and HVAC systems.  Certain relevant pages of the collective bargaining

agreement between Delphi Corporation Columbus Operations and Local 18 S (the "Delphi-Local

18 S agreement") are attached as Exhibit E to the Declaration Of Darrell Kidd In Support Of

Delphi's Motion For Authority To Reject Collective Bargaining Agreements Under 11 U.S.C. §

1113(c) And Modify Retiree Welfare Benefits Under 11 U.S.C. § 1114(g) (the "Kidd

Declaration").  The Delphi-Local 18 S agreement is scheduled to expire on September 30, 2007.

4.  In my capacity as Business Agent for Local 18 S I have been and continue to be

responsible for collective bargaining on behalf of all of the bargaining units represented by Local

2

18 S including the Delphi Columbus bargaining unit. I make this declaration in support of the objections of IUOE Local 18 S to Delphi's Motion for Authority to Reject Collective Bargaining Agreements under 11 U.S. C § 1113 ( c ) and Motion to Modify Retiree Welfare Benefits under 11 U.S.C.§ 1114(g). Except as otherwise stated here, all of the facts I set forth in this declaration are based upon my personal knowledge and my experience as a union leader and negotiator or from information obtained in the course of the performance of my duties. If called upon to testify I could and would testify to the facts set forth here.

5.. I understand that Delphi has filed a bankruptcy petition and is engaged in a process by which it intends to close or sell a number of its current facilities. I have been advised by Delphi representatives that Delphi intends to try to close or sell the Columbus facility at which the Local 18 S-represented employees work. I also understand that Delphi is currently seeking authority from the bankruptcy court to reject its collective bargaining agreements with a number of different unions and that the Delphi-Local 18 S agreement is one of the agreements Delphi is trying to rid itself of.

6.. This spring, I was advised by Robert Gerling, a Delphi labor relations representative, that Delphi was putting together early retirement incentive packages for the employees represented by Delphi's various different unions. I scheduled a meeting with Mr. Gerling for March 31, 2006 in the Toledo, Ohio area, the purpose of which was for Mr. Gerling to present to me the retirement incentive package to be offered to the Local 18 S-represented employees at the Columbus facility. I had explained to Mr. Gerling that I preferred to conduct the actual collective bargaining negotiations on-site at the Columbus facility, as that would allow the bargaining unit's chief steward Roger Struckman and Delphi employee Bill Johnson to participate in the negotiations and ask any questions directly of him. Mr. Gerling had agreed to

3

conduct any such negotiations on-site. On the scheduled day of the meeting, Mr. Gerling called to advise me that, because of the filing Delphi would be making that day in the bankruptcy court, he would have to cancel the meeting, but that he would get back to me once the Local 18 S retirement incentive packages had been cleared by Delphi's lawyers. As of today (April 19, 2006) I have not heard back from Mr. Gerling.

7. Delphi has not informed Local 18 S how specifically the cost structure and operations provisions of the Delphi-Local 18 S collective bargaining agreement covering thirteen employees who work in the powerhouse at the Columbus facility are an impediment to Delphi's competitive position.

8. Last week I was advised by members of the Local 18 S bargaining unit that Mr. Gerling was on-site at the Columbus facility to present the United Auto Workers ("UAW")(who represent the vast majority of the Columbus' facilities employees) with the details of the Human Capital Attrition Program negotiated between the UAW, General Motors, and Delphi that provides early retirement incentives for UAW-represented Delphi employees, as well as certain opportunities to return to work for General Motors under certain circumstances. Several of these Local 18 S members managed to obtain the details of the UAW-GM-Delphi program and called me to ask whether a similar program would be presented to the Local 18 S-represented employees. This Monday (April 17, 2006), I called Mr. Gerling and left him a voice mail indicating that some of the Local 18 S-represented employees had become aware of the details of the UAW-GM-Delphi program and wanted to know whether they would be offered a similar package. I asked him to call me back. I have not yet heard from Mr. Gerling.

9. Since Local 18 S has yet to receive, review and analyze the promised early retirement package, any attempt to engage in collective bargaining negotiations with Delphi concerning the

Local 18 S Columbus facility bargaining unit is like trying to hit a moving target. Without knowing the terms of the package it is difficult to know how many employees will accept the package and leave employment with Delphi; without knowing how many employees will leave and whether Delphi intends to replace them it is difficult to judge Delphi's potential savings pursuant to attrition. Furthermore, Local 18 S cannot respond with respect to proposed modifications of retiree welfare benefits absent an understanding of the nature and effect of the promised early retirement package.

10. In addition, the current Delphi-Local 18 S agreement contains an Article 16, found at pages 12-13 of Exhibit E of the Kidd Declaration, which provides that new employees hired after the agreement's effective date (October 1, 2003) "shall be hired at a rate equal to seventy percent (70) percent of the maximum based rate of the job classification." The percent of the maximum base rate for such employees progresses to 75% after 26 weeks, 80% after 52 weeks, and 85% after 78 weeks. Thus, even if Delphi was to replace some or all Local 18 S employees who took an early retirement package with new employees covered by the above-quoted provisions, Delphi would be able to realize substantial savings in the Local 18 S-represented unit pursuant to the explicit terms of the current collective bargaining agreement (due to expire within 18 months). Without knowing the amount of savings Delphi will realize pursuant to the combination of the early retirement incentive package and Article 16 of the current agreement, it is premature to formulate an economic counteroffer to the substantial wage and benefit concessions currently being sought by Delphi.

11. In this regard, it is my understanding that if the retirement incentive package offered to the Local 18 S-represented employees has the same terms and conditions as that offered to the UAW-represented employees, six or seven of the thirteen employees represented by Local 18 S

would be eligible to take the early retirement package.  Upon information and belief, it is likely

that, if offered this package, at least three employees (i.e., 23% of the current unit) will take it

and leave employment with Delphi.

12.  I declare under penalty of perjury, and pursuant to 28 U.S.C. § 1746, that the

foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 19th day of April, 2006.

    /s/    Charles Scherer
CHARLES SCHERER

# Exhibit B

## To

## OPPOSITION OF INTERNATIONAL UNION OF OPERATING ENGINEERS LOCALS 18 AND 832 TO DEBTORS' MOTION FOR AUTHORITY TO REJECT COLLECTIVE BARGAINING AGREEMENTS AND TO MODIFY RETIREE BENEFITS AND MEMORANDUM OF LAW IN SUPPORT OF OPPOSITION

Hearing date and time: May 9, 2006

Barbara Mehlsack (BM 1390)
GORLICK, KRAVITZ & LISTHAUS, P.C.
17 State Street, 4th Floor
New York, New York 10004
(212) 269-2500
bmehlsack@gkllaw.com

Richard Griffin, General Counsel
INTERNATIONAL UNION OF OPERATING ENGINEERS
1125 17th Street, NW
Washington, DC 20036
(202) 778-2675
rgriffin@iuoe.org

Attorneys for International Union of Operating Engineers
Local Union Nos. 18 and 832

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------
                             :

    In re                         :    Chapter 11

DELPHI CORPORATION, et al.,    :    Case No.05-44481 (RDD)

                     :
               Debtors.    (Jointly Administered)

                             :
--------------------------------------------------------

DECLARATION OF JIM GLATHAR
IN SUPPORT OF IUOE LOCAL UNION NOS. 18 AND 832 OPPOSITION
TO DELPHI'S MOTION FOR AUTHORITY TO REJECT
COLLECTIVE BARGAINING AGREEMENTS

I, Jim Glathar, declare and state as follows:

1. I am currently a Business Agent for International Union of Operating Engineers Local

Union No. 832 ("Local 832"). I have held this position since 1995. Prior to becoming a

Business Agent, I served as the union's steward representing the bargaining unit at the

University of Rochester.

2. Local 832 is located in Rochester, New York and has 1337 members. Local 832 S is a

branch of Local 832 which primarily represents stationary engineers and skilled maintenance

employees performing building systems' operation and maintenance work or heating, ventilating

and air conditioning systems (HVAC) work at approximately 30 different employers, including

the University of Rochester (220 employees), Xerox (62 employees), Cornell University (40

employees), and Monroe County, New York (30 employees).

3. Included among the employees whom Local 832 S represents are certain employees at

the Delphi Energy & Chassis Rochester Operations facility in Rochester, New York ("Delphi

Rochester bargaining unit"). This facility produces fuel injection systems. Local 832 S

represents six employees at this facility in the classification of powerhouse operator. The six

employees maintain and operate the facility's compressors, small boilers, and the hot water

station. Relevant portions of the collective bargaining agreement between Delphi Energy &

Chassis Rochester operations and Local 832 S (the "Delphi-Local 832 S agreement") are

attached as Exhibit F to the Declaration Of Darrell Kidd In Support Of Delphi's Motion For

Authority To Reject Collective Bargaining Agreements Under 11U.S.C. § 113(c) And Modify

Retiree Welfare Benefits Under 11 U.S.C. § 1114(g) (the "Kidd Declaration"). The Delphi-

Local 832 S agreement is scheduled to expire on September 14, 2007, less than a year and a half

from today.

4. 4. In my capacity as Business Agent for Local 832/832S I have been and continue to

be responsible for collective bargaining on behalf of all of the bargaining units represented by

Local 832 S including the Delphi Rochester bargaining unit. I make this declaration in support

2

of the objections of IUOE Local 832 S to Delphi's Motion for Authority to Reject Collective

Bargaining Agreements under 11 U.S. C § 1113 ( c ) and Motion to Modify Retiree Welfare

Benefits under 11 U.S.C.§ 1114(g).  Except as otherwise stated here, all of the facts I set forth in

this declaration are based upon my personal knowledge and my experience as a union leader and

negotiator or from information obtained in the course of the performance of my duties.  If called

upon to testify I could and would testify to the facts set forth here.

    5..  I understand that Delphi has filed a bankruptcy petition and is engaged in a process

by which it intends to close or sell a number of its current facilities.  I have been advised by

Delphi representatives and I have also learned by reviewing Delphi press releases that Delphi

intends to keep the Rochester facility—at which the Local 832 S-represented employees work—

open.

    6..  I also understand that Delphi is currently seeking authority from the bankruptcy court

to reject its collective bargaining agreements with a number of different unions and that the

Delphi-Local 832 S agreement is one of the agreements Delphi is seeking the authority to reject.

    7..  I have also learned from Robert Gerling, a Delphi labor relations representative, that,

as part of its ongoing discussions with the United Auto Workers (UAW) and General Motors

(GM), Delphi has negotiated a Human Capital Attrition Program that provides early retirement

incentives for UAW-represented Delphi employees, as well as certain opportunities to return to

work for General Motors under certain circumstances.  I have not yet been officially notified that

a similar program will be offered to the Local 832 S-represented Delphi employees.  However, I

have been advised by Mr. Gerling that it is Delphi's intent to do so.  I was also told by Glenn

Spiroff, Local 832 S's steward at the Rochester facility, that a plant human resources manager

advised him this week that Delphi would be extending the retirement incentive package to the

3

Local 832 S-represented employees.  Local 832 S has not yet received the promised retirement incentive package.

7.  Delphi has not informed Local 832 S how specifically the cost structure and operations provisions of the Delphi-Local 832 S collective bargaining agreement covering six powerhouse operators at the Rochester facility are an impediment to Delphi's competitive position.

8.  If the retirement incentive package offered to the Local 832 S-represented employees has the same terms and conditions as that offered to the UAW-represented employees, four of the six employees represented by Local 832 S would be eligible to take the early retirement package. Upon information and belief, it is likely that, if offered this package, these four employees will take it and leave employment with Delphi.

9.  The current Delphi-Local 832 S agreement has a Wage Agreement, detailed at page 40 of Exhibit F of the Kidd Declaration, which provides, at Part I.C, that new employees hired after the Wage Agreement's effective date (March 24, 2004) "shall be hired at a rate equal to seventy percent (70) percent of the maximum base rate of the job classification." The percent of the maximum base rate for such employees progresses to 75% after 26 weeks, 80% after 52 weeks, and 85% after 78 weeks.  Pursuant to this provision, if four of the six Local 832 S-represented employees take early retirement and Delphi replaces all or some of them with new employees covered by the above-quoted provisions of the Wage Agreement, Delphi will be able to realize substantial wage savings in the Local 832 S-represented unit pursuant to the explicit terms of the current collective bargaining agreement.

10.  Since Local 832 S has yet to receive the promised early retirement package and is not in a position to analyze it or to know how many employees will leave Delphi and whether or not

4

Delphi intends to replace them, Local 832 S is not in a position to assess Delphi's potential

savings.    The absence of this information makes it impossible for Local 832 S to respond with a

counterproposal to Delphi's sought for concessions or to respond meaningfully to proposed

modifications of retiree welfare benefits.

    11.    I declare under penalty of perjury, and pursuant to 28 U.S.C. § 1746, that the

foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 19th day of April, 2006.

                        __/s/__Jim Glathar
                        JIM GLATHAR

# Exhibit C

## To

**OPPOSITION OF INTERNATIONAL UNION OF OPERATING ENGINEERS LOCALS 18 AND 832 TO DEBTORS' MOTION FOR AUTHORITY TO REJECT COLLECTIVE BARGAINING AGREEMENTS AND TO MODIFY RETIREE BENEFITS AND MEMORANDUM OF LAW IN SUPPORT OF OPPOSITION**

# International Union of Operating Engineers



AFFILIATED WITH THE AFL-CIO

LOCAL NO. 101
6601 WINCHESTER, SUITE 280
KANSAS CITY, MO. 64133

OFFICE (816) 737-8600
FAX (816) 737-8700

RODGER KAMINSKA, Business Manager
SCOTT RETTIG, President
KURT CHAFFEE, Vice President
TIM GOOCH, Financial Secretary
GARY BENNETT, Recording Secretary
MIKE CHARLTON, Treasurer

March 30, 2006

Mr. Kevin Butler
Vice President, Human Resource Management
Delphi Corporation
5725 Delphi Drive
Troy, MI  48098-2815

Dear Mr. Butler:

This letter is in response to the "Proposal for Modification to IUOE-Delphi Agreements" dated March 25, 2006. This proposal was mailed to our General President, Vincent J. Giblin in Washington DC and forwarded to our Local 101 office in Kansas City, Missouri.

I am requesting an extension period to discuss our Collective Bargaining Agreement, which expires September 14, 2007. We have an unusual situation compared to other Delphi plants across America. We currently have one Operating Engineer, Jeff Lewis operating and maintaining the wastewater plant in Olathe, Kansas. I am not sure if you are aware but the Delphi battery plant was totally demolished this year and Mr. Lewis is the only Delphi hourly employee working during the clean up. Also, there has been no designated date set for the final of the site clean up which does not appear to last through the expiration date of this contract.

Please contact me for we can work out the final details of this plant closing and our contract agreement. My office number is 816-737-8600, Extension 24 or you may E-Mail me at db101@kc.rr.com.

Respectfully,

Harvey "Danny" Baird
Business Representative
Local 101-S

Cc:   Richard Griffin, General Counsel IUOE
      Jeff Lewis