**Hearing Date and Time: May 12, 2006 at 10:00 a.m.**
**Objection Deadline: May 5, 2006 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | : | |
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | | |

MOTION FOR ORDER UNDER 11 U.S.C. § 363(b) AND
FED. R. BANKR. P. 6004 AUTHORIZING DEBTORS' ENTRY
INTO AGREEMENTS WITH BOOZ ALLEN HAMILTON INC.

("BOOZ ALLEN MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order pursuant to 11 U.S.C. § 363(b) and Fed. R. Bankr. P. 6004 authorizing the Debtors' entry into and performance under agreements with Booz Allen Hamilton Inc. ("Booz Allen") to provide ongoing support for Delphi's selling, general, and administration expenses ("SG&A") and organization transformation. In support of this Motion, the Debtors respectfully represent as follows:

## Background

A.  The Chapter 11 Filings

1. On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. This Court entered orders directing the joint administration of the Debtor's chapter 11 cases.

2. On October 17, 2005, the Office of the Unites States Trustee appointed an official committee of unsecured creditors (the "Creditors' Committee"). No trustee or examiner has been appointed in the Debtors' cases.

3. This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4. The statutory predicates for the relief requested herein are section 363(b) of the Bankruptcy Code and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B. <u>Current Business Operations Of The Debtors</u>

5. Delphi and its subsidiaries and affiliates (collectively, the "Company") had global 2005 net sales of approximately $26.9 billion, and global assets as of August 31, 2005 of approximately $17.1 billion.[1] At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.

6. The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company supplies products to nearly every major global automotive original equipment manufacturer.

7. Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM. Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a

---

[1] The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

3

global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.      Events Leading To The Chapter 11 Filing

8.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[2] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.8 billion on net sales of $26.9 billion.

9.    The Debtors believe that the Company's financial performance has deteriorated because of: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

10.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions with its major unions and GM had not progressed sufficiently by the end of the third quarter of

---

[2]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

4

2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

D.     The Debtors' Transformation Plan

11.     On March 31, 2006, the Company outlined the key tenets of its transformation plan. The Company believes that this plan will enable it to return to stable, profitable business operations and allow the Debtors to emerge from these chapter 11 cases in the first half of 2007. To complete their restructuring process, the Debtors must focus on five key areas. First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business. Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company. Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus. Fourth, the Debtors must transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint. Finally, the Debtors must devise a workable solution to their current pension situation.

12.     In connection with the first two elements of the Company's transformation plan, Delphi continues to participate in discussions with its unions and GM. Throughout those discussions, Delphi has consistently communicated a clear message to both its hourly workforce and GM: Delphi is committed to finding a consensual resolution to its issues and intends to continue to discuss with its unions and GM ways to become competitive in the Debtors' U.S. operations. To that end, Delphi, GM and the UAW recently received this Court's approval of a tripartite agreement providing for a special hourly attrition program for Delphi's UAW-

5

represented employees.  This special hourly attrition program could provide as many as 18,000 of Delphi's 23,000 existing UAW-represented long-term hourly employees with "soft landings" through retirement attrition programs and GM flowbacks.  Delphi also hopes to reach agreement on similar hourly attrition programs with its other unions, which could provide as many as 4,500 additional hourly employees with retirement programs or incentives.

          13.       These hourly attrition programs constitute an important first step in implementing the Debtors' transformation plan, but will not resolve all of the issues related to Delphi's uncompetitive labor agreements.  Moreover, Delphi has not yet reached comprehensive agreements with its unions and GM.  Therefore, on March 31, 2006, Delphi moved under sections 1113 and 1114 of the Bankruptcy Code for authority to reject its U.S. labor agreements and to modify retiree benefits.[3]  Contemporaneously therewith, the Debtors also moved to reject unprofitable supply contracts with GM.[4]  Among the reasons for the GM contract rejection motion was the Debtors' belief that GM must cover a greater portion of the costs of manufacturing products for GM at plants that bear the burden of the Debtors' legacy costs.  This initial motion covers approximately half of the Debtors' North American annual purchase volume revenue from GM but only 10% of the Debtors' total contracts with GM.  Although the filing of these motions was a necessary procedural step, the Debtors remain focused on reaching a consensual resolution with all of Delphi's unions and GM before a hearing on the motions is necessary.

          14.       To implement the third element of the Debtors' transformation plan, the Company announced plans to focus its product portfolio on those core technologies for which the

---

[3] Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And Under 11 U.S.C. § 1114(g) Authorizing Modification of Retiree Welfare Benefits (Docket No. 3035)

[4] Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain Executory Contracts With General Motors Corporation (Docket No. 3033)

6

Company has significant competitive and technological advantages and expects the greatest opportunities for increased growth.  To that end, the Company will concentrate the organization around the following core strategic product lines: (a) Controls & Security (Body Security, Mechatronics, Power Products, and Displays), (b) Electrical/Electronic Architecture (Electrical/Electronic Distribution Systems, Connection Systems, and Electrical Centers), (c) Entertainment & Communications (Audio, Navigation, and Telematics), (d) Powertrain (Diesel and Gas Engine Management Systems), (e) Safety (Occupant Protection and Safety Electronics), and (f) Thermal (Climate Control & Powertrain Cooling).[5]

15.     In contrast, the Company similarly identified certain non-core product lines that do not fit into its future strategic framework, including Brake & Chassis Systems, Catalysts, Cockpits and Instrument Panels, Door Modules and Latches, Ride Dynamics, Steering, and Wheel Bearings.  The Company will seek to sell or wind down these non-core product lines (which will include approximately one-third of its global manufacturing sites) and will consult with its customers, unions, and other stakeholders to carefully manage the transition of such affected product lines.  The Company intends to sell or wind down the non-core product lines and manufacturing sites by January 1, 2008.

16.     As part of its organizational restructuring, the fourth element of the Debtors' transformation plan, the Company expects to reduce its global salaried workforce by as many as 8,500 employees as a result of portfolio and product rationalizations and initiatives adopted following an analysis of the Company's selling, general, and administration ("SG&A") cost saving opportunities.  The Company believes that once its SG&A plan is fully implemented,

---

[5]  The Company does not expect the portfolio changes to have a significant impact on its independent aftermarket or consumer electronics businesses.  Similarly, the Company does not expect an impact on medical, commercial vehicles, or other adjacent-market businesses and product lines.

7

the Company should realize savings of approximately $450 million per year in addition to savings realized from competitive measures planned for its core businesses and the disposition of non-core assets.

17.    As noted above, the final key tenet of the transformation plan is to devise a workable solution to the Debtors' current pension situation. The Debtors' goal is to retain the benefits accrued under the existing defined benefit U.S. pension plans for both the Debtors' hourly and salaried workforce. To do so, however, it will be necessary to freeze the current hourly U.S. pension plan as of October 1, 2006 and to freeze the current salaried U.S. pension plan as of January 1, 2007. Despite the freeze, because of the size of the funding deficit, it will also be necessary for the Debtors to obtain relief from the Pension Benefit Guaranty Corporation, the Internal Revenue Service, the Department of Labor, and potentially Congress, to amortize funding contributions over a long-term period. The Company intends to replace the hourly plan (for certain employees) and the salaried plan with defined contribution plans.

18.    Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

Relief Requested

19.    By this Motion, the Debtors seek entry of an order under section 363(b) of the Bankruptcy Code and Bankruptcy Rule 6004 approving and authorizing, as more fully set forth below, the Debtors' entry into and performance under an agreement with Booz Allen for the second phase (the design phase) of the Debtors' SG&A restructuring program (the "Booz Allen

8

Agreement"), which has a targeted completion of September 2006. With the assistance of Booz Allen, the Debtors are undertaking an aggressive program to reshape their SG&A costs that should result in potential savings of more than $450 million by the anticipated completion of the SG&A transformation program in 2008. Although Delphi believes that the program contemplated by the Booz Allen Agreement is being undertaken in the ordinary course of its business, out of an abundance of caution, the Debtors are requesting this Court's approval of the Booz Allen Agreement.

20. In addition, the Debtors are requesting this Court's approval of procedures under which Delphi may enter into an agreement with Booz Allen covering the implementation phase of the SG&A restructuring program, which is expected to occur from September 2006 through, at minimum, March 2007. Although the exact terms of this implementation agreement have not been fully negotiated between the parties, the Debtors seek approval to enter into such an agreement, without further court approval, after giving notice to specified parties-in-interest.

### Basis For Relief

21. Prior to the commencement of the Debtors' chapter 11 cases, Delphi engaged Booz Allen to assist it in evaluating potential SG&A savings. Delphi and Booz Allen contemplated that the SG&A restructuring program would be executed in a phased approach. During phase one of the program, which has been completed, Booz Allen and Delphi:

- Evaluated, quantified, and agreed to overall SG&A savings of approximately $450 million (with additional potential savings of approximately $90 million upon the exit from certain businesses);

- Evaluated, quantified, and targeted savings by function;

- Identified the primary axis of the Company's organization and simplified its structure to achieve transparency and accountability for each business;

- Created working teams to achieve change throughout the business; and

9

- Structured an overall program of changes which, upon implementation, would achieve most of the projected savings by the end of 2007.

22.     The second, design phase of the SG&A restructuring program will build upon what Booz Allen and Delphi developed during phase one. During the second phase of the program, Booz Allen will develop and design a plan to realize the targeted SG&A savings. Realizing the savings and transforming Delphi's SG&A will involve the following main activities:

- The creation of a finance, human resources, and sales back-office shared service organization;

- The streamlining of divisional/product business units' SG&A in finance, human resources, and customer interaction processes;

- The streamlining of the corporate core of the organization;

- The transformation of information technologies, including the creation of information technologies shared services and exploration of other opportunities to reduce costs;

- The implementation of new product organization; and

- The streamlining of the global supply management organization.

23.     The Debtors' SG&A transformation is believed to be one of the largest transformations undertaken in the global automotive supply industry. The transformation program will likely run through 2007 and into 2008 before all phases are complete. At the conclusion of phase two in September 2006, the Debtors anticipate that the implementation phase will commence immediately. Currently, the Debtors estimate that the implementation phase of the SG&A restructuring program will last at least through the first quarter of 2007. Subsequent phases may follow.

A.     <u>The Second Phase</u>

24.    Booz Allen and Delphi began work on the second phase of the program, as set forth in the Booz Allen Agreement, on April 3, 2006 and anticipate completion of this second phase by September 2006, before the start of the 2007 fiscal year planning and budgeting process. With the assistance of Booz Allen, the Debtors should have approximately $340 million of SG&A savings factored into their line budgets for the 2007 fiscal year. Implementation of these cost saving measures will begin in 2006, with the objective of achieving significant savings in the first quarter of 2007.

25.    Booz Allen and the Debtors estimate that the second phase of the SG&A transformation program will cost approximately $13 million in fees. In addition, Delphi will pay Booz Allen's expenses (at cost), which are currently estimated to be approximately 18% of fees. Because of the magnitude of the SG&A transformation project, Booz Allen has agreed to provide to the Debtors a discount based on the total fees charged by Booz Allen beginning with the second phase and continuing through all subsequent phases. Specifically, fees of more than $10 million but less than or equal to $20 million will be discounted by 3% and fees greater than $20 million will be discounted by 5%. Accordingly, approximately $3 million of the estimated phase two fees should be discounted by 3% and all fees incurred in the third (implementation) phase, and any subsequent phases of the program, would be discounted by at least 3%.

26.    In addition, as more fully described in the Booz Allen Agreement, Booz Allen has agreed that as much as $1.0 million of its fees will not be payable by Delphi if specified, pre-determined targets are not met. Conversely, Booz Allen will receive up to $1.0 million in additional fees if agreed-upon progress toward the detailed targeted savings is exceeded. The "at risk" fees will be withheld by Delphi in five equal amounts of $200,000 from the fees otherwise due to Booz Allen under the Booz Allen Agreement. During a meeting which

11

will be held on or about December 1, 2006, Delphi and Booz Allen will jointly review Delphi's budgets and the SG&A savings reflected therein, and will determine whether or not Booz Allen is entitled to receive either or both of the withheld fees and the additional $1.0 million in fees.

B    The Implementation Phase

27.    Although the scope of Booz Allen's support during the implementation phase of the SG&A restructuring program has not been fully negotiated between the parties and thus is not covered by the Booz Allen Agreement, Booz Allen and Delphi anticipate that Booz Allen will participate in the implementation phase of the program commencing in September 2006. This third phase of the program will focus on implementing the changes designed in phase two of the program and achieving the remaining $110 million of targeted savings (of the total projected $450 million of SG&A transformation plan savings) identified during phase two. Based on the parties' current concept of the more limited role that Booz Allen will perform in the implementation phase, the parties estimate that Booz Allen's fees for the portion of the implementation phase which should be completed through March 2007 will be approximately $10 million. All fees incurred by Booz Allen in the implementation phase will be subject to the fee discount as outlined above.

28.    By this Motion, the Debtors seek authority to enter into an agreement with Booz Allen for the implementation phase of the SG&A restructuring program (the "Implementation Agreement") and to pay Booz Allen under that agreement, without further court approval, but subject to the following procedures (the "Procedures"):

(a)    As soon as Delphi and Booz Allen have reached agreement regarding Booz Allen's role in the implementation phase, the Debtors would submit the Implementation Agreement to (i) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, Suite 2100, New York, New York 10004 (Att'n: Alicia M. Leonhard, Esq.) and (ii) counsel for the Creditors' Committee, Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022-4802 (Att'n: Robert J.

12

Rosenberg, Esq.) (the "Notice Parties").  The Implementation Agreement would be served by facsimile, overnight delivery, or hand delivery.

(b) The Notice Parties would have ten business days following initial receipt of the Implementation Agreement to object to or request additional time to evaluate the Implementation Agreement.  Any objections would be submitted in writing to counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Suite 2100, Chicago, Illinois 60606 (Att'n: John Wm. Butler, Jr., Esq.) and counsel for Booz Allen, Chadbourne & Parke LLP, 30 Rockefeller Plaza, New York, New York 10112 (Att'n: Howard Seife, Esq.).  If counsel to the Debtors and counsel to Booz Allen received no written objection or written request for additional time prior to the expiration of such ten business day period, the Debtors would be authorized to enter into and perform their obligations under the Implementation Agreement.

(c) If a Notice Party objects to the proposed Implementation Agreement within the proscribed ten business day period, the Debtors and such objecting Notice Party would meet and confer in an attempt to negotiate a consensual resolution of the objection.  Should either party determine that an impasse exists, the Debtors would move the Bankruptcy Court for authority to enter into the Implementation Agreement upon notice to the objecting party and other parties-in-interest in accordance with the terms of the Third Supplemental Order Under 11 U.S.C. §§ 102(1) and 105 and Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing Omnibus Hearing Dates and Certain Notice, Case Management, and Administrative Procedures, entered April 20, 2006 (Docket No. 3293) (the "Case Management Order").

29. In the exercise of their business judgment, the Debtors believe that the proposed agreement with Booz Allen is in the best interests of the Debtors' estates because the savings and organizational efficiency to be achieved with the assistance of Booz Allen will maximize the recovery for all stakeholders.  Moreover, the Booz Allen Agreement reflects changes made in response to feedback received from the Creditors' Committee.  Additionally, the Debtors believe that the Procedures described herein are in the best interests of the Debtors' estates.  Accordingly, and out of an abundance of caution, the Debtors hereby seek authority, but not direction, to enter into and perform, as of the date of entry into the Booz Allen Agreement, all obligations required under the Booz Allen Agreement, and to enter into and perform under an Implementation Agreement in accordance with the Procedures set forth above.

Applicable Authority

30.     Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1). Uses of estate property outside the ordinary course of business may be authorized if the debtor demonstrates a sound business justification for it. See In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good business reason exists to grant debtor's application under section 363(b)); In re Delaware Hudson Ry. Co., 124 B.R. 169, 179 (Bankr. D. Del. 1991). Once the debtor articulates a valid business justification, a presumption arises that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992). As a rule, the debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74, 81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)).

31.     The Debtors submit that entering into the Booz Allen Agreement reflects a sound exercise of the Debtors' business judgment. As outlined in Delphi's March 31, 2006 press release, as part of its overall transformation plan and restructuring strategy, Delphi is committed to realizing SG&A cost saving opportunities. The Debtors anticipate that by working with Booz Allen to streamline their organization and transform their SG&A, the Debtors should achieve approximately $450 million in projected savings. Moreover, the resulting corporate structure should allow the Debtors to operate more efficiently and effectively going forward.

    32.  Furthermore, the Procedures will provide the Debtors with both flexibility and a framework for entry into an appropriate Implementation Agreement with Booz Allen without the necessity for a further court application, but still providing for a review by major parties-in-interest in these chapter 11 cases. This Court has previously granted the Debtors authority to take action prospectively under section 363 of the Bankruptcy Code pursuant to procedures similar to those outlined above. See, e.g., Order Under 11 U.S.C. § 363 Approving Procedures to Sell Certain De Minimis Assets Free and Clear of Liens, Claims, and Encumbrances and to Pay Market Rate Broker Commissions in Connection with Such Sales without Further Court Approval, dated October 27, 2005 (Docket No. 766); Order Under 11 U.S.C. §§ 365(a) and 554 and Fed .R. Bankr. P. 6006 Approving Procedures for Rejecting Unexpired Real Property Leases and Authorizing Debtors to Abandon Certain Furniture, Fixture, and Equipment, dated January 6, 2006 (Docket No. 1776); Order Under 11 U.S.C. §§ 363, 1107, and 1108 Approving Procedures to Enter Into or Renew Real Property Leases Without Further Court Approval, dated January 6, 2006 (Docket No. 1777); and Order Under 11 U.S.C. Sections 363, 1107, and 1108 Authorizing Delphi Automotive Systems LLC to Make Equity Investments in Delphi Furukawa Wiring Systems LLC and Approving Procedures to Make Additional Contributions Without Further Court Approval, dated March 17, 2006 (Docket No. 2858). Without the Procedures for entering into an Implementation Agreement, the Debtors submit that they and their estates would incur added and unnecessary expense and delay in seeking further court approval of the exercise of their business judgment.

### Notice Of Motion

33.  Notice of this Motion has been provided in accordance with the Case Management Order.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

### Memorandum Of Law

34.  Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order (a) authorizing the entry into and performance of the Booz Allen Agreement, (b) approving the Procedures under which Booz Allen and Delphi may enter into an Implementation Agreement without further court approval, and (c) granting the Debtors such other and further relief as is just.

Dated:   New York, New York
         April 21, 2006

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP

By:   /s/ John Wm. Butler, Jr.
      John Wm. Butler, Jr. (JB 4711)
      John K. Lyons (JL 4951)
      Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By:   /s/ Kayalyn A. Marafioti
      Kayalyn A. Marafioti (KM 9632)
      Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession