**Hearing Date and Time: May 12, 2006 at 10:00 a.m.**
**Objection Deadline: May 5, 2006 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - | x | |
| In re | : | Chapter 11 |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | (Jointly Administered) |
| Debtors. | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - | x | |

MOTION FOR ORDER UNDER 11 U.S.C. § 365 AND
FED. R. BANKR. P. 6006 AUTHORIZING REJECTION OF
<u>OEM LICENSE AND SUPPLY AGREEMENT WITH INOVISE MEDICAL, INC.</u>

("INOVISE REJECTION MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order pursuant to 11 U.S.C. § 365 and Fed. R. Bankr. P. 6006 authorizing Delphi Medical Systems Corporation ("Delphi Medical") to reject that certain OEM License and Supply Agreement dated as of April 11, 2005 between Inovise Medical, Inc. and Delphi Medical. In support of this Motion, the Debtors respectfully represent as follows:

## Background

A.    The Chapter 11 Filings

1.    On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. This Court entered orders directing the joint administration of the Debtor's chapter 11 cases.

2.    On October 17, 2005, the Office of the Unites States Trustee appointed an official committee of unsecured creditors. No trustee or examiner has been appointed in the Debtors' cases.

3.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4. The statutory predicates for the relief requested herein are section 365 of the Bankruptcy Code and Rule 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.   Current Business Operations Of The Debtors

5. Delphi and its subsidiaries and affiliates (collectively, the "Company") had global 2005 net sales of approximately $26.9 billion, and global assets as of August 31, 2005 of approximately $17.1 billion.[1] At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.

6. The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company supplies products to nearly every major global automotive original equipment manufacturer.

7. Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM. Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global

---

[1] The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

3

supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.    Events Leading To The Chapter 11 Filing

8.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[2]  Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.8 billion on net sales of $26.9 billion.

9.    The Debtors believe that the Company's financial performance has deteriorated because of: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

10.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major unions and GM had not progressed sufficiently by the end of the third quarter of

---

[2]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

4

2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

D.     The Debtors' Transformation Plan

11.    On March 31, 2006, the Company outlined the key tenets of its transformation plan.  The Company believes that this plan will enable it to return to stable, profitable business operations and allow the Debtors to emerge from these chapter 11 cases in the first half of 2007.  To complete their restructuring process, the Debtors must focus on five key areas.  First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business.  Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company.  Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus.  Fourth, the Debtors must transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint.  Finally, the Debtors must devise a workable solution to their current pension situation.

12.    In connection with the first two elements of the Company's transformation plan, Delphi continues to participate in discussions with its unions and GM.  Throughout those discussions, Delphi has consistently communicated a clear message to both its hourly workforce and GM: Delphi is committed to finding a consensual resolution to its issues and intends to continue to discuss with its unions and GM ways to become competitive in the Debtors' U.S. operations.  To that end, Delphi, GM and the UAW recently received this Court's approval of a tripartite agreement providing for a special hourly attrition program for Delphi's UAW-

5

represented employees. This special hourly attrition program could provide as many as 18,000 of Delphi's 23,000 existing UAW-represented long-term hourly employees with "soft landings" through retirement attrition programs and GM flowbacks. Delphi also hopes to reach agreement on similar hourly attrition programs with its other unions, which could provide as many as 4,500 additional hourly employees with retirement programs or incentives.

13. These hourly attrition programs constitute an important first step in implementing the Debtors' transformation plan, but will not resolve all of the issues related to Delphi's uncompetitive labor agreements. Moreover, Delphi has not yet reached comprehensive agreements with its unions and GM. Therefore, on March 31, 2006, Delphi moved under sections 1113 and 1114 of the Bankruptcy Code for authority to reject its U.S. labor agreements and to modify retiree benefits.[3] Contemporaneously therewith, the Debtors also moved to reject unprofitable supply contracts with GM.[4] Among the reasons for the GM contract rejection motion was the Debtors' belief that GM must cover a greater portion of the costs of manufacturing products for GM at plants that bear the burden of the Debtors' legacy costs. This initial motion covers approximately half of the Debtors' North American annual purchase volume revenue from GM but only 10% of the Debtors' total contracts with GM. Although the filing of these motions was a necessary procedural step, the Debtors remain focused on reaching a consensual resolution with all of Delphi's unions and GM before a hearing on the motions is necessary.

14. To implement the third element of the Debtors' transformation plan, the Company announced plans to focus its product portfolio on those core technologies for which the

---

[3] Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And Under 11 U.S.C. § 1114(g) Authorizing Modification of Retiree Welfare Benefits (Docket No. 3035)

[4] Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain Executory Contracts With General Motors Corporation (Docket No. 3033)

Company has significant competitive and technological advantages and expects the greatest opportunities for increased growth. To that end, the Company will concentrate the organization around the following core strategic product lines: (a) Controls & Security (Body Security, Mechatronics, Power Products, and Displays), (b) Electrical/Electronic Architecture (Electrical/Electronic Distribution Systems, Connection Systems, and Electrical Centers), (c) Entertainment & Communications (Audio, Navigation, and Telematics), (d) Powertrain (Diesel and Gas Engine Management Systems), (e) Safety (Occupant Protection and Safety Electronics), and (f) Thermal (Climate Control & Powertrain Cooling).[5]

15. In contrast, the Company similarly identified certain non-core product lines that do not fit into its future strategic framework, including Brake & Chassis Systems, Catalysts, Cockpits and Instrument Panels, Door Modules and Latches, Ride Dynamics, Steering, and Wheel Bearings. The Company will seek to sell or wind down these non-core product lines (which will include approximately one-third of its global manufacturing sites) and will consult with its customers, unions, and other stakeholders to carefully manage the transition of such affected product lines. The Company intends to sell or wind down the non-core product lines and manufacturing sites by January 1, 2008.

16. As part of its organizational restructuring, the fourth element of the Debtors' transformation plan, the Company expects to reduce its global salaried workforce by as many as 8,500 employees as a result of portfolio and product rationalizations and initiatives adopted following an analysis of the Company's selling, general, and administration ("SG&A") cost saving opportunities. The Company believes that once its SG&A plan is fully implemented, the

---

[5] The Company does not expect the portfolio changes to have a significant impact on its independent aftermarket or consumer electronics businesses. Similarly, the Company does not expect an impact on medical, commercial vehicles, or other adjacent-market businesses and product lines.

Company should realize savings of approximately $450 million per year in addition to savings realized from competitive measures planned for its core businesses and the disposition of non-core assets.

17. As noted above, the final key tenet of the transformation plan is to devise a workable solution to the Debtors' current pension situation. The Debtors' goal is to retain the benefits accrued under the existing defined benefit U.S. pension plans for both the Debtors' hourly and salaried workforce. To do so, however, it will be necessary to freeze the current hourly U.S. pension plan as of October 1, 2006 and to freeze the current salaried U.S. pension plan as of January 1, 2007. Despite the freeze, because of the size of the funding deficit, it will also be necessary for the Debtors to obtain relief from the Pension Benefit Guaranty Corporation, the Internal Revenue Service, the Department of Labor, and potentially Congress, to amortize funding contributions over a long-term period. The Company intends to replace the hourly plan (for certain employees) and the salaried plan with defined contribution plans.

18. Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

## Relief Requested

19. By this Motion, the Debtors seek an order under section 365 of the Bankruptcy Code and Bankruptcy Rule 6006 authorizing Delphi Medical to reject that certain OEM License and Supply Agreement dated as of April 11, 2005 between Inovise Medical, Inc. ("Inovise") and Delphi Medical (the "Agreement") effective as of May 12, 2006.

8

Basis For Relief

20. On April 11, 2005, Delphi Medical and Inovise entered into the Agreement, pursuant to which Inovise granted Delphi Medical a license of certain intellectual property for use in Delphi Medical's electrocardiography ("ECG") products. Specifically, Inovise granted Delphi Medical exclusive (as to certain markets) and nonexclusive (as to certain other markets) licenses of its Audicor software (the "Audicor Software") which was to be used in Delphi Medical's multiparameter vital signs monitors (the "Products"). Pursuant to the Agreement, Inovise also agreed to sell Delphi Medical certain Inovise single-use disposable sensors (the "Sensors" and, collectively with the Audicor Sofware, the "Inovise Devices"), which would be necessary to be used with the Products incorporating the Audicor Software.

21. The Inovise Devices represent only one of multiple possible technologies which could be incorporated into the Products. The Inovise Devices remain in the developmental stages. Although Inovise has developed prototypes of vital signs monitors incorporating the Inovise Devices, the actual functionality of the Inovise Devices in a clinical setting has not yet been determined. It is crucial to Delphi Medical's successful launch of the Products that they incorporate technologies with proven functionality. Accordingly, Delphi Medical has determined that it cannot assume the inherent risk created by the unproven nature of the Inovise Devices in bringing the Products to market successfully.

22. Furthermore, to be successful in the marketplace, the Inovise Devices will require a broad base of physicians to be aware of the technology, understand it, and request it. Such acceptance by physicians does not currently exist and Delphi Medical believes that it will be a considerable period of time, if ever, before a critical mass of physicians supporting the Inovise Devices develops. Therefore, Delphi Medical has determined that marketing the Products incorporating the Inovise Devices is likely to be a significant hindrance to market

acceptance of the Products. In contrast, Delphi Medical can, if rejection of the Agreement is approved, incorporate existing and widely-accepted ECG technology into the Products, thereby improving the likelihood of a successful market launch of the Products. Absent the immediate rejection of the Agreement, however, Delphi Medical cannot take steps to integrate alternative technology into the Products because of certain exclusivity restrictions contained in the Agreement.

23. Finally, the costs associated with the Agreement and the Inovise Devices further necessitate the immediate rejection of the Agreement.[6] Delphi Medical has determined that the cost of the Inovise Devices is not competitive with the cost of alternative and more widely-accepted ECG technologies. When combined with the significant concerns regarding the marketability of Products incorporating the Inovise Devices, Delphi Medical is concerned that the cost of the Inovise Devices would likely make the Products unprofitable.

24. Therefore, Delphi Medical has determined, in its business judgment, that continued performance under the Agreement constitutes an unnecessary use of Delphi Medical's cash resources and that rejection of the Agreement is necessary. Immediate rejection of the Agreement will free Delphi Medical from the burdensome financial commitments required under the Agreement and will also allow Delphi Medical to proceed immediately with the process of incorporating alternative ECG technology into the Products. Delphi Medical must be able to begin that process expeditiously if it is to bring the Products to market in accordance with its current product launch schedule. Finally, Delphi Medical has determined that the prospects for the ultimate success of the Products will be significantly better if the Products incorporate proven and widely-accepted ECG technology rather than the unproven Inovise Devices. For all of these

---

[6] The financial and most other terms of the Agreement are protected by disclosure limitations included therein.

10

reasons, Delphi Medical has determined, in the sound exercise of its business judgment, that rejection of the Agreement is in the best interests of Delphi Medical, its estate, its creditors, and other parties-in-interest.

## Applicable Authority

25.  Section 365(a) of the Bankruptcy Code provides, in relevant part, that "the trustee, subject to the court's approval, may reject any executory contract or unexpired lease of the debtor. 11 U.S.C. § 365(a). Other than requiring court approval, Congress prescribed no guidelines limiting a debtor's discretion to reject the kind of executory contracts at issue in this Motion.

26.  The Supreme Court has recognized "the traditional 'business judgment' standard applied by the courts to authorize rejection of the ordinary executory contract" under section 365(a), and it cited the Second Circuit's decision in In re Minges, 602 F.2d 38, 42-43 (2d Cir. 1979), as an example of the articulation of that standard. NLRB v. Bildisco and Bildisco, 465 U.S. 513, 523 (1984). In re Minges, in turn, mandates a "flexible" standard requiring only that the debtor exercise its discretion in the best interests of the estate and its creditors. In re Minges, 602 F.2d at 42-43. See also In re The Penn Traffic Co., 322 B.R. 63, 68 (Bankr. S.D.N.Y. 2005) ("It is well established that the decision whether to assume or reject an executory contract under Section 365(a) is a matter of business judgment to be exercised in the best interests of the debtor in possession and its creditors.").

27.  In all circumstances, the touchstone of the section 365(a) analysis is straightforward: "It is enough if, as a matter of business judgment, rejection of the burdensome contract may benefit the estate." In re Minges, 602 F.2d at 43 (emphasis added). Accord In re Sundial Asphalt Co., 147 B.R. 72 (E.D.N.Y. 1992).

28. The purpose of section 365(a) of the Bankruptcy Code is to give the debtor the opportunity to go through its inventory of executory contracts and decide "which ones would be beneficial to adhere to and which ones would be beneficial to reject." Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098 (2d Cir. 1993). When a debtor does so in a reasonable manner and in good faith, courts generally approve the debtor's decisions. See In re G Survivor Corp., 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994) ("Generally, absent a showing of bad faith, or an abuse of discretion, the debtor's business judgment will not be altered.").

29. In Orion Pictures, the Second Circuit stated that a bankruptcy court should "apply its best 'business judgment' to determine if it would be beneficial or burdensome to the estate" to reject or assume the contracts. In re Orion Pictures Corp., 4 F.3d at 1099. The Orion Pictures decision also cautions: "it is important to keep in mind that the bankruptcy court's 'business judgment' in deciding a motion to assume is just that —a judgment of the sort a businessman would make." Id. at 1099. In other words, the Court "sits as an overseer of the wisdom with which the bankruptcy estate's property is being managed by the trustee or debtor-in-possession" Id.

30. The vast majority of courts recognize that the business judgment standard is not a strict standard and presents a "low threshold" for the debtor to meet. See In re The Penn Traffic Co., 322 B.R. 63, 68 (Bankr. S.D.N.Y. 2005); Lubrizol Enters., Inc. v. Richmond Metal Finishers Inc., 756 F.2d 1043, 1047 (4th Cir. 1985) (collecting cases); In re W&L Assoc., Inc., 71 B.R. 962, 966 (Bankr. E.D. Pa. 1987) ("We do not consider the 'business judgment test' to be a strict standard to meet"); In re Fashion Two Twenty, Inc., 16 B.R. 784, 787 (Bankr. N.D. Ohio 1982) ("The less rigid 'business judgment' is favored by most Courts and is adopted as the proper

standard herein."). "More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

31. The Second Circuit's Orion Pictures decision also instructs that proceedings on a motion under 11 U.S.C. § 365(a) should be streamlined, consistent with the statutory purpose of allowing a debtor-in-possession to manage affairs efficiently in the best interests of the estate:

> At heart, a motion [under section 365(a)] should be considered a summary proceeding, intended to efficiently review the trustee's or debtor's decision to adhere to or to reject a particular contract in the course of the swift administration of the bankruptcy estate. It is not the time or place for prolonged discovery or a lengthy trial with disputed issues.

Orion Pictures, 4 F.3d at 1098-99.

32. Courts have recognized that there are myriad reasons why a debtor might determine, reasonably, that the rejection of a contract "may benefit the estate," including, among other things, that: (a) the contract is uneconomical to complete according to its terms, (b) the contract is financially draining to the estate, and (c) rejection will make the debtor more attractive to a prospective purchaser or investor. See In re Riodizio, 204 B.R. at 425; see also In re G Survivor Corp, 171 B.R. at 758 (listing possible factors).

33. Here, the Debtors have exercised their sound business judgment in determining to reject the Agreement. Incorporating the Inovise Devices into the Products will jeopardize the successful launch of the Products, as the Inovise Devices have not garnered significant market acceptance and have not yet been proven to be feasible. In contrast, alternative technologies that are widely-accepted are available to Delphi Medical and could be incorporated into the Products absent the Agreement. The likelihood of success of the Products

13

would be greatly enhanced through the use of these alternate technologies.  In addition, these alternative technologies would be more cost-effective, thereby improving the profitability of the Products for Delphi Medical.  The express terms of the Agreement, however, prohibit Delphi Medical from utilizing any alternative technologies in the products in certain critical markets.  Therefore, the Debtors believe that immediate rejection of the Agreement is in the best interests of the Debtors, their estates, their creditors, and other parties-in-interest.

## Notice Of Motion

34.    Notice of this Motion has been provided in accordance with the Third Supplemental Order Under 11 U.S.C. §§ 102(1) and 105 and Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing Omnibus Hearing Dates and Certain Notice, Case Management, and Administrative Procedures, entered by this Court on March 28, 2006 (Docket No. 3293).  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

## Memorandum Of Law

35.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (a) authorizing Delphi Medical to reject the Agreement effective as of May 12, 2006 and (b) granting them such other and further relief as is just.

Dated: New York, New York
      April 21, 2006

    SKADDEN, ARPS, SLATE, MEAGHER
      & FLOM LLP

    By: /s/ John Wm. Butler, Jr.
      John Wm. Butler, Jr. (JB 4711)
      John K. Lyons (JL 4951)
      Ron E. Meisler (RM 3026)
    333 West Wacker Drive, Suite 2100
    Chicago, Illinois 60606
    (312) 407-0700

      - and -

    By: /s/ Kayalyn A. Marafioti
      Kayalyn A. Marafioti (KM 9632)
      Thomas J. Matz (TM 5986)
    Four Times Square
    New York, New York 10036
    (212) 735-3000

    Attorneys for Delphi Corporation, et al.,
      Debtors and Debtors-in-Possession