MEYER, SUOZZI, ENGLISH & KLEIN, P.C.
Attorneys for United Steelworkers
1350 Broadway, Suite 501
New York, New York 10018
212 239 4999
Lowell Peterson (LP 5405)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

In re:

DELPHI CORPORATION, et al.                    Case Nos. 05-44481 (RDD)
                                              Jointly Administered

                              Debtors.
-------------------------------------------------------------x

## OBJECTIONS OF USW TO DEBTORS' MOTION FOR ORDER UNDER 11 U.S.C. § 1113(c) AUTHORIZING REJECTION OF COLLECTIVE BARGAINING AGREEMENTS AND UNDER 11 U.S.C. § 1114(g) AUTHORIZING MODIFICATION OF RETIREE WELFARE BENEFITS

The United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union (USW), AFL-CIO (the "USW" or "United Steelworkers") objects to the Debtors' Motion for Order Under 11 U.S.C. § 1113(c) Authorizing Rejection of Collective Bargaining Agreements and Under 11 U.S.C. § 1114(g) Authorizing Modification of Retiree Welfare Benefits (the "1113/1114 Motion").

### Preliminary Procedural Observations

1.      This is a case in which the Debtors have opted to place litigation before bargaining and to place confrontation before consultation.  On the date they filed the Chapter 11 petition, in what was a first in the USW's extensive experience, the Debtors filed a motion to establish a briefing and trial schedule for a Section 1113 and 1114 motion.  The Debtors then presented a slashing bargaining proposal that would unconscionably undermine the standard of

living of their hourly workers and retirees. The Debtors withdrew that proposal, only to roll it

out again several months later largely unchanged. After very little bargaining with the USW, the

Debtors filed the 1113/1114 Motion, simultaneously announcing the closing of two-thirds of

their U.S. manufacturing operation. All parties are now hurtling toward a trial on May 9 with

little idea of how these business will be reorganized, other than that the hourly workers will bear

the brunt. The Debtors' conduct is a signal example of how not to manage a large industrial

concern.

2.      The USW is at a loss to understand the Debtors' decision to employ this

counter-productive tactic. The Debtors have repeatedly characterized this as a "labor

transformation" case, asserting that a fundamental restructuring of labor costs is the central

mission of the Chapter 11 process. If so, it is utterly bewildering that the Debtors would choose

to start the bargaining process with the USW by firing the procedural equivalent of live

ammunition. By this action, the Debtors have made it clear that they do not perceive the USW

and the other unions as partners in the difficult transformation process, but instead as enemies to

be overcome. This is a grave misjudgment.

3.      In addition to being a giant leap backwards in the relationship between the

USW and the Debtors, one which will make consensual resolution significantly more difficult,

the Debtors' decision to ramp up litigation will serve to distract the parties' attention from the

real work that must be done - that is, serious, detailed, good faith efforts to negotiate new

collective bargaining agreements.

4.      Notwithstanding the Debtors' ill-advised return to the costly forum of

high-stakes litigation, the USW is determined to focus its energies and resources on the

negotiations. The USW will resist any effort by the Debtors to engage in gamesmanship at the

2

bargaining table - that is, maneuvers designed to create a record for litigation instead of agreement.

5.    The USW will also resist any excessive discovery.  The statute itself requires the Debtors to provide the unions "with such relevant information as is necessary to evaluate" the modification proposals, 11 U.S.C. Sections 1113(b)(1)(B) and 1114(f)(1)(B), and that delineates the appropriate framework - as opposed to the scorched earth discovery practice often favored by huge, multi-national law firms.

6.    On practical level, many or most of the facts relevant to a determination of the 1113/1114 Motion have simply not occurred yet.  At trial we will present a more complete and up to date picture of bargaining between the Debtors and the USW.  In the meantime, it is impossible to develop a meaningful record about the parties' good faith in negotiations that have barely commenced.  Moreover, the unions cannot determine the purported necessity of the Debtors' proposals without relevant information required by the statute.  Thus, unless and until that information is provided by the Debtors, the USW will have good cause to reject the Debtors' proposals.

7.    Accordingly, it is not possible to set forth in these Objections most of the facts which will ultimately be relevant to this Court's determination.

**Background**

8.    The USW is the exclusive bargaining representative of between 900 and 1,000 hourly employees employed at two of the Debtors' facilities, a plant in Vandalia, Ohio and the Home Avenue plant in Dayton, Ohio.  Among the international unions that represent Delphi employees, the USW represents the third largest complement.  In addition, the USW is the

"authorized representative" for purposes of Section 1114 of those persons receiving retiree benefits pursuant to the collective bargaining agreements between the Debtors and the USW.

9.    At the outset of these cases, the Debtors announced that they sought to reduce by almost two-thirds the wages paid to their hourly employees, to freeze and then terminate their defined benefit pension plans, and to eliminate their retiree benefit programs.

10.    We wish the parties could report to the Court that the Debtors' extreme bargaining stance has changed since last autumn. We had hoped that the progress represented by the Debtors' agreement with General Motors and the UAW to enter an hourly employee attrition program, approved by this Court on April 7, 2006, indicated a new sensitivity to the real needs of the Debtors' production workforce.

11.    Unfortunately, nothing has changed at all. The proposals which are actually on the table are the ones the Debtors made in November, and then withdrew. To be sure, if General Motors decides to contribute additional millions of dollars to the Debtors' cause, the Debtors are willing to pass that money along, in whole or in part, to the union-represented employees. This hardly represents a revised view of this case, but merely a pass-through of contributions from a major customer whose self-interest would not be served by a strike at Delphi.

12.    In fact, the Debtors' hourly workers are in many respects facing an even more bleak picture than the one painted in November. Although many of them will be able to get out of harm's way by participating in the Hourly Attrition Program (we hasten to note that the Debtors have not even proposed such a program to the USW, although they have repeatedly promised to do so), thousands will not. Not only do the Debtors seek massive concessions from the remaining employees, but most of Delphi's manufacturing capacity in the United States will

4

simply be shuttered or sold.  To put it another way, Delphi's remaining hourly employees will either be unemployed or will suffer deep wage and benefit cuts.

13.    Indeed, Delphi has all but announced that one of the two USW-represented plants will close.

14.    Home Avenue is cited as one of the plants which primarily produce parts for GM and which are projected in the aggregate, to generate a $2.1 billion operating loss in 2006.  Motion for Order Under 11 U.S.C. § 365 and Fed. R. Bankr. P. 6006  Authorizing Rejection of Certain Executory Contracts with General Motors Corporation dated March 31, 2006 ( the "GM Loss Contracts Rejection Motion") at para. 30.  Home Avenue is one of the four plants which were the focus of the Debtors' loss contact analysis.  GM Loss Contract Rejection Motion at para. 40.  The Debtors assert that the plant had a negative margin of 22.4 percent in 2005.  GM Loss Contract Rejection Motion at para. 44.  See also Declaration of Randall S. Eisenberg in Support of Debtor's Motion for Order Under 11 U.S.C. § 365 and Fed.R. Bankr. P. 6006 Authorizing Rejection of Certain Executory Contracts with General Motors (the "Eisenberg Decl.") at paras. 19, 22.

15.    Although the USW does not concede the accuracy of these estimates and strenuously disagrees that the Home Avenue plant should be closed, there can be no doubt that this is what the Debtors intend to do.

**Section 1113**

16.    In Truck Drivers Local 807 v. Carey Transp., Inc., 816 F.2d 82, 88 (2d Cir. 1987), the Second Circuit wrote that Section 1113 includes three substantive requirements:

> 1.    the proposal is "limit[ed]" to "those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor " and that

insures that "all creditors, the debtor and affected parties are treated fairly and equitably," (11 U.S.C. §1113(b)(1)(A),

2.    the union has rejected the proposal "without good cause," (11 U.S.C. §1113(c)(2), and

3.    the balance of equities clearly favors rejection. (11 U.S.C. §1113(c)(3).

17.    The Debtors must prove that they have made a proposal based on the "most complete and reliable information available at the time of such proposal" (11 U.S.C. §1113(b)(1)(A)), provided the Union with "such relevant information as is necessary to evaluate the proposal" (11 U.S.C. §1113(b)(1)(B)), and met "at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of said agreement." 11 U.S.C. §1113(b)(2).

### Failure to Provide Information

18.    As indicated in the March 31, 2006 letter from USW Assistant General Counsel David R. Jury to Kevin Butler, Delphi's Vice President, Human Resource Management, the Debtors have provided some information the USW needs to evaluate the Debtors' proposals, but there are enormous gaps.  Exhibit "A" to the Declaration of Lowell Peterson (the "Jury Letter").  The letter enclosed a chart prepared by USW advisor Potok and Co., Inc.  For example, as of that date the Debtors had failed to provide even the most rudimentary information about the wages paid to USW-represented employees at each plant.  Jury Letter at paras. 4,5.  While the Debtors have begun to provide additional information, this is still far short of what the USW has requested.

19.    Of course, detailed wage data are the most basic information an employer must provide.  Before being asked to agree to reduce the wages paid to its members, the USW is entitled to know the wages they actually earn.  The plant breakdowns are particularly critical

here because  (a) the Home Avenue plant is slated to close, eliminating the wages there from the Debtors' labor cost column and (b) as the Debtors themselves have indicated, many or most of the hourly employees at the Vandalia plant receive "non-traditional" wage rates that are a fraction of the allegedly over-market wage the Debtors complain about so vociferously in their motion papers.  Declaration of Bernard J. Quick in Support of Delphi's Motion for Authority to Reject Collective Bargaining Agreements Under 11 U.S.C. § 1113 (c) and Modify Retiree Welfare Benefits Under 11 U.S.C. § 1114 (g) dated March 31, 2006 ( the "Quick Decl.") at paras. 27-28.

20.    The USW hopes and expects the Debtors to provide all of the information described  in the Potok Letter.  If not, this (along with the needless delays) will be an important issue at trial.

**Good Faith**

21.    Section 1113(b)(2) requires the Debtors to negotiate with the unions in "good faith in attempting to reach mutually satisfactory modifications of said agreement."  11 U.S.C. §1113(b)(2).

22.    The requirement that a party bargain in good faith implies "an open mind and a sincere desire to reach an agreement", NLRB v. Reed & Prince Mfg. Co., 118 F.2d 874, 885 (1st Cir. 1941), cert. denied , 313 U.S. 595 (1941).  See also, NLRB v. Montgomery Ward & Co., 133 F.2d 676, 686 (9th Cir. 1943) (requiring an "open mind and a sincere desire to reach an agreement");  In re: Walway, 69 B.R. 967, 973 (Bankr. E.D. Mich. 1987).

23.    One of the centerpieces of the Debtors' labor transformation strategy is a major attrition program funded by General Motors.  The Court has already approved such a

program for UAW-represented employees and the Debtors have repeatedly stated that they will propose a similar program to the USW.

24.     The attrition program would enable hourly employees to avoid the trauma of layoff or wage and benefit cuts, and would provide the full context to consider the Debtors' proposed labor and retiree concessions.

25.     However, the Debtors have not put an attrition program for USW members on the table.  It is impossible to conduct the 1113/1114 negotiations when this critical element of the program has not even been proposed.

26.     One of the more bizarre aspects of the 1113/1114 Motion is the fact that the Debtors had not made a concrete proposal to modify the USW collective agreements. Instead, they have made a proposal that (a) presents at least two radically different scenarios depending on the extent to which GM "contributes" some unspecified amount and (b) bears no relationship to the actual wage rates that apply to USW-represented employees.

27.     However vigorously one might assert that GM bears responsibility for Delphi's failure or success, the fact remains that GM is not a party to the USW collective bargaining agreements covering the workers at the Home Avenue and Vandalia plants.  The Debtors in effect pretend that there is an invisible presence at the bargaining table.  This is completely inconsistent with the Debtor's obligation to bargain in good faith with the USW.

28.     We understand the political dynamic the Debtors are trying to establish, and the various unions have the ability to "bring GM to the table" in an abstract sense by virtue of their ability to strike at Delphi, indirectly causing some level of economic pressure on Delphi's major customer.  But there is nothing in Sections 1113 or 1114 which permit the

Debtors to play that game. These negotiations are supposed to be serious and in good faith, and not a form of multi-lateral brinksmanship.

29.    At the same time, by clearly indicating that the Competitive Benchmark Proposals are far more onerous than they would be if GM contributed, the Debtors have given the unions good cause to reject those proposals. In this respect the Debtors have been too clever by half. It would be preposterous for any union to agree to those proposals. Doing so would guarantee that GM would not contribute. No rational corporation would contribute money to an effort to obtain contract settlements when the unions have agreed to settle without the contribution. The USW certainly has good cause to reject the Competitive Benchmark Proposals instead of placing itself in that absurd bargaining position.

30.    Moreover, even the less onerous GM Consensual Proposals are a moving target. Presumably, they would not become operative once GM contributes, say, a dollar, and logically their final economic terms are related in some manner to the amount of GM's contribution. It is impossible to negotiate with an absent contributor. The Debtors cannot fulfill their obligation to negotiate with the USW in good faith in these circumstances.

31.    Finally, the USW has good cause to reject the Debtors' proposals because the Debtors' negotiations with the other unions have not concluded. The USW represents approximately three percent of the Debtors' unionized workforce. The USW recognizes that, in large part, the template for any new labor agreement will be established by the unions that represent greater numbers of the Debtors' employees. It would be unrealistic for the Debtors to insist that the USW conclude a new labor agreement before the terms - or even the outlines - of agreements with the other unions have been established.

**Necessity**

32.     The Debtors' proposed modifications must be "limit[ed]" to "those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor." 11 U.S.C. §1113(b)(1)(A).

33.     As noted above, the Debtors intend to close one of the two plants whose hourly employees are represented by the USW. At the remaining plant in Vandalia, Ohio, the substantial majority of the hourly employees are paid at the non-traditional rate. The Debtors' proposals to the USW ignore this fact. Indeed, some of the wage proposals the Debtors have trumpeted in the press would give pay hikes to a number of USW members in Vandalia.

34.     This is not just a matter of sloppy bargaining (although it does cast the Debtors' good faith into considerable doubt, at least with respect to the USW). It also means that it is not necessary to reject the USW collective bargaining agreements to meet the Debtors' stated goal of bringing its wage rates in line with the "market".

35.     The Debtors' expert is Michael L. Wachter, who has apparently fashioned a business out of testifying against unions in § 1113 and other proceedings . Declaration and Expert Report of Michael L. Wachter in Support of Delphi's Motion for Authority to Reject Collective Bargaining Agreements Under 11 U.S.C. § 1113(c) and Modify Retiree Welfare Benefits Under 11 U.S.C. § 1114(g) dated March 30, 2006 (the "Wachter Decl.") at para. 2. Apparently Prof. Wachter has never met an employer wage-cut proposal he does not like.

36.     The USW does not concede that Prof. Wachter's general analysis of "market rates" is accurate. His reliance materials have not yet been provided to the USW, but prior experience suggests that he ignores regional wage variations and fails to account for increased skill levels associated with the kind of sophisticated manufacturing techniques used by

Delphi.  See Wachter Decl. at para.10 (similar workers "economy-wide"), 20 ("roughly similar skills").  Moreover, his suggestion that quit rates of up to 21% per year - that is, complete turnover every five years - are appropriate and acceptable demonstrates that he does not understand the importance of stability and on the job learning in high-tech manufacturing facilities.  Wachter Decl. at para. 14.  Wachter's assumptions do not apply in unionized industrial workplaces such as Delphi.

37.    In any event, Prof. Wachter does admit that "a few hundred" of Delphi's workers are not "substantially above the market levels needed to attract and retain employees".  This includes employees hired with "non-traditional wages" under USW collective bargaining agreements.  Wachter Decl. at para. 9.

38.    Prof. Wachter states that the average "economy-wide" wage of skilled workers is $21.46 per hour,  Wachter Decl. at para. 39, and the average "economy-wide" wage of production workers is $13.34 per hour.

39.    He admits that the average wage of Delphi workers represented by the USW and the IUE-CWA who receive the "non-traditional" wages is $12.41 per hour - that is, less than the market rate.  Wachter Decl. at para. 41.  Prof. Wachter does not estimate the hourly wage of skilled employees earning the "non-traditional" rates.  Nor does he estimate the hourly cost of benefits for these employees.  The benefit costs in many instances are related to the employees' hourly rates; because these employees are paid substantially less than the "traditional wage" workers, their benefit costs are also substantially lower.

40.    Prof. Wachter also admits that the compensation paid by the Debtors' competitors in the auto parts industry is "influenced by the above-market wages of some mature suppliers in the auto parts industry."  Wachter Decl. at para. 61.  In other words, the wages

earned by the bulk of the hourly employees represented by the USW are even further below the wages earned by other auto parts workers than they are below the "economy-wide" average.

41.    There is a logical flaw at the heart of a portion of Prof. Wachter's analysis. He assigns "legacy" costs to the Debtors' employees on an hourly basis, which boosts his estimate of their wages by approximately 25%.  This is distinct from the projected cost of providing retiree medical and pension benefits to those hourly employees themselves.  Wachter Decl. at para. 51.   However, the "legacy" costs - that is, the current and projected cost of providing benefits to people who are already retired - are fixed costs, not variable labor costs. Perhaps it might be politically expedient to thump on the drum about how unionized manufacturing workers should either mortgage their own futures to protect the benefits of retirees or cast those retirees aside, that is irrelevant to the Debtors' stated justification for their wage and benefit proposals; the centerpiece of the Debtors' pay analysis is the "market rate". Thus, if it costs $x per hour to attract and retain a suitable employee, the Debtors cannot pay employees $x per hour minus some amount per hour ascribed to "legacy" costs.

### Equality of Sacrifice/Balance of Equities

42.    Section 1113(b)(1)(A) requires that the Debtors' proposals must "assure[ ] that all creditors, the debtor and all of the affected parties are treated fairly and equitably."  11 U.S.C. §1113(b)(1)(A). The purpose of this provision is to "spread the burdens of saving the company to every constituency while ensuring that all sacrifice to a similar degree."  Century Brass, 795 F.2d at 273.

43.    Delphi has been lavishing extraordinary pay on its top executives.  This directly contravenes the equality of sacrifice requirement set forth in the statute.  In re Lady H. Coal Co., 193 B.R. 233, 242 (Bankr. S.D. W.Va. 1996); In re Jefley, Inc., 219 B.R. 88, 93-94

(Bankr. E.D. Pa. 1998); In re Indiana Grocery Co., 136 B.R. 182, 195-96 (Bankr. S.D. Ind. 1990).

44.    Based on its experience representing employees in dozens of bankruptcies in the steel, iron ore, aluminum, metals, glass, and other industries, the USW comprehends that some degree of sacrifice is always possible and often unavoidable. Most debtors likewise understand that when hourly workers are asked to give concessions, shared sacrifice among all employee groups (including executives) is the norm. Delphi and its CEO, Robert "Steve" Miller, are apparently the exception.

45.    At a time when it asks its workers and retirees to make unfathomable sacrifices, the denizens of Delphi's corporate suite are lining the pockets of a small number of top executives. In retrospect, the Debtors' decision to bifurcate their request for a Key Employee Compensation Plan ("KECP") appears to be shrewd and manipulative, allowing the executives to grab millions of dollars now while leaving the rest until after the workforce has been gutted.

46.    As this Court is aware, the Debtors fully intend to bring the balance of the KECP back to this Court in a few short months. At that time, the Debtors will seek authorization to make massive cash payments under the Revised Annual Bonus and the Emergence Bonus plus an allocation 10% of the equity of the reorganized operation to the chosen executives.

47.    One might think that the affected executives would be quite satisfied with the extraordinary payments they can receive under the Revised Annual Bonus and Emergence Bonus portions of the KECP. Apparently not.

48.    On top of these lucrative packages, the executives would retain their severance packages of 12 to 18 months of compensation (including the target bonus for many).

These payments would be on top of the cash portion of the Emergence Bonus.  Assuming 30% of the executives are terminated (which might be conservative, given the scope of the downsizing announced by the Debtors), the severance pay alone would cost the estate another $30.5 million, according to the KECP itself.

49.       Thus, the executives of what is apparently (if the Debtors' statements to the press are to be believed) one of the most colossal failures of a manufacturing firm in American history stand to become quite wealthy simply by staying on the job.  If they are terminated, they will still receive hefty severance pay on top of their generous Revised Annual Incentives.  If their operating entities are sold off or shuttered, they will receive pro rata Emergence Bonuses in addition to severance pay.  Within the executive suite the Debtors' largess seems to know no bounds.   While this may be what management desires, this stark juxtaposition of executive greed and worker sacrifice tips the balance of equity in favor of the USW and the employees and retirees it represents.

50.       The Second Circuit has written that "the likelihood and consequences of a strike if the bargaining agreement is voided" is one of the equitable considerations in a Section 1113 request.  Carey Transp., 816 F. 2d at 93.

51.       The USW, like the other unions, recognizes the gravity of any decision to engage in a strike against Delphi.  Still, it is essential that the Debtors - and the other important constituencies in this case - understand that it is in no one's interest to force a Hobson's choice on the unions and their members.  The hourly employees are not mere factors of production, but real, flesh and blood people with bills to pay and dreams to realize, and they will not go passively into economic desolation.

**Section 1114**

52.    As the Court has written, "compliance with §1114 is substantively and procedurally the same as compliance with §1113". <u>In re Ionosphere Clubs, Inc.</u>, 134 B.R. 515, 519-520 (Bankr. S.D.N.Y. 1991).  Section 1114(f) mirrors the provisions of Sections 1113(b) and (c).

53.    Therefore, the Debtors' failure to comply with the requirements of Section 1113 also dooms their motion to approve modification of its retiree medical benefits under Section 1114.

54.    At the risk of belaboring the obvious, we also note that the Section 1114 negotiations will take place against the backdrop of the Benefit Guarantee agreement between the Debtors and General Motors under which GM guaranteed certain medical and pension benefits to former GM employees who went to work for Delphi.  Exhibit "C" to the Declaration of Mark R. Weber in Support of Delphi's Motion for Authority to Reject Collective Bargaining Agreements Under 11 U.S.C. § 1113(c) and Modify Retiree Welfare Benefits Under 11 U.S.C. § 1114(g) dated March 31, 2006.

55.    Presumably there must be multi-dimensional discussions to determine the effect of this Benefit Guarantee on the retiree medical benefits, and the effect of a Section 1114 modification of those benefits on GM's obligations under the Benefit Guarantee.  Thus, the issue is too intricate for the sledgehammer approach wielded by the Debtors in this motion.

75962

**Conclusion**

56.     For all of the reasons set forth herein, the 1113/1114 Motion must be

denied.


Dated:  April 21, 2006


                                    MEYER, SUOZZI, ENGLISH & KLEIN, P.C.


                                    By: _____/s/ LOWELL PETERSON_____
                                           Lowell Peterson (LP 5405)

                                    1350 Broadway, Suite 501
                                    New York, New York 10018
                                    212 239 4999
                                    212 239 1311 (fax)
                                    lpeterson@msek.com

                                    David R. Jury
                                    Assistant General Counsel
                                    United Steelworkers
                                    Five Gateway Center, Room 807
                                    Pittsburgh, Pennsylvania 15222
                                    (412) 562-2545
                                    (412) 562-2429 (fax)
                                    djury@usw.org

                                    Attorneys for United Steelworkers