Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                         :
   In re                          :        Chapter 11
                         :
DELPHI CORPORATION, et al.,     :        Case No. 05-44481 (RDD)
                         :
                 Debtors.   :        (Jointly Administered)
                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(e) AND 1107(b)
AND FED. R. BANKR. P. 2014 AUTHORIZING EMPLOYMENT AND
RETENTION OF BLAKE, CASSELS & GRAYDON LLP AS CANADIAN
COUNSEL TO DEBTORS NUNC PRO TUNC TO JANUARY 9, 2006

("BLAKES RETENTION APPLICATION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this application (the "Application") for an order under 11 U.S.C. §§ 327(e) and 1107(b) and Fed. R. Bankr. P. 2014 authorizing the employment and retention of Blake, Cassels & Graydon LLP ("Blakes") as Canadian counsel to the Debtors, nunc pro tunc to January 9, 2006. In support of this Application, the Debtors submit the Declaration Of Susan M. Grundy In Support Of Application For Order Under 11 U.S.C. §§ 327(e) And 1107(b) And Fed. R. Bankr. P. 2014 Authorizing Employment And Retention Of Blake, Cassels & Graydon LLP As Canadian Counsel To Debtors Nunc Pro Tunc To January 9, 2006, dated April 20, 2005 (the "Grundy Declaration"). In further support of this Application, the Debtors respectfully represent as follows:

Background

A.  The Chapter 11 Filings

1.  On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. This Court entered orders directing the joint administration of the Debtor's chapter 11 cases.

2.  On October 17, 2005, the Office of the Unites States Trustee appointed an official committee of unsecured creditors (the "Creditors' Committee"). No trustee or examiner has been appointed in the Debtors' cases.

3.  This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.  The statutory predicates for the relief requested herein are sections 327(e) and 1107(b) of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.  Current Business Operations Of The Debtors

5.  Delphi and its subsidiaries and affiliates (collectively, the "Company") had global 2005 net sales of approximately $26.9 billion, and global assets as of August 31, 2005 of approximately $17.1 billion.[1] At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest

---

[1] The aggregated financial data used in this Application generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

2

public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.

      6.      The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company supplies products to nearly every major global automotive original equipment manufacturer.

      7.      Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM. Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.    <u>Events Leading To The Chapter 11 Filing</u>

      8.      In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the

3

Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[2]
Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.8 billion on net sales of $26.9 billion.

9. The Debtors believe that the Company's financial performance has deteriorated because of: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

10. In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions with its major unions and GM had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

11. On March 31, 2006, the Company outlined the key tenets of its transformation plan. The Company believes that this plan will enable it to return to stable, profitable business operations and allow the Debtors to emerge from these chapter 11 cases in the first half of 2007. To complete their restructuring process, the Debtors must focus on five

---

[2]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

4

key areas. First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business. Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company. Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus. Fourth, the Debtors must transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint. Finally, the Debtors must devise a workable solution to their current pension situation.

12. In connection with the first two elements of the Company's transformation plan, Delphi continues to participate in discussions with its unions and GM. Throughout those discussions, Delphi has consistently communicated a clear message to both its hourly workforce and GM: Delphi is committed to finding a consensual resolution to its issues and intends to continue to discuss with its unions and GM ways to become competitive in the Debtors' U.S. operations. To that end, Delphi, GM and the UAW recently received this Court's approval of a tripartite agreement providing for a special hourly attrition program for Delphi's UAW-represented employees. This special hourly attrition program could provide as many as 18,000 of Delphi's 23,000 existing UAW-represented long-term hourly employees with "soft landings" through retirement attrition programs and GM flowbacks. Delphi also hopes to reach agreement on similar hourly attrition programs with its other unions, which could provide as many as 4,500 additional hourly employees with retirement programs or incentives.

13. These hourly attrition programs constitute an important first step in implementing the Debtors' transformation plan, but will not resolve all of the issues related to

5

Delphi's uncompetitive labor agreements.  Moreover, Delphi has not yet reached comprehensive agreements with its unions and GM.  Therefore, on March 31, 2006, Delphi moved under sections 1113 and 1114 of the Bankruptcy Code for authority to reject its U.S. labor agreements and to modify retiree benefits.[3]  Contemporaneously therewith, the Debtors also moved to reject unprofitable supply contracts with GM.[4]  Among the reasons for the GM contract rejection motion was the Debtors' belief that GM must cover a greater portion of the costs of manufacturing products for GM at plants that bear the burden of the Debtors' legacy costs.  This initial motion covers approximately half of the Debtors' North American annual purchase volume revenue from GM but only 10% of the Debtors' total contracts with GM.  Although the filing of these motions was a necessary procedural step, the Debtors remain focused on reaching a consensual resolution with all of Delphi's unions and GM before a hearing on the motions is necessary.

        14.       To implement the third element of the Debtors' transformation plan, the Company announced plans to focus its product portfolio on those core technologies for which the Company has significant competitive and technological advantages and expects the greatest opportunities for increased growth.  To that end, the Company will concentrate the organization around the following core strategic product lines: (a) Controls & Security (Body Security, Mechatronics, Power Products, and Displays), (b) Electrical/Electronic Architecture (Electrical/Electronic Distribution Systems, Connection Systems, and Electrical Centers), (c) Entertainment & Communications (Audio, Navigation, and Telematics), (d) Powertrain (Diesel

---

[3]     Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And Under 11 U.S.C. § 1114(g) Authorizing Modification of Retiree Welfare Benefits (Docket No. 3035)

[4]     Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain Executory Contracts With General Motors Corporation (Docket No. 3033)

6

and Gas Engine Management Systems), (e) Safety (Occupant Protection and Safety Electronics), and (f) Thermal (Climate Control & Powertrain Cooling).[5]

15. In contrast, the Company similarly identified certain non-core product lines that do not fit into its future strategic framework, including Brake & Chassis Systems, Catalysts, Cockpits and Instrument Panels, Door Modules and Latches, Ride Dynamics, Steering, and Wheel Bearings. The Company will seek to sell or wind down these non-core product lines (which will include approximately one-third of its global manufacturing sites) and will consult with its customers, unions, and other stakeholders to carefully manage the transition of such affected product lines. The Company intends to sell or wind down the non-core product lines and manufacturing sites by January 1, 2008.

16. As part of its organizational restructuring, the fourth element of the Debtors' transformation plan, the Company expects to reduce its global salaried workforce by as many as 8,500 employees as a result of portfolio and product rationalizations and initiatives adopted following an analysis of the Company's selling, general, and administration ("SG&A") cost saving opportunities. The Company believes that once its SG&A plan is fully implemented, the Company should realize savings of approximately $450 million per year in addition to savings realized from competitive measures planned for its core businesses and the disposition of non-core assets.

17. As noted above, the final key tenet of the transformation plan is to devise a workable solution to the Debtors' current pension situation. The Debtors' goal is to retain the benefits accrued under the existing defined benefit U.S. pension plans for both the Debtors'

---

[5] The Company does not expect the portfolio changes to have a significant impact on its independent aftermarket or consumer electronics businesses. Similarly, the Company does not expect an impact on medical, commercial vehicles, or other adjacent-market businesses and product lines.

7

hourly and salaried workforce. To do so, however, it will be necessary to freeze the current hourly U.S. pension plan as of October 1, 2006 and to freeze the current salaried U.S. pension plan as of January 1, 2007. Despite the freeze, because of the size of the funding deficit, it will also be necessary for the Debtors to obtain relief from the Pension Benefit Guaranty Corporation, the Internal Revenue Service, the Department of Labor, and potentially Congress, to amortize funding contributions over a long-term period. The Company intends to replace the hourly plan (for certain employees) and the salaried plan with defined contribution plans.

18. Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

Relief Requested

19. By this Application, the Debtors request authorization to employ and retain Blakes as Canadian counsel, effective as of January 9, 2006. Accordingly, the Debtors respectfully request the entry of an order under sections 327(e) and 1107(b) of the Bankruptcy Code and Bankruptcy Rule 2014 authorizing the employment and retention of Blakes pursuant to an ongoing professional relationship between the Debtors and Blakes.

Basis For Relief

20. The Debtors submit that Blakes' proposed retention meets all the prerequisites for retention of special counsel under section 327(e) of the Bankruptcy Code.

### The Debtors' Employment Of Blakes Is In The Best Interests Of The Estates

21.     Blakes is especially attuned to the unique Canadian law issues that have arisen and may in the future arise in the Debtors' chapter 11 cases.  Blakes has a well-established and prominent bankruptcy and insolvency practice in Canada with extensive experience in cross-border insolvency matters and in dealing with troubled suppliers in the automotive industry.  Blakes has a highly qualified and dedicated team of partners, associates, students, and law clerks with a broad range of expertise in commercial law, litigation, and many other practice areas related to business law.  Accordingly, the Debtors believe that Blakes is well-qualified to serve as Canadian counsel in these chapter 11 cases in an efficient and effective manner.

22.     The Debtors believe that the employment of Blakes will enhance and will not duplicate the employment of Skadden, Arps, Slate, Meagher, & Flom LLP ("Skadden, Arps"), the Debtors' general bankruptcy counsel, Shearman & Sterling LLP, the Debtors' special counsel, Togut, Segal & Segal LLP, the Debtors' conflicts counsel, or any of the other professionals retained by the Debtors to perform specific tasks that are unrelated to the work to be performed by Blakes as Canadian counsel to the Debtors.  The Debtors understand that Blakes will work with the other professionals retained by the Debtors to avoid any such duplication.

### Services To Be Rendered By Blakes

23.     The Debtors wish to retain Blakes to provide services to the Debtors in connection with Canadian law issues related to the Debtors' business and industry.  The Debtors anticipate that such services will include the following:

   (a)    legal advice and litigation services with respect to tort, contract, and general business disputes in Canada;

   (b)    legal advice and representation with respect to out-of-court commercial workouts in Canada;

9

  (c)  legal advice and representations with respect to financially distressed suppliers in Canada; and

  (d)  miscellaneous commercial and litigation advice related to Canadian issues.

  24.  Blakes has indicated its desire and willingness to represent the Debtors as set forth herein and to render the necessary professional services as Canadian counsel to the Debtors.

  25.  The Debtors may request that Blakes undertake specific matters beyond the scope of the responsibilities set forth above. Should Blakes agree in its discretion to undertake any such matter, the Debtors will seek further order of this Court.

Disinterestedness Of Professionals

  26.  Section 327(e) does not require that Blakes and its attorneys be "disinterested persons" as defined in section 101(14) of the Bankruptcy Code. Rather, section 327(e) of the Bankruptcy Code requires that Blakes not represent or hold any interest adverse to the estates or the Debtors with respect to the matter on which Blakes is to be employed.

  27.  The Grundy Declaration filed in support of this Application contains information available to date on Blakes' connections with certain parties-in-interest, as required by Bankruptcy Rule 2014(a). According to the Grundy Declaration, Blakes, its partners, counsel, and associates do not hold or represent any interest adverse to the Debtors, their creditors, any other party-in-interest in these chapter 11 cases, their respective attorneys and investment advisors, the United States Trustee, or any person employed in the Office of the United States Trustee, with respect to the matters on which Blakes is to be employed.

  28.  Blakes has disclosed to the Debtors that Blakes has in the past represented, currently represents, and will likely in the future represent certain of the Debtors' creditors and other parties-in-interest in matters unrelated to the Debtors or their chapter 11 cases. Blakes does

not believe that the foregoing raises any actual or potential conflict of interest of Blakes relating to the representation of the Debtors as their Canadian counsel in these chapter 11 cases, but such relationships are disclosed out of an abundance of caution.  The Debtors understand that, in order to vitiate any actual or potential conflicts of interest, Blakes will not assist the Debtors in connection with their analysis, negotiations, and litigation, if any, with parties with whom Blakes has existing client relationships, and that Skadden, Arps (or other counsel if Skadden, Arps has a conflict), instead, will handle these tasks.

Professional Compensation

29.    Blakes intends to apply to this Court for compensation and reimbursement of expenses in accordance with section 330(a) of the Bankruptcy Code, the Bankruptcy Rules, applicable guidelines established by the United States Trustee, and orders of this Court.  Blakes acknowledges that all compensation will be subject to this Court's review and approval, after notice and a hearing.

30.    Under the applicable provisions of the Bankruptcy Code, and subject to the approval of this Court, the Debtors propose to pay Blakes its standard hourly rates as disclosed in the Grundy Declaration.  Blakes has agreed to accept as compensation for the services rendered in connection with its representation of the Debtors Blakes' standard hourly rates, which vary from Cdn$470 to Cdn$830 per hour for partners, Cdn$275 to Cdn$570 per hour for associates, Cdn$105 to Cdn$270 per hour for law clerks and Cdn$155 to Cdn$170 per hour for students.

31.    No arrangement is proposed between the Debtors and Blakes for compensation to be paid in these chapter 11 cases other than as set forth above and in the Grundy Declaration.

32. At the Debtors' request, Blakes has continued to assist the Debtors in connection with Canadian legal issues since January 9, 2006 and hence the Debtors request Blakes' retention to be effective <u>nunc</u> <u>pro</u> <u>tunc</u> to January 9, 2006.

Conclusion

33. For the foregoing reasons, the Debtors submit that the employment of Blakes as the Debtors' Canadian counsel on the terms set forth herein is in the best interests of the estates.

Notice

34. Notice of this Motion has been provided in accordance with the Third Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered by this Court on April 20, 2006 (Docket No. 3293). In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

Memorandum Of Law

35. Because the legal points and authorities upon which this Application relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order (a) authorizing the Debtors to employ and retain Blakes as their Canadian counsel, nunc pro tunc to January 9, 2006, to perform the services set forth herein and (b) granting the Debtors such other and further relief as is just.

Dated:   New York, New York
        April 21, 2006

                                  DELPHI CORPORATION, on behalf of itself and certain of its subsidiaries and affiliates, as Debtors and Debtors-in-Possession

                                  By:  /s John D. Sheehan
                                       Name: John D. Sheehan
                                       Title:  Vice President, Chief Restructuring Officer, and Controller