Marianne Goldstein Robbins
Jill M. Hartley (JH 3652)
PREVIANT, GOLDBERG, UELMEN,
GRATZ, MILLER, & BRUEGGEMAN, S.C.
1555 N. RiverCenter Drive - Suite 202
Milwaukee, WI 53212
Telephone:    (414)271-4500
Facsimile:    (414)271-6308

Attorneys for IBEW Local 663 and
IAMAW District 10

Hearing Date and Time: May 9, 2006 at 10:00 a.m.
Objection Deadline: April 21, 2006 at 4:00 p.m.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

In re:

DELPHI CORPORATION, et al.,

Debtors.

Chapter 11
Case No. 05-44481 (RDD)

(Jointly Administered)

---

**MEMORANDUM OF LAW IN SUPPORT OF IBEW LOCAL 663 AND IAMAW DISTRICT 10'S OBJECTION TO DEBTORS' MOTION TO REJECT COLLECTIVE BARGAINING AGREEMENTS UNDER 11 U.S.C. §1113(c) AND TO MODIFY RETIREE BENEFITS UNDER 11 U.S.C. §1114(g)**

---

## TABLE OF CONTENTS

**SUMMARY OF ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**I. THE REQUIRED SHOWING BEFORE REJECTION MAY BE APPROVED** . . . . . . 11

**II. THE DEBTOR HAS FAILED TO COMPLY WITH THE MOST BASIC REQUIREMENT OF MAKING A PROPOSAL FOR CONCESSIONS  NECESSARY FOR SUCCESSFUL REORGANIZATION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**III. THE DEBTOR HAS FAILED TO COMPLY WITH ITS DUTY TO PROVIDE INFORMATION RELEVANT TO THE REJECTION MOTION** . . . . . . . . . . . . . . . . . . . 18

**IV. THE DEBTORS' PROPOSAL IS NOT FAIR AND EQUITABLE** . . . . . . . . . . . . . . . 22

**V.  THE DEBTORS HAVE FAILED AND REFUSED TO NEGOTIATE IN GOOD FAITH** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**VI.  THE DEBTOR'S PROPOSAL IMPROPERLY INCLUDES NON-MONETARY ITEMS NOT NECESSARY TO THE GOAL OF REORGANIZATION OR REHABILITATION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**VII.    THE UNIONS REJECTED THE DEBTOR'S PROPOSALS WITH GOOD CAUSE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

## TABLE OF CASES

In re American Provision Co., 44 B.R. 907 (Bankr. D. Minn. 1984) . . . . . . . . . . . . . . . . . . . . . 13

In re Blue Ribbon Transportation, 113 L.R.R.M. 3505 (Bankr. D.R.I. 1983) . . . . . . . . . . . . . . 23

In re: Century Brass Products, Inc., 705 F.3d, 265, 273  (2nd Cir. 1986) . . . . . . . . . 12, 23, 29, 30

In re Cook United, 50 B.R. 561 (Bankr. N.D. Ohio 1985) . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

In re Fiber Glass Industries, Inc., 49 B.R. 202, 206-207 (N.D.N.Y. 1985) . . . . . . . . . . . . . . . . 21

In re Fitzgerald, 44 B.R. 628 (Bankr. W.D. Mo. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

In re George Cindrich General Contractors, 130 Bankr. 20 (Bankr. W.D. Pa. 1991) . . . . . . . . 22

In re Horsehead Industries, Inc., 300 B.R. 573, 588 (Bankr. S.D.N.Y. 2003) . . . . . . . . . . . 26, 29

In re Indiana Grocery, 136 Bankr. 182 (Bankr. S.D. Ind. 1990) . . . . . . . . . . . . . . . . . . . . . . 23, 24

In re Jefley, Inc., 219 B.R. 88 (Bankr. E.D. Pa. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

In re K & B Mounting, 50 B.R. 460 (Bankr. N.D. Ind. 1985) . . . . . . . . . . . . . . . . . . . . . . . . 21, 26

In re Kentucky Truck Sales, 52 B.R. 797 (Bankr. W.D. Ky. 1985) . . . . . . . . . . . . . . . . . . . . . . . 24

In re Liberty Cab & Limousine Co., Inc., 194 B.R. 770, 776 (Bankr. E.D. Pa. 1996) . . . . . . . . 31

In re Maxwell Newspapers, 981 F.2d 85, 89 (2nd Cir. 1992) . . . . . . . . . . . . . . . . . . . 11, 29, 30, 32

NLRB v. Bildisco & Bildisco, 465 U.S. 513 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 30

NLRB v. Manley Truck Line, 779 F.2d 1327, 1331 n.7 (7th Cir. 1985) . . . . . . . . . . . . . . . . . . . 11

In re Royal Composing Room, Inc., 848 F.2d 345, 349 (2nd Cir. 1988) . . . . . . . . . . . . . . . . . . . 32

In re Russell Transfer, Inc., 48 B.R. 241, 243-244 (Bankr. W.D. Va. 1985) . . . . . . . . . . . . . . . 30

In re Salt Creek Freightways, 47 B.R. 835 (Bankr. D. Wyo. 1985) . . . . . . . . . . . . . . . . . . . . . . . 18

Truck Drivers Local 807 v. Carey Transportation, 816 F.2d 82, 87 (2nd Cir. 1987) . . . . 11, 12, 32

In re Valley Kitchens, 52 B.R. 493 (Bankr. S.D. Ohio 1985) . . . . . . . . . . . . . . . . . . . . . . . . .   29

<u>In re Walway Co.</u>, 69 B.R. 967, 975 and n.18 (Bankr. E.D. Mich. 1987) . . . . . . . . . . . . 13, 24, 31

<u>In re William P. Brogna</u>, 64 B.R. 390 (Bankr. E.D. Pa. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . 29

## SUMMARY OF ARGUMENT

Debtors have not complied with the requirements of 11 U.S.C. §§ 1113 or 1114 with respect to their motion to reject the collective bargaining agreement and modify the retiree benefits covering employees and retirees represented by IBEW Local 663 and IAMAW District 10.  These two unions represent skilled electricians and machinists at Debtor's Milwaukee facility.  From the beginning, they were treated as an afterthought; management specifically indicated they had no intention to meet with these unions until they had reached agreement with the UAW which represents production employees at the Milwaukee facilities.  As recently as March 30, 2006, representatives of these two unions were informed that they would not be subject to the present motions to reject their collective bargaining agreements and modify retiree benefits, with good reason.  The two unions did not receive proposals from the Debtors until March 28, 2006.  Those proposals were indefinite and contingent.  While the unions were promised an attrition proposal, none was included; many of the items in the proposals were contingent on GM funding, which as of today, has not been confirmed. The unions have not received much of the relevant information they sought in early November, 2005. These unions did not receive the assistance of any experts, compensated by the Debtors.  As of this writing, the Company has not been available for substantive negotiations on even one occasion.

The Company's proposals to these unions seek to abrogate virtually all contractual protections which have been negotiated over the years, whether or not they will improve the Company's financial status or ability to reorganize.  Essentially, the Company is using §1113 as a hammer to weaken these unions and rid itself of its statutory obligation under the guise of §§ 1113 and 1114.

The proposal submitted to the unions is not fair and equitable as compared with the proposals provided to other unions or the benefits provided to salaried employees.  The Debtors have not

agreed to provide the same attrition package, the same retiree benefit package or the same pension package as has been provided to other union employees, claiming that General Motors has not provided the same benefit guarantees. At the same time, however, the Company has continued retiree benefits and pension benefits as well as retention bonuses to salaried employees which have not been offered to the employees and retirees represented by Local 663 and District 10. Not only are the employees represented by Local 663 and District 10 subject to more onerous loss of rights, compensation and benefits, but the Company has also indicated its intention to close the facility effective December 31, 2007. As a result, the employees represented by these unions are being asked to make the ultimate sacrifice of loss of employment. To add insult to injury, Debtors seek to remove the protection which these unions negotiated to blunt the impact of such loss. Under these circumstances, the balance of the equities clearly does not favor rejection of the collective bargaining agreement or modification of retiree benefits.

## FACTS

The International Brotherhood of Electrical Workers, Local 663 ("hereinafter IBEW") represents journeyman electricians working at the Debtors' Oak Creek, Wisconsin plant. IBEW has two collective bargaining agreements with the Company, one covers the employees employed with the E & C division, and the other covers the employees employed by the E & S division. The E & S bargaining unit has approximately 20 active employees, while the E & C bargaining unit has approximately 40 active employees. For purposes of this proceeding, IBEW also represents approximately 13 retirees formerly employed by Delphi at the E & C and E & S divisions in Oak Creek, Wisconsin. Oak Creek is a suburb of Milwaukee; the plants are identified in the Company's documents as Milwaukee, Wisconsin.

2

The International Association of Machinists and Aerospace Workers, District 10 ("hereinafter IAM") represents a bargaining unit of machinists at the Debtors' Oak Creek, Wisconsin facility. The bargaining unit includes a number of classifications such as grinder, inspector, machine repair, tool room and tool & die maker. The IAM bargaining unit currently consists of approximately 45 active employees. For purposes of this proceeding, the IAM also represents approximately 10 to 12 retirees formerly employed at the E & S division of the Company's Oak Creek, Wisconsin plant.

The remainder of the employees working out of the Oak Creek facility are production employees represented by the UAW.

Randal A. Middleton is the current President/Business Manager for IBEW Local 663, and has held that position for the past 11 years. As President and Business Manager, Middleton is the chief spokesperson for the Local in all negotiations and interactions with the Company. Don Griffin is the current Business Agent assigned to represent the IAM bargaining unit at the Oak Creek plant. Griffin assumed that role in November 2005 after the former agent retired, and has been the IAM's chief spokesperson in all negotiations and interactions with the Company since that time.

On October 24, 2005, the Company contacted both the IBEW and IAM and set up meetings to present the Company's 1113/1114 proposals. Each Union separately met with Company representatives and received copies of the terms and conditions sheets associated with the Company's 1113/1114 proposals. At that meeting, the Company was represented by Rob Gerling and site labor relations representatives. The Company made it clear to both Unions that the October 24th meetings were not intended as negotiations; but rather, for informational purposes only. Shortly after the Unions' meetings with the Company, on October 31, 2005 and November 1, 2005, both the IBEW and the IAM, respectively, submitted to the Company identical requests for information

3

regarding the 1113/1114 proposals.  While some information was provided, the Company refused to provide information on the compensation and concessions applied to salaried employees.  The Company further ignored many of the requests for financial information, including requests for liquidation analyses and claim recovery.

In November 2005, Rob Gerling contacted Middleton by telephone and asked to set up a meeting, indicating that he had additional information to provide to the Union in connection with the 1113/1114 proposals.  Middleton met with Rob Gerling in Detroit, Michigan on November 16, 2005, pursuant to his request, and Gerling gave him the Company's revised 1113/1114 proposals.  Gerling highlighted some of the changes from the Company's original proposals, specifically mentioning the changes to the health and welfare and wage proposals.  Gerling candidly told Middleton at the November 16, 2005 meeting, that the Company did not have any plans to meet to negotiate with the IBEW at that time, and that the IBEW should not expect any meetings to bargain over the 1113/1114 proposals until the Company had a tentative agreement with the UAW.  The meeting ended with Gerling advising Middleton that he would be in touch regarding any possible negotiation dates.

Around the same time in November 2005, the Company's revised 1113/1114 proposals were transmitted to the IAM.  Sometime in late November or early December, IAM Business Agent Griffin also had a discussion with Gerling in which Gerling informed him that the Company did not intend to meet with the IAM and IBEW before negotiating with the larger unions, the UAW, IUE and USW.

On November 22. 2005, counsel for the IBEW and the IAM sent a letter to the Company's counsel confirming the unions' understanding  that the Company would not seek negotiations with

4

the IBEW and IAM until a tentative agreement was reached with the larger unions like the UAW and IUE. Neither the IBEW nor the IAM received any contact from Gerling or anyone else within Company management disputing the statements in the November 22nd letter of counsel, or to schedule bargaining dates over the Company's 1113/1114 proposals in 2005 and into early 2006.

Sometime in January 2006, the Unions heard discussion in the shop indicating that the Company had extended the date for filing its 1113/1114 motion with the bankruptcy court and further, that the Company had withdrawn its November 1113/1114 proposals to the UAW to engage in more serious negotiations. No one from Delphi management ever contacted the IBEW or the IAM to advise them that the Company had withdrawn its November 1113/1114 proposals to the IBEW or the IAM. However, through the grapevine, Middleton heard that this was the case.

Both the IBEW and the IAM requested and received information from Charles McWee, Director of Industrial Relations, during January, February and March 2006, however, there was no bargaining, and no meaningful conversation regarding the Company's proposals during this time. Finally, on March 22, 2006, Gerling forwarded a copy of the Special Attrition Package the Company negotiated with the UAW to both the IAM and the IBEW. Middleton also had a telephone conversation with Gerling on March 22, 2006. During their phone call, Gerling informed Middleton that he hoped to have a similar attrition proposal to share with the IBEW by Monday, March 27, 2006. Gerling conveyed the same information to Griffin during a telephone call around the same time.

On March 28, 2006, the IBEW and the IAM received copies of the Company's latest 1113/1114 proposals for the bargaining units at the Oak Creek facility. On that same day, Gerling again contacted Middleton via telephone and indicated that he wanted to address the UAW Special

5

Attrition Package with both the IAM and IBEW, and answer any questions that the Unions had

regarding the program.  In addition, he indicated that he also wanted to address the Unions on the

latest 1113/1114 proposal and answer any questions with regard to the proposal.  At first this was

to be a face to face meeting, but Gerling later said he would only be available for a conference call.

Middleton contacted Griffin to coordinate a time for the conference call.

       Pursuant to Gerling's request, on March 30, 2006, both IBEW shop committees, Middleton,

the IAM committee and its business agent Don Griffin, participated in a conference call with Gerling

and Ed Kettle as well as the local Delphi Management.  During that conference call on March 30th,

the Company presented a power point presentation explaining the three options available under the

UAW special attrition package.  Gerling again indicated that it was the Company's intention to offer

a substantially similar attrition package to the IAM and IBEW members. The Company confirmed

that the meeting on the 30th was intended as a Q & A session and not a negotiation session over the

1113/1114 proposals.

       Middleton asked Gerling where and when the Company' negotiations over the 1113/1114

proposals with the IBEW and IAM would take place, and Gerling responded that he did not have a

preference as to location and asked for the Unions' availability for bargaining..  Both Middleton and

Griffin advised Gerling that they were available for negotiations over the Company's proposal at any

time from that day forward.  The Unions asked who would negotiate on the Company's behalf and

Gerling responded that he would be involved as well as a financial person and legal counsel.  Gerling

also made the statement that even if both Unions immediately accepted and signed the terms and

conditions package that had been presented in connection with the latest 1113/1114 proposals, the

Company would probably not be able to accept it because they first needed to reach agreement with the UAW and IUE.

The Unions asked a series of questions of Gerling and the other Company representatives during the meeting, and Gerling briefly addressed the terms and conditions of the Company's latest proposal. Gerling, however, prefaced his comments regarding the proposal by advising the Unions that the proposals were contingent upon GM providing the commitments necessary to finance the proposals. Although both Middleton and Griffin offered to make themselves available for bargaining at any time, Gerling did not set a date for negotiations; rather, he simply told the Unions that he would get back to them regarding bargaining. Following the meeting on March 30, the Union sent written requests for information to Gerling. To date, the unions have not received responses to the requests.

On April 5, 2006, the Unions' counsel sent correspondence to the Company's attorneys reiterating the Unions' statements to Gerling that the IBEW and IAM were ready and willing to meet to bargain, and requesting dates for negotiations.        Finally, on Thursday, April 13, 2006, two weeks after the Unions' meeting with Company representatives, Gerling contacted Middleton by telephone to discuss setting a date for negotiations over the 1113/1114 proposals. Although Middleton advised Gerling that he was available that day or the next, (April 13 and 14), or any day the week of April 17 and beyond, Gerling stated that the first day he was available to meet was April 20. Middleton and Gerling tentatively set bargaining for April 20 and 21 and Gerling subsequently contacted Griffin on April 14 and confirmed the IAM's availability for negotiations on those dates as well.

During Griffin's telephone conversation with Gerling, Griffin inquired whether the company had the information the Unions had requested regarding Delphi's estimate of the cost savings

7

attributable to their 1113/1114 proposals. Gerling indicated that he did not have that information, but would have a financial person with him on the 20th who could answer those questions. Gerling also told Griffin that the Company did not yet have the commitments from GM necessary to fund their latest proposal and as a result, he did not believe that the parties could accomplish much in negotiations on April 20.

The IAM and IBEW are currently set to begin negotiations on April 20 at 1:00 p.m. This will be the first opportunity the Unions have to negotiate with the Company over its 1113/1114 proposals.

The Unions have, with limited success, accessed the virtual data room that the Company has established. For example, although the website listed a category of documents described as "unpublished letters of understanding" when Middleton attempted to view the documents in that category, he received a message that he did not have authorization to review the data. Middleton received the same message when he attempted to access splinter union agreements, financial information and negotiations minutes. While there was general data available to the Unions in the virtual data room, it was not specific enough to evaluate the Company's proposals.

Both the IBEW and IAM sent identical information requests to Kevin Butler, Vice President HRM, dated October 31, 2005 and November 1, 2005, respectively. While the Company has responded to certain of the Union's questions, not all inquiries were answered. For example, although the Unions requested information regarding the salaries and benefits of management and non-union employees, as well as any information regarding concessions those employees were making in the Chapter 11 case, the Company refused to provide specific information, claiming that such individuals' compensation was confidential. In addition, the Company has not responded to

8

the following questions asked by the Unions in their October 31, 2005 and November 1, 2005
correspondence:

10.    What, if any, concessions have been applied to non-union employees including, but
not limited to, supervisors, managers and top executives.  Describe the concessions
to whom it applied, the date it applied and the amount.

11.    From January 2004 until the present, identify any secured creditor, unsecured
creditor, service provider or other interested party besides employees who
have received less than 100% of their usual compensation or price.

(a)    Describe concessions from all other interested parties which Delphi
has obtained from secured creditors, unsecured creditors, vendors and
employees since January, 2004.

(b)    State their compensation or price structure prior to reduction and the
amount and date of any reduction.

12.    Identify concessions from all other interested parties which Delphi has
proposed requested and provide the response Delphi has obtained in response
to each proposal from secured creditors, unsecured creditors, vendors and
employees since January, 2004.

13.    Provide all projections as to the extent to which each of the following
category of creditors are likely to be impaired from recovering full value of
their claims:

(a)    Provide projections as the recovery for every issue of unsecured bond
or note.

(b)    Identify any trade creditors which have had their contracts assumed
and will receive full value.

(c)    Provide projections as to all other trade creditors concerning the
extent to which their claims will be impaired; and

(d)    Provide the basis for the projection.

16.    Provide the complete, absolute priority recovery analysis of the Debtor,
including, but not limited to, a breakdown of the value of each legal entity:

(a)    Cash;

9

(b)    Intercompany receivables;

(c)    Intercompany payables;

(d)    Operating losses;

(e)    Operating assets;

(f)    Non-operating assets;

(g)    Value above assets;

(h)    Equity holdings in other subsidiaries:

Breakdown of Claims:

(a)    Debtor's evaluation of claims including:

(1)    intercompany claims;

(2)    administrative claims;

(3)    secured claims;

(4)    priority unsecured claims; and

(5)    non-priority unsecured claims.

(b)    Provide the Debtor's evaluation of the priority status of:

(1)    unpaid employee obligations;

(2)    retiree benefit obligations;

(3)    pension obligations; and

(4)    environmental obligations;

(c)    Debtor's evaluation of any contingent or unliquidated claims on the basis of:

(1)    its evaluation and the Debtor's allocation of debts

10

(2)    the basis of allocation of debts between any subsidiaries.

17.    Provide all liquidation analyses performed by Delphi or any of its subsidiaries.

22.    All agreements or correspondence with GM concerning maintenance of pension and OPED benefits or elimination of such support.

23.    All information and projections Delphi has made with respect to the proposed concessions and why they are necessary to allow Delphi to compete successfully.

Despite the fact that the Unions have not received all the information they have requested, or which is necessary to evaluate the Company's 1113/1114 proposals, the IBEW and the IAM have developed a counter-proposal which will provide the Company with substantial savings from the two Unions and significantly contribute to the Company's effort to reorganize.  The Unions intend to present the counter-proposal to the Company during their April 20 and 21 bargaining sessions.

**ARGUMENT**

**I.    THE REQUIRED SHOWING BEFORE REJECTION MAY BE APPROVED.**

Section 1113 of the Code was passed to reverse the two holdings of NLRB v. Bildisco & Bildisco, 465 U.S. 513 (1984), that a debtor can unilaterally abrogate the terms of an existing collective bargaining agreement without court approval and that the debtor need meet only a lenient test for rejection with court approval.  See Truck Drivers Local 807 v. Carey Transportation, 816 F.2d 82, 87 (2nd Cir. 1987).  The new statute contains "meticulous procedural safeguards" and "exhaustive procedural requirements to ensure that the interests of the union are represented and protected."  NLRB v. Manley Truck Line, 779 F.2d 1327, 1331 n.7 (7th Cir. 1985).  As in In re Maxwell Newspapers, 981 F.2d 85, 89 (2nd Cir. 1992), these safeguards and higher standards are imposed "to prevent [the debtor] from using bankruptcy as a judicial hammer to break the union."

11

Section 1113 of Chapter 11 provides the criteria for objection of a collective bargaining

agreement. First:

> [1] [P]rior to filing an application seeking rejection of a collective bargaining
> agreement, the debtor-in-possession . . . shall . . . make a proposal to an authorized
> representative of the employees covered by such agreement,
>
> [a] based on the most reliable information available at the time of such proposal,
> . . .
> [b] which provides for such necessary modifications in the employees benefits and
> protections that are necessary to permit reorganization of the debtor and:
>
> [c] assures that all creditors the Debtor and all of the effective parties are treated
> fairly and equitably.

11 U.S.C. Sec. 1113(c)(b)(1)(A).  Secondly,

> [2]  [P]rior to filing an application seeking rejection of a collective bargaining
> agreement, the debtor in possession . . . shall . . . provide . . . the representative of the
> employees with such relevant information as is necessary to evaluate the proposal.

11 U.S.C. Sec. 1113(b)(1)(B).  Thirdly,

> [3]  During the period beginning on the date of the making of a proposal . . . and
> ending on the date of the hearing . . . the [debtor-in-possession] shall meeting, at
> reasonable times, with the authorized representative to confer, in good faith, in
> attempting to reach mutually satisfactory modifications of such agreement.

11 U.S.C. Sec. 1113(b)(2).   Fourth, the criteria for approving application for rejection include

additionally that:

> [4]  The authorized representative of the employees has refused to accept such
> proposal without good cause.

11 U.S.C. Sec. 1113(c)(2).  And Fifth,

> [5]  [T]he balance of the equities clearly favors rejection of such agreement.

11 U.S.C. Sec. 1113(c)(3). See, also In re: Century Brass Products, Inc., 705 F.3d, 265, 273  (2nd Cir.

1986). and Truck Drivers Local 807 v. Carey Transportation, Inc., 816 F.2d 82, 88 (2nd Cir. 1987).

12

A majority of jurisdictions have adopted the nine part test of In re American Provision Co., 44 B.R. 907 (Bankr. D. Minn. 1984) for rejection of collective bargaining agreements. See Annot., 89 A.L.R. Fed. 299, 309, 315 (1988). The nine parts follow:

1. The debtor-in-possession must make a proposal to the union to modify the collective bargaining agreement after the petition is filed but before the application to reject is made.

2. The proposal must be based upon the most complete and reliable information available at the time of the proposal.

3. The proposed modifications must be necessary to permit the reorganization of the debtor.

4. The proposed modifications must assure that all creditors, the debtor and all of the affected parties are treated fairly and equitably.

5. The debtor must provide to the union such relevant information as is necessary to evaluate the proposal.

6. Between the time of the making of the proposal and the time of the hearing on approval of the rejection of the existing collective bargaining agreement, the debtor must meet at reasonable times with the union.

7. At the meetings, the debtor must confer in good faith in attempting to reach mutually satisfactory modifications of the collective bargaining agreement.

8. The union must have refused to accept the proposal without good cause.

9. The balance of the equities must clearly favor rejection of the collective bargaining agreement.

The debtor has the burden of proof as to all nine factors, and as to the last factor (balancing the equities), must carry the burden by a quantum of proof that is clear and convincing. In re Walway Co., 69 B.R. 967, 975 and n.18 (Bankr. E.D. Mich. 1987). In re American Provision Co., 44 B.R. 907, 909 (Bankr. D. Minn. 1984).

Section 1114 provides parallel procedural and substantive requirements for approval of an application to modify retiree benefits. First:

13

[1]  [P]rior to filing an application seeking modification of retiree benefits the [debtor-in-possession] shall . . . make a proposal to the representative of the retirees,

[a]  based on the most complete and reliable information available at the time of such proposal

[b]  which provides for those necessary modifications in the retiree benefits that are necessary to permit the reorganization of the debtor;

and

[c]  assures that all creditors, the debtor and all of the effected parties are treated fairly and equitably.

11 U.S.C. Sec. 1114(f)(1)(A).  Secondly,

[2]  [P]rior to the filing of an application seeking modification of the retiree benefits, [the debtor-in-possession] shall . . . provide . . . the representative of the retirees with such relevant information as is necessary to evaluate the proposal.

11 U.S.C. Sec. 1114(f)(1)(B).  Thirdly,

[3]  During the period beginning on the date of the making of a proposal . . . and ending on the date of the hearing. . . . the [debtor-in-possession] shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such retiree benefits.

11 U.S.C. Sec. 1114(f)(2).  Fourth, additionally, the court has found

[4]  The authorized representative of the retirees has refused to accept such proposal without good cause.

11 U.S.C. Sec. 1114(g)(2).  Fifth, the proposal:

[5]  [I]s clearly favored by the balance of the equities.

11 U.S.C. § 1114(g)(3).

The Debtors here cannot meet the rigorous test for rejecting a collective bargaining agreement, or modifying retiree benefits, and their motion should be denied.

14

## II.  THE DEBTOR HAS FAILED TO COMPLY WITH THE MOST BASIC REQUIREMENT OF MAKING A PROPOSAL FOR CONCESSIONS NECESSARY FOR SUCCESSFUL REORGANIZATION.

As the facts demonstrate, the Debtor has gone through numerous changes to its 1113/1114 proposals to the Unions.  The original proposal was made in October 2005.  That original proposal was then amended, and the amended proposal was presented to the Unions in November 2005.  In January, 2006, the Company apparently withdrew its November proposals from some Unions, although neither the IBEW nor the IAM were advised that the proposals they received were withdrawn.  In March 2006, the Company then presented the Unions with a new proposal.  That new proposal, however, is contingent upon General Motors (GM) providing certain monetary commitments necessary to finance the proposals.  Without those commitments from GM, the Company intends to implement the non-contingent terms, and discuss with the Union which contingent proposals will be implemented and/or maintained.  To date, the Debtors have been unable to advise the Unions as to whether they will offer a number of terms in the March proposal, or when they expect to have that information.

Section 1113(b)(1)(A) contains the debtors' obligation to provide the Union with a proposal:

(b)(1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or truestee...shall–

(A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably...

15

The court may only approve an application for rejection of a collective bargaining agreement if the court finds that "the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1)." 11 U.S.C. §1113(c)(1). The debtors' proposal to the Unions does not satisfy the requirements of Section 1113 and its application to reject the agreements must be denied.

The debtors' 1113/1114 proposals are not proposals at all; rather, they are projections of proposals which the Company may be able to make to the Unions if and when GM commits to providing the financing necessary to fund the proposals. The Company has told the Union that it cannot commit to these proposals before GM takes a position, and in fact, the proposals to the IAM and IBEW themselves so state:

> The following proposals in this Term Sheet are contingent upon a commitment by General Motors to provide Delphi with financial support sufficient to fund the difference between the cost of these programs and the cost of Delphi's proposal of November 15, 2005
>
>> The wage rates for existing employees set forth in Appendix A-1 including buydown payments,
>>
>> The modified Dental Plan set forth in Appendix B,
>>
>> Buyout and buydown payments,
>>
>> Retiree Medical Accounts, and
>>
>> Defined Contribution Plan
>
> In the event that GM does not agree to provide financial support, the non-contingent terms set forth in or appended to this Term Sheet shall govern. In the event that GM agrees to provide financial support, but that support is insufficient to fund all of the contingent proposals set forth herein, or if GM is unable to meet its commitments, Delphi and the [Union] agree to discuss which contingent proposals will be implemented and/or maintained.

Although the Unions have requested information regarding whether GM will commit to provide the financing necessary to fund these proposals, or at the least, when the debtor will know GM's position, the Company has, to date, been unable to provide that information.  The Company's proposals as written, contingent upon a commitment from GM which may or may not be forthcoming, are premature and do not satisfy the Code's requirement to make a proposal which requests those modifications necessary to permit the debtor's reorganization.

The reality of the Company's contingent proposal is that even if the Union accepted all the terms and conditions in the March proposal, the Company could not agree to provide all the benefits included, unless and until GM committed to finance its portion of the proposal.  The Unions certainly cannot be expected to meaningfully bargain with such contingencies.  In fact, the Company so acknowledged when Gerling told IAM Business Agent Griffin that he didn't expect for the parties to be able to accomplish much in their upcoming April 20 and 21 bargaining because the Company did not yet have GM's commitment to fund the proposals.  Most importantly, however, the Court cannot and should not approve an application to reject a collective bargaining agreement when it is unclear as to what proposals will be implemented after the application is granted because the proposals are contingent on the willingness of a third party to contribute to the debtors' reorganization with monetary commitments to finance the 1113/1114 proposals.

In order to comply with the requirements of 1113/1114, the Company must present a definite proposal which provides for modifications necessary for the debtor to successfully reorganize.  This clearly cannot be said of the Company's proposal.  If GM does not commit to the funding necessary for the contingent provisions, the Company proposes to discuss with the IBEW which of those contingent proposals will be implemented and/or maintained.  If the Company has not determined

17

which contingent proposals are to be implemented absent GM funding, it clearly has not determined

that the proposed modification is necessary to its reorganization and has not met the requirements

of Section 1113.

The Company's motion to reject their Agreements with the IAM and the IBEW is premature

and must be denied.

### III. THE DEBTOR HAS FAILED TO COMPLY WITH ITS DUTY TO PROVIDE INFORMATION RELEVANT TO THE REJECTION MOTION.

Section 1113(b)(1)(B) and 1114(b)(1)(B) require that a debtor provide the union "with such

relevant information as is necessary to evaluate the proposal" to amend the contracts or modify

retiree benefits.   This requirement is mandatory.   A debtor seeking modifications to its labor

agreement must voluntarily come forward and offer all relevant information to the union; the union

has no obligation to ask for the information.   "This court agrees that the debtor has an affirmative

duty to provide to the union all of the relevant information necessary to adequately evaluate the

debtor's proposal."   In re Salt Creek Freightways, 47 B.R. 835 (Bankr. D. Wyo. 1985).

The debtor has in large part failed to fulfill its obligation to come forward with information

necessary for the Unions to evaluate the 1113/1114 proposals.   Although the Company's original

proposals were provided in October 2005, the Unions have yet to see any costing of the concessions

contained in the original, amended or latest proposals.   Without knowing the amounts the Company

anticipates saving with each proposal, it is impossible for the Unions to formulate an intelligent

response.   The Company has also failed and refused to provide specific information regarding

salaried employees and any concessions which they may be making.   Given that equality of sacrifice

is one of the criteria which the Court should examine in deciding an 1113/1114 motion, the

18

information clearly falls within that which the debtor has an affirmative duty to provide.  The
Company's proposal, as addressed below, also contains a number of language changes which appear,
on their face, to be completely unrelated to the Company's ability to reorganize, yet the Company
has provided the Unions with no explanation of what cost savings it hopes to achieve by removal
of the language.

    Not only has the Debtor failed voluntarily to come forward with all the information necessary
to adequately evaluate its proposal, it has failed to provide relevant information in response to the
Unions' specific requests.  It is correct, as the Debtor notes, that it set up a website where it has
posted documents related to the bankruptcy.  The Unions have, however, had numerous difficulties
accessing the information contained on the website.  Morever, what is contained therein is
insufficient to evaluate the Debtors' proposal.  For example, when IBEW Business Manager Randy
Middleton attempted to view a category of documents entitled "Unpublished Letters of
Understanding," he received a message that he did not have authorization to view the data.  He
received an identical message when he attempted to access splinter union agreements, various
financial information and minutes of negotiations.  The general data that Middleton was able to
access was not specific enough to evaluate the Company's 1113/1114 proposals.

    In addition to attempting to glean information posted on the debtors' website, the Unions
have submitted various information requests to debtors since the start of the process.  On October
31, 2005, and November 1, 2005, the IBEW and IAM submitted identical information requests to
Kevin Butler, Vice President HRM.  Charles McWee, Director of Industrial Relations responded to
the Unions' information requests, providing responses to some, but not all of the Unions' inquiries.
With respect to those questions seeking information regarding compensation of non-union

19

employees and reductions in their compensation or benefits, the Company, through McWee, declined to provide any specific information alleging that the salaries, bonuses and other compensation of individual employees is considered to be confidential. The outstanding information which McWee's response did not address also included answers to questions regarding the concessions which have been applied to non-union employees, identification of creditors or service providers who have received less than 100% of their usual compensation or price, information regarding concessions made by all interested parties since January 2004, projections as to the extent that various creditors are likely to be impaired from recovering full value of their claim, an absolute priority recovery analysis of the debtor and a all liquidation analyses performed by Delphi.

By the express terms of the statutes, this information must be provided "prior to filing an application" §1113(b)(1) and § 1114(f)(1). The requirement that information necessary to evaluate the proposal be provided "prior to filing the application" has a pragmatic impact of avoiding unnecessary litigation. If necessary information is provided prior to the application, there is an opportunity to reach settlement without commencing litigation. In this case, even basic information on the costing of concessions requested on March 30, 2006, and the treatment of other constituencies, remains outstanding as of this date. In fact, when asked when the Unions would receive the Company's estimate of the cost savings attributable to the proposed modifications, Rob Gerling advised the Unions that the financial person who would be attending the April 20th bargaining session should be able to give them that information.

In failing to provide the information prior to filing its application, Debtor violated the express provisions of §§ 1113(b)(1)(B) and 1114(f)(1)(B) that information be provided "prior to filing an application." Without the information listed above, it is impossible for the Unions to fully evaluate

20

the Debtors' proposals.  The debtors' failure to provide the information is fatal to the application to

reject:

> The trustee has an affirmative obligation to provide all of the relevant financial and
> other information necessary to evaluate the proposal and if that obligation is not met
> or if the trustee otherwise delays the proceeding, the application should be denied.

130 Cong. Rec. H7496 (daily ed. June 29, 1984)(remarks of Rep. Morrison).  Accord In re K & B

Mounting, 50 B.R. 460 (Bankr. N.D. Ind. 1985)(denying application to reject because of failure to

produce information).

The Union did not receive detailed and reliable financial information demonstrating that the

changes requested were necessary and would actually have the effect of rehabilitating the Debtor,

proof that other constituencies were making equivalent sacrifices, and so on——in other words, the

very factors this court must find as facts before it can grant the Debtor's motion.  It is not sufficient

that the Company provided the Union with its most recent business plan and financial forecasts.  In

order to intelligently respond to the Company's proposals, the Unions need to know what savings

the Company anticipates achieving by each of its proposals and further, how that savings ultimately

plays into the overall plan of reorganization.  See In re Fiber Glass Industries, Inc., 49 B.R. 202, 206-

207 (N.D.N.Y. 1985).  The court explained in K & B Mounting:

> [N]either the union nor the court could assess the necessity of these modifications,
> since the debtor did not substantiate its proposal with "relevant" information selected
> from "the most complete and reliable information available" when the debtor made
> its proposal.  As stated above, the debtor's bankruptcy filings are hardly sufficient.
> The union should be supplied with detailed projections and recommendations,
> perhaps made by a management consultant, preferably one who is independent of the
> interested parties.  The debtor should present full and detailed disclosure of its
> difficulties and its proposed short-run and long-run solutions....

21

Id. at 467.  Accord In re George Cindrich General Contractors, 130 Bankr. 20 (Bankr. W.D. Pa. 1991).

The requirement of §1113(b)(1)(B) is mandatory and places the burden on the Debtor to voluntarily come forward with information necessary to evaluate Debtors' proposal prior to filing its applications.  It did not do so and still has not done so.  As a result of the Debtors' failure to comply with its duty, the motion must be denied.

## IV.    THE DEBTORS' PROPOSAL IS NOT FAIR AND EQUITABLE.

Sections 1113 and 1114 mandate that all parties be treated fairly and equitably when modifications to a labor agreement are proposed.  11 U.S.C. §1113(b)(1)(A) and (c)(3), 11 U.S.C. § 1114(b)(1) and (g)(3).    Without substantial sacrifice by all parties, rejection is simply not permitted.  The legislative history of §1113 reveals the congressional intent to spread the burden of reorganization among all parties, not simply the unionized workforce:

> This language guarantees that the focus for cost cutting must not be directed exclusively at unionized workers.   Rather the burden of sacrifices in the reorganization process will be spread among all affected parties.  This consideration is desirable since experience shows that when workers know they alone are not bearing the brunt of the sacrifices, they will agree to shoulder their fair share and in some instances without necessity for a formal contract rejection.

130 Cong. Rec. S8898 (daily ed. June 29, 1984)(Sen. Packwood).

The House conferees expressed similar views.  130 Cong. Rec. H7489 (daily ed. June 29, 1984)(Remarks of Rep. Rodino); 130 Cong. Rec. H7491 (daily ed. June 29, 1984)(Remarks of Rep. Moorehead); 130 Cong. Rec. H7494-7495 (daily ed. June 29, 1984)(Remarks of Rep. Lungren); 130 Cong. Rec. H7496 (daily ed. June 29, 1984).

> This section would ensure that, where the trustee seeks to repudiate a collective bargaining agreement, the covered employees do not bear either the entire financial

22

> burden of making the reorganization work, or a disproportionate share of that burden,
> but only their fair and equitable share of the necessary sacrifices.

(Remarks of Rep. Morrison) 130 Cong. Rec. H7496 (daily ed. June 29, 1984). This approach has

been embraced by the courts. E.g., In re Cook United, 50 B.R. 561 (Bankr. N.D. Ohio 1985).

> In other words, all parties affected by the bankruptcy must have made or be willing
> to make contributions to the debtor's reorganization which are proportionate to the
> concessions which are contained in the bargaining proposal....[T]he court must look
> not only to the changes proposed, but also to the concessions to be made by creditors,
> stockholders, or owners of the debtor, as well as by other non-union employees.

In re Kentucky Truck Sales, 52 B.R. 797, 802 (Bankr. W.D. Ky. 1985). Accord In re Fitzgerald, 44

B.R. 628 (Bankr. W.D. Mo. 1984). Holders of perfected security interests are among those who

must make sacrifices before a rejection motion can be granted. See, e.g., In re Indiana Grocery, 136

Bankr. 182 (Bankr. S.D. Ind. 1990).

The conferees gave the courts even more specific guidance on §1113's "equity" requirement

by citing In re Blue Ribbon Transportation, 113 L.R.R.M. 3505 (Bankr. D.R.I. 1983) in the record.

130 Cong. Rec. S8898 (daily ed. June 29, 1984)(Remarks of Sen. Packwood). Blue Ribbon required

as a condition precedent to rejection that management salaries be reduced by 25%, that perks be

eliminated, and that other concessions be made by management officials. The Second Circuit has

noted that this provision was enacted to "spread the burdens of saving the company to every

constituency while ensuring that all sacrifice to a similar degree." In Re Century Brass Products,

Inc., 795 F.2d 265, 273 (2nd Cir.), cert. denied, 479 U.S. 949 (1986). Accord In re Jefley, Inc., 219

B.R. 88 (Bankr. E.D. Pa. 1998)(compensation to principals was too high to find that wage cuts for

retail clerks were fair and equitable).

While exact equality of sacrifice may not always be required, all parties must make some concessions, not just workers. E.g., In re Kentucky Truck Sales, 52 B.R. 797 (Bankr. W.D. Ky. 1985); In re Cook United, 50 B.R. 561 (Bankr. N.D. Ohio 1985). Even holders of perfected security interests who stand to benefit greatly from a successful reorganization are included. In re Indiana Grocery Co., 136 B.R. 182 (Bankr. S.D. Ind. 1990). When balancing the equities, moreover, the debtor's burden increases from a mere preponderance of the evidence to clear and convincing proof. In re Walway Co., 69 B.R. 967, 975 and n.18 (Bankr. E.D. Mich. 1987).

The debtor cannot meet its burden of proving that all parties have been treated fairly under any standard. When compared to the proposals made to the Company's other unions, and the benefits provided to salaried employees, the proposals submitted to the IAM and IBEW are neither fair nor equitable. The debtor has not proposed to the IAM or IBEW the same attrition package, retiree benefit package or pension package as has been proposed to other union employees, claiming that General Motors has not provided the same benefit guarantees. The debtor seeks to freeze the hourly-rate employees pension plan and eliminate the company's obligation to provide retiree health insurance in its proposals to the Unions. The benefit guarantees in place for the UAW, IUE and USW, however, provide that GM will provide up to 7 years of credited service in the event that Delphi ceases to provide on-going credited service under the pension plan due to financial distress (Weber Declaration, Exhibit 99.2, 99.4 and 99.5). Those same guarantees will kick in and provide retiree medical coverage if the debtor's proposal is implemented (Weber Declaration, Exhibit 99.2, 99.4 and 99.5). Thus, while the Company's proposals, if implemented, will freeze the IAM and IBEW members' pensions, and eliminate retiree medical benefits for IAM and IBEW members, the larger unions' members will be guaranteed continuation of those benefits by GM.

24

At the same time, the Company has continued retiree benefits and pension benefits for salaried employees. According to the declaration of Steven Gebbia, the Company will maintain retiree health care for all salaried employees who were entitled to it at the start of the Chapter 11 case, and further maintain the "30 and out" retirement option for those salaried and management employees as well (Gebbia Declaration p. 20, ¶57). While it appears that salaried employees hired after 1993 have never been entitled to retiree health coverage, and salaried employees hired after 1988 have never been entitled to the "30 and out" retirement option, those hired before 1993 and 1988 will keep their retiree health coverage and "30 and out" retirement option (Gebbia Declaration p. 20, ¶57). The only employees thus being required to sacrifice retiree health coverage and endure a pension freeze are the IAM and IBEW members. The singling out of this small group of employees for such drastic cuts in benefits surely does not meet 1113's requirement that all parties be treated fairly and equitably when modifications to a labor agreement are proposed.

Not only are the IAM and IBEW employees subject to more onerous loss of benefits than members of the other Unions and salaried employees, but the Company has also indicated its intention to close the Oak Creek facility effective December 31, 2007. As a result, the employees represented by these unions are being asked to make the ultimate sacrifice of loss of employment. To add insult to injury, Debtors seek to remove the protections which these unions negotiated to blunt the impact of such loss. The Company cannot meet its burden of proving its proposals are fair and equitable and its motion to reject must be denied.

25

V.    **THE DEBTORS HAVE FAILED AND REFUSED TO NEGOTIATE IN GOOD FAITH.**

Sections 1113(b)(2) and 1114(f)(2) obligate the Debtors to meet with the Unions to bargain over the concessionary proposals.  This obligation is mandatory, and must occur in a specific time frame: "During the period beginning on the date of the making of the proposal...and ending on the date of the hearing."

The requirement in §1113(b)(2) obligating the Debtor to meet "at reasonable times" is borrowed from the National Labor Relations Act, 29 U.S.C. §158(d), requiring employers to "meet at reasonable times and confer in good faith" with union representatives.  Failure to have actual meetings on the proposal which is made the basis for the court's decision is fatal to the application to reject.  In re K & B Mounting, 50 B.R. 460 (Bankr. N.D. Ind. 1985).  The failure to meet is fatal even if the reason is that the union refuses to meet until the debtor first provides the union with the relevant information to evaluate the proposal under §1113(b)(1)(B).  Id.  See also In re Horsehead Industries, Inc., 300 B.R. 573, 588 (Motion under §1114 to terminate retiree health benefits denied where debtors failed to demonstrate they engaged in any good faith negotiations over proposal).

The Debtors provided the Unions with their initial proposals for concessions during meetings on October 24, 2005.  No bargaining took place at that meeting, rather, the meeting was, according to the Debtors' representative Rob Gerling, strictly for the purpose of providing the proposals and answering any questions.  In November, 2005, the Company provided the Unions with revised 1113/1114 proposals, but again, did not engage in any bargaining.  In fact, when the Unions received the revised proposals in November 2005, Rob Gerling advised both Middleton and Griffin that the

26

Company did not have any plans to negotiate with the IBEW or IAM until the Company had a tentative agreement with its larger unions such as the UAW and IUE.

Counsel for the IAM and the IBEW sent letters on behalf of both Unions to the Company's counsel dated November 22, 2005, making the Company aware of the Unions' availability to bargain, and confirming the Unions' understanding that the Company would not seek negotiations with the IAM or IBEW until a tentative agreement was reached with the larger unions like the UAW and IUE. Neither the Debtors', nor their counsel responded to the November 22, 2005 letters, nor did the Company contact the IAM or IBEW to set bargaining dates. In January 2006, the IAM and IBEW representatives heard talk within the facility that the Company had extended the date for filing of its 1113/1114 motion and withdrawn its 1113/1114 proposals to the UAW in order to engage in more serious negotiations. No one from the Company ever contacted the IAM or the IBEW to advise the unions that the Company had withdrawn its 1113/1114 proposals as they related to the IAM or IBEW.

Despite the Unions' availability, no bargaining took place in January, February or March 2006. At the end of March, Gerling sent the Unions a copy of the Special Attrition Package the Company negotiated with the UAW and communicated to both the IAM and the IBEW that the Company intended to offer a substantially similar package to them. No such proposal has yet been received.

On Tuesday, March 28, 2006, both the IBEW and the IAM received copies of the Company's third and latest 1113/1114 proposals for the Unions' three bargaining units. On March 30, 2006, Middleton and the IBEW shop committees, and IAM Business Agent and the IAM committee participated in a conference call with Gerling and several other Company representatives to discuss

27

the attrition package and the latest proposals.  The Company confirmed during the March 30th call,

that like the discussions over the earlier proposals, the meeting was purely informational and not

intended as negotiations.  Gerling also advised the Unions that the 1113/1114 proposals were

contingent upon GM providing the monetary commitments necessary to finance the proposals.

While both Middleton on behalf of the IBEW, and Griffin on behalf of the IAM, told Gerling

that they were available to bargain over the Company's proposals any time from that day forward,

Gerling did not commit to any dates at that time.  Further, Gerling advised the Unions that even if

both the IBEW and IAM accepted and signed the terms and conditions sheet for the 1113/1114

proposals that day, the Company would likely not be able to accept it because it first needed to reach

agreements with the UAW and IUE.

On Thursday, April 13, 2006, Gerling contacted Middleton by telephone to discuss

bargaining dates.  Although Middleton indicated that he was available on April 13 or 14 or any day

the week of April 17, Gerling indicated that the first day he was available to meet was April 20.

Gerling subsequently confirmed the IAM's availability for bargaining on those dates as well during

a telephone call with Griffin on April 14.  Gerling went on to tell Griffin that he didn't know how

much the parties could accomplish in negotiations since the Company did not yet have a

commitment from GM to fund the contingent proposals that had been presented in March.  April

20th will be the first bargaining session over the Company's 1113/1114 proposals.

It is now nearly six months from the date the Company provided the Unions with its initial

proposals and nearly three weeks after the Unions received the most recent 1113/1114 proposals, and

the parties have still not met to negotiate.  This is not because of the Unions' unavailability or

unwillingness to bargain.  On the contrary, the Unions have made themselves available for

28

bargaining throughout the process.  The Company chose to negotiate first with its larger Unions, the

UAW, IUE and USW, and essentially came to the IAM and IBEW as an afterthought.  Even now,

it appears clear that the Company will merely be going through the motions with the Unions on April

20 and 21 because it does not have commitments from GM to fund its contingent proposals, nor does

it have agreements with the UAW, IUE or USW as far as the IAM and IBEW are aware.

The lack of negotiations over the debtors' proposals for concessions dooms their application

for rejection of the agreements.  See In re Horsehead Industries, Inc., 300 B.R. 573, 588 (Bankr.

S.D.N.Y. 2003)  (Motion to reject agreement denied where no negotiations took place been debtor

and union representatives).

## VI.    THE DEBTOR'S PROPOSAL IMPROPERLY INCLUDES NON-MONETARY ITEMS NOT NECESSARY TO THE GOAL OF REORGANIZATION OR REHABILITATION.

Section 1113 was not intended to permit debtors to use "Chapter 11 as medicine to rid

themselves of corporate indigestion," In re Century Brass Prods., 795 F.2d 265, 272 (2nd Cir. 1986),

or as a "judicial hammer to break the union."  In re Maxwell Newspapers, 981 F.2d 85, 89 (2nd Cir.

1992).  Hence a debtor, even one in need of financial relief, cannot take advantage of its bankruptcy

to rid itself of unwanted, non-monetary provisions in a labor agreement to which it previously had

agreed.  Inclusion of non-financial demands is not "necessary" for the debtor's rehabilitation, and

rejection should be denied if the debtor insists upon having such provisions in its proposal.  In re

William P. Brogna, 64 B.R. 390 (Bankr. E.D. Pa. 1986); In re Valley Kitchens, 52 B.R. 493 (Bankr.

S.D. Ohio 1985).  The legislative history once again agrees:

> [T]he debtor will not be able to exploit the bankruptcy procedure to rid itself of
> unwanted features of the labor agreement that have no relation to its financial
> condition and its reorganization and which earlier were agreed to by the debtor.

130 Cong. Rec. S8898 (daily ed. June 29, 1984)(Remarks of Sen. Packwood).

As Century Brass and Maxwell Newspapers intimated, particularly offensive are provisions merely designed to weaken the union rather than to strengthen the debtor. The archetype of such an offensive provision is the clause designed to eliminate the bargaining unit itself, by allowing the debtor to subcontract away union jobs. As the paramount purpose of Chapter 11 is to preserve jobs, see NLRB v. Bildisco and Bildisco, 465 U.S. 513 (1984)("the fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs"), a rejection that eliminates jobs is a legal oxymoron. See also In re Russell Transfer, Inc., 48 B.R. 241, 243-244 (Bankr. W.D. Va. 1985)(summarizing congressional purpose behind §1113 by noting its main purpose is job preservation). The legislative history of §1113 likewise indicates that the sole legitimate purpose of rejection is job preservation. E.g., 130 Cong. Rec. H7495 (daily ed. June 29, 1984)(Remarks of Rep. Lungren)("This is an important provision of the compromise, because it underscores the primary purpose of chapter 11; that is, to maintain the debtor's business so that both the debtor and his employees can keep their jobs"). By definition, then, a proposal designed to take away jobs cannot be justified under §1113.

In addition to the monetary concessions the debtor sought from the Unions, the company's proposal contained several non-monetary elements not necessary to the goal of rehabilitating the struggling business. For example, the Company has proposed to eliminate all voluntary overtime provisions. Thus, instead of first seeking volunteers for overtime before mandating overtime according to inverse seniority, the debtor proposes to eliminate employees' ability to volunteer for overtime work. The debtor's proposed changes to the current overtime procedures have no bearing on its ability to reorganize, rehabilitate or prevent liquidation and will not provide the Company with

30

any cost-savings.  The Company has and will have the ability to determine when overtime is required and whether those overtime hours are worked by volunteers or are mandated will make no difference in the cost to the Company.

The same is true for the changes that the Company seeks to make to the Attendance policy and its proposal requiring the day shift union representative to function as Chairperson.  Neither of these provisions will result in any financial savings or have any impact on the Company's ultimate ability to reorganize.  These proposals are gratuitously harmful, and were apparently included as a means to preclude agreement.

In another example of the Company's non-monetary proposals, the debtor seeks to eliminate all provisions of the agreement that restrict the Company's right to source work.  This proposal is clearly not necessary to 1113's ultimate goal of reorganizing or preserving jobs for union employees.  Indeed, it is a thinly-disguised effort to eliminate the union and the bargaining unit.  This proposal is a classic example of what the Congress intended to prevent by requiring that proposed changes be "necessary" to the goals of reorganizing and job preservation.

There can hardly be a more potent example of using bankruptcy as a "judicial hammer to break the union" than proposing to eliminate bargaining unit jobs.  By authorizing the contract's rejection, the court will become that hammer.  It is the debtor's burden to show why non-monetary, and thus presumptively unnecessary, job-destroying provisions, are in fact essential to the continuation of its business.  In re Liberty Cab & Limousine Co., Inc., 194 B.R. 770, 776 (Bankr. E.D. Pa. 1996)(debtor bears burden of persuasion as to all elements of §1113); In re Walway Co., 69 B.R. 967, 975 and n.18 (Bankr. E.D. Mich. 1987)(same).

31

These are only a handful of the numerous non-economic language items the debtor has proposed to modify or eliminate. The debtor cannot show how these disputed provisions will result in cost savings and therefore aid the ultimate goal of rehabilitation. Lacking evidence that these proposed modifications are necessary to prevent liquidation, the proposals are not "necessary" as required by Section 1113(b)(1) and warrant denial of the application for rejection.

## VII.    THE UNIONS REJECTED THE DEBTOR'S PROPOSALS WITH GOOD CAUSE.

Before a Court may grant a debtor's application for rejection of the collective bargaining agreements or modification of retiree benefits, the debtor must prove that the representatives lacked good cause for refusing its proposed modifications. Truck Drivers Local 807 v. Carey Transportation, Inc., 816 F.2d 82, 91 (2nd Cir. 1987). While it is the debtor's ultimate burden to persuade the court that the union lacked good cause for rejecting its proposals, "the union must come forward with evidence of its reason for declining to accept the debtors's proposal in whole or in part." Id. at 92. A union has good cause to reject the proposed modifications, "where the union makes compromise proposals during the negotiating process that meet its needs while preserving the debtor's savings, its rejection of the debtor's proposal would be with good cause." In re Maxwell Newspapers, Inc., 981 F.2d 85, 90 (2nd Cir. 1992). Accord In re Royal Composing Room, Inc., 848 F.2d 345, 349 (2nd Cir. 1988).

The Unions have prepared a counter-proposal to the debtors' 1113/1114 proposals, and intend to present that proposal during the parties' upcoming bargaining sessions. The Union's proposal is a comprehensive response to each of the provisions the Company has proposed to modify or eliminate, and identifies the Union's rationale for each and every proposal it has rejected.

32

Moreover, the Union's proposal provides the Company with substantial savings toward the ultimate goal of reorganizing while also meeting the minimum needs of the Unions' members and retirees.

By contrast, as set forth above, Debtors' proposed concessions are not based on the most complete and reliable information available, contain proposals to modify non-economic provisions and are inequitable. The Debtors cannot meet their burden of proving the Unions rejected its proposals without good cause.

## CONCLUSION

The proposals which Debtors have made to the Unions are not fair and equitable and seek to eliminate non-monetary provisions solely for the purpose of destroying the bargaining unit and ridding itself of contract language which limits its ability to control employees' non-economic conditions of employment. Debtors have failed to provide the Unions with the information necessary to evaluate its proposals and have failed to bargain in good faith. The Unions request that the Court deny Debtors' Application to reject their collective bargaining agreements and modify the retiree benefits of their retirees in their entirety

Dated this 20th day of April, 2006.

---

MARIANNE GOLDSTEIN ROBBINS
Wisconsin State Bar No.1015168
JILL M. HARTLEY
Wisconsin State Bar No. 1027926
PREVIANT, GOLDBERG, UELMEN,
GRATZ, MILLER & BRUEGGEMAN, S.C.
1555 N. RiverCenter Drive, Ste. 202 - P. O. Box 12993
Milwaukee, WI  53212
414/271-4500  FAX414/271-6308
mgr@previant.com
jh@previant.com
Attorneys for IBEW Local 663 and IAMAW District 10

33

34